UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

VOLUME ONE OF ONE

---

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                      Fort Myers, Florida
vs.                                August 6, 2013

PATRICIA LYNN HOUGH,             10:33 a.m.

        Defendant.

---

TRANSCRIPT OF GOVERNMENT'S MOTION TO DISQUALIFY COUNSEL

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                            Tax Division
                      P.O. Box 813
                      Washington, DC  20044
                      BY:  CARYN FINLEY, ESQ.

                      U.S. Department of Justice
                            Tax Division
                      Suite 7334
                      601 D Street NW
                      Washington, DC
                      BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

```
                        A P P E A R A N C E S
                     (Continued From Previous Page)


FOR THE DEFENDANT:          Bingham McCutchen, LLP
                            The Water Garden
                            1601 Cloverfield Boulevard
                            Suite 2050 North
                            Santa Monica, CA  90404-4082
                            (310) 904-1000
                            BY:  NATHAN J. HOCHMAN, ESQ.

                            Bruce L. Udolf, PA
                            500 East Broward Boulevard
                            Suite 1400
                            Fort Lauderdale, FL  33394
                            (954) 858-8831
                            BY:  BRUCE L. UDOLF, ESQ.

REPORTED BY:                JEFFREY G. THOMAS, RPR-CP, CRR
                            Official Federal Court Reporter
                            United States Courthouse
                            2110 First Street, Suite 2-194
                            Fort Myers, FL  33901
                            (239) 461-2033


                            *  *  *
```

I N D E X

| August 6, 2013 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 1 | 4 |
| The Court Questions Mr. Hochman | 1 | 5 |
| Argument by Ms. Finley | 1 | 13 |
| Argument by Mr. Hochman | 1 | 25 |
| Argument by Ms. Finley | 1 | 29 |
| The Court Questions Dr. Hough | 1 | 33 |
| Argument by Ms. Finley | 1 | 40 |
| Discussion Re Trial Date | 1 | 42 |
| Discussion Re Trial Schedule and Trial Procedure | 1 | 43 |
| Discussion Re Juror Note Taking | 1 | 45 |
| Certificate of Court Reporter | 1 | 58 |

* * *

1          THEREUPON, the above-entitled case having been called to

2     order, the following proceedings were held herein, to-wit:

3                                    -  -  -

4               THE COURT:  All right.  This is the case of United

5     States versus Patricia Lynn, is it Hough?  Is that how you say

6     that?

7               MR. HOCHMAN:  Yes, Your Honor.

8               THE COURT:  2:13 Criminal 72.

9               Let me get the appearances from counsel, beginning

10    with counsel for the government.

11              MS. FINLEY:  Good morning, Your Honor.  Caryn Finley

12    and Margaret Leigh Kessler for the United States.

13              THE COURT:  Good morning.

14              MR. HOCHMAN:  Good morning, Your Honor.  Nathan

15    Hochman and Bruce Udolf for the defendant, Patricia Lynn Hough,

16    who is present in court.

17              THE COURT:  Good morning all.

18              All right.  We're here on the government's motion to

19    disqualify counsel; and for, potentially, what is generically

20    referred to as a Garcia hearing.

21              I guess I would prefer to start by asking some

22    questions of both sides, and establish, at least in my own

23    mind, what the basic facts are, before hearing argument from

24    counsel.

25                   Anyone have different thoughts as to how to proceed?

1          MR. HOCHMAN:  No, Your Honor.

2          THE COURT:  The co-defendant, Mr. Frederick, last I

3    looked, he was not a participant yet.  Is it safe to assume he

4    is a fugitive?

5          MS. FINLEY:  Yes, Your Honor; Dr. Frederick is a

6    fugitive.  There's an arrest warrant out for his failure to

7    appear at arraignment.

8          THE COURT:  All right.

9          And, Mr. Hochman, let me go through my understanding,

10   and have you correct me if I'm incorrect.  In part, I'm doing

11   it because I want to make sure that Dr. Hough understands the

12   same thing I do, in case we do have an inquiry as to her.

13         You were the attorney of record for Mr. Frederick

14   during the investigative component of this case?

15         MR. HOCHMAN:  Yes, Your Honor.

16         THE COURT:  And you were not the attorney of record

17   for Miss -- I'm sorry -- Dr. Hough for the investigation

18   component.  Is that correct?

19         MR. HOCHMAN:  That's correct, Your Honor.

20         THE COURT:  Are they married?

21         MR. HOCHMAN:  Yes, Your Honor.

22         THE COURT:  And were they married --

23         MR. HOCHMAN:  They separated a couple years ago, but

24   they have been married ever since -- throughout the . . . .

25   Well, decades, Your Honor, and during the investigative stage

1    of the case.

2              THE COURT:  Okay.  But you represented Dr. Frederick,

3    and not Dr. Hough.

4              MR. HOCHMAN:  That's correct, Your Honor.

5              THE COURT:  For the investigative portion.

6              MR. HOCHMAN:  That's correct.  And Dr. Hough is

7    represented by a gentleman, Charles Falk, who is also counsel

8    of record in this case.  He's a tax lawyer in New Jersey.  Or

9    based in New Jersey.

10             We had a joint defense arrangement between Mr. Falk

11   and myself, Dr. Frederick and Dr. Hough; and, as we state in

12   the pleadings and in the waivers, at all points, all

13   information amongst the four of us was shared without any

14   limitation.

15             THE COURT:  All right.  Let me take it step by step.

16   You may have answered my questions, but . . . .  The joint

17   defense agreement that you had between -- or with the two

18   defendants, was that in writing?

19             MR. HOCHMAN:  No, it wasn't, Your Honor.  It was an

20   oral agreement, Your Honor.

21             THE COURT:  And did you, as the attorney for Mr. -- I

22   keep saying mister.  I apologize.  Dr. Frederick.  Obtain

23   confidential information from Dr. Frederick?

24             MR. HOCHMAN:  Confidential in the sense of

25   information -- well, actually, to the extent that Dr. Hough was

1    present when Dr. Frederick is sharing the information from me,

2    I don't believe it would be confidential per se.  I think it

3    was in the ambit of the entire joint defense arrangement, Your

4    Honor.

5              THE COURT:  Well, without regard to the joint defense

6    arrangement, did you obtain information from Dr. Frederick that

7    would be confidential within the attorney/client privilege?

8              MR. HOCHMAN:  Yes.  Other than the fact that it was

9    then shared with Dr. Hough and her counsel.  So confidential

10   initially, Your Honor, and then shared with Dr. Hough and her

11   counsel per the joint defense arrangement.

12             THE COURT:  All right.  You're perhaps anticipating

13   my question.  So you received information, and then you did

14   share that information that would otherwise be privileged with

15   Dr. Hough and her counsel?

16             MR. HOCHMAN:  Yes.  Per the joint defense

17   arrangement, Your Honor, so as to preserve the privilege for

18   the entire information.

19             THE COURT:  Was there any confidential information

20   you received from Dr. Frederick that was not shared, for

21   whatever reason, with Dr. Hough?

22             MR. HOCHMAN:  No, Your Honor.

23             THE COURT:  And your representation of Dr. Frederick

24   terminated when?

25             MR. HOCHMAN:  Approximately May 28th, if I have the

1    date correct, Your Honor.  Let me check it very quickly.

2           I believe it was May 28th, Your Honor.  The

3    indictment, I believe, was May 15th or 16th.  And then he

4    informed me he was terminating my services on, I believe,

5    May 28th.

6           THE COURT:  And is that the document you've attached

7    to your response?  There's a letter, May 28th of 2013.

8           MR. HOCHMAN:  Yes, Your Honor.

9           THE COURT:  And do you recognize Dr. Frederick's

10   signature on that letter?

11          MR. HOCHMAN:  I do, Your Honor.

12          THE COURT:  And is that your signature, as well?

13          MR. HOCHMAN:  It is, Your Honor.

14          THE COURT:  And this letterhead, looks like it's your

15   letterhead?  Is that --

16          MR. HOCHMAN:  That's correct, Your Honor.

17          THE COURT:  And did you write that letter?

18          MR. HOCHMAN:  I did, Your Honor.

19          THE COURT:  And did you review it with Dr. Frederick?

20          MR. HOCHMAN:  I sent it to him, Your Honor.  In

21   letter form.  I did not subsequently review it before he signed

22   it, Your Honor.

23          THE COURT:  So you sent him this letter, presumably

24   you had signed it --

25          MR. HOCHMAN:  Right.  I mean, I don't recall our last

1    conversation; but this letter I did not review with him before

2    I sent it.  I sent it to him, and then received a signed copy

3    back after I had been terminated.

4              THE COURT:  And it's dated the 28th of May.  Is that

5    the approximate date that you sent it to him?

6              MR. HOCHMAN:  Yes, Your Honor; that is the

7    approximate date I sent it to him.

