UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Case No. 2:13-cr-00072-JES-UAM

UNITED STATES OF AMERICA,

Plaintiff

v.

DAVID LEON FREDERICK, and
PATRICIA LYNN HOUGH

Defendants.
______________________________________/

**DEFENDANT PATRICIA LYNN HOUGH'S MOTION IN LIMINE NO. 1 TO PRECLUDE INTRODUCTION OF UBS BANK CONTACT NOTES AND INCORPORATED MEMORNDUM OF LAW**

COMES NOW, Defendant Patricia Lynn Hough, by and through her counsel of record, and hereby moves in limine to preclude introduction of foreign bank records, consisting of contact notes in UBS bank files, on the grounds that they are unreliable, that their admission violates the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment, and that they constitute multiple levels of inadmissible hearsay not falling within any exception to the hearsay rule. This motion is based on the attached memorandum of law and attached exhibits, the files and records in this case, and such further evidence and argument as may be presented at any hearing on this motion, and in support thereof states as follows:

## MEMORANDUM OF LAW

### I. BACKGROUND

Dr. Patricia Hough ("Dr. Hough"), along with her now-estranged husband and co-defendant Dr. David Fredrick ("Dr. Fredrick"), founded and developed several medical schools in the Caribbean, including the Saba University School of Medicine and the Medical University of the Americas. The

schools were built and operated by a non-profit foundation, the Saba School of Medicine Foundation (the "Foundation"), organized under Netherlands-Antilles law. The evidence at trial will show that Dr. Fredrick assumed responsibility for the financial and business aspects of the schools, while Dr. Hough, a licensed physician and experienced professor, was responsible for the academic and clinical programs of the schools and for securing accreditations from the United States Department of Education and the various state and international medical licensing boards. Principally due to Dr. Hough's hard work and persistence, the Saba University School of Medicine grew from 22 students in 1993 to over 500 students in 2004, with its graduates enjoying a 94% first-time passage rate on the United States medical board exams and eligible to practice medicine in any of the 50 states.

Due to a hostile takeover attempt and a series of lawsuits against the schools and the Foundation beginning in the mid-1990s, as well as the ability under Netherlands-Antilles law for a plaintiff to freeze a defendant's assets during the pendency of litigation, the Foundation's Board of Directors tasked Dr. Fredrick with protecting the Foundation's assets (and the continued operation of the medical schools) by placing them in offshore accounts. Dr. Fredrick placed the Foundation's assets in accounts in the Bahamas, and later in Switzerland and Liechtenstein. Dr. Fredrick was advised and assisted in this process by Dieter Luetolf, a banker at UBS in Switzerland, and Beda Singenberger, a Swiss financial advisor who was recommended by Luetolf. In a series of transactions over eight years, some directed by Dr. Fredrick and some by Singenberger (but ***none*** directed by Dr. Hough), the Foundation's assets moved between a series of accounts set up by Luetolf and Singenberger in the names of various entities and in the names of Dr. Fredrick and Dr. Hough. Although Luetolf's and Singenberger's churning of these accounts generated substantial fees to UBS and Singenberger's company, the assets at all times remained those of the Foundation and not the personal assets of Dr. Hough or Dr. Fredrick. [1]

Swiss anti-money laundering regulations require that banks maintain a "Form A" identifying the individual responsible for the funds in an account. Luetolf and Singenberger, without direction from Dr.

[1] Singenberger was indicted in 2011 in the Southern District of New York. He has not appeared on that case.



*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

Hough, completed those forms for some of the accounts in the names of Dr. Hough and Dr. Fredrick. A small number of those forms were signed by Dr. Hough; on those, whoever filled out the form identified her as a beneficial owner; the majority of the Form A's were not signed by Dr. Hough. As will be shown at trial, Form A has nothing to do with United States tax law, and Dr. Hough understood the form to mean simply that she would assume responsibility for administering the accounts should something happen to Dr. Fredrick. The evidence will further show that: (1) Dr. Hough did not initiate or direct a single transaction to or from any of the offshore accounts; (2) none of the communications between Dr. Fredrick and/or Dr. Hough and Luetolf or Singenberger, mentioned anything about taxes or the IRS; (3) Dr. Hough repeatedly told her accountants that she wanted to do whatever was required to be fully compliant with her tax obligations; (4) Dr. Hough never authorized the use of any of the funds in the offshore accounts for her own personal benefit; and (5) to the extent that Dr. Fredrick ever used any Foundation funds for personal expenses, Dr. Hough understood that to be pursuant to loans authorized by the Foundation's Board (and duly repaid) or as an offset to Dr. Fredrick's substantial deferred compensation.[2] Most importantly, the evidence will show that the assets in question, regardless of the names of the accounts or the names listed on the Forms A, at all times remained the assets of the Foundation, which continues to be active today in fulfilling its charitable mission by providing medical care and equipment to the needy throughout Central America.

