IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. 2:13-cr-00072-FtM-JES-UAM |
| ) | |
| PATRICIA LYNN HOUGH, ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S CONSOLIDATED RESPONSE AND OPPOSITION TO
DEFENDANT PATRICIA LYNN HOUGH'S MOTIONS IN LIMINE NO. 1 AND 2**

COMES NOW the United States, by and through counsel, and submits the Government's Consolidated Response and Opposition to Defendant Patricia Lynn Hough's Motion in Limine No. 1 to Preclude Introduction of UBS Bank Contact Notes (Docket #63, hereinafter "Def's Motion in Limine No. 1") and Motion in Limine No. 2 to Preclude Introduction of Co-Conspirator Statements Before All Requirements for Admissibility Have Been Met ("Def's Motion in Limine No. 2").[1] The government respectfully asserts that the defendant's Motions are not supported by the law. In support thereof, the government submits the following:

**FACTUAL BACKGROUND**

On May 15, 2013, an indictment was returned, charging David Leon Fredrick ("Fredrick") and Patricia Lynn Hough ("Hough") each with one count of *Klein* conspiracy, in violation of 18 U.S.C. § 371. Specifically, the two were charged with conspiracy to impede and impair the Internal Revenue Service ("IRS") in the ascertainment of their taxes. The indictment

---

[1] On October 2, 2013, the defendant filed a Supplement to Motion in Limine No. 1. The government's response herein addresses all of the arguments contained therein. The government would note that all but one of the cases cited in the Supplement do not involve analysis under FRE 803(6).

1

also charges Hough and Fredrick each with four counts of filing a false tax return for tax years 2005 through 2008, in violation of 26 U.S.C. § 7206(1).

Fredrick and Hough, together with unindicted co-conspirators Beda Singenberger ("Singenberger") and their UBS, AG ("UBS") banker, Dieter Luetolf ("Luetolf"), conspired to use nominee entities, including foreign entities and a foreign foundation, to conceal from the IRS Fredrick and Hough's ownership and income derived from the operation and sale of Saba University School of Medicine, Medical University of the Americas ("MUA"), and other assets. Fredrick and Hough opened and maintained undeclared accounts at UBS and other Swiss banks in their individual names, in the names of the schools, and in the names of nominee entities to conceal assets and income from the IRS.  In fact, Hough and Fredrick owned and controlled all of these accounts, the assets therein and the income earned thereon.  As part of the conspiracy, Fredrick and Hough filed false and fraudulent individual income tax returns, Forms 1040, that failed to report their interest in or signature authority over the various undeclared accounts and which also failed to report the receipt of significant interest and other income, predominately in 2007 from the sale of the schools.  Fredrick and Hough communicated with Luetolf and Singenberger by email, telephone and during in-person meetings and provided them with written and oral instructions for use of the undeclared accounts, including wiring and expenditure instructions.

Hough and Fredrick, both United States citizens, had an obligation to report to the IRS on Schedule B of their individual income tax returns, Forms 1040, whether they had a financial interest in, or signature authority over, a financial account in a foreign country where the account was maintained.  They also had an obligation to report all income they earned from foreign bank

accounts on their tax returns. Furthermore, they were required to report income from the sale of the schools.

Saba University School of Medicine Foundation, dba Saba University School of Medicine, ("Saba University School of Medicine Foundation"), a foundation established and incorporated under the laws of the Netherlands Antilles on October 31, 1988, was to provide for the education and training of healthcare professionals, and promote the general well-being of the residents of the Island of Saba. Saba University School of Medicine was located on the Island of Saba. Fredrick and Hough owned Saba University School of Medicine Foundation, which owned Saba University School of Medicine. Fredrick and Hough funded the creation of Saba University School of Medicine with their own funds. Saba University School of Medicine Foundation maintained an undeclared account at UBS and Fredrick and Hough had signature authority. Saba University School of Medicine Foundation also had an undeclared account at Fortis Bank and Lichtenstein Landesbank.

