IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.   ) | Case No. 2:13-cr-00072-FtM-JES-UAM |
| ) | |
| PATRICIA LYNN HOUGH, ) | |
| ) | |
| Defendant.   ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT PATRICIA LYNN HOUGH'S RENEWED MOTION TO STRIKE UBS RECORDS**

COMES NOW the United States, by and through counsel, and submits the Government's Response to Defendant Patricia Lynn Hough's Renewed Motion to Strike UBS Records (Def's Motion)[1]. The government respectfully asserts that the defendant's Motion is not supported by the law. In support thereof, the government submits the following:

**A. LAW**

The disputed UBS records were offered into evidence at trial as business records through a properly executed 18 USC §3505 certification, supplemented by a live custodian. The hearsay portion of 18 U.S.C. §3505 was intended to closely track the business records exception set forth in Fed.R.Evid. 803(6) and should be interpreted in the same manner as Rule 803(6). *United States v. Ross*, 33 F.3d 1507, 1515 (11th Cir. 1994) (citations omitted). The government presented evidence above and beyond that which is required to establish the admissibility of the records of UBS and these documents are admissible as non-hearsay business records. *See*, *Ohio v. Roberts*, 448 U.S. 56, 66 n.8 (1980); *United States v. Massey*, 89 F.3d 1433 (11th Cir. 1996).

---

[1] The government hereby incorporates its Consolidated Response to Defendant's Motions in Limine No. 1 and 2 herein.

1

10626449.1

The reliability of business records—and the reason they are excluded from hearsay—"is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation." Fed.R.Evid. 803(6) advisory committee's note; *see also* 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.08[2] (Joseph M. McLaughlin 2d ed. 1997) ("Memoranda that are casual, isolated, or unique do not qualify as business records."). Tracing the business records exception back to its origins, Wigmore emphasized the importance of the requirement that the record in question be made as part of a "habit and system of making such a record with regularity." 5 John Henry Wigmore, Evidence in Trials at Common Law § 1522, at 442 (Chadbourn rev.1974). He explained that the entry must be "part of a series of entries or reports, not a casual or isolated one.... [A] memorandum casually made, would not answer this requirement." *Id*. § 1525, at 446. The Supreme Court in *Palmer v. Hoffman*, 318 U.S. 109, 113–14, (1943), held that the analysis should focus on whether the entries were "made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls" for the business, such as "payrolls, accounts receivable, accounts payable, bills of lading and the like." *Id*.

The Eleventh Circuit has repeatedly said that "[i]t is not essential that the offering witness be the recorder or even be certain of who recorded the item. It is sufficient that the witness be able to identify the record as authentic and specify that it was made and preserved in the regular course of business." *United States v. Atchley*, 699 F.2d 1055, 1059 (11th Cir. 1983) (the proponent of a document ordinarily need not be the entity whose first-hand knowledge was the basis of the facts sought to be proved and there is no requirement that the government establish

when and by whom the documents were prepared or precisely how they were compiled); *see also United States v. Brown*, 553 F.3d 768, 792 (5th Cir. 2008). Furthermore, as long as there is additional circumstantial evidence to support the trustworthiness of the documents, it is not necessary for the individual who prepared the documents to testify. *Itel Capital Corp. v. Cups Coal Co.*, 707 F.2d 1253, 1259 (11th Cir.1983).

Additionally, courts have not construed the rules so strictly as to require that the business records take a particular form, and have held that documents prepared or communicated by a third party are properly admitted as part of the business entity's records if the business integrated the document into its records and relied on them. *United States v. Hawkins*, 905 F.2d 1489 (11th Cir. 1990); *United States v. Parker*, 749 F.2d 628 (11th Cir. 1984); s*ee also United States v. Childs*, 5 F.3d 1328, 1333-34 (9th Cir. 1993); *United States v. Jakobetz*, 955 F.2d 786, 801 (2d Cir. 1992; *United States v. Sokolow*, 91 F.3d 396, 403 (3d Cir.1996) (explaining that business records exception still applies even though the records were derived from outside sources as long as there are other assurances of accuracy present).

