UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

_____

THE UNITED STATES OF AMERICA,

             Plaintiff,

                                      Fort Myers, Florida
vs.                                October 08, 2013

PATRICIA LYNN HOUGH,              4:47 p.m.

             Defendant.

_____

TRANSCRIPT OF JURY TRIAL, DAY ONE

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:     U.S. Department of Justice
                              Tax Division
                       P.O. Box 813
                       Washington, DC  20044
                       BY:  CARYN FINLEY, ESQ.

                       U.S. Department of Justice
                       Tax Division
                       Suite 7334
                       601 D Street NW
                       Washington, DC
                       BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

                         A P P E A R A N C E S
                      (Continued From Previous Page)


FOR THE DEFENDANT:        Bingham McCutchen, LLP
                          The Water Garden
                          1601 Cloverfield Boulevard
                          Suite 2050 North
                          Santa Monica, CA  90404-4082
                          (310) 904-1000
                          BY:  NATHAN J. HOCHMAN, ESQ.

                          Bruce L. Udolf, PA
                          500 East Broward Boulevard
                          Suite 1400
                          Fort Lauderdale, FL  33394
                          (954) 858-8831
                          BY:  BRUCE L. UDOLF, ESQ.

REPORTED BY:              JEFFREY G. THOMAS, RPR-CP, CRR
                          Official Federal Court Reporter
                          United States Courthouse
                          2110 First Street, Suite 2-194
                          Fort Myers, FL  33901
                          (239) 461-2033


                            *  *  *

I N D E X

October 8, 2013                                    Vol.    Page

Preliminary Discussions                              1       4

Opening Statement by Ms. Kessler                     1       4

Opening Statement by Mr. Saunders                    1      13

– – –

GOVERNMENT'S WITNESSES

| WITNESS | DIRECT Vol. Pg. | CROSS Vol. Pg. | REDIRECT Vol. Pg. | RECROSS Vol. Pg. | VOIR DIRE Vol. Pg. |
|---|---|---|---|---|---|
| J. MARC FUTTERKNECHT | 1   61 | | | | |

– – –

GOVERNMENT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Government's Exhibit 3R Admitted in Evidence | 1 | 75 |

– – –

|  | Vol. | Page |
|---|---|---|
| Court Recessed for the Day | 1 | 82 |

* * *

1      FOLLOWING JURY VOIR DIRE, the jury having been selected

2  and duly sworn, the above-entitled case having been called to

3  order, the following proceedings were held herein, to-wit:

4                            - - -

5      MS. KESSLER:  May it please the Court, ladies and

6  gentlemen of the jury, counsel, this is a case about fraud,

7  fraud on the United States Treasury and the United States -- or

8  excuse me -- the Internal Revenue Service, in the amount of ten

9  and a half million dollars.

10      The defendant and her co-conspirators took well-timed

11  steps to carry out their conspiracy to defraud, including the

12  use of offshore bank accounts, the use of nominee entities, and

13  the filing of false individual income tax returns.

14      The evidence will show that the defendant,

15  Dr. Patricia Hough, and her husband, Dr. Fredrick, founded,

16  owned, and controlled medical schools in the Caribbean.  Those

17  schools became very successful and profitable, and were by all

18  accounts well respected.

19      One of those schools was the Saba University School

20  of Medicine.  That school was owned by a nonprofit foundation.

21  The evidence will show that the defendant, Dr. Fredrick, and --

22  excuse me, the defendant and her husband, Dr. Fredrick, owned

23  and controlled The Foundation, as well as the Saba University

24  School of Medicine.  The two other schools were known as the

25  Medical University of the Americas.  That had two locations;

1    one in Belize, and one in Nevis.

2              The evidence will show that, in 2007, the defendant

3    and Dr. Fredrick sold the schools and the assets of the

4    schools, including the land and buildings, for more than

5    $37 million.  The defendant and Dr. Fredrick did not report the

6    majority of the money they received from that sale on their

7    income tax returns, and they did not pay tax on it.

8              The defendant is charged with two crimes.  The Judge

9    will give you instructions at the end of the case as to the law

10   that you must follow to reach your verdict.

11             First, the defendant is charged with conspiracy to

12   defraud the United States.  A conspiracy is an agreement

13   between two or more people to accomplish an unlawful plan.  The

14   defendant must have known the unlawful purpose of the plan and

15   willfully joined it.  During the course of the conspiracy, one

16   of the conspirators must commit an overt act to further the

17   objective of the conspiracy.  The evidence you will hear will

18   prove all these things beyond a reasonable doubt.

19             Second, the defendant is charged with filing false

20   individual income tax returns for the years 2005, 2006, 2007,

21   and 2008.  The evidence will show that the defendant falsely

22   stated on these income tax returns that she did not have an

23   interest in, or signature authority over, a financial account

24   in a foreign country.

25             The evidence will show that the defendant, in fact,

OPENING STATEMENT BY MS. KESSLER                6

1    had an interest in, or signature authority over, at least eight

2    separate financial accounts in Switzerland and Liechtenstein.

3    The evidence will show that the defendant also filed false

4    income tax returns for these years because she did not report

5    the interest and investment income that she earned in those

6    undeclared foreign accounts.

7            The defendant's 2007 individual income tax return

8    will also be shown to be false because she did not report as

9    income the more than 37 million -- or she did not report the

10   sale of the medical schools, that transaction, which involved

11   more than $37 million.

12           As you listen to the evidence, pay careful attention

13   to the timing of events.  As the old adage goes, timing is

14   everything.  The timing of acts taken by the defendant after

15   significant events evidences and reveals her intent and

16   knowledge.

17           You will hear that, in 1988, the defendant and

18   Dr. Fredrick founded Saba University School of Medicine

19   Foundation.  The defendant and Dr. Fredrick owned the

20   Foundation.

21           The Foundation, in turn, owned Saba University School

22   of Medicine.  The school became operational in 1993.  The

23   defendant served on the board of directors and the board of

24   trustees, and she was also the dean of clinical medicine for

25   the school.  Dr. Fredrick was the president and director of the

1    Foundation.

2          The defendant and Dr. Fredrick opened and undeclared

3    foreign account at UBS, a bank in Switzerland, in the name of

4    the Foundation.  The defendant and Dr. Fredrick had signature

5    authority over that account, and also identified themselves as

6    beneficial owners of that undeclared account.

7          You will hear evidence that Medical University of the

8    Americas was a for-profit corporation that was established in

9    1999.  Medical University of the Americas, or MUA, operated a

10   medical school on the island of Nevis, in the West Indies.

11   They also operated another in Belize.

12         The defendant served as a director of MUA and a

13   director of accreditation.  Dr. Fredrick owned a majority of

14   the shares of MUA, and was a director of MUA.

15         The defendant and Dr. Fredrick opened an undeclared

16   account, again at UBS in Switzerland, in the name of MUA.  The

17   defendant and Dr. Fredrick, again, had signature authority over

18   that account, and they again identified themselves as

19   beneficial owners of that account.

20         You will hear evidence that the defendant, along with

21   Dr. Fredrick, their financial adviser, Beda Singenberger, and

22   their UBS banker, Dieter Luetolf, conspired to use nominee

23   entities, including foreign entities and the Saba Foundation,

24   for the following purposes:  They did so to hide from the IRS

25   that the defendant and Dr. Fredrick owned the Saba University

1    School of Medicine Foundation and MUA; they did so to hide from

2    the IRS the diverted income they received from the schools;

3    they did so to hide from the IRS the income they received from

4    the sale of the schools for $37 million; and they did so to

5    hide from the IRS the interest and investment income they

6    earned in the undeclared foreign bank accounts in the name of

7    the schools and other nominee entities.

8           During a period of approximately ten years, the

9    defendant and Dr. Fredrick opened offshore bank accounts in

10   their joint names, in their individual names, and in the name

11   of nominee entities such as Apex, Top Fast, New Vanguard, and

12   Medical Technology Associates.

13          You will see evidence that these nominee entities

14   served no business purpose other than to receive and to hide

15   the unreported income of the defendant and Dr. Fredrick.  The

16   defendant and Dr. Fredrick had signature authority over these

17   accounts, they identified themselves as beneficial owners of

18   these accounts, and the defendant did not report the existence

19   of these accounts on her individual income tax returns as she

20   was required to.

21          You will also hear that the defendant and her husband

22   used these nominee entities and others, such as Lynn, Leon &

23   Lyon Group, LLC, to hide their true ownership of assets and

24   real property.

25          You will hear evidence that the defendant and

1    Dr. Fredrick caused their undeclared foreign accounts to be

2    closed in jurisdictions where circumstances were changing and

3    they believed there was a likelihood of IRS scrutiny of the

4    accounts.

5            You will also hear that the defendant and her

6    husband, once aware of this likelihood, moved those accounts to

7    other jurisdictions where they believed they would be shielded

8    from disclosure to the IRS.

9            Witnesses will tell you that the defendant and

10   Dr. Fredrick did not disclose the existence of the vast

11   majority of these accounts to them.  These witnesses include

12   the defendant's income tax return preparer, Thomas Murtha;

13   auditors, Jerome Schneider and Jeffrey Gallant; the in-house

14   accountant for the schools, David Minchenberg; and the

15   purchaser of the school, Steven Rodger.

16           You will hear evidence that, in 2007, Dr. Fredrick

17   and the defendant sold the Saba School of Medicine and MUA for

18   more than $37 million to Equinox Capital.  Mr. Steven Rodger

19   will testify about the details of that sale.  You will hear

20   that Dr. Fredrick directed the apportionment of the funds from

21   the sale of the schools among entities controlled by he and the

22   defendant.

23           A large part of the funds from the sale of Saba and

24   MUA were allocated to the sale of the land on which Saba

25   University sat.  You will hear from Laura Whitley,

1   Dr. Fredrick's daughter.  She will testify that, in 1999, the

2   defendant and Dr. Fredrick made it appear that she purchased

3   the land where Saba was located for one quarter of a million

4   dollars.  The land was referred to as Round Hill.  You will

5   hear that the defendant and Dr. Fredrick each owned half of the

6   outstanding shares of an entity called Round Hill Project

7   Holding Company.  You will then hear that the defendant and

8   Fredrick caused Ms. Whitley to sell the property to Round Hill

9   Project Holding Company for $17,000.  This sales price was

10  substantially below the price of a quarter-million dollars paid

11  in the original purchase by Ms. Whitley on behalf of the

12  defendant and Dr. Fredrick.

13          The defendant and Dr. Fredrick then sold their shares

14  of Round Hill Holding Company to New Vanguard, another entity

15  that the defendant and Dr. Fredrick controlled.  When the

16  schools were sold, the shares of Round Hill Project Holding

17  Company owned by New Vanguard were valued at $34 million.

18          Despite owning and controlling New Vanguard, and New

19  Vanguard having received $34 million for the shares of Round

20  Hill Holding Company, the defendant and Dr. Fredrick did not

21  report this sale on their income returns and paid no tax on

22  this transaction.

23          Finally, you will hear evidence of money moved

24  between and among the undeclared foreign accounts in their

25  names, and in the names of the nominee entities controlled by

1    the defendant and Dr. Fredrick.  These transfers, carried out

2    at the direction of the defendant and Dr. Fredrick, allowed the

3    defendant and Dr. Fredrick to make personal purchases.  Those

4    included the purchase of a condo in Sarasota, Florida, in the

5    name of Lynn, Leon & Lyon Group, using at least $800,000 from

6    an undeclared account at UBS in the name of Top Fast.

7            This also included the purchase of a home in

8    Asheville, North Carolina, again in the name of Lynn, Leon &

9    Lyon Group, using $1.1 million from an undeclared account at

10   UBS in the name of New Vanguard.

11           They also purchased land next to that Asheville,

12   North Carolina, home.  That purchase again was made in the name

13   of Lynn, Leon & Lyon Group, using $200,000 from an undeclared

14   foreign account in the name of New Vanguard.

