UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

---

THE UNITED STATES OF AMERICA,

          Plaintiff,

                              Fort Myers, Florida

vs.                             October 9, 2013

PATRICIA LYNN HOUGH,            9:00 a.m.

          Defendant.

---

TRANSCRIPT OF JURY TRIAL, DAY TWO

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:   U.S. Department of Justice
     Tax Division
  P.O. Box 813
  Washington, DC  20044
  BY:  CARYN FINLEY, ESQ.

  U.S. Department of Justice
     Tax Division
  Suite 7334
  601 D Street NW
  Washington, DC
  BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

A P P E A R A N C E S
(Continued From Previous Page)


FOR THE DEFENDANT:        Bingham McCutchen, LLP
                          The Water Garden
                          1601 Cloverfield Boulevard
                          Suite 2050 North
                          Santa Monica, CA  90404-4082
                          (310) 904-1000
                          BY:  NATHAN J. HOCHMAN, ESQ.

                          Bruce L. Udolf, PA
                          500 East Broward Boulevard
                          Suite 1400
                          Fort Lauderdale, FL  33394
                          (954) 858-8831
                          BY:  BRUCE L. UDOLF, ESQ.

REPORTED BY:        JEFFREY G. THOMAS, RPR-CP, CRR
                    Official Federal Court Reporter
                    United States Courthouse
                    2110 First Street, Suite 2-194
                    Fort Myers, FL  33901
                    (239) 461-2033


                         *  *  *

I N D E X

October 9, 2013                                          Vol.      Page

Preliminary Discussions                                   2          6

- - -

GOVERNMENT'S WITNESSES

| WITNESS | DIRECT Vol. Pg. | CROSS Vol. Pg. | REDIRECT Vol. Pg. | RECROSS Vol. Pg. | VOIR DIRE Vol. Pg. |
|---|---|---|---|---|---|
| J. MARC FUTTERKNECHT | 2   7 | 2  110 | 2  196 | 2  213 | |
| SHIRLEY BALL | 2  217 | 2  223 | 2  231 | | |
| THOMAS MURTHA | 2  232 | | | | |

- - -

GOVERNMENT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Government's Exhibit 3S Admitted in Evidence | 2 | 28 |
| Government's Exhibit 3GG Admitted in Evidence | 2 | 33 |
| Government's Exhibit 3HH Admitted in Evidence | 2 | 39 |
| Government's Exhibit 3JJ Admitted in Evidence | 2 | 45 |
| Government's Exhibit 3KK Admitted in Evidence | 2 | 47 |
| Government's Exhibit 3U Admitted in Evidence | 2 | 49 |
| Government's Exhibit 3V Admitted in Evidence | 2 | 66 |
| Government's Exhibit 3W Admitted in Evidence | 2 | 69 |
| Government's Exhibit 3Y Admitted in Evidence | 2 | 73 |
| Government's Exhibit 3Z Admitted in Evidence | 2 | 75 |
| Government's Exhibit 3AA Admitted in Evidence | 2 | 76 |

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

GOVERNMENT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Government's Exhibit 3C Admitted in Evidence | 2 | 77 |
| Government's Exhibit 3D Admitted in Evidence | 2 | 82 |
| Government's Exhibit 3E Admitted in Evidence | 2 | 83 |
| Government's Exhibit 3CC Admitted in Evidence | 2 | 91 |
| Government's Exhibit 3DD Admitted in Evidence | 2 | 93 |
| Government's Exhibit 3EE Admitted in Evidence | 2 | 95 |
| Government's Exhibit 3J Admitted in Evidence | 2 | 95 |
| Government's Exhibit 3K Admitted in Evidence | 2 | 97 |
| Government's Exhibit 3L Admitted in Evidence | 2 | 99 |
| Government's Exhibit 3N Admitted in Evidence | 2 | 101 |
| Government's Exhibit 3O Admitted in Evidence | 2 | 103 |
| Government's Exhibit 3P Admitted in Evidence | 2 | 104 |
| Government's Exhibit 3I Admitted in Evidence | 2 | 107 |
| Government's Exhibit 3A Admitted in Evidence | 2 | 128 |
| Government's Exhibit 3G Admitted in Evidence | 2 | 156 |
| Government's Exhibits 1A through 1H Admitted in Evidence | 2 | 217 |
| Government's Exhibits 1T through 1Y Admitted in Evidence | 2 | 218 |
| Government's Exhibit 1K Admitted in Evidence | 2 | 219 |
| Government's Exhibit 1AA Admitted in Evidence | 2 | 220 |

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

GOVERNMENT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Government's Exhibit 1BB Admitted in Evidence | 2 | 221 |
| Government's Exhibit 1R Admitted in Evidence | 2 | 222 |
| Government's Exhibit 1S Admitted in Evidence | 2 | 222 |
| Government's Exhibit 1II Admitted in Evidence | 2 | 223 |
| Government's Exhibits 1L through 1Q Admitted in Evidence | 2 | 227 |

– – –

|  | Vol. | Page |
|---|---|---|
| Renewed Motion by Mr. Hochman | 2 | 251 |
| Response by Ms. Finley | 2 | 253 |
| Further Discussion Re Motion | 2 | 255 |
| Court Recessed for the Day | 2 | 257 |

* * *

1          THEREUPON, the above-entitled case having been called to

2     order, the following proceedings were held herein, to-wit:

3                              - - -

4               THE COURT:  Good morning, everyone.

5               Both sides ready for the jury?

6               MR. HOCHMAN:  Yes, Your Honor.

7               MS. FINLEY:  Yes, Your Honor.

8               THE COURT:  I was told one of the jurors missed the

9     exit, I think he's from Naples, and he ended up north of town,

10    which is why he's late.

11              Have the jury step in, please.

12              (At 9:23 a.m., the jury was escorted into the

13        courtroom.)

14              THE COURT:  Good morning, ladies and gentlemen.

15              And, Ms. Finley, you may proceed with your witness.

16              MS. FINLEY:  Thank you, Your Honor.

17              I'm sorry, Your Honor.  May we have the projector?

18              THE COURT:  You may.

19              THE WITNESS:  Good morning.

20              THE COURT:  Good morning.  I would remind you that

21    you're still under oath.

22              THE WITNESS:  Okay.

23              THE COURT:  And you may proceed.

24              MS. FINLEY:  Thank you, Your Honor.

25

1                      JEAN MARC FUTTERKNECHT,

2    having been recalled as a witness by the Government, and

3    having been previously called as a witness and duly sworn,

4    was examined and testified as follows:

5                         DIRECT EXAMINATION

6    BY MS. FINLEY:

7    Q      Good morning, Mr. Futterknecht.

8           Yesterday, when we stopped for the day, we were talking

9    about the beneficial owner and the Form A.  On the document,

10   which will take a minute to come up, but -- let me just

11   take . . . .

12              MS. FINLEY:  Your Honor, may I approach the witness?

13              THE COURT:  You may freely.

14   BY MS. FINLEY:

15   Q      I have what is marked as Exhibit 3R before you.

16          (An exhibit was projected onto the projector screen.)

17   BY MS. FINLEY:

18   Q      And is there a place on the Form A for the contracting

19   party to elect that the contracting party is the sole

20   beneficial owner or that the beneficial owner is a different

21   person?

22   A      Yes.  There are two boxes, where the client has to

23   indicate whether the beneficial owner is himself or somebody

24   else.  So these are two boxes in the middle part of the

25   document.

1    Q      And on this Form A, what box is checked?

2    A      The first one, which says that the contracting party is

3    the sole beneficial owner of the assets -- concerned or

4    deposited.  I can't read it on the copy.

5    Q      Okay.  And if we turn to Page 2 of Exhibit 3R, can you

6    explain to the jury what the basic document for account --

7    custody account relationship is?

8    A      This is the main document, or the basic document, which

9    every client has to sign.  And this document essentially says

10   it is used to actually establish the relationship.  So a

11   business relationship consists of several elements, depending

12   on what services and products the client want to have, and this

13   is kind of the overall, or the umbrella, document that is

14   established for opening a new business relationship.

15   Q      Now, if we move to sort of where we start, at the upper

16   part of the page, there is a . . . in the basic data section,

17   it says type of relationship, numbered account relationship.

18          Can you explain to the jury, what a numbered account

19   relationship individual is?

20   A      Well, first of all, every relationship has a number,

21   what we call the master number.  And the numbered account is

22   nothing else but the fact that, within the bank, when

23   transactions must be executed, when other people are involved

24   in handling transactions, that they do not see the actual name

25   of the client, but only a number.  So it's a kind of privacy

1  within the bank.

2  Q      And on this document, who is listed as the account

3  holder?

4  A      The account holder is Patricia Hough.

5  Q      And in the small type just above the account holder's

6  section, is the account holder asked to provide identification

7  documents?

8  A      Yes.  It says:  "Please enclose copies of the

9  identification document shown."

10  Q      And the account holder, is that the same as the

11  contracting party?

12  A      Correct.

13  Q      And if we move down to the bottom part of the page, the

14  correspondence instruction section, can you explain to the jury

15  what that section entails?

16  A      The client can . . . choose whether he wants to have

17  entire mail sent to his home address or to another address that

18  he indicates, that he can indicate, or whether he wants to have

19  the entire mail retained with the bank.  In this case, the

20  client chose to have retained mail.

21  Q      And if we turn to the second page, on Page 3, for the

22  basic document, if you can tell, who signed this document?

23  A      This was signed by Patricia Hough.

24  Q      And where was it signed, or where does it state that it

25  was signed?

1    A       It was signed on April 7, 2004, in a place which I would

2    read as Garden, MA.

3    Q       If we can move down to Page 5 of Exhibit 3R, is this an

4    example of the identification documents that are required by

5    UBS?

6    A       Yes.

7    Q       And in this case, what kind of document is this?

8    A       It's a copy of a passport, a U.S. passport.

9    Q       And if we turn to Page 6 -- I'm sorry.

10         Before we turn, whose passport is it for?

11   A       It's Patricia Lynn Hough's passport.

12   Q       And if we turn to Page 6, is that another form of

13   identification?

14   A       That's another type of identification document we would

15   accept, yes.

16   Q       And is that also for Patricia Hough?

17   A       Yes.

18         MR. HOCHMAN:  Your Honor, may I just have a moment

19   with counsel, because my number is not matching?

20         THE COURT:  Sure.

21         (Counsel confer privately.)

22         MR. HOCHMAN:  Thank you, Your Honor.

23   BY MS. FINLEY:

24   Q       Now, if we turn to Page 7 of Exhibit 3-R -- and this is

25   the supplement for new account, U.S. status tax form, U.S.

1    withholding tax, and some other language after that –– can you

2    explain to the jury what this document is?

3    A      This document is used to establish whether the client is

4    a U.S. person or not.

5    Q      And if we move to the item under Number 1 –– actually,

6    let me just take one step back.

7           At the top of the document, there is a master number,

8    and an account number?

9    A      Correct.

10   Q      So the master number is the overall number for that

11   client; is that correct?

12   A      (Witness nods head up and down.)

13   Q      And the account number is what you testified to be the

14   object?

15   A      Correct.

16   Q      And so here, Point S-1, do you know what kind of object

17   that is?

18   A      Point S always stands for a security account.

19   Q      So now, if we move to the Item Number 1, and to the

20   extent that you can read the copy, if you could read that to

21   the jury, please.

22   A      So Item 1 reads:  "Non-U.S. person declaration, natural

23   person . . ."

24          Now it gets a bit difficult.  I can really hardly read

25   it on this copy ––

1   Q      Okay.

2   A      -- but essentially the question is:  "Are you a U.S.

3   citizen?"

4          And answer is yes.  The "yes" box is ticked.

5          And:  "Are you a resident and/or do you have a permanent

6   residency permit in the U.S.A." -- again, some small print

7   which I cannot read on this copy.

8          The answer is:  Yes.

9          And the next question is:  "Are you liable to tax in the

10  U.S.A. or any other," grounds?

11         And again the answer is yes.

12  Q      And if we look at Item Number 2, that item is titled,

13  "Beneficial Ownership".  If you could read that to the

14  jury . . . if you can.

15  A      So beneficial ownership:  "I, the signed account holder,

16  hereby declares that" -- difficult to read -- "beneficial owner

17  of the assets and income to which this declaration relates in

18  accordance with U.S. tax law."

19  Q      So that beneficial ownership paragraph is different than

20  the beneficial owner paragraph that is in the Form A; is that

21  correct?

22  A      That's correct, yes.

23  Q      And under Number 4, do you understand what Number 4 is

24  about?  Oh or can you explain to the jury what Number 4 is?

25  A      The Number 4 says:  Disclosure of status as U.S. person,

1  agreement for the state of U.S. securities and deduction of

2  U.S. backup withholding tax.

3          So do I have to read the entire section?

4  Q    No.  Do you know what that section, Number 4, is for?

5  A    I don't know it in detail, because tax matters are not

6  really my . . . area of expertise.  But it is generally about

7  the tax status or status regarding withholding tax.

8  Q    And why does UBS require account holders to fill out

9  this form?

10  A    UBS entered into an agreement with U.S. tax

11  authorities -- and again, I don't know the details, but it is

12  about -- essentially, it is about doing that, withholding taxes

13  properly, and how they're determined and handled.

14  Q    Is this with respect to whether an account holder can

15  invest in U.S. securities?

16  A    Yes.  Ultimately, it ends up with this.

17  Q    So . . . .  I'll withdraw that question.

18          And then on the bottom of the page, is that also signed

19  on April 7, 2004?

20  A    Correct, it is.

21  Q    And it appears to be signed by Patricia Hough?

22  A    Yes.

23  Q    Now, if we just turn to Page 8, briefly, at the top of

24  the page, this account number, the object, is S-2; is that

25  right?

1    A       Yes.

2    Q       And so for each object, does the account holder have to

3    fill one of these forms out?

4    A       Yes.  For each securities account.

5    Q       And is it the account holder that's filling this out, or

6    the beneficial owner, under Swiss law?

7    A       This has to be signed by the account holder.

8    Q       If we could turn to Page 10 of 3R, and this document is

9    titled, "Supplement for New Account, U.S. Status, Assets and

10   Income, Declaration for U.S. Taxable Persons," can you explain

11   to the jury what this document is?

12   A       With this document, the client waived his right to

13   invest in U.S. securities.

14   Q       And why do they have to fill this document out?

15   A       If the client does not invest in U.S. securities, the

16   withholding tax issue . . . is kind of no longer an issue.

17   Q       And if you know, would UBS, if it -- if an account

18   holder was a U.S. person, were they able to invest in U.S.

19   securities?

20   A       No.  At that time we blocked all accounts for

21   investments in U.S. securities for U.S. persons.

22   Q       Now, if we turn to Page 13 of 3R, this document is

23   titled, "General Power of Attorney", who is the . . . name

24   listed at the top of the page?

25   A       On the top of the document, it's Patricia Hough.

1  Q      And who does Patricia Hough authorize to be the power of
2  attorney on this account?
3  A      A person called Charlene L. Varga.
4  Q      And what rights does the power of attorney, for this
5  power of attorney, have with respect to the account?
6  A      It's a general power of attorney.  That means the holder
7  of this power of attorney can exercise the same rights as the
8  account holder himself.
9  Q      And if we actually look at the bottom of the document,
10 is that -- is there a box that you can tick to decide what type
11 of authority the person would have?
12 A      It's . . . a power of attorney which entitles the holder
13 to act alone, so not . . . not together with somebody else.
14 Q      And if we turn to the second page of the power of
15 attorney, on Page 14, again, who signs this power of attorney?
16 A      This was signed by Patricia Hough.
17 Q      Now, turning to Page 15, the asset management agreement,
18 can you explain to the jury what this document is?
19 A      The client decided to have his assets managed by the
20 bank.  And for this, the bank needs an agreement, and this
21 is -- this is the respective agreement, or contract, for the
22 bank to be authorized to manage the client's assets.
23 Q      And for each securities account, or each object, does an
24 asset management agreement have to be filled out?
25 A      Yes.  I mean, the client has a certain discretion how to

1  structure it, but if he -- if he wants a different investment

2  strategy for different securities accounts, then . . . then a

3  separate agreement for each security account would be

4  necessary.

5  Q     And if we turn to Page 18, is this the page that the

6  client would indicate the type of investment strategy they want

7  to enter into?

8  A     Yes.

9  Q     And turning to the last page of that document -- or,

10  sorry, Page 19, again, who is this document signed by?

11  A     This was signed by Patricia Hough.

12  Q     Now, you testified earlier that UBS maintains

13  correspondence and e-mails between the client adviser and the

14  client, and other internal UBS documents, as a part of it is

15  ordinary course of business.

16           MS. FINLEY:  If I may have marked Exhibit 3S?

17           THE COURT:  3S?

18           MS. FINLEY:  3S, as in "Sam."

19           THE COURT:  I think that was marked yesterday.

20           (Ms. Finley confers with the courtroom deputy

21      privately.)

22  BY MS. FINLEY:

23  Q     Now, looking at that file, are these the correspondence,

24  e-mails, and other internal UBS documents for account

25  ending 2267?

1    A      Yes.  This relates to 2267.  Um-hum.

2    Q      And again, were these records made at or near the time

3    indicated on the document by, or from, information transmitted

4    from a person that had knowledge?

5              MR. HOCHMAN:  Objection, foundation.

6              THE COURT:  Overruled.

7              MS. FINLEY:  You may answer the question.

8              THE WITNESS:  Yes.

9    BY MS. FINLEY:

10   Q      And are they kept in the ordinary course of UBS's

11   business?

12   A      That's correct.

13   Q      And were these records made in the ordinary course of

14   UBS's business?

15   A      Yes.

16             MS. FINLEY:  Your Honor, at this time the government

17   would offer Exhibit 3S into evidence?

18             MR. HOCHMAN:  Objection, Your Honor.  I believe that

19   we can try to -- objection on foundation, Your Honor . . . and

20   hearsay . . . double hearsay actually.

21             THE COURT:  Let me see the exhibit, please.

22             (The Court reviews Government's Exhibit 3S.)

23             THE COURT:  Come to sidebar, please.

24                          AT SIDEBAR

25             THE COURT:  All right.  Which portion of the

1    composite exhibit do you object to, as either hearsay or double

2    hearsay?

3           MR. HOCHMAN:  Sure.  All e-mails and all

4    correspondence, because this defendant has no idea whether or

5    not Dieter Luetolf made these at or about the time of the

6    occurrence.  He never spoke to Dieter Luetolf.  He has no

7    independent knowledge because he never dealt with this account

8    before.  He's just a custodian.  And he has no idea.

9           The key question of the five is, was the document

10   made at or near the time of the occurrence of the event.

11   Again, unless you have some knowledge to show that a document

12   was made at or near the time of the event, you can't possibly

13   have the foundation to establish that key element of the

14   business records exception.

15          Also, what you'll see is that these were

16   communications back and forth with Patricia Hough and –– in

17   some instances, and Dieter Luetolf, a few of those.

18          And the other type of documents that we don't oppose,

19   if Your Honor will scroll forward in the documents, would be

20   documents like this, Your Honor, we do not oppose.  So it's

21   just the communication documents that are intermixed within

22   here that we do oppose.

23          THE COURT:  The ones you don't oppose, first one

24   looks like UBS payment order.  And I know, from looking at the

25   exhibit, there are others similar.

1          MR. HOCHMAN:  Yes.  Documents that deal with

2     bank . . . typical bank information, we do not oppose.

3     Documents that deal with communications are the ones we do

4     oppose.

5          And then, you know, for instance, where there's

6     handwriting on it, we don't know whose handwriting it is, there

7     has been no foundation for whose handwriting it is, and he

8     doesn't know.  So the documents you're looking at right now,

9     Your Honor, again, are just the typical bank documents, we

10    would not oppose.

11         So we can try to do this, if Your Honor would reserve

12    ruling on this, I can -- and we would not oppose the documents

13    you're now looking at, titled, "Client Trade Information,"

14    because, again, these are typical bank documents that don't

15    require --

16         THE COURT:  All right.  You started to say

17    something --

18         MR. HOCHMAN:  I was starting to say, perhaps what we

19    can do at the break, rather than use the jury's time now, is I

20    can come up with a list in this Exhibit 3S of the documents

21    that we're opposing.  There are documents about contact sheets.

22    He has no knowledge, one way or the other, if this is accurate,

23    made at the time.  There's dates on it, but he doesn't know if

24    Dieter Luetolf followed the bank's policy because he never

25    spoke to him.

1          THE COURT:  I'll let you do whatever you need do to

2    specifically identify the documents in 3S that you object to.

3          MR. HOCHMAN:  Yes, Your Honor.  It's going to be --

4          THE COURT:  I think I understand the distinction

5    you're making.

6          MR. HOCHMAN:  Yes.

7          THE COURT:  And I think the record will reflect, from

8    just looking at the documents, which ones are being objected

9    to, and which are not.

10          MR. HOCHMAN:  Yes.  It will make that -- there's page

11    numbers, I think, in the bottom left-hand corners --

12          THE COURT:  Oh, I see.

13          MR. HOCHMAN:  -- so I can object by page number.  And

14    they just happen to be all interspersed, or else it would have

15    been a cleaner objection, Your Honor.

16          THE COURT:  All right.  You can put it on the record

17    at some point.  We don't need to do that now.

18          MR. HOCHMAN:  And you can reserve rulings on at least

19    those documents that I am objecting on, to see if there is an

20    objection to be laid or not laid.

21          THE COURT:  No.  I don't need to reserve.  The

22    objection is overruled.

23          MR. HOCHMAN:  All right.  Thank you, Your Honor.

24          THE COURT:  Now, I'm not going to remember to let you

25    make your detailed objection unless you remember.

 1                MR. HOCHMAN:  Okay.

 2                THE COURT:  So at some point you need to, at a recess

 3    or something, but I'm going to put the burden on you to do

 4    that.

 5                MR. HOCHMAN:  Thank you, Your Honor.

 6                MS. FINLEY:  Just for moving forward because, for

 7    every single account there are similar documents that I am

 8    going to offer in a similar manner, containing similar e-mails

 9    and other correspondence, and so is that something, then, for

10    each set of documents?

11                MR. HOCHMAN:  I'll make the same objection.

12                MS. FINLEY:  Make the same objection and then

13    detail . . . .

14                THE COURT:  And are all these the same foundation and

15    same person?

16                MS. FINLEY:  Mr. Luetolf, yes.  And e-mails between

17    him and Dr. Hough and Dr. Fredrick.

18                THE COURT:  Between him and one or two of the

19    defendants, not third parties?

20                MS. FINLEY:  The only third parties would have been

21    the internal bank people.  So if he needed to execute part of

22    his duties, as Mr. Futterknecht had testified to, as far as

23    corroborating that the people who are filling out these forms

24    are who they say they are, so the correspondence is him

25    corresponding with the internal bank people.

1          THE COURT:  Is it different than the documents to

2    which counsel does not object?

3          I'm not sure I understand -- I'm going to admit, over

4    objection, the correspondence between the defendant and

5    Mr. . . . Lubeck?

6          MS. FINLEY:  Luetolf.

7          THE COURT:  I'll get it by the end of the trial, and

8    correspondence between Mr. Luetolf and the defendant, likewise

9    correspondence between the co-defendant and Mr. Luetolf, and

10   vice versa.

11         MS. FINLEY:  And if there are e-mails where

12   Mr. Luetolf is e-mailing someone -- or Mr. Singenberger, who's

13   also an alleged co-conspirator -- to make a transaction such as

14   wire certain funds, or Mr. Luetolf is directing someone at the

15   bank to wire those funds, which category do those fall into?

16         THE COURT:  I'll give counsel a chance to make an

17   objection.  At this point, I don't understand the objection to

18   relate to those as well.

19         MR. HOCHMAN:  Certainly.  So, Your Honor, and by the

20   way, we would incorporate both arguments for our motions in

21   limines, which deal with these issues as to both co-conspirator

22   statements and sort of a double-hearsay issue on the bank

23   records, and then the additional objection for foundation on

24   all these records.

25         The foundation objection is that he just doesn't

1    know, Your Honor, that he's testifying about something he

2    doesn't know about on a key element for the business records.

3           On the co-conspirator issue, the issue is that they

4    haven't established a conspiracy yet, and they have to do it

5    independent of these records.

6           Your Honor has said, in your ruling on that, that the

7    government proceeds at its peril because if it introduces these

8    records and they can't establish a conspiracy at some point, it

9    could result either in the suppression of the records or,

10   worse, a mistrial or dismissal.

11          So we renew all those objections, Your Honor.

12          And then we can specify, you know, as we go through,

13   the type objections.  The problem, of course, is that they're

14   being entered in bulk, so it's not like we are having a

15   conversation on a one-by-one document basis.

16          THE COURT:  You're correct.  I guess to the extent

17   I've ruled, I've ruled generally, and you will have the

18   opportunity to make it specific for the record purposes.  But I

19   agree in part with what you say, certainly.

20          Now, this is the subject of the motion in limines,

21   and I have no problem with your incorporating your memos and

22   your objections from this written pleadings.

23          With regard to the co-conspirator, I believe you said

24   something to the effect that the . . . these documents, that

25   the foundation has to be laid without these documents.  I don't

 1    think that's correct.  I think that the documents can be

 2    considered, along with other evidence, that the persons were

 3    co-conspirators, and . . . .

 4              MR. HOCHMAN:  That's correct.  These documents, by

 5    themselves, if these were the only documents, this wouldn't

 6    establish a conspiracy.  But they can be considered with other

 7    documents.

 8              THE COURT:  Okay.  We agree with that.  And we agree

 9    that so far they haven't done it.  But it has to start

10    someplace, in terms of admitting evidence.  And as I suggested

11    in my order, at the end of the day, if the government hasn't

12    established the foundations for the co-conspirators, they're in

13    a whole lot more trouble than the jury instructions are ever

14    going to fix, as far as I see it.  So they do it at their

15    peril.

16              MR. HOCHMAN:  Okay.

17              MS. FINLEY:  Your Honor, just for the record, with

18    respect to the foundation under the business records for the

19    other types of records that are not correspondence between the

20    defendant or co-conspirators and Mr. Luetolf, with respect to

21    the other documents, these are records that the bank maintains

22    in its ordinary course of business, as Mr. Futterknecht

23    testified to, that the bank needs to rely on these documents,

24    and it has an interest in maintaining accurate records that are

25    made at the time that they are done because if a client were to

1    not instruct, or money were to leave an individual's account

2    without permission, then the bank would be in a whole lot of

3    trouble, and so the reliability that they were made at or near

4    the time, these are things that are required by the bank in

5    order to carry out its ordinary course of business.

6              THE COURT:  You may be a little sidetracked.  I am

7    not sure counsel is objecting to those.

8              MR. HOCHMAN:  You're talking about the trade

9    information at the end of Exhibit 3S.  We were not objecting to

10   those trade summation documents.

11             THE COURT:  Let me give you an example, just so, if I

12   see it, I make sure I understand it.

13             For example, if there's an e-mail from the defendant

14   directing the bank officer, Luetolf, to do something, and then

15   Luetolf sends an e-mail, or a communication, to another bank

16   person, saying, "Do it," I would admit that as a business

17   record.

18             I don't know if there's an objection to that.  For

19   the first part, I know there is an objection to.  Once you get

20   past that, the officer directing an employee to carry out a

21   certain function, I would see that as more of a classic

22   business record.

23             But I don't know if you object to that, so I guess

24   that's my question.

25             MR. HOCHMAN:  And, Your Honor, what I will do is go

1    through the records, and we'll just come up with very

2    specific -- these records are contained within certain

3    exhibits, so I'll make the objection, and then we'll file --

4    and since it's not going to be every document in the exhibit,

5    I'll follow it up, probably in writing --

6              THE COURT:  That's fine.

7              MR. HOCHMAN:  -- with specific numbers so that the

8    Court can then look at it.  And there might even be certain

9    exhibits that the Court can reconsider when you look at them

10   now, with a broader context of how it all plays out, that the

11   Court might consider your ruling with regard to a specific

12   exhibit.

13             THE COURT:  There may be a specific exhibit, you're

14   right.  For our purposes, I'm satisfied with you, for each

15   other exhibit, standing up, making your objection generically.

16   I'm going to give you the same ruling.  You can identify the

17   specific documents at some point.  If you think the fact

18   pattern is different than what we've discussed here, you need

19   to tell me that.  Otherwise, I'm going to assume --

20             MR. HOCHMAN:  Sure.  And what I'll do is, I'll follow

21   it up in writing, rather than having us go through sidebar on

22   each document each time.  We'll do it promptly so that the

23   Court can certainly rule before the end of --

24             THE COURT:  I understand you think I'm wrong, but if

25   there's any particular document that you think . . . .

1          MR. HOCHMAN:  Is different.

2          THE COURT:  -- is different, call it to my attention.

3          MR. HOCHMAN:  I will.

4          MS. FINLEY:  And then I'm sorry, Your Honor, just for

5     functionality and to move things along, the questions that I

6     asked him about these types of e-mails, in order to lay the

7     foundation, I am -- I was not intending then to ask those again

8     for each chunk of those exhibits for the separate accounts,

9     unless the Court -- or if I just move to offer it, it's going

10    to be under that same basis.

11         MR. HOCHMAN:  And again, I would ask that they lay

12    the foundation for this particular set of records each time.

13    With other types of records, we already have a stipulation in

14    place, just a straight bank statement or the account-opening

15    documents.

16         THE COURT:  I think you better do it for record

17    purposes, since this seems to be a material issue.

18         MS. FINLEY:  That's fine.  And if I just can

19    understand, with respect to the basic account and the

20    documents, and account statements, can I then -- I don't need

21    to lay the more specific foundation, I can offer them pursuant

22    to our notice.

23         MR. HOCHMAN:  I think what you could do is, you could

24    just say, "are these business records like the other business

25    records you've testified," without having to go through all

1   five of the elements of the business records sections.

2              MS. FINLEY:  But not with respect to the e-mails.

3              MR. HOCHMAN:  With respect to the e-mail documents, I

4   would ask you to do the entire presentation.

5              THE COURT:  That's fine.

6              MS. FINLEY:  Thank you, Your Honor.

7                         IN OPEN COURT

8              THE COURT:  All right.  As stated at sidebar,

9   Exhibit 3S will be admitted.

10             (Government's Exhibit 3S was admitted into evidence.)

11             MS. FINLEY:  Thank you, Your Honor.

12             Permission to publish?

13             THE COURT:  You may do so.

14             (An exhibit was projected onto the projector screen.)

15   BY MS. FINLEY:

16   Q      If we can look at the first page of Exhibit 3S, what is

17   this document?

18   A      This is a telefax sent to Patricia Hough.  The fax

19   number of the receiving party is indicated.  The fax contains

20   three pages -- consists of three pages.  The subject is,

21   "Power."

22             And do you want to read me, the text?

23   Q      If you could read that into the record, please.

24   A      "Dear Pat, as discussed, here's the power of attorney

25   form attached.  You can put more than one attorney on the form

1    and can specify below whether they are authorized to sign only

2    jointly or by their sole signature.  The attorney needs to sign

3    beside his" -- "her/his name.  You sign at the bottom as

4    principal.  Best regards, Dieter Luetolf."

5    Q      And on the document, can you tell what the date is?

6    A      There is a handwritten note indicating, on the top, of

7    14th of June, '04.

8    Q      And in Switzerland, they put the month second, and the

9    day of the month first?

10   A      The day of the month first, and then the month, and then

11   the year.

12   Q      Can you tell the jury who Dieter Luetolf is?

13   A      Dieter Luetolf is, or was, the client adviser for this

14   relationship.

15   Q      And earlier you testified about -- excuse me -- the

16   archive system.

17          The scan -- the bar code on the top, is that part of

18   UBS's system to make sure that this document is maintained for

19   the account?

20   A      Yes.  The documents are scanned, and then they receive

21   this bar code so that they can be retrieved.

22   Q      And you also testified about the . . . archive with the

23   R-E-G-I stamp at the top of the page.

24          Is that the stamp that would show it was archived?

25   A      Yes.  R-E-G-I stands for "registration."

1    Q      Now, if we can turn to Page 2 of Exhibit 3S, can you

2    explain to the jury what this document is?

3    A      So "UTS" stands for "UBS Transfer System."  This is a

4    system in which we, or the client adviser, captures a . . . a

5    payment . . . payment instruction, and with all the details:

6    Who is the sending party; who is the receiving party; the

7    amount of money; and other technical details, like transaction

8    number, and then the information of this kind.

9    Q      And these document -- these payment orders are also

10   maintained by UBS?

11   A      Yes.

12   Q      And if we can turn to Page 9 of Exhibit 3S . . . .

13   Before a client adviser can take any action on an account, do

14   they need to receive instructions from the client?

15   A      Yes.

16   Q      Can a client adviser take action without receiving

17   instruction?

18   A      Theoretically he could, yes.  But that would not be

19   okay.

20   Q      And why would that not be in compliance with UBS's

21   rules?

22   A      Well, the client adviser cannot dispose of the funds

23   without client's instruction, unless he has an asset management

24   agreement.  Then, of course, it's part of the agreement that

25   they sell and buy and invest, according to the agreed strategy.

1   Q      So if we look at Exhibit 3S, Page 9, if you could read

2   the body of the letter into the record.

3   A      "Dear Sir" -- there's something written, a handwritten

4   note, which I cannot read on this copy -- "Dear Sir, will you

5   kindly transfer all equities and other assets to the newly

6   formed company.  Afterwards, will you please close and cancel

7   all existing accounts, et cetera.  Thank you very much for your

8   endeavors.  Yours sincerely" -- two signatures, one I read as

9   Patricia Hough, and the other one . . . I can't read it from

10  the . . . .

11  Q      And is there a date on that letter?

12  A      June 23rd, 2005.

13  Q      And if we turn now to Page 23 of Exhibit 3S, and just if

14  you can take a look at the page behind it, Page 24, can you

15  explain to the jury what this document is?

16         (An exhibit was projected onto the projector screen.)

17  A      This is a printout from the client history, the

18  electronic client history, so the Client Adviser Work Bench,

19  CAWB, where the client puts in information, additional

20  information that he obtains from the client, meeting notes and

21  so on.

22  Q      And so if we look at the bottom of Page 23, the total

23  asset composition . . . .

24         (An exhibit was projected onto the projector screen.)

25  A      Um-hum.

1   Q      Can you explain what information is supposed to go in

2   that box?

3   A      The client adviser is expected to provide information

4   about how many assets the client has, how they are composed, so

5   it gives an overview of the client's total wealth.

6   Q      And if you could read that into the record, please.

7   A      "They own medical colleges in Caribbean, University of

8   Saba, with a website address indicated.  Dr. D.F. is president.

9   They are currently in negotiations to sell these.  Mrs. P.H.

10  also does medical consulting.  That means advising hospitals in

11  the United States on how to pass the various periodic

12  regulatory checks.  Funds were moved to us from UBS Bahamas,

13  which no longer takes U.S. clients, and originate from their

14  schools/consulting business.  Assets come from joint account

15  that was split in two."

16  Q      And if we can . . . .  Actually, we'll move on to the

17  next exhibit.

18         That information, where does the client adviser usually

19  get that type of information about the client?

