```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                    FORT MYERS DIVISION

 3              CASE NO.:  2:13-CR-72-FtM-29UAM

 4   _____

     THE UNITED STATES OF AMERICA,
 5
                   Plaintiff,
 6                                       Fort Myers, Florida
     vs.                                 October 10, 2013
 7
     PATRICIA LYNN HOUGH,                    9:00 a.m.
 8
                   Defendant.
 9   _____

10          TRANSCRIPT OF JURY TRIAL, DAY THREE

11      HELD BEFORE THE HONORABLE JOHN E. STEELE
             UNITED STATES DISTRICT COURT JUDGE
12
                    A P P E A R A N C E S
13

14   FOR THE UNITED STATES:    U.S. Department of Justice
                                 Tax Division
15                             P.O. Box 813
                               Washington, DC  20044
16                             BY:  CARYN FINLEY, ESQ.

17                             U.S. Department of Justice
                                 Tax Division
18                             Suite 7334
                               601 D Street NW
19                             Washington, DC
                               BY:  MARGARET LEIGH KESSLER, ESQ.
20

21
                    (Appearances Continue on Following Page)
22

23

24

25
```

```
 1                    A P P E A R A N C E S
                 (Continued From Previous Page)
 2

 3   FOR THE DEFENDANT:       Bingham McCutchen, LLP
                              The Water Garden
 4                            1601 Cloverfield Boulevard
                              Suite 2050 North
 5                            Santa Monica, CA  90404-4082
                              (310) 904-1000
 6                            BY:  NATHAN J. HOCHMAN, ESQ.

 7                            Bruce L. Udolf, PA
                              500 East Broward Boulevard
 8                            Suite 1400
                              Fort Lauderdale, FL  33394
 9                            (954) 858-8831
                              BY:  BRUCE L. UDOLF, ESQ.
10
     REPORTED BY:        JEFFREY G. THOMAS, RPR-CP, CRR
11                       Official Federal Court Reporter
                         United States Courthouse
12                       2110 First Street, Suite 2-194
                         Fort Myers, FL  33901
13                       (239) 461-2033

14
                              *  *  *
15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2    October 10, 2013                                  Vol.      Page

3    Preliminary Discussions                             3         8

4                              – – –

5                     GOVERNMENT'S WITNESSES

6    WITNESS              DIRECT    CROSS    REDIRECT RECROSS VOIR DIRE
                          Vol. Pg. Vol. Pg. Vol. Pg. Vol. Pg. Vol. Pg.
7
     THOMAS MURTHA          3   11   3   39   3   82   3   90
8
     MARIO DECASTRO         3   93   3  124   3  155   3  160
9
     JERRY SCHNEIDER        3  162   3  236   3  264
10
                              – – –
11
                     GOVERNMENT'S EXHIBITS
12
                                                      Vol.      Page
13
     Government's Exhibit 5J Admitted in Evidence        3        22
14
     Government's Exhibit 5H Admitted in Evidence        3        28
15
     Government's Exhibit 5I Admitted in Evidence        3        29
16
     Government's Exhibits 5E and 5F Admitted in         3        33
17       Evidence

18   Government's Exhibit 8B marked for                   3        95
         identification
19
     Government's Exhibit 8B Admitted in Evidence        3        99
20
     Government's Exhibit 6B marked for                   3       105
21       identification

22   Government's Exhibit 6B Admitted in Evidence        3       106

23   Government's Exhibit 6C marked for                   3       108
         identification
24

25              (Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

GOVERNMENT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Government's Exhibit 6C Admitted in Evidence | 3 | 109 |
| Government's Exhibit 6D Admitted in Evidence | 3 | 112 |
| Government's Exhibit 6F marked for identification | 3 | 115 |
| Government's Exhibit 6F Admitted in Evidence | 3 | 116 |
| Government's Exhibit 6H marked for identification | 3 | 119 |
| Government's Exhibit 6H Admitted in Evidence | 3 | 120 |
| Government's Exhibit 6I marked for identification | 3 | 120 |
| Government's Exhibit 6I Admitted in Evidence | 3 | 121 |
| Government's Exhibit 7II marked for identification | 3 | 164 |
| Government's Exhibit 7DD marked for identification | 3 | 170 |
| Government's Exhibit 8A marked for identification | 3 | 172 |
| Government's Exhibit 8A Admitted in Evidence | 3 | 174 |
| Government's Exhibit 8C marked for identification | 3 | 178 |
| Government's Exhibit 8C Admitted in Evidence | 3 | 179 |
| Government's Exhibit 8D marked for identification | 3 | 180 |
| Government's Exhibit 8E marked for identification | 3 | 181 |

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

GOVERNMENT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Government's Exhibit 8D Admitted in Evidence | 3 | 181 |
| Government's Exhibit 8E Admitted in Evidence | 3 | 182 |
| Government's Exhibit 8I marked for identification | 3 | 188 |
| Government's Exhibit 8J marked for identification | 3 | 190 |
| Government's Exhibit 8J Admitted in Evidence | 3 | 193 |
| Government's Exhibit 8K marked for identification | 3 | 196 |
| Government's Exhibit 8K Admitted in Evidence | 3 | 197 |
| Government's Exhibit 8Q marked for identification | 3 | 202 |
| Government's Exhibit 8Q Admitted in Evidence | 3 | 203 |
| Government's Exhibit 8H Admitted in Evidence | 3 | 205 |
| Government's Exhibit 8FF marked for identification | 3 | 206 |
| Government's Exhibit 8FF Admitted in Evidence | 3 | 207 |
| Government's Exhibit 8DD marked for identification | 3 | 208 |
| Government's Exhibit 8DD Admitted in Evidence | 3 | 209 |
| Government's Exhibit 7EE marked for identification | 3 | 210 |
| Government's Exhibit 8AA marked for identification | 3 | 210 |

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

GOVERNMENT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Government's Exhibit 8AA Admitted in Evidence | 3 | 211 |
| Government's Exhibit 8Y marked for identification | 3 | 212 |
| Government's Exhibit 8Y Admitted in Evidence | 3 | 213 |
| Government's Exhibit 8U marked for identification | 3 | 214 |
| Government's Exhibit 8U Admitted in Evidence | 3 | 215 |
| Government's Exhibit 8N marked for identification | 3 | 218 |
| Government's Exhibit 8N Admitted in Evidence | 3 | 218 |
| Government's Exhibit 8S marked for identification | 3 | 220 |
| Government's Exhibit 8S Admitted in Evidence | 3 | 221 |
| Government's Exhibit 8V marked for identification | 3 | 221 |
| Government's Exhibit 8V Admitted in Evidence | 3 | 222 |
| Government's Exhibit 8O marked for identification | 3 | 224 |
| Government's Exhibit 8O Admitted in Evidence | 3 | 225 |
| Government's Exhibit 8CC marked for identification | 3 | 227 |
| Government's Exhibit 8CC Admitted in Evidence | 3 | 228 |

- - -

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

DEFENDANT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Defendant's Exhibit 40 Admitted in Evidence | 3 | 126 |
| Defendant's Exhibit 78 marked for identification | 3 | 248 and |
| Defendant's Exhibit 78 Admitted in Evidence | 3 | 249 |
| Defendant's Exhibit 79 marked for identification | 3 | 251 |
| Defendant's Exhibit 79 Admitted in Evidence | 3 | 251 |

– – –

| | Vol. | Page |
|---|---|---|
| Court Recessed for the Day | 3 | 272 |

* * *

1     THEREUPON, the above-entitled case having been called to

2  order, the following proceedings were held herein, to-wit:

3                              – – –

4     THE COURT:  Good morning, everyone.

5     Let's have Ms. Rebecca Davis brought in, please.

6     Ms. Davis, we received your note yesterday,

7  indicating that you had some knowledge about Mr. Flischel, who

8  was in business with Mr. Murtha, who is the witness, and you

9  thought you should bring it to my attention.  This is very

10  general knowledge.  I have had some personal contact with them.

11     I am going to ask you to give us a little bit more

12  information if you would, please.

13     JUROR DAVIS:  Well, Englewood is a small town.  I

14  have lived there for many years.  When the names of the

15  witnesses were called, I did not . . . recognize the name until

16  it was tied with the other two.  I do not know the witness, but

17  I thought it was important to note that my husband and I are

18  entertainers, and so our faces are seen a lot.  And so I didn't

19  want it to come up if he recognized me, that doesn't

20  necessarily mean I know him, because I do not know him.

21     THE COURT:  And you'd mentioned that you had some

22  contact with Mr. Flischel?

23     JUROR DAVIS:  Yes.

24     THE COURT:  And what is the nature of that?

25     JUROR DAVIS:  Not business, but in social settings.

1    And as recently as last week I saw his wife.

2         THE COURT:  Anything about that relationship with

3    Mr. Flischel that impacts your ability to judge the credibility

4    of this witness?

5         JUROR DAVIS:  No, sir.

6         THE COURT:  Or the credibility of the case in

7    general?

8         JUROR DAVIS:  No.

9         THE COURT:  Anything else you want to add with regard

10   to this?

11        JUROR DAVIS:  No.  I just wanted to be sure that it

12   was brought up.  Like I said, I was more concerned that

13   somebody would recognize me, and I didn't want it to look like

14   I was keeping that I knew him, because I did not know.

15        THE COURT:  Counsel, any other areas of inquiry you

16   would like me to make?

17        MS. FINLEY:  No, Your Honor.

18        MR. HOCHMAN:  No, Your Honor.  I think that was very

19   good.

20        THE COURT:  All right.

21        Thank you very much.

22        JUROR DAVIS:  Thank you.

23        (Thereupon, Juror Katherine Davis was escorted from

24      the courtroom.)

25        THE COURT:  All right.  Counsel, in the absence of

1    the jury, any issues anyone wants to raise with regard to

2    Ms. Davis?

3              MR. HOCHMAN:  No, other than we note that, at least

4    in our notes, we thought she was an x-ray technician married to

5    an electrician, and we didn't know this thing about the

6    entertainer.

7              THE COURT:  You know, I hadn't remembered knowing

8    that either, but I don't necessarily make the kind of notes you

9    do.

10             MR. HOCHMAN:  I don't think it leads itself

11   necessarily to any more questions, I just note that if -- if

12   for some reason she comes back up at some point in the future,

13   if we could ask a few more questions about what her

14   entertainment background is, or something like that.  But I

15   wouldn't actually pull her back in for that, Your Honor.

16             THE COURT:  I almost asked her that, but I didn't

17   want to be nosey, because I didn't remember that information

18   before.  All right.  I don't see any reason to doubt her

19   ability to be fair at this point.

20             MR. HOCHMAN:  I agree, Your Honor.

21             THE COURT:  And I assume the government has no

22   different position?

23             MS. FINLEY:  No, Your Honor.

24             THE COURT:  Both sides ready for the jury?

25             MS. FINLEY:  We are, Your Honor.

1          MR. HOCHMAN:  Yes, Your Honor.  I'm sorry.

2          THE COURT:  Have the jury step in, please.

3          (At 9:09 AM, the jury was escorted into the

4     courtroom.)

5          THE COURT:  If you'd have Mr. Murtha come back to the

6     witness chair, and you may proceed.

7          MS. FINLEY:  Thank you, Your Honor.

8          Could we may be get the screen all the way down, and

9     the . . . .

10          THE COURT:  I think we can.

11          (The witness resumed the witness chair.)

12          MS. FINLEY:  Your Honor, may I approach the witness?

13          THE COURT:  You may, freely.

14          MS. FINLEY:  Thank you.

15                         THOMAS MURTHA,

16     having been recalled as a witness by the Government, and

17     having been previously called as a witness and duly sworn,

18     was examined and testified as follows:

19                       DIRECT EXAMINATION

20     BY MS. FINLEY:

21     Q     Mr. Murtha, I'm handing you a stack of exhibits, 1A

22     through 1H, and 1T through 1Y, that have already been admitted

23     into evidence.

24          Now, if you'd take a look at the first exhibit, 1A, do

25     you recognize that document?

1   A      Well, it's signed . . . .  The preparer's signature is

2   Raymond Flischel, so it would come from the Flischel,

3   Townsend & Murtha firm, which it is labeled as such.

4          MS. FINLEY:  Madam Clerk, I'm sorry, could I have the

5   projector on?

6          THE COURTROOM DEPUTY:  I thought I did.  There it is.

7          MS. FINLEY:  Thank you.

8   BY MS. FINLEY:

9   Q      And if we can turn to the second page of the exhibit,

10  which is really the first page of the tax return, whose tax

11  return is this for?

12  A      Patricia Hough.

13  Q      And what year is it for?

14  A      2001.

15  Q      And as you said, on the second page, under preparer,

16  someone else at your firm prepared the tax return?

17  A      That's correct.

18  Q      And that was Mr. Flischel?

19  A      That's correct.

20  Q      And just -- you inherited Dr. Hough and Dr. Fredrick as

21  clients from Mr. Flischel?

22  A      That's correct.

23  Q      If we could turn to Page 5 of the exhibit, and in the

24  bottom left-hand corner there are little numbers down there

25  that say Page 5, and it's the Schedule B.

1    A      I have it.

2    Q      And at the bottom part of Schedule B, in 2001, did

3    Dr. Hough report that she had interest in, or a signature

4    authority over, a financial account in a foreign country?

5    A      No.

6    Q      And did she state whether she received a distribution

7    from, or were the grantor of, or a transfer to, a foreign

8    trust?

9    A      The question is answered no.

10   Q      Now, if we could turn to Exhibit 1B, and again if we

11   could turn to the second page of the exhibit, whose tax return

12   is this?

13   A      Patricia Hough.

14   Q      And what year is it for?

15   A      2003.

16   Q      And if we turn to the third page, did you prepare this

17   tax return?

18   A      Yes, I did.

19   Q      And if we turn now, again, to the Schedule B, for -- can

20   you tell me is there a Schedule B on this tax return?

21   A      I don't see a Schedule B included in the return.

22   Q      Now, if we turn back just briefly to the first page of

23   the tax return, under Line 8A, is that where an individual

24   would report taxable interest?

25   A      That's correct.

1   Q      And so if you had interest income from a bank account,

2   or any other type of interest income you might earn, like from

3   an escrow account or a mortgage, or things like that?

4   A      That's correct.

5   Q      Now, if you know, do banks normally issue what's called

6   a Form 1099 for your interest income?

7   A      Yes, they do.

8   Q      And do you know whether banks provide that information

9   to the Internal Revenue Service?

10  A      Yes, they do.

11  Q      And do you know, on Line 8A, where it says, "Attach

12  Schedule B if required," what the "if required" is?

13  A      There was a threshold during that year that required the

14  Schedule B, and I don't recall right now what that threshold

15  was.

16  Q      And if you didn't . . . did not meet that threshold, so

17  say if the threshold here was less than $1,075, but you did

18  have a foreign bank account, would you still have to attach a

19  Schedule B to your tax return?

20  A      I believe you were supposed to.

21  Q      If we move to Exhibit 1C, and if we turn to the second

22  page, is this the 2004 tax return for Patricia Hough?

23  A      That's correct.

24  Q      And again, on the second page, did you prepare this tax

25  return?

1   A       Yes, I did.

2   Q       And if we can turn to Page 5, which is the Schedule B,

3   and . . . does Dr. Hough report whether she had interest in, or

4   signature authority over, a financial account, such as a bank

5   account or a securities account, or other financial account?

6   A       No.

7   Q       Now, if we can move to Exhibit 1D, is this the 2005 tax

8   return for Patricia Hough?

9   A       Yes, it is.

10  Q       And again, did you prepare it, on the second page?

11  A       Yes, I did.

12  Q       And on all of these tax returns -- and we can go back

13  and look if you need to -- do you see that Dr. Hough signed the

14  tax return?

15          (The witness examines an exhibit.)

16  A       I believe she did, yes.

17  Q       And just above her signature, does an individual sign a

18  tax return under penalties of perjury?

19  A       (Examining exhibit) Well, there's a statement.  Should I

20  read it?

21  Q       Sure.

22  A       Under penalties of perjury; yes, it does.  That's

23  correct.

24  Q       That's just above her signature?

25  A       That's correct.

1   Q      If we can turn, now, to the Schedule B which is on

2   Page 5, on the 2005 tax return, did Dr. Hough report whether

3   she had an interest in, or signature authority over, a

4   financial account in a foreign country?

5   A      She did not.

6   Q      Now, if Dr. Hough had had interest income from a foreign

7   account, where on her tax return would she have reported that?

8   A      On Schedule B.

9   Q      And then would that have then been carried over to

10  Line 8A, on the front of the tax return?

11  A      That's correct.

12  Q      And if she had interest income from a foreign bank

13  account that was not reported on this tax return, would that

14  have increased or decreased her total income on her tax return?

15  A      It probably would have increased the income -- the total

16  income.

17  Q      And if you could tell the jury, where is the total

18  income line on the tax return?

19  A      Line 22 on Page 1.

20  Q      Now, are you familiar with an entity named Round Hill

21  Holding Company?

22  A      Can you repeat that name?

23  Q      Sure.  Round Hill Holding Company.

24  A      I don't believe I've heard of that.

25  Q      Did Patricia Hough tell you that, in 2005, she sold

1   shares in a company named Round Hill Holding Company, that she

2   was the 50 percent shareholder in?

3   A       I don't recall that.

4   Q       Would you have wanted to know that information in

5   preparing her tax return?

6   A       If it was a taxable sale, yes.

7   Q       And if she had gain on the sale of the shares, should

8   she have recorded that on her tax return?

9   A       I believe so.

10  Q       And would that gain have increased or decreased her tax

11  due and owing?

12  A       It could possibly have increased the tax due.

13  Q       Now, if we look at Exhibit 1E, 2000 -- or for the tax

14  year 2005, did you prepare an amended individual income tax

15  return?

16  A       Yes, I did.

17  Q       And could you explain to the jury what -- why this was

18  prepared?

19  A       Well, there's an explanation for the -- on Page 2 of the

20  1040 CPA.  It says:

21          "Taxpayer inadvertently omitted a sale of investment

22  property when the return was originally filed.  Schedule D,

23  reporting this sale, is attached to this amended return."

24  Q       So a taxpayer, if they forget something, could come back

25  and tell you, and you would include it on an amended return?

1   A     That's correct.

2   Q     Now, if we can turn to Exhibit 1F . . . and again, is

3   this the 2006 tax return for Patricia Hough?

4   A     Yes, it is.

5   Q     And again, do you prepare this tax return?

6   A     Yes, I did.

7   Q     And if we can turn to the Schedule B, does this tax

8   return have a Schedule B?

9   A     I don't see a Schedule B.

10   Q     And again, if we turn back to the first page, on

11   Line 8A, how much taxable interest did Dr. Hough report in

12   2006?

13   A     $910.

14   Q     And so, again, that same "attach Schedule B if required"

15   note is there.

16         Is it likely that the $910 then fell under that

17   threshold?

18   A     I believe it did.

19   Q     And again, if Dr. Hough had signature authority or an

20   interest in a foreign account, would she still have to file a

21   Schedule B and report that to the IRS?

22   A     I believe so.

23   Q     Now, did Doctor . . . do you know whether Dr. Hough was

24   providing services to Saba for investigation of a school in

25   China?

1   A      I don't have any knowledge of that.

2   Q      And if Dr. Hough provided consulting services to Saba

3   for a project in China, would that be something she would have

4   to report on her tax return?

5          MR. HOCHMAN:  Objection, improper hypothetical, lack

6   of foundation.

7          THE COURT:  Overruled.

8          MS. FINLEY:  You can answer the question.

9          THE WITNESS:  I'm sorry.  Could you repeat it?

10         MS. FINLEY:  Sure.

11  BY MS. FINLEY:

12  Q      If Dr. Hough received compensation for consulting

13  services for . . . investigating, or looking into a school in

14  China, is that something that she would have had to report on

15  her tax return?

16  A      Yes.

17  Q      And do you know where on your tax return you would

18  report that?

19         Are there different places on the tax return you might

20  report it?

21  A      Well, it's possible you might put it under other income

22  on Line 21.  More than likely it would be on Line 13, business

23  income.

24  Q      If we can turn to Exhibit 1G . . . this is the 2007 the

25  Form 1040 for Dr. Hough.

1          And again, did you prepare this tax return?

2    A      Yes, I did.

3    Q      And when -- when does it say that you signed this tax

4    return?

5    A      On April 8th, 2008.

6    Q      And if you can tell, can you tell when Dr. Hough signed

7    the tax return, or what the date is?

8    A      Looks like April 10th of 2008.

9    Q      And if you can take a look in that tax return, is there

10   a Schedule B attached?

11   A      Yes, there is.

12   Q      And what page is that on?

13   A      It's Page 4 of the . . . of the return.

14   Q      And that's Page 5 of the exhibit?

15   A      Page 5 of the exhibit.

16   Q      And again, did Dr. Hough, in 2007, report to the

17   Internal Revenue Service whether she had an interest in, or

18   signature authority over, a foreign account -- financial

19   account in a foreign country?

20   A      No.

21   Q      If Dr. Hough -- I think you testified yesterday that you

22   understood Dr. Hough had some relationship to these medical

23   schools; is that correct?

24   A      Yes.

25   Q      And did she -- did she own the medical schools?

1    A       Not to my knowledge.

2    Q       And if Dr. Hough had told you that she owned the medical

3    school, and in 2007 she sold the medical schools for

4    $37 million, how would you account for that on the tax return?

5    A       Probably in the capital gains or losses area, but there

6    are other possibilities too.

7    Q       And would Dr. Hough get certain offsets if she

8    contributed money toward the creation of the school?

9    A       That would -- that would be part of the basis that she

10   would be able to deduct from the proceeds.

11   Q       And if Dr. Hough had sold this school for $37 million

12   and reported that on her tax return, would that have increased

13   or decreased her total income on Line 22?

14   A       It would have increased the total income.

15   Q       And would that have increased or decreased her tax due

16   and owing?

17   A       It would have increased the tax.

18   Q       Now, if we can just turn to Exhibit 1H . . . is this the

19   2008 tax return for Patricia Hough?

20   A       Yes, it is.

21   Q       And when was this tax return prepared?

22   A       It shows April 3rd of 2009.

23   Q       Again, that's your signature at the bottom?

24   A       Yes, it is.

25   Q       And if we turn to Page 5, on the Schedule B, does

1    Dr. Hough report an interest in, or signature authority over, a

2    financial account in a foreign country?

3    A       No.

4    Q       Now, if we can turn briefly to Exhibit 1H -- sorry.  I'm

5    going to give you another exhibit.

6              MS. FINLEY:  Sorry, Your Honor.

7              Your Honor, may I approach?

8              THE COURT:  You may.

9    BY MS. FINLEY:

10   Q       I'm going to show you what's been marked as Government's

11   Exhibit 5J --

12             MS. FINLEY:  -- which the government would offer into

13   evidence at this time.

14             MR. HOCHMAN:  One moment?

15             (Mr. Hochman reviews various documents.)

16             MR. HOCHMAN:  May I have a moment with counsel, Your

17   Honor?

18             THE COURT:  You may.

19             (Mr. Hochman and Ms. Finley confer privately.)

20             MR. HOCHMAN:  I'm sorry, Your Honor.  No objection

21   to 5J.

22             THE COURT:  All right.  5J will be admitted.

23             (Government's Exhibit 5J was admitted into evidence.)

24             MS. FINLEY:  Permission to publish, Your Honor?

25             THE COURT:  You may do so.

