UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

THE UNITED STATES OF AMERICA,

          Plaintiff,

                                     Fort Myers, Florida
vs.                                    October 11, 2013

PATRICIA LYNN HOUGH,              9:00 a.m.

          Defendant.

TRANSCRIPT OF JURY TRIAL, DAY FOUR

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:   U.S. Department of Justice
                            Tax Division
                       P.O. Box 813
                       Washington, DC  20044
                       BY:  CARYN FINLEY, ESQ.

                       U.S. Department of Justice
                            Tax Division
                       Suite 7334
                       601 D Street NW
                       Washington, DC
                       BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

```
                    A P P E A R A N C E S
                (Continued From Previous Page)


FOR THE DEFENDANT:        Bingham McCutchen, LLP
                          The Water Garden
                          1601 Cloverfield Boulevard
                          Suite 2050 North
                          Santa Monica, CA  90404-4082
                          (310) 904-1000
                          BY:  NATHAN J. HOCHMAN, ESQ.

                          Bruce L. Udolf, PA
                          500 East Broward Boulevard
                          Suite 1400
                          Fort Lauderdale, FL  33394
                          (954) 858-8831
                          BY:  BRUCE L. UDOLF, ESQ.

REPORTED BY:              JEFFREY G. THOMAS, RPR-CP, CRR
                          Official Federal Court Reporter
                          United States Courthouse
                          2110 First Street, Suite 2-194
                          Fort Myers, FL  33901
                          (239) 461-2033


                        *   *   *
```

# I N D E X

| October 11, 2013 | | | | | | Vol. | Page |
|---|---|---|---|---|---|---|---|
| Preliminary Discussions | | | | | | 4 | 6 |

- - -

## GOVERNMENT'S WITNESSES

| WITNESS | DIRECT Vol. Pg. | CROSS Vol. Pg. | REDIRECT Vol. Pg. | RECROSS Vol. Pg. | VOIR DIRE Vol. Pg. |
|---|---|---|---|---|---|
| DAVID C. MINCHENBERG | 4   7 | 4   101 | 4   190 | 4   202 | |
| JEFFREY GALLANT | 4   204 | 4   225 | | | |
| CHARLENE VARGA | 4   226 | 4   258 | | | |

- - -

## GOVERNMENT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Government's Exhibit 7A Admitted in Evidence | 4 | 19 |
| Government's Exhibit 7B Admitted in Evidence | 4 | 20 |
| Government's Exhibit 7C Admitted in Evidence | 4 | 29 |
| Government's Exhibit 7X Admitted in Evidence | 4 | 39 |
| Government's Exhibit 7AA Admitted in Evidence | 4 | 48 |
| Government's Exhibits 7D and 7E Admitted in Evidence | 4 | 53 |
| Government's Exhibit 7G Admitted in Evidence | 4 | 64 |
| Government's Exhibits 7Q, 7S, 7V, and 7W Admitted in Evidence | 4 | 70 |
| Government's Exhibits 7M and 7U Admitted in Evidence | 4 | 77 |

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

GOVERNMENT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Government's Exhibit 7K Admitted in Evidence | 4 | 81 |
| Government's Exhibit 7P Admitted in Evidence | 4 | 93 |
| Government's Exhibits 7Y and 7EE Admitted in Evidence | 4 | 96 |
| Defendant's Exhibit 88 Admitted in Evidence | 4 | 149 |
| Government's Exhibit 7BB Admitted in Evidence | 4 | 174 |
| Government's Exhibit 7MM Admitted in Evidence | 4 | 192 |
| Government's Exhibit 7NN Admitted in Evidence | 4 | 194 |
| Government's Exhibit 7OO Admitted in Evidence | 4 | 198 |
| Government's Exhibit 9L Admitted in Evidence | 4 | 209 |
| Government's Exhibit 9B Admitted in Evidence | 4 | 211 |
| Government's Exhibit 9D Admitted in Evidence | 4 | 214 |
| Government's Exhibit 9C Admitted in Evidence | 4 | 215 |
| Government's Exhibit 9J Admitted in Evidence | 4 | 216 |
| Government's Exhibit 9E Admitted in Evidence | 4 | 217 |
| Government's Exhibit 9N Admitted in Evidence | 4 | 218 |
| Government's Exhibit 9P Admitted in Evidence | 4 | 221 |
| Government's Exhibit 9Q Admitted in Evidence | 4 | 222 |
| Government's Exhibit 9O Admitted in Evidence | 4 | 224 |
| Government's Exhibit 2P marked for identification | 4 | 231 |

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

GOVERNMENT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Government's Exhibit 2P Admitted in Evidence | 4 | 232 |
| Government's Exhibits 2K and 2L marked for identification | 4 | 240 |
| Government's Exhibits 2K and 2L Admitted in Evidence | 4 | 244 |
| Government's Exhibit 2A Admitted in Evidence | 4 | 246 |
| Government's Exhibit 2B Admitted in Evidence | 4 | 247 |
| Government's Exhibit 2H Admitted in Evidence | 4 | 249 |
| Government's Exhibit 2G Admitted in Evidence | 4 | 250 |
| Government's Exhibit 2E Admitted in Evidence | 4 | 251 |
| Government's Exhibit 2C Admitted in Evidence | 4 | 253 |
| Government's Exhibit 2F Admitted in Evidence | 4 | 254 |

– – –

DEFENDANT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Defendant's Exhibit 73 Admitted in Evidence | 4 | 134 |
| Defendant's Exhibit 80 Admitted in Evidence | 4 | 145 |

– – –

|  | Vol. | Page |
|---|---|---|
| Court Recessed for the Day | 4 | 274 |

* * *

1       THEREUPON, the above-entitled case having been called to

2   order, the following proceedings were held herein, to-wit:

3                                   - - -

4           THE COURT:  Good morning, everyone.  Both sides ready

5   for the jury?

6               MR. HOCHMAN:  Yes, Your Honor.

7               THE COURT:  Ms. Finley?

8               MS. FINLEY:  We are, Your Honor.  I'm sorry.

9               THE COURT:  Have the jury step in, please.

10              (At 9:04 AM, the jury was escorted into the

11          courtroom.)

12              THE COURT:  Good morning, ladies and gentlemen.

13              Ms. Finley, you may proceed.

14              MS. FINLEY:  Thank you, Your Honor.  The government

15  calls David Minchenberg.

16              THE COURT:  Right up here, please.

17              THE WITNESS:  Thank you.

18              THE COURTROOM DEPUTY:  If you would raise your right

19  hand.  Do you solemnly swear or affirm to tell the truth, the

20  whole truth, nothing but truth, in the case now before the

21  Court?

22              THE WITNESS:  Yes, I do.

23              THE COURTROOM DEPUTY:  You may have a seat.

24              State your full name, spelling your last.

25              THE WITNESS:  David C. Minchenberg, spelled M I N C H

1   E N B E R G.

2          MS. FINLEY:  Thank you, Your Honor.

3                  DAVID C. MINCHENBERG,

4   called as a witness by the Government, and having been first

5   duly sworn, was examined and testified as follows:

6                  DIRECT EXAMINATION

7   BY MS. FINLEY:

8   Q      Good morning, Mr. Minchenberg.

9          Can you tell the jury what you do for a living?

10  A      I'm an accountant.

11  Q      And where did you go to school for your undergraduate

12  degree?

13  A      Fitchburg State College.

14  Q      What's your degree in?

15  A      My degree is a minor in English, and a concentration in

16  accounting.

17  Q      And do you have any graduate work?

18  A      None.

19  Q      Could you briefly describe for the jury your employment

20  history -- when did you graduate from college?

21  A      May, 1997.

22  Q      And could you briefly describe for the jury your

23  employment history since you graduated from college?

24  A      After graduation, in the fall of 1997, I worked for

25  Arthur Andersen for approximately four years.  After Arthur

1    Andersen, I was the vice-president of finance of a credit

2    union.

3         After employment with the credit union for approximately

4    a little over a year, I took some time off for medical leave,

5    rejoined another credit union, then worked as an accountant for

6    a real estate entity for a while, then worked for a management

7    company overseeing two medical schools for . . . just under two

8    years, and then worked for myself, as independent contractor,

9    for approximately another two years, and then joined my . . .

10   previous employment, where I'm an independent contractor for a

11   real estate entity, where I've been for the last five years.

12   Q    And the last five years, what title do you have at that

13   company?

14   A    Predominantly, I am the comptroller and chief financial

15   officer of the entity that oversees several real estate

16   endeavors, or companies.

17   Q    Now, you mentioned that, in 2002, you took some medical

18   leave for about a year.

19        Could you just briefly describe for the jury what

20   medical problems you've had?

21   A    Certainly.  I had to undergo surgery for my spinal cord

22   and my lower brain, for what's called a Chiari malformation

23   surgery.

24   Q    And because of the surgery and your medical issues, are

25   you on medication?

1    A       Yes, I am.

2    Q       And does the medication affect your memory?

3    A       No.

4    Q       Does it affect your ability to do your job?

5    A       No.

6    Q       Are you a CPA?

7    A       Yes.

8    Q       When did you become a CPA?

9    A       My license was issued in December, 2000.

10           MS. FINLEY:  Your Honor, may I approach the witness

11   and show him what's been marked as Exhibit 7MM?

12           THE COURT:  You may.

13           MS. FINLEY:  May I approach freely?

14           THE COURT:  Yes.

15   BY MS. FINLEY:

16   Q       Now, Mr. Minchenberg, have you met with the government

17   before testifying here today?

18   A       Yes.

19   Q       You've met with the government several times?

20   A       Correct.

21   Q       When you attended those meetings, were you attending

22   pursuant to a proffer letter?

23   A       No.

24   Q       But if you look at Exhibit 7MM, do you recognize that

25   document?

1    A      Correct.  I do.

2    Q      And what is that document?

3    A      This is a proffer letter.

4    Q      And so when you met with the government, were you

5    meeting with us pursuant to the terms in that letter?

6    A      I met with the government because I was subpoenaed,

7    originally.

8    Q      And when you were subpoenaed, did you ask for a letter?

9    A      My attorney recommended that I receive a letter.

10   Q      And --

11          MR. HOCHMAN:  Objection, nonresponsive to the

12   question.

13          THE COURT:  Overruled.

14   BY MS. FINLEY:

15   Q      And what is your understanding of that letter?

16   A      My understanding of this letter is, I'm to cooperate

17   with the government, based upon their subpoena.

18   Q      And does it have other requirements for you to be

19   truthful?

20          MR. HOCHMAN:  Objection --

21          THE WITNESS:  Yes.

22          MR. HOCHMAN:  Impermissible question at this point.

23          THE COURT:  Sustained.

24          MR. HOCHMAN:  And move to strike the answer.

25          THE COURT:  Granted.

1    BY MS. FINLEY:

2    Q     Are you familiar with Dr. Fredrick and Dr. Hough?

3    A     Yes.

4    Q     How are you familiar with them?

5    A     Dr. Fredrick and Dr. Hough were the individuals . . .

6    who initially interviewed me for the accounting position of the

7    management company . . . of the medical schools that I

8    previously discussed, in my earlier employment history.

9    Q     When did you first meet with Dr. Fredrick and Dr. Hough?

10   A     In the spring . . . of 2004.

11   Q     And what position were you interviewed for?

12   A     The position of . . . the head accountant of the

13   management company for two medical schools.

14   Q     Did you interview with both Dr. Fredrick and Dr. Hough?

15   A     I believe so.

16   Q     And were you ultimately hired?

17   A     Yes.

18   Q     And who was your direct -- who did you directly report

19   to?

20   A     Dr. Fredrick.

21   Q     And which entity were you employed by?

22   A     A company called EIC, Inc.

23   Q     What was your title there?

24   A     I gave myself the title of comptroller.

25   Q     What was your salary?

1   A        Approximately $55,000 a year.

2   Q        Can you describe for the jury your duties as the . . .

3   comptroller, or . . . the CFO, of EIC?

4   A        My job was to . . . initially, oversee the books and

5   records of the Saba University School of Medicine.

6   Q        And was that -- do you know -- are you familiar with an

7   entity named the Saba School -- the Saba University School of

8   Medicine Foundation?

9   A        Yes.

10  Q        What is your understanding of what that entity is?

11  A        The Saba University School of Medicine Foundation was

12  the foundation that owned and operated the medical school on

13  the university -- on the island of Saba.

14  Q        And you said that your duties were to oversee all the

15  accounting work for the school.

16           Did you also oversee accounting work for another

17  university?

18  A        Yes.  The Medical University of the Americas.

19  Q        And when you say, "overseeing the accounting work," what

20  does that mean?

21  A        I didn't oversee every aspect, but predominantly the

22  accounting for student revenue, student expenses, and other

23  types of income and expenses of the university, but I want to

24  make clear that not all income and expenses that were incurred

25  by the school.

1    Q      Where were the offices for EIC; where did you work?

2    A      EIC had an office on Walnut Street in Gardner,

3    Massachusetts.

4    Q      And was there more than one location of the offices for

5    EIC?

6    A      Yes.

7    Q      Where was the other location?

8    A      Well, EIC was housed on Walnut Street, and there was

9    another building in Gardner that ran the operations of MUA on

10   Graham Street, in Gardner.

11   Q      Was the Saba School of Medicine in the EIC building or

12   the MUA building?

13   A      Saba was in the EIC building.

14   Q      Which building did you work in?

15   A      The EIC building on Walnut Street.

16   Q      Did Dr. Fredrick have an office at EIC?

17   A      Yes.

18   Q      Did Dr. Hough?

19   A      Yes.

20   Q      Could you describe the physical layout, just very

21   briefly, of the office?

22   A      It was a simple -- the exterior of the building was a

23   simple one-story building, maybe about six to eight thousand

24   square feet.  We had simple offices.  Many of the people had

25   individual offices.  Some people shared a space with cubicles.

1    It was not lavish by any means.  We had a technology office for

2    the computers and servers of the office.

3    Q      Could you describe for the jury EIC's recordkeeping?

4    A      The recordkeeping was fairly thorough.  I predominantly

5    would have knowledge about the finance department, depending

6    on . . . the different departments that ran different

7    operations, they would be responsible for their own

8    recordkeeping.

9    Q      So, for the finance department, what kind of records did

10   the finance department maintain?

11   A      The finance department would maintain records of income

12   and expenses that were incurred in the course of business;

13   also, bank statements that would come in monthly, based upon

14   where bank accounts were held, et cetera.

15   Q      Would they keep supporting documentation --

16   A      Yes.

17   Q      -- for various transactions?

18   A      Yes.

19   Q      Would the finance department keep correspondence that

20   was necessary for the accounting function?

21   A      I don't know if they printed out hard copies.  They may

22   have.  I did in certain circumstances.  But electronically,

23   copies may have been kept on computers.

24   Q      Now, with respect to the physical copies of some of

25   these records, were they maintained in file cabinets?

1   A       Yes.   There's metal file cabinets in the rooms . . . in

2   several rooms.

3   Q       Now, you said you started working for EIC.

4           And if you could just describe for the jury, what did

5   EIC do?

6   A       EIC was a management company that performs services to

7   run, again, the medical -- to oversee the operations of the

8   medical schools, Saba -- I'll just abbreviate and call it

9   Saba -- and MUA, their operations of an academic program.

10  Q       Do you know who owned EIC?

11  A       I believe EIC . . . EIC, I believe, changed ownership

12  during my tenure.   But initially, I believe, it was owned by

13  Dr. Fredrick when I started.

14  Q       And when you say it was changed ownership during your

15  tenure, how did it change?

16  A       Originally, when I started, EIC was a Massachusetts S

17  corporation --

18  Q       Let me just stop you.

19          What's an S corporation?

20  A       An S corporation, for tax purposes, is designated as

21  what they call a flow-through entity, where taxes are not paid

22  at the corporate level, but rather the individual level.   In

23  other words, if there's income or losses, they are not paid by

24  the corporation, they are . . . distributed on what's called a

25  Form K1, and attached to your individual tax return.

DAVID C. MINCHENBERG — DIRECT/FINLEY                    16

1   Q      And the owner of the entity would then report that on

2   their personal 1040?

3   A      Correct.

4   Q      Now, Mr. Minchenberg, when did you stop working for EIC?

5   A      I believe March, 2006.

6   Q      And when you left your employment, did you take

7   documents and computer records with you?

8   A      Yes.

9   Q      Why did you do that?

10  A      For several reasons.

11  Q      What were the reasons?

12  A      I felt that there may have been a lack of compliance,

13  and I wanted to make sure I had records, should they be needed

14  in the future.

15  Q      What kind of lack of compliance did you think was going

16  on at EIC?

17  A      Tax compliance.

18  Q      Were you authorized to take those records from EIC?

19  A      I don't know.

20  Q      Do you know if Dr. Fredrick or Dr. Hough authorized you

21  to take those records?

22  A      I didn't ask them.

23  Q      So they didn't know that you took them.

24  A      I don't believe so.

25  Q      Did you maintain those records in your home after you

1    left the employment?

2    A      Yes.

3    Q      And were you then served with a subpoena by the

4    government, in this case, to produce those records?

5    A      Yes.

6    Q      And did you produce them to the government?

7    A      Yes.

8    Q      And were those hard copies as well as electronic

9    documents?

10   A      Yes.

11   Q      And those are documents that you took from the filing

12   cabinets, or the server, at EIC.

13   A      Well, from my personal computer.

14   Q      Your personal computer, though, was part of your

15   employment at EIC?

16   A      Yes.  But I also had worked from home frequently.

17   Q      And was working from home something that was authorized

18   by your employment?

19   A      Yes.

20   Q      So you were authorized to forward necessary information

21   to your home computer in order to carry out your duties.

22   A      Yes.

23   Q      I'm now going to show you what's been marked as

24   Government's Exhibit 7A.  And I'm also going to show you what's

25   been marked as 7B.  If you could take a look at those

1    documents.

2              (The witness examines exhibits.)

3              THE WITNESS:  Okay.

4    BY MS. FINLEY:

5    Q     Let's start with 7A.  Do you recognize 7A?

6    A     (Examining exhibit) Can you just give me a second to

7    look through all the pages?

8    Q     Sure.

9    A     Thank you.

10             (The witness examines exhibits.)

11             THE WITNESS:  Okay.

12   BY MS. FINLEY:

13   Q     So what is 7A?

14   A     7A appears to be . . . an outline for EIC, Inc., listed

15   chronologically, from A through W, of the different types of

16   management services that EIC provides to the medical schools.

17   Q     When was this document created; is there a date on it?

18   A     In October, 2004.

19   Q     And who created it?

20   A     I did.

21   Q     And does it say that it's prepared by David C.

22   Minchenberg?

23   A     Yes.

24   Q     Were these documents -- did you create it in or around

25   October of 2004?

1    A      Yes.

2    Q      Was this document maintained in EIC's ordinary course of

3    business?

4    A      Yes.

5    Q      Why was this created?

6    A      To the best of my memory, this document was created as

7    part of -- and I would have to first preface by stating there

8    might have been a cover letter with this, but this was created

9    as an RFP, as a request for proposal, that I prepared to send

10   out to large accounting firms in Boston, seeking tax advice for

11   EIC and the two medical schools.

12          MS. FINLEY:  Your Honor, at this time the government

13   would offer 7A into evidence.

14          MR. HOCHMAN:  No objection, Your Honor.

15          THE COURT:  7A will be admitted.

16          (Government's Exhibit 7A was admitted into evidence.)

17   BY MS. FINLEY:

18   Q      Now, if we could turn to 7B, if we could take a look at

19   that document.

20          Do you recognize this document?

21   A      (Examining exhibit) Yes.

22   Q      And is this a similar description of what Saba

23   University School of Medicine and Medical University of America

24   does?

25   A      Yes.

1    Q      And it has the same October 27th, 2004, date, prepared

2    by you?

3    A      Yes.

4    Q      And was this similarly created for the RFP, or the

5    request for proposal?

6    A      Yes, it was.

7    Q      And was it maintained in the records of EIC?

8    A      Yes.

9           MS. FINLEY:  Your Honor, at this time the government

10   would offer 7B into evidence.

11          MR. HOCHMAN:  No objection, Your Honor.

12          THE COURT:  7B will be admitted.

13          (Government's Exhibit 7B was admitted into evidence.)

14   BY MS. FINLEY:

15   Q      Now, did the medical schools, Saba and MUA, did they pay

16   a management fee to EIC?

17   A      In reviewing the audited financial statements, I

18   remember seeing that a management fee was accounted for.  In

19   other words, there might have -- there was an entry for it.  I

20   can't recall if funds were ever transferred from the management

21   school, I mean the medical schools, to EIC in that exact

22   amount.

23   Q      What was your understanding of Dr. Hough's relationship

24   to the medical schools?

25   A      Dr. Hough, to the best of my memory, was in charge of

1    the clinical rotation department, which was the second half, or

2    the last two years, of the medical school program.

3    Q      And how often was she in the office?

4    A      Not on a daily basis.  I would say probably . . . she

5    would come in every two to three weeks for, perhaps, like a

6    week to ten days.

7    Q      What was your understanding of Dr. Fredrick's

8    relationship to the schools?

9    A      Dr. Fredrick's relationship was . . . he was the

10   hands-on, day-to-day decision maker and operator of the medical

11   schools.

12   Q      What kind of things did he do?

13   A      He did everything from establishing budgets, hiring and

14   firing faculty members on the island, making decisions for

15   construction of buildings, buying supplies that needed to be

16   shipped to the islands because the necessary supplies for

17   either students or faculty were not available there.  Four

18   times a year they had to ship those supplies.  He coordinated

19   the acquisition and shipping of those supplies four times a

20   year; so, literally, everything from soup to nuts throughout

21   the year.

22   Q      When you had discussions about finances, were there

23   times that Dr. Hough was involved in those conversations?

24   A      I can't recall, to the best of my memory, all three of

25   us being together, surrounding a financial discussion.

1    Q      Do you know how the schools were structured?

2           If we start with Saba, how was the school structured

3    from an entity standpoint?

4    A      As discussed earlier, to the best of my memory, it was a

5    not-for-profit foundation, formed in the Netherlands Antilles.

6    Q      And do you know if Dr. Fredrick had a title with The

7    Foundation?

8    A      I believe he was . . . either a trustee or on the board

9    of directors.

10   Q      Do you know if Dr. Hough had a title with the

11   foundation?

12   A      I can't recall.

13   Q      Now, with respect to MUA, how was MUA structured?

14   A      MUA was a for-profit entity.  And I'm not sure which

15   jurisdiction in the Caribbean it was formed.

16   Q      Do you know who owned MUA, or who the shareholders were?

17   A      It was predominantly owned by Dr. Fredrick.  However,

18   throughout its ownership term, there were several owners that

19   came and went.  Shareholders came and went throughout its

20   history.

21          MS. FINLEY:  Your Honor, at this time I would like to

22   show the witness Exhibit 7C.

23          And if you can just take a look at that while I get

24   this all organized?

25          (The witness examines an exhibit.)

1          MR. HOCHMAN:  I'm sorry, was there a question?

2          MS. FINLEY:  I think he's still reviewing the

3   documents.

4          THE WITNESS:  I am reviewing the documents.  There's

5   several pages.

6          MS. FINLEY:  I don't think he will answer the

7   question until he makes sure he knows what the document is.

8          THE WITNESS:  Okay.  I've reviewed all the pages.

9   BY MS. FINLEY:

10  Q     So, Mr. Minchenberg, we met before you came here today;

11  correct?

12  A     Yes.

13  Q     And I showed you all these documents; right?

14  A     Yes.

15  Q     And would you describe yourself as a fairly methodical

16  person?

17  A     Yes.

18  Q     So you want to make sure that what I'm showing you is

19  what I previously showed you.

20  A     Correct.

21  Q     Now, you recognize 7C.

22  A     Yes, I do.

23  Q     And what is 7C?

24  A     7C are share transfers in MUA.

25  Q     And if we look at the first page, who are shares being

1    transferred between?

2              MR. HOCHMAN:  Objection as to contents of this

3    document before it's admitted into evidence, Your Honor.

4              THE COURT:  Sustained.

5    BY MS. FINLEY:

6    Q     Is this a document that was maintained in the EIC

7    offices?

8    A     Yes.

9    Q     And how are you familiar with this document; was it used

10   for something?

11   A     This document -- or these documents, plural, because

12   there's more than one page, were given to me by Dr. Fredrick.

13   Q     And then what did you do with them?

14   A     This was part of the process of attempting to prepare a

15   Form 5471 for the medical school, MUA.

16   Q     And were these documents maintained in EIC's offices?

17   A     Yes.

18             MS. FINLEY:  Your Honor, at this --

19             MR. HOCHMAN:  Maintained in whose offices?

20             MS. FINLEY:  EIC.

21   BY MS. FINLEY:

22   Q     After Dr. Fredrick gave them to you?

23         Or do you know if they -- if he gave them to you from

24   EIC's offices originally or, after you received them, you then

25   kept them at EIC's offices?

1    A       Could you repeat your questions, please?

2    Q       Sure.

3    A       Thank you.

4    Q       Do you know where Dr. Fredrick got the document from?

5    A       I presume he kept them in his own office.

6            MR. HOCHMAN:  Objection, motion to strike, as

7    speculation.

8            THE COURT:  The objection is sustained.

9    BY MS. FINLEY:

10   Q       Do you know where he got it from?

11   A       No.

12   Q       And once he gave it to you, what -- where did you

13   maintain it?

14   A       I kept a copy in my office.

15   Q       And were you keeping that as part of your duties at EIC?

16   A       Yes.

17           MS. FINLEY:  Your Honor, at this time the government

18   would offer Exhibit 7C into evidence.

19           MR. HOCHMAN:  I object to certain documents within

20   7C, Your Honor.  I believe no foundation has been laid for at

21   least one of them.

22           THE COURT:  You'll need to come to sidebar with the

23   exhibit then.

24           MR. HOCHMAN:  Thank you, Your Honor.

25                          AT SIDEBAR

1          THE COURT:  Why don't you just show me which ones you

2    object to.

3          MR. HOCHMAN:  Your Honor, I'll expand the objection,

4    because I believe that the -- that these -- I don't know for

5    sure.  I think these are the documents that Mr. Minchenberg

6    stole from the office.  So whether or not -- it's unclear

7    whether he is saying that these are documents that he

8    recognizes at the office or these are documents that he stole

9    from the office and brought to his house, and that's where he

10   believes that they -- that they have been produced.

11         I think he actually produced these documents directly

12   to the government.  These are not documents that EIC produced

13   to the government.

14         MS. FINLEY:  No.

15         THE COURT:  That may be true.  I don't know if that's

16   true or not, but it wouldn't matter if he stole them.  That's

17   not a basis for that not being admitted.

18         MR. HOCHMAN:  There's two parts, Your Honor.  There's

19   an e-mail here, Page 3 of the documents.

20         THE COURT:  Is that the Yahoo --

21         MR. HOCHMAN:  Yeah, the Yahoo e-mail.

22         THE COURT:  Okay.

23         MR. HOCHMAN:  I believe that e-mail pertains to . . .

24   I don't believe that e-mail pertains to the transfer of the

25   shares, Your Honor.

1            THE COURT:  Okay.

2            MR. HOCHMAN:  And then the second part is . . . .

3    That would be it, Your Honor.

4            THE COURT:  Do you need to look at it?

5            MS. FINLEY:  Yeah.  Just so I can respond, Your

6    Honor.

7            Your Honor, I think that this is the instructions

8    from Mr. Cornell to Dr. Fredrick and Dr. Hough, who are noted

9    in the "To" and the "CC" lines regarding the execution of the

10   first page of that exhibit.

11           THE COURT:  And who is Mr. Cornell?

12           MS. FINLEY:  I think he is a lawyer who -- a

13   transaction lawyer, I think, who was helping them fill out the

14   transfer documents.

15           THE COURT:  All right.  Any other documents you have

16   an objection to?

17           MR. HOCHMAN:  That would be it, Your Honor.  Assuming

18   that the Court will allow it in without the foundation of where

19   these documents actually came from to get here, in court, which

20   I believe is the additional level they have to establish, then

21   this would be the only additional -- this would be the only

22   document amongst that I would object to.

23           THE COURT:  I frankly did not understand what

24   you're -- the point you're trying to make.

25           MR. HOCHMAN:  He's not the custodian of EIC.  These

1    records didn't come from EIC to the government to be here.  We

2    believe that if they can establish that he took these records

3    from his office at EIC, when he stole them, brought them to his

4    house, then turned them over to the government, that would be

5    the additional foundation we believe they have to lay to get

6    these documents in.  If they can lay that foundation, Your

7    Honor, then I would withdraw my objection.

8              MS. FINLEY:  Your Honor . . . .

9              THE COURT:  Okay.  Maybe I misunderstood.

10             MS. FINLEY:  I thought I asked these questions, that

11   he took those documents and brought them to his house, and when

12   he got the subpoena --

13             MR. HOCHMAN:  Well, you asked a very general question

14   about documents.

15             THE COURT:  That's true.

16             MR. HOCHMAN:  You didn't ask in particular about

17   these documents.

18             MS. FINLEY:  I will clarify that.

19             MR. HOCHMAN:  I just want to be able to ask him

20   later:  Are these documents that you stole from the office.

21             MS. FINLEY:  I'll just ask him that.

22             THE COURT:  That's a fair point.

23             MR. HOCHMAN:  Thank you.

24             THE COURT:  And then, in terms of the e-mail --

25             MR. HOCHMAN:  I will withdraw my objection, Your

DAVID C. MINCHENBERG – DIRECT/FINLEY                    29

1    Honor.

2              THE COURT:  To everything?

3              MR. HOCHMAN:  Yes.  As long as she establishes the

4    additional foundation.

5              THE COURT:  Okay.

6                        IN OPEN COURT

7    BY MS. FINLEY:

8    Q     Mr. Minchenberg, this document that we're looking at,

9    were these a portion of the records that you took from EIC's

10   offices when you left employment?

11   A     Yes.

12   Q     And you maintained those documents, then, in your home,

13   until the government requested them?

14   A     Yes.

15             MS. FINLEY:  Your Honor, at this time the government

16   would move 7C into evidence.

17             MR. HOCHMAN:  No objection, Your Honor.

18             THE COURT:  7C will be admitted.

19             (Government's Exhibit 7C was admitted into evidence.)

20             MS. FINLEY:  Permission to publish, Your Honor?

21             THE COURT:  You may.

22             (An exhibit was projected onto the projector screen.)

23   BY MS. FINLEY:

24   Q     If we could look at the top of the exhibit . . . .

25             Now, who is transferring shares to whom?

1   A      Patricia Hough is transferring sharing to David

2   Fredrick.

3   Q      And what company does she have shares in?

4   A      The Medical University of the Americas Limited.

5   Q      And is there a date on this document as to when the

6   shares were transferred?

7   A      October 15th, 2003.

8   Q      And how much was she paid for her transfer of the

9   shares?

10  A      $1,000.

11  Q      Are you familiar with Dr. Hough's signature?

12  A      Not other than what's signed here.

13  Q      In the course every your duties, did you have an

14  opportunity to see her signature on documents?

15  A      Occasionally.

16  Q      And does that look like her signature?

17  A      I can't remember.

18  Q      Is Dr. Fredrick's signature on this document?

19  A      Yes.

20  Q      And is he acknowledging receipt of the shares?

21  A      Yes.

22  Q      Now, if we could turn to the third page of that exhibit,

23  7C, and we look at the top, is there an e-mail from

24  Mr. Cornell, or William Cornell, to Patricia Hough, copied to

25  David Fredrick?

1    A      Yes.

2    Q      And what is the date on that document, on that e-mail?

3    A      October 10th, 2003.

4    Q      And does it appear that Mr. Cornell is giving

5    Dr. Fredrick and Dr. Hough some instructions about filling out

6    the form?

7    A      Yes.

8    Q      Now, as the comptroller, were you familiar with the

9    schools' finances?

10   A      Can you be more specific with the question, please?

11   Q      Sure.

12          With respect to Saba, did you know how much income they

13   took in, in a year, generally speaking?

14   A      Yes.

15   Q      And what their expenses generally were?

16   A      Yes.

17   Q      Did the schools -- with respect to Saba, did the school

18   have debt . . . in excess of their income?

19   A      No, the school did not have debt.

20   Q      Did Saba have large bank balances?

21   A      Generally, yes.

22   Q      And with respect to MUA, did MUA have debt?

23   A      Yes.

24   Q      And who did it owe money to?

25   A      Saba.

DAVID C. MINCHENBERG – DIRECT/FINLEY                    32

1    Q       And did MUA have large bank balances?

2    A       Relatively, yes.

3    Q       Less than they were to Saba, in comparison.

4    A       Correct.

5    Q       Were the medical schools profitable?

6    A       Yes.

7    Q       Did there come a time will when an audit was conducted

8    for Saba and MUA?

9    A       Yes.

10   Q       And do you remember when that was?

11   A       The first audit for Saba . . . started soon after my

12   hire, which would have been the beginning of the summer of

13   2004.

14   Q       Why did the books and records need to be audited?

15   A       Saba needed audited financial statements because certain

16   states needed Saba to have audited financial statements so that

17   Saba could have accreditation in those states, so that students

18   could . . . have rotations in those states.

19   Q       Do you know the name of the firm that conducted the

20   audit?

21   A       Yes.

22   Q       What was it?

23   A       Schneider & Associates.

24   Q       And did they conduct an audit for both Saba and MUA?

25   A       Yes.

1   Q     Was there a time frame for the audit in what years were

2   being audited?

3   A     The time frame -- I'll answer one question at a time,

4   please.  The time frame need to be as quickly as possible.

5   Saba was the first school to be audited.  And then, I believe,

6   MUA was audited the subsequent year.

7   Q     And when you say the -- and my question was inartful.

8         The time frame for the conducting of the audit was

9   immediately --

10  A     Correct.

11  Q     -- right when you started.

12        Do you know what financial year was being audited?

13  A     I believe it was 2004.

14  Q     And then with respect to MUA -- was that for Saba?

15  A     That was for Saba.

16  Q     And then did Saba have financials done for another year?

17  A     The following year.

18  Q     And then, for MUA, was it just for 2005?

19  A     I believe so.

20  Q     Can you describe for the jury what your duties were,

21  related to the audit?

22  A     An audit -- well, from my job, coming in as the first

23  financial professional for Saba, at that time the school was in

24  existence . . . for an extended period of time, say almost ten

25  years.  So I had to prepare the books and records, to the best

1    of my ability, for our external accountants,

2    Schneider & Associates, to audit our financial records, which

3    consists of both the income statement and the balance sheet.

4        To do so, you have to provide the auditors with

5    supporting evidence for those books and records, which consists

6    of statements, supporting receipts, records, copies of checks,

7    et cetera, so that they can verify balances to determine

8    whether your financial statements are fairly represented.

9    Q    In collecting that information, who did you get that

10   information from, in order to transmit it to the auditors?

11   A    A variety of sources.  A set amount of sources, as

12   you've discussed, were already kept in the files and records

13   that had been maintained over the years.  If those were not

14   available in the records that had been maintained, a good deal

15   of information had to come from Dr. Fredrick.

16   Q    In some circumstances, did information come from

17   Dr. Hough?

18   A    I can't recall.

19   Q    Then were part of your responsibilities, then, to

20   interface with Schneider & Associates in providing that

21   information?

22   A    Regularly.

23   Q    Who was the primary person at Schneider & Associates

24   that you dealt with?

25   A    A partner by the name of Dean Hiltzik.

1   Q       Did you also deal with an individual named Jerry

2   Schneider?

3   A       Yes.  He was the managing partner.

4   Q       Of the firm or the audit?

5   A       Of the firm.

6   Q       As part of your duties as comptroller of EIC, were your

7   responsibilities to prepare corporate income tax returns?

8   A       No.

9   Q       Did EIC have an outside accountant who did that?

10  A       Yes.

11  Q       As part of your duties, did you prepare individual

12  income tax returns for Dr. Fredrick and Dr. Hough?

