UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

---

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                    Fort Myers, Florida

vs.                                  October 15, 2013

PATRICIA LYNN HOUGH,              10:18 a.m.

        Defendant.

---

TRANSCRIPT OF JURY TRIAL, DAY FIVE

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                            Tax Division
                      P.O. Box 813
                      Washington, DC  20044
                      BY:  CARYN FINLEY, ESQ.

                      U.S. Department of Justice
                            Tax Division
                      Suite 7334
                      601 D Street NW
                      Washington, DC
                      BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

```
                    A P P E A R A N C E S
                 (Continued From Previous Page)


FOR THE DEFENDANT:          Bingham McCutchen, LLP
                            The Water Garden
                            1601 Cloverfield Boulevard
                            Suite 2050 North
                            Santa Monica, CA  90404-4082
                            (310) 904-1000
                            BY:  NATHAN J. HOCHMAN, ESQ.

                            Bruce L. Udolf, PA
                            500 East Broward Boulevard
                            Suite 1400
                            Fort Lauderdale, FL  33394
                            (954) 858-8831
                            BY:  BRUCE L. UDOLF, ESQ.

REPORTED BY:        JEFFREY G. THOMAS, RPR-CP, CRR
                    Official Federal Court Reporter
                    United States Courthouse
                    2110 First Street, Suite 2-194
                    Fort Myers, FL  33901
                    (239) 461-2033


                            *  *  *
```

I N D E X

| October 15, 2013 | | | | | | | | | Vol. | Page |
|---|---|---|---|---|---|---|---|---|---|---|
| Preliminary Discussions | | | | | | | | | 5 | 5 |

– – –

### GOVERNMENT'S WITNESSES

| WITNESS | DIRECT | | CROSS | | REDIRECT | | RECROSS | | VOIR DIRE | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. |
| MARC RUDOW | 5 | 6 | 5 | 28 | 5 | 35 | | | | |
| MICHAEL HARTMAN | 5 | 37 | 5 | 48 | | | | | | |
| MARION CRONAN | 5 | 51 | | | | | | | | |
| PERRY GARNER | 5 | 64 | 5 | 72 | 5 | 74 | 5 | 75 | | |
| FREDRICK AHLES | 5 | 77 | 5 | 87 | 5 | 92 | | | | |
| PAUL DALBEC | 5 | 93 | 5 | 114 | 5 | 200 | 5 | 214 | | |
| MELANIE ANN PITTS | 5 | 217 | 5 | 225 | | | | | | |

– – –

### GOVERNMENT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Government's Exhibits 12B, 12C, and 12D Admitted in Evidence | 5 | 8 |
| Government's Exhibits 12E, 12F, 12G, and 12H Admitted in Evidence | 5 | 13 |
| Government's Exhibits 12I, 12J, and 12K Admitted in Evidence | 5 | 17 |
| Government's Exhibit 12N Admitted in Evidence | 5 | 24 |
| Government's Exhibits 12P and 12Q Admitted in Evidence | 5 | 27 |

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

GOVERNMENT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Government's Exhibits 13B, 13C, 13D, 13E, and 13F Admitted in Evidence | 5 | 40 |
| Government's Exhibits 13G and 13H Admitted in Evidence | 5 | 46 |
| Government's Exhibits 14A, 14B, 14C, 14D Admitted in Evidence | 5 | 76 |
| Government's Exhibits 19B, 20C, 20D, 21A, 21C, 21D, and 22B Admitted in Evidence | 5 | 79 |

– – –

DEFENDANT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Defendant's Exhibit 113 Admitted in Evidence | 5 | 126 |
| Defendant's Exhibit 114 Admitted in Evidence | 5 | 127 |
| Defendant's Exhibit 112 Admitted in Evidence | 5 | 138 |
| Defendant's Exhibit 110 Admitted in Evidence | 5 | 157 |
| Defendant's Exhibit 111 Admitted in Evidence | 5 | 160 |
| Defendant's Exhibits 115, 116, and 117 Admitted in Evidence | 5 | 182 |

– – –

|  | Vol. | Page |
|---|---|---|
| Court Recessed for the Day | 5 | 231 |

* * *

1     THEREUPON, the above-entitled case having been called to

2  order, the following proceedings were held herein, to-wit:

3                              - - -

4          THE COURT:  Good morning, everyone.

5          Both sides ready for the jury?

6          MR. HOCHMAN:  Yes, Your Honor.

7          MS. FINLEY:  I'm sorry.  Yes, Your Honor.

8          THE COURT:  Have the jury step in, please.

9          (At 10:19 AM, the jury was escorted into the

10     courtroom.)

11          THE COURT:  Good morning, ladies and gentlemen.

12          And, Ms. Finley, or Kessler, you may proceed.

13          MS. FINLEY:  Thank you, Your Honor.

14          The government calls Marc Rudow.

15          THE COURTROOM DEPUTY:  If you'd raise your right

16  hand.

17          Do you solemnly swear to tell the truth, the whole

18  truth, nothing but the truth, in the cause now before the

19  Court?

20          THE WITNESS:  I do.

21          THE COURTROOM DEPUTY:  You may have a seat.

22          State your full name, spelling your last.

23          THE WITNESS:  Marc Rudow, R-U-D-O-W.

24          THE COURTROOM DEPUTY:  Thank you.

25          MS. FINLEY:  Your Honor, before we begin, can we turn

1    on -- and we're going to lower the screen, if we may.  Thank

2    you.

3              THE COURT:  We may.

4              MS. FINLEY:  Thank you, Your Honor.

5              May I proceed?

6              THE COURT:  You may.

7              MS. FINLEY:  Thank you.

8                        MARC RUDOW,

9    called as a witness by the Government, and having been first

10   duly sworn, was examined and testified as follows:

11                      DIRECT EXAMINATION

12   BY MS. FINLEY:

13   Q     Good morning, Mr. Rudow.

14         Can you tell the jury what you do for a living?

15   A     I am a real estate attorney in Asheville, North

16   Carolina.  I do some estate work as well.

17   Q     How long have you lived in North Carolina?

18   A     Since 1979.

19   Q     Are you familiar with David and Patricia Hough?

20   A     Yes, I am.

21   Q     Can you tell the jury how you became familiar with them?

22   A     In 2008, they came to see me about doing some work on

23   their property.  They were interested in some asset protection

24   issues, and I discussed that with them briefly.

25   Q     What property were they coming to talk with you about?

1    A      I don't know if it was specific to any particular

2    property.  I don't have notes that suggest that.  But it was --

3    I think the property up on the mountain, the property that we

4    subsequently transferred.

5    Q      And is that property in Asheville, as well?

6    A      Yes, it is.

7    Q      Now, when you first met with Patricia Hough and

8    Dr. Fredrick, were they both there at the first meeting?

9    A      I believe they were; yes.

10   Q      Now, at the first meeting, you said that they were

11   interested in some asset protection.

12          Did they provide you with documents to explain what --

13   what they needed you to do?

14   A      We just talked, I think, generally about the issue of

15   physicians and liability, and the notion of tenants by the

16   entireties, and liens against property, and equity, and sort of

17   execution, on how to protect from liability.  I think that was

18   the main tenor of that.  I don't remember seeing any particular

19   documents that we had at that time.

20   Q      Did there come a time where they did provide you with

21   documents?

22   A      At a later time, yes.

23          MS. FINLEY:  And, Your Honor, if I may show the

24   witness Exhibits 12B; 12C, as in "cat"; and 12D, as in "dog"?

25          THE COURT:  You may.

```
1              (Ms. Finley provides exhibits to the witness.)

2              MS. FINLEY:  The Court's indulgence, if I could

3    consult with counsel for a moment?

4              THE COURT:  You may.

5              (Ms. Finley confers with Mr. Hochman privately.)

6              MS. FINLEY:  Your Honor, we would offer 12B, as in

7    "boy"; 12C, as in "court."

8              MR. UDOLF:  No objection.

9              THE COURT:  I heard it.  I didn't see who said it.

10             MR. HOCHMAN:  Mr. Udolf, Your Honor.

11             THE COURT:  Okay.  Thank you.

12             MR. UDOLF:  I'm sorry.

13             THE COURT:  12B, C, and D will be admitted.

14             MS. FINLEY:  Permission to publish, Your Honor?

15             THE COURT:  You may.

16             (Government's Exhibits 12B, 12C, and 12D were

17       admitted into evidence.)

18             (An exhibit was projected onto the projector screen.)

19   BY MS. FINLEY:

20   Q    If we could start with 12B, Mr. Rudow --

21   A    Yes.

22   Q    -- could you explain to the jury what this document is?

23   A    It was presented to me as an obligation that LLL Group

24   had incurred.  And they wanted to . . . secure the repayment of

25   that note with the property that they owned.
```

1   Q       And, at the top, the LLL Group, is that Lynn,

2   Leon & Lyon?

3   A       Yes.

4   Q       And who is the lender?

5   A       Top Fast Finance Limited, is the way that it reads in

6   the document.

7   Q       And how much -- under the credit facility, how much does

8   it say that Lynn, Leon & Lyon Group bore?

9   A       It says 1.2 million there.

10  Q       Okay.  And if you look down under Paragraph 6, is there

11  a different amount under --

12  A       It says 1.6 million there.

13  Q       If you can let me finish the question, just so the court

14  reporter can be able to distinguish who's speaking.

15          And what was the term of this credit facility?

16  A       The term was in Paragraph 7.  Although I didn't draft

17  this document, it looks like it was to be repaid July of 2010.

18  Q       And I think you said that Dr. Hough and Dr. Fredrick

19  came to you in 2008?

20  A       Yes.

21  Q       And if you turn to Page 4 of Exhibit 12B, who is signing

22  the agreement . . . to the extent that you can make out the

23  signatures.

24  A       For Lynn, Leon & Lyon Group; looks like it's . . . .

25  Looks to me like David Fredrick.

1   Q      And for the Top Fast, do you know whose signature that

2   is?

3   A      I have no idea.

4   Q      And what is the date on the credit agreement?

5   A      August 1, 2005.

6   Q      Now, if we can turn to Exhibit 12D, as in "dog."

7   A      Um-hum.

8   Q      I guess, after speaking with Dr. Fredrick and Dr. Hough,

9   did they decide to go forward and place a lien on the property?

10  A      I believe they did.

11  Q      And if we look Exhibit 12D, the bottom e-mail, who is

12  that from?

13  A      It is from Dr. Patricia Hough.

14  Q      And is it -- who is it to?

15  A      To me.

16  Q      And what is the date?

17  A      February 25th, 2008.

18  Q      And what is Dr. Hough asking you?

19  A      To send -- it looks like she's asking me to send her a

20  copy of the draft deed of trust.

21  Q      Okay.  If we can now move to Exhibit 12C, is this the

22  deed of trust?

23  A      That is correct.

24  Q      Okay.  And if this was filed in -- I think it's Buncombe

25  County.  I'm not sure if I'm saying that --

1   A        Buncombe County.

2   Q        Okay.  Did they file the deed of trust?

3   A        They did.

4   Q        If we can look at the date, when was it filed with the

5   county, if you can tell?

6   A        It was recorded on March 4th, 2008, I believe is what it

7   says.

8   Q        And who is the grantor?

9   A        The grantor is Lynn, Leon & Lyon Group, LLC.

10  Q        And can you just explain to the jury what the grantor

11  is?

12  A        The grantor is the -- generally the owner of the

13  property that transfers an interest such that a lien is

14  created.

15  Q        And who is the beneficiary?

16  A        The beneficiary is a group called Top Fast Finance

17  Limited.

18  Q        And your name appears in the middle, there, as trustee.

19           Can you explain why your name is on the deed?

20  A        In North Carolina, mortgages are basically three-party

21  instruments.  They're deeds of trust, and you need a named

22  trustee.  And it can be anyone.  So typically we put our firm,

23  our name in, if there's not another party available.

24  Q        And how much . . . in the second paragraph of the page,

25  how much was the lien for?

1    A       It was for 1.5 million.

2    Q       And I think -- did the lien describe the property that

3    is being liened?

4    A       Yes, it does.  And that's the last . . . paragraph on

5    that first page, which says:  "Being all of the property

6    conveyed by deed."

7    Q       And does it say the date of that conveyance?

8    A       It was July, 2000 -- July 25th, 2005, and it was dated.

9    I'm not sure if it was recorded that date or not, but that was

10   the date of the deed itself.

11   Q       And does that mean that was the date they purchased it

12   or they filed with --

13   A       No.  That probably means the date that the deed

14   was . . . signed.  It may have been recorded a few days later.

15   Q       And if we can just turn to Page 3.

16   A       Um-hum.

17   Q       Can you tell who signed the deed?

18   A       I know that is David Fredrick, because his signature is

19   notarized and his name is typed in the box on -- where the

20   notary's acknowledgment appears.

21   Q       I'm now going to give you what's been previously marked

22   as Exhibits 12E, as in "Edward"; 12F, as in "Frank"; 12G, as is

23   "gym," and 12H, as in "hello."

24          MS. FINLEY:  Your Honor, at this time the government

25   would offer 12E, 12F, 12G, and 12H into evidence.

1        MR. UDOLF:  No objection.

2        THE COURT:  12E, F, G, and H will be admitted.

3        (Government's Exhibits 12E, 12F, 12G, and 12H were

4    admitted into evidence.)

5    BY MS. FINLEY:

6    Q    Now, if we can turn to Exhibit 12E, did there come a

7    time --

8        MS. FINLEY:  I'm sorry, Your Honor, permission to

9    publish?

10       THE COURT:  You may.

11       (An exhibit was projected onto the projector screen.)

12   BY MS. FINLEY:

13   Q    Did there come a time when Dr. Fredrick and Dr. Hough

14   requested your services again?

15   A    Yes.

16   Q    Do you remember when that was?

17   A    I don't remember, but the e-mail here shows

18   November 14th, 2008, when they purchased an adjoining lot.

19   Q    And if we can look at that e-mail in Exhibit 12E, the

20   bottom part of the e-mail, who is the e-mail from?

21   A    Dr. Patricia Hough.

22   Q    And who is it to?

23   A    To me.

24   Q    Is there anyone copied on the e-mail?

25   A    David Fredrick.

1   Q       Do you know whether Dr. Fredrick ever got this e-mail?

2   A       No.

3   Q       And you said the date is November 14th, 2008.

4   A       Correct.

5   Q       Could you read the e-mail to the jury?

6   A       The part from Dr. Hough and Dr. Fredrick?

7   Q       Yes, sir.

8   A       "We have put down an offer on some land next to our home

9   on Patton Mountain Road, in the name of our LLC.  Michael

10  Hartman is the agent.  Would you please give us a call when you

11  have a few minutes.  We are in Florida" -- and then their phone

12  numbers follow.

13  Q       Now, if you look at Exhibit 12F, and if we can look at

14  the bottom of the page, the November 17th, 2008, e-mail --

15  A       Um-hum.

16  Q       -- who -- at the very bottom part of the page, who is

17  the e-mail from?

18  A       David Fredrick to Susan Floyd, my legal assistant, CC'ed

19  to Patricia Hough.

20  Q       And if you could read this e-mail to the jury.

21  A       "Susan, I received the documents and will fax the signed

22  copy to you in the A.M.  I have instructed our overseas bank to

23  wire transfer funds to your account.  I will need to know

24  immediately when they arrive so I do not have to follow up

25  again.  Pat and I are leaving on a business trip to the

1   Caribbean tomorrow, A.M., Tuesday, and will only be available

2   by e-mail since our cell phones do not work on Saba or

3   St. Martin.  The overseas bank is normally reliable, but one

4   can never be sure how long it takes for wires to make it

5   through the process, so a closing on Monday, the 24th, sounds

6   okay if all goes well.  If not, it will have to be whenever the

7   funds arrive.  Thanks for your help.

8          "David L. Fredrick, Ph.D."

9   Q      Now, if we turn to Exhibit 12G . . . .

10  A      Um-hum.

11  Q      What is this document?

12  A      That is a settlement statement that represents the

13  receipt and disbursement of funds in connection with the lot

14  purchase.

15  Q      And how much did Lynn, Leon & Lyon Group pay for the lot

16  on Patton Mountain Road?

17  A      They paid 200,000 for it.

18  Q      And did they have a loan for that, or was it all cash?

19  A      It looks like they paid cash.

20  Q      And if we can look at the second page, does Dr. Fredrick

21  sign the settlement statement?

22  A      Yes.

23  Q      Now, if we can move to Exhibit 12H, can you explain to

24  the jury, the procedure for -- do you receive the funds, in

25  your escrow account, in order to pay for the land on behalf of

1   the client?

2   A      We receive all the closing funds -- when there's a

3   lender involved, from the lender; when there is cash buyer,

4   from the buyer -- and we put it into our trust account.  And

5   then we disburse so that everybody doesn't have to write

6   individual checks for every single item and expense.

7   Q      And what is -- is this a wired transfer confirmation for

8   your escrow --

9   A      It appears to be related to the funds that Dr. Fredrick

10  had sent in to the account; yes.

11  Q      And what is the date on the wire transfer?

12  A      November 18th, 2008.

13  Q      And does it say what the originating bank is?

14  A      Originating bank name is Fortis Banque (Suisse SA).

15  Q      And does it says the originator of the funds?

16  A      New Vanguard Holdings Limited.

17  Q      Now, in November of 2009, did Dr. Fredrick approach you

18  about selling the home and the land on Patton Mountain Road?

19  A      Yes.

20         MS. FINLEY:  The Court's indulgence for just a

21  moment?

22         If I can show you Exhibits I, J, and K.

23         THE COURT:  Are all of those 12?

24         MS. FINLEY:  They are -- I'm sorry, Your Honor --

25  12I, 12J, 12K.

1              (Ms. Finley provides exhibits to the witness.)

2    BY MS. FINLEY:

3    Q      So, in 12I, are these a series of e-mails that you

4    maintain in your files?

5    A      Yes, that is correct.

6              MS. FINLEY:  Your Honor, at this time the government

7    would offer 12I, 12J, and 12K into evidence.

8              MR. UDOLF:  No objection.

9              THE COURT:  12I, J, and K will be admitted.

10              (Government's Exhibits 12I, 12J, and 12K were

11        admitted into evidence.)

12              MS. FINLEY:  Permission to publish, Your Honor?

13              THE COURT:  You may.

14              (An exhibit was projected onto the projector screen.)

15    BY MS. FINLEY:

16    Q      Now, within the exhibits, are they chronological from

17    most recent to the farthest back?

18    A      They appear to be.

19    Q      So if we could start at the back of the exhibit, on

20    Page 21.

21    A      Um-hum.

22    Q      Can you explain to the jury, what was the deal initially

23    going to be . . . if you remember.

24    A      With --

25    Q      Yes -- well, was there initially a first buyer?

1    A       There was a first buyer that did not ever work out.

2    Q       And who are you dealing with for the sale of the land

3    and this house?

4    A       Looks like most of the e-mails were from Dr. Fredrick.

5    Q       And did you deal at all with the initial buyer or the

6    later buyer?

7    A       I think we had some communications with the initial

8    prospective buyer, e-mails back and forth.

9    Q       How is it that -- with respect to the initial buyer, how

10   was the transaction going to occur?

11   A       I believe it -- I don't have my settlement statement

12   here, but I believe it was a $1.2 million sale, with the buyer

13   paying $200,000 down on the outstanding debt to Top Fast, and

14   assuming the $1 million balance still due on that loan.

15   Q       And . . . .  If you can turn to Page 20, is this an

16   e-mail from Beth Baumann, who is an employee of your firm, to

17   Dr. Fredrick?

18   A       Yes.

19   Q       And is it dated November 4, 2009?

20   A       Yes.

21   Q       And what is Ms. Baumann asking of Dr. Fredrick?

22   A       Well, we're trying to make sure that the loan is

23   assumable before we allow the transfer to take place.  And

24   we're trying to get some communications from Top Fast to that

25   effect.

1   Q      Can you explain to the jury what you mean by, "the loan

2   is assumable"?

3   A      Most . . . most deeds of trust these days have what is

4   called "due-on-sale clauses" in them, which means they are

5   immediately due and payable upon the transfer of the property

6   to a new party if they are transferred without the consent of

7   the lender.  So if there is a transfer, which is unusual these

8   days, of an existing loan, we have to get consent from the

9   lender.  So we were trying to get that from Top Fast.

10  Q      And the so does that, in essence, mean that the buyer

11  would now be responsible for the mortgage?

12  A      Immediate repayment if there was a due-on-sale clause,

13  for -- repayment under the terms of the agreement, if not.

14  Q      Now you said that with respect to the initial buyer, you

15  had some communication, you think, with -- with the buyer.

16         Did you have some communication also with Top Fast?

17  A      We did.  I have some e-mails from Top Fast.

18  Q      If we turn to Page 17 . . . .

19         (An exhibit was projected onto the projector

20      screen.).

21  A      Yes.

22  Q      And on the bottom of the page, who is the e-mail from?

23  A      Top Fast Finance Limited.

24  Q      And is it Mike Gilroy?

25  A      It is Mike Gilroy, yes, um-hum.

1    Q      And if you could read the e-mail to the jury.

2    A      "Dear Ms. Baumann, I have been asked to confirm that

3    Marcos Arana, representing the firm Investment Corp SA, has

4    paid our company, Top Fast Finance Limited, a deposit of

5    $200,000, and has been approved for a mortgage assumption of

6    $1 million, for the house located at 470 Patton Mountain Road,

7    Asheville, North Carolina, 28804.  Top Fast Finance Limited

8    received the deposit of $200,000 on Wednesday, October 28,

9    2009, and approved Mr. Marcos Aranea for a mortgage of

10   $1 million at a rate of 4.5 percent for 20 years.  Thank you

11   for your assistance in handling the closing for Dr. David

12   Fredrick."

13   Q      Now, did this deal ultimately fall through?

14   A      I was told that it did; yes.

15   Q      And if we could turn to Page 15 of Exhibit 12I, in the

16   middle of the page, is there an e-mail from David Fredrick to

17   your employee, Beth Baumann?

18   A      Yes.

19   Q      Is Dr. Fredrick informing your firm that the deal came

20   through -- sorry -- fell through?

21   A      Yes.

22   Q      Did he also tell the firm that there was another

23   contract?

24   A      Yes.

25   Q      Now, if we could just jump to Exhibit 12J, for a

1   moment . . . do you recognize this document?

2   A      Yes.

3   Q      And what is this?

4   A      A letter from Dr. Fredrick.

5   Q      And what is Dr. Fredrick telling Ms. Baumann?

6   A      That he has a contract with a buyer called Aldunatec, to

7   assume the mortgage and sell the house and the adjacent

8   three acres.

9   Q      Now, if we could move back to 12I . . . and we look at

10  Page 14 --

11  A      Um-hum.

12  Q      -- at the top, the January 15th, 2010 . . . .

13  A      Okay.

14  Q      Did Ms. Baumann have questions for Dr. Fredrick

15  concerning the . . . carrying out of the deal?

16  A      She did.  She asked, in an e-mail that looks like it

17  went out on January 15th, 2010, a number of questions, to which

18  responses were provided by Dr. Fredrick in the return e-mail.

19  Q      And did -- did Dr. Fredrick, after Number 4 within the

20  body of that e-mail, did he say whether he was going to be

21  seeing the buyer?

22  A      Did he say whether he was going to be seeing the buyer?

23  Q      Yeah.  Did you provide the contract or other documents

24  that the buyer needed to sign, to the buyer directly, or did

25  you provide them to Dr. Fredrick?

1    A       I think they went through Dr. Fredrick.

2    Q       Now, do you remember whether there was a title search

3    for --

4    A       We did not -- we did not do a title search.

5    Q       In your experience, is it unusual for there not to be a

6    title examination?

7    A       Most of the time buyers want to confirm that the seller

8    has good title; but there are times when there are sales

9    between family members and related entities, or someone who

10   doesn't want to spend the money searching the title, that that

11   doesn't happen.

12           And there's nothing wrong with that, it's just -- we

13   always ask, because we don't want to incur the expense and

14   spend the time doing the work if folks don't want us to do

15   that.

16   Q       Now, if we could jump to Exhibit 12K . . . .

17           (An exhibit was projected onto the projector screen.)

18   A       Yes.

19   Q       And is this the real estate sales agreement for Lynn

20   Leon group to Aldunatec?

21   A       It appears to be, yes.

22   Q       And where is Aldunatec located?

23   A       They are located in Quito, Ecuador.

24   Q       And if we turn to Page 4 -- actually, let me ask you:

25   How much was the ultimate purchase price going to be?

1    A      1.2 million.

2    Q      And is that in Paragraph 3?

3    A      Is that what?

4    Q      Is that located in Paragraph 3?

5    A      Yes.  Yes.

6    Q      And it states that the buyer is going to assume --

7    A      Assume the existing mortgage; correct.

8    Q      Now, if we can turn to Page 4 . . . .

9           (An exhibit was projected onto the projector screen.)

10   A      Yes.

11   Q      Who signs for the buyer?

12   A      It says Florencio Montenegro, but I cannot read it.

13   Q      And who signs for the seller?

14   A      It says Dr. Fredrick, and it looks like the signature he

15   affixed to other documents previously.

16   Q      Now, if we can turn back . . . actually, if we can -- if

17   I can show you Exhibit 12N . . . .

18          (The witness examines an exhibit.)

19          MS. FINLEY:  And if we can publish 12N, please?

20          THE COURT:  It's not admitted yet.

21          MS. FINLEY:  I'm sorry.  Your Honor, at this time the

22   government would move to admit Exhibit 12N, as in "Nancy."

23          THE COURT:  Any objections?

24          MR. UDOLF:  No objection, Your Honor.

25          THE COURT:  12N will be admitted, and may be

1    published.

2              MS. FINLEY:  Thank you, Your Honor.

3              (Government's Exhibit 12N was admitted into

4         evidence.)

5              (An exhibit was projected onto the projector screen.)

6    BY MS. FINLEY:

7    Q     Now, again, is this the -- as you testified earlier,

8    it's for the disbursement of funds and where all the money

9    needs to go on the transaction?

10   A      This is a summary of the money received and disbursed;

11   correct.

12   Q      And the seller is Lynn, Leon & Lyon Group?

13   A      Correct.

14   Q      And the buyer is Aldunatec?

15   A      Correct.

16   Q      And it states that the contract sales price, as in the

17   agreement we looked at, is $1.2 million.

18   A      A loan assumption; yes.

19   Q      And if we can look at the last page -- sorry, on the

20   bottom of the first page, first, does it appear that there are

21   signatures?

22   A      It does.

23   Q      And whose signatures appear there?

24   A      It says Florencio Montenegro and David L. Fredrick.

25   Q      And if we turn to the second page of Exhibit 12N -- I'm

1   sorry, the third page, are the individuals the same individuals

2   signing on that page?

3   A      It says the same people are signing; correct.

4   Q      All right.  And if we turn this back, and if we can

5   maybe put them side by side, from the first page and the third

6   page, does it appear that Mr. Montenegro's signature is

7   different on the first page from the third page?

8   A      I'm not a handwriting expert, but it does look like a

9   different signature.

10  Q      Did Dr. Fredrick ever say what his relationship was to

11  Mr. Montenegro?

12  A      If he did, I don't think I have any information on that.

13  Q      Now, if we could turn back to Exhibit 12I --

14  A      All right.

15  Q      -- and turn to Page 6 . . . .

16  A      Um-hum.

17  Q      Once the . . . transaction was completed, what did you

18  do with the closing documents and other documents that the

19  buyer might need?

20  A      (Witness reviews exhibit.)

21  Q      And if we look at the e-mail dated February 9, 2010, in

22  the middle of the page, did your employee request that

23  information from Dr. Fredrick?

24  A      Yes.

25  Q      And what did Dr. Fredrick say?

1    A      "I'll Hang on to the original deed and settlement

2    statement until I get a more accurate address.  He recently

3    moved from Ecuador to Guatemala, and said he would send me his

4    new address in a few days.  I will also be meeting him next

5    week so, if appropriate, could I hand carry it to him.  Let me

6    know."

7    Q      And if we can turn to Page 1 of Exhibit 12I . . . .

8    A      Um-hum.

9    Q      Even though the -- Aldunatec was assuming the mortgage,

10   were there some funds that needed to be distributed?

11   A      There were closing costs and prorations; that's correct.

12   Q      All right.  And did your firm request wire or bank

13   information for the buyer?

14   A      I think we did.

15   Q      And do you remember who provided that information to

16   you?

17   A      I'd have to go back over the e-mails, but . . . .  I

18   think it was probably Dave Fredrick, "the new owner will send

19   the account information within a few days."

20   Q      And you don't remember ever receiving any e-mails

21   directly from the buyer.

22   A      I don't remember seeing any.

23   Q      Did Dr. Fredrick or Dr. Hough ever tell that you they

24   controlled Aldunatec?

25   A      No.

1   Q       And now I'm going to show you what's been marked as

2   Exhibit 12P and 12Q.

3               (Ms. Finley provides exhibits to the witness.)

4               MS. FINLEY:  Now, if we could look at 12P -- Your

5   Honor, at this time we would offer 12P and Q, as in "queen,"

6   into evidence.

7               THE COURT:  Any objections?

8               MR. UDOLF:  No objection, Your Honor.

9               THE COURT:  12P and 12Q will be admitted.

10              (Government's Exhibits 12P and 12Q were admitted into

11       evidence.)

12  BY MS. FINLEY:

13  Q       And looking at Exhibit 12P, and we look on Page 3, who

14  is providing the wire transfer information for Mr. Montenegro?

15  A       Dr. Fredrick is.

16  Q       And if we turn to Page 2, is that the wire transfer

17  information?

18  A       It looks like it is, um-hum.

19  Q       And if we turn to Page 1 of 12P, is that the

20  confirmation that the funds were disbursed?

21  A       I think so, um-hum.

22  Q       And can you tell, on the top, how much money was

23  disbursed?

24  A       $1,180.71.

25  Q       And lastly, if you can look at 12Q . . . .

1    A       Yes.

2    Q       What is 12Q?

3    A       12Q is the deed transferring the property from Lynn,

4    Leon & Lyon Group LLC to Aldunatec, both tracts, subject to the

5    deed of trust.

