UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

---

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                  Fort Myers, Florida
vs.                               October 16, 2013

PATRICIA LYNN HOUGH,              9:00 a.m.

        Defendant.

---

TRANSCRIPT OF JURY TRIAL, DAY SIX

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                          Tax Division
                    P.O. Box 813
                    Washington, DC  20044
                    BY:  CARYN FINLEY, ESQ.

                    U.S. Department of Justice
                        Tax Division
                    Suite 7334
                    601 D Street NW
                    Washington, DC
                    BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

A P P E A R A N C E S
(Continued From Previous Page)


FOR THE DEFENDANT:        Bingham McCutchen, LLP
                          The Water Garden
                          1601 Cloverfield Boulevard
                          Suite 2050 North
                          Santa Monica, CA  90404-4082
                          (310) 904-1000
                          BY:  NATHAN J. HOCHMAN, ESQ.

                          Bruce L. Udolf, PA
                          500 East Broward Boulevard
                          Suite 1400
                          Fort Lauderdale, FL  33394
                          (954) 858-8831
                          BY:  BRUCE L. UDOLF, ESQ.

REPORTED BY:              JEFFREY G. THOMAS, RPR-CP, CRR
                          Official Federal Court Reporter
                          United States Courthouse
                          2110 First Street, Suite 2-194
                          Fort Myers, FL  33901
                          (239) 461-2033


                          *  *  *

I N D E X

| October 16, 2013 | | | | | | Vol. | | Page |
|---|---|---|---|---|---|---|---|---|
| Preliminary Discussions | | | | | | 6 | | 5 |

– – –

GOVERNMENT'S WITNESSES

| WITNESS | DIRECT | | CROSS | | REDIRECT | | RECROSS | | VOIR DIRE | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. |
| STEVEN RODGER | 6 | 7 | 6 | 62 | 6 | 129 | | | | |
| LAURA WHITLEY | 6 | 137 | 6 | 164 | | | | | | |
| JASON HARRELL | 6 | 166 | 6 | 208 | | | | | | |
| SUSAN MCBRIDE | 6 | 215 | 6 | 225 | | | | | | |
| SHEILA MAURER | 6 | 227 | | | | | | | | |

– – –

GOVERNMENT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Government's Exhibits 10A, 10B, and 10C<br>    Admitted in Evidence | 6 | 20 |
| Government's Exhibits 10F and 11A Admitted in<br>    Evidence | 6 | 34 |
| Government's Exhibits 11B, 11E, and 11F<br>    Admitted in Evidence | 6 | 41 |
| Government's Exhibits 11J, 11K, and 11L<br>    Admitted in Evidence | 6 | 45 |
| Government's Exhibit 11Q Admitted in Evidence | 6 | 46 |
| Government's Exhibits 11S, 11U, and 11Z<br>    Admitted in Evidence | 6 | 49 |

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

GOVERNMENT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Government's Exhibits 11AA, 11BB, and 11CC Admitted in Evidence | 6 | 54 |
| Government's Exhibits 11H, 11I, 11N, 11O, 11P, 11R, 11V, 11W, 11X, 11Y, 11DD, 11EE, 11FF, 11GG, 11HH, 11II, and 11MM Admitted in Evidence | 6 | 62 |
| Government's Exhibits 11JJ and 11KK Admitted in Evidence | 6 | 79 |
| Government's Exhibit 11M Admitted in Evidence | 6 | 124 |
| Government's Exhibit 6L Admitted in Evidence | 6 | 146 |
| Government's Exhibit 6J Admitted in Evidence | 6 | 155 |
| Government's Exhibit 6M Admitted in Evidence | 6 | 156 |
| Government's Exhibit 16J Admitted in Evidence | 6 | 160 |
| Government's Exhibits 15B, 15C, and 15D Admitted in Evidence | 6 | 167 |
| Government's Exhibits 16B, 16E, 17B, and 17C Admitted in Evidence | 6 | 173 |
| Government's Exhibit 16C Admitted in Evidence | 6 | 182 |
| Government's Exhibit 16N Admitted in Evidence | 6 | 208 |
| Government's Exhibit 30C Admitted in Evidence | 6 | 250 |

– – –

|  | Vol. | Page |
|---|---|---|
| Miscellaneous Discussions | 6 | 260 |
| Court Recessed for the Day | 6 | 262 |

* * *

1    THEREUPON, the above-entitled case having been called

2  to order, the following proceedings were held herein,

3  to-wit:

4                            - - -

5

6         THE COURT:  Good morning, everyone.

7         Both sides ready for the jury?

8         MS. FINLEY:  Your Honor, there are several exhibits

9  this morning that we're going to offer in front of the jury,

10  but there's one that we're not contested about, there is one

11  that we are, that I think the Court may want to hear argument

12  on.  I don't know if you want to hear that now.

13         MR. HOCHMAN:  Are you going to publish it in front of

14  the jury?

15         MS. FINLEY:  I am not going to publish it at this

16  time.

17         MR. HOCHMAN:  Your choice, Your Honor.  If she is not

18  publishing it this morning, we can deal with it at some later

19  point.

20         And the other issue is, some of the exhibits were

21  going to be introduced with a disk to go back to the jury, and

22  I didn't know what the Court's ability was to have a disk go

23  back to the jury.

24         THE COURT:  I think we have that worked out, so we

25  have a computer monitor with nothing else on it that can be

1    sent to the jury, assuming one of them can work the computer.

2              THE COURTROOM DEPUTY:  There is a stripped computer

3    with a keyboard and a monitor.  Sometimes the government, the

4    type of technology they use, doesn't work; but if it's normal,

5    it should work.

6              THE COURT:  I guess the bottom line is, I think we

7    can send them back equipment on which they can access the

8    exhibit but not access the internet, for example.

9              MR. HOCHMAN:  Okay.  Yeah.

10             MS. FINLEY:  That would be important.

11             MR. HOCHMAN:  Okay, Your Honor, we can . . . .  I

12   think we can deal with these exhibit issues sometime later.

13             MS. FINLEY:  We will offer the ones that we have no

14   contest about.

15             THE COURT:  Okay.  That works.

16             Have the jury step in, please.

17             (At 9:06 AM, the jury was escorted into the

18        courtroom.)

19             THE COURT:  Good morning, ladies and gentlemen.

20             And you may call your next witness.

21             MS. FINLEY:  Thank you, Your Honor.

22             The government calls Steven Rodger to the stand.

23             THE COURTROOM DEPUTY:  If you'd raise your right

24   hand.

25             Do you solemnly swear or affirm to tell the truth,

1   the whole truth, nothing but the truth, in the case now before

2   the Court?

3                THE WITNESS:  I do.

4                THE COURTROOM DEPUTY:  You may have a seat.

5                State and spell your full name, please.

6                THE WITNESS:  Steven, S-T-E-V-E-N, Rodger,

7   R-O-D-G-E-R.

8                THE COURTROOM DEPUTY:  Thank you.

9                MS. FINLEY:  Ms. Alexander, may we have the projector

10  on?

11               THE COURTROOM DEPUTY:  It's on.

12               MS. FINLEY:  It's on?  Thank you.

13                              STEVEN RODGER,

14  called as a witness by the Government, and having been first

15  duly sworn, was examined and testified as follows:

16                           DIRECT EXAMINATION

17  BY MS. FINLEY:

18  Q      Good morning, Mr. Rodger.

19  A      Good morning.

20  Q      Could you tell the jury your background; what do you do

21  for a living?

22  A      I manage what is called a private equity firm, which is

23  an investment firm that will invest in private businesses

24  generally, is what we do, and for growth capital, or when

25  people want to retire, and for change of control, if they want

1    to get out of businesses.  Those are the situations we

2    generally invest in.

3    Q      And I don't know if you can move forward a little or put

4    the microphone a little closer, just so . . . the acoustics are

5    not great.

6    A      Okay.

7    Q      And what's the name of your company?

8    A      It's called Equinox Capital.

9    Q      And what is your position with the company?

10   A      I'm the managing general partner.

11   Q      Does Equinox, or Equinox, have a specialty in the types

12   of entities or companies that it normally invests in?

13   A      We, over time, have been in a number of different

14   industries.  And it varies over time, depending on what we

15   perceive to be good for our investors.  And at this point we're

16   largely focused on education.

17   Q      Are you familiar with Dr. Fredrick and Dr. Hough?

18   A      Yes.

19   Q      How did you first come to meet or hear about them?

20   A      I invested, or my firm did rather, in a business called

21   St. Matthew's University School of Medicine, which was a

22   proprietary medical school located on Grand Cayman.  And as I

23   became familiar with other similar enterprises, I heard -- that

24   was the first I heard of Dr. Fredrick and Dr. Hough.

25   Q      And what was your involvement -- I guess you said that

1  you . . . your company purchased St. Matthew's?

2  A     Yes.

3  Q     Was there also some ongoing litigation between

4  St. Matthew's and Saba and Dr. Hough and Dr. Fredrick?

5  A     There was at the time of our purchase; yes.

6  Q     And when did you purchase St. Matthew's?

7  A     January 27th, 2006.

8  Q     Okay.  So, through the course of your familiarity, and I

9  guess learning the . . . the region, and the medical schools,

10 did you have an opportunity to actually meet Dr. Fredrick and

11 Dr. Hough?

12 A     I'm not sure whether I met them . . . .  I don't think I

13 met them until my very first time when I spoke to Dr. Fredrick

14 about whether he had an interest in selling the schools that he

15 managed.

16 Q     And do you remember when that was?

17 A     That was in the . . . summer . . . September 2006.

18 Q     And you said that you heard that he was interested in

19 selling his medical schools.

20       Where did you hear that?

21 A     You hear it from a lot of different sources when you're

22 in the investment business, because it's your business to find

23 things.  And I had heard it from some investment bankers, and

24 then one person who was associated with our group as well.

25 Q     So once you heard that, what did you do?

1    A       Got on the phone and called the . . . I called

2    Dr. Fredrick.

3    Q       And why did you call Dr. Fredrick?

4    A       He was the name I heard most often in terms of, you

5    know, the lead manager of the school.  And he's located in the

6    United States, and . . . .  Go to the source, that's, you know,

7    that's what you do when you're an investor in private equity.

8    Q       Now, was your first meeting with him around that same

9    time, in September of 2006?

10   A       Yes.

11   Q       And where was your first meeting?

12   A       Well, I'm based in Connecticut, and Dr. Fredrick was

13   based in Massachusetts, so we agreed to meet halfway, at

14   Sturbridge.

15   Q       Okay.  And was it -- was Dr. Fredrick the only person

16   you met with at that meeting?

17   A       Yes.

18   Q       And what was discussed; what was the context, or the

19   purpose, of that initial meeting?

20   A       The context was . . . well, I told Dr. Fredrick why I

21   was interested in meeting.  And he said that he was skeptical,

22   but that he would meet anyway.  And so we got together.

23           And he said:  Well, I don't know how we're going to be

24   able to really get this thing off the ground, given that we've

25   got some issues between a company that you're involved with and

1    my institutions.

2    Q      Let me stop you there.

3           So can you explain to the jury why he was skeptical, or

4    why you think he was -- based on your conversation, what was

5    making him skeptical?

6    A      Well, in order to invest, or purchase somebody's

7    business, you have to -- they have to share with you a lot of

8    confidential information . . . or nonpublic.  And since this

9    was a private institution, everything wouldn't have been out in

10   the public.  And as there was some overhanging litigation,

11   that's -- and I was a potential adversary in the situation, it

12   wouldn't be the kind of -- it wouldn't be normal to want to

13   disclose a lot of confidential information to an adversary -- a

14   potential adversary.

15   Q      So when you met in Sturbridge Village, what kind of

16   things did you talk about?

17   A      Well, we talked about how we might get over the hump of

18   this issue of confidentiality.

19          And I said, "If you tell me three things about your

20   schools," and I asked him the size of its enrollment and a

21   couple of other facts, I said, "I'll give you a price right

22   now, and you can decide whether you're interested in going any

23   further."

24   Q      And did he do that?

25   A      He did.  And I gave him the price.

1          And he said:  Let's talk.

2    Q      And do you remember the price?

3    A      It was 40 some-odd million dollars.  There was more than

4    one university involved that I understood that he was managing.

5    Q      So if we can take a step back right there, what did you

6    understand him to be managing?

7    A      I understood him to be involved in the management of

8    Saba University School of Medicine, located on an island called

9    Saba, and the Medical University of the Americas, which was

10   located on an island call Nevis.

11   Q      And I guess once -- I guess, was it sort of like the

12   proverbial handshake and, "We're going to move on to the next

13   step," once you agreed on price?

14   A      It was the proverbial back of the envelope, literally

15   the back of the napkin.  Yeah.

16   Q      So once you agreed in principle that you were going to

17   move forward, what happened next?

18   A      Well, the challenge then was to figure out a

19   confidentiality agreement whereby which could share, or

20   exchange, confidential information, or rather I could see

21   confidential information of the institutions that . . . he was

22   associated with.  And that . . . was a delicate exercise that

23   was worked out by our attorneys, but they were successful,

24   because I think both Dr. Fredrick and myself, you know, were

25   pretty diplomatic about it.

1  Q      So approximately how many times did you meet with

2  Dr. Fredrick over the course of the deal?

3  A      Actual meetings?  Maybe five.

4  Q      Did you talk to him on the phone a number of times?

5  A      Yes.  In situations like this, it's normal to talk more

6  than you can imagine.

7  Q      And as part of your, I guess, due diligence, or

8  assessing the information, did you also go to Gardner to meet

9  with the staff?

10  A      Yes.  I met with the staff just one time before we

11  closed.

12  Q      What did you understand was the operation in Gardner?

13  A      The typical arrangement where there would be a U.S.

14  administrative presence that would help manage these offshore

15  entities and . . . .  These are four-year medical schools,

16  both -- Medical University of America, I refer to as MUA, and

17  Saba, I refer to as Saba.

18          Saba and MUA are four-year, M.D.-granting institutions.

19  Two years of their -- of the program will be conducted on the

20  islands, and two years will be in teaching hospitals in the

21  U.S. and Canada.  And so it's efficient to have people in the

22  United States to help supervise the clinical network, which is

23  pretty extensive for both the universities, as well as some

24  administrative functions.

25  Q      Do you know who owned the entity in Gardner?

1    A      It was a separate LLC.  And I can't remember whether --

2    I can't remember if Dave Fredrick owned it or not, or whether

3    it was another company.  I'm sorry, I can't remember.

4    Q      Was Dr. Fredrick your primary contact?

5    A      Yeah.  I mean, that's -- we like to do it that way.  We

6    don't want . . . we have an expression in private equity:  When

7    you're trying to negotiate with multiple parties, it's like

8    herding cats.

9           And we prefer not to do that, and so we asked

10   Dr. Fredrick to be the designated representative, so that we

11   could talk to one person.  And so it's easier for me, and my

12   team, to just have a point of contact in that regard.

13   Q      Now, did you have any contact with Dr. Hough during the

14   course of the deal?

15   A      Yes.  Yes.

16   Q      And what was her involvement with, to the extent there

17   was any, with the negotiations?

18   A      I mean . . . periodically, there might be something

19   that . . . Pat was involved with, you know, just listening.  We

20   didn't have much hard negotiating.  You know, the biggest

21   hurdle was always price.  And if price isn't a problem, then a

22   lot of it's just detail stuff.  I mean, I certainly negotiated

23   Pat's consulting agreement with her, because it's her agreement

24   for her ongoing involvement.

25          But most of the negotiations -- you know, Dave was

1   involved because he had to generate lots of paper.  These

2   situations -- I mean, the stack of paper would be . . . at

3   least eight or nine feet tall, you know, in what it took to

4   paper over the situation.  So I interfaced with Dave.

5        Mostly, with Pat, it would be more about learning about

6   the business and things that were her expertise in that area --

7   in those areas.

8   Q    When you had questions, was she able to answer them?

9   A    Yeah.  I mean . . . .  Yes.

10  Q    Did she seem knowledgeable about the schools?

11  A    Yes.

12  Q    Now, what did you understand her role to be with MUA and

13  Saba?

14  A    I think Pat, from -- I'm sorry, Dr. Hough, was very much

15  involved in the development of the clinical networks, was very

16  much . . . .  Because these were startup schools.  And when I

17  say "development," you know, a lot of the arrangements were

18  actually -- you have to affiliate with these teaching hospitals

19  in the United States, where students can conduct their

20  education when they come over here.  Pat set up a lot of that

21  and was very much involved in curriculum development.  And Pat

22  knows a lot about medical education.

23  Q    During your . . . I guess not negotiations, I don't want

24  to say "negotiations," but during the course of the deal, was

25  she concerned with the direction of the schools?

1    A      Yeah.  Yes.  I mean, any . . . anybody who has built

2    something from nothing would be very concerned with who was

3    going to be involved, and whether they were going to, you know,

4    carry the same banner that they've put out there.  And she was

5    very concerned whether or not we were going to be good

6    representatives for the universities going forward.

7    Q      Now, you said that Dr. Hough was involved with the

8    clinical aspect, and some of the -- I guess she was involved

9    with the accreditation?

10   A      Yes.

11   Q      Now, would the school have been an attractive investment

12   for your company if Saba and MUA were not accredited?

13   A      No, they wouldn't have been.

14   Q      Now, what was your understanding of Dr. Fredrick's role

15   with Saba and MUA?

16   A      Dave had general charge of the operations, would be how

17   I would describe it.

18   Q      Was he very invested in what was . . . in the schools?

19   A      Yes.  Dave cared about everything.

20   Q      And were you impressed with the quality of education

21   that Saba and MUA was offering?

22   A      Yes.  We had invested in St. Matthew's to start, and I

23   thought that they were doing a good job.  And then, when I went

24   to see Saba the first time, I was struck how incredibly better

25   it was.  And the Medical University of the Americas, or MUA,

1   was a younger school, and wasn't as mature, and as far along in

2   its development, but it too was very strong, and had a great

3   foundation.  But Saba was a . . . really, quite a remarkable

4   place.

5   Q      So when you seek to purchase an asset like the schools,

6   what kind of due diligence do you undertake to determine -- I

7   guess, once you've made that agreement, what kind of things are

8   you doing to culminate the deal?

9   A      Well, we do a lot of things.  We'll look at, you know,

10  things that would be -- what would be under the guise of

11  general business due diligence.  There will be financial due

12  diligence.  And then there will be, what do we really need to

13  have.  Because with private companies, oftentimes they're

14  just . . . they're not publicly traded companies where

15  everything is wrapped up with in a neat little bubble, and it's

16  all out there in documents.  You have to dig around and seek

17  some things for yourself.

18      And then a lot of due diligence took place on how to

19  actually consummate a transaction in two jurisdictions that

20  this isn't a commonplace occurrence, and there's . . . .  It's

21  actually -- in the United States, it's actually, despite

22  everybody complaining about all the regulations and all the

23  laws all the time, it actually makes life easier.

24  Q      We don't need to get into it, I guess, but based on your

25  answer, Saba, and I guess the Netherlands Antilles at the

1    time --

2    A       Yes.

3    Q       -- and Nevis, the established laws and framework for

4    doing all of this wasn't as developed as they might be in the

5    United States.

6    A       Absolutely not.  Not anywhere near so.

7    Q       What did you understand, and who did you understand

8    owned The Foundation -- I'm sorry -- owned the medical school.

9    A       Well, the medical school was part of The Foundation,

10   per se, the Saba University School of Medicine Foundation, I

11   believe, is what it was called.

12   Q       And did you know who owned The Foundation?

13   A       No.

14   Q       Did you care who owned The Foundation?

15   A       No.

16   Q       Why not?

17   A       Well, we didn't want to buy it.  You know, The

18   Foundation is what I would refer to as a person, you know,

19   where it could be a corporate entity, it could be something.

20   But folks like us, we don't -- if possible, we always want to

21   buy the business, not the person, and . . . .  Because then you

22   separate yourself from any history that may exist.

23           In the past, it is typical in our industry to try to do

24   that.  We always try to make sure that we have no liability to

25   the past.  And the easiest way to do that is to buy the

1   business out of the foundation.

2   Q      And did you have an understanding of who owned Medical

3   University of the Americas?

4   A      We did.

5   Q      Who owned that?

6   A      I knew who the stockholders were.  Dave Fredrick owned

7   250 shares out of 22,000 or something.  And a guy named Cuthwin

8   Lake owned a couple -- about a similar amount.  And then the

9   rest was owned by a corporation.

10  Q      And do you remember the name of the corporation, and

11  we'll look at some of the documents --

12  A      I think it was New Vanguard.

13  Q      Do you know who owned New Vanguard?

14  A      No.

15  Q      So your concern going forward was that Dr. Fredrick had

16  the authority to sign for all these entities because you only

17  wanted to deal with one person?

18  A      Yeah.  Our concern was like when you buy a house, was

19  that we got good title to the house we bought.  So buying a

20  company is the same thing, you want to make sure that it's

21  validly transferred and that you have good title to it.

22  Q      I'm going to show you what's been marked as

23  Exhibit 10A, 10B, and 10C.

24            (Ms. Finley provides exhibits to the witness.)

25            MS. FINLEY:  Your Honor, at this time the government

1    would offer Exhibit 10A; 10B, as in "boy"; and 10C, as in "cat"

2    into evidence?

3              MR. HOCHMAN:  No objection, Your Honor.

4              THE COURT:  10A, B, and C will be admitted.

5              (Government's Exhibits 10A, 10B, and 10C were

6         admitted into evidence.)

7              MS. FINLEY:  Permission to publish?

8              THE COURT:  You may.

9              (An exhibit was projected onto the projector screen.)

10   BY MS. FINLEY:

11   Q     So if we can start with Exhibit 10A . . . and can you

12   tell the jury what this document is?

13             MS. FINLEY:  And, Ms. Alexander, I'm sorry, if we can

14   just dim the lights?  Thank you.

15             THE WITNESS:  This is a purchase agreement that was

16   drafted for part of the transaction.  EIC Acquisition Corp. was

17   a corporation we formed, and it was buying these other entities

18   listed below, and then it says other stuff.

19   BY MS. FINLEY:

20   Q     And you're free to look at the screen, but you also have

21   the actual document in front of you, if you need to, because I

22   know we'll get into some smaller print, and I know I have some

23   trouble myself reading on the screen.

24             Was EIC the Gardner, Massachusetts, portion of the

25   business?

1   A       Educational International Consultants was, I believe.

2   And EIC Acquisition Corp. was a company we formed to do the

3   buying.

4   Q       And what is the date on the agreement, or at least on

5   the front page?

6   A       It's February 14th, 2007.

7   Q       And if we can turn to Page 6 of Exhibit 10A, in the top

8   paragraph, does that lay out who the parties are to the

9   agreement?

10  A       Where it says, "This purchase agreement dated," blah,

11  blah, blah?

12  Q       Right.

13  A       Yes.  Yes.

14  Q       And who were the parties to the agreement?

15  A       Well, the purchaser is EIC Acquisition Corp., which is a

16  company that we formed, and Medical Education Group . . . .

17  I'm sorry, I'm forgetting who that is.  And Educational

18  International Consultants, or EIC, is the . . . entity that was

19  their U.S. administrative office in Gardner.

20  Q       And if we look under the portion of -- where it says,

21  "Witnesseth" --

22  A       Um-hum.

23  Q       -- is there a paragraph about Dr. Hough?

24  A       Yes.

25  Q       And what does that say?

1    A        "Whereas Dr. Hough, as defined below, does not own any

2    EIC interests, but has agreed to execute this agreement for the

3    purposes set forth herein."

4    Q        Now, do you know what, "The purposes set forth herein,"

5    were, or is it a lot of purposes?

6    A        Largely, I think at the end of the day, for

7    indemnification.

8    Q        So if we can turn to Page 52, of Exhibit 10A?

9             (An exhibit was projected onto the projector screen.)

10   Q        And there's a paragraph under 9.2, guarantee of

11   Dr. Fredrick and Dr. Hough.

12            If you could read that paragraph to the jury.

13   A        That's Section 9.2?

14   Q        Yes.

15   A        "Guaranty of Dr. Fredrick and Dr. Hough.  In

16   consideration of the purchase price to be delivered hereunder,

17   and other good and valuable consideration, all of which

18   directly or indirectly provides significant economic and other

19   benefits to Dr. Fredrick and Dr. Hough, the receipt of which is

20   hereby acknowledged, Dr. Fredrick and Dr. Hough, (the

21   guarantors), hereby jointly and severally, unconditionally,

22   guarantee to purchasers the full and prompt payment and

23   punctual performance by the sellers and the guarantors of any

24   and all obligations of and payments by the sellers and the

25   guarantors arising here under, and set forth in the master

1   indemnification agreement, (the guaranty)."

2   Q      So why did Dr. Fredrick and Dr. Hough have to personally

3   guarantee the sale?

4   A      Well, that was at our request.  As I said, these . . .

5   you know, we . . . didn't care who the owners of some of the

6   corporations were, and the jurisdictions were somewhat far

7   afield, so . . . we wanted somebody that we knew where they

8   were, if there was a problem, and . . . that we could go after.

9          Indemnification matters, and corporations can run into

10  more than inconsequential amounts of money, and whether or not

11  the individuals have it or don't have it, we want to get their

12  attention so they help us get it, if they don't have it.

13  Q      How did Dr. Fredrick and Dr. Hough respond to the

14  requirement that they guarantee the sale?

15  A      Like any other seller.  You know, their behavior was

16  typical, in my view.  Nobody wants to guarantee anything unless

17  they feel that's the only way it's going to get done.

18  Q      And would you have closed the deal without the personal

19  guarantee?

20  A      No.

21  Q      Why?  I guess for the reasons you . . . .

22  A      For the reasons I stated.  We want assistance if we need

23  assistance.

24  Q      Would you have closed the deal with someone else as the

25  guarantee, other than Dr. Fredrick and Dr. Hough?

1    A       In this instance?

2    Q       In this instance.

3    A       No.

4    Q       And I know that you said that there was a master

5    indemnification agreement, I think it's probably in here

6    somewhere, in the big sheaf of paper, but that would lay out,

7    in very stark detail, the timing and the different parameters

8    of how long the guarantee lasts; is that fair?

9    A       Yeah.  They were guaranteeing the obligations under the

10   indemnification.  And the indemnification agreement would have

11   fairly typical aspects to it, you know, sort of what I would

12   call pedestrian-type liabilities; and then as sort of a

13   one-level liabilities; and then things that are more in the

14   case of misrepresentation; and then, if there was a huge

15   problem, sort of another layer of liabilities.

16           And that's all very -- you know, from my perspective,

17   it's all normal.

18   Q       These are how you get the deal done?

19   A       Yeah.  This is how you lawyers do it all.  All right?

20   Q       And if we turn to Page 61, and the pages sort of just

21   before and after it, but there are signature pages for each of

22   these . . . purchase agreements that we're going to review; is

23   that right?

24   A       Yes.

25   Q       Okay.  And on Page 61, who signs as the seller

1    representative?

2    A       David Fredrick.  Dr. David Fredrick.

3    Q       And who -- for Medical Education Group, who signs?

4    A       Oh, that was David Fredrick.  And that was the other

5    U.S. administrative arm.

6    Q       And does it list a title for him with respect to Medical

7    Education Group?

8    A       It says "owner" next to title.

9    Q       And then Dr. Fredrick and Dr. Hough, do they sign as the

10   guarantors?

11   A       Yes; they sign individually as guarantors.

12   Q       Now, if we can turn to Exhibit 10B, as in "boy."

13           (An exhibit was projected onto the projector screen.)

14   Q       Is this the purchase agreement for the Medical

15   University of the Americas?

16   A       Yes.

17   Q       And on the front page, who is -- it's dated the same,

18   February 14th, 2007?

19   A       That's correct.

20   Q       And who are the parties to this transaction?

21   A       The parties are:  MUA Management Company Limited, which

22   is a company that we formed in Nevis; MUA Properties was an

23   entity that owned property in Nevis; Medical University of the

24   Americas Limited was the corporate entity that was the school;

25   Educational International Consultants, once again, was the U.S.

1    administrative arm; Lynn Leon Group, I believe, was a real

2    estate . . . entity; and New Vanguard was another entity.

3    Q       And if we can turn to Page 6 again -- I'm sorry, Page 8.

4    A       Page 8?

5    Q       Sorry.

6            (An exhibit was projected onto the projector screen.)

7    A       I'm out of order here in my . . . sorry, not out of

8    order, but my pages are numbered . . . .

9    Q       If you look in the left-hand bottom corner, there's

10   little page numbers.  Sorry.

11   A       Oh.  There you go.  Thank you.

12           Did you say eight?

13   Q       Eight.

14   A       Okay.  I'm with you.  I'm sorry.

15   Q       And this paragraph, again, like the other, lists out the

16   various parties to the agreement.

17   A       That's correct.

18   Q       And is Dr. Fredrick listed individually as part of the

19   sellers?

20   A       Yes, he is.

21   Q       And further down there's another "whereas" paragraph

22   with respect to Dr. Hough; is that correct?

23   A       Yes.  It's a copy from the . . . from the previous

24   agreement.  They'll all be the same.

25   Q       So she didn't own any shares of the properties, but was

1    agreeing to execute the agreement for the purposes set therein.

2    A       Yes.

3    Q       Now, did you understand what MUA's assets were?

4    A       When you refer to MUA, you mean the . . . the corporate

5    entity that --

6    Q       What were you buying when were you buying MUA?

7    A       We were buying -- there was a corporation that the

8    school resided in.  We were buying that corporation.  And we

9    were buying a real estate -- and we bought real estate, I

10   believe, directly -- yes, that's right.  MUA Properties was a

11   company that we formed that purchased real estate from another

12   corporation that owned that real estate.  So we were buying

13   both property and the school per se.

14   Q       So that the physical land that the school sat on?

15   A       Yes.

16   Q       Okay.  So we turn to, now, Page 15 of Exhibit 10B.

17           (An exhibit was projected onto the projector screen.)

18   Q       There are some paragraphs called "knowledge of the

19   company," or "knowledge paragraphs"?

20           Can you explain to the jury what these paragraphs are?

21   A       There are a lot of -- within a purchase agreement, there

22   will be a part of the document that will . . . the sellers will

23   make representations to the buyer about conditions of certain

24   things, or certain sets of circumstances; and sometimes those

25   representations are absolute in nature, and sometimes those

1    things are qualified by knowledge; and there's always, in these

2    agreements, an argument about what "knowledge" means.

3            And so, in this case, this is how we defined, for each

4    of those entities, what knowledge meant, as related to where

5    knowledge was part of the representations that were made.

6    Q       And if we just scroll down, there's a "knowledge of the

7    sellers" section . . . toward the bottom of the page.

8    A       Yes.

9    Q       Did Dr. Hough represent that she had knowledge of the

10   sellers . . . or that she included as having knowledge of the

11   sellers?

12   A       It included knowledge that Dr. Hough was supposed to

13   have.

14   Q       Now, if we can turn to Page 58.

15   A       Fifty-eight?

16   Q       Fifty-eight.

17           As part of all three of these deals, was there a section

18   on non-compete?

19   A       Yes.

20   Q       And that's typical for these kinds of deals.

21   A       Yes, that's very typical.

22   Q       Why is that?

23   A       Well, you don't want to give somebody, or anybody -- it

24   doesn't matter who gets the money, you don't want to pay a lot

25   of money for something, and then the people who have the

1   expertise go across the street and start a similar enterprise

2   the next day.

3   Q     And as part of the non-compete, if we turn to Page 59,

4   the next page, I think you said that -- is this one of the

5   things that you negotiated directly with Dr. Hough?

6   A     Yes.

7   Q     And what . . . was her concern?

8   A     Dr. Hough is a licensed psychiatrist, and she wanted to

9   be able to continue to practice, which is necessary in order to

10  maintain a valid license.

11  Q     And if we now turn to Page 72, there's a similar

12  guaranty section for the MUA purchase agreement for Dr. Hough

13  and Dr. Fredrick?

14         (An exhibit was projected onto the projector screen.)

15  A     One more time, please?

16  Q     There's a similar guaranty section.

17  A     Yes.  It's the exact same as the previous.

18  Q     Now, if we can turn to Page 84 . . . .

19         (An exhibit was projected onto the projector screen.)

20  A     Okay.

21  Q     And again, all of these documents have various signature

22  pages; is that correct?

23  A     Yes.

24  Q     So, on Page 84, I think you said that New Vanguard was

25  one of the entities that was part of the agreement.

1          You don't know who owned New Vanguard.

2    A     No.

3    Q     Who was signing for New Vanguard?

4    A     Beda Singenberger, who was the sole director.

5    Q     Did you -- do you know who Beda Singenberger is?

6    A     The sole director.  That's . . . .

7    Q     That's your knowledge?

8    A     That's literally all I know about him.

9    Q     Did you ever deal with Mr. Singenberger?

10   A     No.

11   Q     Did you ever meet with him?

12   A     No.  He was not in the country.

13   Q     Did you ever speak to him on the phone?

14   A     I don't believe I did.

15   Q     Now, if we can turn to Page 87.

16             (An exhibit was projected onto the projector screen.)

17   Q     Schedule A, does this list out the number of shares

18   owned by the various shareholders?

19   A     Yes.

20   Q     And I think we talked about, earlier, that Dr. Fredrick

21   had 250 shares --

22   A     Yes.  That was incorrect.  It's 1,750; yes.

23   Q     And New Vanguard had 20,000?

24   A     Yes.

25   Q     And the Cuthwin Lake that you referenced, he had 250?

1    A       Right.

2            MS. FINLEY:  Now, if we can turn to Exhibit 10C.

3            (An exhibit was projected onto the projector screen.)

4    Q       Is this the purchase agreement for the Saba School of

5    Medicine Foundation?

6    A       Yes.

7    Q       And again, the first page lists out the various parties

8    to the agreement; is that correct?

9    A       That's correct.  Saba Management Company BV is a company

10   we formed.  EIC acquisition Corp. is a company that we had

11   formed.  The Foundation is the entity that owned the school.

12   And New Vanguard owned a company that owned some real estate.

13           And EIC here, or Educational International, is their

14   U.S. administrative office.  And Round Hill was the real estate

15   and the –– was owned New Vanguard.

16   Q       If we can turn to 10C, Page 8 . . . .

17           (An exhibit was projected onto the projector screen.)

18   Q       Again, does the top part again list out in more detail

19   who the parties are?

20   A       Yes.

21   Q       Now, if we move down to the middle part of the page,

22   what is your understanding of what Round Hill is?

23   A       Round Hill was a, I believe, a Netherlands Antilles

24   company that owned the property under the school.

25   Q       Do you know who owned Round Hill?

1    A       New Vanguard.

2    Q       Now, you said that The Foundation owned the school.

3    A       Yes.

4    Q       Were you interested in buying The Foundation?

5    A       No.

6    Q       And how . . . .  Can you explain to the jury how you

7    went about, then, purchasing the school; was there a certain

8    entity that needed to be created?

9    A       Yes.  This was actually quite complicated.  The

10   Foundation was an Antillean not-for-profit entity.  And in

11   order to buy assets –– and we wanted to buy the assets out of

12   this entity.  And there was a particular type of transaction

13   that Dutch law recognizes, where Saba is largely governed by

14   Dutch law.  And in translation, it would be a drop-down merger.

15           And what . . . what this entailed was The Foundation

16   dropping all of the assets that were defined in a document,

17   which were all of the assets related to the university, that

18   were owned by The Foundation, dropping those into a new entity,

19   called a –– which was named Saba Dropdown BV, and which was a

20   Netherlands Antilles BV.  And we then, at the close, purchased

21   that entity.  This all happened simultaneously.

22   Q       Now, were you intending to continue the not-for-profit

23   status?

24   A       We didn't have anything to do with it.

25   Q       All right.  And as part of your due diligence, did you

1   want to know about all of the assets The Foundation owned, in

2   order to operate the school?

