UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

---

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                      Fort Myers, Florida

vs.                                  October 17, 2013

PATRICIA LYNN HOUGH,                9:00 a.m.

        Defendant.

---

TRANSCRIPT OF JURY TRIAL, DAY SEVEN

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                         Tax Division
                  P.O. Box 813
                  Washington, DC  20044
                  BY:  CARYN FINLEY, ESQ.

                  U.S. Department of Justice
                    Tax Division
                  Suite 7334
                  601 D Street NW
                  Washington, DC
                  BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

                        A P P E A R A N C E S
                     (Continued From Previous Page)


FOR THE DEFENDANT:         Bingham McCutchen, LLP
                           The Water Garden
                           1601 Cloverfield Boulevard
                           Suite 2050 North
                           Santa Monica, CA  90404-4082
                           (310) 904-1000
                           BY:  NATHAN J. HOCHMAN, ESQ.

                           Bruce L. Udolf, PA
                           500 East Broward Boulevard
                           Suite 1400
                           Fort Lauderdale, FL  33394
                           (954) 858-8831
                           BY:  BRUCE L. UDOLF, ESQ.

REPORTED BY:               JEFFREY G. THOMAS, RPR-CP, CRR
                           Official Federal Court Reporter
                           United States Courthouse
                           2110 First Street, Suite 2-194
                           Fort Myers, FL  33901
                           (239) 461-2033


                              *  *  *

I N D E X

| October 17, 2013 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 7 | 6 |

– – –

GOVERNMENT'S WITNESSES

| WITNESS | DIRECT | | CROSS | | REDIRECT | | RECROSS | | VOIR DIRE | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. |
| SHEILA MAURER | 7 | 8 | 7 | 203 | | | | | | |

– – –

GOVERNMENT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Government's Exhibits 3M, 3Q, 3T, 3X, 3DD, 3FF, 3LL, 3F, 18A, 18B, 23A, 23B, 23C, 23D, and 24A Admitted in Evidence | 7 | 7 |
| Government's Exhibits 4A through 4N Admitted in Evidence | 7 | 7 |
| Government's Exhibit 30B marked for identification | 7 | 31 |
| Government's Exhibit 30B Admitted in Evidence | 7 | 31 |
| Government's Exhibit 30A marked for identification | 7 | 44 |
| Government's Exhibit 30A Admitted in Evidence | 7 | 45 |
| Government's Exhibit 30D marked for identification | 7 | 50 |
| Government's Exhibit 30D Admitted in Evidence | 7 | 51 |
| Government's Exhibit 30P marked for identification | 7 | 60 |

(Index Continues on Following Page)

4

I N D E X
(Continued From Previous Page)

GOVERNMENT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Government's Exhibit 30P Admitted in Evidence | 7 | 62 |
| Government's Exhibit 30L marked for identification | 7 | 68 |
| Government's Exhibit 30L Admitted in Evidence | 7 | 69 |
| Government's Exhibit 30Q marked for identification | 7 | 77 |
| Government's Exhibit 30Q Admitted in Evidence | 7 | 78 |
| Government's Exhibits 30G, 30H, 30I, 30J, and 30K marked for identification | 7 | 80 |
| Government's Exhibit 30G Admitted in Evidence | 7 | 82 |
| Government's Exhibit 30H Admitted in Evidence | 7 | 90 |
| Government's Exhibit 30E marked for identification | 7 | 97 |
| Government's Exhibit 30E Admitted in Evidence | 7 | 98 |
| Government's Exhibit 30F Admitted in Evidence | 7 | 104 |
| Government's Exhibit 3II Admitted in Evidence | 7 | 114 |
| Government's Exhibit 30I Admitted in Evidence | 7 | 118 |
| Government's Exhibit 30R marked for identification | 7 | 129 |
| Government's Exhibit 30R Admitted in Evidence | 7 | 130 |
| Government's Exhibit 30O marked for identification | 7 | 131 |
| Government's Exhibit 30O Admitted in Evidence | 7 | 132 |
| Government's Exhibit 30K Admitted in Evidence | 7 | 140 |

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)


DEFENDANT'S WITNESSES

| WITNESS | DIRECT | | CROSS | | REDIRECT | | RECROSS | | VOIR DIRE | |
|---------|--------|--------|-------|--------|----------|--------|---------|--------|----------|--------|
| | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. |
| ALAN GRUBER | 7 | 146 | 7 | 187 | 7 | 197 | 7 | 202 | | |

– – –

DEFENDANT'S EXHIBITS

| | Vol. | Page |
|---|------|------|
| Defendant's Exhibit 270 Admitted in Evidence | 7 | 158 |

– – –

| | Vol. | Page |
|---|------|------|
| Miscellaneous Discussions | 7 | 263 |
| Defendant Advised of Right to Testify | 7 | 265 |
| Court Recessed for the Day | 7 | 266 |

* * *

1        THEREUPON, the above-entitled case having been called

2    to order, the following proceedings were held herein,

3    to-wit:

4                            - - -

5            THE COURT:  Good morning, everyone.

6            (The Court Security Officer answered a knock on the

7        door.)

8            THE COURT:  I think they're ready for us.

9            How about you, are you ready for the jury?

10           MR. HOCHMAN:  Yes, Your Honor.

11           MS. FINLEY:  Yes, sir.

12           THE COURT:  All right.

13           Have the jury step in, please.

14           And can we get the witness back . . . and

15    Ms. Kessler.

16           (The witness resumed the witness stand.)

17           (At 9:04 AM, the jury was escorted into the

18        courtroom.)

19           THE COURT:  Good morning, ladies and gentlemen.

20           And, Ms. Kessler, you may proceed.

21           MS. KESSLER:  Preliminarily, Your Honor, we would

22    like to move in a few exhibits.  The first are on a CD

23    disk . . . 3BB, like "boy."

24           THE COURT:  Give me the number again, please?

25           MS. KESSLER:  3BB, like "boy."

```
 1              THE COURT:  Okay.
 2              MS. KESSLER:  3F, like "Frank"; 3FF, like "Frank";
 3   3LL, like "Larry"; 3M, "Mary"; 3Q, "queen"; 3T, "Tom"; 3X,
 4   "x-ray"; also, Exhibit 18A; 18B, like "boy"; 23A; 23B; 23C;
 5   23D; and 24A.
 6              MR. HOCHMAN:  No objection, Your Honor.
 7              THE COURT:  All right.  Exhibits 3M, Q, T, X, DD, FF,
 8   LL, and F, as well as 18A; 18B; 23A, B, C, and D; and 24A, will
 9   all be admitted.
10              (Government's Exhibits 3M, 3Q, 3T, 3X, 3DD, 3FF, 3LL,
11        3F, 18A, 18B, 23A, 23B, 23C, 23D, and 24A were admitted
12        into evidence.)
13              MS. KESSLER:  And then there's also a couple more, in
14   the four series, Your Honor, I'm sorry, 4A, all the way through
15   4N, like "Nancy."
16              THE COURT:  Any objections?
17              MR. HOCHMAN:  No objection, Your Honor.
18              THE COURT:  All right.  4A through N will be
19   admitted.
20              (Government's Exhibits 4A through 4N were admitted
21        into evidence.)
22              MS. KESSLER:  And just for the record, 25A was
23   admitted yesterday.
24              THE COURT:  All right.  Are you telling me or asking
25   me?
```

1          MS. KESSLER:  It was more just so that the jury knew,

2   so if I referenced it --

3          THE COURT:  Oh, okay.

4          MS. KESSLER:  -- that was all.

5          MR. HOCHMAN:  And, Judge, just to clarify, Your

6   Honor, it was 25A is redacted, if I recall.

7          MS. KESSLER:  Yes.  Thank you.

8          THE COURT:  Yes, that's correct.

9          MS. KESSLER:  And then I wanted to make one other

10  point of clarification, Your Honor, the transcript from

11  yesterday did not read that I had sought to qualify Ms. Maurer

12  as an expert in tax computations, and the government did ask

13  for her to be recognized as a summary witness and an expert in

14  income tax computation.

15         THE COURT:  All right.  When I say, "all right," that

16  means you may proceed.

17         MS. KESSLER:  Thank you.

18                        SHEILA MAURER,

19  having been recalled as a witness by the Government, and

20  having been previously called as a witness and duly sworn,

21  was examined and testified as follows:

22                     DIRECT EXAMINATION

23  BY MS. KESSLER:

24  Q     Ms. Maurer, yesterday we were talking about, when we

25  left off, a joint account in the name of Patricia and

1    Fredrick -- excuse me, Dr. Hough and Dr. Fredrick, at UBS.

2    And . . . .  I wanted to ask you about how you computed

3    interest, if any, that had been earned in that account.

4                MS. KESSLER:  Your Honor, may I approach the witness

5    freely?

6                THE COURT:  You may.

7    BY MS. KESSLER:

8    Q     I'm going to hand you what's been admitted previously as

9    Exhibit 30C, like "cat."

10               MS. KESSLER:  Permission to publish, Your Honor?

11               THE COURT:  You may publish any exhibit that's been

12   admitted.

13               MS. KESSLER:  Thank you.

14               If we could turn to Page 15 of this exhibit, in

15   reviewing this . . . .

16               Could we have the lights dimmed?

17               Thank you.

18   BY MS. KESSLER:

19   Q     Looking at Page 15, is this one of your work papers,

20   Ms. Maurer?

21   A     Yes, it is.

22   Q     And what were you determining here, with this work

23   paper?

24   A     The amount of interest that was earned in the account

25   that is . . . .  I'm just looking for the three numbers . . . .

1    Wait.  I believe it's 268, Subaccount 60U.

2    Q      And did you do a computation similar to this, as to all

3    the subaccounts for this master account?

4    A      Yes, I did.

5    Q      Now, could you walk the jury through, you have some

6    entries for October through December of 2002.

7           How much interest did you determine to be earned in this

8    subaccount for the year 2002?

9    A      $4,214.26.

10   Q      Now, you also tracked the interest earned in 2003 and

11   2004?

12   A      Yes, I did.

13   Q      And that's reflected here on this page?

14   A      Yes, it is.

15   Q      Now, if we -- did you then carry forward the interest

16   you computed to another spreadsheet?

17   A      Yes, I did.

18              MS. KESSLER:  If we turn to Page 5 of this exhibit,

19   30C.

20              (An exhibit was projected onto the projector screen.)

21   BY MS. KESSLER:

22   Q      Did you prepare this document?

23   A      Yes, I did.

24   Q      Is this another of your work papers?

25   A      Yes, it is.

1   Q      Now, we -- on the prior page, we see that you had

2   calculated interest as $4,214.26, for the year 2002, on this

3   subaccount.  That is on this page as well.

4          What is the computation that you are doing here?

5   A      I am dividing the interest, $4,214.26, by 2 and coming

6   up with $2,107.13.

7   Q      Now, why are you dividing this by two?

8   A      This is a joint account for Patricia Hough and David

9   Fredrick, but they filed their 2002 income tax returns as

10  married filing separately, so I attributed half the interest

11  income to Patricia Hough, and half of the interest income to

12  David Fredrick.

13  Q      Now, did you then take -- and then did you do that also

14  for 2003 and 2004 here?

15  A      Yes, I did.

16  Q      Now, did you then carry this computation forward to a

17  further spreadsheet?

18  A      Yes, I did.

19  Q      If we turn to Page 2 of this document -- of this

20  exhibit, what is this document?

21  A      This is another document where I'm . . . rolling up all

22  the numbers into a spreadsheet so I can divide it by -- so I

23  can attribute it to each tax year, and --

24  Q      Now -- I'm sorry go, ahead.

25  A      I'm okay.  I'm good.

1    Q      On the left-hand column, what are these entries?

2           There's a number of numbers here.

3    A      These are the master accounts and the subaccounts for

4    the income it's generated from.

5    Q      Now, the interest income figure that we just saw you

6    divide into 2, for 2002, was $2,107.13.

7           Does that appear here, on Page 2 of this exhibit?

8    A      Yes, it does.  If you go on the column for 2002, at the

9    top, and trace it down, it's across from Subaccount 268 and --

10   the master account of 268, and the Subaccount is 60U, and it's

11   $2,107.13.

12   Q      Now, did you do the same thing for all of the --

13   actually, I withdraw that question.

14          Now, did you also determine the interest income for that

15   master account for other years, as well?

16   A      Yes.  For this master account there was interest in 2003

17   and 2004.

18   Q      And those are reflected to the right of the figure that

19   you were just looking at?

20   A      Yes.

21   Q      Are they separated by Subaccount 61A and 60Q?

22   A      Yes.

23   Q      Did you calculate those numbers in the same way you

24   computed the number that we just walked through for the 2002

25   interest figure?

1   A      Yes, I did.

2   Q      Now, if we turn to Subaccount 61A, for this same Master

3   Account 268, which we would be turning to Page 58?

4   A      Yes.

5   Q      Did you also compute the interest earned for

6   Subaccount 61A of this account?

7   A      Yes.

8   Q      Was this subaccount in a different currency other than

9   U.S. Dollars?

10  A      This is a Euro account.

11  Q      And that's reflected there, in the upper left-hand

12  corner?

13  A      Yes.

14  Q      The interest amounts that you have entered here, on this

15  page, are those in Euros?

16  A      Yes.

17  Q      Now, did you perform a currency conversion -- let me ask

18  you this:  Did you do your computation of tax due and owing in

19  U.S. Dollars?

20  A      Yes, I did.

21  Q      So then did you have to compute or do a currency

22  conversion as to any income items that were earned in a

23  different currency?

24  A      Yes, I did.

25  Q      Can we turn to . . . how did you -- if we turn to

1    Page 4.

2              (An exhibit was projected onto the projector screen.)

3    Q      What is this document?

4    A      This is where I did the currency conversions.  And then,

5    at the bottom, I divided it in half, so that I could attribute

6    it to the separate returns.

7    Q      Now, how did you determine what currency conversion rate

8    to use?

9    A      I had to use a Google currency conversion program.

10   Q      What does that do, or what does it tell?

11   A      It converts Euros to U.S. Dollars.

12   Q      Now, did you pick a particular date, or a date and time,

13   for which to use the conversion rate from?

14   A      I used the conversions as a -- the conversions at the

15   end of the year.

16   Q      December 31st?

17   A      Yes.

18   Q      Now, currencies fluctuate daily, and quite often; is

19   that right?

20   A      Yes.

21   Q      What is the basis for doing it as of the year-end?

22   A      I understand it to be IRS policy because it reduces the

23   burden on the taxpayers and, I guess, the IRS, just to compute

24   it as of the end of the year.

25   Q      All right.  And so you had -- when we were looking at

1   Page 58, you had determined interest income for 2003 on the

2   subaccount to be $3,624.

3        Can you explain what the -- the computation you've done

4   just below that here, on Page 4?

5   A    Just what -- the $4,571.13, divided by 2, are the one

6   where I -- 3,624 Euros is $4,571.13.

7             COURT REPORTER:  I'm sorry.  Say that again.

8             THE WITNESS:  I'm sorry.  Okay.

9             12/29/2003, the amount in Euros, in interest, was

10  $3,624.  And if you convert it -- I mean it's 3,624 Euros.  If

11  you convert it to U.S. Dollars, it's $4,571.13.

12  BY MS. KESSLER:

13  Q    And then, at the bottom, you divided it in half, to

14  $2,285.56?

15  A    Yes.

16  Q    And that would be the portion attributable to each of

17  Dr. Fredrick and Dr. Hough?

18  A    Yes, it is.

19  Q    And then did you also carry this forward to your

20  computation at Page 2, that we looked at a few minutes ago,

21  with regards to the other interest that was earned?

22  A    Yes, I did.

23  Q    Now, in 2002, did you observe any dividends to be earned

24  in this master account or its associated object accounts?

25  A    No.

1    Q        And how do you know that from looking at this

2    spreadsheet you prepared?

3    A        Under dividends, the accounts that have dividends in

4    them were master account ending in 8833, and master account

5    ending in 3443.

6    Q        Did you also proceed to determine whether there were

7    investment expenses paid out of this account?

8    A        Yes, I did.

9    Q        Why is that important?

10   A        Taxpayers are allowed a deduction on Schedule A for

11   investment expenses.  The expenses are attributed to earning

12   income, so they're deductible on Schedule A.

13   Q        Now, did you use the same method to identify any

14   investment expenses as you did to identify interest and

15   dividends?

16   A        Yes, I did.

17   Q        And was that using the transaction spreadsheet that you

18   prepared, where you listed out all the transactions occurring

19   in the account?

20   A        Yes.  And then I sorted it by the transactions that were

21   fees charged by UBS.

22   Q        And if we turn to Page 16 of this exhibit, which object

23   account are we in at this point?

24   A        60U.

25   Q        Did you determine -- what is this document at Page 16?

1    A       This is the sorted spreadsheet for the different years

2    for the fees charged by UBS.

3    Q       And what investment expenses did you determine to be

4    charged for the year 2001, as to this subaccount?

5    A       $222.77.

6    Q       And you did the same computation for 2002, '3, and '4?

7    A       Yes, I did.

8    Q       Now, if we turn to Page 11 of this exhibit, did you

9    prepare this spreadsheet as well?

10   A       Yes, I did.

11   Q       And what are you computing here?

12   A       I'm going -- I'm attributing half the expenses to David

13   Fredrick, and half the expense for Patricia Hough.

14   Q       And did you then carry forward that 50 percent of each

15   of these investment expenses for these years to the . . . .

16           MS. KESSLER:  Court's indulgence.  I lost my place.

17   BY MS. KESSLER:

18   Q       If we turn to Page 6 --

19   A       Yes.

20   Q       -- did you prepare this work paper as well?

21   A       Yes.

22   Q       And does this carry forward and sort of compile all of

23   the investment expenses you determined as to this account?

24   A       Yes.

25   Q       And is this only the 50 percent?

1    A        Yes.

2    Q        Did you also determine, or seek to determine, whether

3    there were capital gains or losses based on transactions that

4    occurred in these accounts?

5    A        Yes, I did.

6    Q        If we turn to Page 17 of this exhibit, can you explain,

7    first of all, how you tracked transactions that were occurring

8    in the account related to purchases and sales of securities?

9    A        I had to utilize a column for valor numbers.

10   Q        Can you explain what the valor number is?

11   A        The unique identifying numbers applied to different

12   stocks and securities.  I had to sort by the valor number.

13   Q        So once you sorted by valor number, what did you do?

14   A        Once I sorted by valor number, then I had -- I was

15   determining the sales price and the basis.

16   Q        Can you explain what basis is?

17   A        Basis is your cost in the investment.

18   Q        And why is that important for purposes of calculating

19   capital gain or loss?

20   A        If you have to determine the gain, you take the sales

21   price minus the basis, and that's your gain.  But if your cost

22   is more than you sold it for, then you have a loss.

23   Q        And you take -- is that something reported as a -- is

24   the net included as an income item on the tax return?

25   A        Yes, it is.

1   Q      Now, if we look at this Page 17, is there an entry for

2   February 9th, 2004?

3            MR. HOCHMAN:  I'm sorry, which exhibit are we looking

4   at again?

5            MS. KESSLER:  30C, at Page 17.

6            MR. HOCHMAN:  Thank you.

7   BY MS. KESSLER:

8   Q      Do you see an entry for a sale on February 9th, 2004?

9   A      Yes, I do.

10  Q      And what is the valor number of that security?

11  A      359540.

12  Q      And how many shares of the security did you determine to

13  have been sold?

14  A      600.

15  Q      And what was the sales price?

16  A      $96,948.

17  Q      Did you also determine the date that the security had

18  been purchased?

19  A      Yes.

20  Q      When was that?

21  A      12/22/2003.

22  Q      And what was the purchase amount?

23  A      $96,702.84.

24  Q      And was it the same number of shares?

25  A      Yes.

1   Q      If we turn to Page 29 of this exhibit, what is this

2   document?

3   A      This is the account statement provided by UBS.

4   Q      Now, did you see -- do you see, reflected on here, the

5   purchase of the 600 shares -- or the purchase of this

6   investment that we talked about?

7   A      Yes, I do.

8   Q      And what date did that occur?

9   A      12/22/2003.

10  Q      And the debit amount?

11  A      $96,702.84.

12  Q      Now, if we turn to Page 120 of this exhibit, I'm sorry,

13  let me ask you one more question about Page 29.  I'm sorry.

14         Does Page 1 -- does the statement information on

15  Page 129 indicate the number of shares that were purchased or

16  sold?

17  A      No, it doesn't.

18  Q      So do you have to consult a separate document in order

19  to determine the number of shares?

20  A      Yes.

21  Q      Now, if we turn to Page 120, what is this document?

22  A      This is a printout of the safekeeping account for the

23  securities.

24  Q      And is the valor number listed here?

25  A      Yes.

1    Q      Where?

2    A      It's . . . .

3    Q      Is that on the left-hand column?

4    A      Yes.  Yes.  It's highlighted.  It's 359540.

5    Q      And the date of the transaction is located here, as

6    well, 12/22/2003?

7    A      Yes, it is.

8    Q      Now, how did you determine the number of shares

9    purchased?

10   A      It . . . starts on the right as zero, and the word

11   "kauf" means purchase.  And it's 600,000, but they . . . .

12   Most of the statements in UBS stuff, they cut it off to 600, so

13   6,000 or 600.

14   Q      In your review of the statements does it appear that,

15   for the purposes of these bank accounts, the way here in the

16   United States we would do numbers, they use a comma instead of

17   what would be a period here in the United States?

18   A      Yes.

19   Q      So that, in your review, actually means 600.000 shares?

20   A      Yes.

21   Q      And is this the purchase of the shares we were talking

22   about?

23   A      Yes, it is.

24   Q      Now, this document, does it reflect the purchase price?

25   A      No, it doesn't.

1    Q      So you have to consult the prior page that we were

2    looking at --

3    A      Yes.

4    Q      -- to get the purchase price.

5           Now, if we look at Page 144.

6           Does this -- what is this document?

7    A      This is another security custody account printout.

8    Q      And does this reflect the sale of the shares we've been

9    discussing?

10   A      Yes.

11   Q      How many shares are sold?

12   A      600.

13   Q      And on what date?

14   A      February 9th, 2004.

15   Q      And again, you can't determine the sales price through

16   this document.

17   A      No.  Just the number of shares.

18   Q      Now, if we look at Page 31 . . . do you see the sale

19   occurring here, on Page 31?

20   A      I'm sorry, I . . . .  Yes.

21   Q      And where is that?

22   A      It's the second one from the bottom, with the Valor

23   Number 359540.  It's February 9, 2004, and it's $96,948.

24   Q      Now, if we go back to Page 17 -- is that what you had to

25   do for every single security that was bought and sold in the

1    account --

2    A      Yes.

3    Q      -- and for all of the accounts that --

4    A      Yes, I had to do that.

5    Q      Now, were some of the securities bought and sold using

6    other currencies?

7    A      Yes, they were.

8    Q      And did you have to do a currency conversion for all of

9    those, similar to what we did for the interest entry?

10   A      Yes, I did.

11   Q      And did you do the same conversion -- use the same

12   conversion methodology as to all, all the accounts that we're

13   going to talk about today?

14   A      Yes, I did.

15   Q      Now, if we look at Page 17, what did you -- focusing

16   again on this transaction, the purchase on December 22nd, 2003,

17   and sale on February 9th of 2004, for the security with

18   Valor 359540, what did you determine to be the capital gain or

19   loss?

20   A      $245.16.

21   Q      And on this document, which is Pages 17 and 18, are you

22   performing the same analysis and computation for all of the

23   securities' purchases and sales in the subaccount?

24   A      Yes.

25   Q      Now, if we turn, then, to Page . . . .  Did you carry

1   that forward, then, to one of your other spreadsheets?

2   A      Yes, I did.

3   Q      If we turn to Page 3 . . . .

4   A      Yes.

5   Q      Is the gain of $245.16 reflected here?

6   A      Yes.  On the far right, under 2004.

7   Q      And what are you doing here, on this document?

8   A      I'm totaling -- summing up all the gains and losses for

9   the year, and then I'm . . . dividing them by two, and then

10  attributing half to Dr. Fredrick, and half to Dr. Hough.

11  Q      And that's, again, because it was a joint account and

12  they filed separately?

13  A      Yes.

14  Q      Now, if we turn to Page 2.

15         Did you then carry forward your total gain or loss

16  numbers to your overall income computation for this master

17  account?

18  A      Yes, I did.

19  Q      Now, on Page 3, you had reflected a total gain of

20  $10,878.84 . . . for 2004.

21         Is that reflected on Page 2 --

22  A      Yes.

23  Q      -- 2A?  I'm sorry.

24  A      It's the first entry under the column for 2004, across

25  from the account ending in 268.

1   Q      Now, did you do that as to this -- actually, I'll

2   withdraw that question.

3          Now, did you ultimately do a computation of whether

4   there was overall income tax -- additional income tax due and

5   owing related to Dr. Fredrick and Dr. Hough for this case?

6   A      Yes, I ultimately did.  Yes.

7   Q      And did you include . . . if we look at Page 2A, did you

8   include all of this information in your computations, did you

9   include the year 2002 or 2003?

10                 MR. HOCHMAN:  Just for clarification, Page 2A?

11                 I don't have a 2A, Your Honor.

12                 THE COURT:  Are we still on Exhibit 30?

13                 MR. HOCHMAN:  Exhibit 30C, 2A?

14                 (Ms. Kessler and Mr. Hochman confer privately.)

15                 MR. HOCHMAN:  If I might just take a look at it very

16   quickly, Your Honor?

17                 THE COURT:  Sure.

18                 (Mr. Hochman and Ms. Kessler confer privately.)

19                 MR. HOCHMAN:  If there's an issue, Your Honor, I'll

20   look on the screen, and I'll see if I can get a copy

21   afterwards.

22                 THE COURT:  All right.

23                 MS. KESSLER:  May I talk with counsel for just a

24   second?

25                 THE COURT:  Sure.

1            (Ms. Kessler and Mr. Hochman confer privately.)

2    BY MS. KESSLER:

3    Q      Now, did you, for 2001 and 2004, the -- looking at

4    Page 2 of this document, if we could look at 2, instead of 2A?

5            (An exhibit was projected onto the projector

6        screen.).

7    BY MS. KESSLER:

8    Q      For 2002, 2003, and 2004 of this document, it appears

9    that you -- if we look, for example, at 2003, did you determine

10   long-term capital gains for 2003?

11   A      Yes -- long-term?

12   Q      Yes.

13   A      No.  I didn't have any long-term.  I had short-term.

14   Well, I had gains.

15   Q      I'm sorry, I'm looking in the wrong column.

16          Did . . . .  Were any of these income items for 2003

17   and '4, and 2002, included in the tax computations you did,

18   that we're going to go through later on?

19   A      No.  These, I was directed that the years 2002, 2003,

20   and 2004 would be . . . out of the scope of the revenue agent's

21   report that I ultimately created.

22   Q      So you -- you computed the tax for 2005, 2006, 2007, and

23   2008.

24   A      Yes.

25   Q      But you still had to review all the transactions that

1  occurred in these earlier years for these accounts.

2  A      Yes, I did.

3  Q      Particularly with regard to the securities, why was that

4  important?

5  A      This account was closed, and half of the cash and

6  securities were moved to an individual account for Patricia

7  Hough, and half of the securities were -- and cash was moved to

8  an individual account for David Fredrick.  So the basis was

9  contained in the joint account, and I had to calculate that, to

10 calculate the basis for the gains and losses, and in the

11 separate accounts.

12 Q      All right.  When you totaled up the income items for

13 2002, '3, and '4, did you compare those to tax returns filed by

14 Dr. Hough and Dr. Fredrick?

15 A      Yes, I did, to the extent possible.

16 Q      And were you able to determine whether these items had

17 been reported on those tax returns?

18 A      The returns that were available to me, these items were

19 not reported on those returns.

20 Q      Now, you're saying that, the returns that were available

21 to you; were there some years that there was not a return?

22 A      Yes.

23 Q      Do you recall which year that was?

24 A      I believe, for Patricia Hough, the 2002 return was not

25 available.  Oh, and the same for David Fredrick.  I believe the

1    2002s were not available.

2    Q      Did the IRS have information indicating the -- what was

3    reported on the returns that had been filed?

4    A      No.  They don't have information that detailed for those

5    years.

6    Q      Okay.  Now, if we turn to Page 14 of this Exhibit 30C,

7    approximately when was this subaccount for this master account

8    closed?

9    A      Sometime in the middle of 2004, I believe it was June or

10   July of 2004, some accounts were closed, a few -- a couple of

11   days, or weeks before, and some -- you know, they closed at

12   different times.  But it was in and around July of 2004.

13   Q      And were, eventually, all of the subaccounts related to

14   this master account closed?

15   A      Yes.

16   Q      And what -- did you make a determination as to where the

17   assets went after the account was closed?

18   A      Yes.

19   Q      Where did you determine -- what was in the account at

20   the time it was closed?

21   A      There were cash and securities -- you know -- small

22   amounts of cash, but most of the cash had been invested in

23   securities.  It was mostly securities in --

24   Q      I'm sorry.  I didn't mean to interrupt.

25   A      I'm good.

1   Q      If we look at Exhibit 3HH, where did you determine the

2   securities and cash in the account to have moved?

3   A      Fifty percent went to account ending in 267, for

4   Patricia Hough; and half went to an account ending in -- Master

5   Account Number 263, for David Fredrick.

6   Q      Now, if we look at Exhibit 3HH, which I think -- I

7   believe has been admitted, at Page 27?

8          (The witness examines an exhibit.)

9   A      Okay.

10  Q      Not only did you -- did you actually see the securities

11  moving?

12  A      Yes.

13  Q      Did you also, in your review of the documents, see

14  correspondence for Patricia Hough indicating that that should

15  happen?

16  A      Yes, I did.

17  Q      And is that reflected at 3HH, Page 27?

18  A      Yes.  Yes.

19  Q      Now, if you turn to Page 30, did you also see

20  instructions in the same regard from . . . signed by both

21  Dr. Fredrick and Dr. Hough?

22  A      Yes.

23  Q      Did you also review the account documents for the joint

24  account and the newly created individual accounts?

25  A      Yes.

1    Q       Did you observe there to be an even split of all the

2    cash coming from the joint account and moving to the two new

3    individual accounts?

4    A       Generally -- yes.  Generally.  There may have been one

5    account where there was a few dollars different; but, yes,

6    their instructions were followed.  It was 50 percent to one,

7    and 50 percent to the other.

8    Q       If we turn back to Exhibit 30C, at Page 36.

9            (The witness examines an exhibit.)

10   A       Yes.

11   Q       Is this the transaction log you did for object

12   account -- which object account is this?

13   A       80D.

14   Q       Are there payment orders as the last entries here, in

15   late June of 2004?

16   A       Yes, there are.

17   Q       In what amount?

18   A       The last two payment orders are on June 25th, 2004.  And

19   it's $1,280.39 being moved out of the account one time, and

20   $1,280.39 being moved out of the account a second time, and the

21   balance in the account becomes zero.

22   Q       Now, did you prepare a similar review of the individual

23   accounts, or accounts in the name of Patricia Hough and David

24   Fredrick?

25   A       Yes, I did.

1          MS. KESSLER:  If I could have marked Exhibit 30B?

2          THE COURT:  B, as in "boy"?

3          MS. KESSLER:  Yes, sir.

4          THE COURT:  Thank you.

5    BY MS. KESSLER:

6    Q      What is Exhibit 30B?

7    A      30B is the master account ending in Number 267, for

8    Patricia Hough.

9    Q      Did you perform a similar review of this account,

10   similar to what you did for the account we just looked at?

11   A      Yes, I did.

12   Q      And does this exhibit contain all of the work papers

13   that you prepared?

14   A      Yes, it does.

15   Q      Does it contain all of the account documents that you

16   used in order to prepare your analysis?

17   A      Yes, it does.

18          MS. KESSLER:  Your Honor, I'd move Exhibit 30B into

19   evidence?

20          MR. HOCHMAN:  No objection, Your Honor.

21          THE COURT:  30B will be admitted.

22          (Government's Exhibit 30B was admitted into

23      evidence.)

24          MS. KESSLER:  Permission to publish?

25          THE COURT:  You may.

1           MS. KESSLER:  If we could turn to Page 37.
2           (An exhibit was projected onto the projector screen.)
3  BY MS. KESSLER:
4  Q    Did you prepare a similar transaction log for all of the
5  subaccounts in this master account?
6  A    Yes.
7  Q    And did you observe the cash we've been talking about to
8  move into this account?
9  A    Yes.  It's there.
10 Q    Where is it?
11 A    It is on 6/25/2004.  It's a credit for $1,280.39.
12 Q    Now, did you also -- if we turn to Page 44, did you
13 review the account documents from UBS to see that that
14 occurred?
15 A    Yes, I did.  That would have been the document I started
16 with to -- yes.
17          MR. HOCHMAN:  I am sorry, what was the number again;
18 124?
19          MS. KESSLER:  44.
20          MR. HOCHMAN:  144.
21          MS. KESSLER:  No.  044.
22          MR. HOCHMAN:  Thank you.
23 BY MS. KESSLER:
24 Q    Do you see that transaction occurring here on Page 44?
25 A    Yes.  It's 6/25/2004, credit instruction, $1,280.39.

1   Q      Now, did you -- when you reviewed the account documents

2   related to the account in Dr. Fredrick's name, did you see,

3   also observe a similar transaction to occur?

4   A      Yes.

5   Q      Did you also -- turn back to 30C.

6          Did you also observe securities to be split evenly and

7   transferred out of the account?

8   A      Yes, I did.

9   Q      If you could turn to Page 17 of this document.

10         (The witness examines an exhibit.)

11   A      Yes.

12   Q      There's an entry with the Memo Number 1062349, in the

13   right column?

14   A      Yes.  I have that.

15   Q      And is that the valor number we talked about earlier?

16   A      Yes.

17   Q      What is happening here?

18   A      I have 61A as the date, but this was an early document.

19   This one now -- okay.  On 12/23/2003, 2,540 shares were

20   purchased.  And this Valor Number 1062349, on February 9th,

21   2004, 870 units of this valor number were purchased.  They

22   weren't sold, they were transferred, 1,705 were transferred to

23   an account ending in 63, Subaccount S1, which is David

24   Fredrick's account, and 1,705 units were moved to the account

25   ending in 267, Subaccount S1, which is Patricia Hough's

1   account.

2   Q      Now, if you'd look at Page 148 of this document.

3          (The witness examines an exhibit.)

4   Q      Do you see those transfers reflected here?

5   A      Yes.  Valor Number 1062349, at the beginning, there were

6   3,410 units of this valor number, and then . . . there's an

7   umbuchung, that means a transfer, and 1,705 go to account

8   ending in 263, and the same amount goes to Account –– gets

9   transferred to Account 267.

10  Q      Now, if we turn to Exhibit –– back to Exhibit 30B, and

11  look at Page 127 . . . .

