UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

---

THE UNITED STATES OF AMERICA,

          Plaintiff,

                                 Fort Myers, Florida
vs.                               October 18, 2013

PATRICIA LYNN HOUGH,              9:00 a.m.

          Defendant.

---

TRANSCRIPT OF JURY TRIAL, DAY 8

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                           Tax Division
                       P.O. Box 813
                       Washington, DC  20044
                       BY:  CARYN FINLEY, ESQ.

                       U.S. Department of Justice
                       Tax Division
                       Suite 7334
                       601 D Street NW
                       Washington, DC
                       BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

A P P E A R A N C E S
(Continued From Previous Page)


FOR THE DEFENDANT:      Bingham McCutchen, LLP
                         The Water Garden
                         1601 Cloverfield Boulevard
                         Suite 2050 North
                         Santa Monica, CA  90404-4082
                         (310) 904-1000
                         BY:  NATHAN J. HOCHMAN, ESQ.

                         Bruce L. Udolf, PA
                         500 East Broward Boulevard
                         Suite 1400
                         Fort Lauderdale, FL  33394
                         (954) 858-8831
                         BY:  BRUCE L. UDOLF, ESQ.

REPORTED BY:          JEFFREY G. THOMAS, RPR-CP, CRR
                         Official Federal Court Reporter
                         United States Courthouse
                         2110 First Street, Suite 2-194
                         Fort Myers, FL  33901
                         (239) 461-2033


* * *

I N D E X

| October 18, 2013 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 8 | 5 |

– – –

### GOVERNMENT'S WITNESSES

| WITNESS | DIRECT | | CROSS | | REDIRECT | | RECROSS | | VOIR DIRE | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. |
| SHEILA MAURER | | | 8 | 8 | 8 | 156 | 8 | 173 | | |

– – –

I N D E X

| | Vol. | Page |
|---|---|---|
| Government Rests | 8 | 181 |

– – –

### DEFENDANT'S WITNESSES

| WITNESS | DIRECT | | CROSS | | REDIRECT | | RECROSS | | VOIR DIRE | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. |
| THOMAS WALKER | 8 | 185 | 8 | 208 | 8 | 216 | | | | |
| ANTOINE SOLAGNIER | 8 | 219 | 8 | 245 | 8 | 250 | | | | |

– – –

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)


DEFENDANT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Defendant's Exhibit 100 marked for<br>    identification | 8 | 11 |
| Defendant's Exhibit 141 marked for<br>    identification | 8 | 11 |
| Defendant's Exhibits 30I.4, 30I.5 and 30I.6<br>    Admitted in Evidence | 8 | 91 |
| Defendant's Exhibit 30I.1 Admitted in Evidence | 8 | 141 |
| Defendant's Exhibit 30I.2 Admitted in Evidence | 8 | 148 |

– – –

|  | Vol. | Page |
|---|---|---|
| Sidebar Discussion Re Witness | 8 | 252 |
| Sidebar Discussion Re Juror Notes | 8 | 254 |
| Sidebar Discussion Re Scheduling | 8 | 255 |
| Court Answers Juror Questions | 8 | 259 |
| Discussion Re Rule 29 Motion | 8 | 260 |
| Court Recessed for the Day | 8 | 261 |

* * *

1      THEREUPON, the above-entitled case having been called

2  to order, the following proceedings were held herein,

3  to-wit:

4                          – – –

5           THE COURT:  Good morning, everyone.

6           A couple of housekeeping matters.

7           First of all, Mr. Saunders, do I need to review with

8  you the cell phone policies?

9           MR. SAUNDERS:  No, Your Honor.  And I explained to

10  the CSOs what happened.  I apologize for the circumstances.

11          THE COURT:  All right.

12          MR. SAUNDERS:  The phone was in my bag with the

13  battery out during the entire proceedings, and given to the

14  defendant when we left the courthouse.  But I recognize that

15  was a violation.  I apologize for that.

16          THE COURT:  Second thing is, I plan on working

17  Monday.  I rescheduled things so, kind of depending on where we

18  are -- actually, not depending on where we are, unless we're

19  done, that would be my plan.

20          MR. HOCHMAN:  So will we have court 9:00 to 5:00 on

21  Monday, Your Honor?

22          THE COURT:  Yes.

23          MR. HOCHMAN:  Very good.

24          THE COURT:  All right.  Both sides ready for the

25  jury?

1      MS. KESSLER:  Your Honor, I feel like I need to put

2  on the record an interaction I had with two of the jurors.  I

3  believe it was Jurors 7 and 5 were walking together in front of

4  me.  They were . . . I'm sorry, Number 8.  I can't count.

5      They were walking in front of me.  It seemed that

6  they were jokingly commenting to themselves but looking at me,

7  and saying that they wished we would talk faster the lawyers

8  would talk faster, but then Juror Number 5 actually turned to

9  me and asked if we could talk faster.

10      I didn't respond other than to do this (putting

11  finger to lips), meaning, "I can't speak to you," and that was

12  it.

13      THE COURT:  All right.  Juror Number 8 is Harvey, so

14  it's unlikely Harvey was one of the two female jurors; Harvey

15  Shaw?

16      MS. KESSLER:  It's the male, I believe he's an

17  attorney?

18      THE COURT:  Yes.  I thought you said two females.

19      MS. KESSLER:  No.  It was a male and a female.  I am

20  sorry if I misspoke.  It was -- I believe the woman sits in --

21  I can confirm once they're in here, but I believe it's Juror

22  Number 5 and Juror Number 8.

23      THE COURT:  All right.  It probably doesn't matter

24  who they are.

25      MR. HOCHMAN:  Your Honor, I don't know if Your Honor

1    wants to just advise them that we have to speak at an

2    appropriate speed because there is a court reporter taking this

3    all down.  If we spoke too fast, he wouldn't be able to take it

4    down.

5              THE COURT:  Sounds to me like it was probably said in

6    jest.  I can't imagine otherwise, frankly.  I mean, I'll say

7    something if you want me to.  I guess my initial inclination is

8    just to let it pass.

9              MR. HOCHMAN:  That's fine, Your Honor.  I'll go with

10   your inclination.

11             THE COURT:  All right.  Anything else?

12             MR. HOCHMAN:  No.  We're ready to proceed.

13             MS. FINLEY:  No, sir.

14             THE COURT:  If we can have the witness back on the

15   witness chair, and have the jury step in, please.

16             (The witness resumed the witness stand.)

17             (At 9:08 AM, the jury was escorted into the

18        courtroom.)

19             THE COURT:  Good morning, ladies and gentlemen.

20             And you may proceed.

21             And we have a different light operator, as you can

22   see.  Let us know if you have problems seeing the documents,

23   because we'll play with some of these other lights if

24   necessary.

25             You may proceed.

1      MR. HOCHMAN:  Thank you very much, Your Honor.

2                      SHEILA MAURER,

3  having been recalled as a witness by the Government, and

4  having been previously called as a witness and duly sworn,

5  was examined and testified as follows:

6                    CROSS EXAMINATION

7  BY MR. HOCHMAN:

8  Q      Ms. Maurer, in answering my questions yesterday about

9  whether you interviewed anyone with the Saba Foundation, Sinco

10 Trust, UBS, any of the other Swiss or Liechtensteinian banks,

11 or anyone from Hong Kong, you said that you hadn't and it

12 wasn't your role; is that correct?

13 A      Correct.

14 Q      Whose role is it?

15 A      I'm not sure.  I'm not exactly sure.

16 Q      Is it Special Agent Cameron Lalli's role to do these

17 interviews?

18 A      It is his role to do interviews.  I'm not sure what that

19 entails.

20 Q      Well, your role is to seek the truth, correct, not just

21 find facts that fit your theory and shut your eyes to ones that

22 don't; correct?

23 A      Correct.

24 Q      And your job is not to be just substantially correct, as

25 you said yesterday, but to be 100 percent correct; is that

1    right?

2    A      My job is to be as correct as possible, as the documents

3    that I was given allow.

4    Q      And in some cases that means that you are only going to

5    be substantially correct; is that right?

6    A      I guess.

7    Q      Now, you're an expert in tax computation; correct?

8    A      Yes.

9    Q      You're not someone who just takes whatever numbers

10   they're given by the prosecutors and puts them on a piece of

11   paper; correct?

12   A      I am not.

13   Q      I believe you stated that the IRS actually has a

14   computer program to do that function; correct?

15   A      Yes.

16   Q      And, as an expert, your job is not just to -- is not

17   just to rely on select evidence that's presented to you, but to

18   demand all the evidence that could bear on your calculations;

19   isn't that correct?

20   A      I cannot demand, in this case, documents.

21   Q      Maybe "demand" is the wrong word; ask nicely, your job

22   is to ask nicely for all evidence that could bear on your

23   calculations; isn't that correct?

24   A      My job is to ask if there are other documents available.

25   Q      And did you ask if there were other documents available,

1    during the four and a half years of your investigation, beyond

2    the boxes of UBS and other bank records you received?

3    A      I'm sure, at some point, I did --

4    Q      And --

5    A      -- I asked for certain documents.

6    Q      Well, you said that you got some interview notes early

7    in 2009; correct?

8    A      I believe so.

9    Q      And you knew that Special Agent Lalli was conducting a

10   criminal investigation over the last four and a half years;

11   correct?

12   A      Yes.

13   Q      Did you ask nicely for his interview memoranda so you

14   could review it to see if it bore on your calculations?

15   A      I did not ask for his memorandums of interview.

16   Q      Now, you asked me, yesterday, to give you, if I wanted,

17   certain evidence to show that your calculations were erroneous,

18   and that you would consider my evidence and make any

19   appropriate changes to your calculations.

20          Do you recall that?

21   A      Yes.

22   Q      And I actually gave you, at the beginning of yesterday,

23   two different documents to consider that would bear on your

24   calculations; isn't that correct?

25   A      You gave me two documents.

1           MR. HOCHMAN:  I'd like to present and mark for

2  evidence Defense Exhibits 100 and 141, Your Honor?

3           And do we have an exhibit list?

4           And we'll present the Court with an exhibit list,

5  Your Honor.

6  BY MR. HOCHMAN:

7  Q    Now, if you could look at Exhibits 100 and 141, that are

8  before you, do you see them?

9  A    Yes, I do.

10 Q    And we'll start with Exhibit 100.

11          Is that a certification from the board of Saba School of

12 Medicine Foundation, signed in November, 2009?

13          MS. KESSLER:  Objection.  I believe this witness

14 has -- excuse me -- doesn't have the knowledge to be able to

15 say what this document is.  Foundation.

16          THE COURT:  Sustained.

17          MR. HOCHMAN:  Sure.

18 BY MR. HOCHMAN:

19 Q    The document you have in front of you, that's a copy of

20 the two documents I presented you yesterday; correct?

21 A    It appears to be.

22 Q    And I'm referring to Exhibits 100 and 141; correct?

23 A    I'm not sure if this is a copy.  This appears to be a

24 copy.

25 Q    And I'm sorry, which one do you say is a copy, and which

1    one do you say is not a copy?

2    A      100 appears to be copy.  141, I'm not sure if this is a

3    copy.

4    Q      Do you have the document that you were presented

5    yesterday with you?

6    A      Yes.

7    Q      So Exhibit 141 is a copy of the document that you were

8    presented with yesterday; is that correct?

9    A      Yes.

10   Q      And did you investigate Exhibits 100 and 141, to

11   determine whether or not your calculations would change in this

12   case?

13           MS. KESSLER:  Objection, Your Honor.  This witness

14   does not have personal knowledge to lay the foundation for this

15   document.

16           MR. HOCHMAN:  And, Your Honor -- I'm sorry.  May I

17   respond, or . . . .  May I approach at sidebar, Your Honor?

18           THE COURT:  I think that's a good idea.

19           MR. HOCHMAN:  Thank you.

20                          AT SIDEBAR

21           THE COURT:  The reason I hesitated, I wasn't sure

22   that the objection wound up with a question.  I thought the

23   question was, "did you investigate."  The answer is going to be

24   either yes or no.

25           MS. KESSLER:  Okay.

1           THE COURT:  Maybe I misunderstood.

2           MR. HOCHMAN:  Well, I think there's going to be some

3    subsequent questions, so it might make sense to suggest them

4    now.

5           She asked me to give her documents to investigate.  I

6    gave her two documents.  She authenticated that these are the

7    copies of the documents I gave her.

8           I can ask her if she actually conducted her

9    investigation.  Part of our defense is that the government

10   didn't investigate leads they were presented with.  I would ask

11   to introduce these not for the truth of the matter, but for the

12   fact that these are the documents that I gave her and asked her

13   to investigate.

14          I expect you will give a limiting instruction, if you

15   admit them, that they were not admitted for the truth of the

16   matter asserted, only that they were given to the agent for her

17   to investigate.

18          THE COURT:  So if you give the agent a statement by

19   your client saying, "I'm not guilty of anything," and ask her

20   to investigate, she either says, "I did" or "I didn't," you

21   would expect that document to be admitted and go to the jury?

22          MR. HOCHMAN:  No, Your Honor.  I think what this

23   says -- this is actual factual representations, and we have one

24   from the Saba Foundation and one from the board, including a

25   gentleman named John Nekic.

```
 1              THE COURT:  So where did this come from?

 2              MR. HOCHMAN:  This came from the Saba Foundation.

 3    It's a notarized document.  This came and was given to the

 4    government in discovery, Your Honor, in connection with this

 5    case.  It was given by defense discovery.

 6              THE COURT:  When?

 7              MR. HOCHMAN:  Before the indictment, Your Honor.

 8              MS. KESSLER:  Well, I believe one of them was

 9    provided last month.

10              THE COURT:  One at a time.

11              MS. KESSLER:  I believe one of the documents was

12    provided within the last few weeks.  I would also say that this

13    document, in particular, contains self-serving hearsay by the

14    defendant in exactly the nature that Your Honor was commenting

15    on in the Court's example.

16              THE COURT:  Let me take a look at it.

17              (The Court reviews documents.)

18              THE COURT:  All this is just self-serving hearsay

19    under the guise of some type of certification.  The board, or

20    the signatory, say something, call it a certification, and

21    somehow it's going to be admissible?

22              MR. HOCHMAN:  Well, again, Your Honor, it's

23    admissible just to see whether or not, given the invitation

24    that she made to give her evidence to investigation, that it

25    would affect her calculations, clearly what's said in here
```

1    would affect her calculations.  It deals with whether or not

2    The Foundation, New Vanguard, or Top Fast owned these, or

3    whether or not Dr. Fredrick and Dr. Hough do.

4            THE COURT:  No.  You can ask her if she did anything

5    between last night and this morning to investigate this.  You

6    are not going to admit these for the purpose you say.  That's

7    prejudicial.  And clearly, and I'm using these for that

8    purpose, you are really using this for the truth of the matter.

9    Regardless of what you say, that's the impact you want the jury

10   to draw from these.  And I'm not going to let -- and this is

11   rank hearsay.  You know, fancied up to look like a business

12   record.  That's all it is.

13           You can, and you can have it admitted -- I said that

14   wrong -- identified for the record, for record purposes.  And

15   you may examine her as to what, if anything, she did in

16   response to you giving these to her last night.  I'm not going

17   to allow the documents to go to the jury.

18           MR. HOCHMAN:  Okay.  Then, outside the presence right

19   now, I would like to move these documents in for the very

20   limited purpose that these were the documents that were

21   presented to the . . . to Agent Maurer to investigate.  I think

22   she's going to say that she didn't investigate them.  And we

23   would admit them for only that purpose, and not -- and with a

24   specific limiting instruction read by Your Honor, or given by

25   Your Honor at the time, instructing the jury that they are not

1   to consider anything in these documents for the truth of the

2   matter asserted.

3            THE COURT:  That's overruled.  The Court would find

4   that the admission of these documents is unduly prejudicial,

5   confusing to the jury, and misleading, and they are not, in my

6   view, really being offered for what you're saying.

7            MR. HOCHMAN:  Okay.

8                        IN OPEN COURT

9            THE COURT:  You may proceed.

10           MR. HOCHMAN:  Thank you.

11  BY MR. HOCHMAN:

12  Q     Agent Maurer, after you received Government's Exhibit--

13  or Defense Exhibits 100 and 141, did you contact Dr. Haraldo

14  Bautista, at the Saba School of Medicine Foundation, after

15  court last night?

16  A     No.

17  Q     Did you contact Florencio Montenegro, a director of the

18  Saba School of Medicine Foundation, after court last night?

19  A     No, I did not.

20  Q     Did you contact -- now I'm referencing, if you could

21  look at Exhibit 100, did you contact Dr. John Nekic, of the --

22  a director of the Saba School of Medicine Foundation, after

23  court last night?

24  A     No.

25  Q     With respect to Mr. Nekic, in particular, are you aware

```
 1    that the government subpoenaed Mr. Nekic, or Dr. Nekic --

 2              MS. KESSLER:  Objection.

 3              THE COURT:  Basis?

 4              MS. KESSLER:  One, I don't believe this --

 5              COURT REPORTER:  You'll have to speak up, please.

 6              MS. KESSLER:  I'm sorry.

 7         I don't believe that this question is also within the

 8    personal knowledge of the witness.

 9              THE COURT:  I think that's what the question is, so

10    the objection is overruled.

11              MR. HOCHMAN:  If I might restate it, Your Honor?

12              THE COURT:  Sure.

13              MR. HOCHMAN:  Because the question sort of got cut

14    off.

15              THE COURT:  Okay.

16    BY MR. HOCHMAN:

17    Q    With respect to John Nekic, are you aware that the

18    government subpoenaed him to testify at this trial, and he was

19    sitting at the Hotel Indigo --

20              MS. KESSLER:  Objection.  Relevance.

21              THE COURT:  Come to sidebar.

22                            AT SIDEBAR

23              THE COURT:  What is a good-faith proffer that this

24    witness would possibly know that a subpoenaed person was

25    sitting at the Hotel Indigo?
```

1          MR. HOCHMAN:  Because this witness was with the

2    government team the entire time.  They kept all their witnesses

3    at the Hotel Indigo.  I happen to be staying at the Hotel

4    Indigo and saw Mr. Nekic at the Hotel Indigo.  And she's part

5    of the government team.  I mean, she's an expert --

6          THE COURT:  So she saw what everybody else saw,

7    that's your proffer?

8          MR. HOCHMAN:  Yeah.  If she's aware that Dr. John

9    Nekic was, in essence, here all last week.

10         THE COURT:  And the relevance of that is what?

11         MR. HOCHMAN:  The relevance is, I'm wondering whether

12   or not she contacted Dr. John Nekic, in connection, after the

13   court yesterday, when she received Defense Exhibit 100.

14         THE COURT:  The objection is sustained.  You can ask

15   that question.

16         MR. HOCHMAN:  Okay.  Let me ask it that way, then.

17         THE COURT:  You may.

18         MR. HOCHMAN:  Thank you.

19                        IN OPEN COURT

20   BY MR. HOCHMAN:

21   Q     With respect to Dr. John Nekic, did you ever contact

22   Dr. John Nekic after court yesterday, in connection with

23   Defense Exhibit 100?

24   A     No.

25   Q     Did you ever ask the prosecutors for Dr. John Nekic's

1    phone number after court yesterday, to contact him?

2    A      No, I did not.

3    Q      Did you ask Special Agent Cameron Lalli for Dr. John

4    Nekic's phone number, so that you could give him a call last

5    night and talk to him with respect to Defendant's Exhibit 100?

6    A      No, I did not.

7    Q      Do you think it would be useful to have talked to the

8    directors of the board of the Saba School of Medicine

9    Foundation in connection with the documents which are Defense

10   Exhibits 100 and 141, after court yesterday, to see if those

11   documents . . . or to verify the contents of those documents?

12   A      That's not my role in the case.

13   Q      Whose role would that be?

14   A      Interviews are conducted by special agents and

15   attorneys.

16   Q      Do you lack the ability to make a phone call to Dr. John

17   Nekic?

18   A      I'm capable of making a phone call, but it's not my role

19   in this case to contact these people.

20   Q      Didn't you say to me, yesterday, during your

21   cross-examination, that I could provide you with information,

22   and you would follow up on it?

23   A      I didn't say follow up.  I said I would consider it.

24   Q      Did you consider Defense Exhibits 100 -- let's start

25   with Defense Exhibit 100.  Did you consider Defense Exhibit 100

1   in connection with your calculations?

2   A      Yes, I did.

3   Q      And does Defense Exhibit 100 alter your calculations?

4   A      No, it does not.

5   Q      Why doesn't it?

6   A      This document is dated November, 2009.  This document

7   was created after the investigation began.  This document was

8   created extemporaneously.  This document is unreliable and

9   self-serving.

10  Q      And is it unreliable and self-serving because it doesn't

11  comport with your theory of this case?

12  A      No.

13  Q      What about that document is unreliable and self-serving?

14  A      It was created after the day -- after the investigation

15  began, and it is trying to . . . state things that I did not

16  see in the documents that I had that were contemporaneous

17  documents.

18  Q      What things in particular do you believe this document

19  is stating that you did not see in the documents?

20          MS. KESSLER:  Your Honor, I'm going to object based

21  on hearsay.  I think the question is seeking to elicit the

22  hearsay that's contained within the document.

23          THE COURT:  Sustained.

24  BY MR. HOCHMAN:

25  Q      Well, you said that there are certain things in this

1    document that you call self-serving.  What things?

2              THE COURT:  Counsel, I sustained the objection.

3              Come to sidebar.

4                          AT SIDEBAR

5              THE COURT:  If you give me another face like that,

6    you're going to make it to prison before your client does.  Do

7    you understand that?

8              MR. HOCHMAN:  I completely understand that.  It was

9    my mistake.  I apologize --

10             THE COURT:  You don't have to agree with any of my

11   rulings, but in front of this jury, you do that again, and I

12   don't tolerate that in my courtroom.

13             MR. HOCHMAN:  That was completely 100 percent

14   inexcusable by myself.  I reacted emotionally, and I shouldn't

15   have, Your Honor.

16             THE COURT:  All right.

17                          IN OPEN COURT

18             THE COURT:  You may proceed.

19             MR. HOCHMAN:  Thank you.

20   BY MR. HOCHMAN:

21   Q      With respect to Exhibit 141, did that alter your

22   calculations in this case?

23   A      No.

24   Q      Why not?

25   A      For the same reasons that document 100 did not.

1   Q       And which reasons are those?

2           MS. KESSLER:  Objection.  I believe the question,

3   again, seeks to elicit hearsay from the document.

4           THE COURT:  That's overruled.  She can give the

5   general reasons.

6   A       This document was issued the 25th day of September,

7   2013, which is a few days before the trial began.  So the

8   information in here is extemporaneous, and self-serving,

9   and . . . the reliability comes into question.

10  Q       And just to be clear, but you didn't check out these

11  documents with any of the people who wrote these documents;

12  correct?

13  A       I did not contact these people.

14  Q       Now, switching gears a little, correspondence audits.

15  You said you were involved with correspondence audits earlier

16  in your career; is that correct?

17  A       I said that.

18  Q       And how many correspondence audits would you estimate

19  you did in the early part of your career?

20  A       It's been a long time.  I would say maybe 50.

21  Q       50.  And, in a correspondence audit, I believe you said

22  what happens is that the IRS notifies taxpayers by

23  correspondence, by mail, if they made a mistake on their tax

24  return, and then you ask them to try to fix that mistake.  Is

25  that correct?

1    A       Yes.

2    Q       You give them that chance to fix the mistake, and if

3    they owe more tax, they have to pay more tax; correct?

4    A       Yes.

5    Q       And if they present you with evidence showing that they

6    don't owe more tax, then they don't have to pay more tax;

7    correct?

8    A       Correct.

9    Q       And if they -- if you notify them of the mistake, and

10   they fix the mistake, they don't get criminally prosecuted;

11   correct?

12   A       Correct.

13   Q       Now, in April or May, 2009, when you got those three

14   boxes of UBS records, you realized, at the time you were

15   looking at those records, that Dr. Patricia Hough had signature

16   authority over certain UBS accounts because she was listed as

17   the authorized signatory over those accounts; is that correct?

18   A       She was listed as the signatory.  She was listed as the

19   contracting partner.  She was listed as the beneficial owner.

20   Q       I'm focusing just on the signatory authority part of it.

21   Do you have that in mind?

22   A       Yes.

23   Q       She was listed -- and you recall Mr. Futterknecht

24   testifying that the only people who can sign on behalf of a UBS

25   account are the people who are authorized signatories; correct?

1    A       I believe that's correct.

2    Q       And you realized, when you were reviewing, in April or

3    May of 2009, these UBS accounts, in which some of them

4    Dr. Patricia Hough was the authorized signatory, that she had

5    signature authority over those accounts; correct?

6    A       Yes.

7    Q       And you also had her tax returns at that time, and you

8    could look at Schedule B and see that she hadn't checked the

9    box yes for signature authority; is that correct?

10   A       Yes.

11   Q       Now, did you contact Dr. Patricia Hough back in April or

12   May, 2009, like you had done with your correspondence audits,

13   and tell her she had made a mistake, and ask her to fix it?

14   A       This is not the same type of case.

15   Q       I'll ask the question again.  Did you contact Dr. Hough

16   in April or May, 2009, when you realized she had made a

17   mistake, like you would do in correspondence audits, and tell

18   her that she made that mistake, and ask her to fix it?  Yes or

19   no?

20   A       It is not my role in the case to contact Dr. Patricia

21   Hough.

22   Q       Did you contact her under these circumstances, yes or

23   no, back in April or May, 2009, and ask her to fix the mistake

24   that you had located?

25   A       I did not.

1    Q      Now, you told me that, if I had any issues with your

2    analysis, I could bring them to your attention, and you would

3    fix them; correct?

4    A      I said that.

5    Q      Did you give Dr. Patricia Hough, back in April or May,

6    2009, the same opportunity to correct any mistakes she might

7    have made?

8    A      That's not my role in the case.

9    Q      Yes or no, did you give her that opportunity?

10   A      No, I did not.

11   Q      Now, Dr. Patricia Hough, to your knowledge, never knew

12   that the IRS had received her files from UBS; correct?  At the

13   time that you're reviewing those files in April or May, 2009.

14   Is that correct?

15          MS. KESSLER:  Objection, calls for hearsay.  I also

16   don't think that this witness could testify to what the

17   defendant knew or did not know.

18          THE COURT:  The objection is sustained absent a

19   foundation.

20   BY MR. HOCHMAN:

21   Q      Do you know, in April or May of 2009, whether

22   Dr. Patricia Hough knew that UBS had given over her files to

23   the United States Government?

24   A      I do not know that.

25   Q      That's because you didn't contact her in April or May,

1    2009, to inform her that you were holding her UBS files;

2    correct?

3    A       This is not the type of case that I would be contacting

4    Dr. Patricia Hough.

5    Q       You didn't contact her in April or May, 2009, to inform

6    her that you were holding her files; correct?

7    A       No.  Of course not.

8    Q       Now, in fact, under the Deferred Prosecution Agreement,

9    UBS turned over the names of the clients, UBS clients, to the

10   United States, under seal, which means they filed them with the

11   court confidentially, and the record was not open to the

12   public.  Isn't that correct?

13   A       I don't know those specifics.

14   Q       Well, you testified that you knew about the Deferred

15   Prosecution Agreement; correct?

16   A       I know about the -- I knew about the Deferred

17   Prosecution Agreement.

18   Q       And that's because the Deferred Prosecution Agreement is

19   a document that was actually filed in the Southern District of

20   Florida; correct?

21   A       Yes.

22   Q       And you reviewed it?

23   A       I read that document.

24           MR. HOCHMAN:  May I present Government's Exhibit 25A,

25   which I believe is in evidence, to the witness?

1      THE COURT:  It is in evidence, and you may.

2      MR. HOCHMAN:  Thank you very much, Your Honor.

3      (Mr. Hochman searches through the government's

4    exhibits.)

5      MR. HOCHMAN:  Your Honor?  May I present my copy of

6    25A to the witness?  I'm having a somewhat difficult time

7    making . . . .  I'm sorry.  It was put in the teen section.

8      THE COURT:  Okay.

9      (Mr. Hochman provides an exhibit to the witness.)

10   BY MR. HOCHMAN:

11   Q      Now, may I direct your attention, on Exhibit 25A, to the

12   sixth page.

13      Do we have 25A in the system?

14      And it says, under disclosure of client data -- oh, by

15   the way, 25A is the Deferred Prosecution Agreement between the

16   United States and UBS AG; correct?

17   A      Yes.

18      THE COURT:  There is a way of publishing that even

19   without it being in the computer system, through the overhead.

20      MR. HOCHMAN:  I think we're just focusing on one

21   sentence, Your Honor, so we can just deal with this one

22   sentence if we could.

23   BY MR. HOCHMAN:

24   Q      Do you see there is a heading here, in this agreement,

25   next to Paragraph 9 on Page 6, called "Disclosure of Client

1    Data"?  Do you see that?

2    A      Yes.

3    Q      And do you see, in Paragraph 9, that it basically says

4    UBS will provide to the United States certain United States

5    clients, which they call disclosed accounts, as set forth in a

6    letter between UBS and the government dated February 16, 2009,

7    attached hereto, as Exhibit E, and here is the language I want

8    you to focus on, "And filed separately understood seal."  Do

9    you see that?

10   A      I see it.

11   Q      That means that UBS didn't publicly reveal all the U.S.

12   taxpayers it was providing to the U.S. Government, but it filed

13   those names under seal with the court, and they weren't

14   publicly available.  Correct?

15   A      I believe that's what it means.

16   Q      Thank you.  So yesterday I asked you about why you would

17   change your May 14, 2013 report that you had worked on for four

18   years, and you changed it six days into the middle of this

19   trial, on October 14, 2013.  Do you recall that discussion?

20   A      I recall the discussion.

21   Q      And you said that it was because you learned for the

22   first time, during this trial, that Dr. Fredrick and Patricia

23   Hough owned the Saba School of Medicine Foundation and MUA.  Do

24   you recall that?

25   A      I recall that.

1   Q      And when I asked you what testimony or documents you

2   relied on, you said Mario deCastro, but then could not remember

3   anything else on this key issue until you checked your notes.

4   Do you remember that?

5   A      Correct.

6   Q      Let's start with Mario deCastro.  With respect to Mario

7   deCastro, you were here, in court, when he testified; correct?

8   A      Correct.

9   Q      And you remember that Mario deCastro said that he never

10  met, communicated, or spoken, at any point in time, with

11  Dr. Patricia Hough; correct?

12  A      Correct.

13  Q      That he represented a law firm that, in turn,

14  represented a -- that he was part of a law firm that

15  represented the potential buyers of the Saba School of Medicine

16  Foundation and MUA back in 2002 and 2003; correct?

17  A      I don't -- I know that there was a document.  I don't

18  remember the exact dates.

19  Q      Well, you remember that the . . . the potential buyers

20  that he was representing were involved in a potential sale

21  which never occurred; correct?

22  A      Correct.

23  Q      And that potential sale was back in 2002/2003; correct?

24  A      I remember vaguely that that was the dates.

25  Q      And you also remember that he acknowledged, in his

1    testimony, that no one owns a nonprofit foundation; correct?

2    A     Yes.

3    Q     And he also admitted that his firm was not hired to do

4    due diligence on the deal, since the deal never went forward;

5    correct?

6    A     I believe that's what he stated.

7    Q     And so he actually didn't check out who owned the

8    schools, because his firm wasn't hired to do due diligence,

9    because the deal never went forward; correct?

10   A     I remember a document for which David Fredrick stated

11   that, "We own the medical schools".

12              MR. HOCHMAN:  May I present Exhibits 6B, D, and E to

13   the witness?

14              THE COURT:  Sure.  Are those admitted already?

15              MR. HOCHMAN:  They are, Your Honor.

16              THE COURT:  You may.

17              MS. KESSLER:  Your Honor, 6E is not admitted into

18   evidence.

19              THE COURT:  6E is not.

20              MR. HOCHMAN:  Actually, Your Honor, since 6E is not

21   in evidence, I don't believe this witness would have seen it,

22   so I'll just present her with 6B and 6D.

23              THE COURT:  All right.

24              THE WITNESS:  Am I done with this one?

25              MR. HOCHMAN:  Yes.

```
 1              (Mr. Hochman provides exhibits to the witness.)

 2              MR. HOCHMAN:  All right.  Let turn to 6B, if we

 3    could?

 4              And can we publish 6B?  We need to switch over back

 5    in this direction.

 6              (An exhibit was projected onto the projector screen.)

 7    BY MR. HOCHMAN:

 8    Q      Now, Exhibit 6B is one of the documents that

 9    Mr. DeCastro submitted into evidence.  Do you recall that?

10    A      I recall this.

11    Q      And Mr. DeCastro said, when he introduced it into

12    evidence, that it was from his law firm's files, but that he

13    did not participate in the creation of this document.  Correct?

14    A      I don't recall that exactly, and, unfortunately, my

15    notes weren't that detailed.

16    Q      Well, that is letter from David Fredrick to Brad

17    Anderson and Mark VanCura in connection with the deal; and

18    Mr. DeCastro's law firm didn't represent David Fredrick, it

19    represented Brad Anderson and Mark VanCura; correct?

20    A      Yes.

21    Q      So Mr. DeCastro, when -- he said, did he not, that he

22    did not participate in the creation of this document.  Correct?

23              (The witness examines an exhibit.)

24    A      I believe that's what he said.

25    Q      And Mr. DeCastro also said he didn't -- he hadn't spoken
```

1    to David Fredrick in connection with this document, so he

2    didn't have any discussion as to what David Fredrick was

3    thinking when he used the words in this document.  Correct?

4    A     I don't remember him saying that he did not know what

5    Dr. Fredrick was thinking.  I remember that he may have said

6    that -- he didn't contact Dr. Fredrick.

7    Q     And you see nowhere on this document the name Patricia

8    Hough; correct?

9    A     Her name is not on this document.

10   Q     And, at this time -- it says, in the first paragraph --

11   and I'll just read it.  You don't have to zoom in.

12         It says, "At the present time, I am the sole owner of

13   the Saba University School of Medicine."  Do you see that?

14               (The witness examines an exhibit.)

15   A     Yes.

16   Q     Now, did you ever contact Dr. Fredrick and ask him why

17   he wrote these words in this letter?

18   A     No, I didn't.

19   Q     Did you ever ask him why he would say that he is the

20   owner of the Saba School of Medicine when the Saba School of

21   Medicine Foundation, the nonprofit entity, owns the Saba School

22   of Medicine?

23   A     I did not contact Dr. Fredrick.

24   Q     Did you contact Dr. Patricia Hough and ask her if she

25   had ever seen this document?

1   A       I did not.

2   Q       Now, if I could turn you to 6D.  Now, 6D is a letter of

3   intent.  Where 6B was sort of a letter from Dr. Fredrick to the

4   potential buyers, 6D is actually more of an agreement, or a

5   potential agreement, to buy the schools.  Correct?

6   A       It says letter of intent.

7   Q       And a letter of intent is obviously a more . . . how

8   should we put this?  An agreement that's farther down the stage

9   than an opening letter like in Exhibit 6B, as far as buying the

10  schools; correct?

11  A       That sounds like it would be correct.

12  Q       Now, if we could highlight the first paragraph, please,

13  and zoom in?  And if you could highlight the words in the last

14  five lines of this paragraph?

