UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

---

THE UNITED STATES OF AMERICA,

          Plaintiff,

                                  Fort Myers, Florida

vs.                                 October 21, 2013

PATRICIA LYNN HOUGH,             9:00 a.m.

          Defendant.

---

TRANSCRIPT OF JURY TRIAL, DAY NINE

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                          Tax Division
                    P.O. Box 813
                    Washington, DC  20044
                    BY:  CARYN FINLEY, ESQ.

                    U.S. Department of Justice
                          Tax Division
                    Suite 7334
                    601 D Street NW
                    Washington, DC
                    BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

```
                    A P P E A R A N C E S
                (Continued From Previous Page)


FOR THE DEFENDANT:        Bingham McCutchen, LLP
                          The Water Garden
                          1601 Cloverfield Boulevard
                          Suite 2050 North
                          Santa Monica, CA  90404-4082
                          (310) 904-1000
                          BY:  NATHAN J. HOCHMAN, ESQ.

                          Bruce L. Udolf, PA
                          500 East Broward Boulevard
                          Suite 1400
                          Fort Lauderdale, FL  33394
                          (954) 858-8831
                          BY:  BRUCE L. UDOLF, ESQ.


REPORTED BY:      JEFFREY G. THOMAS, RPR-CP, CRR
                  Official Federal Court Reporter
                  United States Courthouse
                  2110 First Street, Suite 2-194
                  Fort Myers, FL  33901
                  (239) 461-2033


                       *  *  *
```

3

I N D E X

| October 21, 2013 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 9 | 4 |
| Motion for Judgment of Acquittal by Mr. Hochman | 9 | 4 |
| Response by Ms. Finley | 9 | 7 |
| Order of Court | 9 | 26 |

– – –

DEFENDANT'S WITNESSES

| WITNESS | DIRECT Vol. Pg. | CROSS Vol. Pg. | REDIRECT Vol. Pg. | RECROSS Vol. Pg. | VOIR DIRE Vol. Pg. |
|---|---|---|---|---|---|
| PATRICIA HOUGH | 9   30 | | | | |

– – –

DEFENDANT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Defendant's Exhibit's 207 Admitted in Evidence | 9 | 83 |
| Defendant's's Exhibits 101 marked for identification | 9 | 89 |
| Defendant's Exhibit 101 Admitted in Evidence | 9 | 90 |

– – –

| | Vol. | Page |
|---|---|---|
| Discussions Re Scheduling | 9 | 286 |
| Court Recessed for the Day | 9 | 289 |

* * *

1        THEREUPON, the above-entitled case having been called

2   to order, the following proceedings were held herein,

3   to-wit:

4                        - - -

5            THE COURT:  Good morning, everyone.

6            MR. HOCHMAN:  Good morning, Your Honor.

7            MS. FINLEY:  Good morning, Your Honor.

8            THE COURT:  All right.  Mr. Hochman?

9            MR. HOCHMAN:  Thank you, Your Honor.

10           Your Honor, we would move, under Rule 29, for a

11  judgment of acquittal on all counts charged against Dr. Hough

12  in this case.  We actually, Your Honor, will submit, based on

13  the lack of government evidence to date to establish each and

14  every one of the elements for a conspiracy, and each and every

15  one of the elements for a 26 United States Code Section 72.061

16  charge.

17           And we will submit on that basis, Your Honor.

18           THE COURT:  All right.

19           MR. HOCHMAN:  The second motion -- or the second

20  renewable motion we would like to bring to the Court's

21  attention is the motion dealing with the co-conspirator

22  statements and exclusion.

23           The government's case is now in, Your Honor.  I think

24  what's come out, particularly -- and I will focus on two

25  individuals, Dieter Luetolf and Beda Singenberger, as well as

1    Dr. Fredrick, of course.  The standard, Your Honor, is

2    independent evidence, other -- substantial independent evidence

3    other than the evidence of the statements themselves.  And I

4    believe what you've seen with Dieter Luetolf, Your Honor, is no

5    testimony about Dieter Luetolf and his role in this.  The only

6    thing you have that we can surmise is a bunch of documents,

7    which are the very documents that they are saying are

8    co-conspirator statements involving Mr. Luetolf.  We had Mr.

9    Futterknecht -- to the extent we had anyone testify about

10   Dieter Luetolf, we had Mr. Futterknecht, from UBS, basically

11   say Dieter Luetolf has done nothing wrong, based on his

12   estimation; to the extent he did anything wrong, he made

13   certain mistakes that Mr. Luetolf then documented in his

14   testimony; but, again, no showing that these are mistakes that

15   are part of a criminal conspiracy, Your Honor.

16           You have, in essence, Mr. Luetolf, as best we can

17   tell, processing information.  He gets requests, he processes

18   the information.  There's no sense, or no independent evidence,

19   that, when he was doing the processing of information, he was

20   doing it as part of a criminal conspiracy agreement, and he was

21   trying to defraud the United States of America, he was trying

22   to defraud the Internal Revenue Service, Your Honor.  There is

23   not one iota of testimony that Mr. Luetolf had any of that you

24   intent, had joined in an agreement, had participated in the

25   agreement, knowing of the agreement.  And, therefore, Your

1    Honor, we do not believe that the government has satisfied its

2    burden with respect to Mr. Luetolf.

3              There's even less information, Your Honor, about Beda

4    Singenberger.  We have absolutely nobody from Sinco Trust, or

5    for that matter anyone who knows Beda Singenberger, having

6    testified thus far.  The only thing we know about Mr.

7    Singenberger is that he shows up, his signature actually, seems

8    to show up on a lot of documents.

9              We have, again, Mr. Beda Singenberger processing,

10   apparently, information that he's receiving, no -- not any

11   evidence of which has been presented by the government thus

12   far, showing that Mr. Singenberger was participating in some

13   criminal -- knowingly participating in some criminal

14   conspiracy, knowingly joined some agreement to defraud the

15   United States or the Internal Revenue Service, knowingly took

16   any actions in furtherance of that agreement.

17             So with respect to all the communications dealing

18   with Mr. Singenberger, and all the communications, Your Honor,

19   dealing with Mr. Luetolf, we believe that they have not

20   established them as part of the conspiracy.

21             There is more evidence, obviously, with respect to

22   David Fredrick, but we again don't believe that they have shown

23   that David Fredrick has participated in a criminal conspiracy

24   to defraud the IRS, Your Honor.  And that obviously is the key

25   part here, did he participate in a criminal conspiracy to

RESPONSE BY MS. FINLEY                    7

 1    defraud the IRS?

 2            You have seen all the e-mails, all the traffic, all

 3    the testimony, and not one witness, not one, has said that

 4    there is any agreement -- by anyone for that matter, including,

 5    obviously, Dr. Hough -- to defraud the IRS.  We have obviously

 6    a lot of money moving all over the place.  We have explanations

 7    for the money.  But one of the key parts, Your Honor, is that,

 8    whatever their intent, asset protection and whatnot, there is

 9    no intent, and not one document, where they are saying that

10    they are going to defraud the IRS, which is the criminal

11    conspiracy that has been charged in the case.

12            So it's the basis under which we would submit, under

13    the Rule 29 motion, why the government hasn't fulfilled its

14    evidence against Dr. Hough, as well, on the conspiracy, but

15    certainly with respect to the co-conspirator statements, the

16    government's lack of evidence showing the key parts of a

17    conspiracy, and that these individuals entered into it, and

18    then made statements in furtherance of it and during the scope

19    of it, we believe is completely lacking.

20            THE COURT:  All right.  Thank you.

21            Ms. Finley?

22            MS. FINLEY:  Thank you, Your Honor.

23            I think I'll try and respond to both arguments

24    together, both with respect to the Rule 29 and the 902.11

25    arguments, since they piggyback on one another.

1          With respect to the Rule 29, evaluating the evidence

2    in the light most favorable to the government, the government

3    has proven both charges -- all charges in the indictment.

4    There has been extensive evidence of the agreement and

5    participation in the conspiracy to defraud.  Most of the time

6    when you have a conspiracy, the conspirators don't sit down

7    together and verbalize, "We're all going to sit down, and now

8    we're going to defraud the IRS."

9          You have to look at their intent, and their

10   knowledge, and their . . . knowledge of the objectives of the

11   conspiracy, based on their actions and the things that they say

12   amongst each other, to each other, and the way that they carry

13   out the various courses of conduct.

14         With respect to Dr. Hough and Dr. Fredrick,

15   independent of each other, they're opening bank accounts in

16   their own individual names; they file separate tax returns that

17   are also independent of each other, that both do not report

18   their interest in, and signature authority over, the joint bank

19   account, the various nominee entity accounts, and their own

20   individual bank accounts that are in their individual names

21   that have neither of the other on them.

22         Dr. Fredrick and Dr. Hough drafted and received

23   correspondence between and amongst Mr. Singenberger and

24   Mr. Luetolf --

25         MR. HOCHMAN:  I'm sorry, I can't hear the last little

1    part.

2          MS. FINLEY:  That Dr. Hough and Dr. Fredrick received

3    and drafted correspondence between and amongst Mr. Luetolf and

4    Mr. Singenberger.  The correspondence included statements from

5    the defendants, that evidence that those accounts were hers,

6    that she knew that; that she knew that they were closing

7    various accounts and moving money into new accounts.

8          Furthermore, Dr. Hough's co-conspirator,

9    Dr. Fredrick, has stated on more than one occasion to

10   Mr. Luetolf that he didn't want his name on any wire transfers

11   back into the United States.

12         And Mr. Luetolf, as the client adviser, notes that

13   Dr. Fredrick and Dr. Hough were moving their money into the

14   Swiss bank accounts from the Bahamas because of the change in

15   information treaties with the United States, not for asset

16   protection, but in order to continue to conceal and not have to

17   disclose their information to the IRS.  That, again, I think

18   shows that everybody knows what the objective is, is to conceal

19   their income from the United States.

20         Again, in 2008, when the situation with UBS becomes

21   national news, there's a call from the client, that was in

22   Mr. Luetolf's client adviser work bench, where they're asking

23   about the situation with UBS.

24         At that point, everybody knows that the situation

25   with UBS is the fact that they're about to enter into a

1    Deferred Prosecution Agreement for assisting U.S. taxpayers in

2    evading their taxpayers.  Mr. Luetolf, Mr. Singenberger,

3    continued to take the same steps that they have taken

4    throughout the course of all the conduct to assist Dr. Hough

5    and Dr. Fredrick in evading and concealing their assets from

6    the IRS by continuing to administer the accounts and assisting

7    them in moving the monies from UBS to other banks, either in

8    Switzerland or Liechtenstein.

9            And Mr. Singenberger was serving as nothing more than

10   a nominee, as evidenced by the fee that he charged that

11   specifically stated exactly what his services were, that these

12   were nominee shareholders, there's a director's fee, there are

13   fees in the Three Series that show that he created the

14   entities.  These are all in place, as is stated in the Deferred

15   Prosecution Agreement, in order to assist the U.S. taxpayers

16   from concealing their identity from the United States

17   authorities.

18           There were meetings amongst and between the

19   defendants.  They had -- Mr. Singenberger create nominee

20   entities that served no other purpose.  Dr. Hough causes to be

21   sent from the various accounts into the United States for a

22   variety of purchases in the nominee names.  And while she might

23   not have been the individual actually directing Mr. Luetolf to

24   do so, she was well aware of what was happening because she was

25   assisting in the purchase of those assets.

1          They both participate in placing false liens on the

2   house in Asheville, in the name of Ample Dynamic, when she

3   knows that she's, in essence, borrowing money from herself.

4   And they provide false documents to real estate agents in order

5   to continue to conceal their income and their ownership when

6   they're questioned about whether they're questioned about their

7   authority to sign on behalf of these alleged entities.

8          Furthermore, she knows that these are her funds that

9   she's concealing, she causes monies to be transferred from New

10  Vanguard into her personal checking account, which they then

11  use for their property taxes on their personal home, and

12  transfer some of those monies into an investment in a money

13  market.  And they both independently provided false information

14  to their return preparer for preparation of their personal

15  income tax returns when they specifically denied to Mr. Murtha

16  when asked a direct question, "Do you have a foreign bank

17  account," they say that they don't, and at that time they

18  already have at least one bank account in their joint

19  individual names.

20         That's not something that's confusing, that's not

21  something that, "I'm not sure."  It's in their names.  It's not

22  even in an entity.  It's not in Saba School of Medicine, it is

23  not in MUA, it's not in New Vanguard; it's in Patricia Hough

24  and David Fredrick.

25         And between 2001 and 2008, they proceed to open

1    almost ten different bank accounts which they have signature

2    authority over, and which, again, they split their money, they

3    put some of the monies into the individual accounts in their

4    own names.

5            And, you know, Mr. Murtha testified that he didn't

6    ask the question again because he expects his clients to

7    provide him with information if their circumstances change.

8    And the government would submit that opening three or four

9    additional bank accounts, that you have signature authority

10   over, or your name is on, is a change in circumstance.

11           And then again, in 2008, he asks the question again

12   when the UBS problem hits the newspapers, and they again deny

13   it.  There is no other purpose behind denying that, other than

14   that your intent is that you are intending to defraud the

15   Internal Revenue Service, and then filed false individual

16   income tax returns from 2001 through 2008 which failed to

17   report any of the interest income, the dividends, investment

18   income, the sale of the medical school, and does not check the

19   box on Schedule B.

20           The government would submit that all of that evidence

21   supports both the Rule 29 -- denial of the Rule 29 motion and

22   is evidence of each individual's participation, knowing

23   participation, in the conspiracy.

24           THE COURT:  Let me ask you a couple of questions.

25           With regard to Count 6, which is the 2005 substantive

1    tax count, what are the items that the government maintains

2    should have been included in Line 22 for total income that were

3    not?

4              MS. FINLEY:  For the 2005 tax return?

5              THE COURT:  Yes.

6              MS. FINLEY:  It would be . . . the interest income.

7              THE COURT:  From what?

8              MS. FINLEY:  And maybe I can use the defendant's

9    exhibit, if I may, that has the chart of the RARs.

10             THE COURT:  Sure.

11             MS. FINLEY:  In 2005 there was interest income from

12   their -- from Dr. Hough's -- from their -- I think their

13   individual account, and then from New Vanguard and Top Fast.

14             And then there were $116 in dividend income.  And

15   again, there was capital gain or loss of a little bit more than

16   $195,000.  And those, again, were from just the, I think,

17   individual account, and the New Vanguard account was opened

18   toward the end of 2005.

19             And so there are -- Revenue Agent Maurer did not

20   calculate additional tax and additional income from the Saba

21   account, from the MUA account, and . . . additionally, the

22   profits, the government would submit that there is evidence

23   that those amounts were not included on her tax return either.

24   But those are what makes up the total income line that is

25   false.  And then separately, on the Schedule B, she did not

1    check the box for having a foreign account.

2              THE COURT:  So what's the total amount for Schedule--

3    I'm sorry -- for Line 22, that you assert should have been

4    there, should have been added to the number that was there?

5              MS. FINLEY:  Sorry, Your Honor.  Well, I'm not sure I

6    have exactly done the math, but if you add up the taxable

7    interest, the ordinary dividends, and capital gain, that would

8    go into Line 22.  Those are all above the Line 22.

9              THE COURT:  You are looking at it, I'm not.

10             Is it a hundred dollars or a hundred thousand

11   dollars?

12             MS. FINLEY:  It's almost $240,000.

13             THE COURT:  Okay.  And then, for Count 7, which is

14   for year 2006, you've got the number wrong on the indictment,

15   but -- for Line 22, but beyond that, what's the amount that you

16   claim should be there that's not?

17             MS. FINLEY:  With respect to Line 26, given that the

18   government had changed the numbers based on the evidence that

19   came out at trial, there is unreported taxable interest of

20   $28,000; but, due to the loss, the total income line would be

21   less.

22             However, the government would argue that there is

23   evidence that there was additional income not reported from the

24   profits.  But if the Court were not to accept that, then with

25   respect to the unreported -- the total income line, it would be

1    substantially less.  The government would argue that that is

2    still material because the IRS needs to rely on information

3    provided by the taxpayer in order to accurately compute the tax

4    due and owing.

5            But alternatively, in 2006, they had multiple bank

6    accounts that they had signature authority and interest in, on

7    Schedule B, and the jury could find them guilty with respect to

8    that prong of the 720.61 count.

9            THE COURT:  Let me go back to the beginning, what I

10   think you said.

11           MS. FINLEY:  Sure.

12           THE COURT:  The indictment has . . . the amount for

13   Line 22 is $46,245.  I think that is a actually wrong figure

14   for that line.

15           MS. FINLEY:  If I may get the notebook?

16           THE COURT:  Sure.

17           (Ms. Finley reviews various documents.)

18           MS. FINLEY:  Yes, Your Honor.  On the tax return it's

19   $46,554, on the total income line.  So the indictment, I guess,

20   is off by $3,000.

21           THE COURT:  It looks like you just put the number in

22   Line 37, instead of the number in Line 22?

23           MS. FINLEY:  Yeah.

24           THE COURT:  But in any event, I guess you need to

25   tell me . . . again, your view of the evidence as it came in

1    establishes that the 46,000 and change, whatever it is, is too

2    high, and that the actual total income should have been lower

3    than that.

4            MS. FINLEY:  That's correct.

5            THE COURT:  And I understand you still think the

6    count survives because of the foreign accounts.

7            But with regard to the -- this aspect of the false

8    statement, how does this portion survive that testimony?

9            MS. FINLEY:  We would argue that the items that go

10   into that, even on here, the $28,000, that that goes into

11   Line 22, and so even though Line 22 is now a negative number,

12   that that is information that is material to the IRS because it

13   relies on this to compute tax due and owing.  So based on that,

14   we would argue that it should survive.

15           THE COURT:  That's not what you charged.

16           MS. FINLEY:  Additionally, Your Honor, if you look

17   at . . . .

18           THE COURT:  I mean, if you go to the body of the

19   counts, it says you allege that she believed it was

20   substantially greater --

21           MS. FINLEY:  Um-hum.

22           THE COURT:  -- and, as your evidence is, it was

23   actually substantially less.

24           MS. FINLEY:  Well, I think the government doesn't

25   have to allege -- and since there's no requirement that we

1    prove a tax due and owing, we have presented evidence that the

2    jury could find that it's substantially greater because the

3    profits of the school, there's been testimony and financials

4    that while, for a tax computation, Ms. Maurer might not have

5    felt comfortable including, she did testify that there was

6    evidence from numerous witnesses that the schools were

7    extremely profitable, and if the jury credits the government's

8    theory that this is their school, then the profits of the

9    school should have been reported on other income or on capital

10   gain, and that would have --

11           THE COURT:  That's not what your expert witness said.

12           MS. FINLEY:  I'm sorry?

13           THE COURT:  That's not what your expert witness said,

14   is it.

15           MS. FINLEY:  She said there were profits that should

16   have been reported.

17           THE COURT:  She still comes up with a negative number

18   on the bottom line.

19           MS. FINLEY:  Well, she did not want to commit to the

20   exact number because she felt, for her -- for a tax

21   computation, but that she still believed that there were

22   unreported profits.

23           THE COURT:  Yeah.  I mean, it still has to be . . . .

24   I guess I really don't understand how an indictment alleges

25   that $46,000, roughly, was a number that was false because the

1    taxpayer believed there was substantially greater amount of

2    income.

3          Your evidence is that the income was actually a

4    negative number, which is what the witness -- your witness was

5    comfortable saying.  And then she's less comfortable saying

6    there's other free floating money out there that should have

7    been attached and declared, but wasn't.

8          But isn't that what she changed part of the report

9    on?

10         MS. FINLEY:  Well, she changed part of her report

11   because the -- based on the evidence that came out at trial,

12   the evidence supported that they did own The Foundation.  And

13   so she removed the two and a half million dollars in income for

14   2006 because, otherwise, not doing so would be in essence

15   double counting, so she felt that . . . including the profits,

16   while she was confident of the diversion out of the school, she

17   felt not less confident that there were not profits, but to

18   include it on this computation.

19         Again, I don't think that the computation necessarily

20   binds the government in the proof that it has to present, and

21   that there is evidence that there was an additional income in

22   those years, both in the profits from the school as well as the

23   interest income from the Saba account and the MUA account, that

24   she just did not do a computation.

25         I think that the jury could -- the bank records are

 1    in evidence.  There is evidence to show that there was interest

 2    income in those accounts, and that that was not reported on the

 3    return.

 4            THE COURT:  So you're going to agree with Mr. Hochman

 5    in your rebuttal that your agent got it wrong.

 6            MS. FINLEY:  No.

 7            THE COURT:  Well, she clearly got it wrong, it is

 8    just a matter of which wrong you want to pick.

 9            MS. FINLEY:  No.  I think she got it right under both

10    circumstances.  She had not had . . . received the evidence

11    that -- the same evidence that the jury had, because of the

12    deCastro letter.  And so, at the time that she did the draft

13    computations, she determined that their diversion of the

14    5 million in one year, and the 3 million or so in 2006 -- or

15    excuse me, 2006 -- was income to them.  And to include that,

16    based on the computation that she did here, would be in essence

17    double counting.  And so they are actually consistent

18    arguments.

19            THE COURT:  They're not consistent with what you've

20    indicted as to that count.  You've indicted 46,000 was

21    substantially less than the real income was, now you have

22    testimony that the real income was a negative number, and you

23    have a theory, unsupported by your witness, that there was

24    other income that should have been declared, kind of free

25    floating, and I guess at some point you will tell the jury what

1    that is, but . . . .   How can how can that possibly be enough

2    to get to the jury?

3         MS. FINLEY:  Well, I think, Your Honor, again, the

4    government believes that it has presented evidence that there

5    are numerous items in -- above Line 22, that go into Line 22,

6    that they can determine that there was additional evidence,

7    even if it's not on the revenue agent's RAR.

8         THE COURT:  So tell me what it is.

9         MS. FINLEY:  Again, I think it's the profits, that

10   there are financials from 2006 that show net profits in the

11   millions of dollars, and that the jury could find that those

12   profits, based on the government's argument that this is their

13   school, should have been reported on . . . you know, the

14   capital gain or the other income line, and that that would have

15   made Line 22 substantially greater than the 46,000.  Because if

16   you added the 2 million, or . . . I think it was 2 million or

17   so on each school, onto the tax return, that would make Line 22

18   substantially greater.  And she knew that if the jury credits

19   that she -- this was her school, she knew it was her school,

20   then she knew that the profits should have been reported on her

21   return.

22        THE COURT:  What are your numbers for eight and nine,

23   in terms of the amount that you claim should have been added to

24   the . . . Line 22, in the 2007 and 2008 returns?

25        MS. FINLEY:  For 2007 return, there is interest

1   income of $106,000, 311 -- 301,000.  Then there are dividends,

2   additional dividends of $40.  And then there are additional

3   capital gains and losses from the investment stock

4   transactions, as well as the 15-plus million from the sale of

5   the school.

6           THE COURT:  All right.

7           MS. FINLEY:  And then for 2008, there's $459,832 in

8   interest income; $8,883, in dividends income; and a little over

9   1.7 million in capital gain and loss.  And that adds a little

10  over 1.7 million to Line 22.

11          THE COURT:  Who are your conspirators in Count 1?

12          MS. FINLEY:  My conspirators are Dr. Fredrick,

13  Dr. Hough, Mr. Singenberger, and Mr. Luetolf.

14          THE COURT:  With regard to the latter two, what is

15  the evidence that they did something other than simply help two

16  conspirators go about their own conspiracy, as opposed to being

17  a knowing participant themselves?

18          I mean, they were in the business of being Swiss

19  bankers, according to the testimony of your witness.  They --

20  from the paperwork, they did what Swiss bankers are supposed to

21  do.  The documents reflect comments from one or both of the

22  defendants about not wanting their names on various documents,

23  and reflects correspondence from Mr. Luetolf, I think it is, in

24  terms of explaining what they can and cannot do.

25          But how does that make either of the Swiss bankers

1   co-conspirators, as opposed to simply someone providing a

2   service, that is utilized by others, in furtherance of the

3   conspiracy?

4          MS. FINLEY:  Well, I think that they know that

5   Dr. Hough and Dr. Fredrick are using the services in order to

6   conceal their assets and income from the IRS, that --

7          THE COURT:  How do they know that?

8          MS. FINLEY:  I think that they know that they are

9   U.S. citizens, first of all, so they know that the way they are

10  filling some of these forms out are not accurate.

11         THE COURT:  How do they know that; what form do they

12  know is not accurate?

13         MS. FINLEY:  They certainly know that Dr. Fredrick

14  and Dr. Hough are the beneficial owners of the various

15  entities.  And --

16         THE COURT:  So?

17         MS. FINLEY:  -- based on the Deferred Prosecution

18  Agreement, and . . . that bankers and financial intermediaries

19  understood that the filling out of these forms was for the

20  purpose of concealing assets.

21         THE COURT:  So you want me to use the . . . the

22  Deferred Prosecution Agreement of a different entity as

23  substantive evidence against these two defendants, and

24  substantive evidence to support that Mr. Luetolf and

25  Mr. Singenberger are co-conspirators?

1          MS. FINLEY:  No.  I think it's one portion of it.  I

2     think additionally, Your Honor, the . . . the underlying tenor

3     that both Mr. Singenberger and Mr. Luetolf are on e-mails where

4     the discussions are had about non-disclosing to the IRS, that

5     Dr. Hough and Dr. Fredrick's desire not to disclose those to

6     the IRS, shows that they know the objective of the conspiracy

7     is to conceal that from the IRS.

8          THE COURT:  You are going to need to show me those

9     e-mails, because I don't remember talk about the IRS in

10    particular.

11         MS. FINLEY:  Well, from disclosure to the U.S.

12         THE COURT:  Well, that's different.  I mean, it's one

13    thing to want to keep your assets private for whatever reasons.

14    It's something else if -- I mean, if there's an e-mail saying,

15    "I want to do this because I don't want to pay taxes to the

16    United States," or, "because I want to cheat my government," or

17    something, that's different.  But I don't remember anything

18    like that.  And as you pointed out, it's not likely to have

19    that put in writing, but . . . .

20         MS. FINLEY:  And I don't mean to say that it says

21    that they are trying to cheat the IRS.  I think that the

22    various e-mails are referencing the changes in banking policies

23    with the United States, for disclosure to the United States.

24    And I don't believe that the government would argue

25    circumstantially that, because of the forms that they're

1   filling out with respect to reporting to the IRS, and actually

2   opening the accounts, and Dr. Fredricks does e-mail

3   Mr. Luetolf, and says he's trying to find out what the policies

4   are with respect to disclosure once he moves his information to

5   Switzerland --

6            MR. HOCHMAN:  I'm sorry, I didn't catch that last.

7            MS. FINLEY:  Once he moves his accounts to

8   Switzerland, he's e-mailing -- I think in 2003, he e-mails

9   Mr. Luetolf to ask what the policies are with Switzerland for

10  disclosure to the United States.

11           And given the way that they're moving money around,

12  his discussions about, "our money, our account, I move it from

13  this account to this account, does my name have to be on it,"

14  that is evidence that . . . the concealment is a purpose of the

15  conspiracy, in concealing it from the United States Government

16  and the IRS.

17           And with respect to Mr. Singenberger, he does provide

18  these nominee shareholders, he's signing things that says he's

19  a director, that he's giving permission, and all he is, is a

20  rubber stamp.  And he knows that these things are being used to

21  purchase assets and to continue to conceal their identities.

22           He's on e-mails where the four of them are not clear

23  on how Dr. Fredrick is supposed to ask for money, now that

24  Mr. Singenberger is now involved, showing that these people are

25  not anything more than rubber stamps in order to assist them in

1    concealing their assets from the United States.

2            And then certainly after 2008, any steps that

3    Mr. Luetolf and Mr. Singenberger take to assist Dr. Fredrick

4    and Dr. Hough, at that point, the . . . the jig is sort of up

5    with respect to UBS, and with --

6            THE COURT:  Say that sentence again?

7            MS. FINLEY:  At the point after 2008, when the

8    UBS . . . and certainly 2009, when UBS enters into the

9    voluntary disclosure, I am not imputing that necessarily means

10   that what they were doing before, but certainly at that point

11   they understand what U.S. taxpayers were doing, that . . . that

12   there's allegations that that's what they were doing, and they

13   continue to assist Dr. Fredrick and Dr. Hough with concealing

14   the assets.  They continue to sign things for them.

15           Mr. Singenberger, into 2011, is still providing

16   minutes and things, when they need to continue to conceal the

17   assets from the IRS, by saying that Ample Dynamic owns

18   something, or pointing Dr. Fredrick as director.  When that

19   doesn't work, then they appoint Ms. Whitley as a vice-president

20   so that she can sign.  All these things, show that there's

21   really no sub -- the substance is that it is really

22   Dr. Fredrick, there is no form other than a stamp.

23           THE COURT:  Even if all that is true, how does that

24   relate to the other two alleged co-conspirators' knowledge that

25   this is a tax fraud conspiracy, as opposed to some other kind

1    of conspiracy?

2           MS. FINLEY:  Other than the knowledge that, as the

3    government has already talked about from the evidence, with

4    respect to the way that things are described, and the things

5    that they're discussing, that would be the government's

6    evidence, that they understand the purpose is to conceal from

7    the IRS.

8           THE COURT:  All right.  Thank you.

9           All right.  The Court's going to deny the Rule 29

10   motion as to the conspiracy count, which is Count 1.  The Court

11   finds that, viewing the evidence in the light most favorable to

12   the government, a reasonable jury could find the defendant

13   guilty of the conspiracy alleged in Count 1.

14          The Court is not convinced by a preponderance of the

15   evidence that Mr. Luetolf or Mr. Singenberger were

16   co-conspirators in the conspiracy alleged in Count 1, but the

17   Court is satisfied as to Defendant Hough and the absent

18   Defendant Fredrick.

19          As to the substantive counts, the Court is going to

20   deny the Rule 29 motion as to Counts 6, 8, and 9, and the Court

21   is going to take the matter under advisement as to Count 7.

22   The Court finds as to Counts 6, 8, and 9, that a reasonable

23   jury could indeed find that the defendant made the false

24   statements alleged in the indictment.

25          With regard to Count 7, the Court would find that a

1    reasonable jury could find the false statement based upon the

2    second allegation; that is, with the foreign accounts.  The

3    Court wants to think a little bit more about the first part of

4    that; that is, the Line 22 income.

5          All right.  We're running a little bit late.

6          What's your witness situation?

7          MR. HOCHMAN:  Your Honor, given the Court's finding

8    that there is not a preponderance of evidence established that

9    Mr. Singenberger and Mr. Luetolf were part of this conspiracy,

10   we would ask the Court then to strike all co-conspirator

11   statements that were related to Mr. Luetolf and

12   Mr. Singenberger that otherwise don't have Mr. Fredrick, as

13   part of -- or Dr. Hough as part of that communication.

14          Examples of that, Your Honor, would be those CAWB,

15   those client work bench notes, that Mr. Luetolf is taking, that

16   we have been objecting to, that don't have a communication

17   directly with Dr. Fredrick.  He's not sending them to

18   Dr. Fredrick, they're just sitting inside the UBS files.  We

19   believe -- for a variety of reasons we believe them

20   untrustworthy; but in addition, if he's not part of the

21   conspiracy and the government's best theory is that, if we had

22   a to guess as to who wrote those notes it was Mr. Luetolf, and

23   they are not part of the conspiracy, we'd ask the Court to

24   strike those type of communications that we already objected

25   to.

1          THE COURT:  That request will be denied.  The order

2   that I signed the other day dealing with the renewed motion

3   admitted them not as co-conspirator statements.  I specifically

4   said they might be eventually admitted for that reason too, but

5   I did not admit them at that point for that time.  And I am not

6   admitting them at this point for that purpose, so I don't

7   expect the government to argue to the jury in a fashion that

8   would suggest that they were co-conspirator statements.

9          MR. HOCHMAN:  Thank you, Your Honor.

10          Your Honor, we are going to call Dr. Hough as our

11   first witness.

12          THE COURT:  All right.

13          MR. HOCHMAN:  Thank you.

14          THE COURT:  Can we bring the jury in?

15          THE COURTROOM DEPUTY:  We're one short.

16          THE COURT:  All right.  Let's take five minutes while

17   he checks on the jury.

18          THE COURTROOM DEPUTY:  We have them all.

19          (At 9:39 AM, court was recessed.)

20                       AFTER RECESS

21          (At 9:43 AM, court was reconvened.)

22          THE COURT:  All right.  Everybody ready?

23          MR. HOCHMAN:  Yes, sir.

24          THE COURT:  Have the jury step in, please.

25          MS. FINLEY:  Your Honor, does Dr. Hough -- in other

1    cases I have had where the defendant decides to testify, the

2    Court questions to make sure she understands the rights she's

3    giving up.

4             THE COURT:  Do you think what I said last week was

5    not enough?

6             MS. FINLEY:  No.  That's fine.

7             THE COURT:  Okay.

8             (At 9:44 AM, the jury was escorted into the

9        courtroom.)

10            THE COURT:  Good morning, ladies and gentlemen.

11            Mr. Hochman, you may proceed.

12            MR. HOCHMAN:  Thank you very much, Your Honor.

13            The defense would call Dr. Patricia Hough to the

14   stand.

15            THE COURT:  Come forward, please.

16            THE COURTROOM DEPUTY:  If you'd raise your right

17   hand.

18            Do you solemnly swear or affirm to tell the truth,

19   the whole truth, nothing but the truth, in the case now before

20   the Court?

21            THE WITNESS:  I do.

22            THE COURTROOM DEPUTY:  You may have a seat.

23            State your full name, spelling your last.

24            THE WITNESS:  My first name is Patricia; last name is

25   Hough, spelled H-O-U-G-H.

1          THE COURTROOM DEPUTY:  Thank you.

2          MR. HOCHMAN:  And, Dr. Hough, could you move the

3    microphone a little bit closer?

4          THE WITNESS:  Yes.  Let me get my sweater on.

5          MR. HOCHMAN:  May I proceed, Your Honor?

6          THE COURT:  You may.

7          MR. HOCHMAN:  Thank you very much.

8                    PATRICIA HOUGH,

9    called as a witness by the Defendant, and having been first

10   duly sworn, was examined and testified as follows:

11                    DIRECT EXAMINATION

12   BY MR. HOCHMAN:

13   Q     Dr. Hough, are you nervous today?

14   A     Yes, I am.

15   Q     Have you ever testified in federal court before?

16   A     No, I haven't.

17   Q     Have you testified in any court before?

18   A     My job as a social worker, I would testify on behalf of

19   children and juveniles.

20   Q     We'll get back to that a little bit later.  Let me start

21   out with a question.

22         When were you born?

23   A     August 7th, 1946.

24   Q     And that would make you 67 years old today?

25   A     Yes.

1    Q       Where were you born?

2    A       I was born in Youngstown, Ohio.

3    Q       Do you have any siblings?

4    A       I have one sister.

5    Q       And what's her name, please?

6    A       Charlene Varga.

7    Q       Is that an older or younger sister?

8    A       She is four years younger than me.

9    Q       And could you please describe for this jury your

10   upbringing?

11   A       Well, my father was a World War II veteran.  He had been

12   trained as a mechanic.  We were very . . . we didn't have much

13   money when we were growing up.  We lived in a rented house with

14   no indoor plumbing.  We had an outhouse.  My mother was very

15   unhappy.  They . . . when I was about four or five years old,

16   they were fighting all the time, and eventually divorced.

17   Q       Was this part of the projects area of Youngstown, Ohio?

18   A       No.  After they divorced, my father was a mechanic for

19   Studebaker.  That's an old car.  They went out of business, and

20   he lost his job.  So we ended up moving into the public housing

21   projects.

22   Q       And about what age were you at this time?

23   A       Six.

24   Q       And were you living with your mother or your father in

25   the public housing projects?

1    A       We lived with my mother.

2    Q       Was your mother working at the time that you moved into

3    the public housing projects?

4    A       No.  We were on welfare.

5    Q       And at some point did your mom get a job?

6    A       Yes.

7    Q       How soon after you moved into public housing projects

8    did your mom get a job?

9    A       About four years.

10   Q       And at some point did you live with your dad sometime

11   when you were growing up?

12   A       Yes.

13   Q       Where did he live?

14   A       He had a tiny little one-bedroom trailer in Youngstown.

15   Q       Now, did you go to elementary school around where were

16   you living in the projects with your mother?

17   A       Yes.

18   Q       And can you describe what type of elementary school that

19   was?

20   A       Well, it was called Covington.  It was adjacent to the

21   projects, and it was considered the worst elementary school in

22   Youngstown.

23   Q       At some point did you move out of the inner city, around

24   ninth grade?

25   A       Yes.

1  Q      How did that happen, how did you move out of the inner

2  city around ninth grade?

3  A      My mother's older sister, my aunt Alice, and her

4  husband, helped us to put down a down payment on a little home

5  in a suburb nearby them.

6  Q      Was this in a better school district?

7  A      Oh, significantly better.

8  Q      And did you go to this school district from the ninth

9  grade all the way through 12th grade?

10  A      Yes, I did.

11  Q      Did you graduate from high school?

12  A      Yes.

13  Q      What year would that have been?

14  A      In 1964.

15  Q      Did you work while you were in high school?

16  A      Yes.

17  Q      What type of work did you do?

18  A      Just odd jobs.  Before I was 16, I mowed lawns, I

19  baby-sat, some elderly neighbors would give me a few dollars to

20  clean their house.  When I was 16, I went to work as a clerk in

21  a drugstore.

22  Q      About how many hours a week were you working at that

23  point?

24  A      Twenty to twenty-five.

25  Q      And why did you have to work while were you in high

1    school?

2    A       I wanted to start saving money to go to either nursing

3    school or college.

4    Q       In addition to going to school and working, were you

5    involved in taking care of your younger sister?

6    A       Yes, I was.

7    Q       What did you do?

8    A       Well, I mean, from the time she started school in first

9    grade, I would always walk her to school, walk her back, you

10   know, at noon; make lunch; get her back home; baby-sit for her

11   at night when necessary.

12   Q       Did you also make dinner for her?

13   A       Yeah.  I learned how to -- started to try to cook about

14   fifth grade.

15   Q       How did you -- how did you do academically in high

16   school?

17   A       I was an honor student.

18   Q       Were you part of any honor society?

19   A       I was inducted into the National Honor Society.

20   Q       And what is it -- the National Honor Society recognizes

21   what percentage of students in a high school, if you know?

22   A       Top five or ten percent.

23   Q       In a high school, outside of an academic side, what

24   extracurricular activities were involved in?

