UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

_____

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                    Fort Myers, Florida
vs.                                October 22, 2013

PATRICIA LYNN HOUGH,           9:00 a.m.

        Defendant.

_____

TRANSCRIPT OF JURY TRIAL, DAY 10

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                           Tax Division
                      P.O. Box 813
                      Washington, DC  20044
                      BY:  CARYN FINLEY, ESQ.

                      U.S. Department of Justice
                           Tax Division
                      Suite 7334
                      601 D Street NW
                      Washington, DC
                      BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

A P P E A R A N C E S
(Continued From Previous Page)


FOR THE DEFENDANT:          Bingham McCutchen, LLP
                            The Water Garden
                            1601 Cloverfield Boulevard
                            Suite 2050 North
                            Santa Monica, CA  90404-4082
                            (310) 904-1000
                            BY:  NATHAN J. HOCHMAN, ESQ.

                            Bruce L. Udolf, PA
                            500 East Broward Boulevard
                            Suite 1400
                            Fort Lauderdale, FL  33394
                            (954) 858-8831
                            BY:  BRUCE L. UDOLF, ESQ.

REPORTED BY:                JEFFREY G. THOMAS, RPR-CP, CRR
                            Official Federal Court Reporter
                            United States Courthouse
                            2110 First Street, Suite 2-194
                            Fort Myers, FL  33901
                            (239) 461-2033


                         *  *  *

I N D E X

October 22, 2013                                    Vol.      Page

Preliminary Discussions                             10         5

– – –

DEFENDANT'S WITNESSES

| WITNESS | DIRECT Vol. | Pg. | CROSS Vol. | Pg. | REDIRECT Vol. | Pg. | RECROSS Vol. | Pg. | VOIR DIRE Vol. | Pg. |
|---|---|---|---|---|---|---|---|---|---|---|
| PATRICIA HOUGH | 10 | 5 | 10 | 16 | 10 | 120 | | | | |
| LUIS RIVERA | 10 | 130 | 10 | 192 | | | | | | |

– – –

DEFENDANT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Defendant's Exhibit 205 marked for identification | 10 | 6 |
| Defendant's Exhibit 205 Admitted in Evidence | 10 | 7 |
| Defendant's Exhibit 210 marked for identification | 10 | 11 |
| Defendant's Exhibit 30I.7 Admitted in Evidence | 10 | 172 |
| Defendant's Exhibit 30I.8 Admitted in Evidence | 10 | 175 |

– – –

GOVERNMENT'S EXHIBITS

|  | Vol. | Page |
|---|---|---|
| Government's Exhibit 33 Admitted in Evidence | 10 | 65 |
| Government's Exhibit 5D Admitted in Evidence | 10 | 95 |

– – –

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

|  | Vol. | Page |
|---|---|---|
| Defense Rests | 10 | 196 |
| Charge Conference | 10 | 200 |
| Renewed Motion for Judgment of Acquittal | 10 | 258 |
| Order of Court | 10 | 258 |
| Order of Court | 10 | 260 |
| Court Recessed for the Day | 10 | 260 |

* * *

1      THEREUPON, the above-entitled case having been called

2  to order, the following proceedings were held herein,

3  to-wit:

4                          – – –

5           THE COURT:  Good morning, everyone.

6           Both sides ready for the jury?

7           MR. HOCHMAN:  If I may have 30 more seconds, Your

8  Honor?  I have everything set up, I just need to get one las

9  thing out of this box.

10          THE COURT:  You may.

11          (The defendant resumed the witness stand.)

12          MR. HOCHMAN:  Thank you, Your Honor.  I'm all set.

13          THE COURT:  All set?

14          Have the jury step in, please.

15          (At 9:05 AM, the jury was escorted into the

16      courtroom.)

17          THE COURT:  Good morning, ladies and gentlemen.

18          Mr. Hochman, you may proceed.

19          MR. HOCHMAN:  Thank you very much, Your Honor.

20                       PATRICIA HOUGH,

21  called as a witness by the Defendant, and having been first

22  duly sworn, was examined and testified as follows:

23                    DIRECT EXAMINATION

24  BY MR. HOCHMAN:

25  Q     Good morning, Dr. Hough.

1   A       Good morning.

2   Q       Now yesterday, I believe, you had testified that you did

3   extensive traveling on behalf of the Saba Foundation.

4           Do you recall that?

5   A       Yes.

6   Q       When you were traveling, did you have your credit card

7   statements sent to the EIC office in Gardner, Massachusetts?

8   A       Yes.

9   Q       Were there times when were you traveling outside of that

10  EIC office where the Saba Foundation would pay your credit card

11  bills so that they would not be untimely, and you would

12  reimburse the Saba University?

13  A       Yes.

14  Q       At some point when you returned, did you determine if

15  the Saba Foundation had, in fact, paid your personal expenses?

16  A       Yes.  The bursar would give me the statement, and I

17  would take out my personal charges and write a check.

18              MR. HOCHMAN:  I would like to show what will be

19  marked for identification, Your Honor, as Defense Exhibit 205.

20  BY MR. HOCHMAN:

21  Q       Do you recognize what has been marked for identification

22  as Defense Exhibit 205?

23  A       Yes, I do.

24  Q       What is contained generally in Defense Exhibit 205?

25  A       These are checks I wrote at various times to reimburse

```
 1   The Foundation, from . . . there's three from 2006, and one

 2   from 2005.

 3   Q      Do you recognize your signature on these checks?

 4   A      Yes, I do.

 5   Q      Did this come from your and Dr. Fredrick's bank account?

 6   A      Yes.  It was our personal account.

 7           MR. HOCHMAN:  Defense would move in Defense

 8   Exhibit 205?

 9           THE COURT:  Any objection?

10           MS. FINLEY:  No objection, Your Honor.

11           THE COURT:  205 for the defendant is admitted.

12           (Defendant's Exhibit 205 admitted into evidence.)

13           MR. HOCHMAN:  And if we could switch the screen and

14   dim the lights, Your Honor, to publish Defense Exhibit 205?

15           THE COURT:  You may.

16           (An exhibit was projected onto the projector screen.)

17   BY MR. HOCHMAN:

18   Q      This is Page 1 of Defense Exhibit 205; do you see that,

19   Dr. Hough?

20   A      Yes.

21   Q      And what is reflected on this page?

22   A      This is my reimbursing Saba University for personal

23   expenses on my Visa for three months, for $340.72.

24   Q      If you could turn to the second page of this exhibit?

25           MR. HOCHMAN:  If we could publish the second page?
```

1    And focus up -- you don't have to focus up.  The checks are up.

2              (An exhibit was projected onto the projector screen.)

3    BY MR. HOCHMAN:

4    Q      And what do these three sections on the second page of

5    Defense Exhibit 205 represent?

6    A      The first one is a reimbursement in July of 2006.

7              The second one, it just says credit card reimbursement

8    to Saba Foundation.

9              The third one is a large check, in May, 2006.  I'm a

10   points collector, so I had put a trip we took for my

11   60th birthday, it was a cruise, on that credit card, and

12   reimbursed the university for the total costs.

13   Q      Why did you reimburse the -- why did you reimburse the

14   university at all?

15   A      Well, because I owed them money.  It was my personal

16   expenses.

17   Q      Well, if you owned the Saba Foundation, why are you

18   reimbursing the university?

19   A      I never owned the Saba Foundation.

20   Q      Now, you've testified to your charitable and volunteer

21   work since 1960, over the last 50 years.

22              Are you aware of whether or not the Saba Foundation

23   engaged in charitable work prior to the sale in April, 2007?

24   A      Yes.

25   Q      What type of charitable work did the Saba Foundation

1  engage in, prior to the sale in April of 2007?

2  A       Well, the first priority was the island of Saba -- a lot

3  of equipment, ultrasounds, x-rays; opened up a dental clinic,

4  brought in dentists -- because they basically had no services.

5  They would have to go to Saint Maarten.  And that was

6  especially critical for the children.

7          On Nevis, we completely refurbished the Alexandra

8  Hospital with a lot of updated, more technical equipment,

9  special . . . call it like a CR x-ray, ultrasounds, mobile

10 units.  We sent . . . .  There were huge containers.  I mean,

11 these were 40, 45-foot containers or bigger, they were huge,

12 full of beds for the nursing home.

13 Q       And just to get a sense of what a container would be, if

14 there were one in this courtroom, how much of the courtroom

15 would it fill?

16 A       Well, maybe two and a half would fill the courtroom.

17 Q       And so two and a half containers would fill the

18 courtroom, and you sent one of these containers with supplies

19 to Nevis -- or, excuse me, the Saba Foundation sent one of

20 these containers with supplies to Nevis?

21 A       Yes.

22 Q       Continue on, what other type of charitable work did the

23 Saba Foundation do prior to the 2007 sale?

24 A       We had a relationship with a hospital that was run by

25 nuns on Saint Lucia.  One of our -- the builder for MUA Nevis

1    was from there, and I went and worked with them.  We sent them

2    supplies by our container coming to Nevis, and then this

3    gentleman would put it on his company's containers to Saint

4    Lucia.

5            I became involved with Dr. Gruber's foundation, probably

6    about 2000, when we met him.  And we gave personal donations to

7    that big event every year, when about 60 of them go down and do

8    so many operations.

9            During that, we -- I had a good friend, a physician from

10   El Salvador, who was interested -- there's a children's

11   hospital called Hospital Bloom, and I was contacted by --

12   there's a Salvadoran and American, it's AHF, health

13   organization in Miami, if I would help with some refurbishings.

14           So we gathered funds from various sources, including the

15   Saba Foundation, and sent a big container full of mostly

16   technical equipment to the children's hospital in El Salvador.

17   Q       After the sale in April of 2007, are you aware of

18   whether or not the Saba Foundation continued to do charitable

19   work?

20   A       Yes.

21   Q       And what type of charitable work did it do?

22   A       The Foundation redid its mission statement, its bylaws,

23   and, rather than just focusing on education or medical schools,

24   expanded into the direct provision of health care,

25   concentrating mainly on the thousands of rural poor in Haiti.

1    It's been in the Eastern and Western Caribbean, and the

2    thousands of poor in the South America.

3    Q      And what type of activities did it do to fulfill this

4    changed mission statement after the sale in 2007?

5    A      Do you want me to list them all?  I mean, we have a big

6    website and newsletters.  Do you want me to start naming them?

7    Q      Well, would it refresh your recollection to look at the

8    website, or a copy of the website, to see what type of

9    charitable work the Saba Foundation has been engaged in, from

10   approximately 2007 going forward?

11   A      Yes.

12           MR. HOCHMAN:  Your Honor, may I present, marked for

13   identification only, Defense Exhibit 210, to refresh the

14   defendant's recollection?

15           THE COURT:  You may.

16           (Mr. Hochman provides an exhibit to the witness.

17   BY MR. HOCHMAN:

18   Q      And if you could go, briefly, through Exhibit 210, and

19   see if it refreshes your recollection, in particular on Pages 4

20   and 5.

21           (The witness examines an exhibit.)

22   A      Yes.

23   Q      Does this refresh your recollection as to the type of

24   charitable activities the Saba Foundation has been involved in

25   after April, 2007?

```
1    A      Yes.

2    Q      What type of charitable activities has the Saba

3    Foundation been involved in after April, 2007?

4           MS. FINLEY:  Objection, Your Honor.  I think, if

5    she's done refreshing her recollection, then she shouldn't be

6    reading from the document.

7           THE COURT:  That's correct.

8           MR. HOCHMAN:  Yes.  If you could put the document

9    down and not refer to it as you're answering this question.

10          THE WITNESS:  Give me another minute.

11          (The witness examines an exhibit.).

12   BY MR. HOCHMAN:

13   Q      All right.  So what type of charitable activities is the

14   Saba Foundation engaged in after April of 2007?

15   A      We have had partnerships with another -- a number of

16   organizations that apply on our website.  As director of

17   projects, I do research on the . . . usually a site visit

18   before any recommendations.

19          There's two that are located right here in . . . just in

20   Naples.  One is Hope for Haiti, where the Kuehner Foundation,

21   they have -- they're out in a very neglected, remote little

22   peninsula in Haiti that's received absolutely no aid for years.

23   There's not even roads out there.  It's an area called Les

24   Cayes.

25          There's another organization in Naples, that's People
```

1    for Guatemala.  They are a very close partner, and we have done

2    extensive rural health projects, ranging from provision of safe

3    water and sanitation to helping equip and fund their rural

4    health clinics that go throughout an area called Chimaltenango.

5    It's a very large geographic area and remote villages.

6         We work with ECHO, that's just north of Fort Myers,

7    in . . . trains all of the . . . workers through the Peace

8    Corps and others that go to do agricultural projects and . . .

9    we've just started working with them about food sources for

10   poultry and alternative food sources for a big poultry farm

11   project that the lieutenant governor talked about.

12   Q    And if I may ask you, how about that -- the one that

13   Dr. Gruber talked about, ASAPROSAR, has the Saba Foundation

14   worked with ASAPROSAR at all since April of 2007?

15   A    Well, I had to -- to work for Saba for two years; but,

16   from 2009 -- no.  It was January, 2010 on, I have been at all

17   their projects, and over there several times, not only for

18   their big volunteer group from Boston, but we support --

19   ASAPROSAR serves many rural mountain areas that are remote in

20   the mountains of Northern El Salvador, and we provide funding

21   for a physician and health care team that go to several

22   villages.

23   Q    And are there other -- and I'll just sort of ask you in

24   a very general way:  Are there other partner organizations in

25   Guatemala . . . based in Massachusetts and in North Carolina,

1    that the Saba University partners with to do charitable work in

2    Haiti and in Guatemala?

3    A      Yes, there's several.

4    Q      Are you familiar with a gentleman named Florencio

5    Montenegro?

6    A      Yes.

7    Q      Who is Florencio Montenegro?

8    A      He is our chief operations officer.

9    Q      Are you familiar with Dr. Haraldo Bautista?

10   A      Yes.

11   Q      Who is Haraldo Bautista?

12   A      He is a dentist in Guatemala who's chairman of the board

13   for the Saba Foundation.

14   Q      You said Florencio Montenegro was the chief operations

15   officer for what organization?

16   A      For the Saba Foundation, and our offshoot in Guatemala

17   is Proyecto Salud y Vida.

18            COURT REPORTER:  Say that again, please?

19            THE WITNESS:  It's P-R-O-Y-E-C-T-O, S-A-L-U-D, then

20   Y, then V-I-D-A.

21   BY MR. HOCHMAN:

22   Q      Dr. Hough, where are you currently employed?

23   A      I'm in the United States.  I'm -- I work for the

24   Sarasota County department of health.

25   Q      How long have you worked there for?

1    A        Since March of 2009.

2    Q        And what have you done for the Sarasota -- I'm sorry,

3    Sarasota County . . . .

4    A        It's the department of health.

5    Q        The department of health.

6             What do you do for the Sarasota County department of

7    health?

8    A        I'm employed in a special project as part of a . . .

9    primary health care team for the whole south county.  We also

10   serve Charlotte County, since their adult services closed, and

11   I provide psychiatric services as part of their team.  I also

12   have a social worker, and some part-time counselors.

13   Q        What types of patients do you see?

14   A        The patients are . . . have to meet a low-income

15   standard, and they're uninsured, and they are the residents of

16   either Sarasota or Charlotte County.

17   Q        How much are you paid on this job on an annual basis,

18   approximately?

19   A        Oh . . . under $24,000.

20   Q        Why do you work there?

21   A        Well, I wanted to volunteer there, but they -- because I

22   have to prescribe controlled substances, and . . . beyond the

23   state liability insurance, malpractice insurance . . . I'm

24   sorry . . . they pay me a small amount.  But I wanted to go,

25   after I stopped with Saba University, back into psychiatry.  I

```
 1   really missed it.
 2            MR. HOCHMAN:  No further questions, Your Honor.
 3            THE COURT:  All right.  Thank you.
 4            Ms. Finley?
 5            MS. FINLEY:  Thank you, Your Honor.
 6                        CROSS EXAMINATION
 7   BY MS. FINLEY:
 8   Q       Good morning, there.
 9   A       Good morning.
10   Q       So I just wanted to go back over your background first.
11           So you have a BA, a bachelor of arts, or bachelor of
12   science, in both sociology and biology?
13   A       Yes.
14   Q       And you completed that in three and a half years?
15   A       Yes.
16   Q       And then you have a master's in social work; is that
17   correct?
18   A       Yes.
19   Q       And then you have a Ph.D. in philosophy.
20           Is that a concentration, then, in sociology, or is it
21   Ph.D. in both philosophy and sociology?
22   A       No.  It's a doctor of philosophy in sociology.
23   Q       And how long does it take to get that doctorate?
24   A       I worked on it almost four years.
25   Q       And then you went back to medical school and you got
```

1   your M.D.

2   A      Yes.

3   Q      And then you spent some time teaching.

4          Over the course of the last 25 or 30 years, you have had

5   different teaching positions; is that correct?

6   A      Yes.

7   Q      And when you teach, you expect your students to ask

8   questions when they don't understand things that you're

9   explaining to them, so that you can elaborate and explain more

10  fully if there's confusion; is that correct?

11  A      Yes.

12  Q      Now, I think you just testified that you work presently

13  as a psychiatrist for Sarasota County, for the mental

14  health . . . .   You said the county mental health?

15  A      It's just general medical county health department.

16  Q      So, as part of your job do you read charts . . . or

17  patient files?

18  A      Yes.

19  Q      And you read them completely, so that you can understand

20  the patients that you're going to treat.

21  A      Well, some of the charts are two or three feet thick, so

22  I read everything that I need to treat the patient.

23  Q      And you want to make sure that you understand everything

24  that's relevant in order to prescribe medication; correct?

25  A      Yes.

1    Q      And you want to make sure you read everything that might

2    be relevant if you have to make a diagnosis; correct?

3    A      Yes.

4    Q      And you prescribe medication; correct?

5    A      Yes.

6    Q      And before you prescribe medication, you read the

7    prescription pad to make sure that you've written down exactly

8    what medication the patient needs.

9    A      Yes.

10   Q      And then you sign your name to it.

11   A      Yes.

12   Q      And you wouldn't sign a blank prescription pad, would

13   you?

14   A      No.

15   Q      And you wouldn't sign a blank prescription pad if your

16   husband put that prescription pad in front of you.

17   A      No.

18   Q      And you rely on your patients to give you all of the

19   relevant information that you might need to make a diagnosis;

20   correct?

21   A      Rely on my patients, sometimes their families.

22   Q      And so you ask those individuals questions?

23   A      Yes.

24   Q      And you try to elicit information?

25   A      Yes.

1    Q       And you expect them, or their family members, to be

2    honest with you when you ask questions; correct?

3    A       Yes.

4    Q       And if they don't give you all of the information, then

5    you can't make a proper -- or you may not make a proper

6    diagnosis; correct?

7    A       Yes.

8    Q       And if you've prescribed somebody medication and their

9    symptoms change, you would expect them to speak up, your

10   patients, and let you know if something had changed, with how

11   they're feeling on the medication.

12   A       I tell every patient to call if they've got side

13   effects, or come in.

14   Q       And if you saw something in the news or in a medical

15   journal that talked about potential side effects of medication

16   that you had prescribed, then you would follow up with your

17   patients and inquire whether they were having those side

18   effects; correct?

19   A       Yes.

20   Q       Now, if we go back to, I guess, the beginning of the

21   schools, in the beginning, when -- I guess in the late -- mid

22   to late eighties, I think you testified that you were reluctant

23   to participate in your husband's adventure, I guess, in trying

24   to create the school.

25   A       I would call it his dream.

```
1    Q       But you were supporting your husband.

2    A       Well, I -- in the late eighties I was a full-time

3    resident in psychiatry, working 60 or 70 hours a week, or more.

4    Q       But you supported him.  You didn't deter him from his

5    dream.

6    A       No, I did not.

7    Q       And you even put $100,000 of your inheritance into it.

8    A       Yes.  Later, I did.

9    Q       And, in fact, if the schools didn't succeed, you and

10   Dr. Fredrick would be in financial ruin; isn't that correct?

11   A       No.  I have very good earning power as a physician . . .

12   at that time.

13   Q       And so you didn't put every dime of your money into the

14   school?

15   A       It was.  But, as I said, I had . . . at that time, more

16   earning power than I ever had in my life.

17   Q       And then you eventually did get involved in helping with

18   the schools; is that correct?

19   A       Yes.

20   Q       And you worked tirelessly on the clinical rotation and

21   the accreditations; correct?

22   A       Well, I worked very hard on them.

23   Q       You poured your heart and soul into it?

24   A       I do that pretty much with every job.

25   Q       And you knew that the schools would not succeed without
```

1   the clinical rotations and the accreditations; correct?

2   A     Yes.

3   Q     And so your role was critical to the success of the

4   schools because, as Dr. Gruber testified, without

5   accreditation, nobody would want to go to a medical school.

6   A     Yes.

7   Q     And this work required that you travel around the

8   country to meet with hospitals?

9   A     Yes.

10   Q     And you were extremely busy?

11   A     Yes.

12   Q     And that . . . those travels happened from the late

13   nineties through when the schools were sold?

14   A     I . . . started making some contacts in hospitals I knew

15   in -- a little before that, in Chicago, and in the

16   Baltimore/Washington area.  I would take time off of my

17   full-time job, at the Medical College of Georgia, and do that.

18         But, yes, I would say I was much more intensely involved

19   starting in 2006, when I ceased employment at the Medical

20   College of Georgia.

21   Q     In 2006 or 1996?

22   A     I'm sorry, 1996.

23   Q     Okay.  So from 1996 forward, the schools were your

24   primary employment?

25   A     Yes.

1    Q     And as part of that you had to negotiate with the

2    hospitals in order to have them allow your students to come and

3    do their rotations; is that correct?

4    A     Can you define what you mean by "negotiate"?

5    Q     You had to discuss with the hospitals the terms for

6    allowing the students to come and participate at the hospital

7    and do their rotations.

8    A     I mean, the . . . .  I would discuss their backgrounds,

9    their basic science preparation, their scores on exams.  I

10   would also look at the hospital's curriculum to see if it was

11   suitable.  Most hospitals already had students -- international

12   medical students, and they already kind of had their own forms.

13   Q     But the hospitals don't have to accept your students;

14   isn't that correct?

15   A     No.

16   Q     And there are some -- there are some terms, or

17   agreements, between Saba and these hospitals that allow the

18   Saba students to do their rotations there; isn't that correct?

19   A     Yes.

20   Q     And you were . . . involved in those agreements.

21   A     I did not sign them.  They went . . . you know, all

22   those went through the board and our administration.

23   Q     But without you, the board would have nothing to sign

24   because you were out there . . . .

25   A     Well, I paved the way.

1   Q      And . . . .  The Foundation -- there was a fee

2   associated with allowing the students to do their rotations at

3   the hospitals; isn't that correct?

4   A      Yes.

5   Q      And so you knew that The Foundation would have enough

6   money to pay those fees; isn't that correct?

7   A      The students were charged a certain amount per semester.

8   And, I mean, that was tuition, and . . . the cost went through

9   our administrator and through our accountants.  I mean, they

10  would do an analysis.  Some were more than others.

11  Q      And so you knew, though, that the school was going to

12  have enough funds in its budget to pay the fees necessary for

13  the students to do their clinical rotations.

14  A      Well, I didn't know -- I mean, if they approved it, then

15  it was compatible with our lower tuition rates.

16  Q      And you knew enough about the financials in order to

17  know that the school's monies were being looted, allegedly, by

18  these deans in the late nineties.

19  A      Those were only accounts on Saba, and those were brought

20  to my attention, when I took over as temporary dean, by the

21  local school administrator.

22  Q      And so you didn't have any concern that the funds in

23  other places, like in the United States, were going to be

24  looted?

25  A      No.

1          MS. FINLEY:  And if we could put Defense Exhibit 115

2    on the stand -- excuse me -- on the screen?

3          (An exhibit was projected onto the projector screen.)

4    BY MS. FINLEY:

5    Q     Now, in this picture, Dr. Fredrick is not in this

6    picture; correct?

7    A     No.

8          MS. FINLEY:  And if we could put Exhibit 116?

9          (An exhibit was projected onto the projector screen.)

10   BY MS. FINLEY:

11   Q     And Dr. Fredrick isn't in this picture either.

12   A     No.

13   Q     Now, you know that the schools, at least between 2000

14   and when they were sold, were extremely profitable; correct?

15   A     I wouldn't say "extremely."  They spent -- a lot of

16   money was going to -- I mean, millions were going into

17   building.

18   Q     And there was a profit, too -- at least in the years

19   that we reviewed, 2004, 2005, and 2006 -- of several million

20   dollars for both Saba and MUA; isn't that correct?

21         MR. HOCHMAN:  Objection, foundation.

22         THE COURT:  Sustained.

23         MS. FINLEY:  Court's indulgence.

24         (Ms. Finley reviews various exhibits.)

25         MS. FINLEY:  Your Honor, may I approach?

```
1              THE COURT:  You may.

2              MS. FINLEY:  I am going to hand you what's previously

3     been admitted as 8C; 8Q; 8AA; 9B, as in "boy"; and 9N, as in

4     "Nancy."

5              (Ms. Finley provides various exhibits to the

6         witness.)

7              MR. HOCHMAN:  Excuse me, is that 8AA?

8              MS. FINLEY:  8AA.

9              MR. HOCHMAN:  Thank you.

10             MS. FINLEY:  Permission to publish, Your Honor?

11             THE COURT:  You may.

12             MS. FINLEY:  And if we could look at 8C.

13             (An exhibit was projected onto the projector screen.)

14    BY MS. FINLEY:

15    Q      These are the financials for -- the year ended April 30,

16    2004, for the Saba School of Medicine Foundation; is that

17    correct?

18    A      That's what it's titled.

19    Q      And for the accreditation process, you actually needed

20    audited financials to present to the accrediting bodies; is

21    that correct?

22    A      I don't remember these . . . this particular financial

23    ever being part of any accreditation.  All of those

24    applications and financials were before 2004.

25    Q      And, in fact, in 2004 and 2005, you e-mailed
```

1    Mr. Minchenberg, requesting where the financials were, because

2    you needed to provide them to the accrediating body.

3    A      I think this was just Florida, wanted a yearly

4    statement.

5    Q      And so you did know that financials were being done

6    because the State of Florida needed them.

7    A      Yes.

8    Q      And so if we look at . . . .  If we look at Page 5 of

9    8C, in 2004, the Saba School of Medicine Foundation had total

10   revenue of just less than $8 million; is that correct?

11           MR. HOCHMAN:  Objection, foundation as to whether or

12   not she's just having her read the document or whether she

13   knows it out of her own personal knowledge.

14           THE COURT:  Overruled.

15   BY MS. FINLEY:

16   Q      Is that correct?

17   A      What line are you referring to?

18   Q      The total revenue line.

19   A      The one that just says, "revenue, tuition and fees"?

20   Q      Yes, and then underneath it there's $7,972,514; is that

21   correct?

22   A      Yes, I see it.

23   Q      And then total costs and expenses for the Foundation

24   were $7,789,977; is that correct?

25   A      That's what's on the statement.

```
1   Q       Okay.  And so the difference would be a little more than
2   $2 million, is that correct, doing rough math?
3   A       That's what's listed here, in this document.
4   Q       Now, you testified that you needed the financials for
5   the State of Florida; is that correct?
6   A       Yes.
7   Q       And you would want to make sure that they were complete
8   before you presented them to the State of Florida.
9   A       I relied on our accountants for that.
10  Q       And you would review them in order to make sure that you
11  were not providing false information to the State of Florida.
12  A       I would look at them, but I had to . . . I didn't do any
13  of the calculations.  I just had to trust the accountants.
14  Q       And you would want to make sure that they showed all of
15  the assets and liabilities because this is something that's
16  going to the accrediating board, or to the State of Florida,
17  that they're going to rely on.
18  A       I did not participate in anything with Mr. Schneider,
19  but I understand he has a good reputation.
20  Q       Now, you and your husband, together, discussed things
21  about the school.  I think, yesterday, you testified the whole
22  day about all of the things your husband told you about the
23  Foundation; is that correct?
24  A       When we were together.
25  Q       And he kept you in the loop regarding developments about
```

1  the schools?

2  A      Not everything.

3  Q      And how do you know that, if you're . . . .  You know

4  that there are things he didn't keep you in the loop about?

5  A      I mean, we didn't discuss containers.  There were things

6  that we just didn't discuss, that he did, in terms of

7  purchasing and containers.  It wasn't every little thing.

8  Q      A one of the things that you testified yesterday that he

9  kept you in the loop on was MUA Belize; is that right?

10  A      Yes.

11  Q      And you testified that, when Dr. Fredrick was going to

12  sell his ownership interests in MUA Belize, that you saw the

13  contract.

14  A      No.  I didn't see it immediately.  It was -- I think

15  they had a verbal agreement, and then some months later there

16  was a contract.

17  Q      And you saw the contract.

18  A      I don't . . . I don't remember it specifically.

19  Q      But I think, yesterday, you said that -- you testified

20  that you read the contract and reviewed it enough to know that

21  the sales price was $850,000.

22          MR. HOCHMAN:  Objection, Your Honor, misstates the

23  evidence as to whether or not she actually reviewed the

24  contract.

25          THE COURT:  Overruled.

```
1              THE WITNESS:  Can you show me a copy of the contract
2    to refresh my memory?
3              MS. FINLEY:  I will look for it.  And if we can find
4    it, I will come back to it; how is that?
5              THE WITNESS:  Okay.
6    BY MS. FINLEY:
7    Q      And you also testified yesterday that you then reviewed
8    Dr. Fredrick's tax returns to know that he had reported the
9    sale of his interest in MUA Belize on his tax return.
10   A      I did not specifically review his return, but we were in
11   the same room with Tom Murtha, doing them together.
12   Q      And so you knew, and paid attention enough during that
13   meeting, to know that he had reported his interest in the sale
14   of MUA Belize.
15   A      Yes.
16   Q      Now, you remember when Mr. Rodger testified at the
17   trial; do you remember his testimony, just that he testified?
18   A      He testified.
19   Q      And Mr. Hochman asked, if you remember, Mr. Rodger,
20   about his use of the word, "my company."
21          Do you remember that interaction?
22   A      Whose use of the words, "my company"?
23   Q      That Mr. Rodger kept calling it -- let me rephrase that.
24          Mr. Hochman was asking Mr. Rodger about his company, or
25   calling it, "my company."
```

1          Do you remember that?

2    A      Yes.

3    Q      And when you testified yesterday, you used the words,

4    "our schools," when were you referring to MUA and Saba; isn't

5    that correct?

6    A      Yes.

7    Q      And you used the words, "our deans."

8    A      Yes.

9    Q      And you used the words, "our standards," when you were

10   talking about MUA Belize, for why you weren't happy with what

11   was going on down there; isn't that correct?

12   A      Yes.

13   Q      And you talked about, "we had planned," what you and

14   Dr. Fredrick had planned for the school?

15   A      I mean, that "we" might have been other people.

16   Q      And when talking about The Foundation, in fact, you

17   called it, "our Foundation," did you not?

18   A      Yes.

19   Q      You used these pronouns, like Mr. Rodger, because

20   Mr. Rodger owns Equinox and you owned the Foundation.

21   A      I never owned The Foundation.

22   Q      Now, I want to talk a little bit about the UBS accounts.

23          Sometime . . . I think you testified yesterday, sometime

24   after September 11th, 2001, you took a trip to Europe; is that

25   correct?

1  A      Yes.

2  Q      And Dr. Fredrick, you testified, provided you with this

3  package of information; right?

4  A      Yes.

5  Q      And he tells you:  Can you swing on by to Zurich for me

6  and meet with Mr. Luetolf.

7  A      No.  I was going there -- I already had reservations and

8  planned to go there to visit some very old friends.

9  Q      And while were you over there, he asked you to go and

10  meet with Mr. Luetolf.

11  A      Yes, he did.

12  Q      And you met with Mr. Luetolf; correct?

13  A      Yes.

14  Q      And I think you testified yesterday that you provided

15  that big package of information to him?

16  A      Yes.

17  Q      And you talked to him about the background of the

18  school.

19  A      It was a short meeting.  I mean, he asked me some

20  questions about, you know, why the . . . about students, and

21  the need for physicians in the U.S., but not in detail.

22  Q      And you told him who were you; correct?

23  A      Yes.

24  Q      And who Dr. Fredrick was.

25  A      Yes.

1   Q      And you answered the questions about the schools, that

2   he had.

3   A      Yes.

4   Q      And you remember Mr. Futterknecht testifying that the

5   client adviser was required to know who the customer was; isn't

6   that correct?

7   A      Yes.

8   Q      And part of that, Mr. Futterknecht testified, was to

9   understand who the customer is, and where the money comes from;

10  correct?

11  A      That was his testimony.

12  Q      And Mr. Futterknecht then said that the client adviser

13  was required to input that information into UBS's system for

14  compliance, or anti-money laundering purposes; isn't that

15  correct?

16         MR. HOCHMAN:  Objection, foundation as to her

17  repeating Mr. Futterknecht's testimony.

18         THE COURT:  Overruled.

19         MR. HOCHMAN:  I'm sorry.  Improper question, Your

20  Honor.

21         THE COURT:  The first part of that overruled, the

22  second part is sustained, unless there is a question other

23  than, do you remember what someone else said.

24         MS. FINLEY:  Thank you.

25

BY MS. FINLEY:

Q       And the process that you went through with Mr. Luetolf,
when you sat down with him after September 11th, was just that
process, he was attempting to understand who the client was,
and where the money came from.

A       The meeting was a very short meeting.  He was busy
copying documents, and coming in and out of the room, and I had
to leave to catch a flight back to London.  It was a very short
meeting.

Q       Now, you testified that you were -- I think, yesterday,
that you were the caretaker, or the representative of The
Foundation; is that right?

A       I was a caretaker for the funds, and . . . on -- I can't
remember which document I'm listed as a representative.

Q       And as the caretaker, then, you would want to make sure
that all of the paperwork is fill out correctly in your role as
the caretaker.

A       What paperwork are you talking about?

Q       Anytime you are signing on behalf of The Foundation, you
would want to make sure -- as you're the caretaker, the
fiduciary -- that you are protecting The Foundation's
interests; isn't that correct?

A       Dr. Fredrick was . . . the primary caretaker.  He did
all the financial management.  I was there just in case of his
demise.  I did not set up -- I mean, I didn't set up the

1    details of the accounts.

2    Q      So now you're not the caretaker, you're like the backup

3    caretaker?

4    A      No.  I'm a caretaker, but he did all the day-to-day

5    financial management.

6    Q      And so when you signed documents to open bank accounts

7    on behalf of The Foundation, in your role as caretaker, you

8    didn't want to make sure that the documents . . . on the face

9    of them, said the right things.

10   A      I was just often handed signature pages, or there

11   were -- I don't remember ever being shown . . . large account

12   opening statements.

13   Q      So you just signed things in your role as caretaker

14   without reading them.

15   A      I trusted Dr. Fredrick, and also from what I -- what I

16   had known of Mr. Luetolf, to have been doing things properly.

17          MS. FINLEY:  Your Honor, at this time the government

18   is going to offer a summary chart?

19          I'm sorry, I don't remember what number I have that

20   as.  Thirty-two.

21          MS. KESSLER:  Your Honor, may I get the easel?

22          THE COURT:  Certainly.

23          MR. HOCHMAN:  Your Honor, may I be heard at sidebar

24   before this exhibit is shown to Dr. Hough?

25          THE COURT:  You may.

```
 1              MR. HOCHMAN:  Thank you.
 2                         AT SIDEBAR
 3          THE COURT:  Is this a copy of it?
 4              MR. HOCHMAN:  Yes.  The only reason I'm asking before
 5     we show it to Dr. Hough is, obviously Dr. Hough has not been
 6     introduced as a summary witness, and she just said that this is
 7     a summary chart.
 8              So I don't know . . . .  If she's treating Dr. Hough
 9     somehow as a defense summary witness, then this chart is
10     improper to show to impeach a defense summary witness because
11     she's not.  If there is some purpose that she's showing
12     Dr. Hough the chart, I would like her to state it before she
13     shows to it Dr. Hough.
14              MS. FINLEY:  I am not using to it impeach.  I am
15     using it to show when accounts were opened and the flow of the
16     money, which, as the -- based on her testimony, she should
17     know, because she's on either as the beneficial owner, having
18     opened the accounts, or on the accounts.
19              MR. HOCHMAN:  Your Honor, she's not the proper
20     witness to introduce this through.  We actually do have a
21     defense expert that she can try and introduce it through.  And
22     it's incomplete.  It actually doesn't have all the accounts.
23     It's missing at least -- I'm sorry, may I see it?
24              THE COURT:  Oh, sure.
25              MR. HOCHMAN:  It's missing at least three accounts
```

1   that we know that the agent looked at, because they're part of

2   her Revenue Agent's Report analysis.