8              THE COURT:  And it says via e-mail, so I assume

9    that's how you sent it to him.

10             MR. HOCHMAN:  That's correct, Your Honor.

11             THE COURT:  And do you know when you got it back from

12   him, signed?

13             MR. HOCHMAN:  I would have gotten it back from him,

14   signed . . . .  Let me just . . . .  (Examining documents) I

15   believe the same day, Your Honor.  Just checking real quick.  I

16   believe it was the same day.  (Examining documents) Yes.

17             THE COURT:  And what is it that is your understanding

18   as to what you can do as a result of this letter signed by

19   Dr. Hough in terms of your representation -- I'm sorry,

20   Dr. Frederick.  In terms of your representation of Dr. Hough?

21             MR. HOCHMAN:  I think the key parts of it, Your

22   Honor, is that I cross-examined Dr. Frederick on any

23   information that I learned during the representation of

24   Dr. Frederick.  I can take positions on Dr. Hough's behalf that

25   could potentially be adverse to Dr. Frederick.  And, I mean,

1    those are certainly the two big issues.  And then I can use

2    information that I gathered on -- while representing

3    Dr. Frederick on Dr. Hough's behalf.

4         But as I mentioned before, with respect to that

5    information, it had already been shared with Dr. Hough and her

6    counsel, so some of this was just repeating what was already in

7    place.

8         I think the only additional part would be potentially

9    taking positions that could be adverse to Dr. Frederick, and

10   then cross-examining him were he to take the stand in his own

11   defense.

12        THE COURT:  Is there anything that remains, in your

13   view, that you cannot do in your representation of Dr. Hough?

14        MR. HOCHMAN:  No, Your Honor.  I think that pretty

15   much covered everything I could think of.

16        THE COURT:  The retainer agreement that you provided

17   with Dr. Hough, although, obviously, it's redacted, you left in

18   a provision dealing with waiver of conflict of interest.  What

19   do you perceive that provision to do?

20        MR. HOCHMAN:  That provision sort of was the mirror

21   provision of the one that Dr. Frederick got.  It informed

22   Dr. Hough of my -- of the abilities -- that there could be a

23   conflict; however, I was able, under the Dr. Frederick waiver,

24   to be able to use information that I had obtained while

25   representing Dr. Frederick on her behalf; that I may take

1   positions potentially adverse, if Dr. Frederick were to be at a

2   joint trial, against Dr. Frederick; and then I could cross

3   examine him.

4          So, effectively, whatever limitation I might have had

5   in having represented Dr. Frederick before, I wouldn't have

6   based on -- if there was a joint trial, based on

7   Dr. Frederick's waiver.

8          THE COURT:  And do you perceive this provision of the

9   retainer agreement to waive anything by Dr. Hough?

10          MR. HOCHMAN:  What it waives, it's more -- well, it

11   waives any potential conflict of interest; but I think, in

12   light of Dr. Frederick's waivers, there's no limitation on what

13   I can do.  So what we are trying to do, Your Honor, is inform

14   her of all the potential issues that could be out there per my

15   obligations of providing her that information; let her know

16   that we think that, based on the waivers, we will be -- I don't

17   know if we had obtained or going to obtain from Dr. Frederick,

18   that we wouldn't have these limitations, and thereby express to

19   her what our abilities would be in defending her in case.

20          What we did not anticipate at that time, Your Honor,

21   is that Dr. Frederick wouldn't be here, at least so far, for a

22   joint trial, so that . . . obviously, if he's not here, the

23   issues of cross-examining him never arise, the issues of using

24   information potentially adverse to him never arise vis-a-vis

25   him.  So any -- I don't anticipate any limitations, whatsoever,

1    at this point, in representing Dr. Hough, in a Dr. Hough only

2    trial.

3            THE COURT:  I don't read the waiver of conflict of

4    interest provision of Dr. Hough's retainer agreement as

5    constituting a waiver of anything by Dr. Hough.

6            MR. HOCHMAN:  That's correct.

7            THE COURT:  Am I reading it correctly?

8            MR. HOCHMAN:  That's correct, Your Honor.  She's

9    not -- the only thing she's -- I mean, she's waiving the

10   concept of a potential conflict of interest; but, given

11   the . . . given the abilities I would have under

12   Dr. Frederick's waiver to do all I've already expressed, she's

13   effectively not having any limitations imposed on me, therefore

14   there's nothing to waive.

15           It's more, in some ways, an acknowledgment of the

16   issues, and then, to the extent there's any potential conflict,

17   which I don't think there would be, but if we wanted to put

18   those very broad words in, she would be waiving that.

19           THE COURT:  I frankly don't recall seeing words of

20   waiver by Dr. Hough.  I guess . . . although it's called a

21   waiver of conflict of interest, and I viewed this, after

22   reading it, as more of a disclosure of the relationship with

23   Dr. Frederick and the anticipated waiver by Dr. Frederick.

24           MR. HOCHMAN:  The only words of waiver state, "You

25   also agree to waive any potential conflict of interest that's

1    described above between the firm's representation of you and

2    its prior representation of Dr. Frederick.  You should, of

3    course, feel free to consult with separate counsel" --

4              THE COURT:  Where is that, please?

5              MR. HOCHMAN:  I'm sorry.  If you look at that letter,

6    Your Honor, it's on Page 5 of the letter, before the redaction.

7              THE COURT:  I do see that.  Thank you.

8              Okay.

9              MR. HOCHMAN:  Thank you very much, Your Honor.

10             THE COURT:  All right.  Those were my questions.  I

11   appreciate that.

12             Who is going to argue?  Ms. Finley?

13             MS. FINLEY:  I am, Your Honor.

14             THE COURT:  So where does that leave us in the --

15   with response to your motion to disqualify counsel?  And talk

16   to me about the inherent -- to the extent you're relying upon

17   Dr. Frederick's rights, it's both ironic and, perhaps,

18   inherently a conflict of interest for the government to do that

19   for someone who is not even present in court.  It's kind of

20   interesting that Dr. Frederick is having you protect his rights

21   by being a fugitive.

22             MS. FINLEY:  Yes, Your Honor, I think it is unusual;

23   but I think that the Court -- that the government would argue

24   that there is an actual conflict of interest here, and that, if

25   you accept the fact that Mr. -- that Dr. Frederick has signed

1    this waiver, that . . . let me take this back.

2           The inherent conflict -- that is, an actual

3    conflict -- is that Mr. Hochman is trying to have successive

4    representation.  He formerly represented Dr. Frederick up

5    through indictment.  Mr. Hochman and I had numerous

6    discussions -- up until May 28th, when he informed the

7    government that he no longer represented Dr. Frederick -- that

8    he was still representing him.  We had discussions about

9    summons date, the fact that he had been indicted, and so

10   it's . . . .  It goes on until May 28th.

11          And so under Rule 1.9, he is doing, absent a waiver,

12   exactly what Rule 1.9, counsels that they should not do.

13          THE COURT:  Well, certainly, his conversations with

14   you aren't privileged.

15          MS. FINLEY:  No.  I'm saying, with respect to his

16   successive representation, he formerly represented

17   Dr. Frederick in a matter that is at issue here, in the same

18   matter; he is now going to take, potentially, positions that

19   are adverse to Dr. Frederick; and he's going to take those

20   positions using information that he obtained during his

21   attorney/client relationship.

22          I think to say that, because Dr. Frederick is not

23   here, that those issues are not ripe, I think is a

24   misstatement, because the government is going to present its

25   case, and Dr. Frederick, if he's not here, is still going to be

1    a component of her case, and I don't think that Dr. Hough's

2    defense changes just because he's not here.  It's going to

3    probably highlight and point the finger at the defendant.

4            So the way the government reads the waiver is it's

5    not just that they can cross examine Dr. Frederick with respect

6    to attorney/client information, it's that they can cross

7    examine witnesses, and use all that information to develop

8    evidence to defend Dr. Hough, ultimately to exculpate her and

9    inculpate Dr. Frederick.

10           I think --

11           THE COURT:  So, assuming that's an accurate reading,

12   why is that problematic?

13           MS. FINLEY:  Because the government believes that

14   Dr. Frederick's waiver, and under the case law, that he has not

15   made a knowing, and voluntary, and intelligent waiver that the

16   Court can . . . can make a finding on that.

17           THE COURT:  How would you possibly know that?

18           MS. FINLEY:  Well, I don't --

19           THE COURT:  Have you talked to Dr. Frederick?

20           MS. FINLEY:  I have not.  But I don't think that -- I

21   think the case law calls for the Court to make an on-the-record

22   inquiry of Dr. Frederick to be able to make that finding.

23           THE COURT:  So you're willing to have me disqualify

24   counsel of record at the very beginning of the case because

25   Dr. Frederick is a fugitive, and the only evidence that he has

1  signed a fairly detailed waiver saying he could do just what

2  you want me to preclude from happening?