The government, however, has secured an indictment charging Dr. Hough with conspiring with Dr. Fredrick, as well as with Singenberger and unindicted co-conspirator Luetolf, to defraud the United States by obstructing the functions of the IRS, and with four counts of tax evasion pertaining to the tax years 2005 through 2008. The charges are predicated on the flawed assumption that because Dr. Hough was identified (on a Swiss anti-money laundering Form A) as the beneficial owner of certain offshore

[2] For example, in 2006, Dr. Fredrick paid $250,000 from a Foundation account to each of his four half-siblings. Those payments according to the government's own witnesses were kept secret from Dr. Hough. By way of contrast, Dr. Hough, occasionally made gifts to her own sister; however, those gifts always came from Dr. Hough's personal domestic accounts, on which she dutifully paid all taxes owing, and not from any offshore Foundation account.


*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

accounts of the Foundation, the income from those accounts constituted income to her personally that she was required to declare on her individual United States tax returns. The government further contends that Dr. Hough was required to identify on her tax returns the offshore Foundation accounts for which she had signature authority; the evidence, however, will demonstrate that Dr. Hough's accountants never advised her when preparing the above referenced returns of that requirement, that she was unaware of it, and that she signed her returns in the good-faith belief that they were true, correct, and complete.

Dr. Hough does not believe that the government will call a single witness who will testify to the existence of a conspiracy between her, Dr. Fredrick, Luetolf, and/or Singenberger to defraud the United States.[3] Nor will the government produce any witness to testify that Dr. Hough ever believed that the assets in the offshore accounts belonged to her personally. Rather, Dr. Hough anticipates that the government's evidence – such as it is – will consist of UBS bank records reflecting correspondence and other statements by Dr. Fredrick, Luetolf, and/or Singenberger, which the government will seek to introduce as foreign business records under 18 U.S.C. § 3505 and co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E).[4] Included within those UBS records are "contact notes" entered by unidentified persons that purport to reflect the substance of correspondence, telephone calls, and meetings with Dr. Hough and/or Dr. Fredrick (or some other unknown person, as the source of the purported information is frequently unidentified). By this motion, Dr. Hough seeks to preclude the use of

[3] To the contrary, Dr. Hough anticipates that a number of government witnesses will testify, as they did before the grand jury, to her good-faith efforts to comply with the tax laws and her reliance on Dr. Fredrick and financial professionals to properly manage the Foundation's offshore accounts and prepare her tax returns.

[4] Contemporaneously with this motion, Dr. Hough is filing a separate motion in limine seeking the preclusion of any co-conspirator statement until the government has met the requirement of proving by a preponderance of the evidence, through substantial evidence independent of the alleged co-conspirator statements themselves, that Dr. Hough was involved in a conspiracy with the declarant(s) and that the particular statement was made during the course and in furtherance of the conspiracy. This motion, by contrast, seeks the preclusion of all UBS notes – constituting one sub-category of the alleged co-conspirator statements at issue – regardless of whether the government can prove the requisite foundational facts under Rule 801(d)(2)(E).