Medical University of the Americas Limited ("MUA") was a corporation established and incorporated under the laws of St. Christopher-Nevis, West Indies, on April 29, 1999, to provide medical education and related services. MUA operated a for profit medical school on Nevis, West Indies. Fredrick owned 1,750 shares of MUA, and Fredrick and Hough served as Directors. Hough also served as Director of Accreditation. MUA maintained an undeclared account at UBS and Fredrick and Hough had signature authority over that undeclared account. MUA also had an undeclared foreign account at Lichtenstein-Landesbank.

Over the course of nearly a decade, Hough and Fredrick opened a host of undeclared offshore bank accounts in a variety of jurisdictions in their individual names, in the names of the schools, and in the names of nominee entities, including Apex, Top Fast, New Vanguard and

MTA. Hough and Fredrick were the beneficial owners of and had signatory authority over all of these accounts and owned and controlled each of them.

In addition to the accounts at UBS, Fredrick and Hough opened bank accounts in the names of the nominee entities and the medical schools at other offshore banks, including Fortis Banque, Liechtenstein Landesbank, and Bank Alpunim. Fredrick and Hough were again identified as the beneficial owners of the nominee entities' undeclared accounts, though the schools themselves were identified as the owners of the accounts in the schools' names.

The evidence will show that Hough and Fredrick caused the undeclared accounts to be closed in jurisdictions when circumstances changed causing there to be an increased likelihood of IRS scrutiny of these accounts. Hough and Fredrick then moved the accounts to banks in other jurisdictions, with the purpose of maintaining the secrecy of these accounts from the IRS and United States authorities. In addition, between 2001 and 2011, Fredrick and Hough caused dozens of monetary transactions to be conducted using the undeclared accounts

In 2007, Fredrick and Hough sold Saba School of Medicine and MUA for more than $36 million after years of trying to entice a buyer. The schools were purchased by Equinox Capital, a private equity investment firm. The sale was personally guaranteed by Hough and Fredrick. Singenberger had limited involvement with the sale of the schools and the assets; he signed some of the required sale documentation. Fredrick directed and requested the proposed apportionment of funds from the sale of the schools among the nominee entities controlled by he and Hough.

One of the largest assets involved in the sale was the land on which the Saba University School of Medicine was located. In the decade prior to the sale, Fredrick and Hough caused the purchase of this land in a nominee, Fredrick's daughter, Laura Whitley. Hough and Fredrick each owned 50% of the outstanding shares of Round Hill Project Holding Company. Later,

Hough and Fredrick caused Fredrick's daughter to sell the property to Round Hill Holding Company at a price drastically below the price originally paid for the land. Hough and Fredrick then sold their shares in Round Hill Holding Company to New Vanguard, which they owned and controlled. New Vanguard, as part of the sale of the schools to Equinox Capital, sold the Round Hill Holding Company shares for nearly $34 million. Hough and Fredrick did not report the majority of the proceeds of this sale on either of their individual income tax returns.

In addition, Frederick and Hough caused transfers of funds amongst the various accounts, including causing funds to be distributed from the medical schools' undeclared accounts to undeclared accounts in the nominee entities' names. The transfers were done to access funds in the undeclared accounts for their personal use, including to purchase real estate in Sarasota, Florida, Asheville, North Carolina and Greenville, North Carolina, to purchase planes, to make gifts to family members, and to pay personal expenses. In some correspondence with Luetolf related to these transactions, Fredrick expressed concern about their individual names being on wire transfers into the United States and instructed Luetolf to ensure that only the names of the nominee entities appeared on any wire transfers. Hough and Fredrick also caused these assets to be purchased in the names of the nominee entities in order to conceal their ownership.

During the time in question, Hough and Fredrick did not report the existence of any of the foreign accounts they owned and controlled to their individual income tax return preparers. Except for the accounts in the name of Saba University School of Medicine Foundation and MUA, Hough and Fredrick did not report the existence of any of the foreign accounts to the in-house Chief Financial Officer of EIC, or the accountants preparing audits for purposes of Department of Education review. The CFO of EIC and other professionals advised Fredrick and Hough of potential problems with the legal structure of the schools, potential legal consequences

5

resulting therefrom, and suggested changes to the structure to come into compliance. Evidence indicates that Fredrick and Hough followed through on little if any of the advice they were given on these issues.