In the recent case *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mex.*, 2012 WL 85447 *3 (E.D.La. Jan 11, 2012) the court detailed its FRE 803(6) analysis for e-mails:

> First of all, the email must have been sent or received at or near the time of the event(s) recorded in the email. Thus, one must look at each email's content to determine whether the email was created contemporaneously with the sender's acquisition of the information within the email, Second, the email must have been sent by someone with knowledge of the event(s) documented in the email. This requires a particularized inquiry as to whether the declarant—the composer of the email—possessed personal knowledge of the information in the email. Third, the email must have been sent or received in the course of a regular business activity, which requires a case-by-case analysis of whether the producing defendant had a policy or imposed a business duty on its employee to report or record the information within the email. Fourth, it must be the producing defendant's regular practice to send or receive emails

>that record the type of event(s) documented in the email. This would require proof of a policy of the producing defendant to use email to make certain types of reports or to send certain soils of communications; it is not enough to say that as a general business matter, most companies receive and send emails as part of their business model. Fifth, a custodian or qualified witness must attest that these conditions have been fulfilled—which certainly requires an email-by-email inquiry. Lastly, the objecting defendant is permitted under the rule to argue that the particular email should be excluded due to concerns of lack of trustworthiness, based on the information source underlying the email content or the circumstances under which the email was sent and received. Clearly, there is no across-the-board rule that all emails are admissible as business records.

*Id*.

Hearsay contained within otherwise admissible business records is admissible when the "participant in furnishing the information that is recorded was acting routinely, under a duty of accuracy, with employer reliance on the statement or in short 'in the regular course of business'." *Clark v City of Los Angeles*, 650 F.2d 1033 at 1037 (9th Cir. 1981) (*citing United States v. Pitman*, 475 F.2d 1335 (9th Cir. 1973)).  Banks depend on keeping complete and accurate records and consequently, such records are a common type of business record routinely admitted as an exception to the hearsay rule.  *United States v. Miller*, 830 F.2d 1073, 1077 (9th Cir. 1987).

Any inaccuracies contained within otherwise admissible business records go to the weight of the evidence, not to admissibility.  *United States v. Catabran*, 836 F.2d 453, 458 (9th Cir. 1985); *SEC v. Jasper*, 678 F.3d 1116, 1124 (9th Cir. 2012) (*citing*, *United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999)).  There is no support for the contention that these documents were changed, distorted or manipulated to somehow undermine their inherent characterization as business records.  *See*, *Miller,* at 1077-78 (because banks depend on accurate records and no suggestion record were manipulated, records admissible as business records pursuant to §3505).

## B. EVIDENCE THE GOVERNMENT INTRODUCED AT TRIAL

The government has established that it was UBS's business practice to obtain such information from persons with personal knowledge, the bank relied on it and maintained the records in their ordinary course of business. The government called Jean Marc Futterknecht ("Mr. Futterknecht") as a custodian of records or other qualifying witness from UBS. Mr. Futterknecht executed a Certification of Foreign Records of Regularly Conducted Activity pursuant to Title 18 United States Code §3505 ("Certification") that was admitted into evidence by the Defendant. *See* Government's Exhibit 3A. That Certification states that the documents produced by UBS and referenced therein (1) are original or duplicates of foreign (Switzerland) business records; (2) the records were made at or near the time of the occurrence of the matters set forth by or from information transmitted by, a person with knowledge of those matters; (3) the records were kept in the course of a regularly conducted business activity; and (4) the records were made by the regularly conducted business activity as a regular practice. *See Id.* The Certification specifies documents by Bates numbers which Mr. Futterknecht testified he reviewed in his office in Switzerland; he stated that the documents in his office all had the Bates Numbers as detailed in the Certification. These same Bates Numbered documents make up the records that are included in the contested exhibits. Mr. Futterknecht reviewed the records and stated both in Court and in the Certification that they complied with the requirements under FRE 803(6) and 18 USC § 3505. Furthermore, Mr. Futterknecht testified that it was his understanding that the records were originally produced to the government pursuant to the UBS Deferred Prosecution Agreement.