15           Another personal purchase was the purchase of a home

16   in Greenville, North Carolina, in the name of Ample Dynamic,

17   using $590,000, again from an undeclared foreign account in the

18   name of Top Fast and Dy- -- Ample Dynamic.  Excuse me.

19           They placed a deposit on an airplane in the name of

20   Top Fast.  They purchased a plane in the name of Dr. Fredrick

21   and Ample Dynamic, using $1.6 million from undeclared foreign

22   accounts in the name of New Vanguard and Ample Dynamic.

23           They paid personal expenses from funds transferred

24   from undeclared foreign accounts to their individual accounts

25   in the United States, and made gifts to family members.

1          Ladies and gentlemen, pay careful attention to the

2     details of this case.  Remember that not every member of a

3     conspiracy must play a lead role, not everyone does the

4     speaking all of the time.  Pay attention to the timing of

5     events and the details of events.  Pay attention to what the

6     defendant and her co-conspirators say at the time that

7     transactions take place.  Pay attention to what the defendant

8     and her co-conspirators say about ownership.  Pay attention to

9     control and use of the funds.  Pay attention to demonstrated

10    knowledge of transactions.

11         These things will show what is really happening.

12    They will show that the defendant owned the medical schools

13    along with her husband, Dr. Fredrick.  They will show that the

14    defendant, along with her husband, owned and controlled the

15    foreign bank accounts that were opened in varied names and

16    jurisdictions.

17         Timing and their actions will show that the defendant

18    conspired with her husband, Dr. Fredrick, with Beda

19    Singenberger, and with Dieter Luetolf, to defraud the United

20    States Treasury and the IRS.  Timing and her actions will show

21    that the defendant and her husband filed false income tax

22    returns that were false because they did not report the

23    existence of these accounts, they did not report her financial

24    interest and signature authority over them.  They were false

25    because they did not report the interest and investment income

1   from those foreign accounts.

2            Timing and the actions will show that the defendant

3   willfully failed to report her share of the proceeds from the

4   more than $37 million received from the sale of the schools on

5   their individual income tax returns.  At the conclusion of this

6   case, Ms. Finley will have a chance to speak with you again,

7   and the government will ask you to return the only verdict that

8   the evidence supports, guilty on all counts in the indictment.

9            Thank you for your careful attention, thank you for

10  serving as jurors.

11           THE COURT:  Thank you.

12           Mr. Hochman?

13           MR. HOCHMAN:  Yes, Your Honor.

14           Could we have just a moment to set up?

15           We're going to need a screen.

16           THE COURT:  You may.

17           (The projector was turned on.)

18           MR. SAUNDERS:  May it please the Court, counsel; good

19  afternoon, ladies and gentlemen.

20           Ms. Kessler, the prosecutor, just told you what she

21  thinks this case is about.  Now I'm going to do the same.

22           Can you stand up?

23           This is Dr. Patricia Hough.  Dr. Patricia Hough is

24  who this case is about, because she is the one that the

25  government has decided to charge with five serious crimes:

1    Conspiracy to defraud the United States, and four counts of

2    filing false tax returns.

3            This 67-year-old physician, teacher, and public

4    servant, who has never had any problems with the law in her

5    entire life, is the one who the government will ask you to

6    believe was so cunning and devious and clever and diabolical

7    that she conspired, with her husband, with a financial adviser,

8    with a Swiss banker, to steal -- I think it will turn out, when

9    you hear the government's IRS witness -- almost $50 million.

10           Miss Kessler talked about 37 million.  I think, when

11   you hear the IRS agent's calculation, it's higher than that.

12   $50 million, to steal that from her own charitable foundation,

13   to hide it in her secret Swiss bank accounts, and then to

14   commit tax fraud for four consecutive years.  That is, in

15   essence, what the government told you the evidence in this case

16   will show.  That is the government's theory.

17           Well, ladies and gentlemen, I am here this afternoon

18   to tell you that the evidence in this case will show that the

19   government's theory is absurd, and that the government, in this

20   case, is flat-out, 100 percent wrong, wrong about who Pat Hough

21   is, wrong about what Pat Hough did, wrong about what Pat Hough

22   knew, even wrong about the most basic fact about whether there

23   was any theft from that foundation at all.

24           Now, as the Judge told you, nothing that Miss Kessler

25   said and nothing that I'm saying here today is evidence.  We're

1    just tell you what we expect the evidence will be.  So let me

2    tell you now what we expect you to learn about Dr. Patricia

3    Hough during this trial, and what we expect the evidence to be,

4    and not to be, with respect to the charges against her.

5           First thing you are going to learn about Pat Hough --

6    something that's very important, given what she's charged with

7    in this case -- is that she's never been about gathering wealth

8    or material possessions for herself, not in the least.  In

9    fact, it's quite the opposite.  You'll learn that, for a

10   doctor, she lives a very simple, modest life.  She doesn't

11   drive a Mercedes, she drives a ten-year-old Volvo.  When she

12   travels, she doesn't say in the Ritz Carlton or the Four

13   Seasons, she stays in the Best Western or the Econo Lodge.  She

14   doesn't wear fancy clothes or buy fancy jewelry.

15          For the past four and a half years she has chosen to

16   work for low pay for the Sarasota County Department of Public

17   Health, providing psychiatric services to the uninsured, the

18   poorest and neediest in the system.  On those occasions in her

19   life when she's had a little extra money, she's donated,

20   usually to the college that she attended herself on a

21   scholarship, that has a scholarship fund.

22          Because you will learn in this trial, from witness

23   after witness, including the government's own witnesses, that

24   Pat Hough's life has always been about how many people she can

25   help, how many lives she can change.  That has been the story

1   of her life for the past 67 years.

2            Pat was born in 1946 --

3            THE COURT:  Counsel; surnames, please.

4            MR. SAUNDERS:  Thank you, Your Honor.

5            -- was born in 1946, in Youngstown, Ohio.  She grew

6   up in a housing projects of the inner city, started working

7   when she was 16, in 1962.  And then she got her first good

8   break, when someone took a chance on her.  Because she was

9   smart, and hard working, and dedicated to her community, her

10  church gave her a scholarship to attend Phillips University,

11  which is a church college located in Enid, Oklahoma.

12           Without that opportunity, Pat Hough would have had a

13  very different life.  But she received a gift, the gift of an

14  education.  And that gift, you will hear, implanted in her a

15  lifelong desire to give back, to pay it forward.

16           She worked her way through college, working 20 to

17  30 hours a week, working every summer, to pay the costs that

18  the scholarship didn't cover.  She worked in the school

19  cafeteria.  On weekends she scrubbed toilets in motel rooms.

20           And when she graduated from Phillips University in

21  1968, she didn't seek out some high-paying job.  She started

22  work as a social worker at a state school for the mental

23  handicapped in Enid, Oklahoma, where she had done some

24  volunteer work while in college.

25           She continued her education on scholarship.  She got

1    her master's in social work and her doctorate.  And she got

2    herself teaching jobs, first at Inner City Community College in

3    Chicago, and later on at the University of Texas in El Paso.

4              And Pat Hough loved being a teacher and a social

5    worker because it allowed her to have a hands-on real effect,

6    and an impact, and improve people's lives.

7              But one of her dreams, you will hear, had always been

8    to be a doctor.  She had an opportunity to go to medical school

9    straight out of college, where she studied premed.  But she

10   didn't have the money, and her father was sick, and she had to

11   go to work.  So she deferred that dream for 15 years.

12             Now, she didn't want to be a doctor to be some rich

13   plastic surgeon in New York City.  He goal was always to figure

14   out how many people she could help, and how to help the people

15   who were most in need.

16             She finally got an opportunity, when she was 37 years

17   old, to go to medical school on a full scholarship at a school

18   called Ross University, which is on the island of Dominica in

19   the Caribbean.

20             She got her M.D. at Ross University, and she got

21   something else.  Because while she was at Ross, she met

22   Dr. David Fredrick, who was a teacher there, and they got

23   married one year later.

24             Dave Fredrick, you will hear, I expect, in this

25   trial, was a couple of years older than Pat Hough, and he also

1    came from very simple and very poor beginnings.  He also, like

2    her, grew up in the housing projects, in this case in

3    Wisconsin.  His father abandoned the family when he was just an

4    infant.  His mother remarried and gave him four half-siblings.

5    He had to drop out of high school in tenth grade to go to work,

6    to help support his family.  And then he joined the Army when

7    he was 17 years old.

8           And although he never graduated high school, he got

9    to go to college on veterans loans.  And through further grants

10   he continued his education.  He got his master's and his

11   doctorate in counseling psychology.

12          He's called Dr. Fredrick, but he's not a medical

13   doctor, like Dr. Hough is.  He's a Ph.D.

14          Now, both Dr. Fredrick and Dr. Hough came from

15   nothing.  Both of them have worked hard their entire life, and

16   both of them deeply value education, and appreciated the

17   educational gifts that they had been given.  And both of them

18   wanted to find a way to pass that on to others.

19          Now, I told you that Pat Hough's dream was to be a

20   doctor.  Well, you will hear Dave Fredrick had a dream, too,

21   and that was to start a medical school.  He knew that there was

22   an urgent need for medical doctors in the United States, and he

23   knew that there was a shortage of affordable U.S. medical

24   schools to train and provide those doctors.  And he wanted to

25   be able to provide a quality affordable medical school

1   education to anyone who wanted it.

2           Dave Fredrick supported Pat Hough in fulfilling her

3   dream, and she supported him in fulfilling his.  While

4   Dr. Fredrick was teaching at Ross University, he was contacted

5   by the government of the island of Saba, in the Caribbean,

6   about developing a medical school there.  Now, Saba, you don't

7   know exactly where it is, is the smallest of a series of six

8   islands that, up until just a couple of years ago, made up an

9   independent country called the Netherlands Antilles, which was

10  part of the Kingdom of the Netherlands.  And the Netherlands

11  Antilles actually dissolved and broke up in 2010, but Saba

12  still exists as a municipality of the Netherlands.  It's not

13  part of the United States.

14          In 1986, Dave Fredrick reached an agreement with the

15  government of Saba to build a medical school on the island.  At

16  that time you will hear that Saba was one of the smallest, most

17  undeveloped islands in the Caribbean, had a population of about

18  1,500.

19          And as you can imagine, this was quite an

20  undertaking, to build a medical school where there was nothing.

21  They had to build a campus; to set up a curriculum; to set up

22  an infrastructure; to get the equipment; to get approved by the

23  World Health Organization in order to function as a medical

24  school; and to attract teachers, administrators, and perhaps

25  most importantly, students.

1          To build a school from nothing on a tiny undeveloped

2    island in the Caribbean was the longest of long shots.  And

3    Dave Fredrick, with Pat Hough's help, worked on it for seven

4    years, just trying to get it off the ground.

5          He would go shopping here in the United States for

6    supplies, everything from desks to x-ray machines to toilet

7    paper.  And he'd pack up these big shipping containers and send

8    them down to Saba.

9          And you'll hear that Dave Fredrick was a pilot, and

10   he had his own little plane, a little Beechcraft.  And he would

11   fly it back and forth to Saba, to meet with people and set up

12   the school, and try to get his dream going.

13         And what was Pat Hough doing at this time?  She was

14   focusing on the academic side of the school.  Remember, she was

15   the teacher, she was the doctor.  I don't know if any of you

16   are familiar with medical schools or have family members who

17   are doctors, but how it basically works is, it's a four-year

18   curriculum.  That's true of most U.S. medical schools, and it

19   was true on Saba.

20         The first two years, medical students spend in the

21   classroom studying what are called the basic sciences,

22   everything from biology to biochemistry, to neurology, anatomy,

23   all of the basic sciences.

24         And then your third and fourth years, you apply to do

25   what are called "clinical rotations" at hospitals.  You're

1   getting hands-on training and working directly with doctors and

2   with patients.  And medical students in their third and fourth

3   years do those clinical rotations in areas including pediatrics

4   and surgery and clinical medicine and other specialties.

5           And then when you graduate at the end of four years,

6   you do what's called a residency, which many students end up

7   doing at the same hospitals where they did their rotations as

8   medical students.