20  A      From conversations and contacts with the client.

21  Q      I'm going to show you what's been marked as Exhibit 3GG.

22         And are these documents in 3GG, are these the basic

23  account-opening documents for an account for contracting

24  partner Patricia Hough and David Fredrick?

25  A      Yes.  These are typical basic documents.

1   Q       And these documents are kept in the ordinary course of

2   UBS's business?

3   A       Yes.

4           MS. FINLEY:  Your Honor, at this time, the government

5   would offer Government's Exhibit 3GG into evidence?

6           THE COURT:  Any objection?

7           MR. HOCHMAN:  No objection.

8           THE COURT:  3GG will be admitted.

9           (Government's Exhibit 3GG was admitted into

10      evidence.)

11          MS. FINLEY:  Permission to publish?

12          THE COURT:  You may.

13          (An exhibit was projected onto the projector screen.)

14  BY MS. FINLEY:

15  Q       And if we can look at the first page of Exhibit 3GG, and

16  at the top it says:  "Contracting Party, Patricia Hough, David

17  Fredrick"?

18  A       Correct.

19  Q       And on this Form A, what do they declare -- or who do

20  they declare is the beneficial owner?

21  A       They declare that the contracting party partner is the

22  beneficial owner.

23  Q       And can you tell the date on the bottom, when this

24  document was filled out?

25  A       This was signed in Boston on October 17, 2000 and . . .

1    I think it's one, as far as I can read from the document.

2    Q       And with respect to this specific document, you can't

3    tell if it was done in person or by correspondence, can you?

4    A       No, I can't.

5    Q       If we turn to Page 2 and 3, just briefly, the documents

6    that we viewed for Patricia Hough's individual account, those

7    same kinds of documents would show up in all account-opening

8    documents; is that correct?

9    A       Yes.

10   Q       Okay.  So this is a . . . Page 2 is an opening of an

11   account, custody account.

12           If we look at Page 3, can you tell, on this document,

13   whether it was filled out in person or . . . by correspondence?

14   A       This was filled out in person, as indicated on the

15   bottom of the document.

16   Q       And does it have the same date, October 17th, as the

17   beneficial owner document in Form A?

18   A       Correct.

19   Q       So it appears that these documents were filled out in

20   person, in Boston . . . based on the record?

21   A       Oh.  "In person" means that the person was present at

22   the bank, or at least with the client adviser, in the presence

23   of the client adviser --

24   Q       Okay.

25   A       -- not necessarily in the premises of the bank, but in

1  presence of the client adviser.

2  Q      Okay.  And if we turn to Page 7, is this an

3  identification for David Fredrick?

4  A      Yes.

5  Q      And again, if we can turn to Page 8, is this the same

6  similar form that waives the right to invest in U.S.

7  securities?

8  A      Yes.  That's indicated in the middle of the document,

9  waiver to –– waiver of right to invest in U.S. securities.

10  Q      And if we can turn to Page 10 of Exhibit 3GG . . . can

11  you explain this document to the jury?

12  A      This is a document by which the client confirms that he

13  does not want to –– that he waives the right to invest in U.S.

14  securities.

15  Q      And who is this document signed by?

16  A      This is signed by the client adviser, Dieter Luetolf.

17  Q      And why does the client adviser have to sign this

18  document?

19  A      We have a default process in place for clients who did

20  not respond themselves within the given timeframe.  And we have

21  to come to a conclusion what to do with these accounts, and the

22  default solution was that they should not be investments in

23  U.S. securities.

24  Q      And if –– but if we look back at Exhibit 9 –– sorry ––

25  Page 9, and Page 8, did Patricia Hough and David Fredrick fill

1    out the waivers in 2001?

2    A      Excuse me, could you repeat that?

3    Q      If we look at Page 8 and 9, did the client fill out the

4    waivers to invest in U.S. securities?

5    A      Yes, they did.

6    Q      And then if we could turn to Page 21 --

7    A      Can I make one additional remark?

8    Q      Sure.

9    A      Page 8 and 9 relate to the securities account S1,

10   whereas Page 10 relates to S2 --

11   Q      Okay.

12   A      -- so that's a bit of difference.  We have to have these

13   documents, these papers, for each security account.

14   Q      Okay.  And would the client adviser rely on a previous

15   election made by the client?

16   A      I can't answer this.  That would be speculation, if I

17   answer this with yes or no.

18   Q      Would a U.S. person be able to invest in

19   U.S. securities?

20   A      No.  The accounts were blocked for investments by

21   U.S. persons.

22   Q      And if we can turn then to Page 21 of 3GG.

23          For the account for Patricia Hough and David Fredrick,

24   who is designated as the power of attorney?

25   A      Charlene Lee Varga.

1    Q       I'm going to hand you now what's been marked as
2    Exhibit 3HH.
3            And just before we get into this, can you explain what
4    it means, if someone's blocked from investing in
5    U.S. securities, can they invest in other types of securities?
6    A       Yes.
7    Q       So other foreign securities.  They just couldn't invest
8    in GM, for example.
9    A       Yes.
10   Q       If we look at Exhibit 3HH, are these, again, e-mails,
11   and correspondence, and other internal bank documents,
12   maintained by UBS?
13              (The witness examines an exhibit.)
14   A       Yes.  Except for -- well, except the last few pages,
15   client's trade information, this is something that was kind of
16   special that was used just to list all the investments, or the
17   trades.  This from UBS systems in that sense.
18   Q       Are these records made at or near the time by a person
19   with knowledge of the information in the documents?
20              MR. HOCHMAN:  Objection, foundation.
21              THE COURT:  That objection is overruled.
22              THE WITNESS:  Yes, these documents were made by UBS
23   employees.  Um-hum.
24   BY MS. FINLEY:
25   Q       And were they made at or near the times that are on the

1    documents?

2    A       Yes.

3            MR. HOCHMAN:  Same objection, Your Honor.

4            THE COURT:  Same ruling.

5    BY MS. FINLEY:

6    Q       And are they kept by UBS in the ordinary course of

7    business?

8    A       Yes.

9    Q       And are these the types of business that UBS keeps in it

10   is ordinary course of business?

11   A       Yes.

12           MS. FINLEY:  Your Honor, at this time the government

13   would move Exhibit 3HH into evidence.

14           MR. HOCHMAN:  Your Honor, I would object on the same

15   bases that I objected on Exhibit 3S, I believe.

16           THE COURT:  All right.  Same ruling as at sidebar:

17   3HH will be admitted with the exception of what the witness

18   identified as the last few documents, which either aren't bank

19   records, or I didn't understand what his testimony was.  So you

20   may take that out of the exhibit, or . . . .  Tell me

21   otherwise.

22           MR. HOCHMAN:  Interestingly enough, Your Honor, I

23   have no objection to those particular client trade information.

24   The objection was to the remaining portion of the exhibit.

25           THE COURT:  All right.  In that case, the entirety of

1    3HH will be admitted.

2              (Government's Exhibit 3HH was admitted into

3        evidence.)

4              MS. FINLEY:  Thank you, Your Honor.

5              Permission to publish?

6              THE COURT:  You may.

7              (An exhibit was projected onto the projector screen.)

8    BY MS. FINLEY:

9    Q      If we could turn to Page 2, and . . . .  Who is this

10   e-mail from?

11   A      This was sent by David Fredrick.

12   Q      And who is it to?

13   A      It's addressed to Dieter Luetolf.

14   Q      And what is the date?

15   A      Friday, December 12, 2003.

16   Q      What is the subject?

17   A      "Status Report."

18   Q      And if you could read the e-mail into the record.

19   A      "Dear Dieter:  If you have a minute on Monday, can you

20   give me a call at" —— and then a telephone number —— "I was

21   curious about the status of SZ with regard to U.S. account

22   holders, et cetera.  What can you do to protect ourselves from

23   open disclosure?  We still have some funds in SG Hambros in

24   Warsaw, but know that we need to pull them out and close our

25   account before January 1st.  What's your advice?

1          "Thanks, DF and PH."

2    Q      If you can turn to Page 11 . . . and could you read this

3    document?

4    A      "Please" -- now there is a word that I cannot really

5    read -- "Please" -- something -- "U.S. Dollars 3 million in an

6    absolute return portfolio defensive."

7    Q      And is there a date and signature?

8    A      It's dated 21st of January, 2004.  Place is Boston.

9    Q      And is an absolute return portfolio defensive a type of

10   investment strategy?

11   A      Correct.

12   Q      If we look at Exhibit 14 -- I'm sorry -- Page 14 of

13   Exhibit 3HH, who is this e-mail from?

14   A      This is from D. Luetolf, so Dieter Luetolf.

15   Q      And is he sending it to himself . . . .  At the very

16   top.

17   A      Yes.  It's sent to himself.

18   Q      And then, in the original message, who is that -- who

19   was in the "from" line?

20   A      It's from David Fredrick to Dieter Luetolf.

21   Q      And is anyone copied on the e-mail?

22   A      Yes.  It's indicated P.L. Hough at Yahoo.com.

23   Q      And if we can move to Page 20 of Exhibit 3HH, who is

24   this e-mail from?

25   A      This was sent from David Fredrick.

1    Q        Who is it to?

2    A        Dieter Luetolf.

3    Q        And what is the date of the e-mail?

4    A        Friday, February 6th, 2004.

5    Q        And is anyone cc'd, or copied, on the e-mail?

6    A        Again, P.L. Hough at Yahoo.com.

7    Q        And if you could read this e-mail to the jury.

8    A        "Dear Dieter, thank you again for the nice meeting and

9    dinner we had a few weeks ago.  Following our visit, Pat and I

10   were discussing who would handle our overseas financial affairs

11   in the event of our death.  Not a pleasant thought, but one we

12   must consider.

13            "Presently we have all our funds in one joint account

14   with UBS.  I believe that Pat's sister, Charlene Varga, is

15   authorized to handle our affairs in that account if we were to

16   die.  Can you please confirm that Charlene Varga is an

17   authorized signatory and all paperwork is completed.

18            "In addition, we would like to consider dividing the

19   funds from the joint account into two separate accounts, one

20   for each of us.  Presently, we have approximately ten in the

21   joint account, with the major part being managed.  Second,

22   would it be possible for you to open a second numbered account

23   for me, keeping the current joint one for Pat?  Obviously, we

24   would like to keep the current managed funds as is but" -- and

25   then Number 3 -- "divide the total amount equally, so

1   50 percent is in my account and 50 percent is in Pat's account.

2   If I have not explained this clearly, let me know.  In summary,

3   we would like to have two separate numbered accounts, one for

4   me and one for Pat, with the funds equally divided.  Charlene

5   would be an authorized signatory for Pat's account, and I will

6   decide on another individual for my account.  I am considering

7   an irrevocable trust where only the interest is available on a

8   monthly or annual basis.

9          "We are still in the process of finding a buyer for the

10  schools, so in the future we would send equal amounts to

11  deposit into each account.

12         "Please call or e-mail if you have any questions.

13         "Regards, DF."

14  Q      Now we turn to Page 27 of Exhibit 3HH.  And at the top

15  of the page, is this an e-mail from Patricia Hough?

16         (An exhibit was projected onto the projector screen.)

17  A      This is from Patricia Hough, yes.

18  Q      To David Fredrick and Dieter Luetolf?

19  A      Yes.

20  Q      And is it dated March 18th, 2004?

21  A      Correct.

22  Q      And . . . if you could read the top part of the e-mail.

23  A      "Dear Dieter, Dave and I have discussed this

24  arrangement, and I am in full agreement.  Please let us know

25  how we can split best the accounts and what new paperwork is

1    needed.  Have you received the signed form from my sister?

2         "Sincerely, Patricia Hough."

3    Q       Now, if we could turn to Page 30, and 31.  The

4    instructions that you talked about that the client adviser

5    would need, would that include instructions to close accounts?

6    A       According to the –- to one of the e-mails I read before,

7    yes.

8    Q       And so the . . . the client adviser could not close a

9    client's account –- I guess absent any sort of fraud, but under

10   normal circumstances –- without instruction from the client.

11   A       Yes.  He would need respective instruction.

12   Q       And would they need that same instruction in order to

13   open a new account?

14   A       Yes.  Unless it is in the context of the asset

15   management.  So if the bank decides to invest in, let's say,

16   Japanese securities, they would need the Japanese currency

17   account, a yen account, and then they would open it without a

18   basic instruction.  But this is covered by the asset management

19   agreement.

20   Q       So the explicit instruction is contained in that asset

21   management agreement.  The client understands that the bank may

22   open additional object accounts in order to carry out the

23   objective.

24   A       Yes.  In particular, for mainly foreign currency

25   accounts.

1    Q       And if we can look at Page 30, can you just read that

2    into the record?

3    A       "Dear Sirs, please transfer half of all assets in the

4    above account to a new account to be opened in the name of

5    David Fredrick."

6    Q       And who is it signed by?

7    A       It's signed by David Fredrick and Patricia Hough.

8    Q       And on Page 31, are Dr. Fredrick and Dr. Hough

9    instructing the bank to remove David Fredrick's name from the

10   joint account, and Dr. Hough's name will remain on the account

11   alone?

12   A       Yes:  "Please remove the name of Dr. David L. Fredrick

13   from the joint account.  Patricia L. Hough will remain as the

14   sole name on this account.  One-half of all the existing assets

15   will remain in this account."

16   Q       So if we move to Exhibit JJ . . . .

17           THE COURT:  I'm sorry, what was that number again?

18           MS. FINLEY:  JJ.

19           THE COURT:  2JJ?

20           MS. FINLEY:  3JJ.  I'm sorry.

21           (An exhibit was projected onto the projector screen.)

22   BY MS. FINLEY:

23   Q       Do you recognize these documents?

24   A       Yes.  It's essentially the same basic documents that are

25   established for . . . for banking relationships.

1    Q      And are these documents maintained in the ordinary

2    course of UBS's business?

3    A      Yes, they are.

4           MS. FINLEY:  Your Honor, at this time the government

5    would offer Exhibit 3JJ into evidence?

6           THE COURT:  Any objections?

7           MR. HOCHMAN:  No objection, Your Honor.

8           THE COURT:  Exhibit 3JJ will be admitted.

9           (Government's Exhibit 3JJ was admitted into

10      evidence.)

11          MS. FINLEY:  Permission to publish?

12          THE COURT:  You may do so.

13          (An exhibit was projected onto the projector screen.)

14   BY MS. FINLEY:

15   Q      If we could look at Page 1 of Exhibit 3JJ, who is the

16   client on this account?

17   A      The client is David Fredrick.

18   Q      And if you look at the date on the bottom, March 23rd,

19   2004, is that on or around the same date of the letters we just

20   looked at in the previous exhibit; do you remember?

21   A      Yes, I think so.

22   Q      And who is noted as the beneficial owner of this

23   account?

24   A      It's indicated that the contracting partner is the sole

25   beneficial owner of the assets concerned.

1  Q      And again, in 3JJ, that exhibit contains all of the same

2  kinds of account-opening documents we've reviewed in the two

3  other accounts.

4  A      That's correct.

5  Q      If we turn now to Exhibit KK . . . and I ask you to

6  please just review those records.

7             (Witness reviews exhibit.)

8  Q      And again, except for those couple of pages at the back

9  that UBS produced, are these the same kind of e-mails and

10 correspondence that UBS maintains in its ordinary course of

11 business?

12 A      Yes, that's correct.

13 Q      And are these records made, at or near the time that

14 they're indicated on the document, by a person with

15 information . . . that has knowledge of the information

16 contained in that document?

17             MR. HOCHMAN:  Objection, Your Honor, foundation.

18             THE WITNESS:  Yes.

19             THE COURT:  Overruled.

20             THE WITNESS:  Yes.

21 BY MS. FINLEY:

22 Q      And are they maintained by UBS in the ordinary course of

23 business?

24 A      Yes.

25 Q      And are these the types of records that UBS keeps in

1    its . . . or creates as part of its ordinary course of

2    business?

3    A      Yes.

4            MS. FINLEY:  Your Honor, at this time the government

5    would offer Exhibit 3KK into evidence?

6            MR. HOCHMAN:  Your Honor, same objection as with

7    respect to Exhibit 3S incorporated herein.

8            THE COURT:  All right.  Those objections will be

9    overruled for the reasons previously stated.  3KK will be

10   admitted.

11           (Government's Exhibit 3KK was admitted into

12      evidence.)

13   BY MS. FINLEY:

14   Q      If I could just ask you to turn to Page 14.

15           MS. FINLEY:  And I'm sorry, permission to publish,

16   Your Honor?

17           THE COURT:  You may.

18           (An exhibit was projected onto the projector screen.)

19   BY MS. FINLEY:

20   Q      And is this an e-mail from David Fredrick to Dieter

21   Luetolf, dated April 5th, 2005?

22   A      Yes.

23   Q      And if you could read the e-mail to the jury, please.

24   A      "Dieter, thanks for the info on the bank checking as a

25   better means of getting funds to the U.S. without having my

1    name on a wire transfer.

2         "First, would you please have your bank send a bank

3    check for 50,000 U.S. dollars to Ms. Marion Cronin, with" --

4    with an address indicated, and telephone number.

5         Then, second:  "Also, I will get those papers for MUA

6    signed and returned to you this week.  I have 1.5 that need to

7    go to you in a MUA account, and another two for Saba.

8         "Pat and I are doing fine.  Next week we will be

9    spending a week or so in our Florida home.  We may have found

10   another potential buyer for the medical schools.  This one

11   lives in England, so, for them, everything looks like a

12   50 percent discount when compared to dollars.

13        "If you need any other info concerning the bank check,

14   please let me know.  You can send it by Fed Ex, and bill my

15   account.

16        "Thanks.  David."

17   Q    If I could show you what's been marked as Exhibit 3UU --

18   I'm sorry, it's 3U, not . . . .

19        And again, are these the various account-opening

20   documents for the account, Saba School of Medicine Foundation?

21   A    Yes.

22   Q    And are these records kept and maintained, and created,

23   in the ordinary course of UBS's business?

24   A    Yes.

25             MS. FINLEY:  Your Honor, at this time the government

1    would offer Exhibit 3U into evidence.

2              MR. HOCHMAN:  No objection, Your Honor.

3              THE COURT:  3U will be admitted.

4              (Government's Exhibit 3U was admitted into evidence.)

5              MS. FINLEY:  Permission to publish?

6              THE COURT:  It may be published.

7              (An exhibit was projected onto the projector screen.)

8    BY MS. FINLEY:

9    Q     Looking at the first page, the Form A, at the top it

10   says Saba School of Medicine Foundation is the account holder,

11   the contracting party; is that correct?

12   A     That's correct.

13   Q     And what -- who is identified here as the beneficial

14   owner of the assets?

15   A     The beneficial owners of the assets are Fredrick, David;

16   and Patricia Hough.

17   Q     And so the -- in this case, the box -- the different box

18   is ticked, that the beneficial owner are other individuals, not

19   the contracting party?

20   A     That's correct.

21   Q     And is it signed by what appear to be David Fredrick and

22   Patricia Hough?

23   A     Correct.

24   Q     And is there a date on there?

25   A     2004, September the 1st, or January the 9th.  I would

1    say -- what is it -- January 9th, probably.

2    Q       And can you tell from this document whether it was done

3    in person or by correspondence?

4    A       Account opening was done in person.

5    Q       And if we look at Page 2 and 3, just briefly, these

6    again are the identification documents that are required by

7    UBS?

8    A       Yes.  These are passport copies of the beneficial

9    owners, as indicated on the Form A.

10   Q       So we turn to Page 6, this document is titled, "Base

11   Document for non-U.S. Domiciliary Companies for United States

12   Tax Withholding."

13           Can you explain to the jury what a domiciliary company

14   is?

15   A       A domiciliary company is a company that does not engage

16   in any commercial or manufacturing business, or any other . . .

17   commercial activity or operation.  So it's essentially kind of

18   a shell company.

19   Q       And so does a domiciliary company do real business?

20   A       No.

21   Q       For a domiciliary company, does UBS still have to

22   identify the beneficial owner?

23   A       Yes.  For all domiciliary companies we have to identify

24   beneficial owners.

25   Q       What if the beneficial owner was a charity, or what if

1   the domiciliary company was a charity?

2   A     There are a few exceptions, and charities is one of

3   them.  So religious associations, or purely social

4   associations, or cultural associations.  For these kind of

5   entities there is no obligation to identify the beneficial

6   owner.

7   Q     Now, is there any difference on how would you fill out a

8   Form A for a domiciliary company versus an individual account?

9   A     No.  It's essentially the same.

10  Q     And here, on Page 6, is Saba School of Medicine

11  Foundation waiving, through Mr. Luetolf, the right to invest in

12  U.S. securities.

13  A     No.  It says investments -- in the middle section:

14  "Investments in U.S. securities, the account holder wants to

15  invest in U.S. securities," and no box is ticked.  So, yes, he

16  waived the right to invest in U.S. securities; yes, that's

17  correct.

18  Q     Are there different documents or information that has to

19  be provided if the contracting party is an operating company,

20  versus a domiciliary company?

21  A     With regards to beneficial ownership or --

22  Q     Yes.

23  A     For an operating company we do not have to have to

24  determine the beneficial owner.  So no Form A would be required

25  for operating companies.

1   Q       Now, if you look at Exhibit 12 -- sorry -- Page 12 of

2   the exhibit, and I know this is in Swiss German, but if you

3   could just explain to the jury what this document is.

4   A       This is a document, an internal document which we

5   created to support client advisers in the determination whether

6   a legal entity is a domiciliary company or not.  And it

7   contains a list of indications, or indicia, which can

8   either . . . which either indicate that it is a domiciliary

9   company or not.

10  Q       And in some records we're going to review in a little

11  while, there is one of these forms in English; is that correct?

12  A       Ya.

13  Q       We will go over the one in English so you don't have to

14  educate us all on German right now.

15          But in the bottom part of the page, if -- is there a

16  part where it says to the client adviser:  If any of the boxes

17  on the top are checked, then this entity is a domiciliary

18  company?

19  A       Yes.  So it's basically, you have the A-to-F indications

20  where the client adviser has to indicate whether it . . .

21  whether it is a -- where they have the domicile and so on.  And

22  then the conclusion is, finally, is it a domiciliary company or

23  not.

24  Q       And if we turn to Page 13, the authorization

25  signature -- signatories page, is this, in essence, a signature

1    card for the account?

2    A      Yes, it is.  That's correct.

3    Q      And who on the Saba School of Medicine Foundation has

4    signature authority?

5    A      There are two authorized signatories.  One is David

6    Fredrick, and the other one is Patricia Hough.

7    Q      And can you tell, do they -- if . . . .  Do they both

8    need to sign, or is it they can each act by themselves?

9    A      No.  They can each act by themselves, so by sole

10   signature.

11   Q      Why does the bank need this document?

12   A      Well, we have to be sure that only those authorized to

13   act or represent, the client give us instructions.

14   Q      I'm going to now show you what's been marked as

15   Exhibit 3B.

16          THE COURT:  Let's use this point to take a morning

17   recess.

18          MS. FINLEY:  Thank you, Your Honor.

19          THE COURT:  All right, ladies and gentlemen, let's

20   take a 15-minute recess.  Please do not discuss the case among

21   yourselves, or allow anyone to discuss it with you or in your

22   presence.  About fifteen.

23          (At 10:39 a.m., the jury was escorted from the

24      courtroom.)

25          THE COURT:  All right.  Fifteen minutes.

 1              (At 10:39 a.m., court was recessed.)

 2                        AFTER RECESS

 3              (At 10:54 a.m., court was reconvened.)

 4              THE COURT:  Both sides ready for the jury?

 5              MR. HOCHMAN:  Yes, Your Honor.

 6              MS. FINLEY:  Yes, sir.

 7              THE COURT:  Do we have a CSO someplace?

 8              Have the jury step in, please.

 9              Oh, wait.

10              (The Court reviews a document.)

11              THE COURT:  Be seated.

12              Let me just read it.

13              I received a note from Juror Number 4, which is

14     Steven Lucas.  I haven't read it all, but it is, I think, the

15     longest note I've ever received from a juror.  So let me just

16     read it as I go, out loud.

17              It says:  "Dear Sir, I apologize for the delay this

18     morning.  I had driven past the exit and had to go 16 miles

19     north to Tucker's Grade exit to turn around, and it added

20     32 miles to my trip.  But the reason for this letter is to

21     inform you of my bias opinion on the trial that I have been

22     chosen to sit as juror.  I have just been a juror in Collier

23     County last month.  I spent four days.  I feel strongly that I

24     have done my civic duty.

25              "I have been up all night considering my opinion on

1    this matter.  I cannot convince myself to be fair after

2    hearing, on radio news this morning, on how my government is

3    taking away benefits to soldier's family upon their deaths at

4    war.  That made me sure.  I am not in fair mind to sit here

5    with these thoughts" -- raging, I believe -- "through my mind.

6    I have already made my decision.  I wish to excuse myself from

7    any further proceedings on this case.  I am sorry for any

8    inconvenience I may have caused.

9              "Juror Number 4.

10             "Signed, Steven Lucas."

11        So why don't you confer with whoever you wish to

12   confer with.

13             (Counsel confer at their respective counsel tables.)

14             THE COURT:  Who would like to go first?

15             MR. HOCHMAN:  I'll go first, Your Honor.

16             I think it makes sense, obviously, to bring Mr. Lucas

17   out, explore his opinions, see whether or not he is of the

18   mindset that seems to be reflected in this letter, or what he

19   said yesterday, which is that he could be openminded, fair, and

20   impartial on all the issues we questioned him on.

21             MS. FINLEY:  Your Honor, can we have the witness

22   leave the room before we continue?

23             THE COURT:  Sure.

24             MS. FINLEY:  I'm not sure if that's something he

25   needs to hear.

1        THE COURT:  Sure.  He doesn't need to be bothered

2   with this.

3        (The witness left the courtroom.)

4        MS. FINLEY:  I think the government concurs with

5   Mr. Hochman's suggestion, if we could just explore that a

6   little further on the record.

7        THE COURT:  All right.  Have Mr. Lucas step in.

8        (Thereupon, at 11:00 a.m., Juror Lucas was escorted

9      into the courtroom.)

10       THE COURT:  Just have a seat anywhere.

11       Mr. Lucas --

12       MS. FINLEY:  Your Honor.

13       MS. KESSLER:  Your Honor?  I'm sorry.  That door is

14   still open.

15       THE COURT:  All right.  Mr. Lucas, I received your

16   note from a few minutes ago.  First of all, I understand your

17   reason for being late.  That's not a problem.

18       With regard to the real reason you sent the note, I'd

19   like you to talk to me a little bit more about what's changed

20   from yesterday, when you said you could be a fair and

21   openminded juror, to today, when you're saying to the contrary.

22       JUROR LUCAS:  As well as in that letter, I've just

23   done some jury duty in Naples, and I take it very seriously.

24   And it was a wonderful experience for me, this whole system and

25   how it all works.  And . . . .

1            THE COURT:  I forgot.  We probably need to get you a

2       microphone for the court reporter again.

3            (The Court Security Officer provided a microphone to

4       Juror Lucas.)

5            Thank you.  Go ahead.

6            JUROR LUCAS:  Did you hear that part?

7            And this one here, there again, it took me off guard

8       that I was even going to jury duty again.  And when I got

9       selected, I was a little bit offguard.  But I'm a very honest

10      person, and I said that I would be unbiased, because that's

11      what a juror is supposed to do.

12           Last night I was thinking about the case and what's

13      happened here, and it turned my thinking around to where, in

14      that letter, as I was listening to our news this morning, it

15      reassured me, that our government is taking away the death

16      benefits for soldiers that are overseas, have gotten killed,

17      the government has taken away that benefit to their families

18      without their dads and their husbands and stuff like that, and

19      it put a different perspective on my way of thinking about my

20      government.

21           And this is based on that, especially when she was

22      talking about the government is doing this to Patricia, and so

23      I feel strongly that . . . right now, I'm not sure if I like my

24      government or some of their decisions.

25           THE COURT:  All right.  Do you understand that, at

1    the end of this case, the verdict form will not have any place

2    where it says:  Do I like my government, yes or no.

3          This isn't a referendum on what is going on in

4    politics, or the government, or anything else.  What the jury

5    is called upon to decide is whether these prosecutors have

6    proven, beyond a reasonable doubt, the guilt of this defendant,

7    not anything else that we may or may not like about what the

8    government is doing.

9          JUROR LUCAS:  And I'm trying to clear that.  But I

10   can't.  And there again, I am fair and unbiased, up until

11   today, thinking about it.  And when I heard that news this

12   morning, it somewhat reassured me.

13         And it is United States Government against so-and-so.

14   And I, I don't feel that's fair.  I don't know the history of

15   Patricia Hough, and so far what I've seen, and I haven't seen

16   the whole trial, I think she's come from something and has done

17   something, and the government is trying to get their money from

18   her, from a hardworking person as myself, and I don't feel that

19   to be fair, already, I've already decided that.

20         THE COURT:  Do you understand that you haven't heard

21   but an hour of testimony?

22         JUROR LUCAS:  I do understand that part also.

23         THE COURT:  And you understand that, if not you -- I

24   mean, this case is going to go on with or without you, the

25   government is going to do what it is going to do in this

1    courtroom.  What happens outside the courtroom, none of us know

2    what's going to happen, but it's going to happen.  And

3    whether -- I mean, that shouldn't impact on whether this

4    client, this defendant, is guilty or not guilty.  I mean, so

5    you can be mad at your government, and that's not a problem.

6              JUROR LUCAS:  I'm really not.  I'm not anti -- I'm

7    not that way.  Honestly.  I pay my taxes and do all the things

8    that are right.  And I start thinking -- and I am a CPA, and if

9    he comes to me and said, "Mr. Lucas, we are going through all

10   the taxes, and we discovered that we found an extra thousand

11   dollars' loophole that we could do that," well, that's exciting

12   to me.  And I think Mrs. Hough has done the same thing.  It's

13   just on a larger scale, obviously.

14             So I'm feeling, I'm already leaning towards that way,

15   to say, what has she done wrong, even though I haven't heard

16   the case and the defense and the prosecution.

17             THE COURT:  All right.  Are you telling me that you

18   are so biased at this point that it doesn't matter what the

19   government proves any more?

20             JUROR LUCAS:  It's very possible.

21             THE COURT:  Why didn't you tell me that yesterday?

22   That didn't change overnight.  Either you're a biased person or

23   you can follow the Court's instructions, and you can, despite

24   what you might think as you go along, consider the evidence at

25   the end of the day, you may decide that you were wrong --

1          JUROR LUCAS:  I could be.  But I don't have a clear

2     mind right now, going into it.  I've already seem to lean

3     towards that side, and I don't want to do that.

4          THE COURT:  Well, you know, part of the . . . the

5     trial dynamics sometimes is like a ping pong game you're

6     watching, sometimes one side is winning, and then the other

7     side seems to be doing pretty good, and at the end of the day,

8     that's when you have all of the evidence.  Not right now.

9     Right now, you haven't even heard from the defense lawyer ask

10    his first question of a witness.

11         JUROR LUCAS:  There's also more underlying there.

12    This case takes two weeks, and this is probably part of my

13    decision, too, and I'm throwing all this stuff in my head, that

14    I have a family to support, and I have a business to keep

15    going, and this two weeks is financially going to put a burden

16    on me.

17         And I was thinking:  Well, I wonder, if our

18    government is paying for these people to sit over here and, as

19    I'm sitting here doing my volunteer work, which I just have

20    completed, I don't get benefited for that.  And so I go into a

21    financial despair because of this whole situation, and the time

22    to try to get more money from Mrs. Hough, and it just keeps

23    snowballing.  And I'm just being honest and telling you

24    straight how I feel.

25         THE COURT:  I guess my problem is, you should have

1   been honest yesterday.  I had other jurors I could pick instead

2   of you.  It's hard for me to believe that, overnight, you go

3   from a person who tells me they are open and unbiased, to

4   someone that says:  I have financial problems with the case,

5   and I've got, you know, philosophical problems with the case.

6           JUROR LUCAS:  Well, I didn't, because of the case.

7   The one I just left was an armed robbery suspect criminal case.

8   And it was different.  I felt more of a juror at that time.

9   This one here seems to be more political -- or not political,

10  more governmental, for taxes.  And I don't feel --

11          THE COURT:  So you found it easy not to like someone

12  charged with armed robbery, but it's different with a

13  white-collar case; is that what you're telling me?

14          JUROR LUCAS:  No.  I'm probably not making sense.

15  There's two issues here.  My financial burden now, and I was

16  actually thinking, how much does Your Honor make per year, I

17  was thinking, what is that going to do with me being a juror?

18  But I know that I'm not making any financial money right now to

19  run three children at home and a business, and I'm losing money

20  to give my time for this, and I don't feel it's fair to me.

21  And I think I would certainly lean with her because I don't

22  think it's fair to her also.

23          THE COURT:  Yeah.  I hope you never get in trouble

24  because, you know, that's why we have jurors that are supposed

25  to be fair.

1           JUROR LUCAS:  Yes.  And I'm honored that I was

2    selected.  I was really surprised that I was selected, and I

3    was being fair and unbiased yesterday.

4           THE COURT:  Yeah.  That's hard for me to believe.

5           JUROR LUCAS:  It happened overnight --

6           THE COURT:  You're done.  Go on back.

7           (The juror was escorted from the courtroom.)

8           THE COURT:  Mr. Lucas is excused for cause.

9           Anyone want to object?

10          MR. HOCHMAN:  Yes, Your Honor.  I think that he might

11   have revealed, in the last part of what he was saying, the real

12   reason why he wants off the jury, which is the financial

13   hardship.  As we heard from, probably Juror Number 3 now,

14   Mr. Aminian, with the one car for the two parents, and the 150

15   students that are sitting in some school waiting for him to

16   show up, and then the other, Ms. Bones, who talked about the

17   fact that she's got three people at her business that are

18   waiting for her to return, I mean, financial hardship is

19   clearly a factor in a lot of these jurors' consideration, as

20   one would expect, in a two-week trial.

21          To let him off, which, I think he's . . . as best I

22   can tell, using that to then say:  Okay, well, how do I get off

23   this jury, and I heard yesterday that there were some magic

24   words, and the magic words are that I just can't be fair.

25          And I think that the overnight transformation in his

 1    fairness, or to unfairness or bias, is a ruse, Your Honor.

 2          THE COURT:  And you'd take the same position if he

 3    told me overnight that he thought the government was doing

 4    great, and your client had to be someone who was committing

 5    violations, otherwise she wouldn't be there with three lawyers;

 6    you'd feel the same way?

 7          MR. HOCHMAN:  I would want to know, Your Honor, at

 8    the end of the day -- we start with the presumption of

 9    innocence.  I mean, an hour into this trial, actually, if you

10    had to rule on a Rule 29, you would have to rule for the

11    defense.  So would he.

12          So, yeah, I mean, to the extent that he feels that

13    way, if he felt that the presumption of innocence didn't apply,

14    and that she's guilty from the start, absolutely I'd ask you to

15    strike him in a heartbeat.

16          THE COURT:  All right.  Any objection from the

17    government?

18          MS. FINLEY:  No objection, Your Honor.  I think, for

19    whatever was the underlying reason, he now cannot be fair and

20    impartial, and that's the standard.