```
 1              (An exhibit was projected onto the projector screen.)
 2    BY MS. FINLEY:
 3    Q     So in 5J, can you tell the jury what this document is?
 4    A     It looks like an e-mail that I received from Dr. Hough.
 5    Q     And . . . what date is the e-mail?
 6    A     Looks like January 7th of 2008.
 7    Q     And is there anyone cc'd or copied in the e-mail?
 8    A     David Fredrick.
 9    Q     And if you could read the e-mail to the jury?
10    A     "Hi Tom.  New Year greetings and hope that you and Pat
11    had a wonderful time climbing those mountains out West.  Dave
12    and I each need to make a SEP contribution to VALIC for this
13    year.  My gross income is 168K, as an independent contractor.
14    Dave's income is 144K, and the corporation pays for the
15    apartment in Gardner, 12,000 per year, that is considered part
16    of his gross income.  He is an independent contractor.  Can you
17    give us a ballpark figure for each of us so we can send it to,
18    VALIC by January 15th?
19              "Also, should I pay anything on January 15th, as my
20    income should be the same for 2009?"
21    Q     Is this an example of a type of communication that you
22    received from Dr. Hough on preparing her tax return?
23    A     It's not normally how . . . how we prepared the return,
24    but occasionally I've had e-mails.
25    Q     And she would e-mail you, or provide other information
```

1   in writing?

2   A      Usually, yes.

3   Q      Now, I am going to ask you if you can look at

4   Exhibit 1T . . . and would you tell the jury what this document

5   is?

6   A      It's a U.S. individual income tax return for David

7   Fredrick.

8   Q      And what year is it for?

9   A      2003.

10  Q      And in looking at this tax return, can you tell whether

11  Dr. Fredrick reported financial interest in, or signature

12  authority over, a foreign income?

13  A      The questions are marked "no," on Schedule B.

14  Q      And Schedule B is also, again, on Page 5 of the exhibit?

15  A      Correct.

16  Q      And if you can turn to Page 6 -- I'm sorry.

17         If we can turn to Exhibit 1U --

18             MR. HOCHMAN:  I'm sorry?

19             MS. FINLEY:  1U.

20  BY MS. FINLEY:

21  Q      And is this the 2004 tax return for David Fredrick?

22  A      Yes, it is.

23  Q      And again, did you prepare this tax return?

24  A      Yes, I did.

25  Q      And is there -- if we can turn to Page 5, in 2004, did

1   Dr. Fredrick report whether he had an interest in, or signature

2   authority over, a financial account -- or securities account in

3   a foreign country?

4   A      No, he did not.

5   Q      And if you can turn to Page 6, you used that term

6   "capital gains" a couple of questions back.

7          Can you explain to the jury what you would report on

8   this form, the Schedule D?

9   A      Sure.  Certain business and investment income items are

10  reported on Schedule D, which is capital gains and losses.  And

11  what's reported is the sale, say, of a security.  If you sold,

12  say, IBM, sold a hundred shares for five thousand dollars, you

13  would report that as the . . . the sales price, and then you

14  would have the opportunity to include the basis, which means

15  what you paid for the item, or the stock, or the investment,

16  and the difference between the proceeds and the basis would be

17  your gain or loss on the item.

18  Q      So in 2004, did Dr. Fredrick report that he had

19  long-term capital gains or losses?

20  A      Yes, he did.

21  Q      And on Line 8, it looks like Medical Universities of the

22  Americas, with the letter B next to that?

23  A      Correct.

24  Q      Do you remember what that was for?

25  A      I believe he had stock in that . . . company.

1    Q       That he sold?

2    A       I believe so.

3    Q       And the Schedule D also requires you to put the date

4    that it's acquired and the date that it's sold?

5    A       That's correct.

6    Q       And if we turn now to Exhibit 1V . . . and is this the

7    2005 tax return for David Fredrick?

8    A       That is correct.

9    Q       And again, is there a Schedule B on this tax return, on

10   Page 5?

11   A       Yes, there was.

12   Q       And does Dr. Fredrick, in 2005, report to the IRS

13   whether he has an interest in, or signature or other authority

14   over, a financial account in a foreign country?

15   A       No.

16   Q       And if we turn to Page 7, in 2007 -- sorry -- in 2005,

17   did Dr. Hough sell additional stock in Medical Universities of

18   the Americas?

19           MR. HOCHMAN:  Objection.  Wrong foundation for this

20   exhibit.  Dr. Hough didn't sell anything on David Fredrick's

21   tax return.

22           MS. FINLEY:  I apologize if I -- I will rephrase the

23   question, Your Honor.

24           THE COURT:  The objection is sustained.

25           You may do so.

1    BY MS. FINLEY:

2    Q      On Dr. Fredrick's tax return, does he report that he

3    sold stock in Medical Universities of the Americas?

4    A      Yes.

5    Q      And if we can turn -- does -- the B doesn't appear on

6    that Line 8, does it, like it did in the previous exhibit?

7    A      There's a dash.

8    Q      Right.  And if we look back at Exhibit 1U, the

9    Schedule D in that year, if we can put them side by side, are

10   these different, at least stock that he held for different

11   amounts of time?

12   A      Yes.

13   Q      So now, if we can turn to 1W, is this Dr. Fredrick's

14   2006 Form 1040?

15   A      That's correct.

16   Q      And again, did you prepare this tax return?

17   A      Yes, I did.

18   Q      And on Page 5, on the Schedule B, does Dr. Fredrick

19   report whether he has an interest in, or signature authority

20   over, a foreign income?

21   A      No.

22   Q      Now, again, if Dr. Fredrick had interest income from a

23   foreign account, or signature authority, he would have reported

24   that in one of those boxes?

25   A      Yes.

1  Q      And the interest income would be carried forward, if he

2  had it, onto Line 8A?

3  A      That's correct.

4  Q      If we can turn to Exhibit 1X . . . and this is the 2007

5  Form 1040, for Dr. Fredrick?

6  A      That's correct.

7  Q      And on the second page, when did you prepare this tax

8  return?

9  A      April 8th, 2008.

10  Q      And on Page 5, did Dr. Fredrick report whether he had an

11  interest in, or signature authority over, a foreign account?

12  A      No.

13         MS. FINLEY:  Now, if we can turn back to Page 4,

14  which is the Schedule A, itemized deduction, and I'm going

15  to . . . .  Sorry.  I'm going to hand you what's been marked as

16  Exhibit 5H.

17         Your Honor, the government would offer 5H into

18  evidence at this time.

19         MR. HOCHMAN:  No objection, Your Honor.

20         THE COURT:  5H will be admitted.

21         (Government's Exhibit 5H was admitted into evidence.)

22         MS. FINLEY:  And I apologize, I'm also going to offer

23  Exhibit 5I.

24         MR. HOCHMAN:  No objection, Your Honor.

25         THE COURT:  5I will be admitted.

1              (Government's Exhibit 5I was admitted into evidence.)

2       BY MS. FINLEY:

3       Q      So, on Dr. Fredrick's 2007 Form 1040, how much does it

4       say that his gifts to charity were?

5       A      210,525.

6       Q      And would you have received information from either

7       Dr. Fredrick or Dr. Hough, in order to put that number on the

8       tax return?

9       A      Yes.

10      Q      Now, if we can turn to Exhibit 5H . . . do you recognize

11      this document?

12      A      I believe I do.

13      Q      And what is this?

14      A      This is information given to me about donations.

15      Q      Who gave it to you?

16      A      I'm not sure, but it says "Hough Donations" on the

17      title.

18      Q      And does it say that there were donations -- there are

19      donations in 2000 -- or do you know what year it is, based on

20      the document?

21      A      I don't think I see the year here anywhere.

22      Q      All right.  And if we look at Exhibit 5I, can you tell

23      the jury what this is?

24      A      Looks like an acknowledgment . . . .  Actually, it's a

25      donation, looks like by Pat Hough . . . to Phillips University.

1   Q     And how much is it for?

2   A     $100,000.

3   Q     And what year was it in?

4   A     2007.

5   Q     And if we look at Exhibit 5H, is there a 100,000-dollar

6   donation noted to Phillips University?

7   A     Yes, there is.

8   Q     Now, on the top of -- above the $255,000, there's some

9   handwriting.

10        Do you recognize that handwriting?

11  A     Yes, I do.

12  Q     And whose handwriting is it?

13  A     That would be my handwriting.

14  Q     And what does that say?

15  A     It looks like it says:  "Pat, 55,000; Dave, 200,000."

16  Q     Okay.  And so who would have told you that information?

17  A     Pat or Dave.

18  Q     And if we look back at the 2007 Schedule A, do you know

19  whether that $210,000 . . . that that number, that 200,000, is

20  contained in there?

21  A     I'm sorry.  Could you repeat that?

22  Q     Sure.  On the Schedule A for Dr. Fredrick in 2007, he

23  reported $210,525 in gifts by cash or check.

24  A     Correct.

25  Q     Would you have used that information you obtained from

1    Dr. Fredrick and Dr. Hough in order to allocate the monies to

2    his tax return versus hers?

3    A      Probably.  I don't have a direct memory of doing this,

4    so . . . .

5    Q      Would you have just decided on your own how to

6    allocate --

7    A      No.

8    Q      Now, in 2007, if Dr. Fredrick owned the Saba Foundation,

9    should he have reported that -- and he sold it, should he have

10   reported that on his tax return?

11   A      If he owned the Saba Foundation, you said?

12   Q      Right.

13   A      Yes.

14   Q      And would that -- if he sold the Saba Foundation for

15   $37 million, would it have increased or decreased his total

16   income?

17   A      It would have increased his total income.

18   Q      Would it have increased or decreased his tax owing?

19   A      It would have increased his tax owing, if there was a

20   gain.

21   Q      Now, if Dr. Fredrick or Dr. Hough owned shares of a

22   foundation or an entity in another name, would that still have

23   to be reported on their tax return?

24   A      I don't know.

25   Q      If Dr. Fredrick and Dr. Hough came to you and told you

1    that they owned shares in an entity in another name, what would

2    you have done?

3    A       I probably would have asked more questions to determine

4    if there was income or . . . you know, what was involved.  But

5    if that was a foreign entity, I probably would have tried to

6    find some . . . body who deals with those kinds of tax issues.

7    Q       And if Dr. Fredrick had owned property in the name of

8    Round Hill Holding Company, and sold that property, should he

9    have reported it on his tax return?

10   A       I believe so.

11   Q       If he had a gain?

12   A       If he had a gain.

13   Q       And would that have increased or decreased his total

14   income?

15   A       If he had a gain, it would have increased his total

16   income.

17   Q       And if he had a gain, would it have increased or

18   decreased his tax owing?

19   A       It would have increased his tax.

20   Q       Now, if we look at Exhibit 1Y, is that Dr. Fredrick's

21   2008 Form 1040?

22   A       Yes, it is.

23   Q       And on Schedule B, Page 5, did he report an interest in,

24   or a signature authority over, a financial account in a foreign

25   country?

1    A       No, he does not.

2              MS. FINLEY:  Sorry.  One moment, Your Honor.

3              (Ms. Finley confers with Ms. Kessler privately.)

4              MS. FINLEY:  Your Honor, at this time the government

5    would offer Exhibit 5E and 5F into evidence.

6              MR. HOCHMAN:  No objection, Your Honor.

7              THE COURT:  Exhibit 5E and F will be admitted.

8              (Government's Exhibits 5E and 5F were admitted into

9         evidence.)

10   BY MS. FINLEY:

11   Q       Just before we move on, if we could go back just briefly

12   to Dr. Fredrick's 2007 tax return, and the Schedule A --

13   actually, let's look briefly at the first page.

14             (An exhibit was projected onto the projector screen.)

15   BY MS. FINLEY:

16   Q       How much was Dr. Fredrick's adjusted gross income in

17   2007, that was reported on the return?

18   A       It was 688,534.

19   Q       That's his total income?

20   A       That's the total income on Line 22.

21   Q       And on Line 37, how much was his adjusted gross income?

22   A       652,354.

23   Q       And if we turn to the second page, do you deduct off of

24   your adjusted gross income your Schedule A itemized deductions?

25   A       Correct.

1   Q       And that reduces the tax due and owing?

2   A       That's correct.

3   Q       And if we can look at Dr. Hough's 2007 individual income

4   tax return -- sorry -- 1G . . . what is Dr. Hough's total

5   income in 2007?

6   A       133,069.

7   Q       And her adjusted gross income?

8   A       $102,079.

9   Q       If we turn to the second page, her -- after her itemized

10  deductions -- thank you -- what is her total . . . .   Sorry.

11              (Ms. Finley confers Ms. Kessler privately.)

12  BY MS. FINLEY:

13  Q       What is her taxable income on Line 43?

14  A       50,627.

15  Q       So was it more advantageous for Dr. Fredrick to take the

16  charitable donation on his tax return than on her tax return?

17  A       Yes.

18  Q       And if Dr. Fredrick did not make that charitable

19  donation, whose -- but Dr. Hough did, whose tax return should

20  it have been on?

21  A       The person who made the deduction -- the payment, I

22  believe, or the -- based on the account that it came out of and

23  the title of the account.

24  Q       So if we can move back to Exhibit 5E . . . now, you said

25  earlier that you weren't an international tax expert.

1    A     No, I'm not.

2    Q     And did the issue of Form 5471 ever come up with

3    Dr. Fredrick or Dr. Hough?

4    A     It did.

5    Q     And what was discussed?

6    A     I don't really recall the discussion on it.  I know

7    somebody else prepared it, and I guess I was given a copy, but

8    I didn't have any part in preparing it or . . . I had never

9    seen that form before this.

10   Q     And this memo that's from an individual named David

11   Minchenberg, cc'd -- it's to the files, but it's cc'd to

12   Dr. David Fredrick, that was in your accounting files in your

13   office?

14   A     Yes.

15   Q     And --

16         MR. HOCHMAN:  Just for the record, which exhibit

17   number are we looking at?

18         MS. FINLEY:  I'm sorry.  5E.

19         MR. HOCHMAN:  Thank you.

20   BY MS. FINLEY:

21   Q     And do you know how you got this memo?

22   A     I don't remember.

23   Q     And behind it, and in the following pages, if we turn to

24   Page 2, does it appear, based with on that letter, that this

25   was filed with the IRS?

1   A      Yes, it does.

2   Q      And is it signed by David Fredrick?

3   A      Yes, it is.

4   Q      And then in the remaining pages is the actual form that

5   was reportedly filed with the IRS.

6   A      That's what it looks like.

7   Q      And if we turn to Page . . . Exhibit 5F, did you also

8   have in your files the return receipt that shows this was filed

9   with the IRS?

10  A      (Examining exhibit) That's what I see; yes.

11  Q      Now, after -- this looks like it was December, 2004,

12  based on the memo to the file.

13         In 2005 forward, did Dr. Fredrick or Dr. Hough ever come

14  to you and say:  We need to file a 5471?

15  A      I don't believe so.

16  Q      And if they had told you that they needed to file a

17  5471, or they had ownership in foreign companies, what would

18  you have done?

19  A      I would have advised them to get somebody who knows how

20  to handle that stuff.

21  Q      Would you have advised them not to report that

22  information to the Internal Revenue Service?

23  A      No.  I would have advised them to get . . . some

24  consulting on it, and find out what was required.

25  Q      And in the information that was provided to you by

1    Dr. Hough to prepare her tax returns, was that information

2    provided to you in an organized fashion?

3    A      Yes.

4    Q      And if you can just describe to the jury how, generally,

5    it was provided?

6    A      Well, generally, Dr. Hough would bring in the . . . all

7    the paperwork that had to do with her filing of a tax return,

8    1099 interest, dividends if they existed, her 1099 for her

9    service income from where she worked, and any other items that

10   were applicable to that taxable year, and the deductions.

11   Q      And would she sit there while you prepared the tax

12   return?

13   A      No.  We prepared the tax return afterward.  Generally we

14   would go through the documents and, you know, basically make

15   sure that we had the same documents, or the same income items,

16   that were being reported the year before, or find out why not,

17   and address any new issues that came up.

18   Q      And if Dr. Hough did not provide you information, as

19   your role as the return preparer, would you have known to put

20   something on her tax return if she didn't tell you?

21   A      No.

22               MR. HOCHMAN:  Objection, leading.

23               THE COURT:  Overruled.

24               THE WITNESS:  No -- I'm sorry.  Could you repeat it?

25               MS. FINLEY:  Sorry.

1  BY MS. FINLEY:

2  Q     If a client doesn't tell you information, then you can't

3  put it on the tax return.

4  A     That's correct.

5  Q     And is the tax return only as good as the information

6  provided by the client?

7  A     Yes, it is.

8           MS. FINLEY:  Thank you.

9           Your Honor, I have no further questions.

10           THE COURT:  All right.  Thank you.

11           Mr. Hochman?

12           MR. HOCHMAN:  May I have just a moment to approach

13  sidebar, Your Honor?

14           THE COURT:  Sure.

15                        AT SIDEBAR

16           MR. HOCHMAN:  I apologize, Your Honor.  I need to go

17  to the restroom real quick.  If we could take a five-minute

18  break, that would be great.

19           THE COURT:  Sure.  No problem.

20           Did I say good morning to the jury?

21           MR. HOCHMAN:  I don't know.

22           MS. FINLEY:  I don't know.

23           THE COURT:  I was sitting here thinking I normally

24  try and do that, and I don't remember.  Getting old.

25           Okay.  We'll do that.

1                          IN OPEN COURT

2               THE COURT:  All right.  Those of you standing up,

3       don't sit down.  We're going to take about a ten-minute recess.

4               Again, please do not discuss the case among

5       yourselves, or allow anyone to discuss it with you or in your

6       presence.  About ten minutes.

7               (At 9:53 AM, the jury was escorted from the

8           courtroom.)

9               THE COURT:  All right.  Ten minutes.

10              MR. HOCHMAN:  Thank you, Your Honor.

11              (At 9:53 AM, court was recessed.)

12                          AFTER RECESS

13              (At 10:08 AM, court was reconvened.)

14              THE COURT:  Both sides ready for the jury?

15              MR. HOCHMAN:  Yes, Your Honor.

16              THE COURT:  Have the jury step in, please.

17              Mr. Hochman, you may proceed.

18              MR. HOCHMAN:  Thank you very much.

19                       CROSS EXAMINATION

20      BY MR. HOCHMAN:

21      Q    Mr. Murtha, that I just want to ask you first about a

22      general principle.

23              If you don't own stock in a company, and if that company

24      is sold, you don't have to report any gain; correct?

25      A       That would be correct.

1   Q       Because if it's not your money, it's not your income;

2   correct?

3   A       If you don't have ownership --

4   Q       If you don't have ownership, it is not your income, and

5   you don't have to report it; correct?

6   A       That would be my understanding; yes.

7   Q       If we can go back to your background that we started off

8   with, you said that you had a BA in management?

9   A       Yes, I did.

10  Q       And then you got an MBA from St. John's University?

11  A       In accounting.

12  Q       In accounting.

13          And then you said you had your own tax preparer business

14  from 1987 to 1997; is that correct?

15  A       That is correct.

16  Q       And about how many tax returns do you prepare on average

17  every year?

18  A       The last ten years, probably . . . four to five hundred.

19  Q       Four to five hundred.

20          So times 10, somewhere between 4,000 and 5,000 for the

21  last 10 years.

22          And how about the ten years prior to that, about the

23  same?

24  A       A little bit less; but, yeah, in the thousands.

25  Q       So you have prepared certainly north of 5,000 returns in

1    your life?

2    A      Easily.

3    Q      And those would be individual returns and small business

4    returns?

5    A      Yes, they would.

6    Q      And you said you also got something called a CP -- or

7    you are a CPA.

8           What exactly is that?

9    A      That's a certified public accountant.

10   Q      And how does one become a CPA?

11   A      Well, there are education requirements which include the

12   proper coursework in the undergraduate level, and then what

13   they call the fifth year, which is basically graduate-level

14   courses in accounting and tax.

15          And then you have to pass a rather rigorous exam that's

16   uniform countrywide, CPA exam.

17   Q      And does that exam actually have four parts to it?

18   A      Yes, it does.

19   Q      And the parts deal with practice, theory, law, and

20   auditing; is that correct?

21   A      That's correct.

22   Q      And if you don't pass all four parts, you can't become a

23   CPA?

24   A      You have to pass all four parts to become a CPA.

25   Q      And it takes a number of years, probably, to study up to

1   be qualified to even take the exam; is that correct?

2   A      That would be correct.

3   Q      And even though you -- and you passed the exam; correct?

4   A      Very well; yes.

5   Q      And you became a registered CPA in Florida?

6   A      That's correct.

7   Q      And so notwithstanding the fact that you are a

8   registered CPA that had all that training, you had the MBA from

9   St. John's in accounting, you prepared thousands of returns, do

10  you consider yourself an expert in all aspects of the tax law?

11  A      No, I don't.

12  Q      And why not?

13  A      Well, there's just so much involved that you really,

14  early on, most CPAs who are in public practice and tax end up

15  concentrating in a certain area.  And my area, just because of

16  the demographics here, were basically families and retired

17  people, individual tax returns and small businesses.  So that's

18  where I concentrated my efforts and my studies over the years.

19  Q      And is that also because the tax code is very

20  complicated, and to become a master of every part every it

21  would take . . . more than a lifetime?

22  A      That's probably true.

23  Q      And one of the areas you don't have any expertise, I

24  think you said, is dealing with the reporting requirements for

25  foreign bank accounts; is that correct?

1   A       I don't have any in-depth experience in that.

2   Q       And that's because this area, like a lot of other areas

3   of tax law, is very complicated, ever changing, and filled with

4   regulations; is that correct?

5   A       That's true.

6   Q       Now, your clientele -- did you say your general

7   clientele were retirees and people with pensions; is that

8   correct?

9   A       That was a good percentage of our clientele for the

10  firm, yes, and my clientele.

11  Q       And those clients didn't have foreign bank accounts; is

12  that correct?

13  A       No, they didn't.

14  Q       And, you know, if -- based on your interactions with

15  Dr. Patricia Hough, was she a CPA?

16  A       No.

17  Q       Did she prepare thousands of people's tax returns?

18  A       No.

19  Q       Do you know if she had an MBA -- or did she have an MBA

20  in accounting, to your knowledge?

21  A       Not to my knowledge.

22  Q       She had a medical degree, didn't she?

23  A       That is true.

24  Q       By the way, do you take continuing education classes in

25  tax law and accounting?

1    A      Yes.

2    Q      Do you know if Dr. Hough did?

3    A      I don't know.  But I imagine, the medical field, you

4    have to.

5    Q      And the same would be -- well, the medical field, you

6    would take continuing education in the medical field, but you

7    don't know that Dr. Hough took continuing education in

8    accounting and tax; correct?

9    A      I don't believe so.

10   Q      And you said her tax knowledge was about average; is

11   that correct?

12   A      Yes.

13   Q      And that was the same true with Dr. Fredrick; correct?

14   A      I would say, yes.

15   Q      And Dr. Fredrick, to your knowledge, was not a CPA;

16   correct?

17   A      Not that I know of.

18   Q      He didn't have a MBA in accounting; is that correct?

19   A      Not that I know of.

20   Q      And Dr. Fredrick didn't prepare thousands of tax returns

21   over his lifetime; is that correct?

22   A      Not that I know of.

23   Q      Now, dealing with your new client interviews, you told

24   us, when a new client shows up at your firm, you do an intake

25   interview; is that correct?

1    A       That's correct.

2    Q       We'll call that the new client intake interview.

3            Because at the moment the new client shows up at your

4    firm, you pretty much know nothing about them; correct?

5    A       Correct.

6    Q       In you said you asked a number of questions to find out

7    what type of business or income they have, what type of

8    deductions they may be able to claim, those types of questions;

9    is that correct?

10   A       That's correct.

11   Q       And you said that that initial interview lasts, you

12   know, somewhere along the -- excuse me -- somewhere along the

13   lines of about 30 minutes; is that correct?

14   A       That's correct.

15   Q       And again, the point of that is, you don't have any even

16   documentation, any prior returns in front of you, to compare,

17   as you said, you know, the prior year with the current year for

18   a brand-new client; is that correct?

19   A       That's correct.

20   Q       Now, you also said that, once do you this intake

21   interview, you don't have to repeat the process, year in and

22   year out, and ask all the same questions again, because you

23   have that documentation in your file, and if a client has

24   something new, they can bring it to your attention; otherwise,

25   you don't ask the same questions; is that correct?

1    A      That would be true.

2    Q      And that would be true on whether or not you ask a

3    question on whether or not you have a foreign bank account; is

4    that correct?

5    A      From year to year, yes.

6    Q      So just to be clear, if you asked in a new client intake

7    interview, unless something new came up, you wouldn't repeat

8    that question for the subsequent years' returns; correct?

9    A      Probably not.

10   Q      Now, with respect to when Dr. Patricia Hough and

11   Dr. Fredrick came to see you, you said it was in the 2001/2002

12   time period; correct?

13   A      I believe so; yes.

14   Q      And that wasn't the first time that they had come to the

15   Flischel, Townsend & Murtha firm; is that correct?

16   A      That's correct.

17   Q      In fact, they came into the firm in the late nineties,

18   and their first tax preparer was Ray Flischel; is that correct?

19   A      That's correct.

20   Q      And they had gone to Mr. Flischel, presumably, for a

21   couple of years by the time they ended up with you; is that

22   correct?

23   A      That's correct.

24   Q      So they would have had a file at Flischel, Townsend &

25   Murtha that would have had their prior returns in it; is that

1  correct?

2  A      That is true.

3  Q      And that would be a file that, when they came in to see

4  you, you presumably would have had in front of you in order to

5  be able to compare the prior year with the current year; is

6  that correct?

7  A      That's correct.

8  Q      So when they came in to see you, that was not a new

9  client intake interview, as you've described before; would that

10 be correct?

11 A      That's true.

12 Q      This would have been one of those continuation

13 interviews, that you described, that goes on for subsequent

14 years; is that correct?

15 A      Well, I hadn't done their taxes before, so I probably

16 would have been a little more in depth than normal.

17 Q      A little more, certainly.  You probably would have asked

18 them about the type of business they were in.

19        And I believe you said that they said they were in the

20 business of administering medical schools; correct?

21 A      That's correct.

22 Q      And then they gave you the name of one of the schools,

23 the Saba School of Medicine?

24 A      I believe so; yes.

25 Q      And I believe you also said the other school was the

1    Medical University of the Americas; is that correct?

2    A       I believe so; yes.

3    Q       And you also said, though, that there was a

4    Massachusetts management company that they worked for, that

5    they actually got paid from; correct?

6    A       That's correct.

7    Q       And that was called EIC; is that correct?

8    A       Correct.

9    Q       And EIC would have sent them those things called the

10   1099s.  That would have listed how much it paid them in income

11   for their services every year; correct?

12   A       Correct.

13   Q       Now, since this was not a new client intake interview,

14   it happened in 2001 and 2002, which is probably, what, at least

15   12 years ago, plus or minus, do you -- are you certain whether

16   or not you actually asked them, at that first interview, since

17   you had a file in front of you with their prior returns,

18   whether or not they had a foreign bank account?

19   A       Well, based on the way I did my interviews, I believe I

20   did ask them that question.

21   Q       You -- when you asked a question, you said before, of a

22   new client, and in this case you knew that they were being paid

23   from a Massachusetts company, so my question is:  Are you

24   certain, as you sit here today, about a conversation you had

25   12 years ago, that you asked them whether or not they had

1    foreign bank accounts?

2    A      Well, I can't recall at this moment the exact

3    conversation I had.  I mean, that would be impossible, at least

4    for me.  But the boxes were marked "no," and I know that would

5    have been asked in the interview.

6    Q      Well, the boxes were marked "no" from the prior year,

7    too.  And you said that, in a continuation interview, you

8    wouldn't change -- you wouldn't ask the same foreign-bank

9    question in the subsequent years with boxes marked "no" in the

10   prior year, unless something changed that was brought to your

11   attention; isn't that correct?

12   A      That's correct.

13   Q      So are you certain that, in your first interview, where

14   you had their prior return with boxes marked "no," that you

15   would have asked them the foreign-bank question; are you

16   certain of that?

17   A      I'm certain I would have asked that question.

18   Q      And with respect to that question, assuming you're

19   certain of it, would you have asked them about all foreign bank

20   accounts or some specific foreign bank accounts?

21   A      I would have -- I would have just asked if -- do you

22   have any foreign bank accounts.

23   Q      And would you have asked them, foreign bank accounts

24   related to the islands, where the medical schools were located?

25   A      I probably would have asked the question generally, "Do

1   you have any foreign bank accounts?"

2   Q       And did you ever ask them, with foreign bank accounts,

3   whether or not they had signature authority over those foreign

4   bank accounts?

5   A       I don't believe I did.

6   Q       And the reason you didn't ask them about signature

7   authority is, at the time, you were not aware that there was a

8   separate requirement to report just signature authority of a

9   foreign bank account if you didn't own the foreign bank

10  account; correct?

11  A       I don't remember when we became aware, or . . . .  I

12  wouldn't say we weren't aware.  The question we generally just

13  asked is if they had a foreign bank account . . . of all of our

14  clients, or any of our clients that could have it.

15  Q       And did you ever pull out the return, show them

16  Schedule B, and read them all the lines from Schedule B, while

17  you were having this conversation with them?

18  A       No.

19  Q       And was it your understanding that, "Do you have a

20  foreign bank account," referred to, "Do you have your own

21  personal money in a foreign bank account,"as opposed to just

22  signature authority over a foreign bank account?"

23  A       Could you repeat that?  I'm not sure I . . . .

24  Q       And was it your understanding that, when you said, "Do

25  you have a foreign bank account," that referred to just -- to

1    owning a foreign bank account, having your own personal funds

2    in that foreign bank account, as opposed to just having

3    signature over the foreign bank account and having no financial

4    interest in it?

5    A       That was probably the general thinking.

6    Q       Now, with respect to Schedule B -- actually, let's focus

7    on Schedule B for a moment.

8            You said, before, that there were certain times when you

9    actually don't have to file a Schedule B with respect to a

10   return; is that correct?

11   A       That's correct.

12   Q       And your understanding was, if there was no interest

13   with respect to the Schedule B, or dividends that met the

14   threshold, you didn't have to file that particular return;

15   correct --

16   A       That's correct.

17   Q       -- I mean that particular schedule.

18   A       That's correct.

19   Q       Now, did you ever go over the fact that there was a

20   Part 3, in Schedule B, with Dr. Hough or Dr. Fredrick?

21           And that's the Part 3 that deals with foreign bank

22   accounts.

23   A       Probably not specifically gone . . . pulled out the form

24   and looked at it and said:  Hey, here it is.

25   Q       And did you ever tell them at any point that, "Look,

1    guys, if you don't have interest and you don't have dividends,

2    we need to" –– and then you show them Schedule B, Part 3 –– "we

3    might have to fill out this part"?

4            Did you ever have that conversation with them, ever?

5    A       I don't think so, because I don't think I ever had any

6    knowledge that they had any foreign interest or bank accounts.

7    I never saw that, so I don't think I would have gone that far

8    in depth.

9    Q       Right.  And you never had the signature-authority

10   discussion with them ever; isn't this correct?

11   A       Not that I can recall.

12   Q       Now, if we could turn to . . . what's been marked as

13   Government's Exhibit 1B, I think you might have that in front

14   of you?

15           MR. HOCHMAN:  And if we could put 1B up on

16   the . . . .

17           THE WITNESS:  I don't have it.

18           MR. HOCHMAN:  I'm sorry?

19           THE WITNESS:  I don't have it.

20           MR. HOCHMAN:  Oh.  If I could approach the witness,

21   and approach freely, Your Honor?

22           THE COURT:  You may.

23           MR. HOCHMAN:  Thank you.

24           (Mr. Hochman provides an exhibit to the witness.)

25           (Mr. Hochman and Ms. Finley confer privately.)

1    BY MR. HOCHMAN:

2    Q      All right.  Let's start with 1B.

3           And -- oh, by the way, did you ever tell Dr. Fredrick

4    and Dr. Hough that you didn't have international tax

5    experience?

6    A      I don't think it ever came up.

7    Q      Okay.  So the answer is no --

8    A      No.

9    Q      -- excuse me.  The answer is yes, you never told them

10   that you -- let me put it in the positive:  Is it correct, yes

11   or no, that you never told Dr. Fredrick and Dr. Hough that you

12   lacked international tax experience; correct?

13   A      No, maybe not.  Because there was a time when we had

14   that 57 form that we had here, that . . . at that point I would

15   have said, "Hey, I don't know how to fill this thing out," you

16   know, if it came to that.  So I may have told them at that

17   point.  I can't recall that conversation.

18   Q      Okay.  Did you have any -- did you refer them back to an

19   expert for the 5471?

20   A      No.  They already had somebody.

21   Q      They already had somebody.  They already had an expert

22   that prepared the 5471 for them.

23   A      That's correct.

24   Q      All right.  If we can deal with, starting with

25   Exhibit 1B, and I think Ms. Finley asked you to search for the

1  Schedule B in Exhibit 1B.

2          Do you see it there?

3  A      I don't see in it this one, no.

4  Q      And this is the first tax return -- the 2003 tax return

5  you prepared for Dr. Patricia Hough?

6  A      That's correct.

7  Q      And is it fair to say that, when a taxpayer signs

8  something under penalty of perjury, that they can't possibly

9  know what's in a schedule that's not in their return?

10 A      That's true.

11 Q      And did you have any discussions, that you can recall,

12 with Dr. Hough, telling her that she wasn't going to have a

13 Schedule B in this return?

14 A      No.

15 Q      No, you did not have this discussion.

16 A      No, I did not have that discussion.

17 Q      Thank you.

18         And I'll direct your attention, if I could, to Page 5 of

19 this exhibit.  And on Page 5, if you could focus on the middle,

20 it talks about net profit.

21         Page 5 is what's called a Schedule C; do you see that?

22 A      Yes, I do.

23 Q      And tell the jury briefly what a Schedule C is.

24 A      Well, it's the form where people who are engaged in

25 their own individual businesses, in other words, they don't get

1   a W2 from a company, but rather they work either as a

2   contractor or on their own as sole proprietors, this is where

3   you report your business activity, in that activity.

4   Q     And you see that there's gross receipts listed of

5   152,000?

6   A     That's correct.

7   Q     And Dr. Hough only gave you expenses against that amount

8   for $2,430; is that correct?

9   A     That's true.

10   Q     Percentage-wise, that's less than three percent expenses

11   based on her total amount of gross income; correct?

12   A     That's correct.

13   Q     Is that very conservative, in your estimation, based on

14   preparing thousands of returns, that someone is only going to

15   report about three percent of expenses against their income?

16        MS. FINLEY:  Objection, Your Honor.  Relevance,

17   foundation.

18        THE COURT:  Both objections are overruled.

19        THE WITNESS:  It depends on the business that they're

20   in.  And, you know, some people get paid like just a management

21   fee, and there's no expenses against it.  But $2,000 on 152 is

22   not a lot.

23   BY MR. HOCHMAN:

24   Q     And would you say, generally, that Dr. Hough was someone

25   who was conservative and conscientious about her taxes?

1   A       I would say so.

2   Q       And would you say the same for Dr. Fredrick?

3   A       Yeah, I would say so.

4   Q       If I may turn your attention to Exhibit 1C, which is

5   Dr. Hough's 2004 tax return?

6           And I'd like to -- this is the first tax return that you

7   actually filed a Schedule B for Dr. Hough; correct?

8   A       I'm not sure.  But there is a Schedule B with this

9   return.

10  Q       And this is a return you prepared; correct?

11  A       That's correct.

12  Q       And you prepared the 2003 return that had no Schedule B;

13  correct?

14  A       (Examining exhibit) Okay.  I got it.  Yes, that's

15  correct.

16  Q       So this is the first Schedule B that you prepared for

17  Dr. Hough; is that correct?

18  A       Correct.

19  Q       And we are talking the 2004 return.

20          If you could turn to Page 5, please --

21  A       Okay.

22  Q       -- of the 2004 return, and we can just focus on the

23  bottom, Part 3, for the moment.

24              MR. HOCHMAN:  Your Honor, I am going to do my best to

25  read this for Part 3.

1            And it starts out:  "You must complete this part if

2    you, A, had over $1,500 of taxable interest or ordinary

3    dividends" --

4    BY MR. HOCHMAN:

5    Q      Do you see that?

6    A      I do.

7    Q      -- "or, B, had a foreign account" -- do you see that?

8    A      I do.

9    Q      -- "or, C, received a distribution from, or a grantor

10   of, or a transfer to, a foreign trust."

11          Do you see all that?