13  A       No.

14  Q       As part of your duties, did you give --

15          MS. FINLEY:  Withdraw the question, Your Honor.

16  BY MS. FINLEY:

17  Q       Did you have any discussions with Dr. Fredrick or

18  Dr. Hough about their personal tax returns?

19  A       Yes.

20  Q       What kind of discussions did you have?

21  A       Throughout my tenure, we had discussions about --

22          MR. HOCHMAN:  Objection as to who "we" is, Your

23  Honor.

24          THE COURT:  Sustained.

25

```
 1   BY MS. FINLEY:

 2   Q     If you could identify more particularly, when you're

 3   describing the "we," who would be involved in that

 4   conversation?

 5   A     I will.  More frequently, I had discussions with

 6   Dr. Fredrick.  I remember, at least on one occasion with

 7   Dr. Hough, one occasion with her, about compliance with . . .

 8   reporting 5471s for their personal income taxes.

 9   Q     Were you responsible for compiling -- other than with

10   respect to the 5471s, were you responsible for compiling

11   information for preparation of their income tax returns?

12   A     No.

13   Q     Do you know . . . .

14         MS. FINLEY:  Withdraw that question, Your Honor.

15   BY MS. FINLEY:

16   Q     Are you familiar with what Lynn, Leon & Lyon Group is?

17   A     I believe I am.

18   Q     And what is that?

19         MR. HOCHMAN:  Objection, foundation.

20         THE COURT:  Sustained.

21   BY MS. FINLEY:

22   Q     Do you know what Lynn, Leon & Lyon Group is?

23         MR. HOCHMAN:  Objection, asked and answered.

24         THE COURT:  Overruled.

25         THE WITNESS:  I believe I am.
```

1   BY MS. FINLEY:

2   Q      What is Lynn, Leon & Lyon?

3          MR. HOCHMAN:  Objection, foundation.

4   BY MS. FINLEY:

5   Q      How do you know what Lynn, Leon & Lyon Group is?

6   A      It was an entity that was brought to my attention that

7   owned one of the properties that we operated out of in Gardner,

8   Massachusetts.

9   Q      Who brought that to your attention?

10  A      Dr. Fredrick.

11  Q      Do you know what kind of entity Lynn, Leon & Lyon Group

12  is?

13  A      Yes.

14  Q      What kind of entity is it?

15  A      It was an LLC.

16  Q      Do you know who owned that LLC, or who the shareholders

17  were?

18  A      I can't be a hundred percent sure.

19  Q      Do you know what Lynn, Leon & Lyon Group stands for?

20  A      I believe so.

21  Q      Who told you what that stands for?

22  A      Dr. Fredrick.

23  Q      What did he tell you that it stood for?

24  A      I can't remember the specific names, but three cats they

25  had.

1   Q      And the "they" is who?

2   A      Like Leon, Lyon . . . and I can't remember the third.

3   Q      When you say the three cats "they" had, who had?

4   A      Dr. Fredrick and Dr. Hough.

5   Q      Are you familiar with an entity named Round Hill Holding

6   Company?

7   A      Yes.

8   Q      How are you familiar with Round Hill Holding Company?

9   A      I am familiar with Round Hill Holding Company,

10  specifically answering, because Dr. Fredrick and Dr. Hough

11  talked about it, and gave me information about that entity.

12  Q      Why were they giving you information about that entity?

13  A      In the effort of . . . trying to prepare 5471s for

14  Schneider & Associates to review, to prepare a final 5471 for

15  filing.

16          MS. FINLEY:  Your Honor, may I hand Exhibit 7X to the

17  witness, please?

18          THE COURT:  You may.

19          MS. FINLEY:  And if I could ask you to review that

20  document.

21          THE WITNESS:  If you'll just give me a second, I'll

22  do so.

23          MS. FINLEY:  Okay.

24          (The witness examines an exhibit.)

25          THE WITNESS:  Okay.  I've quickly reviewed this.

1    BY MS. FINLEY:

2    Q      What is this document?

3    A      I'm not an attorney, but it appears to be . . . a

4    granting of land in the Round Hill Project Holding Company.

5    Q      And who provided you with this document?

6    A      Dr. Fredrick.

7    Q      And what did you do with this document?

8    A      I forwarded this -- let me just go to the final pages --

9    to Dean Hiltzik.

10   Q      At Schneider & Associates?

11   A      Correct.

12   Q      And where was this document maintained?

13   A      In my files.

14   Q      And were those the files you then took with you when you

15   left EIC?

16   A      Yes.

17          MS. FINLEY:  Your Honor, at this time the government

18   would offer 7X into evidence.

19          MR. HOCHMAN:  No objection.

20          THE COURT:  7X will be admitted.

21          (Government's Exhibit 7X was admitted into evidence.)

22          MS. FINLEY:  Your Honor, permission to publish?

23          THE COURT:  You may.

24          (An exhibit was projected onto the projector screen.)

25

1    BY MS. FINLEY:

2    Q        If we look at Paragraph 1 -- or actually, if you'd just

3    look at the top first, is there a date on this document?

4    A        It says February 2nd, 2001.

5    Q        And in Paragraph 1, who is the grantor of the property?

6    A        It appears to be Laura Walls.

7    Q        Do you know who Laura Walls is?

8    A        Dr. Fredrick's daughter.

9    Q        And in Paragraph 2, who . . . is receiving benefit,

10   or -- of the property?

11   A        Round Hill Holding Company.

12   Q        And who is listed as the managing director of Round Hill

13   Holding Company?

14   A        As it's written, Miss Patricia Lynn Hough.

15   Q        And if we move down to the bottom full paragraph, does

16   it say when Laura purchased the land?

17   A        February 12th, 1999.

18   Q        Now, there's some handwriting on this document.

19            Do you know whose handwriting it is?

20   A        Mine.

21   Q        And do you know when you made those notes?

22   A        I don't know the specific date.

23   Q        Do you know why you made the notes?

24   A        It was in my effort to prepare a draft form of the 5471.

25   Q        And if we look at the bottom of that paragraph, do you

1  know what Laura -- Ms. Walls is granting to Round Hill Holding

2  Company?

3  A     Could you repeat the question?

4  Q     Of course.

5        If we look at the bottom of the paragraph, do you know

6  what -- or even in your notes there, what did you understand

7  Laura was granting to Round Hill Holding Company?

8             MR. HOCHMAN:  Objection, Your Honor, the document

9  speaks for itself.

10            THE COURT:  Overruled.

11            MS. FINLEY:  You can answer the question.

12            THE WITNESS:  I can answer?  Okay.

13            In my understanding, I was trying to interpret the

14  document, and it was my understanding . . . that . . . they

15  were granting rights to construct buildings.

16  BY MS. FINLEY:

17  Q     And if we turn to the third page of Exhibit 7X -- I'm

18  sorry, the second page of 7X, under Number 5, what would

19  happen -- I guess -- was there a term for this . . . amount of

20  time that the -- Round Hill could use the property?

21  A     Yes.

22  Q     How long was that term?

23  A     Well, the term specifically is called a termination of

24  rights.

25  Q     Okay.  And what happened at the end of the termination

42

1   of rights?

2   A       My understanding is, it would revert back to the

3   grantor.

4   Q       And the grantor was Dr. Fredrick's daughter?

5   A       Correct.

6   Q       Do you know whether Dr. Hough had any offshore bank

7   accounts in her name personally?

8   A       I was not aware of any.

9   Q       And did you ever have any discussions with her about

10  whether she had any offshore bank accounts in her name

11  personally?

12  A       No.

13  Q       Do you know whether Dr. Fredrick had any offshore bank

14  accounts in his name personally?

15  A       He did not tell me that.

16  Q       Do you know whether Saba had any offshore bank accounts

17  in its name?

18  A       Yes.

19  Q       And do you know whether MUA had any offshore bank

20  accounts in its name?

21  A       I can't remember.

22  Q       With respect to Saba, how did you find out that Saba had

23  offshore bank -- an offshore bank account?

24  A       As part of our first audit.

25  Q       And prior to the audit, did you know whether Saba had

1    any offshore bank accounts?

2    A       No.

3    Q       And who provided you information alerting you to that

4    fact?

5    A       Dr. Fredrick.

6    Q       Now, as part of an audit, do you send out -- or does the

7    accounting firm send out something called a bank confirm

8    letter?

9    A       Yes.

10   Q       And do you know where the bank was that Saba had its

11   account?

12   A       Can you be specific about which account?

13   Q       I can.

14           With respect to the offshore, the overseas, or foreign

15   account, do you know where the bank was?

16   A       Switzerland.

17   Q       And Saba had domestic bank accounts as well; is that

18   right?

19   A       Correct.

20   Q       And did you know where those bank accounts were?

21   A       They were located in Gardner, Massachusetts.

22   Q       And when you started working at Saba, did you try to

23   familiarize yourself with the banking procedures of Saba?

24   A       Yes.

25   Q       And would that have included understanding where the

1   school maintained its money?

2   A      Yes.

3   Q      And would that be something that would be reflected in

4   the books and records of Saba?

5   A      Yes.

6   Q      Would it be something that, in an accounting ledger

7   or . . . the general ledger, that there should be accounts for

8   those assets?

9   A      Yes.

10  Q      And when you started at Saba, or EIC, did you see

11  a . . . account for the offshore account?

12  A      When I started there?

13  Q      Yes.

14  A      No.

15  Q      Do you know what kind of funds were in the offshore

16  account for Saba?

17  A      Some of them.

18  Q      And what ones do you know?

19  A      I remember there being, specifically, some hedging

20  funds, that Schneider & Associates had to do some more complex

21  accounting for.

22  Q      And do you know who had signature authority on the

23  offshore account?

24  A      Dr. Fredrick.

25  Q      And how do you know that?

1   A      He had to give me authorization to contact his banking

2   representative in Switzerland.

3   Q      Do you remember the name of the banking representative?

4   A      No.

5   Q      Do you know whether Dr. Hough ever had signature

6   authority over the Saba account in Switzerland?

7   A      No, I don't know.

8   Q      Did you ever ask her?

9   A      No.

10  Q      Do you know whether Saba had other offshore accounts in

11  the country of Saba, or on the island?

12  A      I assume they did, but --

13         MR. HOCHMAN:  Objection, move to strike.

14         THE COURT:  The objection is sustained.  The motion

15  is granted.

16  BY MS. FINLEY:

17  Q      Do you know whether they did?

18  A      No.

19  Q      Do you know what an entity named New Vanguard is?

20  A      Could you repeat your question?

21  Q      Sure.

22         Do you know what an entity named New Vanguard is?

23  A      No.

24  Q      Have you ever heard of New Vanguard?

25  A      No.

1   Q     Do you know what an entity named Top Fast is?

2   A     No.

3   Q     Do you know an entity named Ample Dynamics?

4   A     No.

5   Q     Do you know what Medical Technology Associates is?

6   A     Yes.

7   Q     How do you know what it is?

8   A     It was a name that came up as part of our first-year

9   audit in Saba.

10  Q     Prior to the audit, had you heard of MTA?

11        We'll shorten "Medical Technology Associates."

12  A     No, I had not.

13  Q     Who provided you information, once it came up in the

14  audit, about what Medical Technology Associates is?

15  A     Predominantly, Dr. Fredrick.

16  Q     What did Dr. Fredrick tell you MTA was or did?

17  A     That it was a company, a Caribbean company -- I can't

18  remember the specific . . . country of its origin -- that

19  provided marketing services to . . . Saba.  And I can't

20  remember if they did MUA as well.

21  Q     Do you know what Apex Consultants is?

22  A     I don't know what it is.  The name sounds familiar.

23  Q     With respect to Medical Technology Associates, I'm going

24  to show you what's been marked as Exhibit 7AA, as in "apple."

25        If you can take a look at that document?

DAVID C. MINCHENBERG – DIRECT/FINLEY                    47

1    A      Certainly.

2             (The witness examines an exhibit.)

3    BY MS. FINLEY:

4    Q      And do you recognize that document?

5             (The witness continues to examine exhibit.)

6    A      Yes.

7    Q      And what is the document, just a general description?

8    A      It's just a document stating that a Laura --

9             MR. HOCHMAN:  Objection as to the contents of the

10   document.

11             THE COURT:  Sustained.

12   BY MS. FINLEY:

13   Q      Is it a letter detailing who the director of Medical

14   Technology Associates is?

15   A      Yes.

16   Q      And what is the date on the document?

17   A      June 22nd, 2004.

18   Q      And . . . .  Did you have this document in the records

19   of EIC?

20   A      Yes.

21   Q      And do you know why you had this document?

22   A      I can't remember.

23   Q      Do you remember what you did with the document?

24   A      I believe I kept this as part of the files I took with

25   me.

1    Q      And it was kept in EIC's ordinary course of business in

2    the offices?

3    A      No.  This would have been kept in Dr. Fredrick's files.

4    Q      At EIC?

5    A      Yes.

6          MS. FINLEY:  Your Honor, at this time the government

7    would offer 7AA into evidence.

8          MR. HOCHMAN:  Objection, improper business foundation

9    for this record, and improper foundation of this witness to

10   know how Dr. Fredrick kept any record.

11         THE COURT:  The objection is overruled.  Exhibit 7AA

12   is admitted.

13         (Government's Exhibit 7AA was admitted into

14      evidence.)

15         MS. FINLEY:  Your Honor, permission to publish?

16         THE COURT:  You may.

17         (An exhibit was projected onto the projector screen.)

18   BY MS. FINLEY:

19   Q      Now, who is listed here as the director of -- or a

20   director of Medical Technology Associates?

21   A      I'll need you to be more specific, because there's

22   directors listed all on the top of the letterhead, it's signed

23   by a director at the bottom, and it seems to be appointing a

24   person --

25   Q      Okay.

1   A       -- so we . . . .

2   Q       If we look in the body of the letter, is Ms. Whitley

3   being appointed as a director for Medical Technology

4   Associates?

5   A       That is what -- the action seems to be taking place.

6   Q       And at the top, what is her title, as director?

7   A       Just as it's saying, it's to certify that she is -- has

8   been appointed as one of the directors.

9   Q       Now, as part of the audit, if Dr. Fredrick or Dr. Hough

10  had an ownership interest in Saba Foundation, is that something

11  that you would have wanted to relay to the auditors?

12  A       Yes.

13  Q       Why?

14  A       Because it's a contradiction in terms, as far as the

15  audit goes.

16  Q       And what does that mean?

17  A       To the best of my understanding, a foundation, a

18  not-for-profit foundation, cannot be owned by an individual.

19  Therefore, if an individual had an ownership in a foundation,

20  it would have to be disclosed to the auditors, because they

21  would need to make note of it in their audited financial

22  statements.

23  Q       In the course of the audit, did questions arise about

24  the business structures of the schools?

25  A       Yes.

1    Q      Who raised those questions?

2    A      Certainly the auditors did, I did, and discussions with

3    myself and Dr. Fredrick.

4    Q      What, generally, were the issues that you had?

5    A      Can you be very specific about . . . which schools, and

6    perhaps conversations between whom?

7    Q      We'll get into the specifics --

8    A      Okay.

9    Q      -- how's that?

10          Did you provide advice, or assist with providing advice,

11   on business structures?

12   A      Yes.

13   Q      And at whose direction did you do that at, if anyone's?

14   A      Both my own, Dr. Fredrick's, and in discussions with the

15   accountants, Schneider & Associates.

16   Q      And were there -- did you have concerns about tax

17   consequences of the way Saba and MUA were presently . . .

18   structured?

19   A      Yes.

20   Q      Were there also concerns about asset protection?

21   A      Yes.

22   Q      Because of -- were there other concerns . . . about the

23   impact of the structure as it stood?

24   A      There were many concerns, in my opinion, when I arrived,

25   about the operations of the business, not just asset

1    protection, taxation . . . I think ownership was another issue

2    that was ongoing during my tenure.

3    Q       And what about ownership was ongoing?

4    A       Well, the question about how . . . MUA was owned, that

5    was discussed; whether there was ever going to be restructuring

6    for the two . . . previous . . . items that you mentioned,

7    taxation or asset protection.  So they sort of come under an

8    umbrella.

9    Q       Because of these concerns, did you do -- did you do

10   anything because of that?

11   A       Part of this goes back to what we earlier discussed, the

12   RFP.

13   Q       All right.  And so if I hand you 7D and 7E, for

14   identification . . . D, as in "dog," E, as in

15   "elephant" . . . .

16           (The witness examines exhibits.)

17   BY MS. FINLEY:

18   Q       And if you can look at, first, 7D, and . . . .

19   A       Can you just give me a moment to review this?

20   Q       Sure.

21   A       Thank you.

22           (The witness examines exhibits.)

23           THE WITNESS:  Okay.  I'm ready.

24           MS. FINLEY:  All right.

25           THE WITNESS:  Thank you.

1    BY MS. FINLEY:

2    Q      What is this document?

3    A      This document, as I briefly mentioned sometime earlier

4    today, was the cover letter -- and actually the following pages

5    are the request for proposal that I sent out to some very large

6    accounting firms in Boston . . . soon after we completed the

7    first audit of Saba University.

8    Q      And when you say, "the following pages," are those the

9    pages in Exhibit 7E?

10   A      That's correct.

11   Q      And who created 7D and 7E?

12   A      I did.

13   Q      And where were these documents maintained?

14   A      They were maintained in my office at EIC.  I can't

15   recall if -- there would have been a hard copy, because I sent

16   out a small three-ring binder to each of the accounting firms,

17   so certainly they would have been on my computer, and probably

18   a three-ring hard-copy binder on one of the shelves in my

19   office.

20   Q      And were these documents part of the documents that you

21   took from EIC when you left?

22   A      Yes.

23          MS. FINLEY:  Your Honor, at this time the government

24   would offer 7D and 7E into evidence?

25          MR. HOCHMAN:  No objection, Your Honor.

1         THE COURT:  7D and 7E will be admitted.

2         (Government's Exhibits 7D and 7E were admitted into

3    evidence.)

4         MS. FINLEY:  Permission to publish?

5         THE COURT:  You may.

6         (An exhibit was projected onto the projector

7    screen.).

8    BY MS. FINLEY:

9    Q     Now, in 7D, when you gave us the documents -- the

10   government has exhibited it in the way that you gave it, with

11   respect to this document, the second page is before the first

12   page.

13   A     It's backwards.

14   Q     It's backwards.

15         So if we start on the second page . . . where did you

16   get the information to create this document?

17   A     Well, this information . . . .  On the first case -- on

18   the first place, is, in my opinion . . . is fairly commonplace

19   for someone . . . that is an accountant with several years of

20   good, solid training, that thinks about how an operation should

21   be looked at, that may have potential tax consequences.  It was

22   part of my training of those four years of Arthur Andersen,

23   very structured, methodical training, that goes into facts and

24   circumstances.

25   Q     And so you are laying that out for these firms that

1   you're sending the information to.

2   A      That's correct.

3   Q      Now, if we look on the Page 2, under "Issues," what are

4   the issue -- what are the issue category, generally?

5   A      Do you want me to read them?

6   Q      No.  Just explain what would have been contained under

7   the issues, or what the purpose of the issue category is.

8   A      Well, I am seeking guidance, or I'm requesting a

9   proposal for guidance, for current legal and tax issues that

10  pertain to the operations, similarly seeking guidance for any

11  past legal . . . and tax issues that pertains to the operations

12  of the business.  And I'm asking to identify any future legal

13  and tax issues that pertain to the operations, including

14  those -- and I'm almost reading verbatim -- that related to the

15  restructure changes that we wanted to make to the future

16  operations of the business, and any possible exit strategy.

17  Q      And who is the exit strategy for?

18  A      Dr. Fredrick and Dr. Hough.

19  Q      And is that -- is that who you're identifying as the

20  owners . . . in -- on this document?

21  A      There's no mention of it on Page 2.

22  Q      But in that last sentence it says:  ". . . as well as

23  the ultimate exit strategy of the owners."

24  A      Correct.

25  Q      And are the owners Dr. Fredrick and Dr. Hough, as you

1    understood it?

2    A      Well, Dr. Fredrick was the owner of MUA.

3    Q      Okay.  But it --

4    A      Or a majority owner, pardon me.

5    Q      So it's in the plural.  Where there other people?

6    A      There were other owners of MUA.

7    Q      So this was not about Saba?

8    A      Well, Saba was a not-for-profit foundation.

9    Q      So you did not understand there to be owners?

10   A      No.

11   Q      Now, if we look at 7E . . . this one's a little

12   difficult to read.  If we can just zoom in on the top part,

13   that says, "Educational Information Consultants," on the first

14   page.

15          And there are three different categories, or three

16   different entities, in this 7E; is that right -- well, in the

17   whole document.

18   A      Pardon me?

19   Q      In this document, you are discussing three different

20   entities.

21   A      Yes, I am.

22   Q      All right.  So the first entity is EIC.

23          Could you explain to the jury what the first

24   paragraph -- the first column, "Legal," meant?

25   A      Okay.  The first column, "Legal," discusses EIC, which

1    is the headline above.  And "Legal," right below it, tells us

2    that it is a U.S. Massachusetts S Corp., as we've discussed

3    earlier, and it's 100 percent owned by Dr. Fredrick.

4    Q    And in the operations column, does that column refer

5    back to the documents in, I think it was 7A and B, that we

6    reviewed today?

7    A    Correct.  And listed there specifically, there were

8    notations of A through W, I believe, that listed all of the

9    operations.

10   Q    Now, if we look at the column, "Goals," if we can move

11   over, what -- can you explain generally what was contained in

12   the "Goals" column?

13   A    Do you want me to read them?

14   Q    No.  I just want you to explain what you would have

15   put -- what you were putting in that column for all three

16   entities, the general . . . .  Were you explaining to the

17   people you were issuing the RFP to, what advice you were

18   seeking?

19   A    Okay.  Well, very simply, if we look at this column that

20   says, "Proposed," then let's go back to your Exhibit 7D --

21   Q    Okay.

22   A    -- and again, accountants -- and fortunately, even these

23   large firms that I worked for, even though Arthur Andersen no

24   longer exist these were very similar companies, these were all

25   attorneys that I was speaking to, but they were international

1    tax attorneys, et cetera.  And they are very analytical and

2    structured people.  They are almost pigeon-holed.  And if you

3    ask them, just like you're asking me today, I'll ask you to

4    slow down, and I'll ask you very methodical questions, and I'll

5    ask you very specific questions.

6         And so when I say, "proposed," I'm asking them to look

7    at these specific questions, and then refer back to the issues

8    on this Exhibit 7D.

9         So when I said, "Please identify current and legal tax

10   issues, identify past legal and tax issues, identify all future

11   legal and tax issues that pertain to the operations of our

12   business, including those related to the desired

13   restructuring," so they know, without me even having to go down

14   there -- these people have done this for 20, 30 years -- that

15   when I give them a spreadsheet like this, saying "proposed,"

16   they know to refer back to this document, and say that there

17   were past operations, current operations, and they want to seek

18   a -- pardon me -- a proposal.

19   Q    Now, you said you were seeking advice from international

20   lawyers and other experts.  Are you an expert in international

21   law?

22   A    No; not whatsoever.

23   Q    Are you an expert in international tax?

24   A    Not whatsoever.

25   Q    So if we can move to the Saba University School of

1   Medicine category, and if we can actually move to the goals.

2   A       Okay.

3   Q       I apologize.  If we look under Number 5 . . . .  Can you

4   read that to the jury?

5   A       Number 5:  "Convert the nonprofit status in the

6   Netherlands Antilles to a for-profit entity especially oriented

7   to minimizing any taxes upon the sale or IPO of Saba.  The

8   ownership will be structured as a 50 percent Dr. Fredrick, and

9   50 percent Dr. Hough."

10  Q       Were part of the going-forward strategy to convert Saba,

11  potentially, from a nonprofit to a for-profit?

12  A       Those discussions had been had.

13  Q       Who did you have those discussions with?

14  A       Dr. Fredrick and the accountants,

15  Schneider & Associates.

16  Q       And who . . . did you come up with a 50/50 breakdown for

17  the ownership of this potential for-profit entity?

18  A       I had had that discussion with Dr. Fredrick.

19  Q       And he told you that it was going to be 50/50?

20  A       I can't remember.

21  Q       Did you make -- did you just put that down there?

22  A       That was my assumption.

23  Q       Did Dr. Fredrick tell you that Dr. Hough was going to

24  have no ownership interest?

25  A       No.

1   Q      Now, as part of the goals, was tax minimization for this

2   ultimate exit strategy one of the considerations, or issues,

3   you wanted the firms to opine on?

4   A      Absolutely.

5   Q      And . . . .  Were you seeking advice about how to not

6   pay taxes at all?

7   A      No.

8   Q      Were you seeking advice -- did you ever tell

9   Dr. Fredrick that he didn't have to pay taxes if the school was

10  ever sold?

11              MR. HOCHMAN:  Objection, leading.

12              THE COURT:  Overruled.

13              You may answer.

14              THE WITNESS:  I may answer?

15              MS. FINLEY:  Yes, you may.

16              THE WITNESS:  Can you repeat the question?

17  BY MS. FINLEY:

18  Q      Did you ever tell Dr. Fredrick that he didn't have to

19  pay taxes if the schools were ever sold?

20  A      No.

21  Q      Did you ever tell Dr. Hough that she would not have to

22  pay taxes if the schools were ever sold?

23  A      No.

24  Q      Now, if we could turn back to the tax column for a

25  moment, and if we look at Number 5, if you could read Number 5.

1    A       For which entity?

2    Q       For Saba.

3    A       Read it again?

4    Q       Number 5, under the tax column?

5    A       Okay.  Pardon me.

6            Are you ready?

7    Q       I'm ready.

8    A       All right.

9            "Since Saba's inception, there has been no U.S. tax

10   declaration status made.  Further, no federal and/or state tax

11   information and/or reporting has ever been filed.  Please note,

12   as mentioned in the goals, two years of the medical school's

13   curriculum occurs in the United States, (clinical medicine

14   rotations)."

15   Q       Can you explain to the jury what that paragraph is

16   about?

17   A       Just give me a second.  I want to read it and . . .

18   articulate it very well.

19           Yes.

20           As it states, and as it's written, and specifically as

21   it is in the tax column, one of the significant overriding

22   issues upon starting the audit was . . . Saba was set up as a

23   not-for-profit foundation in the Netherlands Antilles.  The

24   students completed two years of a four-year program on the

25   island of Saba, their basic science program.  That's where they

1    worked in laboratories, worked on cadavers, etcetera.

2         The second two years, they came to the United States and

3    worked during -- doing clinical rotations in teaching hospitals

4    throughout the United States.  It's like if you ever went into

5    a hospital and the doctor says do you mind if a student comes

6    in and observes.  That's the clinical rotation part of their

7    studies.

8         This was all new to me, trying to understand

9    international taxation, because it was never part of my

10   background.  Schneider & Associates was trying to introduce me

11   to this, and they had hired their own people to try to get a

12   handle on all this.

13        One of the problems, to the best of my understanding,

14   was never mind the international taxation of the not-for-profit

15   foundation of students on the Island of Saba, but once the

16   students came back to the U.S. and did clinical rotations at

17   these teaching hospitals throughout the United States, they

18   were effectively . . . students -- even though this was a

19   not-for-profit foundation in the Caribbean, but they were in

20   United States hospitals; and one of the very complex

21   international tax questions was we were accepting tuition

22   revenues for students now in the United States.  We were paying

23   United States hospitals sums of money for these students to

24   perform rotations in their hospitals.

25        So, if you will, there was now a jurisdictional issue,

1    which was well beyond any of my training or knowledge, about

2    does that create a United States tax issue, in the U.S., for

3    those students being here.

4    Q      And you were concerned that there -- were you concerned

5    there may be exposure for the school?

6    A      Yes.

7    Q      Were you concerned that there may be exposure for any

8    thing or any body else?

9    A      Could you be specific with that question, please?

10   Q      Were you considering whether . . . any other entity

11   might have tax exposure because of this concern that Saba might

12   be a U.S. taxable entity?

13   A      You're asking which entity -- you're saying any other

14   entity.

15   Q      Other than Saba itself.

16   A      I'm not sure about your question.  I'm sorry.

17          MS. FINLEY:  I will withdraw it.

18          If we can move on, I'm going to show you what's been

19   marked as Exhibit 7G.  And if you can begin looking at that

20   exhibit.

21          (The witness examines an exhibit.)

22          THE WITNESS:  Okay.  I've read it.

23          MS. FINLEY:  All right.

24   BY MS. FINLEY:

25   Q      Is this an e-mail?

1    A      Yes, it is.

2    Q      Who is the e-mail from?

3    A      It's from myself.

4    Q      And is it from an address related to your employment?

5    A      Yes, it is.

6    Q      And if you could just talk into the microphone just --

7    A      Oh, I'm sorry.

8    Q      No problem.  And when is it sent?

9    A      December 28th, 2004.

10   Q      Who is it sent to?

11   A      Dr. Fredrick, Dr. Hough, Jerry Schneider, and Dean

12   Hiltzik.

13   Q      What is the subject?

14   A      Proposed restructured entities.

15   Q      And did you indicate if this was a -- what kind of

16   importance this e-mail was?

17   A      High importance.

18   Q      Did you maintain this e-mail either electronically or in

19   your office at EIC?

20   A      Yes, I did.

21   Q      And is this an e-mail that you took with you when you

22   left EIC?

23   A      Yes, I did.

24          MS. FINLEY:  Your Honor, at this time, the government

25   would move Exhibit 7G into evidence.

1            MR. HOCHMAN:  No objection.

2            THE COURT:  7G will be admitted.

3            (Government's Exhibit 7G was admitted into evidence.)

4            MS. FINLEY:  Permission to publish.

5            THE COURT:  You may.  Can you tell me what the --

6    well, I guess we'll see what the date is.

7            MS. FINLEY:  December 28th, 2004.

8            THE COURT:  Thank you.

9            (An exhibit was projected onto the projector screen.)

10   BY MS. FINLEY:

11   Q     Now, what is this e-mail about?

12   A     This e-mail is about proposed restructuring entities for

13   the medical schools and the management company.

14   Q     And who is the letter addressed -- or the e-mail

15   addressed to?

16   A     Dr. Fredrick, Dr. Hough --

17           MR. HOCHMAN:  Objection, asked and answered.

18   A     -- Jerry Schneider --

19           THE COURT:  Hang on a second.

20           THE WITNESS:  Okay.

21           THE COURT:  The objection is?

22           MR. HOCHMAN:  Asked and answered, Your Honor, first

23   time around.

24           THE COURT:  Overruled.

25           MS. FINLEY:  Go ahead.

1          THE WITNESS:  Repeat it all?  Dr. Fredrick,

2    Dr. Hough, Jerry Schneider, and Dean Hiltzik.

3    BY MS. FINLEY:

4    Q      Now, if you could read the paragraph beginning, "In

5    creating," to the jury?

6    A      Certainly.

7          "In creating the new proposed entities, the primary

8    overriding goal was to establish a structure of entities that

9    would be positioned for a future trigger event.  This future

10   trigger event would be a sale of Saba and/or MUA, a public

11   offering, or other exit strategy, as determined by Dr. Fredrick

12   and Dr. Hough.  When I created this structure, the second

13   overriding goal was to create structures that maximized asset

14   protection while simultaneously minimized any tax liabilities."

15   Q      Do you remember whether you ever discussed this e-mail

16   with Dr. Hough?

17   A      I don't remember.

18   Q      Do you remember whether you discussed this e-mail with

19   Dr. Fredrick?

20   A      Yes.

21   Q      Do you ever remember Dr. Hough saying I received this

22   e-mail, and I'm not on board with what's in it?

23          MR. HOCHMAN:  Objection.  He just testified that he

24   doesn't remember having any discussions with Dr. Hough.

25          THE COURT:  Was the last question a Dr. Hough

1    question or a Dr. Fredrick question?

2              MS. FINLEY:  Dr. Hough.

3              THE COURT:  The objection is sustained.

4              MS. FINLEY:  Your Honor, I'm not sure if we're going

5    to take a morning break.  I don't mean to be presumptuous, but

6    this might be a good place to stop.

7              THE COURT:  That works for me.

8              Let's take 15 minutes.  Please do not discuss this

9    case among yourselves, or allow anyone to discuss it with you

10   or in your presence.  15 minutes.

11             (At 10:36 AM, the jury was escorted from the

12        courtroom.)

13             THE COURT:  All right.  15 minutes, please.

14             (At 10:36 o'clock, a.m., court was recessed.)

15                         AFTER RECESS

16             (At 10:55 o'clock, a.m., court was reconvened.)

17             THE COURT:  Both sides ready for the jury?

18             MS. FINLEY:  Your Honor, just for the record, we

19   provided Mr. Minchenberg with the records that we were going to

20   provide over the break so that he had a chance to read them.  I

21   didn't talk to the witness, but for that purpose only.

22             THE COURT:  Okay.  Other than that, everybody ready?

23             MR. HOCHMAN:  Yes, Your Honor.

24             MR. SAUNDER:  Yes, sir.

25             THE COURT:  Have the jury step in, please.

1          (At 10:57 AM, the jury was escorted into the

2       courtroom.)

3          THE COURT:  And you may proceed.

4          MS. FINLEY:  Thank you, Your Honor.

5   BY MS. FINLEY:

6   Q     Mr. Minchenberg, did the issues of Form 5471 come up

7   while you were employed at EIC?

8   A     Yes.

9   Q     Was this a frequent conversation?

10  A     With whom?

11  Q     Was the issue something that was frequently discussed

12  generally?

13  A     Yes.

14  Q     And who did you discuss it with?

15  A     Both Dr. Fredrick and the accountants,

16  Schneider & Associates.

17  Q     Did you ever discuss it with Dr. Hough, whether in

18  writing or in person?

19  A     Yes.

20  Q     And do you remember if it was in writing?

21  A     Yes.

22  Q     Do you remember whether you spoke with her in person?

23  A     I believe once.

24  Q     Can you explain to the jury, in very lay terms, what a

25  5471 is?

1    A       I believe a 5471 is an informational return for a

2    U.S. citizen who has ownership in a foreign corporation.

3    Q       Were you tasked with preparing 5471s?

4    A       Yes.

5    Q       Who tasked you with that?

6    A       Dr. Fredrick.

7    Q       What did you do -- and can you explain to the jury what

8    you did to try to complete the 5471s?

9    A       Well, I need to be specific.  My role is not to complete

10   5471s for the preparation of either Dr. Fredrick or Dr. Hough

11   to use them for the filing of their personal income tax

12   returns.  It was to assist in completing a draft -- as I was

13   not an expert, by any means, in these -- for

14   Schneider & Associates to review and prepare 5471s for

15   Dr. Fredrick and Dr. Hough, to have their accountant file them

16   with their personal income tax returns.

17   Q       Did you collect information to prepare the drafts?

18   A       Yes.

19   Q       Who did you collect that information from?

20   A       Both Dr. Fredrick and Dr. Hough.

21   Q       And, when you collected the information, did you create

22   a chart for the different entities that you were drafting

23   Form 5471s for?

24   A       Yes.

25   Q       And what did the chart do?

1    A      Well, the requirements to file 5471s are fairly

2    comprehensive, and I would have to go back off memory, but

3    there were several different categories of filers.  Depending

4    upon the category, you either file –– follow . . . into several

5    different categories, and it depends on the facts and

6    circumstances.  So I created, if you will, a box of . . .

7    similar to what you saw on the overhead projector, a cross –– a

8    checklist of several different items that would determine

9    whether it was Category I, or Category II, or Category III.

10   And also, this was a checklist of items that would be required

11   to complete these tax returns, these 5471s.

12          And I sent this spreadsheet, this checklist, to both

13   Dr. Fredrick and Dr. Hough, because most of the things –– I had

14   certain things available, but most of the things were required

15   from either of those two individuals.

16   Q      Okay.  Now, once you collected that information, did you

17   make your best attempt to draft the exhibits –– the . . . the

18   5471s, based on the information provided to you by Dr. Fredrick

19   and Dr. Hough?

20   A      Yes.

21   Q      And then did you send them to Jerry Schneider?

22   A      Yes.  For reviewing that work product.

23   Q      I am going to now hand you Exhibit 7W; 7V, as in

24   "Victor"; 7Q; and 7S.

25   A      Okay.

1   Q      Now, during the break you had an opportunity to look

2   these over; is that correct?

3   A      Yes, I did.

4   Q      And are these records in 7W, 7V, 7Q, and 7S, are these

5   records that you took from EIC when you left employment?

6   A      Yes, I did.

7          MS. FINLEY:  Your Honor, at this time the government

8   would offer 7W, 7V, 7Q, and 7S into evidence.

9          MR. HOCHMAN:  Hold on one second.

10         No objection, Your Honor.

11         THE COURT:  7Q, 7S, 7V, and 7W, will be admitted.

12         (Government's Exhibits 7Q, 7S, 7V, and 7W were

13     admitted into evidence.)

14         MS. FINLEY:  Thank you, Your Honor.

15         Permission to publish?

16         THE COURT:  You may.

17         (An exhibit was projected onto the projector screen.)

18   BY MS. FINLEY:

19   Q      If we could turn first to Exhibit 7W, is this a memo

20   that you wrote to the files on December 2nd, 2004?