6    Q       And that was the house -- the tract that the -- and the

7    house and the land next door.

8    A       That's correct.

9    Q       And what is the date of the deed?

10   A       The deed is dated February 2nd, 2010.

11   Q       And was it filed on the same day or --

12   A       It was.

13           MS. FINLEY:  May I confer with my counsel for a

14   moment, Your Honor?

15           THE COURT:  You may.

16           (Ms. Finley confers with Ms. Kessler  privately.)

17           MS. FINLEY:  The government has no further questions.

18           THE COURT:  All right.  Thank you.

19           Mr. Udolf?

20                        CROSS EXAMINATION

21   BY MR. UDOLF:

22   Q       Good morning, Mr. Rudow.

23           So, if I may ask you, were you involved in the original

24   purchase of this property on Patton Mountain Road?

25   A       Only the lot, not the house.

1   Q      All right.  The lot -- you had nothing to do with the

2   transaction that you were questioned about earlier today that

3   took place in 2005; is that correct?

4   A      Correct.

5          MR. UDOLF:  Can we bring up 12B, please?

6          (An exhibit was projected onto the projector screen.)

7   BY MR. UDOLF:

8   Q      Earlier, when counsel was questioning you, they noted

9   that this price was for $1.2 million; is that correct?

10  A      That the amount of the note was for 1.2?

11  Q      Right.

12  A      It's a little inconsistent because it says 1.2 in one

13  place and 1.6 in another.

14  Q      That's what I was going to ask you about.

15         Do you know why there is a difference in those numbers?

16  A      I did not prepare that document so I do not know.

17  Q      The note in Paragraph e, there is a parenthesis that

18  says 1,206,000 Swiss franks; is that correct?

19  A      It does say that.  Above it, it says 1 million

20  U.S. dollars.

21  Q      Down below, in Paragraph 6, Subsection 1, it says USD,

22  U.S. dollars, 1.6; is that right?

23  A      Correct.

24  Q      You don't know which one is accurate; is that correct?

25  A      I do not.

1   Q      You don't . . . .  You don't have any explanation for

2   that, do you?

3   A      I do not.

4   Q      All right.  Now, you said you have been a real estate

5   attorney -- how many closings do you do a year; do you know?

6   A      Probably three or four hundred, at least.

7   Q      Do you know how many closings you've done since this

8   particular event?

9   A      That was about three years ago, so I would expect a

10  thousand, at least.

11  Q      And as a real estate attorney, you know it's not

12  uncommon for people to be concerned with asset protection; is

13  that right?

14  A      Correct; yeah.

15  Q      Particularly doctors.

16  A      Correct.

17  Q      And that's because doctors are more vulnerable, perhaps,

18  than most people to lawsuits; is that right?

19  A      Correct.

20  Q      And it's not uncommon for people to purchase property,

21  either doctors or people who want to protect their assets, to

22  put it in the title of an LLC; correct?

23  A      Correct.

24  Q      Which is a limited liability company.

25  A      Right.

1    Q      Which is what -- I forget the name of the acronym, but

2    which is what LLL was --

3    A      Correct.

4    Q      -- the entity that was purchasing this property.

5    A      That was the name in which they took the house, as well,

6    so it makes sense to take the lot in the same name.

7    Q      Now, in all of these documents that have been admitted

8    into evidence, all these 12-series documents, each of those

9    documents, with the letter 12 -- with the number 12, and

10   letters, contain a series of sub-pages, is that right; some of

11   them as much as 20 pages; is that correct?

12   A      Correct, um-hum.

13   Q      All right.  Have you looked through all those documents

14   as you prepared for your testimony here today?

15   A      At some point I think I did; yes.

16   Q      As a matter of fact, all these documents came, I

17   believe, all from your records; isn't that right?

18   A      Correct.

19   Q      All right.  Other than the two e-mails that you've

20   previously told us about, from Dr. Hough, were there any other

21   e-mails sent to -- sent by Dr. Hough at all?

22   A      I don't recall any other e-mails from Dr. Hough.

23   Q      All right.  Were any of the documents that you have read

24   from -- and there were a lot of them, I'm not going to go

25   through each one -- were any of these documents, the deeds, the

1    contracts, the letters, were any of those documents signed by

2    Patricia Hough?

3    A      They were not.

4    Q      All right.  Have you ever met Patricia Hough, other than

5    the first time you did the intake on this particular case?

6    A      I don't recall any other times that she was in my office

7    to go over any of this.

8    Q      As a matter of fact, I saw you this morning, and

9    Dr. Hough came up to me, and you thought she was someone that

10   worked for me; is that right?

11   A      Correct.

12          MR. UDOLF:  Well, let's look at -- if we could see

13   Exhibit 12H?

14          (An exhibit was projected onto the projector screen.)

15   BY MR. UDOLF:

16   Q      There was no secret, was there, that . . . that some of

17   the money -- well, I'm jumping ahead.

18          After the property was purchased in 2005, in February of

19   2008, there was a lien placed on that property; is that

20   right --

21   A      I think that's the right date.

22   Q      -- by Top Fast?

23   A      Yeah.  Whenever that happened, a recorded document?

24   Q      And that's the document that was shown to you earlier.

25   A      Right.

1   Q      And that was for $1.2 million; is that correct?

2   A      I think it said 1.5 on the deed of trust.

3   Q      And again, you don't know why it says 1.5 --

4   A      I remember seeing a note in the file, when I reviewed

5   the file, that said 1.5.  So, for some reason, Dr. Fredrick

6   suggested that we put 1.5, and not 1.6.

7   Q      But that was at Dr. Fredrick's suggestion?

8   A      That's right.

9   Q      And then in the latter part of '08, Dr. Fredrick

10  indicated that he wanted to purchase an adjoining set of lots

11  to his property; is that right?

12  A      Lot, I think; right.

13  Q      Do you know how many acres that was?

14  A      I don't remember.

15  Q      Do you know why he wanted to purchase that?

16  A      I would assume to protect his property, but I don't know

17  why.

18  Q      Okay.  And do you know how that was paid for?

19  A      The lot purchase was paid for with cash.

20  Q      All right.  Well, now, when you use the term,

21  "Cash" . . . .

22  A      There's no lender involved.  There was no lender

23  involved --

24  Q      Does that mean literally that --

25          COURT REPORTER:  One at a time, please.

```
 1              MR. UDOLF:  Sorry.
 2   BY MR. UDOLF:
 3   Q      Does that mean that someone comes in with a suitcase
 4   full of cash?
 5   A      Oh, no.  They wire funds to our account.
 6   Q      And in fact, this document that we're looking at here,
 7   which is Government's Exhibit 12H, reflects that wiring; is
 8   that right?
 9   A      Correct.
10   Q      And that's being wired from New Vanguard Holdings; is
11   that right?
12   A      That is the originator.
13   Q      And that is from a Swiss bank account, is it not?
14   A      It appears to be.
15   Q      And it's no secret that that's coming from a Swiss bank
16   account, is it.
17   A      It's not public knowledge, but it's clearly disclosed on
18   that document; that's correct.
19   Q      All right.  Counsel asked you earlier about the fact
20   that there was not a title search done on this property when
21   this property was eventually sold in the beginning of 2010; is
22   that right?
23   A      Yes.
24   Q      And you said that's not uncommon; it's not usual, but
25   it's not unusual, to see that; is that right?
```

1   A      From time to time, when they're related parties, family

2   transfers, that's typically when you see it.  When people don't

3   put any money into the project, they don't always spend the

4   time --

5   Q      And there was no money being put into this project, was

6   there?

7   A      The Aldunatec sale, that's correct.

8   Q      They were just assuming the note; is that correct?

9   A      Correct.

10  Q      And the note was for how much?

11  A      The balance at that point was 1.2 million.

12          MR. UDOLF:  I believe that's all I have.  Thank you.

13          THE COURT:  All right.  Thank you.

14          Ms. Finley?

15          MS. FINLEY:  Just briefly, Your Honor.

16                    REDIRECT EXAMINATION

17  BY MS. FINLEY:

18  Q      Mr. Rudow, do you know whether Dr. Hough is a 50 percent

19  partner in the Lynn, Leon & Lyon Group?

20  A      I have no idea.

21  Q      And do you know who owns New Vanguard?

22  A      I have no idea.

23          MS. FINLEY:  No further questions, Your Honor.

24          THE COURT:  Mr. Udolf, anything further?

25          MR. UDOLF:  Nothing, thank you, Your Honor.

1            THE COURT:  You may stand down.  Thank you.

2            THE WITNESS:  Thank you.

3            (The witness left the witness stand and left the

4       courtroom.)

5            THE COURT:  You may call your next witness.

6            MS. FINLEY:  Thank you.

7            MS. KESSLER:  Your Honor, the government calls

8    Mr. Hartman.

9            THE COURT:  Right up here, please.

10           MR. HOCHMAN:  Your Honor, our monitors are dark.  I

11   don't know where the power button is.

12           THE COURT:  Well, mine is dark too.

13           (There was discussion off the record.)

14           (Mr. Hochman confers with the Courtroom Deputy

15       regarding the video feed.)

16           MR. HOCHMAN:  Your Honor, we'll figure it out during

17   the break.

18           THE COURT:  All right.

19           THE COURTROOM DEPUTY:  If you'd stand and raise your

20   right hand, please.

21           Do you solemnly swear or affirm to tell the truth,

22   the whole truth, nothing but truth, in the case now before the

23   Court?

24           THE WITNESS:  I do.

25           THE COURTROOM DEPUTY:  Thank you.  You may have a

1    seat.

2              State your full name, spelling your last.

3              THE WITNESS:  Michael Alan Hartman, H-A-R-T-M-A-N.

4                        MICHAEL HARTMAN,

5    called as a witness by the Government, and having been first

6    duly sworn, was examined and testified as follows:

7                        DIRECT EXAMINATION

8    BY MS. KESSLER:

9    Q      Good morning, Mr. Hartman.

10   A      Good morning.

11   Q      Can you tell the jury where you live?

12   A      I live in Flat Rock, North Carolina.

13   Q      And what do you do for a living?

14   A      I am a North Carolina real estate broker.

15   Q      How long have you been doing that?

16   A      January 1st, 2002, is when I started.

17   Q      Did there come a time, as part of that job, that you

18   came into contact with Dr. Fredrick, David Fredrick, or

19   Patricia Hough?

20   A      Yes.

21   Q      Approximately when was that?

22   A      2005.

23   Q      And who did you have contact with?

24   A      Dr. Fredrick.

25   Q      What was the reason for him contacting you?

1    A      Dr. Fredrick called to look at a property that I had

2    listed for sale, and said he was interested in finding a

3    vacation home in the mountains of North Carolina.

4    Q      Did Dr. Fredrick give you any parameters of what sort of

5    property he was looking for?

6    A      Well, he was interested in a larger home, one with a

7    view, convenient to the Asheville airport.

8    Q      Did he give you square footage or price parameters?

9    A      Well, it would have been anywhere, say, from eight or

10   nine hundred thousand to a million five.

11   Q      Dollars, not square feet?

12   A      Yes.  Thank you.

13   Q      Did you have ongoing contact with Dr. Fredrick, or meet

14   with him on more than one occasion, to look at properties?

15   A      Yes.  During that year, I would send him potential

16   properties for consideration.  He would pick out the ones he

17   was interested in, and fly into the Asheville airport, where I

18   picked him up, and we'd go look.

19   Q      Is Asheville near where you live, Flat Rock?

20   A      Kind of between Flat Rock and Asheville.

21   Q      Did Dr. Fredrick indicate that he wanted to focus in one

22   particular area?

23   A      Well, not initially.  The first property that I showed

24   him was in Flat Rock.  But after a while, it became more

25   apparent that he liked Asheville better than Flat Rock; a

1    little higher in elevation, a little closer to the airport.

2    Q       Did you have much contact with Dr. Hough in the course

3    of this process?

4    A       I'm sorry, say that again?

5    Q       Did you have much contact with Dr. Hough in the course

6    of this process?

7    A       No.  None.

8    Q       During the course of the process, did you have

9    conversations with Dr. Fredrick about what he and his wife did

10   for a living?

11   A       Yes.  I knew that he was a doctor, and that he had

12   medical school, or schools.

13   Q       Did you recall where those were?

14   A       No.  I believe he said they were offshore, in the

15   Florida area.

16           MS. KESSLER:  If I could have Government's

17   Exhibit 13-B, like "boy"; 13C, like "cat", 13D, like "dog"; E,

18   like "Edward"; and F, like "Frank," marked?

19           THE COURT:  You may.

20           MS. KESSLER:  Thank you.

21           May I approach the witness freely, Your Honor?

22           THE COURT:  You may.

23   BY MS. KESSLER:

24   Q       Mr. Hartman, if you could open up and take a look at

25   Exhibit 13B?

1          THE COURT:  First of all, any objection to any of

2     those exhibits?

3               MR. UDOLF:  None, Your Honor.

4               THE COURT:  13B, C, D, E, and F will be admitted.

5               (Government's Exhibits 13B, 13C, 13D, 13E, and 13F

6          were admitted into evidence.)

7               MS. KESSLER:  Permission to publish, Your Honor?

8               THE COURT:  You may.

9               (An exhibit was projected onto the projector screen.)

10    BY MS. KESSLER:

11    Q     Looking at Exhibit 13B, the first page of this document,

12    what is this, Mr. Hartman?

13    A     This is a copy of a listing, out of our multiple listing

14    service, at 470 Patton Mountain Road in Asheville.

15    Q     Was this property ultimately purchased by Dr. Fredrick?

16    A     Yes, ma'am.

17    Q     Looking at the very top of this document, what do those

18    two dollar numbers there mean, LP and ORG LP?

19    A     Well, the . . . .  The second one stands for "original

20    listing price."  And the top one is the last listing price,

21    the -- prior to it selling.

22    Q     Can you describe this property?

23    A     Well, it's an -- as you can see in the right-hand

24    column, it has 5,588 square feet, built in 1996.  On the left

25    side, it has five bedrooms, two and a half baths.  And just

1   below, in the next section, it has approximately 7.3 acres.

2   Q       Do you recall when this property was purchased by

3   Dr. Fredrick?

4   A       Well, I sold this property to him in 2005, July of 2005.

5   Q       And do you recall the name of the entity that the

6   property was titled in, after the purchase?

7   A       Yes.  It was purchased in the name of Lynn, Leon & Lyon

8   Group.

9   Q       Did Dr. Fredrick tell you why it was purchased in the

10  name of that entity?

11  A       No.

12  Q       Did Dr. Fredrick tell you anything about the intended

13  use of this property?

14  A       Just as his residence.

15  Q       Did he ever say that it was intended to be used as a

16  dormitory or any sort of residential property for -- related to

17  the medical schools?

18  A       No.

19  Q       Did there come a time when Dr. Fredrick contacted you

20  about looking at additional properties?

21  A       Yes.

22  Q       And did Dr. Fredrick say why he wanted to look at

23  additional properties?

24  A       He was interested in looking at additional properties as

25  an investment, something that he could pass on to his heirs

1    upon his death.

2    Q      When Dr. Fredrick --

3           MS. KESSLER:  If we could look at -- publish

4    Exhibit 13D, please?

5           (An exhibit was projected onto the projector screen.)

6    BY MS. KESSLER:

7    Q      Do you recognize this document, 13D, like "dog"?

8    A      Oh.

9           (Witness examines document).

10   A      Yes.

11   Q      What is this document?

12   A      Well, the first page of that document is an e-mail sent

13   to him, on June the 24th, to update him on results of a

14   property search that I was undertaking for him.

15   Q      And did you look at a number, or did Dr. Fredrick

16   consider a number of properties at this time?

17   A      Yes.

18   Q      Do you recall the parameters of the search this time?

19   A      Parameters were 400 acres or more, if possible; up to

20   $10 million.

21   Q      And was Dr. Fredrick interested -- were you looking in

22   the same area -- general area, again?

23   A      Well, he didn't limit my search to any given area, so I

24   had a fairly broad spectrum of search.

25   Q      Do you recall what states he looked in?

1    A      Yes.  Obviously, I looked in the Asheville area of North

2    Carolina.  I looked in Tennessee.  I found some parcels there.

3    I found one, I-81 in Virginia.  But the bulk of them were in

4    North Carolina, in different directions from Asheville.

5    Q      And looking back to Exhibit 13D, were these the

6    documents that you would have required to be signed by a

7    potential buyer before you would assist them in . . . .

8    A      Yes.  Once we got to where we were going to do

9    something, then I put him under an agency agreement,

10   nonexclusive agency agreement.

11   Q      Which is this -- the page on the bottom left-hand

12   conner, Page Number 6?

13          I just want to make sure what document you're looking

14   at.

15          Is it this document?

16   A      Yes.

17   Q      Now, do you recognize the signature midway near the

18   bottom of this document?

19   A      Yes.

20   Q      And whose signature is that?

21   A      It's Dr. Fredrick's.

22   Q      And is that your signature below?

23   A      Yes, ma'am.

24   Q      And when -- when was this agency agreement executed, if

25   we could move to Page 8, the last page of the exhibit?

1    A        It was executed by him on 6/15, and by me on 6/25

2    of '08.

3    Q        Now, if we move back to Exhibit 13C, did your search pan

4    out for any of those large tracts of land for Dr. Fredrick?

5    A        No.  None of them -- well, the first one that I looked

6    at, at his request, was not a good investment, and I suggested

7    he not buy it.  The others, we never actually looked at them,

8    and he did not buy any of them.  The only thing that he did buy

9    as a result of this effort was a lot located next to his

10   current residential parcel in Asheville.

11   Q        And if we turn to Exhibit 13C, do you recognize this

12   document?

13   A        Yes.  That is the parcel that he bought next to his

14   existing seven acres.

15   Q        And did you approach Dr. Fredrick about purchasing this

16   property, or did he approach you?

17   A        He approached me.

18   Q        Was an offer put in to purchase the property?

19   A        Yes.

20   Q        Turning to Exhibit 13E, Page 2 . . . .

21            Are you in the same place in 13E, Page 2?

22   A        Yes, ma'am.

23   Q        Do you recognize this document?

24   A        Yes.  This was the offer that was made on the lot.

25   Q        And what was the name of the entity that would be buying

1   the property pursuant to this offer?

2   A     Oh.  At the top, Lynn, Leon & Lyon Group LLC.

3   Q     And if we look further down, Paragraph 2, what was the

4   purchase price?

5   A     200,000.

6   Q     Now, this document that we're looking for, if we pan

7   out, there aren't any initials on this document.

8         Was this the proposed draft that you sent to

9   Dr. Fredrick?

10  A     Yes.

11  Q     And . . . .  And was that -- the terms of that offer,

12  were those prepared at the client's request, or instruction?

13  A     Yes.

14  Q     Now, if we turn to Exhibit 13F, again turning to Page 2,

15  is this the executed offer to purchase signed by and initialed

16  by Dr. Fredrick?

17  A     Yes.

18  Q     Are those his initials at the bottom . . . of Page 1.

19  I'm sorry.  Page 2, excuse me.

20  A     Yeah, these are all his initials.

21  Q     And turning to Page 9 of the document . . . .

22        Whose signature is that, at the bottom?

23  A     That is his signature.

24  Q     What was the date of the offer to purchase this

25  property?

1   A      Well, he signed it on . . . November 10th . . . of '08.

2   Q      Did Dr. Fredrick say why he wanted to buy this lot?

3   A      Just for additional privacy.  Seemed like a natural

4   thing, he said, for him to do, since he already owned the

5   seven acres, to buy it.

6          MS. FINLEY:  Your Honor, may I approach to have

7   Exhibits 13G and H marked?

8          THE COURT:  You may.

9          MS. KESSLER:  At this time I'd move into evidence

10  Exhibits 13G and H.

11         MR. UDOLF:  No objection.

12         THE COURT:  13G and H will be admitted.

13         (Government's Exhibits 13G and 13H were admitted into

14     evidence.)

15  BY MS. KESSLER:

16  Q      If we turn first to Exhibit 13G, was the offer to

17  purchase the lot next door accepted?

18  A      Yes.

19         (An exhibit was projected onto the projector screen.)

20  Q      And what is this document?

21  A      This is the executed contract that the offer was based

22  on, and then signed by both parties.

23  Q      And did the terms remain generally the same as the

24  initial offer made by Dr. Fredrick, in terms of purchase price

25  and the name in which the property would be purchased?

1    A       Yes.

2    Q       Now, what was your understanding of how the property

3    would be purchased; would it be purchased by way of a loan, or

4    cash, or some other manner?

5    A       Cash.

6    Q       If we turn to Exhibit 13-H, like "Harry" . . . .

7            Do you recognize this document, Mr. Hartman?

8    A       Yes.

9    Q       What is this?

10   A       This is the Housing and Urban Development settlement

11   statement, called a HUD statement, on settling this purchase.

12   Q       And this is -- is this signed -- or executed?

13   A       This one is not signed or executed.  But it was signed

14   and executed.

15   Q       This reflects the same terms as your understanding of

16   the ultimate purchase of the property?

17   A       Yes.

18   Q       And does it indicate on here in any place that the

19   purchase was made in cash?

20   A       Yes.  On the left-hand column, which represents the

21   buyer's transaction, at the bottom, he had put $10,000 down on

22   the lot --

23   Q       Is that at Line 302?

24   A       Yes, ma'am.

25           And then the line below that shows that the balance due

1   was in cash, from the buyer, of 191,126.57.

2   Q      Now, if we look back at Exhibit --

3          MS. KESSLER:  No further questions, Your Honor.

4          THE COURT:  All right.

5          Mr. Udolf?

6                        CROSS EXAMINATION

7   BY MR. UDOLF:

8   Q      Good morning, Mr. Hartman.

9   A      Good morning.

10  Q      Before we go further, does the term "cash" have a

11  different meaning in real estate transactions than it does in

12  everyday life?

13         When you say there's a cash deal, what does that mean?

14  A      Just means it was not financed.

15  Q      All right.  And, in fact, in this particular deal, where

16  there was $200,000 paid, that was done by wire transfer from a

17  Swiss bank account; is that correct?

18  A      I don't know the source of the money.

19  Q      All right.  But -- you anticipated my next question.

20         Do you know whether any of this money used for the

21  purchase of the Asheville home was a loan that was approved by

22  the board of Dr. Fredrick's foundation?

23  A      I do not know that.

24  Q      Do you recall ever talking with Dr. Hough, at all?

25  A      No.

1    Q      You do not know Dr. Hough, do you?

2    A      Only by name.

3    Q      I see.

4           And you had no dealings with her relative to the

5    original purchase of this property in 2005?

6    A      Correct.

7    Q      You had no dealings with her in the search of the

8    properties in June, 2008, when you say Dr. Fredrick was looking

9    for other properties to invest in; is that right?

10   A      No.  No.

11   Q      And you had no dealings with her for the purchase of the

12   lot for $200,000, in November of '08; is that right?

13   A      Correct.

14   Q      All your dealings, at all times, were with Dr. Fredrick;

15   is that right?

16   A      Yes.

17   Q      And, in fact, all of the documents that you were shown

18   here this morning, each and every one of them where there's --

19   Dr. Fredrick's signature appears, there is no signature for

20   Dr. Hough; is that right?

21   A      That's correct.

22           MR. UDOLF:  I brief that's all.  Thank you very much.

23           THE COURT:  All right.  Thank you.

24           MS. KESSLER:  No redirect, Your Honor.  Thank you.

25           THE COURT:  You may stand down.  Thank you.

```
 1                    THE WITNESS:  Thank you.
 2                    (The witness left the witness box.)
 3               THE COURT:  You may call your next witness.
 4               MS. KESSLER:  Your Honor, may we have a moment to
 5     confer with counsel?
 6               THE COURT:  Sure.
 7               You may stand and stretch.  I'm going to try to keep
 8     you to noon, and not break at 10:00.
 9               Anyone have other needs?
10               No one?  All right.
11               MS. KESSLER:  Your Honor, may we take a five-minute
12     break?
13               THE COURT:  I just told them I wasn't going to do
14     that.
15               MS. KESSLER:  I'm sorry.
16               THE COURT:  However, cooler minds have prevailed.
17     Let's take ten minutes.
18               Again, please do not discuss the case among
19     yourselves, or allow anyone to discuss it with you or in your
20     presence.  About ten minutes.
21                    (At 11:27 AM, the jury was escorted from the
22          courtroom.)
23                    (At 11:28 AM, court was recessed.)
24                              AFTER RECESS
25                    (At 11:39 AM, court was reconvened.)
```

1          THE COURT:  All right.  Both sides ready for the

2    jury?

3          MR. UDOLF:  Yes, Your Honor.

4          MS. FINLEY:  Yes, Your Honor.

5          THE COURT:  Have the jury step in, please.

6          Would you like to get your next witness in?

7          (At 11:40 AM, the jury was escorted into the

8       courtroom.)

9          THE COURTROOM DEPUTY:  If you'd raise your right

10   hand.

11         Do you solemnly swear or affirm to tell the truth,

12   the whole truth, nothing but the truth, in the case now before

13   the Court?

14         THE WITNESS:  Yes, ma'am.

15         THE COURTROOM DEPUTY:  You may have a seat.

16         If you would state your full name, spelling your

17   last.

18         THE WITNESS:  Marion Ruth Cronan, C-R-O-N-A-N.

19                         MARION CRONAN,

20   called as a witness by the Government, and having been first

21   duly sworn, was examined and testified as follows:

22                      DIRECT EXAMINATION

23   BY MS. KESSLER:

24   Q    Miss Cronan, can you tell the members of the jury what

25   you do for a living?

1    A     I am retired, and I worked . . . retail management.

2    Q     I'm sorry, you retired, you worked what?

3    A     Retail.

4    Q     Where do you live?

5    A     Superior, Wisconsin.

6    Q     And what did -- do you know an individual by the name of

7    David Fredrick?

8    A     Yes.

9    Q     What is your relationship to him?

10   A     Brother.

11   Q     Is he your full brother or your half-brother?

12   A     Half.

13   Q     Looking back on your relationship, do you speak with him

14   often?

15   A     Not often.

16   Q     Let me ask you this:  Did you all grow up together?

17   A     Yes.

18   Q     Were you similar in age?

19   A     He's . . . three years older than me.

20   Q     Did you grow up in the same house --

21   A     Yes.

22   Q     -- for a significant period of time?

23   A     Up until he went into the army.

24   Q     Okay.  Did you have a close relationship when you were

25   growing up?

1   A       Yes.

2   Q       And then did that change after your brother left to join

3   the army?

4   A       Yes.

5   Q       How did it change?

6   A       Well, he lived quite a ways away, and he was busy going

7   to school, and he was in the army, and I didn't see him much.

8   Q       When you say he was busy running the school, what are

9   you referring to?

10  A       I meant he was going to college.

11  Q       Oh, going to school.  I'm sorry.

12  A       Yes.  Going to school.

13  Q       Did you talk often during that time?

14  A       No.

15  Q       Did you see each other often?

16  A       No.

17  Q       Can you estimate about how often you would see or talk

18  to one another?

19  A       No.

20  Q       Do you think that you would talk to him maybe once a

21  year, or was it more or less than that?

22  A       It was probably maybe three times a year --

23  Q       All right.

24  A       -- like birthdays and holidays.

25  Q       Okay.  Has your -- did your relationship stay the same

54

1    as you all moved further on in life?

2    A      Yes.

3    Q      Talking infrequently, but on major holidays or

4    birthdays, things like that?

5    A      Right.

6    Q      Do you know Patricia Hough?

7    A      Yes.

8    Q      And how do you know her?

9    A      She's my sister-in-law.

10   Q      Is she married to your brother?

11   A      Yes.

12   Q      Do you speak with her often?

13   A      No.

14   Q      About the same as would you speak to your brother?

15   A      Right.

16   Q      What do you understand Dr. Fredrick and Dr. Hough to do

17   for a living?

18   A      At this point right now, she works at a . . . at a

19   center in Sarasota.

20   Q      Looking back, did you ever understand them to be

21   involved in some offshore medical schools?

22   A      Yes.

23   Q      What did you understand the work to be that they did

24   related to those schools?

25   A      I think she did all the accreditations for the schools,

1    which I understand, and he did the work of like supplying --

2    and getting container ships together for sending over to the

3    schools, of supplies, and getting students.

4    Q      Do you recall the name of those schools?

5    A      Saba.

6    Q      Do you recall where that is?

7    A      It's over in the Caribbean.

8    Q      And have you ever been to the campus?

9    A      No.

10   Q      Do you know who started the school?

11   A      David and Pat.

12   Q      Do you recall when that was?

13   A      No, I don't.  Maybe . . . .  I can guess.  But -- no?

14   Okay.

15   Q      How do you know that they started the schools; how did

16   you learn that?

17   A      From them.

18   Q      Can you be clear about who "him" is?

19   A      David and Pat.

20   Q      Do you know what -- where they obtained the money in

21   order to start the schools?

22   A      No, I don't.

23   Q      Did you ever talk about Saba University School of

24   Medicine with Dr. Hough?

25   A      Well, I mean, indirectly.  It would be like if we

1    talked, if it was concerning the schools, I mean -- you know,

2    if she was traveling to get accreditations throughout the

3    states.  But that's about . . . .  That's about it.

4    Q     Okay.  Do you have any understanding of who owns the

5    schools?

6    A     No.  Right now you mean?

7    Q     Did you ever?

8    A     Well, I think they ran them.  I don't know if -- I know

9    they ran the schools, they started the schools.

10   Q     All right.  And when you refer to "they," I just want to

11   make sure you're referring to Dr. Fredrick and Dr. Hough?

12   A     Yes.

13   Q     Okay.  Have you ever received money or gifts from your

14   brother or Dr. Hough?

15   A     Yes.

16   Q     Do you recall when that was, when the first gift was

17   that you received?

18   A     It was in -- in 2005.

19   Q     2005?

20   A     Yes.

21   Q     And do you recall how much that gift was?

22   A     50,000.

23   Q     What was the nature of that gift; what was -- how did it

24   come about?

25   A     How did it -- it came about -- I had gotten ill, my

1    sister talked to him, and he sent me money.

2    Q      Your sister talked to him and -- are you referring to

3    your brother?