3   A      We wanted -- our diligence was to try to ascertain what

4   we needed in order to continue the operations of the school

5   that were owned by The Foundation.  And so the documents would

6   focus on that.

7   Q      Do you know whether The Foundation had other assets

8   other than the school?

9   A      There were some things like, there was some cash in

10   the . . . .  The only thing that I think I saw was some cash in

11   some accounts that were excluded.

12   Q      Do you know where those accounts were?

13   A      I can't recall.  There were a variety of accounts.

14   Q      And if we look at Page 91, or . . . .  Is that the

15   guaranty paragraph again, similar to the other ones we saw?

16   A      Yes; same as the others.

17   Q      Now, at the end of the agreement, if we can just look at

18   the signature pages again, there's a lot of signature pages.

19        Were you all sitting together when these things were

20   signed?

21   A      Yes; yes, we were.

22   Q      Okay.  And did . . . did items need to be signed on

23   various pages so some signatures appear on some pages, some

24   appear on other?

25   A      Yes.  And there's a very particular process that we had

1   to go through for signing, because it was subject to Dutch law.

2   And so you have all these –– it's very tedious.  We had to

3   time-stamp every page.  And we were on the phone to

4   Saint Maarten at the same time, and some guy was recording

5   every single page at the time.

6   Q     And were you present with Dr. Hough and Dr. Fredrick

7   when the documents were signed?

8   A     When this . . . .  The closing documents that are time

9   stamped, yes.  The purchase agreement was signed on 2006 . . .

10  on February 14th.

11            MS. FINLEY:  Okay.

12            Your Honor, may I approach?

13            THE COURT:  You may.

14            MS. FINLEY:  I'm going to show you now what's been

15  marked as Exhibit 10F and 11A.

16            (Ms. Finley provides exhibits to the witness.)

17            MS. FINLEY:  Your Honor, at this time the government

18  would offer 10F, as in "frank," and 11A into evidence.

19            MR. HOCHMAN:  No objection, Your Honor.

20            THE COURT:  10F and 11A will be admitted.

21            (Government's Exhibits 10F and 11A were admitted into

22      evidence.)

23            MS. FINLEY:  Your Honor, permission to publish?

24            THE COURT:  You may.

25            (An exhibit was projected onto the projector screen.)

BY MS. FINLEY:

Q      If we can look at 10F first, can you explain to the jury what this document is?

A      This document, called "Flow of Funds Memorandum," is something that most people prepare, most firms like mine prepare, in a closing setting, when you're about to release funds to the various entities that are part of it, and also there are other parties that are involved.  There was a bank involved, for instance, that was called Ares here.  Because there are so many entities and so many parties wiring different funds simultaneously, we actually put together a document that tracks it all.

Q      So this tells who is paying, who is getting paid, and what portion each party is paying.

A      Yes.  This is the most tedious document of all to prepare, because I was very tired at this point.

Q      Was it an important document because it tells who is getting paid and who is not?

A      Most people think it's the most important document.

Q      Okay.  For both parties.  You don't want to pay too much.

A      That's right.

Q      And the seller wants to make sure they're getting all of their money?

A      Yes.  Literally, it has to be balanced to the penny.

1   Q      All right.  So if we can turn to Page 3 --

2          MS. FINLEY:  And this is extremely small, so if we

3   can blow it up and start at the top.

4   BY MS. FINLEY:

5   Q      Does this page detail how much money is getting

6   disbursed for each portion of the deal?

7          (An exhibit was projected onto the projector screen.)

8   A      Page 3 is . . . related to one aspect of the

9   transaction; yes.

10  Q      And what aspect of the transaction is that related to?

11  A      I'm sorry.  Actually, this is the consolidated one.  I

12  didn't get -- I have to travel my eyes down.

13         It refers, generically, to cash to sellers, and it

14  tracks down -- the three and a half million, I . . . I can't

15  remember whether that was part of the MUA transaction or not.

16  We had this definition of excess cash -- do you want me to go

17  through every --

18  Q      No.  I think just -- if we look down at the bottom of

19  the first part, on the Saba purchase agreement, at the end, it

20  says:  "To Saba University School of Medicine Foundation" --

21  A      Yes.

22  Q      How much of the funds, or the apportionment of funds,

23  were they going to get?

24  A      They were going to get $988,997.14.

25  Q      And for New Vanguard, for the Round Hill -- and let me

1   ask you:  Was -- what asset did Round Hill hold?

2   A      They held the land underneath the university.

3   Q      And what amount of the total were they going to get for

4   the land?

5   A      The land price was 33,944,000, even.

6   Q      And if we move down toward the bottom of the document,

7   does that show how much Dr. Fredrick and New Vanguard were

8   going to get for their shares in MUA?

9   A      Yes.  This is the MUA piece of the transaction.  And as

10  you track it down, you can see a gross proceeds to

11  Dr. Fredrick, and then, at the very bottom, it estimates all

12  up, what the net is.

13  Q      And what was the net?

14  A      The total MUA purchase agreement price was, net of all

15  the things that had to be accounted for, 2,541,572.04.

16  Q      And if we turn to Page 4, what was the total purchase

17  price for Saba, MUA, and EIC?

18  A      $37,628,054.53.

19  Q      Now, if we can turn to Page 7 . . . .

20         (An exhibit was projected onto the projector screen.)

21  Q      Can you explain to the jury what the sources at closing

22  is?

23  A      This is the part of this flow-of-funds document where

24  first we define where it's supposed to go, and then we also

25  define who's going to be sending what to where.

1    Q      And are there wire transfer information so that the

2    parties know exactly where to wire the money?

3    A      Yes.  And then there's also some notational entries, as

4    well, that support our beginning balance sheet and how we book

5    the transaction.

6    Q      All right.  And Equinox had various partners who were

7    providing the funding; is that correct?

8    A      That's correct.

9    Q      So were some portions of the deal going to be paid --

10   like for the 33 million for Round Hill, one entity was not only

11   going to pay that, it might have been split up amongst the

12   various buyers?

13   A      That's correct.  Those are generally in that Section 1

14   there.

15   Q      And with respect to the wire transfer information for

16   the sellers, do you know where you got that information from?

17   A      We make a request of the seller representative and their

18   counsel to provide all of the information, "if you want the

19   money, tell us where to send it," you know, that's the old

20   joke.

21   Q      And with respect to the breakdown that we were looking

22   at on Page 4, can you explain to the jury how -- I'm sorry, on

23   Page 3 -- how that came about; is that something that you

24   decide?

25              (An exhibit was projected onto the projector screen.)

1   A     Well, we always like to decide.  We like to make all the

2   decisions.  But it doesn't always work out that way.  The

3   allocation of funds is always a negotiated item in

4   transactions.  And . . . we always want things exactly the way

5   we want, and sometimes we win, and sometimes we don't.  And in

6   this case . . . this was an allocation that was stipulated by

7   the sellers, principally.

8   Q     And was that Dr. Fredrick that made the request for the

9   apportionment?

10  A     Well, he was the one that communicated it, but this --

11  attorneys are involved at this point.  There are a lot of

12  things that are related to what this means for us, and it's a

13  heavily negotiated item.  There are a lot of people negotiating

14  this.

15  Q     At the end of the day, for your firm, did you look at

16  this as a package deal?

17  A     Yes.  At the end of the day, we had . . . .  For our

18  going-forward tax position, it matters where the money is

19  allocated.  And so, to the extent permissible, we try to get

20  things skewed exactly to our advantage.  But, at the end of the

21  day, sometimes you trade off that position for what you

22  perceive to be the total value.  And in this case the total

23  value merited a less than optimal . . . allocation from our

24  perspective.

25  Q     Were there any portions of the allocation that were

1   particularly difficult for negotiations?

2   A      The land was . . . the amount going to Round Hill was

3   always a problem . . . unfortunately for us.

4   Q      And that was a -- was that an item that the sellers

5   didn't want to budge on?

6   A      That, and others; yes.

7   Q      Now, if we can look just briefly with respect to

8   Exhibit 11A, is this the master indemnification agreement that

9   you were referring to?

10  A      Yes; yes, it is.

11  Q      And does this lay out, in detail, the guaranty that

12  Dr. Fredrick and Dr. Hough provided as part of the deal?

13  A      This lays out, in detail, the items that they were --

14  that were subject to guaranty.

15  Q      And if we look at Exhibit-- Page 18, do Dr. Fredrick and

16  Dr. Hough sign this agreement?

17         (An exhibit was projected onto the projector screen.)

18  A      Yes; yes, they did.  And that was at our request, again.

19  Q      I am going to show you what's been marked as

20  Exhibit 11B, 11E, and 11F -- E, as in "Edward"; F, as in,

21  "Frank" -- I'm sorry -- B, as in "boy"; E, as in, "Edward"; F,

22  as in "Frank."

23         MS. FINLEY:  Your Honor, may I approach?

24         THE COURT:  You may.

25         MS. FINLEY:  Your Honor, at this time the government

1    would offer Exhibit 11B, as in "boy"; 11E, and 11F into

2    evidence.

3              MR. UDOLF:  No objection.

4              THE COURT:  11B, E, and F will be admitted.

5              (Government's Exhibits 11B, 11E, and 11F were

6         admitted into evidence.)

7              MS. FINLEY:  Permission to publish?

8              THE COURT:  You may.

9              (An exhibit was projected onto the projector screen.)

10   BY MS. FINLEY:

11   Q     Now, if we start with 11B, and turn to the second page,

12   as part of these purchase agreements, are there disclosure

13   schedules?

14   A     Yes.

15   Q     And what are disclosure schedules?

16   A     Generally speaking, disclosure schedules are an

17   opportunity for sellers to disclose things that may be at odds

18   with the representations that are made, so it's their . . .

19   they may be -- the way we generally write our representations

20   are . . . tell me a certain -- whether something or not is

21   true, and it may be true except for this one thing.

22        And the disclosure schedules, the way this document is

23   prepared, these would generally be the things that were the

24   exception to that representation, or they just may be lists of

25   things that were required to be disclosed in the document.

1          MS. FINLEY:  So if we could turn to Page 6 of the

2   disclosure schedule . . . .

3          (An exhibit was projected onto the projector screen.)

4   BY MS. FINLEY:

5   Q     And if we can look at the item under Schedule 5.10, can

6   you explain to the jury what this item is disclosing?

7   A     Schedule 5.10, there was probably a representation made,

8   in Section 510, that would provide for a Schedule 5.10, of

9   which this is it, and it would probably have been a

10  representation about, is there any litigation against MUA,

11  and . . . and this schedule, here, these items here would be

12  the exceptions to the statement that, is there any litigation

13  threatened or pending.

14  Q     Now, under the first item, does it state that a student

15  was dismissed for cheating, and had requested monetary damages

16  of $42,095, plus costs?

17  A     Yes.

18  Q     And that litigation was not concluded at that point.

19  A     No.

20  Q     And the next item, is that the St. Matthew's litigation?

21  A     Yes.  That would have been related to that.  That was a

22  matter that was filed in Nevada.

23         MS. FINLEY:  Now, if we can turn to Exhibit 11E.

24         (An exhibit was projected onto the projector screen.)

25

```
 1   BY MS. FINLEY:
 2   Q     Who is listed as the -- on the board of directors for
 3   MUA?
 4   A     The individuals listed here, Dr. Fredrick, Dr. Hough,
 5   Mr. Singenberger, and --
 6              MR. HOCHMAN:  Objection, Your Honor, misstates
 7   that -- it's MUA, it's actually MUA Limited, it's Ltd.
 8              THE COURT:  All right.
 9   BY MS. FINLEY:
10   Q     Is this MUA Limited; that's what the top says?
11   A     Yes.  And this would have been board of directors of a
12   corporate entity, MUA Limited.
13   Q     Do you know who Laura Whitley is?
14   A     Actually, I don't.
15   Q     Now, if we turn to the second page of 11E, who is listed
16   on the board of trustees for MUA?
17   A     The board of trustees of -- this would be the school
18   board . . . MUA board of trustees:  Dr. Cardell Rawlins,
19   Mr. Elvin Bailey, Dr. Jesse Lewis, Mr. Rex Pitts, and Dr. Ed
20   McAloon.
21   Q     Is that M-C capital-A-L-O-O-N?
22   A     Yes.
23   Q     And do you know any of these people?
24   A     I know Dr. Rawlins.  I know . . . I met Mr. Pitts one
25   time.  And the others I do not know.
```

1    Q       Do you know whether Mr. Pitts has any familial

2    relationship to Dr. Fredrick or Dr. Hough?

3    A       I think that Mr. Pitts may, through marriage, be related

4    to Dr. Hough, I think.

5               MS. FINLEY:  Now, if we look at Exhibit 11E . . . .

6               (An exhibit was projected onto the projector screen.)

7               MS. FINLEY:  I'm sorry.  I meant 11F.  I apologize.

8               (An exhibit was projected onto the projector screen.)

9    BY MS. FINLEY:

10   Q       Are these the shares –– Arthur Andersen, is this the

11   shares certain for Medical University of the Americas Limited?

12   A       This is actually the annual return, which lists the

13   shareholdings.  You're required, in the federation, to do this

14   every year.

15   Q       And if we turn to the second page, does it list out who

16   the directors of the company are?

17   A       Yes.  This is a further part of the annual return, which

18   you're required to provide every year.  And the directors ––

19   and this is an annual return for the company, Medical

20   University of the Americas Limited.  And the Section 8 would be

21   for the directors.

22   Q       Now I'm going to show you what's been marked as

23   Exhibit 11J, 11K, and 11L.

24               MS. FINLEY:  Your Honor, may I approach?

25               THE COURT:  You may.

1          MS. FINLEY:  May I approach freely?

2          THE COURT:  Yes.

3          MS. FINLEY:  Your Honor, at this time the government

4    would offer Exhibit 11J, 11K, and 11L into evidence.

5          MR. HOCHMAN:  No objection.

6          THE COURT:  11J, K, and L will be admitted.

7          (Government's Exhibits 11J, 11K, and 11L were

8       admitted into evidence.)

9          MS. FINLEY:  Permission to publish?

10         THE COURT:  You may.

11   BY MS. FINLEY:

12   Q     If we turn to Exhibit 11 J . . . .  As part of the deal,

13   did you need written acknowledgment that the shareholders were

14   accepting the deal?

15         (An exhibit was projected onto the projector screen.)

16   A     Based on the way . . . it was structured, this was

17   structured -- this part of the transaction was structured as a,

18   quote/unquote, takeover bid, which is a legal term in

19   Saint Kitts and Nevis.  And . . . and the signatures confirmed

20   their acceptance; yes.

21   Q     And if we turn to Page 2 on 11J, is that

22   Mr. Singenberger signing to accept the takeover --

23   A     Yes.

24   Q     -- as the director of New Vanguard?

25   A     Yes.

1    Q      Now, if we can turn to 11K, did you also need written

2    consent of the board of directors for Medical University of the

3    Americas Limited?

4    A      It's customary to get unanimous written consent.  And

5    this was more our requirement, again.

6    Q      And if we turn to Page 5 of 11K, on this page, who

7    signed as the director acknowledging their consent?

8    A      On Page 5, we have Dr. Fredrick and Dr. Hough.

9    Q      And if we turn to Page 6, who signs on Page 6?

10   A      Beda Singenberger.

11   Q      Now, if we turn to Page-- sorry, Exhibit 11L, I guess --

12   did you also need the sole consent of the director for New

13   Vanguard?

14          (An exhibit was projected onto the projector screen.)

15   A      Yes.

16   Q      And if we turn to Page 4, is that Mr. Singenberger as

17   well?

18   A      Yes, it is.  He was the sole director.

19   Q      Okay.  I'm just going to show you one more document.  I

20   can show you Exhibit 11Q.

21          MS. FINLEY:  Your Honor, at this time the government

22   would offer Exhibit 11Q into evidence.

23          MR. HOCHMAN:  No objection.

24          THE COURT:  11Q will be admitted.

25          (Government's Exhibit 11Q was admitted into

1        evidence.)

2                MS. FINLEY:  Permission to publish?

3                THE COURT:  You may.

4                (An exhibit was projected onto the projector screen.)

5    BY MS. FINLEY:

6    Q     You said that that portion of the MUA deal was the land,

7    and you said that New Vanguard Holdings owned the land.

8                Do you have a recollection of this document?

9                (An exhibit was projected onto the projector screen.)

10   A      This was a letter concerning . . . Hillside properties,

11   which we . . . there was a clarification in a previous document

12   as to who the owner was, of 60 percent of the shares, and this

13   document clarified.

14   Q     And if we look at the third paragraph -- is this letter

15   from you?

16   A      Yes.  This is -- this is a letter from Equinox Capital,

17   requesting of Dr. Fredrick, who may have signed a

18   representation about the ownership of 60 percent of the shares

19   of Hillside properties, what . . . it was . . . inappropriately

20   referred to as being owned by one entity, and this clarified it

21   and corrected it.

22   Q     All right.  And if we look at the third paragraph, what

23   is the correction, if you could read that to the jury?

24   A      "You hereby advise Equinox that New Vanguard Holdings

25   owns 100 percent of the issued and outstanding equity

1  securities of MTA, for the purchased MTA shares.  You hereby

2  represent and warrant that you are authorized signatory of MTA,

3  and MTA owns 60 percent of the issued and outstanding capital

4  interests of Hillside."

5  Q      Did you know what MTA was?

6  A      It was Medical Technology Associates.

7  Q      Did you know who owned Medical Technology Associates?

8  A      No.

9          MS. FINLEY:  All right.  Now, if I could show you

10  Exhibits 11S, as in "Sam;" 11U; and 11Z, as in "zebra."

11          (An exhibit was projected onto the projector screen.)

12  BY MS. FINLEY:

13  Q      Now, you said that the initial -- I am just going to

14  take a step back for a second.

15          The initial meeting with Dr. Fredrick, the "back of the

16  napkin" deal, that was in September of 2006?

17  A      Yes.

18  Q      And then, in February of 2007, the parties signed the

19  purchase agreement.

20  A      Correct.

21  Q      And when did the deal actually close?

22  A      April 3rd, 2007, I believe.

23          MS. FINLEY:  Your Honor, at this time the government

24  would offer Exhibits 11S, 11U, and 11Z into evidence.

25          MR. HOCHMAN:  No objection, Your Honor.

1          THE COURT:  Exhibits 11S, U, and Z will be admitted

2   into evidence and may be published.

3          (Government's Exhibits 11S, 11U, and 11Z were

4       admitted into evidence.)

5          MS. FINLEY:  Perfect.

6   BY MS. FINLEY:

7   Q      These are the disclosure schedules for the purchase

8   agreement for Saba; is that correct?

9   A      Yes; that's correct.

10  Q      And if we can turn to Page 8 . . . .

11         And again, in the section -- or the Schedule 5.10,

12  dealing with litigation, is the first item, again, the

13  St. Matthew's litigation?

14  A      Yes, it is.

15  Q      And what is the second item?

16  A      This was an employment matter.  One of the maintenance

17  staff had been terminated, and there was an item that was under

18  discussion here, that's enumerated.

19  Q      And how much was he asking for, the employee?

20  A      $8,500, according to the schedule.

21  Q      Now, if we can turn to Page 11 of Exhibit 11S, under

22  Schedule 5.20, can you read the middle paragraph -- the middle

23  item -- I'm sorry, the second item.  I apologize.

24  A      The second item?

25  Q      Yes.

1    A        "Dr. David Fredrick owns approximately 55 percent of

2    Hillside Properties, which houses students in 24 rooms.

3    Promissory note dated April 1, 2005, by Hillside Properties,

4    Inc., as borrower, for 1,068,897."

5    Q        Now, this disclosure schedule was part of the purchase

6    agreement in February of 2007; is that right?

7    A        That's right.

8    Q        And the letter that we looked at just previously, I

9    think in 11Q, that letter concerning the ownership of Hillside

10   Properties was dated April 3rd, 2007.

11   A        That's correct.

12   Q        So is that letter clarifying what was in the

13   disclosures?

14   A        Yes.  That was probably the genesis of it.

15   Q        Now, if we can turn to Page 13, under Schedule 7.5, what

16   was Round Hill's purpose?

17   A        Round Hill owned real estate, and did nothing else other

18   than own real estate.  It didn't have any other operations.

19   Q        Now, if we can turn to Page 14, and if we could start in

20   Schedule 7.7 . . . .

21            How many acres was Round Hill?

22   A        It says here, on Schedule 7.7, that Round Hill owns

23   approximately 10 acres on the Island of Saba.

24   Q        And if we turn to Schedule 7.8, is SSUM, does that stand

25   for Saba School -- Saba University School of Medicine?

1    A      It's the Saba School of Medicine.  I don't know why we

2    did it SSUM.  We never do it now.

3    Q      And if you could read that to the jury.

4    A      "SSUM occupies the campus without a lease and rent free

5    from Round Hill.  A lease by Round Hill and Laura Ashley Walls,

6    daughter of David Fredrick, dated February 2, 2001, was

7    terminated."

8    Q      And if we move down to Schedule 7.19, could you read

9    that paragraph?

10   A      "Dr. Pat Hough and Dr. David Fredrick were prior owners,

11   directors, and officers, and sold their shares of Round Hill to

12   New Vanguard, and resigned as officers/directors as of such

13   date of sale.  Round Hill originally purchased the Round Hill

14   property from Laura Walls, the daughter of Dr. David Fredrick.

15   SSUM occupies the campus without a lease and rent-free from

16   Round Hill."

17   Q      And under Schedule 7.20, who has sole authority to sign

18   for Round Hill?

19   A      It says Beda Singenberger has sole authority to sign,

20   pursuant to power of attorney.

21   Q      Now, if we can turn to Exhibit 11U, is this a similar

22   written consent of the board of trustees of Saba School of

23   Medicine Foundation?

24   A      Yes.

25   Q      And if we turn, starting on Page 6, do the various board

1   members sign, authorizing the sale?

2   A     Yes; they're all signing.  They're not in the same place

3   at the same time, so we're sending it all to where they are.

4   Q     And if we can turn to Exhibit Z . . . .

5         (An exhibit was projected onto the projector screen.)

6   Q     Is this a power of attorney for Round Hill?

7   A     Yes.

8   Q     And who is Round Hill giving power of attorney to?

9   A     "I hereby grant full power of attorney to Dr. David Leon

10  Fredrick."

11  Q     And if we can turn to the second page of 11Z, who is

12  signing as the director of Round Hill Project Holding Company?

13  A     Dr. David Fredrick.  And Dr. Patricia Hough.

14  But . . . .  Were there two Round Hills here?

15  Q     Do you remember there being two Round Hills?

16        Is that -- is that power of attorney inconsistent with

17  the information we read in the disclosure schedule, in the

18  previous exhibit, that they had resigned?

19        MR. HOCHMAN:  Objection as to the timing of the

20  resignation, Your Honor; vague as to the timing.

21        MS. FINLEY:  Your Honor, I'll clarify.

22        THE COURT:  All right.

23        MS. FINLEY:  If we can turn back to Exhibit 11S.

24        (An exhibit was projected onto the projector screen.)

25

1   BY MS. FINLEY:

2   Q     And if we look at the first page -- or on the second

3   page, these are the disclosure schedules dated February 14th,

4   2007; is that right?

5   A     Yes.

6   Q     All right.  And we can go back to Page 14 . . . and

7   Schedule 7.19.

8         Does it say there that -- at least with respect to an

9   entity described here as Round Hill, that Dr. Fredrick and

10  Dr. Hough had resigned as officers and directors as of the date

11  that they sold their shares in Round Hill?

12  A     Yes.  That's what it says here.

13  Q     Do you know when they sold their shares?

14  A     No.

15  Q     And if we go back, then, to Exhibit 11Z, the power of

16  attorney, at least with respect to an entity named Round Hill

17  Project Holding Company, on April 5th and April 3rd, 2007, are

18  Dr. Hough and Dr. Fredrick signing as directors?

19  A     Yes, they're signing as directors.

20  Q     And if we turn to the third page of 11Z, does

21  Mr. Singenberger also sign?

22  A     Yes, he does.

23        MS. FINLEY:  Now I'm going to show you what's been

24  marked as Exhibit 11AA; 11BB, as in "boy"; and 11CC.

25        (Ms. Finley provides exhibits to the witness.)

1          MS. FINLEY:  Your Honor, at this time the government

2     would offer 11AA, 11BB, and 11CC.

3          MR. HOCHMAN:  No objection, Your Honor.

4          THE COURT:  11AA, BB, and CC will be admitted and may

5     be published.

6          (Government's Exhibits 11AA, 11BB, and 11CC were

7       admitted into evidence.)

8          MS. FINLEY:  Thank you, Your Honor.

9          Now, if we can actually turn to Exhibit 11BB first.

10         Permission to publish?

11         THE COURT:  Yes.

12    BY MS. FINLEY:

13    Q     And if we look at the first page of 11BB, is this a

14    letter to Dr. Hough from an attorney, dated July 22nd, 2004?

15         (An exhibit was projected onto the projector screen.)

16    A     Yes, it is.

17    Q     And enclosed with the letter is a certified registered

18    copy of the deed of conveyance for the Round Hill real estate;

19    that's what the letter says?

20    A     Yes.  Yes, that's what it says.

21    Q     And so if we can turn to Page 2.

22    A     Okay.

23    Q     Can you tell what date is listed at the top of the page?

24    A     On June 22nd, 2004, at 10:30 a.m.

25    Q     And who is the seller?

1   A       It is Mrs. Laura Ashley Whitley.

2   Q       And in Paragraph 2, who is the buyer?

3   A       Round Hill Project Holding Company N.V.

4   Q       And did -- here it states Mrs. Patricia Hough granted

5   the power of attorney in her capacity as managing partner for

6   Round Hill; is that what the document says?

7   A       Yes.  Yes, it is.

8   Q       And if we can turn to Page 11BB -- I'm sorry --

9   Exhibit 11BB, Page 3 . . . and toward the middle of the page.

10          How much did Round Hill Project Holding Company purchase

11  the property from Ms. Whitley for?

12              (An exhibit was projected onto the projector screen.)

13  A       $30,260.

14  Q       Is that the Netherlands Antilles currency?

15  A       That's -- yeah.

16  Q       And above that does it say 17,000?

17  A       Yes.  17,000, yeah, that's in -- that's Dutch Flanders.

18  And, yeah, 17,000 U.S.

19  Q       And if we can turn to Exhibit AA, are these documents

20  being provided to you so that you know who holds legal title to

21  the property?

22  A       We would have reviewed these to track the history of the

23  property, and where -- you know, to the extent it was recorded.

24  And these are all things that are just recordings that take

25  place in the jurisdiction.

1   Q       All right.  If we can turn to Exhibit 11AA . . . .

2           And what are these documents, or what is this document?

3   A       11AA says it's a shareholders board meeting for Round

4   Hill Project Holding.

5   Q       And what is the date?

6   A       February 8th, 2005.

7   Q       And what members are present?

8   A       It says that Dr. David Fredrick and Dr. Patricia Hough

9   are present.

10  Q       And if we look under the new business agenda, Item

11  Number 1, did Dr. Fredrick present a proposal from New Vanguard

12  to purchase 100 percent of the shares of Round Hill for

13  $500,000?

14  A       Yes, that's agenda Item Number 1.

15  Q       And did Dr. Hough, according to the document, discuss

16  the implications of the sale on the -- that it would have on

17  the buildings and the -- occupied by the school?

18  A       Yes.  The minutes reflect that Dr. Hough discussed any

19  implications the sale of shares would have on the buildings

20  occupied by Saba University School of Medicine.

21  Q       And if we look down to the -- that next paragraph, the

22  last full sentence, what was the date for the transfer -- what

23  date was the transfer of shares scheduled for?

24  A       Date for transfer of shares is scheduled for April 15,

25  2005.

1    Q       Now, if we can turn to Exhibit 11CC, and if we can look

2    at the first page of 11CC, is this a ratification and transfer

3    agreement relating to Round Hill Project Holding Company

4    between David Fredrick and Patricia Lynn Hough, as the sellers,

5    and New Vanguard Holdings Limited, as the buyer?

6    A       Yes.

7    Q       And is it dated April 3rd, 2007?

8    A       Yes, it is.

9    Q       And the meeting minutes that we just looked at said that

10   the shares were actually transferred in April of 2005; is that

11   right?

12   A       Yes.  One moment, please.

13           (The witness examines an exhibit.)

14   A       I'm not sure that this is in conflict, because whereas

15   below it says by private deed dated April 15th.  So the time

16   lines are accurate with the others.

17   Q       But the transfer agreement appears not to have been

18   executed at the time of the sale.  So this -- this document was

19   created afterwards to reflect what had happened previous.

20           MR. HOCHMAN:  Objection, leading.

21           THE COURT:  Sustained.

22   BY MS. FINLEY:

23   Q       Does it appear that this document was created afterwards

24   to reflect what previously happened in the minutes?

25           MR. HOCHMAN:  Objection, leading, again.

1            THE COURT:  You need to stand to make objections,

2    first of all.

3            MR. HOCHMAN:  Oh, I'm sorry.

4            Objection, leading, again, Your Honor.

5            THE COURT:  The objection is sustained.

6    BY MS. FINLEY:

7    Q      And if we turn to the third page of the exhibit, does

8    David Fredrick and Patricia Hough sign the document?

9    A      Yes, they do.

10   Q      And Dr. Fredrick signs for New Vanguard?

11   A      He signs as duly authorized attorney in fact; yes.

12   Q      And he also signs as the attorney in fact for Round

13   Hill?

14   A      Yes, that's correct.

15   Q      And you said earlier that, when you actually executed

16   the final documents, are these the time stamps that you're

17   referring to?

18   A      Yes.  This is the notarial process.

19   Q      Now, are you familiar with an individual named John

20   Nekic?

21   A      Yes, I am.

22   Q      How are you familiar with John Nekic?

23   A      He was an employee of one of the U.S. administrative

24   offices, and . . . he worked principally for the operations of

25   Medical Universities of the Americas from out of Massachusetts.

1   Q      And after the sale was executed, did you keep on some of

2   the employees?

3   A      Yes.  Most.

4   Q      Did you keep on Dr. Nekic?

5   A      For a while.

6   Q      And did there come a time that you let him go?

7   A      He was eventually . . . let go, yes.

8   Q      Why was that?

9   A      He did not have the skills that we needed to move

10  forward with in the position that he held under the former

11  administration.

12  Q      Now, after you purchased the schools in 2007, was Saba

13  School of Medicine going to start a program, an academic

14  program, in Greenville, North Carolina?

15  A      When we –– I'm sorry, what was the timing of that?

16  Q      After 2007, was the Saba –– or April of 2007, was the

17  Saba School of Medicine going to start an academic program in

18  Greenville, North Carolina?

19  A      Not to my knowledge.

20  Q      And did the board . . . .  Did you become a member of

21  the board of the Saba School of Medicine?

22  A      I am the . . . I'm on the board of directors for the

23  corporate entity that owns Saba University School of Medicine,

24  and I am a secretary to the board of trustees to Saba

25  University School of Medicine itself.

1    Q       And is Dr. Dalbec on that board?

2    A       Dr. Dalbec is . . . is chairman of the board of trustees

3    of Saba University School of Medicine.

4    Q       And after the time that you purchased the school, did

5    Dr. Fredrick or Dr. Hough ever come back to the board of

6    trustees requesting money for a home to be purchased in

7    Greenville, North Carolina?

8    A       Not the board of trustees of Saba University School of

9    Medicine, no.

10              MS. FINLEY:  Your Honor, may I have a moment?

11              THE COURT:  You may.

12              (Ms. Finley confers with Ms. Kessler privately.)

13              MS. FINLEY:  I have no further questions, Your Honor.

14   Thank you.

15              THE COURT:  Let's take a morning recess.  About 15

16   minutes.

17              Please do not discuss the case among yourselves, or

18   allow anyone to discuss it with you or in your presence.

19              Fifteen minutes.

20              (At 10:36 AM, the jury was escorted from the

21      courtroom.)

22              THE COURT:  All right.  Fifteen minutes.

23              MR. HOCHMAN:  Thank you, Your Honor.

24              (At 10:36 AM, court was recessed.)

25                      AFTER RECESS

1              (At 10:54 AM, court was reconvened.)

2              THE COURT:  Both sides ready for the jury?

3              MR. HOCHMAN:  Yes, Your Honor.

4              I think the government wanted to offer some

5    additional exhibits that it is not going to publish?

6              MS. FINLEY:  There are a handful that I would just

7    like to read into the record now.  I am not publishing them.  I

8    would read them into the record now.

9              THE COURT:  Okay.

10             MS. FINLEY:  Do you want me to do it now or in front

11   of the jury?

12             THE COURT:  Whatever you want to do.

13             MS. FINLEY:  Okay.  I'll just do it in front of the

14   jury.

15             THE COURT:  Okay.

16             Have the jury step in, please.

17             And if we can retrieve the witness?

18             (The witness returned to the witness stand.)

19             (At 10:55 AM, the jury was escorted into the

20        courtroom.)

21             THE COURT:  Ms. Finley, you may proceed.

22             MS. FINLEY:  The government just wanted to offer into

23   evidence the following exhibits:  Exhibit 11H; 11I; 11N, as in

24   "Nancy"; 11O; 11P; 11R; 11V, as in "Victor"; 11W; 11X; 11Y;

25   11DD; 11EE; 11FF; 11GG; 11HH; 11II; and 11MM, as in "Mary."

1          MR. HOCHMAN:  No objection, Your Honor.

2          THE COURT:  All right.  Each of those exhibits will

3   be admitted.

4          Do you need me to go through them again, Deputy?

5          THE COURTROOM DEPUTY:  No.

6          THE COURT:  No?  Okay.

7          (Government's Exhibits 11H, 11I, 11N, 11O, 11P, 11R,

8      11V, 11W, 11X, 11Y, 11DD, 11EE, 11FF, 11GG, 11HH, 11II,

9      and 11MM were admitted into evidence.)

10         THE COURT:  And you may proceed with cross.

11         MR. HOCHMAN:  Thank you very much, Your Honor.

12                      CROSS EXAMINATION

13   BY MR. HOCHMAN:

14   Q     Good morning, Mr. Rodger.

15   A     Good morning.

16   Q     I would like to discuss your background first, before we

17   go through the eight to nine feet of documents.

18   A     Sure.

19   Q     You originally have a bachelor's of arts degree from the

20   University of Virginia; is that correct?

21   A     Yes.

22   Q     And you then had a master's degree from Harvard

23   University; is that correct?

24   A     Yes.

25   Q     Are you aware of whether or not Dr. Hough has a master's

1    of business administration from Harvard or any other

2    university?

3    A      I am not aware of that, no.

4    Q      You worked in the investment banking department of

5    Donaldson, Lufkin & Jenrette Securities Corporation; correct?

6    A      That's correct.

7    Q      How long did you work there for?

8    A      Approximately two years.

9    Q      What did you do there?

10   A      I reviewed -- I was a financial analyst and reviewed the

11   financials, principally, of companies that were clients of the

12   firm.

13   Q      And that's one of the top firms in, what, investment

14   banking in the United States?

15   A      It was at the time; yes.

16   Q      And you also worked in the mergers and acquisition

17   department of Bear, Stearns & Company; is that correct?

18   A      That's correct.

19   Q      And Bear, Stearns & Company was one of the top companies

20   of its stature at the time as well; is that correct?

21   A      Yes.

22   Q      And then you worked as a principal in the private equity

23   firm of Bessemer Securities Corporation; is that right?

24   A      That is correct.

25   Q      You have 21 years of private equity investment

1   experience; is that about right?

2   A     That's about right.

3   Q     And you were then the founding partner of Equinox

4   Capital; is that correct?

5   A     Yes.

6   Q     You founded it in 1996?

7   A     Yes.

8   Q     So it has been in existence approximately 17 years at

9   this point?

10  A     Yes, that's correct.

11  Q     And you are responsible for the firm's investment

12  activities, resource allocation, portfolio oversight, and

13  administration; is that correct?