12         (The witness examines an exhibit.)

13         (An exhibit was projected onto the projector screen.)

14  Q      Which account is this, Exhibit 30B?

15  A      This is the individual account for Patricia Hough.

16         I'm sorry.  What page am I on?

17  Q      127.

18         (The witness examines an exhibit.)

19  A      Okay.

20  Q      Did you observe, or –– is this an account statement for

21  the individual account?

22  A      Yes.  It's Valor Number 1062349.  It begins on the far

23  right with zero units, and there you have the word,

24  "umbuchung," and 1,705 units are coming into Patricia Hough's

25  account from the joint account ending in 268.

1   Q      And did you see similar documentation when you reviewed

2   an individual account in the name of Dr. Fredrick?

3   A      Yes, I did.

4   Q      And did you observe the same thing to happen as to all

5   of the cash and securities from the joint account?

6   A      Yes.

7   Q      When, approximately, was the joint account closed?

8   A      I'm going to -- I'll flip to a page, and then I'll give

9   you a . . . .  Oh, the joint -- I'm sorry.  Okay.  I believe I

10  stated before, it was June/July of 2004?

11  Q      Okay.

12         MR. HOCHMAN:  And just for clarification, which

13  exhibit is the witness now looking at?

14         THE WITNESS:  I'm going to tell you.  I'm in

15  Exhibit 3C now.

16         MS. KESSLER:  30C.

17         THE WITNESS:  30C?  All right.

18         MR. HOCHMAN:  Thank you.

19         THE WITNESS:  I'm going to Page 36.

20         The account zeros out in June of 2004.

21         MS. KESSLER:  Thank you.  I think you can probably

22  set aside Exhibit 30C.

23  BY MS. KESSLER:

24  Q      If we turn to Exhibit 30B, like "boy," you testified

25  that you observed about half of the joint account at the -- the

1    prior joint account we discussed to move into a UBS account

2    ending in 267.

3           Did you review documents for this account?

4    A    Yes, I did.

5    Q    And were these documents similar to what you reviewed

6    for the joint account?

7    A    Yes.  Yes.

8    Q    Did you also hear testimony with regard to this account?

9    A    Yes, I have.

10   Q    And did you see documents entered into evidence related

11   to this account?

12   A    Yes, I did.

13   Q    Now, do you recall --

14          MS. KESSLER:  If we could pull up Exhibit 3R?

15          (An exhibit was projected onto the projector screen.)

16   BY MS. KESSLER:

17   Q    If we look at Page 1 of Exhibit 3R, who is identified as

18   the contracting party for this account?

19   A    Patricia Hough.

20   Q    And the beneficial owner?

21   A    The beneficial owner is the same as the contracting

22   party, Patricia Hough.

23   Q    And if you turn to Page 2 of this document . . . .  I'm

24   sorry, Page 3, who appears to have signed this document

25   identifying the beneficial owner?

1   A       Patricia Hough.

2   Q       Also within Exhibit R, did you see account opening

3   documents indicating that the account holder was Patricia

4   Hough?

5   A       Yes.

6   Q       And did you see correspondence from Patricia Hough

7   related to this account?

8   A       Yes.

9   Q       Did you also see copies of identification documents,

10  such as passport photos for Patricia Hough?

11  A       Yes.

12  Q       And did you see a power of attorney related to this

13  account entered by Patricia Hough?

14  A       Yes, I did.

15  Q       And who was appointed as power of attorney?

16  A       Charlene Varga.

17  Q       Who do you understand that to be?

18  A       Patricia Hough's sister.

19  Q       Based on this and other pieces of evidence, I want you

20  to assume, for purposes of your computations, that this account

21  was owned by Patricia Hough.

22          If this account were not owned by Patricia Hough, how

23  would that affect the income tax computation that is performed?

24  A       It would not be included in income tax computations with

25  Patricia Hough.

SHEILA MAURER – DIRECT/KESSLER          38

1    Q       Are you able, looking at Page 1 of Exhibit 30B, if you

2    look at the bottom, if we look at this document, which entry

3    relates to this account?

4    A       It's the last set of -- where there's a master number,

5    267, and all the subaccounts.

6    Q       So this account also had subaccounts similar to the

7    joint account we reviewed?

8    A       Yes.

9    Q       Can you tell, from looking at this, approximately when

10   this account was opened?

11   A       April of 2004.

12   Q       Now, did you analyze this account and the transactions

13   in it, in the same manner that you analyzed the joint account?

14   A       Yes, I did.

15   Q       And was the purpose in doing so to determine whether

16   there were income items that need to be recorded?

17   A       Yes.

18   Q       What type of account was this?

19   A       It's an investment account.

20           MS. KESSLER:  If we turn to Page 2 of this document.

21           MR. HOCHMAN:  Again, this document is 30B, Your

22   Honor?

23           MS. KESSLER:  Yes.

24           MR. HOCHMAN:  Thank you, Your Honor.

25

1   BY MS. KESSLER:

2   Q      Looking at Page 2 of this document, did you determine

3   whether there was income interest earned in the subaccounts for

4   this account . . . ending in 267?

5   A      Yes.

6   Q      Did you do that in the same manner that you determined

7   the interest income for the other joint account that we talked

8   about?

9   A      Yes, I did.

10  Q      How much interest income did you determine to be earned

11  for master account ending in 267, Subaccount 60W, for the year

12  2005?

13  A      $8,925.

14  Q      Did you also find that interest was earned for two other

15  subaccounts for that same year?

16  A      Yes.  61Q and 65N.

17  Q      Now, was any of that income -- or interest income,

18  excuse me -- earned in a currency other than United States

19  dollars?

20  A      Yes, I believe so.

21  Q      And did you perform a currency conversion similar to

22  what we discussed related to the prior account?

23  A      Yes.

24  Q      Did you also determine whether there were any dividends

25  earned in this account?

1  A      There were no dividends earned in this account.

2  Q      For 2005, '6, or '7?

3  A      That's correct.

4  Q      Did you . . . did you seek to determine dividends in the

5  same manner that you did for the prior account?

6  A      Yes.

7  Q      Did you also seek to determine whether there were any

8  capital gains or losses resulting from the sale of securities

9  in this account?

10  A      Yes, I did.

11  Q      And did you do that in the same way?

12  A      Yes, I did.

13  Q      Were you able to -- I think that you talked, earlier,

14  about having to use the basis from some securities from the

15  prior account; is that right?

16  A      Yes, I did.

17  Q      Were you able to determine whether there were any

18  capital gains or losses for this account in 2005?

19  A      Yes.

20  Q      And what is reflected for Master Account 2267, for the

21  year 2005?

22  A      $78,999.15 in overall gain.

23  Q      And is that short-term gain or long-term gain?

24  A      Short-term.

25  Q      Now, this document we're looking at, is this the total

1    short-term gain -- short-term gain that you determined for this

2    account for all of 2005?

3    A      For account ending in 267, yes.

4    Q      Were you able to determine -- in review of all these

5    different accounts, were you able to determine the basis for

6    all the securities that you saw to be sold?

7    A      Not all the time.

8    Q      When there were occasions that you could not determine

9    the basis, how did you treat those sales?

10   A      I treated them as neither a gain nor a loss.

11   Q      And why did you do that?

12   A      It seemed conservative not to charge them for a gain if

13   they had no basis.

14   Q      And were there particular reasons why you might not have

15   been able to determine basis in some instances?

16   A      This had to be based on the documents that UBS supplied

17   to me, and sometimes they . . . documents were missing, or I

18   just couldn't . . . and I had nothing to find the units, that

19   kind of thing.  If I couldn't determine the units . . . .  It

20   was just based on what I could find in the documents.

21   Q      All right.  For purposes of the interest income, and the

22   dividends, and the capital gains reflected here on Page 2, who

23   did you treat, for purposes of your computation, as having to

24   report all of this . . . this, these income items?

25   A      Since this was an individual account in Patricia Hough's

1    name, and she filed separately, all of this income should have

2    been reported on her 2005 income tax return, just hers alone.

3    Q      Now, did you also, for this account, determine whether

4    investment expenses were paid from the -- any of the object

5    accounts within this master account?

6    A      Yes, I did.

7    Q      If we turn to Page 9.

8           (The witness examines an exhibit.)

9    Q      Reflected here for Master Account 2267, did you find

10   that there were investment expenses paid in any of the

11   subaccounts?

12   A      Yes, I did.

13   Q      And what's reflected here, on this expense summary?

14          Are these the investment expenses you saw to have been

15   charged in this master account?

16   A      Yes, they are.  It's the middle one, ending 267 60W, and

17   those are the expenses that relate to each subaccount that I

18   observed that expenses were paid out of.

19   Q      Now, when you prepared your tax computations, did you

20   allow for only Patricia Hough to deduct these investment

21   expenses?

22   A      Yes.  They were her expenses.

23   Q      These were not split.

24   A      No.

25   Q      If we turn to Exhibit 30B, at Page 18 . . . and this is

1    the second page of what document?

2    A      This is my master spreadsheet for Master Account

3    267 . . . Subaccount 63B.

4    Q      And can you tell from this spreadsheet approximately

5    when, at least, this subaccount was closed?

6    A      July 25th, 2005.

7    Q      And did you observe that this entire master account was

8    also closed?

9    A      Yes, it was.

10   Q      Was that at or near the same time period?

11   A      Yes, it was.

12   Q      And did you track the movement of the assets that were

13   contained in this account when the account was closed?

14   A      Yes, I did.

15   Q      Where did you observe them to go?

16   A      They went into an UBS account in the name of New

17   Vanguard Holdings.  It ends in . . . .  Well, it ends in

18   Subaccount 833.

19   Q      And did you determine that in the same manner that you

20   tracked the assets that were initially in the joint account and

21   moved to the separate accounts?

22   A      Yes.  It was the same methodology to track where they

23   went.

24   Q      Now . . . .

25          (Ms. Kessler and Ms. Finley confer privately.)

1          MS. KESSLER:  If I could approach and have

2   Exhibit 30A marked?

3          THE COURT:  You may.

4   BY MS. KESSLER:

5   Q     Did you do a similar analysis as to interest income --

6   well, actually, let me back up.

7          What is Exhibit 30A?

8   A     This is Master Account Number 263.  This is David

9   Fredrick's individual account.

10  Q     And did you prepare the work papers contained in this

11  document?

12  A     Yes, I did.

13  Q     And did you review all of the bank account documents

14  that are in this exhibit?

15  A     Yes.

16  Q     And did you do this for purposes of preparing your

17  computations?

18  A     Yes, I did.

19  Q     And is this binder organized in the same manner as the

20  prior two we looked at?

21  A     Yes, it is.

22         MS. KESSLER:  Your Honor, I'd move Exhibit 30A into

23  evidence.

24         THE COURT:  Any objection?

25         MR. HOCHMAN:  No objection, Your Honor.

1          THE COURT:  30A will be admitted.

2          (Government's Exhibit 30A was admitted into

3      evidence.)

4  BY MS. KESSLER:

5  Q      Now, you testified that you observed half of the joint

6  account at UBS to move to another account ending in 263?

7  A      Yes.

8  Q      And is that this account?

9  A      Yes, it is.

10 Q      Did you also . . . .  Did you review the same types of

11 documents for this account as you did for the prior two

12 accounts?

13 A      Yes, I did.

14 Q      And did you also hear testimony with regard to this

15 account?

16 A      Yes, I did.

17 Q      And did you see documents entered into evidence with

18 regard to this account?

19 A      Yes, I did.

20 Q      Referring to Exhibit 3JJ, Page 1 of this document, who

21 did you observe to be the contracting party for this account?

22 A      David Fredrick.

23 Q      And the . . . who was identified as the beneficial

24 owner?

25 A      The contracting partner is the beneficial owner.

1    Q      And within this exhibit did you also observe account

2    opening documents to have been signed by David Fredrick?

3    A      Yes, I did.

4    Q      And did you observe identification -- copies of

5    identification documents like a passport for Dr. Fredrick?

6    A      Yes, I did.

7    Q      Now, based on this and other evidence submitted at

8    trial, as well as the source of the cash and the securities

9    that moved into this account, I want you to assume for purposes

10   of your income tax computation that this account is owned by

11   Dr. Fredrick.

12          Now, if this account were not owned by Dr. Fredrick,

13   would any interest items occurring in this account be

14   attributable to him for purposes of taxes?

15   A      No.

16   Q      If we look --

17          MS. KESSLER:  Permission to publish, Your Honor?

18          THE COURT:  You may.

19   BY MS. KESSLER:

20   Q      If we look at Page 17 of this document --

21          MR. HOCHMAN:  This is Exhibit --

22          MS. KESSLER:  -- 30A, at Page 17.

23          MR. HOCHMAN:  Thank you.

24   BY MS. KESSLER:

25   Q      Did you also track the transactions that occurred in

1   this account?

2   A      Yes, I did.

3   Q      Approximately whether did this account open?

4   A      April of 2004.

5   Q      Now, did this master account ending in 263 also have

6   subaccounts similar to the other accounts we've looked at?

7   A      Yes, it did.

8   Q      And did you determine whether there was -- if we could

9   turn, actually, to Page 2 of this exhibit, did you perform a

10  similar analysis to determine interest income, dividends, and

11  short- and long-term capital gains as to this account?

12  A      Yes, I did.

13  Q      And as to those, did you do so in the same manner as you

14  did in the two prior accounts?

15  A      Yes, I did.

16  Q      If we look at the interest income for this account

17  ending in 2263, did you determine whether there was interest

18  income earned in this account in 2005 . . . any of the

19  subaccounts, that is, for 2263?

20  A      Yes.

21  Q      And how much was earned for Subaccount 60L?

22  A      $8,925.

23  Q      And did you also determine that interest income was

24  earned for Subaccount 61R, 62H, and 65K?

25  A      Yes, I did.

1    Q      Was any of the interest income earned in currency other

2    than United States dollars?

3    A      Yes.

4    Q      And did you perform the similar currency conversion?

5    A      Yes.

6    Q      Now, any income earned in this account, did you treat

7    this as income to whom?

8    A      This is David Fredrick's income.

9    Q      And why was -- why would you treat this solely as his?

10   A      It's an individual account, and he filed separately.

11   Q      Did you also determine, looking again at Page 2, whether

12   there were any dividends earned in this account?

13   A      There were not.

14   Q      And did you make a determination as to capital gains and

15   losses?

16   A      Yes, I did.

17   Q      And for 2004, did you determine whether there were

18   short-term gains or losses?

19   A      2004?

20   Q      Yes.  Master Account 2263?

21   A      263?  There was an overall loss.

22   Q      And was this one of the accounts where you were unable

23   to determine the basis for some of the securities that were

24   sold?

25   A      I believe so.

1    Q      And so any security sales where that was the case, would

2    you have treated the basis -- or treated the sale as neither a

3    gain or a loss?

4    A      Yes.

5    Q      Did you also determine short-material capital gains and

6    losses for this year as to -- or for this account, excuse me,

7    as to 2005?

8    A      Yes.

9    Q      And what were those?

10   A      There was an overall capital gain of $69,531.29.

11   Q      And did . . . if we turn to Page 9 of this document, did

12   you also, with regard to this account, look at whether there

13   were investment expenses paid?

14   A      Yes, I did.

15   Q      And what is reflected here, on Page 9, with regard to

16   that?

17   A      The middle section, account ending in 263, those are the

18   investment expenses that I observed to have been paid out of

19   the various subaccounts.

20   Q      And those were paid in 2004 and 2005, for this master

21   account?

22   A      Yes.

23   Q      And when you prepared your tax computations, did you

24   allow for all of these deductions to be included in

25   Dr. Fredrick's income tax computation?

1   A       Yes.  They where.  All of these expenses were his.

2   Q       Now, if we turn to Exhibit 30A again, this time at

3   Page 17.

4            (The witness examines an exhibit.)

5   A       Yes.

6   Q       Can you tell, from looking at your transaction report

7   for Subaccount 62H, approximately when this account was closed?

8   A       July of 2005.

9   Q       And similar to the joint account we reviewed before, in

10  Exhibit 30C, did you also track the movement of the assets from

11  this account?

12  A       Yes, I did.

13  Q       And where did you observe them to go?

14  A       New Vanguard Holdings, the UBS account for New Vanguard

15  Holdings.

16  Q       And do you recall what that account number ends in?

17  A       8833.

18           MS. KESSLER:  Court's indulgence.  I need to

19  get . . . .

20           If I could approach and have 30D marked in evidence;

21  D, like "dog"?

22           THE COURT:  You may.

23  BY MS. KESSLER:

24  Q       If you look at Exhibit 30-D, do you recognize this

25  exhibit?

1    A       Yes.

2    Q       And what is this?

3    A       These are my work papers, and the account documents from

4    UBS, for New Vanguard Holdings Limited.

5    Q       And that is a master account number ending in what?

6    A       8833.

7    Q       And did you rely on the documents contained in

8    Exhibit 30D for part of your income tax computations?

9    A       Yes, I did.

10   Q       Is this also organized in the same manner that the three

11   prior exhibits, 30A through C, were organized?

12   A       Yes.  Yes, it is.

13           MS. KESSLER:  I'd move Exhibit 30D into evidence; D,

14   like "dog"?

15           MR. HOCHMAN:  No objection.

16           THE COURT:  30D will be admitted.

17           (Government's Exhibit 30D was admitted into

18      evidence.)

19   BY MS. KESSLER:

20   Q       Did you review the documents contained in Exhibit 30D?

21   A       Yes, I did.

22   Q       Did you also hear testimony with regard to this account?

23   A       Yes, I have.

24   Q       And did you see documents entered into evidence with

25   regard to this account?

1    A      Yes, I did.

2    Q      Let me show you what's marked as Exhibit 3C, like "cat."

3           What are these documents contained in Exhibit 3C?

4    A      These are the opening documents for . . . New Vanguard

5    Holdings Limited, the account ending in 8833.

6    Q      Now, if we look at pages –– Page 1, who is identified as

7    the contracting party?

8    A      New Vanguard Holdings Limited.

9    Q      And who is identified as the beneficial owners?

10   A      David Leon Fredrick and Patricia Lynn Hough.

11   Q      And at Page 2, who signed this document?

12   A      Beda Singenberger.

13   Q      Now, what was the source of –– what did you determine to

14   be the source of funds and securities when this account was

15   opened?

16   A      The securities and cash from 263, David Fredrick's

17   individual account, and the account ending in 267, Patricia

18   Hough's individual account, went into this account.

19   Q      Now, did you hear any evidence at trial that New

20   Vanguard conducted any actual business?

21   A      New Vanguard Holdings is a domiciliary . . . company,

22   which means it's a nonoperating company.

23   Q      Now, based on these and other evidence, I would like you

24   to assume for purposes of your tax computations that this

25   account was owned jointly by Dr. Hough and Dr. Fredrick.

1        If this account were not owned jointly by Dr. Hough and

2   Dr. Fredrick, how would that affect your income tax

3   computations?

4   A      It would not be included in my income tax computations.

5   Q      Now, did you examine all the transactions that occurred

6   in this account similar to the way you did in the three prior

7   accounts?

8   A      Yes, I did.

9   Q      If we look at Exhibit 30D, at Page 19 . . . what is this

10  document?

11  A      This is my spreadsheet for account -- Master

12  Account 8833, Subaccount 61N.

13  Q      Now, when you were preparing your master spreadsheets

14  for the different subaccounts, and this and all the other

15  master accounts, how did you double-check yourself to make sure

16  that you hadn't missed any transactions?

17  A      The running balance on the far right, I always checked

18  to make sure that my running balance reconciled to the account

19  running balance -- the account statements from UBS.

20  Q      And what type of account did you observe this New

21  Vanguard account to be?

22  A      This is an investment.

23  Q      Looking at this object account, 61N, Page 19,

24  approximately when did you -- was this account opened?

25  A      July of 2005.

1   Q      And what was the source of the funds and the securities

2   to start this account?

3   A      The two individual accounts from Patricia Hough and

4   David Fredrick.

5   Q      Now, if we turn to Page 2 of this document, did you

6   analyze this account in the same way you did the others, to

7   determine interest income?

8   A      Yes, I did.

9   Q      And did you -- did you find that there was interest

10  income in this account for 2005, '6, or '7, for any of the

11  subaccounts?

12  A      Five, six, and seven.

13  Q      And is that reflected here, at the bottom of this

14  account -- or page?  Excuse me.

15  A      Yes.

16  Q      Now, did you also look to see whether there was any --

17  were any dividends earned in any of the subaccounts for this

18  master account?

19  A      Yes.  There were -- for 2005, 2006, and 2007.

20  Q      Now, if you -- we look to the top, did you also

21  determine whether there were any short-term capital gains?

22  A      Yes.

23  Q      Are those -- what were the short-term capital gains for

24  2005?

25  A      $116,960.95.

1   Q     Now, did you determine if there was a short-term capital

2   loss in 2006?

3   A     Yes, I did.

4   Q     And then a gain, again, in 2007?

5   A     Yes, I did.

6   Q     Now, if we look at the top of the page, it's entitled,

7   "Income Summary, Patricia Hough."

8         I've instructed you to assume that this is a joint

9   account for purposes of your computations.

10        The items reflected here, do they reflected 50 percent,

11  or half, of the interest, capital gains, and dividends that you

12  observed to be earned in the account?

13  A     Yes.  Half is attributable -- half of the income is

14  attributable to Patricia Hough, and half to David Fredrick.

15  Q     Did you have to convert any currency . . . or

16  transactions, convert the currency for them in this account as

17  well?

18  A     Yes, I did.

19  Q     And did you do that in the same way as you did for the

20  other accounts?

21  A     Yes, I did.

22  Q     Now, if we turn to Page 10 of this document -- or

23  exhibit.  We're still on 30D.

24        Did you also look to see whether there were investment

25  expenses paid from any of the subaccounts associated with this

1    master account?

2    A      Yes, I did.

3    Q      And are those reflected here, at the bottom, for the

4    years 2005 through 2007?

5    A      Yes.

6    Q      Now, did -- does this page, Page 10, reflect all of the

7    investment expenses, or just half?

8    A      These would be -- these would be half.

9    Q      And why is that important?

10   A      Half belongs as an expense for Patricia -- for Patricia

11   Hough, and half is an expense for David Fredrick.

12   Q      Now, the two documents we've just looked at, for

13   Exhibit 30D, only detail information for the years 2005 through

14   2007.

15          Did you also look for income and expense items for 2008,

16   from this account?

17   A      Yes.  The documents that I got -- that I had for UBS

18   ended 12/31 of 2007.  At a later date I received documents

19   pertaining to New Vanguard, for the year 2008.

20   Q      So you received the 2008 documents at another time.

21   A      Yeah, subsequent . . . .

22   Q      To the review related to --

23   A      Yes.

24   Q      -- 2005, '6, and '7?

25   A      Yes.

1  Q      Now, if we turn to Page 556 of this document.

2            MR. HOCHMAN:  Page?

3            MS. KESSLER:  556.

4            MR. HOCHMAN:  Thank you.

5            THE WITNESS:  Okay.

6  BY MS. KESSLER:

7  Q      What is reflected here?

8  A      At the time I received 2008 information for New Vanguard

9  Holdings at UBS, I also received some documents for four other

10 accounts at . . . four other accounts located at Landesbank and

11 Fortis Banque.

12 Q      Now, does this page, 556, reflect interest income that

13 you saw to be earned in this account -- actually,

14 Subaccount 60B -- in 2008?

15 A      Yes.  It's the very last . . . it's $255,144.73.

16 Q      And is that the total amount earned in the account?

17 A      Yes.

18 Q      And so only half of that would have been attributable to

19 Dr. Hough?

20 A      Yes.

21 Q      And is that what's -- what you're computing in the

22 second column --

23 A      Yes.  I --

24 Q      -- excuse me, the far-right column?

25 A      Yes.  I just added it all up, and there was $919,664 in

1   total.  But this sheet shows that only half of it, $459,832.02,

2   is attributable to Patricia Hough in 2008.

3   Q      Now, that total of $919,000, that relates to some other

4   accounts that we haven't yet gone over; is that right?

5   A      That's correct.

6   Q      Okay.  Did you observe there to be any dividends earned

7   in this account, this New Vanguard account, at UBS, in 2008?

8   A      No.

9   Q      And what about long-term capital gains?

10  A      No.  I didn't have enough information provided at a

11  subsequent date to determine what valor numbers were bought and

12  sold, and what the units were.

13  Q      Okay.

14  A      I didn't have enough information.  I had no information.

15  Q      Did you also look to see whether there were investment

16  expenses paid out of this account?

17  A      Yes, I did.

18  Q      If we turn to Page 557, does this reflect investment

19  expenses you found paid out of the account ending in . . . I

20  believe on 833?

21  A      They're the last four entries.

22  Q      Now, the four entries, $13.52, is that where you're

23  talking about?

24  A      Yes.

25  Q      Now, are these the total investment expenses that were

1   paid out of these four subaccounts?

2   A     Yes.

3   Q     And were only half of those attributable to Dr. Hough,

4   for purposes of your tax computation?

5   A     Yes.

6   Q     Now, looking at this document in its entirety, does it

7   reflect investment expenses from a number of additional

8   accounts, other than the one we're talking about right now?

9   A     Yes, it does.

10  Q     And so you've split in half the total amount here, at

11  the bottom right?

12  A     Yes, I did.

13  Q     Okay.  Now, if we turn to Exhibit . . . remain in

14  Exhibit D, like "dog," and turn to Page 75 . . . .

15        MS. KESSLER:  Court's indulgence.

16        (Ms. Kessler reviews various documents.)

17  BY MS. KESSLER:

18  Q     Did you see evidence -- are we on Page 75?

19  A     Yes, I am.

20  Q     I'm not on 75.

21        Did you see evidence in these documents of a transfer in

22  the amount of $250,000, from New Vanguard, on May 3rd, 2006?

23  A     Yes.

24  Q     And what -- on the UBS account document, what does it

25  indicate the reference or memo there?

1    A      The first, the 5/3/2006, the payment went to Patricia

2    Hough, in the amount of $250,000.

3            MS. KESSLER:  If I could approach and have marked

4    Exhibit 30P?

5            THE COURT:  You may.

6    BY MS. KESSLER:

7    Q      Looking at -- what are these documents contained in

8    Exhibit 30P?

9    A      It shows the . . . payment to Patricia Hough coming out

10   of the account --

11   Q      Are these bank documents?

12   A      Yes.  Okay.

13   Q      And all related to this $250,000 transfer?

14   A      Yes.

15           MS. KESSLER:  Your Honor, I move Exhibit 30P into

16   evidence; P, like "Paul."

17           MR. HOCHMAN:  Your Honor, just the -- we'd

18   incorporate all prior objections that we made in connection

19   with the documents starting back with 30S, and the subsequent

20   documents as to this exhibit as well.

21           THE COURT:  You need to come to sidebar.

22                         AT SIDEBAR

23           THE COURT:  First, what was the letter?

24           MS. KESSLER:  30P, like "Paul."

25           THE COURT:  And I'm sorry, I didn't understand your

1   objection.

2            MR. HOCHMAN:  Oh.  The objection, Your Honor, that,

3   like some of the other documents, there's writing on some of

4   these -- some of these documents from 30P are not just the bank

5   statements, like the first page, but they include some

6   correspondence and some of the other types of stuff we objected

7   to.  I just wanted to preserve the objection.

8            THE COURT:  Let me take a look at the individual

9   documents.

10            (The Court reviews Government's Exhibit 30P.)

11            MR. HOCHMAN:  For instance, there are some documents

12   that have handwriting on them.  We don't know whose handwriting

13   it is.

14            THE COURT:  I see.  Have these all been admitted

15   elsewhere?

16            MR. HOCHMAN:  Over objection.  See, that's . . . yes,

17   but some of these we objected, to Your Honor.  So I would just

18   preserve the objection to any one of these documents that we

19   have previously objected to that are now incorporated into 30P.

20            THE COURT:  I think that's fair.

21            The objection will be overruled to the extent that I

22   overruled it before, but will be preserved.

23            MR. HOCHMAN:  Thank you.

24            MS. KESSLER:  Thank you.

25                            IN OPEN COURT

1              THE COURT:  30P will be admitted.

2              (Government's Exhibit 30P was admitted into

3      evidence.)

4              MS. KESSLER:  Permission to publish, Your Honor?

5              THE COURT:  You may.

6              (An exhibit was projected onto the projector screen.)

7      BY MS. KESSLER:

8      Q      If we could turn to Page 2 of this document, can you

9      tell the jury what this document is?

10     A      This is the actual wire transfer payment order.  It

11     shows the amount of $250,000 being wired out of New Vanguard

12     Holding account ending in 8833, going to Wachovia Bank, in the

13     U.S.A.  There's an account number that it's going to, for

14     Patricia Hough.

15     Q      And what is the account number there?

16     A      78764.

17     Q      Now, if we look at Page 4 of this document, what is

18     this?

19     A      This is a signature card for a bank account, and the

20     signers are Patricia Hough and David Fredrick.

21     Q      And does it appear to be an account ending in the same

22     numbers as those referenced in Page 2?

23     A      Yes.

24     Q      Now, if we turn to Page 5 of this document, what is

25     this?

1   A      It's the . . . appears to be the first page of a bank

2   statement for David Fredrick and Patricia Hough, at the account

3   number we just referenced.

4   Q      And what bank is this with . . . referenced down there

5   at the bottom?

6   A      Oh.  Wachovia.

7   Q      Is that here in the United States?

8   A      Yes.  Wachovia in Englewood, Florida.

9   Q      Does this bank account statement reflect a transfer in

10  of $250,000?

11  A      Yes.  Under deposits and other credits, $250,000 is

12  going into this account.

13  Q      And further down, does the actual -- is the deposit

14  reflected as occurring on May 3rd of 2006?

15  A      Yes.

16  Q      From UBS, New Vanguard?

17  A      Yes.

18  Q      Now, if we turn to Page 8 of this document, is this

19  another Wachovia statement for the -- or statement for the same

20  account?

21  A      Yes.

22  Q      What month is this for?

23  A      October of 2006.

24  Q      Through when?

25  A      Oh.  Through November of 2006.

64

1    Q       And is there a payment reflected here, at the bottom, on

2    November 10th of 2006?

3    A       Yes.

4    Q       What is the amount?

5    A       $21,032.89.

6    Q       And what is the description?

7    A       Sarasota tax collector . . . property taxes.

8              (Ms. Kessler and Ms. Finley confer privately.)

9    BY MS. KESSLER:

10   Q       If we also look at Page 7 of this document, is this an

11   account statement for July 26th through August 23rd of 2006?

12   A       Yes.

13   Q       And do you see a transfer on July 31st, in the amount of

14   $150,000?

15   A       Yes.

16   Q       Do you know what this is for?

17   A       I believe it's to be moved into another account.  I

18   don't remember exactly.  It's a CD or a money market.  I

19   don't . . . .

20   Q       Thank you.

21           Now, if we turn to page -- if we go back to Exhibit 30D,

22   and turn to Page 73 . . . did you see evidence, in your review

23   of the New Vanguard account, of a transfer on March 16th, 2006?

24   A       Yes.

25   Q       And what was the amount of that transfer?

1    A       $282,580.

2    Q       Based on the evidence that you've heard at trial, and as

3    well as this document, what does that appear to relate to?

4    A       It's the purchase of land on Nevis.  Nevis?  Nevis?

5    Q       Now, if we turn now to Page 83 of Exhibit 30D, did you

6    hear testimony from some of Dr. Fredrick's siblings that they

7    received gifts back in April of 2007?

8    A       Yes, I did.

9    Q       Do you see gifts to Marion Cronan reflected here, on

10   Page 83?

11   A       Yes.

12   Q       Were there two, actually?

13           Let me rephrase the question.

14           Do you see a transfer of $72,000 -- $72,700 on

15   April 13th of 2007?

16   A       Yes.

17   Q       And what was that for?

18   A       This was the mortgage payoff that was mentioned in

19   testimony for the Cronans.

20   Q       Did you also hear testimony from Ms. Cronin, that she

21   received cash as well?

22   A       Yes, I did.

23   Q       And is there an additional transfer of $177,300

24   reflected here?

25   A       Yes.

1    Q      When is that?

2    A      April 13th of 2007.

3    Q      Did you also hear testimony from Ms. McBride, that she

4    received a gift?

5    A      Yes, I did.

6    Q      Did she indicate that she received a gift related to her

7    mortgage payoff?

8    A      Yes, she did.

9    Q      And do you see a transfer in the amount of $84,150?

10   A      Yes.

11   Q      When did that occur?

12   A      April 13th, 2007.

13   Q      Now, did you hear testimony from Ms. McBride, that she

14   also received cash?

15   A      Yes.

16          MR. HOCHMAN:  Objection, Your Honor.  Misstates the

17   testimony.  She never said she received cash.  She said she

18   received a wire transfer.

19          THE COURT:  That objection is sustained.

20   BY MS. KESSLER:

21   Q      Did you hear testimony that she received money in the

22   form of a deposit to her bank account by wire?

23   A      Yes, I did.

24   Q      Do you -- is that transfer reflected on this document,

25   Page 83?

1    A       Yes.

2    Q       What was the amount and the date of that transfer?

3    A       The date is April 13th, 2007.  It's $165,850.32.

4    Q       Now, did you also hear testimony from Perry Garner, that

5    he received a gift of $250,000?

6    A       Yes, I did.

7    Q       Is that reflected on this statement?

8    A       Yes, it is.

9    Q       And what was the date of that transfer?

10   A       April 13th, 2007.

11   Q       And then did you hear testimony from Melanie Pitts, that

12   she received a gift of $250,000?

13   A       Yes, I did.

14   Q       And is that gift reflected on this paper?

15   A       Yes, it is.

16   Q       What is the date of that gift?

17   A       April 13th, 2007.

18           MS. KESSLER:  Your Honor, this might be an

19   appropriate time for a break.

20           THE COURT:  All right.

21           We'll take the morning recess for about 15 minutes.

22   Please do not discuss the case among yourselves, or allow

23   anyone to discuss it with you or in your presence.

24   About 11:00 o'clock.

25           (At 10:42 AM, the jury was escorted from the

1     courtroom.)

2            THE COURT:  All right.  Fifteen minutes.

3            MR. HOCHMAN:  Thank you, Your Honor.

4            (At 10:43 AM, court was recessed.)

5                      AFTER RECESS

6            (At 11:01 o'clock, AM, court was reconvened.)

7            THE COURT:  Both sides ready for the jury?

8            MS. KESSLER:  Yes.

9            MS. FINLEY:  Yes.

10           THE COURT:  Have the jury step in, please.

11           (At 11:02 AM, the jury was escorted into the

12    courtroom.)

13           THE COURT:  You may proceed.

14           MS. KESSLER:  Your Honor, if I could approach and

15    have Exhibit 30L, like "Larry," marked?