15          Do you see, in those five lines that have been

16  highlighted, that this is a letter of intent written to

17  Dr. Fredrick and Dr. Hough, and it basically is with respect to

18  their -- and it says, here . . . .  "Their interests related

19  to."  Do you see where it starts that?  It's actually the two

20  words right above -- there it is.  "The interests related to

21  EIC."  Do you see that?

22  A       Yes.

23  Q       That's Education -- what is it called?  Education

24  Information Consultants.  Correct?

25  A       And sometimes it was Education International

1   Consultants.

2   Q      And that's the company that Dr. Fredrick owns

3   100 percent of up in Gardner, Massachusetts.  Correct?

4   A      Yes.

5   Q      And then it says Saba, and that's -- the reference there

6   is to the Saba School of Medicine; is that correct?

7   A      I believe so.

8   Q      And then MUA is the Medical University of the Americas.

9   Correct?

10  A      Correct.

11  Q      And then let's focus on the language that comes right

12  after that.  "That are held by Fredrick and/or Hough or

13  otherwise," and here, focus on this language, "Directly or

14  indirectly in their control."

15         Do you see that?

16  A      Yes.

17  Q      Do you remember when Mario deCastro was asked those

18  questions about whether or not there was any definition in this

19  agreement as to what's meant by direct or indirect control, and

20  he said there was no definition in this letter of intent?  Do

21  you recall that?

22  A      I recall there was a discussion.

23  Q      I'm sorry?

24  A      I recall there was a discussion.

25  Q      There was a discretion?  What does that mean?

1    A      Discussion.

2    Q      Oh, discussion.  And you also recall him saying that, if

3    someone is a -- on the board of directors of a nonprofit

4    foundation, that they actually can control the foundation.  Do

5    you recall him saying that?

6    A      I don't remember those exact words.

7    Q      Well, do you recall words along those lines?

8    A      Could you say it again?

9    Q      Certainly.  That if someone is on the board of directors

10   of a nonprofit foundation, that they have the ability to either

11   directly or indirectly control the foundation.

12   A      I honestly don't recall him saying that.  I'm not saying

13   he didn't say it, I'm just saying I don't . . . that's not

14   something that sticks in my memory.  I don't know.

15   Q      But that's a true statement, isn't it?  That if someone

16   sits on the board of directors, as a member of the board of

17   directors, they would be able to, either directly or

18   indirectly, control that foundation?

19   A      I believe that's a true statement.

20   Q      And then, if you can look down at this document on

21   Paragraph 2?  And again, just to be clear, this is one of the

22   documents that Mario deCastro talked about; correct?

23   A      That is correct.

24   Q      So if you can look at Line 2, where it says, "Fredrick

25   and Hough have a controlling interest in MUA Nevis, Saba, and

1    50 percent of MUA Belize."

2          Do you see that?

3    A     I see that.

4    Q     And they would have a controlling interest, for instance

5    with Saba, to the extent that either one of them sat on the

6    board of directors; correct?

7    A     It says controlling interest, and I would . . . not

8    agree with you, maybe, on what that means.

9    Q     Because you -- it's ambiguous.  You don't know what it

10   means.  Correct?

11   A     I take it to mean that they own those . . . those

12   entities listed.

13   Q     And you based that on some definition of the words,

14   "Controlling interest," somewhere in this agreement?

15   A     Not a definition that is in this agreement.

16   Q     That's just based on your 25 years at the IRS, dealing

17   with notions of controlling interest; is that correct?

18   A     It has to do with my experience at the IRS.  And just to

19   read things.

20   Q     I'm sorry.  I cut you off.  Could you say the last part

21   again?

22   A     The way I'm reading things, my experience, and the way I

23   read things.

24   Q     So, in your experience, what you're referring to is your

25   25 years of experience with the IRS; is that correct?

1 A  Yes.

2 Q  And you're aware, are you not, that Dr. Hough has no

3 experience at the IRS; correct?

4 A  That's correct.

5 Q  And you see, on the last page, here, of this agreement,

6 that -- second to the last page -- that Dr. Hough signs this

7 agreement?  Do you see that?

8 A  I see that.

9 Q  And do you recall, when I asked Mr. DeCastro whether or

10 not he had any knowledge of the circumstances under which

11 Dr. Hough signed this agreement, he said he had no knowledge?

12 Do you recall that?

13 A  I'm sure that he was asked if he had knowledge if

14 Patricia Hough signed this, and he said he had no knowledge.

15 Q  And you have no knowledge of the circumstances under

16 which Dr. Patricia Hough signed this agreement; correct?

17 A  I have no knowledge.

18 Q  And you have no knowledge as to whether or not any of

19 these terms were discussed with Dr. Patricia Hough before she

20 signed this agreement.  Correct?

21 A  I have no knowledge.

22 Q  And if I could show you one more document, Exhibit 8B,

23 which I believe is in evidence, Your Honor.

24     MS. KESSLER:  8B or D?

25     MR. HOCHMAN:  8B, like in boy.

 1   BY MR. HOCHMAN:

 2   Q      Do you have 8B before you?

 3   A      Yes.

 4          MR. HOCHMAN:  This was the other document that Mario

 5   deCastro talked about, isn't it?

 6          And if we could put 8B -- publish it, and focus on

 7   Page 2, Your Honor?

 8          (An exhibit was projected onto the projector screen.)

 9          MR. HOCHMAN:  Thank you.

10   BY MR. HOCHMAN:

11   Q      This is that document that Mario deCastro testified

12   about; correct?

13   A      Yes.

14   Q      And you recall that he also said that Dr. Patricia

15   Hough, to his knowledge, was never shown this document.

16   Correct?

17   A      I don't -- I don't remember that testimony.  I don't

18   remember.

19   Q      Well again, you don't see Dr. Patricia Hough as either a

20   sender or receiver of this document; correct?

21   A      I don't see her as a sender or receiver of this

22   document.

23          MR. HOCHMAN:  And if you could turn to Page 3 of this

24   document, please?  And we'll focus on Paragraph 4.  And if you

25   can zoom in on that, if possible?

1    BY MR. HOCHMAN:

2    Q      Now, again, Mario deCastro, who prepared this document,

3    said that he still hadn't done the due diligence on the Saba

4    School of Medicine Foundation to determine its ownership;

5    correct?

6    A      He did not do due diligence.  Because the sale was never

7    brought to fruition.

8    Q      Right.  Because the sale never went through.  Correct?

9    In fact -- I'm sorry, you have to . . . .  Correct?

10   A      Could you repeat the question?

11   Q      Because the sale never went through, he never did his

12   due diligence; correct?

13   A      I believe that's what he said.

14   Q      In fact, as you see on the first line, he actually

15   identifies the Saba School of Medicine Foundation, he

16   identifies it in quotes, "The Saba University Netherlands

17   Antilles," end quote.

18          Do you see that?

19   A      Yes.

20   Q      And that's not the name of the Saba School of Medicine

21   Foundation; correct?

22   A      That is not the name.

23   Q      And that's not the name of the Saba School of Medicine

24   at all; correct?

25   A      That is not the name.

1   Q      Thank you.

2          So you said that Mario deCastro was one of the people

3   that you relied on, and the documents he presented, to change

4   your Revenue Agent Report, the one that you gave the

5   prosecutors on May 14th, 2013, and then revised six days into

6   this trial; correct?

7   A      Correct.

8   Q      And then you said you were going to consult with your

9   notes last night.

10         Did you have a chance to consult with your notes to

11  determine if there were any other witnesses or exhibits that

12  resulted in you changing your conclusion six days into this

13  trial?

14  A      Yes, I did.

15  Q      And what were they?

16  A      I have 3S, Page 23.

17  Q      I'm sorry?

18  A      3S, Page 23.

19  Q      3S, Page 23.

20         Okay.  What else?

21  A      3EE, Page 86.

22  Q      Okay.

23  A      I have 6D, as in "dog"; 6F; 6B, as in "boy"; 6H; and I

24  have this document, 8B.

25  Q      8B?

1   A      8B.

2   Q      Okay.  Anything else?

3   A      7II.

4   Q      7II.  Okay.

5   A      That's it.

6   Q      All right.  Well, we just dealt with 8B.

7          And what about 8B convinced to you change your findings,

8   six days into the trial, that Dr. Fredrick and Dr. Hough owned

9   the Saba School of Medicine?

10             (The witness examines an exhibit.)

11  A      It's Page 3, Number 2.

12             MR. HOCHMAN:  If you can put Page 3, Number 2, of 8B

13  up?

14             (An exhibit was projected onto the projector screen.)

15             MR. HOCHMAN:  I'm sorry.  This is 8B, Page 3; B, like

16  in "boy."

17             (An exhibit was projected onto the projector screen.)

18             MR. HOCHMAN:  And highlight Paragraphs 2, 3, and 4,

19  if you could.

20  BY MR. HOCHMAN:

21  Q      Again, we're back with the letter that Mario deCastro

22  wrote to his clients; correct?

23  A      Correct.

24  Q      And that's Brad Anderson and Roy Dobbs; correct?

25  A      Yes.

1   Q      By the way, did you ever contact Brad Anderson, at any

2   point, up until even now?

3   A      I have not contacted him.

4   Q      I'm sorry?

5   A      I have not contacted him.

6   Q      How about Roy Dobbs, to find out what he knew about this

7   transaction, and whether or not David Fredrick and Patricia

8   Hough owned the Saba School of Medicine?

9   A      I have not contacted him.

10  Q      And you agree that they could shed some light on this

11  issue, as to what was told to them back in 2002 and 2003, about

12  who owned the Saba School of Medicine; correct?

13  A      I don't know that.  It's possible.

14  Q      And the reason you don't know that is because you didn't

15  contact them; correct?

16  A      I did not contact them.

17  Q      And then you said, Paragraph 2, it says, "The investors

18  are planning to acquire a 75 percent equity interest in a

19  venture consisting of four companies.  This venture is

20  currently owned by Dr. David Fredrick, M.D., and his wife,

21  Dr. Patricia Hough, M.D."

22         Correct?

23  A      I see that's what it says.

24  Q      You recall that Mario deCastro said that he got this

25  information from his clients; correct?

1    A       I believe so.

2    Q       And that Mario deCastro hadn't actually been able to

3    check out this information to see if it's accurate because he

4    didn't do the due diligence on the deal, because the deal

5    didn't go through; correct?

6    A       That's correct.  But I would not know why Mario deCastro

7    would put something in this document that he didn't base as

8    reliable.

9    Q       Well, he based it as reliable, based on the very limited

10   due diligence he had done at that point.  And, in fact, in this

11   letter, he says that he will be conducting -- I think it's on

12   Page 2 of this exhibit -- he will be conducting further due

13   diligence going forward, if the deal were to have gone through.

14           In fact, if we can turn to Page 2 of this document,

15   focusing on the first full paragraph, focus on the bolded

16   words, it says:

17           "The comments contained herein are provided with the

18   understanding that they are subject to further thought,

19   consideration, research, and due diligence."

20           Isn't that correct?

21   A       That's correct.

22   Q       So you have no basis, whatsoever, to rely on this

23   document as compelling evidence, evidence beyond a reasonable

24   doubt, to show that Dr. Fredrick or Dr. Hough actually owned

25   the Saba School of Medicine Foundation; correct?

1   A       Like I said, I don't believe that these statements would

2   be misrepresentative, because these were statements received

3   from Dr. Fredrick.  I don't believe that . . . this would be

4   purposely misstated.

5   Q       Well, again, you have no independent idea what the

6   circumstances were behind the statements that Mario deCastro

7   made in this particular document; correct?

8   A       The circumstances were that Dr. Fredrick and Patricia

9   Hough were attempting to sell the schools.

10  Q       They were attempting to sell the schools on behalf of

11  the Saba School Foundation; isn't that correct?

12  A       I don't . . . read that paragraph that way.  It says

13  that they were –– it's a venture consisting –– the venture is

14  currently owned by Dr. Fredrick and his wife.  It doesn't say

15  Saba School of Medicine Foundation.

16  Q       But again, Mario deCastro prepared this memo, had not

17  done, as he said, anything other than very limited amount of

18  due diligence, which is basically just taking the

19  representations he had gotten, without checking them out;

20  correct?

21  A       He did not do due diligence.

22  Q       And you did no due diligence with respect to Mario

23  deCastro, because you never spoke to him directly before this

24  trial; correct?

25  A       I did not speak to Mario deCastro.

1    Q       Did you speak to anyone from the Jones Walker firm to

2    find out how this document came to be created?

3    A       No.

4    Q       There's one other name listed.  I think Mario deCastro

5    said that he had a boss that he worked for, that he submitted

6    this document to.

7            If you can look at Page 2 of this document . . . .

8                MR. HOCHMAN:  And if we could scroll to the "from"

9    line?  Zoom in?

10                (An exhibit was projected onto the projector screen.)

11   BY MR. HOCHMAN:

12   Q       Alex P. Trostorff, of New Orleans; do you see that?

13   A       Yes.

14   Q       Did you speak to Alex P. Trostorff, to see whether or

15   not the statements in this document were based on actual due

16   diligence?

17   A       I did not speak to this Mr. Trostorff.

18   Q       Now, we'll get to some of the other exhibits in a

19   moment, but let me just go, if I might, with a slightly

20   different set of issues.

21           Are you familiar with the Liechtenstein Landesbank and

22   Fortis accounts that were opened up in the name of the Saba

23   Foundation and MUA?

24   A       I'm aware that there were accounts opened.

25   Q       And have you reviewed the accounts that were opened at

1   LLB -- we'll call Liechtenstein Landesbank, "LLB," okay?

2   A      Okay.

3   Q      Just so I don't have to keep saying it every time.

4          -- and Fortis Banque, did you have a chance to review

5   those accounts?

6   A      I'm sure I saw those accounts.  I did not review them

7   and analyze them, as I did with the other documents that I have

8   in these binders.

9   Q      Well, if you're going to find out who owns the Saba

10  Foundation, wouldn't it be a good place to start by looking at

11  the Saba Foundation and the MUA accounts that were opened up by

12  someone other than Dieter Luetolf?

13  A      I did not review those documents.

14  Q      But that -- I know you didn't review them, but I'm

15  asking you, if you want to find out who owns the Saba School of

16  Medicine Foundation, and MUA, wouldn't a good place to start be

17  the actual accounts that were opened at two banks, other than

18  UBS, in their names?

19  A      I'm not sure if it's a good place to start, but they

20  could have been reviewed possibly.

21          MR. HOCHMAN:  All right.  May I present the witness

22  with Exhibits 4A, 4C, 4F, and 4B, Your Honor?

23          THE COURT:  You may.

24          MR. HOCHMAN:  A, B, C, and F, Your Honor.  Thank you.

25

1   BY MR. HOCHMAN:

2   Q     Let's start with 4A, if we could?

3         Now, Exhibit 4A is the Saba School of Medicine

4   Foundation's Fortis Banque account; do you see that?

5   A     Yes.

6            MR. HOCHMAN:  And if we could put Page 1 of

7   Exhibit 4A on the screen?

8            (An exhibit was projected onto the projector screen.)

9   BY MR. HOCHMAN:

10  Q     This is the Form A for the Saba School of Medicine

11  Foundation, Fortis Banque account; is that correct?

12  A     Yes, it is.

13           MR. HOCHMAN:  Could you focus in on the contracting

14  party, please, at the top?

15           (An exhibit was projected onto the projector screen.)

16  BY MR. HOCHMAN:

17  Q     Saba School of Medicine Foundation was the contracting

18  party; correct?

19  A     Yes.

20           MR. HOCHMAN:  And if you could focus on the very top

21  of this document as well?

22           (An exhibit was projected onto the projector screen.)

23  BY MR. HOCHMAN:

24  Q     This is the Fortis Banque Suisse SA Form A for that

25  account; correct?

1    A      Correct.

2    Q      And then if you can look at the very bottom -- or excuse

3    me, the area that's at the bottom of this screen, but -- I'm

4    sorry, it's sort of in the middle.

5            It says, "The contracting party," and it has two boxes?

6            Do you see where it says, that there's a box that's

7    checked that says the contracting party is the sole beneficial

8    owner of the assets concerned; do you see that?

9    A      I see that.

10            THE COURT:  That's not --

11   BY MR. HOCHMAN:

12   Q      And who is --

13            THE COURT:  Counsel, that's not exactly what it says.

14            MR. HOCHMAN:  Did I read it wrong?

15            Contracting -- I'm sorry.  The first box -- I'm

16   sorry.  Just reading from the first box.  But let me --

17   actually, I'll read.

18            It says:  "The contracting party hereby declares" --

19            THE COURT:  No, it doesn't.

20            MR. HOCHMAN:  I'm sorry.  "Partner."

21            I'm sorry, Your Honor.

22   BY MR. HOCHMAN:

23   Q      "The contracting partner hereby declares," and then in

24   parentheses it says, "mark with a cross where appropriate," and

25   the box that's checked is, "that the contracting partner is the

1    sole beneficial owner of the assets concerned."

2         Do you see that?

3    A    Yes, I do.

4    Q    And that means that the Saba School of Medicine is the

5    beneficial owner of the -- excuse me -- the Saba School of

6    Medicine Foundation, in this document, is the beneficial owner

7    of the Saba School of Medicine Foundation; correct?

8    A    The beneficial owner of the account at Fortis Banque.

9    Q    At Fortis Banque, that's correct . . . is the Saba

10   School of Medicine Foundation; correct?

11   A    I think I need you to say that again.

12   Q    I'm happy to.

13        This document, this Form A, says that the Saba School of

14   Medicine Foundation, which is the contracting partner, is the

15   sole beneficial owner of the assets in this account; correct?

16   A    Correct.

17   Q    You don't see David Fredrick identified as the

18   beneficial owner of the Saba School of Medicine Foundation for

19   this account; correct?

20   A    Correct.

21   Q    You don't see Dr. Patricia Hough identified as the

22   beneficial owner of the Saba School of Medicine Foundation;

23   correct?

24   A    Correct.

25   Q    And do you see the date on the bottom of this form?

1    A        Yes.

2    Q        The date is the 18th of August in 2006; do you see that?

3    A        Yes.

4    Q        Now, 18th of August, 2006, is way before you get the

5    documents in April or May, 2009; correct?

6    A        It is before.

7    Q        Do you view this as a self-serving document . . . that

8    was created before the UBS could have possibly turned over the

9    documents to the U.S. Government?

10   A        This was created before the documents were turned over.

11   Q        So this is not a self-serving document; correct?

12   A        This Form A is not a self-serving document.

13   Q        In fact, this Form A says, categorically, without any

14   exception, that the Saba School of Medicine Foundation is the

15   beneficial owner of the assets in that account; correct?

16   A        That's what it says.

17   Q        And if you could turn to Exhibit 4B?

18            And Exhibit 4B are the notes, and some of the

19   correspondence, relating to this Saba School of Medicine

20   Foundation Fortis Banque account; correct?

21            (The witness examines an exhibit.)

22            MR. HOCHMAN:  And if we could focus on the first two

23   paragraphs, and the signature line too?

24            And actually expand it out just a little bit more to

25   capture the date, too?

1   BY MR. HOCHMAN:

2   Q     This is a letter from the Saba School of Medicine;

3   correct?

4   A     The letterhead is Saba School of Medicine.

5   Q     Saba University School of Medicine; correct.

6         Signed by Dr. Fredrick; correct?

7   A     Correct.

8   Q     As the president of the Saba School of Medicine; do you

9   see that?

10  A     Yes.

11  Q     And it says:

12        "The undersigned also certifies that, on April, 2007" --

13  excuse me.  The first paragraph is:

14        "This is to confirm that the Saba University School of

15  Medicine is owned by the Saba School of Medicine Foundation."

16        Do you see that?

17  A     Yes.

18  Q     And do you see the date of this document, December 1st,

19  2008?

20  A     Yes.

21  Q     And that's also way before -- way before -- it's at

22  least a year before, or -- actually, it could probably even

23  just be months before, I guess, April or May of 2009, when you

24  received the documents in connection with this case; correct?

25  A     It's dated before I received the boxes.

1   Q      So this document is not a self-serving document, as

2   well; correct?

3   A      This document was created, I believe . . . .  This

4   document was created, I believe, to facilitate the sale, as I

5   read it.

6   Q      Well, that's the second paragraph, but you see the first

7   paragraph?

8          Because this document is in the Fortis Banque account --

9   or, excuse me -- Fortis Banque records for the Saba School of

10  Medicine Foundation.

11         And I'm focused -- you're right, there is a second

12  paragraph, but I'm focused on the first paragraph, and that's

13  not a self-serving statement, correct, under your definitions?

14  A      I don't know why this document was created.

15  Q      Well, actually, wasn't in document created so it would

16  be clear that the Saba School of Medicine Foundation owned the

17  Saba University School of Medicine?

18  A      I don't know why this document was created.

19             MR. HOCHMAN:  If we could turn to Exhibit 4C.  And

20  focus on the third page, please?

21         (An exhibit was projected onto the projector screen.)

22  BY MR. HOCHMAN:

23  Q      Now, the Saba School of Medicine Foundation not only had

24  an account at UBS, it had an account at Liechtenstein

25  Landesbank -- excuse me -- an account at Fortis, but it also

1    had an account at Liechtenstein Landesbank; is that correct?

2    A      That's what it says here; yes.

3    Q      And that's what is reflected in Exhibit 4C; correct?

4    A      Yes.

5    Q      And on Page 3 of 4C, this is the Form A version for the

6    Liechtenstein Landesbank for this account for the Saba

7    University School of Medicine; isn't that correct?

8    A      Yes.

9    Q      And if we could focus on the . . . sort of the first

10   half, down to the checked boxes, if we could?

11          It says the contracting party is the Saba University

12   School of Medicine; correct?

13   A      Yes.

14   Q      And you see the box that's checked?

15   A      Yes.

16   Q      And that box says the contracting partner is the sole

17   beneficial owner of the assets concerned.

18          Do you see that?

19   A      Yes.

20   Q      So that means that the Saba University School of

21   Medicine is the sole beneficial owner for the assets in the

22   account of the Saba University School of Medicine; isn't that

23   correct?

24   A      Correct.

25              MR. HOCHMAN:  And if we could expand the document a

1    bit?

2    BY MR. HOCHMAN:

3    Q      They actually even provide some more information about

4    the Saba University School of Medicine, its address, its

5    domicile, and its country.

6           Do you see that on this document, Exhibit 4C, Page 3?

7    A      Yes.

8    Q      And you see, at the bottom, it says, "signature of the

9    contracting partner"; do you see that?

10   A      Yes.

11   Q      And that's David Fredrick's signature, isn't it?

12   A      That is.

13   Q      And David Fredrick is signing on behalf of the Saba

14   University School of Medicine; isn't that correct?

15   A      I believe that's what this document is representing.

16   Q      And this document was signed on February 2nd, 2006;

17   correct?

18   A      Correct.

19   Q      And this document also would not be a self-serving

20   document, because it was signed at least three years before the

21   government's investigation began in this case; correct?

22   A      It was created three years before the investigation of

23   the case.

24   Q      Is it's not a self-serving document; correct?

25   A      Not with regards to the investigation.

1    Q      If you could turn to Exhibit 4A, like in "frank"?

2           Now, you also checked out the bank accounts not just for

3    the Saba school foundation, but also for the Medical University

4    of the Americas; correct?

5    A      I'm sorry, say that again?

6    Q      You not only checked out the Saba School of Medicine

7    Foundation's bank accounts, but also those for the Medical

8    University of the Americas; correct?

9    A      I reviewed those.

10   Q      Because you wanted to know who the beneficial owner was

11   of the Medical University of the Americas; is that right?

12          Is that correct?

13          (The witness examines an exhibit.)

14   A      This would be a piece of information that would be part

15   of the consideration to determine who owned Medical University

16   of the Americas.

17   Q      And did you, in fact, view this -- look at this piece of

18   America in reaching your conclusion as to who owned the Medical

19   University of the Americas?

20   A      I would have seen this document.

21          MR. HOCHMAN:  And again, if we could focus on the top

22   part of this document, this Form A?

23   BY MR. HOCHMAN:

24   Q      Do you see that the contracting partner is identified as

25   the Medical University of the Americas?

1    A        Yes.

2    Q        And you see the box that's checked that says, "the

3    contracting partner," the Medical University of the Americas is

4    the sole beneficial owner of the assets concerned; do you see

5    that?

6    A        Yes.

7    Q        And that means that -- and the reason that that is

8    accurate is, the Medical University of the Americas is an

9    operating company; correct?

10   A        The Medical University of the Americas was an operating

11   company.

12   Q        So when Dieter Luetolf, at UBS, when it had and treated

13   the Medical University of the Americas as a domiciliary

14   company, he made a mistake; correct?

15   A        I don't know what those documents were about.

16   Q        And the same thing with the Saba School of Medicine

17   Foundation, when Dieter Luetolf treated the UBS account as a

18   domiciliary company, as opposed to an operating company, Dieter

19   Luetolf made a mistake; isn't that correct?

20   A        I don't know the circumstances of those documents, of

21   how they were created or who filled them out, or -- I really

22   don't know.

23   Q        And you took no effort to find out; correct?

24   A        I did not make phone calls.

25   Q        Or any e-mails, or communications, whatsoever, to find

1    out the answer; correct?

2    A        I did not.

3    Q        If you could look at the bottom part of this document,

4    please?

5    A        Yes.

6    Q        And you see who it's signed by on behalf of the

7    contracting partner; do you see that?

8    A        Yes.

9    Q        It's signed by David Fredrick and Patricia Hough; do you

10   see that?

11   A        Yes.

12   Q        And you see the date, August 30th, 2006.

13   A        Yes.

14   Q        That's about two and a half years before you ever get

15   the files in this case; correct?

16   A        Correct.

17   Q        So this document would not be a self-serving document;

18   correct?

19   A        Not in this case.

20            I would like to say that the Form As were not the only

21   documents considered in determining the beneficial -- the

22   Form As were not the only documents that were used in

23   considering who owned the accounts.

24   Q        Because you consider Form As as unreliable?

25   A        No.

1    Q      So if the Form As are reliable, don't we just stop the

2    analysis right now, because this analysis, right here, in these

3    Form As, says that the Saba School of Medicine Foundation is

4    owned by the Saba School of Medicine Foundation.

5    A      What I believe I said was, the Form As are one indicator

6    of who owns the account.  They were not totally rely -- they

7    were not the only documents relied upon . . . to determine the

8    owners of the accounts.

9    Q      Okay.

10           So again, are you saying that this particular Form A,

11   that we just looked at, for the Saba School of Medicine

12   Foundation, is not reliable?

13   A      It is not the sole indicator of who owned the account.

14   Q      Because sometimes, on a Form A, it might indicate a

15   beneficial owner that's not the beneficial owner; is that what

16   you're trying to say?

17   A      There may be underlying transactions and documents aside

18   from the Form A that reveals who the beneficial owner of the

19   assets and who gets the economic benefit of the account.

20   Q      Because if the assets were, let's say, the Saba . . .

21   the Saba School of Medicine Foundation's assets, if we make

22   that the starting point of our assumption, and they get put

23   into an account that doesn't have the Saba School of Medicine

24   Foundation -- sort of like our colloquy back and forth about

25   the thousand dollars that you were going to give me that you

1   weren't -- but if we deal with, the Saba School of Medicine

2   Foundation has assets, and it puts those assets in an account

3   not in its name, the mere fact that the account is in a

4   different name doesn't mean it's not the Saba School of

5   Medicine Foundation's assets; correct?

6   A     I'm not following if we're talking about the same thing.

7   Q     Sure.  Let me see if I can make it . . . do it in a

8   different way.

9         We talked, yesterday, about -- and again I'll use this

10  example, and I know you're not going to give me a thousand

11  dollars, but that if you gave me a thousand dollars of your

12  money, and I put it in the Nathan Hochman account, it doesn't

13  convert it into Nathan Hochman's money; correct?

14  A     That's correct.

15  Q     So the Saba School of Medicine Foundation gave me a

16  thousand dollars, and I put it in the Nathan Hochman account,

17  it still remains the Saba School of Medicine Foundation's

18  money; correct?

19  A     Yes.  If it was put in your account, and . . . .  Well,

20  I don't think this is what I'm trying to say.  What I'm trying

21  to say is, the Form A has beneficial owners listed; but

22  underlying documents, such as the e-mails and instructions,

23  indicate who is directing the account, and removal of funds for

24  personal expenses or personal use also indicate whose account

25  that belongs to.

1   Q       Well, let's break that down.

2           So, if you reviewed an account and you didn't see an

3   e-mail or an instruction from a particular person, you could --

4   that would be a significant factor in whether or not that

5   person owned the account; correct?

6   A       It would be one factor that would be considered,

7   overall, in --

8   Q       Would that be a significant factor for you?

9   A       I don't believe that I would call it significant.  I

10  said it would be one factor.

11  Q       And in dealing with the personal expense side, if it

12  turned out that someone had the authority from, in this case

13  let's say The Foundation, to make a request for certain funds

14  in a Swiss bank account, to . . . as a loan, to pay for, let's

15  say, a property, would that influence you in determining that

16  it would be The Foundation's bank account, if they did get the

17  loan from The Foundation?

18  A       That would depend on loan documents and indicators that

19  it was a loan, and that it was paid back.

20  Q       Well, there are plenty of loans that are still

21  outstanding, correct, and not paid back as -- and not

22  necessarily paid back -- let me rephrase.

23          It doesn't not make it a loan if it hasn't been paid

24  back yet; correct?

25  A       There should be loan terms.  There should be explanation

1   of loan terms . . . loan terms, interest, and statements of

2   when payback is expected, and when payments should be made.

3   Q      Are you aware of people having loans with each other

4   that don't have a formal written document for the loan?

5   A      I have seen those types of loans.

6   Q      And does that make it an invalid loan, the fact that

7   there is not a formal written document laying out all the

8   terms?

9   A      Sometimes yes, sometimes no.  It depends on the

10  underlying circumstances of the document and the related

11  parties involved.

12          MR. HOCHMAN:  If I may present the witness with

13  Exhibit 3C, Your Honor?

14          THE COURT:  You may.

15          MR. HOCHMAN:  Thank you.

16          Now, if we could put the first page of 3C on the

17  screen?

18          (An exhibit was projected onto the projector screen.)

19  BY MR. HOCHMAN:

20  Q      Now, what Exhibit 3C is, is the UBS New Vanguard

21  account; correct?

22  A      Yes.

23  Q      And you see on Form A, it's listed David Leon Fredrick

24  and Patricia Lynn Hough as the beneficial owners of this

25  account; correct?

1   A       Yes.

2   Q       Do you see Dr. Fredrick or Dr. Hough's signature

3   anywhere on this document, the Form A?

4   A       No, I don't.

5   Q       You see Beda Singenberger's signature; correct?

6   A       Yes.

7   Q       Look through this entire packet . . . as fast as you

8   want, and tell me whether or not you see David Fredrick or

9   Patricia Lynn Hough's name anywhere else, other than on this

10  first page of this document.

11          And while you're looking, also see if you see their

12  signatures anywhere else, other than -- well, actually,

13  anywhere on any of the pages of the document.

14              (The witness examines an exhibit.)

15  A       I don't see their signatures.

16  Q       And you don't even see their names anywhere, other than

17  the first page of this document; correct?

18  A       No; but Beda Singenberger is an intermediary that they

19  gave permission to sign for them.

20  Q       And on what do you base that?

21  A       I believe . . . .  I don't . . . .  I don't know, in my

22  notes, where I have this, and . . . .  But I believe there was

23  a . . . .  Well, for Beda Singenberger to be able to sign for

24  this, they would have to sign -- have to have signed some type

25  of contract with Beda Singenberger, to allow him to put his

1   signature on these documents.

2   Q      That is actually not correct, isn't that right?

3          What you just said is not correct, that David Fredrick

4   and Patricia Hough had to sign a New Vanguard document to allow

5   Beda Singenberger to sign his name.

6   A      I believe that Patricia Hough and David Leon Fredrick

7   would have had to sign a Sinco Treuhand document to allow him

8   to sign for this account.

9   Q      Have you ever seen a Sinco Treuhand document with David

10  Fredrick's or Patricia Hough's signature on it?

11  A      I believe I have.

12  Q      You have.

13  A      I believe so.

14  Q      Please tell me where in the evidence I can find this

15  document.

16  A      I can't.

17  Q      Pretty important document, isn't it?

18  A      Yes.

19  Q      And last night, when you were looking to establish

20  whether or not David Fredrick and Patricia Hough were the owner

21  of the Saba School of Medicine Foundation and all these

22  accounts, did you look for an exhibit that has that document in

23  it?

24  A      I did not.

25  Q      And actually, if you look at the -- Page 39 of this

1    document, that lists authorized signatories . . . .

2              MR. HOCHMAN:  And if we can put 39, and focus on the

3    top four there, please?

4              (An exhibit was projected onto the projector screen.)

5    BY MR. HOCHMAN:

6    Q     There are four people who are authorized signatories to

7    this agreement; correct?

8    A     Yes.

9    Q     Beda Singenberger; Daniel Eric Joerin, spelled

10   J-O-E-R-I-N; Erwin Schulthess; and Brigitte Schaufelberger.

11             Do you see that?

12   A     Yes.

13   Q     Do you see David Fredrick's or Patricia Hough's name

14   anywhere on this document of authorized signatories?

15   A     Their names aren't on this document.

16   Q     And do you see, with respect -- and if you can turn to

17   Page 41, there's a certified corporate resolution . . . that

18   says that Beda Singenberger is the director of New Vanguard

19   Holdings, and that further resolved, and he lists four

20   different people, that these are the people who are allowed to

21   sign on behalf of New Vanguard; do you see that?

22   A     Yes.

23   Q     Now, New Vanguard is a Hong Kong corporation; isn't that

24   correct?

25   A     Yes.

1   Q      And David Fredrick -- either -- well, David Fredrick was

2   not an officer of New Vanguard?

3   A      I don't know that.  I know that David Fredrick put his

4   funds into an account with New Vanguard.  I don't know what his

5   title would be from New Vanguard.

6   Q      Excuse me.  David Fredrick put funds that were in the

7   David Fredrick account into New Vanguard; isn't that correct?

8   A      That's correct.

9   Q      And is it possible that the funds that were in the David

10  Fredrick account, in the name of David Fredrick, were actually

11  the Saba School of Medicine Foundation's money?

12  A      I don't believe that to be true.

13  Q      And isn't it true that the money that went into the

14  David Fredrick account came from the David Fredrick/Pat Hough

15  joint account; is that correct?

16  A      That's correct.

17  Q      And the money that went into that account came from,

18  originally, the Saba School of Medicine Foundation.

19  A      I don't know that . . . I didn't see that.  That's . . .

20  that it came from -- I don't know where it came from, but I

21  don't know that those original funds came from the Saba School

22  of Medicine Foundation.

23  Q      Did you take any efforts to track the original source of

24  funds?

25  A      I . . . .  I tracked it back as far as I could.

1    Q       And as far as you could was where?

2    A       An account in the Bahamas.

3    Q       And the Bahamas account was set up by David Fredrick,

4    for asset-protection reasons, to put the Saba School of

5    Medicine Foundation's funds outside of the Island of Saba;

6    correct?

7    A       I don't know that.

8    Q       Do you have any evidence that David Fredrick, in the

9    late 1990s, or Patricia Hough, had earned millions of dollars

10   of their own income; do you have any evidence of that?

11   A       Those . . . .  There were millions of dollars that went

12   into a joint account at UBS in the name of David Fredrick and

13   Patricia Hough.

14   Q       Right.  And those millions of dollars came from the

15   tuition, the money, the revenues, that had been generated by

16   the Saba School of Medicine up to that point of 2001; isn't

17   that correct?