25   A       Since I worked, in school I was just in school

Case 2:13-cr-00072-SPC-NPM   Document 124   Filed 10/25/13   Page 35 of 289 PageID 2901

PATRICIA HOUGH — DIRECT/HOCHMAN                 35

1   activities like choir, hall monitor, library assistant, but on
2   weekends I was very active in our church.
3   Q      What type of things did you do while were you active in
4   your church group?
5   A      Well, my mother had us in this big church with a big
6   youth program from the time we were very little, and -- you
7   know, there were summer camps, just all kinds of kids'
8   activities to keep us out of trouble.
9          And when I was in seventh and eighth grade, there were
10  sort of formal youth groups, and I was active and an officer in
11  those.
12  Q      What type of officer were you in the church youth
13  groups?
14  A      Let's see.  Oh, vice-president, president.
15  Q      And did you do any volunteer work?
16  A      We were . . . part of what the church did was to keep us
17  very, very active in volunteer activities.
18  Q      And did you do any volunteer work with any inner city
19  youth?
20  A      We had reading, tutoring programs on weekends for inner
21  city children.  And then . . . after church on Sundays, we
22  would go visit elderly shut-ins.
23  Q      And what is an elderly shut-in?
24  A      It was a church member that was too old or sick to be
25  able to sit through church service.

1    Q      And what would you do for that church member?

2    A      Oh, well, we might have tapes to play.  You know, we

3    would bring them some of the flowers that were used for the

4    service in the church, just do readings with them.  There was

5    always a minister with us.  But they seemed to like having

6    young kids around.

7    Q      Did you do any volunteer work during the summers while

8    you were in high school?

9    A      Yes.  Every summer the church had a one-month youth

10   tour, volunteer project.  And I was -- even when I was working,

11   I was able to go on all of those for high school.

12   Q      And did you go to certain locations in each of the

13   different summers?

14   A      One summer we went to Appalachia, and to -- it was a

15   church-related social center way up -- I think it was the

16   mountains of Tennessee.

17   Q      And what did you do in that time in Appalachia?

18   A      We did tutoring children that were . . . in recreation

19   for a month, that were in day care.  We visited some of the

20   home.  We took supplies.

21   Q      Did you also do a volunteer summer in Mississippi?

22   A      Yes, I did.

23   Q      And can you describe to the jury what that summer was

24   about?

25   A      We went as a group to Southern Mississippi, and stayed

1    on a college campus that had a huge, kind of like a head start,

2    but it was a preschool program, and we tutored children, played

3    with them, other people, and there were all kinds of services,

4    medical, we knew a lot about nutrition, and we were able to go

5    out and visit some of their homes.

6    Q      And can you tell the jury if you did any volunteer

7    summer programs in high school in Mexico?

8    A      Another one was to go -- we went to Northern Mexico, to

9    help build a health center.

10   Q      And when you -- at some point, you said, you graduated

11   high school; correct?

12   A      Yes.

13   Q      That was in 1964?

14   A      Yes.

15   Q      What did you do -- did you actually go to college right

16   after high school?

17   A      No.  A few months after I graduated, yes.

18   Q      And which college was that?

19   A      Phillips University, in Enid, Oklahoma.

20   Q      How were you able to go to college financially?

21   A      My church . . . I knew my ministers very well, and they

22   applied through the directors to get me a scholarship supposed

23   to be designated for somebody in ministry, but they said:  Just

24   as long as you do the service, you can get the scholarship.

25   Q      And where was that scholarship given to you to attend?

1   A      I just had to go to any one of the church-affiliated

2   colleges.

3   Q      And was Phillips University a church-affiliated

4   colleges?

5   A      Yes.

6   Q      And did the scholarship that you received to attend

7   Phillips University, did that cover all of your living and

8   tuition expense?

9   A      No.  It was about $1,500 a year.

10  Q      What percentage of the expenses did it not cover?

11  A      About 50 percent.

12  Q      How were you able to pay for that additional 50 percent?

13  A      I had saved as much as could when I was working during

14  high school, and, you know, I was assured I would have a job in

15  college, so I worked the entire time I was in college.

16  Q      What type of jobs did you have during the academic years

17  of college?

18  A      Oh, I had a lot of jobs.

19  Q      Would you describe several of them for the jury?

20  A      The first one -- when I got there, I was a waitress --

21  let's see, I worked in the kitchen and the cafeteria.  Then I

22  became a waitress in the school cafeteria.  I . . . the two

23  summers I had initially off, I was the youth director for my

24  church, and that was paid.

25         I worked at the Enid state school for the mentally

1    handicapped, my last two years, as a recreation therapist.

2    That was only for two months in the summer.  I waitressed

3    tables on and off at a restaurant.  And I worked weekends as a

4    maid in a motel.

5    Q      Now, about how many hours a week were you working while

6    you were in college?

7    A      Pretty much full time in the summer, but . . . oh, in

8    college; 20 to 30 hours.

9    Q      Other than the scholarship, did anyone else help you pay

10   for your education and living expenses in college?

11   A      No.

12   Q      What did you study in college?

13   A      I had a minor in -- I had a major in pre-medicine and

14   sociology.

15   Q      Now, during college, in addition to studying, and in

16   addition to working 20 to 30 hours a week, were you also active

17   outside of academics in working?

18   A      Yes.

19   Q      And in what way were you active?

20   A      I wouldn't have sororities or fraternities.  I was in a

21   social service club and student government.

22   Q      And is that social service club where you met Tom

23   Walker, who testified in court?

24   A      It was actually student government that we were both on.

25   Q      Ah.  And did you do volunteer work while were you in

1    college?

2    A       Yes.

3    Q       What type of volunteer work?

4    A       In my particular club we would do things to improve the

5    campus.  And we did volunteer work on weekends at the Enid

6    state school for the mentally handicapped.

7    Q       What type of volunteer work did you do for the Enid

8    state school for the mentally handicapped?

9    A       We would do mainly recreation.  We would, for the . . .

10   women -- just worked with the women's cottages.  We would try

11   to bring them gifts if there was a birthday; cosmetics,

12   supplies.  And then I additionally, with a couple other club

13   members, helped direct their choir on Sundays.

14   Q       Were you able to complete college in four years?

15   A       I actually graduated in three and a half.

16   Q       What year did you graduate?

17   A       In 1968.

18   Q       How did you end up doing academically in college?

19   A       I was an honor student.  I was on the dean's list.

20   Q       And why did you end up graduating in three and a half

21   years?

22   A       Well, tuition and expenses kept going up.  I was just

23   about out of funds.  And I just needed to go to work.

24   Q       Now, when you graduated college, did you have an idea of

25   what you wanted to do next?

1    A       Yes.

2    Q       What was that idea?

3    A       I wanted to go to medical school.

4    Q       Why did you want to go to medical school?

5    A       Well, I wanted to do, always, something in health care.

6    When I grew up, we didn't have . . . any health insurance, and

7    the only way we got health care was through public clinics.

8    That was in the projects and even after.  So I really saw

9    myself becoming like a general practitioner and doing that kind

10   of work.

11   Q       Did you end up applying to medical school while in

12   college?

13   A       Yes.

14   Q       Did you get into medical school?

15   A       I got an early admission interview at the University of

16   Oklahoma medical school.

17   Q       Did you end up going to the University of -- medical

18   school of Oklahoma?

19   A       No, I withdrew my application.

20   Q       Why did you withdraw your application?

21   A       Although I had the grades, they made it very clear to me

22   that there were almost no scholarships, and it would be

23   impossible for me to work and be a medical student.

24   Q       So if you didn't end up going to medical school, what

25   did you end up doing?

1  A      There was a position open for a social worker at the

2  Enid state school, and I was hired.

3  Q      And what did you do as a social worker at the -- this is

4  the Enid state school for the mentally handicapped?

5  A      Yes.

6  Q      What did you end up doing as a social worker?

7  A      Oh, I had two cottages, very lightly adolescent girls

8  that I was responsible for.  I did admissions.  I took care of

9  my cottages.  I ran groups, and helped with discharges and

10  placements.

11  Q      How much were you paid on a monthly basis back then, if

12  you recall?

13  A      Not much.  I think my take-home was under $200 a month.

14  Q      And this is the period of roughly 1968?

15  A      Yes.

16  Q      Were you able to pay for your living expenses back then?

17  A      Yes.  I shared an apartment and . . . you know, I tried

18  to save.  I didn't live expensively.

19  Q      How long did you work in this position as a social

20  worker back in 1968?

21  A      From about January, 1968, through August, 1968.

22  Q      And what happened at that point?

23  A      I went to get a master's degree in social work at the

24  University of Illinois, in Chicago.

25  Q      Why did you go get that master's degree in social work

1    at the University of Illinois in Chicago?

2    A      My immediate supervisor in the social work department

3    had a master's degree, and I'd worked there three or four

4    months, and he said:  Look, Pat, you need to move on.

5          And he had all kinds of professional journals and use

6    letters, and he said:  Look, there's grants, there's a need,

7    you need to move on and get a master's degree.

8    Q      All right.

9             (There was a brief interruption while the issue of

10        feedback through the sound system was addressed.)

11           THE COURT:  Mr. Hochman, you may proceed.

12           MR. HOCHMAN:  Thank you, your Honor.

13   BY MR. HOCHMAN:

14   Q      So what was the advantage of getting a master's of

15   social work, if you could tell the jury?

16   A      Well, I mean, it was a much higher level of training.

17   It was a very needed professional degree at that time.  And it

18   certainly paid more than what I was earning with a bachelor's

19   degree.

20   Q      How did you afford to go to that program with the

21   master's?

22   A      With my supervisor, Tim's, help, I applied to several

23   different government or private grants, and eventually received

24   a National Institute of Mental Health traineeship.

25   Q      I think you said you started around sometime in

1    September-ish, 1968?

2    A       Yes.

3    Q       How long were you in the program for?

4    A       Until about the beginning of June of 1970.

5    Q       While were you in the program did you also work?

6    A       Yes, I did.

7    Q       Where did you work?

8    A       Again, I did some waitressing jobs, and then found a job

9    at night, doing admissions, at a state psychiatric facility.

10   On weekends, my second year, I worked doing admissions in an

11   alcoholic treatment center.

12   Q       Why did you have to work while were you in this master's

13   program?

14   A       There was a small monthly stipend that -- I mean, this

15   was Chicago, it didn't cover my rent or my books . . . or other

16   expenses.

17   Q       I'm sorry?

18   A       Or my living expenses.

19           (There was a brief interruption while the issue of

20       feedback through the sound system was addressed.)

21           (There was discussion off the record.)

22           THE COURT:  All right.  Let's try again.

23   BY MR. HOCHMAN:

24   Q       I think we were talking about, Dr. Hough, why you had to

25   work while were you in school for the master's program.

1         Could you tell us again?

2    A       Well, it was Chicago.  It was very expensive.  And the

3    stipend I got more living did not cover my books or living

4    expenses fully.

5    Q       And were you a full-time student in this master's

6    program?

7    A       Oh, yes.

8    Q       How many hours a week did you work, in addition to being

9    a full-time student?

10   A       Twenty, twenty-five hours a week.

11   Q       Now, did you also do, I think it's called social

12   fieldwork, while were you in this master's of social work

13   program?

14   A       Yes.

15   Q       What is entailed in social field work?

16   A       You place two days a week in an actual social . . . in

17   an actual institution -- in my case, it was university

18   hospitals -- and a big state psychiatric institute the second

19   year.  And you're under supervision, but you have to fully

20   function as a social worker.

21   Q       What does that mean, "you have to fully function as a

22   social worker"?

23   A       You have to do everything that the supervisor tells you

24   to do; but, although you're a trainee, you have to do

25   admissions, counseling, link with resources, work with

1    families, deal with multitudes of other social service

2    agencies.  All these people were very poor that I worked with.

3    Q       Now, in addition to being a full-time student and

4    working, did you also do volunteer work while were you at this

5    master's program in Chicago?

6    A       Yes.

7    Q       What type of volunteer work did you do?

8    A       I grew very close to the Jane Addams Hull House, and I

9    would go there in the evenings, at least one evening a week, to

10   tutor inner city children.  And then I fostered animals in my

11   apartment.

12   Q       In June, 1970, at the completion of this program, what

13   happened next?

14   A       I graduated.  My father was ill.  It was between June

15   and September.  It was pretty chaotic.

16           Do you want me to do that, or talk about school?

17   Q       When you graduated, what degree did you graduate with?

18   A       My had a master's degree in social work.

19   Q       And after you received that degree, what happened at

20   that point?

21   A       I was hired at special projects of the Chicago public

22   schools, and if you -- a mental health center, but it didn't

23   begin in September so I had a lot of time off.

24   Q       And what did you do during your time off before your

25   next job started?

1   A       I . . . early in the summer, my father's health had

2   deteriorated to the extent that he had a form of memory loss

3   and early dementia, that I took him out to live with his

4   sister -- she wanted him to live with her, he had no income --

5   and got him settled.  And then, after that, I went with the

6   church that I attended to volunteer in Mexico and Guatemala.

7   Q       And this is the summer of 1970?

8   A       Yes.

9   Q       What type of volunteer work did you do back then, in the

10  summer of 1970?

11  A       Well, when we were in Mexico and Guatemala, some flew,

12  some drove, some took supplies, but we took a lot of health and

13  medical supplies.  A portion that I was attached to was doing

14  health and medical screening.  Another part would work around

15  helping with sanitation.  It wasn't particularly religious, but

16  they would -- it was all service to real impoverished

17  communities in an area called Chiapas, in Southern Mexico, and

18  then right at the border in Northern Guatemala.

19  Q       So after that summer of 1970 is over, did you start a

20  job?

21  A       Yes.

22  Q       What job was that?

23  A       I was the . . . this is my CV, which the defense have,

24  and my official title was social . . . school social work

25  services coordinator.

1    Q       That was your official title at this time?

2    A       That was my official title.

3    Q       Tell the jury exactly what a school social worker

4    coordinator was -- actually, tell also where this job was

5    located.

6    A       It was located in the inner city in Chicago.

7    Q       So what is a school -- what did you do as a school

8    social worker coordinator in the inner cities of Chicago?

9    A       Well, I was . . . there were several of us hired in

10   that, but I was in a discreet area called Lakeview Uptown.  And

11   I worked with a team.  It was a nurse, a community worker, and

12   myself as a social worker.  And we worked -- and then we worked

13   in the schools where the principals, guidance counselors,

14   teachers, would identify very high-risk children for neglect,

15   abuse, health problems.  So we would do a lot of home visits

16   and really try to work with the families to . . . try to keep

17   the children in school, rather than truant officers.  Sometimes

18   we would go with them if they weren't coming to school, and try

19   to find out what was going on in the house or the family that

20   was keeping the child from school.  That was very frequently

21   lice.

22   Q       And were these some of the worst schools in the inner

23   city Chicago school district?

24   A       They were among the worst.

25   Q       Now, as part of your job, I think you said earlier in

1    your testimony, did you have to go to court?

2    A      Then, yes.

3    Q      And what did you do when you -- did you testify in

4    court?

5    A      Yes.

6    Q      What did you testify about, generally?

7    A      It was not like this.  I mean, it was a juvenile or

8    family court, and I would try to get either the child, the

9    juvenile, or the family, into services that would help them to

10   function, as opposed to punitive punishment.

11   Q      How long did you work at this job for?

12   A      From 1973, I had a --

13   Q      You started in 1970; is that correct?

14   A      I'm sorry, 1970.  I'm sorry.

15   Q      How long did you work in the job for, until you stopped

16   working the job?

17   A      About three and a half years.

18   Q      Were you also, at that time, on the faculty of the

19   University of Chicago school?

20   A      It was a school social services administration; yes.

21   Q      And what position did you hold on that faculty?

22   A      I was an adjunct professor.

23   Q      Was that a paid position?

24   A      No.

25   Q      Why did you do it?

1    A      I just loved teaching, and I would have four of their

2    students with me, and my team, out in our fieldwork setting

3    while they were doing their training.

4    Q      Now, during this time period, approximately 1970 to

5    1974, were you taking care of just yourself at that time?

6    A      No.  I was taking care of my father also.

7    Q      Why were you taking care of your father at that time?

8    A      Well, as I said before, he had some type of early

9    dementia memory problem, and he lost his job as a mechanic and

10   had absolutely no means of support.  And he was a veteran, we

11   got him some services, but he . . . he couldn't be alone.  He

12   really needed to be somewhere with structure.  And my sister

13   was newly married in a tiny apartment, and I was living in the

14   inner city.  He was exceptionally close to his sister in New

15   Mexico, and we talked as a family.

16          And she said:  Bring him out here.  I live in the middle

17   of nowhere.  There's a lot.  Can you get him a little trailer?

18          And I said yes.

19          That's what I did.

20   Q      Did you provide him any money after you set him up out

21   in New Mexico?

22   A      I sent my aunt, for his care, about a hundred dollars a

23   month until he got disability.

24   Q      Now, in 1973, did you apply for a grant to study

25   comparative health systems?

1    A      Yes, I did.

2    Q      Who offered this grant?

3    A      It was offered through the University of London,

4    England.

5    Q      And did you receive the grant?

6    A      Yes, I did.

7    Q      What did the grant enable you to do?

8    A      It enabled me to, initially, to travel overseas to do

9    the initial bulk of the studies in England, studying their

10   national health care system.  And then we were permitted to

11   select other countries, we were given a list, where we wanted

12   to study the healthcare systems.  And I chose Holland, Spain,

13   and Germany.

14   Q      And did you actually attend the program in London?

15   A      Oh, yes.

16   Q      And at some point did you attend -- or did you go to

17   these other countries to study their health systems?

18   A      Oh, yes, I did.

19   Q      Now, beginning in 1975, did you also receive the

20   opportunity to stay in Europe and work as a lecturer in the

21   University of Maryland Overseas Division in West Berlin?

22   A      Yes.

23   Q      What did you do there?

24   A      I was assigned to teach -- if it was during the day,

25   they were U.S. Army troops through Berlin Brigade -- various

1    courses in sociology and social welfare.  And if it was in the

2    evening, it would be a mixture of U.S. dependents and troops.

3    Q      When you say, "U.S. dependents," you mean like family

4    members of the troops?

5    A      Family members; yes.

6    Q      So you would teach the troops and their families; is

7    that correct?

8    A      Yes.

9    Q      Did you also teach at the John F. Kennedy Institute

10   while in West Berlin?

11   A      Yes.  After I got there and met some contacts, I was

12   offered a position.

13   Q      Who did you teach and what did you teach them?

14   A      I was in an unusual place.  They studied us.  And so I

15   taught German students in English about mainly American social

16   welfare and social problems.

17   Q      And for how long were you offering these programs in

18   Europe?

19   A      About four and a half years.

20   Q      So for a rough time period, 1975 through somewhere in

21   1979; is that correct?

22   A      Yes.

23   Q      Did you receive a degree while you were in West Berlin?

24   A      Yes, I did.

25   Q      What degree was that?

1   A      It was a doctorate of philosophy and sociology.

2   Q      And which university did you receive that from?

3   A      It was . . . Freie Universität Berlin, Free University

4   of Berlin.

5   Q      And that would be at the end of this program, 1979?

6   A      Yes.

7   Q      So that at that point you have a Ph.D. in social

8   psychology; is that correct?

9   A      Yes.

10  Q      And a master's degree in social work as well; correct?

11  A      Yes.

12  Q      What did you do at that point?

13  A      There weren't a lot of jobs for a Ph.D., and I needed to

14  get back to the United States.  I wanted to be with my family.

15  So I applied . . . the spring of '75, I applied to a lot of

16  different academic and social work positions in the United

17  States.

18  Q      Did you ever receive a job at one of them?

19  A      Yes.

20  Q      Which academic institution gave you that job?

21  A      It was Roanoke College, in Salem, Virginia.

22  Q      And what position did you get at Roanoke College, in

23  Salem, Virginia?

24  A      I was an assistant professor in social work and

25  sociology.

1    Q       And as an assistant professor, what did you do?

2    A       I taught courses.  But, because of the social work

3    degree, I was asked to develop study program for concentration,

4    which was new for the school, in social work.

5    Q       What was your annual salary back then, that you were

6    paid?

7    A       Seventeen or eighteen thousand dollars a year.

8    Q       How long did you work for the Roanoke college?

9    A       I worked two academic years.

10   Q       And that now takes us up to about 1981; is that correct?

11   A       Yes.

12   Q       What happened at this point?

13   A       I liked teaching, and I wanted to go into a larger

14   university program, and so I applied for a -- positions at

15   major programs.

16   Q       Did you receive a position at a major program?

17   A       Yes.

18   Q       What position was that, and which program was it?

19   A       I was assistant professor of sociology and social work

20   at the University of Texas, at El Paso.

21   Q       So then did you move from Salem, Virginia, down to

22   El Paso, Texas?

23   A       Yes, I did.

24   Q       When you got to El Paso, Texas, what did you do in this

25   position as an assistant professor?

1   A     I was assigned to teach courses.  And then I coordinated

2   the committee to accredit the bachelor's degree in social work

3   my first year.  And then I started -- I did a few graduate

4   courses my second year.

5   Q     I heard the word "accredit."

6         Can you tell the jury what you did to accredit the

7   social work program?

8   A     Well, there was an organization called The Council on

9   Social Work Education Accreditation.  And I attended a

10  conference about going through the process, and then came back

11  and helped make sure that we had -- go over all the standards,

12  or . . . pages and pages of standards in terms of coursework.

13  It wasn't me alone.  There were other faculty.  But I was the

14  one that went to conference.  So we just made sure that we were

15  meeting all the standards and -- for accreditation.

16  Q     So it would be the early 1980s, when you first learned

17  how to accredit a program; is that correct?

18  A     Yes.

19  Q     And with respect to this particular program, you said

20  you were paid roughly 17,000 or so dollars for Roanoke College.

21        Did you get paid any more while you worked for El

22  Paso -- or University of Texas, at El Paso?

23  A     A thousand, a thousand five hundred dollars more.  It

24  was an increase, and that was for nine months.

25  Q     So your salary was around 18,500, 19,000, for the year?

1    A      Yes.

2    Q      Did you also do volunteer work while were you at the

3    University of Texas, at El Paso?

4    A      Yes.

5    Q      What type of volunteer work did you do?

6    A      On designated days I would go with a group, sometimes

7    taking my bilingual social work students with me, to the

8    women's prison in Juarez, Mexico, right across the boarder.

9    Q      Now, you were at this program at the University of

10   Texas, El Paso, for about how long?

11   A      Two years.

12   Q      And so it would be 1981 to 1983?

13   A      Yes.

14   Q      Focus you in August of 1983, okay?

15          About how old were you in August of 1983?

16   A      Thirty-seven.

17   Q      What happens at that point in August of 1983?

18   A      I began medical school at Ross University School of

19   Medicine, on the island of Dominica.

20   Q      And the island of Dominica is in the Caribbean?

21   A      It's in the West Indies; correct.

22   Q      And how did that come about?

23   A      I did lectures.  We had a little exchange program, and I

24   did lectures at the Texas tech medical school in El Paso.  It

25   was in the department of psychiatry.  I got friendly with the

1    faculty.  I kind of told them I had this dream, I wanted to go

2    to medical school, and had done premed.

3            And they were very encouraging.  They said:  Go to

4    medical school.  You'll make -- why don't you go into

5    psychiatry?  There's a need.

6            They were very encouraging.

7    Q     And did you -- how did you end up getting into the Ross

8    school?

9    A     There were residents in training there from Caribbean

10   medical schools that the faculty knew very well.  They were

11   from the school in Grenada, and the school on Dominica, which

12   were considered to be higher quality.  And I . . . I talked to

13   some of them, and then I wrote away for admissions material.

14   Q     Were you accepted into the Ross school?

15   A     Yes.

16   Q     And who paid for it?

17   A     Well, I was accepted at Grenada also, but Ross, at that

18   time, had a really unique program where, if you had a Ph.D.

19   with experience in teaching, you could go tuition free and get

20   a small monthly stipend.

21   Q     So did you attend the Ross school of medicine as a

22   student?

23   A     Yes.

24   Q     All right.  And were you also, it sounds like, a

25   teaching assistant at the school?

1    A       Yeah.  I was on that special stipend.

2    Q       And that stipend covered all your tuition and then gave

3    some extra money?

4    A       Yes.

5    Q       How long were you at the Ross school of medicine on

6    Dominica?

7    A       From August of 1983, and I graduated in June of 1988.

8    Q       While were you at the Ross school, did you meet someone

9    named Dr. David Fredrick?

10   A       Yes, I did.

11   Q       How did that come about?

12   A       He was teaching . . . medical psychology for students,

13   and he was the school psychologist.

14   Q       Was he married at the time you met him?

15   A       No.  He was divorced.

16   Q       Was he older or younger than you?

17   A       About two years older than me.

18   Q       Did you ever take any classes taught by him?

19   A       No.

20   Q       What was he doing while -- and what type of classes was

21   he teaching while he was there?

22   A       Medical psychology.

23   Q       Did you and Dr. Fredrick start dating?

24   A       Yes.

25   Q       And at some point did you get married?

1    A       Yes.

2    Q       When was that?

3    A       About a year after we met.

4    Q       What was the date of that, if you recall?

5    A       July 9th, 1984.

6    Q       Was Dr. Fredrick also from the Midwest, like yourself?

7    A       Yes.

8    Q       What was his upbringing like?

9    A       He grew up in Northern Wisconsin.  It was a small town

10   called Superior.  His family was very large, and very, very

11   poor.  His biological father abandoned the family, or abandoned

12   him, and his mother.  He grew up with four sisters, and they

13   lived in public housing.  He kind of shared that with me.

14           He talked about having to go with his -- he thought his

15   stepfather was always his real father, and he would go duck

16   hunting just to get food for the table.  He sold fishing worms

17   in the summer.  He was like me, did all kinds of odd jobs.

18   Q       Did he actually finish high school?

19   A       No.

20   Q       How did that come about?

21   A       His stepfather and mother divorced --

22               MS. FINLEY:  Objection, Your Honor, hearsay.

23               THE COURT:  Sustained.

24   BY MR. HOCHMAN:

25   Q       Did you ever visit, with Dr. Fredrick, where he grew up?

1   A       Yes.

2   Q       And what did you see when you visited him?

3   A       He showed me -- the projects were still there, and it

4   was a really -- just a very small, rundown town.

5   Q       Do you know if Dr. Fredrick was ever in the army?

6   A       Yes.

7   Q       Did you actually visit Dr. Fredrick when he visited

8   people that he had served with in the army?

9   A       Yes.

10  Q       Do you know what years he was in the army?

11  A       I think he enlisted at 17, so it might have been around

12  1961.

13  Q       Did you visit Dr. Fredrick when he -- or Dr. Fredrick

14  ever show you where he went to college and got his advanced

15  degrees?

16  A       Yes.

17  Q       Where did he go to college, and where did he get his

18  advanced degrees?

19  A       He got his bachelor's degree at East Carolina

20  University, in Greenville, North Carolina.  And he got his

21  master's degree there.

22  Q       What was his master's degree in?

23  A       It was a master's in vocational and rehabilitation

24  psychology, I believe.

25  Q       What does that mean, "vocational rehabilitation

PATRICIA HOUGH - DIRECT/HOCHMAN

1    psychology"?

2    A      He worked mainly with handicapped people.

3    Q      And what did he do for them?

4    A      He did counseling, found resources, helped to work to

5    get them in . . . to be rehabilitated vocationally, to do other

6    kinds of jobs if they were injured or handicapped.

7    Q      And he's been referred to as Dr. David Fredrick.

8           Was he a medical doctor?

9    A      No.

10   Q      What type of doctor was he?

11   A      He was a doctor in philosophy, a Ph.D.

12   Q      A doctor of philosophy and what?

13   A      A Ph.D., a doctor in philosophy, but it was in

14   counseling and psychology.

15   Q      Do you know where he got his doctorate degree from?

16   A      It was from the University of Southern Mississippi.

17   Q      With respect to when you met him, did you -- did he

18   share your interests in volunteer work?

19   A      Yes.

20   Q      In what way . . . in what way that you were able to

21   observe?

22   A      Well, with he would always go with us -- we were student

23   groups, and we would go throughout Dominica -- it was a very,

24   very large, poor island -- into isolated areas to do

25   hypertension and diabetes training, that's just kind of rampant

1    in those populations; also look for, you know, maybe children

2    who were undernourished and refer to them to pediatrics.

3           He was a pilot with a small plane, and he would . . .

4    the hospital had a relationship with a hospital for sick kids

5    in Canada, and he would fly the mothers and the children over

6    to Antigua, to get a jet to go to Toronto.  The kids usually

7    needed heart surgery -- you know, they weren't dying but they

8    needed surgery.  So he would do that.  He would fly to other

9    islands to pick up medications.

10   Q      And this volunteer work is occurring in roughly the

11   mid-1980s?

12   A      We were there between 1983 and '88.

13   Q      And that's when this volunteer work is occurring?

14   A      Yes.

15   Q      Did Dr. Fredrick ever share with you one of his life

16   goals?

17            MS. FINLEY:  Objection, Your Honor.  Hearsay.

18            MR. HOCHMAN:  State of mind, Your Honor?

19            THE COURT:  Sustained.

20   BY MR. HOCHMAN:

21   Q      Did you ever learn whether or not Dr. Fredrick wanted to

22   start a medical school?

23   A      Yes.

24   Q      How did you learn that?

25   A      He was a ham radio operator.  There was no, you know,

1    internet.  It was expensive to call.  So he was part of a -- it

2    was a big network, and he was speaking to people --

3            MS. FINLEY:  Objection, Your Honor.  Hearsay.

4            THE COURT:  Sustained.

5    BY MR. HOCHMAN:

6    Q    After Dr. Fredrick . . . did Dr. Fredrick explain to

7    you, at some point, that he wanted to start a medical school?

8    A    Yes.

9            MS. FINLEY:  Objection, Your Honor.  Hearsay.

10           THE COURT:  Sustained.

11   BY MR. HOCHMAN:

12   Q    What was your understanding as to whether or not -- let

13   me ask it this way:

14           Was it one of your life goals to start a medical school?

15   A    No.

16   Q    Whose life goal was it, if you know?

17   A    It was my husband's.

18   Q    And did you share that goal with him?

19   A    Eventually.

20   Q    What was your understanding that it took to start a

21   medical school?

22   A    It was a massive undertaking.

23           MS. FINLEY:  Objection, foundation.

24           THE COURT:  I'm sorry?

25           MS. FINLEY:  Foundation.

1          THE COURT:  Sustained.

2   BY MR. HOCHMAN:

3   Q     Do you have an understanding of what it takes to start a

4   medical school?

5   A     Yes.

6   Q     What was your understanding?

7          MS. FINLEY:  Objection, Your Honor.  Where does she

8   get this understanding from.  Foundation.

9          THE COURT:  Sustained.

10  BY MR. HOCHMAN:

11  Q     Where did you receive your understanding of what it took

12  to start a medical school?

13  A     While I was at Ross University, it was undergoing a

14  series of accreditations through the department of education,

15  through the State of New York, the State of California, the

16  State of New Jersey, and it was something that involved

17  everyone.  I was a teaching assistant, but I had experience in

18  social work, so I was actually part of those committees and the

19  site visits.

20  Q     What are the different things necessary to start a

21  medical school?

22  A     Well, it's a tremendous undertaking.  You have to

23  have -- you have to develop a curriculum; obviously, a very

24  complicated physical facility, with laboratories; faculty have

25  to be specially qualified to teach the courses.  You have to

1    always keep approval and accreditation in mind, meeting those

2    standards, if you want to provide a good education.  And you

3    have to recruit students.

4    Q      Was there a need for more medical schools, in your

5    opinion?

6    A      Not in my opinion.  It's been well published, because of

7    the baby boomers, that there's a shortfall of that 200,000

8    physicians by the year 2020.

9    Q      And the medical school that you and Dr. Fredrick were

10   discussing starting, what type of medical school did you want

11   to start -- or you and Dr. Fredrick want to start.

12   A      Very high-quality medical school that would have

13   reasonable tuition.

14   Q      And what was the reason why you wanted to establish a

15   high-quality medical school?

16   A      There were many in the Caribbean that weren't, and it's

17   just not something either one of us would ever do.

18   Q      And what was the reason that you wanted to establish an

19   affordable medical school?

20   A      The tuition where I went to school, and some of the

21   others, was about as high as a private medical school in the

22   United States; so we wanted to make it more like state-school

23   tuition.

24   Q      And what was the point of making it more like a

25   state-school tuition?

1    A       You could really attract the best students, maybe

2    students that did not come from wealthy families, students who

3    might be really smart but, for one reason or another, could not

4    get into a U.S. or Canadian school.

5    Q       So was the point to make as much money as possible?

6            MS. FINLEY:  Objection.  Leading.

7            THE COURT:  Sustained.

8    BY MR. HOCHMAN:

9    Q       What was the goal with respect to the amount of tuition

10   you were going to charge?

11   A       To make it affordable.  But I know there were concerns

12   with the board that, you know, you had to be able --

13           MS. FINLEY:  Objection.  Hearsay.

14           THE COURT:  That objection is sustained to the extent

15   it's responsive; I'm not sure it is, but sustained.

16   BY MR. HOCHMAN:

17   Q       Well, at some point in 1986, I'll direct your attention

18   to 1986, did events occur that led to the beginning of the

19   establishment of the Saba School of Medicine Foundation?

20   A       Yes.

21   Q       What was your understanding as to how it began?

22   A       I was doing my third-year surgery rotation on the island

23   of Saint Kitts, and there was a meeting where the governor and

24   all the government of Saba flew to Saint Kitts to meet with

25   Dr. Fredrick.

1    Q      And what was the point, if you understood, as to why

2    the -- it was the governor of Saint Kitts, you said?

3    A      No; Saba.

4    Q      Saba.  I'm sorry.

5           But they flew to Saint Kitts to meet with Dr. Fredrick?

6    A      He would fly over to meet with me on weekends.

7    Q      The school at that time is on the Dominica; is that

8    correct?

9    A      Yes.

10   Q      I believe that you do a certain -- two years of basic

11   science, is that correct, as part of medical school?

12   A      Yes.

13   Q      And the third and fourth years were clinical rotation?

14   A      It's in hospitals; yes.

15   Q      Where was your third and fourth year of clinical

16   rotation --

17   A      Mostly at Princess Margaret Hospital in Dominica, and

18   the hospital -- France Hospital on Saint Kitts.

19   Q      So you are actually on Saint Kitts, doing your clinical

20   rotation, at the time that Dr. Fredrick is meeting with the

21   governor of Saba, to discuss the Saba School of Medicine; is

22   that correct?

23   A      Yes.

24   Q      And after that meeting what happened?

25   A      He told me --

1            MS. FINLEY:  Objection, Your Honor, hearsay.

2            THE COURT:  Sustained.

3    BY MR. HOCHMAN:

4    Q     What happened with respect to whether or not the Saba

5    School of Medicine Foundation -- the Saba School of Medicine

6    Foundation was able to come into existence?

7            And don't refer to what Dr. Fredrick is telling you.  If

8    you could refer to -- well, let me ask it this way:

9            At some point, do you actually go to the island of

10   abandoned a?

11   A     Yes.

12   Q     And why did you go to the island of Saba?

13   A     Dr. Fredrick, and the other partner from Ross that he

14   got to help him, Dr. Dobrow, wanted me to go and look at it --

15           MS. FINLEY:  Objection, Your Honor, hearsay.

16           THE COURT:  Sustained.

17   BY MR. HOCHMAN:

18   Q     Well, why did you go -- without discussing the

19   conversations with Dr. Fredrick or anybody else, actually who

20   accompanied you to go to the island of Saba?

21   A     Dr. Fredrick and Dr. Matthew Dobrow.

22   Q     And who was Dr. Matthew Dobrow?

23   A     Dr. Dobrow was a member teaching medicine at Ross

24   University.  He had a degree from Harvard and had attended

25   medical school at Johns Hopkins.

1    Q      What is the point of Dr. Fredrick and Dr. Dobrow

2    accompanying you to the island of Saba?

3    A      I was having a hard time believing that such a small

4    island could support medical school, and they just wanted my

5    input.

6    Q      And what did you observe when you visited the island of

7    Saba -- and I wanted to get a timeframe for this:  This would

8    be around 1986?

9    A      Yes.  Shortly after that government visit.

10   Q      So shortly after the government visit, and you are

11   visiting the island of Saba, what did you see and what did you

12   observe during your visit?

13   A      It was a really amazing little island, just a very --

14   just very sweet, friendly people.  And it was extraordinarily

15   safe, and no one locked their doors.  It was clean.  I always

16   called it "the little train that could," because it had a large

17   network of roads.  The Dutch had earlier told them that they

18   couldn't build roads, but the people built a large network of

19   roads.  The Dutch told them they couldn't build an airport;

20   they built an airport.

21          And they said:  We'll have a medical school.

22          They were amazing people.

23   Q      And how did the island of Saba compare with the island

24   of Dominica, where the medical school was located?

25   A      It was much smaller, but it was extraordinarily safe.

1    You didn't get a key to your hotel room if you went there.

2    People didn't lock doors.  And it was very, very clean.  The

3    people were middle class.  It was half African descent and half

4    Dutch English descent, which made it, you know, extremely

5    unique among islands in that area.

6    Q     And how did that compare to the island of Dominica?

7    A     Dominica, next to Haiti, was the poorest island in the

8    Caribbean, and there was a lot of crime.

9    Q     And were you able to open up the doors of the Saba

10   School of Medicine right then, in 1986?

11   A     No, they were not able to do that.

12   Q     Why not?

13   A     It took many -- I mean, it takes a lot of years of

14   planning with governments and . . . everything else.  It's a

15   pretty massive undertaking.  And it's expensive.

16   Q     And the undertaking includes, as I think you said

17   before, building buildings, faculty, curriculum . . . .  What

18   else?

19   A     Well, the government has to be the entity to grant the

20   school a charter and apply for listing with the World Health

21   Organization.

22   Q     And did that -- does that occur immediately, back in

23   1986?

24   A     There has to be some evidence that it's really going to

25   exist, some contracts and commitments, and some structure.

1   Q       And just so I'm clear, when you say, "the government,"

2   is that the government of Saba?

3   A       It was the government of Saba, but it also involved the

4   government of the Netherlands Antilles.

5   Q       And they have to apply to the World Health Organization;

6   is that correct?

7   A       Yes.

8   Q       Is that what's been referred to as WHO, W-H-O?

9   A       W-H-O; yes.

10  Q       And that's in order to get what?

11  A       It's a listing in the world directory of medical

12  schools.  And without that listing, which indicates government

13  approval, no graduate can apply for residency or ever get a

14  license, I think anywhere.