3        COURT REPORTER:  Repeat that please.

4        MR. HOCHMAN:  It's missing at least three accounts we

5   know Revenue Agent Maurer looked at, because it's part of her

6   analysis.  So it's also an incomplete chart.

7        If she wants to go through the various accounts with

8   Dr. Hough, and show her documents or ask her questions, we are

9   obviously not opposed to do that.  But doing it through this

10  incomplete summary chart that has lines and arrows in it, in a

11  variety of colors that are -- at minimum, we would say, the

12  prejudicial value outweighs the probative value of this

13  particular chart, it's incomplete, and Dr. Hough is the wrong

14  witness to go through with it.

15       THE COURT:  Those objections are overruled.

16       I don't know if she can lay the foundation to admit

17  the chart, but you can use it to cross examine her, and she

18  says whatever she says.  I mean, I assume -- maybe I shouldn't

19  I assume she's never seen it before.

20       MR. HOCHMAN:  That's a correct assumption.

21       THE COURT:  That wouldn't surprise me.  So you may or

22  may not be able to do what you need to do.  But the objection

23  is overruled.

24       MR. HOCHMAN:  Thank you very much, Your Honor.

25                      IN OPEN COURT

1          (Ms. Finley and Mr. Hochman confer privately.)

2          MR. HOCHMAN:  One more time, Your Honor?

3                          AT SIDEBAR

4          MS. FINLEY:  Your Honor, I just asked Mr. Hochman --

5    I was passed a note, that Mr. Hochman appears to be nodding and

6    coaching his client, from the audience, and I just asked if he

7    could stop doing that in front of the jury.

8          MR. HOCHMAN:  And I told Ms. Finley that I was

9    absolutely offended by that.  I did not in any way make a head

10   shake, a head nod, or indicate in any way whatsoever to coach

11   my client.  I'm offended that Ms. Finley has said this, and I

12   wanted to put it on the record that I am completely offended

13   and it did not happen.

14         MS. FINLEY:  Your Honor, I also want to address,

15   since this perhaps raises another issue, yesterday, during the

16   break, we noticed that the defendant was reviewing and had a

17   copy of Mr. Hochman's outline, and was reviewing it during the

18   break.  And I intend to ask her about in an on

19   cross-examination.

20         THE COURT:  Those are two different issues.

21         MR. HOCHMAN:  And that's fair cross, certainly.

22         THE COURT:  I think so too.

23         As to the first one, I didn't see Mr. Hochman doing

24   anything like that.  If I do -- I'll keep an eye, I guess.

25         MR. HOCHMAN:  Please do, Your Honor.

1      THE COURT:  I would be surprised if I saw such

2  conduct.  Given the last two weeks with both sides, I just

3  don't sense that that's what goes on in this case, so . . . but

4  I'll stay awake for that.

5      MR. HOCHMAN:  Please do.

6                  IN OPEN COURT

7      THE COURT:  You may proceed.

8      MS. FINLEY:  Thank you, Your Honor.

9  BY MS. FINLEY:

10  Q      Now, I guess -- so after you drop off the information at

11  Mr. Luetolf's, you return back to the United States; is that

12  right?

13  A      I went back to London for a few days, and then came back

14  to the United States.

15  Q      And then Mr. Luetolf sent the package of materials back

16  to the United States for you to sign?

17  A      I didn't get anything directly.  I'm not sure how those

18  came.

19  Q      So Dr. Fredrick gave you documents, then, to sign, to

20  open the initial account?

21  A      Yes.

22  Q      And so I just want to understand:  You said that all of

23  this . . . all of these accounts are for asset protection;

24  correct?

25  A      Yes.

```
 1   Q      Okay.  And so I think you testified yesterday, the money
 2   isn't safe in Saba, right, so you had to open -- first there
 3   was accounts in the Bahamas?
 4   A      I didn't open accounts in the Bahamas, but I know that,
 5   after . . . the first big federal lawsuit by a faculty member,
 6   that steps were taken.
 7   Q      To put them in the Bahamas, to put the money in the
 8   Bahamas.
 9   A      That was not selected by me.
10   Q      But you know the money is in the Bahamas.
11   A      That's what I was told.
12   Q      All right.  And there's also a lot of money in the
13   United States, because you're on the bank accounts in the
14   United States.
15   A      I never did any day-to-day administration of those
16   accounts.
17   Q      But you know there are numerous bank accounts in the
18   United States on which you have signatory authority.
19   A      Yes.
20   Q      And your sister, Charlene Varga, is also a signatory on
21   those accounts.
22   A      Yes.
23   Q      And I guess you testified, yesterday, that you were told
24   that, somehow the Bahamas, or the -- Saba wasn't safe enough,
25   so the funds had to be moved to the Bahamas.
```

1    A       I believe it wasn't Saba, it was the Netherlands

2    Antilles banks, and that was the location that was selected as

3    an alternative.

4              MS. FINLEY:  Okay.  If I can approach the witness,

5    Your Honor?

6              THE COURT:  You may.

7    BY MS. FINLEY:

8    Q       And I'm going to hand you a chunk of exhibits that we're

9    going to go over.

10             (Ms. Finley provided exhibits to the witness.)

11   BY MS. FINLEY:

12   Q       And if you could take a look, first, at Exhibit 3GG.

13

14             MS. FINLEY:  And, Your Honor, permission to publish?

15             THE COURT:  You may.

16             (An exhibit was projected onto the projector screen.)

17   BY MS. FINLEY:

18   Q       So 3GG, if we look at Page 1, is this document the one

19   you said Dr. Fredrick asked you to sign?

20   A       I was given a lot of documents.  I don't know -- I mean,

21   I didn't fill out the name and the date.

22   Q       All right.  And do you remember -- I think yesterday you

23   testified, sometimes the documents were blank, sometimes they

24   had information filled out on them.

25             Do you remember if this was one that was blank or had

1    some information filled out?

2    A      I don't remember.  It's more than ten years ago.

3    Q      Okay.  And if we turn to Page 21 of this exhibit, now,

4    did you provide Mr. Luetolf, Charlene Varga's name to be

5    included as a power of attorney on this account?

6    A      I believe Dr. Fredrick did that.

7    Q      And then you asked your sister, or explained to her why

8    she was going to be the power of attorney on these accounts?

9    A      He spoke with her.

10   Q      And he told her, as you testified, that this was for

11   your estate; isn't that correct?

12   A      No, I don't know that.  I think she . . . years before,

13   was always our executrix on our wills, living wills, and we had

14   something called a family limited partnership.  I know she had

15   questions.  I would have talked to her also, but --

16   Q      In your role as a caretaker, then, you would have told

17   her that she now had power of attorney over The Foundation and

18   all of its monies; is that correct?

19   A      I didn't say those words to her.  That was in case of

20   our demise.  Yes, she would be a caretaker and protect the

21   funds.

22   Q      And you would have wanted her to understand The

23   Foundation so that she could take care of them properly; isn't

24   that correct?

25   A      Yes.

1    Q      But you didn't explain to her what she was supposed to

2    do, other than there was a safe somewhere in your house that

3    would give her directions.

4    A      Dr. Fredrick kept extreme details, not only in a safe in

5    our house, but she had access to our safety deposit box.  And

6    it was all . . . .  It was all the information that she would

7    need about people, lawyers.  There were papers.  It was a

8    substantial amount of information.

9    Q      And so all of the information about The Foundation was

10   kept in your personal safe in your house and your personal

11   safety deposit box?

12   A      No.  It wasn't all the information.  It was what she

13   would need in case we both died.

14   Q      And you met --

15          MS. FINLEY:  If we can look now at Exhibit 3HH.  And

16   if we can turn to Page 14.

17          (An exhibit was projected onto the projector screen.)

18   BY MS. FINLEY:

19   Q      And this is an e-mail that you were copied on, that

20   Mr. Hochman asked you about yesterday; do you remember?

21   A      I'm not there yet.

22   Q      Sorry.

23          (The witness examines an exhibit.)

24   A      Yes, I see that I'm cc'd.

25   Q      Now, I think yesterday you testified that you remember

1   that, on Thursday, January 15th, 2004, you were in Belize.

2   A      I rechecked my passport and, according to this, yes, I

3   was in Belize.

4   Q      And it says that Mr. Luetolf is coming to the United

5   States and was going to meet with you, and, if you were around,

6   you'd be there too.

7          Is that generally what the e-mail says?

8   A      Yes.

9   Q      Okay.  And if we can look at Page 11, now, you also, I

10  think, testified yesterday that this letter, dated 1/21/04, in

11  Boston, I think, was it that this was a blank piece of paper

12  that you signed?

13          MR. HOCHMAN:  Objection, misstates the date on the

14  letter.

15          MS. FINLEY:  Excuse me, 1/21/2004.

16          THE COURT:  All right.

17          MR. HOCHMAN:  I believe the letter says 21.1.04.

18          THE COURT:  That's what it says.  That's not the

19  date, unless there is a month called 21.

20          Go ahead.

21  BY MS. FINLEY:

22  Q      Does it have the month first, and then the date -- and

23  then the month -- excuse me.

24          Does it have the day of the month first, then the month,

25  and then the year?

```
 1   A       It appears to be the European way of writing dates.

 2   Q       And that would then be January 21st, 2004?

 3   A       Yes.

 4   Q       And I think, yesterday, you testified that that is your

 5   signature; correct?

 6   A       Yes.

 7   Q       And is this a document that was blank when you signed

 8   it, or the information was filled out at the top when you

 9   signed it?

10   A       I don't know.  Because in reviewing the Southwest flight

11   records that I gave you, and my travel on the 21st of January,

12   I was in Orlando, Florida, at a Florida Commission for

13   Independent Education meeting.

14   Q       All right.  So it is your signature, and you don't

15   remember -- is it your practice to sign blank pieces of paper

16   with your signature?

17   A       Blank?  Usually not.

18   Q       And if you were to sign a blank piece of paper, would

19   you ask what it was for?

20   A       I just don't remember signing this.  And I . . . know,

21   according to my flight records, that I took a flight to Orlando

22   that day.

23   Q       Now, we know, going back to Exhibit 3GG, and if we could

24   turn to Page 18.

25                   (An exhibit was projected onto the projector screen.)
```

1                    (The witness examines an exhibit.)

2    BY MS. FINLEY:

3    Q       And is that your signature?

4    A       Yes.   That looks like my signature.

5    Q       And that date is listed, January 21st, 2004?

6    A       Yes.

7    Q       And . . . it says that it's in Boston?

8    A       Yes.

9            MS. FINLEY:  And if we can go back out for a second?

10   BY MS. FINLEY:

11   Q       And I think -- does it have the same -- similar

12   instructions at the top, that was in Page 11 of Exhibit 3HH?

13   A       I can barely read 3HH.

14   Q       Okay.  Let's go back and take a look at it.  If we can

15   go back to Page 11 . . . .

16           And does Page 11 of 3HH say:"

17           "Please manage USD 3MIO in an absolute return portfolio

18   defensive" . . . if you can read it.

19   A       Okay.

20   Q       Is that what it says?

21   A       Yeah.  It's the same description.

22   Q       And have the same dates.

23   A       Yes.

24   Q       And they both have your signature on them.

25   A       Yes.

1    Q      And so, in October of 2001, you open a bank account at

2    UBS, now in Switzerland, in your husband and yours joint name,

3    and your husband tells you that it's safer to do it that way

4    for The Foundation, to have it in your names; is that correct?

5    A      No.

6    Q      All right.  So you don't -- you don't know, at the time,

7    it's being opened in your joint names?

8    A      I knew I had to be a signatory.

9    Q      And you know that, somehow, Switzerland is going to

10   protect it better than wherever it was?

11   A      That's what the asset-protection plan was.

12   Q      And when you, yourself, have liability, as a medical

13   doctor, is it better, then, to put things in your name?

14   A      No.

15   Q      So after you open the account in your joint names, I

16   think you testified yesterday that your -- the lawyers,

17   or . . . someone said that you don't want to leave your money

18   in the Caribbean, in the Bahamas, so you have to move all the

19   money from the Bahamas to Switzerland; is that right?

20   A      No.

21   Q      Okay.  So why does the money get moved from the Bahamas

22   to Switzerland?

23   A      It was never my money, and I understood that the account

24   was Saba School of Medicine Foundation's account.

25   Q      I'm just asking you why -- let's put off whose money it

1    is at the moment.

2           Why is it getting moved; because it's not safe in the

3    Bahamas?

4    A       I don't know if it was safe.  There was a problem, and

5    it went from . . . the UBS there, to the one in Switzerland.

6    Q       And it wasn't safe in the Bahamas because the Bahamas

7    and the United States were about to enter into a banking

8    agreement that would disclose information to the IRS; isn't

9    that right?

10          MR. HOCHMAN:  Objection, foundation.

11          THE COURT:  Overruled.

12          THE WITNESS:  I didn't know that at the time.

13   BY MS. FINLEY:

14   Q       Okay.  So it's now not safe in the Bahamas, and the

15   money is moved to Switzerland.

16          And then you're aware that there are two British Virgin

17   Island entities that are created in 2003; are you not?

18   A       I don't know if I was aware exactly at that date.  I

19   heard their names.

20   Q       Okay.  If you could take a look at Government's

21   Exhibit 3J.

22          (An exhibit was projected onto the projector screen.)

23   BY MS. FINLEY:

24   Q       So the date on -- this is the Form A for Medical

25   Technology Associates; is that what this is?

1   A       (Examining document) Yes.

2   Q       And I think if we -- do you remember, there was a

3   document that said, Laura Whitley was the clinical director for

4   Medical Technology Associates.

5           Do you remember that?

6   A       Can you show me?

7           MS. FINLEY:  Sure.

8           (Ms. Finley searches various exhibits.)

9           MS. FINLEY:  I will show it to you.  I just can't

10  find it right at the moment.  But I'm keeping a list of all the

11  things that we're going to show to you after the break.  I'll

12  find it during the break.

13  BY MS. FINLEY:

14  Q       So in all -- on August 13, 2003, do you sign a Form A

15  for Medical Technology Associates?

16  A       That is my signature.

17  Q       And on this document, do you remember, was this one

18  blank when it was filled out?

19  A       It's over ten years ago.  I don't remember.

20  Q       So you remember that there were all of these things you

21  were signing, but you don't remember if they were filled out

22  when you signed them.

23  A       Yes.

24  Q       And if -- if we presume that this was blank, this is now

25  the second document that you're signing, I guess that your

1     husband is asking you to sign, that you sign in blank.

2          MR. HOCHMAN:  Objection, improper hypothetical.

3          THE COURT:  I'm not sure I understood the question.

4     Ask it again, please.  The objection will be sustained.

5          MS. FINLEY:  I'm sorry, Your Honor.  I apologize.

6     BY MS. FINLEY:

7     Q     I think you said, for Exhibit 3GG, Government's

8     Exhibit 3GG, the account in your joint name, you can't remember

9     if that document was filled out or blank when you signed it; is

10    that right?

11    A     That's correct.

12    Q     And so now, on 3J, you can't remember whether this one

13    was blank or filled out when you signed it.

14    A     I signed a lot of forms.  I don't remember.

15    Q     And as the caretaker of The Foundation's money, you

16    would ask -- now this is the second time -- you would ask why

17    you're filling out blank forms?

18          MR. HOCHMAN:  Objection as to who she's asking.

19          THE COURT:  Overruled.

20          THE WITNESS:  Well, I would always ask Dr. Fredrick.

21    He would normally say:  This is something that Dieter Luetolf

22    needs, you know, would you sign it?

23    BY MS. FINLEY:

24    Q     And Dr. Fredrick would say:  This is something Dieter

25    Luetolf needs for The Foundation's money, or for our joint

1    account?

2    A      I always thought it was The Foundation's money.

3    Q      And if we can look at Page 9 of Exhibit 3J, and on the

4    top, is that your handwriting, where it says, "Patricia Hough,

5    U.S.A."?

6    A      Yes.

7    Q      So this one you did fill out; is that correct?

8    A      I mean, that's my signature, but . . . at the top, where

9    it says, "Company," that's not my handwriting.

10   Q      I'm just talking about where it says your name,

11   "Patricia Hough, U.S.A.," and your signature, with your

12   birthday --

13   A      Yes, that's my handwriting.

14   Q      And so then, at the bottom of the page, is that also

15   your signature?

16   A      Yes.

17   Q      And is that also your handwriting where it says,

18   "Patricia Hough, Secretary"?

19   A      Patricia Hough . . . that's my signature.  I don't know

20   about the "Secretary."  I don't ever remember having that

21   position.

22   Q      And if we can -- and do you remember if this is a

23   British -- if Medical Technology Associates was a British

24   Virgin Islands company?

25   A      I knew that later in the . . . in the discovery, when

1    this case started.

2    Q       And did you have any discussions with Dr. Fredrick or

3    Mr. Luetolf, at the time, as to why the Bahamas wasn't safe

4    anymore, to leave the money, but having another Caribbean

5    entity was okay?

6    A       No, I didn't have any such discussion.

7            MS. FINLEY:  Now, if we could ask you to turn to 3N,

8    as in "Nancy."

9            (An exhibit was projected onto the projector screen.)

10   BY MS. FINLEY:

11   Q       And then another entity, called Apex Consultants, was

12   opened --

13   A       I'm not there.

14   Q       I'm sorry.

15   A       3N, as in "Nancy"?

16   Q       3N, as in "Nancy," yes.

17   A       I don't have it.

18           MS. FINLEY:  I'm sorry.

19           (Ms. Finley provides an exhibit to the witness.)

20           (The witness examines an exhibit.)

21           MS. FINLEY:  Just let me know when you're ready.

22           THE WITNESS:  Oh, I'm ready.

23           MS. FINLEY:  Okay.  Sorry.

24   BY SPEAKER G:

25   Q       So Apex Consultants, in that name, an account was opened

1    on July 14th of 2003.

2            Is that what that says?

3    A      Yes.

4    Q      And at the top, is that your name?

5    A      Yes.

6    Q      And is that your handwriting?

7    A      The printing is not mine.

8    Q      And that's your signature.

9    A      It is my signature.

10   Q      And do you remember if this one was blank when you

11   signed it?

12   A      No, I do not.

13   Q      So it may be that we're now on the third account that's

14   blank when you're signing it; is that . . . .

15   A      I don't remember one way or the other.

16   Q      Okay.  Now, Mr. Singenberger . . . when did you first

17   understand that he became involved?

18   A      It was in early 2006.

19   Q      All right.  So at the time that these accounts are being

20   opened, in 2003, he's not involved yet.

21   A      No.  I don't believe so.

22            MS. FINLEY:  So if we can turn now to Exhibit 3P.

23            (An exhibit was projected onto the projector screen.)

24            MS. FINLEY:  And if we can turn to Page 6.

25

1    BY MS. FINLEY:

2    Q    So, in 2003, the money from the Bahamas is transferred

3    to UBS, to the account that has your and Dr. Fredrick's name

4    listed on it.

5    A    Can you please restate the account information?

6    Q    In 2003, December, the letter states that the money from

7    the Bahamas is going to be transferred to the account at UBS

8    that has your and your husband's name on it.

9    A    I didn't write this letter.

10   Q    And it says -- the letter says, though, that:

11        "My wife and I have decided to close our account at SB

12   Hambros in Nassau."

13        Is that what it says?

14   A    That's the first sentence.

15   Q    And he doesn't say, "We decided to close The

16   Foundation's account in Nassau," does he?

17   A    That sentence is not there.

18   Q    And he tells the bank in the Bahamas that you and he are

19   closing the account because of the change in banking policies

20   puts you at a disadvantage.

21        Is that what the letter says?

22   A    Yeah.  That's what he wrote.

23   Q    And it doesn't say that it puts The Foundation at a

24   disadvantage, does it?

25        MR. HOCHMAN:  Objection, the letter speaks for

```
1    itself.

2              THE COURT:  Overruled.

3              THE WITNESS:  No.

4              MS. FINLEY:  Now, if we can turn, I'm sorry, back to

5    3HH . . . and if we can turn to Page 20.

6              (An exhibit was projected onto the projector screen.)

7    BY MS. FINLEY:

8    Q      So I think, yesterday, you testified that Dr. Fredrick

9    then told you that it wasn't safe to keep the accounts for The

10   Foundation in your own names; is that right?

11   A      No.  He said that The Foundation accounts in the

12   Bahamas, I believe, would not be protected from U.S. lawsuits.

13   Q      That's not what he told the bank, though, right, in the

14   letter we just looked at?

15   A      I know what he told me.  I never saw that letter until

16   discovery.

17   Q      And so once the money is in the account in your joint

18   names, the accounts get split in two.

19          Do you remember that?

20   A      I remember that happening.

21   Q      And so did Dr. Fredrick tell you that, "Now it's not

22   safe to have the accounts in our joint names, so we need to

23   split them into our individual names"; is that what he told

24   you?

25   A      It's what he said, he had a plan with Dieter Luetolf.
```

1    Q     And did he explain to you how splitting it into your

2    individual names somehow offered more asset protection than

3    having it in your joint names?

4    A     It was Foundation money, and I was to remain on . . .

5    that original Foundation account, and another account was to be

6    opened for . . . with David as the caretaker.

7    Q     All right.  Well, let's take a look at Exhibit 3HH,

8    Page 20.

9          And if we can look at the top, it's dated February 6th,

10   2004; is that right?

11   A     Yes.

12   Q     And Dr. Fredrick's writing the letter to Mr. Luetolf;

13   correct?

14   A     Yes.

15   Q     And you're copied on it; correct?

16   A     Yes.

17   Q     And that's your e-mail, PL Hough at Yahoo.com?

18   A     Yes.

19   Q     And I think, in the first paragraph, it's talking about

20   how you met with Mr. Luetolf a few weeks ago.

21         Do you remember that?

22   A     I remember meeting with him.

23   Q     Okay.  And you were at that meeting?

24   A     I don't know for sure, but . . . I know I met with him

25   twice in the United States.

1    Q      Okay.  And Dr. Fredrick, in his letter, or the e-mail,

2    lays out what you and he have decided to do with the joint

3    account; is that correct?

4    A      It's what was recommended to do with the funds.  The

5    main issue here was my sister being sole signatory for a

6    foreign account -- overseas account -- because of her fear of

7    flying.

8    Q      But that fear of flying didn't stop you from keeping her

9    on your account, did it?

10   A      No.  She flew here.  She'll do what she has to do.

11   Q      All right.  So it's okay for her to stay on your account

12   and -- for The Foundation, but Dr. Fredrick is going to have

13   someone else on his account for The Foundation?

14          Is that what happened?

15   A      I don't know precisely what happened on that side, but

16   it was The Foundation -- the original Foundation account with

17   me as caretaker, and Charlene remained.

18   Q      And if we can look at the beginning of the third

19   paragraph, it says:

20          "In addition, we would like to consider dividing the

21   funds from the joint account into two separate accounts, one

22   for each of us."

23          Is that what it says?

24   A      Yes.

25   Q      And it doesn't say it's . . . The Foundation's account;

1    correct?

2    A      Not there.

3    Q      And, in fact, it doesn't say it anywhere in this letter,

4    in this e-mail, does it.

5    A      I don't see it.

6    Q      And it describes the accounts as Pat's account, under

7    Number 3 in that paragraph?

8    A      Yes.

9    Q      And he describes it as his account, or "one for me and

10   one for Pat"; is that right?

11   A      Yes.

12   Q      And that the monies from the joint account are going to

13   be evenly split into two separate numbered accounts.

14   A      Yes.

15   Q      And down at the bottom it says that you're still trying

16   to find a buyer for the schools.

17          And that's in 2004; correct?

18   A      Yes.

19   Q      And that, if you were to sell the schools, that equal

20   amounts to deposit would be -- would be deposited into each

21   account.

22   A      I don't know that.  I mean, that's the future.  I don't

23   know.

24   Q      But you do know that, when you ultimately sold the

25   schools in 2007, that the $34 million that was paid for Round

1    Hill to New Vanguard got split to the penny between Fortis

2    Banque and Liechtenstein Landesbank.

3    A      No.  I never saw those . . . transfer funds until I

4    saw -- until this criminal investigation began.

5    Q      And you said that you never gave any instructions to UBS

6    with the accounts; isn't that right?

7    A      I don't remember verbally ever dealing with UBS.  I

8    recall, because I had concerns, as I testified yesterday, when

9    I saw this e-mail, about why The Foundation wasn't in there.

10         And there was a . . . on speakerphone, Dr. Fredrick had

11   Dieter Luetolf on the phone, and he said that . . . that he

12   thought this would . . . be a good arrangement, that he

13   recommended it.

14   Q      So this arrangement now is, you're on a conference call

15   with Dieter Luetolf?

16   A      At some point after, because the e-mail doesn't

17   reference The Foundation.  And I'm saying why is it, you

18   know . . . why would it be just mine or David's?

19   Q      So you did raise, with Dr. Fredrick and Mr. Luetolf:

20   Hey, The Foundation is not listed here anywhere?

21   A      I had questions about how the account was set up.

22   Because at all times I thought it was -- it was -- it was The

23   Foundation money, it wasn't mine.

24   Q      And so you wouldn't sign documents that then didn't say

25   that; correct?

1    A      What; Foundation?

2    Q      Right.  If the documents you're signing don't say it's

3    The Foundation's money, you wouldn't have signed them.

4    A      All the money -- all the documents I ever signed, it was

5    my understanding, were for Foundation funds and asset

6    protection.

7    Q      So . . . .  I guess there comes a time that you now

8    have -- there's a joint account that was closed, and The

9    Foundation's money now goes into two individual accounts that

10   are now in your name and Dr. Fredrick's name.

11          And then, I guess, The Foundation now also has accounts

12   in the name of Medical Technology Associates and Apex

13   Consultants, is that right, by the end of 2004?

14   A      I don't know how many accounts were there for sure.

15   Q      But we just reviewed the documents that your signature

16   is on, that show that that's how many accounts there are.

17   A      Yes.  But at the time I didn't know, you know, exactly

18   how many accounts.  I knew that there were a lot of layers of

19   protection and some different companies.

20   Q      And this layer of protection is to protect it from the

21   IRS and not from lawsuits.

22   A      No.  It was to protect from lawsuits by . . . this time,

23   in 2004, we had been told that St. Matthew's University was

24   going to launch a massive lawsuit.

25   Q      And you'd also been told that the Bahamas was about to

1    start sharing taxpayer information with the IRS.

2    A       I had not been told that.

3    Q       And so now, I think, we get to the point where there's a

4    bank account in 2005, that's opened in the name of Saba School

5    of Medicine Foundation.

6            Do you remember that?

7    A       I saw those papers.

8    Q       Okay.  And so now, for asset-protection purposes, it's

9    okay to open an account in the name of the company, or The

10   Foundation, that you're concerns . . . about their assets.

11   A       Where was that account?

12   Q       At UBS.

13   A       In Switzerland.

14   Q       Yes.

15   A       Mr. Luetolf opened it in Switzerland.

16   Q       And you heard Mr. Futterknecht testify that Mr. Luetolf,

17   or any client adviser, could not open any bank account without

18   a client's direction.

19   A       I don't know that I heard that.  I thought you had to

20   have . . . like a "know your client" or identifiable

21   information.

22   Q       You just testified that Mr. Luetolf opened the account,

23   but isn't it that you or your husband, or the client, opened

24   the account?

25   A       I never opened any accounts independently.

1   Q      But you signed to open them.

2   A      I think one -- I signed documents; yes.

3   Q      So I guess there comes a time, I think now we're getting

4   into when Mr. Singenberger arrives on the scene.

5          And did Mr. Singenberger -- or did Dr. Fredrick tell you

6   that Mr. Singenberger said that it was now safer to have a Hong

7   Kong entity; is that what you testified yesterday?

8   A      Mr. Singenberger worked with UBS, and he was an expert

9   in asset protection.  At that time there was the $200 million

10  lawsuit from St. Matthew's had been unsealed.

11  Q      Okay.  And so Mr. Singenberger advised to Dr. Fredrick

12  to create a Hong Kong entity?

13  A      I mean, I'm not sure how that was done, whether it was

14  done with Dieter Luetolf, Dr. Fredrick, and Mr. Singenberger.

15  I was just told about it.

16  Q      And you were told that that Hong Kong entity offered

17  more protection, or it was the safest jurisdiction for asset

18  protection?

19  A      That's what I was told.

20  Q      Okay.  And so New Vanguard is the Hong Kong entity that

21  was created; is that right?

22  A      That's a name I saw.

23         MS. FINLEY:  So now if we could look at 3S?

24         (An exhibit was projected onto the projector screen.)

25         MS. FINLEY:  And if you can turn to Page 9.

1          (The witness examines an exhibit.)

2    BY MS. FINLEY:

3    Q     And I think, yesterday, you testified that that was your

4    signature; correct?

5    A     Yes.

6    Q     And you did not remember whether the handwriting was

7    included when you signed the letter.

8    A     No.  I don't remember one way or the other.

9    Q     Do you remember whether the printed portion of the

10   letter was there?

11   A     I think so.

12   Q     And so . . . as the caretaker of The Foundation, did you

13   not want to know where the money was being moved?

14   A     I mean, things are written in here afterwards.  I don't

15   remember if "New Vanguard" was printed on there or not.  And I

16   don't know about the other entity.

17   Q     All right.  But I'm saying, if New Vanguard was not on

18   there, it says:  "Will you kindly transfer all equities and

19   other assets to the newly formed company?"

20         Did you ask, at the time, "Well, what's this newly

21   formed company"?

22   A     I knew the name, "New Vanguard," through Dr. Fredrick.

23   Q     So, at the time you signed this, you do know that there

24   is New Vanguard?

25   A     The date's in 2005 -- yes.  I had met Mr. Singenberger

1  earlier that year -- maybe not.  Well, let's see.  I think it

2  was 2005.  And Dr. Fredrick told me he had formed another

3  company after we got the $200 million lawsuit.

4  Q     And so all the money from your -- from the account in

5  your name, and the account in Dr. Fredrick's name, goes into

6  the New Vanguard account; is that right?

7  A     I know that The Foundation money that had my name on the

8  account was put into another layer of protection.

9  Q     And it's now out of your name and into the name of a

10  Hong Kong company.

11  A     That was an asset-protection strategy for The Foundation

12  funds.

13  Q     And if Hong Kong is now the safest place to open an

14  account, or to have an entity, why . . . does Dr. Fredrick open

15  an account in the name of Medical University of the Americas?

16            MR. HOCHMAN:  Your Honor, I'll object on foundation,

17  as to her knowledge of what Dr. Fredrick knows.

18            THE COURT:  Overruled.

19  BY MS. FINLEY:

20  Q     Do you know that Dr. Fredrick, then, in --

21            MS. FINLEY:  Excuse me, Your Honor.  I'm sorry.

22  BY MS. FINLEY:

23  Q     -- in September of 2005, opens an account at UBS in the

24  name of Medical University of the Americas?

25  A     Can you show me the paperwork, and the dates?

1    Q      Sure.

2           MS. FINLEY:  And, Your Honor, I don't know if this

3    might be a good time for a break, so I could stop choking, and

4    I could get the documents?

5           THE COURT:  All right.  We'll do that.

6           We'll take 15 minutes.

7           Please do not discuss the case among yourselves, or

8    allow anyone to discuss it with you or in your presence.

9    Fifteen minutes.

10          (At 10:36 AM, the jury was escorted from the

11      courtroom.)

12          THE COURT:  All right.  Fifteen minutes.

13          I think we've got some cough drops.

14          MS. FINLEY:  Yeah.  I have a tickle in the back of my

15   throat.  Thanks.

16          (At 10:37 AM, court was recessed.)

17                        AFTER RECESS

18          (At 10:57 AM, court was reconvened.)

19          THE COURT:  Both sides ready for the jury?

20          MR. HOCHMAN:  Yes, Your Honor.

21          MS. FINLEY:  Yes, Your Honor.

22          THE COURT:  Have the jury step in, please.

23          (At 10:57 AM, the jury was escorted into the

24      courtroom.)

25          THE COURT:  You may proceed.

1          MS. FINLEY:  Thank you, Your Honor.

2          May I approach?

3          THE COURT:  You may.

4          (Ms. Finley confers with Mr. Hochman privately.)

5    BY MS. FINLEY:

6    Q     I'm going to show you -- we're going to take just one

7    step back for a second.  I'm going to show you what has been

8    marked as Exhibit 33, and what has been admitted as 7AA.

9          Now, if you could take a look at 33, what is that

10   document?

11   A     This is a document I got through Southwest Airlines,

12   that showed flights that I took on that airline.

13         MS. FINLEY:  And, Your Honor, at this time the

14   government would move to admit Government's Exhibit 33?

15         MR. HOCHMAN:  No objection, Your Honor.

16         THE COURT:  33 will be admitted.

17         (Government's Exhibit 33 admitted into evidence.)

18   BY MS. FINLEY:

19   Q     Now, I think you said that you believed that you were

20   leaving for Orlando on the 21st of January, 2004.

21         Could you show me, on there, where that is?

22   A     It's not on this flight record.  It was in one of my

23   calendars.

24   Q     So you flew a different airline?

25   A     No.  I flew Southwest.

1    Q       So then it would be on there; correct?

2    A       If I used -- I noticed that was missing also, when I was

3    trying -- Mr. Hochman had me reconstructing a lot of my

4    activities.  And when I called Southwest Airlines, the man that

5    did this, he said that if I used a free certificate, which I

6    had a lot of, that it would not show up here.

7    Q       So you remember that you used a free certificate for

8    that flight?

9    A       Well, I think that's why it wasn't there.  I had tons of

10   free flights, at that time, with Southwest Airlines.

11              MS. FINLEY:  I also put in front of you Exhibit 7AA.

12              And if we could have permission to publish, Your

13   Honor?

14              THE COURT:  You may.

15              (An exhibit was projected onto the projector screen.)

16   BY MS. FINLEY:

17   Q       So you asked me to show that you Laura Whitley was the

18   clinical director for Medical Technology Associates.

19              Is that what this document says?

20   A       Yes.

21   Q       And your understanding, from Dr. Fredrick, is that

22   Medical Technology Associates is really The Foundation?

23   A       I understood it was a Foundation entity at one time.

24   Q       And what did it do?

25   A       I don't know.  It was an entity.

```
1    Q      And as the caretaker of The Foundation, you didn't want

2    to know what Medical Technology Associates did?

3    A      It was an asset-protection entity.  That's what I

4    understood it to be.

5    Q      Okay.  And how is Laura Whitley -- I guess, in 2004, I

6    think she testified, she was about to have a baby, is that

7    correct, in the summer of 2004?

8    A      Yes.

9    Q      And do you know her to have skills to be a clinical

10   director . . . or any sort of medical-related entity?

11   A      No.

12   Q      And if it's just for asset protection, then why does it

13   need a board of directors?

14   A      I never saw this document until it was produced by

15   discovery.

16   Q      So you just know that Dr. Fredrick told you Medical

17   Technology Associates was some entity for asset protection;

18   correct?

19   A      It was an asset protection for Foundation funds.

20   Q      And that it was -- that, therefore, owned by The

21   Foundation?

22   A      It was . . . .  It was -- I don't know if it was owned.

23   It was an asset-protection entity for Foundation funds.

24   Q      And so on -- the beneficial owner on the Form A, then

25   you would expect, when you signed it, that you would make sure
```

```
1    that it said the ultimate economic beneficiary is The
2    Foundation.
3    A      I can't remember the form for that now.  I think that
4    was one that might have been filled in later.  I don't know.
5           Have we seen that?
6    Q      Yes, we did.
7    A      Which exhibit is it?
8    Q      That is at 3J.
9    A      (The witness examines an exhibit.)
10          Okay.  Now I remember.
11   Q      So this is one you think was blank when you filled it
12   out?
13   A      I don't remember one way or another.  It's my signature,
14   but a lot of things are typed in.  And some of the other
15   handwriting there isn't mine.
16   Q      I'm going to show you now -- you asked to see the
17   account opening documents for the Medical University of the
18   Americas, so I'm going to show you what has been admitted as
19   3Y.
20          And I think I was asking you, I think you said that Hong
21   Kong -- your understanding now from Dr. Fredrick, or
22   Mr. Singenberger, or Mr. Luetolf, was that Hong Kong entities
23   now are the safest for asset protection; right?
24   A      That's what I was told.
25   Q      All right.  And so did you know that Dr. Fredrick opened
```

1   an account at UBS in the name of Medical University of the

2   Americas on September 2nd, 2005?

3   A      I'm not a signatory on this document, so . . . he did

4   it.