3          MS. FINLEY:  Yes, sir.  I think, given the overall

4  facts of the case -- which the case law talks about this being

5  a very fact/case-specific analysis -- I think, if you look at

6  the facts and the timing, I think even Mr. Hochman said the

7  anticipated waiver, all of this happens in one day.  I think it

8  doesn't give anybody any time to really have any independent

9  reflection.  Again, the government is speculating about that,

10 but it's clear that Mr. Hochman didn't talk to Dr. Frederick.

11 It's happening all on the same day.

12         Not only is he waiving the rights, terminating

13 Mr. Hochman, Dr. Hough apparently had already contemplated

14 hiring Mr. Hochman, so there was, I guess, some discussion

15 about Mr. Hochman already going to be fired.

16         And then you add that layer on that Dr. Frederick

17 ultimately did not appear at trial -- excuse me, at

18 arraignment, that perhaps he had anticipated he had no problem

19 making a waiver of these expansive rights, that he didn't think

20 he was going to be here.

21         And all of that goes into whether that is a knowing

22 and voluntary, intelligent waiver such that he can come back on

23 the eve of trial and make a different statement, or say I

24 didn't really understand all of that, and the case law as the

25 government reads it is that the Court in its discretion could

ARGUMENT BY MS. FINLEY                    17

1    reject that waiver.

2          And if even if he was here, Your Honor, and he made

3    those statements, the Court could still reject that waiver

4    because of . . . he's essentially waiving the duty of loyalty.

5    And the government would argue that that perception for the

6    trial is a bad perception for the fairness of cases and the

7    attorney/client privilege.

8          THE COURT:  So why don't you have your IRS agent go

9    out and make the arrest?  If you just find Mr. Frederick, we

10   can figure all this out.

11         MS. FINLEY:  Your Honor, the government is attempting

12   vigorously to find Dr. Frederick.  We have gotten arrest

13   warrants, and have taken other law enforcement investigative

14   steps to find him; but at this point he's removed himself in a

15   way that we are not able to locate him at the present time.

16   But we are -- we obviously don't want to have two trials in

17   this case, and so we are working expeditiously to try and make

18   that happen.

19         THE COURT:  I would share that feeling about not

20   wanting two trials.

21         MS. FINLEY:  I think there's one other point, Your

22   Honor.  With respect to the right that Dr. Frederick is in

23   essence waiving here is a constitutional right, so he is

24   waiving his right to conflict-free counsel; and, like any other

25   constitutional right, the Court should have that waiver be on

1    the record.

2              If he's not here, and it's a constitutional right, we

3    should just go to trial without him.  He's not been here, so we

4    should -- he doesn't get his constitutional right to be present

5    for trial.  So, like other constitutional rights, his right to

6    testify, his right to plead guilty, his right to forego

7    examination of witnesses, his right to --

8              THE COURT:  None of which he has right now, because

9    he's a fugitive.

10             MS. FINLEY:  He is, but we would never -- I would

11   submit we would never allow a defendant to not be questioned

12   about his knowing and voluntary waiver of those rights.  Even

13   if he was here, you would have a questioning of those . . .

14   waiver on the record.

15             THE COURT:  But he's not here.

16             MS. FINLEY:  He is not here.

17             THE COURT:  I mean, people waive constitutional

18   rights all the time without doing it in court.  I take

19   confessions, and waive consents to search, and all those kinds

20   of things.  There's no judge there advising the person that do

21   you really want to make this statement?  Do you really want to

22   consent to a search at your house?  Do you really think that's

23   a good idea?  How is that any different?

24             I've got evidence that is uncontradicted that the man

25   waived his right.  Not in a judicial proceeding.  And now he's

1    not here.

2         MS. FINLEY:  I think the question is whether it's a

3    knowing waiver; and, without more, the government would submit

4    the record could show that it's not a knowing waiver.

5         THE COURT:  So what are you going to proffer that

6    would show that it's not a knowing waiver?

7         MS. FINLEY:  I think that the evidence of the timing

8    of it, that he didn't have any independent counsel, the very

9    things that the Garcia Court lays out, that the Court should be

10   inquiring, absent your making the questions, all of those

11   things are not necessarily contained in that waiver.  And,

12   obviously, Mr. Hochman can't write down every possibility; but,

13   given the expanse of waiver, and the use of that information,

14   the government would submit that the case law, counsel's not

15   having it on the record, and where the Court can't have it,

16   that would mean that Mr. Hochman should be disqualified.

17        THE COURT:  Are you going to stand with a straight

18   face and tell the 11th Circuit that that was right, to kick

19   this lawyer off the case, from almost the first day, because of

20   a fugitive, who signed what he signed, and then took off, and

21   isn't it in court, and you're just guessing that there may be

22   something that was -- could be elicited from the Court, that

23   can't because of his fugitive status?

24        I mean, there's a Sixth Amendment right involved,

25   where part of it says a person has a right to counsel of

1    choice.  Absent a pretty compelling reason otherwise.

2            MS. FINLEY:  Yes, Your Honor.  And I think we talked

3    about the hindsight, but that courts are often put in a

4    position to have guessing -- a guessing game about the

5    potential outcome.  And I think the government obviously would

6    not be making the motion if it were not willing to defend it in

7    the 11th Circuit.

8            THE COURT:  It wouldn't be the first time that the

9    government has done that, and then saw the error of their ways.

10           MS. FINLEY:  I think the cases that the government

11   has cited to, and other cases that we did not cite to, have --

12   I can cite for the Court -- not just in the 11th Circuit, but

13   in other courts, where the Court did not conduct that colloquy,

14   or even where the defendant is present and the Court -- there's

15   a case from the Eastern District of Pennsylvania where two

16   defendants were present, it is in the context of a joint

17   representation, but because the two defendants were

18   uncooperative in the court, and there were language issues with

19   the translator, the defendants were not cooperating, the court

20   was not able to conduct the colloquy, and the judge

21   disqualified the defense counsel because the colloquy and the

22   knowing waiver was not able to be made on the record.

23           There are numerous cases where one party waives and

24   the other doesn't, and . . . notwithstanding that Dr. Frederick

25   has arguably waived in this letter, that the government is

1   submitting that is not a sufficient waiver.  And so, because of

2   that -- again, if Dr. Frederick were here, and the Court could

3   question Dr. Frederick in a Garcia hearing, then I think that

4   the outcome might be different.  I think the government would

5   still submit that the Court would -- in its discretion, could

6   find that there is a serious potential for conflict, and still

7   disqualify Mr. Hochman.

8           THE COURT:  So what is the prejudice to Dr. Hough

9   that you're trying to protect?  I mean, since you're protecting

10  everybody's interest in the case.

11          MS. FINLEY:  Well, I think that Dr. Frederick,

12  facially -- excuse me, that Dr. Hough, facially, is sort of the

13  beneficiary of all of the waivers, because she's going to be

14  able to arguably use this attorney/client privileged

15  information to her advantage by pointing the finger at her

16  husband, using the very evidence that her husband provided his

17  former counsel.  So if you drum it down, it's potentially

18  Dr. Frederick told Mr. Hochman I did it, and now Mr. Hochman

19  can use that information and say my previous client told me he

20  did it, and now I'm going to use that for Dr. Hough.

21          THE COURT:  That's real easy.  I'm going to

22  disqualify him if he's going to be a witness.  But that's not

23  what we have.

24          MS. FINLEY:  I think, on its face, Dr. Hough is not

25  necessarily at a disadvantage.  I think, down the road, she

1    could come back and say that Doctor -- that Mr. Hochman was

2    still protecting certain duties of loyalty for himself, as a

3    lawyer, from ethical responsibilities; and that, perhaps, he

4    doesn't fully engage in the defenses he might need to because

5    he's harboring certain information, or doesn't use it to the

6    best of his advantage, because he's still concerned about what

7    Dr. Frederick might say.  Again, without having Dr. Frederick

8    here to fully narratively explain what he understands this

9    expansive waiver to be.  And then she could come back, if there

10   is a conviction, and file an ineffective assistance of counsel,

11   and her conviction could be at issue.

12          THE COURT:  But we know that's going to happen if I

13   recuse counsel.  At least I assume she's going to tell me she

14   wants this attorney to represent her.  So, one way or the

15   other, you've got a guaranteed issue if I recuse, and you've

16   got a potential issue if I don't.

17          MS. FINLEY:  And I think Your Honor also talked about

18   the potential for Mr. Hochman to be a witness.  The government

19   also, about two weeks ago, sent Mr. Hochman a letter, in

20   anticipation of preparing for trial, that . . . we would not

21   argue that this evidence would be admissible, but that if they

22   intended to offer any evidence, at Dr. Hough's trial, about

23   Dr. Frederick's flight or his failure to appear --

24          THE COURT:  His what?  His flight?

25          MS. FINLEY:  His flight, or his fugitive status, that

1    somehow that was indicative of his consciousness of guilt, or

2    see, he did it, he doesn't want to be here.