*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

such unreliable double- or triple-hearsay and disallow the government from engaging in the sort of "trial by document" that is anathema to the Sixth Amendment and to the fundamental fairness required by the Due Process Clause of the United States Constitution. Given the weakness of the government's evidence against Dr. Hough, it would be manifestly improper to allow the government to seek to convict her through the introduction of out-of-court, unreliable, and uncross-examinable statements of alleged criminals.[5]

## II. ARGUMENT

### A. The UBS Contact Notes at Issue Are Vague, Unreliable, and Untrustworthy

Examples of the UBS contact notes at issue are attached as Exhibits A-F hereto.[6] As can be seen from a review of the notes, they purport to recount or summarize various contacts, including e-mail, telephone conversations, and in-person visits. They also include "internal notes" that do not apparently pertain to any client contact. The contact notes are often extremely vague as to the person with whom the contact was made (Dr. Fredrick, Dr. Hough, or someone else), as well as whether the contact is being recounted verbatim, paraphrased, or interpreted. Some of the notes are in German, or alternate between German and English, and there is no indication if the author of the notes is fluent in English or is using the correct words to accurately reflect the substance of the contact. The notes also contain fragments and stray punctuation marks (perhaps the result of the UBS computer program) that suggest that the content

[5] The evidence of Dr. Hough's involvement with the bank accounts at issue and of her knowing and willful failure to disclose those accounts on her individual tax returns is so meager that one wonders how a grand jury found even the existence of probable cause as to her. Indeed, it appears likely that the government's purpose in indicting Dr. Hough was to exert leverage to secure a plea from Dr. Fredrick. With Dr. Fredrick not a part of this trial, however, the government is left with its lack of evidence against Dr. Hough.

[6] Dr. Hough notes that the government has stated its intention to seek to introduce UBS notes reflecting telephone conversations, meetings, etc., but has not informed Dr. Hough which contact notes it will seek to introduce. The government has further confirmed to Dr. Hough that it will not be calling Dieter Luetolf as a witness at trial, but will be seeking to authenticate and introduce the contact notes and other UBS documents through a UBS custodian of records. (Exh. F).



*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

of the e-mail or other contact has been altered in the process of being entered into the UBS database (whether through being retyped by hand or digitally scanned is unclear).

For example, a note dated July 14, 2003 reflects a "visit to client" and states:

> Signed derivatives form. ? ?Good meeting, going through the various documentation issues and culminating in a presentation of our analysis and recommendations for the investment of approx. USD 30 mio. Which went down very well with them, to the point that they readily signed the PM forms for all three accounts, because it is uncert at this time whether the assets will ultimately kept in one account in their name or possibly in different accounts. ?Total expected new is: 24 mio for schools, 3 mio currently held in US, 1 mio in the [REDACTED] ? ?[REDACTED] has an exclusive school in Manhattan where the tuition for the kindergarten costs more than their tuition for university! He has put in a number of bids for their schools. ? ?It seems that the deal will take plac before mid-August, with a group of mid-western businessmen who seem serious enough to have paid quite a lot lawyers fees. ?

(Exh. A at 2). The same set of notes reflects the following e-mail contact on December 17, 2003:

> Dieter:??I just spoke to Pat and she agrees that we should move ?5.0 to the Enhanced Return Managed Portfolio??Thanks again for the information and advice.??Regards,??DF

(*Id.*). And the notes contain this report of a telephone conversation on December 31, 9999 [sic]:

> Still trying to sell his medical schools. When the transaction takes place, we should receive double digit USD amount.Regular contact on trips.

(*Id.* at 3).

The questions that arise in response to the above are numerous and obvious, and presumably cannot be answered by a UBS custodian of records who did not personally prepare the notes. Who was present at the "visit to client"? Where did it take place? Who made the various statements that are reported in that note? Is the writer quoting the speaker or paraphrasing? What accounts were discussed? What were the analysis and recommendations that was presented? Who wrote the e-mail? Is the note the complete text of the e-mail, or excerpted? Who was the telephone conversation with? When did it take place? What transaction was being referenced? Who wrote the notes? Were any dates or content erroneously entered other than year 9999?

The same questions and more are raised with respect to entries in other sets of contact notes


*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

relating to other UBS accounts. A few examples follow:

> (Visit to client) Please close account, covering debit from NWV.

(Exh. B at 2).

> (Telephone conversation) confirm the split. He is looking at a way to transfer another USD 6 mio from the Us. He is working with his accountant in this respect.??They are negotiating with various parties to sell the schools.

(Exh. C at 1).