I. RESPONSE TO DEFENDANT'S MOTION IN LIMINE NO. 1

a. *EVIDENCE THE GOVERNMENT WILL SEEK TO INTRODUCE*

The government expects to call Jean Marc Futterknecht ("Mr. Futterknecht") as a custodian of records from UBS. Mr. Futterknecht has executed a Certification of Foreign Records of Regularly Conducted Activity pursuant to Title 18 United States Code §3505 ("Certification"). That Certification states that the documents produced by UBS and referenced therein (1) are original or duplicates of foreign (Switzerland) business records; (2) the records were made at or near the time of the occurrence of the matters set forth by or from information transmitted by, a person with knowledge of those matters; (3) the records were kept in the course of a regularly conducted business activity; and (4) the records were made by the regularly conducted business activity as a regular practice. *See* Certification signed by Jean Marc Futterknecht, Executive Director, UBS AG, on September 26, 2013, attached hereto as Exhibit 1. Mr. Futterknecht is expected to also testify at trial to lay the foundation for the admissibility of UBS documents as foreign business records and will be subject to cross examination by the defense. A portion of the documents which Mr. Futterknecht will testify about include UBS documents entitled "Client CAWB Information," (hereinafter "Client Workbench Notes") some of which were attached as Exhibits A through E to Def's Motion in Limine No. 1. The government proffers to the Court that Mr. Futterknecht will testify to facts relevant to the Client Workbench Notes including the procedure in which the Client Workbench Notes were prepared, maintained and relied upon by UBS in the course of their regularly conducted business.

*b.  LEGAL DISCUSISON*

The Federal Rules of Evidence begin from the proposition that all relevant evidence is admissible.  Fed.R.Evid. 402.  Hearsay, an out of court statement offered in court for the truth of the matter asserted, is generally not admissible.  Fed.R.Evid. 802.  However, Federal Rule of Evidence 803(6) sets forth the business records exception to the hearsay rule.  18 U.S.C. §3505 provides for the admission of foreign business records into evidence as another, similar, exception to the hearsay rule.  The hearsay portion of 18 U.S.C. §3505 was intended to closely track the business records exception set forth in Fed.R.Evid. 803(6) and should be interpreted in the same manner as Rule 803(6).  *United States v. Ross*, 33 F.3d 1507, 1515 (11th Cir. 1994) (citations omitted).

Defendant Hough argues that the Client Workbench Notes contained within documents authenticated as certified business records produced by UBS should not be admitted as Foreign Business Records pursuant to 18 U.S.C. §3505 because (1) they lack trustworthiness; (2) their admission would violate the Confrontation Clause and defendant Hough's due process rights; and (3) the notes contain inadmissible hearsay.

The disputed UBS records will be introduced at trial as business records through a properly executed §3505 certification supplemented by a live custodian.  Courts have routinely upheld the admission of foreign business records accompanied by certification alone.  *Ross*, *supra*, at 1517; *United States v. Strickland*, 935 F.2d 822, 830 (7th Cir. 1991) (§3505 was enacted to create simple, inexpensive substitute for cumbersome, expensive procedure required for admission of foreign business records, *citing* H. Rep. No. 907, 98th Cong., 2d Sess. 3, reprinted in 1984 U.S. Code Cong. & Admin. News.); *see also*, *United States v. Miller*, 830 F.2d 1073, 1077 (9th Cir. 1987) (admission of records pursuant to §3505 does not violate

confrontation clause).  Here, the government is presenting evidence above and beyond that which is required to establish the admissibility of the records of UBS.  It is the position of the government that the UBS records at issue are admissible as non-hearsay business records.  *See*, *Ohio v. Roberts*, 448 U.S. 56, 66 n.8 (1980); *United States v. Massey*, 89 F.3d 1433 (11th Cir. 1996).