Mr. Futterknecht detailed the training, the employment requirements for keeping and recording accurate client/account information, the Swiss statutory scheme for creation and

10626449.1

maintenance of the records, the reliance by UBS on the records and the underlying basis for that, and UBS's retention policy concerning these documents. He testified that the records are maintained for ten years from the date of the occurrence and then, to the extent those ten years have not elapsed, ten years from the date of the closing of the account.

The government has more than established the requirements under FRE 803(6) and 18 USC § 3505. The fact that Mr. Luetolf on a handful of occasions made a mistake does not in and of itself make the records unreliable. Defendant Hough can argue the weight of the evidence. As Mr. Futterknecht testified, if Mr. Luetolf, or any client advisor, was systematically making mistakes in filling out the records, failing to comply with client instructions, or carrying out trades or transfers without client consent, Mr. Futterknecht testified that he expected that the employees time with UBS would be short-lived. UBS could not maintain its business if employees were regularly failing to follow the terms of their employment, including the record-keeping requirements.

To argue that the account statements and account opening documents are business records but the emails and other correspondence are not is inconsistent with the Certification and the testimony of Mr. Futterknecht about how and why these documents are created, relied upon and maintained by UBS in the ordinary course of business.[2] UBS is a bank that must, as testified to by Mr. Futterknecht, have instructions from its clients as to the activities carried out in the accounts it maintains and manages. Furthermore, because UBS's employees, including Dieter Luetolf, cannot open, close, execute trades or transfer funds without the express written consent of the contracting party or individual(s) with signature authority, the bank relies on these explicit

---

[2] As detailed in the government's Consolidated Response, the government established how the disputed records are corroborated by other records within that specific exhibit and by the account opening documents and account statements, thus establishing how all three sets of exhibits for each account work hand-in-hand with each other and establish their reliability. This evidence establishes their reliability and trustworthiness

6

instructions, either by phone, email or letter correspondence.  He detailed how the client advisors and the financial intermediaries are required by both their contractual relationship with UBS and by Swiss law to provide accurate and truthful information to UBS.  Mr. Futterknecht further testified that the Client Workbench is used for multiple purposes, including recording pertinent client information for anti-money laundering ("AML") and "Know Your Customer" ("KYC") compliance.  The Workbench also records client meetings at which the accounts may be opened or other instructions provided, emails and phone calls with client.  The emails, correspondence and Client Work Bench are relied upon and maintained by UBS to ensure that the transactions and activities in and surrounding the accounts are executed according to client wishes.

### C. EVIDENCE PROVING THE EXISTENCE OF THE CONSPIRACY AND EACH CONSPIRATORS' KNOWING PARTICIPATION[3]

While the government is not finished presenting its case-in-chief, sufficient evidence has already been admitted at trial to establish that Hough, Fredrick, Singenberger and Luetolf were each fully aware of and acted pursuant to a common plan or agreement to defraud the IRS in the ascertainment of Fredrick and Hough's income and tax due and owing by using undeclared foreign bank accounts and nominee entities.