9           Now, hospitals don't have to accept just anyone from

10  any school for rotations or for residencies.  So it's very

11  important for any medical school, particularly a school that is

12  just starting out, to establish and maintain relationships with

13  hospitals, so that when their students reach the third and

14  fourth year, they have some place to go to do their rotations.

15          And that, ladies and gentlemen, was Pat Hough's job.

16  She was the dean of clinical medicine for the school.  And at

17  Saba University School of Medicine, the students would spend

18  their first two years on the island, taking classroom

19  instruction, and then they would spread out to do their

20  clinical rotations across the United States, at hospitals where

21  the school had relationships.

22          So most of what Pat Hough did in those early days

23  when the school was being put together was visit hospitals.

24  She was traveling back and forth between Augusta, Georgia,

25  where she was completing her own residency, and the Netherlands

1   Antilles, and Chicago and Baltimore and New York, visiting

2   hospitals, meeting with administrators, educating them about

3   the plans for the school, so that when that first class of

4   students came in and reached their third year, they would have

5   some place to go to do their clinicals.

6        Now, you will learn that Dave Fredrick and Pat Hough

7   not only put their time and sweat into building the school,

8   they put their money into it, too.  They put in their limited

9   savings.  And when they were short on money, Pat took a -- Pat

10  Hough, excuse me -- took a 100,000-dollar inheritance which she

11  had just received from an aunt who had just passed away

12  childless, and she took that inheritance and put the entire

13  $100,000 into the school because she believed in her husband's

14  dream, and they both believed, like in that movie, "Field of

15  Dreams," if you build it, they will come.  And they absolutely

16  right.

17       Saba University School of Medicine opened its doors

18  in 1993.  And you will hear that, over the next several years,

19  it became one of the most successful and highly regarded

20  Caribbean medical schools ever.  And it still is today.

21       That didn't happen overnight.  In 1993, when they

22  opened, they had a class of about 20 students taking classes in

23  one building that was leased from the government of Saba.

24       By 2004, due to the continued hard work of Pat Hough

25  and her husband, Dave Fredrick, the school had over

1    500 students, a faculty of 27, and a campus of 12 buildings.

2    In fact, the school was so successful that, in 2007, the Saba

3    School of Medicine and its sister school, MUA, were purchased

4    for a total of over $40 million.  And we'll get back to that in

5    a little while.

6              Now, let me make one thing very clear here.  Some of

7    you might come in to the jury with certain preconceptions or

8    biases about a Caribbean medical school.  And you'll hear there

9    were, in fact, plenty of schools that were set up and that

10   failed over these same years, mostly because they were all

11   about making money, and because they didn't have the academic

12   programs and standards that would allow students to pass their

13   medical board exams, and because they didn't have the

14   relationships with hospitals that would allow students to do

15   their clinical rotations and do their residencies at hospitals

16   in the United States.  So people would end up graduating from

17   these schools with worthless diplomas.

18             Saba School of Medicine, I don't think there will be

19   any dispute in this trial from either side, was different.  You

20   will hear throughout this trial that the Saba University School

21   of Medicine is a completely legitimate, recognized, and

22   accredited medical school whose graduates can do rotations and

23   practice medicine anywhere in the United States, and in Canada,

24   and in Europe.

25             Although you'll hear that other Caribbean medical

1   schools had a first-time passage rate for the medical boards of

2   about 15 percent, the Saba University School of Medicine

3   passage rate was in the nineties, year and after year.  And

4   you'll hear that was mostly through the hard and dedicated work

5   of Pat Hough and Dave Fredrick.

6          Now, the evidence will show that the two of them did

7   different jobs and they focused on different things.  Dave

8   Fredrick, as president of the school, was responsible for the

9   business affairs, for the day-to-day operations of the school.

10  And Pat Hough was responsible for running the academic side.

11         And in addition to visiting hospitals and setting up

12  those relationships for clinical rotations, Pat Hough was also

13  responsible for securing accreditations from the U.S.

14  Department of Education, and from individual states in the U.S.

15         And you'll hear about accreditation in this trial.

16  Generally what that's all about is that when medical students

17  graduate, if they want to be licensed to practice in a

18  particular state, they have to meet the requirements of the

19  medical board in that state.  There are 50 different medical

20  boards in the U.S., and each one of them has separate

21  requirements for accreditation and licensing.  And particularly

22  when you're dealing with a foreign medical school, if you

23  you've been accredited by that state, then it makes the

24  licensing process much easier because it means that the state

25  has already inspected this medical school and has found that

1    its standards and its curriculum are on a par or comparable

2    with medical schools in the United States.

3            They set up visits.  The medical board, the

4    accreditation board comes down to the school, they inspect the

5    facilities, they sit in on classes, they interview students.

6    And the accreditation standards of the U.S. Department of

7    Education and the individual states are among the highest in

8    the world.  You'll hear that some states, including California

9    and New York, have even higher standards than the other states,

10   especially with respect to international medical schools.

11           So Pat Hough's main job for the school, and what she

12   spent most of her time doing, was really sort of an academic

13   ambassador.  As I said, she would be traveling around meeting

14   with hospitals and trying to establish relationships to set up

15   clinical rotations for Saba students.  And she was also meeting

16   with the state accreditation boards and the U.S. Department of

17   Education, giving them information about the school, setting up

18   and managing accreditation visits.

19           And ultimately, by 2004, just 11 years after it had

20   opened its doors with that small class of 20 students, Pat

21   Hough got the Saba School of Medicine accredited by the U.S.

22   Department of Education, by the toughest states in the United

23   States, including New York and California, so that Saba

24   students could be licensed to practice medicine from coast to

25   coast, and in Canada, and as I said, even in the EU, where Saba

1    is the only Caribbean medical school to satisfy the strict

2    European standards for accreditation.

3              Now, that is a phenomenal achievement for any medical

4    school, let alone an offshore medical school, let alone one as

5    new as Saba School of Medicine.

6              Another thing that you will learn that made the Saba

7    school different from those other Caribbean medical schools is

8    that while a lot of those other schools, as I said, were all

9    about making money, Saba University was a not-for-profit

10   school, set up and run by a nonprofit foundation called the

11   Saba School of Medicine Foundation.

12             And you'll be hearing a lot about that foundation

13   during this trial.  It is a nonprofit foundation set up and

14   governed by Netherlands Antilles law.  And one of the purposes

15   of this nonprofit Saba foundation was to make sure that the

16   Saba school kept functioning, that it was adequately funded.

17             And the Saba foundation also funded other charitable

18   works.  It shipped medical equipment to needy hospitals in

19   Central America, and it set up treatment and testing programs

20   for the needy and the poor in Central American countries.

21             And you'll hear that, even though the Saba school, as

22   I said, was sold in 2007, the Saba Foundation continues to

23   operate today, and continues to provide and perform important

24   work for thousands and thousands of needy people throughout

25   Central America.

 1          Now, one very important thing to realize, that you

 2     will learn from the evidence in this case, about a nonprofit

 3     foundation is that no one owns it.  Miss Kessler said, I think

 4     four or five times, Dr. Fredrick and Pat Hough owned that

 5     foundation.

 6          No one can own a foundation.  It is not like a

 7     company that issues shares.  It is like the American Red Cross.

 8     No one owns the Red Cross.  It's a nonprofit, it's run by a

 9     board of directors that has the responsibility to oversee The

10     Foundation and make sure that it runs correctly and that it

11     carries out its mission.

12          That board of directors for the Saba Foundation at

13     various times included Dr. Fredrick, some of the other doctors

14     who were involved as teachers from the school, a couple of

15     Dr. Fredrick's family members, and representatives from the

16     government of Saba.  And you'll hear that Pat Hough was only

17     involved with that board of directors for a very short time in

18     its early existence.  Because again, she was busy traveling and

19     handling the academic side of the school.  That's what she did.

20          Now, as far as being a nonprofit, you will hear in

21     this trial that the Saba School of Medicine could have made a

22     lot more money if that's what they had been about.  When they

23     became successful, they could have increased tuition.  They

24     could have owned housing.  They've got a captive audience of

25     hundreds of students on the island who need a place to live.

1    The Foundation and the University could have owned the housing,

2    and collected rent, millions of dollars of rent a year.  They

3    did none of that.

4            With respect to the tuition, they kept it low.

5    Because, again, the purpose that Dave Fredrick had was to

6    provide an affordable quality medical education, and the

7    purpose wasn't to make a profit.

8            As far as the dormitories, those were all locally

9    owned, all the housing, locally owned by the residents of Saba.

10   You will hear, Dave Fredrick insisted on that.

11           Because another purpose of the Saba Foundation,

12   stated right in its charter, was to help the residents of the

13   island of Saba.  And you will learn that the Saba school of

14   medicine completely transformed that little island.  It brought

15   in money, it caused a boom in construction of housing, it

16   created hundreds of jobs.  And within a few short years, the

17   Saba school of medicine represented more than one-third of the

18   total economy of Saba.

19           And not surprisingly, word of the school's success

20   spread to other islands in the Caribbean.  And the government

21   of Nevis, an island in the West Indies, approached Dave

22   Fredrick and said:  Can you work your magic again here; can you

23   set up a medical school on our island?

24           In the late 1990s, Dave Fredrick opened the Medical

25   University of the Americas, you will hear it referred to in

1    this trial as MUA, on the island of Nevis.

2            Ladies and gentlemen, he pulled it off again, with

3    Pat Hough again helping out, taking care of the academic side

4    and the accreditations and the rotations.  MUA Nevis became, in

5    just a few short years, a successful and highly regarded

6    medical school.

7            Now, this didn't guarantee that Dave Fredrick's

8    efforts would always be successful.  You will hear there were a

9    couple of ventures that didn't pan out, because you will hear

10   that he and Pat Hough insisted on only the highest quality

11   standards for the education that they would provide.

12           In 2001, they were approached by another couple that

13   was setting up a medical school on the island of Belize.  And

14   they wanted to partner with Dave Fredrick, given his successful

15   track record.  And Dave Fredrick partnered with that couple to

16   set up a new branch of the MUA, the University of the Americas,

17   on the island of Belize.

18           For a number of reasons, Dave Fredrick and Pat Hough

19   eventually realized this partnership wasn't going to work out,

20   and that they wouldn't be able to duplicate the same high

21   standards that they insisted on, at Belize, as they had done on

22   Saba and on Nevis.

23           And in 2004, Dave Fredrick sold his interests in MUA

24   Belize.  And by the way, you will hear he reported every dime

25   of his proceeds from that sale on his federal income tax

1    returns, every dime.

2             You'll hear that the Foundation at one time looked

3    into setting up a medical school in China.  And in 2005,

4    Pat Hough went to China on behalf of the Foundation to meet

5    with hospitals and educators, and determine if that program

6    would work.

7             And ultimately she went back to the board, and she

8    reported on her trip and her exploring of that possibility, and

9    the board decided that what they had done on Saba and on Nevis

10   couldn't be replicated in China at that time, and they wanted

11   to keep their focus on the islands and the schools that they

12   had.  So the China project got shelved.

13            Now, along with the success of the Saba school came

14   problems.  The evidence will show that, very shortly after its

15   creation in 1993, the Saba school of medicine was threatened,

16   from inside and from outside.  From inside, threatened by a

17   group of school administrators who were in partnership with a

18   corrupt faction within the government of Saba, and who wanted

19   to take over the school and its revenues for themselves.  That

20   takeover attempt was unsuccessful, and so this group ultimately

21   went and set up a competing medical school on a neighboring

22   island.

23            But from the outside, you will hear that the Saba

24   school of medicine was hit by a series of lawsuits, the kind

25   that played many other successful enterprises.  And by the way,

1    when that group of administrators went and set up their

2    neighboring school, you'll hear that they looted the Saba

3    school's bank accounts that were on the island of Saba, and

4    over which they had signature authority.