21          THE COURT:  He's excused.

22          Bring him back and tell him to bring whatever stuff

23    he's got.

24          (Juror Lucas was escorted into the courtroom.)

25          THE COURT:  Mr. Lucas, do you have any personal

1   belongings left in the jury room?

2            JUROR LUCAS:  No, sir.

3            THE COURT:  You are excused.  It is my belief you

4   have done a disservice to yourself and to the other jurors who

5   will spend the next two weeks deciding the case that you didn't

6   want to do.  You're excused.

7            JUROR LUCAS:  Sorry.

8            THE COURT:  Sorry is not good enough.

9            (Juror Lucas left the courtroom.)

10           THE COURT:  Everyone ready for the jury?

11           MS. FINLEY:  Yes, Your Honor.

12           MR. HOCHMAN:  Yes, Your Honor.

13           THE COURT:  Have the jury step in.

14           (The witness returns to the courtroom and the witness

15       stand.)

16           THE COURT:  And, Ms. Finley, if you could try and

17   break about 5 minutes to 12:00, I've got a judges meeting to

18   discuss logistical things.

19           MS. FINLEY:  Yes, Your Honor.

20           (At 11:11 a.m., the jury was escorted into the

21       courtroom.)

22           THE COURT:  You may proceed.

23           MS. FINLEY:  Thank you, Your Honor.

24   BY MS. FINLEY:

25   Q      If we can turn to Exhibit 3V, as in "Victor" -- I think

1    that may have sounded like B, but V, as in "Victor" -- can you

2    review this exhibit and tell the jury what this document --

3    these documents are.

4              (The witness examines an exhibit.)

5    A       This is a document that shows the . . . that shows that

6    the foundation with the name of "Saba School of Medicine

7    Foundation" was established.

8    Q       And does the bank retain documents such as these to show

9    the existence of the entities?

10   A       Yes.  For legal entities, we keep entity-related

11   document that show the existence as identification documents.

12   Q       And if we look at the first page of the document, are

13   Mr. Luetolf's stamp on the document?

14             THE COURT:  Mr. Who?

15             MS. FINLEY:  Mr. Luetolf's stamp on the document.

16             THE WITNESS:  Yes.  On the bottom of the document.

17             MR. HOCHMAN:  I'm sorry, Your Honor.  I can't recall,

18   did the government move this exhibit in yet?

19             THE COURT:  Not yet.

20             MR. HOCHMAN:  Okay.

21   BY MS. FINLEY:

22   Q       And are these records . . . maintained in the ordinary

23   course of UBS's business?

24   A       Yes.

25   Q       And why does UBS -- if I didn't ask you that already,

1    why does UBS need to maintain these records?

2    A     We need evidence of the existence and identity of a

3    legal entity.

4            MS. FINLEY:  Your Honor, at this time the government

5    moves Exhibit 3V into evidence.

6            MR. HOCHMAN:  No objection, Your Honor.

7            THE COURT:  3V will be admitted.

8            (Government's Exhibit 3V was admitted into evidence.)

9            MS. FINLEY:  Permission to publish?

10           THE COURT:  You may do so.

11           (An exhibit was projected onto the projector screen.)

12   BY MS. FINLEY:

13   Q     And just on the first page it says, at the bottom:

14   "True copy of a deed of a foundation bearing the name Saba

15   School of Medicine Foundation."

16           THE COURT:  Can we get that back row of lights,

17   please?

18   BY MS. FINLEY:

19   Q     Is that what it says at the bottom?

20   A     Yes.

21   Q     And if we can . . . just ask a couple of questions.  You

22   testified earlier about financial intermediary.

23           Can you explain what a financial intermediary does?

24   A     Some clients who prefer to have their assets managed not

25   by the bank, but they have to have accounts, but by somebody

1    else for different reasons.  And then they choose to cooperate

2    with an external asset manager.  And he would then manage the

3    assets deposited with the bank on behalf of the client.

4    Q     What kind of relationship does UBS have with financial

5    intermediaries?

6    A     We have no direct relationship in that sense.  We want

7    to know who the financial intermediary is.  There is a

8    possibility, also, that we delegate all the identification

9    requirements to the financial intermediary, who would then do

10   it on behalf of the bank.

11        In such a case, we would have an agreement between the

12   bank and the financial intermediary which stipulates, in

13   detail, what the requirements are, what documents we would like

14   to obtain, and all the details of . . . concerning these

15   dedicated tasks.

16   Q     Are you familiar with a company called Sinco Treuhand,

17   T-R-E-U-H-A-N-D?

18   A     Sinco Treuhand, I am not personally familiar with it,

19   but I saw that name in the documents that I reviewed.

20   Q     And based on the documents that you reviewed, what is

21   Sinco Treuhand?

22   A     It's a fiduciary company.

23   Q     And is that a financial intermediary?

24   A     Ya.

25   Q     Does UBS rely on the information provided by the

1    financial intermediary?

2    A     Yes.  We're –– UBS relies on such information, and it's

3    another source of information that we rely upon.

4    Q     Do the same compliance rules apply to the financial

5    intermediary as they do to the client adviser?

6    A     Yes.  They are subject to the same anti–money laundering

7    law.

8    Q     Do you know . . . have you heard of an individual named

9    Beda Singenberger?

10   A     Yes.

11   Q     And is Mr. Singenberger an employee of Sinco?

12   A     As far as I know, he is a representative of Sinco, yes.

13   Q     And you know that because of the documents?

14   A     Yes.

15   Q     And if we look at ––

16              MS. FINLEY:  Sorry, Your Honor, just one moment.

17              If I could hand the witness Exhibit 3W?

18   BY MS. FINLEY:

19   Q     And if you could review those records.

20              (The witness reviews an exhibit.)

21   Q     And again, are these the e-mails and other internal

22   documents and correspondence for the Saba School of Medicine

23   Foundation account at UBS?

24   A     Yes.

25   Q     And are these records made, at or near a time that is

1    noted on the record, by people with information . . . people

2    with knowledge of the information contained in the documents?

3    A       Yes.

4    Q       And are these records ordinarily kept in the -- sorry.

5            Are these records kept in the ordinary course of

6    business?

7    A       Yes.

8            MS. FINLEY:  Your Honor, at this time the government

9    would move Exhibit W -- 3W into evidence.

10           MR. HOCHMAN:  And I would object and incorporate my

11   objections to Exhibit 3S, in connection with the Exhibit 3W

12   here, Your Honor.

13           THE COURT:  We're in the same pattern as 3S?

14           MR. HOCHMAN:  Yes; same type of document, same

15   objections.

16           THE COURT:  All right.  Those objections will be

17   overruled, 3W will be admitted.

18           (Government's Exhibit 3W was admitted into evidence.)

19   BY MS. FINLEY:

20   Q       If I could direct your attention to Page 158 of 3W.

21           MS. FINLEY:  And permission to publish, Your Honor?

22           THE COURT:  You may.

23           (An exhibit was projected onto the projector screen.)

24   BY MS. FINLEY:

25   Q       And is this a September 2nd, 2008, letter from

1   Dr. Fredrick to Patrick Hoffman at UBS --

2   A      Which page is it?

3   Q      I'm sorry.  158.

4   A      158.

5           MS. FINLEY:  Your Honor, if I may approach?

6           THE COURT:  You may.

7   BY MS. KESSLER:

8   Q      And this is a September 2nd, 2008, letter from David

9   Fredrick to Patrick Hoffman?

10  A      Correct.

11  Q      And is Patrick Hoffman an employee of UBS?

12  A      Yes.

13  Q      Do you know what type of employee he is?

14  A      A client adviser.

15  Q      And if you could read the body of the letter to the

16  jury.

17  A      "Dear Patrick, in compliance with our recent telephone

18  conversation, please accept this letter as confirmation of our

19  desire to appoint Mr. Beda Singenberger, Sinco Trust Limited,

20  and/or his associate, Mr. Erwin Schulthess, to have total

21  access and control over our UBS account, Saba School of

22  Medicine Foundation, Account Number 2245.

23         "Thank you for your assistance.  If you have any

24  questions, please do feel free to contact me directly at" -- an

25  indicated e-mail or telephone number.

1   Q      And is there some handwriting there that you could read?

2   A      Yes.  It says:  "Spoke to client and told him that you

3   require a general POA" -- which stands for "power of attorney."

4   Q      And so this letter authorizing or appointing

5   Mr. Singenberger access to the accounts, the bank requires the

6   power of attorney form that we reviewed in the other account.

7   A      Yes.

8   Q      If we could turn to Page 183 of Exhibit 3W, and if we

9   could look at the contact date, dated August 29th, 2008.

10         And again, the client adviser would be inputting this

11  information into the system?

12  A      Yes.

13  Q      And it looks like the creation date is the same date as

14  the contact date; is that correct?

15  A      Which section are you referring to?

16  Q      On August 29th, 2008.

17  A      August 29th, the contact date and creation date are the

18  same; yes.

19  Q      And if you could read that note into the record, please.

20  A      It starts with an abbreviation which I think is ARBM:

21  "Okay.  Spoke to client about the situation with UBS, and also

22  informed him that, in case of any transactions planned, I would

23  need his instructions.  Client was of the opinion that Sinco

24  Treuhand, who had accounts with us for the same BO" -- which

25  stands for beneficial owner -- "can give us instructions.  He

1    will think about everything and is going to contact us as soon

2    as he knows where to go."

3    Q    And if you look at, and turn to, Page 160, 160?

4    A    150?

5    Q    One six zero.

6         Is this an October 5th, 2008, letter from David Fredrick

7    to Mr. Hoffman again?

8    A    Yes.

9    Q    And is Miss -- Dr. Fredrick asking the bank to liquidate

10   his assets and send them to another bank?

11   A    Yes.

12   Q    And what bank is he asking UBS to transfer the assets

13   to?

14   A    It should go to the Liechtenstein Landesbank,

15   (Switzerland) Ltd., in Zurich.

16   Q    At this time I'm going to show you what's been marked as

17   Exhibit 3Y.

18        And are these the account-opening documents for the

19   Medical University of the Americas?

20   A    Yes.

21   Q    And are these records kept in the ordinary course of

22   UBS's business?

23   A    Yes.

24        MS. FINLEY:  Your Honor, at this time the government

25   would offer Exhibit 3Y into evidence.

1          MR. HOCHMAN:  No objection, Your Honor.

2          THE COURT:  3Y will be admitted.

3          (Government's Exhibit 3Y was admitted into evidence.)

4          MS. FINLEY:  Permission to publish?

5          THE COURT:  You may do so.

6          (An exhibit was projected onto the projector screen.)

7     BY MS. FINLEY:

8     Q       And if we look at the first page, again, on the Form A,

9     the contracting party is the University of the Americas.

10          Who is noted as the beneficial owner of the account?

11    A       The beneficial owner is David Fredrick and Patricia

12    Hough.

13    Q       And if we turn to Page 11 . . . this is the domiciliary

14    company decision sheet.

15          Is this the same sheet that was in the previous exhibit?

16    A       Yes, but it is slightly different version.

17    Q       And at some point UBS changed their forms to comply with

18    new regulations, or just to update them?

19    A       Yes.

20    Q       And if we look at the middle of the page -- and who

21    filled out this form?

22    A       This was filled out by Dieter Luetolf, client adviser.

23    Q       And again, this form has A through D, the last form had

24    A through F, in the middle of the decision table.  And under

25    the decision line just below it, does it state -- has at least

JEAN MARC FUTTERKNECHT – DIRECT/FINLEY                 74

1   one statement applies box been ticked; is that correct?

2   A      Yes.

3   Q      And so if any of A through D are noted, then this would

4   be a domiciliary company.

5   A      Then it would be considered as a domiciliary company;

6   yes.

7   Q      And if we could turn to Page 12, the next page, who are

8   the authorized signatories for the Medical University of

9   Americas' bank account?

10  A      David Fredrick and Patricia Hough . . . by their sole

11  signature.

12  Q      And I'm going to show you what's been marked as

13  Exhibit 3Z.  And if you can just explain what these documents

14  are.

15             (The witness examines an exhibit.)

16  A      These are company documents which we require for legal

17  entity for which we open accounts to -- as evidence of their

18  existence, and . . . ya, identity.

19  Q      And does UBS keep these records in it is ordinary course

20  of business?

21  A      Yes.

22             MS. FINLEY:  Your Honor, at this time the government

23  would offer 3Z into evidence.

24             MR. HOCHMAN:  No objection, Your Honor.

25             THE COURT:  3Z will be admitted and may be published.

1          (Government's Exhibit 3Z was admitted into evidence.)

2          MS. FINLEY:  Thank you, Your Honor.  I actually will

3    not publish this one.

4          THE COURT:  Okay.

5    BY MS. FINLEY:

6    Q      But while it's up there, are these the memorandum of

7    association and articles of association for Medical

8    Universities of Americas?

9    A      Yes.

10   Q      Now, if we can move to Exhibit AA, 3AA . . . .

11         (The witness examines an exhibit.)

12   BY MS. FINLEY:

13   Q      Are these the e-mails and internal correspondence, and

14   other correspondence within the bank, for Medical Universities

15   of Americas?

16   A      Yes.

17   Q      And are these . . . documents created at or near the

18   time, by an individual with knowledge of the contents?

19         MR. HOCHMAN:  Objection, foundation.

20         THE COURT:  Overruled.

21         THE WITNESS:  Yes.

22   BY MS. FINLEY:

23   Q      And are these record . . . Records kept by UBS in the

24   ordinary course of its business?

25   A      Yes.

1          MS. FINLEY:  Your Honor, at this time the government

2    would offer . . . Exhibit 3AA into evidence.

3          MR. HOCHMAN:  Your Honor, I object, and incorporate

4    by reference all the objections made in connection with

5    Exhibit 3S.

6          THE COURT:  All right.  Those objections are noted

7    and overruled.  Exhibit 3AA will be admitted.

8          (Government's Exhibit 3AA was admitted into

9       evidence.)

10         MS. FINLEY:  Thank you, Your Honor.

11   BY MS. FINLEY:

12   Q    Now, if I can show you what's been marked as

13   Exhibit 3C . . . .

14         (Ms. Finley confers with the Courtroom Deputy

15      privately.)

16         MS. FINLEY:  Just for the record, Your Honor, the

17   Medical University of the Americas articles that we just showed

18   was 3Z.  3AA was the correspondence, just for the record.  I

19   had the wrong sticker on the actual . . . .

20         THE COURT:  All right.  I think you said it right.

21   That corresponds with my notes.

22         MS. FINLEY:  All right.  I just wanted to make sure.

23   My exhibit sticker was incorrect on there.

24         THE COURT:  All right.

25

1    BY MS. FINLEY:

2    Q      Looking at Exhibit 3C, are these the account-opening

3    documents for New Vanguard Holdings Limited?

4    A      Yes.

5    Q      And are these, again, the records that are kept and

6    maintained by UBS in its ordinary course of business?

7    A      Yes.

8            MS. FINLEY:  Your Honor, at this time the government

9    would offer 3C into evidence.

10           MR. HOCHMAN:  No objection, Your Honor.

11           THE COURT:  3C will be admitted.

12           (Government's Exhibit 3C was admitted into evidence.)

13           MS. FINLEY:  Permission to publish?

14           THE COURT:  You may.

15           (An exhibit was projected onto the projector screen.)

16   BY MS. FINLEY:

17   Q      So this contracting partner is listed as New Vanguard

18   Holdings Limited.

19           Does it have an address for where that's located, if you

20   can tell?

21   A      It's operated in . . . Hong Kong.

22   Q      And who is signing as the contracting party, at the

23   bottom, if you can tell?

24   A      Now, is it the first document of the set?

25   Q      Yes.  The Form A.

1   A      Form A, it's signed by . . . .  I recognize the

2   signature as Beda Singenberger's signature.

3   Q      And you recognize the signature because of the other

4   documents that you have reviewed?

5   A      Yes.

6   Q      And when does it say that it was signed?

7   A      On the 28th of June, 2005.

8   Q      And was that signed in person or by correspondence?

9   A      In person.

10  Q      And does this Form A also have that same warning, that

11  willfully entering false information is a criminal offense

12  under Swiss law?

13  A      Yes.

14  Q      And again, Beda Singenberger is the financial

15  intermediary, or is a financial intermediary?

16  A      The representative of Sinco.  Yeah.

17  Q      And in this case is he the representative of New

18  Vanguard?

19  A      Yes.  He signs on behalf of New Vanguard.

20  Q      And who is noted as the beneficial owner, or owners?

21  A      There are two beneficial owners.  One is David Leon

22  Fredrick, and the other one is Patricia Lynn Hough.

23  Q      And if we can turn to Page 2 of Exhibit 3C, the

24  Corporations and Complex Trusts Certification of Beneficial

25  Owner and Non-U.S. Person Status, can you explain to the jury

1   what this document is?

2   A      This is a document also required in the context of the

3   U.S. withholding-tax issues.  And the document certifies -- or

4   with this document it is explained or indicated that . . . what

5   the U.S. person's status is of this company, and who the

6   beneficial owner is of the company.

7   Q      And this company, New Vanguard, is located in Hong Kong,

8   according to the documents.

9          Is it, therefore, a non-U.S. person?

10  A      It is domiciled in Hong Kong and, therefore, a non-U.S.

11  person.

12  Q      And why does the bank need this form filled out?

13  A      In order to decide whether . . . investments in U.S.

14  securities are possible or not.

15  Q      And if this corporation is a non-U.S. person, then it

16  can invest in U.S. securities?

17  A      As far as I know.  And again, I'm not the expert in tax

18  matters, but in this case the . . . the -- according to this

19  form, the beneficial owner is the company, itself, and it is a

20  non-U.S. person, this company.  And, therefore, it can invest

21  into U.S. securities.  That's my understanding of how this

22  works.

23  Q      And the beneficial owner for this document is according

24  to U.S. tax law, not according to the Form A that lists

25  Patricia Hough and David Fredrick as the beneficial owner.

1    A      That's correct.

2    Q      And if we can turn to Page 12, can you explain what this

3    document is?

4    A      It's a base document for non-U.S. domiciliary companies

5    for U.S. tax withholding purposes.  It indicates who the

6    contracting partner is, and whether the client wants to invest

7    in U.S. securities, and . . . and whether this was established

8    personally or through correspondence, and what the status of

9    the account holder is.

10   Q      And in this case they're all checked yes; is that

11   correct?

12   A      That's correct.

13   Q      So this -- this entity, New Vanguard, wants to invest in

14   U.S. securities.

15   A      Correct.

16   Q      And again, this is signed by the client adviser, not by

17   the contracting party.

18   A      Correct.

19   Q      So, based on the fact that the top of the document says

20   "Non-U.S. Domiciliary Company," does that mean that New

21   Vanguard is a domiciliary company?

22   A      It's a domiciliary company, but not a U.S. domiciliary

23   company; yes.

24   Q      And so if we turn to Page 39, this is the authorized

25   signatures page, who are the authorized signatories on this

1    account?

2    A       Authorized signatories are Beda Singenberger, and

3    another person called Daniel Eric Joerin, Erwin Schulthess, and

4    Brigitte Schaufelberger.

5    Q       And if we turn to Page 41 of 3C, can you explain what

6    the verified corporate resolutions are?

7    A       This is a document which indicates that the -- that this

8    client, this corporation, has taken a resolution that the

9    people listed in the middle section of these documents are

10   authorized to represent the company.

11   Q       And those are the same people that were on authorized

12   signature.

13   A       And then the next step is, they would be listed on this

14   as authorized signatories; yes.

15   Q       And on Page 123, that's the domiciliary company decision

16   sheet, that shows that the client adviser determined if this

17   was a domiciliary company.

18   A       Yes.

19   Q       I'm now going to show you what has been marked as

20   Exhibit 3D.

21           (The witness examines an exhibit.)

22   BY MS. FINLEY:

23   Q       Are these again the corporation documents and other

24   corporate documents that establish the existence of New

25   Vanguard?

1    A      Yes.

2    Q      And are these documents kept and maintained by UBS in

3    its ordinary course of business?

4    A      Yes.

5          MS. FINLEY:  Your Honor, at this time the government

6    would offer 3D into evidence.

7          THE COURT:  Any objection?

8          MR. HOCHMAN:  No objection, Your Honor.

9          THE COURT:  3D will be admitted.

10         (Government's Exhibit 3D was admitted into evidence.)

11   BY MS. FINLEY:

12   Q      And just . . . .  On Page 2, we don't need to publish,

13   but this confirms that New Vanguard is a Hong Kong corporation;

14   is that correct?

15   A      Yes.  In the middle it says it's incorporated in Hong

16   Kong.

17         MS. FINLEY:  If we turn, now, to Exhibit 3E?

18         (The witness examines an exhibit.)

19   BY MS. FINLEY:

20   Q      Are these the correspondence and e-mails, and internal

21   correspondence, for the New Vanguard account at UBS?

22   A      Yes.

23   Q      And are these records made at or near the time noted in

24   the record, by an individual with knowledge of the information

25   contained in the record?

1        MR. HOCHMAN:  Objection, foundation.

2        THE COURT:  That objection is overruled.

3        THE WITNESS:  Yes.

4  BY MS. FINLEY:

5  Q      And are these records maintained, and of the type of

6  record maintained, in the ordinary course of UBS's business?

7  A      Yes.

8        MS. FINLEY:  Your Honor, at this time the government

9  would offer Exhibit 3E into evidence.

10        MR. HOCHMAN:  Your Honor, object on the same grounds

11  incorporated by reference, the same grounds that I did for

12  Exhibit 3S.

13        THE COURT:  Is it the same fact pattern as 3S again?

14        MR. HOCHMAN:  Yes, Your Honor.

15        THE COURT:  All right.  Those objections are noted

16  and overruled.  3E will be admitted.

17            (Government's Exhibit 3E was admitted into evidence.)

18        MS. FINLEY:  Permission to publish, Your Honor?

19        THE COURT:  You may do so.

20            (An exhibit was projected onto the projector screen.)

21  BY MS. FINLEY:

22  Q      If I could have you turn to Page 19 of 3E . . . and can

23  you explain to the jury what this document is?

24            (The witness examines an exhibit.)

25  A      It's an invoice issued by Sinco, addressed to New

1    Vanguard, the New Vanguard company.  It's a bill for services

2    rendered to New Vanguard by Sinco Treuhand.

3    Q      And if we go down to the middle, is there a fee for the

4    legal domicile?

5    A      Yes.  That's the first position.

6    Q      It looks like all of these fees are from July of 2007,

7    through the end of June of 2008; is that right?

8    A      Yes.

9    Q      And there's a fee for the business registration?

10   A      Yes.

11   Q      A fee for nominee shareholders?

12   A      Correct.

13   Q      A fee for directors?

14   A      Yes.

15   Q      And directors insurance?

16   A      Yes.

17   Q      And the total fee is a little over . . . is that Swiss

18   dollars?  I'm sorry, I don't know the currency.

19   A      Swiss franks, 9,100 and something.

20   Q      Do you happen to know generally the exchange rate

21   between the U.S. and . . . .

22   A      Yes.  One dollar is 90 Swiss cents.

23   Q      And do these instructions cause UBS to transfer the

24   9,163 franks from New Vanguard's account to pay the fees to

25   Sinco . . . Sinco's account?

1   A      Well, it is addressed from Sinco to New Vanguard.  It

2   should be paid to an account with Wegelin Bank.  It does not

3   expressly indicate and contain an instruction to pay it.

4   Q      Okay.  And if we turn to Page 116 . . . this is a

5   securities statement.

6          Is this the type of document that UBS creates to show

7   the trades that are occurring within the accounts?

8   A      It shows the situation at the given point in time.  So

9   it is not . . . it is not that kind of . . . it does not show

10  the individual trades, but the positions at the . . . given

11  time.

12  Q      So, as of December 29th, 2006, the New Vanguard account

13  has these various investments; is that what that means?

14  A      In the securities account S1, yes.

15  Q      And do all the accounts that would have a securities

16  object would have these types every statements?

17  A      Yes.

18  Q      If we can turn to Page 142 of Exhibit 3E . . . .  I'm

19  sorry -- yes, 142.

20          (An exhibit was projected onto the projector screen.)

21  BY MS. FINLEY:

22  Q      And is this an e-mail from David Fredrick to Mr. Luetolf

23  in June of 2005?

24  A      Yes.

25  Q      And if you could read the e-mail to the jury, please?

1   A       "Dieter, I am considering purchasing another home in

2   North Carolina.  I plan on purchasing the home in the name of

3   one of our companies, Apex, or MTA.  I believe we have an

4   account at UBS for both.

5           "If I have the funds moved from my personal account to

6   MTA or Apex, then have you wire the money to UBS –– "to the

7   U.S., will you still need to have my name listed on the wire

8   transmittal sheet?

9           "Thanks for looking into this.  DF."

10  Q       And if we can turn to Page 203 of 3E . . . and is this

11  an e-mail from ––the top of the e-mail says from Dieter Luetolf

12  to Patrick Hoffman, but the body of the e-mail is from David

13  Fredrick to Mr. Luetolf?

14  A       Correct.

15  Q       And Patricia Hough is copied?

16  A       Correct.

17  Q       And it's dated July 15th, 2006.

18  A       Correct.

19  Q       And if you could read that e-mail to the jury.

20  A       "Dieter, with interest rates rising and everything else

21  very unstable, I am considering taking all the funds in all our

22  accounts and putting them into a simple interest-bearing

23  account.  This will give us a safe and known appreciation each

24  year.  What are your thoughts on this?

25          "DF."

1  Q     And lastly, if I could ask you to turn to Page 222.

2        And is this an e-mail from Mr. Hoffman to David

3  Fredrick?

4  A     Yes.

5  Q     Dated March 5th, 2007?

6  A     Yes.

7  Q     And is Mr. Hoffman providing Dr. Fredrick the account

8  balances for the various accounts listed here?

9  A     Yes.  Total assets as of the 2nd of March, 2007.

10 Q     And is it the 5th of March?

11 A     Second.

12 Q     Oh, I see.  All right.  You're correct?

13       MR. HOCHMAN:  I'm sorry, Your Honor.  Can I just get

14 the page number one more time?

15       MS. FINLEY:  203.

16       MR. HOCHMAN:  203?

17       Thank you, Your Honor.

18       MS. FINLEY:  I'm sorry.  222.

19       MR. HOCHMAN:  222.

20       THE WITNESS:  Mail was sent the 5th of March; but,

21 yes, it's as of the second.

22       MS. FINLEY:  Thank you.

23 BY MS. FINLEY:

24 Q     And it looks like Mr. Hoffman is sending the e-mail on

25 behalf of Mr. Luetolf, because Mr. Luetolf has gotten into a

1    skiing accident?

2    A       Yes.  According to the last sentence before the

3    signature.

4    Q       And as of the date, March 2nd, 2007, in these various

5    accounts, how many -- how much assets are in these accounts?

6    A       26,594,265 U.S. dollars.

7            MS. FINLEY:  Your Honor, this might be a good time to

8    break.

9            THE COURT:  All right.  Thank you.

10           Ladies and gentlemen, we're going to take a lunch

11   recess.  We'll come back at 1:00 o'clock.  Please do not

12   discuss the case among yourselves, or allow anyone to discuss

13   it with you or in your presence.  I'll see you back here

14   about 1:00 o'clock.

15           (At 11:51 a.m., the jury was escorted from the

16       courtroom.)

17           THE COURT:  All right.  1:00 o'clock.

18           (At 11:51 a.m., court was recessed.)

19                        AFTER RECESS

20           (At 1:02 p.m., court was reconvened.)

21           THE COURT:  Counsel, the Court security officer

22   informed me that one of the jurors asked the question, and he

23   didn't know how serious it was, but it was one of those, "Oh,

24   by the way, can we ask questions," and he assumed it meant

25   questions of witnesses.

1          So what are your thoughts?

2          MR. HOCHMAN:  No, Your Honor.

3          THE COURT:  No, you have no thoughts, or --

4          MR. HOCHMAN:  No.  My thought is that the . . . .

5  Yeah.  That's a dangerously ambiguous answer.  My thought is

6  that the jurors should not be able to ask questions of

7  witnesses.

8          MS. FINLEY:  I think we would concur, Your Honor.

9          THE COURT:  So do I.

10         Like I said, I don't have a sense as to whether that

11 was a thought-out inquiry or just one juror curious.

12         Do you want me to tell them anything, or just proceed

13 as we are and see if it comes up again?

14         MR. HOCHMAN:  Was it a . . . did he actually do it in

15 the form of a note?

16         THE COURT:  No.  This is passing -- you know, as they

17 were passing out, and he commented to the Court Security

18 Officer with that inquiry.

19         MR. HOCHMAN:  Maybe at the end of the day, Your

20 Honor, when you give the normal admonition, could throw in

21 something along the lines of, "You might want to be asking

22 questions, but that's not" -- however you want to phrase it,

23 basically, so it's not highlighting the issue to that

24 particular juror.

25         THE COURT:  So nip it in the bud somehow.

1           MR. HOCHMAN:  Yes.

2           MS. FINLEY:  That's fine, Your Honor.

3           THE COURT:  All right.  I'll think of something.

4           MR. HOCHMAN:  Thank you, Your Honor.

5           THE COURT:  Have the jury step in, please.

6           MR. HOCHMAN:  Your Honor?

7           THE COURT:  Yes.

8           MR. HOCHMAN:  Were you going to put Alternate

9  Number 1 in . . . .

10          THE COURT:  At some point I was going to ask you if

11  you just wanted me to slide her . . . .  I think it's a her --

12          MR. HOCHMAN:  Yes, Your Honor.

13          THE COURT:  Next time they come in, I'll tell them.

14          (At 1:04 p.m., the jury was escorted into the

15      courtroom.)

16          THE COURT:  And you may bring the witness in.

17          (The witness resumed the witness stand.)

18          THE COURT:  For future reference, was an hour long

19  enough for lunch?

20          (Jurors indicated affirmatively.)

21          THE COURT:  And, Ms. Craig, next time we have the

22  jurors come back in, I'm going to have you take the open seat,

23  which is Number 4.  You don't have to do it now, but just next

24  time we have you come in.

25          And you may proceed.

1        MS. FINLEY:  Thank you, Your Honor.

2   BY MS. FINLEY:

3   Q      I'm going to show you now what's been marked as

4   Exhibit 3CC.  If you could take a look at that exhibit.

5        Now, again, are these the relationship-opening documents

6   for Top Fast Finance Limited?

7   A      Yes.

8   Q      And are these records kept and maintained in the

9   ordinary course of UBS's business?

10  A      Yes.

11       MS. FINLEY:  Your Honor, at this time the government

12  would offer Exhibit 3CC into evidence.

13       MR. HOCHMAN:  No objection, Your Honor.

14       THE COURT:  3CC will be admitted.

15       (Government's Exhibit 3CC was admitted into

16     evidence.)

17       MS. FINLEY:  Permission to publish?

18       THE COURT:  You may do so.

19       MS. FINLEY:  If we could turn to Page 1 of the

20  exhibit . . . .  And we can talk while it's coming up there.

21  BY MS. FINLEY:

22  Q      For this entity, Top Fast, on Page 1, who is identified

23  as the beneficial owner?

24  A      The beneficial owner is David Leon Fredrick.

25  Q      And what date is this document filled out?

1    A       On the 15th of December, 2005.

2              MS. FINLEY:  And I'm sorry, the Court said that . . .

3    it's not on.  There we go.  Thank you.

4              (An exhibit was projected onto the projector screen.)

5    BY MS. FINLEY:

6    Q       And I'm sorry, what date was that filled out on?

7    A       15th of December, 2005.

8    Q       And again, based on your review of the documents, that

9    appears to be Mr. Singenberger's signature; is that correct?

10   A       That's correct.

11   Q       And if we turn to Page 2, is this another Form A?

12   A       Yes.

13   Q       And who is identified as the beneficial owner?

14   A       Patricia Lynn Hough.

15   Q       And again, this is signed on the same date, by

16   Mr. Singenberger?

17   A       Correct.

18   Q       And, in reviewing just the remaining documents in that

19   exhibit, there are the same types of documents that we've gone

20   over today:  The base documents; and the domiciliary sheets;

21   and the forms to allow them to invest in U.S. securities; is

22   that correct?

23   A       Yes, correct.

24   Q       And if we turn now to Exhibit DD . . . if you could take

25   a look at those documents.

1          (The witness examines an exhibit.)

2    BY MS. FINLEY:

3    Q     And those again are the incorporation documents for Top

4    Fast; is that correct?

5    A     That's correct.

6    Q     And those documents are maintained in the ordinary

7    course of UBS's business?

8    A     Yes.

9          MS. FINLEY:  Your Honor, at this time we would offer

10   Exhibit 3DD into evidence.

11         THE COURT:  Any objections?

12         MR. HOCHMAN:  One second, Your Honor?

13         No objection, Your Honor.

14         THE COURT:  3DD will be admitted.

15         (Government's Exhibit 3DD was admitted into

16      evidence.)

17   BY MS. FINLEY:

18   Q     And just, from the front page, is Top Fast Incorporated

19   also a Hong Kong corporation?

20   A     Yes; incorporated in Hong Kong.

21   Q     Now I'm going to show you what's been marked as

22   Exhibit 3J.

23         (The witness examines an exhibit.)

24         MS. FINLEY:  Your Honor, I'm just going to take one

25   quick step back.

1  BY MS. FINLEY:

2  Q      If I could just show you, first, what's been marked

3  as 3EE.

4            (The witness examines an exhibit.)

5  BY MS. FINLEY:

6  Q      And, in 3EE, are these the correspondence and e-mail and

7  internal bank records, correspondence, for Top Fast Finance

8  Limited?

9  A      Yes.

10  Q      And are these documents created at or near the time, as

11  indicated on the document, by a person who has knowledge of

12  that information?

13            MR. HOCHMAN:  Objection, foundation.

14            THE COURT:  The objection is overruled.

15            THE WITNESS:  Yes.

16  BY MS. FINLEY:

17  Q      And are they kept and maintained in the ordinary course

18  of UBS's business?

19  A      Yes.

20            MS. FINLEY:  Your Honor, at this time the government

21  would offer Exhibit 3CC into evidence -- 3EE into evidence.

22            MR. HOCHMAN:  Your Honor, I object on the same

23  grounds, and incorporate all those grounds, that I objected to,

24  Exhibit 3S.

25            THE COURT:  Same fact pattern as 3S again?

1          MR. HOCHMAN:  Yes, Your Honor.

2          THE COURT:  All right.  The objection is overruled.

3    Exhibit 3EE will be admitted.

4          (Government's Exhibit 3EE was admitted into

5      evidence.)

6          MS. FINLEY:  Now, if we can turn to 3J . . . .

7    BY MS. FINLEY:

8    Q     Is this the account-opening documents for Medical

9    Technology Associates?

10   A     Yes.

11   Q     And are these documents also kept in the ordinary course

12   of UBS's business?

13   A     Yes.

14         MS. FINLEY:  At this time, Your Honor, the government

15   would offer 3J into evidence.

16         THE COURT:  Any objections?

17         MR. HOCHMAN:  No objection, Your Honor.

18         THE COURT:  3J will be admitted.

19         (Government's Exhibit 3J was admitted into evidence.)