12   A      Yes, I do.

13   Q      And if you don't meet one of those three parts, you

14   never need to fill out that particular section, Part 3.

15   A      That's correct.

16   Q      What does it mean to have a foreign bank account?

17          Let me put it differently:  Do you see any definition,

18   anywhere in this return, on what it means to have a foreign

19   bank account?

20   A      No.

21   Q      And if someone was just reading the return, and didn't

22   believe they had a foreign bank account, they would never have

23   to get to Question 7A and 7B; correct?

24   A      I suppose that's correct.

25   Q      So let's go to 7A for a moment . . . let's just assume

58

1    we get to 7A.

2           It says, in 7A:  "At any time during 2004" -- before we

3    get to 7A, I'm sorry -- when we dealt with that little

4    Subsection B, and it says, "have a foreign bank account," it

5    doesn't say, "have a foreign bank account or signature

6    authority over a foreign bank account"; correct?

7    A       That's correct.

8    Q       So conceivably, if all you have is signature authority

9    over a foreign bank account, you never get to 7A and 7B;

10   correct?

11          In other words, if you don't have a foreign bank

12   account, and you only have signature authority over a foreign

13   bank account, you never get to 7A and 7B; correct?

14   A       I suppose so.

15   Q       So let's get to 7A now, for a moment.  It says:

16          "At any time during 2004, did you have an interest in,

17   or signature over, or other authority over, a financial account

18   in a foreign country, such as a bank account, securities

19   account, or other financial account?"

20          Do you see that?

21   A       Yes, I do.

22   Q       But before this question is over, it has some additional

23   words.

24          Can you read those additional words before this question

25   is over?

1    A       "See Page B-2 for exceptions and filing requirements for

2    Form TDF90-22.1."

3    Q       Ah.  So there are some exceptions to this statement that

4    would apply, that may mean that you can answer no; correct?

5    A       That's correct.

6    Q       And B-2, let me -- I think we're on Schedule B.  I'm

7    looking through, I see C, I see D, I see E, I see an SE, I see

8    the alternative minimum tax.

9            Where is B-2?

10   A       I don't know what B-2 is --

11   Q       You've prepared returns since 1987, thousands of

12   returns, that all have presumably, at some point, some of them

13   at least, Schedule B.

14           And this statement says, "See Page B-2," and you don't

15   know where B-2 is?

16   A       There must be an instruction page or something, because

17   I don't . . . .

18   Q       That's a guess, isn't it --

19   A       Yes, it is.

20   Q       -- that's a guess at this point?

21   A       It is.  I don't know what it is.

22   Q       And Dr. Hough obviously didn't have the level of

23   experience that you have preparing returns; correct?

24   A       That's correct.

25   Q       And as you sit here today, can you tell us what the

1    exceptions that are referred to in B-2 are?

2    A     I don't know, offhand, what they are.

3    Q     And if those exceptions apply, the answer "no" could be

4    the right answer; correct?

5    A     That's correct.

6    Q     And then look at 7B, if you could.  It says, only if you

7    answer 7A "yes," do you have to enter the name of the foreign

8    country.

9          Do you see that?

10   A     Yes.

11   Q     So if you answered -- if the answer to 7A is correct to

12   be "no," you never get to 7B; correct?

13   A     That's true; correct.

14   Q     And if we could turn the page to Page 6, we're going to

15   put Page 6 up there, and if I could focus you on the middle,

16   again, Dr. Hough relates gross receipts from her business as a

17   psychiatrist of 144,000.

18         And her expenses are $4,474, again roughly less than

19   3 percent; correct?

20   A     That's correct.

21   Q     All right.  If I can now turn your attention to

22   Exhibit 1D, like in "David."  And . . . actually, if you could

23   go to Line 28 of 1D.  If we could focus on Line 28 for a

24   moment?

25         I see the amount that's entered into this self-employed

1    SEP simple and qualified plans; do you see that?

2    A      Yes, I do.

3    Q      I remember what Dr. Hough sent you, that you read it

4    before, that typed-out instruction that asked about what she

5    should do and put into her SEP plan, her SEP IRA plan.

6           Is that what this is referring to?

7    A      Yes.

8    Q      And is that a type of retirement account that

9    self-employed people can have?

10   A      That's correct.

11   Q      And that's completely legitimate; correct?

12   A      Yes.

13   Q      Now, by the way, the penalty of perjury line, on Page 2

14   here, did you ever take out the return, read this penalty of

15   perjury line -- if we could switch to Page 2, I'm sorry, on

16   this return, above the signature?

17          Did you ever take out the return and read that line to

18   Dr. Hough, and explain to her what it meant?

19   A      I don't believe so.

20   Q      And the same would be true for Dr. Fredrick?

21   A      Yes.

22   Q      And if we could go to Page 6 . . . and again, Dr. Hough

23   is reporting $178,130 of income from her psychiatrist practice;

24   do you see that?

25   A      Yes, I do.

1   Q       All right.  And she reports total expenses of $3,000, a

2   little less than 2 percent; correct?

3   A       Correct.

4   Q       And that would be, again, a fairly conservative estimate

5   of expenses; correct?

6   A       Correct.

7   Q       Because, based on your thousands of tax returns that

8   you've seen, if someone wants to, how shall we put this, play

9   close to the line, or be very aggressive, they can put expenses

10  for entertainment, and meals, and travel, and . . . other types

11  of expenses, depreciation, car and truck expense, advertising.

12  They can basically load up that whole section.

13          If we could focus on that section, which is –– it says

14  "Expenses," for a moment?

15          You see that every line other than the last line of

16  other expenses is left blank; isn't that correct?

17  A       That's correct.

18  Q       And based on your experience, if someone who is making

19  $178,130 wanted to be very aggressive with their taxes, and get

20  close to or even cross the line, they could start adding in a

21  lot of numbers in these various expense lines; correct?

22  A       They could, I suppose, yeah.

23  Q       And Dr. Hough didn't, other than the $2,920 –– $2,920

24  that's shown as other expenses; do you see that?

25  A       Yes, I do.

1    Q       And if you turn the page, you'll see that what she

2    attributed that number to was professional licenses,

3    transcripts, and a conference; do you see that?

4    A       Yes, I do.

5    Q       If you can turn to Exhibit 1E, which is Dr. Hough's

6    2005 return?

7            Excuse me, 1E is the amended 2005 return.

8    A       Correct.

9    Q       Now, Dr. Hough approached you when she realized that she

10   had left off a certain amount of money from her return; is that

11   correct?

12   A       That's correct.

13   Q       I believe you said -- on Page 2 here, if we can go to

14   Page 2 of this exhibit, 1E, and go to the disclosure on the

15   bottom -- that she had left off a sale of investment property

16   when the return was originally filed; do you see that?

17   A       Yes, I do.

18   Q       And if Dr. Hough had not brought this to your attention,

19   you wouldn't have found out about it; correct?

20   A       That's true.

21   Q       And she wouldn't have had to pay the additional tax on

22   the gain she had, of approximately $11,000 gain; correct?

23   A       On the gain, that's correct.

24   Q       And she reported that 11,000-dollar gain to the IRS;

25   correct?

1    A       Correct.

2    Q       And if she hadn't reported it, the IRS would never have

3    known about it; correct?

4    A       I don't know, because I don't know if it would have been

5    reported and caught up in their computerized matching program,

6    so . . . .

7    Q       Certainly -- I'm sorry.

8            Certainly you wouldn't have known about it; correct?

9    A       No, I wouldn't have known.

10   Q       If you can turn to Exhibit 1F, which is the 2006

11   Dr. Hough return, and I'll focus your attention on Page 6.

12           Now, that year, if you could focus on the long-term

13   capital gains?

14   A       Yes.

15   Q       That year, Dr. Hough sold what looks like to be stock

16   and some property; do you see that?

17   A       Yes, I do.

18   Q       And she brought all that information to your attention?

19   A       Yes.

20   Q       And you put it down on her return?

21   A       That's correct.

22   Q       And it equaled $183,431?

23   A       Of sales, yes.

24   Q       Of sales.

25           And then she paid tax on that; is that correct?

1   A      That's correct.

2   Q      If you could turn to Exhibit 1G?

3          Actually, before we get off of 2006, do you see

4   Schedule B anywhere in 2006?

5   A      (Examining exhibit) No, I don't.

6   Q      So you never had a conversation with Dr. Hough, when you

7   gave her the return, that Schedule B was missing here; correct?

8   A      Correct.

9   Q      Because generally, when you gave Dr. Hough her return,

10  you weren't involved in that process at all; correct?

11  A      That's correct.

12  Q      You would complete the return, you would sign your name,

13  and would you hand it to a member of your staff; is that

14  correct?

15  A      That's correct.

16  Q      And then a member of your staff would then arrange to

17  give it to Dr. Hough, or, if it's Dr. Fredrick's return,

18  Dr. Fredrick; correct?

19  A      That's correct.

20  Q      And they had two separate returns because they were

21  married filing separately; correct?

22  A      That's correct.

23  Q      And just so I understand for a moment what that actually

24  means, that means when Dr. Hough has income, she has to report

25  that income on her return; is that correct?

1   A       That's correct.

2   Q       And when Dr. Fredrick has income, he has to report his

3   income on his return; is that correct?

4   A       That's correct.

5   Q       And Dr. Hough does not have to report Dr. Fredrick's

6   income on her return; is that correct?

7   A       That's correct.

8   Q       Now, if they own something jointly, and it's a 50/50

9   split, they'd each have report half of it on their returns; is

10  that correct?

11  A       Yes, that's correct.

12  Q       And if they owned some stock in their own name, they

13  would only -- the person who owns the stock in their name has

14  to report it on their return; correct?

15  A       That's generally correct; yes.

16  Q       And if they had a joint bank account -- actually, we'll

17  get there in a second.

18          If we can go to Exhibit 1G?

19          Now, the government focused you on, in Exhibit 1G, this

20  is now the 2007 Dr. Hough return.  If you can go to

21  Page 4 . . . and if you look at charitable gifts, do you see

22  the number of $47,101?

23  A       Yes, I do.

24  Q       And I think the government contrasted that against

25  210,000 or so dollars for Dr. Fredrick.

1              Do you remember that?

2    A      Yes, I do.

3    Q      And then the government asked you about a . . .

4    handwritten notes that you had taken about that discussion, and

5    a Phillips University letter with a check at the bottom of it.

6    A      That's correct.

7    Q      Let's pull out that -- since we're on that issue, let's

8    pull out that letter now.  It's Exhibit 5H and Exhibit 5I.

9              Now, is it true that, if money is given from a joint

10   bank account, that that gift can -- even though you might

11   say -- or even though one party of the joint bank account might

12   have gotten the letter back thanking them for the gift, that

13   the money can be allocated to either party in the joint bank

14   account?

15   A      I would probably have to refresh myself by looking up

16   the publication on that one; but, yeah, that's my

17   understanding.

18   Q      Because that's exactly what you did when they gave you

19   the information.  In other words, Dr. Hough and Dr. Fredrick

20   presented you, according to your notes, with the fact that

21   approximately $255,000 had been given to the Phillips

22   University through this joint account.

23             And to the joint account, I'd prefer you to Exhibit 5I,

24   if we could switch to that.

25   A      Correct.

1   Q       And focus on the check, if you could.  And look at the

2   top left-hand portion of the check, joint account in the name

3   of Patricia Hough or Dr. David Fredrick.

4   A       Correct.

5   Q       And you made the determination that they could allocate

6   it, that amount of money, approximately $210,000 to

7   Dr. Fredrick, and approximately 47,000 or so to Dr. Hough;

8   correct?

9   A       More than likely.  I don't remember that moment, but

10  more than likely.

11  Q       Well, they're not the tax experts; correct?

12  A       Correct.

13  Q       And in that conversation you're the tax expert; correct?

14  A       Yes.

15  Q       And they had every reason to rely on you; correct?

16  A       That's true.

17  Q       Because you had all this experience for decades at that

18  point; correct?

19  A       Correct.

20  Q       And you'd prepared their returns for a couple of years

21  at that point; correct?

22  A       Correct.

23  Q       And you gave them no indication that you didn't know

24  what you were doing; correct?

25  A       Correct.

1  Q       So then you made the decision:  Okay, I'll allocate --

2  because it's a joint account, I'll allocate $210,000 to

3  Dr. Fredrick, and then I'll allocate the 45,000 or so,

4  remaining, whatever the difference is, to Dr. Hough.

5          Is that correct?

6  A       I'll repeat that I -- more than likely, that's how it

7  happened.

8  Q       And then if you could turn to Page 6 -- I'm sorry -- of

9  this 2007 return, 1G.  And again, what we're looking at, what

10 Dr. Hough's reporting for her income as a psychiatrist, it's

11 $127,500.  She's taking total expenses of $3,377.

12         A little less than 2 percent; correct?

13 A       Correct.

14 Q       If you could turn to 1H.

15         Oh, by the way, when we were dealing with those

16 charitable contributions, do you know that Phillips University

17 is the church college that gave Dr. Hough a scholarship that

18 allowed her to attend when she was in college?

19 A       I don't know if I was aware of that.  I don't recall

20 that.

21 Q       And did you ever have any discussion that the reason

22 that Phillips University was getting those very large

23 contributions was that Dr. Hough and Dr. Fredrick wanted to pay

24 back Phillips University for helping out Dr. Hough?

25 A       I think I knew that Dr. Hough had gone to that

1  university, but I don't remember a discussion on the other

2  details.

3  Q     All right.  Well, turn to Exhibit 1H, and turn your

4  attention to the fourth page, with the charitable gifts.

5        And you see there's a $37,771 number?

6  A     Yes.

7  Q     And the bulk of that was a payment, again, to Phillips

8  University, wasn't it?

9  A     I don't know if I have the backup to that.

10  Q     Oh, it was not included in the tax return in the IRS's

11  files here?

12  A     I don't see it in Exhibit 1H.

13  Q     All right.  We'll . . . .  Why don't we move on, then,

14  to Exhibit 1T.  We'll go to Dr. Fredrick very briefly.

15        And, with respect to Dr. Fredrick, I draw your attention

16  to -- actually, we don't have to go to 1T, we'll start --

17  excuse me -- at 1U.  We won't start with the 2003 return, we'll

18  start with Dr. Fredrick's 2004 return.

19        Do you have that in front of you?

20  A     Yes, I do.

21  Q     And the government brought your attention to it -- well,

22  actually, could you go to Page 5 for a moment?

23        Now, I've seen this big X on a lot of pages in these

24  returns; you might have seen it as well?

25  A     Yes.

1   Q      Did you put these big Xes all over these returns?

2   A      No.

3   Q      Do you know how these big Xes came to be?

4   A      No.

5   Q      Would anyone in your staff have put a big X through a

6   return like this?

7   A      No.

8   Q      If you could turn to Page 6?

9          Now, you see where Dr. Fredrick, in 2004, is reporting

10  long-term capital gains -- if we could focus on that part -- to

11  the Medical Universities of the Americas and the letter B.

12         Do you see that?

13  A      Yes.

14  Q      Do you know that the letter B stood for "Belize"?

15  A      I believe that's what it did stand for.

16  Q      And if Dr. Fredrick had not told you about this sale of

17  his Medical University of America's Belize stock, a foreign

18  stock; correct -- or, excuse me, a stock in a foreign company;

19  correct?

20  A      So the foreign company is in Belize; yes, okay.

21  Q      Okay.  So it's a foreign company.

22         So it's not going to -- the sale of this stock is not

23  going to generate a 1099 in the United States; correct?

24  A      I haven't seen anything like that before.

25  Q      So if it doesn't generate a 1099, the IRS is not going

1   to know about the sale of this stock unless Dr. Fredrick tells

2   you to tell the IRS; correct?

3   A      I suppose that would be correct.

4   Q      And so if Dr. Fredrick had wanted to hide the fact that

5   he had made $495,000, from the IRS, that would have been pretty

6   easy to do by not telling you about this entire transfer;

7   correct?

8   A      I suppose it would be easy just to not put it on the

9   return.

10  Q      And I notice that there's a -- $5,000 is listed for

11  something calls "basis."

12  A      Correct.

13  Q      Can you explain to the jury what "basis" in a stock sale

14  means?

15  A      Usually, the basis is what the person paid when they

16  purchased the stock originally.

17  Q      And if Dr. Fredrick wanted to -- and then -- is the way

18  you work the figure out, what your gain is, you deal with the

19  sales price, minus your basis, equals the gain from the sale;

20  is that correct?

21  A      That's correct.

22  Q      So in this case the sales price is 500,000, his basis

23  was 5,000, which leaves his gain at 495,000; is that correct?

24  A      That's correct.

25  Q      And you pay tax based on your gain; is that correct?

1    A       That's correct.

2    Q       You don't pay tax based on, necessarily, the date you

3    acquired stock; correct?

4    A       That's correct.

5    Q       You pay it on, in this case, the final line in the

6    middle of Page 6, that says 495,000.

7            Do you see that?

8    A       Yes, I do.

9    Q       So if Dr. Fredrick had wanted to reduce the amount of

10   gain that he had from that sale, he could have come up with a

11   number much bigger than $5,000; correct?

12   A       Well, anybody can put down the basis, you know, but if

13   they get audited, they're going to get . . . have a problem.

14   Q       I understand that.

15           And if he wanted to put down a much larger number than

16   5,000, he could have just told it to you, and you would have

17   put it down; correct?

18   A       Right.  I didn't see any documentation of the 5,000, so

19   what he told me is what we used.

20   Q       Well, actually, I think you did see some documentation

21   of the 5,000.  If I can turn your attention to . . . .

22   Exhibit 5E, which is the 5471 dealing with the Medical

23   University of the America of Belize; do you see that?

24           (The witness examines an exhibit.)

25

1    BY MR. HOCHMAN:

2    Q      And if I could turn your attention to Page 5 of 5E . . .

3    and at the very top line, please?

4    A      Okay, yes.  Yes, I see it there.

5    Q      There's a 5471 filed with the IRS that lists that

6    Dr. Fredrick has $5,000 of basis listed in his stock for the

7    University of the Americas Belize.

8           Do you see that?

9    A      I think what I see is the number of shares.

10   Q      I'm sorry, the number of shares.

11          And do you know what the par value was for that number

12   of shares?

13   A      No, I don't.

14   Q      Well, assume that the par value for those shares was one

15   dollar, does that mean that he had $5,000 of basis?

16   A      If that's what he paid for it, if he paid the par value.

17   Q      Thank you.

18          By the way, dealing with this 5471 for a moment, as long

19   as we have it out, if Dr. Fredrick doesn't file the 5471, the

20   IRS will never know about his interest in MUA Belize; correct?

21   A      Well, they wouldn't know from his reporting, and I don't

22   know if they would have other ways of finding it out,

23   but . . . .

24   Q      But to your knowledge, if he didn't report the MUA

25   Belize stock -- excuse me -- the MUA Belize ownership, then the

1    IRS would have no way of finding out, to your knowledge.

2    A      To my knowledge, they wouldn't.

3    Q      So let's go back to, if we could, the 2004 return.  And

4    this is, again, Page 6 of 1U, where he's paying the gain on

5    $495,000.

6    A      Correct.

7    Q      And just so I'm clear, if he had said to you, "Instead

8    of $5,000, my basis -- I paid $500,000 for that stock," what

9    would his gain have been?

10   A      Zero.

11   Q      And what would his tax have been?

12   A      Zero.  On that transaction.

13   Q      Now let's turn to the 2005 return, and look to see what

14   Dr. Fredrick reported in 2005 on this transaction, which is on

15   1V, like in "Victor," Page 7.

16          MR. HOCHMAN:  And if we can highlight the

17   transaction?

18   BY MR. HOCHMAN:

19   Q      This looks like he got paid on a second amount of stock

20   he sold in the amount of $240,000; do you see that?

21   A      Correct.

22   Q      And what does he say his basis is?

23   A      Zero.

24   Q      Zero.

25          So does that mean that he had to realize all $240,000 as

1    gain, and pay tax on that entire gain?

2    A       That's what he did; yes.

3    Q       And if he wanted to reduce his gain, and let's say, say,

4    "I paid $240,000 for the stock," that would have resulted in a

5    zero gain; correct?

6    A       That's correct.

7    Q       And a zero gain would be zero tax.

8    A       That's correct.

9    Q       But he ended up paying full tax, did he not, on the

10   entire amount of the sales price.

11   A       That's correct.

12   Q       If we could turn to Exhibit . . . .  1X, like in

13   "Xavier"?

14           And I'll focus you on Page-- actually, Page 4, and the

15   210,000-dollar charitable gift, I'll focus you on Page 7.

16           MR. HOCHMAN:  And if we could highlight the long-term

17   capital gains.

18   BY MR. HOCHMAN:

19   Q       Now, 2007 was the year that Dr. Fredrick and -- that

20   the -- let's see -- 2007 was the year that the Saba School of

21   Medicine and MUA were sold; correct?

22   A       Correct.

23   Q       And in that year, Dr. Fredrick, on his return, reported

24   $765,366 as a sales price; do you see that?

25   A       Yes, I do.

1   Q       And after you got done subtracting certain basis -- and

2   let's say, for the first property, it was at 50 Gardner Street;

3   do you see that?

4   A       Yes, I do.

5   Q       And it says here that they bought the property -- or at

6   least their basis in the property was 256,000?

7   A       That's correct.

8   Q       And that it netted out to 222,908?

9   A       Correct.

10  Q       The stock in MUA, that would be MUA Nevis; isn't that

11  correct?

12  A       I'm not sure.

13  Q       Well, we'll fill in that gap in a moment, but the stock

14  in MUA resulted in a gain to Dr. Fredrick of 132,973.

15          Do you see that?

16  A       Yes, I do.

17  Q       And again, what does he put down for basis on that?

18  A       Zero.

19  Q       So that means he had to pay full tax on that sale; is

20  that correct?

21  A       That's correct.

22  Q       And then with his equity in EIC, which he sold, it looks

23  like he had a certain amount of basis that reduced it to a

24  final gain; do you see that?

25  A       Yes, I do.

1    Q       And if you add up all those gains, as you did, you have

2    at the very bottom, net long-term capital gain of $431,613; is

3    that correct?

4    A       That's correct.

5    Q       Dr. Fredrick had to pay tax on that amount; is that

6    right?

7    A       That's correct.

8    Q       Now I'll take you to, if I might . . . .  Let me take

9    you to the last return, which is . . . Exhibit 1Y.  It's the

10   2008 return.

11           Now if you go to Page 2, if you could?

12           You signed this return on April 3rd, 2009; correct?

13   A       That's correct.

14   Q       And you said -- and is it true, if you could look back

15   at Exhibits . . . let me get the number -- 1H; yes, 1H -- which

16   is Dr. Hough's 2008 return, you signed that on April 3, 2009.

17   A       That's correct.

18   Q       And with respect to that particular year, you had said,

19   in April of 2009, that you had learned that the IRS had a

20   program for off -- for people who had foreign bank accounts;

21   correct?

22   A       That's correct.

23   Q       And that's people who had either signature authority

24   or -- and/or a financial interest in a foreign bank account;

25   correct?

1   A       I believe so.

2   Q       And you said that there was some discussion in your

3   office about this; is that correct?

4   A       That's correct.

5   Q       And that was in April, 2009; is that right?

6   A       I'm not sure of the time on that.  I'm not sure when the

7   IRS came up with this program.  I know it lasted about six

8   months or so, where people could turn themselves in, more or

9   less.

10  Q       And did you have a discussion -- you said you were

11  preparing about 500 returns at that time.

12          Did you have a discussion with all the people that you

13  were preparing returns for about this new IRS program?

14  A       No.

15  Q       And you knew, at that point, that Dr. Fredrick and

16  Dr. Hough had sold the school, or a good part of that sale, and

17  were no longer connected with the schools by April of 2009;

18  correct?

19  A       That's correct.

20  Q       And with respect to what was going on, your

21  understanding is that this was a program that the IRS was

22  offering to people who had either signature authority or a

23  financial interest in an account that, if they entered the

24  program, they wouldn't be criminally prosecuted; is that

25  correct?

1   A      That's correct.

2   Q      They might have to pay some money, but only if they

3   had -- excuse me -- only if they had a financial interest in

4   the account, not if they just had signature authority in the

5   account; correct?

6   A      I don't know if I remember those details.

7   Q      And you didn't have this type of detailed discussion

8   with Dr. Fredrick or Dr. Hough; correct?

9   A      It wouldn't have been a detailed discussion, no.

10  Q      And would it have been a discussion that you would have

11  had with them when they came in, presumably; if you had that

12  discussion, you would have had that discussion with them when

13  they came in that year to bring you the materials; correct?

14  A      That's correct.

15  Q      And about how far in advance would you have had --

16  generally, how far in advance do Dr. Fredrick and Hough come in

17  before you prepare the return?

18  A      It was usually . . . if I recall correctly, it was

19  usually around the beginning of April.

20  Q      Well, you prepared this on April 3rd.

21  A      Right.

22  Q      So they would have come in two days beforehand?

23  A      Could have been.

24  Q      Could it have been a week before that?

25  A      It could be a week before.

1   Q       So it could have been somewhere, let's say,

2   between . . . you know, March . . . whatever ten days would be,

3   or seven or ten days, so March 25th to April 1st?

4   A       It could have been.  I don't know.  I don't know,

5   offhand, looking at this.

6               MR. HOCHMAN:  May I have a moment, Your Honor?

7               THE COURT:  You may.

8               (Mr. Hochman confers with co-counsel at defense

9         counsel table.)

10  BY MR. HOCHMAN:

11  Q       One last brief area, Mr. Murtha.

12          Are you familiar with something called the annual

13  exemption for gifts?

14  A       Yes, I am.

15  Q       And what is that; can you tell the jury what that is?

16  A       Well, it is an exemption for a de minimus amount of

17  gifts -- not de minimus, to mean like $13,000.  It was back

18  when I was in practice for a while, where you could give that

19  amount of gifts to any one person without having to file a gift

20  tax return.

21  Q       And that would be a -- so, in other words, if I were to

22  give you a gift, I could give you a gift of up to -- let's say

23  $13,000 was that year's limit, I could give you a gift of up to

24  $13,000 and not have to file a gift tax return; is that

25  correct?

1   A      That's correct.

2   Q      Now, let's say it's myself and my wife, and we each want

3   to give you a gift, could we each give you a gift of $13,000,

4   and not have to file a gift tax return?

5   A      Yes.

6   Q      Let's say you're married -- are you married?

7   A      I sure am.

8   Q      Let's say my wife and myself want to give your wife and

9   yourself each a gift of 13,000.  So I can give my gift of

10  13,000 to you, I can give a 13,000-dollar gift to your wife.

11  My wife, in turn, can give you 13,000, and your wife 13,000.

12         Is that correct?

13  A      Yes.

14  Q      So in this example, as a couple, we can give you and

15  your wife up to $52,000 without having to file a gift tax

16  return; is that correct?

17  A      That's correct.

18             MR. HOCHMAN:  No further questions.

19             THE COURT:  Ms. Finley?

20             MS. FINLEY:  Thank you, Your Honor.

21                         REDIRECT EXAMINATION

22  BY MS. FINLEY:

23  Q      Now, Mr. Murtha, why do people hire you?

24  A      Because they don't know how to prepare their tax

25  returns.

1    Q      So they come to you because you do have more expertise

2    than the average person.

3    A      That's correct.

4    Q      And when you meet with them, you need to get information

5    to know how to prepare their return accurately.

6    A      That's correct.

7    Q      And you rely on your clients to provide you with all of

8    the necessary information that goes onto their tax return.

9             MR. HOCHMAN:  Objection, leading, Your Honor.

10            THE COURT:  Sustained.

11   BY MS. FINLEY:

12   Q      Do you rely on your clients to provide you with accurate

13   information to prepare their tax returns?

14   A      Yes.

15   Q      And if they don't . . . if they don't tell you

16   something, would you know it?

17   A      No.

18   Q      And as part of that reliance on your clients, if

19   something new happened, do you expect them to tell that to you?

20   A      If something new in their financial life happened, yes.

21   Q      Now, if we can turn . . . .  If we can look at the

22   2004 tax return for Dr. Hough, which I believe is 1C, do you

23   know whether foreign banks have to issue Form 1099s to the IRS?

24   A      I don't believe they do.

25   Q      And so if the bank -- the foreign bank is not reporting

1    the interest income to the IRS, then the IRS would not know

2    about it.

3    A      That's correct.

4    Q      Mr. Hochman asked you whether you ever told Dr. Fredrick

5    and Dr. Hough what -- that . . . you did not have international

6    tax experience.

7           Do you remember that question?

8    A      Yes, I do.

9    Q      Did Dr. Hough or Dr. Fredrick ever ask you if you had

10   international tax experience?

11   A      I don't remember them asking me directly.

12   Q      Did they ever ask you, or explain to you, their

13   circumstances would require international tax experience?

14   A      No.

15   Q      Now, if we can look at the Schedule B, and if we can

16   just take the 2004 return in 1C, and let's just look again at

17   this question.

18          Now, you said that you asked Dr. Hough and Dr. Fredrick,

19   "Do you have a foreign account," is that right, or some

20   general-type question?

21   A      At some point, yes.

22   Q      Now, if we look again at the initial question, isn't

23   that the question that the IRS asks under B:  Did you have --

24   or . . . .  You must complete this part if you, B, had a

25   foreign account?

1    A       That's correct.

2    Q       And then, if you had a foreign account, you would then

3    look at 7A, and determine if you had an interest in or a

4    signature or other authority over a financial account, then you

5    would have to report that.

6    A       Correct.

7            MR. HOCHMAN:  Objection, misstates 7A, because it

8    doesn't finish the exception line.

9            THE COURT:  Overruled.

10   BY MS. FINLEY:

11   Q       Now, you said, when you asked them that question, they

12   said no.

13           You didn't ask any follow-up questions?

14   A       No.

15   Q       And if they had told you, "I have a foreign account,"

16   would you have looked at Schedule B-2. about the exceptions and

17   how to properly fill this form out?

18   A       Yes.

19           MR. HOCHMAN:  Objection, leading, improper

20   hypothetical.

21           THE COURT:  Overruled.

22           MS. FINLEY:  You can answer the question.

23           THE WITNESS:  Could you repeat that, please?

24           MS. FINLEY:  Sure.

25

1    BY MS. FINLEY:

2    Q      If they had told you that they had a foreign account,

3    would you have looked at B-2 for the exceptions?

4    A      Yeah.  I would have had to dig into the rules.

5    Q      In 2004, did Dr. Hough ever say to you, "I have a

6    foreign account that's in my own name, that I have signature

7    authority over"?

8    A      Not that I can recall.

9    Q      And, in 2004, did Dr. Hough ever say to you, "I have a

10   foreign account that Dave and I own jointly, or have jointly,

11   and we're signature authority on that foreign account"?

12   A      Not that I can recall.

13   Q      Now, Mr. Hochman asked you if you read this tax return

14   to Dr. Hough.

15          Do you read the tax returns to each of your clients?

16   A      No.

17   Q      And . . . you're aware that Dr. Hough is a doctor.

18          Do you assume that a medical doctor understands the

19   items on her tax returns?

20   A      Not really.

21   Q      Do you know that Dr. Fredrick -- excuse me -- Dr. Hough

22   does read her tax returns?

23          MR. HOCHMAN:  Objection, leading.

24          MS. FINLEY:  Your Honor, I said, "Do you know."

25          THE COURT:  I'm sorry, I didn't hear what you said.

1          MS. FINLEY:  I said:  Do you know if Dr. Hough reads

2   her tax returns.

3          THE COURT:  That's my memory as well.  Overruled.

4          THE WITNESS:  No, I don't know whether she reads the

5   whole tax return or not.

6   BY MS. FINLEY:

7   Q     Now, if we can turn to Exhibit 1E, don't we know -- or

8   do you know if Dr. Hough read her tax return for 2005?

9   A     Well, based on the -- on this amendment, I would assume

10  that she looked at it and realized that she left something off

11  at some point.

12  Q     And if we can look just at the . . . well, we'll just

13  actually turn back to one previous exhibit . . . for the

14  original 2005 return.  And we'll just look at the penalty of

15  perjury section.

16        Can you just read that portion, of what it says?

17  A     What exhibit are we on?

18  Q     I'm sorry.  We're on 1D, of Exhibit 3, Page 3.

19  A     Do you want me to read the printed --

20  Q     Yes.

21  A     It says:  "Under penalties of perjury, I declare that I

22  have examined this return and accompanying schedules and

23  statements, and to the best of my knowledge and belief, they

24  are true, correct, and complete.  Declaration of preparer other

25  than taxpayers is based on all information of which preparer

1    has any knowledge."

2    Q      And so that second part is for you; is that correct?

3    A      That's true.

4    Q      So based on the knowledge that you're provided?

5    A      Yes.

6    Q      And I think you testified that -- was Dr. Hough precise

7    when she gave you information to prepare her tax returns?

8    A      She was organized and . . . and had the material, and

9    knew if something was missing.

10   Q      And if we can look at Exhibit 5H.

11          (An exhibit was projected onto the projector screen.)

12   BY MS. FINLEY:

13   Q      Now, this sheet of paper says, "hough Donations."

14   A      Yes.

15   Q      Does it say, "Hough and Fredrick Donations"?

16   A      No.

17   Q      And they were married, filing separate?

18   A      Correct.

19   Q      And, in fact, Doctor -- was Dr. Hough precise enough

20   that she told you that she had a donation for $39.99 for Publix

21   Thanksgiving?

22   A      Yes.

23   Q      And if Dr. Hough had wanted to hide her -- a foreign

24   account and interest income from the IRS, would that be easy to

25   do, if the IRS didn't get a 1099 from the foreign bank?

1          MR. HOCHMAN:  Objection, calls for speculation.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yeah, it would probably be easy enough.

4    BY MS. FINLEY:

5    Q     Now, you testified that you remember that, in 2008, or

6    early 2009, there was discussion in the press about UBS.

7    A     Yes.

8    Q     And Mr. Hochman asked you if you had any detailed

9    discussions with Dr. Hough.

10         And you said you didn't think you had any detailed

11   discussions.

12   A     That's correct.

13   Q     Do you think that you -- does that mean that you had

14   some discussion?

15   A     Not about UBS.  I . . . at the time, we were concerned

16   about this deadline for coming forward with the foreign

17   accounts, and we wanted to make sure that our clients that had

18   sizeable returns knew about it.

19   Q     And would you have told them that, or would you have

20   asked . . . had some discussion?

21   A     I don't recall the discussion at the time.  But we were

22   asking everybody if they had foreign accounts.

23   Q     And the voluntary disclosure program, was that for the

24   present year, or could it also have been for prior years?

25   A     I think it was for whatever you had at the -- I don't

1  remember whether it went back.  I don't remember.

2  Q     And when you asked Dr. Hough that question, if she had a

3  foreign account, in 2008 or 2009, do you remember what she

4  said?

5  A     I --

6           MR. HOCHMAN:  Objection.  Based on -- assumes facts

7  not in evidence, if the question was asked that way.

8           THE COURT:  Overruled.

9           THE WITNESS:  Could you repeat that, please?

10 BY MS. FINLEY:

11 Q     You said that you thought that you would have asked your

12 clients again, and you believe you asked Dr. Hough again, if

13 she had a foreign account.

14       Do you know what she said?

15 A     Well, the boxes were checked no, so I have to assume the

16 answer was no.

17          MS. FINLEY:  No further questions, Your Honor.

18          THE COURT:  Mr. Hochman?

19          MR. HOCHMAN:  Yes, Your Honor.

20                    RECROSS EXAMINATION

21 BY MR. HOCHMAN:

22 Q     Mr. Murtha, when you say Dr. Hough was organized, you

23 meant organized in the sense of, she would have her 1099s

24 handy, if she had any K-1s, they would be handy, not in the

25 sense that she had some overall tax expertise; correct?

1    A       That's correct.

2    Q       And you have absolutely no idea whether or not Dr. Hough

3    ever read her Schedule B, because you weren't ever there when

4    the schedule-- when the entire tax return was given to her;

5    correct?

6    A       That's correct.

7    Q       And, with respect to signature authority, and I just

8    want to make sure this is clear -- and this goes all the way

9    back from 2001, when you would have first met with Dr. Fredrick

10   and Dr. Hough, all the way till the end, in April, 2009 -- you

11   didn't have an appreciation for the fact that signature

12   authority alone could require you to actually check that box in

13   Schedule B; correct?

14   A       I'm not sure how to answer that.

15   Q       In other words, and I want to make it clear then:  When

16   I say, "signature authority alone," it means that you don't

17   have a financial interest in the account, that all you have is

18   the ability to sign on a foreign bank account, but you don't

19   own it, it's not your money, it's not -- if you answer the

20   question -- let me back it up.  Maybe I can do it this way.

21           When you ask the question, "Do you have a foreign bank

22   account," you understand that to mean, "Do you own the foreign

23   bank account, does it have your own funds in it"; correct?

24   A       We are thinking a traditional bank account that you have

25   money in.