21   A      Yes.  Yes.  I'm sorry.

22   Q      Did you -- and is the subject, "IRS Forms 5471-MUA

23   Nevis"?

24   A      Yes.

25   Q      Did you provide, or is Dr. Fredrick -- Dr. Fredrick cc'd

1    on this memo?

2    A      Yes, it is.

3    Q      Do you know if you provided it to Dr. Fredrick?

4    A      Yes, I did.

5    Q      And without reading the content, can you explain to the

6    jury what is memorialized in this memo?

7    A      Certainly.  In discussing previously the 5471s, I

8    actually prepared one Form 5471 that was submitted directly to

9    the Internal Revenue Service on behalf of Dr. Fredrick.  And

10   even though this memo states, in the RE section, "IRS Form 5471

11   MUA Nevis," it was actually for MUA Belize.

12   Q      Let me stop you.

13          Is that noted in the first paragraph, MUA Belize?

14   A      Yes, it is.

15   Q      Continue.

16   A      Okay.  Dr. Fredrick had an interest, also, in a medical

17   school on the island of Belize.  And it was determined that he

18   also needed to file a 5471 for his ownership in that entity,

19   which he claimed that that company became either defunct or he

20   no longer had an interest in that ownership.

21   Q      Now, at the bottom there is some handwriting.

22          Is that your handwriting.

23   A      Yes, it is.

24   Q      And it said that the 5471 was received and signed for by

25   the IRS on December 6th, 2004; is that correct?

1  A      Yes, it is.

2  Q      Now, did you reach out to the IRS to ask about the

3  actual mechanism for this to be filed with the IRS?

4  A      Yes, I did.

5  Q      And is that detailed in Paragraph 5 of Exhibit 7W?

6  A      Yes, I did.

7  Q      Did the IRS give you guidance as to whether the form had

8  to be filed in an amended tax return for Dr. Fredrick, or if

9  the form could just be mailed in to the IRS?

10 A      Yes, it did.

11 Q      Which one?

12 A      That it could be mailed directly to the service center

13 without having to amend their tax return.

14 Q      And in Paragraph 5, do you detail the specific person at

15 the IRS, with their identification number, that you spoke to?

16 A      That's correct.

17 Q      If we move on to Exhibit 7V, as in "Victor," was this a

18 November 19th, 2004, letter that is to the Internal Revenue

19 Service from David Fredrick?

20 A      That's correct.

21 Q      Do you know who drafted this letter?

22 A      I did.

23 Q      What did you do with it after you drafted it?

24 A      I prepared the draft of this letter, with Dr. Fredrick's

25 name, and had him sign it.

1   Q      And then, based on your notation in Exhibit 7W, did

2   Dr. Fredrick file it with the IRS?

3   A      Yes.  And then it was sent certified, return receipt

4   mail, to the service center -- IRS service center.

5   Q      Did you ever provide the memo, or the filed 5471 to

6   Dr. Fredrick's individual income tax return preparer?

7   A      I can't recall.

8   Q      Was this the only Form 5471 that needed to be filed?

9   A      No.

10  Q      Do you remember approximately how many other ones needed

11  to be filed?

12  A      Based upon my understanding -- and again, I was not an

13  international tax expert, but based upon my understanding, if

14  any U.S. citizen had ownership in a foreign entity, they had to

15  file a Form 5471.

16  Q      Now, with respect to the entities, or whether Form 5471

17  needed to be filed, did you . . . know who had ownership of any

18  of these entities prior to you having to draft the forms?

19          MR. HOCHMAN:  Objection, vague as to which entities.

20          THE COURT:  Overruled.

21          If he understands the question, he may answer it.

22          THE WITNESS:  I was given a list, by Dr. Fredrick, of

23  5471s, or companies that needed filing for 5471s.

24  BY MS. FINLEY:

25  Q      And, but for that list, did you have any personal

1    knowledge of Dr. Fredrick or Dr. Hough's ownership of foreign

2    entities?

3    A      I did not know the specific ownership by person or by

4    entity.

5    Q      Were you relying on the information from Dr. Fredrick or

6    Dr. Hough to prepare the necessary forms, or to draft the

7    necessary forms?

8    A      To draft the Form 5471?

9    Q      Yes.

10   A      No.

11   Q      If you did not know about a company, would you have

12   drafted a 5471?

13   A      No.

14   Q      If you can turn to Exhibit 7Q . . . and are these a

15   series of e-mails between you and Dr. Hough?

16   A      Yes.

17   Q      And if we can start on the second page, in the middle of

18   the page, on January 20th, 2005, at 6:55 p.m., is that the

19   first e-mail in this exhibit?

20   A      It appears so.

21   Q      Can you explain to the jury, on the bottom, where it

22   says, "David Minchenberg wrote," and then you've written some

23   stuff to Dr. Fredrick -- excuse me, to Dr. Hough, what are you

24   telling Dr. Hough?

25   A      Basically, I am trying to explain -- in fairly lay terms

1   because, again, I'm not an expert -- of what Form 5471 is, and

2   that it's an informational return for the IRS, it does not, by

3   the filing nature in itself, create a tax to the filer.  And

4   that's basically it, in this particular paragraph.

5   Q     And did Dr. Hough respond to your e-mail?

6   A     She asks where we are at with the filing.

7   Q     And did you respond -- if you'd turn to the first page,

8   on January 21st, at 12:04a.m. -- well, presumably Doctor --

9   Dr. Hough is responding to another e-mail of yours.

10        Did you respond to Dr. Hough's question about where we

11  are with the filing?

12  A     Yes, I did.

13  Q     And what did you tell her?

14  A     I know that -- I said that there's many legal and tax

15  issues that existed, and I need her and Dr. Fredrick to make

16  decisions before they can move forward.

17  Q     Did you recommend that you, Dr. Fredrick, and Dr. Hough

18  sit down and discuss these issues?

19  A     Yes.

20  Q     And what was Dr. Hough's response?

21  A     She said it was not urgent, and that we could sit down

22  when she gets back.

23  Q     Did you respond to that e-mail on -- of Dr. Hough's, at

24  the top of the page of 7Q?

25  A     Yes, I did.

1    Q      And what were you telling her there?

2    A      I wanted to let her know that I felt it was important,

3    and that we needed to act quickly to get them prepared before

4    the April 15th tax filing deadline.

5    Q      Now, if we turn to Exhibit 7S, as in "Sam," and we look,

6    does this appear to be your original e-mail that we just

7    discussed in 7Q, at the middle of the page -- the second page

8    of the exhibit?

9              (An exhibit was projected onto the projector screen.)

10             THE WITNESS:  Are we on 7S, like in "Sam?"

11   BY MS. FINLEY:

12   Q      S, like "Sam."

13   A      Okay.

14   Q      So the first e-mail, working backwards, is that the same

15   e-mail that we discussed in Exhibit 7Q, where you were laying

16   out the rules, and Dr. Hough said:  Where are we with the

17   filing?

18   A      Yes.

19   Q      And then, at the top, is there another response that was

20   not contained in Exhibit 7Q?

21   A      Yes.

22   Q      And what date was this response?

23   A      The date was January 20th.

24   Q      And what are you telling Dr. Hough?

25   A      That . . . at the top of the page, that I could write up

1  a summary of the dynamics that we are facing and the decisions

2  that need to be made.  And I offered to contact her in Florida

3  or e-mail it to her.

4          MS. FINLEY:  Thank you.

5          Now, if I could give you Exhibit 7U and 7M.

6  BY MS. FINLEY:

7  Q    In 7U and 7M, are these records that you took from the

8  EIC offices when you left?

9  A    Yes.

10         MS. FINLEY:  Your Honor, at this time the government

11 would offer 7U and 7M into evidence.

12         THE COURT:  Any objections?

13         MR. HOCHMAN:  One second, Your Honor?

14         (Mr. Hochman reviews exhibits.)

15         MR. HOCHMAN:  No objection, Your Honor.

16         THE COURT:  7M and 7U will be admitted.

17         (Government's Exhibits 7M and 7U were admitted into

18     evidence.)

19         MS. FINLEY:  Permission to publish?

20         THE COURT:  You may.

21         (An exhibit was projected onto the projector screen.)

22 BY MS. FINLEY:

23 Q    So, if we can look at 7U, is that an e-mail from you to

24 Dr. Fredrick and Dr. Hough on January 31st, 2005?

25 A    Yes, it is.

1    Q      And the subject is:  "Important Tax and Reorganization

2    Meeting"?

3    A      Yes, it is.

4    Q      And again, the importance is high?

5    A      Yes, it is.

6    Q      And if you could read the first paragraph of the letter?

7    A      Certainly.

8           "After speaking with Dr. Hough today, I would like to

9    schedule a meeting for Thursday, February 3rd, 2004.  It would

10   be best to have this meeting after hours, 5:30 p.m. or so, so

11   that we can have privacy.  I would like to cover the tax issues

12   so that -- "that we need to discuss, as well as our

13   reorganization plan."

14   Q      Do you remember whether you had that meeting?

15   A      I can't recall.

16   Q      Now, turning your attention to Exhibit 7M, as in "Mary,"

17   is this a memo from you to Dr. Fredrick and Dr. Hough, copied

18   to Mr. Schneider and Mr. Hiltzik, on February 9th, 2005?

19   A      Yes.

20   Q      And the subject is:  "Saba and MUA Tax Compliance and

21   Other Key Initiatives"; is that correct?

22   A      Yes, it is.

23   Q      And can you explain to the members of the jury what is

24   contained in this memo?

25   A      Yes.  Basically what this is, is this is a memo, as

1  noted, to Dr. Fredrick and Dr. Hough, with a copy to Jerry

2  Schneider and Dean Hiltzik, that summarized a meeting . . .

3  that Dr. Fredrick and I had, that briefly talked about what was

4  setting forth tax compliance for several foreign entities,

5  dates needed for completion, and other key initiatives for

6  management company . . . and entities that owned the real

7  estate in Gardner, Massachusetts.

8  Q     Do you remember whether you provided this document to

9  Dr. Hough?

10  A     I believe this was sent as an e-mail, but I can't

11  recall.

12  Q     Normally, when you put individuals in the "to" line, is

13  it your practice not to forward it to all the individuals

14  you're addressing the memo to?

15  A     It would not be a practice to not include those parties.

16  Q     Now, if we can turn just briefly to the second page,

17  under, "Other Key Initiatives," and I think this is also on the

18  first page, did you break it down by what needed to be done,

19  the data that you needed for it, and then whether it had been

20  completed, and perhaps whether there was a target date for

21  these things to be done?

22  A     Yes.

23  Q     And on the second page, under "Other Key Initiatives,"

24  are you . . . .  Well, why don't you explain, generally, what

25  these initiatives are about.

DAVID C. MINCHENBERG – DIRECT/FINLEY                    80

1    A       Well, the goal was to establish a new management company

2    which was based in Florida, rather than Massachusetts, and that

3    was to replace EIC, Inc.  And that was at the recommendation of

4    Schneider & Associates . . . to have . . . the LLCs' mortgage

5    property take out mortgages on the physical property in

6    Gardner, Massachusetts -- because I believe one of the

7    entities, either MUA or Saba, had a loan on the building --

8    rather than have a loan with a traditional bank.

9            So it was recommended by the auditors to get a

10   traditional loan from a bank, rather than have a loan from one

11   of the businesses.  So it was recommended that we apply for a

12   loan from a bank, such as Bank of America, which is written

13   here, and then create a traditional lease, where the management

14   company pays rent, just as any other business would.

15   Q       And these initiatives part of your -- or the proposed

16   restructuring?

17   A       Correct.

18   Q       And would you have had a "data needed for completion"

19   under each of the different areas that needed to get done . . .

20   in this memo.  On the first page there's a separate "data

21   needed for completion" section for the 5471.

22   A       Yes.

23   Q       Now, did you update this memo as things were completed?

24   A       I believe, several times during the course of my tenure,

25   there were correspondences about this progress.

1    Q        Would you describe yourself as detail oriented?

2    A        Generally, very detailed.

3             MS. FINLEY:  I'm going to now show you what's been

4    marked as Exhibit 7K.

5             THE WITNESS:  Do you want me to keep this open?

6             MS. FINLEY:  Yes, keep that open.

7             THE WITNESS:  Okay.  I don't have much room.

8             (The witness examines an exhibit.)

9             THE WITNESS:  Okay.  I've taken a quick look at this.

10   BY MS. FINLEY:

11   Q        Now, can you explain to the jury -- let me just ask,

12   first, did you create this document?

13   A        Yes, I did.

14   Q        And did you keep it in your records?

15   A        Yes, I did.

16   Q        And did you take it with you when you left EIC?

17   A        Yes, I did.

18            MS. FINLEY:  Can you --

19            Your Honor, the government at this time would offer

20   7K into evidence?

21            MR. HOCHMAN:  No objection.

22            THE COURT:  7K will be admitted.

23            (Government's Exhibit 7K was admitted into evidence.)

24            MS. FINLEY:  Permission to publish?

25            THE COURT:  You may.

1              (An exhibit was projected onto the projector screen.)

2      BY MS. FINLEY:

3      Q      Now, if you just turn toward . . . let me look at the

4      specific page for a second.

5              If you look at the bottom of Page 4 --

6      A      The fourth page in this --

7      Q      In the bottom left-hand corner of the page there is a

8      little exhibit number with a four after it, if you can see?

9              It's very small, it's not showing up on there, but where

10     it says "tax compliance"?

11     A      Okay.

12     Q      That, and the next page, is that the same memo that we

13     were just looking at in Exhibit 7M?

14             (The witness examines an exhibit.)

15     A      They appear to be part of the same . . . continuation.

16     Q      So if we can turn back to the first page, can you

17     explain to the jury why you created this memo?

18     A      Very simply.  First, my handwriting documents that this

19     was created in February, '05.

20     Q      And is that above the words, "substance over form"?

21     A      Correct.

22     Q      And was that -- if you look just back at Exhibit 7M, is

23     that the same date as the memo in 7M?

24     A      Yes.

25     Q      Okay.  So why did you create this memo?

```
1    A       I created this memo as I had a personal meeting with

2    Dr. Fredrick after hours, to discuss my concerns about tax

3    compliance and, based upon my lay understanding of complying

4    with filing and potential implications of noncompliance, what

5    those ramifications to be.

6    Q       Did you also have concerns for yourself, in drafting

7    this memo?

8    A       Yes.

9    Q       What were those concerns?

10   A       Well, my concerns were that . . . there was potential

11   liability if noncompliance continued.

12   Q       Did you seek advice about your concerns?

13   A       Yes.

14   Q       Who did you contact?

15   A       I contacted the American Institute of CPAs, of which I

16   was a member, and the Mass. Society of CPAs, of which I was a

17   member.

18   Q       And the Mass. Society is Massachusetts?

19   A       Massachusetts, pardon me.

20   Q       Did they give you advice?

21   A       Yes, they did.

22   Q       What was their advice?

23   A       Their advice was, if I had -- and I remember the

24   gentleman I spoke with in the Massachusetts Society, I didn't

25   write down the individuals at the American Institute, but their
```

1    best advice was, if I felt there was any wrongdoing or if

2    generally I was uncomfortable, it should be a company I try to

3    distance myself as soon as possible.

4    Q      Did they suggest that you put something in writing?

5    A      Yes.

6    Q      And is that this memo?

7    A      Yes.

8    Q      So if we start at the top, it says:  "Overriding all the

9    entities is a concept called 'substance over form.'"

10          Can you explain to the jury what you meant, in this

11   memo, about substance over form?

12   A      Okay.  Substance over form -- and I'll try to make it

13   very brief, because I'm not a complete tax expert, but

14   basically we'll try to make it very simple.

15          In my understanding of tax law, the IRS will basically

16   look at two concepts.  And that is, they will look at how a

17   structure is formed, and they'll take a look at both the legal

18   form and the tax form, which is the structure.  And then

19   they'll look at the -- which will include the individuals or

20   the business structure, and the formation of it.

21          And if you look at a structure -- let's just try to

22   simplify it and say that a transaction through the structure

23   will go from A to Z, and there might be a business transaction

24   that starts with A, but then ultimately there's the individuals

25   that own the business, and whether they profit or lose from a

1    business, but they're the beneficiaries at Z.  And if they earn

2    money or lose money, they -- in either respect, it can be a

3    benefit.  If they earn money, they get a deposit.  Or

4    sometimes, even if they enjoy losses, that can be a benefit.

5         But the IRS can look at these structures which are

6    formed, and they can determine whether, if they collapse these,

7    does it meet the criteria of a legal transaction?

8         So they collapse the structure.  So this is where they

9    look at the structure over form.  So they collapse both the

10   structure and the formations, and say:  Does it meet all of the

11   legal criteria of the Internal Revenue Code, and the legal

12   structures, where all of these transactions going from a

13   business structure to the beneficiary, the owners of

14   businesses, does it meet these things, because basically it's a

15   transaction.

16        So when they collapse it, the structure over form, if it

17   meets it, and meets the minimization, then that's great.  If it

18   falls within the structure of the law, that's wonderful.

19        If it doesn't when they collapse all these things,

20   basically they'll say that they collapsed the structure and it

21   wasn't a solid business structure that met the foundations of

22   tax law.

23        And that's my best explanation.

24   Q    Now, in the findings section you say:  "The worst case,

25   Saba and MUA are taxable to Dr. F."

1          What did you mean by that?

2    A      This is taking just that scenario.  Certainly, in MUA,

3    when we get to the structure over form, Dr. Fredrick, for the

4    Medical University of the Americas, was the primary owner of

5    the Medical University of the Americas; and, without seeking

6    proper tax advice and minimization strategies -- which are all

7    within the structure of the Internal Revenue Code, but you want

8    to make sure you have sound advice -- if you don't find all of

9    these things -- and, as we've discussed earlier today, one of

10   the key elements that was brought to my attention, through our

11   accountants that we hired, Schneider & Associates, one of the

12   key elements was never discussed:  Were these schools -- before

13   we talk about Saba -- taxable.  Because we had transactions of

14   students doing business in the United States and in the

15   islands.  It was never determined, from their inception -- well

16   beyond my scope of knowledge, pardon me.  And money was sitting

17   in bank accounts, large sums of money.

18         So, when answering the question, was it taxable to

19   Dr. Fredrick regarding MUA, he was the primary owner.  Beyond

20   my scope of knowledge.  It needed people with great knowledge.

21   International tax knowledge.  I didn't know.  He needed to seek

22   the advice.  But certainly, with the structure-over-form

23   discussion, he was at the end of the rainbow.

24         So, when you collapsed this, did it meet all of the

25   criteria?  I didn't know.

1   Q       And if we move down to the bottom half of the memo, the

2   international business corporations, what section is that

3   about; is this about the 5471s, or --

4   A       Yes, it is.

5   Q       And . . . were you explaining to Dr. Fredrick that there

6   may be tax liability?

7   A       In this memo, that's what I'm doing.

8   Q       And did you have a discussion with Dr. Fredrick, in

9   person, about it?

10  A       Yes.

11  Q       And did you also have concerns that there might be

12  potential criminal exposure for Dr. Fredrick?

13  A       Yes, I did.

14  Q       And did you lay that out for him in this memo?

15  A       Yes, I did.

16  Q       You also -- is that under the notes section under the

17  first bullet point?

18  A       Yes, it is.

19  Q       And if we turn just briefly to Page 4, did you also

20  detail potentially what some of the statutes would be that he

21  might be liable under?

22  A       Yes, I did.

23  Q       Now, under the notes section back on Page 1 of 7K, it

24  says, "If we try to sell our businesses" -- under Note 2 --

25  "like the Providence Equity offer, they would be structured as

1    a stock sale."

2         Did you know at the time whether Dr. Fredrick or

3    Dr. Hough were trying to sell the businesses?

4         MR. HOCHMAN:  Objection, compound question.

5    BY MS. FINLEY:

6    Q    Do you know whether --

7         MS. FINLEY:  Withdrawn, Your Honor.  I'll rephrase

8    it.

9         THE COURT:  Okay.

10   BY MS. FINLEY:

11   Q    Do you know whether Dr. Fredrick was trying to sell the

12   businesses?

13   A    I knew that they had offers to sell the business -- or

14   businesses, plural.

15   Q    And when you say, "they," who do you mean?

16   A    Pardon me.  Dr. Fredrick and Dr. Hough.

17   Q    Was Providence Equity one of the potential buyers that

18   had made a proposal?

19   A    Yes.

20   Q    Now, if you could turn to -- the second page is another

21   copy of the first page; is that correct?

22   A    Yes.

23   Q    It just doesn't have your handwriting on it, that it was

24   created on the 9th of February?

25   A    Correct.

1    Q       So if we turn to Page 3, titled, "Dr. Fredrick and

2    Dr. Hough, Critical Taxi Items" --

3    A       Okay.

4    Q       -- and if we look at the first paragraph, can you

5    explain to the jury what you were detailing in this paragraph?

6    Or let me withdraw the question.

7            Is this paragraph more detailed, that you had explained

8    under . . . the worst-case, Saba and MUA are taxable to Dr. F.,

9    is that more detail about why that might be?

10   A       It starts laying out more of the why; so, yes, more

11   detail.

12   Q       And in the middle of the paragraph, you tell

13   Dr. Fredrick that the IRS may, or will, apply a concept over --

14   of substance over form.

15   A       Yes.  Those exact words are in this paragraph.

16   Q       And do you tell Dr. Fredrick that there might be

17   significant tax consequences?

18   A       Yes.

19   Q       And within that paragraph there's also a discussion

20   about the consequences for the failure to file the 5471s, is

21   that correct, at the bottom of the paragraph?

22           (The witness examines an exhibit.)

23   A       Yes.  It is.  It is in the second-to-the-last sentence.

24   Q       And if we could move down toward the bottom of the page,

25   under the paragraph titled, "Game Plan," and what did you

1    detail was the game plan?

2    A      I simply said that a strategy could be put together to

3    disconnect the businesses from Dr. Fredrick and Dr. Hough, but

4    can only be done with proper planning.

5    Q      You never told them . . . did you ever tell them:  You

6    would never have to pay tax on it?

7    A      Absolutely not.

8    Q      Had you made a determination that they did have to pay

9    tax?

10    A      Well --

11           MR. HOCHMAN:  Objection, timing, and details of that

12    determination.

13           THE COURT:  Sustained.

14           Rephrase.

15    BY MS. FINLEY:

16    Q      Through the RFPs and the advice that you were getting

17    from the various accounting firms leading up to this memo, at

18    this point, in February of 2005, did you know whether they owed

19    taxes?

20    A      They would have a taxable amount due.

21    Q      You had determined that, based on your opinion, that

22    they were going to have taxable . . . tax due.

23    A      Based upon -- absolutely.

24    Q      Now, looking at the last paragraph, can you just read

25    that into the record?

1    A       Which page, please?

2    Q       On Page 3, "In a worst-case scenario . . . ."

3    A       Certainly.

4            "In a worst-case scenario, we are committing tax fraud.

5    This is why Jerry is contracted through our law firm,

6    Bowditch & Dewey, so that he is protected under attorney/client

7    privilege.  Further, the filing of MUA Belize's 5471 was

8    falsified."

9    Q       And does that paragraph continue on Page 4?

10   A       Yes, it's continued.

11   Q       And could you read that?

12   A       "I have called in all my favors for the brightest minds

13   of the industry.  They are willing to help us.  I wholly

14   recommend that we meet with these parties to establish a plan

15   to come into full compliance with the IRS.  There is currently

16   too much to risk, and again, we do not want to be subject to

17   any fraud claims.  We would lose all accreditations, lenders,

18   et cetera."

19   Q       Now, you said that you discussed this with Dr. Fredrick.

20           Do you remember if you discussed this memo with

21   Dr. Hough?

22   A       No, I don't recall doing so.

23   Q       Now, did there come a time -- was there a later time

24   where you followed up on this memo with Dr. Fredrick?

25   A       Yes, I did.

1            MS. FINLEY:  May I have you take a look at

2    Government's Exhibit 7P.

3            (The witness examines an exhibit.)

4            MS. FINLEY:  P, as in "Paul."

5            THE WITNESS:  Okay.

6    BY MS. FINLEY:

7    Q      Now, after you gave Dr. Fredrick this memo, what

8    happened . . . back in February.

9    A      Well, that was hand delivered to him.  It wasn't sent

10   via e-mail.

11   Q      Okay.

12   A      And I sent it to him, via e-mail, again, in August of

13   2005.

14   Q      Did you send the e-mail to other people, as well?

15   A      Yes, I did.

16   Q      Did you . . . copy them openly, or did you blind cc

17   them?

18   A      I believe I blind copied them.

19   Q      Do you remember who you blind copied?

20   A      The list is not here, but . . . .  I believe it

21   was . . . Jerry Schneider, one of the auditors; the partner,

22   Dean Hiltzik; my attorney in Boston; one of the board members

23   of Saba, who was also a CPA; my sister; myself at home; and I

24   believe my wife.  The list I don't have with me.

25   Q      From your best recollection?

1   A      Best memory.

2   Q      Now, is this e-mail something that you took from EIC

3   when you left?

4   A      Well, it was already sent to my house, so . . . .

5   Q      Okay.  And if you look at the top of the exhibit, is

6   that Dr. Fredrick responding to you at your Saba address?

7   A      His response is at the bottom of the page?

8   Q      Yes.  I'm sorry.  Did he respond to you?

9   A      He responded at the bottom of the page.  My response is

10  at the top, on Page 1.

11  Q      And your response was from your Saba.edu e-mail?

12  A      Yes, that's correct.

13          MS. FINLEY:  Your Honor, at this time the government

14  would offer 7P into evidence.

15          MR. HOCHMAN:  No objection.

16          THE COURT:  7P will be admitted.

17          (Government's Exhibit 7P was admitted into evidence.)

18          MS. FINLEY:  Permission to publish?

19          THE COURT:  You may.

20          (An exhibit was projected onto the projector screen.)

21  BY MS. FINLEY:

22  Q      So if we start at the very bottom of the first page, it

23  says, "Dr. Fredrick."

24          Is that the beginning of the e-mail that you wrote to

25  Dr. Fredrick in August of 2005?

1   A       Okay.

2   Q       And if we turn to the second page, is that the body of

3   the e-mail?

4   A       Yes, it is.

5   Q       Now, could you read the e-mail to the jury?

6   A       Okay.  Certainly.

7           "Dr. Fredrick:  Attached please find the tax issues that

8   we discussed in early February.  While I was preparing for and

9   during our annual audits, I revisited these issues; and, as

10  requested, destroyed all hard copies except this electronic

11  version, and want to stress the importance of completing these

12  items to become compliant with all the IRS federal rules and

13  regulations.  As discussed in February, my goal was to make

14  sure that you completed all the items listed so that you and

15  Dr. Hough were not in violation of these rules and eliminated

16  various personal and company exposure.

17          "However, I cannot begin to stress the importance of

18  complying with these laws.  It is absolutely paramount.  If you

19  not able to do so, with deep sadness, I may have to step aside

20  from certain accounting and reporting-related activities of

21  this company because, as a licensed CPA, I cannot be associated

22  with such types of noncompliance.

23          "If you have any questions, or need any information

24  and/or assistance, please feel free to contact me.  I'm here to

25  help you in any way I can.

1              "Best wishes.  David."

2     Q     Now, did Dr. Fredrick respond to your e-mail?

3     A     Yes, he did.

4     Q     And is that response on Page 1 of 7P?

5     A     Yes, it is.

6     Q     And, just summarizing, what was his response to your

7     e-mail?

8     A     He basically said that I had been holding on to this and

9     looking for the right the time to send it.

10    Q     And did you respond to his e-mail at the top of Page 1

11    of 7P?

12    A     Yes, I did.

13    Q     And what did you say to him?

14    A     I said I wasn't looking for any -- I didn't have any

15    ulterior motive but to simply tell him I had rules and

16    regulations I needed to comply with.

17    Q     I'm just going to show you what's been marked as 7II;

18    7DD, as in "dog"; 7EE; 7DD; and 7Y.

19            And if you could just look through these documents, and

20    can you tell me:  Are these records that you took from EIC when

21    you left?

22            (The witness examines exhibits.)

23    A     Yes, they are.

24            MS. FINLEY:  Your Honor, at this time the government

25    would offer all of those exhibits into evidence.  And I have to

1    grab them back from him to read them off.  I recognize there

2    were a lot of them.

3             THE COURT:  I'm not sure I got all of them either.

4    So why don't you do that.

5             MS. FINLEY:  Yes.  7DD, 7II . . . .

6             MR. UDOLF:  7DD is already in.

7             MS. FINLEY:  7II, we had as not having been entered

8    yesterday, so we were double-checking.

9             7DD.  7EE.

10            MR. HOCHMAN:  Your Honor, object on relevancy on 7II,

11   and 7DD.  The rest I have no objection.  If you want, Your

12   Honor, at a break, I could express the relevancy objection, if

13   the government doesn't need to publish those.

14            THE COURT:  Tell me the ones you don't object to

15   first.  Let's do it this way.

16            MR. HOCHMAN:  The ones I do not object to is 7Y,

17   7EE . . . yeah, 7EE.  And I think that's it.  And then the ones

18   I object to are 7DD and 7II.

19            THE COURT:  All right.  7Y will be admitted.  7EE

20   will be admitted.

21            (Government's Exhibits 7Y and 7EE were admitted into

22      evidence.)

23            THE COURT:  And I am going to need to see DD and II,

24   unless you can take us to noon without getting into that.

25            MS. FINLEY:  I am not going to show the witness.  It

1   was just further foundation that these records were kept.

2           THE COURT:  All right.  We'll talk about the

3   admissibility of those, then, later.

4   BY MS. FINLEY:

5   Q     Based on your -- let me ask you:  When you were at EIC,

6   did you have an opportunity to observe Dr. Hough in her role as

7   the clinical -- I'm not sure what title you used for her --

8   handling the clinical aspect of the school?

9   A     I saw her interact with . . . the person who assisted

10  her, coordinating students at the various teaching hospitals

11  occasionally.

12  Q     Did you have opportunities -- if Dr. Hough had questions

13  relating to the accreditation that might be impacted by the

14  finances, did she e-mail you with those questions?

15  A     I believe, once or twice, she gave me the name of our

16  law firm in Washington, DC, that I had to contact.  So she was

17  occasionally in touch with me regarding that, and she was up to

18  speed on the accreditation in various states.

19          MS. FINLEY:  The Court's indulgence for a moment?

20          (Ms. Finley confers with Ms. Kessler privately.)

21  BY MS. FINLEY:

22  Q     Now, when did you leave your employment at EIC?

23  A     Again, I believe it was March, 2006.

24  Q     And why did you leave?

25  A     For several reasons.  First and foremost, I was

1  concerned about the . . . compliance activities.

2        Second, my hours were being cut dramatically.  So I was

3  being paid significantly less than when I started.

4        And, third, I wasn't given any time off for doctors'

5  visits, et cetera, that I needed to continue seeing.

6        MS. FINLEY:  Thank you, Your Honor.  The government

7  has no further questions.

8        THE COURT:  All right.  Thank you.

9        Mr. Hochman, do you want to start your cross or break

10 for lunch?

11       MR. HOCHMAN:  Probably break for lunch, Your Honor?

12       If we could be seen at sidebar very quickly?

13       THE COURT:  Before we break?

14       MR. HOCHMAN:  Before we break, just very quickly.

15       THE COURT:  You may.

16                    AT SIDEBAR

17       MR. HOCHMAN:  There's two out-of-town witnesses that

18 we're going to see whether or not we can --

19       MS. FINLEY:  Three out-of-town witnesses.

20       MR. HOCHMAN:  -- that we are trying to see if we can

21 get on.  If we can do a 45-minute lunch break, if possible,

22 just to see if we can squeeze them in before 5:00 o'clock

23 today?

24       THE COURT:  Okay.  I've got to make at least a cameo

25 appearance down at the U.S. Attorney's Office.  One of the

1    fellows is leaving after 25 years, so I want to make sure he's

2    really gone.

3              MR. HOCHMAN:  Maybe 10 to 1:00, we could come back?

4              THE COURT:  I'll tell them quarter to 1:00.

5              MR. HOCHMAN:  That would be great.  Thank you, Your

6    Honor.

7              THE COURT:  Do you want to forego cross of this

8    fellow and do that later?

9              MR. HOCHMAN:  Oh.

10             THE COURT:  I didn't mean to forego cross completely.

11             MS. FINLEY:  We had one witness who has been here

12   since Monday, and one witness is the one that they are going to

13   call in their case in chief, with the travel issue, so . . . .

14   Mr. Minchenberg has also been here since Saturday.

15             THE COURT:  And he's from out of town, too?

16             MS. FINLEY:  Yes.  Every single witness is from out

17   of town.  We tried -- we sent a lot of them home today.

18             THE COURT:  Just a thought . . . I don't know. You

19   guys work it out.  I don't know.

20             MR. HOCHMAN:  Okay.

21             THE COURT:  Okay?

22             MR. HOCHMAN:  All right.

23                          IN OPEN COURT

24             THE COURT:  All right.  Ladies and gentlemen, we're

25   going to break for lunch.  I'm not going to give you quite an

1    hour, because we're trying to get the witnesses who are from

2    out of town, so they can leave and not have to come back next

3    week.  So if I could get you back here at quarter to 1:00, I

4    would appreciate it.

5            And again, the same instructions apply:  Do not

6    discuss if case among yourselves, or allow anyone to discuss it

7    with you or in your presence.  See you back here at quarter

8    to 1:00.

9            (At 11:53 AM, the jury was escorted from the

10       courtroom.)

11           THE COURT:  All right.  12:45.

12           (At 11:54 a.m., court was recessed.)

13                        AFTER RECESS

14           (At 12:50 a.m., court was reconvened.)

15           THE COURT:  Both sides ready for the jury?

16           MR. HOCHMAN:  Yes, Your Honor.

17           MS. FINLEY:  Yes, Your Honor.

18           THE COURT:  Do I need the lights as they are, or

19   turned on?

20           MR. HOCHMAN:  This is fine, Your Honor.

21           THE COURT:  If you'd ask the witness to step back in,

22   and the jury to step in.

23           (The witness returned to the witness stand.)

24           (At 12:50 PM, the jury was escorted into the

25       courtroom.)

1          THE COURT:  You may proceed.

2          MR. HOCHMAN:  Thank you very much, Your Honor.

3                         CROSS EXAMINATION

4    BY MR. HOCHMAN:

5    Q      Good afternoon, Mr. Minchenberg.

6    A      Good afternoon.

7    Q      I want to go back through your background just a little,

8    so I get a sense of your level of expertise.

9          You said you graduated Pittsburg state college in 1997,

10   with a concentration in accounting; is that correct?

11   A      That's correct.

12   Q      That means that you took a number of accounting classes

13   in college?

14   A      Correct.

15   Q      What kind of accounting classes?

16   A      To graduate with a concentration of accounting classes,

17   you have to have . . . .  Do you want me to detail them all?

18   Q      Well, did you study individual taxation?

19   A      One class.

20   Q      Corporate taxation?

21   A      I believe so.

22   Q      And then, when you graduated, you went to Arthur

23   Andersen; is that correct?

24   A      Yes.

25   Q      And at the time, Arthur Andersen was one of the biggest

1    accounting firms in the world; isn't that correct?

2    A     Yes.

3    Q     It employed a select number of people; is that correct?

4          Is that fair to say?

5    A     What do you mean by a select number of people?

6    Q     They didn't just take anyone off the street, they wanted

7    to take someone who was going have been very good at their job;

8    correct?

9    A     They . . . interviewed people, and offered jobs, based

10   upon --

11   Q     And you were one of those people that they offered a job

12   to; correct?

13   A     Yes.

14   Q     And you were there for four years; right?

15   A     Approximately, yes.

16   Q     And when you were there, you did work involving

17   individual taxation?

18   A     No.

19   Q     What type of work did you do at Arthur Andersen?

20   A     Predominantly what they call "flow-through taxation."

21   Q     Flow-through taxation.

22         So situations where -- like you were saying before, with

23   an LLC or an S Corp, where corporate income would flow through

24   to an individual's tax return?

25   A     Correct.  And I also did audit work.

1    Q      And audit work as well.

2           And restructuring work, where you would actually come up

3    with better structures for corporations to minimize their

4    taxes; is that correct?

5    A      I read memos on them.  I was not one of the people

6    who . . . developed restructuring.

7    Q      By the way, there is nothing wrong with taxpayers trying

8    to minimize their taxes within the rules; correct?