4    A      Yes.

5    Q      Do you recall how much money he sent to you?

6    A      50,000.

7    Q      Did you understand that money to be a gift?

8    A      Yes.

9    Q      Was there ever any discussion that you might need to pay

10   it back?

11   A      No.

12   Q      Now, did there come a time that you received a gift from

13   Dr. Hough?

14   A      Yes.

15   Q      Do you recall when that was?

16   A      You know, I -- no, I don't.  It was in that period of

17   time.  It was . . . .  It could have been in 2 -- maybe 2006.

18   Q      Okay.  In or around the mid-2000s.

19   A      Yes.

20   Q      And do you recall the amount of the gift?

21   A      10,000.

22   Q      And do you recall how that gift came about?

23   A      She helped me out with some insurance.

24   Q      Was that related to the medical problems that you were

25   having?

1   A      Yes.

2   Q      Did you understand . . . that that was also a gift; was

3   there ever any discussion that that would need to be repaid?

4   A      No.

5   Q      Did there also come a time when you received a

6   substantial gift in April of 2007?

7   A      Yes.

8   Q      What was the amount of that gift?

9   A      250,000.

10  Q      How did that gift come about; how did you find out about

11  that?

12  A      I found out about it . . . .  Well, it was from my

13  sister that had talked to David, and he was putting into an

14  account to pay off our houses.

15  Q      Okay.  Did you receive a payoff on your house?

16  A      Yes.

17  Q      Was it paid off in full?

18  A      Yes.

19  Q      And out of the $250,000, was there money left over?

20  A      Yes.

21  Q      And did you receive the remainder?

22  A      Yes.

23  Q      How did you receive that; was it cash, or --

24  A      It was just -- it was always in the bank.

25  Q      It was deposited to the bank?

1    A      Right.   It was deposited directly -- he deposited --

2    David deposited it directly into the bank.

3    Q      All right.   Was there -- what did you understand had

4    happened, that your brother would have this kind of money to

5    make a gift of this amount to you?

6    A      That . . . the schools had been sold.

7    Q      Okay.   Did . . . .

8            MS. KESSLER:   Court's indulgence.

9    BY MS. KESSLER:

10   Q      Did you ever believe that you would have to pay this

11   back, or did you always understand it to be a gift?

12   A      To be a gift.

13   Q      Did you ever, at any time, with these gifts, have any

14   discussion with Dr. Fredrick or Dr. Hough about potential gift

15   tax issues that would go along with these gifts?

16   A      No.

17   Q      Can you describe your sister-in-law, Patricia Hough; is

18   she a shrinking violet?

19   A      No.

20   Q      How would you describe her?

21           MR. UDOLF:   Objection, Your Honor, relevance.

22           THE COURT:   Do you care to be heard?

23           MS. KESSLER:   Excuse me?

24           THE COURT:   Do you care to be heard?

25           MS. KESSLER:   I think it might be more appropriate to

1    be heard at sidebar.

2                 THE COURT:  All right.

3                        AT SIDEBAR

4          MS. KESSLER:  The defense has been arguing -- seems

5    to be arguing that the defendant, Patricia Hough, may have

6    signed all the -- many of the documents at issue in this

7    account without ever having looked at them, and at the

8    direction of her husband, so that's the relevance of this line

9    of questioning.

10                THE COURT:  I'm not sure "shrinking violet" is

11   the . . . the right characterization to go there.

12                MS. KESSLER:  Okay.

13                THE COURT:  So to that degree, the specific objection

14   will be sustained.

15                MS. KESSLER:  Okay.

16                THE COURT:  But assuming you're going to go some

17   other way to get the same information, let me hear.

18                MR. UDOLF:  Well, Judge, let me alert the Court to

19   where I think they're going with this, because when they

20   interviewed all the witnesses last week, the family witnesses,

21   they asked them the same question:  Is Pat the type of person

22   that would sign any document that was put in front of her.

23                And basically what they're asking for is opinion

24   evidence of habit.  And we think that's most inappropriate

25   because they can't -- for no other reason than they can't lay a

1    foundation.  Most of these witnesses have never even been

2    around the defendant very long.  They certainly would not know

3    her well enough to know what her habits would be with regard to

4    whether she would sign a document without reading it.  That's

5    basically where they're going with it.

6              THE COURT:  Well, if that's where they're going, I'd

7    let them do that, if they could lay the foundation.

8              MR. UDOLF:  I don't think they can.

9              THE COURT:  Is that where you're going?

10             MS. KESSLER:  Um-hum.

11             THE COURT:  I take that as a yes.

12             MS. KESSLER:  Yes.  I'm sorry.

13             THE COURT:  Do you think you can lay a foundation

14   with this witness; are you going to try?

15             MS. KESSLER:  We'll find out, I guess.

16             THE COURT:  All right.  I'll let you try.  Okay.

17                           IN OPEN COURT

18   BY MS. KESSLER:

19   Q     In your personal interactions with your sister-in-law,

20   Patricia Hough, did you ever observe her to be someone who

21   would be pressured into doing something she didn't want to do?

22             MR. UDOLF:  Objection.  It does not go to foundation

23   for this type of evidence, Your Honor.

24             THE COURT:  Overruled.  The question was whether she,

25   that is the witness, made such observations.

1        MS. KESSLER:  Do you want me to repeat the question?

2        THE WITNESS:  Yes.

3   BY MS. KESSLER:

4   Q    In your observations or your interactions with your

5   sister-in-law, Patricia Hough, did you ever observe her to be

6   someone who would be pressured into doing something she did not

7   want to do?

8   A    No.

9   Q    Can you describe the interaction you just -- you

10  observed between her and your brother, the nature of their

11  relationship?

12  A    Well, they . . . they both, I think, had their own jobs

13  to do when they were -- you know, had the schools.  She did all

14  the -- I know she did all the travel arrangements.  I mean, you

15  know, what David told me.  They . . . traveled a lot . . .

16  together.

17  Q    In terms of them dealing one-on-one with each other in

18  front of you, did you ever see that happen; them, together,

19  with you?

20  A    With me?

21  Q    Yes.

22  A    Yes.

23  Q    And did you observe there to be a difference in . . .

24  power, for lack of a better word, between the two, in their

25  interactions with each other?

1   A      Well, I . . . I got to think how to word this.  I think
2   David let Pat do a lot of the planning of stuff.
3   Q      Okay.  Did you observe one to tell the other what to do,
4   or vice versa, when you were with them?
5   A      What I was with them, I mean, it mostly was discussed
6   what was going on, you know, just getting things planned.  And
7   Pat would be -- you know, she would be the one to plan stuff.
8   I mean, like, you know, if they were to go somewhere -- it was
9   mostly -- she was a -- take charge.
10           MS. KESSLER:  Okay.
11           (Ms. Kessler and Ms. Finley confer privately.)
12           MS. KESSLER:  No further questions, Your Honor.
13           THE COURT:  Mr. Udolf?
14           MR. UDOLF:  On any issue?
15           MS. KESSLER:  Correct.
16           MR. UDOLF:  If I could have a second, Your Honor?
17           (Mr. Udolf and Mr. Hochman confer privately.)
18           MR. UDOLF:  No questions of the witness, Your Honor.
19           THE COURT:  You may stand down.  Thank you.
20           You may call your next witness.
21           (The witness left the witness box.)
22           MS. KESSLER:  Your Honor, the government would call
23   Perry Garner.
24           THE COURTROOM DEPUTY:  If you would raise your right
25   hand, please.

1              Do you solemnly swear or affirm to tell the truth,

2      the whole truth, nothing but the truth, in the case now before

3      the Court?

4              THE WITNESS:  I do.

5              THE COURTROOM DEPUTY:  You may have a seat.

6              State your full name, spelling your last.

7              THE WITNESS:  Perry Tillman Garner, G-A-R-N-E-R.

8              THE COURTROOM DEPUTY:  And would you spell your

9      middle name, please?

10             THE WITNESS:  T-I-L-L-M-A-N.

11             THE COURTROOM DEPUTY:  Thank you.

12                          PERRY GARNER,

13     called as a witness by the Government, and having been first

14     duly sworn, was examined and testified as follows:

15                        DIRECT EXAMINATION

16     BY MS. KESSLER:

17     Q      Sir, could you tell the jury what you do for a living?

18     A      I am a -- work for a contractor to the United States

19     Government, as a helicopter flight maintenance, simulator

20     maintenance.

21     Q      Where do you live?

22     A      In Chesapeake, Virginia.

23     Q      Do you know an individual by the name of David Fredrick?

24     A      I do.

25     Q      How do you know him?

1   A       He's my half-brother.

2   Q       Do you all share the same mother?

3   A       Yes.

4   Q       Did you all grow up together?

5   A       No.

6   Q       What sort of age difference is there between you and

7   Dr. Fredrick?

8   A       Twenty years.

9   Q       Had he already moved out of the house by the time when

10  you were young?

11  A       Yes.

12  Q       As you were growing up, did you have much of a

13  relationship with your brother, Dr. Fredrick?

14  A       None.  Not from an early age.

15  Q       And did that remain the same for a period of time?

16  A       For quite a while.  We didn't reconnect until I

17  was . . . married and out of the house, and . . . probably in

18  my thirties anyway.

19  Q       What prompted you to reconnect in your thirties?

20  A       I can't really put my finger on anything that prompted

21  it, it just kind of happened.

22  Q       How would you describe your relationship with

23  Dr. Fredrick; are you close?

24  A       More distant than anything.

25  Q       How often do you talk?

1    A      I haven't spoken with him in probably three years now.

2    Q      All right.  And looking back over the past, is that

3    consistent with how your relationship is?

4    A      More or less.  There was a period of time we tried to

5    get together and spend more time together, but it wasn't . . .

6    even then it was no more than may be once, twice a year.

7    Q      When you were attempting to be in contact more often,

8    what was going on at that time . . . or what prompted that?

9    A      I really . . . really can't put my finger on any

10   specific thing that prompted it.  It was --

11   Q      Okay.  Okay.

12          Do you know Patricia Hough?

13   A      Yes.

14   Q      And who is she?

15   A      She is my sister-in-law.

16   Q      Do you have a similar relationship to her, or do you

17   speak to her often?

18   A      Less than I do to Dr. Fredrick.

19   Q      And has that historically remained the same?

20   A      Yes.

21   Q      What do you understand Dr. Fredrick and Dr. Hough

22   to . . . that they used to do for a living?

23   A      Well, I know they were both . . . Dr. Hough is a medical

24   doctor, and a psychologist I believe, or psychiatrist.

25   But . . . and Dr. Fredrick was a teacher at a college for a

1    while.  Then they opened . . . or started a medical university.

2    Q      Is that -- are you familiar with the Saba University

3    School of Medicine?

4    A      Familiar, yes.

5    Q      Do you know the name?

6    A      Yes.

7    Q      Is that the medical school --

8    A      Yes.

9    Q      -- you understand them to have started?

10   A      Yes, it is.

11   Q      Have you ever been to the campus?

12   A      No.

13   Q      Do you know where it's located?

14   A      Vaguely.  Geographically, I know where it's at.

15   Q      Where is that?

16   A      It's on the island of Saba.

17   Q      Okay.  Is that in the Caribbean?

18   A      Yes.

19   Q      Do you know who owns the medical school?

20   A      It was always my . . . understanding that they owned it

21   together.

22   Q      And when you refer to "they," who are you referring to?

23          MR. UDOLF:  Objection to his understanding, Your

24   Honor.

25          THE COURT:  Sustained, absent a foundation as to the

1    source.

2              MS. KESSLER:  Okay.

3    BY MS. KESSLER:

4    Q      Did you have conversations with Dr. Fredrick or

5    Dr. Hough which led you to that understanding?

6    A      Yes.

7    Q      Do you have any knowledge of what money was used to

8    start the school?

9    A      Again, it was my understanding that it was money that

10   they had used from their own finances.

11   Q      And is that based on conversations you had with

12   Dr. Fredrick and Dr. Hough?

13   A      Yes.

14   Q      What . . . .  What work did Dr. Fredrick do for the

15   school -- Saba University, on a day-to-day basis, so far as

16   you're aware?

17   A      He was the president.

18   Q      And what work did Dr. Hough do related to the school on

19   a day-to-day basis?

20   A      I believe she was the . . . I think they call it

21   clinical administrator.

22   Q      And what did you understand that to mean?

23   A      That she took care of arranging internships at various

24   hospitals for the students when they -- it was time for them to

25   come out of school and do their internships.

1   Q      All right.  Now, are you familiar with an entity called

2   the Medical University of the Americas?

3   A      Vaguely.

4   Q      How have you heard of that?

5   A      Just in passing, through conversation with the family.

6   Q      Did you hear about it through conversation with your

7   brother and sister-in-law, or from your siblings?

8   A      More my siblings.  I don't recall ever hearing it from

9   them.

10  Q      Okay.  Have you ever received money or gifts from your

11  brother or Dr. Hough?

12  A      Yes, from my brother.

13         MR. UDOLF:  Objection, compound question.

14         THE COURT:  Overruled, given his answer.

15  BY MS. KESSLER:

16  Q      And do you recall receiving a gift in December of 2004?

17  A      The timing . . . throws me.  I don't remember the dates

18  very well, but I did receive one about that timeframe.

19  Q      Do you recall receiving a gift for $75,000?

20  A      Yes.

21  Q      And was that around the time of December, 2004, would

22  you estimate?

23  A      Yeah.

24  Q      All right.  How did this gift come about?

25  A      It was a . . . a gift that he gave us to --

1   Q      Who is the "he" that you're referring to?

2   A      Oh, I'm sorry.  Dr. Fredrick.

3   Q      Go ahead?

4   A      That he, Dr. Fredrick, gave us to . . . basically pay

5   off our mortgage that we had acquired on the house we were

6   living in.

7   Q      How did –– can you explain how that came about?

8   A      The ––

9   Q      Did you have conversations with Dr. Fredrick before he

10  made that gift to you?

11  A      No.

12  Q      Okay.  What was going on at the time that you received

13  that gift?

14  A      We –– my mother was in fairly poor health, so we sold

15  our home and moved in to her home to help care for her.  And

16  the house wasn't big enough to accommodate my family and her,

17  so we actually took a mortgage out on the home to do an

18  addition and renovation on the house.

19  Q      And was this gift that Dr. Fredrick made to you to help

20  out with that?

21  A      Yes.  Yeah.  That was what it was for.

22  Q      Did you –– was your understanding that this money was a

23  gift?

24  A      Yes.

25  Q      Did you ever have any conversation or receive any papers

1    where you were asked to pay the money back --

2    A        No.

3    Q        -- or commit to doing so?

4    A        No.

5    Q        In April of 2007, did you receive another gift?

6    A        Yes.

7    Q        Do you recall the amount of that gift?

8    A        250,000.

9    Q        How did that gift come about?

10   A        We . . . were told that, when Dr. Fredrick sold the

11   medical schools, which they were attempting to do at the time,

12   that once the --

13   Q        Just for the record, when you're saying that "they" were

14   attempting to do at the time, who are you testifying referring

15   to?

16   A        Dr. Fredrick and Dr. Hough.

17   Q        Okay.

18   A        That once the schools were sold, that he was going to

19   give the family members a, quote/unquote, nest egg, to help

20   with financial issues.

21   Q        And did you receive the gift of $250,000?

22   A        Yes.

23   Q        And what form did it come in?

24   A        It was a wire transfer.

25   Q        To a bank account of yours?

1   A      Yes.

2   Q      And did you ever have any discussion with Dr. Fredrick

3   about what you should do with the money?

4   A      No.

5   Q      Did you also understand this money to be a gift?

6   A      Yes.

7   Q      And were you ever asked to pay it back in any way?

8   A      No.

9   Q      As to both of these gifts, the $75,000 gift and the

10  $250,000 gift, did you ever have any discussions with your

11  brother or your sister-in-law about the gift tax implications

12  of that?

13  A      No.

14         MS. KESSLER:  No further questions, Your Honor.

15         THE COURT:  Mr. Udolf?

16                      CROSS EXAMINATION

17  BY MR. UDOLF:

18  Q      Mr. Garner, counsel just asked you whether or not you

19  were ever asked to pay back any of the monies that you got from

20  your brother, even the 75,000 or the 250,000; is that right?

21  A      Correct.

22  Q      You were, however, asked by your brother to execute a

23  note for that amount, were you not?

24  A      Correct.

25  Q      Do you know why?

1    A        From conversations I had via the siblings and

2    Dr. Fredrick, it was that Dr. Hough was not aware that he had

3    given us the gifts and, when she found out, that she was upset

4    about it, and he was trying to calm the situation.

5    Q        So when you say that -- when counsel asked you if you

6    ever got any gifts from Dr. Fredrick or Dr. Hough, it was

7    Dr. Fredrick that gave you those gifts; is that right?

8    A        Correct.

9    Q        It was not Dr. Hough.

10   A        Correct.

11   Q        She was not aware of it.

12   A        Not upon the receipt of the gifts.

13   Q        All right.  Does that hold true for all the $250,000

14   gifts that were given to your other siblings?

15   A        I couldn't tell you that.

16   Q        Well, at some point you found out that Dr. Hough was

17   extremely upset about this; is that right?

18   A        Correct.

19   Q        And you found that out from your brother; is that right?

20   A        Correct.

21   Q        You indicated that you -- it was your impression that

22   Dr. Hough and Dr. Fredrick owned a medical school; is that

23   right?

24   A        Yes.

25   Q        Which medical school are you talking about?

1    A       Well, actually -- Saba was the original one.  And I

2    believe, a few years later, they had opened a second one on

3    Nevis.

4    Q       Were you aware of the fact that the Saba school was

5    owned by a nonprofit foundation?

6    A       I am now.  I was not at the time.

7               MR. UDOLF:  That's all I have, Your Honor.

8               THE COURT:  Any redirect?

9                         REDIRECT EXAMINATION

10   BY MS. KESSLER:

11   Q       Mr. Garner, after you signed that note, did you have any

12   understanding that you really did have to pay it back?

13   A       That I did not or did?

14   Q       Did you have any understanding about whether you would

15   actually have to pay back the $250,000?

16   A       No.  When we were sent the note, he specifically said

17   that it was just to calm the situation.  He actually sent us

18   a . . . document stating that the note had already been paid,

19   and -- or repaid . . . at the same time.

20   Q       Did you make any payments back?

21   A       No.

22               MS. KESSLER:  No further questions, Your Honor.

23               THE COURT:  Mr. Udolf?

24               MR. UDOLF:  Yes, I have a few questions.

25

RECROSS EXAMINATION

1

BY MR. UDOLF:

2

3  Q     You said he sent "us" a note; who is "us"?

4  A     Well, myself and, from conversations with my siblings,

5  them.

6          MS. KESSLER:  Objection.

7          THE COURT:  Hang on a second.

8          The objection is sustained.

9  BY MR. UDOLF:

10  Q     You said the note had been paid back.

11         Do you know how the note had been paid back?

12  A     No.

13  Q     Did you, in fact, know that -- did your brother ever

14  tell you that the money that he was giving you was an advance

15  on monies that he was owed by the foundation?

16  A     No.  I never heard that.

17         MR. UDOLF:  All right.  That's all.

18         THE COURT:  Anything else?

19         MS. KESSLER:  Nothing, Your Honor.  Thank you.

20         THE COURT:  You may stand down.  Thank you.

21         (The witness left the witness stand and left the

22     courtroom.)

23         THE COURT:  All right.  I think we'll take a lunch

24  recess at this point, for about an hour.

25         Please do not discuss the case among yourselves, or

1   allow anyone to discuss it with you or in your presence.  We'll

2   try and get started at 1:15.

3           (At 12:09 PM, the jury was escorted from the

4       courtroom.)

5           THE COURT:  All right.  1:15.

6           (At 12:10 PM, court was recessed.)

7                          AFTER RECESS

8           (At 1:20 PM, court was reconvened.)

9           THE COURT:  Both sides ready for the jury?

10          MR. HOCHMAN:  Yes, Your Honor.

11          MS. FINLEY:  We are, Your Honor.

12          THE COURT:  Have the jury step in, please.

13          (At 1:21 PM, the jury was escorted into the

14      courtroom.)

15          THE COURT:  Later.

16          MS. FINLEY:  Thank you, Your Honor.  Before the

17  government calls its next witness, it just wants to offer into

18  evidence Exhibit 14A, 14B, 14C, and 14D.

19          MR. HOCHMAN:  No objection, Your Honor.

20          THE COURT:  Those exhibits will be admitted.

21          (Government's Exhibits 14A, 14B, 14C, 14D were

22      admitted into evidence.)

23          THE COURT:  So counsel know, when I said, "Later,"

24  I've received a note from the jury:  "Please give information

25  on timing (completion) of trial," and I'll do that at the end

1    of the day.

2              You may proceed.

3              MS. FINLEY:  Thank you, Your Honor.

4              The government calls Fred Ahles to the stand.

5              THE COURT:  Mr. Ahles, right up here, please.

6              THE COURTROOM DEPUTY:  If you would raise your right

7    hand.

8              Do you solemnly swear or affirm to tell the truth,

9    the whole truth, nothing but the truth, in the case now before

10   the Court.

11             THE WITNESS:  Yes.

12             THE COURTROOM DEPUTY:  You may have a seat.

13             State your full name, spelling your last.

14             THE WITNESS:  Fredrick Joseph Ahles, A-H-L-E-S.

15                          FREDRICK AHLES,

16   called as a witness by the Government, and having been first

17   duly sworn, was examined and testified as follows:

18                          DIRECT EXAMINATION

19   BY MS. FINLEY:

20   Q     Good afternoon, Mr. Ahles.

21         What do you do for a living?

22   A     I own a company in Fort Lauderdale called Premiere

23   Aircraft Sales, and we sell airplanes.

24   Q     Do you know David Fredrick?

25   A     Yes.

1    Q        How do you know Dr. Fredrick?

2    A        He contacted me a few years ago, to sell his airplane

3    for him.

4    Q        Now, do you know Dr. Hough?

5    A        I do not.

6    Q        Never met her?

7    A        I do not.  I have not.

8    Q        Do you know why Dr. Fredrick was selling his airplane?

9    A        I do not.

10   Q        Do you know -- did you meet with Dr. Fredrick?

11   A        Yes.

12   Q        Did he tell you why -- what he used his airplane for?

13   A        Not that I recall.

14   Q        I'm going to hand you a couple of exhibits:  21A, as in

15   "apple"; 19B, as in "boy"; 20C; 22B; 20D --

16            THE COURT:  I'm sorry, that last letter?

17            MS. FINLEY:  D, as in "dog."

18            THE COURT:  Okay.  Thank you.

19            MS. FINLEY:  -- 21C, as in "cat"; and 21D, as in

20   "dog."

21            (Ms. Finley provides exhibits to the witness.)

22            MS. FINLEY:  Your Honor, at this time the government

23   would move 21A; 19B, as in "boy"; 20C; 22B; 20D; 21C; and 21D

24   into evidence.

25            THE COURT:  Any objections?

1          MR. HOCHMAN:  No, Your Honor.

2          THE COURT:  All right.  If I can say this in a little

3   bit different order --

4          MS. FINLEY:  Sure.  I know.

5          THE COURT:  -- 19B, 20C, 20D, 21A, 21C, 21D, and 22B

6   are all admitted.

7          MS. FINLEY:  B, as in "boy."

8          THE COURT:  B, as in "boy," yes.

9          MS. FINLEY:  Thank you.

10         (Government's Exhibits 19B, 20C, 20D, 21A, 21C, 21D,

11     and 22B were admitted into evidence.)

12         MS. FINLEY:  Permission to publish?

13         THE COURT:  You may.

14         (An exhibit was projected onto the projector screen.)

15   BY MS. FINLEY:

16   Q    You said that you first met Dr. Fredrick when he

17   contacted you to sell his airplane.

18         Can you tell the jury, is there a contractual

19   relationship that you enter into to sell an airplane?

20   A    Yes.  It's very similar to when we sell a home through a

21   realtor.  There's an agreement that states a selling price and

22   a commission to be paid to the agent.

23         MS. FINLEY:  Your Honor, permission to publish 21A?

24         THE COURT:  You may.

25

1    BY MS. FINLEY:

2    Q     If we look at Exhibit 21A, on the first page --

3          THE COURT:  We're probably going to need the lights

4    down and the machine on.

5          MS. FINLEY:  I think the feed is not on as well.

6          (An exhibit was projected onto the projector screen.)

7    BY MS. FINLEY:

8    Q     Is this the brokerage agreement that your firm from your

9    aircraft enters into with clients?

10   A     Yes.

11   Q     And is this the brokerage agreement between Premiere

12   Aircraft and Ample Dynamic?

13   A     Yes, it is.

14   Q     And what is the date on the agreement?

15   A     May 26th, 2010.

16   Q     And what is being sold, what kind of plane?

17   A     A Piper Malibu Meridian.

18   Q     Can you describe for the jurors what kind of airplane

19   that is?

20   A     Yes.  It's a single-engine turbo prop aircraft with six

21   seats.

22   Q     What kind of distance does it fly?

23   A     It will fly about a thousand miles at 300 miles an hour.

24   Q     If you had all six passengers in it, is this the type of

25   plane that you would use to transport cargo?

1    A       No.

2    Q       And on the bottom, who is signing the agreement?

3    A       I signed, myself, Fred Ahles, for Premiere, and . . .

4    Mr. Fredrick for Ample Dynamic.

5    Q       Now, did you know what Dr. Fredrick did for a living?

6    A       I do not.

7    Q       And at the top, under the agent and owner -- or excuse

8    me, under the owner, where is it listed that Ample Dynamic is

9    located?

10   A       Englewood, Florida.

11   Q       And do you operate, then, like a real estate agent, do

12   you get a commission based on the sales price?

13   A       Yes.

14   Q       And here, in Paragraph 1, do you have like a floor, that

15   you and the client agree you will sell the plane for at least

16   $1.1 million?

17   A       That's correct.

18   Q       Now, do you know when Dr. Fredrick purchased the

19   airplane?

20   A       I do not.

21   Q       If we look at Exhibit 19B, does this appear to be the

22   purchase agreement for the Piper Meridian that's listed in the

23   brokerage agreement?

24   A       Yes, it does.

25   Q       And what date is listed here?

1    A       November 14th, 2007.

2    Q       How much was the purchase price for the airplane?

3    A       $1,600,000.

4    Q       And who signs as the purchaser?

5    A       David Fredrick.

6    Q       And is there an entity listed below?

7    A       Lynn Group, in Gardner, Massachusetts.

8    Q       Now, as part of your due diligence -- do you do . . . do

9    you conduct due diligence when you're getting ready to sell an

10   airplane?

11   A       Yes.  One of the -- besides the aircraft records, from a

12   legal standpoint, we do a title search to determine who owns

13   the plane and if there's any liens against it.

14   Q       And if we can look at Exhibit 20C, is that the title

15   search that your company conducts?

16          (An exhibit was projected onto the projector screen.)

17   A       Yes, it is.

18   Q       And who is listed as the record owner?

19   A       Ample Dynamic.

20   Q       And who, at least according to the document, was signing

21   for Ample Dynamic when it was registered?

22   A       When it was registered, Beda Singenberger.

23   Q       Do you know who Beda Singenberger is?

24   A       I do not.

25   Q       And you said that, at the bottom it says -- or you

1  talked about it, to make sure there are no liens, is that at

2  the bottom where it says, "No liens of record"?

3  A     Correct.

4  Q     Why is that important?

5  A     Well, particularly during the past few years, with the

6  economy the way it was, people would sell things for less than

7  what they owed to the bank, and that made it very difficult for

8  the agent to get a sale finished under that circumstance.  So

9  we wanted to find out right away, when we listed an airplane to

10 sell, if there was a lien and what the amount of it was.

11 Q     Based on the statement in this record, do you know

12 whether there was ever a loan that was paid off, or whether the

13 original purchase was done by cash?

14 A     I can't tell that from this title search.

15 Q     You just know that nobody's owed money?

16 A     At this time, yeah, at the time the title search was

17 done.

18 Q     Okay.  Now, if we can turn to Page-- excuse me --

19 Exhibit 22B, can you explain to the jury what this document is?

20 A     This is the sales agreement entered between my company,

21 as the agent for the seller, and the ultimate buyer of the

22 aircraft.

23 Q     And how much did the plane ultimately sell for, under

24 Paragraph 2?

25 A     1,255,000.

1   Q      And so if we went -- just referencing back to the

2   brokerage agreement, the brokerage agreement said 1.1 million.

3          Did you get a better sales price than you had

4   anticipated?

5   A      Yes.

6   Q      Now, you said, on the bottom of the page, those are your

7   initials, on the left part of the page?

8   A      Correct.

9   Q      Now, if we can turn to Page 11 of Exhibit 22B, when was

10  the sales agreement executed?

11         (An exhibit was projected onto the projector screen.)

12  A      Looks like June 17th, 2010.

13  Q      And again, you are signing on behalf of -- as an

14  agent --

15  A      Correct.

16  Q      -- of the ultimate owner?

17  A      Correct.

18  Q      And in this case, if we look at Exhibit 20D, did Ample

19  Dynamic provide you with a power of attorney?

20  A      Yes, they did.

21  Q      Do you know why they did?

22  A      I don't recall.

23  Q      But these were in your files, your Premiere Aircraft;

24  correct?

25  A      Correct.  Our closing agent, you know, would have

1    received this.

2    Q      And do you know -- you said that you do not know

3    Patricia Hough; is that correct?

4    A      I'm sorry?

5    Q      You do not know Patricia Hough.

6    A      I do not.

7    Q      Do you know Florencio Montenegro?

8    A      I do not.

9    Q      Did Dr. Fredrick ever talk about either of those

10   individuals?

11   A      Not that I recall.

12   Q      Now, once the plane was sold, did you receive wire

13   transfer information about where to send the proceeds of the

14   sale?

15   A      Yes, we did.

16   Q      And if I can have you look at Exhibit 21C.

17          (An exhibit was projected onto the projector screen.)

18   A      Yes.

19   Q      Are these the wire transfer instructions?

20   A      Yes.

21   Q      Do you know who provided those to you?

22   A      I do not.

23   Q      And who . . . whose attention is the wire going to go

24   to?