14  A     That's correct.

15  Q     Now, Dr. Hough, to your knowledge, has no investment

16  banking or private equity experience; correct?

17  A     No.  To my knowledge, she does not.

18  Q     And Dr. Fredrick also has no private equity or

19  investment banking experience to your knowledge; is that

20  correct?

21  A     That's correct.

22  Q     Now, with all your extensive experience in doing deals

23  over the past 21 years, do you still rely on other

24  professionals to help you with those deals?

25  A     That's correct.

1   Q      And for instance, you rely on lawyers to help you with

2   the legal aspects of a deal; is that correct?

3   A      Yes, with the legal documentation.

4   Q      Now, you've dealt with a number of legal documents in

5   every single deal over the last 21 years; correct?

6   A      Yes, definitely.

7   Q      So why do you still rely on lawyers for each deal if

8   you've already dealt with these legal documents in each and

9   every deal?

10  A      Each deal is different.

11  Q      And each deal has unique legal aspects to it; is that

12  correct?

13  A      Every deal has . . . is different in many respects,

14  and . . . .  The law is different in different jurisdictions,

15  and . . . can't just copy the previous document and submit it

16  again as being applicable to the next.

17  Q      So even though you have 21 years of experience in

18  private equity investing, you still have to rely on lawyers for

19  the legal aspects of each one of these deals; correct?

20  A      Yes, for the legal aspects.

21  Q      Because you're not a lawyer; is that correct?

22  A      I'm not a lawyer.

23  Q      And with respect to different parts of the deal -- like,

24  for instance, you said the Saba and MUA deal had issues dealing

25  with foreign law; is that correct?

1    A      That's correct.

2    Q      So you couldn't just hire a U.S. lawyer that knows

3    nothing about Dutch or West Indies law; correct?

4    A      No.  A U.S. lawyer would know about U.S. law.

5    Q      So for this deal, for instance, you'd want to hire a

6    U.S. lawyer for the U.S. law; correct?

7    A      That's correct.

8    Q      A Dutch lawyer, or Saint Maarten lawyer, for Dutch law;

9    correct?

10   A      It was a little more complicated with Saba, because we

11   were trying to figure out who was really in charge.  But

12   that . . . we definitely were looking for local expertise and

13   local knowledge.

14   Q      Same thing with the island of Nevis; correct?

15   A      Nevis was simpler.  It was clear who was in charge

16   there.

17   Q      How many lawyers did you have working on this deal at

18   any one point?

19   A      Well, since it involved banks, and . . . and not just

20   our own money, and others, at one point or another,

21   probably . . . probably a team of 50.

22   Q      A team of 50 lawyers working on this deal, bringing

23   their expertise to bear to help you complete it; correct?

24   A      Yes.  And the bills to pay for it; yes.

25   Q      All right.  And because you don't have their expertise,

1    you had to rely on their expertise in this deal; correct?

2    A      With respect to legal matters; yes.

3    Q      And the same thing, for instance, with accounting:  If

4    you had certain accounting questions, would you rely on an

5    accountant to answer those questions; correct?

6    A      To the extent that we were looking for accounting

7    guidance, yes.  It's different in the accounting piece of

8    things than it is with respect to legal.

9    Q      Now, you try to anticipate all the questions that you

10   can ask the lawyers, but sometimes you even require the lawyers

11   to tell you about stuff that you don't know about; correct?

12   A      My view is that I have to watch my lawyers very

13   carefully.

14   Q      But sometime the lawyers will bring up an issue that you

15   didn't even know how -- you didn't even know to ask the

16   question about because you didn't know it was an issue?

17   A      Well, I rely on them to make sure that I know everything

18   that they know, so that they -- so that I am aware.

19   Q      And so if the lawyer doesn't bring it to your attention,

20   and you don't otherwise know it, you'll never know it; correct?

21   A      If I don't know something, there's no way I'll know it,

22   I agree with that.

23   Q      And again, if the lawyer doesn't bring it to your

24   attention, and you don't already know it, you're not going to

25   know it; correct?

1    A       If it's a legal matter, likely yes.

2    Q       And the same with an accounting matter; correct?

3    A       I wouldn't be looking to my lawyers for accounting

4    advice.

5    Q       With respect to your accountants, the same type of

6    question:  If there is an accounting question that you don't

7    even know exists, and the accountant doesn't bring it to your

8    attention, then you're still not going to know it exists;

9    correct?

10   A       Generally speaking, yes.

11   Q       Now, starting with -- now, in order to do this

12   particular deal, you used various legal entities to do the

13   deal; correct?

14   A       Yes.

15   Q       You created --

16   A       Yes.

17   Q       -- various legal entities in order to do the Saba MUA

18   deal; is that correct?

19   A       Yes.  We had to.

20   Q       Now, why didn't do you all these deals under the name of

21   Steven Rodger?

22           In other words, forget the corporations, Steven Rodger

23   will be the one party that signs all the documents in your

24   individual name; why didn't you do the deal like that?

25   A       I'm not the owner.

1    Q      You're not the owner.

2           You could have done.  I mean, everybody could have given

3    you the ownership, and given you all the money, and put it in

4    your bank account, and you could have wrote the check in your

5    own name, and Steven Rodger would own these schools.

6           That is possible; correct?

7    A      It would be nice if everybody gave me that much money.

8    But, no, nobody's going to just give me the money.  You know,

9    they want an investment.  So we have to form something for them

10   to put the money in.

11   Q      Ah.  So if they gave you -- so you have to actually form

12   corporations in order for the investors to have shares of the

13   corporations to make these deals; is that correct?

14   A      That's one way to do it.

15   Q      And also, if Steven Rodger owned the schools, and the

16   schools were sued, then the people suing could go after all of

17   Steven Rodger's assets; correct?

18   A      If I owned it individually?

19   Q      Yes.

20   A      That could be possible.

21   Q      So isn't it a reason that you set up all these various

22   corporations for asset protection; isn't that one of the

23   reasons?

24   A      Not all the various corporations, no.

25   Q      Isn't the reason you set up many of these corporations

1    for asset-protection reasons?

2    A       No.

3    Q       Well, when you -- you set up more than one corporation,

4    correct, to deal with the Saba MUA deal?

5    A       Yeah.  But that was largely tax driven.

6    Q       Sorry?

7    A       It was largely tax driven.

8    Q       But also you acknowledge that if one corporation, for

9    instance, owns the property, and something happens -- and let's

10   say -- let's say we have one corporation that owns the property

11   in Saba and MUA, and there's an incident that happens in MUA,

12   then they could go after that corporation because it owns both

13   the Saba and MUA properties; correct?

14   A       Now you're talking about the law, and I . . . I

15   can't . . . I don't know if that's true.  It would depend on

16   the nature of the claim, and . . . .  I'm not quite sure . . .

17   we like things neat and tidy, the way they are in this

18   particular situation, and this was for us, and everybody's

19   different.  But for us, in this situation, things were driven

20   largely by tax considerations for us.

21   Q       But you understand that there's an asset-protection

22   reason to setting up multiple corporations, is that correct, in

23   a general realm?

24   A       That corporate -- one corporate veil is enough.

25   Q       One corporate veil is enough.

1   A      I mean, if it's a valid claim, one corporate veil should

2   be enough.

3   Q      In other words, if someone was going to -- we can deal

4   with this in a moment when we deal with some of the lawsuits,

5   but if someone is going to sue a corporation, then the

6   corporate assets of that corporation could all be at stake; is

7   that correct?

8   A      Well, they could be.  But the fact . . . .  My lawyers

9   always tell me, don't sue one person, sue everybody.  So I

10  imagine if I had 35 corporations, and you were my attorney, you

11  would advise me to sue all 35, and we'll figure out who's got

12  the problem later.

13  Q      But again, the reason you'd even begin to set up

14  35 corporations is, the idea is that you can put different

15  assets in different corporations; is that correct?

16  A      I'm not trying to be argumentative.  There are three

17  considerations on corporate structure from my viewpoint.  It's

18  the actual business operations that are being conducted; there

19  are tax considerations; and then there are different legal

20  structures within the . . . within the various places, all

21  three of which govern and will determine what the end result

22  is.

23  Q      And isn't there a fourth consideration, which is

24  liability reasons for a particular corporation?

25  A      Well, that was within my third branch there, yes.

1   Q      Ah.  So your third branch has the liability, or what I

2   call the asset protection; correct?

3   A      It has . . . there are some jurisdictions that are not

4   attractive, and so you might be concerned, yes.

5   Q      Okay.  Is there anything illegal about setting up all

6   the corporations that you created in connection with the

7   Saba/MUA deal, to your knowledge?

8   A      Is there anything illegal?

9   Q      Yes.  Is there anything illegal about setting up all

10  these corporations?

11  A      Absolutely not.

12  Q      Because Equinox -- Equinox has actually been sued over

13  the last five years or so; isn't that correct?

14  A      Oh, yes.

15  Q      And Equinox has set up, in various deals, a variety of

16  corporations like it set up in the Saba/MUA deal; isn't that

17  correct?

18         Yes or no.

19  A      In the past you mean?

20  Q      Yes.

21  A      We've made previous investments and set up other

22  corporations; yes.

23  Q      In fact, in every one of your deals, you set up more

24  than -- you create more than one corporation to deal with that

25  particular deal; isn't that correct?

1    A      Generally speaking, yes.

2    Q      For instance, in a prior deal, you set up Equinox

3    Capital 3 LP, Equinox Capital SBIC, LP, Equinox Partners 3 LLC,

4    Equinox SBIC Partners, LLC and then you have your original

5    Equinox Capital, Inc; isn't that correct?

6    A      That's correct.  Are those are just a . . . our primary

7    investment vehicle.  It's really one enterprise.

8    Q      Now, I'd like to go to -- you testified about a meeting,

9    David Fredrick and Dr. Patricia Hough; do you recall that?

10         Now, when you met Dr. Hough and Dr. Fredrick, you said

11   that that was as a result of your being interested in the Saba

12   school and the MUA school; correct?

13   A      Yes.

14   Q      And you said, at the time, that you had ownership of

15   St. Matthew's school in the Grand Cayman; is that correct?

16   A      Yes.  An investment vehicle that we had set up had

17   purchased that school.

18   Q      And with respect to that investment vehicle, are we

19   talking about the -- just another corporation that you had set

20   up to buy that particular school?

21   A      Yes.  Set up so people could invest in it; yes.

22   Q      And that particular lawsuit was a lawsuit against

23   St. Matthew's against the Saba school; correct?

24   A      I believe so.

25   Q      And that lawsuit was asking for $50 million compensatory

1  damages, and $150 million of punitive damages; is that correct?

2  A     I can't remember exactly, but they were big numbers like

3  that.

4  Q     Does that sound approximately correct?

5  A     Approximately.

6  Q     And when you met with Dr. Fredrick and -- Dr. Fredrick

7  the first time -- and it was Dr. Fredrick, not Dr. Hough the

8  first time; is that correct?

9  A     Absolutely.

10  Q     And at that time, if the -- what we'll call a

11  $200 million lawsuit, 50 compensatory damages, 150 punitive

12  damages, if that lawsuit had been successful, it would have

13  wiped out both Saba and MUA; is that correct . . . based on

14  your knowledge of the finances of Saba and MUA; is that

15  correct?

16  A     If there was a final judgment in that amount?  It

17  wouldn't have been good for them.

18  Q     And "it wouldn't be good for them" means they would have

19  been wiped up; correct?

20  A     I don't . . . .  No.  I don't know.  I can say that that

21  would have been a very, very heavy burden to carry, but I

22  don't -- I don't know that they would have been wiped out.

23  Q     Did you know if they had $200 million to pay for that

24  judgment?

25  A     I didn't know.  I wouldn't know.

1    Q      Well, you're familiar with the finances, aren't you,

2    with respect to the Saba and MUA?

3    A      Yes.  Of what the universities themselves were doing,

4    yes.

5    Q      Did you see anything close to $200 million with respect

6    to the finances for Saba or MUA?

7    A      You mean -- if you're asking, did I have knowledge that

8    they could write a check for $200 million?

9    Q      Could they have written a check for $200 million?

10   A      I wasn't aware that they had $200 million of cash on

11   hand.

12   Q      Right.  So the $200 million judgment, just to make the

13   point, would have wiped out all the finances and assets and

14   everything that Saba and MUA schools had; is that correct?

15           MS. FINLEY:  Objection, argumentative, as to the

16   question.

17           THE COURT:  Sustained.

18   BY MR. HOCHMAN:

19   Q      Now, you would agree, based on your experience, that it

20   would have been normal business practice for these schools,

21   facing a $200 million lawsuit, to engage in asset protection to

22   try and protect their assets; correct?

23   A      I . . . .  I can't say whether that would be normal.

24   And I -- it depends on the merit of the case, and it depends

25   upon each person's individual circumstances, etcetera, and

1    their tolerance for risk.  There are many factors that

2    influence people's decisions to do things.  And the first

3    person I would ask in that instance would be my attorney,

4    whether or not I'm going to lose the case.

5    Q      Okay.  By the way, that case was dismissed, isn't that

6    correct, the St. Matthew's case?

7    A      It is . . . it was dismissed.

8    Q      It was dismissed in connection with the sale of the Saba

9    University and MUA schools to Equinox; correct?

10   A      That's correct.

11   Q      Now, with respect to Dr. Fredrick, you testified, I

12   believe, that he really cared about these schools; is that

13   correct?

14   A      Oh, yes.

15   Q      Is it fair to say that they were part of his soul?

16   A      Dave cared very much about Saba.

17   Q      Is it fair to say, as a description, and I think these

18   are your own words, that they were part of his soul?

19   A      Dave and the university . . . .  He cared more than

20   anything about that university and its success.

21   Q      And Dr. Fredrick and Dr. Hough -- and Dr. Hough also, I

22   think you said, cared about the -- that school and its success;

23   is that correct?

24   A      Oh, definitely.  I mean, they were completely committed

25   to the opportunity and making sure that it was a first-rate

1    place.

2    Q      And both Dr. Fredrick and Hough are very charitable; is

3    that correct?

4    A      I am aware that they are; yes.

5    Q      And through The Foundation, they delivered hospital

6    supplies to remote areas in Central America, and stuff like

7    that; correct?

8    A      I don't know through what -- through what they do it,

9    but I know that they are very charitable all over the world.

10   Q      You and Dr. Fredrick both share an interest in flying

11   private planes; isn't that correct?

12   A      Yes.

13   Q      Do you have a private plane?

14   A      I do.

15   Q      Dr. Fredrick has a private plane; are you aware of that?

16   A      I'm aware that he had access to one.  I don't know who

17   owned it.

18   Q      Did he discuss with you flying in his private plane?

19   A      We always talked -- all pilots talk about flying.

20   Q      Did you ever actually go flying with Dr. Fredrick?

21   A      Only twice.

22   Q      And this would be a plane that he piloted?

23   A      Yes.  Once that he piloted, and once he was in a plane

24   that I was flying.

25   Q      Now, on your financial discussions concerning the

1    Saba/MUA deal, we're with Dr. Fredrick, with the exception of

2    the consulting agreement that Dr. Hough engaged in; is that

3    correct?

4    A    That's correct.

5    Q    And you also said your discussions with Dr. Hough were

6    about academic stuff:  Clinical rotations, the academics on the

7    Saba/MUA campuses, accreditation, stuff like that; is that

8    correct?

9    A    Yes.

10   Q    And you also said, if I recall, in your direct, that

11   Dr. Hough was interested in being able to teach and practice

12   medicine, after she was -- after this sale had gone through in

13   April of 2007; is that correct?

14   A    Yes.

15   Q    And that was the focus of both what she was restricted

16   in, as far as the non-compete goes; is that correct?

17   A    Those were the exceptions to her non-compete that she

18   was allowed to do, those things that she -- that she talked

19   about, you know, practicing clinical medicine.

20   Q    And with respect to Dr. Hough, you actually entered into

21   a consulting agreement with her so that she would actually be

22   available to the schools for a two-year period after the April,

23   2007, sale; is that correct?

24   A    I believe so.

25           MR. HOCHMAN:  Your Honor, may I present what's been

1    marked as Government's Exhibit 1 -- excuse me -- 11KK to the

2    witness?

3              THE COURT:  You may.

4              MR. HOCHMAN:  And also present 11JJ to the witness?

5              THE COURT:  You may.

6              (Mr. Hochman provides exhibits to the witness.)

7    BY MR. HOCHMAN:

8    Q    Let's start with 11KK, if we could.

9    A    Okay.

10             MR. HOCHMAN:  I'd like to move 11KK and 11JJ into

11   evidence, Your Honor.

12             MS. FINLEY:  No objection, Your Honor.

13             THE COURT:  11JJ and KK will be admitted.

14             (Government's Exhibits 11JJ and 11KK were admitted

15        into evidence.)

16   BY MR. HOCHMAN:

17   Q    11KK is the consulting agreement that EIC Acquisition

18   Corporation entered into with Dr. Patricia Hough, dated

19   April 3rd, 2007; is that correct?

20   A    That's correct.

21   Q    And that is the agreement that allowed her -- or

22   that . . . effectively employed her as a consultant for a

23   two-year period -- or actually two 12-month periods after

24   April 3rd, 2007; is that correct?

25   A    Yes.

1   Q       Why did you want Dr. Hough to stay on?

2   A       She knows quite a bit about the universities and their

3   operations.

4   Q       And were you willing to pay her a consulting

5   compensation of $170,000 per year, based on her expertise?

6   A       Yes.

7   Q       And if you could turn to Exhibit 11JJ?

8           Now, not only did you want Dr. Hough to stay on, you

9   wanted Dr. Fredrick to stay on; is that correct?

10  A       That's correct.

11  Q       And so did you enter into -- when I say "you," EIC

12  Acquisition Corporation, did EIC Acquisition Corporation enter

13  into an employment agreement with Dr. Fredrick?

14  A       Yes, we did.

15  Q       And why did you do that?

16  A       Again, very knowledgeable about the operations of the

17  universities.

18  Q       And this was a two-year agreement so that he would work

19  for two 12-month periods back to back --

20  A       Right.

21  Q       -- for the schools; is that correct?

22  A       That's correct.

23  Q       And as part of that, he would be paid $145,000 per year?

24  A       Yes.

25  Q       And he would do, effectively, the same types of duties

1    that he was doing before.

2    A      Yes.  Generally.

3    Q      Now, you said that you, at some point, had to let

4    Mr. Nekic go; is that correct?

5    A      That's correct.

6    Q      But you kept Dr. Paul Dalbec; isn't that correct?

7    A      Yes.

8    Q      And Dr. Paul Dalbec was the chairman of the board of

9    trustees for the Saba school; correct?

10   A      Yes.  That's a non-compensated position.

11   Q      A non-compensated position.

12          Did you find Dr. Dalbec -- did you find his skill level

13   to be up to the task to be the chairman of the board of

14   trustees?

15   A      Paul is a very good chairman of the board of trustees.

16   Q      Paul is an honest person; is that correct?

17   A      To my knowledge, yes.

18   Q      He's got, certainly, knowledge of the schools, having

19   been around them as long as he has?

20   A      Yes.  His experience with the history of the school, and

21   his understanding, and he having gone to an offshore school

22   himself, in his undergraduate medical educational period for

23   himself, all these things were -- you know, make his knowledge

24   base very valuable.

25   Q      And if I can now turn you to -- and we can get into sort

1    of the deal documents.  Start with 10A, if you could.

2    A      Okay.

3           MR. HOCHMAN:  And if we can publish 10A and dim the

4    lights, Your Honor?

5           THE COURT:  You may.

6           (An exhibit was projected onto the projector screen.)

7    BY MR. HOCHMAN:

8    Q      Now, before we actually start marching through these

9    documents, a couple of overview questions.

10          You said that the documents -- if you piled all these

11   documents up, all these agreements was about eight or nine feet

12   of paper; is that correct?

13   A      That's about right.

14   Q      And did you read every word on each page of these eight

15   or nine feet of documents?

16   A      I can't say I've read each and every one, but a good

17   deal of them.

18   Q      Did you prepare, yourself, any of these documents?

19   A      No.  These are all legal documents that are reviewed by

20   counsel on both sides, unless they were related to the

21   financing, which would not have had -- our financing would not

22   have had any involvement with the sellers.

23   Q      So one of those 50 lawyers or so prepared these legal

24   documents that amounted to eight or nine feet of paper;

25   correct?

1    A       All of us had a lot of attorneys, both sides.

2    Q       So when you say, "all of us," that means that on your

3    side you had a lot of attorneys, and also on the Saba

4    school/MUA side, they had a lot of attorneys; is that correct?

5    A       Yes.  It was a . . . even though, in today's world,

6    where people talk about billions all the time, you know, and

7    our $44 million transaction, or whatever it was, was very

8    complex.

9    Q       And you relied, did you not, when you signed your name

10   to these documents, on the lawyers preparing the documents

11   correctly; is that right?

12   A       We exercise our fiduciary responsibilities very

13   carefully when we review what our attorneys have done, and we

14   make sure that our attorneys, to -- the best of our ability, we

15   review what they have done.

16           If you're saying that I blindly signed documents because

17   I paid some somebody some money, that's not what I do for a

18   living.

19   Q       I understand.  Because you have 21 years of investment

20   banking and private equity experience; correct?

21   A       No.  What I do is -- it's helpful to have a lot of

22   experience, so that point would I agree with.  But in terms of

23   me representing my investors, I can only speak for myself, not

24   related to this trial at all, I'm very careful about what I

25   sign, and I quiz and inquiry, and conduct due inquiry, before I

1    sign anything.

2    Q     Very good.

3          And with respect to Dr. Hough, you said that there's

4    certain documents that she signed on April 3rd, 2007; correct?

5    A     Yes.

6    Q     And those would be documents that she signed in a big

7    room; isn't that correct?

8    A     That's correct.

9    Q     And you were in that room; correct?

10   A     Yes.

11   Q     And Dr. Fredrick was in that room as well?

12   A     Yes.

13   Q     Was Beda Singenberger in that room?

14   A     No.

15   Q     And that room was in your lawyer's -- a huge room,

16   probably as big as this courtroom; is that correct?

17   A     It was a big room with a big, long table in it.

18   Q     Like a . . . would it be fair to say that big, long

19   table would have occupied most of this courtroom?

20   A     It would go end to end; yes.

21   Q     And on that table there were these various documents

22   making up the eight to nine feet of documents; correct?

23   A     Yes.

24   Q     And that signing day lasted most of the day, most of

25   April 3rd, 2007; is that correct?

1    A       Yes.  It was a very, very large signature package.

2    Q       And there were lawyers that were present in the room; is

3    that correct?

4    A       Yes.

5    Q       Where else were the lawyers located on that particular

6    signing day?

7    A       I believe that we had a lawyer -- or a notary -- in

8    Saint Maarten, which is . . . a kind of lawyer, to process

9    documents in Saint Maarten that needed to be recorded.

10          And then we had somebody in the Netherlands, as well.

11   And then we just had local counsel.  I don't think we had any

12   need for anybody else, elsewhere in the world.  It was really

13   the Saba part of the transaction that drove the need to have

14   people, not in other parts of the world.

15   Q       And the documents that were signed in -- on April 3rd,

16   that day, they're the ones that also have the time next to the

17   signature; is that correct?

18   A       Yes.

19   Q       And the documents in this packet of documents that are

20   signed that don't have that time stamp, shall we say, they were

21   signed at a different occasion; is that correct?

22   A       This transaction was structured in a sign-and-pause type

23   manner, which is -- the purchase agreements were signed in

24   February.  They had been negotiated and reviewed, and people

25   signed independently.  We weren't in the same room for that.

1   That was large body of the documentation.  But there were

2   certain things that then get closed.  It was the closing part

3   of the transaction where we were all in the same room together.

4   Q      Very good.

5          Now, you've testified about how you go about signing

6   documents.

7          Do you know, one way or the other, whether Dr. Hough

8   actually reviewed each and every word of each and every

9   document that she signed at the time that she signed it?

10  A      I don't know.

11  Q      And do you know whether or not she -- her lawyers

12  explained anything to her before she signed the document; do

13  you know one way or the other?

14  A      I don't know.  I know everybody was --

15  Q      Do you know one way or the other?

16             THE COURT:  Counsel --

17             MR. HOCHMAN:  I'm sorry.

18             THE COURT:  -- don't interrupt his answer, please.

19             MR. HOCHMAN:  I'm sorry, Your Honor.

20             THE WITNESS:  We were all represented by counsel.  I

21  don't know how they conduct their affairs with their counsel.

22  BY MR. HOCHMAN:

23  Q      And with the documents that were signed outside of

24  April 3rd, those are the ones without the time stamp, you don't

25  know one way or the other whether Dr. Hough signed that

1    document and was just presented as a signature to sign, or

2    whether or not she reviewed the document in total, or whether

3    or not it was explained to her.

4         You don't know any of that; correct?

5    A    No, that's not true.

6    Q    Okay.  Let's break it down then.

7         With respect to documents that were signed outside of

8    your presence, you don't know if Dr. Hough signed her name upon

9    a piece of paper that was given to her without reading any

10   other part of the document; correct?

11   A    Well, now, the process is a little different than that.

12   I mean, we had a lot of group calls where we were all on when

13   people were discussing the implications of what we were

14   proposing, or what they were counter-proposing.  So we will --

15   everybody was generally aware of the implications, which --

16   which is why, in all deals, not unique to this deal, in all

17   deals there's a fair amount of . . . at points, you know,

18   arguing about it, because you do know the implications and you

19   don't necessarily like them.

20   Q    You said that Dr. Fredrick was the point person for this

21   deal; correct?

22   A    That's correct.

23   Q    Dr. Hough is not the point person for this deal; is that

24   correct?

25   A    That's correct.

1    Q      So when you're having these conference calls about the

2    deal points, other than her consulting agreement, Dr. Fredrick

3    would have been the point person; correct?

4    A      All except for the guaranties.

5    Q      Okay.  And then with respect to the guaranty, that also

6    would have been an issue that Dr. Hough was involved with, as

7    well; correct?

8    A      Absolutely.  She's a very diligent person about that.

9    Q      Okay.  Let's go through, if we could -- you have

10   Exhibit 10A before you?

11            (The witness examines exhibits.)

12   Q      And if you could turn to the sixth page . . . and if we

13   could focus on the whereas clauses?

14          Do you see the first whereas clause, it says the parent

15   owns 100 percent of EIC's membership interests?

16            (The witness examines an exhibit.)

17   A      Yes, I see it.

18            MR. HOCHMAN:  Could we open up the . . . to do the

19   top half, to get the very top?

20            There we go.  Thank you.

21   BY MR. HOCHMAN:

22   Q      The parent here is Medical Education Group LLC; is that

23   correct?

24   A      That's correct.

25   Q      Because you had said before that you weren't sure what

1    Medical Education Group LLC was, but that was the parent of

2    Educational International Consultants, EIC; correct?

3    A      That's correct.

4    Q      And the last line there of the whereas, it says:

5           "Dr. Hough, as defined below, does not own any EIC

6    interests but has agreed to execute this agreement for the

7    purposes set forth herein."

8           Is that correct?

9    A      That's correct.

10   Q      So in other words, what that means is, she doesn't have

11   any shares of the parent, which is Medical Education Group;

12   correct?

13   A      That's correct.

14   Q      And she doesn't have any shares of the Educational

15   International Consultants, EIC LLC; correct?

16   A      I don't want to be argumentative.  It's the –– "EIC

17   Interests" is a capitalized term, and I would have to look in

18   the definitions of the document what it is, but I don't know

19   that she owns any of that.

20          MR. HOCHMAN:  If we could turn to Page 41 of this

21   document?  And if we could focus on the first paragraph?

22          (An exhibit was projected onto the projector screen.)

23   BY MR. HOCHMAN:

24   Q      This is the non-compete.  You can actually see that, on

25   Page 47.2, is the non-compete for this document.

1          Do you see that?

2               (The witness examines an exhibit.)

3   A     By the way, I just read the definition of "EIC

4   Interests," so your statement was correct.

5   Q     All right.  Thank you.  The statement being that

6   Dr. Hough didn't have any --

7   A     Yes.

8   Q     -- shares of EIC, the . . . of the company known as EIC.

9   A     That's correct.  Sorry.  I caught up with you.  Now I'm

10  back.

11  Q     Page 41, top of the page, if you could.

12  A     Page 41?

13  Q     Page 41, in that lower left-hand corner.

14        Now, Page 41 is the non-compete, and I believe you read,

15  or discussed part of this in your direct testimony.

16        Do you recall that?

17  A     Yes.

18  Q     And this is the non-compete that's identical in each one

19  of these agreements where a non-compete is mentioned; is that

20  correct?

21  A     I believe they're identical; yes.

22  Q     So we'll go over it this one time, and it would be fair

23  to say that, when we go over the definitional section of this,

24  this would apply every time it shows up in any of the other

25  agreements; is that correct?

1    A     That's correct.  I get charged by the word, even though

2    they are the same three times.

3    Q     Very good.

4          So it says here, "for a period commencing on the Closing

5    Date."

6          Now, "the Closing Date" is capitalized; do you see that?

7    A     Yes.

8    Q     And that means that you need to go into what you were

9    saying before, which is the definitional section of the

10   agreement, to find out what "Closing Date" means; isn't that

11   correct?

12   A     Yes.  Unless they cleverly hid it somewhere else, it

13   should be there.

14   Q     And that's because it's very important, is it not, with

15   these agreements, to make sure that everyone is on the same

16   page as to what the definition of a word means; isn't that

17   correct?

18   A     For important things like a closing date, yes.

19   Q     Well, the --

20   A     Yes.

21   Q     I'm sorry, I didn't mean to cut you off.

22         The definitional section of this agreement starts on

23   what we marked as Page 6, and goes all the way to Page 15;

24   isn't that correct?

25              (The witness examines an exhibit.)

1   A      I am getting there with you, but . . . .  And that

2   would -- that's not long, that's just typical for documents of

3   this nature, that things get defined.

4   Q      Sure.  And there are probably over a hundred different

5   defined terms in it; isn't that correct?

6   A      Yes; which is fairly typical.

7   Q      So if someone, a lay person, someone without your level

8   of experience, is reading this document, and it says, "for a

9   period commencing on the Closing Date," you have to know to

10  look in the definitional section in order to find what the term

11  "Closing Date" means; correct?

12  A      Correct.

13  Q      And then it says, "and ending ten years from the Closing

14  Date," and this too has its own definition, called now the

15  restricted period; correct?

16  A      Yes.

17  Q      And the parent, and the only way to figure out who the

18  parent is, is to go back in the definitional section to see who

19  the parent is; correct?

20  A      Correct.

21  Q      "Dr. Hough, Dr. Fredrick, and their respective

22  Affiliates" -- even the word "Affiliates" is -- has a

23  capital A, which means it has its own unique definition too;

24  isn't that correct?

25  A      Yes.

1   Q      And it says:  "Shall not directly or indirectly

2   engage" -- by the way, there any definition of what it means to

3   be indirect -- indirectly engage?

4          Do you see that anywhere in there?

5   A      No.  That's something that lawyers talk about, they seem

6   to understand what it means, so they don't capitalize it.

7   Q      "Engage, participate in, invest in" -- and then if you

8   scroll down a few more words, it says, "in a restricted

9   business."

10         And that too has a definition; isn't that correct?

11  A      Yes.

12  Q      And it says:  "Anywhere in the restricted area."

13         And that, too, has a definitional section for

14  "restricted area"; isn't that correct?

15  A      That's correct.

16  Q      Let's just look very briefly at those two definitions.

17  So I'll turn your attention to Page 14.

18              MR. HOCHMAN:  If we could put 14 up?

19              (An exhibit was projected onto the projector screen.)

20              MR. HOCHMAN:  And focus on the top part, that talks

21  about restricted area and restricted business?

22  BY MR. HOCHMAN:

23  Q      Now, Dr. Hough is being -- it says she's restricted to

24  the restricted area.

25         And I'm sorry, I'll wait till you get there.

1    A        I'm here with you.

2    Q        But then, when you look at the definition of the

3    restricted area, it says it means anywhere in the world.

4             Do you see that?

5    A        Yes.

6    Q        So Dr. Hough is what, she's restricted anywhere in this

7    world, but if we went to a different world, she wouldn't be

8    restricted.

9             Is that the idea of this definition?

10   A        The way it works is, whatever businesses she's

11   restricted in, that's the area it applies to.

12   Q        Anywhere in the world.

13   A        That's correct.

14   Q        So the restriction -- the restricted area isn't

15   restricted unless you're thinking that she's going to go to

16   some other planet or the moon; is that correct?

17   A        That's correct.

18   Q        And "restricted business" has its own definition that

19   talks about different . . . basically, different types of

20   medical school activity; is that correct?

21   A        Yes.

22   Q        And again, it just doesn't say different types of

23   medical school activity; it has probably a . . . .  I'm just

24   estimating, maybe a hundred words in the restricted business

25   section that define restricted business; is that correct?

1    A      That's correct.

2    Q      So going back to that non-compete, you'd have to

3    understand what "closing date, restricted period, affiliates,

4    restricted business, restricted area" -- and for that matter,

5    the word "indirectly" -- all mean in order to understand what

6    your non-compete actually entails; is that correct?

7    A      Yeah.  But most people in -- and I'm quite confident

8    that people who sign these agreements are very -- these are the

9    ones that people pay attention to.  They are employment

10   agreements, and they're non-competes.

11   Q      I understand.  But that's what you -- back to my

12   question, you'd have to understand all these terms in order to

13   understand what you're signing; correct?

14   A      You must understand all the terms in order to understand

15   what you're signing; yes.

16   Q      And you have no knowledge, one way or the other, if

17   Dr. Hough read each and every one of these words, and

18   understood each and every one of these words, before she signed

19   it; is that correct?

20   A      I can't speak about the entire document, but the only

21   parts that -- where documents are personal to people, the

22   non-compete, and her employment agreement, are really one,

23   because -- and so I'm quite confident that she knew what we

24   meant here.

25   Q      All right.  But the rest of the agreement, not dealing

1   with the guaranty or the non-compete, you don't have that level

2   of confidence; correct?

3   A      Well, no one was happy about the guaranties.  And we

4   didn't expect them to be happy, and they understood.

5   Q      Carving out the guaranty --

6   A      Oh, carving out the guaranty.  I'm sorry.

7   Q      Carving out the guaranty and the non-compete and the

8   consulting agreement, you were unaware if Dr. Hough had any

9   knowledge of the particular -- or excuse me, had reviewed all

10  the terms of the particular rest of the deal before she signed

11  the deal; is that correct?

12  A      I wasn't in the room with her, so that's a correct

13  statement.

14  Q      And if we could go on Page 41, to the bottom of 41, to

15  the E line?

16         And this is -- again, we'll see this in a variety of

17  different documents as to Dr. Hough is permitted to do; is that

18  correct?

19  A      Yes.  Those are clear delineations and exceptions.

20  Q      This is like what they call the carve outs --

21  A      Yes.

22  Q      -- of a non-compete.

23  A      Yes.

24  Q      And one of the things she can do is be a licensed

25  physician?

1    A       Yes.

2    Q       Because that was very important to her; correct?

3    A       Oh, very important.

4    Q       And she could hold classroom teaching positions, and you

5    actually have to turn the page --

6            MR. HOCHMAN:  And if we could turn the page and

7    highlight the first paragraph of Page 42 of this exhibit.

8    BY MR. HOCHMAN:

9    Q       It says she can hold classroom teaching positions in

10   various types of institutions other than restricted businesses

11   in prohibited territories; is that correct?

12   A       That's correct.

13   Q       This time we actually have a definition of "prohibited

14   territories" right there, which talked about the Caribbean,

15   Mexico, Belize, Panama, Guyana, Eastern Europe, and China.

16           Do you see that?

17   A       Yes.

18   Q       Allowing her basically to hold these positions -- she

19   could hold a classroom teaching position in the United States,

20   for instance.  It's not a prohibited territory.