16           THE COURT:  You may.

17    BY MS. KESSLER:

18    Q     If we can take a look at 30L, can you tell the jury what

19    this is?

20    A     These are my work papers, and the account statements,

21    and security account statements and year-end statements, for

22    Top Fast.  It ends in 3443.

23    Q     And was this account also at UBS?

24    A     Yes, it was.

25    Q     Did you prepare the work papers that are contained in

1   this exhibit?

2   A     Yes, I did.

3   Q     And does it contain the account documents that you

4   relied on as part of your tax computation?

5   A     Yes, it does.

6   Q     And is it organized in the same manner as the other

7   materials, or the other prior exhibits we have gone through?

8   A     Yes, it is.

9          MS. KESSLER:  Your Honor, I'd move Exhibit 30L into

10  evidence.

11         MR. HOCHMAN:  No objection, Your Honor.

12         THE COURT:  30L will be admitted.

13         (Government's Exhibit 30L was admitted into

14     evidence.)

15  BY MS. KESSLER:

16  Q     Now, did you hear testimony regarding this account,

17  Ms. Maurer?

18  A     Yes, I did.

19  Q     And did you see documents admitted into evidence related

20  to this account?

21  A     Yes, I did.

22  Q     Showing you what's marked as Exhibit 3CC, like

23  "cat" . . . if you could --

24         MS. KESSLER:  I believe this is already admitted, so

25  I'd like to publish it?

1           THE COURT:  You may.

2           (An exhibit was projected onto the projector screen.)

3    BY MS. KESSLER:

4    Q      If we could look at Page 1 of this . . . .

5           MS. KESSLER:  Could we have the lights?  Thank you.

6    BY MS. KESSLER:

7    Q      Looking at Page 1 of Exhibit 3CC, what is this document?

8    A      This is Form A, a verification of beneficial owner's

9    identity for an account ending in 3443.

10   Q      And who is identified as the contracting party?

11   A      Top Fast Finance Limited.

12   Q      And on Page 1 of this document, who is identified as a

13   beneficial owner?

14   A      David Leon Fredrick.

15   Q      And who appears to sign this document at the bottom?

16   A      Beda Singenberger.

17   Q      Now, if we turn to Page 2, who is also identified as a

18   beneficial owner of this account?

19   A      Patricia Lynn Hough.

20   Q      In reviewing the documents related to this Top Fast

21   account at UBS, did you determine the source of the funds that

22   came into this account?

23   A      Yes, I did.

24   Q      And what was that?

25   A      There was a $5 million transfer of funds into this

1   account.

2   Q      Do you recall which subaccount that appeared in?

3   A      I don't recall, but I can find it, if you allow me time

4   to look.

5   Q      Sure.

6   A      Okay.

7   Q      Actually, if you turn to Subaccount 60Z, which is, I

8   think, Page 48?

9   A      Yes.  There it is.

10          MS. KESSLER:  Permission to publish 30L, Your Honor?

11          THE COURT:  You may.

12          MS. KESSLER:  Page 48?

13          (An exhibit was projected onto the projector screen.)

14   BY MS. KESSLER:

15   Q      And at the top here, is that credit you were referring

16   to reflected?

17   A      Yes.  It is the $5 million credit from the account for

18   the Saba University School of Medicine Foundation.

19   Q      And when was that?

20   A      January 6th of 2006.

21   Q      During the trial, have you heard any evidence that Top

22   Fast conducted any business?

23   A      They did not.

24   Q      Based on this and other evidence, I want you to assume,

25   for purposes of your tax computations, that this account, in

1    the name of Top Fast, was owned jointly by Dr. Hough and

2    Dr. Fredrick.

3        Now, if this account was not owned jointly by Dr. Hough

4    and Dr. Fredrick, would any of the income or investment expense

5    items be included in your tax computations?

6    A    They would not be included.

7    Q    Now, did you review all of the transactions in this

8    account in the same manner that you did the four prior

9    accounts?

10   A    Yes, I did.

11   Q    If we could turn to Page 48 of this document . . .

12   that's where we were before.

13       Is this spreadsheet similar to the spreadsheet that you

14   prepared in your review of the other accounts?

15   A    Yes.

16   Q    And does this reflect all the transactions you observed

17   to occur in Subaccount 60Z --

18            COURT REPORTER:  Could you say it again?

19            MS. KESSLER:  I'm sorry.

20            COURT REPORTER:  Just ask the question.

21   BY MS. KESSLER:

22   Q    Does this spreadsheet reflect all of the transactions

23   you saw to occur in Subaccount 60Z, like "zebra"?

24   A    Yes.

25   Q    Now, did this account also have multiple subaccounts

```
1    similar to the other UBS accounts?

2    A       Yes, it did.

3    Q       What type of an account did you observe the Top Fast

4    account to be?

5    A       An investment account.

6    Q       And if we look at, again, Page 48, Subaccount 60Z,

7    approximately when was the -- this subaccount opened?

8    A       December 21st, 2005.

9    Q       Did you see, at any time, securities move into this

10   account?

11   A       Yes, I did.

12   Q       Do you remember approximately when that was?

13   A       I believe it was . . . sometime in March of 2007, in and

14   around March of 2007.

15   Q       Was that approximately at around the time of the sale of

16   the schools?

17   A       Yes, it was.

18   Q       Was it before the sale was settled?

19   A       Yes, it was.

20   Q       And where did you observe those securities to come from?

21   A       The account at UBS for Medical University of the

22   Americas.

23   Q       Now, if we look at Page 1 of Exhibit 30L, what is this

24   document?

25   A       The income summary for Patricia Hough?
```

1    Q      Yes, ma'am.

2    A      This is . . . I'm rolling up the numbers for all the

3    accounts for all the years.

4    Q      The same totaling up of your income items?

5    A      Yes.  From the subaccounts, yes.

6    Q      And this is all -- withdraw that question.

7           Did you examine this account to determine whether there

8    was interest income?

9    A      Yes, I did.

10   Q      And did you find that there was interest income in 2006

11   and 2007?

12   A      Yes, I did.

13   Q      Are those reflected there, at the bottom?

14   A      Yes.  Those are the very -- the very . . . near the

15   bottom, for account ending in 3443.

16   Q      Did you also determine whether there were any dividends

17   earned in this account in 2005, '6, or '7?

18   A      There were dividends earned in 2006.

19   Q      How much?

20   A      $73.96.  This would have been . . . one of those . . .

21   amounts that I had to divide in half.

22   Q      So these numbers actually reflect half of the dividends

23   that were earned in this account.

24   A      Yes.

25   Q      And the other half -- if we turn to Page 1A,

1    Exhibit 30L, are the other half reflected on this income

2    summary for David Fredrick?

3    A      Yes, they are.

4    Q      Now, if we turn back to Page 1, did you also seek to

5    determine whether there were any capital gains or losses?

6    A      Yes.

7    Q      And did you find that there were short-term capital

8    gains in this account -- excuse me, losses?

9    A      Yes.

10   Q      For what years?

11   A      2006 and 2007.

12   Q      Losses for both years?

13   A      Yes.

14   Q      Did you have difficulty determining the basis of some

15   securities that were sold in this account?

16   A      Yes, I did.  Like I said, a lot of the securities --

17   most of the securities transferred in, and also the documents

18   from UBS, they were weak on supplying me information.

19   Q      They were what?

20   A      I didn't -- I think they were -- I was a little short on

21   information from UBS for this account.

22   Q      So were there securities transactions in this that you

23   treated the same way as others where you couldn't determine

24   basis?

25   A      Yes.

76

1   Q     And how was that?

2   A     Neither gain nor loss.

3   Q     Now, if we turn to Page 2 of this Exhibit 30L, did you

4   also determine the investment expenses that occurred in this

5   account ending in 3443?

6   A     Yes, I did.

7   Q     And what is reflected here; is this 100 percent of the

8   investment expenses in this account, or half?

9   A     This is just -- this is the half that is attributable to

10  Patricia Hough.

11  Q     And what were the investment expenses paid for this

12  account in 2006?

13  A     $13,970.57.

14  Q     And in 2007?

15  A     $24,994.26.

16  Q     Now, you didn't see any -- you don't report, here, any

17  investment expenses for 2008.

18        Do you recall why that is?

19  A     This account was closed sometime in 2008.  I didn't

20  analyze 2008.  It was closed in 2008, and the -- it was

21  transferred to Fortis Banque or Landesbank.

22  Q     Did you have complete account documents for after 2007?

23  A     I had some account statements, but I didn't have any

24  securities statements.

25  Q     Okay.  Now, do you recall Dr. Dalbec testifying here at

1    trial?

2    A       Yes, I do.

3    Q       Do you recall that he testified that Dr. Fredrick told

4    him he placed a deposit of $50,000 on a purchase of a plane?

5    A       Yes.

6    Q       Now, if we turn to Page 76 of Exhibit 30L?

7            (The witness examines an exhibit.)

8    Q       Are you there?

9    A       Yes.

10   Q       Did you see evidence on this page that a deposit of

11   $50,000 was placed for the purchase of a plane?

12   A       Yes.

13   Q       And looking at this account statement, do you see that

14   transaction occurring here?

15   A       7/31 of '07, 50,000 goes out.  It goes to Cirrus Design

16   Corporation, deposit for David Fredrick.

17           MS. KESSLER:  If I could approach and have

18   Exhibit 30Q, like in "queen," marked?

19           THE COURT:  You may.

20   BY MS. KESSLER:

21   Q       Ms. Maurer, can you tell us what is contained in

22   Exhibit 30Q?

23   A       Bank information.

24   Q       Do they relate to this transaction involving the deposit

25   with Cirrus?

1    A       Yes.

2            MS. KESSLER:  Your Honor, I'd move into evidence

3    Exhibit 30Q, like "queen"?

4            MR. HOCHMAN:  I have no objection, Your Honor.

5            THE COURT:  30Q will be admitted.

6            (Government's Exhibit 30Q was admitted into

7        evidence.)

8    BY MS. KESSLER:

9    Q       Do you recall hearing testimony from Dr. Dalbec that the

10   purchase of the plane related to the $50,000 deposit -- excuse

11   me -- did not actually go through?

12   A       I remember that testimony.

13   Q       Now, if we look at Page 30Q -- excuse me, Page 2 of

14   Exhibit 30Q --

15           MS. KESSLER:  Permission to publish, Your Honor?

16           THE COURT:  You may.

17           (An exhibit was projected onto the projector screen.)

18   BY MS. KESSLER:

19   Q       What is this document?

20   A       This is the actual wire transfer payment order for the

21   50,000 coming out of Top Fast Finance Limited, at UBS account

22   ending in 3443.  And it goes -- the 50,000 goes to Republic

23   Bank, in the U.S.A., and it's . . . Cirrus Design Corporation.

24   Q       Now, if we turn to Page 5 of this document, what is

25   this?

1    A      This is a Wachovia Bank account statement for David

2    Fredrick and Patricia Hough.

3    Q      And what's the date of this statement?

4    A      June 23rd, 2010, through July 23rd, 2010.

5    Q      Do you see a deposit here reflected of $50,400, on

6    July 22nd?

7    A      Yes, I do.

8    Q      Now, if we turn to Page 8 of this exhibit, what is this?

9    A      This is a $50,000 check, paid to the order of David

10   Fredrick, from Cirrus Design Corporation.

11   Q      And if we move back forward to Page 6, is this the

12   deposit slip that went along with that $50,000 check and

13   another item?

14   A      I believe it was . . . yeah, the deposit.  But it's $400

15   additional to the 50,000.

16   Q      Now, did you also hear testimony during trial related to

17   the purchase of some property in Greenville, North Carolina?

18   A      Yes, I did.

19   Q      And was that testimony from Laura Whitley?

20   A      Yes.

21         MS. KESSLER:  Approaching the witness with

22   Exhibit 15C; C, like "cat"?

23         I believe this exhibit is already in evidence.

24         (An exhibit was projected onto the projector screen.)

25

1    BY MS. KESSLER:

2    Q      Did you see a deed for the purchase of a –– did you see

3    a deed for a purchase of that property in Greenville, North

4    Carolina, by an entity by the name of Ample Dynamic?

5    A      Yes, I did.

6    Q      And what was the purchase price for this property?

7    A      Purchase price is $590,000.

8    Q      Now, if we look at Exhibit 30L, at Page 72?

9           (The witness examines an exhibit.)

10   A      Yes.

11   Q      Do you see a transaction reflected here, June 11th of

12   2007?

13   A      Yes.

14   Q      And who was payment made to the order of?

15   A      Ample Dynamic Trading Limited.

16   Q      And the debit amount?

17   A      $590,016.42.  $590,016.42.

18          MS. KESSLER:  Thank you.

19          Your Honor, may I approach counsel?

20          THE COURT:  You may.

21          (Ms. Kessler and Mr. Hochman confer privately.)

22          MS. KESSLER:  Your Honor, if I could have marked as

23   evidence Exhibits 30G, 30H, 30I, 30J, and 30K?

24          THE COURT:  You may.

25

1    BY MS. KESSLER:

2    Q      Ms. Maurer, can you tell the jury what Exhibit 30G is?

3    A      30G?

4    Q      G, like "George"?

5    A      This is the Top Fast Finance account at Fortis Banque.

6    Q      What does this account end in, in terms of the number?

7    A      13,33.  Oh, the master account is 439, and the

8    Subaccount is 13 -- well, the master account is 439.

9    Q      Well, did you prepare -- what is contained in

10   Exhibit 30G?

11   A      My work paper, my spreadsheets, the account statements,

12   and then the account statements for subaccounts, and then

13   monthly portfolio statements from Fortis.

14   Q      Did you prepare the work papers that are contained in

15   Exhibit 30G?

16   A      Yes, I did.

17   Q      And in order to -- in doing so, did you rely on the

18   account documents from Fortis Banque that are also contained in

19   30G?

20   A      Yes, I did.

21   Q      And did you do this as part of your computation of tax

22   due and owing?

23   A      Yes, I did.

24          MS. KESSLER:  And -- actually, at this time, I'd move

25   Exhibit 30G into evidence.

1          MR. HOCHMAN:  No objection, Your Honor.

2          THE COURT:  30G will be admitted.

3          (Government's Exhibit 30G was admitted into

4      evidence.)

5          MS. KESSLER:  Now, what is . . . .

6          Permission to publish, Your Honor?

7          THE COURT:  You may.

8  BY MS. KESSLER:

9  Q      Did you review documents related to this account?

10         (An exhibit was projected onto the projector screen.)

11  A      Yes, I did.

12  Q      Now, where was this account located, what financial

13  institution?

14  A      This is Fortis Banque.

15  Q      Do you know where that's located?

16  A      Switzerland?

17  Q      Now, were the documents that you reviewed from Fortis

18  Banque similar to those what you reviewed from the UBS accounts

19  previously?

20  A      I don't believe I would consider them that similar.

21  Q      How were they different?

22  A      I got them at a subsequent date, and I don't have . . .

23  safekeeping account documents, I . . . I just have some monthly

24  asset statements and some account statements.

25  Q      Okay.  Were the documents that you received complete;

1  were they sufficient for you to be able to prepare your

2  computations?

3  A      Yes.  Yes.  Yes.

4  Q      Did you hear testimony related to this account during

5  trial?

6  A      Yes.

7  Q      And did you see documents admitted into evidence related

8  to this account?

9  A      Yes, I did.

10          MS. KESSLER:  If I could have Exhibit 4G marked as --

11  actually, I believe it was admitted this morning; 4G?

12          THE COURTROOM DEPUTY:  4G?  I don't have that.

13          Do you have 4G?

14          THE COURT:  I'll have to check.

15          MS. KESSLER:  I thought it was part of the list of

16  exhibits that we . . . .

17          THE COURT:  4G had been admitted.

18          THE COURTROOM DEPUTY:  I missed it.

19          MS. KESSLER:  Permission to publish?

20          THE COURT:  You may.

21          (An exhibit was projected onto the projector screen.)

22  BY MS. KESSLER:

23  Q      Looking at Page 1 of this document, what is this?

24  A      This is a Form A for Top Fast Finance Limited at Fortis

25  Banque.

1   Q      And who is identified as the contracting party --
2   party -- partner.  Excuse me.
3   A      Top Fast Finance Limited.
4   Q      And who is identified as the beneficial owners?
5   A      David Leon Fredrick and Patricia Lynn Hough.
6   Q      Now, if we look at the bottom of this document, who
7   signed this document?
8   A      Beda Singenberger.
9   Q      If we turn now to Page 30G, at Page 1, can you tell,
10  based on your review of the documents, when this account was
11  opened?
12  A      30G . . . .
13           (The witness examines an exhibit.)
14  A      March of 2007?
15  Q      Now, do you recall testimony from Mr. Steven Rodger
16  during trial?
17  A      Yes, I do.
18  Q      Now, did Mr. Rodger testify that he entered into a
19  purchase agreement for the sale of the medical schools on
20  February 14th of 2007?
21  A      Yes, he did.
22  Q      Where did you observe the assets in this account to come
23  from?
24  A      From the UBS account for Top Fast.
25  Q      Based on this and other evidence, I want you to assume

1   for purposes of your tax computations that this account was

2   owned jointly by Dr. Hough and Dr. Fredrick.

3          Now, similar to the other accounts, if this was not an

4   account owned by Dr. Fredrick and Dr. Hough, would the income

5   items and investment expenses be relevant to your tax

6   computation if that were the case?

7   A      They would not be included.

8   Q      Now, did you analyze the transactions in this account in

9   the same manner that you analyzed the prior accounts we've

10  discussed?

11  A      Yes, I did.

12  Q      And did you examine all of the transactions?

13  A      Yes, I did.

14  Q      Did you do so in the same way?

15  A      Yes, I did.

16  Q      What type of account was this account in the name of --

17  or at Fortis Banque?

18  A      It's an investment account.

19  Q      Now, if we look at, again, at Exhibit 30G, Page 1, was

20  this account at Fortis Banque somewhat similar to the UBS

21  accounts, in that they have subaccounts as well?

22  A      Yes.

23  Q      What are those?

24  A      10,01, 13,33, 14,02 -- I'm sorry.

25          COURT REPORTER:  Ten, comma --

```
 1            THE WITNESS:  I guess it's -- I'll just read it off
 2    the screen.  They do it different ways in different documents.
 3            10.01, 13.33, 14.02, 18.14.
 4    BY MS. KESSLER:
 5    Q     Now, if we turn to Page 2 of Exhibit 30G, what is this
 6    document?
 7    A     This is . . . the income summary for the 2008 accounts
 8    for Patricia Hough.
 9    Q     And did you determine whether there were short-term
10    capital gains in this account for 2008?
11    A     Yes, I did.
12    Q     And are those referenced on this page here; can you
13    point them out?
14    A     Yes, I can.  The account ending 439/10.01, $74,461.38.
15    That's a capital -- overall capital gain.
16            439/13.33, the overall gain of $31,913.08; 439/14,02,
17    overall loss of $480.93; 439/18,14, $55,968.70, overall gain.
18    Q     Now, did you determine whether there were capital gains
19    or losses within this account in the same way that you did with
20    regard to the UBS accounts we discussed earlier?
21    A     Yes, I did.
22    Q     Did you also examine this account to determine whether
23    there were any dividends earned in the account?
24    A     Yes, I did.
25    Q     Were there any?
```

1  A      No.

2  Q      Now, did you also examine the account for whether there

3  was interest income earned in the account?

4  A      Yes, I did.

5  Q      And are those reflected there, near the bottom, with the

6  accounts ending in the -- for the master account ending in

7  439 --

8  A      Yes.

9  Q      -- and the four corresponding subaccounts?

10  A      Yes.

11  Q      Did you determine whether there were interest and

12  dividends in the same way that you did in the -- as to the

13  prior accounts that we've discussed?

14  A      Yes, I did.

15  Q      Now, on this document, the middle column indicates

16  total, that it's a total number for capital gains, dividend,

17  and interest income.

18          Did you do a similar computation, because this was a

19  joint account, and split that in half?

20  A      Yes, I did.

21  Q      Where is that reflected on this document?

22  A      Under the column kauf, 2008, one-half, that's where I

23  split it in half.  The income items in half.

24  Q      Now, for all these computations, if any of the

25  transactions occurred in a currency other than U.S. Dollars,

1    did you convert that transaction currency in the same way you

2    did for the other accounts?

3    A       Yes, I did.  But when I was doing this, I didn't use

4    Google.  They had distributed a special conversion app for our

5    desktop computers to use.

6    Q       Who is "they"?

7    A       They, the IRS, the management.

8    Q       Okay.

9    A       Okay.

10   Q       Now, if we turn to Page 3 of Exhibit 30G, did you also

11   examine the account to determine if there were investment

12   expenses charged to the account?

13   A       Yes, I did.

14   Q       And are those reflected about midway down the page?

15   A       Yes, they are.

16           MR. HOCHMAN:  What page?

17           MS. KESSLER:  Page 3.

18   BY MS. KESSLER:

19   Q       Are those reflected in entries that end with the Account

20   Number 439, and three different subaccount numbers?

21   A       Yes.

22   Q       What was the investment expense paid in 2008, for

23   Subaccount 13,33?

24   A       $11,527.08.

25   Q       Now, did you -- the second -- the computation here, the

1    middle column, this also reflects a total amount.

2          As part of your computation, did you split this in half?

3    A     Yes.  It would have been split in half.

4    Q     And why was that?

5    A     Because this was a joint account, and David Fredrick and

6    Patricia Hough filed separately, they each are allowed half the

7    expenses.

8    Q     Now, if we could turn to 30H, which is also in this

9    binder . . . what is contained in Exhibit 30H; H, like in

10   "Harry"?

11   A     These are my work papers and the account statements that

12   I had for the Top Fast Finance Limited account at Landesbank.

13   It's the Master Account 134.

14   Q     What's the name on this account?

15   A     Top Fast Finance Limited.

16   Q     And that is -- does that end in 133?

17   A     Oh, okay.  Yes, it does.  Something overlapped in these

18   accounts.  But okay.  There was one -- it was 134, that was Top

19   Fast.  I don't know how it got confused.  I didn't confuse it.

20   I think Landesbank did --

21   Q     Okay.

22   A     -- but yes, it would be -- most of the stuff was in the

23   account ending 133.

24   Q     Now, the documents contained in Exhibit 30H, are your

25   work papers contained in Exhibit 30H?

1    A       Yes.

2    Q       And are bank or . . . securities statements contained in

3    Exhibit 30H?

4    A       Yes.

5    Q       What institution was this account with?

6    A       Landesbank.

7    Q       Do you know where that is located?

8    A       Liechtenstein.

9    Q       Now, did you rely on the statement information from

10   Landesbank that is contained in 30H, in order to prepare your

11   computations?

12   A       Yes.

13   Q       And is this document similar to what you prepared, and

14   we discussed, for prior accounts you analyzed?

15   A       Yes.

16           MS. KESSLER:  I'd like to move Exhibit 30H into

17   evidence, Your Honor?

18           MR. HOCHMAN:  No objection, Your Honor.

19           THE COURT:  30H will be admitted.

20           (Government's Exhibit 30H was admitted into

21      evidence.)

22           MS. KESSLER:  Permission to publish?

23           THE COURT:  You may.

24           (An exhibit was projected onto the projector screen.)

25

1   BY MS. KESSLER:

2   Q      If we could look at Page 1 of this document, you

3   discussed a minute or so ago, there seem to perhaps be some

4   confusion as to the master account number for this account.

5          Which account are we referring to when we're looking at

6   Exhibit 30H?

7   A      It's something that is 152,134.33.  It's called a

8   D-account.

9   Q      Okay.  And are the entries above that also related to

10  this account?

11  A      Yes.  They are Top Fast at Landesbank.

12  Q      Now, did you review documents from this account as part

13  of your analysis?

14  A      Yes, I did.

15  Q      And how did these documents from Landesbank compare to

16  the documents you reviewed from UBS and . . . Fortis?

17  A      They were similar.  Yes.

18  Q      Did you hear testimony during trial with regard to this

19  account?

20  A      Yes, I did.

21  Q      Did you see documents entered into evidence related to

22  this account?

23  A      Yes, I did.

24              (Ms. Kessler and Ms. Finley confer privately.)

25              MS. KESSLER:  If I could approach the witness with

1    what was previously admitted as Exhibit 4H?

2    BY MS. KESSLER:

3    Q       Ms. Maurer, what kind of documents are contained in

4    Exhibit 4H?

5    A       Account opening documents.

6    Q       Now, if we look at Page --

7                MS. KESSLER:  Permission to publish, Your Honor?

8                THE COURT:  You may.

9                (An exhibit was projected onto the projector screen.)

10   BY MS. KESSLER:

11   Q       If we look at Page 1 of this document, who is -- what is

12   this document?

13   A       Account opening for Top Fast Finance Limited at

14   Landesbank.

15   Q       And when was this account opened?

16   A       December 5th, 2006.

17   Q       If we --

18   A       I'm sorry.  Is that a six?  I'm having trouble.  My copy

19   is . . . .

20   Q       If you want to look at Exhibit 30H, Page 1, that

21   might -- do you want to look at 30H, your notes on when the

22   accounts were opened?

23   A       Okay.  2006.

24   Q       Now, if we turn to Page 3 and 4 of this document -- or

25   start with Page 3, who is identified as one of the beneficial

1    owners of this account?

2    A       David Leon Fredrick.

3    Q       And if we turn to Page 4?

4    A       Patricia Lynn Hough.

5    Q       And who signs this document?

6    A       Beda Singenberger.

7    Q       Who is identified as the contracting party?

8    A       Top Fast Finance Limited.

9    Q       Now, in your review of the documents related to this

10   account, do you know where the assets in the account came from?

11   A       They were moved from the UBS account.

12   Q       Based on these and other pieces of evidence, I want you

13   to assume, for purposes of your tax computations, that this

14   account is owned jointly by Dr. Fredrick and Dr. Hough.

15           Now, similar to the other accounts, if this account was

16   not owned by Dr. Fredrick and Dr. Hough, would this be, the

17   income and expense items be relevant to your computations?

18   A       They would not be.

19   Q       Now, did you analyze this account in the same way that

20   you analyzed the prior accounts we've discussed?

21   A       Yes, I did.

22   Q       Did you examine all of the transactions in the account?

23   A       Yes, I did.

24   Q       And did you do so in the same way?

25   A       Yes, I did.

1    Q       What type of account was this?

2    A       An investment account.

3    Q       Now, if we look at Exhibit 30H, at Page 1, where is this

4    account reflected?

5    A       It's reflected down . . . in the interest income . . .

6    of 133 --

7    Q       I'm sorry.  Page 1 of 30H?

8    A       Oh.  Sorry.  Okay.

9    Q       Is this account reflected as the first account entry

10   under Landesbank?

11   A       Under Landesbank, Top Fast; yes.

12   Q       Now, similar to the other foreign accounts, does this

13   account also have subaccounts?

14   A       Yes, it does.

15   Q       And those are reflected there as well?

16   A       Yes.

17   Q       If we could move to Page 2 of this document, what is

18   this?

19   A       That's my income summary for 2008, that includes this

20   account.

21   Q       Now, for this account, which ends in 134 . . . did you

22   determine whether there were short-term capital gains related

23   to this account for 2008?

24   A       Yes.

25   Q       How much?

1    A        $100,598.50.

2    Q        Now, did you determine whether there were capital gains

3    or losses in this account in the same way that you did for the

4    other accounts we've discussed?

5    A        Yes, I did.

6    Q        And were there instances where you could not determine

7    the basis for these transactions as well?

8    A        Yes.

9    Q        And did you treat them in the same way that you did the

10   prior transactions?

11   A        Yes.

12   Q        Did you treat them as neither a gain nor a loss?

13   A        Right.

14   Q        Now, did you determine whether there were dividends

15   earned in this account for 2008?

16   A        No dividends.

17   Q        Was there interest earned in any of the accounts?

18   A        Yes.

19   Q        How much was that?

20   A        I don't see any.  I'm sorry.

21   Q        Is the entry at 133.85 related to this account or a

22   different account?

23   A        It must be related to a different account.

24   Q        Okay.

25   A        133,85; oh, no.  It's this account.  I'm sorry.  It's

1    $12,000.

2    Q      Okay.  Now, the second column of this summary indicates

3    that these are total numbers for 2008.

4           Did you, again, split these numbers in half?

5    A      Yes, I did.

6    Q      And who did you attribute half to?

7    A      Half to Patricia Hough, and half to David Fredrick.

8    Q      Now, if we turn to Page 3, did you also examine this

9    account for investment expenses that were paid?

10   A      Yes, I did.

11   Q      And did you observe any investment expenses to be

12   charged to these accounts?

13   A      Yes, I did.

14   Q      Where are these reflected here?

15   A      The account ending in 133.85, $1,856.06; the account

16   ending in 133.90, $684.42; the account -- this account that

17   says 134.33 is -- it's the same -- it's this account, and it's

18   $33,506.88.

19   Q      And is that the D-account that you had referenced

20   earlier from Page 1?

21   A      Yes.  That's the strange D-account; yes.

22   Q      Now, for all of your computations with regard to this

23   account, did you use the same currency conversion methodology,

24   if it was necessary?

25   A      Yes, I did.

1          MS. KESSLER:  If I could approach and have

2   Exhibit 30E marked as evidence?

3          THE COURT:  You may.

4   BY MS. KESSLER:

5   Q      Ms. Maurer, what's contained in Exhibit 30E?

6   A      These are my work papers and the account statements for

7   New Vanguard Holdings Limited.  This is at Fortis Banque.  It's

8   account ending in 439.

9   Q      Now, does this -- the print's kind of small.

10         Can you check and see if it might be 438 instead of 439?

11  A      Oh, it's 438.  Yeah.  I've got light print -- okay; 438,

12  yes.

13  Q      Now, does this document -- or this exhibit, excuse me,

14  contain work papers that you prepared?

15  A      Yes.

16  Q      Are they related to this account?

17  A      Yes.

18  Q      And does the exhibit also contain bank documents that

19  you used as part of your computation?

20  A      Yes.

21  Q      And did you rely on all of these documents contained in

22  this exhibit for purposes of your tax computations?

23  A      Yes, I did.

24         MS. KESSLER:  I'd move Exhibit 30E into evidence,

25  please.

1          THE COURT:  Any objections?

2          MR. HOCHMAN:  No objection, Your Honor.

3          THE COURT:  30E will be admitted.

4          (Government's Exhibit 30E was admitted into

5     evidence.)

6          MS. KESSLER:  Permission to publish?

7          THE COURT:  You may.

8          (An exhibit was projected onto the projector screen.)

9  BY MS. KESSLER:

10  Q     This is Page 1 of this Exhibit 30E.

11        Where is this account reflected?

12  A     It's the second one down, 438, New Vanguard Holdings.

13  Q     And does this account also have subaccounts similar to

14  the others?

15  A     Yes.

16  Q     Did you hear -- review evidence related to this account?

17  A     Yes, I did.

18  Q     Did you see documents entered into evidence related to

19  this account?

20  A     Yes, I did.

21  Q     And did you review documents related to this account

22  similar to the documents you reviewed for the other accounts

23  we've been talking about?

24  A     Yes, I did.

25          MS. KESSLER:  If I could have Exhibit 4J marked as

1    evidence?

2            THE COURT:  4J?

3            MS. KESSLER:  J, like "John."

4            THE COURT:  That's in already.

5            MS. KESSLER:  Oh, that's in?

6            Permission to publish?

7            THE COURT:  You may.

8            (An exhibit was projected onto the projector screen.)

9    BY MS. KESSLER:

10   Q     Ms. Maurer, what is this document, Exhibit 4J?

11   A     It's the Form A account opening document at Fortis

12   Banque.

13   Q     And who is identified as the contracting partner?

14   A     New Vanguard Holdings Limited.

15   Q     Who is identified as the beneficial owners?

16   A     David Leon Fredrick and Patricia Lynn Hough.

17   Q     Can you tell who signed this document?

18   A     Beda Singenberger.

19   Q     And when does it appear to be signed?

20   A     November 29th, 2006.

21   Q     Now, if we look . . . based on your analysis, or your

22   review of the account, where did you understand the assets in

23   this account to come from?

24   A     The sale of the schools.

25   Q     And when did that occur?

1    A        April of 2007.

2    Q        Now, based on these and other pieces of evidence, I

3    would like you to assume, for purposes of your tax

4    computations, that this account was owned jointly by Dr. Hough

5    and Dr. Fredrick.

6            Again, if this account were not owned jointly by

7    Dr. Fredrick and Dr. Hough, would it be relevant to your tax

8    computations?

9    A        No, it would not.

10   Q        Did you analyze this account in the same manner that

11   analyzed the others that we have been talking about?

12   A        Yes, I did.

13   Q        And did you examine all of the transactions in the

14   account?

15   A        Yes, I did.

16   Q        Did you do so in the same way that you did the other

17   accounts?

18   A        Yes, I did.

19   Q        What type of account was this?

20   A        This is an investment account.

21   Q        Now, if we turn to Exhibit 30E, at Page 2, did you

22   determine whether there were short-term capital gains related

23   to this account?

24   A        Yes, I did.

25   Q        Actually, what is this document, Page 2?

1   A      This is my income summary for 2008 for -- and it
2   includes this account.
3   Q      And others?
4   A      Yes.
5   Q      Are short-term capital gains related to the account
6   we've been talking about, ending in 38, reflected on this
7   document?
8   A      Yes, they are.
9   Q      And what are those?
10  A      438/10.01; $939,710.93, overall gain.
11  Q      Were there also -- I'm sorry, did I interrupt?
12         Were there also short-term capital gains for
13  Subaccount 13,33?
14  A      Yes.
15  Q      How much?
16  A      $403,266.24.
17  Q      And what about Subaccount 18.14?
18  A      $948,833.69.
19  Q      Did you determine capital gains in the same way that you
20  did for the other accounts?
21  A      My documents -- let's see.
22         (The witness examines an exhibit.)
23  A      Yes.  Yes, I did.
24  Q      Now, did you also look to determine whether there were
25  any dividends earned in this account in 2008?

1    A        Yes, I did.

2    Q        Were there any?

3    A        I don't see any.

4    Q        Now, did you also look at whether there was interest

5    income earned in this master account or any of its subaccount?

6    A        Yes, I did.

7    Q        Was there any?

8    A        Yes, there was.

9    Q        And are those reflected under interest income, the four

10   entries starting with 38?

11   A        Yes.

12   Q        Now, again on this document, the second column indicates

13   that the numbers there are totals.

14            What did you do with those total numbers as part of your

15   tax computations?

16   A        Split them in half; half for Patricia Hough, and half

17   for David Fredrick.

18   Q        To the extent that you had to, did you perform any

19   currency conversions in the same manner for this account as you

20   did the others?

21   A        Yes, I did.

22   Q        Now, if we turn to Page 3 of this document, did you also

23   review the accounts to see if there were any investment

24   expenses charged to the accounts?