18   A       I don't know exactly if it was tuition.  I don't know

19   where those funds were accumulated from.

20   Q       But your best estimate, based on how much you know that

21   David Fredrick and Patricia Hough were earning, being doctors

22   or consultants, versus how much the Saba School of Medicine

23   was, based on tuition, is that the money came from the Saba

24   School of Medicine Foundation, rather than David Fredrick and

25   Patricia Hough; correct.

1  A      I really am not following that.  I'm not following what

2  you're saying.

3  Q      Again, the account that was set up in the Bahamas was

4  set up on behalf of the Saba School of Medicine Foundation;

5  correct?

6  A      I don't know that.

7  Q      Did you ever take any steps to try to find out the

8  answer to that question?

9  A      I was unable to find out those original documents from

10  that account in the Bahamas.

11  Q      What steps did you take to try and find that out?

12  A      I looked through the documents that I had -- that were

13  provided that were available to me.

14  Q      Did you have any documents from any of the Bahamas

15  accounts?

16  A      No, but . . . and I don't know the exhibit, but one of

17  the exhibits states, when UBS was doing their due diligence,

18  was that the money in this joint account was coming from the

19  Bahamas, because . . . David Fredrick and Patricia Hough were

20  concerned about the changes in the law.

21  Q      Right.  But my question is the origin of the money.

22         Did you get any Bahamas' accounts, Bahamanian accounts'

23  documents, in order to track where the money originally came

24  from?

25  A      I did not.

1   Q       Do you think that's pretty important, to get something

2   like the Bahama bank account records to track where the money

3   originally came from?

4   A       It would have been nice if those had been available.

5   Q       Did you ask the prosecutors if they could get Bahamas

6   accounts' bank records for you, so that you could review them?

7   A       I did not.

8   Q       Did you ask Special Agent Lalli if he could get the

9   Bahamas bank records so that you could review them?

10  A       I did not.

11  Q       You knew which banks, it was SG Hambros and UBS Bahamas,

12  that the money came from; correct?

13  A       Yes, I believe.

14  Q       Did you contact SG Hambros to say:  Can you please give

15  me the bank records so that I can figure out if these millions

16  of dollars started with David Fredrick and Patricia Hough, or

17  they were the Saba School of Medicine Foundation's money?

18  A       I did not make phone calls.

19  Q       Or any type of communication to SG Hambros; correct?

20  A       Correct.

21  Q       And you also didn't have any type of communication with

22  UBS Bahamas; correct?

23  A       Correct.  There was also testimony . . . .

24          MR. HOCHMAN:  I don't think there's a pending

25  question right now.

1              If I might, I'd like to turn your attention to

2    Exhibit 3CC.

3              If I might present that to the witness, Your Honor?

4              THE COURT:  As long as it's been introduced already,

5    you may present it.

6              MR. HOCHMAN:  Thank you, Your Honor.

7              (Mr. Hochman provides an exhibit to the witness.)

8    BY MR. HOCHMAN:

9    Q     Now, Exhibit 3CC are the Top Fast opening documents at

10   UBS; correct?

11   A     Yes.

12             MR. HOCHMAN:  If we could put Page 1 of 3CC on?

13             (An exhibit was projected onto the projector screen.)

14   BY MR. HOCHMAN:

15   Q     And this is the Form A from the Top Fast UBS account; is

16   that correct?

17   A     Correct.

18   Q     And on Page 1, it identifies David Fredrick as the

19   beneficial owner; correct?

20   A     Yes.

21   Q     And on Page 2, it identifies Patricia Lynn Hough as the

22   beneficial owner; correct?

23   A     Correct.

24   Q     And neither page is signed by David Fredrick or Patricia

25   Hough; is that correct?

1    A       Correct.

2    Q       You have no idea whether or not these documents were

3    ever shown or discussed with David Fredrick or Patricia Hough,

4    at the point at which they were signed; correct?

5    A       I would not have been there to witness any of that.

6    Q       And Mr. Futterknecht, himself, said the same thing, that

7    he didn't participate in . . . in these documents; correct?

8    A       Yes.

9    Q       And you haven't seen any other witness in this case who

10   has talked about how these documents in Government's

11   Exhibit 3CC came to be; correct?

12   A       Could you repeat the question?

13   Q       Mr. Futterknecht didn't say he knew about these

14   documents, and there's no other witness in this trial that has

15   testified that said they knew anything about how this Form A,

16   in Exhibit 3CC, on Pages 1 and 2, came about; correct?

17   A       Mr. Futterknecht explained what this document was, and

18   what it was for, and what it represents.  He did say that he

19   wasn't present at the meeting where these document were signed.

20   Q       And there's no other witness in this trial that

21   testified that they were present at the time these documents

22   were signed; correct?

23   A       Correct.

24   Q       Do the same exercise, if you could, and look through

25   this entire document, and see, other than on Pages 1 and 2, if

1    David Fredrick or Patricia Hough's name is even mentioned.

2          And while you're looking, see whether or not they signed

3    the document in any place.

4          (The witness examines an exhibit.)

5    A    Their names are not here.  They did not sign.

6    Q    Could you turn to Page 16, the authorized signatory

7    line . . . .  We'll just go through that very quickly.

8          There are four authorized signatories.  They are the

9    same ones that were the authorized signatories for New

10   Vanguard; is that correct?

11   A    Correct.

12   Q    And you don't see David Fredrick or Patricia Hough's

13   name as an authorized signatory; correct?

14   A    Correct.

15   Q    And you heard from Mr. Futterknecht that only the

16   authorized signatories can direct UBS with respect to this

17   account; isn't that correct?

18   A    As I said before, I believe there was a contract between

19   Patricia Hough and David Minchenberg that would allow these

20   people to sign for them on this account.

21   Q    And do you have any evidence of this contract for Top

22   Fast?

23   A    I . . . I can't pull it up right now.

24   Q    And if . . . when you have a moment during the recess,

25   if you can go back through your notes, I'd appreciate it, and

1   see if you can find evidence of this contract between David

2   Fredrick, Patricia Hough, and Sinco, through either New

3   Vanguard or Top Fast.

4         Would you do that for me?

5   A     I have a couple other things that are . . . I need to

6   attend; but I will try.

7   Q     And if you could turn to Page 20 of this document, once

8   again, it says Beda Singenberger, as a director, sole director

9   of Top Fast Finance, along with three other people, are

10  authorized to sign; correct?

11  A     Correct.

12  Q     And if we look at the Ample Dynamic documents -- well,

13  actually, when you said that you looked at certain accounts,

14  those . . . what was it, six -- the five accounts, none of the

15  five accounts that you looked at in depth was the Ample Dynamic

16  Trading account; correct?

17  A     Correct.

18  Q     Is it fair to say -- I mean, we can go through the

19  exercise, as well, with the UBS account and pull it out, but is

20  it fair to say that, once again, if David Fredrick and Patricia

21  Hough's name were on the beneficial owner lines for Ample

22  Dynamic, that they didn't sign the document in any place in the

23  packet, and they also didn't have their name mentioned in any

24  of the other opening documents?

25  A     I don't -- I don't know that.  I don't remember the

1    opening documents that I saw for Ample Dynamic.

2            THE COURT:  Is this a convenient place for a recess?

3            MR. HOCHMAN:  It would be, Your Honor.  Thank you.

4            THE COURT:  All right.  Let's take 15 minutes.

5            Do not discuss the case among yourselves, or allow

6    anyone to discuss it with you or in your presence.

7    About 11:00 o'clock.

8            (At 10:43 AM, the jury was escorted from the

9        courtroom.)

10           THE COURT:  All right.  Fifteen minutes.

11           MR. HOCHMAN:  Thank you, Your Honor.

12           (At 10:44 AM, court was recessed.)

13                        AFTER RECESS

14           (At 10:59 AM, court was reconvened.)

15           THE COURT:  Both sides ready for the jury?

16           MR. HOCHMAN:  Yes, Your Honor.

17           MS. KESSLER:  Yes.

18           THE COURT:  Have the jury step in, please.

19           (At 11:01 AM, the jury was escorted into the

20       courtroom.)

21           THE COURT:  You may proceed.

22           MR. HOCHMAN:  Thank you, Your Honor.

23   BY MR. HOCHMAN:

24   Q    Ms. Maurer, I'd like to go through, because I had a

25   chance to pull all the exhibits and make it faster, the various

1    exhibits that you relied on to change your revenue agent's

2    report over four and a half years from the time you started

3    this investigation.

4         You said 3S -- Exhibit 3S, Page 23, was an exhibit you

5    relied on to change your opinion; is that correct?

6              (The witness examines an exhibit.)

7              MR. HOCHMAN:  And, Your Honor, can we dim the lights

8    and put 3S, Page 23, which has been admitted into evidence, on

9    the screen?

10             THE COURT:  Yes.

11             MR. HOCHMAN:  Thank you very much, Your Honor.

12             (An exhibit was projected onto the projector screen.)

13   BY MR. HOCHMAN:

14   Q    And 3S, 23, is a document that occurs in . . . I think

15   it's Patricia Hough UBS file; is that correct?

16   A    Yes.  In her individual account.

17   Q    In her individual account.

18        Do you have any idea which person at UBS actually put

19   this information in, if, in fact, it was a person at UBS?

20   A    Well, as Mr. Futterknecht explained, these are client

21   notes that are important to the case, so they were put in on or

22   around the time that the event happened, and there were certain

23   people who could do this.

24   Q    I understand that; but do you know which one of the

25   people at UBS put this information into the account?

1    A      I do not know.

2    Q      And with respect to this information, it says, in the

3    bottom paragraph, "They own medical colleges in the Caribbean."

4          Do you see that?

5    A      Yes.

6    Q      "In Nevis and Belize as well."  And it says:

7    "Dr. Fredrick is the president, and they are currently in

8    negotiations to sell these.  And Mrs. P.H. also does medical

9    consulting, advising hospitals in the United States on how to

10   pass the various periodic regulatory checks."

11         Do you see that?

12   A      Yes.

13   Q      It says:  Funds were moved to us from UBS Bahamas, which

14   no longer takes U.S. clients, and originate from their

15   schools/consulting business."

16         Do you see that language, "originate from their

17   schools/consulting business"?

18         And in viewing those records, does that give you more

19   confidence that the original source of these funds came from

20   the Saba School of Medicine Foundation, and not David Fredrick

21   and Patricia Hough?

22   A      No.

23   Q      The second exhibit you talk about is Exhibit 3E,

24   Page 86 --

25   A      But I . . . .  Never mind.  What I was referring to --

1           MR. HOCHMAN:  I don't believe there's a pending

2    question.

3           If we could put on the board, Your Honor,

4    Exhibit 3EE, Page 86?

5           THE COURT:  You may.

6           What was the page number for the 3S exhibit?

7           MR. HOCHMAN:  I'm sorry.  This is -- the last one,

8    Your Honor?

9           THE COURT:  Yes.

10          MR. HOCHMAN:  The last one was 3S, Page 23.

11          THE COURT:  Thank you.

12          MR. HOCHMAN:  And this is 3EE, Page 86.

13          THE COURT:  Thank you.

14          (An exhibit was projected onto the projector screen.)

15   BY MR. HOCHMAN:

16   Q     Now, you have no idea who at UBS prepared this document;

17   correct?

18         Is that correct, you actually don't know which

19   individual at UBS prepared this document?

20   A     No.

21   Q     No, you do know; or no, you don't know?

22   A     I do not know who the designated employee is to upload

23   things into the client work bench.

24   Q     And it says here:  "The client and her husband are

25   consultants, own and operate medical schools.  She is in the

1    process of becoming honorary consul for El Salvador."

2            Do you see that?

3    A       Yes.

4    Q       And with respect to that, you don't know what was

5    discussed between anyone at UBS and Doctors Fredrick and Hough,

6    that led someone to putting this information in these notes; is

7    that correct?

8    A       They discussed that they own and operate medical

9    schools.

10   Q       Well, you're assuming that's what they discussed because

11   that's what shows up in these notes, but you don't know the

12   nature of the discussions that preceded someone putting this

13   down; correct?

14   A       It was a discussion between her and her husband.  I

15   don't . . . .  I don't know who put this in, but somebody felt

16   it was important to record this information.

17   Q       Now, are you aware that, when Dr. Hough first approached

18   Dieter Luetolf at UBS, that she presented him with all the

19   catalogs and all the documentation -- official documentation of

20   the Saba School of Medicine Foundation?

21   A       I have no way of being aware of that.

22   Q       Have you reviewed the original accounts to see what was

23   presented to Dieter Luetolf by Dr. Hough at their original

24   meeting in late September of 2001?

25   A       I don't have those documents.

1    Q      Now, you said that you relied, also, on 6D, like in

2    "David"; 6F; 6B, like in "boy"; and 6H.  And I'll call those

3    the Mario deCastro documents.

4           Do you recall that?

5    A      Yes.

6    Q      And we don't have to discuss them.  I think we've

7    already discussed those documents, as well as 8B, which was

8    Mario deCastro's opinion.

9           And I think you had one more document, 7II was a

10   document you relied on?

11   A      I have it in my notes, and I -- I wanted to look at it

12   again.

13   Q      Well, the problem with 7II is, it's never been admitted

14   into evidence.

15          Are you aware of that?

16   A      You could be correct.

17   Q      So when you just said that you relied on 7II to change

18   your opinion about who owned the Saba School of Medicine

19   Foundation, you're incorrect; correct?

20   A      It must have been 7II was presented and objected to.

21   I . . . I guess it was not admitted into evidence.

22   Q      Now, did the government ever hand you copies of the

23   exhibits that they were going to introduce into this case

24   before they introduced them?

25   A      They did not hand me documents before they introduced

1   them.

2   Q      And did you come up during the break and look through

3   the documents that had been introduced as admissible evidence

4   in this case?

5   A      I did not.

6   Q      So is it fair to say the only way you saw a document,

7   sitting in the gallery, is if it was projected up here on the

8   projector; is that correct?

9   A      It could have been projected, or it could have been

10  spoken of.

11  Q      All right.  Then what do you recall of Exhibit 7II that

12  was spoken of, but wasn't admitted into evidence or put on the

13  projector?

14  A      If it's not in evidence, I'm not sure if I should be

15  talking about it.

16  Q      You know, if you relied on -- well, if you relied on

17  something presented here, in court, about 7II, it's presented

18  here in court.

19         What did you rely on?

20  A      I don't -- I don't want to say, if it's not in evidence.

21  I didn't realize it was not presented into evidence, so . . . I

22  don't want to speak of that document then.

23  Q      Did someone give you a copy of 7II?

24  A      No.

25  Q      So the only way you know of 7II is if it was shown on

1   the projector, and it won't be shown on the projector unless

2   it's in evidence.

3          You understand that; correct?

4   A      Correct.

5   Q      So what about 7II, the discussion about 7II, led you to

6   do a 180-degree change, from your May 14th report to your

7   October 14th report, on who owned the Saba School of Medicine

8   Foundation?

9   A      It wasn't about 7II.  There were several documents that

10  we've talked about ahead of it; 7II, I put on here as one of

11  the documents.

12  Q      Which is wrong because -- well, are you saying that what

13  you're relying on is discussion about 7II, not the document

14  itself?

15  A      I don't remember.

16  Q      You wrote 7II as one of the list that you presented this

17  morning.

18         Why did you put it on the list?

19  A      Because I had something in my notes about 7II, but I

20  didn't scratch it off, that it wasn't presented in evidence.

21  Q      And is there a chance, then, that your notes are wrong,

22  as far as evidence that you relied on to make a 180-degree

23  change in your opinion about who owned the Saba School of

24  Medicine Foundation?

25  A      The change in my opinion wasn't based solely on 7II.

1    Q       It wasn't based on 7II at all; correct?

2    A       It should not have been based on 7II if it was not

3    presented into evidence.

4    Q       If you could turn to Exhibit 30I?

5            Actually, I don't think you have 30I.

6                MR. HOCHMAN:  May I approach the . . . .

7                THE COURT:  You may.

8                MS. KESSLER:  Mr. Hochman?  I think 30I may be in one

9    of the binders that are behind her seat.

10               MR. HOCHMAN:  Thank you.

11   BY MR. HOCHMAN:

12   Q       Do you have binders behind you that would have 30I?

13           Do you have Exhibit 30I before you?

14               MR. HOCHMAN:  We don't need to publish it yet.

15               (The witness examines an exhibit.)

16               THE WITNESS:  Yes.

17   BY MR. HOCHMAN:

18   Q       Now, 30I is your October 14, 2013 report; correct?

19   A       Yes.  It's a revised report.

20   Q       And are you 100 percent confident, as you sit here

21   today, that 30I, your revised report, is a hundred percent

22   accurate?

23   A       I am not a hundred percent confident that this document

24   is a hundred percent accurate.

25   Q       You have some doubt about this document; correct?

1   A      I believe I'm going to be questioned about items in this

2   document.

3   Q      That wasn't my question, though.

4          My question is:  You have some doubt about this

5   document; correct?

6   A      I believe that I could have -- that there could be human

7   error involved in this document.

8   Q      What kind of human error?

9   A      I -- I don't -- I am not sure.

10   Q      Are you pretty certain that there could be some human

11   error involved in this document?

12   A      I don't know if I would say "pretty certain."  I believe

13   there could be human error involved in this document.

14   Q      Do you think this document is only substantially

15   correct?

16   A      I believe this document is correct.

17   Q      You have had over four and a half years to prepare this

18   document.

19          Are there any additional changes you want to make in

20   this document before I ask you any more questions?

21   A      No.

22   Q      And this document --

23          MR. HOCHMAN:  Now, if we can show this document,

24   please?

25               (An exhibit was projected onto the projector screen.)

1          MR. HOCHMAN:  And focus on the top part that says,

2   "adjustments to income"?

3   BY MR. HOCHMAN:

4   Q     This document contains --

5   A     Oh, I thought we were talking about 30I-1.  You're

6   talking about 30I-2.

7   Q     Yes, 30I-2.

8         Do any of your answers change, or do you think there

9   could be human error, as well, in 30I-2, 30I, Page 2?

10  A     It's possible.

11  Q     And I'll focus again on the adjustments to income, that

12  first section?

13        These are the adjustments to Dr. Patricia Hough's total

14  income line; correct?

15  A     Yes.

16  Q     And you're aware --

17  A     They're adjustments to her taxable income line.

18  Q     Taxable income.

19        But you're aware, on a tax return, that it has various

20  sections, and one of the sections, on Line 22, says, "total

21  income"; correct?

22  A     Yes.

23  Q     And the items that would make up total income on your

24  adjustments would be taxable interest, ordinary dividends, and

25  capital gains or loss, the first three lines; correct?

1   A       That would be in the total income line.

2   Q       And that's Line 22 of a tax return; correct?

3   A       Correct.

4   Q       And the other ones, itemized deductions, exemptions,

5   standard deduction, those are on a different part of the

6   return, they're not part of the total income calculation;

7   correct?

8   A       They are part of the taxable income.

9   Q       They are part of the taxable income, but they are not

10  part of the total income; correct?

11  A       Correct.  Taxable interest, ordinary dividends, and

12  capital gain or loss, they would be in adjusted gross income.

13          MR. HOCHMAN:  And if we could highlight those first

14  three?

15  BY MR. HOCHMAN:

16  Q       Those are the three that will be focused on because they

17  affect Line 22, the total income line; correct?

18  A       Okay.

19  Q       Now, with respect to those, again, any additional

20  changes you want to make on Exhibit 30I, Page 2, for

21  adjustments to total income, beyond those already indicated on

22  Exhibit 30I, Page 2?

23  A       I don't believe so.

24  Q       And has your supervisor -- you said your supervisor

25  didn't review the May 14th, 2013, report.

1      Did your supervisor review this change that you made,

2  six days into trial, on the October 14, 2013, report?

3  A      No.

4  Q      Did you offer to -- did anyone at the IRS review this

5  change in your report?

6  A      No.

7  Q      Did you discuss this change in your report before you

8  did it with anyone on the prosecution team?

9  A      Yes.

10 Q      And who was that?

11 A      It would have been Caryn Finley and Lee Kessler.

12 Q      And did they advise you, six days into trial, to make a

13 change in your revenue agent's report?

14 A      I'm not sure if it was advised.  It was discussed with

15 them, and . . . I determined to make these adjustments -- to

16 make a change.

17 Q      What were those discussions?

18 A      I -- I don't believe the discussions that I had with

19 them -- were -- for 2005.  I believe my discussions were for

20 2006 and 2007.

21 Q      Okay.  And what were those discussions for 2006 and

22 2007?

23 A      2006 and 2007, it started with 2007, when I determined

24 that David Fredrick and Patricia Hough owned the medical

25 schools, and not just the Round Hill property.

1   Q      Okay.  So you increased the number for 2007, is that

2   correct, the total income number for 2007; is that correct?

3   A      I didn't increase it because . . . I removed the line

4   that I had for other income from foreign accounts, which were

5   the items that were taken out of the schools to pay for

6   personal expenses.  So, overall, in 2007, the total income line

7   went down.

8   Q      And we'll get to how your calculations were in a moment.

9          But you discussed these changes, for 2006 and 2007, with

10  Ms. Finley and Ms. Kessler?

11  A      Yes, I did.

12  Q      Did they agree to the changes?

13  A      I believe so.

14  Q      Did they ask you to make any more changes?

15  A      No.

16  Q      Did the idea for the changes come from you or come from

17  them?

18  A      The idea of the changes . . . I believe started with me,

19  when I asked a question or answered a question.

20  Q      What question did you ask, and what question did you

21  answer?

22  A      I'm not sure.  It was a discussion, and that's when I

23  discussed with them that I saw evidence that I believed the

24  schools were owned by Patricia Hough and David Fredrick.

25  Q      And that's why you took off the other lines for 2006 and

1    2007, income from undeclared foreign accounts; is that correct?

2    A     Correct.

3    Q     Now, would you consider it to be a serious error on your

4    part if you made a $10,000 error in your calculations?

5    A     It would be an error.

6    Q     Would you consider $10,000 a serious error?

7    A     It is not a good error.

8    Q     I'm sorry?

9    A     It wouldn't be good to make that type of error.

10   Q     How about a hundred thousand-dollar error, would that be

11   a serious error, in your mind?

12   A     That would be a serious error.

13   Q     How about a million-dollar error, would that be a

14   serious error in your mind?

15   A     That would be a serious error.

16   Q     Now, you made 6,731,077 dollars' worth of errors in your

17   May 14, 2013 report.

18         Would you consider those to be serious errors?

19   A     If I made that type of error, it would be a serious

20   error.

21         MR. HOCHMAN:  Your Honor, I'd like to present the

22   witness with what will be marked for identification as 30I.4,

23   30I.5, and 30I.6.

24         THE COURT:  Are those a part of the government's 30I?

25         MR. HOCHMAN:  These are defendant's exhibits, and I

1    have labeled them in the 30I series because they relate to this

2    30I report, Your Honor.  And I apologize if I haven't given

3    you -- we have a separate exhibit sheet that I will give Your

4    Honor for these exhibits.

5              THE COURT:  All right.

6              MR. HOCHMAN:  Do you have an extra copy?

7              MS. FINLEY:  Your Honor, the government would request

8    that they be numbered that manner that makes it clear that

9    these are not government's exhibits.

10             MR. HOCHMAN:  They will be tagged, Your Honor, with a

11   tag that says it's a defense exhibit.

12             THE COURT:  All right.  Let me just tell the jury,

13   with regard to the exhibits, because both sides are using

14   numbering, when you get to see the exhibits finally, you'll see

15   an exhibit tag.  One will say, "Government's Exhibit Number 1,"

16   one will say, "Defendant's Exhibit Number 1."

17             So if you look at the tag, you can tell which is

18   which, to the extent it matters to you who presented it.

19             So with that, as long as the tag says it's

20   Defendant's 30, that will be fine.

21             MS. KESSLER:  I would note, Your Honor, that the

22   printout includes a tag that says it's a government's exhibit.

23             MR. HOCHMAN:  And that's because that's how I got it,

24   Your Honor.

25             THE COURT:  I'm sorry, the defense exhibit has a tag

1    that says government?

2              MS. KESSLER:  That's correct.

3              MR. HOCHMAN:  It's a Xerox, because the original

4    document that I had, that I didn't want to alter, original

5    there was a Xerox that says "Government's Exhibit" here, but we

6    will make it clear on the designation that it is a defense

7    exhibit.

8              THE COURT:  Let me see one, just as an example.

9              (Examining document)  That's fine.

10             And just for the jury, on various exhibits, you may

11   see copies of tags with numbers on it.  The tag I'm talking

12   about is literally the tag that's stapled to it; and in this

13   one it will say defendant's exhibits, the other ones will say

14   government's exhibits, and it will have a number and the date

15   that it was admitted.  So this is the tag that I'm talking

16   about.  I don't really think you're going to have any problem.

17             MR. HOCHMAN:  All right.  If we could, Your Honor,

18   put a -- actually, let me address 30I.4, 30I.5, and 30I.6,

19   starting with 30I.4.

20   BY MR. HOCHMAN:

21   Q    Is 30I.4 the Revenue Agent's Report, Form 4549, that you

22   prepared for Dr. Patricia Hough, dated May 14, 2013?

23   A    Yes.

24   Q    If you can turn to 30I.5, is 30I.5 the schedule that you

25   prepared of the income from undeclared foreign accounts in

1    connection with David Fredrick and Patricia Hough's 4549, for

2    May 14th, 2013?

3    A    Yes.

4    Q    And 30I.6, is that the Revenue Agent's Report that you

5    prepared for David Fredrick, Form 4549, for -- dated May 14,

6    2013?

7    A    Yes.

8         MR. HOCHMAN:  I'd move into evidence Exhibits 30I.4,

9    30I.5, and 30I.6, Your Honor.

10        THE COURT:  Any objections?

11        MS. KESSLER:  Your Honor, the government objects to

12   30I.4 and 30I.6, because I don't believe that they are a copy

13   of the complete report that was prepared, Your Honor.

14        THE COURT:  All right.  Well, why don't you establish

15   that foundation, or if it's not . . . .

16        MR. HOCHMAN:  Certainly.

17   BY MR. HOCHMAN:

18   Q    30I.4 represents the -- one, two, three -- first four

19   pages of the Revenue Agent's Report that you prepared for

20   Patricia Hough, is that correct, the May 14, 2013?

21   A    Yes, it is.

22   Q    And the remaining pages of the Revenue Agent's Report

23   are just additional calculations that result in the sort of

24   summary numbers that are presented in these first four pages;

25   correct?

1    A        They are additional pages that are presented that . . .

2    allow better understanding of some of these calculations that

3    the computer generates.

4    Q        Very good.

5             And with 30I.6, 30I.6 represents the first four pages of

6    the Revenue Agent's Report from May 14, 2013, for David

7    Fredrick; is that correct?

8    A        That's correct.

9    Q        And again, the remaining pages of that report has

10   explanations of the items that go into these first four pages;

11   correct?

12   A        Explanations of the computer-generated items.

13   Q        And when you say, "computer-generated items," these are

14   your numbers; correct?

15   A        The top adjustments to income are my numbers.

16   Q        Okay.  And that would be true for 30I.6, David Fredrick,

17   and 30I.4, Patricia Hough; correct?

18   A        Yes.

19            MR. HOCHMAN:  I would seek admission of 30I.4, 30I.5,

20   and 30I.6, Your Honor.

21            THE COURT:  Any objections?

22            MS. KESSLER:  None.

23            THE COURT:  Each of those exhibits will be admitted.

24            (Defendant's Exhibits 30I.4, 30I.5 and 30I.6 were

25         admitted into evidence.)

1          MR. HOCHMAN:  And, Your Honor, if we could do a split

2     screen with Government's Exhibit 30I, and that will be Page 2

3     of 30I, and then we'll have the Defendant's Exhibit 30I.4 next

4     to it.

5          THE COURT:  You may if you can.

6          MR. HOCHMAN:  Let's see if it happens.

7          (An exhibit was projected onto the projector screen.)

8     BY MR. HOCHMAN:

9     Q     Now, looking up at the projector, just so it's clear,

10    the Government's Exhibit 30I is on the right side of the

11    screen, and that represents your October 14, 2013, report for

12    Dr. Patricia Hough; is that correct?

13    A     Say that again.

14    Q     On the left-hand side of the screen, is represented

15    Government's Exhibit 30I, which is your October 14th, 2013,

16    report for Patricia Hough?

17    A     Yes.

18    Q     And on the right-hand side of the screen is your

19    May 14th, 2013, report for Dr. Patricia Hough, which is Defense

20    Exhibit 30I.4; correct?

21    A     Correct.

22         MR. HOCHMAN:  Now, if we could focus on 30I.4, and

23    30I itself, and just focus on the adjustment language . . . or

24    the adjustment lines.  If we could zoom in on each side.

25         (An exhibit was projected onto the projector screen.)

1          MR. HOCHMAN:  Well, I'll start, and we'll let the

2    projector catch up with us.

3    BY MR. HOCHMAN:

4    Q     On 30I.4, there is a line on adjustments to income that

5    does not exist on 30I; correct?

6    A     Correct.

7    Q     And if we could highlight the line that's on the

8    right-hand side, it says, "income from undeclared foreign

9    accounts"; do you see that?

10         And it's somewhat faint to see at a distance, but you

11   can read it on the exhibit that you have in front of you;

12   correct?

13   A     Correct.

14   Q     And it says that, for 2006, that there's $2.5 million

15   that you are adding as an adjustment to Dr. Patricia Hough's

16   income for 2006; correct?

17   A     Correct.

18   Q     And that's on your May 14, 2013, report; do you see

19   that?

20   A     Yes.

21   Q     Now, if you look over at your October 14, 2013, report,

22   you have taken that $2.5 million away; is that correct?

23   A     That's correct.

24   Q     You no longer --

25         THE COURT:  Mr. Hochman, I'm sorry to interrupt.  I

1    trust that you're comfortable with the fact that I'm sure the

2    jury can't read that?

3            And I say that because I'm having a hard time,

4    and . . . .

5            MR. HOCHMAN:  You know what we could do, if we could

6    just put 30I.4 up alone, and blow it up even bigger.

7            THE COURT:  If that's okay with you, that's fine.

8            MR. HOCHMAN:  That's the only way.  Otherwise, my

9    eyes are -- I can just barely read from it here.

10           If you can, just put 30I.4, and blow up the

11   adjustments.

12           THE COURT:  Does that work better for the jury?

13           (Jury indicates in the affirmative.)

14           THE COURT:  All right.

15   BY MR. HOCHMAN:

16   Q     So focusing on income from undeclared foreign accounts

17   on 30I.4 -- which is the May 13, 2013, report -- you put

18   $2.5 million as the amount of an adjustment; correct?

19   A     Correct.

20   Q     And that means you are basically saying that Pat Hough

21   did not report, had in that line, $2.5 million for 2006;

22   correct?

23   A     Correct.

24   Q     And in the revised October 14, 2013, report -- we don't

25   have to put that up, I'll just talk about it -- you took that

1   entire $2.5 million away; correct?

2   A       Correct.

3   Q       Because you no longer considered it to be unreported

4   income for Dr. Patricia Hough; correct?

5   A       I no longer considered this type of income that I'm

6   representing here to be the correct way to . . . portray the

7   unreported income of Patricia Hough on this return.

8   Q       Did you put that $2.5 million somewhere else in

9   two-point -- I'm sorry -- in 2006, on your revised report, to

10  capture the 2.5 million?

11  A       If I was able to . . . determine the income that she

12  received from being an owner of the medical schools, I would

13  have replaced that number with income from medical schools.

14  Q       But you weren't able to determine that, despite being on

15  this case for four and a half years; correct?

16  A       I was not able to determine that . . . without making an

17  estimate; but, at the time of May 14th, I had not heard

18  testimony that . . . that the schools belong to Patricia Hough

19  and David Fredrick, and not just the Round Hill properties.

20  Q       Well, let's just deal with this $2.5 million, because

21  you're saying you might have added some additional money in

22  2006, if you had this different information.

23          But with respect to that $2.5 million, you took it off

24  entirely; correct?

25  A       I took that out -- off.

1   Q      And with respect to the $3,736,579 income from

2   undeclared foreign account, for 2007, you took that off as

3   well; correct?

4   A      That's because I was unable to replace it with the

5   amount of net income that would have been earned from the

6   medical schools.

7   Q      You took it off as well; correct?

8   A      I took that off.

9          MR. HOCHMAN:  If we could flash to 30I, and blow up

10  just the adjustments right now?

11         (An exhibit was projected onto the projector screen.)

12  BY MR. HOCHMAN:

13  Q      And 30I, again, being your October 14, 2003, report, has

14  no line for income from undeclared foreign accounts; correct?

15  A      Correct.  And it has no line for income from medical

16  schools.

17  Q      So do you need more time to add in income from medical

18  schools; is that what you're saying, that four and a half years

19  isn't enough time?

20  A      I need . . . documents that would not be based on

21  estimates.

22  Q      Did you ask the prosecutors for those documents?

23  A      I did not ask the prosecutors for those documents,

24  because I did not know I needed them.

25  Q      Once you knew you needed them, did you ask the

1    prosecutors to get them for you?

2    A      I asked the prosecutors if they had documents that

3    weren't here that I could use.

4    Q      And they said they didn't have them?

5    A      We were unable to . . . find documents that would not be

6    based on estimates.

7    Q      And you don't want to estimate; is that correct?

8    A      I do not want to estimate.

9    Q      Because estimates may be right or they may be wrong.

10          They have a certain degree of uncertainty in an

11   estimate; correct?

12   A      Correct.

13   Q      And you don't want to be uncertain, you want to be

14   certain; correct?

15   A      I want to be more certain than for what an estimate

16   provides.

17   Q      Now, the $2.5 million that you took off --

18          MR. HOCHMAN:  Actually, why don't we stay on 30I.  If

19   you could expand this out.

20          (An exhibit was projected onto the projector screen.)

21   BY MR. HOCHMAN:

22   Q      And because you took off that $2.5 million, if you can

23   go down to the very bottom, balance due and owing for 2006, do

24   you see here that there's -- in the balance due and owing for

25   2006, there's actually a negative number, negative $2,282; do

1   you see that?

2   A      Yes.

3   Q      And that means that, under your calculations, for 2006,

4   the United States Government owes Dr. Patricia Hough a refund,

5   is that correct, based on your calculations in Exhibit 30I.

6   A      Yes.  Because I was unable to determine the income from

7   the medical schools.

8   Q      Are you aware of any tax case, criminal tax case, that

9   is based on the U.S. Government owing a taxpayer a refund?

10  A      I am not -- I'm not sure about that.

11  Q      Would you consider the fact that the U.S. Government,

12  under your calculations, owes Dr. Hough a refund, as the fact

13  that Dr. Hough, under your calculations, did not make a

14  substantial -- or excuse me -- did not underreport her income

15  for that year, based on your calculations in Exhibit 30I?

16  A      She underreported her income for that year, but since I

17  could not make anything but an estimate of the income she

18  earned, I could only go with the numbers I was sure of,

19  and . . . .

20  Q      And that creates a refund to Dr. Hough; is that correct?

21  A      Yes.

22  Q      And if you can look at 2007, do you see that your number

23  of $2,429,118, do you see that as a tax owing?

24  A      Yes.

25  Q      If you look back at your May 14, 2013, report, do you

1   see that you came up with a number of 3,661,703; do you see

2   that?