15  Q       And were you personally involved in the initial stages,

16  back in 1986, in setting up the Saba school?

17  A       No.

18  Q       What were you doing back at that time?

19  A       Well, I was a third and fourth-year medical students.  I

20  had to do my clinicals, I had to take my medical licensure, I

21  had to take exams called the USMLEs, and --

22  Q       Let me stop you there.

23          What's that?

24  A       U.S. Medical Licensure exam.

25  Q       And what else were you doing back then?

1   A       I was also applying for residencies in the United

2   States.

3   Q       Why did you apply for residency in the United States?

4   A       I passed my exams, and I wanted to come back to the

5   United States.

6   Q       Did you receive a residency placement?

7   A       Yes, I did.

8   Q       Where was that?

9   A       I had a lot of interviews, but the one I chose was the

10  medical college of Georgia; Augusta, Georgia.

11  Q       And when did you start that program?

12  A       In July of 1988.

13  Q       So July, 1988, did you -- do you go right into the

14  residency program when you start one of these programs?

15  A       It was a type of program with an internship that allowed

16  a lot of general medicine, and that's what I did.  Mostly I did

17  that, yeah.

18  Q       So that was first year of it?

19  A       Yes.

20  Q       And then what was the residency in?

21  A       The specialty was in psychiatry, the next three years.

22  Q       And so that would take you from 1988 to approximately

23  1992?

24  A       Yes.

25  Q       Did you ever become the chief resident of the program?

1    A       Yes, I did.

2    Q       Did you have to work long hours during the internship

3    and residency program?

4    A       Extraordinarily long hours.

5    Q       In what sense?

6    A       It was the old call system, so I would be on call, and

7    up for 36 hours about once every four nights during my

8    internship.  And it was kind of, you go on, it gets a little

9    less worse, and it's once in every five nights.  And then when

10   I was chief resident, I think it was just once a week.

11   Q       So during that four-year period of 1988 through 1992,

12   about how many hours a week are you working . . . working in

13   this residency or internship program?

14   A       Oh, gosh, call -- you know, call hours, about 70.

15   Q       Seventy hours a week?

16   A       At least.

17   Q       What were you being paid on an annual basis during this

18   time period, average?

19   A       Maybe $19,000.  A bunch of us once figured it out.  It

20   was about two dollars an hour.

21   Q       How old were you during this time; and again, I'm

22   focusing on this 1988-through-1992 time period.

23   A       I was 42 when I started medical school, and . . . let's

24   see, I would have almost been . . . 46 when I graduated.

25   Q       How old were the people you were working with during

1    this residency program?

2    A       They were kids.  They were in their twenties.

3    Q       Where were you living at the time you were in this

4    residency program in Augusta, Georgia?

5    A       We had bought a small fixer-upper house near the medical

6    school -- near the hospitals.

7    Q       How much did you pay for it?

8    A       About $90,000.

9    Q       Now, you and Dr. Fredrick are married at this time?

10   A       Oh, yes.

11   Q       And was Dr. Fredrick living with you in Augusta,

12   Georgia?

13   A       Yes.

14   Q       What was he doing while he was in Augusta, Georgia?

15   A       One of the reasons we -- you know, I selected that was,

16   he got an appointment as an associate professor to start a

17   graduate program at Augusta college.

18   Q       And what type of graduate program was that?

19   A       It was a master's degree in counseling.

20   Q       Was he able, to your knowledge, to establish that

21   program?

22   A       Oh, yes.  Within about two years it was fully accredited

23   and the largest graduate program on the campus.

24   Q       Now, while Dr. Fredrick was working at Augusta college,

25   was he also working, to your knowledge, on setting up the Saba

1   School of Medicine?

2   A      Yes.

3   Q      Do you know if he was able to establish the Saba School

4   of Medicine Foundation in 1988?

5            MS. FINLEY:  Objection, hearsay.

6            THE COURT:  I'm sorry?

7            MR. HOCHMAN:  I was just going to say there's a

8   document in evidence that shows it was established in 1988.

9            THE COURT:  I'll take a yes-or-no answer, then we'll

10  take it from there.

11           MR. HOCHMAN:  Sure.

12           THE WITNESS:  Yes.

13  BY MR. HOCHMAN:

14  Q      And you've seen the document in evidence that shows the

15  Saba School of Medicine Foundation was established in 1988,

16  during this trial?

17  A      Yes.

18  Q      Do you recall whether or not Dr. Fredrick ever flew to

19  Saint Maarten for any purpose relating to the Saba School of

20  Medicine Foundation?

21           MS. FINLEY:  Objection, leading.

22           THE COURT:  Overruled.

23           THE WITNESS:  Yes.  He had a lot of breaks, and he

24  flew frequently to Saint Maarten and Saba.

25

1    BY MR. HOCHMAN:

2    Q      And what did he fly to Saint Maarten and Saba for?

3           MS. FINLEY:  Objection, hearsay.

4           THE COURT:  Sustained, absent a foundation.

5    BY MR. HOCHMAN:

6    Q      Well, with respect to the Saba School of Medicine

7    Foundation, are you aware of whether or not Dr. Fredrick ever

8    owned that foundation?

9    A      He never owned that foundation.

10          MS. FINLEY:  Objection, Your Honor, hearsay.

11          MR. HOCHMAN:  State of mind, Your Honor.

12          THE COURT:  Overruled.

13   BY MR. HOCHMAN:

14   Q      I'm sorry, you said he never owned that foundation?

15   A      Yes.

16   Q      Did you ever own that foundation?

17   A      No.

18   Q      Are you sure?

19   A      Yes.

20   Q      How are you sure?

21   A      No individual can own a foundation in the Netherlands

22   Antilles.

23   Q      And during 1988 to 1993, with respect to the finances of

24   setting up the Saba School of Medicine Foundation and the

25   school, were you involved in that at all?

1    A      No.

2    Q      Are you aware of the money that needed to be raised to

3    establish the Saba School of Medicine?

4    A      Yes.

5    Q      And how are you aware of that?

6    A      Well, it takes a lot of money to . . . have the

7    facilities, the supplies.  It was a long ways off.

8    Q      And did you and Dr. Fredrick contribute any monies

9    towards this project?

10   A      Yes.

11   Q      What types of monies?

12   A      A lot of our savings, and . . . my . . . dear Aunt

13   Alice, who had no children, passed away and left me about

14   $100,000, about that time, 1992.

15   Q      And what did you do with the $100,000?

16   A      I considered it our money, and that was the initial

17   funds that were used to open the school.

18   Q      Have you ever received that $100,000 back?

19   A      No.

20   Q      Have you ever even requested to receive that $100,000

21   back?

22   A      No.

23   Q      In . . . did you believe that the Saba School of

24   Medicine was a risky venture?

25   A      Yes.

1    Q       Why?

2    A       There were a lot of stereotypes about Caribbean schools.

3    It's not a name like Aruba, you know, that you hear very often.

4    It would take, you know, a student to take a risk also, to go

5    there.

6            So with quality education, though, I never had any

7    doubts that they could get residencies in the United States or

8    Canada.  I knew they could, as long as they passed their exams.

9    Q       Well, if you believed it was a risky venture, why did

10   you put the entire inheritance you received from your aunt into

11   this venture?

12   A       Well, David had helped me with my dream.  He just did

13   everything while I was in medical school, and residency.  And I

14   really wanted to help him with his dream.

15   Q       Did you know, one way or the other, whether or not

16   Dr. Fredrick had ever started a medical school before the Saba

17   School of Medicine?

18   A       No, he had not.

19   Q       Had you ever started a medical school before the Saba

20   School of Medicine?

21   A       No, I had not.

22   Q       And the time period when it starts -- the initial start

23   was 1986, you said; correct?

24   A       Those are the first meetings; yes.

25   Q       Now, I'll take you forward seven years, to 1993, if I

1    could.

2            Were you aware of whether or not the Saba School of

3    Medicine received a WHO, the World Health Organization,

4    listing?

5    A       Yes, it did.

6    Q       And did it . . . did it receive it in 1993?

7    A       Either 1993 or 1994.

8    Q       And the school opened up -- once it received the

9    listing, was the school able to open up its doors?

10   A       Yes.

11   Q       How big was the initial class, if you recall, when the

12   school first began?

13   A       I think about 19 or 20 students.

14   Q       And what role did Dr. Fredrick play at that point?

15           MS. FINLEY:  Objection, Your Honor, foundation.

16           THE COURT:  Sustained.

17   BY MR. HOCHMAN:

18   Q       Did you have an understanding -- did you actually see

19   Dr. Fredrick involved with the Saba School of Medicine?

20   A       Yes.

21   Q       What was your understanding as to what, based on your

22   observations, as to what role Dr. Fredrick played at the

23   beginning, with the Saba School of Medicine Foundation and

24   school?

25   A       He had a small staff, but he did everything from

1    admissions to, you know, go out and buy equipment and get

2    containers sent to the islands.

3    Q     How many hours a week was he working at around this

4    time, 1993, and beginning of the Saba school, a week?

5    A     He taught full-time at Augusta college, and then I

6    rarely saw him -- he was gone early morning until 9:00

7    or 10:00 o'clock at night.

8    Q     And what role were you playing at the beginning stage,

9    back in 1993, 1994, at the Saba School of Medicine and its

10   foundation?

11   A     I was working as an assistant clinical professor for the

12   Medical College of Georgia, but I still had some free time, and

13   I started developing the third and fourth year of clinical

14   rotations in hospitals in the United States and Netherlands

15   Antilles.

16   Q     What was involved in establishing these clinical --

17   these affiliations with hospitals for clinical rotations?

18   A     Took face-to-face contact visits, assessing that they

19   had the proper training programs -- I knew a lot of them, just

20   because I had intended an international school -- you know,

21   convincing them that we had quality students.  There had to be

22   contracts arrange.

23   Q     And did you have to actually go out to each one of these

24   hospitals, to meet with the hospital administrators, in order

25   to establish this relationship?

1    A       Yes.

2    Q       And that was one of your primary jobs in connection with

3    the Saba School of Medicine?

4    A       That's how I started helping out.

5    Q       And did you ultimately get involved in other primary

6    tasks with respect to the Saba School of Medicine?

7    A       Well, by 1996, the offices were in Massachusetts, and I

8    was only working part-time at the hospital, so I was the

9    associate dean of clinical medicine.  And I was not really a

10   dean at that time, but I really worked on curriculum

11   development, and we had students ready to go out at that time,

12   and I did a lot of traveling.  I was much more aggressive about

13   making sure there were places for students to go.

14           MR. HOCHMAN:  Your Honor, if I could show the witness

15   Exhibit 207, and if we could dim the lights?

16           THE COURT:  You may.

17           MR. HOCHMAN:  And if we could move it over this way,

18   Your Honor?

19           THE COURT:  You may.

20           MR. HOCHMAN:  May I approach the witness freely, Your

21   Honor?

22           THE COURT:  You may.

23           MR. HOCHMAN:  Thank you.

24           (Mr. Hochman provides the witness with a photograph.)

25

1    BY MR. HOCHMAN:

2    Q      Dr. Hough, I'm showing you what's been marked as Defense

3    Exhibit 207.

4           Do you have that before you?

5    A      Yes, I do.

6    Q      And do you recognize Exhibit 207?

7    A      Yes.

8    Q      What is it, please?

9    A      That's at Leonard Chabert Hospital, but that's one of

10   our technically very sophisticated students, kind of showing me

11   how to use some PowerPoint and new medical education

12   technology.

13   Q      Is this a photograph at one of the hospitals that was an

14   affiliate hospital with the Saba School of Medicine?

15   A      It was one of our largest.  It was an LSU charity

16   hospital in Houma, Louisiana.

17          MR. HOCHMAN:  I would move into evidence, Your Honor,

18   Defendant's Exhibit 207?

19          MS. FINLEY:  Foundation as to the time of the photo,

20   please?

21          THE COURT:  Sure.

22   BY MR. HOCHMAN:

23   Q      Dr. Hough, are you familiar with approximately when this

24   photograph was taken?

25   A      I . . . I'm looking at the hairdo.  I think about 1999,

1    2000.

2              THE COURT:  Any objection?

3              MS. FINLEY:  No objection, Your Honor.

4              THE COURT:  207 will be admitted.

5              MR. HOCHMAN:  May I publish, Your Honor?

6              THE COURT:  You may publish.

7              (Defendant's Exhibit's 207 admitted into evidence.)

8              (An exhibit was projected onto the projector screen.)

9    BY MR. HOCHMAN:

10   Q     Dr. Hough, 207 is now being published.

11         Is that you in the middle, in the blue suit, seated,

12   pointing to the computer?

13   A     Yes.

14   Q     And who are these behind you?

15   A     These are all Saba University third and fourth-year

16   students.

17   Q     And they are located -- again, where is this taking

18   place?

19   A     At Leonard Chabert Hospital, in Houma -- spelled

20   H-O-U-M-A, Louisiana.

21   Q     Would this have been a hospital that you would have

22   arranged to be an affiliate hospital of the Saba School of

23   Medicine?

24   A     Yes.

25   Q     By the way, did you also have a similar role with the

1    Medical University of the Americas?

2    A       Eventually, I helped MUA and their clinical dean.

3    Q       And helped them in the sense of establishing these

4    clinical associations for the third and fourth year of their

5    clinical rotations?

6    A       Yes.  For example, Medical University of the Americas

7    students were accepted at Leonard Chabert, and we doubled the

8    size of the program.

9    Q       Now, at some point --

10            MR. HOCHMAN:  Thank you, Your Honor.  We can stop

11   publishing this particular document.

12            (Document removed from projector.)

13   BY MR. HOCHMAN:

14   Q       At some point, did your work -- you said, initially, you

15   were in the residency program when the Saba School of Medicine

16   opened up; is that correct?

17   A       Yes.

18   Q       At some point does your residency program end?

19   A       Yes.

20   Q       When approximately was that?

21   A       In June of 1992.

22   Q       What did you do at that point?

23   A       About two days later I became assistant clinical

24   professor of psychiatry at the Medical College of Georgia, and

25   worked at the teaching unit at Augusta regional hospital.

1    Q       And how long did you do that for?

2    A       Until 1996.

3    Q       And what happened at that point?

4    A       The offices moved to Massachusetts.

5    Q       Which offices now?

6    A       The Saba offices.  But it was called EIC, International

7    Education Consultants.

8    Q       And the EIC offices that moved to Massachusetts, where

9    in Massachusetts did they move?

10   A       A small town called Gardner, Massachusetts.

11   Q       And this was again approximately what year?

12   A       1996.

13   Q       Did you move from Georgia to Massachusetts in that time?

14   A       I moved a few months later.  I had to finish my

15   contract.

16   Q       Now, the entity that you were talking about that was in

17   Massachusetts, was it called EIC?

18   A       Yes.

19   Q       Who owned EIC, to your knowledge?

20   A       That was Dr. Fredrick's company.

21   Q       Did you ever own EIC?

22   A       No.

23   Q       And what was the role that EIC was to play -- this

24   Gardner, Massachusetts-based company -- with respect to the

25   Saba School of Medicine?

1   A      Well, a foreign school can't operate, or -- any foreign

2   school in the States, so it was a representative that did

3   admissions, handled finance, loans, and then eventually the

4   clinical medicine department and accreditations.

5   Q      So did it form -- did it operate in sort of a management

6   capacity for the Saba School of Medicine?

7   A      Yes.

8   Q      And did it operate in a similar capacity for the Medical

9   University of the Americas?

10  A      The Medical University of the Americas had a separate

11  staff and a separate office.

12  Q      But in Gardner, Massachusetts, as well?

13  A      Yes.  Yeah.

14  Q      And run by EIC as well?

15  A      Yes.

16  Q      So just to be clear, EIC ran both the -- excuse me --

17  managed both the Saba School of Medicine and the Medical

18  University of the Americas, but it did it from two different

19  buildings; is that correct?

20  A      Yes.

21  Q      Now, while we're on it, the difference between the Saba

22  School of Medicine Foundation and the Medical University of the

23  Americas, was the Medical University of the Americas, to your

24  knowledge, a nonprofit Netherlands Antilles foundation?

25         MS. FINLEY:  Objection, foundation.

1          THE COURT:  Overruled.

2          MR. HOCHMAN:  I'm sorry?

3          THE COURT:  Overruled.

4          THE WITNESS:  Could you repeat the question?

5          MR. HOCHMAN:  Sure.

6    BY MR. HOCHMAN:

7    Q     Was the Medical University of the Americas, to your

8    knowledge, a non-profit Netherlands Antilles foundation?

9    A     No.

10   Q     What kind of company was it?

11   A     It was a company . . . Nevisium.  A company from Nevis.

12   Q     And the Saba School of Medicine Foundation was a

13   nonprofit company.

14         Was the Medical University of the Americas a non-profit

15   company?

16   A     No . . . I don't believe so.

17   Q     Who owned -- who was one of the owners of the Medical

18   University of the Americas?

19   A     Dr. Fredrick held some shares.

20   Q     Are you aware of a gentleman named Dr. Cuthwin Lake?

21   A     Dr. Cuthwin Lake was the initial dean, and held shares.

22   Q     The initial dean of what?

23   A     Of the Medical University of the Americas.

24   Q     And did you ever hold any shares in the Medical

25   University of the Americas?

1    A      For a very brief time.

2    Q      And what time period was, if you recall?

3    A      Maybe 2002.

4    Q      And when you say -- did you actually know that you had

5    been given any shares in the Medical University of the Americas

6    at the time the shares apparently were given?

7    A      No.

8    Q      How did it come about that you found out that you had

9    received any shares in the Medical University of the Americas,

10   and what did you do once you found that out?

11            MS. FINLEY:  Objection.  Hearsay.  Foundation.

12            THE COURT:  It was at least compound, so I can't

13   tell.

14            MR. HOCHMAN:  I'm sorry, Your Honor.  If I might

15   break it down.

16            THE COURT:  Please.

17   BY MR. HOCHMAN:

18   Q      At some point, did you find out that you had been issued

19   shares in the Medical University of the Americas?

20   A      Yes.

21   Q      Had you ever requested those shares?

22   A      No.

23   Q      Did you know they had been issued to you at the time

24   they were issued to you?

25   A      No.

1    Q      When you found out that you had been issued shares, was

2    that shortly, several months after, you had been issued those

3    shares?

4    A      Yes.

5    Q      What did you do when you found out you had been issued

6    these shares?

7    A      I told Dr. Fredrick I didn't want them, and gave them

8    back, signed them over.

9    Q      And did you do that?

10   A      Yeah.  Through the local lawyer; yes.

11   Q      Now, with respect to the Medical University of the

12   Americas --

13          MR. HOCHMAN:  Your Honor, may I show Exhibit 101?  I

14   don't believe it's in evidence.  I'll present it for

15   identification.

16          THE COURT:  Defendant's 101?

17          MR. HOCHMAN:  Defendant's 101, Your Honor.

18          THE COURT:  All right.

19   BY MR. HOCHMAN:

20   Q      Dr. Hough, do you recognize the picture that's in

21   Defendant's Exhibit 101?

22   A      Yes.

23   Q      What is that a picture of?

24   A      Part of the campus of the Medical University of the

25   Americas.

1    Q     And approximately the time period, if you can recall,

2    when this picture was taken?

3    A     This would be about 2007 or 2008.

4          MR. HOCHMAN:  The defense would move in Defense

5    Exhibit 101, please.

6          THE COURT:  Any objections?

7          MS. FINLEY:  No objection, Your Honor.

8          MR. HOCHMAN:  And we'd ask to publish.

9          THE COURT:  101 will be admitted and may be

10   published.

11         (Defendant's Exhibit 101 admitted into evidence.)

12         (An exhibit was projected onto the projector screen.)

13   BY MR. HOCHMAN:

14   Q     And what's published for Defense Exhibit 101, I believe

15   you said, was the campus of the Medical University of the

16   Americas circa 2007/2008; is that correct?

17   A     Yes.

18   Q     Did it start out like this?

19   A     No.

20   Q     How did it start out?

21   A     It was a former sugarcane plantation with some pot

22   works, with some historic buildings, and then a big

23   existing . . . big, big existing building that was supposed to

24   be a factory, that was never used, a cement building.

25   Q     And when was the campus first established?

1    A       In 2000, the fall of 2000.

2    Q       And that's when the ground breaking happened for this

3    campus; is that correct?

4    A       Yes.  No.  It was renovated.  It opened then.

5    Q       And what involvement did you and Dr. Fredrick have with

6    respect to the establishment of the Medical University of the

7    Americas campus?

8    A       At that time I had very little.  It was primarily

9    Dr. Fredrick, Dr. Lake, and the government of Nevis.

10   Q       And what were your goals for the Medical University of

11   the Americas?

12   A       My goals?  Personal?

13   Q       Yes.

14   A       Well, I mean, I wanted it to be as good as Saba.  I had

15   done a lot of my training on Saint Christopher and in the

16   hospital on Nevis, and Nevis is just a wonderful little island.

17   I just hoped it would do as much for Nevis as the medical

18   school did on Saba.

19   Q       With respect to the tuition, were you looking to charge

20   as much as possible for the tuition for the Medical University

21   of the Americas?

22   A       Well, it wasn't me that decided that.

23   Q       Did you know -- are you familiar with what was charged

24   for the tuition for the Medical University of the Americas?

25   A       It was similar to Saba University, maybe a little lower

1    initially.

2    Q      And how about the quality of the medical education on

3    the Nevis campus -- by the way, we were just looking at the --

4    in Exhibit 101, this is the Nevis campus of the Medical

5    University of the Americas?

6    A      Yes.  It was just a very small part of it.  It was

7    ten acres.

8    Q      And what about the quality of the Nevis MUA curriculum,

9    what was your understanding as to what that quality was?

10   A      It would be the same quality as the Saba Foundation

11   school.

12          MR. HOCHMAN:  Your Honor, at this point, if Your

13   Honor wants to take a morning break, this is probably a good

14   place for it.

15          THE COURT:  All right.  Thank you.

16          Let's take 15 minutes.  Please do not discuss the

17   case among yourselves, or allow anyone to discuss it with you

18   or in your presence.  About 15 minutes.

19          (At 11:07 AM, the jury was escorted from the

20      courtroom.)

21          THE COURT:  All right.  Fifteen minutes.

22          MR. HOCHMAN:  Thank you, Your Honor.

23          (At 11:08 AM, court was recessed.)

24                         AFTER RECESS

25          (At 11:26 AM, court was reconvened.)

1              THE COURT:  Both sides ready for the jury?

2              MR. HOCHMAN:  Yes, Your Honor.

3              If we could dim the lights, as well.

4              THE COURT:  All right.  If we could have the jury

5    step in.  And dim the lights.

6              THE COURTROOM DEPUTY:  I usually let the jury come

7    in, first.

8              THE COURT:  Oh, okay.  I can live with that.

9              (At 11:27 AM, the jury was escorted into the

10        courtroom.)

11             THE COURT:  And you may proceed.

12             MR. HOCHMAN:  Thank you, Your Honor.

13   BY MR. HOCHMAN:

14   Q     Dr. Hough, when the Saba School of Medicine first

15   started, I think you said that you -- did you have a chance to

16   visit the location where they were holding classes?

17   A     Yes.

18   Q     And at some point -- this is now 1993/1994; is that

19   correct?

20   A     Yes.

21   Q     And at some point did they purchase a . . . a different

22   plot of land on the island of Saba?

23   A     Yes.

24             MR. HOCHMAN:  May I present what's already been

25   admitted into evidence, Your Honor, we'll have Defendant's

1   Exhibits 115, 116, and 117?

2            THE COURT:  You may.

3            MR. HOCHMAN:  If we could publish 115, please?

4            (An exhibit was projected onto the projector screen.)

5            MR. HOCHMAN:  While we are waiting for the projector

6   to work, let me ask a few more questions, Your Honor?

7            THE COURT:  Sure.

8   BY MR. HOCHMAN:

9   Q     Dr. Hough, you mentioned that you dealt with EIC in

10  Gardner, Massachusetts; is that correct?

11  A     Yes.

12  Q     I would like to ask you about a few people at EIC, and

13  if you could identify them and what they did, and approximately

14  when they did it.

15         Sandra Murphy.

16  A     She was my assistant . . . she was called the clinical

17  coordinator.

18         Do you want to know when she worked?

19  Q     Approximately.

20  A     1999.  She's still there.

21  Q     And she's still there today?

22  A     Yes.

23  Q     So she kept working after the schools were sold --

24  A     Yes.

25  Q     -- and after EIC was sold.

1          And this is now April of 2007?

2     A     Yes.

3     Q     Lisa Gallant?

4     A     Lisa was the bursar, and helped with loans.

5     Q     And this is the bursar at EIC, in connection with the

6     Saba School of Medicine, and the Medical University of the

7     Americas?

8     A     Mostly the Saba School of Medicine.

9     Q     Bernice Ouellet?

10    A     Bernice worked from 1996, in Massachusetts, as the

11    office administrator for EIC.  Now she is still the office

12    administrator and is still employed.

13    Q     A gentleman named Phillip Thornton?

14    A     Phillip Thornton is the accountant that replaced David

15    Minchenberg.

16    Q     And with respect to Mr. Minchenberg, what role did Lisa

17    Gallant serve?

18    A     She was in the same office.  They were mostly like

19    cubicles, but they were right next to each other, and in

20    finance.

21    Q     And do you know if they worked together?

22    A     Yes.

23          MR. HOCHMAN:  And if we can publish, now,

24    Exhibit 115 -- Defense Exhibit 115?

25               (An exhibit was projected onto the projector screen.)

1    BY MR. HOCHMAN:

2    Q      Dr. Hough, I just want you to identify, is this the --

3    what's been identified as the Round Hill part of the island of

4    Saba?

5    A      Yes.  It was taken about a month after Hurricane Lenny

6    kind of blew off every leaf off every tree on Saba.

7    Q      Do you remember what year Hurricane Lenny came in and

8    blew off everything in Saba?

9    A      Oh, it was in mid-November of 1999.

10   Q      And just identifying people in the picture, to the

11   extent you're able, is that you right in the middle, in a black

12   top?

13   A      Yes.

14   Q      And who are the other gentlemen, if you could identify,

15   if you could, everybody in this photograph?

16   A      In the foreground is Dr. Scott Harris, the dean at that

17   time.

18   Q      The gentleman being the --

19   A      The gentleman in the white shirt and tie.

20   Q      That doesn't actually limit it.

21   A      Oh.

22   Q      If you look at where your right side is, is he to the

23   right of you in the photograph?

24   A      Yeah, I think so; yes.

25   Q      And do you recognize anybody else in the photograph?

1    A      Yes.  Those are all students that were helping.

2           MR. HOCHMAN:  If you could turn to what has been

3    marked, or what's in evidence as Defense Exhibit 116?

4           (An exhibit was projected onto the projector screen.)

5    BY MR. HOCHMAN:

6    Q      And what is in -- what is this photograph of Defense

7    Exhibit 116?

8    A      We're looking at the plans for the major classroom

9    building.

10   Q      And again, this is the Round Hill area of the island of

11   Saba?

12   A      Yes.

13   Q      As the only woman in the photograph, is that you, sort

14   of in the middle?

15   A      Yes.

16   Q      Who are the other gentlemen to your left and right?

17   A      To the far right is Lieutenant Governor Antoine

18   Solagnier.

19   Q      And he would be to your left, is that correct, on the

20   photograph?

21   A      Oh, yes, he's to my left.

22   Q      And do you know who is next to him?

23   A      Commissioner Will Johnson.

24   Q      Who is Commissioner Will Johnson?

25   A      He was a very powerful politician on the island.  There

1   were only two commissioners elected, and he was one of them.

2   Q      And do you know if he was ever on the Saba School of

3   Medicine Foundation board?

4   A      For about a year.

5   Q      And do you recognize the gentleman on your right in the

6   photograph?

7   A      Yes.  That's the dean, Dr. Scott Harris.

8   Q      And he's the gentleman without the coat on?

9   A      Yes.

10  Q      And if you could turn to -- Defense Exhibit 117?

11         (An exhibit was projected onto the projector screen.)

12  BY MR. HOCHMAN:

13  Q      Now, Defense Exhibit 117, do you recognize that?

14  A      Yes.

15  Q      What is it?

16  A      That's the campus of the Saba University medical school.

17  Q      And is that the campus that was built somewhere between

18  2000 and 2005 . . . or --

19  A      Most of it.

20  Q      -- or 2006?

21         I'm sorry, what was your answer?

22  A      Most of it.

23  Q      And is this also located in that same land that you were

24  just looking at, the Round Hill land?

25  A      Yes.

1   Q      Thank you.

2          MR. HOCHMAN:  We can take that photograph off.

3   BY MR. HOCHMAN:

4   Q      Now, at some point in 2001 -- we discussed the Saba

5   School of Medicine, we discussed the Medical University of the

6   Americas at Nevis -- did an opportunity come up to set up

7   another branch of the Medical University of the Americas?

8   A      Yes.

9   Q      Where was that branch to be set up?

10  A      In the country of Belize.

11  Q      And please describe to the jury how that opportunity

12  came up, based on your knowledge.

13  A      Based on my knowledge, I was sitting next to

14  Dr. Fredrick, in Seattle, and he got a call on his cell phone

15  from a Dr. Jeffrey Seersland, asking --

16         MS. FINLEY:  Objection, Your Honor, hearsay.

17         THE COURT:  Sustained.

18  BY MR. HOCHMAN:

19  Q      Well, do you know how . . . do you know how the MUA

20  Belize branch of the Medical University of the Americas got set

21  up?

22  A      Yes.

23  Q      And did you actually participate in the setting up of

24  the Medical University of the Americas Belize branch?

25  A      Some of the academic program.

1   Q      And describe to the jury what you did to help set that

2   up.

3   A      I maintained oversight on the curriculum, quality of

4   faculty.  It was basically its ability to be accredited.

5          Belize was the only country in Central America that did

6   not have its own medical school, so -- and it had a -- one of

7   the best public hospitals, free hospitals, I've seen anywhere

8   in that region.  And we had hoped to work cooperatively with

9   the government of Belize to have it as their medical school.

10  That would be a . . . a joint . . . much like Saba, but with

11  more government involvement.

12  Q      Were there any individuals in Belize that you worked

13  with?

14  A      There was a Dr. Jeffrey Seersland, Dr. René

15  Seersland . . . .  Now I'm forgetting the names.

16  Dr. Giuseppe -- I'm just forgetting the names of some of the

17  government people.

18  Q      Did the Seerslands end up owning half of MUA Belize?

19  A      Yes.

20  Q      Who owned the other half?

21  A      Dr. Fredrick.

22  Q      Did you ever own any shares in MUA Belize?

23  A      No.

24  Q      Why not?

25  A      I didn't want to.

1   Q      And at some point in January, 2004, did you go down to

2   MUA Belize to make an assessment?

3   A      Yes.

4   Q      Who did you go with?

5   A      Dr. John Nekic accompanied me.

6   Q      And why did he accompany you?

7   A      He . . . at that time he was the administrator for the

8   U.S. office for Medical University of the Americas Belize, and

9   also oversight over loans.

10  Q      Who did you meet with when you were down in Belize, in

11  January, 2004?

12  A      I did like I always did, I would meet with the deans, I

13  would meet with the faculty, look over admissions records, kind

14  of judge students' satisfaction.  I would occasionally lecture

15  a class, if they asked me, and also meet with the government

16  officials.

17  Q      Why were you doing an assessment in January, 2004, of

18  the MUA Belize campus?

19  A      There were significant complaints from faculty, and

20  students, and the loan people in the United States.  Our

21  employees were very concerned about how those were being

22  administered.

23  Q      And what did you discover in doing your analysis -- or

24  doing your assessment, excuse me.

25  A      I was there about ten days, and the . . . .  They built

1    a building, they had a campus, and I was disappointed in the

2    laboratories.  I didn't think the laboratories for anatomy and

3    microbiology were as we had planned, or sufficient.  That was

4    true of the library.

5          I tried to speak with as many of the long-time faculty

6    as possible.  There was a great deal of faculty dissatisfaction

7    about administration.  There were student complaints that

8    that . . . about quality, and concern about passing their

9    boards.

10   Q     Why did it matter that the lab -- the laboratories and

11   libraries weren't up to par, or that the faculty had

12   complaints, or the students had complaints about quality?

13   A     It was really clear through -- at the beginning . . . of

14   everyone that participated, that the goal was the same

15   accreditations at Saba and MUA, that we were going to have the

16   same standard and quality.

17   Q     And did you see whether or not MUA Belize had the same

18   standards of quality as the Saba School of Medicine and the

19   Medical University of the Americas?

20   A     At that time it did not.

21   Q     Did you return to . . . to the United States at that

22   point?

23   A     Yes.  Dr. Nekic and I returned and gave reports.

24   Q     To whom?

25   A     To the board of directors at the Saba Foundation, to the

1   dean of MUA, to their board . . . I'm not sure how it got

2   distributed, but we both wrote reports and presented those.

3   Q      What was the ultimate findings of your report?

4   A      My report focused on academics.  But I was very

5   concerned about the quality of administration.  They were just

6   admitting students that wandered in without sufficient

7   documentation.  I was concerned that some of the best faculty

8   that had started were resigning.

9          Dr. Nekic was extremely concerned about how they were

10  administering the loans.

11  Q      Did you -- as a result of your report, was any action

12  taken . . . by Dr. Fredrick or anyone else?

13  A      There was a parting of the ways.

14  Q      What do you mean by a parting of the ways?

15  A      Before it lapsed, the Seerslands and their main

16  administration had given an indication that we could have an

17  amicable parting of the ways, that they could become an

18  entirely separate school.

19  Q      Do you know whether or not Dr. Fredrick . . . whether or

20  not Dr. Fredrick sold his shares back to the Seerslands?

21  A      Eventually he did.

22  Q      And do you know whether or not he got paid for those

23  shares?

24  A      Yes.

25  Q      What was he paid?

1            MS. FINLEY:  Objection, hearsay.

2            THE COURT:  Absent a foundation, sustained.

3    BY MR. HOCHMAN:

4    Q     Did you have a chance to see the sale documents in

5    connection with the sale?

6    A     Yes.

7    Q     And with respect to what you were able to observe, were

8    you able to see how much Dr. Fredrick was to be paid for his

9    shares in MUA Belize?

10   A     Yes.

11   Q     And how much?

12   A     That was $850,000.

13   Q     Do you know if he got paid the entire $850,000?

14   A     He told me did he did not.

15           MS. FINLEY:  Objection, hearsay.

16           THE COURT:  Sustained.

17   BY MR. HOCHMAN:

18   Q     Were you able to see any documentation that showed

19   whether or not Dr. Fredrick got paid the entire $850,000?

20   A     On his tax returns it indicates he did not.

21   Q     Did you speak with -- don't tell me what Dr. Fredrick

22   said to you, but did you speak to Dr. Fredrick about whether or

23   not he had been paid in full under this contract?

24   A     Yes.

25   Q     I'd like to show you --

1              MR. HOCHMAN:  If we can switch over the monitor, Your

2      Honor, to the government's exhibit side?

3              THE COURT:  Sure.

4              MR. HOCHMAN:  I would like to show you what's been

5      admitted into evidence as Government's Exhibit 1U, like in

6      "under," and we'll focus on Page 6.

7              (An exhibit was projected onto the projector screen.)

8              MR. HOCHMAN:  And if we could zoom in on the line

9      that says, "Medical University of the Americas B"?

10     BY MR. HOCHMAN:

11     Q      Now, I'm showing you, Dr. Hough, Dr. Fredrick's 2004 tax

12     return.

13             Do you see that?

14     A      Yes.

15     Q      And I have directed your attention to Page 6 of this tax

16     return, and the line "Medical University of the Americas."

17             Do you see that?

18     A      Yes.

19     Q      And it says $500,000 there.

20     A      Yes.

21     Q      Do you see that?

22     A      Yes.

23     Q      Did you have an understanding as to what this $500,000

24     meant in connection with Dr. Fredrick's 2004 tax return?

25     A      Yes.

1          MS. FINLEY:  Objection, foundation, as to how she

2    knows that.

3          THE COURT:  The objection to the last question is

4    overruled.  It was yes or no, and she said yes.  So we'll see

5    what's next.

6          MR. HOCHMAN:  Let's turn to Exhibit 1V, Your Honor,

7    as in "Victor."

8          (An exhibit was projected onto the projector screen.)

9    BY MR. HOCHMAN:

10   Q     I would again like to turn your attention to Page 7 of

11   this return.  And if we could focus on the Medical Universities

12   of the Americas line?

13         I direct your attention now to Dr. Fredrick's

14   December -- excuse me -- Dr. Fredrick's 2005 U.S. tax return.

15         Do you see that?

16   A     I'm sorry, I'm still on the wrong page.

17         Okay.  I've got it.  Yes, I see . . . I see it.

18   Q     Now, on Page 7, do you see where it says, "Medical

19   University of the Americas," dash, and then it says $240,000?

20   A     Yes.

21   Q     Without describing the contents of your conversation,

22   did you speak with Dr. Fredrick about this $240,000?

23   A     Yes.

24   Q     And with respect to this $240,000, did you have an

25   understanding as to whether -- as to what this $240,000

1    represented?

2    A       The sale of his shares.

3            MS. FINLEY:  Objection, Your Honor.

4            MR. HOCHMAN:  Just yes or no, please.

5            THE WITNESS:  Oh.  Yes.

6            MR. HOCHMAN:  We can take it off, please.

7    BY MR. HOCHMAN:

8    Q       Did you ever receive any of the $740,000 with respect to

9    the sale of MUA Belize?

10   A       No.

11   Q       I'd like to now direct your attention to the late 1990s,

12   if I could.

13           What is going on with respect to any internal strive at

14   the Saba School of Medicine, to your knowledge?

15   A       Some of the deans were fired.

16   Q       And in what way did they -- do you know why they were

17   fired?

18   A       Yes.

19   Q       How do you know that?

20   A       I was there.

21   Q       And would you please tell the jury about the

22   circumstances surrounding their firing?

23   A       Dr. David Gill was the dean of clinical medicine, and he

24   was fired for nonperformance in about mid-1998, and . . . and

25   solicited one of our deans and a government official on Saba to

1   try to take over The Foundation.

2   Q      What happened at that point?

3   A      Well, it was a real shock, because the people on Saba

4   were trusted people.  And . . . a few others, one administrator

5   joined.  They found a big investor in New York, but . . . with

6   the intervention of Lieutenant Governor Solagnier, the

7   attorney . . . the prosecutor on Saint Maarten, they were not

8   successful in trying to take over The Foundation.

9   Q      Did they -- to your knowledge, based on being there, did

10  they do anything with respect to the Saba School of Medicine

11  Foundation's accounts?

12  A      Yes.

13  Q      What was that?

14  A      When I was acting dean, they looted every account on the

15  island.