5   Q      So you didn't know that there was another

6   account . . . .

7   A      At that time, I -- I don't remember.  But, you know,

8   certainly, Medical University of the Americas was a functioning

9   school.

10  Q      And you don't believe that you're a signatory on this

11  account.

12  A      I don't know.  I'm still looking.

13  Q      Why don't we turn to Page 3Y, Page 12.

14         (An exhibit was projected onto the projector screen.)

15  A      Okay.  I am a signatory.  I see that.

16  Q      So when you signed this document, did you ask

17  Dr. Fredrick why, if Hong Kong entities are the safest for

18  asset protection, why you're opening a UBS account in

19  Switzerland in the name of a Nevis entity?

20  A      That is my signature on that page.  I think that was

21  just ordinary business, that Medical University of the Americas

22  also had incurred some lawsuits.

23  Q      And so this is another document that you're just -- you

24  are trusting Dr. Fredrick, and you just signed.

25  A      It may have been filled in.  I don't -- you know, it's a

1    functioning entity of The Foundation . . . at that time.

2    Q      MUA is an entity of The Foundation?

3    A      It was part of the overall umbrella, and the Saba

4    Foundation lent it money.

5    Q      But Dr. Fredrick owns the Medical University of the

6    Americas; isn't that correct?

7    A      He owns a small part -- some of it.

8    Q      And there was another nominal shareholder, correct;

9    Mr. Lake?

10   A      Yes.

11   Q      And then, at a later time, New Vanguard becomes the

12   majority shareholder; isn't that correct?

13   A      It's really confusing, but they kept adding layers of

14   asset protection because there were some major lawsuits on

15   Nevis, and in the United States, against Medical University of

16   the Americas.

17   Q      So issuing stock to New Vanguard was also -- for MUA,

18   you understood that that was also for asset protection?

19   A      I understood anything -- that there were layers of asset

20   protection, and that creation of those sorts of . . . companies

21   was just another layer; that it was, at all times, The

22   Foundation's funds.

23   Q      Okay.  Now, in the end of 2005, do you know whether

24   there was another entity, named Top Fast, that Mr. Singenberger

25   created?

```
 1   A       I heard that name.

 2   Q       All right.  And that's another Hong Kong entity?

 3   A       Yes.

 4   Q       And I guess that also is part of this asset-protection

 5   plan?

 6   A       That's what I was told.

 7   Q       And then, in January of 2007, another Hong Kong entity,

 8   named Ample Dynamic, is created.

 9           Did you know that?

10   A       You said January of 2000 . . . .

11   Q       -- and seven.

12   A       I mean, that's the time of the . . . you know, the

13   ongoing lawsuits, so . . . you know, it was something Beda

14   Singenberger . . . recommended.

15   Q       Well, at that time, actually, hadn't Mr. Rodger and

16   Dr. Fredrick already entered into that napkin agreement?

17   A       They had an ongoing agreement.  It wasn't done.  And

18   there were still outstanding lawsuits against both the Saba

19   University School of Medicine and The Foundation, and the

20   Medical University of the Americas were totally separate from

21   that sale.

22   Q       And then, in August of 2008, your husband calls you, I

23   guess, about this situation.

24           Do you remember seeing the entry in the client work

25   bench?
```

```
 1   A       You'll have to show it to me.
 2               (Ms. Finley reviews various documents.)
 3               MS. FINLEY:  Okay.  If we can go to 3W, Page 183.
 4               (An exhibit was projected onto the projector screen.)
 5               (Ms. Finley provides an exhibit to the witness.)
 6               (The witness examines an exhibit.)
 7               MS. FINLEY:  And then if we can look at the entry on
 8   August 29th, 2008.
 9               (The witness examines an exhibit.)
10   BY MS. FINLEY:
11   Q       So the document says that someone at UBS spoke to the
12   client about the situation with UBS.
13               Is that what the entry says?
14   A       Yes.
15   Q       Okay.  And after . . . after the UBS situation hit the
16   news, you and your husband caused all of the UBS accounts to be
17   closed and moved to other Swiss banks.
18   A       No.
19   Q       So the accounts were not closed and moved to other Swiss
20   banks?
21   A       I can't answer yes or no.  May I explain?
22   Q       Sure.
23   A       I mean, you're asking me two questions.  The first time
24   that I ever knew about a criminal investigation, or anything
25   about F-Bar, was in 2009, in September.  I really didn't know
```

1    about those.  And my husband and I never caused the closing of

2    accounts.  We didn't own those funds.  I don't know how that

3    was done.

4    Q     All right.  So you don't know if your husband, in

5    October of 2008, wrote a letter to Mr. Luetolf, saying he

6    wanted to close the accounts and move them to another bank.

7    You have no personal knowledge of that.

8    A     You'd have to show it to me.  I don't recall seeing it.

9    Q     I mean if you remember.  You don't remember.

10   A     Is it part of the evidence?

11   Q     It is.

12   A     Can you show it to me?

13   Q     But you're testifying, you didn't close any of the bank

14   accounts.

15   A     I didn't write any -- I didn't have that knowledge, and

16   I didn't write anything to Dieter Luetolf.

17   Q     And you didn't discuss with your husband:  Wow, this

18   situation with UBS might make us vulnerable, The Foundation

19   vulnerable.  For asset-protection purposes, we should move it

20   to another bank.

21   A     I didn't have -- what time are you talking about?

22   Q     In October of 2008.

23   A     No, I did not have that conversation, that I can recall.

24   Q     And your husband didn't have that conversation, saying,

25   "Wow, I just heard that UBS is in some trouble.  We need to

1    close all of the accounts of The Foundation because they are

2    vulnerable for asset protection now"?

3            MR. HOCHMAN:  Objection, vague as to timing, who the

4    husband is having conversations with.

5            THE COURT:  Sustained as to the latter part.

6    BY MS. FINLEY:

7    Q    In October of 2008 -- or in the summer -- in the summer

8    of 2008, Dr. Fredrick didn't say to you, "I think The

9    Foundation's funds are vulnerable for asset protection, and we

10   need to close the account"?

11   A    I don't recall a conversation.  I knew that . . . I

12   mean, I knew there were some changes.

13           MS. FINLEY:  Okay.  So if we can go to Page 160

14   of 3W.

15           (An exhibit was projected onto the projector screen.)

16           MS. FINLEY:  And does this appear -- sorry.

17           (The witness examines an exhibit.).

18           THE WITNESS:  Yes.  I have the document.

19   BY MS. FINLEY:

20   Q    All right.  So, in October of 2008, Dr. Fredrick

21   instructed the bank to close the account and move the money to

22   Liechtenstein?

23           MR. HOCHMAN:  Objection, based on foundation, as to

24   whether or not the witness is just reading a document or knows

25   within her own recollection.

1          THE COURT:  Overruled.

2   BY MS. FINLEY:

3   Q     That's what you asked me to show you.  That's what --

4   A     Yes.  I mean, I see the letter.  It's to someone I never

5   met.

6   A     I don't have any recall of this letter at that time.

7   Q     And as the caretaker of The Foundation's money,

8   Dr. Fredrick never updated you on this part, that he was moving

9   the monies?

10  A     There was some movement, but I think it had to do with

11  better management.  I think the board had discussions about

12  Mr. Singenberger being a better manager.  I'm not sure exactly

13  how that happened.

14  Q     And do you think that was around the same time?

15  A     I don't know for sure.

16  Q     All right.  Because Mr. Singenberger had been managing

17  the assets since 2005 or '6.

18  A     About then.

19  Q     And so did Dr. Fredrick or Mr. Luetolf, or

20  Mr. Singenberger, tell you that now the assets had to be moved

21  from UBS, to either Liechtenstein Landesbank or Fortis Banque,

22  because there was something unsafe about UBS now?

23  A     No.  I don't remember any such conversation.

24  Q     Do you know what asset-protection purpose it might have

25  had, to move it from UBS?

1   A      I think it was still part of the asset-protection plan.

2   Q      To move it, as part of the asset-protection plan?

3   A      I don't know.  Mr. Singenberger was sort of the major

4   force in decisions at that time.  That's all I heard from

5   Dr. Fredrick, so . . . .

6   Q      That they just had to be moved.

7   A      There was a decision to move them, and it was

8   still . . . within -- it was still part of an asset-protection

9   plan.

10  Q      Okay.  And then, I guess, Dr. Fredrick or

11  Mr. Singenberger tell you that Switzerland is no longer safe

12  for asset protection, so you have to move all of your assets to

13  Liechtenstein?

14  A      No.  I didn't have that understanding at all.

15  Q      All right.  And what asset-protection purpose does

16  moving the accounts from Switzerland to Liechtenstein serve?

17  A      I believe it's -- it's -- it's protected there.  That

18  was part of their plan.  I . . . .  You know, I just wasn't

19  party to those conversations.

20  Q      But Dr. Fredrick -- yesterday you relayed a lot of

21  information that Dr. Fredrick told you about all these

22  asset-protection plans, and today you don't seem to remember

23  why.

24              MR. HOCHMAN:  Objection, argumentative question.

25              THE COURT:  Overruled.

1      THE WITNESS:  I don't know that I relayed a lot of

2  information.  I know the basic information.  I think these

3  banks were still in Switzerland.  I mean, it has . . . .  It

4  has a Zurich -- you know, the bank is in Zurich.  I'm not

5  sure . . . .  You know, it was in Zurich . . . still in

6  Switzerland.

7  Q      So you did know that the accounts were moved, but they

8  were moved to a Liechtenstein bank in Zurich.

9         Is that what you know?

10  A      Another bank.

11  Q      But you don't know now why moving it out of UBS, in

12  August of 2008, or in October of 2008, somehow protects it

13  more.

14  A      It protects it.  That's my understanding.

15  Q      Did he tell you why UBS was no longer adequate?

16  A      No.

17  Q      Did he tell you it was because UBS was about to enter

18  into a Deferred Prosecution Agreement with the United States,

19  and turn over U.S. taxpayers' information to the United States

20  Government?

21  A      No.  I never knew those facts until 2009.

22  Q      And do you know that, when all of these bank accounts

23  were opened, that nobody asked for your Social Security number?

24  A      I mean, I had provided all of that information earlier,

25  to Dieter Luetolf.

```
1    Q       And why would you need to provide your Social Security

2    number for The Foundation; doesn't The Foundation have its own

3    number?

4    A       I mean, I don't know.  It was . . . part of the . . .

5    process with Dieter Luetolf, way . . . way back, when he said

6    that identifiable people without a criminal background needed

7    to be on the UBS account as signatories.

8    Q       And you know that foreign banks don't report interest

9    income or interest-earning accounts to the IRS.

10   A       I don't know that.

11   Q       And aren't there two forms of asset protection going on

12   here, and one of them is to protect your assets from the IRS?

13   A       No, it's not.  It's to protect The Foundation assets.

14   Q       And I think you testified earlier that The Foundation

15   had bank accounts in the United States; is that right?

16   A       Yes.

17   Q       And as the caretaker of The Foundation, you were on

18   those bank accounts as well.

19   A       Yes.  I had signature authority.

20   Q       And for those, did you ever raise, with Mr. Luetolf, or

21   Mr. Singenberger, or your husband, to say, "You know, we have

22   like ten accounts here, in the United States, those are not

23   being asset protected"?

24   A       Well, I don't know that we had ten accounts, or -- you

25   know, I didn't do the day-to-day financials of the school.  I
```

1    didn't pay bills.  I don't know what those day-to-day balances

2    were.

3    Q     So you weren't concerned about the U.S. assets for

4    purposes of asset protection.

5    A     I don't -- I think the money moved out very quickly.  No

6    bank loans had to come to the United States.  But I think --

7    you know, then they were disbursed to students.  But I don't

8    believe we -- we ever had large bank balances.

9    Q     So you know enough about the financials to know the bank

10   balances, but not enough to know how much money is in it?

11        I -- I'm just . . . .

12   A     That was not -- I traveled.  I did the academic part,

13   and I did accreditations.  The day-to-day bank balances were

14   done by accountant, bursar, Dr. Fredrick, accounting firms.

15   They were not done by me.

16   Q     So you knew -- but you knew that there were not a lot of

17   funds in the domestic accounts.

18   A     Well, one way or another, I didn't know.  But I don't

19   believe large amounts were kept very long in the United States.

20   Q     And so that wasn't part of the asset-protection plan?

21   A     I don't know one way or the other.  It was how the

22   business was conducted.

23   Q     And this form of asset protection, it resulted in the

24   entities for The Foundation and the bank accounts, those were

25   not disclosed to your return preparer, Mr. Murtha.

1    A       What entities?  Can you be more specific?

2    Q       Did you tell Mr. Murtha that The Foundation had a bank

3    account at UBS?

4    A       I don't believe he ever asked that question.

5    Q       But he asked you if you had a foreign account.

6    A       He asked me if we had personal foreign accounts.

7    Q       And you heard him testify that he believes he asked you,

8    "Do you have a foreign account," that he didn't add the word

9    "personal" in.

10   A       I don't know if it was him, and I don't remember -- we

11   started, you know, doing our accounts with Flischel and Murtha,

12   in the late nineties.

13   Q       Okay.  And you didn't tell Mr. Murtha about New

14   Vanguard, did you?

15   A       I was never asked.  I don't know why I would have told

16   him.

17   Q       And when you were opening all these accounts, or signing

18   records, in 2003 -- for MTA; or Apex; or, in 2005, as a

19   signatory on MUA -- you never went back to Mr. Murtha and said:

20   You know, I just signed a signature card for a foreign bank

21   account.

22   A       We just had brief meetings with him for personal taxes.

23   Q       I'm asking you if you ever went back to him and told him

24   that.

25   A       No.

```
1    Q      And you heard Mr. Minchenberg testify that he was
2    completely unaware that Saba or MUA had an account at UBS prior
3    to the audit.
4              MR. HOCHMAN:  I'm sorry, prior to August of?
5              MS. FINLEY:  Prior to the audit.
6              MR. HOCHMAN:  Prior to the audit?
7              THE WITNESS:  And what time is that?
8    BY MS. FINLEY:
9    Q      I think the 2004 audit with Mr. Schneider, that he
10   testified that that was the first time that he heard about the
11   offshore account.
12   A      Mr. Minchenberg admitted, in court, he stole a lot of
13   documents from Dr. Fredrick, so I don't know --
14   Q      That's not the question I'm asking you.
15          I am asking you:  Did Mr. Minchenberg say that he did
16   not know about the foreign accounts until the audit?
17             MR. HOCHMAN:  I believe that misstates the testimony,
18   Your Honor.
19             THE COURT:  I'm sorry, Mr. Hochman, I didn't hear
20   what you said.
21             MR. HOCHMAN:  I'm sorry.  I believe it misstates
22   Mr. Minchenberg's testimony as to when he learned about the
23   foreign bank accounts.
24             THE COURT:  Overruled.  The witness could so respond
25   if that's her memory.
```

1            THE WITNESS:  I don't remember that he put a date,

2   but I remember he testified, you know, he didn't know about the

3   accounts with the audit.

4   BY MS. FINLEY:

5   Q      And do you remember Mr. Dalbec testifying that he didn't

6   know what Top Fast was?

7   A      Yes.

8   Q      And so the board of directors wasn't knowledgeable about

9   all of these entities that were being used for asset protection

10  for The Foundation.

11           MR. HOCHMAN:  Objection, foundation, calls for

12  speculation as to what the board knew.

13           THE COURT:  Overruled.

14           THE WITNESS:  I think Dr. Dalbec -- let's see, Top

15  Fast was a late entity.  When was that created?

16  BY MS. FINLEY:

17  Q      That was in 2005.

18  A      Dr. Dalbec testified that, when we -- in the late

19  nineties, when we started our accreditation processes, the one

20  that we keep calling ACCM, that the directors and the board of

21  trustees were meeting together, and that two distinct entities

22  had to split Dr. Fredrick -- no director could be on the board

23  of trustees, and the board of trustees was responsible for the

24  academic program, and the academic integrity and decisions, of

25  the school of medicine.

1    Q       So Dr. Dalbec, as the chairman of the board, wouldn't

2    know about those things?

3    A       I don't know.

4    Q       Were you at these meetings?

5    A       I would come sometimes, as an invited guest, to give

6    reports on accreditations or hospital affiliations.

7    Q       And when you were at the meetings that you were at, did

8    you hear Dr. Fredrick tell them, "Hey, we're going to open

9    another account and create another entity.  Beda Singenberger

10   said it was for asset protection"?

11   A       Well, if it was a board of trustees meeting after that

12   time, I don't think he was there.  And as an invited guest, I

13   gave a report and left.

14   Q       And so you don't know if the board of trustees or the

15   board of directors ever knew about any of these

16   asset-protection entities.

17   A       I did not attend most of those meetings.

18   Q       And if we . . . you would expect that, if these are the

19   assets of The Foundation, whether it's for asset protection or

20   not, that the auditors would know about these entities.

21   A       Yes.

22   Q       And that Top Fast, and New Vanguard, and Medical

23   Technology Associates, and Ample Dynamic, and Apex Consultants,

24   those would be listed out on the Saba Foundation's financials.

25   A       I don't know anything about audits.  I did not

1    participate in that process.

2    Q      But you would expect that that information would be

3    conveyed to the auditors.

4              MR. HOCHMAN:  Objection, asked and answered.

5              THE COURT:  Overruled.

6              THE WITNESS:  I would expect . . . .  You know, I did

7    not participate in the audit.  I didn't even know

8    Mr. Schneider.

9    BY MS. FINLEY:

10   Q      And so the only people that know about the entities, and

11   all the bank accounts we reviewed, are you -- correct?

12   A      Yes.

13   Q      -- Dr. Fredrick --

14   A      Yes.

15   Q      -- Mr. Singenberger --

16   A      Yes.

17   Q      -- and Mr. Luetolf.

18   A      I would include Thomas Eric Johnson, a director, and

19   then Dr. Haraldo Bautista joined as a director.  As I said,

20   there were directors and trustees.

21   Q      And so Mr. Johnson and Dr. Bautista, they also know

22   about all these entities?

23   A      I wasn't at the meetings, but I think you've got

24   correspondence verifying that from Dr. Bautista.

25   Q      And the board -- because you're a signature authority,

1    and Dr. Fredrick is a signature authority, or

2    Mr. Singenberger's a signature authority, if the board wanted

3    money from any of these accounts, they would have to go through

4    one of the three of you; is that correct?

5    A       What three?

6    Q       You, because you have signature authority on a lot of

7    the accounts; is that right?

8    A       I'm a signature authority, but they wouldn't go through

9    me.

10   Q       What if Dr. Fredrick wasn't around and they needed

11   money?

12   A       I don't remember that ever happening.

13   Q       I'm not asking if it ever happened.

14           I'm asking:  If Dr. Fredrick wasn't around, you have

15   sole signature authority over those bank accounts; correct?

16              MR. HOCHMAN:  Objection as to which exact bank

17   accounts we're now talking about.

18              THE COURT:  Overruled.

19   BY MS. FINLEY:

20   Q       I mean, you can look at MTA, or the account that --

21   let's take your account, the one that's in your name, for The

22   Foundation.

23           If The Foundation had wanted money from that account,

24   they would have to come to you to get it; correct?

25   A       I didn't understand that at the time.  What I was told,

1    by Mr. Luetolf, and then exactly the same by Mr. Singenberger,

2    was, in the case of the demise of Dr. Fredrick, that I would

3    need to come with a certified death certificate, or, you know,

4    something that said that he was totally disabled; there would

5    need to be a resolution from the board of directors; and, you

6    know, that I would need to bring a director with me to

7    Switzerland, to manage those funds.

8    Q       Well, couldn't Dr. Fredrick have just done that by

9    making you the power of attorney, instead of making you a

10   co-signatory?

11   A       I don't know that much about Swiss banking law.

12   Q       But you understood enough that your name and signatory

13   on documents, that you're not sure you looked at when you

14   signed, somehow gave you the authority if Dr. Fredrick were to

15   pass away; that's what you understood?

16   A       I'm really lost in your question.

17   Q       Okay.  Now, you testified that you relied on Mr. Murtha;

18   is that right?

19   A       For our personal taxes; yes.

20   Q       Okay.  And if one of your patients didn't fully disclose

21   all the medications she was on, and you prescribed a medication

22   that conflicted with that medicine, then you wouldn't be

23   responsible if your patient got ill because of that; correct?

24   A       I don't know what medicine has to do with -- with

25   Mr. Murtha.  I mean, you know, if one of my patients gets ill,

1    or has an adverse reaction, I'm the physician.

2    Q      Right.  And just like -- a patient goes to you because

3    you have specialized knowledge; correct?

4    A      Yes.

5    Q      And a patient goes to you and asks questions and

6    provides you information because they can't prescribe

7    themselves medication; correct?

8    A      Yes.

9    Q      And you go to Mr. Murtha because he has specialized

10   knowledge; correct?

11   A      Yes.

12   Q      And you testified yesterday that you didn't understand

13   taxes, so you go to him and provide him with the relevant

14   information to prepare your tax return.

15   A      My personal taxes; yes.

16   Q      And if you did not give Mr. Murtha all the relevant

17   information to prepare your tax return, then your tax return

18   might not be accurate; correct?

19   A      I believe I gave him as much relevant information as

20   possible.

21   Q      So you choose which information you give Mr. Murtha?

22   A      I give him what he asks for.  For personal taxes, he

23   gives us a little list of things -- you know, a little standard

24   list would come out before we met with him, and we would bring

25   those things.

1   Q      And you -- again, you heard Mr. Murtha testify that it

2   was his regular practice to sit down with new clients and ask

3   them whether they had a foreign bank account.

4   A      I did not understand that from him --

5   Q      Okay.

6   A      -- I think he was unsure.

7   Q      All right.  And you also heard him testify that he would

8   never have checked the box "no," on your tax return, if he

9   didn't have that conversation with you.

10  A      Now . . . .  Could you just restate the question --

11  Q      Sure.

12  A      -- in simpler terms?

13  Q      Mr. Murtha testified that he would never have checked

14  the box "no," on your Schedule B, that you do not have a bank

15  account, if you had not told him that you did not have one.

16         MR. HOCHMAN:  Objection as to a series of questions

17  about what this witness recalls about what another witness has

18  said in this trial, unless there's another question that

19  follows.

20         THE COURT:  If I understood the objection, it's

21  sustained.  I didn't hear any question after your statement.

22  BY MS. FINLEY:

23  Q      When Mr. Murtha asked you the direct question, "Do you

24  have a foreign account," you did not ask any follow-up

25  questions of him; correct?

1          MR. HOCHMAN:  Objection, timing as to when Mr. Murtha

2   allegedly asked this question.

3          THE COURT:  Overruled.

4          THE WITNESS:  I don't remember Mr. Murtha asking us

5   that -- or asking me, personally, that question.

6   BY MS. FINLEY:

7   Q    All right.  So, in 2001 or 2002, when you first -- when

8   he first started preparing your tax returns, you don't remember

9   him asking that question.

10  A    I don't remember.

11  Q    Okay.  And, in 2008, when he testified that he asked you

12  that question again, because of the UBS situation, you don't

13  remember him asking you that question again.

14         MR. HOCHMAN:  Objection as to the year 2008,

15  misstates the testimony.  I believe it was in 2009.

16         THE COURT:  Do you care to rephrase, or stick with

17  what you've got?

18         MS. FINLEY:  I will rephrase, Your Honor.

19         THE COURT:  All right.

20         MS. FINLEY:  If that's what -- I think the jury will

21  remember what the evidence says.

22  BY MS. FINLEY:

23  Q    Well, in a later year, 2008 or 2009, you don't remember

24  Mr. Murtha ever asking you that question again.

25  A    No.

1    Q      And if he had asked you that question, you would have

2    asked for clarification; correct?

3                MR. HOCHMAN:  Objection, calls for speculation.

4                THE COURT:  Overruled.

5                THE WITNESS:  Yeah.  I usually want more information.

6    I mean, I didn't . . . .  If I don't understand.

7    BY MS. FINLEY:

8    Q      Because that's a pretty direct question, correct, "Do

9    you have a foreign account?"

10   A      Yes.

11   Q      It's pretty open . . . it's an open-ended question?

12   A      No.  That's a yes or no.

13   Q      And so it -- you might -- you wouldn't have said, "Well,

14   I just signed some bank documents for a foreign account.  It's

15   not for me because I'm just a caretaker."

16          Is that what you mean, you didn't ask for clarification

17   like that?

18   A      We never had a discussion like that.  It was personal

19   taxes, and it was pretty much in and out.

20   Q      And you didn't tell him, like you've told the jury,

21   "Well, I have this caretaker role for The Foundation, and I'm

22   on some accounts for asset-protection purposes.  Do I still

23   have to report that on my tax return?"

24   A      We never had the conversation.

25   Q      And you said on direct that, by 2004, that you actually

1  understood that you were on bank accounts in Switzerland; is
2  that correct?
3  A     They were The Foundation funds.
4  Q     But you understood -- let's presume they're The
5  Foundation's monies; okay?
6        You understood, at that point, that you were on a bank
7  account for The Foundation.
8             MR. HOCHMAN:  Objection as to what the word "on"
9  means, Your Honor; vague.
10            THE COURT:  Overruled.
11            THE WITNESS:  In 2004, when they were doing the
12  changes, I didn't see the word, "Saba School of Medicine
13  Foundation," but Dieter Luetolf assured me that it was The
14  Foundation's account.
15  BY MS. FINLEY:
16  Q     All right.  So now you did raise questions about what
17  was on the forms, and Mr. Luetolf assured you they were The
18  Foundation's?
19        Because before you testified there was nothing on the
20  forms.
21  A     Well, I asked him what was missing, and remember I
22  talked about having a conference call about all the changes.
23  Q     And what changes are these?
24  A     I mean that Dr. Fredrick was . . . .  The big lawsuit
25  was on, and somehow those accounts were being split, that was

1    his recommendation, for asset protection.

2    Q      And then, in 2005, we reviewed today that you were a

3    signatory on a MUA account; correct?

4    A      Yes.  It was MUA funds.

5    Q      And, in 2005, you didn't volunteer to Mr. Murtha that

6    the circumstances had changed, and you now were a signatory on

7    a bank account.

8    A      We never had a discussion.  I didn't know about

9    signatory reporting.

10   Q      Okay.  Now, I just want to understand, if we can,

11   Mr. Hochman asked you, yesterday, about a lot of tax concepts.

12          And I just want to understand what it is you do

13   understand and don't understand; okay?

14          So I think you testified, yesterday, that you do not

15   understand that you signed a tax return under penalties of

16   perjury; is that correct?

17          MR. HOCHMAN:  Objection.  Misstates the testimony,

18   Your Honor.

19          THE COURT:  Overruled.

20          THE WITNESS:  A long time, when I was audited, in the

21   early seventies, I remember something like that.  You know, at

22   the beginning of the audit, the young man said that,

23   and . . . .  You know, but I don't read it, I don't read fine

24   print real well.  But I don't read it every time I sign.  I

25   know that the IRS, you know, has a lot of authority, and, you

1    know, will go after you, and prosecute you, if you submit false

2    information.  I do know that.

3    BY MS. FINLEY:

4    Q      And so you then do know that you sign your tax return

5    under penalties of perjury.

6    A      I don't remember exactly under penalties of perjury;

7    but, yes, if it's not true there can be life-changing

8    consequences.

9    Q      And I think you testified that you don't -- or you

10   didn't know, at the time, before this investigation and trial,

11   that Schedule B requires you to report an interest in, or a

12   signature authority over, a foreign bank account.

13   A      Mr. Murtha never went over Schedule B with me.

14   Q      And you didn't understand, or Mr. Murtha didn't ever ask

15   you, if you had a foreign account.

16   A      I don't remember that discussion with him.

17   Q      And I think, yesterday, that you also testified that you

18   would review your tax return, and that you might have glanced

19   at your Schedule B because you were curious.

20          Did I understand your testimony yesterday?

21   A      Well, it had interest.  And about that, I would just

22   look, you know, is my income right -- you know, there was some

23   interest from bank accounts, and donations, and that was it.  I

24   mean, the rest of them are all done, you know, on a computer,

25   and I didn't understand how it was computed.

1  Q      So you looked at the Schedule B, but didn't notice the

2  bottom part that asked the questions?

3  A      I didn't look at it in detail.

4  Q      And with respect to some tax concepts, I think you said

5  that you didn't understand what taxable interest is; correct?

6  A      I believe Mr. Hochman asked me about a lot of different

7  interest terms.

8  Q      And you don't understand what those are.

9  A      Well, I guess if it's a -- well, I mean, if the bank

10 gives me interest, it's taxed.

11 Q      So you do understand that, when you earn interest in a

12 bank account that's your money, it's taxable to you.

13 A      If it's my personal accounts with interest, and I get

14 the form from the bank, I include them in my tax returns.

15 Q      And what if you don't get a form from the bank, would

16 you still tell Mr. Murtha that you earned interest?

17 A      I would contact the bank first.

18 Q      And if the bank never gave anything to you, would you

19 just not tell Mr. Murtha?

20 A      That did happen once, when a bank closed, but I just

21 showed him statements.  It's a little bank in Gardner.

22 Q      And you don't understand what "basis" is, correct, in an

23 asset?

24 A      True.  That's correct.

25 Q      And you don't understand what capital gains are;

1    correct?

2    A      Not in detail.

3           MS. FINLEY:  All right.  I am going to show you

4    what's been marked as Exhibits 5C and 5D.

5           (Ms. Finley provides exhibits to the witness, which

6       the witness examines.)

7           MS. FINLEY:  And if we can just look at 5D first.

8           (An exhibit was projected onto the projector screen.)

9    BY MS. FINLEY:

10   Q      Is this a letter to you from Mr. Flischel?

11   A      It has my letterhead and my name.  There's no signature.

12   Q      And it's dated August 27th, 1999?

13   A      Yes.

14          MS. FINLEY:  Your Honor, at this time the government

15   would offer 5D into evidence.

16          THE COURT:  Any objections?

17          MR. HOCHMAN:  No objection, Your Honor.

18          THE COURT:  5D, as in "David," will be admitted.

19          (Government's Exhibit 5D admitted into evidence.)

20          MS. FINLEY:  Permission to publish?

21          THE COURT:  You may.

22          (An exhibit was projected onto the projector screen.)

23   BY MS. FINLEY:

24   Q      Now, I think Mr. Murtha testified that you would compile

25   information to provide to him for preparation of the tax

1    return.

2         Is that what you also did for Mr. Murtha -- for

3    Mr. Flischel?

4    A     We would just get a basic list of things to bring.

5    Q     And if we look at the second paragraph, and the second

6    sentence:

7         "Our most complex issue is in the area of capital gains

8    and losses from selling the Merck (gain) and the international

9    pursuit at a substantial loss.  I think we miscalculated what

10   we could deduct as a loss this year."

11        So is it fair to say that you do understand what capital

12   gain and loss is?

13   A     I understand the basis.  I think this was something that

14   Dr. Fredrick and I were reviewing.  Because I . . . you know,

15   we did sell some stock, so . . . as it says . . . it was a

16   complex . . . and I think there was a miscalculation.  I don't

17   remember the specifics.  It's 1999.

18   Q     But you do remember the specifics about the

19   conversations regarding asset protection in 1999.

20   A     No.  I mean, not specifics.  I know it was a huge issue

21   because of lawsuits, from . . . you know, for years.

22   Q     Now, if we continue reviewing, you don't understand what

23   the AMT, or the alternative minimum tax, is; is that right?

24   A     No.

25   Q     But you do understand what the Antillean right of

1   superficies is.

2   A      I . . . I've seen an English translation.  It's

3   extremely complex.

4   Q      But you understand that complex concept.

5   A      No.  I was . . . .  Actually, it was Mr. Speetjens that

6   went over it, and he was the one that created it.

7   Q      And you do understand how placing The Foundation's

8   assets in various jurisdictions and in nominee entities somehow

9   protects The Foundation's assets for asset protection.

10  A      I understand the basic concept that we could have our

11  assets frozen in the Netherlands Antilles banks.

12  Q      And you understood that all of these documents you'd

13  been signing were going to protect The Foundation's monies.

14  A      I always understood them as to be The Foundation's

15  monies, and . . . various asset-protection accounts.

16  Q      And you do also understand that concept of gift tax;

17  correct?

18  A      I mean, I understand the amounts.

19  Q      And you understand that you and your husband could each

20  give gifts to your sister and her husband that would

21  total . . . the total exemption for that year; is that correct?

22  A      Yes.

23  Q      And you do understand that paying for your mother's care

24  is nontaxable . . . or not a gift, not a gift for gift tax

25  purposes.

1  A       I discussed it with our personal lawyer . . . in

2  Englewood . . . before I did it.

3          And he said I could -- he told me I could even claim her

4  on my tax return if I was paying for her care, but I didn't.

5          But, yeah, I ran that through him.

6  Q       And you understand what deferred compensation is.

7  A       Basically, yes.

8  Q       And you understand that a loan is not income.

9  A       We've had a lot of house loans and, you know,

10 never . . . .  I mean, we've never paid . . . included them as

11 income.

12 Q       And you testified that you hire your accountant because

13 taxes are complicated; correct?

14 A       We use an accountant -- I've used an accountant for

15 years because I . . . need help.

16 Q       And you don't understand what it means to have signature

17 authority on a bank account; is that correct?

18 A       Well, I mean, signature authority doesn't mean I own the

19 account.

20 Q       I'm just -- I'm asking you when -- if we presume that

21 Mr. Murtha asked you, "Do you have a foreign account," you did

22 not understand that question.

23 A       I don't remember him asking me that question.

24 Q       And Mr. Hochman asked you some questions about your

25 2005 tax return, about your Schedule C.

1          Do you remember those questions?

2    A     Mr. Who?

3    Q     Hochman?

4    A     Oh, Hochman.  All right.

5    Q     He asked you some questions about the fact that you only

6    took three percent of your total income as expenses.

7          Is that -- do you remember those questions?

8    A     Yes.

9    Q     Okay.  And, in 2005, your Schedule C is actually made up

10   of a 168,000-dollar 1099 from EIC; isn't that correct?

11         Isn't that where you earned your money?

12   A     I don't have it in front of me.  I mean, you can put it

13   on display, if that was the total amount.

14         MS. FINLEY:  If we can put 1D on the screen.

15         (An exhibit was projected onto the projector screen.)

16         MS. FINLEY:  And the Schedule C, which is Page 5 --

17   I'm sorry -- 6, page 6.

18   BY MS. FINLEY:

19   Q     So in 2005, your gross receipts as a psychiatrist was

20   $178,130.

21         Is that what's reported on your Schedule C?

22   A     Yes.

23   Q     And the large bulk of the money you earned in that year

24   came from EIC; correct?

25   A     Yes.

1  Q      And EIC actually paid all of your expenses, did they

2  not?

3  A      I mean, what do you mean by expenses?

4  Q      So if you were flying around for the accreditation, they

5  paid that?

6  A      I submitted travel expenses for the medical schools.

7  Q      And so you were -- those were not out-of-pocket expenses

8  that you were not reimbursed for.

9  A      I was reimbursed when I remembered to . . . put in my

10 expense vouchers and receipts.

11 Q      And so you wouldn't actually have expenses to claim on

12 your Schedule C because EIC paid for your expenses.

13 A      They were -- they paid for business-related expenses.

14 Q      And so if they were paying for them, you then can't

15 deduct them off of your . . . gross receipts.

16 A      Yes.

17 Q      So it's not that they are so low, it's that you never

18 paid them.

19        You're not deducting expenses that you didn't pay for;

20 correct?

21 A      I'm only deducting what I thought were legitimate

22 expenses for donations and professional expenses.

23 Q      Now, you said that you were absentminded about receipts

24 and deductions; is that what you testified to?

25 A      Yes.  I'm a absentminded about keeping them.

1    Q      All right.  If we look at Exhibit 5H, which I think you

2    probably have in front of you, or we can put it up on the

3    screen.

4           And is this your handwriting?

5    A      Yes.

6    Q      And this is titled "Hough Donations"; correct?

7    A      Yes.

8    Q      And you and your husband filed separate tax returns.

9    A      Yes.

10   Q      And you actually list out all the different donations

11   for that year; is that correct?