3            We would argue that's not admissible evidence.  But

4    if the Court were to admit that evidence, then we would intend

5    to call Mr. Hochman as a rebuttal witness.  So there is also

6    the potential for that.  We have not heard back from them on

7    that issue.

8            THE COURT:  Pretty slim potential.  Your argument on

9    the issue of flight is contrary to the 11th Circuit case law.

10   That's usually a position of the government that the flight is

11   indicative of the guilt.  The leading case being the conviction

12   of a federal judge who fled Washington, D.C.  I forgot his

13   name, but it's a published case.

14           So what is it that you think Mr. Hochman can't do in

15   his representation of Dr. Hough, if anything?

16           MS. FINLEY:  The way I read the waiver, there isn't

17   anything that he can't do.

18           THE COURT:  I think that's the way he reads it too.

19           MS. FINLEY:  And I think that, given that

20   expansive -- ultimately, Dr. Frederick is waiving his -- the

21   duty of loyalty that Mr. Hochman owes him.  Which is, you know,

22   a cornerstone of an attorney/client relationship.  Given that,

23   the Court has an interest in having that waiver done on the

24   record.

25           THE COURT:  Bring me Dr. Frederick.  I mean, why do I

1    have an interest in protecting the rights of someone who

2    declines to appear in front of me?  I mean, if it's his rights

3    you're concerned about, you know, bring him in, we'll deal with

4    it.  Right now, all I've got is Dr. Hough.

5           MS. FINLEY:  I think the government would argue that

6    Rule 1.9 and the case law talk about Rule 1.9 being for the

7    protection of the former client, and the case law talks about

8    both defendants being questioned on the record about the

9    waiver.  And so our position is that the case law calls for

10   that, and where that's unable to happen --

11          THE COURT:  Which case do you have that involves a

12   situation where one of the parties was not present in the

13   court, and therefore physically could not be a participant in

14   what's typically called a Garcia hearing?

15          MS. FINLEY:  I did not find a case where,

16   specifically, the defendant was unavailable.  There are cases

17   where either the defendant was unwilling to waive or the Court

18   could not conduct the hearing, and for those reasons . . . in

19   the one case I have, where the Court was not able to conduct a

20   hearing --

21          THE COURT:  The District Court from Pennsylvania?

22          MS. FINLEY:  Yes.

23          THE COURT:  And that was a joint representation, as I

24   recall what you were telling me?

25          MS. FINLEY:  It was a joint representation.

1          THE COURT:  All right.  What else?

2          MS. FINLEY:  Nothing further, Your Honor.

3          THE COURT:  From the defense?  Why shouldn't I do

4    what she says?

5          MR. HOCHMAN:  Your Honor, what you're balancing is

6    Dr. Hough's Sixth Amendment right to counsel of choice, which

7    is . . . the 11th Circuit has viewed as structure error.  They

8    don't even apply harmless error analysis to it.  They basically

9    say if she's denied her counsel of choice, absent very

10   compelling reasons, it's an automatic reversal.  Versus the

11   speculation that Dr. Frederick, if he ever does show up prior

12   to Dr. Hough's trial commencing and concluding, and

13   Dr. Frederick would contradict the waivers he's already signed

14   off on and are before the Court.

15          So you're balancing that speculation that

16   Dr. Frederick would contradict those waivers, which they have

17   no evidence to suggest, and they admit it's speculation, versus

18   the absolute Sixth Amendment right that Dr. Hough has to have

19   counsel of choice, that being myself, proceed on.

20          Part of the reason she wants, I think, myself to

21   represent her is that I have been involved with this case for

22   two years; I have reviewed the tens of thousands of pages of

23   discovery; we've applied two years worth of analysis; we have

24   made several presentations to the government in this case.

25          There is no counsel that's out there that could be up

1    to speed for a trial in . . . hopefully we'll be seeking a

2    trial date with your court for October . . . that could

3    possibly be up to speed by October.

4         My particular background is I was the former

5    Assistant Attorney General of the Tax Division in the

6    Department of Justice.  I have spent 20 years in the criminal

7    tax field, which there are not too many attorneys that get both

8    tax experience and criminal experience.  Which is possibly the

9    reason Dr. Hough wants me to continue as her counsel.

10        So you're weighing that, that counsel of choice,

11   versus the speculation, we believe, in such an inquiry, and you

12   can conduct the Garcia hearing with Dr. Hough, who is present,

13   her Sixth Amendment right trumps the speculation.

14        If Dr. Frederick does show up, and if Dr. Frederick

15   does somehow contradict the waiver, we can deal with that

16   problem at the appropriate time if they're able to bring him

17   before the Court.  But otherwise, Dr. Hough has a speedy

18   trial -- not a speedy trial -- a right to get to a speedy

19   trial, and a speedy trial right; she's got the Sixth Amendment

20   right, versus the speculation.

21        And again, you know, if Dr. Frederick doesn't ever

22   show up, one could also state he has waived his right to

23   complain of a conflict-free representation.

24        But again, if he has a separate trial, Your Honor, at

25   which I'm not present, because Dr. Hough is not present, and he

1   has his own lawyer, he doesn't have any fear that I'm going to

2   somehow cross examine him, because I'm not going to be at that

3   trial, Your Honor.  I'm not going to be presenting Dr. Hough's

4   position at trial.  So if, in fact, he doesn't show up for this

5   trial, and he has his own separate trial, none of the imagined

6   horrors that the government gives before you, by way of

7   speculation, would even exist for Dr. Frederick's trial.

8          So the only situation in which there is any problem

9   here is if Dr. Frederick somehow appears before Dr. Hough goes

10  to trial, and somehow contradicts the waiver that he's

11  already -- written waiver that the Court has before it.

12         If that happens, then we then have to do the Garcia

13  analysis.  But none of that is currently before the Court; so,

14  therefore, we would submit that it would be a violation of

15  Dr. Hough's Sixth Amendment rights to have myself disqualified

16  as counsel, and we believe that that would be an error to do

17  so, Your Honor.

18         THE COURT:  What, if anything, is it that you believe

19  you cannot do on behalf of Dr. Hough based upon your former

20  representation of Dr. Frederick?

21         MR. HOCHMAN:  I believe that there's absolutely no

22  limitation whatsoever on what I can do on behalf of Dr. Hough.

23  I believe that I will be able to zealously argue her position

24  in all forms, and that there's no limitation, whatsoever, based

25  on my prior representation of Dr. Frederick, in representing

1    Dr. Hough in the matter before the Court.

2              THE COURT:  And does that change if Dr. Frederick is,

3    indeed, present in court?

4              MR. HOCHMAN:  No; because I think if Dr. Frederick is

5    present in court, we have at least before the Court a written

6    waiver as to what I can do.  Even if -- and here is the -- we

7    put this as a footnote in our pleadings.  Remember, all the

8    information that Dr. Hough -- I'm sorry -- Dr. Frederick shared

9    with me confidentially was shared with Dr. Hough and her

10   counsel.  So even if I'm not representing Dr. Hough in the

11   future, she already has all that confidential information that

12   Dr. Frederick authorized me to share with her and her counsel.

13   So her new counsel would have all that confidential information

14   as well.

15             So to the extent that Dr. Frederick says well, I

16   don't want you to cross examine me because maybe that's a line

17   that he doesn't want to cross in the future, then Mr. Udolf,

18   who didn't represent Dr. Hough at all until the beginning of

19   this case, could then do the cross-examination of

20   Dr. Frederick.

21             But again, there's so many ifs that were in the

22   speculation, Your Honor, versus the concrete Sixth Amendment

23   right of Dr. Hough to her counsel of choice, that we would say

24   that Sixth Amendment right trumps all of the speculation that's

25   been laid out.

1          THE COURT:  Is there any scenario that you foresee

2     that would result in you being a witness, either for your

3     client or for the government?

4          MR. HOCHMAN:  No, Your Honor.  And we don't intend --

5     it's interesting that the government would be taking the

6     position that they're concerned about us arguing about the

7     flight.  Usually it's the defense that's concerned about the

8     government using the flight evidence against their client.

9     Maybe that precedent will now assure the rest of the defense

10    bar so that they know the government doesn't like flight

11    evidence being used as proof of guilt.

12         We don't intend, whatsoever, to use Dr. Frederick's

13    flight as any evidence whatsoever on Dr. Hough's behalf.  I'll

14    state that -- I'll proffer that to the Court, Your Honor.  So I

15    don't anticipate them -- even if that was to be used, I don't

16    anticipate myself being a witness in any way, shape, or form,

17    to any matter involving Dr. Hough in this trial.

18         THE COURT:  All right.  We'll hear what the

19    government has to say at the bond hearing about flight, and how

20    that's not evidence of guilt.