> (Visit to client) Was a bit late for the meeting since there was some damage to their home in Florida.??Discussion about portfolio and the cash portion. I suggest that we invest 2 x 500?000 in DOCU against EUR, one aggressive and the other conservative, renewable for one month periods until further notice. ??Work with Schneider accountants who are specialists for the Dept. of Education. They now have an audited return which qualifies to GAP standards. This should also make it easier for them to sell. Still interested are Providence Equity Group (RI) who have made a proposal for USD 40 mio. Their accountants feel that the amount should be higher (EBIDA times 7).??They have USD 7 mio in Englewood Bank in Florida and another 3 mio in Gardner. They want to bring this to UBS as quickly as possible, since the bank is really very small (they may be their biggest client). He is meeting with lawyer Peter Gluklich in NY to discuss how to move the money offshore. For this purpose, they want to open an account in the name of Saba School of Medicine Foundation, Netherlands Antilles. Send him the documents as soon as possible.

(*Id.* at 2).

> (Internal note) RBA – Risk Based Approach??Control level: Client Advisor?Started by: TIMER?User: 00032902 (AOM4), 05.04.2005.??Confirmation of client:?The client profile reviewed by me is plausible and updated and in line with the client's behavior that is known to me. The client's classification in the relevant cluster (Regular/PEP/SCAP/SIAP) was checked.??Comment:-

(*Id*. at 3).

> (Visit to client) Discussed account with her husband and spoke to her briefly on the phone. He will show her the DOCU proposal in case she wants to go ahead with that as well.

(Exh. D).

> (Telefongespräch) Transfer of USD 500K (250 to Saba, 250 to P.H.) represents purchase of land on Saba previously held by a company named [REDACTED]. It is ok to name New Vanguard as sender, as discussed


*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

> with D.F …….Loan USD 550k to make transfers and cover debit on USD account. Maturity of loan, May 16 (also maturity of fiduciary fix USD 499K)

(Exh. E at 1).

> (Telefongespräch) wants to transfer around USD 1.5 mio in the next few days.

(*Id.* at 5).

In the absence of a witness who entered these notes and can explain (and be cross-examined about) their meaning, this evidence is unauthenticated and often unintelligible. For example, all we (or the jury) can know about the last excerpt above is that it purports to reflect a telephone conversation between an unidentified person and another unidentified person, in the course of which one of the unidentified persons purportedly said that he or she wanted to transfer money from one unidentified account to another unidentified account in the next few days.

**B. <u>The UBS Contact Notes Are Inadmissible as Foreign Business Records Because They Lack Trustworthiness</u>**

Title 18, United States Code, Section 3505(a)(1) provides:

> In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that –
> (A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
> (B) such record was kept in the course of a regularly conducted business activity;
> (C) the business activity made such a record as a regular practice; and
> (D) if such record is not the original, such record is a duplicate of the original;
> unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

This hearsay exception was designed to track the domestic business records exception of Federal Rule of Evidence 803(6), and it should be interpreted in the same manner. *United States v. Ross*, 33 F.3d 1507, 1515 (11th Cir. 1994). Unlike the Rule 803(6) exception, however, section 3505 does not qualify as a "firmly-rooted" hearsay exception for purposes of Confrontation Clause analysis. *Id*. at 1516.

Here, Dr. Hough understands that the government will be calling a UBS custodian of records to attempt to lay the requisite foundation, rather than relying on a foreign certification. Even if that


*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

custodian is able to testify competently to the foundational requirements of section 3505, however, the records must nevertheless be excluded because both the source of information and the method or circumstances of preparation indicate lack of trustworthiness. *See*, 18 U.S.C. § 3505(a)(1). Specifically, the government will presumably claim that the contact notes were authored by Dieter Luetolf, who is identified in the indictment in this case as an unindicted co-conspirator. (Indictment ¶ 4). Does the government contend that this unindicted co-conspirator, who is reportedly hiding in Switzerland, is a trustworthy source of information? More to the point, how does the government intend to prove that its self-professed co-conspirator, to whom the government has apparently never even spoken (Exh. F), is a trustworthy source? Given the nature of the government's own allegations, it is at the very least a realistic possibility that Luetolf would have reason to fabricate records to insulate himself from potential criminal liability and shift responsibility to others. The source of the information and compiler of the purported business records at issue is an individual whom the government itself contends is an untrustworthy criminal.[7]