          1. <u>Alleged Lack of Trustworthiness</u>

Defendant Hough argues that the Client Workbench Notes should be excluded from evidence because they may have been created by an unindicted co-conspirator who was an employee of UBS which, as asserted by the defense, has an "extensive record of criminal conduct."[2]  The defendant, in essence, claims these records are hearsay because they were not made or authored by either defendant, and the government has not substantiated who actually authored the documents.  The defendant also points to typographical and other similar alleged errors in the Client Workbench Notes as proof that they lack trustworthiness.

Significantly, the defendants do not take issue with the authenticity and business records nature of the rest of the foreign records to be offered, but rather carve out a subset of documents within these foreign business records that are particularly prejudicial to their case because these documents establish evidence of defendant Hough's knowledge of, involvement with, and control over these foreign accounts.

---

[2] The defense argues at page 9 of Def.'s Motion in Limine No. 1 that the information contained in the Client Workbench Notes is unreliable because they were recorded by Dieter Luetolf, an unindicted co-conspirator.  This argument, in and of itself, establishes the basis for admission of the information contained in the Client Workbench Notes in that they are co-conspirator statements.  See discussion, *infra*.

There is no requirement that the government establish when and by whom the documents were prepared or precisely how they were compiled. *United States v.Atchley*, 699 F.2d 1055, 1059 (11th Cir. 1983). The government need only establish that the Client Workbench Notes were prepared at or near the time of the occurrence and based on information prepared by or provided to the bank which it maintained in the ordinary course of business. *See*, *United States v. Bueno-Sierra*, 99 F.3d 375 (11th Cir. 1996). Additionally, courts have not construed the rules so strictly as to require that the business records take a particular form, and have held that documents prepared or communicated by a third party are properly admitted as part of the business entity's records if the business integrated the document into its records and relied on them. *United States v. Hawkins*, 905 F.2d 1489 (11th Cir. 1990); *United States v. Parker*, 749 F.2d 628 (11th Cir. 1984). *See also*, *United States v. Childs*, 5 F.3d 1328, 1333-34 (9th Cir. 1993) (court admitted application for license as record of DMV despite records being made by private company which contracted with DMV and that were adopted as business records of DMV); *United States v. Jakobetz*, 955 F.2d 786, 801 (2d Cir. 1992) (application of business records exception to admit evidence of toll receipts that had been incorporated into records of construction company); *United States v. Sokolow*, 91 F.3d 396, 403 (3d Cir.1996) (explaining that business records exception still applies even though the records were derived from outside sources as long as there are other assurances of accuracy present). The government expects that Mr. Futterknecht will testify that UBS required that these Client Workbench Notes be created and maintained by the client advisors and they were relied upon by UBS in the normal course of its business.

The defense also argues that the government's alleged inability to identify the individual who made statements included in the Client Workbench Notes makes them so unreliable that

they should not be admitted.  This allegation is not supported by the law.  Hearsay contained within otherwise admissible business records is admissible when the "participant in furnishing the information that is recorded was acting routinely, under a duty of accuracy, with employer reliance on the statement or in short 'in the regular course of business'."  *Clark v City of Los Angeles*, 650 F.2d 1033 at 1037 (9th Cir. 1981) (*citing United States v. Pitman*, 475 F.2d 1335 (9th Cir. 1973)).  Banks depend on keeping complete and accurate records and consequently, such records are a common type of business record routinely admitted as an exception to the hearsay rule.  *Miller*, *supra* at 1077 (9th Cir. 1987).  As noted above, either a §3505 certification or testimony of the bank custodian will establish that the Client Workbench Notes are generally always maintained as standard business records, the employees making such records are under a duty to do so accurately, and the bank relies on those records in the course of its regular business.  There is, therefore, no difference between the Client Workbench Notes and any other bank account statements or email and/or bank correspondence for purposes of determining whether the documents are admissible as non-hearsay business records of the bank.