The government's evidence proves, by a preponderance of the evidence, that the defendants and the unindicted co-conspirators agreed to defraud the United States.  Proof of their agreement and participation in the conspiracy, as well as their knowledge of the objective of the conspiracy, is evidenced, by, among other evidence, 1) the defendants' signatures on account opening documents, 2) the defendants drafting and receiving correspondence, 3) meetings amongst and between the defendants and unindicted co-conspirators, 4) the defendants receipt of

---

[3] Given the fact that the government has not yet finished presenting its case, we reserve the right to present additional evidence and argument to the Court as necessary to establish the existence of the conspiracy and each co-conspirator's knowing participation in it.

funds from their offshore bank accounts, 5) the use of these funds for the purchase of personal assets, 6) providing false information to their return preparer for preparation of their individual income tax returns, and 7) the filing of false and fraudulent income tax returns with the IRS.. The evidence establishes that each defendant and unindicted co-conspirator took steps to further the conspiracy, both separately and together, through the creation of companies, nominee entities and bank accounts, the preparation and signing of documents and checks, the filing of false tax returns, and the use of the funds in the undeclared accounts.

     Furthermore, while Fredrick and Hough filed tax returns that elected married filing separate status, Thomas Murtha, their income tax return preparer testified that he dealt with both of them and asked them directly on two separate occasions if they had "a foreign bank account" to which they answered "no."  This resulted in their failure to report their interest in or signature or other financial authority over these bank accounts on their individual income tax returns.  The government anticipates that the evidence will also establish that Hough and Fredrick failed to report the interest income they earned in these foreign accounts and the ultimate sale of the schools to Murtha for inclusion on their tax returns.  Together, Fredrick and Hough also purchased assets and caused payments to be made for their personal benefit and to family members as gifts using funds in the undeclared accounts and requested that their individual names not appear on wires back into the United States.  Statements made by Fredrick in emails also establish that they did not want their individual names on transfers back into the United States and that when it was clear that the banks in the Bahamas and Switzerland were going to begin sharing information with the IRS, Fredrick and Hough caused the bank accounts to be closed and moved to other jurisdictions outside the reach of the IRS.

The proffered evidence proves by a preponderance of the evidence that the actions of each co-conspirator were designed to impede and impair the IRS's ability to correctly determine and assess the defendants' income tax due and owing.

### D. CONCLUSION

Defendant Hough presents no evidence that demonstrates the unreliability of the UBS business records or that UBS would create or rely on inaccurate records in the ordinary course of their business. In fact, Mr. Futterknecht testified to just the opposite: that it was the regular business practice of UBS to create, rely on and maintain the types of records at issue here, that it expects its employees to abide by these business practices, that it is required by Swiss law to maintain these records and that UBS relies on these types of records to carry out its business – namely to manage client accounts and keep accurate records of the requested transactions.

//
//
//
//
//
//
//
//
//
//
//
//

10626449.1

WHEREFORE, the government requests that the Court deny defendant's Renewed Motion to Strike UBS Records.

                          A. LEE BENTLEY
                          Acting United States Attorney

By:   /s/ Caryn D. Finley
       CARYN D. FINLEY
       Trial Attorney, Department of Justice, Tax Division
       New York Bar No. 3953882
       2110 First Street, Suite 3-137
       Fort Myers, Florida 33901
       Telephone: (202) 514-5051
       Facsimile: (202) 514-0961
       E-mail: caryn.finley@usdoj.gov

By:   /s/ Margaret Leigh Kessler
       MARGARET LEIGH KESSLER
       Trial Attorney, Department of Justice, Tax Division
       2110 First Street, Suite 3-137
       Fort Myers, Florida 33901
       Telephone: (202) 514-5193
       Facsimile: (202) 514-9623
       Margaret.Leigh.Kessler@usdoj.gov

10626449.1

**CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing (NEF) to the following:

Bruce L. Udolf
Charles Edward Falk
Brianna L. Abrams

In addition, I have served copies of this filing on the following parties using email:

Nathan J. Hochman
Daniel Saunders

/s/ Caryn D. Finley
CARYN D. FINLEY
Trial Attorney, Department of Justice,
Tax Division
New York Bar No. 3953882
2110 First Street, Suite 3-137
Fort Myers, Florida  33901
Telephone:  (239) 461-2200
Telephone:  (202) 514-5051
Facsimile:  (239) 461-2219
E-mail: caryn.finley@usdoj.gov