5            So the lawsuits start coming in, you have the hostile

6    takeover attempt, the lawsuits on everything, faculty

7    terminated for poor performance, they sue; student expelled for

8    cheating, she sues; competing medical school tries to put you

9    out of business, they claim that you are defaming them, and

10   they sue.  And these lawsuits, you will hear, were from

11   anywhere from a couple hundred thousand dollars to one suit

12   seeking $150 million.

13           And then, while dealing with these lawsuits, the

14   board of directors of the Saba Foundation learned something

15   about Netherlands Antilles law.  And that is that, under

16   Netherlands Antilles law, a court can freeze the assets of a

17   defendant in a lawsuit while the lawsuit is pending, before

18   there's been any type of judgment.

19           The law in the United States doesn't allow that

20   because you can put somebody out of business by freezing their

21   assets and just filing a frivolous lawsuit.  But you'll hear

22   that the law in the Netherlands Antilles allows that.  And for

23   the Saba school, that means that they wouldn't be able to meet

24   their payroll, they wouldn't be able to purchase supplies and

25   equipment and cadavers and everything else that the school

1    needs to keep running, like any medical school.  And all the

2    years and all the investment, all the hard work, and all the

3    students depending on that school to complete their medical

4    education, one frivolous lawsuit, given that asset-freeze law,

5    could shut the whole operation down for good.

6          If the school has all its money there, in accounts

7    where it can be found, where it can be frozen, one frivolous

8    lawsuit could mean the end of everything.

9          So what does the Saba Foundation do?

10          Now, you'll hear that most people on the board didn't

11    come from a business background.  They weren't corporate CEOs

12    or CFOs.  They were all doctors or Saba government officials or

13    teachers.  And so they turned to Dave Fredrick, the man who

14    started from nothing and built up this medical school, and they

15    say to him:  You figure it out.  Just protect our assets,

16    protect our school.

17          And they delegate to Dave Fredrick the job of

18    protecting those assets from the flood of litigation that's

19    already going on, and they expect to continue in the future.

20          Now, you will hear in this trial that protecting

21    assets is a 100 percent legitimate and legal concern.  Let me

22    say that again:  Protecting assets is a 100 percent legitimate

23    and legal concern.  I think even the IRS agent who testifies

24    will agree with that.

25          There is absolutely nothing illegal about moving

1    assets around or putting them in other names in order to

2    protect them; in this case, to protect them from being frozen

3    in response to litigation.

4          Well, Dave Fredrick, you'll hear also, isn't a

5    businessman.  He isn't an accountant.  He's a Ph.D.  He's a

6    teacher.  And he doesn't have experience in how to protect

7    assets.  So he goes to the professionals.  He goes to the

8    lawyers.  He goes to the bankers.  They are in the island of

9    Saba, in the Bahamas.

10         And he asks them:  How do I protect the assets of

11   this Foundation?

12         He first sets up a bank account in the Bahamas for

13   this Foundation.  And remember, this is the Foundation's money,

14   not Dave Fredrick's, and certainly not Pat Hough's.  These are

15   the Foundation's assets that are being used to fund the

16   Foundation's mission to fund the school and to do the

17   Foundation's other charitable work.

18         Now, Dave Fredrick is advised that the law in the

19   Bahamas is changing, and that the Bahamas has entered into a

20   treaty with the United States that will make it easier for

21   plaintiffs and creditors to identify and find the banks and

22   locate those assets.

23         So to protect those assets and protect the continued

24   operation of the school, Dave Fredrick is advised by the

25   bankers he consults with to move the assets from the Bahamas to

1    accounts in Switzerland.

2            And the evidence will show he does exactly what the

3    financial professionals he consults with advise him to do.  He

4    keeps enough on hand to meet the school's operating budget, and

5    the rest he puts in secure accounts offshore so those assets

6    are protected.  And he uses the largest bank in Switzerland,

7    the bank called UBS, and a banker at UBS named Dieter Luetolf.

8            Now, you heard some questioning about this, this

9    morning, while you were being selected as jurors.  And I hope

10   that for those of you who have a misimpression about Swiss bank

11   accounts, which you have already heard from the judge and the

12   lawyers, and what you're going to hear in this trial, will

13   correct any misimpression, that is that there is absolutely

14   nothing illegal about a United States citizen having a Swiss

15   bank account, or a Liechtenstein bank account for that matter.

16           Again, I expect the IRS expert will tell you that,

17   too.  And I expect she will further tell you that there is

18   absolutely nothing illegal about a United States taxpayer

19   having signature authority over a Swiss bank account that's

20   held in the name of some other entity or foundation or trust.

21   Any one of you could go out tomorrow and open up a dozen Swiss

22   bank accounts, and open them in your names, or the name of a

23   trust or a foundation, and have signature authority over them,

24   or give signature authority to somebody else, and it is

25   100 percent legal.

1       Now, if you're a United States taxpayer, you have to

2 pay income tax on any money that is earned in those accounts.

3 Any interest, any capital gains from sale of stocks, any

4 dividends, you have to pay income tax on any income that you

5 earn in that foreign account.

6       But here is the key:  If the money in that account is

7 your money, if you just have signature authority over an

8 account of money that belongs to somebody else -- for example,

9 you could be the chief financial officer of Apple, let's say

10 Apple has a few billion dollars in some Swiss bank account, and

11 you've got authority to sign on that account, and that account,

12 money in that account earns interest, pays dividends, you don't

13 have to pay tax on that money because it's not your money, it's

14 Apple's.  It's not income to you.  You may control the account,

15 but the money in the account doesn't belong to you.  And if

16 it's not your money, it's not your income.  You don't have to

17 pay tax on it at all; not your money, not your income.

18       Now, in this case the evidence will show that the

19 money in those foreign accounts was the same money that came

20 from the Bahamas, which was the same money that came from the

21 Foundation, the Foundation's money, not Dave Fredrick's, and

22 not Pat Hough's.

23       So what will the evidence show happened when Dave

24 Fredrick sets up this account at UBS for the foundation?

25       Is he some expert in wealth management or Swiss

1    banking or tax law; no.  And neither is Pat Hough.  She's a

2    doctor and an educator.  So they leave it to the professionals,

3    to Dave Fredrick's contact at UBS, Dieter Luetolf, and to a

4    financial adviser who Luetolf later refers him to, a man named

5    Beda Singenberger.

6         And the evidence will show that this perhaps is where

7    Dave Fredrick and Pat Hough made their mistake.  Because you

8    will hear that Swiss banks and financial advisers don't make a

9    lot of money if they keep the money sitting there in cash, in

10   the bank account, doing nothing.  They make their money by

11   working that account, by constantly buying and selling and

12   trading, and moving back and forth money between those

13   accounts, and creating subaccounts and other accounts and other

14   entities, because each of those transactions generates fees.

15        You will hear in this case about a number of entities

16   and accounts and subaccounts that were created by Dieter

17   Luetolf and by Beda Singenberger, ten different accounts

18   ultimately at UBS, containing 124 subaccounts.  And you will

19   hear that there were thousands of transactions in those

20   accounts over an eight-year period, money moving left and

21   right, and up and down, and back and forth, and all around in

22   circles.

23        A very small number of those transactions, you will

24   see, were requested by David Fredrick for Foundation business,

25   to set aside money for different projects, to transfer it for

1    various matters relating to the Foundation.  But most of that

2    action, the evidence will show, was created by Dieter Luetolf

3    and Beda Singenberger for no legitimate reason other than to

4    create fees for themselves, hundreds of thousands of dollars in

5    fees to Dieter Luetolf and Beda Singenberger over that

6    eight-year period.  They moved that money all around in

7    accounts in the Foundation's name, in the Saba school's name,

8    in MUA's name, in Dave Fredrick's and Pat Hough's individual

9    names.

10              Beda Singenberger, you will hear, even created three

11   Hong Kong companies.  Their names were Ample Dynamic, Top Fast,

12   and New Vanguard.  And those were nothing more than names that

13   Beda Singenberger pulled off the shelf to create these

14   companies, to create these accounts to move money around.

15              But the evidence at this trial will show that, no

16   matter what account that money was sitting in, at all times the

17   money belonged to the Saba Foundation, not to Dave Fredrick,

18   and not to Pat Hough.

19              So I want to give you a very simple framework to keep

20   in mind.  As you start hearing all the evidence in this case

21   about those bank accounts, and when you're seeing all the

22   evidence of all those transactions, and witnesses are talking

23   about Top Fast, and New Vanguard, and Ample Dynamic, and other

24   companies, and about money moving from this account to that

25   account and back again, very simple framework:  Not her money,

1    not her income.

2             And that, ladies and gentlemen, is the number one

3    distinction between what the government told you the evidence

4    in this case will prove and what we believe the evidence will

5    actually show.

6             The distinction between those accounts containing the

7    Foundation's assets, or Pat Hough's and Dave Fredrick's

8    personal assets.  And at the end of all the churning of those

9    accounts by Dieter Luetolf and Beda Singenberger, you will see,

10   ladies and gentlemen, that the money ends up back in an account

11   of the Saba Foundation.  That's where it stays.  And that's

12   where it is today.  As we all sit here in this courtroom, as

13   Pat Hough sits here on trial for very serious crimes, the

14   $50 million or so that the government wants you to believe was

15   stolen from the Saba Foundation, as part of this supposed

16   conspiracy to defraud the IRS, and the basis for the tax fraud

17   charges against her, it isn't in Pat Hough's pocket, it isn't

18   sitting in a safe deposit box, it isn't stuffed in her

19   mattress, it isn't buried under a palm tree.  It is sitting

20   safely in an account in the name of the Saba Foundation.  And

21   that money is still being used to this day to fund eye clinics

22   in Guatemala, and hypertension programs in El Salvador, and to

23   send containers of medical equipment to hospitals for the poor

24   and the needy.

25             That is what the evidence in this case will show.

1    The money started out as the Saba Foundation's money, it went

2    through a lot of different accounts, in a lot of different

3    names, and it ended up with the Saba Foundation.  Not her

4    money, not her income.

5           So how do we end up here?  How does the government

6    end up charging this woman with being some grand conspirator

7    and criminal mastermind who stole nearly $50 million that was

8    never stolen?

9           The evidence in this case will show, ladies and

10   gentlemen, this was a sloppy and deeply flawed investigation by

11   the IRS.  The chief investigator, Mr. Cam Lalli, is sitting

12   here in court today.  And that investigation was full of

13   mistakes, assumptions, and speculation, the same kind of

14   assumptions that I expect the government will be asking you to

15   make in this trial.

16          And the government, I expect, is going to focus on

17   three things, you heard about some of them during the opening

18   statement, three things that it is going to claim to show that

19   money in those accounts, despite all the evidence to the

20   contrary, was really Pat Hough's and Dave Fredrick's money.

21          The government is going to talk about what are called

22   Form As.  These are forms that are filled out when a Swiss

23   account is opened.  And they are going to talk about the

24   movement of money between the accounts.  And finally -- and

25   again, you heard this from Miss Kessler -- they are going to

1    talk about property and assets that were supposedly purchased

2    with funds from those accounts.  So let me tell you now what

3    the evidence will be about those things.

4         First, the Form As.  You'll learn that, when you open

5    up a Swiss bank account, you have to complete what's called a

6    Form A.  Form A, you'll see it in this trial.  You'll hear

7    about it, I expect, from the government's first witness.  It

8    isn't a tax document.  It has absolutely nothing to do with tax

9    liability either in the United States or in Switzerland.

10        Form A is a document required by Swiss

11   anti-money-laundering law.  The Swiss just want to have a

12   person on the account, the name of an actual person who can be

13   listed as what they call the beneficial owner, somebody who is

14   responsible for the money so that the Swiss authorities can

15   make sure this isn't a drug dealer laundering the proceeds of

16   this activity or some other type of illegal activity.  Form A

17   is about money laundering.  It is absolutely nothing for tax

18   purposes.  It is not a document the IRS ever gets.  It sits

19   there in the Swiss bank's file.