20         MS. FINLEY:  Permission to publish?

21         THE COURT:  You may.

22         (An exhibit was projected onto the projector screen.)

23   BY MS. FINLEY:

24   Q     For MTA, or Medical Technology Associates, who is

25   elected as the beneficial owner, or identified as the

1   beneficial owner?

2            (The witness examines an exhibit.)

3   A       According to this Form A, Page 1, it is David Fredrick

4   and Patricia Hough.

5   Q       And was this document signed on August 13th, 2003?

6   A       Yes.

7   Q       And at the bottom, it is not clear whether it was done

8   in person or by correspondence, because both boxes appear to

9   have marks in them; is that correct?

10  A       Correct.

11  Q       And if we turn to Page 2 and 3, again, are these the

12  identification documents that UBS would have required?

13  A       Yes.

14  Q       And turning to Page 8, did UBS, or Mr. Leutolf, as based

15  on the stamp at the bottom, determine that this was a

16  domiciliary company?

17  A       Yes.

18  Q       If we could turn to the next page, Page 9 . . . who are

19  the authorized signatories for Medical Technology Associates?

20  A       There are two.  One is David Fredrick, and the second

21  one is Patricia Hough.

22  Q       And on the bottom, was this document executed on either

23  June 2nd, 2003, or February 6th, 2003?

24  A       Yes.

25  Q       Now, if we could turn to Page 10 and 11, can you just

1   explain again what the corporation resolution is?

2   A     It's a document that indicates that the legal entity

3   decided that two individuals listed in Section 2 are the ones

4   who can represent the company to UBS.

5   Q     And who is listed on Section 2, or in Section 2?

6   A     Patricia Hough and David L. Fredrick.

7   Q     And on Page 11, are there signatures appear to be there

8   as well?

9   A     Yes.

10  Q     Now I'm going to show you what has been marked as

11  Exhibit 3K.

12        And are these the incorporation documents for Medical

13  Technology Associates?

14  A     Yes.

15  Q     And are these records kept and maintained in the

16  ordinary course of UBS's business?

17  A     Yes.

18        MS. FINLEY:  Your Honor, at this time the government

19  would offer Exhibit 3K into evidence.

20        MR. HOCHMAN:  No objection.

21        THE COURT:  3K will be admitted.

22        (Government's Exhibit 3K was admitted into evidence.)

23  BY MS. FINLEY:

24  Q     And where was -- if we can publish --

25        MS. FINLEY:  Permission to publish, Your Honor?

1      THE COURT:  You may.

2          (An exhibit was projected onto the projector screen.)

3  BY MS. FINLEY:

4  Q      Looking at the first page, is Medical Technology

5  Associates a British Virgin Islands company?

6  A      Yes.

7  Q      And it appears to be incorporated on the 10th day of

8  December, 1997?

9  A      Yes.

10  Q      And if we turn to Page 46, the certificate of

11  incumbency, does it list who the directors of Medical

12  Technology Associates are?

13  A      Yes.

14  Q      And who are they?

15  A      According to Number 3, they are David L. Fredrick and

16  Patricia Hough.

17  Q      I now show you what's been marked as Exhibit 3L.

18          (The witness examines an exhibit.)

19  BY MS. FINLEY:

20  Q      And again, are these the internal correspondence,

21  correspondence with the client, and e-mails, client

22  workbenches, that are maintained as part of Medical Technology

23  Associates' account by UBS?

24  A      Yes.

25  Q      And are these documents made at or near a time by a

1   person with information . . . with knowledge about the

2   information contained in the records?

3           MR. HOCHMAN:  Objection, foundation.

4           THE COURT:  The objection is overruled.

5           THE WITNESS:  Yes.

6   BY MS. FINLEY:

7   Q     And are these records kept and maintained by UBS in the

8   ordinary course of its business?

9   A     Yes.

10          MS. FINLEY:  Your Honor, at this time the government

11  offers 3L into evidence.

12          MR. HOCHMAN:  Your Honor, incorporate by reference

13  all the arguments made with respect to Exhibit, 3S with respect

14  to these documents.

15          THE COURT:  All right.  And once again, we have the

16  same fact pattern as 3S?

17          MR. HOCHMAN:  Yes, Your Honor.

18          THE COURT:  All right.  Exhibit 3L will be admitted.

19          MS. FINLEY:  Thank you, Your Honor.

20          Permission to publish?

21          THE COURT:  You may do so.

22          (Government's Exhibit 3L was admitted into evidence.)

23          (An exhibit was projected onto the projector screen.)

24  BY MS. FINLEY:

25  Q     If we could just turn to Page 13.

1          Does it appear, based on the letter, that Medical

2   Technology Associates, and an entity named Apex Consultants, at

3   some point were closed?

4   A     Yes.  It says:  "Please close the accounts of Medical

5   Technology Associates and Apex" -- counsel, something I can't

6   read.

7   Q     And can you tell the date?

8   A     7th of November, 2006.

9   Q     And are there two signatures on the document?

10  A     Yes.

11  Q     And can you tell whose signatures they are?

12  A     Patricia Hough and . . . the other one, I would say, is

13  David Fredrick's signature.

14  Q     I'm now going to show you what's been marked as

15  Exhibit 3N.

16         Are these the account-opening documents for Apex

17  Consultants?

18  A     Yes.

19  Q     And are these documents maintained in the ordinary

20  course of UBS's business?

21  A     Yes.

22         MS. FINLEY:  Your Honor, at this time the government

23  would offer 3N into evidence.

24         MR. HOCHMAN:  No objection, Your Honor.

25         THE COURT:  3N will be admitted.

1          (Government's Exhibit 3N was admitted into evidence.)

2          MS. FINLEY:  And permission to publish?

3          THE COURT:  You may do so.

4          (An exhibit was projected onto the projector screen.)

5    BY MS. FINLEY:

6    Q     Looking again at Form A, for Apex Consultants, are David

7    Fredrick and Patricia Hough identified as the beneficial owners

8    for Apex Consultants?

9    A     Yes.

10   Q     And is this signed on July 14th, 2003?

11   A     Yes.

12   Q     And the document at the bottom, the box on the bottom

13   that says, "in person," is checked; is that correct?

14   A     Yes.

15   Q     And again, reviewing this file, the same documents that

16   we have referred to before are contained in this file as well,

17   is that correct, the waivers, and the authorized signatory

18   sheets?

19   A     Yes.

20   Q     And if we turn to Page 6, do David Fredrick and Patricia

21   Hough waive their right to invest in U.S. securities?

22   A     Yes.

23   Q     And turning to Page 10 and 11, are Patricia Hough and

24   David Fredrick the secretary and the director for Apex

25   Consultants?

1    A       Patricia Hough is indicated as director of Apex; yes.

2    Q       Is she indicated at the secretary, actually?

3    A       Secretary, yes.

4    Q       And David Fredrick is the director?

5            (The witness examines an exhibit.)

6    A       He is the one who can represent the company to UBS, so

7    signatory.

8    Q       I'm sorry.  He is a director and she is a secretary; is

9    that their titles?

10   A       Well, in Section 1 it says:  "Patricia Hough, Secretary

11   of Apex Consultants Limited.  And so it is resolved that UBS

12   AG, and further resolved that" -- and then these are the two

13   names that they can represent the company to UBS.

14   Q       Now I'm going to show you what's been marked as 30.

15           (The witness examines an exhibit.)

16   BY MS. FINLEY:

17   Q       And 30, are these the incorporation documents for Apex

18   Consultants Limited?

19   A       Yes.

20   Q       And are these documents kept and maintained in the

21   ordinary course of UBS's business?

22   A       Yes.

23           MS. FINLEY:  Your Honor, at this time the government

24   offers 30 into evidence.

25           MR. HOCHMAN:  No objection, Your Honor.

1          THE COURT:  3O will be admitted.

2              (Government's Exhibit 3O was admitted into evidence.)

3   BY MS. FINLEY

4   Q     I'd like to now show you what has been marked as

5   Exhibit 3P.

6          And are these, again, the e-mails and internal and

7   external correspondence, client workbench, for Apex

8   Consultants?

9   A     Yes.

10  Q     And are these records made at or near a time, as

11  indicated on the document, by a person with knowledge of the

12  contents of the document?

13         MR. HOCHMAN:  Objection, foundation.

14         THE COURT:  That objection is overruled.

15         THE WITNESS:  Yes.

16  BY MS. FINLEY:

17  Q     And are they kept and maintained by UBS in the ordinary

18  course of business?

19  A     Yes.

20         MS. FINLEY:  Your Honor, at this time the government

21  would offer 3P into evidence.

22         MR. HOCHMAN:  Restating all the objections from, and

23  incorporating them by reference from, Exhibit 3S.  And these

24  are the similar type of documents as 3S.

25         THE COURT:  Those objections are noted and overruled.

1   Exhibit 3P will be admitted.

2            (Government's Exhibit 3P was admitted into evidence.)

3            MS. FINLEY:  Thank you, Your Honor.

4            Permission to publish?

5            THE COURT:  You may do so.

6            (An exhibit was projected onto the projector screen.)

7   BY MS. FINLEY:

8   Q     I'd ask you to turn to Page 5.

9         And is this an e-mail from David Fredrick to somebody

10  whose name is blacked out, but CCed to Dieter Luetolf; is that

11  correct?

12  A     Correct.

13  Q     And it's dated December 15th, 2003?

14  A     Correct.

15  Q     And if you could read the e-mail to the jury.

16  A     "Dear" -- name is blacked out -- "please let me know if

17  you received the copy of the letter attached concerning the

18  closing of our account.  I tried faxing the letter to" -- name

19  blacked out -- "as well as" -- another name blacked out -- "but

20  kept getting an error message on our machine.

21        "After speaking with several people, we concluded that

22  leaving the funds in Nassau makes us too vulnerable.  We will

23  certainly miss seeing everyone in Nassau.

24        "Regards to" -- the name blacked out -- "and the rest of

25  your staff.

1          ""Sincerely, Dr. David Fredrick."

2     Q     And if you could turn to Page 6, please.

3     A     Six?

4     Q     Yes.

5          When UBS receives funds from a client, does it have to

6     know where those funds come from?

7     A     Well, do you mean which bank sent -- from which bank

8     they were sent or what the source of the funds is?

9     Q     The source of the funds.

10    A     Yes, we would like to know this as part of our

11    know-your-client requirements.

12    Q     And if we look at Page 6 of Exhibit 3P, is this letter,

13    again, to -- in this case it's to somebody at Hambros Bank; is

14    that correct?

15    A     Correct.

16    Q     But this document was maintained in UBS's files

17    pertaining to Apex; is that right?

18    A     Yes.

19    Q     And can you read just the first paragraph of this

20    e-mail?

21    A     "Following our telephone discussion last week, my wife

22    and I have decided to close our account at SG Hambros in

23    Nassau.  We have enjoyed a wonderful working relationship with

24    your bank for the past several years, but unfortunately the

25    changes in U.S. and Bahamas banking policies that take effect

1  in January, 2004, put us at a disadvantage."

2  Q     And are there names on the bottom of the form about who

3  the letter is from?

4  A     Yes.

5  Q     It's not signed, though?

6  A     It's not signed, correct.

7  Q     Now I'm going to turn your attention to government's

8  exhibit marked 3I.

9          (The witness examines an exhibit.)

10 BY MS. FINLEY:

11 Q     Can you tell the jurors what is contained in this file?

12 A     These are account statements . . . and debit/credit

13 advices, just one debit advice, Page 26.  This relates to a

14 single transaction, whereas the account statements show

15 the . . . various transactions over a certain period of time.

16      It also contains the statement of assets as per the end

17 of a year, in this case 2003.

18 Q     And are these documents kept and maintained in the

19 ordinary course of UBS's business?

20 A     Yes.

21      MS. FINLEY:  Your Honor, at this time the government

22 would offer 3I into evidence.

23      MR. HOCHMAN:  One moment, Your Honor?

24      THE COURT:  Okay.

25      MR. HOCHMAN:  No objection, Your Honor.

1          THE COURT:  3I will be admitted.

2          MS. FINLEY:  Permission to publish?

3          THE COURT:  You may.

4          (Government's Exhibit 3I was admitted into evidence.)

5

6          (An exhibit was projected onto the projector screen.)

7    BY MS. FINLEY:

8    Q     Now, in all of these statements that we have looked at

9    today, are there account statements and security statements for

10   all of them?

11   A     For all . . . .

12   Q     The accounts that we looked at today.

13   A     No, not in all the files that I have seen account

14   statements.

15   Q     Before you came here today, were there other documents

16   produced by UBS that contained account statements?

17   A     Yes.

18   Q     And those were kept and maintained in the ordinary

19   course of UBS's business?

20   A     Yes.

21   Q     If we could just look at Page 1 of 3I, this is the

22   account statement.

23         And this is what Americans might think of as a bank

24   statement; is that fair to say?

25   A     Sorry, could you repeat this?

1   Q      Is this what Americans might think of as a bank

2   statement; it's all the transactions that are happening in the

3   account?

4   A      Yes.  Now, in this case for the defined period of time

5   starting on the 21st of July, until the 30th of September,

6   2003.

7   Q      And those dates are just under the words, "account

8   statement"?

9   A      Yes.

10  Q      And if we turn to Page 50 . . . .  Could you explain to

11  the jury what this document is?

12  A      This is the statements of assets as of 31st of December,

13  2004.

14  Q      And what does this -- what does a statement of assets

15  provide; what does it do?

16  A      It shows what . . . which assets the client has under

17  this specific master number.

18  Q      And is that a year-end analysis?

19  A      Yes.

20  Q      And is it for the master account, or is it for the

21  object accounts?

22  A      It includes all objects under the master account.

23  Q      And lastly, I'm just going to ask if you could translate

24  a couple of words for us.

25         Can you tell the jurors what the word for "transfer" is

1   in Swiss German?

2   A       "Transfer."

3   Q       Transfer.

4   A       On an account statement or some internal document, it

5   would be, "Umbuchung."

6            COURT REPORTER:  Can you spell that, please?

7            THE WITNESS:   U-M-B-U-C-H-U-N-G.

8   BY MS. FINLEY

9   Q       And what does the word, "Kauf," K-A-U-F, and I'm sure

10   I'm not saying it right, what does that mean?

11   A       "Kauf" means purchase.

12   Q       And "verkauf"?

13   A       Sale.

14   Q       That's V-E-R-K-A-U-F.

15           And what is a valor number?

16   A       That's a number . . . related to a specific security, to

17   identify the security in all the various electronic systems.

18   Q       And at the present time, does UBS take clients that are

19   from the United States?

20   A       At what time?

21   Q       At the present time.

22   A       To some extent, yes.

23   Q       Do they take individual clients?

24   A       Yes.

25           MS. FINLEY:  I have no further questions, Your Honor.

1            THE COURT:  All right.  Thank you.

2            Mr. Hochman?

3            MR. HOCHMAN:  Thank you, Your Honor.

4            May I proceed, Your Honor?

5            THE COURT:  You may.

6                         CROSS EXAMINATION

7    BY MR. HOCHMAN:

8    Q       Good afternoon, Mr. Futterknecht.

9    A       Hello.

10   Q       We have never met before; correct?

11   A       That is correct.

12   Q       And you have never met Dr. Patricia Hough; is that

13   correct?

14   A       We have never met.

15   Q       And UBS has had dealings with Dr. Patricia Hough since

16   2001; is that correct?

17   A       According to the documents, yeah.

18   Q       So in the last 12-year period, not once have you met

19   Dr. Patricia Hough; is that correct?

20   A       No, I have never met her.

21   Q       And you've never called her on the telephone; is that

22   correct?

23   A       Correct.

24   Q       You've never sent her an e-mail?

25   A       Yes.

1   Q      You've never –– I'm sorry ––

2   A      No, I never sent her an e-mail.

3   Q      And you've never received an e-mail from her; is that

4   correct?

5   A      Correct.

6   Q      And the same would be –– in fact, you've had absolutely

7   no communication, whatsoever, in the entire 12-year history

8   that UBS has had dealings with Dr. Patricia Hough; is that

9   correct?

10  A      Correct.

11  Q      And the same would be true for Dr. David Fredrick?

12  A      Correct.

13  Q      But you recognize Dr. Patricia Hough in this courtroom,

14  don't you?

15  A      I have been told that lady over there is Patricia Hough.

16  Q      And who told you that?

17  A      My lawyer.

18  Q      And with respect to recognizing Dr. Patricia Hough, I

19  thought we saw a lot of passport photos throughout at least

20  eight different accounts at UBS, that you talked about, that

21  had Dr. Patricia Hough's photo in there; is that correct?

22  A      There are passport copies with –– yeah, with her

23  picture.

24  Q      Multiple passport copies; isn't that correct?

25  A      Correct.

1    Q      And those passports had her picture in it; correct?

2    A      Yeah.

3    Q      And those passports -- the copies of those passports had

4    her full name, Patricia Lynn Hough; is that correct?

5    A      Correct.

6    Q      Identified her as a United States citizen?

7    A      Yes.

8    Q      Listed her birth state of Ohio; isn't that correct?

9    A      I don't remember that.  I didn't check it in that

10   detail.

11   Q      We'll check it in a moment.

12          She also provided you with her Florida driver's license;

13   isn't that correct?

14   A      I think one of the documents was not a passport but

15   another document, could have been a driver's license.

16   Q      And we'll get there in a moment.

17          And the driver's license had her home address; isn't

18   that correct?

19   A      I don't remember.  I didn't check in that detail.

20          MR. HOCHMAN:  May we approach and get Exhibit 3R,

21   Your Honor?

22          THE COURT:  You may.

23          MR. HOCHMAN:  And may I approach the witness freely?

24          THE COURT:  You may.

25          MR. HOCHMAN:  Thank you.

1           (The witness examines an exhibit.)

2           MR. HOCHMAN:  And I believe 3R is already admitted

3      into evidence, Your Honor?

4           THE COURT:  It is.

5      BY MR. HOCHMAN:

6      Q     Can you turn, if you could, to Page 5 of Exhibit 3R?

7           MR. HOCHMAN:  And may we publish Page 5 of

8      Exhibit 3R, Your Honor?

9           THE COURT:  You may.

10          (An exhibit was projected onto the projector screen.)

11     BY MR. HOCHMAN:

12     Q     You see, this is one of many of Dr. Patricia Lynn

13     Hough's passport copies that is in UBS's files; do you see

14     that?

15     A     Yes.

16     Q     You see it lists Ohio as her state of birth?

17     A     I see Ohio, but I can't read what this relates to.

18     Q     Ah.

19     A     Just under that --

20     Q     You can't read the place of birth?

21     A     That is blacked out.

22     Q     You can turn the page to the next page, and this would

23     be Page 6 of Exhibit 3R, if we could publish that.

24     BY MR. HOCHMAN:

25     Q     And that's Dr. Patricia Lynn Hough's Florida driver's

1    license, as she provided UBS; isn't that correct?

2    A      Yes.

3    Q      And that has her full name in it?

4    A      (No audible response.)

5    Q      And if it wasn't blacked out, it would also identify her

6    full driver's license; isn't that correct?

7    A      I would assume so.  I don't know what has been blacked

8    out.

9    Q      Now, Dr. Patricia Hough never used a fake passport, to

10   your knowledge, is that correct, with UBS?

11   A      I don't know.  I assume that these are true copies.

12   Q      Okay.  She never used a fake driver's license?

13   A      Same answer.

14   Q      She didn't use a fake name.

15          She identified herself at all times as Dr. Patricia Lynn

16   Hough; isn't that correct?

17   A      I don't know.  I see only these names that are on these

18   documents.

19   Q      Well, you had a chance before you came here today to

20   review all the UBS files; is that correct?

21   A      The files that I have been given before I came here;

22   yes.

23   Q      Did you ever see Dr. Patricia Lynn Hough identify

24   herself as anything other than Dr. Patricia Lynn Hough?

25   A      No.

1   Q       And she didn't use any fake addresses, to your

2   knowledge; is that correct?

3   A       Yes.

4   Q       So -- I'm sorry.  I put in a negative.

5           It's correct that she did not use any fake addresses;

6   correct?

7   A       Correct.

8   Q       And so then she didn't conceal her identity from UBS at

9   any point in the last 12 years, to your knowledge; is that

10  correct?

11  A       I have no indication that she cheated or concealed her

12  identity.

13  Q       And she identified herself to UBS as a U.S. citizen on

14  UBS's own form; isn't that correct?

15  A       That's correct.

16  Q       And if you could go to the next page of this exhibit,

17  and we're talking about -- this is the exhibit dealing with the

18  Patricia Hough UBS account.  This is the supplement for new

19  account status sheet that you discussed in your direct

20  testimony.

21          MR. HOCHMAN:  And if I can highlight the three

22  questions in the middle that deal with non-U.S. person

23  declaration?

24          A little bit more, where the boxes are checked?

25          Thank you.

1  BY MR. HOCHMAN:

2  Q     And Dr. Patricia Hough was asked a question -- I'm

3  sorry?

4  A     No.  I didn't say anything.

5  Q     Dr. Patricia Hough was asked a question in this

6  document.  And the question was:  Are you a U.S. citizen?

7        Could you read for the jury the box that is checked?

8  A     The box checked is, "Yes."

9  Q     And could you also read what she checked with respect to

10 the question, "Are you a resident and/or do you have a

11 permanent resident permit in the United States" -- or -- "in

12 the U.S.A."

13 A     The box checked is, "Yes."

14 Q     And how about this box, the box that says:  "Are you

15 liable to tax in the U.S.A. on any other grounds?"

16        What answer did she give in that box?

17 A     The answer is yes.

18 Q     And that would be -- the same would be true for

19 Dr. Fredrick, isn't that correct, with respect to his filling

20 out similar forms in his accounts; is that correct?

21 A     Yes.

22 Q     Now let me ask you a question with respect to your

23 background.

24        You said that you did law studies at the University of

25 Bern; is that correct?

1    A      Correct.

2    Q      You actually got a Ph.D. at the University of Bern as

3    well; correct?

4    A      Yes.

5    Q      And then you worked at a law firm in a district court in

6    Switzerland?

7    A      Yes.

8    Q      And so you started working in 1987, so that would be

9    about 26 years at this point; correct?

10   A      Correct.

11   Q      Let me go, again, through the different areas that you

12   worked in that make up your expertise.

13          You worked in the UBS group legal department; is that

14   correct?

15   A      Yes.

16   Q      And the UBS planning and development department; is that

17   correct?

18   A      Correct.

19   Q      And then you spent, it looks like, 15 years, from 1995

20   to 2010, in the U.S. group compliance department; isn't that

21   right?

22   A      In the UBS, yes, compliance department.

23   Q      UBS group compliance department; is that correct?

24   A      Correct.

25   Q      And that covers the time period from 2000 to 2007; is

1    that correct?

2    A       Correct.

3    Q       And during that time you said that you were actually the

4    representative for the Swiss Bankers Association, you were

5    UBS's representative; is that correct?

6    A       For a specific topic; correct.

7    Q       And that topic dealt with anti-money laundering; is that

8    correct?

9            Because -- I'm sorry.  Yes?

10   A       Yes, that's correct.  In particular, it covered the CDB

11   and the revisions of this CDB agreement or . . . rules.

12   Q       Okay.  And we'll get to that in one second as well.

13           You were also the head of the group financial

14   intelligence unit; is that correct?

15   A       Yes.  For a short period of time.

16   Q       And the head of a compliance team?

17   A       Of a compliance team?

18   Q       Yes.

19   A       Of that financial intelligence unit.

20   Q       Yes.

21   A       Yes.

22   Q       And since 2011, for about the last two years, you are

23   the head of AML, anti-money laundry compliance division, for

24   the global asset management division for all of UBS; is that

25   correct?

1   A        Correct.

2   Q        So you're here as UBS's representative; is that right?

3   A        Correct.

4   Q        And the U.S. Government asked UBS to send a

5   representative to testify at this trial, and UBS designated you

6   to be its representative; is that correct?

7   A        Correct.

8   Q        And the U.S. Government asked that UBS have someone at

9   UBS designated as the custodian of records for all these

10  records, and UBS sent you; is that correct?

11  A        Correct.

12  Q        Now, UBS paid for you to come out here from Zurich; is

13  that correct?

14  A        Yes.

15  Q        And they paid for your flight, your hotel, and all your

16  expenses?

17  A        Yes.

18  Q        Did the U.S. Government pay for any of that, to your

19  knowledge?

20  A        I don't know.

21  Q        You said you had a lawyer here today?

22  A        Yes.

23  Q        Is that the gentleman in the back, in the black suit,

24  right here?

25  A        Yes.

1    Q       Mr. Barish, from New York?

2    A       Yes.

3    Q       And is UBS paying for that lawyer?

4    A       I don't know.  I assume.

5    Q       Let me ask it differently:  Are you paying for that

6    lawyer?

7    A       No, I'm not.

8    Q       To your knowledge, is the United States Government

9    paying for that lawyer?

10   A       Not that I know.

11   Q       To your best understanding, UBS is paying for that

12   lawyer as well?

13   A       I would assume so; yes.

14   Q       Does Mr. Barish represent you, or does he represent UBS,

15   to your knowledge?

16   A       He's here to support me.

17   Q       And the reason that UBS is cooperating with the U.S.

18   Government, and flew you out here to testify in this trial, is

19   that it has to do so pursuant to something called the Deferred

20   Prosecution Agreement it signed with the government, the U.S.

21   Government, back in February, 2009; is that correct?

22   A       I have been told that it's part of this Deferred

23   Prosecution Agreement, yes, that we will provide -- that UBS

24   will provide expert witness --

25   Q       And that's you.

1    A       -- as necessary.  Yes.

2    Q       You are the expert person; correct?

3    A       Correct.

4    Q       And in that Deferred Prosecution Agreement, UBS paid

5    $780 million to the United States so that criminal charges

6    filed against it by the U.S. Government could be deferred, and

7    then dismissed, as long as it abided by the terms of the

8    Deferred Prosecution Agreement; is that correct.

9    A       I was not involved in this Deferred Prosecution

10   Agreement matter, so I have no detailed knowledge of that.

11   Q       You're UBS's representative today, and you don't know

12   about a 780 million-dollar agreement that UBS struck as part of

13   the Deferred Prosecution Agreement?

14   A       I know that we had to pay this amount of money, but I

15   don't know about the details of this agreement.  I was not

16   involved in handling this matter.

17   Q       Have you ever seen the Deferred Prosecution Agreement

18   before?

19   A       No.

20   Q       Has anyone at UBS ever discussed it with you?

21   A       In very general terms only, but not in detail.

22   Q       And you -- I'm sorry.

23   A       Not in details.

24   Q       But you understand that a Deferred Prosecution Agreement

25   meant that, as long as UBS paid that very large sum of money,

1    $780 million, that the criminal charges against it would be

2    deferred, and then ultimately dismissed, as long as they

3    cooperated with the U.S. Government; correct?

4            MS. FINLEY:  Objection, Your Honor, foundation.

5            THE COURT:  Overruled.

6            THE WITNESS:  That's my understanding; yes.

7    BY MR. HOCHMAN:

8    Q     Thank you.

9           And as part of the deal, in engaging in this Deferred

10   Prosecution Agreement, UBS was allowed to continue banking in

11   the United States; is that correct?

12   A     As far as I know, yes.

13   Q     And being able to bank in the United States is worth

14   billions of dollars to UBS; isn't that right?

15   A     I hope we make profit from this business, yes.

16   Q     And that profit could be in the billions of dollars;

17   correct?

18   A     Might be.  I don't know the details and how much profit

19   we actually make.

20   Q     Now, if UBS does not do what the government wants --

21   excuse me.

22          If UBS does not comply with the Deferred Prosecution

23   Agreement, then the U.S. Government could declare the agreement

24   breached, rip it up, and go after UBS; is that correct?

25   A     As far as I know.  But again, I'm not familiar with the

1    details.  There was a certain period of time, and after that

2    period . . . the agreement was kind of concluded.  And there

3    was no -- there are no more, in that sense, negative effects.

4    That's my understanding.

5    Q      Oh, okay.

6           Now, one of the terms of that agreement was that if

7    there was ever a trial, like this trial, the U.S. Government

8    could ask UBS to send someone to testify at the trial, like

9    they've done with you; is that correct?

10   A      That's how I understand it.

11   Q      Now, did you ever receive a subpoena from the U.S.

12   Government, personally, to testify here today?

13   A      No.

14   Q      And that's because a U.S. subpoena is not enforceable in

15   Switzerland, to compel a Swiss citizen to testify in a

16   U.S. court; correct?

17   A      Probably, yes, I would assume so.

18   Q      But the U.S. Government has this ability, if it wants

19   to, to ask UBS to send anybody that it can here; is that

20   correct?

21   A      That's my understanding.

22   Q      Now, the prosecutors contacted you before you testified

23   today; is that correct?

24   A      The prosecutors; yes.

25   Q      And did they interview -- was it on the phone?

1    A       We had a phone-call conversation; yes.

2    Q       And did they meet with you before you testified here

3    today?

4    A       Yes.

5    Q       And you went over all those documents that you've

6    already testified about; is that correct?

7    A       Yes.

8    Q       How much time did you spend gathering all those

9    documents before you signed the certification of the records?

10   A       I did not gather the documents.  That was made by

11   somebody else.

12   Q       Who was that somebody else?

13   A       I got the documents in -- I think three binders full of

14   documents from somebody working in the legal department.

15   Q       In the which?

16   A       In the legal department.

17   Q       In the legal department.

18           And who is that person?

19   A       Katharine Anne Mueller.

20   Q       Could you spell that, please?

21   A       A-N-N-E.  K-A-T-H-A-R-I-N-E.  And the family name is

22   Mueller, M-U-E-L-L-E-R.

23   Q       And besides -- and so Ms. Mueller merely handed you

24   three binders of documents; is that correct?

25   A       Yes.

1    Q      Was any other person at UBS involve with the production

2    of these documents, besides Ms. Mueller?

3    A      I don't know who else was involved in -- for producing

4    these documents.  I got them from Anne Katharine, and that's

5    all I know.

6    Q      And did you ask her --

7    A      No.

8    Q      If I might finish the question.

9           Did you ask her if she had relied, in turn, on somebody

10   else to pull these records before they ended up with her and

11   then gave them to you?

12   A      No, I did not ask her.

13   Q      How do you know that Ms. Mueller pulled all the records

14   that were engaged in those files -- excuse me -- that were part

15   of those files.

16   A      I assume that these are the relevant documents that --

17   the relevant documents for this trial.

18   Q      So you assumed it.  You don't know it.

19          Is that correct?

20   A      Ya.  I have no own direct knowledge that these are all

21   the documents.

22   Q      And so you got the documents from Miss Mueller.

23          Did you go through each one of these documents and --

24   and by the way, were these documents that you received -- let

25   me repeat the question.

1      Were the documents that you received from Miss Mueller

2   the ones that you turned over to the United States Government?

3   A      I don't know what -- which documents were turned over.

4   I was not involved in sending documents.

5   Q      So I'm a little bit confused.

6      Miss Mueller handed you three binders of documents, then

7   what did you do with them?

8   A      I reviewed them.

9   Q      You reviewed them.

10  A      Um-hum.

11  Q      And then what did you do with them after you reviewed

12  them?

13  A      Well, I kept them in my office.  I got copies of these

14  documents.

15      But first of all, I got e-mails with attachments.  I

16  could not open these attachments.  Then I asked her to give me

17  her copies, printouts.  And she gave me three binders full of

18  documents.  And these documents are still in my office in

19  Zurich.

20  Q      So what documents ended up being sent to the U.S.

21  Government, if those documents are still in your office?

22  A      I assume that another set of documents was sent to the

23  U.S. Government.

24  Q      You assume it.  You don't know.

25      Is that correct?

1    A      I was not involved in producing and sending these

2    documents to the U.S. Government.

3    Q      So did you ever compare the documents that you have been

4    testifying about, today, with the documents that are actually

5    sitting in your office, that you received from Miss Mueller?

6    A      No, I did not compare them.  I had only this one set of

7    documents that I have been given.

8    Q      And the documents that you were given, were they

9    originals, by the way?

10   A      No.

11   Q      So Miss Mueller gave you copies; and they went to your

12   office; and someone else made copies of these copies, you're

13   guessing, because you don't know, and sent those documents

14   here, to the United States; and they eventually ended up before

15   you, today, as exhibits; is that correct?

16   A      That's what I have to assume.  All I know is that I got

17   three binders of documents, first in electronic form.  I could

18   not open them, and I asked for hard copies.  And I have been

19   given three binders of hard-copy documents.

20   Q      Did you ever compare the copies that you have been

21   looking at, or even -- let me stop there.

22          Did you ever compare the copies in your office against

23   the originals to see if, in fact, they were accurate copies?

24   A      No, I did not.

25   Q      So, then, you did not obviously compare the documents

1    you have been -- you sent to the United States against the

2    originals to see if those were accurate copies?

3    A       No, I did not compare those.

4    Q       Now, in your 3505 certification, and that's

5    Exhibit 3A --

6             MR. HOCHMAN:  May I place that before the witness,

7    Your Honor?

8             THE COURT:  You may.

9             MR. HOCHMAN:  Thank you, Your Honor.

10            THE COURT:  That's not been admitted, but you may

11   show it to the witness, of course.

12            MR. HOCHMAN:  Thank you, Your Honor.

13            I would move 3A into evidence, Your Honor?

14            THE COURT:  Any objections?

15            MS. FINLEY:  No objection.

16            THE COURT:  Exhibit 3A will be admitted.

17            (Government's Exhibit 3A was admitted into evidence.)

18            MR. HOCHMAN:  Your Honor, if we can publish

19   Exhibit 3A, Page 4?

20            (An exhibit was projected onto the projector screen.)

21            MR. HOCHMAN:  And focus on the printed words, if we

22   could.  That's fine.  Thank you.

23   BY MR. HOCHMAN:

24   Q       Mr. Futterknecht, is that your signature on Page 4 of

25   Exhibit 3A, which is a certification of foreign records of

1    regularly conducted activity?

2    A      Yes, that's my signature.

3    Q      And you see, right above it, it says:  "I hereby

4    declare, certify, or state, under penalty of perjury, that the

5    foregoing is true and correct."

6           Do you see that?

7    A      Yes.

8    Q      What do you understand the words, "under penalty of

9    perjury," to mean?

10   A      That I would be held liable if these were not correct.

11   Q      So you would have taken the time, before you would have

12   signed a declaration like this, to make sure everything in the

13   declaration is 100 percent accurate; is that correct?

14   A      Yes.

15   Q      And you took that time; correct?

16   A      Yes.  I reviewed all these three binders full of

17   documents.

18   Q      And do you want to take a moment right now and

19   acknowledge that any of the words in your declaration might not

20   be accurate, or are you a hundred percent confident that

21   everything in your certification is a hundred percent accurate?

22   A      I am still confident that I –– that this is accurate,

23   yeah.

24   Q      Okay.  So let's go to the Line 3, which is right in

25   front of you.  It says:

1     "The records are originals or duplicate copies of

2     foreign Switzerland business records."

3         Now, you just got done telling me that you don't know

4     whether or not these are accurate copies of records of the

5     original records that are sitting back in UBS, because you

6     never made any comparison between the originals and the copies

7     that are produced; is that correct?