```
1    Q      You have your money in it; correct.

2           So you are not addressing a situation where you might

3    have signature authority over someone else's account; correct?

4    A      That's correct.

5    Q      And I want to make this clear:  So you never had that

6    discussion, about signature authority over someone else's

7    account, with Dr. Fredrick or Dr. Hough, ever.

8    A      I don't think I did, not when it came to signature

9    authority.

10              MR. HOCHMAN:  No further questions.

11              THE COURT:  All right.  Thank you.

12              Ms. Finley, anything further?

13              MS. FINLEY:  Nothing further, Your Honor.

14              THE COURT:  May the witness be excused?

15              MS. FINLEY:  He may.

16              MR. HOCHMAN:  Yes, Your Honor.

17              THE COURT:  You may stand down.  Thank you.

18              THE WITNESS:  Thank you, Your Honor.

19              (The witness left the witness stand and left the

20        courtroom.)

21              THE COURT:  You may call your next witness.

22              MS. KESSLER:  The government calls Mario deCastro.

23              THE COURT:  Right up here, please.

24              THE COURTROOM DEPUTY:  If you'd raise your right

25    hand.
```

1              Do you solemnly swear or affirm to tell the truth,

2      the well truth, nothing but truth, in the case now before the

3      Court?

4                  THE WITNESS:  I do.

5                  THE COURTROOM DEPUTY:  You may have a seat.

6                  State your name, spelling your last.

7                  THE WITNESS:  Mario A. deCastro, D-E-C-A-S-T-R-O.

8                  THE COURTROOM DEPUTY:  Thank you.

9                            MARIO DECASTRO,

10     called as a witness by the Government, and having been first

11     duly sworn, was examined and testified as follows:

12                          DIRECT EXAMINATION

13     BY MS. KESSLER:

14     Q      Good morning, Mr. deCastro.

15     A      Good morning.

16     Q      Can you tell the jury where you reside?

17     A      Currently, I reside in Leesburg, Virginia, right beside

18     Washington.

19     Q      And where do you work?

20     A      I work at a public accounting firm called McGladrey LLP.

21     Q      What kind of work do you do for them?

22     A      I currently do -- I practice tax law within the public

23     accounting scene.  It's tax consulting, corporate and

24     international.

25     Q      Was there a time when you were employed with Jones

1    Walker?

2    A      Yes, ma'am.

3    Q      And where is that located?

4    A      I was with their Miami office.  They are based out of

5    New Orleans.

6    Q      When did you work for Jones Walker?

7    A      I worked for Jones Walker . . . I worked for Jones

8    Walker from February of 2002 through . . . early summer, 2004,

9    or midsummer 2004.

10   Q      And what did you do for Jones Walker?

11   A      I was -- my title was a special counsel, which was akin

12   to a mid-level or senior-level associate.

13   Q      And what were your responsibilities as a special

14   counsel?

15   A      I was assigned to the business practice and the tax

16   practice.

17   Q      Did there come a time when you were engaged to -- excuse

18   me -- engaged to represent an entity called Huntington

19   Institute?

20   A      Yes, ma'am.

21   Q      Do you recall about when that was?

22   A      I believe it was sometime in 2003.

23   Q      And who were the individuals that you dealt with when

24   you were working with Huntington Institute?

25   A      We dealt with three principals, or owners.

1   Q       Do you recall their names?

2   A       One of them was Mr. Brad Anderson.

3   Q       Do you recall the other two?

4   A       I think one was Mr. Dobbs.  I don't remember his first

5   name.  And I believe the other was a Mr. VanCura, or

6   Dr. VanCura.  I forget his title.

7           MS. KESSLER:  Your Honor, may I approach the witness

8   freely?

9           THE COURT:  You may.

10          MS. KESSLER:  I'm going to ask to mark what's

11  Government's Exhibit 8B.

12          THE COURT:  I'm sorry, 8B?

13          MS. KESSLER:  8B, like "boy."

14  BY MS. KESSLER:

15  Q       If you could look at Exhibit 8B?

16          Do you recognize this document?

17  A       The cover?

18  Q       Well, let me ask you that:  Do you recognize the first

19  page?

20  A       I don't recollect the first page, but I recall the . . .

21  the name on it.

22  Q       And what's the name on the first page?

23  A       The title is on the fax cover.  It says, "Saba

24  University School of Medicine."

25  Q       And looking to the second page, and through the end of

1    the document, do you recognize the rest of the document?

2    A     It's a memo that was written by my firm.

3    Q     By your firm, Jones Walker?

4    A     Yes, ma'am.

5    Q     Approximately when was this memorandum prepared by your

6    office?

7    A     We prepared this memorandum sometime in . . . in June of

8    2003.

9    Q     Were you involved in the preparation of this memo?

10   A     I was, with my boss.

11   Q     And who was the memo -- actually, I'll withdraw that

12   question.

13         Can you tell whether this memorandum was a draft or a

14   final product from your office?

15   A     It was a draft.

16   Q     And how do you know that?

17   A     Because we labeled it "Draft".  And we stated it was a

18   draft, I think, at the beginning and at the end.

19         MS. KESSLER:  Your Honor, I'd move in Government's

20   Exhibit 8B at this time.

21         THE COURT:  Any objections to 8B?

22         MR. HOCHMAN:  Yes.  On hearsay grounds, Your Honor,

23   beyond business records, and relevance.

24         THE COURT:  The first objection is overruled.

25         Second objection, I guess I need to see the letter.

1    I probably need to see counsel at sidebar.

2                          AT SIDEBAR

3         MS. KESSLER:  Here is my copy.

4         THE COURT:  All right.  Save me some reading, and

5    tell me what this is all about.

6         MS. KESSLER:  The cover letter is a cover letter from

7    Dr. Fredrick, sending that memorandum to -- actually, could I

8    look at it -- Mr. Schneider, who is a witness, who will be

9    called next.

10        Dr. Fredrick refers to the memorandum as very

11   confidential, and says that it might help down the road in

12   discussions about operating structure.

13        The memo that is attached relates to a proposed sale

14   and purchase of Saba University, as well as the Belize and

15   Nevis entities, MUA.  It includes discussion in there as to who

16   the owners are, what the terms of the potential sale would be,

17   the price, things of that nature.

18        MR. HOCHMAN:  And the additional ground, Your Honor,

19   would be foundation on how this particular witness knows

20   anything that went into this document.  I don't believe a

21   foundation has been laid for this witness.

22        MS. KESSLER:  I believe the witness testified that he

23   helped draft the memorandum, and it was drafted at his firm.  I

24   can explore that further with the witness if necessary.

25        THE COURT:  All right.  I think you need to lay a

1    better foundation with regard to business records.  I

2    understand the relevance issue now.

3         MS. KESSLER:  My -- I'm sorry.  I didn't mean to

4    interrupt, Your Honor.  My understanding is that there has been

5    a stipulation to the business records exception to the hearsay

6    rule for this document that was part of the notice that was

7    filed with the Court.

8         MR. HOCHMAN:  And the foundation is the foundation

9    for relevancy.  I don't think she's laid enough ground as to

10   why this particular document would be relevant, at least up

11   until now.

12        THE COURT:  All right.  I'm a little bit confused.  I

13   understand the relevancy objection.

14        Do you still have a business record objection?

15        MR. HOCHMAN:  No, no, no, Your Honor.  The foundation

16   was the -- it was sort of an amplified relevancy objection, it

17   was to explain the relevancy objection, that she hasn't laid

18   the pieces down to show how this is relevant . . . in part,

19   Your Honor, because the sale never went through.  And

20   Dr. Hough -- and there's no evidence that Dr. Hough saw this

21   particular e-mail -- or excuse me -- this particular

22   correspondence.

23        And then if she wants to get into co-conspiracy for

24   situations, there's no allegation that any of these other

25   individuals are part of the conspiracy, other than Dr. Fredrick

1    arguably.

2              (The Court reviews the document.)

3              THE COURT:  All right.  The relevancy objection is

4    overruled.  The business record objection, as I understood it,

5    is basically withdrawn.

6              MR. HOCHMAN:  Yes.

7              THE COURT:  And so we have, essentially, to the

8    extent there is a foundation objection, I guess that's based on

9    relevancy.

10             MR. HOCHMAN:  Correct.  It would be a relevancy

11   objection, I think, again, because this document, unlike some

12   other documents, deals with a sale that never occurred, that

13   was never shown to Dr. Hough.  We'd ask, also, that there's

14   hearsay within hearsay of this particular document, and it

15   doesn't fit into any co-conspirator exception, as well.

16             THE COURT:  All right.  The objection is overruled.

17             MR. HOCHMAN:  Okay.  Thank you.

18                        IN OPEN COURT

19             THE COURT:  Exhibit 8B will be admitted.

20             (Government's Exhibit 8B was admitted into evidence.)

21   BY MS. KESSLER:

22   Q     Now, referring to the --

23             MS. KESSLER:  If we could -- Your Honor, permission

24   to publish, please?

25             THE COURT:  You may.

1           (An exhibit was projected onto the projector screen.)

2    BY MS. KESSLER:

3    Q      Referring to the first page of this exhibit,

4    Mr. deCastro, was this -- are you familiar with this document,

5    other than having looked at the government's exhibit?

6           Did you prepare this piece of paper?

7    A      The first page; no, ma'am.

8    Q      If you could tell the jury who this letter is addressed

9    to?

10   A      It appears to be addressed to a Jerry Schneider.

11   Q      And the letterhead on the correspondence?

12   A      It's from Saba University of Medicine -- School of

13   Medicine.

14   Q      And could you read to the jury the contents of the

15   correspondence, please?

16   A      Sure.  It says:

17          "Attached is a very confidential legal review of a

18   recommended legal tax structure for our medical universities

19   for a potential buyer.  I assume this information might help us

20   somewhere down the road, should we need to consider a new

21   operating structure.

22          "I will call you later today to discuss how to proceed

23   with regard to your proposal.

24          "Regards."

25   Q      Now, moving to the second page of this exhibit, I

1   believe you testified earlier that this was a draft prepared by

2   your office.

3        Were you involved in the drafting of this document?

4   A    Yes, ma'am.

5   Q    And who were you working with to prepare this document?

6   A    The partner I reported to, in the tax section of the

7   firm.

8   Q    Were you also working with the client, the Huntington

9   Institute?

10  A    Yes.

11  Q    And did they -- did you have discussions with them, with

12  regard to the contents of this letter, in terms of the facts

13  that you assumed?

14  A    Yes.

15  Q    If we could move to Page 3 of the exhibit, Page 2 of

16  your memorandum.

17        Looking at the paragraph numbered two, who did you --

18  were the investors your clients?

19  A    Yes.

20  Q    And could you read to the jury Paragraph Number 2,

21  please?

22  A    "The investors are planning to acquire a 75 percent

23  equity interest in a venture consisting of four companies.

24  This venture is currently owned by Dr. David Fredrick, M.D.,

25  and his wife, Dr. Pat Hough, M.D."

1    Q      Do you know Dr. Fredrick or Dr. Hough?

2    A      No, ma'am.

3    Q      Were they your clients?

4    A      No, ma'am.

5    Q      Looking at Paragraph Number 3, which was the -- what was

6    the first company that was going to be involved in the sale?

7    A      One of the companies was a Massachusetts corporation, an

8    S Corp.

9    Q      And how did you refer to that company in this paragraph?

10   A      We referred to it as EIC, Inc.

11   Q      And then moving to the fourth paragraph of this

12   memorandum, what was the name of the second company that was

13   part of the sale?

14   A      Saba University Netherlands Antilles.

15   Q      And looking at Paragraph Number 5, the third entity

16   involved in the sale?

17   A      The Medical University of Americas, Nevis, West Indies.

18   Q      And was there a fourth entity also involved; is that set

19   forth in Paragraph Number 6?

20   A      Yes.  It was -- we identified it as the Medical

21   University of the Americas, Belize Campus.

22   Q      Now, if we turn to Page 5 of the exhibit, page -- what I

23   think is numbered Page 4, of the memorandum you prepared, can

24   you read to the jury that first paragraph, entitled "Step 2"?

25   A      "The investors obtain recourse financing in an amount of

1    $28 million from a venture capital entity, and the investors

2    purchase 75 percent of Dr. Fredrick's interest in New Hold Co.

3    Dr. Fredrick's sale of his interest in New Hold Co. will

4    trigger taxation to him in the form of capital gains at the

5    reduced rate of 15 percent."

6    Q    Based on the information that was provided to you by

7    your clients related to this potential transaction, did you

8    expect that, if this sale had gone through, Dr. Fredrick would

9    have been subject -- or the sellers would have been subject to

10   a capital gains tax?

11           MR. HOCHMAN:  Objection, assumes facts not in

12   evidence about what he was provided prior to forming his

13   opinion.

14           THE COURT:  Sustained.

15   BY MS. KESSLER:

16   Q    As part of your representation of the Huntington

17   Institute, did you have any contact -- or excuse me.

18           Was your firm asked to perform due diligence related to

19   the sale of these schools?

20   A    Come again?

21   Q    As part of your representation of the Huntington

22   Institute, was Jones Walker initially asked to perform some

23   sort of due diligence related to the potential sale of the

24   schools?

25   A    No, ma'am.

1    Q      Was there any discussion that you might perform due

2    diligence?

3    A      We . . . .  We were asked to -- to hold some boxes of

4    documents that related to due diligence --

5    Q      Okay.

6    A      -- in the event that we would be asked to do so.

7    Q      And what is due diligence; what do you understand it to

8    be?

9    A      My understanding of due diligence is a processing that's

10   undertaken by either accounting or legal professionals with

11   respect to a potential or pending transaction, whereby we go

12   through and we kick the tires to make sure that the entity or

13   assets that are going to be acquired are what, in fact, they

14   are, and to make sure that it's financially sound and legally

15   sound, make sure that there aren't any . . . potential

16   contingencies or liabilities that the client may be purchasing

17   or that we're stepping into the shoes of.

18   Q      Now, did your firm, Jones Walker, ultimately perform any

19   due diligence?

20   A      No, ma'am.

21   Q      Did this -- did this potential sale that you referenced

22   in the memorandum that we looked at previously, Exhibit 8B, did

23   that sale go through?

24   A      My understanding is that it did not.

25   Q      Now, as part of your representation of the Huntington

1    Institute, did you ever meet Dr. Fredrick?

2    A     Not that I recall.

3    Q     Did you ever meet Dr. Hough?

4    A     No.

5    Q     Did you have very much contact with either of those

6    individuals?

7    A     No.

8           MS. KESSLER:  If I could ask for Exhibit 6B to be

9    marked?

10          MR. HOCHMAN:  What number, please?

11          MS. KESSLER:  6B.

12   BY MS. KESSLER:

13   Q     If you could look at this document, Mr. deCastro?

14   A     6B?

15   Q     6B, yes.

16          What is this document?

17   A     It appears to be a letter.

18   Q     From whom?

19   A     From Dr. L. Fredrick . . . on behalf of the Saba

20   University.

21   Q     And who is it addressed to?

22   A     It's addressed to Mr. Brad Anderson, Mr. Mark VanCura.

23   Q     And are those two of the individuals you had been

24   representing as part of the Huntington Institute?

25   A     Yes, ma'am.

1    Q       What is the date of this letter?

2    A       It's February 18th, 2002.

3    Q       If you were -- would read the first page -- the first

4    sentence of this letter, what is the letter regarding?

5            THE COURT:  Wait a second.  He can't be reading a

6    letter that's not admitted.

7    BY MS. KESSLER:

8    Q       Reading to yourself what the first sentence says --

9            MS. KESSLER:  I'm sorry, Your Honor.

10   BY MS. KESSLER:

11   Q       -- what is this letter regarding?

12   A       It's a letter regarding the potential purchase of

13   medical schools.

14           MS. KESSLER:  Your Honor, at this time the government

15   would move to admit 6B.

16           THE COURT:  Mr. Hochman?

17           MR. HOCHMAN:  Objection.  Based on the date of this

18   letter, and the fact that the witness said that the sale did

19   not go through, relevancy, Your Honor.

20           THE COURT:  All right.  That objection is overruled.

21   Exhibit 6B will be admitted.

22           (Government's Exhibit 6B was admitted into evidence.)

23   BY MS. KESSLER:

24   Q       If you could read to the jury the first paragraph of

25   this . . . .

1          MS. KESSLER:  Excuse me, Your Honor, permission to

2    publish?

3          THE COURT:  You may.

4          (An exhibit was projected onto the projector screen.)

5    BY MS. KESSLER:

6    Q     Looking at Paragraph 1 of Exhibit 6B, can you read to

7    the jury what is said there?

8    A     Paragraph 1?

9    Q     Yes, sir.

10   A     "Thank you for your telephone call regarding -- "your

11   telephone call today regarding the potential purchase of our

12   medical schools and educational enterprises.  Attached is a

13   school catalog that will provide you with information about

14   Saba University School of Medicine and the Medical University

15   of the Americas.  At the present time, I am the sole owner of

16   Saba University School of Medicine on Saba, Netherlands

17   Antilles, and have controlling shares of the Medical University

18   of the Americas in -- "on Nevis, West Indies."

19   Q     And what is the date of this letter?

20   A     February 18, 2002.

21   Q     Now, looking at -- turning to Page 2 of Exhibit 6B,

22   there's some financial information set forth there.

23         What does this letter from Dr. Fredrick indicate the

24   gross revenues of Saba University School of Medicine are?

25   A     7,700,000.

1   Q       And the profits per year?

2   A       3,700,000.

3   Q       Now, as to the Medical University of the Americas, what

4   are the projected profits indicated there?

5   A       3,500,000.

6   Q       And who is this signed by?

7   A       David L. Fredrick.

8           MS. KESSLER:  Your Honor, if I could approach to have

9   Exhibit 3C marked -- Exhibit 6C marked, excuse me.

10          THE COURT:  You may.

11  BY MS. KESSLER:

12  Q       If you could take a look at Exhibit 6C?

13          What is this document?

14  A       The's a printed e-mail . . . e-mail that was sent.

15  Q       And what is the date of this document?

16  A       Saturday, 1 March 2003.

17  Q       And who is the e-mail from?

18  A       It is from David Fredrick.

19  Q       And who is it addressed to?

20  A       To Brad and others.

21  Q       And . . . reading to yourself the content of this

22  e-mail, does it appear to -- what is it regarding?

23          (The witness examines an exhibit.)

24          THE WITNESS:  It's regarding the sale, and the

25  schedule for due diligence and closing.

1   BY MS. KESSLER:

2   Q      The sale of the schools?

3   A      Yes, ma'am.

4          MS. KESSLER:  Your Honor, the government would move

5   to admit 6C.

6          MR. HOCHMAN:  Objection, Your Honor, relevance.

7   Again, it pertains to a sale that never occurred.

8          THE COURT:  All right.  That objection is overruled.

9   Exhibit 6C will be admitted.

10         MS. KESSLER:  Permission to publish, please?

11         THE COURT:  You may do so.

12         (Government's Exhibit 6C was admitted into evidence.)

13         (An exhibit was projected onto the projector screen.)

14  BY MS. KESSLER:

15  Q      If you could read to the jury, beginning with the third

16  sentence of the first paragraph of this e-mail?

17  A      Okay.

18         "Second, if your group has a significant portion of

19  their funds offshore, it would be possible and may be desirable

20  for both parties to keep a majority of the funds offshore."

21         Keep going?

22  Q      You may continue, please.

23  A      "We would not be opposed to having 20 million remain

24  offshore and the remainder paid in the U.S.  But Pat --

25         Continue?

1    Q       Yes.

2    A       "But Pat has returned and sends her regards.

3    Psychologically, we are both prepared for a transition, the

4    sooner for us, the best it would be emotionally.

5            "Call me.  DF."

6    Q       And this e-mail is sent from whom?

7    A       From David Fredrick.

8    Q       Who did you understand the "we" referenced in this

9    e-mail to be?

10           MR. HOCHMAN:  Objection, foundation.

11           THE COURT:  Sustained.

12           MS. KESSLER:  Thank you.

13           If I could approach with Exhibit 6D?

14           THE COURT:  You may.

15   BY MS. KESSLER:

16   Q       If you could take a look at Exhibit 6D?

17           What is this document?

18   A       It looks like a letter, a letter of intent.

19   Q       And the date of this document?

20   A       April 7, 2003.

21   Q       And who is it addressed to?

22   A       It's addressed to Dr. David Fredrick, and Dr. Pat Hough.

23   Q       And if you turn to the last -- or the second to the last

24   page of this document, is this document signed?

25   A       Yes, ma'am.

1    Q      And who -- is it signed by Dr. Patricia Hough?

2           MR. HOCHMAN:  Objection, foundation, as to his

3    knowledge of Dr. Hough's signature.

4           MS. KESSLER:  Is there -- I can rephrase.

5    BY MS. KESSLER:

6    Q      Is there a signature there, above a line that says,

7    "Dr. Patricia Hough"?

8    A      Yes, ma'am.

9    Q      And does it appear to be that name that is that

10   signature?

11          THE COURT:  Wait a second.  This hasn't been

12   admitted, so you can't elicit the contents of the document.

13          MS. KESSLER:  Okay.

14   BY MS. KESSLER:

15   Q      Turning back to the beginning of this document, if you

16   can take a look at it, does this letter -- is it regarding,

17   again, a potential sale of the medical schools we've been

18   discussing?

19   A      It appears to be.

20   Q      And does it appear to be signed, at the next to the last

21   page, by the parties involved?

22          (The witness examines an exhibit.)

23   A      Yes.

24          MS. KESSLER:  Move to admit Government's Exhibit 6D?

25          MR. HOCHMAN:  Objection, relevance, as to this

1    particular document relating to a sale that never occurred.

2            THE COURT:  That objection is overruled.  Exhibit 6D

3    will be admitted.

4            MS. KESSLER:  Permission to publish, Your Honor?

5            THE COURT:  You may do so.

6            (Government's Exhibit 6D was admitted into evidence.)

7            (An exhibit was projected onto the projector screen.)

8    BY MS. KESSLER:

9    Q     Looking again at Page 1 of this exhibit, what is the

10   date of this letter of intent?

11   A     April 7, 2003.

12   Q     And the letter of intent is addressed to whom?

13   A     Addressed to Dr. David Fredrick, Dr. Pat Hough,

14   Education Information Consultants, Inc.

15   Q     Now looking, then, to the first full paragraph of this

16   document, who is identified as the seller here?

17   A     Dr. David Fredrick, Dr. Patricia Hough, and Education

18   Information Consultants, collectively, as the seller.

19   Q     Thank you.  And what is to be -- if you would

20   continue -- actually, if you could read the first paragraph of

21   this letter of intent.

22   A     Okay.

23           "The letter of intent confirms the mutual intentions of

24   CFCC Limited and/or assigns, purchaser, and Dr. David Fredrick,

25   Dr. Patricia Hough, and Education Information Consultants, a

1   Massachusetts corporation, EIC, collectively, seller, with

2   respect to a proposed transaction, the transaction to purchase,

3   through an entity or entities to be formed by purchaser, CFCC

4   Limited, certain shares and interests related to EIC, Saba

5   University School of Medicine Foundation, located in Saba,

6   Netherlands Antilles; Medical University of the Americas

7   located in Nevis, West Indies, MUA Nevis; and Belize, Central

8   America, MUA Belize.  MUA Nevis and MUA Belize are collectively

9   referred to as MUA, as described in the recitals herein, and

10  other" -- "and all other subsidiaries, affiliates, assets and

11  interests related to EIC, Saba, and MUA, that are held by

12  Fredrick and/or Hough, or otherwise directly or indirectly in

13  their control, and able to be" -- it looks like -- "sold or

14  transferred by them, including, without limitation, any common

15  or preferred shares, options, warrants, debt instruments,

16  realty, and other interests, collectively, the assets."

17  Q       Now, looking at the recitals just below, if you could

18  read Item Number 1?

19  A       "Fredrick and Hough control and own a hundred percent of

20  EIC."

21  Q       And Item Number 2?

22  A       "Fredrick and Hough have the controlling interest in MUA

23  Nevis, Saba.  And 50 percent of MUA Belize."

24  Q       Looking down further, there is a discussion of the

25  purchase price after the Number 1, still on Page 1.  Can you

1    read to the jury what is said there?

2    A      "Purchaser desires to purchase 100 percent of all of the

3    stock" -- "all of the stock or interest related to the assets

4    and assigned 25 percent to the sellers.  The purchase price" --

5    "the purchase price for such purchase shall be $28 million,

6    which shall be paid by purchaser to seller, in cash, at

7    closing."

8    Q      And who was identified, again, as the seller in this

9    document?

10   A      The seller is Dr. David Fredrick, Pat -- Dr. Pat Hough,

11   and Education Information Consultants.

12   Q      Now, if you could turn to the second page of this

13   document.

14   A      Um-hum.

15   Q      About two thirds of the way down, the paragraph begins

16   with, "The definitive," can you read to the jury what is stated

17   there?

18   A      Paragraph 4, "Definitive agreement," from there?

19   Q      Yes, sir.  Thank you.

20          I'm sorry.  From the second page -- the second paragraph

21   that's on the screen right now.  I don't know if you can see

22   behind you.

23   A      Okay.

24          "The definitive agreement shall provide that each of

25   Hough and Fredrick, or that assignees, shall have a right" --

1    "shall have a right to 25 percent of all the profits beginning

2    four years after the date of closing, it being understood that,

3    prior to such date, revenue in excess of the expenses will be

4    applied to debt service agreements, significant capital

5    improvement, and other expenses incurred in good faith.

6    Although it is not the intention to sell the schools in the

7    foreseeable future, 25 percent of any sale proceeds, at any

8    time, will be paid to Hough and Fredrick.  These terms cannot

9    be diminished in any way."

10   Q      If we turn to the next to the last page of the document,

11   Page Number 5?

12   A      Yes.

13   Q      Who does the -- does the document appear to have been

14   signed by Dr. David Fredrick?

15   A      Yes.

16   Q      Does it appear to have been signed by Dr. Patricia

17   Hough?

18   A      Yes.

19           MS. KESSLER:  Thank you.

20           If I could approach to have Exhibit 6F marked?

21   BY MS. KESSLER:

22   Q      What is -- if you could take a look at 6F.

23           What is this document?

24           (The witness examines an exhibit.)

25   A      It's an agreement.

1   Q      And what is the date of the agreement?

2   A      It's dated June 25th, 2003.

3   Q      And who are the parties to the agreement?

4   A      The sellers.  Let me see.  Hold on.  It's by and between

5   Huntington Institute Limited, purchaser, and David Fredrick and

6   Patricia Hough, collectively, sellers.

7   Q      And turning to the third page of this document, does the

8   document appear to have been signed by any individuals or

9   parties to the potential transaction?

10  A      Yes.

11  Q      And is there a signature . . . who does it appear that

12  there are signatures there from?

13  A      From the sellers, David Fredrick, Patricia Hough.

14         MS. KESSLER:  Your Honor, I'd move into evidence

15  Exhibit 6F.

16         MR. HOCHMAN:  Same relevancy objection, Your Honor.

17         THE COURT:  All right.  Same ruling.  Exhibit 6F will

18  be admitted.

19         (Government's Exhibit 6F was admitted into evidence.)

20         MS. KESSLER:  Permission to publish, Your Honor?

21         THE COURT:  You may.

22         (An exhibit was projected onto the projector screen.)

23  BY MS. KESSLER:

24  Q      In the first paragraph of this agreement, I think I just

25  asked you, who are the sellers identified here?

1   A      Identifies the sellers as David Fredrick and Patricia

2   Hough.

3   Q      And looking at the Paragraph Number 1, up on the screen

4   or on the document in front of you, could you read to the jury

5   what that says there?

6   A      "Sellers own or control Education Information

7   Consultants, EIC, a Massachusetts corporation, Saba University

8   School of Medicine Foundation, Saba, a Netherlands Antilles

9   foundation, Medical University of the Americas, a Nevis

10  corporation located in Nevis, West Indies, MUA Nevis, and

11  Belize, Central America, MUA Belize, the assess.

12  Q      Looking further down, at Paragraph Number 3, what is

13  indicated as the purchase price?

14  A      $28 million.

15  Q      And what is purchaser going to purchase as part of this

16  transaction?

17  A      "Either directly or through one or more affiliates shall

18  purchase all the stock and ownership interests related to the

19  assets."

20  Q      Thank you.  Now, if we could turn to Page 2 of this

21  document, if you could read to the jury what is in Paragraph C,

22  at the top?

23  A      I'm sorry, could you come again?

24  Q      Could you read to the jury what is in Paragraph

25  Number C?

1   A       "100 percent of the controlling interest of sellers in

2   EIC, Saba, and MUA Nevis, as well as the 50 percent

3   profit-sharing interest in MUA Belize shall be conveyed to a

4   holding company, Huntington Institute Limited.

5   Q       And Huntington Institute Limited was the party that you

6   were representing?

7   A       Yes.

8   Q       And could you read Paragraph D?

9   A       "Immediately upon transfer of the controlling interest,

10  25 percent of all of the issued and outstanding shares or

11  ownership interests of purchaser shall be transferred to

12  sellers or their assignees.  These 25 percent -- these

13  25 percent ownership shares are not subject to dilution, cash

14  calls, or default.  Sellers shall have equal voting rights and

15  adequate minority owner protections.  The remaining 75 percent

16  shall remain in the ownership of the three named

17  directors/owners/assignees of the Huntington Institute

18  Limited."

19  Q       Thank you.

20          Now, moving down to Paragraph F, what is your

21  understanding of what this paragraph indicates would happen

22  pursuant to this agreement?

23  A       The sellers were to participate, on a pro rata basis, in

24  the profits of Huntington Institute Limited after three years.

25  Q       And if there were to be a sale in the future?

1    A      It goes on to say the sellers would participate in that

2    sale as 25 percent owners of any profits realized upon such

3    sale.

4    Q      Now, turning to the last page of Exhibit 6F, is this

5    document signed?

6    A      Yes, ma'am.

7    Q      And who does it appear to have been signed by?

8    A      The sellers.  Dr. David Fredrick, Dr. Patricia Hough.

9           MS. KESSLER:  If I could approach to have Exhibit 6H

10   identified, Your Honor?

11          THE COURT:  You may.

12   BY MS. KESSLER:

13   Q      If you could look at Exhibit 6H, please?  What does this

14   document appear to be?

15   A      An e-mail.

16   Q      From whom, sir?

17   A      From David Fredrick.

18   Q      And who is it addressed to?

19   A      To Brad Anderson, Mark VanCura, and Ray Dobbs.

20   Q      And who is cc'd on this e-mail?

21   A      P.L. Hough.  At yahoo.com.

22   Q      Thank you.  What's the date of this e-mail?

23   A      July 3, 2003.

24          MS. KESSLER:  Your Honor, the government would move

25   in Government's Exhibit 6H.

1          MR. HOCHMAN:  Same relevancy objection, Your Honor.

2          THE COURT:  All right.  Same ruling.  Exhibit 6H will

3   be admitted.

4          MS. KESSLER:  Permission to publish?

5          THE COURT:  You may.

6          (Government's Exhibit 6H was admitted into evidence.)

7          (An exhibit was projected onto the projector screen.)

8   BY MS. KESSLER:

9   Q     If you could read the first sentence of this e-mail,

10  please?

11  A     I'm sorry?

12  Q     The first sentence of this e-mail?

13  A     "Received the signed agreement today, and will initial

14  the changes and then fax it back to Ray tonight."

15  Q     And then, looking at the second paragraph there, can you

16  read that?

17  A     Second paragraph?

18  Q     Yes, sir.

19  A     "Now that it looks like we are all on a road to closure,

20  I will start providing more updated info on the univ," I guess

21  University, "activities, that will be important to know."

22         MS. KESSLER:  Thank you.

23         If I could approach to have 6I marked, Your Honor?

24         THE COURT:  You may.

25

1    BY MS. KESSLER:

2    Q      If you could look at 6I, please?  What is this document?

3    A      An e-mail.

4    Q      And who is it from?

5    A      Patricia Hough.

6    Q      And who is it addressed to?

7    A      Brad Anderson, D. Bradford Anderson.

8    Q      And are individuals –– do people appear to be cc'd on

9    this e-mail?

10   A      Yes.

11   Q      And the date?

12   A      Tuesday, July 8, 2003.

13   Q      Who was cc'd on this e-mail?  Or what are the addresses?

14   A      WRDTexas@AOL.com and DRFrederick@yahoo.com.

15          MS. KESSLER:  If you could –– actually, the

16   government moves 6I into evidence.

17          MR. HOCHMAN:  Same relevancy objection, Your Honor.

18          THE COURT:  All right.  Same ruling.  6I will be

19   admitted and may be published.

20          MS. KESSLER:  Thank you.

21          (Government's Exhibit 6I was admitted into evidence.)

22          (An exhibit was projected onto the projector screen.)

23   BY MS. KESSLER:

24   Q      If you would read the contents of this, starting with

25   "Dear Brad"?

1    A       "Dear Brad, we need to talk soon for an update on the

2    next steps.  I would think you need to form an LLC soon, and

3    other entities.  I would be happy to come to New Orleans and

4    meet with the owners attorneys.  Of particular concern is the

5    Belize situation and the issuing of shares.  We have delayed

6    having our 50 percent issued in our names pending closing and

7    legal advice.  We can have them issued to the LLC or other

8    entity if that is advisable.  I am back in Gardner, so give me

9    a call at the office or at home.  David, like Ray, doesn't have

10   much patience for this type of work, so I will be the

11   designate.  We are moving ahead, making sure all is in order on

12   our end.  Best regards.  Pat."

13            MS. KESSLER:  The Court's indulgence?  Could I

14   consult counsel, Your Honor?

15            THE COURT:  Oh, sure.  Actually, this would probably

16   be a good time for lunch, unless you see it otherwise.

17            MS. KESSLER:  Your Honor, I have no further questions

18   of this witness.

19            THE COURT:  Oh.  Did you want to talk to your lawyer

20   first?

21            MS. FINLEY:  I gave her the thumbs up.

22            THE COURT:  All right.

23            MS. KESSLER:  Just wanted to double-check with my

24   co-counsel.

25            THE COURT:  All right.  Good time to stop for lunch

1    then?

2           MS. KESSLER:  That's fine.

3           THE COURT:  We'll take about an hour,

4    about 1:00 o'clock.

5           Please do not discuss the case among yourselves, or

6    allow anyone to discuss it with you or in your presence.

7    1:00 o'clock.

8           (At 12:00 PM, the jury was escorted from the

9       courtroom.)

10          THE COURT:  All right.  1:00 o'clock.

11          (At 12:00 PM, court was recessed.)

12                      AFTER RECESS

13          (At 1:03 PM, court was reconvened.)

14          THE COURT:  Both sides ready for the jury?

15          MR. HOCHMAN:  Your Honor, if I could have 30 seconds,

16   please?

17          MR. SAUNDERS:  Your Honor, while Mr. Hochman is

18   taking those things, there are a few housekeeping matters John

19   Nekic.  He flew down here at the government's request I believe

20   on Tuesday, along with another government witness, Charlene

21   Varga, who is coming up soon, but who apparently is terrified

22   of flying alone.  Ms. Finley has decided to not call Mr. Nekic.

23   We would definitely be calling him in the defense case.  And to

24   minimize the convenience for both him and Ms. Varga, who needs

25   him to travel with, to require them to stick around until next

1    week, we plan to call him, at some point, out of order, as a

2    defense witness.  I just wanted to make sure there are no

3    problems with that.

4              THE COURT:  That's fine.  There are no problems as

5    far as I'm concerned.

6              MR. SAUNDERS:  Thank you, Your Honor.

7              MS. FINLEY:  I'm sorry.  That's correct.  If I can

8    respond to that.

9              MR. SAUNDERS:  And the Court will advise the jury, to

10   some degree, of what's going on, and . . . .

11             THE COURT:  I will.

12             MR. SAUNDERS:  Thanks.

13             MR. HOCHMAN:  I'm ready, Your Honor.

14             THE COURT:  Are you sure?

15             MR. HOCHMAN:  Yes, Your Honor.

16             THE COURT:  Have the jury step in, please.

17             Have the witness come on in, please.

18             (The witness resumed the witness stand.)

19             (At 1:05 PM, the jury was escorted into the

20        courtroom.)

21             THE COURT:  Mr. Hochman, you may proceed.

22             MR. HOCHMAN:  Thank you very much.

23                          CROSS EXAMINATION

24   BY MR. HOCHMAN:

25   Q    Mr. deCastro, prior to coming here today, you asked for

1    a letter from the prosecutors confirming that you were just a

2    witness; is that correct?

3    A     Yes, sir.

4    Q     And that's called a nontarget letter; is that correct?

5    A     Yes, sir.

6    Q     And that means that you were being called only as a

7    witness, and not as a subject, or a target, of the

8    investigation; correct?

9    A     That's correct.

10          MR. HOCHMAN:  Your Honor, may I present and approach

11   the witness with what has been marked as Exhibit Number 40, for

12   identification?

13          THE COURT:  You may.

14          And I'm sorry, what was that exhibit number again?

15          MR. HOCHMAN:  Four zero, Your Honor.  It's Defense

16   Exhibit 40.

17          THE COURT:  Oh, defense.  Do we have a list?

18          MR. HOCHMAN:  We are in the process of compiling that

19   list, Your Honor.  It will just be . . . if Your Honor wants a

20   copy right here, and then I've got the labeled exhibit right

21   here.

22          THE COURTROOM DEPUTY:  I need to mark the labeled

23   exhibit.

24          MR. HOCHMAN:  Oh, I'm sorry.

25          THE COURTROOM DEPUTY:  Do you want me to give this to

1    the Judge?

2                MR. HOCHMAN:  Yes, please.

3                THE COURT:  And this is my copy to write on?

4                MR. HOCHMAN:  Yes, sir.

5                THE COURT:  Any objection to Exhibit 40?

6                MS. KESSLER:  No, Your Honor.

7                THE COURT:  Defendant's Exhibit 40 will be admitted.

8                MR. HOCHMAN:  Thank you, Your Honor.

9                (Defendant's Exhibit 40 was admitted into evidence.)

10               MS. KESSLER:  Your Honor, the Court would -- the

11   government would simply ask that the contact information,

12   including counsel's phone number, be redacted from the

13   document?

14               THE COURT:  Any objection?

15               MS. KESSLER:  Withdrawn.

16               THE COURT:  All right.  Go ahead.

17   BY MR. HOCHMAN:

18   Q    Mr. deCastro, you've been presented what has been moved

19   into evidence as Exhibit 40.

20        Do you see that?

21   A    Yes, sir.

22   Q    And is that the letter that you received from Caryn

23   Finley, who is behind me, sitting at government counsel table?

24   A    Yes, sir.

25   Q    And that letter states as follows:

1          "Please be advised that a criminal investigation of

2   Dr. David Fredrick and Dr. Patricia Hough is being conducted in

3   the Middle District of Florida.  You are neither a target or a

4   subject of the investigation, but rather a witness who the

5   government believes may have relevant information relating to

6   the investigation."

7          Do you see that?

8   A       Yes, sir.

9   Q       Now, Mr. deCastro, you did absolutely nothing wrong; is

10  that correct?

11  A       Yes, sir.

12  Q       Yet you asked for this letter because you know, based on

13  your own experience, that the fact you did nothing wrong does

14  not mean that the government won't come after you anyway;

15  correct?

16  A       That was my impression, yes, under the advice of counsel

17  internally at the firm.

18  Q       And let me ask you, then, some questions about what you

19  know, and what you don't know.  Let's start with me.

20         We have never met, you don't know me; correct?

21  A       That's correct.

22  Q       We have never talked or communicated in any way before

23  your testimony today; correct?

24  A       That's correct.

25  Q       But you do know the government prosecutors, don't you?

1    A      That's correct.

2    Q      And you've spoken to the government prosecutors before

3    your testimony today; is that correct?

4    A      That's correct.

5    Q      And you don't know Dr. Patricia Hough; is that correct

6    as well?

7    A      That's correct.

8    Q      You've never met her before today; correct?

9    A      That's correct.

10   Q      You haven't e-mailed her?

11   A      That's my recollection.

12   Q      You've never telephoned -- had a telephone call with

13   her?

14   A      That's my recollection.

15   Q      You've never communicated with her in any way.

16   A      That's my recollection.

17   Q      Is it also your recollection -- is that your same

18   recollection for your lack of communication with Dr. Fredrick?

19   A      No.

20   Q      You actually spoke to Dr. Fredrick?

21   A      I . . . my recollection was that I believe that there

22   were conference calls with counsel, with purchaser -- seller's

23   counsel, and -- and it may have been that . . . that

24   Dr. Fredrick may have been on the phone.  I don't remember

25   though.

1   Q      So you don't recall, as you sit here today, one way or

2   the other, if Dr. Fredrick was on a conference call here and

3   there.

4   A      Correct.

5   Q      But Dr. Hough was never on those conference calls.

6   A      I have no recollection, no.

7   Q      Now, with the exception of that one memo that you

8   prepared, that you've testified about, you played absolutely no

9   role, in any of the other documents that you've been shown, and

10  talked to . . . and read parts of to the jury; is that correct?

11  A      That's correct.  My firm didn't prepare the documents.

12  Q      And you're not the custodian of records for Jones

13  Walker; is that correct?

14  A      That's correct.

15  Q      Because you don't even work for Jones Walker today;

16  right?

17  A      That's correct.

18  Q      Now, with respect to all the documents that you've been

19  testifying about, they all concerned a sale that never

20  occurred; correct?

21  A      That's correct.

22  Q      And you provided advice in a memo concerning that sale

23  that did not go through; correct?

24  A      That's correct.

25  Q      And you had not done any due diligence, yourself, at

1    that point, about the Saba School of Medicine Foundation or the

2    Medical University of the Americas; correct?

3    A      That's correct, other than to verify facts that were

4    provided to us.

5    Q      To verify facts that had been provided to you.

6           Well, let's start with this:  The Saba School of -- Saba

7    School of Medicine Foundation is a nonprofit Netherlands

8    Antilles foundation.

9           Do you agree?

10   A      That's my recollection.

11   Q      And nobody owns a nonprofit Netherlands Antilles

12   foundation; correct?

13   A      I . . . .  I wouldn't necessarily say that.

14   Q      Okay.  Did you know, for a fact, if anyone owns -- if

15   anyone can own a nonprofit Netherlands Antilles foundation?

16   A      No.  I wouldn't know.  I wouldn't say that.

17   Q      You don't know one way or the other; is that correct?

18   A      That's correct.

19   Q      You have to say that louder.

20   A      That's correct.

21   Q      And with respect to -- well, you're a tax lawyer; right?

22   A      A general corporate lawyer; yes.

23   Q      Okay.  And you deal with nonprofit foundations in the

24   course of your work?

25   A      I do not, in the domestic context.

1   Q      Have you ever dealt -- do you know anything about

2   nonprofit foundations?

3   A      Not in the domestic context.

4   Q      In the foreign context?

5   A      In the foreign context, foundations are commonly used.

6   Q      Now, does a nonprofit foundation have shares that one

7   can own?

8   A      It would depend on the charter.

9   Q      Do you know, in this case; did you actually look at the

10  Saba School of Medicine Foundation's charter and see if it ever

11  actually issued shares?

12  A      I don't recollect.

13  Q      Would it surprise to you learn that it never issued any

14  shares?

15  A      No.

16  Q      Because, again -- but again, you don't know, one way or

17  the other, whether or not this nonprofit foundation had shares

18  that it issued; correct?

19  A      Correct.

20  Q      Because, if it didn't issue shares, you couldn't own

21  shares; correct?

22  A      In the hypothetical setting, yes, you're correct.

23  Q      And if you don't own shares, you don't own a nonprofit

24  foundation; correct?

25  A      Not in the foreign context.

1   Q       Let me try it this way then.

2           With respect to controlling a nonprofit foundation, you

3   can control, directly or indirectly, a nonprofit foundation by

4   sitting on its board of directors; is that correct?

5   A       That's correct, in the domestic and international

6   context.

7   Q       Okay.  And you can control it, as well, if it's a

8   nonprofit foundation dealing with a medical school, if you're

9   also not only on the board of directors but the president of

10  the medical school, is that correct, you might have some direct

11  or indirect control over the foundation.

12  A       In the hypothetical, correct.

13  Q       Now, if you could turn to Exhibit 8B, which I believe

14  you have before you.

15          MR. HOCHMAN:  And if I might publish 8B, Your Honor,

16  Page 1?

17          THE COURT:  You may.

18          MR. HOCHMAN:  Actually, I'll start with Page 2, Your

19  Honor.

20  BY MR. HOCHMAN:

21  Q       Now, this was the memo that the government discussed,

22  that you prepared in connection with some analysis dealing with

23  a sale that did not go through; is that correct?

24  A       That's correct.

25  Q       Now, your clients, were they Dr. Patricia Hough and

1    Dr. David Fredrick?

2    A      No, sir.

3    Q      Your clients are what's called in this memo the

4    investors; is that correct?

5    A      Correct.

6    Q      And your clients, even though it's crossed out here, I

7    think you said were Brad Anderson, Roy Dobbs, and Mr. VanCura?

8    A      The entity that they represented; yes.

9    Q      Or the entity that those three represented.

10          And again, this memo that you prepared was based on your

11   due diligence at that time; correct?

12   A      On facts that came through our client.

13   Q      The facts that came to your client.

14   A      No.  The facts that came through them, the facts that

15   were communicated to us by my former client, or the firm's

16   former client.

17   Q      I see.  So you didn't do independent verification of the

18   facts that were communicated to you through your client; is

19   that correct?

20   A      Not necessarily.  We were -- we were provided with some

21   background information.

22   Q      Okay.  Let's take the Saba School of Medicine

23   Foundation, did you ever see its charter from 1988?

24   A      I don't recall.

25   Q      Well, if you . . . would it be something that you would

1    have asked to see if you actually had done due diligence in

2    this case?

3    A       Yes.

4    Q       And you said before, on your direct testimony, your firm

5    was never hired to do the due diligence in connection with this

6    transaction; is that correct?

7    A       On the transaction, correct.

8    Q       I'm sorry?

9    A       On the transaction, correct.

10   Q       So dealing with -- and then I look at the -- at the memo

11   here.

12           This memo wasn't written to David Fredrick; is that

13   correct?

14   A       That's correct.

15   Q       And this memo wasn't written to Dr. Patricia Hough; is

16   that correct?

17   A       That's correct.

18   Q       And you have no idea, whatsoever, whether or not

19   Dr. Patricia Hough ever read this memo; is that correct?

20   A       That's correct.

21   Q       And as a matter of fact, if we can turn to the first

22   page of this memo, it's sent from . . . it's sent from David

23   Fredrick to Jerry Schneider.

24           You don't see Dr. Patricia Hough's name anywhere on this

25   transmittal document; correct?

1    A      That's correct.

2    Q      Now, with respect to the memo, if we could turn to the

3    third page?

4    A      Three of seven?

5    Q      Yes.  It's in the very bottom left-hand corner.  It says

6    8B, 0003; do you see that, bottom left-hand corner?

7           It would be, actually, two of seven.

8    A      Wait.  I'm one page ahead of you.  Yes.

9    Q      Now, you state in Paragraph 2:

10          "The investors are planning to acquire a 75 percent

11   equity interest in a venture consisting of four companies.

12   This venture is currently owned by Dr. David Fredrick, and his

13   wife, Dr. Patricia Hough."

14          Did you ever speak to Dr. Patricia Hough, to find out if

15   she owned this venture?

16   A      No, sir.

17   Q      Did you ever speak directly to Dr. David Fredrick, to

18   see if he owned this venture?

19   A      No, sir.

20   Q      And then you say that there's basically four different

21   entities.

22          There's EIC; do you see that in Paragraph 3?

23   A      Yes, sir.

24   Q      Then there is the Saba University Netherlands Antilles.

25          And you say that's a foundation; correct?

1    A       We identified it as such.

2    Q       And again, you hadn't actually looked at its charter to

3    see whether or not it has shares, or not has shares, as far as

4    it being a nonprofit Netherlands Antilles foundation; correct?

5    A       I don't recall; correct.

6    Q       And you don't know of anyone -- you can't recall -- or

7    excuse me.

8            You don't know, as you sit here today, whether anyone

9    can actually own the Saba University School of Medicine

10   Foundation; correct?

11   A       That's correct.

12   Q       Now, if I can take you to the third -- excuse me --

13   what's been marked as the fourth page, it's three of seven, the

14   next page.

15           Now, the point of this memo is that you came up with a

16   structural step analysis to come up with different steps that

17   your investors could do to manipulate the corporate structure

18   in order to have a deal that minimized tax as much as possible;

19   correct?

20   A       Not necessarily.

21   Q       Well, was one of your goals in structuring a deal for

22   the sale to minimize tax as much as possible?

23   A       Not necessarily.

24   Q       Did you want to maximize tax for your clients as much as

25   possible?

MARIO DECASTRO - CROSS/HOCHMAN                    137

```
 1    A       Of course not.