9    A      As long as it's within the framework allowed by the

10   Internal Revenue Code.

11   Q      There's nothing wrong with a taxpayer engaging in asset

12   protection; is that correct?  There's nothing wrong with a

13   taxpayer -- it's acceptable for a taxpayer to engage in asset

14   protection; correct?

15   A      I'm trying to separate what you're saying, a taxpayer

16   and asset protection, I view them as two distinct . . . .

17   Q      Let's get rid of the word "taxpayer."

18          It's acceptable for a person to engage in asset

19   protection; is that correct?

20   A      The way I view it, yes.

21   Q      Now, after you left Arthur Andersen, and you said that

22   you worked for a credit union as the VP of -- vice-president of

23   finance; correct?

24   A      Correct.

25   Q      And then you also had a similar job at a real estate

1    entity; is that correct?

2    A      I was doing -- not a vice-president of finance, but I

3    was working doing comptroller-type work at a real estate

4    entity.

5    Q      Did you ever prepare anyone's returns?

6    A      Individual returns?

7    Q      Yes.

8    A      No.

9    Q      Do you prepare your own return?

10   A      No.

11   Q      You actually go to somebody else to prepare your return?

12   A      Yes.

13   Q      Is that because your return is too complicated for you

14   to prepare?

15   A      No.

16   Q      Is it -- and what is the reason why you go to someone

17   else to prepare your return?

18   A      My training at Arthur Anderson, as you were alluding to,

19   was a very, very large firm, at the onset of what you were

20   discussing.  As such, just as you're an attorney specializing

21   in whatever your specialty is, my training was in flow-through

22   entities.  Being such a large firm at Arthur Anderson, people

23   specialize in very, very distinct work.  As such, I was a

24   flow-through specialist.  And I only spent four years there.

25   To become truly a master in that area, and to rise to a level

1    of partner, you'd have to spend 15 to 20 years --

2    Q       If I might just interrupt you briefly.  I'm asking about

3    preparing tax returns, and whether or not your tax return is

4    too complicated for you to prepare.

5            Is it too complicated?

6    A       I don't know.

7    Q       How long have you been filing tax returns for?

8    A       Over 20 years.

9    Q       And have you used a preparer for each one of those

10   returns?

11   A       Predominantly, yes.

12   Q       Do you consider yourself a detail-oriented person?

13   A       Yes.

14   Q       Because you believe in the importance of precision;

15   correct?

16   A       Correct.

17   Q       And you don't put things down in writing unless the

18   you're sure of what you're saying; correct?

19   A       I put things down . . . .  I put things down in writing

20   to memorialize them; not necessarily if I'm sure about them,

21   but to memorialize facts.

22   Q       And you try to be accurate when you put things down in

23   writing; correct?

24   A       I'm trying to state facts.  Hopefully, they're accurate,

25   or I'm trying to state something that I'm trying to get a

1    message across.

2    Q      Well, you are not trying to state inaccurate facts;

3    correct?

4    A      Correct.

5    Q      And you're someone who is always trying to comply with

6    the law; is that correct?

7    A      That is correct.

8    Q      And you're someone who's willing to admit your mistakes

9    when you make them?

10   A      Yes.

11   Q      And you're someone who's willing to admit when you don't

12   know something; is that correct?

13   A      Yes.

14   Q      And one of the things that you don't know about is

15   foreign bank reporting requirements; is that correct?

16   A      Yes; that's correct.

17   Q      And have you -- when you file your tax returns every

18   year, have you filed a Schedule C before -- excuse me -- a

19   Schedule B?

20   A      Would I -- I don't know.  I'd have to look at my tax

21   return or ask my taxpayer -- my preparer.

22   Q      Do you ever have interest or dividend income?

23   A      I believe occasionally.

24   Q      And are you familiar with Part 3, of Schedule B, of your

25   tax return?

1   A       No.

2   Q       Well, have you ever read your tax return -- do you read

3   your tax returns when you file them?

4   A       Very briefly.

5   Q       Are you aware that there is a penalty of perjury line

6   that is right above the signature line, that:  Under penalty of

7   perjury, I've reviewed my return and the schedules, and they're

8   true, correct, and complete?

9   A       I'm sure it's there.

10  Q       And you sign your returns; is that correct?

11  A       Yes.

12  Q       Under penalty of perjury, making that attestation; is

13  that correct?

14  A       Yes.

15  Q       But you don't review every word in your return before

16  you sign it; is that correct?

17  A       I don't review every single word on my tax return.

18  Q       And you believe you're complying with the law, even

19  though you don't review every single word of your tax return at

20  the time that you sign it.

21  A       Yes.  Because I fully give my tax preparer everything he

22  needs, and every receipt that I have, for the preparation of

23  that tax return.

24  Q       But you understand that, ultimately . . . .  Ultimately,

25  when you sign your return -- actually, I'll withdraw the

1  question.

2          With respect to . . . then, the notion of what is called

3  for by Schedule B, whether it deals with -- what the precise

4  foreign bank requirements are, you have no idea; is that

5  correct?

6  A      That is correct.

7  Q      Even though you have been involved with accounting since

8  at least, probably, the mid-nineties; is that correct?

9  A      That's correct.

10 Q      And even though you've actually prepared at least -- or

11 excuse me, signed at least 20 years' worth of your own tax

12 returns; is that correct?

13 A      That's correct.

14 Q      Do you believe that you committed any crimes while you

15 worked at EIC, or for the Saba Foundation or MUA?

16 A      No.

17 Q      Well, when the government first wanted to meet with you,

18 you hired an attorney, didn't you?

19 A      Yes.

20 Q      And I think you said, earlier, your attorney asked, on

21 your behalf, for a proffer agreement; isn't that correct?

22 A      That is correct.

23 Q      And the proffer agreement basically was a statement that

24 the government was going to treat you as a witness, and, in

25 response to that, you were willing to meet with them; is that

1    correct?

2    A      I believe so.

3    Q      Now, if you hadn't done anything wrong, why do you need

4    to have a proffer agreement that says the government is going

5    to treat you as a witness?

6    A      Well, I haven't done anything wrong, and I was

7    recommended to have an attorney, and to come forth and tell the

8    truth to the government and the IRS.

9    Q      And weren't you worried, though, if you didn't have that

10   agreement, that said the government was going to treat you as a

11   witness, that the government might investigate you, even though

12   you did nothing wrong?

13   A      No.

14   Q      Now, the person that was going to decide, pursuant to

15   that agreement, who was telling the truth, that was the

16   government; correct?

17   A      Could you . . . repeat your question?

18   Q      Sure.  Under your agreement with the government, the

19   entity that was going to decide whether or not you were

20   truthful was the government, it wasn't going to be a judge;

21   correct?

22   A      I assume so, correct.

23   Q      Because if the government decided that you were being

24   untruthful, it would be the government who could prosecute you;

25   correct?

DAVID MINCHENBERG - CROSS/HOCHMAN                    110

1    A       I believe so.

2    Q       And you have met with the government several times

3    before your testimony today; isn't that correct?

4    A       Yes, it is.

5    Q       You met with them back on, I believe it was,

6    December 14th of 2010; do you recall that?

7    A       Yes, I did.

8    Q       It was a three or four-hour meeting with the government;

9    do you recall that?

10   A       I don't remember the length, but I remember meeting in

11   2010.

12   Q       And you had your attorney there; is that correct?

13   A       That is correct.

14   Q       And the lead case agent, a man named Cameron Lalli --

15   who is in the first row; do you see him there?

16   A       Yes, I do.

17   Q       Was he in that meeting back in December of 2010?

18   A       I believe so.

19   Q       And the government prosecutors were there too; is that

20   correct?

21   A       I believe they were.

22   Q       And they asked you a variety of questions during that

23   meeting; do you recall that?

24   A       I don't remember everything specifically, but they did

25   ask questions.

1    Q     And then the government spoke to you again, did it not,

2    in the grand jury; is that correct?

3    A     That is correct.

4    Q     And then the government spoke to you back in September,

5    about a month ago; is that correct?

6    A     That is correct.

7    Q     And at that time you had three attorneys with you, did

8    you not?

9    A     Actually, they were coming in and out of an office so,

10   at any one time, there were only, I think, one or two

11   attorneys, because . . . they were all busy.

12   Q     I see.  But the collection was, three different

13   attorneys were representing you during that meeting with the

14   government; is that correct?

15   A     Yes.  But it wasn't three attorneys sitting at one table

16   at one time.  So I think you need to be very specific.

17   Q     Thank you.

18         And Mr. Lalli was at that meeting?

19   A     Yes, he was.

20   Q     And the government prosecutors were at that meeting.

21   A     Yes, they were.

22   Q     And one of your attorneys is actually here in court

23   today; isn't he?

24   A     Yes.

25   Q     He's the gentleman with the bow tie, sitting in the

1    second row behind me; is that correct?

2    A       That is correct.

3    Q       Now, let me ask you this question:  Do you recall . . .

4    you said that you contacted the American Institute of CPAs in

5    early 2005, when you suspected that something was wrong in your

6    employment over at Saba and EIC.

7            Do you recall that?

8    A       I was employed by EIC; but, yes, I did contact them.

9    Q       And you also contacted, you said, the Massachusetts

10   societies of CPA?

11   A       That is correct.

12   Q       I want to get a time frame when you contacted them.

13           When approximately was it that you contacted them?

14   A       I can't remember the specific date because I didn't

15   document it, but I remember speaking to the director.  His name

16   is Theodore Flynn.

17   Q       And that would be on the Massachusetts Society of CPAs?

18   A       That is correct.

19   Q       And you didn't document it, meaning you didn't take any

20   notes at the time?

21   A       Unfortunately, I didn't.

22   Q       You didn't send yourself an e-mail?

23   A       I did not.

24   Q       You said you also spoke to someone at the American

25   Institute of CPAs; is that correct?

DAVID MINCHENBERG - CROSS/HOCHMAN                113

1    A       That is correct.

2    Q       And do you remember who?

3    A       No, I do not.

4    Q       And I'm trying to get the when.  And I'll orient you,

5    there is a memo here you sent on, I believe, 2/9/05,

6    February 9th, 2005.

7    A       Okay.

8    Q       Was it before or after that memo?

9    A       I can't recall.

10   Q       Well, was it approximately around the time of that memo?

11   A       I can't remember if it was before or after.

12   Q       Well, was it within a month before or after that memo?

13   A       I can't remember the specific date.

14   Q       Was it before the August, 2005, e-mail to Dr. Fredrick

15   that discussed the memo?

16   A       I can't recall.

17   Q       Well, don't you recall, with respect to the 5471 -- I

18   think the government showed you it, the MUA Belize one -- that,

19   when you spoke to someone from the IRS service center about

20   whether or not you could -- excuse me -- Dr. Fredrick had to

21   amend his return to file a 5471, or you could mail it in to,

22   directly into the IRS, you went ahead and put that person's

23   name, Mr. Taylor, on a memo, and even put their badge number.

24           Do you recall that?

25   A       Yes.

DAVID MINCHENBERG - CROSS/HOCHMAN                    114

1   Q      Because when something is important to you, you actually

2   write down the name, the date, and the person whose -- and even

3   the badge number of the person you're talking to; correct?

4   A      I think what you need to do is understand the facts and

5   circumstances.  When I made the phone call to the American

6   institute, and the Mass. Society of CPAs, I was actually on my

7   cell phone, outside of the office.  Contrary to the point that

8   you just made, when I called the . . . IRS on behalf of

9   Dr. Fredrick, I was inside the office, on company time.  So I

10  did not go back inside, and write a memo, on company time, and

11  document when I called.

12  Q      And that's because you didn't consider it an important

13  phone call; is that correct?

14  A      That's incorrect.

15  Q      Because if you considered it an important phone call,

16  you would have at least written, somewhere, the date, the time,

17  and the person you spoke to; isn't that correct?

18  A      No.  You're making that assumption.

19  Q      Wouldn't it also be fair to say that if you considered

20  it an important phone call, you would have gone back to your

21  office, at some point after you were on the cell phone outside,

22  and written yourself a little note as to who you spoke with,

23  and what they said?

24  A      No.

25  Q      Because wouldn't it be important to memorialize, as you

1   do quite often, the fact that you just got advice to go ahead

2   and potentially leave your employment if you think that there's

3   something wrong there.

4   A       This was something that I did not document.

5   Q       Now, by the way, did the American Institute of CPAs, or

6   the Massachusetts Society of CPAs, ever tell you to steal

7   documents from your employer?

8   A       I didn't ask them the question.

9   Q       Did anyone ever tell you to steal documents from your

10  employer?

11  A       No.

12  Q       That was just your decision to steal documents from your

13  employer; correct?

14  A       Yes.

15  Q       And have you been prosecuted by the State of

16  Massachusetts for your theft of documents?

17  A       No.

18  Q       Have you been prosecuted by the U.S. Attorney -- the

19  U.S. Attorney's Office, or these government prosecutors, for

20  stealing documents from your employer?

21  A       No.

22  Q       You understand it was a crime to steal documents from

23  your employer; correct?

24  A       No.  I don't know if it was even in the handbook whether

25  I was not allowed to.  And further, many of those documents

1    were already at my house because they allowed me to work at

2    home frequently.

3    Q     When you brought the documents to your house, did they

4    become your personal documents?

5    A     No.

6    Q     They were still your employer's documents, but they were

7    located at your house; correct?

8    A     They were never asked to be returned.

9    Q     And then, at that moment in time, they became your

10   personal documents?

11   A     They were just left there.

12   Q     And with respect to the documents, though, that you took

13   from Dr. Fredrick's office, those clearly were not at your

14   home; correct?

15   A     That's correct.

16   Q     You actually walked into his office, without his

17   permission; correct?

18   A     Yes.

19   Q     Went into his cabinet drawers; is that correct?

20   A     Yes.

21   Q     And removed his documents, or the Saba Foundation -- or

22   EIC's documents, without his permission; is that correct?

23   A     That's correct.

24   Q     Did you also go into his computer, too?

25   A     No.

1   Q      Now, with respect -- by the way, did you take anything

2   besides documents from Dr. Fredrick's office?

3   A      No.

4   Q      And, to this day, have you ever been notified by the

5   government prosecutors that you were a subject of an

6   investigation for theft?

7   A      No.

8   Q      Is part of your immunity -- or shall we say that letter

9   that you got that considers you just a witness in the

10  investigation, that also covers their consideration of your

11  potential theft charges; isn't that correct?

12         MS. FINLEY:  Objection, Your Honor, mischaracterizes

13  the letter.  It is not an immunity letter.

14         THE COURT:  The objection is sustained, to the extent

15  that you used that term.

16         MR. HOCHMAN:  Sure.

17  BY MR. HOCHMAN:

18  Q      The government's been investigating all the allegations

19  that involve the documents that you took; correct?

20  A      Yes.

21  Q      And, in that investigation, the government has said, in

22  that proffer letter, that you are just a witness; correct?

23  A      Yes.

24  Q      So the government is not prosecuting you -- has told you

25  that, in exchange for "testimony," they will not prosecute you

1   in connection with your theft of these documents; correct?

2   A     That's not what the proffer letter states.

3   Q     Well, do you anticipate being prosecuted for your theft

4   of these documents?

5   A     Not to my knowledge.

6   Q     And Ms. Finley or Miss Kessler have never told you that

7   you are going to be prosecuted; is that correct?

8   A     They have never said that.

9   Q     Now, I'd like to turn your attention -- actually, before

10  we get to the documents, I want you to -- you talked about

11  Dr. Fredrick and Dr. Hough, and I'd like to focus on Dr. Hough

12  first, okay?

13        Now, you said that Dr. Hough was the clinical liaison to

14  the hospitals that the Saba school and MUA would send students

15  to, in the third and fourth years; is that correct?

16  A     Correct.

17  Q     Would you consider it sort of an academic ambassador to

18  those hospitals from the Saba school and MUA?

19  A     Do you mean her role?

20  Q     Yes.

21  A     I believe that would be a fair statement.

22  Q     She was a dean, actually, of clinical medicine, I think,

23  was her official title; is that correct?

24  A     If it's listed as such, I'll acknowledge that.  I'm not

25  sure, but --

1    Q      And Dr. Hough was also involved in the accreditation

2    side of the school's business; is that correct?

3    A      Yes.

4    Q      And that meant she went from state to state, to state,

5    or even to the Department of Education, getting accreditation

6    for the Saba school and MUA; is that correct?

7    A      Yes.

8    Q      And she was not involved with the accounting of the

9    financial side of the schools; correct?

10   A      No, she was not.

11   Q      That was yourself; is that correct?

12   A      I was part of the accounting department.  There were

13   others in the accounting department.

14   Q      And Dr. Fredrick was also involved with you as it

15   pertained to accounting or financial matters for the schools;

16   is that correct?

17   A      Yes.  As well as others.

18   Q      And Pat spent the –– excuse me –– Dr. Hough spent the

19   bulk of her time basically traveling around the United States,

20   or over to the islands of Saba or Nevis, dealing with the

21   schools, shall we say the academic side of the schools; is that

22   correct?

23   A      Yes, she did travel to the islands.

24   Q      Now, with respect to taxes, you have said that you

25   believe Dr. Hough's opinion towards taxes was that she thought

DAVID MINCHENBERG – CROSS/HOCHMAN                    120

1    she wanted to be in compliance; is that correct?

2    A      Yes.  She talked to me once, that it was something that

3    she acknowledged --

4    Q      Okay.

5    A      -- that she wanted to be in compliance with.

6    Q      And you said that you thought Dr. Hough would try to get

7    the information for her taxes, and make sure it got to the

8    right person; is that correct?

9    A      Yes; I made that statement.

10   Q      And that she did not seem to be the person who would

11   physically make sure she would do the return herself, but

12   Dr. Hough seemed to be a person that would send it to a person

13   to get it done, or at least follow through to see that it was

14   done; is that correct?

15   A      I believe that was my testimony, if you're reading it.

16   Q      But that's an accurate statement, isn't it correct?

17   A      Yes.

18   Q      And you also described Dr. Hough as someone who

19   multitasked; is that correct?

20   A      Yes.

21   Q      As someone whose mind could be in two different places

22   at the same time, such that she could be talking to you on one

23   subject, but you could tell she was also thinking about another

24   subject at the same time; is that correct?

25   A      Yes, that is correct.

1    Q      Now, with respect to the 5471s, let's focus on that.

2    The government obviously focused on that.

3           And the ones I'd like to focus on are the MUA Belize one

4    that you did for Dr. Fredrick, and then also the Round Hill

5    ones that you did for Dr. Fredrick and Dr. Hough.

6           Do you have those in mind?

7    A      I would have to review them, if you have them handy.

8    Q      Certainly.  We'll get you the documents right now.

9           If we could start with . . . .  7W, which I believe you

10   have before you.

11          MR. HOCHMAN:  And if we could put 7W, Your Honor, and

12   publish it?  I think it's in evidence?

13          THE COURT:  You may.

14          (An exhibit was projected onto the projector screen.)

15   BY MR. HOCHMAN:

16   Q      Now, before we even get into the contents of 7W, I

17   wanted to sort of go over the history of the MUA Belize 5471.

18          At some point, you come to learn that Dr. Fredrick has

19   an interest in MUA Belize; is that correct?

20   A      That is correct.

21   Q      And that's because MUA Belize was a for-profit school;

22   correct?

23   A      I can't remember.

24   Q      Well, he had shares in the school; is that correct?

25   A      That's correct.

DAVID MINCHENBERG – CROSS/HOCHMAN                    122

1    Q      Which would signify probably it was a for-profit school?

2    A      I assume so, yes.

3    Q      Well, you knew that MUA Nevis was a for-profit school;

4    is that correct?

5    A      That's correct.

6    Q      And that the Saba medical school was a Netherlands

7    Antilles foundation; is that correct?

8    A      Yes.

9    Q      So going back to MUA Belize, do you remember the story

10   of MUA Belize, that Dr. Fredrick got together with a couple

11   called the Seerslands, spelled S-E-E-R-S-L-A-N-D-S, from

12   Belize, to start the MUA Belize campus?

13   A      I believe I remember the interaction between those

14   parties.

15   Q      And that Dr. Fredrick had been involved with helping to

16   set up that campus and, in response, got a certain ownership

17   share of that campus; correct?

18   A      That's my understanding.

19   Q      And you learned of this after you started in May of

20   2004; is that correct?

21   A      That's correct.

22   Q      Now, by the way, when you were originally hired, you

23   weren't hired to do 5471s for Dr. Fredrick; correct?

24   A      That's correct.

25   Q      And you weren't hired initially to do 5471s for

DAVID MINCHENBERG - CROSS/HOCHMAN                123

1    Dr. Hough.

2    A        That's correct.

3    Q        But that's a job that you assumed while you were

4    employed there; correct?

5    A        No.

6    Q        And when I say, "do" -- I probably should be more

7    specific in my language -- you helped prepare -- or helped

8    gather the information that went into a 5471, that you then

9    send to Schneider & Associates to finally prepare; is that fair

10   to say?

11   A        That's an accurate statement.

12   Q        Thank you.

13            And that job, of helping compile the information to send

14   it to Schneider & Associates, is a job that became part of your

15   duties while you were at EIC; is that correct?

16   A        That's an accurate statement.

17   Q        Now, with respect to this 5471 for Dr. Fredrick, he

18   hadn't filed one for MUA Belize before the one you helped him

19   file; is that correct?

20   A        That's my understanding; correct.

21   Q        And when you told Dr. Fredrick that he had to file this

22   5471, and reveal to the IRS that he actually owned a percentage

23   of this foreign company, did Dr. Fredrick tell you, "No way.  I

24   want to hide my interest from the IRS"?

25   A        Well, first we need to take a few steps back, because I

1    didn't tell him about filing a 5471.  That came from

2    Schneider & Associates --

3    Q      Okay.

4    A      -- so your facts are incorrect.

5    Q      Well, let's say Schneider & Associates told him.

6           At some point, you're involved in the process every

7    gathering the information; correct?

8    A      That's correct.

9    Q      And when you're asking Dr. Fredrick for information to

10   compile his 5471 for MUA Belize, to give that information to

11   the IRS for the first time, did he say, "No way.  I'm not going

12   to give you that information.  I want to hide my interests from

13   the IRS"?

14   A      I can't remember the exact decision that took place.

15   Q      Did he say anything along those lines, that he wanted to

16   hide his interests from the IRS, so he didn't want to file the

17   5471s?

18   A      I can't remember.  It was ultimately filed late.

19   Q      Well, but ultimately he agreed, did he not, to file the

20   5471, revealing to the IRS his interests in MUA Belize;

21   correct?

22   A      Yes.

23   Q      And had he not filed this 5471, revealing his interest

24   in MUA Belize to the IRS, the IRS would never have known about

25   this particular interest; correct?

1    A     That's correct.

2    Q     And that's the whole point of him filing the 5471;

3    correct?

4    A     No.  It's a law, to the best of my understanding.  I'm

5    not an expert in the area.

6    Q     But my point is, he didn't want to keep it secret, he

7    was willing to reveal this to the IRS; correct?

8    A     I believe so, yes.

9    Q     And you weren't aware of any IRS investigation of him

10   going on, back in 2004, that he was responding to; correct?

11   A     There was no request for filing.

12   Q     So the -- when you say there was no request, so the IRS

13   had not contacted him to file it, he voluntarily filed it with

14   the IRS; is that correct?

15   A     That's correct.

16   Q     And you helped him in that process; correct?

17   A     That is correct.

18   Q     And in helping him in that process, did you believe you

19   were doing anything wrong?

20   A     No.

21   Q     And, in fact, you're the one who drafts this letter to

22   the files, "this letter" referring to Exhibit 7W, like -- well,

23   W, which is the cover letter that goes with the MUA 5471 for

24   Dr. Fredrick.

25         Do you see that?

1    A       I'm looking at it; yes.

2    Q       Good.

3           MR. HOCHMAN:  Can we highlight the very top portion

4    with the to, from, and cc, and all that?

5    BY MR. HOCHMAN:

6    Q       Now, I see there it says, "MUA Nevis"; do you see that?

7    A       Yes.

8    Q       Is that something you typed up?

9    A       Yes.

10   Q       And that's wrong; correct?

11   A       That is correct.

12   Q       You made a mistake.

13   A       I did.

14   Q       And you you're willing to admit when you make mistakes;

15   correct?

16   A       Yes.

17   Q       Even though it's on a document that's going to

18   memorialize something important like a 5471; isn't that

19   correct?

20   A       That is correct.

21   Q       And you see, if you could focus now on Paragraph 5, this

22   is where you actually memorialized, on Wednesday, December 1st,

23   2004, contacting a Mr. Taylor at the IRS, and you wrote down

24   his identification number, to obtain specific guidance on

25   whether or not Dr. Fredrick had to amend his return to file the

DAVID MINCHENBERG - CROSS/HOCHMAN                127

1   5471, or whether or not you could just send the 5471 directly

2   to the IRS; is that correct?

3   A      That's correct.

4   Q      And then you were the one who actually sent it in the

5   envelope with a certified mail receipt requested; correct?

6   A      I don't know if I'm the one that went to the post

7   office, but someone . . . .  It got mailed certified return

8   receipt mail.  I don't know if I physically went to the post

9   office with the return.

10  Q      I see.  But you got the actual, the certified receipt

11  coming back because that's your handwriting that says it was

12  received and signed for by the IRS on 12/6/04.

13         Do you see that?

14  A      That is correct.

15  Q      And then -- and again, did you think anything was false

16  with respect to that 5471 that you prepared, or that you

17  compiled information to prepare?

18  A      I believe we had discussions about certain documents

19  within it, or certain . . . ownership transfers . . . share

20  transfers.

21  Q      I'll ask the question again.

22         Did you believe that the document that you prepared,

23  this 5471, was in any way falsified?

24  A      I wasn't sure.

25  Q      You were not sure.

DAVID MINCHENBERG - CROSS/HOCHMAN                128

1              Yet you gave -- you sent in a document, or you had

2    someone send it on your behalf, a document that you were not

3    sure was truthful and accurate, to the Internal Revenue

4    Service?

5    A       I gave it to Dr. Fredrick, for him to determine whether

6    he was going to sign and file it, upon his instructions of how

7    to prepare it.

8    Q       You realize, actually, that Dr. Fredrick doesn't have to

9    sign a 5471.

10             I think you actually put that in one of your memos;

11   correct?

12   A       I'm not sure.

13   Q       Well, you're the one who sent in the 5471 to the IRS,

14   and it has no place to actually sign your name; correct?

15   A       I don't remember how the form is filled out.

16   Q       Well, let's just look at Exhibit 7V, like in "Victor."

17   And if we could put -- the cover letter was typed up by you, if

18   I recall?

19   A       That's correct.

20   Q       And in the second page, in the rest of the documents, is

21   actually the MUA Belize 5471; correct?

22   A       Yes.

23   Q       The one that you sent in to the IRS.

24   A       I didn't send it.

25   Q       The one that you gave to someone to send in to the IRS;

1    correct?

2    A       I believe so.

3    Q       And can you show me what part of this is false?

4            Let's start -- before we get there -- I'm sorry.

5            Can you look at the document -- if you want to take your

6    time to look through every line, please do -- and show me where

7    someone is expected to sign a 5471.

8                  (The witness examines an exhibit.)

9    A       I don't see a spot for a signature.

10   Q       Right.  So when you sent this in, did you believe --

11   excuse me.

12           When you caused this to be sent in, did you believe you

13   were sending in to the IRS a false document?

14   A       We had discussions, Dr. Fredrick and I, about different

15   types of share transfers, during his ownership.

16   Q       So is the information on this 5471, that you have before

17   you, in Exhibit 7V, like in "Victor," false; is there any

18   information in this document that's false, to your knowledge?

19   A       I'm not sure.

20   Q       Did you tell Dr. Fredrick he shouldn't send in this

21   document to the Internal Revenue Service?

22   A       I told him it was up to him.

23   Q       But you sent it in, or you caused --

24   A       No, I did not.  I put it in his hands.

25   Q       So you put it physically -- he reviewed it, in other

1    words.

2    A       Oh, yeah.

3    Q       And you reviewed it; correct?

4    A       I prepared what I could.  He told me what to -- what

5    changes to make on the form.

6    Q       Did you somehow aid and abet Dr. Fredrick in sending in

7    a false 5471 to the Internal Revenue Service?

8    A       I don't believe so.

9    Q       Did you ever state that you thought this document was

10   falsified?

11   A       Yes.  It's in the paperwork we earlier reviewed today.

12   Q       So did you later learn, after you sent this document in,

13   that somehow this document was falsified?

14   A       In the paperwork that was -- that was turned over to the

15   government, there may be documents that state to that effect.

16   Q       But when you wrote that, that the -- the message on,

17   apparently, 2/9/05, which is about three months after you

18   turned in this document, or you caused this document to be

19   turned in to the IRS, did you all of a sudden find out

20   something new that led to you believe that you had participated

21   with a false document being sent to the IRS?

22   A       I can't remember the exact sequence of events.

23   Q       Well, let's assume that my sequence is accurate.

24           December 2nd, 2004, you caused this to be mailed in to

25   the IRS.  You, in your own handwriting, says it was received on

1    12/6/04.

2         On 2/9/05, you write this memo that talks about the MUA

3    Belize 5471 being falsified.

4         And my question is:  Did you somehow learn something,

5    between December, '04, and February, '05, that led to you

6    believe that this document, the 5471, was falsified?

7    A    I may have.

8    Q    What was that?

9    A    I can't remember.  It might have -- it had something to

10   do with share ownership.

11   Q    Did you contact Mr. Taylor, or, for that matter, anyone

12   at the IRS, at the moment you learned that somehow this was

13   falsified, to inform them that they had received a false

14   document?

15   A    No, I didn't.

16   Q    At any point in time did you contact the Internal

17   Revenue Service, the service center, let's say -- I'll even

18   limit the point in time.

19        At any point between February of '05, until March

20   of '06, when you left your employment, do you recall contacting

21   the IRS at that point?

22   A    No, I didn't.

23   Q    How about in '07, did you contact the IRS at that point

24   and let them know that you had -- that you had -- believed now

25   that the 5471 that you were involved with, and caused to be

DAVID MINCHENBERG - CROSS/HOCHMAN                    132

1    sent to the IRS, was falsified?

2    A       No, I didn't.

3    Q       Maybe . . . by '08, you actually contacted the IRS;

4    right?

5    A       No time thereafter.

6    Q       Yet, you're somebody who likes to comply with the law;

7    correct?

8    A       Yes.

9    Q       If I can turn your attention to Exhibit 7 . . . let me

10   make sure I've got the right -- U, like in "upper."

11           (An exhibit was projected onto the projector screen.)

12           MR. HOCHMAN:  Actually, I apologize.  We'll start

13   back a little.  Start on 7S, if you could.

14           (An exhibit was projected onto the projector screen.)

15           MR. HOCHMAN:  No, actually, my bad.  It starts

16   with 7R.  These are the e-mails between you and Dr. Hough,

17   dealing with 5471s.

18           THE WITNESS:  I don't seem to have an R.

19           MS. FINLEY:  I don't think it's in evidence.

20           MR. HOCHMAN:  Oh.  Well, then, we'll just go with the

21   next one.  Let's just do 7S.  These are all multiple series of

22   the same e-mails.

23           (An exhibit was projected onto the projector screen.)

24           MR. HOCHMAN:  May I approach the witness, Your Honor?

25           THE COURT:  You may.

1              MR. HOCHMAN:  Oh, I'm sorry.  He's got it.

2    BY MR. HOCHMAN:

3    Q      Okay.  I want to get back into our sequence.

4              On December 2nd, 2004, you sent in, or caused to be sent

5    in, the MUA Belize 5471 for Dr. Fredrick; correct?

6              That was the other one we were discussing,

7    Mr. Minchenberg.

8    A      Yes.

9    Q      And on your handwritten notes, December 6, 2004, you got

10   back from the IRS acknowledgment that they had received it;

11   correct?

12   A      Yes.

13   Q      And then you have an e-mail, this is the first e-mail

14   that you're sending, which is at the bottom of 7S, that you

15   send to Dr. Hough, and I believe it was December 23rd, 2004,

16   that you sent that e-mail.

17   A      7S?

18   Q      7S, where it says, "David Minchenberg wrote"; do you see

19   that?

20   A      My 7S is December -- is January 20th.

21   Q      Well, the January 20th part is actually her response to

22   your e-mail.

23            Do you recall when you sent your e-mail?

24   A      No, I don't.

25              MR. HOCHMAN:  All right.  Your Honor, may I approach

1    with Defendant's Exhibit 73?

2              THE COURT:  You may.

3              MR. HOCHMAN:  Thank you, Your Honor.

4    BY MR. HOCHMAN:

5    Q     Is Defense Exhibit-- you can compare Defense Exhibit 73

6    to the language at the bottom of Page 1 of Exhibit 7S, that

7    starts, "David Minchenberg wrote," and then it starts,

8    "Dr. Hough, it was great speaking with you today."

9              Is this, in Defense Exhibit 73, that actual e-mail that

10   also has a date on it?

11             (The witness examines an exhibit.)

12   A     It appears to be.

13             MR. HOCHMAN:  I would move Defense Exhibit 73 into

14   evidence, Your Honor.

15             MS. FINLEY:  No objection.

16             THE COURT:  73 will be admitted.

17             (Defendant's Exhibit 73 was admitted into evidence.)

18             MR. HOCHMAN:  And I actually won't publish it, Your

19   Honor, but --

20   BY MR. HOCHMAN:

21   Q     -- because the language in Defense Exhibit 73 matches

22   the language you have in front of you, in Government's

23   Exhibit 7S; correct?

24   A     Could you repeat your question, please?

25   Q     Sure.

1          The language in Defense Exhibit 73 matches that bottom

2    portion that starts out, "David Minchenberg wrote," on the

3    first page of 7S; is that correct?

4    A     Yes.

5    Q     Okay.  Then we'll just use 7S, because it's already on

6    the screen.

7          And this is December 23rd, 2004, you're writing

8    Dr. Hough this e-mail; do you see that?

9    A     Yes.

10   Q     And if we could highlight the first -- excuse me -- the

11   second paragraph, that says, "The IRS requires . . . "?

12         And this is -- just so I understand where your knowledge

13   comes from, on what the IRS requires with a 5471, can you tell

14   the jury all of the different types of people that you talked

15   about to gain this knowledge?

16   A     Well, certainly the first point of reference would have

17   been the external accountants that we hired,

18   Schneider & Associates.

19   Q     Okay.  We have Schneider & Associates.  That would be

20   one.

21         Who else?

22   A     Obviously, what little I learned from reading the

23   instructions --

24   Q     Okay.

25   A     -- okay?

1    Q        Maybe Price Waterhouse at some point?

2    A        Correct.

3    Q        Deloitte & Touche?

4    A        Correct.

5    Q        And Price Waterhouse and Deloitte & Touche are one of

6    what they call "The Big Four" accounting firms in the United

7    States; correct?

8    A        Yes.

9    Q        And you had connections with people who were still

10   working at those firms; correct?

11   A        Yes.

12   Q        And you called them to inform yourself of all the

13   requirements for a 5471, and the related type of issues;

14   correct?

15   A        Not necessarily.  Those were people, as we spoke about

16   earlier today, that I sent out the RFP --

17   Q        Ah.

18   A        -- in the fall.  And I didn't speak necessarily

19   with . . . with international tax experts, the people that I

20   knew, that could possibly . . . be engaged for that RFP

21   program.

22   Q        I see.  And these are the people that have this

23   international tax expertise that you do not have.

24   A        Not necessarily.  These were people that I knew, that

25   could engage the international tax experts.  Again, as I

1    mentioned, these are very specialized firms, just as -- are you

2    a criminal defense attorney?

3    Q      Unfortunately, you can't ask me questions.  This is a

4    one-way street.

5    A      Okay.  But it would be like if this is a criminal

6    defense attorney, it would be like asking you for state laws

7    for generation tax on Q-tip trusts.

8    Q      Did you also ask a gentlemen named Peter Glickage, at

9    Davis law firm, questions about international tax?

10   A      He was engaged -- the answer is yes.

11   Q      So when you're giving this answer to Dr. Hough, this is

12   an answer that you had educated yourself on before you gave

13   this answer to Dr. Hough; correct?

14   A      In a short period of time.  And would I consider this a

15   very small amount of lay knowledge in the area.

16   Q      Very good.

17          And it says here that the IRS requires that, if a U.S.

18   citizen owns an interest in a foreign entity, they must file

19   the Form 5471 with their annual tax return.

20          Do you see that?

21   A      Yes.

22   Q      And you're talking about it being an informational

23   document.