25   A      To my . . . I'm sorry.  The wire?

1   Q      Yes, the wire.

2   A      What bank was it going to?

3   Q      Yes.

4   A      It was going to Liechtenstein Landesbank bank.

5   Q      And if we now look at Exhibit 21D, is this the actual

6   transaction history for that wire?

7          (An exhibit was projected onto the projector screen.)

8   A      Yes, it is.

9   Q      And ultimately, how much was sent to the seller?

10  A      $1,168,171.39.

11  Q      And so the seller took a loss on the plane?

12  A      Compared to what he paid for it.

13         MR. HOCHMAN:  Objection, foundation.

14         THE COURT:  Overruled.

15  BY MS. FINLEY:

16  Q      And again, in the previous exhibit that we looked at, in

17  Exhibit 19B, the sales -- the purchase price was 1.6 million;

18  is that correct?

19  A      That's correct.

20  Q      And based on the sales agreement here, it was

21  1.27 million or so?

22  A      Correct.

23  Q      And the difference between the 1.27 and the 1.1, are

24  those your fees and any other fees that would have been

25  required at closing?

1    A     Yeah.  The selling price and agreement said 1,255,000,

2    and the net amount that he received was a million 168, so that

3    would have been less fees and expenses.

4    Q     And on Exhibit 21D, under the beneficiary, who is

5    receiving the funds?

6    A     Ample Dynamic; Saba Foundation, for Ample Dynamic.

7            MS. FINLEY:  I have no further questions, Your Honor.

8            THE COURT:  All right.  Thank you.

9            Mr. Hochman?

10           MR. HOCHMAN:  Yes, Your Honor.

11                      CROSS EXAMINATION

12   BY MR. HOCHMAN:

13   Q     Good afternoon.

14   A     Good afternoon.

15   Q     Planes are sort of like cars, aren't they, that when you

16   buy them new, after three years or so, they go down in value;

17   is that correct?

18   A     Correct.

19   Q     So when a plane is bought for 1.6 million, one would

20   expect that it would go down in value three years later;

21   correct?

22   A     Correct.

23   Q     And you did your best to get the highest price you could

24   for the plane at the time?

25   A     Yes.

1    Q      And you got 1.255 million; is that correct?

2    A      Correct.

3    Q      You said you don't know Dr. Hough; correct?

4    A      Correct.

5    Q      You never met her before?

6    A      Correct.

7    Q      Never spoke with her?

8    A      Not that I recall.

9    Q      And there's no document here that has her name, other

10   than as a witness to one particular document; correct?

11   A      Excuse me, I don't know that I even saw that.

12   Q      She's not involved in any of the sale documents, as far

13   as who was signing on behalf of the seller; correct?

14   A      Correct.

15   Q      That was Dr. Fredrick; correct?

16   A      Correct.

17   Q      If we could turn to Exhibit 21C?

18          (An exhibit was projected onto the projector screen.)

19          MR. HOCHMAN:  And if we could highlight the top part;

20   it says, "Attention, Ample Dynamic"?

21          If we could --

22   BY MR. HOCHMAN:

23   Q      Actually, do you have that in front of you yet?

24   A      I'm getting closer.

25   Q      Okay.

1    A       Now I do.

2    Q       Very good.

3            Now, it says, "Attention, Ample Dynamic, care of the

4    Saba Foundation."

5            Do you see that?

6    A       Correct.

7    Q       And are you aware that Ample Dynamic was a company that

8    was part of the Saba Foundation?

9    A       I was not.

10   Q       And if you could scroll down a little, and highlight the

11   section as to where the wire would go, where it starts out

12   "Liechtenstein Landesbank," do you see where it says

13   "Liechtenstein Landesbank AG," up there?

14   A       Yes.

15   Q       And that's the wire transfer information on where the

16   funds were to be sent to Ample Dynamic, care of the Saba

17   Foundation; correct?

18           COURT REPORTER:  I'm sorry.  Would you repeat that?

19   I lost you.

20           MR. HOCHMAN:  I'm sorry.

21   BY MR. HOCHMAN:

22   Q       You see the name Liechtenstein Landesbank up there;

23   correct?

24   A       Correct.

25   Q       Than was the bank to where the funds were supposed to be

1   sent for Ample Dynamic, care of the Saba Foundation; is that
2   correct?
3   A      Correct.
4   Q      And you said that the total funds were about
5   1.168 million; correct?
6   A      Yes.
7   Q      It was to be sent to that bank which is located in
8   Vaduz.  Do you see that?
9   A      Yes.
10  Q      Do you know that Vaduz is a city in Liechtenstein?
11  A      I do not know that.
12  Q      And if you go down a little further, it actually has an
13  account number, do you see that, almost at the bottom; where it
14  says, "account number," it's blacked out a little, and then
15  089 --
16  A      Yes.
17  Q      -- 93 USD; do you see that?
18  A      Yes.
19         MR. HOCHMAN:  Your Honor, may I have a moment with
20  counsel?
21         THE COURT:  You may.
22         (Mr. Hochman confers with Ms. Finley privately.)
23         MR. HOCHMAN:  And, Your Honor, just to be clear, the
24  blacking out here was done for privacy reason.  It was not on
25  the original document.

1          THE COURT:  That's fine.

2   BY MR. HOCHMAN:

3   Q      But this alerts you, does it not, as to a foreign bank

4   account that Ample Dynamic, care of the Saba Foundation, has;

5   correct?

6   A      Yes.

7   Q      It tells you which bank it's at; correct?

8   A      Yes.

9   Q      It even tells what the account number is; correct?

10  A      Yes.

11  Q      This isn't some secret Liechtenstein bank account that

12  you were sending the money to, because you have all the

13  information about that bank account; correct?

14  A      Yes.

15          MR. HOCHMAN:  If you can turn the Exhibit to 21D.

16          (An exhibit was projected onto the projector screen.)

17          MR. HOCHMAN:  And if we could highlight the middle,

18  where it says "beneficiary" -- actually, if you could zoom in

19  to where it says "beneficiary," toward the bottom of the

20  document?

21  BY MR. HOCHMAN:

22  Q      Do you see where it says "beneficiary," it says "Saba

23  Foundation favor Ample Dynamic"; do you see that?

24  A      Yes.

25  Q      And it's listed that way because the Saba Foundation

1    owned Ample Dynamic; isn't that correct?

2            MS. FINLEY:  Objection, foundation.

3            THE COURT:  Sustained.

4    BY MR. HOCHMAN:

5    Q       Well, do you know if the Saba Foundation owned Ample

6    Dynamic, which is why it was listed this way?

7    A       I don't know why it's listed that way.

8            MR. HOCHMAN:  No further questions.

9            THE COURT:  Any redirect?

10           MS. FINLEY:  Just one question, Your Honor.

11                          REDIRECT EXAMINATION

12   BY MS. FINLEY:

13   Q       Were you aware that Dr. Fredrick and Dr. Hough owned the

14   Saba Foundation?

15   A       No.

16           MS. FINLEY:  No further questions.

17           THE COURT:  Mr. Hochman?

18           MR. HOCHMAN:  Nothing, Your Honor.

19           THE COURT:  You may stand down.  Thank you.

20           THE WITNESS:  Thank you.

21           (The witness left the witness box.)

22           THE COURT:  You may call your next witness.

23           MS. KESSLER:  The government calls Dr. Paul Dalbec.

24           THE COURT:  Right up here, please.

25           THE COURTROOM DEPUTY:  If you would raise your right

1    hand.

2              Do you solemnly swear or affirm to tell the truth,

3    the whole truth, nothing but the truth, in the case now before

4    the Court?

5              THE WITNESS:  I do.

6              THE COURTROOM DEPUTY:  You may have a seat.

7              State your full name, spelling your last.

8              THE WITNESS:  Paul L. Dalbec, D A L B E C.

9              THE COURTROOM DEPUTY:  Thank you.

10                          PAUL DALBEC,

11   called as a witness by the Government, and having been first

12   duly sworn, was examined and testified as follows:

13                        DIRECT EXAMINATION

14   BY MS. KESSLER:

15   Q      Good afternoon, Dr. Dalbec.

16   A      Good afternoon.

17   Q      Can you tell the jury where you live?

18   A      I live in Danielson, Connecticut.

19   Q      And what do you do for a living?

20   A      I'm a family physician.

21   Q      What type of practice is that?

22   A      I just started a job three weeks ago in an urgent care

23   center, working for a company that's got clinics throughout

24   Connecticut.

25              THE COURT:  Doctor, can you either move closer to the

1    microphone or move it closer to you, or both?  Thank you.

2                THE WITNESS:  Yeah.  Urgent care is a new business,

3    and this is a company that's expanding.  On Halloween I'm going

4    to be opening up a new clinic in Norwich, Connecticut.

5    BY MS. KESSLER:

6    Q    How long have you been a medical doctor?

7    A    I've graduated from medical school in 1992.

8    Q    Where did you go to medical school?

9    A    Ross University --

10   Q    Where's -- I'm sorry.  Go ahead.

11   A    -- in Dominica.

12   Q    Where is Dominica?

13   A    In the West Indies.

14   Q    Do you know Dr. David Fredrick and Dr. Patricia Hough?

15   A    Yes.  Both.

16   Q    When did you first meet Dr. Fredrick?

17   A    When I started medical school in Dominica.

18   Q    And what was the nature of your relationship then?

19   A    I was a student and he was a professor.

20   Q    And how did you meet?

21   A    At the orientation of the first semester class.

22   Q    Did you become friends?

23   A    Yes.

24   Q    And how do you -- did you stay in touch even after you

25   finished medical school?

1    A      He became a roommate of mine while in medical school,

2    and I stayed friends ever since.

3    Q      When did you first meet Dr. Hough?

4    A      When I moved to Augusta, Georgia, for my residency.

5    Q      Is that the first time you met her in person?

6    A      Yes.

7    Q      Had you ever spoken to her or learned of her prior to

8    moving to Augusta?

9    A      Yes.  Dr. Fredrick would speak with her on a ham radio

10   from the island.

11   Q      What was their relationship at the time?

12   A      They were married.

13   Q      Do you recall approximately when this was?

14   A      1989, 1990.

15   Q      Did you become friendly with Dr. Hough as well?

16   A      I didn't know her at the time, just a voice on the

17   radio.

18   Q      Okay.  Would you consider Dr. Fredrick one of your

19   friends?

20   A      Yes.

21   Q      Did there come a time when you learned that Dr. Fredrick

22   was . . . that Dr. Fredrick discussed with you that he might

23   start a medical school?

24   A      Yes.

25   Q      How did that come about?

1    A      Dr. Fredrick and his wife, and Dr. Dobrow, who was a

2    dean at the Ross Medical School, had gone on a weekend holiday

3    on a nearby island, and they met the governor of Saba.

4           And the governor of Saba asked them, as professors at

5    Ross, what it would take to get a medical school started on the

6    island of Saba, because the . . . the people of the island of

7    Saba had talked about attracting that.

8    Q      And did the idea move forward from there?

9    A      It did.

10   Q      And who was involved?

11   A      At that time, it was Dr. Dobrow, Dr. Fredrick, and a

12   person from the island of Saba named Johnson.

13   Q      Now, how did Doctor -- how did these three know each

14   other?

15   A      I don't know.  Dr. Fredrick and Dr. Dobrow worked as

16   professors at Ross.

17   Q      All right.

18   A      I don't know how they met and got to know Mr. Johnson.

19   Q      All right.

20          Did a medical school ultimately open on Saba?

21   A      Yes.

22   Q      Can you . . . .  Do you have information about how that

23   happened; what happened in the interim, after --

24   A      Well, there was some intrigue for a few years because

25   Dr. Dobrow decided he didn't want to do it.

1    Q      Okay.

2    A      He had decided to open an airline business on the island

3    of Dominica.  Dr. Fredrick didn't realize that that had been

4    happening, and so the efforts to get World Health Organization

5    approval was . . . impaired.

6    Q      All right.

7    A      And so when Dr. Fredrick found out that Dr. Dobrow had

8    betrayed him, he arranged with Mr. Johnson to vote Dr. Dobrow

9    out.

10   Q      From the establishment of the --

11   A      From whatever arrangement they had as partners.

12   Q      All right.

13   A      And then Dr. Fredrick proceeded to file papers and

14   contact the World Health Organization, and sometime later was

15   notified by the World Health Organization that the school

16   was . . . accredited, or recognized, and they could go forward.

17   Q      Why is that important, the World Health Organization

18   papers?

19   A      Well, if you don't have an accredited school, the

20   diploma is almost worthless.

21   Q      Do you recall about when the World Health Organization

22   accreditation came through?

23   A      Not exactly.  Maybe 1992, or 1991.  I think it was

24   in '91.

25   Q      All right.  What was your initial role with regard to

1    the Saba School of Medicine?

2    A       I didn't have any role.

3    Q       Did you -- did there come a time when you became

4    involved with admissions decisions for Saba?

5    A       When I was applying, as a graduate of medical school, to

6    residency training programs, I had decided to do family

7    medicine.  And at that time Dr. Fredrick had left Saba, quit

8    his job as a professor --

9    Q       I'm sorry, did you say he left Saba?

10   A       I'm sorry.  That's correct.  He left Dominica and went

11   to be a professor at the Augusta College, in Augusta, Georgia,

12   where Patricia Hough was doing residency training in

13   psychiatry.

14           And he got a job with the Augusta College in a graduate

15   program, master's in psychology.  And he continued to work on

16   getting Saba school going while teaching at the Augusta

17   College.

18           And I stayed in touch with him the whole time, and I

19   knew that the medical school application was going forward and

20   it looked like it was going to happen.  And Dr. Fredrick

21   persuaded me to choose Augusta, Georgia, for my residency,

22   because he would like me to help recruit students to apply to

23   Saba University School of Medicine.

24   Q       So did you ultimately do your residency in Augusta?

25   A       Yes.

1   Q       And approximately what time period are we talking about?

2   A       I graduated from medical school in '92.  So '92, '93,

3   and '94, I was in the residency program in Augusta, Georgia.

4   Q       From '92 to '94, or were you counting up --

5   A       Three years of residency.

6   Q       Okay.  So from '92 to 94 --

7   A       Yes.

8   Q       -- were you in residency.

9   A       Yes.

10  Q       All right.  And were Dr. Fredrick and Dr. Hough both

11  living in the area at that time, too?

12  A       Yes.

13  Q       Did you continue to have a friendly relationship with

14  them?

15  A       Yes.  We were friends.

16  Q       Did you have much contact then?

17  A       The interviews with -- I began interviewing students at

18  about that time, 91/92.

19  Q       Was this in the early part of your residency?

20  A       I was an intern then.

21  Q       I'm sorry.

22  A       Yes.  The first year of residency was called the

23  internship.  And at that time they would . . . review

24  applications, and about once a week I would go to the house --

25  Q       Who is "they"?

1   A       Dr. Hough, Dr. Fredrick, and myself.

2   Q       You would go to their house?

3   A       And we would review the applications, select the ones

4   that we wanted to speak to, and have telephone interviews with

5   the prospective medical school candidates.

6   Q       About how long did that go on?

7   A       Until I finished my residency and left Augusta.

8   Q       So you were involved in the admissions --

9   A       Throughout that time.

10  Q       -- throughout that time.

11          Was the school then up and running --

12  A       Yes.

13  Q       -- also during this time?

14          What did you understand Dr. Fredrick's role to be with

15  the school then?

16  A       He ran the school.

17  Q       And what did you understand Dr. Hough's role to be?

18  A       She didn't have any role at that time.

19  Q       Was she involved in the admissions discussions that you

20  all had?

21  A       She would sit and discuss the interview -- she was

22  present for the interviews.

23  Q       All right.  And was she -- did she weigh in on people

24  who should or should not be admitted?

25  A       Yes.

1   Q       Have you heard of -- do you know whether there is any

2   difference between, or -- let me rephrase that.

3           Based on your understanding, is there any difference

4   between the Saba School of Medicine and The Foundation?

5   A       No.  I don't know any difference between the two.

6   Q       Do you think of them as one and the same?

7   A       Now I think differently.  But at the time I was part of

8   the Saba admissions group, I was . . . not aware of any

9   differences.

10  Q       All right.  Who did you understand to own the Saba

11  School?

12  A       Mr. Johnson and Dr. Fredricks.

13  Q       Now, did there come a time where you were asked to

14  become a member of the board of trustees for Saba?

15  A       Yes.

16  Q       Do you recall approximately when that was?

17  A       It was about 1995 or '96.

18  Q       And did you know yourself to be a member of the board of

19  trustees of the school or The Foundation?

20  A       The school -- the board of trustees was for the school.

21  Q       All right.  What positions did you hold as part of the

22  board of trustees?

23  A       A board member.

24  Q       What were your duties as a board member?

25  A       To attend meetings.

1   Q       How often did the board meet?

2   A       Once or twice a year.

3   Q       And where did you all meet?

4   A       In the beginning, at their offices.

5   Q       When you refer to "their" --

6   A       On the island.  Two places.  They had moved to Gardner,

7   Massachusetts.

8   Q       And who is "they"?

9   A       Dr. Fredrick and Dr. Hough . . . moved to Gardner,

10  Massachusetts.

11  Q       What sort of things did the board oversee?

12  A       The academic program, the consideration of hiring

13  professors, changes in the curriculum . . . the need for

14  expansion --

15  Q       What sort of expansion?

16  A       Physical.  Buildings.

17  Q       Were you all -- was the board consulted regarding large

18  expenditure items?

19  A       Usually.

20  Q       And was the board involved in any review of the budget,

21  or approval of the budget?

22  A       I only remember a couple of occasions when the budget

23  was presented to us.  We looked at it and approved the budget.

24  Q       What about land purchases, were you all consulted about

25  land purchases?

1   A       Yes.

2   Q       When you first were asked to serve on the board, did you

3   all have board meetings in Augusta, Georgia?

4   A       I don't think I was a board member while still living in

5   Augusta.

6   Q       Okay.  Did you ever attend meetings where Laura Whitley

7   was a member of the board?

8   A       When I would go to the meetings in Augusta, and later up

9   in Gardner, she was the daughter of Dr. Fredricks, and she was

10  living with Pat and Dave in Augusta.  She had left her mom and

11  was living with her dad.  She was there at the house, and . . .

12  when we did interviews, she was there.

13  Q       Was she participating in the interviews, or --

14  A       Not that I remember.

15  Q       Did you ever know Miss Whitley to be a member of the

16  board while you were a member?

17  A       Only of having read minutes that I was given when I came

18  to the grand jury.

19  Q       Did you know Ms. Whitley to have any qualifications that

20  made it appropriate for her to be a member of the board?

21          Did she have any background in medicine?

22  A       No.

23  Q       Did she have any background in teaching?

24  A       No.

25  Q       Do you recall approximately how old she was at the time?

1    A      Her late teens.

2    Q      Do you recall whether she had graduated from high school

3    at that time?

4              MR. SAUNDERS:  Objection, vague as to what time.

5              MS. KESSLER:  At the time you were meeting in

6    Augusta.

7              THE WITNESS:  I think she was still attending high

8    school.

9    BY MS. KESSLER:

10   Q      During the time that you were a member of the board of

11   Saba, was Dr. Hough ever a member of the board?

12   A      My own recall was that she had been at the meetings, but

13   I don't remember specifically that she was listed as a board

14   member, except from looking at the meeting's minutes.

15   Q      And at the meetings where you and she were both in

16   attendance, did she participate in those meetings?

17   A      Most of what she did was to report on things she had

18   been doing.

19   Q      Such as . . . what would be an example?

20   A      Helping to develop the clinicals.

21   Q      Can you explain that?

22   A      There's two parts to medical education.  The first two

23   years are science education.  And the second two years are

24   hospital experience.  And her contribution, which started at

25   about that time, was to help find hospitals where these foreign

1    medical students could do their third and fourth year.

2    Q      Would it have been essential to the success of the

3    school for the students to be able to find internships at

4    medical -- or at medical facilities for the latter half of

5    their education?

6    A      Very important.

7    Q      Did Dr. Hough make presentations to the board as to what

8    progress she was making on these issues?

9    A      Yes.

10   Q      And did Dr. Hough seem to be generally aware of what was

11   going on with the schools in your interactions with her?

12              MR. SAUNDERS:  Objection, vague.

13              THE COURT:  Overruled.

14              If the witness understands the question, he may

15   answer.

16              THE WITNESS:  Generally aware; yes.  She lived with

17   the director, and so I think she knew . . . the school's

18   activities.  But beyond that, it's just general.

19   BY MS. KESSLER:

20   Q      What was her formal position with the school?

21   A      Clinical coordinator.

22   Q      So she wasn't just living with the president of the

23   school, she was also involved in the operation of the school,

24   as the clinical director.

25              MR. SAUNDERS:  Objection, leading.

1          THE COURT:  Sustained.

2    BY MS. KESSLER:

3    Q      Do you know who Dr. John Nekic is?

4    A      Yes.

5    Q      Who was he?

6    A      He was a student at Saba who graduated, and then was

7    hired to work in the Gardner office.

8    Q      Was he a member of the board?

9    A      Only from reading the minutes do I see his name listed

10   as board member.

11   Q      Do you recall him attending any meetings that you

12   attended?

13   A      Yes.

14   Q      Who was Katheryn Warr?

15   A      Katheryn Warr was a neighbor of the Fredricks in

16   Augusta, Georgia, who was an accountant.

17   Q      Was she a member of the board as well?

18   A      Yes.

19   Q      Do you recall attending meetings with her?

20   A      Yes.

21   Q      Was the board ever presented with plans, or did it

22   discuss a possible expansion into China?

23   A      Yes.

24   Q      Do you recall approximately when that was?

25   A      No.

1    Q      What was the nature of the discussion?

2    A      Somehow, Dr. Fredrick had found out that there were

3    interested parties in China that would like to see a medical

4    school started up that could train the Chinese doctors in

5    western-style medical education.

6    Q      And was the board consulted about exploring that

7    possibility?

8    A      Yes.

9    Q      What was decided should be done?

10   A      That it . . . it would be worth looking into.

11   Q      And did that happen, so far as you're aware?

12   A      I believe it did.

13   Q      How did the school go about doing that?

14   A      I believe Dr. Hough made a trip to China.

15   Q      And then were you present at board meetings where she

16   reported back on what she had learned?

17   A      We got the feedback that there had been some progress.

18   But ultimately it wasn't successful, and it never happened.

19   Q      Was the board ever consulted regarding spending

20   $5 million related to that project?

21   A      Not specifically.

22   Q      Is that the type or size of expense that you would

23   expect the board would have been consulted on?

24   A      When we initially suggested that she look into it and

25   get back to us, we didn't consider limits, or restrictions, on

1    what that meant.

2    Q       Does $5 million seem like what you, as a member of the

3    board, would have expected to be spent to explore that idea?

4    A       I guess I don't know what it would take to start up a

5    medical school in China.

6    Q       Was the board ever asked to approve a $5 million

7    expense, to your recollection?

8    A       Not specifically.

9    Q       Did Dr. Fredrick ever request loans from the medical

10   school?

11   A       Yes.

12   Q       And do you recall what those were for?

13   A       Payback.

14   Q       When you say "payback," can you explain that further?

15   A       Sure.  When I first started my training in Augusta, and

16   I was an intern, things were just getting started.

17   Q       At Saba?

18   A       At Saba.  The medical school was just getting started,

19   almost entirely done by Dr. Fredrick.  He worked nonstop, seven

20   days a week, continuously, for a period of many years.

21          And then later, when the enrollment grew, there was

22   sufficient funds to compensate him for all of that.  And so the

23   board members felt that, when he wanted to be . . . paid, that

24   we agreed that that was reasonable.

25   Q       If he were being paid for the services he had provided,

1   was there discussion about why the request was made for a loan,

2   instead of an outright payment?

3   A       No.

4   Q       Was it your understanding that the requested loans would

5   be made after the approval by the board?

6   A       Yes.

7   Q       Do you recall ever receiving any report back that the

8   loans had been repaid?

9   A       No.

10  Q       Did the board ever discuss opening offshore bank

11  accounts for asset protection purposes?

12  A       Yes.

13  Q       And were accounts opened?

14  A       I don't know.

15  Q       Was the board ever told that accounts were opened in

16  Switzerland?

17  A       No.

18  Q       Was the board ever told that accounts were opened in

19  Liechtenstein?

20  A       No.

21  Q       Do you know whether Saba had any accounts overseas, or

22  where they were?

23  A       I knew that the money had been moved.  The board members

24  knew that the money had been moved.

25  Q       All right.  Now, have you ever have you heard of Medical

1   University of the Americas?

2   A      Yes.

3   Q      What is that?

4   A      It's a sister school.

5   Q      Where is it?

6   A      In Nevis.

7   Q      And who do you understand to own that?

8   A      I don't know.

9   Q      What was your understanding of Dr. Fredrick's role with

10  MUA?

11         Well, let me back up before I ask that question.

12         Is Medical University of the Americas referred to as

13  MUA?

14  A      Yes, it is.

15  Q      And what did you understand Dr. Fredrick's involvement

16  with MUA to be?

17  A      He did the majority of the work in getting it set up.

18  Q      Was Dr. Hough involved, based on your knowledge,

19  involved with MUA at all?

20  A      I don't think so.

21  Q      Were you ever on the board for MUA?

22  A      No.

23  Q      Did you become aware that the schools might be sold?

24  A      Yes.

25  Q      Do you recall when that was?

1    A      Not exactly.  About a year before the sale took place,

2    the discussions were that Dr. Fredrick had spoken with more

3    than one possible buyer.

4    Q      How did you learn this as part of your -- did you learn

5    this through your position on the board, or as a friend of

6    Dr. Fredrick and Dr. Hough?

7    A      I think it was a board subject.

8    Q      You indicated that you first -- you learned -- when did

9    you learn . . . .  I'm not clear from your answer.

10          You indicated you learned about a year before the actual

11   sale that there had been offers; is that correct?

12   A      Yes.

13   Q      Had those prior potential sales been brought to the

14   attention of the board?

15   A      Yes.

16   Q      Had they been brought to the attention of the board at

17   the time that they occurred, or did you learn about them prior

18   to the ultimate sale?

19   A      It's hard for me to say, because I had been good friends

20   with them for a long, long time, so when I learned that he had

21   talked with people about selling the school --

22   Q      Um hum.  And who is, "He," that you're referring to?

23   A      Dr. Fredricks.

24   Q      Okay.

25   A      He had mentioned that the school might be sold, and that

1    there were parties, including Ross University, who had talked

2    to him about purchasing the school.  And so he was going

3    through the motions of talking with other prospective buyers.

4    But I don't know exactly how many, who, or exactly when he had

5    those meetings.

6    Q      All right.  Was the school ultimately sold?

7    A      Yes.

8    Q      Do you recall when that was?

9    A      Only by reference to the minutes.

10   Q      Okay.  Do you know how much the school was sold for?

11   A      I did not know at the time.

12   Q      Was the board ever advised of how much the school was

13   sold for?

14   A      No.

15   Q      Was the board consulted regarding the sale before it

16   happened?

17   A      To agree to the sale?

18   Q      Yes.

19   A      Yes.

20   Q      Did you discuss it at length, or were you simply asked

21   to approve it?

22   A      We were asked if we thought it could be done, and we

23   agreed.

24   Q      But no discussion was had as to the sale price.

25   A      No.

1   Q       Was any discussion had as to the details of the sale?

2   A       No.

3   Q       Was the board consulted regarding the allocation of the

4   proceeds from the sale?

5   A       No.

6   Q       Did you discuss the sale with Dr. Fredrick or Dr. Hough?

7   A       No.

8   Q       Who did you understand would receive the proceeds from

9   any sale of the school?

10              MR. SAUNDERS:  Objection, foundation.

11              THE COURT:  Overruled.

12              MS. KESSLER:  You can answer.

13              THE WITNESS:  I believe that the ownership was The

14  Foundation . . . the Saba University School of Medicine

15  Foundation.

16  BY MS. FINLEY:

17  Q       Did you believe that the foundation would receive the

18  money?

19  A       Yes.

20  Q       Are you still on the board of the school now?

21  A       Yes.

22  Q       Who owns the school now?

23  A       Equinox.

24  Q       And you are currently on the board of the school now,

25  not the Saba Foundation --

1    A      Yes.

2    Q      -- do I have that correct?

3    A      Yes.

4    Q      Have you ever heard of entities by the name of Top Fast?

5    A      No.

6    Q      Have you ever heard of New Vanguard?

7    A      No.

8    Q      Have you ever heard of Apex?

9    A      No.

10   Q      Have you ever heard of Ample Dynamic?

11   A      No.

12          MS. KESSLER:  Court's indulgence?

13          (Ms. Kessler and Ms. Finley confer privately.)

14          MS. KESSLER:  No further questions, Your Honor.

15          THE COURT:  Thank you.

16          Mr. Saunders?

17          MR. SAUNDERS:  Thank you, Your Honor.

18                      CROSS EXAMINATION

19   BY MR. SAUNDERS:

20   Q      Good afternoon, Dr. Dalbec.

21   A      Good afternoon, Mr. Saunders.

22   Q      How are you today?

23   A      I'm very well, thank you.

24   Q      Let me start by just going back over your background a

25   little bit.

1          You graduated from Ross University, I believe you said,

2     in 1992; is that correct?

3     A     That's correct.

4     Q     Awe then you started your residency in Augusta at that

5     time?

6     A     Yes.

7     Q     And that was at the Medical College of Georgia; correct?

8     A     Yes.

9     Q     Could you explain what a residency is?

10    A     A residency is a training program for your specialty

11    interests in different fields of medicine; family practice,

12    pediatrics, surgery, gynecology, internal medicine, etcetera.

13         And each of the programs consists of a beginning year,

14    first year, of . . . called an internship; and then one to

15    three years more, depending on the specialty involved, junior

16    year, senior year; and then you're eligible to be certified as

17    a specialist in that field.

18    Q     So let me just see if I've got the structure of the

19    medical school education correct, and tell me if I'm wrong on

20    anything.

21         First two years are spent basically in classroom

22    education on the basic sciences; correct?