21   A       That's correct.

22   Q       And I see China is on this list.

23           Do you see that, on Number 7?

24   A       Yes, I do.

25   Q       And China is on this list because the Saba School of

1    Medicine Foundation, in the years past, had actually made

2    inquiries and investigation on whether or not it could open up

3    a campus in China; is that correct?

4    A      Actually, not quite correct.  The list of things here

5    are really the things that were of concern to us, and places

6    where we might have interest in doing things.  And so, for that

7    reason, it was of concern whether or not Dr. Hough might be

8    doing things there.  And so it really wasn't about the history

9    as much as these were just targeted areas that we were

10   interested in.

11   Q      Do you know, one way or the other, whether or not the

12   Saba School of Medicine Foundation had investigated opening up

13   a campus in China in the years preceding April 3rd, 2007, when

14   this deal was consummated?

15   A      I had seen in documents that they had done some China

16   investigation.  I don't know to what extent it was developed.

17   Q      All right.  If you could turn to Page 52, please?

18          And we'll deal with the guaranty one time.  And that's

19   at Paragraph 9 2.

20          And again, this is the same guaranty that we're going to

21   see repeated in document after document, after document, where

22   the guaranty is mentioned; is that correct?

23   A      That's correct.

24   Q      And in this guaranty, this is the guaranty where

25   Dr. Hough and Dr. Fredrick are basically guaranteeing, and I'll

1    say, let's see, all obligations of and payments by the sellers

2    effectively arising under and set forth in that master

3    indemnification agreement; do you see that?

4    A       I do.

5    Q       Did you ever have to go after Dr. Fredrick or Dr. Hough

6    to collect on the guaranty?

7    A       No, we did not.

8    Q       And if I could direct your attention to Page 61 of this

9    document?

10           Do you see Dr. Hough's signature at the bottom?

11   A       Yes, I do.

12   Q       And again, using this as an example for all the other

13   examples, you don't know whether or not, one way or the other,

14   Dr. Hough was presented this page to sign, with sort of a "sign

15   here" type tab, and signed it, without reviewing the rest of

16   the document at the time she signed it.

17           You have no knowledge one way or the other; is that

18   correct?

19   A       I think this was part of the closing package.

20   Q       Do you see any time stamp there?

21   A       It is not a document that would have been filed in Saint

22   Maarten.  It wouldn't have been required to be so.  This would

23   be related to EIC acquisition in the Delaware situation.

24   Q       I'll ask the question again with respect to whether it

25   was done before or after the closing.

1      You have no knowledge, one way or the other, whether or

2   not Dr. Hough read all the other parts of this agreement before

3   she signed her name on Page 61 of this agreement; correct?

4   A      I don't know.  That's a correct statement.

5   Q      Turn the page if you could.  There's another signature,

6   though, on this document.  If we could focus on that top part?

7      It says:  "In consideration of the direct or" -- and

8   this is on Page 62 -- "In consideration of the direct and

9   indirect benefit, the undersigned, Dr. Hough, will realize from

10   these contemplated transactions" --

11      COURT REPORTER:  Slow down, please.

12      MR. HOCHMAN:  I'm sorry.  I'm going too quickly.

13   BY MR. HOCHMAN:

14   Q      -- "the undersigned is a party to this agreement as a

15   guarantor in her general capacity as an affiliate and with

16   respect to the covenants in Section 7.1, .2, .4, .5, 6, 7.6,

17   7.9, 7.12."

18      Do you see that?

19   A      Yes.

20   Q      Now, in order to understand what this means, not only do

21   you have to understand what the words "contemplated

22   transaction" means, correct --

23   A      Yes.

24   Q      -- because that's a defined term, correct?

25   A      Yes, it is.

1    Q      You have to know what an affiliate is; correct?

2    A      Yes.

3    Q      And then you'd have to reference back into the document

4    what the Section 7.1 to 7.12 are; is that correct as well?

5    A      Yes.

6    Q      And then if you go back into the document to see what

7    these sections are -- and actually, you can go to the very

8    front of the document, because there's a table of contents,

9    isn't there, at the very front of this document?

10   A      Yes, there is.

11   Q      And looking at the table of contents, which is on Page 3

12   of this document, 7.1 deals with expenses; do you see that?

13          (An exhibit was projected onto the projector screen.)

14   A      Yes.

15   Q      And she's responsible for that under this covenant she's

16   signing; correct?

17   A      Yes.

18   Q      7.2 deals with the non-compete that we discussed;

19   correct?

20   A      Yes.

21   Q      And 7.4, which is the next in order, is publicity.

22   That's another section she's responsible for.

23   A      Yes.

24   Q      7.5 is confidentiality.

25          7.6 is -- correct?

1   A      Yes.  I'm sorry.

2   Q      7.6, and I'll do these three together, is equitable

3   remedies, 7.9 is exclusivity, and 7.12 is no derogatory or

4   disparaging comments; is that correct?

5   A      Yes.  It's limiting the scope.

6   Q      If we could turn back a page here, I would like to focus

7   on 7.3.

8          See where it says, "tax matters"?

9   A      Yes.

10  Q      7.3 is not involved -- is not listed as one of the

11  covenants in the sections that she signed; is that correct?

12  A      That's -- it was carved out, that's correct.

13  Q      If you could turn to Exhibit 10B, please.  And

14  Exhibit 10B, turn to Page 8.  And if we could focus on the

15  whereas clause, the last whereas clause?

16         Again, this is the MUA agreement; correct?

17  A      It is.

18  Q      And once again:  "Dr. Hough does not own any shares of

19  the Massachusetts property or the Nevis property; but has

20  agreed to execute this agreement for the purposes set forth

21  herein."

22         Do you see that?

23  A      I do.

24  Q      And if you could turn to Page 27 of this agreement?

25         And if we could focus on Paragraph 4, at the bottom?

1        I think you talked about -- and this is where it's

2   referencing the agreement -- these agreement don't have, by

3   themselves, all the documents that are part of the agreement;

4   correct?

5   A     I'm not sure I understand your question.

6   Q     I'll phrase it differently.

7         This entire exhibit, 10B, is 89 pages; correct?

8   A     Yeah; it looks like that way, yeah.

9   Q     I'm sorry?

10  A     Yes.  It doesn't have the schedules and all that.  It's

11  even longer than that.

12  Q     I see.

13        So when you signed this agreement, you don't have the

14  schedules that are actually part of this agreement connected to

15  the agreement; correct?

16  A     It's all one big package.

17  Q     Well, it's one big package, but you'd have to look at a

18  separate package to understand what each of the words in the

19  schedules are that are referenced in this agreement; correct?

20  A     You would have to look at the schedules to understand

21  what's in the schedules.  And if . . . .

22  Q     And there's nowhere --

23  A     Yes.  I mean, know -- yes, there's a lot of paper to go

24  through, and they're separately listed.

25  Q     And there's nowhere to sign -- there's no signature line

1   in this schedule packet; correct?

2   A      I don't believe so, no.  The schedules are part of the

3   document.

4   Q      Well, they're certainly referenced by the document, but

5   what I'm saying is that, when you signed this document, this

6   document, itself, does not have the schedules attached as,

7   let's say, exhibits to this document; correct?

8   A      Yes.  No, that's not correct.  That's what I'm trying to

9   say.  An agreement without your -- without all the schedule

10  disclosure that provided for exceptions, which are to the

11  seller's benefit, the way this document is structured, it would

12  be -- I wouldn't let them sign it.

13  Q      Of course.  I mean, the schedules are physically present

14  in the room, if you want to review them.  I'm just saying that

15  when you sign your name here -- in fact, let's go to when you

16  sign your name, on Page 86 of this document.

17         Do you see where Dr. Hough has signed her name here?

18  A      Yes.

19  Q      And when she signs her name -- and this is just, again,

20  the page where she's a guarantor.

21         Do you see that?

22  A      That's correct.

23  Q      The physical schedules might be somewhere else on that

24  table that you talked about, but they are not connected

25  directly -- they're not part of the document she is signing,

1    part of it in a physical sense.

2    A      It's my understanding, just from the construct of the

3    document, that the exhibits and the disclosure schedules are

4    part and parcel of the document itself.  That's what my

5    attorneys tell me.  But I'm not a lawyer.  You would have to

6    tell me.

7    Q      If you could turn to Exhibit 10C, please?

8           (The witness examines an exhibit.)

9    Q      This is the Saba school's purchase agreement; is that

10   correct?

11   A      Yes; yes, it is.

12   Q      And you had talked, I believe, in your direct testimony,

13   about all the various corporations, or entities, you had to set

14   up to make this transaction happen; correct?

15   A      That's correct.

16   Q      You said there was a Saba Management Company B.V. you

17   had to set up; correct?

18   A      That's correct.

19   Q      You set up the EIC Acquisition Corporation.

20          And that's a Delaware corporation?

21   A      Yes.

22   Q      And you had to set up another Netherlands Antilles

23   corporation, that Saba BV Corporation; is that correct?

24   A      Well, The Foundation had to set that up, and then we

25   purchased it from The Foundation.

1  Q     I see.  So the lawyers had to set this thing up in order

2  to make this happen; is that the idea?

3  A     Yes.

4  Q     And again, if you could turn to Page 8 . . . and I want

5  to focus again on that last whereas clause.

6        And it's true, is it not, that Dr. Hough did not own any

7  of the Dropdown shares, Round Hill shares, or the U.S.

8  property, but agreed to execute this agreement for the purposes

9  set forth herein; is that correct?

10 A     That's correct.

11 Q     Now, you said in your direct testimony that one of the

12 things that you were interested in buying was assets, but not

13 problems or liabilities; is that correct?

14 A     I said that we only wanted to buy things related to the

15 university.

16 Q     Things related to the university.

17       And you understand that the university, the Saba

18 University School of Medicine, was different from the Saba

19 School of Medicine Foundation; correct?

20 A     Yes.

21 Q     And so after the sale, the Saba School of Medicine

22 Foundation kept existing, to your knowledge; correct?

23 A     Yes.  It was permitted to continue to exist.

24 Q     And you didn't own the Saba School Foundation, correct?

25 A     No, we did not own it.

1    Q      But did you own the Saba University School of Medicine;

2    isn't that correct?

3    A      Yes.

4    Q      Now, you said, with respect to assets, that you were

5    interested, obviously, in purchasing the assets of the Saba

6    University School of Medicine; isn't that correct?

7    A      That's correct.

8    Q      You said that was the land, the buildings, the name, you

9    know, the curriculum, all this stuff that goes into the

10   purchase of a school -- a medical school; correct?

11   A      Yeah.  All the tangible and intangible property of a

12   university.

13   Q      Now, if The Foundation had other assets not connected to

14   the medical school, that's not something you would even need to

15   know about; correct?

16   A      No, we would not need to know.  We only want to make

17   sure that we are getting everything that is required to run the

18   university as it had been run.

19   Q      So if The Foundation had money, let's say, in an

20   offshore bank account, you wouldn't need to know that unless it

21   was connected with the school, is that correct, running the

22   school?

23   A      I wouldn't need to know it.

24   Q      If I could turn your attention -- I think you might have

25   covered all the points in this document -- turn your

1    attention --

2            MR. HOCHMAN:  And, Your Honor, may I present to the

3    witness Exhibits-- actually, you know what, we'll go to 10F,

4    and then we'll go back to 10D and E.

5            So if we could to go to 10F, if we could, and publish

6    it, Your Honor?

7            THE COURT:  Have they admitted it already?

8            MR. HOCHMAN:  10F is.

9            THE COURT:  Go ahead.

10           THE WITNESS:  I think it's material, just from what

11   we bought from The Foundation, is that we have this concept of

12   excess cash --

13           MR. HOCHMAN:  Your Honor, there is no question

14   pending.  I don't know what the witness -- I didn't ask a

15   question.  I don't know what the witness is responding to.

16           THE COURT:  All right.

17           MR. HOCHMAN:  I think I'm happy --

18           THE COURT:  Ask him a question.

19   BY MR. HOCHMAN:

20   Q    We'll focus on 10F, and maybe this will come back in

21   play.

22   A    Okay.

23   Q    And if you could turn to --

24           MR. HOCHMAN:  Actually, the front of 10F, if you

25   could focus on the word, "parties," and make it a little

1   tighter, I'm sorry, tighten on -- there you go.

2   BY MR. HOCHMAN:

3   Q      I see a bunch of other corporations, other than the ones

4   we've been talking about.  I'll focus on Ares Capital

5   Corporation.

6          What was Ares Capital Corporation?

7   A      Ares Capital Corporation is a financial company that

8   helped finance our purchase, and they provided debt and equity

9   to the -- to help assist in purchasing it.  So they're a third

10  party that helped finance.

11  Q      Like an investor in the deal; is that correct?

12  A      Well, they were an investor, but they were actually --

13  they were our bank as well.

14  Q      And there's another company I see in the paperwork,

15  Prairie; it's not listed here, but Prairie?

16  A      That's another investor in the deal.

17  Q      And York?  I think that's another name?

18  A      That's another investor in the deal.

19  Q      I see.

20         And so that's where you came up with all the money to

21  buy the schools; is that the idea?

22  A      Yes.

23  Q      If you could turn to . . . Page 3 of 10F?

24         MR. HOCHMAN:  And I'd like to do a split screen, Your

25  Honor, between Page 3 of 10F and, if I might approach,

1    Exhibit 1X, which is right in front of the court clerk?

2            THE COURT:  Sure.  Go ahead.

3            MR. HOCHMAN:  All right.  If we could put 1X next to

4    Exhibit 10F, and with 1X, if we could go to --

5            (An exhibit was projected onto the projector screen.)

6            MR. HOCHMAN:  -- Page 8, I believe, 1X?

7            I'm sorry.  Page 7 of 1X.  Thank you.  We'll put

8    Page 7 on the right, and then we'll go back to 10F on the left.

9    BY MR. HOCHMAN:

10   Q     Now, I'd like to draw your attention down to where it

11   says, "Dr. David Fredrick," on Page 3 of 10F.

12           It says, "To Dr. Fredrick"; do you see that?

13           MR. HOCHMAN:  We're going to have to highlight that.

14   It's about a third of the way down on 10F, even tighter if we

15   could, where it says, "To Dr. Fredrick."

16   BY MR. HOCHMAN:

17   Q     Do you see them "to Dr. David Fredrick there," and then

18   the number, $132,972.98, next to his name?

19   A     For some reason this is looking smaller.  There we go.

20           Yes, I see that now.

21   Q     I'm showing you what's been admitted into evidence as

22   David Fredrick's 2007 tax return.

23           And do you see the number, $132,972, on his tax return

24   somewhere?

25   A     I do.

1    Q      And that's listed under stock in MUA?

2    A      It is.

3    Q      And that's what he received for his stock in MUA; is

4    that correct?

5    A      I believe so.

6           MR. HOCHMAN:  Could you highlight the $132,972?

7           Thank you.

8    BY MR. HOCHMAN:

9    Q      I'd like to show you, then, a little bit lower, right

10   below on the left, Exhibit 10F, it says:  "to Lynn, Leon & Lyon

11   Group LLC."

12          MR. HOCHMAN:  Could you highlight that, please?

13          I'm sorry, are you able to highlight that?  Sorry.

14   BY MR. HOCHMAN:

15   Q      Well, as it's being highlighted, do you see that there's

16   an amount next to it for $478,907?

17          Do you see that?

18   A      I do, yes.

19   Q      And if you can look at David Fredrick's tax return,

20   Exhibit 1X, and do you see that approximate amount on his tax

21   return?

22   A      I do.

23          MR. HOCHMAN:  And if you could highlight that on his

24   tax return, please, his 2007 tax return?

25          Now, if you could turn the page of Exhibit 10, out to

1   Page 4.  Thank you.

2          And if you could highlight where it says, "Medical

3   Educational Group LLC, do you see that, and the line that says

4   $153,485.

5   BY MR. HOCHMAN:

6   Q     Now, Medical Education Group, I think you said, was the

7   parent of EIC LLC; is that correct?

8   A     I believe.  So I mean yes, that's correct.

9   Q     I'm sorry?

10  A     Yes, it's correct.  I'm sorry.

11  Q     Do you see that amount, $153,485, on Exhibit 1X?

12  A     I do see that amount.

13         MR. HOCHMAN:  And could we highlight that on

14  Exhibit 1X, please?

15  BY MR. HOCHMAN:

16  Q     And that would correspond to the amount that Medical

17  Education Group was paid in connection with this deal; is that

18  correct?

19  A     That would correspond.

20  Q     Okay.

21         MR. HOCHMAN:  If we can take 1X off the chart and go

22  back to just Exhibit 10F, and go to Page 5, please.

23  BY MR. HOCHMAN:

24  Q     And Page 5 has all the fees and expenses that were

25  incurred in connection with this deal; is that correct?

1          MR. HOCHMAN:  If we can highlight the first half of

2    Page 5?

3          THE WITNESS:  Unfortunately, yes.

4    BY MR. HOCHMAN:

5    Q     These are -- and you paid, it looks like -- well, it

6    sounds like -- if I might ask who some of these names are:  CMS

7    Derks Star Busmann got $41,000 and change.

8          Who are they?

9    A     I believe they were a Curacao law firm.

10   Q     And Daniel, Brantley & Associates got money; do you see

11   that?

12   A     Yes.  He was on Nevis.  He's an attorney.

13   Q     Kronenberger Burgoyne received 18,000.

14         Who were they?

15   A     They were a California law firm.

16   Q     Michael Harris got $100,000?

17   A     He was somebody who was entitled to a fee if this

18   transaction closed.

19   Q     And the transaction closed, so he got his fee?

20   A     That's correct.

21   Q     And then do you see -- well, I'll scroll down a bit.

22         Do you see where it says, "Equinox Capital, Inc.,

23   advisory fee"?

24          MR. HOCHMAN:  If we could blow that up a bit?

25          Yeah, there it is.

1    BY MR. HOCHMAN:

2    Q      Equinox Capital, Inc. advisory fee, 1.5 million, is that

3    the fee that your company received for doing this deal?

4    A      It was a fee that our –– that we received; yes.

5    Q      And that's the fee that your company received for doing

6    this deal; correct?

7    A      Yes, absolutely.

8    Q      By the way, I just used the words, "your company," and

9    you agree with that.

10          You don't own every share of the company; correct?

11   A      I'm sole shareholder of Equinox Capital, Inc.

12   Q      And that 1.5 million then went to you?

13   A      Not necessarily, no.  It's a company with other

14   employees.

15   Q      All right.  And then if you can look at Michael Harris,

16   he gets another $400,000?

17          Who was Michael Harris, was he the guy who was the

18   broker of this deal?

19   A      Michael Harris was somebody who was involved with

20   St. Matthew's –– he was the founder and former owner of

21   St. Matthew's University, a medical school on Grand Cayman.

22   Q      Okay.  All right.  If we could open the chart just a

23   little, and scroll down a little.  And I see Ares Capital got

24   $600,000 as its closing fee.

25          Is that typical for the investor to get $600,000 when

1   the deal goes through?

2   A      Well, it's not unusual; no.  I mean, it's typical.  It

3   varies, transaction to transaction.  They were . . . .  They

4   argued it was quite low.

5   Q      Okay.  If we could turn to Page 7, and then we'll

6   publish Page 8, but if you could look at Page 7 of this

7   exhibit.

8          We go −− yeah.  Page 7 is sources at closing.

9          Do you see that?

10  A      Yes, I do.

11  Q      And then Page 8 details where some of the money went?

12  A      That's correct.

13  Q      And I would like to focus on a few of these.

14         MR. HOCHMAN:  If we could highlight Number 6?

15  BY MR. HOCHMAN:

16  Q      And you see Number 6, it seems that the Saba School of

17  Medicine Foundation is being paid $749,543.19.

18         Do you see that?

19  A      I see that.

20  Q      And do you see where you were instructed to send the

21  wire?

22         It was not to a domestic account; is that correct?

23  A      That's correct.

24  Q      It was to the Union Bank of Switzerland, which is also

25  known as UBS; isn't that correct?

1    A      Yes.

2    Q      And the account number is blacked out here, but the

3    original document, the account number would have been present;

4    correct?

5    A      Yes.

6    Q      And the account name was the Saba School of Medicine

7    Foundation; do you see that?

8    A      Yes.

9    Q      Now, you wouldn't consider this a secret Swiss bank

10   account that existed so nobody would find out about it, because

11   the exact bank account -- we have a bank account number and

12   name of the account being presented in these documents;

13   correct?

14   A      Yes.  We knew about this account before.  That's sort of

15   what . . . where I was trying to head.  You made a statement

16   that we didn't know of any other accounts.  We knew they have

17   accounts.

18   Q      Very good.

19          If you can turn the page to Page 9.

20          MR. HOCHMAN:  And if we could focus on the D, D

21   letter?

22   BY MR. HOCHMAN:

23   Q      Now, New Vanguard is going to be getting a lot of money

24   from this transaction; isn't that correct?

25   A      Yes.

1    Q      I mean, they'll be getting over $30 million as part of

2    this transaction; is that correct?

3    A      That's correct.

4    Q      And at least one chunk of the money is going to come

5    from Ares Capital, and this example on Page 9, Subparagraph E,

6    is $4 million.

7           Do you see that?

8    A      I do see that.

9    Q      And do you see that it lists Liechtenstein Landesbank AG

10   as the bank where this money will ultimately go; is that

11   correct?

12   A      That's the routing of the wire, and so if the bank is --

13   that's for wire purposes, that's the -- what it is.

14   Q      Right.

15          And are you familiar with what Vaduz is, V-A-D-U-Z?

16   A      I'm sorry, say it one more time?

17   Q      Do you know what Vaduz, V-A-D-U-Z, is?

18   A      I do not.

19   Q      And this lists, again, the account number, which again

20   wouldn't be blacked out in the original; correct?

21   A      No.

22   Q      And -- "no," does that mean correct?

23   A      I'm sorry.  It would not be blacked out.

24   Q      And it also lists the account name of New Vanguard

25   Holdings, Ltd.

1            Do you see that?

2    A       I see that.

3    Q       This is not some secret Swiss bank account that New

4    Vanguard has because it's providing you with the very

5    information of the exact bank, the exact account number, and

6    the exact account name that this bank account is being kept in;

7    correct?

8    A       We were aware that they had bank accounts.  They were in

9    The Foundation.  And then these were the wire funds that

10   would -- naturally we would have to know where it was going,

11   otherwise, it would never get there.

12   Q       Exactly.

13           New Vanguard didn't keep this as a secret from you;

14   correct?

15   A       Not if they wanted us to send the money.

16   Q       This is true.

17           All right.  If you turn the page to Page 10, you'll see

18   that another $6.75 million is being sent to New Vanguard at

19   this same Liechtensteinish Landesbank account; is that correct?

20   A       That's correct.

21   Q       And on Page 11, small amount of money, $12,188.50, is

22   being paid by, it looks like, York Select LP, again to New

23   Vanguard's Liechtensteinian bank account; is that correct?

24   A       Yeah.  I think we paid it on behalf of York, out of

25   Equinox EIC; but generally correct, yes.

1   Q       And if you could turn to Page 17?

2           Again, more money is being sent to New Vanguard's

3   Liechtensteinian Landesbank account, this time 424,657.08; is

4   that correct?

5   A       Yes, I see that.

6   Q       And if you could turn to Page 18?

7           Now, this was a -- quite a large check, this $17,936,845

8   check.

9           Do you see that, the wire transfer?

10  A       I do see that.

11  Q       This wasn't even being sent to New Vanguard's

12  Liechtensteinian -- excuse me -- Liechtensteinish Landesbank

13  account, it was being sent to a different offshore New Vanguard

14  account; correct?

15  A       Correct.

16  Q       And that information, again, was provided to you;

17  correct?

18  A       Absolutely.

19  Q       And that's how you were able to send the wire out;

20  correct?

21  A       That's correct.

22  Q       And they identified New Vanguard's account at a bank

23  called Fortis Banque Swiss ASA; correct?

24  A       Yes.

25  Q       Located in Zurich?

1    A       That's what it says; yes.

2    Q       And again, the account number, while blacked out in this

3    company, was not blacked out when you were given the

4    information; is that correct?

5    A       That is correct.

6    Q       And it identifies the account name as New Vanguard

7    Holdings Ltd.

8    A       Correct.

9    Q       Now, if you could turn to Exhibit 11A?

10           11A, is that master identification agreement?

11   A       Give me one moment here.

12           MR. HOCHMAN:  Your Honor, if you want to take a

13   moment, this would be a nice transition point.

14           THE COURT:  All right.  Great.

15           Lunch?

16           Please do not discuss the case among yourselves, or

17   allow anyone to discuss it with you or in your presence.  1:15.

18           (At 12:10 PM, the jury was escorted from the

19      courtroom.)

20           THE COURT:  All right.  1:15.

21           MR. HOCHMAN:  Thank you, Your Honor.

22           MS. FINLEY:  Thank you, Your Honor.

23           (At 12:10 PM, court was recessed.)

24                         AFTER RECESS

25           (At 1:20 PM, court was reconvened.)

1           THE COURT:  Both sides ready for the jury?

2           MR. HOCHMAN:  Yes, sir.

3           MS. FINLEY:  We are, Your Honor.

4           THE COURT:  Have them step in.  And have the witness

5    step in, please.

6                (The witness returned to the witness stand.)

7                (At 1:21 PM, the jury was escorted into the

8           courtroom.)

9           THE COURT:  You may proceed.

10          MR. HOCHMAN:  Thank you very much, Your Honor.

11   BY MR. HOCHMAN:

12   Q      I'd like to turn your attention to Government's

13   Exhibit 11B, like in boy, Page 6, when you get the exhibit in

14   front of you.

15               (An exhibit was projected onto the projector screen.)

16   Q      And we'll highlight the middle part on Schedule 5.10.

17   And Government's Exhibit B is the schedule that we were talking

18   about before, the disclosure schedule for the MUA part of the

19   deal; correct?

20   A      Um-hum.  Yes.

21   Q      And this is a schedule, again, that if you turn to the

22   very back page, doesn't -- we don't have to publish the back

23   page, we can keep it right there -- doesn't have any signature

24   on it, correct, that says I have reviewed this schedule, sign

25   here; is that correct?

 1    A       That's correct.

 2    Q       Now, if we can focus on Page 6, Schedule 510, this is

 3    that litigation part of the schedule; is that correct?

 4    A       Yes.

 5    Q       And this is for pending litigation, is it not?

 6    A       It would be threatened, pending, or actual.

 7    Q       But not for past and concluded litigation; is that

 8    correct?

 9    A       That's correct.

10    Q       So if there had been litigation from when the school

11    opened up in 1994 until April 3rd, 2007, that was concluded, it

12    wouldn't be listed in this part of the schedule; is that

13    correct?

14    A       That's correct.

15    Q       And your -- you've now had a chance to run schools, it

16    sounds like, since 2006; is that correct?

17    A       Yes.

18    Q       All right.  And schools are routinely threatened with

19    litigation, are they not?

20    A       Yes.

21    Q       And that litigation can come from a variety of sources.

22    It can come from disgruntled faculty members who get fired; is

23    that correct?

24    A       Yes.

25    Q       It can come from students --

1   A       Yes.

2   Q       -- who don't like the grade, and threaten to sue the

3   school?

4   A       Or some variation of that; yes.

5   Q       It can conceivably come from competitor schools; is that

6   correct?

7   A       It can.

8   Q       I would like to now turn your attention to Exhibit 11M,

9   like in mother.

10          I'm sorry, before we get off of that, go back to 11B.  I

11   just have one more question on 11B, which is on Page 8.  My

12   mistake.

13          If we could focus on the hospital affiliation side, on

14   the bottom?  This is a document that listed, on Page 8 of 11B,

15   all of the hospital affiliations that MUA had; is that correct?

16   A       Yes.

17   Q       And those were affiliations that Dr. Hough was charged

18   with obtaining for MUA; is that correct?

19   A       I think so.

20   Q       And if you look on the end of this page, from Behavioral

21   Health Center all the way down to the end, and then the

22   beginning of the next page, Page 9, this lists all the variety

23   of hospital affiliations that had been obtained for MUA;

24   correct?

25   A       That's correct.

1   Q      And as you said, I think in your direct testimony, this

2   was an important -- having these hospital affiliations was very

3   important as far as the value of MUA; is that correct?

4   A      It's critical.

5          MR. HOCHMAN:  Now, if you can turn to Exhibit 11M,

6   like in mother.

7          And if we could put up Exhibit 11M, and publish it,

8   Your Honor?  Oh.  11M is not admitted, Your Honor.

9          I'd move to admit Exhibit 11M like in mother.

10         MS. FINLEY:  No objection, Your Honor.

11         THE COURT:  11M will be admitted and may be

12  published.

13         (Government's Exhibit 11M was admitted into

14     evidence.)

15         MR. HOCHMAN:  Thank you.

16         If we could publish it, please.

17         (An exhibit was projected onto the projector screen.)

18  BY MR. HOCHMAN:

19  Q      Now, 11M is an instrument of transfer of shares from New

20  Vanguard to Management Company Limited.  Do you see that?

21  A      I do.

22  Q      And do you see this signature at the very bottom?

23  That's the Beda Singenberger signature that we've seen on many

24  documents -- or all the documents involving New Vanguard; is

25  that correct?

1   A       That's correct.

2   Q       It was your understanding he was the sole director of

3   New Vanguard; is that correct?

4   A       That's my understanding.

5   Q       I think you also stated that you didn't know who

6   actually owned New Vanguard, you just knew that Beda

7   Singenberger was the sole director of it; is that correct?

8   A       That's correct.

9   Q       And there is the signature of a witness there by the

10  name of Erwin Schulthess?  Do you see that?

11  A       Yes.

12  Q       And did you know that Erwin Schulthess worked with Beda

13  Singenberger at Sinco Trust in Zurich?

14  A       I don't know that.

15  Q       If we could turn to Exhibit S, please?  Like in Sam?

16          (An exhibit was projected onto the projector screen.)

17  BY MR. HOCHMAN:

18  Q       And 11S is the schedules for the Saba school purchase,

19  is that not correct?  Is that correct?

20  A       I believe it's correct, yes.

21  Q       And again, these are not schedules that anyone is

22  signing on the schedule itself; correct?

23  A       Not on the schedule itself, no.

24  Q       And again, if you look at Page 5 –– we don't have to

25  publish Page 5 –– that has the hospital agreement for the Saba

1    school; is that correct?

2    A      That's correct.

3    Q      And if you turn to Page 11, Page 11 lists all the

4    accreditations -- if we can focus on the very bottom part of

5    11 -- all the accreditations that the Saba school had?  Do you

6    see that?

7    A      Yes, I see it.

8    Q      And it actually continues on the next page, at the top,

9    which is now Page 12 of Exhibit 11S.  And these are

10   accreditations that the Saba school had for the World Health

11   Organization, of the General Medical Counsel, Nova Scotia, the

12   Foreign Medical Education and Accreditation Society, Florida,

13   the Medical Board of California, New York, and the

14   Accreditation Commission and Colleges of Medicine; is that

15   correct?

16   A      That's correct.

17   Q      And these are the accreditations that Dr. Hough was in

18   charge of leading to obtain?

19   A      Very material role in getting these.  Yes.

20   Q      And these were very important to the value of the Saba

21   school; is that correct?

22   A      In our view, yes.

23   Q      If you can turn to Page 14 of this document?  And if we

24   could focus on Schedule 7.19.  Do you see Schedule 7.19 -- I

25   think Ms. Finley brought your attention to this schedule where

1    it says Dr. Hough and Dr. David Fredrick were prior owners,

2    directors, and officers, and sold their shares of Round Hill to

3    New Vanguard, and resigned as officers/directors as of such

4    date of sale.  Do you see that?

5    A       I see that.

6    Q       Could there be some confusion that the date of sale

7    referenced here is not the date of sale that they sold their

8    shares to New Vanguard, but the date of sale of this

9    transaction -- of this purchase transaction which Equinox is

10   involved with, which is April 3rd, 2007?

11   A       I'm not -- what's the question?  What's the question?

12   I'm sorry.

13   Q       When it says, "Such date of sale," could that be

14   ambiguous that it's actually referring to April 3rd, 2007, and

15   not necessarily the date in which Pat Hough and David Fredrick

16   sold their shares of Round Hill to New Vanguard?  Is it

17   possible that's ambiguous?

18   A       Now that you suggested that, I . . . . .  I was a bit

19   confused when I saw it myself.

20               MR. HOCHMAN:  If you could turn to 11FF?

21               I think that's in evidence, Your Honor.  If it's not,

22   I'll move it in.

23               THE WITNESS:  I have it.

24               THE COURT:  You can.

25               (An exhibit was projected onto the projector screen.)

1    BY MR. HOCHMAN:

2    Q      Because 11FF is actually David Fredrick and Patricia

3    Hough, on Pages 1 and 2 of this exhibit, resigning as officers

4    of Round Hill Project Holding, but on April 3rd, 2007.  Does

5    that clarify what date is meant, back in the earlier exhibit of

6    11S, as to when they resigned as officers and directors of

7    Round Hill.

8    A      It's clear that this is their date of resignation.

9    Q      And in any event, if you could turn to 11Z, like in

10   zebra?  11Z is where Round Hill is appointing David Leon

11   Fredrick to act as its power of attorney.  Do you see that?

12   A      I do.

13   Q      And this is the one that Ms. Finley brought to your

14   attention, actually has David Fredrick, Pat Hough, and Beda

15   Singenberger's signatures on.  Are you familiar with that?

16   A      Yes.

17   Q      So again, whether it's a . . . so at the time -- and

18   this is, again, all dated on April 3rd, 2007.  Do you see that?

19          If you could turn to the second page of this document,

20   dated April 3rd, 2007?  Do you see that indication?

21   A      Yes, I see that indication.  Yes.

22   Q      And just so the jury understands how these deal closings

23   go, they're sort of like a ballet, a ballet dance, as to which

24   document goes before some other document.  In other words,

25   presumably they would have signed as directors in connection

1    with this document, and then, the next moment, could have

2    signed the document resigning as directors, because that was

3    all part of this deal.  Is that correct?

4    A      It's correct.  I mean, we required their

5    resignations . . . if they hadn't been.

6    Q      Right.  Because you wanted to appoint your own people to

7    run the Round Hill Project holdings company; is that correct?

8    A      Yes.  It was being sold.

9           MR. HOCHMAN:  May I have a moment, Your Honor?

10          THE COURT:  You may.

11          MR. HOCHMAN:  No further questions, Your Honor.

12          THE COURT:  All right.  Thank you.

13          Ms. Finley?

14          MS. FINLEY:  Thank you, Your Honor.

15                       REDIRECT EXAMINATION

16   BY MS. FINLEY:

17   Q      Now, Mr. Rodger, Dr. Fredrick and Dr. Hough were

18   represented by counsel, as well, during this transaction; is

19   that right?

20   A      Yes.

21   Q      And Mr. Hochman asked you a lot about relying on counsel

22   in transactions, did he; do you remember those questions?

23   A      I do remember those questions.

24   Q      And when you rely on your lawyers, is it important for

25   you to disclose all of the information to your lawyers . . . in

1    order for them to provide you with appropriate advice?

2    A      I can speak for myself.

3    Q      For you.

4    A      For me.  I can speak for myself.  We discuss all things

5    extensively.

6    Q      And you would want to fully disclose to your lawyers in

7    order for the lawyer to provide you with an appropriate

8    opinion.

9              MR. HOCHMAN:  Objection, leading, Your Honor.

10             THE COURT:  Sustained.

11   BY MS. FINLEY:

12   Q      Would you provide your lawyer with all of the

13   information so that you could have an opinion you could rely

14   on?

15             MR. HOCHMAN:  Objection, leading, Your Honor.

16             THE COURT:  Overruled.

17             THE WITNESS:  I always try to provide what I think is

18   relevant, and try to be thorough, is how I characterize my

19   actions.

20   BY MS. FINLEY:

21   Q      And you don't know what -- do you know what Dr. Fredrick

22   and Dr. Hough disclosed to their attorneys?