25   A        Yes, I did.

1    Q      Were there any?

2    A      Yes, there were.

3    Q      Are those reflected on this page?

4    A      Yes.

5    Q      What were the investment expenses incurred . . . for

6    2008?

7    A      For Subaccount 10.01, $5,952.36; Subaccount 13.33, it's

8    311,332 –– $311,332.40; 18,14, $2,744.35.  That's it.

9    Q      And were these, again, the numbers in this column,

10   totals for 2008?

11   A      Yes.

12   Q      And did you, again, attribute half of those to

13   Dr. Hough, and half of those to Dr. Fredrick?

14   A      Yes, I did.

15          MS. KESSLER:  If I could have Exhibit 30F marked at

16   the break, if that's all right?

17          THE COURT:  30F?

18          MS. KESSLER:  Yes, Your Honor.

19          THE COURT:  All right.  Thank you.

20   BY MS. KESSLER:

21   Q      Ms. Maurer, what is Exhibit 30F?

22   A      These are work papers, account statements, and documents

23   for New Vanguard Holdings at Landesbank.

24   Q      Did you prepare the work papers that are contained in

25   30–F?

1    A      Yes, I did.

2    Q      And what else is contained in 30-F?

3    A      Work papers, account statements, and a monthly statement

4    of assets sheets.

5    Q      And did you prepare all of the work papers contained in

6    30F?

7    A      Yes, I did.

8    Q      And did you rely on all of the account documents

9    contained in 30F in order to do your computations?

10   A      Yes, I did.

11   Q      Is this document similar to the prior exhibits in the

12   30-series that we've been talking about --

13   A      Yes.

14   Q      -- in terms of its organization?

15   A      Yes.

16          MS. KESSLER:  I'd move Exhibit 30F into evidence,

17   Your Honor?

18          MR. HOCHMAN:  No objection, Your Honor.

19          THE COURT:  30F will be admitted.

20          (Government's Exhibit 30F was admitted into

21      evidence.)

22   BY MS. KESSLER:

23   Q      Now, did you review the same types of documents, in

24   looking at this account, as for the other accounts?

25   A      Yes.  Similar to the 2008 documents, which are fairly

1  similar to the UBS statements; yes.

2  Q      Are they a little different, too?

3  A      They're a little different.

4  Q      How are they different generally?

5  A      I have monthly statement of assets, and that's

6  statements, and . . . .  Make sure I'm saying the right thing.

7  And I had no documents to tell me the units bought and sold of

8  stock.  I had to rely on the monthly statements to determine

9  the stocks that were bought and sold.

10  Q      Okay.  Did you see documents entered into evidence

11  related to this account?

12  A      Yes, I did.

13         MS. KESSLER:  If I could approach the witness with

14  previously admitted 4K, like "King"?

15         THE COURT:  You may.

16  BY MS. KESSLER:

17  Q      What is the date of this exhibit, Ms. Maurer?

18  A      The opening documents for New Vanguard Holdings Limited

19  at Landesbank.

20  Q      If we could look at Page 1 of this document, who is

21  identified as the contracting party?

22  A      New Vanguard Holdings Limited.

23  Q      And who, on Page 1, is identified as the beneficial

24  owner?

25  A      David Leon Fredrick.

1    Q      Who appears to have signed this document?

2    A      Beda Singenberger.

3    Q      And if we turn to Page 2, is there another beneficial

4    owner identified?

5    A      Patricia Lynn Hough.

6    Q      And does this document also appear to have been signed

7    by Mr. Singenberger?

8    A      Yes.

9    Q      Can you tell approximately when this account was opened?

10   A      Can I refer to my --

11   Q      Yes.

12   A      Okay.  December of 2006.

13   Q      Do you recall testimony from Mr. Rodger?

14   A      Yes, I do.

15   Q      And do you recall Mr. Rodger testifying that he reached

16   a handshake -- or I think he may have called it a napkin

17   agreement -- with Dr. Fredrick regarding the sale of the

18   schools, in September of 2006?

19   A      Yes.

20   Q      Where did the assets in this account come from?

21   A      From the sale of the schools.

22   Q      Based on these and other items of evidence, I want you

23   to also assume, for purposes of your tax computations, that

24   this account was owned jointly by Patricia Hough and David

25   Fredrick.

1          Now, again, if this account were not owned jointly by

2    Dr. Fredrick and Dr. Hough, how would that -- how would it

3    affect your tax computations?

4    A     It would not appear.

5    Q     And did you analyze this account in the same manner that

6    you analyzed the prior accounts we've discussed?

7    A     Yes, I did.

8    Q     Did you examine all of the transactions that occurred in

9    this account?

10   A     Yes, I did.

11   Q     And did you do that in the same way that you did the

12   other accounts?

13   A     Yes, I did.

14   Q     What type of account is this one?

15   A     It's an investment account.

16   Q     Now, if we turn to Page 2 of Exhibit 30F, is this,

17   again, your income summary?

18   A     Yes, it is.

19   Q     And you prepared this document?

20   A     Yes, I did.

21   Q     Did you determine whether there was interest income

22   earned in any of the subaccounts for account ending in 134?

23   A     134.49.

24   Q     How much interest income was earned in that account in

25   2008?

1    A       $218,012 even.

2    Q       Did you also determine whether there were dividends

3    earned in one of the subaccounts for the account ending in 134?

4    A       Yes.  It's -- 134.65, dividends, the total dividends

5    $15,095.63.  But this other one, this weird number, 455.36, is

6    also part of this account, and there's dividends of $2,671.23.

7    Q       If we look back at Page 1, do we also have that

8    152,455.36 reflected as an account related to this -- or a

9    subaccount for this New Vanguard Holding account?

10   A       Yes.  It's the bottom line.

11   Q       Now, let's go back to Page 2 again.  Did you also

12   examine the account to determine whether there were capital

13   gains and losses?

14   A       Yes, I did.

15   Q       Were there any short-term capital gains?

16   A       Yes.  In 134.57, there was an overall capital gain of

17   $624,284.68.  Subaccount 65, $282,382.63.  And that's it,

18   because the other one that says 34 is the D-Account for -- it's

19   that weird account that belongs to Top Fast.

20   Q       If we turn back to Page 1 of 30F, is that D-Account

21   you're referring to listed as a subaccount for 152,133?

22   A       Yes.

23   Q       Okay.  Now, I think you had the -- the documents you

24   received on this account were slightly different for purposes

25   of your dealing with the determination of capital gains.  Can

1   you explain how it was different?

2   A      I did not have any unit numbers.

3   Q      On the account statements?

4   A      On the account.  But I had these monthly statement of

5   assets, so . . . .

6   Q      Which page are you looking at?

7   A      I'm sorry.  I'm looking at 30F, Page 4, as an example.

8   Q      Okay.

9   A      Also, I didn't have any valor numbers, so I had to sort

10  by name.  And the first occurrence of something happening with

11  a stock -- I'm looking at 2/27/2008, a purchase price of

12  268,178.50.  That Puts Dax, I don't know what that means.  That

13  was the first time this was purchased.

14  Q      But the account documents that you are looking at did

15  not indicate the number of units purchased?

16  A      No.

17  Q      Okay.

18  A      But it was . . . February, if you look at the month

19  ending statement of 2008, there were zero units for this stock

20  name.

21  Q      Okay.

22  A      And then, during the year, there were sales and more

23  purchases.  But this stock number no longer occurred after

24  September 30th, 2008, so it became zero again.  So that's how I

25  determined that . . . it didn't matter how many units, because

1    if it started in zero and ended in zero, then the same amount

2    of stocks were purchased and sold.

3    Q      Okay.  And did you have to do that for other stock

4    transactions in this account?

5    A      Yes, I did.

6    Q      Now, to the extent that you had to do any currency

7    conversions related to this account, did you do so in the same

8    way?

9    A      Yes, I did.

10   Q      Now, if we turn to Page 3 of this document, did you also

11   examine this account for investment expenses?

12   A      Yes, I did.

13   Q      And did you determine whether there were investment

14   expenses related to the year 2008?

15   A      Yes, I did.

16   Q      And which entries relate to this account?

17   A      134.49, $1,497.61.  134.57, $4,215.42.  134.65,

18   $207,246.58.  455.36, $76.16.

19   Q      Now, those amounts are listed in your column titled,

20   Total for 2008.  Did you again split this in half?

21   A      Yes.

22   Q      And did you attribute half to Dr. Hough and half to

23   Dr. Fredrick for your tax computations?

24   A      Yes, I did.

25             MS. KESSLER:  Your Honor, could I consult with

1    counsel for just a minute?

2              THE COURT:  You may.

3              (Ms. Finley and Ms. Kessler confer privately.)

4              MS. KESSLER:  Your Honor, this is probably a good

5    time to break.

6              THE COURT:  All right.

7              We'll take a lunch recess.  Please do not discuss the

8    case among yourselves, or allow anyone to discuss it with you

9    or in your presence.  Let's get started at 1:15.

10             (At 12:03 PM, the jury was escorted from the

11        courtroom.)

12             THE COURT:  All right.  1:15.

13             (At 12:04 PM, court was recessed.)

14                          AFTER RECESS

15             (At 1:17 PM, court was reconvened.)

16             THE COURT:  You may be seated.

17             Someone says that there was a housekeeping matter?

18             MR. SAUNDERS:  Yes, Your Honor.

19             THE COURT:  Yes, Mr. Saunders.

20             MR. SAUNDERS:  Your Honor, we have the -- the first

21    defense witness is Dr. Alan Gruber.  He's flown down this

22    morning from Boston.  He has to fly back there this evening.

23             So the government has agreed to let us call him out

24    of order.  And our plan, if Your Honor would allow us to do so,

25    take him before we begin our cross with Ms. Maurer.  We just

1    want to make sure that we are reserving our Rule 29, and not

2    waiving anything for the convenience of the witness.

3              THE COURT:  Is that agreeable to the government?

4              MS. KESSLER:  Yes, Your Honor.

5              THE COURT:  All right.  That's agreeable with the

6    Court.

7              MR. SAUNDERS:  The other matter, Your Honor, is, on

8    the order that the Court issued this morning, there is just a

9    brief typo, and that's in the first item of the listed

10   modifications, Paragraph 1, Page 5.  And it says Exhibit E, and

11   it should be 3E.  That's the only correction.

12             THE COURT:  You're absolutely right.

13             All right.  I guess the easiest way to fix it is just

14   do an amended order?

15             MR. SAUNDERS:  That's fine, Your Honor.

16             MS. FINLEY:  That's fine, Your Honor.

17             THE COURT:  In the meantime, you all know what it

18   means, so we'll just get it fixed.

19             (There was discussion off the record.)

20             THE COURT:  All right.  Thank you.

21             And do you want me to tell the jury that we're

22   interrupting the witness because of logistics?

23             MR. SAUNDERS:  Yes, Your Honor.  I think that should

24   be sufficient.

25             THE COURT:  Okay.

1          All right.  Both sides ready for the jury?

2          MS. KESSLER:  Yes, Your Honor.

3          MR. HOCHMAN:  Yes, Your Honor.

4          THE COURT:  Have the jury step in, please.

5          (At 1:21 PM, the jury was escorted into the

6     courtroom.)

7          THE COURT:  You may proceed.

8          MS. KESSLER:  Your Honor, there were two exhibits

9     that I wanted to move to admit.  One of those is Exhibit 3-H,

10    as in "Harry."  The other is 3II, as in "indigo."  3II would be

11    contained on the disk that was referenced this morning.

12         THE COURT:  Any objections to either one?

13         MR. HOCHMAN:  Your Honor, 3H would have been subject

14    to the same type of motion in limine arguments that we've made,

15    and analysis of each and every document.  It hadn't been moved

16    in at this point, so we haven't submitted that to you, but we

17    would make the objections based on all those prior grounds that

18    we've raised.

19         And the other one was 3II?

20         MS. KESSLER:  Yes.

21         MR. HOCHMAN:  And again, Your Honor, I haven't gone

22    through every document in 3II.  I don't think 3II has any of

23    those same documents.  If it does, we would object to those

24    documents alone, and not the rest of the exhibit.

25         THE COURT:  All right.  I'll take the request under

1    advisement.  I can't rule without seeing the documents and

2    knowing whether there is an objection, and whether my saying --

3    and whether they're consistent with what I've done before

4    applies or not.  So unless you want to show me the

5    documents . . . .

6              MS. KESSLER:  I can step forward with 3H.  3II is on

7    the disk.

8              THE COURT:  Okay.  Well, the two of you better get

9    together and see if you agree that 3II doesn't suffer from the

10   same issues as the other one does.  That might make it easy.

11             MS. KESSLER:  Okay.

12             THE COURT:  And then in terms of 3H, why don't you

13   hand that up, and I'll take a look at it while you do that.

14             (Ms. Kessler and Mr. Hochman confer privately.)

15             MR. HOCHMAN:  Your Honor, based on counsel's

16   representation that 3II does not have any of the documents to

17   which we've objected to previously, we would no longer object

18   to the admission of 3II into evidence.

19             THE COURT:  All right.  3II, then, will be admitted.

20             (Government's Exhibit 3II was admitted into

21       evidence.)

22             THE COURT:  All right, Counsel, if you're going to

23   use these now, you need to come to sidebar.

24                          AT SIDEBAR

25             THE COURT:  First of all, where did these documents

1    come from?

2              MS. FINLEY:  These were also part of the UBS

3    documents.  I think, inadvertently, we didn't talk about all of

4    the accounts, so this was another account that was maintained.

5    I think the account opening documents are included in the other

6    stuff, the other materials, that were already admitted.  And

7    these are just the correspondence with respect to that account.

8              MR. HOCHMAN:  And which account is this, by the way?

9              MS. FINLEY:  This is the credit card account, I

10   think.

11             THE COURT:  This is account 7812.

12             MS. FINLEY:  And Exhibit 3G, which was admitted,

13   obviously is the account opening documents for the

14   correspondence that's referenced in 3H.

15             THE COURT:  Okay.

16             MR. HOCHMAN:  And, Your Honor, these documents suffer

17   from some of the same things that you denied admission of other

18   documents.  For instance, there's an amount of German that has

19   not been translated; there's handwriting on documents for which

20   we don't have the source, or the knowledge.

21             MS. FINLEY:  I'm sorry, Your Honor, we will withdraw

22   the Exhibit 3H at this point.  We'll withdraw our moving it in.

23             THE COURT:  Okay.

24                           IN OPEN COURT

25             THE COURT:  You may proceed.

1    BY MS. KESSLER:

2    Q      Ms. Maurer, prior to the break we had walked through

3    your computation of income dividends, capital gains, and

4    investment expenses related to a number of different foreign

5    accounts.

6           Did you do the same sort of analysis and computation

7    related to Dr. Fredrick?

8    A      Yes, I did.

9    Q      And did you prepare work papers and summaries of what

10   you found, as to those items related to Dr. Fredrick, as well?

11   A      Yes, I did.

12   Q      Did you do so in the same manner that you computed that

13   information for Dr. Hough, which we walked through here in

14   court?

15   A      Yes, I did.

16   Q      And were those computations also contained in the

17   materials that we've gone through in the prior exhibits?

18   A      Yes.

19   Q      Now, once you determined the interest and dividends,

20   capital gains, and expenses related to these accounts, did you

21   then attempt to determine whether there was any tax due and

22   owing?

23   A      Yes, I did.

24   BY MS. KESSLER

25   Q      If you could turn to Exhibit 30-I . . . which I think is

1    in that binder.

2         I don't believe that that's been admitted, Your Honor.

3             MS. KESSLER:  It is not.

4             Should I bring the binder over to have that

5    particular exhibit marked?

6             THE COURT:  I thought it had been marked.

7             MS. KESSLER:  Okay.  I wasn't sure.  I couldn't

8    recall which binder it was that we weren't able to mark.

9             THE COURT:  I believe so.

10            (The witness examines an exhibit.)

11            THE WITNESS:  Yes.

12   BY MS. KESSLER:

13   Q     Looking at Exhibit 30-I, what is Page 1 of Exhibit 30-I?

14   A     This is a work paper I'm using to . . . compare the

15   items such as interest per return, return, with the items I

16   have determined for exam, and determining the adjustments that

17   go on the revenue agent's report that calculates tax due and

18   owing.

19   Q     Did you prepare this document at Page 1?

20   A     Yes, I did.

21   Q     And turning to Page 2, through the rest of this exhibit,

22   what is this document?

23   A     This is the revenue agent's report for Patricia Hough,

24   for tax years ending in 2005, 2006, 2007, and 2008.

25   Q     Did you prepare this document?

1    A      Yes, I did.

2            MS. KESSLER:  Your Honor, I'd move Exhibit 30-I into

3    evidence?

4            THE COURT:  Any objections?

5            MR. HOCHMAN:  As a summary chart, Your Honor, no

6    objection.

7            THE COURT:  Exhibit 30I will be admitted.

8            (Government's Exhibit 30I was admitted into

9        evidence.)

10           MS. KESSLER:  Permission to publish?

11           THE COURT:  You may.

12           (An exhibit was projected onto the projector screen.)

13   BY MS. KESSLER:

14   Q     Now, if we could look first at Page 1 of this

15   document . . . we've walked through a number of summary

16   schedules that you prepared, where you were totaling income

17   items from all these accounts that you've reviewed.

18           What is reflected on this page, Page 1 of Exhibit 30-I?

19   A     The per-return figures and the adjustment figures for

20   interest dividends, short-term capital gains and losses,

21   long-term capital gains or losses, and miscellaneous investment

22   expenses.

23   Q     The entries for per return, can you explain to the jury

24   what that means?

25   A     That means when you actually look at the return and make

1    sure that -- the per return is the interest that appears as

2    reported on the return, that Mrs. -- that Dr. Hough filed.

3    Q      Okay.  And that would be the same for each of these

4    entries, per return for dividends would be the dividends that

5    you saw reported on the filed income tax return?

6    A      Yes.

7    Q      Now, what did the entries per exam mean?

8    A      That's when I go to my income summaries, and I . . .

9    where it's totaled up for the year; like interest per exam is

10   all the interest that totals up for my spreadsheets, added with

11   the 6481.  That means that this was the amount of interest that

12   should have been reported.

13   Q      On the tax return --

14   A      On the tax return.

15   Q      And what does the description of adjustment mean?

16   A      It's the difference.  It would be the difference between

17   per return and per exam, the adjustment is what the tax due and

18   owing would be calculated on.

19   Q      So is the adjustment the additional amount that should

20   have been reported?

21   A      Yes.  It should be the additional amount.

22   Q      Now, if we walk down to short-term capital gains and

23   long-term capital gains, can you explain to the jury the

24   difference between short-term and long-term capital gains?

25   A      Short-term are investments held less than a year, and

1   long-term are investments held more than a year.

2   Q       And are they treated differently for tax purposes?

3   A       There is a different tax treatment for long-term capital

4   gains.

5   Q       Now, moving further down this page, under miscellaneous

6   expenses, what expenses fall within here that we've spoken

7   about today?

8   A       The investment expenses that are attributable to the

9   investment income for the . . . income –– the adjustments for

10  interest, dividends, and capital gains.

11  Q       Now, there's an entry here, less two percent AGI.

12          Can you explain what that means?

13  A       These expenses are allowed to exceed two percent of the

14  adjusted gross income reported on the return, or as adjusted

15  per the revenue agent's report.

16  Q       So only after you've exceeded two percent are they

17  deductible?

18  A       Right.  Right.

19  Q       So are you applying that percentage to the total

20  expenses and then coming to the allowable amount?

21  A       Yes.

22  Q       Now, did you use the figures contained in this, Page 1

23  of Exhibit 30I, to prepare the RAR, which starts at Page 2 of

24  this document?

25  A       Yes.

1   Q     Can you explain what this -- we have been referring to

2   it as an RAR.

3         What is this document starting at Page 2?

4   A     RAR stands for "revenue agent's report"; but, as you

5   see, it's a Form 4549, and it's Income Tax Discrepancy

6   Adjustments.

7   Q     And what is this document used for?

8   A     It's used to calculate the balance due, the tax due and

9   owing, for the additional income that I have determined.

10  Q     Now, the entries for taxable interest, ordinary

11  dividends, and capital gain or loss, are those entries, for

12  example, for 2005, based on the figures that were reflected in

13  Page 1 of this document?

14  A     Yes.

15  Q     Can you explain . . . there are entries for itemized

16  deductions here for 2005.

17        Can you explain what that is?

18  A     That is -- the allowable investment expenses are 44,235,

19  but there's also additional limitations on Schedule A

20  deductions, and . . . and it further limits some of the

21  deductions, not just investment expenses but other deductions,

22  and . . . .  It calculates the amount allowable of Schedule A

23  deductions, which includes the additional investment expenses.

24  Q     So is this entry for Line D deductions that are being

25  allowed?

1    A      Those are -- yeah.  In the parenthesis, that means that

2    it's extra deductions being allowed.

3    Q      Okay.  And how much is the additional taxable interest

4    that you've determined should have been reported in 2005?

5    A      $45,695.

6    Q      And ordinary dividends?

7    A      $116.

8    Q      Capital gain or loss?

9    A      $195,960.

10   Q      And there's an entry here, also, at Line F, for standard

11   deduction.

12          Can you explain what that is?

13   A      This would be . . . that the -- itemized deductions

14   exceed the standard deduction, so they're taking away the

15   standard deduction and allowing the higher deduction for

16   itemized deductions.

17   Q      All right.  So the itemized deduction in this case was

18   determined to be more advantageous, in terms of tax --

19   A      Yes.

20   Q      -- advantageous for the taxpayer in terms of tax owed?

21   A      More advantageous for the taxpayer.

22   Q      Now, in determining the per-return items that were

23   reflected on Page 1 of Exhibit 30I, did you review the income

24   tax return filed by Dr. Hough for 2005?

25   A      Yes, I did.

1   Q       Was there an original return filed and an amended

2   return?

3   A       Yes.

4   Q       And did you review both?

5   A       Yes.  This would be as per the amended return.

6   Q       Okay.  Now, if we go back to Page 2 on -- we are on

7   Page 2.

8           What did you determine to be the total adjustments for

9   the year 2005?

10  A       Total adjustments are $205,749.

11  Q       And can you explain how that relates to Line 3, taxable

12  income per return?

13  A       Taxable income is the taxable income reported per . . .

14  in this case it would have been the amended return.  It's

15  adding $205,749 to her taxable income as reported.

16  Q       And does that get you to Line 4, what you believe to be

17  the correct taxable income for that year?

18  A       Yes, it does.

19  Q       And what is that amount?

20  A       $306,636.

21  Q       Now, did you then, at Line 5, determine the tax that

22  would be due on that amount?

23  A       Yes.

24  Q       And what was that?

25  A       $91,921.

1    Q       And then can you explain what Line 6 is?

2    A       It's alternative minimum tax.

3    Q       Is that an additional tax, or separate from the tax in

4    Line 5?

5    A       Yes.

6    Q       And can you explain what Line 7 is?

7    A       The total corrected tax liability of $104,001.

8    Q       And what does that mean?

9    A       That's the tax liability that should have been reported

10   on the return filed by Patricia Hough.

11   Q       Now, moving down to Line 10, there is an entry for

12   self-employment tax.

13           Can you explain that?

14   A       Okay.  I'm sorry.  $104,001 is the total income tax that

15   should have been reported.  She reported self-employment tax of

16   15,850, and that didn't change, so that's added into the total

17   corrected tax.  I'm sorry.

18   Q       All right.  And that's at Line 11?

19   A       Yes.

20   Q       So what is the total tax liability for 2005?

21   A       $119,851.

22   Q       What does Line 12 reflect?

23   A       That's the tax that was shown on the return as reported.

24   Q       And that's the amended return?

25   A       Yes.

1   Q       Now, moving down to Line 16, what is reflected there?

2   A       When you subtract what she reported, the $38,678, from

3   the $119,851, the balance due is $81,173 in tax.

4   Q       Now, there's an entry here, under filing status, in

5   Line 4.

6           Can you explain that?

7   A       That's as per return, and she filed married filing

8   separate.

9   Q       And so have you computed the tax here based on the same

10  filing status as was used when the return was filed?

11  A       Yes, same filing status.

12          Can I say something else?

13  Q       Actually, I think there has to be a question.

14  A       Oh, there has to be -- okay.

15  Q       Does the filing status need to be clarified in some way?

16  A       No.  I . . . I just failed to say that we have a

17  computer program that does most of this calculation.  We put in

18  the adjustments --

19  Q       Yes.

20  A       -- and we have a report-generation software that

21  calculates this -- it's a computer program that calculates

22  these things for us.

23  Q       That calculates the numbers --

24  A       Yes.

25  Q       -- the ultimate tax due?

Case 2:13-cr-00072-SPC-NPM   Document 122   Filed 10/25/13   Page 126 of 266 PageID 2465

SHEILA MAURER - DIRECT/KESSLER                126

```
1    A      The tax due, yes.

2    Q      Now, did you a similar computation for -- did you do a

3    similar computation of whether there was additional tax due and

4    owing for 2006, for Dr. Hough?

5    A      Yes, I did.

6    Q      And looking at Line 16, as to the year 2006, what did

7    you determine the tax due to be?

8    A      Based on the adjustments that I made, I determined that

9    she had additional losses, capital losses, she was entitled to

10   additional expenses.  So, in 2006, it's a refund of $2,282.

11   She overreported her tax liability.

12   Q      Now, did you hear testimony as to the ownership of Saba

13   and MUA during this trial?

14   A      Yes, I did.

15   Q      And did you see exhibits discussed by Mario deCastro,

16   where Dr. Fredrick and Dr. Hough identified themselves as the

17   owners of the schools for a potential sale in 2002 and 2003?

18   A      Yes, I did.

19          MR. HOCHMAN:  Objection, Your Honor, misstates the

20   testimony.

21          THE COURT:  Overruled.

22          The jury can remember what the testimony was, and the

23   witness will give her answer.

24   BY MS. KESSLER:

25   Q      Did you hear testimony from Steven Rodger regarding the
```

1    ultimate sale of the schools?

2    A      Yes, I did.

3    Q      And did Mr. Rodger testify that Dr. Hough and

4    Dr. Fredrick personally guaranteed the sale of the schools?

5    A      Yes, I did.

6    Q      Did Mr. Rodger testify that the bulk of the sales price

7    was allocated to the sale of Round Hill, and payable to New

8    Vanguard?

9    A      Yes, he did.

10   Q      Now, did you also look at evidence that Laura Walls, on

11   paper, purchased that land?

12   A      Yes, I did.

13   Q      Did you see evidence that Dr. Fredrick and Dr. Hough

14   bought that land from her for $17,000?

15   A      Yes, I did.

16          MR. HOCHMAN:  Objection, Your Honor, misstates the

17   testimony and the record.

18          THE COURT:  Same ruling.

19   BY MS. KESSLER:

20   Q      Did you see evidence that they sold the shares of Round

21   Hill to New Vanguard in 2005?

22   A      I've seen that.  And I've heard -- yes.

23   Q      And did you also see evidence that the sale -- did you

24   see any evidence that that sale had been reported on the 2005

25   income tax returns filed by Dr. Fredrick or Dr. Hough?

1    A        No.  That sale was not reported.

2    Q        Now, did you see any -- did you also see evidence as to

3    the ownership of New Vanguard?

4    A        New Vanguard is owned by Patricia Hough and David

5    Fredrick --

6              MR. HOCHMAN:  Objection, nonresponsive to the

7    question.

8              THE COURT:  Sustained.

9    BY MS. KESSLER:

10   Q        Did you see evidence of the ownership of New Vanguard?

11   A        Yes.

12   Q        Can you explain to the jury what "substance over form"

13   means?

14   A        "Substance over form" means that you can't just fill out

15   papers, or forms, and disguise what is really underneath

16   the . . . what the real underlying transaction is.

17   Q        Now, based on the evidence -- based on the evidence

18   we've just discussed, and other evidence, I'm going to ask you

19   to assume that the schools were owned by Dr. Fredrick and

20   Dr. Hough.

21             Based on that information, did you include the sale of

22   the schools in your tax computation for 2007?

23   A        Yes, I did.

24   Q        Now, your tax computation for 2007, did you also

25   determine that there was --

1              MS. KESSLER:  If we could pull up Page 2 of

2    Exhibit 30I --

3    BY MS. KESSLER:

4    Q      Did you also determine that there was additional taxable

5    interest that should have been reported in 2007?

6    A      Yes.

7    Q      And what was that amount?

8    A      $106,301.

9    Q      Did you determine that there were ordinary dividends

10   that should have been reported?

11   A      Yes.

12   Q      How much was that?

13   A      Forty dollars.

14             MS. KESSLER:  If I could have Exhibit 30-R marked as

15   an exhibit?

16             THE COURT:  You may.

17   BY MS. KESSLER:

18   Q      Can you tell the jury what exhibit -- or what is

19   Exhibit 30-R?

20   A      This is another work paper of mine.

21   Q      And is this your handwriting on this document?

22   A      Yes, it is -- well, the numbers are.  There's some down

23   at the bottom that's not mine.

24   Q      Some handwriting and -- of words?

25   A      Yes.

1    Q      What are you attempting to compute here?

2    A      I'm attempting to compute the basis for the sale of the

3    schools.

4    Q      And what is the information contained in this document

5    that you're using to do that?

6    A      This is a depreciation schedule that was included in

7    the . . . financial audits done by . . . I believe it was the

8    firm that Mr. Gallant worked for?

9    Q      Yes.

10   A      It's their depreciation schedules.  It shows the assets

11   that were purchased for the school, and the depreciation for

12   those assets.

13          MS. KESSLER:  Your Honor, I'd move Exhibit 30R into

14   evidence.

15          MR. HOCHMAN:  No objection, Your Honor.

16          THE COURT:  30R will be admitted.

17          (Government's Exhibit 30R was admitted into

18      evidence.)

19          MS. KESSLER:  Permission to publish?

20          THE COURT:  You may.

21          (An exhibit was projected onto the projector screen.)

22   BY MS. KESSLER:

23   Q      Can you explain to the jury what depreciation is?

24   A      Depreciation is a method to allow you an expense against

25   income in the year that it happened.  If you buy an asset,

1    let's say a car, you can't expense that item in the year you

2    bought it.  You have to expense it as you earn income related

3    to that asset.

4    Q     And does the asset have to be used as part of the

5    business for it to qualify for this?

6    A     Yes.  Yes.  It's a business.

7    Q     And so do you report a percentage of depreciation each

8    year going forward?

9    A     Yes, you do.  Until the item is fully depreciated.

10   Q     And how does that affect the cost, or the basis of that

11   item, for purposes of computing any tax if it is sold later?

12   A     The basis goes down every year that you hold the asset

13   and you depreciate it.

14   Q     And does the basis go down in the amount of the

15   depreciation that's taken?

16   A     Yes.

17          MS. KESSLER:  If I could approach and have

18   Exhibit 30-O marked as evidence?

19          THE COURT:  You may.

20   BY MS. KESSLER:

21   Q     What is Exhibit 30-O?

22   A     This is another work paper of mine.  I'm calculating the

23   basis for the sale of the schools.

24   Q     Did you prepare this document?

25   A     Yes, I did.

1              MS. KESSLER:  Your Honor, I'd move Exhibit 30-O into

2     evidence.

3              MR. HOCHMAN:  No objection as a summary chart, Your

4     Honor.

5              THE COURT:  30O will be admitted.

6              MS. KESSLER:  May I publish?

7              THE COURT:  You may.

8              (Government's Exhibit 30O was admitted into

9        evidence.)

10             (An exhibit was projected onto the projector screen.)

11    BY MS. KESSLER:

12    Q     What are you attempting to compute with this work paper?

13    A      This is the purchase price of the schools, minus the

14    basis that I've calculated to find the . . . the gain.

15    Q     Now, you know here that there's an entry here for

16    February 2nd of 2001, with a purchase price of $17,000.

17            What is this?

18    A      That's the purchase of the land, the Round Hill land.

19    Mr. Rodger stated that . . . the Round Hill property, he

20    stated, was just the land, but in the documents that I had and

21    I reviewed before his testimony, I thought Round Hill was the

22    land and the school . . . the buildings and the school property

23    on Round Hill.

24    Q     Okay.  What did you determine to be . . . what did you

25    determine to be the -- I guess, explain to me what you're

1    referring to just with regard to this $17,000 entry.

2    A       That's the $17,000 that was paid for -- to Laura Whitley

3    for the Round Hill property -- the Round Hill land.

4    Q       And did you treat that purchase price as the basis

5    related to that property?

6    A       Yes, I did.

7    Q       And moving down to the next entry, what -- you have an

8    entry here for June 1st, 2001, a campus building.

9            Where did you get this information from?

10   A       From the exhibit that you just showed me.

11   Q       30-R?

12   A       Yes.  30R.

13   Q       And did that -- those materials from Mr. Gallant's firm

14   indicate the cost paid for the campus building?

15   A       Yes, it does.

16   Q       And did you learn -- obtain information regarding

17   whether that building was depreciated from that?

18   A       Yes.

19   Q       Now, did you also compute any additional depreciation in

20   these computations?

21   A       Yes, I did.  I think the last schedule was 4/30/06.  So

22   the sale didn't happen until April of 2007, so there was

23   additional depreciation I had to calculate.

24   Q       And did you calculate that, and add it to the prior

25   depreciation that was taken?

1    A      Yes.   That's what I was doing here.

2    Q      And after taking into account the depreciation on the

3    campus building, what did you determine the basis for that

4    building to be?

5    A      $1,481,850.

6    Q      Now, did you go through the same process with regard to

7    these other items here, on Page 1 of 30-O, the library and

8    generator, etcetera?

9    A      Yes, I did.

10   Q      Then, once you determined the basis as to each of these,

11   were you able to, to the best of your ability, determine the

12   taxpayer's basis in the property . . . known as Round Hill?

13   A      Yes.

14   Q      And what did you determine that to be?

15   A      $3,163,623.

16   Q      Now, is that entry a total of all those numbers above

17   it, in the column under basis?

18   A      Yes.

19   Q      If we turn to Page 2 of this document, you indicate here

20   the sales price of Round Hill is $33,944,000.

21          Where did you obtain that figure from?

22   A      From the . . . sales contract.  It was the one that

23   Mr. Rodger had.

24   Q      And then did you reduce that sales price by the basis

25   you determined on Page 1 of 30-O?

1   A       Yes.

2   Q       And what did you determine to be the gain on the sale

3   from Round Hill?

4   A       30,780,377 -- well, $30,780,377.

5   Q       Now, moving to the next entry, you indicate a sales

6   price here for Saba University School of Medicine for $988,997.

7           Where did you obtain that information?

8   A       From the sales contract.

9   Q       The sales contract Mr. Rodger testified to?

10  A       Yes.

11  Q       What did you determine the taxpayer's basis in the Saba

12  University School of Medicine to be?

13  A       There was no basis in that.

14  Q       Now, how did you -- why did you determine that there was

15  no basis in this?