3   A      Yes.

4   Q      And the difference, approximately, between these two

5   numbers, is about 1 million . . . .  Call it a little over

6   1,200,000; correct?

7   A      I . . . I would believe that was correct.

8   Q      That's a serious error, isn't it.

9   A      I would not classify it as an error.

10  Q      Now, going back, again, to 2006, in your most recent

11  evaluation, you said that the U.S. Government owes Dr. Hough

12  $2,282.

13         But in your May 14th, 2013, report, you said that

14  Dr. Hough owed the U.S. Government $842,310; correct?

15  A      Correct.

16  Q      So would you agree that you made a serious error between

17  the swing of Dr. Hough owing the U.S. Government $842,310, and

18  Dr. Hough being owed, by the U.S. Government, $2,282 for 2006?

19  A      I would not consider . . . that an error.

20  Q      Now, going back to the $2.5 million number, that

21  $2.5 million number --

22         MR. HOCHMAN:  If we could go to, at this point,

23  starting with 30I.4, and we'll focus on the 30 . . . the

24  $2.5 million number.

25         And then the adjustments, if you could zoom in on

1    those?  All right.

2             (An exhibit was projected onto the projector screen.)

3    BY MR. HOCHMAN:

4    Q     So we're going to focus on the 2006, $2.5 million number

5    for income from undeclared foreign accounts.

6          Do you see that?

7    A     Yes.

8    Q     All right.  If you could turn to Exhibit 30I -- Defense

9    Exhibit 30I.5 . . . .

10            MR. HOCHMAN:  And you can put 30I.5 on the screen and

11   take this one off.

12   BY MR. HOCHMAN:

13   Q     30I.5 is titled "Income From Undeclared Foreign

14   Accounts," which is the schedule that you prepared to identify

15   what should go on the 4549; correct?

16   A     This is a schedule that I prepared.

17   Q     And this is the schedule for the backup of the

18   $2.5 million number; correct?

19   A     Correct.

20            MR. HOCHMAN:  And if you could focus on the first

21   section, which has the 2006 numbers, down to 2.7 -- no, before

22   you actually hit the zoom button, on the top, and it might be

23   hard to see -- actually -- I'll just do it.

24            (An exhibit was projected onto the projector screen.)

25

1    BY MR. HOCHMAN:

2    Q      There's the words "date" in one column, is that correct,

3    and that's to the far left . . . "date" is on the far left;

4    correct . . . yes or no?

5    A      Yes.

6    Q      Then the next column is transaction amount; correct?

7    A      Yes.

8    Q      Then there's a Fredrick amount, a Hough amount, a

9    reference number, and description, okay?

10          Do you see all that?

11   A      Yes.

12   Q      I'm going to focus on the Hough amount.  And if we could

13   go down to 2006 . . . .

14          Now, I see that there's a $2.5 million number indicated.

15   And Hough is, by the way the third column.  The first column,

16   it says 5 million, is the transaction amount.  The second

17   column is the Fredrick amount.  The third column is the Hough

18   amount.

19          Do you see that?

20   A      Yes.

21   Q      And basically how you determine the Hough and Fredrick

22   amount, is you just divided the transaction amount by two; is

23   that correct?

24   A      Correct.

25   Q      And so I see that there is a $2.5 million number listed

1   at the top of the 2006 equation, do you see that, for Hough?

2   A     Yes.

3   Q     And you describe it as from Saba Foundation account to

4   Top Fast; correct?

5   A     Correct.

6   Q     This is that $5 million transaction that I think you

7   discussed with the prosecutors during your direct testimony; is

8   that correct?

9   A     Yes.

10  Q     And this transaction no longer shows up on your

11  adjustments to income as seen in the first page -- excuse me,

12  the second page of Exhibit 30I; correct?

13  A     Correct.

14  Q     And you actually made a -- one of those, I guess you

15  could call them, human errors or whatnot, because the total of

16  the lines that you have for 2006 isn't 2.5 million.  It's

17  actually $2,791,290.

18        MR. HOCHMAN:  Could you highlight that number,

19  please?

20  BY MR. HOCHMAN:

21  Q     And you actually made a mistake because you only put the

22  $2.5 million number on the 4549, when you actually probably

23  should have put the 2.79 -- $2,791,290 number; correct?

24  A     That's possible; yes.

25  Q     That was a mistake you made; correct?

1    A      Yes.

2    Q      And either way, none of these -- these transactions

3    referenced in this section, this 2006 section, are on your

4    current October 14th, 2013, Revenue Agent's Report; correct?

5    A      Correct.

6    Q      None of them represent adjustments to income as you have

7    stated in that report; correct?

8    A      Correct.

9    Q      And the ones you've also taken off, it says in the

10   description line -- and now I'm focused on the second line

11   here, the first line being the $5 million transaction, the

12   second line being a $250,000 transaction that says in the

13   description:  "From New Vanguard to Hough, dated May 3rd,

14   2006."

15          Do you see that?

16   A      I'm not sure if I didn't revise this document, but we'll

17   go with what you say.  So if you could repeat the question for

18   me?

19   Q      Certainly.

20          The first line here was a $2.5 million, Saba to Top Fast

21   transaction; correct?

22   A      Right.

23   Q      And the second line is a May 3rd, 2006, $250,000 amount

24   from New Vanguard to Hough; do you see that?

25   A      Yes.

1   Q      And "Hough" is Dr. Patricia Hough; correct?

2   A      Correct.

3   Q      And the $250,000 is actual the $250,000 that you

4   discussed during your direct testimony, and the government

5   showed you, I believe, some exhibits dealing with that;

6   correct?

7   A      Correct.

8   Q      The third line is March 16, 2006, $282,580 amount.

9          And that says:  "From New Vanguard to purchase land in

10  the West Indies"; do you see that?

11  A      Yes.

12  Q      And that's also off . . . as one of your adjustments in

13  your new October 14, 2013, report; correct?

14  A      Correct.

15  Q      And then the last line is an April 17, 2006, $50,000

16  transaction that says:  "Wire transferred to LL and L in

17  Asheville, North Carolina"; correct?

18  A      Correct.

19  Q      That's not listed as income in your new October 14,

20  2013, report; correct?

21  A      Correct.

22  Q      Now, if we could deal with the second -- that's the 2006

23  transactions.  If we could move down to the 2007 transactions.

24         And with respect to the 2007 transactions, it looks like

25  the first -- all of these transactions added up to the

1   $3,736,579 that appears on the May 14th, 2013, report, but was

2   eliminated for the October 14, 2013, report; correct?

3   A       Right.

4   Q       And if you look at the first line, this was a March 6th,

5   2007, transaction for $2,122,000, a wire transfer from MUA to

6   New Vanguard; correct?

7   A       Correct.

8   Q       And that's no longer included in your calculations of

9   adjustments of Dr. Patricia Hough's 2007 income; correct?

10  A       Correct.

11  Q       And the second line is a March 6th, 2007, $1,280,000

12  transaction that's listed as a wire transfer from Saba to New

13  Vanguard; do you see that?

14  A       Correct.

15  Q       And that, too, is not included in your calculations for

16  unreported income for Dr. Hough; correct?

17  A       Correct.

18  Q       Third line is a March 13, 2007, $3,171,836 transaction

19  described as a wire transfer from MUA to Top Fast.

20          And that's no longer considered as an adjustment to

21  Dr. Hough's 2007 income; correct?

22  A       Correct.

23  Q       The fourth line is an April 2nd, 2007, $174,000

24  transaction that's described as a wire transfer from MUA to New

25  Vanguard; do you see that?

1    A      Yes.

2    Q      And that, too, is not included in your calculations for

3    Dr. Hough's 2007 unreported income; correct?

4    A      Correct.

5    Q      And the last line here is an April 5th, 2007, $725,522

6    transaction that's described as a transfer from Saba to New

7    Vanguard; do you see that?

8    A      Yes.

9    Q      And that also is not included in your calculations of

10   Dr. Hough's unreported income; correct?

11   A      Correct.

12          MR. HOCHMAN:  If you could expand the chart out a

13   bit?

14   BY MR. HOCHMAN:

15   Q      Now, you also looked at some things called -- that's

16   listed as -- and we can focus on that, the bottom half of the

17   chart -- "personal expenses paid by income from undeclared

18   foreign accounts."

19          Do you see this?

20   A      Yes.

21   Q      And this actually is on this page and carries over to

22   the next page; correct?

23   A      Correct.

24   Q      And none of the transactions that are listed under

25   "personal expenses paid by income from undeclared foreign

1   accounts" show up in your October 14th, 2013, Revenue Agent's

2   Report for 2005 or 2007; is that correct?

3   A      This was my work paper, and these were never meant to be

4   included in the income from above.  These were some of my

5   notes, tracking what some of the personal expenses -- this was

6   me tracking some personal expenses.  These were never meant to

7   be included in the income from undeclared foreign accounts.

8   Q      I see.

9          But they weren't declared anywhere on your current

10  October 14, 2013, adjustments to income from Dr. Hough;

11  correct?

12  A      Because I couldn't replace them with the income earned

13  from the medical schools.

14  Q      So is the answer correct, that none of these expenses --

15  excuse me -- personal expenses paid by income from undeclared

16  foreign accounts, occurs in your adjustments to Dr. Hough's

17  2005 and 2007 income, as represented in your October 14, 2013

18  Revenue Agent's Report; is that correct?

19  A      Correct.

20  Q      And if we could go through these expenses that you're

21  not including, the first one says an April 15th --

22          MR. HOCHMAN:  If we could focus on the first set, the

23  2005 transactions?

24  BY MR. HOCHMAN:

25  Q      So you were not including, in Dr. Hough's 2005 income, a

1   March 15, 2005, $50,000 transaction that involved sending a

2   bank check to M.C. in Superior, Wisconsin; do you see that?

3   A      Correct.  But this is just me clarifying some of the

4   expenses that were paid.  I couldn't double up on it.  I

5   believe these expenses were already listed up here, from Saba

6   to Top Fast, and MUA to New Vanguard.  So I couldn't double up

7   on it.

8   Q      In your October 14, 2013, report that you revised six

9   days into this trial, you did not include this first expense as

10  an adjustment to Dr. Hough's 2005 income, this $50,000 bank

11  check to M.C. in Superior, Wisconsin; is that correct, that you

12  did not include that?

13  A      In which report?

14  Q      In your most recent report.

15  A      That would not -- was not included in there.

16  Q      And it actually wasn't included in your old report, the

17  May 14, 2013, report; is that correct?

18  A      Because it would be doubling up on the amounts I have

19  from the work paper above.

20  Q      So it wasn't included in either report; correct?

21  A      It was included in the amounts from above.

22  Q      Okay.  But then it -- with your revised report, it

23  wasn't included at all; correct?

24  A      It was not included at all.

25  Q      And by the way, M.C. stands for Marion Cronan; is that

1    correct?

2    A       Yes, I believe so.

3    Q       And the second transaction is an April 20th, 2005,

4    $40,000 transaction.  It says:  "Send a bank check to S.B. in

5    Chesapeake, Virginia; do you see that?

6    A       Yes.

7    Q       And S.B., by the way, is Susan McBride?

8    A       I believe so.

9    Q       And this wasn't included in your most recent 10/14/2013

10   Revenue Agent's Report, as far as an adjustment to Dr. Hough's

11   income; correct?

12   A       No.

13   Q       Correct?

14   A       It was not included.

15   Q       The third transaction is a November 24th, 2005, $5,000

16   transaction that says:  "Send a bank check to D.H. in Fountain

17   Hills, Arizona."

18           Do you see that?

19   A       Yes.

20   Q       And D.H. is Dean Houghson, if you recall?

21   A       I recall.

22   Q       And you didn't include this transaction in

23   Dr. Hough's –– in any of Dr. Hough's 2005 income in your

24   10/14/2013 report; is that correct?

25   A       Correct.

1    Q      And the fourth transaction for 2005, is a July 19, 2005,

2    $1,140,000 transaction that's described as a transfer to

3    purchase a residence in Asheville, North Carolina.

4           This transaction was not included as an adjustment to

5    Dr. Hough's 2005 income for -- as part of your October 14,

6    2013, Revenue Agent's Report; correct?

7    A      Correct.

8    Q      And that's the -- the last transaction, that's the New

9    Vanguard wire transfer for the purchase of the Asheville house

10   in 2005; correct?

11   A      Yes.

12   Q      And that wasn't included in Dr. Hough's adjustments to

13   her income in your most recent report; correct?

14   A      No.

15   Q      Now, if we can focus on the 2007 transactions?

16          In 2007, we have a bunch of transactions that are

17   happening on either 4/12 or 4/13, 2007.

18          Do you see those?

19          And I'm going to group these together.  These are all

20   the transactions dealing with the siblings, either a payoff

21   from New Vanguard for a mortgage for Marion Cronan, a payoff --

22   a transfer of money to Melanie Pitts, a transfer of money to

23   Perry Garner, and a transfer of money to Susan McBride.

24          Do you see that?

25   A      Yes.

1    Q      And all these are either on April 12th or April 13th,

2    2007; is that correct?

3    A      Yes.

4    Q      And you didn't include any of these in Dr. Hough's

5    adjustments to income for 2007; is that correct?

6    A      Correct.

7           MR. HOCHMAN:  If we could turn the page?  If we could

8    go to the next page, please?  Focus on that little chart at the

9    top?

10   BY MR. HOCHMAN:

11   Q      And again, the first two transactions are more

12   transactions dealing with Dr. Fredrick's siblings; correct?

13   A      Yes.

14   Q      And these are cumulatively each the $250,000

15   transactions that you've heard much testimony about, that

16   Dr. Fredrick gave to his siblings on or approximately April 13,

17   2007; correct?

18   A      That's the testimony I heard.

19   Q      And as you said a moment ago, none of these transactions

20   are included in your adjustments for Dr. Hough's 2007 income on

21   your most recent Revenue Agent's Report; correct?

22   A      Correct.

23   Q      If you could focus on the 7/31/2007 transaction for

24   $50,000, that transaction is described as a transfer from Top

25   Fast to Cirrus Design to purchase an airplane.

1        Do you see that?

2   A    Yes.

3   Q    And you have not included that transaction as an

4   adjustment for Dr. Hough's 2007 income; correct?

5   A    I have not.

6   Q    And that's the Cirrus Design $50,000, where the money

7   was paid for a –– as a down payment, excuse me, a down payment

8   for a plane from a company called Cirrus, and the money was

9   returned; correct?

10       That's the transaction, generally, that we're talking

11  about?

12  A    The money was returned, but not to a UBS account.

13  Q    I see.

14       But this is the $50,000 that was sent as the down

15  payment; correct?

16  A    Correct.

17  Q    The next transaction is the June 11, 2007, transaction.

18       And that's a transaction for $590,016; do you see that?

19  A    Yes.

20  Q    And that's a –– and the description is:  "Transfer from

21  Top Fast to Ample Dynamic for a house in Greenville, North

22  Carolina."

23       Do you see that?

24  A    Yes.

25  Q    And that's the transaction, that $590,006 amount, for

1    the Greenville house that we've all been hearing during this

2    trial; is that correct?

3    A       I heard about the Greenville house.

4    Q       And you didn't include that transaction, that payment of

5    money to purchase the Greenville house back in June of 2007, as

6    an adjustment to Dr. Hough's 2007 income; correct?

7    A       Correct.

8    Q       And the last one on this chart is a November 18, 2007,

9    $1,601,000 transaction that's described as a purchase of a

10   Piper Meridian airplane; correct?

11   A       Correct.

12   Q       And this -- you heard the testimony about this, that

13   Dr. Fredrick purchased a Piper Meridian airplane on behalf of,

14   I think it was Ample Dynamic; do you recall that?

15   A       He purchased it through Ample Dynamic.  I'm not sure if

16   he purchased it on behalf of Ample Dynamic.

17   Q       But in either event, you're not including the money that

18   was used for that purchase as an adjustment for income for

19   Dr. Hough's 2007 tax year; is that correct?

20   A       That's correct.

21           MR. HOCHMAN:  Your Honor, I don't know if you want to

22   stop at this point, because it's a breaking point, or I can

23   keep going.

24           THE COURT:  Given a choice, I'll stop.

25           MR. HOCHMAN:  Okay, Your Honor.  That's probably a

1    choice I would probably endorse as well.

2                    THE COURT:  All right.

3                    Let's take an hour for lunch.  1:00 o'clock.

4                    Please do not discuss the case among yourselves, or

5    allow anyone to discuss it with you or in your presence.

6    1:00 o'clock.

7                    (At 11:59 AM, the jury was escorted from the

8         courtroom.)

9                    THE COURT:  All right.  1:00 o'clock.

10                   MR. HOCHMAN:  Thank you, Your Honor.

11                   (At 12:00 PM, court was recessed.)

12                                   AFTER RECESS

13                   (At 1:03 PM, court was reconvened.)

14                   THE COURT:  Both sides ready for the jury?

15                   MR. HOCHMAN:  Yes, Your Honor.

16                   MS. FINLEY:  Yes, Your Honor.

17                   THE COURT:  Have the jury step in, please.

18                   Oh.  We're missing one.

19                   All right.  Be seated.

20                   (Court stood at ease while awaiting for the missing

21        juror to arrive in the jury room.)

22                   THE COURT:  All set?  Okay.

23                   (At 1:06 PM, the jury was escorted into the

24        courtroom.)

25                   THE COURT:  Mr. Hochman, you may proceed:

1              MR. HOCHMAN:  Thank you very much, Your Honor.

2              If we could dim the lights, please?  This side,

3    please?

4    BY MR. HOCHMAN:

5    Q     Ms. Maurer, if I understand correctly, six days into

6    this trial, after hearing the evidence that occurred during the

7    first week, you decided at that point that David Fredrick and

8    Patricia Hough owned the Saba School of Medicine Foundation and

9    MUA; correct?

10   A     Saba School of Medicine Foundation . . . . Saba School

11   of Medicine, MUA, and Round Hill.

12   Q     And Round Hill.

13         And so that means, you got the case in April or May of

14   2009, so for four and a half years, is it correct that you did

15   not believe that David Fredrick and Patricia Hough owned the

16   Saba School of Medicine Foundation and -- and MUA?

17   A     I believed that they did; but, until I heard evidence

18   and saw documents, I wasn't a hundred percent sure.

19   Q     So when you say you believed you did, if you believed

20   that this was a sham from the beginning, why did you ever have

21   to change your Revenue Agent's Report?

22         Because what you said is that the reason you changed

23   your Revenue Agent's Report is that you found testimony, in the

24   first week of trial, that convinced you to change your report

25   that you had been -- that you had already submitted to the

1    prosecutors five months before.

2    A      Correct.

3    Q      So isn't it true that, for at least four and a half

4    years, you believed that David Fredrick and Patricia Hough did

5    not own the Saba School of Medicine Foundation?

6    A      I was not a hundred -- I was not a hundred percent sure

7    that they owned The Foundation -- that they owned the medical

8    schools.

9    Q      Well, your whole report, though, your May 14, 2013,

10   report, was based on the fact that they do not own the medical

11   schools; correct?

12          And that's why, when you changed your mind, and -- you

13   came up with a new report; correct?

14   A      I changed my report due to evidence and documents

15   presented at the trial.

16   Q      And again, you changed your report based on two client

17   notes in the UBS files; correct?

18   A      Correct.

19   Q      After the thousands and thousands of documents that

20   you've reviewed in the UBS files, two client notes resulted in

21   you changing your mind; correct?

22   A      Not two client notes.  I believe we spoke about the

23   information that was provided to Mr. DeCastro.

24   Q      I misspoke.  Two client notes, and the Mario deCastro

25   documents from the Jones Walker file, is what got you to change

1    your mind and come up with the new report six days into this

2    trial; is that correct?

3              (The witness examines an exhibit.)

4    Q       Is that correct?

5    A       Those were indicators of it.

6    Q       Now, when you presented this new report to the

7    prosecutors, this 10/14/2005 report to the prosecutors, they

8    allowed to you fix it; correct?

9            They didn't say that we didn't want a revised report;

10   correct?

11   A       They did not say that.

12   Q       So they permitted you to fix the report; correct?

13   A       They permitted me to change the report.

14   Q       Now, they didn't refer you for criminal prosecution

15   because you had submitted a false statement back on May 14th,

16   2013, that had over $6 million of errors in it; correct?

17   A       The May 14th document did not have $6 million worth of

18   errors on it.  And they did not submit me for prosecution.

19   Q       That's right, because it actually had 6.7 million

20   dollars of errors in it; isn't that correct?

21   A       I don't believe it had $6.7 million of errors on it.

22   Q       Well, you didn't intend to give the prosecutors a report

23   that had $6.7 million of changes that you were going to make

24   five months later, back on May 14, 2013; correct?

25            You didn't intend to give them a false report; isn't

1   that right?

2   A      I don't believe it was a false report.

3   Q      It was just a report that contained serious errors;

4   isn't that correct?

5   A      I don't believe it contained serious errors.

6   Q      The reason you don't believe it contained serious errors

7   is that you, in good faith, presented that May 14, 2013, report

8   to the prosecutors, believing that the numbers were accurate at

9   the time; correct?

10  A      I believe they were accurate at the time.

11  Q      And that was based on the information that you had at

12  that point; correct?

13  A      Yes.

14  Q      And when you got additional information, the prosecutors

15  allowed you to fix your report and submit that.

16         Isn't that what happened?

17  A      They allowed me to submit a new report.

18  Q      Based on additional information, is that what you're

19  saying?

20  A      Yes.

21  Q      If you could turn to --

22         MR. HOCHMAN:  If we could put 30I, Page 2, up?

23         (An exhibit was projected onto the projector screen.)

24  BY MR. HOCHMAN:

25  Q      This is your October 14th, 2013, report.

1          MR. HOCHMAN:  Focus again on the adjustments to

2     income section.

3          (An exhibit was projected onto the projector screen.)

4     BY MR. HOCHMAN:

5     Q    And I want to go through this very briefly.

6          2005, all the numbers --

7          MR. HOCHMAN:  If we could focus, and highlight, the

8     taxable interest, ordinary dividends, and capital gain and loss

9     sections across the lines.  Thank you.

10         (An exhibit was projected onto the projector screen.)

11    BY MR. HOCHMAN:

12    Q    Starting with 2005, all the taxable interest, ordinary

13    dividend, and capital gain or loss came from the UBS accounts;

14    isn't that right?

15    A    In 2005, 2006, and 2007.

16    Q    Okay.  They all come from the UBS accounts that you

17    reviewed; correct?

18    A    Correct.

19    Q    And, in fact, you talked about the David Fredrick/Pat

20    Hough joint account.

21         Do you remember talking about that?

22    A    Yes.

23    Q    And that account was closed in 2004; correct?

24    A    Yes.

25    Q    So actually, that David Fredrick/Pat Hough joint

1   account, for which we have all the documents here, and we have

2   all the testimony, plays absolutely no role in your

3   calculations for the 2005 through 2008 unreported income for

4   Patricia Hough; is that correct?

5   A       2004 is not on there.

6   Q       So the answer is correct; is that right?

7           It plays no role in your 2005 to 2008 calculations and

8   adjustments to income; is that correct?

9   A       It played a role in helping me follow the steps that

10  happened.

11  Q       Okay.  But ultimately, it plays no role in Exhibit 30I,

12  your adjustments to income; correct?

13  A       The calculations that I did for 2004 play no role in

14  this document you have on the screen.

15  Q       And that's 30I; correct?

16  A       Yes.

17  Q       And so, again, if we make an assumption, and the

18  assumption being -- and I think Ms. Kessler asked you this

19  question in connection with all these accounts -- that Patricia

20  Hough -- and why don't we focus on Patricia Hough for now --

21  Patricia Hough was not the owner of any of those accounts, then

22  you said none of the income would be hers; correct?

23  A       Yes.

24  Q       And so that would be for 2005, which just relies on the

25  UBS accounts alone; correct?

1   A     Yes.

2   Q     2006, those numbers would be zeros as well; correct?

3   A     Correct.

4   Q     And with 2007, the taxable interest number would be

5   zero, the ordinary dividends line would be zero, and the --

6   with respect to capital gain and loss, that includes, actually,

7   more than just the UBS accounts; correct?

8   A     That includes the sale of the schools.

9   Q     The sale of the school, and the sale of Round Hill;

10  correct?

11  A     That's all incorporated together; yes.

12  Q     And then, with respect to 2008, if you could turn to

13  Page 4 of this document?

14          MR. HOCHMAN:  If we could highlight just the

15  beginning of -- the adjustments?

16          (An exhibit was projected onto the projector screen.)

17  BY MR. HOCHMAN:

18  Q     But 2008, again, all the numbers on 2008 are just based

19  on the Swiss and Liechtensteinian bank accounts, and nothing

20  else; correct?

21  A     Correct.

22  Q     So if we assume that Patricia Hough was not the owner of

23  any of these bank accounts, none of this income would be hers;

24  correct?

25  A     If we assume she's not the owner, yes.

1    Q      And all of those numbers would be zero as well.

2    A      Yes.

3    Q      So let's deal with Round Hill and the Saba school, if we

4    could.  If we could turn to what's in evidence as Government's

5    Exhibit 30O.  I believe that's in your book.

6           MR. HOCHMAN:  And if we could put up Page 2 of 30O.

7    BY MR. HOCHMAN:

8    Q      Now, we'll start with the --

9    A      I'm sorry, I'm lost.

10   Q      I'm sorry?

11   A      30 . . . .

12   Q      30O, it comes after 30N?  The O and zero kind of look

13   similar.

14          MR. HOCHMAN:  If we could highlight and zoom in on

15   the portion --

16          THE COURT:  This is defendant's 30O?

17          MR. HOCHMAN:  No.  I'm sorry.  This is the

18   government's 30-O, or however they calculated it.  And I was

19   focused on Page 2 of that exhibit, Your Honor.

20          THE COURT:  Thank you.

21          MR. HOCHMAN:  May I approach the witness, Your Honor,

22   and see if I . . . .

23          THE COURT:  You may.

24          (Mr. Hochman approaches the witness box.)

25          MS. KESSLER:  Mr. Hochman, I think it was a separate

1    exhibit not contained in the binder.

2             MR. HOCHMAN:  Oh.

3             Oh, here it is.

4             (Mr. Hochman provides an exhibit to the witness.)

5    BY MR. HOCHMAN:

6    Q     In calculations for the sale of Saba school are

7    contained here in 30O, Page 2; is that correct?

8    A     Yes.

9    Q     And the 988 --

10            MR. HOCHMAN:  If you can focus on and highlight the

11   line of Saba University School of Medicine, $988,997.

12            (An exhibit was projected onto the projector screen.)

13   BY MR. HOCHMAN:

14   Q     Do you see that?

15   A     Yes.

16   Q     And you got that amount, did you not, from the flow of

17   funds memo in connection with the sale of the Saba schools;

18   correct?

19   A     Correct.

20   Q     And I'll show you what's been marked, or in evidence

21   actually, as 10F . . . I believe that's right in front of you?

22            MR. HOCHMAN:  And if we could put 10F on the screen,

23   Your Honor?

24            And direct the witness to Page 8 -- excuse me -- yes,

25   Page 8 of 10F.

1          (An exhibit was projected onto the projector screen.)

2          MR. HOCHMAN:  And if we could highlight the A, the

3    middle part of that?  Thank you.

4    BY MR. HOCHMAN:

5    Q     Now, with respect to the 988,997 number, there were two

6    different wire transfers that were sent from the Equinox group

7    in connection with the payment for the Saba School of Medicine;

8    is that correct?

9          And I'll direct your attention to Pages 8 and 12 of this

10   exhibit.

11   A     What is the question?

12   Q     The question was:  The Equinox group sent two wire

13   transfers in payment of the 988,997 figure for the Saba School

14   of Medicine at the sale; correct?

15   A     Correct.

16   Q     And we see, on Page 8, the first of those wire

17   transfers, which went to the Saba School of Medicine

18   Foundation, United Bank of Switzerland -- that's UBS; correct?

19   A     Yes.

20   Q     -- UBS bank account, in the amount of $749,543.19.

21         Do you see that?

22   A     Yes.

23   Q     It didn't go to a personal bank account of David

24   Fredrick; correct?

25   A     No.

1    Q       And it didn't go to a personal bank account of Patricia

2    Hough; is that correct?

3    A       No.

4    Q       It went to the UBS account that you said that you never

5    reviewed in depth; is that correct?

6    A       Correct.

7    Q       And if you turn to Page 12 of this exhibit --

8            MR. HOCHMAN:  And if we can highlight the first part

9    of it, the A section?

10   BY MR. HOCHMAN:

11   Q       This is the second wire transfer that's reflected,

12   because it's coming from a different Equinox group, and that's

13   for $239,453.95.

14           Do you see that?

15   A       Yes.

16   Q       And that, too, went to the Saba School of Medicine

17   Foundation's UBS account; is that correct?

18   A       Yes.

19   Q       That's the same account that, again, you never reviewed

20   in depth; correct?

21   A       Correct.

22   Q       And the combination of those two wires equals the

23   988,997 total price for the Saba School of Medicine; is that

24   correct?

25   A       Yes.

1    Q        If we can go back to 30O, Page 2?

2             And with respect to that 988,997 number, you basically

3    said that the taxpayer had zero basis in the account; is that

4    correct?

5    A        I stated that Saba University School of Medicine, I

6    put -- I put zero basis in there because I had put all the

7    assets in the basis for Round Hill.

8    Q        And what did you consider the asset of the Saba School

9    of Medicine Foundation?

10   A        I put the assets in Round Hill.

11   Q        What did you consider the assets of the Saba School of

12   Medicine?

13   A        I have . . . I had . . . .  I don't understand what

14   you're asking me.

15   Q        Well, when you were describing basis, before, you said

16   that you include basically what the -- the person, the

17   taxpayer, has spent, his costs involved in creating, in this

18   case the medical school, in order to offset that against the

19   sales price; correct?

20   A        Correct.

21   Q        And the Saba School of Medicine had more than just land

22   and buildings; correct?

23   A        I don't know that.  All I know is what I attributed to

24   Round Hill.

25   Q        And you attributed the land and the buildings to Round

1   Hill; correct?

2   A      Right.  I . . . I did not see any assets, or basis, for

3   Saba University School of Medicine in the contract.

4   Q      Have you ever valued businesses before, as part of your

5   professional background?

6   A      No.

7   Q      Do you realize that businesses that have -- well, you

8   heard testimony, did you not, that one of the valuable things

9   that the Saba School of Medicine had was the affiliation

10  contracts with various hospitals in the United States and

11  Canada; correct?

12  A      Yes.

13  Q      And it had, also, something very valuable, which was

14  accreditations in all 50 United States, and Canada and Europe

15  as well; correct?

16  A      Yes.

17  Q      And to get the accreditations, you heard a lot of

18  testimony that a lot of hard work went into it over the years;

19  correct?

20  A      Correct.

21  Q      What did you value those accreditations at, in

22  determining the basis here?

23  A      I have no basis there.

24  Q      In fact, you heard Steven Rodgers say that one of the

25  things he considered very valuable about the Saba School of

1   Medicine and MUA was the fact that they had these hospital

2   affiliation contracts and the accreditations for the entire

3   United States, Canada, and Europe; correct?

4   A      Correct.

5   Q      What did you value the hospital affiliation contracts

6   as?

7   A      I don't have a value on that.

8   Q      And that's because you have no background in valuing a

9   business; is that correct?

10  A      I did not see any of those things listed in the contract

11  as assets.

12  Q      But you heard about them, didn't you?

13         You said that -- you sat here in trial and heard all

14  these people talk about the hospital affiliations, the

15  accreditations; correct?

16  A      Yes.

17  Q      Did you contact anyone else in the IRS, who has business

18  valuation experience, and ask them to help you out on this

19  project?

20  A      No.

21  Q      There are people in the IRS, though, you know, the

22  entire Internal Revenue Service, that have business valuation

23  experience; isn't that correct?

24  A      Correct.

25  Q      And once again, if David Fredrick and Patricia Hough

1   don't own the Saba School of Medicine, then the money that

2   you've attributed to them, this 988,997, is not their money and

3   not their tax; correct?

4   A      Correct.

5   Q      If you could turn to the first page of this document?

6          So you said that, in addition to the UBS -- the Swiss

7   and Liechtensteinian bank accounts that you've put on your

8   chart for 2005 or 2008, you also, for just 2007, came up with

9   this additional money for the sale of the Saba School of

10  Medicine, and then this additional piece for Round Hill; is

11  that correct?

12  A      Say that again.

13  Q      Well, I'm trying to just go through your -- all your

14  calculations are basically Swiss and Liechtensteinian bank

15  accounts; correct?

16  A      This document is not Swiss and Liechtensteinian.

17  Q      I'm sorry.  Going back to 30I -- I'm just trying to

18  summarize to see that there really is only three pieces to your

19  October 14th Revenue Agent's Report.

20         One piece is the interest, dividends, and capital gains,

21  that reflect from the UBS -- excuse me -- the Swiss and

22  Liechtensteinian bank accounts; correct?

23  A      Yes.

24  Q      And then, just for 2007, you had one piece for the sale

25  of Saba School of Medicine; correct?

1    A        Yes.

2    Q        Then one piece for Round Hill, the sale of Round Hill;

3    correct?

4    A        Round Hill, Saba School of Medicine, and MUA are on the

5    same document.  This piece is Round Hill.

6    Q        Right.  So let's stay with Round Hill for a moment.

7             MR. HOCHMAN:  And if we could focus on the first

8    third of this chart, if we could?

9             (An exhibit was projected onto the projector screen.)

10   BY MR. HOCHMAN:

11   Q        Now, I think you said that one of the important things

12   of figuring out whether or not there's capital gains on the

13   sale of land is, you've got to know what the starting point

14   was, the purchase price; correct?

15   A        The sale of land would be the purchase price.

16   Q        Now, taking a good look at this Page 1 of this document,

17   do you -- is there any -- is this document accurate . . . to

18   the best of your knowledge.

19   A        To the best of my knowledge.

20   Q        To the best of your knowledge, it's a hundred percent

21   accurate; is that correct?

22   A        To the best of my knowledge, it's accurate.

23   Q        A hundred percent accurate; correct?

24   A        To the best of my knowledge, it's a hundred percent

25   accurate.

1    Q      And are you as sure of that as everything else in your

2    testimony?

3    A      I am sure I'm being as accurate as I can be with the

4    documents that were provided to me.

5    Q      Okay.  And one of the documents that was provided to you

6    was the actual purchase of the Round Hill land; is that

7    correct?

8    A      Yes.

9    Q      And the purchase of the Round Hill land, you're saying,

10   occurred on February 2nd, 2001 . . . next to the purchase

11   price?

12   A      Yes.

13   Q      Are you sure?

14   A      The purchase price was $17,000.

15   Q      Are you sure it occurred on February 2nd, 2001?

16   A      I saw several documents related to the purchase of Round

17   Hill for $17,000.  I'm sure one of them that I looked at

18   contained the date, February 2nd, 2001.

19          MR. HOCHMAN:  I'd like to show the witness what's

20   been marked as 8J.

21          THE COURT:  Whose 8J, yours or the government's?

22          MR. HOCHMAN:  May I approach the witness, Your Honor?

23          THE COURT:  Is that the government's 8J?

24          MR. HOCHMAN:  Yes.  The only series that we're using

25   is the 30I point-something, as a defense exhibit, Your Honor.