16  Q      Did Dr. Gill end up filing a lawsuit against the Saba

17  School of Medicine Foundation?

18  A      Yes.

19  Q      And in speaking about lawsuits, I'd like to direct your

20  attention back to the mid-1990s.

21         Are you aware of a lawsuit being filed, in the

22  mid-1990s, against Saba School of Medicine Foundation?

23  A      Yes.

24  Q      And what was that lawsuit involving?

25  A      It was a faculty member that had been terminated for

1    performance and sexual harassment of female students.

2    Q      And were you suing that faculty member for sexual

3    harassment, or was that faculty member suing the Saba

4    Foundation for wrongful termination?

5    A      He sued us in the United States -- he didn't sue us.  I

6    think he sued the school, EIC, Dr. Fredrick, for wrongful

7    termination.

8    Q      And what did you understand -- what was your

9    understanding, based in the mid-1990s, as to whether a United

10   States judgment could be effected on the island of Saba?

11          MS. FINLEY:  Objection, foundation.

12          THE COURT:  Sustained.

13   BY MR. HOCHMAN:

14   Q      Did you come to learn -- and yes or no -- as to what the

15   effect of an U.S. judgment could have on the bank accounts of

16   the school -- Saba School of Medicine Foundation on the island

17   of Saba?

18   A      Yes.

19   Q      How did you come to learn that?

20   A      Through the school lawyers.

21   Q      Did you have discussions with the school's lawyers?

22   A      Briefly, yes.

23   Q      And did the school's lawyers provide you with

24   information that you then acted on?

25   A      Well, the board acted.

1   Q      What was that information?

2            MS. FINLEY:  Objection, hearsay.

3            MR. HOCHMAN:  State of mind, Your Honor.  And forms

4   the basis of an action.

5            THE COURT:  Overruled.

6            THE WITNESS:  Could you restate the question?

7   BY MR. HOCHMAN:

8   Q      What was that advice that you received and acted on?

9   A      I mean, the view would be, the board and all the major

10  deans, was that . . . it was in federal court, it was serious,

11  and that our -- a judgment could be -- could result in accounts

12  and property being frozen in the Netherlands Antilles.

13  Q      And would that -- what was your understanding as to what

14  would happen with the Saba School of Medicine Foundation's

15  accounts in the Netherlands Antilles if a lawsuit were to come

16  through against the Saba School of Medicine Foundation?

17  A      Oh, it would be catastrophic for the school.

18  Q      Why?

19  A      The school just relied on tuition.  There were no big

20  investors.  Excess funds were being held for buildings.  And, I

21  mean, it would be -- it would be catastrophic for the students.

22  They need life-long access to transcripts, to . . . medical

23  licensure is very complicated.  It would have really been

24  horrible . . . for the island and the students.

25  Q      Are you aware of whether or not, in the mid-1990s, as a

1    result of that lawsuit for that former professor, the Saba

2    School of Medicine Foundation took any steps regarding asset

3    protection?

4    A       Yes.

5    Q       And on what do you base your knowledge?

6    A       What I was told, and then what I've seen as part of this

7    case for the last four years.

8    Q       I would like to focus on what you've been able to

9    observe, and -- that forms your state of mind, if we can have

10   that as your focus.

11           What steps in the mid-1990s were taken, to your

12   knowledge, by the Saba School of Medicine Foundation, to engage

13   in asset protection?

14               MS. FINLEY:  Objection, Your Honor.

15               May we just have a sidebar?

16               THE COURT:  You may.

17                           AT SIDEBAR

18               MS. FINLEY:  I think she just said that she had no

19   personal knowledge, until this case, about what steps were

20   taken, and that she was told by other people.  So either she

21   has no foundation because she has no personal knowledge at the

22   time it was happening or it's based on hearsay.  So I am not

23   sure how she can testify as to what was done.

24               MR. HOCHMAN:  I believe what she can testify to, and

25   what forms a key part of her state of mind, is why the Saba

1   School of Medicine both needed asset protection, and we are

2   then going to link this into the UBS accounts and what her

3   understanding was, as to why they were opening up UBS accounts.

4   This sort of forms the foundation for her later actions as to

5   why these UBS accounts were being opened.

6          THE COURT:  Give me an example as to what you

7   anticipate the answer to be to this particular question.

8          MR. HOCHMAN:  Sure.  My understanding of what she's

9   going to say is that she understood that Dr. Fredrick, not

10  herself, was empowered by the board to protect the assets, and

11  then later -- I'm going to link that directly to Dr. Fredrick,

12  asking her to go to meet with Dieter Luetolf, in 2001, to deal

13  with opening up a UBS account that she believed was being

14  opened up for asset-protection reasons with The Foundation's

15  money, not her own, and that was the issue of whether or not

16  the account in her name was her personal funds or the Saba

17  Foundation's funds.

18         These questions are just the basic preliminary

19  questions that will lead quite quickly to opening up the UBS

20  account.  I won't be dwelling in this area more than a couple

21  questions.  But it's her state mind.

22         MS. FINLEY:  I just guess I don't understand the

23  foundation, based on her testimony just now that she was told

24  things but had no personal knowledge about the asset protection

25  at the time, until she saw everything in the last four years.

1          MR. SAUNDERS:  I think she said it was both.  It was

2     what she learned at the time and what she has learned in the

3     last four years of this case.

4          MR. HOCHMAN:  I asked the question, what was she told

5     back then.  And then I wanted to buttress what she saw back

6     again, and whether she saw the documents there or here.  But

7     basically it's the state of mind for her, and then, as a

8     precursor for her reactions later on as to what she thought was

9     going on, and what she thought was the Saba School of Medicine

10    Foundation's asset-protection reasons and actions that it took

11    in the mid-nineties that lead to them -- we would argue,

12    certainly -- taking the similar actions in the 2000s.

13         THE COURT:  Well, I'm going to give you a little bit

14    of leeway, at least in the beginning, to see how it goes.

15         MR. HOCHMAN:  Thank you.

16         THE COURT:  My sense of her answer probably mirrors

17    the government's, in that I interpreted what she said as that

18    she had little knowledge back then, and most of her knowledge

19    comes from this case, being given documents for the last four

20    years.

21         If that's the case, the state mind is diminished in

22    terms of relevancy.  If it's the former, then okay.

23         MR. HOCHMAN:  Very good.

24         THE COURT:  So I think at some point you may want to

25    clear up if she's just regurgitating what she's seen now or if

1   she knew it at the time.

2            MR. HOCHMAN:  Very good.  I'll do that, Your Honor.

3   Thank you.

4            MS. FINLEY:  Thank you.

5                        IN OPEN COURT

6            THE COURT:  You may proceed.

7            MR. HOCHMAN:  Thank you.

8   BY MR. HOCHMAN:

9   Q       Dr. Hough, I would like to focus your state of mind to

10  the mid-1990s, to the time the lawsuit came in that you

11  described a moment ago.

12           Do you have that state of mind in your mind?

13  A       Yes.

14  Q       At that time, what did you understand as to whether or

15  not the Saba School of Medicine Foundation was taking any

16  asset-protection measures?

17  A       A few local lawsuits and that big federal lawsuits, the

18  board, through one of the directors from the island, Thomas

19  Eric Johnson, had met with lawyers on Saint Maarten, and were

20  taking steps to protect the school.

21  Q       Now, were you empowered by the board of the Saba School

22  of Medicine Foundation to take those steps on behalf of the

23  Saba School of Medicine Foundation?

24  A       Then?  No.

25  Q       Do you know who was empowered by the board in the

1    mid-1990s to take those steps on behalf of the Saba School of

2    Medicine Foundation?

3    A       Dr. Fredrick was.

4    Q       Now, in general, with Dr. Fredrick, what was your

5    understanding of Dr. Fredrick's role with respect to the

6    financial affairs of the Saba School of Medicine Foundation?

7    A       At that time his title was president and CFO, chief

8    financial officer.

9    Q       And that was his title, but what did he actually do,

10   with respect to the Saba School of Medicine Foundation's

11   financial affairs?

12   A       He did the management; worked with loans, accounting,

13   purchasing . . . everything, pretty much.

14   Q       Do you know whether or not he was empowered by the Saba

15   School of Medicine Foundation board to take -- to do these

16   financial operations on behalf of the Saba School of Medicine

17   Foundation?

18   A       Yes.

19   Q       And was he empowered . . . so empowered?

20   A       At what time?

21   Q       This is in the -- starting in the mid-1990s.

22   A       Yes.

23   Q       And --

24           MS. FINLEY:  Objection.

25           Can we just, again, have foundation as to when she

1    knew that?

2              THE COURT:  You may.

3    BY MR. HOCHMAN:

4    Q     Did you know this back in the mid-1990s?

5    A     Yes.

6    Q     And then, with respect to taking any asset-protection

7    measures in response to these lawsuits, did you become aware of

8    Dr. Fredrick taking any such actions?

9    A     Yes.

10   Q     When did you become so aware?

11   A     When he flew his plane to the Bahamas, to . . . set up

12   some Foundation bank accounts.

13   Q     And approximately when was that, if you recall?

14   A     Early 1996.

15   Q     And focusing again on your state of mind, what did you

16   understand Dr. Fredrick to be going to the Bahamas to do?

17   A     To see if there were suitable banks to open up

18   Foundation bank accounts.

19   Q     For what purpose?

20   A     To protect the money, to protect the schools, from

21   lawsuits.

22   Q     And do you know if Dr. Fredrick was able to find any

23   banks in the Bahamas to place the Saba School of Medicine

24   Foundation's funds?

25   A     When he returned he told me had did.

1  Q     And when did you learn that approximately?

2  A     It would have been in early 1996, before the move to

3  Gardner.

4  Q     Now I'd like to fast forward, if I might, a few years,

5  to 2001.  And actually, if I could draw your attention, after

6  9/11/2001, so after September 11, 2001.

7        Did you take a trip to Europe at that time?

8  A     Yes.

9  Q     What was the purpose of that trip?

10 A     Saba University had been invited to join a large college

11 consortium in a college in London, or near London, and I went

12 as a representative.

13 Q     And when you went to London as a representative, did you

14 go anywhere else in Europe during that trip?

15 A     Yes.  After the conference, I flew to Switzerland to

16 visit some friends.

17 Q     And while were you in Switzerland, did Dr. Fredrick ask

18 you to do anything?

19 A     Yes.

20 Q     What did he ask you to do?

21 A     He had compiled a large packet of documents -- some were

22 certified, some were originals -- about Medical University of

23 the Americas and the Saba Foundation, and asked me to take

24 those to the United Bank of Switzerland in Zurich, in person.

25 Q     Let's start with what type of documents they were.

1          What documents did Dr. Fredrick give you to take to the

2     United Bank of Switzerland –– we'll call that UBS; do you

3     understand that?

4     A     Yes.

5     Q     What documents did Dr. Fredrick give to you, to give to

6     UBS?

7     A     Pretty much everything official . . . about both

8     schools, either notarized, or I think there were some official

9     charters that they needed copies of; all . . . government

10    contracts; all approvals by the local government; the World

11    Health Organization listing . . . .  There were some catalogs.

12    I didn't look at every document.  There were really a lot of

13    documents.

14    Q     Did Dr. Fredrick explain to you what the purpose of

15    those documents was for?

16    A     They were needed in order to open up accounts in

17    Switzerland at that bank.

18    Q     And with respect to those documents, were there any

19    original documents that he had given you?

20    A     Yes.

21    Q     Which were the originals that he gave you?

22    A     They were government documents with a lot of signatures

23    and seals from Saba and from Nevis.

24    Q     When you say, "from Saba and from Nevis," are you

25    referring to the Saba School of Medicine Foundation and the

1  Medical University of the Americas?

2  A     No.  They were government documents.  They were official

3  documents.

4  Q     Oh, I'm sorry, but official documents about the Saba

5  School of Medicine Foundation and the Medical University of the

6  Americas.

7  A     Yes.

8  Q     Now, when you went to Switzerland, did you go to a

9  particular city to go to UBS?

10  A     On my way back, I took the train from the airport and

11  went into Zurich.

12  Q     And when you were in Zurich, did you go to the UBS

13  building?

14  A     Yes, I did.

15  Q     And who did you see when you went to the UBS building?

16  A     A man by the name of Dieter Luetolf.

17  Q     Had you ever met Mr. Luetolf before this meeting in

18  September -- late September of 2001, in the UBS office in

19  Zurich?

20  A     No.

21  Q     Had you ever communicated with him before that meeting?

22  A     No.

23  Q     Please tell the jury what happened during that meeting.

24  A     I met him.  He introduced himself.  I gave him all the

25  documents.  He went through, he had -- you know -- some of them

1   copied, then he had to have people come in and certify them.

2         And then he just talked to me about his background and,

3   you know, all the services that UBS could provide for The

4   Foundation.

5   Q      And when you met with Mr. Luetolf, how long did that

6   meeting last?

7   A      Under an hour.  Maybe 45 minutes.

8   Q      Did you ever tell Mr. Luetolf, during that meeting, that

9   you and Dr. Fredrick owned the Saba School of Medicine

10  Foundation?

11  A      No.

12  Q      Did you own it during that meeting?

13  A      No, I did not.

14  Q      Have you ever owned it?

15  A      No, I haven't.

16  Q      Did Dr. Fredrick own it during that meeting?

17  A      No.

18  Q      Has he ever owned it?

19  A      No.

20  Q      Did Dieter Luetolf, to your knowledge, ever set up -- or

21  give you any bank account opening documents to sign during this

22  meeting in late September, 2001, in his Zurich office?

23  A      No.

24  Q      Did you actually give Mr. Luetolf any of your personal

25  financial information at this September -- late September,

1   2001, meeting?

2   A      No.

3   Q      After the meeting, did Mr. Luetolf, in fact, set up a

4   Swiss bank account for The Foundation?

5   A      At some point he did.

6   Q      Now, are you aware that the -- with respect to that

7   first bank account, as to whose funds were going into that

8   first bank account?

9   A      The Foundation's.

10  Q      And why were you so aware?

11  A      That's what I was told.  I mean, it was going from one

12  bank to another.

13         MS. FINLEY:  Objection, hearsay.

14         THE COURT:  I'm sorry?

15         MS. FINLEY:  Hearsay.

16         THE COURT:  Counsel?

17         MR. HOCHMAN:  With respect to -- the witness's state

18  of mind, Your Honor, and to what she was told, to the extent it

19  deals with the issues clearly in this case.

20         THE COURT:  The objection will be overruled, absent

21  establishing who it was told her, first of all.

22         MR. HOCHMAN:  Certainly.

23  BY MR. HOCHMAN:

24  Q      Who told you that the money that was going to be going

25  into this first UBS account was the Saba School of Medicine

1   Foundation's money?

2   A      Dr. Fredrick.

3   Q      And what did he tell you?

4   A      There were some sorts of problems with accounts in the

5   Bahamas, and he had been advised by the UBS there to move

6   the -- all the money -- all the funds for The Foundation to

7   Zurich.

8   Q      Did you think there was anything wrong with opening up

9   this bank account at UBS?

10  A      No.

11  Q      Why not?

12  A      I lived and studied in Europe for many years, and German

13  and Swiss banks . . . I mean, they're really considered very

14  safe.

15  Q      And did you think that the money that was going to be

16  going into this first UBS account was your money?

17  A      No.

18  Q      Did you think it was Dr. Fredrick's money?

19  A      No.

20  Q      Why not?

21  A      It was The Foundation's money.

22         MR. HOCHMAN:  I'd like to show you what's in

23  evidence, Your Honor, as Exhibit 3GG, to the witness?

24         THE COURT:  You may.

25         MR. HOCHMAN:  I believe she has it in front of her.

1          If we can publish, I think it's Page 1 of 3GG, Your

2     Honor.

3          (An exhibit was projected onto the projector screen.)

4     BY MR. HOCHMAN:

5     Q     And, Dr. Hough, I'd like to direct your attention to

6     Page 1, of Exhibit 3GG.  And you see, it's a Form A that

7     reflects an account, up in the upper right, with the

8     Number 268?

9          Do you see that?

10    A     Yes.

11    Q     And this account appears to list, as the contracting

12    party, your name and Dr. Fredrick's name.

13         Do you see that?

14    A     Yes.

15    Q     Look at all of the handwriting on this document, from

16    the handwriting under the contracting party, down to the date

17    next to your names.  And if we could focus on the date next to

18    the signed names on the bottom.

19    A     Yes.

20    Q     Is any of this handwriting yours?

21    A     No.

22    Q     If you could turn to the second page of this document.

23    There's handwriting --

24         MR. HOCHMAN:  If we could focus on the upper part of

25    this document?

1   BY MR. HOCHMAN:

2   Q      Is any of that handwriting on Page 2 of this document

3   yours?

4   A      I'm sorry -- yeah, Page 2 of this document.

5          (The witness examines an exhibit.)

6          No.

7   Q      And if you could go to the bottom of this page, there

8   appears to be phone numbers listed, and an e-mail address.

9          Is any of that your writing?

10  A      No.

11  Q      If you can turn to Page 3 of this document and look at

12  all the handwriting on this document, including the writing

13  dealing with the place and date it was signed?

14         Is any of that your handwriting?

15         (The witness examines an exhibit.)

16  A      No.

17  Q      And up until now -- I should have asked this question

18  along way -- is any of this handwriting, to your knowledge,

19  Dr. Fredrick's writing on any of the documents we have looked

20  at so far?

21  A      It looks just like his signature.

22  Q      I'm sorry.  Outside his signature, with respect to the

23  handwriting on the documents, is any of that handwriting, to

24  your knowledge, Dr. Fredrick's?

25  A      No.

1   Q       And if you can turn the page to Page 4 . . . is any of

2   that handwriting your handwriting on Page 4?

3           (The witness examines an exhibit.)

4   A       No.

5   Q       Now, look at Page 5, if you could.  It seems to be a

6   copy of your U.S. passport.

7           Do you see that?

8   A       Yes, it is.

9   Q       Did you provide a copy of your U.S. passport that was

10  supposed to be used to open up a UBS account?

11  A       Yes.

12  Q       Did you provide a fake copy of your U.S. passport?

13  A       No.

14  Q       Did you ever try to conceal your name -- your true name,

15  Patricia Lynn Hough -- from UBS?

16  A       No.

17  Q       Did you ever try to conceal your address, your home

18  address, from UBS?

19  A       No.

20  Q       Did you ever try to conceal where you were from, where

21  you were born, from UBS?

22  A       No.

23  Q       In fact, if you look at the next document, Page 6, you

24  provided UBS with, actually, your Florida State driver's

25  license; isn't that correct?

1    A      Yes.

2    Q      And that listed your home address on Manasota Key, in

3    Englewood, Florida, didn't it?

4    A      Yes.

5    Q      If you look at the next page, Page 7, is that

6    Dr. Fredrick's correct and real U.S. passport, to your

7    knowledge?

8    A      To my knowledge, yes.

9    Q      Did Dr. Fredrick ever take any steps to try and conceal

10   his identity, his address, or where he was from, from UBS?

11   A      No.

12   Q      If you can turn to the next page, and if we could focus

13   up on the top, "PLH"?

14          Do you know who wrote the letters, PLH?

15   A      No.

16   Q      I believe Mr. Futterknecht -- you were here for

17   Mr. Futterknecht's testimony; is that correct?

18   A      Yes.

19   Q      And I believe Mr. Futterknecht said that writing

20   "P.L.H." is not a proper UBS practice.

21          Are you aware of proper UBS practices?

22   A      No.

23   Q      Do you see near the bottom, next to your signature, it

24   seems to the words, "Boston, October 17, 2001"; do you see

25   that?

1    A        Yes.

2    Q        Is that your handwriting or Dr. Fredrick's handwriting?

3    A        It is not my handwriting.  It doesn't look like his

4    handwriting.

5    Q        Does that look like the -- the initials PLH, did you or

6    Dr. Fredrick, to your knowledge, write those initials?

7    A        No.  It doesn't look like any of our . . . the way we

8    write.

9    Q        If you can turn to Page 9 and focus on the top part?

10            Again, it seems to be a D-L, and I guess that's an F.

11            Did you write "DLF" on this document?

12   A        No.

13   Q        And to your understanding, did Dr. Fredrick write -- is

14   that Dr. Fredrick's handwriting on this document?

15   A        Doesn't look like his handwriting.

16   Q        And the same with the place and date, listing Boston,

17   October 17, 2001; is that correct?

18   A        Yes.

19   Q        And then if I could focus you on Page 17, which deals

20   with the asset allocation in this particular document, if we

21   could scroll to the middle of the document . . . it says the

22   word, "defensive," at the bottom of the screen?

23            Did you write the word, "defensive"?

24   A        No.

25   Q        If you could go to the bottom of this document, did you

1    write the words, "absolute return"?

2    A      No.  That's not my handwriting.

3    Q      Did you have any discussions, with Dieter Luetolf or

4    anybody at UBS, about how the money in this account was

5    supposed to be allocated?

6    A      No.  That wasn't my role.

7    Q      And if I can just ask you to look through the rest of

8    the documents here, and answer the question as to whether or

9    not any of the handwriting on any of the remaining documents in

10   Exhibit 3GG is your handwriting or Dr. Fredrick's handwriting.

11   A      You mean other than signatures?

12   Q      Other than the signatures.

13          (The witness examines an exhibit.)

14          No.  It is not my handwriting, and doesn't look like

15      his.

16   Q      Do you know if you signed these documents in blank and

17   then they were fill out later?

18   A      I signed so many documents, I don't remember.

19   Q      Do you recall signing -- do you recall seeing

20   Exhibit 3G, Form A, in this case, in which the contracting

21   party wasn't filled out, but it bore your signature?

22   A      Yes.

23   Q      Do you have 3G before you?

24          And if not, I'll retrieve that.

25          (The witness examines exhibits.)

1   A       I have it.

2   Q       If you could put Page 1 of 3G up on the board, please?

3           (An exhibit was projected onto the projector screen.)

4           MR. HOCHMAN:  And if we could focus on the

5   contracting party at the top?

6   BY MR. HOCHMAN:

7   Q       Is this an example of a situation where you signed a

8   document that doesn't even list who the contracting party is?

9   A       Yes.

10          MR. HOCHMAN:  If we can focus on the bottom of this

11  document and show the signatures?

12  BY MR. HOCHMAN:

13  Q       And is that your date, says 14/7/03?

14  A       That's not -- it doesn't look like my handwriting.  I

15  don't write dates that way.

16  Q       Do you know if Dr. Fredrick -- if that's Dr. Fredrick's

17  handwriting or if he writes dates that way?

18  A       It's kind of how the Europeans write them.  He doesn't

19  write dates that way.

20  Q       And is that his handwriting?

21  A       Doesn't look like it.

22  Q       Now, did anyone ever explain to you what the purpose of

23  a Form A was?

24  A       No.

25  Q       When you signed the original document for this first

1    account that's being opened up at UBS, what did you understand

2    your involvement to be with this account?

3    A       Just as . . . like a custodian, or caretaker.

4    Q       Please explain to the jury what that means . . . what it

5    meant for you back then.

6    A       Can I say what I was told?

7    Q       If you were told it back then, please identify when you

8    were told something and who told it to you.

9    A       Okay.  Back then, after I had gotten back to the United

10   States, and . . . the accounts were being set up, I was told,

11   by Dr. Fredrick, that he'd had a conversation with

12   Liechtenstein Landesbank, and the accounts could not be set up

13   totally as a foundation; that, under their laws, there had to

14   be identified people as co-signers on the account, or

15   identified with the account.

16              MS. FINLEY:  Objection, Your Honor.  Hearsay.

17              MR. HOCHMAN:  State of mind, Your Honor.

18              THE COURT:  Come to sidebar.

19                           AT SIDEBAR

20              THE COURT:  I just wanted to make sure I understand

21   the facts.  She is saying that Dr. Fredrick told her what

22   Mr. Luetolf told her -- told him.

23              MR. HOCHMAN:  Correct.

24              THE COURT:  So you've got a couple different layers

25   of hearsay there, Luetolf to Fredrick, Fredrick to the witness.

1              MR. HOCHMAN:  And we are not introducing it for the

2    truth of the matter asserted.  We are introducing it more as to

3    her state of mind, as to her state of mind as to these

4    documents, which is one of the more important documents in the

5    case.

6              MS. FINLEY:  I guess I'm not -- in my mind, they

7    haven't connected that.  Because didn't you just say that she

8    signed them already, so it was . . . the conversation is after

9    she is signing?

10             THE COURT:  I'm not sure it's going to be consistent,

11   but we're not there yet, I guess.

12             MR. HOCHMAN:  I'll tie it in even tighter, Your

13   Honor.

14             THE COURT:  Well --

15             MR. HOCHMAN:  Because her answer went backward and

16   forward over a couple-week period.  What I am going to try and

17   do is bring her back to just after she met Mr. Luetolf, and run

18   the sequence forward.  I think it will become clearer.

19             THE COURT:  I was going to say, I don't think that

20   part is clear.

21             But in any event, what does that do to your

22   objection, if anything?

23             MS. FINLEY:  I guess what Mr. Luetolf told

24   Dr. Fredrick seems . . . somewhat attenuated as far as what

25   Dr. Fredrick is then telling her, yeah . . . .

1          THE COURT:  In your view it's all co-conspirators.

2          MS. FINLEY:  I guess I'm . . . .  I will withdraw my

3    objection now, and I guess I'll continue to see how it's coming

4    out, because I'm not sure I fully understand the state of mind.

5          MR. HOCHMAN:  I'll try to put in the chronology a

6    little bit tighter.  Her answer went back, slightly

7    unexpectedly, before it went forward.

8          THE COURT:  That may help.

9          MR. HOCHMAN:  Okay.

10                    IN OPEN COURT

11          THE COURT:  You may proceed.

12          MR. HOCHMAN:  Thank you.

13   BY MR. HOCHMAN:

14   Q     Dr. Hough, I want to go back in the chronology so that I

15   make sure that we have the chronology correct.

16         Is it approximately late September, 2001, when you meet

17   with Mr. Luetolf?

18   A     Yes.

19   Q     And you don't sign any bank documents at the time of

20   this meeting with Mr. Luetolf; correct?

21   A     No.

22   Q     You gave him, I think you said, the Saba School of

23   Medicine Foundation documents and the MUA documents during that

24   meeting; correct?

25   A     Yes.  And he gave the originals back to me.

1   Q      And the purpose of giving him these documents at that

2   meeting was what?

3   A      To certify the authenticity of the schools . . . the

4   relationships with the government, and open the accounts.

5   Q      Did you give him Saba School of Medicine Foundation and

6   MUA documents to open up your personal account at UBS?

7   A      No.

8   Q      Did you give them these documents to open up

9   Dr. Fredrick's personal account at UBS?

10  A      No.

11  Q      Did you give him any personal financial information,

12  like your credit report or anything like that, to open up a

13  personal account at UBS?

14  A      No.

15  Q      And at some point after this meeting you go back to the

16  United States; is that correct?

17  A      About two days later.

18  Q      And at some point in the next, we'll say month or so,

19  you end up signing certain documents that we just went over in

20  Exhibit 3GG, dealing with what are indicated on those

21  documents, at least, as the Patricia Hough/David Fredrick

22  account; correct?

23  A      Yes.

24  Q      So that, now going into the chronology, why did you sign

25  those documents; what were you thinking at the time you signed

1    those documents?

2    A      That new accounts had to be set up in a . . .

3    jurisdiction that would protect the assets.

4    Q      And who provided you that information?

5           And you can tell us, as it relates to your state of mind

6    back then.

7    A      While it was discussions, we had a director named Thomas

8    Eric Johnson.  I was just present.  Dr. Fredrick and I were

9    down there meeting with Attorney Speetjens.  He was there and I

10   was there.

11   Q      And how -- and again, what was told to you at that time

12   that forms your state of mind, that led to you signing these

13   documents to open up a UBS bank account?

14   A      Oh, the lawyers said, you know:  Don't leave anything

15   but, you know, what you need to run the schools and any banks

16   in the Caribbean.

17   Q      And did he say anything with regard to opening up a

18   Swiss bank account?

19   A      I don't know that they -- you know, designated the -- he

20   gave a list.  I remember there was a discussion about what were

21   the safest banks in the safer countries.

22   Q      And was Switzerland part of that list?

23   A      Yes.

24   Q      And was UBS part of the list for the banks in

25   Switzerland . . . if you recall.

1   A       I don't recall.

2   Q       How did you end up getting to Dieter Luetolf, by the

3   way?

4   A       I didn't -- I mean, I didn't get to him personally.

5   Somehow, Dr. Fredrick got -- they got in touch.

6   Q       Well, let me ask it slightly differently.

7           How did you know to visit Dieter Luetolf, as the

8   individual at the UBS, when you showed up at UBS's office in

9   late September, 2001?

10  A       Whoever was the UBS representative in the Bahamas set it

11  up with Dr. Fredrick -- or they got the parties together.

12  Q       And how did you get that information to be meeting with

13  Mr. Luetolf?

14  A       From Dr. Fredrick.

15  Q       And so then, when you signed your name on this account,

16  we went over, again, the fact that you know the handwriting on

17  this account is yours.

18          Did you know, actually, at the time, that the account

19  was being set up in your and Dr. Fredrick's name?

20  A       No, I did not.

21  Q       Whose name did you think it was going -- whose name did

22  you think was going to be filled in on the contracting party?

23  A       The Saba University School of Medicine Foundation.

24  Q       Why did you think that?

25  A       I mean, that was the school's money.  That's the

1    documents that I brought to him.

2              MR. HOCHMAN:  Your Honor, we are about to go into

3    another area.  I don't know if you want to break at this point.

4              THE COURT:  I think it would be a good time.

5              MR. HOCHMAN:  Thank you.

6              THE COURT:  Let's take an hour or so for lunch.

7              Please do not discuss the case among yourselves, or

8    allow anyone to discuss it with you or in your presence.

9              Let's get back at 1:30.

10             (At 12:24 PM, the jury was escorted from the

11        courtroom.)

12             THE COURT:  All right.  1:30.

13             MR. HOCHMAN:  Thank you very much, Your Honor.

14             (At 12:26 PM, court was recessed.)

15                          AFTER RECESS

16             (At 1:29 PM, court was reconvened.)

17             THE COURT:  All right.  Everyone set for the jury?

18             MR. HOCHMAN:  Your Honor, can I have 30 seconds?

19             I just have to set these books up.

20             THE COURT:  Sure.

21             MS. KESSLER:  Your Honor, I need to put on the record

22    another interaction that occurred with one of the jurors, with

23    Ms. Maurer, not me.

24             Apparently one of the jurors, and she wasn't certain

25    which one, was on the elevator with her, commenting on how cold

1    the courtroom was.  Ms. Maurer responded in kind that it was

2    cold.  That was the extent of the conversation as I understand

3    it.  She indicated she wasn't certain which juror number it was

4    simply because of where she's sitting.

5              MS. MAURER:  I can describe her.

6              THE COURT:  Doesn't matter.  I rode down on the

7    elevator, and one of the jurors told me it was cold, too.

8              MS. KESSLER:  They are consistent.

9              MS. MAURER:   It must be cold.

10             THE COURT:  That's why I have the afghans.  We have

11   control by about a couple degrees from the courtroom, so we've

12   raised the temperature to the extent we can.  What

13   traditionally happens is, about 3:00 o'clock it will be too

14   warm.  But we'll see if we can't get a little bit better

15   balance.

16             (There was discussion off the record.)

17             MR. HOCHMAN:  I think I have enough documents pulled

18   at this point.

19             THE COURT:  Are you good, or do you need some more

20   time?

21             MR. HOCHMAN:  Fifteen more seconds, Your Honor.

22             THE COURT:  Okay.

23             MR. HOCHMAN:  All right.  All set, Your Honor.

24             (The Court confers with the Courtroom Deputy

25        privately.)

1            THE COURT:  All right.  All set?

2            MR. HOCHMAN:  All set, Your Honor.

3            THE COURT:  Have the jury step in, please.

4            (At 1:35 PM, the jury was escorted into the

5       courtroom.)

6            THE COURT:  All right.  Ladies and gentlemen, I've

7    exercised all my power and authority to try to raise the heat

8    in here a little bit.  From past experience, that means

9    about 3:00 o'clock it's going to get too hot.  So if that

10   happens, you tell me, and I'll exercise my power and authority

11   to see if we can't get it down a little bit.

12           But you may proceed.

13           MR. HOCHMAN:  Thank you, Your Honor.

14           May we put 3G, Page 1, up on the screen, please?

15           (An exhibit was projected onto the projector screen.)

16   BY MR. HOCHMAN:

17   Q     All right, Dr. Hough, do you have Exhibit 3G, Page 1, in

18   front of you?

19   A     Yes, I do.

20   Q     And again, right before the break I was asking a series

21   of questions.  And I think I was -- I apologize, I was getting

22   different documents sort of meshed together.  So I'm going to

23   go back and see if I can actually lay this out as clearly as

24   possible in my questions.

25           3G is a Form A that you signed; correct?

1    A       Yes.

2    Q       And all the signatures in all the other documents, I

3    think, you acknowledged were your signatures and Dr. Fredrick's

4    signatures; correct?

5    A       Yes.

6    Q       Now, this is a Form A for an account that the

7    contracting partner information is missing.

8            Do you see that?

9    A       Yes.

10   Q       It was never filled in, apparently, at any time.

11           Do you see that?

12   A       Yes.

13   Q       And the question I have for you is:  Why did you sign

14   what appears to be, and appears to be always, a blank document?

15   A       Dr. Fredrick would give them to me, and tell me Dieter

16   Luetolf said they were essential to The Foundation accounts.

17   Q       Did you trust Dr. Fredrick?

18   A       Yes.

19   Q       Why did you trust him?

20   A       We had been married over 25 years.  I've never known him

21   to ever cheat, or lie, or -- I mean, I just never knew at that

22   time.  He was very honest about handling the student funds,

23   refunds.  He paid everything on time.  I mean, he was

24   meticulous about that.  I just had no reason at that time.

25   Q       And do you know if Dr. Fredrick, in turn, relied on

1    anyone?

2    A      He talked a great deal to Dieter Luetolf.

3    Q      And what did you understand Dieter Luetolf's background

4    to be at that time?

5    A      Oh, it was . . . it was very impressive, from what he

6    told me.  When I first met him, his grandfather was a bank

7    director of UBS.  He grew up in a diplomatic family in the

8    United States.  He went to the University of Zurich.  He had

9    the equivalent of a master's degree in accounting and finance.

10   Q      Did you rely on Dr. Fredrick and Dieter Luetolf in

11   signing your name to this document?

12   A      Yes.

13   Q      Now, if you can turn back to Exhibit 3GG --

14          MR. HOCHMAN:  And if we can put Page 1 of 3GG back

15   up?

16          (An exhibit was projected onto the projector screen.)

17   BY MR. HOCHMAN:

18   Q      Now, this is the form A for what appears to be listed as

19   the Patricia Hough/David Fredrick UBS account.

20          Do you see that?

21   A      Yes.

22   Q      And that has your signature on that, as well?

23   A      Yes.

24   Q      And I think what you were saying about -- and correct me

25   if I'm wrong -- before the break was that you didn't recognize

1    any of the handwriting on the documents other than the

2    signatures; correct?

3    A      Yes.

4    Q      And you didn't know whether or not your name and

5    Dr. Fredrick's name, and all the handwriting on these

6    documents, appeared at the time you signed it or sometime

7    later; is that correct?

8    A      That's correct.

9    Q      And so why -- why did you sign your name to this

10   document?

11   A      I was asked to, and it was essential to set up the

12   accounts.

13   Q      And which accounts did you believe you were setting them

14   up on behalf of?

15   A      The Foundation.

16   Q      Why did you believe that?

17   A      Well, I mean, it was always -- it was The Foundation's

18   money.  It was The Foundation's money, as far as I knew.

19   Q      Did you ever put any of your personal money in this

20   Patricia Hough/David Fredrick account?

21   A      No.

22   Q      Did you -- with respect to this account, did you go

23   ahead and rely on anyone prior to signing your name on this

24   Form A?

25   A      Well, I mean, it would have been my husband,

1    Dr. Fredrick, and . . . .  A couple times I met Dieter Luetolf.

2    I never really had phone conversations, but . . . I relied on

3    his expertise that that's what had to be done.

4    Q      And what did you understand had to be done?

5    A      That identifiable people with . . . passports and no

6    criminal background had to be signatories on the account.

7    Q      And so basically it was a live person that they needed

8    on the account?

9    A      Yes.  A live person that wasn't a criminal.

10   Q      Now, did you go to Dr. Fredrick and tell him,

11   "Dr. Fredrick, I'd like you to sign this document," or did

12   Dr. Fredrick come to you and ask you to sign this document?

13   A      He always came to me.

14   Q      Did you believe were you signing this on behalf of The

15   Foundation?

16   A      Yes.

17   Q      And by "The Foundation," I mean the Saba School of

18   Medicine Foundation.

19   A      Yes.

20   Q      Did you have . . . .  With respect to this document, did

21   you have any reason to believe that, somehow, you had won the

22   lottery, and you were all of a sudden going to be getting

23   millions of dollars in your own personal account?

24   A      No, I did not.

25   Q      Did anyone ever explain to you what a Form A is?

1   A       No.

2   Q       Did anyone ever explain to you that a Form A is only

3   used for Swiss anti-money laundering purposes, and has nothing

4   to do with U.S. tax purposes?

5   A       Not before this trial.

6   Q       Did you have any information at the time, and this time

7   is in the year 2001, about what a domiciliary company is under

8   Swiss banking law?

9   A       No.

10  Q       Did you have any information -- again, circa 2001 --

11  about what an operating company was under Swiss banking law?

12  A       No.

13  Q       Do you have any expertise, whatsoever, in Swiss banking

14  law?

15  A       No.

16  Q       Liechtensteinian banking law?

17  A       No.

18  Q       Bahamian banking law?

19  A       No.

20  Q       Any country's banking law?

21  A       No.

22  Q       Are you a . . . do you have any legal training?

23  A       No.

24  Q       Any accounting training?

25  A       No.

1    Q      Now, with respect to these documents, if I can now turn

2    your attention to Exhibit 3HH, and, in particular, Page 11 of

3    3HH.

4              (An exhibit was projected onto the projector screen.)

5    BY MR. HOCHMAN:

6    Q      Now, Exhibit 11 -- excuse me -- Exhibit 3HH, Page 11,

7    appears to have your signature and Dr. Fredrick's signature on

8    that.

9              Do you see that?

10   A      I haven't found it yet.

11   Q      I'm sorry.  It's Page 11 of Exhibit 3HH.

12   A      I can see it on the monitor.

13   Q      Very good.

14             Do you see your signature and Dr. Fredrick's signature

15   there?