12   A      Yes.

13   Q      And you remembered that you donated $75.93 to the

14   leadership fund at Phillips.

15   A      Well, they would have sent me a receipt.

16   Q      So you did keep good track of your receipts.

17   A      I'm talking about, you know, Burger King, you know, gas,

18   things like that.  I was not -- I'd just stuff them in my

19   purse.  But anytime I donated to charity, they always send you

20   a receipt, and those would go into just a general file we kept

21   for taxes.

22   Q      And the Phillips -- the items under Number 1 and 2, this

23   doesn't say, "Hough and Fredrick Donations," it says, "Hough

24   Donations"; correct?

25   A      Yes.

1              MS. FINLEY:  And if we can look at Exhibit 5I.

2              (An exhibit was projected onto the projector screen.)

3     BY MS. FINLEY:

4     Q     And is this a copy of the check that you -- one of the

5     checks that you gave to Phillips?

6     A     Do I have that?

7     Q     I'm sorry.  Yes, you do.  5I should be in there.

8              (The witness examines exhibits.)

9

10    A     Yes, I have it.

11    Q     And there's nothing in this letter that says,

12    "Dr. Fredrick and I give a gift," is there?

13    A     It came from our joint account.

14    Q     I know.  But I'm asking you, does the letter -- when

15    you're sending it in to Mr. Clark, the president, you are

16    saying -- you use the word "I," in this letter; correct?

17    A     Yes.

18    Q     Now, with respect to the Round Hill property, I think

19    yesterday you said you were both a caretaker and an owner; is

20    that correct?

21    A     Yes.

22    Q     And so is that a different definition of the word

23    "caretaker" than we've been using for The Foundation, or is it

24    the same definition?

25    A     Okay.  You've just switched off of donations, now we're

1    on Round Hill?

2    Q        Um-hum?

3    A        Do you have an exhibit?

4    Q        I'm just asking:  Yesterday you testified that you were

5    caretaker and the owner, I just want to understand what, with

6    respect to Round Hill, what you mean by "caretaker."

7    A        Round Hill was a caretaker and an asset-protection

8    strategy for the medical school and its buildings.

9    Q        And so you also owned it?

10   A        The way it was set up, I had 50 percent of the shares.

11   Q        But you didn't -- so you had the shares but you didn't

12   own it?

13            I just want to understand.

14   A        I owned it.

15   Q        You owned it.

16            And so if you owned it, and you sold it to New Vanguard,

17   your shares, in 2005, then you would have told Mr. Murtha that,

18   "I sold my 50 percent shares in Round Hill to another entity";

19   correct?

20   A        I didn't make any money on that.  I mean, it was just a

21   share transfer.  I never made a penny on that.

22   Q        All right.  Well, I think -- do you remember that

23   the . . . asset cost $250,000, is that correct, the land?

24            I think you testified yesterday that you understood that

25   it happened so fast, and Dr. Fredrick had to buy it in

1   Ms. Whitley's name?

2   A       That's what I was told.

3   Q       And then somehow the shares get issued, and you now have

4   ownership.

5   A       Well, Laura Whitley was not involved in Round Hill.

6   Q       But she's on the documents; right?

7   A       Which documents?

8   Q       She was on deeds, that she bought it.

9   A       That's not Round Hill.  I mean, that's just a

10  geographical name the people use on small islands.  They have a

11  big round hill in the middle.

12  Q       All right.  The property on which the school sits --

13  A       Yes.

14  Q       -- it's ten acres; correct?

15  A       Yes.

16  Q       And Ms. Whitley . . . that property was purchased in her

17  name.

18  A       She was Laura Walls.  Yes.

19  Q       And then at some point Ms. Walls transfers the asset to

20  the Round Hill Project Holding Company; correct?

21  A       Yes.

22  Q       And you and Mister -- Dr. Fredrick are the 50 percent --

23  you each own 50 percent of the shares of the Round Hill Project

24  Holding Company; correct?

25  A       Yes.

1    Q       So now you own the ten acres of land.

2    A       With that right of superficies, I don't know, there was

3    something about land and buildings divided.  But, you know, it

4    might have -- you know, Round Hill was ten acres, and I owned

5    50 percent of it.

6    Q       And so when you -- when you sold your 50-percent share

7    in Round Hill Project Holding Company to New Vanguard, you

8    should have told Mr. Murtha that you sold the asset for

9    $500,000.

10   A       No, I did not.  I did not sell the assets for -- I mean,

11   I don't even remember that.  It was a share transfer, and there

12   was a transfer tax paid.  You're going to have to show me the

13   documents if that's not right.

14           MS. FINLEY:  Your Honor, I didn't know if you wanted

15   to take a break now, for lunch, and I can collect those

16   documents, and then I have just a little bit more.

17           THE COURT:  All right.  Let's break for lunch.

18           Please do not discuss the case among yourselves, or

19   allow anyone to discuss it with you or in your presence.

20   1:00 o'clock.

21           (At 12:00 PM, the jury was escorted from the

22       courtroom.)

23           THE COURT:  All right.  1:00 o'clock.

24           (At 12:01 PM, court was recessed.)

25                        AFTER RECESS

1                (At 1:05 PM, court was reconvened.)

2                THE COURT:  Both sides ready for the jury?

3                MS. FINLEY:  Yes, Your Honor.

4                MR. HOCHMAN:  Yes, Your Honor.

5                THE COURT:  Have the jury step in, please.

6                (The defendant resumed the witness stand.)

7                (At 1:06 PM, the jury was escorted into the

8        courtroom.)

9                THE COURT:  You may proceed.

10               MS. FINLEY:  Thank you, Your Honor.

11    BY MS. FINLEY:

12    Q     Dr. Hough, when we stopped just before lunch, we were

13    talking about Round Hill, and you asked me if I could show you

14    some of the documents.  So I pulled them.  I am going to show

15    you what's been admitted as 6L; 7X; 11AA; BB, as in "boy";

16    and CC.

17               MS. FINLEY:  Your Honor, may I approach?

18               THE COURT:  You may.

19               (Ms. Finley provides exhibits to the witness, which

20        the witness reviews.)

21               MS. FINLEY:  Okay.  So if we start at 6L . . . .

22               Permission to publish, Your Honor?

23               THE COURT:  You may.

24               (An exhibit was projected onto the projector screen.)

25

BY MS. FINLEY:

Q      And you would agree that this document shows that, in 1999, Ms. Walls, your stepdaughter, bought the property known as Round Hill.

A      Her name is on the document.

Q      But she didn't buy it?

A      I wasn't there for that sale.  I don't know what . . . how things change.  But her name is on the document.

Q      I think you testified, yesterday, that there was an rush to buy the property, and Dr. Fredrick told you that they needed to put it in Ms. Walls' name; is that correct?

A      That was quite a long time after the purchase.

Q      Okay.  And then, if we turn to 7X, in 2004 -- excuse me -- 2001 . . . you, as the -- one of the managing partners -- or managing directors of Round Hill Project Holding Company, Ms. Walls granted the right of superficies to the Round Hill Project Holding Company; is that correct?

A      Yes.

Q      And that allowed Round Hill Project Holding Company to build on the land.

A      No.  It wasn't Round Hill.  It was only a caretaker.  It was Saba University School of Medicine Foundation that built all the buildings.

Q      So now Round Hill is a caretaker also for The Foundation?

1  A       Round Hill was an asset-protection . . . company for The

2  Foundation.

3  Q       And you -- but The Foundation didn't own it, you owned

4  it.

5  A       I owned shares.

6  Q       Right.  And so you were actually the owner, not The

7  Foundation.

8  A       I just owned shares.

9  Q       But when you own shares, that means you own the company;

10 correct?

11 A       It was a caretaker company.  I mean, I didn't feel like

12 I had anything -- I mean, I owned 50 percent of the shares.  I

13 didn't own the whole company.

14 Q       And is that what you told Mr. Minchenberg, when

15 Mr. Minchenberg was preparing the Form 5471, because you

16 owned -- you were only a caretaker, you weren't an owner?

17 A       No.  I had shares.  He said if you -- he was the one

18 that told us about that.  I think you've got all that

19 correspondence.  And we filled out the forms.

20 Q       And that was only because you had shares in your name

21 that you didn't really own, and you -- but you were just

22 caretaking.

23 A       It's hard -- I owned shares, and the purpose of Round

24 Hill was as the protection layer for the medical school and the

25 medical school buildings.

```
 1              MS. FINLEY:  Okay.  Then if we can turn to 11, I
 2   think BB -- actually, I'm sorry, let's look at AA first.  I
 3   apologize.
 4              (An exhibit was projected onto the projector screen.)
 5   BY MS. FINLEY:
 6   Q      And AA are board meeting minutes for the Round Hill
 7   Project Holding Company; correct?
 8   A      Yes.
 9   Q      And it's dated February 8th, 2005; correct?
10   A      Yes.
11   Q      And you are there as a member, and Dr. Fredrick is there
12   as a chairperson.
13   A      No.  I was not there.
14   Q      You were not there.
15   A      No.  Mr. Hochman has had me check my passport, my
16   calendars, my travel schedules.  I was not on Saba at that
17   time.
18   Q      Did you have a phone call?
19   A      Not that I remember.
20   Q      All right.  And so you're making motions and raising
21   concerns that the school will still be able to use the
22   property.  You were not there for any of this.
23   A      I did not participate in this meeting, and I only saw
24   this . . . in discovery.  I'm not sure when I saw it, but not
25   at the time.  I was not there February the 8th, 2005.
```

1   Q      Okay.  Well, if we -- I guess you found out soon

2   thereafter that -- and agreed that Round Hill Project Holding

3   Company should sell its shares for the price of $500,000.

4   A      At some point afterwards, I was asked . . . another

5   asset layer was constructed, with -- I think it's New Vanguard?

6   And I was asked to transfer my shares to that company.

7   Q      And you didn't just transfer them, you sold them for

8   $500,000.

9   A      No.  I understood it was just a transfer . . . with no

10  monetary gain.  I did not receive any money.

11  Q      Did you understand, or did anyone explain to you, why is

12  it that Round Hill Project Holding Company wasn't enough

13  protection for The Foundation, and now it needed to be moved to

14  New Vanguard?

15  A      Because, at that time, again, there was that

16  $200 million lawsuit, and . . . per Mr. Singenberger and

17  others, that was . . . the company in Hong Kong was a much

18  safer entity.

19  Q      And you're aware that Hong Kong is also a tax haven;

20  correct?

21  A      No, I'm not.

22  Q      And, somehow, having an entity in the name of Round

23  Hill, I guess you're saying, was not enough protection, it now

24  needed to be in the name of New Vanguard, per Mr. Singenberger.

25  A      That was their recommendation.  And also from

1    Dr. Fredrick.

2    Q      Okay.  And if you look at Page 4 of Exhibit 11AA, is

3    this the share . . . sheet that lists out who has how many

4    shares?

5    A      Yes, it is.

6    Q      All right.  And so it looks like as of -- is that your

7    signature on the last line?

8    A      Yes.

9    Q      And so on April 15, 2005, New Vanguard was issued

10   additional shares.

11          MR. HOCHMAN:  Objection, foundation as to whether or

12   not she's just reading from the document or if the witness

13   knows it of her own personal knowledge.

14          THE COURT:  Overruled.

15   BY MS. FINLEY:

16   Q      The document that you signed says New Vanguard became a

17   shareholder; correct?

18   A      I think it got all the shares.

19   Q      Okay.  And do you remember that Dr. Fredrick, in the

20   sale of the school, still owned 1,750 shares that he reported

21   on his tax return.

22   A      1,750 shares of what?

23   Q      Of MUA -- excuse me.  I'm sorry.  I withdraw the

24   question.  You are correct.

25          You both sold your shares to New Vanguard.

1    A       We didn't sell them.  They were just signed over.

2    Q       And they're really The Foundation shares that are now

3    being put in another asset-protection entity.

4    A       They were shares that were transferred to another entity

5    for asset protection.

6    Q       And so The Foundation really owned the asset, and it

7    just kept changing the name it was in; is that what you're

8    saying?

9    A       It was a caretaker.  It was -- role.  The Foundation

10   owned all of the buildings.  And it was a function to protect

11   the buildings by separating it from the land with that right of

12   superficies.

13   Q       Okay.  Now, you talked a little about it yesterday,

14   about the various purchases that were made after the school was

15   sold in 2007.

16           Do you remember when you talked about that house in

17   Asheville?

18   A       When.

19   Q       And the house in Greenville?

20   A       Yes.

21   Q       And the plane --

22   A       Yes.

23   Q       -- the Piper?

24           Now, Dr. Fredrick, you said, told you that he had a lot

25   of deferred compensation.

1          Is that what he told you?

2     A     Yes.

3     Q     And did he tell you whether that deferred compensation

4     was for MUA or for Saba?

5     A       Primarily for Saba.

6     Q     And you would expect, then, that deferred compensation

7     would be listed on the financials for The Foundation; correct?

8              MR. HOCHMAN:  Objection, foundation, per this

9     witness's knowledge of that.

10             THE COURT:  Overruled.

11             THE WITNESS:  No, I would not know that.

12    BY MS. FINLEY:

13    Q      All right.  But if this Foundation owed Dr. Fredrick

14    large amounts of money, that would be a liability of The

15    Foundation; correct?

16         So it would be something The Foundation owed to

17    Dr. Fredrick.

18    A     You said "owed" and "liability."  I'm not sure what

19    you're asking.

20    Q     If The Foundation -- if Dr. Fredrick had not received

21    his compensation when he was entitled to it, and he was still

22    owed that money, that would still be something The Foundation

23    should have had to pay him; correct?

24    A     If he asked for it; yes.

25    Q     And that would be a liability.  That would be something

1    that a -- an IOU that The Foundation would have to

2    Dr. Fredrick.

3    A       I mean, I don't know that it would be a liability one

4    way or the other.  I mean, I guess it would be an IOU.

5    Q       And The Foundation would want to know how much that IOU

6    was for; correct?

7    A       I wasn't on The Foundation board; but, I mean, that

8    sounds correct.

9    Q       But you're the caretaker for The Foundation's money, so

10   would you not want to know if Dr. Fredrick was owed $5 million,

11   if the assets of The Foundation couldn't cover that?

12   A       I wasn't a director of the Saba Foundation, except for a

13   very short time when Dr. Dobrow died.  So really, I had a

14   signature as a caretaker.  That didn't mean I was directing

15   everything.

16   Q       And there are no deferred compensations that are listed

17   on the financials, if you know.

18   A       I haven't studied them in detail.  I just don't remember

19   if I've seen that.

20   Q       And Mr. Rodger wasn't told about deferred compensation

21   when he bought the schools, was he?

22   A       I don't know.

23   Q       And did Dr. Fredrick ever tell you that he didn't want

24   to take deferred -- he didn't want to take the money as

25   deferred compensation because deferred compensation is taxable?

1    A        No.

2    Q        And did Dr. Fredrick ever tell you that the reason that

3    he was taking the money out as loans was because loans are not

4    taxable?

5    A        No.

6    Q        Now, as caretaker of The Foundation, when Dr. Fredrick

7    told you that, for the house in Asheville, The Foundation owed

8    him a lot of money, he was going to take a loan to buy the

9    house, did you ask him what the terms of the loan were?

10   A        At that time, no.

11   Q        Did you ask him whether there were loan documents?

12   A        What time are you talking about?

13   Q        When the Asheville house was purchased.

14   A        I wasn't part of that purchase, but I know there were

15   loan documents at some point after, that were created with

16   Mr. Rudow.

17   Q        And did you make sure that Dr. Fredrick repaid the money

18   according to the terms of the loan?

19   A        It was always our intent to pay off the Asheville

20   property with the proceeds of the sale of our Manasota Key

21   home.  That has not sold . . . so the Asheville property went

22   on the market.

23   Q        Did you make sure that The Foundation was getting a good

24   interest rate for the money that it had lent Dr. Fredrick?

25   A        That's not my role.  I mean, I . . . I didn't do the

1   loan documents.

2   Q      I'm asking, in your role as the caretaker of The

3   Foundation.

4   A      Just caretaker and a signatory for funds, I didn't do

5   any day-to-day contracts, or loan documents, payments, wire

6   transfers.  It just wasn't anything I did.

7   Q      Now, you said that Ms. Whitley lived in the Greenville

8   house after that was purchased.

9   A      Yes.

10  Q      And did she pay rent to The Foundation?

11  A      She paid it into . . . I don't know if she paid it into

12  EIC, or where she paid it.  That was something she did with her

13  dad.

14  Q      And you said, in May of 2009, you and Dr. Fredrick went

15  to Switzerland; is that correct?

16  A      Yes.

17  Q      You went there and met with Mr. Singenberger?

18  A      Yes.

19  Q      Was Mr. Luetolf there?

20  A      No.

21  Q      And you're going to Switzerland in May of 2009, that has

22  nothing to do with the fact that UBS had already turned your

23  information over to the Department of Justice in February of

24  2009.

25  A      No.

1    Q      And it's at this meeting that you hear Mr. Singenberger

2    and Dr. Fredrick talking about giving his siblings a million

3    dollars; is that correct?

4    A      That is correct.

5    Q      So that's the first that you hear of that?

6    A      Yes.

7    Q      And I think you testified that you're very angry?

8    A      Shocked.  And angry.

9    Q      And you were angry because Dr. Fredrick had made a

10   financial decision without you?

11   A      Not -- we always made them together about families, and

12   to me it just felt like a violation of trust.

13   Q      And because you're a team?

14   A      You know, we're married . . . for a long time.

15   Q      And you felt that he was giving your money to his

16   siblings without discussing it with you.

17   A      No.  It was not my money.  I -- I had no idea where the

18   money came from, until he told me.

19   Q      And at that point, then, you're angry just because he's

20   giving money to his siblings?

21   A      No.  I mean, it's . . . .  You know, it's really an

22   emotional time.  At least three . . . let's see, not Melanie.

23   His siblings always had financial problems.  There were several

24   bankruptcies.  It was just an exorbitant amount of money to

25   give any one person at one time.  But I know their financial

1    history over the years.

2    Q       And so you testified that you then told Dr. Fredrick

3    that that million dollars was income to him.

4    A       Well, you know, the discussion occurred over a period of

5    time.  I had to cool down.  We had to go back to Frankfurt to

6    get our flight, so . . . he was apologizing, doing a lot of

7    explaining.  I wouldn't talk to him for a while.

8    Q       And I'm just trying to understand why you think that

9    that money is income to him.

10   A       Well, when he eventually said, "Well, you know, it's out

11   of all this deferred compensation that I've had from The

12   Foundation," I mean, at some point I said:  You know, then

13   that's -- I mean, okay, if it's deferred compensation then it's

14   income.

15   Q       So you understood that there might be a . . . an amount

16   above which Dr. Fredrick pulling money out would then be income

17   to him?

18   A       Well, I mean, also, that's way over the gift tax.  But

19   it's his tax, not mine.  I was just concerned.  It wasn't my

20   tax liability.  He was giving the money.

21   Q       And he didn't tell you that he had gone to the board and

22   said:  I have deferred compensation, some more coming to me, so

23   I'm going to take a loan for a million dollars to give to my

24   siblings.

25   A       He said it was authorized.  He said he had gone through

1    the steps, but he didn't want to say anything to me, so it was

2    kept . . . it was not told to me for two years.

3    Q     And if the board approved it because he had deferred

4    compensation, then . . . and it was loan, then it wouldn't be

5    income to him.

6    A     You know, at that point I didn't know if it was a loan

7    or a gift.  I just said:  You know, I think you ought to see a

8    really, really good tax attorney.

9    Q     Now, the Department of Justice, once you were under

10   investigation, invited you to come in to talk, and you said no;

11   isn't that correct?

12   A     No.  I was never invited to talk to the Department of

13   Justice.

14   Q     And even if you had come in and talked to the

15   government, as you sit here today, you believe that your tax

16   returns are accurate, because, under your theory, this is all

17   The Foundation's money; correct?

18   A     I don't believe that I've ever tried to deprive the IRS,

19   or participate in any conspiracy to do that.

20   Q     Now, you testified on direct about what appears to be a

21   life that you've given over to service and charitable causes;

22   is that correct?

23   A     Yes.  Some of it, yeah.

24   Q     And would it be fair to say that, you know, to give your

25   life to service and charitable activities is a dream?

1   A       Yes.

2   Q       And that you and Dr. Fredrick finally hit that dream in

3   2007, when you sold The Foundation for $35 million.

4   A       When I signed as guarantor, it was because of that

5   dream.  I'd done so much work, I thought, "Oh, this was a huge

6   amount of money," and that was a huge leap of faith for me.

7   Q       And you were going to use the money that you earned, the

8   35 million, to be charitable?

9   A       I did not earn it.  It was The Foundation's money.  And

10  it was something where, you know, we could work, we could

11  create great projects, sustaining projects.  I had spent enough

12  time in Central America and Mexico, I just -- you know, it's

13  also part of my church.  This is how I was raised.

14  Q       And you would agree with me that, if you don't pay your

15  taxes on $35 million, it's very easy to be charitable.

16  A       I don't have $35 million.

17          MS. FINLEY:  No further questions, Your Honor.

18          THE COURT:  Mr. Hochman?

19          MR. HOCHMAN:  Yes, Your Honor.

20                       REDIRECT EXAMINATION

21  BY MR. HOCHMAN:

22  Q       Dr. Hough, I'd like to start with one of the last

23  exhibits that Ms. Finley showed you, which is Exhibit 11AA,

24  Page 4.

25          MR. HOCHMAN:  And if we can put that on the screen,

1    Your Honor?

2              THE COURT:  That's fine.

3              (An exhibit was projected onto the projector screen.)

4    BY MR. HOCHMAN:

5    Q      And if we can focus on the -- do you have that in front

6    of you?

7    A      Yes, I do.

8    Q      I see that -- does that appear to be your signature in

9    sort of the bottom right-hand corner?

10   A      Yes, it is.

11   Q      And this is indicating that you transferred over your

12   shares to Round Hill holdings and New Vanguard holdings; do you

13   see that?

14   A      Yes.

15   Q      Do you see any amount of money on this sheet that

16   indicates how much the transfer cost?

17   A      No.

18   Q      That's fine for this exhibit.

19          If we could go to Exhibit 3P, like in "Paul," and if we

20   can go to Page 6 of 3P?

21          Would you put that on the screen?

22              (An exhibit was projected onto the projector screen.)

23   BY MR. HOCHMAN:

24   Q      This is another exhibit that Ms. Finley showed you with

25   respect to some discussions of what's going on in the U.S. and

1   in the Bahamas; do you see that?

2   A       Yes.

3   Q       This is a letter -- the heading of the letter is

4   "Dr. David L. Fredrick"; do you see that?

5   A       Yes.

6   Q       I think you testified, you'd never seen this letter

7   before until discovery in this case?

8   A       Yes.

9   Q       Did you sign this letter?

10  A       No.

11  Q       But it talks about --

12          MR. HOCHMAN:  If you can highlight the words in the

13  middle of the first full paragraph, or zoom in, please?

14          (An exhibit was projected onto the projector screen.)

15  BY MR. HOCHMAN:

16  Q       It says that -- it describes changes in U.S. and

17  Bahamas' banking policies; do you see that?

18  A       Yes.

19  Q       Do you see the word "IRS," or the word "United States

20  taxes," mentioned anywhere in this letter?

21  A       No.

22  Q       With respect to deferred compensation of Dr. Fredrick,

23  when Dr. Fredrick started working at the Saba School of

24  Medicine Foundation, which years would that have been?

25  A       Well, he started working with the government to create

1  the schools in 1986, and then The Foundation was created in

2  about 1989, but . . . he was working all those years.

3  Q     And the doors of the school opened in 1993 or '4, I

4  think you said?

5  A     It was in the fall of 1993.

6  Q     And is it fair to say that Dr. Fredrick wasn't paid for

7  the beginning years once the doors were opened?

8  A     No.  He still was teaching at Augusta College.  He was

9  doing disability testing.  I was working.  We were doing, you

10  know, anything to bring in income.

11  Q     No.  My question was:  To your knowledge, was

12  Dr. Fredrick paid during those early years of 1993, and for the

13  next couple of years, while he was working with the Saba School

14  of Medicine, by --

15  A     No.  Not by the Foundation; no.

16  Q     So there was a period, from 1986 until somewhere in the

17  mid-1990s, that Dr. Fredrick wasn't paid for the work that he

18  had put in, to get the Saba School of Medicine Foundation and

19  its school up and running?

20  A     Yes.

21  Q     Now, Ms. Finley focused on "my" and "his," and some of

22  the usage of the words, "our schools," and "our deans," and

23  "our standards."

24        Do you recall those questions?

25  A     Yes, I do.

1    Q      I recall that, in your direct testimony, you described

2    Phillips University as, "my university."

3           Do you recall that?

4    A      Yes.

5    Q      Do you own Phillips University?

6    A      No.

7    Q      Do you know who owns Phillips University?

8    A      The board of directors.  I don't know.  There's

9    foundations or different entities, but it's about . . . no.

10   Q      So if you don't own Phillips University, why did you use

11   the expression, "my school," or, "my university"?

12   A      It's my school, it's our Legacy Foundation.  I mean, I'm

13   emotionally attached to it.

14   Q      I think also, when you described the Ross School of

15   Medicine, in Dominica, you called that, "my medical school."

16          Do you remember that?

17   A      Yes.

18   Q      Do you own the Ross School of Medicine in Dominica?

19   A      No.

20   Q      Why did you refer to that as, "my medical school"?

21   A      It's my identity.  It's where I went to school.

22   Q      Ms. Finley showed you Schedule C from one of your tax

23   returns.

24          Do you recall that?

25   A      I think so.

1    Q      I think that's the one that had 178,000.  And the

2    discussion was why you took such a relatively small amount of

3    expenses against that.

4           Do you recall that?

5    A      Yes, I remember.

6    Q      You said, if I recall, on direct that you had a home

7    office; is that correct?

8    A      Yes.

9    Q      Did you have expenses associated with your home office?

10   A      Yes.

11   Q      Did EIC pay you for those expenses?

12   A      No.

13   Q      Did you put any of those expenses on the expense list

14   for your Schedule C?

15   A      No.

16   Q      I think you also said that you didn't turn in every

17   receipt to EIC, of expenses that you incurred while were you on

18   business travel.

19          Do you recall that?

20   A      Yes.

21   Q      Did you still pay for that amount, even though you

22   didn't turn in the receipt, out of your own personal funds?

23   A      Yes.

24   Q      Did you put any of those unreimbursed expenses on your

25   tax return Schedule C?

1    A       No.

2    Q       Now, with respect to the Round Hill property and the

3    Round Hill corporation, or company, that you and Ms. Finley

4    were discussing a few moments ago, I think you said that you

5    had shares in the Round Hill Holding -- Round Hill Project

6    Holdings Company; is that correct?

7    A       Yes.

8    Q       Did you own those shares on behalf of any entity?

9    A       When we set it up, it was on behalf of The Foundation.

10   Q       Now, you had your UBS account that you testified about

11   that was in your name; correct?

12   A       At one time; yes.

13   Q       And I think you said that it was the Saba Foundation's

14   money that was in an account with your name on it; correct?

15   A       Yes.

16   Q       You understood that to be for asset-protection reasons;

17   is that right?

18   A       Yes.

19   Q       Now, with respect to the Round Hill property, even

20   though the Round Hill company was effectively in your name,

21   were you still holding it -- holding the property in this case,

22   instead of funds -- on behalf of the Saba Foundation?

23   A       Yes.

24   Q       And was that for asset-protection purposes?

25   A       Yes, it was.

1   Q      What did you understand, if the property, the Round Hill

2   property, was held in the name of the Saba School of Medicine

3   Foundation, what did you understand would be the impact if the

4   Saba School of Medicine Foundation were sued?

5   A      Well, if -- if it were sued and there was a judgment in

6   the Netherlands Antilles, it could be seized.

7   Q      The land could be seized.

8   A      Well, the buildings.

9   Q      And if it was in the Round Hill names -- if the school,

10  itself, was sued, and not Round Hill, then the land could not

11  be seized; correct?

12  A      According to the -- Attorney Speetjens, and the right of

13  superficies, all of those . . . those documents, that's what we

14  were told, that it would protect it from anything outside or

15  within the Netherlands Antilles, any attempts to seize or close

16  the school down.

17             MR. HOCHMAN:  May I have one moment, Your Honor?

18             THE COURT:  You may.

19             (Mr. Hochman reviews his notes.)

20  BY MR. HOCHMAN:

21  Q      Quick question about Manasota Key.

22             I think you testified about Manasota -- the Manasota Key

23  property, that you bought it in the mid-nineties; is that

24  correct?

25  A      Yes.

1   Q      And it's now on the market; is that right?

2   A      It's been on the market since 2008.

3   Q      I think that I heard, during some of the testimony in

4   this case, that there was an elevator in the property.

5          Is there an elevator in that property?

6   A      Yes.

7   Q      Why did you put the elevator in that property?

8   A      My mother was supposed to come and live with us.  We had

9   a separate living area downstairs.

10  Q      I'm sorry.

11         And why, for any reason, did your mother need an

12  elevator in that property?

13  A      She's pretty old, and it's got a lot of stairs.  She

14  was, at that time.

15         MR. HOCHMAN:  One last moment?  I'm sorry, Your

16  Honor.

17         (Mr. Hochman confers with co-counsel at defense

18     counsel table.)

19  BY MR. HOCHMAN:

20  Q      Last two questions, Dr. Hough.

21         Dr. Hough, did you ever conspire with Dr. Fredrick, Beda

22  Singenberger, Dieter Luetolf, or anyone else for that matter,

23  to defraud the United States of America, or the Internal

24  Revenue Service, for the purpose of impeding, impairing,

25  obstructing, or defeating the functions of the IRS in the

1  ascertainment, computation, assessment, and collection of

2  income tax?

3  A      No, I did not.

4  Q      And that's with respect to Count 1.

5         With respect to Counts 6 through 9, did you knowingly

6  and willfully submit a false statement on your tax returns for

7  2005 through 2008?

8  A      No, I did not.

9         MR. HOCHMAN:  No further questions.

10        THE COURT:  Ms. Finley?

11        MS. FINLEY:  Nothing from the government, Your Honor.

12        THE COURT:  You may stand down.  Thank you.

13        You may call your next witness.

14        (The witness left the witness stand and sat in the

15     courtroom.)

16        MR. HOCHMAN:  Thank you, Your Honor.

17        The defense calls Luis Rivera.

18        THE COURTROOM DEPUTY:  If you'd raise your right

19  hand.

20        Do you solemnly swear or affirm to tell the truth,

21  the whole truth, nothing but truth, in the case now before the

22  Court?

23        THE WITNESS:  I do.

24        THE COURTROOM DEPUTY:  You may have a seat.

25        Please state and spell your full name.

1           THE WITNESS:  Luis Rivera, R-I-V-E-R-A.

2           THE COURTROOM DEPUTY:  Is that L-O-U-I-S?

3           THE WITNESS:  L-U-I-S.  Yes, ma'am.

4                        LUIS RIVERA,

5    called as a witness by the Defendant, and having been first

6    duly sworn, was examined and testified as follows:

7                     DIRECT EXAMINATION

8    BY MR. HOCHMAN:

9    Q      Mr. Rivera, good afternoon.

10   A      Good afternoon.

11   Q      I would like to go through your background, if I might,

12   in some level of detail.

13          What is your education, please?

14   A      I went to Rutgers University.  I completed a BS, with a

15   major in accounting and a minor in business administration.

16   Q      And when did you complete that education?

17   A      1979.

18   Q      Afterwards, did you become a certified public

19   accountant?

20   A      I am.  Yes, I did.

21   Q      In which states are you a certified public accountant?

22   A      I am currently licensed in the state of Florida,

23   commonwealth of Puerto Rico, and prior to that I was also

24   licensed in the state of Virginia.

25   Q      What was involved in becoming a certified public

1   accountant?

2   A      It's a pretty rigorous test that you take in four parts.

3   And you pass the test, and it's a combination of not only the

4   positive results on the examination, but also an combination of

5   experience.  And based on that you apply to the state licensing

6   board.  And they review your credentials, and they issue, or

7   not, a license.

8   Q      And what do the different parts, if you recall, what do

9   they focus on?

10  A      It's changed a little bit over time, but back when I

11  took it, there was a part on auditing, there was a part on --

12  which is essentially two parts, on accounting, pure accounting.

13  There was a part on business law.  And there was a part on

14  taxation.

15  Q      And do you take a national exam at the end of it, in

16  order to see whether or not you are going to pass?

17  A      Yes.  It's a uniform examination for all 50 states and

18  the Commonwealth of Puerto Rico.

19  Q      Did you past that exam?

20  A      I did.

21  Q      And did you end up getting licensed in certain states?

22  A      Yes.  Puerto Rico, now Florida and Puerto Rico, and I

23  had a license in Virginia for about four years.

24  Q      Now, you graduated from 1979.

25         In 1980, did you start a job?

1    A        I did.

2    Q        What job was that?

3    A        I started with the Internal Revenue Service criminal

4    investigation division.

5    Q        How long did you work for the Internal Revenue Service

6    criminal investigation division?

7    A        In total, 24 years.

8    Q        What did you do while you worked for the IRS?

9    A        I investigated violations of the tax code, criminal

10   violations of the tax code; different fraud statutes that the

11   IRS is responsible for investigating; money laundering.  And

12   bank regulations.

13   Q        What position did you start with, when you worked for

14   the criminal investigation division at the IRS?

15   A        I started as a special agent -- entry-level special

16   agent.

17   Q        And what is an entry-level special agent at the IRS

18   criminal investigation division?

19   A        When you start, you go to training.  You get trained on

20   the aspects of what the job is going to require and entail.

21   Then you come out to the field office, you are assigned a

22   coach, but it's really like a mentor, a senior agent that will

23   work with you on cases and things like that.

24            And as you progress at the different levels of

25   expertise, you eventually become a senior agent, and you can

1    work and stay at the senior agent level or progress into

2    management if you choose to.

3    Q       Do you know why they call it "special agent"?

4    A       It's a designation –– it's actually an OPM, office of

5    personnel management, designation, and all of the agents from

6    the different agencies are all designated special agents.  The

7    FBI, the ATF, all the agencies, that's the title.

8    Q       And a special agent is what Cameron Lalli, of the IRS,

9    who is sitting here in court, that's his title as well; is that

10   correct?

11   A       That's my understanding, yes.

12   Q       And did you receive any type of tax training, or

13   training on tax issues, as part of your training as an IRS

14   special agent?

15   A       Yes.  At the academy, part of the training included a

16   four-week course on pure taxation.  That was one of the things

17   I did.  And besides that, I've done continuing education over

18   time.

19   Q       How long did you actually work as sort of an entry-level

20   special agent?

21   A       Well, at the field level, because I progressed from

22   entry level to senior special agent ––

23   Q       I see.

24   A       –– ten years.

25   Q       Ten years?

1    And during that ten-year period, what types of cases did

2    you investigate?

3    A    Primarily, but not exclusively, income tax fraud tax

4    cases.  I investigated money-laundering cases.

5    Q    And were you also the lead special agent on a number of

6    those criminal tax investigations?

7    A    Yeah, I was.  It's called a case agent.  But yes, I was

8    a case agent on all of my investigations actually.

9    Q    Did you receive a promotion from special agent, or

10   supervisory special agent, at some point?

11   A    I received a promotion from senior special agent to

12   supervisory special agent.

13   Q    And when you're a supervisory special agent, what are

14   you in charge of; what could you supervise?

15   A    You normally inherit a group which is composed of

16   anywhere between 8 and 12 agents, and staff people, and you

17   supervise their work, you supervise their investigations.

18   Q    And what is your responsibility in supervising their

19   investigations?

20   A    Supervising the investigations entails providing

21   guidance on the investigations, providing guidance -- reading

22   memos, approving reports, reading memorandum, and just ensure

23   that the agents are adhering to policy with respect to the IRM

24   manual -- the Part 9, in particular, which is the controlling

25   part of the special agent's job -- and basically just

1    supervising all the work.

2    Q      Was it part of your job to make determinations of when

3    an investigation was sufficiently developed to present it to

4    the prosecutors?

5    A      That was part of it.  Approving the reports is part of

6    it; yes.

7    Q      How long were you a supervisory special agent for?

8    A      Three years.

9    Q      And at that point what happened in your career?

10   A      At that point, I was assigned to be the attaché at a

11   station in Columbia, for criminal investigation division IRS.

12   Q      And what does an IRS attaché do, in your particular

13   case, in Columbia?