21         MS. FINLEY:  Your Honor, the flight evidence will be

22    evidence against Dr. Frederick.  We would never argue that,

23    just because Dr. Frederick fled, somehow that means that

24    Dr. Hough is guilty.  And the flipside argument that they could

25    make is that, because Dr. Frederick fled, Dr. Hough is

1   therefore interest.  So that's . . . the argument.  Not that

2   the evidence of flight is not evidence of consciousness of

3   guilt, but it would only be with respect to Dr. Frederick, the

4   person that's fleeing.

5          THE COURT:  That makes more sense.

6          MS. FINLEY:  I would put that there.  I don't think

7   we need to spread anything to the defense bar about the

8   government's position.  I apologize if that wasn't clear.

9          But we would not be using evidence of flight against

10  Dr. Hough.  I don't think that would be proper.  And then the

11  flipside of it would be what we are preventing, or would seek

12  to prevent from happening.

13         The Court said that we're only guessing that the

14  written waiver is knowing and voluntary, but the flipside of

15  that is true; we're only guessing that it's not.  In Garcia,

16  the Court lays out that the Court should --

17         THE COURT:  I think you said that backwards.

18         MS. FINLEY:  You said that we are taking at face

19  value that it's voluntary, and . . . that the Court is taking

20  at face value that it's voluntary and knowing; and the flipside

21  of it is just there is -- inadequate evidence before the Court,

22  the government would submit, for either.

23         It's inadequate to say that it was knowing, and it's

24  inadequate to say it wasn't knowing.  And it's a very fact

25  specific analysis.  When you're talking about waiver of

1    constitutional rights, the Supreme Court, in Johnson v. Zerbst

2    and Edwards v. Arizona, talk about that the proper

3    determination by the Court as to whether a waiver is adequate

4    should be done on the record, and using the particular

5    circumstances surrounding each case, including the background,

6    experience, and the conduct of the accused.

7            In Garcia the 11th Circuit specifically says that the

8    Court should address each defendant personally and

9    forthrightly, to advise of all of the dangers; that they should

10   have an opportunity to question the Court; that they should

11   have the opportunity to have independent counsel if they

12   desire; that only then can the Court determine whether that

13   waiver is voluntary.  And it's talking about for both parties.

14           THE COURT:  And, of course, Garcia is not technically

15   applicable, because I don't have both parties, and . . . . I

16   mean, if I could -- if I could question Dr. Frederick, I

17   presume I would.

18           MS. FINLEY:  And I think just the other issue, with

19   respect to the knowing and voluntary, and the facts and

20   circumstances of this case, I think, today, Mr. Hochman talked

21   about the joint defense agreement -- this oral joint defense

22   agreement.  Again, that feeds into what Dr. Frederick

23   understands or doesn't understand as to what he's waiving in

24   that letter.  So we have a statement that we can share

25   everything, but it's not just the sharing of the information,

1   it's the use of that information.

2            I think there are cases where there's joint

3   representation, and the clients don't . . . waive the use of

4   that information against them at trial.  And, even in those

5   situations, the defense attorneys can remain on the case.  So,

6   given the totality of the circumstances, and the expansive

7   nature of the waivers, not only are the attorney/client

8   privilege -- which, you know, other than this in the letter and

9   Mr. Hochman's representations that the joint defense agreement

10  allowed for the sharing, we just know what Dr. Frederick

11  understood.

12           And yes, if he comes back, and we have a trial, he

13  could say then, after the trial, I didn't understand what I was

14  waiving.  You've now used all this attorney/client privileged

15  information to lay out a fact pattern that is extremely

16  detrimental to my case, that I'm going to go to trial because

17  now I've got witnesses locked into a certain story based on use

18  of the attorney/client privileged information that you made to

19  exculpate Dr. Hough, and now I have no opportunity to take that

20  back.

21           THE COURT:  Part of the price of being a fugitive,

22  isn't it?

23           MS. FINLEY:  And . . . .  The government would . . .

24  well, withdraw that.  The government would argue that you don't

25  necessarily lose your constitutional rights just because you're

ARGUMENT BY MS. FINLEY                    33

1   a fugitive, but . . . .

2              THE COURT:  Another interesting position by the

3   government.  We'll see how far that goes.

4              Dr. Hough, if you and your lawyer would come forward,

5   please.

6              Madam Deputy, if you'd place the defendant under

7   oath.

8              THE COURTROOM DEPUTY:  Raise your right hand.  Do you

9   solemnly swear or affirm to tell the truth, the whole truth,

10  nothing but truth, in the case now before the Court?

11             THE DEFENDANT:  Yes, I do.

12             THE COURTROOM DEPUTY:  Please state your full name.

13             THE DEFENDANT:  My name is Patricia Lynn Hough.

14             THE COURT:  And I know you're a doctor, but I don't

15  know what you're a doctor of; so if you would tell me, please?

16             THE DEFENDANT:  I'm a psychiatrist.  I currently work

17  for the State of Florida, for the past four years, in public

18  health, clinics, seeing low income, uninsured patients.  I'm

19  part also of their primary healthcare team.

20             THE COURT:  So I assume you have a medical degree?

21             THE DEFENDANT:  Yes, I do.

22             THE COURT:  All right.  Obviously, I'm not -- you can

23  read, write, and understand English?

24             THE DEFENDANT:  Yes, I do.

25             THE COURT:  All right.  Dr. Hough, do you believe you

1   understand what we've been talking about here, this morning?

2          THE DEFENDANT:  Yes, I do.

3          THE COURT:  Let me start with some basics.  You have

4   a constitutional right to be represented by an attorney in all

5   proceedings in this criminal case.  That typically means you

6   have a constitutional right to be represented by the attorney

7   of your choice.  The choice part is not absolute.  In other

8   words, there may be reasons why the attorney of your choice

9   would not be allowed to represent you.  But, as a general

10  matter, a criminal defendant has a right to be represented by

11  whoever he or she wishes to be represented by.

12         Do you understand those things?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Who do you wish to be represented by in

15  this case?

16         THE DEFENDANT:  I wish to be represented by Attorney

17  Nathan Hochman.

18         THE COURT:  And do you understand what's been said

19  today in terms of his prior representation of your co-defendant

20  and husband, Dr. Frederick?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Do you understand that, normally, an

23  attorney has certain obligations to a client, even a former

24  client, that continues on, essentially into perpetuity,

25  including a duty of loyalty?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Based upon those obligations, an attorney

3     who has represented someone else typically is not allowed to

4     use any confidential communications to that person's detriment.

5     And, using Dr. Frederick as an example, absent some type of

6     waiver, the attorney would not be allowed to use confidential

7     information obtained from Dr. Frederick that may be against

8     Dr. Frederick's best interests, even if it is in your best

9     interests that that be done.

10         Do you understand that?

11         THE DEFENDANT:  Yes, Your Honor, I understand that.

12         THE COURT:  Have I included too many things there?  I

13    know that's kind of a long sentence.

14         THE DEFENDANT:  It was, but I understand it.

15         THE COURT:  Okay.

16         THE DEFENDANT:  I retained independent counsel,

17    Mr. Bruce Udolf.  We have had several in-person lengthy

18    conversations.  I've read Garcia to the best of my ability, and

19    all the documents that have gone back and forth between my

20    counsel and the government.

21         THE COURT:  Your attorney, Mr. Hochman, doesn't

22    believe he has any restrictions that would impact his ability

23    to represent you.  In other words, he believes that the waiver

24    that's been presented to the Court, as signed by Dr. Frederick,

25    essentially frees him from all limitations, and that he can

1    represent you without restraint.

2              Do you understand that?

3              THE DEFENDANT:  Yes, I do, Your Honor.

4              THE COURT:  He may be wrong.  He may get in the

5    middle of trial and say, eh, maybe I better not ask that

6    question, or maybe I better not do that.  You and I will never

7    know.  Because a trial is as much art as science sometimes, and

8    you'll be called upon to make judgment calls.  Some of those

9    will be made on the fly during trial.  And you will have to go

10   with his experience, and what he knows, and what he believes.

11   None of us will know whether what he is doing is impacted by

12   his knowledge of Dr. Frederick and his prior representation.

13   That's just kind of the way it is sometimes.

14             Do you understand that?

15             THE DEFENDANT:  I understand that, Your Honor; but at

16   all times the . . . conversations that we had, by phone or in

17   person, were jointly shared.  I was in attendance with

18   Mr. Hochman and with Mr. Falk.  So I do not believe that there

19   are any . . . really serious unknowns out there.

20             THE COURT:  All right.  I hope you're right.  You may

21   be wrong.  It's been my experience that, when I've gone through

22   these types of hearings, the client typically just loves that

23   lawyer, and is willing to waive anything.  And then, two years

24   later, when they're writing from prison, suddenly the lawyer

25   did a lot of things wrong, and suddenly all those things relate

1    back to that conflict of interest, and how could I be so silly

2    as to let a defendant waive a conflict of interest.