On a broader level, Luetolf's employer UBS is itself an unreliable source of information, having (among its many other documented offenses) paid a fine of $780,000,000 in fines, penalties, interest, and restitution in 2009 to settle charges of conspiring to defraud the United States. Just last year, UBS agreed to pay $1.5 billion to settle a case filed by the U.S. Commodity Futures Trading Commission charging UBS with engaging in a criminal conspiracy to rig LIBOR rates. Only last week, on September 18, 2013, UBS Securities Japan Co. Ltd. was sentenced and paid a $100 million for LIBOR manipulation, and its Zurich-based parent UBS AG entered into yet another non-prosecution agreement with the Department of Justice requiring it to pay an additional $400 million penalty and to continue cooperating with the government (bringing the total penalties paid by UBS in the matter to more than $1.5 billion). Department of Justice Press Release, http://www.justice.gov/criminal/vns/caseup/ubssecurities.html.

[7] For similar reasons, to the extent that the government seeks to introduce e-mails themselves (*i.e.,* printed versions contained in UBS files), as opposed to the contact notes containing the purported content of those e-mails, Dr. Hough will object to such evidence based on authenticity (in the absence of proof that the content was not altered before being printed) and hearsay.



*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

Indeed, the culture of corruption and fraud at UBS during the very time period at issue in this case was such a public liability for the bank that in 2010 it was forced to issue and have all employees sign a "code of business ethics" relating to, among other things, financial crimes. Katharina Bart, "UBS Lays Out Employee Ethics Code," Wall Street Journal Online (Jan. 12, 2010). UBS' extensive record of criminal conduct as alleged by the Department of Justice, as well as its self-interest in cooperating with and assisting the Department, only adds to the untrustworthiness of the double- and triple- level hearsay contained in its purported foreign business records. *Compare, Ross*, 33 F.3d at 1517 (finding foreign bank records at issue sufficiently reliable under 18 U.S.C. § 3505 because, among other things, no motive had been suggested that would lead bank officials to change, distort, or manipulate the records).

As for the method or circumstances of preparation of the records, they too indicate a lack of trustworthiness. As discussed above, among the many unknowns regarding these records are the parties to the conversations, who else was present, whether the content is reported accurately, whether there are second-language issues, whether there is abridgement or paraphrasing, whether information was entered incorrectly (such as the telephone conversation that occurred in the year 9999), or whether Luetolf or UBS altered or manipulated the contents of the notes for their own self-interest. Dr. Hough does not expect that a UBS custodian of records who played no part in the creation of the contact notes will possibly be able to answer any, let alone all, of these questions. The combination of the source of the records and the circumstances of their preparation render the UBS contact notes untrustworthy and should preclude their admission in the absence of any witness who can testify to, and be cross-examined about, the authenticity of their contents.

### C. Admission of the UBS Contact Notes Would Violate the Confrontation Clause and Due Process

Even were the government able to satisfy the trustworthiness requirement of 18 U.S.C. § 3505(a)(1) to allow for introduction of the UBS contact notes, admission of such documents without any witness to testify to (and be cross-examined about) the accuracy of their contents and the circumstances


*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

of their preparation would both violate the Confrontation Clause of the Sixth Amendment[8] and offend the fundamental fairness requirement at the heart of the Due Process Clause.

In the ordinary case involving co-conspirator statements, a witness will testify to an out-of-court statement made by a co-conspirator of the defendant during the course of and in furtherance of the conspiracy. Although that statement is admissible (assuming the requisite foundational requirements for the hearsay exception have been met by a preponderance of the evidence) regardless of whether the co-conspirator testifies and is subject to cross-examination, at least the witness who heard and is testifying to the statement at issue can be cross-examined about how, when, and where the statement was made and whether its contents are being reported accurately. In other instances, such as the introduction of wiretap evidence containing co-conspirator statements, there may be no live witness to testify to hearing the statement in person, but the contents of the recorded out-of-court statement are generally not subject to legitimate dispute, and at least there will ordinarily be a witness to testify and be cross-examined about the manner of interception and its reliability.