There is also no support for the proposition that the documents must be excluded because they contain alleged inaccuracies.  Any inaccuracies contained within otherwise admissible business records go to the weight of the evidence, not to admissibility.  *United States v. Catabran*, 836 F.2d 453, 458 (9th Cir. 1985); *SEC v. Jasper*, 678 F.3d 1116, 1124 (9th Cir. 2012) (*citing*, *United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999)).  There is no support for the contention that these documents were changed, distorted or manipulated to somehow undermine their inherent characterization as business records.  *See*, *Miller, supra* at 1077-78 (because banks depend on accurate records and no suggestion record were manipulated, records admissible as business records pursuant to §3505).

The government further asserts that other evidence corroborates the information contained in the Client Workbench Notes, thereby lending, in fact, a strong level of reliability to the information contained therein.  Defendant Hough argues that the Contact Notes are vague, unreliable and untrustworthy and provides the Court with several examples that purport to establish just that.  However, in addition to the testimony of the UBS Custodian who will explain the procedures for the creation and maintenance of the contact notes, there is other admissible evidence that corroborates the entries within the Client Workbench Notes and establishes their reliability and trustworthiness.

For example, in Exhibit A to Def's Motion in Limine No. 1, the defendant cites to a note dated July 14, 2003 reflecting a "visit to client."  *See* Def's Exhibit A at p. 2.  Corroborative evidence to establish that the information contained in this entry is reliable and accurate include two Meeting Report forms for Apex Consultants Ltd. and Medical Technology Associates which indicate that a meeting took place at "Westin/Stephanie's" on July 7, 2003 with "D.F. & P.H." where remaining bank documents were signed to open the account, including the derivatives form.  One of the meeting reports also notes that the "monies flowing in" will be "from the sale of medical schools in the Caribbean."  *See* Government's Exhibit 2, page 1 and 2; Meeting Reports.  In addition, the evidence establishes that on July 14, 2003, Hough signed account opening documents.  *See* Government's Exhibit 1, page 3; Supplement for New Account US Status Tax Form US Withholding Tax/Natural Person Assets and Income Subject to United States Withholding Tax Declaration of Non-US Status.

The evidence will also corroborate the e-mail contact dated December 17, 2003.  *See* Def's Exhibit A at p. 2.  The bank records contain the actual email from Defendant Fredrick.  *See* Government's Exhibit 3; December 15, 2003 Email from David Fredrick to Dieter Luetolf.

11

In Def.'s Exhibit C, defendant Hough cites to a June 8, 2004 telephone conference in the Contact Notes. The evidence will show that defendants Hough and Fredrick were contemplating splitting their UBS account held in their joint names into two separate accounts in each of their individual names. *See* Government's Exhibit 4; February 6, 2004 Email from David Fredrick to Dieter Luetolf, cc: Patricia Hough (also corroborating a previous visit with Luetolf, ¶ 1). The email goes on to state that "we are still in the process of finding a buyer for the schools, so in the future we would send equal amounts to deposit into each account." *Id*. Clearly, the June 8, 2004 contact note corroborates and confirms completion of Defendant Hough and Fredrick's intentions as laid out in their February 6, 2004 email.

In Exhibit D, the contact notes indicate a meeting was held with the client on August 30, 2004 where the DOCU proposal was discussed. Evidence to establish the trustworthiness and reliability of this entry include a more detailed contact note in Def's Exhibit C, p. 3 which states that on August 30, 2004, during a visit to the client, there was a "[d]iscussion about portfolio and the cash portion. I suggest that we invest 2 x $500?000 [sic] in DOCU against EUR, one aggressive and the other conservative, renewable for one month periods until further notice." *See* Def's Exhibit C at p. 3. On September 9, 2004, Defendant Fredrick wrote "Place 2 x $500k in Double Currency Units for one month periods, ag [sic] EUR one amount more aggressive (7%) – one amount more conservative (3%)." *See* Government's Exhibit 5; September 23, 2004 Handwritten Note Signed by David Fredrick. David Fredrick emailed Mr. Leutolf on February 8, 2005 stating "Pat said you wanted to tell me about a plan that she was in that I was not…you are not going to let her made [sic] more money than me, are you?" Mr. Lutolf responded that "I think the plan that she was referring to is the double currency (DOCU) which you were in before she was." *See Id*. at p. 2.