20        And you will hear that, when Pat Hough was in Europe

21   on business in September, 2001, just shortly after 9/11, she

22   meet with Dieter Luetolf, and they talked about setting up this

23   first UBS bank account.  And she handed Luetolf a package of

24   documents about the Saba school and the Saba Foundation;

25   brochures, the charter, and other types of documents, to

1    explain whose money this was.  But for some reason, or mistake,

2    that you're going to have to guess at, because the government

3    is not going to call Dieter Luetolf to testify to you, Dieter

4    Luetolf opened the account in the name of Dave Fredrick and Pat

5    Hough, and he put their names as the beneficial owners on that

6    Form A.

7            And he sent Dave Fredrick a stack of opening

8    documents for the account.  And Dave Fredrick gave his wife

9    some documents and said:  Here, sign.

10           What the evidence is going to show is that Pat Hough

11   trusted her husband, trusted Dieter Luetolf, to do the forms

12   right and gather the right things to sign.  And her

13   understanding at being named as a beneficial owner on that

14   account was simply that -- was not that the Foundation's money

15   had suddenly become her own, that she had overnight become some

16   multimillionaire.  Her understanding was that she was signing

17   on to have the ability to manage the accounts for the

18   Foundation in case something happened to her husband.

19           Remember, he's a pilot, he's flying his little plane

20   around, back and forth between the islands.  And if something

21   happened to him, Pat Hough understood that she would take over

22   to help the Foundation with the money, with the Foundation's

23   money, not hers.

24           Now, you'll hear that Pat Hough and Dave Fredrick

25   were listed on some of the other Form As for accounts that

1    Luetolf and Singenberger opened.  Not all of them, but some of

2    them.  Some of them list the Saba school or MUA as the

3    beneficial owner.  And some of the other ones that list Pat

4    Hough as the owner, she never even signs, including those three

5    Hong Kong accounts, New Vanguard, Top Fast, and Ample Dynamic.

6    Beda Singenberger is the only one that signs those documents.

7    They are never signed by Pat Hough, even though they list her

8    name.

9            I expect that will be the government's evidence that

10   Pat Hough really owned the money in those accounts, the

11   millions of dollars in the Foundation's foreign accounts.

12   There's signed or unsigned Form A's that listed her name,

13   documents she never asked for, didn't direct, didn't

14   understand, and that had nothing whatsoever to do with United

15   States tax liability.

16           What about the movement of money?

17           Miss Kessler talked to you about this.  I expect the

18   government will have an IRS witness talk to you all about that

19   movement of money back and forth between all those various

20   accounts and subaccounts; movement that, as I you told earlier,

21   the evidence will show was primarily designed to generate fees

22   for Dieter Luetolf and Beda Singenberger.

23           I expect the government will show you some e-mails

24   and correspondence that directs transactions in those accounts.

25   And they're going to say:  Ah-ha, this proves to you that Pat

1   Hough was really the owner of that money.

2            Well, ladies and gentlemen, pay attention and see how

3   many of those e-mails and letters were written or signed by Pat

4   Hough.

5            The evidence will show that, throughout all the years

6   and all that movement of money between accounts, Dr. Patricia

7   Hough did not initiate a single transaction into or out of any

8   one of those Swiss bank accounts.  Because she knew that this

9   wasn't her money, and she understood that any role she would

10  play in managing the assets of the Foundation would come into

11  play only upon Dave Fredrick's death.

12           I expect you'll hear about a small number of times

13  when Pat Hough gave her okay, or approval, to some transaction

14  that Dave Fredrick had already requested, just her okay to

15  whatever her husband was asking UBS to do, documents that the

16  evidence will show were completely consistent with her

17  understanding that she was just a caretaker, just a backup

18  caretaker, of those assets on behalf of the Saba Foundation.

19           And finally there is this supposed use of the money.

20  You heard from Miss Kessler.  She talked to you about giving

21  money to family members, and buying properties and homes and

22  planes and land with money from those UBS accounts.

23           And I expect that the government will again say to

24  you:  Ah-ha, this proves that this was really Pat Hough's

25  money, and that she and her husband stole this money from the

1    Foundation, and they conspired to defraud the IRS, and they hid

2    this money in their secret Swiss bank accounts for years.

3            I'm going to give you another framework to view that

4    evidence in when it comes into this trial, and that's to ask

5    yourself a simple question:  What was Pat Hough's role in any

6    of it; what role did Pat Hough play in any of this; what did

7    Pat Hough do; what did Pat Hough know; what evidence is there

8    that Pat Hough had any involvement in this at all?

9            Because remember, ladies and gentlemen of the jury,

10   she is the one on trial here.  What the evidence will show is

11   that Dave Fredrick was owed a lot of money from the Saba

12   Foundation.  He was owed well into seven figures, in what's

13   called "deferred compensation."

14           And what that basically means is that all those years

15   of the Saba school, when he was working as its president and

16   working every day, he wasn't getting a salary and wasn't

17   getting paid.  He was due one, but the school didn't have the

18   money to pay it because it was just starting out.  But he and

19   the board kept a running tally of how much he was owed.

20           You will hear from members of the board of trustees

21   of the Saba Foundation, who will testify in this trial, that

22   Dave Fredrick occasionally came to the board and he asked for a

23   loan.  And you'll hear from those same members that, because

24   the money that he was asking for was just a drop in the bucket

25   compared to the huge amount that he was owed, the board

1    approved those loans.

2            Now, Pat Hough, by the way, although she too was owed

3    a substantial amount in back compensation, never asked the

4    board for a loan, never took one dime of the Saba Foundation's

5    money.

6            You heard Miss Kessler talk about, they gave money to

7    family members.  I wrote that down, this word "they."  Pay

8    close attention to that when you hear it in this trial.

9    Because the evidence will show that, on one occasion, in 2007,

10   Dave Fredrick got approval from the Saba Foundation board for a

11   1 million-dollar loan.  And he broke that up into four

12   quarters, and he gave $250,000 to each of his half-siblings who

13   were in some pretty serious financial straits at the time.

14           What was Pat Hough's role?

15           What Miss Kessler didn't tell you when she say "they"

16   gave money, and what the evidence in this case will show, is

17   that when Dave Fredrick gave his half-siblings that money, he

18   made sure to do it without Pat Hough's knowledge.  She didn't

19   know anything about it.

20           And sure enough, when she found out about it, and she

21   found out that this wasn't the first time that he had given

22   money to his half-siblings without telling her, she flipped.

23   Because that money, she knew, wasn't theirs to do with as they

24   pleased, it was the Foundation's.

25           Now, compare that to what the evidence will show

1    about Pat Hough's actions.  The evidence will show that when

2    she sent money to her own sister, which she did on a few

3    occasions, she did not send it from the foreign accounts of the

4    Foundation.  She sent it from her own domestic account, her

5    personal account right here in the United States, with money

6    that belonged to her, and on which she had already paid income

7    tax.

8           Now, Miss Kessler also talk to you about those three

9    properties that were purchased:  The holding company in

10   Asheville, North Carolina; the house in Greenville, North

11   Carolina; and the condo in Sarasota.

12          Well, what was Pat Hough's role?

13          The evidence will show that the Asheville house was

14   bought in 2005, for $1.2 million approximately, with a loan

15   that Dave Fredrick requested and was granted by the Saba

16   Foundation.  Dave Fredrick, not Pat Hough.

17          And when that house was sold in 2010, the buyer

18   assumed the debt, assumed that note to the Saba Foundation to

19   pay that money back, so the Foundation was out nothing.

20          The house in Greenville, the evidence will show, was

21   not even purchased for their personal use, but was purchased by

22   the Foundation as a location for a new joint degree program

23   that they were considering establishing with East Carolina

24   University in Greenville.  That house was deemed a possible

25   location for housing and for putting that program.

1          The house was bought by one of the Foundation's

2     companies, Ample Dynamic.  And when that house was sold after

3     the joint degree program didn't get off the ground, the money

4     then went back to the Foundation's companies.

5          As for the Sarasota condo, which the evidence will

6     show Dr. Hough has never lived in, the evidence will show that

7     that property, too, was purchased with a loan that Dave

8     Fredrick, not Pat Hough, openly requested and was granted by

9     the Saba board.

10         You heard Miss Kessler talk about, they purchased an

11    airplane.  There's that word "they" again, that I am going to

12    ask you to be very much on the lookout for during this trial.

13         What was Pat Hough's role with respect to that plane?

14         The evidence will show that that plane was purchased

15    by the Foundation at Dave Fredrick's request; that it was used

16    for Foundation business; and that when it was sold, the

17    proceeds went back to the Foundation, not to Dave Fredrick, and

18    certainly not to Pat Hough.

19         Now, you also heard Miss Kessler talk to you about

20    this piece of property that she talked about, Round Hill.  Let

21    me talk about that for a moment because I think you will hear,

22    and the evidence will show, that that was the single largest

23    item of unreported income that the government claims and is

24    seeking to hold Dr. Hough responsible for.

25         Round Hill is the portion of Saba where part of the

1    medical school was build.  The evidence will show that this

2    parcel of land became available very suddenly from the owners

3    in 1999, and that the Foundation wanted to own that property to

4    expand the campus.  And Dave Fredrick wanted to buy it in the

5    name of a third party for the same reasons of asset protection,

6    so that the land couldn't be frozen, couldn't be seized in

7    response to litigation.

8          And you will hear that there were other parties

9    bidding and trying to buy that land, so he didn't have the time

10   to set up an entity.  And he also wanted someone he trusted

11   because this was right around the time that that hostile

12   takeover was going on.

13         So what Dave Fredrick did was buy the property in the

14   name of his daughter, Laura Walls, who had a different last

15   name.  The money came from the Foundation, but the title was

16   registered in her name, with the idea that he would then set up

17   a company and transfer title eventually to that property.

18         What was Pat Hough's role in having Laura Walls buy

19   that Round Hill property?  As the evidence will show, none,

20   zero, nothing.

21         Now, later on, Dave Fredrick did what he planned to

22   do, and he set up this company called Round Hill Holding

23   Company.  And he transferred the title from Laura Walls to

24   Round Hill Holdings.  And Round Hill Holdings, you'll hear, was

25   owned 50/50 by Dave Fredrick and Pat Hough.

1          Pat Hough signed documents involving Round Hill

2    Holdings, but the evidence will show that at no point did she

3    believe that her involvement with this holding company suddenly

4    made her the owner of this very valuable piece of property on

5    the island of Saba.  Just as she was a caretaker for the

6    Foundation's assets and its Swiss bank accounts, she understood

7    that she was a caretaker of the land on which the Saba school

8    was built.

9          And you will know that because the evidence will

10   show, at the end of the day, when the Saba school was sold in

11   2007, the Round Hill property was not kept in that holding

12   company, where the money would have gone directly to the

13   owners, Dave Fredrick and Pat Hough.  The property was

14   transferred to New Vanguard, one of the Saba Foundation's

15   companies, one of those companies that Beda Singenberger had

16   set up, a company that was not owned by Dave Fredrick and not

17   owned by Pat Hough.  And the money from the sale that was

18   allocated to the purchase of that land, some $33 million, was

19   marked in that sale agreement to go to New Vanguard, with the

20   name of the foreign bank, and even the bank account number,

21   right there in that public sale agreement.

22          Now remember, Miss Kessler said that the evidence

23   will show that they set up these bank accounts to be secret, to

24   hide things, to hide things from everybody, to hide things from

25   the U.S., to hide things from the IRS.  But, in fact, the

1   evidence will show that, rather than keep the entity New

2   Vanguard a secret, or keep the name of its Swiss bank a secret,

3   or even keep its secret Swiss bank account number secret, all

4   that information was laid out there in that public sale

5   agreement, vetted by rows and rows of attorneys and accountants

6   on both sides, out in the open, in broad daylight.  Another

7   fact that the evidence will show is completely inconsistent

8   with any effort by anyone to hide this income.

9           And what happened to that money, that money that was

10  paid to New Vanguard for the sale of that Round Hill property;

11  did it end up in Pat Hough's property?  No.