8     A     That's correct.

9     Q     It says in the next line, which is Number 4:

10        "The records were made at or near the time of the

11    occurrence of the matters set forth by, or from information

12    transmitted by, a person with knowledge of those matters."

13        Now, you are not a person with knowledge of the matters

14    dealing with any of these eight bank accounts at UBS; correct?

15    A     Yes.  I was not involved in this business relationship.

16    Q     I think you said, before, that you weren't involved in

17    any way, shape, or form, in the entire years that any of these,

18    it's actually ten accounts ten UBS accounts were in existence;

19    correct?

20    A     Um-hum.  Correct.

21    Q     So a person with knowledge of those matters, if it

22    wasn't you, it was Dieter Luetolf; correct?

23    A     He was the client adviser; yes.

24    Q     He would be the person with knowledge of these matters;

25    correct?

1    A      Correct.

2    Q      How many times did you meet with Dieter Luetolf, before

3    signing this document under penalty of perjury, to confirm that

4    he prepared these records at or near the time of occurrence?

5    A      I have not met with Dieter Luetolf.

6    Q      You have not met Dieter Luetolf even once?

7    A      Yes.  Or no, I have not met him.

8    Q      Well, how many times did you e-mail Dieter Luetolf, and

9    send him those documents, so that he could review them and have

10   a conversation with you to tell you that the records were made

11   at or near the time of the occurrence of the matters set forth

12   by, or from information transmitted by, a person with knowledge

13   of these matters?

14   A      I have no contact at all with Dieter Luetolf in relation

15   to these documents.

16   Q      Well, Dieter Luetolf still works for UBS; correct?

17   A      There is a person named Dieter Luetolf still in our

18   telephone -- internal telephone directory.  That's what I

19   checked.

20   Q      Do you have any doubt that there -- are there two Dieter

21   Luetolfs, one that worked on all these accounts that you have

22   been testifying about, and some other Dieter Luetolf, who is a

23   different Dieter Luetolf?

24   A      I only know that we have a person called Dieter Luetolf

25   in our internal telephone directory.  Whether it is the same

1    Dieter Luetolf or not, I don't know.

2    Q       Well, did you check with anybody at UBS, knowing you

3    were going to testify -- I mean, you are going to fly all the

4    way over here from Zurich to testify about ten accounts that

5    involved Dieter Luetolf, did you ever check with anybody at UBS

6    to see if the Dieter Luetolf in your telephone directory at UBS

7    is the same Dieter Luetolf that's involved with all ten of

8    these accounts?

9    A       I did not verify that.

10   Q       Well, would you be able to, if we -- we're going to take

11   a break at some point today.

12           Would you be able to make a quick phone call over to

13   Switzerland to verify that the Dieter Luetolf in your telephone

14   directory is, in fact, the Dieter Luetolf that's involved with

15   all these accounts?

16   A       Well . . . .  The offices in Switzerland are already

17   closed, so I don't know whether I can contact anybody over

18   there at this time.

19   Q       Did the U.S. Government ever ask you to confirm that the

20   Dieter Luetolf in your telephone directory is the same Dieter

21   Luetolf that's involved with ten different accounts that you

22   came here to testify about?

23   A       I don't remember that the U.S. Government has asked me

24   this question.

25   Q       Okay.  Well, what we do know about Dieter Luetolf -- by

1  the way, you don't see him here in court today, do you?

2  A      I don't know him.  I've never met him personally, so I

3  would not recognize him if he were here.

4  Q      But you are aware, aren't you, that Dieter Luetolf has

5  been named as an unindicted co-conspirator in this case to

6  defraud the U.S. out of millions of dollars; correct?

7  A      I don't know that.

8  Q      You haven't reviewed the indictment in this case --

9  A      No.

10  Q      -- at all?  I'm sorry?

11  A      No, I have not.

12  Q      You haven't asked anyone -- you're UBS's representative

13  in a situation involving Dieter Luetolf, and you didn't ask

14  anyone at UBS what this case was about?

15  A      I asked -- when I was asked whether I could testify

16  here, then I asked what is it about.

17        And the answer I have been given is, it's a trial

18  against former clients of UBS, and that my job would be to

19  explain certain documents.

20  Q      And nobody at UBS mentioned to you the little fact that

21  Dieter Luetolf is an unindicted co-conspirator in this case?

22  A      Dieter Luetolf was not a person that was discussed in

23  this context with me.

24  Q      Now, if Dieter Luetolf was involved -- well, let me ask

25  you this question:  You said, before, that UBS doesn't like to

1   have clients that are criminals; is that correct?

2   A      Correct.

3   Q      Does UBS employ people that it believes to have

4   committed crimes?

5   A      I don't know.

6   Q      Are you aware of UBS employing anyone that it believes

7   to have committed crimes?

8   A      I am not aware of –– we have thousands of employees, ten

9   thousands of employees, and I am not aware of whether any of

10  them is a criminal or not.

11  Q      Well, if it becomes publicly known, like a public

12  indictment by the United States Government, that someone is an

13  unindicted co-conspirator in a scheme to defraud the U.S. out

14  of millions of dollars, wouldn't that be some knowledge that

15  would come across your desk as the head of compliance at UBS?

16  A      My role is compliance anti-money laundering with regards

17  to clients.  The answer –– the question that you are asking me

18  is regarding something that would have to be handled by our HR

19  department.

20  Q      All right.  Who, by the way, asked you, from UBS, to

21  come here today to testify?

22  A      Pardon?  Who at ––

23  Q      Who at UBS asked you to be UBS's representative to come

24  here and testify?

25  A      That was a colleague from the compliance department.

1    Q        And who is that colleague?

2    A        Martin Peter.

3    Q        And what is his title?

4    A        He is managing director.  M-A-R-T-I-N, that's the first

5    name.  And last name is P-E-T-E-R.

6    Q        And is a managing director someone who would be your

7    boss?

8    A        He used to be my line manager a couple of years ago;

9    yes.

10   Q        And now he's below you on the chart, or is he above you;

11   where does he fit in; is he someone that you report to?

12   A        No, I don't report to him.

13   Q        But he was the one that was contacted by the U.S.

14   Government?

15   A        I don't know by whom he was contacted.  He called me and

16   asked me whether I could go.  Initially it was, he should have

17   appeared here, but he was not available.  So he asked me

18   whether I could come over here.

19   Q        And let me just also confirm:  Do you have any reason to

20   doubt that the Dieter Luetolf that you see that's employed

21   today, as evidenced by the telephone directory at UBS, is the

22   same Dieter Luetolf that's involved with these ten accounts?

23            Do you have any reason to doubt that?

24   A        I have no reason, but I also have no reason to . . . .

25   Well, it could be the same, it could be somebody different.

1   All I know is that we still have a Dieter Luetolf in our

2   telephone directory, as an employee of UBS AG in Switzerland.

3   Q       And since you were certifying that the person with most

4   knowledge of the matters -- excuse me -- that the records were

5   made at the time . . . at the time of the occurrence, by a

6   person with knowledge of the matters, why didn't you go ahead

7   and call up Mr. Luetolf?

8   A       I did not want to talk to him.  Because I wanted to stay

9   as independent as possible.

10  Q       But you're also UBS's representative making

11  certification to a U.S. court and a U.S. jury.

12          Didn't you want to be accurate?

13  A       Yes, of course I want to be accurate.

14  Q       Didn't you want to do your full due diligence and

15  explore, to make sure that you could answer these questions

16  truthfully?

17  A       I have been told that my job here is to explain certain

18  documents, the ones that I have been given, which are copies of

19  originals.  I reviewed those documents just because I wanted to

20  know what these documents are, and whether I can understand

21  them or not.

22  Q       Did you even read this declaration before you signed it?

23  A       Yes, I read it.

24  Q       So how can you make the answer that you are certifying

25  that the records were made at or near the time of the

1    occurrence of the matters set forth by, or from information

2    transmitted by, a person with knowledge of the matters if you

3    haven't spoken to a person with knowledge of the matters?

4    A     Well, these are copies from documents we keep in our

5    records.  And so if they are copies, I have no doubt -- I have

6    no reason to doubt that these copies are -- that these

7    documents, which are copies, were manipulated in any way,

8    so . . . .

9    Q     See, that's not the question.  Because the question is,

10   you have to know that the person who went ahead and made these

11   records had knowledge at the time of it.

12         And how could you possibly know --

13         MR. HOCHMAN:  Actually, I'll withdraw that question,

14   Your Honor.

15   BY MR. HOCHMAN:

16   Q     You said a moment ago that, to your knowledge -- well,

17   to your knowledge, UBS does not employ people that it knows

18   have committed crimes; isn't that correct?

19   A     I said that this is something that the HR department

20   would have to decide and know.

21   Q     Are you aware, personally, having been at UBS for

22   26 years, that UBS has employed someone that it knows has

23   committed a crime?

24   A     I am not aware of such a situation.

25   Q     So does Dieter Luetolf -- assuming that this is the same

1   Dieter Luetolf, we'll make that the assumption, does his

2   continued employment at UBS mean that UBS does not believe he

3   did anything wrong, and that he didn't participate in a

4   criminal conspiracy?

5   A      I can't answer this question because I don't know what

6   the reasons are to further employ Dieter Luetolf, if it is the

7   same Dieter Luetolf.

8   Q      Well, you've now reviewed ten files at length.

9          Do you believe that Dieter Luetolf did anything wrong?

10  A      As I said, I was not involved in handling or managing

11  this relationship; but, based on the documents, I have no

12  reason to believe that he did anything wrong.

13  Q      All right.  Let's turn, if we could, back to Exhibit 3R,

14  which you have in front of you, and focus on Page 1, which is

15  the Form A.

16         Now, you see on this Form A, this is the one with

17  Patricia Hough as the contracting party.

18         Do you see that?

19  A      Yes.

20  Q      What did Dieter Luetolf tell Patricia Hough was meant by

21  the words, "contracting party"?

22  A      Sorry, what exactly is the question; what Dieter Luetolf

23  told Patricia Hough what this meant?

24  Q      Yes.

25  A      I don't know what Dieter Luetolf told Patricia Hough.

1    Q      Okay.  What did Dieter Luetolf tell Patricia Hough was

2    meant by the words, "beneficial owner"?

3    A      I don't know what he told Patricia Hough.

4    Q      Now, it looks like, on this document -- well, do you

5    know whether or not Patricia Hough signed the document in

6    blank, and then Dieter Luetolf filled in the rest of the

7    information when he got the document signed?

8    A      I don't know that.  I cannot conclude that from this

9    document.

10   Q      And you said before, with this document, that you

11   couldn't tell if the box, "correspondence or person," is

12   checked; is that correct?

13   A      That's correct.

14   Q      And that's in part because you didn't look at the

15   original, to compare this copy to the original.  Because

16   perhaps the original, you could have made that determination.

17          Is that correct?

18   A      Maybe.  I don't know how the original looks like.  I

19   said I can't -- I cannot see it from this copy because there is

20   the stamp just more or less over that box.

21   Q      So you had no idea why Patricia Hough signed this

22   document, correct . . . based on your own personal knowledge.

23   A      Well, "no idea"; yes, I have an idea.  And the point is

24   that, in this situation, the client is required to declare who

25   the beneficial owner is.  That's why we want to have this

1    document, or this declaration.

2    Q      But you are assuming that Dieter Luetolf explained any

3    of this to her; correct?

4    A      I don't know what Dieter Luetolf explained to her, and

5    what he did not explain to her.

6    Q      Thank you.  If you could turn to the second page of this

7    document.

8           Do you have any idea whether Dr. Patricia Hough wrote

9    any of the words on the second page of this document?

10   A      I don't recognize whose handwriting this is.  I can't

11   say whether it's Patricia Hough's handwriting or somebody

12   else's.

13   Q      You have no idea.

14   A      I don't know.

15   Q      Turn to the third page.

16          And you see Patricia Hough's signature there?

17   A      Yes.

18   Q      Do you know if any -- if she signed this document in

19   blank, or if it was explained to her?

20   A      I don't know that.

21   Q      If you could turn to the seventh page -- excuse me, not

22   the seventh page, we just went through that one -- the tenth

23   page.

24   A      Page 7?

25   Q      I'm sorry.  Make it Page 10, if you could?

1        Do you . . . did Dieter Luetolf explain what it meant to

2    waive your right to invest in U.S. securities, to Patricia

3    Hough?

4    A    I don't know whether he explained it or not.

5    Q    And do you know if any of the writing on the upper

6    section, where it says, "Hough, Patricia, U.S.," and an

7    address, is Dr. Patricia Hough's handwriting?

8    A    I don't know.

9    Q    If you could turn to Page 13 . . . . Do you know what

10   Doctor -- excuse me -- what Dieter Luetolf explained to

11   Dr. Hough about a general power of attorney?

12   A    No, I don't know.

13   Q    And with respect to Charlene Varga, do you even know who

14   Charlene Varga is?

15   A    No, I don't know.

16   Q    Did you ask anyone who Charlene Varga is?

17   A    No, I did not.

18   Q    By the way, going back for just a moment to the Form A,

19   a Form A is for Swiss anti-money laundering law purposes; is

20   that correct?

21   A    Yes.  It's part of the identification requirements, and

22   according to Swiss law, to the Swiss CDB.

23   Q    It's not for U.S. tax purposes; correct?

24   A    Correct.

25   Q    If you could turn to Page 15 through 19 of this

1    document . . . .  This is that asset management agreement that

2    you discussed with Miss Finley.  And it goes on for several

3    pages.  It has very, very small writing.

4         And do you know if Dieter Luetolf explained what the

5    discretionary service of this asset management agreement was to

6    Dr. Patricia Hough?

7    A     No, I don't know.

8    Q     How about program specifications, which looks like it's

9    in . . . three-point type, do you know whether or not he

10   explained the program specifications to her?

11   A     I don't know.

12   Q     This goes on for pages, so go to the last page, which

13   is -- the second-to-last page, on Page 18 here, on Exhibit 3R.

14        And it says, "Your profiled investment strategy," and

15   there's -- you know, there's a fixed income, defensive, income,

16   aggressive, yield, balanced, growth, or equities.

17        And one of the boxes is filled in; do you see that?

18   A     Yes.

19   Q     Do you know whether or not Dieter Luetolf explained any

20   of these things to Dr. Patricia Hough?

21   A     I don't know what he explained to her.

22   Q     And you don't know whether or not she's the one who

23   filled in the little bubble next to the word, "balanced," and

24   then on the next line, "income," and then eventually "U.S.D.,"

25   U.S. dollars, or whether or not Dieter Luetolf filled that in;

1   is that correct?

2   A      I don't know whether it was him or Patricia Hough.

3   Q      And actually, I think it could even be someone besides

4   Dieter Luetolf; isn't that correct?

5   A      Theoretically, yes.

6   Q      It could be -- I think you say it could be Dieter

7   Luetolf, it could be his assistant, is that correct?

8   A      Ya.  These documents are -- go through various hands

9   before they end up in the archive department.  So several

10  people -- several people see these documents and can . . . have

11  any, add any marks, or cross out boxes and take out the boxes.

12  Theoretically that's possible.

13  Q      Really.  So after someone signs a document, that

14  document can get changed later in the process; is that correct?

15  A      Theoretically; yes.  The client adviser does not carry

16  these personally to the archive department.

17  Q      And you don't know one way or the other if these

18  documents were changed after they were signed; is that correct?

19  A      I don't know whether anybody has changed anything.

20          MR. HOCHMAN:  May I present the witness with

21  Exhibit 3S, Your Honor?

22          THE COURT:  You may.

23          MR. HOCHMAN:  Thank you.

24          Now, if we can put up a . . . the first page of 3S.

25          (An exhibit was projected onto the projector screen.)

1   BY MR. HOCHMAN:

2   Q     Now, this is a -- you talked about this as a letter from

3   Dieter Luetolf to Pat, dealing with a power of attorney.

4         Do you see that?

5   A     Yes.  It's a fax message.

6   Q     And I think you said that there's a date on it, up in

7   the top, that says 14.6.04, do you see that, in handwriting?

8   A     Yes.

9   Q     And that's not Dr. Patricia Hough's handwriting; is that

10  correct?

11  A     I don't know.

12  Q     And are you aware that Dr. Patricia Hough doesn't use

13  the European convention to date, where you put the day, then

14  the month, and the year.  She uses the American convention

15  where you put the month, then the day, and then the year.

16        Are you aware of that?

17  A     I would assume that she writes it the American way.

18  Q     So, based on that assumption, that would not have been

19  Dr. Patricia Hough who would have put that date up toward the

20  top of that document; is that correct?

21  A     I can't answer this . . . in the sense of yes or no.  I

22  would assume it was somebody else.  But I'm not sure whether it

23  was her on not.

24  Q     Okay.  And that person most likely was Dieter Luetolf;

25  is that correct?

1   A       I don't know.

2   Q       Because otherwise it could have been his assistant or

3   his line manager; is that correct?

4   A       Yeah.  Or other people who had this document in hand.

5   Q       Well, you had this document in hand at one point.

6           Did you put that date down?

7   A       No, I did not.  But I did not have the original printout

8   of this fax machine.  I got copies of these documents.

9   Q       True.  But you could have written a date down, put it in

10  a Xerox machine, made another copy, and then it could be the

11  copy you have in front you; correct?

12  A       But that's not what I did.

13  Q       But again, you don't know what was on the original

14  because you never looked at the original --

15  A       I did not check or compare it to the original; correct.

16  Q       If you could go to Page 9 of this exhibit.

17          Now, do you have any idea whether or not this letter

18  that talked about transferring money from one account to

19  another was signed by Dr. Hough, even before the words in the

20  letter were put down?

21  A       The machine-written letters or the hand notes?

22  Q       I'm sorry?

23  A       You said whether it was signed before the text was put

24  down, do you mean the machine type, the machine-typed part of

25  the letter or the hand notes?

1    Q        Let's start with the machine type.

2             Do you have any knowledge whether she signed this

3    letter, in blank basically, after the words -- well, in what

4    appears to be the middle of the letter, and then someone else

5    typed in the letter?

6             You have no idea; correct?

7    A        I can't answer this.

8    Q        And you have no idea whose handwriting is on this

9    document.  Is that correct?

10   A        Correct.

11   Q        You have no idea who dated this document.

12   A        I don't know who dated it.

13   Q        And if you could turn to Page 17 to 22.

14            Now, 17 to 22 is what's called Client Trade Information.

15   It's a document that you -- UBS developed to track all the

16   trades that went on in Dr. Patricia Hough's account; is that

17   correct?

18   A        This is the list of . . . the list of documents, or the

19   set of documents, that I . . . as I mentioned earlier, that

20   this is not kind of regular . . . regular document, that this

21   was specifically produced for this case.

22   Q        And do you have any reason to doubt that these -- this

23   is an accurate document, that it lists all the various trades

24   that went on for six pages in Dr. Patricia Hough's account?

25   A        I have no reason to doubt that this is not the full list

1    or inaccurate.

2    Q      And having actually gone to the task of adding every one

3    of these trades -- and these trades are buying and selling

4    various stocks, do you see that?

5    A      Yes.

6    Q      If you add up all the trades that occurred from May 11,

7    2004, all the way, if you go to the sixth page, to July 19,

8    2005, you come up with about 205 different trade transactions;

9    correct?

10   A      Ya.

11   Q      Now, when UBS manages an account, how does it make

12   money?

13   A      We get money based on the trades, so we get a certain --

14   ya.  We get our fees for trade.  Or we have a flat-fee

15   arrangement with the client, and then it doesn't matter, it's

16   not per trade, but it's a flat fee.

17   Q      And do you know whether or not this was a flat fee or a

18   per-trade transaction?

19   A      No, I don't know.

20   Q      Let's assume it was a per-trade transaction.

21          That would mean that the more trades that are generated

22   in this account, the more money that UBS would make; correct?

23   A      Basically correct, yes.

24   Q      And if you're the client adviser, are you -- how is a

25   client adviser compensated?

1    A      He has a fixed salary plus a bonus.

2    Q      And is the bonus keyed on how many new accounts the

3    client adviser brings in?

4    A      New money he brings in is a part of his bonus

5    calculation.

6    Q      And if UBS makes a lot of money because there's a lot of

7    trades in the account, does he get part of his bonus measured

8    against that as well?

9    A      I don't know exactly, in this detail, how the bonus is

10   measured, but I don't believe it is measured by the number of

11   transaction.  It's primarily the . . . amount of new money that

12   he can bring in.

13   Q      Right.  And that new money can go into the master

14   account; correct?

15   A      Yes.

16   Q      Or the new money can go into the subaccounts, which are

17   what you called, I think, "object accounts."

18   A      Yes.

19   Q      And so the more master accounts you have, and the more

20   subaccounts that you have, that bring in more new money, the

21   bigger a bonus the client adviser will get; is that correct?

22   A      No.  It's not the number of accounts that is relevant,

23   not the number of accounts or master accounts or subaccounts,

24   objects, it's the amount of money that comes in.

25   Q      I see.

1    A      Whether they are allocated to one master account or to

2    different master accounts doesn't matter.

3    Q      Very good.  So UBS makes money, assuming it's on a

4    per-trade basis, on the number of trades.

5           And the client adviser may or may not get some benefit

6    from that; is that correct?

7    A      Correct.

8    Q      Now, you have had a chance to look at Dr. Patricia

9    Hough's records pertaining to Dr. Patricia Hough's account; is

10   that correct?

11   A      Yes.

12   Q      And with respect to all the records in the account that

13   was opened up about 14 months, how much money from that account

14   was taken out and given directly to Dr. Patricia Hough?

15   A      I don't know.  I did not make this detail calculation.

16   Q      I don't even need a detailed calculation.

17          Was there even a dollar, or a frank, or a yen, or a

18   British pound, that was taken out of Dr. Patricia Hough's

19   account and given to Dr. Patricia Hough?

20   A      I don't know.  I have not reviewed the account

21   statements in all the transactions in this . . . to such a

22   detail.

23   Q      But you're aware that over $5 million was sitting in

24   Dr. Patricia Hough's account for 14 months; correct?

25   A      I did not review the account statements in this detail.

1    Q       You didn't look at Page 1 of the account statement that

2    Miss Hough -- excuse me -- Miss Finley showed you an example

3    of, I believe for Apex, where it says the account status, it

4    has a dollar figure next to it; you didn't look at that, or you

5    just don't remember it?

6    A       Well, I looked at such a document.  But you asked me

7    whether any money was ever taken out, and this is something I

8    don't remember or do not recall right now.

9    Q       I see.  But my second question was, there was over

10   $5 million, during this 14-month period, in Dr. Patricia

11   Hough's account; correct?

12   A       Could be.  I don't remember these details.

13   Q       But if it says that on the account statement, that would

14   be an accurate measure of how much was in the account?

15   A       Well, if it says on the account statement it's that much

16   money, then it's that much money.

17           MR. HOCHMAN:  If I may approach the witness, Your

18   Honor, and present him with Exhibit 3GG?

19           THE COURT:  You may.

20           MR. HOCHMAN:  If we could put Page 1 of Exhibit 3GG

21   up.

22           (An exhibit was projected onto the projector screen.)

23   BY MR. HOCHMAN:

24   Q       Now, Exhibit-- excuse me, Exhibit-- what are we on --

25   3GG is the Patricia Hough/David Fredrick account, and that's

1   the Form A for it; correct?

2   A       Correct.

3   Q       You've recognized Patricia Hough and David Fredrick's

4   signatures at the bottom of that form; correct?

5   A       Yes.

6   Q       Are you a handwriting expert, by the way?

7   A       No.

8   Q       But you were able doing through these documents enough

9   to be able to recognize signatures; is that correct?

10  A       I saw them also on other documents.  I saw the same

11  signature on other documents.

12  Q       Well, the fact that it might be on multiple documents

13  doesn't mean that it's Dr. Patricia Hough's signature; isn't

14  that correct?

15  A       Correct.  In that sense, yes.

16  Q       But you probably compared it to the passport document

17  that also has a signature on it that would show you it's

18  Dr. Patricia Hough's signature; correct?

19  A       That's what I meant by other documents with signatures

20  on it.

21  Q       I see, a document that would have a picture on it.

22          Same thing with Dr. David Fredrick; correct?

23  A       Correct.

24  Q       And once again, you have no idea whether or not

25  Dr. Patricia Hough signed this document in blank, and then

1   afterwards all the words were added to it; correct?

2   A     Correct, I do not know that.

3   Q     And you have no what Dieter Luetolf told her about what

4   it meant to be a beneficial owner; correct?

5   A     Correct.

6   Q     Or if he explained the difference between a contracting

7   partner or a beneficial owner; correct?

8   A     Correct.

9   Q     Or whether or not he explained what it meant to check

10  these two little boxes in the middle, between the fact that

11  says, "The contracting partner is the beneficial owner of the

12  assets," or, "The beneficial owner of the assets are," with a

13  listed name; correct?

14  A     I don't know what he explained to . . . yeah, what he

15  explained to Patricia Hough.

16  Q     If you could turn to Page 4 of this document.

17        And it's important, isn't it, for UBS client advisers to

18  actually fill out these documents in full; isn't that correct?

19  A     Correct.

20  Q     So where it calls for someone's name, it's important to

21  actually put down the whole name; correct?

22  A     Yes.

23  Q     Like, for instance, it says in there:  Account Holder

24  Number 1, Hough, Patricia Lynn.

25        Do you see that?

1    A      Yes.

2    Q      And it has for Account Holder Number 2:  Fredrick, David

3    Leon; isn't that correct?

4    A      Correct.

5    Q      It would be inappropriate to just put down some

6    initials; isn't that correct?

7    A      Only initials would not be sufficient.

8    Q      And you said that these documents are actually reviewed

9    by somebody after the client adviser fills them out; is that

10   correct?

11   A      Correct.

12   Q      And that person is supposed to catch errors; correct?

13   A      Yes.

14   Q      And is it actually reviewed at some point after that, by

15   somebody else, before it's archived?

16   A      This is the person that you just mentioned.  Before it's

17   archived, it goes to a . . . a document review, which is a

18   different department, and they review it for formal

19   completeness, and then it goes to the archive.

20   Q      I see.

21          And Mr. Luetolf was prone to making mistakes, wasn't he?

22   A      I don't know.

23   Q      Well, you have had a chance to review these documents.

24          Wasn't Mr. Luetolf prone to making mistakes?

25   A      Ya.  I don't know whether Mr. Luetolf made mistakes or

1    not.

2    Q      Okay.  Well, let's start on Page 8 of this document.  If

3    you could focus on the very top of it, where it has the

4    initials P.L.H.?

5    A      Yes.

6    Q      That's a mistake, isn't it?

7    A      I would have expected the full name there; yes.

8    Q      So that's a mistake; correct?

9    A      Ya.

10   Q      If you turn the document and see the next page, and

11   focus on the top part of the document as well.

12          And you see where it says D.L.F.; do you see that?

13   A      Yes.

14   Q      Another mistake by Mr. Luetolf; correct?

15   A      It is the same as the previous document.

16   Q      No.  The previous document said P.L.H., dealing with

17   Miss Hough, presumably, and this is D.L.F., referring to

18   Mr. Fredrick; is that correct?

19   A      Apparently, yes.

20   Q      So two mistakes in documents that Mr. Luetolf made;

21   correct?

22   A      Correct.

23   Q      He's made other mistakes all over these documents;

24   correct?

25   A      I don't know.

1   Q      Well, let's . . . let's take a look at Exhibit 3G, if I

2   might.

3          And is 3G up there?

4   A      This is 3GG.

5   Q      Yeah, 3GG.  I'd like to get you 3G.

6               MR. HOCHMAN:  Is it a . . . .

7               THE COURT:  That's not been identified yet.

8               MR. HOCHMAN:  Then I'll see if I can identify it,

9   Your Honor.

10              May I approach, please, Your Honor?

11              THE COURT:  You may.

12              (The witness examines an exhibit.)

13  BY MR. HOCHMAN:

14  Q      Is Exhibit 3G, does that contain documents that are

15  business records of UBS?

16  A      Yes.

17  Q      Do you have any reason to doubt that those are the

18  business records that came from your files?

19  A      I have no reason to doubt it.

20              MR. HOCHMAN:  I'd move 3G into evidence, Your Honor?

21              THE COURT:  Any objections?

22              MS. FINLEY:  No objection.

23              MR. HOCHMAN:  May I ask that --

24              THE COURT:  Hang on a second.  I need to say the

25  magic words.

1          MR. HOCHMAN:  I'm sorry, Your Honor.

2          THE COURT:  3G will be admitted, and you may publish

3     them.

4          MR. HOCHMAN:  Thank you, Your Honor.

5          (Government's Exhibit 3G was admitted into evidence.)

6          (An exhibit was projected onto the projector screen.)

7     BY MR. HOCHMAN:

8     Q     Now, we're looking at a Form A on another account here;

9     do you see that?

10    A     Yes.

11    Q     And i think you said it was very important to put down

12    the contracting party, because that's the legal party that has

13    ownership over this account; correct?

14    A     Yes.

15    Q     And on the Form A, the very first page of this exhibit,

16    do you see what Mr. Luetolf put down for the contracting party?

17    A     On the version I have in front of me, there is no name

18    indicated in the section, contracting partner.

19    Q     Another mistake of Mr. Luetolf; correct?

20    A     That's a mistake.

21    Q     And it's another mistake your system, your document

22    review system, failed to catch; correct?

23    A     Correct.

24    Q     Do you know if Mr. Luetolf ever got fired because of any

25    of these errors, having been fired by UBS?

1    A      I don't know.

2    Q      Do you know whether or not anybody took away his bonus

3    for making all these errors?

4    A      I don't know.

5    Q      Are you aware that Mr. Luetolf made other mistakes in

6    the files?

7    A      Other mistakes than the one we just mentioned?

8    Q      Yes.

9    A      I'm not aware of them.

10   Q      All right.  We'll get there in a moment.  I'm going to

11   show you what's been marked -- actually, let's get there now.

12          MR. HOCHMAN:  If I might present the witness with

13   Exhibit 3U?

14          THE COURT:  3U, you may.

15   BY MR. HOCHMAN:

16   Q      Before we get into 3U, let me ask a couple of questions,

17   if I might, about this notion between domiciliary companies and

18   operating companies.  I think you had a discussion with

19   Miss Finley about this.

20          My understanding of a domiciliary company is that it's

21   basically a company that has no employees, no real operations,

22   it's basically a piece of paper; is that correct?

23   A      It's basically a piece of paper, a shell company, yes;

24   no premises, no employees, correct.

25   Q      So it's literally nothing more -- I think we looked at

1    some of those documents -- formation documents, and it's

2    nothing more than that, just a document that's been formed --

3    excuse me -- a company that's been formed that doesn't do

4    anything; is that correct?

5    A      Except holding assets, for instance.

6    Q      Except holding assets.

7           And that UBS is obligated to fill out a Form A for one

8    of these type of companies because you want to know who is

9    really behind the company; is that correct?

10   A      That's correct.

11   Q      And if it's an operating company, you don't need to fill

12   out a Form A; is that correct?

13   A      Correct.

14   Q      And even -- if it's an operating company, let's say it's

15   an operating company in the Cayman Islands, but it's a real

16   operating company, you still wouldn't have -- you wouldn't have

17   to fill out the Form A; is that correct?

18   A      If it is an operating company, we don't need to Form A;

19   correct.

20   Q      And you also don't need the Form A, I think you said, if

21   it's one of these charitable companies, like a nonprofit

22   foundation that does scientific or religious or political type

23   of . . . as a mission like that; is that correct?

24   A      Yeah.  I would not call this a foundation, but

25   corporations, legal entities, which have one of these purposes,

1  religious, social, cultural, charitable, for these kind of

2  corporations we don't need to fill out the Form A.

3  Q    Okay.  And now, would you agree with me that a -- a

4  company that runs a medical school would have a commercial

5  operation; would you agree with me?

6  A    What do you mean by it runs a school; if they have

7  teachers, students, classrooms?

8  Q    I'll give you the list:  Teachers, students,

9  administrator, buildings, classes, and a campus, that's an

10  operating company?

11  A    I would consider this an operating company.

12  Q    Now, even add they've been accredited throughout the

13  United States of America, would that also just be one more

14  indication to show that it's an operating company?

15  A    I'm sorry, could you repeat the first part of your

16  question, if it was --

17  Q    It's a different word.

18       Actually, I'll withdraw that question to get to my next

19  question, which is:  If . . . if you -- if that company were

20  opening up a bank account at UBS, it would be deemed an

21  operating company and not have to have a Form A filled out for

22  it; is that correct?

23  A    It depends what kind of company it is.

24  Q    Okay.  It's a company that runs a medical school, with a

25  campus, with students, with teachers, with administrators, with

1   budgets, with an office, with employees.

2          It would be an operating company that would not have to

3   have a Form A filled out; is that correct?

4   A       Correct.

5   Q       Now turn to Exhibit U –– 3U, excuse me.  This is the

6   Saba School Foundation's UBS account.

7          Do you see that?

8   A       Yes.

9   Q       And I'm going to take you to Page 12.

10          MR. HOCHMAN:  And what I'd like to do, Your Honor,

11   is . . . also split the screen with Exhibit 3J, because Page 12

12   of 3U, which I would like to publish, is in German, or Swiss

13   German, but the same exact words show up in English with

14   another exhibit.

15          So, with your permission, I would like to present him

16   with Exhibit 3J?

17          THE COURT:  You may do so.

18          MR. HOCHMAN:  Thank you.

19          (The witness examines an exhibit.)

20          MR. HOCHMAN:  Now, if you could turn Exhibit 3J to

21   Page 8.  And if we could split the screen between 3J, Page 8,

22   and 3U, Page 12.

23   BY MR. HOCHMAN:

24   Q       Do you see that these are effectively identical

25   documents, one is in Swiss German and one is in English;

1   correct?

2   A       Correct.

3   Q       So what I'll do, if I could, I want you to focus on 3W,

4   the one to the Saba foundation, which is in German, but I'll

5   read the question from 3J, which is in English, to make sure

6   that everyone here understands, and I can't speak German.

7           So the first question says:  "Companies, institutions,

8   foundations, trustee companies, et cetera, which engage in

9   treating, manufacture, running other commercial trade in the

10  country of registration."

11          And there are two boxes, one that says "yes," and one

12  that says "no."

13          Do you see that?

14  A       Yes.

15  Q       Now, we'll make an assumption:  Assuming that the Saba

16  foundation runs a medical school that has teachers, classrooms,

17  a campus, administrators, a budget, offices, employees, would

18  the answer to that question have been yes instead of no?

19  A       In that case, the answer should have been yes.

20  Q       And what did Mr. Luetolf put, as far as the answer to

21  that question?

22  A       He crossed the "no" box.

23  Q       The "no" box.

24          And then the second question, which is the B, says:

25  "Tax haven domicile," and then it gives some examples:

1    Bahamas, British Virgin Islands, et cetera, et cetera.  And

2    when it gets down to the Netherlands Antilles, it identifies

3    Curacao -- not Saba, not St. Martin, but Curacao -- as the

4    island in the Netherlands Antilles it considers a tax haven

5    island.