 2    Q       Because you're trying to minimize tax.

 3    A       Not necessarily.

 4    Q       You're trying to eliminate tax?

 5    A       No.

 6    Q       Defer it?

 7    A       Potentially.

 8    Q       Let's go through your memo, then, and see what you

 9    actually --

10    A       I . . . .

11    Q       I'm sorry?

12    A       You're in charge now.

13    Q       Well, you're setting up a new structure; isn't that

14    correct?

15    A       Right, for an acquisition.  But it could have many

16    reasons, not just deferral of tax.  That could be one reason,

17    potentially.

18    Q       Then maybe I didn't state it correctly.

19            One of the reasons that you're setting up of a new

20    structure is to minimize tax as much as possible; is that

21    correct?

22    A       On a current basis, potentially.  But another reason --

23    another reason in setting up a structure could also be to . . .

24    to limit liability, to provide for a -- it could also be

25    liability -- not tax liability, corporate liability, toward
```

1    exposure.  It could be for a number of reasons, potentially to

2    protect your client as they enter into a new transaction.  And

3    this is in the hypothetical.  This took place ten years ago.

4    Q      That's actually an interesting point.  Let me explore it

5    a little bit more.

6           When you say "limit liability," that means that if a

7    company that's set up gets sued, you want to make it so that

8    the liability is limited as possible.

9           In other words, you set up a variety of companies; if

10   Company 1 is sued, that they can't go after the assets of

11   Company 2, 3, and 4; is that correct?

12   A      Well, in this case, it was an acquisition, so we were --

13   our -- my role, or our role at Jones Walker was to protect the

14   interests of our client, the potential purchaser.

15   Q      Right.  But I'm dealing with -- explain to the jury what

16   you mean by limiting liability?

17   A      When you have a potential -- a buyer, seller, depending

18   on who you represent, you want -- in our case, if you're

19   representing the buyer, you want to make sure that your client

20   doesn't step into a mess from a tort perspective, meaning that

21   people have fallen or slipped in the buildings, or whatnot, or

22   that their contracts, that potentially could create contractual

23   liability, et cetera.

24   Q      So you're setting up a corporate structure such that

25   you're trying to limit the ability of people who might sue an

1    entity to not be able to go after your clients ultimately; is

2    that correct?

3    A       Potentially.

4    Q       It's like a form of asset protection; correct?

5    A       Corporate asset protection.

6    Q       Corporate asset protection.

7            And you set up the structure that has a number of

8    different corporations in order to limit the liability to your

9    investors; is that correct?

10   A       Well, we didn't set up the structure, we recommended it

11   as a viable alternative.

12   Q       Right.  And this is, again, recommendations to your

13   client; correct?

14   A       It was preliminary recommendations.

15   Q       That weren't ultimately followed because the sale never

16   went through; is that correct?

17   A       Correct.  Or, in terms of our representation, we --

18   we -- we reserve to do more analysis.  That's clear in the

19   memo.

20   Q       Okay.  Now, if I can take you to the fifth page of this

21   memo, the government, I believe, discussed Step 2 with you.

22   But I'd like to go down to the next paragraph, which starts

23   with, "If the investors," the second paragraph of this memo:

24           "If the investors merely contribute the funds from the

25   recourse financing to New Hold Co., in return for their

1    75 percent equity interest, the exchange would not trigger any

2    income tax consequences and would therefore benefit from

3    nonrecognition of gain or tax-free treatment under Section 721

4    of the Internal Revenue Code of 1986, as amended, the Code."

5           Do you see that?

6    A     That's correct.

7    Q     So this was your attempt to create some type of -- or

8    potentially create some type of tax-free treatment in

9    connection with this sale; is that correct?

10   A     Well, Section 721 of the code, which lies under the

11   Subchapter K provisions of dealing with partnerships, relates

12   to contributions in formation of a partnership.  You have a

13   similar provision under the corporate tax regime as well.

14   Q     Is there anything illegal in what you're recommending,

15   basically creating new companies and trying to get tax-free

16   treatment?

17   A     On the formation; no.  It's spelled out in the tax code.

18   Q     Sure.  So as long as -- but -- and you're doing your

19   best, as a lawyer for the company, to try and take advantage of

20   whatever is in the code that allows your client to either have

21   a tax-free treatment, a deferral of tax treatment, or otherwise

22   tries to minimize their taxes; is that correct?

23   A     To work within the rules provided.

24   Q     You work within the rules.

25         But again, as long as you're working within the rules,

1    you can try to minimize tax or defer it as long as possible; is

2    that correct?

3    A      To the extent you work within the rules.

4    Q      And is there anything, by the way, illegal with

5    corporate asset protection that you were talking about a moment

6    ago?

7    A      No, nothing, as long as you're not perpetrating a fraud.

8    Q      You didn't do anything illegal, correct, by recommending

9    this structure?

10   A      That's correct.

11   Q      And if you looked back at the very bottom of this page,

12   on Page 5 here, last -- where it starts, number one?

13          On your tax analysis of structure, it says the creation

14   of the new entities under the new acquisition structure will

15   occur free from any U.S. tax consequences to the investors.

16          That would be very good tax planning; correct?

17   A      Well, it's the formation of an entity.

18   Q      And there's nothing illegal with that?

19   A      That's correct.

20   Q      Even though it will occur free from any tax consequences

21   to the investors, there's nothing illegal with that; correct?

22   A      No.

23   Q      And if you can go to the next page, Paragraph 3?

24          It says:  "Deferral opportunities under this structure,

25   as it relates to the foreign university Opcos, which are

1   controlled foreign corporations, will depend on U.S. Subpart F,

2   tax regime."

3        So when you say, "defer opportunities," that means you

4   pay your taxes at some later point in time; is that correct?

5   A      Potentially.

6   Q      And then if you can go down one paragraph,

7   second-to-last sentence?

8   A      I think you're misrepresenting legally, but I'm not here

9   to be an expert witness, but the Subpart F rules are a

10  complicated set of rules, as you probably know or don't know,

11  right?  And they deal with foreign -- how U.S. corporations

12  deal on a day-in and day-out basis overseas.

13  Q      And do you have any idea whether or not Dr. Fredrick

14  understands the complicated subpart --

15  A      He was represented by counsel, I believe.

16  Q      But do you know whether or not he personally understood

17  Subpart F?

18  A      I do not.  I believe he was represented by counsel.

19  Q      Right.  But you have no idea, as you sit here today,

20  I'll ask the question again, whether or not he understood what

21  Subpart F was?

22  A      Correct.

23  Q      And the same thing with Dr. Hough, you have no idea what

24  she understood by Subpart F; correct?

25  A      Correct.

1    Q        If I can turn your attention, now, to Exhibit 6B, like

2    in "boy"?

3    A        Which one?  I'm sorry.

4    Q        6B.

5              MR. HOCHMAN:  And if we could put 6B on the

6    projector, please?  Thank you.

7    BY MR. HOCHMAN:

8    Q        This is a letter you testified about, from Dr. David

9    Fredrick to Brad Anderson and Mark Cura.  Do you see that?

10   A        Yes, sir.

11   Q        And in that letter, do you see any CC or mention --

12   excuse me -- any indication in that letter that this letter

13   came from Dr. Patricia Hough?

14   A        No, sir.

15   Q        Do you have any idea whether Dr. Patricia Hough ever saw

16   this letter?

17   A        No, sir.

18   Q        Do you have any idea whether or not Dr. Patricia Hough

19   ever reviewed this letter?

20   A        No, sir.

21   Q        Do you have any idea whether or not Brad Anderson or

22   Mark Cura -- strike that -- whether or not anybody in this

23   letter shared this letter with Dr. Patricia Hough?

24   A        No, sir.

25   Q        If you can turn to Exhibit C -- 6C.  Excuse me.

1          Exhibit 6C is an e-mail from David Fredrick to

2   DBA Andreas.com, which I think you said was Brad Anderson?

3   A      Yes, because it's directed to Brad, "Dear Brad."

4   Q      And do you have any idea whether or not Dr. Patricia

5   Hough ever saw this e-mail?

6   A      No, sir.

7   Q      Do you know whether or not she reviewed it?

8   A      No, sir.

9   Q      Do you know whether or not David Fredrick or Brad

10  Anderson shared it with her?

11  A      No, sir.

12  Q      If you could turn to Exhibit 6D, like in "David," and if

13  we could focus on the top part of the exhibit, please?

14         Now, this is a letter of intent, and it's being sent to

15  Dr. Fredrick and Dr. Hough; do you see that?

16  A      Yes, sir.

17  Q      Who is it being sent from?

18  A      From CFCC Limited.

19  Q      And who is CFCC Limited?

20  A      I don't recall, other than it . . . medical

21  research . . . .  A company.

22  Q      Was that Brad Anderson's company?

23  A      Yes.  It was signed by him.

24  Q      That was your client; right?

25  A      Yes, sir.  But we represented a different entity, from

1    what I recall, this Huntington Institute.

2    Q      So CFCC is not who your client was?

3    A      I don't -- I don't recall.  I believe it was Huntington

4    Institute.

5    Q      And in this document that was -- and this document was

6    prepared by CFCC, not Dr. Fredrick or Dr. Hough; correct?

7    A      That is correct.

8    Q      And I'll take your attention -- or draw your attention,

9    in the first paragraph.  And if we could highlight the last

10   four lines, four or five lines . . . a little -- I'm sorry --

11   first paragraph, last four or five lines of the first

12   paragraph.

13   A      Where it starts, "to EIC"?

14   Q      Yes.  Sort of the lines that are highlighted there?

15   A      Okay.  Yes.

16   Q      Where it says . . . .  It goes, "As described in the" --

17   I can't even read it from here -- "As described in all other

18   subsidiaries, affiliates, assets and interests related to EIC,

19   Saba, and MUA, that are held by Fredrick and/or Hough, and

20   otherwise directly or indirectly in their control."

21          Do you see that?

22   A      Yes.

23   Q      Is there any definition in this letter, what it means to

24   have something in your direct control?

25   A      Let me take a look.

1    Q      Please.  And while you are looking, also look to see

2    whether there's a definition of "indirect control."

3              (The witness examines an exhibit.)

4    A      It's much easier with Control-F, isn't it?

5    Q      I'm sorry?

6    A      It's much easier when you have the benefit of hitting

7    Control-F.

8              I don't see any definition.

9    Q      And you're used to drafting agreements; correct?

10   A      Yes.  I have in the past.

11   Q      And you understand the importance of defining certain

12   key terms in an agreement so everybody understands what is

13   meant by a particular term; isn't that correct?

14   A      Yes.

15   Q      And you would consider, would you not, the notions of

16   direct or indirect control to be key terms of this agreement;

17   correct?

18   A      They would be operative; yes.

19   Q      So, then, in Paragraph 2 of this agreement, it says --

20            MR. HOCHMAN:  If you can highlight that, or . . . .

21   There it is.

22   BY MR. HOCHMAN:

23   Q      It says:  "Fredrick and Hough have the controlling

24   interest in MUA Nevis, and 50 percent of MUA Belize."

25            Again, you've already looked for the word "control," do

1    you see any definition of what it means to have a controlling

2    interest?

3    A      In the document; no, sir.

4    Q      And that is a key term that one should expect to be

5    defined in such an agreement; correct?

6    A      If you were drafting this; yes.

7    Q      And you said before, if I'm correct, that someone can

8    have indirect or direct control of an organization by sitting

9    on their board of directors; correct?

10   A      Potentially, yes.

11   Q      If I can turn your attention to Page 5 of the agreement,

12   which is the second-to-last page now, you see a . . . do you

13   see Dr. Hough's signature above the name, Dr. Patricia Hough?

14          Do you see that?

15   A      Yes.

16   Q      Were you present when Dr. Hough signed this agreement?

17   A      No, sir.

18   Q      Do you know if Dr. Hough actually read any part of this

19   agreement before she signed it?

20   A      No, sir.

21   Q      Do you know what, if anything, Dr. Hough was told about

22   the terms, indirect or direct control, before she signed it,

23   assuming she even looked at the agreement before she signed it.

24   A      No, sir.

25   Q      Do you have any idea whether or not she was just given

1    the signature page to sign, signed it, and that was

2    incorporated with this agreement?

3    A      I wouldn't know.

4    Q      Because you weren't there.

5    A      That's correct.

6    Q      If we can turn to Exhibit 6E.

7    A      Which one, C?

8             MR. HOCHMAN:  6E.

9             MS. KESSLER:  I don't believe that 6E had been

10   admitted.  I'm not certain, but . . . .

11            MR. HOCHMAN:  You know what?  We'll -- I believe that

12   that's correct, Your Honor.  Let me turn to 6F then.

13            THE WITNESS:  Okay.

14            MR. HOCHMAN:  Okay.  If we could put 6F on the

15   screen?

16            (An exhibit was projected onto the projector screen.)

17   BY MR. HOCHMAN:

18   Q      And focus on Paragraph 1.

19            And this is an agreement between the Huntington

20   Institute and David Fredrick and Patricia Hough; do you see

21   that?

22   A      Yes.

23   Q      And it says, "sellers own or control," and then it lists

24   Education Information Consultants, Saba University School of

25   Medicine Foundation, Medical University of the Americas,

1    located in Nevis and Belize.

2            Do you see that?

3    A      Yes.

4    Q      Focus again on that word, "control."

5            Do you see any definition for the word, "control,"

6    anywhere in this agreement?

7                (The witness examines an exhibit.)

8    A      I do not.

9    Q      And again, that would be a key term that should have

10   been defined in this agreement; correct?

11   A      If you or I were drafting it; yes, I would hope.

12   Q      I appreciate that you give me that level of expertise as

13   well.

14           If you could turn to Paragraph 8 on this first page?

15   A      Which one; 8?

16   Q      Paragraph 8.

17   A      Yes, sir.

18   Q      There it is.

19           You see it says:  "The acquisition shall be as follows:

20   Upon the simultaneous transfer by purchaser of $28 million in

21   U.S. funds" -- and then it says, "to the depository designated

22   by sellers."

23           Do you see that?

24   A      Yes.

25   Q      And that depository designated by sellers could have

1   been the Saba School of Medicine Foundation; correct?

2   A      Perhaps.

3   Q      It could have been the Medical University of the

4   Americas; is that correct?

5   A      Perhaps.

6   Q      It could have been EIC, Education Information

7   Consultants; correct?

8   A      Perhaps.

9   Q      And it could have been, at that time at least, Medical

10  Universities of America in Belize.

11  A      Perhaps.

12  Q      And if I could turn your attention to Page 3 of this

13  document?

14  A      Yes.

15  Q      And you see what appears to be Patricia Hough's

16  signature above the name, Dr. Patricia Hough; do you see that?

17  A      Yes.

18  Q      Were you there when she signed it?

19  A      No.

20  Q      Do you have any idea what was explained to her at the

21  time she signed her name?

22  A      No.

23  Q      Do you have any idea if anything was explained to her at

24  the time she signed her name?

25  A      No.

1  Q      Do you have any idea whether or not she reviewed the

2  document, and all the words in it, before she signed her name?

3  A      No.

4  Q      Do you know whether or not she was just handed this

5  document and told to sign it, and didn't review it?

6  A      I don't know.

7  Q      Because you weren't there.

8  A      That's correct.

9          MR. HOCHMAN:  May I have a moment, Your Honor?

10          THE COURT:  You may.

11          (Mr. Hochman reviews his notes and various exhibits.)

12  BY MR. HOCHMAN:

13  Q      If I could turn your attention to Exhibit 6H.

14          Now, if you could highlight the first two paragraphs?

15  A      6H?

16  Q      Yes.

17          Now, the government highlighted the first sentence, do

18  you recall that, the, "I received the signed agreement today,

19  and will initial the changes, then fax it back to Ray tonight."

20          Do you see that?

21  A      At the very top, yes.

22  Q      And then the government highlighted the -- skipped the

23  next sentence, and then highlighted the next sentence that

24  says:  "Now that it looks like we are all on a road to closure,

25  I will start providing more updated info on university

MARIO DECASTRO – CROSS/HOCHMAN                    152

1   activities that will be important to know."

2          Do you see that?

3   A      Yes.

4   Q      I would like to highlight the missing sentence in the

5   middle.  It starts with "Pat."

6          And it says:  "Pat is presently in DC visiting our legal

7   team that are working with the D.O.E., for our Title IV

8   approval.  Everyone is very positive, including our staff at

9   the D.O.E."

10         Do you see that?

11  A      Yes.

12  Q      And then if you could scroll down to Point 3, if you

13  could?

14  A      Point 3 in -- Paragraph 3, yes?

15  Q      Paragraph 3, yes.  Point 3.

16         And it says there:  "During the next several weeks, Pat

17  and I will be visiting our clinical hospitals in preparation

18  for the ACCM/DOE site visits, which are part of the

19  accreditation process.  Pat has just concluded visits to

20  hospitals in DC and MD" -- presumably Maryland -- "and we will

21  both be visiting our hospitals in Kansas City, St. Louis, and

22  New York later this month."

23         Do you see that?

24  A      Yes.

25  Q      This e-mail was sent from David Fredrick to Brad

1    Anderson, Mark VanCura, and Ray Dobbs.

2         Do you see that?

3    A    Yes.

4    Q    And it was CCed to Pat Hough.

5    A    Yes.

6    Q    Do you have any idea whether or not Pat Hough ever

7    received this e-mail?

8    A    No, other than she was copied.

9    Q    Do you have any idea whether or not she reviewed this

10   e-mail while she was presently in DC, "visiting our legal team

11   that are working with the D.O.E." -- Department of Education --

12   "for our Title 4 approval"?

13   A    I do not.

14   Q    If you could turn to Exhibit 6I, this is an e-mail that

15   was sent from Patricia Hough to Brad Anderson, and I think it

16   was also Roy Dobbs; isn't that right?

17   A    6I?

18   Q    Yes, 6I.

19   A    Okay.

20   Q    Is that correct, do you have that in front of you?

21   A    Yes.

22   Q    And in this e-mail she talks about, if I can draw your

23   attention to the third sentence, "We have delayed having our

24   50 percent issued in our names pending a closing" -- and do you

25   see that part, "legal advice"; do you see that?

1    A      Yes.

2    Q      And then it says:  "We can have them issued to the LLC

3    or other entity if that is advisable", spelled "advisale."

4           Is that correct?

5    A      That's correct.

6    Q      Now, are you aware that, when Roy Dobbs and Brad

7    Anderson went down to the island of Saba and Nevis, the person

8    that showed them around the islands was Dr. Patricia Hough; are

9    you aware of that?

10   A      I am not, or I don't recollect.

11   Q      Are you aware that when Brad Anderson and Roy Dobbs had

12   questions about clinical rotations and the accreditation

13   process that they would go to Dr. Patricia Hough?

14   A      I don't remember.

15   Q      And are you aware that when Roy -- Brad Anderson or Roy

16   Dobbs had any financial questions, they would go to Dr. David

17   Fredrick?

18   A      I don't remember.

19           MR. HOCHMAN:  May I have a moment, Your Honor?

20           THE COURT:  You may.

21           (Mr. Hochman confers with co-counsel privately.)

22           MR. HOCHMAN:  No further questions, Your Honor.

23           THE COURT:  All right.  Thank you.

24           Ms. Kessler?

25           MS. KESSLER:  Thank you, Your Honor.

1                    REDIRECT EXAMINATION

2    BY MS. KESSLER:

3    Q       Mr. deCastro, can you turn to Exhibit 6I, please?

4    A       Yes, ma'am.  I have it right here.  Um-hum.

5    Q       Okay.  Do you have any idea whether Dr. Fredrick

6    received this -- excuse me, I have the wrong exhibit up.

7    A       6I?

8    Q       I'm sorry.  I am correct.

9            Looking at the CC on this e-mail, do you have any idea

10   whether DR Fredrick at Yahoo.com received this e-mail?

11   A       Other than he was addressed?

12   Q       Right.

13   A       Right.

14   Q       Looking then at Exhibit 6H, please.

15   A       Six -- which one?

16   Q       H, like "Henry."

17           Who is this e-mail addressed to, in the "to" line?

18   A       Brad Anderson, Mark VanCura, Ray Dobbs.

19   Q       Those were the individuals you were dealing with for

20   purposes of the potential transaction here.

21   A       Correct.

22   Q       And you really -- do you have any idea whether they

23   received this e-mail?

24   A       Other than they were copied, or rather addressed to.

25   Q       Well, did you receive this document from, presumably,

1   them?

2          MR. HOCHMAN:  Objection, foundation on him receiving

3   anything.

4          THE COURT:  Overruled.  He can answer whether he did

5   or didn't.

6          THE WITNESS:  If it came to us, it came to us from

7   the client.

8   BY MS. KESSLER:

9   Q      And the client was Huntington Institute?

10  A      Correct.

11  Q      And the people associated with the Huntington Institute

12  were Brad Anderson, Mark VanCura, and Ray Dobbs.

13  A      Correct.

14  Q      Now, if you could turn to Exhibit 6D, please.

15         MR. HOCHMAN:  E, like in "Edward," or D, like in

16  "David"?

17         MS. KESSLER:  D, like in "dog."

18         THE WITNESS:  Okay.

19  BY MS. KESSLER:

20  Q      Looking at the first few lines of this document here, do

21  Dr. Fredrick or -- are Dr. Fredrick or Dr. Hough in any way

22  identified as a director, or a trustee, or any other sort of

23  fiduciary capacity related to the entity, or are they simply

24  named individually?

25  A      Dr. Fredrick is identified as president.

1    Q        And is that -- what page are you looking at?

2    A        The very last one.

3    Q        The next to the last page of this document?

4             MS. KESSLER:  If we could pull that up?

5             THE WITNESS:  Yes.

6    BY MS. KESSLER:

7    Q        Does he also sign above that, Dr. David Fredrick, with

8    no title as well?

9    A        Yes.

10   Q        And is Dr. Patricia Hough's name there with no title?

11   A        Yes.

12   Q        And looking at the first page of this document, is any

13   title listed near their names, where they're referred to

14   collectively as the sellers?

15   A        Do you mean at the very top, where it starts, "This

16   letter"?

17   Q        Yes, sir.

18   A        No.  It just identifies them by name.

19   Q        Now, if you could turn to Exhibit 6F, like "Frank,"

20   please.

21   A        6F?

22   Q        Looking at the first paragraph of the first page of this

23   document, do David Fredrick and Patricia Hough -- their name is

24   reflected there.

25             Is there any indication of a title, or fiduciary, or

1    director, trustee, or anything of that nature, where they are

2    identified?

3    A       Where you are highlighting?

4    Q       Yes, sir.

5    A       No, ma'am.

6    Q       Now, if you turn to the last page of this document, is

7    there any title or other fiduciary title --

8    A       No, ma'am.

9    Q       -- listed there?

10           They're simply identified individually as David Fredrick

11   and Patricia Hough, signers.

12   A       Correct.

13   Q       Now, if you could turn to Exhibit 8B, this is the --

14   excluding the first page of this exhibit, the remainder of the

15   exhibit, this is the draft memorandum you prepared with others

16   in your -- with Jones Walker?

17   A       That's correct.

18   Q       And did you prepare this document based on your

19   understanding of who the sellers of Saba, MUA, and the other

20   entities were?

21   A       Yes, ma'am.

22   Q       And did you get that understanding based on what your

23   clients told you?

24   A       Yes, ma'am.

25   Q       Did you have any reason to believe that your clients

1  wouldn't tell you what their understanding was of who the

2  sellers were?

3  A      No.

4          MR. HOCHMAN:  Objection, relevant as to what his

5  clients think about the sale.  Irrelevant, excuse me.

6          THE COURT:  I'm sorry, I lost your last few words.

7          MR. HOCHMAN:  Objection, relevancy, as to what his

8  clients think about this particular sale.

9          THE COURT:  Okay.  Overruled.

10          MS. KESSLER:  No further questions.

11          THE COURT:  Mr. Hochman?

12          MR. HOCHMAN:  No further questions, Your Honor.

13          THE COURT:  All right.  Counsel, if you'd come to

14  sidebar, please?

15                     AT SIDEBAR

16          THE COURT:  Once during every trial I feel obligated

17  to do, to bring to counsels' attention the use of multiple

18  negatives in the same sentence.

19          You asked a question, "There's nothing illegal about

20  that; correct?"  And the answer is no.  I don't know what that

21  means, but that's the record you made, and it's the last I am

22  going to say it, because lawyers do that kind of thing all the

23  time.  So I've done my job, and the rest is on you folks.

24          MR. HOCHMAN:  Thank you, Your Honor.  You're

25  absolutely right.  Sometimes you get caught up in the moment,

1    and you need to put it always in the positive.

2              THE COURT:  You do.  If you want to ask anything of

3    this witness, fine.  I'll let you.  If not, just a word to the

4    wise, what you think you're getting may not be literally what

5    you're getting.  And I'm looking at you because that's the

6    example; but I suspect we all do it, as well.

7              MR. HOCHMAN:  May I reopen just to ask that question

8    again, Your Honor?

9              THE COURT:  You may.  And I don't remember what you

10   were referring to.  You may.

11             MR. HOCHMAN:  I think I remember what I was --

12             THE COURT:  Okay.

13                        IN OPEN COURT

14                     RECROSS EXAMINATION

15   BY MR. HOCHMAN:

16   Q      Mr. deCastro, I just have a very brief follow-up.

17          It is not illegal to -- for a -- to engage in corporate

18   asset protection; correct?

19   A      That is correct.

20   Q      And it is not illegal to try to minimize your taxes

21   within the rules and regulations of the Internal Revenue Code;

22   is that correct?

23   A      That's correct.

24             MR. HOCHMAN:  No further questions.

25             THE COURT:  All right.

1       Ms. Kessler, anything further?

2       MS. KESSLER:  No, Your Honor.

3       THE COURT:  You may stand down.  Thank you.

4       (The witness left the witness box.)

5       THE COURT:  You may call your next witness.

6       MS. KESSLER:  The government calls Mr. Jerome

7  Schneider, Your Honor.

8       THE COURT:  Mr. Schneider, come right on up here,

9  please.

10      THE COURTROOM DEPUTY:  If you would raise your right

11  hand.

12      Do you solemnly swear or affirm to tell the truth,

13  the whole truth, nothing but the truth, in the case now before

14  the Court?

15      THE WITNESS:  I do.

16      THE COURTROOM DEPUTY:  You may have a seat.

17      State your full name, spelling your last.

18      THE WITNESS:  Jerry Schneider.  J-E-R-R-Y.

19  S-C-H-N-E-I-D-E-R.

20      THE COURTROOM DEPUTY:  Thank you.

21      MS. KESSLER:  I'm sorry, Your Honor.  I'm trying to

22  get myself organized.

23                      JERRY SCHNEIDER,

24  called as a witness by the Government, and having been first

25  duly sworn, was examined and testified as follows:

1                         DIRECT EXAMINATION

2    BY MS. KESSLER:

3    Q       Good afternoon, Mr. Schneider.

4    A       Good afternoon.

5    Q       Can you tell the members of the jury where you live?

6    A       Delray Beach, Florida.

7    Q       And what do you do for a living?

8    A       I'm a certified public accountant.

9    Q       Where do you practice?

10   A       I don't practice accounting anymore.  I'm retired.

11   Q       Do you . . . how long were you practicing?

12   A       Over 40 years.

13   Q       Did you say were you a certified public accountant, I'm

14   sorry?

15   A       Yes.

16   Q       And when did you get your CPA license?

17   A       1971 or '72.

18   Q       Did you -- how did you start out practicing after you

19   obtained your license?

20   A       I worked for a few accounting firms for about seven or

21   eight years, and then I went out on my own to create my own

22   firm, probably around 1976, 1977, something like that.

23   Q       How long did you operate your own accounting firm?

24   A       Since that date, through 2000 and -- 10.  Because I

25   retired January 1, 2011.

1    Q       And what sort of . . . education do you have?

2            Did you go to college?

3    A       Yes.

4    Q       And where did you go to school?

5    A       Pace College in New York City.

6    Q       Did you . . . have any graduate education as well?

7    A       Some graduate credits; yes.  Maybe 20.  I'm not sure

8    anymore.

9    Q       I'm sorry, 20?

10   A       Maybe 20, yes.

11   Q       What sort of coursework did you take; anything related

12   to accounting or tax?

13   A       Accounting, yes.  I was an accounting major.

14   Q       In your undergraduate as well as postgraduate?

15   A       Yes.

16   Q       What sort of work did you do as part of your practice

17   when you were operating your own firm from the mid-seventies

18   until your retirement?

19   A       It was a general accounting practice.  We serviced a

20   multitude of industries, restaurants, manufacturers, law firms,

21   medical practices, schools, high net-worth individuals.

22   Q       And what sort of accounting services did your firm

23   provide?

24   A       Tax, financial statement preparation, auditing.  That's

25   basically it.  And consulting, financial consulting, I would

1    say.

2    Q      Did there come a time when you, as part of your

3    professional work, met . . . or learned of individuals by the

4    name of Dr. David Fredrick and Dr. Patricia Hough?

5    A      Yes.

6    Q      Do you recall approximately when that was?

7    A      Towards the end of 2003, I believe.

8    Q      And how did that . . . or how did you come to know about

9    them or meet them?

10   A      He was referred to us from another client.

11   Q      When you say "he," who are you referring to?

12   A      David Fredrick.

13          MS. KESSLER:  Your Honor, may I approach to have

14   Exhibit 7II marked?

15          THE COURT:  You may.

16   BY MS. KESSLER:

17   Q      Mr. Schneider, if you could open that folder and look at

18   Exhibit 7II, please?

19          (The witness examines an exhibit.)

20   Q      What is this document?

21   A      It's an e-mail from a gentleman named Michael Refolo, to

22   a gentleman named Blake Spahn, with a cc to myself, Patricia

23   Hough, Dr. Fredrick, and Michael T. Angelini, I believe -- yes,

24   Angelini.

25   Q      And what's the date of this e-mail?

1    A       November 20th, 2003.

2    Q       What is the nature of this e-mail; what is being

3    discussed, or why were you on the e-mail?

4            That is a lot of questions --

5    A       Okay.

6    Q       -- let me rephrase.

7    A       No problem.

8    Q       What is the nature -- what was the nature of what was

9    being discussed in this e-mail?

10   A       Mr. Refolo is communicating with a gentleman named Blake

11   Spawn, talking about . . . the potential of . . . of Blake

12   Spawn being interested in --

13           MR. HOCHMAN:  Objection, Your Honor, as to the

14   contents of a record not admitted into evidence yet.

15           THE COURT:  Sustained.

16           MS. KESSLER:  Your Honor, the government moves 7II

17   into evidence.

18           THE COURT:  Any objection?

19           (Mr. Hochman confers with Ms. Kessler privately.)

20           MR. HOCHMAN:  May I have one moment, Your Honor, with

21   counsel?

22           THE COURT:  You may.

23           (Mr. Hochman confers with Ms. Kessler privately.)

24           MR. HOCHMAN:  I would object, Your Honor.  Improper

25   foundation as a business record.

1          THE COURT:  You're going to have to show me the

2    exhibit.

3          MS. KESSLER:  I can ask some further questions, Your

4    Honor.

5          THE COURT:  All right.

6    BY MS. KESSLER:

7    Q     Do you recall having received this e-mail?

8    A     I would imagine so.  It's so long ago, it's hard for me

9    to remember, but I would assume I did receive it.

10   Q     All right.  Do you know who Blake Spawn is?

11   A     Yes.

12   Q     And how do you know him?

13   A     He's a client of ours.

14   Q     And how -- how did it come about that you were included

15   on an e-mail between Mr. Refolo and Mr. Spahn?

16   A     Apparently the schools needed audited financial

17   statements --

18   Q     Which schools are you referring to?

19   A     The Saba school and the . . . the one that's -- called

20   MUA.

21   Q     All right.

22   A     And in order to proceed with a business that's getting

23   federal help, you're required to have audited financial

24   statements to adhere to Title IV, which is, you know, part of

25   the Department of Education.  They require audited financial

1    statements of schools.

2    Q      Did Mr. Spawn, was he the source of the referral to you

3    of Dr. Fredrick and the business related to Saba and to MUA?

4    A      Yes.

5    Q      And was that the reason that you were included on this

6    e-mail?

7    A      Yes.

8           MR. HOCHMAN:  Objection, foundation, as to the

9    knowledge of whether or not -- why he was included on this

10   e-mail.

11          MS. KESSLER:  What was your --

12          THE COURT:  Hang on.  Come to sidebar.

13                          AT SIDEBAR

14          THE COURT:  Your exhibit list identifies this as an

15   e-mail from this witness to somebody.  You keep asking him if

16   he received it.

17          MS. KESSLER:  Must be a mistake in the -- he's cc'd

18   on the e-mail.

19          THE COURT:  So the exhibit list --

20          MS. KESSLER:  It must be a mistake.

21          MR. HOCHMAN:  It's also not a record that came from

22   his business records.  It came from a different individual.  So

23   that's why I don't believe he -- you can't lay this as a

24   business record of this business.

25          THE COURT:  Okay.  Well, I don't know if you can or

1    not.  I was focusing on it was coming from him, therefore, it

2    was going to be easy, but I guess --

3              MS. KESSLER:  That must be a mistake.  I apologize,

4    Your Honor.

5              THE COURT:  Okay.

6              MR. HOCHMAN:  And the likelihood he has an

7    independent recollection ten years ago of this particular

8    e-mail, he didn't retrieve from it his computer, would be zero,

9    or at least he should be questioned about it, and then voir

10   dire'd on it.

11             THE COURT:  Okay.  There's no relevance objection.  I

12   don't know the relevance yet.

13             MR. HOCHMAN:  The relevance is tangential relevance.

14   I mean, it's minimally relevant.  But the objections would be

15   business records and foundation.

16             THE COURT:  Okay.  That helps me focus on what I need

17   to focus on.

18             MR. HOCHMAN:  And, Your Honor, I'd like to state for

19   the record that we made a motion in limine on all evidence,

20   e-mails like this, that referenced David Fredrick or Patricia

21   Hough, that could be conceivably admitted for co-conspirator

22   statements.  We reintroduce and incorporate by reference all

23   the arguments we've ever made, including the motions in limine,

24   on all those statements, wherever you see David Fredrick or

25   Patricia Hough in an e-mail or a correspondence.  Rather than

1   having to say that every single time, I would rather do it

2   right now to preserve that objection.

3          THE COURT:  I don't know how helpful that is, but

4   you've said it.

5          MR. HOCHMAN:  Thank you.

6          MS. KESSLER:  For the record, the government's

7   understanding of the motion in limine was that it was related

8   to the e-mails and correspondence that were a part of the UBS

9   records, not as to e-mails and correspondence as to any and all

10  records that were sought to be admitted.

11         MR. HOCHMAN:  The co-conspirator one was a much

12  broader one.  The one that related to e-mails and

13  correspondence in UBS, that one was much more narrow.

14         THE COURT:  Well, it is what it is.

15         MR. HOCHMAN:  Okay.

16         THE COURT:  My memory is that there are two distinct

17  issues there.  One was a co-conspirator, and the other was a

18  business record.  My memory was the business record was UBS.  I

19  think you're right that the co-conspirator was more broad than

20  that, although . . . .  If I was a betting man, I wouldn't bet

21  on it yet without reading the motion again.

22         MR. HOCHMAN:  And you know what, Your Honor, to the

23  extent there was any limitation, we would expand it to every

24  document to which the government seeks admission that mentions

25  David Fredrick or Patricia Hough, and we would seek admission

1   as a co-conspirator statement.

2         THE COURT:  That's overruled.  Just mention of the

3   name doesn't make it inadmissible.

4         MR. HOCHMAN:  Well, until they prove a conspiracy.

5         THE COURT:  Not necessarily.  It can be a business

6   record that mentions the name, and it doesn't have to be a

7   co-conspirator exception someplace.

8         MR. HOCHMAN:  Sure.

9         THE COURT:  So I understand you want to make it broad

10  enough so, every time their name is mentioned, you've got an

11  objection.  You've stated what your position is.

12        MR. HOCHMAN:  Thank you.

13        THE COURT:  Back to what -- you need to lay the

14  foundation.  I don't think you've done it yet, now that I

15  understand which way it goes.

16        MR. HOCHMAN:  Thank you, Your Honor.

17                      IN OPEN COURT

18        MS. KESSLER:  May I approach to have Exhibit 7DD

19  marked, Your Honor?

20        THE COURT:  Double D, as in "dog"?

21        MS. KESSLER:  Yes, sir.

22  BY MS. KESSLER:

23  Q    Mr. Schneider, did there -- in the early parts of your

24  interactions with -- with regard to your potentially being

25  hired . . . .  Let me rephrase that.

JERRY SCHNEIDER – DIRECT/KESSLER                171

1       Did you have discussions with Dr. Fredrick or Dr. Hough

2  about potentially being hired to do accounting work related to

3  the schools?

4  A     Doing auditing work, yes.

5  Q     Okay.  And that was initiated -- was that initiated from

6  a referral by Mr. Refolo?

7  A     No.  It was Mr. Spahn.

8  Q     Or Mr. Spahn, I apologize.

9       Did there come a time when you met with Dr. Fredrick to

10  discuss further whether your firm would be hired to do some

11  auditing work?

12  A     Yes.

13  Q     Why did you understand that auditing work was -- was

14  being considered?

15  A     To participate in the Title IV program, you have to be

16  registered with the Department of Ed, and they require audited

17  financial statements.

18  Q     Did you, in the course of your initial interactions with

19  Dr. Fredrick, understand -- come to any understanding as to

20  whether there were attempts to sell the schools?

21  A     Well, this is -- the referral was talking about a

22  potential sale, but that never went anywhere.  Other than that,

23  no.

24  Q     Other than --

25  A     -- that, no.

1   Q      Okay.  Now, your first meeting with regard to

2   potentially being hired, who do you recall that you met with?

3   A      Dr. Fredrick.

4   Q      And do you recall where you met with him?

5   A      In his office in Massachusetts, I believe in

6   Massachusetts.

7   Q      And do you recall approximately when was that?

8   A      Probably sometime, I'm going to guess, middle towards

9   the end of --

10              MR. HOCHMAN:  Objection to speculation, Your Honor.

11              THE COURT:  Sustained to the extent he's saying he's

12   guessing.

13              THE WITNESS:  It would have been sometime during

14   2004.

15              MS. KESSLER:  If I could step forward and have 8A

16   marked?

17              THE COURT:  You may.

18   BY MS. KESSLER:

19   Q      If you can take a look at the document contained in

20   Exhibit 8A.

21              MR. HOCHMAN:  7A?

22              MS. KESSLER:  Eight.

23              MR. HOCHMAN:  Oh, 8A?  I'm sorry.

24              (The witness examines an exhibit.)

25

1    BY MS. KESSLER:

2    Q      Do you recognize this document?