24          And by "informational document," you mean, when you file

25   this document, you actually don't owe tax on this document; is

1    that correct?

2    A      That was my understanding.

3    Q      It's just a disclosure document; is that correct?

4    A      That was my understanding.

5    Q      And, in fact, it says that, generally, U.citizens are

6    allowed to own foreign entities.

7           Was that your understanding as well?

8    A      That was my understanding.

9    Q      And you communicated that to Dr. Hough?

10   A      Correct.

11   Q      And then you said, usually the only time a tax is

12   triggered, is when the U.S. citizen brings money, in the form

13   of profits, gains, et cetera, back into the United States.

14          Do you see that?

15   A      Yes.  That's my understanding.

16   Q      And you also told Dr. Hough in this e-mail that said:

17   "If the citizen is the beneficiary of said profits, gains,

18   et cetera, and keeps those funds offshore, and doesn't bring

19   them back into the U.S., then there are generally no taxes

20   incurred by the U.S. citizen."

21          Do you see that?

22   A      That's exactly what I wrote.

23   Q      And then you asked her, in December 23rd, 2004, to . . .

24   or you informed her that you thought she was going to have to

25   deal with the requirements of 5471s with respect to any

1   interest she would have had in Round Hill Holdings and MUA, do

2   you see that, which is a summary, sort of, of the next

3   paragraph -- the next two paragraphs.

4   A       Yes, I see that.  I'm sorry.  I see that.

5   Q       Now, Dr. Hough actually gets back to you, doesn't she?

6           And -- actually, at the very top of the screen, which is

7   in the middle of Exhibit 7S, Dr. Hough gets back to you and

8   says -- and she says this about -- let's see December 23rd,

9   January 20th, about a month later, in 2005, she writes:

10          "Dear David, I know you are busy with loans, et cetera.

11  Where are we at with filing?

12          "Sincerely, Dr. H."

13          Correct?

14  A       That's her response.

15  Q       Because between December 23rd, 2004, and January 20th,

16  2005, she wanted to get going and comply with your request, but

17  you were very busy and hadn't gotten back to her; is that

18  correct?

19  A       Well, I had sent her this response.  That was her reply.

20  I had sent her a quick synopsis.

21  Q       Right.  And she wanted to get going with the filing;

22  correct?

23  A       She's asking that question.

24  Q       And your response actually is at -- you say:

25  "Dr. Hough, if it would be helpful" -- and now the top of the

1    screen:

2           "Dr. Hough, if it would be helpful, I will write up a

3    summary, about two pages or so, of the dynamics that we are

4    facing, the decisions to be made.  I can get it to you on

5    Saturday.  Once completed, I'll contact to you in Florida to

6    find out if it's better to e-mail it to you or fax it to you."

7           Correct?

8    A     That was my response to her on the same day.

9    Q     And her response to you was:

10          "David, this is not urgent.  We should sit down and talk

11   about it when I get back.  Dr. H."

12          Correct?  If you need to look for it, it's at 7T.

13   A     Okay.  Can you give me a moment, please?

14   Q     Sure.

15   A     I trust you, but I'd like to see it.

16   Q     T, like in "Thomas."

17   A     No.  They're just not alphabetically organized.  I'm

18   sorry.

19   Q     I get that.

20   A     I don't seem to have it.

21          MR. HOCHMAN:  May I approach, Your Honor?

22          THE COURT:  You may.  Although 7T is not admitted.

23          MR. HOCHMAN:  Oh, it's not admitted.  All right.  Let

24   me see if I can find it somewhere else.

25          Ah.  Go back to 7S.  I'm sorry, no.  It's on 7T.

1              You don't have 7T?

2              MS. KESSLER:  We can't find T.

3              MR. HOCHMAN:  All right.  Do you have 7Q before you?

4              THE WITNESS:  Just give me a minute.  I'll keep

5    looking.

6              MR. HOCHMAN:  Yeah.  I think 7Q you have.  That's the

7    problem with e-mails.

8    BY MR. HOCHMAN:

9    Q     And if you could look down at the bottom of 7Q --

10   A     Yes, sir.

11   Q     -- where it says January 21st, 2005, an e-mail from

12   Patricia Hough to David Minchenberg, and says:

13         "David, this is not urgent, we should sit down and talk

14   when I get back, Dr. H."

15         Do you see that?

16   A     Just give me a second to review this, please.

17   Q     Certainly.

18         (The witness examines an exhibit.)

19   BY MR. HOCHMAN:

20   Q     And I'd ask you to look at the time of these e-mails,

21   because I think what was happening is that e-mails were

22   overlapping e-mails, and the only way to put them together

23   sequentially is to look at the time.

24   A     Correct.  But there seems to be a difference in the

25   e-mails.

1          MR. HOCHMAN:  You know what?  I'll move on, Your

2     Honor.  I think the e-mails will speak for themselves, and we

3     can track it through that way.

4     BY MR. HOCHMAN:

5     Q     And eventually you do meet with Dr. Hough concerning

6     5471s; is that correct?

7     A     I recall having one meeting in her office.

8     Q     And do you recall that Dr. Hough was then cooperative in

9     trying to get you financial information to repair the -- to

10    prepare the Round Hill 5471?

11    A     I believe she did get me some information.  I forget

12    whether it was financial information or . . . ownership, or

13    original, like . . . like organizational papers, something of

14    that nature she got from the islands.  But she was cooperative.

15    Q     And that's because you had advised her that 5471 for

16    Round Hill was a requirement of the IRS, and she was trying to

17    comply with your advice; is that correct?

18    A     Yes.  Well, and I take a step back.  Long before myself,

19    Schneider & Associates advised both Dr. Fredrick and Dr. Hough

20    that filing a 5471 was mandatory.

21    Q     But you -- filing 5471s is mandatory, but you had

22    identified Round Hill as one of the 5471s that she needed to

23    comply with, and you -- and she was following your advice and

24    helping you put that together; is that correct?

25    A     I didn't identify Round Hill.  Dr. Fredrick gave me a

DAVID MINCHENBERG - CROSS/HOCHMAN                    143

1    listing of all foreign companies that had exposure that they

2    needed to comply with.  He gave a listing of companies that

3    needed to be complied with.

4    Q      Ah.  And so Dr. Fredrick was trying to give a list of

5    companies that 5471s would get completed for; correct?

6    A      That's correct.

7    Q      In order to tell the IRS that he had interest in these

8    companies; correct?

9    A      Yes.

10   Q      And if it was Dr. Hough, that she had an interest in the

11   company; correct?

12   A      I don't know what discussions took place between those

13   parties.

14   Q      Well . . . I'll move on.

15          Did you then prepare the 5471s for Dr. Hough and

16   Dr. Fredrick with respect to Round Hill?

17   A      I can't remember about Round Hill.

18          MR. HOCHMAN:  Would it -- Your Honor, may I

19   show . . . .  At this point . . . .

20          THE COURT:  You may.

21          MR. HOCHMAN:  Thank you.  79 is already in evidence,

22   Your Honor, and I'll be adding 80 to it as well, as well as

23   Government's Exhibit-- Defense Exhibit 88.

24          THE COURT:  Tell me those numbers again, please.

25          MR. HOCHMAN:  I'm sorry?

1          THE COURT:  Tell me the numbers again.

2          MR. HOCHMAN:   79 is already in; 80, we are going to

3     add to it, as well as 88.

4          (Mr. Hochman confers with the Courtroom Deputy

5        privately.)

6          MS. FINLEY:  Before we do this, may I approach?

7          THE COURT:  You may.

8                          AT SIDEBAR

9          MS. FINLEY:  May I ask that Mr. Hochman lay a

10    foundation?  Because these are not Mr. Minchenberg's documents,

11    these are Mr. Schneider's documents.  So I don't know that we

12    can establish that they are complete or maybe he sent them to

13    him, but he had an opportunity to establish foundation for

14    these documents yesterday when Mr. Schneider was here.

15         MR. HOCHMAN:  And the foundation is that this is

16    Mr. Minchenberg's handwriting.  I think he will be able to

17    recognize it.

18         THE COURT:  Okay.  You can try.

19                       IN OPEN COURT

20         MR. HOCHMAN:  And I'm also going to present the

21    witness with Exhibit 78, which is already admitted into

22    evidence.  It's right here.

23    BY MR. HOCHMAN:

24    Q     If you could take just a brief moment and go through

25    Exhibit 78, 79, 80, and 88, and just -- what I am going to ask

1    you, the question is if you can identify your own handwriting

2    in these various exhibits.  You can start with the top one.

3    A       Okay.  So 80, first?

4    Q       Yes.

5    A       That's what you put in front of me, so we're going to

6    start with 80 first?

7    Q       Let's start with 80 first.

8    A       Okay.

9            (The witness examines an exhibit.)

10   Q       And do you recognize that handwriting?

11   A       Yes.  That's my handwriting.

12   Q       And is 80 the 5471 that you prepared for Dr. Patricia

13   Hough with respect to Round Hill Holding Company, N.V.?

14   A       I'm just looking for the -- yes, it appears so.

15           MR. HOCHMAN:  I would move Defense Exhibit 80 into

16   evidence, Your Honor.

17           THE COURT:  Any objections?

18           MS. FINLEY:  No objection, Your Honor.

19           THE COURT:  Exhibit 80 will be admitted.

20           (Defendant's Exhibit 80 was admitted into evidence.)

21           MR. HOCHMAN:  And we don't have to publish it, Your

22   Honor.  I would just ask the witness to turn to Page 3 of that

23   document.

24   BY MR. HOCHMAN:

25   Q       And do you see that it's identified, Dr. Patricia Hough

1    and Dr. Fredrick, under the U.S. shareholders of a foreign

2    corporation; do you see that?

3    A       Schedule B, sir?

4    Q       Schedule B, yes.

5    A       Yes, I'm looking at that.

6    Q       And do they have an equal ownership of this foreign

7    corporation?

8    A       That's correct.

9    Q       Fifty shares each?

10   A       That's correct.

11   Q       So that would mean that their percentage of ownership is

12   50 percent each?

13   A       That would be correct.

14   Q       If you could turn to Exhibit 79.

15           And, I'm sorry, with Exhibit 80, that was for 2002; is

16   that correct?

17   A       Yes.

18   Q       Please turn to Exhibit 79 then.

19   A       And again, these were drafts that were sent to, I

20   believe, Schneider & Associates, for review.

21   Q       You actually guessed my fourth question from now, but

22   we'll get there.

23           When you completed these drafts, you send them to

24   Mr. Schneider for review; correct?

25   A       And corrections if necessary.

1    Q      And corrections if necessary.

2           And to actually type out the information onto a 5471

3    that would be submitted to the IRS; correct?

4    A      That's not my understanding.  I thought that he would

5    fully prepare them, review them, make any necessary

6    corrections, because I've never really gone through the

7    process, and communicate with Dr. Fredrick and Dr. Hough about

8    then how to proceed with the filing with their personal

9    accountant.  I, again, was never involved in those discussions.

10   Q      Right.  But you were involved in a 5471 process once

11   before, with the MUA Belize 5471; correct?

12   A      I looked at that as separate and distinct from these

13   entities.

14   Q      But the process is the same, correct?

15          You gather information, you put it on a form, you give

16   it to Mr. Schneider, he types it up, and then he, you know,

17   gives it back to whomever, to file with the IRS; correct?

18   A      I think you need to make a clear and separate

19   distinction.  The 5471 that was filed for Belize was the filing

20   for one year.  This was the filing of late returns for multiple

21   entities, for multiple years, going back many, many years, for

22   upwards -- you're just talking about Round Hill Holdings, but

23   there was Round Hill Holdings, MUA, Dr. Fredrick talked about

24   other entities.  I was never involved in the discussions about

25   how Dr. Fredrick and Dr. Hough were going to . . . file these

1   returns with the Internal Revenue Service.

2   Q     Did you think that Dr. Fredrick and Dr. Hough were

3   asking you to compile these returns in order to stick them in

4   their file cabinet and not turn them over to the IRS?

5   A     It was my advice for them to comply and file these

6   returns.

7   Q     And they were following your advice; isn't that correct?

8   A     I hoped that they were.  I left my employment, and --

9   before they filed, I guess.  I don't know.

10  Q     You don't know one way or the other --

11  A     I don't know what the ultimate end result was.

12  Q     So you didn't know that Mr. Schneider sent these returns

13  to Dr. Hough's lawyer, and asked that lawyer to send them --

14  excuse me -- file them with the IRS; correct?

15  A     I don't know what happened after I left.

16  Q     Got it.

17        And again, just to be clear with Exhibit 79, do you

18  recognize your handwriting as having prepared the 2001 5471 for

19  Dr. Patricia Hough, and Dr. David Fredrick?

20  A     That's correct.

21  Q     And if we can turn to Exhibit . . . . 88, I believe?

22  A     Okay.  I was just reviewing that, 88.

23  Q     Do you recognize Exhibit 88?

24  A     Just give me a moment.

25  Q     Oh, I'm sorry.

1    A       That's okay.  Hold on a second . . . 79, 78, 80, 88.

2            Okay.

3    Q       And is 88 the 2003 -- and I think the 2004 -- Round Hill

4    Holdings draft 5471s that you prepared for Doctors Fredrick and

5    Hough?

6    A       Just let me review them, please.

7            (The witness examines an exhibit.)

8    A       Could you repeat your question as I am going through

9    this, please?

10   Q       Sure.  Do you recognize your handwriting on the 2003 and

11   2004, 54 -- actually, let me confirm that it's 2004 -- excuse

12   me, just 2003, 5471s for Dr. Fredrick and Hough relating to

13   Round Hill Holdings . . . .   Round Hill Holdings Company, N.V.?

14   A       Yes, 2003 is in this bundle . . . for the calendar year.

15   Q       And that's your handwriting in this document; correct?

16   A       Yes, it is.

17           MR. HOCHMAN:  Your Honor, move Defense Exhibit 88

18   into evidence.

19               THE COURT:  Any objections?

20               MS. FINLEY:  No objection.

21               THE COURT:  88 will be admitted.

22           (Defendant's Exhibit 88 was admitted into evidence.)

23   BY MR. HOCHMAN:

24   Q       Now, if someone wanted to keep the existence -- or their

25   shares in ownership of a foreign corporation a secret, the last

1    thing you would do would be send in the 5471s to the Internal

2    Revenue Service, revealing your ownership of that particular

3    foreign corporation; correct?

4    A     I would assume so.

5    Q     Correct, isn't it?  It's not even an assumption.  My

6    statement is correct:  The last thing you would do if you want

7    to keep it as a secret is -- a secret from the IRS is send in

8    these 5471s, advising them of your interest in the foreign

9    corporations.

10          Is that correct?

11   A     That's a correct statement.

12   Q     All right.  Let's turn, if we could, to -- where did it

13   go -- 7K, the tax fraud memo.

14          (The witness examines an exhibit.)

15          MR. HOCHMAN:  And if we could put that up on the

16   screen, Your Honor?

17          THE COURT:  You may.

18          (An exhibit was projected onto the projector screen.)

19   BY MR. HOCHMAN:

20   Q     Now, you said that you had a meeting with Dr. Fredrick,

21   in connection with this memo, back in February of 2005;

22   correct?

23   A     That's correct.

24   Q     Dr. Hough was not at that meeting; correct?

25   A     That is correct.

1   Q      You also said, later, that you send Dr. Fredrick a copy

2   of this memo in August of 2005; correct?

3   A      That's correct.

4   Q      Now, and could you describe, again, who all the people

5   you bcc'd with this memo?

6   A      Again, I don't have the attachment of the bcc, so I will

7   try to go off memory.  I copied myself, at home; my attorney;

8   one of the directors of Saba, who's a CPA; my sister; my wife;

9   jerry Schneider; Dean Hiltzik; and it was sent directly to

10  Dr. Fredrick.

11         To the best of my memory, those are the addressees that

12  it was sent to.

13  Q      And "bcc," by the way, means "blind carbon copy"?

14  A      Yes.

15  Q      That means that when you are sending it to Dr. Fredrick,

16  as we saw in the e-mail, he's not going to see all these other

17  people that you are blind carbon copying, or bcc'ing it to;

18  correct?

19  A      Yes.

20  Q      And the one name that I didn't hear when you listed all

21  these people that you sent this memo to was Dr. Patricia Hough;

22  is that correct?

23  A      That is correct.

24  Q      And you never sent this memo in August, either, to

25  Dr. Patricia Hough; is that correct?

DAVID MINCHENBERG - CROSS/HOCHMAN                     152

1    A      That's correct.

2    Q      Now, when you were -- now, if we look at what this memo

3    is saying, and what you say later, you say, "I hate to use that

4    language, but I can't sugarcoat it, tax fraud is being

5    committed," you believed that tax fraud was being committed

6    because the 5471s were not being filed; correct?

7    A      At that time, correct.

8    Q      At that time.

9           This memo has absolutely nothing do with foreign bank

10   reporting requirements; correct?

11   A      That's correct.

12   Q      Because you don't know anything about foreign bank

13   reporting requirements; correct?

14   A      That's correct.

15   Q      So the issues that are here, in this trial, dealing with

16   foreign bank reporting requirements, have nothing to do with

17   this memo; is that correct?

18   A      Could you restate your question, please?

19   Q      Sure.

20          The issues at this trial that deal with foreign bank

21   reporting requirements have nothing to with your memo; correct?

22              MS. FINLEY:  Objection, Your Honor, as to his

23   knowledge as to what this trial is about.

24              THE COURT:  Sustained.

25

1    BY MR. HOCHMAN:

2    Q      Now, you say on -- if I can turn to the third page of

3    this memo, and if we can focus on that first paragraph.  All

4    right.

5           This is where you list all the various people that you

6    have gotten significant research and opinions from; correct?

7    A      Okay.  I'm going to read it from here.  It's a little

8    easier than turning my neck.

9    Q      If I ask you a question that requires you to read it,

10   please just read it.

11   A      Oh, okay.

12   Q      But what I'm saying first, in the first paragraph you

13   list the people that you have consulted with to come up with

14   your opinion; correct?

15   A      That's correct.

16   Q      Again, PricewaterhouseCoopers, and Deloitte & Touche,

17   these are two of the Big Four accounting firms in the world.

18   A      That is correct.

19   Q      And Peter Glickage, this is a person that is a lawyer at

20   Davies Ward, a big New York firm; correct?

21   A      That's correct.

22   Q      And by the way, we were talking before about the issue

23   of whether or not there are U.S. tax ramifications to Saba

24   school's business; is that correct?

25   A      Not just Saba school's, but MUA.

DAVID MINCHENBERG – CROSS/HOCHMAN                    154

1    Q      Let's start with Saba school -- actually, let's group it

2    together.  We'll do Saba school and MUA together.

3           Did you consult with Mr. Glickage to get an opinion from

4    his firm as to whether or not the Saba school or MUA was going

5    to owe U.S. tax, based on its operations?

6           MS. FINLEY:  Your Honor, may we just approach on

7    this, on a separate item as well?

8           THE COURT:  You may.

9                            AT SIDEBAR

10          MS. FINLEY:  I'm not sure yet where Mr. Hochman is

11   going, but the memos that are at issue here have not been

12   provided to the government because both Dr. Fredrick and

13   Dr. Hough claimed privilege during the investigation with

14   respect to these memos.  So I have concern that, if we begin to

15   get into it, that there is attorney/client information that

16   Dr. Fredrick has not waived, but there are other implications.

17   There's a boatload of other information that the government may

18   then get by waiving the privilege.  I just want to make sure,

19   if we're getting into the advice, and the privilege is going to

20   be waived.

21          MR. HOCHMAN:  Surely.  And Mr. Minchenberg isn't the

22   client.  And if an attorney provided information to

23   Mr. Minchenberg, he's not providing it by way of an

24   attorney/client communication.

25          And as it pertains to Dr. Hough -- and with respect

1    to the memo itself, I'm not going to go into the contents of

2    the memo. I'm going to ask this witness whether or not he's

3    aware of -- he's aware of a tax opinion being made that said

4    that the Saba school and MUA do not owe U.S. taxes, which I

5    believe his answer will be yes.

6            THE COURT:  And the tax opinion that you and he are

7    referring to is what opinion?

8            MR. HOCHMAN:  This is an opinion that Mr. Glickage

9    made upon request, actually, of Mr. Minchenberg, on behalf of

10   the Saba school.  So, if anything, at this point, the Saba

11   school, itself, holds the privilege, not Mr. Minchenberg.  And

12   Dr. Hough, to the extent that she has a privilege in this,

13   she's willing to waive her privilege.  And the Saba school has

14   never asserted privilege.  And Dr. Fredrick may have a

15   privilege, but he's not here to assert it, if he wants to.

16           MS. FINLEY:  But, Your Honor, during the course of

17   the grand jury investigation, Dr. Fredrick did assert the

18   privilege because the government did not receive it.  And I

19   believe, based on . . . .

20           THE COURT:  Who has it now?

21           MS. FINLEY:  The taint team, the privilege team, who

22   was reviewing the records.

23           THE COURT:  So that's one of the items you haven't

24   seen.

25           MS. FINLEY:  I have not seen it.

1          MR. HOCHMAN:  And I don't intend to elicit the

2    contents of the memo, just whether or not this particular

3    witness knows, one way or the other, whether or not the Saba

4    school and MUA have any U.S. tax obligations.

5          THE COURT:  Which is the content of the memo.

6          MR. HOCHMAN:  Well, it's the content of a memo that

7    was written to the Saba school.  So if there's a client out

8    there, that is out there that has a privilege, it would be the

9    Saba school.  And if it was revealed to Mr. Minchenberg, he's

10   not the client.

11         THE COURT:  So do you have the memo?

12         MR. HOCHMAN:  I received a copy, from the taint team,

13   of the memo.  I'm happy to share with the government right now.

14         MS. FINLEY:  Well, the government has concern about

15   taking it, because Dr. Fredrick has not waived the privilege,

16   and we understood that Dr. Fredrick and Dr. Hough would be the

17   people that could waive the privilege on behalf of The

18   Foundation.  And so the argument, I believe, he's making now is

19   inconsistent with the arguments that he was making to the taint

20   team, because if Mr. Minchenberg is on the memo, then it should

21   not have been privileged during the taint review.

22         MR. HOCHMAN:  Mr. Minchenberg received the memo.  How

23   he received the memo --

24         MS. FINLEY:  But if it was disclosed to a third

25   party, he was not -- if you're claiming he was not part of the

1  representation, then the letter is not privileged at that

2  point.  Because Saba would have waived it.  And so during the

3  taint review you would not -- you shouldn't have even asserted

4  it.

5          MR. HOCHMAN:  The government went into this area,

6  Your Honor, by asking --

7          THE COURT:  Hang on a second.  We're kind of past the

8  taint team, as far as I see it.  Dr. Fredrick might have

9  forfeited whatever privilege he may have by being a fugitive.

10  If the government doesn't want to receive a copy of the memo

11  because of concerns you have, that's fine.  I mean, you don't

12  have to.

13          The question you want to elicit from the witness is

14  whether he's aware of this memorandum --

15          MR. HOCHMAN:  Right.

16          THE COURT:  -- and that the opinion is that there's

17  no tax consequences?

18          MR. HOCHMAN:  Correct.  Because the government

19  raised, in direct, with him, the fact that he was looking into

20  this issue, with the implication that, somehow, in these -- in

21  this substantive reform, when the whole thing collapses, that

22  the Saba school and Dr. Fredrick would owe a lot of money, he

23  actually got a real opinion, to answer that question.

24          THE COURT:  When you say "he" got a real opinion,

25  you're talking about the witness.

1          MR. HOCHMAN:  Yes.

2          THE COURT:  All right.  What's the government's

3    position once you get past the privilege?

4          MS. FINLEY:  I think, if we get past the privilege,

5    then presuming that Dr. Fredrick waives his right to assert

6    attorney/client privilege by not being here with respect to

7    this letter --

8          THE COURT:  That's my holding.

9          MS. FINLEY:  Then I think it -- then they can go into

10    it, and you can see the letter.  Based upon -- we would be

11    relying on the Court's ruling on that.

12          THE COURT:  Well, you know, you rely at your peril, I

13    suppose.

14          But . . . .  If the government requests you to

15    produce a copy -- I'm looking at defense counsel, for the

16    record -- of the memorandum, you are to do so.  If they do

17    not -- and as I said, I'll leave that up to them as to whether

18    they want to view it or not.  At some point you may want to put

19    your decision on the record, so the record reflects whether you

20    have seen it or not.

21          Regardless of their decision, the objection is

22    overruled, and you may make the inquiry.

23          MR. HOCHMAN:  Okay.

24          MS. FINLEY:  Does that mean that Dr. Hough is waiving

25    with respect to any other materials that may be in the

1    possession of the taint team that have to do with what was

2    provided to Mr. Glickage, or whoever wrote the opinion that

3    we're going to talk about now, so that the government --

4              MR. HOCHMAN:  Yes.

5              THE COURT:  Okay.

6                        IN OPEN COURT

7              THE COURT:  You may proceed.

8    BY MR. HOCHMAN:

9    Q     I think we were focused on, if we could put it back on

10   the screen, Mr. Glickage.

11         And you had dealings with Mr. Glickage; is that correct?

12   A     I believe I only had one conversation with him.

13   Q     And Mr. Glickage, to your knowledge, informed you that,

14   with respect to the Saba school and MUA, that at least he and

15   his law firm did not believe that there was U.S. tax due and

16   owing for the business that Saba and MUA were doing in the

17   United States; is that correct?

18   A     That's incorrect.

19   Q     That's incorrect.

20         What did Mr. Glickage inform you?

21   A     I never got a straight answer from Mr. Glickage.

22   Mr. Glickage was engaged by Schneider & Associates to work on

23   international tax exposure.  I believe, to the best of my

24   knowledge, I reached out to Mr. Glickage, trying to get that

25   specific answer in a written, formal, case-study type of

1    information.

2    Q      Right.

3    A      And I can't remember if I got a formal written-up

4    documentation, to my satisfaction, whether the schools or not

5    had tax exposure.

6                  MR. HOCHMAN:  May I approach with what's been marked

7    as Defendant's Exhibit Number 70?

8                  THE COURT:  You may.

9                  (The witness examines an exhibit.)

10   BY MR. HOCHMAN

11   Q      If you can take a moment and look at Defendant's

12   Exhibit 70?

13   A      Okay.

14   Q      And does Defendant's Exhibit 70 refresh your

15   recollection as to whether Mr. Glickage looked into the issue

16   as to whether or not Saba school was going to be subject to

17   U.S. federal income taxation?

18                  (The witness examines an exhibit.)

19   A      In my reading of this, it could go either way.

20   Q      And with respect to your reading of this, that could go

21   either way, are you aware of Mr. Glickage's conclusion that:

22   We believe that the Saba school should not be considered to be

23   engaged in a trade or business within the U.S., and so should

24   not be subject to tax on a net income basis under Section 882?

25                  Are you aware of that conclusion?

1          MS. FINLEY:  Objection, Your Honor, I think he said

2    it could go either way.  Foundation.

3          THE COURT:  The objection is overruled.

4          THE WITNESS:  I read this.  And again, Mr. Glickage

5    has more experience in international taxation than myself.  And

6    I looked up the code section, and I thought that this was a

7    very vague conclusion and writeup to support the effect of

8    trade or business.

9    BY MR. HOCHMAN:

10   Q     It might be vague, but did you have greater expertise

11   than Mr. Glickage?

12   A     No.

13   Q     Now, going back to the memo, if we could?

14         And if we can look at the last three sentences in the

15   first paragraph?

16         Now, you talked about certain criminal statutes, do you

17   see that, the statutes dealing with willful failure, a

18   misdemeanor, and purpose to evade felony; do you see that?

19   A     Which page is this on in my document, so I can read it?

20   Q     Page 3 of 7K.

21         Do you see that?

22   A     I'm on Page 3.

23   Q     Bottom of the first paragraph?

24   A     Yes.  I'm right there.  Thank you.

25   Q     You cite two different statutes:  Wilful failure to file

1    a misdemeanor, and privilege to evade felony charges; do you

2    see that?

3    A       Yes.

4    Q       Both of those relate to the 5471 issue; correct?

5    A       That is correct.

6    Q       They don't relate to foreign bank account reporting

7    requirements; correct?

8    A       That is correct.

9    Q       And you say -- now, are you a criminal -- you asked

10   me -- are you a criminal defense lawyer?

11   A       No, I'm not.

12   Q       Did you consult with a criminal defense lawyer before

13   writing this memo?

14   A       I read the code section.

15   Q       And did the code section have stuff dealing with the

16   statute of limitations?

17   A       I don't remember reading that portion.  It may have.

18   Q       So when you say these charges do not have any statute of

19   limitations, you're mistaken, aren't you.

20   A       I'm not sure.

21   Q       So you put something down, in writing, in a document

22   this important, where you're accusing -- or raising the

23   suggestion of tax fraud, and you're not sure about the issue of

24   statute of limitations?

25   A       Typically, it was my understanding that fraud does not

1    have a statute of limitations.

2    Q      Civil fraud does not have a statute of limitations, but

3    criminal fraud does; correct?

4    A      I'm not sure.

5    Q      Well, if all they owed was money back, then there would

6    be no statute of limitations; correct?

7    A      I'm not sure.

8    Q      And you −− so when you actually wrote these words down,

9    you wrote them down just based on a guess?

10   A      No.  As I said, generally, fraud has no statute of

11   limitations.  That was my understanding.

12   Q      Did you actually −− you actually pulled the two

13   sections, 7201 and 7203.

14          Did you bother to actually look up the statute of

15   limitations for either one of these criminal sections of the

16   tax code?

17   A      Not while I was reading the section.

18   Q      Okay.  How about right after you read the section, but

19   before you wrote the memo, did you bother to go ahead and look

20   up the statute of limitations?

21   A      No, I didn't.

22   Q      And are you aware that 26 USC 7201, dealing with tax

23   evasion, and 26 USC 7203, dealing with the willful failure to

24   file a tax return, are none of the charges that have been

25   charged in this case?

1   A       I didn't read the indictment of this case.

2   Q       If we could turn to Page . . . 4 of this memo?  And I'll

3   focus on the bottom part, with tax compliance.

4           Oh, I'm sorry.  Before we get to Page 4, let's go to

5   Page 3, and we'll go to the bottom of 3, last paragraph.  This

6   is, I think, what we discussed earlier.  This is your

7   February 9, 2005, memo, and there you put it, in writing,

8   further, the filing of MUA Belize 5471 was falsified.

9           Did you believe, at that moment in time, on February 9,

10  2005, that you had participated in the compilation of a false

11  5471, that you knew was sent to the IRS?

12  A       If I wrote it, I believed it.

13  Q       And did you take any steps to alert the IRS, thereafter,

14  that you had submitted a -- or participated in the submission

15  of a false 5471 to the IRS?

16  A       I've answered this question.  I said no, from that point

17  thereafter.

18  Q       Now, turn to the next page, if you could.  And on your

19  tax compliance, you list four different companies that you

20  believe the 5471s -- excuse me -- well, as part of this memo,

21  you believed the 5471s need to be submitted for; correct?

22  A       That was the list given to me by Dr. Fredrick.

23  Q       MUA, Round Hill, Apex, and what is TSI?

24  A       I don't know.

25  Q       Could that have been ESI?

1          Because you do know of an ESI, don't you?

2   A       Correct.

3   Q       Is that just another mistake you made, by calling one of

4   these companies TSI instead of ESI?

5   A       I don't believe so.

6   Q       So you think there's two different companies, an ESI and

7   a TSI?

8   A       I'm not sure.  This was a list given to me by

9   Dr. Fredrick.

10  Q       And are you aware of Dr. Fredrick being affiliated with

11  an ESI, Education Supply -- I forgot what the I stands for,

12  Education Supply, with an I.

13  A       I saw invoices in my audit of that company.

14  Q       And in your audit did you see any TSI, Dr. Fredrick

15  company?

16  A       No.  But I never saw anything for Apex either.

17  Q       So this is your mistake, though, writing down the wrong

18  name.

19  A       No.  You're claiming it's a mistake.  I was given a list

20  by Dr. Fredrick.

21  Q       Now, you see, in the -- on the bottom of this, where it

22  says, "data needed for completion, Number 1, MUA all set";

23  correct?

24  A       That's what I typed; correct.

25  Q       And that meant you had all the information that you

1  needed to complete the MUA 5471s; correct?

2  A     That's what I'm stating.

3  Q     I'm sorry?

4  A     I said, that's what I stated.

5  Q     Turn the page, please, and the top paragraph, if we

6  could highlight that?

7        And with Round Hill, Apex and TSI, you basically, for

8  each one of those, state:  I will produce the financial

9  statements.

10        Correct?

11  A     Correct.

12  Q     Because that was your goal, was to help Dr. Fredrick and

13  Dr. Hough comply with the IRS and file these 5471s; correct?

14  A     Yes.

15  Q     If we could turn to 7G, please, like in "George"?

16        Do you have it in front of you?

17  A     Yes, I do.

18  Q     Now, this is the proposed restructuring memo that you

19  issue at the end of 2004; do you see that?

20  A     Yes, I do.

21  Q     And while you say that there's a primary overriding goal

22  about establishing a structure that would be positioned for a

23  trigger event, you also said that there was a secondary

24  overriding goal; correct?

25              (The witness examines an exhibit.)

1              MR. HOCHMAN:  And if we could focus on the third

2    paragraph, and highlight the last part of the last sentence,

3    that starts with, "The second overriding goal."

4    BY MR. HOCHMAN:

5    Q      Do you see that sentence?

6    A      Yes, I do.

7    Q      You talk about the words, "maximizing asset protection."

8           Can you explain to the jury what you meant?

9    A      Yes.  And I want to be very clear.

10          The way I view asset protection as a comptroller, or a

11   CFO of a company, is to protect the financial assets of the

12   business in the event of some type of a catastrophic event.  In

13   other words, if there were to be a significant lawsuit, or a

14   calamity, the --

15   Q      Let me stop you there.

16   A      No, you're not letting my finish the question, sir.

17   Q      I just wanted to ask you if you would consider a lawsuit

18   for $150 million a significant event.

19   A      It depends what the lawsuit was for.

20   Q      Well, let's say it was for . . . defamation, and they

21   were asking for $150 million, would you consider that a

22   significant event?

23   A      Yeah.

24   Q      Okay.  Continue on, please.

25   A      But based upon the nature of this business, looking at

1    safeguarding, like a prudent comptroller would, you want to

2    safeguard assets.  These businesses sat on a large amount of

3    cash.  At the time I wrote this memo, they were sitting on

4    upwards of, say, five to six million dollars of cash.  In my

5    view, that's a large amount of money.

6         And when you're dealing with students that are working

7    in hospitals, where they could make a mistake and have a

8    lawsuit, and you want the make sure that you have sufficient

9    malpractice insurance, or things of that nature, where an

10   accident could happen, that money could be subject to a lawsuit

11   where it could go away.

12        So when I talk about asset protection, I'm talking about

13   preserving the assets of the business.  Even though you might

14   be able to buy insurance, you want to -- you want to secure the

15   assets of the business.  So that's how I define asset

16   protection.

17   Q    I see.  And you gave an example of, you know, a student

18   in a hospital causing some accident, and then the school being

19   sued.

20        That would be one example; correct?

21   A    Yes, I did.

22   Q    And I gave you another example of a school being sued

23   for a lot of money, $150 million, for defamation.

24        That would be another example; correct?

25   A    Yes.

1    Q       Another example might be a former teacher, or professor

2    at the school, that sues the school for wrongful termination;

3    is that correct?

4    A       That could be a cause.

5    Q       And conceivably, with a medical school, you could even

6    have a student that gets kicked out of the medical school, that

7    sues the medical school for being wrongfully kicked out.

8            That would be another example of a lawsuit; correct?

9    A       Correct.  You can buy insurances for most of those

10   issues.

11   Q       By the way, do you know if the school actually had

12   insurance for most of those issues?

13   A       They had some.  I forget the limits offhand.

14   Q       But not enough to cover a 150 million-dollar lawsuit;

15   correct?

16   A       Probably not.

17   Q       In fact, I'll turn your attention, if I could, all the

18   way down to Subparagraph D of this memo.  And if we could focus

19   on the last sentence -- or actually, just leave it the last

20   paragraph, that's fine.

21           Now, you set up a structure that has one, two, three,

22   four, five, six different new foreign companies; correct?

23   A       Correct.

24   Q       And each one of these -- and you're recommending this

25   structure to Dr. Fredrick to adopt; correct?

DAVID MINCHENBERG - CROSS/HOCHMAN          170

1    A      That's my recommendation; correct.

2    Q      And if he adopts this, the idea is that, if one of these

3    six entities gets sued, it's not necessarily going to take the

4    money away from all the entities; is that correct?