23    A     That's correct.

24    Q     And then your third and fourth year of medical school,

25    you're still a student, but you are on site at a hospital doing

1    what's called your clinical rotation; is that correct?

2    A      That's correct.

3    Q      And at that point you graduate from medical school and

4    you get your M.D.; is that correct?

5    A      That's correct.

6    Q      And then you do your residency, which consists of the

7    first year of internship, plus two to three years following

8    that before you're actually fully licensed and eligible to

9    practice; is that right?

10   A      In most states, that's correct.

11   Q      Now, you also served in the air force; is that correct?

12   A      Yes.

13   Q      As a captain?

14   A      First as a captain, then as major.

15   Q      And when was that?

16   A      In 1995, I started in the air force, and I ended in

17   1999.

18   Q      Okay.  So this was after you completed your residency

19   and went into the air force?

20   A      Yes.  Yes, that's correct.

21   Q      Did you remain in touch with Dr. Hough and Dr. Fredrick

22   during that period of time when were you commissioned?

23   A      Yes, I did.

24   Q      Where were you stationed?

25   A      Goldsboro, North Carolina.

1   Q      All right.  And when is it that you -- well, during the

2   time you were in your residency, that's when you started

3   working with admissions at the Saba school; correct?

4   A      That's why I went to Augusta, so I could be close to

5   this and get a good training program at the same time.

6   Q      And you became a member of the board of trustees shortly

7   after the school opened.

8          I believe it was in 1994, that you joined that board; is

9   that correct?

10  A      It was at about that time.

11  Q      So you were on the board at the time that you were

12  serving in the air force?

13  A      That's correct.

14  Q      You then became chairman of the board a few years later,

15  in 1999; is that right?

16  A      That's correct.

17  Q      You've remained in that position, as chairman of the

18  board of trustees of the Saba school, consistently for the past

19  14 years, both before and after the sale of the school in 2007;

20  correct?

21  A      That's correct.

22  Q      So you've been a part of that board, as trustee and then

23  later as chairman, since 1994, or about 19 years; is that

24  right?

25  A      That's correct.

1   Q      Now, I want to go back to what Miss Kessler was asking

2   you about, about this issue of a distinction between the board

3   of the school and the board of The Foundation.

4          You said, I believe, that initially, when you were back

5   in Augusta working on admissions, you didn't have an

6   understanding of who owned the Saba school, it was just

7   starting out; is that right?

8   A      That's correct.

9   Q      But I think you also said, in response to one of

10  Miss Kessler's last questions, that when the school was sold,

11  you expected that the proceeds of that school -- of that sale

12  would go to The Foundation, because The Foundation owned the

13  school; is that correct?

14  A      That's correct, I said that.

15  Q      So am I right that, at some point after your initial

16  early days sitting in the house at Augusta and conducting

17  interviews, you did, in fact, learn that the Saba school was

18  owned by a nonprofit foundation, the Saba School of Medicine

19  Foundation.

20  A      Over the time serving as a board member, and going back

21  and forth to the island, through the accreditation processes

22  that occurred, yes, it became more clear that the operation of

23  the school was a foundation activity.

24  Q      So as you sit here today, it is clear that the school

25  was owned by The Foundation and not by any individual; correct?

```
1   A      That's correct.

2   Q      And one of the things that The Foundation did was to

3   fund and operate the Saba University School of Medicine;

4   correct?

5   A      That's correct.

6   Q      And The Foundation was involved in other activities as

7   well, even apart from and separate from the school; is that

8   true?

9   A      There was more.

10  Q      What type of activities were you aware of the Foundation

11  being involved in, separate and apart from running the school?

12  A      Philanthropic efforts, hypertension treatment.  And I

13  know that, at one point -- I don't know how it ever came about,

14  but Dr. Hough had met some people that were willing to do

15  cataract surgeries in underserved areas, and --

16  Q      I'm sorry, you said, "underserved area"?

17  A      Underserved areas.  Poor countries.  And so she

18  coordinated with the providers, and The Foundation would

19  provide materials and equipment to do cataract surgeries on

20  people that couldn't otherwise have it done.  And they were

21  donating equipment to clinics, and they were running

22  hypertension screening operations.  That's what I knew about.

23  Q      Okay.  And all of these things had nothing to do with

24  the Saba school; correct?

25          MS. KESSLER:  Your Honor, I'm going to object based
```

1    on foundation as to time?

2          THE COURT:  The objection will be sustained to the

3    extent you should establish the time period that you're

4    referring to.

5    BY MR. SAUNDERS:

6    Q      During the period, let's say, starting when you became

7    chairman of the board in 1999, and for the years following

8    that, let's say the years between that and the time of the sale

9    in 2007, were you aware that during that time that The

10   Foundation was involved in this sort of philanthropic

11   activities, setting up the eye clinics and the hypertension

12   programs, and donating medical equipment, etcetera?

13   A      Yes.

14   Q      And to your knowledge, has The Foundation continued to

15   engage in those type of philanthropic activities after the Saba

16   School of Medicine was sold to Equinox in 2007?

17   A      Yes, it did.

18   Q      So putting aside what your understanding or conception

19   might have been when you were first starting out with the

20   school down in Augusta, is it now your understanding, as you

21   sit here today, that the Saba Foundation had, and continues to

22   have, an existence and a structure separate and apart from that

23   of one of the schools that it ran, the Saba University School

24   of Medicine?

25   A      Yes, I think --

1          MS. KESSLER:  Your Honor, objection as to foundation,

2     how the witness knows this, or may know this, if he does.

3          THE COURT:  Overruled.

4     BY MR. SAUNDERS:

5     Q     Is that your understanding?

6     A     Yes.  I've continued to be friends with the Fredricks,

7     and I knew about their activities in The Foundation that

8     continued after the sale of the school.

9     Q     Now, as far as the board meetings, you said you were

10    present at meetings with John Nekic, for example; is that

11    correct?

12    A     Yes.

13    Q     And John Nekic was someone who you said had been a

14    student, and then proceeded to start working for the schools;

15    is that right?

16    A     That's correct.

17    Q     He was a doctor, correct; he graduated with an M.D.?

18    A     He's got an M.D., yes.

19    Q     And . . . .  Well, let me ask it this way:  You stayed

20    involved, since the time of the sale, with the Saba University

21    board, correct --

22    A     I still am.

23    Q     -- board of trustees?

24    A     I still am.

25    Q     Still as the chairman of that board.

1    A      Yes.

2    Q      You have not had involvement since the time of the sale

3    with the Saba Foundation, which does continue to exist, to your

4    understanding; is that correct?

5    A      That's correct.

6    Q      And that has its own separate . . . board, or people who

7    run that particular nonprofit organization, that doesn't

8    include you; correct?

9    A      That's correct.

10   Q      And is it your understanding that the Saba Foundation,

11   during the time before the sale, also had people who were

12   managing and directing that foundation in terms of it is

13   philanthropic activities, or was that being done by the board

14   of trustees at the Saba school?

15   A      I was not directly involved.

16   Q      So is it possible that the Saba school and the Saba

17   Foundation had separate people who were directing their

18   activities?

19          MS. KESSLER:  Objection, calls for speculation.

20          THE COURT:  Sustained.

21   BY MR. SAUNDERS:

22   Q      Well, let me ask this, then:

23          You and the board of the Saba University School of

24   Medicine were not involved, prior to 2007, in directing the

25   non-Saba school-related activities of the Saba Foundation; is

1    that true?

2    A      That's correct.

3    Q      So to the extent those were being directed by someone,

4    it was someone other than the board of trustees of the Saba

5    school; correct?

6    A      Yes.

7    Q      Was there a time that you understood that the Saba

8    University board of trustees and the Saba Foundation board of

9    directors had to . . . or were required to split, and to

10   separate, due to the threat of some outside agency?

11   A      That's correct.

12   Q      And what's your understanding of that?

13   A      When the school began to seek accreditation, there was a

14   group from Ireland, called the ACCM, that was an accrediting

15   body that had been established.  And the accrediting bodies for

16   the United States schools would not accredit foreign schools,

17   so they had applied with the ACCM for recognition.

18   Q      "They," being the Saba school?

19   A      The Saba School of Medicine was looking to get

20   recognition and accreditation.  The ACCM made the

21   recommendation to split those functions.

22   Q      Do you recall when that was approximately?

23   A      I don't recall the exact date.

24   Q      Can you put in it some type of approximate timeframe, in

25   terms of relative to when you became chairman, or --

1   A      It was after I got out of the air force, so it was

2   maybe . . . around 1998, 1999, that they decided to follow the

3   advice of the ACCM.  But it was at the time the ACCM did their

4   site visit, their initial consideration.

5   Q      So it's your understanding that, if I understand you

6   correctly, that at the time of this ACCM recommendation,

7   sometime around the late 1990s, and in response to that

8   recommendation, the functions of the board of the school and

9   the board of The Foundation split; correct?

10  A      That's correct.

11  Q      Now, does that mean it's your understanding that, prior

12  to that ACCM recommendation in the late 1990s, the functions of

13  the board of the school and The Foundation were joined?

14  A      It looks as though we were together, although I only

15  went to one set of meetings, twice a year, as a board meeting,

16  and didn't know I was part of two different entities.

17  Q      Have you ever -- well . . . .  In all the years you've

18  been chairman of the board of the school, since the split from

19  the ACCM recommendation, and including after the sale in

20  between, have you ever been made aware of anyone from the Saba

21  school, or from the board, or from The Foundation, or anyone

22  from MUA, saying:  Wait a minute, somebody made off with our

23  money, we're missing over $40 million?

24  A      No.

25  Q      Nothing like that has ever happened; true?

1    A       No.

2    Q       Now, let's talk about the Saba school a little bit.

3            You were there from the very beginning; right?

4    A       Before the beginning.

5    Q       Before the beginning.

6            In fact, you said you chose to do your residency in

7    Augusta so that you could work with Dr. Fredrick to help

8    recruit students; is that correct?

9    A       That's correct.

10   Q       Can I ask you to . . . .

11           MR. SAUNDERS:  Your Honor, may I approach freely?

12           THE COURT:  You may.

13           (Mr. Saunders provides documents to the witness.)

14   BY MR. SAUNDERS:

15   Q       Let me ask you, Dr. Dalbec, to please look at

16   Exhibit 113, for identification.

17   A       It's a map of the Caribbean.

18   Q       Does it appear to be an accurate map, based on your

19   knowledge of the Caribbean?

20   A       Approximately.

21   Q       Approximately to scale?

22   A       Yes.

23           MR. SAUNDERS:  Your Honor, move in 113?

24           THE COURT:  Is that defendant's 113?

25           MR. SAUNDERS:  Yes, Your Honor.

1          THE COURT:  Any objections?

2          MS. KESSLER:  No, Your Honor.

3          THE COURT:  Defendant's Exhibit 113 will be admitted.

4          (Defendant's Exhibit 113 was admitted into evidence.)

5          MR. SAUNDERS:  Permission to publish, Your Honor?

6          THE COURT:  You may.

7          (An exhibit was projected onto the projector screen.)

8          MR. SAUNDERS:  Okay.

9     BY MR. SAUNDERS:

10    Q     So where you see the red letters, "Saba," pointing to

11    that little green circle, that is the island of Saba, correct?

12    A     It's much larger on the map than it really is.

13    Q     I'm sorry, it's larger on the map than it really is?

14    A     Yes.

15    Q     It's the smallest island in the area; is that true?

16    A     That is correct.

17    Q     And it's part of a chain of islands not all adjacent to

18    each other that constituted, until a few years ago, a foreign

19    country called the Netherlands Antilles; is that right?

20    A     That's right.

21    Q     And Dominica, which is just a few islands down below

22    that, that's where you went to medical school, and where

23    Dr. Fredrick and Dr. Hough met; is that correct?

24    A     That's correct.

25    Q     Could you look at Exhibit 114, Defense 114, please?

1              (The witness examines an exhibit.)

2              Yes.  The island of Saba.

3    Q      Do you recognize that as the island?

4    A      Sure do.

5              MR. SAUNDERS:  Move Defense 114 into evidence and ask

6    permission to publish, Your Honor?

7              THE COURT:  Any objections?

8              MS. KESSLER:  None, Your Honor.

9              THE COURT:  114 will be admitted and may be

10   published.

11             (Defendant's Exhibit 114 was admitted into evidence.)

12             (An exhibit was projected onto the projector screen.)

13   BY MR. SAUNDERS:

14   Q      That's the island of Saba; is that correct?

15   A      All of it.

16   Q      Now, if you look just a little bit to the right of

17   center, in the foreground at the bottom of the picture there's

18   what looks like a landing strip there; is that correct?

19   A      That's correct.

20   Q       Is that where planes, including Dr. Fredrick's plane,

21   come in to and out of the island of Saba?

22   A      Actually, there are only a few planes allowed to land

23   there, and their pilots are specially trained.  It's like

24   landing on an aircraft carrier.  It's very small, and you can

25   only miss the approach going out toward the ocean, because if

1    you miss the approach, you'll run into the mountain going the

2    other way.  So the pilots are just a few that are qualified and

3    certified to do the landings.  They use a special plane, called

4    a de Havilland Twin Otter, that's equipped for rough landings

5    and hard braking.

6    Q      Other than by boat, is that the only way on or off the

7    island of Saba?

8    A      Yes.

9    Q      And the medical school was built, if I'm correct, on the

10   side of the island that we're not seeing right now, the far

11   side of the island; is that correct?

12   A      On the other side; yes.

13   Q      On a place called the bottom?

14   A      "The bottom," in Dutch, is a description of a bowl

15   shape.

16   Q      When the school first started in 1993, how many students

17   were there?

18   A      Just a handful.

19   Q      Do you have an approximate number?

20   A      About nine students in the first class.

21   Q      And where were classes being held at that time?

22   A      In a former grammar school . . . elementary school.

23   Q      Was that on lease from the government of Saba?

24   A      That's correct.

25   Q      Did they still have the little grammar school desks

1   there?

2   A      Yes.  When we walked in, some of the little desks and

3   chairs were still around, and the U.S. students were attending

4   classes.

5   Q      And over the course of your tenure on the board of

6   trustees of that school, how large did the enrollment in the

7   Saba school become?

8   A      It's grown significantly to 120 students per class.

9   Q      For each of four years?

10  A      Well, they do the two years on the island, then they go

11  to do their third and fourth year in rotations in the

12  hospitals.

13  Q      So at any given time there are approximately

14  500 students enrolled in the school, whether on the island or

15  in their rotations; is that right?

16  A      That's about as many as the island can hold.

17  Q      What is, if you know, as chairman of the board, what is

18  the first-time passage rate for graduates of the Saba School on

19  the medical board exams?

20  A      It's very high, about 98 percent.

21  Q      That's extremely high; is that correct?

22  A      It's extraordinarily good.

23  Q      For any medical school, whether in the Caribbean or the

24  U.S.; correct?

25  A      Compared to the United States, when I was an intern and

1    resident in Augusta, the third-year students were being made to

2    go back and restudy and retake their Part 1 exams in the basic

3    sciences because they had a passed rate of less than

4    70 percent.  And so when you look at a 98 percent pass rate,

5    it's among the best of even the U.S. schools.

6    Q      And just to be clear, the medical board exams are in

7    different parts that you take at various stages of your medical

8    education; is that correct?

9    A      That's correct.  Part 1 is the science exam.

10   Q      That's after the first two years?

11   A      That's correct.

12   Q      And when is Part 2?

13   A      After the third year of medical school you're eligible

14   for Part 2.  And when you finish medical school you can take

15   Part 3.

16   Q      Is there a Part 4, or is that it?

17   A      No, that's it.

18   Q      Do you know how many M.D.s have graduated from the Saba

19   School of Medicine?

20   A      Over 1,500.

21   Q      And those students are eligible to be licensed to

22   practice anywhere in the United States; is that correct?

23   A      That's correct.

24   Q      And in Canada?

25   A      Yes.  We have about a third of our students enrolled now

1    are Canadians.

2    Q       And in the EU too; correct?

3    A       Yes.

4    Q       And is the Saba school the only Caribbean medical school

5    that has satisfied the accreditation requirements of the EU?

6    A       Just recently we achieved that milestone.

7    Q       And to your knowledge, some those graduates from the

8    school have become chief residents of hospitals?

9    A       Leaders in their careers.

10   Q       Headed up departments?

11   A       Teaching, heads of departments, chief residents,

12   publishing articles.  It's a proud achievement.

13   Q       Medical research?

14   A       Yes, doing research; achieving grants from the

15   government.

16   Q       So is it fair to say that the graduates of that school

17   have helped and improved, and possibly changed, the lives

18   of . . . thousands of people?

19   A       I have no doubts, and my name is on all of the diplomas.

20   Q       And it's a school that, as a doctor, you are very proud

21   to be associated with; is that correct?

22   A       That's why I continue to do it.

23   Q       And it's fair to say that that school has an outstanding

24   record of success?

25   A       Yes.

1   Q      All at approximately one-third to one-half of the

2   tuition that would be paid at a U.S. medical school; is that

3   right?

4   A      Yes.

5   Q      As chairman of the board of trustees at the school, to

6   whom do you attribute the remarkable succeed of the Saba

7   school?

8   A      Dr. Fredricks.

9   Q      He is a pretty solid medical educator and planner?

10  A      Yes.

11  Q      And he worked very hard for many years; true?

12  A      Unbelievably hard.

13  Q      I think you said earlier he worked very hard, totally

14  unpaid, for many years; correct?

15  A      Yes.

16  Q      He made the school what it is.

17  A      Absolutely.

18  Q      Now, Dr. Hough played a role in the success of the

19  school as well; true?

20  A      She helped out.

21  Q      And with respect to the development of the clinical

22  program and the accreditations, those are very significant to

23  the success of any medical school, including the Saba school;

24  is that correct?

25  A      Dr. Fredrick couldn't have done what she did.  And she

1  was very successful at going out to meet and greet hospital

2  officials all across the country, and do a lot of traveling to

3  meet medical directors at teaching hospitals, to ask them that

4  our students be entitled to visit and do rotations.

5          And that was what the clinical director's job was, and

6  she was very good at it.

7  Q      And were those relationships that she created as

8  clinical director, as well as the work that she did on getting

9  the school accredited throughout the United States and in other

10  countries, a substantial factor in the success of the school?

11  A      Yes.  When the accreditation bodies would examine the

12  schools, they would look at both the basic science curriculum

13  and the clinicals.  And they would go to the different

14  hospitals with Dr. Hough to see how the students were doing and

15  how well the program was set up.  And so she was often on the

16  road with the accrediting body representatives, visiting our

17  teaching hospitals.

18  Q      Between the clinical program, teaching hospitals, and

19  the visits with the accreditation boards, did she travel a lot?

20  A      A lot.

21  Q      Was that the largest part of her job, from your personal

22  observation?

23  A      Yes.

24  Q      And she worked very hard too, just as Dr. Fredrick did;

25  correct?

1   A       A lot of energy, and . . . I was impressed.

2   Q       Is it fair to say that, based on your observations, both

3   Dr. Fredrick and Dr. Hough were very committed to the success

4   of the Saba University School?

5   A       Without a doubt.

6   Q       And, in fact, they both stayed on, at the request of the

7   new buyers, in 2007, for a period of a couple of years after

8   the sale, to help with the transition to the new ownership;

9   correct?

10  A       That's correct.

11  Q       Because, to your understanding as chairman of the board,

12  the new buyers felt they still needed the input of Dr. Fredrick

13  and Dr. Hough to help with that transition; correct?

14  A       Yes.

15  Q       Did you ever, in all of these years, from your first

16  involvement with the school back in the . . . before the

17  beginning, up until today, did you ever get the impression that

18  Dr. Fredrick and Dr. Hough's motivation in running the Saba

19  school, or its sister school, MUA, was to collect assets and

20  amass a fortune?

21  A       No.

22  Q       Did you ever, in all your years knowing them and being

23  involved with the school, hear either Dr. Hough or Dr. Fredrick

24  talk about how much money they were making, or could be making,

25  from the schools?

1    A      No.

2    Q      When the school became successful, as it did in a very

3    short period of time, did you ever see them getting excited

4    about making money?

5    A      No.

6    Q      Did you ever see either of them reward themselves

7    financially for the school's success?

8    A      No.

9    Q      Did you ever, in all of those . . . 19 or more years,

10   see one thing that would suggest to you that Dr. Hough and

11   Dr. Fredrick were setting up this nonprofit medical school in

12   order to syphon off millions of dollars into their secret Swiss

13   bank accounts?

14   A      No.

15   Q      Never saw anything of that; right?

16   A      Never did.

17   Q      So what was their focus on, if not making money?

18   A      Their background and their passion in life, all of the

19   time, was teaching, developing a good school.  They had

20   fantastic relationships with their peers in their fields.

21          Dr. Fredrick was eminently the best leader for the

22   medical school among the professors.  He himself had been a

23   professor, and so he understood a lot of their needs, and a lot

24   of their requirements to make a good school.

25          The retainment of our faculty was incredible compared

1    with other Caribbean schools.  The clinicals program was

2    outstanding because we had to . . . to depend on the generosity

3    of hospitals to host our students.  And Dr. Hough was really

4    great at establishing personal and professional relationships

5    in all of those institutions.

6         And so it goes without saying that, without them and

7    their own drive and ambition to make it a good program, made it

8    easy for the new owners to simply walk into a turn-key

9    operation.

10   Q     So . . . .  Let me ask it this way:

11        If all the work that they did, all that tireless work

12   and that unpaid work, was not about creating some cash cow and

13   making money, and funding Swiss bank accounts, it was

14   about . . . what, creating education?

15   A     Accomplishing a great school.

16   Q     And they did that.

17   A     They certainly did.

18   Q     Are there things that they could have done in running

19   the school that would have increased profit?

20   A     They could have increased the tuition many times.

21   Q     Were their competitors doing that?

22   A     Yes.

23   Q     Was that ever discussed as to whether, once the school

24   became successful, the tuition should be increased?

25   A     It was discussed that they didn't want to increase the

1    tuition.

2    Q      And what did they say about that?

3    A      It would make the medical education beyond the reach of

4    some people who couldn't get loans.  And so the quality of the

5    people you were getting as prospective medical students might

6    change, you might get those who could afford it, rather than

7    those who might deserve to become doctors.

8    Q      So in that instance, faced with a choice between making

9    the school more profitable and keeping it affordable and

10   allowing students to attend, the choice that Dr. Hough and

11   Dr. Fredrick made was the latter; right?

12   A      That's correct.

13   Q      Now, let me ask you to look at Defense Exhibit 112, for

14   identification, please.

15          Do you recognize that exhibit?

16   A      This is a budget report for the year 2005/2006.

17   Q      Was this a document you recall reviewing in your

18   capacity as chairman of the board of trustees?

19   A      Yes.

20   Q      Is this a typical form of budget that would be presented

21   to the board on those occasions when it reviewed the budget?

22   A      Yes.

23   Q      And was this document created and routinely kept in the

24   course of the Saba School of Medicine's course of business as

25   part of it's usual practice?

1    A       Yes.

2            MR. SAUNDERS:  Your Honor, move Government's

3    Exhibit 112 -- excuse me -- Defense Exhibit 112 into evidence?

4            THE COURT:  Any objections?

5            MS. KESSLER:  Can I have a moment?

6            THE COURT:  You may.

7            (Ms. Kessler and Ms. Finley confer privately.)

8            MS. KESSLER:  No objection, Your Honor.  Thank you.

9            THE COURT:  Defendant's 112 will be admitted and may

10   be published.

11           (Defendant's Exhibit 112 was admitted into evidence.)

12           MR. SAUNDERS:  Thank you, Your Honor.

13           I ask if we could show the two pages of that exhibit

14   side by side.  That's doable?

15           There we go.  Thank you.

16           (An exhibit was projected onto the projector screen.)

17   BY MR. SAUNDERS:

18   Q       All right.  Dr. Dalbec, the figures in the box up at the

19   top of the first page, those reflect the actual income for 2004

20   and 2005, for both the basic sciences program, which is the

21   first two years, and the clinical medicine program for the last

22   two years; is that correct?

23   A       Yes.

24   Q       And below that is the projected income from both of

25   those halves of the program for the upcoming fiscal year, 2005

1   to '06; correct?

2   A      That's correct.

3   Q      And then underneath that there are a series of expenses;

4   correct?

5   A      Correct.

6   Q      And then at the end, on the second page, inside that box

7   towards the top, is the total of those expenses; correct?

8   A      That's correct.

9   Q      In the first column, with respect to the actual expenses

10  for the past fiscal year, and in the second column, on the far

11  right, the projected expenses for the upcoming fiscal year;

12  correct?

13  A      That's correct.

14  Q      So with respect to the past year, the '04/'05 year, what

15  is listed as the actual income for the Saba school from the

16  basic sciences program?

17  A      4.378.

18  Q      I'm talking about the income, not the expenses, so I'm

19  back on the first page now.

20  A      The first page.  4.535673 -- 4,535,673.

21  Q      And that's the actual income for the basic sciences

22  program for 04/05; is that correct?

23  A      That's correct.

24  Q      And if you look at the second page, what are the

25  expenses of the basic science program for that same period?

1   A      4,378,865.

2   Q      I believe that's a difference of . . . only about

3   150,000 or so; is that right?

4   A      About that.

5   Q      And looking at the projected revenue and expenses for

6   the upcoming year, what's the projected revenue from basic

7   science for '05/'06?

8   A      4,930,000.

9   Q      And what are the projected expenses for the same period?

10  A      I believe it's' going to be 4,863,000.

11  Q      That's the number on the right-hand side of the box on

12  the second page?

13  A      Yes.

14  Q      And that's a difference of only about 60 or $67,000;

15  correct?

16  A      About that; yes.

17  Q      Looking over the expenses that are listed, these

18  budgeted expenses related to -- and these are expenses related

19  only to the basic sciences part of the program on the island;

20  correct?

21  A      That's correct.

22  Q      Do any of those expenses appear to you to be

23  inappropriate for a medical school basic sciences program?

24  A      I didn't think so.

25  Q      Do any of the numbers, the figures attached to those

1   expenses, strike you as being inappropriate or unreasonable,

2   based on what you know about medical school education?

3   A      No.  They were reasonable.

4   Q      So it's true that the Saba University School of Medicine

5   wasn't a nonprofit in name only; in fact, it wasn't making a

6   significant profit of any kind; isn't that right?

7   A      No, it wasn't.

8   Q      It was meeting its expenses and maybe a little more?

9   A      That's correct.

10  Q      It wasn't some secret cash cow that was generating money

11  that wasn't being put right back into the school; is that

12  correct?

13  A      I don't think so.

14  Q      And was this budget fairly typical for the budgets that

15  you reviewed during your time as chairman of the board?

16  A      Yes, that's true.

17  Q      I want to talk to you a little bit more, we started

18  earlier, with respect to Dr. Hough's role with respect to the

19  school, and we talked about clinical rotations and

20  accreditation.

21         And both of those, I think you said, are very important

22  to the success of any medical school; is that correct?

23  A      They were.

24  Q      Do the clinical rotations, or the location where a

25  student does his or her clinicals, often lead to that student

1    having an opportunity to do a residency at that same hospital?

2    A      Yes.  That's how a lot of programs acquire residents, is

3    to select outstanding students that are doing rotation, and

4    then persuade them to apply to their own programs.

5    Q      And what is the importance of accreditations?

6    A      Accreditations gives the student a couple of . . .

7    effective validity bases.  When it comes to state licensure,

8    when it comes to even getting into a quality residency program,

9    if you're from an accredited school and you have accreditation

10   from major states, then the state medical boards view that as

11   being as important as your actual qualifications.  And for

12   residency programs, they're looking for well-qualified people

13   that come from reputable schools.  And that accreditation

14   process speaks to the idea of the quality of the school.

15   Q      So it makes it easier for you to find a residency; true?

16   A      Yes.

17   Q      It makes it easier for to you get licensed in a state

18   after your residency; correct?

19   A      That's correct.

20   Q      And that's because, as part of the accreditation

21   process, the board of that particular state, or the department

22   of education, or of some foreign country, has actually taken a

23   hard look at the school, and has determined that its programs

24   and its academic standards are on a caliber along with the most

25   recognized U.S. medical schools; is that correct?

1    A       Exactly.

2    Q       And that means that, when a doctor from the Saba school

3    applies for licensure in a state, the state knows it doesn't

4    have to further scrutinize the Saba school because that's

5    already been done and it's passed; is that correct?

6    A       That's correct.

7    Q       And those accreditations are updated and renewed

8    periodically; in other words, once you're accredited, you are

9    not accredited for the life of the school, the board is going

10   to come back and update and check and make sure that everything

11   is up to standard; correct?

12   A       Subject to renewals.

13   Q       And that was Dr. Hough's role in handling those

14   accreditations; is that correct?

15   A       Basically.

16   Q       Dr. Fredrick didn't do that.  That was Dr. Hough's job?

17   A       Dr. Hough's responsibility, and she was the leader and

18   the hardest worker in that area.

19   Q       And what did that work involve?

20           We talked about traveling to the hospitals to set up the

21   rotations.

22           What did her work involving the accreditations involve?

23   A       A lot of the work involved submitting applications,

24   which were reams and reams of forms to be completed and

25   submitted to each of the states, including Texas, California,

1    Florida, and New York, the major states that were the hurdles

2    of the accreditation process.  And there was an enormous amount

3    of paperwork involved.

4    Q      What about traveling to those states and meeting with

5    the members of the accreditation boards, and pitching, if you

6    will, the merits of the school?

7    A      There was an enormous amount of work that had to be done

8    in developing those relationships, and conducting the site

9    visits and the tours of our teaching facilities.

10   Q      The site visits you're referring to is when the board

11   actually come on site to the island and the hospitals where the

12   third- and fourth-year students are doing rotations; correct?

13   A      Yes.

14   Q      And Dr. Hough would meet with those --

15   A      She was the one who did it.

16   Q      -- visitors and escort them around?

17   A      Yes.  She was the hostess for all of our programs.

18   Q      She was traveling both with respect to the job she did

19   with the clinical program as well as the work she was doing on

20   accrediting; is that correct?

21   A      Yes.

22   Q      Now, the board of trustees -- well, you said that it's

23   your recollection, I believe, Dr. Hough was not on the board

24   during time that you were serving.