23   A      No.  I only know what was disclosed in the documents.

24   Q      And, in fact, Mr. Hochman asked you about who owned The

25   Foundation.  You know that -- or who owned the schools, and

1    that you know The Foundation owns the school.

2         Do you remember that question?

3    A    I do remember the question; yes.

4    Q    Now, do you know whether Dr. Hough owned The Foundation,

5    or -- or is that what the document says, that The Foundation

6    owns the school?

7    A    We never looked above . . . .  We only looked into the

8    school level, into The Foundation level, we never looked above

9    it into ownership.  That wasn't necessary as part of what we

10   did.

11   Q    Now, on cross, you had wanted to talk, I guess, about

12   excess cash.

13        Can you explain to the jury what excess cash is?

14   A    This concept of what was in The Foundation, we did have

15   visibility to a number of accounts in The Foundation, of

16   surplus that had . . . that was available.  And we were only

17   buying what we needed, which was the tuition account.

18   Q    And do you know where that tuition account was?

19   A    It was a Bank of America account.

20   Q    So you don't -- do you know whether the Saba School of

21   Medicine Foundation had an account at UBS?

22   A    Yes, we knew this.

23   Q    And did you know that from the flow of funds, or from

24   other independent information?

25   A    We knew . . . because we had to make it clear what we

1  were entitled to take as part of the transaction, and what we

2  were not entitled to.

3  Q      Did you know whether The Foundation had a bank account

4  in the name of Ample Dynamic at UBS?

5  A      We just knew that there were two or three accounts other

6  than the tuition account, and some of which were foreign based.

7  Q      Now, Mr. Hochman also went over a variety of entities

8  that your company, Equinox, has.

9         I can't name all them, but he listed maybe a dozen or so

10 of them?

11 A      Right.

12 Q      Are those companies listed on your financial statements?

13        MR. HOCHMAN:  Objection, relevancy.

14        THE COURT:  Overruled.

15        THE WITNESS:  There are audited financial statements

16 for parts of our enterprise, and then some just file separate

17 tax returns as well.  It varies, depending on what you're

18 talking about within our network.

19 BY MS. FINLEY:

20 Q      Now, the accreditation and the clinical aspect of the

21 school, was that one . . . one part of the school's operation

22 that Dr. Hough was in charge of, or spearheaded?

23 A      Our program, as I stated previously, is a four-year

24 program at all of the universities.  And the first two years

25 are basic sciences, or preclinical in nature.  And then the

1    third and fourth year would be clinical, and does take place in

2    the hospital networks that were referred to in some of the

3    disclosure schedules.

4    Q     And could -- I guess the other part of the school is the

5    actual classes?

6    A     Which is the basic -- when I say "basic sciences,"

7    that's what I mean.

8    Q     And with respect to Dr. Hough and Dr. Fredrick's role,

9    Dr. Hough -- Dr. Fredrick's role, was that more behind the

10   scenes?

11   A     Dr. Fredrick was involved in, you know, the academic

12   side, as well . . . as well as operational side . . . to

13   logistics . . . .  You know, Dr. Fredrick was an excellent

14   general manager of the schools, and made sure everybody was

15   doing what they were supposed to be doing.

16   Q     And is that one of the reasons, their knowledge, that

17   you asked them to stay on, to consult for the two years

18   following the sale?

19   A     Both of them have extensive knowledge in the field and

20   have extensive relationships, and both of which are valuable to

21   the university.

22   Q     Now, you talked a little bit on cross-examination about

23   these group calls, where there were discussions about the

24   implications of various parts of the proposal.

25         Is that fair?

1    A       Yes.

2    Q       Was Dr. Hough on these calls?

3    A       Not all of them, but . . . .  The down-and-dirty ones

4    were the . . . when you're getting to the end of the dealings

5    and the guaranties, where nobody likes to guarantee anything.

6    Nobody wants to ever guarantee anything.  And those were the

7    ones where we definitely had a big group discussion.  They were

8    not . . . .  You kind of have to force everybody together and

9    hopefully you come out with a deal.

10   Q       On these phone calls, did Dr. Hough participate; did she

11   speak up?

12   A     She wasn't in any way leading the discussion, but I

13   would characterize it as more just wanting, probably, to have

14   an awareness of where it was heading, and . . . .

15   Q       And based on your interaction with Dr. Hough, is

16   Dr. Hough someone who would have asked for clarification if she

17   didn't understand something?

18   A       In that setting, you know, it wasn't a Q-and-A-type

19   setting, if we're talking about just that particular setting.

20   She's a very thorough person, though.

21         MS. FINLEY:  Now, if we could bring up Exhibit, I

22   think, 10A, on Page 41.

23         (An exhibit was projected onto the projector screen.)

24   BY MS. FINLEY:

25   Q       And I think this is the part of the non-compete.

1          And was this an important -- you said this was an

2     important part for Dr. Hough.

3     A      Yes.  Because it's personal to her.

4     Q      And within these paragraphs there are the words,

5     "indirectly or directly."

6          Did Dr. Hough ask for a definition of what those words

7     meant in these paragraphs?

8               MR. HOCHMAN:  Objection as to when Dr. Hough would

9     have had this conversation, if any.

10              THE COURT:  Overruled.

11              THE WITNESS:  In my presence, she didn't ask.

12    BY MS. FINLEY:

13    Q      Now, Mr. Hochman asked to you look at Dr. Fredrick's tax

14    return.

15         Do you have any personal knowledge about Dr. Fredrick's

16    tax return?

17    A      No.

18    Q      Do you know what he recorded on his tax return other

19    than what he had you read up there?

20    A      That's the first one I've seen.

21    Q      Do you know what Dr. Fredrick or Dr. Hough is required

22    to report on their tax return?

23    A      No.

24    Q      Now, Mr. Hochman also asked you about the flow of funds,

25    and where funds are supposed to be wired to.

1          Do you know who the beneficial owner of any of those

2    bank accounts listed in the flow of funds?

3    A      The only thing I would know from the flow of funds would

4    be the account name.  And so to the extent that it had an

5    account name associated with it, that's . . . .  I'd be

6    surmising, but I don't know.

7               MS. FINLEY:  One moment, Your Honor.  May I consult

8    with counsel?

9               THE COURT:  You may.

10              (Ms. Finley and Ms. Kessler confer privately.)

11              MS. FINLEY:  I have no further questions, Your Honor.

12   Thank you.

13              MR. HOCHMAN:  No further questions, Your Honor.

14              THE COURT:  You may stand down.  Thank you.

15              (The witness left the witness stand and left the

16       courtroom.)

17              THE COURT:  You may call your next witness.

18              MS. FINLEY:  Thank you, Your Honor.

19              The government calls Laura Whitley.

20              THE COURT:  Right up here, please.

21              THE WITNESS:  Okay.

22              THE COURTROOM DEPUTY:  If you would raise your right

23   hand.

24              Do you solemnly swear or affirm to tell the truth,

25   the whole truth, nothing but the truth, in the case now before

1   the Court?

2                THE WITNESS:  Yes.

3                THE COURTROOM DEPUTY:  You may have a seat.

4                If you would state your full name, spelling your

5   last.

6                THE WITNESS:  Laura Whitley, W-H-I-T-L-E-Y.

7                THE COURTROOM DEPUTY:  Thank you.

8                          LAURA WHITLEY,

9   called as a witness by the Government, and having been first

10  duly sworn, was examined and testified as follows:

11                      DIRECT EXAMINATION

12  BY MS. FINLEY:

13  Q     Good afternoon, Ms. Whitley.

14  A     Hello.

15  Q     Can you tell the jury where you live?

16  A     I live in Greenville, North Carolina.

17  Q     And do you know a David Fredrick?

18  A     Yes, I do.

19  Q     How do you know him?

20  A     He's my father.

21  Q     Now, growing up, did you live with your dad?

22  A     As a teenager, but not as a young adult.

23  Q     And what -- what year were you born?

24  A     1976.

25  Q     And what year -- what years did you live with your dad?

1  A      I believe it was the summer of '91, through the summer

2  of '94.

3  Q      Now, is your father married to Dr. Hough?

4  A      Yes, he is.

5  Q      Do you have a -- do you presently have a close

6  relationship with Dr. Hough?

7  A      Yeah.  I think we're . . . fairly close.

8  Q      And was that always the case?

9  A      I think, as a teenager, we had probably more distant,

10 you know, kind of relationship; but I think I kind of did with

11 everyone, just being a teenager, so . . . yeah.

12 Q      When were you living with your -- were your dad and

13 Dr. Hough married at the time you were living with them in

14 1991?

15 A      Yes.

16 Q      And where were you living at the time?

17 A      In Augusta, Georgia.

18 Q      What was your dad doing for employment?

19 A      He was a college professor.  I believe he may have been,

20 at that time, dean of the department of psychology at the

21 college.

22 Q      And do you know what Dr. Hough was doing?

23 A      She was chief resident at MCG, Medical College of

24 Georgia.

25 Q      Are you familiar with the Saba School of Medicine and

1    the Medical University of America?

2    A      Yes.

3    Q      How are you familiar with them?

4    A      I . . . . Just through . . . I was more or less there

5    when they started.  At one point I worked up in Gardner,

6    Massachusetts, for a very short time, and then, of course,

7    through conversations.  And just knowing them, I know of the

8    schools.

9    Q      I'm sorry, I didn't hear the last part, just knowing

10   that . . . .

11   A      Just through conversation, I know of the schools.

12   Q      And who were those conversations with?

13   A      Both my dad and Pat.

14   Q      And do you know who started the schools?

15   A      I believe it was a joint venture involving my dad, Pat,

16   and I don't know who else.

17   Q      And when they started the schools, was that when you

18   were living in Augusta?

19   A      I believe so.  Although I'm not sure if I was -- if they

20   had actually already sort of started the process, because I --

21   you know, I'm not familiar with what that entails.  So it could

22   have been that they started before I got there, and then at

23   some point I just . . . became aware that -- you know, once

24   they got to really going, that's when I became aware of it.  So

25   I don't want to say they started in '91, because it could have

1    started well before that.

2    Q      They were working on it when you started living with

3    them.

4    A      Yes.

5    Q      Have you ever been to either one of the schools?

6    A      On the island?

7    Q      Yes.

8    A      No.

9    Q      Do you know whether Dr. Fredrick and Dr. Hough put their

10    own money into the schools?

11    A      Yes.

12    Q      And how do you know that?

13    A      Conversations that, you know, they . . . took every

14    penny they had, and they --

15    Q      I'm sorry, the "they" is Dr. Fredrick and Dr. Hough?

16    A      Yes.  Well, mostly -- mostly my dad, you know, and just

17    concern because, basically, if the schools did not go well,

18    they were done.  I mean, just everything was gone.

19    Q      Were there -- were you present when they were having

20    conversations about the -- those finances?

21    A      No.  They -- I wasn't present, but just -- you know, I

22    would be kind of wandering around the house and overhear.  And

23    I knew that, you know, it was all of their money was going into

24    the schools, that it was all their own capital.

25    Q      Now, do you know who owned the schools?

1    A       No, I don't.

2    Q       What did you understand your father's role with the

3    school?

4    A       At what point?

5    Q       Starting toward from the beginning, if you start at the

6    beginning.

7    A       Well, from the beginning, it really -- it never changed.

8    He just did everything.  I mean, from changing the -- you know,

9    the bin liners; to buying things for the containers to go to

10   the island; to managing, you know, personnel; to fixing the

11   copy machine . . . he just did everything.

12          I don't think I ever really understood him to have an

13   official title, but it was just anytime anyone needed anything

14   done, there he was.

15   Q       Okay.  Did you understand what Dr. Hough did for the

16   schools?

17   A       I believe it was in clinical medicine.  She was the --

18   you know -- director of the clinical program, I don't know if

19   they call it dean of the clinical program, but she handled the

20   clinical aspects -- clinicals aspect.

21   Q       Now, you said that you went -- you lived with your dad

22   later on, and worked -- did you work for the company?

23   A       Very short time, yes.

24   Q       And what company was that?

25   A       That was EIC Saba, in Gardner, Massachusetts.

1   Q       And what did you do at -- when you were working at EIC?

2   A       Mainly data entry.

3   Q       Do you remember when that was?

4   A       It was . . . I believe the end -- I think we moved in

5   November or December of '99, up to Gardner, and -- because it

6   was just after Hurricane Floyd.  And then we moved back about

7   four to six months later.  It wasn't a very long time.

8   Q       Based on your observations of living with your father

9   and Dr. Hough, who was in charge of the finances?

10              MR. UDOLF:  Objection, Your Honor, foundation.

11              THE COURT:  Overruled.

12              MS. FINLEY:  You can answer.

13              THE WITNESS:  They were always a team.  I can't say

14  that there was one that stood out, as far as being in charge of

15  the finances.  I think they were all in on this thing together,

16  and so they both stood to lose if it failed.

17              So, you know, the -- when I was living with them,

18  like the financial decisions were fairly, you know, jointly

19  split between the two of them.

20  BY MS. FINLEY:

21  Q       Now, do you know anything about your father and

22  Dr. Hough's personal finances?

23  A       No.

24  Q       Did you ever have any conversations with your father

25  about who would be in charge of his estate if something ever

1    happened to him?

2    A      In charge of the -- you mean like an executor?  I'm

3    sorry.

4    Q      Yeah.  Did you ever have a conversation with him about

5    what would happen if he passed away . . . with his assets.

6    A      No.  He just told me that -- I'm not sure if hearsay, I

7    can say it.  As far as I understood, there was an executor, and

8    I was just told:  If something happens to me, contact this

9    person, and they will tell you what to do.

10   Q      And do you remember the name of the person?

11   A      I believe it was Rex.  And his last name -- it's my

12   uncle, but I can't remember his last name offhand.

13   Q      Did you know whether Charlene Varga had any

14   responsibility?

15   A      I believe she was executor of Pat's estate.

16   Q      From the time that you lived with your father and

17   Dr. Hough in the mid-nineties, through -- let me just --

18          MS. FINLEY:  Sorry, Your Honor, withdraw the

19   question.

20   BY MS. FINLEY:

21   Q      Do you know when the schools were sold?

22   A      No.

23   Q      You don't know what year?

24   A      I don't know what year.

25   Q      Okay.

1   A       I could guess, but it would be a guess.

2   Q       You do know that the schools were sold?

3   A       I do know they were sold.

4   Q       So from the time that you lived with Dr. Fredrick and

5   Dr. Hough, through when the schools were sold, were you ever on

6   the board of directors for either school?

7   A       Not that I'm aware of.

8   Q       Did you ever attend board meetings?

9   A       None that I'm aware of.

10          MS. FINLEY:  Your Honor, if I may approach and show

11  the witness 11E, which has already been admitted into evidence?

12          THE COURT:  You may.

13          MS. FINLEY:  And permission to publish, Your Honor?

14          THE COURT:  You may.

15          (An exhibit was projected onto the projector screen.)

16  BY MS. FINLEY:

17  Q       Did your father ever ask if you could be on the board of

18  directors for MUA Limited?

19  A       Not that I recall, but . . . .

20  Q       Did you know to be on the board of directors?

21  A       No.  No, I didn't know to be on the board.  But I don't

22  know if he ever asked me.

23  Q       All right.  You have no knowledge that you are on the

24  board of directors of MUA Limited.

25  A       Right.  I didn't realize I was on the board of

1    directors.  But I'm not saying he didn't ask me at some point.

2    Q      Okay.  Are you familiar with a piece of property in Saba

3    called Round Hill?

4    A      Yes, I am.

5    Q      And what is your understanding of Round Hill?

6    A      My understanding of Round Hill is that it was a piece of

7    property that was . . . purchased with the intention of

8    building . . . I don't recall if it was dorms or classrooms,

9    for the . . . did you say it was on Saba?

10          I don't -- actually, I can't remember if it was Saba or

11   Nevis.  But it was to build dorms or classrooms on that piece

12   of property.

13          MS. FINLEY:  Your Honor, may I confer with counsel

14   for one moment?

15          THE COURT:  You may.

16          (Ms. Finley and Mr. Hochman confer privately.)

17          MS. FINLEY:  Your Honor, may I approach?

18          THE COURT:  You may.

19   BY MS. FINLEY:

20   Q      I'm going to show you what's been marked as Exhibit 6L,

21   as in "Leo."

22          MS. FINLEY:  Your Honor, at this time the government

23   would offer 6L into evidence?

24          MR. UDOLF:  No objection.

25          THE COURT:  6L will be admitted.

1                    (Government's Exhibit 6L was admitted into evidence.)

2                    MS. FINLEY:  Permission to publish?

3                    THE COURT:  You may.

4                    (An exhibit was projected onto the projector screen.)

5    BY MS. FINLEY:

6    Q       May I have -- have you ever -- let me ask, did -- did

7    you ever purchase land on Saba called Round Hill?

8    A        I'm aware, now, that there was a purchase for land that

9    was the Round Hill property; and that I had -- it would have

10   been purchased essentially in my name, but I didn't . . . go

11   out and finance it.

12   Q       All right.  And that understanding has come more

13   recently, that your name is on this property?

14   A        Well, I was aware that . . . within the last year.  When

15   you say "more recently," I would say within the last year,

16   yeah.

17   Q       Now, when we look at the top of this document, can you

18   tell what day, what date, or what year it is alleged that this

19   document, or the transaction, took place?

20   A        Sure.  The first line, it says, "Upon this nineteen

21   hundred and ninety-nine . . . ."

22   Q       And how old are you in 1999?

23   A        Oh, let me think.  I was 20 or 21.

24   Q       And did you have $250,000 to purchase land?

25   A        No.

1   Q      Do you recall if your dad asked you if he could purchase

2   land in your name?

3   A      Yes, I do.

4   Q      Do you recall that, in 1999, your father asked if --

5   A      No, not in 1999.

6   Q      With respect to this transaction --

7   A      Okay.

8   Q      -- do you remember if your dad asked you if he could

9   purchase the land in your name?

10  A      No, I don't recall.

11  Q      Now I'm going to show you what's been previously

12  admitted as Exhibit 8J and 8K.

13         MS. FINLEY:  And if we can put 8J on the screen.

14         (An exhibit was projected onto the projector screen.)

15  BY MS. FINLEY:

16  Q      If we look at the second page of 8J . . . in 2001, do

17  you know if -- do you have any knowledge that you allowed Round

18  Hill Project Holding Company to build and use the property

19  called Round Hill?

20  A      I was aware that something was being done with the

21  property, at some point, or that, you know, it was -- the

22  property was supposed to be developed.  But I'm not sure about

23  the date.

24  Q      Did anybody ever come to you, as the owner of Round

25  Hill, and say, "We'd like to build things on it"?

1   A       No.

2   Q       And if you can look at Exhibit 8K, and if we can look at

3   the second page, in June of 2004, did the Round Hill Project

4   Holding Company, through Dr. Hough, approach you and ask you to

5   purchase the property named Round Hill?

6   A       Yes.  I believe that was in 1994.

7   Q       In 2004?  Sorry?

8   A       I'm sorry.  2004.  Yes.

9   Q       So, in 2004, you knew that you owned property called

10  Round Hill?

11  A       I knew that there were continuing things with this

12  property; but, because I'd never seen it, I just didn't know

13  very much about it.  But I understood that there were things

14  going on with it.  But no one came to me and asked.

15  Q       So you had no personal knowledge that you owned a piece

16  of property; is that correct?

17  A       That's correct.

18  Q       And you do not have any recollection of anyone coming to

19  you to ask you to sell the property --

20  A       Correct.

21  Q       -- in 2004.

22          And did you receive $17,000 for the property?

23  A       No, I did not.

24  Q       Now, did you ever authorize anyone, either Dr. Hough, or

25  Dr. Fredrick, to sell the property on your behalf?

1   A        Not knowingly.

2   Q        Could you . . . know to sell something you didn't know

3   you had?

4   A        Well, a paper had been presented to me, because I

5   understood that I had signed -- at some point there was this

6   property that was bought, and the purpose of it was for the

7   school.

8           So if somebody brought me a paper and said, "Okay, we're

9   developing it," or, "We're selling it now," or, "Whatever we're

10  doing with it, can you sign it," it didn't feel like mine.

11          So I know that I signed many things, and I can't say

12  that a, like, deed of sale couldn't have been one of them.  But

13  it wasn't something I was aware of, that:  Oh, I understand

14  this to be a deed of sale for that particular piece of

15  property.

16  Q    But did you testify that you didn't find out that you

17  were even on this property until a year ago?

18  A        Right.  Well, I had known about it, but when I was first

19  contacted, it didn't ring a bell.  There was nothing about it

20  that -- that, you know, I could think of, except that it was a

21  piece of property, and I didn't recognize it as the Round Hill

22  Tree, or Round Tree Hill.

23          And then I sat down and thought about it after I was

24  first contacted, and then I said:  That must have been that

25  thing that was five, six years ago.

1        And then I started putting it together, that I know that

2   I signed a couple of pieces of paper about it.

3   Q      Do you know whether Dr. Fredrick and Dr. Hough have a

4   home in Asheville, North Carolina?

5   A      At one time they did; yes.

6   Q      Was this a personal residence?

7   A      I'm not sure.  I only visited once.  They did stay there

8   at times, but not often, so I --

9   Q      Was it -- how was it decorated?

10  A      It was decorated as a home.  The main part of it was.

11  There were several apartments that were decorated as

12  apartments.

13  Q      Are you familiar with a home on Campden Way?

14  A      Yes.

15  Q      Okay.  And what . . . what do you -- were you involved

16  with the purchase of that home?

17  A      Yes.

18  Q      And how did you become involved with the purchase of

19  that home?

20  A      Through my father.

21  Q      And what did your father ask you?

22         And let me just ask you, do you remember when that was,

23  first?

24  A      Oh, boy.  2005 . . . I think?  I don't know.  I'm really

25  bad with dates like that.

1   Q      Do you remember what your dad asked you when it came to

2   that house?

3   A      Sure.  There had been some students rotating at a local

4   hospital, and a lot of students actually, from Saba, that I

5   know, there may have been ones from Nevis, as well, but . . . .

6   The idea was that there would be a place where students could

7   go and stay.  They wouldn't have to get locked into one-year

8   lease agreements –– because it's a college town, some of them

9   were having some trouble finding more flexible lease

10  agreements –– and that it should be appropriate for a number of

11  students to be able to go and live and entertain, and then, of

12  course, be able to leave and not be concerned about breaking a

13  lease agreement.

14  Q      Now, do you know how your father paid for the school ––

15  excuse me –– for the house?

16  A      No, I don't.

17  Q      And did your dad ask you to purchase the home on his

18  behalf?

19  A      I did sign the paperwork, so I guess that would be on

20  his behalf.

21  Q      And do you know if the house was purchased in your name,

22  or do you know whose name it was purchased in?

23  A      It was not purchased in my name.

24  Q      Do you know whose name it was purchased in?

25  A      Oh.  Ample Dynamic, I believe?

1    Q      And do you know what Ample Dynamic is?

2    A      No.

3           MS. FINLEY:  I'm going to show you what's been marked

4    as Exhibit 16J.

5           Sorry.  One moment, Your Honor.  I don't have it, so

6    I'll move on E.

7    BY MS. FINLEY:

8    Q      Do you know if you were ever appointed as a

9    vice-president of Ample Dynamic?

10   A      No.

11   Q      And do you know whether, at the time you purchased the

12   home, or the home was purchased, whether the school had already

13   been sold?

14   A      No, I'm not -- I'm not sure --

15   Q      Okay.

16   A      -- if it had been or not.

17   Q      Now, do you know whether your father and Dr. Hough own a

18   condominium in Sarasota?

19   A      I believe there is; yes.

20   Q      And do you know whose condo it is?

21   A      I believe it's Pat's condo.

22   Q      And how do you know that?

23   A      It was in conversations with my dad.

24          MR. UDOLF:  Objection.  It's outside the scope.

25          MS. FINLEY:  Direct, Your Honor?

1              MR. UDOLF:  It's outside of the scope of the

2    conspiracy.  It's non-furtherance.

3              THE COURT:  If you want to argue at sidebar, I'll

4    hear you.  Otherwise, it will be sustained.

5              MS. FINLEY:  Thank you, Your Honor.  I'll be heard at

6    sidebar.

7              THE COURT:  Okay.

8                          AT SIDEBAR

9              THE COURT:  Why don't you more fully state the

10   objection.  I think I know what you mean, but . . . .

11             MR. UDOLF:  I didn't want to be too speaking.

12             THE COURT:  That's fine.  Go ahead and tell me now,

13   for the record, what your objection is.

14             MR. UDOLF:  For the record, the objection is, unless

15   it can be established that this statement was somehow in

16   furtherance of the conspiracy, it should not be admitted into

17   evidence.

18             THE COURT:  Okay.

19             MS. FINLEY:  Your Honor, there is going to be

20   evidence through the summary witness that Dr. Fredrick and

21   Dr. Hough caused more than $850,000 to be transferred from some

22   of the offshore bank accounts.  And I believe in 2008 and 2009,

23   it is alleged, as an overt act of the conspiracy, to purchase

24   an asset, specifically the condo, in the name of the Leon

25   group, in order to conceal the funds.

1          THE COURT:  And is this witness on the title, or

2     paperwork, or anything like that?

3          MS. FINLEY:  No.  I'm just asking if she knows

4     whether it was -- and I'm sorry, I was just trying to establish

5     a foundation as to how she knew it.  I'm just going to move on.

6          MR. UDOLF:  Judge, if Dr. Fredrick were on trial, it

7     would be admissible as to him, but it would not be admissible

8     as A statement against this conspiracy.

9          THE COURT:  That seems to be the case.  I don't see

10    how it's in furtherance, if Dr. Fredrick told his daughter that

11    the condo was in Dr. Hough's name, which is what you're trying

12    to elicit.

13         MS. FINLEY:  Yes.

14         THE COURT:  And if the daughter has nothing to do

15    with the condo in terms of paperwork, he may have said it, but

16    I just don't see that being in furtherance of the conspiracy.

17    The objection will be sustained.

18                          IN OPEN COURT

19         THE COURT:  You may proceed.

20         MS. FINLEY:  Thank you, Your Honor.

21    BY MS. FINLEY:

22    Q    I'm now going to show you what's been previously marked

23    as Government's Exhibit 6J and 6M.

24         And, Ms. Whitley, if you can just take a look at, first,

25    Exhibit 6J.  You are going to have to look at the hard copy.

1   It is not in evidence yet.

2   A      Oh, okay.  I was waiting for it.  Just looking on the

3   screen.  Okay.

4            (The witness examines an exhibit.)

5   Q      Do you recognize your signature on the document?

6   A      Yes; on the fourth page.

7            MS. FINLEY:  Your Honor, at this time the government

8   would offer Exhibit 6J into evidence.

9            MR. UDOLF:  No objection.

10            THE COURT:  6J will be admitted.

11            (Government's Exhibit 6J was admitted into evidence.)

12            MS. FINLEY:  Permission to publish, please?

13            THE COURT:  You may.

14            (An exhibit was projected onto the projector screen.)

15   BY MS. FINLEY:

16   Q      If we could just turn to the first page, is this a

17   mortgage deed for a building in Gardner, Massachusetts?

18   A      Yes, it is.

19   Q      And can you tell what date is it -- or, at least,

20   there's a note in the middle of the . . . sort of the top.

21            Can you tell what date the note was entered into?

22   A      Oh, note date, July 1st, 1998.

23   Q      Okay.  And if we can turn to the last -- or the fourth

24   page, and is that your signature?

25   A      Yes, it is.

1   Q       And it's dated that you signed that document on

2   February 1st, 1999?

3   A       That is correct.

4   Q       And were you the president and treasurer of Educational

5   Information Consultants, in 1999?

6   A       Not to my knowledge.

7   Q       And do you remember if your father asked you to sign

8   this document?

9   A       Yes.

10  Q       Who is Donna Cryer?

11  A       That's my father's first wife.

12  Q       And if we can look at Exhibit 6M, and if you can just

13  take a look and see if your signature is on that document?

14  A       Yes, it is.

15          MS. FINLEY:  Your Honor, at this time the government

16  would offer 6M into evidence.

17          MR. UDOLF:  No objection.

18          THE COURT:  6M, as in "Mary" --

19          MS. FINLEY:  6M, as in "Mary."

20          THE COURT:  -- will be admitted and may be published.

21          (Government's Exhibit 6M was admitted into evidence.)

22          MS. FINLEY:  Thank you, Your Honor.

23          (An exhibit was projected onto the projector screen.)

24  BY MS. FINLEY:

25  Q       Now, is this a power of attorney for you?

1    A      Yes, it is.

2    Q      And is it dated February 9th, 1999?

3    A      Yes, it is.

4    Q      And again, is that your signature?

5    A      Yes, it is.

6    Q      And do you know why you're providing a power of attorney

7    to the individuals listed under A, B, and C?

8    A      Without reading, or just going based on my recollection?

9    Q      Do you remember filling this out?

10   A      I don't know.  I don't remember signing it; but I know

11   that there was a lot of land issues, so land stuff.  That was

12   just my understanding.  And it appears that this is for a

13   parcel of land.

14   Q      And is that the parcel of land in Saba?

15   A      It is.

16   Q      And do you remember if your father asked you to sign

17   this?

18   A      I don't remember signing this.  It would be speculation

19   to say he asked me, but I wouldn't have just initiated it,

20   signing it myself.

21   Q      And with respect to the building in Gardner, that we saw

22   your name on the note, do you remember if you ever, as

23   president and treasurer of EIC, sold the building to the Lynn,

24   Leon & Lyon Group?

25   A      No.

1   Q      Now I'm going to show you what's been marked and

2   previously admitted as Exhibit 7AA.

3              (The witness examines an exhibit.)

4   Q      And just before we take a look at that, is Walls . . .

5   Walls is your previous -- your name by a previous marriage?

6   A      My first husband; correct.

7   Q      All right.

8              MS. FINLEY:  And now, if we can publish Exhibit 7AA,

9   please.

10             (An exhibit was projected onto the projector screen.)

11  BY MS. FINLEY:

12  Q      Now, are you familiar with an entity named Medical

13  Technology Associates?

14  A      No, I'm not.

15  Q      And were you ever the clinical director of Medical

16  Technology Associates?

17  A      Not that I'm aware of.

18  Q      Have you ever been to the Bahamas?

19  A      No.

20  Q      And what were you doing in 2004?

21  A      In 2004 . . . .  Well, my son was born, my second from

22  my youngest was born in 07/03/04, so July 3, 2004.  So for the

23  majority of the first part of 2004, I was pregnant.  And I have

24  very, very difficult pregnancies, so I'm usually not mobile

25  much.

1   Q       You weren't serving as a clinical director?

2   A       No.

3   Q       Now, over the last ten years or so, have you received

4   money from your dad?

5   A       Yes.

6   Q       And what were those funds for?

7   A       I have four children, and so it's a lot to keep up with,

8   as far as birthdays.  And so he would send me, periodically,

9   like a thousand dollars, $2,000, to do something with the kids,

10  birthday presents, Christmas presents, little stuff like -- you

11  know, that might come up.

12          He paid for my oldest daughter to have braces.  She had

13  horribly deformed jawline and crowded teeth.  And he did help

14  pay for her to have braces and have those fixed.  And Pat as

15  well, she's very concerned about that.

16          So . . . .  Trying to think of anything else.  It was

17  like birthdays, Christmas, holidays, kind of big events for the

18  kids.

19  Q       Now, just turning briefly back to the house in

20  Greenville, I found Exhibit 16J, so I'm going to have it

21  marked, and . . . .

22              MS. FINLEY:  Your Honor, at this time the government

23  would offer 16J into evidence?

24              MR. UDOLF:  No objection.

25              THE COURT:  16J will be admitted and may be

1    published.

2              (Government's Exhibit 16J was admitted into

3       evidence.)

4              MS. FINLEY:  Thank you, Your Honor.

5              (An exhibit was projected onto the projector screen.)

6              MS. FINLEY:  If we can zoom in.

7    BY MS. FINLEY:

8    Q     Do you remember, on April 15, 2011, being appointed the

9    vice-president of Ample Dynamic?

10   A     No.

11   Q     Do you know who Beda Singenberger?

12   A     I've heard the name, but I don't know who he is.

13   Q     And who have you heard the name from?

14   A     My dad.

15   Q     Now, the house in Greenville, did you live in that

16   house?

17   A     Yes, I did, for a short time.

18   Q     Did your dad and Dr. Hough purchase another home for

19   you?

20   A     There was a home previous to that, that was on Gray Fox

21   Trail.

22   Q     And did you live in that house?

23   A     Yes, we did.

24   Q     Now, during the time that you lived with your father and

25   Dr. Hough, did you have an opportunity to observe their

1    interactions?

2    A     Yes, I did.

3    Q     And how would you describe your father's personality?

4    A     I'm sorry?

5    Q     How would you describe your father's personality?

6          MR. UDOLF:  Objection, vague.

7          THE COURT:  Overruled.

8          She may answer if she understands the question.

9          THE WITNESS:  Personality in general, or

10   towards . . . .

11   BY MS. FINLEY:

12   Q     Just personality in general, how would you describe your

13   father?

14   A     He is incredibly dynamic, funny, very hard working, to

15   the exclusion of almost everything.  He works from 5:00 a.m.,

16   he gets up, works, and then he goes to bed

17   at 10:00, 11:00 o'clock, falls asleep, and then does it all

18   over again, seven days a week.  I've never seen anyone in my

19   life work like he does.  But he's also very charismatic, and

20   very funny . . . lots of friends.  Everyone -- you know,

21   everyone says, "Oh, everyone loves him," loves his family very,

22   very much.

23   Q     And how would you describe Dr. Hough?

24   A     Incredibly intelligent.  Probably one of the smartest

25   women I've ever known, and . . . very professional, loving,

1    funny.  Someone, that you know, has close friends, and stays in

2    contact with them for a very long time.  She has people who

3    are, you know, very close friends.  And, there again -- very

4    smart, and very capable, and just, you know, an all-around very

5    successful, driven person.

6    Q      Based on your observation, is Dr. Hough detail oriented?

7    A      Yes.

8    Q      And based on your observations with Dr. Hough, do you

9    think that she would sign a document without reading it?

10             MR. UDOLF:  Objection, Your Honor, foundation.

11             THE COURT:  Sustained.

12   BY MS. FINLEY:

13   Q      Ms. Whitley, when you were in high school, did you cut

14   school?

15   A      Yes, I did.

16   Q      And when you cut school, did you write a note to the

17   school to say you were sick for the day?

18   A      I did.

19   Q      Did you sign Dr. Hough's signature?

20   A      I did.

21   Q      What was Dr. Hough's -- or your father's response to

22   that -- to you cutting school?

23   A      I recall Pat being extremely upset.

24             MR. UDOLF:  Objection, relevance, Your Honor.

25             THE COURT:  Do you care to be heard?

1          MS. FINLEY:  Yes, Your Honor.

2          THE COURT:  Come to sidebar.

3                      AT SIDEBAR

4          MS. FINLEY:  Your Honor, they've asked almost every

5     single witness about, do they know if Dr. Hough didn't sign

6     this, or did she sign it without ever looking at it.  I think

7     the fact that she has a response to somebody signing her

8     signature without her knowledge is relevant.

9          THE COURT:  So this is the stepdaughter's forgery of

10    a school note when the stepdaughter is in high school -- I kind

11    of forget which, grade school or high school?

12         MS. FINLEY:  In high school.

13         THE COURT:  And because the defendant got upset

14    because of that, that relates to all the signatures we've seen

15    in these documents?

16         MS. FINLEY:  I think the fact that she wasn't upset

17    that she had cut school, but the fact that she was more upset

18    about her signature, at a time when they were starting the

19    school, and they were arguing that, I guess, Dr. Fredrick

20    signed things without her knowledge, that if she had known

21    about it, she would have likely been upset at the same time.