16  A       Because all the assets were in Round Hill.

17  Q       Okay.  Now, did you determine whether there was a gain

18  on the sale of the Saba University School of Medicine?

19  A       Yes.

20  Q       And what was that?

21  A       $988,997.

22  Q       Now, next is indicated the sale . . . sales price for

23  MUA.

24          Where did you obtain the figure you have there, for the

25  price of $2,541,572?

1    A        From the sales contract.

2    Q        Was that the sales contract Mr. Rodger testified

3    regarding?

4    A        Yes.

5    Q        Now, you indicate here that you've allowed a basis for

6    this property of the same amount, resulting in no gain or loss

7    on the sale; is that correct?

8    A        Right.

9    Q        Why have you treated this portion of the sale in that

10   manner?

11   A        Mostly because I didn't have enough documents to

12   determine the basis in Medical University of the Americas, so

13   it's neither a gain nor a loss.

14   Q        So you treated this the same way that you treated the

15   sales of securities in the accounts we were talking about

16   earlier --

17   A        Um-hum.  Yes, I did.

18   Q        -- where you couldn't determine the basis.

19   A        I'm sorry.  Yes, I did.

20   Q        Now, last year you have a gain on sale of medical

21   schools.

22            What is that amount?

23   A        31,769,374 dollars.

24   Q        Does that total the figures above it, in the right-hand

25   column?

1    A       Yes, it does.

2    Q       And what year did the sale of the medical schools occur?

3    A       2007.

4    Q       Then below this you have a note.

5            Can you explain that?

6    A       Yes.  This is, again, that I am applying half to

7    Patricia Hough, and half to David Fredrick.  This was jointly

8    owned by them, these properties, so 50 percent is attributable

9    to Patricia Hough, and 50 percent to David Fredrick.

10   Q       Now, if we go back to Exhibit 30I, at Page 2, your

11   revenue agent report . . . .

12   A       Okay.

13   Q       You have an entry here for capital gains of -- for 2007.

14           Can you explain that?

15   A       Could I refer to the first document?

16   Q       Yes.  You want to look at 30I, Page 1, first?

17   A       Yes.  All right.  She had no short-term --

18   Q       Are we looking at the 2007 column for long-term capital

19   gains?

20   A       Yes.

21   Q       Okay.  Can you explain how you reached the number that

22   was reported on the RAR?

23   A       She reported a long-term capital gain of $6,106.  I

24   added in my long-term capital gain of 15 million -- well, if

25   you add the 6,106 to my gain on the school, of $15,890,793, the

1    long-term capital gain . . . the adjustment for my long-term

2    capital gains is $15,884,687.

3    Q       Now, if Dr. Fredrick and Dr. Hough had owned Saba and

4    MUA, would they have been required to each report half of the

5    net profits for the school?

6    A       Yes, they would have.

7    Q       And did you see any indication that they did so in the

8    years 2005, 2006, and 2007?

9    A       They did not.

10   Q       Now, did you see evidence that the schools were

11   profitable presented here during the trial?

12   A       Yes, I did.

13   Q       Do you recall the financial statements that were

14   prepared by Mr. Schneider and presented as evidence?

15   A       Yes.

16   Q       Did those show that the schools were profitable?

17   A       Yes.

18   Q       Did you also see statements prepared by Mr. Gallant, and

19   presented into evidence?

20   A       Yes, I did.

21   Q       And were those also -- did those also indicate that the

22   schools were profitable?

23   A       Yes.

24   Q       Now, did you also recall seeing a letter among documents

25   reviewed by Mr. DeCastro, when he was on the stand, where

1    Dr. Fredrick set forth the profitability of the schools?

2    A       Yes, I did.

3    Q       And did that letter also indicate that the schools were

4    profitable?

5    A       Yes, it did.

6    Q       Now if, in fact, the schools were profitable, and the

7    net profits of the schools had been included on Dr. Hough and

8    Dr. Fredrick's income tax returns, would that have increased

9    the tax due and owing?

10   A       Yes, it would have.

11   Q       Now, did you include any profits from the schools in

12   part of your computation?

13   A       I did not include profits from the school.

14   Q       Why not?

15   A       That would have been based on estimates.  I would have

16   needed more information to come up with a more reliable figure.

17   Q       Now, looking back at the RAR, Page 2, Exhibit 30I, what

18   did you determine the additional tax due and owing for 2007 to

19   be?

20           (An exhibit was projected onto the projector screen.)

21   A       $2,429,118.

22   Q       And if we turn to Page 4, what did you determine the

23   additional tax due and owing to be for 2008?

24   A       $654,022.

25   Q       Now, if we turn to Exhibit 30-K, which is also in that

1    same binder, do you recognize this document?

2    A     This is my same work paper to reconcile my income

3    summary items to the return.

4    Q     And did you prepare this document?

5    A     Yes, I did.

6    Q     And behind it, what is this document, starting at

7    Page 2?

8    A     This is the revenue agent's report, or the Form 4549

9    Income Tax Discrepancy Adjustments, for David Fredrick.

10   Q     And did you prepare this document as well?

11   A     Yes, I did.

12              MS. KESSLER:  I'd move Exhibit 30K into evidence.

13              MR. HOCHMAN:  No objection to the summary chart, Your

14   Honor.

15              THE COURT:  Give me the number again, please; J --

16              MS. KESSLER:  K, like "king."

17              THE COURT:  30K will be admitted.

18              (Government's Exhibit 30K was admitted into

19        evidence.)

20              MS. KESSLER:  Permission to publish, Your Honor?

21              THE COURT:  You may.

22              (An exhibit was projected onto the projector screen.)

23   BY MS. KESSLER:

24   Q     Did you determine whether there was a tax -- move to

25   Page 2, please.

1    Did you determine whether there was a tax due and owing

2    for Dr. Fredrick, the same as you did for Dr. Hough?

3    A      Yes, I did.

4    Q      And did you do so in the same manner that we discussed a

5    few moments ago, with regard to Exhibit 30I?

6    A      Yes, I did.

7    Q      What did you determine the tax due and owing to be for

8    2005?

9    A      $68,119.

10   Q      And for the year 2006?

11   A      For the same reasons as before, he . . . gets a refund

12   of $6,170.

13   Q      And as to the year 2007?

14   A      $2,421,750.

15   Q      And moving to Page 4, did you make a determination as to

16   the year 2008?

17   A      Yes.

18   Q      What was that?

19   A      $672,130.

20   Q      Now, if Dr. Fredrick had owned the medical schools with

21   Dr. Hough, would half of the net profits from the school also

22   be reportable on his individual income tax returns?

23   A      Yes, they would.

24   Q      And would that have increased the tax due and owing for

25   each of these years?

1   A       Yes, it would have.

2   Q       Did you bring your calculator up with you?

3   A       Yes, I did.

4   Q       Can you total up the amounts for the tax due and owing

5   as to all four years for both Dr. Fredrick and Dr. Hough?

6               MR. HOCHMAN:  May I have a clarification, Your Honor?

7               We're talking about the years 2005, '6, '7, and '8?

8               MS. KESSLER:  Yes.

9               THE COURT:  That's fine.

10              THE WITNESS:  I have $3,162,031.

11  BY MS. KESSLER:

12  Q       Is that for whom?

13  A       That would be for Patricia Hough.

14  Q       And if you included, also, the tax due and owing related

15  to Dr. Fredrick?

16  A       I'm just checking things.  I believe my calculator -- I

17  believe I didn't do that right.  Hang on, let me double-check,

18  okay?

19  Q       Sure.

20              (The witness calculates figures with her calculator.)

21  A       I apologize.  I keep getting an error.

22              (The witness continues to use her calculator.)

23  A       $6,317,860.

24  Q       Now, did you, as part of --

25              MR. HOCHMAN:  And just so I'm clear, was that the

1    separate amount for Dr. Fredrick, or the combined amount

2    between Dr. Fredrick and Dr. Hough?

3              THE COURT:  I don't know.

4              THE WITNESS:  I'm sorry, I was answering the question

5    of the combined amount.

6    BY MS. KESSLER:

7    Q     That was Dr. Fredrick and Dr. Hough?

8    A     Yes.

9    Q     Thank you.

10          As part of your computations . . . or . . . .  Did you

11   review Dr. Hough's individual income tax returns for the years

12   2003 through 2008, in your work here?

13   A     Yes, I did.

14             MS. KESSLER:  I would like to approach and hand the

15   witness Government's Exhibit 25, which has been admitted into

16   evidence, Your Honor?

17   BY MS. KESSLER:

18   Q     Do you recall hearing testimony from Mr. Murtha that UBS

19   had gotten into some legal troubles that were in the news,

20   which prompted him to ask his clients regarding foreign bank

21   accounts?

22   A     Yes.

23   Q     Is this the deferred -- referring to Exhibit 25, is this

24   the deferred prosecution agreement for UBS?

25   A     Yes, it is.

1   Q       And pursuant to this agreement, was UBS required to

2   disclose client account information to the United States

3   Government?

4   A       Yes, it was.

5   Q       What is the date of this agreement?

6   A       February 18th, 2009.

7   Q       And do you recall whether Dr. Hough told Mr. Murtha

8   about any of the foreign bank accounts that you reviewed today?

9   A       She did not.

10  Q       And did Dr. Hough report her interest in, or signature

11  authority over, any of these foreign accounts we've reviewed on

12  her 2003 through 2008 individual income tax returns?

13  A       No, she did not.

14          (Ms. Finley and Ms. Kessler confer privately.)

15  BY MS. KESSLER:

16  Q       Did you also review Dr. Hough's 2001 individual income

17  tax return?

18  A       Yes, I -- yes, I did.

19  Q       Did Dr. Hough report the existence -- or excuse me, her

20  interest in, or signature authority over, a foreign bank

21  account in 2001?

22  A       She did not.

23          MS. KESSLER:  Your Honor, I have no further

24  questions.

25          THE COURT:  All right.  Thank you.

1             Ladies and gentlemen, at this point, as you know from

2    experience, normally defense counsel would be given the

3    opportunity to cross examine the witness.  We're going to

4    deviate from that a little bit.

5             There is a witness from out of town that needs to

6    leave town again.  So the defense will be authorized, by the

7    agreement of the parties, to call this witness out of turn.

8             So even though the government hasn't finished the

9    case yet, this will be a defense witness that's being called.

10            And you may proceed.

11            MR. SAUNDERS:  Thank you, Your Honor.

12            The defense calls Dr. Alan Gruber.

13            MS. KESSLER:  Your Honor, is it okay if we leave the

14   binders up here?

15            THE COURT:  Sure.  That shouldn't get in the way.

16            (The witness left the witness stand and left the

17       courtroom.)

18            THE COURT:  Come forward, please.  Right up here,

19   Doctor.

20            THE COURTROOM DEPUTY:  If you would raise your right

21   hand, please.

22            Do you solemnly swear or affirm to tell the truth,

23   the whole truth, nothing but truth, in the case now before the

24   Court?

25            THE WITNESS:  I do.

1              THE COURTROOM DEPUTY:  You may have a seat.

2              If you would, state your full name, spelling your

3    last.

4              THE WITNESS:  Alan, A-L-A-N; middle name is Robert;

5    last name is Gruber, G-R-U-B-E-R.

6              THE COURTROOM DEPUTY:  Thank you.

7              THE COURT:  Doctor, you might want to pull that

8    microphone a little bit closer to you.

9              THE WITNESS:  Does that work?

10             THE COURT:  Sure.

11                         ALAN GRUBER,

12   called as a witness by the Defendant, and having been first

13   duly sworn, was examined and testified as follows:

14                      DIRECT EXAMINATION

15   BY MR. SAUNDERS:

16   Q     Good afternoon, Dr. Gruber.

17   A     Good afternoon.

18   Q     Where do you live?

19   A     Cohasset, Massachusetts.  So if I talk funny . . . .

20   Q     Did you fly down here today just to testify?

21   A     I did.

22   Q     Thank you for that.

23         What is your profession?

24   A     I'm a medical psychologist.

25   Q     How long have you been practicing?

1    A       I have been practicing in mental health and health care

2    for . . . 50 years?

3    Q       Fifty, five-zero?

4    A       Five-zero, yes.

5    Q       And how long have you been a medical psychologist?

6    A       Well, medical psychology is a relatively new field, as

7    things go, so I got board certified about, probably, 17 or

8    18 years ago.

9    Q       What is medical psychology?

10   A       Well, it's a combination -- it -- essentially it's

11   behavioral difficulties that are caused by physical problems,

12   as opposed to straight psychiatric things.

13           So I deal with things like Alzheimer's disease, and

14   people who have had strokes, and things that are physically

15   based, and the behavioral difficulties that come from that, as

16   opposed to primary psychiatric disorders.

17   Q       Would you please tell the jury a little about your

18   educational background, where you got your degrees?

19   A       Well, I started as a nurse . . . after I was in the

20   army.  And I was a combat medic.  And back then one could

21   challenge the nursing exam.  So I challenged the exam, became a

22   nurse, worked my way through college, became a social worker,

23   got a master's degree in social work --

24   Q       Where was that?

25   A       That was at Boston University.

1       Then I was a gang worker for a while, got a master's

2   degree in social work -- or did I say that -- from Boston

3   University, and then got a doctor's degree in social work from

4   Columbia University.

5       When I finished my -- or when I was in my doctor's

6   degree at Columbia, I got interested in brain function, so I

7   did a fellowship in neuropsychology, which is brain behavior

8   relationships, at Tufts New England medical center, and Tufts

9   medical school.  That made me a neuropsychologist back then.

10      I then got a Ph.D. in clinical psychology -- actually,

11  it was a Ph.D. in clinical psychology in medicine, because it

12  was with Tufts medical school.

13      And then I went -- then I . . . I had started medical

14  school at Tufts, stopped for a while, and then went to Saba

15  medical school and got my M.D.

16  Q       So you're a graduate of Saba University --

17  A       Correct.

18  Q       -- Saba University School of Medicine; correct?

19  A       Correct.

20  Q       And do you have another connection with Saba University

21  through your family members?

22  A       Well, my daughter taught there.  I also was . . . headed

23  up some research that we did at Saba.  And I was also a

24  professor at Saba when we developed -- we were trying to

25  develop a combined degree in a doctor of psychology, doctor of

1    medicine, concurrently.

2    Q      And we'll talk about that in just a moment.

3           Do you know Dr. Patricia Hough and her husband,

4    Dr. David Fredrick?

5    A      I do.

6    Q      When did you first meet them?

7    A      Probably around 1997, I would think that would be

8    my -- '96 and '97.

9    Q      What were the circumstances of your meeting?

10   A      We were introduced by a mutual friend, because he knew

11   that I had some interest in the medical psychology area, and he

12   knew that Saba was interested in some of those things.  And so

13   we were introduced, and the relationship developed from there.

14   Q      Now, you mentioned a moment ago this joint degree

15   program that you were developing.

16          What was that about?

17   A      It's complicated, so I won't bore you; but trying

18   to . . . factor it down, is that there's a movement -- or there

19   has been a movement in the United States, over the past 20 or

20   25 years, trying to get psychologists to be able to prescribe

21   medications as well as doing psychotherapy.  And there are some

22   states, and the military, and the Bureau of Indian affairs, for

23   instance, where psychologists do prescribe.

24          And one of the things that I felt strongly about is that

25   if psychologists are going to have the skills to prescribe,

1    they should really be fully qualified in medicine.  And so what

2    the Psy.D.–M.D. program was, was a program designed to compress

3    both the M.D. and the doctor's degree in psychology into a

4    five-year program so that, at the end of five years, someone

5    would graduate with both a doctor's degree in psychology and a

6    doctor's degree in medicine, and be qualified in both areas.

7    Q       So the doctor's degree in psychology, that's called a

8    Psy.D.; correct?

9    A       Correct.

10   Q       And the doctor's degree in medicine is the M.D.

11   A       Yes.

12   Q       Was it important for this program to have the Psy.D.

13   portion of the joint program housed in the United States, as

14   opposed to in the Caribbean?

15   A       Yes.  That's the only way it could function.  You could

16   not get a license -- unlike medicine, one would think that --

17   ordinarily one would think that medicine is more strict than

18   psychology.  Actually, psychology is more strict.  You cannot

19   get a license to practice psychology unless you've graduated

20   from a school that's accredited by the regional accrediting

21   organizations, and they only accredit schools that are based in

22   the United States and Canada.

23          Now, that may be different today, and if it is, I don't

24   know it; but certainly, back then, you had to be United States

25   or Canada based.

1    Q      So despite all the accreditations for Saba and the

2    Medical University of the Americas, they could not be

3    accredited for psychology; is that correct?

4    A      Correct, if someone wanted to practice psychology.  I

5    mean, they could give a doctor's degree in psychology, but that

6    person could not qualify to practice.

7            MS. FINLEY:  Your Honor?  I'm sorry.  Could we just

8    have a timeframe?

9            He said "back then," or, "back when."  I'm not sure

10   what time period we're talking about.

11           THE COURT:  Sure.

12   BY MR. SAUNDERS:

13   Q      When did you first begin developing this idea?

14   A      This would have been around 2000.

15   Q      And did you -- well, was this your idea to begin with,

16   this joint program?

17   A      I think so.

18   Q      Did you present it to Dr. Fredrick?

19   A      Yes.  We discussed it at length.

20   Q      And was he interested in pursuing that with you?

21   A      Very.

22   Q      Did you start working with Dr. Fredrick on developing

23   that program together, at Saba?

24   A      Yes.

25   Q      Was this while you were a medical student or while you

1   were teaching?

2   A      Sort of both.  It was really concurrent for me, because

3   at that point I had two doctor's degrees.  I was qualified to

4   be faculty, but I was also a student.

5   Q      How long did you and Dr. Fredrick work on setting up

6   this joint Psy.D.-M.D. program?

7   A      I would say five or six years.

8   Q      What took so long?

9   A      Dealing with political elements of accreditation, and

10  the concerns about marginalization of established

11  professionals, and licensing, is a very big deal, and it

12  doesn't go easily.

13  Q      Do you know if the program that you were developing with

14  Dr. Fredrick was presented to the board of the school?

15  A      Yes.

16  Q      And was it?

17  A      Yes.

18  Q      Did the board approve exploring and funding the

19  development of this joint degree program?

20          MS. FINLEY:  Objection, Your Honor, foundation as to

21  which school.

22          THE COURT:  Sustained.

23  BY MR. SAUNDERS:

24  Q      Well, you were teaching at Saba; correct?

25  A      Correct.

1    Q     And are you familiar with the Medical University of the

2    Americas?

3    A     Yes.

4    Q     Were you aware that both of those schools were . . .

5    well, that both every those schools were developed by a

6    foundation called the Saba Foundation -- I'm sorry -- the Saba

7    School of Medicine Foundation?

8              MS. FINLEY:  Objection, leading.

9              THE COURT:  Sustained.

10   BY MR. SAUNDERS:

11   Q     Do you know who owned the Saba school?

12   A     I don't believe anyone owned it.  My understanding was

13   that it was a nonprofit organization.

14   Q     And was the program that you were developing --

15   withdrawn.

16         Were you aware that Dr. Fredrick was also involved with

17   the Medical University of the Americas on Nevis?

18   A     Yes.

19   Q     Was the program that you were developing for possible

20   implementation tied to one particular school or the other, or

21   for both schools, if you recall?

22   A     I think we were . . . originally, it was Saba, then it

23   started to move to MUA, and it was really up in the air in

24   terms of which school it was going to be with.  But we were

25   really thinking, at that point, to have it at both schools.

1    Q      And do you recall which board the idea was presented to,

2    whether it was the board of Saba, or the board of . . . .  MUA,

3    or the board of a nonprofit?

4    A      I'm afraid I don't know that.  I do know that it was

5    approved by the board, but my -- I don't have a recollection in

6    terms of which specific board it was.

7    Q      Do you recall that the approval extended to funding the

8    development of the program?

9              MS. FINLEY:  Objection, Your Honor, leading.

10             THE COURT:  Sustained.

11   BY MR. SAUNDERS:

12   Q      Do you recall whether the board's approval included

13   funding the development of the program?

14   A      Yes.

15   Q      Did it?

16   A      It did; yes.

17   Q      Were you paid for the work?

18   A      No.

19   Q      Was Dr. Fredrick paid for the work?

20   A      I don't know.

21   Q      Why were you doing it?

22   A      Because I believed that it, to this day, would have been

23   a terrific program, and it's a shame it didn't happen.

24   Q      It actually never happened?

25   A      It never happened.  It should have.

1   Q      While you were working on the program with Dr. Fredrick,

2   did you and he have discussions regarding buying or leasing a

3   property in the United States in connection with that program?

4   A      Yes.

5   Q      What were you looking for in that regard?

6   A      Well, because of what I've already mentioned about the

7   Psy.D. requirement being -- it had to be based in the United

8   States in order to be accredited for the psychology side of

9   things, I had personally spoken, or met with, a number of

10  different universities, and I know that Dr. Fredrick did as

11  well, in terms of trying to establish a base for the -- for the

12  program.

13  Q      For the Psy.D. portion?

14  A      Correct.

15  Q      And what was the purpose in looking for properties . . .

16  or houses, or other properties?

17  A      Basically to have an academic base for the program where

18  one could run classes, house students, have administrative

19  offices, set up research divisions, etcetera.

20  Q      Was it important to have that property located in

21  proximity to whatever university you were partnering with for

22  the Psy.D. portion of the program?

23  A      Yes.

24  Q      Was that for the reasons you just explained, housing,

25  and --

1    A      Yes.  It would have been sort of silly to start

2    reinventing the wheel from scratch.

3    Q      Did you and Dr. Fredrick go look at any properties

4    regarding this?

5    A      Yes.

6    Q      Where did you look?

7    A      I looked at a school in Quincy, Massachusetts, Eastern

8    Nazarene.  I looked at Curry College in Massachusetts.  I met

9    with and looked at the Massachusetts School of Professional

10   Psychology, in Massachusetts.  I met with people from New

11   Mexico, I believe it was the University of New Mexico.  I met

12   with people from Louisiana, and I'm afraid I don't remember

13   which school it was there.

14          But those . . . at least those, and there were others

15   that sort of fade at this point.

16   Q      Was Dr. Fredrick meeting with schools as well?

17   A      Yes.

18   Q      Were they different schools from the ones you were

19   meeting with?

20   A      We met together with some of them, and he met separately

21   with some of them.

22   Q      Do you know all the schools he met with in terms of

23   exploring the program?

24   A      I probably did at that time.  I don't know now.

25   Q      Did you ultimately acquire any properties in connection

1    with developing the program?

2    A      No, we did not . . . not that I know of, at least.

3    Q      And by the way, who did you understand would be paying

4    for this property if you found it?

5    A      The medical school, the university.

6           MR. SAUNDERS:  Your Honor, may I approach the witness

7    with Defense Exhibit 270, for identification?

8           THE COURT:  You may.

9    BY MR. SAUNDERS:

10   Q      Dr. Gruber, do you recognize Defense Exhibit 270?

11   A      Yes.

12   Q      And what is that?

13   A      That's a brochure describing the Psy.D.-M.D. program at

14   MUA.

15   Q      Did you take part in the creation of this brochure?

16   A      Yes.

17   Q      In fact, it lists your name among the faculty and

18   administration on Page 6; correct?

19   A      Yes.

20          MR. SAUNDERS:  Your Honor, move Defense Exhibit 270

21   into evidence and ask permission to publish?

22          MS. FINLEY:  Objection, Your Honor, foundation, as to

23   when this was created.

24          THE COURT:  All right.  Sustained.

25

1   BY MR. SAUNDERS:

2   Q      Do you recall when this was created?

3   A      I can give a pretty good guess.

4   Q      Well, if it's an educated guess based on your

5   recollection, that's fine.

6   A      Yes.  It would have been around 2002.

7   Q      2002?

8   A      2002, 2003.

9          MR. SAUNDERS:  Move it into evidence, Your Honor, and

10  ask permission to publish?

11         MS. FINLEY:  No objection, Your Honor.

12         THE COURT:  Exhibit 270 will be --

13         THE WITNESS:  Actually, I need to correct that.  I

14  think it probably would have been later.  I'm going to say more

15  like 2004/2005.  Sorry about that.

16         THE COURT:  Still no objection?

17         MS. FINLEY:  No objection, Your Honor.

18         THE COURT:  All right.  Exhibit 270 for the defendant

19  will be admitted, and may be published.

20         (Defendant's Exhibit 270 was admitted into evidence.)

21         (An exhibit was projected onto the projector screen.)

22  BY MR. SAUNDERS:

23  Q      Now, Dr. Gruber, what was the purpose in creating this

24  brochure?

25  A      This specific brochure was what we were using to sort of

1    test out the idea.  The most vivid recollection that I have

2    about it is that -- and the reason why I corrected what I just

3    said is because -- the American Psychological Association has

4    its meetings in the summer, in each summer every year, and

5    there are generally about 25 or 30,000 psychologists that show

6    up, wherever the meeting is.  Many of those people are

7    academics.

8         And we had taken a display table in order to . . . begin

9    to let faculty members of undergraduate schools know about the

10   existence of the program.  And we had also, I believe, sent out

11   a poster to . . . like five or six hundred different

12   undergraduate schools prior to that time.

13        So the purpose of it was to begin to make sure that

14   people knew about it.

15        I would . . . .  We weren't ready, at that point, to

16   bring in new students, because, as I just said, the meetings

17   are held in the summer, and by the summertime everyone knows

18   where they're going to go to graduate school by then, so it

19   would have been for the year after that, or two years after

20   that.

21   Q    So to the extent that this brochure is presenting

22   curriculum and inviting applications, was this an

23   up-and-running program at the Medical University of the

24   Americas at the time that this was issued?

25   A    It wasn't up and running in the sense that there were

1    students enrolled, but it was ready to roll.  It was ready to

2    go.

3    Q      You said it ultimately didn't get off the ground.

4           Why was that?

5    A      Primarily because, though we were ready to roll, as I

6    said, we couldn't line up the psychology piece of it.  We

7    couldn't get a partner, at that point, for the doctor of

8    psychology side.  And we didn't want to go ahead with an

9    international Psy.D. because we knew that we were then going to

10   be preparing students who would come back to the United States

11   and Canada, and though they could practice medicine, they

12   couldn't practice psychology.

13   Q      At some point were you forced to suspend or cease your

14   involvement in developing this program?

15   A      Yes.

16   Q      When was that, and why?

17   A      That would have been around 2006 or 2007.  And I

18   developed a disease called myasthenia gravis, which is a . . .

19   which ranges between a mild . . . disease that causes double

20   vision, to a disease that causes death.  And unfortunately I

21   got the latter type.  It was generalized myasthenia gravis, and

22   I crashed.  So I was in pretty bad shape for about a year.

23   Q      At the time that you became ill, were you and

24   Dr. Fredrick still trying to create this program?

25   A      Yes.

1  Q      And do you know whether Dr. Fredrick continued trying to

2  develop and find a home for the program after you became ill

3  and dropped out?

4  A      Yes.

5  Q      He did?

6  A      Yes, he did.

7  Q      Was he passionate about the program?

8  A      Yes.

9  Q      Is Dr. Fredrick, to your knowledge, the kind of person

10  who . . . likes creating things, particularly in the academic

11  field?

12           MS. FINLEY:  Objection, Your Honor, foundation.

13           THE COURT:  Sustained.

14  BY MR. SAUNDERS:

15  Q      Did you stay informed about Dr. Fredrick's success with

16  the program while were you ill . . . or his progress with the

17  program?

18  A      Somewhat.  Pretty minimally.  I mean, I was . . . .  I

19  was so sick that . . . it really was a back-burner issue for me

20  at that point.

21  Q      So do you know what schools he was seeking to partner

22  with, or what he was doing to try to develop the program while

23  were you dealing with your illness?

24           MS. FINLEY:  Objection, foundation.

25           THE COURT:  Sustained.

1        MR. SAUNDERS:  The question was, "do you know."

2        MS. FINLEY:  I think he said he had minimal

3   involvement.

4        THE COURT:  I'll take a yes or no, and then take it

5   from there.

6        MR. SAUNDERS:  Okay.

7   BY MR. SAUNDERS:

8   Q     Do you know what Dr. Fredrick was doing in connection

9   with developing the program, such as what schools he was

10  meeting with, or anything else he was doing at that time?

11  A     No.  I only know that he was.  I don't know which

12  schools.

13  Q     Now, are you aware that the Saba school and MUA were

14  sold in April, 2007?

15  A     Yes.

16  Q     And do you know if, after that sale, Dr. Fredrick and

17  Dr. Hough remained under contract with those schools for --

18        MS. FINLEY:  Objection, Your Honor, foundation.

19        MR. SAUNDERS:  It's, "do you know."

20        THE COURT:  I'll take a yes or no, but it has to be

21  hearsay.

22        THE WITNESS:  Yes.

23  BY MR. SAUNDERS:

24  Q     Well, you were . . . at some point you recovered from

25  your illness; correct?

1    A       Yes.

2    Q       Did you know --

3    A       Well, it's in remission.  I've still got it,

4    regrettably.

5    Q       And when was that, that you went into remission?

6    A       About 2009 . . . 2008/2009.

7    Q       And do you know, based on your own observations, whether

8    at that time Dr. Fredrick and Dr. Hough were still working in

9    connection with Saba University and MUA?

10   A       Yes.

11   Q       And they were?

12   A       I knew that they were connected.

13   Q       Could we look at Page 3 of this exhibit, please?

14           And on Page 3 -- this is the one that's shown up on the

15   screen, if you can match it -- does this list the curriculum

16   that had been designed for this combined-degree five-year

17   program?

18   A       Yes.

19   Q       And how was this actually to work, in terms of how the

20   five years would be spent and where they would be spent.

21   A       Well, essentially, a student would come to the island

22   and spend about two years -- I haven't looked at this for a

23   while, so this will be by recollection, but spend about two

24   years in class work, doing the combined medical and psychology

25   work that's described here.

1        Somewhere in the third year, they would then come to the

2   United States.  And, at that point, we would combine further

3   classwork and the clinical work that's necessary, both for the

4   Psy.D. and the, M.D., and finish off the five years.

5   Q      So the first stage after the basic science program on

6   the island, on Nevis in this case, would be in the U.S., doing

7   classwork for the psychology portion?

8   A      I'm sorry, say that again.

9   Q      After the initial two years, or two-plus years on the

10  island, would the next portion then be classwork in the U.S.,

11  at whatever university was being partnered with for the

12  program?

13  A      Yes.

14  Q      And then that would be followed by the students'

15  clinical rotations?

16  A      Correct.

17  Q      Which would extend the basic four-year, M.D. program to

18  the five years; is that correct?

19  A      Yes.

20  Q      While you were working with Dr. Fredrick on the

21  Psy.D.-M.D. program, were you down in Saba at the time?

22  A      Yes.  Off and on.

23  Q      And what was Dr. Hough working on, if you know?

24  A      She was totally absorbed, as I recall, by the

25  accreditation processes.  She was working very hard to make

1    sure that Saba and MUA received all the proper accreditations

2    so that students who graduated were able to practice in the

3    United States and Canada.

4           This may be more than you want to know is relevant, but

5    in the United States, New York, California, and Florida have

6    separate accreditation processes, so that even if one goes to

7    an international school, in many . . . in New York, California,

8    and Florida, you still could not practice unless those states

9    have accredited the medical school.

10          And Saba is one of the very few international medical

11   schools where a student can graduate and practice anywhere in

12   the United States and Canada because of that.  And Dr. Hough

13   was the person, as far as I know, who really was totally

14   responsible for that, and was working to bring that about with

15   MUA as well.  She had already achieved it, at that point, for

16   Saba, as I recall.

17   Q    Was that pretty much a full-time job for her, if you

18   recall?

19   A    I can't believe that it wasn't.

20   Q    Moving on, are you familiar with an organization called

21   the Salvadorian Association for Rural Health?

22   A    Yes.

23   Q    Is that organization also known as ASAPROSAR?

24   A    Yes.

25   Q    That's A-S-A-P-R-O-S-A-R.  And is that an acronym for

1    the Spanish for Salvadorian Association for Rural Health?

2    A      Yes.

3    Q      Which I won't try to pronounce, but perhaps you can.

4    A      Asociacion Salvadorena Pro Salud Rural.  I can't say it.

5    Q      We'll just call it ASAPROSAR for now.

6           THE COURT:  Now go ahead and spell all that for the

7    court reporter.

8    BY MR. SAUNDERS:

9    Q      What is ASAPROSAR, Dr. Gruber?

10   A      ASAPROSAR is an organization that was established during

11   the war in El Salvador, now about 27 years ago, by a physician

12   who defied the authorities and kept going into the mountains to

13   take care of the poor people.

14          For people who may not recall, El Salvador, what was

15   going on at that point, you may remember the murder of the

16   Marinol nuns and the priests at the Catholic university.  And

17   this very brave woman, by the name of Dr. Vickie Guzman,

18   nevertheless, went out to take care of the poor people, because

19   people were just being killed all the time.  There were death

20   on the streets, and bodies, etcetera.

21          And through a series of circumstances, my wife and I

22   found out about this, and we went down to visit, and were just

23   so impressed with what she was doing that we established what's

24   called The Friends of ASAPROSAR.

25          I mean, we were the only medical group in the world that

1   worked in El Salvador during the war, without a political

2   agenda.  So we would just take care of anybody who needed to be

3   taken care of, and we do it to this day.  We're in our 27th

4   year.  I'll be going down in January, with a group of about

5   60 healthcare professionals.  We'll see 3,000 patients, do

6   about 150 operations.  And ASAPROSAR works all year long.  We

7   just go down and do it as one big project for the campaign, but

8   they continue to work with the poor people.

9   Q      Let me just stop you and try to clarify.

10          ASAPROSAR is the Salvadoran-based organization that

11  Dr. Guzman started; is that right?

12  A      Yes.

13  Q      And what is Friends of ASAPROSAR?

14  A      That's an IRS 501C3 in the United States.

15  Q      And the 501C3, that's a nonprofit organization; is that

16  correct?

17  A      Yes.

18  Q      What type of medical services does Friends of ASAPROSAR

19  provide in El Salvador through ASAPROSAR?

20  A       Initially, and to a great extent nowadays, we present

21  eye care, both visual health and surgical.  So we do optometry,

22  medical ophthalmology, and surgical ophthalmology.  But because

23  of the nature of the difficulties, we have also branched out.

24  We now do -- we take care of patients with diabetes and

25  hypertension and cardiac difficulties, and . . . it's very

1   broad.  We now have physicians down there on a full-time basis.

2   Q      And are those medical services provided free of charge

3   to patients?

4   A      Well, it goes upon a sliding scale.  A poor person can

5   get cataract surgery, with lens implants, for about three

6   dollars.