1           THE COURT:  All right.  That's fine.

2           MR. HOCHMAN:  Thank you.

3           (Mr. Hochman provides an exhibit to the witness.)

4    BY MR. HOCHMAN:

5    Q     Now, Exhibit 8J was presented, I believe, during the

6    testimony of Jerry Schneider.

7           And you were here for that testimony; correct?

8    A     Correct.

9    Q     And Exhibit 8J --

10          MR. HOCHMAN:  If we could put the second page of

11   Exhibit 8J up?  And focus on the very top of it?

12          (An exhibit was projected onto the projector screen.)

13   BY MR. HOCHMAN:

14   Q     Now, Exhibit 8J seems to reflect a date of February 2nd,

15   2001; isn't that correct?

16   A     Correct.

17   Q     But the purchase didn't happen on February 2nd, 2001;

18   isn't that correct?

19          MR. HOCHMAN:  And if we could scroll down to the

20   middle section.

21          (An exhibit was projected onto the projector screen.)

22   BY MR. HOCHMAN:

23   Q     Because what happens in this document is that the right

24   of superficies occurs; isn't that correct?

25          MR. HOCHMAN:  And if you see in the middle of the

1    document, if you could highlight, it says "the real right of

2    superficies," is my pronunciation of that.

3              THE WITNESS:  This document says that.

4    BY MR. HOCHMAN:

5    Q      This document has nothing to do with the sale of Round

6    Hill; isn't that correct?

7    A      No.  I don't have the document in front of me that I

8    saw, but I have seen a document that has the purchase price of

9    Round Hill for $17,000.

10   Q      Did that occur in 2001?

11   A      If I had the document in front of me, where I saw the

12   $17,000, I could check and see if it was February 2nd, 2001.

13   Q      You came up with that amount, February 2nd, 2001, this

14   is actually a date that you had in your original report, the

15   May 14th, 2013, report; correct?

16   A      Correct.

17   Q      And back then you didn't hear any testimony to come up

18   with that date; correct?

19   A      No.  But I believe there were documents in the sales

20   contract where the $17,000 --

21   Q      Well, there were.  It just didn't occur until 2004,

22   three years later -- actually, over three years later, in June

23   of 2004.

24          Do you recall seeing a document that's three years after

25   the initial purchase price in June of 2004?

1    A       I don't know, but -- okay.  If you want it to be 2004.

2    I'm okay with that.  If you want me to make changes, I'll make

3    changes on the date.

4    Q       I'm not asking to you do anything, ma'am.  I'm just

5    asking you whether or not you knew, when you prepared this

6    document, that you missed the purchase date by three years?

7    A       I did not know, when I prepared this document, that the

8    purchase price was missed by three years.

9    Q       And that was -- but you weren't intending to deceive

10   anybody by putting down 2/2/2001 on the date; correct?

11   A       No.

12   Q       You made a good-faith mistake.

13   A       It appears to be a mistake.

14   Q       You just basically ended up looking at the wrong

15   document when you came up with that particular date; isn't that

16   correct?

17   A       I don't have all the documents in front of me.  I may

18   have looked at the wrong document.

19   Q       Now, you go ahead and then compute a couple of million

20   dollars, $3.1 million of improvements --

21            MR. HOCHMAN:  If we can go back, I'm sorry, to 300,

22   Page 2.  I'm sorry.  Page 1.  Excuse me.

23            And if we can zoom in sort of the middle half?

24            (An exhibit was projected onto the projector screen.)

25

1    BY MR. HOCHMAN:

2    Q     You actually compute a bunch of improvements from 2001

3    to, it looks like, all the way to 2006, that were made on the

4    Round Hill property; isn't that correct?

5    A     Correct.

6    Q     Where did the money come from to make these

7    improvements?

8    A     I would believe they would have come out of the profits

9    of the school.

10   Q     And that school being the Saba School of Medicine

11   Foundation; correct?

12   A     Correct.

13   Q     And so the Saba School of Medicine Foundation is the

14   one -- I think it's actually, if you subtract depreciation,

15   over $5 million worth of improvements in a roughly five-year

16   period; is that about right?

17         To speed things up, if I proffered to you that, on 30R,

18   which is the exhibit you testified about, which contains the

19   information about the improvements, there's a total balance of

20   $5,582,030.78, does that sound approximately right for the

21   amount of improvements that occurred on the Round Hill land for

22   the Saba School of Medicine?

23   A     Okay.

24   Q     And so the Saba School of Medicine put the funds into

25   the -- into the property.

1      Do you know that they also put the original $17,000 into

2  the property?

3  A      Who put the $17,000 in?

4  Q      That's what I'm asking.

5      I believe it's the Saba School of Medicine Foundation

6  put the initial 17,000, back in 2004, into the property, to buy

7  it.

8      Is that correct?

9  A      I . . . I thought this land was transferred several

10 times.  It was Laura Walls, then David and Patricia Fredrick,

11 and then New Vanguard, and . . . New Vanguard purchased it for

12 17,000.  I believe this property went through several different

13 buyers and sellers.

14 Q      But if we disregard the form, and we focus on the

15 substance, are you aware that the Saba School of Medicine

16 Foundation put the initial $250,000 into the property to buy it

17 in Laura Walls' name, put an additional $17,000 later on to

18 actually pay the taxes for the transfer in 2004, and ultimately

19 the property got put into one of its companies, New Vanguard,

20 at the time of the sale of April 3rd, 2007; are you aware of

21 that?

22 A      I don't know if I am aware of all that what you're

23 speaking of, but . . . .  I know that when . . . David Fredrick

24 and Patricia Hough sold it to New Vanguard, New Vanguard paid

25 them $500,000.  And if New Vanguard was a separate entity, then

1  they should have reported it on their 2005 income tax returns,

2  and they didn't, so I believe I . . . just disregarded that and

3  came up with the 17,000 that I actually saw paid for the

4  property.

5          MR. HOCHMAN:  If you could put 30I back on the

6  screen, please?

7          If we could focus back on Government's Exhibit 30I,

8  and then focus on the adjustments, please, on Page 2?

9  BY MR. HOCHMAN:

10 Q      Do you see 2005, back on your October 14, 2013, Revenue

11 Agent's Report?

12 A      Yes.

13 Q      You don't put any value for any sale to New Vanguard on

14 Patricia Hough's 2005 tax year; correct?

15 A      No.  Because New Vanguard and Patricia Hough and David

16 Fredrick are the same thing.

17 Q      Okay.  Yes or no, on your 2005 adjustments for Patricia

18 Hough's tax return, as shown on Exhibit 30I, do you put down

19 any amount that she owes from some sale to New Vanguard in

20 2005; yes or no?

21 A      I didn't put that on the 2005.

22 Q      Because you put -- in 2007, you put down the sale of New

23 Vanguard to the Equinox group; correct?

24 A      That sounds correct.

25 Q      And if the Saba School of Medicine Foundation owned New

1    Vanguard, instead of David Fredrick and Patricia Hough, then

2    they would not be responsible for any income for that sale;

3    isn't that correct?

4    A     If who?

5    Q     If the Saba School of Medicine owned New Vanguard at the

6    time of the April 3rd, 2007, sale, and the 33 million or so

7    went to New Vanguard, owned by the Saba School of Medicine

8    Foundation, not David Fredrick and Patricia Hough, then David

9    Fredrick and Patricia Hough would not be responsible for any

10   income from that sale; correct?

11   A     I believe what you're saying, if David Fredrick and

12   Patricia Hough did not own the schools, then they would not be

13   responsible for any gain or loss, and I would agree that, if

14   they didn't owe own the school, they wouldn't be responsible

15   for the gain.

16   Q     They would not be responsible for the gain.

17   A     Right.

18   Q     But actually, my question was slightly different,

19   because the Equinox group didn't pay the Saba School of

20   Medicine Foundation in connection with the sale of Round Hill;

21   they paid New Vanguard; correct?

22   A     They paid New Vanguard, but New Vanguard is the same as

23   Patricia Hough and David Fredrick.

24   Q     And therein -- and on what do you -- on what do you base

25   that?

1          And let's just focus with Patricia Hough.  Put aside

2   David Fredrick for a second.

3          On what evidence do you base that New Vanguard and

4   Patricia Hough are one and the same?

5   A     There were a couple of things.  The New Vanguard

6   was . . . the Form A did say the beneficial owner was Patricia

7   Hough.  And also, Patricia Hough had an individual account for

8   which she moved all of her funds into New Vanguard, and

9   personal expenses for Patricia Hough were paid out of that

10  account.

11  Q     Okay.  The Form A that you said -- I think we actually

12  looked at the Form A.  And that's the one that had her name

13  listed on one page.

14         She didn't sign that page, she didn't sign any other

15  document in connection with that account, and her name wasn't

16  listed ever again; correct?

17  A     I believe so.

18  Q     And with respect to her moving her money into the New

19  Vanguard account, if the money wasn't hers to begin with, if

20  she was holding that money on behalf of the Saba Foundation,

21  and she moved it into the New Vanguard account to hold the

22  money under the name New Vanguard, again, that wouldn't

23  indicate that she owned the money to begin with; correct, based

24  on my assumptions?

25  A     That was her money, but that's an assumption that I

1    don't agree with.

2    Q      But based on my assumptions, my conclusion is correct,

3    isn't it; that if it wasn't her money, she was just holding it

4    in her account for the Saba Foundation, and she moved it into

5    the New Vanguard account to hold the money on behalf of the

6    Saba Foundation in an account with a different name, it doesn't

7    make it her money; correct?

8    A      I believe that is . . . quite an assumption.  But if you

9    want me to go with that assumption, I will . . . okay.

10   Q      You agree with my conclusion; correct?

11   A      Correct.  But I don't agree with your assumption.

12           MR. HOCHMAN:  Your Honor, I'd like to present the

13   witness with a chart that we've already prepared.  It's

14   Exhibit 30I -- Defense Exhibit 30I.1.  And I have shown it to

15   the government beforehand.

16           THE COURT:  Any objection?

17           MS. KESSLER:  If it's the -- I'm not sure.  There

18   were two.  There's one, at least, that I do object to.

19           MR. HOCHMAN:  This is the one with the RAR, the

20   adjustments.

21           MS. KESSLER:  Yes, the government does object to

22   that.  The government does object, Your Honor.

23           THE COURT:  Is that the chart, there?

24           MR. HOCHMAN:  Yes, Your Honor.

25           THE COURT:  Come show it to me so the jury can't see

1   it.

2          MR. HOCHMAN:  Yes, Your Honor.

3          THE COURT:  With apologies.

4          (Mr. Hochman provides evidence for the Court to

5      review.)

6          (There was discussion at sidebar, off the record.)

7                      IN OPEN COURT

8          THE COURT:  All right.  Counsel, you can summarize

9   your respective positions at a later time on the record; but,

10  for present purposes, the Court overrules the objections, and

11  the defense exhibit will be admitted.

12         And, Mr. Hochman, you're going to have to give me the

13  exhibit number again, I'm afraid.

14         MR. HOCHMAN:  Yes, Your Honor.  This one is 30I.1.

15         THE COURT:  That will be admitted.

16         (Defendant's Exhibit 30I.1 admitted into evidence.)

17         MS. FINLEY:  Mr. Hochman, if you can repeat the

18  number of the exhibit?  We did not hear.

19         THE COURT:  30I.1.

20         MR. HOCHMAN:  Yes.

21         Your Honor, is it possible that I could ask the

22  witness to step down and address this chart?

23         THE COURT:  If we can get the hand-held microphone.

24  And my guess is, you're going to have to get closer than that

25  to the jury.

1            MR. HOCHMAN:  Thank you, Your Honor.

2            THE COURT:  Is that close enough for the jury or not?

3            Oh, we need the lights on.  Of course.  There we are.

4            Mr. Hochman, let me do it this way:  I'm not sure all

5    the jurors can see it, but that's as close as I'm going to let

6    you get to that jury.

7            MR. HOCHMAN:  I'll stay here, Your Honor.

8            THE COURT:  So you figure out --

9            MR. HOCHMAN:  I'll stay here, Your Honor.

10            If the witness can stand down and approach the chart,

11   Your Honor?

12            THE COURT:  She may.

13            MS. KESSLER:  Your Honor, may I stand over to the

14   side?

15            THE COURT:  Both sides can move positions, if you

16   wish.

17            And can I suggest, Mr. Hochman, that you turn the

18   government's microphone around and perhaps use that?

19            We only have one -- maybe that one works for you.

20            (The witness left the witness stand and stood in the

21       front of the jury.)

22            THE COURT:  I hate to make you hold that, but . . . .

23            MR. HOCHMAN:  I'll present the witness with a red

24   marker, Your Honor.

25   BY MR. HOCHMAN:

1   Q      Agent Maurer, what we have before here is Exhibit 30I.1,

2   Defense Exhibit 30I.1.  And this lists your adjustments to

3   Patricia Hough's income for 2005 through 2008; is that correct?

4   A      Yes.

5   Q      And the highlighted portions are the part that goes to

6   the total income line on Line 22; is that correct?

7   A      Correct.

8   Q      Now, I want you to make the assumptions -- the following

9   assumptions:  That Patricia Hough does not own the Saba School

10  of Medicine Foundation, the medical universities of -- the

11  Medical University of the Americas, New Vanguard, Top Fast, and

12  that, to the extent that she was holding any funds in an

13  account in her name, or a joint account with her and her

14  husband, that she was holding those funds on behalf of the Saba

15  School of Medicine Foundation.

16         Do you have those assumptions in mind?

17  A      I don't agree with the assumptions, but I have them in

18  mind.

19  Q      Thank you.

20  A      Did you hear that?  I'm sorry.

21         THE COURT:  Is the witness standing in front of any

22  of your view?

23         (The witness moved to the side of the chart.)

24         THE COURT:  Okay?

25         Go ahead.

1    BY MR. HOCHMAN:

2    Q      So, based on my assumption, is it true that, starting

3    with 2005, the taxable interest listed there, for 2005, would

4    be zero?

5           Is that true?

6    A      Yes.

7    Q      Could you write -- would that also be true for the

8    dividends and the capital gains and -- capital sale or loss,

9    for 2005?

10   A      Yes.

11   Q      Can you write zero in the column marked 2005, in red,

12   next to each one of those items?

13             (The witness marks on the exhibit.)

14             MR. HOCHMAN:  And the record should reflect that the

15   witness wrote a red zero next to each one of those items in the

16   column of 2005.

17             THE COURT:  I'll take your word for that, since I

18   can't see it.

19   BY MR. HOCHMAN:

20   Q      And would the same be true for 2006, 2007, and 2008?

21   A      Based on your assumption that I do not agree with.

22   Q      Okay.  Would you fill in, then, zeros for 2006, 2007,

23   and 2008?

24             (The witness marks on the exhibit.)

25             MR. HOCHMAN:  And Your Honor, if I may present her

1   the other chart?

2           THE COURT:  You may.

3           MR. HOCHMAN:  And I can't recall, did Your Honor

4   admit this into evidence?

5           THE COURT:  I did.

6           MR. HOCHMAN:  Thank you.

7           (The charts were changed.)

8   BY MR. HOCHMAN:

9   Q     You are presented with Defense Exhibit 30I.2.

10          Do you see that before you?

11  A     Yes.

12  Q     And with respect to 30I.2, it has another -- a number of

13  groupings.  And the question I'm going to be asking you about

14  each one of the groupings is whether or not any of the

15  transactions dealing with those groupings ended up on your

16  October 14, 2013 -- October 14, 2013, Revenue Agent's Report,

17  which is Exhibit 30I.

18          Do you have that in mind?

19  A     Yes.

20  Q     So let's start first with David Fredrick's siblings.

21  It's listed as Marion Cronan, Perry Garner, Susan McBride, and

22  Melanie Pitts.

23          Did any of those transactions end up in your report for

24  October 14, 2013?

25  A     No, they did not.

1   Q       If you could write zero next to the line next to the

2   arrow for that grouping.

3             (The witness writes on a sheet of paper.)

4   Q       The next grouping is properties, which is the Asheville

5   house plus lot, Greenville, Sarasota property.

6             (The witness marks on the exhibit.)

7             MR. HOCHMAN:  And I'd like to report to reflect that

8   the witness wrote zero next to that blue arrow for that

9   grouping.

10            THE COURT:  All right.

11  BY MR. HOCHMAN:

12  Q       The next grouping is airplanes.  It says the Cirrus and

13  the Piper Meridian plane.

14            Did any of that play any role in your Revenue Agent's

15  Report dated October 14th, 2013?

16            (The witness marks on the exhibit.)

17            MR. HOCHMAN:  And the witness has again written a red

18  zero, Your Honor.

19            The next grouping is transfer between accounts, and

20  it lists a number of accounts:  The Bahamas accounts, the UBS,

21  accounts, the Liechtenstein Landesbank account, the Fortis

22  Banque, the Zurcher Kantonalbank, the Bank Alpunim.  And then

23  it says, in the names of David Fredrick, Patricia Hough, David

24  Fredrick, Patricia Hough, Apex Consultant, Medical Technology

25  Associates, the Saba School of Medicine Foundation, Medical

1    University of the Americas, Top Fast Finance, New Vanguard

2    Holdings, and Ample Dynamic Trading.

3              And I'm talking here about transactions between, not

4    money that would have gone out for payment for anything, but

5    transactions between and among these accounts.

6              Did any of these accounts end up on your October 14,

7    2013, Revenue Agent's Report?

8    A      No.

9    Q      Could you put a red zero there, as well?

10             (The witness marks on the exhibit.)

11   BY MR. HOCHMAN:

12   Q      And lastly there is a miscellaneous column that shows

13   UBS to Fredrick/Hough account for 250,000; UBS to Lynn, Leon &

14   Lyon, LLC, account, for 50,000; UBS to Dean Houghson, for

15   $5,000; and payment of Sinco, S-I-N-C-O, fees.

16             Did any those play a role, or end up as any of the

17   adjustments for income in your October 14, 2013, Revenue

18   Agent's Report?

19   A      No.

20   Q      Could you put a red zero there?

21             (The witness marks on the exhibit.)

22             MR. HOCHMAN:  I'll indicate for the record, the

23   witness has put red zeros next to each one of the arrows on

24   this chart, Your Honor.

25                  THE COURT:  All right.

 1            MR. HOCHMAN:  The witness can go back to the witness

 2   stand, Your Honor.  I think that's all the charts we have.

 3            THE COURT:  I don't think I've admitted that last

 4   chart.

 5            MR. HOCHMAN:  Oh, I'm sorry.  I would like to move it

 6   for admission, Your Honor.

 7            THE COURT:  The Court will admit 30I.2.

 8            MS. KESSLER:  Your Honor, for the record, the

 9   government would object, based on the discussion we had --

10            THE COURT:  Yes.

11            MS. KESSLER:  -- as to both.

12            THE COURT:  I'll let you summarize that at a later

13   time.

14            (Defendant's Exhibit 30I.2 was admitted into

15       evidence.).

16            (Witness returns to the stand)

17   BY MR. HOCHMAN:

18   Q     Are you familiar with Schedule B?

19   A     Yes.

20   Q     And you're familiar with it because you have done a

21   number of audits over the years; correct?

22   A     Yes.

23   Q     And Schedule B has three parts to it; correct?

24   A     Yes.

25   Q     It's got one part dealing with interest; correct?

1    A       Correct.

2    Q       One part dealing with dividends; is that correct?

3    A       Correct.

4    Q       And a Part 3, dealing with foreign bank accounts; isn't

5    that right?

6    A       Correct.

7            MR. HOCHMAN:  Your Honor, I'd like to present to the

8    witness Exhibit 1 . . . .  Excuse me, Your Honor –– 1D, Your

9    Honor?

10           THE COURT:  You may.

11           THE WITNESS:  Can I put this away?

12           MR. HOCHMAN:  Yes.

13           (Mr. Hochman provides an exhibit to the witness.)

14           THE WITNESS:  How about this?

15           MR. HOCHMAN:  Yes.

16           THE WITNESS:  Can I put this away?

17           MR. HOCHMAN:  Yes.

18           (Mr. Hochman and the witness confer privately.)

19           THE WITNESS:  Here it is.

20           MR. HOCHMAN:  If we can publish Exhibit 1D, on

21   Page 5?

22           (An exhibit was projected onto the projector screen.)

23           MR. HOCHMAN:  And if we can focus on the bottom part

24   of that?

25           And if we could dim the lights, please?

1   BY MR. HOCHMAN:

2   Q      Now, before you, you have Schedule B from Patricia

3   Hough's 2005 tax return; is that correct?

4   A      Correct.

5   Q      And I'd like to focus on Part 3, which has been blown up

6   on the screen.  And the first part, before we even get into 7A

7   and 7B, there's a line on top of it; do you see that?

8              MR. HOCHMAN:  And if we could highlight that first

9   little part of seven, Part 3, please?

10             And if we can zoom in on it, just so it's potentially

11  readable.

12  BY MR. HOCHMAN:

13  Q      Do you have that in front of you?

14  A      Yes.

15  Q      And it says:  "You must complete this part if you had

16  over $1,500 of taxable interest or ordinary dividends; or, had

17  a foreign bank account."

18             Do you see that?

19  A      Yes.

20  Q      Is there any definition that you see anywhere in this

21  tax return as to what it means to have a foreign bank account?

22  A      On this page?  No.

23  Q      Anywhere within this return, this return itself, this

24  Exhibit 1D.

25  A      It's not explained on this form.

1    Q       So if you don't believe that you had a foreign bank

2    account at that moment in time, because you were holding money

3    on behalf of somebody else, then if you answered no, that would

4    be the correct answer; correct?

5               (The witness examines an exhibit.)

6    A       If you did not have a foreign bank account . . . .  If

7    you have a foreign bank account, you should complete this form.

8    Q       But if you're holding money on behalf of somebody else,

9    and somebody else's money and it happens to be in your name,

10   then you don't effectively have a foreign bank account that has

11   your money in it; correct?

12   A       I would think you would know your name was on a foreign

13   bank account.

14   Q       Right.  But the question is:  What it means to say you

15   had a foreign bank account, again, there's no definition of

16   that anywhere here; correct?

17           But let's turn, if we could, to 7A, which is the next

18   question down.

19               MR. HOCHMAN:  And if we could highlight 7A.

20   BY MR. HOCHMAN:

21   Q        And 7A, it says:  "Did you have an interest in o,r a

22   signature or other authority over, a financial account?"

23           Do you see that?

24   A       Yes.

25   Q       Is there any definition in this tax return on what it

1    means to have an interest in a financial account?

2    A      Not in this form, but those instructions for B2 clarify

3    it a little bit.

4    Q      Well, you heard the accountant, Mr. Murtha, testify that

5    he had no idea what Section B2 is referring to.

6           Do you remember that?

7    A      He was not aware of what Page B-2was.

8    Q      And B-2 occurs in some instruction booklet; is that

9    correct?

10   A      In some years it would have been attached to the actual

11   1040 instructions.  In some years it would have been attached

12   to the Schedule AB instructions.

13   Q      And those -- and you know that because you've worked for

14   the IRS for 25 years; correct?

15   A      I know that because I know that, and because I have been

16   with the IRS for 25 years.

17   Q      Because when it says, "See Page B-2," if you look in

18   this tax return, there is no Page B-2; is that correct?

19   A      Correct.

20   Q      And it says, on Page B-2, that it's going to list

21   exceptions.

22          And if you fit under one of the exceptions, you can

23   answer no completely honestly; isn't that correct?

24   A      If you fit those exceptions, you can answer no.

25   Q      But the exceptions aren't listed on the Schedule B;

1    isn't that correct?

2    A       No; you have to go to Page B-2 in the instructions.

3    Q       And they are not listed on Schedule B, and they're

4    listed nowhere else in the return; is that correct?

5    A       They are not -- these exceptions are not listed on the

6    Form 1040.

7    Q       And that would be true for every year that we have tax

8    returns here for Patricia Hough, which is 2001, 2003, all the

9    way to 2008; is that correct?

10   A       Correct.

11   Q       And it references here, under filing requirements, this

12   Form TDF90-22.1.

13           Do you see that?

14   A       Yes.

15   Q       And the Form TDF90-22.1, that's nowhere on this tax

16   return; is that correct?

17   A       It's in the instruction.  That form is not . . . is not

18   in the 1040.

19   Q       Any of Dr. Patricia Hough's 1040s; correct?

20   A       Correct.

21   Q       And that form is not even an IRS form.

22           That's a Treasury Department form; isn't it?

23   A       Correct.  That's what's known as the F-Bar form.

24   Q       And you know that because you've been with the IRS for

25   25 years; right?

1   A       Yes.

2   Q       And that F-Bar form is not a form you even submit with

3   your tax return; isn't that right?

4   A       It is supposed to be submitted . . . Page B-2 gives you

5   when you're supposed to fill it out, and when you're supposed

6   to file it, and where you're supposed to send it.

7   Q       And you know the answers to all those questions, don't

8   you?

9   A       I don't -- I don't know the answers to all those

10  questions.  I would have to look at Page B-2, or I would have

11  to look at a F-Bar form, and make sure I could answer that

12  correctly.

13  Q       Well, isn't it true, the F-Bar form is not included with

14  your tax return when you submit your tax return to the IRS?

15  A       It is not included with your tax return.

16  Q       Because you send it to somewhere else than the IRS.  You

17  send it to the financial crime -- excuse me -- the Financial

18  Crimes Enforcement Network; isn't that correct?

19  A       You send it to Detroit, and I believe that's where that

20  organization is located.

21  Q       And you don't submit this form by April 15th.

22          This is actually a June 30th form; isn't that right?

23  A       June 30th of the following year.

24  Q       And you don't owe any tax by checking the box yes or no;

25  isn't that correct . . . by itself.

1    A       You don't owe any tax.

2    Q       Because let's say you just have signature authority over

3    an account, but it's not your money, then you would still have

4    to potentially check the box yes, for signature authority, but

5    you wouldn't have to report any tax because it's not your

6    money; correct?

7    A       You would have to fill out the F-Bar form to disclose

8    that you have signature authority over a foreign bank account.

9    Q       Unless one of the exceptions applied; correct?

10   A       Yes.

11   Q       And a U.S. taxpayer could have an unlimited number of

12   foreign accounts; correct?

13           There is nothing that prohibits a U.S. taxpayer from

14   having unlimited foreign accounts?

15   A       A U.S. taxpayer can have foreign accounts, I guess

16   unlimited, as long as they follow the requirements to disclose

17   them.

18   Q       And as long as they don't fit under the exceptions;

19   correct?

20   A       Yes.  I believe, in this case, the exceptions don't

21   apply.

22           MR. HOCHMAN:  No further questions.

23           THE COURT:  Ms. Kessler.

24           MR. HOCHMAN:  Actually, Your Honor, may I ask just

25   one last question?  I'm sorry.

```
1                    THE COURT:  One.

2                    MR. HOCHMAN:  One.  Thank you.

3    BY MR. HOCHMAN:

4    Q       You have no idea whether or not Dr. Patricia Hough knew

5    whether or not the exceptions applied; correct?

6    A       I don't know her knowledge of that.

7                    MR. HOCHMAN:  Thank you.

8                    No further questions, Your Honor.

9                    THE COURT:  All right.

10                   Ms. Kessler?

11                   MS. KESSLER:  Your Honor, may I approach the witness,

12   just to make sure that the exhibit I need is up here?

13                   THE COURT:  You may.

14                   (Ms. Kessler examines multiple exhibits.)

15                   MS. KESSLER:  I apologize, Your Honor.  We've got

16   quite a pile.

17                      REDIRECT EXAMINATION

18   BY MS. KESSLER:

19   Q       Good afternoon, Ms. Maurer.

20   A       Good afternoon.

21   Q       If you look at Exhibit 25-A, which I think I pulled out

22   of the file for you . . . it's in a folder at the top, I think?

23   A       Yes.

24   Q       What is this document?

25   A       The Deferred Prosecution Agreement.
```

SHEILA MAURER                           157

1    Q       Involving UBS?

2    A       Yes.

3    Q       Now, if you could turn to Page 7 of that document . . .

4    and look at Paragraph 10, about halfway down the page, sentence

5    starts with, "The government"?

6    A       "The government acknowledges . . ."?

7    Q       Yes.  Can you read that sentence for the jury?

8    A       "The government acknowledges and understands that UBS is

9    subject to certain Swiss laws which may impact its ability to

10   provide documents and information in connection with its

11   cooperation obligations under this agreement, and that FINRA,

12   and other competent Swiss authorities, provide authoritative

13   guidance in this regard."

14   Q       So there were some limitations in the documents that UBS

15   would be able to provide pursuant to this agreement.

16   A       Yes.

17   Q       And so you were somewhat limited in the documents that

18   you had available to you.

19               MR. HOCHMAN:  Objection, leading.

20               THE COURT:  Sustained.

21   BY MS. KESSLER:

22   Q       Were you somewhat limited in the number of documents you

23   had available for purposes of your analysis?

24   A       Yes.

25   Q       Now, if you could turn to what was marked as Defense

SHEILA MAURER

1   Exhibit 30I-4, the draft RAR that was dated May . . . I believe

2   it was May 14th . . . May 14th, 2013?

3          MR. HOCHMAN:  Objection to the classification of it

4   as a draft, Your Honor.

5          THE COURT:  Overruled.

6          MS. KESSLER:  If we could put Page 2 of that document

7   up on the screen.

8          (An exhibit was projected onto the projector screen.)

9   BY MS. KESSLER:

10  Q      Ms. Maurer, do you have a note here on this document,

11  under, "other information," on Page 2?

12  A      It says, "Draft."

13  Q      Why was this a draft, Ms. Maurer?

14  A      It was subject to change.

15  Q      When was this prepared?

16  A      5/14/2013.

17  Q      What does it mean to be a summary expert?

18  A      It means I attend the trial, I review all the documents

19  that are put into evidence, and I listen to the testimony

20  provided.

21  Q      Now, have you ever heard the testimony from Mr. deCastro

22  before, at the time that you prepared this on May 14th?

23  A      I had not heard his testimony.

24         MS. KESSLER:  If we could put up Exhibit 6B, Page 1,

25  please.

SHEILA MAURER                              159

1              (An exhibit was projected onto the projector screen.)

2              MS. KESSLER:  If we could blow up the first paragraph

3      there?

4      BY MS. KESSLER:

5      Q      Had you seen this document when you prepared your draft

6      RAR on May 14th?

7      A      I had not seen this document.

8      Q      Had you seen Page 5 of this document when you prepared

9      this draft of your RAR?

10             MS. KESSLER:  If you could show Page 5, please?

11             (An exhibit was projected onto the projector screen.)

12             THE WITNESS:  I had not seen this.

13     BY MS. KESSLER:

14     Q      Now, if we go back to Page 1 of -- excuse me.

15             Whose signature appears on this Page 5 of this document?

16     A      Bradford Anderson, but then there's Patricia Hough,

17     David Fredrick, and then David Fredrick again.

18     Q      Now, if we go back to Page 1 of this document, how is --

19     do Patricia Hough and Dr. David Fredrick identify themselves as

20     the sellers here?

21     A      Yes.

22     Q      Now, at the time that you prepared this RAR dated

23     May 14th, the draft, had you heard testimony from Mr. Rodger,

24     Steven Rodger?

25     A      No.

SHEILA MAURER                                    160

1    Q       And had you heard the information that Dr. Patricia

2    Hough and Dr. David Fredrick personally guaranteed the sale of

3    the school that actually went through?

4    A       I had not heard that testimony.

5    Q       Now, these documents, Exhibit 60 and the testimony of

6    Mr. DeCastro and -- excuse me, the testimony of Mr. Rodger, are

7    these the type of contemporaneous documents and statements that

8    you would rely on as part of your analysis?

9    A       Yes.

10   Q       Now, as a revenue agent, or a SEP agent, do you have

11   authority to direct a criminal grand jury investigation?

12   A       No, I do not.

13   Q       Did you have power to determine who will be interviewed?

14   A       No, I do not.

15   Q       Do you have subpoena power to obtain documents?

16   A       No, I do not.

17   Q       Do you have subpoena powers to require individuals to

18   appear before the grand jury?

19   A       No, I do not.

20   Q       Now, Mr. Hochman, yesterday, asked you about a fact

21   pattern where, if you were to give him $1,000 to hold into his

22   bank account for you, whether it becomes his money by him just

23   holding it.

24           And what was your answer to that question?

25   A       It does not become his money just by holding it.

1    Q        Now, if Mr. Hochman were to start spending your money

2    for himself, then does it become his money?

3    A        Yes.

4    Q        Why is that?

5    A        Because he's receiving it and spending it.

6    Q        Now, at the time you prepared your draft RAR, I believe

7    you indicated, on cross-examination, that you did not have

8    sufficient evidence to determine that the schools were owned by

9    Dr. Fredrick and Dr. Hough; am I right?

10   A        I . . . .  Yes.  I believe I said that; yes.

11   Q        And so the entries that Mr. Hochman walked through with

12   you related to the . . . .

13            MS. KESSLER:  Court's indulgence.  I need to find

14   that.  Defense Exhibit 30I-5, I believe it is.

15   BY MS. KESSLER:

16   Q        He walked through some . . . computations with you, or

17   some numbers with you, where there were transfers from the Saba

18   Foundation account to Top Fast, in the amount of two and a half

19   million dollars, a number of wire transfers from MUA and Saba,

20   also to New Vanguard, totaling $3.7 million and some change --

21   A        Yes.

22   Q        -- he asked you why you didn't include those on your

23   current RAR.

24            Did you include them on the draft RAR . . . as income

25   items?

1   A       Yes, but . . . .  I  . . . .   There is a mistake here.

2   Because, during lunch, I checked my computer, and I had revised

3   this document, and somehow it didn't get put into evidence

4   correctly.

5   Q       Okay.

6   A       So the revised just shows the 500 million divided into

7   the 2.5 million.

8   Q       You mean the 5 million divided into 2.5 million?

9   A       Yes.  I'm sorry.  I don't know what I said.

10  Q       I think you said 500 million.

11  A       Oh.  Okay.

12  Q       Now, at the time you prepared your draft RAR, were you

13  operating under the assumption that you hadn't seen sufficient

14  evidence to determine that Dr. Fredrick and Dr. Hough owned the

15  schools?

16              MR. HOCHMAN:  Objection, leading, Your Honor.

17              THE COURT:  Sustained.

18  BY MS. KESSLER:

19  Q       Had you made a determination as to ownership of the

20  schools at the time you prepared the May 14th RAR?

21  A       I had not made a positive determination as to who owned

22  the schools.

23  Q       Based on that, why did you include the two and a half

24  million-dollar transfer, as well as the multiple transfers

25  totaling $3.7 million, as income items on the draft RAR?

SHEILA MAURER                                    163

1    A       Because they were moving money out of the bank accounts

2    from Saba and MUA, and using those to pay personal expenses.

3    Q       Similar to the example we talked about, where

4    Mr. Hochman spent the money of yours that he kept into his

5    account for his own personal benefit.

6    A       Yes.

7    Q       Now, after having listened to the first few days of

8    trial, testimony, and exhibits -- or evidence that came in, did

9    you change your opinion as to the ownership of the schools?

10   A       Yes, I did.

11   Q       And what was your opinion then?

12   A       My opinion is that Patricia Hough and David

13   Fredrick . . . have always owned the schools.

14   Q       What about The Foundation?

15   A       They own The Foundation.

16   Q       And based on that, what did you believe the proper

17   treatment was, as to the two and a half million-dollar transfer

18   to Top Fast, as well as the multiple transfers totaling

19   approximately $3.7 million?