16   A      Yes.

17   Q      And this is the 268 account that's, I'll represent to

18   you, the joint Patricia Hough/David Fredrick account.

19             Do you see that?

20   A      Yes.

21   Q      And you see that there's some writing on this document?

22   A      Yes.

23   Q      Something about . . . I see the letter, "USD, three

24   MIO."

25             Do you see that?

1    A       Yes.

2    Q       Something about an absolute return portfolio defensive

3    do you see that as well?

4    A       Yes.

5    Q       And you see it says, Boston, with a date?

6    A       Yes.

7    Q       And that date is 21.1.04?

8    A       Yes.

9    Q       Do you write your dates like that?

10   A       No.

11   Q       Do you -- is any of the handwriting on this document

12   yours or Dr. Fredrick's?

13   A       Just the signatures.

14   Q       With respect to -- do you recall whether or not this

15   document was filled out before or after you signed it?

16           Do you recall one way or the other?

17   A       No, I don't recall one way or the other.  I don't think

18   that I ever signed a document with those words.

19   Q       Did you ever initiate a transaction, just by yourself,

20   in connection with the David Fredrick/Patricia Hough bank

21   account?

22   A       No.

23   Q       Did you ever initiate a transaction, for that matter, by

24   yourself with respect to any of these UBS bank accounts?

25   A       No.

1   Q       And by "no," you mean, "I did not initiate a transaction

2   with respect to any of the UBS bank accounts"; correct?

3   A       I initiated no transactions.

4           MR. HOCHMAN:  And if I can turn your attention to

5   3HH, Page 14.

6           (An exhibit was projected onto the projector screen.)

7           MR. HOCHMAN:  And if we can focus on the first full

8   paragraph?

9   BY MR. HOCHMAN:

10  Q       And this is an e-mail that appears to be from David

11  Fredrick to Dieter Luetolf; do you see that?

12  A       Yes.

13  Q       And you're cc'd on this e-mail?

14  A       Yes.

15  Q       Let me ask you:  At the time, January 15, 2004 -- and

16  you can actually each look at the body of this e-mail, where it

17  says, "Pat is still in Belize" -- were you in Belize at that

18  time, to your knowledge?

19  A       Yes.  I was handling all the -- I was there with all the

20  MUA Belize problems.

21  Q       Is that when were you doing that assessment that you

22  told us about before, where you had to go down to Belize and

23  meet with all the people at MUA Belize?

24  A       I was at MUA Belize.

25  Q       You were at MUA Belize at that time, conducting the

1    assessment?

2    A       Yes.  Let's see.  Yeah, I think it was -- yeah, I was

3    there.  Pretty sure.

4    Q       And Dr. Fredrick is cc'ing you.

5            Did you get a lot of e-mails back in the years of 2004?

6    A       Oh, I was flooded with e-mails.

7    Q       And would that be true for the entire time period, let's

8    say, 2000 all the way to 2009 -- or let's say through the sale

9    of the schools through 2007?

10   A       I was able to cut it a little bit when we -- I just

11   couldn't handle all the student e-mails, and they went to my

12   assistant.  But I had a lot of e-mail traffic about

13   accreditations and hospitals and staff.

14   Q       And since you bring up accreditations and these

15   hospitals, let me ask you a quick question about that, and the

16   travel, the amount of travel.  And I'll focus, let's say,

17   starting in 2000, all the way to the sale of the schools in

18   2007.

19           About how many days on the road were you, on an average

20   year?

21   A       I traveled at least two . . . two weeks every month.  I

22   mean, it might not have been all together, but I really

23   traveled a lot.  Sometimes I might have gone a month to the

24   islands.

25   Q       And where would you be traveling to?

1    A      In the United States, I was traveling from hospitals.  I

2    think the closest was Cape Cod, and the furthest affiliate we

3    had was in Spokane, Washington.

4    Q      And if you had to estimate, how many states in the

5    United States would you travel to, to either accreditation

6    visits or deal with the hospitals for the clinical side of the

7    medical schools' operations?

8    A      Oh, at least a dozen, maybe more.  I've never counted

9    them.

10   Q      Spread out all over the United States?

11   A      We try to have regional clusters so that the students

12   wouldn't have to move around so much.

13   Q      So you're traveling on, I think you said, about two

14   weeks out of the month, so roughly about 180 days or more, plus

15   or minus, every year, in 2000 through 2007?

16   A      It would be about that.  Maybe more.

17   Q      If I can direct your attention to Page 20 of this

18   exhibit.

19          MR. HOCHMAN:  Now, Page 20, if we could highlight the

20   body of the e-mail?

21          (An exhibit was projected onto the projector screen.)

22          MR. HOCHMAN:  Actually, before we get there, let's

23   pull back a second.

24   BY MR. HOCHMAN:

25   Q      There seems to be some handwriting on this document.

1           Do you recognize any of the handwriting on this

2    document?

3    A       No.

4    Q       Is this -- in particular, is this yours or David

5    Fredrick's handwriting?

6    A       It's not mine, and it doesn't look like his.

7           MR. HOCHMAN:  All right.  We can go back to the body

8    of the e-mail.

9           (An exhibit was projected onto the projector screen.)

10   BY MR. HOCHMAN:

11   Q       And this e-mail appears to be from David Fredrick to

12   Dieter Luetolf, with a cc to you on February 6th, 2004.

13          Do you see that?

14   A       Yes.

15   Q       And with respect to this e-mail, do you recall, one way

16   or the other, if you actually got this e-mail on February 6th,

17   2004?

18   A       I'm not sure where I was.

19   Q       You might have been --

20   A       I might have -- I mean, I might have just glanced at it.

21   Q       Well, let's go through the e-mail, if we could, because

22   the e-mail talks -- again, it's from David Fredrick to Dieter

23   Luetolf.  And I'll focus on the second sentence.  It says:

24          "Presently we have all our funds in a joint account with

25   UBS.  I believe that Pat's sister, Charlene Varga, is

1    authorized to handle our affairs in that account if we were to

2    die.  Can you please confirm that Charlene is an authorized

3    signatory on all the paperwork."

4          Right above it, it says, and I should have started with

5    this:

6          "Following our visit, Pat and I were discussing how/who

7    would handle our oversea's financial affairs in the event of

8    our death.  Not a pleasant thought, but one we must consider."

9          Do you see that?

10   A     Yes.

11   Q     Could you explain to the jury what Dr. Fredrick . . .

12   what his issues, if any, were, at this time, with Charlene

13   Varga?

14   A     She had always been on our wills, our living wills,

15   family limited partnership.  She was the person within our

16   immediate circle or families we trusted the most.  Because of

17   all the international travel, and the fact that she really is

18   afraid of airplanes, he was concerned that she would not be

19   able to adequately handle any accounts that were overseas.

20   Q     Now, did he have the same concerns -- did Dr. Fredrick

21   have the same concerns with any Saba accounts that were

22   domestic, in the United States?

23   A     No.  They were . . . they were here in the States.

24   Q     And so with respect to these accounts, did -- actually,

25   if I might, by the time this e-mail is being issued, in

1    February 6th, 2004, by about that time, did you learn, if you

2    hadn't already known, that the account was in the name of

3    Patricia Hough and David Fredrick?

4    A       Until they really changed later, I . . . it didn't

5    compute.

6    Q       But at approximately that time, in 2004, did you

7    understand the account to be in the name of Patricia Hough and

8    David Fredrick?

9    A       Yes.

10   Q       And did you raise any concerns, when you found out this

11   information, with David Fredrick?

12   A       Yes.

13   Q       And what did you say to him?  Please tell the jury.

14   A       It was later -- I said I didn't understand why our names

15   were there; you know, where was the Saba School of Medicine

16   Foundation?  I just didn't understand why . . . why they were

17   set up that way.

18   Q       Why did you think the Saba School of Medicine

19   Foundation's name should be on the account?

20   A       Well, it was the school's money.

21   Q       And what, if anything, was Dr. Fredrick's response when

22   you raised this with him?

23   A       He said that Dieter Luetolf was -- was absolutely

24   insistent that live bodies, people, with identification, had to

25   be signatories for that type of account.

1    Q       Did you know at the time that Dieter Luetolf perhaps

2    made a mistake, treating the Saba School of Medicine Foundation

3    as a domiciliary company instead of an operating company, which

4    would not have required a Form A; did you know that at the

5    time?

6    A       No.

7    Q       Did anyone discuss with you that there had been a

8    mistake made by Dieter Luetolf, at the time, where he treated,

9    on the UBS forms, the Saba School of Medicine Foundation as a

10   domiciliary company?

11   A       No.

12   Q       And so when you're -- and so when Dr. Fredrick raises --

13   or you raise these concerns with Dr. Fredrick, why did you --

14   did you say, "I no longer want to be a signatory"?

15           What did you say to him?

16   A       I -- I -- I needed more confirmation from Dieter

17   Luetolf.  I just didn't understand what was going on.

18   Q       And did you eventually get more confirmation from either

19   Dr. Fredrick or Dieter Luetolf as to why you had to be a

20   signatory on this account?

21   A       I can remember being, you know, in his office.  He set

22   up -- you know, it was on a speakerphone and talking with

23   Dieter.

24   Q       And what, if any, assurances did you get from Dieter

25   Luetolf during that conversation?

1   A       No, he said it was normal, you know, and I shouldn't be

2   worried, I wasn't, you know, breaking any laws.

3   Q       Did you have any reason to doubt Dieter Luetolf when he

4   was saying this?

5   A       No, I did not.

6   Q       Why didn't you have any reason to doubt Dieter Luetolf

7   when he was saying this?

8   A       I mean, he was a high-ranking person, he was an

9   official, and seemed very knowledgeable.

10  Q       If we can continue on with this e-mail.  It says, if we

11  can go down to the next paragraph:

12          "In addition, we would like to consider dividing the

13  funds from the joint account into two separate accounts, one

14  for each of us.  Presently, we have approximately ten in the

15  joint account, with the major part being managed."

16          Do you see that?

17  A       Yes.

18  Q       And then it says:

19          "Would it be possible for to you open up a second

20  numbered account for me, keeping the current one for Pat?

21  Obviously, we would like to keep the current managed funds as

22  is, but" -- and then it says, three -- "divide the total amount

23  equally so 50 percent is in my account and 50 percent is in

24  Pat's account."

25          Do you see that?

154

1    A      Yes.

2    Q      At any point did you view the money that was in the

3    joint account as your personal money?

4    A      No.

5    Q      Was it Dr. Fredrick's personal money?

6    A      No.

7    Q      Whose money was it?

8    A      It was The Foundation's account.

9    Q      Now, at some point do you actually come into agreement,

10   within the next couple of weeks, with this plan to divide the

11   account into two accounts?

12   A      My signature is on that paper.  I was traveling all over

13   the place.

14   Q      Well, you said you thought along those lines as well.

15   A      I did.

16          MR. HOCHMAN:  And with respect to that e-mail, if we

17   could turn to Page 27 of this exhibit . . . and we could

18   highlight the top part of it, please?

19   BY MR. HOCHMAN:

20   Q      Is this the e-mail that you sent from yourself to David

21   Fredrick and Dieter Luetolf on March 18, 2004?

22   A      Yes.

23   Q      Now, you remember, the first e-mail is February 6th,

24   2004.  This one is March 18, 2004.

25          So about six weeks have gone by between the time of the

1    first e-mail and the time of this e-mail; is that correct?

2    A     Yes.

3    Q     And it says, here:  "Dear Dieter, Dave and I have

4    discussed the arrangement, and I am in full agreement."

5          Do you see that?

6    A     Yes.

7    Q     "Please let us know how we can split best the accounts

8    and what new paperwork is needed.  Have you received the signed

9    form from my sister?  Sincerely, Patricia Hough."

10         Do you see that?

11   A     Yes.

12   Q     And I'm sorry, I didn't read the last sentence.

13         MR. HOCHMAN:  Could we go back, I apologize, to

14   Exhibit-- Page 20 of this exhibit, and focus on the last

15   sentence -- couple sentences of the third paragraph.  There we

16   go.

17   BY MR. HOCHMAN:

18   Q     And I want to -- I stopped reading, and I should have

19   kept reading.  It says:

20         "In summary, we would like to have two separate numbered

21   accounts, one for me and one for Pat, with the funds equally

22   divided.  Charlene would be an authorized signatory for Pat's

23   account, and I will decide on another individual for my

24   account.  I'm considering an irrevocable trust where only the

25   interest is available on a monthly or annual basis."

1           So is the idea that what's going to go on here, is that

2    Dr. Fredrick has some concerns about Charlene dealing with

3    these Swiss bank accounts; correct?

4                MS. FINLEY:  Objection, leading.

5                THE COURT:  Sustained.

6    BY MR. HOCHMAN:

7    Q     What concerns did Dr. Fredrick voice in this e-mail

8    concerning Charlene staying on as a power of attorney, or for

9    succession reasons, for the Swiss bank account?

10   A     I mean, it's not in the e-mail, but he had concerns

11   about her ability to take a long flight abroad --

12   Q     And --

13   A     -- to another country.

14   Q     And in the e-mail he's basically saying, Charlene will

15   stay on your account and he'll get someone else; correct?

16   A     Well, my account, that was that -- it was the original

17   account that I always thought was Saba School of Medicine.  It

18   was to stay the same.

19   Q     And why did you have Charlene stay on what would be your

20   account?

21   A     I trust her more than anyone.  I've known her her whole

22   life.  And believe me, she's tough, and she'll step up to the

23   plate when anything needs to be done.

24   Q     So now we can go back, actually, to Page 27, the e-mail

25   that you had on March 18th.

1        So when you say, here, "Dave and I have discussed the

2    arrangement, and I am in full agreement," is the arrangement

3    the one that we have been talking about, where the accounts

4    would be split up and Dave would have someone else as his sort

5    of succession, and you would have Charlene as your person that

6    would step into your place if you were to pass away?

7    A     Well, that was the original account.

8    Q     That was the original account, but --

9    A     Yeah.  I mean, that was my understanding.

10   Q     And was it your understanding, however, that with

11   respect to the new account that was going to be set up in your

12   name, that it was your personal account; did you believe it was

13   going to be your personal account that you could do whatever

14   you wanted to, and those would become your personal funds?

15   A     No.

16   Q     Why not?

17   A     It was all the funds for building and . . . you know,

18   everything needed to hold in reserve for accreditations for the

19   medical school, for The Foundation.

20   Q     Well what I'm asking more is:  Whose funds were they;

21   were these your funds that were going into your account, or was

22   it The Foundation's funds that were going into an account in

23   your name?

24   A     It was The Foundation's funds.

25   Q     And do you know, if I may turn your attention to

1    Page 20 . . . excuse me -- page 30 of this document . . . .

2              (An exhibit was projected onto the projector screen.)

3    BY MR. HOCHMAN:

4    Q     Did you sign an authorization that basically asked to

5    transfer half the assets to the above account to, to a new

6    account, in the name of David Fredrick.

7          Do you see that?

8    A     That's my signature.

9    Q     Why did you sign that?

10   A     Because David gave to it me and said Dieter Luetolf

11   needed it.

12   Q     And did you believe, in signing this document, that all

13   of a sudden you had gotten five more million dollars and won

14   the lottery, and put the money in the Pat Hough personal

15   account for personal uses?

16   A     No, did not.

17   Q     Who did you believe were you holding the money on behalf

18   of?

19   A     For The Foundation, for the medical school.

20   Q     Now, with respect though this authorization, it says

21   that there's going to be a new account opened in the name of

22   Dr. Fredrick.

23         Do you see that?

24   A     Yes.

25   Q     And if you could turn the page, to Page 31, and focus on

1    that?

2           It basically says that you're going to keep the joint

3    account, and they're going to remove Dr. Fredrick's name from

4    it; correct?

5    A      Yes.  That's my understanding.

6    Q      And they would open up a new Dr. Fredrick account;

7    correct?

8    A      Yes.

9    Q      But that didn't happen; correct?

10   A      According to the paperwork trail, no.

11   Q      Because what seems to happen is, they opened up a new

12   account in Dr. Fredrick's name, but then they opened up a new

13   account in your name too; isn't that correct?

14   A      Yes.  I've seen that.

15   Q      And remember the date on this, this document is

16   March 23rd, 2004.

17          Do you recall the documents that showed, in this case

18   before, that said that the David Fredrick account was opened on

19   March 23rd, 2004?

20   A      The one before?

21   Q      Yes.

22   A      Yes.

23   Q      Let me take you to what's been marked as -- and is in

24   evidence as Exhibit 3R.

25              MR. HOCHMAN:  Now, Exhibit 3R, if we can put Page 1

1    of Exhibit 3R up.

2              (An exhibit was projected onto the projector screen.)

3              MR. HOCHMAN:  If we can focus on the top part of it?

4    BY MR. HOCHMAN:

5    Q    Exhibit 3R appears to be the Patricia Hough account --

6    account with the name of Patricia Hough.

7              Do you see that?

8    A    Yes.

9    Q    And do you see the signature line on this document?

10   A    Yes.

11   Q    Is this signature, and all the signatures that appear to

12   be Patricia Hough, your signature?

13   A    Yes.

14   Q    And you see where it says Gardner -- if we can focus on

15   the signature line and the date next to it . . . see where it

16   says, "Gardner, MA, April 7, 2004"?

17   A    Yes.

18   Q    And that . . . that identification of Gardner, MA, and

19   the date, appears on other documents in this exhibit,

20   Exhibit 3R; correct?

21   A    Yes.

22   Q    And is that your writing of Gardner, MA, April 7, 2004?

23   A    Yes.

24   Q    And you see there's a little box that's checked, next to

25   sort of the writing by the bottom, and the box -- there's two

1   boxes there, one that says, "By correspondence," and appears to

2   be checked; right?

3   A     Yes.

4   Q     And the other one says, "In person," and it was not

5   checked; do you see that?

6   A     Yes.

7   Q     And, "By correspondence," did you understand that to

8   mean that you had been sent documents to sign and then send

9   them back?

10  A     Yes.

11  Q     Dieter Luetolf wasn't there when were you signing these

12  documents; correct?

13  A     No.

14  Q     And if you could look at, again, the handwriting at the

15  very top of this document, it says Patricia Hough?

16  A     Yes.

17  Q     Is that your handwriting?

18  A     No.

19  Q     If you could go to the next page.  And there's some

20  handwriting on there, it says:  "Hough, Patricia" --

21          MR. HOCHMAN:  In the middle part, if we could focus

22  on it.

23  BY MR. HOCHMAN:

24  Q     Is that your handwriting?

25  A     No.

1   Q       If we can go to Page 7, is your handwriting on this

2   document?

3   A       Just my signature.  The other is not my writing.

4           MR. HOCHMAN:  And if we could focus on the middle

5   part, which is to the Question Number 1, with the box checked?

6   BY MR. HOCHMAN:

7   Q       It seems that there's certain boxes that are checked

8   here, and the first one says, "Are you a U.S. citizen," and the

9   box is checked yes; correct?

10  A       Yes.

11  Q       Did you tell Dieter Luetolf that you were a U.S.

12  citizen?

13  A       Well, he had my passport.  Yeah.  He knew I was a

14  citizen.

15  Q       Did you ever try to hide the fact that you were a U.S.

16  citizen from Dieter Luetolf --

17  A       No.

18  Q       -- in connection with this account?

19  A       No.

20  Q       The second question has to deal with whether or not

21  you're a resident of the United States.  That box is checked

22  yes, as well.

23          Do you see that?

24  A       Yes.

25  Q       Did you ever try and hide your residency in the United

1    States from Dieter Luetolf?

2    A      No, I never tried to hide my residence.

3    Q      And the third question here is:  "Are you liable to tax

4    in the U.S.A." -- I'm sorry, go back to the third box -- "are

5    you liable to tax in the U.S. A or on any other grounds," and

6    you see that that box is actually checked yes.

7           Do you see that?

8    A      Yes.

9    Q      Did you ever tell Dieter Luetolf that you were not

10   subject to tax in the United States on any grounds?

11   A      Could you reframe that?

12   Q      Let me state that in the positive.

13          Did you . . . .  Did you ever tell Dieter Luetolf that

14   you were not subject to tax in the United States?

15   A      No.  I always thought I was subject to tax.

16   Q      Now, you signed these documents in the name of -- or an

17   account that is listed in the name of Patricia Hough.

18          Did you ever think, when you signed these documents --

19   or what did you think -- strike that.

20          Why did you sign these documents with an account in the

21   name of Patricia Hough?

22   A      Because it . . . it was a strategy or recommendation by

23   Dieter Luetolf to do that, and he said it was a requirement.

24   Q      Did you think that, by the fact -- the mere fact that

25   the name of this account was in the name of Patricia Hough,

1   that it magically converted all the funds in the account to

2   your personal funds?

3   A       No.

4   Q       Whose funds did you believe were in the account in the

5   name of Patricia Hough?

6   A       Those were Foundation funds.

7   Q       If you can turn to Exhibit 3S, like in "Sam."

8           Now, I'll focus you on Page 9 of 3S.

9               MR. HOCHMAN:  And if we could highlight, sort of, all

10  the stuff.

11              (An exhibit was projected onto the projector screen.)

12  BY MR. HOCHMAN:

13  Q       There seems to be -- let's start with the signatures.

14  There's some signatures on this document that seem to be in the

15  name of David Fredrick and Patricia Hough.

16          Do you see that?

17  A       Yes.

18  Q       And are those yours and David Fredrick's signatures?

19  A       Yes.

20  Q       Now, there's a date next to those signatures, which is

21  June 23rd, 2005.

22          Did you or David Fredrick -- do you recognize your

23  handwriting or David Fredrick's handwriting for that date?

24  A       No.

25  Q       Well, when you say no, I want to make sure that I am

1    clear.

2           Does "no" mean that you don't recognize it, or you

3    recognize it as not David Fredrick and your handwriting?

4    A     It doesn't look like either one of ours.

5    Q     All right.  Now, look at the rest of the handwriting in

6    this document.

7           Is the handwriting on this document your handwriting?

8    A     No.

9    Q     To the best of your knowledge, is that David Fredrick's

10   handwriting?

11   A     It doesn't look like his handwriting.

12   Q     And to the best of your recollection, when you signed

13   this document, was there just the typewritten words on the

14   document at the time you signed it?

15   A     I don't remember any documents with a lot of . . . you

16   know, scribbled writing on them like this.

17   Q     So when the document says here, in typed, "Dear Sir,

18   will you kindly transfer all equities and other assets to the

19   newly formed company," and then has some handwriting about what

20   the newly formed company was, what is your recollection as to

21   whether or not they identified the company in that handwriting

22   at the time you signed it?

23   A     When I signed documents, I was always told they were for

24   The Foundation, or one of its . . . they had some entities.

25   Q     Whose idea was it, if you recall, who this particular

1  document that was transferring money from the Patricia Hough

2  account to another account?

3  A      I'm not sure where that came from.

4  Q      Let's start with you --

5  A      No, it didn't come from you.

6  Q      -- did it come from you?

7  A      No.  No.

8  Q      Do you recall if it came from David Fredrick or Dieter

9  Luetolf?

10  A      I don't know which one.  It didn't come from me.

11  Q      Well, would it have been one of those two, or is there

12  someone else?

13  A      I believe, by this date, that UBS had referred

14  Dr. Fredrick and The Foundation to a manager, another type of

15  manager for asset protection.

16  Q      And which manager was that?

17  A      His name was Beda Singenberger.

18  Q      Before we get to Beda Singenberger, let's just finish

19  this document, if we could.  I'll direct your attention to

20  Pages 17 to 22?

21          MR. HOCHMAN:  And we can start, we can put 17 on.

22          (An exhibit was projected onto the projector screen.)

23          MR. HOCHMAN:  And if we could highlight just the

24  first half.

25

1    BY MR. HOCHMAN:

2    Q      Now this, appears to be Client Trade Information that

3    occurred in your account, and it goes on for six pages, all the

4    way to Page 22.

5           Do you see that?

6    A      Yes.  I've got those.

7    Q      And do you see that there's trade, buying and selling,

8    and buying and selling, and buying and selling, that goes on

9    from what looks like May 5th, 2004, all the way to July 19,

10   2005; do you see that?

11   A      Yes.

12   Q      Now, I'm going to represent to you that there's

13   205 different transactions of buying and selling and buying and

14   selling stock that went on from May 11, 2004, to July 19, 2005.

15          Does that sound like approximately how many transactions

16   are in these documents?

17   A      I'll believe your word.

18   Q      And with respect to all 205 transaction that occurred in

19   the Patricia Hough account, how many of these did you instruct

20   UBS to make?

21   A      None.

22   Q      How much of your personal money did you put in the

23   Patricia Hough account?

24   A      None.

25   Q      And if we can assume that you had, at least at one point

1    in time, in this account, over $5 million, how much of that

2    money did you instruct UBS to send to you?

3    A     I never gave instructions to UBS to send me money.

4    Q     Money to you?

5    A     Yes.

6    Q     Money to anyone?

7    A     I never gave any instructions.

8    Q     If you can turn to Page 23 of this exhibit?

9          And I want to make clear, when you say you're not giving

10   instructions, you never received even a dime from this Patricia

11   Hough UBS account; is that correct?

12   A     Yes.

13   Q     Now, if we can focus on Page 23, which is 3S, and

14   highlight the . . . language -- have I got the right language;

15   yes -- under "Total Asset Composition."

16         Now, you recall, this is one of the documents that Agent

17   Maurer relied on when she said that you and Dr. Fredrick owned

18   The Foundation.

19         Do you see that?

20   A     Yes.

21   Q     Do you see any date on this document?

22         And I'm saying, in particular, if you can just focus on

23   the total asset composition language that's right in front of

24   you, do you see any date?

25   A     No.

1    Q       Do you see, actually, anywhere that it indicates who

2    wrote it?

3    A       No, there's no name.

4    Q       Now, dealing with the language itself, it says:  "They

5    own medical colleges in the Caribbean, University of Saba" --

6    and then there's a www.Saba.edu.

7            Do you see that?

8    A       Yes.

9    Q       And then it says:  "Schools in Nevis and Belize."

10           Let's start with that language first.

11           Is it accurate to say that Dr. Fredrick actually did own

12   shares in MUA Nevis?

13   A       Yes.

14   Q       Is it accurate to say that Dr. Fredrick actually owned

15   shares in MUA Belize?

16   A       Yes.

17   Q       Did you own shares in MUA Nevis?

18   A       No.

19   Q       Did you own shares in MUA Belize?

20   A       No.

21   Q       Now, with respect to the University of Saba -- was it

22   actually ever called the University of Saba, by the way?

23   A       No.

24   Q       There is a www.saba.edu.

25           Is that the website, if you recall, for the Saba School

1   of Medicine?

2   A      Yes, that's the website.

3   Q      And on that website, if you recall, back in 2004 to

4   2005, would the website have revealed what the status was,

5   whether or not it was a nonprofit foundation, Netherlands

6   Antilles foundation, for the Saba School of Medicine

7   Foundation, or some other type of entity?

8   A      It was stated as a foundation . . . at that time.

9   Q      A Netherlands Antilles nonprofit foundation; correct?

10  A      Yes.

11  Q      And so is it a true statement, and let's focus on you

12  first, that you owned the medical colleges in the Caribbean; is

13  that true?

14  A      No.

15  Q      Is it a true statement that, other than MUA Nevis and

16  MUA Belize, that David Fredrick -- let me say it differently.

17         Is it true that David Fredrick owned the Saba School of

18  Medicine Foundation?

19  A      No.

20  Q      Now, let's deal for a moment with this individual that

21  you just brought to our attention, which is -- well, let me ask

22  you:

23         You said that there was a financial adviser that started

24  to be involved with the schools in 2005; is that correct?

25  A      Yes.

1   Q      Who was that financial adviser?

2   A      His name was Beda Singenberger.

3   Q      And how did you come to learn, meet, or know Beda

4   Singenberger in 2005?

5   A      Dr. Fredrick told me that Dieter Luetolf introduced him

6   as some kind of an affiliate or consultant for their bank, for

7   UBS.

8   Q      And did you, at some point, participate in any meetings

9   with -- excuse me -- with Beda Singenberger?

10  A      I met him in . . . in early 2005.  I think.

11  Q      Where did you meet him; do you recall?

12  A      In Boston.

13  Q      And who was at that meeting?

14  A      It was just myself, Dr. Fredrick, and Mr. Singenberger.

15  Q      And again, you got referred to Beda Singenberger, I

16  think you said, by Dieter Luetolf; is that correct?

17  A      Dr. Fredrick got referred.

18  Q      And who arranged the meeting between you, Dr. Fredrick,

19  and Beda Singenberger?

20  A      It would have been between Dr. Fredrick and

21  Mr. Singenberger.

22  Q      What did you understand the purpose -- did you discuss

23  what the purpose of the meeting was with Dr. Fredrick at the

24  time?

25  A      Could you give me a date again?

1   Q      Sure.  Early 2005, location of the meeting is Boston; is

2   that correct?

3   A      Yes.

4   Q      So focus on that meeting, early 2005.

5          I think you said there were three people at the meeting:

6   Yourself, Beda Singenberger, and Dr. Fredrick; is that correct?

7   A      Yes.

8   Q      And did you discuss what the purpose of that meeting was

9   to be with Dr. Fredrick?

10  A      Yeah.  There was a gigantic lawsuit that was coming --

11  or might have been filed by then -- and it was asset

12  protection . . . for the schools --

13  Q      When you say, "gigantic lawsuit," I think we've heard

14  some testimony about a $200 million lawsuit that Saint

15  Matthew's had filed against the Saba School of Medicine

16  Foundation.

17         Is that the lawsuit that you're referring to?is that

18  true?

19  A      Yes.

20  Q      And with respect to that meeting, do you know -- did you

21  ever speak to Dieter Luetolf about Beda Singenberger?

22  A      No.

23  Q      Do you know if Dr. Fredrick spoke to Dieter Luetolf

24  about Beda Singenberger?

25  A      He told me he did.

1  Q      He told you he had?

2  A      He told me he spoke to Dieter Luetolf and got the

3  referral . . . or the . . . whatever that was, the meeting.

4  Q      And what, if anything, did you learn from Dr. Fredrick

5  about what Dieter Luetolf had told him about Beda Singenberger?

6  A      That he had a lot of UBS clients, that he was extremely

7  well trained and had contacts in other countries that would

8  further protect the assets of the foundation.

9  Q      And at the meeting you're having in early 2005, in

10  Boston, with Dr. Fredrick and Beda Singenberger, did

11  Mr. Singenberger discuss with you his qualifications?

12  A      Yes.

13  Q      What did he say?

14  A      He attended . . . I don't remember the name, but he had

15  studied as an accountant in Zurich.  He was well traveled, and

16  had been doing business, and . . . with the United Bank of

17  Switzerland, and other big banks, for 25 years maybe.

18  Q      How old do you think he was back when you met him in

19  2005?

20  A      In his fifties.

21  Q      Did Mr. Singenberger, during that meeting, tell that you

22  there was anything wrong or illegal about engaging in asset

23  protection?

24  A      No.

25  Q      Did he present to you, during that meeting, his thoughts

1    about how he would help Saba School of Medicine Foundation

2    engage in asset protection?

3    A      Yes.

4    Q      What did he say?

5    A      He said that, in his opinion, Hong Kong was one of the

6    safest jurisdictions in the world from frivolous lawsuits

7    or . . . or anything that was international, and that he

8    regularly set up asset protection for UBS clients there.

9    Q      And did he tell you that you there was anything wrong

10   about setting up a Hong Kong company for asset-protection

11   reasons?

12   A      No.

13   Q      Are you aware of whether or not anyone did a background

14   check of Mr. Singenberger?

15   A      Yes.

16   Q      And I'm talking about being aware at the time, around in

17   early 2005.

18          Do you have that time in your mind?

19   A      Yes.

20   Q      And what are you aware of, whether or not an asset --

21   I'm sorry -- a background check was done of Mr. Singenberger?

22   A      Dr. Fredrick told me that he contacted the law firm in

23   Worcester, Massachusetts, it was called Bowditch & Dewey.  The

24   partner that represented the school, to help, they had a

25   relationship with a law firm in Zurich.  And he told me that

1    that one in Zurich conducted a background check.

2    Q      And what, if anything, did Dr. Fredrick tell you as to

3    the results of that background check?

4    A      He said that there were -- there was nothing negative,

5    that . . . in general, that Mr. Singenberger and his company

6    had a good reputation.

7    Q      And did Mr. Singenberger mention whether or not he had

8    done this type of asset-protection strategy for any of his

9    other clients?

10   A      He said he did it for dozens of UBS clients.

11   Q      Now, at this 2005 meeting, did Mr. Singenberger ever

12   tell you, or ever present you, with any paperwork to sign at

13   that meeting?

14   A      No.

15   Q      That was a just the initial meeting to meet him, a sort

16   of a meet-and-greet with Mr. Singenberger?

17   A      Yeah.  It was social.  We had drinks, and it was get

18   acquainted, and he was kind of selling his . . . himself.

19   Q      Did Mr. Singenberger work for a company, to your

20   knowledge?

21   A      I believe he had his own company.

22   Q      And was that the company we've heard about called Sinco

23   Trust?

24   A      Yes.

25   Q      And did Mr. Singenberger end up, to your knowledge, at

1   some point, creating some Hong Kong entities for the Saba

2   School of Medicine Foundation?

3   A      Yes.

4   Q      How do you know that?

5   A      I was told by Dr. Fredrick.

6   Q      And when Dr. Fredrick told you this, did he tell you

7   that you that this was to defraud the Internal Revenue Service?

8   A      No.

9   Q      Did he tell you that this was to somehow make it more

10  difficult for the Internal Revenue Service to ascertain your

11  taxes, or collect on those taxes?

12  A      No.

13  Q      Did Dr. Fredrick ever tell you -- did Dr. Fredrick or

14  Beda Singenberger ever tell you that there was anything wrong

15  with the three -- was it three Hong Kong companies, if you

16  know?

17  A      I think eventually.

18  Q      Did they tell you there was anything wrong with setting

19  up these three Hong Kong companies?

20  A      No.

21  Q      Now, did you ever sign any documents for Sinco Trust?

22  A      No.

23  Q      Do you know if Dr. Fredrick ever signed any documents

24  for Sinco Trust, one way or the other?

25  A      I don't know.  One way or -- I don't know.

1    Q       Do you know whether or not Dr. Fredrick had any meetings

2    with Beda Singenberger that you did not attend?

3    A       Traveled a lot.  I mean, I remember, I couldn't tell you

4    the dates, that Mr. Singenberger came a few times to Boston.

5    Q       Well, did Dr. Fredrick ever tell you that he had a

6    meeting with Beda Singenberger, that you were unable to attend?

7    A       Yes.

8    Q       How many of those type of meetings occurred, where

9    Dr. Fredrick would tell you that he had a meeting with Beda

10   Singenberger, over the 2005-to-2008 time period?

11   A       Oh, it was just a couple of times.

12   Q       Now, did you ever . . . strike that.

13           With respect to these three Hong Kong companies, I think

14   you learned through this trial that they have the names of New

15   Vanguard Holdings, Top Fast, and Ample Dynamic.

16           Do you remember that?

17   A       Yes.

18   Q       With respect to any of these companies, did you,

19   Dr. Patricia Hough, own any of these three Hong Kong companies?

20   A       No, I did not.

21   Q       Did Dr. David Fredrick, to your knowledge, own any of

22   these three Hong Kong companies?

23   A       No.

24   Q       Did the Saba School of Medicine Foundation own these

25   three companies?

1    A       I believe it was The Foundation.

2    Q       And was it the Saba School of Medicine's Foundation's

3    funds that went into these three Hong Kong companies, to your

4    knowledge?

5    A       None of my personal funds did.  I mean, it was The

6    Foundation.

7    Q       And are you aware of whether or not any of

8    Dr. Fredrick's personal funds ever went into these three Hong

9    Kong companies . . . one way or the other.

10   A       Well, I don't believe so.

11   Q       And with respect to these three Hong Kong companies, do

12   you recall -- and I'll show you in a moment the documents --

13   ever signing any of the account-opening statements for New

14   Vanguard, Top Fast Finance, or Ample Dynamic?

15   A       No.  I don't recall signing anything with

16   Mr. Singenberger.

17           MR. HOCHMAN:  Your Honor, I actually don't think

18   I . . . I pulled almost all the documents, I don't think I

19   pulled these.

20           If I might approach, Your Honor?

21           THE COURT:  You may.

22           MR. HOCHMAN:  Thank you.

23           May I approach the witness, Your Honor?

24           THE COURT:  You may.

25           (Mr. Hochman provides exhibits to the witness.)

1            MR. HOCHMAN:  And if we can put Exhibit 3C, Page 1,
2   up on the board?
3            (An exhibit was projected onto the projector screen.)
4   BY MR. HOCHMAN:
5   Q     Dr. Fredrick -- not Dr. Fredrick -- Dr. Hough, I have
6   Exhibit 3C, Page 1, up on the screen.
7            Do you see that?
8   A     Yes.
9   Q     And that appears to be a Form A in the name of New
10  Vanguard Holdings Limited.
11           Do you see that?
12  A     Yes.
13  Q     It appears to be indicating that the beneficial owners
14  are yourself and Dr. Fredrick.
15           Do you see that?
16  A     Yes.
17  Q     Did you sign this document?
18  A     No.
19  Q     Did Mr. Singenberger show you this document before he
20  signed it, to your knowledge?
21  A     I don't recall ever seeing it until the investigation,
22  until discovery.
23  Q     Now, if you can look through this exhibit, and I will
24  represent to you, based on Ms. Maurer looking through the same
25  exhibit, that your name doesn't appear anywhere on this

1    exhibit, which is the account-opening documents for New

2    Vanguard Holdings Limited, other than one time, on Page 1, in

3    Form A, in typed writing.

4            Do you see that?

5    A       Oh.  To what numbers are you going?

6    Q       The whole exhibit.

7    A       Everything.

8    Q       Your name only appears one time, on Page 1, in this

9    whole exhibit, for the account opening of New Vanguard; isn't

10   that correct?

11   A       Okay.  So you're going through Page 42?

12   Q       Forty-three.

13   A       Forty-three.

14   Q       Your name only shows up once; correct?

15   A       Yes.

16   Q       And do you recall Ms. Maurer being shown this exhibit

17   and also saying that your signature does not appear anywhere on

18   any of the account-opening documents; do you recall that?

19   A       Yes.

20   Q       And with respect to this entire account, did Mr. Beda

21   Singenberger ever get authorization from you to open up this

22   account?