14   A      At that time, and just shortly -- and actually just

15   before that, the Internal Revenue Service decided to post

16   special agents overseas.  The position is called "attaché"

17   because you are technically attached to the ambassador who is

18   the chief of mission at any particular embassy.

19        And so you are attached to that diplomat, and as part of

20   that you work for the embassy.  Of course, you represent the

21   U.S. Treasury.  And, of course, I represented the IRS as well,

22   because that was my employing agency.

23   Q      Now, if a special agent in the United States wants to,

24   in your case, in Columbia, wants to get information that exists

25   in Columbia, does a special agent have the ability to contact,

1    in your case, you, as the IRS attaché in Columbia, to help them

2    with their investigation?

3    A      That was actually part of my job.  My job included four

4    basic prongs.  One of them was assisting domestic field offices

5    with their investigations anytime they needed a lead overseas,

6    they needed somebody interviewed, they needed documentation,

7    they needed documentation officially certified to be taken back

8    to the United States, as evidence.  It included training,

9    technical assistance to local government in training, and it

10   included, of course, anything else that wasn't captured under

11   the sun.

12   Q      Are there IRS attachés in Europe, Central America, and

13   Hong Kong?

14   A      There are.

15   Q      How long did you work as an IRS attaché?

16   A      Three years.

17   Q      Now, what time period is this now?

18   A      Timeframe?  I could tell you most exactly.  I went, I

19   went to post December, 2007 -- I mean 1997.  And I left post

20   December, 2000.  So three years, almost to the day, actually.

21   Q      So in December, 2000, did you receive a reassignment at

22   that point?

23   A      I was reassigned to the -- I received a fellowship,

24   actually.  I applied for and received a fellowship to the

25   Brookings Institute, but through the IRS, and having won the

1   fellowship, I received -- I got a job with the Senate finance

2   committee.

3   Q      The Senate finance committee, Washington, D.C.?

4   A      The Senate finance committee under Senator Max Baucus.

5   Q      Who is he?

6   A      He was the senator from Montana.  But also, at the time,

7   he was a chairman of the Senate finance committee.

8   Q      How long did you work for the Senate finance committee

9   for the IRS?

10  A      One year.

11  Q      And then what happened?

12  A      Well, after that 9/11 happened.  And shortly after that

13  I was reassigned as the deputy director to work with the task

14  force that was assembled in Washington, consisting of members

15  from all the treasury agencies, including the FBI, which is not

16  a treasury agency, to work on tracing the finances of

17  terrorists.

18  Q      How long did you work in that position?

19  A      One year.

20  Q      And after that position, what did you do?

21  A      I was then reassigned, I was promoted actually, to the

22  assistant special agent in charge of the Miami field office.

23  Q      And what does the assistant special agent in charge of

24  an entire field office entail?

25  A      Well, Miami happens to be our fourth largest office, so

1   we have 12 groups.  Part of my responsibility was to oversee

2   the entire work for 12 of those groups, which included not

3   only -- supervising the supervisors, actually, and as part of

4   my job, of course, approving reports, making prosecution

5   recommendations, acting for the special agent in charge in his

6   absence, and ensuring that policies and procedures of the IRS

7   were adhered to.

8   Q      So who is the -- is there anybody ahead of the assistant

9   special agent in charge in the Miami field office at that time,

10  besides you, as far as the title goes?

11  A      It would have been the special agent in charge.

12  Q      So does that mean you are the number two person in the

13  Miami field office at that time?

14  A      I was, at that time, sir.

15  Q      So if someone like Cameron Lalli worked in that office,

16  you would have been his boss, correct?

17  A      Technically, yes; but there would have been someone

18  between me and him.

19  Q      So his boss' boss?

20  A      Yes.

21  Q      And how many agents did you have in those 12 groups in

22  the Miami office?

23  A      At that time, when I came to the Miami office, which is

24  in July of 2003, I had about approximately 60 special agents

25  under -- in my groups.  I had six groups.

1   Q       And at some point do you retire from the IRS?

2   A       I did.

3   Q       When was that?

4   A       That was in October of 2007.

5   Q       And what have you been doing since October of 2007?

6   A       Upon my retirement, I worked for a public accounting

7   firm in their advisory section which deals with . . . advisory

8   section at that time was, in this particular firm, we did

9   litigation support and forensic work.  And I was there for

10  about a year and three months.  And then, after that, myself

11  with two other partners, we formed the current place where I

12  work now, which is MRW Consulting Group.

13  Q       Now, when you were with the IRS, approximately how many

14  investigations did you participate in, either as a field agent,

15  a supervisory agent, or the assistant special agent in charge?

16  A       Hundreds.  Hundreds.

17  Q       And these would be criminal tax investigations?

18  A       Criminal tax investigations, money laundering, and

19  everything that the IRS -- and everything that the IRS -- the

20  criminal division has jurisdiction over, which would include

21  conspiracy charges, etcetera.

22  Q       And during your 24 years at the IRS, did you ever have

23  the -- did you develop an expertise in how to conduct a

24  criminal tax investigation?

25  A       I certainly did.

1   Q      In what way?

2   A      Well, again, my training in Glencoe, at the academy, was

3   useful to get me started, and then basically conducting the

4   investigations, going through the interview process, perfecting

5   interview techniques, looking at evidence, gathering evidence,

6   speaking to prosecutors, participating in trials with

7   prosecutors, assisting other special agents with their

8   investigations.

9          So that whole process led me to gain the knowledge and

10  experience I needed to progress to the senior agent, and then

11  subsequently to the other positions that I just talked about.

12  Q      And in all those investigations that you participated

13  in, did you ever have a chance to work with an IRS Revenue

14  Agent?

15  A      Oh, yeah, often.  Because in all tax investigations,

16  pretty much, a Revenue Agent gets assigned to the case, because

17  the Revenue Agent is then responsible for taking the numbers

18  that the special agent has gathered, and the evidence, and the

19  investigation, and the Revenue Agent would then compute, do the

20  tax computations.

21  Q      Now, is a Revenue Agent nothing more than just a

22  computer; do you throw out some numbers, and they plug into it

23  a computer program and spit them out?

24  A      Well, in my experience, it wasn't just that.  It was a

25  participatory type of relationship where the Revenue Agent was

1  allowed to ask questions, was allowed to see information, and

2  really, at the end of the day, it would behoove the special

3  agent, really, to provide the information so that you could get

4  accurate tax computations because you're going to need them for

5  court.

6  Q    Who decided what information generally to provide to a

7  Revenue Agent?

8  A    What information did I decide to provide?

9  Q    No.  Who would decide, generally, in an IRS criminal tax

10 investigation, what information to provide to a Revenue Agent?

11 A    Well, on an administrative investigation, as opposed to

12 a grand jury investigation, the special agent has a lot of

13 discretion, and latitude, to be able to control his

14 investigation.  Basically, it is your investigation.

15      And even though you do have a manager, and you report to

16 upper management, the special agent has a lot of latitude to

17 work his case; and as long as you comply with procedures, and

18 the rules that govern a criminal investigation, you can provide

19 the revenue agent with all the information that you think is

20 necessary.

21 Q    And when you say, "All the information," you mean

22 documents, memorandum of interview, stuff like that; is that

23 correct?

24 A    Anything and everything that would be relevant to

25 getting a correct and accurate tax computation.

1  Q      And if the correct and accurate tax computation -- one

2  of the key assumptions is who owns a particular entity, would

3  you expect, based on your training and experience, that a

4  special agent would make available to the Revenue Agent all

5  documents and memorandum of interview that bear on that issue?

6  A      That would be crucial.

7  Q      Now, if it's a grand jury investigation, are there any

8  hurdles that are presented by that?

9  A      Can you repeat the question, please?

10  Q      If it's a grand jury investigation, are there any

11  hurdles that are presented by the fact that it's a grand jury

12  investigation?

13  A      I wouldn't say "hurdles."  I wouldn't characterize them

14  as hurdles.  I would say that, in a grand jury investigation,

15  you would have the prosecutor, whether it be a trial attorney

16  from the department of justice, or an assistant . . . an AUASA,

17  a special assistant from the local office, they're technically

18  in charge of that investigation.

19         However, because tax cases are very, very technical,

20  like money-laundering case, but primarily tax cases, there's a

21  lot of latitude given to the special agent assigned to that

22  grand jury, or to that investigation, to conduct his

23  investigation.

24             (There was discussion off the record.)

25             THE COURT:  Let's take a short recess.  Please do not

1    discuss the case among yourselves or allow anyone to discuss it

2    with you or in your presence.  I'll get you back here as soon

3    as I can.

4              (At 2:03 PM, the jury was escorted from the

5        courtroom.)

6              THE COURT:  All right.  We'll be in recess until

7    we're not.

8              (At 2:03 PM, court was recessed.)

9                          AFTER RECESS

10             (At 2:11 PM, court was reconvened.)

11             THE COURT:  All right.  Both sides ready for the

12   jury?

13             MR. HOCHMAN:  Yes, Your Honor.

14             MS. FINLEY:  Yes.

15             THE COURT:  Have the jury step in, please.

16             (At 2:12 PM, the jury was escorted into the

17        courtroom.)

18             THE COURT:  Mr. Hochman, you may proceed.

19             MR. HOCHMAN:  Thank you very much.

20   BY MR. HOCHMAN:

21   Q     Mr. Rivera, when we last left off, we were talking about

22   what type of documents a special agent, like Cam Lalli, could

23   provide to a revenue agent in a grand jury investigation.

24             Do you have that in mind?

25   A     Yes, sir.

1    Q       Is there a process that a special agent has to go

2    through in order to provide documents, memoranda, and stuff

3    like that, to a revenue agent in a grand jury investigation?

4    A       In a grand jury investigation, the revenue agent -- as

5    well as the special agent, but the revenue agent for sure --

6    needs to be placed on a list that's called 6E.

7    Q       What does 6E stand for, if you know?

8    A       It's a section of the Department of Justice that allows

9    for access to grand jury information, which is typically

10   secret.  It's private.

11   Q       Now, is it hard to get on the 6E list?

12   A       Not really.

13   Q       What's involved in getting on the 6E list?

14   A       You get on the list on a need-to-know basis, because you

15   have a need to access documents or information that is

16   developed by the grand jury in a particular investigation.  And

17   basically you go to the prosecutor and you ask . . . you

18   provide the names, and you can get on the list.

19   Q       And would a revenue agent be a typical person who would

20   need to know about the documents and memorandum of interview

21   and investigation in order to compute tax computations?

22           MS. KESSLER:  Objection, Your Honor, as to relevance.

23           THE COURT:  Do you care to be heard at sidebar?

24           MS. KESSLER:  I'm sorry, I can't tell if you're

25   looking at me or counsel.

1          THE COURT:  I'm looking at him.

2          You are going to lose unless you come to sidebar and

3    tell me otherwise.

4          MR. HOCHMAN:  Sidebar, please.

5                         AT SIDEBAR

6          MR. HOCHMAN:  This is the foundation for Mr. Rivera,

7    to evaluate the revenue agent's report and the investigation

8    that she conducted in assembling that report.

9          I believe his ultimate conclusion -- expert

10   conclusion will be that it's a significantly deficient report.

11   What he is making clear is that there are certain things that

12   could have been done that, according to the testimony of

13   Ms. Maurer, were not done.

14         Right now the jury doesn't know that they actually

15   could have been done, and he's providing that link in the chain

16   of evidence, shall I say, so the jury can understand what could

17   have been done but was not done.

18         MS. KESSLER:  The government does not believe that,

19   under 702, that this individual is an expert or needs to

20   provide any expert opinion that is scientific or specific, or

21   of any nature, that the jury -- this is not coming out very

22   well.

23         Under 702, the jury does not need expert opinion in

24   order to make a determination as to whether the investigation

25   was done sufficiently or properly.  It doesn't require any

1    specific scientific knowledge or background for them to do

2    that.  They can determine whether they have the sufficient

3    evidence to determine whether the . . . what was done is

4    sufficient.  They don't need Mr. Rivera to testify about that.

5            MR. HOCHMAN:  And again, Your Honor, the . . . I'm

6    sorry.

7            THE COURT:  Let me just think.

8            Okay.  I've got a question, but go ahead first.

9            MR. HOCHMAN:  Again, the processes of the IRS are

10   anything other than understandable to a lay person, how an

11   agent conducts an investigation, what they can and cannot rely

12   on, when they can change their revenue agent report, when they

13   cannot change their revenue agent report, whether it is unusual

14   to change a revenue agent's report.

15           Here we have a lot of unusual circumstances that --

16   that the jury doesn't have an idea what the norm is.  They

17   won't be able to understand that it's outside the norm, which

18   goes to the impact, we believe, of the changes of the opinion,

19   and goes to -- directly to the credibility of that opinion.

20           This particular witness has that level of expertise.

21   We believe that expertise can assist the jury in understanding

22   that -- something that they don't have throughout their common

23   knowledge, and we'd be introducing it for that reason.

24           THE COURT:  I guess I don't understand two things,

25   perhaps.  I'm not sure I understand what the expert opinion is,

1    that you attempt to elicit.

2              I understand what you've said now.  I guess that's

3    not what I had anticipated his expertise was going to be.

4              And the second thing is, with regard to what you

5    articulated, this is expert opinion, I don't see the relevance

6    of it.  Assuming they did a really bad investigation, but

7    nonetheless found someone who made false income tax returns,

8    how would the fact that they did a bad investigation be

9    relevant?  It wouldn't be an affirmative defense.

10             MR. HOCHMAN:  What it is, Your Honor, is that it also

11   sets up what he is also ultimately going to be testifying, as

12   to the tax computations themselves.

13             THE COURT:  That's where I thought you were going.

14             MR. HOCHMAN:  Right.  And what went into it.

15             She basically changed assumptions in the middle of

16   the trial.  He will go through the evidence that existed at

17   trial and before trial.  And the issue is whether or not she

18   had access to that information before May 14th, when she

19   provides the first report.

20             I think what he will say is that, in essence, she

21   could have been put on the 6E list, she could have been given

22   this information.

23             She said she wasn't.  We think that's, at a minimum,

24   seriously deficient, but went into her calculations for

25   May 14th, and then she could have been --

1              THE COURT:  There's no comment on your argument.

2              MR. HOCHMAN:  I'm sorry?

3              THE COURT:  Never mind.

4              MR. HOCHMAN:  And, Mr. Saunders reminds me,

5      ultimately it goes to the reliability and credibility of her

6      calculations, both on May 14th and then on October 14th.  And

7      this is just the -- sort of the background to set up what could

8      have been done, because the jury wouldn't otherwise know what

9      could have been done.

10             And it's a relatively few set of questions, Your

11     Honor.  It won't take very much time.  It's not like it's

12     creating a 403 undue delay or issue on time, Your Honor.

13             THE COURT:  All right.  Take me back.

14             What was the last question that you asked, then?

15             MR. HOCHMAN:  I was asking about how difficult it

16     would be to get on the 6E list.  And I think he said it wasn't

17     very difficult.

18             And I would say -- the next question would have been:

19     If you're on the 6E list, what do you have access to?

20             THE COURT:  All right.  And the answer is presumably

21     grand jury material.

22             MR. HOCHMAN:  Right.  Then I go on to another area.

23             I was at the last question when I got stopped.

24             MS. KESSLER:  And again, the government doesn't see

25     how it's relevant, who is or is not on the 6E list.  The

1    issue . . . they're attempting to have this witness testify as

2    to the manner in which the investigation was done, whether or

3    not it was done shoddy or it was done well; and that is not

4    something that requires an expert opinion on.  It is not

5    something scientific, it is not something that is so

6    particularized that the jury cannot make a decision, based on

7    what they have before them, as to whether the investigation was

8    sufficient.

9              THE COURT:  Normally, I think I'd be inclined to keep

10   it out, on the basis that, good or bad, it is not the

11   investigation that typically is on trial; but the results of

12   it, and whether there is evidence in this case of a conspiracy

13   or a false statement.

14             I say, "normally," because I think we've got a little

15   bit different situation here, with the -- where the revenue

16   agent, mid-trial, has changed her report and changed her

17   opinion, in what to me seems to be a fairly significant

18   fashion, based upon testimony -- I'm sorry -- based upon

19   evidence that she said she first saw during trial.

20             MS. KESSLER:  And for -- I'm sorry.  I thought the

21   Court was done.

22             THE COURT:  Go ahead.  I wasn't quite done,

23   but . . . .

24             MS. KESSLER:  I'm sorry.

25             The document that was "changed mid-trial" was marked

1    at all times as a draft, and is in evidence as a draft and that

2    was gone over with the revenue agent.

3         THE COURT:  That may be, but it seems to me that --

4    at least for 2006, I think it is -- her numbers are greatly

5    different than what the grand jury found to be the case.

6         I'm going to overrule the objection.  I'm going to

7    allow the question that you asked.  I'm probably not going to

8    allow very much more than that.  But in light of the agent's

9    change of the report, despite the fact that it was called a

10   draft, I am going to give you some flexibility.  But my general

11   predisposition is, you don't get to try the investigator or the

12   agent.

13        MR. HOCHMAN:  Okay.  I'll try and keep those

14   questions to a minimum, and if I don't -- and not ask the

15   ultimate question, if -- you know, what his opinion is of the

16   investigation, if the Court would otherwise keep that question

17   out.

18        THE COURT:  I think at this point I would, as opposed

19   to his opinion as to --

20        MR. HOCHMAN:  -- tax computation.  And I think -- and

21   they might open the door in cross-examination.  And if they do,

22   I'll walk in.

23        THE COURT:  They might.  Okay.

24        MR. HOCHMAN:  Thank you.

25                         IN OPEN COURT

1          THE COURT:  You may proceed.

2    BY MR. HOCHMAN:

3    Q      Thank you, Mr. Rivera.

4          If Revenue Agent Sheila Maurer had been put on the

5    6E list, what would she have had access to?

6    A      Pretty much anything that would have been developed in

7    the criminal investigation.

8    Q      And have you had a chance to go through the government's

9    discovery in this case concerning this criminal investigation

10   in this case?

11   A      I have.

12   Q      Would she have had access to all the documents that

13   we've seen, for instance, at trial?

14   A      I think so.

15   Q      Would she have had access to memorandum of interview of

16   witnesses that had been interviewed before the trial?

17   A      I think so.

18   Q      And if she was on the 6E list, would she have also had

19   access to grand jury testimony of any witness who testified in

20   front of the grand jury?

21   A      Yes.

22   Q      Now, over the years, have you, both in your experience

23   at the -- 24 years at the IRS, have you seen revenue agent

24   reports?

25   A      Yeah.  Many.  I continue to see them in my work today.

1  Q     What is role of a revenue agent's report in a criminal

2  investigation?

3  A      In a criminal investigation, the revenue agent's report

4  actually forms the basis for the tax computations, the tax

5  deficiencies, interests and penalties that may be charged in a

6  criminal investigation.

7  Q     And how important is a revenue agent's report?

8  A      Crucial.

9  Q     And in what sense is it crucial?

10  A      It forms the basis for the computations that are going

11  to come into the indictment and into the courtroom.

12  Q     Let me go real briefly back into your background.

13        While were you with the IRS, did you do any

14  investigations that involved foreign bank accounts?

15  A      I did, yes.

16  Q     And did you also deal with civil tax matters?

17  A      Yes.

18  Q     Have you, in your current job, in the last six years or

19  so, have you represented clients in audits, in tax collection

20  matters before the Internal Revenue Service?

21  A      I have.

22  Q     And do any of those matters involve foreign bank

23  accounts?

24  A      Yes, they have.

25  Q     By the way, are you familiar with this voluntary

1  disclosure program?

2  A      Extremely familiar.  When I was in the -- when I was the

3  assistant special agent in charge, I pretty much handled, from

4  the criminal investigation side, all of the voluntary

5  disclosures that came to the office.

6       And post IRS, now that I'm in the private sector, we've

7  handled -- in my office, and I personally have handled --

8  numerous foreign account-type issues with voluntary

9  disclosures.

10 Q      And in 2009, do you recall the date when the IRS opened

11 up it is voluntary disclosure program for offshore bank

12 accounts?

13 A      I believe the announcement was made circa March 27th, on

14 a program that was actually approved on March 26th of 2009.

15 Q      Have you actually prepared tax returns for others?

16 A      Many; yes.

17 Q      Approximately how many?

18 A      Hard to say.  I mean, it's . . . hundreds.  We have

19 hundreds of clients in my office.  And I don't prepare all of

20 the returns, but I either prepare or supervise in the

21 preparation of those returns.

22 Q      And would that include individual returns?

23 A      Individuals and entities; yes.

24 Q      Including a nonprofit entity?

25 A      We have one, a foundation actually, that we did tax

1   returns for, and I was actually part of that.

2   Q    Now, as a result of your training at the IRS, your

3   experience in your 24 years at the IRS, your experience with

4   audits and preparing hundreds of returns, how many civil audits

5   have you participated in?

6   A    Representing clients in a civil audit?

7   Q    Yes.

8   A    In my recent experience, I would say probably five or

9   six.

10   Q    How about just general civil tax matters?

11   A    Well, I was in the criminal investigation division for

12   my entire career, so I didn't deal with the civil function

13   after it left criminal investigation.  I mostly dealt with the

14   revenue agent in the context of getting a revenue agent report

15   prepared.

16   Q    And since you've left the IRS, how many civil tax

17   matters have you handled against the IRS?

18   A    Oh, hundreds.  Numerous.  Because we do that in our

19   office.  That's part of the work we do.

20   Q    So based on all this experience that you've talked

21   about, both inside the IRS and outside the IRS, do you consider

22   yourself an expert in tax computation?

23   A    Yeah, I would say so.

24       MR. HOCHMAN:  Your Honor, I'd ask the Court to

25   designate Mr. Rivera as an expert in tax computation.

1           THE COURT:  The Court declines to do so.

2           You may proceed.

3           It's up to the jury whether he's an expert.

4           MR. HOCHMAN:  Oh.  Then I submit -- if the

5    appropriate word is, "I submit Mr. Rivera as an expert" --

6           THE COURT:  You may proceed.

7           MR. HOCHMAN:  Thank you.

8    BY MR. HOCHMAN:

9    Q     Now, in addition to being a certified public accountant,

10   do you have any other accreditations?

11   A     Yes, I do.

12   Q     What are those?

13   A     I'm a certified fraud examiner, which is a certification

14   by the institute of fraud examiners -- Association of Fraud

15   Examiners.

16         And I also hold a designation and a certification as a

17   certified financial forensic, which is a designation granted by

18   the American Institute of Certified Public Accountants.

19   Q     And are you a member of any professional societies?

20   A     Several.  I'm a member of the American Institute of

21   Certified Public Accountants.  I am a member of the Florida

22   Institute of Certified Public Accountants.  I am a member of

23   the Puerto Rico College of Public Accountants.  I am a member

24   of the American Forensic Examiners Association.

25   Q     Have you ever taught, at the IRS, any courses?

1   A       Yes.  Many.

2   Q       Any courses involving foreign bank accounts?

3   A       Courses which included examination and matters dealing

4   with foreign bank accounts; yes.

5   Q       Mr. Rivera, when were you first hired to be a defense

6   expert in this matter?

7   A       The engagement letter with our office was signed

8   August 20th of this current year.

9   Q       So August 20th, about 2 months?

10  A       Two months ago; from Sunday, actually.

11  Q       And over that time, approximately how many hours, up

12  until today, have you spent on this matter?

13  A       Counting the trial, which has been, as you know, two and

14  a half weeks almost, about 150 hours; 140, 150 hours.

15  Q       And did you receive a flat fee for your services?

16  A       I did.

17  Q       And how much was that flat fee for?

18  A       $25,000.  And I didn't receive it, my office did.

19  Q       Now, are you aware that the indictment occurred on

20  May 15, 2013?

21  A       I am.

22  Q       And have you been attending every day of this trial to

23  see the witnesses that have given testimony and the documents

24  that have been admitted into evidence?

25  A       Yes.

1   Q      At the outset, were you given an assignment to do your

2   best to find out whether the Saba Foundation, that's the Saba

3   School of Medicine Foundation, received and still has the

4   proceeds from the sale of the schools in April, 2007?

5   A      That was the initial scope of work.

6   Q      And based on your review of the government's discovery

7   and the government's investigation in this case, did you see

8   any indication that the government pursued that inquiry after

9   April, 2007?

10          MS. KESSLER:  Objection.  Based on our discussion at

11  sidebar, Your Honor.

12          THE COURT:  You're going to need to come to sidebar

13  again.

14          MR. HOCHMAN:  You know what, Your Honor?  I'll

15  actually withdraw that question.  I'll just go to my next

16  question.

17          THE COURT:  Okay.

18  BY MR. HOCHMAN:

19  Q      Now, you heard that Special Agent Maurer worked on her

20  investigation for four and a half years; is that correct?

21  A      I heard that.

22  Q      How long did you have to fulfill your task?

23  A      Well, I've had two months since we were engaged.  But I

24  actually had less time than that, because I do have other

25  things.  But approximately -- less than two months, maybe five

1   to six weeks.

2   Q      How did you go about fulfilling that task?

3   A      Going back on my experience, of course, you always want

4   to go to the source, you always want to go to what, at least

5   one would perceive to be the very best source of information.

6   So in that regard I thought that the Foundation, or people

7   associated with The Foundation, people associated with the

8   foreign bank accounts, might be a good place to start.  So

9   that's what I did.

10  Q      And would the information provided by the Saba School of

11  Medicine Foundation be the type of information that experts in

12  your field would reasonably rely on, in forming the opinion of

13  whether or not the Saba School of Medicine Foundation received

14  and still has the proceeds from the April, 2007 sale?

15  A      Absolutely.

16  Q      Who in The Foundation did you contact?

17  A      In The Foundation, the Saba School of Medicine

18  Foundation, I contacted a gentleman by the name of Florencio

19  Montenegro.

20  Q      And why did you contact that gentleman?

21  A      He's still on the board, and based on the documents that

22  I reviewed and the information that I had on hand at that time,

23  I decided that he would be someone that would probably have

24  direct knowledge of this information.

25  Q      Is he someone whose name you have seen here on documents

1    at trial?

2    A     Yes.

3          MR. HOCHMAN:  May I present the witness with

4    Exhibit 16C, Your Honor?

5          THE COURT:  You may.

6          MR. HOCHMAN:  Thank you.

7          THE COURT:  This is Government's 16C?

8          MR. HOCHMAN:  Yes, I'm sorry, Government's.

9          16C.  And if we can show it on the screen, Your

10   Honor?

11         THE COURT:  You may.

12         MR. HOCHMAN:  Thank you.

13         (An exhibit was projected onto the projector screen.)

14   BY MR. HOCHMAN:

15   Q     And Government's 16C, do you see the letterhead, it says

16   the Saba School of Medicine Foundation?

17   A     I do.

18   Q     And the date on this letter is March 1st, 2011?

19   A     Correct.

20   Q     And if we could focus on the handwriting at the bottom?

21         Do you see the gentleman's name in the right-hand

22   corner; who is that?

23   A     It states:  "Mr. Florencio Montenegro, Board Member."

24   Q     A board member of the Saba School of Medicine

25   Foundation?

1    A      Based on this document, yes.

2    Q      And you heard the testimony of Antoine Solagnier, didn't

3    you?

4    A      I did.

5    Q      You heard him testify that he is still working currently

6    with Mr. Montenegro, on behalf of the Saba Foundation, with

7    respect to an egg farm project in which the Saba Foundation is

8    doing work in Guatemala; is that correct?

9    A      Yes.  I heard him testify so.

10   Q      Did you actually speak with Mr. Montenegro?

11   A      I did.

12   Q      Was it especially difficult to reach him?

13   A      A phone call away.

14   Q      And what date do you recall that you spoke with him?

15   A      I spoke with him September 26th of this year.

16   Q      What country code did you call him at?

17   A      If I may refer to my notes real quickly to that?  But I

18   believe it's 504 -- 502 area code.

19   Q      Were you able to ascertain what country that was for?

20   A      Yes.  It's for Guatemala.

21   Q      Prior to speaking with him, did you receive a notarized

22   document?

23   A      I did.

24          MR. HOCHMAN:  May I present what's been marked for

25   identification as Defense Exhibit 141?

LUIS RIVERA - DIRECT/HOCHMAN                161

1    BY MR. HOCHMAN:

2    Q      And if you could take a look at Defense Exhibit 141, is

3    this a document that you received from Mr. Montenegro?

4    A      It is.

5    Q      And is it a notarized document?

6    A      It is.

7    Q      Does this document, in turn, refer to another document,

8    of a prior certification, in November, 2009?

9    A      It does.

10   Q      And if you can look at what's been marked for

11   identification as Defense Exhibit 100?

12   A      I have it.

13   Q      And is Defense Exhibit 100, the November, 2009,

14   certification referenced by the -- by Exhibit 141?

15   A      I have had a chance to review this document before that;

16   and, yes, it is, it's the same document that's referenced in

17   the letter I received.

18   Q      And the letter you received, what's the date on that

19   letter?

20   A      The letter that I received on the 26th of this year is

21   dated the 25th day of September, 2013.

22   Q      Are these documents that you relied on, in forming your

23   opinion as to where the money is today?

24   A      Yes, they are.

25   Q      And by "money," I mean the Saba School of Medicine

1    Foundation's money that was received from the sale in April,

2    2007.

3    A      Yes.

4    Q      In your phone call with Mr. Montenegro, on

5    September 26th, 2013, did you discuss the topic of where the

6    money had gone from the sale of the Saba School of Medicine

7    Foundation -- excuse me -- where the money from the sale of the

8    schools in April, 2007, went after the sale occurred?

9               MS. KESSLER:  Objection, hearsay.

10               THE COURT:  Sustained.

11   BY MR. HOCHMAN:

12   Q      Did you have a conversation with Mr. Montenegro

13   concerning your task?

14   A      Yes, I did.

15   Q      Is the information Mr. Montenegro provided you something

16   that you relied on in forming your opinion as to where the

17   money from the Saba School of Medicine Foundation's sale, in

18   April of 2007, is today?

19   A      In part, yes.

20   Q      Did you also speak to someone else, in trying to

21   accomplish your task?

22   A      I did.

23   Q      Who was that person that you spoke with?

24   A      I spoke to a gentleman by the name of Erwin Schulthess.

25   Q      And who is Mr. Schulthess?

1   A      He is currently president of Sinco, and works with

2   Sinco, which was, my understanding, is the financial advisers

3   to three companies that have been discussed here:  New

4   Vanguard, Ample Dynamic, and Top Fast.

5   Q      How difficult was it to reach Mr. Schulthess?

6   A      A phone call away.

7   Q      And in what country and city did you reach him at?

8   A      Zurich, Switzerland.

9   Q      How do you know that?

10  A      Well, I dialed a number that I had for him, and I then

11  checked the area codes to ensure that that's what it was, and

12  it came out to Zurich, Switzerland.

13  Q      And have you seen Mr. Schulthess' name on many documents

14  as an authorized signatory for New Vanguard, Top Fast, and

15  Ample Dynamic?

16  A      In several documents, yeah, concerning Sinco, yes.

17         MR. HOCHMAN:  May I present Exhibit 3C, Page 39, to

18  the witness, Your Honor?

19         THE COURT:  You may.  Again, is that Government's 3C?

20         MR. HOCHMAN:  Government's 3C, yes.

21         Do you have that in front of you?  Oh, here it is.

22         And if we could publish Government's Exhibit 3C,

23  Page 39, please?

24         THE COURT:  You may.

25         (An exhibit was projected onto the projector screen.)

1    BY MR. HOCHMAN:

2    Q      Do you have Government's Exhibit 3C, Page 39, before

3    you?

4    A      I do.

5    Q      Do you see the name, Erwin Schulthess, anywhere as an

6    authorized signatory for New Vanguard?

7    A      Yes.  His name is third from the top.

8           MR. HOCHMAN:  Can we highlight that, please?

9    BY MR. HOCHMAN:

10   Q      And did you see Mr. Schulthess' name on, I think

11   virtually every authorized signatory form for New Vanguard, Top

12   Fast, and Ample Dynamic?

13   A      That's my recollection.

14   Q      Did you have a -- excuse me.

15          Did you have a conversation with Mr. Schulthess?

16   A      I did.

17   Q      Do you recall when that happened?

18   A      Yeah.  That happened October 2nd.

19   Q      Of this year?

20   A      Of this year.

21   Q      And did you discuss the topic that -- of which task you

22   were given to pursue?

23   A      I did.

24   Q      Is the information Mr. Schulthess provided you something

25   you relied on, in forming your opinion as to where the money

1    from the sale of the Saba schools, in 2007, is today?

2    A     It is.

3    Q     And after speaking to Mr. Montenegro, and

4    Mr. Schulthess, reviewing the documentation that's been

5    provided to you, and reviewing the information that's been

6    presented in this case, did you form an opinion as to where the

7    money from the Saba school sale, in April of 2007, went?

8    A     I would add to that that my opinion would also include

9    it was based on the testimony and evidence that was presented.

10   Q     And what is that opinion?

11   A     The opinion is that the money is with the Saba School of

12   Medicine Foundation.

13   Q     And you say the money, the money that was –– that went

14   from –– excuse me –– the money that occurred in April, 2007,

15   with the sale of the schools, is currently with the Saba School

16   of Medicine Foundation?

17   A     That's correct, exactly that money.

18   Q     And how much money were you able to determine are

19   currently in the accounts of the Saba School of Medicine

20   Foundation as of September 25th, 2013?

21   A     Just over $54 million.

22   Q     Now, I'd like to focus you on Agent Maurer's revenue

23   agent report.  And we're going to be looking at the two

24   versions of it, the May 14th, 2013, version, and the

25   October 14, 2013, version.

1    A      Okay.

2    Q      Now, with regard to Agent Maurer, you actually heard her

3    testify as an expert in tax computations in this trial; is that

4    correct?

5    A      I did.

6    Q      And do you recall her testimony that she never testified

7    as an expert before, in any court; she wasn't a CPA, an

8    accountant; she had no tax law background; had never

9    participated in sophisticated international deals; and had no

10   expertise in Swiss or Liechtenstein banking law or Netherlands

11   Antilles nonprofit foundations?

12             MS. KESSLER:  Objection, leading.

13             THE COURT:  The question was, does he recall.

14             Overruled.

15             THE WITNESS:  I do recall that.

16   BY MR. HOCHMAN:

17   Q      Now, based on your training and experience for 24 years

18   with the IRS, being a field agent, a supervisory agent, and the

19   number two person in the Miami field office, how does Revenue

20   Agent Maurer's qualifications compare to those of which you are

21   aware that the IRS normally uses in complex cases involving

22   international transactions like these?

23   A      I'm aware that the IRS has revenue agents that do hold

24   CPA certifications, and that have vastly, perhaps, more

25   experience in some of those areas; frankly, I was a little

1    surprised that, on a case like this, someone with those

2    qualifications would be the designated person to represent the

3    government in that area.

4    Q      Now, when you were first brought into this case, what

5    were the first couple of documents you received in order to

6    accomplish your analysis?

7    A      In order to accomplish my -- well, the documents that we

8    had discussed previously, those were some of the documents I

9    received initially.

10   Q      And did you also receive a copy of the indictment?

11   A      Oh, I also -- of course, yes.  And the revenue agent

12   report.

13   Q      And when you received the revenue agent's report, which

14   version did you receive, back in approximately August 20th,

15   2013; the May 14th, 2013, version, or the one that she did six

16   days into trial, on October 14, 2013?

17   A      No.  The one I received and reviewed was the May version

18   of the report.

19   Q      And what was the significance of the May version of the

20   report, to you, at that time?

21   A      Well, it was significant because that was, in my

22   estimation and based on everything that I saw, that report was

23   dated just a day before the indictment.  So I had to assume,

24   and it seems logical, that it was the base for coming up with

25   the numbers for the indictment.

1   Q      And do you know how long Agent Maurer had worked on that

2   report -- this is the May 14th, 2013, report -- before it was

3   completed?

4   A      She had four years to work on it.  I can't tell you

5   exactly how much time she spent on it, but she had four years.

6   Q      Now, did you rely on that report in trying to understand

7   the tax computations in this case in order to assist the

8   defense?

9   A      Of course.  That's all I had.

10  Q      And was that report, even though apparently the report

11  is marked "draft," was that report changed at all between

12  May 14, 2013, and let's say the start of this trial on

13  October 8th, 2013?

14  A      No.  That was the report I always had available to me.

15  Q      If you could look at Exhibit -- Defense

16  Exhibit 30I.4 . . . this is a defense exhibit?

17  A      30I.4.

18  Q      Yes.

19  A      This is the one.

20  Q      I'm sorry, you're looking at -- yeah, there you go.

21  A      Got it.

22         MR. HOCHMAN:  And if we can switch the screens to

23  this table . . . and if we could put up 30I.4, please?