3    Perspectives change.

4           Do you understand that?

5           THE DEFENDANT:  Yes, I understand that, Your Honor.

6           THE COURT:  The decision you have to make here is one

7    that's going to follow you for the duration of the case.  In

8    other words, at the end of the day, if you still want your

9    attorney, and I let him, you're effectively going to waive any

10   either actual or potential conflict of interest.

11          One of the things that means is your not going to be

12   able to tell an appellate court that this was wrong.  You know?

13   Reverse my conviction because of this.  And the reason for that

14   is I can give you a lawyer now that has no possibility of any

15   conflict, not the slightest.  Never heard of you.  That may be

16   good or bad, I don't know; but certainly won't have any

17   conflict of interest.  So, if there's a problem, we can fix it.

18   So that your decision not to change lawyers, while certainly

19   something you can make, is going to stay with you for the

20   duration.

21          Do you understand that?

22          THE DEFENDANT:  Yes, Your Honor.  I've been under

23   investigation for four years.  Since we've had Mr. Hochman, he

24   has spent hundreds and hundreds of hours on the case.  He and

25   Mr. Falk even came to Guatemala to visit the foundation, the

1    board of directors.

2              No one knows the facts better than him.  And I

3    believe in my innocence, and would like the right to a speedy

4    trial, because this has greatly impacted any future work I can

5    do.

6              THE COURT:  All right.

7              Do you understand that there -- I mean, there's some

8    conflict that you can predict.  I mean, if Dr. Frederick ever

9    is apprehended, your attorney may be called upon to examine or

10   cross examine him, which may put you or he in an embarrassing

11   position in front of a jury.

12             Do you understand that?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  There are some conflicts that we just

15   can't predict now, as I was saying, because of the nature of

16   the trial.  What seems to be perfectly fine now, something may

17   happen.  There may be a piece of evidence that is

18   unanticipated.  A witness may say something that's

19   unanticipated, that triggers something that we just don't

20   anticipate.

21             If that happens, and you've agreed to have your

22   attorney continue to represent you, you know, the waiver of any

23   conflict is still going to apply, even though we can't

24   specifically tell you each and every possible conflict of

25   interest.

1          Do you understand that?

2          THE DEFENDANT:  Yes, I understand that, Your Honor.

3          THE COURT:  Do you have any questions, either to me

4   or for your attorney, that you think you would like to have

5   answered before deciding again who it is you want to be

6   represented by?

7          THE DEFENDANT:  No.  I have no further questions,

8   Your Honor.

9          THE COURT:  And, after having heard everything I've

10  said, who is it that you want to be represented by?

11         THE DEFENDANT:  I want to be represented by

12  Mr. Nathan Hochman.

13         THE COURT:  And you do that understanding that that

14  decision would waive any actual or potential conflicts of

15  interest that either exist now or may exist in his

16  representation of you?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  Has anyone done anything to force, or

19  coerce, or improperly induce you to make that decision?

20         THE DEFENDANT:  No, Your Honor.

21         THE COURT:  Have you made any promises that good

22  things will happen if you make that decision?

23         THE DEFENDANT:  No.

24         THE COURT:  Anything you want to say that I haven't

25  asked you?

1          THE DEFENDANT:  No.  I think you've been very

2    thorough, Your Honor.  I appreciate it.

3          THE COURT:  All right.

4          Counsel, Miss Finley, any other areas -- and I can't

5    see, I'm sorry.  That you want the Court to inquire into?

6          MS. FINLEY:  Not with respect to Dr. Hough, Your

7    Honor.

8          THE COURT:  I'm sorry?

9          MS. FINLEY:  Not with respect to Dr. Hough, no, Your

10   Honor.

11         THE COURT:  All right.

12         And the same question for you, Mr. Hochman.  Any

13   other areas you want me to inquire into?

14         MR. HOCHMAN:  No, Your Honor.

15         THE COURT:  All right.  Thank you.  You may have a

16   seat.

17         MR. HOCHMAN:  Thank you.

18         THE COURT:  All right.  Anything else from counsel?

19         MR. HOCHMAN:  No, Your Honor.

20         MS. FINLEY:  Just, Your Honor, for the record, having

21   you now question Dr. Hough, that questioning is all that we

22   believe that would be necessary with respect to Dr. Frederick,

23   notwithstanding his failure to be here.  But we think that

24   she's not really waiving anything, and again, it's the rights

25   that he's waiving, I understand, by not being here.  But we

ARGUMENT BY MS. FINLEY                                   41

1   believe those still do need to be elicited on the record.  His

2   understanding of it.  Just on the record.

3          THE COURT:  So what are you going to do for the

4   record if I grant your motion?

5          MS. FINLEY:  I'm setting the record either way, Your

6   Honor, just so that the government's position -- the government

7   doesn't have a position with respect to Mr. Hochman.  We're

8   happy to go to trial in October.  We are raising the issue

9   because we want to ensure the outcome of the case, and that

10  legal ethics and the issues that are -- the government believes

11  are apparent by having the successive representations here are

12  fleshed out for the record.  And that's why we raised the

13  issue.

14         And so we just believe, especially in light of the

15  colloquy the Court just had, that it highlights even more, for

16  the government, the questions of Dr. Frederick really

17  understands that he's waiving.  Because she's not really

18  waiving anything.  He's the one who is waiving his right to

19  conflict-free counsel, he's waiving his attorney/client

20  privilege, and he's waiving his duty of loyalty.

21         And I understand that the Court is troubled by his

22  failure to appear, but the Court also has an inherent

23  responsibility to . . . make sure that the legal ethical

24  standards are upheld; and, without those questions, we can't be

25  sure that they are.

1          That's the government's argument.  Thank you, Your

2     Honor.

3          THE COURT:  All right.  And, in an abundance of

4     caution, I'm going to take it under advisement.  And sometimes

5     the government has to be careful what they ask for, because

6     they might win.  So we'll see.  I'll get an order out as soon

7     as I can.

8          All right.  We'll be in recess.

9          MR. HOCHMAN:  Your Honor, we have a hearing before

10    the Court on -- next Monday, August 12th, to set a trial date.

11    We were hoping, if the Court is so willing -- obviously, that

12    depends on your ultimate ruling in this issue, but we were

13    hoping the Court would be willing to entertain setting a date

14    certain in October, if only because there's numerous witnesses,

15    both in this country and outside this country, that will be

16    subpoenaed for this trial; and we were hoping, if that's at all

17    possible, to do that today, rather than having to come back.

18         Obviously, we are happy to come back if the Court

19    would like to do it on the 12th rather than today.

20         THE COURT:  I have no reason not to do the status

21    today if everyone is here.  That makes sense to me.

22         MS. FINLEY:  That's fine, Your Honor.  That would be

23    great.  We were hoping October 8th, if that works in the

24    Court's calendar as a date certain.

25         THE COURT:  What's your respective estimate for the

1    length of trial, first of all?

2            MS. FINLEY:  The government anticipates its case will

3    take five to seven days, Your Honor.

4            MR. HOCHMAN:  And the defense case -- again,

5    depending on whether or not the defendant testifies, can be

6    somewhere between one and three days.

7            THE COURT:  So we're talking anywhere from six to

8    nine days-ish?

9            MR. HOCHMAN:  Ish.

10           THE COURT:  Ish.  I know, with lawyers, it's always

11   ish.  Okay.

12           Do we have anyone in custody in this case?  I've got

13   sequester issues with working on Fridays with marshals,

14   but . . . .

15           MS. FINLEY:  We have nobody in custody.

16           MR. HOCHMAN:  No, Your Honor.

17           THE COURT:  All right.  As far as I know, the eighth

18   works, with the caveat I've got something -- I've got three

19   cases specially set in September.  I don't remember the last

20   one, how long it is, but I wouldn't think it would go to the

21   eighth.  So I think we're pretty safe.  So I can do it.

22           MR. HOCHMAN:  Very good.  That would be great, Your

23   Honor.

24           MS. FINLEY:  Just for clarification, Your Honor,

25   having not appeared in this district before, does the Court sit

1  on Fridays normally, or is that an off day?

2            THE COURT:  No.  I normally sit on Fridays.  Monday

3  is my sentencing day, so I typically don't have trial on

4  Monday.  In October, I see that the 14th, which is the Monday,

5  is some federal holiday, I don't know which from looking here.

6            MS. FINLEY:  Columbus Day.

7            THE COURT:  Is that what it is?

8            MS. FINLEY:  Yes.

9            THE COURT:  All right.  Columbus Day.  And so

10 typically the 15th would be -- which is Tuesday, would be my

11 Monday.  If I know I'm in trying, I can try to clear that out.

12 I don't know what I've got in terms of sentencing.  But your

13 typical week would go Tuesday through Friday, and typically

14 from 9:00 to 5:00.  5:00 has become more written in stone with

15 sequester issues.