Here, there will be none of that. Instead, what the government apparently seeks to do is to introduce written statements by one alleged co-conspirator (Luetolf), purporting to document what another alleged co-conspirator (Dr. Fredrick) said to him in some form of oral or written communication, which communication itself often purported to report what Dr. Hough or some other person had said to Dr. Fredrick. And the government will attempt to introduce this evidence not through any witness who can authenticate the contents of any of the multiple levels of hearsay and be cross-examined about the completeness and accuracy of the reporting, but through a custodian of records who played no part in the creation of the records and will presumably be able to say little more than "This came from our file." While criminal trials might be held by means of such evidence in other countries, our Constitution demands more of prosecutors in the United States. To allow Dr. Hough to be prosecuted by means of

[8] Although the statements at issue are non-testimonial under the Supreme Court's holding in *Crawford v. Washington*, 541 U.S. 36 (2004), the *Crawford* Court did not limit application of the Confrontation Clause to testimonial statements. *United States v. Charles,* 722 F.3d 1319, 1323 n.4 (11th Cir. 2013).



*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

double- and triple-hearsay contained in suspect and untrustworthy documents prepared by an alleged criminal in a foreign country, with no ability for her to cross-examine anyone about the accuracy of the contents of the records or the reliability of their preparation, violates due process and Dr. Hough's confrontation rights.[9]

**D. The UBS Contact Notes Are Inadmissible Hearsay**

The government will attempt to use Luetolf's entries in the UBS contact notes to prove that the meetings and conversations reported therein took place as described. Thus, they are unquestionably hearsay. *See,* Fed. R. Evid. 801(c) (out-of court statement is hearsay if it is "offered in evidence to prove the truth of the matter asserted"); *Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d 1200, 1206 (11th Cir. 2008) (using statements of out-of-court declarants to establish that incidents described by declarants had actually taken place is "a classic hearsay purpose").

Even assuming that the government can satisfy the hurdles of proving trustworthiness of the foreign records under 18 U.S.C. § 3505(a)(1) and satisfying the constitutional requirements of the Confrontation and Due Process Clauses, it is left with multiple levels of hearsay. Such hearsay may only be admitted as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E) if the government can first prove by a preponderance of the evidence and through **substantial independent evidence** – *i.e.,* substantial evidence independent of the statements themselves – that a conspiracy existed, that the defendant and the declarant (and in the case of multiple hearsay, all declarants) were members of that conspiracy at the time the statements were made, and that the statements were made in the course of and in furtherance of that conspiracy. In this regard, Dr. Hough refers the Court to her analysis in her contemporaneously filed Motion in Limine No. 2 to Preclude Introduction or Mention of Co-conspirator Statements Before All Requirements For Admissibility Have Been Met, which applies equally to the

[9] The government's intended approach is akin to allowing the government, instead of calling a cooperating co-conspirator witness who is potentially subject to impeachment, to place in evidence the case agent's report of the co-conspirator's out-of-court statement simply by having the agent identify that report as his business record. Indeed, the contemplated situation in this case is even worse, as at least in the above example the agent is available for cross-examination about the accuracy of his business record.



*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

UBS contact notes and to any other alleged co-conspirator statements in any form that the government might seek to introduce at trial.

## III. CONCLUSION

WHEREFORE, for the reasons set forth herein, defendant Patricia Lynn Hough respectfully asks this Honorable Court to preclude the government from introducing into evidence at trial any contact notes from the UBS files and for other and further relief as this Court deems appropriate under the circumstances.

Dated: September 27, 2013

Respectfully submitted,

**BRUCE L. UDOLF, P.A.**
*Counsel for Defendant Hough*
Broward Financial Centre
500 East Broward Blvd., Suite 1400
Fort Lauderdale, Florida 33394
Tel: (866) 951-9058/ Fax (954) 525-2134
budolf@udolflaw.com
Fla. Bar No. 0899933

By: /s/ Bruce L. Udolf

## CERTIFICATE OF COMPLIANCE

WE HEREBY CERTIFY that the undersigned has conferred with opposing counsel prior to the filing of this motion, that counsel has been unable to resolve the issues by agreement, and that the motion concerns matters which are not covered by the scheduling order, as directed in the Court's Criminal Scheduling Order [DE 22], at ¶ II (D).

By: /s/ Bruce L. Udolf

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, on this 27th day of September, 2013.

By: /s/ Bruce L. Udolf



*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*