12

2. <u>Alleged Violation of the Confrontation Clause and Due Process Rights</u>

Defendant Hough also argues that admission of the UBS Client Workbench Notes would violate the Sixth Amendment Confrontation Clause and the Due Process Clause. This argument is without merit and should be denied. The Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004) held that where the government offers hearsay evidence at trial which is testimonial in nature, the Sixth Amendment Confrontation Clause requires actual confrontation regardless of how reliable the statement may be. The *Crawford* opinion went on to say that its holding did not apply to most traditional hearsay exceptions because they are "covered statements that by their nature would not be testimonial." *Id*. at 54. The *Crawford* opinion provided examples of non-testimonial statements. Those examples specifically included "business records or statements in furtherance of a conspiracy." *Id*. at 56. *See also*, *United States v. Hagege*, 437 F.3d 943, 957-958 (9th Cir. 2006) (holding that "foreign business records admitted under §3505 are not subject to the *Crawford* requirement of confrontation"), *United States v. Jamieson*, 427 F.3d 394, 411-412 (6th Cir. 2005) (holding that business records admitted under Rule 807 did not resemble the "formal statement" or "solemn declaration" identified by the Supreme Court in *Crawford*); *United States v. Lopez-Moreno*, 420 F.3d 420, 436-437 (5th Cir. 2005) (holding that public records are not testimonial and recognizing that, under *Crawford*, business records, which are analogous to public records, are not testimonial and are not subject to the requirements of the Confrontation Clause); *United States v. Ellis*, 460 F.3d 920, 92627 (7th Cir. 2006) (holding that medical records created under police supervision during a criminal investigation were non-testimonial business records and did not implicate the Confrontation Clause; "the mere fact a person creating a business record (or other similar record) knows the record might be used

for criminal prosecution does not by itself make that record testimonial"); *United States v. Dwyer*, 2005 WL 1364839, *9 (D.N.J. 2005) (Unpublished) (business records are not testimonial under *Crawford*, and it follows that admission of testimony of custodian of business records relating to contents of loan file did not violate Sixth Amendment).

Further, a common sense consideration of the statements contained in the Client Workbench Notes leads to the conclusion that they in no way constitute statements that are "testimonial" in nature. The statements at issue here are out of court statements made to civilians, and there is no indication that they were intended to be passed along to authorities or were in any way made in anticipation of litigation. The statements contained in the Client Workbench Notes are not testimonial in nature and their admission would not constitute a violation of the Sixth Amendment Confrontation Clause or the Due Process Clause.

## II. RESPONSE TO DEFENDANT'S MOTION IN LIMINE NO. 2

### a. LEGAL DISCUSSION

The defense argues that the Client Workbench Notes contain multiple levels of hearsay and are not admissible on that basis[3]. The foundation for admission of a co-conspirator statement is that there was a conspiracy involving the declarant and the non-offering party, and that the statement was made during the course of and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E); *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). Courts in the Eleventh Circuit apply a "liberal standard" in determining whether a statement is made in furtherance of a conspiracy. *United States v. Siegelman*, 640 F.3d 1159, 1181 (11th Cir. 2011); *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002). The statement need only be intended to further the

---

[3] The legal discussion herein also responds to the third issue raised in Defendant's Motion in Limine No. 1.

conspiracy, it need not actually do so. *United States v. Roberts*, 14 F.3d 502, 515 (10th Cir.1993); *United States v. Maliszewski*, 161 F.3d 992, 1008 (6th Cir. 1998), *cert. denied*, 525 U.S. 1183, 1184 (1999).