12          The evidence will show that that money, like all the

13  other money from all those other accounts, went back into the

14  Saba Foundation, where it still sits today, over $54 million of

15  money sitting today, as we sit here in this trial, in the

16  Foundation's bank accounts, safe, secure, including that money

17  that the government claims was somehow Pat Hough's money that

18  she stole and failed to pay taxes on.  It's all sitting right

19  there, in the name of the Saba Foundation.

20          Ladies and gentlemen, with respect to the charge of

21  conspiracy to defraud the IRS, the evidence in this case will

22  show that there was no conspiracy, there was no agreement, and

23  there was no intent, certainly not on Pat Hough's part, to

24  defraud anybody about anything.

25          Now, as you've been told, in addition to the

OPENING STATEMENT BY MR. SAUNDERS                    51

1    conspiracy charge, there are these four counts of filing false

2    tax returns.  So let me just say a few words about the evidence

3    on those counts.

4              The government has charged Pat Hough with willfully

5    filing false tax returns for four years, 2005 through 2008.

6    And they charge two different false statements on each of those

7    tax returns.

8              First, they claim that they understated her income by

9    not reporting the income from those foreign accounts that we

10   have been talking about.  But again, remember, if the money in

11   those accounts wasn't her money, it was the Foundation's money,

12   which the evidence will show it was, then none of the income

13   that flows from the accounts or transactions is her individual

14   income, none of it has to be declared on her tax returns, and

15   her tax returns are 100 percent accurate on that issue.  Not

16   her money, not her income.

17             And the other -- and just to be clear, that is the

18   only income that the government contends she failed to report

19   on her tax returns, that income from those foreign bank

20   accounts that the evidence will show were never even hers.

21             And the other false statement that the government has

22   charged that brings us all here today involves this:  And this

23   is what's called Schedule B to your 1040 income tax return.

24   And down at the bottom of Schedule B is Part 3.  And within

25   Part 3, you see over there on the left, it says Paragraph 7A.

1            And in Paragraph 7A of Part 3 of Schedule B of

2    Schedule 1040 of your income tax return, they tell you that you

3    have to check a box on the right, "yes" or "no," if you have a

4    foreign bank account where you have either a financial interest

5    or signature authority.

6            Now, interestingly, checking that box does not result

7    in more tax being owed.  If you're that CFO of Apple, and you

8    have signature authority over Apple's account, you are still

9    supposed to check the box "yes," even though that's not your

10   money, because you have signature authority.

11           And the evidence will show that Pat Hough, like a lot

12   of taxpayers, like I think a lot of you said this morning,

13   gives information to her accountant, she gets the return back,

14   and she signs it.  She doesn't look at the fine print.  She

15   doesn't look beyond the first page or two, where it says if you

16   owe money or you're getting a refund.  She certainly doesn't

17   read the 140 pages of instructions that the IRS puts out on how

18   to complete your 1030, and she doesn't press her face up to the

19   paper to read Paragraph 7A of Part 3 of schedule b.

20           The evidence will show that she relied on her

21   accountant to get all those boxes checked correctly, and that

22   she had no reason to doubt his word.  And I expect her

23   accountant will testify in this trial that he didn't have

24   expertise in dealing with foreign accounts, he wasn't

25   particularly familiar with this question either, and that like

1   many accountants, he didn't focus on that, and he did not ask

2   her, when preparing her tax return, if she had signature

3   authority over any foreign accounts; never asked the question,

4   never even discussed.  And that's the evidence with respect to

5   four counts of filing false tax returns.

6           So to wrap up, at last, now that I have told you what

7   we expect the evidence in this case to be, let me finally tell

8   you what we expect some of the gaps in that evidence to be so

9   that you can listen for those that as the evidence comes in.

10  And please remember, throughout this trial, as you have already

11  been instructed and you will be instructed again at the end, at

12  all times, the government has the burden of proof, proof beyond

13  a reasonable doubt.  I expect you are not going to hear, in

14  this trial, from any of the Swiss bankers or financial advisers

15  who actually handled these accounts, you're not going to hear

16  from Dieter Luetolf or Beda Singenberger, who set up the

17  accounts, and the companies who were supposedly involved with

18  this grand conspiracy, who are the direct eye witnesses who

19  could tell what you they were instructed, and what they did,

20  and why.  They are alive and well.  Dieter Luetolf is still

21  working for UBS.  But the government won't be calling them in

22  this case.  Oh, you'll get a witness from UBS.  I believe he

23  will be the government's first witness.  But it's not Dieter

24  Luetolf, or anybody else who dealt with any of these accounts

25  or even met Pat Hough or David Fredrick.

1          Instead, the government will be calling a UBS

2    representative who played no part whatsoever in the facts that

3    are at issue in this trial.  I expect he'll talk to you about

4    those Form A's, but not about what Dieter Luetolf was told, or

5    why he filled them out the way he did.

6          You are also, speaking of gaps, not going to hear

7    from a single witness who will tell that you there was an

8    agreement between Dr. Hough, Dr. Fredrick, Beda Singenberger,

9    and Dieter Luetolf, or anybody else, to defraud the IRS.

10          Remember, Miss Kessler told you that a conspiracy

11   requires proof beyond a reasonable doubt of an agreement, an

12   agreement that the defendant knew about, and that she knowingly

13   and willfully entered into.  There is not one witness who will

14   tell you they conspired with Pat Hough.  There is not one

15   witness who will tell you they ever heard Pat Hough say

16   anything about conspiring with others.  I expect there will not

17   be one witness in this trial to testify that she ever agreed

18   with anybody to defraud the IRS.  Because the evidence will

19   show that never happened.

20          Also, you're not going to hear from a single witness

21   who will tell that you they ever heard Pat Hough say anything

22   about wanting or trying to evade taxes.  To the contrary, the

23   evidence will show, from the government's own witnesses, that

24   Pat Hough is, and always has been, an extremely conscientious

25   taxpayer.  She's been a taxpayer since 1962, over 60 years.

1    She got audited once, in 1973.  The IRS found everything was

2    perfect.  Never a problem.  I expect her accountants will tell

3    that you she repeatedly told them that she wanted to do

4    everything right, to be fully compliant with her tax

5    obligations.

6            You will hear that one of the Saba school's

7    accountants, a man named David Minchenberg, told her that she

8    needed to file an IRS form to disclose her ownership in Round

9    Hill Holdings.  Pat Hough's first and only question was:  How

10   can we get this done?  Let's get this done.

11           You'll hear that back in 2005, when Dr. Hough, after

12   filing her tax return, realized that she had inadvertently

13   forgotten to include an 11,000-dollar gain that she had gotten

14   from a small land sale that year, she picked up the phone, she

15   called her accountant, she told him about it, she had him file

16   an amendment return, and she paid her tax.  That's the kind of

17   taxpayer that Dr. Patricia Hough is.

18           As far as gaps, I expect the government is going to

19   show you a lot of documents in this case, a lot of documents.

20   You are not going to see in there one document ever prepared or

21   written or signed by Dr. Hough -- or for that matter by

22   Dr. Fredrick, or a Dieter Luetolf, or Beda Singenberger -- that

23   mentions anything about evading taxes, or about impeding or

24   impairing the functions of the IRS.  The government will ask

25   you to believe that this is the first tax conspiracy on record

1    where nobody ever said anything about evading taxes.

2              You are not going to hear anyone tell that you Pat

3    Hough is particularly sophisticated about, or knowledgeable

4    about, or even interested in financial affairs, let alone the

5    complexities of Swiss banking and tax law.

6              To the contrary, I expect you'll hear consistently,

7    from a number of the government's own witnesses, that financial

8    matters are just not her thing, that she was focused on being

9    an educator and setting up those clinical rotations and those

10   accreditations, and that she let her husband handle all the

11   business affairs of the school and the Foundation, including

12   those bank accounts.

13             You'll hear that she was so busy dealing with the

14   hospitals and the accreditation boards across the U.S. that she

15   didn't have time to be reviewing financial statements, and that

16   she relied on her husband and his advisers to tell her what to

17   do.  And that was true, both with respect to the school's

18   finances and to her and Dave Fredrick's own personal finances.

19   They were handled by Dave Fredrick.

20             And finally, I expect you are not going to hear any

21   evidence in this trial that Pat Hough ever directed the use of

22   any of the funds in those foreign accounts for her own personal

23   benefit.  There will be no evidence that she went out and

24   bought herself a car.  There will be no evidence that she took

25   a fancy vacation, that she bought out Tiffany's, that she did a

1    single thing that is consistent with somebody that just came

2    into possession of $50 million.  Because it never happened.

3          To the contrary, she kept driving her old Volvo, she

4    kept staying in the Best Western, shopping at discount stores.

5    She kept on working for low pay for the public health

6    department, where she still works today.

7          You will see, in this case, that there was account

8    that Dieter Luetolf opened up in Pat Hough's own name, one of

9    these Foundation accounts, one of these ten accounts that UBS

10   opened, and she had signature authority over it, and it was

11   open for 14 months, and it contained over $5 million.  And you

12   will see that not one penny of that money in her account, in

13   her own name, ever went to Patricia Hough.  Instead, like all

14   the other money from all the other accounts, it all ended up

15   going back into an account controlled by the Saba Foundation.

16   Because Pat Hough never treated the money in those accounts as

17   hers, because it wasn't hers and she never believed it was

18   hers.  And if she never believed it was her money, then she

19   never believed it was her income, and she didn't willfully

20   conspire to defraud anybody, and she didn't willfully file

21   false tax returns.

22         Ladies and gentlemen, that is what we expect the

23   evidence to be, and not to be, in this trial.  As you listen to

24   that evidence, I ask you to keep in mind the frameworks that I

25   have given you for evaluating that.  With respect to the

1    foreign accounts, again, it's not her money, it's not her

2    income.

3            And with respect to all those assets and transactions

4    and movement of funds, and e-mails, and real estate, and the

5    plane, and the gifts to family members, what was Pat Hough's

6    role?

7            As you hear the evidence, please think about those

8    things.  And please keep an open mind, try to hold off on

9    forming any opinions or reaching any conclusions until all the

10   evidence is in.

11           And when this trial is over, you -- not the

12   prosecutors, and not the IRS -- will go back in that jury room,

13   and you will look at that evidence, and you will evaluate it,

14   and you will put it together, and you will reach a decision.

15   And at that time, I believe you will return verdicts finding

16   Dr. Patricia Hough not guilty on each and every one of the

17   counts on which she is charged.

18           Thank you very much for your attention.

19           THE COURT:  Thank you.  I think we'll take an

20   afternoon recess for about 15 minutes.

21           Every time we take a recess, I'm going to tell you

22   the same thing:  Please do not discuss the case among

23   yourselves, or allow anyone to discuss it with you or your

24   presence.

25           In the jury room, I believe you'll find juror

1    buttons.  I'd ask that you wear those, both in court and at

2    recesses.  When you go home at night you can leave them there.

3    But for the rest of the afternoon and the morning, if you'll

4    wear those juror buttons, it helps all of us remember who you

5    are, particularly outside, at recesses or at lunchtime.

6              So let's take about 15 minutes.

7              (At 4:08 p.m., the jury was escorted from the

8         courtroom.)

9              THE COURT:  All right.  Fifteen minutes.

10             (At 4:08 p.m., court was recessed.)

11                        AFTER RECESS

12             (At 4:26 p.m., court was reconvened.)

13             THE COURT:  All right.  Both sides ready for the

14   jury?

15             MR. HOCHMAN:  Your Honor, just a quick housekeeping?

16             THE COURT:  Yes.

17             MR. HOCHMAN:  The government has their IRS expert,

18   who will be attending all the testimony, and we have our

19   expert, Mr. Luis Rivera, who is right here.

20             THE COURT:  All right.

21             MR. HOCHMAN:  Thank you.

22             THE COURT:  That's fine.

23             MR. HOCHMAN:  I just wanted to -- as a housekeeping

24   matter.

25             THE COURT:  That's fine.

1          Have the jury step in, please.

2          MR. HOCHMAN:  And then, therefore, we'll invoke the

3     rule excluding all other witnesses.  I'm sorry.