6          Do you see that?

7    A     Yes.

8    Q     And to your knowledge, the Saba School of Medicine

9    Foundation was not established in Curacao in the Netherlands

10   Antilles; correct?

11   A     I don't recall where it was established, but it was --

12   ya, as far as I remember, it was not in Curacao.

13   Q     It was established, I think, in St. Martin --

14   A     St. Martin.

15   Q     Correct?

16   A     Correct.

17   Q     So the answer there, for the tax haven question, since

18   it wasn't established in Curacao but in St. Martin, should have

19   been no.

20   A     Not necessarily.  This is only a list of examples.  It's

21   not an exclusive list.  It says, "for example," and then the

22   list of countries.

23   Q     Fair enough.

24         But at least based on the list that's given here, the

25   answer should have been no; correct?

1    A       The list is not -- it's just a list of possible

2    examples, but it's not a complete list.

3    Q       Let me ask you slightly differently:  You don't see the

4    island of St. Martin as listed as one of these tax haven

5    examples; correct?

6    A       It is not listed as an example; correct.

7    Q       Yet, Mr. Luetolf checks the box, "yes," that St. Martin

8    is a tax haven, as opposed to the box, "no."

9            Do you see that?

10   A       Yes.

11   Q       Now, the third question:  Office registered with an

12   attorney, notary, trustee, et cetera.

13           And here, let's make the assumption that the Saba school

14   existed on the island of Saba, had existed there and opened its

15   doors since 1993 -- and we're dealing in 2003, so for ten years

16   at this point, or excuse me, 2004, so 11 years at this point --

17   and had an address other than an attorney's address, should

18   that box have been checked "no," if that's true?

19   A       If it had an address other than with an attorney, then

20   the answer should have been no.

21   Q       And that box is checked by Mr. Luetolf, "yes"; isn't

22   that correct?

23   A       Correct.

24   Q       And when it says, "owns its own business premises," if

25   we assume that it owns -- it runs that campus on the island of

1   Saba, the answer should have been checked, "yes"; isn't that

2   correct?

3   A      Correct.

4   Q      And Mr. Luetolf checked that one "no"; correct?

5   A      Correct.

6   Q      And it says:  "Own staff who work exclusively for the

7   company."

8          And Mr. Luetolf actually checks that one "yes"; do you

9   see that?

10  A      Yes.

11  Q      All right.  And that's still a factor to show that it's

12  an operating company; correct?

13  A      It's one of several indicia for an operating company, if

14  they have their own personnel.

15  Q      Very good.

16         And then the last one:  "Do the company staff deal

17  exclusively with administrative work such as bookkeeping and

18  work correspondence"; do you see that?

19  A      Yes.

20  Q      And if a -- if office staff only deal with bookkeeping,

21  that's more indicative of one of these shell companies than an

22  operating company; correct?

23  A      Yes.

24  Q      So if the answer is no, it would show it's an operating

25  company; correct?

1   A       That means that the employees do also other work than

2   only bookkeeping and purely administrative kind of work.

3   Q       So Mr. Luetolf answers that one as "no"; correct?

4   A       He answered it as "no."

5   Q       So, of the six questions here, two of them show an

6   operating company, and four of them do not; is that correct?

7   A       Correct.

8   Q       And of the four that Mr. Luetolf answered, he's 0 for 4;

9   is that correct?

10          He didn't get any of those four right, based on my

11  assumptions; is that correct?

12  A       Correct.

13  Q       And the net effect of that is that, if Mr. Luetolf had

14  checked the boxes in the ways that shows it was an operating

15  company, the Form A would never have been required; correct?

16  A       If it was an operating company it would not be required;

17  yes.

18  Q       And that would be true also for the Medical Universities

19  of the Americas, that if that was an operating company, it

20  would not have required a Form A.

21  A       Well, it's the same for all companies; yes, if they are

22  operating companies, no Form A is required.

23  Q       And isn't there a problem that you have found,

24  especially based on your work with the Swiss Bankers

25  Association, that foundations that didn't have beneficial

1    owners actually couldn't really fit into this whole notion of

2    Form A, at all; isn't that correct?

3    A      Well, does not depend on whether it's called foundation

4    or not.  It's ultimately what they do; do they have own

5    employees, do they have own preparations, and so on.

6    Q      Okay.  But are you aware of something called a Form T?

7    A      Yes.

8    Q      And a Form T is different than a Form A; isn't that

9    correct?

10   A      Correct.

11   Q      And a Form T is designed for foundations, amongst other

12   types of legal entities, that don't have beneficial owners; is

13   that correct?

14   A      The Form T is used for trusts.  And we have -- we

15   developed this special Form T because the concept of trust is

16   not known in Swiss law, and -- but it's kind of similar to a

17   foundation.  I'm not saying it's the same, but it's also a

18   vehicle . . . of which we want to know who is the settler --

19   depending on the task, who is the settler, who are the

20   beneficiaries.

21          And there is also always confusion with regard to the

22   term "beneficial owner, beneficiary," so that's why we have to

23   develop this special Form T for trusts only.

24   Q      Let me repeat what you just said so I make sure I heard

25   it:  There is confusion over the notion of beneficial owners;

1  isn't that correct?

2  A     No.  I said that trustees, when they were asked who is

3  the beneficial owner:  Nobody, they said, there is no other

4  owner than me, as trustee, there are only beneficiaries of a

5  trust.

6  Q     I see.  So there's beneficiaries of a trust, but not

7  beneficial owners; correct?

8  A     (Defendant nods head up and down.)

9  Q     And, in fact, Form T is developed as a declaration for

10  organized associations of individuals, assets, or patrimony

11  without specific beneficial owners upon the opening of a bank

12  account; is that correct?

13  A     Without specific beneficial owners, because the term,

14  "beneficial owners," does not work in relation to a trust.

15  Q     And a foundation, a nonprofit foundation, too; correct?

16  A     No.  For foundations, foundations can have beneficiary,

17  beneficial owners.

18  Q     But foundations also can not have beneficial owners;

19  correct?

20  A     Somebody has to own the money.  Somebody is ultimately

21  entitled to the money.  That's what we understand by beneficial

22  owner, the one who ultimately owns the money.

23  Q     Who -- so in other words, if the entity, you know, if

24  it's . . . if it's the Gates Foundation, okay; nobody owns the

25  Gates Foundation; correct?  Is that correct?

1    A        Ya.  I would assume, yeah.  I don't know --

2    Q        The Gates Foundation owns the Gates Foundation, Bill and

3    Melinda Gates no longer own the money in the Gates Foundation;

4    correct?

5    A        Um-hum.

6    Q        You have to say --

7    A        Ya, the Foundation owns the money --

8    Q        Thank you.

9    A        -- formally, from a formal point of view.  But I don't

10   know the details about the Gates Foundation, but the ultimate

11   purpose of this foundation is not to keep the money for itself,

12   but to give it to others, who deserve obtaining money.

13   Q        Charitable purposes, like using your money, for

14   instance, to help projects in Central America, to help the

15   poor, would that be an example of a charitable project of a

16   foundation?

17   A        That could be an example; yes.

18   Q        Or using your same charitable foundation actually on the

19   Island of Saba, could that be an example?

20   A        That could be an example.

21   Q        And by the way, Form T doesn't come into existence until

22   2008; isn't that correct?

23   A        No.  I think that was established already earlier.

24   Q        When?

25   A        I'm not sure.  I would have to check in which version of

1    the CVB this Form T was introduced.

2    Q      Would it refresh your memory to learn that it was put in

3    the version in 2008?

4    A      Okay.

5    Q      And I mean, again, you were sitting -- I think you were

6    actually involved on the Swiss Bank Association committee that

7    came up with the Form T; isn't that correct?

8    A      Correct.

9    Q      And again, the Form T comes up because there's confusion

10   over foundations that don't have beneficial owners, how we can

11   fill out Swiss anti-money laundering paperwork to make it

12   legitimate.  Correct?

13   A      Correct.

14   Q      And again, these have no -- none of these Form A or

15   Form Ts have anything to do with U.S. taxes; correct?

16   A      They have nothing to do with U.S. taxes.

17          THE COURT:  Why don't you find a convenient place for

18   a recess.

19          MR. HOCHMAN:  This is a good place, Your Honor.

20          THE COURT:  This works?  All right.

21          Let's take about 15 minutes.  Please do not discuss

22   the case among yourselves, or allow anyone to discuss it with

23   you or in your presence.  About 15 minutes.

24          (At 2:49 p.m., the jury was escorted from the

25      courtroom.)

1        THE COURT:  All right.  Fifteen minutes.

2        MR. HOCHMAN:  Thank you, Your Honor.

3        (At 2:50 p.m., court was recessed.) oh

4                        AFTER RECESS

5        (At 3:07 p.m., court was reconvened.)

6        THE COURT:  All right.  Mr. Hochman, I understand

7   that there's matter that you wish to discuss.

8        MR. HOCHMAN:  Yes, Your Honor, very briefly.

9        THE COURT:  You may be seated.

10       Not you, but the others.

11       MR. HOCHMAN:  Thank you, Your Honor.

12       With respect to all the recessive documents -- oh,

13  I'd ask that the witness . . . .

14       THE COURT:  All right.  We'll give him some exercise.

15       (The witness left the courtroom.)

16       MR. HOCHMAN:  Your Honor, given what we've now

17  learned from Mr. Futterknecht, the fact that he's unable to

18  make the business records elements, he admits it, effectively,

19  contradicting his 3505 certification, I would ask on that

20  basis, and on the testimony that's just been developed on

21  cross, I would ask the Court to reconsider its rulings on the

22  classes of documents in the exhibits that I've objected to.

23  Because I now believe that, whatever business records elements

24  that might have been laid for some other documents certainly

25  aren't laid for those.

1      THE COURT:  Ms. Finley?

2      MS. FINLEY:  Your Honor, I think that there, perhaps,

3  might be questions on cross-examination that may clarify --

4  excuse me -- on redirect that may clarify some of the questions

5  that Mr. Hochman asked on cross-examination.

6      And furthermore, the certification that is now in

7  evidence has Bates numbers on them, that those records were

8  kept in the ordinary course of business.  The records that are

9  in evidence at this point have those same Bates numbers.  He

10  testified that they were maintained and created at the time

11  that they're kept in the ordinary course of business, and

12  that -- I don't think anything that he testified to on direct,

13  with respect to the maintenance or the creation of those, was

14  contradicted on cross-examination.

15      I don't think he has to be the person that created

16  them.  I think he testified, on direct, that the client

17  advisers's responsibilities were to create these documents, to

18  maintain them.  If there were e-mails from the banker or from

19  the client, or transferred, or other directions, you would

20  expect that the bank would execute those instructions at the

21  time they received them, and those records support the accuracy

22  of . . . the records themselves that they are kept and

23  maintained in the ordinary course of business, that these are

24  the records the bank relies upon to conduct its business.  And

25  I don't think that the questions on cross-examination

1    contradicted that.

2              THE COURT:  The request will be denied at this point.

3    You're not through with your cross, and the government hasn't

4    had the opportunity to redirect.  And you can reraise that

5    without . . . you can probably raise it without the Court's

6    permission, but you have my permission, at the end, if you wish

7    to do so.

8              MR. HOCHMAN:  Thank you, Your Honor.

9              THE COURT:  Both sides ready?

10             MR. HOCHMAN:  Yes, sir.

11             THE COURT:  Have the jury step in, please.

12             And now let's get the witness in.

13             (At 3:10 p.m., the jury was escorted into the

14        courtroom)

15             (The witness returned to the courtroom and to the

16        jury box.)

17             THE COURT:  And you may proceed.

18             MR. HOCHMAN:  Thank you, Your Honor.

19   BY MR. HOCHMAN:

20   Q     We were talking about the Saba Foundation's UBS account.

21   I'd like to ask you a preliminary question.

22        If Mr. Luetolf saw something put on a form that he

23   believed to be incorrect, presumably Mr. Luetolf would have

24   changed the answer, or redone the form, to make sure it's

25   accurate; is that correct?

1   A      No.  He would have had to ask the client to issue a new

2   form, or sign a new form.  He cannot simply correct it himself.

3   Q      I see.

4          But eventually, when he gets the final signed form, and

5   he looks at the answers in it, if he saw something that was

6   incorrect, he would give it back to the client, put in the

7   correct information, and then get the client to sign it again;

8   is that correct?

9   A      He cannot put in the information himself, especially not

10  the information concerning who is the beneficial owner.  I

11  mean, he can fill in the master number and so, but not the

12  substance of the declaration.  That's not something that he can

13  provide.  He simply will submit the completed form to the

14  client and say, "Sign."

15  Q      So Mr. Luetolf, he can't just give a client a blank form

16  to sign, correct, without having information already filled in;

17  correct?

18  A      The client has to know to which the account the

19  information or the declaration he provides relates.

20  Q      Very good.

21         And we already dealt with Exhibit 3G, the Form A that

22  had the blank contracting party, so we know Mr. Luetolf doesn't

23  follow procedures as he should; correct?

24  A      Seems to be the case.

25  Q      Now let me show you, if I could, in Exhibit 3U?

1          MR. HOCHMAN:  If we could put Page 5 up, this is the

2     Saba Foundation's UBS account.

3     BY MR. HOCHMAN:

4     Q     And if you could focus on the writing, sir, in the

5     bottom third, that deals with Dr. Fredrick -- yeah.  This is

6     the Saba Foundation's account.

7          And do you see the function that's identified next to

8     David Fredrick; do you see that?

9     A     Which page is this in 3U?

10    Q     This is 3U, Page 5.

11         Do you see how Dr. Fredrick is described in this

12    document?

13    A     He is mentioned as account holder.

14    Q     Well, I actually see a word next to "function," it says

15    "representative."

16         Do you see that?

17    A     Representative, yes.

18    Q     And Dr. Patricia Hough, do you see how she is described

19    in her function?

20    A     Also as a representative.

21    Q     And you see that Dr. Hough's signature is next to her

22    identification of herself as a representative, and

23    Dr. Fredrick's signature is next to his identification of

24    himself as a representative, as well, for the Saba Foundation?

25    A     Yes.

1    Q      And this isn't just a fluke, because if you turn to

2    Page 13, under authorized signatories, and go down to the

3    bottom again, and you look at how they're described in their

4    function with respect to the Saba school of medicine, you do

5    see the words "representative" next to each one of those names;

6    is that correct?

7    A      Correct.

8    Q      Now I'd like to turn your attention to Exhibit 3W, which

9    is actually right on the table there.  And Exhibit 3W is

10   dealing again with the Saba School of Medicine Foundation.  And

11   I'd like to turn your attention to Page 158.

12          MR. HOCHMAN:  And if we could put 158 on the monitor,

13   that would be terrific.  And if we could zoom in on the first

14   paragraph?

15   BY MR. HOCHMAN:

16   Q      I think Miss Finley discussed this document with you,

17   because it's David Fredrick advising someone named Patrick

18   Hoffman that Beda Singenberger --

19          MR. HOCHMAN:  And could you highlight the Beda

20   Singenberger name, and then the other name, Erwin Schulthess?

21   BY MR. HOCHMAN:

22   Q      Do you see that name, Erwin Schulthess?

23   A      Yes.

24   Q      Are you familiar with him?

25   A      No.  I don't know him.

1   Q      Do you know that he's part of Sinco as well?

2   A      In one of the documents, he was mentioned as a . . . ya,

3   being related to Sinco.

4   Q      All right.  Erwin Schulthess is related to Sinco.

5          Now, this document is from David Fredrick to Mr. Patrick

6   Hoffman.

7          Do you see Dr. Patricia Hough's name anywhere on this

8   document?

9   A      No, I don't see it.

10  Q      And you said that the client adviser is a gentleman

11  named Dieter Luetolf, that we've been talking about, but I

12  don't see his name here.  I see the name Patrick Hoffman.

13         Is he a client adviser on this account as well?

14  A      I don't know whether he was also a client adviser, or

15  maybe he only deputized Dieter Luetolf while he was on

16  vacation.  I can't tell that.

17  Q      So when someone is on vacation, they can ask another UBS

18  client adviser to step in as the client adviser for a

19  particular account?

20  A      Yes.  There must be coverage also if somebody is on

21  vacation, or might be ill, certainly, so we cannot simply tell

22  the clients:  Sorry, but nothing works until your client

23  adviser is back.

24  Q      How many times have you spoken to Patrick Hoffman to see

25  whether or not that document was received by him at or near the

1    time listed on the document, which is September 2nd, 2008?

2    A       Never spoke to Patrick Hoffman.

3    Q       Did you telephone, e-mail, or contact him in any way,

4    prior to coming here and testifying?

5    A       No.  I have had no contact had with him.

6    Q       You knew that Patrick Hoffman was clearly involved in

7    these UBS accounts; correct?

8    A       I saw that Patrick Hoffman's name appear on several of

9    the documents that I reviewed, but that's it.

10   Q       And Patrick Hoffman is still a UBS employee, isn't he?

11   A       I believe so.  I'm not really sure.

12   Q       And did the U.S. Government ever ask to you contact

13   Patrick Hoffman to see whether or not he could verify that he

14   received this letter on or about September 2nd, 2008?

15   A       No.

16   Q       Did anybody at UBS -- you said there was a gentleman who

17   gave you this assignment.

18           Did that gentleman tell you to go ahead and contact

19   Patrick Hoffman so that you would be able to tell this jury

20   whether or not this document was received on or about

21   September 2nd, 2008?

22   A       No.

23   Q       If you can turn two pages, to Page 160?

24           And again, this is another document to Patrick Hoffman,

25   from David Fredrick, talking about where to send certain Saba

1    school foundation's money.

2           Again, the question is, you don't see Dr. Patricia Hough

3    anywhere on this document; correct?

4    A      No, I don't see her, or her name.

5    Q      And you have no idea how this document -- any of the

6    circumstances behind this document; correct?

7    A      I don't know the circumstances behind this document;

8    correct.

9    Q      Now, it says that the money was going to this bank

10   called Liechtenstein Landesbank.

11          Do you see that?

12   A      Yes.

13   Q      That's not your bank, is it?

14   A      No, that's not UBS.

15   Q      UBS is your bank?

16   A      No, it's not my bank.

17   Q      It's not your bank.

18   A      No.

19   Q      I'm sorry.  UBS is not your bank?  Is it Liechtenstein

20   Landesbank?

21   A      None of them is my bank.  I work for UBS, but it's not

22   my bank.

23   Q      I see.  You don't own UBS.

24   A      Unfortunately.  Only a very small portion.  We have an

25   employee share program.  But that's only a few shares.

1  Q      I see.  But if someone was asking you what your bank

2  was, you know, is -- if you were comparing it versus

3  Liechtenstein Landesbank versus UBS, you would say UBS is your

4  bank, is that correct, not that you own it.

5  A      Okay.

6  Q      But you would refer to it as your bank; correct?

7  A      Yes.

8  Q      Even though you don't own all but a very small portion

9  of it.

10 A      Correct.

11 Q      If you could turn to Page 183 of this document?

12 A      23?

13 Q      183.

14 A      183.

15 Q      And if you look back -- and you can leave that on the

16 chart, but just look back at 178, because I just want you to

17 see, this is what's called that client CAWB information.

18        Do you see that?

19 A      Yes.

20 Q      And what does CAWB stand for again?

21 A      Client Adviser Work Bench.

22 Q      Work Bench.

23        And you have absolutely no personal knowledge how any of

24 the entries came to be on these documents -- on this document;

25 correct?

1    A      Well, I assume that the client adviser made the entries

2    in his Client Adviser Work Bench for this relationship.

3    Q      You just said the word "assume."

4           You have no personal knowledge that any of these things

5    happened on or about the date that they occurred, correct, that

6    are listed here?

7    A      According to the documents, and according to the dates

8    that are indicated on this document, I conclude that they were

9    made on these dates.

10   Q      Okay.  But you didn't speak to any of the people who

11   were involved in inputting this data at the time into this

12   document; is that correct?

13   A      I did not; yes, that's correct.

14   Q      And you weren't actually there -- excuse me -- there at

15   the time they're sitting at their keyboards, presumably,

16   entering this information into the document; correct?

17   A      I was not there; no.

18   Q      And you can't even tell us who actually entered the

19   information into this document; is that correct?

20   A      Correct.

21   Q      And that would be true for all the client CAB

22   information sheets in all the files we've talked about -- or

23   excuse me, in all the files that you've talked about.

24   A      Correct.

25   Q      If you could turn to -- we're going to switch exhibits.

1   We're going to go to 3Y.

2           MR. HOCHMAN:  If I might approach the witness, Your

3   Honor?

4           THE COURT:  You may.

5   BY MR. HOCHMAN:

6   Q      And this is the MUA file.

7           Do you see that in front of you?

8   A      Yes.

9   Q      And with the first page, the Form A, again, you have no

10  idea what the conversation was between David Fredrick and

11  Patricia Hough, and whoever it was that was the client adviser

12  for this file; correct?

13  A      I don't know what the conversation was; correct.

14  Q      And do you see the stamp on the first page --

15          MR. HOCHMAN:  Actually, could we show the first page

16  here?

17  BY MR. HOCHMAN:

18  Q      And if you can focus on the bottom stamp, bottom

19  right-hand corner?

20          Who are these people, Daniel Perron and Jari [sic],

21  looks like Gisler?

22  A      They . . . they work in the country desk.  The

23  abbreviation CD on that stamp stands for "country desk," high

24  net-worth individuals, U.S., Northeast.  And the other person

25  works in the country desk, U.S., Northeast.

1    Q      And we're missing someone's stamp, aren't we; Dieter

2    Luetolf's, aren't we?

3    A      I don't know whether you are missing it, or . . . .

4    Q      So this is the one account that Dieter Luetolf wasn't

5    involved with; or was he involved with this one, and he just

6    forgot to stamp the first page, which is the Form A?

7    A      No.  But this -- these people confirmed that the -- that

8    the form is properly filled in, filled out, from a formal point

9    of view, not with regards to the declaration, who is the

10   beneficial owner.  This is something only the client can

11   ultimately know.

12   Q      So have you talked to Mr. Perron, or Mr. Gisler, to find

13   out whether or not this document was completed on or about

14   02/09/05?

15   A      No, I did not talk to them.

16   Q      And they are current UBS employees as well?

17   A      I don't know whether they are still with UBS or not.

18   Q      And do you see Dr. Patricia Hough's name -- or excuse

19   me -- her signature anywhere on this Form A?

20   A      No, I don't see it.

21   Q      Do you have any idea whether or not she was listed -- or

22   excuse me -- whether or not she was ever told she was going to

23   be listed as a beneficial owner of the Medical Universities of

24   the Americas?

25   A      Whether I have an idea or not was the question?

1    Q      No.  Do you have any actual information about whether or

2    not Dr. Patricia Hough was ever told that she was going to be

3    listed on the Form A of the Medical Universities of the America

4    UBS account, since she didn't even sign it?

5    A      No, I don't know that.

6    Q      And if you could turn to Page 11 of this document?

7           And then, in Page 11, this is the domiciliary company

8    decision sheet, and this is where it looks like Dieter Luetolf,

9    because his stamp is on the bottom of this document at least,

10   made the decision to treat the Medical Universities of America

11   as a domiciliary company as opposed to an operating company.

12          Do you see that?

13   A      Yes.

14   Q      And given the assumption that I've made with you before,

15   that the Medical Universities of America had a campus,

16   teachers, students, administrators, a budget, had classes, that

17   decision by Dieter Luetolf was a mistake; isn't that correct?

18   A      Correct.

19   Q      And if you could go to the next page, on Page 12, and go

20   down to the bottom, where it says David Fredrick?

21          And do you see how David Fredrick is a . . .

22   addressed -- or excuse me -- labeled, at least, as his function

23   with the Medical Universities of America?

24   A      He's mentioned as director.

25   Q      Thank you.

1    Turn to Exhibit 3C, which is the New Vanguard account.

2         MR. HOCHMAN:  If I might approach, Your Honor?

3         THE COURT:  You may.

4    BY MR. HOCHMAN:

5    Q    Now, Exhibit 3C are the account-opening documents for

6    New Vanguard.  Take your time, go through them all, and show me

7    any Dr. Patricia Hough signature on any document, even one.

8    And please identify it by the bottom left-hand number, what

9    document that would be.

10        (The witness examines an exhibit.)

11   A    There is no document with Patricia Hough's signature on

12   it.

13   Q    In fact, Dr. Patricia Hough is only identified one time

14   in all these documents?

15        MR. HOCHMAN:  And if you could put the first page of

16   3C up, please?

17   BY MR. HOCHMAN:

18   Q    She's identified on this Form A as the beneficial owner

19   of New Vanguard.

20        Do you see that?

21   A    Yes.

22   Q    And could you tell us where her signature appears on

23   this document?

24   A    It does not appear on this document.

25   Q    And do you have any personal knowledge about any

1    conversations that might have been had between Dieter Luetolf,

2    David Fredrick, and Dr. Hough, about her showing up on this

3    document as a beneficial owner?

4    A      No, I have no personal knowledge.

5    Q      If I can turn your attention to Page 43 of this

6    document . . . and I'm going to compare it with Exhibit 3CC?

7           MR. HOCHMAN:  If I might present that to the witness?

8           THE COURT:  You may.

9           (The witness examines exhibits.)

10   BY MR. HOCHMAN:

11   Q      Now, New Vanguard is a Hong Kong company; is that

12   correct?

13   A      As far as I remember, yes, it's Hong Kong.

14   Q      Top Fast is also a Hong Kong company?

15   A      Yes.

16   Q      Okay.  If you could look at -- we're looking at 3C,

17   Number 43, which is up there.  And then look at Exhibit 3CC,

18   and that would be Page, I believe, 15.

19   A      Which page; 15?

20   Q      Fifteen, one-five, if I got it right.  Yeah.

21          And then focus on the boxes that are checked in the

22   middle, if you could.  Because Exhibit 3C is the New Vanguard

23   domiciliary company sheet, and Exhibit 3CC is the Top Fast

24   domiciliary company sheet, and they're both Hong Kong

25   companies.

1    Do you see that?

2  A    Yes.

3  Q    But the question, which is A, is:  Is the domicile in a

4  so-called tax haven.

5    And it looks like, for New Vanguard, Dieter Luetolf

6  collection the box, "no."

7    But for Top Fast, also in Hong Kong, he checks the box,

8  "yes."

9    Do you see that?

10  A    Yes.

11  Q    So not only does Dieter Luetolf fill in -- or have

12  people sign blank documents, and put their initials instead of

13  their whole name, he even is internally inconsistent in viewing

14  Hong Kong as either a tax haven or not a tax haven; isn't that

15  correct?

16  A    Well, it was not Dieter Luetolf who filled in both

17  documents.  The one for Top Fast was signed off by Dieter

18  Luetolf.  The other one was signed off by somebody else.

19  Q    I see.  So somebody else -- so -- I'm sorry.  We'll

20  expand the question.

21    So UBS, rather than just Dieter Luetolf, has an

22  inconsistent position on whether or not Hong Kong is a tax

23  haven; is that correct?

24  A    No, I wouldn't say so.  UBS has a consistent position,

25  but obviously some employees of UBS interpreted it in a

1   different way.  Or understand it in a different way.  But it is

2   not UBS, as such.

3   Q      I see.

4          But UBS is . . . it only functions through its

5   employees; correct?

6   A      Correct.

7   Q      So two UBS employees looked at Hong Kong and came to two

8   polar-opposite conclusions; correct?

9   A      Two employees gave two different -- they gave different

10  answers; that's correct.

11  Q      But Dieter Luetolf was the client adviser in both

12  situations; correct?

13  A      Correct.

14  Q      So, ultimately, doesn't Dieter Luetolf have to approve

15  this, at some level, in order to have this -- or to be

16  responsible for it, as you were saying before?

17  A      Well, in -- the other form was filled out by another

18  person.  I don't know why there was somebody else.  Could again

19  be because Dieter Luetolf was not around, and we cannot hold

20  back all the documents until Dieter Luetolf is back.

21  Q      Looks like, on 3C, Page 43, that's the New Vanguard one,

22  that's Marcel Beeler; do you see that?

23  A      Yes.

24  Q      Have you talked to Marcel Beeler, to find out whether or

25  not this document was made on or about the date that appears on

1   this document, which appears to be July 13, 2005?

2   A      I did not talk to him.

3   Q      In any way, shape, or form, you didn't communicate with

4   him; is that correct?

5   A      Pardon?

6   Q      You didn't communicate with him in any way, shape, or

7   form; is that correct?

8   A      I did not communicate with him.

9   Q      Is he an UBS employee right now?

10  A      I don't know.

11  Q      Did you check?

12  A      No.

13  Q      If we could go -- let's see, we're on 3C -- go very

14  quickly to 3E?

15          THE COURT:  What is that exhibit, please?

16          MR. HOCHMAN:  3E, if I might present it?

17          THE COURT:  You may.

18          MR. HOCHMAN:  Thank you, Your Honor.

19  BY MR. HOCHMAN:

20  Q      And if we could go to Exhibit 3E, Page 19?

21          MR. HOCHMAN:  And you can just put it on the screen

22  very briefly.

23  BY MR. HOCHMAN:

24  Q      This dealt with Sinco and its fees; do you see that?

25  A      What?

1   Q      This dealt with the company called Sinco, and its fees,

2   do you see that, for Exhibit 3E, Page 19?

3   A      Yes, um-hum.

4   Q      And I just want to clarify that not only is UBS making

5   money when it manages accounts but, as we see here, Sinco makes

6   money when it manages accounts as well; correct?

7   A      Correct.

8   Q      And we talked about stuff like, I think it was pointed

9   out, this nominee shareholders; do you see that?

10  A      Yes.

11  Q      There's some payment for that?

12  A      Yes.

13  Q      Do you know, one way or the other, whether or not New

14  Vanguard was a nominee for the Saba Foundation, or a nominee

15  for something else?

16         Do you know one way or the other from your own personal

17  knowledge?

18  A      No, I don't know.

19  Q      If you could turn to Page 116?

20         And again, I just want to point out the very top part of

21  this, where it says, "Sinco Treuhand AG."

22         That's who this account statement was sent to; correct?

23  A      Yes.

24  Q      You don't see any indication on this that it was sent to

25  Dr. Patricia Hough; correct?

1    A       No, no indication.

2    Q       Can you turn to Page 142?

3            Now, this e-mail, like a lot of other e-mails, is

4    between David Fredrick and Dieter Luetolf; do you see that?

5    A       Yes.

6    Q       Do you see Dr. Patricia Hough anywhere on this e-mail,

7    as either a "to", "from," or a "sent"?

8    A       No, it's not mentioned.

9    Q       And with respect to e-mails, I think you talked about a

10   few e-mails where you saw a CC, and it had initials PL Hough at

11   Yahoo.com; you recall that?

12   A       Yes.

13   Q       You have no idea whether or not Dr. Patricia Hough

14   actually viewed that e-mail, or -- at the time that the e-mail

15   was sent; correct?

16   A       No, I don't know that.

17   Q       Or even saw the e-mail at some later point, you don't

18   know that?

19   A       I don't know that either.

20   Q       And you don't know if she was traveling around the

21   United States doing clinical rotation visits, you have no idea.

22   A       I don't know.

23   Q       Or whether she was dealing with accrediting boards in

24   New York, California; the Department of Education, you have no

25   idea; correct?

1    A      I don't know.

2    Q      Okay.  If you could turn to Page 203?

3           And again, this is one of those examples of the cc's.  I

4    think you just answered the questions concerning it.  So if we

5    could turn to . . . .  Actually, I asked the questions on that

6    one as well.  So we can skip all that, thankfully.

7              MR. HOCHMAN:  May I have a moment, Your Honor?

8              THE COURT:  Yes.

9              (Mr. Hochman confers with co-counsel privately.)

10             MR. HOCHMAN:  If we could go to Exhibit 3N, Your

11   Honor?

12   BY MR. HOCHMAN:

13   Q      All right.  If you could turn to Page 1, and I just want

14   to make this point once more.  If we show -- this is, I'm

15   sorry, 3N.

16          The government showed you a lot of Form As.  I'll use

17   this one to just sort of group the rest of the ones we have

18   looked at together.

19          And again, this one happens to be for Apex Consultants;

20   do you see that?

21   A      Yes.

22   Q      And so let's go through this.

23          You have no idea, is that correct, whether or not Dieter

24   Luetolf gave this Form A to them blank, and filled in the

25   information afterwards, or whether the information was on it at

1    the time they signed it.

2    A        I have no personal knowledge.  However, in the last part

3    of this document, it's indicated in person.  So that's an

4    indication that it was . . . submitted in person --

5    Q        Well, but also --

6    A        -- in a face-to-face meeting.

7    Q        But you never confirmed it, obviously, with Dieter

8    Luetolf, to see whether or not he checks "in person," he

9    actually shows up, or whether or not he just checks "in person"

10   and doesn't show up.

11   A        I did not verify with this with Dieter Luetolf; correct.

12   Q        And you also didn't verify with Dieter Luetolf what, if

13   anything, he told Dr. Patricia Hough about this document,

14   beneficial owners or contracting parties; correct?

15   A        Correct.

16   Q        And that's true, just so we don't have to go through

17   every single remaining one, for every Form A on the ten UBS

18   accounts; correct?

19   A        Correct.

20   Q        If you could turn to Page 6 here?

21            This is that waiver of right to invest in U.S.

22   securities; do you see that?

23   A        Yes.

24   Q        Is there anything illegal about not investing in U.S.

25   securities, other than sometimes they're not very good?

1    A       Basically, it's not illegal, no.

2    Q       It's not illegal.  It's just a choice that you make in

3    your investment strategy, that you're going to invest in

4    non-U.S. securities; correct?

5    A       This is in relation -- not primarily in relation to the

6    investment strategy, but in relation to these tax requirements

7    that this form is used.  So it's not a decision in the sense

8    of, "I want to invest into everything, but not U.S. securities,

9    because I do not believe that they are a good investment."  The

10   reason for this document is a different one.

11   Q       Right.  And this one -- the reason for this document is

12   even more complicated in some ways than some of the other stuff

13   we've been talking about, because it goes back to something in

14   2001 called the QI agreement; is that correct?

15   A       Yes.

16   Q       QI stands for "Qualified Intermediary," correct?

17   A       Correct.

18   Q       And UBS entered into a qualified intermediary agreement

19   with the United States in 2001.

20   A       Yes.

21   Q       And part of that agreement required them to either

22   withhold from U.S. taxpayers or ask the U.S. taxpayers not to

23   invest in U.S. securities; is that correct?

24   A       That's my basic understanding of this.  But, as I said

25   before, I'm not an expert in tax matters.

1    Q       And there's nothing wrong -- my point is, there's

2    nothing wrong with a U.S. taxpayer saying, "I don't want to

3    invest in U.S. securities"; correct?

4    A       Correct.

5    Q       In fact, there's nothing illegal, to your knowledge,

6    about a U.S. taxpayer having a Swiss bank account; is that

7    correct?

8    A       Basically that's not illegal.

9    Q       And U.S. taxpayers can use Swiss bank accounts for,

10   let's say, asset protection; is that correct?