3    A      Yes.  Yes.

4    Q      Is this -- can you -- can you tell me what this document

5    is?

6    A      This is a document that I -- when I would get a referral

7    for a client, I would send them a list of those services that

8    we would look to provide to the client.  It's called a proposal

9    letter.

10             MR. HOCHMAN:  I'm sorry, Your Honor.  Are we on 8AA?

11             MS. KESSLER:  Eight single-A.

12             MR. HOCHMAN:  Oh, single-A.  My mistake.

13   BY MS. KESSLER:

14   Q      Did you send this e-mail?

15   A      Yes.

16   Q      And who did you send it to?

17   A      Dr. Fredrick.

18   Q      And what was the date of this e-mail?

19   A      December 6th, 2003.

20   Q      Would this have been around the time that you first

21   began negotiating potentially doing work for Dr. Fredrick and

22   the schools?

23   A      Yes.

24             MS. KESSLER:  The government would move Exhibit 8A

25   into evidence, Your Honor.

1          THE COURT:  Any objection?

2          MR. HOCHMAN:  No objection, Your Honor.

3          THE COURT:  Exhibit 8A will be admitted.

4          (Government's Exhibit 8A was admitted into evidence.)

5          MS. KESSLER:  Thank you.

6   BY MS. FINLEY:

7   Q     When you were having your discussions about being hired

8   to do auditing work, who did you have those discussions with?

9   A     Dr. Fredrick.

10  Q     And who did you discuss with . . . the fees that you

11  would be charging with; who did you negotiate that with?

12  A     Dr. Fredrick.

13  Q     Who did you discuss the services to be performed with?

14  A     Dr. Fredrick.

15  Q     Now, what prompted, to your recollection, the need for

16  the auditing services to be provided?

17          MR. HOCHMAN:  Objection, asked and answered.

18          THE COURT:  Overruled.

19          MS. KESSLER:  You can answer.

20          THE WITNESS:  The requirement from the Department of

21  Education, U.S. Department of Education.

22  BY MS. KESSLER:

23  Q     I think you have referred to that as Title IV; am I

24  correct?

25  A     Right, title IV.

1    Q      Why is that important?

2    A      If I remember correctly, I haven't done those audits in

3    many years, in order to have students participate in getting

4    federal loans, you have to be a participant in the Title IV

5    program which requires you to have audited financial segments.

6           MS. KESSLER:  Permission to publish Exhibit 8A, Your

7    Honor?

8           THE COURT:  You may.

9           (An exhibit was projected onto the projector screen.)

10   BY MS. KESSLER:

11   Q      Looking at this e-mail, what are you proposing to

12   Dr. Fredrick here?

13   A      Different phases of what we would do.

14   Q      Is that related to auditing services?

15   A      Yes.

16   Q      And what was the -- is this your initial written

17   proposal?

18   A      Yes.

19   Q      And were you or your firm hired by Dr. Fredrick for this

20   audit?

21   A      Only to the audit, that's correct.

22   Q      What was the name of your company at that time?

23   A      I believe it was Schneider & Associates.

24   Q      Why do you say it that way?

25   A      Well, because the name changed through the course of the

1   years, by -- you know, changes in partnerships.

2   Q      Okay.  What was your role in the conducting of the audit

3   by Schneider & Associates?

4   A      I was the managing partner of the form, which means that

5   I just oversaw the final product, or, you know, attended a

6   number of meetings and maybe sent some e-mails back and forth.

7   But I was not operationally involved.  I had another partner

8   that actually worked there, who handled what we -- who was in

9   charge of the job.

10  Q      Who was that other partner?

11  A      Dean Hiltzik.

12  Q      Is he still with Schneider & Associates?

13  A      Well, it's no longer Schneider & Associates, because I

14  merged my firm with another larger firm in 2008, and then I

15  retired in 2011.  So Schneider & Associates no longer exists.

16  Q      Does Mr. Dean Hiltzik, is he still working?

17  A      No.  He's disabled, and retired.

18          THE COURT REPORTER:  Can you spell the name, please?

19          THE WITNESS:  D-E-A-N.  Last name is H-I-L-T-Z-I-K.

20          THE COURT REPORTER:  Thank you.

21          THE WITNESS:  You're welcome.

22  BY MS. KESSLER:

23  Q      As the managing partner, did you review anything and

24  everything that went out of the -- out of your firm related to

25  the audit, before it left?

1   A       Not anything and everything.  Those things that I

2   thought were material, I would look at.

3   Q       And what do you mean by "material"?

4   A       Significant transactions, compliance with various . . .

5   loans, if any.  Just general proprietary review.

6   Q       But Mr. Hiltzik -- am I pronouncing that correctly?

7   A       Yes.

8   Q       Mr. Hiltzik, did he handle the day-to-day work that

9   needed to be done to perform the audits?

10  A       Yes.  But I wouldn't really call it day to day.  He

11  would go there with a staff of people, I would say probably two

12  or three staff people, to actually perform the audit.

13  Q       What is required to perform the audit?

14  A       Well, I mean, basically what you do is you go through

15  the books and records, which is inclusive of what we call

16  "books of original entry," which are simply cash disbursements

17  and cash receipts, and sales journals, and payroll records.

18          You check that into the general ledger that's maintained

19  by the client.  The general ledger is a summary of all the

20  accounts, such as cash, accounts receivable, property and

21  equipment, loans, accounts payable, all the expenses by

22  category, is all detailed in a general ledger.  And then the

23  auditor is required to verify the accuracy of the assets and

24  liabilities, and test some of the expenses.

25          Verifying the accuracy of assets and liabilities entails

1    sending out . . . bank confirmations to verify that the cash in

2    the bank that's on the books, in fact, does exist; sending

3    out -- if receivables are a factor, independently confirming

4    the accuracy and credibility of the receivables, checking and

5    looking at various invoices to see if they have propriety --

6              MS. KESSLER:  Let me interrupt you there.

7              If I could approach and have Exhibit 8C marked?

8              THE COURT:  You may.

9    BY MS. KESSLER:

10   Q    If you could open up and look at Exhibit 8C, please?

11        Do you recognize this document?

12   A    Yes.

13   Q    What is this?

14   A    This is the audit report for the Saba School of Medicine

15   Foundation, for the year ended April 30th, 2004.

16   Q    Was this prepared by Schneider and Associates?

17   A    This was audited by Schneider and Associates.

18   Q    Did . . . . Did you review and approve this audited

19   financial statement?

20   A    Yes.

21             MS. KESSLER:  Your Honor, the government moves into

22   evidence 8 -- Exhibit 8C.

23             MR. HOCHMAN:  Objection, improper business records

24   foundation.

25             THE COURT:  The objection is overruled.  8C will be

1   admitted.

2              (Government's Exhibit 8C was admitted into evidence.)

3              MS. KESSLER:  Permission to publish, Your Honor?

4              THE COURT:  You may.

5              (An exhibit was projected onto the projector screen.)

6   BY MS. KESSLER:

7   Q      Turning to Page 3 of this document, what is this?

8   A      That's the report that renders our opinion as to these

9   financial statements.

10  Q      And when you say renders your opinion, can you explain

11  that a little bit more?

12  A      Yes.  In the third paragraph, we're basically saying

13  that the financial statements are fairly presented, in all

14  material respects, and properly present the financial picture

15  of the company, and the results of their operations for that

16  period.

17  Q      Now, if you turn to the next page, Page 4, there's an

18  entry for assets, and underneath that, current assets, property

19  and equipment.

20             What is expected to be reflected there?

21  A      Well, this is the equivalent of a balance sheet,

22  which . . . in this year, foundations reported a little bit

23  differently than a for-profit company; but basically you have

24  current assets, cash, and tuitions receivable -- shall I go

25  through the whole thing?

1    Q      Well, let me back up a minute.

2           In the course of the audit, would you have attempted to

3    substantiate the existence of the foundation in order to

4    substantiate the existence of the foundation?

5    A      Yes.

6           MS. KESSLER:  If I could approach and have marked as

7    an exhibit, 8D?

8               THE COURT:  You may.

9               THE COURT:  That was 8E?

10              MS. KESSLER:  D, like in "dog."

11              THE COURT:  Thank you.

12   BY MS. KESSLER:

13   Q      If you could look at Exhibit 8D?

14           (The witness examines an exhibit.)

15   Q      Mr. Schneider, all these records that we have been

16   looking at so far, are these from your files?

17   A      Yes.

18   Q      Now, back to Exhibit 8D, do you know what this document

19   is?

20   A      Yes.

21   Q      What is it?

22   A      It's the articles of organization for Saba School of

23   Medicine Foundation.

24   Q      And why would you have obtained this document?

25   A      When you're doing an audit of an entity, you want to

1    create what we call a permanent file.  The permanent file

2    consists of documentation to support the fact that the entity

3    really exists, it was created, it's real, so you try to get

4    whatever documentation you can.  This is stating that the

5    entity was, in fact, formed.

6              MS. KESSLER:  If I could have Exhibit 8E marked?

7              THE COURT:  You may.

8              MS. KESSLER:  Thank you.

9              MS. KESSLER:  I'm sorry, Your Honor, I may not have

10   offered 8D into evidence.

11             THE COURT:  You did not.

12             MS. KESSLER:  The government would offer 8D.

13             MR. HOCHMAN:  No objection, Your Honor.

14             THE COURT:  8D will be admitted.

15             (Government's Exhibit 8D was admitted into evidence.)

16   BY MS. KESSLER:

17   Q     If you could take a look at Exhibit 8E?

18   A     Okay.

19   Q     What is this document?

20   A     This looks like an agreement between the Netherlands

21   Antilles and the Saba school of medicine.

22   Q     And would you -- did you also obtain this documentation

23   in your attempt to substantiate the existence of Saba School of

24   Medicine Foundation?

25   A     Yes.  This is what would be part of a permanent file,

1    yes.

2              MS. KESSLER:  Your Honor, the government would move

3    into evidence Exhibit 8E.

4              MR. HOCHMAN:  No objection.

5              THE COURT:  Exhibit 8E will be admitted.

6              (Government's Exhibit 8E was admitted into evidence.)

7              MS. KESSLER:  Permission to publish?

8              THE COURT:  You may.

9              (An exhibit was projected onto the projector screen.)

10   BY MS. KESSLER:

11   Q     Looking at Page 1 of this exhibit, Paragraph 2A, can you

12   read to the jury what is happening here?

13   A     "The government hereby grants to the school the right to

14   establish a medical school to include, at the sole discretion

15   of the school, a premedical division and faculties as the

16   school may from time to time decide, with the right to confer

17   degrees of doctor of medicine after the successful completion

18   of a minimum of four academic years of study, and to engage in

19   all necessary and appropriate activities, teaching otherwise as

20   may be incidental to the full operation of such faculties

21   established by the school.  Standards of such school who

22   successfully complete the prescribed course of studies shall be

23   consider as eligible for license to practice medicine in the

24   Netherlands Antilles."

25              Shall I continue to read?

1   Q      No.  Thank you.

2          Moving to Page 2 of this document, Paragraph 7, what

3   is . . . can you read that paragraph, please?

4   A      "A tax holiday period of ten years shall be negotiated

5   for the school by the government in respect of any earnings and

6   profits, if any, from any of its activities."

7   Q      If we could turn back to Exhibit 8C, what entity was

8   this audited financial statement prepared for?

9   A      Saba School of Medicine Foundation.

10  Q      Now, what was your understanding of any difference

11  between the Saba School of Medicine Foundation and the Saba

12  school of medicine?

13  A      It's the same place.

14  Q      Now, is there any -- this is indicated that the entity

15  is Saba School of Medicine Foundation.

16         What do you understand a foundation to be?

17  A      A foundation is a not-for-profit entity.

18  Q      Now, what are the general --

19         MS. KESSLER:  Court's indulgence.

20  BY MS. KESSLER:

21  Q      Who was your primary contact with the Saba School of

22  Medicine Foundation during the course of preparing this audit?

23  A      I would mostly direct my attention to Dr. Fredrick.

24  Again, I wasn't involved in the operational part of the audit.

25  Q      In terms of obtaining -- did you have to obtain detailed

1   financial information in order to prepare the audited financial

2   statement?

3   A      Yes.

4   Q      And who did that sort of information come from?

5   A      That would be their CFO.

6   Q      And what was that person's name?

7   A      I forgot his first name.  Minchenberg.

8   Q      Mr. Minchenberg?

9   A      Correct.

10  Q      And how did you find your interactions with

11  Mr. Minchenberg to be; did you find him to be cooperative?

12  A      Very cooperative.

13  Q      Did he generally provide the information that you

14  requested in a prompt manner?

15  A      Yes.

16  Q      Did you find him to be competent?

17  A      Yes.

18              MR. HOCHMAN:  Objection, leading.

19              THE COURT:  Overruled.

20              MS. KESSLER:  You can answer.

21              THE WITNESS:  Yes.

22  BY MS. KESSLER:

23  Q      Now, turning back, again, to . . . .  There are some --

24  are there any limitations to your audit?  Let me rephrase this.

25              Are you in a position where you have to rely on the

1    information that is provided by your client in order to

2    properly prepare these audited financial statements?

3    A       That's part of the standard, you know, the reliance upon

4    what the client gives you, independently verify where possible.

5    Q       How do you do that?

6    A       Through communications with third parties.

7    Q       Now, if you could turn to Exhibit 8C again, Page 4.

8            Looking here at the current assets, cash in the bank,

9    how much-

10   A       I'm looking at the wrong page.  Excuse me.

11   Q       It should be -- if you look on --

12   A       Statement of financial position.

13   Q       Yes.

14   A       Okay.

15   Q       Current assets, cash in the bank, how much cash in the

16   bank is indicated there?

17   A       $4,761,534.

18   Q       Now, in order to come to this conclusion as to the cash

19   in the bank, what would you rely on to do that?

20   A       We would review the bank statements.  We would check

21   something called the bank reconciliation, which is a

22   reconciling of the books and records to what the bank statement

23   says.  And then we would receive a confirmation from the bank

24   confirming that the bank balance is real and actual.

25   Q       What if the client did not disclose to you the existence

1    of other accounts?

2    A     We wouldn't know about it.

3    Q     Would they be able to be reflected here, on this Page 3

4    of this exhibit, the current assets?

5    A     No.

6    Q     Would you expect that, as part of your -- of being

7    tasked with preparing an audited financial statement, that it

8    would be important to disclose to the auditing firm all bank

9    accounts that are owned or controlled by The Foundation?

10   A     Absolutely.

11         MS. KESSLER:  Court's indulgence.

12   BY MS. KESSLER:

13   Q     Now, do you give instructions to the client as to what

14   sort of information should be . . . turned over to you in order

15   for you to determine what the current assets were?

16   A     They would be what all assets are.  The answer is yes.

17         Normally, what happens is, you would send an

18   engagement -- once you determine what the services are you're

19   going to render, you would send an engagement letter to the

20   client --

21   Q     Yes.

22   A     -- and once he signs that engagement letter, you would

23   also send to the client a list of those things that need to be

24   done and ready for you before you come in.  That keeps the cost

25   down so you don't have to go back and forth with the client.

1   Q      And would you have done that with regard to this audit?

2   A      Yes.

3   Q      That was your general practice?

4   A      Yes.

5   Q      Now, if we could turn to Page 11 of this document.

6          You'll see the page numbers on the bottom left-hand

7   corner?

8   A      I see them.

9   Q      Looking at Paragraph C, is there an outstanding --

10  actually, if you could read Paragraph C, please?

11  A      "Loan due for funds advanced to Medical University of

12  Americas Nevis MUA, an affiliated entity that operates a

13  medical school on the island of Nevis, West Indies.  The funds

14  were used to construct MUA's academic building and to purchase

15  furniture, equipment, and supplies, from 1999 to 2003.  Total

16  funds advanced during this period were $3,343,228.  The loan

17  balance at April 30, 2004, is noninterest bearing, unsecured,

18  and due on demand."

19  Q      Now, would you have attempted to obtain information to

20  substantiate this loan as part of the auditing of the financial

21  statements?

22  A      Yes.

23         MS. KESSLER:  If I could approach and have Exhibit 8I

24  marked, Your Honor?

25              THE COURT:  You may.

1    BY MS. KESSLER:

2    Q      If you could look at Exhibit 8I?

3           (The witness examines an exhibit.)

4    Q      What is this document?

5    A      Letter agreement and loan assumption.

6    Q      Would you have -- did you obtain this document in your

7    attempt to substantiate the loan that's referenced in the

8    financial statement we previously were looking at?

9    A      Yes.

10          MS. KESSLER:  Government moves into evidence

11   Exhibit 8I, Your Honor.

12          MR. HOCHMAN:  Objection, Your Honor.  Missing several

13   of the elements of the business record, and potential voir dire

14   on whether or not this individual, himself, obtained this

15   document.

16          THE COURT:  Come to sidebar.

17                          AT SIDEBAR

18          THE COURT:  This is an August 1st, 2005, letter that

19   was obtained to complete an April 30th, 2004, report?

20          MS. KESSLER:  I may have made a mistake, Your Honor.

21   I'll go back and double-check.

22          THE COURT:  All right.

23          MS. KESSLER:  I may have confused one of the

24   documents.  If so, I apologize.

25          MR. HOCHMAN:  And, Your Honor, I think the record is

1    that he didn't do anything other than sort of -- he didn't

2    obtain any documents.  He just reviewed what's in the file.  He

3    hasn't reviewed his Schneider file because he's not part of

4    Schneider anymore.  These documents came from the current . . .

5    the current file that, my understanding, came from the current

6    file he left two years ago.

7            So he's not the custodian of record, he didn't review

8    it from the file, he's not on this particular document, he

9    didn't get it because he wasn't doing the -- it was Dean

10   Hiltzik, not Jerry Schneider, was the one in charge of viewing

11   documents on the ground.  So he would have no idea of viewing

12   documents in this file.  And if he said he got this document,

13   there is no way he got this document.

14           THE COURT:  At this point the objection is sustained.

15           You can lay a better foundation, if you can.

16           We'll take it from there.

17                        IN OPEN COURT

18   BY MS. KESSLER:

19   Q     If you can turn back to Exhibit 8C, looking at Page 12

20   of this document --

21   A     8C, you said?

22   Q     C.

23   A     I don't think I have that.

24           MS. KESSLER:  May I approach, Your Honor?

25           THE COURT:  That's the audit report.

1           MS. KESSLER:  Yes.

2           THE WITNESS:  All right.  I've got two together.

3    That's why.  Okay.

4    BY MS. KESSLER:

5    Q     Looking at Page 12 of this document --

6    A     Yes.

7    Q     -- is this a continuation of the notes section of the

8    audited statement for April of 2004?

9    A     Yes.

10   Q     And what is indicated about ownership of the land where

11   the Saba campus property is located?

12   A     The note says:  "The school's president owns the Saba

13   campus property through a wholly-owned entity.  The entity does

14   not charge the school for use of the property."

15          MS. KESSLER:  Court's indulgence.

16          If I could approach and have Exhibit 8J marked, Your

17   Honor?

18          THE COURT:  You may.

19   BY MS. KESSLER:

20   Q     Would you look at this document?

21   A     Yes.

22   Q     What is this document, sir?

23   A     This is a . . . .  It looks like a fax, not an e-mail,

24   from David Minchenberg --

25   Q     I'm sorry.  Okay.  Go ahead.

1    A        -- to Dean Hiltzik.

2    Q        And what is attached to this document -- to this fax

3    cover sheet?

4    A        Shall I read it?  Because I am not familiar with it.

5    Q        Let's back up.

6             All the documents that we've been looking at here this

7    morning, were these produced by Schneider and Associates?

8    A        Yeah.  They were in our file.  Yes.

9    Q        And are they kept --

10            MR. HOCHMAN:  Objection, foundation, as to how he

11   knows they were in the file, and when he reviewed that file?

12            MS. KESSLER:  Your Honor, could we approach?

13            THE COURT:  No.  The objection is overruled.  You get

14   to cross if you want.  She can ask one question at a time.

15            MS. KESSLER:  Thank you, Your Honor.

16   BY MS. KESSLER:

17   Q        Were these -- all these documents that we have been

18   looking at here, were these documents contained in your files

19   at Schneider and Associates?

20   A        Yes.

21   Q        And are they made at or near the time of the event?

22   A        Say that again?

23   Q        Is it your business practice to keep this sort of

24   documents in your files that we are looking at here today?

25   A        Yes.

1    Q      And is it your normal course of business to maintain

2    these documents in your file?

3    A      Yes.

4    Q      And are they created at or near the time of the event?

5    A      Yes.

6    Q      And are they created by a person who has knowledge of

7    the event?

8    A      Yes.

9    Q      Now, looking again at Exhibit 8J, is this another

10   document that was contained in the files of Schneider and

11   Associates?

12   A      Yes.

13   Q      And, as part of your preparation of the financial

14   statements for Saba for 2004, did you attempt to substantiate

15   the ownership of the land on which Saba sat?

16   A      Yes.

17   Q      And was that in order to substantiate the information

18   that was contained in the note we just went over?

19   A      Yes.

20   Q      Now, looking at this document, Exhibit 8J, is this

21   related to your attempts to substantiate that information?

22   A      Yes.

23          MS. KESSLER:  Your Honor, I'd move into evidence

24   Exhibit 8J.

25          THE COURT:  Mr. Hochman?

1          MR. HOCHMAN:  No objection on this particular

2     document, Your Honor.

3          THE COURT:  All right.  8J will be admitted.

4          (Government's Exhibit 8J was admitted into evidence.)

5          MS. KESSLER:  Permission to publish, please?

6          THE COURT:  You may.

7          (An exhibit was projected onto the projector screen.)

8     BY MS. KESSLER:

9     Q    Looking at the first page of this exhibit, what is

10    this . . . the very first page, yes.

11    A    That's a -- it looks like a fax cover sheet.

12    Q    And who is the fax from and to?

13    A    It's from David Minchenberg to Dean Hiltzik.

14    Q    Now, moving to the second page of this document, looking

15    at Paragraph 1, who is the first -- could you read Paragraph 1,

16    please; who is the grantor?

17    A    Okay.  Mistress Laura Ashley Walls.

18    Q    Do you know who Laura Ashley Walls is?

19    A    No.

20    Q    Looking at Paragraph 2, could you read that, please?

21    A    "Ms. Patricia Lynn Hough, a medical doctor residing on

22    Saba, at these presents acting as managing director of, and as

23    such legally representing, Round Hill Project Holding Company

24    NV, a limited liability company established in Saba, said

25    company hereinafter to be referred as Round Hill."

1              THE COURT:  I think you misread the word after

2    "medical."

3              MS. KESSLER:  I'm sorry, Your Honor?

4              THE COURT:  You read, "medical director," it says

5    "medical doctor."

6              THE WITNESS:  Oh.  Excuse me.  Sorry.

7    BY MS. KESSLER:

8    Q      Looking further down, after the portion that starts,

9    "which immovable property" --

10   A      Um-hum.

11   Q      -- can you read how the ownership was obtained by the

12   grantor?

13   A      You want me to read that?

14   Q      Yes.

15   A      "Which immovable property was obtained in ownership by

16   the grantor by means of the transcription in the public

17   registers of Saba on February 24th, in Register C, Volume 14,

18   Number 97, of an authentic copy of a deed of sale and purchase

19   executed before me, civil law notary, on February 12th, 1999,

20   the appearer Sub 1, acting as aforementioned, declare that

21   grantor herewith grants to Round Hill, for whom the appearer

22   Sub 2, acting as aforementioned, declared herewith to accept

23   the legal right of superficies" -- in Dutch.  Do I have to read

24   that too?

25   Q      Definitely.  No.

1          Now, do you know who Laura Walls is?

2   A      No.

3              MR. HOCHMAN:  Objection, asked and answered.

4              THE COURT:  Overruled.

5   BY MS. KESSLER:

6   Q      When does this document indicate that Ms. Walls

7   purchased this property?

8              MR. HOCHMAN:  Objection, document speaks for itself.

9              THE COURT:  It does.  You may publish it.

10             MS. KESSLER:  Thank you.

11             (An exhibit was projected onto the projector screen.)

12  BY MS. KESSLER:

13  Q      Looking at the bottom half of this document, how much is

14  the property purchased for -- or excuse me -- what is being

15  paid for the right of superficies?

16  A      One thousand U.S. dollars.

17  Q      Now, turning to Page 2 of this document, the line

18  starting after paragraph numbered 7, can you read to the jury

19  that portion?

20  A      "There appears declared for the computation of the

21  transfer tax to assess the value of the right of superficies on

22  250,000 U.S. dollars, taking into consideration that Round Hill

23  has erected and built the university buildings and its

24  facilities with all the appurtenances, therefore -- "thereto,

25  for its own account and costs.

1           "The appearers are known to me, civil law notary."

2                MS. KESSLER:  If I could approach and have Exhibit 8K

3      marked, Your Honor?

4                THE COURT:  You may.

5      BY MS. KESSLER:

6      Q        If you could look at Exhibit 8K?

7                Is this also a document that was contained in your file

8      at Schneider and Associates?

9      A        Yes.

10     Q        What is this document?

11     A        It says it's a copy of the deed of ownership for the

12     property on Saba.

13     Q        And why would you have obtained this document?

14     A        Part of the permanent file.

15     Q        I'm sorry?

16     A        Part of our permanent file.

17     Q        Why would you have need of this document?

18     A        All of this shows who owned the property.

19                MS. KESSLER:  Looking at Page 2 of this document,

20     Your Honor, the government would move Exhibit 8K into evidence.

21                THE COURT:  Any objections?

22                MR. HOCHMAN:  No objection, Your Honor.

23                THE COURT:  8K will be admitted.

24                MS. KESSLER:  And permission to publish, Your Honor?

25                THE COURT:  You may.

1          (Government's Exhibit 8K was admitted into evidence.)

2          (An exhibit was projected onto the projector screen.)

3    BY MS. KESSLER:

4    Q      Looking at Page 2 of this document, what is the date of

5    this deed?

6    A      June 22nd, 2004.

7    Q      And if you look at Paragraph 1 of this document, who is

8    identified as the seller?

9    A      Okay.  Ms. Laura Ashley Whitley, born Fredrick.

10   Q      Do you know who that individual is?

11   A      No.

12   Q      Looking at Paragraph 2 of this document, who is

13   identified as the purchaser?

14   A      Mrs. Patricia Lynn Hough, a medical doctor.

15   Q      And was she --

16          MR. HOCHMAN:  Objection, misstates the document, Your

17   Honor.

18   BY MS. KESSLER:

19   Q      If you could read that entire paragraph from,

20   "Mrs. Patricia Lynn Hough," to, "buyer"?

21   A      Ms. Patricia Lynn Hough, a medical doctor, residing at

22   63 Walnut Street, Gardner, Massachusetts 014440, United States

23   of America, who granted this power of attorney in her capacity

24   as managing director and, as such, legally representing Round

25   Hill Project Holding Company NV, a limited liability company

1    established in Saba, Netherlands Antilles, said company

2    hereinafter to be referred to as buyer."

3    Q    If you look further on to Page 3 of this document, after

4    the portion that is underlined, can you read to the jury

5    the . . . purchase price?

6    A    "The appearers to this deed declare that this sale and

7    purchase with transfer has been effected for the amount of

8    17,000 United States dollars, which, for the computation of

9    transfer tax to be levied on this deed, is calculated to be

10   equivalent to" -- and I don't have to read any of that, do I?

11   Q    Thank you.

12   A    You're welcome.

13        MS. KESSLER:  If I could approach to have Exhibit 8H

14   marked, Your Honor?

15        THE COURT:  You may.  And why don't you find a

16   convenient place for the afternoon recess.

17        MS. KESSLER:  This might be a good time, Your Honor.

18        THE COURT:  This works?  All right.

19        Ladies and gentlemen, let's take 15 minutes for the

20   afternoon recess.  Please do not discuss the case among

21   yourselves, or allow anyone to discuss it with you or in your

22   presence.  Fifteen minutes.

23        (At 2:45 PM, the jury was escorted from the

24        courtroom.)

25        THE COURT:  All right.  Fifteen minutes.

1              (At 2:46 PM, court was recessed.)

2                        AFTER RECESS

3              (At 3:02 PM, court was reconvened.)

4         THE COURT:  Both sides ready for the jury?

5         MR. HOCHMAN:  Yes, Your Honor.

6         MS. FINLEY:  Yes, Your Honor.

7         THE COURT:  Have the jury step in, please.

8              (At 3:03 PM, the jury was escorted into the

9    courtroom.)

10        MS. KESSLER:  May I proceed, Your Honor?

11        THE COURT:  Not yet.

12        All right.  Good idea.

13        Come to sidebar.

14                       AT SIDEBAR

15        THE COURT:  A note from the jury:  "Please ask

16   attorneys to identify documents with Bs, Cs, Ds, Ts, and Zs,

17   etcetera, with words beginning with the same letter.  Also,

18   please lower image on screen so back row of jurors can see top

19   documents."

20             I assume you can adjust that?

21        MS. FINLEY:  Lower it?

22        THE COURT:  Lower.  The lights interfere physically.

23   I know I can't see through the lightbulbs sometimes.  So I

24   assume that's what the jury is getting at.

25             MR. HOCHMAN:  Is there a chance to ask the jury if a

1    particular juror can't see document, that they indicate and

2    sort of stand up for the moment, or move their seat briefly?

3            THE COURT:  Sure.  I mean, we'll go ahead and try to

4    lower the machine so that it lowers the image, but I'll tell

5    them, in the future, if they still can't see, they need to tell

6    us.

7            MR. HOCHMAN:  Very good.

8            (The Court confers with the Courtroom Deputy.)

9                            IN OPEN COURT

10           THE COURT:  We got your note with regard to using

11   words instead of just certain letters for the exhibits, and

12   I've read that to the lawyers, and I presume they will try to

13   comply.  I think that's a good idea.

14           With regard to lowering the image on the screen, I

15   hate to do this, but I'm going to send you back in because

16   we're going to play with the machine and see what we can do.

17   So instead of having you watch us play with it, I'm going to do

18   it outside of your presence.

19           But in the future, if there's an exhibit that is

20   projected on the screen that someone can't see still, just

21   raise your hand, and we'll play with it and get it so that you

22   can see it.  I know the lights hang down low, and sometimes I

23   can't see the tops of the exhibits either.  But it's more

24   important for you folks to see the whole exhibits.

25           So let us play with it for a few minutes and see what

1   we can do, and then we'll get you back.

2                (At 3:06 PM, the jury was escorted from the

3        courtroom.)

4                THE COURT:  All right.  Counsel, why don't you give

5   us an example on the machine.  There you go.

6                And let's –– Brenda, if you'll take the books off and

7   see what happens when we do that.

8                THE COURTROOM DEPUTY:  The difference is the

9   documents coming from the computer are a different size from

10  the ELMO.  Systems was using the ELMO to do it.  You see what I

11  mean?

12               THE COURT:  Okay.

13               THE COURTROOM DEPUTY:  It's a different size

14  document.

15               THE COURT:  So we can do this off the record.

16               (There was discussion off the record.)

17               THE COURT:  All right.  Have the jury step in,

18  please.

19               (At 3:14 PM, the jury was escorted into the

20       courtroom.)

21               THE COURT:  All right.  Ladies and gentlemen, I can't

22  say I think we fixed it.  I think we're going to do better.

23  But don't get worried.  You may see some of the document go off

24  the screen at the bottom.  The lawyers know to blow up the part

25  they want you to read.  So give them a second or two before you

1    raise your hand that you can't read everything, because not the

2    entire document may be important.  So the lawyers will try to

3    focus your attention on what it is that is.

4              If it continues to be a problem, obviously, raise

5    your hand, and we will do something else.

6              You may proceed.

7              MS. KESSLER:  Thank you, Your Honor.

8              May I approach and have 8Q marked?

9              THE COURT:  8Q?

10             MS. KESSLER:  Yes.

11             THE COURT:  You may.

12   BY MS. KESSLER:

13   Q     Mr. Schneider, can you look at what's been marked as

14   Exhibit 8Q?

15             Do you recognize this document?

16   A     Yes.

17   Q     What is this document?

18   A     It's the financial statement that was audited for Saba

19   School of Medicine Foundation for the year ended April 30th,

20   2005.

21   Q     Was this audited financial statement prepared by

22   Schneider and Associates?

23   A     Yes.

24             MS. KESSLER:  Your Honor, the government would move

25   into evidence Exhibit 8Q.

1          THE COURT:  Any objections?

2          MR. HOCHMAN:  Just for the record, Your Honor,

3    improper business records foundation.

4          THE COURT:  Sustained.

5    BY MS. KESSLER:

6    Q     Mr. Schneider, did you -- is this a document that was

7    kept in the normal course of business in your practice's files?

8    A     Yes.

9    Q     And was it made at or near the time of the events that

10   occurred?

11   A     Yes.

12   Q     And was it made by a person with knowledge of the events

13   that occurred?

14   A     Yes.

15         MS. KESSLER:  Your Honor, I'd move again into

16   evidence Exhibit 8Q.

17         THE COURT:  Mr. Hochman?

18         MR. HOCHMAN:  No objection now.

19         THE COURT:  Exhibit 8Q will be admitted.

20         (Government's Exhibit 8Q was admitted into evidence.)

21         MS. KESSLER:  Permission to publish, Your Honor?

22         THE COURT:  You may do so.

23         (An exhibit was projected onto the projector screen.)

24   BY MS. KESSLER:

25   Q     Is this the 2005 audited financial statement Schneider

1    and Associates prepared for Saba School of Medicine Foundation?

2    A       Yes.

3    Q       Now, did Schneider and Associates follow the same

4    procedure in preparing the audit for this time period as it did

5    for the prior?

6    A       Yes.

7    Q       Did it obtain financial information from the individuals

8    associated with the Saba School of Medicine Foundation?

9    A       Yes.

10   Q       And was it your understanding that this audit was

11   prepared for the same reason that the prior audit was prepared?

12   A       Yes.

13   Q       And what was that?

14   A       For Title IV funding for the Department of Education.

15   Q       I'm sorry, I couldn't hear you.

16   A       Title IV funding for the Department of Education.

17              MS. KESSLER:  Thank you.

18              Your Honor, if I could approach with Exhibit 8H,

19   which was previously marked?

20              THE COURT:  You may.

21   BY MS. KESSLER:

22   Q       Mr. Schneider, could you look at Exhibit 8H, like

23   "Henry"?

24   A       Yes.

25   Q       What is this document?

1   A       This document is e-mails from . . . first from David

2   Fredrick to David Minchenberg, with a copy to me and a

3   gentleman, Dieter Luetolf.  It was from me to Dean Hiltzik.

4   Q       Was in document maintained in the Schneider and

5   Associates files?

6   A       Yes.

7   Q       And was it . . . kept there as part of the normal course

8   of business?

9   A       Yes.

10  Q       And was this a document that you would have received as

11  part of your duties in preparing the audited financial

12  statements for Saba?

13  A       Yes.

14  Q       Are you -- looking at the e-mail at the bottom, are you

15  included on this e-mail?

16  A       Yes.

17          MS. KESSLER:  Your Honor, the government would move

18  Exhibit 8H into evidence.

19          MR. HOCHMAN:  No objection, Your Honor.

20          THE COURT:  8H will be admitted.

21          (Government's Exhibit 8H was admitted into evidence.)

22          MS. KESSLER:  Permission to publish, Your Honor?

23          THE COURT:  You may.

24          (An exhibit was projected onto the projector screen.)

25

1  BY MS. KESSLER:

2  Q      Turning your attention to Exhibit 8H, did Schneider and

3  Associates, in preparing the 2005 Saba audited financial

4  statements, learn that there was a UBS account in the name of

5  The Foundation?

6  A      This probably refers to the 2004 financial statement,

7  which is dated July, 2005.

8  Q      All right.  So Schneider and Associates was told about a

9  bank account at UBS.

10  A      Yes.

11  Q      And in order to prepare the financial statements, would

12  you have obtained statement information from UBS?

13  A      Yes.

14         MS. KESSLER:  May I approach and have Exhibit 8FF,

15  both like "Frank," marked?

16         THE COURT:  You may.

17  BY MS. KESSLER:

18  Q      If you could look at Exhibit 8FF, sir?

19  A      Okay.

20  Q      What are these documents?

21  A      These are statements from . . . statements for the Saba

22  School of Medicine Foundation.  And it is from UBS.

23  Q      And would you -- your office have obtained these as part

24  of its preparation of the audited financial statements for

25  Saba?

1    A      Yes.

2    Q      And would you have maintained these, in the ordinary

3    course of business, in your company's file?

4    A      Yes.

5    Q      And would you have obtained it at or near the time that

6    you were preparing the financial statements?

7    A      Yes.

8            MS. KESSLER:  Your Honor, the government would move

9    Exhibit 8FF into evidence.

10           MR. HOCHMAN:  No objection, Your Honor.

11           THE COURT:  8FF will be admitted.

12           (Government's Exhibit 8FF was admitted into

13       evidence.)

14   BY MS. KESSLER:

15   Q      Now, if we could --

16           MS. KESSLER:  Permission to publish, Your Honor?

17           THE COURT:  You may.

18           MS. KESSLER:  Thank you.

19           (An exhibit was projected onto the projector screen.)

20   BY MS. KESSLER:

21   Q      Looking at the first page of this document, in the upper

22   right-hand corner, can you tell the jury what the title, or the

23   account titling of this was?

24   A      Saba School of Medicine Foundation.

25   Q      And what is the time period that this statement applies

1    to?

2    A      It's probably -- it's the value as of April 30th, 2005.

3    Q      And what is that value?

4    A      U.S. dollars, 4,480,897.

5           MS. KESSLER:  Your Honor, permission to approach to

6    have Exhibit 8DD, like "dog," marked?

7           THE COURT:  You may.

8    BY MS. KESSLER:

9    Q      Mr. Schneider, if you could look at Exhibit 8DD . . .

10   what is this document?

11   A      This is a . . . what we call, in my world, it's a trial

12   balance separating assets and liabilities, and . . . explaining

13   assets and liabilities, which came off a system that the school

14   used for their accounts.