5    A      Well, I think you are taking one small piece of this

6    memo out of context.

7    Q      We certainly don't want to do that, so let's see if I

8    can rephrase the question.  And actually, let's look at the

9    last sentence here of this particular paragraph.

10          And this is NewCo Number 4, which is something called a

11   foreign personnel company, which I guess is established . . .

12   it's an employment company for entities with assets, and is

13   geared to protect those assets against potential litigation; is

14   that correct?

15   A      That's what I wrote; correct.

16   Q      I see.

17          So this foreign company that you're recommending being

18   created would be the company that would actually employ

19   everybody; is that correct?

20   A      That's my recommendation.

21   Q      And then if one of those employees sues that company,

22   then they might not be able to get to the assets of the parent

23   company; correct?

24   A      That's my understanding.

25   Q      In fact, you actually write that --

1    A       Correct.

2    Q       -- you say, by establishing the FPC, the foreign

3    personnel company, if litigation potential arose, the only

4    assets available to attachment were those of that company,

5    rather than the parent company; correct?

6    A       That's correct.

7    Q       And again, the idea here is, we're maximizing asset

8    protection and minimizing tax, through your structure; is that

9    correct?

10   A       That's correct.

11   Q       Now, did Dr. Fredrick -- let me ask it this way:

12           With respect to your dealings with the Saba School, at

13   all points you dealt, in your mind, with the Saba school

14   honestly; is that correct?

15   A       I felt I did; yes.

16   Q       And when you dealt with paperwork with the Saba school,

17   that you submitted to the Saba school, that paperwork was

18   accurate and truthful; is that correct?

19   A       I believe so.

20   Q       Are you sure?

21   A       Well, at one time, Dr. Fredrick asked me to change

22   financial statements for him.

23   Q       Did you?

24   A       Yes.

25   Q       And that's not accurate, is it?

1    A        Pardon?

2    Q        That's not accurate, is it?

3    A        What?

4    Q        Changing a financial statement?

5             Or was it; was it acceptable to change the financial

6    statement?

7    A        No, it was not.

8    Q        But you did it anyway.

9    A        Yes.

10   Q        Did you ever get prosecuted for it?

11   A        No, I did not.

12   Q        Did you ever submit an invoice to the Saba school for

13   work that you didn't perform?

14   A        Not that I'm aware of.

15            MR. HOCHMAN:  Can I get 7BB.

16            May I approach, Your Honor?

17            THE COURT:  You may.

18   BY MR. HOCHMAN:

19   Q        Mr. Minchenberg, just take a quick look at 7BB, if you

20   could?

21   A        Okay.

22   Q        Have you looked at it?

23   A        Yes.

24   Q        Do you recall a time -- you started in May, 2004;

25   correct?

DAVID MINCHENBERG - CROSS/HOCHMAN                173

1    A       Yes.

2    Q       You worked real hard on the first audit, and then you

3    were entitled to a bonus in August of 2004; is that correct?

4    A       Yes.

5    Q       And you did get a 10,000-dollar bonus in August of 2004;

6    is that correct?

7    A       That's correct.

8    Q       And that was based on your work for the school; is that

9    correct?

10   A       Yes.

11   Q       Excuse me, work for the school on the audit; correct?

12   A       Yes.

13   Q       And for nothing else; correct?

14   A       That's correct.

15   Q       Did you submit an invoice to be paid for that $10,000?

16   A       Yes.

17   Q       Was this an invoice that you and Dr. Fredrick had agreed

18   you could submit?

19   A       Yes.

20   Q       And I'll show you Exhibit BB -- 7BB.

21           Is that the invoice you submitted to get your

22   10,000-dollar bonus?

23   A       Yes.

24   Q       And that's a false invoice, isn't it?

25   A       It's an invoice that I submitted, and these services

1    were not -- let me just read here.  Yeah, I did not complete

2    a . . . an appraisal:

3            MR. HOCHMAN:  I'd move Exhibit 7BB into evidence.

4            THE COURT:  Any objections?

5            MS. FINLEY:  No objection.

6            THE COURT:  7BB will be admitted.

7            (Government's Exhibit 7BB was admitted into

8        evidence.)

9            MR. HOCHMAN:  If we could put 7BB on the screen.

10           (An exhibit was projected onto the projector screen.)

11           MR. HOCHMAN:  If we could highlight the first

12   paragraph?  Actually, highlight, if you could, the first half

13   of the page, down to the lines where it says $10,000.  That's

14   good.

15   BY MR. HOCHMAN:

16   Q     So this is an invoice that a company called Route Two

17   Property Consultants submitted; is that correct?

18   A     That's correct.

19   Q     And that Route Two Property Consultants is your company?

20   A     Yes.

21   Q     Located in Templeton, Massachusetts?

22   A     Yes.

23   Q     And the date is August 24, 2004; correct?

24   A     Yes.

25   Q     You're submitting this invoice to get paid a

1    10,000-dollar bonus.

2    A       Yes.

3    Q       And you submitted it to the Saba school; correct?

4    A       That's correct.

5    Q       It says here, in the invoice, that you're being paid for

6    services for evaluating and determining the market value of the

7    respective real estate properties located on Walnut Street and

8    Graham Street in Gardner, Massachusetts; is that correct?

9    A       That's correct.

10   Q       You never did those services; correct?

11   A       No, I did not.

12   Q       That's a false invoice; correct?

13   A       In this sense, yes.

14   Q       Did you bring this false invoice to the attention of

15   Jerry Schneider, when he was doing the financial audits in

16   2004?

17   A       They were recognized in the expenses of the . . . books

18   and records of Saba.

19   Q       Put it differently:  You participated in those books and

20   records being inaccurate; correct?

21   A       No.  The expenses were recognized.

22   Q       Well, the expense -- the expense was recognized, but it

23   was a false expense; correct?

24   A       No.  The expense was recognized and paid.

25   Q       But the booking of it, the description of the expense,

1   would have been false; correct?

2   A      That's correct.

3   Q      So you participated in a falsification of the books and

4   records for the Saba school; correct?

5   A      That's correct.

6   Q      The government ever prosecute you for that?

7   A      No.

8   Q      And so besides -- and then with respect to . . . .   And

9   the idea for this came from you?

10  A      No.  Dr. Fredrick.

11  Q      And this is August 24, 2004; correct?

12  A      Yes.

13  Q      Did you call -- and did Dr. Fredrick actually suggest

14  this -- the exact language on this invoice?

15  A      No.  He wanted an invoice produced so that other people

16  in the department didn't know I was getting paid for it.

17  Q      But the exact language of this invoice came from you;

18  correct?

19  A      Yes.

20  Q      And who is Jean A. Harris-White?

21  A      A relative.

22  Q      Did Jean A. Harris-White work for the company?

23  A      She's deceased.

24  Q      Did she work for the company back then, in 2004?

25  A      Yes.

1   Q      Does she know that this invoice was false when you asked

2   her to submit it?

3   A      I can't remember.

4   Q      I'm sorry?

5   A      I said I can't remember.

6   Q      And when I say "submitted," I'm wrong.

7          Did you ask -- did you tell her that she was signing a

8   false invoice?

9   A      I can't remember.

10  Q      You know she signed the invoice, though; right?

11  A      Yes.  I can't remember.

12  Q      And that's because you wanted to keep your little crime

13  to yourself; correct?

14  A      I should have just told everyone in the department I was

15  getting paid a bonus.  There were certain people that didn't

16  like me in the accounting department.

17  Q      But instead, you just lied to the school and its books

18  and records in submitting a false invoice; correct?

19  A      That's exactly what happened.

20  Q      Now, with respect to this issue, when Dr. Fredrick asked

21  you to submit a false invoice -- did he actually ask you to

22  submit a false invoice; was that the conversation?

23  A      Yes.

24  Q      Did you, at that moment in time, call up the

25  Massachusetts Society of CPAs and say:  What am I supposed to

1   do?  My employer has just asked me to submit a false invoice?

2   A      No, I did not.

3   Q      Because that's because you called up the American

4   Institute of CPAs and asked them for advice on what to do when

5   your employer asks to you submit a false invoice; is that

6   correct?

7   A      Could you repeat your question, please.

8   Q      Did you ask the American Institute of CPAs, back in

9   August of 2004, before you submitted the false invoice, if you

10  should leave your work because of your concerns with your

11  employer?

12  A      Are you asking a question about leaving the employer, or

13  this invoice?

14  Q      I'm asking whether you called the American Institute of

15  CPAs, back in August of 2004, when your employer supposedly

16  asked you to submit a false invoice.

17  A      I didn't call them about this invoice.

18  Q      You just got your $10,000; correct?

19  A      I got paid this amount.

20  Q      And you kept working for the very employer who told you

21  to submit a false invoice; is that correct?

22  A      That's correct.

23  Q      Knowing that you had actually personally participated in

24  the falsification of the records of the school that you were

25  working for; correct?

DAVID MINCHENBERG - CROSS/HOCHMAN                179

1    A      That's correct.

2    Q      And then you said, later on, you did at some point call

3    both the Massachusetts and the American CPA societies; correct?

4    A      Yes.

5    Q      And you said that would have been -- is it fair to say

6    it would have been sometime in the period between the

7    February 9th, 2005, date of the first -- when the first memo's

8    dated, or up to the August, 2005, date, when you send that memo

9    to Dr. Fredrick and everybody on your bcc list?

10          Is that the accurate time period, I'm just trying to

11   establish it, when you would have had this conversation with

12   either the Massachusetts or the American CPA societies?

13   A      Again, I cannot remember the precise time that I called

14   them.

15   Q      But is it fair to say that, by the time you sent that

16   memo the second time, you probably -- probably -- had that

17   conversation by then?

18   A      I don't know.

19   Q      And they basically -- and tell us again what the advice

20   was that they gave you?

21   A      They recommended that I leave the employ as soon as I

22   can, something of that nature.

23   Q      All right.  And --

24   A      I can't remember the verbatim conversation.  And, sir,

25   you've asked the question almost ten times.

1    Q       Thank you.

2    A       Would you like to ask it an eleventh?

3    Q       I'll ask it actually a different way.

4            You didn't leave -- back in August, 2004, when you're

5    falsifying an invoice; you didn't leave when you're falsifying

6    or at least you think you're falsifying the MUA Belize 5471;

7    you didn't leave when you went ahead and brought tax fraud to

8    Dr. Fredrick's attention, and he forgot that you even had the

9    conversation; did you leave --

10           MS. FINLEY:  Objection, Your Honor, he answered one

11   of the five questions he just posed.

12           THE COURT:  He hasn't asked the real question, yet.

13   So to that extent the objection is sustained.

14   BY MR. HOCHMAN:

15   Q       Did you leave after you sent the August, 2005, memo?

16   A       I left in March, 2009.

17   Q       March, 2006.

18   A       Pardon me, 2006.

19   Q       So you stayed on an additional 180 days, probably a

20   little bit more, maybe 200 additional days, even though, at

21   some point, you received advice from the Massachusetts and the

22   American CPA societies to leave?

23   A       That's correct.

24   Q       And the reason you stayed on was because you believed

25   that Dr. Fredrick was doing his best to try to comply with the

1    requirements?

2    A        Absolutely not.  The only reason I stayed there was, I

3    was under significant financial distress, I needed the work.

4    And finally, when things were at their absolute terrible,

5    absolute worse -- I was treated terribly -- I left and said:

6    Whatever happens, happens.

7    Q        Isn't it true you were fired in March, 2006?

8    A        No.  I resigned.

9    Q        Isn't it true that you stopped coming in to work by

10   March, 2006?

11   A        No.  That's incorrect.

12   Q        Isn't it true that you wanted to be a financial adviser,

13   and not just an employee, of the Saba school, and when

14   Dr. Fredrick wouldn't give you that position, you all of a

15   sudden turned on him?

16   A        No.  That's incorrect entirely.

17   Q        Isn't it true that you went ahead and . . . and agreed

18   to stay on because you believed Dr. Fredrick was trying to

19   comply with the 5471 requirements?

20   A        No.  I told you why I was staying there.

21   Q        Well, again, you, yourself, were helping Dr. Fredrick

22   and Hough try to comply with the 5471 requirements; isn't that

23   correct?

24   A        You have the draft 5471s that I completed and sent to

25   Mr. Schneider.  They had plenty of time to file them.  I can

1   let you know, or you can ask the Internal Revenue Service

2   that's here, did they file them while I was there or

3   thereafter.  I can't give you the answer.

4   Q     But my point, and this is where the question is, if your

5   big issue is 5471s, Mr. Minchenberg, and they're trying to

6   comply with 5471s, then they're trying to do what you want them

7   to do; correct?

8   A     Everything was there for them to file them.

9            MR. HOCHMAN:  Your Honor, may I have a moment?

10           THE COURT:  You may.

11           MR. HOCHMAN:  And I don't know if you want to take

12   the afternoon recess, since we started early.

13           THE COURT:  I'm pretty close, if it works for you.

14           MR. HOCHMAN:  If we can take that, and that way I

15   will not have to delay the jury.

16           THE COURT:  Sure.

17           Let's take 15 minutes.  Please do not discuss the

18   case among yourselves, or allow anyone to discuss it with you

19   or in your presence.  Fifteen minutes.

20           (At 2:34 PM, the jury was escorted from the

21       courtroom.)

22           MS. FINLEY:  Your Honor, I'm sorry, since we

23   looked -- we have looked at the memo, I wanted to just put on

24   the record the basis for why we looked at it.

25           THE COURT:  Okay.

1          MS. FINLEY:  Based on Mr. Minchenberg's testimony

2     that he read the letter, and Mr. Hochman's representations that

3     his client, Patricia Hough, has waived the privilege with

4     respect to this memo and the underlying information that went

5     into the memo, and we asked at sidebar if we could make a

6     decision about it --

7          MR. UDOLF:  We should have the witness step down.

8          THE COURT:  Sure.  You can be excused.

9          THE WITNESS:  Thank you.

10          (The witness left the courtroom.)

11          MS. FINLEY:  Based on our further conversation at

12     sidebar, where the Court said that . . . he could decide based

13     on the testimony whether we should look at it, Mr. Hochman then

14     threw it on our table and said, "Look at it at your own peril."

15          MR. HOCHMAN:  I didn't throw it, Your Honor, I gently

16     placed it on the table.

17          MS. FINLEY:  Face up.  So based on the testimony and

18     Mr. Hochman's testimony that his client has waived the

19     privilege with respect to this document, then that is why the

20     government has looked at it.

21          THE COURT:  All right.  Anything you want to add to

22     that?

23          MR. HOCHMAN:  No, Your Honor.

24          THE COURT:  All right.  Fifteen minutes.

25          (At 2:35 PM, court was recessed.)

1                        AFTER RECESS

2              (At 2:54 PM, court was reconvened.)

3              THE COURT:  All right.  We need the witness.

4              Other than that, both sides ready for the jury?

5              MR. HOCHMAN:  Yes, Your Honor.

6              MS. FINLEY:  Yes, Your Honor.

7              THE COURT:  Have the jury step in, please.

8              (The witness resumed the witness stand.)

9              (At 2:55 PM, the jury was escorted into the

10        courtroom.)

11             THE COURT:  And you may proceed.

12             MR. HOCHMAN:  Thank you, Your Honor.

13   BY MR. HOCHMAN:

14   Q     Mr. Minchenberg, before the break, I think we were

15   talking about, I asked you the question about whether or not

16   you had been fired from your job, and you said you weren't;

17   correct?

18   A     That's correct.  I resigned.

19   Q     You had been fired, though, from the IC Federal Credit

20   Union, the job you had before EIC; is that correct?

21   A     Yes.

22   Q     And are you still, by the way, a licensed CPA?

23   A     Yes.

24   Q     Have you been continuously licensed since you were first

25   licensed in 2000?

DAVID MINCHENBERG – CROSS/HOCHMAN                185

1   A      Yes.

2   Q      Do you have to, as part of your CPA, take an annual

3   licensing -- or excuse me -- take continuing education classes

4   to maintain that license?

5   A      Yes.

6   Q      And in any of those classes, does it say that you can

7   submit a false invoice to your employer?

8   A      I haven't studied any class in that area.

9   Q      Is there an area, that it's on the submission of false

10  invoices to one employer, that you just didn't sign up for?

11  A      I don't understand your question.

12  Q      Sure.

13         Is there a class actually that you can sign up for

14  that's entitled "False Invoices to Your Employer," and you just

15  haven't taken that class yet?

16  A      Not that I'm aware of.

17  Q      You understand, through common sense, that you can't

18  submit -- that there is no class, no CPA class that you

19  possibly could have taken that would have allowed you to submit

20  a false invoice to your employer; correct?

21  A      As I said earlier, we could have just recharacterized

22  this as a professional service invoice.  It was incorrect to do

23  so.

24  Q      So that's another way of saying my question is correct,

25  there is no class that advised you to do this; correct?

DAVID MINCHENBERG - CROSS/HOCHMAN                186

1    A       Correct.

2    Q       Nor is there a class that advised you to falsify a 5471;

3    correct?

4    A       That's correct.

5    Q       Nor is there a CPA continuing education class that said

6    that you can steal documents from your employer; is that

7    correct?

8    A       I'm sure there's a class that doesn't cover that; I'm

9    not sure.

10   Q       Well, the classes that do cover it say that you have to

11   be ethical and honest; correct?

12   A       I took the documents because I was uncomfortable with

13   the organization complying with their tax duties.

14   Q       You stole the documents because you were uncomfortable

15   violating the law because you believed that they were complying

16   with their duties; correct?

17   A       Violating which law?

18   Q       Let's start with Massachusetts law for theft.

19   A       Can you show that to me?

20   Q       Let's say -- does that mean that you don't believe you

21   were violating Massachusetts theft law?

22   A       I'm not sure.

23   Q       How about federal law for theft?

24   A       I'm not sure.

25   Q       You were at the EIC and Saba employment for roughly

DAVID MINCHENBERG - CROSS/HOCHMAN                    187

1   22 months; is that correct?

2   A      As I said, it was the spring of 2004, to the early

3   spring of 2006.

4            MR. HOCHMAN:  Now, if we could turn briefly to

5   Exhibit 7P, put it on the -- if we could turn the lights down a

6   bit and put it on the screen, please?

7            THE COURTROOM DEPUTY:  I could turn the lights on.  I

8   don't put it on the screen.

9            MR. HOCHMAN:  That's perfect.

10            (An exhibit was projected onto the projector screen.)

11  BY MR. HOCHMAN:

12  Q      And that's the August 9th, 2005, David Minchenberg to

13  David Fredrick e-mail about that tax fraud memo.

14            And I'll highlight the last sentence that says:  "I am

15  bound to certain rules and ethics that come with my license."

16            Do you see that?

17  A      Um-hum.

18  Q      And that's -- those are rules and ethics that come with

19  your CPA license; correct?

20  A      Yes.

21  Q      And it says:  "I'm not uncomfortable with anything other

22  than having to abide with the rules and regulations promulgated

23  thereunder."

24            Correct; do you see that?

25  A      I don't see.

DAVID MINCHENBERG — CROSS/HOCHMAN                188

Q        What state are you licensed in, for your CPA?

A        Massachusetts.

Q        Any other states?

A        No.

Q        Did you report to the Massachusetts CPA -- is there a --
is there sort of a part of the Massachusetts CPA board that, if
you committed an illegal act, you would need to report to?

A        Probably.

Q        Did you call up the Massachusetts CPA board to tell them
that you had submitted a false invoice?

A        No.

Q        Falsified a 5471?

A        Again, I gave that to Dr. Fredrick.  He chose to file
it.

Q        Or stole any documents; did you call them up?

A        No.

Q        Because you realize that, if you called them up at any
point in time and told them these things, you would lose your
CPA license; correct?

A        I'm not sure that I would.  Under the facts and
circumstances by which Dr. Fredrick and Dr. Hough operated this
company, I feel very comfortable with the acts I undertook.
They put me under great strain.  They operated a company under
unique circumstances by which I felt my acts were justified.

Q        Dr. Minchenberg -- not doctor -- Mr. Minchenberg, you

1    were three months into your employment when you falsified the

2    invoice.  If you had told the Massachusetts CPA board, and

3    called them up and self-reported, you would have lost your

4    license for falsifying an invoice for your employer like that;

5    isn't that correct?

6    A       I'm not sure.  I did wrong.  I simply should have

7    submitted an invoice for services and a bonus, simple as that.

8    Q       And so when you stole the documents and you left in

9    March, 2006, did you call the IRS up and say:  Hey, guys, I got

10   a lot of documents about my employer that I feel uncomfortable

11   with, come and get them?

12   A       No.

13   Q       You waited until probably, what, until the end of the

14   year, you know, about March of -- or maybe December, 2006, to

15   call up the IRS then?

16   A       No.

17   Q       2007?

18   A       No.

19   Q       'eight?

20   A       No.

21   Q       'nine?

22   A       They sat in a basement.

23   Q       Sat in a basement, documents that you believed showed

24   some . . . some scheme; is that correct?

25   A       No.  These were documents in case something ever went

1    wrong because I felt uncomfortable with that organization.

2    Q      Ahhh.  So when the IRS finally came in -- what, about

3    2010; is that correct?

4    A      I believe so.

5    Q      And they came and they -- and they came to you with a

6    subpoena; is that how they got to you the first time?

7    A      I believe so.

8    Q      You basically said:  Look, I've got basement full of

9    documents.  It's my "get out of jail free" card.

10           Isn't that correct?

11   A      No.  They asked if I had anything, and I said I did, and

12   I turned them over.

13   Q      And you handed them those documents and, in fact, you

14   got out of jail for free; correct?

15   A      I would testify, and tell the truth, just as I'm doing

16   today.

17           MR. HOCHMAN:  No further questions.

18           THE COURT:  Ms. Finley?

19           MS. FINLEY:  Thank you, Your Honor.

20                      REDIRECT EXAMINATION

21   BY MS. FINLEY:

22   Q      So we'll just pick up where Mr. Hochman left off.

23           When the IRS, or the government, served you with that

24   subpoena for your records, where were the records when you got

25   your subpoena?

DAVID MINCHENBERG – REDIRECT/FINLEY                  191

1   A      They were -- actually, I was fortunate.  Someone had

2   actually picked them up, and they were just getting ready to be

3   shredded.  And I called, and they were probably a day away from

4   being shredded.  So. . . .

5   Q      They were already in the garbage or the shredding --

6   A      Exactly.  Someone had picked them up and . . . .

7   Q      And do you know whether you have a duty to report people

8   committing crimes?

9   A      I personally don't know the law.

10  Q      I'm going to show you what's been . . . .  I think

11  already marked as Exhibit MM, and I'm not sure if you have that

12  one in front of you already.

13  A      If you give me a second, I can look.

14         You mean of those files from the gentleman?

15  Q      No.  I think you may have MM in front of you already.

16  A      I put them back in order, so . . . .

17  Q      It's 7MM.  Yup.

18         Now, can you tell the jury what 7MM is?

19  A      This is the proffer letter, as it's explained to me.

20  Q      And . . . and is it directed to your lawyer?

21  A      Yes, it is.

22  Q      And it's signed by a prosecutor, not me, but another

23  prosecutor with the Department of Justice?

24  A      Yes, it is.

25  Q      And it's signed by you.

1    A      Yes, it is.

2    Q      And does this document memorialize what your

3    understanding is of what the government was providing you, and

4    what your obligations were?

5    A      Absolutely.

6            MS. FINLEY:  Your Honor, at this time the government

7    would offer 7MM into evidence.

8            MR. HOCHMAN:  No objection.

9            THE COURT:  7MM will be admitted.

10           (Government's Exhibit 7MM was admitted into

11       evidence.)

12   BY MS. FINLEY:

13   Q      Now, let's just talk about the bonus and the document

14   that Dr. Fredrick asked you to create.

15           When you got your bonus for $10,000, did Dr. Fredrick

16   tell you -- let me ask you this first -- withdraw the question.

17           Did you report that bonus on your tax return?

18   A      Absolutely.

19   Q      Did -- when you got that bonus, did Dr. Fredrick say

20   anything to you about reporting that bonus on your tax return?

21   A      No.

22   Q      Did Dr. Fredrick ever tell you about benefits of

23   offshore bank accounts?

24   A      Yes.

25   Q      What did he say?

1    A      He told me he could show me how to not pay taxes by

2    opening a bank account in the Caribbean.

3    Q      Do you have a foreign bank account?

4    A      No.

5    Q      And with respect to the financials that you said were

6    falsified, why were the financials falsified?

7    A      I believe, and this is just going off memory, that

8    Dr. Fredrick wanted to improve the financials of MUA, Medical

9    University of the Americas, because they had a loan to Saba

10   for -- I forget who he was showing them to.  I can't remember

11   offhand.

12   Q      Okay.  And did he want to show less income or more

13   income?

14   A      It was actually a balance sheet.

15   Q      And did he want to show less income or more income to

16   whatever he was providing the --

17   A      Less of a loan.

18   Q      Now, did you feel that you left EIC on good terms?

19   A      I would say . . . not on great terms, sort of like

20   strained, but not like I was getting fired.  As I said, my

21   hours were being shortened, my work week was being shortened

22   from a full-time position to . . . a part-time position, which

23   was ironic, considering the schools were growing substantially.

24   Q      I'm going to show you what's been marked as Exhibit 7NN,

25   as in "Nancy."  If you can take a moment and tell me if you

1    recognize that document.

2              (The witness examines an exhibit.)

3    A      Okay.

4    Q      Do you recognize that document?

5    A      I do now.  I haven't seen it in years.

6    Q      And what is the document?

7    A      It's just a quick note from Dr. Hough to myself, wishing

8    me well upon my departure.

9              MS. FINLEY:  Your Honor, at this time the government

10   would offer Exhibit 7NN into evidence.

11             MR. HOCHMAN:  No objection.

12             THE COURT:  7NN will be admitted.

13             (Government's Exhibit 7NN was admitted into

14      evidence.)

15   BY MS. FINLEY:

16   Q      Did you care about Dr. Fredrick and Dr. Hough . . . when

17   you worked there?

18   A      I felt that Dr. Hough was a pleasant person.

19   Dr. Fredrick . . . I didn't like well at all.

20   Q      And why was that?

21   A      I thought he was conniving, manipulative, and just not a

22   good person.

23   Q      Now, with respect to Dr. Hough, Mr. Hochman asked you

24   whether you -- you thought that she wanted -- your impression

25   was that she wanted to be in compliance with her duties; is

1    that right?

2    A       I felt that way; yes.

3    Q       Do you know if she was in compliance?

4    A       I do not know.

5    Q       And let's just talk a little bit about the 5471s again.

6            Whose duty was it to comply with the 5471 reporting

7    requirements?

8    A       I hate to do this:  Can you be more specific?

9    Q       Were these your foreign corporations that needed to get

10   reported to the IRS?

11   A       No.

12   Q       Were the 5471s going to be on your tax return?

13   A       No.

14   Q       Whose tax returns -- or whose entities, were they?

15   A       Ultimately, the person who has any interest in that

16   foreign corporation.

17   Q       And did you actually file the 5471s?

18   A       No.  And to be very specific, other than MUA Belize that

19   was previously talked about today, I don't know about -- if any

20   other 5471 was ever filed.

21   Q       And with respect to the one that was filed, did you

22   actually file it, or did someone else?

23   A       Someone else did.

24   Q       And, Mr. Hochman -- I think you maybe just answered my

25   question:  All the drafts that he showed you, you don't know if

1    any of those were ever filed.

2    A      No, I don't.

3    Q      And you don't know if Jerry Schneider forwarded the

4    completed 5471s to Dr. Hough's attorneys, who then were

5    instructed to give them to Dr. Hough, and Dr. Fredrick, to

6    file.

7    A      Attorney or accountant, I don't know the end product, if

8    they were ever completed or filed.

9    Q      And the information that you used to prepare the 5471s,

10   did you create that information?

11   A      Some of the information.

12   Q      And where did you get the information to create the data

13   that went on there?

14   A      Well, the information necessary to complete the

15   Form 5471 comes from a variety of sources.  Some of it is

16   organizational structure, like where did you form that

17   corporation.  That information was gathered from either

18   Dr. Hough or Dr. Fredrick.  That would be the -- the origin, or

19   the island where they formed the corporation, whether it

20   was . . . like, say, Saba, or the British Virgin Islands,

21   wherever these were formed, I can't remember.

22          The number of shares, that might have been in the

23   organizational documents, just like in the United States, if

24   you formed a corporation, you'd have the articles of

25   incorporation.  So I would need to get that type of

1   information.

2          And what was very difficulty is, I was given the task of

3   trying to, from scratch, create financial documents.  Because

4   Form 5471 necessitates income and expenses, and I can't

5   remember if it's a balance sheet.  And so I would have to

6   interview Dr. Fredrick or Dr. Hough, and ask them what type of

7   activities, like Round Hill Holding or MUA, had.  And generally

8   they were nominal -- not MUA, we had those books, but Round

9   Hill Holding, and just reviewing that for the first time,

10  and . . . .

11  Q     Let me just stop you for a second.

12  A     Sure.  Go ahead.

13  Q     Was it difficult to get information from Dr. Fredrick

14  and Dr. Hough?

15  A     I thought so.

16  Q     I'm going to show you what's been marked as Exhibit 700.

17  And if you can just take a minute and look over that document.

18          (The witness examines an exhibit.)

19          THE WITNESS:  Okay.

20  BY MS. FINLEY:

21  Q     What is this document?

22  A     I didn't read all of the pages, but the first page is a

23  correspondence from myself to Dr. Fredrick, copying Jerry

24  Schneider and Dean Hiltzik, regarding the Round Hill 5471

25  information.

1    Q      And when is it dated?

2    A      December 2, 2005.

3    Q      And would it be fair to say that, within the e-mails,

4    you're documenting the things that you were doing to prepare

5    the returns and . . . how it was difficult to get information?

6    A      Yes.

7             MR. HOCHMAN:  Objection, Your Honor.

8    Mischaracterizes the e-mail.

9             THE COURT:  To the extent it characterizes an exhibit

10   that's not been admitted, the objection is sustained.

11            MS. FINLEY:  Your Honor, at this time the government

12   would offer 7OO into evidence.

13            MR. HOCHMAN:  No objection.

14            THE COURT:  7OO will be admitted.

15            (Government's Exhibit 7OO was admitted into

16       evidence.)

17   BY MS. FINLEY:

18   Q      And then, lastly, Mr. Hochman asked you about what's

19   been marked as Defense Exhibit 70-001.

20            And this is a memo that you said you read, by

21   Mr. Glickage; is that right?

22   A      Seven zero?

23   Q      Seven zero.

24   A      From Davies Ward?

25   Q      Yes.

1    A      Okay.

2    Q      And you said you read that memo?

3    A      Yes, I did.

4    Q      Do you know what information was provided to

5    Mr. Glickage in order to prepare that memo?

6    A      No, I don't.

7    Q      Do you know whether Mr. Glickage was ever told about an

8    entity named Top Fast?

9    A      No, I don't.

10   Q      Or an entity named New Vanguard?

11   A      No, I don't.

12   Q      Do you know whether he was told about an entity named

13   Medical Universities of the Americas, for that memo?

14   A      No, I don't.

15   Q      Do you know whether he was ever told about an entity

16   named Ample Dynamics?

17   A      No.

18          MR. HOCHMAN:  Objection, Your Honor.  The witness has

19   already testified that he doesn't know anything about what

20   Mr. Glickage was told.

21          THE COURT:  The objection is overruled.

22   BY MS. FINLEY:

23   Q      Do you know if he was told anything about Apex

24   Consultants?

25   A      No.

1    Q      Do you know -- what is the date on that memo?

2    A      October 27th, 2004.

3    Q      Now, do you know whether Dr. Fredrick or Dr. Hough, or

4    anyone, told Mr. Glickage that, in February of 2002,

5    Dr. Fredrick and Dr. Hough were trying to sell Saba University

6    and Medical Universities of Americas?

7    A      Could you repeat your question, please?

8    Q      Do you know whether Mr. Glickage was told that, in

9    December of 2002, Dr. Hough and Dr. Fredrick were trying to

10   sell the schools?

11          MR. HOCHMAN:  Same objection, the witness has

12   testified initially he knows nothing about what Mr. Glickage

13   was told for the benefit of the memo.

14          THE COURT:  The objection is overruled.

15          THE WITNESS:  I don't know.

16   BY MS. FINLEY:

17   Q      And do you know whether Mr. Glickage was told that, in

18   April of 2003, Dr. Fredrick and Dr. Hough signed a letter of

19   intent, stating that they have the controlling interests in MUA

20   Nevis and Saba?

21          MR. HOCHMAN:  Objection to the extent that the facts

22   in this question in any way become evidence in this trial if

23   the witness's answer is, "I don't know."

24          THE COURT:  Is that a different objection than the

25   last one?

1              MR. HOCHMAN:  It sort of --

2              THE COURT:  If it is, you need to explain it to me,

3    because I don't understand.

4              MR. HOCHMAN:  I'll object again on foundation for the

5    witness, a good-faith basis for this question, given the

6    witness's initial answer that he doesn't know what Mr. Glickage

7    was told concerning this memo.

8              THE COURT:  The objection is overruled.

9    BY MS. FINLEY:

10   Q     And do you know -- do you know whether Mr. Glickage

11   would have found it important to know that, with respect to

12   rendering an opinion about whether Saba was a U.S. taxpayer --

13             MR. HOCHMAN:  Same objection, Your Honor.

14             MS. FINLEY:  I don't think I finished the question,

15   but . . . .

16             MR. HOCHMAN:  I'm sorry.

17             THE COURT:  Well, then, let's have you finish.

18   BY MS. FINLEY:

19   Q     Do you know whether Mr. Glickage . . . would have wanted

20   to know if Dr. Hough and Dr. Fredrick owned Saba University

21   School of Medicine for purposes of rendering that opinion?

22             MR. HOCHMAN:  Now I'll object based on foundation,

23   and the question calls for speculation.

24             THE COURT:  That objection -- or those objections are

25   sustained.

1           MS. FINLEY:  I have no further questions, Your Honor.

2           THE COURT:  Mr. Hochman?

3           MR. HOCHMAN:  Very briefly, Your Honor.

4                         RECROSS EXAMINATION

5    BY MR. HOCHMAN:

6    Q      So, Dr. Fredrick told you not to -- that you could open

7    up a bank account in the Caribbean, not to pay taxes; is that

8    correct?

9    A      Yes.

10   Q      And he told you that, about the time when you got the

11   10,000-dollar bonus; correct?

12   A      Yes.

13   Q      August of 2004; correct?

14   A      I don't know if it was before or after; in the

15   neighborhood.

16   Q      So roughly three to four months after you started at

17   EIC; is that correct?

18   A      In that area; yes.  But it was around the time of the

19   bonus.

20   Q      Did you tell Dr. Fredrick, "Look, I'm a licensed CPA.

21   You're telling me to commit tax fraud.  I'm out of here"?

22   A      I just said, "No, thank you."  I didn't use the words

23   you're speaking.

24   Q      Did what Dr. Fredrick said make you feel uncomfortable?

25   A      I can't remember my reaction.

1    Q      Do you believe that Dr. Fredrick was asking you to

2    commit tax fraud?

3    A      Not necessarily.

4    Q      Opening up a bank account in the Caribbean to not pay

5    taxes, in your mind, does not equal tax evasion?

6    A      Not if it's -- it can be done legally.  I'm not aware of

7    all the facts and circumstances to do things.

8    Q      Ah.  Because you can open up offshore bank accounts that

9    are legitimate offshore bank accounts?

10   A      They may be.

11   Q      I'm sorry?

12   A      They may be.

13   Q      And maybe that's what Dr. Fredrick was telling you, was

14   to open up a legitimate offshore bank account?

15   A      I'm not sure.

16   Q      But it's possible; is that correct?

17   A      It may be possible.

18   Q      And although you think of him as a "conniving,

19   manipulative, not a good person" kind of person, it's possible

20   that he was just advising you to open up a legitimate bank

21   account; is that correct?

22   A      It's possible.

23          MR. HOCHMAN:  No further questions.

24          THE COURT:  Any further questions, Ms. Finley?

25          MS. FINLEY:  No, Your Honor.

1      THE COURT:  May the witness be excused?

2      MR. HOCHMAN:  Yes, Your Honor.

3      MS. FINLEY:  Your Honor, Mr. Minchenberg will be

4  excused, but we ask that he not be released from his subpoena.

5      THE COURT:  All right.  You may stand up.  Thank you.

6      (The witness left the witness box.)