25          She came occasionally and would be making presentations

1    about her work, but was not actually a member of the board; is

2    that right?

3    A      There were meetings where she would come to inform us as

4    to the progress of the accreditations and the rotation

5    development, and, in reviewing the minutes, I think, early on,

6    had been at the board meetings.  But as time went on, there was

7    no more attendance at the board meetings.

8    Q      She was not a voting member of the board?

9    A      Not in -- after a short time, she was not a voting

10   member.

11   Q      And what are you refusing to as a short time?

12   A      By the time I went to the offices in Gardner, I don't

13   believe she was a member of the board or participated in any

14   voting decisions.

15   Q      And when was that?

16   A      When I left Augusta and went into the air force, in

17   1995/96.  I would have to refer to the minutes to be precise

18   about the time when she is no longer appearing in the minutes.

19   Q      But your recollection, regardless of the minutes, your

20   best recollection as of today is, as of '95 or '96, she no

21   longer had a role as a voting member of the board; is that

22   correct?

23   A      That's correct.

24   Q      Dr. Fredrick was a voting member of the board; is that

25   correct?

1    A      Up until the ACCM thought that that function should be

2    split off because they thought it was a conflict of interest

3    for him to sit on board of directors and be the CEO and

4    president.

5    Q      Now, did the board include among its members any CEOs or

6    CFOs, or other people with business experience?

7    A      No.  We didn't have anyone of that description.

8    Q      And is it fair to say that the board was primarily

9    focused on overseeing the education and the development of the

10   medical school rather than on the financial management of the

11   schools?

12   A      I would say so.

13   Q      To the extent that there were financial issues that came

14   up, is it your understanding that those would have been

15   addressed by The Foundation which owned the school?

16   A      Yes.

17   Q      And you, as the board of directors -- excuse me -- board

18   of trustees of the school, I believe you said you were

19   consulted regarding large expenditure items and land purchases,

20   and reviewing the budget, such as the one we just saw, but that

21   your primary task was overseeing the academic program; correct?

22   A      We did not function as comptrollers or CFO function at

23   all.

24   Q      Because you didn't have the experience to do that;

25   correct?

1   A      That's correct.

2   Q      And that wasn't essentially within the job description.

3   You were focused on curriculum and faculty appointments and

4   things like that.

5   A      Yes.  I did not consider that the board's mission.

6   Q      Did you become aware, as members of the board, or as a

7   member of the board, and later chairman, of lawsuits that were

8   filed against the Saba school and The Foundation beginning

9   shortly after the school opened?

10  A      Yes.

11  Q      And let me ask you specifically about a lawsuit in 1995,

12  by an individual named Mohammed Entezampour,

13  E-N-T-E-Z-A-M-P-O-U-R.

14         Is that name familiar to you?

15  A      Yes, it is.

16  Q      Who was Mister -- or Dr. Entezampour?

17  A      He was a professor who was hired to each on the island.

18  And after a short time it became apparent that he was not . . .

19  suitable for teaching.  He was doing a bad job.  So he was

20  fired.  And then he sued.

21  Q      He sued the school?

22  A      Yes.

23  Q      For wrongful termination?

24  A      Yes.

25  Q      Do you recall that being around 1995?

1    A       Yes.

2    Q       And do you recall how much he was asking for in damages?

3    A       It was over a million dollars.

4    Q       What happened to the school's assets when that lawsuit

5    was filed, if you recall?

6    A       We were told, on the board, that it threatened to lock

7    up and freeze the school's assets, financial assets.

8    Q       In fact, were the assets of the school frozen in

9    response to the lawsuit?

10   A       I believe that that was what took place.

11   Q       Was there a time when the school was concerned about its

12   ability to make payroll for the next month because its assets

13   had been frozen?

14   A       That's right.

15   Q       And was that discussed by the board?

16   A       Yes.

17   Q       Did the board, at that time, discuss the likelihood,

18   given the school was just in its infancy, of other lawsuits

19   being filed in the future?

20   A       Yes, we did talk about that, as a liability.

21   Q       And a medical school, for example, could face lawsuits

22   by terminated faculty such as this one; right?

23   A       Yes.

24   Q       Or by discharged students; correct?

25   A       That's correct.

1    Q      Or for any . . . accidents on school property, or at

2    university hospitals where students are working; correct?

3    A      That's correct.

4    Q      Any issues relating to medical schools on their clinical

5    rotations could result in litigation against the school;

6    correct?

7    A      All of those situations.

8    Q      And was that discussed generally by the board, in terms

9    of:  We have a new medical school here, we've just been hit

10   with a lawsuit for over a million dollars, and this is likely

11   going to be the first of many.

12   A      That's correct.

13   Q      And was it your understanding, based on the freezing of

14   those assets of the school in response to that first lawsuit,

15   that, under Netherlands Antilles law, a plaintiff had the

16   ability to freeze the defendant's assets during the pendency of

17   litigation?

18   A      That's what we understood.

19   Q      And that was discussed by the board members?

20   A      Yes.

21   Q      And was it your understanding, as a result of that, that

22   even in the most frivolous lawsuit could potentially result in

23   the school's assets being frozen and the entire school being

24   forced to shut down?

25   A      Yes, that's true.

1   Q      And is it true that the board of trustees of the school

2   was concerned about making sure that the school would continue

3   to operate, and that its assets could be protected in the face

4   of . . . present and upcoming litigation?

5   A      Yes, we were concerned about that.

6   Q      And did the board members authorize someone to talk to a

7   lawyer to find out how to protect the school's assets from

8   seizure under Netherlands Antilles law?

9   A      We wanted to know what we could do.

10  Q      And did you ask someone to find out?

11  A      We asked Dr. Fredrick to do the necessary investigation

12  to find out what could be done.

13  Q      Was there a specific authorization to Dr. Fredrick to

14  talk to a lawyer on St. Martin --

15  A      That's correct.

16  Q      -- who was familiar with Netherlands Antilles law?

17  A      Correct.

18  Q      And to your knowledge, did he do that?

19  A      Yes.

20  Q      Did he report back to the board?

21  A      Yes.

22  Q      And in response to his consultation with the lawyer in

23  St. Martin, the board decided to authorize Dr. Fredrick to move

24  the school's and The Foundation's assets offshore; correct?

25  A      That's correct.

1   Q      And that was to maintain the financial stability of the

2   Saba University School of Medicine; true?

3   A      Yes.

4   Q      And the board decided, in its open consultation, to keep

5   enough assets on hand to meet the school's monthly operating

6   expenses, and to move everything else to overseas accounts to

7   protect it from being seized or frozen; correct?

8   A      That's correct.

9   Q      Was there anything secret about that between

10  Dr. Fredrick and the board?

11  A      No.

12  Q      Was this some type of grand heist of school assets that

13  was being orchestrated by Dr. Fredrick and Dr. Hough, by moving

14  those assets to foreign accounts?

15  A      No.  We understood it to be under the advice of others.

16  Q      Under the advice of others to move those assets for what

17  purpose?

18  A      To protect us from an unreasonable liability.

19  Q      And was it your understanding that Dr. Fredrick had

20  consulted with lawyers and bankers and financial professionals

21  in reaching the decision to do that?

22  A      Yes.

23  Q      Now, in fact, a number of other lawsuits were later

24  filed against the school and The Foundation; true?

25  A      That's true.

1   Q      Can you remember what some of those lawsuits were about

2   in the following years?

3   A      Yes.  There was several cases where lawsuits were

4   brought against the university.  One was a medical student who

5   felt he had been unreasonably . . . molested by a faculty

6   member.  There was the case of a professor psychiatrist in

7   Massachusetts, who wanted to take the school away from us for

8   himself.  There was a suit that was outrageous, from St.

9   Michael's, about infringement, and they were suing for

10  $150 million.

11  Q      I'm sorry, 150 million?

12  A      $150 million.

13  Q      Now, when those lawsuits came in, at the time they came

14  in, were they discussed by the board?

15  A      Yes.  We were notified of their existence.

16  Q      And did the board discuss the issue of protecting the

17  assets of the school each time one of those new lawsuits came

18  in?

19  A      Yes.  We were reminded, when that would happen, of the

20  first case, and how it endangered the financial stability of

21  the school, to have those funds exposed.

22  Q      So was this an ongoing discussion over the years, this

23  idea of making sure that the school's assets were protected

24  offshore so they would be safe from litigation?

25  A      Yes.  We knew it.

1  Q      Were you aware -- by the way, do you remember when that

2  $150 million lawsuit was filed?

3  A      It was . . . after 1999.  It was . . . I'm not sure

4  exactly when.  It was 2004, 2005.  I'm not sure exactly when.

5  Q      And were there other lawsuits among the ones that you

6  described that were also seeking damages in the millions of

7  dollars?

8  A      Yes.

9  Q      I believe you said St. Michael's.  Was it St. Matthews?

10  A      St. Matthews, yes.

11  Q      That was the $150 million law suit?

12  A      Yes.

13  Q      And were you aware, in your role as chairman of the

14  board, that the school's and The Foundation's assets were being

15  held at banks outside the U.S. and outside the Netherlands

16  Antilles?

17  A      I didn't know where, but I knew they were elsewhere.

18  Q      In fact, that was whole point, to keep them elsewhere,

19  so they would be out of reach of litigants; is that correct?

20  A      That's correct.

21  Q      Did you know precisely where those accounts were held?

22  A      I did not, no.

23  Q      Did it matter to you?

24  A      No.

25  Q      Why?

1   A      Because I thought that it had been done with good

2   advice, by a trusted person.

3   Q      Now, you said you "thought."

4          Has that thought changed or do you still believe that?

5   A      I still believe that.

6   Q      You still believe that that movement had been done for

7   good reasons, and by a person who was trusted, for good

8   reasons, correct --

9   A      Yes.

10  Q      -- as you sit here in this trial.

11  A      Yes.

12  Q      Were you aware in your role of chairman of the board

13  that Dr. Fredrick was protecting those assets in the names of

14  other companies and entities that were owned by The Foundation?

15  A      I did not know the specifics.  But I knew that it had

16  been moved, and there were places where the money was kept, but

17  I did not know the specific --

18  Q      In fact, you did know on at least one occasion, that

19  land -- I believe you testified about this previously to the

20  grand jury -- that land and other assets of the school were

21  being held in the names every other entities for the purpose of

22  asset protection; correct --

23  A      Yes, that was my understanding.

24  Q      -- that was your understanding?

25  A      Yes.

1   Q       So for purposes of asset protect, it wouldn't make sense

2   to have everything sitting in the name of the Saba University

3   School of Medicine, where it could easily be located; isn't

4   that true?

5   A       I didn't believe that there was any intrigue to the idea

6   of dividing the assets in different places.

7   Q       In fact, there was no deep dark secret about that

8   either; correct?

9   A       No, there wasn't.

10  Q       And were you aware, in your role as chairman, that

11  Dr. Fredrick and his advisers had set up companies in different

12  names to hold real estate and to hold assets of The Foundation;

13  true?

14  A       Yes, that's true.

15  Q       Did you know what those names were?

16  A       I didn't know the names.

17  Q       I believe Miss Kessler read you off, at the end of her

18  questioning, a list of names.

19  A       Yes.

20  Q       You didn't recognize them?

21  A       I didn't recognize those names.

22  Q       Did you ever ask for a list of the names of the various

23  entities that Dr. Fredrick and his advisers had set up to hold

24  on to the assets and protect the assets of the foundation?

25  A       No, I did not.

1  Q      Why not?

2  A      I didn't feel it was necessary for me to understand that

3  the money was being protected.

4  Q      Did you trust him to handle the assets appropriately?

5  A      Yes.

6  Q      Do you still trust today that he trust that he handled

7  the assets appropriately?

8  A      Yes, I do.

9  Q      Could you please look at Defense Exhibit 110, for

10 identification?

11        Do you recognize that document?

12 A      Yes, I do.

13 Q      And is that your signature that appears on it?

14 A      Yes, it is.

15 Q      Do you recall signing this on or about May 25th, 2006?

16 A      Yes, I remember signing these documents.  There was more

17 than one, but this was one of them.

18 Q      Okay.  And is this a true and correct copy of a letter

19 that you did, in fact, sign on May 25th, 2006?

20 A      Yes.

21        MR. SAUNDERS:  Your Honor, I'd move Defense 110 into

22 evidence and ask to publish.

23        THE COURT:  Any objections?

24        MS. KESSLER:  No objection.

25        THE COURT:  Exhibit-- Defense Exhibit 110 will be

1   admitted and may be published.

2              (Defendant's Exhibit 110 was admitted into evidence.)

3              (An exhibit was projected onto the projector screen.)

4   BY MR. SAUNDERS:

5   Q     Dr. Dalbec, it's a brief letter, could you just read

6   that aloud?

7   A     "On behalf of the board of trustees for Saba University

8   School of Medicine, I hereby assign Dr. David Fredrick, Social

9   Security Number" --

10  Q     You don't have to read that part into the record.

11  A     -- "the power of attorney to conduct all banking and

12  business transactions on behalf of Saba School of Medicine

13  Foundation, also known as Saba University School of Medicine."

14  Q     Now, let me point out that last section that you just

15  read:  Saba School of Medicine Foundation, a/k/a -- or d/b/a,

16  doing business as, Saba University School of Medicine.

17        Was it your understanding at the time you signed this --

18  at least by the time you signed this document, in 2006, that

19  the Saba Foundation was the nonprofit organization that owned

20  and ran the Saba University School of Medicine?

21  A     Yes, I think it is a fair description.

22  Q     Now, can you understand, when you signed this, that it

23  constituted a power of attorney to Dr. Fredrick to conduct all

24  banking and business transactions on behalf of the Saba

25  Foundation and the Saba school?

1    A       Yes, I understood it to mean that.

2    Q       Was this the first time that you had signed a similar

3    power of attorney giving Dr. Fredrick that right?

4    A       No.

5    Q       When had you done this before?

6    A       We had done it when the lawsuit first happened.  We

7    wanted to empower him to conduct such business and transactions

8    as to be able to move the funds.

9    Q       Would that be sometime in the mid-1990s?

10   A       Yes.

11   Q       And do you have a recollection, as we sit here today, of

12   signing a very similar document, giving Dr. Fredrick written

13   power of attorney to conduct all banking and business

14   transactions on behalf of the Saba school and the Saba

15   Foundation in or around 1995?

16   A       Yes, I did.

17   Q       Do you know what happened to that particular document?

18   A       Not really.

19   Q       Did you know, or ask why you were being asked, 11 years

20   later, to sign something similar again?

21   A       It was the same purpose and type of letter, so I never

22   questioned why a second document of the same kind was needed.

23   Q       Do you recall a hurricane hitting Saba in 1999;

24   Hurricane Lenny, I believe it was?

25   A       Yes.

1   Q      And was there a lot of damage to the school and its

2   property as a result of that hurricane?

3   A      Yes.  Some of the buildings were pretty much destroyed.

4   Q      Were you aware that a lot of the school's records were

5   destroyed during that hurricane?

6   A      Yes.

7   Q      In any event, regardless of the reason that you were

8   asked to sign this again, this did not reflect something new

9   that had come up in 2006; is that correct?

10  A      Correct.

11  Q      This was an extension of the authorization that

12  Dr. Fredrick had had since at least 1995, by the board of

13  trustees, to conduct all banking and business transactions on

14  behalf of the Saba Foundation and the Saba school; is that

15  correct?

16  A      That's correct.

17  Q      Could you look at Exhibit 111, please?

18         THE COURT:  Mr. Saunders, if I could have you redact

19  that number before the hard copy goes in?

20         MR. SAUNDERS:  Yes, Your Honor.  And I'll actually

21  hold off on publishing 111 because it has the same issue.

22  BY MR. SAUNDERS:

23  Q      Let me ask you, Dr. Dalbec, with respect to Exhibit 111,

24  what is this document?

25  A      This is a similar document that entitles Dr. Fredrick to

1    conduct a transaction.

2    Q     What's the date of this letter?

3    A     July 10th, 2008.

4    Q     Is that your signature that appears on it?

5    A     Yes.

6    Q     That's an original signature, not a stamp; is that

7    correct?

8    A     I believe it is my original signature.

9    Q     Do you recall signing this, as you recalled signing the

10   previous document?

11   A     I remember seeing the letter asking for this power to be

12   given.

13   Q     And signing it?

14   A     Yes.

15          MR. SAUNDERS:  Ask to move in, but not to publish at

16   this point, Your Honor, Exhibit 111.

17          THE COURT:  Any objection?

18          MS. KESSLER:  No objection.

19          THE COURT:  Exhibit 111 will be admitted.

20          (Defendant's Exhibit 111 was admitted into evidence.)

21   BY MR. SAUNDERS:

22   Q     Dr. Dalbec, this is again a "to whom it may concern"

23   letter dated July 10, 2008; is that correct?

24   A     Yes.

25   Q     It's short.  Could you read it aloud to the jury, just

1    omitting the Social Security number that appears on the second

2    line?

3    A      "On behalf of the board of trustees for Saba School of

4    Medicine Foundation, I hereby affirm and assign Dr. David

5    Fredrick the power of attorney to conduct all banking and

6    business transactions on behalf of Saba School of Medicine

7    Foundation.  On April 3rd, 2007, Saba School of Medicine

8    Foundation sold a portion of the corporation known as Saba

9    School of Medicine BV to Equinox Capital.  This transaction did

10   not change the corporate structure of the foundation, which is

11   still a valid organization in the Netherlands Antilles."

12   Q      Now, the first sentence of that letter basically repeats

13   almost verbatim the letter that we just looked at from 2006; is

14   that correct?

15   A      That's correct.

16   Q      And that's the grant of the power of attorney to

17   Dr. Fredrick to conduct all banking and business transactions

18   on behalf of the foundation; correct?

19   A      Yes.

20   Q      And the second paragraph simply says that, as a result

21   of the April 3rd, 2007, sale, that sale, which sold a portion

22   of the Saba School of Medicine to Equinox, did not change the

23   corporate structure of the foundation, which is still a valid

24   organization in the Netherlands Antilles; is that correct?

25   A      That's correct.

1   Q      And did that reflect your understanding that the

2   existence of The Foundation had survived the sale of the

3   school, and that The Foundation had continued to exist as a

4   separate organization?

5   A      Yes, I did know that The Foundation continued.

6   Q      Do you recall the reason why this particular document

7   was signed?

8   A      Only that the transaction of the sale had taken place

9   and that the paperwork needed to be part of it.

10  Q      So, to your recollection, this had something to do with

11  the change in ownership?

12  A      Yes.

13  Q      By the way, did Dr. Fredrick have the board's

14  authorization to negotiate the terms of the sale of the schools

15  to Equinox?

16  A      Yes.

17  Q      Do you recall, there was actually a board authorization

18  signed by all board members that gave Dr. Fredrick specifically

19  the power to execute all documents and negotiate the terms of

20  the sale; true?

21  A      Yes.  The board members knew and agreed.

22  Q      And you signed that authorization; correct?

23  A      Yes.

24  Q      And as part of that, you were asked about whether the

25  board discussed the allocation of proceeds.

1       The sale involved a number of different assets and

2  entities; correct?

3  A       Yes.

4  Q       There was the Saba School of Medicine; true?

5  A       The school.

6  Q       There was the MUA, in Nevis, that was part of the sale;

7  correct?

8  A       That was also part of the sale.

9  Q       There was the U.S. company, EIC --

10 A       Yes.

11 Q       -- that handled the management of the schools, that was

12 also sold; correct?

13 A       That's correct.

14 Q       And that was a company that was owned by Dr. Fredrick

15 and Dr. Hough; is that true?

16 A       Yes.

17 Q       There was also some property that was used to house

18 those offices that were being sold as part of a sale; is that

19 correct?

20 A       Yes.

21 Q       And did the board authorize Dr. Fredrick to determine,

22 as part of negotiating that sale on behalf of -- on behalf of

23 the school and The Foundation, to determine how the proceeds

24 would be allocated with the various land and assets that were a

25 part of the sale?

1    A      Did the board specifically designate each part of that?

2    Q      Did the board authorize Dr. Fredrick to determine how

3    that allocation would be made?

4    A      Yes.

5    Q      Was that within the scope of the authorization that he

6    was given by the board to negotiate the terms of the sale?

7    A      Yes, it was.

8    Q      And did you believe that Dr. Fredrick would exercise

9    that duty and that authorization in good faith?

10   A      Yes.

11   Q      Do you still believe today, knowing everything that you

12   know, and everything that's been alleged in this indictment,

13   that Dr. Fredrick exercised that authority in good faith?

14   A      Yes, I do.

15          MR. SAUNDERS:  Your Honor, this might be a good time

16   to take a break?

17          THE COURT:  All right.

18          Ladies and gentlemen of the jury, let's take about

19   15 minutes.  Please do not discuss the case among yourselves or

20   allow anyone to discuss it with you or in your presence.  About

21   fifteen.

22          (At 3:08 PM, the jury was escorted from the

23      courtroom.)

24          THE COURT:  All right.  Fifteen minutes.

25          MR. HOCHMAN:  Your Honor, very briefly, just

1    housekeeping, we've got two issues:  The Touhy issue I think is

2    one; and the second was the motion that we filed to strike

3    certain parts of government's exhibits.  I didn't know if you

4    wanted to argue them at the end of the day today, when you

5    would like that to be argued, because we -- to the extent that

6    the defense gets to its case in the next two or so days, we'd

7    like to see, particularly with the bank documents, which ones

8    may or may not be stricken.

9            THE COURT:  The government filed a response . . .

10   they might have filed it yesterday, I just saw it this morning,

11   and I'm almost through reading it, so I'm not quite ready

12   for -- to rule on that motion.

13           MR. HOCHMAN:  We'd ask if we can have just brief oral

14   argument when the Court's at the point when it's had the papers

15   reviewed, if possible.

16           THE COURT:  Brief.

17           MR. HOCHMAN:  Brief.  It wouldn't be me, Your Honor,

18   it would be Mr. Saunders, so it will be brief.

19           MR. SAUNDERS:  Five minutes just to respond to the

20   government's opposition, Your Honor.

21           THE COURT:  All right.  There may be specific

22   documents I have issues with.  But other than that, I think I

23   understand the position.

24           But to respond to your question, I'll give you a

25   brief opportunity to argue that motion, if you wish.

1              With regard to the Touhy issue, I guess it's a

2       nonissue right now, until the government rests and you decide

3       who you want to call.

4              MR. HOCHMAN:  Sure.  And we've already served

5       Mr. Lalli with a subpoena.  And I guess to the extent that they

6       want to quash the subpoena, that's probably, at this point, how

7       it will get before Your Honor.

8              THE COURT:  I don't know.  Right now it's a notice

9       from the government, and I read the case that somebody gave me

10      last week.  I hope you've got more than that.

11             MR. HOCHMAN:  We have actually the Touhy regulations

12      themselves, Your Honor, which Mr. Saunders, I believe, gave

13      your clerk this morning.

14             THE COURT:  I have got those.  But a Ninth Circuit

15      case doesn't do much for me, for whatever that's worth.

16             MR. HOCHMAN:  We think the Touhy regulations, that

17      says that a subpoena is not required for a subject matter

18      involving a criminal investigation --

19             THE COURT:  That's not exactly what it says.

20             MR. HOCHMAN:  Actually, I don't want to start with

21      that.  Mr. Saunders --

22             THE COURT:  Don't argue then.

23             MR. HOCHMAN:  I want to turn it over to him.

24             MR. SAUNDERS:  Your Honor, we can address it at the

25      time when the government moves to quash, if that's what they're

1   going to do.

2                  THE COURT:  I wasn't really inviting argument right

3   now.

4                  MR. HOCHMAN:  I didn't want to argue it, Your Honor.

5                  THE COURT:  All right.  Let's take the rest of our

6   15 minutes.

7                  MR. HOCHMAN:  Thank you, Your Honor.

8                  (At 3:12 PM, court was recessed.)

9                             AFTER RECESS

10                 (At 3:32 PM, court was reconvened.)

11                 THE COURT:  Counsel, before I have the jury brought

12  in, let's talk about the question that they had asked about,

13  essentially, giving them information about the timing for the

14  completion of the trial.

15                 What's it looking like?

16                 MS. FINLEY:  Your Honor, the government has three

17  more fact witnesses that -- two who are additional -- I'm

18  sorry.  There's four more fact witnesses:  Two more siblings,

19  so they are fairly quick, as you saw today; Dr. Fredrick's

20  daughter, who I don't think will be that long; and an

21  individual, Mr. Rodger, who we hope we might get to start this

22  afternoon.

23                 And then the government will put on its summary

24  witness who may be more long, but we would anticipate that we

25  could finish by the close of tomorrow, if not Thursday morning,

1    given what I expect will be a long cross of the summary

2    witness.

3              THE COURT:  Okay.  And assuming it gets to the

4    defense Thursday, noon?

5              MR. HOCHMAN:  I think that a lot depends, quite

6    honestly, if we call the defendant, Your Honor.  If we don't

7    call the defendant, it could be relatively short.  I think we

8    have a rebuttal expert and then some potential character

9    witnesses, and maybe one fact witness, and then the defendant.

10             If the defendant testifies, I would imagine her

11   direct would be a decent part of a day.  And depending on how

12   fast the direct and the cross get done, I would imagine one

13   full day, probably a day and a half, Your Honor.  And then

14   whether or not the government calls a rebuttal case.

15             So I think, if we can get to the defense case

16   Thursday noon, there's a chance we could get done by Friday,

17   but more likely, if the defendant testifies, we're done

18   by . . . midday or certainly by Tuesday.  And then that builds

19   in a small government's rebuttal case as well.  And then the

20   closing, obviously, and then the rest of the stuff, probably by

21   Wednesday, is my guess.  It might be -- and obviously, if the

22   defendant doesn't testify, we could probably do the closing,

23   start the government's closing on Friday, or just start it all

24   on Tuesday.

25             THE COURT:  I've got some scheduling issues if we get

1    into next week.  But we'll see what happens.  But in any event,

2    it sounds like both sides agree that, contrary to what I told

3    the jury, it is not going to be done by Friday.

4              MR. HOCHMAN:  It would be . . . I mean, it depends on

5    the government.  If we do call the defendant, Your Honor, it

6    depends on the government's cross of the defendant.  I mean,

7    that could take -- we could finish on Friday, conceivably, but

8    it just depends on their cross, and I would imagine their cross

9    would be somewhat lengthy.

10             THE COURT:  Would it be safe to tell them that I

11   don't know for sure, but it may well go into next week?

12             MR. HOCHMAN:  I think we could say that.  And

13   certainly for the jury deliberations, it will go into next

14   week, even if they were to get the case late Friday.

15             THE COURT:  Sure.

16             MR. HOCHMAN:  So we could certainly tell them that,

17   between the case and jury deliberations, we anticipate on going

18   into next week.

19             By the way, does the Court -- if somehow the jury

20   were to get the case Friday afternoon, would the Court actually

21   have them deliberate on Monday, or just have them come back on

22   Tuesday?

23             THE COURT:  No.  I'd have them deliberate on Monday,

24   because Monday is, typically I'm doing sentencings, so they can

25   be deliberating when I'm doing other cases.

1              MR. HOCHMAN:  The problem is.  I don't see us getting

2     done with closings by Friday, even if we don't call the

3     defendant.  The chances are we don't finish the defense case

4     until Friday noon.  So it's a . . . I don't think we'll get to

5     closings on Friday.  I think those would probably be most

6     likely next Tuesday at the earliest.

7              THE COURT:  Okay.  All right.

8              MR. HOCHMAN:  Thank you very much.

9              THE COURT:  Have the jury step in, please.

10             And let's get the witness back in.

11             MS. FINLEY:  He's coming, Your Honor.

12             (The witness resumed the witness stand.)

13             (At 3:37 PM, the jury was escorted into the

14        courtroom.)

15             THE COURT:  You may proceed.

16             MR. SAUNDERS:  Thank you, Your Honor.

17    BY MR. SAUNDERS:

18    Q     Dr. Dalbec, just before the break I asked you a question

19    about the various entities that were part of the sale of the

20    schools and other assets in 2007; and I believe I misspoke in

21    my question, which is not evidence, with respect to the

22    ownership -- how the ownership was set up at EIC.

23             Do you have personal knowledge of who owned that

24    company?

25    A     No, I don't.

1    Q       So putting aside my question and previous answer, would

2    you defer to the corporate documents and the ownership

3    documents, as far as who actually owned that company, as far as

4    Dr. Fredrick and Dr. Hough?

5    A       I would have to.

6    Q       Were you aware of an attempted takeover of the Saba

7    school by a dean named Dr. David Gill?

8    A       Yes.

9    Q       I believe you made some reference to that earlier, that

10   one of these lawsuits was by somebody who was trying to take

11   the school.

12           That was this Dr. Gill?

13   A       That's what he was trying to do.

14   Q       And this was around 1999; correct?

15   A       Correct.

16   Q       And he was essentially an employee of the school who

17   decided that he wanted to own it; true?

18   A       That's true.

19   Q       And he got a group of people together, in short,

20   basically to . . . to take the school from The Foundation;

21   correct?

22   A       That's correct.

23   Q       Was he successful at doing that?

24   A       No.

25   Q       And what did he do then?

1    A      Then he sued.

2    Q      Did he also start a competing medical school?

3    A      Later.  He joined with another couple of people and

4    opened a medical school on Eustachia, which is an island near

5    Saba.

6    Q      And just asking about this for this reason:  As chairman

7    of the board, was this takeover attempt in the late 1990s,

8    another concern, in addition to the lawsuits that we've talked

9    about, of why the board felt that it would be appropriate to

10   protect the school and its assets by moving those funds

11   offshore?

12   A      Yes.  It was another form of threat.

13   Q      You talked earlier about being aware that Dr. Fredrick

14   was owed a substantial amount of money in deferred

15   compensation; correct?

16   A      That's correct.

17   Q      And just to be correct, by "deferred compensation," I'm

18   talking about payment that Dr. Fredrick was owed for his work

19   as president of the school in all those years, when he was

20   working so hard, as you described, but for which he hadn't been

21   paid because, at the time, the school didn't have the money to

22   pay him; is that correct?