22         MR. UDOLF:  There is a difference in signing things

23    in blank or signing things without reading it, and forgery,

24    especially amongst a young girl, high school girl.  There's a

25    world of difference, Your Honor.

1      THE COURT:  And do we know when this witness was in
2  high school?
3      MS. FINLEY:  She testified she was living with them
4  between 1991 and 1994.
5      MR. UDOLF:  From her freshman year to her junior year
6  in high school.  She's 37 now.
7      THE COURT:  The objection is sustained.
8                      IN OPEN COURT
9      MS. FINLEY:  I have no further questions, Your Honor.
10      THE COURT:  All right.  Thank you.
11      Mr. Udolf?
12      MR. UDOLF:  I just have a couple of questions, Your
13  Honor.
14                    CROSS EXAMINATION
15  BY MR. UDOLF:
16  Q     I just have a couple questions for you, Miss Whitley.
17  A     Sure.
18  Q     All the documents that the prosecutor has shown you,
19  when you signed all these documents, you didn't intend to
20  defraud anyone, did you.
21  A     No.
22  Q     You trusted your dad.
23  A     Yes.
24  Q     And certainly your father would not involve you in
25  something that was illegal; right?

```
1    A       No.
2            MS. FINLEY:  Objection, speculation.
3            THE COURT:  Sustained.
4    BY MR. UDOLF:
5    Q       Do you trust your father in that regard, that he would
6    not ask you to do something illegal?
7    A       I trust my father.
8    Q       With respect to the Round Hill property, you are aware,
9    are you not, that that property was purchased in a hurry?
10   A       Yes.
11   Q       And there wasn't sufficient time to form an LLC to put
12   it in someone else's name?
13   A       Exactly.
14   Q       And at the time, you had a different name than your
15   father, it was Walls; correct?
16   A       All right.
17   Q       And as far as you were concerned, you never owned the
18   Round Hill property; is that correct?
19   A       That's correct.
20           MR. UDOLF:  No further questions.
21           THE COURT:  Any redirect?
22           MS. FINLEY:  No, Your Honor.
23           THE COURT:  You may stand down.  Thank you.
24           You may call your next witness.
25           (The witness left the witness box.)
```

1          MS. FINLEY:  Thank you, Your Honor.

2          The government calls Jason Harrell.

3          THE COURT:  Right up here, please.

4          THE COURTROOM DEPUTY:  If you'd raise your right

5     hand.

6          Do you solemnly swear or affirm to tell the truth,

7     the whole truth, nothing but truth, in the case now before the

8     Court?

9          THE WITNESS:  I do.

10         THE COURTROOM DEPUTY:  You may have a seat.

11         State your full name, spelling your last.

12         THE WITNESS:  Jason Todd Harrell, H-A-R-R-E-L-L.

13         THE COURTROOM DEPUTY:  And your middle name was?

14         THE WITNESS:  Todd, T-O-D-D.

15         THE COURTROOM DEPUTY:  Thank you.

16                        JASON HARRELL,

17    called as a witness by the Government, and having been first

18    duly sworn, was examined and testified as follows:

19                      DIRECT EXAMINATION

20    BY MS. FINLEY:

21    Q     Good afternoon, Mr. Harrell.

22    A     Hi.

23    Q     What do you do for living?

24    A     I'm a real estate agent and broker.

25    Q     In where?  I'm sorry.

1    A      In Greenville, North Carolina.

2    Q      And are you familiar with David Fredrick and Patricia

3    Hough?

4    A      Yes, I am.

5    Q      And how are you familiar with them?

6    A      I was their buyer's agent when they purchased a home in

7    Greenville, and then later their seller's agent when they sold

8    the home in Greenville.

9              MS. FINLEY:  Your Honor, may I approach?

10             THE COURT:  You may.

11             MS. FINLEY:  I am going to show you what's been

12   marked as Exhibit 15B, C, and D.

13             Your Honor, at this time the government would offer

14   15B, as in "boy"; 15C; and 15D.

15             MR. UDOLF:  No objection.

16             THE COURT:  15B, C, and D will be admitted.

17             (Government's Exhibits 15B, 15C, and 15D were

18        admitted into evidence.)

19             MS. FINLEY:  Your Honor, permission to publish?

20             THE COURT:  You may.

21             (An exhibit was projected onto the projector screen.)

22   BY MS. FINLEY:

23   Q      Mr. Harrell, can we look first at Exhibit 15B, please?

24          Can you explain to the jury what this document is?

25   A      This is an MLS sheet on the home when it was listed,

1   when it was purchased.

2   Q      And could you just -- does the document describe the

3   home?

4   A      The list price on it was 600,000.  It had five bedrooms,

5   four bathrooms, one full bath, right about 46, 4,700 square

6   feet, built in 2005.

7   Q      Now, did you meet with Dr. Fredrick or Dr. Hough with

8   respect to the purchase of this house?

9   A      Not on the purchase of the home, I did not.

10  Q      Who did you meet with?

11  A      It was Laura Whitley.

12  Q      And do you know who Laura Whitley is?

13  A      Their daughter.

14  Q      And can you describe for the jurors how the transaction

15  began, or how did you come to meet Ms. Whitley?

16  A      Ms. Whitley either called or e-mailed, wanted to look at

17  a home.  I went out and showed her the home.  She said her

18  parents were buying her a house.

19         And we wrote up an offer, negotiated it, and it was a

20  pretty straightforward, clean transaction.

21  Q      Now, what type of neighborhood is this home located in?

22  A      It's one of the nicer neighborhoods in Greenville, with

23  a upper moderate-price neighborhood.

24  Q      What did you understand the home was going to be used

25  for?

1    A      My understanding was that Laura and her family were

2    going to live in the home.

3    Q      And who told that you?

4    A      I believe Laura did.

5    Q      And did Laura ever tell you that the home was going to

6    be used to operate a dormitory?

7    A      No, not that I'm aware.

8    Q      Based on the neighborhood that that was in, could they

9    have operated a dormitory in that house?

10   A      I'd have to check the covenants, to be honest with you.

11   I don't think it would be permitted in that neighborhood.  But

12   I'm not a hundred percent for sure.

13   Q      Now, if we can look at Exhibit 15C, what is this

14   document?

15          (An exhibit was projected onto the projector screen.)

16   A      This is the offer to purchase contract, when the home

17   was purchased.

18   Q      And who is listed as the buyer?

19   A      The buyer is listed as Laura Whitley.

20   Q      And who is listed -- sorry.  Withdraw the question.

21          If we can turn to the last page, does Ms. Whitley sign

22   the offer to purchase?

23   A      Yes, she does.

24   Q      Now, if we can turn to Exhibit 15D, as in "dog" . . . .

25          And can you tell when this house was purchased?

1    A      On June the 11th of '07.

2    Q      And does the settlement statement basically list all of

3    the cash due, and what the sellers are going to get at the

4    closing?

5    A      Yes.  It shows that it was a cash transaction, and it

6    shows the funds that the buyer must bring to closing.

7    Q      And if we can just turn back to the top, the purchase

8    offer was in Ms. Whitley's name.

9           Who is the settlement statement's name in?

10   A      The settlement statement is in Ample Dynamic Trading

11   Limited.

12   Q      And what address is associated with Ample Dynamic?

13   A      Grey Fox Trail.

14   Q      And can you tell from this document whether any of the

15   purchase was financed?

16   A      No; none of the purchase was financed.

17   Q      Do you know where the money came from to purchase the

18   house?

19   A      I don't know what account it came from.  I know it was

20   wired to the closing attorney.

21   Q      And then at the bottom of the document, does Ms. Whitley

22   sign the document?

23   A      That is correct.

24   Q      And for Ample Dynamic?

25   A      Correct.

1   Q      Now, did there come a time when David Fredrick or

2   Patricia Hough decided to sell the home?

3   A      About a year, year and a half later, I think I got a

4   phone call from Laura that she -- that her parents wanted to

5   sell the home, and asked me, would I assist in the sale of the

6   it.

7   Q      Do you know what they had been using the home for

8   between when they bought it and when they called you?

9   A      I assumed that Laura was living in the home.

10          MR. HOCHMAN:  Objection, move to strike, on the

11   assumption.

12          THE COURT:  Sustained.

13   BY MS. FINLEY:

14   Q      Do you know if Ms. Whitley was living in the home?

15   A      When I went over to the home, her things -- well, things

16   were there, personal items, that type of thing.

17   Q      Do you know why they were selling the home?

18   A      I asked her --

19          MR. HOCHMAN:  Objection as to foundation.

20          THE COURT:  Overruled.

21          THE WITNESS:  I asked her --

22          MR. HOCHMAN:  Objection, nonresponsive to the "do you

23   know" question.

24          THE COURT:  Overruled.

25          THE WITNESS:  Will you ask the question again?

1          MS. FINLEY:  Sure.

2    BY MS. FINLEY:

3    Q      Do you know --

4          MS. FINLEY:  I'll lay further foundation, Your Honor.

5    BY MS. FINLEY:

6    Q      Did you talk with Ms. Whitley about why they were

7    selling the home, or did you talk to anybody about it?

8    A      I asked her why they were selling the home, and she said

9    that her husband didn't like the home, and they just wanted to,

10   I think, downsize.

11         MS. FINLEY:  Okay.  Now, if I can . . . .  Sorry,

12   Your Honor.  If I can get just all of the documents that he

13   needs?

14         I'm going to show you what has been marked as 17B,

15   17C, 16B, and 16E.

16   BY MS. FINLEY:

17   Q      Now, if we could look at --

18         MS. FINLEY:  I'm sorry.  Your Honor, at this time the

19   government would offer 17B, 17C, 16B, and 16C into evidence.

20         MR. HOCHMAN:  No objection, Your Honor.

21         THE COURT:  I'm sorry, 16 was 16C?

22         MS. FINLEY:  16 . . . .  I'm sorry, Your Honor.  May

23   I approach there?  I apologize.

24         THE COURT:  Sure.  That was just different than what

25   I wrote down.

1          MS. FINLEY:  17B and 17C . . . and 16B and 16E.

2          THE COURT:  E.  All right.

3          MS. FINLEY:  Sorry.  E, as in "Edward."

4          THE COURT:  Mr. Hochman, any objections to any of

5    those?

6          MR. HOCHMAN:  No, Your Honor.

7          THE COURT:  All right.  16B, 16E, 17B, and 17C will

8    be admitted.

9          (Government's Exhibits 16B, 16E, 17B, and 17C were

10       admitted into evidence.)

11         MS. FINLEY:  Permission to publish?

12         THE COURT:  You may.

13         MS. FINLEY:  Now, if we can turn first to

14   Exhibit 17B, and if we can turn to the second page.

15         (An exhibit was projected onto the projector screen.)

16   BY MS. FINLEY:

17   Q    At the bottom, is there an e-mail from you to David

18   Fredrick?

19   A    Yes, there is.

20   Q    And what is the date of the e-mail?

21   A    June 14th of 2010.

22   Q    And is that around the time that they were trying to

23   sell the home?

24   A    Yes, that was.

25   Q    And was this a difficult time in the market in

1   Greenville?

2   A       Yes, it definitely was.

3   Q       Now, if we can turn your attention to

4   Exhibit 17C . . . .

5           Now, prior to coming here today, you and I had a chance

6   to meet; is that correct?

7   A       Yes.

8   Q       And you had a chance to look at these exhibits.

9   A       That's correct.

10  Q       All right.  And you had a chance to review Exhibit 17C?

11  A       Correct.

12  Q       Now, what is in Exhibit 17C?

13  A       This is a lot of correspondence between myself and the

14  sellers.  So far as simple things, as having the lawn mowed,

15  there was a leak, and we worked on the restoration of the home

16  so we could get it back on the market, worked on a price

17  reduction, and down to negotiating an offer and answering

18  questions and concerns about why the home had not sold.

19  Q       And are -- as part of the sale, who were you dealing

20  with to sell the house?

21  A       I tried to copy both parties when we were selling the

22  home.

23  Q       When you say, "both parties," who do you mean?

24  A       Fredrick and Hough --

25  Q       All right.

1    A      -- but I would say I probably had more personal contact

2    with Dr. Hough, I would say, so far as more e-mails with her.

3    Q      All right.  Now, within this Exhibit 17C, are there

4    e-mails between you and Dr. Hough?

5    A      Yes, there are.

6    Q      And are there e-mails between you and David Fredrick?

7    A      Yes, there are.

8    Q      And as part of the sale, did Ms. Whitley also have

9    some -- was she providing assistance to her parents?

10   A      Her primary was what could she do to make the house

11   better so that it could sell, as far as lawn maintenance, any

12   staging, that type of thing.  I dealt more with Fredrick and

13   Hough on the actual dollars and cents on the sale of the house.

14   Q      If we could turn to Exhibit 17C there, chronologically,

15   from the back forward, so if we can start from the back, on

16   Page 81 . . . .

17   A      Okay.

18   Q      And at the top of the page, is there an e-mail dated

19   August 17th, 2010?

20   A      There is.

21   Q      Who is the e-mail from?

22   A      From Dr. Hough.

23   Q      And who is it to?

24   A      To myself.

25   Q      There anyone copied on the e-mail?

1    A       Let's see.  Yes.  Dr. Fredrick is.

2    Q       And could you read the e-mail?

3    A       Sure.

4            "Jason, this appears to be a pro forma marketing plan

5    for your firm.  How many times has the house been shown since

6    the listing?  Has there been an open house, and if so, when?

7    How many other homes have sold in the neighborhood?  What were

8    the asking and selling prices?  You should be giving us

9    feedback by e-mail at least every two weeks.  Sincerely, Pat."

10   Q       Now, as part of the transaction, did you have

11   opportunity to meet with Dr. Hough?

12   A       I met with her before the home closed, not before we

13   listed, but she came down, and I met with her and Laura at the

14   house . . . prior to closing.

15   Q       Can I direct your attention to Page 35 in 17 . . . .

16           At the top of the page, is there an e-mail dated

17   February 28, 2011?

18   A       Yes, there is.

19   Q       And is that when you met Dr. Hough at the house?

20   A       Yes, it is.  We had gotten an offer, and then we were

21   going to meet at the house.

22   Q       Now, you just said that you got an offer.

23           Did the sale eventually go to contract?

24   A       Yes, it went to contract.  We had some negotiation, and

25   then it went to contract.

1    Q     Okay.  And when it went to contract, were there any

2    issues about who could sign for the contract?

3    A     Not on my end, with the offer to purchase; but when it

4    came to signing the deed, the attorney needed proof as to who

5    could sign for the company.

6    Q     And were you involved in the go-betweens in order to get

7    that documentation?

8    A     Just assisting the attorney, and asking them to send the

9    documents that we needed.

10   Q     And if we could turn to Page 33, at the bottom, there's

11   an e-mail, March 3rd, 2011.

12         Is that from you?

13   A     Yes, it is.

14   Q     And it's to Dr. Hough and Dr. Fredrick?

15   A     Correct.

16   Q     And are you asking for that documentation in the third

17   paragraph?

18   A     Yes.  I said that we need documentation that gives

19   whomever signed the contract for the owner of record the

20   authority to do so.

21   Q     And if we turn to the top of that page, does

22   Dr. Fredrick respond?

23   A     Yes, he does.

24   Q     And is Dr. Hough copied on the e-mail?

25   A     Yes, she is.

1    Q      And what does Dr. Fredrick say?

2    A      He says:  "I am, 'on the road,' and will be at my

3    computer and fax on Sunday.  I will fax you the signed

4    agreement and the letter from Ample Dynamic giving me the

5    authority to sign on behalf of the company.  You should have

6    everything by Monday," and then it gives an address.

7    Q      Now, if we could just turn for a moment to

8    Exhibit 16B . . . .

9           What is this document?

10   A      This is the sale of the home, the offer to purchase.

11   Q      And do you know what Ample Dynamic is?

12   A      No, I don't.

13   Q      Do you know who owns Ample Dynamic?

14   A      No, I don't.  I assumed -- well, I was told that the --

15   Dr. Hough and Dr. Fredrick --

16          MR. HOCHMAN:  Objection, foundation.  Speculation.

17          THE COURT:  Sustained for the first part.

18   BY MS. FINLEY:

19   Q      I was asking you, yes or no, do you know who owns Ample

20   Dynamic?

21   A      Not directly, no.

22   Q      Did somebody tell you who owned Ample Dynamic?

23          MR. HOCHMAN:  Objection, hearsay.

24          THE COURT:  I'll take a yes or a no on that one.

25

1    BY MS. FINLEY:

2    Q      Yes or no, did somebody tell you who owned Ample

3    Dynamic?

4    A      Yes.

5    Q      Who told you?

6    A      Laura.

7    Q      Now, if we can look back at Exhibit 16B, how much were

8    they going to sell the house for?

9    A      455.

10   Q      And so they were taking a loss?

11   A      Definitely.

12   Q      Okay.  And if we turn to the last page, on Page 8, for

13   the purchase and the contract, who signs for Ample Dynamic?

14   A      David Fredrick.

15   Q      And what is the date?

16   A      March the 2nd of 2011.

17   Q      Now, if we could turn back to Exhibit 17C, and turn to

18   Page 22, is this an e-mail dated March 10th, 2011?

19   A      Yes, it is.

20   Q      And were you still trying to get the documentation for

21   somebody to have permission to sign?

22   A      That is correct.

23   Q      And who was this e-mail to?

24   A      This e-mail was -- they were both copied on this e-mail.

25   Q      And when you say the "both" --

1    A       Dr. Hough and Dr. Fredrick; yes.  Sorry.

2    Q       Now if we can turn to Exhibit 16E . . . .

3            Do you remember, was there a discussion about the kind

4    of document that was required for Dr. Fredrick to sign on

5    behalf of Ample Dynamic?

6    A       I think we needed something -- the attorney was

7    requesting that he have proof that they were able to sign on

8    behalf of Ample Dynamic.

9    Q       And at the bottom, is Steve Jones the attorney?

10   A       Yes.  Steve Jones was the closing attorney.

11   Q       And is there an e-mail dated March 14th, 2011, from

12   Mr. Jones to David Fredrick, and you?

13   A       Yes.

14   Q       And do you know who the other person is on the cc line?

15   A       That is actually my assistant, who helped with the

16   paperwork.

17   Q       All right.  And in this e-mail, is Mr. Jones requesting

18   from -- explaining to Dr. Fredrick that the power of attorney

19   is not sufficient?

20   A       Yes, he was.

21   Q       And if you turn to the top of the page, did Dr. Fredrick

22   respond?

23   A       Yes, he did.

24   Q       Okay.  And did he just respond to Mr. Jones?

25   A       That is correct.

1    Q      And if you could read the e-mail?

2    A      The response e-mail?

3    Q      Yes.

4    A      Okay.

5           "Dear Steven, I am presently in Central America working

6    with our foundation.  I am pleased that you will assist with

7    the closing on our behalf.  Please feel free to e-mail me the

8    documents, and I will sign them and have them notarized by a

9    local attorney if you wish, then send back to you by Fed Ex.

10   Ample Dynamic Trading Company Limited is a Hong Kong registered

11   company.  I will see if our foundation funds manager can send

12   us a copy of the registration documents for Ample Dynamic and

13   some documentation that Ample Dynamic is a company owned by

14   Saba School of Medicine Foundation.  I will try to work on this

15   within the next week.

16          "Best regards, Dr. David Fredrick."

17   Q      I am now going to show you an exhibit marked 16E . . .

18   and 16C.

19               MS. FINLEY:  Sorry, Your Honor.  Do you have 16C up

20   there?

21               THE COURT:  No, I don't.

22               MS. FINLEY:  Sorry, Your Honor.

23               (Ms. Finley confers with Ms. Kessler privately.)

24               MS. FINLEY:  I'm going to show you what's previously

25   been marked as Government's Exhibit 16C.

1    Your Honor, at this time the government would offer

2    16C into evidence.

3    MR. HOCHMAN:  No objection, Your Honor.

4    THE COURT:  16C will be admitted.

5    (Government's Exhibit 16C was admitted into

6    evidence.)

7    BY MS. FINLEY:

8    Q    Now, was there documentation ultimately provided?

9    A    Yes, there was.

10    MS. FINLEY:  Your Honor, permission to publish?

11    THE COURT:  You may.

12    (An exhibit was projected onto the projector screen.)

13    BY MS. FINLEY:

14    Q    And is this the document that was provided?

15    A    Yes, it was.  There was sent to the closing attorney,

16    Steven Jones.

17    Q    And the document is giving Dr. Fredrick authority to

18    sign on behalf of Ample Dynamic and Saba School of Medicine

19    Foundation; is that correct?

20    A    That's correct.

21    Q    And does it also say that Ample Dynamic is wholly owned

22    by Saba medical school foundation?

23    A    Yes, it does.

24    Q    Now, if we can turn back to Exhibit 17C, and turn to

25    Page 16, once it went to contract, were there still some issues

1   with the house?

2   A       Pardon?

3   Q       Once it went to contract, were there still some issues

4   with the house?

5   A       The buyer's agent did inspection.  There were

6   miscellaneous items that needed to be fixed that the buyer

7   requested to be fixed.

8   Q       Now, did you communicate that information to Dr. Hough

9   or Dr. Fredrick?

10  A       Yes, I did.

11  Q       And did Dr. Hough respond concerning these issues raised

12  by the buyer's attorney?

13  A       Yes, she did.

14  Q       And if we can look at the e-mail dated March 25th, from

15  Dr. Hough, what was Dr. Hough's response?

16  A       She says:

17          "Jason, I was pretty specific about nickel-and-dime-ing

18  by the buyers who are getting a steal on this house.  We cannot

19  read the total estimate as it is illegible, but anything over

20  1,500 is too much.  If they want a perfect home, let me buy a

21  new one.  Dirty filters and cutting back vegetation are going

22  too far.  You need to work on these people as Dave and I are

23  out of the country as medical volunteers and setting up an eye

24  clinic in Guatemala.  We can negotiate on some of the oriental

25  rugs and antiques that are in the house if they are interested.

1   So if you want the sale, get to work and eliminate the BS, or

2   you and the other realtor can reduce your commissions.  As you

3   can tell, I am very unhappy, and Dave is too angry to even

4   reply.  Pat."

5   Q      And did it ultimately close?

6   A      It ultimately closed.

7   Q      And did the house sell?

8   A      Yes, the house sold.

9   Q      When the house sold, were there issues with the signing

10  of the deed?

11  A      Yes, there were.  Because we had to get a -- as I

12  remember, we had to get a power of attorney for Laura to be

13  able to sign for Ample Dynamic to transfer the deed.

14  Q      And if I can show you what's been previously admitted as

15  16J . . . show you what's been admitted as 16J . . . is this

16  the document that permitted Ms. Whitley to sign?

17  A      Yes, it is.

18  Q      Now, do you know where the money was ultimately -- the

19  proceeds from the sale were wired to?

20  A      The sellers, Dr. Fredrick and Dr. Hough, gave e-mail

21  instructions to the attorney.  The attorney holds the money and

22  either cuts the check or wires the proceeds.  And I think, in

23  this case, they were wired.

24  Q      You have no personal knowledge about the wire, though.

25  A      No.  That would be the attorney that would have handled

1    that.

2              MS. FINLEY:  Court's indulgence?

3              No further questions, Your Honor.

4              THE COURT:  All right.  Mr. Hochman, would you like

5    to begin your cross or break for an afternoon recess?

6              MR. HOCHMAN:  If we could break, Your Honor.  And

7    that way I'll assemble it so we're ready to go when we start.

8              THE COURT:  All right.  Let's take 15 minutes.

9              Please do not discuss the case among yourselves, or

10   allow anyone to discuss it with you or in your presence.

11   Fifteen.

12             (At 2:54 PM, the jury was escorted from the

13        courtroom.)

14             THE COURT:  All right.  Fifteen minutes.

15             MR. HOCHMAN:  Thank you, Your Honor.

16             (At 2:54 PM, court was recessed.)

17                        AFTER RECESS

18             (At 3:11 PM, court was reconvened.)

19             THE COURT:  All right.  A couple housekeeping

20   matters.

21             First of all, one of the jurors mentioned to the

22   court security officers that he or she, and I don't know which

23   one it was, was having difficulty hearing one of the defense

24   lawyers.

25             And I assume that's you, Mr. Udolf.

1           MR. UDOLF:  It probably is.

2           THE COURT:  So I just, for whatever it's worth, point

3    that out to you.

4           The other thing is, there was a request, when

5    documents are presented on the overhead, to have the lights

6    dimmer than they are.  So to the extent that anyone wants that

7    accomplished, feel free to ask, and we'll do what we can.

8           That's my news.  Anything before we have the jury in?

9           MR. HOCHMAN:  Can the lights get dimmer, by the way,

10   than they are right now?

11          THE COURTROOM DEPUTY:  I can make the whole room

12   black.

13          MR. HOCHMAN:  I think the problem is, they'd fall

14   asleep.

15          THE COURT:  As long as it doesn't wake me up, that's

16   okay.

17          MR. HOCHMAN:  Is this as dim as they get, short of

18   going completely out?

19          THE COURT:  No.  We can dim the back row, which is

20   done when we have documents projected.  And then we can dim

21   parts of these.

22          THE COURTROOM DEPUTY:  This is how it's been all

23   along.

24          THE COURT:  All right.  Hit one else and see what it

25   looks like.

1            MR. HOCHMAN:  Maybe we can give that a try.

2            THE COURT:  I've not had any problem reading the

3    documents, but . . . .

4            MR. UDOLF:  Judge, it may be glare coming from the

5    window over there.  If we can shut that blind, maybe?

6            THE COURT:  Is there a blind?

7            THE COURTROOM DEPUTY:  Yes, there is a blind.  And

8    it's usually closed.  Well, it's slanted up instead of down.

9            Is that better?

10           MR. HOCHMAN:  Yes, that's better.  And then we could

11   turn the light a little bit on so they could see the witness.

12           THE COURT:  Let's leave it that way, with the way it

13   was before, with the lights on, and see if we get any

14   complaints.

15           MR. HOCHMAN:  Thank you.

16           THE COURT:  And then someone said there were some

17   evidentiary issues coming up?

18           Does that make sense to talk about those now or

19   later?

20           MS. FINLEY:  Yes, Your Honor.

21           THE COURT:  You all may be seated.  I'm going to

22   stand because I have a chance.

23           MS. FINLEY:  I think we wanted to see if we could

24   resolve the motion to strike, the defendant's motion to strike,

25   because, after this next witness, we are going to have our

1   summary witness, and she will be, presumably, talking about the

2   issue.

3            THE COURT:  I can do that.

4            MS. FINLEY:  Okay.  And then we have some exhibits

5   that we've both agreed on, but there's one exhibit that the

6   government wants to offer that the defendant is going to

7   object, or has objections to, and we felt it was better to

8   argue that outside the presence of the jury.

9            THE COURT:  And is that dependent on the motion to

10  strike, or is that a separate issue?

11           MS. FINLEY:  It's a separate issue.

12           THE COURT:  All right.

13           MR. SAUNDERS:  Your Honor, on the motion to strike, I

14  had asked yesterday for five minutes to address the

15  government's opposition.  I can reduce it to two, but I would

16  like to have an opportunity just to make a couple of points.

17           THE COURT:  I was debating whether to give you three

18  or none, so I will settle on two as well.

19           MR. SAUNDERS:  I can probably do it in under two,

20  Your Honor.  Just three quick points.

21           First of all, the government points out that

22  Mr. Futterknecht answered the proper questions regarding

23  foundation for business records, and we don't dispute that.

24  The question is whether he was qualified as an appropriate

25  custodian to do that, given that he had not made any comparison

1   of the documents he reviewed to the originals or, for that

2   matter, to those documents that were introduced here in court.

3   He had really never seen those before, had no idea, ultimately,

4   how many of those documents were created.

5          Second, with respect to the issue of e-mails, which

6   is part of the motion to strike that we've filed, the

7   government cites an Eastern District of Louisiana case, in the

8   Deepwater Horizon case, on Page 4, 3 and 4 of their brief.

9          And that case specifically says that it is not enough

10  to simply just admit all the e-mails wholesale, that a

11  custodian or qualified witness must attest that all of these

12  conditions have been fulfilled, which certainly requires an

13  e-mail by e-mail inquiry.

14         There has been no e-mail by e-mail inquiry.  These

15  are all just pulled up in bulk, and a whole mass of records for

16  different accounts that the government has just thrown into

17  evidence, and there has been no inquiry for any of these

18  e-mails individually as to whether the foundational

19  requirements have been met.

20         And hearsay within those e-mails, again according to

21  the government's own brief, requires a showing that the

22  participant, in furnishing the information, which in this case

23  would be Dr. Fredrick or, in some cases, Dr. Hough, was acting

24  in the regular course of business.  Certainly,

25  Mr. Futterknecht, or no other witness, has been able to lay a

1    foundation for that.

2                   And finally, Your Honor, with respect to the

3    documents, e-mails, and correspondence that were admitted

4    pursuant to the government's pledge that they would prove up a

5    conspiracy, and that these are co-conspirator statements, as we

6    outlined in our motion in limine before trial, that requires

7    substantial independent evidence, independent of the documents

8    themselves, of the existence of a conspiracy.

9                   Our position is, there has been no evidence

10   introduced in this trial to date, and we're wrapping up the

11   government's case, that Dieter Luetolf or Beda Singenberger

12   were involved in a conspiracy with Pat Hough or, for that

13   matter, anyone else.

14                  Putting aside the document and looking at independent

15   evidence, there has not been one witness who has testified

16   about anything about Beda Singenberger, other than his name is

17   on documents.  The only witness to speak about Dieter Luetolf

18   was Mr. Futterknecht, who said that Dieter Luetolf is still

19   employed by UBS and, as far as he knows, has done absolutely

20   nothing wrong.

21                  So putting aside the documents themselves, and they

22   don't prove a whole lot, but in terms of looking for

23   substantial independent evidence that would warrant the

24   admission of anything said or written by Dieter Luetolf or Beda

25   Singenberger, as a co-conspirator statement involving

1    Dr. Hough, our position is:  There has been nothing; we don't

2    think there's anything more coming in with respect to those

3    individuals; and the Court can rule right now that statements

4    by those people do not come in as co-conspirator statements.

5              THE COURT:  All right.  I do have some questions,

6    primarily for the government as the proponent, as to specific

7    documents.  And I don't know if you have those at their ready,

8    so to speak.

9              MS. FINLEY:  Your Honor, if we can pull them up on

10   the monitor, if that may be quicker.

11             THE COURT:  That's fine.  However you want to do it.

12             MS. FINLEY:  We'll have her pull them up.

13             THE COURT:  Exhibit 3E, at Page 53.

14             That's not it.

15             MR. SAUNDERS:  Your Honor, is the Court looking at

16   the page numbers at the bottom left, which are the page numbers

17   of the exhibit, or the Bates numbers?

18             THE COURT:  I'm assuming it's the Bates numbers, the

19   0053.

20             MR. SAUNDERS:  Yes, Your Honor.  That's Page 4 of the

21   exhibit.

22             THE COURT:  I can't give you page --

23             MS. FINLEY:  It is Page 4 of the exhibit.

24             THE COURT:  That's it.  The one you have up there.

25   And that's what I'm referring to, by the -- I guess the Bates

1   number at the bottom, 0053.

2          My problem with that is, is that's mostly in what I

3   gather to be German, and since I don't understand German, and

4   the jury doesn't either, I don't see how I can figure that's a

5   business record or relevant.

6          MS. FINLEY:  Your Honor, with respect to that

7   document, we may actually have a translation of it.  I'm not

8   sure, other than my understanding that these are –– I'd have to

9   look at the translation to know offhand, to know exactly what

10  it says.  These were the instructions or other correspondence

11  within the bank, that the employees would have made to either

12  open the accounts.  I'd have to, again, look to see if we have

13  this one translated.

14         And with respect to that document and

15  Mr. Futterknecht's testimony, that he did review these records,

16  he did look at them specifically, document by document, because

17  he reviewed the certification and looked at the Bates numbers,

18  compared the Bates numbers –– or put the Bates numbers onto the

19  certification.

20         So he did do an e-mail by e-mail analysis to make

21  sure that these are the records that are maintained and

22  created, and maintained in the ordinary course of UBS's

23  business.

24         THE COURT:  And so just out of curiosity, how are you

25  going to argue this to the jury –– I mean ––

1            MS. FINLEY:  This specific document?

2            THE COURT:  Sure.  I mean, are you --

3            MS. FINLEY:  I don't think the government was going

4    to argue this specific document.

5            MR. SAUNDERS:  With respect to this --

6            THE COURT:  Mr. Saunders, if I need you, I'll call

7    upon you.

8            MR. SAUNDERS:  Sorry, Your Honor.

9            THE COURT:  The Court is going to strike Exhibit 3E,

10   at Bates Number 0053.  Absent a translation, I don't know what

11   that means.  And other than the fact that it is in the banker's

12   file, that's all we have.

13           Exhibit 3L, and again Bates Number 78, I can't tell

14   you, again, what page of your exhibit it is . . . .

15           MR. SAUNDERS:  It's Page 16, Your Honor.

16           THE COURT:  And again, my question is for the

17   government.  I see the entry, but I don't see any indication of

18   the source of that information.  So other than the fact that

19   it's in the bank record, how do I go about making a

20   trustworthiness evaluation?

21           MS. FINLEY:  I think, Your Honor, based on the

22   testimony of Mr. Futterknecht, that only the bank or the client

23   adviser, and Mr. Luetolf was the client adviser for these

24   accounts, or his immediate supervisor would have had access to

25   these client workbenches in order to input the information.  It

1    was a necessary, required part of the client adviser's job to

2    input that information because the bank needed to know the

3    source of the funds and who the client was for the AML or the

4    KYC, the "know your customer" requirements, not only for the

5    bank but for Swiss law.

6             THE COURT:  All right.  Exhibit 3P, Bates Number 74,

7    maybe someone can translate what that is on your exhibit page.

8             MR. SAUNDERS:  74, Your Honor?

9             THE COURT:  She's got it up there.  Looks to me like

10   it's just a blank page.

11            MS. FINLEY:  The government has no objection to that

12   being struck.

13            THE COURT:  All right.  The next one I question is

14   Exhibit 3W, Page 87 Bates.  And this is an e-mail from

15   Mr. Luetolf, but there's no account number, no date, no

16   addressee.

17            How am I supposed to determine that is either

18   relevant or trustworthy?

19            MS. FINLEY:  Your Honor, I would -- there are other

20   documents within that same file that are talking about the fact

21   that Dr. Fredrick had been corresponding with Mr. Luetolf about

22   selling the school, and this e-mail is relevant because -- or

23   relevant within the file that it's trustworthy because there

24   are other e-mails, both before and after, that discuss the

25   potential sale.

1          Dr. Fredrick was corresponding with Mr. Luetolf about

2     the potential buyer opening an account at UBS in order to

3     facilitate the transaction.  And UBS blacks out the name in

4     this case, because it's not a related party or a bank employee,

5     but somebody that Dr. Fredrick had provided their information

6     to Mr. Luetolf, in order to carry out the transaction of

7     selling the school.

8          THE COURT:  But it doesn't even have an account

9     number.  I mean, how am I supposed to hook this document up to

10    anything else?

11         MS. FINLEY:  I think that Mr. Futterknecht testified

12    that the records within that exhibit were all from the account

13    that is referenced in that exhibit.

14         THE COURT:  All right.  Exhibit 3W, same exhibit,

15    Page 115, with a Bates number.  And I guess this is the same

16    situation as Page 87, in terms of it's from Mr. Luetolf, but

17    it's got no addressee or account number.

18         So do I gather your position would be the same as to

19    this?

20         MS. FINLEY:  Yes, Your Honor.  There are numerous

21    documents within that series.  There were other due-diligence

22    documents on behalf of Mr. Luetolf, where they were trying to

23    ascertain the source of the funds for the potential buyer who

24    was going to use UBS for the bank.  And so this is another

25    account that -- excuse me, another document that is related to

1    that transaction, what is going to happen in that account.  I

2    think it says MUA at the top.