7   Q      And you have been involved with Friends of ASAPROSAR for

8   how many years, did you say?

9   A      Twenty-seven.

10  Q      Did you found that organization?

11  A      Yes.

12  Q      Are you its president?

13  A      Yes.

14  Q      And with your -- the U.S. based nonprofit, Friends, do

15  you work directly with ASAPROSAR in El Salvador?

16  A      I do.

17  Q      At some point did Dr. Hough contact you about your work

18  in El Salvador?

19  A      She did.

20  Q      When was that, to the best of your recollection?

21  A      I would say about four years ago.

22  Q      About 2009?

23  A      Probably, yeah.

24  Q      That was after the sale of the medical schools?

25  A      It was certainly after the sale of the medical schools;

1    yes.

2    Q      And was Dr. Hough still working with the Saba Foundation

3    at the time?

4    A      Meaning the Saba Foundation that was doing work in

5    Guatemala and Central America?

6    Q      That's correct.

7    A      Yes.

8    Q      And what did she contact you about?

9    A      At that point she had established a relationship with

10   several medical facilities in Guatemala, and one of the things

11   that they apparently needed pretty desperately was work with

12   ophthalmology and optometry.  And she knew that we had a

13   reasonably mature, well-established program, and contacted me

14   to see if we could get together, and if she could come down and

15   look at it, and . . . see what we could do to translate it, and

16   might I be able to help them, and . . . that's what we did.

17   Q      Was it your understanding that the Saba Foundation was

18   already funding an existing program in Guatemala?

19   A      Yes.  Quetzaltenango, I believe.

20   Q      Quetzaltenango?

21   A      I believe.  A place in Guatemala.

22   Q      And so the contact with you in El Salvador, to your

23   understanding, was that for the purpose of expanding the

24   program that the foundation was already doing in Guatemala?

25              MS. FINLEY:  Objection, Your Honor, leading and

1    hearsay.

2              THE COURT:  Sustained.

3    BY MR. SAUNDERS:

4    Q     Did you and Dr. Hough work together after she contacted

5    you?

6    A     Yes.

7    Q     What was the nature of that work?

8    A     Essentially, I was helping her to understand what it is

9    that we had already discovered, in terms of how to run these

10   programs, how to get the involvement of North Americans, how

11   to . . . work with the campesinos, the -- the campesinos are

12   the word for rural dwellers, poor people -- in terms of getting

13   them into the programs, helping them to trust modern medicine,

14   etcetera.  So we worked together on the development of those

15   kinds of programs that could be transferred from El Salvador to

16   Guatemala.

17   Q     Did Dr. Hough come to El Salvador to observe your

18   program?

19   A     She did.

20   Q     Did she have people with her?

21   A     Yes.

22   Q     Do you recall who?

23   A     There were three people:  Florencio Montenegro, who was

24   working with The Foundation at that point; and there was a

25   husband and wife physician team, I believe their names were

1    Hernandez, the Doctors Hernandez.  I'm not totally sure of

2    that, but I think that's who they were.

3    Q      And when Dr. Hough and Mr. Montenegro, Florencio

4    Montenegro, and the husband-and-wife doctors were in

5    El Salvador, what did you do there; what did you show them?

6    A      We showed them essentially everything we do:  How we did

7    it, how we set it up; how we get things from the United States

8    to El Salvador; the mobile units that we go into the villages;

9    the health promoters; the way that we identify and prescreen

10   patients so that we can limit the patients we see.  Because of

11   the 3,000 patients, those are already screened, and if we

12   didn't limit it, we'd have 30,000.

13          So we basically went through all of those mechanics in

14   terms of how we set that.

15   Q      And did they take that information with them back to The

16   Foundation's program in Guatemala?

17   A      Yes.

18   Q      At some point did the Saba Foundation begin to work more

19   directly with ASAPROSAR?

20   A      Yes.

21   Q      What did The Foundation do in that regard?

22   A      Well, they knew at that point, given our discussions,

23   that we were very concerned about, particularly, diabetes and

24   hypertension.

25          Again, without getting too technical, one of the things

ALAN GRUBER – DIRECT/SAUNDERS                172

1   that leads to blindness is that hypertension distorts the blood

2   vessels in the eyes, and diabetes, I think most -- lots of

3   people know, causes diabetic retinopathy, because of the

4   diabetes.  And what happens is that people become blind because

5   their diabetes and hypertension is not dealt with.  There's not

6   effective screening, there aren't effective medications,

7   etcetera.

8          And as a result of the discussions, we were able to

9   submit a grant to The Foundation, and they funded the

10  development of our diabetes and hypertension program.

11  Q       So that diabetes and hypertension program was founded by

12  The Foundation?

13  A       Yes.

14  Q       And created by Dr. Hough?

15  A       Correct.

16  Q       How many years has The Foundation been underwriting that

17  program in El Salvador, if you know?

18  A       I want to say three anyway.

19  Q       Has Dr. Hough visited El Salvador on behalf of The

20  Foundation during that time to observe the program and monitor

21  it?

22  A       Yes.

23  Q       Is that program still continuing as we sit here today?

24  A       Yes.

25  Q       Do you have an estimate of how many patients have been

1    helped, or lives saved, just through that one program funded by

2    the Saba Foundation?

3    A        Yes.

4    Q        What would that estimate be?

5    A        Nine to twelve thousand people, with an additional . . .

6    four to five hundred surgical interventions.

7    Q        Do you attribute those benefits and those saved lives to

8    Dr. Hough and to the Saba Foundation?

9    A        Um-hum.   Yes.

10   Q        Are you familiar with a hospital called San Juan de

11   Dios?

12   A        Yes.

13   Q        What is that?

14   A        San Juan de Dios is a large public hospital in Santa

15   Ana.

16   Q        Santa Ana, El Salvador?

17   A        Santa Ana, El Salvador -- Santa Ana -- which is the

18   second largest city in the country.  And it's essentially the

19   hospital where people go because they can't go anywhere else.

20   Q        Because they don't have the money?

21   A        Correct.  It's a thousand-bed hospital.

22   Q        A thousand-bed?

23   A        Yes.

24   Q        Does that mean a thousand patients or a thousand actual

25   beds?

1    A       It's supposed to be a thousand actual -- it's supposed

2    to take care of a thousand actual patients at one time.  But

3    they don't because they don't have the capacity.  It's supposed

4    to be a thousand-bed hospital.

5    Q       Have you and Dr. Hough had occasion to work together in

6    connection with the San Juan de Dios hospital?

7    A       Yes.

8    Q       Please tell the jury what that was about.

9    A       San Juan de Dios hospital, it's hard to describe, for

10   people who haven't been in undeveloped countries . . . .  For

11   instance, San Juan de Dios has 60,000 unfilled prescriptions a

12   month for the patients that they see in their outpatient

13   center.  If a person needs cataract surgery, they have to wait

14   anywhere from five to seven years after they are unable to

15   count fingers at arm's length.  And then, often, they don't get

16   implants because they don't have the implants to put in

17   surgically.

18          Their intensive care unit, the last time I was there,

19   only had -- well, they had about 20 beds in intensive care, but

20   they only had one working EKG.  The pediatric floor didn't have

21   any neonatal equipment.

22          And I could go on.  So it's a very, very difficult

23   place.

24   Q       And did Dr. Hough and the Saba Foundation begin a

25   program at San Juan de Dios?

1   A      Yes.   They started discussions when I was involved with

2   them.

3   Q      And what were those discussions regarding?

4   A      Essentially, to start equipping the hospital so that

5   they could start taking care of patients more adequately.

6   Q      And do you know if that program is still ongoing?

7   A      As far as I know, it is, yes.

8   Q      Did you visit the hospital with Dr. Hough?

9   A      Yes.

10  Q      Were you present for her meetings and initiating that

11  program?

12  A      Yes.

13  Q      Are you familiar with an organization called the

14  American Medical Resources Foundation, or AMRF?

15  A      I am, yes.

16  Q      What is AMRF?

17  A      AMRF is an organization that takes equipment that is

18  being thrown out by hospitals, being disposed of.  They . . .

19  fix the equipment up, they rehab it, and then they . . . use

20  it -- and then they donate it to hospitals where it's needed in

21  underdeveloped countries.

22  Q      Have you been involved with AMRF?

23  A      Yes.

24  Q      Did you introduce Dr. Hough and the Saba Foundation to

25  AMRF?

1    A       Yes.

2    Q       Do you know if the Saba Foundation has become involved

3    with AMRF, in terms of funding the shipment of medical

4    equipment to underdeveloped countries?

5            MS. FINLEY:  Objection, Your Honor.  Can we have some

6    time frames as to all of these things?  We're talking general.

7            THE COURT:  The objection is sustained.

8    BY MR. SAUNDERS:

9    Q       I think you said the work with ASAPROSAR, in terms of

10   The Foundation's direct funding, began about three years ago;

11   is that correct?

12   A       Correct.

13   Q       And the work in connection with San Juan de Dios, do you

14   know when that began?

15   A       Two years ago.

16   Q       And with respect to AMRF?

17   A       Four years ago?

18   Q       And let me ask again, then:  Has The Foundation, to your

19   knowledge, been active with AMRF in funding the shipment of

20   medical equipment to needy countries?

21   A       Yes.

22   Q       So all of this activity in the past four years, based on

23   that, is it your understanding that the Saba Foundation has

24   remained a funded and active philanthropic organization after

25   the sale of the Saba and MUA schools in 2007?

1              MS. FINLEY:  Objection, Your Honor, hearsay.

2              THE COURT:  Sustained.

3    BY MR. SAUNDERS:

4    Q      Do you know, based on your own personal interactions and

5    being funded by The Foundation, whether The Foundation has

6    continued to remain a funded and active philanthropic

7    organization since 2007?

8    A      Yes.

9    Q      And has it?

10   A      Yes.

11   Q      During all of the years that you have known Dr. Hough

12   and Dr. Fredrick -- which I believe you said was since 1997, so

13   about 16 years; correct?

14   A      Yes.

15   Q      -- did you ever observe them to enjoy any luxuries or

16   live a lavish lifestyle?

17   A      No.

18   Q      Did you see their house in Gardner, Massachusetts?

19   A      Yes.

20   Q      Was it a lavish home?

21   A      No.

22   Q      Do you know what cars they drove?

23   A      Yes.

24   Q      Were they lavish cars?

25   A      No.

1    Q      Did you ever know them to take expensive vacations

2    together?

3    A      No.

4    Q      Based on your observations and experience over the past

5    16 years of knowing Dr. Hough, does she do anything that you

6    would consider extravagant?

7    A      No.

8    Q      Based on your observations, when Dr. Hough saves money,

9    or tries to save money, is that so she can have more to put in

10   her pocket?

11   A      No.

12   Q      What is it for?

13   A      My experience with Dr. Hough is that she is fastidious

14   when it comes to accountability for the -- at least my

15   interaction with her -- around the issues that The Foundation

16   serves.  She has consistently always required appropriate

17   reports.  Whenever she's visited El Salvador, I've never known

18   her to stay at any of the luxury hotels.  She doesn't even pick

19   up the tab sometimes.  She's very . . . very focused on

20   accountability of The Foundation's money, and how we are

21   spending those grant funds.

22   Q      So is the money that is being saved going to her, or

23   back to The Foundation, to your knowledge?

24   A      Well, I really have no way of knowing, so . . . but I --

25   I don't know how it would go to her, as opposed to The

1   Foundation.

2   Q       Do you know what work Dr. Hough does now?

3   A       Yes.

4   Q       Where does she work?

5   A       She's a psychiatrist.  She works with the Florida

6   department of public health.  She works with poor people.  She

7   could do what most of my colleagues regrettably do, which is

8   see lot of private patients, and don't even take Medicare or

9   Medicaid; but she chooses not to do that.  She continues to

10  work in the public sector, in a -- basically in a clinical

11  setting.

12  Q       Would you say Dr. Hough is an intelligent person?

13  A       Yes.

14  Q       Does she still love what she does, based on your

15  observations?

16  A       Yes.

17  Q       You talked about her being fastidious.

18          Is she detail oriented when it comes to the things that

19  she's focused on, such as you've discussed, accreditation and

20  the charitable work of The Foundation?

21  A       Yes.

22  Q       What about with respect to financial matters, or the

23  day-to-day operation of the schools, did you have the

24  opportunity to observe, during your time on Saba, whether she

25  was as detail oriented on those matters?

1              MS. FINLEY:  Objection, Your Honor, foundation.

2              THE COURT:  Sustained.

3    BY MR. SAUNDERS:

4    Q     Did you have occasion, during the time that you have

5    known Dr. Fredrick and Dr. Hough, to form an impression about

6    her sophistication with financial matters?

7    A     I never --

8    Q     Yes or no at this point.

9    A     Yes.

10   Q     And what was that impression based on?

11             MS. FINLEY:  Objection, Your Honor, foundation.  As

12   to how he formed --

13             THE COURT:  Overruled.  I think that's what he's

14   doing with this question.

15             THE WITNESS:  I never knew Dr. Hough to be involved

16   with any of the financial things.  It was always accreditation

17   and program.

18   BY MR. SAUNDERS:

19   Q     Did you know Dr. Fredrick to be involved with those

20   things?

21   A     Yes.

22   Q     When you had discussions regarding financial issues

23   pertaining to the school, who did you go to for those?

24   A     Dr. Fredrick.

25   Q     Did you ever . . . .  Why did you go to Dr. Fredrick?

1    A     I wouldn't even think about going to Dr. Hough.  It

2    wasn't her territory.  She didn't do that kind of thing.  As

3    far as I know, I'm not sure that she really knew anything other

4    than superficial about the budgets and the money that was there

5    to be expended one way or the other.

6    Q     And what's your basis for that opinion?

7    A     Just my experience with her.  Whenever we were in any

8    discussions, she would always defer it, and basically say, "I

9    don't know."

10   Q     Discussion about what?

11   A     About finances, about the budget processes, or how much

12   was available, and . . . .  She just never claimed any

13   particular knowledge about that in any of the discussions we

14   had.

15   Q     Did she ever tell you to talk to her husband about those

16   matters?

17   A     I don't think she ever told me.  I just knew that's who

18   I had to talk to.

19   Q     During all of the many years that you've known

20   Dr. Hough, have you ever had reason to doubt her integrity?

21   A     No.

22   Q     Have you ever known her, in the 16 years that you've

23   known her, to be anything less than 100 percent forthright and

24   honest?

25   A     No.

1   Q       Is the same true for Dr. Fredrick?

2   A       Yes.

3   Q       Have you had the opportunity, during the years that

4   you've known Dr. Hough, to form an opinion as to her character

5   for honesty and truthfulness?

6   A       Yes.

7   Q       What is that opinion, Doctor?

8   A       I think she's . . . extremely honest.  She's the kind of

9   person who tells you what she thinks.  She doesn't pull

10  punches.  If she thinks that something needs to be done, or

11  there's an issue to be addressed, she lets you know about it.

12  She's very straight.

13  Q       Have you known her to exaggerate?

14  A       No.

15  Q       Have you known her to cut corners or bend rules?

16  A       No.  Quite the opposite, actually.

17  Q       What do you mean by that?

18  A       Well, I almost think that it would make her

19  extraordinarily uncomfortable to bend rules or cut corners.

20  It's not who she is, in my perspective at least.

21  Q       And has that been consistent across all the years that

22  you've known her?

23  A       Yes.

24  Q       Now, Dr. Gruber, would that opinion of Dr. Hough change

25  if you were told that the government in this case was claiming

1   that Dr. Hough took millions of dollars from the Saba

2   Foundation, hid the money for her own use in secret Swiss bank

3   accounts, failed to declare income from those accounts on her

4   tax returns, and conspired with her husband and others to

5   defraud the United States; would that change your opinion?

6   A     If I knew that?

7   Q     If you were told that that's what the government is

8   alleging in this case.

9   A     I would be flabbergasted.

10  Q     Why?

11  A     That's just not who I know Pat Hough to be.  It just

12  doesn't make sense to me.  I can't -- A, I can't believe that

13  she would do something that would be so dumb.  It's just not --

14  it's just not who she is.

15        And secondly, she's . . . you know, sort of a -- I don't

16  want to be a little insulting here, but she's sort of a little

17  anal.  She plays by the rules.  And I've never known her not to

18  play by the rules.  I just can't see her putting herself in

19  that situation.

20        MR. SAUNDERS:  Your Honor, if we can take a break

21  now, I'll confer with counsel, and possibly pass the witness

22  when we come back from break.

23        Is that all right?

24        THE COURT:  That's fine.

25        All right.  Let's take a 15-minute break.

1            Please do not discuss the case among yourselves or

2       allow anyone to discuss it with you or in your presence.

3            (At 3:04 PM, the jury was escorted from the

4       courtroom.)

5            THE COURT:  All right.  Fifteen minutes.

6            (At 3:05 PM, court was recessed.)

7                          AFTER RECESS

8            (At 3:20 PM, court was reconvened.)

9            THE COURT:  Both sides reddy for the jury?

10           THE COURTROOM DEPUTY:  Not quite.

11           THE COURT:  All right.  Now, everybody ready?

12           MR. SAUNDERS:  Yes, Your Honor.

13           MS. FINLEY:  Yes, Your Honor.

14           THE COURT:  All right.  Have the jury step in,

15      please.

16           (At 3:21 PM, the jury was escorted into the

17      courtroom.)

18           THE COURT:  And, Mr. Saunders, you may proceed.

19           MR. SAUNDERS:  Thank you, Your Honor.

20      BY MR. SAUNDERS:

21      Q    I just have a few more questions, Dr. Gruber.

22           MR. SAUNDERS:  Could we please put up Page 6 of

23      Exhibit 270?

24      BY MR. SAUNDERS:

25      Q    If you can turn to that in your brochure, if you would,

1   Dr. Gruber.  It is the page that's titled, "Psychology Faculty

2   and Administration," about three pages from the end.

3   A       Yes.

4   Q       That's your name and credentials up at the top; correct?

5   A       Yes.

6   Q       And second from the bottom there's a Dr. Helen Gruber.

7           Is that your wife?

8   A       Yes.

9   Q       Was she also involved in helping develop the program?

10  A       Yes.

11  Q       And underneath that is Dr. Hough; correct?

12  A       Yes.

13  Q       And above your wife's name is Dr. David Fredrick;

14  correct?

15  A       Correct.

16  Q       Now, it shows that your wife received a B.S. at Eastern

17  Nazarene College.

18          Is that one of the schools that you were looking at to

19  partner for the joint degree program?

20  A       Yes.

21  Q       And as to Dr. Fredrick, it indicates that he received

22  his M.A. in counseling at East Carolina University; is that

23  correct?

24  A       Yes.

25  Q       Do you know if East Carolina University is located in

1   Greenville, North Carolina?

2   A      I don't know.

3   Q      Okay.  You can set that down.

4          As far as just the last question I asked you before the

5   break, I checked the transcript, and I just want to go back and

6   cover it again.  And let me just to ask you to answer yes or no

7   at this point.

8          You talked about your opinion of Dr. Hough, her

9   character for truthfulness and honesty.

10          Again, if you were to be told the things that I told you

11   the government is alleging in this case, specifically that she

12   took millions of dollars from Saba Foundation accounts, put

13   them in her own accounts, hid them in Swiss bank accounts for

14   her own use, for her own benefit, lied about it on her tax

15   returns, conspired with Dr. Fredrick and others to defraud the

16   United States, if you were told that those were the allegations

17   that the government has made in this case, would that change

18   your opinion of Dr. Hough's character for truthfulness and

19   honesty, yes or no?

20   A      Well, I'm sorry, I just don't -- would it change my

21   opinion if I was told that; no, I would not change my opinion

22   if I was told that, because I wouldn't believe it.

23   Q      And why not?

24   A      It's just not who I see her to be.  She's a woman of

25   enormous integrity in all the years that I've known her.  I

1    just can't see it.  It just doesn't make sense to me.

2    Q     And that's over 17 years; correct?

3    A     Correct, yes.

4          MR. SAUNDERS:  No further questions, Your Honor.

5    Thank you.

6          THE COURT:  Ms. Finley?

7          MS. FINLEY:  Thank you, Your Honor.

8                     CROSS EXAMINATION

9    BY MS. FINLEY:

10   Q     Hi, good afternoon, Dr. Gruber.

11   A     Hi.

12   Q     Now, you talked a little bit about Dr. Hough's role with

13   both Saba and MUA, and the schools, and I think you said that

14   her role was critical to the success of the universities; is

15   that correct?

16   A     Yes.

17   Q     And her role was so critical because the clinical

18   portion of medical school is . . . just as critical, it's

19   probably the most important part of going to medical school; is

20   that correct?

21   A     Yeah, maybe.

22   Q     Or as important as learning.  You can't --

23   A     Right.

24   Q     -- you can't go out into the field until you have the

25   science?

1   A      It obviously doesn't make any sense if you can't do what
2   you are supposed to have learned to do, so yes.
3   Q      And a medical school cannot be successful without
4   accreditation; correct?
5   A      It depends upon . . . I'm sorry.  I don't mean to vague
6   about this.  There are medical schools in the world where you
7   can get an M.D. that would be useless.
8   Q      Because it is not accredited?
9   A      Because they are not appropriately accredited, and
10  basically they operate out of an upstairs garage somewhere.
11  And there are those medical schools that exist.
12  Q      And so your medical education would be pretty much
13  worthless if you were to go to a school that was not
14  accredited?
15  A      Correct.
16  Q      It would be hard to attract students to your medical
17  schools if you were not accredited?
18  A      Somehow they do it, but it never made sense to me that
19  people sign up and pay the money, but they do.
20  Q      And you are a graduate of Saba medical school.
21  A      Correct, yes.
22  Q      And you would not go to Saba medical school if it was
23  not accredited.
24  A      Correct.
25  Q      And Mr. Saunders reviewed your very impressive

1   background on direct.

2         And I think, in Defense Exhibit 270, it also covers

3   Dr. Hough's background, on Page 6; is that correct?

4   A     Is that this?

5   Q     Yes.  In the pamphlet.

6   A     Yes.

7   Q     So you were aware that Dr. Hough has a college degree

8   from Phillips University.

9         I know that's not in your -- you are aware that she did

10  go to college or got an undergraduate degree?

11  A     Yes.

12  Q     And you're also aware that, I think, she has a degree in

13  social work?

14  A     Correct, I did know that.

15  Q     And then she also has a Ph.D. from a university in

16  Berlin.

17  A     Yes.  I did know that too.

18  Q     And she then also went to medical school at Ross

19  University in the Caribbean.

20  A     Yes.

21  Q     And so Dr. Hough has a similar impressive educational

22  background . . . to you.

23  A     Yes.

24  Q     Now, you talked a little bit about this joint program,

25  if that's the right term for it, the Psy.D.-M.D. program, and

1   that this was something that was being worked on from 2000

2   forward, but that it stopped -- it wasn't going to come to

3   fruition; is that correct?

4   A       Correct.

5   Q       And so you don't know if, after the schools were sold,

6   Dr. Fredrick bought a house that he alleged was going to be

7   used for the school.

8   A       I do not know that; correct.

9   Q       And you said that you had been looking for an academic

10  base to run classes and have offices for this program; is that

11  correct?

12  A       Correct.

13  Q       And you would not expect that a five-bedroom four-bath

14  house in a residential neighborhood would be an appropriate

15  venue for that type program.

16  A       Probably not.  You know . . . not as I picture that.  I

17  mean, obviously, we all know that you can renovate places.  But

18  no, just as a general question, I would have to say no.

19  Q       It wouldn't have the classroom space or office space --

20  A       Correct.

21  Q       -- square footage that would be required to run that

22  kind of facility.

23  A       Right.

24  Q       And you don't know whether, when Dr. Hough and

25  Dr. Fredrick sold the medical schools, or they were sold, that

ALAN GRUBER - CROSS/FINLEY                    191

1    they entered into a non-compete agreement with the buyer of the

2    schools.

3         Are you aware of that?

4    A    No.

5    Q    And so if they were to try and start a program such as

6    this, after the schools were sold, they would have been barred

7    by the non-compete agreement.

8         Are you aware of that?

9    A    No.

10   Q    Now, I just want to understand.

11        You, I think, said -- when did you go to Saba for

12   medical school?

13   A    I graduated in 2000.

14   Q    And did you immediately become a professor after that?

15   A    I was . . . I think I had mentioned earlier that, at

16   that point in my life, I already had two earned doctor's

17   degrees, so I was both faculty and student concurrently.

18   Q    And as part of your position on the faculty, you didn't

19   have access to the financials for the university.

20   A    Correct.

21   Q    And so you have no idea where the university banked,

22   kept its bank accounts.

23   A    Correct.

24   Q    You have no idea what is on their financial statements.

25   A    Correct.

ALAN GRUBER – CROSS/FINLEY                    192

1  Q      And, in fact, you said that you wouldn't talk to

2  Dr. Hough about the finances because you believed she didn't

3  know anything about them; is that right?

4  A      Yes.

5  Q      And so you don't know that she is a signatory on a bank

6  account that is in the name of Saba University School of

7  Medicine Foundation.

8  A      Correct.  I do not know that, or nor did I.

9  Q      And you don't know that she's also a signatory on a bank

10 account in the name of Medical University of the Americas.

11 A      Correct.

12 Q      And so you don't really know what Dr. Hough knows about

13 the financials, you just know you didn't go to ask her

14 questions about it.

15 A      Correct.

16 Q      Now, you mentioned an individual named Florencio

17 Montenegro.

18 A      Correct.

19 Q      And are you aware that Mr. Montenegro bought

20 Dr. Fredrick and Dr. Hough's house in Asheville, North

21 Carolina, by assuming a 1.2 million-dollar mortgage?

22         MR. HOCHMAN:  Objection, misstates the evidence.  He

23 didn't buy it personally.

24         THE COURT:  Not your witness.

25         MR. SAUNDERS:  Same objection, Your Honor.

1          THE COURT:  Overruled.

2    BY MS. FINLEY:

3    Q      Are you aware of that?

4    A      No.

5          THE COURT:  But nice try.  Go ahead.

6          MS. FINLEY:  Thank you, Your Honor.

7    BY MS. FINLEY:

8    Q      Now, Mr. Saunders walked you through a lot of the

9    activities that you and Dr. Hough had been involved with over

10   the last, I think you said, four years.

11   A      Yes.

12   Q      And I think you said that you were ill around 2006 and

13   2007?

14   A      Correct.

15   Q      And when did you sort of get back in action?

16   A      Probably around 2009ish.

17   Q      And do you know if that would have been after February

18   of 2009?

19   A      Oh . . . .  No.  I think I probably was -- I wasn't as

20   good as I am now, but I think I was reasonably functional

21   around February of 2009.

22   Q      And so all of these activities that you detailed, they

23   would have all been after February of 2009.

24   A      If not . . . if not after, certainly not long before

25   then.  And that's a reasonable approximation.

ALAN GRUBER – CROSS/FINLEY                    194

1   Q       Now, are you aware that, after 2007, a home in

2   Greenville was purchased by Dr. Fredrick and Dr. Hough, through

3   an entity named Ample Dynamic?

4               MR. SAUNDERS:  Objection.

5               Was the question after 2007?

6               MS. FINLEY:  Yes, it was.

7               MR. SAUNDERS:  Objection, misstates the evidence.

8               THE COURT:  Overruled.

9               The jury heard the evidence.  They can make that

10  determination.

11  BY MS. FINLEY:

12  Q       Are you aware that a house was purchased?

13  A       No.

14  Q       And are you aware that Dr. Fredrick purchased a

15  $1.6 million plane after 2007?

16  A       No.

17  Q       And are you aware that Dr. Fredrick and Dr. Hough

18  purchased land in Asheville, North Carolina --

19  A       No.

20  Q       -- after 2007?

21  A       No.

22  Q       Are you aware that Dr. Fredrick and Dr. Hough gave large

23  gifts to their siblings after 2007?

24              MR. SAUNDERS:  Objection, misstates the evidence, as

25  far as after 2007.  There is no evidence.

1          THE COURT:  Sustained.

2    BY MS. FINLEY:

3    Q      Are you aware that Dr. Fredrick gave each of his

4    siblings $250,000 in April of 2007?

5    A      No.

6    Q      And you said that you thought Dr. Fredrick and Dr. Hough

7    lived a very modest lifestyle; is that correct?

8    A      Correct.

9    Q      And so you were aware that they live on a house in

10   Englewood that is on the market for more than two and a half

11   million dollars.

12   A      No, I'm not.

13   Q      And that the house is gulf to bay and has an elevator?

14   A      No.

15   Q      And so you don't really know anything about Dr. Fredrick

16   and Dr. Hough's finances, do you.

17   A      No.

18   Q      Now, you also stated that you thought that your opinion

19   was that Dr. Hough was extremely honest and forthright.

20          Is that your opinion?

21   A      Correct.  Yes.

22   Q      So given that she's so honest and forthright, you would

23   expect that, if her accountant asked her a direct question, "Do

24   you have a foreign bank account," and she had a bank account

25   that was in her own name that was in a foreign country, she

1    would answer yes to that question.

2              MR. SAUNDERS:  Objection, incomplete hypothetical.

3              THE COURT:  Overruled.

4              You may answer.

5              THE WITNESS:  Yes, I would expect her to tell the

6    truth.

7    BY MS. FINLEY:

8    Q       And I think Mr. Saunders asked you, if you heard the

9    allegations that were in this indictment, that Dr. Fredrick and

10   Dr. Hough conspired with each other and others to defraud the

11   Internal Revenue Service, that that would not change your

12   opinion; is that correct?

13   A       Yeah, the question still confuses me.  The allegation

14   doesn't change my mind.  I would just be very surprised if the

15   allegation were true.  I guess that's what I am trying to say.

16   Q       And if that was proven, that Dr. Fredrick and Dr. Hough

17   did conspire to defraud the Internal Revenue Service by not

18   reporting the sale of the medical schools on their tax returns,

19   because they would -- would be required to do so, if that was

20   proven, would that change your opinion?

21             MR. SAUNDERS:  Objection, Your Honor, "if that were

22   proven" is an improper question at this point.

23             THE COURT:  Overruled.

24             THE WITNESS:  Yeah, I would be very surprised.

25

1    BY MS. FINLEY:

2    Q       Would it change your opinion about them?

3    A       Yes.

4            MS. FINLEY:  Thank you, Your Honor.  No further

5    questions.

6                THE COURT:  Mr. Saunders, redirect?

7                MR. SAUNDERS:  Just a moment, Your Honor?

8                (Mr. Saunders and Mr. Udolf confer privately.)

9                        REDIRECT EXAMINATION

10   BY MR. SAUNDERS:

11   Q       Dr. Gruber, if you were told that the house, that the

12   prosecutor described was purchased in Greenville, North

13   Carolina, had 11 rooms, including 5 bedrooms, rooms that could

14   be used for meetings, conferences, etcetera, would that be a

15   suitable location for a home base for the program that you and

16   Dr. Fredrick were seeking to develop?

17   A       Yeah.  Yes.

18   Q       You were asked if it would change your opinion of

19   Dr. Hough's honesty if you knew -- or -- I'm sorry.

20           You were asked if it would change your belief that she

21   didn't know anything about the financial matters if you were

22   told that she was a signatory on certain bank accounts.

23           Do you recall that?

24   A       Yes.

25               MS. FINLEY:  Misstates the question, Your Honor.

1              MR. SAUNDERS:  That's what I understood the question

2    to be.

3              THE COURT:  I'm sorry, I didn't hear you.

4              MS. FINLEY:  I'm sorry, Your Honor.  I think that

5    misstated my question.

6              THE COURT:  Is that an objection?

7              MS. FINLEY:  It is an objection, misstates the

8    question.

9              THE COURT:  Overruled.

10             The jury can remember both the question and the

11   answer.

12             MR. SAUNDERS:  I'll ask a different question, Your

13   Honor.

14   BY MR. SAUNDERS:

15   Q      You don't know whether Dr. Hough was a signatory on any

16   bank accounts; correct.

17   A      Correct, I do not know.

18   Q      Assuming that she was a signatory on those bank

19   accounts, you don't know if she knew she was a signatory on

20   those bank accounts; is that correct?

21   A      Yes, that is correct.

22   Q      Now, the prosecutor suggested, I believe, that the

23   various activities that you've talked about in connection with

24   the philanthropic activities of The Foundation all occurred

25   sometime around, or after, February of 2009.

1          Did you know Dr. Hough to be philanthropically minded

2     prior to February, 2009?

3     A     Yes.

4     Q     Is that something that was suddenly born in her, in your

5     observation, since 2009, or is it consistent with the person

6     that you had known since 1997?

7     A     It was consistent.  And we had spoken about the work --

8               MS. FINLEY:  Objection, Your Honor.

9               THE COURT:  The objection is sustained to the part

10    beginning, "We had spoken."

11    BY MR. SAUNDERS:

12    Q     Had you had occasion to discuss philanthropic activities

13    with Dr. Hough prior to 2009?

14    A     Yes.

15    Q     Substantially prior to 2009?

16    A     Yes.

17    Q     And was it your understanding that she was of that mind

18    consistently across those years that you have known her?

19              MS. FINLEY:  Objection, Your Honor, hearsay.

20              THE COURT:  Sustained.

21              MR. SAUNDERS:  May I have a moment, please, Your

22    Honor?

23              THE COURT:  You may.

24              (Mr. Saunders and Mr. Hochman confer privately.)

25

1    BY MR. SAUNDERS:

2    Q      The prosecutor compared, earlier, your educational

3    background to Dr. Hough's educational background.  I notice

4    that they were similarly impressive.

5           Do you recall that?

6    A      Yes.  Thank you.

7    Q      Does the fact that you have -- since we're comparing you

8    and Dr. Hough, does the fact that you have a compressive

9    educational background, to use the prosecutor's words, mean

10   that you are thoroughly attentive and detail oriented with

11   respect to everything that crosses your path in your life?

12   A      I'm sorry, my wife should be here.  I am obsessive about

13   things that I believe I'm supposed to know.  So if it's in my

14   area of expertise, then . . . it disturbs me if I don't know

15   the answer to something.

16          But when it comes to things outside of my area of

17   expertise, most frequently plumbers, carpenters, accountants,

18   and lawyers, then I figure that's why God made those people.

19   And I rely on them in the same way that, frankly, I'm very

20   comfortable with my patients relying on me, because I . . . if

21   I don't know something, I will say to somebody, "I don't know,

22   but I will certainly find out the answer," and I see Pat Hough

23   basically the same way.

24   Q      So when you don't know something, such as law or

25   accounting, you rely on other people, despite your impressive

1    educational background, to provide you with help and guidance

2    on those matters; correct?

3    A       My impressive educational background has taught me that

4    I really don't know everything.

5    Q       And do you believe Pat Hough knows everything, based

6    upon your interactions with her?

7    A       I believe that she does not.  I believe that she

8    believes that she does not.