20           Would it have been proper to include those as income

21   items on the RAR that was completed within the last few days?

22   A       No.  That would have been inconsistent with my

23   determination that they own the schools and they have always

24   owned the schools.

25   Q       Because you can't steal from yourself?

SHEILA MAURER                                                              164

1    A        Correct.

2    Q        Now, did you -- you indicated that, based on the

3    evidence you had heard, you believed that Dr. Hough and

4    Dr. Fredrick owned the schools.

5            Based upon that, how should any profits from the schools

6    have been treated during the time period that is the basis of

7    the RAR . . . the current one.

8    A        They should have . . . included the net income from

9    those operations as ordinary income on their income tax

10   returns.

11   Q        Now, did you see evidence that there was -- the schools

12   were, in fact, profitable?

13   A        Yes, I did.

14   Q        Referring back to Exhibit 6B . . . if we turn to turn to

15   what I think is Page 3?

16            MR. HOCHMAN:  What's the exhibit number?

17            MS. KESSLER:  6B.  I'm sorry.  Actually, I think it

18   may be Page 2.

19   BY MS. KESSLER:

20   Q        Do you recall seeing this document as part of the

21   evidence?

22   A        Yes, I do.

23            MS. KESSLER:  And if we could focus in some, on the

24   top -- the financial information there?

25            (An exhibit was projected onto the projector screen.)

SHEILA MAURER                          165

1   BY MS. KESSLER:

2   Q      What did -- who signed this letter?

3   A      David Fredrick.

4   Q      And what does --

5          MS. KESSLER:  Actually, if we can go back to the

6   first page.  Thank you.

7          (An exhibit was projected onto the projector screen.)

8   BY MS. KESSLER:

9   Q      What is the date of this letter?

10  A      February 18th, 2002.

11         MS. KESSLER:  And then back to the second page?

12         (An exhibit was projected onto the projector screen.)

13  BY MS. KESSLER:

14  Q      What was indicated as the profits per year for Saba

15  University School of Medicine?

16  A      $3,700,000.

17  Q      And what did he estimate as the projected profits per

18  year for MUA?

19  A      $3,500,000.

20         MS. KESSLER:  Now, if we can next look at Exhibit 8C.

21         (An exhibit was projected onto the projector screen.)

22  BY MS. KESSLER:

23  Q      What is this document?

24  A      The audited financial statements for Saba School of

25  Medicine Foundation.

SHEILA MAURER

166

1    Q      And if we turn to Page 5 of this document . . . .

2           What was indicated as the total revenue?

3    A      $7,913,676.

4    Q      I'm sorry, the total revenue . . . Line 3?

5    A      Oh, I'm sorry.  $7,972,514.

6    Q      And the total costs and expenses?

7    A      $5,789,977.

8    Q      So this indicates that revenues exceeded expenses for

9    the year 2004.

10   A      Correct.

11          MS. KESSLER:  If we move to Exhibit 8Q.

12          (An exhibit was projected onto the projector screen.)

13   BY MS. KESSLER:

14   Q      What is this document?

15   A      Financial statements for Saba School of Medicine

16   Foundation.

17          MS. KESSLER:  And if we turn to Page 5 of this

18   document, as well.

19          (An exhibit was projected onto the projector screen.)

20   BY MS. KESSLER:

21   Q      What was the time period for this document?

22   A      It would have -- year ended April 30th, 2005.

23   Q      And the total revenue?

24   A      $9,321,445.

25   Q      Versus the total costs and expenses?

SHEILA MAURER                              167

1    A        $7,139,541.

2    Q        Can you repeat -- I think you may have misspoken as to

3    the number:  Total costs and expenses?

4    A        $6,139,541.  Did I get it right that time?

5    Q        I think so.

6    A        Okay.

7    Q        Now, if we turn to Exhibit 8A, did you also see

8    financial statements for the Medical University of the Americas

9    as part of the evidence?

10   A        Yes, I did.

11   Q        And if we turn to Page 5 of this document, 8A, what is

12   the . . . time period for this document?

13   A        Year ended April 30th, 2005.

14   Q        And the total revenue determined?

15   A        $5,632,336.

16   Q        And the total costs and expenses?

17   A        $3,312,649.

18   Q        And what was the net income?

19   A        $2,319,687.

20   Q        Did you also see similar financial statements for Saba

21   and MUA for the year . . . .

22            MS. KESSLER:  If we could turn to Exhibit 9N, like

23   "Nancy."

24            (An exhibit was projected onto the projector screen.)

25

SHEILA MAURER                        168

1   BY MS. KESSLER:

2   Q     What is this document?

3   A     Saba School of Medicine Foundation financial statements

4   for the year ended April 30th, 2006.

5   Q     And if we turn to Page 5 of this exhibit, as well, what

6   was listed as the total revenue?

7   A     $11,911,756.

8   Q     And the total expenses?

9   A     $7,272,201.

10  Q     Based on these five exhibits that we've looked at, did

11  it appear that the schools were profitable?

12  A     Based on these documents, it appears that the schools

13  were profitable.

14  Q     Now, did you -- I am sorry, I didn't mean to interrupt.

15  A     They were profitable.

16  Q     Did you include profits from the schools as part of your

17  Revenue Agent Report computing additional tax due and owing?

18  A     I did not.

19  Q     Why not?

20  A     I have these --

21         MR. HOCHMAN:  Objection, asked and answered, Your

22  Honor.

23         THE COURT:  Overruled.

24  BY MS. KESSLER:

25  Q     You can answer.

1   A       The first document we looked at was an estimate, and

2   these documents, I would have to make additional computations,

3   and look at additional source documents, to . . . be more

4   confident of the numbers I would put on the RAR.

5   Q       Were you attempting to be conservative?

6   A       Yes.

7   Q       Now, looking back at the May 14th . . . .  When you

8   determined the basis for the assets related to the sale of the

9   schools, Mr. Hochman asked you some questions about whether you

10  included the value of the hospital affiliations and the

11  accreditations as part of your basis determination.

12          Is basis based on value, or is it based on cost?

13  A       Basis is based on cost.

14  Q       And did you see any evidence of cost related to

15  obtaining hospital affiliations?

16  A       No, I did not.

17  Q       Did you see any costs related to obtaining the

18  accreditations?

19  A       No, I did not.

20  Q       If we could turn to Exhibit 4B, like "boy" . . . .

21          Mr. Hochman asked you some questions about this document

22  on cross-examination.

23          What is the date of this document?

24  A       December 1st, 2008.

25  Q       And who is it signed by?

SHEILA MAURER                                    170

1    A       David Fredrick.

2    Q       Now, if you could read . . . read the contents of this

3    letter?

4    A       "This is to confirm that Saba University School of

5    Medicine is owned by Saba School of Medicine Foundation.

6           "The undersigned also certifies that, on April, 2007,

7    the Saba School of Medicine Foundation established an second

8    entity, called Saba Drop Down, B.V." -- which I would believe

9    is British Virgin Islands -- "Saba Drop Down B.V., consisting

10   of real estate property that was sold to Equinox Corporation.

11   After the sale, Saba University School of Medicine remained a

12   part of Saba School of Medicine Foundation, which itself still

13   is an operative business in the Netherlands Antilles."

14   Q       Do you recall Mr. Rodger's testimony?

15   A       Yes.

16   Q       Do you recall whether he testified to whether his

17   company had any interest in purchasing The Foundation?

18   A       They weren't interested in purchasing The Foundation.

19   Q       Did he testify that he purchased only the schools?

20           MR. HOCHMAN:  Objection, leading.

21           THE COURT:  Sustained.

22   BY MS. KESSLER:

23   Q       What did Mr. Rodger testify he purchased -- or his

24   company purchased.  Excuse me.

25   A       They purchased the schools.

SHEILA MAURER

1   Q      Was this letter written after the sale of the schools

2   occurred, based on the testimony of Mr. Rodger and the

3   accompanying documents?

4   A      Yes.

5   Q      Now, if we look at Defense Exhibit 30I.2, in fact, are

6   many if not all of the entries on this exhibit facts that you

7   would consider in determining dominion and control?

8   A      Yes.

9          MR. HOCHMAN:  Objection, vague as to "dominion and

10  control," Your Honor.

11         THE COURT:  Overruled.

12  BY MS. KESSLER:

13  Q      Why would this be important, the fact on here, as --

14  well, let's break it down a little bit.

15         The date -- the entries related to David Fredrick

16  siblings, how would this . . . facts related to them and gifts

17  to them be important in determining dominion and control over

18  where the money that was given to them came from?

19  A      It means that these are personal expenses of Patricia

20  Hough and David Fredrick, so if they could order these

21  transfers and expenses to be paid, they had control over the

22  account that they came out of.

23  Q      And would the same be true for the properties, the

24  Asheville house, the Greenville house, the Sarasota condo?

25  A      Yes.  They are personal expenses that they directed to

1    be paid out of the accounts.

2    Q      And would the same be true for the airplanes?

3    A      Yes.

4    Q      And would the same be true for the transfers between the

5    accounts?

6    A      They had dominion and control, because they could order

7    the transfers between the accounts.

8    Q      And would the same be true for the items listed as

9    miscellaneous, UBS to Fredrick and Hough accounts, $250,000;

10   UBS to Lynn, Leon & Lyon, LLC, account, in the amount of

11   $50,000; UBS to Dean Hough -- Dean Houghson, excuse me, for

12   $5,000; and payment of Sinco fees?

13   A      These are personal expenses paid out of the accounts,

14   and these expenses were paid as directed by Patricia Hough and

15   David Fredrick.

16   Q      Would a more appropriate title for this exhibit be

17   "Evidence of Dominion and Control by Patricia Hough and David

18   Fredrick"?

19               MR. HOCHMAN:  Objection, argumentative.

20               THE COURT:  Overruled.

21               THE WITNESS:  This . . . .  Yes.  Yes.

22               MS. KESSLER:  I have no further questions, Your

23   Honor.

24               THE COURT:  All right.  Thank you.

25               Mr. Hochman?

1                    RECROSS EXAMINATION

2    BY MR. HOCHMAN:

3    Q       If we could go back a moment to the transaction that you

4    and I are having hypothetically, because I know you won't give

5    me the money.

6            If you give me, hypothetically, a thousand dollars, and

7    I put it in the Nathan Hochman account, it's still your money;

8    correct?

9    A       It's still my money.

10   Q       And if I ask you, "Agent Maurer, do you mind if I get a

11   loan for a thousand dollars," and you say yes, and I take the

12   thousand dollars in my account and I use it to buy something

13   for myself, that thousand dollars in the account was your money

14   that you have now loaned to me; correct?

15   A       You've turned it into a loan; yes.

16   Q       And I got permission from you, in our example, to take

17   money that was in the Nathan Hochman account, that I was

18   holding for you, and actually give it to Nathan Hochman as part

19   of a loan.

20           Do you understand that?

21   A       Yes.  I loaned you the money.

22   Q       And the fact that -- when I receive a loan, a loan is

23   not taxable to me, as long as I intend to pay it back; correct?

24   A       A loan is not taxable to you.

25   Q       So if the Saba -- School of Medicine Foundation made a

1    loan to Dr. Fredrick, that loan would not be taxable to him as

2    long as he intended to pay it back; correct?

3    A      If they made a loan, and there was proper documentation

4    to show that it was a loan.

5    Q      Well, again, you said before that loans can be done with

6    documentation and without documentation; correct?

7    A      Correct.

8    Q      And you were here for Dr. Paul Dalbec's testimony,

9    weren't you?

10   A      I was here for his testimony.

11   Q      The chairman of the board of the Saba School of

12   Medicine.

13          Do you recall that?

14   A      He was listed as that.

15   Q      Well he actually testified under penalty of perjury as

16   to that; correct?

17   A      Okay.

18   Q      And Steven Rodger confirmed that when he testified;

19   correct?

20   A      Yes.

21   Q      Do you remember Steven Rodger actually kept Mr. Dalbec

22   on after the sale because he found him to be honest, ethical,

23   and hardworking.

24          Do you recall that?

25   A      Yes.

1   Q      And do you recall that Mr. Dalbec said that the board,

2   Dr. Fredrick -- excuse me -- that the board had approved loans

3   for Dr. Fredrick for the various categories that are contained

4   in Exhibit 30 -- Defense Exhibit 30I.2.

5   A      He said that they had . . . allowed loans to David

6   Fredrick.

7   Q      And if the Saba Foundation made a loan to David

8   Fredrick, it is not taxable to David Fredrick; correct?

9   A      If the underlying facts show that it's truly a loan,

10  then it's not income to David Fredrick.

11  Q      And in particular, with the siblings, you heard

12  testimony that . . . that Dr. Patricia Hough had no idea that

13  Dr. Fredrick had made the loans at the time he made them.

14         Do you remember that testimony?

15  A      Those were gifts.

16  Q      Strike that.

17         That Dr. Hough had absolutely no involvement whatsoever

18  in the gifts to the siblings.

19         Do you recall that?

20  A      Yes.  I recall that they testified that she didn't --

21  that they believed she didn't participate in giving the gifts.

22  Q      And she was actually upset when she found out the amount

23  of the gift; isn't that correct?

24  A      One or two of them testified to that fact.

25  Q      Now, with respect to Exhibit 30I.4 -- Defense

1    Exhibit 30I.4, which is your May 14th, 2013, Revenue Agent's

2    Report, you gave that to the government the day before the

3    indictment; correct?

4    A      I don't remember the day of the indictment, but I would

5    assume it was close to that time.

6    Q      Assume the indictment was May 15, 2013; does that sound

7    approximately right?

8    A      It sounds approximately right.

9    Q      Now, when you gave the government your Revenue Agent's

10   Report dated May 14, 2013, did you tell them not to rely on it

11   because you were still in the process of gathering information?

12   A      I did not tell them not to rely on it.

13   Q      And you know that the government provided that Revenue

14   Agent's Report, the May 14, 2013, report, to the defense in

15   connection with this trial; isn't that correct?

16   A      I believe so.  You have it.

17   Q      And when you sat here, in front -- in the first row, on

18   the first day of trial, before you heard any more additional

19   testimony, if you had been asked to testify at that moment in

20   time, you would have said everything in the May 14, 2013,

21   report was true and correct; isn't that right?

22   A      If I had testified first, before any other testimony?

23   Q      Yes.

24   A      I would have believed this document was correct.

25   Q      And you've now realized that that document has

1    $6.7 million worth of errors in it; correct?

2    A       I don't agree to that.

3    Q       It has $6.7 million of changes; would you agree with

4    that?

5    A       Yes.

6            MR. HOCHMAN:  No further questions.

7            THE COURT:  Ms. Kessler, anything else?

8            MS. KESSLER:  Nothing further, Your Honor.  Thank

9    you.

10           THE COURT:  You may stand down.  Thank you.

11           You may call your next witness.

12           MS. KESSLER:  Your Honor, I wanted to clarify, I

13   don't know if we should approach sidebar, related to the

14   defense exhibits.  I don't think the clarification that was

15   required was made as to Exhibit . . . the one that's on the

16   right.  I'm not sure of the numbering on the two.

17           THE COURT:  You can do that at sidebar, if you'd

18   like, or during a recess.

19           MR. HOCHMAN:  Your Honor, we don't release the

20   witness, then, until we do this clarification?

21           THE COURT:  That's fine.

22           MR. HOCHMAN:  Thank you.

23           THE COURT:  You may stand down still.

24           THE WITNESS:  I can go over there?

25           THE COURT:  You can.

1          THE WITNESS:  Thank you.

2          (The witness left the witness stand and sat in the

3     courtroom.)

4          MS. KESSLER:  Your Honor, may we have a sidebar?

5          THE COURT:  You may.

6          MS. KESSLER:  Thank you.

7                         AT SIDEBAR

8          MS. KESSLER:  The government doesn't have any further

9     evidence.  I was concerned about resting without that

10    clarification having been made as to that exhibit.

11         THE COURT:  Okay.  Why don't you go ahead and put

12    your objections on the record.

13         MS. KESSLER:  My objection to . . . .

14         MR. HOCHMAN:  30I.2.

15         MS. KESSLER:  -- Defense Exhibit 30I.2, which

16    contains a chart that reflects some of the information on the

17    RAR, the objection is that the additional columns added, which,

18    at the top, in red, indicate Count 5, 6, 7, and 8, and below

19    them . . . I can't see that far.

20         MS. FINLEY:  I think it's five, six --

21         MR. HOCHMAN:  Or six, seven, eight, and nine.

22         MS. KESSLER:  The fact that that contains the

23    language as to the count for each column gives the impression

24    that tax loss is an element of the offense, when it is not.  I

25    don't believe the clarification that that refers only to total

1    income was made during the examination of Ms. Maurer.  And,

2    therefore, I renew the objection to the admission of that

3    evidence -- or exhibit, excuse me.

4         THE COURT:  All right.  I think you're right, the tax

5    loss isn't the focus of the case.  I don't think the chart, as

6    drafted, does what . . . implies or infers what you think it

7    does.  Counsel did not talk about tax loss being the focus in

8    the jury instruction, or at least the draft jury instruction

9    will clearly tell them that tax loss is not something the

10   government has to prove.  So that observation -- and I don't

11   anticipate counsel to argue to the contrary at any point.  And

12   if he does, I'll fix that.  But with those observations, the

13   objection to that exhibit is overruled.

14        The exhibit next to it, which I assume is 30I.1 --

15        MR. HOCHMAN:  I'm sorry, Your Honor, I might have

16   mixed up the one -- I actually mixed it up.

17        The one that they have just been talking about is

18   30I.1.  That is the one with the count written on it.  30I.2 is

19   the vertical chart with the groupings on it.

20        THE COURT:  The objection to 30I.1 will be overruled.

21        What are your objections if any, to 30I.2, the --

22        MS. KESSLER:  The one with the blue writing?

23        THE COURT:  Yes.

24        MS. KESSLER:  The government would continue to object

25   to that document, and further object because the witness, in

1    fact, stated during redirect that the titling of that document

2    does not accurately represent what she believes the contents

3    reflect.

4              THE COURT:  You don't need to argue.  That's

5    overruled.  Both sides can argue what the title should be.  The

6    content, I think, is accurate, based upon her testimony.

7              All right.  Now, in terms of additional witnesses?

8              MS. KESSLER:  None.

9              THE COURT:  All right.  What I'll do is have you rest

10   in front of the jury, send the jury for our afternoon recess,

11   then hear whatever motions you have.

12             In terms of your witnesses, are you all set?

13             MR. HOCHMAN:  Yes.  In fact, we have two that we need

14   to get on as soon as possible, because they ideally have a

15   plane reservation that we delayed.

16             THE COURT:  Would you like to reserve your Rule 29

17   motion and just proceed with the testimony?

18             MR. HOCHMAN:  Yes, Your Honor.

19             For the record, we fully intend to make a Rule 29

20   motion as soon as the government rests its case, and then we

21   can make the actual motion, if we could, at some later point,

22   prior to the conclusion of the defense case.

23             THE COURT:  Any objection?

24             MS. KESSLER:  No.  Thank you.

25             THE COURT:  All right.  We'll do that.

1          MR. HOCHMAN:  Thank you very much, Your Honor.

2          THE COURT:  I think we'll still recess after she

3    rests.

4          MR. HOCHMAN:  Okay.  Thank you.

5                     IN OPEN COURT

6          THE COURT:

7          MS. KESSLER:  Your Honor, the government rests.

8          THE COURT:  All right.  Ladies and gentlemen, that

9    concludes the testimony and the evidence from the government.

10          Before we turn the case over to the defendant, we'll

11    take a recess.  I know you were just standing, but we'll take a

12    formal recess for 15 minutes.

13          Please do not discuss the case among yourselves, or

14    allow anyone to discuss it with you or in your presence.

15          (At 2:47 PM, the jury was escorted from the

16       courtroom.)

17          THE COURT:  All right.  Mr. Hochman, your Rule 29

18    motion will be deemed to have been made now.  We'll hear

19    argument on it later.  And then we'll take 15 minutes, and you

20    can call your witnesses.

21          MR. HOCHMAN:  Thank you very much, Your Honor.

22          THE COURT:  All right.  Fifteen minutes.

23          (At 2:47 PM, court was recessed.)

24                      AFTER RECESS

25          (At 3:04 PM, court was reconvened.)

1          MR. HOCHMAN:  Your Honor, Mr. Saunders needs to raise

2     a brief issue before our first witness comes in, please.

3          THE COURT:  All right.  You may be seated.

4          MR. SAUNDERS:  Thank you, Your Honor.

5          Your Honor, yesterday, when character witness Alan

6     Gruber was testifying, Ms. Finley asked him, on

7     cross-examination, a question, saying:  "If it was proven that

8     Dr. Fredrick and Dr. Hough did conspire to defraud the Internal

9     Revenue Service by not reporting the sale of the medical

10    schools on their tax returns because they would be required to

11    do so, if that was proven, would that change your opinion?"

12         THE COURT:  You're not going by what's happened with

13    another witness, I assume.

14         MR. SAUNDERS:  I expect the same question might be

15    asked of our next two witnesses, and I want avoid compounding

16    the error, Your Honor.

17         THE COURT:  There was no objection, so there was no

18    error, but go ahead.

19         MR. SAUNDERS:  There was an objection, Your Honor, to

20    that question, at the time, and the Court overruled that

21    objection.  And this is on Page 196 of yesterday's transcript.

22         I've provided the Court, if the Court's had an

23    opportunity to look at it, with the Fifth Circuit, 1977 case of

24    U.S. versus Candelaria Gonzalez, 547 F.2d. 291, a 1977 Fifth

25    Circuit case.  It's finding authority in circuit.  And it deals

1    with a similar situation where the government asked, on

2    cross-examination of a defense character witness, in that case

3    it was a reputation opinion, whether that reputation would

4    change if the defendant were convicted.

5            And the Fifth Circuit in that case found that that

6    was such an improper question and that it reversed the

7    presumption of innocence in asking the witness to assume the

8    defendant's guilt, that it, in and of itself -- and it was

9    asked of two different witnesses over objection -- required

10   reversal.

11           So we would just ask, at this point, that any similar

12   questioning of any further character witnesses be precluded.

13   And if the Court agrees, we will ask the Court to provide a

14   curative instruction to the jury regarding the question and

15   answer of Dr. Gruber yesterday on that subject.

16           THE COURT:  You can ask.  It's a different situation.

17   The question yesterday was the witness's personal opinion, not

18   his reputation in the community.  And he gave what his personal

19   opinion was.  That's different than the case you've just given

20   me.

21           MR. SAUNDERS:  I think in both situations, Your

22   Honor, it asks the witness to assume the defendant's guilt, and

23   reverses the presumption of innocence; and I think that was

24   what concerned the Candelaria Gonzalez court, that the question

25   itself requested a presumption of guilt, whether it's offered

GOVERNMENT RESTS

1    in the form of reputation or opinion testimony, that assumption

2    in a criminal case before the case has been submitted to the

3    jury is improper.

4              THE COURT:  I disagree.

5              All right.  Go ahead.

6              Ready; both sides ready?

7              MR. HOCHMAN:  Yes, Your Honor.

8              MR. SAUNDERS:  Yes, we are ready.

9              THE COURT:  Have the jury step in, please.

10             Hang on a second.  I'm sorry.  I'm sitting here.  I

11   have two notes.

12             They're basically about scheduling issues.  I know

13   we've got some time concerns.  So maybe we should discuss them

14   afterwards?

15             MR. HOCHMAN:  That would be great, Your Honor.

16             THE COURT:  All right.

17             MR. HOCHMAN:  Thank you.

18             THE COURT:  Don't let me forget, please.

19             MR. HOCHMAN:  I'll make a note right now.

20             THE COURT:  Make a note not to forget the note.

21             Have the jury step in, please.

22             (At 3:08 PM, the jury was escorted into the

23        courtroom.)

24             THE COURT:  Mr. Saunders?  You may proceed.

25             MR. SAUNDERS:  Thank you, Your Honor.

1          Defense calls Thomas Walker.

2          THE COURTROOM DEPUTY:  If you'd raise your right

3    hand.

4          Do you solemnly swear or affirm to tell the truth,

5    the whole truth, nothing but the truth, in the case now before

6    the Court?

7          THE WITNESS:  I do.

8          THE COURTROOM DEPUTY:  You may have a seat.

9          State your full name, spelling your last.

10         THE WITNESS:  Thomas S. Walker.  W-A-L-K-E-R.

11         THE COURTROOM DEPUTY:  Thank you.

12                    THOMAS WALKER,

13   called as a witness by the Defendant, and having been first

14   duly sworn, was examined and testified as follows:

15                  DIRECT EXAMINATION

16   BY MR. SAUNDERS:

17   Q     Good afternoon, Judge Walker.

18         And I address you as Judge Walker because you are, in

19   fact, a retired district judge; is that correct?

20   A     Correct.

21   Q     Where did you serve as a judge?

22   A     In Southern Oklahoma.

23   Q     Was that in state court rather than federal?

24   A     Yes.

25   Q     How many years were you on the Oklahoma bench?

1    A       I was elected in 1978, took the bench in January of '79,

2    and was unelected in 2010, and retired at the end of 2010.

3    Q       So that's, I believe, about 32 years; is that right?

4    A       I believe that's correct.

5    Q       And that was an elected position?

6    A       Yes.

7    Q       How many times were you elected?

8    A       Well, every four years, except . . . I didn't have but

9    one opponent, and he prevailed.

10   Q       So there was one time when you were not elected?

11   A       There was one time when I was not elected.

12   Q       And that was in 2010?

13   A       Yes, sir.

14   Q       What type of cases did you handle during your 32 years

15   as a judge?

16   A       In Oklahoma there is but one court system, the District

17   Court, and it is a court of general jurisdiction.  The Court

18   handles everything from small claims to class actions, traffic

19   tickets to capital murder.

20           So when I started, I did what the chief told me to do.

21   And when I became the chief, I did what I pleased.

22   Q       So you became chief judge at some point?

23   A       Yes, sir.

24   Q       When was that?

25   A       About the last ten years.

1    Q      And in addition to serving as a judge on the district

2    court, the court of general jurisdiction, did you serve on any

3    special courts or commissions within the district court?

4    A      Yes.  Because Oklahoma is such a rural state, we don't

5    have a separate tax court, and so the court of tax review is

6    composed of one district judge from each of the judicial

7    districts.  And, for several years, I was the representative

8    from my judicial district, until I was appointed to the court

9    on the judiciary, which is the disciplinary body for judges,

10   and I just didn't have time to do all three, so I asked to be

11   removed from the court of tax review.

12   Q      And you continued to serve on the disciplinary

13   committee?

14   A      The court on the judiciary.  It was a nine-judge court.

15   Q      And did you also serve as a president of the Oklahoma

16   Judicial Conference?

17   A      I was the president in 1993.

18   Q      Now, since your retirement in 2010, from District Court,

19   are you still working as a judge?

20   A      In a manner of speaking, yes.  I guess to cut to the

21   chase, not all Indian tribes have their own court system; and

22   those that don't can look to the BIA for a court system.  And I

23   am a -- I guess you'd call it a contract judge.  I work on a

24   per diem basis as an appellate judge for seven -- six Indian

25   tribes in the western part of the state.

THOMAS WALKER – DIRECT/SAUNDERS                 188

1    Q      Now, you mentioned BIA.  Is that the Federal Bureau of

2    Indian Affairs?

3    A      Yes.  I'm sorry.  I forgot, I'm not in Oklahoma anymore.

4    Q      So you are employed at this point by the federal

5    government; is that right?

6    A      I guess that's the case, yes.

7    Q      So you can get back to work now?

8    A      Yes.

9    Q      And how long have you been serving on the court for the

10   Bureau of Indian Affairs?

11   A      Year and a half.

12   Q      Are you part Indian, yourself?

13   A      Yes.

14   Q      Do you serve on the state ethics commission in Oklahoma?

15   A      Yes.

16   Q      What is that?

17   A      The ethics commission is created by the Oklahoma

18   constitution.  It is five members appointed by different

19   entities.  We promulgate and enforce the rules for ethical

20   conduct for all state officials, be they elected, appointed, or

21   just employees; and we promulgate and enforce the rules for

22   campaign financing for state officials who are elected.

23   Q      Now, who appointed you to the ethics commission?

24   A      The chief justice of the state supreme court.

25   Q      And for how long have you served on that commission?

1    A       A little over two years.  It's a five-year term.

2    Q       Going back to before 1978, when you were first elected,

3    where did you practice as an attorney?

4    A       In Norman, Oklahoma, just south of Oklahoma City.  And

5    then in the town where I live now, Ardmore, which is

6    maybe . . . 80 miles, 90 miles south of Oklahoma City.

7    Q       What type of law did you practice?

8    A       If they could walk in the door and pay a fee, that's

9    what I did.

10   Q       Did you also serve as a district attorney or assistant

11   district attorney?

12   A       I was an assistant district attorney for a very short

13   time.

14   Q       Apart from your legal career, you have also had a career

15   in the military; is that correct?

16   A       Yes.

17   Q       And let me ask you to describe that career and -- well,

18   let me ask you:  What years were you in the service?

19   A       From 1968 until 2005.

20   Q       What were you doing during for that period of time?

21   A       Well, after undergraduate school, I was in the army.

22   And after I was discharged from the army, I went to law school.

23   And in law school I joined the National Guard.  I stayed in the

24   National Guard until I couldn't get promoted anymore.  And then

25   I transferred to the army reserve.

1   Q      So you joined the army in 1968?

2   A      Yes.

3   Q      Did you do a tour in Viet Nam?

4   A      I did.

5   Q      And with the National Guard, what rank did you achieve?

6   A      Brigadier general.

7   Q      Is that an appointment that's approved by the U.S.

8   Congress?

9   A      By the Senate; yes.

10  Q      And when were you appointed as a brigadier general?

11  A      I think the appointment was in . . . September of 1999,

12  I believe.

13  Q      So are you addressed as Judge Walker, or General Walker,

14  or either, or both?

15  A      Well, my favorite is Pops.  That's what my grandkids

16  call me.  It depends on who it is.

17  Q      I'll stick with Judge Walker.

18  A      Okay.

19  Q      All right.  Do you know Patricia Hough?

20  A      Yes.

21  Q      How long have you known her?

22  A      Since the fall of 1964.

23  Q      So 49 years; correct?

24  A      Yes.

25  Q      Where did you meet?

1   A      On the campus of Phillips University in Enid, Oklahoma,

2   where we both went to undergraduate school.

3   Q      Were you in the same class at Phillips?

4   A      Yes.

5   Q      And what class was that, what graduating year?

6   A      1968.

7   Q      How large was the class at Phillips, the graduating

8   body?

9   A      Counting graduate students, 1,300, maybe; 1400?  Not

10  very large.

11  Q      Did you know Dr. Hough very well when you were in

12  college together?

13  A      Reasonably well.

14  Q      Did you run in the same circles or different circles?

15  A      Different.

16  Q      How so?

17  A      Pat was probably the more traditional student at a

18  church school.  And I was . . . not.  I didn't let classes

19  interfere too much with my college education.

20  Q      Were you on friendly terms with her?

21  A      Oh, yes.  Oh, yeah.

22  Q      And after you graduated in 1968, and you went into the

23  army, did you stay in touch?

24  A      No.  We . . . after a time, when we both started going

25  back to reunions, we reestablished friendship.

THOMAS WALKER – DIRECT/SAUNDERS                    192

1    Q      And when was that, that you reestablished contact?

2    A      Oh, Lord.  I'm going to guess five or six years later.

3    I really don't remember.

4    Q      Five or six years after graduation?

5    A      Yes.  Probably the mid-seventies.  It's just a guess.  I

6    think that's the first time I attended a reunion, and my

7    recollection is that Pat was there, but that was a long time

8    ago.

9    Q      Have you seen her regularly at reunions since then?

10   A      Yes.

11   Q      And did you develop a relationship with her, which we'll

12   go into shortly, in which you saw her more frequently than just

13   at reunions?

14   A      Yes.

15   Q      Did you ever meet her husband, Dr. David Fredrick?

16   A      Yes.

17   Q      How many times have you met him?

18   A      Three or four, maybe?  Five?

19   Q      Is that when he would accompany her to the reunions?

20   A      Yes.

21   Q      What was your impression of him?

22   A      Told a lot of jokes.  Seemed like a nice guy.

23   Q      Now, Phillips University, you said that was a church

24   college; correct?

25   A      Yes.

1   Q      And that school went bankrupt and closed in 1998; is

2   that right?

3   A      Yes.

4   Q      But it's alumni continued to have reunions?

5   A      Yes.

6   Q      Is there still today an activity alumni association of

7   Phillips University?

8   A      Very.

9   Q      And what does that alumni association do?

10  A      We provide opportunities for alums to stay connected

11  with each other, and we provide a minuscule scholarship for

12  music students.

13  Q      Does the alumni association have a board of directors?

14  A      Yes.

15  Q      Did you serve on that board?

16  A      I am the chairman and the president of the association.

17  Q      When did you become involved with the board of the

18  association, the alumni association?

19  A      2009?

20  Q      Is Dr. Hough also a member of that board?

21  A      Yes.

22  Q      Did she join before or after you?

23  A      Before.

24  Q      Do you and Dr. Hough both share a passion for the school

25  you attended?

1   A       I'm not confident "passion" is a strong enough word; but

2   yes.

3   Q       How often does the board of the alumni association meet?

4   A       Minimum of four times a year.

5   Q       Where are those meetings held?

6   A       Typically in Enid, Oklahoma, which is where the campus

7   was located; from time to time in Tulsa, which is in the

8   eastern part of the state; and in Oklahoma City, which is in

9   the central part of the state.

10  Q       And you are aware that Dr. Hough lives here in Florida;

11  is that correct?

12  A       I am aware of that; yes.

13  Q       How many of those minimum four meetings a year does she

14  typically get to?

15  A       Depending on her work in Central America, two to three.

16  Q       Two to three a year?

17  A       Yes.  It varies from year to year.

18  Q       And when a board member can't attend a meeting of the

19  alumni association board, is there a proxy system in place

20  whereby they can vote through another member?

21  A       Yes.

22  Q       And on those occasions when Dr. Hough cannot attend, are

23  you typically her proxy?

24  A       Yes.

25  Q       Is Dr. Hough a valued member of that board?

1   A       Absolutely.

2   Q       Now, apart from the alumni association, are you familiar

3   with something called the Phillips legacy foundation?

4   A       I am.

5   Q       And what is that?

6   A       It is a charity, the purpose of which is to provide

7   scholarships to students at church-related liberal arts

8   schools.

9   Q       Where, if you know, did that foundation get its

10  endowment; where did it get its money to give those

11  scholarships?

12  A       When the school closed, as it was going through the

13  bankruptcy process, a lot of artwork was discovered.  And it

14  was a circumstance of where you see something so often you

15  don't see it anymore.  And it was not until the bankruptcy that

16  all of the artwork was gathered into one place, and someone

17  realized:  We've got some money here.

18          So after the artwork was auctioned off, and all the

19  debts of the school were paid, there was a little over

20  $3 million left.  And it was . . . held, I guess you could say,

21  as an endowment for these scholarships.

22  Q       And has that endowment been invested and continue to

23  fund these scholarships over the years?

24  A       Yes.

25  Q       And by the way, who owns the Phillips Legacy Foundation?

1   A      Can't be owned.  It's a charity.  I mean, it doesn't

2   issue stock.