23   A       No.

24   Q       Did you give Mr. Singenberger any instructions in

25   connection with this account?

1    A      No.

2    Q      Did you send him any e-mails with respect to this

3    account, giving him instructions?

4    A      No.  To the -- to the best of my recall.

5    Q      Sure.

6           Would the same be true for the Top Fast account?

7    A      Yes.

8    Q      Let me show you Exhibit CC.  That's the one I was

9    looking for.

10          May I show you what's been marked as 3CC.

11          (An exhibit was projected onto the projector screen.)

12   BY MR. HOCHMAN:

13   Q      And again, this is --

14          MR. HOCHMAN:  If we can scroll to the top of this

15   page.

16   BY MR. HOCHMAN:

17   Q      This is the Top Fast Finance UBS account; do you see

18   that?

19   A      Yes.

20   Q      Do you recall the testimony of Special Agent -- or

21   excuse me -- Revenue Agent Maurer, that your signature does not

22   appear anywhere on this document, or, for that matter, any of

23   the account-opening documents of Top Fast Finance limited?

24   A      Yes.

25   Q      And do you recall that your name does not appear -- if

1    we can turn to Page 2 of this document -- other than on Page 2,

2    in typewritten letters, with respect to Top Fast Finance?

3           Do you see that?

4    A    Yes.

5    Q    Did you give any instructions to Beda Singenberger, or

6    anyone else at Sinco Trust, with respect to this Top Fast

7    Finance account?

8    A    No.

9    Q    Did you exercise any control or authority over this Top

10   Fast Finance UBS account?

11   A    No.

12   Q    Would that be true for every Top Fast Finance account,

13   whether at UBS, Liechtenstein Landesbank, Fortis Banque, or any

14   other bank?

15   A    I don't know how many accounts it had, but that would --

16   I never had any control over any accounts.

17   Q    And you never had any signature authority over this Top

18   Fast Finance account; correct?

19   A    No.

20   Q    And the same would be true for that New Vanguard

21   account, that you never had any signature authority over that

22   New Vanguard; correct?

23   A    Yes.

24   Q    Yes, you had signature authority; or yes, it's correct?

25   A    Yes, it's correct.  I had no signature authority.

1   Q      You had no signature authority over the New Vanguard

2   account; correct?

3   A      Correct.

4   Q      And you had no -- you had no financial interest in the

5   New Vanguard account; correct?

6   A      No.

7            MS. FINLEY:  Objection, leading.

8            THE COURT:  Sustained.

9   BY MR. HOCHMAN:

10  Q      Did you have any financial interest in the New Vanguard

11  account?

12  A      No.

13  Q      Did you have any other authority, other than signature

14  authority, over the New Vanguard account?

15  A      I had no authority, at all, over that account.

16  Q      And did you ever have a financial interest in the Top

17  Fast Finance account?

18  A      No.

19  Q      And again, when I've referred to the New Vanguard and

20  Top Fast Finance accounts, I'm referring to all those accounts

21  at whatever Swiss or Liechtensteinian bank they might be in.

22         Do you understand that?

23  A      Yes.

24  Q      And do your answers change for any of the other

25  accounts, besides UBS, with respect to New Vanguard or Top Fast

1    Finance?

2    A       No.

3    Q       No, your answers don't change?

4    A       No, my answers don't change.

5    Q       And would the same be true, and I'm show you the . . . .

6    Would the same be true for the Ample Dynamic account?

7            Are you familiar with the Ample Dynamic accounts that

8    were opened up at UBS?

9    A       I'm familiar with that name.

10   Q       And let me just go through the questions again.

11           For all Ample Dynamic Trading accounts that are in any

12   Swiss or Liechtensteinian bank, did you ever have any signature

13   authority over any Ample Dynamic Trading account?

14   A       No.

15   Q       Did you ever have any other authority over any Ample

16   Dynamic Trading account in any Swiss or Liechtensteinian bank?

17   A       No.

18   Q       Did you ever have any financial interest in any Ample

19   Dynamic Trading account that was either in a Swiss or

20   Liechtensteinian bank?

21   A       No.  I had no financial interest.

22   Q       With respect to -- actually, I'll withdraw that thought.

23           You had several meetings with Beda Singenberger; isn't

24   that correct?

25   A       One in the States, and . . . three in Zurich.

1   Q      And the one in the States is the one that you've

2   testified with respect to the early 2005 meeting; is that

3   correct?

4   A      That's the only one I remember in the United States.

5   Q      And you said you also had some meetings in Zurich with

6   him?

7   A      Yes.

8   Q      And when were those meetings . . . approximately.

9   A      There was one . . . in 2009, one in 2008.  And I . . . .

10   There was an earlier one, I don't remember.

11   Q      All right.  We'll get back to the 2009 meeting in a

12   second.  But before we leave the UBS accounts, I want to focus

13   on two very critical accounts, the Saba School of Medicine's

14   UBS account, and the Medical University of the Americas UBS

15   account.

16         Do you have those accounts in mind?

17   A      I mean, I have them in mind, not in front of me.

18   Q      Then let's put them in front of you.  Let's go with

19   Exhibit 3U; U, like in "under."

20         (An exhibit was projected onto the projector screen.)

21   BY MR. HOCHMAN:

22   Q      Now, do you recall the testimony of Agent Maurer, that

23   the UBS Saba School of Medicine Foundation account was not one

24   of the accounts that she reviewed in depth?

25         Do you recall that?

1    A       Yes.

2    Q       And have you look through the account opening documents,

3    this is the -- do you recognize your and David Fredrick's

4    signatures with respect to these documents?

5    A       Yes.

6    Q       And if I can draw your attention to Page . . . 5.

7            MR. HOCHMAN:  And if we can highlight down -- a

8    little lower, where the signature blocks are?

9    BY MR. HOCHMAN:

10   Q       Is that David Fredrick and -- David Fredrick's

11   signature, to your knowledge?

12   A       It looks like his signature.

13   Q       And is that your signature, Patricia Hough?

14   A       Yes.

15   Q       And do you recognize the writing that's next to each one

16   of your names?

17   A       It looks like my printing and his printing.

18   Q       And how do you describe your role with respect to the

19   Saba School of Medicine Foundation?

20   A       Representative.

21   Q       Is that an accurate description of your role as you

22   believed it at the time?

23   A       Representative, caretaker.

24   Q       And is -- and apparently the same title is given under

25   David Fredrick's name.

1    Do you see that?

2    A    Yes.

3    Q    And would that be an accurate title for Dr. Fredrick, in

4    connection with the Saba School of Medicine Foundation?

5    A    Yes.

6    Q    Did you ever describe yourself as the owner, in any of

7    these documents, of the Saba School of Medicine Foundation?

8    A    No.

9    Q    Doctor, if you can turn to Page 12 -- I'm sorry --

10   Page 13.

11        MR. HOCHMAN:  And if we can highlight, again, the

12   signature line.

13        (An exhibit was projected onto the projector screen.)

14   BY MR. HOCHMAN:

15   Q    This is the authorized signatory page; do you see that?

16   A    Yes.

17   Q    And it lists both you and Dr. Fredrick as authorized

18   signatories for the Saba School of Medicine Foundation;

19   correct?

20   A    Yes.

21   Q    And the same type of questions:  Did you believe that

22   the money that's in the Saba School of Medicine Foundation was

23   your own personal money?

24   A    No.

25   Q    Did you believe it was Dr. Fredrick's personal money?

1    A       No.

2    Q       Whose money did you believe it was?

3    A       It belonged to The Foundation and the medical school.

4    Q       And did you describe yourself on this document, when you

5    gave yourself a title, as the owner of the Saba School of

6    Medicine Foundation?

7    A       No.  It says "representative."  It's signed

8    representative.

9    Q       This is the same designation that you gave yourself in

10   the prior document; is that correct?

11   A       Yes.

12   Q       It's the same designation as Dr. Fredrick identified

13   himself as with respect to this document; is that correct?

14   A       Yes.

15   Q       Do you have Exhibit 4A before you; a, like in "alpha"?

16   A       Is it an early or a later one?

17           (Mr. Hochman searches through the exhibits.)

18   BY MR. HOCHMAN:

19   Q       Do you see it?

20           MR. HOCHMAN:  May I approach the witness, Your Honor?

21           THE COURT:  You may.

22           MR. HOCHMAN:  Thank you, Your Honor.

23           THE WITNESS:  Here it is.

24           MR. HOCHMAN:  And if we could put Exhibit 4A, Page 1,

25   up?

1    BY MR. HOCHMAN:

2    Q      This is the Form A for the Fortis Banque.

3           MR. HOCHMAN:  If we could focus on the top part of

4    that?

5    BY MR. HOCHMAN:

6    Q      Do you see that?

7    A      Yes.

8    Q      And with respect to this Form A, it indicates that the

9    contracting partner is the Saba School of Medicine Foundation.

10          Do you see that?

11   A      Yes.

12   Q      It's checked -- the box is checked that the contracting

13   partner is the sole beneficial owner of the assets concerned;

14   is that right?

15   A      Yes.

16   Q      Was it your understanding that the owner of the Saba

17   School of Medicine Foundation's assets was the Saba School of

18   Medicine Foundation?

19   A      Yes.

20          MS. FINLEY:  Objection, leading.

21          THE COURT:  Sustained.

22   BY MR. HOCHMAN:

23   Q      Who did you understand the owner to be of the Saba

24   School of Medicine Foundation's assets?

25   A      The Foundation.

1    Q      Is that consistent with what is indicated on this form?

2    A      Yes.

3    Q      If you could turn to Exhibit 4C, and I believe it's 4C,

4    Page 3.

5           Now, this is a . . . Saba School of Medicine,

6    Liechtenstein Landesbank account Form A.

7           Do you see that?

8    A      Yes.

9    Q      And if you can -- do you see who the contracting partner

10   is?

11   A      Yes.

12   Q      Is that the Saba School of Medicine?

13   A      Yes.

14   Q      And do you see the box that's checked that says that the

15   contracting partner is the sole beneficial owner of the assets

16   concerned?

17   A      Yes, I do.

18          MS. FINLEY:  Objection, Your Honor, foundation as to

19   this document, whether she's even seen it before.

20          THE COURT:  Overruled.

21          This has previously been admitted; correct?

22          MR. HOCHMAN:  Yes, Your Honor.

23          THE COURT:  Overruled.

24   BY MR. HOCHMAN:

25   Q      And is this a -- based on your understanding, is this a

1    correct description, that the Saba School of Medicine is the

2    sole beneficial owner of the assets concerning this account?

3    A      Yes, it is.

4    Q      And who signs this on behalf of the Saba School of

5    Medicine?

6    A      David Fredrick.

7    Q      If I can turn your attention to Exhibit Number 4F, like

8    in "Frank," Exhibit 4F is the Fortis Banque opening Form A for

9    the Medical University of the Americas; is that correct?

10   A      (Examining exhibit)  Yes.

11   Q      And -- Exhibit 4F, I'm sorry, I said 4A.

12          And it's indicated here, the box is checked, that the

13   contracting partner is the sole beneficial owner of the assets

14   concerned; is that correct?

15   A      Yes.

16   Q      Who is identified as the contracting partner?

17   A      Medical University of the Americas.

18   Q      Is that an accurate statement, based on your

19   understanding at the time, back in 2006, that the Medical

20   University of the Americas was the beneficial owner of its

21   assets?

22   A      Yes.

23   Q      And do you actually sign, along with David Fredrick,

24   this document, at the bottom of the document on Page 1 of 4F?

25   A      Yes.  That's my signature.

1    Q      And in what capacity were you signing your name on this

2    document?

3    A      At that time I had become a member of the board of

4    directors.

5    Q      If I can turn your attention to Page 2 of this document?

6           With respect to Page 2, do you see your signature there?

7    A      Yes.

8    Q      Do you see Dr. Fredrick's signature as well?

9    A      Yes.

10   Q      And this document says that:  "On behalf of the board of

11   directors for the Medical University of the Americas, I hereby

12   assign Dr. Fredrick –– "Dr. David Fredrick, the power of

13   attorney to conduct all banking and business transactions on

14   behalf of the Medical University of the Americas."

15          Do you see that?

16   A      Yes.

17   Q      And was that your –– what was your understanding as to

18   what this document was –– meant?

19   A      I mean, it was . . . a power of attorney by the board

20   that he was the business manager, the chief financial officer.

21   Q      And what was your understanding Dr. Fredrick's role, in

22   general, with the Medical University of the Americas?

23   A      He set up all the initial government agreements, and did

24   primarily business management.

25   Q      And did he have a similar role with the Saba

1    University -- excuse me -- the Saba School of Medicine

2    Foundation?

3    A      Yes.

4    Q      And did you have a role with respect to business

5    operations of the Medical University of the Americas?

6    A      No.

7    Q      Did you have a role with respect to the business

8    operation of the Saba School of Medicine Foundation?

9    A      No, I did not.

10   Q      May I turn your attention to a slightly different topic,

11   probably equally exciting, tax returns.  I'd like to start in

12   the late 1990s, if I could.  I direct your attention to the

13   late 1990s.

14          Did you have your tax returns prepared in the late 1990s

15   by anyone?

16   A      Yes.  By a tax preparer.

17   Q      And who was that tax preparer in the late 1990s?

18   A      It was a firm in Englewood called . . . Flischel &

19   Townsend.

20   Q      When you say Englewood, is that Englewood, Florida?

21   A      Yes.

22   Q      And did you meet with a person, initially, at

23   Englewood -- I'm sorry, at Flischel & Townsend, in the late

24   1990s?

25   A      Yes.

1    Q      And who was that?

2    A      Ray Flischel.

3    Q      And how long at that point, by the late 1990s, had you

4    had your tax returns prepared by a tax preparer?

5    A      I think ever since 1970, when I started -- you know,

6    when I got a real income.

7    Q      Why did you use a tax preparer?

8    A      I don't want to make mistakes.  I don't understand some

9    of the forms.

10   Q      And what role did you believe a tax preparer was going

11   to serve in helping you file a tax return?

12   A      Well, to go through all of my . . . you know, wages, my

13   receipts, my deductions, and make sure that those were properly

14   done.

15   Q      Why was it important for you to have that information

16   properly put on your tax return?

17   A      Well, I mean, it's important that things be done right

18   with the IRS.  I got a random audit in the early seventies, and

19   I've been -- I've always been very careful, before and after.

20   Q      Let me ask you, actually, a couple questions about that

21   random audit.

22          Do you remember about what year you were audited?

23   A      It was for 1972, but I was . . . it was in the fall

24   of '73, just as I was preparing to go study in London.

25   Q      Had you ever been audited before that?

1    A       No.

2    Q       Have you ever been audited since that?

3    A       No.

4    Q       And with respect to that audit, how did you -- what

5    steps did you take to address that audit?

6    A       I had already moved all of my things from Chicago to my

7    mother's in Ohio, and this notice got forwarded to me that I

8    would be back in Chicago in two weeks for an audit.  You know,

9    we called the IRS, my mother helped me, and they said there was

10   some deferment form I could do.

11           But she worked with an accountant in a big firm, and

12   asked him, and I remember talking to him on the phone, and he

13   said, "Absolutely don't leave the United States without doing

14   that.  You can get your funds frozen, they can lose the form.

15   You need to do this.

16           So I did it.

17   Q       And this is attending an interview with the IRS revenue

18   agent?

19   A       Yes.  I dug up all my documents and went back to

20   Chicago.

21   Q       So did you put off your trip to London in order to deal

22   with this IRS?

23   A       I was about a week late starting classes.

24   Q       And did you -- did you deal with the IRS situation?

25   A       Yes.

1   Q      What was the result of the audit?

2   A      Nothing.  It was . . . it was . . . everything was okay.

3   Q      Now, prior to seeing Ray Flischel in the late 1990s at

4   Flischel & Townsend, were you and Dr. Fredrick already filing

5   your tax returns as married, filing separately?

6   A      I think we started that in 1997 or '98.

7   Q      Can you please describe the circumstances by which you

8   and Dr. Fredrick ended up filing your tax returns as married,

9   filing separately?

10  A      As the EIC grew, the employees wanted a retirement plan,

11  so there was a firm called Heritage that came to the offices

12  and worked out different plans; but the man -- I don't remember

13  his name, but he reviewed the retirement plans that both David

14  and I had with VALIC.

15  Q      V-A-L-I-C; is that correct?

16  A      Yes.

17  Q      And what, if any, recommendations did he make with

18  respect to filing your returns as married, filing separately?

19  A      He said, since we were independent contractors, that if

20  we filed separately, we could both put in more -- substantially

21  more money per year into the retirement accounts.

22  Q      And did you follow that person's advice?

23  A      Yes.

24  Q      And did you end up starting to file married, filing

25  separately, about 1996 or 1997?

1    A        I think it was 1997 or '98.

2    Q        '97 or '98.  Thank you.

3             And that was before you met with Ray Flischel; correct?

4    A        Yes.

5    Q        And when you met with Ray Flischel, about how long did

6    that meeting last, if you recall?

7    A        It wasn't a long meeting.  I think less than an hour.

8    Q        And was that a meeting prior to filing your tax returns?

9    A        We brought everything with us, I believe, to file that

10   year.

11   Q        And so this would be a meeting, in approximately 1999 or

12   so, with Mr. Flischel?

13   A        Yes.

14   Q        And that would be, what, 14 years ago?

15   A        Yes.

16   Q        And the meeting lasted, you said, less than an hour?

17   A        To the best of my recollection.

18   Q        Was there anything particularly memorable about this

19   meeting?

20   A        No.  It was just a routine tax -- I think they were real

21   complex then.

22   Q        Do you have a recollection one way or the other about

23   whether or not Mr. Flischel asked you if you had any foreign

24   bank accounts?

25   A        One way or the other, no, I don't.

1   Q       Did Mr. Flischel -- do you remember Mr. Flischel ever

2   pulling out Schedule B and going over with you, during this

3   meeting that occurred 14 years ago?

4   A       No, I do not.

5   Q       Now, I'd like to direct your attention to 2001.

6           You heard Mr. Murtha testify in this case?

7   A       Yes.

8   Q       And he said that he met with you and Dr. Fredrick, he

9   thought, possibly as early as 2001; correct?

10  A       Yes.

11  Q       Do you recall having a meeting with Mr. Murtha in 2001?

12  A       I mean, I recall going to file taxes, and it wasn't Ray

13  Flischel.  It was a new guy.  It was Tom.

14  Q       And so you recall that Mister -- when you went into the

15  meeting, Mr. Flischel wasn't there; correct?

16  A       Yes.

17  Q       And you said, I think, that Mr. Murtha was there?

18  A       Yes.

19  Q       Did Mr. Murtha explain anything to you about why he was

20  there and Mr. Flischel wasn't?

21  A       Just that he was a new partner and taking a lot of Ray's

22  clients.

23  Q       Now, at that point, when were you meeting with

24  Mr. Murtha, you have already filed a couple of tax returns with

25  Mr. Flischel; is that correct?

1    A      Yes.

2    Q      Were you a new client for the firm when you were meeting

3    with Mr. Murtha?

4    A      No.

5    Q      How long do you recall the first meeting with Mr. Murtha

6    to have occurred -- to have taken, excuse me.

7    A      Thirty-five, forty-five minutes.

8    Q      And was that about the average amount of time you spent

9    with Mr. Murtha over the years, as he prepared your tax

10   returns?

11   A      Yes.

12   Q      Was there anything memorable that occurred, other than

13   the fact it was Mr. Murtha, instead of Mr. Flischel, during

14   that initial meeting you had with Mr. Murtha in 2001?

15   A      No.

16   Q      And again, that 2001, that would be 12 years ago;

17   correct?

18   A      Yes.

19   Q      Do you recall, one way or the other, whether or not

20   Mr. Murtha discussed with you if you had any foreign bank

21   accounts?

22   A      I -- I -- one way or the other, I don't recall.

23   Q      Now, do you recall Mr. Murtha testifying?

24   A      Yes.

25   Q      And do you recall him saying to you -- saying, during

1   his testimony, that he never pulled out a Schedule B and showed

2   you the Schedule B, and read you all the questions off of it;

3   correct?

4   A       Correct.

5   Q       And do you recall him saying, in particular with Part 3,

6   dealing with the foreign bank accounts, he never went over with

7   you, line by line, what was in Part 3; correct?

8   A       Correct.

9           MS. FINLEY:  Objection, leading.

10          THE COURT:  Sustained.

11  BY MR. HOCHMAN:

12  Q       Is what Mr. Murtha said accurate, that he never pulled

13  out a Schedule B and went over -- went over it with you, at any

14  time you were dealing with Mr. Murtha?

15  A       Yes.

16  Q       Now, if Mr. Murtha -- if Mr. Murtha had asked you the

17  questions back in 2001, when you were meeting with him, "do you

18  have a foreign bank account," what would have been your

19  answers?

20  A       I mean, back in -- are you talking about early 2001?  I

21  mean, I would have thought he meant my own money, and I

22  didn't -- I mean, I didn't have any personal overseas bank

23  accounts.

24  Q       And by "personal," do you mean that you didn't have any

25  personal funds in an overseas bank account?

1    A       Yes.

2    Q       Now, at the time that you were meeting with Mr. Murtha,

3    are you working for EIC?

4    A       Yes.

5    Q       Are you getting paid by EIC?

6    A       Yes.

7    Q       And did they give you something called a Form 1099, for

8    all the money that they had paid you during the year?

9    A       Yes.

10   Q       What did you do with that Form 1099, with respect to

11   Mr. Murtha?

12   A       Well, I mean, I gave it to the tax preparer.

13   Q       And EIC was a U.S. bank -- excuse me -- a U.S. based

14   management company; correct?

15   A       Yes.

16   Q       That's the one up in Gardner, Massachusetts?

17   A       Yes.

18   Q       Now, if Mr. Murtha had asked you to get him some

19   additional information, would you have?

20   A       Yes.

21   Q       Actually, what types of documents did you bring

22   Mr. Murtha, on average, every time you would meet with him to

23   prepare your tax returns?

24   A       I mean, he would keep the wage . . . .  Wages; things

25   that banks or mutual funds sent with, you know, interest or

1    earnings; my professional deductions for licenses or

2    conferences; and charitable donations.

3    Q    And you said that you were paid by EIC.

4         Were you ever paid through any foreign bank account,

5    your salary at EIC?

6    A    No.

7    Q    Did you rely on Mr. Murtha to prepare an accurate tax

8    return for you?

9    A    Yes.

10   Q    Why did you rely on him?

11   A    He had gone over his credentials with us, he seemed

12   well-trained, and I don't think Flischel & Townsend would have

13   taken him in as a partner if he wasn't qualified.

14   Q    Did you know him to be a CPA when you first met him in

15   2001?

16   A    Yes; he said he was a CPA.

17   Q    And is this the reason that you relied on Mr. Murtha to

18   prepare your tax return every year that he prepared it?

19   A    Yes.

20   Q    Why didn't you prepare your tax returns yourself?

21   A    I mean, some of it was time.  Neither of us had the

22   know-how, and I think everything was going through computerized

23   systems at that time, you know, to -- I remember the returns

24   kept getting thicker and thicker.

25   Q    And do you recall Mr. Murtha testifying that he never

1    asked you, again, to the extent that he asked you the first

2    time, about foreign bank accounts in the years that followed

3    from the first time he prepared your return?

4    A      Yes, I remember his testimony.

5    Q      And if he had asked you, during those years, the same

6    question, "do you have any foreign bank accounts," what would

7    have been your answer?

8    A      I mean, in terms of do I have any in my own name, with

9    my funds; no.

10   Q      And what did you understand the words, "have any foreign

11   bank accounts," to mean?

12   A      That I would have been putting my personal earnings, or

13   funds, in a foreign bank account.

14   Q      And did Mr. Murtha ever ask you a slightly different

15   question, which is, "Do you have signatory authority over a

16   foreign bank account"?

17   A      I don't remember.

18   Q      Well, do you remember, when Mr. Murtha testified, that

19   he said that he never asked you if you had signatory authority

20   over a foreign bank account; do you recall that?

21   A      Now that you are reminding me, yes.

22   Q      And is that an accurate statement, that Mr. Murtha never

23   you told, or never asked you the question, if you had signature

24   authority over a foreign bank account?

25   A      Yes.

1   Q     Now, after Mr. Murtha would prepare your tax return in

2   any given year, would you actually meet with Mr. Murtha to

3   discuss the return before you sign it?

4   A     No.

5   Q     How did you get the return from Mr. Murtha after he

6   prepared it?

7   A     The office, you know, clerk would call us to pick them

8   up, or they'd be mailed.

9           MR. HOCHMAN:  Your Honor, we are going to start in on

10  a bunch of documents.  I don't know if you want to take a break

11  now or keep going.

12          THE COURT:  This works for me.

13          MR. HOCHMAN:  All right.  Thank you.

14          THE COURT:  Let's take 15 minutes.

15          Please do not discuss the case among yourselves, or

16  allow anyone to discuss it with you or in your presence.

17          Fifteen minutes.

18          (At 3:00 PM, the jury was escorted from the

19      courtroom.)

20          THE COURT:  All right.  Fifteen minutes.

21          (At 3:00 PM, court was recessed.)

22                          AFTER RECESS

23          (At 3:19 PM, court was reconvened.)

24          THE COURT:  Both sides ready for the jury?

25          MR. HOCHMAN:  Yes, Your Honor.

1          MS. FINLEY:  Yes, Your Honor.

2          THE COURT:  Have the jury step in, please.

3          (At 3:19 PM, the jury was escorted into the

4     courtroom.)

5          THE COURT:  You may proceed.

6          MR. HOCHMAN:  Thank you, Your Honor.

7   BY MR. HOCHMAN:

8   Q     Dr. Hough?

9   A     Yes.

10  Q     How are you doing?  Are you okay?

11  A     I'm a little tired.  I'm okay.

12  Q     All right.  We're going to be going through some tax

13  returns, but we'll do our best to get through this as smoothly

14  as possible.

15          Can you turn to Exhibit 1D?

16          MR. HOCHMAN:  And if we could put Exhibit 1D up on

17  the screen?

18          MS. KESSLER:  Is that 1D?

19          MR. HOCHMAN:  1D, as in "David."

20          And if we could turn to Page 2.

21          (An exhibit was projected onto the projector screen.)

22  BY MR. HOCHMAN:

23  Q     Doctor, what I am showing you is your 2005 tax return.

24          Do you see that?

25  A     Yes.

1    Q      I want to go through this tax return, and we'll use this

2    tax return as an example for all your other tax returns; okay?

3    A      Yes.

4    Q      I want to start with, there are three lines that are a

5    part of the total income.

6            MR. HOCHMAN:  And if we could focus on the total

7    income section, and if we could focus on the first 7 . . .

8    7 through, let's say, 14, those lines, further highlight them,

9    or zoom in on them.

10           There we go.  All right.

11           (An exhibit was projected onto the projector screen.)

12   BY MR. HOCHMAN:

13   Q      Line 8A says, "taxable interest"; do you see that?

14   A      Yes.

15   Q      Do you know what taxable interest is?

16   A      It's . . . .  No.  I mean, it's interest that there's

17   taxes on.

18   Q      But do you know how to compute taxable interest versus

19   nontaxable interest --

20   A      No.

21   Q      -- versus tax-exempt interest; do you know how to

22   compute that?

23   A      No.

24   Q      Is that something you would rely on Mr. Murtha for?

25   A      Yes.

1    Q     Do you see the line that says, "ordinary dividends"?

2          MR. HOCHMAN:  Can we highlight that?  And also

3    highlight the taxable interest line?

4          (An exhibit was projected onto the projector screen.)

5    BY MR. HOCHMAN:

6    Q     Dr. Hough, do you know what an ordinary dividend is?

7    A     No.

8    Q     Do you know what an extraordinary dividend is?

9    A     Not a clue.

10   Q     Do you know what a non-ordinary dividend is?

11   A     Never heard of it.

12   Q     Do you even know that there is nothing that even exists

13   that is called an extraordinary or non-ordinary dividend?

14   A     No.

15         MR. HOCHMAN:  If you can highlight the line that

16   says, Line 13, "Capital gains or loss"?

17         (An exhibit was projected onto the projector screen.)

18   BY MR. HOCHMAN:

19   Q     And by the way, with ordinary dividends, have you ever

20   computed what an ordinary dividend is for you?

21   A     No.

22   Q     Line 13, it talks about capital gain and loss.

23         Have you computed your own capital gain or loss?

24   A     No.

25   Q     Would you even know how to compute your own capital gain

1    or loss?

2    A       No.

3    Q       You heard Agent Maurer talk about basis.

4            Do you know what "basis" is?

5    A       No.

6    Q       Do you know how to compute basis?

7    A       No, I don't.

8    Q       Have you ever studied the Internal Revenue Code?

9    A       No.

10   Q       How about the tens of thousands of pages that make up

11   the regulations to the Internal Revenue Code, have you studied

12   them?

13   A       No.

14   Q       Have you ever studied something called IRS Notices?

15   A       No.

16   Q       Have you ever studied an IRS chief counsel memoranda?

17   A       No.

18   Q       Have you ever studied IRS revenue procedure rulings?

19   A       No.

20   Q       Have you ever studied any of the case law that has

21   developed in all the courts across the United States

22   interpreting the Internal Revenue Code?

23   A       No, I have not.

24   Q       While we are dealing with your levels of expertise, let

25   me ask you a few other questions.

1              Are you familiar with the laws of the Netherlands

2    Antilles?

3    A      No.

4    Q      Nevis?

5    A      No.

6    Q      Are you an expert in Swiss law?

7    A      No.

8    Q      Liechtensteinian law?

9    A      No, I'm not.

10             MR. HOCHMAN:  If we could focus a little bit farther

11   down on this return, on Line 28?

12             (An exhibit was projected onto the projector screen.)

13   BY MR. HOCHMAN:

14   Q      Now, on Line 28, I see that there's something called

15   "Self-Employed SEP," and then in all caps it says, "SIMPLE,"

16   and then it says, "Qualified Plans," and there is an amount,

17   $33,440, on there.

18             Do you see that?

19   A      Yes.

20   Q      What is that?

21   A      That's a retirement plan through VALIC that . . . when

22   Dr. Fredrick and I became -- got 1099s, independent

23   contractors, that's what we entered as retirement savings.

24   Q      And is this what you were talking about, about the

25   advice you got in 1997 and '98, to file married, filing

1   separately, so that you could maximize the amount you could put

2   in your retirement plans?

3   A      Yes.

4   Q      If you could turn to Page 3 of this document?

5          MR. HOCHMAN:  And if we could focus on that very

6   small language above Dr. Hough's name, the signature.

7              (An exhibit was projected onto the projector screen.)

8          MR. HOCHMAN:  And this is as blown up as we can get,

9   I think.

10  BY MR. HOCHMAN:

11  Q      Dr. Hough, do you see that there is a line right above

12  your signature, in very small writing, it starts, "Under

13  penalties of perjury"?

14  A      Yes.

15  Q      And you see, the line continues on that says, "I declare

16  that I have examined this return and accompanying schedules and

17  statements, and, to the best of my knowledge and belief, they

18  are true, correct, and complete."

19         Do you see that?

20  A      Small print.  Most of it.  I mean, I see it, yeah.

21  Q      Did Mr. Murtha ever pull out these words and explain

22  them to you?

23  A      No.

24  Q      Did Mr. Flischel ever explain them to you?

25  A      No.

1   Q      Now, obviously you signed your return, but did you ever

2   read these words in any level of detail or focus before you

3   signed any of your returns?

4   A      Not in detail.

5   Q      Now, did you examine every word and every number on your

6   return, before you signed it?

7   A      No.

8   Q      Why not?

9   A      I didn't know what a lot of those schedules meant.

10  Q      And so why did you sign the return, even though you

11  didn't know what all the schedules meant?

12  A      I mean, I trusted Mr. Murtha and the computer programs,

13  to make sure that they were right, because I was giving him

14  reliable information.

15  Q      Why did you rely on Mr. Murtha as opposed to doing them

16  yourself?

17  A      I could never compute them my own.  You have to have

18  special training and computer programs to do that.

19  Q      And why did you rely on Mr. Murtha, even though you

20  didn't read every word and every number in every schedule in

21  your return?

22  A      Well, I mean, he's a CPA with what was supposed to be

23  the best accountants in town.

24  Q      I'd like to turn your attention to Page 5 of this

25  exhibit.  And this is Schedule B.

1          MR. HOCHMAN:  If we could focus on Part 3?

2    BY MR. HOCHMAN:

3    Q      And I think you said earlier that Mr. Murtha never

4    showed you, and pulled out Schedule B, Part 3, and discussed it

5    with you.

6          Do you recall that?

7    A      Yes.  That's what he testified to, and that's what I

8    recall.

9    Q      Did you even know, prior to this case, you know, prior

10   to the onset of this criminal investigation, that there was a

11   Schedule B, Part 3, in your tax return?

12   A      I really wasn't aware of it, like discretely as a

13   Schedule B.

14   Q      Did you ever read Part 3, Schedule B, of your tax return

15   before you signed it?

16   A      Well, I mean, it has interest, I understand interest,

17   so, you know, I would glance at it.

18   Q      And with respect to the words, and if I could focus on

19   the words, in the very first line it says:  "You must complete

20   this part if you" -- and then there is -- it says B, "had a

21   foreign account."

22          What did you understand the words, assuming you had ever

23   focused on them, "had a foreign account," to mean?

24   A      I mean, that would mean that I had a -- I put my money

25   in another country.

1   Q      So your personal funds in a foreign account?

2   A      Yes.

3   Q      Did you ever have your personal funds in a foreign

4   account?

5   A      No.

6   Q      So under the terms of Schedule B, you never even get to

7   the next questions; isn't that correct?

8   A      Yes.

9   Q      Let's get to the next question, just to look at it.

10         MR. HOCHMAN:  The next question, if we could

11  highlight the next question, it might be easier to see,

12  Question 7A.

13  BY MR. HOCHMAN:

14  Q      It says:  "At any time during 2005, did you have an

15  interest in or, signature or other authority over, a financial

16  account in a foreign country."

17         Let's start with the words, "interest in."

18         Do you see any definitions of the words, "interest in,"

19  anywhere in your tax return?

20  A      No.

21  Q      Do you see what it means to say, "other authority,"

22  anywhere -- excuse me, the definition of, "other authority,"

23  anywhere in your tax return?

24  A      No.

25  Q      And respect to signature, again, I think you said before

1    that Mr. Murtha never discussed with you just having signature

2    authority over an account; is that correct?

3    A      Yes; that's correct.

4    Q      Now, if you go to that next line, where it says, "See

5    Page B-2 for exceptions"; do you see that?

6    A      Yes.

7    Q      Had you ever focused on this "See Page B-2 for

8    exceptions" line before?

9    A      No.

10   Q      And assuming somehow you had focused on, "See Page B-2,"

11   do you see a Page B-2 in connection with your tax return?

12   A      The form; no.

13   Q      Do you even know where to look for Page B-2?

14   A      No.

15   Q      And it says there that there are exceptions that are

16   located in B-2.

17          Do you know what any of those exceptions are, such as

18   the answer, "no," would be the correct answer?

19   A      No, I don't.

20   Q      And did Mr. Murtha, or for that matter anyone else,

21   prior to this criminal investigation, ever discuss with you

22   what the exceptions were with respect to Question 7A, Part 3,

23   of Schedule B?

24   A      No.

25   Q      It also references filing requirements for foreign

1    TDF90-22.1.

2            Do you see that as well?

3    A       Yes.

4    Q       Do you know what a Form -- prior to this case, do you

5    know what a Form TDF90-22.1 is?

6    A       No, I never heard of it.

7    Q       Did Mr. Murtha ever show you Form TDF90-22.1?

8    A       No, I never saw this form.

9    Q       Did Mr. Murtha ever show you the 240 pages of

10   instructions that go along with your Form 1040?

11   A       No.

12   Q       Did you ever, on your own, go ahead and pull out the

13   instructions that go along with your 1040?

14   A       No.

15   Q       Did you ever see anywhere on this return, at the back of

16   it, that the instructions for your 1040 are included?

17   A       No.

18   Q       And that would be true for all your returns; correct?

19   A       Yes.

20   Q       Did you know that the Form TDF90-22.1 was a form that

21   you don't even include with your tax return?

22   A       No.

23   Q       Did you know that the Form TDF90-22.1 is not a tax form,

24   but a disclosure form; did you know that?

25   A       No, I didn't.

1    Q        Did you know that that form doesn't actually get sent to

2    the IRS, but gets sent to the financial crimes network center

3    in Detroit, Michigan?

4    A        No, I did not, prior to this case.

5    Q        And did you know, prior to this case, that that form is

6    not even due on April 15, that form is due on June 30th?

7    A        No.

8    Q        If you could turn to the next page, Page 6.

9             MR. HOCHMAN:  Now, focus on the total expense line,

10   if I could, and actually put all the numbers, if you could, and

11   blow them up.  There it is.

12            (An exhibit was projected onto the projector screen.)

13   BY MR. HOCHMAN:

14   Q        It says here that your income was $178,130; do you see

15   that?

16   A        Yes.

17   Q        And your total expenses were $3,005; do you see that?

18   A        Yes.

19   Q        That represents approximately less than three percent of

20   your total income -- or excuse me -- your total amount of gross

21   receipts and sales; isn't that correct?

22   A        Yes.

23   Q        Why did you only report less than three percent as total

24   expenses compared against your gross receipts and sales?

25   A        Those were . . . .  I mean, those were the receipts and

1    the deductions I thought I had.

2    Q      Did you keep all your receipts during the year that

3    would represent your expenses?

4    A      I am known to be really absentminded about that.

5    Q      And did you have a home office, by the way?

6    A      Yes.

7    Q      I'm looking here, on the expenses.  I don't see any home

8    office deduction.

9           Did you take the home office deduction?

10   A      No.

11   Q      You didn't take any other deductions other than for

12   professional licenses, transcripts, and a conference; is that

13   correct?

14          If I can refer you to the next page?

15   A      Well, maybe some contributions.

16   Q      I'm sorry?

17   A      I can't read it.  The type is too small.

18   Q      If you can look at the next page, Page 7, the only

19   deductions you took --

20   A      Oh, I see, yes.

21   Q      -- were professional licenses, transcripts, and

22   conference; is that correct?

23   A      Yes.

24   Q      And so we don't have to go into that return, is less

25   than three percent what you took on your expenses every year?

1    A       As we looked over the last several years, yes.

2    Q       Why weren't you more aggressive; why weren't you trying

3    to get up against the line or even cross the line with respect

4    to your tax return?

5    A       I mean, it's just not something that I would do.

6    Q       Why not?

7    A       I would never -- I don't want to push limits with the

8    IRS.

9    Q       If I can turn your attention to Page 8 of this return?

10           This is the Schedule E, income or loss from partnerships

11   and S corporations; do you see that?