24         (An exhibit was projected onto the projector screen.)

25

1   BY MR. HOCHMAN:

2   Q      Now, you have 30I.4 before you; do you see that?

3   A      Yes, I do.

4          MR. HOCHMAN:  If we could focus on the bottom third

5   of this exhibit?

6   BY MR. HOCHMAN:

7   Q      This is the May 14th, 2013, report; correct?

8   A      That's correct.

9   Q      And I see there's a government's Exhibit 30I; do you see

10  that?

11  A      Yeah.  There's a sticker on the bottom, or a copy of a

12  sticker on the bottom of this one, 30I.

13  Q      And was this the report that was given to you and the

14  defense at the start of this trial; it was supposed to be the

15  government's revenue agent report for this trial?

16  A      This is the one.

17  Q      Now, did you actually rely on this report in preparing

18  your analysis to assist the defense in this case?

19  A      Yes, of course.

20  Q      And what was the -- to you, what was the impact of this

21  report changing six days into trial?

22  A      Well, frankly, I was shocked.  I've never seen a report

23  change like that, in a criminal trial, into the trial.  I

24  guess, with four years to investigate and come up with a

25  report, I personally would have expected that it would have

1    been a final and a complete report.

2    Q     And was it your expectation -- did you have any reason

3    to doubt that Revenue Agent Maurer had access, at least from

4    the time the case was indicted, on May 14, 2013, to the first

5    day of trial, on October 8, 2013, to the government's documents

6    that it was going to introduce in trial?

7    A     Well, as she was testifying, I took some notes of her

8    testimony.  And she specifically mentioned some documents that

9    she relied on.  And except for one document, I think it

10   was 7II, all of the other documents have been admitted into

11   evidence, and they were provided in discovery.  And it's my

12   understanding that the government had these documents all

13   along.

14   Q     Well, do you recall that two of the documents -- I think

15   it's 3S, and then there is 3EE documents, these were client

16   notes in the UBS files, do you recall that she relied on -- and

17   those -- two of those documents -- to change her opinion in

18   this case?

19   A     I recall that that's what she stated; yes.

20   Q     And these were two of the accounts that she had actually

21   looked at in depth; is that not correct?

22   A     They were part -- they were documents that were part of

23   the documents that she had testified that she looked into in

24   depth.

25   Q     And with respect to the other documents, those were the

1    Mario deCastro documents?

2    A       Yes.

3    Q       Do you recall her actually relying, as far as changing

4    her report, on any testimony apart from documents?

5    A       My recollection is that she testified that she relied on

6    the testimony of Mr. deCastro to formulate her new theory and

7    change the report.

8    Q       But when she actually explained what testimony she

9    relied on, Mr. deCastro, did it turn out that all she relied on

10   from Mr. deCastro were the documents that he introduced?

11   A       Yes, that's exactly right.

12   Q       Now, have you had a chance to compare Special Agent

13   Maurer's May 14th, 2013, report with the October 13, 2013,

14   report, to compare them?

15   A       I have, yes.

16   Q       And have you come up with a summary chart showing the

17   total amount of changes on the May 14, 2013, report?

18   A       Yes.

19           MR. HOCHMAN:  May I present what will be marked as

20   Defense Exhibit 30I.7, to the witness?

21   BY MR. HOCHMAN:

22   Q       And is Exhibit 30I.7 a chart that -- a summary chart

23   that you prepared that summarizes the changes that you observed

24   between the May 14th, 2013, report of Revenue Agent Maurer, and

25   the one she prepared on October 14, 2013?

1   A      That's the one; yes.

2            MR. HOCHMAN:  We'd seek to admit Defense

3   Exhibit 30I.7 as a summary chart, Your Honor.

4            THE COURT:  Any objections?

5            MS. KESSLER:  No, Your Honor.  Thank you.

6            THE COURT:  30I.7, for the defendant, is admitted.

7            MR. HOCHMAN:  We ask to publish, Your Honor?

8            THE COURT:  You may.

9            (Defendant's Exhibit 30I.7 admitted into evidence.)

10           (An exhibit was projected onto the projector screen.)

11           MR. HOCHMAN:  And if you could just highlight

12  the . . . .

13  BY MR. HOCHMAN:

14  Q      Now, if you can take us through this summary report, and

15  start at the top, Mr. Rivera.

16  A      Well, these are the changes to the May 14th, 2013,

17  report.  And the first part of it is, as it's labeled it says:

18  "Decreases to Dr. Patricia Hough's Total Income."

19           And the first line is the first decrease to that total

20  income, and it was a decrease of $2.5 million for the year

21  2006, which had formally been labeled, "Undeclared Income From

22  Foreign Accounts."

23           The second --

24  Q      I'm sorry, go ahead.

25  A      The second line on that, at the top, is a change for the

1    year 2007, of $3,736,579.  Again, same categorization, from

2    undeclared income from foreign accounts.

3    Q     And what is the total of the changes that she made to

4    decrease Dr. Patricia Hough's total income, based on taking off

5    the 2006 to 2007 undeclared foreign income?

6    A     Just adding up the numbers, $6,236,579.

7    Q     And did she actually even increase and make a change in

8    the other direction to Dr. Patricia Hough's total income for

9    2007?

10   A     Yes.  Below the $6 million number that I just referred

11   to, it's labeled, "Increase to Dr. Patricia Hough's Total

12   Income," and that increase actually was in 2007.  And it

13   represents an increase, essentially a split from the sale of

14   the Saba school.  Some of it went to Dr. Hough.  And the other

15   part, because I actually looked at the -- at Dr. Fredrick's

16   report, went to Dr. Fredrick.

17   Q     So what are the grand total of all the changes that she

18   made to Dr. Patricia Hough's total income, from the May 14,

19   2013, report to the October 14, 2013, report?

20   A     Between decreases and increases, you have a change of

21   $6,731,077.

22   Q     Now, in your 24 years of working with the IRS criminal

23   investigation division in all the capacities you did, had you

24   ever seen a revenue agent change their revenue agent's report

25   during trial?

1    A       No, I never have.  That's actually a pretty staggering

2    change.

3    Q       In any amount, have you ever seen a revenue agent change

4    their revenue agent's report during trial?

5    A       I have never seen it.

6    Q       And what is the significance to you that this particular

7    revenue agent changed her report, six days into the middle of

8    this trial, by $6,731,077?

9    A       Quite frankly, I mean, what it told me -- I was shocked

10   by it, but what it told me is that I'm pretty much dealing with

11   a deficient investigation, substantially --

12          MS. KESSLER:  Objection, Your Honor, based on the

13   discussion we had at sidebar.

14          THE COURT:  Sustained.

15   BY MR. HOCHMAN:

16   Q       What was the -- with respect to the significance, had

17   you ever seen a report change six days into -- or at any point

18   after a trial began, to the amount of $6.7 million?

19   A       I never have.

20   Q       I'd like to present you with Defense Exhibit 30I.8,

21   please.

22          Did you have occasion to prepare another summary chart

23   reflecting the changes in the 2006 tax year for Dr. Patricia

24   Hough, which is Count 7?

25   A       Yes, I did.

1   Q      And are you able, then -- in order to prepare this

2   chart, did you match the numbers between the May 14, 2013,

3   report and Agent Maurer's 10/14/2013 report?

4   A      Yes.  Basically, a comparison of the first report and

5   the second report.

6           MR. HOCHMAN:  I would move into evidence, Your Honor,

7   Defense Exhibit 30I.8?

8           THE COURT:  Any objections?

9           MS. KESSLER:  No, Your Honor.  Thank you.

10          THE COURT:  Defendant's 30I.8 will be admitted and

11  may be published.

12          (Defendant's Exhibit 30I.8 admitted into evidence.)

13          MR. HOCHMAN:  Thank you, Your Honor.

14          (An exhibit was projected onto the projector screen.)

15  BY MR. HOCHMAN:

16  Q      If you could explain to the jury what's contained in

17  Defense Exhibit 30I.8?

18  A      As I pointed out, it's basically a comparison between

19  the two reports.  You can see the headings, it's the

20  adjustments to total income, Line 22.

21          As you move to the right, you'll see the date, 5/14/13,

22  and then the date, 10/14/13.  They represent the dates of the

23  two revenue agent reports that we're dealing with.

24          And as you move down the adjustments to total income

25  column, it's the taxable income as reflected for taxable

1    interest.  That didn't change.  Ordinary dividends didn't

2    change.  And capital gains didn't change.

3         The big change, of course, is the income from undeclared

4    foreign accounts, which goes from $2.5 million to zero.

5    Q    And so how did that affect the ultimate total income on

6    Line 22, adjustments?

7    A    It substantially decreased the total income on Line 22,

8    which eventually led to a refund, or . . . money due to

9    Dr. Hough, as opposed to an additional tax.

10   Q    And focusing first on the total income, it starts out

11   at -- the total income under her May 14th report, is that there

12   should be $2,486,271 that she did not report on her return; is

13   that correct?

14   A    That was the original report.  That's the number on the

15   original report, yes.

16   Q    On her revised report, she's actually saying that

17   Dr. Hough overstated her total income by $13,729.

18        Do you see that?

19   A    That's exactly the impact of the change.  It's an

20   overreporting.

21   Q    Are you aware of any criminal tax case ever being

22   brought where a defendant overstated their income?

23             MS. KESSLER:  Objection as to relevance.

24             THE COURT:  Overruled.  I'll take it.

25             THE WITNESS:  No, not in an overstatement of income.

1    It's usually an understatement of income.  That's what it is.

2    BY MR. HOCHMAN:

3    Q       And are you aware of any -- and you said that, actually,

4    Dr. Hough, under the 10/14/13 calculations, was entitled to a

5    refund; is that correct?

6    A       According to the report, yes.

7    Q       Are you aware of any criminal tax case that was ever

8    brought where a defendant was entitled to a refund?

9    A       In my entire career, I never saw a criminal

10   investigation where the taxpayer was entitled to a refund and

11   was charged with a crime.

12   Q       Now, you were here in court when Revenue Agent Maurer

13   gave her reasons, as you said, for changing her opinion, or her

14   report, from the 5/14/13 report to the 10/14/13 report.

15           Do you recall that?

16   A       I recall that.

17   Q       And I believe that was because she reached a different

18   conclusion, six days into this trial, as to who owned the Saba

19   School of Medicine Foundation.

20           Do you recall that?

21   A       That's what I heard.

22   Q       And you actually heard, as you said before, the evidence

23   that she relied on; correct?

24   A       Yes, I actually noted it.

25   Q       Now, with respect to that -- with respect to other

1    evidence that you have heard in this trial, what evidence, in

2    particular, have you focused on to determine whether or not

3    Dr. Fredrick and Dr. Hough owned the Saba School of Medicine

4    Foundation?

5    A      Well, several pieces actually, quite a bit.  There's, I

6    think, extensive testimony from numerous witnesses either

7    saying that the Saba School of Medicine Foundation is either a

8    nonprofit or . . . they believe it to be a nonprofit.  You

9    know, those witnesses including several CPAs that testified to

10   that effect.

11          I looked at a variety of documents, and . . . I looked

12   at them singularly, in and of themselves, and I also looked at

13   them in conjunction with all of the evidence; in other words,

14   in their totality.

15          And another piece of evidence that I thought was kind of

16   interesting, and I did not hear anyone mention it, is the

17   audited financial statements, particularly in the audited

18   financial statements, which I thought was important in that

19   determination.

20   Q      And in what way -- actually, before we get to the

21   audited financial statements, you said you relied -- or you

22   heard the testimony of several CPAs in this case, in which it

23   says that Dr. Hough -- we'll focus on Dr. Hough -- that

24   Dr. Hough did not own the Saba School of Medicine Foundation,

25   or, for that matter, Dr. Fredrick.

1          Do you recall that?

2    A      I do.

3    Q      Would one of those have been Jerome Schneider, Jerry

4    Schneider, who testified?

5    A      Jerry Schneider testified, I think he prepared the

6    audited financial statements for one of the entities.

7    Q      And do you recall his testimony that no one can own a

8    foundation?

9    A      Correct.

10   Q      Do you recall Mr. Minchenberg testifying similarly, that

11   no one can own the Saba School of Medicine Foundation?

12   A      Similarly, he said the same thing; yes.

13   Q      Do you recall actually Mr. deCastro testifying that he

14   doesn't even know whether anyone can own the Saba Foundation?

15   A      He did; yes, I remember that.

16   Q      Do you remember Mr. Murtha, another CPA, testifying that

17   Dr. Hough did not own the medical schools?

18   A      I remember that testimony.

19   Q      Do you recall Mr. Gruber -- Dr. Gruber, excuse me,

20   testifying that he did not believe anyone owned the Saba School

21   of Medicine Foundation?

22   A      I do.

23   Q      And do you recall Antoine Solagnier, the former governor

24   of Saba, and the man who held all those positions on Saba,

25   testifying that, by definition, the Saba School of Medicine

1  Foundation cannot be owned by an individual?

2           MS. KESSLER:  Objection, Your Honor.  I am not aware

3  that there is a question, other than the repeating of the

4  testimony that was alleged to have occurred.

5           MR. HOCHMAN:  The question is about to follow, Your

6  Honor.

7           THE COURT:  Let's get there.  Overruled pending the

8  question.

9  BY MR. HOCHMAN:

10  Q      And were you able to form an opinion based on all the

11  testimony that you heard concerning who owned the Saba School

12  of Medicine Foundation?

13  A      Based on the testimony and all the documentation, yes, I

14  was able to form an opinion.

15  Q      And were the documents that you relied on, I believe you

16  saw documents of Form As, of the Saba School of Medicine

17  Foundation, in which the box was checked that the contracting

18  partner, the Saba School of Medicine Foundation, was also the

19  sole beneficial owner.

20           Do you recall those documents?

21  A      I recall those documents, and those are in part some of

22  the documents I used to make my determination.

23  Q      And what was that determination?

24  A      My determination is, those documents are really, at

25  best, questionable.  In my experience, documents sometimes can

1    speak for themselves, but may times you need that context, you

2    need to add substance to the document, and the best way to do

3    that is with testimony.

4         I can see a number, but I don't really know what that

5    number means necessarily, just by looking at it.  I can see a

6    checked box, but I don't really know necessarily -- I can read

7    what it says, but why did it get checked that way becomes very

8    important, at least in my determine -- in trying to make a

9    determination.

10   Q     Now, you said that you also look at the audited

11   financial statements in this case.

12   A     I did.

13   Q     And do you have experience looking at audited financial

14   statements?

15   A     I look at them all the time.

16   Q     Do you understand what the difference is between a

17   foundation, a nonprofit foundation's audited financial

18   statement and one for a for-profit corporation?

19   A     Oh, absolutely.

20   Q     You understand, for instance, in this case, that the

21   Saba School of Medicine Foundation is a nonprofit foundation,

22   and the Medical University of the Americas is a for-profit

23   corporation; is that correct?

24   A     That's my understanding.

25             MR. HOCHMAN:  I'd like to show the witness what's

1   been marked as Government's Exhibits 9B, and Government's

2   Exhibit 9N.

3   BY MR. HOCHMAN:

4   Q       I believe you have those before you, 9B and 9N?

5   A       I have them right here.

6           MR. HOCHMAN:  And we'll focus on Page 4 of each of

7   those exhibits, Your Honor.

8           If we could publish Page 4 of 9B?

9           THE COURT:  You may, if those have been admitted.

10          MR. HOCHMAN:  Yes, Your Honor.

11          And if we could switch the screen back to the

12  government, we'll publish this.

13          (An exhibit was projected onto the projector screen.)

14          MR. HOCHMAN:  And if we could highlight the very top,

15  Your Honor, the top section?

16          (An exhibit was projected onto the projector screen.)

17  BY MR. HOCHMAN:

18  Q       This is the MUA, Medical University of the Americas,

19  financial -- part of their financial statement for the year

20  ending April 30th, 2006.

21          Do you see this?

22  A       I do.

23  Q       And is the Medical University of the Americas a

24  for-profit corporation based on the way the financial statement

25  is set up?

1    A      Yes.  Based on the way the financial statement has been

2    prepared, it would indicate to me that it is a for-profit

3    entity.

4    Q      And in what way do you see that?

5    A      Well, if you note, if you note, right beneath where it

6    says "Medical University of the Americas," the title of the

7    statement itself is, "Balance Sheet."  And, of course, it has

8    as of a particular ending date, in this case April 30th, 2006.

9    But it says, "Balance Sheet."

10          MR. HOCHMAN:  And if we could put in a split screen,

11   Your Honor, Exhibit 9N, Page 4, which is the Saba School of

12   Medicine Foundation's financial statement for 2006.

13          And if we could highlight the top part of each?

14          (An exhibit was projected onto the projector screen.)

15   BY MR. HOCHMAN:

16   Q      Turning to Exhibit 9N, Page 4, Saba school's, can you

17   read to the jury what's right below what it says, "Statements

18   of Financial Position"?

19          Do you see that?

20   A      Well -- yes.  Well, under Saba School of Medicine

21   Foundation it says, "Statement of Financial Position," yes.

22   Q      What's the difference between a balance sheet and a

23   statement of financial position, as far as the impact as to

24   whether or not the financial statements for a nonprofit

25   corporation -- excuse me -- nonprofit foundation versus a

1   for-profit corporation?

2   A      It's the presentation.  For-profit entities have a

3   balance sheet.  Governmental -- which are nonprofits of

4   course -- and nonprofit entities have a statement of financial

5   position.  It's a huge difference because, accounting-wise, one

6   is what is called "fund" -- F-U-N-D -- "accounting," which is

7   how statements for nonprofits and governmental entities are

8   prepared.  And the other one is just a for-profit, it's just a

9   regular financial statement.

10  Q      And does a nonprofit foundation have profits?

11  A      A nonprofit foundation?

12  Q      Yes.

13  A      They don't have profits.

14  Q      So they don't have profits to distribute to owners; is

15  that correct?

16  A      Not only that, I think if you also focused on the bottom

17  of the balance sheet, you'll see that, presentation-wise, it

18  makes a huge difference because a for-profit states that

19  stockholders equities.  That means you have stockholders.

20          MR. HOCHMAN:  Could we just -- since we can't see

21  that much, if we could just put 9N, Page 4, on the screen, and

22  get rid of the split screen, please . . . and then focus on the

23  bottom half of that?

24          There you go.

25          (An exhibit was projected onto the projector screen.)

```
1    BY MR. HOCHMAN:

2    Q       This is the MUA balance sheet.

3            And can you explain to the jury what you're looking at,

4    to see whether or not this is a company that actually can

5    distribute profits?

6    A       As you move down the statement, you'll see that it has

7    assets, current assets, and a variety of those.  It has current

8    liabilities.  It has loans.

9            But then, at the bottom is the basic equation, where

10   assets equal zero.  Liabilities per stockholders' equity, basic

11   accounting formula, it says, "Stockholders' equity," and that's

12   what you would expect to see.  And, in fact, according to

13   generally accepted auditing standards, that is the computation

14   for the for-profit entity.  It says, "Stockholders," because it

15   would have stockholders.  And from there -- not from there, but

16   from the income statement, you would have distributions to the

17   stockholders.

18   Q       And the auditors who came up with this -- this is what's

19   called an audited financial statement; is that correct?

20   A       From my understanding, this is the audited financial

21   statement; correct.

22   Q       What is the auditor able to do, in order to obtain, or

23   complete, an audited financial statements?

24   A       Well, when you do an audit -- an audit is basically

25   called assurance.  In other words, you are providing an
```

1   assurance over these financial statements that they

2   represented, not only -- and that their presentation is fair,

3   and in all material respects represents the position of the

4   entity being audited.

5   Q       Now, are the auditors independent?

6   A       Well, this auditor has to be independent to provide an

7   audited financial statements.  That's one of the requirements.

8   Q       And in order to come up with an audited financial

9   statement, is the auditor able to go through the books and

10  records of the entity, as well as speak to all of the relevant

11  people?

12  A       The auditor has to do various things.  Among the

13  professional standards is independence.  The auditor must be

14  independent.  And that is just a standard for the professional.

15          But beyond that, the auditor has to get confirmations.

16  In other words, he can't just rely on what the auditee tells

17  him.  He has to get independent cooperation of balances and

18  other information that would be material.

19          In this particular case, I believe that part of the

20  evidence that has been presented is the fact that, at least for

21  the Saba School of Medicine, they've actually examined

22  documentation which must have told them -- had to have told

23  them, because that's how they presented the statement -- that

24  it was a not-for-profit institution.

25  Q       Well, let me -- and let me stop you there.

1        So MUA, in its financial statement, has this line,

2   shareholders equity, with money attached to it.

3              MR. HOCHMAN:  If we could put Exhibit 9N up,

4   please . . . and focus on the bottom half?

5              (An exhibit was projected onto the projector screen.)

6   BY MR. HOCHMAN:

7   Q     Do you see anything indicating shareholders' equity for

8   the Saba School of Medicine Foundation?

9   A     Well, this is precisely my point.  This is what the two

10  statements illustrate.  You will see that it has unrestricted

11  net assets.  It not stockholders' equity.  And for a nonprofit,

12  that's exactly what you would have.  You would have

13  unrestricted -- you could have restricted -- for example, I

14  happen to be a member of the Red Cross, and there will be gifts

15  that are designated as restricted.

16       In this particular case, it seems that the net assets of

17  the entity are unrestricted.

18  Q     And is that -- is that an indication, or is that a

19  statement, in essence, by the auditors, that they have

20  determined that the Saba School of Medicine Foundation is, in

21  fact, a nonprofit foundation?

22  A     Yes, it's an indication of that.

23              MS. KESSLER:  Objection.

24              THE COURT:  Wait.  Too many people talking at one

25  time.  I'm sorry.

 1              MS. KESSLER:  I said:  Objection, hearsay.

 2              THE COURT:  Ask the question again for me, please.

 3    BY MR. HOCHMAN:

 4    Q      Is the -- based on your training and experience dealing

 5    with financial statements, what is the significance of the fact

 6    that you don't see a shareholder's equity statement as part of

 7    the Saba School of Medicine Foundation's financial statement?

 8              THE COURT:  The objection is overruled.

 9              You may answer.

10              THE WITNESS:  The significance is that these

11    statements are prepared consistent with the preparation of a

12    not-for-profit institution.  So when I see this, it tells me

13    this must be a -- if I had listened to anything in this trial,

14    and I looked at this, that would be my conclusion, based upon

15    the language and the presentation of this statement.

16    BY MR. HOCHMAN:

17    Q      And does the fact that a nonprofit foundation has net

18    revenues mean that it's not a nonprofit foundation?

19    A      I'm sorry, can you repeat that question?

20    Q      Sure.

21         Does the fact that a nonprofit foundation has net

22    revenues mean that it's not a nonprofit foundation?

23    A      Well, it actually has net assets.  It's not even

24    revenues, it's assets, because that's how they are represented.

25    That's how you represent the assets of, or the revenues of a

1    not-for-profit, they're represented in terms of assets.

2    Q       Let me turn you, if I could, to the next page of this

3    exhibit, N, 9N, Page 5.

4            Now, 9N, Page 5, there's a total revenue and total

5    expenses lines; do you see that?

6    A       Yes, I do.

7    Q       And does the fact that a nonprofit, the Saba School of

8    Medicine Foundation, has total revenue and total expenses mean

9    that it's not a nonprofit foundation?

10   A       No, it doesn't really mean that.

11   Q       What does it mean?

12   A       It just means that it has, like any other entity,

13   revenue and expenses.

14   Q       But it has no profits because it's a nonprofit

15   foundation; correct?

16   A       That's correct.

17   Q       And, therefore, there's nothing to distribute to anyone

18   because no one can own a nonprofit foundation; correct?

19              MS. KESSLER:  Objection, leading.

20              THE COURT:  Sustained.

21              THE WITNESS:  Actually, it doesn't have -- that's

22   correct, it doesn't --

23              THE COURT:  Mr. Rivera, there's no question.

24              THE WITNESS:  I'm sorry.  I'm sorry, Your Honor.

25

1   BY MR. HOCHMAN:

2   Q      Do you see any line here that indicates any net profits?

3   A      No.

4   Q      Now, going back to . . . your analysis of whether or

5   not -- of who owns the Saba School of Medicine Foundation, I

6   believe you talked about the testimony in this case and the

7   documents you reviewed; correct?

8   A      Correct.

9   Q      I believe you've also talked about the documents that

10  you received, and the conversations you had with Mr. Montenegro

11  and Mr. Schulthess; correct?

12  A      I did.

13  Q      And you just talked about the significance of reviewing

14  these audited financial statements; do you recall that?

15  A      Um-hum.  Yes.

16  Q      As well as the Saba School of Medicine Foundation

17  Form As that you reviewed as well.

18  A      Correct.

19  Q      Did you form an opinion as to who owns the Saba School

20  of Medicine Foundation?

21  A      No one owns the Saba School of Medicine Foundation.

22  They can't have an owner.

23  Q      And how does that opinion affect your opinion about the

24  accuracy of Agent Maurer's revised October 14, 2013, revenue

25  agent report?

1    A       I think the methodology is flawed, significantly flawed.

2            MR. HOCHMAN:  Your Honor, may I present to the

3    witness what's already in evidence, which is the big chart,

4    Defense Exhibit 30I.1?

5            THE COURT:  You may.

6            MR. HOCHMAN:  And if it's okay, I'll just hold it up

7    rather than have the agent step down, and I'll speak very

8    loudly.

9            THE COURT:  Sure.

10   BY MR. HOCHMAN:

11   Q       Did you see Agent Maurer fill in what's been marked as

12   Defense Exhibit 30I –– in evidence as Defense Exhibit 30I.1?

13   A       Yeah, I saw when she filled in that exhibit.

14   Q       And do you see that she put zeros down for interest,

15   dividends, and capital gain, based on the assumption that

16   Dr. Hough and Dr. Fredrick do not own the Saba School of

17   Medicine Foundation?

18   A       That's her third calculation.  Yes.

19   Q       And do you believe this third calculation is correct?

20   A       I believe it's correct.

21           MR. HOCHMAN:  No further questions.

22           THE COURT:  Ms. Kessler?

23           MS. KESSLER:  Yes.

24           THE COURT:  We got a little bit off schedule on

25   breaks.

1          Anyone need a break now?  Are you okay?

2          All right.

3          MS. KESSLER:  Court's indulgence.

4          (Ms. Kessler examines various documents.)

5                    CROSS EXAMINATION

6   BY MS. KESSLER:

7   Q     Now, if we could turn to Exhibit 30I.4 . . . if we look

8   at -- this is the draft computation dated May 14th?

9   A     30I --

10  Q     -- underscore four?

11         MS. KESSLER:  May I approach the witness, Your Honor?

12         THE COURT:  You may.

13         (Ms. Kessler assists the witness with the exhibit.)

14         THE WITNESS:  Okay.  Got it.  Thank you.

15         MS. KESSLER:  That's it.

16         THE WITNESS:  Thank you.

17  BY MS. KESSLER:

18  Q     Now, if we could look at -- I'm sorry.

19        Do you have the document now?

20  A     I do.  Thank you so much.

21  Q     Now, this is the draft Revenue Agent Report dated

22  May 14th, 2003; is that correct?

23  A     That's correct.

24  Q     And if we turn to Page 2 of this document, did you read

25  that this is noted as a draft document?

1    A       I read that.

2    Q       And the indictment in this case was handed down on

3    May 15th of 2003; is that correct?

4    A       The following day; yes.

5    Q       And do you have any idea what documentation the

6    government or Ms. Maurer had in her possession prior to the

7    indictment date versus after the indictment date?

8    A       I only base my opinion as to what documentation she had

9    available based on the -- her own testimony of what documents

10   she actually relied on.

11   Q       Do you have any idea whether Ms. Maurer had access to

12   the information from Mister -- that Mr. deCastro testified to,

13   in the six series of the government's exhibits, prior to the

14   indictment on May 15th, 2013?

15   A       It was provided as discovery, so I have to think the

16   government had it.

17   Q       My question is:  Do you know, yes or no, whether Agent

18   Maurer had access to the documents that Mr. deCastro testified,

19   wherein the defendant and her husband identified themselves as

20   owner of the schools and The Foundation prior to the date of

21   the indictment?

22           MR. HOCHMAN:  Objection, misstates the documents as

23   to Dr. Hough.

24           THE COURT:  Overruled.  He may answer.

25           THE WITNESS:  No, I don't know that she had access to

1   those documents.

2   BY MS. KESSLER:

3   Q      And you don't know when those were received by the

4   government either, do you?

5   A      I don't know that.

6   Q      Now, you were with IRS CI for a number of years, more

7   than 20?

8   A      Twenty-four.

9   Q      And generally, Revenue Agent reports are prepared in

10  preparation for trial; isn't that correct?

11  A      Yes.

12  Q      And they are generally -- excuse me.

13         The Revenue Agent who testifies with regard to those

14  revenue agent reports at trial are considered what is called a

15  summary witness; isn't that correct?

16  A      Yes.

17  Q      And so his or her testimony would be based upon the

18  evidence as it comes out at trial; isn't that correct?

19  A      Not necessarily, but it can be.

20  Q      Would it -- okay.

21         Do you recall that Revenue Agent Maurer testified that

22  her Revenue Agent Report, the tax computation that she prepared

23  in this case, was, in fact, based on her observation of the

24  evidence that came out in trial here; isn't that correct?

25  A      I think she's testified as such; yes.

1    Q      And if Revenue Agent Maurer believed, based on the

2    evidence she heard at trial here, that the schools and The

3    Foundation were not owned by Dr. Fredrick and Dr. Hough, the

4    computation dated October . . . the most recent --

5    A      October 14th?

6    Q      -- would have been incorrect, wouldn't have it?

7    A      It would have been a left pocket to right pocket --

8    Q      But it wouldn't have accurately reflected what she

9    believed the evidence --

10   A      It would have been incorrect.

11   Q      In fact, if she had kept her computation -- based on her

12   listening to the evidence and her conclusion, if she had kept

13   the computation the same as the May 14th computation, she would

14   have been double counting because she would have been counting

15   transfers from The Foundation and the schools, to the benefit

16   of Dr. Hough and Dr. Fredrick, and that would not have been

17   proper.

18   A      That's exactly what she said; yes.

19          MS. KESSLER:  I have nothing further.

20          THE COURT:  Mr. Hochman.

21          MR. HOCHMAN:  Very briefly, Your Honor.

22          May I consult with my co-counsel?

23          THE COURT:  You may.

24          (Mr. Hochman confers with co-counsel at defense

25      counsel table.)

DEFENSE RESTS                                    196

1           MR. HOCHMAN:  No further questions, Your Honor.

2           THE COURT:  You may stand down.  Thank you.

3           THE WITNESS:  Thank you.

4           THE COURT:  You may call your next witness.

5           MR. HOCHMAN:  Defense rests, Your Honor, and we

6    reserve on making a motion, as well.

7           THE COURT:  You may do so.

8           Ms. Finley or Ms. Kessler?

9           MS. FINLEY:  The government has no rebuttal case,

10   Your Honor.

11          THE COURT:  Counsel, if you'd come to sidebar,

12   please?

13          MR. HOCHMAN:  Thank you very much.

14                        AT SIDEBAR

15          THE COURT:  May I assume that the consensus is, we'll

16   send the jury home, do the charge conference, and then do

17   closing arguments first thing in the morning?

18          MR. HOCHMAN:  Yes, Your Honor.

19          MS. FINLEY:  Yes, Your Honor.

20          THE COURT:  Okay.

21                       IN OPEN COURT

22          THE COURT:  Ladies and gentlemen, both sides have

23   rested, so that means you've heard all the evidence in the case

24   that you're going to hear.  The next step of the proceedings is

25   closing arguments.

1              For you, the next step is a recess.  What the lawyers

2      and I are going to do after you leave is have what's called a

3      jury charge conference, or a jury instruction conference, where

4      we go over the proposed instructions I will read you at the end

5      of the case.  The lawyers have the right to know what I'm going

6      to tell you the law is, before they make their closing

7      arguments to you.  So we're going to that this afternoon.

8              I'm going to have you come in at 9:00 o'clock

9      tomorrow morning.  We'll begin with the closing arguments.  I

10     expect that will take pretty much all morning.  I'm trying to

11     get both sets of closing arguments at the same time, so you get

12     to listen to everybody without anything other than the normal

13     morning recess.  And then, depending how long that takes, we

14     may break for lunch.  And then I'll give you the instructions,

15     or I may give you the instructions after that.  I'm not sure.

16     But we're going to try to get the closing arguments and the

17     instructions as close to one time as possible.

18             So rather than keep you here and then get halfway

19     through an opening, or an opening and closing argument, I'm

20     just going to send you home, and then we'll start up

21     at 9:00 o'clock in the morning.  So that's kind of a

22     long-winded way of saying, you're going to be in recess for the

23     rest of the afternoon.

24             Again, even though the case is over in terms of

25     testimony, all those rules and admonitions I told you about

1    before are even more important.  You still can't talk about the

2    case, you still can't do any research about the case, because

3    it's not over until the lawyers make the closing arguments and

4    I tell you with the law is.

5            So, with those admonitions, have a good evening, and

6    I'll see you at 9:00 o'clock in the morning.

7            (At 3:20 PM, the jury was escorted from the

8        courtroom.)

9            THE COURTROOM DEPUTY:  They want to know if there was

10   any possibility they would have to stay past 5:00 tomorrow

11   because they would have to make arrangements.

12           THE COURT:  The -- a juror, or some jurors, want to

13   know if there is any possibility that they would have to stay

14   past 5:00 tomorrow because they have to make arrangements.  I

15   think the honest answer is twofold:  One, no, because I won't

16   let them stay past 5:00, but it depends on how long they

17   deliberate whether they have to come back in the morning.

18           MR. HOCHMAN:  I think maybe the Court can just say

19   that the Court will dismiss the jurors at the regular time it's

20   been dismissed, if they're still in session, or something along

21   those lines.

22           THE COURT:  And then they'll come back Thursday

23   morning?  That's fine.

24           Do you want me to have them out, or do you want me to

25   go in, or have the Court Security Officer do that, or what's

DEFENSE RESTS                              199

1    your pleasure?

2              MR. HOCHMAN:  Probably do it on the record just to be

3    clear, Your Honor.

4              THE COURT:  All right.  Let's have the jury brought

5    back in.

6              (At 3:23 PM, the jury was escorted into the

7         courtroom.)

8              THE COURT:  Good morning, ladies and gentlemen.

9              Are you all ready?

10             I just wanted to make sure you're all awake.

11             There was a question about tomorrow.  Tomorrow, we're

12   going to shut down at 5:00 o'clock.  I mean, that's the

13   building rule.  So if you still need to deliberate past that,

14   that's fine.  We'll just have you come back the next day

15   at 9:00 o'clock.  But we don't keep jurors past 5:00 o'clock

16   now because of budget reasons and things like that.

17             So for planning purposes, I expect you to get the

18   jury . . . the case before that, obviously, and you can stay

19   until 5:00 o'clock, and then I'm going to send you home and

20   have you come back the next morning.

21             So I hope that helps in terms of planning?

22             Okay.  Thank you.

23             Now, all those things before, I said, go and have a

24   good evening.

25             (At 3:24 PM, the jury was escorted from the

CHARGE CONFERENCE                        200

1          courtroom.)

2                THE COURT:  All right.  You may be seated.

3                Anybody need a recess before we get started with the

4     charge conference?

5                You can go.  Let's take ten minutes.  I assume that

6     the Court's second form of the verdict instructions were handed

7     out during lunch, and that's what I intend to begin with.  So

8     let's come back in ten minutes.

9                (At 3:25 PM, court was recessed.)

10                         AFTER RECESS

11                (At 3:34 PM, court was reconvened.)

12                THE COURT:  All right.  Counsel, unless you're more

13     comfortable standing, no one needs to stand, as long as the

14     court reporter can hear all of us.

15                What I propose to do is go through the instructions

16     that the Court has proposed earlier this afternoon, page by

17     page, and solicit objections and/or comments, and then proceed

18     to the verdict form, which I think we've given you two options,

19     neither of which I really like, but we'll get there when we get

20     there.

21                First of all, Page 1, any objections there?

22                MS. FINLEY:  No, Your Honor.

23                MR. HOCHMAN:  Mr. Udolf will be taking the lead here

24     for us, Your Honor.