16            Typically, we'll have one morning recess, about 15

17 minutes, midmorning.  One recess in the afternoon.  Take an

18 hour to hour and a quarter for lunch each today, break as close

19 to 5:00 as humanly possible.

20            In terms of jury selection, that's Seat Number 1

21 closest to the spectator's section.  One through six, and seven

22 through whatever.  I fill the box with 18.  The Court will

23 conduct voir dire.  I do allow brief follow-up by counsel.  I

24 underline the words brief and follow-up in terms of counsel's

25 voir dire.  Exercise challenges at sidebar.

1    There's no back striking, so if you accept 12, you

2    can't go back and eliminate another one of those jurors.  The

3    only exception to that is sometimes more information comes up,

4    and then I will allow back striking as to a particular juror.

5    But the general rule is no back striking.

6    Alternates, I'll try and probably get two or three in

7    this case.

8    Note taking.  Thoughts on whether jurors should take

9    notes?

10    MR. HOCHMAN:  I would think -- I have no opinion, but

11    I think they should be allowed if the Court has otherwise

12    allowed them in other, more lengthy trials, such as this one.

13    It will be fairly complex, Your Honor, dealing with domestic

14    and international tax and accounting issues.

15    We would certainly have no objection if the jurors

16    took notes, with the admonition that they -- the notes are for

17    themselves, they can't use the notes to show to another juror,

18    all that kind of stuff.

19    THE COURT:  They can use to it show to another juror,

20    but I've got a pattern instruction in terms of not giving notes

21    priority over the notes of other jurors, and things like that.

22    MR. HOCHMAN:  All right.

23    MS. FINLEY:  We would have no objection to the jurors

24    taking notes.

25    THE COURT:  If you would remind me, on the morning of

1    trial, that we will allow them to take notes.

2                MR. HOCHMAN:  With respect to the challenges, for

3    cause would be up at the sidebar.  Do you also have the

4    peremptories up at sidebar?

5                THE COURT:  I do.  All of it at sidebar.  We'll leave

6    the jurors seated in the box so you can see who it is that

7    you're challenging or excusing.

8                Any sidebar conference Dr. Hough, even though I may

9    say, "Counsel, approach the bench," I'm including you in that.

10   So you may approach for any sidebar we have if you wish.  If

11   you don't wish, you don't have to.  So if you don't come up, I

12   will assume you've decided not to come up for that particular

13   sidebar.  But you're welcome to come up anytime.

14               MR. HOCHMAN:  And I assume, with peremptories, let's

15   see, if the government exercises a peremptory, and then it's

16   the defense challenge after that, we can go back, discuss it

17   with Dr. Hough, what we want to do, and then come back to the

18   Court for the defense -- is it that sort of back and forth,

19   Your Honor?

20               THE COURT:  No.  After we finish the voir dire, I'll

21   give you each an opportunity to . . . I'll say something like,

22   "Counsel, take a look at your notes and, when you're ready,

23   come to sidebar."  And then, when you come to sidebar, I'll

24   expect you to know who you're going to challenge.  And we'll go

25   back and forth, but I'm not going to give you the opportunity

1    to regroup after each peremptory.

2            MR. HOCHMAN:  Fair enough.  And then, assuming we

3    start with the original 12, if we strike Juror Number 1, does

4    Juror Number 13 then go into the one position?

5            THE COURT:  No.  If we keep -- let's say we have 12.

6    If, for some reason, the first six are challenged, and then

7    everyone passes, Number 7 will come down and be Number 1.  So

8    we keep those same jurors.  They just come down, fill the front

9    numbers, and then we backfill the box and go to the next round.

10           MR. HOCHMAN:  I see.

11           THE COURT:  Does that answer the question or not?

12           MR. HOCHMAN:  Yes.  But it might turn out that if I

13   strike, let's say, Juror Number 1 on the first defense

14   peremptory, you know, the government strikes Juror Number 3,

15   then I assume we'll get -- we'll have six jurors above them.

16   If we eventually strike six people, then we want to voir dire

17   beyond the 18 presumably, because then we'll have to bring in a

18   new six, voir dire them.

19           THE COURT:  That's right.

20           MR. HOCHMAN:  Got it.

21           THE COURT:  We voir dire the 18, and we may get six

22   out of the 18 as jurors, they'll come down, and they'll watch

23   us voir dire the next 12.

24           MR. HOCHMAN:  I see.

25           THE COURT:  And then, if we still run out of jurors

1    in that 12, say we pick up four, we'll refill the jury box, go

2    through those, and hopefully . . . I think three times is kind

3    of typical cycle before we get enough jurors.

4              MR. HOCHMAN:  Unless there's a lot of for cause

5    objections.  Does the Court ever use juror questionnaires ahead

6    of time, in the jury room, where we prepare a questionnaire,

7    ahead of time, that sort of lays out . . . .

8              THE COURT:  Not as a judge.

9              MR. HOCHMAN:  Not as a?

10             THE COURT:  Not as a judge I haven't used that.

11             MR. HOCHMAN:  Okay.  And I assume that the Court

12   would entertain us submitting proposed voir dire questions?

13             THE COURT:  Yes.  I would encourage that, because I

14   intend to do most of it.  And, as I said, I do allow brief

15   follow-up questions.  I don't allow, "If you're a tree, what

16   kind of tree would you be," and those kind of things.

17             MR. HOCHMAN:  Fair enough, Your Honor.

18             THE COURT:  But anything related to the case.  I

19   assume you will know more than I will, and so there may be

20   something that you need to talk about that, for some reason,

21   you didn't include in voir dire, or I didn't sense the

22   importance of it, it might make sense to follow up; but, "What

23   magazines do you read," and those kind of things, I'm not

24   likely to let happen.

25             MR. HOCHMAN:  Okay.  And then, with respect to the

```
 1    statement of the case, what the case is about, does the Court

 2    generally come up with its own statement?  Do you want a

 3    proposed statement from us?  How do you deal with something

 4    like that?

 5            THE COURT:  The truth of the matter is I typically do

 6    it, myself.  I would encourage, particularly in a case like

 7    this, if you can come up with a joint statement, a

 8    paragraph . . . and the purpose of it is just to follow up with

 9    do you know anything about the case.

10            MR. HOCHMAN:  Right.

11            THE COURT:  So it doesn't need to be detailed, but I

12    would encourage you to do that.  Because, in a drug case, it's

13    easy.  In this case, it may not be so easy to do it.  But I'm

14    really just trying to find out if they know anything about the

15    case before coming the trial.

16            MR. HOCHMAN:  And the last question along those

17    lines -- and not my last question, but one of the last -- do

18    you also want us to give you a list of proposed witnesses, so

19    you can run that by the jurors and see if they know any of

20    them?

21            THE COURT:  Yes.  I want a list of potential

22    witnesses, I want your voir dire questions, and, at some point,

23    I want your exhibit list.  I don't need the exhibit list for

24    jury selection, but I do need the other two things.

25            MR. HOCHMAN:  Very good.  Would you actually
```

1  entertain a jury -- even though you haven't done it as a judge,

2  would you entertain a jury questionnaire that we can lay

3  out . . . you know, that the jurors can fill out ahead of time?

4  I know that involves them filling it out, us getting it,

5  looking through it ahead of time, and all that sort of stuff.

6          THE COURT:  I will entertain anything you give me.

7  Unless there's something I don't know about this case, which

8  I'm sure there is, you may be hard pressed to convince me to do

9  that.

10          MR. HOCHMAN:  I see.  Because, again, they have to

11  pick the jurors . . . the venire they have to pick ahead of

12  time to give them time for the questionnaire, to get it back to

13  us.

14          THE COURT:  There's just nothing about this case that

15  strikes me as the need for that.  I don't think this is a high

16  publicity case.  It's maybe long in terms of duration, but I

17  just . . . .  I don't see where this is an inflammatory

18  or . . . .  Where we're going to have a problem picking fair

19  jurors.

20          MR. HOCHMAN:  And I agree with Your Honor.  I think

21  it's a . . . it's a complicated case, certainly.  I think it

22  involves a lot of moving parts.  But it's not -- we don't

23  believe it's high profile in that sense.  And hopefully, if we

24  give you enough good voir dire questions, we can get the jurors

25  prejudices and biases to the forefront, and figure out the best

1   jury.

2          THE COURT:  Okay.  Any other questions about

3   procedures, or anything?

4          MR. HOCHMAN:  Oh.  Just so I'm clear, exhibits, when

5   you show a witness an exhibit, do you expect the -- some courts

6   like to have the actual exhibit books sitting before each

7   witness, all tabbed and ready to go.  Some courts want

8   each . . . as you're presenting a witness, you present them,

9   either through the court clerk or yourself, bringing up the

10  actual exhibit to the witness that the witness will be dealing

11  with.