A pre-trial *James* hearing is but one option available for a court faced with an admissibility question regarding a co-conspirator statement. *See United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979), *overruled in part by Bourjaily*, 483 U.S. 171 (1987) (holding that, in deciding whether there is sufficient proof of the existence of a conspiracy and whether the declarant and the defendant were members of the conspiracy, the court should consider the co-conspirator statement(s) which the government is seeking to admit under Rule 801(d)(2)(E)).

The Eleventh Circuit has repeatedly stated that district courts need not hold a pretrial *James* hearing regarding such statements.[4] *See, e.g., United States v. Van Hemelryk*, 945 F.2d 1493, 1498-99 (11th Cir. 1991). In stressing that there is no requirement for such a hearing, the Eleventh Circuit has declared "[t]he district court has discretion to admit the statements subject to proffer of these requirements during the course of the trial." *Id*. at 1498 (citing *United States v. Fernandez*, 797 F.2d 943, 945 (11th Cir. 1986) (internal quotations omitted). Indeed, the Eleventh Circuit has expressly authorized district courts to defer ruling on the admissibility of co-conspirator statements until after all of the evidence has been presented at trial. "Co-conspirator statements can be provisionally admitted subject to the government 'connecting them up' with sufficient evidence." *United States v. Hasner*, 340 F.3d 1261, 1273 (11th Cir. 2003)

---

[4] The government would note that pursuant to the Court's Scheduling Order (Dkt. #22(II)(B) and (C)), the defendant was supposed to file a motion for a *James* hearing within 14 days of the filing of the Scheduling Order. At this late date, and supported by Eleventh Circuit case law and the proffer of evidence herein, the government submits that provisionally admitting the statements subject to connection, including their use in opening statement is both authorized and appropriate. *See Hasner*, 340 F.3d at 1273.

10597343.1

(citing *United States v. Allison*, 908 F.2d 1531, 1533-34 (11th Cir. 1990)).  Moreover, in the unlikely event that the Court determines after-the-fact that certain co-conspirator statements are inadmissible, a curative instruction to the jury would cure any prejudice that may have been caused.  *See United States v. Trujillo*, 146 F.3d 838, 844 (11th Cir. 1998).

A document prepared by a co-conspirator of a defendant may be admitted as an admission under Rule 801(d)(2)(E). *See*, *United States v. Squillacote*, 221 F.3d 542, 563-64 (4th Cir. 2000); *see also*, *United States v. LaHue*, 261 F.3d 993, 1008 (10th Cir. 2001) (discussing the admissibility of documents under Rule 801(d)(2)(E));  *United States v. Moran*, 759 F.2d 777, 786 (9th Cir. 1985) (finding letters and deposit slips signed by the defendant admissible as admissions of a party opponent).  This is true even if the government cannot identify which, among the defendant's many co-conspirators, is actually the declarant.  *United States v. Cruz*, 910 F.2d 1072, 1081 n. 10 (3d Cir.1990).  "Unidentifiability [of the declarant] may be important in some situations, but when the statement itself and the surrounding circumstances provide sufficient evidence of reliability, unidentifiability will not be particularly important.").  *See supra* re: reliability of statements in emails and Client Workbench Notes.

The existence of a conspiracy and the defendant's involvement in it are preliminary questions of fact that are resolved by the trial judge under Rule 104(a).  *Bourjaily*, 483 U.S. at 178.  "In making its determination [the district court] is not bound by the rules of evidence except those with respect to privileges." *Id*.  Further, "[w]hen the relevancy of evidence depends upon fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Fed. R. Evid. 104(b).

10597343.1

1. Evidence Proving the Existence of the Conspiracy and Each Defendants' Knowing Participation

The government will present evidence that Fredrick, Hough, Singenberger and Luetolf were each fully aware of and acted pursuant to a common plan or agreement to defraud the IRS in the ascertainment of Fredrick and Hough's income and tax due and owing by using undeclared bank accounts and nominee entities.