4          THE COURT:  Oh.  The "therefore" is kind of

5     important.

6          MR. HOCHMAN:  I'm sorry, Your Honor.  In my head I

7     stopped, and I forgot the "therefore" part.

8          THE COURT:  The rule will be invoked except for the

9     expert witnesses and any case officers or case agents.  I'll

10    leave it up to the lawyers, since I don't know who the

11    witnesses are, to enforce the rule to make sure there are no

12    other witnesses present during testimony, or that they discuss

13    any testimony that has been given in court.

14         MR. HOCHMAN:  Thank you, Your Honor.

15         (At 4:27 p.m., the jury was escorted into the

16      courtroom.)

17         THE COURT:  You may call your first witness.

18         MS. FINLEY:  Thank you, Your Honor.

19         The government calls Jean Marc Futterknecht.

20         THE COURTROOM DEPUTY:  If you'd raise your right

21    hand.

22         Do you solemnly swear or affirm to tell the truth,

23    the whole truth, nothing but the truth, in the case now before

24    the Court?

25         THE WITNESS:  Yes, I will.

1          THE COURTROOM DEPUTY:  You may have a seat.  Watch

2     your step there.

3          State your full name, spelling your last.

4          THE WITNESS:  Futterknecht, F-U-T-T-E-R-K-N-E-C-H-T.

5     And my first name is Jean Marc.

6          THE COURTROOM DEPUTY:  Spell your first name.

7          THE WITNESS:  J-E-A-N, M-A-R-C.

8          THE COURTROOM DEPUTY:  Thank you.

9                    JEAN MARC FUTTERKNECHT,

10    called as a witness by the Government, and having been first

11    duly sworn, was examined and testified as follows:

12                    DIRECT EXAMINATION

13    BY MS. FINLEY:

14    Q    Good afternoon, Mr. Futterknecht.

15         Could you tell the jury where you live?

16    A    I live in Zufikon, Switzerland, Z-U-F-I-K-O-N.

17    Q    Where are you employed?

18    A    I am employed with UBSAG.

19    Q    Can you tell the jury, what is UBSAG?

20    A    UBS is a global financial services provider for private

21    clients, for corporate clients, and for institutional clients.

22    We are present in all major financial centers in the world, in

23    50 different countries, and we currently have approximately

24    62,000 employees worldwide.

25    Q    Where is UBS headquartered?

1    A      UBS is headquartered in Zurich and Oslo, Switzerland.

2    Q      How long have you worked for UBS?

3    A      That's 26 years.

4    Q      Was your current position at UBS?

5    A      Currently, I am a member of group compliance department,

6    looking after, in particular, questions around the issues,

7    topics related to anti-money laundering.  And in the group

8    compliance department, I'm responsible for one of the three

9    divisions of UBS, which is global asset management.

10   Q      You don't have to talk too closely, but if you just keep

11   your voice up, I think everybody will hear you.

12          And can you describe for the jurors what your job

13   responsibilities are?

14   A      I'm responsible to ensure that the group standards which

15   we develop in group compliance department are correctly

16   properly implemented in the division global asset management.

17   Q      And what kind of compliance issues are you enforcing?

18   A      I am, in particular, responsible for anti-money

19   laundering-related matters, which comprises the, what we call

20   traditional anti-money laundering, including anti-terrorist

21   financing, including embargoes and international sanctions, and

22   anti-bribery and corruption.

23   Q      And can you explain to the jurors what -- why that's

24   important for the bank, the anti-money laundering.

25   A      Well, we have to know whose assets we have on our books,

1  whose assets we manage.  We don't want clients who are

2  ultimately criminal or who have derived their assets from

3  illegal activities.  That's one point.

4       Another point is we have to know whether our clients are

5  politically exposed persons.  This is a regulatory requirement

6  in Switzerland.  If we have politically exposed persons, we

7  have to obtain the okay for establishing such relationships

8  from our top management.

9  Q    And as part of your duties, are you also involved in

10  internal and external working groups?

11  A    I am a member of a working group of the Swiss Bankers

12  Association, which deals with the Swiss compliance code of

13  conduct for banks, which is about identifying clients and

14  beneficial owners when they open banking relationships.

15  Q    And the Swiss Bankers Association is an external entity

16  not related to UBS; is that correct?

17  A    That's a separate, external entity not related to UBS;

18  yes.

19  Q    How long have you been in the position that you just

20  described?

21  A    My role as head of AML for global asset management, I

22  have taken on at the beginning of 2011.

23  Q    And before your current position, what did you do at

24  UBS?

25  A    I was a member of the group compliance department, where

1   we essentially developed the concepts.  AML related concepts.

2   Anti-money laundering concept.  So these concepts, the rules,

3   procedures, internal policies, we also developed training

4   material for the client advisers in particular.

5   Q      Can you describe for the jury your educational

6   background?

7   A      I started law at the University of Bern in Switzerland.

8   After that I was a trainee with law firm in Switzerland and the

9   District Court in Switzerland.

10  Q      Are you familiar with the procedures for establishing a

11  client business relationship at UBS?

12  A      Yes.

13  Q      And with respect to establishing the client business

14  relationship, are the principal procedures different if the

15  client is a Swiss person or a foreign person, whether it's

16  Europe or the United States?

17  A      No.  They are essentially the same.

18  Q      Generally, and we're going to get into each -- each of

19  these things more specifically, but what types of documents are

20  generated when a client initiates a business relationship with

21  UBS?

22  A      We . . . establish a basic agreement, a basic

23  account-opening document, which essentially says that the

24  client wants to open a business relationship with the bank.

25  And it contains the general terms and conditions, or reference

1    at least, to these, all the details about the client's name,

2    date of birth, address of residence, signature, place of

3    jurisdiction, and overall the instruction for the agreement

4    that he wants to establish a business relationship with the

5    bank.

6    Q     And as part of the account-opening process, do -- does

7    UBS obtain information on the client itself?

8    A     Yes.  We have to identify the clients by means of

9    official document, official identification document.

10   Q     And are there obligations of the bank -- I think you

11   testified earlier -- are those the AML, or the anti-money

12   laundering requirements to know who the customer is?

13   A     Well, basically, we want to know or have to know who the

14   client is.  That means we have to identify the client.  Then we

15   have to know more about his background, how he made his money,

16   his financial situation overall.

17         So this kind of information is something that we want to

18   obtain.

19   Q     How are these account opening -- or the business

20   relationship opening documents stored and maintained at UBS?

21   A     These are physical documents which are stored in a

22   central department in an archiving department.  Today they are

23   scanned electronically, kept in an electronic form.  In

24   previous years they were kept physically.

25   Q     And does UBS have a system that maintains those

1    documents?

2    A      Yes.  We have an archiving system for this.

3    Q      And the account-opening documents, do they go through

4    any type of verification process for completeness and accuracy?

5    A      Yes.  First of all, the client adviser has to sign off

6    on the document, and also indicate where the account was

7    opened, by means of correspondence or face to face.  That means

8    whether the client was present when the account-opening

9    document was signed.

10          And then it goes -- or the document goes to a separate

11   department, document management services.  They check them

12   again for completeness, or formal completeness.  And if not,

13   they are returned to the client adviser.

14   Q      So they're not complete, the --

15   A      If they are not.  If something is missing, they go back;

16   yes.

17   Q      As part of the relationship-opening documents, do you

18   require identification of the client?

19   A      Yes.

20   Q      And what types of identification, typically, are

21   provided?

22   A      A photocopy of a passport, or any other formal

23   identification document.

24   Q      Now, when you initiate a business relationship, does the

25   client get a master account number?

1    A      Yes.  Every client relationship comes with a master

2    account number.  The base number, in other words, would be

3    another term.

4    Q      A base number would be --

5    A      A base or master number.

6    Q      And can you explain to the jury what objects are of the

7    base account, if that's correct?

8    A      The objects are the different, or the individual

9    accounts the client has.  This could be a savings account, a

10   foreign currency account, a securities account, and so on.  And

11   these are all linked to one and the same base number.  But the

12   client can have several base numbers, with . . . several

13   objects linked to one base number, or master number.

14   Q      Are there other records that are maintained by UBS as

15   part of the master account, or the client relationship?

16   A      Yes.  We have to keep entire correspondence between the

17   bank and the client in both ways, so mail sent from the bank to

18   client, or mail sent from the client to the bank.  Then, of

19   course, the account statements, and . . . yeah, payment

20   instructions, instructions to do certain investments, so the

21   entire correspondence.

22   Q      And would that include e-mails?

23   A      Yes.

24   Q      Do the -- you used the word "client adviser."

25          Can you explain to the jury what a client adviser is?

1    A       A client adviser is the front person, the person who

2    services the client, or the first contact for the client.

3    Q       And is that the person that communicates -- that the

4    client would communicate with when they want to do something

5    with their account?

6    A       Yes.  The communication takes place between client and

7    client adviser.

8    Q       And do the client advisers and the employees of UBS have

9    a responsibility to maintain accurate records?

10   A       Yes.

11   Q       And why is that?

12   A       We have a law that requires that we keep basic documents

13   and all correspondence that was established.

14   Q       And does that include -- does that responsibility

15   include when they're inputting information into internal UBS

16   databases?

17   A       Yes.

18   Q       And included in the items that you described that are

19   maintained by UBS, are internal bank correspondence within the

20   bank kept as part of that file, as well?

21   A       Yes, e-mails and notes that the client adviser takes.

22   Q       Are the e-mails and the correspondence, the other

23   internal bank documents, are they maintained similarly, by UBS,

24   as the account-opening documents?

25   A       Yes.  In a similar way.

1    Q       So they are archived or scanned?

2    A       Archived, scanned, and kept for the entire period which

3    is required, yes.

4    Q       And we have had an opportunity to meet before you

5    testified here today; is that correct?

6    A       Yes.

7    Q       And in -- you reviewed a lot of records that were

8    provided by UBS?

9    A       Yes.

10   Q       And within those records that were provided by UBS, were

11   there relationship-opening documents?

12   A       Yes.  Basic documents, as I described before.

13   Q       And were there also correspondence, e-mails and internal

14   documents?

15   A       Yes.

16   Q       Within the records that you reviewed, is there something

17   called a client adviser workbench?

18   A       Correct.

19   Q       And can you explain to the jury what -- do you sometimes

20   call it a CAWB, or the workbench?

21   A       Client adviser workbench, CAWB, yes.

22   Q       And can you explain to the jury what that is?

23   A       This is what we call the client history.  It's a tool,

24   an electronic tool, in which the client adviser can input

25   further information, a summary of conversations he had with the

1  client, all information that was delivered, telephone calls,

2  discussions about investment strategies, and the like.

3  Q     Does the workbench also detail the background, some of

4  the things you detailed earlier, about who the client is; is

5  that maintained in the workbench?

6  A     That's correct, yes.  This is what we call a KYC

7  information, "know your clients," know information about the

8  client's background, his situation, his family situation.  All

9  this would be kept in the CAWB.

10 Q     Who can make entries in the CAWB?

11 A     That's the client adviser, his assistant, his

12 intermediary financial . . . ultimately a limited number of

13 persons.

14 Q     And is the CAWB blocked to others within the bank so

15 only those individuals that you stated could make entries?

16 A     Yes, that's correct.

17 Q     And again, is it part of the job responsibility of the

18 client adviser to enter information into that log?

19 A     Yes.

20 Q     And his or her responsibility would be to accurately

21 record the information in the log.

22 A     Yes.

23 Q     And in the records that you reviewed, are there client

24 adviser workbench . . . benches in the materials?

25 A     There are extracts from the CAWB; yes.

1   Q      How long does UBS maintain these records?

2   A      We are obliged to maintain them for ten years.

3   Q      And is it -- is there a difference between how long you

4   maintain them when the account is still open, or when it's

5   closed?

6   A      We have to maintain them for ten years after the event

7   took place.  And when we close an account, we have to keep it

8   for another ten years.

9   Q      Can you explain to the jury what a financial

10  intermediary is?