11   A       What do you mean by "asset protection"?

12   Q       Well, protecting your assets from lawsuits, let's say.

13   If you're going to be sued in the United States, or those

14   lawsuits can -- the judgments can go to the Island of Saba and

15   freeze all your assets, and you want to protect your assets,

16   you might want to move them out of Saba and into Switzerland;

17   is that correct?

18   A       No, not necessarily.  Switzerland has a financial

19   treatise with a lot of countries and can lend legal assistance

20   that would disclose the details of relationships.

21   Q       Well, the details of the relationships, of course, of

22   course you disclose the details of a relationship.  But someone

23   has to go to the effort of going to Switzerland, then, to try

24   and effectuate the judgment; isn't that correct?

25   A       Ya.  It's probably easier if you have it in the same

1    country than in a different country.

2    Q      And, therefore, it gives you some additional asset

3    protection by moving your money to Switzerland.

4           And there's nothing wrong or illegal about that;

5    correct?

6    A      There are different or various situations for people to

7    move their assets out of their own country.

8    Q      Exactly.  Legitimate reasons; correct?

9    A      Yes, legitimate reasons.

10   Q      If you can go to Page 10 of this document?

11          And again, I'll make this point for all the other

12   corporate resolutions that are showing up in all the other

13   documents:  You have no idea who filled out the handwritten

14   words in this document for the corporate resolution; correct?

15   A      Correct.

16   Q      And the corporate resolution itself, I mean, this is

17   like two-point type.  This is very, very small type.

18          You have no idea whether or not Dieter Luetolf or

19   anybody else from UBS went over all these words and concepts

20   with Dr. Patricia Hough, before she signed this document for

21   the corporate resolution; is that correct?

22   A      I don't know whether it has been explained to her or

23   not.

24   Q      And that would be true for all the corporate resolutions

25   sitting in these ten different UBS accounts that you talked

1    about; correct?

2    A        Correct.

3    Q        Now, I understand, in all fairness, that you have been

4    asked to be here, correct; this wasn't your choice?

5    A        Correct.

6    Q        And if the U.S. Government had asked UBS to send Dieter

7    Luetolf, assuming he is still an employee of UBS, UBS could

8    have sent Dieter Luetolf; correct?

9    A        I don't know.  I would assume so, ya, but I don't know

10   of reasons why he should not be here.

11   Q        Well, assuming that Dieter Luetolf is an employee of

12   UBS, under the Deferred Prosecution Agreement, UBS, to

13   cooperate and abide by the agreement, could have sent Dieter

14   Luetolf, had the U.S. Government requested that Dieter Luetolf

15   be sent; is that correct?

16   A        I assume it is correct, yes; but I don't know the

17   details of this agreement, and . . . that's why I only can say

18   I assume that it's correct.

19            MR. HOCHMAN:  No further questions.

20            THE COURT:  Ms. Finley?

21                         REDIRECT EXAMINATION

22   BY MS. FINLEY:

23   Q        Mr. Futterknecht, Mr. Hochman asked you a lot about what

24   the Deferred Prosecution Agreement contained.

25            And that's part of why you are here, as part of the

1   Deferred Prosecution Agreement; is that correct?

2   A      Yes.

3   Q      And as part of the Deferred Prosecution Agreement, did

4   UBS turn over, or was required to disclose, client data to the

5   United States Government?

6   A      I believe this was the case, yes.

7   Q      And are you aware whether the records that you reviewed

8   in your office back in Switzerland are those documents that

9   were turned over by UBS pursuant to the Deferred Prosecution

10  Agreement?

11  A      I would assume so, yes.

12  Q      And --

13          MR. HOCHMAN:  Objection, motion to strike.

14          THE COURT:  The objection is sustained.  The motion

15  to strike is granted.  The jury shall disregard that answer.

16  BY MS. FINLEY:

17  Q      And in your declaration on -- in Exhibit 3A, your

18  declaration says that, under Number 2, that the certification

19  concerns the records that were previously provided to the

20  Department of Justice.

21          Is that what the declaration says?

22  A      I don't have it in front of me, but I assume it's

23  correct, yes.

24          MS. FINLEY:  If we can put it up on the screen, 3A,

25  the first page.

1    BY MS. FINLEY:

2    Q      If you'd want to look at the screen, and under Number 2,

3    it says that these are documents previously provided to the

4    Department of Justice?

5    A      Correct.

6    Q      And . . . .  Back in your office in Switzerland, if we

7    can just pull out on the exhibit for a second, this document

8    contains a lot of random numbers.

9           And do you know what those -- are those identifying

10   numbers on the documents that were produced by UBS?

11   A      Well, these are the same numbers as are on these

12   documents.

13   Q      And were they on also the records that you reviewed when

14   you were in Switzerland?

15   A      Yes, they were also on these documents.

16   Q      And those are the same records that we reviewed here

17   today?

18           MR. HOCHMAN:  Objection, foundation.

19           THE COURT:  Overruled.

20           THE WITNESS:  Yes.

21   BY MS. FINLEY:

22   Q      You believe that if we looked for A-00116-0799, that it

23   would be in the records that we've reviewed?

24   A      Yes.

25   Q      Now, is your job responsibilities -- is it your

1    responsibility to talk with every employee at UBS; do you have

2    to talk with every single employee?

3    A       No, that's not my responsibility.  It wouldn't be

4    possible, by the way.

5    Q       I'm sorry?

6    A       It wouldn't be possible.

7    Q       Why wouldn't it be possible?

8    A       We have 62,000 employees, so I cannot talk to everybody.

9    Q       And as part of the functioning of the bank, when

10   Mr. Luetolf takes information down from a client, and then

11   sends -- say, to transfer money, does the person who he's

12   sending the information to, to execute that transfer, does that

13   person then have to go back to Mr. Luetolf and have a personal

14   conversation with him, to make sure that the information

15   Mr. Luetolf is transferring is what it is?

16            MR. HOCHMAN:  Objection, foundation, as to knowledge

17   of Mr. Luetolf's personal practices.

18            MS. FINLEY:  I'll rephrase the question, Your Honor.

19            THE COURT:  You may.

20   BY MS. FINLEY:

21   Q       With respect to employees at the bank, if an employee

22   received a -- a client adviser received a request to transfer

23   money, that request would then be transmitted to someone else

24   in the bank, who would execute that transfer; is that correct?

25   A       He can -- that person could either enter the transaction

1  directly in the respective system, or he could ask an assistant

2  to do it on his behalf.

3  Q      And does UBS talk to the client adviser every single

4  time a transaction is carried out on behalf of the bank?

5  A      If UBS talks to the client adviser; no.  The client

6  adviser gets the instruction, and then he carries it out.

7  Q      And the client adviser then maintains that instruction

8  in UBS's files, that's what you testified; is that correct?

9  A      Yes.

10  Q      And why did it maintain those instructions?

11  A      Well, these are key elements of the conversation of

12  correspondence between the client and the bank, and we

13  are . . . legally obliged to keep these elements, these

14  correspondence, for a period of ten years.

15  Q      And if I asked you, right now, to obtain account

16  information like we've been reviewing, for a John Doe, for

17  another client, would you have obtained them in the same way

18  you did here today?

19          MR. HOCHMAN:  Objection, irrelevant.

20          THE COURT:  Overruled.

21          THE WITNESS:  Well, we would have to go to the

22  systems where the information is contained and make printouts

23  from those systems.

24  BY MS. FINLEY:

25  Q      And would you have talked to John Doe, that person's

1   client adviser, or every person that put a stamp on the

2   documents, in order to obtain those records?

3   A       No.  No.

4   Q       Mr. Hochman asked you a lot about Mr. Luetolf, and that

5   he was charged with a crime.

6           Do you know whether Mr. Luetolf has been charged with a

7   crime?

8   A       No, I don't know.

9   Q       And do you understand what the term "unindicted

10  co-conspirator" is?

11  A       No.

12  Q       Do you understand what a co-conspirator is?

13  A       Well, I could imagine what it is, but I don't know the

14  formal definition of this term.

15  Q       And did you need to talk with Dieter Luetolf to know

16  that the records that we've talked about today are the records

17  that are maintained by UBS in its ordinary course of business?

18  A       No.  There was no need for that.

19  Q       And, um . . . I'll withdraw that, that "um."

20          And how do you know that the records, say the e-mails,

21  or the client instructions, how do you know that those are made

22  at or near the time; would there be other documents that

23  should -- if someone requested a transfer, should there be

24  another document that corroborates a transfer was made?

25          MR. HOCHMAN:  Objection, leading.

1          THE COURT:  Sustained.

2          MS. FINLEY:  I'll move on to the next question.

3          Actually, with the Court's indulgence, may I just

4  have a moment?

5          THE COURT:  Sure.

6          (Ms. Finley confers with co-counsel privately.)

7  BY MS. FINLEY:

8  Q     If you remember, when we were looking at Dr. Fredrick

9  and Dr. Hough's joint account, there was a request by them to

10  split that account in two.

11          Do you remember, we looked at an e-mail from

12  Dr. Fredrick, and I think Dr. Hough was CCed on that e-mail; do

13  you remember?

14  A     Yes.

15  Q     And I think we also looked at another record in that

16  same file where Dr. Hough was e-mailing Mr. Luetolf, where she

17  was saying:  I agree with the previous e-mail sent, that we

18  want to split the account in two?

19          MR. HOCHMAN:  Objection, beyond the scope of

20  cross-examination on that document.

21          THE COURT:  Overruled.

22          THE WITNESS:  I don't remember the text of these

23  e-mails in detail, but I believe it was along these lines, yes.

24  BY MS. FINLEY:

25  Q     And then do you remember that you then saw that those

1    accounts were actually split to two accounts?

2    A       Yes.

3    Q       And so UBS again -- is UBS relying on the information

4    being transmitted by the client --

5    A       Yes, of course.

6    Q       -- when carrying out those requests?

7    A       Yes.

8    Q       And it's maintaining those records in its ordinary

9    course of business to have a record of what was requested by

10   the clients?

11   A       Yes.

12   Q       Are you familiar with U.S. tax laws?

13   A       No, I'm not.

14   Q       And are you familiar with U.S. criminal laws?

15   A       No, I'm not.

16   Q       And are you familiar with whether . . . what

17   circumstances somebody could be committing a U.S. tax crime?

18   A       No, I'm not familiar with this.

19   Q       So you don't know whether Mr. Luetolf was, or was not,

20   committing any U.S. criminal tax charge -- crime.

21   A       I don't know that, no?

22   Q       Now, Mr. Hochman also went over a lot of these forms,

23   and what Mr. Luetolf may or may not have told Dr. Hough.

24           Are you familiar with what kind of training the UBS

25   employees, or the client advisers, receive about the forms?

1   A      To some . . . .

2            MR. HOCHMAN:  No objection, Your Honor.

3            THE WITNESS:  Okay.  To some extent, yes, I'm

4   familiar with this.  It's part of the basic KYM AML training

5   they obtain.

6   BY MS. FINLEY:

7   Q    And would part of that training be to understand the

8   forms?

9   A      Yes.

10  Q    Would part of the training, and part of a client

11  adviser's duty would be to . . . UBS would expect that a client

12  adviser, if a client had a question, would explain the form.

13  A      Yes.

14  Q    Does -- and I think Mr. Hochman also asked you about

15  changing things on documents after a client might have signed

16  it.

17           Does UBS allow employees to randomly change documents,

18  say while they're walking them down to the archives?

19  A      No.  No.

20           MS. FINLEY:  If we could turn to Exhibit 3R, and

21  Page 20 -- I'm sorry, 3S . . . and Page 24?

22           (An exhibit was projected onto the projector screen.)

23           MS. FINLEY:  And if we --

24           MR. HOCHMAN:  Is this 3R?

25           MS. FINLEY:  3S.

1          MR. HOCHMAN:  3S.

2          MS. FINLEY:  And if we can go down to the notes

3   on . . . looks like August 30th, 2004.

4   BY MS. FINLEY:

5   Q     I think Mr. Hochman asked you about the asset management

6   agreement and what kind of guidance a client might give UBS

7   about how they wanted to trade.

8          Do you remember those questions?

9   A     Yes.

10  Q     And if we can look here, it looks -- is it on

11  August 30th, 2004, does it look like there was a client contact

12  by a visit to the client?

13  A     Yes, there was a contact by phone.

14  Q     And it looks like, if we presume that this contact --

15  was it by phone or by visit, under the contact medium?

16  A     On the contact medium, it says visit to client.

17  Q     And it looks like the creation date is maybe two weeks

18  after the contact date that bears the date of September 15th,

19  2004?

20  A     Correct.

21  Q     And if you could just read that to the jury?

22  A     "Discussed account with her husband, and spoke to her

23  briefly on the phone.  He will show her the DOCO proposal in

24  case she wants to go ahead with that as well."

25  Q     And so does it appear that Dieter -- that the client

1    adviser, whoever is making that contact, discussed the account

2    with a woman, based on the pronouns?

3              MR. HOCHMAN:  Object, leading.

4              THE COURT:  Overruled.

5              THE WITNESS:  My read is, he discussed it with her

6    husband, so Mr. Fredrick.

7    BY MS. FINLEY:

8    Q      With Dr. Fredrick?

9    A      Dr. Fredrick.

10             MR. HOCHMAN:  Objection, no foundation.

11             THE COURT:  Overruled.

12   BY MS. FINLEY:

13   Q      This is the client adviser work bench for one of

14   Dr. Fredrick's and Dr. Hough's accounts.

15   A      Well, I don't know in which file this is, but it is,

16   yes, client adviser work bench related to one of the accounts.

17   Q      Do you have 3S in front of you there?

18   A      3X?

19   Q      3S, as in "Sam."

20   A      No.  Oh, yes, I have it.

21   Q      If we go to . . . .  Can you tell, from those records,

22   which account we're talking about, or if you look at 3R?

23             (The witness examines a document.)

24   A      I'm going through the document.  The first few documents

25   contain only the number, so this is a numbered account.  I have

1    to find --

2    Q       If you look at 3R, perhaps, Exhibit 3R.  And I think we

3    have the first page up there on the screen.  That has

4    Account 2267 at the top.

5    A       Yes.

6    Q       Does that help you on the Exhibit 3S, Page 24, to know

7    whose account that information is in?

8    A       Yes.  The number for this numbered account is the same

9    as this one, or part of this one.  One part is blacked out

10   here.

11   Q       Okay.  Can a client adviser trade in a client's account

12   without permission from the client, subject to the asset

13   management agreement?

14   A       He should not, of course; but . . . .  Anything is

15   possible, so he could make trades without the client's

16   instruction.

17   Q       And if UBS's employees were making trades without

18   client's instructions, would that be good business practice or

19   bad business practice?

20           MR. HOCHMAN:  Objection, irrelevant, and foundation.

21           THE COURT:  Overruled.

22           THE WITNESS:  It would be extremely bad business

23   practice.

24   BY MS. FINLEY:

25   Q       And if UBS found that a client adviser was trading in an

1    account without permission, what would happen?

2    A      He would face serious consequences, up to dismissal.

3    Q      And Mr. Hochman also asked you about fees and trading.

4           Is it a client adviser's job to make money for the

5    client?

6    A      The client adviser should, of course, primarily act in

7    the interests of the client with regard to the assets the

8    client deposited with the bank.  That's what clients expect of

9    the bank.

10   Q      The client adviser's job is not to lose the client

11   money?

12   A      Yes, of course.

13   Q      And if activities were going on in a client's account

14   that were not authorized, would you expect the client to call

15   the bank?

16   A      The client receives the account statements and can

17   review them.  And if he detects anything unusual, yes, I would

18   expect him to call the bank and ask:  Hey, what's going on?

19   Q      Now, Mr. Hochman also asked you about Dr. Hough's

20   account, that it had $5 million in it, and that you have no

21   reason to believe that that's not accurate.

22          Do you remember that question?

23   A      Yes.

24   Q      Do you have any reason to believe that any of the other

25   information in these records is not equally accurate?

1    A     No.  I don't have reason to doubt that it is inaccurate.

2    Q     Now, if UBS did not think that the signatures on these

3    accounts were the beneficial owners's signature or the contract

4    parties' signatures, what should a client adviser do?

5    A     She should contact the client and verify with the

6    client, and ask him:  Did you sign this; is this your

7    signature?

8          Actually, we have a signature specimen on the

9    account-opening basic document, so we could verify it.  And if

10   it's not the client's signature, he could call the client and

11   ask for verification.

12   Q     And Mr. Hochman also asked you a lot of hypotheticals,

13   or things that required you to assume what Mr. Luetolf was

14   told; do you remember?

15   A     (Witness Nods head up and down.)

16   Q     Is it an equal assumption that Mr. Luetolf answered the

17   questions on all of these documents based on the information

18   that he received from his clients?

19         MR. HOCHMAN:  Objection, leading.  Improper

20   hypothetical.

21         THE COURT:  Overruled.  He may answer.

22         THE WITNESS:  Yes.

23   BY MS. FINLEY:

24   Q     And is Mr. Luetolf expected -- does Mr. Luetolf answer

25   the questions on these documents based on his understanding of

1    the situation?

2              MR. HOCHMAN:  Objection, no foundation of the

3    personal practices of Mr. Luetolf.

4              THE COURT:  Sustained.

5    BY MS. FINLEY:

6    Q     Does a client adviser . . . are they expected to answer

7    the questions on these forms, and fill them out, according to

8    their understanding of the information?

9    A     Yes.

10   Q     And where does a client adviser receive their

11   understanding of the information?

12   A     We have internal policies.  Client advisers are trained

13   on these matters, so these are the basic tools as for the

14   client advisers.

15   Q     And does a client adviser make the decision about how to

16   fill these forms out based on speculation?

17   A     No.

18   Q     And if a client doesn't tell a client adviser proper

19   information, then would the incorrect form be filled out

20   potentially?

21   A     If the client adviser has any suspicious or doubts

22   whether the information that he got from the client does not

23   make sense, or could not be correct, he would have to go back

24   to the client and verify, and . . . then hopefully get right

25   answers.

1          If he's still convinced that these answers are not

2    correct, then the ultimate conclusion would be not to open the

3    relationship or terminate an existing relationship.

4    Q      Now, are you aware, do you know that, in the Deferred

5    Prosecution Agreement that Mr. Hochman asked you about, that

6    UBS pled guilty to conspiracy to impede the Internal Revenue

7    Service?

8    A      Along these lines, yes; but not in detail.

9    Q      And do you know that, as part of the Deferred

10   Prosecution Agreement, that UBS admitted that it was assisting

11   or facilitating undeclared U.S. taxpayers in hiding their

12   assets and income from the Internal Revenue Service?

13              MR. HOCHMAN:  Objection, leading.

14              THE COURT:  Overruled.

15              You may answer.

16              THE WITNESS:  I believe this was part of it, yes.

17   BY MS. FINLEY:

18   Q      And are you also aware that, as part of the Deferred

19   Prosecution Agreement --

20              MS. FINLEY:  Your Honor, I'll withdraw the question

21   and re-ask.

22   BY MS. FINLEY:

23   Q      Do you know that, in the Deferred Prosecution Agreement,

24   that UBS admitted that . . . .

25              MR. HOCHMAN:  Objection to foundation to whatever he

1   knows about this agreement in any specifics, Your Honor.  The

2   foundation hasn't been laid as to his detailed knowledge or

3   anything in particular of this agreement.

4           THE COURT:  Overruled.  I think -- although I think

5   that's the point.

6           But go ahead.

7           MS. FINLEY:  Thank you, Your Honor.

8   BY MS. FINLEY:

9   Q     Do you know that, in the Deferred Prosecution Agreement,

10  that UBS admitted, rather than risk losing U.S. clients, that

11  it would assist U.S. clients in creating and maintaining sham,

12  nominee, or conduit offshore companies in jurisdictions like

13  Panama, Hong Kong, and the British Virgin Islands, in order to

14  assist clients to conceal their investments in U.S. securities

15  and thereby evade UBS's obligation to provide tax information

16  to authorities?

17  A     I have not this detailed knowledge about this.

18          MS. FINLEY:  One moment, Your Honor.

19          (Ms. Finley confers with co-counsel privately.)

20          THE COURT:  Ms. Finley, I'm going to instruct the

21  jury, that's an example of where the witness says, "I don't

22  know," and you're not allowed to infer from the question that

23  the content of the question is true.

24          So it was a long question that had a bunch of

25  details.  If the answer is, "I don't know," you can't assume

1    that what the attorney said is evidence until it's proved.

2              All right.  Go ahead.

3              MS. FINLEY:  Thank you, Your Honor.

4              I think that's all the questions that I have, Your

5    Honor.

6              THE COURT:  All right.  Mr. Hochman, any recross?

7              MR. HOCHMAN:  Very briefly, Your Honor.

8                      RECROSS EXAMINATION

9    BY MR. HOCHMAN:

10   Q      Mr. Futterknecht, you've described a variety of UBS

11   policies concerning the handling of documents, the training,

12   and all that; correct?

13   A      Yes.

14   Q      But you have no personal knowledge, as you sit here

15   today, whether or not Dieter Luetolf followed any of those

16   policies; correct?

17   A      Correct, yes.

18   Q      In fact, what you know, from your own personal

19   knowledge, is that Dieter Luetolf had clients sign blank forms,

20   put their initials on forms instead of filling them out, and

21   made other errors in the forms that you reviewed.

22              That's what you do know; correct?

23   A      I don't know whether he made clients sign a blank form.

24   Q      Do you want me to go look at that Form A again and --

25   A      Oh, that one, yes.  No.  No, that's okay.  I don't

1    remember that you referred to this one.

2    Q      So you know he makes mistakes, and you have no idea

3    whether or not he followed all the policies that you've

4    outlined in general; correct?

5    A      Correct.

6    Q      And the only person who would really know that answer is

7    Dieter Luetolf, and you never spoke to him; correct?

8    A      Correct.

9             MR. HOCHMAN:  Thank you.  No further questions.

10            THE COURT:  Miss Finley, anything further?

11            MS. FINLEY:  Nothing further, Your Honor.

12            THE COURT:  May the witness be excused?

13            MR. HOCHMAN:  Your Honor, we would . . . .

14            THE COURT:  Do you need to come to sidebar?

15            MR. HOCHMAN:  Yes, please, Your Honor.

16                          AT SIDEBAR

17            MR. HOCHMAN:  Dieter Luetolf is an employee of UBS.

18   We have been informed that by the government.  So I can either

19   ask that witness, not excuse him, and ask him to check with his

20   HR people, and then call him back on the stand, or I can get a

21   stipulation from the government.  But I'm hesitant to release

22   him because he seems to think -- he's saying there could be two

23   Dieter Luetolf is, which isn't true.

24            THE COURT:  I wouldn't say he's suggesting it, but

25   he's not eliminating the possibility.

1          MR. HOCHMAN:  Right.  And the government knows for a

2    fact that this -- the Dieter Luetolf is still employed by UBS,

3    so either hold onto him and work with him to get that or, if he

4    wants to go back to Switzerland, I can get a stipulation from

5    the government or something.

6          MS. FINLEY:  Our understanding from his attorney is

7    that Mr. Luetolf is still an employee, so we have no problem

8    stipulating based upon that representation from the bank's

9    lawyer.

10         MR. HOCHMAN:  A stipulation is fine.

11         THE COURT:  So he can be excused?

12         MR. HOCHMAN:  Yes.

13         THE COURT:  Okay.

14                        IN OPEN COURT

15         THE COURT:  You may stand down, and you may be

16   excused.

17         THE WITNESS:  Thank you.

18         (The witness left the witness box.)

19         MR. HOCHMAN:  Your Honor, may we do the stipulation

20   right now, if possible?

21         THE COURT:  Sure.  Let the witness get off the

22   witness stand, and then you may.

23         MR. HOCHMAN:  Thank you.

24         THE COURT:  You may proceed.

25         MR. HOCHMAN:  The stipulation, ladies and gentlemen

```
 1    of the jury, is that the United States and the defendant,

 2    Dr. Patricia Hough, stipulate that the Dieter Luetolf who was

 3    involved in all ten UBS accounts is still employed by UBS.

 4              THE COURT:  And, Ms. Finley, is that correct?

 5              MS. FINLEY:  That is correct, Your Honor.

 6              THE COURT:  And let me just tell the jury that, when

 7    the parties stipulate to a fact, that means both sides agree,

 8    so neither side has to present any other evidence as to that.

 9    You may assume that that fact has been established for your

10    purposes.

11              All right.  You may call your next witness.

12              MS. FINLEY:  Thank you, Your Honor.  The government

13    calls Shirley Ball.

14              THE COURTROOM DEPUTY:  If you'd raise your right

15    hand, do you solemnly swear or affirm to tell truth the whole

16    truth, nothing but the truth, in the case now before the Court?

17              THE WITNESS:  I do.

18              THE COURTROOM DEPUTY:  You may have a seat right

19    behind you.

20              If you would, state your full name, spelling your

21    last, first and last, please.

22              THE WITNESS:  Shirley Ball.  S-H-I-R-L-E-Y, B-A-L-L.

23              THE COURTROOM DEPUTY:  Thank you.

24              THE COURT:  And you can move that microphone closer

25    to you, if that makes you more comfortable.
```

1          THE WITNESS:  Thank you.

2                    SHIRLEY BALL,

3  called as a witness by the Government's, and having been

4  first duly sworn, was examined and testified as follows:

5                 DIRECT EXAMINATION

6  BY MS. FINLEY:

7  Q     Good afternoon, Ms. Ball.

8  A     Good afternoon.

9  Q     Could you tell the jury where you work?

10 A     I work at the Internal Revenue Service in Memphis.

11 Q     And what do you do in the Internal Revenue Service?

12 A     I'm a court witness coordinator in the criminal

13 investigation division.

14          MS. FINLEY:  Your Honor, at this time the government

15 moves into evidence 1A through 1H.

16          THE COURT:  Mr. Hochman?

17          MR. HOCHMAN:  Let me just confirm, if I can find it.

18          No objection, Your Honor.

19          THE COURT:  All right.  That's 1A through H?

20          MS. FINLEY:  That's correct.

21          THE COURT:  All right.  Those exhibits will be

22 admitted.

23          (Government's Exhibits 1A through 1H were admitted

24      into evidence.)

25          MS. FINLEY:  We also move in 1T through 1X --

1    sorry -- through 1Y.

2              THE COURT:  Any objections?

3              MR. HOCHMAN:  I'm sorry, it was 1Y through --

4              MS. FINLEY:  1T through 1Y.

5              MR. HOCHMAN:  No objection, Your Honor.

6              THE COURT:  All right.  1T through 1Y will be

7    admitted.

8              (Government's Exhibits 1T through 1Y were admitted

9         into evidence.)

10             MS. FINLEY:  Your Honor, may I approach?

11             THE COURT:  You may.

12   BY MS. FINLEY:

13   Q     I'm going to hand you just a couple of exhibits that

14   we'll go over, and I'll get them marked afterwards.

15         If you could look at Exhibit 1K . . . now, as part of

16   your duties as a court witness coordinator -- is that what your

17   title is?

18   A     Right, that's my title.

19   Q     What does that mean?

20   A     As court witness coordinator, part of my duties is to

21   serve as the custodian of records and fact witness to the

22   documents that we present at trial.

23   Q     And do you have the ability, then, to search the IRS's

24   records to determine if certain documents were received, not

25   received, by the IRS?

1    A      Yes.

2    Q      And if I show you what's been marked as Exhibit 1K, can

3    you explain what this document is?

4    A      This is the certified copy of an account transcript for

5    the year 2002, in regards to Form 1040, U.S. Individual Income

6    Tax Return, for Patricia Hough.

7    Q      And, in your search of the IRS records, were you able to

8    find the actual physical tax return for Patricia Hough?

9    A      Not for 2002.

10   Q      And what does this transcript represent?

11   A      This transcript shows whether or not a return is filed,

12   whether or not any payments are made, any assessments . . .

13   extensions filed, refunds issued, anything like that.

14   Q      And based on Exhibit 1K, was a tax return for Patricia

15   Hough filed in 2002?

16   A      Yes.

17   Q      And if we can look at Exhibit 1BB, and 1AA . . . sorry,

18   those are out of order.

19          MS. FINLEY:  And just before I move on, Your Honor,

20   the government would offer Government's Exhibit 1K into

21   evidence?

22          THE COURT:  All right.  Any objection to 1K?

23          MR. HOCHMAN:  No objection, Your Honor.

24          THE COURT:  1K will be admitted.

25          (Government's Exhibit 1K was admitted into evidence.)

1  BY MS. FINLEY:

2  Q      And with respect to 1AA, what is that document?

3  A      This is a certified account transcript for the tax

4  period 2001, with regard to the Form 1040, individual income

5  tax return, for David Fredrick.

6  Q      And what does the transcript indicate was a tax return

7  for David Fredrick filed in 2001?

8  A      For his 2001 return; yes.

9          MS. FINLEY:  And, Your Honor, at this time the

10  government would move Exhibit 1AA into evidence?

11          THE COURT:  Any objections?

12          MR. HOCHMAN:  No objection, Your Honor.

13          THE COURT:  Exhibit 1AA will be admitted.

14          (Government's Exhibit 1AA was admitted into

15    evidence.)

16  BY MS. FINLEY:

17  Q      And with respect to 1BB, can you tell the jury what that

18  document is?

19  A      This is the certified account transcript for the tax

20  period 2002, in regard to the Form 1040, for David Fredrick.

21  Q      And can you tell from the search of the records whether

22  a 2002 Form 1040 -- let me just ask you, what is a Form 1040?

23  A      That's the U.S. Individual Income Tax Return.

24  Q      And was a Form 1040 for 2002 filed by David Fredrick?

25  A      Yes.

1          MS. FINLEY:  Your Honor, at this time the government

2     would move 1BB into evidence.

3          MR. HOCHMAN:  No objection.

4          THE COURT:  1BB will be admitted.

5          (Government's Exhibit 1BB was admitted into

6       evidence.)

7     BY MS. FINLEY:

8     Q     Now, if I could ask you to take a look at 1R?

9           Could you explain to the jury what 1R is?

10    A     1R is the certified account transcripts for the years

11    2000, 2001, 2002, 2003, '4, '5, '6, '7, '8, '9, '10, '11, and

12    '12, in regards to the Form 709, United States United States

13    Gift (and Generation-Skipping Transfer) Tax Return form, for

14    Patricia Hough.

15    Q     And did you search the IRS's records to determine

16    whether any gift tax returns were filed by Patricia Hough

17    during 2000 through 2012?

18    A     Yes, I did.

19    Q     And what did you find?

20    A     No Form 709s were filed.

21    Q     And if we look at --

22          MS. FINLEY:  Your Honor, at this time the government

23    would offer 1R into evidence.

24          THE COURT:  Any objections?

25          MR. HOCHMAN:  No objection.

1           THE COURT:  1R will be admitted.

2           (Government's Exhibit 1R was admitted into evidence.)

3   BY MS. FINLEY:

4   Q     And with respect to 1S, can you explain what this

5   document is?

6   A     This is a Form 3050, Certification of Lack of Record,

7   where I did the search for the Form 709 for Patricia Hough for

8   the years 2000 through 2012.  It just puts it in a nutshell on

9   one sheet of paper.

10          MS. FINLEY:  Your Honor, at this time the government

11  would offer 1S into evidence.

12          THE COURT:  Any objections?

13          MR. HOCHMAN:  No objection.

14          THE COURT:  1S will be admitted.

15          (Government's Exhibit 1S was admitted into evidence.)

16  BY MS. FINLEY:

17  Q     And lastly, if we could turn to 1II, what is this

18  document?

19  A     This is the Certification of Lack of Record, Form 3050,

20  in regards to David L. Fredrick, on a Form 709, from the years

21  2000 through 2012.

22  Q     And based on your search of the IRS records, did

23  David L. Fredrick file any gift tax returns from the years 2000

24  through 2012?

25  A     No, he did not.

1              MS. FINLEY:  Your Honor, at this time the government

2    would move 1II into evidence.

3              MR. HOCHMAN:  No objection.

4              THE COURT:  Exhibit 1II will be admitted.

5              (Government's Exhibit 1II was admitted into

6       evidence.)

7              MS. FINLEY:  I have no further questions, Your Honor.

8              THE COURT:  Mr. Hochman?

9              MR. HOCHMAN:  Yes, Your Honor.

10                        CROSS EXAMINATION

11   BY MR. HOCHMAN:

12   Q     So were you the custodian that was involved in trying to

13   locate the 1040 tax returns for Dr. Patricia Hough and

14   Dr. David Fredrick?

15   A     Yes, sir.

16   Q     And it looks like, for Dr. Patricia Hough, you managed

17   to find the 2001, and then the 2003 through 2008, actual 1040s

18   that were received by Internal Revenue Service; is that

19   correct?

20   A     That's correct.

21   Q     But you didn't find the 2002 return; is that correct?

22   A     That's correct.

23   Q     But you know it was filed.

24   A     Right.

25   Q     Did you lose it?

1    A       No, sir.  At this . . . a Form 1040 is only maintained,

2    or retained in our files, for seven years after it's been

3    processed.  So the 2002 would have been destroyed at the time

4    we searched for it.

5    Q       So how did you get the 2001?

6    A       Some returns are . . . are retained when we know we're

7    going to need them.

8    Q       So you retained the 2001 return, but you didn't --

9    because you thought you might need that, but somehow you didn't

10   think you'd need the 2002 return, but you kept the 2003 to 2008

11   returns?

12   A       Well, it's not up to me as to what we keep.  I just do

13   the search for them, and if they're there, then they're sent to

14   me.  If they're not there, then I get the information that

15   they've been destroyed.

16   Q       Sure.

17           And so did someone not follow the IRS's policy for 2001,

18   and that's why the 2001 return was saved, but they followed the

19   IRS's policy of destruction with 2002, and that's why we don't

20   have it here today?

21   A       I can't speak to that.

22   Q       Well, was there a different policy dealing with the 2001

23   return than dealing with the 2002 return, to your knowledge, as

24   far as when it gets destroyed?

25   A       I don't know who made the decision on which ones were to

1    be retained longer, and which ones were to be -- it was okay to

2    destroy.

3    Q      And is it -- when you say you don't know the answer,

4    could you find out the answer?

5    A      No.

6    Q      Is the answer -- you're the custodian of -- how long

7    have you been the custodian of records for the IRS; how long

8    have you been doing this job?

9    A      Just three years.

10   Q      And how long ago did you get the request to pull these

11   returns?

12   A      I'm not sure.  Sometime earlier this year.

13   Q      Six months ago or so?

14   A      Possibly.

15   Q      So in the last six months, did you ever ask anybody any

16   questions as to where Dr. Hough's 2002 return went?

17   A      I don't need to.  If they tell me it's been destroyed, I

18   know it's been destroyed.

19   Q      Did you ask any questions as to why 2001 was preserved?

20   A      I don't need to know.

21   Q      Is that just luck, or is that someone at the IRS not

22   following one of the IRS's destruction policies, for some

23   reason that you don't know?

24   A      I don't know the answer to that.

25   Q      Now, the importance, though, of a tax return versus a

1    transcript --

2           MR. HOCHMAN:  Let's go to 1K, if we could.  Pull out

3    1K.  And if we could put the . . . I think 1K is in evidence.

4           If we could put the second page of 1K up on the

5    screen?