15   Q      And what sort of information is included in the

16   document?

17   A      It's the balances as of April 30th, 2006 -- I guess

18   it's '6 and '5 --

19   Q      And -- I didn't mean to interrupt.

20   A      -- it's hard to read this, even by me.  It says, as of

21   April 30th, 2005, so it's the balances as of that date.

22   Q      And would -- was this document contained in Schneider

23   and Associates' files?

24   A      Yes.

25   Q      And is it a document that you . . . you would have

1   needed in order to prepare the audited financial statements for

2   Saba School of Medicine Foundation?

3   A     Yes.

4   Q     And is it part of your normal course to maintain this

5   document in your files?

6   A     Yes.

7          MS. KESSLER:  The government would move Exhibit 8DD

8   into evidence.

9          THE COURT:  Any objections?

10          MR. HOCHMAN:  No objection, Your Honor.

11          THE COURT:  8DD will be admitted.

12          (Government's Exhibit 8DD was admitted into

13      evidence.)

14          MS. KESSLER:  Permission to publish?

15          THE COURT:  You may.

16          (An exhibit was projected onto the projector screen.)

17  BY MS. KESSLER:

18  Q     Looking at Page 1 of Exhibit 8DD, looking at the top

19  portion of this document, at the current assets listed, is

20  there an United Bank of Switzerland account listed there?

21  A     Yes.

22  Q     And would you have taken this into account in preparing

23  the computation of, or auditing the assets held by The

24  Foundation as part of the auditing -- I think I need to start

25  over with that question.

1    A      The answer is yes.

2    Q      Would you have taken this information into account in

3    preparing the audited financial statements for Saba?

4    A      Yes.

5    Q      Now, was Schneider and Associates also hired to prepare

6    audited financial statements for Medical University of the

7    Americas?

8    A      Yes.

9           MS. KESSLER:  May I approach to have Exhibit 7EE,

10   like "Edward," marked, Your Honor?

11          THE COURT:  You may.

12   BY MS. KESSLER:

13   Q      If you could look at Exhibit 7EE, what is this document?

14   A      The financial statements for the year ended April 30th,

15   2004, for Medical Universities -- University of the Americas.

16   Q      Were you also engaged to prepare the audited financial

17   statements for Medical University of Americas for 2005?

18   A      Yes.

19          MS. KESSLER:  May I approach to have Exhibit 8AA

20   marked as evidence?

21          THE COURT:  You may.

22   BY MS. KESSLER:

23   Q      Looking at Exhibit 8AA, what is this document?

24   A      It's a financial statement for Medical University of the

25   Americas for the year ended April 30th, 2005.

1   Q       Did your office -- did Schneider and Associates prepare

2   this document?

3   A       Yes.  We audited this; yes.

4   Q       And is there a document that you would have maintained

5   in the Schneider and Associates files through the ordinary

6   course of business?

7   A       Yes.

8           MS. KESSLER:  Government would move Exhibit 8AA into

9   evidence.

10          MR. HOCHMAN:  No objection, Your Honor.

11          THE COURT:  8AA will be admitted.

12          (Government's Exhibit 8AA was admitted into

13      evidence.)

14  BY MS. KESSLER:

15  Q       If you could look back again at Exhibit 7EE.

16  A       Do you want me to do that?

17  Q       Yes, please.  I think we were just looking at it.

18  A       Right.  Yes.  Okay.

19  Q       This -- is this the audited financial statements for MUA

20  for 2004?

21  A       For April 30th, 2004; yes.

22  Q       Did your office prepare this financial statement as

23  well?

24  A       Yes.  We audited; yes.

25          MS. KESSLER:  Your Honor, I'd move Exhibit 7EE into

1    evidence.

2            MR. HOCHMAN:  Objection, Your Honor.  There's no

3    indication that this document actually came from his office, as

4    evidenced by the bottom right-hand corner on every page of the

5    document.

6            THE COURT:  The objection is sustained.  I just don't

7    remember if you laid the foundation for this one, as you did

8    the others.  So if you didn't . . . .

9    BY MS. KESSLER:

10   Q    In preparing both the 2004 audited financial statements

11   of MUA and the 2005 audited financial statements for MUA, did

12   you follow the same procedures that you did for those related

13   to Saba?

14   A    Yes.

15   Q    And did you again rely on information that was provided

16   by the client to accurately audit those financial statements?

17   A    Yes.

18           MS. KESSLER:  If I could approach, Your Honor, to

19   have Exhibit 8Y, like "young," marked?

20           THE COURT:  You may approach freely for all the

21   exhibits.

22           MS. KESSLER:  Thank you.

23   BY MS. KESSLER:

24   Q    Mr. Schneider, what is this document in 8Y?

25   A    Before you issue a financial statement, our rules are

1   that you're required to obtain a representation letter from the

2   client.

3   Q      And what does that representation -- what is

4   contained -- should be contained in that representation letter?

5   A      That's the client confirming to you that he made

6   available to you all the books and records; confirming to you

7   that the books and records are accurate and complete, you

8   didn't withhold anything, and you disclosed any contingencies

9   or anything that could affect the financial statements.

10  Q      And Exhibit 8Y, is this a document that you maintained

11  in your files at Schneider and Associates?

12  A      Yes.

13  Q      And would it have been required as part of the

14  preparation of the audited financial statements for MUA?

15  A      Yes.

16          MS. KESSLER:  Your Honor, I'd move 8Y into evidence.

17          THE COURT:  Any objections?

18          MR. HOCHMAN:  No objection, Your Honor.

19          THE COURT:  8Y will be admitted.

20          (Government's Exhibit 8Y was admitted into evidence.)

21          MS. KESSLER:  Permission to publish, Your Honor?

22          THE COURT:  You may.

23          (An exhibit was projected onto the projector screen.)

24  BY MS. KESSLER:

25  Q      What is the date of this letter, Mr. Schneider?

1    A       It was prepared on December 6th, 2005.

2    Q       And is it from the Medical University of the Americas?

3    A       Yes.

4    Q       And if you turn to Page 3, the last page of this

5    exhibit, who signed this . . . letter?

6    A       David Fredrick and David Minchenberg.

7    Q       And are those the individuals you dealt with primarily

8    in your involvement with the preparation of the audited

9    financial statements?

10   A       Yes.

11   Q       Now, in preparing the MUA . . . the audited financial

12   statements for MUA in both 2004 and 2005, would it have been

13   important for Schneider and Associates to be aware of all

14   assets that were owned by MUA?

15   A       Yes.  That's the purpose of the representation letter;

16   yes.

17   Q       And I didn't -- I'm sorry if I interrupted.

18           Would that -- would it also be important for you to be

19   aware of financial accounts that were offshore?

20   A       Absolutely.

21           MS. KESSLER:  I'd like to have marked as Exhibit 8U.

22   BY MS. KESSLER:

23   Q       If you could take a look at Exhibit 8U, please.

24           Was Schneider and Associates also engaged to do some

25   work related to preparation of Form 5471 for Medical University

1    of the Americas?

2    A       Yes.

3    Q       And what is this document?

4    A       This is an engagement letter for us to prepare the 5471

5    forms for 2000, 2001, '2, '3, '4, and '5.

6    Q       Was this letter prepared by your office?

7    A       Yes.

8    Q       And was it part of the files that were maintained in

9    your office?

10   A       Yes.

11   Q       And is it a document that you would have kept in the

12   ordinary course of business?

13   A       Yes.

14   Q       And is it a document that you would have used as part of

15   your engagement for preparation or involvement with the 5471s?

16   A       Yes.

17           MS. KESSLER:  The government would move into evidence

18   Exhibit 8U.

19           MR. HOCHMAN:  No objection.

20           THE COURT:  8U will be admitted.

21           (Government's Exhibit 8U was admitted into evidence.)

22           MS. KESSLER:  Permission to publish.

23           THE COURT:  You may.

24           (An exhibit was projected onto the projector screen.)

25

1    BY MS. KESSLER:

2    Q      Looking at the second paragraph of this document, that

3    begins with, "We will prepare," can you read to the jury what

4    your -- Schneider and Associates had been engaged to do?

5    A      "We will prepare federal Form 5471 for the years ended

6    April 30th, 2000, 2001, 2002, 2003, 2004, and 2005.  These

7    returns will be prepared from information provided to us

8    without verification by us, and will be prepared in accordance

9    with the appropriate federal income tax laws and regulations.

10   However, Dr. David L Fredrick and Dr. Patricia Hough have the

11   ultimate responsibility for Forms 5471, and, therefore, you

12   should review these returns with your clients carefully before

13   they are filed."

14   Q      Who are these addressed to?

15   A      It says Michael Refolo, but it was addressed to someone

16   named Michael Angelini.

17   Q      And does it appear that Mr. Refolo or Mr. Angelini are

18   part of a Bowditch & Dewey LLP?

19   A      Yes.

20   Q      Do you know who Bowditch & Dewey LLP is?

21   A      A law firm, a local law firm.

22   Q      Do you understand them to be local counsel?

23   A      Yes.

24   Q      For whom?

25   A      For Medical University of the Americas Limited, and I

1    assume for Dr. Fredrick and Dr. Hough.

2            MR. HOCHMAN:  Objection, move to strike the last part

3    of the answer.

4            THE COURT:  The objection is sustained, motion is

5    granted.

6    BY MS. KESSLER:

7    Q       Referring back to the last sentence you just read, why

8    do you include that sentence in your letter?

9    A       The last -- are you talking about on Page 2 or Page 1?

10   Q       Page 2, second paragraph, the sentence that begins with,

11   "However"?

12   A       Oh, "However"?  Well, because the information for an

13   entity comes from an individual or individuals.  So, since it's

14   their entity, they are the ones who are ultimately responsible

15   for the information provided to us.

16   Q       Now, in the course of the work that you did for the

17   preparation of the Form 5471, did you all prepare the initial

18   drafts of the 5471s, or did someone else?

19   A       Someone else.  The engagement was very specific.

20   They -- Mr. Minchenberg prepared the 5471s, and all we were

21   asked to do was run it through our system because he wanted to

22   make sure that he answered the questions properly.  We have a

23   computerized system that has a diagnostics attached.  So he was

24   concerned that something might pop up on the diagnostics, and

25   we ran it through system.

1          MS. KESSLER:  Can I approached to have Exhibit 8-N,

2    like "Nancy," marked?

3    BY MS. KESSLER:

4    Q       If you could look at Exhibit 8N, like "Nancy," what is

5    contained in this exhibit?

6    A       This is a fax from Dean Hiltzik -- no, fax from David

7    Minchenberg, to Mr. Hiltzik, re Dr. Fredrick's 5471.

8    Q       And these documents contained herein, were they part of

9    the files Schneider and Associates maintained?

10   A       Yes.

11   Q       And did they maintain these documents in the ordinary

12   course of business?

13   A       Yes.

14   Q       And were these documents used as part of your -- the

15   services you were engaged to perform related to the 5471s?

16   A       Yes.

17          MS. KESSLER:  I'd move into evidence Exhibit 8N, Your

18   Honor?

19          MR. HOCHMAN:  No objection.

20          THE COURT:  8N will be admitted.

21          (Government's Exhibit 8N was admitted into evidence.)

22          MS. KESSLER:  Permission to publish, Your Honor?

23          THE COURT:  You may.

24          (An exhibit was projected onto the projector screen.)

25

1    BY MS. KESSLER:

2    Q       Looking at Page 1 of this document, what is

3    Mr. Minchenberg enclosing with this fax cover sheet?

4    A       Dr. Fredrick's 5471s.

5    Q       Were they drafts?

6    A       What these were, were, I believe, based on this fax,

7    that he had sent the penciled-in 5471s, probably to me, and

8    asked me to take a look at them and comment if he missed

9    anything.  And I had -- obviously, there were some comments

10   that I made.  He corrected them.  So this is probably the 5471

11   that was final by him to run through our system.

12   Q       And if we look at Page 3 of this exhibit, is this how

13   you recall receiving the draft Form 5471 from Mr. Minchenberg?

14   A       Yes.

15   Q       With the handwriting?

16   A       Yes.

17   Q       Can you explain to the jury what your understanding

18   is -- or what your understanding is of when a Form 5471 needs

19   to be filed?

20   A       It's attached to your personal income tax return.  It's

21   a requirement of anybody that maintains an interest in a

22   foreign company.

23           MS. KESSLER:  Thank you.

24           Now . . . .  Court's indulgence.

25           I'd like to have marked Government's Exhibit 8S, as

1   in "Sam."

2   BY MS. KESSLER:

3   Q       If you could take a look at Government's Exhibit 8S, as

4   in "Sam" . . . as part of the back-and-forth for the

5   finalization and preparation of the Form 5471, was additional

6   information required to do that?

7   A       Yes.

8   Q       And what additional information was required?

9   A       Balances in a bank called RBTT, and Victoria.  Must be

10  another bank.

11  Q       And who did you obtain that information from?

12  A       It came from my files.

13  Q       Was this -- the document we're looking at, was it

14  maintained as part of your files?

15  A       Yes.

16  Q       And was it information that you collected for purposes

17  of preparing 5471s?

18  A       Yes.

19  Q       And do you use this information for purposes of

20  preparing the 5471s?

21  A       Yes.

22          MS. KESSLER:  I'd move 8S, as in "Sam," into

23  evidence.

24          MR. HOCHMAN:  No objection, Your Honor.

25          THE COURT:  8S will be admitted.

1             (Government's Exhibit 8S was admitted into evidence.)

2             MS. KESSLER:  Permission to publish?

3             THE COURT:  You may.

4             (An exhibit was projected onto the projector screen.)

5    BY MS. KESSLER:

6    Q     Mr. Schneider, can you tell the jury who this e-mail is

7    from?

8    A     Dr. Patricia Hough.

9    Q     And who is it addressed to?

10   A     David Minchenberg and David Fredrick.

11   Q     And what is the subject line?

12   A     "Round Hill Project Account Info for 5471."

13   Q     And what sort of information is provided?

14   A     Balances as of certain dates.

15           MS. KESSLER:  I would like to have marked

16   Exhibit 8-V, like "Victor."

17   BY MS. KESSLER:

18   Q     If you could look at the documents contained in

19   Exhibit 8V?

20         Were these documents maintained in the business files

21   for Schneider and Associates?

22   A     Yes.

23   Q     And are they related to your preparation of Form 5471?

24   A     Yes.

25   Q     And are they maintained in the normal course of

1   business?

2   A      Yes.

3   Q      And are they documents related to the preparation of

4   Form 5471?

5   A      They are the 5471s.

6          MS. KESSLER:  Your Honor, the government would move

7   Exhibit 8-V into evidence.

8          MR. HOCHMAN:  No objection.

9          THE COURT:  8V will be admitted.

10         (Government's Exhibit 8V was admitted into evidence.)

11         MS. KESSLER:  Permission to publish?

12         THE COURT:  You may.

13         (An exhibit was projected onto the projector screen.)

14  BY MS. KESSLER:

15  Q      If we look at Page 1 of this document, did you prepare,

16  or finalize, Form 5471 for -- in the name of Patricia Hough?

17  A      Yes.

18  Q      Actually, I guess you need to look at Page 2, to answer

19  that question.

20  A      Yes.

21  Q      And what was the entity that you were reporting

22  information for?

23  A      Round Hill Holding Company N.V.

24  Q      And did Schneider and Associates finalize Form 5471 for

25  Dr. Hough, related to Round Hill Holding Company?

1   A      As I said before, that final draft that was penciled in,

2   we took that information and put it into our computer system,

3   so that the forms could look . . . I think the words from

4   Minchenberg were "professional," so that he could file them.

5   Q      Now, if you look at Page 2 of this document, did you

6   prepare a Form 5471 related to the year December 31st, 2001?

7   A      Yes.

8   Q      And if you could look at Page --

9   A      It's April 30th, 2001.

10  Q      Oh.  My apologies.  At the top, there, is that where you

11  get the --

12  A      Yes.

13  Q      Okay.  I have the wrong entry.

14         Then moving to Page 11 of this exhibit?

15  A      Yes.

16  Q      Did you also prepare Form 5471 for the year 2002?

17  A      Yes.

18  Q      Then looking forward to Page 20?

19  A      Yes.

20  Q      Did you prepare them for 2003?

21  A      Yes.

22  Q      And then, at Page 29, did you prepare them for 2004?

23  A      Yes.

24  Q      And what percentage of . . . stock ownership did

25  Ms. Hough -- or excuse me -- Dr. Hough reflect on this document

1   for each of those years?

2   A      100 percent.

3   Q      Looking back to the first page of this exhibit, what was

4   happening here?

5   A      We forwarded these forms to Michael Refolo, for him to

6   pass on to his client for filing.

7              MS. KESSLER:  If I could approach and have

8   Exhibit 8O, like "Oliver," marked?

9   BY MS. KESSLER:

10  Q      If you take a look at Exhibit 8O . . . .

11  A      Yes.

12  Q      Do you recognize this document?

13  A      Yes.

14  Q      Is this a document that came from your business files at

15  Schneider and Associates?

16  A      Yes.

17  Q      And is it a document that you maintain in the normal

18  course of business?

19  A      Yes.

20  Q      What is this document?

21  A      It's an e-mail from David Minchenberg to David Fredrick,

22  myself, and Dean Hiltzik.

23  Q      Is there anyone else on the "to" line?

24  A      Dr. Hough.

25  Q      Now, did there come a time, in the course of your work

1    related to the medical schools, that discussion was had about

2    proposed row structuring of entities?

3    A     David Minchenberg was . . . interested in trying to come

4    up with restructuring for Dr. Fredrick.

5    Q     And does this document relate to that discussion?

6    A     Wasn't a discussion, he just sent an e-mail.

7    Q     But it was part of your files that you maintain?

8    A     Yes.

9              MS. KESSLER:  Your Honor, I'd move 80 into evidence.

10             MR. HOCHMAN:  No objection.

11             THE COURT:  80 will be admitted.

12             (Government's Exhibit 80 was admitted into evidence.)

13             MS. KESSLER:  Now, if -- permission to publish, Your

14   Honor?

15             THE COURT:  You may.

16             (An exhibit was projected onto the projector screen.)

17   BY MS. KESSLER:

18   Q     Do you recall why, what prompted, the -- this e-mail,

19   why there was discussion coming from Mr. Minchenberg about

20   proposed restructuring?

21   A     Well, as part of his job as a CFO, I think what he was

22   trying to do was come up with a structure that made economic

23   sense for --

24   Q     Did the -- go ahead.

25   A     -- you know, for the schools.  He was always thinking,

1    for lack of a better word.

2    Q      Did -- was there -- did he tell you that he . . . .  Let

3    me rephrase that.

4           Was there some reason that the current structure didn't

5    make sense?

6                MR. HOCHMAN:  Objection, foundation.

7                THE COURT:  Overruled.

8                THE WITNESS:  "Yes and no" is the best answer I can

9    give you.  Yes, it made sense, because --

10               THE COURT:  Hang on a second.  That's the answer.

11   She can ask another question.

12   BY MS. KESSLER:

13   Q      Can you explain why you say, "yes or no"?

14   A      Yes, because it seemed to be appropriate for what he

15   wanted.

16   Q      Who is the "he" you're referring to?

17   A      David Fredrick.  No, in the sense that I think that

18   David Minchenberg wanted to have him to have a clearer

19   organization, with an umbrella company, and he was trying to

20   create different entities.

21   Q      Again, which -- I just want to make sure, because we're

22   talking about -- you've mentioned David Minchenberg and

23   David -- Dr. Fredrick.

24   A      I'll mention last names only.

25   Q      Okay.

1    A      So I think what Minchenberg was trying to do was to make

2    things easy to control, to create internal controls, create a

3    more responsible environment for the operations of the school.

4    Q      Now, if we look at Paragraph 3 of this document, begins

5    with, "In creating," can you read that?

6    A      "In creating the new proposed entities, the primary

7    overriding goal was to establish a structure of entities that

8    would be positioned for a future trigger event.  The future

9    trigger event would be a sale of Saba and/or MUA, or a public

10   offering, or other exit strategy, as determined by Dr. Fredrick

11   and Dr. Hough.  When I created this structure, the second

12   overriding goal was to create structures that maximized asset

13   protection while simultaneously minimized any tax liabilities."

14   Q      Were you involved in any discussions about this . . .

15   whether to incorporate potential restructuring with

16   Dr. Fredrick, Dr. Hough, or Mr. Minchenberg?

17   A      No, not at all.

18          MS. KESSLER:  May I have marked Exhibit 8CC, like

19   "cat"?

20   BY MS. KESSLER:

21   Q      If you could take a look at this document, 8CCT . . . is

22   this a document that was contained in the Schneider and

23   Associates files?

24   A      Yes.

25   Q      And is it a document that you maintain in the ordinary

1   course of business?

2   A      Yes.

3   Q      And is it a document you would have received as part of

4   your work with -- related to the medical schools?

5   A      Yes.

6          MS. KESSLER:  Your Honor, I'd move into evidence

7   Exhibit 8CC?

8          MR. HOCHMAN:  Objection, Your Honor, as to the date

9   or timing of this particular document, as to whether or not it

10  was in connection with any particular audit or any particular

11  function that Mr. Schneider's company was involved with.  I

12  don't see a date on the document.

13         THE COURT:  The objection is overruled, given what

14  the testimony was by the witness.  8CC will be admitted.

15         (Government's Exhibit 8CC was admitted into

16      evidence.)

17         MS. KESSLER:  Permission to publish, Your Honor?

18         THE COURT:  You may.

19         (An exhibit was projected onto the projector screen.)

20  BY MS. KESSLER:

21  Q      Mr. Schneider, what . . . what is the nature of this

22  document; what's being discussed?

23  A      Well, again, Minchenberg was -- was always looking at

24  restructuring and coming up with different scenarios, and . . .

25  that was what he felt part of his role was.  So this was

1    apparently some e-mail, or document, that he prepared,

2    expressing some of his issues and concerns.

3    Q     Now, can you read the second portion of the title of

4    this document, at the top, "Overriding . . ."?

5    A     "Overriding all the entities is a concept called

6    'substance over form.'"

7    Q     Can you explain to the jury what "substance over form"

8    means?

9    A     In this context?

10   Q     Yes.

11   A     I have no idea.

12   Q     Can you explain what it means in general?

13   A     It's --

14         MR. HOCHMAN:  Objection, relevance as to what it is

15   in general.

16         THE COURT:  Sustained.

17   BY MS. KESSLER:

18   Q     Looking at the upper right-hand side of this document,

19   there's some handwriting there?

20   A     Yes.

21   Q     Do you recognize that handwriting?

22   A     That's my handwriting.

23   Q     And what is -- what have you written there?

24   A     That was to my secretary, for her to hold for me for the

25   next time I met with Dr. Fredrick.

1   Q      Do you recall whether you discussed this memorandum --

2   this document with Dr. Fredrick?

3   A      I don't recall, but I kinda doubt it.

4   Q      Why do you say that?

5   A      I just don't remember, but I'm pretty sure, if I would

6   have discussed it with him, I would recall.  I don't recall

7   that I did.

8   Q      Now, did Mr. Minchenberg have concerns about Saba, MUA,

9   and EIC, related to tax issues?

10  A      He had concerns about everything, to be frank with you.

11  Q      Looking down at the bottom portion of this document, on

12  your notes, the first arrow there, can you read that first

13  entry?

14  A      "I hate to use the language, but can't sugarcoat it.

15  Tax fraud is being committed.  I've attached the corresponding

16  IRC code sections that apply.  Felony charges would apply.  Any

17  such actions would jeopardize all our accreditations,

18  et cetera."

19  Q      Now, you said that Mr. Minchenberg had concerns about

20  everything.

21         What else did he have concerns about?

22  A      All the things that he's mentioning in this particular

23  document.

24  Q      Such as what?

25  A      I have to read the whole document to respond.

1    Q        Did he have concerns about the potential sale of the

2    medical schools?

3                MR. HOCHMAN:  Objection, hearsay.

4                THE COURT:  Sustained at this point.

5                MS. KESSLER:  I'll approach and give you Exhibit 8B,

6    like "boy."

7    BY MS. KESSLER:

8    Q        Looking at Exhibit 8B, what is this document,

9    Mr. Schneider?

10   A        It's a fax to me, dated December 18th, 2003, which is,

11   "A legal review of recommended legal tax structure for our

12   medical schools by a potential buyer."

13   Q        And who sent this to you?

14   A        It looks like David Fredrick.

15   Q        Do you recall having any . . . actually, looking at the

16   first page of this --

17               MS. KESSLER:  Your Honor, I want to confirm, is this

18   document -- I believe it's in evidence?

19               I just want to confirm.

20               THE COURT:  It is.

21               MS. KESSLER:  Permission to publish?

22               THE COURT:  You may.

23               (An exhibit was projected onto the projector screen.)

24   BY MS. KESSLER:

25   Q        Looking at the first page of this document, do you

1    recognize the handwriting up there in the upper right?

2    A      That's my handwriting.  It says, "file correspondence."

3    Q      Okay.  Do you recall whether you had any . . . .  What

4    is discussed in the attached -- the memorandum attached to this

5    fax cover sheet?

6            MR. HOCHMAN:  Objection.  The memorandum speaks for

7    itself.

8            THE COURT:  Overruled.

9            MS. KESSLER:  You can answer.

10           THE WITNESS:  "Revised overview of acquisition of

11   medical universities in Nevis, Netherlands Antilles, and

12   Belize, and U.S. management company."

13   BY MS. KESSLER:

14   Q      Looking at Page 3 of this document, the second of the

15   attached memorandum, but the Page Number 3, looking at

16   Paragraph 2, can you read what is entered there?

17   A      "The investors are planning to acquire a 75 percent

18   equity interest in a venture consisting of four companies.

19   This venture is currently owned by Dr. David Fredrick and his

20   wife, Dr. Pat Hough."

21   Q      Now, do you recall . . . .  Let me back up.

22           If we look in Paragraph 3, what is one of the entities

23   that's going to be part of the sale?

24   A      "One company is a Massachusetts corporation that is a

25   Subchapter S corporation for federal income tax purposes.  This

1    company is called EIC, Inc.  This company has approximately

2    U.S. $1 million in assess, two buildings, and some equipment."

3    Q       Okay.  Now, if you look at Paragraph 4, what is the

4    second entity that's involved in the potential sale?

5    A       "The second company is a foundation in the Netherlands

6    Antilles in Saba.  It is called Saba University Netherlands

7    Antilles.  This entity operates as a medical school with about

8    48,000 square feet of land and some ten new buildings."

9    Q       Now -- I'm sorry.

10   A       No.  I'm done.

11   Q       It appears that the Saba Foundation is going to be sold

12   as part of the potential transaction set forth in this

13   document; is that right?

14   A       I think it says -- repeat your question again, please.

15   Q       Is the Saba Foundation one of the entities that would be

16   sold as part of the transaction in this document?

17   A       Yes.  Yes.

18   Q       Now, what's your understanding of -- is it odd to you

19   that a foundation would be sold?

20   A       Yes.

21   Q       Why?

22   A       Because a foundation is technically not owned by

23   anybody.

24   Q       Why do you say that?

25   A       It operates under the rules of wherever it was formed,

1    the profits remain, or the equity remains within the entity.

2    It can be sold, but if it's sold, the question is, who has the

3    right to sell it?  Because there are no individuals that own

4    it.

5    Q      And looking at, again, at Paragraph 2 of the same Page 3

6    of this document, if you could read the second sentence in that

7    paragraph?

8    A      This is on Page 3?

9    Q      Yes, sir.

10   A      Number 2?

11   Q      Yes.

12   A      "The investors are planning to acquire a 75 percent

13   equity interest in a venture consisting of four companies.

14   This venture is currently owned by Dr. David Fredrick and his

15   wife, Dr. Pat Hough."

16   Q      And does it make -- you stated a minute ago that a

17   foundation couldn't be sold.

18   A      Well, let me clarify that, if I may.  That's under U.S.

19   law.  For lack of a better word, I don't know what the rules

20   are in wherever they were formed.  But more than likely they're

21   the same.

22          MR. HOCHMAN:  Objection, nonresponsive to the

23   question, and lack of foundation for this witness to know

24   anything.

25          THE COURT:  Sustained.

1          MR. HOCHMAN:  And move to strike answer.

2          THE COURT:  That motion is denied.

3    BY MS. KESSLER:

4    Q     Now, did you have any discussions with Dr. Fredrick or

5    Dr. Hough regarding restructuring or sale of the medical

6    schools and this -- regarding restructuring or sale of the

7    medical schools?

8    A     With regard to this particular memo?

9    Q     Yes.

10   A     This memo was prepared prior to when I was engaged --

11   Q     Okay.

12   A     -- so I think this is just part of information that he

13   was providing to me.

14   Q     Do you recall having any substantive conversation about

15   the contents of it with either Dr. Fredrick or Dr. Hough?

16   A     It's too long ago.  I honestly don't recall.

17   Q     All right.  In any conversations that you may have had

18   with Dr. Fredrick or Dr. Hough, would you ever have advised

19   them that asset protection or restructuring plan would mean

20   that they would not have to pay taxes on the proceeds from the

21   sale of the schools?

22   A     No, of course not.

23          MS. KESSLER:  If I could have one second, Your Honor?

24          THE COURT:  You may.

25          (Ms. Kessler confers with Ms. Finley in private.)

1          MS. KESSLER:  Your Honor, I don't have any further

2     questions.

3          THE COURT:  All right.  Thank you.

4          Mr. Hochman?

5          MR. HOCHMAN:  Yes, Your Honor.

6          THE COURT:  Do any of the jurors need to stand and

7     stretch?  Now is a good time.

8          (Jurors stand and Stretch.)

9          THE COURT:  All right.  Anytime you're ready.

10                    CROSS EXAMINATION

11    BY MR. HOCHMAN:

12    Q     Mr. Schneider, why don't we actually take our tour

13    through your testimony backwards from where the government

14    ended, and we'll work our way back to the beginning.

15          So let's start with that last document that we were just

16    dealing with, Government's Exhibit 8B, do you have that in

17    front of you?

18    A     Yes.

19          MR. HOCHMAN:  If you could put Page 3 of 8B up on the

20    screen?

21          And first, I want you to take a look at the first

22    page of that.

23          You don't have to move the image.

24    BY MR. HOCHMAN:

25    Q     The first page of this is David Fredrick sending you

1    this document; is that correct?

2    A       Correct.

3    Q       Pat Hough is not involved or not mentioned as a sender

4    of this document to you; correct?

5    A       Correct.

6    Q       She's not cc'd on the cover letter at all?

7    A       Correct.

8    Q       And if you look at the second page of this document,

9    she's not indicated anywhere as having been in either the "to"

10   or the "from" line –- the "to" was obviously crossed out, but

11   the "from" line, as having received this document; do you see

12   that?

13   A       Correct.

14   Q       And you don't see her signature anywhere on this

15   document; is that correct?

16   A       Correct.

17   Q       And now, on Page 3, if we could focus on Paragraph 4?

18           What was the school's name, the foundation's name?

19   A       Not this.  Saba School of Medicine Foundation, I

20   believe.

21   Q       So this Saba University Netherlands Antilles, do you

22   have any idea what that is?

23   A       No.

24   Q       And it's not the Saba School of Medicine Foundation that

25   you're familiar with; correct?

1   A       I would guess so.  I really don't know.

2   Q       As you were saying, to your knowledge, the Saba School

3   of Medicine Foundation cannot be owned by anyone; correct?

4   A       Correct.

5   Q       If I can take you backwards, then, to Exhibit 8CC?

6   A       Okay.

7   Q       And Exhibit 8CC, I think you said this was a memo that

8   you had received from David Minchenberg; is that correct?

9   A       I believe so; yes.

10  Q       And, in this memo, if I may draw your attention to it,

11  his chief concern seems to be the failure of filing these

12  5471s; is that correct?

13  A       Can you point me in that direction so I don't have to

14  read the whole . . . .

15  Q       Sure.

16  A       I see it.

17          Yes, he was very concerned about that.  That's correct.

18  Q       And that's what he believed, if you don't file the

19  5471s, then tax fraud would be committed; is that correct?

20  A       It wouldn't be tax fraud, it would be penalties.

21  Q       So he's actually wrong, it wouldn't be tax fraud, it

22  would be penalties?

23  A       That's correct.  Many people didn't even know about

24  those forms.

25  Q       You actually had other clients that didn't know about

1    these forms?

2    A      No, I didn't.  My clients knew about these forms.

3    Q      But you are aware that other people, other

4    accountants --

5    A      Correct.

6    Q      -- had clients that didn't know about 5471s.

7    A      Yes.

8    Q      And 5471, is that a form you actually sign --

9    A      No.

10   Q      -- a taxpayer signs?

11   A      No.  It's attached to your personal income tax return.

12   Q      So how do you know if a -- so the form doesn't have any

13   "under penalty of perjury I have reviewed this form, and

14   declare it to be true, complete, and correct"; correct?

15   A      It's part of your 1040 form, where you're making that

16   statement when you sign a 1040.  It's attached to the 1040, so

17   it's applicable to the 5471.

18   Q      But if you send it in -- let's say you've already sent

19   in the 1040 for that particular year, if you want to go ahead

20   and -- but forgot to send in your 5471, do you have to amend

21   your tax return to send in the 5471, if you know, or can you

22   just send in the 5471 to the IRS?

23   A      I believe you would have to amend your 1040.  I believe.

24   I would have to check the instructions.

25   Q      Would it surprise you to learn that David Minchenberg

1    checked with the IRS and found out that you can just send in

2    the 5471 without having to amend your 1040?

3    A       Okay.  Good.  Fine.

4    Q       Now, if you believed -- when you got this memo, and this

5    mention, as the government highlighted for you, of the words,

6    "tax fraud being committed," you said that you don't recall

7    discussing this memo with David Fredrick; correct?

8    A       Yes.  I know that I discussed it with David Minchenberg.

9    I do recall that for sure.

10   Q       Very good.

11           But you don't recall, you said, discussing it with David

12   Fredrick; is that correct?

13   A       Correct.  I wasn't involved in his personal stuff, so I

14   have no interest in that really.

15   Q       Well, you were involved a little, weren't you; you were

16   preparing 5471s?

17   A       Only the 5471s, that's correct.

18   Q       And that's what this memo is about, is 5471s, so you had

19   some, even a minor involvement, shall we say, with David

20   Fredrick's 5471s.

21   A       Yes.  But the memo is discussing other things as well.

22   Q       True.

23           But if you believed that tax fraud was being committed,

24   certainly you would have contacted David Fredrick, and had a

25   full discussion with him about this; correct?

1    A       Yes.

2    Q       And the fact that you don't recall actually having that

3    type of discussion with him and being enormously concerned,

4    such that you would recall it today, indicates that that

5    discussion probably didn't happen; correct?

6    A       The 5471s, if that's the major subject you're talking

7    about, filing the 5471s brings you up to date, subject to

8    penalties.  So I don't understand your question.

9    Q       So you can actually cure the 5471 problem by submitting

10   the documents, and then you just might be subject to having to

11   pay civil penalties; correct?

12   A       Correct.

13   Q       Writing a check basically.

14   A       That's correct.

15   Q       And what this memo makes clear, if I turn your attention

16   to Page 3, is that his recommendation for compliance was to

17   fill out all the 5471s for the various entities; is that

18   correct?

19   A       Correct.

20   Q       And if you look, if I might draw your attention --

21           MR. HOCHMAN:  Actually, can we highlight the very

22   bottom of tax compliance?

23   BY MR. HOCHMAN:

24   Q       So he highlights the MUA, Round Hill, Apex, and

25   something called TSI.

1          Do you know what TSI is?

2    A     No.

3    Q     And then he says:  "Data needed for completion, MUA all

4    set."

5          Do you see that?

6    A     Yes.

7    Q     If you could turn the page to the top of the next page,

8    this is now Government's Exhibit 8CC, Page 4.

9          And it says, "Round Hill, certificate of organization,

10   financial activity from inception," and then it says," I will

11   produce the financial statements."

12         Do you see that?

13   A     Yes.

14   Q     And the "I" in this sentence is referring to David

15   Minchenberg; is that correct?

16   A     Correct.

17   Q     And then, for Apex, it says, "Certification of

18   organization, financial activity from inception," and then it

19   says, "I" -- is that David Minchenberg?

20   A     Yes.

21   Q     -- "will produce the financial statements."

22         And then, in Number 4, it says, "TSI, certificate of

23   organization, financial activity from inception," and again,

24   "I" -- that's David Minchenberg?

25   A     Yes.

1    Q       -- "will produce the financial statements."

2            And then it had a target date below that, original

3    target date of March 4th, 2005; do you see that?

4    A       Yes.

5    Q       And then if you can scroll down a little bit farther on

6    this document, starting with the sentence, "Data needed for

7    completion"; do you see that sentence --

8    A       Yes.

9    Q       -- "Data needed for completion"?

10           And you see what Mr. Minchenberg wrote, he wrote,

11   "None."

12   A       Yes.

13   Q       Which I interpret, or do you interpret, to mean that he

14   had all the data he needed in order to do the completion?

15   A       Yes.

16   Q       If we could turn to Exhibit 80 -- 8O, I guess it would

17   be.

18           MR. HOCHMAN:  And if we could highlight the third

19   paragraph?

20           (An exhibit was projected onto the projector screen.)

21           MR. HOCHMAN:  And then just if we could highlight

22   that whole paragraph.  Actually, highlight just the last

23   sentence, if you would.  A little bit more.  That's good.

24   That's a good sentence.

25

1    BY MR. HOCHMAN:

2    Q       This is the David Minchenberg to you, Dean Hiltzik,

3    David Fredrick, and P.L. Hough, e-mail; correct?

4    A       Correct.  Dean Hiltzik.

5    Q       Dean Hiltzik, yes.

6            And this is the e-mail that came in December 28, 2004,

7    basically end of 2004; do you recall that?

8    A       Yes.

9    Q       And when David Minchenberg is now coming up with a

10   potential new structure, he talks about the first -- the

11   primary overriding goal being one to . . . set up the school

12   for a trigger event; do you see that?

13   A       Yes.

14   Q       Maybe a sale, a public offering, or some other strategy;

15   do you see that?

16   A       Yes.

17   Q       But the second overriding goal, it says:  "When I

18   created this structure, the second overriding goal was to

19   create structures that maximize asset protection while

20   simultaneously minimizing any tax liability."

21           Do you see anything wrong with the concept of maximizing

22   asset protection?

23   A       No.

24   Q       Do you see anything wrong with the concept of minimizing

25   tax liability?