7      THE COURT:  You may call your next witness.

8      MS. FINLEY:  The United States will call Jeffrey

9  Gallant.

10      THE COURTROOM DEPUTY:  If you would raise your right

11  hand.  Do you solemnly swear or affirm to tell the truth, the

12  whole truth, nothing but the truth, in the case now before the

13  Court?

14      THE WITNESS:  I do.

15      THE COURTROOM DEPUTY:  You may have a seat.

16      State your full name, spelling your last.

17      THE WITNESS:  Jeffrey Joseph Gallant, G-A-L-L-A-N-T.

18      THE COURTROOM DEPUTY:  Thank you.

19                      JEFFREY GALLANT,

20  called as a witness by the Government, and having been first

21  duly sworn, was examined and testified as follows:

22                      DIRECT EXAMINATION

23  BY MS. FINLEY:

24  Q    Good afternoon, Mr. Gallant.

25      THE COURT:  May I suggest you retrieve the exhibits

1    that are on the witness stand?

2              MS. FINLEY:  Yes, Your Honor.  Sorry.

3              (Ms. Finley removed exhibits from the witness box.)

4              MS. FINLEY:  May I proceed, Your Honor?

5              THE COURT:  You may.

6    BY MS. FINLEY:

7    Q      Good afternoon.

8           Could you tell the jury what you do for a living?

9    A      I'm a CPA.

10   Q      How long have you been a CPA?

11   A      Approximately 30 years.

12   Q      Do you have your own firm?

13   A      Yes, I do.

14   Q      And where is it located?

15   A      It's located in Gardner, Massachusetts.

16   Q      Are you familiar with David Fredrick?

17   A      Yes, I am.

18   Q      How are you familiar with him?

19   A      We prepare the . . . the tax return for EIC.

20   Q      And when was that?

21   A      We started in 1999.  One of my other partners, who

22   passed away in 2002, was the original partner.  And then I took

23   over in 2002.

24   Q      Do you know Patricia Hough?

25   A      I do not.

1    Q       Have you ever met her?

2    A       I have not.

3    Q       Can you explain to the jury what your process is when

4    you are hired by a new client?

5    A       Yes.  Basically, we sit down with the client, and we

6    document basically their internal controls, which also gives us

7    the -- like a general understanding of what their business is.

8            Then we basically test those controls.  We will do a

9    sample of probably 25 to 40 transactions, to, you know,

10   basically be sure that those controls are working effectively,

11   and that we can place some kind of reliance on them.

12   Q       And that's for an audit?

13   A       That's for an audit.

14   Q       Okay.  When you first were engaged by Dr. Fredrick, did

15   you sit down and talk with him about the business that he

16   operated?

17   A       Yes.

18   Q       And what did you understand Dr. Fredrick to do?

19   A       Basically, EIC was the management company --

20           MR. HOCHMAN:  Objection as to the timing of this

21   conversation, Your Honor.

22           THE COURT:  Go ahead and establish it.

23           MS. FINLEY:  Thank you, Your Honor.

24   BY MS. FINLEY:

25   Q       When did you first meet with Dr. Fredrick when you were

1    preparing returns?

2    A      I probably met with him, the first time, in 2003.

3    Q      And is this when you would have learned what

4    Dr. Fredrick did, and his relationship to the business?

5    A      Yes.

6    Q      And what was that relationship?

7    A      Basically, he was the owner of EIC, which is the

8    management company which oversaw Saba University, and also MUA.

9    Q      And do you know what Dr. Fredrick did for EIC or the

10   medical schools?

11   A      Yes.  He was the president, and basically the -- you

12   know -- chairman of the board.

13   Q      Did you have -- ever speak with Dr. Fredrick's personal

14   income tax return preparer?

15   A      I have not.

16   Q      Now, as part of your engagement, did there come a time

17   where you were . . . further engaged to conduct an audit?

18   A      Yes.

19   Q      And who was the audit of?

20   A      The audit was of Saba University and MUA.

21   Q      And was it Saba University School of Medicine, or was it

22   Saba University School of Medicine Foundation?

23   A      The Foundation.

24   Q      And do you know how MUA was structured?

25   A      Yes.  It's structured as a corporation owned by

1    Dr. Fredrick.

2    Q       And do you know how Saba was structured?

3    A       I believe Saba was structured as a nonprofit foundation.

4    Q       And how did you know this?

5    A       Basically, asking questions of Dr. Fredrick, and also

6    the management team over at EIC.

7    Q       Do you know why the audits needed to be done?

8    A       Yes.  They needed to be done for the school's

9    accreditation.

10   Q       Do you know whether there had been previous audits?

11   A       Yes.  There was previous audits.

12   Q       Do you know who conducted those audits?

13   A       Yes.  It was an accounting firm out of New York.  I just

14   don't know the name.

15   Q       You don't remember the name?

16   A       No, I don't.

17           MS. FINLEY:  Just a moment, Your Honor?

18           (Ms. Finley confers with Mr. Hochman privately.)

19   BY MS. FINLEY:

20   Q       I'm going to show you what has been marked as

21   Exhibit 9L.

22           MS. FINLEY:  And I'm also, just to save some time,

23   also going to ask him to look at Exhibit 9C, as in "cat"; 9J;

24   9E; and 9B.

25

 1   BY MS. FINLEY:

 2   Q      So, in starting with 9L --

 3          MS. FINLEY:  Your Honor, at this time the government

 4   would offer 9L into evidence?

 5          MR. HOCHMAN:  No objection.

 6          THE COURT:  9L will be admitted.

 7          (Government's Exhibit 9L was admitted into evidence.)

 8   BY MS. FINLEY:

 9   Q      Can you tell the jury what this is?

10   A      Yes.  This is our standard engagement letter for an

11   audit.

12   Q      And what does this letter do?

13   A      It basically establishes a contract between our

14   accounting firm and the client that we're auditing.

15   Q      And what is the date of the letter?

16   A      The letter is dated May 1st, 2006.

17   Q      And on the last page of the exhibit, on Page 4, who

18   signs the letter?

19   A      The letter was signed by Dr. Fredrick, president.

20   Q      He's the president of the Saba University School of

21   Medicine Foundation?

22   A      Correct.

23   Q      Does this letter give the audit objectives and the

24   management responsibilities?

25   A      Yes.

```
1    Q      If I ask you to turn to 9B, as part of the audit, would
2    you have asked for documentation for the items that were going
3    to go into the financials?
4    A      Yes.
5    Q      And that would include books and records?
6    A      Correct.
7    Q      Trial balance?
8    A      Yes.
9    Q      Who did you deal with on the audit?
10   A      On the audit we dealt with Phillip Thornton.
11   Q      Was he an employee of EIC?
12   A      Yes, he was.
13   Q      During the course of the audit, did Dr. Fredrick ever
14   tell you whether he had signatory authority on the Saba School
15   of Medicine bank accounts in the United States?
16   A      Yes, he did.
17   Q      And did he -- did you also conduct an audit for MUA?
18   A      Yes.
19   Q      And did Dr. Fredrick tell you whether he had signatory
20   authority on the domestic bank accounts for MUA?
21   A      Yes.
22   Q      Do you know whether Dr. Fredrick had signature authority
23   over offshore bank accounts for Saba or MUA?
24   A      Yes, he did.
25   Q      How do you know that?
```

1    A      Basically, he's the one that signed the confirmations

2    that we sent out to different organizations to get the

3    information back.

4    Q      During the course of your audit, were there any issues

5    raised about Form 5471?

6    A      No, there wasn't.

7    Q      Were there any questions of you about Schedule B on a

8    personal tax return?

9    A      No, there wasn't.

10   Q      And you didn't prepare Dr. Fredrick's personal tax

11   returns.

12   A      I did not.

13   Q      What if Dr. Fredrick had told you that he had an

14   offshore bank account, what would you have done?

15   A      At that point, I pretty much told Dr. Fredrick that I

16   was not a specialist in foreign activities, so I probably

17   wouldn't have told him anything.

18   Q      If we can direct your attention to Exhibit 9B --

19          MS. FINLEY:  And may I publish, Your Honor?

20          THE COURT:  Any objection to 9B?

21          MR. HOCHMAN:  None, Your Honor.

22          THE COURT:  9B will be admitted and may be published.

23          (Government's Exhibit 9B was admitted into evidence.)

24          (An exhibit was projected onto the projector screen.)

25

1    BY MS. FINLEY:

2    Q      Are these the Medical University of the Americas'

3    financial statements for the year ended April 30th, 2006?

4    A      Yes.

5    Q      An if we could turn to Page 4 of the financials, what

6    were the total assets for MUA at the end of April of 2006?

7    A      10,061,460.

8    Q      And what were the total liabilities?

9    A      Total liabilities were $4,439,006.

10   Q      And under the liabilities section, there's a loan

11   payable, related entity.

12          Do you know what that was about?

13   A      Yes.  Those are the loans that were made to several

14   related . . . basically entities.

15   Q      Do you remember which ones they were?

16   A      If I look in the notes of the financials, I'm sure it

17   discloses --

18   Q      If you look on Page 10 of the financials?

19   A      Yes.

20   Q      Does Note 6 detail the payable to the related entities?

21   A      Yes, it does.

22   Q      And is it cash advances from Saba to MUA?

23   A      Yes, they are.

24   Q      Now, going back briefly to Page 4, what is the total

25   shareholder's equity?

1    A       It's $5,822,454.

2    Q       And can you just explain to the jury what shareholder

3    equity is?

4    A       It's basically the net worth of the company at a book

5    value.

6    Q       And what is the -- what's a shareholder; is that

7    somebody other than the company?

8    A       The shareholder would be the . . . the owner of the

9    shares of stock, which my understanding was Dr. Fredrick.

10   Q       Now, if we can turn to Page 11 of the financials, and we

11   look at Note 9, notes receivable officer and prior period

12   adjustment, can you explain to the jury what this entry is?

13   A       What this was, was this was money that was borrowed by

14   the officer that was written off the . . . the year before, and

15   we basically reversed that entry and brought it back onto the

16   books.

17   Q       And under Note 10, stock offering, do you know whether a

18   stock offering -- MUA stock offering was being considered?

19   A       Yes.

20   Q       And do you know who, based on the note, was interested

21   in purchasing shares of MUA?

22   A       It was New Vanguard holding company.

23   Q       And at the time, based on the note, had the purchase

24   occurred?

25   A       No, it didn't.

1   Q      And were you provided documents to substantiate the

2   items you placed on the financials?

3   A      Yes.

4   Q      Do you know what New Vanguard is?

5   A      It was a . . . it was a related party, basically owned

6   by Dr. Fredrick.

7   Q      And if I ask you to look at Exhibit 9D --

8          MS. FINLEY:  Your Honor, at this time the government

9   would offer 9D into evidence?

10          THE COURT:  9D, as in "delta"?

11          MS. FINLEY:  D, as in "delta".

12          THE COURT:  Any objection?

13          MR. HOCHMAN:  No objection, Your Honor.

14          THE COURT:  9D will be admitted.

15          (Government's Exhibit 9D was admitted into evidence.)

16          MS. FINLEY:  Permission to publish?

17          THE COURT:  You may.

18          (An exhibit was projected onto the projector screen.)

19          THE WITNESS:  I don't have 9D.

20          MS. FINLEY:

21   BY MS. FINLEY:

22   Q      I'm sorry.  We'll skip -- if you don't have it up there,

23   we'll find it afterward.  But up on the screen is what 9D is.

24          Do you recognize the handwriting on that document?

25   A      Yes.  Yes.

1    Q        And whose handwriting it?

2    A        That's a staff -- staff accountant that works for us,

3    Sheila Katlanta, K-A-T-L-A-N-T.

4    Q        And do you know where she got the information that New

5    Vanguard was a related entity to MUA?

6    A        Yes.  I believe she got it from Phillip Thornton.

7    Q        I'm sorry, you have to speak up a little bit.

8    A        She got it from Phillip Thornton.

9    Q        Okay.  Now, turning your attention to Exhibit 9C --

10            MS. FINLEY:  Your Honor, at this time we would offer

11   9C into evidence.

12            THE COURT:  Any objections?

13            MR. HOCHMAN:  One second, please.

14            No objection, Your Honor.

15            THE COURT:  9C will be admitted.

16            (Government's Exhibit 9C was admitted into evidence.)

17            MS. FINLEY:  Permission to publish?

18            THE COURT:  You may.

19            (An exhibit was projected onto the projector screen.)

20   BY MS. FINLEY:

21   Q        Is this the adjusted trial balance for MUA?

22   A        Yes, it is.

23   Q        And under the assets, is "UBS Union Bank, Swiss,"

24   listed, a cash account?

25   A        Yes, it is.

1   Q       At the top.

2           And did -- were there also investment accounts at UBS?

3   A       Yes, there were.

4   Q       And you testified earlier that you would have done bank

5   confirmations in order to determine, or check, the information

6   on the trial balance?

7   A       That's correct.

8   Q       If you look at Exhibit 9J --

9           MS. FINLEY:  At this time, Your Honor, the government

10  would offer 9J into evidence?

11          THE COURT:  Any objections?

12          MR. HOCHMAN:  No objection.

13          THE COURT:  9J will be admitted.

14          (Government's Exhibit 9J was admitted into evidence.)

15          MS. FINLEY:  Permission to publish?

16          THE COURT:  You may.

17          (An exhibit was projected onto the projector screen.)

18  BY MS. FINLEY:

19  Q       Is this the overview of total assets for account ending

20  3428, for Medical University of the Americas, as of April 30th,

21  2006?

22  A       Yes, it is.

23  Q       And there's some handwriting on the bottom.

24          Do you know whose handwriting that is?

25  A       Yes.  That is my staff accountant's handwriting.

1    Q      And do the numbers on -- in the handwriting match up to

2    the breakdown on the trial balance?

3    A      Yes, they do.

4    Q      Now, after you complete an audit, do you provide a

5    client a letter?

6    A      Yes, we do.

7    Q      What's that letter called; is there a name for it?

8    A      Yes.  It's called a client representation letter.

9    Q      And what does that do?

10   A      It pretty much explains to the client that they gave us

11   all the information to conduct the audit, and that everything

12   was received.

13   Q      And that's the information that you rely on to prepare

14   accurate financials?

15   A      That's correct.

16          MS. FINLEY:  Your Honor, at this time the government

17   would offer 9E into evidence.

18          MR. HOCHMAN:  No objection, Your Honor.

19          THE COURT:  9E will be admitted.

20          (Government's Exhibit 9E was admitted into evidence.)

21   BY MS. FINLEY:

22   Q      And is 9E the letter that you just described?

23   A      Yes, it is.

24   Q      And who signs this letter?

25   A      It was signed by Dr. Fredrick.

1    Q       And that's on Page 3?

2    A       Yes.

3    Q       So now, if we move . . . I hand you what's been marked

4    as Exhibit 9N; N, like "Nancy."  Sorry.

5            What is 9N, Mr. Gallant?

6    A       These are the audited financial statements for Saba

7    Medical School Foundation.

8    Q       For what year?

9    A       For the period ended April 30th, 2006.

10           MS. FINLEY:  And, Your Honor, at this time the

11   government would offer 9N into evidence?

12           MR. HOCHMAN:  No objection.

13           THE COURT:  9N will be admitted.

14           MS. FINLEY:  Permission to publish?

15           THE COURT:  You may.

16           (Government's Exhibit 9N was admitted into evidence.)

17           (An exhibit was projected onto the projector screen.)

18   BY MS. FINLEY:

19   Q       Now, if we turn to Page 4 of the financials, in the end

20   of April of 2006, what was Saba Foundation's current assets?

21   A       $23,108,676.

22   Q       And what were their total current liabilities?

23   A       $4,638,397.

24   Q       And if we turn to Page 5, for the year ending

25   April 30th, 2006, what was the total revenue taken in by Saba?

1   A        $11,911,756.

2   Q        And at the end of the year, after expenses are deducted,

3   what were the net assets at the end of the year?

4   A        Net assets are $18,470,279.

5   Q        And if I can now ask you to turn to Page 9, of 9N, and

6   if we look at Note 5, "Notes Receivable, officer, and prior

7   period adjustments," can you explain to the jury what that

8   entry is for?

9   A        Yes.  It was the same thing as in . . . MUA.  This was a

10  debt that was written off in the prior period that we brought

11  back onto the books.

12  Q        And do you know what Medical Technology Associates is?

13  A        I do not.

14  Q        Do you know what ESI is?

15  A        I do not.

16  Q        And do you know who the officer is that's referenced in

17  Note 5?

18  A        I believe it's Dr. Fredrick.

19  Q        Now, if we turn to Page 10, and we look at Note 7, under

20  deposits, it says that there was a $5 million deposit paid to

21  Top Fast finance for services for the establishment of a school

22  in China; is that correct?

23  A        That's correct.

24  Q        Do you know what that was about?

25  A        I believe it was a deposit that was --

1          MR. HOCHMAN:  Objection, foundation as to his

2     knowledge.

3          THE COURT:  Sustained.

4          You need to establish the source of his knowledge

5     first.

6     BY MS. FINLEY:

7     Q     Do you know if you received any information pertaining

8     to that entry for the financials?

9     A     Yes, we did.

10    Q     Okay.  And if I can direct your attention to

11    Exhibit 9P . . . what is 9P?

12         MR. HOCHMAN:  T, like in "Tom"?

13         MS. FINLEY:  P, as in "Paul."  Sorry.

14    BY MS. FINLEY:

15    Q     What is 9P?

16    A     I don't have 9P.

17    Q     Oh, I'm sorry.  The end of the day.  I'm going to hand

18    you 9P and 9O, and 9Q.

19         What is 9P?

20    A     9P is an e-mail that Sheila Katlanta received from

21    Phillip Thornton.

22    Q     And Phillip Thornton was an employees of Saba?

23    A     Was an employee of EIC.

24    Q     Of EIC?

25    A     EIC, yeah.

1    Q      And are you cc'd on the e-mail?

2    A      Yes.

3    Q      And David Fredrick is cc'd?

4    A      Correct.

5    Q      And what date is on the e-mail?

6    A      August 10, 2006.

7            MS. FINLEY:  Your Honor, at this time the government

8    would offer Exhibit 9P into evidence.

9            MR. HOCHMAN:  No objection, Your Honor.

10           THE COURT:  9P will be admitted.

11           (Government's Exhibit 9P was admitted into evidence.)

12           MS. FINLEY:  Permission to publish?

13           THE COURT:  You may.

14           (An exhibit was projected onto the projector screen.)

15   BY MS. FINLEY:

16   Q      Now, this is an e-mail from Sheila to Phillip.

17          If we look at the last paragraph of the e-mail, can you

18   read what Sheila is asking of Phillip?

19   A      This is basically Phillip responding to Sheila.

20   Q      Sorry.  I apologize.  Yes.

21   A      "At this point, I am unable to give you any contact

22   information to enable you to get independent confirmation of

23   the balance shown as a deposit of 5 million with Top Fast

24   Finance.  By copy of this e-mail, I will ask Dr. Fredrick if he

25   can provide this as a matter of urgency, please."

1    Q      And if I direct your attention to Exhibit 9Q, do you

2    know whether documentation was provided?

3    A      Yes, it was.

4    Q      And is 9Q the documentation your firm received?

5    A      Yes, it was.

6           MS. FINLEY:  Your Honor, at this time the government

7    would offer 9Q into evidence.

8           MR. HOCHMAN:  No objection.

9           THE COURT:  9Q will be admitted.

10          (Government's Exhibit 9Q was admitted into evidence.)

11          MS. FINLEY:  Permission to publish?

12          THE COURT:  Yes.

13          (An exhibit was projected onto the projector screen.)

14          MS. FINLEY:  And if we could just zoom in a little

15   bit.

16   BY MS. FINLEY:

17   Q      Is this a . . . letter from Top Fast to -- it says here

18   Mr. Fredrick; is that fair to say?

19   A      Yes.

20   Q      And it's dated January 4th, 2006?

21   A      Yes.

22   Q      And who is it from?

23   A      It's from Daniel Jorin.

24   Q      Is that J-O-R-I-N?

25   A      Yes.

1    Q      And what does this cover letter say?

2    A      It just basically says that:

3           "We are pleased to confirm that you agree to our

4    proposal regarding a reduced one-time payment.  The payments

5    are in the amount of U.S.D. 5 million.  Provided that the

6    payment will be effective until 31st January 2006, at the

7    latest.  This corresponds to a discount rate of five percent.

8    We look forward to our future cooperation."

9    Q      And if we look now to Page 3 of 9Q, and it's a little

10   bit light, but is this a cooperation agreement between Top Fast

11   and Saba?

12   A      Yes, it is.

13   Q      And . . . if we look at the last page, on Page 5, who

14   signs for Top Fast?

15   A      Daniel Jorin.

16   Q      And who signed for the company?

17   A      David Fredrick.

18   Q      And was this the information you received in order to

19   make the entry in Note, 7 on the financial statements?

20   A      Yes, it was.

21   Q      Did you verify whether services were performed?

22   A      I did not.

23   Q      Did you rely on the information provided by your client?

24   A      Correct.

25   Q      Now, looking at 9O, is this the balance sheet for Saba

1    School of Medicine for April, 2006?

2    A     Yes, it is.

3          MS. FINLEY:  And, Your Honor, at this time the

4    government would offer Exhibit 90 into evidence.

5          MR. HOCHMAN:  No objection.

6          THE COURT:  90 will be admitted.

7          (Government's Exhibit 90 was admitted into evidence.)

8    BY MS. FINLEY:

9    Q     And did you receive confirmation that Saba University

10   School of Medicine had a bank account at UBS?

11   A     Yes.

12   Q     And does that appear on the balance sheet?

13   A     Yes, it does.

14   Q     Now, as part of the audit, do you examine MUA and Saba's

15   litigation risk?

16   A     Yes, we do.

17   Q     And what do you do to find out what their litigation

18   risk is?

19   A     We basically question -- question management.  And we

20   also look for any kind of large legal fees.

21   Q     And did you determine whether MUA or Saba had litigation

22   risk, at least for April 30th, 2006?

23   A     Yes, we did.

24   Q     And what did you determine?

25   A     There wasn't any.

1              MS. FINLEY:  Your Honor, I have no further questions.

2              THE COURT:  Mr. Hochman?

3                          CROSS EXAMINATION

4    BY MR. HOCHMAN:

5    Q      To your knowledge, did Dr. Hough have any involvement,

6    whatsoever, with your 2006 Saba or MUA audits that you

7    testified to about?

8    A      No, she didn't.

9    Q      She did not?

10   A      She did not.

11             MR. HOCHMAN:  No further questions.

12             THE COURT:  Ms. Finley?

13             MS. FINLEY:  Nothing further from this witness, Your

14   Honor.  Thank you.

15             THE COURT:  You may stand down.  Thank you.

16             THE WITNESS:  Thank you.

17             (The witness left the witness box.)

18             THE COURT:  You may call your next witness.

19             MS. KESSLER:  Your Honor, the government calls

20   Charlene Varga.

21             THE COURT:  If the jury needs to stand and stretch,

22   now is a good time.

23             (The jurors stood and stretched.)

24             THE COURT:  Me too.

25             THE COURTROOM DEPUTY:  If you'd raise your right

1    hand.

2              Do you solemnly swear or affirm to tell the truth,

3    the whole truth, nothing but the truth, in the case now before

4    the Court?

5              THE WITNESS:  I do.

6              THE COURTROOM DEPUTY:  You may have a seat.

7              Please state your full name, spelling your last.

8              THE WITNESS:  Charlene L. Varga, V-A-R-G-A.

9              THE COURTROOM DEPUTY:  Thank you.

10                       CHARLENE VARGA,

11   called as a witness by the Government, and having been first

12   duly sworn, was examined and testified as follows:

13                    DIRECT EXAMINATION

14   BY MS. KESSLER:

15   Q    Good afternoon, Ms. Varga.

16   A    Good afternoon.

17   Q    Could you tell the members of the jury where you live?

18   A    Columbia, Ohio.

19   Q    And what do you do for a living?

20   A    RN.

21   Q    Are you retired?

22   A    Yes.

23   Q    When did you retire?

24   A    Friday was my last day.

25   Q    Congratulations.

1    A      Thirty-eight and a half years.

2    Q      Do you know the defendant, Patricia Hough?

3    A      Yes, I do.

4    Q      And how do you know her?

5    A      She is my sister.

6    Q      Do you have any other siblings?

7    A      No.

8    Q      Which of the two of you is the oldest?

9    A      She is.

10   Q      What does your sister do for a living currently?

11   A      She's working for -- she's in a clinic run by the State

12   of Florida.  She works as a psychiatrist.

13   Q      And what did you understand her to do for a living,

14   looking back to the early 2000s?

15   A      The early 2000s?

16   Q      Yes, ma'am.

17   A      Well, they were working for medical schools.

18   Q      Have you -- do you recall the names of those medical

19   schools?

20   A      Saba and . . . MUA.

21   Q      What do you understand Saba School of Medicine to be?

22   A      It was a school to -- to educate doctors.

23   Q      Do you know where that was located?

24   A      The Dutch Antilles.

25   Q      Have you ever visited the school?

1    A      No.

2    Q      Who did you understand to have started Saba?

3    A      My sister and Dr. Fredrick.

4    Q      Do you know when that was?

5    A      I can't remember exactly.  Somewhere in the 1990s, maybe

6    middle.

7    Q      What was your understanding of your sister's role in the

8    operation of Saba?

9    A      You mean every day?

10   Q      Yes.

11   A      She was more toward academic, was my understanding.  She

12   was the academic part of it.

13   Q      And who did you understand to have owned Saba?

14          MR. UDOLF:  Objection, Your Honor, unless she knows

15   of her own knowledge.

16   BY MS. KESSLER:

17   Q      Did you know --

18          THE COURT:  Hang on, let me rule.

19          MS. KESSLER:  Sorry, Your Honor.

20          THE COURT:  Give me something to do.

21          The objection is sustained.

22          Now go ahead.

23   BY MS. KESSLER:

24   Q      Did you know who owned Saba?

25   A      I would have to say no, I didn't know exactly who owned

1    it.

2    Q      Did you have a belief as to owned it?

3           MR. UDOLF:  Objection.

4           THE COURT:  Basis?

5           MR. UDOLF:  Foundation.

6           THE COURT:  Sustained.

7    BY MS. KESSLER:

8    Q      I believe you said that you recall that there was a

9    second medical school that your sister was associated with,

10   MUA.

11          Do you know what that stood for?

12   A      Medical University of America, I think.

13   Q      Okay.  And is that -- what was that school; was it

14   similar to Saba?

15   A      That was my understanding.

16   Q      A medical school to train doctors?

17   A      To train doctors.

18   Q      Where was that located; do you know?

19   A      Nevis.

20   Q      Did you know whether there were two schools associated

21   with MUA?

22   A      I don't know.

23   Q      Did you ever visit the Nevis location of MUA?

24   A      No.

25   Q      And who did you understand started MUA?

1   A       I don't know.  I don't know on that one.

2   Q       What did you understand your sister's role to be in the

3   operation of MUA?

4   A       I just always thought the academic part of . . . .

5   Q       You said you thought she was involved in the academic

6   part of things.

7   A       Correct.

8   Q       Can you explain that a little bit more?

9   A       Not really.  I mean, just the academics of, you know,

10  training students.

11  Q       Okay.  Have you ever received gifts from your -- well,

12  let me back up.

13          Is your sister married?

14  A       Yes.

15  Q       And do you know her husband?

16  A       Yes.

17  Q       What is his name?

18  A       Dr. David Fredrick.

19  Q       And what sort of relationship do you have with your

20  sister?

21  A       Close.

22  Q       Do you talk to her often?

23  A       Yes.

24  Q       What sort of relationship do you have with her husband,

25  Dr. Fredrick?

1   A      I was close to hims.

2   Q      You talked to him often as well?

3   A      No.

4   Q      Now, over the years, have you received gifts from your

5   sister and brother-in-law?

6   A      Yes.

7   Q      Are they generous to you?

8   A      I would say, yes.

9   Q      Do you recall whether they made a gift to you in the

10  year of 2000?

11  A      I believe it started in 2000.  Now, you have the list.

12  Q      Would you like to refer to that list?

13  A      Yes, I would, because I'm tired, and . . . it would be

14  easier if I could do that.

15          MS. KESSLER:  I'm going to hand up what I'd like to

16  be marked as Exhibit 2P, like "Paul."  This is a new exhibit.

17  It's not on the list.

18          MS. KESSLER:  May I approach the witness freely, Your

19  Honor?

20          THE COURT:  You may.

21          THE WITNESS:  Thank you very much.

22          MS. KESSLER:  You're welcome.

23  BY MS. KESSLER:

24  Q      Do you recognize this document, ma'am?

25  A      Yes.  I wrote this out.

1    Q       You wrote this out?

2    A       Yes.

3    Q       And what is it?

4    A       It's a list of the gifts that my sister and her husband

5    gave to my husband and I.

6    Q       Now, does that help you to recall more details about a

7    gift that was made to you in the year 2000?

8    A       Yes.

9    Q       What was the amount of the gift that was made to you?

10            MR. UDOLF:  We have no objection to the exhibit being

11   put into evidence, Your Honor.

12            MS. KESSLER:  Okay.  The government would move

13   Exhibit 2P into evidence.

14            THE COURT:  All right.  2P will be admitted.

15            (Government's Exhibit 2P was admitted into evidence.)

16            MR. UDOLF:  2P?

17            THE COURT:  P, as in "Paul."

18            MS. KESSLER:  I lost track of the question that I had

19   asked.  I apologize.

20   BY MS. KESSLER:

21   Q       Does this refresh your recollection about the gift you

22   received in 2000?

23   A       Yes.

24   Q       And what was the amount of the gift?

25   A       $29,000.

1    Q      And what was that for?

2    A      They paid our house off.

3    Q      Do you recall how that came about?

4    A      Yes.  I had been working, and on my way home from work I

5    stopped at the bank to make my house payment.  And the lady at

6    the bank said, "Well, your house is paid off."

7           And I said, "That's ridiculous, that's impossible."

8           She said, "Well, it's Good Friday, so really I can't

9    look into it, you'll have to check Monday."

10          So I went home, and I said to my husband -- forgive

11   me -- "That stupid bank, you know, they think our house is paid

12   off."

13          And he had tears in his eyes, and he said, "Call your

14   sister."

15          And I said, "Well, why, what would she know?"

16          And he said, "Call your sister."

17          And I did, and my sister told me it was for my birthday.

18   Q      Had you had any discussion about this leading up --

19   A      No.  This was a surprise.

20   Q      A good one.

21   A      I'll say.

22   Q      Did . . . referring back to your list, did you also

23   receive -- are you married?  You're married.

24   A      Yes.  Forty-four years.

25   Q      Did you and your husband receive a gift in July of 2003?

1    A        Yes.

2    Q        And what was the amount of that gift?

3    A        It was $27,000.

4    Q        And how did that gift come about?

5    A        Well, my husband and I were looking -- we have horses

6    and a trailer, and our truck wasn't . . . doing a good job

7    pulling it, and we were looking for a diesel truck.  And Pat

8    and Dave came to visit, and they just went with me, looking for

9    trucks.  And we found one, and . . . we traded ours in, and

10   they paid the rest toward this truck.

11   Q        Now, did you also receive a gift from your sister and

12   her husband in December of 2004?

13   A        Yes.

14   Q        And what was the nature of that gift?

15   A        It was a Guardian generator, a standby generator, if

16   your power goes off.

17   Q        How did that gift come about?

18   A        I think it was complaining about power outages, and we

19   have a well, and if the power goes off, no water and four

20   thirsty horses.  And she paid for a generator.  They both did.

21   Q        Did you also receive a gift from your sister and your

22   brother-in-law in November of 2006?

23   A        Yes.

24   Q        How did that gift come about?

25   A        Well, some years previously, Dr. Fredrick had said to my

1   husband, if he ever wanted to work for himself, be his own boss

2   and start up a business, that he would help him.

3         So I called at that time, because my husband was having

4   a rather hard time with his employer, and --

5   Q     Who did you -- I'm sorry to interrupt.

6         Who did you call?

7   A     My sister.

8   Q     Okay.

9   A     And I said, "Does that offer still stand?"

10        And she talked to Dr. Fredrick, and they said yes.

11  Q     And so how much was the gift that was given to you then?

12        And we're talking about November of 2006.

13  A     Yeah.  It was a van and, you know, some cash to start up

14  the business.

15  Q     Do you recall exactly how much money was given to you?

16  A     42,000.

17  Q     And just for the record, you're referring back to your

18  notes, which are --

19  A     Yes, I am.

20  Q     -- 2P?

21  A     Yes.

22  Q     Thank you.

23        And then did you and your husband also receive a gift

24  from your sister and her husband in November of 2007?

25  A     Yes.

1    Q       How much was that gift?

2    A       $21,397.

3    Q       And what was the nature of that gift?

4    A       To enlarge our barn.  It was very small, and we had

5    wanted to enlarge it, and they gave us money to enlarge it.

6    Q       Who did you talk to about that gift, how did it

7    functionally happen?

8    A       I think I had just been having a conversation with my

9    sister about things, you know, that we were planning in the

10   future.  And I'm grumping, "I'd like to have new bedroom

11   furniture, and I think we'll probably eventually enlarge the

12   barn."

13           And that's all that was said.  And the next day at a

14   restaurant, they said they would like to do that.

15   Q       They were there on a visit at this time?

16   A       We were visiting them.  My husband and I were visiting

17   them.

18   Q       You were together?

19   A       Yes.

20   Q       How much was the amount of the gift for the bedroom

21   furniture?

22   A       $2,832.

23   Q       And for the addition to the barn?

24   A       $21,397.

25   Q       Now, did you also receive a gift from your sister in

```
1    February of -- your sister, and perhaps brother-in-law, in

2    February of 2008?

3    A      Yes.

4    Q      And what -- how did that come about as well?

5    A      I believe, if I recall correctly, that Dr. Fredrick --

6    you know, we had a small farm, and we have a very small

7    inefficient tractor.  And he thought it might be a good time to

8    buy something, and he said, "Go out and look, they might be on

9    sale."

10   Q      And did you go out and look?

11   A      We went out and looked.  And they were on sale.

12   Q      Did you find a good one?

13   A      Yup, we did.

14   Q      And did your sister and her husband help you out with

15   paying for that?

16   A      Yes.  They paid for that.

17   Q      How much was that?

18   A      $16,975.55.

19   Q      And then in July of 2008, did your sister and

20   brother-in-law make another gift to you for a TV and a DVD

21   player?

22   A      Yes.

23   Q      How did that occur?

24   A      Well, our TV was on the frits, and, you know, all I did

25   was make a comment that we were going to have to go TV
```

1    shopping, and Dr. Fredrick said, "Go to Best Buy and buy a

2    Panasonic TV and DVD."

3           So we did.

4    Q      And he told you what he thought you should get, the

5    brand?

6    A      Yeah.

7    Q      And looking back at your notes, can you recall how much

8    that gift was?

9    A      Yeah.  $2,667.75.

10   Q      Later, also -- or excuse me, also in 2008, did your

11   sister and brother-in-law help you out with problems you were

12   having with paying your insurance?

13   A      Yes.  I carried the health insurance for myself and my

14   husband, and I had taken some sick days.  I was ill.  And . . .

15   that made my health insurance could go way, way up, and they

16   very kindly paid it for me.

17   Q      And approximately how much was --

18   A      $600, it was.

19   Q      Also, in July of 2008, did your sister and

20   brother-in-law make another gift to you related to a vehicle?

21   A      Yes.  It was a Subaru Forester.

22   Q      Can you explain to the jury how that came about?

23   A      Yeah.  We went and bought it and took out a loan, and --

24   Q      You and your husband?

25   A      Yes.  And, you know, paid as much as we could, and they

1    paid off the balance, $9,557.60.

2    Q      Just to be clear, you say, "They paid off the balance."

3           Who are you referring to?

4    A      Well . . . Dr. Fredrick and my sister.

5    Q      And did you talk about that before it happened, or was

6    this similar to the mortgage, where you just found out that the

7    balance was zero?

8    A      No.  I think I had just been talking to my sister and

9    made the comment that we bought a Subaru, and, you know, I

10   said, "We just took out, you know, a loan," and she paid it

11   off.  She offered to pay what the loan was.

12   Q      Did she send you a check in order to do that?

13   A      I believe so.

14   Q      Now, in 2009, did you also receive a gift, or gifts,

15   from your sister and brother-in-law?