23   A      That's correct.

24   Q      Do you recall precisely how much Dr. Fredrick was owed

25   in deferred compensation?

1   A       No, I do not know how many dollars were the total amount

2   that was deserved.

3   Q       There was a lot of dollars, correct?

4   A       A lot of dollars.

5   Q       A big number?

6   A       Yes.

7   Q       And do you know, did the board keep some type of running

8   tally, as reflected in the minutes, of how much Dr. Fredrick

9   was owed in deferred compensation for all those years that he

10  had not been paid?

11  A       No, we did not.

12  Q       As chairman you understood that, at some point, he was

13  entitled to be paid that money; correct?

14  A       Yes.

15  Q       And was Dr. Fredrick's deferred compensation something

16  that was discussed among the board members from time to time?

17  A       Yes.

18  Q       And, from time to time, Dr. Fredrick would come to the

19  board and would ask for personal loans against that amount that

20  he was owed in deferred compensation; true?

21  A       Yes, he did.

22  Q       How many times in your tenure on the board, to your

23  recollection, did Dr. Fredrick ask the board to approve that

24  type of personal loan?

25  A       Several.  I can remember at least three or four times

1    that we addressed it as board members but, in general, knew

2    that these requests were something we would honor.

3    Q     And he was asking for loans from the accounts and assets

4    of the school and The Foundation; correct?

5    A     That's correct.

6    Q     Did he ever, at any time, say:  Well, this is all my

7    money anyway, so just give to it me --

8    A     No.

9    Q     -- all the assets in these accounts are mine.

10   A     No.

11   Q     In fact, if he believed that all this was already his

12   money, there would be no reason for him to come to the board

13   and ask it to loan it to him; correct?

14        MS. KESSLER:  Objection, speculation.

15        THE COURT:  Sustained.

16   BY MR. SAUNDERS:

17   Q     When he made those requests for loans, were they

18   approved by the board?

19   A     Yes, they were.

20   Q     In fact, the board approved them routinely; right?

21   A     Yes, they did.

22   Q     And that was because the board knew that he was already

23   owed far more in deferred compensation than he was asking for

24   in loans; correct?

25   A     That's correct.

1    Q      Now, Miss Kessler asked you, do you know why he would

2    want this in loans rather than just as a straight payment.

3           Do you know the reason for that?

4    A      No, I don't.

5    Q      Are you aware that there are reasons why someone might

6    lease a car instead of buying it?

7    A      I think there are always reasons.

8    Q      There are certain advantages to having money in loans

9    that are paid back as opposed to outright compensation;

10   correct?

11   A      Yes.

12   Q      Was there anything particularly underhanded or

13   suspicious in Dr. Fredrick asking for loans to be made to him

14   against his deferred compensation that he would then remain in

15   debt and pay back to the board?

16   A      No, there wasn't any concern in that way.

17   Q      Did the board ever ask for documentation of those loans,

18   such as promissory notes?

19   A      No, we did not.

20   Q      Do you know if the board always asked Dr. Fredrick

21   precisely how he intended to use the money that he was asking

22   for as loans?

23   A      No, we didn't.

24   Q      Why not?

25   A      We felt that, when we decided that he deserved the

1    money, it no longer was a critical factor that we know exactly

2    how it would be spent.

3    Q       So whether he planned to use the money that he was

4    borrowing to buy a house, or planned to use the money that he

5    was borrowing to help out family members who were in need, or

6    any other purpose, would that have affected the board's

7    agreement to loan him this money because he was entitled to it?

8    A       I don't think it would have.

9    Q       As chairman of the board, you said earlier you trusted

10   him with the assets of the school; is that correct?

11   A       Yes, we did.

12   Q       And he never gave you any reason not to; is that true?

13   A       That's true.

14   Q       He was open and up front about coming to the board for

15   loans; is that correct?

16   A       Yes, he was.

17   Q       And he was open and up front about telling the board how

18   he was protecting the school and its assets by moving the money

19   offshore; is that correct?

20   A       He was open in doing it, we just didn't know the

21   specifics of these other accounts and companies that you

22   mentioned.

23   Q       But you don't believe he was hiding that from you, it

24   was just simply that you never asked; correct?

25   A       That's correct.

1   Q      If you had asked him, do you believe he would have told

2   you?

3   A      I think so.

4   Q      Now, Dr. Hough was owed money in deferred compensation

5   too, wasn't she?

6   A      Yes, she was.

7   Q      For all those years that she had worked, starting up the

8   schools and the clinical program and the accreditations, there

9   were many years when she didn't collect any salary either;

10  correct?

11  A      Not only the work and the amount that was due to be

12  paid, but she had also helped start the school with some of her

13  own money that she had taken personally and contributed it to

14  the startup.

15  Q      Do you know where that money came from?

16  A      She . . . I believe part of it was inheritance -- now,

17  this is not part of the board's knowledge, but it was part of

18  my personal knowledge of having known the Fredricks.  Part of

19  it came from money that was from an inheritance, part from

20  property that was disposed so that she could get the money.

21  Q      And she put that money into the school to build it up;

22  correct?

23  A      Yes.

24  Q      And as chairman of the board, was it your understanding

25  that she was entitled at some point to get repaid for that

1   initial investment, as well as the deferred compensation that

2   she hadn't collected for her work for the school?

3   A      Yes.

4   Q      And yet, did Dr. Hough ever come to the board once and

5   ask for a loan?

6   A      I don't believe so.

7   Q      Did she ever demand payment for the money that was owed

8   her?

9   A      No.

10  Q      Were you aware that Dr. Fredrick was working, along with

11  a dean of the school by the name of Dr. Arthur Maron,

12  M-A-R-O-N, in developing a joint degree program with East

13  Carolina University in Greenville, North Carolina?

14  A      Yes, I was aware of that.

15  Q      Could you tell the jury what that joint degree program

16  was all about?

17  A      It was going to be a program developed by Saba to take

18  people who were in the field of psychology, and give them the

19  medical training and credentialing to be able to prescribe

20  medication, because only psychiatrists can prescribe medication

21  and psychologists cannot.  But if you developed a PsyD program,

22  or psychology doctor program, you could then entitle people in

23  the field of psychology and counseling to prescribe.

24          And so the idea was proposed that we foster a program to

25  train existing psychologists with graduate degrees to become

1   M.D. psychiatry people.

2   Q       And again, I apologize, I believe I misspoke when I gave

3   you the name.  It was Dr. Alan Gruber who was the doctor

4   involved in that; correct?

5   A       Yes.  Dr. Maron was a pediatrician.

6   Q       So Dr. Alan Gruber was the doctor with whom Dr. Fredrick

7   was working with on creating this joint degree program;

8   correct?

9   A       Yes.

10   Q       And this joint degree would be the PsyD, which is the

11   doctorate of psychology, and the M.D., which is the doctor of

12   medicine; correct?

13   A       Yes.

14   Q       And were you aware that this joint degree program was

15   being explored in conjunction with East Carolina University,

16   which is located in Greenville, North Carolina?

17   A       Yes.  That's where Dr. Fredrick had done graduate

18   training, and it's where his daughter, Laura, was living -- is

19   living.

20   Q       And did the board approve development and exploration of

21   that joint degree program?

22   A       Yes.

23   Q       Do you know when this was, approximately?

24   A       It's been over a period of 20 years, when all this was

25   taking place, and I would have to see the minutes to find the

1    spot where it was brought up and discussed and told:  Let's

2    look into it.

3    Q     Was it done over the course of many years, to your

4    knowledge?

5    A     It took a while to find out whether we were going to do

6    it or not, because part of the questions we had, had to do with

7    the state's licensing of these individuals, whether or not, if

8    you produce PsyD's, whether there would be any objections from

9    the psychiatric profession or from the field of counseling,

10   because it was a form of competition in their field.  So we

11   didn't know whether it would be successful or not.

12   Q     And ultimately those objections prevented the program

13   from going forward; correct?

14   A     That's true.

15   Q     During the time that the program was being explored, do

16   you remember whether or not real estate was purchased in

17   Greenville, in the location of this planned program, to house

18   students and classes for that PsyD/MD joint program in North

19   Carolina --

20   A     I now know that was true, but I don't believe I was

21   informed, at the time that it took place, that a property had

22   been purchased for the program.

23   Q     Let me ask you this:

24         Would the purchase of property for that program have

25   been within the scope of the authorization that was granted by

1    the board to explore and develop that program?

2    A       Yes, I believe it would have been.

3    Q       Now, do you remember Dr. Fredrick making a proposal to

4    the board, in 1999, to acquire property on Saba known as Round

5    Hill?

6    A       Yes.

7    Q       And what was Round Hill?

8    A       Round Hill was a suitable piece of land big enough, and

9    in the location you referred to as the bottom, to expand the

10   campus -- actually, to have a campus.

11   Q       This was still at the time that classes were being held

12   out of the grammar school?

13   A       Yes.

14   Q       And the plan was to build an actual campus for the Saba

15   school on this property called Round Hill; is that correct?

16   A       That's correct.

17   Q       And was it your understanding that Round Hill came up

18   for sale and became available, and the board approved

19   Dr. Fredrick taking action on behalf of the school to acquire

20   that property?

21   A       Yes.  The man, Leo Chance, was a native who believed he

22   was doing the right thing to help the medical school grow,

23   somewhat to the objections of some of the islanders who felt

24   that it should be a commercial venture of other nature.

25   Q       Let me ask to you look at Exhibits 115, 116, and 117,

1    for the defense, that are before you for identification.

2              (The witness examines exhibits.)

3    Q      Have you seen these photos before, before your testimony

4    today?

5    A      No.  No.  I have been familiar with the people, the

6    scenery, but I don't know about the specific photographs as

7    having been presented to me.

8    Q      With respect to the scenery, are these all photographs

9    that were taken at one time or another in the location that

10   we've been discussing as Round Hill?

11   A      Yes.  This is . . . the Round Hill before and after the

12   building of the campus.

13   Q      And do they fairly depict Round Hill as it appeared both

14   before and after the building of the Saba Campus?

15   A      That's true.

16             MR. SAUNDERS:  Your Honor, I'd move Defense 115, 116,

17   and 117 into evidence and ask to publish them?

18             THE COURT:  Any objection?

19             MS. KESSLER:  No objection.

20             THE COURT:  Defense 115, 116, and 117 are admitted

21   and may be published.

22             (Defendant's Exhibits 115, 116, and 117 were admitted

23        into evidence.)

24             (An exhibit was projected onto the projector screen.)

25

1    BY MR. SAUNDERS:

2    Q      What are we looking at in 115?

3    A      That's the view from the lower part, looking towards the

4    hillside, which is the site of the present campus.

5    Q      And this what it looked like before anything was built

6    there?

7    A      It was a pasture, and there were goats and cows that

8    used to wander around that spot.

9    Q      This is the property that was bought from Leo Chance?

10   A      Yes.

11   Q      With board approval; correct?

12   A      Correct.

13   Q      And that's Dr. Hough in the middle there?

14   A      Yes, it is.

15          MR. SAUNDERS:  Could you please put up Defendant's

16   Exhibit 116?

17          (An exhibit was projected onto the projector screen.)

18   BY MR. SAUNDERS:

19   Q      What are we looking at here?

20   A      That's the lieutenant governor; and Johnson, Will

21   Johnson; Dr. Hough; and I'm not sure who the fellow is on the

22   right.

23   Q      The man on the left, with his back to the camera, is the

24   Lieutenant Governor of Saba?

25   A      Yes, it is.

1    Q       And to the right of him in the photograph is

2    Mr. Johnson, who was --

3    A       Yes.

4    Q       -- also a representative of the Saba government?

5    A       Yes.

6    Q       And to the right there is Dr. Hough, looking at what

7    appears to be an architectural plan; correct?

8    A       A building, yes.

9    Q       And this is what Round Hill looked like before anything

10   was built there?

11   A       Yes.

12           MR. SAUNDERS:  Would you please put up Defense 117?

13           (An exhibit was projected onto the projector screen.)

14   BY MR. SAUNDERS:

15   Q       And those were the before, this is the after; is that

16   correct?

17   A       That's true.  The view that we saw before is if you were

18   standing in the middle of that scene, looking to the right, the

19   hill goes up to the right very steeply.

20   Q       So Round Hill is a property on which this entire campus

21   was built; is that correct?

22   A       That's correct.

23   Q       Now, you weren't aware, at the time that this was

24   initially purchased, that the property was being put in the

25   name of Dr. Fredrick's daughter, Laura Walls; correct?

1   A      I found out at some point that the property was placed

2   in her name; yes.

3   Q      Okay.  And when you learned about that, were you angry?

4   A      No.

5   Q      Did you feel that the board had somehow been duped?

6   A      No.

7   Q      Did you have an understanding why it had been done that

8   way?

9   A      The same way that the assets had been moved to protect

10  against seizure, freezing, claims upon it.

11  Q      By not putting the property in the name of the Saba

12  school or the Saba Foundation, but putting it in the name, at

13  least initially, of Laura Walls; is that correct?

14  A      I thought it was part of an overall strategy of asset

15  protection.

16  Q      In fact, when that property was later moved to an entity

17  known as Round Hill Holdings, that was also part of your

18  understanding of that asset protection; correct?

19  A      Correct.

20  Q      And that sounded like a good idea; correct?

21  A      Yes.

22  Q      Did it seem like a reasonable means to you of protecting

23  the school's most important asset, the land upon which it was

24  built?

25  A      Yes.

1   Q      Let me ask about the China issue for a moment here,

2   because you were asked about that by the government on direct.

3          Now, you said that you were not aware that $5 million

4   had been spent on China.

5   A      That's correct.

6   Q      Do you know if that assumption is true, that $5 million

7   was spent on the China project?

8   A      I do not know if it was spent or not.

9   Q      But were you aware, as a member of the board, that The

10  Foundation was looking into the possibility of opening a campus

11  in China; is that correct?

12  A      A project, yes.

13  Q      And you are aware that Dr. Hough traveled to China, to

14  meet with people and discuss that possibility; correct?

15  A      Yes.

16  Q      The status of that China project was an ongoing

17  discussion at board meetings; is that true?

18  A      It had potential.

19  Q      And it was discussed by the board; correct?

20  A      Yes.

21  Q      And Dr. Hough came in and reported on the progress of

22  exploring that potential; true?

23  A      Yes.

24  Q      And if the board ultimately made the decision to approve

25  that project, there would be funding required to put it into

1    place; true?

2    A       I would imagine.

3    Q       Well, there could be the cost of actually building the

4    campus, for example.

5    A       Doing it, yes.

6    Q       And the cost of acquiring the land; true?

7    A       Sure.

8    Q       And the cost of hiring faculty and doing other things to

9    get a medical school up and running; correct?

10   A       Yes.

11   Q       And of handling legal matters with the Chinese

12   government; true?

13   A       I would think so.

14   Q       As chairman of the board of trustees of the school who

15   approved exploring this possible China expansion, would you

16   believe it appropriate to set aside funds in a dedicated

17   account to allow for funding of that project should it come to

18   fruition?

19   A       Yes.

20   Q       That would have been a completely reasonable business

21   practice; correct?

22   A       Yes, it would have been reasonable.

23   Q       And would doing that, would setting aside those funds to

24   use for China, if needed, have been within the scope of the

25   authorization that was given, by the board, to explore this

1    China project?

2    A      Yes.

3    Q      Do you believe that there was anything wrong or

4    deceitful or underhanded in setting aside $5 million in a

5    dedicated account for further board-approved exploration and

6    development of the potential medical school in China?

7    A      I wouldn't have thought so.

8    Q      And as chairman of the board, if Dr. Fredrick had come

9    to you and said, "We're setting aside $5 million, just in case

10   we go forward with this China project, in a dedicated account

11   for that purpose," would you have approved that action?

12   A      Yes, we would have.

13   Q      Now, you were subpoenaed here today by the government;

14   correct?

15   A      Yes, I was.

16   Q      Actually, you were subpoenaed here last week by the

17   government; correct?

18   A      Yes, last Monday.

19   Q      But you're getting around to testifying today; true?

20   A      Yes, sir.

21   Q      And you when you were first contacted, were you

22   contacted by Special Agent Lalli, who is sitting in the first

23   row here?

24   A      Yes, I was.

25   Q      About your subpoena?

1  A        Yes.

2  Q        And when he talked to you, he assured you that you are

3  not a subject or a target of any criminal investigation, you're

4  just a witness; is that correct?

5  A        That's correct.

6  Q        The government isn't claiming that you did anything

7  wrong in connection with your oversight of the Saba school;

8  true?

9  A        True.

10  Q        Or in authorizing Dr. Fredrick to open up those offshore

11  accounts to protect the school's assets; correct?

12  A        That's correct.

13  Q        And the government isn't claiming, to your knowledge,

14  that you did anything wrong in approving those loans to

15  Dr. Fredrick against his deferred compensation; correct?

16  A        Correct.

17  Q        It is your understanding that the government is not

18  going after you for any of that, you're just a witness;

19  correct?

20  A        I didn't believe that to be true --

21  Q        You didn't believe --

22  A        -- that I was being a target of their investigation or

23  subject to criminal charges.

24  Q        And, in fact, it's important for you to have that

25  understanding, as you sit and testify here today; correct?

1    A       Yes.

2    Q       Because if the government were to decide to charge you

3    with even a single felony offense, that could mean the loss of

4    your medical license, right?

5    A       Yes, it would.

6    Q       Permanently.

7    A       Yes.

8    Q       So it's important to you personally that the government

9    is not saying that you did anything wrong here.

10   A       True.

11   Q       And, in fact, you didn't do anything wrong; true?

12   A       I did not do anything wrong.

13   Q       You took actions that you believed to be in the best

14   interests of the Saba school that you were very proud of;

15   correct?

16   A       Yes.  And still am.  I continue to serve.

17   Q       And do you still believe that the actions that you took

18   in approving the asset protection, in approving the loans, in

19   approving the China project and the Round Hill purchase and

20   everything else, were in the best interests of this school that

21   you hold so dear?

22   A       I did believe that, yes.

23   Q       Do you still believe it today?

24   A       Yes, I do.

25   Q       Now, the government brought you down here to Fort Myers

1    in August of 2012, to testify before the grand jury; correct?

2    A       Yes.

3    Q       And I believe it was Ms. Finley, asked you some

4    questions before the grand jury; true?

5    A       Yes.

6    Q       And Agent Lalli, who I'll represent to you is the lead

7    IRS investigator in this case, he wasn't there in the grand

8    jury room, was he?

9    A       I don't believe so.

10   Q       But you met him that day, sitting in the witness room;

11   correct?

12   A       Yes, I did.

13   Q       Did he take that opportunity to interview you about your

14   knowledge of the facts of this case?

15   A       No.

16   Q       Did he ask you any questions at all?

17           MS. KESSLER:  Objection, relevance.

18           THE COURT:  Sustained.

19           MR. SAUNDERS:  May I be heard, Your Honor?

20           THE COURT:  At sidebar.

21           MR. SAUNDERS:  Thank you.

22                          AT SIDEBAR

23           MR. SAUNDERS:  Your Honor, it's no secret, because I

24   mentioned it in opening last week, that one of the defenses in

25   this case is that this was a sloppy and incomplete

1    investigation by Agent Lalli, who basically looked at

2    documents, didn't dig underneath them, didn't talk to the

3    witnesses who had direct knowledge, never made any effort to

4    interview members of the board, or anything.  And still, to

5    this day, as Dr. Dalbec sits here testifying, Agent Lalli has

6    not asked him a single question.

7            I think that's an appropriate defense to show that

8    the government's investigation was incomplete, and I think

9    pointing out through this witness that, to date, the lead

10   investigator in charge of this case has not asked him any

11   questions at all, is appropriate for the jury to know in

12   assessing the government's investigation.

13           MS. FINLEY:  Your Honor, I'm going to respond because

14   Miss Kessler was not on this case at this time this happened,

15   so I think --

16           THE COURT:  Neither one of your personal knowledge is

17   relevant.  The objection is sustained.  The fact that an agent

18   doesn't talk to someone as he's sitting outside waiting to

19   testify in front of the grand jury does not show any defense to

20   argue to the Court and to the jury that it shows -- it just

21   doesn't.  You have a man waiting to testify and tell his story

22   to the grand jury, and you are complaining that the agent

23   doesn't talk to him.

24           MR. SAUNDERS:  I'm further going to connect that,

25   Your Honor, that during all of the time since the grand jury,

1    during the time preceding indictment, and the months between

2    indictment and trial, and even in their interview they had last

3    week, Agent Lalli still hasn't asked him a single question.

4              THE COURT:  Sustained.

5                        IN OPEN COURT

6              THE COURT:  You may proceed.

7              MR. SAUNDERS:  Thank you, Your Honor.

8    BY MR. SAUNDERS:

9    Q      Dr. Dalbec, in your role as chairman of the board, as

10   well as a personal friend of Dr. Hough and Dr. Fredrick, did

11   you ever have the opportunity to get an impression of

12   Dr. Hough's and Dr. Fredrick's levels of business knowledge and

13   sophistication?

14   A      They were educators, not businesspeople.

15   Q      Was it your understanding that they took advice and

16   direction from others in business matters?

17   A      That's correct.

18   Q      Between the two of them, Dr. Fredrick and Dr. Hough, who

19   was more focused on the business side of the schools?

20   A      It was Dr. Fredricks.

21   Q      Who managed the school's assets between the two of them?

22   A      It was Dr. Fredricks.

23   Q      Who made decisions regarding investments and

24   acquisitions?

25   A      It was Dr. Fredricks.

1    Q        Did you ever know Dr. Hough to play an active role in

2    the financial side of operating either schools or The

3    Foundation?

4    A        I never witnessed any such activity by her.

5    Q        Based on your observations and conversations, did she

6    even appear to be interested in the financial side of the

7    operation?

8    A        In the beginning she left it entirely up to David.  As

9    things progressed, then she became active when it was more of

10   the types of activity that she preferred, such as clinical

11   medicine, and medicine itself, and teaching.

12   Q        So when she became involved, it was with the academic

13   side, and not with the business side; is that correct?

14   A        That's correct.

15   Q        And by the way, we talked earlier about the

16   accreditations and the clinicals with respect to the Saba

17   school.

18            Was she involved in the same capacity when MUA Nevis

19   opened?

20   A        Although I didn't take part in the steps that led to the

21   opening of the MUA, my experience, knowing her and

22   Dr. Fredrick, she would have been very important to the

23   development of their clinicals program as well.

24   Q        So again, her involvement, to your understanding, with

25   MUA, as well as with the Saba school, was on the academic side

1    and not on the business side; fair?

2    A      That's fair to say.

3    Q      Did you ever have discussions -- well, let me ask it

4    this way:

5           When you had discussions regarding the financial status

6    of the school, who did you have those discussions with, as

7    between Dr. Fredrick and Dr. Hough?

8    A      It would be Dr. Fredricks.

9    Q      And when you had discussions about the school's budget,

10   as between Dr. Fredrick and Dr. Hough, who did you have those

11   discussions with?

12   A      It would be with David Fredricks.

13   Q      And when you had discussions about purchasing assets for

14   the school, as between Dr. Fredrick and Dr. Hough, who did you

15   have those conversations with?

16   A      It was with Dr. Fredricks.

17   Q      And when you had discussions regarding the banking

18   affairs of the school and of The Foundation, as between

19   Dr. Fredrick and Dr. Hough, who did you have those discussions

20   with?

21   A      It was Dr. Fredricks.

22   Q      Did you ever discuss financial matters relating to the

23   schools with Dr. Hough, at all?

24   A      No.

25   Q      In fact, when financial matters came up, she would tell

1    you that they're being handled by Dr. Fredrick; correct?

2    A      That's correct.

3    Q      Was that her . . . common, routine answer every time

4    financial issues came up?

5    A      Yes.

6    Q      And you said earlier that, when the school was facing

7    threats from the takeover, and from all these lawsuits,

8    Dr. Fredrick was appointed by the board to take care of that,

9    and to handle protecting school's assets.  Did you ever

10   consider asking Dr. Hough to take that role?

11   A      No.

12   Q      Why not?

13   A      She had never done anything like that.  That I had

14   experience seeing.

15   Q      Based on everything you had seen, and all the years that

16   you had known her and Dr. Fredrick, and everything you had

17   witnessed, did you think for a moment that Dr. Hough was the

18   right person to be handling protecting the school's assets and

19   foreign accounts?

20   A      I don't think she had an interest in that.  And no, I

21   wouldn't have asked her to do that.

22   Q      What was Dr. Fredrick's and Dr. Hough's lifestyle like

23   during the time that you've known them?

24   A      Always modest.  I've known them from the time that I was

25   living on Dominica, and we became friends.  My wife and I, and

1    my daughter, visited them many times.  They came to my wedding

2    in Staten Island in 2000.

3         They are people who live what to everybody would seem a

4    middle-class life.  They drive used cars.  They live in a

5    modest home.

6         The house in Massachusetts was a Victorian wood-frame

7    house that wasn't pretentious, and it was the original home of

8    the medical school that was used for offices and the operation

9    of the school.  Everybody would come to work at their house.

10        He had used Ford pickup up there.  In Florida, in

11   Manasota Key, he had a used Chevy pickup that was the basic

12   stock model, that had roll-up windows and no radio.  And --

13   Q    What kind of car did Dr. Hough drive?  Do you know?

14   A    She had been driving a Ford Explorer that they bought at

15   a sale out in the Midwest after a hailstorm had damaged a whole

16   fleet of cars and they got all pucked up, so they dropped the

17   price down.  And so they went out and bought one, and drove it

18   back to Massachusetts.  And then, later, traded that on a Volvo

19   SUV that she's still driving.  And I think it must be

20   approaching about ten years old now.

21   Q    Did you know them to ever take expensive vacations

22   together?

23   A    No.

24   Q    Other than business travel, did they ever take any

25   vacations together?

1  A      No.  I don't remember them enjoying a spa, or a vacation

2  getaway, that was not somehow connected with the clinical

3  rotations or the business of running the school.

4  Q      Did you ever know Dr. Fredrick and Dr. Hough to give

5  each other lavish gifts?

6  A      No.

7  Q      Did you ever know her to wear expensive clothes or

8  jewelry?

9  A      No.

10  Q      Did you ever know them to go out to an expensive

11  restaurant for a meal?

12  A      No.  In fact, when we went to their house, we would cook

13  out on the grill.

14  Q      When they traveled for the school, did they travel first

15  class?

16  A      No.

17  Q      Did Dr. Hough, in all of her travels around to different

18  cities to meet with hospitals and accreditation boards, did she

19  stay in expensive hotels?

20  A      No.  Sometimes she stayed with friends.

21  Q      When she stayed in hotels, where did she stay?

22  A      I'm not sure, but what I was accustomed to seeing her do

23  was the Ramada and Holiday Inn, or things like that.

24  Q      No Four Seasons or Ritz Carltons?

25  A      No.

1    Q       Did you ever see any signs, whatsoever, from either

2    Dr. Hough or Dr. Fredrick, of any form of extravagance?

3    A       No, I didn't.

4    Q       Did you ever see anything, in all the 20-plus years that

5    you have known them, that showed them as living, or planning to

6    live, the lifestyle of the rich and famous?

7    A       No.

8    Q       In the 25 years or so that you've known them, did you

9    ever see either Dr. Hough or Dr. Fredrick do one thing that

10   would be consistent with having millions of dollars of their

11   own money stashed away in secret Swiss bank accounts?

12   A       No.

13   Q       Now, you've known . . . focusing on Dr. Hough, you've

14   known her for going on 25 years; true?

15   A       Yes.

16   Q       Known her personally and professionally; correct?

17   A       That's true.

18   Q       You know her well.

19   A       Yes, I do.

20   Q       Have you had the opportunity to form an opinion as to

21   Dr. Hough's character for truthfulness and honesty?

22   A       She's straightforward.  She speaks her opinion directly.

23   I believe everything she's done was, in my opinion, honest.  I

24   don't believe she's . . . up to anything illegal.  I've never

25   witnessed it either in her personal behavior or in her

1    professional behavior.  I don't consider that part of her

2    character at all.

3    Q      And you say that knowing the nature of the charges in

4    this case; correct?

5    A      Yes.

6             MR. SAUNDERS:  May I have one moment, please, Your

7    Honor?

8             THE COURT:  You may.

9             (Mr. Saunders confers with co-counsel privately.)

10            MR. SAUNDERS:  I have nothing further, Your Honor.

11            THE COURT:  Okay.  Any redirect?

12            MS. KESSLER:  Yes, Your Honor.

13            May I have one second to get an exhibit?

14            THE COURT:  You may.

15            MS. KESSLER:  Thank you.

16            (Ms. Kessler reviews various exhibits.)

17            (Ms. Kessler confers with the Courtroom Deputy.)

18            MS. KESSLER:  Sorry, Your Honor.  It's not . . . .

19            (Ms. Kessler continues to review exhibits.)

20                         REDIRECT EXAMINATION

21   BY MS. KESSLER:

22   Q      Dr. Dalbec, you had testified on direct that the school

23   and foundation, as you understood it, were one and the same; is

24   that correct?  At the beginning?

25   A      In the beginning, I only knew about being on the board

1   of trustees; and it was, in my mind, one activity.

2   Q      But you also said that you were on the board of the

3   trustees for the school, not the board of trustees for the

4   foundation; is that right?

5   A      There was paperwork showing there were two things that

6   existed.

7   Q      Was your understanding that you were only involved with

8   the board so far as it was related to the school?

9   A      I only knew that I was part of the board of trustees.

10  Q      For the school.

11  A      For the medical school.

12  Q      For the medical school.

13  A      Yes.

14  Q      Not for The Foundation.

15  A      They didn't separate those and identify them at the time

16  I was doing it.

17  Q      So there's really some confusion in your mind as to

18  which entity you were involved with.

19  A      I was on the board of trustees, and the paperwork

20  sometimes shows that it's listed as the Saba School of Medicine

21  Foundation.  And it only became clear to me that there were two

22  parts when the ACCM decided to separate us into two bodies.

23  Q      Okay.  And that was in -- I believe you said that was in

24  1998 or 1999?

25  A      When the ACCM did an accreditation evaluation of the

1    school.