3           THE COURT:  And the same with the next page, 116, I

4    assume your position is the same?

5           MS. FINLEY:  Yes, Your Honor.  And I think, at the

6    bottom, Mr. Luetolf is referencing Dr. Fredrick, again, showing

7    that these documents are related to the other correspondence in

8    the file, where Dr. Fredrick was corresponding with Mr. Luetolf

9    about sale, and again, that the subject line references MUA.

10          THE COURT:  All right.  Page 119 from the same

11   Exhibit 3W, my same issue, so . . . .  I assume your response

12   is the same?

13          MS. FINLEY:  My response would be the same, Your

14   Honor.

15          THE COURT:  Page 121 from Exhibit 3W, my problem

16   there was, it contained part of the e-mail that I had a

17   question about earlier.  So I assume your position is going to

18   be the same for that one.

19          MS. FINLEY:  Yes, Your Honor.  These are the e-mails

20   I was referencing that correspond with each other and the

21   activity that is expected to happen in the account . . . based

22   on representations by Dr. Fredrick to Mr. Luetolf.

23          THE COURT:  Okay.  And 122, how do I know, or how

24   does the record know, what MedCo is?

25          MS. FINLEY:  Your Honor, may I just look to see

1    what's surrounding that specific e-mail?

2    A       Sure.

3           MS. FINLEY:  Again, Your Honor, the government would

4    represent, or . . . support our response with the same answer

5    from before.  The government believes that this is part of the

6    sale transaction, and Mr. Luetolf's efforts to do his due

7    diligence to know his customer.  There are other references, in

8    other e-mails, about them trying to determine source of the

9    funds, and who the ultimate buyer was going to be, so they knew

10   what funds were going to be wired to UBS.

11          THE COURT:  Well, other than the fact that a whole

12   sentence -- I take that back -- a whole line is blacked out.

13          It says:  "I give you full authorization to speak

14   to" -- blank.  And then the person giving the authorization is

15   blacked out, as well as the person who, to whom speaking was

16   authorized.

17          What do I do with that?  What does anyone do with

18   that?

19          MS. FINLEY:  On this specific document, Your Honor, I

20   will not object to your striking this specific document.

21          THE COURT:  All right.

22          The next one is 3W, Pages 160 to 163.  And my

23   question there was, I know it says, "Here is a paper trail,"

24   but how do I know who the sender is, or what the subject is,

25   from all this?

1          MS. FINLEY:  Your Honor, we have no objection if you

2     strike this document.

3          THE COURT:  That's 160 and 163.

4          MR. SAUNDERS:  160 through 163, Your Honor?

5          THE COURT:  160 through 163.

6          Same exhibit, 3W, Page 233, I guess my question is,

7     here is the source of the information that is set forth in the

8     client information supplemental form.  It doesn't seem to

9     indicate how that information was obtained, who obtained it, or

10    who put it in, or even the date.

11         MS. FINLEY:  I think Mr. Futterknecht testified that,

12    with respect to the beneficial owner and who the client was,

13    that the client adviser would have spoken to the client to

14    provide that information, and then was required to place it in

15    this document so that the bank had knowledge of who the client

16    was, and the source of the funds.

17         THE COURT:  And when was that entered, or the

18    approximate date?

19         MS. FINLEY:  It is not listed, Your Honor.

20         THE COURT:  So what do I make of that?

21         MS. FINLEY:  I think that Mr. Futterknecht testified

22    that, when the accounts were opened, that this is the type of

23    information that he -- that the bank would have expected the

24    client adviser to obtain from the client, that . . . .  That is

25    the first page of the client workbench, and then the subsequent

1    pages are dealing with actual contacts.

2              And I believe that this account was opened on or near

3    the time that's alleged on the next page, in 2004 . . . and

4    that there were other sources that the client adviser –– again,

5    only the client adviser or his assistant, or supervisor, would

6    have access to the client workbench, and that is part of the

7    client adviser's duties, was to know who has the ultimate

8    benefit from that.  And they would either ask the client or,

9    based on other information provided by the client, input this

10   information.

11             THE COURT:  All right.  235.  The entry for October

12   the 26th, 2004, gave me concern in terms of the source for

13   that, and hence its reliability.  There's nothing under the

14   contact medium.

15             MS. FINLEY:  Again, Your Honor, Mr. Futterknecht

16   stated that they used this to detail not just contacts, but

17   things that were occurring with the account.  And this was

18   noted as an internal note.  The body of that specific item on

19   October 26th, 2004, I believe, deals with, again, the . . . the

20   knowing your customer and the AML, and the bank's compliant

21   quality review, as stated in the last line, that this is part

22   of the bank's duties to, again, know their customer and know

23   the source of the funds in the account, and that that would be

24   an internal note on the account that this action was taken, and

25   they were verifying the funds.

1          THE COURT:  Page 236, again, Exhibit 3W, the entry

2    for March the 2nd of 2006, starts out in English, and then

3    switches to what I assume is German.

4          MS. FINLEY:  Your Honor, with respect to that, we

5    would not object to redacting that.  Again, I would . . . I

6    would represent, though, that that entry and telephone

7    conversation is again related to the -- at least with respect

8    to the English part, is related to the sale of the school

9    that . . . the . . . .

10         THE COURT:  Well, I might be allowed to leave the

11   English in, except for the fact that it says, "based on the

12   information below," and then the information below is in

13   German.

14         MS. FINLEY:  And so I have no objection with respect

15   to that, because of the German.

16         THE COURT:  All right.

17         The Court's going to direct that the -- that entry be

18   deleted, not just the German part but the English as well.

19         Page 239 of Exhibit 3W, the July the 9th, 2008, entry

20   in the middle of the page, again, is German -- I'm saying

21   that's German.  Is it really German?

22         MS. FINLEY:  I think its Swiss German, Your Honor?  I

23   think there is a difference.  That's what I have been told.

24         THE COURT:  I see the defendant wanting to tell me

25   what the answer is, but I would advise you not --

1          MR. SAUNDERS:  It's Swiss German; "Schweizerdeutsch,"

2     it's called.  It's a dialect that's spoken.  The writing is in

3     German though.

4          THE COURT:  So if I say "German," in the order, I'm

5     not going to embarrass myself?

6          MR. SAUNDERS:  We won't call you on it, Your Honor.

7          THE COURT:  All right.  239, then, what's the

8     government's view with regard to the July 9th, 2008, German

9     entry?

10          MS. FINLEY:  With respect to that, because it's in

11     German, Your Honor, the government would have no objection.

12          THE COURT:  All right.  Exhibit 3EE, Page 171, the

13     May 14th entry is in German again.

14          MS. FINLEY:  And again, Your Honor, the government

15     did not have this one translated.  And so based on the

16     language, we will not object.

17          THE COURT:  All right.  Exhibit 3HH, we've got a

18     couple more of these German issues.  Page 59, looks like

19     there's three entries there in German, two on September

20     the 10th of 2002, and one on November the 20th, 2002.

21          MS. FINLEY:  Again, we did not translate this one, so

22     we will not object.

23          THE COURT:  All right.  The Court will strike the

24     pages, or portion of pages, that I have indicated.

25          I want to take a look at the other pages where the

1    argument is that the surrounding e-mail provides the support.

2    I'm not sure about that, but I want to take a look at the

3    surrounding e-mails.  I'll get a written order out first thing

4    in the morning.  But at least for present purposes, the ones

5    I've indicated in court will be deleted, will be deleted.

6              And when I say "deleted," either the page will be

7    taken out from the exhibit, or you can redact the particular

8    entries that are in German, for example.

9              MS. FINLEY:  Yes, Your Honor.  Ms. Sorley is going to

10   do that, and we'll make new copies to place in the originals.

11             THE COURT:  That's fine.

12             MR. SAUNDERS:  And for the record, the Court is

13   overruling our objection to the remaining pages?

14             THE COURT:  Not yet.  Well, maybe you did say it

15   correctly.  I'm overruling your objection to the pages that I

16   didn't discuss specifically.  As to some of those, I'm taking

17   them under advisement, and you may or may not prevail on those.

18   But as to the other pages that I didn't specifically identify,

19   you can count on the objection as being overruled.

20             MR. SAUNDERS:  Thank you.

21             MS. FINLEY:  And just with respect to the other

22   documents, the government intends to offer into evidence the

23   Deferred Prosecution Agreement between the United States and

24   UBS.  We believe that the defense opened the door to that

25   during cross-examination of Mr. Futterknecht.

1              THE COURT:  May I see it?

2              MS. FINLEY:  You may.

3              MR. HOCHMAN:  And, Your Honor, the defense would have

4    no objection to the agreement itself, which is 16 pages and

5    certified by the Court in Florida.  However, there are exhibits

6    that don't appear to be -- the certification appears to be on

7    the 16th page, Your Honor.  It doesn't occur on either the

8    first page, and it doesn't include Exhibits A through D.  So we

9    would not object so the Deferred Prosecution Agreement that

10   seems to be certified on Pages 1 through 16, and object for now

11   on the exhibits being included with it.

12             THE COURT:  So the Exhibit A is the resolution of the

13   UBS board, I presume -- I thought it was USB -- UBS -- I

14   presume, authorizing the agreement, then there's the

15   information that's Exhibit B.

16             Exhibit C appears to be a statement of facts.

17             Do any of those facts relate to this case?

18             MR. HOCHMAN:  This case; no, Your Honor.  We would

19   argue no.

20             MS. FINLEY:  Your Honor, we would argue yes, given

21   the cross-examination, and that --

22             THE COURT:  No, no.  I don't mean have been made

23   relevant, but do the facts relate to any of the underlying

24   facts we've heard testimony about?

25             MS. FINLEY:  They relate to the use of the accounts,

1    and what UBS was doing with its clients with respect to the

2    various types of entities and types of accounts they were

3    opening, and the documents that were being executed by the

4    clients.

5              THE COURT:  And are either of the defendants in this

6    case named, or their accounts named?

7              MS. FINLEY:  Not specifically.  It names that there

8    are clients generally.  No specific client is referenced.  And

9    this is the agreement under which the documents that are at

10   issue in the defendant's motion to strike were provided to the

11   government.

12             THE COURT:  I'm sorry, say that again.

13             MS. FINLEY:  The documents that were provided to the

14   government, and Mr. Futterknecht had said that, previous to him

15   reviewing them, that there were records provided to the

16   government pursuant to the deferred prosecution agreement, and

17   the records that are at issue in the defendant's motion to

18   strike are just those records.

19             MR. HOCHMAN:  Your Honor, we would introduce one

20   additional objection to the exhibits, a 403 objection.  Because

21   if you see in Exhibit B, actually, is an information that was

22   filed, that talks about various taxpayers and uses -- and I'll

23   point it out to the Court -- well, actually, it talks about

24   managers and bankers, with a capital M and a capital B.  It

25   doesn't talk about whether or not any of those managers or

1    bankers are the ones involved here.  The jury could potentially

2    speculate that they are or not.  It's certainly unclear whether

3    they are.

4              They talk about United States clients.  I don't

5    believe that -- and they talk about it just like that,

6    quote/unquote, United States clients.  It's unclear from that,

7    and prejudicial, substantially prejudicial, whether or not

8    those United States clients actually include Dr. Fredrick or

9    Patricia Hough.

10             So I think what they're trying to do is, they're

11   trying to use a guilty plea by UBS, that doesn't mention

12   Dr. Hough and Dr. Fredrick, to somehow say that that includes

13   Dr. Hough or Dr. Fredrick.  Otherwise, it would be -- this part

14   of it would be completely irrelevant.

15             Moreover, as you see in Exhibit C, there is factual

16   basis that even goes a few steps further, and talks about the

17   fact -- I'll see if I can point it out.  I'm trying to see if

18   it's here.  It talks about, at one point, the fact that there

19   are 20,000 different clients, Your Honor, 17,000 of which, they

20   believe, were involved.

21             And I'm trying to find that exact -- those numbers.

22   It might be in the information, Your Honor.  I'll find it.  In

23   Paragraph 8 of Exhibit C, it talks about 11,000 to

24   approximately 14,000 U.S. domiciled U.S. private clients who

25   have chosen not to provide an IRS Form W-9.

1          Again, it's almost guilt by association.  The

2   prejudice is oozing out of this as to whether or not it

3   includes Dr. Fredrick or Dr. Hough.  If it doesn't include

4   them, obviously, then they fall in the category of clients of

5   UBS that did nothing wrong; and if it does include them, it's

6   unclear and subject to speculation, so I would think the 403

7   reasons to keep out the information and the statement of facts.

8          And then the last Exhibit D is, again, with respect

9   to Exhibit D, this is a notification, an information letter

10  that had been approved that was supposed to go out to UBS

11  clients.  There has been no information whether or not UBS

12  sends Dr. Fredrick or Dr. Hough this letter.

13         And again, it would be either irrelevant, or 403,

14  substantially prejudicial, outweighing its probative value to

15  include this to allow either the government or the jury to make

16  some inference that they received a letter that there's no

17  evidence that they did, or, for that matter, that it was ever

18  actually sent to Dr. Fredrick or Dr. Hough, this particular

19  letter.

20         And Exhibit E, apparently, is filed separately under

21  seal and not part of this exhibit.

22         THE COURT:  So what was Exhibit E; does anybody know?

23         MS. FINLEY:  I believe it's under seal, Your Honor.

24  I think -- I'm not sure, since it's under seal, I don't know if

25  I can reveal it.

1          THE COURT:  All right.  What is marked as

2    Government's Exhibit 15 will be admitted from Pages . . . .

3          MR. HOCHMAN:  I think it's 25, Your Honor.

4          MS. FINLEY:  Exhibit 25?

5          THE COURT:  Oh, maybe it is.  Okay.  I'll take your

6    word, 25.  And I'm looking at the docket entries from the

7    Southern District of Florida, in the upper right-hand, Pages 1

8    through 18 are admitted, which is the deferred prosecution

9    agreement.  As I understand it, that's admitted without

10   objection.  The Court will not admit the Exhibits A through E,

11   E being, of course, sealed, so we don't know what that is

12   anyhow.

13         MR. HOCHMAN:  Thank you, Your Honor.

14         MS. FINLEY:  Thank you, Your Honor.

15         MR. HOCHMAN:  I'm ready to proceed when you are.

16         THE COURT:  All right.  If you'd hand this back to

17   the government?

18         And have the jury step in, please.

19         (At 3:47 PM, the jury was escorted into the

20      courtroom.)

21         (The witness resumed the witness stand.

22         THE COURT:  Ladies and gentlemen, I apologize for the

23   delay.  The lawyers and I took care of some business that

24   hopefully will save us time on the other end, but rather than

25   have you come in and leave again, we just took care of it all

1    at once.

2              You may proceed.

3              MR. HOCHMAN:  Thank you, Your Honor.

4                        CROSS EXAMINATION

5    BY MR. HOCHMAN:

6    Q     When last we left off, you had said that the proceeds

7    had been wired for the April 2011 sale; do you recall that?

8    A     Yes.  That's my understanding, that the wire

9    instructions were sent to the target.

10   Q     Very good.

11             MR. HOCHMAN:  Your Honor, may I approach the witness

12   with Exhibit N?

13             THE COURT:  You may.

14             MR. HOCHMAN:  And I would move into evidence

15   Exhibit 16N, like in "Nancy."

16             THE COURT:  Any objections?

17             MS. FINLEY:  No objection.

18             THE COURT:  16N will be admitted.

19             (Government's Exhibit 16N was admitted into

20        evidence.)

21             MR. HOCHMAN:  And may we publish 16N, Your Honor?

22             THE COURT:  You may.

23             (An exhibit was projected onto the projector screen.)

24   BY MR. HOCHMAN:

25   Q     These are the wire instructions that had the amount that

1   was sent to Ample Dynamic Trading in connection with the sale

2   in April of 2011; is that correct?

3   A       That is correct, it appears.

4   Q       And if I could turn your attention to the --

5           MR. HOCHMAN:  If we could blow up sort of the middle

6   part of it, where it says "Ample Dynamic Trading"?

7   BY MR. HOCHMAN:

8   Q       Do you see where it says, "Ample Dynamic Trading," and

9   then it has an address that says 48 William Mansion, on

10  16-18 McDonald, in Central Hong Kong; do you see that?

11  A       Yes.

12  Q       Now, below that, it says the beneficiary bank of Ample

13  Dynamic Trading, you see it says LGD Bank in Liechtenstein?

14  A       Yes.

15  Q       And then if you scroll down a little bit further, it

16  says the remitter is the Jones law firm.

17          That's Steve Jones, who was handling the transaction,

18  correct, selling the home?

19  A       Correct.

20  Q       And then at the very bottom --

21          MR. HOCHMAN:  No, no.  I'm sorry.  Not the very

22  bottom.  Where you just were.  You almost had it.  A little

23  lower now.  I'm sorry.  Two lines.  There you go.

24  BY MR. HOCHMAN:

25  Q       It says:  "For further credit to Bank Alpinun" --

1    spelled A-L-P-I-N-U-N -- "AG."

2          Do you see that?

3    A     Yes.

4    Q     And that's the ultimate bank for Amply Dynamic Trading

5    that the money is going to go to; correct?

6    A     The attorney handled this.  I don't know.

7    Q     And the date of this is 4/20/2011?

8    A     Yes, it is.

9          MR. HOCHMAN:  Thank you.  We don't need that anymore.

10   BY MR. HOCHMAN:

11   Q     So approximately how many real estate deals do you do on

12   an average month?

13   A     A month we -- we do about 150 a year, so I guess you

14   would say we do 12 to 15 per month.

15   Q     So, since June, 2007, you have had easily over, what,

16   probably 600 different real estate deals?

17   A     Probably five to six.

18   Q     And if I can turn your attention Government's

19   Exhibit 15B, which was the MLS for this property, this property

20   being the Greenville property on Campden Way, do you see that?

21         MR. HOCHMAN:  If we could publish the first page of

22   16B, like in "boy" -- excuse me -- 15B, like in "boy."

23         THE WITNESS:  I don't think I have it.  I can see it

24   here though.

25

1    BY MR. HOCHMAN:

2    Q        Yes.  And that's the house that we're all talking about

3    in Greenville; correct?

4    A        That is correct.

5    Q        That house has 11 rooms and 5 bedrooms; is that correct?

6    A        That's right.

7    Q        And is about 4,625 square feet; is that right?

8    A        Correct.

9    Q        That's big enough for a number of students to live in,

10   if the house were to be used for that purpose; correct?

11   A        Correct.

12   Q        And they would have enough rooms to have conferences in,

13   or have meetings in; correct?

14   A        Yes.  There was, you know, formal areas, as well as a

15   common area, a great room; yes, sir.

16   Q        Now, the price of the house, back in 2007, it was bought

17   for 590,000; is that right?

18   A        That's correct.

19   Q        From June, 2007, the market went pretty much down over

20   the next couple of years; is that correct?

21   A        It went down about 27 to 35 percent.

22   Q        So if I could do my math somewhat quickly, a sales price

23   in 2011 of 455,000, would be about the average percentage that

24   the market had gone down through that time period; is that

25   correct?

JASON HARRELL - CROSS/HOCHMAN                    212

1    A      That is correct.

2    Q      Now I would like to turn your attention, if I could, to

3    Exhibit 16C.

4           If you could take a look 16C real quick?

5    A      I've got it, yes.

6    Q      So who is the owner of Ample Dynamic Trading Company

7    Limited?

8    A      It says on this document it's wholly owned by Saba

9    School of Medicine Foundation.

10          MR. HOCHMAN:  Can we highlight just the words below

11   "to whom it may concern," those three paragraphs?

12          And when I say "highlight," zoom in -- my bad -- zoom

13   in on those three paragraphs?  Thank you.

14   BY MR. HOCHMAN:

15   Q      So it says Ample Dynamic Trading is wholly owned by the

16   Saba School of Medicine Foundation, which in turn is the owner

17   of the property located at 304 Campden Way in Greenville, North

18   Carolina; correct?

19   A      That's what it says, yes.

20   Q      And this was the authorization to have David Fredrick

21   act on behalf of Ample Dynamic Trading company and the Saba

22   School of Medicine Foundation to sell this property; is that

23   correct?

24   A      Correct.

25          MR. HOCHMAN:  And if we can zoom to the full document

```
 1    at this point?

 2    BY MR. HOCHMAN:

 3    Q      This letter comes from the Saba School of Medicine

 4    Foundation, from the Netherlands Antilles, Dutch West Indies;

 5    do you see that?

 6    A      I do.

 7    Q      And it's signed by two gentlemen --

 8           MR. HOCHMAN:  Can we focus and zoom on the

 9    signatures?

10    BY MR. HOCHMAN:

11    Q      -- Dr. Haraldo Batista, who is the board chairman of the

12    Saba School of Medicine Foundation -- do you see that?

13    A      I do.

14    Q      -- and Mr. Florencio Montenegro, who is a board member

15    of the Saba School of Medicine Foundation as well.

16           Do you see that?

17    A      Yes.

18           MR. HOCHMAN:  May I have one moment, Your Honor?

19           THE COURT:  You may.

20           (Mr. Hochman confers with co-counsel privately.)

21           MR. HOCHMAN:  No further questions, Your Honor.

22           THE COURT:  All right.  Ms. Finley?

23           MS. FINLEY:  I have no further questions, Your Honor.

24           THE COURT:  You may stand down.  Thank you.

25           THE WITNESS:  Thank you.
```

1                THE COURT:  You may call your next witness.

2                (The witness left the witness stand and left the

3        courtroom.)

4                MS. FINLEY:  Thank you, Your Honor.

5                The government calls Susan McBride.

6                THE COURT:  Right up here, please.

7                THE COURTROOM DEPUTY:  If you would raise your right

8        hand, please.

9                Do you solemnly swear or affirm to tell the truth,

10       the whole truth, nothing but the truth, in the case now before

11       the Court?

12               THE WITNESS:  Yes.

13               THE COURTROOM DEPUTY:  You may have a seat.

14               State your full name, spelling your last.

15               THE WITNESS:  Susan McBride, M-C-B-R-I-D-E.

16               THE COURTROOM DEPUTY:  Thank you.

17               MS. FINLEY:  Your Honor, I am just going to approach

18       and remove those exhibits.

19               THE COURT:  That's fine.

20               (Ms. Finley retrieves exhibits from the witness box.)

21                          SUSAN MCBRIDE,

22       called as a witness by the Government, and having been first

23       duly sworn, was examined and testified as follows:

24

25

1                       DIRECT EXAMINATION

2    BY MS. FINLEY:

3    Q      Good afternoon, Ms. McBride.

4           Can you tell the jury where you live?

5    A      Chesapeake, Virginia.

6    Q      And are you familiar with David Fredrick and Patricia

7    Hough?

8    A      Yes.

9    Q      How are you familiar with Dr. Fredrick?

10   A      That's my brother.

11   Q      And how are you familiar with Dr. Hough?

12   A      My sister-in-law.

13   Q      What do you do for a living?

14   A      I work at a credit union.

15   Q      And do you have any other siblings?

16   A      Yes.

17   Q      How many other siblings do you have?

18   A      Five.

19   Q      And is Dr. Fredrick the oldest in the birth order?

20   A      Yes.

21   Q      And where do you appear in the birth order?

22   A      Fourth.

23   Q      Are Dr. Hough and Dr. Fredrick married?

24   A      Yes.

25   Q      Do you know how long they have been married?

1    A        About 28, 29 years.

2    Q        Can you describe your relationship with your brother;

3    are you close?

4    A        I would say we are; yes.

5    Q        Okay.  And how often do you see your brother?

6    A        I haven't seen him in a long time.

7    Q        Do you talk to him, or have you talked to him often in

8    the past?

9    A        In the past, yes.

10   Q        And how often would you speak with him?

11   A        Probably once a week.

12   Q        And if we could put a timeframe on that, has that been

13   as long as Dr. Hough and Dr. Fredrick have been married?

14   A        No.  Actually, probably . . . from the time my mother

15   died.

16   Q        And when did your mom pass away?

17   A        2003.  I mean, I talked to him periodically before that,

18   but more, you know, like the once-a-week thing started after

19   she passed away.

20   Q        Are you familiar with the Saba School of Medicine?

21   A        Yes.

22   Q        And what's your understanding of what that is?

23   A        It's a medical school.

24   Q        And do you know what your brother's relationship is to

25   the school?

1    A       I believe him and Pat owned it.

2    Q       And why do you believe that?

3            MR. UDOLF:  Objection to her belief.

4            THE COURT:  I missed the last word after "objection."

5            MR. UDOLF:  Belief, that they owned it.

6            THE COURT:  If that's a foundation objection, that's

7    sustained.

8    BY MS. FINLEY:

9    Q       Since, I guess, have you had opportunity to talk with

10   your brother about medical schools?

11   A       On and off.

12   Q       And did you have opportunities to talk with your

13   sister-in-law about the schools?

14   A       No, not really.

15   Q       And so did you talk with your brother about his

16   relationship to the medical school?

17   A       Yes.

18   Q       And what did he tell you?

19           MR. UDOLF:  Objection, hearsay, not in furtherance.

20           THE COURT:  Do you care to be heard?

21           MS. FINLEY:  I guess I will rephrase the question,

22   and then maybe I'll ask to be heard, depending on if there's

23   another objection.

24           THE COURT:  Okay.

25

```
 1   BY MS. FINLEY:

 2   Q     I guess . . . do you have an understanding from your

 3   brother of what his role is with the school?

 4             MR. UDOLF:  Objection.

 5             THE COURT:  Basis?

 6             MR. UDOLF:  The understanding would necessarily be

 7   based on hearsay.

 8             MS. FINLEY:  I'm not asking her to say what it is,

 9   I'm asking her if she has an understanding.

10             THE COURT:  I'll take a yes-or-no answer.

11             MS. FINLEY:  Do you have --

12             THE WITNESS:  Yes.

13   BY MS. FINLEY:

14   Q     And what is your understanding, based on -- I guess that

15   will be --

16             MS. FINLEY:  He's going to object, so I will be

17   heard.  If I can ask the question and he can object.

18   BY MS. FINLEY:

19   Q     What did your brother tell you about his role with the

20   school?

21             MR. UDOLF:  Objection.

22             THE COURT:  All right.  Come to sidebar.

23                        AT SIDEBAR

24             THE COURT:  All right.  How is what Dr. Fredrick told

25   this witness about Dr. Fredrick's role in the medical school in
```

1   furtherance of the conspiracy?

2           MS. FINLEY:  I think that statements about their

3   ownership, if it's a truthful statement, even if it's a

4   truthful statement, can still further the conspiracy, because

5   it shows that they're saying one thing to certain people and

6   another thing to other people.  So I don't think a statement in

7   furtherance has necessarily to be a false statement.  And I

8   think that --

9           THE COURT:  Assuming the answer is going to be true,

10  still, how is that in furtherance of the conspiracy?

11          MS. FINLEY:  Well, I can ask her then, do you know

12  who owns the school, and she's going to say -- she just said

13  yes, she does.  And I asked her who, and he's going to object

14  to foundation.  The foundation is, her brother told her.

15          THE COURT:  Yeah.  And we're going to get back to how

16  is that in furtherance of the conspiracy.

17          MS. FINLEY:  I'll withdraw the question.  I'll ask a

18  different one that will not elicit hearsay.

19          THE COURT:  So you say.

20                      IN OPEN COURT

21          THE COURT:  You may proceed.

22  BY MS. FINLEY:

23  Q     Are you familiar with the Medical University of America

24  in Nevis?

25  A     Yes.

1    Q       Now, did you -- I guess going back to 2003, or before

2    2003, did you have opportunity to visit with your brother?

3    A       Yes.

4    Q       And about how often would you visit with your brother?

5    A       Whenever he came to see my mother.

6    Q       How often was that?

7    A       I think he tried to get there at least three or four

8    times a year.

9    Q       And would Dr. Hough be there?

10   A       Sometimes.

11   Q       And would you talk with Dr. Hough at those occasions?

12   A       Well, you know, hello, how are you.  You know, normal

13   stuff.

14   Q       And have you been to either of the schools?

15   A       No.

16   Q       Do you have personal knowledge about where your brother

17   or Dr. Hough banked?  For their personal finances.

18   A       No.

19   Q       Based on your interactions with Dr. Hough over the

20   years, could you describe your observations of her relationship

21   with Dr. Fredrick?

22           MR. UDOLF:  Objection, vague.

23           THE COURT:  Overruled.  If the witness understands

24   the question, she may answer.

25           THE WITNESS:  Their relationship?

1              MS. FINLEY:  Yes.

2              THE WITNESS:  Well, they were married.

3   BY MS. FINLEY:

4   Q      Were they close?

5   A      Yes.

6   Q      Did they -- based on your observations, did you have an

7   opportunity to see their interactions together?

8   A      A few times, yes.

9   Q      And did they . . . .  I'll withdraw the question.

10         In December of 2004, did you receive $75,000 from your

11  brother?

12  A      Yes.

13  Q      And where -- how did you receive those funds?

14  A      It was wired.

15  Q      And where was it wired into?

16  A      Into my account.

17  Q      And did you know that you were going to get those funds?

18  A      Not until just before I received them.

19  Q      And who sent those funds?

20  A      My brother.

21  Q      And did he -- did you ask him why he sent the money?

22  A      He wanted to do something for us, and my husband had

23  lost his job, and I think he was, you know, trying to help us

24  out.

25  Q      And was THAT a gift?

1    A        Yes.

2    Q        Did you have to pay it back?

3    A        No.

4    Q        Do you know was it a gift from your brother or from

5    Dr. Hough?

6    A        My brother.

7    Q        Now, did there come a time, again, where you received

8    additional funds from your brother?

9    A        Yes.

10   Q        Did you receive money from him in 2005?

11   A        Yes.

12   Q        And how much was that?

13   A        I believe it was 40,000.

14   Q        And what was this for?

15   A        It was to help with things, and in case my sister needed

16   some extra money for her medical.

17   Q        And which sister are you talking about?

18   A        Marion.  I'm sorry.  Marion Cronin.

19   Q        And was this a gift?

20   A        Yes.

21   Q        And do you know whether -- who was the gift from?

22   A        David.

23   Q        Do you know whether Dr. Hough was aware of these two

24   gifts?

25   A        I believe she was not aware of them.

1    Q       And why do you believe that?

2    A       I just didn't think that -- I know, you know, when I

3    said we should call and thank everybody, he said don't worry

4    about it; so I just took it to believe that.  But I could be

5    wrong.

6    Q       Now, do you know where the money came from?

7    A       No.  I do not.

8    Q       Now, in April of 2007, did you receive additional funds

9    from your brother?

10   A       Yes.

11   Q       How much did you receive?

12   A       250,000.

13   Q       And where were those funds deposited?

14   A       Well, one wire went to pay off our mortgage, and the

15   other wire went into our account.

16   Q       And what -- can you describe for the jury how did you

17   find out that you were going to get $250,000?

18   A       My brother had called and said that -- you know, he had

19   always said, once the schools were sold, he was going to do

20   something nice for the family.  And he called and said that he

21   was paying off our mortgages, and giving us some extra money.

22   Q       And was this $250,000, was this a gift?

23   A       Yes.

24   Q       And did there come a time where your brother provided

25   you with loan papers?

1    A       Yes.

2    Q       And can you describe for the jury what that was about?

3    A       I don't know why he sent them, but he sent loan papers.

4    We signed them.  And I asked him if we had to start paying it

5    back or do anything, and he says no, that the foundation owed

6    him money, and that when he got the money, he would take care

7    of it.

8    Q       And did you ever make any payments on --

9    A       No.

10   Q       Now, did you ask to take a loan from the foundation?

11   A       No.

12   Q       In November of 2009, did your brother -- did you return

13   approximately $200,000 to the foundation?

14   A       Yes.

15   Q       Can you explain to the jury what happened there?

16   A       My brother had called me and said that I needed to send

17   back the 75,000 and the 40, and then the 75 that he had given

18   to my brother.

19   Q       And what's your brother's name?

20   A       Perry.  And he said to -- you know, that -- plus the

21   interest.

22   Q       Okay.

23   A       And that's what I did.

24   Q       Did you have $200,000?

25   A       No.  He just said --

1    Q        Let me ask the question.

2    A        I'm sorry.

3    Q        Did you have $200,000 to send back to the foundation?

4    A        No.

5    Q        How did you send the money back?

6    A        He sent me a check.

7    Q        And what did you do with that check?

8    A        I deposited it, let it clear the account, and then we

9    wired it back.

10   Q        And did Dr. Fredrick provide you with the wire

11   information?

12   A        Yes.

13            MS. FINLEY:  The Court's indulgence.

14            I have no further questions, Your Honor.

15            THE COURT:  All right.  Thank you.

16            Mr. Udolf?

17                         CROSS EXAMINATION

18   BY MR. UDOLF:

19   Q        Ms. McBride, as I understand it, Dr. Fredrick cleared

20   out his retirement account to send you that money to send back

21   to him; is that correct?

22   A        I belief so; yes.

23   Q        And Pat Hough had nothing to do with that transaction at

24   all.

25   A        I believe not, no.

1  Q     As far as you know, Pat Hough knew nothing about the

2  gifts that were made to you in 2004, 2005, and 2010.

3  A     Correct.

4             MR. UDOLF:  No further questions.

5             THE COURT:  Ms. Finley?  Any additional questions?

6             MS. FINLEY:  No further questions, Your Honor.

7             THE COURT:  You may stand down.  Thank you.

8             (The witness left the witness box.)

9             THE COURT:  You may call your next witness.

10            MS. KESSLER:  Your Honor, the government would call

11  Sheila Maurer.

12            Your Honor, may I consult counsel?

13            THE COURT:  Yes.

14            THE COURTROOM DEPUTY:  If you would raise your right

15  hand.  Do you solemnly swear or affirm to tell the truth, the

16  whole truth, nothing but truth, in the case now before the

17  Court?

18            THE WITNESS:  I do.

19            THE COURTROOM DEPUTY:  You may have a seat.

20            State your full name, spelling your last.

21            THE WITNESS:  Sheila Maurer.  M A U R E R.

22                         SHEILA MAURER,

23  called as a witness by the Government, and having been first

24  duly sworn, was examined and testified as follows:

25

1                        DIRECT EXAMINATION

2    BY MS. KESSLER:

3    Q        Good afternoon, Ms. Maurer.

4    A        Good afternoon.

5    Q        Can you tell the jury what you do for a living?

6    A        I'm a Revenue agent with the Internal Revenue Service.

7    Q        How long have you been with the IRS?

8    A        25 years.

9    Q        Can you tell us your education, looking back before you

10   joined the IRS?

11   A        In 1978, I earned an associate of science degree, and I

12   worked in dental offices for a while.  I had a son.  I went

13   back to school.  In 1986, I got a bachelor of science degree in

14   computer science with an emphasis in accounting.

15   Q        What school did you go to to get your bachelor of

16   science?

17   A        University of Central Oklahoma.

18   Q        And I'm sorry, I missed it, when did you say you

19   graduated?

20   A        1986.

21   Q        Can you tell the jury what sort of accounting courses,

22   or how many credits, you had to take to get that degree?

23   A        24 hours of accounting, and six hours of business law

24   classes.

25   Q        Do you recall any of the specific courses that you took?

1   A      Principles of Accounting 1 and 2, Intermediate

2   Accounting 1 and 2, cost accounting, advanced accounting.  Just

3   the basic curriculum for accounting classes.

4   Q      Did you take any tax-specific classes as part of

5   obtaining your bachelor's of science?

6   A      I don't remember.  I don't think -- no, I don't think I

7   did.

8   Q      Okay.  Did there come a time when you were hired by the

9   IRS?

10  A      Yes.

11  Q      Approximately when was that?

12  A      In July of 1988.

13  Q      And what office were you hired with?

14  A      Plantation, Florida.

15  Q      What was your first job with the IRS?

16  A      It may have been -- no, it was Plantation, Florida.  My

17  first job with the IRS was I was a . . . tax examiner/clerk.