9    Q       What is she an expert in?

10            You talked about your own expertise.

11            What is Dr. Hough's area of expertise, based on your

12   observations?

13   A       Psychiatry and medical education.

14   Q       And for areas outside her areas of expertise, is it your

15   impression that she, like you, relies on other people to guide

16   her through those areas?

17   A       That's certainly been my experience with her, as we've

18   dealt with, particularly, the grant functions in El Salvador,

19   and, I would say, back when I was active with the university.

20   I mean, she doesn't make believe that she understands all that

21   stuff.  And I -- and I don't get into that with her, because

22   every time it's come up, she punts it to somebody else.

23   Q       And does "all that stuff" include financial matters?

24   A       I mean financial matters, yes.

25            MR. SAUNDERS:  Nothing further, Your Honor.  Thank

1    you.

2              THE COURT:  Ms. Finley?

3              MS. FINLEY:  Extremely briefly, Your Honor.  Thank

4    you.

5                        RECROSS EXAMINATION

6    BY MS. FINLEY:

7    Q     You said that you expect that your patients rely on you

8    for your expertise; is that correct?

9    A     I'd like to think that.

10   Q     And so, in turn, you expect your patients to tell you

11   all of the relevant information that you would need to diagnose

12   them or provide them with medical advice.

13   A     Yes.

14   Q     And you ask them questions in order to elicit

15   information to form that diagnosis.

16   A     That's correct; yes.

17   Q     And you expect your patients to be honest with you in

18   their responses.

19   A     I do.

20   Q     And you need honesty from them because otherwise your

21   diagnosis or your opinion might not be based on all of the

22   relevant facts.

23   A     That's correct.

24             MS. FINLEY:  No further questions, Your Honor.

25             THE COURT:  Mr. Saunders, anything further?

1          MR. SAUNDERS:  Nothing, Your Honor, thank you.

2          THE COURT:  You may stand down.  Thank you.

3          (The witness left the witness stand and left the

4     courtroom.)

5          THE COURT:  And let's recall Ms. Maurer.

6          And, Mr. Hochman, you may proceed once she gets up

7     there.

8          MR. HOCHMAN:  Thank you.

9          (Ms. Maurer resumed the witness stand.)

10                         SHEILA MAURER,

11    having been recalled as a witness by the Government, and

12    having been previously called as a witness and duly sworn,

13    was examined and testified as follows:

14                       CROSS EXAMINATION

15    BY MR. HOCHMAN:

16    BY MR. HOCHMAN:

17    Q     Good afternoon, Ms. Maurer.

18    A     Good afternoon.

19    Q     Now, Ms. Maurer, you have been designated as an expert

20    in this case; is that correct?

21    A     In tax calculations.

22    Q     In tax calculations.

23          And this is your first time being designated as an

24    expert by the government in your 25-year career in the IRS; is

25    that correct?

1   A       That's correct.

2   Q       This is the first time's you've ever testified as an

3   expert in court; is that correct?

4   A       That's correct.

5   Q       And you've never testified as an expert in any other

6   setting, like a deposition; correct?

7   A       I have not.

8   Q       And how many revenue agents work in your Special

9   Enforcement Program section of the IRS?

10  A       In my group; 13 or 14.

11  Q       And are you aware whether any of them have been

12  designated as an expert before today?

13  A       Yes.

14  Q       How many?

15  A       I don't know everybody's background or experience.  I

16  would think maybe half.

17  Q       Now, you have been here since the first day of trial; is

18  that correct?

19  A       Yes, I have.

20  Q       And you said that you have seen and heard all the

21  testimony of all the government's witnesses; correct?

22  A       Yes, I have.

23  Q       And you've seen all the exhibits that have been admitted

24  into evidence; is that correct?

25  A       That's correct.

1    Q        And part of -- or that, along with your own analysis,

2    forms the basis of your testimony; is that correct?

3    A        Yes.

4    Q        Now, you saw David Minchenberg, Jerry Schneider, Tom

5    Murtha, and Jeffrey Gallant testify; is that correct?

6    A        That's correct.

7    Q        And all of them are certified public accountants;

8    correct?

9    A        I believe -- I'm not sure about Mr. Schneider, but the

10   other . . . .  Who were the other three?  Murtha?  Yes.

11   Q        David Minchenberg.  He's a certified public accountant.

12   Tom Murtha, certified public accountant.

13   A        Yes.

14   Q        Jeffrey Gallant, a certified public accountant?

15   A        Yes.

16   Q        And Jerry Schneider, too, the gentleman who testified,

17   is a CPA from New York.

18   A        Yes.

19   Q        Are you a certified public accountant?

20   A        No, I'm not.

21   Q        Have you ever taken the certified public accountant

22   test?

23   A        No, I have not.

24   Q        Have you ever taken the courses necessary to become a

25   certified public accountant?

1    A      No, I have not.  I have taken the required accounting

2    courses to be a revenue agent, but I have not taken any courses

3    to try to pass a CPA exam.

4    Q      And, in fact, you haven't passed a CPA exam; correct?

5    A      No.

6    Q      Are you an accountant?

7    A      No, I am not.

8    Q      Now, you have a bachelor's of science in computer

9    science from the University of Central Oklahoma; is that

10   correct?

11   A      Yes.

12   Q      And you received a minor in accounting; is that correct?

13   A      I'm not sure if it was designated as a minor.  I said it

14   was an emphasis in accounting.

15   Q      All right.  Are you aware of the resumé that your –– do

16   you have a resumé that you provided the prosecutors to provide

17   to me?

18   A      Yes.

19   Q      And doesn't it say that you have a minor in accounting?

20   A      If it does, I must have assumed at the time it was a

21   minor.

22          MR. HOCHMAN:  Your Honor, I actually only have one

23   copy of this.

24   BY MR. HOCHMAN:

25   Q      Would it refresh your recollection to see the resumé

1    that you provided the prosecutors, that they provided me?

2    A      Okay.

3            MR. HOCHMAN:  Your Honor, I only have one copy.  I

4    will designate this Defense Exhibit 300, and we'll --

5            THE COURT:  Do you want it as an actual exhibit, or

6    just show it to her?

7            MR. HOCHMAN:  Just show it to her.

8            THE COURT:  Just show it to counsel and show it to

9    her.  You don't need it as an exhibit, I don't think.

10           MR. HOCHMAN:  Thank you, Your Honor.

11           (Ms. Finley and Mr. Hochman confer privately.)

12           MR. HOCHMAN:  May I approach the witness, Your Honor?

13           THE COURT:  Yes.

14           THE WITNESS:  I remember this.  I remember, at the

15    time, it was on my . . . .

16    BY MR. HOCHMAN:

17    Q      So you received a minor in accounting in 1986, 27 years

18    ago; is that correct?

19    A      Yes.

20    Q      Do you prepare your own tax return?

21    A      Yes, I do.

22    Q      Have you ever prepared -- well, actually, you heard

23    Mr. Murtha testify that he's prepared thousands of tax returns

24    over the last 25 years.

25           Have you prepared any tax return other than your own?

1    A       No.  My son's.

2    Q       Other than yourself and your son's tax returns, have you

3    prepared any tax return other than those -- yourself and your

4    son's?

5    A       No.

6    Q       Now, you heard that Mario deCastro testified; is that

7    correct?

8    A       Yes.

9    Q       And Mario deCastro is a tax lawyer; correct?

10   A       Yes.

11   Q       Are you a tax lawyer?

12   A       No.

13   Q       Have you ever taken any tax law classes?

14   A       No, I haven't.

15   Q       And you heard Steven Roger testify; is that correct?

16   A       Yes.

17   Q       And he's a private equity investor who has participated

18   over the years in a number of sophisticated international

19   deals, including the deal with the Saba Foundation; correct?

20   A       Yes.

21   Q       How many sophisticated international deals have you

22   participated in?

23   A       None.

24   Q       So you are not a CPA, you're not a tax preparer, you're

25   not a tax lawyer, you're not an accountant, and you haven't

1    participated in sophisticated international deals.

2         Do you have any special expertise in Netherlands

3    Antilles law dealing with nonprofits?

4    A    No, I do not.

5    Q    How about Nevis law dealing with for-profit

6    corporations?

7    A    No.

8    Q    Do you have any expertise in Swiss banking law?

9    A    No.

10   Q    Do you have any expertise in Swiss anti-money laundering

11   regulations?

12   A    No.

13   Q    Have you ever attended -- do you remember

14   Mr. Futterknecht coming in from UBS and testifying?

15   A    Yes.

16   Q    And do you recall that he was -- he talked about being a

17   member of the Swiss Bankers Association, the association that

18   creates the code of compliance that Swiss banks are obligated

19   to live under; Do you recall that?

20   A    Yes.

21   Q    Have you ever attended a meeting of the Swiss Bankers

22   Association?

23   A    No.

24   Q    Are you a member of the Swiss Bankers Association?

25   A    No.

1    Q      Are you an expert in Liechtensteinian banking law?

2    A      No.

3    Q      How many criminal tax investigations have you conducted?

4    A      Conducted?

5    Q      Conducted.

6    A      I don't conduct them.

7    Q      So the answer is none?

8    A      None.

9    Q      And even though you're with the IRS, you are on the

10   civil side, not on the criminal side; is that correct?

11   A      That's correct.

12   Q      And the criminal side is called the criminal

13   investigations division; is that correct?

14   A      Yes.

15   Q      And that's the part of the IRS that Special Agent

16   Cameron Lalli, who is sitting back behind me on the right, is

17   part of; is that correct?

18   A      Yes.

19   Q      And Special Agent Cameron Lalli is the lead investigator

20   in this case; isn't that correct?

21   A      Yes.

22   Q      Now, you've never been a special agent with the criminal

23   investigation division of the Internal Revenue Service;

24   correct?

25   A      I have never -- I have not.

1   Q      And you have never received the training that a special

2   agent of the Internal Revenue Service criminal investigation

3   division receives; correct?

4   A      Yes.

5   Q      Correct, is that correct?

6          It's correct that you've never received that training;

7   correct?

8   A      It is correct that I have never received that training.

9   Q      Now, you do have expertise, however, in being an expert

10  witness; isn't that correct?

11  A      Say that again?

12  Q      You do have expertise, do you not, in being an expert

13  witness; correct?

14  A      I do have expertise . . . .

15         MR. HOCHMAN:  Let me rephrase, Your Honor.

16  BY MR. HOCHMAN:

17  Q      Do you have any training in being an expert witness?

18  A      Yes.

19  Q      You actually attended the expert witness training

20  classes that the IRS offers; isn't that correct?

21  A      That is correct.

22  Q      And did you learn, as part of those classes, how to

23  testify in front of a jury?

24  A      Yes.

25  Q      And did they give you certain pointers so that you would

1  look and appear more credible during your testimony in front of

2  a jury?

3  A       No.

4  Q       Did they tell you that you needed to be 100 percent

5  accurate when you prepare an expert report that will be

6  presented to a jury?

7  A       I'm not sure if they said 100 percent accurate.

8  Q       So they told you, you could be, what, 70 percent

9  accurate when you presented your report to the jury?

10 A       No.  I would say that they said accurate; but, okay, a

11 hundred percent accurate, if you . . . .

12 Q       Well, you are not trying to be 67 percent accurate;

13 correct?

14 A       Correct.

15 Q       You're not trying to be 87 percent accurate; correct?

16 A       We are trying to be as accurate as the facts and

17 documents that we have allow.

18 Q       You are trying to be 100 percent accurate as the facts

19 and documents will allow; correct?

20 A       Yes.

21 Q       And it's your belief that you were a hundred percent

22 accurate in the report and schedules that you prepared;

23 correct?

24 A       It is my belief.

25 Q       Now, you understand the importance of being a hundred

1   percent accurate because your report and your schedules are

2   going to be relied on by the prosecutors; correct?

3   A      Correct.

4   Q      And they will be relied on by the jury that you're

5   testifying in front of; correct?

6   A      Correct.

7   Q      And you were also taught the importance of being

8   thorough, as well as accurate; correct?

9   A      As thorough as the evidence and the facts and the

10  documents allow.

11  Q      As thorough as the evidence, the facts, and the

12  documents allow.

13         So does that mean that if you realize you're not -- you

14  haven't been a hundred percent thorough, you can stop and not

15  try to be a hundred percent thorough?

16  A      No.  It means if other things are presented to me that I

17  need to consider, I will consider those.

18  Q      And you'll make it known, won't you, that if you need

19  certain additional information, that someone hopefully can

20  bring that information to you; correct?

21  A      If it's available.

22  Q      If it's available.

23         Now, with so much in a criminal -- so much at stake in a

24  criminal case, you were taught to not leave any stone unturned

25  in making sure you were as thorough and accurate as possible;

1    isn't that correct?

2              MS. KESSLER:  Objection, Your Honor.  Argumentative.

3              THE COURT:  Overruled.  She can answer.

4              THE WITNESS:  Repeat the question?

5              MR. HOCHMAN:  Sure.

6    BY MR. HOCHMAN:

7    Q    With so much at stake in a criminal case, you were

8    taught to leave no stone unturned in making sure that you were

9    as thorough and accurate as possible; correct?

10   A    With the documents that I have given, I am supposed to

11   be as thorough and as accurate in making my determinations as

12   possible.

13   Q    Now, you said that you were first assigned to work on

14   the case back in April or May, 2009; is that correct?

15   A    Yes.

16   Q    It's about four and a half years ago; is that correct?

17   A    Yes.

18   Q    About 54 months ago; isn't that right?

19   A    Yes.

20   Q    Now, who gave that you assignment?

21   A    Management of Internal Revenue Service.

22   Q    Management of the Internal Revenue Service.

23        Is that your local field office -- your local office in

24   Plantation, Florida?

25   A    I'm not sure the flow that came down, but it was

1    assigned to me by . . . management of IRS.  It came from my

2    immediate managers.  And then from above that, I don't know

3    where it was assigned to me from.

4    Q    So, but you got it directly from your immediate

5    managers.

6         Is it plural, there's more than one manager you have?

7    A    I have a manager, Larry Harris.  But as this is a grand

8    jury case, I have been working under the grand jury manager.

9    Q    And what's that person's name, please?

10   A    Terry Davis.

11   Q    Carey Davis?

12   A    Terri Davis.

13   Q    And is that a man or a woman?

14   A    It's a woman.

15   Q    Terri Davis.

16        And you said that you received back in April or May of

17   2009, three boxes of UBS documents when you began your

18   assignment; correct?

19   A    Correct.

20   Q    And I was unclear, did those boxes contain the 10 or 11

21   different UBS accounts at that point?

22   A    Yes.

23   Q    And did Ms. Davis ask you to analyze all those UBS bank

24   accounts?

25   A    Yes.

1   Q      And analyze them in depth; isn't that correct?

2   A      At that time, I was assigned to work with what the

3   special agent and the AUSA that was assigned to the case, I was

4   assigned to work with what they told me to work with, or what

5   they provided me to work with.

6   Q      And I thought you were said you were provided with three

7   boxes of documents that had 10 to 11 UBS accounts; correct?

8   A      Yes.

9   Q      So that was your assignment, analyze in depth the 10 or

10  11 accounts that were in the UBS boxes; correct?

11  A      No.  Analyze in depth -- review all of them, but

12  analyze . . . I think it was four or five of those, in depth.

13  Q      Who selected the four or five, was that you or somebody

14  else?

15  A      Not me.  It would be the AUSA that was assigned to the

16  case at the time.

17  Q      What does an AUSA mean?

18  A      Assistant United States Attorney.

19  Q      And who was the AUSA assigned to the case at the time?

20  A      I don't remember.

21  Q      Was there a special agent of the IRS assigned to the

22  case at the time?

23  A      Yes.

24  Q      And who was that?

25  A      Cameron Lalli.

1    Q       That's the gentleman seated behind us here in the

2    gallery?

3    A       Yes.

4    Q       And you received the case in April or May of 2009;

5    correct?

6    A       Yes.

7    Q       Now, you said that -- and you said it was the -- just so

8    I'm clear, was it the AUSA or Mr. Lalli who told you which four

9    of the ten to eleven UBS accounts you should analyze in depth?

10   A       That came down from the AUSA.

11   Q       Did you ever discuss that with Mr. Lalli?

12   A       I'm sure I . . . I was probably on joint phone calls

13   with him during these discussions.

14   Q       Now, and which are the four accounts that you analyzed

15   in depth?

16   A       The first joint account, the two individual accounts,

17   the New Vanguard account, and the Top Fast account.

18   Q       Well, the first joint account is the David Fredrick and

19   Patricia Hough account?

20   A       Yes.

21   Q       Then there was the Patricia Hough account?

22   A       Yes.

23   Q       And then the David Fredrick account.

24   A       Yes.

25   Q       Then you said a New Vanguard account?

1   A       Yes.  And then the Top Fast account.

2   Q       That's five.  You said four a moment ago.

3   A       It's five.

4   Q       Five.

5           So you didn't analyze in depth the Saba School of

6   Medicine Foundation account; correct?

7   A       I did not.

8   Q       You didn't analyze in depth the Medical University of

9   the Americas UBS account; correct?

10  A       I did not.

11  Q       You didn't analyze in depth the Medical Technology

12  Associates UBS account?

13  A       I did not.

14  Q       You didn't analyze in depth the Apex Consultants

15  account?

16  A       I did not.

17  Q       You didn't analyze in depth the Ample Dynamic account at

18  UBS?

19  A       I did not.

20  Q       And you didn't analyze in depth the David Fredrick/Pat

21  Hough credit card account; is that correct?

22  A       That's correct.

23  Q       And is that true that, in the last four and a half

24  years, up until today, you still haven't analyzed those five

25  additional accounts -- again, the Saba, MUA, Apex, Medical

```
 1   Technology Associates, Ample Dynamic, and there's actually a

 2   sixth, the credit card.

 3         You haven't analyzed those six accounts in depth, even

 4   up until today; is that correct?

 5   A     That's correct.

 6   Q     And is that because nobody has asked you to do that?

 7   A     That is because I was never instructed to analyze those

 8   in depth.

 9   Q     And you've had many discussions, have you not, with the

10   prosecutors here, Ms. Finley and Ms. Kessler?

11   A     I'm not sure what you mean by "many."  I've had

12   discussions with Ms. Finley.

13   Q     Ms. Finley.

14         Ms. Kessler, too?

15   A     Yes.  Lately, yes.

16   Q     And when did those discussions with Ms. Finley and

17   Ms. Kessler start?

18   A     About a year ago.

19   Q     And at any point in that year, did they ask you to look

20   in depth at those six additional bank accounts, that being the

21   Saba, MUA, Medical Technology Associates, Apex Consultant,

22   Ample Dynamic, or the David Fredrick/Pat Hough credit card

23   account?

24   A     They never instructed me to look at those in depth.

25   Q     How about Mr. Lalli, Agent Lalli, did he ever instruct
```

1    you to look at those six accounts in depth prior to your

2    testimony here today?

3    A       That was not his . . . call to do so, that I believe.

4    Q       That wasn't my question.

5            Did Mr. Lalli ever ask you to look at those six accounts

6    that we just talked about, in depth, prior to your testimony

7    today?

8    A       No, he did not.  But that wasn't his assignment.

9    Q       So Mr. Lalli is following the directions of the

10   prosecutors; is that correct?

11   A       I'm not sure about that.  I just know that Mr. Lalli

12   would not have made that decision without discussing it with

13   the AUSAs or the prosecutors.

14   Q       Well, the --

15   A       He wouldn't have instructed me to do that without . . .

16   the attorneys instructing him to tell me to do that.

17   Q       So your understanding of the process is that these

18   attorneys, Ms. Finley and Ms. Kessler, behind me, instruct

19   Mr. Lalli what to do, and then he would instruct you?

20           Is that how it proceeds?

21   A       Not Ms. Finley and Ms. Kessler, just whoever was the

22   attorney assigned to the case at the time.

23   Q       Well, don't you understand Ms. Finley and Ms. Kessler to

24   be the attorneys assigned to the case at this time?

25   A       Yes.

1  Q      And Ms. Finley, you said, you've spoken to her as early

2  as a year ago; correct?

3  A      Yes.

4  Q      So in the last year, to your knowledge, Ms. Finley and

5  Ms. Kessler have not instructed Agent Lalli to instruct you to

6  look at those six additional accounts in depth; is that

7  correct?

8  A      Correct.

9  Q      Now, you've heard about some other, additional banks

10 that are at issue in this case, isn't that correct --

11 A      Yes, sir.

12 Q      Excuse me.

13        -- beyond UBS, Liechtenstein Landesbank, and Fortis

14 Banque; correct?

15 A      Correct.

16 Q      I think there are two additional banks, Zurcher Kantonal

17 Bank, and Bank Alpunim.

18        Are you familiar with those?

19 A      Yes.

20 Q      And did you look at those, any entities, bank accounts,

21 in those banks, at any time today?

22 A      No.  I didn't review those in depth.  I didn't analyze

23 those in depth.

24 Q      Why not?

25 A      I wasn't instructed to do so.

1    Q     And who would have been the one to give you the

2    instruction to look at those additional bank accounts prior to

3    today?

4    A     I looked at them.  I was instructed to look at them.

5    But I wasn't instructed to analyze them in depth.  That would

6    have been by Mrs. Finley.

7    Q     And Ms. Kessler as well?

8    A     Later on, Ms. Kessler; yes.

9    Q     And you're aware, are you not, that some of the entities

10   in this case actually have bank accounts in some of these other

11   banks; isn't that correct?

12   A     That's correct.

13   Q     Now, was . . . .  I think you said that -- let's go back

14   to the beginning, April, May, 2009, when you originally were

15   given your assignment.

16         And your assignment, I think you said during your direct

17   testimony, was to determine whether there was any interest,

18   dividend, or investment income in the accounts that were not

19   reported on a corresponding tax return.

20         Was that your original assignment?

21   A     Yes.

22   Q     And whose corresponding tax returns were you told to

23   compare these UBS accounts against?

24   A     Patricia Hough and David Fredrick.

25   Q     So a decision was made, back in April and May, 2009,

1    that David Fredrick and Patricia Hough owned all the UBS

2    accounts that you were given to analyze; is that correct?

3    A      I don't know if that was the decision.  I know that

4    there were accounts that their names were on, and I was told to

5    analyze them.  I'm not sure if anybody had already determined

6    definitively that they owned them at that time.  That's -- I

7    don't know.

8    Q      But don't you -- but were you given anybody else's name,

9    or anybody else's tax returns, to compare these UBS accounts

10   to?

11   A      No.

12   Q      So the decision was already made, it was predetermined,

13   that the -- all of these accounts that you were going to be

14   looking at were David Fredrick and Pat Hough's, as early as

15   April or May of 2009; isn't that correct?

16   A      I was given those returns because those were the names

17   that appeared on the accounts.  If somewhere in the review and

18   analysis it turned out that those tax returns didn't correspond

19   with those accounts, then it would have been -- I would have

20   rolled it forward, I would have brought it forward, and it

21   would have never been -- it would never have proceeded if it

22   was not in the accounts of Pat Hough and David Fredrick.

23   Q      So you had actually two assignments back in April and

24   May of 2009.

25          The first assignment was to figure out the interest,

1    dividends, and investment income for the UBS accounts; correct?

2    A      Yes.

3    Q      And the second assignment, though, was to find out whose

4    interest, dividend, and investment income in the UBS accounts

5    that money belonged to; correct?

6    A      Well, I was -- I was concurring that it was theirs,

7    their money.

8    Q      So you were told, back in April/May, 2009, it was their

9    money, and you persist in that belief up until today; isn't

10   that correct?

11   A      I don't believe I was told it was their money.  I was

12   told that this -- these are the accounts, David Fredrick and

13   Patricia Hough, their names are on them, and I made -- and I

14   concurred that this was whose tax return it was supposed to be

15   on, and to this day forward I still believe that.

16   Q      Were you ever given anybody else's names to compare the

17   UBS accounts to other than David Fredrick and Patricia Hough?

18   A      No.

19   Q      Now, I think you said, several times in your testimony,

20   that you understand the fundamental principle that, if David

21   Fredrick and Patricia Hough did not own the accounts, that any

22   income generated from the accounts was not theirs.  Correct?

23   A      Correct.

24   Q      So basically, if it's not their money, it's not their

25   income.  Correct?

1   A      Basically.

2   Q      Now, to do your analysis, you said, you believe that you

3   reviewed the opening documents from each of these accounts;

4   correct?

5   A      Yes.

6   Q      And you looked at the account statements?

7   A      Yes.

8   Q      The year-end statements?

9   A      Yes.

10  Q      The e-mails and notes from the client work bench?

11  A      Yes.

12  Q      And then you created a spreadsheet to analyze whether

13  there was, in fact, any unreported interest, dividends, and

14  investment income for each of the accounts; correct?

15  A      Yes.

16  Q      Well, each of the accounts -- you said you looked at 11

17  accounts.  Did you do these analyses for those 11 accounts?

18  A      No.  I stated before I did it for the five accounts.

19  The spreadsheet analysis.

20  Q      So your spreadsheet analysis was just for the five

21  accounts.  It's the David Fredrick/Pat Hough joint account;

22  correct?

23  A      Yes.

24  Q      The David Fredrick -- and this is UBS accounts:  The

25  David Fredrick account, the Pat Hough account, the New Vanguard

1   account, and the Top Fast account, all being UBS accounts;

2   correct?

3   A       Correct.

4   Q       Now, you have been working --

5   A       What was the question, though?  I'm lost as to what your

6   question was.

7   Q       Well, the question was your detailed spreadsheet on the

8   UBS accounts --

9   A       Were for those five accounts.

10  Q       Those five accounts, and not for the other six; correct?

11  A       Those five that you just mentioned; yes.

12  Q       Great.  And you have been working on this case for four

13  and a half years.  How many hours would you estimate you spent

14  on your analysis?

15  A       I don't -- I don't know.

16  Q       Would you estimate you spent more than 500?  Over the

17  last four and a half years.

18  A       I don't know.

19  Q       Well, would you estimate you spent more than a hundred?

20  A       More than a hundred.

21  Q       Do you actually keep records of your time with the IRS

22  on what you're spending your time on?

23  A       Yes, I do.

24  Q       And have you had a chance to -- and you have to fill out

25  those records accurately; correct?

1    A      Yes.

2    Q      And when you log in hours on this case, you have to put

3    those hours down on the form to show what you've been up to;

4    correct?

5    A      Yes.

6    Q      So, in the last four and a half years, based on all the

7    work that you've testified about, would it be fair to say

8    you've spent more than 250 hours on this case?

9    A      That would be fair to say.

10   Q      Is it maybe as much as 500 hours?  Possibly?

11   A      Possibly.

12   Q      So somewhere, let's say, between 250 and 500 hours on

13   this case.  Is that a fair estimate of your time?

14   A      That would be a fair estimate.

15   Q      Now, you prepared a first report, what you've called the

16   Revenue Agent's Report, in this case, dated May 14th, 2013;

17   correct?

18   A      Correct.

19   Q      And you're aware that . . . and -- excuse me.  As part

20   of that report, that's a report that -- I mean, I think we've

21   seen a version -- a different version -- here today; is that

22   correct?

23   A      That's correct.

24   Q      We'll get to that in a minute.  But that May 14, 2013

25   report, you understood that to be a report that would include

1   all the adjustments for the income for Patricia Hough and David

2   Hough -- for Patricia Hough and David Fredrick; correct?

3   A      Yes.

4   Q      And, as part of preparing that report, you knew that, at

5   some point, that report would be given to the prosecutors;

6   correct?

7   A      Yes.

8   Q      And that report would then be given to the defense;

9   isn't that correct?

10  A      Yes.

11  Q      And then that report would be acted upon by the

12  prosecutors; isn't that correct?

13  A      Correct.

14  Q      Now, in the period of . . . so in that report -- again,

15  we use May 14, 2013.  And let's just say you got the case in

16  May of 2009.  So, during that four-year period, how many

17  interviews did you conduct of people prior to finalizing your

18  report on May 14, 2013?

19  A      That is not my role in the case.

20  Q      So is the answer zero?

21  A      The answer has to be zero.  That's not my role in the

22  case.

23  Q      Okay.  So did you ever fly down to Saba or Nevis to see

24  the school?

25  A      The answer is no.  That is not my role in the case.

1    Q        Did you ever interview any Saba School of Medicine

2    Foundation board members prior to completing your report?

3    A        The answer is no.  That is not my role in the case.

4    Q        When you keep saying that's not your role in the case,

5    you are the one that's determining who owns these accounts;

6    correct?

7    A        I am concurring with attorneys that that is who owns the

8    accounts.

9    Q        Well, you said it before, that you don't just blanket --

10   you don't just rubber stamp what the attorneys are telling you.

11   You said that, in your investigation, if you learn that someone

12   other than David Fredrick and Patricia Hough own these

13   accounts, you wouldn't include it in your figures; correct?

14   A        Correct.

15   Q        So what I'm asking about is the investigation you did to

16   learn whether or not David Fredrick and Patricia Hough actually

17   own these accounts.

18            So let me ask you this question along those lines.  Did

19   you actually interview any of the MUA board members to see who

20   owns MUA?

21   A        No.  That is not my role in the case.

22   Q        And you didn't do it.  Correct?

23   A        Correct.

24   Q        And the Saba school foundation's main headquarters over

25   the last seven years -- several years has been located in

1   Guatemala.  Have you gone down to Guatemala to interview anyone

2   in connection with the Saba School of Medicine Foundation?

3   A       No.  That is not my role in the case.

4   Q       Did you ever look at the Saba Foundation's website,

5   which is WWW.SabaFoundation.org, to learn about whether or not

6   the Saba Foundation is still in existence?

7   A       I looked at the website.

8   Q       And did you notice that the Saba Foundation is still in

9   existence?

10  A       The website was started in and around 2009.  And I

11  haven't checked it in a few months, but I'll take your word

12  that the website is still in existence.

13  Q       And if you went through the website, you learned about

14  all the charitable activities that the Saba Foundation has been

15  up there over the last four years; correct?

16  A       I read on a website that they were doing activity.

17  Q       Philanthropic activities; correct?

18  A       I read on the website that they were doing . . .

19  charitable acts.

20  Q       Charitable acts.  Helping the poor, and those in medical

21  need; correct?

22  A       I read that on the website.

23  Q       All over Central America, and a particular focus in

24  Guatemala.  Correct?

25  A       I saw that on the website.

1    Q      Well, did you ever contact Florencio Montenegro, of the

2    Saba Foundation, to ask him whether or not the funds that are

3    in the Saba Foundation belong to Dave and Pat or -- excuse me,

4    David Fredrick and Patricia Hough, or belong to The Foundation?

5    A      No.  That's not my role in the case.

6    Q      Did you ever have Haraldo Bautista, the current chairman

7    of the Saba Foundation, whether or not the funds in the Saba

8    Foundation belong to Dr. Fredrick and Dr. Hough, or belong to

9    the Saba Foundation?

10   A      No.  That's not my role in the case.

11   Q      Did you ever interview any of the accountants or lawyers

12   involved with the Saba Foundation or MUA?

13   A      No, I have not.

14   Q      Did you actually ever speak to any of the government's

15   witnesses that its presented at this trial before you finalized

16   your report on May 14, 2013?

17   A      No, I did not.

18   Q      How many times did you go to Switzerland before you

19   finalized your report?

20   A      None.

21   Q      How many times have you met with Dieter Luetolf?

22   A      None.

23   Q      Well, did you e-mail him, or telephone him, or

24   communicate with him in any way?

25   A      No, I didn't.

1   Q      Now, in your review of the documents, you knew that
2   Dieter Luetolf was the client adviser for all of the UBS
3   accounts; correct?
4   A      Correct.
5   Q      He was the one that was involved in helping set up these
6   accounts; correct?
7   A      Yes.
8   Q      And he's a pretty central figure in this case, isn't he.
9   A      He is in this case, but I wouldn't know to say if he was
10  a central figure in this case.
11  Q      Well, he's the primary client adviser in connection with
12  these 11 UBS accounts; correct?
13  A      Yes.
14  Q      And you would agree, would you not, that, knowing what
15  Dieter Luetolf has to say as to whether or not the money in
16  these accounts was the Saba Foundation's money or the people
17  whose names were on the accounts is a pretty important thing to
18  know in this case; correct?
19  A      Repeat the question?
20  Q      Well, Dieter Luetolf, if you had been able to -- you
21  understand that speaking to Dieter Luetolf would be important
22  to find out whether or not the money that is in the UBS
23  accounts is the Saba Foundation's money or the people who are
24  indicated in the names of the accounts; correct?
25  A      I am not sure if the information Dieter Luetolf had

1    would have been any different than in the paperwork that was

2    provided by UBS.

3    Q       Well, you would have known -- if you had been able to

4    speak to Dieter Luetolf, he could have told you what he advised

5    Dr. Hough and Dr. Fredrick in connection with the forms that

6    they signed; isn't that correct?

7    A       If I had spoken to him?  I don't know what he would have

8    said.  But it was not my role in the case to speak to Dieter

9    Luetolf.  I don't know what he would have said.

10   Q       You don't know because you never asked him; correct?

11   A       I never asked him.  It wasn't my role in the case.

12   Q       Did you ever ask the prosecutors to contact UBS,

13   pursuant to the Deferred Prosecution Agreement, and ask UBS to

14   make Dieter Luetolf available to you so you could ask him these

15   key questions?

16   A       No.  That is not my role in the case.

17   Q       But again -- you keep saying it's not your role in the

18   case.  Your role is to be thorough; isn't that correct?

19   A       My role is to be as thorough as possible with the

20   documents I have been provided.

21   Q       Well, but you have the ability, do you not, to ask the

22   prosecutors to provide you with more documents if that would

23   help in your analysis; correct?

24   A       Yes.

25   Q       Did you ever ask the prosecutors to make Dieter Luetolf

1    available to you, through the UBS Deferred Prosecution

2    Agreement, so you could ask him some key questions?

3    A      It's not my job to interview.

4    Q      Is the answer no, that you never asked the prosecutors

5    to make Dieter Luetolf available to you?

6    A      I did not ask the prosecutors to ask Dieter Luetolf –– I

7    didn't ask them to make Dieter Luetolf available for me to ask

8    questions.

9    Q      Now, you heard from Mr. Futterknecht that a foundation

10   that runs a medical school with buildings, students, teachers,

11   administrators, offices, and a multimillion-dollar budget is an

12   operating company, not a domiciliary company; correct?

13   A      Correct.

14   Q      And the notion of this word –– I heard you use it with

15   respect to New Vanguard is a domiciliary company; is that

16   correct?

17   A      Yes.

18   Q      When did you first learn this concept of domiciliary

19   companies?

20   A      I knew there was a concept between operating and

21   nonoperating companies; but I did not know that UBS used that

22   word until . . . I can't say his name.  The witness from UBS

23   explained that.  That domiciliary meant nonoperating.

24   Q      Okay.  I see.  So he just supplied the additional word

25   for the concept that you already knew about; correct?