3   Q      Is it a 501C3 charity under United States law?

4   A      Yes.

5   Q      That means it's a nonprofit organization; correct?

6   A      Yes.

7   Q      So if no one owns it, who controls it, who directs it?

8   A      The board of directors.

9   Q      Okay.  So in addition to the alumni association, the

10  Phillips legacy foundation also has a separate board of

11  directors?

12  A      Yes.

13  Q      And do you serve on that board as well?

14  A      Yes.

15  Q      And when did you join?

16  A      2010, I believe.

17  Q      Was Dr. Hough also a member of that board?

18  A      In 2010?

19  Q      Yes.

20  A      Yes.

21  Q      Has Dr. Hough, to your knowledge, also been a

22  contributor to the legacy foundation?

23  A      One of the largest.

24  Q      I am sorry, I didn't hear the answer.

25  A      One of the largest.

1    Q      Do you know if she attended Phillips University on

2    scholarship?

3    A      I think so.

4    Q      And has she, in connection with the legacy foundation,

5    demonstrated a commitment to giving back to the school so that

6    other students can have the opportunities that she had?

7    A      Demonstrated as a -- again, not a strong enough word.

8    But yes.  Sorry.

9    Q      How did you come to be involved with the board of

10   directors of the Phillips legacy foundation?

11   A      Pat called me and asked me.

12   Q      And did you have an understanding of why she wanted you

13   to join her on that board?

14   A      Yes.  She was very displeased at the way it was being

15   operated.  The initial 3 million, I think it was 3.2 million,

16   had dwindled to just over 500,000.  And she wanted someone that

17   knew more about how those things worked, to ask the questions

18   that she didn't know to ask.

19   Q      Knew more than who?

20   A      Than she.

21   Q      About what?

22   A      Well, how charities are funded, and . . . ours was a

23   little bit more complicated because there was three entities,

24   and . . . it was difficult for her to keep up with the . . .

25   the -- I guess you could say integrated financing of the three.

THOMAS WALKER — DIRECT/SAUNDERS                    198

1   Q      What do you mean by the three entities?

2   A      Well, when the university closed it went through

3   bankruptcy.  But it still existed as a 501C3, not-for-profit

4   educational -- yes, educational institution.  And it stayed

5   open, and continues to stay open, because there were, and

6   continue to be, estates, the beneficiary of which is Phillips

7   University.

8          And so the plan is, once all of those estates are

9   received, then the university will dissolve as a legal entity,

10  and those monies transferred either to the legacy foundation or

11  to the surviving theological seminary.

12         And so the finances of all three were intertwined,

13  and . . . she knew something was going wrong, but couldn't

14  figure out what it was.

15  Q      The three entities being the university itself, which

16  still survives to receive these estates --

17  A      Yes, sir.

18  Q      -- the legacy foundation, and the third being a

19  seminary?

20  A      The third being the alumni association . . . .  The

21  legacy foundation is a Type 3 supporting charity of . . . the

22  alumni association.

23  Q      Is it a fairly complicated structure?

24  A      It is.

25  Q      And have you had an opportunity, during your years

1   working with Dr. Hough on both boards, to form an opinion

2   regarding her level of financial sophistication?

3   A     Yes.

4   Q     And what is that opinion?

5   A     I would not use the word "high."  She's very smart lady,

6   to the point of being a brilliant lady; but that's just not her

7   strong suit.

8   Q     Does she appear, in your conversations and meetings with

9   he, to understand the details of the financial structure of

10  these three different entities and how they relate to each

11  other?

12  A     No.

13  Q     In your work on the board, on the legacy foundation

14  board, are members at meetings presented with financial

15  statements?

16  A     Yes.

17  Q     Do you recall, at any of these meetings, Dr. Hough

18  asking any questions about the detailed entries on the

19  financial statements?

20  A     I don't want to nitpick.  She would ask questions, but I

21  wouldn't say they were about the detailed entries on the

22  financial statements.  It was more of a . . . "I don't

23  understand this, can you explain this to me" kind of question.

24  Q     And would she ask those questions to you or to the

25  board?

1    A       On no, I'm sorry.  I misled.  Our treasurer.  Our

2    treasurer would present the report.  And she would ask the

3    treasurer, "I don't understand --

4               MS. FINLEY:  Objection, Your Honor, hearsay.

5               THE COURT:  Sustained.

6    BY MR. SAUNDERS:

7    Q       Did you observe her, during your meetings with the

8    foundation board, to be knowledgeable regarding accounting

9    issues?

10   A       No.

11   Q       What about regarding investments?

12   A       No.

13   Q       Would she be the one on the board asking questions about

14   investments and interest rates, and rates of return, and fees,

15   and the like?

16   A       No.

17   Q       When the board -- well . . . did the board have occasion

18   to actually vote on financial-related matters?

19   A       Yes.

20   Q       What type of matters would come before the board for a

21   vote?

22   A       We had a finance committee, and it had almost complete

23   authority.  But if something different was contemplated, then

24   it had to be presented to the entire board for, I guess you

25   could say, approval, or confirmation.

1    Q      And on those occasions when you were present with

2    Dr. Hough at meetings where financial issues came up for a

3    vote, did she look to you to guide her on how to vote?

4    A      To a certain extent.  Probably others more than me.  But

5    yes, to a certain extent.

6    Q      Did you observe her turning to others for guidance on

7    how to vote?

8    A      Oh, yes, absolutely.

9    Q      And when or others gave her guidance, did you observe

10   her to vote as was suggested?

11   A      Yes.

12   Q      So with respect to the Phillips legacy foundation, is it

13   correct that she relied on others for guidance about financial

14   matters that she did not understand?

15   A      Yes.

16   Q      Now, you mentioned the finance committee, that's a

17   finance committee that made these presentations to the board;

18   is that right?

19   A      I think it's the investment committee.  If I said

20   "finance," I misspoke.  It's called the investment committee.

21   Q      Is Dr. Hough on that committee?

22   A      No.

23   Q      And to your understanding, when Dr. Hough has relied on

24   others to guide her in those matters in connection with the

25   foundation, is that because those matters are beyond her areas

1    of expertise?

2    A       Yes.

3    Q       Based open your own personal experience with Dr. Hough,

4    do you know her to be someone who relies on others for advice

5    and guidance in areas that are beyond her particular fields of

6    expertise?

7    A       Oh, absolutely.

8    Q       Have issues relating to tax status come up before the

9    foundation?

10   A       Yes.

11   Q       What type of issues?

12   A       There are those on the board of directors who believe

13   that we should apply to the IRS to change our tax status from a

14   Type 3 supporting charity to a publicly supported charity.

15   Q       And has that been brought up for a vote before the

16   board?

17   A       No.

18   Q       Has it been brought up for discussion?

19   A       It began as informal discussions, sort of among

20   ourselves, and was brought to the board, I think, for a formal

21   discussion.  I think it was after . . . .  I think it was after

22   Pat left, but I'm not positive about that.

23   Q       Do you recall being present with her at any time when

24   these matters relating to the change in tax status were being

25   discussed?

1    A       Oh, absolutely.

2    Q       Prior to her leaving the board?

3    A       Yes.

4    Q       And at that time, when those issues were raised, did you

5    form an impression of her understanding of those issues?

6    A       Yes.

7    Q       What was that impression?

8    A       She did not understand the ins and outs of it, and did

9    not understand . . . that it did not change the legal

10   relationships, only the tax status of one charity.

11   Q       Was that explained to her?

12   A       I think I did.  I'm not positive.

13   Q       And when you would take the time to explain things to

14   her, would that help her understand it?

15   A       Oh, sure.

16   Q       How often does the board of the legacy foundation meet?

17           You said the alumni board meets, I think, quarterly?

18   A       Yes.  A minimum of four times a year, but I would say it

19   averages three to five, depending on what's going on at the

20   time.

21   Q       And those are in addition to the meetings of the alumni

22   association?

23   A       Yes.

24   Q       Is Dr. Hough's attendance at the legacy foundation

25   meetings at the time she was on the board about the same?

1    A      Yes.

2    Q      Two to three times a year?

3    A      Yes.

4    Q      Now, you said, when she asked you to join, you

5    understood she was displeased with the way that the

6    foundation's assets were being spent; is that right?

7    A      Yes.

8    Q      Did you, once you joined the board, join with her in

9    opposing the way that the foundation was going through its

10   assets?

11   A      Yes.

12   Q      Is it fair to say, based on your interactions with

13   Dr. Hough, that she is fiscally conservative?

14   A      Very.

15   Q      Have you ever known her, in the 49 years that you have

16   known her, to be extravagant or to act like she has a lot of

17   money?

18   A      No.

19   Q      Have you ever known her to act as a person who has

20   millions of dollars squirreled away in secret bank accounts?

21   A      No.

22   Q      During all the years that you have known her, some

23   50 years, with a break in there, have you ever had reason to

24   doubt Dr. Hough's integrity?

25   A      No.  Absolutely not.

1   Q      Have you ever known her to take shortcuts, or bend the

2   rules, or violate the law?

3   A      Quite the contrary.

4   Q      What do you mean?

5   A      Well, when she asked me to join the board of directors,

6   she had this sense that things weren't copasetic, that

7   something was not being done according to Hoyle, and . . . said

8   to me, "You'll know the questions to ask.  I don't."

9   Q      Have you had the opportunity, in the 49 years that you

10  have known Dr. Hough, to form an opinion as to her character

11  for truthfulness and honesty?

12  A      Absolutely.

13  Q      And what is it?

14  A      Top drawer.  No hesitation.  No reservation.  Absolute

15  top drawer.

16  Q      Now, it's been part of your job for more than three

17  decades to judge people's character and truthfulness; is that

18  right?

19  A      Yes.

20  Q      And has your opinion of Dr. Hough's character for

21  honesty been consistent across all the years that you've known

22  her?

23  A      Yes.

24  Q      Now, let me ask you if your opinion would change –– let

25  me withdraw that.

1           Have you reviewed the indictment in this case?

2    A      No.

3    Q      Do you know what Dr. Hough is charged with?

4    A      You gave me about a seven-word synopsis, and that's what

5    I know.

6    Q      That's about it.

7    A      That's about it.  I started to look it up, and I

8    thought:  No, I better not.

9    Q      Let me ask, now, if your opinion of her character would

10   change if I were to tell you that the government is alleging,

11   in this case, that Dr. Hough took millions of dollars from the

12   foundation that ran the medical schools that she was involved

13   with in the Caribbean; converted those monies to her own use;

14   hid them in secret Swiss bank accounts under her name, for her

15   own use and benefit; failed to declare that money on her tax

16   returns; and conspired with her husband and others to defraud

17   the United States and the Internal Revenue Service.  Let me ask

18   you to assume that that's what the government is alleging in

19   this case.

20   A      Okay.

21   Q      Does the nature of those allegations change your

22   opinion?

23   A      No.

24   Q      Why not?

25   A      Not at all.  I wouldn't be here if it changed my

1    opinion.

2    Q      Why?

3    A      With no disrespect to the Judge, I was a judge a heck of

4    a long time, and -- and -- and I value my word, and I don't

5    give it lightly.  And if I had any hesitation, I wouldn't be

6    here.

7    Q      Well, what about the allegations that I've told you of

8    these serious breaches and violations, and taking money, and

9    concealing money, and failing to declare it, and conspiring to

10   defraud the IRS, does knowing that those are the nature of the

11   allegations, in more detail than you've known it before, change

12   your opinion about whether she's an honest and truthful person?

13   A      Not in the least.

14   Q      And why not?

15   A      It's just not the Pat Hough that I've known for all

16   these years, that I went to a tiny college with, and I would

17   see from year to year, over the years, and then over the last

18   five or six years become acquainted with again.  That's just

19   not that person.

20   Q      Would it be consistent with your knowledge of

21   Dr. Hough's personality and character for her to have relied on

22   others for guidance in connection with financial matters

23   relating to the schools that she was involved with?

24   A      I would be surprised if she didn't.  I mean -- I'm

25   sorry.  Absolutely yes, that is in keeping with her character.

1              MR. SAUNDERS:  One moment, please, Your Honor?

2              I have no further questions.

3              THE COURT:  All right.  Thank you.

4              Ms. Finley?

5              MS. FINLEY:  Thank you, Your Honor.

6                        CROSS EXAMINATION

7    BY MS. FINLEY:

8    Q       Good afternoon.

9    A       Good afternoon.

10   Q       I just wanted to go over, I just want to make sure that

11   I understand how you -- you described two different boards of

12   directors, so I just want to make sure I understand.

13           There's a board of directors for the legacy foundation;

14   is that right?

15   A       Yes, ma'am.

16   Q       And then there's a board of directors for the alumni

17   association.

18   A       Yes, ma'am.

19   Q       And --

20   A       There's actually three.

21   Q       And the third one?

22   A       The university, because it's still a legal entity, has

23   its own board of trustees.  And I'm a member of that board of

24   trustees.

25   Q       And are you on the board of directors of the alumni

1    association?

2    A      Yes, ma'am.

3    Q      And you're also on the board of directors for the legacy

4    foundation.

5    A      Yes.

6    Q      Okay.  And Dr. Hough, she's on the board of directors

7    for the alumni association --

8    A      Yes, ma'am.

9    Q      -- and the legacy foundation.

10   A      Was.

11   Q      Was.  Not presently.

12   A      Correct.  She resigned.

13   Q      Okay.  Is she a representative to the legacy foundation,

14   or is that the same thing?

15   A      She was.

16   Q      And you said that you've sort of become better

17   acquainted with Dr. Hough in the last five to six years.

18   A      Yes, ma'am.

19   Q      And do you -- and that she's one of the university's or

20   the school's largest contributors --

21   A      I believe she is; yes, ma'am.

22   Q      -- monetarily.

23   A      Yes, ma'am.

24   Q      Do you know where she gets the money from to give those

25   charitable contributions?

1    A       I assume she draws a salary of some kind.

2    Q       And do you know anything about her personal finances?

3    A       No, ma'am.

4    Q       Do you know -- you said that you believe that

5    she's . . . doesn't spend extravagantly, or . . . .  She lives

6    maybe a frugal life?

7            Is that what your understanding is?

8    A       I have never seen anything that would lead me to

9    conclude that she tends toward extravagance.

10   Q       Would you . . . find -- would it change your opinion if

11   she lived in a $2.5 million house on the water with an

12   elevator?

13           That's not extravagant?

14           MR. SAUNDERS:  Objection, Your Honor, with no

15   evidence about how much was actually paid for that house as

16   opposed to its current value today.

17           THE COURT:  Overruled.

18           THE WITNESS:  I'll have to give you kind of a weasel

19   answer:  That kind of house in Southern Oklahoma is a mansion.

20   That kind of house in Los Angeles might be a hovel.  I can't

21   answer that without a context.  And I'm sorry.  And I'm not

22   trying to be evasive.

23   BY MS. FINLEY:

24   Q       No.  That's a fair enough answer.

25           Would a $1.6 million house in Asheville, North Carolina,

1    would that be extravagant, or is that the same answer?

2    A       I don't know.  I have driven through Asheville.  That's

3    all I know about it.

4    Q       So you don't really know anything about her finances

5    other than your . . . four or five times a year, you see her at

6    an alumni association meeting, to base your statement that

7    she's frugal.

8    A       Yes, ma'am.  Yes, ma'am, that's correct.

9    Q       Okay.  Now, you said that she's fiscally conservative, I

10   guess, when it comes to things with the board?

11   A       Yes, ma'am.

12   Q       And so she knows when to speak up if she has questions.

13   A       Oh, absolutely.

14   Q       She's not shy.

15   A       No.

16   Q       She speaks her mind.

17   A       Yes, ma'am.

18   Q       She inquires, she solicits your advice when she doesn't

19   understand something.

20   A       Yes, ma'am.

21   Q       Now, with respect to Dr. Hough, would you say that she's

22   detail oriented?

23   A       I guess, to be a physician, you have to be.  I mean, you

24   have to be observant to be a physician.

25   Q       Now, how does someone get -- if we're talking just first

1    about the alumni association board --

2    A        Yes, ma'am.

3    Q        -- how does someone get to be on that board?

4    A        We have a nominations committee.  And each year, when

5    there are vacancies, they seek out alums to be a member.  And

6    I'm assuming that she was sought, whenever she became a member

7    of the board.

8    Q        And do you know if the alumni association has a website?

9    A        Yes and no.  All three entities have a website under

10   Phillips University.  And then there are . . . what do you call

11   them, pull-down menus, one for the university, one for the

12   alumni association, and one for the legacy foundation.

13             MS. FINLEY:  Your Honor, may I approach the witness?

14             THE COURT:  You may.

15   BY MS. FINLEY:

16   Q    I'm going to show you what's been marked as Government's

17   Exhibit 31.

18             THE COURT:  You might want to move the microphone a

19   little closer to it.

20             THE WITNESS:  I'm sorry.  My voice carries so much

21   that I don't often use a microphone.

22             THE COURT:  We'll see.

23             I'm sorry.  That's 31?

24             MS. FINLEY:  Thirty-one, Your Honor.

25             THE COURT:  Thank you.

1          MR. SAUNDERS:  I have two different ones.

2          MS. FINLEY:  They are together.  I just stapled them.

3    I'm sorry.  That was my bad stapling job.  That's why the

4    paperclip is around them both.

5    BY MS. FINLEY:

6    Q     If you could take a look at Exhibit 31, and does this

7    appear to be the -- a printout of the Phillips University

8    Alumni and Friends Association board of directors website page?

9    A     It doesn't look like it.  I mean, it doesn't have

10   photographs and the artwork.

11   Q     If you take a look in the pages within it, are there

12   photographs?

13   A     Oh, I see.  Yes.  Okay.

14   Q     And is there a date on the bottom, today's date?

15   A     Yes, ma'am.

16         MS. FINLEY:  Your Honor, at this time the government

17   would move into evidence Exhibit 31.

18         THE COURT:  Any objection?

19         MR. SAUNDERS:  Objection to at least portions of it

20   as hearsay, Your Honor.  There are postings and statements and

21   those sorts of things that are completely -- actually, the

22   whole document is hearsay.

23         THE COURT:  Do you care to be heard?

24         MS. FINLEY:  I will just ask him questions about it

25   then.  I will withdraw my moving into evidence of the document

1    and use it for identification at this point.

2                THE COURT:  All right.

3    BY MS. FINLEY:

4    Q      Is there an entry for Dr. Hough?

5                MR. SAUNDERS:  Your Honor, if the document is not in

6    evidence, testimony about its contents is improper.

7                THE COURT:  I'll overrule the objection.

8                You can give a yes-or-no answer.

9                THE WITNESS:  Ask it again.

10   BY MS. FINLEY:

11   Q      Is there an entry for Dr. Hough?

12   A      Yes.

13   Q      And Dr. Hough is actually on the budget and finance --

14               MR. SAUNDERS:  Excuse me.  Your Honor?

15               MS. FINLEY:  I'll rephrase the question.

16               THE COURT:  Okay.

17   BY MS. FINLEY:

18   Q      Do you know if Dr. Hough is on the budget and finance

19   committee for the Phillips University Alumni Association board

20   of directors?

21   A      She is not.

22   Q      Was she at one point?

23   A      Not that I know of.  I didn't appoint her.  But I don't

24   know.  She may have been.

25   Q      Now, Mr. Saunders asked you about what you knew about

1    the indictment in this case.

2    A      Yes, ma'am.

3    Q      And have you heard any of the evidence that's been

4    presented in this case?

5    A      No.

6    Q      And you don't know what the jury has heard.

7    A      Correct.

8    Q      And all you've heard is the -- I think Mr. Saunders said

9    it was one or two sentences that he described what he believed

10   the allegations were, to you.

11   A      Yes, ma'am; right.

12   Q      And, as a judge, you would want to consider all of the

13   evidence before forming an opinion, would you not?

14   A      Well, of course.

15   Q      And so you would want to keep an open mind.

16   A      Sure.

17   Q      And so it's possible, if you heard all of the evidence,

18   that you might change your opinion about whether Dr. Hough is

19   honest or not.

20           MR. SAUNDERS:  Objection, speculation, Your Honor,

21   and foundation.

22           THE COURT:  Overruled.

23           THE WITNESS:  Well, sure.

24           MS. FINLEY:  No further questions, Your Honor.

25           THE COURT:  Mr. Saunders, any redirect?

1        MR. SAUNDERS:  Briefly, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MR. SAUNDERS:

4    Q      Judge Walker, you said in response to the prosecutor's

5    question of whether Dr. Hough is detail oriented, I believe you

6    said --

7    A      Yes.

8    Q      -- that she would have to be, to be a physician; is that

9    right?

10   A      Well, yes.  I think so.

11   Q      Based on your observations and your dealings with her

12   over the years, do you believe her to be as detail oriented in

13   every other aspect of her life as she would be in her role as a

14   physician?

15         MS. FINLEY:  Objection, Your Honor, "every other

16   area," I'm not sure -- foundation.

17         THE COURT:  Sustained.

18   BY MR. SAUNDERS:

19   Q      The question was a general question of, do you believe

20   her to be detail oriented, without restriction.  And you

21   answered with respect to her role as a physician.

22   A      Yes.

23   Q      So my question is, with respect to the general question

24   that was asked, do you believe her to be detail oriented,

25   period . . . in general, with respect to whatever, do you

1    believe she is as detail oriented in other aspects of her life

2    as she would be in her role as a physician?

3              MS. FINLEY:  Objection, foundation.

4              THE COURT:  Overruled.

5              THE WITNESS:  I can answer that only to that which I

6    have observed --

7    BY MR. SAUNDERS

8    Q      That's all I'm asking for.

9    A      -- only that which I have observed.  And the answer is

10   no.

11   Q      What do you mean by that; what have you observed?

12   A      Well, again, it's why I got involved with the legacy

13   foundation in the first place.  Pat asked me to do it because

14   there were things going on --

15             MS. FINLEY:  Objection, Your Honor, hearsay.

16             THE COURT:  Sustained.

17   BY MR. SAUNDERS:

18   Q      Put aside what she said, and focusing on what you've

19   observed, what's the basis for your belief that she is not as

20   detail oriented in other aspects of her life as she might be in

21   medicine?

22   A      I hate to say this about a friend, but sometimes the

23   questions that she would ask at the board of directors

24   meetings, of the treasurer, she just didn't quite get it, what

25   was going on.

1    Q       And would those be with respect to detailed issues going

2    on with the foundation?

3               MS. FINLEY:  Objection, hearsay.

4               THE COURT:  Overruled.

5               THE WITNESS:  Yes, sir.

6               MR. SAUNDERS:  Nothing further.  Thank you, Your

7    Honor.

8               THE COURT:  Any recross?

9               MS. FINLEY:  No, Your Honor.

10              THE COURT:  You may stand down.  Thank you.

11              Why don't you leave that there.  The government will

12   get that if they need it.

13              THE WITNESS:  Thank you, sir.

14              (The witness left the witness stand and left the

15        courtroom.)

16              THE COURT:  You may call your next witness.

17              MR. SAUNDERS:  Your Honor, the government calls --

18   excuse me, the defense calls Antoine Solagnier.

19              COURT REPORTER:  Can you spell those names for me,

20   please?

21              MR. SAUNDERS:  S-O-L-A-G-N-I-E-R.

22              THE COURT:  Right up here, please.

23              THE COURTROOM DEPUTY:  If you'd raise your right

24   hand.

25              Do you solemnly swear or affirm to tell the truth,

1    the whole truth, nothing but truth, in the case now before the

2    Court?

3              THE WITNESS:  Yes, I do.

4              THE COURTROOM DEPUTY:  You may have a seat.

5              State your full name, spelling -- state and spell

6    your full name.

7              THE WITNESS:  My full is Antoine Solagnier.  First

8    name is A-N-T-O-I-N-E; last name, S-O-L-A-G-N-I-E-R.

9              THE COURTROOM DEPUTY:  Thank you.

10             MR. SAUNDERS:  Could I ask the clerk to --

11             THE COURTROOM DEPUTY:  I'm sorry, S-O-L --

12             THE WITNESS:  S-O-L-A-G-N-I-E-R.

13             THE COURTROOM DEPUTY:  Thank you.

14             MR. SAUNDERS:  Can we switch over to that side?

15             THE COURTROOM DEPUTY:  I did.

16             MR. SAUNDERS:  Thank you.

17                       ANTOINE SOLAGNIER,

18   called as a witness by the Defendant, and having been first

19   duly sworn, was examined and testified as follows:

20                       DIRECT EXAMINATION

21   BY MR. SAUNDERS:

22   Q      Good afternoon, sir.

23   A      Good afternoon.

24   Q      Where do you currently live?

25   A      I live on the island of Curacao.

1   Q      Where is Curacao?

2   A      Curacao is off the coast of Venezuela in the Caribbean

3   Sea.

4   Q      And what work do you do on Curacao?

5   A      Currently I'm an independent consultant.

6   Q      Consultant on what?

7   A      Business startups and finances.

8   Q      Did you formally live on the island of Saba?

9   A      Correct.

10  Q      And were you a member of the government of Saba?

11  A      Yes.

12  Q      Were you, in fact, the governor of Saba?

13  A      Correct.

14  Q      What position, or positions, did you hold on Saba with

15  the government, and for what period of time?

16  A      I moved to Saba in 1993, when I assumed the position of

17  head of finance.  The head of finance is also the head of the

18  civil registry of the island government.  I held that position,

19  or those positions, until 1999.  I had also assumed the

20  position as acting public prosecutor from the years 1994 to

21  1999; and, on behalf of the island government, I was a board

22  member of the Development Bank of the Netherlands Antilles.

23          THE COURT:  Can the jury hear all right?

24          All right.  Go ahead.

25

1   BY MR. SAUNDERS:

2   Q      And, at some point did you -- what year did you become

3   governor?

4   A      I became governor in 1999.

5   Q      Is it lieutenant governor, or governor, or is there a

6   difference?

7   A      There is no difference.  It is generally referred to as

8   both of them.  And lately they have been referring to it

9   as . . . to solve the issue, they call it the island governor.

10  Q      So were you the head honcho, if you will, the top of the

11  Saban government, during the years in which you served from

12  1999 to 2006?

13  A      Yes.  The chairman of the island counsel, the chairman

14  of the executive counsel.  It is a position that is an

15  appointed position by, ultimately it's the Dutch Queen that

16  wrote my -- that signed my assignment.  But it is the Dutch

17  government that selects the person.

18  Q      So you were selected by the government and appointed --

19  commissioned by the Queen?

20  A      Correct.

21  Q      What were your duties -- let's go back to your first

22  years, from 1993 to 1999, as head of finance and head of the

23  civil registry.  What were your duties in those regards?

24  A      I was responsible for all budgetary affairs of the

25  island government.  I was responsible for collection of all

1  taxes, and all other revenues of the island, and for

2  overlooking all expenditures, making sure they fall within the

3  budget, etcetera, on behalf of the island council.

4  Q     And what about as a board member of the Development Bank

5  of the Netherlands Antilles?

6  A     The board member, exercised as part of the board, the

7  supervisory functions over the functioning of the director of

8  the Development Bank.

9  Q     And, as the civil registry, the head of the civil

10  registry, what was that about?

11  A     Responsible for maintaining all registers, and also

12  performing all duties and assignments such as weddings and

13  such.

14  Q     And as . . . by the way, are you familiar with what the

15  tax rates were for real estate transfers on Saba in the mid

16  2000s?

17  A     Poof.  I would . . . if memory serves me right, anywhere

18  between four and seven percent.

19  Q     Okay.  Thank you.  What were your duties, then, when you

20  became governor?

21  A     As I said, the island governor is responsible for --

22  it's the chairman of the island council, the parliament of the

23  island.  Also, the chairman and voting member of the executive

24  council, the executive branch of the island government.  The

25  chief of police also.

1    Q      What length of time were you appointed?

2    A      I was, in fact, appointed for two terms; one starting in

3    1999, for six years, and the second one starting in 2005.

4    However, the second one I did not complete.  I quit after

5    approximately one year.

6    Q      Why did you quit?

7    A      It was an agreed-upon deal with the Dutch Minister.

8    There were some duties he wanted me to complete, some

9    assignments that he wanted me to complete; and additionally, at

10   that time, I was done with 90 percent of those assignments, as

11   well as a good opportunity came for me to become the . . .

12   registrar of the common courts of the Netherlands Antilles.

13   Q      And that was in 2006?

14   A      Correct.

15   Q      And you said you became, I'm sorry, registrar of the

16   common courts of the Netherlands Antilles?

17   A      Yes.  It's the person responsible for all operational

18   matters of the common court of the Netherlands Antilles.  The

19   sign outside, I think I read that the equivalent here is the

20   court clerk.

21   Q      And how long did you serve there?

22   A      That was for two years.

23   Q      Where was that based?  Were you still on Saba?

24   A      No.  To execute that, that was in Curacao.

25   Q      That's when you moved to Curacao?

1    A       Correct.

2    Q       And after you completed your service as the registrar,

3    what did you do next?

4    A       I became the manager of operations of Arubian Police

5    Force.

6    Q       That's on the island of Aruba?

7    A       That's correct.

8    Q       What were your duties in that position?

9    A       All matters of personnel, finance, housing, information,

10   automation, everything except the . . . the duties of the

11   police officers itself.  All operative matters.

12   Q       When you left Aruba, did you go back to Curacao?

13   A       Correct.

14   Q       And you are now serving as a business and financial

15   consultant; is that right?

16   A       Correct.  But for one year and six months I was also,

17   besides already performing independent services, I managed also

18   the national park on Curacao.

19              MR. SAUNDERS:  Can I ask if we can just put Defense

20   Exhibit 116 up on the screen?  I don't think I need to provide

21   it to the witness.  It's a photograph.  He can look at it from

22   there.

23              (An exhibit was projected onto the projector screen.)

24   BY MR. SAUNDERS:

25   Q       Who is the dashing fellow on the left of that

1    photograph?

2    A       The person on the left of the photograph is myself.

3    Q       And who are the other people in the photograph?

4    A       Next to me is Commissioner Will Johnson, and after that

5    is Dr. Hough.  There's a fourth person I do not recognize.

6    Q       Who was Commissioner Will Johnson?

7    A       Will Johnson is a . . . a veteran politician on the

8    Island of Saba, had served for something like 40 years in all,

9    in different positions, was senator and an island council

10   member, and the last position was an executive council member

11   commissioner.

12   Q       And are you familiar with the location that's depicted

13   in this photograph as an area known as Round Hill on the Island

14   of Saba?

15   A       That is correct.

16   Q       And is this where the campus of the Saba University

17   School of Medicine stands today?

18   A       Yes.

19   Q       You moved to Saba, you said, in 1993; and that's when

20   you became head of finance; is that correct?

21   A       That's correct.

22   Q       And was that about the time that the Saba School opened?

23   A       Yes.  It opened right around -- or became operational

24   right around then.  If memory serves me right, the first class

25   was in session when I moved there in December of '93, with

1   something around 20 students.

2   Q      And when . . . when development was made on Round Hill,

3   as depicted in this photograph, do you recall when that was?

4   A      Yes.  This occurred soon after November, 1999, which is

5   when a hurricane struck the Island of Saba.  The . . . .  Yes.

6   Q      And were you governor at the time?

7   A      Yes.  Correct.

8   Q      What was the population of Saba when you first moved

9   there in 1993?

10  A      Approximately 1200 inhabitants.

11  Q      Did that change over the years, as the Saba School

12  became successful?

13  A      Correct.  It has changed considerably.  When I left in

14  2006, the island population was between 2,000 and 2,100.  Which

15  includes a good number of students, because the number of

16  students has increased over the years.  As well as faculty and

17  family members of the students.  But also included people who

18  migrated to Saba because of the increased economic activity on

19  the island.

20  Q      So you said that the number of students increased.  Do

21  you recall how large the first class was when you first got to

22  Saba in 1993?

23  A      Yeah.  I thought it was 19, but it could be 20.  But not

24  more than 25.  It was very, very small.

25  Q      And how many students were there by the time you left

1    Saba in 2006?

2    A      I believe it was 319 students.

3    Q      Is that just students on the island, apart from anybody

4    doing rotations in the U.S.?

5    A      Yes; students studying and residing on the island.

6    Q      Did the Saba School have a positive impact on the

7    economy of the Island of Saba?

8    A      Yes.

9    Q      What percentage, if you know, of the economy, or of the

10   gross domestic product of Saba, did the school represent by the

11   time you left?

12   A      Based on a study that was carried out in 2004, and which

13   result remained the same all the way through 2006, the economy

14   of the island was . . . divided roughly in three equal

15   organizations, one being -- one third being revenues from

16   tourism of the island, one third being subsidies that the

17   island got and received from the Dutch government and the

18   Netherlands Antillean government, and one third of the economy

19   is attributable to the presence of the medical school.

20   Q      And how does the school contribute to the economy?

21   Where does it generate that money?

22   A      Well, first of all, the employees of the medical school

23   contribute their income taxes to the island government coffers;

24   but mainly it is to do with the economic activity to house the

25   number of students that's there.  300 students, or roughly 300

1    students, with faculty and family members, etcetera, are all

2    people who need to rent houses, drive cars, be able to have

3    groceries available for them, and telephone service available

4    for them, and so on; so you can imagine that it does add up, on

5    a small-scale island like Saba, to a considerable percentage.

6    Q      Is it fair to say that the school has transformed the

7    island in your time there?

8    A      Yes.  It has transformed it not only economically, but

9    also socially.  Many services that were not available prior to

10   the arrival of the medical school were made available partially

11   due to the presence of the school.

12          MR. SAUNDERS:  Could I please ask you to display

13   Defense Exhibit 117?

14          (An exhibit was projected onto the projector screen.)

15   BY MR. SAUNDERS:

16   Q      And showing you Defense Exhibit 117, a photograph of the

17   Saba School, is this the same location, this Round Hill

18   location, that we were looking at in the undeveloped prior

19   photograph, Exhibit 116?

20   A      Correct.

21   Q      And is this what the school, to your knowledge, looks

22   like today?

23   A      Yes.

24   Q      When did you first meet Dr. Hough?

25   A      I first met, shook hands, and spoke words to Dr. Hough

1   in 1999, so after I became -- I assumed the position of

2   governor of the island.

3   Q       Did you meet her husband, Dr. David Fredrick, at the

4   same time?

5   A       Correct.

6   Q       And over the years that you were on Saba as the

7   governor, did you come to develop a relationship with them?

8   A       Yes.

9   Q       Would they spend time with you when they were on the

10  island?

11  A       Yes.

12  Q       In your role as governor, who did you understand owned

13  the Saba School of Medicine?

14          MS. FINLEY:  Object . . . .  I withdraw.

15          THE COURT:  You may answer.

16          THE WITNESS:  The Saba School of Medicine is . . .

17  the property owned by the Saba School of Medicine Foundation.

18  BY MR. SAUNDERS:

19  Q       Okay.  And was the Saba School of Medicine Foundation a

20  Netherlands Antilles foundation?

21  A       Correct.

22  Q       Chartered under Netherlands Antilles law?

23  A       Yes.

24  Q       And who did you understand owned that foundation?

25  A       There is no such thing as an owner of a foundation.  A

1   foundation is a legal entity that has no transferable shares.

2   Q      And is that true for every foundation under Netherlands

3   Antilles law, to your knowledge?

4   A      Correct.

5   Q      Does Netherlands Antilles law permit a foundation to be

6   owned by an individual?

7   A      No.  Not at the time.

8   Q      And have there been some changes at some point?

9   A      There have been some changes, but the changes have been

10  recent, and I do not carry . . . have enough knowledge to tell

11  you anything sensible about it.