12   A       Yes.

13   Q       Do you have any idea how to compute this schedule?

14   A       No.

15   Q       If you can turn to the next page, which is Schedule SE,

16   Page 9 . . . .

17           Do you have any idea how to compute this schedule for

18   self-employment tax?

19   A       No.

20   Q       Turn to the next page, Page 10.  This is one of my

21   favorites, the Form 6251, alternative minimum tax for

22   individuals.

23           Do you have any idea how to compute, for the next two

24   pages, the alternative minimum tax for individuals?

25   A       No.

1   Q     Who did you rely on to come up with all this

2   information?

3   A     My accountant, Mr. Murtha.

4   Q     And did you review it, at all, before signing the

5   return?

6   A     Reviewed some of it, maybe just the . . . you know, to

7   make sure that the wages, and –– you know, what I knew were

8   deductions were correct.

9   Q     So the wages are basically the first and second pages of

10  your return; is that correct?

11  A     Yes.

12  Q     And would that be consistent for all your returns?

13  A     Pretty much, yes.

14  Q     If I might show you Exhibit 1E, which is your amended

15  2005 return?

16        You end up filing an additional return in 2005.

17        How did that come about?

18  A     I believe, sometime in 2006, I was just going through a

19  lot of old filing, and found a sale document on a small piece

20  of land I owned, and that I had forgotten to report.

21  Q     But you had already filed your 2005 return; right?

22  A     Yes.

23  Q     And this was going to result in your paying more tax;

24  isn't that correct?

25  A     Maybe.  Yeah.

1   Q        Well, it says were you going to pay 2,000 -- $2,365 more

2   of tax; correct?

3   A        Yes.

4   Q        So why did you do it?

5   A        I mean, I made a mistake.  I didn't report it.  And I

6   needed to amend my return.

7   Q        And did you contact Mr. Murtha to file this amended

8   return on your behalf?

9   A        Oh, almost immediately.

10   Q        And he did, it appears that he did, and you signed it

11   and sent it in; correct?

12   A        Yes.

13   Q        And paid the additional tax?

14   A        Yes.

15   Q        If you could turn to Exhibit 1F, as in "Frank"?

16            Now, in Exhibit 1F, which is your 2006 return, I want

17   you to look pretty hard, and see if you can find a Schedule B.

18                (The witness examines an exhibit.)

19   A        I don't see a Schedule B.

20   Q        When you signed your return, did you even know a

21   Schedule B was missing?

22   A        No.

23   Q        Why not?

24   A        It's not something I knew much about.

25   Q        Did anyone ever discuss with you that if you don't hit a

1    certain threshold for taxable interest, or ordinary dividends,

2    that you don't have to file a Schedule B?

3          Did anyone ever have that discussion with you?

4    A     No.

5    Q     If you could turn to Exhibit 1G, like in "George."  This

6    is your 2007 return.

7               (An exhibit was projected onto the projector screen.)

8               MR. HOCHMAN:  Now, focus on Page 4, and highlight the

9    charitable gift line.

10   BY MR. HOCHMAN:

11   Q     Here, in 2007, this is the return that you would have

12   filed after the sale in April of 2007; correct?

13   A     Yes.

14   Q     And if I recall correctly, Mr. Murtha testified that

15   there were certain charitable gifts that you and Dr. Fredrick

16   gave that year; is that correct?

17   A     Yes.

18   Q     There were gifts to the Phillips University; is that

19   correct?

20   A     Yes.

21   Q     Could you describe to the jury what those gifts were?

22   A     I gave a hundred and -- or we gave $150,000 to the

23   Phillips University Legacy Foundation for scholarships for

24   students, and $100,000 to the alumni association.

25   Q     So about $250,000 total?

1    A       About.

2    Q       And was part of that indicated on David Fredrick's

3    return, and part of it indicated on your return?

4    A       Yes.

5    Q       Which checking account did the checks for the $250,000

6    come out of?

7    A       It came out of our joint account.

8    Q       And who decided how to allocate which amounts of money

9    between your 2007 return and Dr. Fredrick's 2007 return?

10   A       Mr. Murtha did.

11   Q       Did you have any reason to doubt his allocation of the

12   money between -- charitable gift deduction between your and

13   Dr. Fredrick's return?

14   A       No, I did not.

15   Q       Did Mr. Murtha also prepare your 2008 return?

16   A       Yes, he did.

17   Q       Now, when you would meet with Mr. Murtha, how long would

18   it normally take, from the time that he's preparing -- excuse

19   me -- the time that you meet with him until the time you

20   receive a return back from him; was it approximately two weeks?

21   A       About two weeks.

22   Q       And at the time you met with Mr. Murtha, then, in March,

23   2009, for the 2008 return, were you or Dr. Fredrick aware that

24   UBS had signed a Deferred Prosecution Agreement in February of

25   2009?

1    A       No, I was not.  And I don't believe he was.

2    Q       Did you know that UBS had turned your name over, under

3    seal, confidentially, to the court, as part of the Deferred

4    Prosecution Agreement?

5    A       No, I did not.

6    Q       Did you know that Revenue Agent Sheila Maurer was about

7    to get three boxes of your UBS records in April or May of 2009?

8    A       No.

9    Q       And you said the schools were sold in April of 2007; is

10   that correct?

11   A       Yes.

12   Q       So, then, by March of 2009, how much time had elapsed

13   between the sale of the schools in April, 2007, and March of

14   2009?

15   A       Just a little under two years.

16   Q       Had you told Mr. Murtha that the schools were sold in

17   April of 2007?

18   A       Yes.

19   Q       Did Mr. Murtha, in fact, put down the amounts that David

20   Fredrick, Dr. Fredrick, had received from the sale of the

21   schools on Dr. Fredrick's 2007 tax return?

22   A       Yes, he did.

23   Q       And if I could draw your attention to Exhibit 1X, do you

24   have that in front of you?

25           MR. HOCHMAN:  Actually, you know what, Your Honor?  I

1   think I made a mistake.  I don't think I gave that one over.

2           May I approach?

3           THE COURT:  Sure.

4           MR. HOCHMAN:  Oh, here it is.

5           (An exhibit was projected onto the projector screen.)

6   BY MR. HOCHMAN:

7   Q      And 1X is Dr. Fredrick's 2007 tax return; do you recall

8   that?

9   A      Yes.

10  Q      If you could turn to Page 4?

11          MR. HOCHMAN:  And we can focus on the charitable gift

12  line.

13          (An exhibit was projected onto the projector screen.)

14  BY MR. HOCHMAN:

15  Q      It says $210,025; do you see that?

16  A      Yes.

17  Q      Is that his, Dr. Fredrick's, part of the $250,000

18  charitable gift that you and Dr. Fredrick gave to the Phillips

19  University?

20  A      Yes.

21  Q      And just to be clear, you were the one who initiated the

22  gift with Phillips University; is that correct?

23  A      Yes, I did.

24  Q      That wasn't Dr. Fredrick, that was you.

25  A      Yes.

1  Q      And what's your connection with -- you say you went to

2  college at Phillips University.

3         What's your connection with Phillips University?

4  A      I have lifelong friendships, and I had so many memories,

5  and . . . it was such a wonderful education.  They were

6  unfailingly kind and got me through all, you know, my

7  undergraduate education.  So I always wanted to be able to give

8  back, especially a scholarship fund.

9  Q      And were you able to give back to Phillips University in

10 payment for what they had done for you?

11 A      Yes.

12 Q      How were you able to give back to them?

13 A      Through the Legacy Foundation primarily, and then with

14 scholarships, and then through helping -- even though the

15 undergraduate school has become a state school, it's closed,

16 they still have offices there, and a very active alumni

17 association.  So we have reunions, we do a lot of projects, so

18 I -- I gave another large donation to that.

19 Q      And have you consistently given, over the years, to the

20 Phillips University alumni fund and legacy fund?

21 A      Yes.

22 Q      Actually, are you active with Phillips University alumni

23 fund or the Legacy Foundation?

24 A      Yes, I am.

25 Q      And in what way are you active?

1    A        I've been on the -- I have been a member of the

2    association, but I have been active on the board of directors

3    of both entities at different times, and the same time.

4    Q        And what committees have you served on, to your

5    knowledge?

6    A        I served on the Legacy Foundation.  It's not just a

7    scholarship, it's leadership training.  We always have a

8    conference in the fall.  I've helped organize that, and also

9    supervised -- every scholar has to do a volunteer project and

10   present it.  So I have been on that one.  And then I've been on

11   alumni recruitment for the legacy.

12   Q        Now, I think Ms. Finley showed Mr. Walker some . . . a

13   copy of a website from either legacy or the alumni foundation

14   that listed you sitting on some board dealing with finance.

15            Do you remember that?

16   A        Yes.

17   Q        Do you actually sit on some board dealing with finance?

18   A        No, not to my knowledge.

19   Q        Did you ever volunteer for such a board?

20   A        No.

21   Q        To your knowledge, were you even appointed to such a

22   board?

23   A        Tom Walker would never appoint me to that board.

24   Q        Why not?

25   A        He sat with me on too many committees.  And he would

1    always ask, and I would say -- I mean, you could volunteer, or

2    you could be appointed, but they ask.  They don't force you.

3    And I just -- it's not a committee I would sit on.

4    Q      But why not?

5           Do you have the skill set, the business and accounting

6    and financial skill set to sit on that committee?

7    A      No.

8              MS. FINLEY:  Objection, leading.

9              THE COURT:  Sustained.

10   BY MR. HOCHMAN:

11   Q      Why not; why would you not sit on such a committee?

12   A      I don't have the skill set.  But we have graduates, two

13   or three, that are CPAs, ministers of our churches are good

14   with funds, they sit on that committee.  I don't.

15   Q      And if you could turn to Page 7 of that document?

16             MR. HOCHMAN:  And if we could highlight the lines in

17   the middle?

18             (An exhibit was projected onto the projector screen.)

19   BY MR. HOCHMAN:

20   Q      Do these represent, this total of $765,366 amounts, do

21   these represent the amount that Dr. Fredrick reported on his

22   tax return in connection with what he received from the April,

23   2007, sales?

24   A      Yes.

25   Q      And you see it says 50 Gardner Street; is that what he

1    received in connection with the Lynn, Leon & Lyon -- his

2    ownership of Lynn, Leon & Lyon?

3    A      Yes.

4    Q      And with the stock in MUA, is that MUA Nevis?

5    A      Yes, it is.

6    Q      And it says equity in EIC, LLC; is that the company

7    you've talked about, up until now, called EIC?

8    A      Yes.

9    Q      The one that Dr. Fredrick owns 100 percent of?

10   A      Yes.

11   Q      Now, at the time, again, when we're dealing with the

12   2000 --

13          MR. HOCHMAN:  Thank you very much.  We're okay with

14   this.

15   BY MR. HOCHMAN:

16   Q      So now we're back dealing with your 2008 return, in

17   March of 2009.

18          Do you have that in your mind?

19   A      I think so.

20   Q      I'm sorry.  I'm switching you forward a year.  This was

21   the 2007 return prepared in 2008.  Now I'm switching you

22   forward a year for the 2008 return prepared in 2009.

23   A      Okay.

24   Q      Okay.  Sorry for jumping around slightly like that.

25          You said that you -- the schools had been sold; correct?

1   A       Yes.

2   Q       And were you still working for EIC at that time?

3   A       Yes.   There was a requirement that both Dr. Fredrick and

4   I stay on for one to two years, through a transition period.

5   Q       And were you still receiving those 1099s from EIC, which

6   is the U.S. based company?

7   A       Yes.

8   Q       And did you give those 1099s to Mr. Murtha to include

9   with your tax return?

10  A       Yes.

11  Q       Did Mr. Murtha ever discuss with you voluntary

12  disclosures when you met with him in what's probably the middle

13  of March of 2013 -- excuse me, 2009, to deal with your 2008

14  return?

15  A       I don't remember any such conversation.

16  Q       Do you remember any such conversation where he discussed

17  UBS with you at all?

18  A       No.

19  Q       Do you recall him ever asking whether or not you had any

20  foreign bank accounts at that time?

21  A       I don't recall him asking that question.

22  Q       And did he show you Schedule B, during your mid-March of

23  2009 meeting with him, and go over Part 3 of it with you?

24  A       No.   I don't remember him doing that.

25  Q       And do you recall Mr. Futterknecht's testimony that, by

1    the end of 2008, all 11 of the UBS accounts involved in this

2    case had closed down?

3    A       Yes, I do.

4    Q       And so by March, 2009, were you a signatory on any

5    account?

6    A       No, I was not.

7    Q       Did you have any personal financial interest in any

8    foreign bank accounts in March, 2009?

9    A       No.

10   Q       Did you have any other authority over any foreign bank

11   accounts in March, 2009?

12   A       No.

13   Q       So even assuming Mr. Murtha had asked you the question

14   if you have any foreign bank accounts in mid-March of 2009,

15   what would your answer have been?

16   A       No, I don't have any authority.

17   Q       I'd like to switch to a different type of tax form, a

18   5471, and ask you this question:

19           Before this case -- or excuse me, before Mr. Minchenberg

20   brought to your attention a 5471, had you ever heard of a 5471?

21   A       No, I had not.

22   Q       And what did you understand, when Mr. Minchenberg

23   brought it to your attention, a 5471 was?

24   A       It was a form that needed to be filed if you -- if a

25   U.S. citizen owned more than 50 percent of a foreign

1    corporation.

2    Q      And who provided you that information?

3    A      Mr. Minchenberg.

4    Q      And do you recall approximately when Mr. Minchenberg

5    provided you that information?

6    A      It was around Christmas.  I think it was 2004, but maybe

7    2005.

8    Q      Do you recall the testimony of Mr. Minchenberg, where he

9    said that form was a disclosure form, not a tax form?

10   A      I do now, yes.

11   Q      And where he said that that form either had to be

12   attached with your tax return or be filed separately with the

13   IRS; do you recall that?

14   A      Yes.

15   Q      Do you know if Dr. Fredrick filed one of these 5471s for

16   his ownership in MUA Belize?

17   A      Yes, I saw that form.

18   Q      And you actually saw it here in court, did you not?

19   A      Yes.

20   Q      And did Dr. Fredrick, with respect to his MUA Belize

21   interests, list that interest on that form?

22   A      Yes.

23   Q      With respect to these 5471s, did Mr. Minchenberg ever

24   say that you needed to file a 5471?

25   A      Yes, he did.

1    Q      What do you recall about that conversation?

2    A      Well, at first it was an e-mail when I wasn't there.

3    And he said he had to do it -- he'd work with Perry Schneider

4    and get it done.

5    Q      And what did you do with respect -- in response to

6    Mr. Minchenberg contacting you about a 5471?

7    A      I mean, I told him to do it.

8    Q      Why?

9    A      Well, I mean, it's . . . .  You know, it's required.  It

10   was something I didn't know about, but it was a requirement

11   with the IRS.

12   Q      Did you do any research on 5471s, yourself?

13   A      No.

14   Q      Did you contact anyone else about 5471s, other than

15   Mr. Minchenberg?

16   A      No.  Dr. Fredrick dealt with Jerry Schneider.

17   Q      Other than Jerry Schneider and Mr. Minchenberg, did you,

18   yourself, contact anybody else?

19   A      No.

20   Q      Did you rely on Mr. Minchenberg?

21   A      Yes.

22   Q      Why did you rely on Mr. Minchenberg to complete the

23   5471?

24   A      He . . . seemed to understand what it was, and I knew he

25   was working, you know, with a big accounting firm in New York.

1   Q        Did Mr. Minchenberg ask you to help him in any way, in

2   coming up you with the information to put on your 5471?

3   A        He asked me to, when I was on Saba, to look at the bank

4   account that Round Hill had, and give him various balances,

5   and . . . I think three or four years.

6   Q        And again, the 5471, I should have brought this up

7   earlier, that Mr. Minchenberg is asking you to provide

8   information on, was that dealing with your interest in Round

9   Hill Project Holdings, N.V.?

10  A        Yes.

11  Q        And did you actually obtain some information, some

12  banking information, about Round Hill's bank accounts?

13  A        Yes.  I got it on Saba and e-mailed it to him.

14  Q        Why did you cooperate with Mr. Minchenberg in the

15  preparation of your 5471 for Round Hill?

16  A        I mean, he asked me to.  And it's . . . I want to do

17  things right.

18  Q        And do you know if that 5471 was actually sent to the

19  IRS?

20  A        I did not do it personally.  It was . . .

21  Mr. Minchenberg told me it was, and then it was sent, I think

22  to Mike Refolo at Bowditch & Dewey, and sent.

23  Q        And did you hear Mr. Minchenberg's testimony that a 5471

24  doesn't actually even have to be signed by the taxpayer?

25  A        Yes.

1    Q      So let's focus, if we could, a moment on Round Hill, and

2    I'll ask you a few questions along those lines with respect to

3    Round Hill.

4           In 1999, did you become aware that a property could

5    become available on the island of Saba that the school could

6    build its campus on?

7    A      Yes.

8    Q      And what did you understand, back in 1999, that property

9    to be?

10             MS. FINLEY:  Objection, foundation.

11             THE COURT:  Sustained.

12   BY MR. HOCHMAN:

13   Q      How did you become aware that there was going to be a

14   property coming on the market that the Saba School of Medicine

15   Foundation could purchase and build this campus?

16   A      Dr. Fredrick told me he had received a call from Thomas

17   Eric Johnson, who is one of the foundation directors on Saba,

18   that a man named Leo Chance was selling a very large parcel of

19   land on Saba, and wanted it to go to the medical school wanted

20   the medical school to buy it.

21   Q      And this is approximately 1999?

22   A      Yes.

23   Q      Now, before 1999, where was the Saba School of Medicine

24   holding its classes?

25   A      There were some . . . it's why the school was able to

1    start.  The government had rather large buildings, one was a

2    former school that had been completely renovated, another

3    building had medical labs, and then there was another huge

4    building for classrooms.

5    Q       Was there also an elementary school that was used?

6    A       That . . . it wasn't a -- it was a comprehensive school,

7    but it was sitting at little desks.  It was totally gutted and

8    remodeled with, you know, normal desks and labs and facilities,

9    toilets, everything was done.

10   Q       Now, what was the area called that Round Hill was

11   located in?

12   A       It was called the bottom.

13   Q       All right.  And was the other Saba School of Medicine's

14   facilities located toward the top of the island of Saba?

15   A       Part of it was in the bottom, and then the . . . we had

16   it divided that the first three -- there were five semesters in

17   two years, and the first three were all located in the bottom,

18   and the other two were located . . . in a big building over an

19   area called Cove Bay, that was kind of over the hill.

20   Q       And did Cove Bay get pretty much destroyed by the

21   hurricane that blew through in 1999?

22   A       It was devastated.

23   Q       I'm sorry?

24   A       It was devastated.

25   Q       Now, with respect to the sale of the property that's

1    been called Round Hill, you said that Leo Chance had put on the

2    market, what was your understanding as to who purchased Round

3    Hill?

4    A      It was my understanding it was The Foundation purchased

5    Round Hill.

6    Q      And on what basis -- and on what do you base your

7    understanding?

8    A      From what Dr. Fredrick told me.

9    Q      And what did he tell?

10   A      I wasn't there.  He went and he did all of the -- he and

11   Thomas Eric Johnson, two directors, did all the negotiations.

12   But he said it had been purchased for the medical school.

13   Q      Did he say how much it was purchased for?

14   A      $250,000.

15   Q      Did he tell you, at the time, who, or what, was the

16   title holder for the property?

17   A      No.  I mean, I just assumed it was The Foundation.

18   Q      And at some point -- this is 1999.  At some point in

19   2000, was there a ground breaking on the property?

20   A      Yes, there was.

21   Q      Did you learn something more about who the title was

22   being held in for the Round Hill property in about this time of

23   2000, during the ground breaking?

24   A      Well, it was after the ground breaking.  I had been

25   on . . . I had been on the island for some reason.  I think it

1   was some orientation.  But, in meeting with the architect, he

2   would bring out a lot of papers, and it shows that Laura

3   Walls -- that the property was registered to Laura Walls.

4   Q      Who did you understand Laura Walls to be?

5   A      Laura Walls is my stepdaughter.

6   Q      And what was your reaction in finding out that the

7   property was registered to Laura Walls?

8   A      I was pretty astonished.

9   Q      Why?

10  A      She was really young then, with a young child.

11  Q      Did you confront Dr. Fredrick about the situation?

12  A      I wouldn't say I confronted him.  I mean, I said why in

13  the world is this in Laura's name?

14  Q      And what, if anything, did he say back to you?

15  A      He said that -- that the sale was done so quickly, in

16  such a short period of time, there were other people that want

17  it, that Speetjens, the notary, the lawyer that handled

18  everything, said there wasn't time to set up any other kind of

19  a company.  He didn't want it in the medical school, because of

20  asset protection, so he was supposed to find a close trusted

21  relative.

22  Q      And what was your understanding as to what the problem

23  would be for asset protection purposes if the Round Hill

24  property was put in the Saba School Foundation's name?

25            MS. FINLEY:  Objection, foundation.

1          THE COURT:  Sustained.

2     BY MR. HOCHMAN:

3     Q     Did you have an understanding as to whether or not there

4     would be a problem -- and now I'm focusing back in the year

5     1999/2000 -- if the Round Hill property was put in the Saba

6     School Foundation's name?

7     A     Now well, what we had learned bay back in 1995, with the

8     first lawsuits, was that it could be frozen or seized.

9     Q     So if the Round Hill property was in the Saba School of

10    Medicine Foundation's name, then, if there was a judgment, it

11    could seize the property?

12    A     Yes.  Or, you know, if there were tax issues, I mean,

13    even under Antillean law, it was seizable.

14    Q     Did you have any conversations with Dr. Fredrick about

15    moving the property out of Laura Walls' name and into an

16    entity's name?

17    A     I said . . . and I talked with Mr. Johnson, who was a

18    director, and, you know, we really ought to go to the lawyer,

19    Speetjens, and there needed to be another way.  It was not a

20    good idea to have it in a young girl's name.

21    Q     Did you participate in another way being created into

22    which this property could be placed?

23    A     I was at the meeting.  We went to Saint Maarten, where

24    the lawyer was located, and they wanted to create a company,

25    and suggested, just for the land, that David and I could

1    be . . . caretakers, owners.

2    Q      And was a company formed, in approximately 2000, in

3    connection with Round Hill?

4    A      Yes.

5    Q      What company was that?

6    A      Round Hill Holding Company.

7    Q      And what was your and David's percentage interest?

8    A      Each of us had 50 percent.

9    Q      And this is the same Round Hill Holdings that you filed

10   the -- that were sent in through Mr. Minchenberg, that 5471?

11   A      Yes.

12   Q      Once the Round Hill Holding property was -- excuse me,

13   Round Hill Project Holding Company was formed, did you

14   immediately move the property into that company's name?

15   A      No.  It wasn't immediate.

16   Q      Are you familiar with something called a right of

17   superficies?

18   A      It's a very complicated Dutch Antillean word.

19   Q      Did you participate in a right of superficies being

20   obtained by Round Hill Project holdings in connection with this

21   Round Hill land?

22   A      It was something that Mr. Speetjens knew about, and did

23   a document that allowed -- did some kind of separation between

24   land and buildings.  It allowed buildings to be built, but it

25   protected them.  Like a landowner couldn't claim it.  It

1    protected them for, I think, about 20, 25 years.

2    Q      And that right of superficies, I think we've seen it a

3    couple times up here, that's the February 2nd, 2001 document;

4    is that correct?

5    A      That's the -- yes.

6    Q      And, once that was created, are you aware of whether or

7    not the Saba School of Medicine Foundation started to build

8    buildings on this land?

9    A      Oh, they built huge buildings.

10   Q      And did the money for those buildings, to your

11   knowledge, come from the Saba School of Medicine Foundation?

12   A      Yes.

13   Q      And I think the documents showed that was over

14   $5 million spent on these buildings.  Does that sound

15   approximately correct?

16   A      It was more over time, but the initial major classroom

17   buildings and library cost that much.

18   Q      And I think we saw a picture of the completed Saba

19   School of Medicine, and did that picture -- and we don't have

20   to put it up again -- did that show the buildings that were

21   built on the Round Hill property between, let's say, 2001 and

22   2006?

23   A      Yes.

24   Q      Now, in 2004 -- in June, 2004, are you aware of the

25   Round Hill property being transferred from Laura Walls into the

1    Round Hill Project Holdings Company?

2    A       Yes.

3    Q       How did that come about?

4    A       By then, Mr. Speetjens had retired.  It was still that

5    firm, but . . . I think it was Young Scott -- it was done

6    through their firm.  They arranged the transfer.

7    Q       And were you involved, in some way, in that transfer?

8    A       I signed documents.

9    Q       And did the documents you signed transfer the property

10   into Round Hill Project Holdings?

11   A       Yes.

12   Q       And I believe the price was $17,000, if I'm not

13   mistaken?

14   A       Yes.

15   Q       Did you understand that $17,000 to represent something?

16   A       It was a property transfer -- it was a tax.

17   Q       And I think Mr. Solagnier said that the transfer tax on

18   the island was about four to six percent?

19   A       Yes.

20   Q       And the total amount that it had been bought for

21   initially was $250,000?

22   A       Yes.

23   Q       And if you do the math, that's a little over $17,000; is

24   that correct?

25   A       Yes.

1    Q      Now, with respect to that property -- so now the

2    property is in Round Hill Project Holdings, and you are a

3    50 percent owner; is that correct?

4    A      Yes.

5    Q      Did you all of a sudden think that you had hit the

6    lottery again, and now you were a 50-percent owner of the Round

7    Hill Project -- excuse me, the Round Hill land?

8    A      No.  It was a . . . a protection for the school, and

9    that right of superficies was still in effect.  To the best of

10   my knowledge.

11   Q      So did you believe that the property, the Round Hill

12   Holding property, became the personal property of Patricia

13   Hough and David Fredrick, or was it owned by somebody else?  Or

14   something else.

15   A      I mean, it was owned by the LLC that . . . .  For

16   protection.

17   Q      And protection for whom?

18   A      For the medical school buildings and The Foundation.

19   Q      That's the Saba School of Medicine Foundation?

20   A      Yes.

21   Q      And, at some point -- and now we'll fast forward to the

22   sale, April 3rd, 2003.  Excuse me, April 3rd, 2007.  Do you

23   have that date in mind?

24   A      That's a very memorable date.  Yes.

25   Q      And I believe you -- that Mr. Rodger testified that he

1   met you in Providence, Rhode Island; is that correct?

2   A      Yes.

3   Q      In a lawyer's conference room; do you recall that?

4   A      Yes.

5   Q      And I think he said that the table in the conference

6   room, to sign all the documents, was almost as long as this

7   court.  Do you recall that?

8   A      I think it was longer.

9   Q      And he talked about there being 50 lawyers involved in

10  the transaction?  Do you recall that?

11  A      Yes.

12  Q      Did you have lawyers representing, to your knowledge,

13  your side of the transaction?

14  A      Yes.

15  Q      Was that that Bowditch & Dewey firm you referred to

16  before?

17  A      I believe it was Bowditch & Dewey.

18  Q      Bowditch & Dewey.  Thank you.  And I think Mr. Rodger

19  described it as eight to nine feet of documents that were there

20  that day?

21  A      They were all spread out, but it was thousands of pages.

22  Q      Now, the thousands of pages that were all spread out in

23  a room with a table bigger than this courtroom, what parts of

24  those documents were you folks signing?

25  A      The parts that involved me personally were my employment

1   agreement, a non-compete agreement, and then I had to sign as a

2   guarantor.

3   Q      So let's go through each one of those if we could.  With

4   your employment agreement, was that a consulting agreement?

5   A      Yes.

6   Q      And what did you understand it to provide?

7   A      There were still two accreditations for Medical

8   University of the Americas.  There was, I think, one

9   accreditation for New York for Saba.  But there was a very

10  critical one for Saba.  It was becoming part of the

11  Netherlands, as an island.  And the Dutch accrediting

12  organization, the initials are NVAO, needed to approve it for

13  the medical school to continue operation.

14  Q      And what did your consulting agreement provide as to

15  what you would been doing for the schools?

16  A      I was to continue to direct accreditations, to train a

17  designate by Steven Rodger how to do them, and then also to

18  help kind of introduce everyone, the new deans and the new

19  people, to all the hospitals.

20  Q      Is this why you were kept on, for this transition

21  purpose?

22  A      Yes.

23  Q      And approximately how much were you paid each year?  By

24  the way, was it a two-year agreement?

25  A      Yes.

1    Q       How much were you paid each year?

2    A       Oh, more than I'd ever been paid.  I think it was

3    $170,000.

4    Q       $170,000 per year?

5    A       Yes.

6    Q       So you said that the consulting employment agreement was

7    one.  You said the non-compete was the second thing you were

8    concerned about?

9    A       Yes.

10   Q       What were your concerns with the non-compete agreement?

11   A       The initial non-compete mike Refolo showed me, it had a

12   lot of restrictions about where I could practice medicine,

13   which practically was the whole world.  I mean, it was -- and

14   also teaching.  And although I didn't want to teach in any

15   school that they could consider competing, I really argued that

16   if I wanted to teach in a U.S. medical school, or -- you

17   know -- somewhere in Europe, that I should be able to do that.

18   That wasn't competing with Saba, or MUA, or this other school.

19   And I greatly was offended, you know, by any restriction on my

20   medical license.  I felt that should be anywhere worldwide.

21   Q       And, at the end of the day, did the non-compete allow

22   you to practice as a medical doctor?

23   A       Yes.  Anywhere.

24   Q       Did it allow you to work in the United States?

25   A       Yes.

1    Q       And were those sort of your central concerns that were

2    addressed by the non-compete?

3    A       Yes.

4    Q       And you said the third thing was a guaranty.

5    A       Yes.

6    Q       What did you understand that you were guaranteeing?

7    A       I didn't understand anything about it at first, because

8    I really didn't own anything that was being sold.  I didn't own

9    shares.

10   Q       And I think, actually, each one of those agreements

11   reflect a statement in the whereas clauses, if you recall, that

12   Dr. Hough does not own shares of whatever that particular

13   agreement was referring to.  Do you recall that?

14   A       That was eventually put in, after some negotiation.

15   Q       And again, with respect to this provision of

16   guaranteeing, what did you understand that you were

17   guaranteeing?

18   A       It was a guaranty for the entire sale.  I knew the

19   accreditations.  I think there's intellectual property or

20   something.  I mean, I could guaranty that.  I knew the

21   hospitals and the contracts, so I could guaranty that.  But

22   there were a lot of legal documents, and a lot of just numbers

23   and financials.

24   Q       So you were guaranteeing, basically, that whole eight or

25   nine feet of documents; isn't that correct?

1   A      Yes.

2   Q      Did you read every word in those eight or nine feet of

3   documents before you signed your name as a guarantor?

4   A      No.  It was -- it was so far beyond what I could

5   understand.

6   Q      Did you rely on anyone to interpret those documents for

7   you before you signed those agreement?

8   A      Yes.  I had meetings with Mike Refolo, who was the major

9   person at Bowditch & Dewey who had anything to do with the

10  sale.

11  Q      And what, if anything, did he do with those documents

12  such that you were willing to sign them as a guarantor?

13  A      Well, nowhere is there a hundred percent.  He said he

14  thought the accountants had done a good job.  I knew him to be

15  really conscientious.  But I was always -- I mean, they had 50

16  lawyers, and we had three.  And he went through the areas that

17  really applied to me, we straightened those out, and . . . .

18  It really came down -- I said no, I'm not going to sign, and it

19  really came down to Steven Rodger said unless I signed as

20  guarantor, there was no sale.

21  Q      And were you willing to sign as guarantor so there could

22  be a sale?

23  A      Yes.

24  Q      And with respect to the actual signature of all these

25  documents on that day of April 3rd, 2007, were the documents

1    sort of laid out on the table and, over the course of the day,

2    you would come up, sign your name, and then go sit down again?

3    A      It was very few times.

4    Q      And describe -- I mean, was it along the lines of what

5    I've just described, where you would come up, they would show

6    you where to sign, and you would sign, and then would you sit

7    back down again?

8              MS. FINLEY:  Objection, leading.

9              THE COURT:  Overruled.

10   A      They were the document . . . what I signed, like what a

11   guarantor signature page looked like.  My contract.  And my

12   non-compete.

13   Q      Did you read over each one of the agreements on

14   April 3rd, 2007, before you signed your name?

15   A      Oh, some of them were hundreds of pages long.

16   Q      So you didn't?

17   A      No.

18   Q      What does no mean?

19   A      I did not read over all the agreements.

20   Q      If you could look to before you at Exhibits 10A, B, C,

21   10F, 11K, 11R, 11S, 11X, 11Z, 11AA, and 11CC.  And the question

22   will be -- and I'll -- you make an assumption, too.  These are

23   just some of the eight to nine feet of documents that existed

24   before you on April 3rd, 2007, for your signature; is that

25   correct?  If you want to just briefly look through them.

```
1               (The witness examines exhibits.)
2    A      Do you want me -- you do not want me to read these, do
3    you?
4    Q      Excuse me?
5    A      Do you want me to look at each page?
6    Q      No.  You can just basically look at the first page of
7    each document.
8               (The witness examines exhibits.)
9    Q      Because then I'm just going to draw your attention to
10   one or two of these documents.
11              (The witness continues to examine various documents.)
12   Q      And as you're going through them, if you could answer
13   these questions.
14          10A is the EIC purchase agreement; is that correct?
15   A      Yes, it is.
16   Q      10B is the MUA purchase agreement?
17   A      Yes, it is.
18   Q      10C is the Saba School of Medicine Foundation purchase
19   agreement?
20   A      Yes, it is.
21   Q      10F is the flow of funds memorandum?
22   A      Yes.
23   Q      11K is the MUA resolution?
24   A      11K?
25   Q      K.  11K.  Is the MUA resolution?  Do you see that?
```

```
 1                   (The witness examines exhibits.)

 2    Q      Do you not have it there?

 3    A      Let me take one more look.

 4           I don't have it.

 5    Q      Let's skip 11K for now.

 6    A      Okay.

 7    Q      11R is a share transfer agreement for New Vanguard and

 8    David Fredrick and Hillside Properties?   Do you see that?

 9    A      Yes.

10    Q      11S is the binder for Saba School of Medicine

11    Foundation?

12    A      Yes.

13    Q      11X is the share transfer agreement?

14    A      Yes.

15    Q      11AA -- excuse me, 11Z -- did I say 11Z?

16    A      Yes, I think so.

17    Q      Is a power of attorney for Round Hill?

18    A      Yes.

19    Q      11AA is the Round Hill Project board meeting minutes?

20    A      Yes.

21    Q      And 11CC is a ratification agreement dealing with Round

22    Hill. Do you see that?

23    A      Yes.

24    Q      And not every one, but most of these agreements, were

25    the ones that you signed on April 3rd, 2007; is that correct?
```

1    A      Yes.  Yes.

2    Q      And is it fair to say that you didn't read every word of

3    every document at the time you signed it?

4    A      Yes.

5           MR. HOCHMAN:  If you could turn to one of these

6    agreements, which is 10F.

7           And if we could put 10F on the screen, please?

8           (An exhibit was projected onto the projector screen.)

9    BY MR. HOCHMAN:

10   Q      10F is a flow of funds memorandum?  Do you recall that

11   being discussed by Mr. Rodger when he testified?

12   A      Yes.

13   Q      Did you participate, at all, in the decisions on how to

14   allocate the funds request with to the sale of the schools in

15   April of 2007?

16   A      No, I did not.

17   Q      What was your understanding as to who participated in

18   this discussion on behalf of the Saba School of Medicine, MUA,

19   and EIC?

20   A      Dr. Fredrick and the lawyers from Bowditch & Dewey.

21   Q      Why did you not participate in the discussion of what

22   the flow of funds would be?

23   A      It's way outside my area of expertise, and I really

24   didn't own anything.  Any shares or any of the entities.

25   Q      Did you even see Exhibit 10F, the flow of funds

1   memorandum, at the time of the sale?

2   A      No.  The first time I saw it was during this

3   investigation.

4   Q      On this document, you don't see your signature line

5   anywhere; is that correct?

6   A      That's correct.

7   Q      Thank you.  We're done with these documents now.

8          I'd like to discuss a couple different items that were

9   mentioned during this trial.  And we're going to start with

10  properties.

11         With respect to properties, there are three properties

12  that you've heard testimony about in this trial.

13         A property in Asheville, North Carolina.  Do you recall

14  that?

15  A      Yes.

16  Q      A property in Sarasota, Florida.  Do you recall that?

17  A      Yes.

18  Q      And then there is a property in Greenville, North

19  Carolina.  Do you recall that?

20  A      Yes.

21  Q      Let's start with the Asheville property first.

22         What was your understanding, if any, of how the purchase

23  of the Asheville property was purchased?  And the purchase, I

24  believe, was in 2005, if I'm not mistaken.

25             MS. FINLEY:  Objection, foundation.

1            THE COURT:  To what he said, or the question?

2            MS. FINLEY:  With the question.  He said, "What's

3    your understanding?"  I don't know if she has one.

4            THE COURT:  Sustained.

5    BY MR. HOCHMAN:

6    Q      Do you have an understanding as to how the Asheville

7    property came to be purchased in 2005?

8    A      Yes.

9    Q      What is that understanding -- well, before we get there,

10   on what do you base that understanding?

11   A      Conversations with my husband, Dr. Fredrick.

12   Q      What was your understanding based on conversations with

13   your husband, Dr. Fredrick?

14   A      He had been looking, for some time, for a home in North

15   Carolina that was in a little cooler climate.  When we lived in

16   Augusta, we used to go up to the mountains a lot, and really

17   liked that area.

18   Q      And, at some point, did you find out that the property

19   in Asheville had been purchased?

20   A      Yes.

21   Q      And what was your understanding as to -- did you have an

22   understanding as to where the funds for the purchase came from?

23   A      Yes.

24   Q      Where did you get that understanding from?

25   A      From Dr. Fredrick.

1    Q      And what did he tell you?

2    A      Well, when I asked him about, you know, where is the

3    money going to come from?  Are we going to get loans.  He said

4    that, based on his years of deferred compensation, that he was

5    going to ask for a loan from the board of directors.

6    Q      And do you know if Dr. Fredrick actually had years of

7    deferred compensation while working for the Saba School of

8    Medicine Foundation?

9    A      Oh, there were years where he had no salary.

10   Q      Would those be the beginning years, when The Foundation

11   was just up and running, in the sort of early to mid nineties?