25                THE COURT:  All right.  And I think I heard him say

CHARGE CONFERENCE                    201

1    no.

2              MR. UDOLF:  That's correct, Your Honor.

3              THE COURT:  Going through Page 2, to the bottom of

4    Page 3, should still be all pretty much pattern.

5              Any objections there, two or three?

6              MR. UDOLF:  No, Your Honor.

7              MS. FINLEY:  No, Your Honor.

8              THE COURT:  Page 4?  And that continues into Page 5,

9    with pattern; any objections to Page 4?

10             MR. UDOLF:  Not on behalf of the defense, Your Honor.

11             MS. FINLEY:  None from the government, Your Honor.

12             THE COURT:  All right.  Page 5, any objection to

13   what's on Page 5?

14             MS. FINLEY:  No, Your Honor.

15             MR. UDOLF:  No, sir.

16             THE COURT:  And continuing on to Page 6, any

17   objection to Page 6?

18             MR. UDOLF:  None.

19             MS. FINLEY:  No, Your Honor.

20             THE COURT:  Page 7, I guess my question is the second

21   full paragraph, I think came from yours, but I don't recall any

22   summaries or charts that have not been admitted.

23             MR. UDOLF:  Judge, the only thing we would add to

24   this portion of the charge is, it doesn't make any reference to

25   the defense expert, Luis Rivera, who just testified.  We would

CHARGE CONFERENCE                                      202

1   ask that it be altered to read:  "On the other hand, charge of

2   summaries have been prepared by Revenue Agent Maurer, and by

3   defense expert Luis Rivera, and have been admitted into

4   evidence."

5               THE COURT:  And his charts were the 30I-series

6   charts?

7               MR. HOCHMAN:  Yes, Your Honor, Defense Exhibit 30I.7,

8   and 30I.8.

9               THE COURT:  The second sentence assumes that some of

10  the charts have not been admitted, which is not the case, I

11  don't think.  So unless you have something that you have for

12  demonstrative only?

13              MS. FINLEY:  The government has charts for

14  demonstrative only.

15              THE COURT:  All right.  "Revenue Agent Maurer or

16  defense witness Rivera . . ."?

17              MR. UDOLF:  It should be, "and."

18              THE COURT:  They weren't prepared by both of them.

19  It makes it sound like it was jointly prepared.

20              MR. UDOLF:  Probably "or," Your Honor.

21              THE COURT:  Should we call him "defense witness

22  Rivera"?

23              MR. UDOLF:  I would rather have him called "expert,"

24  Judge.

25              THE COURT:  I'm sure you would.  Super expert.

1            MR. HOCHMAN:  If, rather than giving Agent Maurer her

2   title, if we can say, "Sheila Maurer," and "Luis Rivera."

3            THE COURT:  That's fine.  I want to make sure the

4   jury knows who we are talking about.  I could just say

5   "witnesses."

6            MR. HOCHMAN:  Witnesses Sheila Maurer and Luis

7   Rivera.

8            THE COURT:  I was just going to not have any names

9   and just say "witnesses."  If you want names, I don't have any

10  problem with that, I guess.

11           MS. KESSLER:  That's fine, Your Honor.  Her title is

12  Revenue Agent, so I am not sure that the description is not

13  inaccurate.

14           MR. HOCHMAN:  We'll call him "former assistant

15  special agent in charge," then.

16           THE COURT:  And "current font of all knowledge."

17           All right.  I'm going to change it to, "Witnesses

18  Sheila Maurer or Luis Rivera have been admitted into evidence,"

19  and leave off all titles.

20           Okay.  Anything else about that paragraph that needs

21  changing?

22           MR. UDOLF:  No.

23           MS. FINLEY:  No, Your Honor.

24           THE COURT:  All right.  Page 8, anything there that's

25  objectionable?

1          MR. UDOLF:  No, sir.

2          MS. FINLEY:  No, Your Honor.

3          THE COURT:  Page 9?

4          MR. UDOLF:  No, Your Honor.

5          MS. FINLEY:  Not from the government.

6          THE COURT:  And I want both sides to -- I mean, I did

7    make some changes in the description of Count 1, by eliminating

8    the phrase, "known and unknown to the grand jury".  Other than

9    that, I think I tracked the language of Count 1.

10         All right.  That's Page 9.

11         Page 10?

12         MR. UDOLF:  I'm sorry, your Honor?  Could we go over

13   that again?

14         THE COURT:  Sure.

15         MR. SAUNDERS:  The Court deleted -- sorry -- "known

16   and unknown to the grand jury," but the indictment does charge

17   that she conspired with David Leon Fredrick and others.

18         THE COURT:  So you want me to put, "and others"?

19         MR. UDOLF:  Well, this takes place in a larger

20   discussion, Judge.  Because it's problematic on how we deal

21   with Dieter Luetolf and Beda Singenberger.  Because they're

22   just not named in the section, on the first page of the

23   indictment that says "parties".  They're also throughout the

24   indictment, in the manner and the means section, and throughout

25   the overt acts section.

1          Now, admittedly, some of those overt acts are

2    basically having them being contacted by David Fredrick, for

3    instance; but there are other overt acts that are there that --

4    in which they are -- basically they are the actors in the overt

5    acts.  And I don't know if we . . . if we have to go through

6    and reform the whole indictment, or . . . my idea is to have

7    the Judge instruct the jury that:  They are no longer to be

8    considered by you as co-conspirators for purposes of the

9    charges in this case.

10          And I'll tell you why, Judge.  In reliance on the

11   indictment, both sides, in their opening statements, made

12   extensive references to Singenberger and to Luetolf.  Counsel

13   for the government, Ms. Kessler, on several occasions referred

14   to co-conspirators and, by name, referred to both Luetolf and

15   Singenberger -- by my count, twice, by name -- in her opening

16   statement; and we, in turn, through Mr. Saunders, referenced

17   those individuals on numerous occasions.  I have a list of

18   probably around 30 times where they were discussed in the

19   opening statement.

20          And to just take them out, and without any

21   explanation from the Court, I mean, we would like to be able

22   to, as we would in any case, like to remind the jurors of what

23   representations or promises were made by the government and by

24   the defense in the opening statements, and to let them know

25   that they can no longer consider the actions of Singenberger

1    and Luetolf as acts -- as co-conspirator acts.

2              THE COURT:  Because of my ruling?

3              MR. UDOLF:  Yes, sir.

4              THE COURT:  So you don't object when the government

5    says, because of my ruling, "You can consider these two

6    remaining named defendants to be conspirators."

7              I mean, it can be a two-edged sword.  My ruling

8    eliminates two of them, but by leaving in this defendant and

9    Dr. Fredrick, the jury can read into that, that I made a ruling

10   that perhaps they shouldn't be considering.

11             MR. UDOLF:  Well, I think they could probably

12   consider the actions Dr. Fredrick in any event, assuming that

13   they find that they were co-conspirators.

14             THE COURT:  Well, I think that's right, but that's --

15   given the posture of the case, that's . . . has to be more than

16   an assumption, because if they don't find Dr. Fredrick as a

17   conspirator, you can't have a one-person conspiracy, and that's

18   all you got left unless they follow instructions, or the

19   suggestion here, and put and others.  I think you only have a

20   two-person conspiracy at this point left.

21             MR. UDOLF:  In that case, we would suggest leaving

22   everybody in, submitting it to the jury and letting us argue it

23   to the jury, Your Honor, without informing the jury of the

24   Court's ruling.

25             THE COURT:  So leave in the two names, or the "and

1    others," and then you can argue both sides can argue the --

2    whether either Mr. Luetolf or Mr. Singenberger is a

3    co-conspirator; is that what you -- I just want to make sure I

4    understand.

5            MR. UDOLF:  Yes, sir.

6            MS. FINLEY:  I just want to make sure I understand --

7            THE COURT:  Okay.

8            MS. FINLEY:  -- for closing argument.

9        So now they're saying that the government can argue

10   that Mr. Luetolf and Mr. Singenberger are co-conspirators?

11           THE COURT:  That's what I understand him to be

12   saying.

13           MS. FINLEY:  Even though the Court ruled -- contrary

14   to the Court's ruling.

15           THE COURT:  That's what I am understanding they are

16   saying.

17           MS. FINLEY:  I just want to make sure.

18           MR. SAUNDERS:  Well, is the Court's ruling going to

19   be precluding the government from arguing that?

20           THE COURT:  Absolutely.  I found there was not a

21   preponderance of the evidence to establish that they were

22   co-conspirators for purposes of the co-conspirator exception.

23   I don't see how that would change in terms of their

24   co-conspirator status in Count 1, in general.

25           MR. HOCHMAN:  May we have a moment, Your Honor?

1          THE COURT:  Sure.

2          MR. HOCHMAN:  Thank you.

3          (Counsel for the defense confer privately.)

4          MR. HOCHMAN:  Your Honor, given what this colloquy

5    has been, we would agree that the government should not be able

6    to argue that Beda Singenberger or Dieter Luetolf are

7    co-conspirators.  To the extent that there are overt acts that

8    only have Beda Singenberger and Dieter Luetolf in them, we

9    would ask to strike those overt acts from the indictment that

10   would be presented to the jury.

11         THE COURT:  All right.  That's a little bit different

12   issue.

13         But in terms of striking, what says the government?

14         MS. FINLEY:  I have a response on the striking part,

15   and I haven't looked through it again with a fine-toothed comb,

16   but I believe that the manner and means and the overt acts are

17   that Dr. Fredrick and Dr. Hough caused them to do things;

18   causing other people to do things doesn't necessarily make

19   them -- in argument, does not necessarily make them

20   co-conspirators.  Their actions are at the direction of one of

21   the two co-conspirators.

22         THE COURT:  Sure.  If -- and I haven't looked at the

23   overt acts with this in mind, but if there is an overt act that

24   says Dieter Luetolf did something, period, that probably needs

25   to get stricken.  If the overt act says defendant Fredrick

1    caused him to to something, that doesn't need to get stricken.

2         MR. HOCHMAN:  I would agree with that, Your Honor.

3         MR. SAUNDERS:  I haven't been through it in detail,

4    but I happened to flip to overt act KKKK, on Page 29 of the

5    indictment and it says:  "On or about June 6th, 2005, UBS

6    banker D.L." -- which is Luetolf -- "e-mailed Fredrick and

7    explained that" -- and then there's a quote from the e-mail.

8         That would be an overt act only attributable to

9    Dieter Luetolf, who is no longer part of the conspiracy.

10        THE COURT:  All right.

11        MR. UDOLF:  And there are others, Judge, I have in

12   front of me.

13        THE COURT:  We don't need to get there yet.

14        MR. UDOLF:  Okay.

15        THE COURT:  I mean, I assume, as I just said, any

16   overt act attributed only to someone who is no longer a

17   co-conspirator under the Court's ruling will need to get

18   redacted.  But we'll deal with that shortly.

19        The question now is with regard to Page 9.  What I've

20   done is, I've essentially redacted the indictment, or the

21   summary of the indictment, to remove references to other

22   co-conspirators besides the defendant and Dr. Fredrick.

23        And what started this was your suggestion that

24   perhaps we needed to keep somebody else, or at least have the

25   words "others" in there.

1              MR. SAUNDERS:  I will withdraw that, Your Honor, in

2     light of our colloquy.

3              THE COURT:  All right.  So, with that being said, any

4     objection to the phraseology, then, on Page 9?

5              MR. UDOLF:  No, sir.

6              MS. FINLEY:  No, Your Honor.

7              THE COURT:  Let's go . . . continue to Page 10.

8              Any objection to Page 10?

9              MR. UDOLF:  No objection by the defendant.

10             MS. FINLEY:  No objections to Page 10, Your Honor.

11             THE COURT:  On Page 11, I would call your attention

12    to the first full paragraph after the numbered one.  This kind

13    of gets us back into the co-conspirator issues.

14             MR. HOCHMAN:  And again, given the colloquy we've

15    had, we have no objection to that paragraph, Your Honor.

16             We'd only point out that -- and I know you put it in,

17    in Page 12, dealing with the overt act, dealing with the

18    statute of limitations, dealing with the overt act?

19             I think -- and when we get to the verdict we can sort

20    of even emphasize this in the verdict, in fact, it's in the

21    joint verdict form we sent you, sort of having a special check

22    the box on the statute of limitations issue for overt acts

23    after May 15, 2007.

24             But that would be my only concern.  If the Court's

25    willing to put that in the verdict form, that the jury has to

1    find unanimously of an overt act, on or after May 15, 2007,

2    then we don't have to deal with it right here, because in the

3    next page you deal with it, but there's a gap, and, you know, I

4    it's unclear whether or not the jury is really going to

5    understand that.

6            THE COURT:  You're right, that's not in my verdict

7    form.  I don't quite remember why I didn't include it, if you

8    both had --

9            MR. HOCHMAN:  And we did, Your Honor.  We both put it

10   in our verdict forms, or the verdict form we agree with.

11           THE COURT:  I think that's probably doable.

12           MR. HOCHMAN:  The other way to do it, Your Honor,

13   Mr. Saunders points out, is actually having a fifth element for

14   the conspiracy that states that the overt act was committed

15   during the existence or life of the conspiracy, and after

16   May 15th, 2007, which is the language from Page 12 of your

17   instructions.

18           THE COURT:  I'm sorry.  You want that as a fifth

19   element, or added --

20           MR. HOCHMAN:  As a fifth element, Your Honor.

21           THE COURT:  Okay.  Say that again for me, please?

22           MR. HOCHMAN:  Sure.  The fifth element would be, "the

23   overt act" . . . .  Where did it go?

24           MR. UDOLF:  Right here.

25           MR. HOCHMAN:  "Was" -- actually, it would be -- yeah.

CHARGE CONFERENCE

1    "The overt act was performed during the existence or life of

2    the conspiracy, and after May 15th, 2007."

3           MS. FINLEY:  Your Honor.  Your Honor.  The government

4    would note that, in your paragraph where you explain what an

5    overt act is, that it's specifically stated there.  With

6    respect to when you're describing then, and explaining to them

7    what an overt act is.

8           MR. SAUNDERS:  We would submit, Your Honor, that it's

9    actually more proper, given the importance of it in this case,

10   to include it as an element that the jury would go through as

11   their checklist of findings, and not have to look for what the

12   definition is of an overt act.  It should be right in there, in

13   the element, that the government has satisfied the statute of

14   limitations.

15          THE COURT:  Ms. Finley?

16          MS. FINLEY:  I'm not sure I specifically -- I mean,

17   proving an overt act within the statute is an element, but

18   between the jury instruction as it is now and the verdict form

19   that we both have proposed, it specifically says that, "We, the

20   jury, unanimously find the act in furtherance of the conspiracy

21   was or was not committed on or after May 15th, 2007".

22          MR. HOCHMAN:  And, Your Honor, from the defense, the

23   reason we bring this up is because I think -- I forgot the

24   count, there's over 100 overt acts, and roughly 80 percent of

25   the overt acts don't occur after May 15, 2007.  So about

1   80 percent of the overt acts occurred before May 15, 2007.  So,

2   in this particular case, this issue is not an academic issue,

3   but a real one, we believe.

4             THE COURT:  Well, why don't we just amend Paragraph 3

5   so that it reads, "During the conspiracy, one of the

6   conspirators knowingly engaged in at least one overt act

7   described in the indictment that was committed on or after

8   May 15th, 2007"?

9             MR. HOCHMAN:  That's fine, Your Honor.

10            MS. FINLEY:  That's fine.

11            MR. SAUNDERS:  Judge, there is some alternative

12   language, that I think is a little cleaner, modifying element

13   three, and that would just be, "During the conspiracy, and

14   after May 15th, 2007, one of the conspirators," etcetera.

15            THE COURT:  You said, "On or after," or, "After"?

16            MR. UDOLF:  After.

17            MR. SAUNDERS:  After, Your Honor, I believe.

18            MS. FINLEY:  It could also be on.

19            THE COURT:  That's my question.

20            MR. HOCHMAN:  I don't believe there's an overt act

21   actually charged on May 15, 2007, so I don't think that is a --

22   I believe, when I went through them, I didn't see one on that

23   exact date.  But I might stand -- I don't have the indictment

24   in front of me.  If we could take a quick look at it?

25            THE COURT:  Well, assuming that there's nothing

1    charged on that date.  So it would read, then, "During the

2    conspiracy, and after May 15, 2007, one of the conspirators

3    knowingly engaged in at least one overt act described in the

4    indictment".  And then continued.

5              All right.  What says the government?

6              MS. FINLEY:  That's fine, Your Honor.

7              THE COURT:  All right.  I'll make that change.

8              And with regard to the first full paragraph there,

9    any thoughts as to how else to deal with that?  Or does that

10   meet with your approval?

11             COURT REPORTER:  That's fine, Your Honor.

12             MR. UDOLF:  That's okay.  No objection.

13             THE COURT:  Did you find a typo?

14             MR. UDOLF:  It was on the other one.  Not on this

15   one.

16             MR. SAUNDERS:  I'm sorry.  One moment, please, Your

17   Honor.

18             (Counsel for the defense confer privately.)

19             MR. SAUNDERS:  Your Honor, looking at that first full

20   paragraph, I just am a little concerned by the language, "You

21   must find that the government presented enough evidence".

22             THE COURT:  Sufficient evidence?

23             MR. SAUNDERS:  How about, "Evidence to establish

24   Dr. Fredrick's criminal participation in that conspiracy beyond

25   a reasonable doubt"?

1            THE COURT:  So just strike the word, "Enough".

2            MR. SAUNDERS:  And add, "Beyond a reasonable doubt,"

3    at the end.

4            THE COURT:  Evidence to establish . . . .  Okay.

5            What says the government?

6            MS. FINLEY:  I think we have to prove that she

7    conspired with Dr. Fredrick beyond a reasonable doubt.  I'm not

8    sure . . . .

9            MR. SAUNDERS:  Well, that requires --

10            THE COURT:  Hang on.  She's thinking.  She'll come to

11    it.

12            MS. FINLEY:  I'm just thinking on how I'm going to

13    say what I want to say.

14            (Ms. Finley and Ms. Kessler can have privately.)

15            MS. FINLEY:  I withdraw.  I will withdraw my

16    objection.  Or my -- I wasn't objecting.  I will withdraw my

17    explanation.

18            THE COURT:  You will take your thought back.

19            MS. FINLEY:  Thank you.

20            THE COURT:  Because the paragraph begins with the

21    elements that the government has to show, beyond a reasonable

22    doubt, that two or more people.  So think we said that already.

23    But I will add -- I'll strike the word, "Enough," and so that

24    it reads, "The government presented evidence to establish

25    Dr. Fredrick's criminal participation in that conspiracy beyond

1    a reasonable doubt".

2              All right.  Anything else as to Page 11?

3              MS. FINLEY:  No, Your Honor.

4              THE COURT:  Mr. Udolf?

5              MR. UDOLF:  No, sir.

6              THE COURT:  All right.  Let's go on to Page 12.  I

7    think we get back to the pattern here.  Either the pattern or

8    the joint instructions, I forget now which.

9              Anything on Page 12?

10             MS. FINLEY:  No, Your Honor.

11             MR. UDOLF:  No, sir.

12             THE COURT:  All right.  Let's move on to Page 13.

13             MR. UDOLF:  Judge, on Page 13, we had submitted three

14   proposed jury instructions on this issue.  Instruction

15   Number 3, 4, and 5 in our supplemental proposed instructions.

16             Proposed Instruction Number 3 is pretty much

17   identical to this, except it eliminates a sentence, "If you

18   find that impeding the IRS was only a collateral effect of the

19   agreement, rather than one of its purposes, then you must find

20   the defendant not guilty."  That's from the Atkinson case

21   that's cited in our supplemental instructions.

22             THE COURT:  Okay.  I read that.

23             MR. UDOLF:  We would just ask that that be added.

24             THE COURT:  All right.

25             What says the government?

CHARGE CONFERENCE

1        MS. FINLEY:  Your Honor, actually, the government,

2   with respect to the instruction that is presented, we actually

3   would prefer if the interfere with the lawful functions of the

4   Internal Revenue Service tracks the language of the indictment,

5   because it's not just about collecting taxes, but it's also

6   about the ascertainment of taxes.  That's how it's alleged in

7   the charging language.  And so we believe that's not a full

8   statement of . . . .

9        THE COURT:  Read the phrase from the indictment.  I

10   know it includes collecting, but . . . .

11        MS. FINLEY:  That, "The defendants herein, and

12   individuals known and unknown to the grand jury, did

13   unlawfully, voluntarily, intentionally, and knowingly conspire,

14   combine, confederate, and agree, together and with each other,

15   to defraud the United States for purposes of impeding,

16   impairing, obstructing, and defeating the lawful government

17   functions of the Internal Revenue Service, of the Treasury

18   Department, in the ascertainment, computation, assessment, and

19   collection of revenue, to wit, income taxes."

20        So the government believes that that limits what is

21   actually charged in the indictment.

22        And then, with respect to their argument with respect

23   to impeding, that is one of the things alleged in the charging

24   language that they could find that they did these acts or

25   conspired to impede the IRS.  And if they find that, then . . .

1    the other elements, they would find beyond a reasonable doubt

2    that the defendants conspired to impede the IRS in the

3    ascertain, computation, assessment and collection of revenue.

4           THE COURT:  Let me see if I understood what you've

5    just said, in terms of the instruction.  The second sentence in

6    that paragraph, as I understand what you've said, you want to

7    read as follows:

8           "The government must also prove, beyond a reasonable

9    doubt, that the purpose of the agreement was to impede, impair,

10   obstruct, and defeat the lawful functions of the Internal

11   Revenue Service in the ascertainment, computation, assessment

12   and collection of income taxes."

13          MS. FINLEY:  Yes, Your Honor.

14          THE COURT:  And then what was your position as to the

15   sentence that the defense wanted?

16          MS. FINLEY:  Well, I think their sentence, "If you

17   would find that impeding the IRS was only a collateral effect,"

18   I think if they find that impeding the IRS was what they were

19   doing, then they would find them guilty, and so I don't think

20   that that statement is an accurate statement.  And it's

21   misleading.

22          THE COURT:  All right.  Let me go back to Mr. Udolf

23   in terms of the amendment to the second sentence that the

24   government wants to strike where I've got, "Interfere with the

25   lawful functions," and essentially track more closely the

1    conspiracy language in Count 1.

2              MR. UDOLF:  We have no objection to that, Your Honor.

3              THE COURT:  All right.  The Court will do that.  I'll

4    take a look at Aldrich again, but my memory is I read that when

5    I wrote this, and I had read your proposed instruction, so I'm

6    inclined to leave it like this.  But I'll double-check.

7              MR. UDOLF:  Thank you, Judge.

8              MR. HOCHMAN:  And, Your Honor, if I might highlight

9    where this actually comes into issue in this case?

10             THE COURT:  You may.

11             MR. HOCHMAN:  The government keeps saying, I believe

12   without any evidence to back it up, that one of the moves that

13   was made was that there was a U.S./Bahamas tax treaty and

14   that's the reason that Dr. Fredrick actually suggested moving

15   the money.  The only evidence that's come in was that there was

16   a change in U.S. and Bahamas banking laws, which is Exhibit 3P,

17   the one that I showed to Dr. Hough at the end.  There's nothing

18   referencing the IRS or tax.  So here the asset protection

19   reasons that the jury can find that Dr. Hough and Dr. Fredrick

20   engaged in may have had some collateral impact on the IRS, but

21   not the primary -- but were not the agreement itself.

22             And that, I believe, is where the Atkinson

23   instructions get to, which is if you agree to do something, and

24   it has a collateral effect on the IRS, the mere fact that it

25   has a collateral effect on the IRS does not mean that you have

CHARGE CONFERENCE

1    impeded or impaired the IRS.  That's how I see it playing out

2    in this particular case.

3         THE COURT:  All right.  And my initial inclination is

4    that the third sentence there covers that.  And, certainly,

5    each side can argue that.  But I think that paragraph tells

6    them that.  But in any event.

7         With regard to the conspiracy instructions, that

8    concludes what the Court has proposed.

9         Any conspiracy-related instruction that I haven't

10   included, that someone thinks should be included?

11        MR. UDOLF:  Judge, just for the record, we would urge

12   that one sentence from our Proposed Instruction 3.  We would

13   also object to not charging our Proposed Instruction 4 and 5,

14   which basically deals with -- they're both extracts from the

15   Atkinson case, and . . . they're just restating the -- our

16   position in a different way.

17        THE COURT:  All right.  I think so too.  That's my

18   memory.

19        MR. UDOLF:  That's all we have as to the conspiracy.

20        THE COURT:  Okay.  Let's talk about the substantive

21   counts then.  Those begin on Page 13.  Any objections to the

22   rest of Page 13?

23        MS. FINLEY:  No, Your Honor.

24        MR. UDOLF:  I don't believe so, Judge.

25        THE COURT:  All right.  Page 4?

1              MS. FINLEY:  Your Honor, this is one -- and I have to

2      apologize, because we proposed this one, as well.  I know it's

3      a standard instruction, but the word, "Helped," to me, in

4      Paragraph 3?

5              THE COURT:  Okay.

6              MS. FINLEY:  In the elements, element three, where it

7      says, "One the defendant made or helped to make".

8              THE COURT:  So what word besides, "Helped"?

9              MS. FINLEY:  The government would prefer the word,

10     "caused".  "Help," to the government, seems a more appropriate

11     adverb when you're talking about a 7206.2 charge, where it's

12     aiding and assisting in the preparation of a tax return; and so

13     the government felt that, "Caused to be made," would be a

14     better description.

15             THE COURT:  And we have "caused" earlier, as I

16     recall, in this.  Number 1.  I see it.

17             MS. FINLEY:  Yes.

18             THE COURT:  Okay.  What says the defendant?

19             MR. UDOLF:  Judge, this is straight from the pattern

20     instruction.  We'd ask the Court to charge the language that's

21     there.

22             THE COURT:  Do you see any difference between

23     "helped" and "caused" -- "helped to make," as opposed to

24     "caused to be made"?  Is there anything in the case that's

25     going to be argued on the difference between those words?

1          MR. UDOLF:  "Caused" is fine.

2          THE COURT:  All right.

3          MS. FINLEY:  It's actually more of a burden on the

4    government, but . . . .

5          THE COURT:  All right.  I'll change it to, "One the

6    defendant made or caused to be made, the U.S. individual tax

7    return," etcetera.  And delete the word "Helped".

8          All right.  Anything else on Page 14?

9          MS. FINLEY:  No, Your Honor.

10         THE COURT:  Mr. Udolf?

11         MR. UDOLF:  No, Your Honor.

12         THE COURT:  All right.  Page 15?

13         MS. FINLEY:  Your Honor, in the . . . .  Sorry.  The

14   paragraph . . . the last full paragraph, the government does

15   not have to show -- the word "helped" is used again, so it only

16   has to prove that the defendant intentionally helped to file?

17   I think, there, we would also argue that "caused" would be the

18   better verb.

19         THE COURT:  So, "Caused to be filed"?

20         MS. FINLEY:  Yes.

21         THE COURT:  Any objection?

22         MR. SAUNDERS:  No objection, Your Honor.

23         THE COURT:  All right.  The other thing I would point

24   out, in the third paragraph, the definition material, in the

25   pattern instruction, that is stated as separate sentences,

1    separated by some other paragraphs.  I merged that into a

2    single sentence.

3             MR. UDOLF:  That's fine.

4             MS. FINLEY:  That's fine, Your Honor.

5             MR. UDOLF:  We have no objection.

6             THE COURT:  All right.  Anything else on Page 15?

7             MR. SAUNDERS:  Yes, Your Honor.  On the second full

8    paragraph, "Declaration is false"?

9             THE COURT:  Yes, sir.

10            MR. SAUNDERS:  Certainly, the first sentence of that

11   makes sense in the context of this case.  "A declaration is

12   false if it is untrue when made and the person knows that it is

13   untrue."  The second sentence talks about a document being

14   used, and I don't think we have any issue in this case.  It's

15   making the return, it's filing the return, it's not using

16   anything.

17            So, just for clarity I would ask that the second

18   sentence of that paragraph be stricken.

19            THE COURT:  All right.

20            Any objections?

21            MS. FINLEY:  No objection, Your Honor.

22            THE COURT:  All right.  The Court will strike that

23   sentence.

24            All right.  Anything else on Page 15?  Hearing

25   nothing . . . .

CHARGE CONFERENCE

1          MS. FINLEY:  I'm sorry.  Nothing else, Your Honor.

2          THE COURT:  Page 16?  And the one thing I recall

3   doing that I think is different from your joint proposed

4   instructions was taxable income.  I think you called it, "Gross

5   income," as opposed to "taxable".  And I think I just changed

6   it from, "Gross income," to, "Taxable income," since taxable

7   income isn't what the indictment charges.

8          MS. FINLEY:  Well, changing that paragraph, taxable

9   income, then, we literally took the definition of what gross

10  income is from the Internal Revenue Code.  Taxable income,

11  definitionally, is something -- there are additional things

12  that go into your taxable income; and so that actually would

13  not be a correct statement.

14         MR. HOCHMAN:  And, Your Honor, since taxable income

15  is not actually what this case is about, I'd ask to strike that

16  first sentence.  The case is about total income from Line 22.

17  And I think you can even say, "Total income as found in Line 22

18  includes, but is not limited to."  And then it will be very

19  clear for the jury, when they go to the tax return, what line

20  they need to focus on.

21         THE COURT:  So just strike the first sentence

22  completely.

23         MR. HOCHMAN:  Yes, Your Honor.

24         THE COURT:  And then continue with reference to

25  Line 22?

1              MR. HOCHMAN:  Yes, sir.

2              THE COURT:  All right.

3              Any objections from the government?

4              MS. FINLEY:  No objection, Your Honor.

5              THE COURT:  All right.  I'll strike the first line --

6    the first sentence, rather.  Then tell me again how you want

7    Line 22 incorporated?

8              MR. HOCHMAN:  Sure.  "Total income, as found in

9    Line 22 of the tax return."

10             THE COURT:  All right.

11             All right.  I changed that a little bit from what you

12   said.  "Total income, as found at Line 22 of a tax return,

13   includes," etcetera.

14             MR. HOCHMAN:  That's fine, Your Honor.  Thank you.

15             THE COURT:  All right.

16             Any objection from the government to that?

17             MS. FINLEY:  No, Your Honor.

18             THE COURT:  All right.  Anything else on Page 16?

19             MR. SAUNDERS:  Your Honor, at the very end of that

20   first run-over paragraph, about halfway down, "We unanimously

21   find that none of these items was material and falsely reported

22   on the defendant's return, "And then we would ask that it say,

23   "must," rather than, "Should find the defendant not guilty".

24             THE COURT:  Any objections?

25             MS. FINLEY:  No, Your Honor.

1            THE COURT:  All right.  I'll make that change.

2            Anything else on Page 16?

3            MR. UDOLF:  Your Honor, the next thing I have sort of

4     bleeds over into Page 17.

5            THE COURT:  Okay.

6            MR. UDOLF:  And this is sort of the flipside of our

7     proposed instruction.  Our proposed instruction read, "The mere

8     fact that a taxpayer has signed a tax return does not, in

9     itself, prove her knowledge of the contents.  Although

10    knowledge may be inferred from the signature along with the

11    surroundings facts and circumstances, whether or not to draw

12    such an inference is left entirely up to you."

13           This is leaning in the opposite direction.  It says,

14    "If you find proof beyond a reasonable doubt that the defendant

15    signed her tax return, that is evidence from which you may, but

16    are not required, find or infer that she had knowledge".

17           THE COURT:  So why am I instructing the jury at all

18    as to this matter?  I mean, you can both argue, but --

19           MR. UDOLF:  That's fine.

20           MR. HOCHMAN:  That's fine, Your Honor.

21           THE COURT:  So I guess my proposal would be just to

22    strike that.  And you can both argue what the fact that she

23    signed it means.

24           MS. FINLEY:  That's fine, Your Honor.

25           THE COURT:  All right.  I'll strike the bottom of

1    Page 16 and the top of Page 17.

2              All right.  What else on Page 17 then?  And the one

3    thing I will say -- this kind of bleeds over into Page 18 as

4    well -- is that I debated the placement of the instruction on

5    character and good faith, whether to move it up a little bit.

6    I ended up leaving it here.  I don't have strong feelings as to

7    placement, but if someone has a place that makes more sense in

8    the instructions, I certainly would be willing to hear.

9              MR. SAUNDERS:  Your Honor, the concern that I have

10   with the placement, where it is now, is that this is right in

11   the middle of the instructions, regarding the substantive

12   counts, speaking with respect to the character instruction.  We

13   have been talking about the elements of 6 through 9.  The

14   instruction immediately afterward talks about good faith being

15   a complete defense to Counts 6 through 9.  I think the

16   placement should make clear that character applies not just to

17   those counts, but to all counts of the indictment, and it might

18   be placed earlier in the general instructions, before we get to

19   the elements.

20             THE COURT:  Okay.

21             MR. SAUNDERS:  Hang on just one moment, Your Honor.

22   I'm sorry.

23             (Counsel for the defendant can have privately.)

24             MR. HOCHMAN:  We're looking for a proposed place for

25   the character instruction, Your Honor.

CHARGE CONFERENCE                                        228

1              MR. SAUNDERS:  Perhaps, Your Honor, right around

2     the . . . right after the expert witness . . . where we talked

3     about different forms of evidence, and how to consider them,

4     there's the expert witness instruction on six and seven . . . .

5     Hang on a second.

6              MS. FINLEY:  I would actually say maybe if we put it

7     just before the technical expert.  You discuss the different

8     types of witnesses and their testimony, and it might be better

9     grouped in that portion.

10             THE COURT:  On Page 6, toward the bottom, before we

11    get into the expert instructions, is what you're suggesting?

12             MS. FINLEY:  Yeah.

13             THE COURT:  Okay.

14             MR. SAUNDERS:  I'm sorry.  Just one moment, Your

15    Honor.

16             The other alternative, Your Honor, would be

17    immediately following the reasonable doubt instruction on the

18    top of Page 3.  So it's the instruction that we're talking

19    about here . . . relates to reasonable doubt.  It says, "You

20    may consider, in deciding whether the government has proved

21    beyond a reasonable doubt that the defendant committed the

22    offense".

23             MS. FINLEY:  Well, Your Honor, all of this relates to

24    reasonable doubt, including whether the jury decides that they

25    believe her testimony, which is why there's that paragraph that

1    they should evaluate her testimony just the same way as other

2    witnesses; and the same thing would be true about whether

3    someone is a law abiding citizen.  I'm not sure how that is

4    more or less important to reasonable doubt.  They all go to

5    reasonable doubt and evaluating all of the witnesses.  And all

6    of the testimony.

7              MR. UDOLF:  Judge, I would suggest placing the

8    character charge right after -- on Page 6, right after the

9    paragraph that notes the defendant has a right not the testify.

10   That really sort of makes the most sense to put it there.

11             THE COURT:  All right.

12             What are your thoughts to that?

13             MS. FINLEY:  That, I have no problem with, Your

14   Honor.

15             THE COURT:  All right.

16             MR. UDOLF:  Judge, the other thing is that we had

17   jointly submitted a charge on character evidence, which is

18   based on the pattern charge.  The Court omitted the first

19   sentence of that, which says, "Evidence of a defendant's

20   character traits may create a reasonable doubt."  We would ask

21   that that be inserted, as there was no objection.  It is my

22   understanding neither party objected.

23             THE COURT:  Say that again for me, please?

24             MR. UDOLF:  "Evidence of a defendant's character

25   traits may create a reasonable doubt."  The remainder of that

1   request is identical to the Court's honest and law abiding

2   charge.  We just ask that that one sentence be inserted there.

3            MR. SAUNDERS:  And, for the record, that's

4   11th Circuit Pattern Special Instruction 12.

5            THE COURT:  All right.  So that paragraph would then

6   begin, "Evidence of a defendant's character traits may create a

7   reasonable doubt.  You should consider testimony," etcetera.

8   And then I would move all of that from Pages 17 to 18 to

9   Page 6, and it would become the third full paragraph.

10           MR. HOCHMAN:  Yes, Your Honor.

11           MS. FINLEY:  Yes, Your Honor.

12           THE COURT:  Okay.  I'll do that.

13           All right.  The rest of Page 17, the on or about, the

14   knowingly and willfully, I think all those are pattern.