12         What's the Court's preference in this regard?

13         THE COURT:  I have had it done both ways.  There's no

14  particular need, in my view, to give a witness a notebook that

15  has all the exhibits if you're just going to be talking about

16  one at a time.  But if that witness is going to be going

17  through all of them, then yeah.  Otherwise, you just have the

18  dead time as you guys walk back and forth.  So kind of depends

19  who the witness is and what the exhibits are, I think.

20         MR. HOCHMAN:  Okay.

21         THE COURT:  I think that my pretrial order talks

22  about having a copy for the Court of exhibits.

23         MR. HOCHMAN:  Certainly.

24         THE COURT:  Again, that's worked well or not so well,

25  depending on the case.  I mean, I've got three feet of exhibits

1   back here from a trial that I have not looked at yet, and I'm

2   not sure I need to.  So I don't know what to tell you.

3           The important exhibits, certainly, I would like to

4   have.  If they're just bank records that are months and months

5   and months of bank records, that you're going to use three

6   entries, I don't need to have a copy of all those.

7           MR. HOCHMAN:  And then as far as publicly --

8   publicly . . . .

9           THE COURT:  Publicity?

10          MR. HOCHMAN:  Not publicity.

11          MS. FINLEY:  Publication?

12          MR. HOCHMAN:  Publication.  Thank you.

13          Publication of the exhibit.  Does the Court allow it

14  to be done via computers?

15          THE COURT:  Yes.

16          MR. HOCHMAN:  So, in other words, you can admit it

17  into evidence -- a particular exhibit into evidence, and then,

18  Your Honor, I would like to put it on the screen, so that the

19  jurors can follow along with the witness.

20          THE COURT:  Sure.  We have the Elmo system there that

21  you can literally put the document on the screen and project it

22  onto a screen.

23          MR. HOCHMAN:  I see.  There is a screen right there?

24          THE COURT:  There is.

25          MR. HOCHMAN:  Oh.

1          THE COURT:  Or you can do it through the computer

2    system, so that it will project through the computer, and then

3    you can do whatever you need to do.  So there's two different

4    ways.  And I'd suggest you get with my courtroom deputy.  But

5    if nothing else, you can lay it on the screen there, and

6    project it.  But if you got them all copied onto your computer,

7    for example, that's doable too.

8          MR. HOCHMAN:  Very good.  All right.

9          Thank you.  I this that answers all my questions.

10          THE COURT:  If you're going to do the computer, I

11    would advise you that no one here is going to help you.  I'm

12    not going to, certainly, know how to do it.  So you've got to

13    figure that out.

14          MR. HOCHMAN:  Get one of those computer expert people

15    who actually know what they're doing, because I don't know if

16    anyone --

17          THE COURT:  We have a guy down there that will help

18    you in terms of court equipment, but then he leaves.  From that

19    point, on you're on your own in terms of the machine and

20    whatnot.

21          MR. HOCHMAN:  Very good.

22          THE COURT:  Jury instructions I'd like to get as soon

23    as I can.  I forget now if the order says three or five days

24    before trial.  But . . . three?  All right.

25          MR. HOCHMAN:  And do you usually have the conference

1    over jury instructions at the conclusion of the evidence?

2              THE COURT:  I do.  I do.  And I typically give the

3    jury instructions after closing arguments.  Once, I gave them

4    before because both sides asked.  That was fine.

5              MR. HOCHMAN:  And with respect to the admission of

6    exhibits, do you expect that, when we've laid the proper

7    foundation, we should attempt to admit the exhibit at that

8    time, or do you like us to wait until the conclusion of

9    evidence or the conclusion of a particular witness to move in

10   the exhibits in total?

11             THE COURT:  At that time.

12             MR. HOCHMAN:  At that time.

13             MS. FINLEY:  With respect to jury instructions, do

14   you suggest that, to the extent that we can agree on jury

15   instruction, we can concur before -- I know that there are

16   motions about conferring, but I have seen, in some courts,

17   where we have joint proposed instructions and ones we disagree

18   on.

19             THE COURT:  I think that's great.  I think that's the

20   way to do it.  I use the pattern 11th Circuit questions to the

21   extent that I can.  Most of the preliminary instructions will

22   be agreed upon.  That's my experience.  The offense

23   instructions, depending on what the offense is, that may or may

24   not be a problem.  If there's any special instructions,

25   obviously feel free to submit that.  But to the extent you can

1    agree, that's helpful.  Doesn't mean I'm going to agree, but

2    it's a leg up.

3              MS. FINLEY:  And with respect to opening and closing,

4    the Court permits us to stand at that podium?

5              THE COURT:  Yes.  And there will be a microphone

6    there, but for opening and closing you can use that.  You can

7    stand at the Elmo if you want, but most lawyers like to be

8    facing the jury square.  I don't let you get up any closer than

9    that.  So, depending how long your arm is, if you can touch the

10   podium, you're okay.  Because the court reporter has to take

11   everything down, there's some benefit being close to the podium

12   and the microphone as well.

13             MS. FINLEY:  But we could move to the left or right

14   of it?  We're not glued, per se, to the podium?

15             THE COURT:  As long as you can touch that podium to

16   the left or the right, you're okay.  And that the court

17   reporter can hear you.  So I don't know how long your arms are,

18   but you should be okay.

19             MS. FINLEY:  I'll start stretching.

20             THE COURT:  Okay.

21             MR. HOCHMAN:  I think that's great, Your Honor.

22   Thank you.

23             MS. FINLEY:  Thank you.

24             THE COURT:  Any exhibits you're going to be using in

25   opening that anyone wants to . . . or is that kind of too far

1    down the road?

2             MR. HOCHMAN:  I think we're still -- from the defense

3    standpoint, we're still working out which exhibits we're going

4    to use, or which charts we might want to use as demonstrative

5    aids.

6             THE COURT:  I would encourage agreement to the extent

7    that you want to use those in openings.  If there's no

8    objection, that's fine.  If there is an objection, I expect

9    someone is going to tell me about it, because otherwise, if it

10   happens, I will assume that you've talked about it.

11            MR. HOCHMAN:  And if we come to the point where we

12   can't agree on certain evidence, and we need to file some

13   motions in limine, when does the Court like to hear those?

14            THE COURT:  Kind of depends what they are.  If

15   they're real motion in limine because there's a real dispute,

16   as opposed to . . . you know, some I've seen, I've had motions

17   in limine that one lawyer wants the Court to tell the other

18   lawyer to behave.

19            MR. HOCHMAN:  You won't see that from us, Your Honor.

20            THE COURT:  If it's an issue -- I guess the real

21   answer is, if it's a real issue, I'd rather have it sooner

22   rather than later; but, there's an education process -- and I

23   mean you educating me, because I'm not going to know -- some

24   motion in limines, the answer is that I find I can't rule in

25   limine, I don't know.  But at least I'm sensitized at that

1  point.

2           So I don't want to overly encourage motions in

3  limine; but, to the extent you've got an issue that justifies

4  it, sooner rather than later.  And, by that, certainly before

5  trial.  Depending on what it is, I may well rule the morning of

6  trial.

7           MR. HOCHMAN:  Very good.  And then, with respect to

8  stipulations, in entering a stipulation, some courts allow you

9  to read the stipulation, some courts say mark it as an exhibit,

10  because it effectively is a piece of evidence and that will go

11  back to the jury.  How does this Court deal with stipulations?

12           THE COURT:  Both.  Have it marked as an exhibit

13  that's admitted, it goes back to the jury room, and then allow

14  counsel, if they wish, to publish, that is to read it, like any

15  other exhibit.

16           MR. HOCHMAN:  Very good.  I'm sure I'll have other

17  questions, but thank you very much for answering those.

18           THE COURT:  All right.

19           I will see everyone . . . well.  I'll see the

20  government -- I don't know if I'm going to see you yet, or

21  not -- on October the 8th.  But I'll let you know.

22           MR. HOCHMAN:  Thank you very much, Your Honor.

23           MS. FINLEY:  So we're excused from that hearing on

24  the 12th; correct, Your Honor?

25           THE COURT:  Yes.  The hearing as to your case is

1    done, so no one needs to come back.

2             MS. FINLEY:  Thank you.

3             MR. HOCHMAN:  Thank you, Your Honor.

4                  -- -- -- -- -- -- -- --

5        (Thereupon, at 11:50 o'clock a.m., the above-entitled

6        matter was concluded.)

7                  -- -- -- -- -- -- -- --

8                       CERTIFICATE

9        I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

10   ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC RECORD IN

11   THE ABOVE-ENTITLED MATTER.

12

13       Dated this 24th day of September, 2013.

14

15                       /s/ Jeffrey G. Thomas
                         _____
16                       JEFFREY G. THOMAS, RPR

17

18

19

20

21

22

23

24

25