The government's evidence will prove, by a preponderance of the evidence, that the defendants and the unindicted co-conspirators agreed to defraud the United States. Proof of their agreement and participation in the conspiracy, as well as their knowledge of the objective of the conspiracy, will be evidenced, by, among other evidence, the defendants' signatures on various documents, the defendants drafting and receiving correspondence, as well as meetings amongst and between the defendants and unindicted co-conspirators, the defendants receipt of funds from their offshore bank accounts and the use of these funds for the purchase of personal assets, providing false information to their return preparer for preparation of their individual income tax returns, and the filing of false and fraudulent income tax returns with the IRS. The evidence establishes that each defendant and unindicted co-conspirator took steps to further the conspiracy, both separately and together, through the creation of companies, nominee entities and bank accounts, the preparation and signing of documents and checks, the filing of false tax returns, and the use of the funds in the undeclared accounts.

Furthermore, while Fredrick and Hough filed tax returns that elected married filing separate status, the return preparer, Thomas Murtha, will testify that he dealt with both of them and asked them if they had an offshore bank account and they answered "no." This resulted in their failure to report interest in or signature or other financial authority over these bank accounts on their individual income tax returns. They further failed to report the interest income they

earned in these accounts, income diverted from the schools to the accounts, and the ultimate sale of the schools to Murtha for inclusion on their tax returns. Together, Fredrick and Hough also purchased assets and caused payments to be made to themselves for their personal benefit and to family members as gifts using funds in the undeclared accounts. Statements made by Fredrick also establish that they did not want their individual names on transfers back into the United States. Moreover, when it was clear that the banks in the Bahamas and Switzerland were going to begin sharing information with the IRS, Fredrick and Hough caused the bank accounts to be closed and moved to other jurisdictions outside the reach of the IRS.

The proffered evidence proves by a preponderance of the evidence that the actions of each co-conspirator were designed to impede and impair the IRS's ability to correctly determine and assess the defendants' income tax due and owing.

III.   CONCLUSION

The defendant presents no evidence that demonstrates the unreliability of the UBS business records or that UBS would create or rely on inaccurate records in the ordinary course of their business. In fact, Mr. Futterknecht will testify to just the opposite: that it was the regular business practice of UBS to create, rely on and maintain the types of records at issue here.

WHEREFORE, the government requests that the Court (1) deny Defendant Patricia Lynn Hough's Motion in Limine No. 1 to Preclude Introduction of UBS Bank Contact Notes (Docket

#63) and Motion in Limine No. 2 to Preclude Introduction of Co-Conspirator Statements Before All Requirements for Admissibility Have Been Met.

                                        A.  LEE BENTLEY
                                        Acting United States Attorney


                     By:     /s/ Caryn D. Finley
                            CARYN D. FINLEY
                            Trial Attorney, Department of Justice, Tax Division
                            New York Bar No. 3953882
                            2110 First Street, Suite 3-137
                            Fort Myers, Florida  33901
                            Telephone:  (202) 514-5051
                            Facsimile:  (202) 514-0961
                            E-mail: caryn.finley@usdoj.gov


                     By:     /s/ Margaret Leigh Kessler
                            MARGARET LEIGH KESSLER
                            Trial Attorney, Department of Justice, Tax Division
                            2110 First Street, Suite 3-137
                            Fort Myers, Florida  33901
                            Telephone:  (202) 514-5193
                            Facsimile:  (202) 514-9623
                            Margaret.Leigh.Kessler@usdoj.gov

10597343.1

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 3, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing (NEF) to the following:

Bruce L. Udolf
Charles Edward Falk
Brianna L. Abrams

      In addition, I have served copies of this filing on the following parties using email:

Nathan J. Hochman
Daniel Saunders

                                        /s/ Caryn D. Finley
                                        CARYN D. FINLEY
                                        Trial Attorney, Department of Justice,
                                        Tax Division
                                        New York Bar No. 3953882
                                        2110 First Street, Suite 3-137
                                        Fort Myers, Florida  33901
                                        Telephone:  (239) 461-2200
                                        Telephone:  (202) 514-5051
                                        Facsimile:  (239) 461-2219
                                        E-mail: caryn.finley@usdoj.gov

10597343.1