11  A      A financial intermediary is an external third party

12  specialized in asset management, investment advice.  A

13  financial intermediary is an external third party, not an UBS

14  employees.  There is an agreement between the client and the

15  financial intermediary, normally the financial intermediary

16  would advise the client on investments and assets, investment

17  adviser, investment manager.

18  Q      Are financial intermediaries also expected to provide

19  accurate information as part of that contractual relationship

20  with UBS?

21  A      Yes.

22  Q      And are client advisers, if you know -- excuse me --

23  financial intermediaries, are they bound by Swiss law to

24  provide accurate information?

25  A      Yes.  They are also subject to the Swiss anti-money

1    laundering law.

2    Q      Why is it important for UBS to maintain these types of

3    records that we've talked about?

4    A      Well, we have to have these records in order to prove

5    that the client has given certain instructions if there should

6    be a dispute after a certain time.  And with regards to the

7    basic documents, we are obliged to keep these documents

8    identification documents, specimen of signatures, to know who

9    our client is, and to have . . . we have to comply with these

10   obligations which are imposed on us by Swiss law.

11   Q      Does UBS rely on clients providing accurate information

12   to the bank in order to run its business?

13   A      Yes.

14   Q      And does UBS rely on its client adviser or financial

15   intermediaries to also provide correct information to the bank

16   in order to run the business?

17   A      Yes.

18   Q      And I think you said it's a requirement of Swiss

19   anti-money laundering rules that they are required to provide

20   such accurate information?

21          MR. HOCHMAN:  Objection, asked and answered.

22          THE COURT:  Overruled.

23          MS. FINLEY:  You can answer.

24          THE WITNESS:  Yes.  We both use essentially the

25   client to provide accurate information.

```
 1   BY MS. FINLEY:
 2   Q      Are the records we discussed, are they the bank's
 3   records, or the client adviser's records?
 4   A      No; they are the bank's records.
 5   Q      And the records that we reviewed before coming here
 6   today, were all of those records made at or near the time that
 7   they state on the records from information provided by someone
 8   with knowledge of those records?
 9   A      Yes.  These were records --
10           MR. HOCHMAN:  I'm sorry, Your Honor.  Objection.
11   Foundation.
12           THE COURT:  Overruled.
13           THE WITNESS:  Yes.  Those records were produced when
14   those events took place.
15   BY MS. FINLEY:
16   Q      And were the records that we reviewed also kept in the
17   ordinary course of UBS's business?
18   A      Yes.
19   Q      And was making those records a regular practice of UBS?
20   A      Yes.
21   Q      And I'm going to show you what's been marked as
22   Exhibit 3A.
23           MS. KESSLER:  Your Honor, may I approach freely?
24           THE COURT:  You may.  Freely.
25
```

1   BY MS. FINLEY:

2   Q      Now, do you recognize that document?

3   A      Yes.  That's a declaration which I signed.

4   Q      And if you can just . . . generally describe what that

5   document is.

6   A      It says that -- it's a list of documents which I

7   reviewed.  And we show documents that are produced in the

8   normal course of business.

9   Q      And in fact, the certification in front of you, in 3A,

10  has those same questions about that the records were made at or

11  near the time by a person with knowledge of the records; is

12  that correct?

13  A      Correct.

14  Q      And that they were part of the regularly conducted

15  activity of UBS?

16  A      That's correct.

17  Q      And they were made as part of the regular practice.

18  A      That's correct.

19          MS. FINLEY:  Your Honor --

20          If I can turn your attention, I am going to provide

21  you with Exhibit 3R.  And 3S.

22          Your Honor, at this time, pursuant to his testimony

23  and the 3505 certification, the government would offer

24  Exhibit 3R into evidence.

25          THE COURT:  Do you intend to offer 3A, or not?

1              MS. FINLEY:  Unless we have some . . . I can offer

2      3A, but at this time . . . .

3              THE COURT:  I'm just asking.

4              MS. FINLEY:  I am not offering 3A at this point.

5              THE COURT:  Okay.  3R?

6              MR. HOCHMAN:  No objection to 3R, or 3A for that

7      matter.

8              THE COURT:  Okay.  Well, 3R will be admitted, and you

9      can proceed.

10             (Government's Exhibit 3R was admitted into evidence.)

11             MS. FINLEY:  Thank you, Your Honor.

12             Permission to publish?

13             THE COURT:  You may.

14             (An exhibit was projected onto the projector screen.)

15             MS. FINLEY:  If we look at the first page of the

16     exhibit.

17             (An exhibit was projected onto the projector screen.)

18     BY MS. FINLEY:

19     Q     Can you explain to the jury what this document is?

20     A      This is the so-called Form A, which we have to apply in

21     cases where we have to identify the beneficial owner of a

22     business relationship.  It's a document that is -- contains a

23     declaration given by the client, not by the bank.  And this

24     declaration essentially says who the beneficial ownership --

25     who the beneficial owner is.  It can either be the contractual

 1   partner or it can be somebody else.  If it is somebody else,

 2   then the account holder or contractual partner, that's the

 3   same, then the client has to indicate who this third party is.

 4   Q      So you use a lot of terms there.

 5          Who is the contracting partner, what is the contracting

 6   partner?

 7   A      The contracting partner is the account holder.

 8   Q      And in this case who is the contracting partner?

 9   A      The contracting partner is Patricia Hough.

10   Q      And with respect to the word "beneficial owner," what do

11   you understand a beneficial owner to be?

12   A      The beneficial owner has to be seen in contrast to the

13   account holder, who is the owner from a purely legal form,

14   legal point of view, whereas the beneficial owner is the one

15   who ultimately owns the funds from an economic point of view.

16   Internally or, ya, in practice, we use a different description,

17   a more pragmatic description or definition, and we say the

18   beneficial owner is the one who shouts the loudest when the

19   money is gone.

20   Q      And in this case, if we move to the middle of the page,

21   who is identified as the beneficial owner?

22   A      The client declared that he, himself, is the beneficial

23   owner.

24   Q      And when you say "the client," the client is the

25   account -- is the contracting party?

1       And do you do anything to verify the beneficial owner's

2   identity?

3   A       If the account relationship, or business relationship,

4   was opened by correspondence, we have to obtain an official

5   identification document.  That's the minimum.  In some cases we

6   also ask for such an identification document, even if we don't

7   have a legal obligation to do so.

8   Q       And does the contracting party, or the contracting

9   partner, have to also be the beneficial owner; is it the same

10  person?

11  A       No, not necessarily.

12  Q       Who does UBS consider to be the client?

13  A       The client is the contracting party, the . . . the legal

14  owner of the assets.

15  Q       And if you look back at the top, under the title of the

16  document, under verification of the beneficial owner identity,

17  there's some small print that says:  "Form A, as per Article 3

18  and 4, CDB."

19          Can you explain to the jury what that is?

20  A       The CDB is the code of conduct for -- you heard code of

21  due diligence for banks?  And the Article 3 and 4 are the

22  respective articles which are about the obligation to determine

23  the beneficial owner.

24  Q       And is that something that all Swiss banks have to

25  comply with?

1   A      Yes.

2   Q      Why is it important to the bank to identify the

3   beneficial owner?

4   A      Well, we want to know whose money we ultimately have on

5   our books, whose money we are ultimately managing.  We don't

6   want to satisfy ourselves with an intermediary or a strawman or

7   somebody who acts on behalf of somebody else but who is not the

8   owner of the assets deposited with the bank.

9   Q      Does the client adviser receive training about this

10  form?

11  A      Yes.  This is part of the training.

12  Q      Does every securities account have to identify the

13  beneficial owner?

14  A      We can, based on the assumption that the contracting

15  party is the same as the beneficial owner, if there are

16  indication that this might not be the case, then we have to go

17  through this process and request the Form A declaration from

18  the client.  If the business relationship was opened by

19  correspondence, then we have to establish this Form A, or

20  require this Form A in all cases.  And also for domiciliary

21  companies, we also have to establish this Form A.

22  Q      Now, as we move to the bottom of the page, can you tell

23  what date this was filled out?

24  A      Excuse me?  When?

25  Q      When.  What date?

1    A       That was filled out on April 7th, 2004.

2    Q       And, if you're familiar, can you tell who the signature

3    is?

4    A       This is the signature of Patricia Hough.

5    Q       Now, you don't know that to be her signature, but based

6    on the document --

7    A       Uh-huh.

8    Q       You have no personal knowledge that that's her

9    signature.

10   A       No, I have no personal knowledge.  But I saw the same

11   signature on other documents which I had to review.

12   Q       Now, underneath your signature, there are two boxes, "By

13   Correspondence," and, "In Person".  Is this where the client

14   adviser would check how the account was opened?

15   A       Correct.

16   Q       And, in this case, how was the account opened?

17   A       The box, "In person," is not ticked, and whether the

18   box, "By correspondence," is ticked or not I really can't say,

19   because there is a stamp just more or less over that box, so.

20   Q       Now, if we can just pull back out to the full exhibit,

21   there are a lot of stamps on this document.  If we look at the

22   bottom right-hand corner, is there a stamp for Dieter Luetolf?

23   A       Yes.  On the bottom of the right side.  Dieter Luetolf.

24   Q       Can you explain what these stamps are?

25   A       Ya.  That's the -- that's the stamp the client adviser

 1    applied.  And by this he confirms the respective box that he

 2    ticked on this form.  On this one we don't see whether it's the

 3    in-person box or the by-correspondence box.  But he confirms

 4    whether this was established face to face or by correspondence.

 5    Q      And are there criminal consequences when you fill out

 6    this form?

 7    A      Excuse me?

 8    Q      Are there criminal consequences if you provide false

 9    information on this Form?

10    A      For the client?  Yes.

11    Q      And is that listed on the document?

12    A      That is mentioned just above, in the lower section just

13    above the line.

14    Q      Does the beneficial owner have to be an individual, or

15    can the beneficial owner be a company?

16    A      It can be a company, provided it is an operating

17    company.

18    Q      And does the beneficial owner also have to have -- to be

19    a signatory on the account?

20    A      No.

21          MS. FINLEY:  Your Honor, this might be a good place

22    to stop for the evening.

23          THE COURT:  That's a good time.

24          Ladies and gentlemen, we're going to recess for the

25    evening.  A couple things.  First of all, I am going to, once

1  again, advise you do not discuss the case among yourselves, or

2  allow anyone to discuss it with you or in your presence.

3         I also want to tell you that you're a guinea pig for

4  us, collectively.  We're allowing, for the first time, jurors

5  to bring cell phones into the building.  So you're the first

6  jurors who are going to be allowed to bring cell phones into

7  the building.  Not into the jury room.  So, when you come in,

8  the CSOs will lock them up for you in a box, and give you . . .

9  I don't know if it's a key, or something that will let you get

10 it out.  But if you wish to, you can bring your cell phone in

11 so, during recesses and whatnot, if you need a cell phone, you

12 can use that.

13        You still can't use the cell phone to do any of those

14 things I told you not to do, but you'll have access to the

15 phones.  And I think we're going to keep it downstairs.  The

16 CSOs can point out where the lockboxes are.

17        So for federal court, we haven't done that in the

18 past, so we'll see how it works.

19        9:00 o'clock work for everyone tomorrow?  8:30?  No?

20        All right.  9:00 o'clock.  See you in the morning.

21        JUROR 4:  (Holding up note pad) Do we leave those

22 here, sir?

23        THE COURT:  Yes.  You can leave those in the jury

24 room.  That will be locked up.

25        (At 5:00 p.m., the jury was escorted from the

COURT RECESSED FOR THE DAY                                     82

```
1        courtroom.)

2             All right.  9:00 o'clock.

3             MR. HOCHMAN:  Thank you much.

4             MS. FINLEY:  Thank you, Your Honor.

5             THE COURT:  You may stand down.

6                     -- -- -- -- -- -- -- --

7             (At 5:00 o'clock, p.m., court was recessed, to be

8        reconvened at 9:00 a.m., on Wednesday, October 9, 2013.)

9                     -- -- -- -- -- -- -- --

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```