6           (An exhibit was projected onto the projector screen.)

7           MR. HOCHMAN:  And if we could focus on the last part

8    of it, it talks about information from return.

9    BY MR. HOCHMAN:

10   Q    So all we know about Dr. Hough's 2002 return, because

11   the IRS didn't keep it, is just a couple of numbers here.

12          We know the adjusted gross income; correct?

13   A    Correct.

14   Q    But we don't know all the factors that go into adjusted

15   gross income; is that correct?

16   A    Correct.

17   Q    And we know her taxable income, but we don't know how

18   that was computed; is that correct?

19   A    That's correct.

20   Q    And we know the ultimate tax, and we don't even know how

21   that was computed; correct?

22   A    Correct.  It was either reported on the return, or, if

23   we noticed a mistake, we would have made the adjustment.

24   Q    So you don't see any adjustments here, do you?

25   A    No, sir.

1          MR. HOCHMAN:  May Exhibits 1L through 1Q be presented

2   to the witness, Your Honor?

3          THE COURT:  They may.

4          MR. HOCHMAN:  Thank you.

5          May I approach, Your Honor?

6          THE COURT:  Yes, you may.

7   BY MR. HOCHMAN:

8   Q     Now, if I can take you to 1L, 1L is the --

9          MR. HOCHMAN:  And I would move in 1L through 1K in --

10  what did I say, excuse me -- 1L through . . . 1Q into evidence,

11  Your Honor?

12         THE COURT:  Any objections?

13         MS. FINLEY:  No objection, Your Honor.

14         THE COURT:  1L through 1Q will be admitted.

15         (Government's Exhibits 1L through 1Q were admitted

16    into evidence.)

17         MR. HOCHMAN:  Thank you.

18  BY MR. HOCHMAN:

19  Q     And 1L through 1Q are these transcripts of accounts for

20  2003 through 2008, for Dr. Hough; is that correct?

21         (The witness examines exhibits.)

22  A     Yes.

23  Q     And if the IRS -- and you were saying before, with

24  adjustments, if the IRS thought there was anything wrong with

25  these tax returns, they would make adjustments on them;

SHIRLEY BALL - CROSS/HOCHMAN                    228

1    correct?

2    A       Correct.

3    Q       And there would be some type of indication on the

4    account transcript that an adjustment had been made?

5    A       Yes, sir.

6    Q       And just looking, if we could, quickly, you don't have

7    to put them on the board, 1L, do you see any adjustments in 1L,

8    which is the 2003 transcript of Dr. Hough?

9    A       No, there's not.

10   Q       Could you go to 1M, which is the 2004 adjustment?

11   A       No, there's not.

12   Q       1N, which is the 2005?

13   A       (Examining exhibit).

14   Q       Do you see any adjustment there?

15   A       There is an adjustment on this one.  An amended tax

16   return was filed, and we adjusted.

17   Q       An amended tax return was filed by Dr. Hough.

18   A       Yes.

19   Q       And she reported more tax.

20   A       Yes.

21   Q       Did she pay it?

22   A       Yes, sir.

23   Q       And that was 2005, huh?

24   A       Right.

25   Q       2006, which is Exhibit 1O, do you see any adjustments

1    there?

2    A      No, I don't.

3    Q      Exhibit 1P is 2007, for Dr. Hough.

4           Do you see any adjustments there?

5    A      (Examining exhibit).

6           No, I don't.

7    Q      And Exhibit 1Q is the 2008 . . . transcript for

8    Dr. Hough.

9           Do you see any adjustments there?

10   A      (Examining exhibit).

11          No, I don't.

12   Q      And turning your attention just briefly to Dr. Fredrick,

13   my understanding is, is that we don't have the returns for 2002

14   and 2001, for Dr. Fredrick; is that correct?

15   A      I believe that's correct.

16   Q      And you talked about this notion of gift tax returns?

17          You said that neither Dr. Hough nor Dr. Fredrick had

18   filed any gift tax returns between 2000 and 2012; do you recall

19   that?

20   A      I did.

21   Q      And with respect to gift tax returns, if someone gives a

22   certain amount of money every year to, let's say, their sister,

23   is there a certain amount of money that the IRS allows you to

24   give every year that's tax free?

25   A      I don't know.

1    Q      Isn't there, for instance, somewhere between, depending

2    on the year, 10 to 14,000 dollars, from the years 2000 to

3    present day, where you can give a certain amount of gift to

4    someone, and it falls within that tax-free amount?

5           MS. FINLEY:  Objection, Your Honor, asked and

6    answered, and foundation.

7           THE COURT:  The objection is overruled.  She can

8    answer if she knows it.

9           THE WITNESS:  I don't know.  I haven't been trained

10   on the requirements for filing the 709.

11   BY MR. HOCHMAN:

12   Q      Well, do you know whether or not Dr. Hough has ever been

13   trained on the requirements of filing a 709?

14   A      No, I don't know.

15   Q      Do you know whether Dr. Hough was ever obligated to file

16   a 709, between the years of 2000 and 2012?

17   A      I don't know.

18   Q      And if she wasn't obligated to file a gift tax return

19   between 2000 and 2012, then your not finding a gift tax return

20   for her during that time period would make sense.

21   A      That's true.

22          MR. HOCHMAN:  No further questions.

23          THE COURT:  Ms. Finley?

24

25

REDIRECT EXAMINATION

BY MS. FINLEY:

Q      Ms. Ball, is your job just to search the records as they are maintained by the IRS?

A      That's correct.

Q      And are there -- I think you alluded that there may be a lot of reasons -- are there a lot of reasons why some tax returns may be maintained longer than other tax returns?

A      Yes.

Q      And whether an adjustment is made on a tax return at any one time does not necessarily mean that that tax return is accurate; is that correct?

A      That's correct.

          MS. FINLEY:  No further questions, Your Honor.

          THE COURT:  Mr. Hochman, any recross?

          MR. HOCHMAN:  No, Your Honor.

          THE COURT:  You may stand down.  Thank you.

          THE WITNESS:  Thank you, Your Honor.

          (The witness left the witness box.)

          THE COURT:  You may call your next witness.

          MS. FINLEY:  Your Honor, the government calls Thomas Murtha.

          THE COURT:  Right up here, please.

          THE COURTROOM DEPUTY:  If you'd raise your right hand.

1          Do you solemnly swear or affirm to tell the truth,

2    the whole truth, nothing but the truth, in the case now before

3    the Court?

4              THE WITNESS:  I do.

5              THE COURTROOM DEPUTY:  You may have a seat.

6              State your full name, spelling your last.

7              THE WITNESS:  Thomas Murtha, M-U-R-T-H-A.

8              THE COURTROOM DEPUTY:  Thank you.

9              MS. FINLEY:  Your Honor, I'm going to use some of the

10   one series.  They have been admitted, but Ms. Alexander hasn't

11   had a chance to mark them yet.  We'll use them and mark them

12   after we finish with the witness, if that's okay?

13             THE COURT:  That's fine.

14                      THOMAS MURTHA,

15   called as a witness by the Government, and having been first

16   duly sworn, was examined and testified as follows:

17                    DIRECT EXAMINATION

18   BY MS. FINLEY:

19   Q     Good afternoon, Mr. Murtha.

20         What do you do for a living?

21   A     Right now, I'm a merger and acquisition adviser.

22   Q     And before you were a merger and acquisition adviser,

23   what did you do?

24   A     I was a CPA, in public practice.

25   Q     When did you become a CPA?

1    A       In 2000.

2    Q       Did you have your own business?

3    A       I was a partner in a firm with two other partners.

4    Q       And what was the name of that firm?

5    A       Flischel, Townsend & Murtha.

6    Q       And when did you leave that firm?

7    A       In December of 2010.

8    Q       Can you tell the jury about your educational background?

9    A       Sure.  I got my bachelor's degree from CW Post College,

10   on Long Island, in 1976.  I got my master's degree from

11   St. John's University, in accounting, in New York, also on Long

12   Island, New York, in about 1981.

13          I worked for various companies in the New York area, as

14   a private accountant for the companies, as junior accountant,

15   and worked my way up.

16          In 1987, we decided to move to Florida, and we moved to

17   the Tampa area.  And I operated a non-CPA tax and accounting

18   practice from 1987 until about 1997, when we moved to the

19   Englewood area.

20   Q       And then, in 1997, what did you do?

21   A       Well, I met up with Flischel and Townsend, and started

22   working with them, and eventually became a partner in the firm

23   after I obtained my CPA.

24   Q       Are you familiar with Dr. David Fredrick?

25   A       Yes, I am.

1  Q      Are you familiar with Dr. Patricia Hough?

2  A      Yes, I am.

3  Q      And do you see Dr. Hough in the courtroom today?

4  A      Yes, I do.

5  Q      And can you identify her by an article of clothing,

6  where she's sitting?

7  A      She's sitting second from the right, from my position.

8  Q      By an article of clothing?

9  A      Article of clothing?  She's wearing a top that's . . .

10 leopard top, or something like that?  I don't know.

11         MS. FINLEY:  Your Honor, let the record reflect that

12 the witness has identified Dr. Hough?

13         MR. HOCHMAN:  So stipulated, Your Honor.

14         THE COURT:  All right.  It may so reflect.

15         MS. FINLEY:  Thank you.

16 BY MS. FINLEY:

17 Q      Can you tell the jury how it is that you became familiar

18 with Dr. Fredrick and Dr. Hough?

19 A      They were clients of the firm, and in around 2001 or '2,

20 I . . . they came in to get their taxes done, and I was the

21 done that sat with them to do that.

22 Q      So what services . . . I guess you provided tax

23 preparation services for them?

24 A      Individual tax preparation services.

25 Q      Did you provide any investment advice to them?

1   A        No, we did not.

2   Q        Did you provide any financial advice?

3   A        No.

4   Q        Did you provide any audit advice?

5   A        No.

6   Q        When a client comes in and meets with you, could you

7   walk the jury through what your normal practice is for intake

8   of a new client?

9   A        When a new client comes into the firm, generally we try

10  to make an appointment with them, and they would come in and

11  sit down with one of the CPAs, which in this case would be me;

12  and we would go over the various types of income that they

13  have, where it was coming from, learn a little bit about what

14  they did for a living, whether they were retired, or still

15  working, and . . . we have a lot of retirees in the Englewood

16  area, so we try to get some kind of idea of what they did and

17  what where the income sources were from, so that we knew that

18  we would be complete.

19  Q        And what were your procedures, generally, when you

20  prepared a tax return for your clients?  Do you have a

21  procedure that you followed every year once a client engaged

22  your practice?

23  A        Well, yes.  Some clients would make an appointment to

24  come in, and we'd sit with them for maybe a half hour or so,

25  and they would sit in front of my desk, and we'd go through

1    each of the income items, and kind of compare it to the year

2    before, and make sure we have everything that we're supposed to

3    have, and see if anything new had happened for the year.

4    Q      I think you said that you believe you first started

5    preparing tax returns for Dr. Hough and Dr. Fredrick in 2001 or

6    2002?

7    A      That's correct.

8    Q      Did you have that kind of meeting with them when you

9    began preparing --

10   A      Yes.

11   Q      And generally speaking, when you complete a tax return,

12   do you go over it with the client?

13   A      Most of the time, the client will come in and pick up

14   the return, and pay for it, and leave with it, without a review

15   from . . . from any of the CPAs or any of the people.

16   Q      And do you remember if you reviewed tax returns that you

17   prepared for Dr. Hough and Dr. Fredrick with them?

18   A      I don't think I ever did.

19   Q      Are you familiar with what Dr. Hough and Dr. Fredrick do

20   for a living?

21   A      Yes.  They were managing medical schools in the

22   Caribbean.

23   Q      And how did you get that understanding?

24   A      From a conversation with them.  During the interview.

25   Q      And do you know where they worked?

1   A       I believe it was Saba, or . . . an island somewhere.

2   One of the islands.

3   Q       Do you know who their employer was?

4   A       My understanding was that they worked for a company in

5   Massachusetts that employed them to run the schools.

6   Q       Do you remember the name of that company?

7   A       I believe it was EIC?

8   Q       Do you know whether Dr. Hough had any other employment?

9   A       Dr. Hough, I believe, sometimes had some medical

10  employment.

11  Q       Did Dr. Fredrick or Dr. Hough ever tell you what their

12  relationship was to the medical schools?

13  A       Yes.  They said that they were administering the . . .

14  the medical schools, and . . . basically running the medical

15  schools, was my understanding.

16  Q       Did Dr. Hough or Dr. Fredrick ever tell you that they

17  owned the medical schools?

18  A       No, they did not.

19  Q       Who did Dr. Fredrick or Dr. Hough -- and if you remember

20  who told you -- tell you who owned the medical schools?

21  A       I don't remember who told me, or whether they both did;

22  but my understanding was that the medical schools were owned by

23  a nonprofit organization in the Netherlands Antilles.

24  Q       Do you understand what -- whether Dr. Hough also -- what

25  her role was, specifically, with the schools?

1   A      I believe she had something to do with placing the

2   students, after they graduated, in various hospitals to do

3   their internships.

4   Q      When you prepared their tax returns, did you have access

5   to their bank records?

6   A      No.

7   Q      How would they provide you information in order to

8   prepare their tax returns?

9   A      Well, generally, at the end of the year, different banks

10  and organizations are required to report the income on, say,

11  Form 1099 interest, and 1099 dividends, and K-1s if they have

12  shares in a company, and 1099s if they have employment and

13  they're paid as contractors.  So there are various methods.

14  But usually there's documentation from the payer of what the

15  income is.

16  Q      Did Dr. Fredrick or Dr. Hough explain to you, or tell

17  you how the schools were structured, how they were set up?

18  A      No.  I didn't really have an understanding of that.

19  Q      And do you remember, I think you said one was Saba.  Do

20  you remember the name of the other medical school?

21  A      I thought it was . . . MUI?  Medical University of the

22  Americas?  Or something like that.

23  Q      Are you familiar with a Schedule B on a Form 1040?

24  A      Yes, I am.

25  Q      Can you explain to the jury what a Schedule B is?

1   A       A schedule B is a backup schedule to the tax return

2   that's filed if you have interest and dividends income over a

3   certain amount.

4   Q       And there are other items on the Schedule B that require

5   you to report a foreign bank account?

6   A       Yeah.  There are questions on -- there two questions, on

7   the bottom of the form, that ask certain questions about

8   foreign bank accounts.

9   Q       And if a U.S. taxpayer has a foreign bank account, are

10  they required to fill out other forms?

11  A       I believe, if it's over a certain amount, they're

12  required to fill out a . . . another form.

13  Q       When you initially met with Dr. Fredrick and Dr. Hough

14  for the intake, did you ask them if they had any foreign bank

15  accounts?

16  A       It would have been part of my normal interview to ask

17  that question.

18  Q       And do you remember what their answer was?

19  A       I believe the answer was no.

20  Q       And when you asked them this question, did you

21  differentiate whether they had an account personally, versus

22  any relationship with . . . any other type of relationship with

23  the bank account?

24  A       I don't recollect that I did.  I don't believe that I

25  would have.

1   Q      So you didn't ask them if they had signature authority
2   on the bank account.
3   A      It's not a question I would have normally asked.  I
4   don't believe I did.
5   Q      But you would normally ask if someone had a foreign bank
6   account.
7   A      It would be in the nature of, "Do you have any foreign
8   bank accounts?"
9   Q      And the computer program that you use to prepare the tax
10  return, is there a diagnostic, or an area that would prompt you
11  to ask those questions?
12  A      The diagnostics in the program that we were using during
13  that time would . . . would prompt you at the end.  When you
14  finished the return, there was a review process of the return,
15  and it would prompt you as to whether you had completed
16  everything.  And it would even give us -- there were critical
17  diagnostics where there were things that needed to be put on
18  the return.
19         You know, in other words, you know, if there's mortgage
20  interest but you don't have any taxes on your house, so stuff
21  like that, that just wouldn't make sense.  And the diagnostics
22  would cue us as to whether those questions on Schedule B were
23  checked or not.
24  Q      Did you ask them that question every year that you
25  prepared their tax return?

1   A       I did not.

2   Q       And why did you not?

3   A       Well, generally, we wouldn't ask the question unless we

4   were aware that something had changed, or we saw some evidence

5   of . . . you know, foreign income coming in.  Sometimes a

6   client would come in with a foreign income item, and then that

7   would give rise to a further discussion; but in . . . in the

8   event that nothing really changed, we probably were a little

9   lax in asking that question again.

10  Q       And do you expect your clients to be forthcoming and

11  honest with you about the information they provide for

12  preparation of their tax return?

13  A       Yes.  I'm sorry.  Yes.

14  Q       And if something had changed, would you expect your

15  clients to tell you of those changes?

16  A       Yes.

17  Q       Did Dr. Fredrick or Dr. Hough ever tell you that they

18  had an interest in, or signature authority over, a bank account

19  in the Bahamas?

20  A       No.

21  Q       Did Dr. Fredrick or Dr. Hough ever tell that you they

22  had an interest in, or signature authority over, bank accounts

23  in Switzerland?

24  A       No.

25  Q       Did Dr. Fredrick or Dr. Hough ever tell you that they

1    had an interest in, or signature authority over, a bank

2    account, or bank accounts, in Liechtenstein?

3    A      No.

4    Q      Did Dr. Hough or Dr. Fredrick, when you asked that

5    question the first time, "Do you have a foreign account," did

6    they ask a follow-up question that said, well, I don't really

7    have an account, but I'm a signature on an account?

8    A      I don't remember any conversation like that.

9    Q      Had Dr. Fredrick or Dr. Hough told you that they had

10   signature authority over, or an interest in, a foreign bank

11   account, what would you have done?

12   A      I probably would have followed it up.

13   Q      And what do you mean by follow it up?

14   A      I would have asked more questions.  I'm not sure I

15   always understand what that meant anyway.  But if I didn't know

16   it, I would have followed up and asked more questions, and dug

17   into it.  Into what that meant.

18   Q      And if they told you that they had signature authority

19   over a foreign bank account, would you have reported that on

20   their tax return?

21   A      Yes.  If it would answer the question that way, yes.

22   Q      What if they told you that they just had signature

23   authority for purposes of working for the school?

24   A      I don't believe they ever did.  But I would have . . . I

25   don't know.  I don't know what I would have done.

1    Q      Well, you don't have a lot of experience with foreign

2    bank accounts?

3    A      I'm not an international tax expert, by any means, and I

4    would refer work like that out.

5    Q      So if you didn't know the answer, you would have sought

6    additional guidance from a colleague --

7              MR. HOCHMAN:  Objection.  Leading.

8              THE COURT:  Sustained.

9    BY MS. FINLEY:

10   Q      What would you have done if you didn't know the answer?

11   A      If I didn't know the answer, I probably would have done

12   a little research on my own, to try to keep the client in the

13   firm.  And if I -- and if I couldn't handle it, I would have

14   tried to refer them to another -- to an expert, or told them to

15   go find an expert.

16   Q      Would you have told them not to report it?

17   A      No.

18   Q      As part of your job as a CPA, are you familiar with

19   problems that UBS had in or around 2008?

20   A      Yeah.  It was in the newspapers.

21   Q      What was in the newspapers?

22   A      That the Swiss government had been -- or that the Swiss

23   bank had been somehow coerced into giving information to the

24   U.S. Government on . . . on private accounts that they held.

25   Q      And when that occurred, did you ask clients whether --

1    again, that was -- I'll withdraw the question.

2         When that occurred, was that something that heightened

3    your awareness to foreign bank accounts?

4              MR. HOCHMAN:  Objection, leading.

5              THE COURT:  Overruled.

6    A    I think more than the newspaper article was that the

7    IRS, at some point, had issued -- and this, again, was in the

8    papers also -- that there was a certain amount of time that

9    taxpayers had to reveal their foreign bank accounts and

10   everything.  I think that, more than the UBS thing -- because

11   we didn't really have any clients that had overseas accounts

12   like that.  So I think it was more the . . . the potential

13   penalty of not declaring accounts.  People may not have

14   realized they had these accounts, or realized what it meant.

15   And that heightened our efforts on that, because we didn't want

16   to be held liable for it, you know, when the client comes

17   screaming back later, when they get a $10,000 penalty or

18   something.

19   Q    So would you have asked your clients, again, whether

20   they had a foreign account?

21   A    Yes.

22   Q    And you said that you didn't think any of your clients

23   had offshore bank accounts.

24   A    Correct.

25   Q    Is that because none of your clients told you that they

1    had offshore bank accounts?

2    A      We had a handful of . . . like British people that had

3    come over, and . . . became residents here, and they had

4    accounts.  There were a couple of them.  And we advised them to

5    close those accounts.  But generally speaking, our typical

6    client did not have, or had not revealed to us that they had,

7    overseas bank accounts.

8    Q      So it's possible they didn't tell you.

9              MR. HOCHMAN:  Objection, leading.

10             THE COURT:  Sustained.

11   BY MS. FINLEY:

12   Q      How would you characterize Dr. Hough's tax knowledge?

13   A      I would say average.

14   Q      What do you mean by average?

15   A      Well, like most of my clients, they . . . she understood

16   what papers to bring in to me at the end of the year.  She knew

17   that taxes were due on April 15th, and if they didn't get all

18   the papers they needed, that she would have to get an

19   extension.  She understood the different income items that

20   she'd always had, and showed up with them.  And deductions that

21   were available to her also.

22   Q      And would she communicate with you by providing records?

23   Did she communicate with you by providing records for

24   preparation of her tax return?

25   A      Yes.  She'd sit across the desk, and we would pass the

1    papers across and, you know, check it against the prior year,

2    to make sure that we had everything that had been there the

3    year before.

4    Q      And how would you characterize Dr. Fredrick's tax

5    knowledge?

6    A      About the same.

7    Q      Now, did you have a relationship with Dr. Fredrick and

8    Dr. Hough outside of your professional relationship?

9    A      We had a -- there was a group of . . . of people that we

10   socialized with occasionally, and somewhere a couple of years

11   into my business relationship with . . . with Pat and Dave, we

12   were at a party, and they were there.  And then, from that time

13   on, from time to time, we would show up at the same party.

14   Q      During your interactions with them, did Dr. Hough and

15   Dr. Fredrick appear to get along well?

16   A      I thought so.

17   Q      And when -- did you meet with them professionally,

18   together, for preparation of their tax returns?

19   A      Most of the time.

20   Q      And did they provide information freely in front of each

21   other?

22   A      Absolutely.

23   Q      Are you aware whether -- are you aware generally where

24   Dr. Hough and Dr. Fredrick live?

25   A      I know they lived in Englewood.

1  Q      And are you aware whether they had any other homes?

2  A      Well, the only home I was aware of was, I believe, in

3  Asheville.

4  Q      Is that in North Carolina?

5  A      North Carolina.  They may have had a home.

6  Q      And how do you know that?

7  A      From socializing with them, I think, and maybe . . .

8  there may have been some tax issues.  I don't remember.

9  Q      Were you aware whether Dr. Fredrick or Dr. Hough had an

10 airplane?

11 A      Yes.

12 Q      And how are you aware of that?

13 A      Dave told me that he had an airplane at one point.

14 Q      Do you know whether he used the airplane for work?

15 A      I don't know that.

16 Q      When you began preparing Dr. Hough's tax returns and

17 Dr. Fredrick's tax returns, did they file their tax returns

18 married, jointly, or married filing separately?

19 A      They filed married filing separately.

20 Q      Did you ever discuss with them why they did that?

21 A      Early on, I mentioned that they might benefit from

22 filing together.  Jointly.

23 Q      Do you continue to prepare their tax returns now?

24 A      No.

25 Q      Do you know why you don't?

1   A       I suspect . . . .

2   Q       Do they come back -- I'll withdraw the question and

3   rephrase.

4           Do you remember what was the last year that you prepared

5   their taxes?

6   A       Probably the 2008 return.  Or maybe 2009.

7           MS. FINLEY:  Your Honor, this might be a good place

8   to stop.

9           THE COURT:  All right.

10          Counsel, if you'd come to sidebar please.

11                          AT SIDEBAR

12          THE COURT:  Some of the exhibits have the redactions

13  blacked out.  Is that because you folks have done it, or is

14  that the way it was in the original?  I want to tell the jury

15  it was you folks.

16          MS. FINLEY:  I think, anywhere where there was an

17  account statement, like an account number, or an address, or

18  date of birth, the typical things that we would be required to

19  redact, we redacted.  There are certain other places where

20  individual's names were redacted, and that was pursuant to the

21  Deferred Prosecution Agreement, and so the IRS redacted them,

22  and we don't have unredacted --

23          THE COURT:  So it's a combination?

24          MR. HOCHMAN:  For UBS records, it's a combination.

25  For other records, it would just be the government.

1          MS. FINLEY:  Yeah.

2          THE COURT:  Okay.  So what do you want me to tell the

3     jury about the redactions?  There was some examination about

4     filling out the form completely, and in the middle you see

5     these things redacted?

6          MS. FINLEY:  I think that --

7          MR. HOCHMAN:  Should we get together on a statement

8     we could give the jury tomorrow morning?

9          THE COURT:  Sure.

10          MS. FINLEY:  I think that the reasons why UBS

11     redacted the records are similar to the reasons we would be

12     required to, because those people's names were not at issue in

13     the deferred prosecution, so it's a privacy issue, just like --

14     and so I think, perhaps -- I don't know that the jury needs to

15     know.

16          THE COURT:  Well, I don't know either.  It's just

17     that, at some point, I guess, if I was a juror, I might want to

18     know who did that.  Might be able to figure it out with account

19     numbers these days; and if it's just the last four digits of

20     Social Security, people might figure that out.  But why don't

21     you just think about it.

22          MR. HOCHMAN:  Okay.

23          THE COURT:  Because at some point we may want to tell

24     the jury something.

25          MR. HOCHMAN:  Okay.

1              MS. FINLEY:  Okay.

2              MR. HOCHMAN:  Thank you.

3                      IN OPEN COURT

4              THE COURT:  All right.  Ladies and gentlemen, we're

5      going to recess for the evening.  We'll come back

6      at 9:00 o'clock tomorrow morning.

7              There are a couple things, now that we got started,

8      that I do want to advise you of.  You've seen a large number of

9      exhibits come, and my guess is, over the course of the next few

10     days, you'll see a large number of other exhibits come in.

11     Some of them have been disclosed to you on the overhead

12     projector.  Others haven't.

13             You don't need to worry about whether you've seen

14     them or not.  Anything that's admitted as an exhibit will

15     eventually come back to you during your deliberations.  So the

16     lawyers get to decide whether you see it now or they just give

17     it back to you later on.

18             A similar vein is the lawyers get to decide what

19     questions they ask.  So you may have questions that you would

20     really like to ask, but that's not the way it works.

21             Other than that, 9:00 o'clock in the morning.

22             The instructions I gave before, about not talking

23     about the case, or allowing anyone to discuss it with you or in

24     your presence, or doing any kind of independent research, still

25     applies.  And I'll see you at 9:00 o'clock.

1            (At 5:01 PM, the jury was escorted from the

2        courtroom.)

3            THE COURT:  The witness may stand down, and we'll be

4    in recess until . . . what did I say?  9:00 o'clock.

5            MR. HOCHMAN:  Your Honor, since it might be fresh in

6    your memory, if you want to do it tonight, or first thing

7    tomorrow, to renew the motion?  Since Mr. Futterknecht is done

8    testifying, I could amplify on grounds I have?

9            THE COURT:  Sure.

10           MR. HOCHMAN:  We can let the witness go.

11           THE COURT:  The witness can still stand down.

12           (The witness left the witness box.)

13           MR. HOCHMAN:  Your Honor, again, I'm not focusing on

14   the documents I didn't object to; it's obviously the ones that

15   I did.  But I think what we've learned from Mr. Futterknecht is

16   they got the wrong witness, Your Honor, or at least the witness

17   didn't do the job he should have.  And he admitted it, for

18   instance, with that CAWB, that he has no idea who inputted that

19   information.

20           It may have been the client adviser.  We now know

21   there are multiple client advisors.  It could have been the

22   assistant.  The client manager.  Miss Finley actually brought

23   up one instance when there was a 16-day gap between when there

24   was a client visit on 8/30/2005, and they didn't even input the

25   information into the system until September 15, 2005.  So I

1    think that we have an unqualified witness, who did no efforts,

2    and did no due diligence to get qualified.

3            And 3505 also has an additional division that says,

4    in essence, if the source of the information, or the method or

5    circumstances of preparation, indicate a lack of

6    trustworthiness, then those records can be excluded for that

7    reason alone, Your Honor.  And here again --

8            THE COURT:  I'm sorry, did you say 3505?

9            MR. HOCHMAN:  Yes, Section 3505, which is the

10   certification that they were using to get these in.

11           THE COURT:  Okay.  I'm thinking rules of evidence,

12   and that didn't compute.

13           MR. HOCHMAN:  This is under 18 USC 3505, which is the

14   section that deals with foreign records of regularly conducted

15   activity.

16           And so, Your Honor, I believe that, especially given

17   his admissions, that there's lack of trustworthiness all over

18   the documents.  We know, apparently, that Mr. Luetolf had

19   clients sign documents in blank, which violate their policies.

20   We know that he had -- he filled in with initials, where he

21   should always fill it in with full names.  But again, we don't

22   know what other mistakes he made other than the ones that I was

23   pointing out.

24           And we know that times were not inputted

25   contemporaneously.  I mean Miss Finley, herself, pointed to one

1    that was 16 days later.  We don't know if it was based on

2    notes, an audio conversation, a tape, or just someone's memory.

3    We don't even know who the person is.  He wasn't even able to

4    identify, in those notes in specific, which person is

5    physically entering them into the system.

6            So would I say the combination of all this creates

7    that lack of trustworthiness in these documents, coupled with

8    the fact that that one key element of a business records

9    exception, that you know basically who prepared the document at

10   or near the time of the event, is completely lacking with these

11   specific records.

12           And again, I will more refine the request, as I told

13   Your Honor, to exclude, because they were included in these

14   different exhibit packets, standard bank records; so all I'm

15   talking about, Your Honor, are notes, and e-mails, and what was

16   the subject of the motion in limine.

17           THE COURT:  All right.  Thank you.

18           Ms. Finley?

19           MS. FINLEY:  Thank you, Your Honor.

20           THE COURT:  Hang on half a second, please.

21           All right.  Go ahead, please.

22           MS. FINLEY:  Thank you, Your Honor.  Well, the

23   government, Your Honor, is . . . .  Sorry.  The word I'm

24   looking for has just totally escaped me there.

25           The government is relying on not only the 3505 that

1   lays out that those records, all of them, are made at or near

2   the time, by a person with knowledge, and all -- the other two

3   requirements under the business records, but also supplemented

4   by Mr. Futterknecht's live testimony about how these documents

5   are created, why they're created.  They were created pursuant

6   to not only the bank's rules, but pursuant to the Swiss Law

7   that they're required to maintain them, and that they're

8   required to maintain accurate records.  And I'm not sure why

9   this set of documents, with respect to the e-mails and the

10  correspondence, is any different than account statements or

11  account opening documents such that they have any less

12  trustworthiness, because those documents go hand in hand with

13  the account statements.

14          UBS would not know to transfer money, as

15  Mr. Futterknecht said, unless his client advised them to.  So

16  transfer on an account statement is supported, and further

17  supports the trustworthiness of those records, because the

18  action actually took place.

19          I think, with respect to the document I showed the

20  witness about the 16 days, I think that actually shows the

21  trustworthiness, because he says he was visiting the client;

22  and if he was visiting the client in the United States, perhaps

23  he was meeting with other clients, and he did not get back to

24  Switzerland for two weeks to input the information.  So I don't

25  think that a two-week lag somehow makes that document unworthy.

1           He also testified about the requirements for

2     maintaining the records.  8036 and 11th Circuit case law in

3     United States v. Ross says that the 3505 or foreign record

4     should be treated in the same manner as the 8036 records; and

5     8036 does not require that -- it's not necessary that the

6     person who actually prepared the records testify, nor that it

7     be prepared by the business that has custody of it; and that it

8     is the business practice of the recording entity to obtain the

9     information from persons with knowledge.

10          That's what a bank does.  It obtains information from

11    its clients in order to execute requests by their clients in

12    the business that they are maintaining, which is a bank.  And

13    so those documents are a cornerstone of the bank's ability to

14    conduct its business, and therefore they are reliable and

15    should be admitted pursuant to 8036 and 3505.

16          THE COURT:  All right.  Thank you.

17          Mr. Hochman, you had suggested, at sidebar, yesterday

18    I think, that you were going to file something in writing.

19          MR. HOCHMAN:  Today, Your Honor.

20          THE COURT:  Was that today?

21          MR. HOCHMAN:  Yes.

22          THE COURT:  That you said it today, or you were going

23    to file it today?

24          MR. HOCHMAN:  I said it today, because

25    Mr. Futterknecht finally got testifying about the stuff today.

1          THE COURT:  I guess it just seems like a long time

2    ago.

3          MR. HOCHMAN:  It does, Your Honor.

4          THE COURT:  But in any event, that may actually be

5    helpful.  And you can identify the exhibit, and then which

6    subparts of that.

7          MR. HOCHMAN:  I will do that, Your Honor.

8          THE COURT:  I think I can figure it out by looking at

9    the exhibits, but not always.

10         MR. HOCHMAN:  I think it would be helpful, because

11   we'll focus on -- the government again, to the extent that it's

12   a bank record, and the bank is following it, I understand that.

13   I have already said we are not objecting to a bank-generated

14   record.  It's these conversations within here, that lack any

15   foundation or trustworthiness, that I am objecting to.  I

16   think, if I highlight those, Your Honor, you will at least be

17   able to see our point better.

18         THE COURT:  All right.  As I said, I think that would

19   be helpful too.

20         MR. HOCHMAN:  Very good.  I'll get that done.

21         THE COURT:  If you could get that to me sooner,

22   rather than later, obviously.

23         MR. HOCHMAN:  I'll try to get it to you, if not

24   tomorrow, certainly by Thursday.  Oh.  Tomorrow is Thursday.

25         THE COURT:  See, you were going to fool me.  Because

1    I didn't pick up on that.

2            MR. HOCHMAN:  Time is slipping away, Your Honor.

3    I'll get it to you by Friday.

4            THE COURT:  That's fine.

5            We have another note from the jury.  This is from

6    Rebecca Davis.  Who is Juror Number 10.  It says, "I have some

7    general knowledge of Mr. Flischel, who was in business with

8    Mr. Murtha.  I thought I should bring it to the Judge's

9    attention.  This is very general knowledge.  I have had some

10   personal contact with them."  And then it's signed by

11   Ms. Davis.

12           So may I suggest that, first thing in the morning, we

13   have Ms. Davis come out individually, and find out just . . .

14   the specifics of what it is she is talking about.

15           MR. HOCHMAN:  Yes, Your Honor.

16           MS. FINLEY:  Yes, Your Honor.

17           THE COURT:  All right.  We'll be in recess.

18                   -- -- -- -- -- -- -- --

19           (At 5:11 o'clock, a.m., court was recessed, to be

20       reconvened at 9:00 a.m., on Thursday, October 10, 2013.)

21                   -- -- -- -- -- -- -- --

22

23

24

25