```
 1   A       No.

 2   Q       Now, take -- you can flash back to the whole document.

 3           And in this document he lays out one, two, three, four,

 4   five, six different, what he calls "NewCos."

 5           Do you see that?

 6   A       Yes.

 7   Q       All six different NewCos being foreign NewCos; do you

 8   see that?

 9   A       Yes.

10   Q       I direct your attention to the deed, NewCo Foreign

11   Number 4; do you see that?

12   A       Yes.

13   Q       And I'd like you to read the last sentence, if you

14   could, of that particular paragraph?

15   A       "By establishing the FPC, if litigation potential arose,

16   the only assets available to attachment are those of FPC,

17   rather than the parent company."

18   Q       So Mr. Minchenberg was concerned that, if litigation

19   arose and a lawsuit came about, such that the NewCo Number 4

20   was sued, the only assets that could be attached would be those

21   of NewCo Number 4, and not the parent company; correct?

22   A       I guess so.

23   Q       And that is a form of asset protection; correct?

24   A       I guess so, yes.

25   Q       And in your estimation a legitimate form of asset
```

1    protection.

2    A      Depending on the facts and circumstances, yes.

3    Q      Did Mr. Minchenberg ever express to you that this was

4    any illegal form of asset protection?

5    A      No.  But he's not qualified to say that.  He's not an

6    attorney.

7    Q      He's not an attorney.

8           Do you know Mr. Minchenberg to be a CPA?

9    A      Yes.

10   Q      And are you saying that CPAs can't opine, and can't come

11   up with opinions, valid opinions, as to whether a structure

12   will work?

13   A      Work, yes; legal, I don't think we should do that.

14   Q      And does that include yourself?

15          You are a CPA; right?

16   A      Yes, sir.

17   Q      Are you a lawyer?

18   A      No, sir.  Thank God.

19          MR. HOCHMAN:  I don't know if the Bible will

20   intervene on this one.

21          THE COURT:  Go ahead.  Deal with that.

22   BY MR. HOCHMAN:

23   Q      I'd like to turn your attention to 8V, like in "Victor."

24          And 8V talks about –– this is the –– this is you sending

25   this guy, Michael Refolo, the Form 5471 for Round Hill Holding.

1          Do you recall that?

2    A     Yes.

3    Q     And these are the ones that you received from David

4    Minchenberg; is that correct?

5    A     We received the . . . the penciled-in forms that he did.

6    And then, as I stated before, he ran them through our system

7    to -- just to check and see if every answer was given to every

8    question.

9    Q     And do you know if David Minchenberg prepared any Round

10   Hill forms for David Fredrick -- excuse me.

11         Do you know if David Minchenberg prepared any Round Hill

12   Project Holdings 5471 forms for David Fredrick?

13   A     I have to look.  I don't remember.

14   Q     Please do.

15         (The witness examines an exhibit.)

16   A     I assume it would be contained in 8V.  This 8V?

17   Q     You can look through there, or -- actually, start with

18   your own memory, if you could.

19   A     I honestly don't recall.  It's too many years ago.  I

20   don't know.

21   Q     All right.  Well, we'll start with your memory, and then

22   we'll work --

23   A     Well, I'm looking at 8V.

24   Q     -- work our way forward.

25   A     The 5471s in 8V are all with the name, Patricia Hough.

1   Q      And do you know if -- excuse me -- David Minchenberg

2   ever sent your office any 5471 checklists with respect to

3   Dr. Fredrick?

4   A      I don't recall.  Too long ago.

5   Q      Would it refresh your recollection if you saw a

6   checklist that was sent to your office by David Minchenberg,

7   concerning Dr. Fredrick's Round Hill 5471?

8   A      Sure.

9          MR. HOCHMAN:  May I approach the clerk, Your Honor?

10         THE COURT:  You may.

11         MR. HOCHMAN:  And I've presented to the clerk what's

12  been marked for identification as Defense Exhibit 78.

13         MR. HOCHMAN:  And may I approach freely?

14         THE COURT:  You may.

15  BY MR. HOCHMAN:

16  Q      Mr. Schneider, is this a document that came from the

17  files of formerly Schneider & Associates?

18  A      I honestly don't recall.  I don't know.

19  Q      Do you see the indication MP&S, 5115, on the first page

20  of this document?

21  A      Okay.  Then it must have come from my office.  Could be.

22  Q      And would this have been kept in the regular course of

23  your business activities?

24  A      If it came from my files, yes.

25  Q      And was it the regular practice of your business to keep

1    such records?

2    A      Yes.

3    Q      And was the information on this document made at a time

4    of the event or occurrence, to your knowledge.

5    A      I don't know.  I would assume so.

6            MR. HOCHMAN:  I would move this in, which is Defense

7    Exhibit 78, into the record, Your Honor?

8            THE COURT:  Any objections?

9            MS. KESSLER:  No, Your Honor.

10           THE COURT:  Defendant's 78 will be admitted.

11           (Defendant's Exhibit 78 was admitted into evidence.)

12           MR. HOCHMAN:  Your Honor, we have to switch over,

13   since this is one of the defense exhibits, to . . . this

14   computer, apparently, to publish it.

15           May I publish it, Your Honor?

16           THE COURT:  Sure.  If you can switch over.  Don't

17   look to me to help.

18           THE COURTROOM DEPUTY:  I already did it.

19           THE COURT:  Okay.

20           MR. HOCHMAN:  Get a pretty picture.  All right.  Here

21   we go.

22   BY MR. HOCHMAN:

23   Q      And Mr. Schneider, at the top of this document, it

24   indicates –– and I'm talking about the first page of this

25   document.  I think the screen is showing the second page?

1          MR. HOCHMAN:  Do you have the first page?

2          There we go.

3    BY MR. HOCHMAN:

4    Q     Top-left corner, you see that says:  "Dr. Fredrick

5    checklist for items needed to complete each 5471"?

6    A     Yes.

7    Q     And then it lists various things that would go on the

8    5471.

9          Is that -- can you recognize that as David Minchenberg's

10   writing?

11   A     I wouldn't recognize his handwriting.

12   Q     And do you recognize anyone from your . . . your

13   office's handwriting on this document?

14   A     No.

15   Q     Would this have been one of the documents, though, that

16   Mr. Minchenberg would have supplied your office to, as you put

17   it, professionalize the look of a 5471?

18   A     This would have been the backup for the 5471.

19   Q     And would he have sent this to your office in order to

20   make sure that he was getting all the information necessary for

21   a 5471?

22   A     It was his checklist.

23   Q     And it was a checklist he would have discussed with you?

24   A     Probably.  I don't recall.

25          MR. HOCHMAN:  May I have just one moment, Your Honor?

1          May I approach the witness with what would be marked --

2     sorry, Your Honor -- as Defense Exhibit 79, Your Honor?

3          THE COURT:  You may.

4     BY MR. HOCHMAN:

5     Q     And is -- I show you what's been marked as Defense

6     Exhibit 79.

7          And with respect to Defense Exhibit 79, would this have

8     been the type of draft document that David Minchenberg would

9     have sent you in connection with Dr. Patricia Hough and

10    Dr. David Fredrick's 5471?

11    A     Yes.  Looks like it.

12    Q     And it would be the type of document, again, that your

13    office would keep in the regular course of its business

14    activity?

15    A     Yes.

16         MS. KESSLER:  Your Honor, we have no objection as to

17    foundation for this document.

18         MR. HOCHMAN:  Thank you.

19         I would move Exhibit 79 into evidence, Your Honor.

20         THE COURT:  79 will be admitted.

21         MR. HOCHMAN:  Thank you.

22         (Defendant's Exhibit 79 was admitted into evidence.)

23         MR. HOCHMAN:  And if you could turn to the second

24    page of this document?  Or actually, let's start on the first

25    page, if I could.  And we can highlight just the very top of

1    it, so the first third of the document.  All right.  And if you

2    can blow it up at all, or . . . .  There it is.

3    BY MR. HOCHMAN:

4    Q     Can you see where it says that the total percentage of

5    foreign corporation owned by Dr. Patricia Hough, what

6    percentage is listed there?

7    A     Fifty.

8    Q     Are you aware of how that number became 100 percent on

9    the documents that you reviewed before?

10   A     I have no idea.  I don't recall.

11   Q     And if you can turn to the second page of this document,

12   and look at the top, it says Dr. Patricia Hough and Dr. David

13   Fredrick each have an equal number of shares.

14         And this is in Round Hill Holding Company, N.V; is that

15   correct?

16   A     Correct.

17   Q     And that would be indicative of them each owning

18   50 percent; is that correct?

19   A     Correct.

20   Q     And if you could look at 8V again, v like in "Victor"?

21   A     Yes.

22   Q     And if you look, again, on the second page of 8V, which

23   is the Dr. Patricia Hough typed version of the 5471, do you

24   know how David Fredrick's name ended up not coming out on the

25   5471 that your office prepared?

1   A       I can only guess.  I don't recall.

2   Q       I'm not looking for you to guess.  If you don't recall,

3   you don't recall.

4   A       I don't recall.

5   Q       But in any event, if you could turn to the first page of

6   Exhibit 8V?

7           And V like in "Victor."  I'm sorry.

8   A       Yes.

9           MR. HOCHMAN:  And if we can now switch back to the

10  computer so we can have this 8V show up on it?

11          (An exhibit was projected onto the projector screen.)

12          THE COURTROOM DEPUTY:  I'm sorry, what would you

13  like?

14          MR. HOCHMAN:  I'm sorry.  We wanted to switch over to

15  this computer.  There we go.

16          And if we could -- oh, there we go.  Thank you very

17  much.

18  BY MR. HOCHMAN:

19  Q       And just so I'm confirming, your office sent this Mike

20  Refolo, the lawyer for Dr. Fredrick and Hough, the Round Hill

21  5471s to be filed with the IRS; is that correct?

22  A       Correct.

23  Q       In fact, you gave the lawyer the IRS's address, correct,

24  in your transmittal e-mail.

25  A       Correct.

1    Q      And you noted before that Dr. Hough and Dr. Fredrick

2    didn't have to sign the 5471s; correct?

3    A      Correct.

4    Q      And since these were old 5471s, again, assuming David

5    Minchenberg is right that you don't have to amend your return,

6    these could just be sent directly in to the Internal Revenue

7    Service; correct?

8    A      Correct.

9    Q      And then you also say they should be sent certified

10   mail; correct?

11   A      Correct.

12   Q      So it was your understanding that Mr. Refolo was going

13   to go ahead and actually get these filed on behalf of his

14   client; correct?

15   A      Correct.  Yes.  Yes.

16   Q      Thank you.

17          If we could turn to Exhibit 8S, as in "Sam"?

18   A      It's going to take me a while to find that.

19          Oh, got it.  Okay.

20          (An exhibit was projected onto the projector screen.)

21   BY MR. HOCHMAN:

22   Q      Again, David Minchenberg asked Patricia Hough to help

23   him out in preparing the 5471s; correct?

24   A      Yes.

25   Q      And as partner for help, she went ahead and stopped by

1    some banks in order to get bank information -- actually, old

2    bank information, for '01 -- 2001, 2002, 2003, and 2004, with

3    respect to the Round Hill Project accounts.

4          Do you see that?

5    A    Yes.

6    Q    And then that information, in turn, was used for the

7    54 -- the preparation of 5471s; is that correct?

8    A    I guess so, yes.  I don't recall, but I guess so.

9          MR. HOCHMAN:  Can you turn to Exhibit 8N, like in

10   "Nancy"?

11          (An exhibit was projected onto the projector screen.)

12          THE WITNESS:  Okay.  Yes.

13   BY MR. HOCHMAN:

14   Q    And again, with respect to 8N, we're again dealing with

15   a David Minchenberg issue with Dr. Fredrick's 5471s.

16          Do you see that?

17   A    Yes.

18   Q    And these are the 5471s dealing with the MUA Belize

19   situation; do you see that?

20   A    Yes.

21   Q    And this indicates that, again, Mr. Minchenberg has

22   prepared the preliminary draft of the 5471 for David Fredrick

23   to send in to the Internal Revenue Service; correct?

24   A    Yes.  Correct.

25   Q    So when David Minchenberg is screaming "tax fraud," in

1    that memo that we reviewed before --

2    A      Yes.

3    Q      -- and that tax fraud is related to the failure to file

4    5471s, Dr. Fredrick and Dr. Hough are curing whatever alarm

5    there was by actually filing the 5471s; correct?

6    A      Yes.

7    zzz

8           MR. HOCHMAN:  If I can take you to 8Y, like in

9    "yellow"?

10          (An exhibit was projected onto the projector screen.)

11          THE WITNESS:  Yes.

12   BY MR. HOCHMAN:

13   Q      And 8Y is this rep letter that you talked about that you

14   need for your audits; is that correct?

15   A      Correct.

16   Q      And you saw, on Page 3, I think you said -- and this is

17   the MUA 2005 audit; do you see that?

18   A      Yes.

19   Q      And it's signed by two people --

20   A      Yes.

21   Q      -- David Fredrick and David Minchenberg.

22          Do you see Dr. Patricia Hough anywhere on this

23   particular rep letter?

24   A      No.

25   Q      In fact, I think you said that all your contact, or

1    virtually all your contact, in connection with your engagement

2    for the Saba School of Medicine Foundation, or the Medical

3    Universities of America, was with Dr. David Fredrick or David

4    Minchenberg; is that correct?

5    A      That's correct.

6    Q      And not Dr. Hough.

7    A      That's correct.

8    Q      If you can turn to Exhibit 8DD.

9    A      DD?

10   Q      DD, like in "David," twice?

11   A      I thought you were going to say something else.

12   Q      David squared.

13          (An exhibit was projected onto the projector screen.)

14          MR. HOCHMAN:  Now, if we can highlight that line

15   above the union United Bank of Switzerland in the

16   checking/savings issue?

17   BY MR. HOCHMAN:

18   Q      How did you get the information that the Saba School of

19   Medicine had an account at the United Bank of Switzerland?

20   A      This is off the books and records of the Saba School of

21   Medicine.

22   Q      So you wouldn't consider this a secret Swiss bank

23   account, would you?

24   A      No, of course not.

25   Q      Because it's right there in the books and records of the

1   Saba School of Medicine; is that correct?

2   A       Correct.

3   Q       And they turned that information over to you, their

4   auditors; correct?

5   A       Correct.

6   Q       And they actually gave you the account representative's

7   name, this Dieter Luetolf, to contact, and ask whatever

8   questions you wanted; correct?

9   A       Correct.

10   Q       And they -- in fact, didn't Dieter Luetolf even send

11   you, I think, the account balance statement for the Saba School

12   of Medicine; is that correct?

13   A       I'm sure he did; yes.

14   Q       And even filled out one of those -- I think those

15   confirmation forms that you send out that says:  Please tell us

16   how much you have in the account at a particular moment in

17   time.

18   A       I'm sure he did, yes.

19            MR. HOCHMAN:  If you can go to Exhibit 8FF.

20            (An exhibit was projected onto the projector screen.)

21   BY MR. HOCHMAN:

22   Q       Now, Exhibit 8FF is -- did you -- is a document coming

23   out of your files.

24            But in your files, you didn't black out the account

25   number; correct?

1   A      No.  I don't do that.

2   Q      That's just been blacked out for -- for privacy reasons

3   for this trial; is that correct?

4   A      I didn't do it, so I don't know.  I don't know why it

5   was done.

6            MR. HOCHMAN:  Your Honor, may I have a moment?

7            THE COURT:  You may.

8            (Mr. Hochman confers with Ms. Finley privately.)

9            MR. HOCHMAN:  Your Honor, the parties are in

10   agreement, I believe, that we can advise the jury that the

11   blackout on this document was done for privacy reasons for this

12   trial.

13            THE COURT:  The jury is so informed.

14   BY MR. HOCHMAN:

15   Q      So, Mr. Schneider, isn't it true that Mr. Fredrick --

16   excuse me.

17        Well, Mr. Fredrick made available to you the actual bank

18   account number in UBS that the Saba School of Medicine kept its

19   account -- kept its funds in?

20   A      Yes.

21            MR. HOCHMAN:  If we can go to Exhibit 8H.

22            (An exhibit was projected onto the projector screen.)

23   BY MR. HOCHMAN:

24   Q      And 8H is actually the contact information for Dieter

25   Luetolf, including his e-mail address.

1        If you could focus on the bottom part of that?

2   A      Yes.

3   Q      And did your office actually contact Mr. Luetolf, to

4   your knowledge?

5   A      I didn't personally, but I'm sure that somebody on the

6   staff did; yes.

7            MR. HOCHMAN:  And if I could direct your attention to

8   Exhibit 8C?

9            (An exhibit was projected onto the projector screen.)

10           THE WITNESS:  Yes.

11  BY MR. HOCHMAN:

12  Q      Now, this is the Saba School of Medicine Foundation's

13  financial statement; do you see that?

14  A      Yes.

15  Q      And if you could turn to the third page?

16  A      Yes.

17  Q      And it starts out to the board of trustees?

18  A      Yes.

19  Q      The Saba School of Medicine Foundation, the foundation

20  part, didn't have a board of trustees, it had a board of

21  directors, didn't it?

22  A      Could be.  I don't recall.

23  Q      A board of trustees would have been the Saba University

24  School of Medicine; isn't that correct?

25  A      Usually, foundations have boards of trustees.

1   Q       Well, they have both at times, boards of trustees and

2   boards of directors.

3   A       I don't believe so.

4   Q       Do you know one way or the other which one the Saba

5   School of Medicine Foundation had, versus the Saba University

6   School of Medicine?

7   A       I believe they have the same facility, no?

8   Q       Well, isn't it true the Saba School of Medicine

9   Foundation runs the Saba University School of Medicine?

10  A       You mean like a DBA, is that what you're talking about?

11  Q       A DBA or runs it, is in charge of --

12  A       Yeah.  A DBA.  Fine.

13  Q       Okay.  If I can draw your attention to Exhibit . . . .

14  I'm sorry -- within this exhibit.  We won't leave it just yet.

15  Actually, we will leave it.

16              MR. HOCHMAN:  May I have one moment, Your Honor?

17              THE COURT:  You may.

18          (Mr. Hochman confers with co-counsel at defense

19      counsel table.)

20  BY MR. HOCHMAN:

21  Q       You know, it was pointed out to me, Mr. Schneider, I

22  don't know if we've actually told the jury what a 5471 is.

23          We've been talking about it, we have shown it, but what

24  actually is a Form 5471?

25  A       A 5471 is a form that you are required to attach to your

1    Form 1040, if you meet the requirements of 5471.  They have

2    four or five categories based upon the percentage of ownership

3    that you have in a foreign entity.  And depending upon how much

4    of a percentage of ownership you have, that puts you into

5    different categories and different reporting.

6         For example, if I recall correctly, if you own

7    15 percent, you just list the details.  If you own, I think

8    it's more than 50 percent, or 50 percent or more, then you have

9    to list the balance sheet and income statement of the entity

10   under accounting methods.

11        So that's -- it's just -- it's an informational return

12   for the government, because they want to know who owns foreign

13   entities.

14   Q    And so, again, it's not something you have tax on; is

15   that correct?

16   A    No, no tax at all.

17   Q    So I guess it is what they call a disclosure statement?

18   A    Okay.  It's an informational return.

19   Q    And would that also be true of a form called TDF90-22.1?

20   A    We call that the F-bar in my world because we can't

21   remember that stuff.

22   Q    The F-bar, that is a foreign bank account form?

23   A    Yes.

24   Q    Now, Mr. Minchenberg's memo had nothing to do with the

25   reporting of foreign bank accounts; correct?

1    A       Correct.

2    Q       Or this F-bar form; is that correct?

3    A       That's correct.

4    Q       And you're -- you never provided any guidance to

5    Dr. Fredrick about F-bar forms; correct?

6    A       No.  As I told you before, we had nothing to do with his

7    personal affairs, other than the 5471 that we were engaged to

8    help with.

9    Q       Okay.  But you saw obviously that the Saba School of

10   Medicine had a UBS account; correct?

11   A       Yes.

12   Q       And nobody, to your knowledge, informed Dr. Fredrick if

13   he had any F-bar obligations; is that correct?

14   A       I did not.  No.

15   Q       Do you know if anyone on your staff did?

16   A       No.

17   Q       No you don't know, or nobody --

18   A       No, they wouldn't have.  Everything would have flowed

19   through me.

20   Q       Since everything would have flowed through you,

21   Dr. Fredrick was never provided with this information on

22   whether or not he had to, or not have to, file an F-bar;

23   correct?

24   A       That would be the responsibility of his personal

25   accountant because it's part of his return.  When you are

1   preparing a 1040 tax return, there's a question on Schedule A,

2   at the bottom of the form, which asks you if you have any

3   foreign bank accounts.  And it also says, if you did, you're

4   required to file this form, F-bar, let's call it.

5   Q      And if you only had -- and again -- what I just want to

6   be clear is that you never provided any information, one way or

7   the other, to Dr. Fredrick about F-bar forms, even though you

8   knew that he was involved with a UBS account for the Saba

9   School of Medicine.

10  A      That's correct.  It was not in the terms of our

11  engagement.

12  Q      And you didn't obviously then provide any information to

13  Dr. Hough with respect to her foreign bank account reporting

14  requirements; is that correct?

15  A      That's correct.

16             MR. HOCHMAN:  No further questions.

17             THE COURT:  Ms. Kessler?

18             MS. KESSLER:  Yes, Your Honor.

19                       REDIRECT EXAMINATION

20  BY MS. KESSLER:

21  Q      Mr. Schneider, if you could turn and find Exhibit 8S,

22  like "Sam?"

23             MS. KESSLER:  Permission to publish?

24             I think this has already been admitted and I've

25  published it.

1          THE COURT:  If it's been admitted, then you may

2     publish it.

3               MS. KESSLER:  Thank you.

4               (An exhibit was projected onto the projector screen.)

5          THE WITNESS:  8S, you say, huh?

6          MS. KESSLER:  Yes.

7          THE WITNESS:  I got it.

8          MS. KESSLER:  Got it?

9          THE WITNESS:  Yup.

10    BY MS. KESSLER:

11    Q     This is the document that we looked at earlier, where

12    financial information related to bank accounts for Round Hill

13    Project were provided to you, sir?

14    A     Yes.

15    Q     And, in your experience, will banks provide information

16    regarding accounts to someone who does not have signature

17    authority over those accounts?

18    A     They would not; no.

19    Q     Now, if you could turn to -- if you could find the

20    Defense Exhibit 79, and as well as Exhibit 8N.

21               (The witness examines exhibits.)

22               THE WITNESS:  Okay.  Got it.

23               MS. KESSLER:  And 8N, as well.

24               THE WITNESS:  8N?  Okay.

25               (An exhibit was projected onto the projector screen.)

1          THE WITNESS:  I need more room here.

2          Okay.  Got it.  Okay.

3    BY MS. KESSLER:

4    Q     Now, if you'd look at the draft Form 5471, which was the

5    Defense Exhibit 79001 --

6    A     Yes.

7    Q     -- what is the . . . time and date that's listed for the

8    year at the very top of that document?

9    A     January 1, 2001, through December 31, 2001.

10   Q     And this was a draft document?

11   A     Yes.

12   Q     Provided by Mr. Minchenberg?  Provided by

13   Mr. Minchenberg?

14   A     Yes.  Yes.

15   Q     And if you'd look at Exhibit 8 -- just a moment, I need

16   to find . . . .  Exhibit 8V.  I was mistaken.

17   A     B, as in "boy"?

18   Q     V, as in "Victor."

19   A     Got it.  I can find the things.

20   Q     Just trying to be helpful.

21   A     Okay.

22   Q     There's a lot up there.

23         If you look at the second page of Exhibit 8V, which is

24   also -- is this also a 5471 for --

25   A     Yes.

1    Q      -- Patricia Hough?

2    A      Yes.

3    Q      And I believe that, when you were walked through this

4    with defense counsel, did -- could you compare the reporting

5    period at the top of this document to the reporting period at

6    the top of the draft 5471, that you were looking at from

7    Defense Exhibit 79?

8    A      This says September 11th, 2000, to April 30th, 2001.

9    Q      So a different reporting period as to each document.

10   A      Yes.

11   Q      Now, if you'd look at . . . Exhibit 8V again --

12   A      V, yes.

13   Q      -- this is the first page of this document.

14          Are you sending the finalized Forms 5471 to Mr. Refolo?

15   A      Yes.

16   Q      Why are you sending them to him?

17   A      He engaged us to do this.

18   Q      And what were you instructing him should happen next?

19   A      "Attached are the 5471s for these years which are to be

20   filed with the Internal Revenue Service in Philadelphia,

21   Pennsylvania.  Please pass on the attached to your client for

22   filing with the government.  Please note, no signature is

23   required, but the forms should be sent via certified mail,

24   return receipt requested."

25   Q      You have no idea what happened once these returns made

1   it to Mr. Refolo.

2   A       That's correct.

3   Q       You don't know whether he would have filed these

4   returns?

5   A       That's correct.  I don't know what he did with them.

6   Q       And you don't know what his practice would have been for

7   him to forward those to the client, for the client to file

8   them.

9   A       That's correct.

10              MS. KESSLER:  I have no further questions, Your

11   Honor.

12              THE COURT:  Mr. Hochman?

13              MR. HOCHMAN:  No further questions, Your Honor.

14              THE COURT:  You may stand down.

15              May the witness be excused?

16              MR. HOCHMAN:  Yes, Your Honor.

17              MS. KESSLER:  Yes, Your Honor.

18              (The witness left the witness stand and left the

19        courtroom.)

20              THE COURT:  Unless you have a witness who can be done

21   in 14 minutes . . . .

22              MS. FINLEY:  I do not.

23              THE COURT:  All right.  Thank goodness.

24              We are going to take a recess until tomorrow morning.

25   For your planning purposes, I want to remind you that, Monday,

1    we're not having court.  I think it's Columbus Day, so the

2    building is closed.  So if you show up Monday, you're going to

3    be all by yourself.

4            Please do not discuss the case among yourselves, or

5    allow anyone to discuss it with you or in your presence.  I'll

6    see you tomorrow morning at 9:00 o'clock.

7            (At 4:46 PM, the jury was escorted from the

8        courtroom.)

9            THE COURT:  All right.  Counsel, I was going to

10   suggest, tomorrow, after we finish with the jury, that whoever

11   it is that wants to argue Touhy can do that.

12           Is that the case, Touhy?

13           MR. HOCHMAN:  Yes, Your Honor.

14           THE COURT:  If you've got a few minutes now, do you

15   want to do it now?

16           MR. HOCHMAN:  If we could do it tomorrow, Your Honor,

17   it would be great.

18           MS. FINLEY:  Your Honor, I'm sorry, is there a motion

19   before the Court, or are we just going back to the government's

20   notice?

21           THE COURT:  Yes.  I think you are the one that raised

22   it.

23           MS. FINLEY:  Last time you said there was nothing for

24   the Court to rule on, so I just . . . .

25           MR. HOCHMAN:  We have not had a chance to respond to

1    it in writing, Your Honor, so I think if we could present our

2    arguments orally --

3         THE COURT:  There is really nothing to respond to,

4    there is no motion.  And to the extent I'll give both sides a

5    chance to educate me, I'd rather do that before the weekend

6    starts, because I might be bored over the weekend.

7         MR. HOCHMAN:  Thank you.  And we'll also get you a

8    more specified list of exhibits that we were objecting to.

9         THE COURT:  That would be helpful.

10        MR. SAUNDERS:  With respect to the motion in limine

11   that we made regarding the co-conspirator statements, the Court

12   indicated that it would reserve ruling, it would allow those

13   alleged co-conspirator statements into evidence subject to

14   being stricken if the government ultimately does not provide

15   the necessary foundation of an existing conspiracy at the time

16   between Dr. Hough and whoever made the statement, whether it be

17   Dr. Fredrick, Dieter Luetolf, or Beda Singenberger, or somebody

18   else.

19            I just want to make sure, on the record, that we have

20   a continuing objection on hearsay grounds with respect to all

21   of these alleged co-conspirator statements that have been

22   coming in, the e-mails, the statements by David Fredrick,

23   Dieter Luetolf, et cetera, that have been coming in as

24   co-conspirator statements, that we have a continuing hearsay

25   objection to those statements and those exhibits.

1      THE COURT:  I'm not sure they have been coming in as

2  co-conspirator statements, but you can make that objection if

3  that's what you want.

4      MR. SAUNDERS:  To the extent that that is the

5  exception that applies, where there are multiple levels of

6  hearsay within a business record, then the statements -- the

7  hearsay within the business record, I believe, would be coming

8  in only as a co-conspirator statement, and we just want to make

9  sure we have a continuing objection on record to those.

10     THE COURT:  Any objection to that process?

11     MS. FINLEY:  No, Your Honor.  I think that's what we

12  understood your order to say.

13     THE COURT:  Okay.

14     MS. FINLEY:  My only objection was perhaps to the

15  statement that co-conspirator statements made by

16  co-conspirators before another co-conspirator joins the

17  conspiracy can then be attributed to that co-conspirator who

18  later joins, even if they weren't aware.  But the government

19  can brief that issue on the law.  But . . . .

20     THE COURT:  I guess it's getting late.  I don't

21  understand what you just said.  But in any event, the . . .

22  your concern about preserving the objection is taken care of.

23     MR. SAUNDERS:  Thank you, Your Honor.

24     MR. HOCHMAN:  Thank you, Your Honor.

25     THE COURT:  Okay.  9:00 o'clock.

COURT RECESSED FOR THE DAY                    272

1             MR. HOCHMAN:  Thank you, Your Honor.

2             (There was discussion off the record.)

3                  -- -- -- -- -- -- -- --

4             (At 4:50 o'clock, p.m., court was recessed, to be

5       reconvened at 9:00 a.m., on Friday, October 11, 2013.)

6                  -- -- -- -- -- -- -- --

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25