16   A      Yes.

17   Q      Can you explain to the jury how these gifts came about?

18   A      These were just spontaneous, and they came, four checks,

19   for $12,000 each.

20   Q      Did they come in the mail?

21   A      Yes.

22   Q      And when you said four checks for $12,000 each, can you

23   explain how . . . who were the checks made payable to?

24   A      Well, two of them were to me, and two of them were for

25   my husband.

1    Q      And who were they from?

2    A      Two of them were from my sister, and two from

3    Dr. Fredrick.

4    Q      And so the total amount was what?

5    A      $48,000.

6    Q      Did you have a discussion with your sister or

7    brother-in-law about why they didn't just send one big check

8    for $48,000?

9    A      I think it's regarding gift tax.

10   Q      Okay.  And can you explain a little bit more what you

11   mean by that?

12   A      Well, you're allowed to give -- back then, I think it

13   was $12,000 that you can give to, you know, a friend or a

14   family member, whoever, as a gift, and that person does not

15   have to pay taxes on it.

16   Q      Okay.  Now, in . . . .  If I could have -- I would like

17   to have Exhibits . . . .  Oh.

18            (Ms. Kessler confers with Ms. Finley privately.)

19            MS. KESSLER:  If I could approach to have 2K and 2L

20   marked, Your Honor?

21            THE COURT:  You may.

22   BY MS. KESSLER:

23   Q      In regards to the $48,000 of gifts that you received,

24   did you have any conversation with your sister about who was

25   paying the gift tax on that, or who would?

```
1   A     Well, it's my understanding there was no gift tax on it
2   because it was all within the limit that you're allowed.
3   Q     The limit?
4   A     Yes.
5   Q     Okay.  Did you get a gift later, in 2009?
6   A     This was the last that I recall getting, because I kept
7   a list of it.  That was the last gift we had gotten.
8   Q     That you and your husband received.
9   A     Right.
10  Q     Was there -- who is your mother?
11  A     My mother was Marion Hough.
12  Q     Did there come a time when your sister -- did you -- did
13  you have some responsibility for the care of your mother?
14  A     Yes, I did. I was power of attorney and made all her --
15  she had dementia.  I made all health-care decisions.
16  Q     Did there come a time when she needed help financially
17  related to her care?
18  A     Yes.
19  Q     And do you recall about when that was?
20  A     Well, I've had to do a lot of thinking because it's all
21  at home and my husband could not find it.  But I did a lot of
22  thinking.
23        She had -- she was in assisted living, had fallen, and
24  they wanted to put her in a nursing home.  And I wanted to keep
25  her in assisted living, so I wanted to get 24-hour caregivers
```

1    to keep her safe.  And I just figured I'd use her money up

2    until it's gone.  And my sister sent money so we could keep her

3    in that situation, which was the kindest thing to do for her.

4    Q      Did your sister send money in order to help pay for

5    that?

6    A      Yes.

7    Q      Do you recall how much that was?

8    A      $250,000.

9    Q      Do you recall when that was?

10   A      Well, I've gone back and forth with that, and I thought

11   that it was either early 2010 or late 2009.

12   Q      Why don't you open up the folder with Exhibit 2K; K like

13   "king".

14   A      Right.

15   Q      Does this document help you to recall when you would

16   have -- that gift would have been made, or that transfer?

17   A      Yeah.  It looks like September 14th of '09.

18   Q      And if I could ask some more questions about that.

19          Did . . . .  Did there come a time when your sister

20   contacted you, and indicated that she needed some of that money

21   back?

22   A      Yes.

23   Q      When -- do you recall when that was?

24          Actually, let me withdraw that question.

25   A      Yes.

```
1    Q        Can you take a look at Exhibit 2L, like "Larry"?

2    A        Sure.  Get it open here.  Here we go.  Okay.

3             And that is dated December 7th of 2010.

4    Q        And what is happening on December 7th of 2010?

5    A        It looks like $100,000 was wire transferred back to my

6    sister's account.

7    Q        What sort of conversation did you have with your sister

8    that prompted this to happen?

9    A        Well, she said that she -- she needed some of it back to

10   pay legal fees.

11   Q        And so you sent it back?

12   A        Yes.

13   Q        When the initial gift of $250,000 was made, did you have

14   any discussion with your sister about the gift tax implications

15   for that?

16   A        Well, this was for my mother's care, so I did not

17   consider -- I wouldn't consider that a gift.  That's for our

18   mother's care.

19   Q        Was it made directly to a -- was it --

20   A        It was wire transferred to a bank.

21   Q        To your mother's bank account?

22   A        Yes.  Which I was on it because I was power of attorney.

23   Q        Okay.  But it wasn't a payment to the assisted living

24   facility or anything of that nature?

25   A        No.  Because we had two separate entities.  I had
```

1    private caregivers, plus assisted living, that I am paying both

2    of them.

3    Q      Okay.  Thank you.

4           Thinking back to the other gifts that you received from

5    your sister, other than the $250,000 gift --

6              MS. FINLEY:  Actually, Your Honor, if I could move

7    into evidence Exhibits 2K and 2L?

8              THE COURT:  Any objections?

9              I'm sorry.  I spoke over you.

10             Any objections?

11             MR. UDOLF:  No objection, Your Honor.

12             THE COURT:  2K and 2L will be admitted.

13             (Government's Exhibits 2K and 2L were admitted into

14        evidence.)

15   BY MS. KESSLER:

16   Q      Thinking back to the gifts, other than the $250,000

17   gift, did you understand that all of those monies, or

18   assistance that you received in purchasing things, were those

19   all gifts?

20   A      Yes.

21   Q      Did you ever understand any of those to be a loan?

22   A      No.

23   Q      Did you ever have any conversation with your sister and

24   brother-in-law where they indicated they might need to be

25   repaid?

1    A      No.

2           MS. KESSLER:  Now . . . .  If I could just have

3    moment to make sure I have the correct . . . I apologize, Your

4    Honor, I think some of these are duplicative, and I don't want

5    to . . . .

6           (Ms. Kessler reviews various exhibits.)

7           MS. KESSLER:  If I could approach and have marked

8    Exhibits 2A, like "apple"; 2B, like "boy"; 2H, like "Harry";

9    2G, like "George"; 2E, like "Edward"; and 2C, like "cat"?

10          MR. UDOLF:  Judge, can I just ask counsel, when she

11   presents the documents for identification by the witness, can I

12   just ask that she call out the number?  Because I have

13   different numbers and I find it confusing.

14          THE COURT:  Sure.  I need to have her do that for me,

15   as well.  I kind of lost track of the numbers.

16          MS. KESSLER:  Sure.

17   BY MS. KESSLER:

18   Q      Ms. Varga, if you could take a look at Exhibit 2A, like

19   "apple."

20          (The witness examines an exhibit.).

21   BY MS. KESSLER:

22   Q      Did there come a time when your sister asked you to be

23   signatory on a number of -- over the years, were you asked to

24   be signatory on a number of bank accounts by your sister and

25   brother-in-law?

1    A      Yes.  I mean, I signed a number of things . . . .

2    Q      Okay.  Did you have a -- let's talk just about

3    Exhibit 2A?

4    A      Okay.

5    Q      Is this -- looking at . . . about halfway down on the

6    top, is that your signature?

7    A      Yes.

8    Q      And is your name underneath there?

9    A      Yes.

10   Q      Printed?

11   A      Yes.

12   Q      And what . . . .

13          MS. KESSLER:  Your Honor, I'd move Exhibit 2A into

14   evidence?

15          MR. HOCHMAN:  Is that the one that says 7468, at the

16   top?

17          MS. KESSLER:  Yes.

18          MR. UDOLF:  No objection.

19          THE COURT:  2A will be admitted.

20          (Government's Exhibit 2A was admitted into evidence.)

21          MS. KESSLER:  Permission to publish, Your Honor?

22          THE COURT:  You may.

23          (An exhibit was projected onto the projector screen.)

24   BY MS. KESSLER:

25   Q      Is that your signature, Ms. Varga, there, about halfway

1   down from the top?

2   A       Yes, it is.

3   Q       And what is listed as your title underneath?

4   A       It says:  Agent of Saba School of Medicine

5   F-O-U-N-D-A-T.

6   Q       Did you ever understand yourself to have any . . . power

7   to act on behalf of Saba?

8   A       No.

9   Q       Do you recognize the signature over to the right and

10  above?

11  A       Well, I can tell you that that looks like my sister's

12  signature, and that looks like David's signature.

13  Q       And looking at the very top of this document, what is

14  listed as the account holder name?

15  A       Saba School of Medicine Foundation.

16  Q       Now, if we could turn to Exhibit 2B.

17          MS. KESSLER:  Your Honor, the government would move

18  Exhibit 2B into evidence.  This has a Bates Number ending

19  in 15.

20          MR. UDOLF:  No objection.

21          THE COURT:  Exhibit 2B, as in "boy," is admitted.

22          (Government's Exhibit 2B was admitted into evidence.)

23          MS. KESSLER:  Permission to publish, Your Honor?

24          THE COURT:  You may.

25          (An exhibit was projected onto the projector screen.)

1    BY MS. KESSLER:

2    Q        Do you recognize this document, ma'am?

3    A        Well, I -- I see my signature on it.  I don't

4    specifically remember it, but I see that I signed it.

5    Q        That's your signature right there, the third one down?

6    A        Yes.

7    Q        Do you recognize the signatures above that?

8    A        It looks like my sister's and my brother-in-law's.

9    Q        Is this your driver's license here, at the bottom, and

10   your Social Security Card?

11   A        Yes.

12   Q        And what is the account title for this account, near the

13   top?

14   A        "Englewood Bank," it says.

15   Q        Actually, if you look a little bit further down, there

16   is an entry for account title, on the left-hand side?

17   A        Business advantage?

18   Q        Account title?

19   A        Title.  Oh.  Saba School of Medicine Foundation.

20   Q        If we could continue to move on to Exhibit 2H, like

21   "Harry" . . . .

22            MS. KESSLER:  It should have a number at the end,

23   Counsel, ending in 927.

24            The government would move Exhibit 2H into evidence,

25   Your Honor?

1          MR. UDOLF:  No objection.

2          THE COURT:  2H will be admitted.

3          (Government's Exhibit 2H was admitted into evidence.)

4          MS. KESSLER:  Permission to publish it?

5          THE COURT:  You may.

6          (An exhibit was projected onto the projector screen.)

7     BY MS. KESSLER:

8     Q     Ms. Varga, is this your signature again on this

9     document?

10    A     Yes.

11    Q     And do you recognize the signatures above yours?

12    A     Looks like my sister's and her husband's.

13    Q     And again, looking at the account title here, what is

14    the name of the entity?

15    A     Saba School of Medicine Foundation Tuition Refund Escrow

16    Account.

17    Q     Did you ever understand, after conversations with your

18    sister or your brother-in-law, that you would have the

19    authority to make payments out of a tuition escrow account?

20    A     I never understood that.  I never got that information.

21    Q     All right.  If we could move next to Exhibit 2G, like

22    "George" . . . .

23          MS. KESSLER:  Your Honor, the government would move

24    Exhibit 3-R into evidence.

25          This, Counsel, ends at the bottom with 808.

```
 1              MS. FINLEY:  That's in.

 2              MS. KESSLER:  I misspoke.  I'm sorry.

 3              MR. UDOLF:  Are you talking about 2G?

 4              MS. KESSLER:  It is late in the day, Ms. Finley.

 5         Exhibit 2G, like "George."

 6              MR. UDOLF:  Is that Number 7031?

 7              MS. KESSLER:  Account number?

 8              MR. UDOLF:  Yes.

 9              MS. KESSLER:  Yes.

10              MR. UDOLF:  Okay.

11              MS. KESSLER:  The government would move 2G into

12    evidence.

13              MR. UDOLF:  No objection.

14              THE COURT:  It will be admitted.

15              (Government's Exhibit 2G was admitted into evidence.)

16              MS. KESSLER:  Permission to publish?

17              THE COURT:  You may.

18              (An exhibit was projected onto the projector screen.)

19    BY MS. KESSLER:

20    Q     Ms. Varga, is that your signature on the document as

21    well?

22    A     Yes.

23    Q     And do you recognize the signatures above yours?

24    A     It looks like their signatures.

25    Q     And when you say, "theirs," are you referring to your
```

1   sister and your brother-in-law?

2   A      Yes.  My sister and her husband.

3   Q      What date did you sign this document?

4   A      Looks like January 4th of 2006.

5   Q      And what is the account title for this document?

6   A      Medical Education Group LLC.

7   Q      Did you ever understand that you had any authority to

8   make decisions regarding the finances of Medical Education

9   Group?

10  A      No.

11  Q      Have you ever heard of Medical Education Group?

12  A      No.

13  Q      If you could turn to Exhibit 2E, like "Edward" . . . .

14         MS. KESSLER:  Your Honor, the government would move

15  2E into evidence?

16         MR. UDOLF:  Is that 5601 account number?

17         MS. KESSLER:  Yes, sir.

18         MR. UDOLF:  No objection.

19         THE COURT:  2E will be admitted.

20         (Government's Exhibit 2E was admitted into evidence.)

21         MS. KESSLER:  Permission to publish?

22         THE COURT:  You may.

23         (An exhibit was projected onto the projector screen.)

24  BY MS. KESSLER:

25  Q      Is this again your signature, Ms. Varga?

1    A       Yes.

2    Q       And do you recognize the signatures above yours?

3    A       It looks like my sister's and her husband's.

4    Q       And what date did you sign this?

5    A       September 1st of 2005.

6    Q       And what is the account title as to this?

7    A       Medical University of the Americas.

8    Q       Did you ever understand yourself to have authority to

9    make financial decisions on behalf of Medical University of the

10   Americas?

11   A       No.

12   Q       Did you have any role at all with Medical University of

13   the Americas?

14   A       Not to my knowledge.

15   Q       With Saba School of Medicine . . . with –– excuse me ––

16   Medical Education Group?

17   A       No.

18   Q       Were you ever on the boards of any of these entities?

19   A       No, not that I know of.

20   Q       If we could move to Exhibit 2C, like "cat" . . . .

21           MS. KESSLER:  Your Honor, I'd move Exhibit 2C into

22   evidence.

23           MR. UDOLF:  Is that account Number 74 ––

24           MS. KESSLER:  Yes.  The Bates at the bottom, 456.

25           MR. UDOLF:  No objection.

```
1              THE COURT:  2C will be admitted.
2              (Government's Exhibit 2C was admitted into evidence.)
3              MS. KESSLER:  Permission to publish?
4              THE COURT:  You may.
5              (An exhibit was projected onto the projector screen.)
6    BY MS. KESSLER:
7    Q     Ms. Varga, does it appear that you signed this document
8    as well?
9    A     Yes.
10   Q     What is -- when did you sign this document?
11   A     March 28th of 2006.
12   Q     And what is the account that you have signature
13   authority over, according to this document?
14   A     It says, "Saba School of Medicine Foundation."
15   Q     And do you recognize the signatures above yours?
16   A     Yes.  They look like my sister's and her husband's.
17   Q     And finally, if we could move to Exhibit 2-F.
18   A     I don't have that.
19             MS. KESSLER:  I missed it.  If I could have 2-F, like
20   "Frank," marked?  Thank you.
21             Your Honor, the government would move 2-F, like
22   "Frank," into evidence?
23             MR. UDOLF:  Is that Account 7473?
24             MS. KESSLER:  Yes, sir.
25             MR. UDOLF:  No objection.
```

1           THE COURT:  2F will be admitted.

2           (Government's Exhibit 2F was admitted into evidence.)

3           MS. KESSLER:  Permission to publish?

4           THE COURT:  You may.

5           (An exhibit was projected onto the projector screen.)

6  BY MS. KESSLER:

7  Q      Ms. Varga, is your signature on this document as well?

8  A      Yes.

9  Q      And is this a different account?

10 A      This is an account titled "Medical University of the

11 Americas Ltd."

12 Q      What date did you sign this document?

13 A      March 28th of 2006.

14 Q      Do you recognize the signatures above yours?

15 A      Looks like my sister's and her husband's.

16 Q      And did you understand that you had the ability to make

17 financial decisions as to Medical University of the Americas?

18 A      No.

19 Q      Now, did there come a time when your sister, or

20 brother-in-law, contacted you regarding being power of attorney

21 on foreign bank accounts?

22 A      I -- the only power of attorney that I ever know that I

23 had was for my mother.  I don't know that I was power of

24 attorney at anything else, just my mother.

25 Q      Okay.

1                  MS. KESSLER:  Your Honor, if I could approach the

2     witness with what's been previously admitted Exhibit 3-R?

3                  THE COURT:  You may.

4                  MS. KESSLER:  If we could turn to Page 13 of the

5     exhibit?

6                  (An exhibit was projected onto the projector screen.)

7     BY MS. KESSLER:

8     Q      Ms. Varga, if you could read from the top of this

9     document, the last name of the . . . .  I forget that there's a

10    copy in front of me.  It's been a very long day.

11           Can you read to me the last name of the --

12                 MS. KESSLER:  Can we zoom in on that more?  I need

13    glasses.

14    Q      -- last name of the undersigned?

15           What is the name handwritten at the top of the document?

16    A      Okay.  Thank you.

17           It's Hough, Patricia L.

18    Q      And is that your sister?

19    A      Yes.

20    Q      And what is the title of this document, further up?

21    A      General Power of Attorney.

22    Q      And did you sign this document?

23    A      Yes.

24    Q      Is that your signature there, down about halfway?

25    A      Yes.

1    Q      Do you recall having conversations with your sister

2    about being power of attorney on a bank account for her?

3    A      No, I do not.

4           MS. KESSLER:  Trying to turn to the correct page,

5    Your Honor.  I apologize.  Next to the last one.

6           If I could approach the witness, Your Honor, with the

7    exhibit previously admitted 3GG, like "George"?

8           THE COURT:  You may.

9           MS. KESSLER:  Permission to publish?

10          THE COURT:  Yes.

11          MS. KESSLER:  If we could turn to Page 21 of the

12   exhibit?

13          (An exhibit was projected onto the projector screen.)

14   BY MS. KESSLER:

15   Q      Ms. Varga, is this another general power of attorney

16   document?

17   A      That's what it says.

18   Q      And who are the two individuals named at the top?

19   A      Hough, Patricia Lynn; and Fredrick, David Leon.

20   Q      And is that your sister and brother-in-law?

21   A      Yes, it is.

22   Q      And did you sign this document, ma'am?

23   A      Yes, I did.

24   Q      Do you know what UBS is?

25   A      I believe it's United Swiss Bank, or the United Bank of

CHARLENE VARGA - DIRECT/KESSLER                257

1   Switzerland.

2   Q       How do you know that?

3   A       Because I knew, all I knew was that they had business

4   with a bank in Switzerland.

5   Q       And the "they" that you refer to, who is that?

6           You said "they" had business --

7   A       Oh.  My sister and her husband.

8   Q       And when you had -- did you have discussions with your

9   sister about being the person that would take care of things if

10  something happened to she and her husband?

11  A       Yes.  They wanted somebody that they could trust to

12  carry out their wishes if they were both killed in an airplane

13  accident or a car accident.  They said they wanted somebody

14  that they could trust.

15  Q       And did you understand that you were the person that

16  they had decided should do that?

17  A       Yes.

18  Q       And what instructions did you have from them?

19  A       The instructions I had was, in the event that they were

20  both, God forbid, killed, that I would go to their house, to a

21  specified place where there were instructions on what I was to

22  do.

23  Q       And did you sign documents related to -- did you also

24  sign documents that you thought needed to be signed in order to

25  implement that?

1    A      Yeah.  I was just -- I just signed documents.  They

2    asked me to sign documents, and I signed them.

3    Q      And did you, after looking at all of these documents,

4    did you believe that these were signed related to their . . .

5    the possible need that you might have to handle their personal

6    affairs if they died?

7    A      Well, I -- I understood -- my understanding was that I

8    would call people who would -- because I would have no

9    knowledge of any of -- what to do, that I would call people who

10   would take care of things.

11   Q      But it was related to their estate.

12   A      Yes.

13          MS. KESSLER:  Court's indulgence, if I could check

14   with counsel?

15          No further questions, Your Honor.

16          THE COURT:  All right.

17          Mr. Udolf?

18                        CROSS EXAMINATION

19   BY MR. UDOLF:

20   Q      Hi, Ms. Varga.

21   A      Hi, how are you?

22   Q      I'm not going to ask you to look at all these documents

23   again.  We have been through all that.  But just to summarize,

24   all the documents that counsel just showed you, 2A, 2B, 2H, 2G,

25   2E, 2C, 2F, all those bank documents --

1    A      Yes.

2    Q      -- those are all for domestic banks; correct, at the

3    Englewood bank --

4    A      Well, I saw Englewood bank.  But there was one that

5    wasn't.  It was evidently the Swiss bank.

6    Q      I am going to get to that in a second.

7           But the two-series documents, those were all for the

8    Englewood bank in Florida; is that correct?

9    A      Yes.

10   Q      And none of those were personal accounts, did you notice

11   that, in looking at those documents?

12   A      Yes.

13   Q      For instance, 2A was for the Saba Foundation, 2B was for

14   the Saba Foundation.  It was a business advantage account;

15   correct?

16   A      Yes.

17   Q      And 2H was for the Saba Foundation tuition refund escrow

18   account; is that correct?

19   A      Yes.

20          MS. KESSLER:  Your Honor?  I'm sorry.  I hadn't heard

21   a question when I -- we'd ask --

22          MR. UDOLF:  I said, "correct."

23          MS. KESSLER:  Request that the statement be performed

24   in the manner of a question to the witness.

25          THE COURT:  Hang on.  He got it in there in the end.

CHARLENE VARGA – CROSS/UDOLF                    260

```
1              So go ahead.
2    BY MR. UDOLF:
3    Q      Isn't it true that Exhibit 2G is a business loyalty
4    money market account for Medical Education Group?
5    A      Yes.
6    Q      All right.  And do you know what a business loyalty
7    money market account is; is that something like a courtesy
8    account?
9    A      Oh, I would have no idea.
10   Q      And 2E is a business advantage checking account for MUA;
11   is that correct?
12   A      Yes.
13   Q      And 2C is a business loyalty money market account for
14   Saba school foundation.  That was in '06; is that correct?
15   A      Yes.
16   Q      And 2F is a business loyalty money market account for
17   MUA Limited; is that correct?
18   A      Yes.
19   Q      And you signed that in '06; is that correct?
20   A      Yes.
21   Q      There is no dispute that you signed any of these things.
22   A      Pardon me?
23   Q      There is no dispute but that you signed all of these
24   things; is that right?
25   A      Right.
```

1    Q      And that's because your sister or -- either your sister

2    or your brother-in-law asked you to sign these documents.

3    A      Yes.

4    Q      You knew that you were going to be the executrix on her

5    will.

6    A      I knew that.

7    Q      On both their wills or just her will; do you remember?

8    A      I believe both of theirs.

9    Q      All right.  And they trusted you to look after their

10   interest and do the things that they wanted to do with their

11   estate --

12   A      Yes.

13   Q      -- is that correct?

14   A      Yes.

15   Q      And they trusted you to . . . to represent them, their

16   interests, because they knew that you were the kind of person

17   that would do what they wanted to do --

18   A      Absolutely.

19   Q      -- and knew it was important to them; is that right?

20   A      Absolutely.

21   Q      They knew that you would do that because you had taken

22   care, or served as the executor on the will of one of your

23   other relatives, in the eighties, is that right?

24          Were you on one of the living wills for someone else,

25   for your aunt?

1   A       That would have been my Aunt Alice, yes.  She died in

2   1992.

3   Q       And you took care of her estate for her.

4   A       Yes.

5   Q       That was a complicated estate, wasn't it.

6   A       Yes, it was.

7   Q       And they told you where to go, where you could find all

8   these important documents in some closet in their home; is that

9   right?

10  A       Yes.

11  Q       And you knew that one of the things that was very

12  important to them was the good work they had done in the

13  Caribbean and South America; is that correct?

14  A       That was the most important thing.

15  Q       All right.  And if they were going to entrust anyone to

16  look after, and to act as guardian of, whatever interests they

17  controlled or were in charge of looking after, they knew they

18  could rely on you to do that; is that right?

19  A       Yes.

20  Q       And that is why they wanted you to sign all these

21  documents --

22  A       That's what they said, with every one of them.

23  Q       Now, you said you knew that they had some account in

24  Switzerland; is that correct?

25  A       Yes.

1    Q       You did not realize that the . . . the power of attorney

2    that you signed, that the prosecutor just showed you, was

3    actually a power of attorney for a Swiss bank?

4    A       No.  Because I didn't read it.

5    Q       Because you trusted them?

6    A       Yes, I did.

7    Q       And you trusted that your sister would never ask you to

8    sign on to do something that was questionable, or put you in a

9    position that would be questionable.

10   A       Yes, I trusted her.

11   Q       And so you signed that document, didn't even look at it

12   or read it, did you?

13   A       That's correct.

14   Q       As in any of these domestic bank accounts; is that

15   right?

16   A       That's correct.

17   Q       I want to go back to the beginning of this

18   investigation, but first, counsel brought this up:  She said

19   that you were the only sister of the defendant; is that right?

20   A       Yes.

21   Q       All right.  In fact, you're the only surviving member of

22   the immediate family --

23   A       Yes.

24   Q       -- of Patricia Hough; is that right?

25   A       Yes.

```
 1    Q      And as the only surviving member of her immediate
 2    family, you received a grand jury subpoena from the government,
 3    in December of 2010, to provide evidence against your sister
 4    and her husband; is that right?
 5    A      Yes.
 6    Q      And when you got that, the first thing you did was
 7    picked up the phone and called the investigator, the IRS
 8    investigator; is that right?
 9    A      Yes.
10    Q      And that was Agent Cameron Lalli; is that right?
11    A      Yes.
12           MS. KESSLER:  Your Honor, objection as to relevance?
13           THE COURT:  You're going to have to come to sidebar.
14                          AT SIDEBAR
15           MR. UDOLF:  We just want to go into the fact that she
16    provided this list, she cooperated with the government, she was
17    told that she did nothing wrong, and that's -- that's what I'm
18    going into.  That's all.
19           MS. KESSLER:  The government doesn't really
20    understand the relevance of that, but . . . .
21           THE COURT:  Is that an objection?
22           MS. KESSLER:  Yes.  That's an objection to relevance,
23    Your Honor.
24           THE COURT:  It's overruled, if you do as you say.
25    We'll see how far it goes.
```

CHARLENE VARGA – CROSS/UDOLF                    265

1          MR. HOCHMAN:  I'm not going far.

2          THE COURT:  Okay.

3                        IN OPEN COURT

4    BY MR. UDOLF:

5    Q      Did you call Agent Lalli as soon as you got that

6    subpoena?

7    A      Shortly thereafter.

8    Q      And did you talk to him, and did he ask you questions?

9    A      Yes.

10   Q      All right.  And during your colloquy with him, or your

11   discussion with him, did Agent Lalli tell you that you did

12   nothing wrong?

13   A      Yes.

14   Q      All right.  And you knew you had done nothing wrong,

15   because all you had done was signed some documents that your

16   sister or your brother-in-law had asked you to sign; is that

17   right?

18   A      Yes.

19   Q      You trusted them.

20   A      Yes.  Absolutely.

21   Q      And you didn't think that they would ever mislead you or

22   ask you to do anything wrong.

23   A      No.

24   Q      Do you still trust your sister and your brother-in-law?

25   A      Yes.

1  Q      And they trusted you, and that's why they wanted you to

2  serve as a signatory on these accounts; is that correct?

3  A      Yes.

4  Q      When you talked to Agent Lalli, you talked for him for,

5  what, 20 minutes, half an hour?

6  A      It was probably a good half-hour.

7  Q      And that was in December of 2010; is that right?

8  A      Yes.

9  Q      Then, in August of 2012, you were summoned to the grand

10 jury, here in Fort Myers; is that right?

11 A      Yes.

12 Q      And you met Agent Lalli again?

13 A      Yes.

14 Q      And you went into the grand jury.

15        How long were you in the grand jury?

16 A      About ten minutes.

17 Q      All right.  And had anybody talked to you before you

18 went in, about what your testimony was going to be?

19 A      No.

20 Q      All right.

21 A      Not that I remember.

22 Q      Other than those ten minutes, or the half-hour that you

23 talked to Agent Lalli over the telephone, in December of 2010,

24 had you ever talked to any agent for the government again,

25 prior to your sister's indictment?

```
 1    A       No.

 2    Q       I want to talk to you about the gifts that are on this

 3    list that you were asked about.

 4            I notice the gifts that your sister gave you range from

 5    $600 to as much as $48,000; is that right?

 6    A       Yes.

 7    Q       And you told us that the reason for the $48,000 was that

 8    you can give a maximum of $12,000 a person, one person can give

 9    another person $12,000 a year as a gift before they had to pay

10    gift tax on that amount; is that right?

11    A       Yes.

12    Q       So the maximum amount you could have received in any one

13    year, from two people, you and your husband could have received

14    was $48,000?

15    A       Yes.

16    Q       So that's why it was structured that way; is that right?

17    A       That is my understanding.

18    Q       In terms of the $250,000 that you provided to your

19    mother --

20            MS. KESSLER:  Objection, assumes facts not in

21    evidence.

22            THE COURT:  Sustained.

23            MR. UDOLF:  Well . . . .

24    BY MR. UDOLF:

25    Q       How did it come about that you provided -- you were
```

1    provided $250,000, or your mother was provided $250,000, from

2    your sister in 2009?

3    A      Well, I explained to my sister what I wanted to do,

4    that, you know, being in the medical profession, and I'm not

5    overly fond of nursing homes, that I wanted to keep her in

6    assisted living with 24-hour caregivers, and that I would just

7    go through her money; and then, when it was done, then she

8    would have to go to a nursing home.  And my sister wanted to

9    help with that, to keep her there.

10   Q      In fact, your mother had a 100,000-dollar annuity that

11   hadn't yet matured; is that right?

12   A      Yes.  Yes.

13   Q      And so your sister, basically, provided you $250,000,

14   but also said she might need to get some of that money back

15   once the annuity had matured; is that right?

16   A      Yes.  She said that; yes.

17   Q      And as a matter of fact, in the next year, once this

18   investigation was underway, she told you that she needed to get

19   $100,000 of that money back --

20   A      Yes.

21   Q      -- because she had to pay her previous lawyers for this

22   investigation; is that right?

23   A      Yes.

24   Q      So, in fact, what she did was ended up giving or

25   providing $150,000 for your mother's care; is that right?

1    A      Yes.

2    Q      Do you know if, under the gift tax law, care for a

3    dependent parent is treated as a gift, or do you have any

4    expertise in that area?

5           MS. KESSLER:  Objection.  I'd request some further

6    questions about foundation, or the ability of the witness to

7    answer that question.

8           MR. UDOLF:  I don't think she can.

9           THE COURT:  The second part of the question will be

10   the one that she can answer; that is, does she have any

11   particular expertise.

12   BY MR. UDOLF:

13   Q      Do you have any expertise in the area of taxation when

14   it comes to providing dependent care for an elderly parent?

15   A      I don't have any expertise.  I would -- wouldn't think

16   that would be taxable, but I have no expertise to back that up.

17   Q      I see.

18   A      It was care for her mother.

19   Q      When the government was asking you those questions, they

20   were talking to you as if it were a gift; right?

21   A      Right.  Yeah.

22   Q      Do you know if it was subject to tax or not?

23          MS. KESSLER:  Objection, foundation.

24          MR. UDOLF:  I'm just asking if she knows.

25          THE WITNESS:  No, I don't know.

```
 1              THE COURT:  Hang on a second.  You need to let me
 2    rule.
 3              She can answer yes or no, and then you can take it
 4    from there.
 5    BY MR. UDOLF:
 6    Q     Do you know?
 7    A     No.
 8    Q     Just briefly, we talked earlier about the trust that you
 9    had for your sister.
10    A     Yes.
11    Q     And that's why you signed these documents.  You grew up
12    in Youngstown, Ohio; is that right?
13    A     Yes.
14    Q     Your parents were divorced from as early as you
15    remember; right?
16    A     I was a baby.
17    Q     And you and your sister, for the first few years of your
18    lives, lived in the projects; is that right?
19    A     Yes.
20    Q     And for a period of time, your sister left the home and
21    went to live in your father's trailer.
22    A     Yes.
23    Q     And then she came back, and you -- during this period of
24    time, and during the time were you growing up, your mother
25    worked.
```

1    A       Yes.

2    Q       And she was out of the house a lot.

3            MS. KESSLER:  Objection, this is outside the scope of

4    direct, so I'd ask that the questions not be leading.

5            THE COURT:  Overruled.

6            MR. UDOLF:  I just have a few more questions, Judge.

7    BY MR. UDOLF:

8    Q       Pat made dinner when you came home from school?

9    A       Yes.  She would make dinner.

10   Q       All right.  And your sister was a role model to you?

11   A       Absolutely.

12   Q       All right.  When she -- was she a good student?

13   A       Excellent student.

14   Q       Did she get into a college on a scholarship?

15   A       Yes.

16   Q       And she worked her way through college?

17   A       Through college.

18   Q       Did she want to go to medical school?

19   A       Yes.

20   Q       Was she able to go to medical school when she got out of

21   college?

22   A       Yes.  Well, later on.

23   Q       I'm talking about when she -- she went to medical school

24   when she was around 37; is that right?

25   A       Yes.

```
1    Q       Was she able to go to medical school right away?

2    A       No.

3    Q       Why not?

4    A       Because I don't believe she could get into an American

5    medical school on this --

6    Q       She couldn't afford to go to medical school; isn't that

7    right?

8    A       Right.

9            MR. UDOLF:  She had to go to work.

10           Thank you very much, Ms. Varga.

11           THE WITNESS:  You're welcome.

12           MS. KESSLER:  Nothing further, Your Honor.

13           THE COURT:  You may stand down.  Thank you.

14           (The witness left the witness box.)

15           THE COURT:  Counsel, come to sidebar, please.

16                            AT SIDEBAR

17           THE COURT:  What's the situation with your witnesses?

18   Did you get to who you needed to get to?

19           MS. FINLEY:  She was the one who was scared to fly,

20   Your Honor, so the other gentleman is going to, I think, fly

21   home with her tonight, and then he'll be back to testify on

22   Tuesday.

23           THE COURT:  Okay.  I'll just send the jury home a

24   little bit early then.

25           MS. FINLEY:  Thank you.
```

```
1                        IN OPEN COURT
2               THE COURT:  All right.  Does anyone have any
3      objection if we break 15 minutes early?  Those objections will
4      be overruled, if you have any.
5               I want to remind you a couple things.  It's Tuesday,
6      not Monday.  And it's going to be 10:00 o'clock we're going to
7      start on Tuesday.  I've got a couple other cases I need to take
8      care of before that, so it's going to be 10:00 o'clock Tuesday
9      morning.
10              Please do not discuss the case among yourselves or
11     allow anyone to discuss it with you or in your presence.  Don't
12     do any of those things in terms of internet, or talking about
13     that we spent some time on about during jury selection.
14              And finally, have a good long weekend.
15              (At 4:45 PM, the jury was escorted from the
16         courtroom.)
17              THE COURT:  All right.
18              Counsel, I currently regret telling you I'd talk to
19     you about Touhy tonight, but . . . .
20              MR. HOCHMAN:  Do you want to talk about it on
21     Tuesday, Your Honor?
22              THE COURT:  I guess that's my pleasure now, just
23     because it seems like it's been a real belong day.
24              MR. HOCHMAN:  We agree, Your Honor.
25              MS. FINLEY:  We concur.
```

1              THE COURT:  If you want to make me sit and listen, I

2    will, but . . . .

3              I have two sentencings at 9:00 and 9:30; so if this

4    is like a ten-minute discussion we'll give you a little bit

5    before 10:00o'clock on Tuesday.  If it's going to take longer,

6    we can figure out some other time.

7              MR. SAUNDERS:  Your Honor, I don't think it's going

8    to be more than ten minutes.  If Your Honor wants to do it

9    Tuesday, I do have one case that we will be relying on, that I

10   can provide the clerk with.  I have a copy for the Court.

11             THE COURT:  That would be great.  And make sure the

12   government has a copy too.

13             MR. SAUNDERS:  They have a copy, Your Honor.

14             THE COURT:  All right.  Have a good weekend.

15                  -- -- -- -- -- -- -- --

16             (At 4:48 p.m., court was recessed, to be reconvened

17        at 10:00 a.m., on Tuesday, October 15th, 2013.)

18                  -- -- -- -- -- -- -- --

19

20

21

22

23

24

25