2    Q      Right.  And then, at that time, after that

3    accreditation, then the two split formally.

4    A      They had to be identified separately.

5           MS. KESSLER:  Okay.

6           Do you mind bringing up 110?  Defense Exhibit 110?

7           (An exhibit was projected onto the projector screen.)

8           MS. KESSLER:  I'm sorry.  I meant 111.

9           (An exhibit was projected onto the projector screen.)

10   BY MS. KESSLER:

11   Q      Yet, on Exhibit 111 . . . is that your signature there,

12   at the bottom?

13   A      Yes.

14   Q      And it says that you are chairman of the board of

15   trustees of the school of medicine foundation?  At the bottom?

16   A      Yes.

17   Q      And the date of this letter is July of 2008?

18   A      Yes.

19   Q      Approximately ten years after the time that you

20   understood that the two split formally?

21   A      Yes.

22   Q      And . . . who did you understand to own The Foundation?

23   A      I do not know.

24   Q      Do you remember testifying before the grand jury in

25   August of -- do you remember testifying before the grand jury?

1    A       Remember what?

2    Q       Do you remember testifying before the grand jury, and

3    answering questions from Ms. Finley, on this case?

4    A       Yes.

5    Q       And do you recall being asked, back toward the beginning

6    of your --

7               MR. SAUNDERS:  Excuse me, Your Honor.  Improper

8    impeachment at this point.  She hasn't entered the transcript

9    into the record.

10              THE COURT:  I haven't heard the question yet.

11              MR. SAUNDERS:  It's hearsay to read it at this point.

12              MS. KESSLER:  The question was do you recall being

13   asked the following question, and I was going to ask the

14   question that was asked in the grand jury.

15              MR. SAUNDERS:  She can refresh his recollection, Your

16   Honor, but not read the transcript into evidence at this point.

17              THE COURT:  Let me see what you're going to read

18   first.

19              MR. SAUNDERS:  Page, counsel?

20              MS. KESSLER:  I think it's 147.  It's cut off at the

21   top of mine.

22              (Ms. Kessler provides a document to the Court, which

23       the Court reviews.)

24              THE COURT:  The objection is sustained.  You may show

25   that to him.

1             MS. KESSLER:  I'm sorry?

2             THE COURT:  The objection is sustained.  You may show

3    him the transcript, but you may not read that yet.

4             MS. KESSLER:  May I approach?

5             THE COURT:  You may.

6             (Ms. Kessler provides a document to the witness,

7         which the witness reviews.)

8    BY MS. KESSLER:

9    Q     Do you recall being asked questions in the grand jury

10   regarding the ownership -- your understanding of the ownership

11   of The Foundation?

12   A     Yes.

13   Q     Do you recall being asked the question that I had

14   highlighted on this page that I just showed you?

15            MR. SAUNDERS:  Objection, Your Honor.  If this is

16   refreshing recollection, that's not how it's done.

17            THE COURT:  So far, the objection is overruled.

18   BY MS. KESSLER:

19   Q     Do you recall being asked the question that was

20   highlighted on the page that I just showed you?

21   A     Yes.

22   Q     And do you recall what your answer was to the grand jury

23   at that time?

24   A     I believed that the Saba School of Medicine was started

25   by that group of Dobrow, Johnson, and Dr. Fredrick; and that,

1    by that extension, The Foundation might be theirs.  That they

2    would be the owners.

3    Q      The same three people?

4    A      I didn't know for sure.  But that was -- that was what I

5    through was the ownership.  Because Dobrow had died at some

6    point.  And I don't know what happened to Johnson's part of the

7    ownership ever.

8    Q      Okay.  Now, you testified, at both in direct and on

9    cross-examination, about Dr. Hough's role regarding the

10   accreditation part of the school.  I believe you testified that

11   Dr. Fredrick couldn't have -- or Dr. Fredrick couldn't do what

12   she did, referring to the accreditation; is that correct?

13   A      That's correct.

14   Q      And was it your understanding that she, alone, dealt

15   with the accreditation for the school?

16   A      No.  It was a group effort.

17   Q      Did she lead that effort?

18   A      I guess you could say she led that effort.

19   Q      And she traveled a whole lot as part of that effort.

20   A      Yes.

21   Q      And she put in a lot of hours for that effort.

22   A      Yes.

23   Q      And she put in a lot of energy for that effort.

24   A      Yes.

25   Q      Now, if the accreditation had never gone through, and

1   wasn't successful, would the school have been successful?

2   A      That's hard to say.  It wouldn't be as good as it is

3   now.

4   Q      If you didn't have accreditation, how could you have the

5   second half of the medical school curriculum, which is the

6   internship portion?

7   A      You can operate the medical school, but when these

8   students graduate, and then go on to apply for licenses in the

9   states, and try to get into residencies, that's when the

10  questions of the caliber of the education would be brought up.

11  Q      And so if the Saba didn't have this accreditation, it

12  wouldn't be as attractive of a school for students; is that

13  correct?

14  A      That is correct.

15  Q      And so her contribution on this point helped to make the

16  school quite a success.

17  A      That's correct.

18  Q      Now, you testified that she did a lot of this work based

19  on deferred compensation; is that correct?

20  A      I don't remember saying it was based on deferred

21  compensation.

22  Q      How was she paid?

23  A      I believe she had a salary.

24  Q      Did she receive deferred compensation, as well?  Did she

25  come to the board asking for salary to be paid to her at a

1    later date?

2    A      No.

3    Q      Okay.  Now, you were asked, by Mr. Saunders, about --

4    and talked about this split between the board of the school and

5    The Foundation back in 1998 and 1999.  Do you recall that?

6    A      Yes.

7    Q      And that recommendation they split came from an entity

8    called ACCM --

9    A      Yes.

10   Q      -- is that correct?  And then, after that date, you were

11   no longer a -- you were not a part of the board of The

12   Foundation, but only of the school.

13   A      That's what I see as happening.

14   Q      Now, you also said that Dr. Hough was only involved to

15   the extent that she handled accreditation and academic matters

16   for the school.  Is that your understanding?

17   A      Yes.

18          MS. KESSLER:  If we could pull up Exhibit 110?

19   Defense Exhibit 110?

20          (An exhibit was projected onto the projector screen.)

21   BY MS. KESSLER:

22   Q      Now, whose signature is this at the bottom right of this

23   document?

24   A      Dr. Patricia Hough.

25   Q      And can you read the paragraph -- the direction of that

1   letter on behalf of the board of trustees?

2   A      "On behalf of the board of trustees for Saba University

3   of medicine, I hereby assign Dr. David Fredrick the power of

4   attorney to conduct all banking and business transactions on

5   behalf of the Saba School of Medicine Foundation, also known as

6   Saba University School of Medicine."

7   Q      Yet she was only involved in the accreditation; is that

8   your understanding?

9   A      Yes.

10         MS. KESSLER:  If we could look at Defense

11  Exhibit 112?

12         I think it's up in front of there, but whichever is

13  easier to look at, the screen or the hard copy.

14         (An exhibit was projected onto the projector screen.)

15  BY MS. KESSLER:

16  Q      You testified that these were financial records for the

17  Saba University School of Medicine; is that true?

18  A      Yes.

19  Q      And if we turn to the second page of this document, is

20  this document signed?

21  A      No.

22  Q      Did you compare this document, and the information

23  contained in it, to the books and records of the foundation?

24  A      No.

25  Q      Do you have a specific recollection of ever having

1    compared these numbers to the -- to the financials for the Saba

2    School of Medicine?

3    A       This was the budget that had been presented at the board

4    meeting.

5    Q       Was this in your possession?

6    A       No.

7    Q       How do you know that this document and the details

8    therein were presented to the board?

9    A       I remember this happening.

10   Q       You have a specific recollection as to this document?

11   A       Yes.

12           MS. KESSLER:  Can we switch so that we can pull up a

13   government's exhibit?

14   BY MS. KESSLER:

15   Q       Now, you testified, when you were talking about this

16   Defense Exhibit 112, that the university was not profitable.

17   Is that true?  The university was not making a whole lot of

18   money?

19   A       Yes.  It wasn't making a whole lot of money.

20           MS. KESSLER:  Okay.

21           If we could pull up Government's Exhibit 9N?

22           (An exhibit was projected onto the projector screen.)

23   BY MS. KESSLER:

24   Q       Dr. Dalbec, what's the title of this document?

25   A       Saba School of Medicine Foundation Financial Statements

1   for the Year Ended April 30th, 2006.

2   Q     Do you recall that Saba had to have some audited

3   financial statements prepared in relation to their

4   accreditation?

5   A     I believe there had been an audit conducted as part of

6   the accreditation process.

7                MS. KESSLER:  Okay.

8                If we could turn to Page 5 of this exhibit?

9   BY MS. KESSLER:

10  Q     If you could read there, from the top, what the total

11  revenue was for the year ended April 30th, 2006?

12  A     Total revenue, $11,911,756.

13  Q     And the total expenses for that period?

14  A     7,272,201.

15  Q     What would you estimate the difference to be?

16  A     4 million.

17  Q     4 million and some change?

18  A     Yes.

19  Q     You were on the board for the school in 2002 and 2003;

20  is that correct?

21  A     Yes.

22  Q     Did Dr. Fredrick or Dr. Hough inform the board that they

23  were trying to sell the school at that time?

24  A     As I had said earlier, the process of selling the school

25  began over a period of time.

1    Q      Do you recall it having been ongoing more than five

2    years, to when -- prior to when it was actually sold?

3    A      I think it came up now and again that somebody would

4    approach Dr. Fredricks about the purchase of the school, and --

5    Q      Do you recall him presenting that fact to the board?  Or

6    telling you that personally.

7    A      I don't remember when I was told that he was serious

8    about selling the school.

9    Q      Okay.  Now, you indicated that you primarily, or only,

10   discussed financial matters related to the school with

11   Dr. Fredrick.  Is that right?

12   A      Yes.

13   Q      Now, you don't -- did you know that Dr. Hough had

14   signature authority over the Saba school bank account?

15   A      I did not know that.

16   Q      Did you have any idea what was discussed between

17   Dr. Fredrick and Dr. Hough?

18   A      No.

19   Q      Do you know anything, at all, regarding Dr. Hough and

20   Dr. Fredrick's personal finances?

21   A      No, I don't.

22   Q      Do you know how Dr. Fredrick and Dr. Hough spent money

23   following the sale of the school in 2007?

24   A      No, I do not.

25   Q      Did you know that they bought a condo in Sarasota,

1   Florida?

2   A       No.

3   Q       Did you know that they made -- that a $50,000 deposit

4   was made on a plane?

5   A       No.  Oh, wait a minute.  I went to an air show with

6   Dr. Fredricks, in Lakeland, Florida.

7   Q       Okay.

8   A       It's called Sun and Fun.  And at that he had told me

9   that he had put a down payment on a small jet, called a Cirrus,

10  and that . . . against her objections, because she didn't

11  really want him to fly a jet.  That he thought that it was a

12  practical investment because you don't buy it, you put your

13  name on a waiting list as a buyer.

14  Q       Um-hum.

15  A       And that he thought, even though he might not ever get

16  to buy it, or fly it, that that position in line -- and I think

17  he was Number 509 out of -- all the people had bought the jet

18  that was not yet produced -- that when the time came for the

19  company to produce it and sell it, that his place in line might

20  be worth three or four times that.

21  Q       All right.  Do you know whether he bought that plane?

22  A       He did not.

23  Q       Did you know that he purchased another plane for more

24  than a million dollars after the sale of the school in 2007?

25  A       I know he bought the Piper, but I didn't know the price.

1    Q      All right.  Did you know that he bought a home in

2    Asheville, North Carolina, after the sale of the school, for

3    more than a million dollars?

4    A      No.

5             MR. SAUNDERS:  Objection, misstates the evidence.

6    When you say after the sale of the school?  The evidence is

7    Asheville was --

8             THE COURT:  Is it a date issue?

9             MR. SAUNDERS:  It's 2005, Your Honor.

10            MS. KESSLER:  Okay.  I'm sorry.  Withdrawn, Your

11   Honor.

12            THE COURT:  All right.

13   BY MS. KESSLER:

14   Q      Did you know that he purchased land in Asheville, North

15   Carolina, following the sale of the school?

16   A      No.

17   Q      Did you know that gifts were made to his siblings, in

18   the amount of a million dollars, following the sale of the

19   school in 2007?

20   A      No.

21            MS. KESSLER:  Nothing further, Your Honor.

22            THE COURT:  Mr. Saunders, anything further?

23            MR. SAUNDERS:  May I have a moment to confer, Your

24   Honor?

25            THE COURT:  You may.

1          (Defense counsel confer privately.)

2          MR. SAUNDERS:  I'm sorry, Your Honor.  Just one

3    moment.

4          (Defense counsel continue to confer privately.)

5          MR. SAUNDERS:  Just briefly, Your Honor.

6                    RECROSS EXAMINATION

7    BY MR. SAUNDERS:

8    Q     Just a couple of points, Dr. Dalbec.

9          With respect to Dr. Fredrick and his involvement with

10   the school and The Foundation, you testified earlier, I

11   believe, that he remained active, running the school, for a

12   period of time, a couple of years, after the sale, as part of

13   the transition; correct?

14   A     That was the agreement.

15         MS. KESSLER:  Your Honor, objection.  This is outside

16   of the scope of cross -- redirect, excuse me.

17         THE COURT:  It is, but I'll allow you to,

18   essentially, cross.

19         MR. SAUNDERS:  I'll tie it in, Your Honor.

20         THE COURT:  All right.

21   BY MR. SAUNDERS:

22   Q     He remained involved after the sale of the school;

23   correct?

24   A     Yes.

25   Q     And the times that he would come to the board for

1   approval for loans, that continued after the sale of the

2   school; correct?

3   A      Yes.

4   Q      And with respect to Dr. Hough and the issue of deferred

5   compensation which you were asked about just now, by

6   Ms. Finley, she collected a salary at some point in her work

7   for the school; correct?

8   A      At some point, yes.

9   Q      But not for the early years in which the school was just

10  starting out and had no money; correct?

11  A      No.

12  Q      So it was for those years that she was still owed money

13  in compensation that she had not been paid; correct?

14  A      Correct.

15  Q      As well as repayment of the personal investment that she

16  had made to start the school; correct?

17  A      That's correct.

18  Q      And yet, to your knowledge, she never demanded payment

19  of that money from the foundation.  She let it sit with the

20  school.  Correct?

21  A      Yes.

22          MR. SAUNDERS:  I have nothing further, Your Honor.

23  Thank you.

24          THE COURT:  Ms. Kessler, anything further.

25          MS. KESSLER:  Nothing further.  Thank you.

```
1              THE COURT:  You may stand down.  Thank you.
2              (The witness left the witness box.)
3              THE COURT:  You may call your next witness.
4              MS. FINLEY:  Your Honor, may we confer with counsel
5    for one moment?
6              THE COURT:  Sure.
7              (The witness left the witness stand and left the
8         courtroom.)
9              (Ms. Finley and Mr. Hochman confer privately.)
10             MS. KESSLER:  Your Honor, the government calls
11   Melanie Pitts.
12             THE COURT:  Right up here, please.
13             THE COURTROOM DEPUTY:  If you would raise your right
14   hand.
15             Do you solemnly swear or affirm to tell the truth,
16   the whole truth, nothing but the truth, in the case now before
17   the Court?
18             THE WITNESS:  Yes, I do.
19             THE COURTROOM DEPUTY:  You may have a seat.
20             Please state your full name, spelling your last.
21             THE WITNESS:  Melanie Ann Pitts.  P I T T S.
22             THE COURTROOM DEPUTY:  Thank you.
23                  MELANIE ANN PITTS,
24   called as a witness by the Government, and having been first
25   duly sworn, was examined and testified as follows:
```

1                       DIRECT EXAMINATION

2    BY MS. KESSLER:

3    Q      Good afternoon, Ms. Pitts.  Could you tell the jury

4    where you live?

5    A      I live in Colleyville, Texas, which is between Dallas

6    and Fort Worth.

7    Q      And what do you do for a living?

8    A      I'm retired as of last April.

9    Q      What did you do before you retired?

10   A      I was in retail.

11   Q      Are you married?

12   A      Yes.

13   Q      Who is your husband?

14   A      Rex A. Pitts.

15   Q      Is he retired?

16   A      Yes.

17   Q      What did he do for a living before he retired?

18   A      He was with TWA, in management.

19   Q      What is TWA?

20   A      Oh.  It was TWA Airlines.  And then he did consulting

21   for other airlines in negotiating contracts.

22   Q      Do you know Dr. David Fredrick?

23   A      Yes.

24   Q      How do you know him?

25   A      He's my half brother.

1   Q     Is there a difference in age between the two of you?

2   A     Two years.

3   Q     Who's the youngest?

4   A     I am.

5   Q     And did you grow up together?

6   A     Yes.

7   Q     Did you live in the same home growing up?

8   A     Yes.

9   Q     Did you have a close relationship then?

10  A     I don't remember much about my childhood back then.

11  Q     All right.  Did your brother leave the home before you

12  did?

13  A     Yes.

14  Q     And why was that?

15  A     I guess he joined the army.  I don't know.  I don't

16  remember much.

17  Q     Okay.  After your brother was not living in the same

18  house as you, do you recall whether you spoke often?

19  A     No.

20  Q     You don't recall, or you didn't --

21  A     No, we did not speak.

22  Q     Did you see each other often?

23  A     No.

24  Q     Did there come a time when you and your brother began to

25  speak a bit more often?

1    A      Yes.

2    Q      Do you recall when that was?

3    A      Yes.  After my mother died.

4    Q      And when, approximately, was that?

5    A      Ten years ago.

6    Q      How did your relationship change at that point?

7    A      We began to see each other like once a year at least.

8    Q      Was that more often than you had seen one another before

9    then?

10   A      Yes.

11   Q      Did you talk more often?

12   A      Yes.  Probably.

13   Q      Approximately how often did you talk then?

14   A      Oh, certainly on holidays.

15   Q      Okay.  What do you understand Dr. Fredrick to do for a

16   living?

17   A      He was president of Saba.

18   Q      What is Saba?

19   A      A medical school.

20   Q      Do you know where it's located?

21   A      On the Island of Saba.  Oh, in the Dutch West Indies, I

22   guess.

23   Q      Have you ever been there?

24   A      No.

25   Q      Do you know what Dr. Hough does for a living?

1    A       Yes.

2    Q       And what is that?

3    A       She worked at the schools also.

4    Q       Do you know what she did -- what kind of work she did

5    for the schools?

6    A       Yes.  She . . . I understood she did the accreditations,

7    and traveled, and got hospitals to take on their students and

8    things --

9    Q       As part of their education?

10   A       As part of -- yeah.

11   Q       And I can't recall whether I asked you this already.

12   Have you ever been to the campus of Saba University?

13   A       No.

14   Q       Did you have a daughter, or stepdaughter, who attended

15   Saba?

16   A       Yes, I did.

17   Q       When was that?

18   A       I don't know.  I think she graduated three or four years

19   ago.  I can't remember the years.

20   Q       Is that a daughter or stepdaughter?

21   A       It's a stepdaughter.

22   Q       Did you ever talk to Dr. Fredrick or Dr. Hough about the

23   ownership of Saba University School of Medicine?

24   A       No.

25   Q       When you spoke with Dr. Fredrick or Dr. Hough, did they

1    ever refer to the schools as theirs in those conversations?

2              MR. UDOLF:  Objection, Your Honor; compound question.

3              THE COURT:  Overruled.  I'll take a yes or no, and

4    then it can be pursued.

5    BY MS. KESSLER:

6    Q      Did Dr. Fredrick or Dr. Hough ever refer to the schools

7    as theirs in conversations with you?

8    A      No.  I don't -- no.

9    Q      Okay.  Who started the schools?

10   A      As far as I know, Pat and David were instrumental in

11   getting the charters or whatever.

12   Q      And do you know that from speaking with them?

13   A      No.  Just hearsay.

14   Q      Okay.  And do you know what money was used to start the

15   school?

16   A      No.

17   Q      Are you familiar with the Medical University of the

18   Americas?

19   A      Yes.  I've heard that name.

20   Q      Do you know where that's located?

21   A      Nevis.

22   Q      And have you ever been there?

23   A      No.

24   Q      Okay.  Did there come a time that you received some

25   gifts from your brother?

1    A       Yes.  I received one gift.

2    Q       Do you recall when that was?

3    A       I guess it was 2007.

4    Q       Do you recall who that gift was from?

5    A       Yes.  It was from my brother.

6    Q       And what was the amount of that gift?

7    A       $250,000.

8    Q       Did you have a conversation with your brother before you

9    received that gift?

10   A       No.

11   Q       How did you find out about it?

12   A       Through my husband.  It was deposited in our checking

13   account.

14   Q       Did you ever have any conversation with your brother

15   about that gift after you had received it?

16   A       Yes.

17   Q       And what was the nature of that conversation?

18           MR. UDOLF:  Objection, Your Honor.  Could we have a

19   time?

20           MS. KESSLER:  I believe the question was after the

21   gift.

22           MR. UDOLF:  Well, that takes it into a period after

23   the date alleged in the indictment.

24           MS. KESSLER:  I can ask a different question.

25           THE COURT:  Go ahead.  Try and pinpoint a date with

1    better accuracy.

2    BY MS. KESSLER:

3    Q       Did you ever discuss with your brother the reason for

4    having received that money?

5    A       No.

6    Q       Did you ever discuss with your brother where he got that

7    money?

8    A       No.

9    Q       Did there ever come -- did you ever have a discussion

10   with your brother that you would have to pay that money back?

11   A       No.

12   Q       Did you always understand that that was only a gift?

13   A       Yes.

14   Q       Were you ever asked to sign documentation indicating

15   that you would pay the money back?

16   A       We did sign a loan agreement; yes.

17   Q       Who asked to you do that?

18   A       My brother.

19   Q       And did you sign the paperwork?

20   A       Yes.

21   Q       Did you ever understand that you actually had to pay it

22   back?

23   A       No.

24   Q       Did you ever actually make any payments to pay it back?

25   A       No.

1   Q       Approximately how long after you received the gift did

2   this paperwork arrive?

3   A       I would say it was approximately a year and a half.

4   Q       Did you ever discuss gift tax issues related to this

5   money with your brother?

6   A       No.  We never discussed the money.

7   Q       You never discussed the money, ever, with your brother?

8   A       Only to say thank you.

9   Q       Okay.  Did there come a time when your husband was asked

10   to serve as a board member for the school?

11   A       Yes.

12   Q       Do you recall how this came about?

13   A       No.

14   Q       Do you know how long he was on the board?

15   A       Yes.  As far as I know, a couple of years.

16   Q       Do you remember when that was?

17   A       Not years-wise.

18   Q       Okay.

19   A       I imagine it was . . . .  I don't know.

20   Q       You're not sure?

21   A       I don't know.

22   Q       Okay.  Does your husband have any type of medical

23   background?

24   A       No.  But he had business background.

25   Q       Does he have any teaching background?

1    A       No.  Yes.

2    Q       Yes?

3    A       I mean, teaching pilots and things.

4    Q       Okay.  Teaching people how to fly planes?

5    A       Yes.

6    Q       Does your husband ever -- actually, let me withdraw

7    that.  Oh, I'm sorry.  Which school was he on the board for?

8    Was it for --

9    A       I believe Saba.

10   Q       I'm sorry.  I spoke over you.

11   A       Saba.  I think.  I don't even know.

12           MS. KESSLER:  Okay.

13           I have no further questions, Your Honor.

14           THE COURT:  All right.  Thank you.

15           Mr. Udolf?

16                    CROSS EXAMINATION

17   BY MR. UDOLF:

18   Q       Miss Pitts, your brother is considerably older than you;

19   is that correct?

20   A       Oh, two years.

21   Q       And could you describe to the jury what kind of home

22   life he had growing up you?

23   A       It wasn't good.

24   Q       Did your mom abandon you?

25   A       Yes.

1  Q      All right.  At some particular point, have you told the

2  prosecutor, previously, that you felt that your brother was

3  trying to make up for a miserable childhood that you all had --

4  A      Yes.

5  Q      -- by giving you this gift?

6  A      Yes.

7         MS. KESSLER:  Objection as to relevance of this line

8  of questioning?

9         THE COURT:  That objection is overruled.

10 BY MR. UDOLF:

11 Q      Did you . . . .  You said you never discussed this gift

12 with your brother other than to thank him; is that right?

13 A      Yes.

14 Q      Did you ever thank Pat Hough?

15 A      No.

16 Q      Why not?

17 A      I thanked my brother, and I said I want to thank Pat.

18 And he said no, no, no.  Don't thank her.  She doesn't know.

19 And he said . . . led me to think they do things separately,

20 because he said -- he gave me an example, he says, well, I was

21 at the office one day, and someone called to thank her for a

22 contribution to her school --

23        MS. KESSLER:  Objection, hearsay.

24        THE COURT:  Sustained.

25        THE WITNESS:  So . . . .  No.

1   BY MR. UDOLF:

2   Q      Do you know why you were asked to execute a loan some

3   year and a half -- loan document some year and a half after you

4   got this gift?

5   A      Yes.  I believe it became apparent to Pat that he had

6   given the siblings the money.

7   Q      Did you become aware of the fact that Pat was not aware

8   that any of the siblings had gotten this $250,000?

9              MS. KESSLER:  Objection, foundation.

10             THE COURT:  Sustained.

11  BY MR. UDOLF:

12  Q      Did you discuss the issue of whether Pat knew this with

13  your brother?

14  A      Just when I called to say thank you, and he said -- and

15  I said --

16             MS. KESSLER:  Objection.  Hearsay.

17             THE COURT:  Overruled.  That door has been opened.

18             MR. UDOLF:  You can go ahead and answer the question.

19             THE WITNESS:  Ask it again.

20  BY MR. UDOLF:

21  Q      Did you -- did you ever ask your brother -- well, what

22  did you say to your brother -- when you told your brother that

23  you wanted to thank Pat, what did he say to you?

24  A      He said no.  Pat doesn't know about it.  And he said --

25  the conversation led to . . . she does things, and he does

 1   things.

 2   Q      Now, you told us about your husband being on the board.

 3   A      Yes.

 4   Q      Your husband is Rex Pitts; is that right?

 5   A      Yes.

 6   Q      And was it David Fredrick that asked your -- your

 7   brother, David Fredrick, that asked your husband to be on the

 8   board?

 9   A      Yes.

10   Q      Do you know why that was?

11   A      I thought maybe it had to do with his daughter going to

12   school, and because he's a very bright, honest, knowledgeable

13   person.

14   Q      All right.  And did you ever talk to Rex about what was

15   taking place on the board?

16   A      No.

17   Q      All right.  In fact, you told the grand jury, did you

18   not, "My husband never tells me anything"?

19              MS. FINLEY:  Objection.

20              MS. KESSLER:  Objection.

21   A      And that's correct, he never tells me anything.

22              THE COURT:  Hang on a second.  I have two objections

23   here.

24              Let the real lawyer in the case . . . .

25              MS. FINLEY:  Sorry, Your Honor.

1          MS. KESSLER:  Objection as to the relevance.

2          THE COURT:  Overruled.

3   BY MR. UDOLF:

4   Q     Did you tell the grand jury that your husband never

5   tells you anything?

6   A     Yes.

7          He's retired military.  He's kind of a . . . kind of

8   a . . . you know.  Control freak.

9          THE COURT:  Miss Pitts?  You need to wait for a

10  question.

11         THE WITNESS:  Oh.

12         THE COURT:  Okay?

13  BY MR. UDOLF:

14  Q     Do you know where this money came from that your brother

15  was giving you?

16  A     I understood the schools owed him some money.

17  Q     And how did you understand that -- come to understand

18  that?

19  A     That's what my sister said.

20  Q     Which sister was that?

21  A     Suzy and Marion.

22         MR. UDOLF:  That's all the questions I have, Your

23  Honor.

24         THE COURT:  All right.

25         Ms. Kessler?

1          MS. KESSLER:  Nothing, Your Honor.  Thank you.

2          THE COURT:  You may stand down.  Thank you.

3          MR. UDOLF:  Judge, we would ask that this witness

4  about remain available for re-call.

5          THE COURT:  All right.  She may.

6          (The witness left the witness stand and left the

7      courtroom.)

8          THE COURT:  Do you have a relatively brief witness?

9          MS. FINLEY:  No, Your Honor.  We tried to put the

10  relatively brief one on before we started the longer one.

11         THE COURT:  All right.

12         We're going to break for the evening.

13         I did, as I indicated before, get your note asking if

14  I could give you some information as to the timing with regard

15  to the completion of the trial.

16         This is one of those where I want to tell you the

17  answer is yes, but I'm afraid I can't really tell you that I

18  have any hard information.  The testimony may finish up by the

19  end of the week, and the case may even get to you by the end of

20  the week; but I can't promise you that.  It just kind of

21  depends on how things go.  So there's the possibility the case

22  may go into the beginning of next week.  I'll have a better

23  sense in a day or so; but, as of right now, that's kind of the

24  best I can tell you.

25         I know that doesn't give you very concrete

1    information, but that's the best I can do right now.

2              I know, during the jury selection process, I told you

3    we'd be finished by the end of the week.  That may or may not

4    turn out to be . . . that's true.  I just can't tell you.  If

5    it's going to cause a problem for any of you, we can talk about

6    that later; but, at least for planning purposes, it's not

7    beyond the realm that I'm going to need you into early next

8    week.  All right?

9              Now, with that said, please do not discuss the case

10   among yourselves, or allow anyone to discuss it with you or in

11   your presence.

12             We're going to go back to the normal time

13   tomorrow, 9:00 o'clock in the morning.

14             All right.  See you at 9:00 o'clock.

15             (At 4:51 PM, the jury was escorted from the

16        courtroom.)

17             THE COURT:  All right.  9:00 o'clock.

18             MR. SAUNDERS:  Thank you, Your Honor.

19             MS. KESSLER:  Thank you.

20                      -- -- -- -- -- -- -- --

21             (At 4:52 p.m., court was recessed, to be reconvened

22        at 9:00 a.m., on Wednesday, October 16, 2013.)

23                      -- -- -- -- -- -- -- --

24

25