18  Q      And what time period did you hold that position?

19  A      1988 till around 1990?

20  Q      So about two years?

21  A      Yes.

22  Q      What did your job as a tax examiner involve?

23  A      I did some correspondence audits, and I did some data

24  transcription.

25  Q      Can you explain to the jury what a correspondence audit

1   is?

2   A      It's a . . . it's an audit that is done by mail.  You

3   send a letter to the taxpayer and ask for a specific document

4   that they need to send in so you can verify an issue on the

5   return.  They send the document in, and you review the document

6   and determine if it meets the requirements.  And you either

7   send the report saying everything is okay, or you send the

8   report saying there's a problem, and you may owe –– and you owe

9   taxes.

10  Q      What sort of thing prompts a correspondence audit?

11  A      Back then, it could have been a dependent issue, needed

12  a Social Security number for a dependent.  It could have been a

13  filing status issue, like if you needed to supply a divorce

14  decree.  So it could have been even that your wages didn't

15  match.

16  Q      Following correspondence audits, do they always result

17  in tax due, or was it ever the opposite in your experience?

18  A      I have had tax due, I have had cases that were no change

19  except that it is filed, and there have been cases where the

20  taxpayer received additional refunds.

21  Q      As part of your job as a tax examiner, did you perform

22  computations of tax due and owing?

23  A      Yes, I did.

24  Q      Now, after your two years as a tax examiner, did you

25  receive a promotion?

1    A      Yes.

2    Q      And what was your next position?

3    A      I was promoted to tax auditor.

4    Q      Now, approximately how long were you a tax auditor?

5    A      Approximately three years.

6    Q      What sort of responsibilities did you have as a tax

7    auditor?

8    A      That's when you're in the office, and you have a little

9    cubical.  And you're assigned a case, and the taxpayer has an

10   appointment, they come in, they sit in front of you, you

11   interview them, they bring documents, you look at the documents

12   and verify that the documents . . . they verify the issues on

13   the return and . . . .  Then, after a certain amount of time,

14   if you can't verify the issues, you issue a report stating if

15   they owe taxes, or if you accepted the return as filed, or if

16   they are getting a refund.

17   Q      So what are you ultimately trying to refund as a tax

18   auditor?

19   A      We are trying to determine the substantially correct

20   tax.

21   Q      And what sort of training did you receive in order to

22   become -- or when you first were promoted to tax auditor?

23   A      We have things called phase training.  There were three

24   phases of tax auditor training.  It takes a year or two to get

25   through it.  You have to go to classroom training for three

1   weeks, and you learn issues, and techniques, and . . . things

2   like that.

3         And then you go back to the office, and you are assigned

4   to an on-the-job instructor, and they sort a hover around and

5   watch you, and make sure if you're interpreting the law right,

6   if you're making the correct computations --

7   Q      Do they supervise your work?

8   A      Oh.  Yes.

9   Q      Okay.

10  A      Thank you.  They supervise your work very closely.  And

11  that could last for . . . anywhere to three weeks or two

12  months.

13  Q      So, after you finish the first phase, do you go back to

14  a second phase?

15  A      You go back to a second phase.  During these phases,

16  they're introducing more . . . tax law issues, and the issues

17  become a little more complex.

18  Q      As you proceed?

19  A      As you proceed, yes.

20  Q      And then, after you finish each -- after you finish each

21  phase, do you then go back and put what you learned in that

22  phase into practice with your on-the-job instructor?

23  A      Yes, we do.

24  Q      And you may have said this.  If you did, I apologize.

25  How many phases were there you had to go through?

1    A       Three.  Three.

2    Q       Now, as a tax auditor, I presume you're performing

3    audits?

4    A       Yes, I am.

5    Q       And what are you trying to accomplish for purposes of an

6    audit?

7    A       I'm trying to determine if the return I have in front of

8    me has reported the substantially correct tax, and I adjust it

9    up or down, as the audit progresses, with source documents,

10   interviews, and verifications.

11   Q       When you refer to the tax return in front of you, is

12   that the return filed with the IRS?

13   A       Yes.

14   Q       Now, what sort of taxpayers were you working with as a

15   tax auditor?  Was it only individual people?

16   A       Yes.  It was individual income tax returns that

17   were . . . either wages, and interest income, and then you

18   worked your way up to those returns with Schedule C businesses,

19   which are self-employment businesses.

20   Q       When you referred to it as a Schedule C business, is

21   Schedule C a form that's attached to the Form 1040?

22   A       Yes, it is.

23   Q       And what gets reported on Schedule C?

24   A       You report your gross receipts from your self-employment

25   business, and then you list your expenses, and you subtract

1   your expenses from your gross receipts, and you have either net

2   income or net loss.  That goes to the front of the 1040, and

3   that's the way you calculate your AGI, adjusted gross income.

4           Then, on the next page, you deduct your standard

5   deduction, or Schedule A, and your -- did I say exemptions?

6   Filing status and exemptions.  Then you get taxable income, and

7   taxable income is what you determine your income on.

8   Q       That's how you determine your income tax?

9   A       Income tax, yes.

10  Q       So am I correct that, as a tax auditor, you were working

11  on a daily basis to compute tax due and owing as part of these

12  audits?

13  A       Yes.  At that time, I believe we had ten new assigned

14  cases a week.

15  Q       Okay.  How long were you -- or when -- did you get

16  another promotion after you were a tax auditor?

17  A       Yes.

18  Q       When was that?

19  A       In 1994.

20  Q       And what were you promoted to do?

21  A       In 1994 is when I was promoted to revenue agent.

22  Q       And what -- during your career with the IRS, how long

23  were you a revenue agent?

24  A       It's approximately 20 years now.

25  Q       Are you still a revenue agent today?

1    A       Yes, I am.

2    Q       What sort of duties do you have as a revenue agent?

3    A       As a revenue agent, I examine returns of individuals, I

4    examine returns of corporations, S corporations, partnerships,

5    some trusts, and various other business entities.

6    Q       You mentioned S corporations.  What's that?

7    A       It's a flow-through entity.  It's a corporation, but the

8    net profit or loss . . . an S corporation -- a corporation

9    that's a C corporation pays tax.

10   Q       The corporation pays its own tax?

11   A       Yes.  An S corporation, it flows to the person who owns

12   the S corporation, and they pay the tax on the net income.

13   It's a flow-through entity.

14   Q       Okay.  Is it fair to say that, generally, the sorts of

15   audits that you do as a revenue agent, as compared to when you

16   were a tax auditor, have become more complex?

17   A       Yes.

18   Q       And have you continued, since 1994, when you became a

19   revenue agent, to compute tax due and owing, on a regular

20   basis, as part of these audits?

21   A       Yes.

22   Q       If you can estimate, approximately how many audits do

23   you think you've performed, as a revenue agent, for individual

24   taxpayers?

25   A       As a revenue agent?  Not as a tax auditor, just a

1    revenue agent?

2    Q      You can do both.  How many do you think you did as a tax

3    auditor?

4    A      Maybe . . . probably less than a thousand.  Probably

5    500.

6    Q      And then as a revenue agent?

7    A      Probably about 300.

8    Q      Now, how come so many fewer as a revenue agent than as a

9    tax auditor?

10   A      Because as a revenue agent you are really dealing with

11   corporations and S corporations.  The exam starts at the

12   corporate level or partnership level.

13   Q      And so are they more complex?

14   A      They are more complex.

15   Q      Do they take more time to do?

16   A      Yes.

17   Q      Can you estimate about how many agents you have done

18   regarding businesses as a revenue agent?

19   A      Probably about 500.

20   Q      Now, what sort of training did you receive when you were

21   promoted to become a revenue agent?

22   A      Okay.  This goes back to phase training.  At the time I

23   became a revenue agent --

24   Q      When was that?  Ballpark.

25   A      1994?

1    Q      Okay.

2    A      There were five phases of revenue agent training.

3    Q      Do you recall what the first phase was?

4    A      That's when they review individual auditing.

5    Q      Auditing of individuals?

6    A      Auditing of individuals.  Just the same thing.  Go to a

7    classroom for three –– approximately three weeks.  Then you go

8    back and you practice what you learn, and you are supervised

9    with an on-the-job instructor.  I'm not sure the time period

10   that you're supervised.

11          Then you go away to class, again, for about three weeks.

12   I believe the . . . the second one was corporations.  And then

13   you would come back and practice what you learned.

14          The third one was S corporations, and you come back and

15   practice what you learned.

16          Partnerships would have been the fourth one, and you

17   come back and practice that.

18          And I think they abolished the fifth one before I ever

19   got to it.  They started revamping their training program.

20   Q      All right.  So can you estimate about how long the

21   training, in total, lasted?

22   A      It was a long time.  Between a year and a year and a

23   half.

24   Q      All right.  Now, during your time as a revenue agent,

25   have you been asked to work on specific projects or tasks?

1    A       Yes.  I have.

2    Q       Can you describe one of those?

3    A       I became -- I think, in 2003, I was assigned to the ATAT

4    Group.  That's the -- let me think.  Abusive Tax Avoidance

5    Transaction Group.

6    Q       Okay.  And what did you do as part of that assignment?

7    A       I had some training on specific types of tax avoidance

8    schemes that were being promoted by abusive preparers, either

9    on the internet, or just advertisements and stuff.  And we

10   would be assigned these returns that were part of this abusive

11   promoter project, and we would unwind the scheme to get to the

12   substantially correct tax.

13   Q       When you say you would unwind the scheme, what does that

14   mean?

15   A       There's schemes where trust, offshore corporations --

16   Q       Well, let me rephrase the question.  Are you just --

17   when you say unwind a scheme, are you just trying to figure out

18   what happened?

19   A       Yes.  Figure out what happened, and . . . Where the

20   income was ultimately earned, and who should pay the tax on the

21   income.

22   Q       Okay.  Were you also -- were you tasked with any other

23   special projects as a revenue agent?

24   A       From 2006 to the present, I'm a . . . Special

25   Enforcement Program revenue agent.

1    Q      Does the IRS use an abbreviation for that?

2    A      SEP.  I'm a SEP agent.

3    Q      I'm sorry, when did you say?

4    A      2006.

5    Q      Did you receive training to become a SEP agent?

6    A      Yes.

7    Q      And can you describe what sort of training you had?

8    A      I've had three weeks of basic SEP training.  That's a

9    classroom training where they go into indirect methods of

10   determining income, they --

11   Q      What does that mean?  What does that mean?

12   A      It means if the taxpayer hasn't used an accounting

13   method that correctly states income, we have indirect methods

14   we can use to determine the correct income.  It's like bank

15   deposit analysis.

16   Q      So you look at what's happening in the bank account?

17   A      Right.

18   Q      All right.  What else did you learn in the first part of

19   your SEP training?

20   A      It describes the different types of cases you can be

21   assigned to work with our criminal investigation division.  It

22   describes cooperating agent cases.  It describes cases that we

23   start, and then we refer them to criminal investigation.  It

24   describes grand jury cases, and what they are.  There's

25   different types of witnesses.  There's expert witnesses,

1   summary witnesses.  It describes a little bit what goes on when

2   you're the witness in a tax case.

3   Q      Did you receive . . . .  When do you recall this

4   training occurred?

5   A      Probably 2007?

6   Q      And do you recall about how long it lasted?

7   A      I believe it was three weeks.

8   Q      Okay.  What is the Special Enforcement Program?

9   A      We're assigned cases that are specific projects that the

10  government -- that the IRS is working on.  Sometimes they're

11  abusive preparers, they're abusive promoters . . . sometimes

12  it's offshore credit card cases.

13  Q      Does there have to be something special about the cases

14  that you are assign to, or what makes a case come to a SEP

15  agent?

16  A      I don't know who determines that.  I don't know the

17  general -- I know that a lot of our cases come . . . not all of

18  our cases, but some of our cases come through CI.  But I don't

19  know who decides --

20  Q      Okay.  What does CI mean?

21  A      Criminal Investigation.

22  Q      So do you work a lot with the criminal side of the IRS?

23  A      On occasion, it seems like I've worked with them a lot.

24  And there are occasions when I'm working with them and

25  occasions when I'm not.  I have a mix of cases in my inventory.

1   Q      You are not devoted solely to one side or the other.

2   A      No.  No.  No.

3   Q      As part of your training did you receive training on

4   becoming a summary witness?

5   A      Yes.

6   Q      Can you describe to the jury what it means to be a

7   summary witness?

8   A      I sit through the trial, I take notes, I determine what

9   evidence has been spoken and presented in, and then I'm . . .

10  asked to, I guess, determine a calculation.

11  Q      A calculation of what?

12  A      Tax.  If there is tax.

13  Q      I'm sorry?

14  A      If there is tax.  A calculation of tax.

15  Q      If there is tax due and owing?

16  A      Yes.  Yes.

17  Q      What was the nature of your summary witness training?

18  A      It was part of a training class that lasted about a

19  week.

20  Q      And was there an emphasis on taking good notes?

21  A      Yes.  I'm not sure if -- there were some discussions

22  about taking notes.

23  Q      And have you been taking notes throughout this trial?

24  A      I have been taking notes.

25  Q      And did you do so as to all the witnesses that you

1   heard?

2   A       Yes, I did.

3   Q       Did you listen to all the witnesses who have testified

4   in this case?

5   A       Yes, I did.

6   Q       And have you been observing the evidence that has been

7   admitted into evidence?

8   A       Yes, I have.

9   Q       Have you been present throughout the trial?

10  A       Yes.

11  Q       And did you hear the testimony of all the witnesses who

12  testified before you?

13  A       Yes.

14  Q       As a SEP agent and as a revenue agent, is part of your

15  duties to perform audits and do computations of tax due and

16  owing?

17  A       Yes.

18  Q       Do you do that on a routine basis as part of your job?

19  A       Yes, I do.

20  Q       And how long have you been a SEP agent?

21  A       About seven years now.

22          MS. KESSLER:  Your Honor, I'd move to designate

23  Ms. Maurer as summary witness with tax computation.

24          THE COURT:  You may proceed.

25

1    BY MS. KESSLER:

2    Q       As part of your duties as a SEP agent or a revenue

3    agent, were you assigned to work on the case that we have been

4    hearing about this past week?

5    A       Yes, I have.

6    Q       And do you recall approximately when it was that you

7    were assigned?

8    A       It was in 2009.  April or May of 2009.

9    Q       And what were you asked to do?

10   A       I was asked to review documents that were provided from

11   UBS.

12   Q       What were you -- what sort of documents were provided?

13   A       There were . . . .  Binders.  There were 11 -- 10 or 11

14   different accounts from UBS.  And they contained opening

15   documents.  They contained instruction documents.  They

16   contained account statements.  They had year-end statements.

17   And they had the statements of securities, called safekeeping

18   accounts.  And they're also e-mails and notes from the client

19   workbench in the files.

20   Q       All right.  Can you describe the volume of documents

21   that you received, about how much it was?

22   A       It was about three boxes?

23   Q       Okay.  And what were you asked -- were you asked to

24   review these documents?

25   A       Yes, I was.

1  Q      And why were you asked to review them?  What were you to

2  do?

3              MR. HOCHMAN:  Objection, foundation, as to who asked.

4              THE COURT:  Overruled.

5  BY MS. KESSLER:

6  Q      You can answer.  What were you asked to do?

7  A      I was asked to analyze the documents, determine if there

8  was interest, dividend, and investment income in the accounts

9  that were not reported on a corresponding tax return.

10  Q      Okay.  Did you do that?

11  A      Yes.

12  Q      What sort of accounts did you look at?

13  A      They were investment accounts.

14  Q      Do you recall about how many there were that you had to

15  look at?

16  A      There was a lot of accounts.  10 or 11.  But I was

17  instructed to analyze five of them.

18              MR. HOCHMAN:  Objection.  Sorry.  Objection, Your

19  Honor.  Foundation as to who is instructing, when the

20  instructions are coming, or any of those type of foundational

21  questions.

22              THE COURT:  That objection is overruled.

23  BY MS. KESSLER:

24  Q      I'm sorry, I think that you had said you were asked to

25  look at -- I'm not sure where were you interrupted.  So what

1    sort of accounts were you asked to look at?

2    A        Investment accounts.

3    Q        Do you recall approximately how many?

4    A        Four.  And then, a few months, later the fifth -- a

5    fifth one.  And then, sometime later, documents came in from

6    other banks, other than UBS.  And I believe that was four other

7    accounts.

8    Q        Did you review -- did you perform an in-depth analysis

9    analyzing every single transaction for every bank account that

10   you received information for, or did you review some more in

11   depth than others?

12   A        I reviewed some more -- oh, okay.  I reviewed -- I

13   looked at, and I read the documents in all 11 files; but there

14   were four that I was -- I was asked to analyze in depth.  And

15   that meant I had to analyze every transaction.

16            I took the bank account statements, and I transferred

17   all that -- all the transactions onto an Excel spreadsheet so

18   that I could manipulate the spreadsheet to determine income --

19   interest income, dividends, and investment income.

20   Q        Okay.  When you say, "Manipulate the spreadsheet," what

21   do you mean by that?

22   A        I . . . listed all the transactions.  I would sort it

23   by . . . by a description, interest, dividends.  I would sort

24   it so that I could add up the interest, and add up the -- there

25   was no single document that was provided that told you year-end

1    interest or year-end dividend, or year-end --

2    Q      Okay.

3    A      So I had to create my own way of determining all the

4    interest that was earned during the year, or dividends earned

5    during the year.  And the only way I could figure out how to do

6    it was to sort the transactions that occurred in the account.

7    Q      All right.  Were you working in conjunction with CI, or

8    Criminal Investigation, for this work?

9    A      Yes, I was.

10   Q      Do you recall how many accounts from UBS you analyzed?

11   A      Five.

12   Q      Now, why were you asked to perform this analysis?  What

13   were you seeking to determine?

14   A      I was seeking to determine if there was unreported

15   interest dividends and investment income from the foreign

16   accounts.

17   Q      And then what were you to do with that information once

18   you determined whether there was income in the accounts?

19   A      Calculate tax due and owing.

20   Q      If any?

21   A      Yes.

22   Q      What sort of -- did you review the same sort of

23   documents that you described a few minutes ago, that you

24   received from UBS; bank statements, year-end statements, that

25   kind of thing?

1   A      Yes.

2   Q      And was this review particularly complex?

3   A      Yes.  Because there were a lot of documents, and . . .

4   the dates were funny to begin with.  You had to get used to the

5   dates --

6   Q      Why?  Why were they funny?

7   A      It's not month, day, year.

8   Q      The way it is here in the United States?

9   A      Yes.

10  Q      Okay.  Why else was it complex, or difficult?

11  A      Some of the documents were in German.  Some of them

12  could have been in French.  There were different languages.

13  And like I said, there was no single document or -- there

14  weren't like a couple of pages of documents you could look at.

15  You had to manually go through and determine things.

16  Q      You had to look at -- did you have to look at every

17  single transaction occurring in the account?

18  A      Yes.  Yes.  But you could make sure you were doing it

19  right, because the account statements, on -- on the UBS, they

20  kept a running . . . running balance.

21  Q      Okay.

22  A      So I made sure my transactions, as I put them in the

23  spreadsheet, the running balance matched.

24  Q      So would you look at the -- all of the bank documents --

25  were you looking at the bank documents, and logging the

1    transactions as you read through them on the bank statements?

2    A       Yes.

3    Q       And then, in order to make sure that you didn't miss any

4    transactions, or . . . transposed, or mistyped a number, or

5    things like that, you were then comparing it to the month-end

6    balance?  Do I understand that correctly?

7    A       Well, they did a daily running --

8    Q       Oh, okay.

9    A       Every transaction they did, they did a running balance.

10               MS. KESSLER:  Okay.

11               Your Honor, the next portion is probably

12   substantially more than 20 minutes.  I don't know whether the

13   Court wants me to proceed or not.

14               THE COURT:  Come to sidebar.

15                              AT SIDEBAR

16               THE COURT:  What kind of progress are we making in

17   terms of the government resting?

18               MS. KESSLER:  This is the government's last witness.

19   I would guess, probably, she's going to be like four hours or

20   so on direct.

21               THE COURT:  Four hours for you?

22               MS. KESSLER:  I would think so.  It's a lot of

23   accounts that she had to analyze.  The first account will be

24   very slow, because we have to go through the methodology; and

25   then it should pick up after that.  Four hours actually may be

1    an overestimate.  I hope.

2              THE COURT:  So when you say more than 20 minutes, you

3    are a master of the understatement.

4              MS. KESSLER:  Oh, yeah.

5              MR. HOCHMAN:  Your Honor, I would like to at least

6    get some more done today, so we can try and shoot to get the

7    evidence in by the end of the week.

8              THE COURT:  That's kind of my thought.

9              Let's get it started.

10             MS. KESSLER:  All right.

11                            IN OPEN COURT

12             THE COURT:  Don't look at me like that.  You can

13   blame me for not being allowed to go home early.  I told her to

14   work until 5:00.

15             MS. KESSLER:  If I could approach and have

16   Exhibit 30-C marked?

17             THE COURT:  You may.

18             MS. KESSLER:  Thank you.

19             May I approach the witness, Your Honor?

20             THE COURT:  You may.

21   BY MS. KESSLER:

22   Q     Ms. Maurer, can you explain to the jury what's in this

23   binder?

24   A     This is one of the accounts I reviewed.  These are my

25   work papers.  This is for account -- UBS account -- is this too

1    loud?  Am I okay?

2         This is for Account 268, Subaccount 60U.  I'm sorry,

3    this is for Master Account Number 268, ending in 68.  These are

4    my work papers.  These are the . . . statements.  Then there's

5    the safekeeping, security account statements.  And then there's

6    the year-end statements.

7    Q     Did you prepare the computations that are contained in

8    this binder?

9    A     Yes, I did.

10   Q     And did you rely on the other documents in this binder

11   in order to prepare your computations?

12   A     Yes, I did.

13   Q     Can you explain how the binder is organized?

14   A     Okay.  It's organized under Master Account 268, and then

15   my work papers are on top, and then there's a . . . .  Sections

16   for each subaccount, or object account.

17   Q     Can you explain what that is?  An object account?

18   A     Within the master account, there were different object

19   accounts.  The man from UBS talked about those.  I called them

20   subaccounts because there would be -- within the master account

21   there would be accounts that were in U.S. Dollar currency,

22   Swiss Frank currency, Great British Pound currency, and Euro

23   currency; and then the object accounts included what they

24   called safekeeping accounts, or securities accounts.

25   Q     All right.  Now, do you have a different tab for each

1    subaccount in that binder?

2    A       I have a different tab for the subaccounts that had

3    transactions in them.  Some of the subaccounts may not have had

4    transactions, so they probably don't have a special tab, or

5    binder.

6    Q       Okay.  And then all of the account documents that you

7    relied on are also included in this binder; is that right?

8    A       Yeah.  It's what was provided from UBS.  It's based on

9    what UBS provided.

10   Q       All right.

11   A       It's what I had.

12           MS. KESSLER:  Your Honor, I'd move Exhibit 30-C into

13   evidence.

14           MR. HOCHMAN:  No objection, Your Honor.

15           THE COURT:  30C will be admitted.

16           (Government's Exhibit 30C was admitted into

17       evidence.)

18           MS. KESSLER:  Permission to publish, Your Honor?

19           THE COURT:  You may.

20           (An exhibit was projected onto the projector screen.)

21   BY MS. KESSLER:

22   Q       Now, did you review all the documents that are contained

23   in this binder?

24   A       Yes, I did.

25   Q       What sort of types of documents did you review?

1  A       Account statements, safekeeping account statements, and

2  year-end statements.

3  Q       All right.  Now, this -- what we're looking at up on the

4  screen here is the first Page of Government's Exhibit 30C.  Can

5  you tell the jury what this is?

6  A       Well, I was trying to organize my work, and this is one

7  page of about four pages where I listed all the master account

8  numbers.

9  Q       Okay.

10  A       And on this one, the one in the middle, 268, that's this

11  account here.

12  Q       Okay.  Now, under where it says 268, there's a whole

13  column of other numbers and letters below that.  Can you

14  explain to the jury what you understand that to be?

15  A       Those are the object accounts, or what I called

16  subaccounts until I learned that they were object accounts.

17  Q       And the tabs within the binder, if there were

18  transactions for those subaccounts, there would be a

19  corresponding tab in the binder?

20  A       Yes.

21  Q       Okay.  Did you hear testimony with regard to this

22  account during this trial?

23  A       Yes, I have.

24  Q       And did you see documents entered into evidence related

25  to this account?

1    A       Yes, I have.

2            MS. KESSLER:  Your Honor, may I approach the witness?

3            THE COURT:  You may.

4            MS. KESSLER:  Approach with what I understand is

5    admitted as Exhibit 3GG.

6            MR. HOCHMAN:  I'm sorry, I didn't hear the number.

7            MS. KESSLER:  3GG, like George.

8            MR. HOCHMAN:  Thank you.

9            MS. KESSLER:  Permission to publish, Your Honor, 3GG?

10           THE COURT:  I'm sorry?

11           MS. KESSLER:  Permission to publish 3GG?

12           THE COURT:  You may publish any exhibit that has been

13   admitted.

14           MS. KESSLER:  Thank you.

15           (An exhibit was projected onto the projector screen.)

16   BY MS. KESSLER:

17   Q       Turning you to Page 1 of this document, what is this

18   document?

19   A       That's the Form A.  The UBS Form A.

20   Q       And for what account is this?

21   A       The account ending in 268.

22   Q       The master account ending in 268?

23   A       Yes.

24   Q       Now, if you look, who is listed as the contracting party

25   for this account?

1    A       Patricia L. Hough and David L. Fredrick.

2    Q       And if you look further down, is there a box checked

3    indicating the identity of the beneficial owner?  Page 1?

4    A       Page 1?  Oh, yes.  It says that the beneficial owner is

5    the same as the contracting party.

6    Q       Now, if you look down at the very bottom, who does this

7    document appear to have been signed by?

8    A       Patricia Hough and David Fredrick.

9    Q       Turning on to Page 2 of this document, what is this

10   document?

11   A       It's another account opening document.  It lists the

12   account holders.

13   Q       And who are those identified as?

14   A       Patricia Hough and David Fredrick.

15   Q       Now, if we turn to Page 3, is this a continuation of the

16   account opening documents?

17   A       Yes.

18   Q       And who does it appear has signed this document?

19   A       David Fredrick and Patricia Hough.

20   Q       Turning to Page 5 of this document, what is this?

21   A       This is a copy of a passport, Patricia Lynn Hough.  This

22   is the . . . ID information that UBS required for opening an

23   account.

24   Q       And if we turn to Page 6, what is this?

25   A       This is a copy of the driver's license of Patricia Lynn

1   Hough.  Patricia L. Hough.  It's identifying information.

2   Q      And if we turn to Page 7, what is this?

3   A      A copy of a passport for David Fredrick.  Identifying

4   information.

5   Q      If we look at Page 8 of this document, what is this?

6   A      Supplement for new account status.

7   Q      And what is listed here as the -- who is listed here as

8   the account shoulder?

9   A      P.L.H.

10  Q      And who appears to have signed this document at the

11  bottom?

12  A      Patricia Hough.

13  Q      And then if we could turn to Page 9, who is also

14  identified as an account holder here?

15  A      D.L.F.

16  Q      And do you -- who appears to have signed this document?

17  A      David Fredrick.

18  Q      Now, if we turn to Page 21, still on Exhibit 3GG, what

19  is this document?

20  A      A general power of attorney.

21  Q      And who is -- who are the individuals identified at the

22  top?

23  A      Patricia Hough and David Fredrick.

24  Q      And can you read, below where their names are typed,

25  what is happening here with this document?

1    A      They are . . . this writing is very small for me.  They

2    are identifying Charlene -- they're giving power of attorney to

3    Charlene Lee Varga.

4    Q      And did you hear testimony during this trial from an

5    individual by the name of Charlene Varga?

6    A      Yes, I did.

7    Q      And who was that?

8    A      Charlene Varga identified herself as Patricia Hough's

9    sister.

10   Q      And if we look at the bottom, does that appear to be

11   Miss Varga's signature there, so far as you're aware?

12   A      Yes.  It says -- yes.  It's associated with the printed

13   name on there.

14   Q      Okay.  Now, if you look at the bottom of this document,

15   who appears to have signed this document?

16   A      Patricia Hough and David Fredrick.

17   Q      Now, all these documents that we just looked at in

18   Exhibit 3GG, do they all relate to the master account number at

19   UBS ending in 268?

20   A      Yes.

21   Q      Based on these and other pieces of evidence, I'm going

22   to ask you to assume, for purposes of your income tax

23   computations, that this account was owned jointly by Patricia

24   Hough and David Fredrick.

25          Now, if you would have been asked to assume that this

1    account was not owned jointly by Dr. Hough and Dr. Fredrick,

2    how would this affect your income tax computations for them?

3    A     If this account was not owned by Patricia Hough and

4    David Fredrick?

5    Q     Yes, ma'am.

6    A     It wouldn't appear in my tax computations.

7    Q     All right.  Now, did you examine all the transactions in

8    this account, as we discussed earlier?

9    A     Yes.

10   Q     If we could turn to Page 13 of this document.  I think

11   it should be the first page behind the tab marked 60U.

12         MR. HOCHMAN:  Is this still 30C?

13         MS. KESSLER:  Yes.

14         THE WITNESS:  I have it here.

15   BY MS. KESSLER:

16   Q     What is this document?

17   A     This is the spreadsheet that I created from analyzing

18   the accounts statement that I was provided by from UBS.

19   Q     Which account is this for?

20   A     The account ending in 268, Subaccount 60U.

21   Q     Now, when you were analyzing all these transactions,

22   were you attempting to determine the interest, dividends,

23   capital gains, things of that nature?

24   A     Yes, I was.

25   Q     Does this -- how many pages is this spreadsheet?

1   A      One, and a little bit on the second page.

2   Q      Now, does the spreadsheet reflect all of the

3   transactions you observed to occur in Object Account 60U?

4   A      Yes.

5   Q      I think you -- how did you double-check to be sure you

6   hadn't missed any transactions?

7   A      That running balance corresponds with the running

8   balance on the UBS account statements.

9   Q      The running balance on the right-hand column?

10  A      Yes.

11  Q      Okay.

12  A      Starts with zero and then, when you add or subtract,

13  debit or credit, it keeps track of it.

14  Q      All right.  Did you do this same sort of analysis as to

15  all of the subaccounts within this master account ending in

16  268?

17  A      Yes.

18  Q      What type of account did you observe this joint account

19  to be?

20  A      It's an investment account.

21  Q      When . . . approximately when was the account opened?

22  A      October 1st, 2001.

23          MR. HOCHMAN:  Your Honor, just ask, if the witness is

24  looking at a particular document to give the answer, to

25  identify what that document is.

1          THE COURT:  I think that's fair.

2    BY MS. KESSLER:

3    Q      What page did you look at in order to see when the

4    account was opened?

5    A      I'm sorry.  I'm looking at the Page 13 for the

6    Subaccount 60U.

7    Q      And when you say Page 13, you're referring to the page

8    number in the bottom left-hand corner?

9    A      Right.

10   Q      All right.

11   A      And the reason why I'm -- do you want me to explain why

12   I'm looking at that other document?

13   Q      Sure.  What was the other page that you looked at?

14   A      It must be Page 1.

15   Q      Okay.

16   A      Subaccounts were not opened all on the same dates.

17   Subaccounts could have been opened later, whenever they decided

18   to invest in Great British Pounds or Euros.  And so the

19   account -- the master account --

20   Q      Go ahead.

21   A      I'm trying to determine -- I'm sorry.  Okay.  There are

22   different times that the subaccounts were opening -- were open;

23   and I'm trying to make sure I picked the date of the earliest

24   opening.

25   Q      So on Page 1, this column that's second from the right,

1   does that list the date that you first saw transactions

2   occurring --

3   A      Yes.

4   Q      -- or that subaccount being opened?

5   A      Yes.  60U was on 10/1 of 2001.  And then some of them

6   weren't even opened until 2004.  I was making sure that that

7   was the earliest.

8   Q      Now, the right -- the very right-hand column of this

9   document, what does that note?

10  A      That's the type of currency that is in the account.

11  Q      And can you explain what those abbreviations mean?

12  A      Well, USD is U.S. Dollar; EUR is Euros; CAD is Canadian

13  Dollar, GBP is Great British Pounds; CHF is Swiss Franks.

14  Q      Okay.  Thank.

15         Now, if you'd look back, again, at Page 13 of

16  Exhibit 30C, what was the first deposit that you saw into this

17  object account?

18  A      October 31st of 2001, there was a deposit of 1,250,000.

19  Q      Now, after you reviewed and logged all the transactions

20  that you saw to occur in -- we'll focus on subaccount -- or

21  Object Account 60U -- what did you do with this spreadsheet?

22  A      I sorted it by the description column.

23  Q      And why were you sorting it?

24  A      Because if I sorted it by the description, the interest

25  transactions would be in one spot, and the dividend

1   transactions would be in one spot, and the security and stock

2   sales would be in one spot.

3           MS. KESSLER:  All right.

4           Your Honor, this is probably a good stopping point.

5           THE COURT:  All right.

6           We'll break for the evening.  Please do not discuss

7   the case among yourselves, or allow anyone to discuss it with

8   you or in your presence.  Don't do any of the independent

9   research kind of things that I told you not to do last week

10  now, and have a good evening.  See you at 9:00 o'clock tomorrow

11  morning.

12          (At 4:59 PM, the jury was escorted from the

13      courtroom.)

14          THE COURT:  All right.  9:00 o'clock tomorrow

15  morning.

16          Let me ask counsel, can you access the court computer

17  docket so, if I file that order, you can get it?

18          MS. FINLEY:  Yes, Your Honor.

19          THE COURT:  Okay.  Good.

20          MR. SAUNDERS:  Your Honor?

21          MS. FINLEY:  I just had one housekeeping matter?

22          THE COURT:  Sure.

23          MS. FINLEY:  Given the fact that the government will

24  likely west tomorrow, the government has not received any

25  exhibits for the defendant's case in chief, nor a witness list;

1   and we would ask that they provide that now that they're

2   getting ready for their case in chief.  And not in the middle

3   of the day tomorrow, when they're ready to start their case.

4          THE COURT:  Mr. Hochman?

5          MR. HOCHMAN:  Of course, Your Honor.  We have been

6   getting government's witness lists about 7:00 p.m. the night

7   before the day, and we certainly will respond in kind.

8          MS. FINLEY:  Your Honor, we don't even know who the

9   names of the witnesses are, since they never filed a witness

10  list; so we don't even know who the potential witnesses are.

11         THE COURT:  I think you know that they're not from

12  Florida.  As I recall there's one name from Florida.  And that

13  limits it to 49 other states, and various other foreign

14  countries I suppose.

15         MR. HOCHMAN:  And they certainly know Mr. Rivera, our

16  expert, who has been in court the entire time, and potentially

17  Dr. Hough.  And we will let them know the additional witnesses,

18  Your Honor.

19         THE COURT:  All right.

20         Mr. Saunders?

21         MR. SAUNDERS:  And we will be filing -- with respect

22  to the Touhy issue, we will be filing the response to the

23  government's motion they filed yesterday sometime this evening;

24  and I suppose, at some point, when the defense is starting its

25  case, we'd ask the Court to rule on that, so we know what

1    procedure we need to follow.

2             THE COURT:  Sure.  Depending on -- if you would

3    attach a copy of the subpoena, as well.  I don't recall that

4    being attached.

5             MR. SAUNDERS:  We are attaching it to ours, Your

6    Honor.

7             THE COURT:  All right.  Thank you.

8             All right.  We'll be in recess then.

9                      -- -- -- -- -- -- -- --

10            (At 5:01 p.m., court was recessed, to be reconvened

11       at 9:00 a.m., on Thursday, October 17, 2013.)

12                      -- -- -- -- -- -- -- --

13

14

15

16

17

18

19

20

21

22

23

24

25