1    A      Correct.

2    Q      And when you reviewed the Form A for the Saba School of

3    Medicine's UBS account, did you know that the Form A actually

4    should not have been filled out because the Saba School of

5    Medicine was an operating company, as opposed to a domiciliary

6    company?

7    A      I don't know where that confusion came from.

8    Q      And that's because you never asked Dieter Luetolf why he

9    filled out the Form A for the Saba School of Medicine UBS

10   account; correct?

11   A      Correct. But that was -- it was an investment account.

12   It wasn't an operating account for Saba.

13   Q      Well, the issue, as Mr. Futterknecht told us, is not

14   investment versus non-investment account, it's whether or not

15   it's an operating company or a domiciliary company; correct?

16   A      Correct.

17   Q      And he said, I believe, that, under these set of

18   circumstances, it would be an operating company, and therefore

19   the Form A should never have been filled out for the Saba

20   School of Medicine's UBS account; correct?

21   A      I don't know where the confusion came from. I don't

22   know . . . where the information came from. I . . . the Saba

23   University School of Medicine is an operating account. I don't

24   know why those documents were filled out the way they were.

25   Q      Well, you believe that the Saba School of Medicine

1   Foundation, if I recall, is owned which Dave Fredrick and

2   Patricia Hough; correct?

3   A      Correct.

4   Q      And isn't part of your analysis based on seeing the

5   Form A in the Saba School of Medicine's UBS account?

6   A      Yes.

7   Q      And that Form A, which should never have been filled

8   out, lists, as beneficial owners, David Fredrick and Patricia

9   Hough; correct?

10  A      Correct.

11  Q      Because an operating company like the Saba School of

12  Medicine Foundation doesn't need to fill out a Form A, because

13  it has no beneficial owners; isn't that correct?

14  A      The Saba School of Medicine Foundation is owned by

15  Patricia Hough and David Fredrick.  I don't know what

16  discussions there were about the Form A with Dieter Luetolf.

17  Q      Well, again, I'm going to the whole notion of whether or

18  not an operating company like the Saba School of Medicine

19  Foundation, which you've already conceded to me, had to fill

20  out a Form A listing beneficial owners; and I believe you said

21  it did not.  Correct?

22  A      That's what the witness from UBS said.

23  Q      And do you have any reason to doubt Mr. Futterknecht,

24  the witness from UBS?

25  A      I don't have any reason to doubt him.

1    Q      And since -- and the whole point of not filling out a

2    Form A is because there are no beneficial owners of this

3    operating company.  Because, if there were, you'd have to fill

4    out a Form A.  And, because it's an operating company, you

5    don't have to fill out a Form A.  Correct?

6    A      But I don't know where the part of Foundation fits in

7    with that.

8    Q      Well, Mr. Futterknecht said, whether it's a foundation,

9    a company, an LLC, whatever the entity is, as long as it's an

10   operating company, which we've agreed the Saba School of

11   Medicine Foundation was, then you don't have to fill out the

12   Form A because there are no beneficial owners of that company;

13   correct?

14   A      For a foundation, there should not be beneficial owners.

15   Q      Thank you.

16          Now, other than Dieter Luetolf, I believe you saw that

17   there were other UBS people associated with these various UBS

18   accounts; correct?

19   A      Correct.

20   Q      I think Patrick Hoffman was one, and there are a bunch

21   of other names whose stamps were presented on the documents in

22   evidence; correct?

23   A      Yes.  I don't know if I would say a bunch, but I know

24   the name Patrick Hoffman was on there; yes.

25   Q      And did you ever speak with Patrick Hoffman before

1    preparing your report in this case?

2    A        No.

3    Q        Did you ever communicate with him, in any way, to find

4    out if the money in the UBS accounts was the Saba Foundation's

5    money or the money listed on the title of the particular

6    account?

7    A        I did not speak to him.

8    Q        Did you ever ask the prosecutors to make -- to ask UBS

9    to make Mr. Hoffman available to you pursuant to the Deferred

10   Prosecution Agreement?

11   A        I did not.

12   Q        So you spoke to nobody at UBS with respect to any of

13   these UBS accounts.  Is that correct?

14   A        I did not speak to anyone at UBS.

15   Q        And you testified that you did not have all the records

16   you needed to determine the interest, dividend, and -- well,

17   excuse me.  That you didn't have certain records from the UBS

18   files that would have made it easy to determine the interest,

19   dividend, and investment income from the UBS accounts; correct?

20   A        Correct.

21   Q        And I believe that, with respect to income statements,

22   you said you didn't have any income statements; correct?

23   A        They were not given to me by UBS, or made available to

24   me by anyone, during the years that I have had the case.

25   Q        So, in the last four and half years, did you ever ask

1    one of the prosecutors to ask UBS to make these records

2    available to you pursuant to the Deferred Prosecution

3    Agreement?

4    A     It's my understanding that the documents we got from UBS

5    were the documents we were going to get, that there was –– they

6    weren't going to supply those.

7    Q     They weren't going to comply with the Deferred

8    Prosecution Agreement?

9    A     I don't know all of the dates of the Deferred

10   Prosecution Agreement; but I know that, at a certain point, I

11   was told that those income statements would not be made

12   available from UBS.

13   Q     Well, the prosecutor, Ms. Kessler, during your direct

14   testimony, actually showed you a copy of the Deferred

15   Prosecution Agreement.  Was that the first time you've ever

16   seen that Deferred Prosecution Agreement?

17   A     No.

18   Q     So you knew about the Deferred Prosecution Agreement,

19   and you could have requested these additional statements from

20   UBS if you wanted to; correct?

21   A     I could not request them from UBS.

22   Q     You could have requested them from the prosecutors to

23   get them from UBS through the Deferred Prosecution Agreement;

24   correct?

25   A     I could have asked, but I knew that . . . that they

1    wouldn't be made available.

2    Q      And how did you know that UBS was not going to comply

3    with a request from the United States Government under the

4    Deferred Prosecution Agreement?

5    A      I just knew from conversations that they weren't going

6    to be made available.

7    Q      Conversations with whom?

8    A      Other agents.  Management.  I can't tell you specifies.

9    Q      Anyone in the Department of Justice that you spoke with,

10   that had the agreement with UBS, did you speak to anyone at the

11   Department of Justice to ask them whether or not UBS would make

12   available the records that you needed?

13   A      I did not speak to anyone in the Justice Department.

14   Q      Now, with respect to the other banks that you have

15   testified about, Fortis Banque, did you ever make a request of

16   the prosecutors to ask Fortis Banque for additional bank

17   records?

18              MS. KESSLER:  Objection.  Can we approach sidebar?

19              THE COURT:  You may.

20                         AT SIDEBAR

21          MS. FINLEY:  Your Honor, again, Ms. Kessler just got

22   on the case six weeks ago, so the objection is something

23   relevant to knowledge she doesn't necessarily have.

24          THE COURT:  So I get to scream at Mr. Hochman about

25   making objections when they're not his witness, but I'm going

1    to let you talk?

2              Any objection to that?

3              MR. HOCHMAN:  No, Your Honor.

4              THE COURT:  Go ahead.

5              MS. FINLEY:  I'm so chastised.

6              The records that Mr. Hochman is about to go into are

7    records that we received from the defendant; and we have made

8    an agreement that we were not going to mention where we had

9    gotten those records.  So we're into, now . . . I'm just not

10   sure where he's going, as to what records.  Because the witness

11   knows not to mention where she got the records from, because

12   she knows we got them from the defendant.

13             THE COURT:  And the records are what?

14             MS. FINLEY:  The Fortis Banque and the Liechtenstein

15   Landesbank.

16             MR. HOCHMAN:  I will make it clear.  I will just ask

17   if she made a request to get the records from the bank.  I will

18   not deal with where she got the records, Your Honor.

19             THE COURT:  Does that work?

20             MS. FINLEY:  I just didn't want unnecessary

21   information to be elicited.

22             THE COURT:  All right.

23                            IN OPEN COURT

24             THE COURT:  You may proceed.

25

1   BY MR. HOCHMAN:

2   Q      Ms. Maurer, did you ever contact Fortis Banque,

3   yourself, or ask anyone from the government to contact Fortis

4   Banque on your behalf, in order to get records related to the

5   entities in this case?

6   A      I did not.

7   Q      Did you ever contact Zurcher Kantonal Bank yourself, or

8   ask anyone from the government, on your behalf, to obtain

9   records of the entities with the bank accounts related to this

10  case?

11  A      I did not.

12  Q      Have you ever asked Liechtenstein Landesbank, yourself,

13  or ask through anyone in the government, to obtain records from

14  that bank related to the accounts of the entities involved in

15  this case?

16  A      I did not.

17  Q      Did you ever ask, yourself, or ask anyone from the

18  government on your behalf, to ask Bank Alpunim for additional

19  records so you could conduct your very thorough analysis?

20  A      I did not.

21  Q      Did you ever . . . .  Well, you were aware, were you

22  not, that there is not only a client adviser at UBS associated

23  with these accounts, but there was also something called a

24  financial adviser involved in this case, as well; correct?

25  A      Are you speaking of Beda Singenberger?

1   Q       I am speaking of Beda Singenberger.

2   A       Yes.

3   Q       And you understood that Beda Singenberger was the

4   financial adviser for the New Vanguard, Top Fast, and Ample

5   Dynamic accounts; correct?

6   A       He was hired and given power of attorney by Patricia

7   Hough and David Fredrick to perform some of the duties

8   associated with the case.

9   Q       Hired and given power of attorney.

10  A       He was given power of attorney to handle some –– he was

11  the intermediary, or fiduciary.  The word that the man from

12  UBS –– they were fiduciaries.  They were . . . a layer

13  between . . . Patricia Hough and David Fredrick, then Beda

14  Singenberger, and then the client adviser.

15  Q       Correct.  And Mr. Singenberger, he is representing New

16  Vanguard, Top Fast, and Ample Dynamic; correct?

17  A       For Patricia Hough and David Fredrick.

18  Q       When you say for Patricia Hough and David Fredrick,

19  aren't you aware that Ample Dynamic –– we'll take Ample Dynamic

20  as one example.  That Ample Dynamic Trading is a wholly owned

21  company by the Saba School of Medicine Foundation?

22  A       I don't believe that to be true.

23          MR. HOCHMAN:  And that's because –– well.

24          If I may show the witness what's been marked –– or

25  actually what's in evidence as 16C, and publish 16C, Your

1    Honor?

2              THE COURT:  You may.

3              (Mr. Hochman provides an exhibit to the witness.)

4              MR. HOCHMAN:  Can we publish 16C?  I'm sorry.  You

5    have to turn the direction this way.

6              (An exhibit was projected onto the projector screen.)

7              MR. HOCHMAN:  If we can zoom in on the second

8    paragraph, please?

9    BY MR. HOCHMAN:

10   Q     Ms. Maurer, you said that you have sat through all the

11   testimony and evidence in this case so far; correct?

12   A     Correct.

13   Q     So you were aware, were you not, when 16C was presented

14   as evidence in this case; correct?

15   A     I don't remember this.

16   Q     Are you saying that you don't think 16C is evidence in

17   this case?

18   A     If you say it was presented in evidence, then it's

19   evidence in the case; but this -- I must not have concentrated

20   on this, or seen this.

21   Q     You were sitting in the first row, were you not, right

22   behind the prosecutors, the entire trial; isn't that correct?

23   A     Yes, I was.

24   Q     At any point during this trial, did you get up during

25   testimony and leave?

1    A       No.

2    Q       So it's fair to say, at every moment of this trial while

3    we have been in session, you have been sitting in the first

4    row, watching the testimony and looking at the evidence as it's

5    been admitted; correct?

6    A       Yes.

7    Q       Do you see the little evidence tag that you're holding,

8    that shows this is an admitted piece of evidence, 16C?

9    A       Yes, I do.

10   Q       Let's focus on the second paragraph that says ample

11   Dynamic Trading Company Limited is wholly owned by the Saba

12   School of Medicine Foundation, and that this deals with the

13   Greenville property.  Do you see that?

14   A       Yes.

15   Q       That changes your mind, does it not --

16   A       No.

17   Q       It doesn't change your mind.

18   A       No.

19   Q       Do you see who this is signed by?  This document?

20   A       Yes.

21   Q       It's signed by Florencio Montenegro, a board member of

22   the Saba School of Medicine Foundation; correct?

23   A       Say that again?

24   Q       It's signed by Florencio Montenegro.

25           If we could focus on the signature lines, please?

1    A       Yes.

2    Q       A board member of the Saba School of Medicine

3    Foundation, as well as Dr. Haraldo Bautista, the board

4    chairman; is that correct?

5    A       Yes.

6    Q       And you see the letterhead is the Saba School of

7    Medicine Foundation.  Do you see that?

8    A       I remember this document now.

9    Q       And this document, this doesn't say maybe, possibly, or

10   if; it says that Ample Dynamic is wholly owned by the Saba

11   School of Medicine Foundation.  Correct?

12   A       Yes.  But this was a document that was created on

13   March 1st, 2011.  This is . . . this was . . . created for a

14   purpose in the file for selling the house or buying the house.

15   I can't remember exactly.  This would be -- this March 1st,

16   2011 date?  This does not change my mind.  This is a date that

17   I would call extemporaneous.  It was something that was created

18   after the event, and it is self-serving.

19   Q       Self-serving document.  Who do you . . . .  So do you

20   have any reason to doubt the authenticity of this document?

21   A       I believe typed it --

22   Q       I'm sorry --

23   A       -- I believe somebody created it.  I believe it's an

24   authentic document, but . . . .

25   Q       And you have never followed up and checked with

1  Dr. Bautista or Mr. Montenegro, one way or the other, to

2  confirm whether the statement Ample Dynamic Trading Company is

3  wholly owned by Saba School of Medicine Foundation is true;

4  correct?  You've never checked on that.

5  A       I have never called those gentlemen and asked them.

6  Q       In fact, you've taken absolutely no action whatsoever to

7  independently investigate whether or not the Ample Dynamic

8  Trading Company is wholly owned by the Saba School of Medicine

9  Foundation, or David Fredrick and Pat Hough; correct?

10 A       It is not my role to take independent investigative

11 actions in the case.

12 Q       Let's go back to Beda Singenberger for a moment.  How

13 many times have you spoken to Beda Singenberger at Sinco Trust

14 in Zurich?

15 A       None.

16 Q       Now, Beda Singenberger's address has to be on probably a

17 couple hundred documents, because it's on all the bank

18 statements you looked at; correct?

19 A       It's not on all the bank statements I looked at.

20 Q       Actually, I misspoke.  It would be on the New Vanguard,

21 Top Fast, and Ample Dynamic bank statements, where the address

22 would be located under Sinco, and then there's a word,

23 Treuhand, with an address in Zurich; correct?

24 A       Correct.

25 Q       In fact the address is IDA Strassa 15, at 8003 Zurich;

1    isn't that correct?

2    A       I don't -- I don't know the address.

3    Q       Would it refresh your recollection to see some documents

4    that would show that address?

5    A       I will take your word for that, that that's the address.

6    Q       Have you ever communicated or written a letter to

7    Mr. Singenberger to ask him, as the financial adviser for all

8    these UBS accounts, whether or not the accounts were owned by

9    the Saba Foundation or whether or not they were owned by David

10   Fredrick and Pat Hough?

11   A       I have not contacted Beda Singenberger.

12   Q       And, with respect to that, you talked a little bit about

13   substance over form.  Do you remember that discussion you had

14   with Ms. Kessler?

15   A       Yes, I do.

16   Q       And I think what you're saying is that the name on the

17   account doesn't control who actually owns the account.

18   Correct?

19   A       I don't believe that's . . . what that -- what I was

20   speaking with Ms. Kessler.

21   Q       Let's deal with whole concept of substance over form.

22   If the form has a name on the account, but the substance turns

23   out to be something different than the name on the account,

24   then you would say substance over form; is that correct?

25   A       If the form does not adequate -- does not represent the

1    underlying substance, then it's substance over form.

2    Q      Thank you.

3           Let me give you an example, if I could.  If you gave me

4    a thousand dollars of your money, and I took your money, and I

5    put it in a mattress, my mattress, and I was holding that money

6    for you, in my mattress, has that become my money because it's

7    under my mattress?

8    A      No, it does not.

9    Q      Now, instead of my sticking it under my mattress, what

10   if I go ahead and I stick it in my -- or place it in my bank

11   account, the Nathan Hochman bank account, but it's your money

12   that I'm holding for you?  Does the fact that I stuck it in the

13   Nathan Hochman bank account make it my money?

14   A      Are you saying that it's just a thousand dollars of my

15   money?

16   Q      Yup.

17   A      And I'm not paying you for services, or . . . or

18   property, or . . . .

19   Q      Correct.

20   A      It's just my money, and I'm asking you to hold it?

21   Q      Yes.

22   A      And you put it in your bank account?

23   Q      Yes.  Has it become my money because it's in the Nathan

24   Hochman bank account?

25   A      No.  But then I lose pretty much a lot of the rights to

1   it unless I trust you.

2   Q       Unless you trust me.  Because I will be acting as your

3   caretaker.  Let's say, as part of my hypothetical, I'm your

4   fiduciary, I'm your caretaker, I'm responsible for the money.

5   Okay?  Now, let's say that money sitting in the Nathan Hochman

6   bank account, earns interest.  I'll make it an amount.  Let's

7   say, over time, it makes a hundred dollars worth of interest.

8   Is that hundred dollars worth of interest on the underlying

9   money, which has always been your money, is the interest also

10  yours, or do I somehow get $100 for Nathan Hochman?

11  A       It would be my interest.

12  Q       And you would be responsible for paying tax on it;

13  correct?

14  A       I should be the one responsible for paying taxes on it.

15  Q       So the mere fact that your money sits in the Nathan

16  Hochman bank account —— excuse me, the mere fact that the bank

17  account in which your money sits in says Nathan Hochman doesn't

18  magically transform it into Nathan Hochman's money; correct?

19  A       No.

20  Q       Correct?

21  A       Correct.

22  Q       Thank you.

23  A       But I wouldn't put a thousand dollars of my money in

24  your bank account.

25  Q       Well . . . .  I understand that.

1          Now, the person who works with -- the person who works

2     with Mr. Singenberger is a gentleman name Erwin Schulthess.

3     You have seen had his name on a number of documents; correct?

4     A     I've seen his name.

5     Q     And he works at Sinco Trust as well; correct?

6     A     Correct.

7     Q     You never contacted him; correct?

8     A     Correct.

9     Q     You never contacted anyone at Sinco, for that matter.

10    A     I have not.

11    Q     But you would agree that it's important -- it would be

12    important to speak with the financial advisers to learn that

13    information as to whether or not they believed, at least, that

14    they were dealing with the Saba Foundation's money, or David

15    Fredrick and Patricia Hough's money; correct?  That would be

16    important, wouldn't it?

17    A     I don't know if it would be important.

18    Q     Do you think it would be relevant?

19    A     It could possibly be relevant.

20    Q     Now, did you go -- now, the three Hong Kong companies,

21    which are Top Fast, New Vanguard, and Ample Dynamic; correct?

22    Correct?

23    A     New Vanguard . . . .  Yes.

24    Q     And each of those companies, and all the paperwork,

25    lists certain directors that are located in Hong Kong.  Do you

1   recall that from the paperwork for New Vanguard, Top Fast, and

2   Ample Dynamic?

3   A       Correct.

4   Q       Did you ever go to Hong Kong to speak to any of the

5   directors that are listed for the three Hong Kong companies in

6   the UBS paperwork?

7   A       No.

8   Q       Now, the IRS has an attaché in Hong Kong that can do

9   assignments sent from the United States you; is that correct?

10  A       I believe there's procedures.  But I haven't reviewed --

11  if you say there's an attaché in Hong Kong, okay.

12  Q       Did you ever contact the IRS attaché, their person in

13  Hong Kong, to try and reach out to the directors of the three

14  Hong Kong corporations here, New Vanguard, Ample Dynamic, and

15  Top Fast?

16  A       No; but as I said, that would not have been my role in

17  the case.  It's not my . . . .

18  Q       Did you ever reach out to the attaché in Central

19  America, Switzerland, or Liechtenstein, and ask them to go

20  ahead and reach out to the various parties in these cases that

21  were located in their jurisdictions?  Did you do that?

22  A       No, I did not.

23  Q       I'm sorry?

24  A       No.

25  Q       Now, after you spent about 48 months doing your

1    analysis, you finally prepared a report dated May 14, 2013; is

2    that correct?

3    A       Correct.

4    Q       That's about five months ago.  A little over five months

5    ago.  Correct?

6    A       Correct.

7    Q       And that was just prior to the indictment being

8    returned, the very next day, which is May 15, 2013; correct?

9    A       It was just prior to that; yes.

10   Q       And you gave the prosecutors a couple -- a copy of your

11   RAR, your Revenue Agent's Report?

12   A       Correct.

13   Q       And you knew the importance of making sure that that

14   report was 100 percent accurate; correct?

15   A       Based on the documents and the facts and circumstances

16   that I knew at the time.

17   Q       But again, you were striving for 100 percent accuracy;

18   correct?

19   A       I was driving to be accurate.

20   Q       And you believed it was 100 percent -- it was

21   100 percent accurate, or you wouldn't have given it to the

22   prosecutors; correct?

23   A       I believed it was accurate.

24   Q       Did you ever ask the prosecutors for more time, and say

25   look, I need some more time, I am not ready to give you my

1   report on May 14, 2013, the day before this indictment was

2   return?

3   A      No, I did not.

4   Q      Did you ever put any caveats or exceptions in that

5   report to say -- back on May 14, 2013, to say this was like a

6   preliminary draft, or that your final report would be issued in

7   the future?

8   A      I believe the May 14 document may have said draft copy.

9   Q      And you believe that why?  Because you've reviewed the

10  May 14th report and seen that it says draft copy, or are you

11  just speculating?

12  A      I would like -- I would like to review the document, but

13  I'm pretty sure it said draft copy.

14  Q      The prosecutors were going to bring criminal charges

15  based on that May 14, 2013, RAR; correct?

16  A      Correct.

17  Q      By the way, did that report have to be approved by

18  anyone else at the IRS before you gave it over to the

19  prosecutors?

20  A      No.

21  Q      Did you have a supervisor involved in this case?  That

22  you said that . . . Terri Davis, was it?

23  A      Yes.  She didn't review.

24  Q      Did anyone over at the SEP branch where you work, did

25  anyone review your report prior to your giving it over to the

1   prosecutors?

2   A      No, they did not.

3   Q      Was it the policy of the SEP branch just to have one of

4   its SEP agents prepare a report without any additional review

5   on the IRS's side?

6   A      That's the way it happened.  I believe it is.

7   Q      That's the way it happened?

8   A      I believe that's standard procedure.

9   Q      So it's standard procedure to have no separate IRS

10  independent IRS review before you give it to the Department of

11  Justice prosecutors; is that correct?

12  A      In this type of case.

13  Q      Is this some special kind of case?

14  A      It's a grand jury case.

15  Q      It's a grand jury case.  So you said, though, that you

16  were assigned a manager just for grand jury cases; correct?

17  A      Correct.

18  Q      And that's -- is it Terri Davis again?

19  A      Yes.

20  Q      And Terri Davis is supposed to supervise you; correct?

21  A      Correct.

22  Q      Did Terri Davis supervise you in connection with the

23  preparation of your May 14, 2013 report?

24  A      I did not give it to her for review.

25  Q      Why not?

1    A      I did not understand that that was procedure.

2    Q      Do you now understand that to be procedure?

3    A      It's not procedure.

4    Q      Now, after the prosecutors got your report, did they

5    ever call you up and say we don't think this is very accurate,

6    can you try again?

7    A      No, they did not.

8    Q      Do you know if Special Agent Lalli reviewed your report?

9    A      I don't know.

10   Q      Do you know whether or not Special Agent Lalli

11   supervised, or reviewed your report?

12   A      I don't know.

13   Q      Did Special Agent Lalli ever ask you to make any changes

14   in your May 14, 2013 report?

15   A      He did not.

16   Q      Did the prosecutors?

17   A      Yes.

18   Q      Did they ask you to make any changes to that report

19   before they indicted the case the next day, May 15, 2013?

20   A      No.

21   Q      Well, you just sort of suggested where my next question

22   is going.  So after you gave your report to the prosecutors on

23   May 14, 2013, up until October 8th, 2013, the first day of this

24   jury trial, did you make any changes to your report?

25   A      No, I did not.

1    Q      Now, you said you sat through the opening statements,

2    all the testimony, and all of the exhibits during the first

3    week of this trial of this case; correct?

4    A      Correct.

5    Q      So that's October 8th we started, a Tuesday; and I

6    believe the evidence was done, at least for that week, 9th,

7    10th -- on October 11th, a Friday; is that correct?

8    A      Correct.

9    Q      So, after hearing that testimony and all the

10   cross-examination, did you make a change to your May 15, 2013

11   report?

12   A      Yes, I did.

13   Q      And you made that change to your May 14, 2013 report on

14   October 14th, 2013; isn't that correct?

15   A      Correct.

16   Q      Five months to the day after you first submitted the

17   report to the prosecutors; correct?

18   A      Correct.

19   Q      And you made at least three key changes to your report

20   based on errors in your original report; correct?

21   A      They were not errors.  I made changes, but they were not

22   due to errors.

23   Q      What were they due to?

24   A      I heard testimony that . . . and I reviewed documents,

25   and, from the evidence and documents, I understood that David

1    Fredrick and Patricia Hough owned the medical schools.  Okay?

2    In 2007, I needed to show their gain on the sale of the medical

3    schools, because they were -- they owned the medical schools.

4    But my RAR had based income that I had attributed in them of

5    money coming out of the medical schools that they used for

6    personal expenses.

7          But if you own something, then the income is treated a

8    different way.  It's not income to you when you pull out the

9    money and use it for personal expenses; the money is yours when

10   you earn it each year.  So I changed my RAR based on the fact

11   that they owned the medical schools, and I was gonna -- and the

12   capital gain on that was going to be charged to them.  So if

13   they owned the medical schools, then the RAR should show, every

14   year, income to them from their ownership of the schools, not

15   when it came out and they used it for personal expenses.

16   Q    What evidence did you hear -- well.  The evidence that

17   you heard during this first week of trial, that changed your

18   mind, you had never heard before the first day of this trial?

19   Is that correct?

20   A    I had never heard.

21   Q    And that's because you didn't speak to any of the

22   government witnesses; correct?

23   A    That is correct.

24   Q    Did the government ever give you any of its memorandum

25   of interview, of its conversations with the witnesses for you

1    to review prior to preparing your May -- yes, prior to

2    preparing your May 14th report?

3    A       I got a few, but not -- I don't have -- I was not

4    regularly given memorandums of interview.

5    Q       Which interviews did you get?

6    A       I don't know.  They were way back in the beginning.  I

7    don't remember.  There were only two or three.

8    Q       Two or three.  Which ones?

9    A       I really don't remember.

10   Q       Was it back in 2009?

11   A       Yes; it would have been back in 2009.

12   Q       Now, you've heard that a number of witnesses went to the

13   grand jury.  Did the government ever give you any of the grand

14   jury transcripts before you completed your report on May 14th?

15   A       No, they didn't; but I'm not sure if that's procedures,

16   or policies, or if they're supposed to.  I don't know.  I was

17   not given transcripts.

18   Q       And that was true before the trial here, as well;

19   correct?

20   A       Correct.

21   Q       On October 8th.

22   A       Correct.

23   Q       So the first time you're hearing some evidence that

24   resulted in you changing your Revenue Agent's Report was

25   between October 8th and October 11th, during this trial; is

1   that correct?

2   A      Yes.

3   Q      What testimony did you hear, what evidence did you hear,

4   that changed your mind?

5   A      There was evidence from Mario deCastro.

6   Q      Okay.

7   A      And there were a couple of others.  I just really

8   don't -- I can't pull them out of my head right now.

9   Q      This is a pretty big issue, a huge issue, resulting in

10  your changing your report; and you've given me Mario deCastro.

11  Is there a particular document that you saw on the screen that

12  changed your mind to say that, before, David Fredrick and

13  Patricia Hough were not the owners of the Saba school, but --

14  A      No, but.

15  Q      -- let me finish my question, if I might.  But that now,

16  after you hear the testimony, they are the owners of the Saba

17  school?

18  A      It wasn't just Mario deCastro.  I know there were other

19  documents, and testimony.  I just can't remember those right

20  this very minute.

21  Q      Would you like a moment to go through your notes?

22  A      I'll try.  I would like . . . .  I'll try.

23         MR. HOCHMAN:  Actually, since we're -- I can ask a

24  few more questions, Your Honor, and then, during the recess, or

25  overnight, she can go through her notes.

1        THE COURT:  That's fine.

2   BY MR. HOCHMAN:

3   Q        With respect to that new RAR that you came up with on

4   October 14th, 2013, six days into this trial, are you a hundred

5   percent confident that that Revenue Agent's Report is a hundred

6   percent accurate?

7   A        It is . . . .  Based on the –– based on what I was given

8   to use, it is the best . . . it's substantially correct.

9   Q        Substantially correct.  That sounds like something less

10  than a hundred percent correct.

11  A        It's correct as to the documents that I had to work

12  with.

13  Q        Well, you have not had just documents.  You had three

14  days, four days, or three and half days, worth of testimony and

15  exhibits; correct?

16  A        Correct.

17  Q        Enough that you actually changed the report; correct?

18  A        Correct.

19  Q        So are you a hundred percent confident that your report

20  now, which is Exhibit 30I, is a hundred percent accurate?

21  A        Based on what I know now, it's accurate.

22  Q        A hundred percent accurate.

23  A        I'm not going to say a hundred percent accurate.

24  Q        And that's because people make mistakes; correct?

25  A        Correct.

1    Q       Even expert witnesses make mistakes?

2    A       Correct.  But I will change any mistakes that you have,

3    that you have found, that you need me to change.  I am

4    perfectly willing to change them.

5    Q       Well, do you need some more time?  I mean, you have had

6    this case for four and a half years.  You gave your original

7    report on May 14th.  You've given a revised report on

8    October 14th.  Would you like some additional time to go

9    through Exhibit 30I, and some of the other 30 series --

10   A       No, I don't want to go through those.  I'm just saying,

11   if there is a specific item that you're saying that is

12   incorrect, I'll look at that and make changes.  I don't want to

13   go through everything.  I assume you're talking about specific

14   items.  So if you are, if you give those to me, I will look at

15   those and make changes.

16   Q       Well, if I say to you that the number one change you

17   should make is that the Saba Foundation owned all the UBS

18   accounts, the Liechtenstein Landesbank accounts, the Fortis

19   Banque accounts, and none of that income, none of that money,

20   was David Fredrick and Pat Hough's money, so it wasn't their

21   income, will you change your charts, and put zeros down where

22   you put the numbers?

23   A       No, I will not.

24   Q       And that's because you believe that your charts are a

25   hundred percent accurate; correct?

1   A      You keep saying that, and I keep telling you it's as

2   accurate as I can with the information that I have available.

3          MR. HOCHMAN:  Again, I think, Your Honor, we could

4   take a break, if we could?  It's 5:00 o'clock.  And if the

5   witness wants to review her notes, and make any more changes to

6   her chart, she should have the evening to do so.

7          THE COURT:  All right.  When I say all right, I'm

8   referring to taking a recess.

9          MR. HOCHMAN:  Thank you very much, Your Honor.

10         THE COURT:  Please do not discuss the case among

11  yourselves, or allow anyone to discuss it with you or in your

12  presence.  Don't do any of those bad things I've been telling

13  you about for the last two weeks, and have a good evening.

14  9:00 o'clock tomorrow morning.

15         (At 4:59 PM, the jury was escorted from the

16      courtroom.)

17         THE COURT:  All right.  The witness may stand down.

18         (The witness left the witness stand and sat in the

19      courtroom.)

20         THE COURT:  Any estimates in terms of conclusion?

21         MR. HOCHMAN:  Your Honor, I think I . . . .  If I

22  might wait until the witness steps down, Your Honor?

23         THE COURT:  Sure.  I was really talking about

24  conclusion of the case, not your . . . .

25         MR. HOCHMAN:  Oh.  I'll turn to the government.

1          THE COURT:  Is this your last witness?

2          MS. FINLEY:  This is our last witness.  We'll rest

3    when she is done.

4          THE COURT:  I guess I am maybe asking you, then.  I

5    know, before, we were talking about having some outside chance

6    of at least finishing up tomorrow?

7          MR. HOCHMAN:  I think, Your Honor, that a lot depends

8    on whether or not the defendant testifies.  And we'll make a

9    decision -- well, either tonight or . . . depending on when we

10   have to make that decision, we'll certainly make that decision.

11   If she does testify, I anticipate probably a full day between

12   direct and cross.

13         And then our expert I don't think will be that long,

14   Your Honor.  Certainly not anywhere close to the government's

15   expert.  And then have two fact -- sort of fact character

16   witnesses that will be very short.

17         THE COURT:  So still a possibility, depending on

18   decisions, to finish up late tomorrow, maybe?  Or is that just

19   unrealistic?

20         MR. HOCHMAN:  I would say . . . yeah.  And there's --

21   Mr. Saunders points out that we still haven't determined

22   whether or not we are going to call Agent Lalli to the stand.

23   And we have one witness that has travel problems, Mr. Nekic,

24   that we are trying to resolve the travel problems.  So I think

25   that it would be very, very optimistic to finish by the end of

1    tomorrow if the defendant doesn't testify.  We're probably into

2    Tuesday, Your Honor.

3              THE COURT:  Okay.  All right.

4              While we're talking about it, if Dr. Hough will move,

5    so I can see her directly?

6              Dr. Hough, you just heard your attorney indicate, or

7    allude to the possibility that you may or may not testify.  As

8    you've heard, I believe during the voir dire and during the

9    instructions, any defendant, including yourself, has an

10   absolute right to testify on their own behalf.  You also have

11   an absolute right not to testify.  That choice is yours, and

12   yours alone.  Your attorneys will give you their best advice;

13   but, in the end, it's your decision to make, not theirs.

14             Do you understand that?

15             THE DEFENDANT:  Yes, I understand that, Your Honor.

16             THE COURT:  At some point tomorrow, or maybe next

17   week, the lawyers will be called upon to either call you or not

18   call you.  If you testify, I will assume that you have decided

19   that's what you want to do.  If you don't testify, I will

20   assume that that's because you've decided that you don't want

21   to testify.

22             Fair enough?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Okay.  9:00 o'clock tomorrow morning?

25             MR. HOCHMAN:  Thank you, Your Honor.

COURT RECESSED FOR THE DAY                                     266

-- -- -- -- -- -- -- --

(At 5:03 p.m., court was recessed, to be reconvened at 9:00 a.m., on Friday, October 18, 2013.)

-- -- -- -- -- -- -- --