12  Q      But at any rate, at the time that the Saba Foundation

13  was formed, that was prior to any of these changes; correct?

14  A      Correct.

15  Q      So that is a foundation that, by definition, cannot be

16  owned by any individual?

17  A      Correct.

18  Q      So if it's not owned, who is a foundation, under

19  Netherlands Antilles law, governed, or run by?

20  A      It is governed by its own statutes, the bylaws of the

21  foundation, which stipulates what purpose the funds may be used

22  for.

23  Q      And the bylaws don't actually make decisions.  Who makes

24  the decision on behalf of the foundation?

25  A      The decision maker is the board of the foundation.

1    Q      The board of directors?

2    A      The board of directors, yes.

3    Q      So is it correct that a Netherlands Antilles foundation

4    can be managed and directed by individuals, but not owned by

5    individuals?

6    A      Correct.

7    Q      And does the fact that an individual, in directing or

8    managing the foundation, or acting on the foundation's behalf,

9    makes decisions in connection with the foundation's financial

10   affairs, transform the foundation's assets into that

11   individual's assets?

12   A      No, it does not.

13   Q      Were you aware -- put back up, please, 117.

14          Were you aware of the sale of this Round Hill property

15   to The Foundation was taking place?

16   A      Yes.

17   Q      And I'm sorry, was it your understanding that it was the

18   Foundation that was buying this property?

19   A      Yes.

20   Q      Was the government involved, and encouraging The

21   Foundation to buy the Round Hill property?

22   A      Yes.

23   Q      How did that sale come about?

24   A      That sale came about after November of 1999, when the

25   island was hit by a hurricane.  We had encouraged the . . . the

```
 1    Saba School to buy property and start constructing their own

 2    facilities because, up until that point, it was all operated

 3    out of rental properties; and within the government there

 4    existed the fear that the school could have moved, easily, to a

 5    different location.

 6          And why that is a risk is because the local citizens of

 7    the island, in the meantime, have started making investments,

 8    and building apartments, and starting their own little

 9    enterprises; and they would be left holding the short end of

10    the stick if the school had decided to move.

11          So we encouraged the board to make an investment and

12    to . . . yes, to remain, and be operational on Saba.

13    Q       And did the board follow that request, and set down

14    stakes, and purchase that property?

15    A       Yes.

16    Q       Are you aware that the Round Hill property was,

17    initially at least, purchased in the name of a third party?

18    A       I was made aware of it after the fact.  Not at that

19    point.

20    Q       When?

21    A       It was approximately a year after the purchase had taken

22    place.

23    Q       Okay.  Was that somehow . . . hidden as a secret from

24    the Saba University and government that it was purchased in the

25    name of a third party?
```

1    A        No.  Not to my knowledge.  The fact was revealed in a

2    newspaper article that it was not in the name of the foundation

3    that it was purchased.  But that fact does not surprise me.

4    Q        Why not?

5    A        That is -- it is not necessary for the property to be in

6    the name of The Foundation for The Foundation to have access to

7    it.

8    Q        Well, in your . . . in your role as a financial

9    consultant, does buying that property in the name of a third

10   party make sense to you?

11   A        Yes, it does.

12   Q        Why is that?

13   A        For different reasons.  The main reason is to protect

14   the . . . the asset, to protect the enterprise -- the operation

15   of the organization.  And the other one is that eventual sale

16   to other parties could be done easier, as well.

17   Q        Easier by putting it in the name of a third party?  How?

18   A        Well, if the third party is a company, for example, you

19   can transfer the shares instead of transferring the property.

20   Q        And if a third party -- if the third party is an

21   individual?

22   A        That doesn't make that much of a difference.

23   Q        For purposes of the first reason you gave, asset

24   protection, does it matter whether the third party is an

25   individual or an entity?

1    A       No.

2    Q       Now, are you aware of a procedure in the Netherlands

3    Antilles by which a plaintiff in litigation, who is suing

4    somebody, can freeze the assets of the party they're suing

5    while that lawsuit remains pending?

6    A       Yes.

7    Q       And, under the law of the Netherlands Antilles, can that

8    freeze go on indefinitely?

9    A       Yes.

10   Q       Is that, in fact, in your experience, a common practice

11   used by litigants on Saba to put pressure on their opponents?

12   A       Not on Saba, but in the Netherlands Antilles as a whole.

13   And it is a practice that does . . . it's quite common.  It is

14   used to put pressure on the other party to get moving on the

15   issue.

16   Q       And can a plaintiff who freezes assets under Netherlands

17   Antilles law effectively put their opponent out of business if

18   the freeze lasts long enough?

19   A       Correct, yes.

20   Q       Now, in your work as a financial consultant, if you were

21   advising a client in the Netherlands Antilles who was facing

22   repeated lawsuits, and the possibility of having assets frozen,

23   what would you counsel them to do?

24   A       I would counsel them to . . . to protect different parts

25   of the operation in different entities so that the complete

1  operation of the organization is not at stake at any given

2  moment.  So capital would be -- it would be advisable not to

3  keep it all in one hand.  And also property, or parts of the

4  properties, not to keep them all in one hand.

5  Q       And what about as far as location for putting the

6  assets?  What would you advise them?

7  A       I would advise to put them not only in different

8  entities, but also in different countries.

9  Q       Why?

10  A       For the same purpose, because if the ownership of any of

11  these entities is eventually traced to the same organization,

12  the plaintiff would then seize, also, those properties; and

13  having them outside of the Netherlands Antilles makes it harder

14  for the plaintiff to achieve such.

15  Q       And would that be your advice to clients back in the mid

16  1990s, as well as today?

17  A       Yes.

18  Q       In your experience as head of the finance department on

19  Saba, as the governor as Saba, as working for the Development

20  Bank on Saba, or Development Bank of the Netherlands Antilles,

21  is there anything unusual or abnormal about a Netherlands

22  Antilles foundation putting its assets in Swiss bank accounts

23  to protect them from being frozen in response to litigation?

24  A       No.

25  Q       Is that, in fact, a sound business practice?

1   A       Yes, for . . . depending on the type of business and the

2   type of risks that the business is incurring.

3   Q       Okay.  So if a business is facing a higher risk of

4   lawsuits, then it makes more sense for them to be taking the

5   actions we have been discussing; correct?

6               MS. FINLEY:  Objection, leading.

7               THE COURT:  Sustained.

8   BY MR. SAUNDERS:

9   Q       When you say it depends on the level of risk, what do

10  you mean?

11  A       The size of the operation is one factor that need to

12  take concerned with.  And also the risks that the organization

13  is assuming.  And in relationship to the -- the Saba School of

14  Medicine, the organization is one that was being placed under

15  pressure by different parties, by competing schools in the

16  area, from forces within the school, itself, which --

17              MS. FINLEY:  Objection, Your Honor, foundation, as to

18  how he knows any of these things.

19              THE COURT:  Sustained.

20              THE WITNESS:  I didn't understand.

21              MR. SAUNDERS:  You don't have to answer.  Let me ask

22  a different question.

23  BY MR. SAUNDERS:

24  Q       Were you aware, in your role within the government of

25  Saba, of pressure being placed on the school by certain

1   factions within the government?

2            MS. FINLEY:  Objection, leading.

3            THE COURT:  Sustained.

4   BY MR. SAUNDERS:

5   Q    What risks to the Saba University School of Medicine

6   were you personally aware of in connection with your own

7   function as governor and the things you observed while you were

8   on the island?

9   A    The -- what I said, the risks, and the . . . and the

10  pressures being felt by the organization, some of it were, as I

11  said, from other medical schools that were trying to start up

12  in the region, in the Caribbean region, trying to steal

13  students, and steal revenue from . . . from the Saba School of

14  Medicine.  This was done through . . . through media attacks,

15  and spreading information that was not correct towards the

16  potential student, or actually even towards the students that

17  were at the school already, trying to lure them away to study

18  in other universities.

19  Q    Were you aware of an attempt, in the late 1990s, by

20  people within the school, to take over the school and basically

21  take its property and assets for themselves?

22           MS. FINLEY:  Objection, foundation and hearsay.

23           THE COURT:  Overruled to the extent I'll take a yes

24  or no answer, then we'll proceed from there.

25

1   BY MR. SAUNDERS:

2   Q      Were you aware of that happening?

3   A      Yes.

4   Q      How were you aware of it?

5   A      I was aware of it through information I received from

6   the directors of the school, as well as the former dean of the

7   school.

8              MS. FINLEY:  Objection, hearsay.

9              THE COURT:  Let him finish identifying his sources,

10  then I'll rule on the objection.

11  BY MR. SAUNDERS:

12  Q      I'm sorry, you said from directors of the school?

13  A      Yes.

14  Q      And?

15  A      And former deans of the school.

16  Q      And were you aware, in the mid 1990s, in your capacities

17  within the government at the time, I suppose as the head of

18  finance and civil registry, of lawsuits being filed against the

19  Saba School and the Saba Foundation?

20             MS. FINLEY:  Objection, leading.

21             THE COURT:  Sustained.

22  BY MR. SAUNDERS:

23  Q      Do you know whether any lawsuits were filed, in the mid

24  1990s, against the Saba Foundation and the Saba school?

25  A      Personally, I only know of one.

1    Q      What's the one that you know of personally?

2    A      It was a student that . . . in my capacity as public

3    prosecutor, I was shipping him off the island because he did

4    not behave according to our legislation.  And had seized assets

5    from the school to try to claim some damages from the school as

6    well.

7    Q      So he turned around, sued the school, and actually froze

8    the assets?

9    A      Yes.

10   Q      And when was that, to the best of your recollection?

11   A      That was, if I have to estimate, around 1996.

12   Q      Now, were you aware, from your interactions with the

13   school and your role as the governor, of what Dr. Hough's role

14   was in connection with the school?

15           MS. FINLEY:  Objection, leading.

16           THE COURT:  Overruled.

17   A      Dr. Hough's?  To be quite honest, the exact the title --

18           THE COURT:  Hang on a second.  That calls for a yes

19   or no answer.

20   BY MR. SAUNDERS:

21   Q      Were you aware of what role she served for the school?

22   A      Yes.

23   Q      And were you aware of that because somebody told you, or

24   because you personally observed her performing that role?

25   A      Because I personally observed her performing.

1   Q       Okay.   And based on your personal observations, what

2   role did she fill?

3   A       The role that Dr. Hough filled was the one of . . .

4   assuming the responsibility for the quality and the contents of

5   the product that was delivered by the Saba School of Medicine.

6   Q       What did that actually entail?  What did she actually

7   do?

8   A       The area where I had most contact with her is the area

9   of obtaining accreditation for the school's educational

10  services by various organizations in different countries --

11  continents and countries.

12  Q       What was the nature of your contact with her in

13  connection with accreditations?

14  A       We prepared together to receive parties that would come

15  from different states and from different countries to visit the

16  school who also had an interest in discussing with the

17  government the relationship between the government and the

18  medical school.  Prior and afterwards.  There was only one

19  occasion that that took me off the island.  All the other

20  instances, the parties came to the island.

21  Q       And when you went off the island, did you meet up with

22  Dr. Hough in connection with an accreditation?

23  A       Yes.   I traveled to California, and I met with her, and

24  Dr. Fredrick also, there.

25  Q       They were both there for that accreditation in

1    California?

2    A        Correct.

3    Q        In your proposal as both head of finance and as

4    governor, did you -- did financial matters ever come up that

5    you needed to -- financial matters relating to the school, or

6    the school's relationship with the government, that you needed

7    to discuss with somebody at the school?

8    A        Yes.

9    Q        And when those matters would come up, who did you speak

10   to?

11   A        Financial matters was mainly Dr. Fredrick is my . . . my

12   contact.

13   Q        Do you ever discuss those financial matters with

14   Dr. Hough?

15   A        I tried to.  But Dr. Hough would always refer those

16   matters to Dr. Fredrick.

17              MS. FINLEY:  Objection.

18              THE COURT:  Sustained.

19   BY MS. FINLEY:

20   Q        What would Dr. Hough tell you to do?

21              MS. FINLEY:  Objection, hearsay.

22              THE COURT:  It's hearsay.  Do you want to come to

23   sidebar?

24              MR. SAUNDERS:  Yes, Your Honor.

25                         AT SIDEBAR

1    MR. SAUNDERS:  Your Honor, I believe the statement,

2  "Talked to Dave Fredrick about that," is not an assertion of

3  fact, it's a direction, and as such is a verbal act.  It is not

4  for the truth of the assertion, it is a direction which is not

5  essentially a statement that would constitute hearsay.

6    THE COURT:  You're past that.  The question was

7  calling for an answer that he's about to relay what the

8  defendant said as being offered by the defendant.  It's

9  hearsay.

10    MR. SAUNDERS:  Except what the defendant said in this

11  case isn't being offered for the truth of anything.  It is not

12  an assertion of fact.  It is as if I said to Ms. Finley,

13  "Please sit down."  That's not an assertion, it's a verbal act.

14  It's a direction, an order, a command; and, as such, is not

15  offered for the truth of anything.

16    THE COURT:  I agree with that.  That's not what

17  you're calling for.  What was your question?

18    MR. SAUNDERS:  The question is, "What did she direct

19  you to do when you went to her?"  I believe that was the

20  question.  "What did she direct you to do when you went to her

21  with these matters?"

22    THE COURT:  I'm not going to allow that.

23    MR. SAUNDERS:  Okay.

24                        IN OPEN COURT

25    THE COURT:  You may proceed.

1        MR. SAUNDERS:  Thank you, Your Honor.

2   BY MR. SAUNDERS:

3   Q       Mr. Solagnier, are you currently working with the Saba

4   School of Medicine Foundation?

5   A       Yes.

6   Q       Has that foundation continued to exist even though the

7   schools have been sold?

8   A       Yes.

9   Q       Where is it currently headquartered?

10  A       It is currently headquartered in Guatemala.

11  Q       And what are you presently working with the Saba

12  Foundation on, what project?

13  A       There is a poultry project that The Foundation wants to

14  put in place.  An egg farm to deliver eggs to hungry children,

15  basically.  For which I'm preparing the business plan.

16  Q       Where is that planned egg farm located?

17  A       In the district of Zacapa in Guatemala.

18  Q       Who are you currently working with on the foundation in

19  connection with that project?

20  A       My main point of contact is a gentleman by the name of

21  Florencio Gonzalez Montenegro.

22  Q       And Mr. Montenegro grow is a member of The Foundation?

23  A       Yes.

24  Q       Anyone else that you are currently dealing with on the

25  foundation, other than Mr. Montenegro?

1    A       I have met also with Dr. Bautista, and a gentleman by

2    name of Martine.  I'm sorry, but I forgot his last name.

3    Q       And is Dr. Bautista, based on your dealings with him,

4    also associated with the Saba Foundation currently?

5            MS. FINLEY:  Objection, leading.

6            THE COURT:  Overruled.

7            MR. SAUNDERS:  You can answer.

8            THE WITNESS:  Yes.

9    BY MR. SAUNDERS:

10   Q       Let me ask you this, Mr. Solagnier, during the years

11   that you have known Dr. Hough, since were you first introduced

12   to her in 1993, and knowing her more over the years, have you

13   ever had reason to doubt her honesty or integrity?

14   A       No.

15   Q       Have you had the opportunity, in your dealings with her,

16   to form an opinion of Dr. Hough's character for truthfulness

17   and for honesty?

18   A       Yes.

19   Q       What is that opinion?

20   A       I have no reason to mistrust her truthfulness or

21   honesty.

22   Q       Has she ever given you reason to mistrust her?

23   A       No.

24   Q       Has your opinion as an honest and truthful person

25   remained consistent across the 20 years that you've known her?

1    A       Yes.

2                MR. SAUNDERS:   Thank you.

3                I have no further questions, Your Honor.

4                THE COURT:  All right.  Thank you.

5                Ms. Finley?

6                MS. FINLEY:  Thank you, Your Honor.

7                          CROSS EXAMINATION

8    BY MS. FINLEY:

9    Q       Good afternoon.

10   A       Hi.

11   Q       And I'm sorry, can you say your last name again?

12   A       Solagnier.

13   Q       Solagnier.  Mr. Solagnier, you are not on the board of

14   The Foundation.

15   A       No.

16   Q       And you never have been on the board of The Foundation.

17   A       No.

18   Q       And you have no personal knowledge about Dr. Fredrick or

19   Dr. Hough's personal finances.

20   A       Personal finances, no.

21   Q       And you don't have any personal knowledge about . . . if

22   we go from 2007 backward, toward the inception of the

23   foundation, you have no personal knowledge about The

24   Foundation's finances.

25   A       No.

1    Q      And you don't know whether The Foundation has entities,

2    or was doing things for asset protection, do you.

3    A      No.

4    Q      And you never gave them advice about how to do asset

5    protection.

6    A      In the early 1990s, in 1994, I did have a question that

7    I answered to the then dean, Dr. Buchanan, about the . . .

8    vulnerability of a foundation.

9    Q      And you don't know how they -- if they even implemented

10   your advice from 1994 through when they sold the school, or The

11   Foundation sold the school.

12   A      I did not give him any advice.  He had a question, I

13   answered it.

14              MS. FINLEY:  Okay.  And . . . .

15              Court's indulgence?

16              Now, if we can just look at Exhibit 3V, Page 1, which

17   has been admitted.

18         And permission to publish?

19              THE COURT:  You may.

20              MR. HOCHMAN:  3B?

21              MS. FINLEY:  V, as in victor.  I'm sorry, let me get

22   it for you.  I apologize.

23   BY MS. FINLEY:

24   Q      Do you recognize this document?

25   A      Yes.

ANTOINE SOLAGNIER - CROSS/FINLEY                    247

1    Q      All right.  Is this the . . . I guess the charter, or

2    the articles of incorporation, for The Foundation?

3    A       The first page.  The cover sheet.

4    Q      And the pages coming after, those are the . . . .

5    A       Those are the actual articles.

6    Q      Okay.  And if we look under -- on Page 2, it was created

7    in 1988; is that correct?

8    A       Correct.

9    Q      And it appears that Dr. Fredrick was there personally,

10   and another individual, named Thomas Johnson, was also

11   involved, but he did not appear personally.

12   A       Correct.

13   Q      And you don't know whether Dr. Johnson provided -- I

14   guess provided Dr. Fredrick a power of attorney?

15             MR. SAUNDERS:  Objection to foundation, Your Honor.

16             THE COURT:  I guess that was the question, whether he

17   knows.  So the objection is overruled.

18   BY MS. FINLEY:

19   Q      Do you know?

20   A       It is stated here that Mr. Johnson has a power of

21   attorney.  Sorry, Mr. Bizot has a power of attorney .

22             MR. SAUNDERS:  Objection, motion to strike, if he's

23   simply reciting what's in the document.

24             THE COURT:  That's overruled.  He may publish any

25   portion of the document, because it has been admitted.

ANTOINE SOLAGNIER – CROSS/FINLEY                248

1   BY MS. FINLEY:

2   Q      So it appears from the document that Mr. Johnson

3   provided Mr. Bizot with a power of attorney to act for him?

4   A      Yes.

5   Q      And if we move down to the middle of the page, under

6   purpose?  "The purpose of the foundation is to provide for the

7   education, training, of healthcare professionals, as well as

8   promoting the general well-being of the residents of the Island

9   of Saba."

10  A      Correct.

11  Q      Do you think that spending $1.6 million on a house in

12  Asheville, North Carolina, is for the benefit of the residents

13  of the Island of Saba?

14              MR. SAUNDERS:  Objection, improper hypothetical, Your

15  Honor.

16              THE COURT:  Sustained.

17  BY MS. FINLEY:

18  Q      If Dr. Fredrick and Dr. Hough took $1.6 million from The

19  Foundation to buy a house in Asheville, North Carolina, do you

20  think that that would be for the general well-being of the

21  residents of the Island of Saba?

22              MR. SAUNDERS:  Objection.  Again, improper

23  hypothetical.  And . . . that's it.

24              THE COURT:  Okay.  That objection is overruled.

25  A      Okay.  If . . . if one of these persons had taken money

1    from The Foundation to buy an asset somewhere else?  If that is

2    a benefit of the school?

3    Q      Yes.

4    A      It could be.  As compensation for work performed for the

5    foundation.

6    Q      But you don't know if that is for the –- if it's not for

7    the compensation?  And they just took it?

8    A      I don't know that.

9    Q      I'm saying, in the hypothetical, if it was not for

10   compensation, and they just took the money, that wouldn't be

11   for the benefit of Saba.

12           MR. SAUNDERS:  Same objection, Your Honor.

13           THE COURT:  Same ruling.

14   BY MS. FINLEY:

15   Q      And you don't know whether Dr. Fredrick and Dr. Hough

16   obeyed the rules set forth in this document when operating The

17   Foundation.

18   A      I know that there was no issue raised in conformity with

19   the document over the years that I've been living and working

20   on Saba.

21   Q      But you don't know how they ran the school or how they

22   used the money.  You don't know how Dr. Fredrick and Dr. Hough

23   used money from the Foundation.

24   A      No.

25   Q      And you said that now The Foundation is doing work in

1    Guatemala.  Did The Foundation then amend its purpose to now

2    benefit the people of Guatemala?  If you know?

3    A       I don't know.

4              MS. FINLEY:  No further questions.

5              THE COURT:  Mr. Saunders?

6              MR. SAUNDERS:  May I have a moment, please, Your

7    Honor?

8              THE COURT:  You may.

9              MR. SAUNDERS:  This may be a good stretch time.

10             THE COURT:  You mean for the jury?

11             MR. SAUNDERS:  For the jury.

12             THE COURT:  Sure.  If you need to stretch, go ahead.

13             (Mr. Saunders and Mr. Hochman confer privately.)

14                        REDIRECT EXAMINATION

15   BY MR. SAUNDERS:

16   Q      Mr. Solagnier, you said, in response to the prosecutor's

17   question that . . . I believe you said that, in 1994, Dean

18   Buchanan asked you a question about the vulnerability of The

19   Foundation, and you answered him?

20   A       He asked me a question concerning the difference between

21   a foundation and an incorporated company under the laws of the

22   Netherlands Antilles.

23   Q      And you said that related to vulnerability.  What type

24   of vulnerability was he asking you about?

25   A       Taxation.

1    Q       And did you answer his question?

2    A       Yes.

3            MR. SAUNDERS:  I have nothing further, Your Honor.

4            THE COURT:  Anything else from the government for

5    this witness?

6            MS. FINLEY:  Nothing further, Your Honor.

7            THE COURT:  You may stand down.  Thank you.

8            (The witness left the witness stand and left the

9        courtroom.)

10           THE COURT:  You may call your next witness.

11           MR. HOCHMAN:  Your Honor, there is sort of a legal

12   issue we'd like to discuss with the Court and potentially get a

13   ruling, rather than going to sidebar in the middle of the

14   witness.  It will take . . . it might take a little bit of a

15   while.  So I don't know if the Court wants to break for the

16   day, and do the legal ruling now, and then we can bring the

17   witness back on Monday or Tuesday of next week, whenever you'd

18   like to do that.

19           THE COURT:  Let's come to sidebar for at least a few

20   minutes.

21           MR. HOCHMAN:  Thank you, Your Honor.

22                          AT SIDEBAR

23           THE COURT:  Give me a preview of what the issue is.

24           MR. SAUNDERS:  The issue relates to the document that

25   Mr. Hochman was discussing up at sidebar before, the

1    exhibit . . . .

2           MR. HOCHMAN:  We are intending to call a defense

3    expert witness that we revealed to the government.  Part of

4    what he's going to testify is he conducted an investigation to

5    determine the source of ownership of the Saba School funds.  As

6    part of that, he actually went ahead and talked to two people.

7    He talked to Florencio Montenegro in connection -- and actually

8    received, as part of his investigation, that document that I've

9    showed you before, with the notary stamp on it, from the Saba

10   School Foundation, being signed by Mr. Montenegro.

11          THE COURT:  I remember now.

12          MR. HOCHMAN:  It was Defense Exhibit 141.  And then

13   he also spoke to Erwin Schulthess.  And Erwin Schulthess, you

14   might have seen his name many times, from Sinco Trust.  He was

15   one of the ones that worked with Beda Singenberger as one of

16   the signatories on those accounts.  And he's speaking with

17   Mr. Schulthess from the Sinco Trust financial advisory firm,

18   and with Mr. Montenegro, as part of his expert analysis.

19          He is going to testify that he relied on these

20   documents in coming up with his opinion -- the basis of his

21   opinion.  Under Rule 703 he is allowed to rely on inadmissible

22   hearsay.  Obviously there's a . . . a limiting instruction that

23   the Court could give, but this is different than what we tried

24   to do, before, with these documents.

25          But he will testify that as part of his normal course

1    of conducting an investigation like this -- and, by the way, he

2    was a former assistant special agent in charge of the IRS, and

3    worked for the IRS for 24 years, and conducted hundreds of

4    investigations; so we will be able to establish his

5    qualifications in abundance.

6            THE COURT:  Okay.  I think I've got the idea.  I

7    don't need the entire argument.

8            Do I gather the government objects to the

9    introduction of those two exhibits?

10           MS. FINLEY:  Yes, Your Honor, we would object to

11   Mr. Rivera talking about what these witnesses have said,

12   because that is hearsay.  And I apologize, because I have

13   anticipated this issue, started to look at the issues under

14   Rule 703; and I believe that, while he can rely on hearsay, I

15   am not sure that the hearsay can be elicited at the trial.  He

16   can say that there are things that he relied upon, I am not

17   sure that he can relate what these two witnesses, who are not

18   subject to cross-examination, can testify to.

19           THE COURT:  All right.  Is he your next witness?

20           MR. HOCHMAN:  We actually can call Special Agent

21   Lalli, who is a much more brief witness.  At least start him

22   today.

23           THE COURT:  Okay.

24           MR. HOCHMAN:  And then we can hold Mr. Rivera for

25   whatever it is, Monday or Tuesday.

1          THE COURT:  All right.  Here is my memory what the

2     rules are.  And I stand to be corrected.

3          My memory is that an expert witness can testify as to

4     that he did certain investigation, or study.  He can identify

5     the persons that he received information from.  But he cannot

6     testify, on direct, as to the substance of that information.

7     He can state his opinion as to whatever it is, but can't, on

8     direct, state the substance of the information.

9          That may change based upon cross-examination.  In

10    other words, the government could, indeed, ask him to relate

11    what he was told by whoever it was that he had a conversation

12    with; and, of course, if they do, then that opens up on

13    redirect.  But my memory is that the party offering the expert

14    cannot elicit that initially.

15         That's my memory, and that's kind of where I'm at.

16    But I don't have to decide take right now.

17         MR. HOCHMAN:  We can look into it more over the

18    weekend, Your Honor.

19         THE COURT:  And so can I.  But from other cases,

20    that's just my sense of things.

21         We have two notes.  One of them, Juror Number 5, has

22    a parent teacher conference Monday, at 8:15, and is worried

23    that she might be late if we started at 9:00.  She asked that

24    we start at 9:30 on Monday.

25         MR. HOCHMAN:  That's fine, Your Honor.

1          THE COURT:  The other juror, who didn't sign it,

2     says -- and let me read it.

3          "In view of the complexity of this matter, and in an

4     effort to facilitate the deliberation process, would you give

5     the jurors permission to take their notes with them over the

6     weekend?"

7          I'm inclined to say no.

8          MR. HOCHMAN:  I would say no, as well, Your Honor.

9          MS. FINLEY:  The government would agree.

10         THE COURT:  All right.  And what should I tell them

11    in terms of timing?

12         MR. HOCHMAN:  We are going to make a decision this

13    weekend, Your Honor, on whether or not to call Dr. Hough.  But

14    we will certainly have the decision ready by Monday.  Absent

15    that, there will be Special Agent Lalli and our defense expert.

16         MR. SAUNDERS:  And potentially John Nekic.  Who will

17    actually be brief if we call him.

18         MR. HOCHMAN:  Again, there was a travel issue.  He

19    was here for a week, and then he went back home; and we are

20    trying to bring him back out.  So if we don't call Dr. Hough,

21    we would definitely be done within probably two or three hours

22    of additional testimony.  If we do call Dr. Hough, I would say

23    probably a full day for her testimony.

24         THE COURT:  Assuming Dr. Hough does not testify, does

25    the government anticipate rebuttal?

1          MS. FINLEY:  I don't think so, Your Honor.

2          And, just for the record, we offered to keep

3  Dr. Nekic around, and offered to let him testify, at the

4  government's expense, once we released him; so, as far as

5  travel . . . .

6          MR. SAUNDERS:  We couldn't get to him that day

7  because we also had other witnesses who had travel issues, and

8  then he had to go.

9          THE COURT:  All right.  Again, assuming Dr. Hough

10  does not testify, will the parties anticipate giving closing

11  arguments on Monday?  We still have to do a charge conference.

12  You've got my draft.  You have the weekend.  Unless you want to

13  do it tonight.

14          MR. HOCHMAN:  We just got it, and, unfortunately, I

15  didn't have a chance to take a look at it because I was getting

16  ready for today.

17          THE COURT:  That's fine.  So I guess my question is

18  would you estimate giving closings on Monday?

19          MS. FINLEY:  The government would anticipate closing

20  on Monday if Dr. Hough does not testify.

21          MR. HOCHMAN:  I don't know if we can finish closings

22  on Monday, but . . . .

23          THE COURT:  Leads into my next question:  How long do

24  you anticipate?

25          MS. FINLEY:  I think my gut reaction would be my

1   closing argument would probably be an hour, and I would

2   reserve -- I probably would ask for half -- no more than half

3   an hour for rebuttal.  That would be my gut reaction.

4               MR. HOCHMAN:  And usually my closing is about equal

5   to the government's arguments; so if they're an hour and a

6   half, ours will be an hour and a half, Your Honor.

7               THE COURT:  All right.  For openings, the government

8   underestimated and -- excuse me, the government overstated the

9   amount -- I said that backwards.  Anyhow, we aren't always

10  right.  I understand that.  But both of you are within the

11  right range in terms of what I would allow.

12              MR. SAUNDERS:  Would the Court consider breaking at

13  this point?

14              THE COURT:  That's what I'm actually thinking about.

15              MR. HOCHMAN:  I'm sure it would make the jurors

16  happy.

17              THE COURT:  I was actually trying to get Tuesday,

18  so . . . .  I've got a personal commitment that I'm going to

19  have to break, but I don't see any way around that.

20              MR. HOCHMAN:  Is that all of Tuesday, or part of

21  Tuesday?

22              THE COURT:  It's an hour, but it's in Jacksonville,

23  so it's . . . .  He's just going to have to retire without me.

24              Okay.  Does it make sense to start with the agent or

25  not?

1          MR. HOCHMAN:  We're not going to finish with him,

2    Your Honor.

3          MR. SAUNDERS:  And I can also represent that I can

4    probably spend over the weekend culling down the direct that I

5    can't right now.

6          THE COURT:  With that promise, I'll tell the jury

7    they can go home.  I'm going to inquire and see if there's any

8    problems for next week.  Through Wednesday?

9          MR. HOCHMAN:  Yes.  If the defendant testifies, we

10   will probably close on -- if the Court's going on Tuesday, part

11   of it at least, it would be Wednesday.

12         MR. SAUNDERS:  And then there is the time for

13   deliberations, which I don't think has really been discussed

14   with them.

15         THE COURT:  That's on them.

16         MR. HOCHMAN:  And by the way, Your Honor, I just

17   wanted the apologize again for this morning.  It was, as I said

18   before, unprofessional, an emotional response, totally uncalled

19   for, and I'll make sure it never happens again.

20         THE COURT:  We're fine.

21         MR. HOCHMAN:  Okay.

22         THE COURT:  And I appreciate that, and . . . not a

23   problem.

24         MR. HOCHMAN:  Okay.  Thank you very much, Your Honor.

25                      IN OPEN COURT

1          THE COURT:  All right.  I have two notes from one of

2    the recesses.  One is, because of a scheduling issues, one of

3    the jurors wanted to know if we could start at 9:30 on Monday.

4    The answer is yes, we will.

5          The other note is someone wanted to take their notes

6    home over the weekend.  And I will not allow that.  The notes

7    need to be left here.  And the reason for that is, when you

8    deliberate, you can't start deliberating until you're all

9    together, at the end of the case.  And so I really don't want

10   you taking home your notes and doing whatever you intend to do.

11   I appreciate the effort, but we just can't do that.

12         In terms of the conclusion of the case, we're going

13   to come back Monday at 9:30.  I'm going to tell you what my

14   best estimate is, and you are not going to believe me, because

15   I've been wrong once already; but I'm thinking the case will

16   get to you by Wednesday.  I know that wasn't what I told you

17   during the selection process.

18         Do we have anyone with problems with that?

19   Scheduling issues?  If we have to come back Monday . . . well,

20   Monday through Wednesday.

21         JUROR 3:  Well, I do, but, you know, I guess . . . .

22         THE COURT:  We messed you up enough already?

23         JUROR 3:  I mean, my students -- I'm just worried

24   about my students.

25         THE COURT:  I remember that.

 1          JUROR 3:  And canceling classes for the past two

 2  weeks, and not to mention the timing.  But still, I can go

 3  another week.

 4          THE COURT:  Okay.

 5          JUROR 2:  Not a week.

 6          JUROR 3:  Not a week?

 7          JUROR 2:  Not a week.

 8          THE COURT:  Don't be telling us another week.  I'm

 9  telling you Wednesday, and I'm pretty confident in telling you

10  Wednesday.

11          Anyone else -- does anyone have any insurmountable

12  problems with another three days next week?  No?

13          All right.  I'm going to let you go until 9:30.

14  Please do not discuss the case among yourselves or with anyone

15  else, and do not do any reading or internet research, or any of

16  those other things.  And have a good weekend.

17          I said Monday, right?

18          (The jurors indicated affirmatively.)

19          THE COURT:  Okay.  Monday.

20          (At 4:47 PM, the jury was escorted from the

21      courtroom.)

22          MS. FINLEY:  Your Honor, I was going to suggest we

23  can argue Rule 29 now, or first thing on Monday.

24          THE COURT:  That's a good idea.  I hadn't remembered

25  that, actually.

COURT RECESSED FOR THE DAY                                    261

1              MR. HOCHMAN:  If we could argue it -- and I

2    apologize, Your Honor, I'd like to give it more thought so I

3    can make a more succinct argument.  Maybe we can come in

4    at 9:00 o'clock on Monday, instead of 9:30?

5              THE COURT:  Sure.  We've got half an hour there.  I

6    am not suggesting that you take half an hour.

7              MR. HOCHMAN:  I'll make it as succinct as possible,

8    Your Honor.

9              THE COURT:  All right.

10             MR. HOCHMAN:  All right.  We'll see you

11   at 9:00 o'clock.  Thank you.

12             THE COURT:  Anything else?

13             MS. FINLEY:  No, Your Honor.

14             THE COURT:  What's the matter?  You look

15   disappointed.

16             MS. FINLEY:  No.  I just -- we still have some time,

17   so I just thought we could go now, and so we are ready to go on

18   Monday morning.

19             THE COURT:  All right.  We can wait until Monday.

20             9:00 o'clock for us, 9:30 for the jury.

21             MR. SAUNDERS:  Thank you, Your Honor.

22             MR. HOCHMAN:  Thank you, Your Honor.

23             THE COURT:  Have a good weekend.

24             (At 4:48 p.m., court was recessed, to be reconvened

25        at 9:00 a.m., on Monday, October 21, 2013.)