12   A      Yes.

13   Q      And did you have any reason to doubt Dr. Fredrick when

14   he told you that he was going to get a loan from the board

15   based on his deferred compensation?

16   A      No.

17   Q      Why not?

18   A      I had a very -- I mean, he had just worked -- he had

19   just worked night and day, and had a good relationship with the

20   board, so I . . . I didn't have any doubts about that.

21   Q      Now, at some point in 2008, an adjacent lot becomes

22   available.  Do you recall that?

23   A      Yes.

24   Q      And I think that lot -- there was testimony in the

25   documents that it was purchased for $200,000.  Do you recall

1    that?

2    A      Yes.

3    Q      What was your understanding as to where the money was to

4    come from to make the purchase for $200,000?

5    A      He asked for another loan.

6    Q      Who is, "He"?

7    A      Dr. Fredrick.

8    Q      And to which organization, or to which person, did he

9    ask for the loan from?

10   A      It was from the board of directors.  The new board of

11   directors for Saba Foundation.

12   Q      Is this something that he would have told you at

13   approximately the time that that lot was purchased in November,

14   2008?

15   A      Yes.

16   Q      Did you believe him?

17   A      Yes.

18   Q      Why did you believe it?

19   A      Gotten another loan, and I had made the stipulation,

20   when we bought the Asheville property, that, by 2008, our

21   Manasota Key house had to go on the market, because it was just

22   too much property.  We needed to either get a condo . . . but

23   that had to be put on the market.

24   Q      And when we're talking about the Manasota key house for

25   a moment, when did you buy the Manasota Key house?

1    A      We bought the property in -- I think we saw it, and the

2    contract was '96, and we purchased it in January of '97.

3    Q      How much did you purchase it for back in January of '97?

4    A      $500,000.

5    Q      Where did the money come from to make this purchase?

6    A      Oh, from a lot of sources.  We didn't have much at that

7    time, but we had sold -- we always bought fixer uppers for

8    homes, and we had had kind of a historical property that we

9    sold in Augusta, Georgia, so we . . . and our house in Gardner

10   didn't cost that much.  So we got that, we got an equity loan

11   for our Gardener house, my mother lent us some money, and then

12   he sold some mutual funds that he had bought back in the

13   seventies.  So we managed to get it together.

14   Q      And that was the -- you paid approximately $500,000 back

15   in -- what year was it?

16   A      19 -- it was early 1997.

17   Q      And I'll fast forward.  What would that be, 20 . . . no.

18   Ten . . . .  16 years to the present day.

19   A      Yes.

20   Q      Has the property risen in value?

21   A      Yes.

22   Q      Is the property worth somewhere around two and a half

23   million dollars at this point?

24   A      Well, we got a couple loans and, you know, we've added

25   on; but yes, that's what it's on the market for now.

1    Q      So let's go back to -- we're dealing with the Asheville

2    property, if I'm not mistaken?

3    A      Yes.

4    Q      At some point, does the Asheville property get sold?

5    A      Yes.

6    Q      Approximately when was that, if you recall?

7    A      It was after the . . . we found out we were under

8    investigation.  It was in early 2010.

9    Q      And, when it was sold, did you have an understanding as

10   to who bought the property?

11   A      It was a company.

12   Q      What company was that?

13   A      I didn't know the name.  It was a company from South

14   America.

15   Q      Were you involved at all in the transaction involving

16   the sale of the Asheville property?

17   A      No.  At that particular time, I was down with Dr. Gruber

18   and his group in El Salvador.

19   Q      And what were you doing, by the way, in El Salvador with

20   Dr. Gruber?

21   A      Oh, hypertension, diabetes screening clinics, eye

22   operations.  Visiting, you know, San Juan de Dios, doing a lot

23   of work with our foundation and his foundation.

24   Q      The sale of this Asheville property, was this about

25   2010, the sale?

1  A      Yes.

2  Q      Who handled the sale, on your end, for the Asheville

3  property?

4  A      Dr. Fredrick did.

5  Q      And did Dr. Fredrick tell you where the -- what happened

6  with any sale proceeds?

7  A      Said we broke even.  You know, that it was pretty much a

8  break even.

9  Q      If I can turn your attention to the -- well, actually,

10  did you know, at the time -- and now I'm going to focus you

11  back in 2010, as opposed to what you've learned in this

12  investigation.  Did you know, at the time, that the property --

13  that the buyer of the property had just assumed a note, as

14  opposed to making an actual payment?

15  A      No.

16  Q      Did you have an understanding from -- was it

17  Dr. Fredrick -- as to what happened with the sale of the

18  property?

19  A      I just thought it was sold.

20  Q      And, if it was sold, where did you understand the money

21  to go back to?

22  A      The Saba Foundation.

23  Q      And did you believe, at the time, in 2010, that the Saba

24  Foundation controlled Ample Dynamic?

25  A      That was one of those Hong Kong entities Beda

1   Singenberger set up for The Foundation, so . . . .  Yeah.  It

2   was an entity.

3   Q      So did you believe, also, at that time, that New

4   Vanguard and Top Fast were Saba Foundation companies?

5   A      Yes.

6   Q      So did you believe, also, at that time, that New

7   Vanguard and Top Fast were Saba Foundation companies?

8   A      Yes.

9   Q      So let's switch, if we could.  That's the Asheville

10  property.  Let's go to Sarasota for a moment.  With respect to

11  the Sarasota property, do you remember when that property was

12  purchased?

13  A      It was purchased in the spring of 2008.

14  Q      And did you have discussions with Dr. Fredrick in the

15  spring of 2008 about the purchase of the Sarasota property?

16  A      Yes.  We had our Manasota property . . . the key

17  property on the market, and, you know, it was still a

18  good . . . a good time.  It was being shown.  And . . . .  I

19  just had a friend -- I knew of a condominium area in Sarasota

20  that was not far from the department of health, and a . . .

21  unit became available that was really far under market value.

22  Q      And that was what we referred to as the Sarasota

23  property?

24  A      Yes.

25  Q      Did you understand what the source of the money was

1    going to come -- did you understand where the source of the

2    money was that was going to pay for this property?

3    A      Yes.  We had not sold Manasota Key yet, so he asked for

4    another loan from The Foundation.

5    Q      Who is he?

6    A      Dr. Fredrick.

7    Q      On what did he base the request to The Foundation for a

8    loan?

9    A      On his deferred compensation.

10   Q      And did you understand him to have a very significant

11   amount of deferred compensation that was owed to him by the

12   Saba School of Medicine Foundation?

13   A      Yes, I did.

14   Q      And did -- to your understanding, did the Saba School of

15   Medicine Foundation make a loan to you and Dr. Fredrick to buy

16   the Sarasota property?

17   A      It went through our LLC, which is called Lynn,

18   Leon & Lyon Group.

19   Q      Why did you set up AN LLC -- call it LLL, if that's

20   okay.  Why did you set up the LLL, LLC?

21   A      Our attorney, Robert Dickenson, suggested we do that.

22   There's a thing called homestead in Florida, and Manasota Key

23   was homesteaded, and that really protects it.  But the one

24   in -- they said if you're going to get a second one, don't put

25   it in your own names, but it in an LLC.

1   Q      Is that because doctors periodically get sued, and you

2   wanted to do some asset protection for yourself?

3   A      Oh, yeah.  I've always been aware of that.

4   Q      And then, with respect to the Sarasota property, did you

5   ever live in the Sarasota property?

6   A      No.

7   Q      Has it been a rental property?

8   A      Yes.

9   Q      And, with respect to that property, does LLL still have

10  that property?

11  A      Yes.

12  Q      And that's the Sarasota property.

13         Let's switch to the Greenville property if we could.

14  With respect to the Greenville property, what is your

15  understanding as to why that WAS purchased?  Actually, do you

16  have an understanding as to why that property was purchased?

17  A      Yes.

18  Q      What is that understanding based on?

19  A      Well, Dr. Fredrick was a great creator of programs, and

20  always needed to be busy.  And as Dr. Gruber described, he had

21  what's called Psy.D./M.D., which is the doctorate -- clinical

22  doctorate and medical doctor combination; and that is what he

23  was going to do.  It wasn't going to be against his non-compete

24  to do the . . . doctor of psychiatry part, and those students

25  would feed into Medical University of the Americas St. Matthews

1    or . . . Saba.

2    Q      And I think you heard that -- there was testimony that

3    you needed a U.S. based partner for the Psy.D./M.D. program.

4    Do you recall that?

5    A      Yes.

6    Q      Where did Dr. Fredrick go to medical school, if you are

7    aware?

8    A      He didn't go to medical school.

9    Q      Not medical school, I'm sorry.  Where did he get his

10   bachelor's and master's at?

11   A      At East Carolina University in Greenville.

12   Q      Do you know if Dr. Fredrick's daughter also lived in

13   Greenville, North Carolina?

14   A      Yes.  She lived there and attended East Carolina.

15   Q      Now, were you at all involved in the involving the

16   Greenville purchase or sale?

17   A      No.  Not at all.  Oh.  The sale.  I'm sorry.  Not with

18   the purchase, but I did help with the sale.

19   Q      With respect to the purchase, what was your

20   understanding as to where the funds were going to be coming

21   from -- did you have an understanding as to where the funds

22   were going to be coming from to purchase the Greenville

23   property?

24   A      Well, it was supposed to be for faculty.  To be kind of

25   faculty and an administrative headquarters.  So it came from

1   The Foundation.

2   Q      And when you say The Foundation, which Foundation are

3   you referring to?

4   A      Oh, the Saba School of Medicine Foundation that

5   continued after the sale.

6   Q      And even though Dr. Fredrick was no longer -- well,

7   actually, Dr. Fredrick, in 2008, was still working, you said,

8   with the Saba School of Medicine; is that correct?

9   A      Yes.

10  Q      But this program would have been outside of that, which

11  it was allowed under his non-compete.  Is that your

12  understanding as well?

13  A      I know he went to lawyers and checked into it.  But

14  that's what he wanted to do.

15  Q      Had he been working on this Psy.D./M.D. program for a

16  number of years at the point at which the Greenville property

17  was purchased?

18  A      Oh, yeah.  Way back when he first met Dr. Gruber.  I

19  think it was over ten years.

20  Q      Do you know if they were actually able to pull off and

21  establish this Psy.D./M.D. program in Greenville, North

22  Carolina?

23  A      He had agreements with East Carolina and psychiatric

24  hospitals, but . . . some of those agreements fell through.

25  Q      Did you ever live in the Greenville property?

1    A      No.

2    Q      Did Dr. Fredrick ever live in the Greenville property?

3    A      No.

4    Q      Do you know if Laura Walls -- or probably, at that

5    point, known as Laura Whitley -- lived in the Greenville

6    property for any period of time?

7    A      For less than a year.

8    Q      And the property was bought in June of 2007; is that

9    correct?

10   A      That sounds like the right date.

11   Q      And how soon thereafter -- did she live in the property

12   at the beginning?

13   A      Yeah.  They were -- they had another child, and they

14   were in a really tiny home, and there needed to be -- this was

15   a bit of a bargain property that needed some fixing up, so they

16   moved in as caretakers and kind of oversaw . . . some of the

17   construction, and took care of it.

18   Q      Were they paying rent at the time?

19   A      Yeah.  They paid some amount of rent.  And utilities.

20   Q      How long did she live in the property for?

21   A      It was under a year.  She showed me her . . . closing

22   statement on their current home.  And that was in May of 2008.

23   Q      So, between approximately May, 2008 -- do you know when

24   the property was sold?  Do you recall?

25   A      You mean the Greenville -- for the Psy.D./M.D.?

1    Q      Yes.  That property.

2    A      The market had fallen, so . . . .  I think it sold in

3    2012.  But it might have --

4    Q      2012 or 2011; does that sound right?

5    A      It might have been 2011.  It took a while.

6    Q      And did anyone live in the property from May of 2008

7    until it was sold in 2011?

8    A      No.  It was vacant.  Just except we . . . we had some --

9    we had furniture in storage that we had had in Asheville, and

10   we -- you know -- put that around to make it show better.

11   Q      And I believe you saw -- or there is a document that

12   shows that the sale proceeds, when the property was sold in

13   2011, went back to Ample Dynamic Trading.  Do you recall that

14   document?

15   A      Yes, I do.

16   Q      What was your understanding as to who owned Ample

17   Dynamic Trading in 2011?

18   A      That was one of The Foundation entities.

19   Q      So the money went back to The Foundation?

20   A      Yes.

21   Q      Let me switch to planes.  We have done property.  Let's

22   do some planes.  Let me focus on the Piper Meridian plane

23   that's been testified about.  Do you have that in mind?

24   A      Yes.

25   Q      How did you learn -- and I'll focus you back in 2007.

1   How did you -- or did you learn that Dr. Fredrick was

2   interested in purchasing a Piper Meridian plane?

3   A      After the sale, when we were going back and forth

4   between Florida and Asheville and Gardner, he wanted a little

5   larger, faster plane that he could fly nonstop.  So I knew he

6   was looking.

7   Q      What plane was he flying at that point?

8   A      It was a small Bonanza.

9   Q      And how long had he had that small Bonanza plane for?

10  A      Since the nineties.

11  Q      Do you know how old that plane was when he bought it?

12  A      It was from the seventies.  It wasn't a new plane.

13  Q      So the plane, in 2007, was probably close to 40 years

14  old?

15  A      30-some years old, yeah.

16  Q      All right.  And so he expressed to you an interest in

17  getting a new plane?  Is that correct?

18  A      Yes.

19  Q      Do you know if he actually bought a Piper Meridian

20  plane?

21  A      Yes, he did.

22  Q      Did he have I have discussions with you, ahead of time,

23  about which plane he was going to buy, or how much he was going

24  to spend?

25  A      No.  I have very little knowledge or interest in

1    airplanes.

2    Q       Why not?

3    A       Well, I'm not a pilot and I don't like flying in small

4    planes.

5    Q       Did Dr. Fredrick, at some point, show up at your local

6    airport with a Piper Meridian plane?

7    A       I wouldn't say showed up.  He had to get an instructor,

8    and they -- again, he found another good sale, or bargain.  It

9    was out in Phoenix, and they went out -- it was a very

10   technical plane.  He couldn't fly it.  So they flew it back to

11   the Venice Airport.

12   Q       So they flew from it Phoenix, Arizona; is that correct?

13   A       Yes.

14   Q       And you said they flew it back to, you said, the Venice

15   Airport?

16   A       Yes.

17   Q       Is this in . . . .

18   A       This is next to Englewood.

19   Q       And he flew it back to next to your home in Englewood?

20   A       Yes.

21   Q       When Dr. Fredrick flew to Venice Airport with this

22   plane, did you have a discussion with him about the plane?

23   A       I mean, he showed it to me.  It was -- I don't know that

24   there was a bunch of a discussion.

25   Q       Did you ever learn what the price of the plane was?

1   A       Yes.

2   Q       How did you learn that?

3   A       Well, he told me.

4   Q       And this would have been about the time that he showed

5   up with the plane?

6   A       Yes.

7   Q       And what did he tell you was the purchase price?

8   A       About $1.6 million.

9   Q       What was your reaction upon hearing that plane cost

10  $1.6 million?

11  A       That was a lot of money.

12  Q       Where did he -- did he tell you where the source of the

13  funds to buy the plane came from?

14  A       Well, he said it was the . . . .   The -- it was

15  registered in The Foundation, and that the money came with

16  approval of the board, and would be used for further Foundation

17  activities.

18  Q       And did Dr. Fredrick, in fact, use the plane for

19  Foundation activities?

20  A       Yes.

21  Q       In what capacity?  Or in what ways?

22  A       Well, he flew to Greenville quite a lot when he was

23  developing this program.  And then he would have to fly back

24  and forth to the . . . by then, the Saba management entity was

25  called R3.  And so he would have to go there quite frequently.

1   Q      Where was this?

2   A      It was in Gardner, Massachusetts.  It was the same

3   buildings.

4   Q      And so he would fly from your local Venice, Florida,

5   airport, to Gardner, Massachusetts?

6   A      A nearby airport called Fitchburg.

7   Q      And was Fitchburg much closer to Gardner, Massachusetts

8   than, say, Boston was?

9   A      Oh, much closer.

10  Q      What was the advantage, then, of having a plane that was

11  able to fly from the local airport to the Fitchburg airport

12  near the . . . offices that were in Gardner, Massachusetts?

13  A      Well, I mean, his . . . I mean, it was faster.  It was

14  certainly newer.  It was safer.  It had really sophisticated

15  navigation, radar -- I mean it was a much more safe -- it was

16  just a safer, sophisticated plane.

17  Q      You said he also flew from the Venice Airport to

18  Greenville, North Carolina?

19  A      Yes.  He would do that.

20  Q      What was that in connection with?

21  A      That program that he was -- that joint program he was

22  trying to get off the ground.

23  Q      That's that Psy.D./M.D. program?

24  A      Yes.

25  Q      Did he ever travel for any personal reasons using the

1    Piper Meridian airplane?

2    A       Sometimes to Asheville, or sometimes personal.

3    Q       And when he would travel for personal reasons, were you

4    aware of how he paid for it?

5    A       He paid for the gas by credit card.

6    Q       How do you know that?

7    A       I have a Citibank American Airlines credit card -- I'm a

8    big points collector -- and his credit card was attached to

9    mine.  So it would -- by that, it would show up on bills.  It

10   would just show up.  I would see the bills.

11   Q       At some point, do you know if Dr. Fredrick sold the

12   plane?

13   A       Yes.

14   Q       Approximately when was that?

15   A       It was in 2010.

16   Q       And do you know where the funds went -- do you know

17   where the funds went from the sale?

18   A       He told me they went back to The Foundation.

19   Q       Did it go to one of the Foundation companies?

20   A       Documents during the investigation, I think it was Ample

21   Dynamic.

22   Q       Do you know if Dr. Fredrick ever had a deposit down, in

23   2007, on another plane?

24   A       I learned about that during the investigation.

25   Q       You didn't know about it at the time in 2007?

1    A       No.

2    Q       Did you know about the sale -- excuse me, the return of

3    that deposit before the criminal investigation?

4    A       No.  I've learned about it more recently.

5    Q       I would like to direct your attention now to May of

6    2009.  With respect to May, 2009, did you -- this would

7    be . . . let's see.  May of 2009.  Did you and Dr. Fredrick, in

8    that month, travel to Zurich together?

9    A       Yes.

10   Q       For what purpose?

11   A       He had a reunion, at what's left in Frankfurt, of his

12   corps, with some of his old army buddies.

13   Q       And after you traveled to Frankfurt so he could meet

14   with his old army buddies, did you go anywhere else?

15   A       Yeah.  We toured the Black Forest, went into

16   Switzerland.

17   Q       At some point, did you end up in Zurich?

18   A       We spent a night outside Zurich.

19   Q       And when you spent that night outside of Zurich, did you

20   visit anyone in Zurich?

21   A       Yes.  We took the train in and had dinner with

22   Mr. Singenberger.

23   Q       At that dinner with Mr. Singenberger, was there anybody

24   present?

25   A       Ah.  I keep saying ah.  His lady friend.

1   Q      Did you, at that point, in May of 2009, and directing

2   your attention to May of 2009, did you meet with

3   Mr. Singenberger, as well, in his office?

4   A      I didn't.  I mean, I don't remember.  I just remember

5   going to dinner with him.

6   Q      And was that in May of 2009, or was that actually

7   potentially in 2008?

8   A      I'm mixed up.  I don't know.

9   Q      Well, at some point in 2009, did you meet with

10  Mr. Singenberger and Dr. Fredrick in Mr. Singenberger's office?

11         MS. FINLEY:  Objection, Your Honor.  She said she

12  didn't remember if she had dinner in 2009.

13         THE WITNESS:  Well, we had dinner on more than one

14  occasion with him.

15         THE COURT:  Hang on a second.

16         THE WITNESS:  Oh.  I'm sorry.

17         THE COURT:  The objection is overruled.

18         Now you may proceed.

19         THE WITNESS:  We had dinner -- I know that I met with

20  him three times.  I'm so tired.  I have to review my notes.  I

21  just am mixed up about dates.

22  BY MR. HOCHMAN:

23  Q      Okay.  Of the three times, let me see if I can take you

24  through the three times.  You said at one time you met, you

25  testified, about early 2005.  Correct?

1   A      Yes.

2          MR. HOCHMAN:  Your Honor, may I just have a moment to

3   grab a quick bit of water?

4          THE COURT:  Sure.

5   BY MR. HOCHMAN:

6   Q      All right.  We had a first meeting in early 2005; is

7   that correct?  With Mr. Singenberger?

8   A      Yes.

9   Q      And then I believe is the meeting in Boston.  That was

10  sort of the initial meeting, the meet and greet.

11  A      Yes.

12  Q      Was there another meeting, dinner meeting with

13  Mr. Singenberger, in 2008?  If you recall.

14  A      I'm not sure if that was the other, but now I do recall

15  2009.

16  Q      Okay.  So, in 2009 -- I'll direct you to May of 2009.

17  After you had dinner with Mr. Singenberger, at some point did

18  you meet in his office?

19  A      The next day.  Yes.  We went to his office.

20  Q      And what was the purpose of that meeting?

21  A      Dr. Fredrick was going to get some papers, or look at

22  something.  It was a very brief meeting.

23  Q      And did something come up during that meeting that

24  caught your attention?

25  A      Yes.

1   Q       What was that?

2   A       It was just in the course of conversation.  You know, we

3   were kind of sitting around a table in a reception area, and

4   Mr. Singenberger came out and said something about the

5   $1 million that you sent to your siblings.

6   Q       So, in May, 2009, Mr. Singenberger is describing

7   $1 million you sent to your siblings.  What was your reaction

8   when you heard that?

9   A       I . . . I jumped out of the chair, and I said, "What?"

10  I didn't even know that I had heard the right thing.

11  Q       And why did you have that type of reaction?

12  A       Well, that's a huge amount of money.

13  Q       And did -- was Dr. Fredrick present in this meeting?

14  A       Yes.

15  Q       Did he respond when you brought up your concerns about

16  this money?

17  A       Oh my concerns, I said -- you know, to both of them --

18  explain what is this all about.  And so he explained that he

19  had sent each of his half siblings $250,000 in 2007.

20  Q       Now, had you, prior to finding out about this million

21  dollars, over the years had you and Dr. Fredrick actually sent

22  his family members money?

23  A       Oh, yes.  Quite a bit.

24  Q       What type of amounts did you send his family members

25  over the years?

1   A       Well, his mother was -- was really ill for a long period

2   of time, and she would get into the -- she needed a lot of

3   medication.  She had diabetes and heart failure.  So we would

4   send -- for a while we sent several hundred dollars a month for

5   her medications, and to help her with bills.

6   Q       Did you also help her out with her mortgage at some

7   point?

8   A       Yeah.  We paid off her mortgage on her house.

9   Q       And did you help out any of Dr. Fredrick's siblings over

10  the years?

11  A       His young . . . his brother.  His only brother, Perry,

12  had asked for loan, sometime in the late nineties, to start his

13  own construction business, and we lent him that.

14  Q       How much was that?

15  A       It was about $18,000.

16  Q       How much was the payoff of the mother's mortgage?

17  A       About $16,000.

18  Q       Did you help out any of the other of Dr. Fredrick's

19  siblings?

20  A       Yes.  When Marion was diagnosed with this very serious

21  liver disease, she became increasingly weaker on all the . . .

22  chemotherapy she was getting, and we sent her some money -- or

23  I sent her $10,000 for insurance and health care.  And then, at

24  some point, she needed -- when she applied for disability, we

25  helped out with money for a lawyer.  And then further expenses.

PATRICIA HOUGH – DIRECT/HOCHMAN                    276

1   Q     And did you -- did you have some notion of the ability

2   to give a tax-free gift in any particular year?

3   A     Yes.

4   Q     What was your understanding about your ability to give a

5   tax-free gift in any particular year?

6   A     Well, I mean, early on, it was -- I think it was about

7   $10,000, or you would have to pay tax.  And then I remember

8   that going up to $12,000 a year.

9   Q     And what did you understand that to mean?  For instance,

10  if you and Dr. Fredrick were going to give, let's say your

11  sister, for instance, Charlene Varga, and her husband a gift,

12  and the amount that you could give up to tax free was $12,000,

13  how much could you give them, in total, tax free?

14  A     Each of us could give each of them 12,000, and that

15  would be $48,000.

16  Q     So, with respect to Dr. Fredrick's family, did you ever

17  exceed the maximum that both you and Dr. Fredrick could give a

18  family member in any one year?

19  A     From what I knew we were giving, no.

20  Q     And with respect to your family, were the gifts given to

21  Charlene Varga?

22  A     Yes.

23  Q     Did you also give some money to your mother at some

24  point?

25  A     Yes.

1   Q      And with respect to the money that went to your mother,

2   what did you understand that money to be for?

3   A      That was for her care in assisted living.

4   Q      And did you understand that to be a taxable or not

5   taxable gift?

6   A      It was for her care in assisted living.

7   Q      And because it's for care in assisted living, did you

8   understand it to be part of a taxable gift, or did you

9   understand that care -- payment for care to be not taxable?

10  A      I understood it to be nontaxable.

11  Q      And with respect to the gifts that were given to your

12  sister, Charlene Varga, and her husband, I believe that we've

13  seen, or heard testimony, that it occurred starting in the year

14  2000; is that correct?

15  A      That sounds correct.

16  Q      Did they ever exceed the maximum gift limit, to your

17  knowledge, that Dr. Fredrick and you could give to Charlene

18  Varga and her husband?

19  A      No.

20  Q      So now we'll go back to May of 2009.  You're sitting in

21  Beda Singenberger's office.  You just heard that there's a

22  million dollar gift that Dr. Fredrick has given to his

23  siblings.  What was your concern about that million dollar

24  gift?

25  A      I was concerned that I hadn't -- you know -- been

1   involved.  We had always discussed what we were giving to our
2   families together, and . . . .  I mean, it was just a huge
3   amount of money.  I knew we did not have that kind of money.
4   Q     And what was Dr. Fredrick's reaction when you were
5   bringing these concerns to his attention?
6   A     He apologized.  "I'm sorry.  I'm sorry.  My mother made
7   me promise to take care of them."  He said a lot about that.
8   Q     Did you have any particular concerns that Dr. Fredrick
9   had exceeded that maximum gift amount?
10  A     Well, I mean, after -- I was really an emotional
11  reaction.  I was so -- I was really upset, and kind of felt
12  betrayed that . . . you know, I didn't know about that.  That
13  had been a secret for two years.
14        But when I kind of cooled off, you know, I said, you
15  know, this . . . .  He said it was based on his deferred
16  income.  But, you know, after that, I think Mr. Singenberger
17  kind of exited, we left, you know, we talked, and I said that's
18  income.  You have some -- sounds like there's tax problems if
19  that's deferred income.
20  Q     Is that --
21  A     Or gift.  I mean, I didn't know, but I said I think
22  there could be some problems.
23  Q     And would these be problems that Dr. Fredrick would have
24  to address on his tax return?
25  A     Yes.

1  Q      What, if anything, did you tell Dr. Fredrick about what

2  he should do to address these potential tax problems?

3  A      I was very insistent that he find a very qualified tax

4  lawyer, someone to see immediately when we got back to the

5  states.

6  Q      And do you know if Dr. Fredrick, in the summer of 2009,

7  consulted with an experienced tax lawyer?

8  A      Yes.

9  Q      And I'll direct your attention -- were you actually part

10 of those meetings in the summer of 2009?

11 A      No.

12 Q      So I'd like to direct your attention, then, to the end

13 of September, 2009.  Do you have that in mind?

14 A      Oh, yes.

15 Q      Did you and Dr. Fredrick have a conversation, then,

16 about his tax issue?  Or about the tax issue.

17 A      Yeah.  I mean, we had . . . some.  We had several.  He

18 would tell me about the meetings that he was having in Tampa.

19 Q      And what, in particular, did you learn from Dr. Fredrick

20 at the end of September, 2009?

21 A      The really bad news?

22 Q      What did you learn?

23 A      I learned we were under federal criminal investigation

24 for tax evasion.

25 Q      And who told you that?

1    A       He did.

2    Q       And, when you learned that, what was your reaction?

3    A       Oh, I almost passed out.

4    Q       Why?

5    A       I mean, it was -- it was a shock.  I never . . . had any

6    problems like that in my life.

7    Q       Now, in September of 2009, you're 63; is that right?

8    A       Yes.

9    Q       Had you ever been the target of any criminal

10   investigation in all the 63 years?

11   A       No.

12   Q       Had you ever been charged with a crime in all those 63

13   years?

14   A       No.

15   Q       Had you ever had any problems with any medical board

16   during your professional career?

17   A       No, I have not.

18   Q       Had you ever been sued for malpractice?

19   A       No.

20   Q       Had you ever had any disciplinary actions brought

21   against you in your professional career?

22   A       No, I had not.

23   Q       And other than that 1973 audit, had you ever been

24   audited before?

25   A       No.

1   Q       And at that point, in September, 2009 -- or excuse me,

2   before September, 2009, did anyone from the IRS contact you and

3   say, Dr. Hough, we might have some problems with your return,

4   and we'd like you to fix them?

5   A       No.

6   Q       If someone had contacted you prior -- prior to or at

7   September, 2009, and told you, Dr. Hough, we've discovered some

8   problems with your return, we'd like to you fix them, what

9   would you have done?

10  A       I would have fixed them.  I would have tried to resolve

11  it.

12  Q       Why is that?

13  A       I don't want any problems.  You know, I certainly don't

14  want to be a criminal.  I don't want any problems with the IRS.

15  Q       If someone had asked you, from the IRS, for some

16  documentation to show whether or not you owned the Saba School

17  of Medicine Foundation, would you have provided it to them?

18  A       Yes.

19  Q       Were you ever given that opportunity?

20  A       No, I was not.

21  Q       Why do you not want any problems with the IRS?

22  A       I think, like most people, it's a powerful organization,

23  and, you know, they can seize everything, put you in jail.  I

24  mean, I have a healthy fear of the IRS.

25  Q       Now, you heard that David Minchenberg, who said he did

1    nothing wrong during his testimony, got a witness letter.  Do

2    you recall that?

3    A      Yes.

4    Q      And you heard Mario deCastro, who also said he did

5    nothing wrong, he got a witness letter too; do you recall that?

6    A      Yes.

7    Q      Did you ever get a witness letter from the government so

8    that they could talk to you even though you did nothing wrong?

9    A      No.

10   Q      Did Special Agent Cameron Lalli, the gentleman sitting

11   back there in the gallery, in the brown suit, did he ever

12   contact you, back in 2009, and ask you for . . . you know, your

13   thought, your statements, your opinions, your evidence, on

14   whether or not you owned the Saba School of Medicine Foundation

15   or MUA?

16   A      No, he did not.

17   Q      Had he contacted you back then, would you have

18   cooperated with him?

19   A      Yes, of course.

20   Q      Why?

21   A      I mean, I don't -- I don't want to be a target of A

22   criminal investigation.  You know, I would not -- you know --

23   want to go through that.  I would cooperate.  This is a pretty

24   awful thing to have to go through.

25   Q      I would like to direct your attention to the fall of

1    2010.  What, if anything, happened between you and Dr. Fredrick

2    in the fall of 2010, about three years ago?

3    A      We separated.

4    Q      Was that a legal separation?

5    A      That is a . . . there is no legal separation in Florida,

6    but it was a mutual agreement.

7    Q      What caused the separation?

8    A      He was . . . profoundly affected by this, on . . . .  It

9    was his idea --

10   Q      What do you mean.  What is this?

11   A      Well, I mean, this investigation just about destroyed

12   him.

13   Q      And did he ask to separate from you at that time?

14   A      He felt it was -- it was better for me and better for

15   him.

16   Q      What was the condition -- was he suffering from anything

17   at that time?

18          MS. FINLEY:  Objection, Your Honor.  May we approach?

19          THE COURT:  You may.

20                         AT SIDEBAR

21          MS. FINLEY:  This seems to be all hearsay, and I'm

22   not sure how this goes to state of mind, what Dr. Fredrick is

23   suffering from, or why they got separated.  Especially in light

24   of where Dr. Fredrick --

25          THE COURT:  Do you want to ask if he's a fugitive?

1          MS. FINLEY:  Well, I -- perhaps.  I feel like we're

2     opening the door.  And I want to make sure that's what

3     Mr. Hochman intends to be doing, because . . . .  There's a lot

4     of areas right now that he's delving into, including issues

5     about whether she cooperated or not.  She was asked to produce

6     information, she was asked to come in for a proffer.  She

7     didn't want to.

8          THE COURT:  That's all fair game.

9          MR. HOCHMAN:  And, Your Honor, I focused on the fall

10    of 2010 in large part because the conspiracy is charged all the

11    way through 2011.  I haven't gone beyond, and don't intend to

12    go beyond, the fall of 2010, and limited it my questions to the

13    fall of 2010, during the period of the conspiracy.  I don't

14    intend to go beyond the period of the conspiracy.  I think the

15    jury needs to understand the relationship during the entire

16    conspiracy.

17         MS. FINLEY:  Well, that may be true, but what

18    Dr. Fredrick is telling her about the impact the investigation

19    is having on him, I don't know how that hearsay evidence -- she

20    can say that they've gotten separated, but what he's telling

21    her about it, I think, is still hearsay, and doesn't go to

22    state of mind.

23         MR. HOCHMAN:  And, Your Honor, I think I've asked

24    enough questions in this area.  I don't intend to ask anymore.

25    Again, I think I had the right to ask, since the conspiracy was

1    charged through 2011.  I don't think it opens the door as to

2    what happened in June of 2013, and whether or not he showed up

3    for the charges.

4              THE COURT:  Well, we can decide that later, if the

5    government seeks to ask that question.

6              Is there actually a question that's not answered?

7              MR. HOCHMAN:  I don't know.  I'll withdraw --

8    whatever question might be pending, I'll withdraw it.

9              And, Your Honor, I think this would -- we could break

10   for the day, if it's okay with Your Honor, and then I'll have

11   a -- I can pare it down, overnight, to have a much more brief

12   follow-up tomorrow morning.

13             THE COURT:  This is fine.

14             MR. HOCHMAN:  Thank you.

15                      IN OPEN COURT

16             THE COURT:  All right.  Mr. Hochman, is this a

17   convenient place for a recess?

18             MR. HOCHMAN:  It is, Your Honor.

19             THE COURT:  All right.

20             Ladies and gentlemen, we'll recess for the evening.

21   Please do not discuss the case among yourselves, or allow

22   anyone to discuss it with you or in your presence.  I'll see

23   you at 9:00 o'clock tomorrow morning.

24             (At 5:02 PM, the jury was escorted from the

25        courtroom.)

1          THE COURT:  All right.  You may stand down.

2          (The witness left the witness stand and sat in the

3     courtroom.)

4          THE COURT:  And what's your . . . prognosis, I guess,

5     for tomorrow?

6          MR. HOCHMAN:  We should be done tomorrow, Your Honor.

7          THE COURT:  With everything?

8          MR. HOCHMAN:  With everything.  With the entire

9     defense case.  I don't know if there's a rebuttal case, but the

10    defense case should be done -- I mean barring a very lengthy

11    cross-examination of Dr. Hough.

12         THE COURT:  I'm trying to figure out when we can do a

13    charge conference.

14         MR. HOCHMAN:  Ideally, Your Honor, if we can -- I

15    think, based on our estimates of our witnesses, hopefully we'll

16    be done by early after afternoon; so my thought was perhaps we

17    could do a charge conference tomorrow afternoon, and open first

18    thing on Wednesday.

19         THE COURT:  How does the government see it?

20         MS. FINLEY:  We're prepared to do the charging

21    conference now or whenever the Court finds convenient.  And I

22    don't anticipate, at this point, that we will have a rebuttal

23    case.  I reserve the right to change that, but at this point I

24    don't expect that to be the case.

25         THE COURT:  Of course.  Everybody reserves the right

1   to do everything.  So that's fine.

2          All right.  Assuming you finish sometime in the

3   afternoon, I think it makes sense to send the jury home,

4   because we are going to try to get the closing arguments to the

5   jury as close to one stretch as we can.

6          MR. HOCHMAN:  I think, if we start first thing on

7   Wednesday, Your Honor, we both estimated about an hour and a

8   half, so that would take us, with the break, just past noon.

9          THE COURT:  Then we have jury instructions of . . . I

10  don't know how long yet, but --

11         MR. HOCHMAN:  Does the Court, by the way, instruct

12  before closing arguments or after?

13         THE COURT:  You know, 99.8 percent of the time I've

14  done it after.  I think I've done it once before.  I couldn't

15  tell you now if it was civil or criminal case.  The lawyers

16  wanted and it, and I did it.  But typically afterwards.

17         MR. HOCHMAN:  Afterwards is certainly fine.

18         THE COURT:  That's my typical practice.

19         All right.

20         MR. HOCHMAN:  Thank you very much.

21         MS. FINLEY:  Does the Court send the indictment back

22  to the jury.

23         THE COURT:  Typically.

24         MS. FINLEY:  Do we need to redact that?  Can we deal

25  that at the charge conference?

1           THE COURT:  Both.  I would anticipate redacting the

2   counts dealing with Dr. Fredrick, except for the Count 1, where

3   I would expect to leave his name in.  I think there's a

4   sentence in Count 1 that identifies two co-conspirators.  I

5   would think that would be redacted.  That's all that comes to

6   mind.  I don't know if there's a forfeiture provision, or

7   anything else.

8           MS. FINLEY:  No, Your Honor.

9           THE COURT:  So that's what comes to my mind in terms

10  of redacting it.

11          MS. FINLEY:  And then I had one other question.  I

12  didn't know if the Court -- given that the exhibits are fairly

13  voluminous, does the Court ever send back a redacted exhibit

14  list for the jury?

15          THE COURT:  You know, I don't have any personal

16  objections.  I just don't recall a case where both sides have

17  agreed on the description.

18          MR. HOCHMAN:  I think that might be the case here,

19  Your Honor.

20          THE COURT:  If there is an agreement, I'll do it.

21  Otherwise, my experience has been it's just we spend more time

22  with lawyers fighting over how it's described.

23          So if the two sides can agree, I'll be happy to do

24  it.  But I'll leave that up to you.

25          All right.  Anything else?

COURT RECESSED FOR THE DAY

1        MR. HOCHMAN:  That's it, Your Honor.

2        THE COURT:  All right.  I'll see you at 9:00 o'clock.

3        MR. HOCHMAN:  Thank you very much.

4                    -- -- -- -- -- -- -- --

5        (At 5:06 p.m., court was recessed, to be reconvened

6    at 9:00 a.m., on Tuesday, October 22, 2013.)

7                    -- -- -- -- -- -- -- --