15           Any objections there?

16           MR. UDOLF:  No.

17           MS. FINLEY:  No, Your Honor.

18           THE COURT:  All right.  Page 18 is the good faith.

19   I'm not sure if we've talked about if this is the right

20   placement for good faith.

21           MS. FINLEY:  Your Honor, just with respect to the

22   good-faith instruction generally, I believe that good faith is

23   also a defense to Count 1, and not just Counts 6 through 9.

24           MR. HOCHMAN:  We agree, Your Honor.

25           THE COURT:  So if you conspire in good faith?

1           MS. FINLEY:  If she believes, in good faith, that she

2    is not doing anything wrong, they can't form the requisite

3    intent to defraud the IRS.

4           MR. HOCHMAN:  Because of the unique nature of the

5    conspiracy here, the tax crimes are knowingly and willfully, as

6    opposed to other crimes in Title 18, which are just knowingly,

7    which --

8           MS. FINLEY:  Well I think -- I'm sorry.

9           THE COURT:  Let her talk.  She's making your argument

10   better than you.  Otherwise, I'm going to argue with you.

11          MS. FINLEY:  Actually, the 371 charge, the client

12   conspiracy, the intent element actually is only knowingly,

13   though, with respect to the Title 26 charges, the intent

14   element is willfully.  So I think it's actually they only have

15   to knowingly conspire to defraud the IRS.  If we had charged a

16   substantive conspiracy, such as conspiracy to evade their

17   taxes, then the willfully would apply.  But with respect to the

18   client conspiracy, the intent element actually is only

19   knowingly.  That being said, we do believe that, if she

20   believes, in good faith, that she is not doing anything wrong,

21   then she could not knowingly join the conspiracy to defraud.

22          THE COURT:  So your bottom line is I should add in

23   Count 1 along with Count 6 through 9?

24          MS. FINLEY:  Yes, but . . . . Yes.

25          THE COURT:  Not for the reason they say.

1             MS. FINLEY:  Yes.

2             THE COURT:  For whatever reason, I'll make that

3    change.  And then the issue becomes, again, where do I put

4    that?

5             MS. FINLEY:  It's fine where it is.  You've just

6    described what willfully is, and here is an option for the jury

7    why she may not have acted willfully.

8             THE COURT:  Okay.

9             MR. HOCHMAN:  That's fine, Your Honor.

10            THE COURT:  All right.  So the first sentence will

11   say, "Good faith is a complete defense to Counts 1, and

12   Counts 6 through 9," etcetera.

13            MR. SAUNDERS:  Perhaps the Court can say, "To all

14   counts," or, "To all charges"?

15            THE COURT:  Okay.  I like that.  "To all," you want,

16   "Counts"?  Since we've told them what they are, I guess.

17            MR. SAUNDERS:  That's fine, Your Honor.

18            THE COURT:  "All counts of the indictment."  Okay.

19            All right.  Anything else on Page 18?

20            MS. FINLEY:  No, Your Honor.

21            THE COURT:  Mr. Udolf?

22            MR. UDOLF:  No, sir.

23            THE COURT:  All right.  Page 19?

24            MS. FINLEY:  No, Your Honor.

25            MR. UDOLF:  No objection.

CHARGE CONFERENCE                              233

1              THE COURT:  Page 20?

2              MR. UDOLF:  No objection.

3              MS. FINLEY:  No objection, Your Honor.

4              THE COURT:  Page 21?  And going over into Page 22.

5              MR. HOCHMAN:  Your Honor, where it says, "Explain

6    verdict," is the Court just going to read the verdict to them?

7              THE COURT:  Yes.  At that point, I'll literally pick

8    up the verdict form, show it to them, and then read what the

9    verdict form is.  After that, I'll come back to the

10   instruction.

11             MR. HOCHMAN:  Very good, Your Honor.  No objection.

12             MS. FINLEY:  No objection.

13             MR. UDOLF:  No objection.

14             THE COURT:  All right.  Any additional instruction,

15   that I have not included here, that anyone believes should be

16   included?

17             MR. UDOLF:  Yes, Your Honor.  Our proposed

18   Instruction Number 1, which is contained in our first

19   supplemental proposed instructions?

20             THE COURT:  Tell me what that is.

21             MR. UDOLF:  Is says, "If the circumstantial evidence,

22   and all the evidence in the case is susceptible of two equally

23   reasonable constructions, one indicating guilt and the other

24   innocence, then you are obligated under the law to accept that

25   construction indicating innocence, and you should find the

1    defendant not guilty."

2              THE COURT:  All right.  That will not be given.

3              Anything else?

4              MR. UDOLF:  That's it.

5              THE COURT:  From the government?

6              MS. FINLEY:  Yes, Your Honor.

7              THE COURT:  Yes what?  Any additional?

8              MS. FINLEY:  She was talking to me at the same time.

9    I apologize, Your Honor.

10             THE COURT:  Any additional --

11             MS. FINLEY:  We have no other additions, Your Honor.

12             THE COURT:  All right.  Let's take a look at the

13   verdict form.  And I think you got two.  And the difference is

14   on the substantive counts, which breaks it down into having the

15   jury find which of the false . . . which of the types of false

16   statement was made.  The first one doesn't do that.

17             MR. HOCHMAN:  Your Honor, with respect to Count 1,

18   the conspiracy, we would add in the language we had in the

19   joint proposed verdict form.  Dealing with the overt act.

20             THE COURT:  I'm sorry, say that again?

21             MR. HOCHMAN:  Dealing with the overt act that -- the

22   date of the overt act.

23             THE COURT:  Following what we did on the

24   instructions?  The same verbiage?

25             MR. HOCHMAN:  Yes, Your Honor.

1          MS. FINLEY:  The proposed instruction -- the proposed

2    verdict form we had said, "We, the jury, unanimously find that

3    an act in furtherance of the conspiracy (check one) was or was

4    not committed on or after May 15th, 2007."

5          MR. HOCHMAN:  And that's fine, Your Honor.

6          THE COURT:  I'm sorry.

7          MS. FINLEY:  Would you like me to pass it up, Your

8    Honor?

9          THE COURT:  I thought I had all of yours.

10         If you can tell me the docket number?  Maybe I can

11   find it here.

12         MS. FINLEY:  79-1.

13         THE COURT:  Yes.  I've got that.  Okay.

14         (Examining document)  Okay.  So, under this, if they

15   check guilty, and was not committed after May 15th, that's

16   essentially a not guilty verdict?

17         MR. HOCHMAN:  Yes, Your Honor.

18         MS. FINLEY:  On the conspiracy.

19         THE COURT:  On the conspiracy.  Right.

20         MS. FINLEY:  Because they wouldn't have found an act

21   in the --

22         THE COURT:  So it's not inconsistent, they just think

23   they're finding her guilty, but not really.

24         MS. FINLEY:  Correct.  It's a special verdict form

25   for the overt act.

1        THE COURT:  All right.  Let's talk about a couple

2   form things, I guess.  I typically, in the verdict form,

3   summarize the language of the indictment as I've done in my

4   proposal.  Yours doesn't.  And I'm not necessarily opposed to

5   that, because it's shorter.

6        MR. HOCHMAN:  Actually, Your Honor, again, from the

7   defense, your language is fine, and I would just include the

8   additional language for Count 1 dealing with the overt act

9   that's in our joint proposed verdict that you have before you.

10        THE COURT:  If I include that in the body of the

11   form, do I need to have them check anything other than guilty

12   or not guilty?  In other words, if I say did they conspire with

13   an overt act being on or after May the . . . whatever the date

14   was.

15        MR. HOCHMAN:  I mean, I would prefer, Your Honor, the

16   way we did it because, again, this is a somewhat unusual

17   situation, where it's not just that there's one overt act

18   before that date, there's a whole lot of them that they could

19   pick from.  One of 80 or thereabouts.  So, given the number of

20   overt acts, we would ask that that be a broken-out line, shall

21   we say, as proposed.

22        THE COURT:  And how do you propose that I change the

23   verbiage I have for Count 1 to include the overt act date?

24        MS. FINLEY:  Well, I think, given the Court's

25   instructions, and that it says it in both places, that just

1    having a separate line after, "We, the jury" -- well, I think

2    you could even swap them.  "We, the jury, unanimously find that

3    an act in furtherance of the conspiracy was or was not

4    committed on or after May 15th."  And then the next check would

5    be, "We, the jury, unanimously find the defendant not guilty or

6    guilty."

7              THE COURT:  Don't I really need an instruction in the

8    first one saying the question about the overt act being before

9    or after that date, and then an instruction saying if you found

10   it was only before that date, don't proceed anymore, you're

11   done?

12             MR. HOCHMAN:  That actually makes more sense, Your

13   Honor.

14             THE COURT:  And then, if you find it after, then

15   answer do you find her guilty or not guilty.  Because they can

16   find an overt act after that date and still find her not

17   guilty.

18             MS. FINLEY:  Yes.

19             THE COURT:  But they can't find an overt act before

20   that date and find her guilty.

21             MS. FINLEY:  Yes.  I agree.  And I think, looking at

22   the next -- for the next charges, some -- a sentence similar to

23   what you have there, but swapped, where they would first have

24   to find the overt act, and then, if you find the overt act was

25   committed, then proceed with the next step.

1          THE COURT:  Yes.

2          MR. HOCHMAN:  Makes sense, Your Honor.

3          THE COURT:  Okay.  Let me work on the language

4     overnight, and we'll get this to you, obviously, in the

5     morning.  Or maybe before, if we can.

6          All right.  Anything else as to the conspiracy count

7     verdict form?  Anybody's thoughts?

8          MR. HOCHMAN:  I'm sorry, what was the question, Your

9     Honor?

10          THE COURT:  Anything else as to the Count 1 verdict

11     form?

12          MR. HOCHMAN:  No, Your Honor.  I think, with those

13     clarifications, that would be sufficient.

14          THE COURT:  All right.

15          MS. FINLEY:  Nothing, Your Honor.

16          THE COURT:  The substantive counts -- and again, I

17     guess similar -- I guess the first issue is whether we want to

18     essentially have a form of a special verdict to have the jury

19     tell us which of the two methods, and if so, the way that I've

20     got it proposed here, with three choices, upon thinking about

21     it, I don't really like that, and what I'd probably do is have

22     a direction to -- you know -- check all that apply, and then

23     just have the first two . . . .

24          MR. SAUNDERS:  And eliminate the "or" between the

25     two?

1          THE COURT:  Exactly.

2          MR. HOCHMAN:  So, Your Honor, what would happen, just

3    to play out a scenario, if they were to check guilty, but then

4    they don't check either one of the boxes?

5          THE COURT:  I'd send the jury back, saying that they

6    haven't properly completed the form.  Because the instructions

7    says, "If you find the defendant guilty, indicate below whether

8    you" -- and we may need to change that language.  It says

9    whether you -- if they say yes as to one and no as to the

10   other, they have to check something.  And maybe we need to be a

11   little clearer so as to tell them that.  Because, of course, if

12   they can't check one of those, then they have to find her not

13   guilty.

14         MR. HOCHMAN:  One would assume, Your Honor.  Yeah,

15   that's fine, I think.

16         THE COURT:  What are your thoughts as to what the

17   verbiage is?

18         MR. HOCHMAN:  The only question is whether or not,

19   again, we flip it around.  Whether or not you have them check

20   one of the two boxes first -- actually, that doesn't work

21   either.

22         THE COURT:  Not here.

23         MR. HOCHMAN:  No, that doesn't work.

24         Your Honor, I think that's probably the best way to

25   do it, unless you build in both situations.  I think this is

1    probably the best way to do it, Your Honor.

2            MS. FINLEY:  I think the language maybe saying,

3    "Indicate below the manner in which you unanimously agree"?

4            MR. HOCHMAN:  We don't know if they did.

5            MS. FINLEY:  Presumably they would check which way

6    that they are unanimously agreeing.

7            MR. HOCHMAN:  Or they've just messed it up, and they

8    don't have the unanimous agreement on one of the two, but they

9    somehow thought if six agreed on this one, and six agreed on

10   that one, that's 12, and that's good enough, so . . . .

11           THE COURT:  Well, they won't be able to have done

12   that based upon my instructions and my explanation of the

13   verdict form.  And this hopefully will help them understand.

14           MR. HOCHMAN:  Right.  Hopefully.

15           THE COURT:  Right.  How about if it says, "Indicate

16   below which manner you unanimously agree that the income tax

17   return was false"?

18           MR. SAUNDERS:  As to which . . . .  "As to which

19   matter"?

20           THE COURT:  "Indicate below the manner".

21           MR. SAUNDERS:  It has to be false as to a material

22   matter.

23           THE COURT:  Oh, "Matter," instead of, "Manner".

24           MR. SAUNDERS:  "Indicate belong the matter in which

25   you unanimously agree the material was false".

1          MS. FINLEY:  Manner, M A N N E R, not matter.

2          THE COURT:  But he's suggesting matter, M A T T E R,

3     is the right word.

4          MR. SAUNDERS:  Doesn't the statute say it has to be

5     false as to a material matter?

6          MS. FINLEY:  Yes.

7          THE COURT:  I think you're right, and the way I've

8     written it is not right.  I think the word is, "matter," not,

9     "manner".  "Indicate below the matter you unanimously agree".

10         MR. HOCHMAN:  Maybe to which?

11         MR. SAUNDERS:  "The matter to which you unanimously

12    agree the income tax return was false."

13         MR. HOCHMAN:  And then probably take out the

14    "because".

15         MR. SAUNDERS:  "The matter that you unanimously agree

16    was false," is probably sufficient.  "Indicate below the matter

17    that you unanimously agree was false."

18         THE COURT:  You keep changing this.

19         MR. SAUNDERS:  I'm just trying to make it easier.  I

20    was coming up with too many words.

21         THE COURT:  All right.

22         MR. SAUNDERS:  "Indicate below the matter that you

23    unanimously agree was false."

24         THE COURT:  All right.  You may have it now.  Let me

25    just read it.  "If you find the defendant guilty, indicate

CHARGE CONFERENCE                              242

1  below the matter that you unanimously agree was false,"

2  semicolon, strike the word, "Because," and then, in

3  parenthesis, "Check all that apply," delete the "or" in

4  between, and delete the third option that's on Page 3.

5           MR. HOCHMAN:  No objection to that, Your Honor.

6           THE COURT:  All right.  Does that do it for the

7  government?

8           MS. FINLEY:  That's fine, Your Honor.  And then there

9  is just an extra word, "The," before her total income?  There's

10 a typo.

11          THE COURT:  Yes.  Okay.  We'll strike "the" there.

12          MR. UDOLF:  Where?

13          MS. FINLEY:  In the first checked box.

14          THE COURT:  The first line in the first checked box,

15 "Her total income," instead of, "The her."  And then similar

16 changes as to the other counts.

17          All right.  Anything else, then, as to the verdict

18 form?  We'll make those changes similar throughout.

19          MR. HOCHMAN:  Nothing else, Your Honor.

20          MS. FINLEY:  None from the government, Your Honor.

21          THE COURT:  Now, in terms of the indictment, as I've

22 said, I typically send the indictment back.  In this case, we

23 may need to redact some things.  And refresh my memory as to

24 what the defense decided you wanted with regard to the

25 unindicted co-conspirators.  Or have we not really got a

1    position yet?

2          MR. HOCHMAN:  Your Honor, we would actually leave in

3    the names Beda Singenberger and Dieter Luetolf, but take out

4    any overt acts, as we were discussing before, in which just

5    Beda Singenberger or Dieter Luetolf was mentioned.

6          THE COURT:  Let me give an example, and you tell me

7    how you want me to change it, if at all.

8          Paragraph 3 of the indictment says, "Beda

9    Singenberger, a co-conspirator not charged in this indictment,

10   was a citizen and resident of Switzerland, and a CPA."  Either

11   leave the whole sentence, or take out the phrase, "A

12   co-conspirator not charged in this indictment," to me, seems to

13   be the two options.

14         MS. FINLEY:  The government would say just take out,

15   "A co-conspirator not charged in the indictment."

16         MR. HOCHMAN:  That would be fine, Your Honor, taking

17   that language out.

18         THE COURT:  All right.  The Court will do that on

19   Page 1, Paragraph 3.

20         MR. HOCHMAN:  May we have a moment, Your Honor?  We

21   are having just a slight disagreement over here.

22         (Counsel for the defense confer privately.)

23         MR. HOCHMAN:  I apologize, Your Honor.  It's probably

24   a little late in the day.  We're not coordinating as fast as we

25   could.  Given the fact that it was argued in opening statements

CHARGE CONFERENCE                                244

1    by both sides, we would ask to actually leave it in.

2              THE COURT:  And then may I ask what you're going to

3    do with it in closing argument?

4              MR. HOCHMAN:  Say the government says there was four

5    co-conspirators in their opening statements, and they haven't

6    proved -- in two of them, there's absolutely no evidence for.

7    And now let's deal with the two remaining.

8              THE COURT:  And then if the government comes back and

9    says well, sure, we got evidence as to that, and let me show

10   you what it is, you would not object.  You'd say they're wrong,

11   but --

12             MR. HOCHMAN:  Yeah.  If we open the door, Your Honor,

13   then they can respond to it.

14             THE COURT:  All right.

15             MR. HOCHMAN:  But it gives us the option of whether

16   or not we want to open the door.

17             THE COURT:  Okay.  Understanding I wouldn't let them

18   argue that unless you open the door.

19             MR. HOCHMAN:  Right.  I understand.

20             THE COURT:  Based on my ruling.

21             MS. FINLEY:  But then, Your Honor, you're removing

22   the acts that are alleged only as done by Mr. Singenberger and

23   Mr. Luetolf, and if they open the door, then I would be able to

24   argue that those acts were made by a co-conspirator.  But

25   they're removed now.

1          MR. HOCHMAN:  Hold on one second, Your Honor.

2          (Counsel for the defense confer privately.)

3          MS. FINLEY:  Your Honor?  Then I'm stuck, in my

4    closing, having to argue one way, waiting to see if they're

5    going to open the door, so my rebuttal may then be inconsistent

6    with my closing, and I'm doing my closing based on the Court's

7    ruling.  It just seems that it has to be one way or the other.

8          THE COURT:  You find that to be a problem?

9          MS. FINLEY:  Well, I --

10         THE COURT:  I'm teasing.

11         MS. FINLEY:  If I say something incorrect in my

12   closing . . . .

13         MR. HOCHMAN:  I think what we are debating here is we

14   would be happy, obviously, taking them out; but we would like

15   to argue that the government made certain promises in opening

16   that they are not able to fulfill now, and they have been taken

17   out because they didn't even hit the different standard that

18   the Court's viewing the situation.  We should both be able to

19   benefit from that Court's ruling by taking them out in the

20   overt acts, but also be able to say to the jury here is what

21   Ms. Kessler said in opening.  Let's see if what she said has

22   proven true in this trial.  I think we should be able to at

23   least argue that without opening the door to the fact that --

24         THE COURT:  So your argument would go something like

25   the government promised in opening that it would show four

1    co-conspirators, they haven't shown the two bankers, and we

2    know that because the Court's ruled?

3            MR. HOCHMAN:  Well, we know that because -- well,

4    basically we'll just say -- we would have to actually not

5    reference -- unless the Court obviously lets us reference its

6    ruling, we couldn't say that, certainly; but we could just

7    say . . . .  Well, we could just say that you're going to get a

8    set of instructions that are going to show that they are not

9    part of the co-conspirators for you to consider.

10           THE COURT:  I think that's true.

11           MR. SAUNDERS:  And if we can argue that without

12   issue, Your Honor, then I think we're fine striking the

13   language from the indictment, as long as it doesn't impair our

14   ability to make that argument.

15           MS. FINLEY:  Well, Your Honor, notwithstanding the

16   Court's ruling, the government still has arguments that it

17   believes it could make to the jury as to why there is

18   sufficient evidence to show that those individuals were

19   co-conspirators.

20           THE COURT:  Yeah.  I don't think I'd let you do that.

21   Having failed to convince me that you had at a preponderance

22   level, I'm not sure I'm going to let you argue to the jury --

23   let me rephrase that.  I'm pretty sure I'm not going to let you

24   argue to the jury that they should find to the contrary.

25           MS. FINLEY:  No.  I understand that.  But they're

1    going to -- they're allowed to then argue -- I think that's no

2    longer in the indictment.

3              THE COURT:  Well, as I understand it, they want to

4    argue that the government promised certain things in opening,

5    and let's see if they delivered.  Common defense argument.  And

6    they're going to go through and they're going to say you didn't

7    deliver on virtually anything, but one of those things is going

8    to be this.  So far, that's pretty standard, and . . . I don't

9    think, objectionable.  You come back, and you're going to be

10   stuck with my ruling.  And so either you're going to discuss

11   and say something, I don't know what, or you're going to, you

12   know, argue the things you can argue.

13             So let me get a final consensus from the defense

14   team.

15             MR. HOCHMAN:  Yes.

16             THE COURT:  Is it your position that the Court

17   should, in Paragraph 3, take out the phrase, "A co-conspirator

18   not charged in this indictment," and, in Paragraph 4, take out

19   similar language that says, "An unindicted co-conspirator," as

20   to Mr. Luetolf, and delete any overt act that was committed by

21   either of them individually, without the participation of the

22   two named defendants.

23             MR. SAUNDERS:  Yes, Your Honor.  As long as we're

24   understanding the Court correctly that doing that won't impair

25   our ability to make the argument we just articulated to you.

CHARGE CONFERENCE

248

1    THE COURT:  That argument being that the government

2  promised to show you they were co-conspirators, but the jury

3  instructions will tell you that they are not co-conspirators.

4    MR. SAUNDERS:  That's correct, Your Honor.

5    THE COURT:  And the government's position is an

6  objection to that or not?

7    MS. FINLEY:  We're just going to object for the

8  record, Your Honor.

9    THE COURT:  And what would you have me do?

10    MS. FINLEY:  I'm not sure.  I think we're boxed in by

11  the Court's ruling, so . . . .

12    THE COURT:  I think that's probably the bottom line,

13  given the Court's ruling.

14    All right.  The Court will strike that phrase in

15  Paragraph 3, and strike that phrase in Paragraph 4.

16    Paragraph 25, on Page 7, talks about the conspiracy

17  with individuals known and unknown to the grand jury.  And you

18  want me to just leave that there?  Or not?

19    MR. HOCHMAN:  We would request you take it out, Your

20  Honor.

21    THE COURT:  Does the government see that any

22  differently?

23    MS. FINLEY:  Well, I think, technically, Your Honor,

24  the jury could find an unnamed co-conspirator, that there was

25  someone else that she was conspiring with.  Under the law.

1          THE COURT:  Like who?  I asked you, at the Rule 29

2    motion, to identify the co-conspirators, and I got two other

3    names.  Who else would you suggest the evidence supports?

4          MS. FINLEY:  Nobody.

5          THE COURT:  Yeah.

6          All right.  The Court will strike the phrase, "And

7    individuals known and unknown to the grand jury," in

8    Paragraph 25.  And when I say the Court will strike, I really

9    mean the government will do a redacted version that has that

10   stricken.

11         MR. HOCHMAN:  And Your Honor, just for clarification,

12   with respect to all the initials that are throughout the

13   indictment, was it the Court's intent to actually have the

14   names spelled out?

15         THE COURT:  I don't know.  I was going to ask you all

16   that.  I had to do a little cheat sheet, in the beginning, to

17   figure out who everybody was.

18         MR. SAUNDERS:  I think, actually, we found a couple

19   of typos, earlier, with respect to those initials.

20         THE COURT:  Yeah, I remember that you told me that.

21   I think it's helpful to the jury if they had actual names, but

22   I'll leave that up to you two.

23         MR. HOCHMAN:  We'll give it a little thought, Your

24   Honor, and we'll get to the back to the government.

25         MS. FINLEY:  Please get it back to us quickly on

1    that, since we will have to be changing it tonight.

2            MR. HOCHMAN:  Actually, Your Honor, can you give us

3    one second, and we'll do it now?

4            THE COURT:  Sure.

5            (Counsel for the defense confer privately.)

6            MR. HOCHMAN:  I think it would actually help the jury

7    to understand who all these initials are, and which Caribbean

8    bank or Swiss bank we're talking about; so we would have no

9    objection to putting in the names and the banks' names into the

10   indictment.

11           THE COURT:  I think that's a good idea.

12           So if the government would do that as well?

13           MS. FINLEY:  Yes, Your Honor.

14           THE COURT:  Then in terms of the overt acts,

15   beginning at Page 9?

16           MR. UDOLF:  I think the first one is in K, Judge.

17           THE COURT:  This is one of those situations where the

18   defendant is alleged to have caused Mr. Singenberger to do

19   something.

20           MS. FINLEY:  Again, Your Honor, the government would

21   argue that the defendant, or her co-conspirator . . . .  Caused

22   them to do things, that doesn't make them co-conspirators.

23           THE COURT:  Right.  I don't see K as being a problem.

24           MR. UDOLF:  Same thing with M and N.

25           THE COURT:  When you say same thing?

1          MR. UDOLF:  Same thing meaning that these are just

2     situations -- overt acts in which the defendant and her husband

3     are alleged to have caused Mr. Singenberger to take certain

4     actions.

5          THE COURT:  Right.  And those will not be stricken or

6     redacted.

7          MR. UDOLF:  Actually, Judge, the first one that I

8     found was in Paragraph S.

9          THE COURT:  S.  All right.  Let me get there.

10          (The Court reviews the indicated paragraph.)

11          THE COURT:  All right.  That is the same thing.

12          MS. FINLEY:  I think Z may be the first thing, Your

13     Honor.  Z as in zebra?

14          THE COURT:  Z?  Okay.

15          MR. UDOLF:  What about V?

16          MR. HOCHMAN:  We would agree with the government that

17     Z should be out.

18          MS. FINLEY:  Though, Your Honor, I would say that

19     Dr. Hough is responding to that in that overt act, so

20     it's . . . .

21          THE COURT:  So just the first sentence?

22          MS. FINLEY:  Yes.  I would say, "On or about

23     December 11, 2002, Hough responded to UBS banker D.L., by

24     e-mail, that he could".

25          THE COURT:  Any objection to striking that portion?

1              MR. HOCHMAN:  No objection, Your Honor.

2              THE COURT:  All right.  I'll direct that the

3     government do that, then.  Make that redaction.

4              MS. FINLEY:  Your Honor, if I can just -- should it

5     say what she is responding to?  Not that it's necessarily to

6     Mr. Luetolf, but that she responded -- well, "she responded to

7     Mr. Luetolf by e-mail that -- "regarding relative C.V. becoming

8     the power of attorney, and that he could mail the form"?

9     Because otherwise the sentence as to what she is doing has no

10    context.

11             THE COURT:  What says the defense?

12             MR. HOCHMAN:  I guess we could clarify it as to what

13    form.  Instead of just saying, "The form," we could say "The

14    power of attorney form", or, "A power of attorney form".

15             THE COURT:  Does that take care of your concern?

16             MS. FINLEY:  I would just ask if we could say,

17    "Responded to UBS banker by e-mail that he could mail the power

18    of attorney form on their undeclared account to their U.S.

19    address" -- "in their joint names to their U.S. address."

20             MR. HOCHMAN:  That's fine, Your Honor.

21             THE COURT:  All right.

22             MS. FINLEY:  If I can have one moment just to write

23    down?

24             THE COURT:  Yes.

25             MS. FINLEY:  Okay.  Thank you, Your Honor.

1          THE COURT:  The next one that I see is VV, as in

2    Victor squared, that has UBS e-mailing Fredrick.  Not exactly

3    what we've been talking about, but it's got a third party doing

4    something that you're calling an overt act.  Is that

5    problematic or not?

6          MR. HOCHMAN:  We'd ask to strike that, Your Honor.

7          MS. FINLEY:  I believe, Your Honor, if I can find the

8    page, but they're e-mailing because they're asked asking and

9    he's responding to their request.  So if I could find that

10   page, it would be a response, an act caused by Dr. Fredrick,

11   because he requested that information.

12         THE COURT:  That may be true, but that's not how it's

13   phrased.  Is this before or after the statute of limitations

14   date?

15         MS. FINLEY:  It is before.

16         THE COURT:  All right.  So it's not going to be

17   material in any event.

18         All right.  The Court will grant the request, and

19   will strike that.  And, by "that," I mean Paragraph VV on

20   Page 21.

21         DDD.

22         MR. HOCHMAN:  Like in Victor, Your Honor?

23         THE COURT:  As in David.  Triple David.

24         MR. HOCHMAN:  Yes, Your Honor.  And a similar

25   thinking for the previous one.  We would ask that that be

1    stricken.

2            MS. FINLEY:  The government would argue that Fredrick

3    is causing the conversation to happen because he's calling

4    about the situation, and he's causing Mr. Luetolf to provide

5    that information to him.

6            THE COURT:  But again, that's not the way it's

7    alleged.  Unlike a whole host of these where you allege that

8    Fredrick caused certain things, you've not alleged that here.

9    And I think -- you can correct me if I'm wrong -- that the

10   entire quote is a quote by . . . .  Dieter?  I forget his name.

11   Lubeck?

12           MS. FINLEY:  Luetolf.

13           THE COURT:  Luetolf.  A long day.

14           MS. FINLEY:  Well, I think it's his taking down the

15   information that is being transmitted to him from Dr. Fredrick,

16   and his response from Dr. Fredrick.  Or from the client.

17           THE COURT:  All right.  The Court will strike, on

18   Page 22, Paragraph DDD.

19           MS. FINLEY:  Your Honor, can I just ask for

20   clarification on that?

21           THE COURT:  Sure.

22           MS. FINLEY:  Just so I understand how I can or cannot

23   argue that?  That fact is in evidence, however.

24           THE COURT:  It is.

25           MS. FINLEY:  And so the government, while not arguing

CHARGE CONFERENCE

1    that Mr. Luetolf is conspiring, could still argue that the

2    evidence supports that Dr. Fredrick called and told that

3    information to him.

4             THE COURT:  You may.

5             MS. FINLEY:  All right.  I just wanted to make

6    sure --

7             THE COURT:  You may not argue that it's an overt act,

8    but you may argue that it is evidence, because it is.

9             MS. FINLEY:  Thank you.  I just wanted to make sure.

10   Thank you.

11            THE COURT:  Yes.

12            MR. HOCHMAN:  Next one we have, Your Honor, is 4Ks.

13   KKKK.

14            THE COURT:  Okay.

15            MS. FINLEY:  No objection on that one, Your Honor.

16            THE COURT:  All right.  I'll direct that that be

17   stricken as an overt act.

18            MR. HOCHMAN:  And that's the last one we have, Your

19   Honor.

20            THE COURT:  Okay.  Good.

21            MR. SAUNDERS:  May I just ask, is the government

22   going to be just blacking those portions out, or renumbering

23   after they delete some?

24            MS. FINLEY:  I think however the Court would prefer.

25            THE COURT:  I would prefer that it be done as

1    unobtrusively as possible, given that I don't really want you

2    to have to retype the whole indictment.  If you can cut and

3    paste, that would be fine.  I think you need to leave the

4    paragraph letters there, because I don't want you to reletter

5    the whole indictment.  That would just create reams of

6    confusion, I think.

7              MS. FINLEY:  It may be that then the easiest way to

8    do it would be then to just redact, or to -- I mean, I hate to

9    put black boxes on things, but . . . .

10             MR. HOCHMAN:  That's fine, Your Honor.

11             MS. FINLEY:  My technological saviness may limit some

12   of this as well.

13             THE COURT:  There's a couple options.  One is you can

14   just delete the whole thing and don't say anything, and copy

15   close together, and they'll just think you made a mistake in

16   the lettering, because there's not that many of them.  Or you

17   can put in the letter, and put, in parenthesis "Redacted by

18   court order."  Or I suppose you could black it out.

19             MR. HOCHMAN:  I like that redacted by court order,

20   Your Honor.  Excellent suggestion.

21             THE COURT:  I thought you might.

22             MS. FINLEY:  You know what, Your Honor?  Ms. Kessler

23   says I have to put the names in, so I'm going to actually do it

24   in a Word document or put it in Word, so I won't actually be

25   able to do it -- I'll have to actually use the original Word

1    documents anyway.  So I can just remove the whole paragraph and

2    leave . . . .  Leave the -- not out of order, but just remove

3    those in the alphabet.

4              MR. HOCHMAN:  I think, again, just for the record,

5    Your Honor, so that when we get an indictment that's different,

6    if it changes all the lettering, it will be hard to then track

7    what's going on.  I think if they're going -- either they

8    should black out the stuff that's been redacted, or leave it,

9    or take it out and just leave it blank for that letter, but

10   keep the lettering in place.

11             THE COURT:  I think you keep the lettering in place.

12   If you need to black it out, fine.  If you can delete it

13   without having, you know, big sections of black, that would be

14   my preference.

15             MS. FINLEY:  Okay.

16             THE COURT:  And depending on how technically oriented

17   the jury is, we may get a note saying, "What happened to

18   Paragraph 4K?"  But I'll take that risk.

19             MR. HOCHMAN:  And the only reason we say this is

20   we'll probably get this either late tonight or tomorrow, and

21   then we'll have to check it real quick against what the Court

22   now said; and so if she renumbers it in a way that we can't

23   make a quick comparison . . . .

24             THE COURT:  Yes.  Don't renumber or reletter.  That

25   will just make it too hard.

1          MR. HOCHMAN:  Thank you, Your Honor.

2          THE COURT:  Anything else?

3          MR. HOCHMAN:  Two things, Your Honor.  We row renew

4   our Rule 29 motion.  We'd ask the Court actually to still take

5   Count 6 -- excuse me, Count 7 under advisement, as opposed to

6   ruling at this point.

7          And we would also ask the Court just to allow us to

8   go work with your court clerk to make sure we've moved

9   everything into evidence.  We have our list, I know she has her

10  list, but we would not like to finally finally rest until -- or

11  we rest with the caveat of making sure that what we think is in

12  evidence is in evidence.  And if, for some reason, it's not,

13  we'd ask the Court to reopen the record just to move into -- or

14  attempt to move into evidence stuff we thought was otherwise

15  moved in.

16         THE COURT:  I'll allow both side to reopen if, after

17  consulting with the Courtroom Deputy, you find an exhibit that

18  you felt was admitted and it isn't.  I'll let you reopen to

19  move those in.

20         MR. HOCHMAN:  Thank, Your Honor.

21         THE COURT:  That's not a problem.

22         With regard to the renewed Rule 29 motions, the Court

23  will deny the motions to the extent I denied them earlier; but,

24  based on the testimony, the Court would find that a reasonable

25  jury could find the defendant guilty of the offenses.

ORDER OF COURT

1          The Court will reserve, however, as to Count . . . I

2     think it's Count 7, that relates to 2006, for the reasons I've

3     said before.

4          MR. HOCHMAN:  Yes, Your Honor.

5          THE COURT:  I guess the reason I said it before is

6     because I wanted to think about it.  And I'm still thinking.

7          All right.  In terms of closing arguments, both sides

8     want 90 minutes?

9          MS. FINLEY:  I think 90 minutes total, between our

10    closing and rebuttal, will be more than enough.  We'll split it

11    accordingly.

12         THE COURT:  Do you want the Court to notify you of

13    any particular time period other than 90 minutes?

14         MS. FINLEY:  No, Your Honor.

15         THE COURT:  And for the defense?

16         MR. HOCHMAN:  Your Honor, I would estimate 90 to 100

17    minutes.  I mean, somewhere right in there.

18         THE COURT:  All right.  I will do 90 to 100 minutes.

19    If you get over a hundred minutes . . . .

20         MR. HOCHMAN:  Once I hit 90 minutes, Your Honor, if

21    you could actually notify me.  I'll do my best to check the

22    clock, as well.  When I have ten minutes left, that would be

23    terrific.

24         THE COURT:  Sure.  That's fine.

25         All right.  Anything else?

1            MS. FINLEY:  No, Your Honor.

2            THE COURT:  All right.  See everybody in the morning.

3            MS. FINLEY:  Thank you, Your Honor.

4            MR. HOCHMAN:  Thank you, Your Honor.

5            THE COURT:  And one other thing I should say for the

6    record.  The government's motion to quash the defendant's

7    subpoena is denied as moot.

8            MS. FINLEY:  Yes.

9            MR. HOCHMAN:  Thank you, Your Honor.

10            THE COURT:  All right.  We'll be in recess.

11                    -- -- -- -- -- -- -- --

12            (At 5:08 PM, court was recessed, to be reconvened at

13       9:00 AM, on Wednesday, October 23, 2013.)

14                    -- -- -- -- -- -- -- --

15

16

17

18

19

20

21

22

23

24

25