UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.: 2:13-CR-72-FtM-29UAM

THE UNITED STATES OF AMERICA,

                    Plaintiff,

                                        Fort Myers, Florida
vs.                                     October 08, 2013

PATRICIA LYNN HOUGH,                    9:00 a.m.

                    Defendant.

TRANSCRIPT OF JURY SELECTION FOR JURY TRIAL

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:     U.S. Department of Justice
                              Tax Division
                           P.O. Box 813
                           Washington, DC  20044
                           BY:  CARYN FINLEY, ESQ.

                           U.S. Department of Justice
                              Tax Division
                           Suite 7334
                           601 D Street NW
                           Washington, DC
                           BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

A P P E A R A N C E S
(Continued From Previous Page)


FOR THE DEFENDANT:          Bingham McCutchen, LLP
                            The Water Garden
                            1601 Cloverfield Boulevard
                            Suite 2050 North
                            Santa Monica, CA  90404-4082
                            (310) 904-1000
                            BY:  NATHAN J. HOCHMAN, ESQ.

                            Bruce L. Udolf, PA
                            500 East Broward Boulevard
                            Suite 1400
                            Fort Lauderdale, FL  33394
                            (954) 858-8831
                            BY:  BRUCE L. UDOLF, ESQ.

REPORTED BY:                JEFFREY G. THOMAS, RPR-CP, CRR
                            Official Federal Court Reporter
                            United States Courthouse
                            2110 First Street, Suite 2-194
                            Fort Myers, FL  33901
                            (239) 461-2033


                            *  *  *

I N D E X

| October 8, 2013 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 1 | 5 |
| Initial Instructions to Jury Venire | 1 | 29 |
| Jurors Provide Biographical Information | 1 | 32 |
| Voir Dire by the Court | 1 | 45 |
| Sidebar Conference with Juror Garvey | 1 | 66 |
| Sidebar Conference with Juror Crouse | 1 | 67 |
| Sidebar Conference Re Juror O'Connor | 1 | 68 |
| Jurors Provide Biographical Information | 1 | 69 |
| Voir Dire by the Court | 1 | 71 |
| Voir Dire by Ms. Finley | 1 | 78 |
| Voir Dire by Mr. Hochman | 1 | 79 |
| Challenges for Cause | 1 | 91 |
| Peremptory Challenges | 1 | 95 |
| Sidebar Conference with Juror Crouse | 1 | 100 |
| Peremptory Challenges | 1 | 100 |
| Stricken Jurors Excused | 1 | 103 |
| New Jurors Called | 1 | 104 |
| Jurors Provide Biographical Information | 1 | 105 |
| Voir Dire by the Court | 1 | 116 |
| Voir Dire by Ms. Finley | 1 | 126 |
| Voir Dire by Mr. Hochman | 1 | 127 |
| Challenges for Cause | 1 | 129 |

(Index Continues on Following Page)

I N D E X
(Continued From Previous Page)

|                                              | Vol. | Page |
|----------------------------------------------|------|------|
| Sidebar Conference with Juror Lee            | 1    | 129  |
| Challenges for Cause                         | 1    | 131  |
| Voir Dire by the Court                       | 1    | 132  |
| Challenges for Cause                         | 1    | 132  |
| Voir Dire by the Court                       | 1    | 133  |
| Challenges for Cause                         | 1    | 133  |
| Sidebar Conference with Juror Garczewski     | 1    | 134  |
| Sidebar Conference Re Juror Judith Davis     | 1    | 134  |
| Voir Dire by the Court                       | 1    | 135  |
| Peremptory Challenges                        | 1    | 136  |
| Stricken Jurors Excused                      | 1    | 138  |
| Discussion re Opening Statements             | 1    | 140  |
| Jurors Provide Biographical Information      | 1    | 141  |
| Voir Dire by the Court                       | 1    | 147  |
| Voir Dire by Ms. Finley                      | 1    | 156  |
| Voir Dire by Mr. Hochman                     | 1    | 157  |
| Challenges for Cause                         | 1    | 162  |
| Peremptory Challenges                        | 1    | 162  |
| Stricken Jurors Excused                      | 1    | 163  |
| Jury Placed Under Oath                       | 1    | 164  |
| Initial Jury Instruction                     | 1    | 164  |
| Certificate of Court Reporter                | 1    | 169  |

* * *

1    THEREUPON, the above-entitled case having been called to

2  order, the following proceedings were held herein, to-wit:

3                              - - -

4         THE COURT:  All right.  This is the case of United

5  States versus Patricia Lynn, I know I asked it over the phone,

6  is it Huff [sic]?

7         MR. HOCHMAN:  Yes, sir.

8         THE COURT:  Case 2:13 Criminal 72.  Let me have,

9  first of all, everyone identify themselves and their respective

10  clients, beginning with the government.

11        MS. FINLEY:  Good morning, Your Honor.  Caryn Finley

12  for the United States.

13        MS. KESSLER:  Good morning, Your Honor, Margaret

14  Leigh Kessler for the United States.

15        MS. FINLEY:  And would you like me to identify

16  everyone else sitting for government?

17        THE COURT:  You have more people than I have room for

18  my on list.

19        MS. FINLEY:  Special Agent Lalli from the IRS,

20  Christina Sorley from the IRS, and then Revenue Agent Moore.

21  He is our summary expert witness.

22        THE COURT:  Okay.

23        MS. FINLEY:  And then Ms. Kent, who is here to

24  assist, but is sitting over there for the moment, while jury

25  selection occurs.

```
 1              THE COURT:  I understand.
 2              MR. HOCHMAN:  Good morning, Your Honor.  Nathan
 3    Hochman on behalf of Patricia Lynn Hough.  Ms. Hough is sitting
 4    next to me.  Next to her is Attorney Bruce Udolf.  Next to
 5    Mr. Udolf is Daniel Saunders, Your Honor.
 6              MR. SAUNDERS:  Good morning, Your Honor.
 7              THE COURT:  Good morning.
 8              MR. HOCHMAN:  And we're being assisted by Sanford
 9    Marks, at the end.
10              THE COURT:  Good morning, everyone.
11              All right.  Counsel, I once had a trial where I
12    called one of the lawyers Mr. Smith for four days, and finally
13    he stood up and said, Judge, you do understand my name is
14    Jones.  I said no, I didn't understand that.  Why didn't you
15    tell me that four days ago?  So if I get you wrong, please tell
16    me.  Otherwise, you're going to be the wrong guy for the
17    duration of the case, from past experience.
18              All right.  A few housekeeping matters.  I wasn't
19    sure I had cracked the government's code for the indictment, in
20    terms of the entities.  I gather that UBS banker D.L. is
21    Dieter . . . Is it Luetolf?
22              MS. FINLEY:  Luetolf.
23              THE COURT:  All right.  And who is L.W.?
24              MS. FINLEY:  That is Laura Whitley.  She is
25    Dr. Fredrick's daughter.
```

```
 1                THE COURT:  And C.V.?

 2                MS. FINLEY:  She is Charlene Varga, Dr. Hough's

 3    sister.

 4                THE COURT:  And M.C.?

 5                MS. FINLEY:  Is Marion Cronin, a sister of

 6    Dr. Fredrick.

 7                THE COURT:  P.G.?

 8                MS. FINLEY:  Perry Garner.

 9                THE COURT:  I'm sorry, Perry?

10                MS. FINLEY:  Perry Garner.  A brother of

11    Dr. Fredrick.

12                THE COURT:  S.M.?

13                MS. FINLEY:  S.M. is Susan McBride, a sister of

14    Dr. Fredrick.

15                THE COURT:  S.B.?

16                MS. FINLEY:  S.B., Your Honor, this is an error on my

17    part.  It's supposed to be M.P., Melanie Pitts.

18                THE COURT:  M.P.  Okay.  Melanie.  And B.C.

19                MS. FINLEY:  I think B.C. is, unfortunately, maybe a

20    typo.  I don't know who that . . . I know that Mr. Hochman had

21    noted to me that I had gotten some of the initials incorrect.

22                THE COURT:  So I don't need to worry about B.C. then?

23                MS. FINLEY:  I don't think so.

24                THE COURT:  You would be the one to know.

25                MS. FINLEY:  You do not.
```

1              THE COURT:  Okay.

2              All right.  Now, the bank entities, UBS AG is

3    actually the name of the entity?

4              MS. FINLEY:  Yes, Your Honor.

5              THE COURT:  And then what is Swiss Bank Number 1?

6              MS. FINLEY:  Swiss Bank Number 1 is Fortis Banque.

7    F as in Frank, O R T I S.

8              THE COURT:  And Swiss Liechtenstein bank Number 1?

9              MS. FINLEY:  Is Liechtenstein Landesbank.

10             THE COURT:  L A N D I S?

11             MS. FINLEY:  L A N D E S B A N K.

12             THE COURT:  All right.  And Lichtenstein Bank

13   Number 1?

14             MS. FINLEY:  Is Bank Alpunim.  A L U P I N U M.

15             THE COURT:  And Swiss Kantonalbank Number 1?

16             MS. FINLEY:  It's Zurcher, Z U R C H E R, Kantonal

17   Bank, with a K, A N T O L . . . sorry . . . T O N A L B A N K.

18             THE COURT:  Okay.  You have to do Kantonal again.  K?

19             MS. FINLEY:  I'm sorry.  K A N T O N A L.

20             THE COURT:  You didn't know there was going to be a

21   spelling test.

22             All right.  UK Bank Private Number 1.

23             MS. FINLEY:  Is S.G. Hambros, H A M B R O S, bank.

24             THE COURT:  Then I assume Caribbean Medical School

25   Foundation Number 1 is the Saba University School of Medicine

```
1   Foundation?

2             MS. FINLEY:  That's correct.

3             THE COURT:  And then the Caribbean Medical School

4   Number 2 is University of the Americas Limited?

5             MS. FINLEY:  That's correct.

6             THE COURT:  Those were the only ones I noted.

7             All right.  In terms of the identities of the

8   witness, does the government have a name for the number one

9   witness, the IRS service center witness?

10             MS. FINLEY:  Her name is Shirley Ball.

11             THE COURT:  All right.

12             And, from the defense witness list, the potential

13   character witnesses' names?

14             MR. HOCHMAN:  We're still in the process of

15   determining that, Your Honor.  We do have the IRS -- excuse me,

16   the defense expert.  His name is Luis Rivera, spelled L U I S.

17   Rivera is R I V E R A.

18             THE COURT:  R I?

19             MR. HOCHMAN:  V E R A.  Common spelling of Rivera.

20             THE COURT:  All right.

21             In terms of your character witnesses, if any of the

22   jurors know the character witnesses you propose to call in any

23   fashion, they will not be allowed to testify.  So if you've got

24   names, you better tell me now, and I'll run the names through

25   by the jury.  Otherwise, you will not be allowed to call them.
```

1    I am not going to do this during the trial.

2              MR. HOCHMAN:  May I have one moment, Your Honor?

3              THE COURT:  You may.

4              (Mr. Hochman confers with co-counsel and the

5         defendant privately.)

6              MR. HOCHMAN:  Your Honor, Arthur Maron is a Florida

7    state resident.  All the others that we're thinking of calling

8    are out of state; so I think, with the Court's admonition that,

9    if the juror knows a potential out-of-state witness, that that

10   witness will not be allowed to be called, we bear that in mind,

11   Your Honor; but Arthur Maron is a Florida resident, so that

12   would be one of the names that we would give you.

13             THE COURT:  M A R I N?

14             MR. HOCHMAN:  M A R O N, Your Honor.

15             THE COURT:  All right.

16             MS. FINLEY:  Your Honor, the government has two

17   potential rebuttal witnesses, depending on the . . . .

18             THE COURT:  That applies to the government too.

19             MS. FINLEY:  So I wanted to . . . one would be

20   Special Agent Robert Crockett.

21             THE COURT:  Hang on a second.  Crockett?

22             MS. FINLEY:  Crockett.

23             THE COURT:  Okay.

24             MS. FINLEY:  And Sherry Dunlop.  D U N L O P.

25   Sherry, S H E R R Y.

1          THE COURT:  Okay.  The government provided me a

2     witness -- I'm sorry, an exhibit list, and then there was

3     a . . . I forget what you call it.  I think it was some type of

4     joint notice with regard to authenticity of documents.

5          With regard to the government's witness list, is

6     there any exhibit there that both sides agree can be admitted

7     as is?  I mean, typically I do this in civil cases.  I'll go

8     through and admit whatever exhibits are coming in by agreement,

9     and then the proponent does not have to do anything formally.

10    I'm wondering if there's any of those exhibits that fall in

11    that category.

12         MR. HOCHMAN:  Your Honor, there may be.  I have not

13    gone through the -- I have, obviously, the joint notice, but I

14    have not matched that up, exhibit by exhibit, with the exhibit

15    list, so I don't have . . . we could go through that exercise

16    right now, live; but if you would give me the opportunity to

17    match the two lists together, I can indicate which ones we're

18    not going to oppose.

19         THE COURT:  That's fine.  We don't need to do that

20    now.  Just, to the extent that we're interested in saving some

21    time, that might be better to do it at some point.

22         MR. HOCHMAN:  Sure.  And that's why we entered into

23    that joint notice, Your Honor.  As you'll see, with respect to

24    that joint notice, there are a lot of categories of traditional

25    bank documents, IRS returns, property-type records we're

1    obviously not opposing, and they can come in.  There are

2    certain records within the bank records, however, that were the

3    subject of that motion in limine.

4         THE COURT:  Right.

5         MR. HOCHMAN:  And we would certainly be opposing

6    those under the same types of grounds.

7         THE COURT:  All right.  I do understand that.

8         Did the defense have an exhibit list?

9         MR. HOCHMAN:  Not at this time, Your Honor.  We may

10   or may not introduce some exhibits, depending upon -- in

11   cross-examination, just depending on what a particular witness

12   says.  Hopefully, we won't need to do that.  And then, with

13   respect to our case, depending on what case we end up deciding

14   to call, we'll certainly give the Court an exhibit list before

15   we begin our case.

16        THE COURT:  All right.

17        MS. FINLEY:  Your Honor, I'm sorry, just on that

18   point, for the record, we've asked for reciprocal discovery

19   numerous times, and we've gotten some trickled things in; and

20   so to the extent, at this point, that there are exhibits that

21   the defense intends to offer in its case in chief, that the

22   government has not received yet, we would make another on the

23   record request for those exhibits.  Or evidence.

24        THE COURT:  All right.  Well, your request is noted.

25   Nothing I can do at this point.  I don't know what his exhibits

1    are, so I don't know if there's a problem or not.

2         All right.  The jury sits, Juror Number 1 is

3    closest -- in the first row, closest to the people sitting in

4    the chairs right there, so we'll have one through seven -- I'm

5    sorry, one through six, seven through twelve, thirteen through

6    eighteen, will be jury in the box.  I don't know how many

7    potential jurors we have, but the remainder will be seated in

8    the spectators section.

9         The Court addresses the 18 of the seated jurors for

10   the most part.  And then the Court does allow brief followup

11   questions of those 18.  When we finish with the peremptories,

12   however many you have left, the Court will slide those down so

13   that we fill in, say, the first seven, and then fill the

14   remainder, go through the process again, and fill those down.

15   So, as you go through the process, the jurors that are

16   remaining will become your lower numbered jurors until we get

17   12 plus alternates.

18        I suppose it depends on just how many we have, but I

19   would propose at least two alternates.  Maybe three, if it's a

20   two-week trial.

21        MR. HOCHMAN:  I would think three, Your Honor.  Also,

22   given the fact we might have an interruption, potentially, next

23   week, that would make sense.  And then, just so I'm

24   understanding, let's say, of the first six, we get rid of

25   three, does that mean -- let's say there's jurors one, two, and

1    three, to make it easy.  Does that mean that four, five, and

2    six slide down into the one, two, and three position?

3            THE COURT:  Yes.

4            MR. HOCHMAN:  And then everybody rotates over, and

5    then the next row comes in, and then if we fill -- you then put

6    in -- let's say we do six originally -- actually, there's ten

7    defense -- there's 16 total, potentially.

8            THE COURT:  Right.

9            MR. HOCHMAN:  Are the jurors then lined up in the

10   order that they would then fill the next seats?

11           THE COURT:  Supposed to be.  And it's been pretty

12   good.  I used to not have that, and then somebody else said,

13   oh, yeah, we can do that.  I said no, you can't.  But they

14   really can.  So I can't guarantee it, but I think -- I know

15   that they're supposed to be seated in the order in which

16   they're called.  Now, once you get in the spectators section,

17   whether Number 19 is this end or that end, I don't know.

18           MR. HOCHMAN:  Well, we'll know which juror is

19   Number 19?  Is that from the list that we have?  Are these the

20   actual lists that they're going to be lining up in?

21           THE COURT:  Yes.  So the first 18 will be seated.

22   Number 19, Wendy Walker, I suppose if you look at one end, if

23   it's a man, it's probably the other end.

24           MR. HOCHMAN:  I see.

25           THE COURT:  But I wouldn't know who -- I don't

1   remember where they have 19 seated in the spectators section is

2   what I'm trying to say.

3          MR. HOCHMAN:  All right.  And then a couple of . . .

4   questions.  I know that each side has submitted a summary of

5   the case.  Ours was very succinct.  The government's was

6   longer.  We expressed our objections to what we thought was

7   some of the more . . . rhetorical flourishes in the

8   government's summation of the case beyond what we think is

9   necessary to just inform the jury of the basics.  I didn't know

10  which one the Court was going to give, and if the Court was

11  going to give it at the very beginning of this.

12         THE COURT:  I'm not going to give either one

13  precisely as written by either side.  I do intend to give this

14  early on in the Court's voir dire, in connection with I'm going

15  to give you a brief summary of the case, my question is do you

16  know anything about the case before coming to court, and then

17  read my changes to the submissions that you both have made, and

18  then get the answer whether they know anything about the case

19  or not.

20         I've taken out some of the things from the

21  government's.  I'm reading largely from the government's,

22  although I've taken out the government's version of what your

23  position is.  And for that I just have that Dr. Hough has

24  pleaded not guilty, and denies all charges against her, which I

25  think is fairly consistent with what you've said in your

1   proposal.

2           MR. HOCHMAN:  Yes, sir.

3           THE COURT:  And the rest of it seemed to me to be --

4   that may, in fact, be what the position is, but . . . it just

5   has a certain tone to it I didn't like.

6           But that does bring me to a question as to whether

7   you want me to say more about your case than just the pled not

8   guilty, denies everything.

9           MR. HOCHMAN:  I think, at this point, Your Honor,

10  that's satisfactory.

11          THE COURT:  All right.

12          MR. HOCHMAN:  I think we'll wait until we get an

13  opportunity to address the jury to give them more of a detail

14  as to what the defense position is.

15          THE COURT:  With regard to the government's language,

16  I've . . . I'm going to change it.  I'm going to indicate that

17  there's five counts against this defendant.

18          I was going to talk to you about two matters that may

19  or may not have evidentiary significance.  One is the treatment

20  of the co-defendant, who is a fugitive; and the second is . . .

21  the defendant's title as doctor, which I suppose may have some

22  evidentiary significance in this case, given the nature of the

23  charge.

24          MR. HOCHMAN:  Your Honor, the interesting thing about

25  the -- we have each submitted an instruction on how to deal

1    with David Fredrick.

2              THE COURT:  I haven't read those, actually.

3              MR. HOCHMAN:  And the only difference between our

4    instruction and the government's instruction is that we add

5    sort of a . . . when you tell a jury not to speculate?  That's

6    an invitation for them almost to speculate.  And so what we

7    decided to do is that -- the government obviously was

8    concerned, in the last hearing, of any mention that he's a

9    fugitive.  We're obviously concerned that they might speculate

10   that he pled guilty.

11             So what we decided in our original version was we

12   said the David Fredrick case is no longer with you, and will be

13   addressed in a separate trial.  And then we talked to the

14   government, and they said we don't know if he's going to go to

15   trial.  So we suggested what if we changed the word trial to

16   proceeding, because that would cover every conceivable aspect

17   of Dr. Fredrick.

18             And I think that's where we would come down, Your

19   Honor, to let the jury know that his case will be addressed in

20   a separate proceeding, avoids a speculation that he's a

21   fugitive, avoids the speculation that he's pled guilty, and

22   since we are dealing with a conspiracy here, Your Honor, if the

23   jury thinks he pled guilty, that's sort of one big leg that

24   Dr. Hough did it.  If her husband pled guilty.

25             So I think that, if we can add that additional

1  language -- and it will be addressed in a separate proceeding

2  for Dr. Fredrick -- I think that's both accurate, and sort of

3  eliminates the various possibilities that could be prejudicial

4  to either side.

5       MS. FINLEY:  Your Honor, the government doesn't

6  actually think that that necessarily -- the separate

7  proceeding -- is accurate, because we don't know.  It's

8  potentially that Dr. Fredrick doesn't ever come back, or the

9  government doesn't find him, so there would never be another

10  proceeding; and to say that there will be another proceeding

11  implies that Dr. Fredrick has pled not guilty, or is still

12  going to go to trial, and that equally has some implication,

13  or . . . the jury could speculate the other way.  And so we

14  felt that the proposed instruction from the Ninth Circuit,

15  unmodified, doesn't have any connotations in it.

16       THE COURT:  Well, why doesn't it make sense, when I

17  give a version of the government's first full paragraph, saying

18  that the indictment charges defendant Hough and co-defendant

19  Dr. Fredrick, of one count of conspiracy to defraud -- I'm

20  going to strike the millions of dollars, and then add four

21  counts -- four substantive counts -- why doesn't it make sense

22  just to say only Dr. Hough is on trial at this time?  And

23  not . . . .

24       MR. HOCHMAN:  Again, it's a . . . part of it, Your

25  Honor -- that certainly makes sense.  The issue is whether, at

1   some point in this case, both in terms of the evidence that's

2   going to be received -- it's going to talk about

3   Dr. Fredrick -- that the jury is going to wonder what's going

4   on with Dr. Fredrick.

5           Now, I think it is appropriate -- and additionally,

6   Your Honor, the Ninth Circuit case that's referred to in the

7   instruction, I was actually counsel, back in 2002, on that

8   case.  We had a situation where a co-defendant died in the

9   middle of the jury deliberations.  And they were given an

10  instruction that, we found out later, the jury ended up

11  speculating did he plead guilty, was he a fugitive.

12          And having lived that situation in real life, that's

13  why we want to sort of eliminate those possibilities by saying

14  only Dr. Hough is on trial at this moment, and, you know, any

15  co-defendant will be resolved in a separate proceeding, or

16  would be resolved in a separate proceeding.  That's probably

17  also probably true about Dieter Luetolf and Beda Singenberger,

18  since they are co-conspirators, but it's only Dr. Fredrick

19  that's been indicted here.

20          THE COURT:  I'm not sure that's actually true as to

21  the unindicted co-conspirators.

22          MR. HOCHMAN:  Well, at least to Dr. Fredrick,

23  certainly.  The government has already indicted Beda

24  Singenberger in a separate indictment, which is not before the

25  Court; and I don't know what they're going to do with

1  Mr. Luetolf.  So you're right.  But in relation to

2  Dr. Fredrick, again because he's her husband, it leads itself

3  to much more speculation than it would if it was just a third

4  party.

5          THE COURT:  So you want me to say something along the

6  lines that only Dr. Hough is on trial at this time.

7  Dr. Fredrick's guilt or innocence will be decided in a separate

8  proceeding?

9          MR. HOCHMAN:  Yes, Your Honor.

10         THE COURT:  And Ms. Finley?

11         MS. FINLEY:  I think, with the addition of guilt or

12  innocence, then the government has no objection, Your Honor.

13         THE COURT:  I understand your point that that may not

14  be literally true if he never shows up, but I don't think we're

15  in the business necessarily of telling the jury the literal

16  truth all the time.

17         And then the middle paragraph, if you have the

18  government's proposed statement, the one that begins to talk

19  about the conspiracy, I'm . . . deleting some verbiage there,

20  but essentially leaving it as is.

21         Any particular objections to the way they've got it?

22         MR. HOCHMAN:  Your Honor, just the . . . obviously,

23  the objection we've already raised as to just that we think

24  it's more appropriate to strip it down; but, given that the

25  Court's going to give the second paragraph, no additional

```
1    edits, Your Honor.

2             THE COURT:  All right.

3             Counsel, going back to the jury selection, I don't

4    know if we talked at a prior hearing, I don't allow back

5    striking.  So, once you pass 12, those are the 12 you get,

6    absent new information that sometimes may be developed.  But if

7    you pass six in the first round, for example, unless you get

8    more information from those six, you can't go back and back

9    strike those six.  So those are -- however many survive the

10   first round, those are the jurors, absent new information.

11            As you say, ten and six are the peremptories.

12            MR. HOCHMAN:  Two quick questions, Your Honor.  Are

13   you going to ask, initially, to time qualify the jury, so that

14   we can sort of deal with those for cause challenges, just

15   considering whether someone can sit for two weeks?

16            THE COURT:  Sure.

17            MR. HOCHMAN:  I don't know how many of the jurors

18   that's going to get for cause.

19            THE COURT:  I typically do that in the end.  I guess,

20   to the extent I have a reason for doing it that way, you get

21   them a little bit more invested.  Otherwise, the first time I

22   tell them it's a two-week trial, I have hands go up with some

23   reason that they can't be here for two weeks.

24            MR. HOCHMAN:  Sort of entice them with some idea of

25   how enticing the trial might be?
```

1          THE COURT:  Something like that.  Certainly, at some

2     point . . . .  The cause part of it, in the past, I've been

3     fairly . . . restrictive; but, at sidebar we can discuss it,

4     depending what the reason is.  If it's just I don't want to be

5     away from work for two weeks, kind of depends on what the work

6     is.

7          MR. HOCHMAN:  Sure.  And again, just trying to get

8     the dynamics, Your Honor.  So put the 18 in the box, you ask

9     all the questions of the 18.  Are you also asking the same

10    questions of the people in the gallery?  Are they answering the

11    same initial questions?

12         THE COURT:  They are not.  I tell them to pay

13    attention, because at least some of them may find themselves in

14    the jury box; but I don't call for responses from them when I'm

15    talking to these 18.

16         MR. HOCHMAN:  Got it.  And so you then gather all the

17    information, have your voir dire, then the attorneys get some

18    limited voir dire to follow up with these jurors, and then do

19    we -- do we do it live, Your Honor?  Some courts actually have

20    us come up to sidebar to announce the strikes.  And I would

21    imagine, if we put one in here -- I mean, in other words, if I

22    strike juror number one, and everyone moves down, and 19 comes

23    there into that spot, do you then voir dire Juror Number 19,

24    who is in the new spot?

25         THE COURT:  I'm sorry.  I didn't explain it well

1    enough.

2              MR. HOCHMAN:  Sure.

3              THE COURT:  When we all finish our questions, you

4    have 18 in the jury box.  We'll come to sidebar.  You'll make

5    your challenges for cause.  You'll make your peremptories.  Say

6    we have six left.  That's when I move the people.  That's when

7    I excuse the other 12.  We move the six down, backfill 12, and

8    do the process again.  So it is not, every time we strike a

9    juror, we fill it with somebody else.

10             MR. HOCHMAN:  I see.  But when you're saying we do

11   the peremptories, for instance, I strike juror number one, and

12   let's say I want to strike juror number two, and the government

13   goes next, and they strike juror number two, so I don't have to

14   use my peremptory for that.

15             THE COURT:  Correct.

16             MR. HOCHMAN:  Do we do that in order at sidebar, or I

17   go one, and they go two, and then we just keep going?

18             THE COURT:  The government exercises the first

19   peremptory, you exercise yours, government does one, you do

20   two, government does one, you do two, and then eventually we'll

21   get to the point where you each have one left.

22             MR. HOCHMAN:  And we do that at sidebar?

23             THE COURT:  We do that at sidebar, with jurors seated

24   there, so you can see who they are.  But obviously, the theory

25   is not talking loud enough so they can hear us.

1          MR. HOCHMAN:  So, with each strike, we kind of

2   recalculate, knowing that we have less strikes, if we want to

3   preserve a strike for someone who might be otherwise out here,

4   or, you know, keep the people there.

5          THE COURT:  Right.  I mean, that's why, presumably,

6   it helps to have the jurors out in the spectators' section

7   seated in the order, so you can at least look at them.  You

8   don't know anything about them, but you can see them.

9          MR. HOCHMAN:  And then, if we say we pass once, on

10  the panel, does that mean we accept the panel from then on?  In

11  other words, you can't do a back strike if you pass?  Is that

12  correct, Your Honor?

13         THE COURT:  If you, for example, in the first 18 --

14  say we're down to ten left, and you pass.  Those ten are your

15  jurors.  So you're going to backfill it, you're going to have

16  two other jurors that you can challenge, and then the

17  alternates.

18         MR. HOCHMAN:  Okay.  Do we lose -- if we get down

19  to -- I'm trying to see what number we have to get down to

20  before you start backfilling and voir diring, because it might

21  be that, when I hear who the next six are coming up, compared

22  to the ones that are still there, I might not want to pass.  So

23  that's why I'm trying to get a sense of at what point do you

24  start backfilling, so that I know who's coming up next.

25         THE COURT:  When you tell me, at sidebar, you're done

1    with your peremptories as to these 18, if the government tells

2    me they're done, and I look and see how many I have left.

3              MR. HOCHMAN:  Got it.

4              THE COURT:  And then -- I mean, you may have used all

5    your challenges.  I don't know.  But whatever is left, then I

6    have the remaining jurors fill the front seats, in order; I

7    have the jurors from the spectators section backfill --

8              MR. HOCHMAN:  Got it.

9              THE COURT:  -- redo the peremptory -- redo the voir

10   dire as to the newly seated jurors.  You will exercise your

11   peremptories as to the newly seated jurors unless, as I said,

12   some new information is given by one of the previously seated

13   jurors.

14             So if you've got six . . . if you've used six of your

15   peremptories, and you've got six jurors left at the end of it,

16   I guess you know you've got four peremptories to deal with the

17   next six jurors.

18             MR. HOCHMAN:  I see.  I see how that works.  Thank

19   you very much, Your Honor.

20             THE COURT:  Have I said that so you understand?

21             MR. HOCHMAN:  Yes.  I think I understand the ground

22   rules, and I'll just do my best to make sure that -- if I make

23   a mistake, Your Honor, please just let me know, and I'll fix

24   it.  But I think I understand the ground rules.

25             THE COURT:  If you have a question, I'll try and do a

1    better explanation.  But I think it flows okay.

2              MR. HOCHMAN:  Okay.

3              MS. FINLEY:  I just want to clarify.  If you do pass,

4    though, you lose your peremptory?

5              THE COURT:  No, no, no.  You don't lose a peremptory.

6    You just lose the ability to exercise a peremptory as to those.

7              MS. FINLEY:  In other courts, if you pass, you lose

8    your strike.

9              THE COURT:  I hadn't thought of doing that.  I don't

10   think I'm going to make this that case, since I've never done

11   that before.

12             Every time the Court has a sidebar conference,

13   Ms. Hough, you are allowed to appear; so when I say, "Counsel,

14   come to sidebar," I'm not going to say counsel and you, but

15   that's what I mean.  You don't have to come to any of the

16   sidebars.  If you don't come, I will assume you don't wish to

17   come.  If you do come, that's fine.

18             Notes?  In terms of the jurors taking notes?  Anyone

19   have any preferences?

20             MR. HOCHMAN:  No objection, Your Honor.

21             I think there's a standard instruction, that has been

22   jointly submitted, that says when you bring those notes back to

23   the jury room, they're only your notes, they're not evidence,

24   etcetera, etcetera.  So maybe the Court, in the preliminary

25   instructions, for the first day, can let the jurors know that.

1          THE COURT:  Yeah.  I'll deal with the notes in the

2     preliminary instructions.

3          MS. FINLEY:  We have no objection, Your Honor.

4          THE COURT:  All right.  I am going to allow the jury

5     to take notes.  Seems to make sense.

6          All right.  Any other questions before I have the

7     jurors come up?

8          MS. FINLEY:  Your Honor, the government also filed a

9     notice concerning the defendant's placing Special Agent Lalli

10    on their witness list; and we have requested that they comply

11    with the Touhy regulations under the IRS, and they have not.

12    So that's just one issue as to whether Special Agent Lalli has

13    authorization from his agency to testify if they do intend to

14    call him; and without the compliance of the Touhy regs, they

15    can't make that inquiry as to the agency.

16         THE COURT:  All right.  I read the notice.  It's not

17    a motion, so it doesn't call upon me to do anything.  If the

18    defense does it right, they will be allowed to call him.  If

19    they don't, they won't.

20         MR. HOCHMAN:  Actually, if I may turn this over, very

21    briefly, to Mr. Saunders, because he's my Touhy expert.  If he

22    could just address this issue very briefly.

23         THE COURT:  No.  Nothing for me to rule on.  I mean,

24    you're either going to do it right or wrong.  If you do it

25    wrong, the witness isn't going to be allowed to testify.  I

1   don't need to decide it now.

2          MR. HOCHMAN:  I think what we are going to have to do

3   is present you with the law that says we actually don't have to

4   comply with the Touhy regs with respect to this particular

5   agent in the room.

6          THE COURT:  I don't need to worry about that until

7   it's your case.

8          MR. HOCHMAN:  Very good, Your Honor.  Thank you.

9          THE COURT:  All right.  Anything else?  Questions?

10          All right.  Let's have the jurors come on up.

11          (Beginning at 9:45 a.m., court stood at ease while

12      awaiting the arrival of the jury venire.

13          MR. HOCHMAN:  Your Honor?

14          THE COURT:  Yes, sir?

15          MR. HOCHMAN:  With respect to alternates, do we get

16   additional strikes?

17          THE COURT:  You do.

18          MR. HOCHMAN:  How many for the defense, and how many

19   for the government?

20          THE COURT:  One per two alternates.  So if we have

21   three, you each will get two.

22          MR. HOCHMAN:  Very good.

23          (Thereupon, court continued to stand at ease while

24      awaiting the arrival of the jury venire.)

25          MR. HOCHMAN:  Your Honor?  May I ask you, one last

1  time, to make sure?  Is it one for the government and one for

2  the defense, then one for the government and one for the

3  defense, or two?

4           THE COURT:  Two.

5           MR. HOCHMAN:  That's when we start the two.  Very

6  good.

7           THE COURT:  Right.

8           MR. HOCHMAN:  There was just a debate in the defense

9  camp.

10           THE COURT:  I think that math works out.

11           MR. HOCHMAN:  Yes.

12           (Court continued to stand at ease while awaiting the

13      arrival of the jury venire.

14           (At 9:58 a.m., the jury venire was escorted into the

15      courtroom.)

16           THE COURT:  The jurors may be seated.

17           THE COURT:  Good morning, ladies and gentlemen.  My

18  name is John Steele.  I'm a United States District Court Judge

19  here in the Middle District of Florida.  On behalf of all the

20  judges, I'd like to welcome you here this morning.  I know, for

21  some of you, you'd rather be somewhere else besides federal

22  court, but it's an important service that all of you perform.

23  I do want to take a few minutes to explain what we're going to

24  be doing this morning, and then I'm going to start doing it.

25           In a few moments, I'm going to have the 18 jurors

1   seated in the jury box rise, individually, and give us the

2   information that you have set forth on the sheets of paper.

3   After we get all of that information, I'll have some questions

4   for you.  My questions will be, hopefully, designed to make

5   sure that you're all qualified to sit on this particular case.

6        There may be a reason that this isn't the case for

7   you.  You may know some of the witnesses.  You may know some of

8   the events.  And that's what we're trying to do, is make sure

9   that you come into the case with no particular bias, and no

10  reason why you can't be fair to both sides of the case.  It is

11  a criminal case, which I'll explain shortly.

12       When I have finished my questions, the lawyers for

13  each side will be allowed to ask some brief follow-up

14  questions.  Their purpose is the same as mine.

15       At the conclusion of the process, we'll have what we

16  call a sidebar conference, and the lawyers will come literally

17  to the sidebar up here.  Under our rules they're allowed to

18  excuse a certain number of you for no particular reason.  If

19  that happens, don't take it personally.  That's just the way

20  the process works.

21       When we go through that process, if experience is any

22  indication, some of you will not be here any longer.  Those of

23  you seated in the spectators section think you're safe.  Some

24  of you will find yourself seated in the jury box.  And the

25  reason I'm going to ask you to pay attention now is because I'm

1    going to ask you the same questions that you hear me ask the

2    first group.  And we'll proceed in the same fashion, and after

3    we question the newly seated jurors, we'll go through, and the

4    lawyers will be given the opportunity to what we call challenge

5    certain jurors.  And we'll keep the process going until we have

6    enough jurors to try the case.

7            After we have selected the jury, the Court will give

8    the jury a brief jury instruction, the lawyers will be given an

9    opportunity to make an opening statement, and we'll begin with

10   the taking of the testimony.

11           At the conclusion of the case, the lawyers will be

12   given the opportunity to make their closing arguments to you;

13   and then, when the lawyers have finished that, I will give you

14   the Court's jury instructions; that is, I'll give you all the

15   law you need to know to decide the case.  But that obviously

16   isn't going to all happen today.

17           The parties anticipate the case may last as long as

18   the end of next week.  Keep in mind Monday is a legal holiday.

19   But other than that, Congress willing, we're going to be going

20   through the end of however long it takes.  But we anticipate it

21   may be the end of next week.  So, in a nutshell, that's what

22   we're going to be doing both today and for the duration of the

23   case.

24           So let me begin with Juror Number 1, which is you,

25   Mr. . . . is it Chobrda?

1          JUROR CHOBRDA:  Chobrda, yes.

2          THE COURT:  We're going to get you a microphone.

3    Maybe.

4          Like I said, you're going to have to speak loudly.

5          JUROR CHOBRDA:  My name is Adam Chobrda.  I live in

6    the City of Cape Coral.  I just bought a house, so I've lived

7    there less than six months.  I have lived in Florida for 32

8    years.

9          I currently work in the City of Fort Myers as a

10   wastewater plant operator.  I'm not married.  I'm single.  I

11   have no children.

12         I have some college experience.  I was in the army,

13   and honorably discharged.  I have no court experience as a

14   witness, plaintiff, or defendant.  And I have previous jury

15   experience for a criminal case, and yes, the jury verdict was

16   given.

17         THE COURT:  And was that a state case or a federal

18   case?

19         JUROR CHOBRDA:  It was state.

20         THE COURT:  And were you the foreperson?

21         JUROR CHOBRDA:  I don't know.  I was in the jury

22   room.

23         THE COURT:  If you don't know, you probably weren't.

24         JUROR CHOBRDA:  Right.

25         THE COURT:  All right.  Thank you.

1              Is this microphone on the podium working?  Let's see

2      if we can't turn that around.

3              JUROR MASCHMEYER:  Can you hear me?  Hello?

4              THE COURT:  Oh, that's great.

5              JUROR MASCHMEYER:  My name is Melissa Maschmeyer.  I

6      live in Cape Coral, Florida.  I have lived there for 24 years,

7      I've lived in the State of Florida for 27 years.  I work in the

8      human resources.  And I'm single.  I have no children.  I have

9      a bachelor's degree.  I've never been in the military.  And I

10     have no experience in . . . court experience.  And then no jury

11     experience.

12             THE COURT:  All right.  Thank you.

13             Mr. Clark?

14             JUROR CLARK:  Yes.  My name is John Clark.  I live in

15     the City of Naples.  I've lived there since 1996.  I'm retired.

16     I was a real estate developer.

17             I'm married.  My wife is retired.  She was a

18     restaurateur.  I have two children.  One just graduated with a

19     degree in electrical engineering.  I have another daughter at

20     Wellesley College.

21             I have a master's of science.  I have not been in the

22     military.  I have not been in a court case, but I have served

23     on a federal trial in the state of Massachusetts, I believe in

24     1983, and I was the foreman.

25             THE COURT:  I don't want to know what the verdict

1    was, but did the jury reach a verdict?

2              JUROR CLARK:  Yes.

3              THE COURT:  And was that a civil or criminal case?

4              JUROR CLARK:  Criminal.

5              THE COURT:  And if we can keep that microphone moving

6    down, we'll get to Mr. Barbuto?

7              JUROR BARBUTO:  My name is William A. Barbuto, Jr.,

8    and I live in Fort Myers.  I have been here for 17 years.  I've

9    lived in Florida for 17 years.  I'm a retail manager.

10             I am married.  My wife is a baker.  I have one child,

11   17 years old.

12             I do have college experience.  I was not in the

13   military.  And I have been a witness and a defendant, and have

14   been sued in court.  And have not served on jury.

15             THE COURT:  Tell me a little bit about your

16   litigation experience.  You said you were a witness, a

17   defendant, and had been sued in court.

18             JUROR BARBUTO:  I was a witness in a multiple-car

19   accident that I had to go to several trials on.  And I was a

20   defendant in a traffic violation.  And I was sued for

21   traffic -- for an accident.

22             THE COURT:  Anything about any of those litigation

23   experiences that you think would make it hard for you to be

24   fair to both sides in a criminal case?

25             JUROR BARBUTO:  No.  That's been a long time ago.

1          THE COURT:  All right.  Thank you.

2          Ms. Falter?

3          JUROR FALTER:  My name is Jacalyn Falter, and I live

4    in Naples, Florida, for six months and a day.  And in Syracuse,

5    New York, the rest of the time.  I've lived there ten years.  I

6    own a payroll service company in Syracuse.

7          I'm married.  My spouse is retired.  We have three

8    children:  A daughter, 40, who's a comptroller at our

9    construction company; a son, 38, who is a civil engineer, and

10   works at our construction company; another son, 36, who is a

11   construction engineer, and guess where he works?  Our

12   construction company.

13         I have one year of business college.  No military

14   service.  No previous court experience.  And I served on a

15   Collier County jury in 2011, and I did a criminal case in

16   Syracuse in the late eighties.

17         THE COURT:  And did each of those cases render

18   verdicts?

19         JUROR FALTER:  The one in Collier County was

20   dismissed, and the one in Syracuse we found him --

21         THE COURT:  I don't need to know the verdict.

22         JUROR FALTER:  Yes.  It went to verdict.

23         THE COURT:  And were you the foreperson?

24         JUROR FALTER:  No.

25         THE COURT:  Thank you.

1          Ms. Garvey?

2          JUROR GARVEY:  My name is Lynn Garvey.  I live in

3     Cape Coral for seven years.  I have been in Florida for 24

4     years.  I'm a copywriter.  I am divorced.

5          I have two sons:  31, he's an attorney; 33, he's a

6     business manager and a business owner.

7          I have a bachelor's degree.  I have not served in the

8     military.  Yes, I have had court experience, and I've never sat

9     on a jury, but I've been called for a jury.

10          THE COURT:  When you say you have court experience,

11     are you referring to the jury, or something else?

12          JUROR GARVEY:  No.  Personal.

13          THE COURT:  Something you'd rather not say in public?

14          JUROR GARVEY:  Yes.

15          THE COURT:  I'm going to have you come to sidebar a

16     little bit later, but I'll come back to you.  But you're still

17     not done.

18          JUROR GARVEY:  Oh.  Sorry.

19          THE COURT:  You said you had a son who is an

20     attorney.  Does he practice locally?

21          JUROR GARVEY:  In Fort Lauderdale.

22          THE COURT:  Do you know what areas of law he

23     practices in?

24          JUROR GARVEY:  Yes.  He's a securities attorney.

25          THE COURT:  Thank you.  And is that long enough you

1    to get back to the second row without choking any jurors there?

2              JUROR BURDA:  I am Karen Burda.  I have lived in

3    Lehigh since '97, when I moved down from Indiana.  I work at

4    Lowe's.  I'm married.  He just retired.  I have no children.

5              High school graduate.  No military.  I have been

6    called four times for jury, but two were settled out of court,

7    and I wasn't picked for the other one.

8              And that's pretty well it.

9              THE COURT:  That's it?  All right.  Thank you.

10             Mr. Turner?

11             JUROR TURNER:  My name is Scott Turner.  I'm a

12   resident of Lehigh Acres.  I've lived there 20 years.  I've

13   lived in Florida for 54 years.  I'm a business analyst at the

14   Lee County Clerk of Court's office.

15             I'm married, and my wife works part-time at Future

16   Aviation, where they make airplane parts.

17             I have four children.  Brian is 30, and he's in

18   nursing school.  Eric is 27.  He's also in nursing school.  And

19   he's employed at Jackson Memorial Hospital.  Stephanie is 25.

20   She's an administrator at a nonprofit organization.  Brianna is

21   22, and she's a cosmetologist.

22             I have no previous military service, or court

23   experience, or jury service.

24             THE COURT:  And tell me a little bit more about what

25   you do as far as your employment.

1            JUROR TURNER:  Yes.  I've worked there for three

2    months.  I support the computer programs that they use to

3    handle the cases.  All the clerks.

4            THE COURT:  You're talking about the clerk of courts

5    over in state court?

6            JUROR TURNER:  Yes.  Right across the street.

7            THE COURT:  And you have been doing that for three

8    months?

9            JUROR TURNER:  Yes.

10           THE COURT:  What did you do before that?

11           JUROR TURNER:  I was a systems analyst at a land

12   development company.

13           THE COURT:  And is your job in the clerk's office now

14   all computer related?

15           JUROR TURNER:  Yes.

16           THE COURT:  Thank you.

17           Ms. Humphries?

18           JUROR HUMPHRIES:  Hello.  My name is Tammy Humphries.

19   I live in Moore Haven, Florida, which is in Glades County.

20   I've lived there for 46 years.  I'm 46.  So my entire life.

21   I'm a sixth grade English teacher.

22           I'm married.  My husband is a contractor.  We have

23   one daughter, Teal, who goes to the University of West Alabama.

24   And I have a bachelor's degree.  No military.  No previous

25   court experience.  And I've never served on a jury.

1          THE COURT:  Thank you.

2          JUROR HUMPHRIES:  You're welcome.

3          THE COURT:  Mr. Jiles?  We're going to -- let's see

4     if the remote works a little bit better.

5          JUROR JILES:  My name is Dan Jiles.  I live in Alva,

6     Florida, and I have lived there for four years, and have lived

7     in Florida for 20.  I am a retired insurance executive.

8          I am married.  My wife was a -- is also retired.  A

9     business owner.  I have one daughter, who lives in California,

10    who is a marketing manager for a software company.

11         I have a college degree.  I did serve in the U.S.

12    Army, and did receive an honorable discharge.  I've never had

13    any court experience, and have never served on a jury.

14         THE COURT:  Thank you.  Ms. Angulo.

15         JUROR ANGULO:  My name is Juliette Angulo.  I live in

16    Cape Coral, Florida.  I have been living there for ten years.

17    I was born in Florida.  I work in advertising for a media

18    company.  I am single.  I don't have any children.

19         I have a bachelor's degree.  No military service, no

20    court experience, and no prior jury service.

21         THE COURT:  Thank you.

22         Mr. O'Connor?

23         JUROR O'CONNER:  My name is Tom O'Connor.  I live in

24    the State of Florida.  I have lived here for 43 years.  My

25    occupation was a route salesman.

1            I'm married, 56 years.  My wife is a clerk.  I have

2     five children, two boys and three girls.

3            I got a tenth-grade education.  I've served in the

4     United States Army.  No court experiences, and no jury service.

5            THE COURT:  You said you were a route salesman.  Tell

6     me a little bit more about that.

7            JUROR O'CONNOR:  I worked as a franchise operator for

8     Arnold Bakeries, and I delivered bread to Lee, Collier, and

9     Charlotte Counties.

10           THE COURT:  All right.  Thank you.

11           Mr. . . . is it Pfeffenberger?

12           JUROR PFEFFENBERGER:  Pfeffenberger.  My name is

13    Michael Pfeffenberger.  I'm from Naples.  I've lived there for

14    12 years.  11 years.  And I've lived in Florida for 11 years.

15    I'm a retired bank president.  Married to a retired teacher.

16           Two children.  41 years old, a contract employee

17    exec.  And a 40-year-old public librarian exec.

18           I have a bachelor's degree.  And no military

19    experience.  I was a witness in court once, and no jury duty.

20    The court case was a civil case, and I was a witness for my

21    employee -- employer.

22           THE COURT:  Anything about that civil case that you

23    think might make it hard for you to be fair to both sides?

24           JUROR PFEFFENBERGER:  Nothing.

25           THE COURT:  And what bank was it that you retired

Case 2:13-cr-00072-SPC-NPM   Document 132   Filed 11/13/13   Page 41 of 169 PageID 3524

JURORS PROVIDE BIOGRAPHICAL INFORMATION           41

1  from?

2          JUROR PFEFFENBERGER:  It's now U.S. Bank.

3          THE COURT:  And what was it before?

4          JUROR PFEFFENBERGER:  I went through five mergers.

5  Do you want me to give you . . . .

6          THE COURT:  Do you remember?

7          JUROR PFEFFENBERGER:  Yes, I do.

8          THE COURT:  All right.  Go ahead.

9          JUROR PFEFFENBERGER:  Home Banking Company, Third

10 National Society Bank, Central Trust Company, First Star, and

11 U.S. Bank.

12         THE COURT:  Thank you.

13         Ms. Vega?

14         JUROR VEGA:  Hi.  My name is Tanya Vega.  I live in

15 Cape Coral.  I've lived there for 13 years.  I've lived in

16 Florida 29 years.  I am an insurance adjustor.

17         I'm married.  My Husband is a photographer.  I have a

18 three-year-old son.

19         I have a bachelor's degree.  I have no military

20 experience.  No previous court experience.  And no previous

21 jury experience.

22         THE COURT:  Thank you.

23         Ms. Crouse?

24         JUROR CROUSE:  Yes.  My name is Ellen Crouse.  I live

25 in the City of Naples.  I have lived there for 24 years, and

1   I've lived in the State of Florida for 24 years.  I'm an office

2   manager for an eye doctor.

3          I am married.  My husband is a pool technician.  I

4   have a son, 28, who is a fireman; and I have a daughter, 34,

5   who does scientific research.

6          I've completed secretarial school.  I have no

7   military service.  I was a defendant.  And I also served on a

8   jury, a civil trial, where there was a verdict reached.

9          THE COURT:  You said you were a defendant.  Do you

10   remember the type of case?

11          JUROR CROUSE:  Well, I was -- yes.  I would prefer to

12   not say.

13          THE COURT:  All right.  I'll come back to you, as

14   well, then.

15          JUROR CROUSE:  Thank you.

16          THE COURT:  Mr. Aminian?

17          JUROR AMINIAN:  Yes, Aminian.  My name is Farshad

18   Aminian, and my city of residency is Estero, and, you know,

19   I've been in Estero for seven years, and in Florida seven

20   years.  And my occupation is assistant professor at Florida

21   Gulf Coast University.

22          And I'm married.  And my wife is also assistant

23   professor, Florida Gulf Coast University.  And then we have two

24   children.  One is three year old.  My daughter.  And my brand

25   new son, four months old.  And my degree is master's of fine

1    arts.

2              And I haven't served in United States Army, and I

3    don't have any experience previous court experience, but I have

4    served as a juror in Fort Myers, state court, and the case also

5    reached a verdict.

6              THE COURT:  And what is it that you teach at the

7    university?

8              JUROR AMINIAN:  I am in communication and philosophy

9    department, but I teach cinema studies.

10             THE COURT:  Thank you.

11             Mr. Lucas?

12             JUROR LUCAS:  Hi.  My name is Steve Lucas.  I live in

13   Naples, Florida.  I have lived there for about 20 years.  I've

14   lived in Florida for approximately 30 years.  I am

15   self-employed with Naples Hardware Service.  We specialize in

16   doors and hardware.

17             I am married.  My wife works in my office.  I have

18   three children:  15, 13, and 8.

19             I have a high school diploma.  No military service.

20   No previous court persons.  But I have served on a jury, and it

21   was a criminal case.

22             THE COURT:  All right.  Thank you.

23             Ms. Lane?

24             JUROR LANE:  Hi.  I'm Renee Lane.  I live in Fort

25   Myers, Florida.  I have lived here for 40 years.  I was born in

1    Florida.  I was in advertising, and now I'm a homemaker.

2            I'm married.  My husband is a physician.  I have

3    three children:  A 30-year-old daughter, who is a physician; a

4    27-year-old son, who is a welder; and a 16-year-old daughter.

5            I have a bachelor's degree.  I have never been in the

6    military, I have no previous court experience, and I have never

7    served on a jury.

8            THE COURT:  Did I understand you to say you have a

9    daughter who is a physician?

10           JUROR LANE:  Yes.

11           THE COURT:  And where does she practice medicine?

12           JUROR LANE:  She practices in Naples.

13           THE COURT:  You need to move that microphone back.

14           JUROR LANE:  Oh.  She practices in Naples.  My

15   husband is also a physician.

16           THE COURT:  And where does he practice; Naples, as

17   well?

18           JUROR LANE:  Fort Myers.

19           THE COURT:  All right.  Do you remember when either

20   your husband or your daughter graduated from medical school?

21           JUROR LANE:  My daughter graduated from medical

22   school probably two years ago.

23           THE COURT:  All right.

24           JUROR LANE:  She's been practicing one year.

25           THE COURT:  And how about your husband, how long has

1    he been practicing?  Maybe we'll do it that way.  Forever?

2              JUROR LANE:  Probably forever.  He's been here a long

3    time.  Probably 40 years.

4              THE COURT:  All right.  Thank you.

5              THE COURT:  Ladies and gentlemen, as I told you

6    before, this is a criminal case; and, since it's a criminal

7    case, it's been presented on what's called an indictment.  An

8    indictment literally are pieces of paper that tells the Court,

9    and the defendant, and now you, the jury, what the charge is.

10             The fact that a defendant has been indicted is not

11   evidence of any guilt.  That's just the process by which the

12   case is brought in federal court.  So the fact that there is an

13   indictment is not, in itself, any evidence.

14             I'm going to summarize for you the indictment in the

15   case, and then my follow-up question would be whether you know

16   anything about the case before coming to court today.

17             In this particular case, it is the case of the United

18   States of America versus David Leon Fredrick and Patricia Lynn

19   Hough.  The indictment charges the defendants in five counts.

20   A count is just a charge, so all that means is there's five

21   charges in this case.

22             The only defendant that is on trial is Dr. Hough.

23   The guilt or innocence of the other named defendant will be

24   decided in a separate proceeding.

25             In this case, Dr. Patricia Lynn Hough and her

1    co-defendant, Dr. David Leon Fredrick, are each charged in one

2    count of conspiracy to defraud the Internal Revenue Service by

3    concealing assets and income in offshore banks, at UBS in

4    Switzerland, and bank accounts in other foreign countries.

5    There's also four what's called substantive counts, which I'll

6    discuss in a moment.

7         The indictment alleges that Dr. Hough conspired to

8    defraud the Internal Revenue Service with her husband,

9    Dr. Fredrick; and Beda Singenberger, a citizen and resident of

10   Switzerland; and Dieter Luetolf, a UBS banker.

11        The indictment alleges that the conspiracy was

12   carried out by creating or causing to be created, and using or

13   causing to be used, nominee entities and undeclared bank

14   accounts in defendants' names and in the names of nominee

15   entities at UBS and other foreign banks.

16        The indictment alleges that this was done to conceal

17   assets and income from the Internal Revenue Service, including

18   the sale of real estate associated with a medical school on the

19   Island of Saba, and shares of stock Dr. Hough and Dr. Fredrick

20   owned in a medical school on the island of Nevis.

21        Dr. Hough is also charged, in four substantive

22   counts, with filing falls individual tax returns for 2005,

23   2006, 2007, and 2008.  The indictment alleges that Dr. Hough

24   filed false tax returns which substantially understated her

25   total income, and failed on Schedule B, Parts 1 and 3 of each

1    return, to report that she had an interest in or signature or

2    other authority over bank securities or other financial

3    accounts located in foreign countries.

4               Dr. Hough has pled not guilty and denies all of the

5    charges against her.

6               Do any of you know anything about the case before

7    coming to court today?  I see we're going to need to get some

8    ground rules.

9               If the answer is no, I need to see some heads

10   shaking.  If the answer is yes, I need to see some hands go up.

11   So let me try it again.

12              Any of you think you know anything about the case?

13   And Mr. Clark, I think you have your hand up.

14              JUROR CLARK:  I don't know anything about this

15   particular case, but I was a client of UBS, and at one time,

16   back in Boston, they did approach me on putting money over into

17   Switzerland, and I said no, and I dropped my account with UBS.

18   That's my only . . . .

19              THE COURT:  All right.  How long ago was that?

20              JUROR CLARK:  1998.

21              THE COURT:  All right.  And you said that was in

22   Boston?

23              JUROR CLARK:  Yes.

24              THE COURT:  Any other contacts with either them or

25   that proposed transaction since then?

1          JUROR CLARK:  No.  I don't know anything about these

2    individuals.  I just know, from reading the newspapers and

3    being involved with United Bank of Switzerland there, that they

4    were doing that with wealthy individuals in this country.

5          THE COURT:  All right.  Anyone else know anything

6    about this case before coming to court?  I see heads shaking?

7    No?  All right.

8          What I'm going to do next is have the lawyers present

9    in the court identify themselves and any other persons who may

10   be seated at counsel table.  And then my follow-up question

11   will be whether you know any of those individuals.

12         Ms. Finley?  Let's begin with the government.

13         MS. FINLEY:  Thank you, Your Honor.

14         Good morning.  My name is Caryn Finley, and I'm an

15   attorney with the Department of Justice Tax Division.  With me

16   is my co-counsel, Margaret Leigh Kessler, who is also an

17   attorney with the Department of Justice Tax Division.

18         Sitting next to her is Special Agent Cameron Lalli.

19   He is a special agent with the Internal Revenue Service.

20         Next to him is Christina Sorley.  She's an employee

21   of the Department of Justice who will be running our computer

22   system.

23         Seated next to her is Revenue Agent Moore.  Sheila

24   Moore.  She's a revenue agent with the Internal Revenue

25   Service.  And Sandra Kent, who is an employee of the IRS.

1          THE COURT:  Thank you.

2          Mr. Hochman?

3          MR. HOCHMAN:  Good morning.  My name is Nathan

4   Hochman, and I represent defendant Patricia Hough, who is to my

5   left.  I will be assisted in this effort by Counsel Bruce

6   Udolf; Counsel Daniel Saunders, who are being assisted as well

7   by Sanford Marks.

8          THE COURT:  Thank you.

9          Do any of the members of the jury know any of the

10  ladies and gentlemen who have been introduced here, in the

11  courtroom?  No?  All right.

12          I'm going to read a list of potential witnesses.

13  These are persons who may be called in this case to testify.

14  And my question will be do you believe you know any of these

15  concerns.

16          Shirley Ball.  Fred Ahles.  Marion Cronin.  Paul

17  Dalbec, Mario deCastro, Jean Marc Futterknecht.  Jeffrey

18  Gallant, Perry Garner, Jason Harrell, Susan McBride, David

19  Minchenberg, Thomas Murtha, John Nekic, Steven Rodger, Marc

20  Rudow, Melanie Pitts, Jerome Schneider, Charlene Varga, Laura

21  Whitley, Katheryn Yates, Robert Crockett, Sherry Dunlop.  Luis

22  Rivera, Arthur Maron, and Cameron Lalli.

23          Any of those names ring a bell with anyone?

24          Mr. Aminian?  We'll get you the microphone here.

25          JUROR AMINIAN:  I think the deCastro and Yates.  You

1    know, because, you know, I have 150 students every semester.

2    Those names are -- you know -- kind of familiar.  They might

3    not be related, but --

4              THE COURT:  Mario deCastro?

5              JUROR AMINIAN:  That's very familiar name.  And

6    Yates.  Last name.  Katheryn Yates?

7              THE COURT:  Katheryn Yates.  Again, you might know

8    them as students?

9              JUROR AMINIAN:  As students, yes.

10             THE COURT:  Are those likely to be the same persons?

11             MS. FINLEY:  No, Your Honor.

12             THE COURT:  I don't think we're going to have any

13   students.

14             All right.  Anyone else think you know any of those

15   names?  No one?

16             Now, as I indicated, the parties expect the case may

17   last until the end of next week.  Our typical day after today

18   is we'll typically get started at 9:00 o'clock in the morning,

19   we'll break from roughly 12:00 to 1:00 for lunch, and then

20   we'll break at 5:00 o'clock each evening.  In the morning,

21   we'll take one midmorning break.  In the afternoon, we'll take

22   one midafternoon break, roughly 15 minutes, thereabouts.  So

23   that's kind of what you have to look forward to.

24             My question is, does anyone have any impairment,

25   physical impairment, that would need to be accommodated if

1    you're selected in the jury?  Anyone who has a need for more

2    breaks than that, or anything that I need to be aware of?  No

3    one?  I see some heads moving.  I assume you're all disabled.

4    All right.  No one?

5              Mr. O'Connor?

6              JUROR O'CONNOR:  Yeah.  I have a problem hearing.

7    And I didn't realize that it was a problem until I started

8    talking about I had jury duty, and a friend of mine come up and

9    he says with your hearing, I don't think you belong in there.

10   And I told the young lady this morning, and she said to mention

11   it to you.

12             THE COURT:  How much of what I said have you heard?

13             JUROR O'CONNOR:  So far, it's not too much of a

14   problem; but I . . . when this young man was talking over here?

15   I . . . I didn't get really enough to understand what he was

16   saying.

17             THE COURT:  Does it help you if you're looking at the

18   speaker?

19             JUROR O'CONNOR:  If I look at you, like when I look

20   at you, I look mostly at your lips.

21             THE COURT:  All right.  Thank you.

22             JUROR O'CONNOR:  Thank you.

23             THE COURT:  Anyone else, any physical issues?  No?

24             Do any of the 18 of you know one another before

25   coming to court today?  No one?

1              Have any of you ever studied law?  Mr. Clark?  I see

2    a tentative hand.  Let's get the microphone from Mr. O'Connor.

3              JUROR CLARK:  I studied real estate law, conveyance

4    law.

5              THE COURT:  Real estate law and what law?

6              JUROR CLARK:  Just real estate law.

7              THE COURT:  And how long ago was that?

8              JUROR CLARK:  When I was at the University of

9    Michigan, 1977.

10             THE COURT:  Okay.  And I believe you said you were a

11   developer, so you've used that for your career?

12             JUROR CLARK:  Right.

13             THE COURT:  All right.  Thank you.

14             Anyone else studied law in the past?  No one?

15             Have any of you, or members of your family, ever

16   worked for the United States Government, that you haven't

17   mentioned already?  No one?  Do any of you presently have any

18   litigation pending with or against the United States

19   Government?  No one?  Have any of you ever had litigation, in

20   the past, with or against the United States Government?  No

21   one?

22             Does anyone anticipate litigation with or against the

23   United States Government?  No one?

24             Do any of you have any matters pending in front of

25   the United States Attorney's Office, or in front of the

1    Department of Justice, of any kind?  No one?

2              Do any of you have any close personal friends or

3    relatives who work in law enforcement?

4              Ms. Maschmeyer?

5              JUROR MASCHMEYER:  Yes.  My sister's fiancé works for

6    the sheriff's department, so . . . .

7              THE COURT:  Here in Lee County?

8              JUROR MASCHMEYER:  Yes.

9              THE COURT:  Anything about that relationship that you

10   think would make it hard for you to be fair to both sides in

11   this case?

12             JUROR MASCHMEYER:  No.

13             THE COURT:  All right.  Thank you.  Anyone else, law

14   enforcement, either your own experience, relatives, close

15   personal friends?  No one?

16             Do any of you have such -- have strong feelings about

17   law enforcement, either pro or con, such that you couldn't be

18   fair to both sides in a criminal case?  No one?

19             Does anyone have any personal belief that would make

20   it difficult for you to sit in judgment of another person?  No

21   one?

22             Now, for my next question I'm going to give you a

23   jury instruction, and my question would be could you follow the

24   instruction if you're called upon to be a juror in this case.

25             If you are selected as a juror in the case, your

1    verdicts will decide the disputed issues of fact.  Under our

2    system of procedure, you are the sole judges of the facts.  If,

3    at any time, I should make any comment regarding the facts, you

4    should disregard it.

5           The Court will decide the questions of law that arise

6    during the trial; and, before you retire to deliberate, the

7    Court will instruct you on the law that you are to follow in

8    reaching your verdicts.

9           Regardless of any opinion you may have as to what the

10   law should be, it would be a violation of your sworn duty to

11   base a verdict on any view of the law other than that which is

12   given to you by the Court.  It would also be a violation of

13   your sworn duty to base a verdict upon anything other than the

14   evidence or the lack of evidence in the case.

15          In a criminal case such as this, the entire burden of

16   proof is upon the government, from the beginning to the end of

17   the trial, and this burden never shifts from the government to

18   the defendant.

19          The government in any criminal case -- I'm sorry.

20   Say that again.

21          The defendant in any criminal case is presumed to be

22   innocent until the government, by competent evidence, has shown

23   her guilt beyond a reasonable doubt.  This presumption of

24   innocence remains with the defendant, as to each and every

25   material allegation in the indictment, until it has been met

1    and overcome by evidence beyond a reasonable doubt.

2              A defendant has a constitutional right not to

3    testify.  No juror is allowed to hold this against the

4    defendant, or to draw any adverse inference if the defendant

5    exercises her constitutional right not to testify.

6              You, as jurors, will be required to calmly, fairly,

7    and dispassionately consider all of the evidence in the case,

8    and from the evidence, and from the law which the Court will

9    give you, arrive at your verdicts.  You should not be swayed

10   from the performance of your duty by prejudice, sympathy, or

11   any other sentiment.

12             Now, with that instruction as background, can all of

13   you follow that instruction if you're called upon as a juror in

14   this case?  I see heads nodding.

15             Let me ask it a little bit different.  Is there

16   anyone who can't follow that instruction?  All right.  No

17   hands.

18             Now, one of the instructions, if you're selected,

19   that I'm going to repeat until you're really tired of it, I'm

20   going to tell you you cannot talk about the case, even among

21   yourselves, until the end of the case.  And you certainly can't

22   talk about it with anybody else:  Significant others, spouse,

23   children.  You just can't talk about the case.

24             My question is, does anyone know yourself well enough

25   to say listen, I just can't go two weeks without talking about

1    this case?  Is that going to be a problem for anyone?  No one?

2    Let me see the heads shaking.  All right.

3          The second issue in this day and age, there's all

4    kinds of ways -- social media things -- all kinds of ways we

5    communicate nowadays and learn information.  You cannot do your

6    own investigation in the case.  You can't use the internet, or

7    you can't twitter, or tweet, or anything else people can do,

8    that I can't do, to learn about the case.

9          So again, is there anyone who just has to get onto

10   that internet, and know themselves, and says listen, telling me

11   not to do it is like a red flag, I'm going to Google something?

12   Anyone have those concerns?

13         Because it's really important to both sides that you

14   get all your information from the courtroom.  You've got the

15   best seat in the house.  And it's really bad for all of us if

16   someone decides to violate that rule, and plug in a name in

17   Google, or plug in a location, or plug in anything.  Because if

18   I find out about it, not only do you get in trouble, I've got

19   to try the case all over again.  So nobody wants to do that.

20   So it's real important.

21         Anyone just think you're not going to be able to stay

22   away from that internet, and you're going to have to do your

23   own research in the case?  Anyone have those kinds of issues?

24   No one?

25              JUROR ANGULO:  Sir?

1              THE COURT:  I'm sorry.  Ms. . . .

2         JUROR ANGULO:  Angulo.  I work in a newspaper.  I

3  can't guarantee that I won't hear anything that may influence

4  me.  But I won't personally go on line and search.

5              THE COURT:  Well, I am going to have you here

6  from 9:00 to 5:00, so when you say you work at a newspaper, how

7  are you going to hear something?

8         JUROR ANGULO:  I'm just saying that that is where I

9  work, over at the News Press.  So my work hours are usually

10  from 11:00 to 8:00.

11              THE COURT:  Oh, I see.

12              JUROR ANGULO:  Yes.

13              THE COURT:  Well, one of the things you can't do --

14  and I'm looking at you, but I'm talking to everyone -- is you

15  can't read about the -- I don't know that there are going to be

16  any articles in the newspaper or not.  But you can't read any

17  articles in the paper.  And when I said social media, I guess I

18  still include newspapers.  But you can't be reading newspaper

19  articles that you may see.  You can't listen to TV news that

20  you might hear, or radio news that might mention the case.  All

21  those kinds of things you can't do.

22              One of the instructions I'm going to give all of you

23  is that, if someone tries to talk to you about the case, you

24  need to turn around and walk away.  That includes seeing us

25  downtown.  If you see the lawyers downtown, because it's a

 1    small area, they're going to turn around and walk away from

 2    you.  They're not being rude, they just know they are not

 3    supposed to have any contact.  So that's very important.

 4              Tell me what -- I mean, do you anticipate that's

 5    going to be a problem?  I mean, people can know you're a juror,

 6    but they can't talk to you about this case or . . . .

 7              JUROR ANGULO:  Correct.  I'd just like to state that,

 8    to get to my office, I walk through the news room.  They

 9    constantly have all sorts of news, discussing, debating.  I

10    can't guarantee that I won't overhear any discussions.  But I

11    won't personally go out of my way to find information about the

12    case.

13              THE COURT:  And can you assure us that, if that

14    happens, and if you're walking through the news room, and

15    somehow this case is talked about, you'll tell us?

16              JUROR ANGULO:  Yes.  I'll let you know if I . . . .

17    Correct.

18              THE COURT:  Okay.  That's good.

19              All right.  Anyone else?  Issues like that?  No one?

20              Can I see, by a show of hands, if any of you have had

21    any training in bookkeeping, accounting, tax preparation?  I

22    see -- I was going to say no hands.

23              All right.  Where is the microphone?  All right.

24    Let's give that to Mr. Jiles.

25              JUROR JILES:  Yes.  In Central State University,

1    where I went to school, I started out as an accounting major.

2    For about a year.  And then I changed that major.

3            THE COURT:  All right.  So that's been, I'd guess,

4    more than ten years ago?

5            JUROR JILES:  Yes.

6            THE COURT:  Give it right behind you, to Miss Crouse.

7            JUROR CROUSE:  I'm an office manager for an eye

8    doctor, and I do all the bookkeeping and accounting for him.

9            THE COURT:  And do you do any of the work on the tax

10   returns?

11           JUROR CROUSE:  No, I do not do that.

12           THE COURT:  And, Ms. Vega, did you have your hand up?

13           JUROR VEGA:  I do my own taxes, and the taxes for my

14   husband's business.

15           THE COURT:  Okay.

16           Anyone else?  Mr. Pfeffenberger?

17           JUROR PFEFFENBERGER:  As a commercial lender, I have

18   obviously reviewed a lot of financial statements, and I was

19   responsible to do the -- some of the reporting -- regulatory

20   reporting, for the bank, to the comptroller of currency.

21           THE COURT:  And did you have any participation in the

22   actual preparation of a corporate tax return?

23           JUROR PFEFFENBERGER:  Just general questions that

24   would be asked for keeping of the records and things of that

25   nature.

1          THE COURT:  Okay.  Let's go down in the front row,

2    Ms. Maschmeyer.

3          JUROR MASCHMEYER:  I went to college and took

4    accounting classes, and then also I worked at a bank as a

5    lending assistant, and I dealt with tax returns.

6          THE COURT:  And tell me a little bit more about that

7    latter part.  At the bank and the tax returns.  What did you

8    do?

9          JUROR MASCHMEYER:  I would just take in the tax

10   returns from the clients and the customers, and make sure we

11   have all of them updated for their profile.

12         THE COURT:  But did you have any responsibility in

13   checking them for accuracy, for example?

14         JUROR MASCHMEYER:  Huh-uh.  No.

15         THE COURT:  All right.  Thank you.

16         And Ms. Falter?  I think you had your hand up?

17         JUROR FALTER:  I did payroll at my husband's

18   construction company.

19         THE COURT:  Okay.  And anything with the tax returns?

20         JUROR FALTER:  We had CPAs come in and do that.

21         THE COURT:  All right.  Which is a nice lead-in to my

22   next question.

23         How many of you have your tax return prepared by

24   someone else, whether be it an accountant, or CPA, or tax

25   preparer, or whatever?  All right.  We'll let the lawyers take

1   a look at this.  I'm not going to.

2              All right.  Thank you.

3              Has anyone ever worked for the IRS?  That should have

4   been covered elsewhere.  I just wanted to make sure.

5              Have any of you or your businesses ever been audited

6   by the IRS?

7              Ms. Crouse, in the back?  Let's get the microphone

8   back to her.

9              JUROR CROUSE:  Yes.  My husband and I, our tax return

10  was audited by the IRS probably three or four years ago.  We

11  had to go through the whole auditing process.  We had to come

12  up here to Fort Myers.  And we had done them wrong, and so we

13  had to pay a penalty.

14             THE COURT:  All right.  Anything about that process

15  that you think would be hard for you to be fair to both sides

16  when one side is being prosecuted basically for the IRS?

17             JUROR CROUSE:  No, I don't think so.

18             THE COURT:  All right.  Anything about that

19  experience that left a bad taste in your mouth, for lack after

20  better word?

21             JUROR CROUSE:  No.  No.

22             THE COURT:  All right.  Ms. Garvey, I think you had

23  your hand up?

24             JUROR GARVEY:  There have been tax issues in my life.

25  And I'd just as soon talk to you about that.

1          THE COURT:  All right.  I've got you on my list, so
2     we'll cover that too.
3          JUROR GARVEY:  Thank you.
4          THE COURT:  Anyone else?  Let's get the phone --
5     phone.  Let's get the microphone down to Mr. O'Connor.
6          JUROR O'CONNOR:  This is a very old case.  It was 50
7     years ago.  I was audited and . . . I had to pay more taxes.
8          THE COURT:  All right.  Anything about that that you
9     think would make it hard for you to be fair in this case?
10          JUROR O'CONNOR:  Yes, I think I can be fair.
11          THE COURT:  All right.  Thank you.
12          Anyone else, tax audit -- or when I say audit, I
13     don't necessarily mean to limit myself to the formal audit.
14     Any contacts with IRS?  Let's do it that way.  Other than just
15     paying your taxes and filing tax returns.  Anything out of the
16     ordinary contacts with the Internal Revenue Service?  No one?
17     All right.
18          I'm not sure my question about studying accounting
19     included studying taxation.  Do we have anyone who has studied
20     taxes in particular?  Tax preparation, tax laws, anything tax
21     related?  No one?  All right.
22          Do we have anyone, besides Ms. Lane, who has
23     relatives that are physicians?  No one?  All right.
24          Ms. Garvey?
25          JUROR GARVEY:  I have a nephew.

1              THE COURT:  A nephew.  We'll get you the microphone

2       from whoever has it.

3              JUROR GARVEY:  Yes.  A nephew.

4              THE COURT:  A nephew.  And where does the nephew

5       live?

6              JUROR GARVEY:  Portland, Oregon.

7              THE COURT:  And what's the extent of your contact

8       with your nephew?

9              JUROR GARVEY:  Very little.

10             THE COURT:  All right.  Thank you.

11             Do any of you have a personal physician who has

12      graduated from a foreign medical school, that is, a medical

13      school outside the United States, that you know of?

14             Mr. Clark?

15             JUROR BARBUTO:  Barbuto.

16             THE COURT:  I'm sorry?

17             JUROR BARBUTO:  Barbuto.

18             THE COURT:  Oh.  I had the wrong person.  I'm sorry.

19             JUROR BARBUTO:  Just a family physician that I

20      believe got his degree outside of the country.  But I don't

21      know any particulars.

22             THE COURT:  Okay.  You don't know where?

23             JUROR BARBUTO:  I think it was probably Iran.

24             THE COURT:  Okay.

25             And in the back row, if you'd just pass that back to

1    Ms. Vega.

2            JUROR VEGA:  My son's pediatrician graduated from a

3    college in India.

4            THE COURT:  Okay.  Anyone else?

5            JUROR AMINIAN:  My family physician also graduated

6    from Iran.

7            THE COURT:  Okay.  That was Mr. Aminian.  All right.

8            Have any of you used the services of a bank outside

9    the United States?  I know we had one person that had talked

10   about a contact with UBS.  Has anyone actually had dealings

11   with a foreign bank?  No one?  All right.

12           Now, I told you earlier on that the parties

13   anticipate the case may last through the end of the week.  End

14   of next week.  Does anyone have any scheduling issues, or prior

15   commitments, that would be a problem?

16           And where is the microphone?

17           JUROR HUMPHRIES:  Next week, on the 17th, I'm

18   supposed to fly to see my daughter at UWA in Alabama.

19           THE COURT:  The 17th?  Okay.

20           JUROR HUMPHRIES:  Yes, sir.

21           THE COURT:  Thank you.

22           And right behind you, Mr. Aminian.

23           JUROR AMINIAN:  My only concern is, you know, my

24   classes that I'm teaching, you know, I mean, I have literally

25   150 students.  You know, relying on me.  And also we have two

1   kids, one car, and . . . a wife who is also a full-time

2   professor.  So that's the only concern I have regarding the

3   length of the trial.

4            THE COURT:  All right.  Thank you.

5            Mr. Clark?

6            JUROR CLARK:  I had a sinus lift about a week and a

7   half ago.  I have stitches I have to have taken out within a

8   week to ten days.

9            THE COURT:  Is that something that typically would be

10  like an hour apartment to do, or do you know?

11           JUROR CLARK:  I don't know.  I think it's probably 10

12  or 15 minutes.

13           THE COURT:  Okay.

14           All right.  Anyone else?  Behind you.  Ms. Angulo.

15           JUROR ANGULO:  Angulo.  Yes.  Tomorrow I have a

16  mentor session with a student in the morning, 10:00 a.m.  And

17  then Thursday I have an a.m. doctor's appointment.

18           THE COURT:  All right.

19           And in the back row, Ms. -- oh, I'm sorry.

20  Ms. Maschmeyer.

21           JUROR MASCHMEYER:  I just started a new job two weeks

22  ago.  Just thought I would let you know.

23           THE COURT:  All right.

24           And Ms. Crouse?

25           JUROR CROUSE:  I have a scheduled doctor's

1   appointment a week from tomorrow.  With my orthopedic surgeon.

2            THE COURT:  So that's the 16th?

3            JUROR CROUSE:  Yes.  At 1:45.

4            THE COURT:  Okay.

5            Anybody else?  All right.

6            Is there anything I haven't asked, other than the two

7   people I need to see at sidebar, that you think the lawyers or

8   the Court need to know about your ability to sit fairly to both

9   sides in this case?  You know a little bit about what the

10  allegations are.  Anything that you think we need to know?

11           All right.  Ms. Garvey, if I can see you at sidebar,

12  please?

13                          AT SIDEBAR

14           THE COURT:  Let me get the lawyers here.

15           JUROR GARVEY:  Okay.

16           THE COURT:  And this is a microphone that goes right

17  to the court reporter's headphone, so we all have to talk into

18  the microphone.  Not only so that we can hear, but so the jury

19  can't.

20           JUROR GARVEY:  Okay.  First, thank you for not having

21  me say this in front of everyone.  Ten years ago, my husband

22  was involved in a federal case.  It's very emotional for me.

23           THE COURT:  Take your time.  A criminal case?

24           JUROR GARVEY:  And it involved taxes.

25           THE COURT:  Taxes?

1          JUROR GARVEY:  He is now in federal prison.

2          THE COURT:  He is now in federal prison?

3          JUROR GARVEY:  He is.

4          THE COURT:  This may not be the case for you.

5          Anyone see it differently?

6          MS. FINLEY:  No, Your Honor.

7          THE COURT:  All right.  We're going to thank and

8    excuse you.  I would ask that you call that phone number next

9    week.  There may be another case that goes to trial.  This

10   isn't your case.

11         JUROR GARVEY:  Thanks.

12                         IN OPEN COURT

13         (Juror Garvey left the courtroom.)

14         THE COURT:  And I think it was Ms. Crouse?  You can

15   leave that microphone there, but . . . .

16                         AT SIDEBAR

17         THE COURT:  This is a microphone that goes right to

18   the court reporter's headphone, so we all have to kind of talk

19   into that loud enough so that he can hear but no one else can.

20         JUROR CROUSE:  I was arrested for DUI 14 years ago.

21         THE COURT:  Okay.  Anything about that arrest that

22   you think would make it difficult for you to sit fairly in a

23   criminal case?

24         JUROR CROUSE:  No, not really.  No.

25         THE COURT:  Can I ask you the result of the case?

1          JUROR CROUSE:  It was reduced to reckless driving,

2     and I was on probation, and . . . for -- I think it was a

3     six-month period.  And I lost my license for . . . I think it

4     was a few months.

5          THE COURT:  And you said that was 14 years ago?

6          JUROR CROUSE:  14 years ago, yes.

7          THE COURT:  Any other questions as to that?

8          MS. FINLEY:  Not from the government, Your Honor.

9          MR. HOCHMAN:  Was that locally, or some other state?

10         JUROR CROUSE:  In Naples, Florida.

11         THE COURT:  Thank you.

12         JUROR CROUSE:  Okay.

13         (Juror Crouse returned to the jury box.)

14         THE COURT:  Counsel, I propose to go ahead and fill

15    Seat Number 6 with a new juror, and then catch whoever that

16    person is up before I turn it over to you folks.

17         MR. HOCHMAN:  Does the Court want to address, now,

18    the hearing issue?

19         THE COURT:  Say again?

20         MR. HOCHMAN:  Do you want to address the man with the

21    hearing issue in this case?

22         THE COURT:  Yes.

23         MR. HOCHMAN:  In a long trial, I think it might make

24    a difference.

25         THE COURT:  Is that a challenge for cause?

1          MR. HOCHMAN:  Yes; that would be a challenge for

2    cause.

3          MS. FINLEY:  The government would agree, Your Honor.

4          THE COURT:  I agree as well.  We will replace

5    Mr. O'Connor, as well.

6          MS. FINLEY:  Which number is he?

7          THE COURT:  Number 7.  No reason to take a chance.

8          MR. HOCHMAN:  Very good.

9                         IN OPEN COURT

10          THE COURT:  Mr. O'Connor, I'm going to thank and

11    excuse you from this case.  I have concerns about your hearing

12    issue, and, given the length of the trial, this probably isn't

13    the case for you.  If you would call that number, because there

14    may be another case going next week.

15          JUROR O'CONNOR:  Thank you.

16          THE COURT:  I appreciate it.

17          (Jurors O'Connor left the courtroom.)

18          THE COURT:  And, Madam Deputy, if you'd fill seats

19    six and seven, please.

20          THE COURTROOM DEPUTY:  Yes, sir.

21          Wendy Walker, Seat Number 6.  Jennifer Bones, Seat

22    Number 7.

23          THE COURT:  All right.  Let's get the microphone to

24    Ms. Walker to begin with.

25          JUROR WALKER:  Hi.  My name is Wendy Walker.  I live

1    in Fort Myers.  I have been living in Lee County for ten years.

2    I have lived in Florida for 25 years.  I worked as a medical

3    assistant.  Right now I'm unemployed.

4              I'm married.  My husband is a contractor.  I have two

5    children.  My daughter is going to FGCU for nursing, and my son

6    is taking his GED.

7              I have two associate's degrees; one is medical

8    assistant, one is medical administration.  I have no military

9    service, no court experience, and no jury experience.

10             THE COURT:  Tell me a little bit more about your

11   employment as a medical assistant.

12             JUROR WALKER:  I worked for Specialty in Health Care.

13   And then I worked for Dr. Dean Silvers, he was a cardiologist.

14             THE COURT:  And, as I understand it, you're not

15   currently employed?

16             JUROR WALKER:  Right.

17             THE COURT:  Thank you.

18             If you'd hand the microphone right down to the end,

19   to Ms. Bones?

20             JUROR BONES:  My name is Jennifer Bones.  I live in

21   Punta Gorda.  I have lived in Florida for eight years, in Punta

22   Gorda for eight years.  I am employed as a general manager for

23   two companies.  One is a homeowners association, the other is a

24   private club.

25             I am married.  My husband is a retired elementary

1    school principal.  I have three adult children.  I have a

2    30-year-old son who works construction, a 28-year-old daughter

3    in insurance, and a 24-year-old daughter who is an operations

4    manager for a hotel.

5            I have some college.  I do not have any military

6    experience.  I have no court experience.  And I have never

7    served on a jury.

8            THE COURT:  Thank you.  You can keep that microphone,

9    because I'm going to talk to the two of you and catch you up,

10   basically.

11           First of all, do either of you know anything about

12   the case before coming here today?

13           No?  You get the microphone, but you have to speak

14   loud, so the court reporter can hear your answer as well.

15           Right here.

16           JUROR WALKER:  Okay.  No.

17           THE COURT:  All right.

18           JUROR BONES:  No.

19           THE COURT:  Do either of you know any of the persons

20   who were identified earlier, in court?

21           JUROR BONES:  No.

22           JUROR WALKER:  No.

23           THE COURT:  Do any of you believe you know any of the

24   potential witnesses whose names I read?

25           JUROR BONES:  No.

1        JUROR WALKER:  There is one name.  Was it Merring?

2   M E R R  I N G?  Or Maron?

3        THE COURT:  I had a Murtha.

4        JUROR WALKER:  Last name.

5        THE COURT:  An Arthur Maron?

6        JUROR WALKER:  Oh.  Okay.  No, that's okay.

7        THE COURT:  Okay?

8        Do either of you have any physical issue that would

9   need to be accommodated given the length of the trial and the

10  hours that I had explained?

11       Do either of you know any of the other jurors on the

12  box right there?

13       JUROR BONES:  No.

14       JUROR WALKER:  (Juror shakes head side to side.)

15       THE COURT:  All right.  Have either of you ever

16  studied law?

17       JUROR BONES:  No.

18       JUROR WALKER:  No.

19       THE COURT:  Have any of you, or members of your

20  family, ever worked for the United States Government?

21       JUROR BONES:  No.

22       JUROR WALKER:  (Juror shakes head side to side.)

23       THE COURT:  I need to hear you.

24       JUROR WALKER:  Okay.  Sorry.

25       THE COURT:  I can see your head shaking, but --

1            JUROR WALKER:  Sorry.

2            THE COURT:  Do either of you presently have, or have

3    you ever had, or do you intend to have, litigation with or

4    against the United States?

5            JUROR BONES:  No.

6            JUROR WALKER:  No.

7            THE COURT:  Do you, or any relative or close personal

8    friends, work in law enforcement?

9            JUROR BONES:  No.

10           JUROR WALKER:  No.

11           THE COURT:  Do either of you have such strong

12   feelings about law enforcement, either pro or con, that you

13   couldn't be fair to both sides in a criminal case?

14           JUROR BONES:  No.

15           JUROR WALKER:  No.

16           THE COURT:  Do either of you have such personal

17   beliefs that would make it difficult for you to sit in judgment

18   of another person?

19           JUROR BONES:  No.

20           JUROR WALKER:  No.

21           THE COURT:  You heard the instruction that I read

22   talking about the burden's on the government, from the

23   beginning to the end of the case, the burden never shifts, the

24   government has to prove its case beyond a reasonable doubt, and

25   if they failed to do so, it's your obligation to find the

1    defendant not guilty.

2           I told you that every defendant has a constitutional

3    right not to testify, and that if the defendant exercises that

4    right in this case, you cannot hold that against her in any

5    fashion.

6           I also told the jury that the verdicts had to be the

7    result of a calm, fair, and dispassionate consideration of the

8    evidence and the Court's instructions to you, and that you

9    should not be swayed in the performance of your duty by

10   prejudice, sympathy, or any other sentiment.

11          Can both of you follow those instructions if you're

12   selected?

13          JUROR BONES:  Yes.

14          JUROR WALKER:  Yes.

15          THE COURT:  Internet and other social contact.  Do

16   either of you believe you're going to have any problem not

17   discussing the case even, if with one another, until the end of

18   the case, when I tell you, and not discussing the case with

19   anyone else, and not doing any independent research, by any

20   means, as to anything connected with the case?

21          JUROR WALKER:  No.

22          JUROR BONES:  No.

23          THE COURT:  Can all of you do that?

24          JUROR BONES:  I'm sorry, yes.

25          JUROR WALKER:  Yes.

1          THE COURT:  I changed the question.  Let me get you

2   on the same page.  Can all of you follow those instructions?

3          JUROR BONES:  Yes.

4          JUROR WALKER:  Yes.

5          THE COURT:  Do either of you have any background in

6   bookkeeping, accounting, or tax preparation?

7          JUROR BONES:  I have a bookkeeping background in

8   accounting.  I do not do tax preparation.  I do get all our

9   stuff together to give to the CPA, and review it with her once

10  she's finished.

11         THE COURT:  All right.

12         And, Ms. Walker, how about you?

13         JUROR WALKER:  No.

14         THE COURT:  Nothing.

15         JUROR WALKER:  Huh-uh.

16         THE COURT:  All right.

17         Have either of you ever worked for the Internal

18  Revenue Service?

19         JUROR BONES:  No.

20         JUROR WALKER:  No.

21         THE COURT:  Have either of you ever been audited by

22  the Internal Revenue Service?

23         JUROR BONES:  No.

24         JUROR WALKER:  No.

25         THE COURT:  Have either of you ever had any contacts

1    outside normal with the Internal Revenue Service?  And by that
2    I mean other than filing tax returns.
3                JUROR BONES:  In my business, yes.  We brought the
4    homeowners association in house, and it took us a year for the
5    IRS to quit billing us for payroll that we didn't even have.
6                THE COURT:  All right.  And did that eventually get
7    worked out?
8                JUROR BONES:  It took about a year.  Yes.
9                THE COURT:  All right.  And how long ago was that?
10               JUROR BONES:  About a year and a half ago.
11               THE COURT:  Anything about that experience that you
12   think would make it hard for you to be fair to both sides when
13   one side is going to be a lot of IRS testimony?
14               JUROR BONES:  No.
15               THE COURT:  You can't be iffy here.
16               JUROR BONES:  I just spent a year and a half arguing
17   we didn't have a payroll we didn't have.  So that does kind of
18   affect your view.
19               THE COURT:  That's all I'm asking you.  And you can
20   have whatever view you want of the IRS.  I don't care.  But
21   what you have to be able to do is put that view aside, and be
22   able to decide, in this case, if the IRS -- if the government
23   proves its case, I can find the defendant guilty, if there is a
24   reasonable doubt, I can find the defendant not guilty and put
25   aside that it is the IRS that's involved.

1          Can you do that?

2          JUROR BONES:  Yes.

3          THE COURT:  Ms. Walker, how about you?  Any issues

4   with the IRS?

5          JUROR WALKER:  No.

6          THE COURT:  Any scheduling issues from either of you?

7          JUROR BONES:  I did ask for a delay for jury duty.  I

8   do manage a homeowners association.  This is -- the next two

9   weeks, we have our board meeting tomorrow, we have to get a

10  budget ready to go out for a member vote.  It has to be out.

11  The homeowners have to be out this Friday, the private club has

12  to be out in two weeks.

13         I have a small staff of three people, and two are

14  brand new employees.  So time-wise this is a very inconvenient

15  time for me, because I'm leaving my office with two people who

16  have to get a lot done, who have never done it before.  So I

17  will have to work -- when we get out of court, I'm going to

18  have to work until that's done at night.

19         THE COURT:  All right.

20         And Ms. Walker?

21         JUROR WALKER:  No.

22         THE COURT:  Do either of you utilize the services of

23  a physician that, to your knowledge, has graduated from a

24  medical school outside the United States?

25         JUROR BONES:  No.

1           JUROR WALKER:  No.

2           THE COURT:  And have either of you ever utilized the

3    services of a foreign bank, a non U.S. bank?

4           JUROR BONES:  No.

5           JUROR WALKER:  No.

6           THE COURT:  Is there anything I haven't asked you

7    that you think the lawyers or the Court should know about your

8    ability to serve in this case?

9           JUROR BONES:  No.

10          JUROR WALKER:  No.

11          THE COURT:  All right.  I think you're up to date.

12          Miss Finley?  Any follow-up questions?

13          MS. FINLEY:  Your Honor, would you like me to go to

14   the podium, or should I . . . .

15          THE COURT:  Please.

16          MS. FINLEY:  Good morning.

17          This case involves possible criminal violations of

18   federal law, so it's a criminal, and not a civil proceeding.

19   Does any member of the prospective jury feel that violations of

20   federal tax laws should be prosecuted -- should not be

21   prosecuted as a federal crime?

22          Are you, your family members, or a relative, or any

23   close friend, affiliated with any group or organization, formal

24   or informal, that is engaged in the study of federal tax or

25   state laws, or federal or state tax policy in general?

1          Does anybody like paying their taxes?

2          Does any member of the prospective jury hold strong

3     personal or philosophical feelings about the tax system in the

4     United States or the IRS?

5          I think that's it.  Thank you, Your Honor.

6          THE COURT:  All right.  Thank you.

7          Mr. Hochman?

8          MR. HOCHMAN:  Is anyone here nervous?  And by that I

9     mean -- and I must confide in you that I'm nervous, because I

10    have the responsibility of representing Dr. Patricia Hough.

11    I'm sure the prosecutors are nervous.  And you, the jury, are

12    going to have the ultimate responsibility, as the Judge said,

13    to have the fate of Dr. Patricia Hough in your hand.

14         And what we're looking for is a fair and impartial

15    jury, a jury that's able to put its biases aside.  Because

16    everyone has bias.  I have biases.  The prosecutors have

17    biases.  And there are certain cases that we shouldn't sit on.

18    But there are other cases that we are able to put our bias

19    aside, and be fair and impartial.

20         By a show of hands, is everyone in this jury able to

21    be fair and impartial to both sides?  Is there anyone who

22    wouldn't be able to be fair and impartial to both sides?

23         Now, one of the examples of biases, or the issues

24    that we're going to have to deal with, has to do in some ways

25    with paper.  Who here has either bought or leased a car or a

1    home at any point in their life?  By a show of hands.  And the

2    people who have bought or leased a car or a home, who got a

3    huge stack of paper that they were sort of asked to sign with

4    those little stickies, or someone said sign here, sign there?

5             Did everyone pretty much receive that big stack of

6    paper?  And it would have been given to you, if it was a house,

7    maybe by an escrow agent or a lawyer, or if it was a car, maybe

8    the leasing agent; and they said look, here is the deal, please

9    sign here.

10            Did everyone review every single word of every single

11   page they signed?  If anyone did that, could they raise their

12   hand?

13            And for the people who didn't do it, are you -- were

14   you able to trust, in essence, the escrow agent, or the lawyer,

15   or the leasing agent, that they were presenting you honest

16   documentation, and that you were signing your name even though

17   you didn't have a chance to do that?

18            Miss Burda.  You had that experience, it sounds like?

19   And could you describe what -- why it was that you were able to

20   sign your name on all that big stack of paperwork?

21            JUROR BURDA:  I wanted my house.

22            THE COURT:  Mr. Hochman, we are not going there with

23   this jury.

24            MR. HOCHMAN:  Well, let me switch it to a tax return.

25   Ms. Burda, do you use a tax preparer or a CPA at all?

Case 2:13-cr-00072-SPC-NPM   Document 132   Filed 11/13/13   Page 81 of 169 PageID 3564

1          JUROR BURDA:  I use AARP at the library in Lehigh.

2          MR. HOCHMAN:  I'm sorry?

3          JUROR BURDA:  AARP does taxes in Lehigh.

4          MR. HOCHMAN:  And they prepare your tax return for

5     you every year?

6          JUROR BURDA:  Yes.

7          MR. HOCHMAN:  And why do you use that person as

8     opposed to preparing your own tax return?

9          JUROR BURDA:  One, they're free.  And they have three

10    different people look at it.

11         MR. HOCHMAN:  And do they have more expertise in

12    taxes than, let's say, yourself has?

13         JUROR BURDA:  Most likely.

14         MR. HOCHMAN:  And you trust the people who prepare

15    your tax return.

16         JUROR BURDA:  Yes.

17         MS. FINLEY:  Your Honor, I'm sorry.  May we approach

18    for one moment?

19         THE COURT:  No.  He's not going to do this anymore.

20         MR. HOCHMAN:  I'm sorry, Your Honor?

21         THE COURT:  I said he's not going into this area

22    anymore.

23         MR. HOCHMAN:  Thank you, Your Honor.

24         With respect to people who are married in this jury,

25    do . . . and may I have a show of hands of the people who are

1    married, currently, in this particular jury?

2              With respect to those, in your marriages, is there

3    one person more than another who is in charge of your financial

4    affairs?  Either your spouse or yourself?  Could you, by a show

5    of hands, if it's one or the other, could you raise your hands?

6              And Miss Falter, if I might ask, is it you or your

7    husband who is more in charge of the financial affairs in your

8    house?

9              JUROR FALTER:  It's my husband.

10             MR. HOCHMAN:  And when your husband is in charge of

11   the financial affairs, does he sometimes present you with

12   documentation and ask you to sign it?

13             JUROR FALTER:  Yes.

14             MS. FINLEY:  Your Honor, objection.  May we approach?

15             THE COURT:  You may.

16                          AT SIDEBAR

17             MS. FINLEY:  Your Honor, some of these voir dire

18   questions are not general questions, it's a cross-examining of

19   the jurors; and the questions are very open ended, and he's

20   pontificating in the midst of his question.  So I would just

21   ask that he ask more direct questions, instead of laying out

22   his case in the form of his questions.

23             MR. HOCHMAN:  Your Honor, we're just trying to

24   determine the jurors' openness to accepting the theory of our

25   case, which is that, in this particular case, that a spouse can

1   trust another spouse.  Actually, the question I was about to

2   ask was:  "Is everyone in this jury going to be open to the

3   concept that a spouse can trust another spouse, and ask them to

4   sign paperwork that they might not have read every single word

5   of?"

6          THE COURT:  I'll let you ask that question.  I am not

7   going to allow you to voir dire each individual juror as to --

8   which you're doing so far, in terms of which of the two of them

9   pays the bills, and I assume it's going to get into do you

10  trust the other one.  I assume we all know what the answer

11  really is.

12         So you can ask the general question that you said,

13  but the objection is otherwise sustained.

14         MR. HOCHMAN:  Thank you, Your Honor.

15                        IN OPEN COURT

16         THE COURT:  You may proceed.

17         MR. HOCHMAN:  Thank you, Your Honor.

18         So a question for the entire panel.  Are you able to

19  keep an open mind about someone who relies on someone else, and

20  trusts them to do it right, even if they haven't read every

21  single word of the document that they might be signing?  If you

22  can keep an open mind, please raise your hand.

23         And if you can't keep an open mind on something like

24  this, could you raise your hand as well?

25         I think, Mr. Clark and Ms. Angulo, you didn't raise

1    your hand in either direction.

2            JUROR ANGULO:  The question isn't very clear.  Will

3    you have an open mind as far as trusting someone else?

4            MR. HOCHMAN:  Sure.  Can you keep an open mind to the

5    idea that someone can trust someone else when it comes to

6    paperwork, and signing paperwork, even if they haven't read

7    every single word of that particular document?

8            JUROR ANGULO:  But trust is a very moral issue.  It's

9    a value that one has.  And what do you mean by open mind?

10            MR. HOCHMAN:  You, as a juror -- and we'll give you

11    the microphone.  You, as a juror, in evaluating evidence that

12    you'll hear in this court, will hear, we anticipate, some

13    evidence on this issue.  And what I'm looking for is whether or

14    not you can keep an open mind that you're willing to consider

15    that evidence, as opposed to having some firm and set belief

16    that you will not alter no matter what the evidence says.

17            Can you keep that open mind?

18            JUROR ANGULO:  I'll hear the evidence, and then I'll

19    make a judgment.

20            MR. HOCHMAN:  Yes.

21            JUROR ANGULO:  Yes.

22            MR. HOCHMAN:  Mr. Clark?

23            JUROR CLARK:  I keep going back -- did I mention that

24    I had been a client of UBS, and that I had switched because I

25    didn't believe in their practices?

 1            THE COURT:  You mentioned that early on.

 2            JUROR CLARK:  That's just bugging me.  I just wanted

 3    to let you know that that was the reason I switched my trust

 4    and bank accounts from UBS to Bank of America.  It was because

 5    of those practices of . . . of trying to entice Americans to

 6    hide money overseas, or in Swiss bank accounts.

 7            MR. HOCHMAN:  So is it fair to say that you wouldn't

 8    be able to keep an open mind with respect to evidence that

 9    might come in about Swiss bank accounts?

10            JUROR CLARK:  I could keep an open mind, but I . . .

11    I don't believe that that's a proper thing for Americans to do,

12    so . . . .

13            MR. HOCHMAN:  And do you think that -- is that a

14    strong belief that you have?

15            JUROR CLARK:  Yes.

16            MR. HOCHMAN:  And do you think that strong belief

17    would make you not a proper juror for this particular case?

18            JUROR CLARK:  It might.

19            MR. HOCHMAN:  And let me ask the rest of the panel

20    here.  Does anyone else have a strong belief that, if you --

21    just by the mere fact you have a -- or were involved with a

22    Swiss bank account, that there's something suspicious about

23    that?  Who has that belief, that strong believe, that just by

24    the mere facts you have a Swiss bank account, there must be

25    something that's suspicious?  Please raise your hand if you

1    have that belief.

2              Let me see.  There's Miss Walker, Miss Falter,

3    Mr. Clark, and then, in the back, Miss Crouse.

4              And if you were to learn that there are legitimate

5    reasons to have a Swiss Bank account, having nothing to do with

6    anything illegal or whatnot, would you be able to keep an open

7    mind, to consider the evidence that there might be a legitimate

8    reasons to have a Swiss Bank account?

9              Miss Walker.

10             JUROR WALKER:  I'd keep an open mind.

11             MR. HOCHMAN:  There's a little doubt at the end of

12   your voice.

13             JUROR WALKER:  I work for a doctor that had one.  It

14   was just . . . I just don't think it was . . . I don't know why

15   he had to have a Swiss Bank account.  I don't -- you know, he

16   seemed a little . . . you know.  A Jewish doctor.

17             MR. HOCHMAN:  Miss Falter.

18             JUROR FALTER:  Yeah.  I think I'd try to keep an open

19   mind, but I agree.  I don't know why you'd need to have a Swiss

20   Bank account.

21             MR. HOCHMAN:  And do you think, because of that

22   belief, that you would not be a -- this is not the proper jury

23   for you to sit on?

24             JUROR FALTER:  Possibly.

25             MR. HOCHMAN:  And Miss Walker, the same to you.

1    Because of your belief, would you believe that this is not a

2    proper jury for you to sit on?

3              JUROR WALKER:  Yes.

4              MR. HOCHMAN:  And turning back to Miss Crouse?  If

5    you can pass the microphone in her direction?

6              Miss Crouse, do you have strong beliefs concerning

7    whether or not someone can -- there are legitimate -- excuse

8    me -- legitimate reasons to have a Swiss Bank account?

9              JUROR CROUSE:  I don't understand why you can't keep

10   your money in this country.

11             MR. HOCHMAN:  And, because of that belief, do you

12   think that this is potentially a jury that you should not be

13   sitting on?

14             JUROR CROUSE:  Yes.  Very well.

15             MR. HOCHMAN:  Anyone else?  And again, I appreciate

16   very much the candor here, because again, everyone has biases,

17   and we're trying to find a jury that, as best it can, can be

18   fair and impartial in this case, not in some other case.

19             Does anyone have a strong belief concerning Swiss

20   Bank accounts?  Yes.

21             JUROR MASCHMEYER:  I don't believe it should be in

22   the Swiss account.  I think it should be in this country.

23             MR. HOCHMAN:  Is that a belief that you think makes

24   you an improper juror for this particular case?

25             JUROR MASCHMEYER:  It all depends on the evidence,

1    but . . . I would have to hear the evidence in the case.

2              MR. HOCHMAN:  But you start out with a bias, as you

3    say, against people who have or are involved with Swiss Bank

4    accounts; is that correct?

5              JUROR MASCHMEYER:  Um-hum.

6              MR. HOCHMAN:  You have to actually say yes or no.

7              JUROR MASCHMEYER:  I'm sorry.  Yes.

8              MR. HOCHMAN:  But you would be willing to keep your

9    mind open to hear evidence, and if the evidence showed that

10   there was a legitimate purpose for that Swiss bank account,

11   would you be able to keep your mind open enough to have that

12   compete against your initial bias, and then reach a fair and

13   impartial verdict?

14             JUROR MASCHMEYER:  Yes.

15             MR. HOCHMAN:  Anyone else that has these feelings

16   about Swiss Bank accounts?

17             And for the people who have not said that they have

18   those strong feelings about Swiss Bank accounts, are you

19   willing to promise me that you will keep that open mind

20   throughout the course of all the evidence in this case, and, at

21   the end, reach a fair and impartial verdict based just on the

22   evidence in the case, and not on any particular bias or lack of

23   bias that you might have with respect to a Swiss Bank account?

24             THE COURT:  Mr. Hochman, I'm not going to allow you

25   to extract a promise of any kind from the jury.

1          MR. HOCHMAN:  Thank you very much, Your Honor.

2          THE COURT:  You need to rephrase that.

3          MR. HOCHMAN:  Sure.

4          For all the people other than the ones that have

5    answered about a strong position concerning Swiss Bank

6    accounts, would the rest of you be able to keep an open mind

7    until the close of evidence, and evaluate the evidence fairly

8    and impartially, and put aside whatever thoughts you might have

9    today about the legitimacy or illegitimacy of a Swiss Bank

10   account?  By a show of hands, could you raise your hands if

11   you're able to do that and keep that?

12         And open mind?  And again, with the exception of the

13   ones who have spoken, which is Miss Walker, Miss Falter,

14   Miss Maschmeyer, and Miss Crouse, is there anyone else who has

15   a strong belief concerning Swiss Bank accounts that would make

16   this a jury that maybe you shouldn't sit on?

17         JUROR LUCAS:  Swiss Bank accounts have a stigma where

18   he or she may say he or she has their money in a Swiss Bank

19   account, and laughter may follow that.  Just like I'm Italian,

20   but I'm not a mafia, so the stigmatism to those things does not

21   apply, and maybe people have heard that over and over, and tend

22   to believe one way or another.

23         MR. HOCHMAN:  And that's the exact point.  Do you

24   have that believe in the stigma about a Swiss Bank account?

25         JUROR LUCAS:  No.  I'm very open minded about it.

1          MR. HOCHMAN:  Does anyone have this belief in a

2   stigma of a Swiss Bank account that you might have heard in the

3   movies or read in a book?

4          JUROR LUCAS:  I'm sure everybody has heard that

5   statement.

6          MR. HOCHMAN:  But as far as, again, the other ones

7   that we -- haven't articulated a strong view, you can put that

8   stigma, or that sort of stuff you hear in the books or the

9   movies, to the side, and consider the evidence that you're

10  going to hear in this court fairly and impartially.

11         If there's anyone who can't do that, raise your hand.

12         All right.  Thank you very much, Your Honor.

13         THE COURT:  All right.  Counsel, take a look at your

14  notes, and, when you're ready, come to sidebar, please.

15         Ladies and gentlemen, what's going to happen next is

16  the lawyers are going to take a look at the notes for a few

17  minutes, then they're going to come to sidebar and go through

18  what we call the peremptory challenges.

19         Between now and then, feel free to stand and stretch.

20  But once we get started, I need to have you sit down and be

21  quiet, because, ironically, we have to talk soft enough so you

22  can't hear us, but yet loud enough so the court reporter can

23  hear us.  So feel free to stand and stretch until you see the

24  lawyers come on up.

25         (Thereupon, counsel conferred at their respective

1      counsel tables.)

2          THE COURT:  I'm going to ask the jury to be quiet,

3   and spectators as well, in the jury.

4                          AT SIDEBAR

5          THE COURT:  All right.  Challenges for cause, if any,

6   from the government.

7          MS. FINLEY:  I think Juror Number 19, Your Honor.

8   Wendy Walker.

9          THE COURT:  There is no 19.

10         MS. FINLEY:  Well, she is now Number 6.

11         THE COURT:  Number 6.  Okay.  And what's her problem?

12         MS. FINLEY:  I think she said she could not keep an

13  open mind about offshore bank accounts?

14         THE COURT:  I'm not sure about that.  Counsel had

15  some opine that perhaps they weren't the jurors for this case;

16  but that's not the decision they're called upon to make.

17         MR. HOCHMAN:  Sure.  And we would agree with the

18  government on Number 6.  And the basis is, you're right, it's

19  not an ultimate decision for them to make, but I think it

20  certainly tells you a lot about their mindset if they think, on

21  this very key issue of the case, that they can't be fair and

22  impartial, and would not be a proper juror.

23         THE COURT:  See, I don't think that's what they said.

24  Any of those four that you've identified, I don't think you've

25  done -- no one ever asked them if they couldn't follow the

1    instruction.  There is nothing inherently illegal about having

2    a Swiss Bank account.  And saying we don't know why people

3    would have one or don't have one ourselves, in my mind, doesn't

4    establish cause.  You may or may not want them on the jury for

5    other reasons, for peremptory reasons, but I'm having hard time

6    seeing cause there.

7              MR. HOCHMAN:  And again, I'm . . . may I have a

8    moment, Your Honor?

9              THE COURT:  You may.

10              (Mr. Hochman and Mr. Udolf confer privately.)

11              MR. HOCHMAN:  Another ground, Your Honor, has to do

12   with her derogatory statement about Jews.  I happen to be

13   Jewish.  Mr. Udolf is Jewish.  Mr. Saunders is Jewish.  Miss

14   Finley is Jewish.  I'm concerned that the derogatory

15   statement --

16              THE COURT:  She's going to not like either side,

17   then, I guess.

18              Now that I'll buy.  As to her.

19              MR. HOCHMAN:  Okay.

20              THE COURT:  The Court will strike Number 6,

21   Ms. Walker, for cause.  I'd forgotten about that.

22              All right.  Other challenges for cause from the

23   government?

24              MS. FINLEY:  We have no other ones, Your Honor.

25              THE COURT:  Challenges for cause from the defense?

1          MR. HOCHMAN:  Yes, Your Honor.  We would challenge

2    Juror 2, Juror 3, Juror 5, Juror 15, for cause.  The basis on

3    each one of them has to do with their responses to the

4    questions on Swiss Bank accounts.  And, Your Honor, I didn't

5    ask it just once, I asked it three or four or five different

6    times, to see if they would change their mind.

7          It wasn't just the do you think you're an improper

8    juror, it has to do with their strong beliefs that they have --

9    and I asked the followup question could you put those strong

10   beliefs out of your mind to consider the evidence fairly and

11   impartially.  I actually did ask that, and none of those jurors

12   raised their hand, unlike all the other jurors, who raised

13   their hand when I asked could you be fair and impartial, and

14   put whatever biases -- or stigma, I said, as well -- out of

15   your mind.  So, with respect to 2, 4, 5, and 15 --

16          THE COURT:  You missed three.

17          MR. HOCHMAN:  2, 3, 5, and 15.  I think that their

18   lack of ability to say that they would be fair and impartial,

19   and be able to put that strong belief out of their mind to

20   evaluate this evidence, particularly since the central -- one

21   of the central issues in this case is going to be Swiss Bank

22   accounts; and whether or not you think that what was done was

23   legitimate or not legitimate, that's where the unreported

24   income is all coming from.

25          THE COURT:  What says the government?

1              MS. FINLEY:  I don't know that those jurors said they

2       could not be impartial, I think that they just had a . . . that

3       they might have stigma, but that they could listen to the

4       evidence and would not bring that bias with them into the jury

5       box.

6              THE COURT:  The challenges for cause for 2, 3, 5, and

7       16?

8              MS. FINLEY:  15.

9              MR. UDOLF:  15, yes.

10             THE COURT:  15.  Is Denied.

11             MR. HOCHMAN:  And I have one specific additional

12      reason for Number 3.

13             THE COURT:  Okay.

14             MR. HOCHMAN:  Because he was the only juror

15      approached by UBS.  He seemed very passionate.  His body

16      language was certainly passionate on this issue that what he

17      thought they were selling him was wrong, he turned it down.

18      And then he was consistently one of the jurors who said he

19      couldn't put it out of his head.  He was the only one.

20             THE COURT:  He's different than the others.

21             MS. FINLEY:  I think Mr. Hochman also asked, though,

22      could the jurors understand that there might be a legitimate

23      reason for having a Swiss Bank account, and I think that --

24             THE COURT:  We moved a little bit off of that.  For

25      Number 3, Mr. Clark had a different set of answers for the UBS,

1    and he told us early on that -- he volunteered it again, to

2    make sure we remembered, I guess.  And I don't know who that

3    hurts, but it seems to me that, given the nature of the case,

4    that could be problematic for somebody.

5              MS. FINLEY:  The government has no objection for

6    cause, Your Honor.

7              THE COURT:  All right.  The challenge for cause for

8    Number 3 will be granted.

9              All right.  Any other challenges for cause from the

10   defendant?

11             MR. HOCHMAN:  May I have one more moment, Your Honor?

12             THE COURT:  You may.

13             MR. HOCHMAN:  None that we haven't articulated, Your

14   Honor.

15             THE COURT:  Okay.  Then we'll begin with

16   peremptories, with the government first.

17             MS. FINLEY:  Your Honor, the government strikes

18   Number 4.

19             THE COURT:  Mr. Barbuto?

20             All right.  To the defendant?

21             MR. HOCHMAN:  The defense would strike, after hearing

22   the Court's overruling of my objection for cause, Juror

23   Number 2.

24             THE COURT:  Ms. Maschmeyer.

25             And back to the government.

1          MS. FINLEY:  Your Honor, the government strikes Juror

2    Number 5, Jacalyn Falter.

3          THE COURT:  Okay.  You object to the cause, and then

4    you strike the peremptory.  But so be it.

5          Go ahead.  To the defense?  Two, if you have two?

6          MR. HOCHMAN:  The defense would strike Juror Number 8

7    and then Juror Number 9.

8          THE COURT:  That's Ms. Angulo and Mr. Jiles.

9          All right.  Back to the government.

10         MS. KESSLER:  I'm sorry, they just struck Angulo?

11         THE COURT:  Angulo and Jiles.  Eight and nine.

12         That's right, isn't it?  Eight and nine?

13         MR. HOCHMAN:  Yes.

14         THE COURT:  Okay.

15         MS. FINLEY:  We strike Juror Number 12, Your Honor.

16   Karen Burda.

17         MR. HOCHMAN:  Which number?

18         MS. FINLEY:  Number 12.

19         THE COURT:  All right.

20         We're back to the defense, then, for two, if you have

21   two.

22         MR. HOCHMAN:  Your Honor, the defense would strike

23   Juror Number 13.

24         And, Your Honor, with respect to Juror Number 15, I

25   know she said she had this medical appointment with an

1    orthopedic surgeon next week.  Would the Court accommodate

2    that?  Just so I know . . . .

3              THE COURT:  I don't think that was 14.  I think that

4    was 15.

5              MR. HOCHMAN:  I'm sorry.

6              THE COURT:  She's got the doctor's appointment on the

7    16th.  I was going to get back to you, depending on who you

8    challenged, with whether we need to deal with that or not.

9              MR. HOCHMAN:  Because that might affect whether or

10   not we challenge her.  She's going to otherwise -- if the

11   Court's going to let her go for the medical appointment, I may

12   or may not challenge her.

13             THE COURT:  Well, there's two jurors that I have

14   issues with because of scheduling.  Actually, three.  And maybe

15   we should talk about those before we continue further.

16             Ms. Bones has a homeowners thing to do for her

17   business.  Miss Humphries, I believe, is going on vacation on

18   the 17th.  And then Ms. Crouse has the medical appointment on

19   the 16th.  The 14th is Monday.  The 16th is Wednesday.  So it's

20   probably a little early to think that it will be done.

21             MR. HOCHMAN:  It won't be done by the 16th.  It might

22   be done by the 17th.

23             THE COURT:  So talk to me.

24             MR. HOCHMAN:  On Ms. Crouse, I would ask that she be

25   let go.  And Ms. Bones, I don't have a strong feeling one way

1    or the other.

2            THE COURT:  And Ms. Humphries.

3            MR. HOCHMAN:  And Ms. Humphries, I think we could be

4    done by the 17th, so I would probably keep her.

5            THE COURT:  You don't want her deliberating, worrying

6    about . . . .

7            MR. HOCHMAN:  Yeah.  I mean, if we're going to let

8    people go for that reason, yeah, I'd probably have

9    Ms. Humphries, then, as well.

10           THE COURT:  I'm not prepared to make this a precedent

11   for the duration of this case, but . . . .

12           Let me hear from the government and I'll tell you

13   what I think.

14           MS. FINLEY:  With respect to Ms. Crouse, we don't

15   know if like perhaps she could reschedule, if it's an emergency

16   that she needs to go in, of if she could reschedule her

17   appointment such that it might not be an inconvenience, or if

18   we could maybe she could have -- depending on where the

19   appointment is?

20           THE COURT:  She's the one that said it was an

21   orthopedic appointment?

22           MS. FINLEY:  Yes.

23           With respect to Miss Humphries, I think if she does

24   have prepaid travel, I think she might be preoccupied about her

25   flight, and . . . .

1           THE COURT:  So I hear both sides having concern with

2    Miss Humphries.  I have concern.  I'm prepared to find that's

3    cause.  I don't want either one of you having to use a

4    peremptory for her.

5           Anyone see that differently?

6           MS. FINLEY:  No, Your Honor.

7           THE COURT:  All right.  Miss Humphries I'll excuse

8    for cause.

9           And what says the government as to Ms. Bones and her

10   appointment issue?

11          MR. HOCHMAN:  I think it's -- obviously, like many

12   jurors, she's got work concerns; but if we made that the

13   precedent, then we wouldn't have -- we would be pretty deep

14   into a jury pool.  So I think I would not seek a for-cause

15   challenge for Ms. Bones.

16          THE COURT:  I don't necessarily disagree, but . . . .

17          MS. FINLEY:  We are fine with that, Your Honor.

18          THE COURT:  Okay.  And do you want me to ask

19   Ms. Crouse to come to the bench and see whether that medical

20   appointment can get postponed?

21          MR. HOCHMAN:  Yeah.  I think she said it was at an

22   orthopedic surgeon, so maybe it can, or maybe it's something

23   she needs to attend to.

24                        IN OPEN COURT

25          THE COURT:  Miss Crouse?  May I see you up here,

1    please?

2                        AT SIDEBAR

3              THE COURT:  I should have asked you, and I didn't.  I

4    apologize.  You said you had a medical doctor's appointment on

5    the 16th?

6              JUROR CROUSE:  Yes.

7              THE COURT:  And I believe you said it was an

8    orthopedic surgeon?

9              JUROR CROUSE:  Well, yes.  I had knee replacements,

10   and it's my yearly checkup for that.

11             THE COURT:  Is that something that could be

12   postponed?

13             JUROR CROUSE:  Yeah.  I mean, it can be changed, yes.

14             THE COURT:  Without undue hardship?

15             JUROR CROUSE:  Um-hum.

16             THE COURT:  Okay.  Thank you.

17             JUROR CROUSE:  Yup.

18             (Juror 15 returns to the jury box.)

19             THE COURT:  All right.  I think that takes care of

20   it.

21             MR. HOCHMAN:  Thank you, Your Honor.

22             THE COURT:  And we're still with the defendants.  You

23   have one more for this round.

24             MR. HOCHMAN:  I think we'll ask Miss Crouse, then --

25   we'll exercise our challenge on Ms. Crouse, Number 15.

1              THE COURT:  Okay.

2              All right.  Back to the government?

3              MR. HOCHMAN:  Before the government uses its

4    peremptory, looking back at my notes, I see that Mr. -- Juror

5    Number 16, Mr. Aminian?  I forgot about him.  He's the one that

6    teaches a class with 150 people in it.  He's got one car, young

7    kids, and a wife that works full time.  I would move for cause

8    on him, as well, Your Honor.  It sounds like a two-week trial,

9    and it might be more than two weeks, and it might be very

10   taxing on him, such that he might be distracted here.

11             THE COURT:  Ms. Finley?

12             MS. FINLEY:  I think, again, we all have jobs, and I

13   only have one car, and . . . and if we get started striking for

14   cause because of those kind of general family obligations, then

15   a lot of people would be asking to be dismissed, or saying they

16   were not able to serve.

17             THE COURT:  All right.  I'm going to deny the

18   challenge for cause.

19             MR. HOCHMAN:  Okay.

20             THE COURT:  Not that it's not close, but . . . I

21   think the answer is a lot of people have hardship issues.  And

22   Ms. Bones, as well.

23             MR. HOCHMAN:  Okay.

24             THE COURT:  So that brings us to the government.

25             MS. FINLEY:  Your Honor, we would strike Juror

1   Number 14, Tanya Vega.

2           THE COURT:  All right.  Back to the defendant for

3   two, if you have two.

4           MR. HOCHMAN:  We'll exercise a peremptory on Juror

5   Number 11, Your Honor.

6           THE COURT:  All right.  Mr. Turner.

7           MS. FINLEY:  Your Honor, they struck somebody after

8   that already.  Didn't they strike . . . .  Juror Number 15?

9           MR. HOCHMAN:  I thought, on a pool of 18, you could

10  exercise strikes.

11          THE COURT:  Anywhere you want in the 18.  Right.

12          Was that the concern?

13          MS. FINLEY:  I thought that, once you passed over

14  them, and they were --

15          THE COURT:  No.  Once you pass the 18, you can't back

16  strike; but you can strike in any order you want.

17          MS. FINLEY:  Oh, okay.  I misunderstood.  Thank you,

18  Your Honor.

19          MR. HOCHMAN:  And we've used six challenges?

20          THE COURT:  You have.

21          MR. HOCHMAN:  We won't exercise our seventh right

22  now.

23          THE COURT:  Okay.  Back to the government then.

24          MS. FINLEY:  We're okay, Your Honor, at this point,

25  too.

STRICKEN JURORS EXCUSED                          103

1              THE COURT:  Let's go through and make sure our notes

2    agree.  Mr. Chobrda remains Number 1.  Ms. Bones becomes Juror

3    Number 2.  Mr. Aminian becomes Number 3.  Mr. Lucas becomes

4    Number 4.  And Ms. Lane becomes Number 5.

5              Does that correspond with everyone's notes?

6              I didn't hear the government say.

7              MS. FINLEY:  I'm sorry.  We are fine.  Yes, Your

8    Honor.

9              MR. HOCHMAN:  Yes, Your Honor.

10             THE COURT:  Okay.  The government has two

11   peremptories left.  The defendant has four.

12             I guess what I would propose -- well.  You have two

13   options.  Break for lunch now, and resume at 1:00 o'clock, or

14   do one more round and see where we're at before we break for

15   lunch.

16             MR. HOCHMAN:  How long do you think it will take,

17   Your Honor.

18             THE COURT:  12:30ish.

19             All right.  We'll make this easy.  I'll decide this

20   one.

21                        IN OPEN COURT

22             THE COURT:  I'm going to thank and excuse some of

23   you.  I would ask that you call that telephone number Monday

24   evening.  I don't know that there's another case going next

25   week, in front of another judge, but there may be.  So if you

1    would call that, I would appreciate it.

2              In the first row, I would like to thank and excuse

3    everyone except Mr. Chobrda.  So the others of you may be

4    excused.

5              In the second row, I would like to thank and excuse

6    everyone except Ms. Bones.  The rest of you may be excused.

7              And in the third row, I would like to thank and

8    excuse Mr. Pfeffenberger, Ms. Vega, and Ms. Crouse.

9              (Thereupon, the excused jurors left the courtroom.)

10             THE COURT:  Now the Court Security Officer is going

11   to keep you in the same order, but move you down, so we don't

12   have those blank chairs sitting there.

13             (Thereupon, the Court Security Officer seated the

14       jurors in their newly assigned seats.)

15             THE COURT:  All right.

16             Madam Deputy, please refill the jury box.

17             THE COURTROOM DEPUTY:  Yes, sir.  Chris Youngblood,

18   Seat Number 6.  Jennifer Williamson, Seat Number 7.  Holly

19   Beeson, Seat Number 8.  Warren Howell, Seat Number 9.  Jeffrey

20   Garczewski, Seat Number 10.  And I'm sorry if I didn't

21   pronounce your name correctly.  Bryan Lee, Seat Number 11.

22   Joan Morgan, Seat Number 12.  Judith Davis, Seat Number 13.

23   Jane Decker, Seat Number 14.  Harvey Shaw, Seat Number 15.

24   Samuel Raybourn, Seat Number 16.  Kim Garnick, Seat Number 17.

25   Rebecca Davis, Seat Number 18.

1          THE COURT:  All right.  Let's begin with

2     Mr. Youngblood.

3          JUROR YOUNGBLOOD:  Hi.  My name is Chris Youngblood.

4     I live in Bonita Springs, Florida.  I have lived there for 55

5     years, same amount of time in Florida.  I am an electrical

6     inspector for Lee County.

7          I'm married.  My wife is an audio technician for the

8     VA Administration.  I have four children.  They're all in

9     college.

10          I have some level of college.  I have no military

11     service, I have no court experience, and I have never been on a

12     jury.

13          THE COURT:  Thank you.  Pass that right back to

14     Ms. Morgan.

15          JUROR MORGAN:  Joan Morgan, Port Charlotte, Florida.

16     15 years.  And I have lived there 15 years.  I work for a

17     hospital in Charlotte County.

18          I'm married.  My husband is unemployed.  And I have

19     one son.  He's 38, and he's the manager for apartment complexes

20     and country clubs in Minnesota.

21          And I have a high school diploma.  No military

22     experience.  No previous court experience.  Jury duty.

23          THE COURT:  You have had jury duty before?

24          JUROR MORGAN:  Yes.

25          THE COURT:  Have you actually served on a jury?

1                JUROR MORGAN:  Yes.

2                THE COURT:  Do you remember how many times?

3                JUROR MORGAN:  One time.  The rest were either

4    dismissed or settled.

5                THE COURT:  And did the jury reach a verdict?  I

6    don't want to know what it is.

7                JUROR MORGAN:  Yes.

8                THE COURT:  Were you the foreperson?

9                JUROR MORGAN:  No.

10               THE COURT:  You said you work for a hospital?  How

11   long have you done that?

12               JUROR MORGAN:  14 years.

13               THE COURT:  And give me some idea of what you do for

14   the hospital.

15               JUROR MORGAN:  Registration.  Admitting.

16               THE COURT:  Thank you.  Mr. Lee?

17               JUROR LEE:  My name is Bryan Lee.  I live in Lehigh

18   Acres.  I've lived there for six years.  I've lived in Florida

19   for 11 years.  I'm an architect.

20               I'm married.  My wife is a teacher.  I have one son.

21   He's four years old.

22               I have a bachelor's degree.  No military service.  No

23   court experience.  I was called for jury duty before, but I was

24   not selected as a juror.

25               THE COURT:  Thank.

1           Mr. Garczewski?

2           JUROR GARCZEWSKI:  My name is Jeffrey Garczewski.  I

3    live in Port Charlotte.  I have been in Port Charlotte for

4    seven years.  I have been in the State of Florida for eight.  I

5    am a self-employed web developer/graphic designer.

6           I am married.  My wife is an assistant state attorney

7    at the 20th Circuit.  We have one child.  She's 15 months old.

8           I did attend college, but I did not finish my degree.

9    No military service.  I was not in any trials.  I was called

10   once for jury duty in the 20th Circuit, but I was not selected.

11          THE COURT:  How long has your wife been an assistant

12   prosecutor over there?

13          JUROR GARCZEWSKI:  Eight years.

14          THE COURT:  Is she physically located in Fort Myers?

15          JUROR GARCZEWSKI:  No.  We are in Punta Gorda.

16          THE COURT:  Punta Gorda, okay.  This is a criminal

17   case, as you know.  Do you see any difficulties with you

18   sitting fairly to both sides in a criminal case, given your

19   wife's occupation?

20          JUROR GARCZEWSKI:  No.

21          THE COURT:  No concerns about that.

22          JUROR GARCZEWSKI:  None.  No.

23          THE COURT:  Okay.

24          Mr. Howell?

25          JUROR HOWELL:  Morgan Howell, Jr.  I reside in Cape

1    Coral.  I have been here for 23 years.  Lived in Cape Coral for

2    23 years.  I'm a fuel loop truck driver.

3            I'm married.  My wife is self-employed.  I have a

4    stepdaughter, 23, who is in legal studies in Florida Gulf Coast

5    University.  I have a 28-year-old stepson who is a manager of a

6    hydraulic supply company.

7            Eleventh grade education.  No military.  I have been

8    a defendant in a case.  And no prior jury at all.

9            THE COURT:  Do you care to tell me about your

10   experience as a defendant in a case, or is that something you

11   want to do at sidebar?

12           JUROR HOWELL:  I was a defendant in a domestic

13   violence case.  It was dismissed.

14           THE COURT:  All right.  Thank you.

15           Ms. Beeson?

16           JUROR BEESON:  I'm Holly Beeson.  I now live in Alva,

17   Florida, for the last 13 years.  I have lived in Florida for 35

18   years.  I am a retired elementary art teacher in Lee County for

19   about 24 years.

20           I'm almost divorced.  My almost ex is a retired

21   assistant port authority police chief.  And I have two

22   children.  My daughter is 37, and she's in education, and also

23   home schools.  And they live in Michigan with my three

24   wonderful grandchildren.  And my son is 32, and he manages a

25   warehouse.  I think it's hardware, nuts and bolts, here

1    on . . . whatever.  In Fort Myers.

2            And my level of education is a bachelor of science

3    degree in art education.  I have never served in the military,

4    and no previous court experience.  And I've not served on a

5    jury.

6            THE COURT:  Anything about your almost ex's

7    occupation that would make it difficult for you to sit fairly

8    to both sides in a criminal case?

9            JUROR BEESON:  Not at all.

10           THE COURT:  Thank you.

11           Ms. Williamson?

12           JUROR WILLIAMSON:  My name is Jennifer Williamson.  I

13   live in Cape Coral, Florida.  I have been living there for five

14   years.  I have been in Florida for 24 years.  I am a therapy

15   technician.

16           I am married.  My husband is self-employed.  I have

17   five stepchildren.  One son that is eight months old.  The

18   oldest son is a manager in a supermarket.  My stepdaughter is a

19   waitress.  One son is employed with my husband.  I have one

20   son, stepson, that is away, training in the navy.  I have one

21   son that is incarcerated.

22           I have a high school education.  I have no military

23   service.  I have no previous court experience.  And I have not

24   served on a jury.

25           THE COURT:  What type of work does your husband do?

1    I know he's self-employed.

2              JUROR WILLIAMSON:  He's in marine construction.

3              THE COURT:  And you've got one stepson who is

4    incarcerated.  Do you know if that was a state or a federal

5    case?

6              JUROR WILLIAMSON:  I have no idea.

7              THE COURT:  Is there anything about his situation

8    that would make it difficult for you to sit fairly in a

9    criminal case?

10             JUROR WILLIAMSON:  No.

11             THE COURT:  Thank you.

12             Ms. Davis?

13             JUROR JUDITH DAVIS:  My name is Judy Davis.  I live

14   in Rotunda.  I have lived there for nine years, and I have

15   lived in Florida for nine years.  I am retired, and I was a HR

16   representative.

17             I'm married, and my husband is also retired.

18             I have three adult daughters.  Two are teacher's

19   assistants, and one is a nurse anesthetist.

20             I have a high school education.  No military

21   experience.  I did have court experience.  I was a witness --

22   character witness in an adoption trial.  And I have no jury

23   service.

24             THE COURT:  Thank you.

25             Ms. Decker?

1              JUROR DECKER:  My name is Jane Decker.  I live Fort

2    Myers.  For about 11 years.  In Florida 11 years.  I was -- I'm

3    a retired homemaker/substitute teacher.

4              I am married.  My husband is a retired civil

5    engineer.  I have a daughter -- we have a daughter, 40, an

6    environmental engineer; a son, 38, who is a sales manager for

7    Dell.

8              I have a bachelor's degree.  No military.  I was on a

9    jury for a civil trial, in New Jersey, in the 1980s.

10             THE COURT:  And did the jury reach a verdict?

11             JUROR DECKER:  Yes.

12             THE COURT:  Thank you.

13             Mr. Shaw?

14             JUROR SHAW:  My name is Lee Shaw.  I live in Fort

15   Myers.  Been there three years.  Been in Florida three years.

16   I'm a lawyer.

17             I'm married.  My wife is a homemaker.

18             Three kids:  42, 37, 32.  One works at Dell Computer,

19   in the financial area.  One is a counselor.  And one owns a

20   real estate title company.

21             I have a bachelor's degree and a law degree.  I

22   served in the U.S. Navy.  Honorably discharged.  I have been a

23   witness in a civil suit.  And I have served on the state court

24   in Tennessee, and also the federal grand jury in Tennessee.

25             THE COURT:  All right.  You're not done yet.  I know

1    you said you're retired.  Do you practice at all?

2            JUROR SHAW:  Very small amount.  I help my son in his

3    title company business from time to time.

4            THE COURT:  All right.  And when you did practice

5    law, what was the areas that you practiced?

6            JUROR SHAW:  Business and real estate.

7            THE COURT:  Did that get you involved in taxes of any

8    kind?

9            JUROR SHAW:  I did tax work for the first three years

10   of my practice, and then had an opportunity to change course,

11   and not much tax involved after the first three years.

12           THE COURT:  And, for the first three years, give me a

13   little bit of an idea of what you did.

14           JUROR SHAW:  I was working primarily in gift and

15   estate tax in a large law firm.

16           THE COURT:  And where was that?

17           JUROR SHAW:  In Memphis, Tennessee.

18           THE COURT:  Thank you.

19           Mr. Raybourn?

20           JUROR RAYBOURN:  My name is Sam Raybourn.  I live in

21   South Fort Myers.  We just moved.  Lived there about six

22   months.  I have lived in Lee County for 23 years.  I have been

23   in construction for 23 years here in Lee County.

24           Married.  My wife, Jacquelyn, is in auto sales.  We

25   have a beautiful one and a half-year-old daughter.

1          I have a high school education.  I was born into the

2     military, but I have not served.  My court experience, I tried

3     to take someone to small claims court, but they left the state,

4     so I kind a dropped it.  And I have never been on a jury.

5          THE COURT:  Thank you.

6          Ms. Garnick?

7          JUROR GARNICK:  My name is Kim Shohan Garnick, and

8     I'm a resident of Naples.  I've lived there for six years.

9     I've lived in Florida for six years.  Currently I'm working for

10    a temporary service out of Fort Myers.

11         I am not married.  I have no children.

12         I have a bachelor of arts degree from the University

13    of Colorado.  I have no military service.

14         I was a witness, I believe in 1984, in New York, for

15    a defendant.  It was a nonjury trial.  I think I was either a

16    plaintiff or a defendant, for myself, in 2003.  I've never been

17    sued, and I've never sued anyone.

18         I did jury duty in New Jersey in 1994.  It was a

19    criminal trial.  And . . . I believe that's everything.

20         THE COURT:  All right.  You confused me a little bit.

21    I thought I heard you say you were either a plaintiff or a

22    defendant, but you've never been sued or sued.

23         JUROR GARNICK:  Correct.  I just don't know what the

24    term plaintiff is.

25         THE COURT:  Okay.  Well, have you ever brought suit

1   against anyone in a civil matter?

2            JUROR GARNICK:  No.

3            THE COURT:  And have you ever been sued by anyone in

4   a civil matter?

5            JUROR GARNICK:  No.

6            THE COURT:  Do you have any experience in court of

7   any kind?

8            JUROR GARNICK:  As I say, I was a witness in New York

9   for a defendant.

10           THE COURT:  Right.

11           JUROR GARNICK:  And I guess I was a defendant.

12           THE COURT:  Okay.  Was that in a criminal case?

13           JUROR GARNICK:  No.  It was civil.

14           THE COURT:  And how long ago was that?

15           JUROR GARNICK:  That was in 2003.

16           THE COURT:  Has that resolved to your satisfaction?

17           JUROR GARNICK:  It's expired at this point.

18           THE COURT:  All right.  But that was a case where

19   someone had sued you?

20           JUROR GARNICK:  No.  Huh-uh.

21           THE COURT:  All right.

22           JUROR GARNICK:  Just by way of explanation.

23           THE COURT:  Sure.

24           JUROR GARNICK:  I had a parking ticket that went to

25   warrant.

1          THE COURT:  Oh, okay.  All right.

2          JUROR GARNICK:  And I know I shouldn't laugh, but it

3     was pretty awful.

4          THE COURT:  Whatever that situation is, that's all

5     taken care of now?

6          JUROR GARNICK:  Oh, yeah.  A long time ago.

7          THE COURT:  Anything about those matters collectively

8     that would make it difficult for you to sit fairly in a

9     criminal case?

10         JUROR GARNICK:  No.  Huh-uh.  Not at all.

11         THE COURT:  Thank you.

12         The other way, Ms. Davis?

13         JUROR REBECCA DAVIS:  I'm Rebecca Davis.  I live in

14    Port Charlotte.  I have been a resident there for six years.  I

15    have been in the State of Florida for 28 years.  I'm an x-ray

16    technologist.

17         I'm married.  My husband is an electrician.  I have

18    two adult children:  A 25-year-old stay-at-home mom; a

19    28-year-old son who is an assistant manager for Publix.

20         I have an associate's degree in radiography.  I was

21    not previously in the military, although I was a military

22    spouse for ten years.

23         Last year, I was named as a defendant in a property

24    dispute with my ex-husband, but it was settled out of court.

25         And I have no previous jury experience.

1          THE COURT:  All right.  Thank you.

2          JUROR REBECCA DAVIS:  Thank you.

3          THE COURT:  I'm going to be addressing my questions

4    primarily to the newly seated jurors, but sometimes something

5    is said, so those of you seated already have a memory flash,

6    and you need to add something?  If that happens, feel free to

7    raise your hand; but otherwise I'll be talking primarily to the

8    newly seated jurors.

9          For the newly seated jurors, do any one of you

10   believe you know anything about the case before coming to court

11   today?  No one?

12         Does anyone believe you know any of the ladies or

13   gentlemen seated at counsel table?

14         How about the names of the witnesses, anyone think

15   you may know that?

16         Mr. Lee?

17         JUROR LEE:  You mentioned a Cronin?  What was the

18   first name on that?

19         THE COURT:  I did.  Marion Cronin.

20         JUROR LEE:  No.

21         THE COURT:  No?  All right.

22         Anyone else?  No?

23         Does anyone have any physical impairment that would

24   need to be accommodated if you're selected in this case?  No

25   one?

1              Do any of the 18 of you know one another before

2      today?  No?  All right.

3              Have any of the newly seated jurors ever studied law?

4      Of course, the lawyer.  Anyone else?  No one?  All right.

5              Have any of you, or members of your family, ever

6      worked for the United States Government, that you haven't

7      mentioned already?

8              Mr. Lee?

9              JUROR LEE:  My father was military.

10             THE COURT:  All right.  And Mr. Raybourn?

11             JUROR RAYBOURN:  My father was in the military.

12             THE COURT:  Military?  All right.

13             JUROR REBECCA DAVIS:  My ex-husband was in the

14     military.

15             THE COURT:  All right.  Anyone else?  U.S.

16     Government?  No one?  All right.

17             Do any of you presently have, or have you ever had,

18     or do you anticipate having, any litigation with or against the

19     United States Government?

20             Have any of you, or members of your family, or close

21     personal friends, ever worked in law enforcement, that you

22     haven't mentioned already?

23             Ms. Davis?  Do you have the microphone?

24             JUROR REBECCA DAVIS:  No, I do not.  Oh.

25             My brother-in-law just retired from Charlotte County

1    Sheriff's Department.

2              THE COURT:  Okay.  Does that cause you any problems

3    sitting in a criminal case?

4              JUROR REBECCA DAVIS:  No, sir.

5              THE COURT:  And, by problems, I mean you can be fair

6    to both sides?

7              JUROR REBECCA DAVIS:  Yes.

8              THE COURT:  And down towards the end, Ms. Decker?

9              JUROR DECKER:  I have a friend and neighbor that

10   works for the DEA.

11             THE COURT:  All right.  Anything about that

12   relationship that would make it hard for you to sit fairly to

13   both sides in a federal criminal case?

14             JUROR DECKER:  No.

15             THE COURT:  And Ms. Davis?

16             JUROR JUDITH DAVIS:  I have a nephew in the police

17   department and a cousin in the police department in New Jersey.

18             THE COURT:  Anything about those relationships that

19   would make it difficult for you to be fair?

20             JUROR JUDITH DAVIS:  No.

21             THE COURT:  Okay.  Thank you.  Anyone else?  Law

22   enforcement?  Of course, the wife we know about.

23             JUROR GARCZEWSKI:  Yeah.  My wife.  And we have

24   several friends that are . . . .  A couple police officers, and

25   a county court judge that is an associate of ours.

1          THE COURT:  Anything about those relationships that

2    would make it difficult for to you sit fairly to both sides?

3          JUROR GARCZEWSKI:  No.

4          THE COURT:  All right.  Anyone else, law enforcement?

5    No one?

6          Does anyone have such strong feelings about law

7    enforcement, either pro or con, doesn't matter, that you could

8    not sit fairly to both sides?  No one?

9          Mr. Youngblood?

10          JUROR YOUNGBLOOD:  I have a second cousin who was on

11    the Fort Myers Police Force.

12          THE COURT:  All right.  Does that make it hard for

13    you to be fair in this case?

14          JUROR YOUNGBLOOD:  No, it does not.

15          THE COURT:  Okay.  I appreciate it.

16          Anyone else?

17          Does anyone have any personal feelings that would

18    make it difficult for you to sit in judgment of another person?

19    No one?

20          You heard the instruction that I read earlier, about

21    the case . . . the burden in the case being on the government,

22    and only the government.  The government has to prove each and

23    every element of all the charges by beyond a reasonable doubt.

24    That if the government fails to do that, your obligation is to

25    find the defendant not guilty.

1          The defendant has no burden at all, doesn't have to

2     do anything.  If the defendant exercises her constitutional

3     right not to testify, you cannot consider that in any fashion.

4          I also told you that you have to decide the case

5     based upon the evidence presented, and not by sympathy,

6     prejudice, or any other sentiment.

7          Can all of you follow that instruction if you're

8     selected?  Is there anyone who cannot?  No one?  All right.

9          Use of the internet to investigate the case.

10    Anyone -- do I have anybody on the jury that knows themselves

11    well enough to say listen, I have to use the internet,

12    otherwise I go crazy?  No one?

13         Also, you can't talk to your spouse, significant

14    others, children, anybody else, about the case or what's -- who

15    said what, or who is doing what.  You can't even talk among

16    yourselves until the end of the case.  Is there anyone who says

17    I just got a talk about the case?  I know myself?  Anyone have

18    those issues?  No one?

19         By a show of hands, may I see anyone who has had

20    experience in bookkeeping, or accounting, or tax preparation?

21    I probably made that too broad.  Let's keep the hands up for

22    accounting.  All right.  And how about tax preparation?

23         All right.  Ms. Davis, I know we have two

24    Miss Davises, one at each end, but the right side Ms. Davis.

25              JUROR REBECCA DAVIS:  I prepared my own taxes for a

1    couple years in a row, but that's it.

2              THE COURT:  That's it.

3              JUROR REBECCA DAVIS:  Um-hum.

4              THE COURT:  And Ms. Garnick?

5              JUROR GARNICK:  I did bookkeeping for the New York

6    Press Photographers Association.  And I recently took a class

7    in QuickBooks.

8              THE COURT:  Okay.

9              By a show of hands, may I see the number of people

10   that prepare their own tax returns typically?  All right.

11             And may I see a show of hands of those that utilize a

12   professional, either an accountant, or CPA, or tax preparer, or

13   something else?  All right.  Thank you.

14             Have any of the newly seated jurors ever been audited

15   by the IRS?  We have three hands.  I lost track of the

16   microphone again.

17             All right.  Mr. Shaw?

18             JUROR SHAW:  Yes.  My professional PC was audited one

19   time by the IRS about three, four years ago.

20             THE COURT:  Anything as a result of that that would

21   make it difficult for you to sit fairly in a case involving

22   testimony from IRS agents?

23             JUROR SHAW:  No.

24             THE COURT:  Ms. Decker?

25             JUROR DECKER:  We were audited about five years ago.

1    My husband and I.

2             THE COURT:  Same question.  Anything about that audit

3    that would make it hard for you to be fair?

4             JUROR DECKER:  No.

5             THE COURT:  And Ms. Davis?

6             JUROR JUDITH DAVIS:  I have been audited twice.

7             THE COURT:  Anything about those that make it hard

8    for you in this case?

9             JUROR JUDITH DAVIS:  No.

10            THE COURT:  No?  All right.

11            Is there anyone who has had contact with the IRS in

12   some capacity less than an audit but more than just filing your

13   income tax every year?  And I'm trying to make that as broad as

14   I can.  Nobody?  All right.

15            Have any of you ever utilized the services of a

16   foreign bank?  All right.

17            And may I assume from that none of you have what's

18   been referred to as a Swiss Bank account?  All right.

19            Do any of you have a physician that you knew

20   graduated -- or that you know graduated from a medical school

21   outside the United States?

22            Ms. Garnick?  We'll get you the microphone again.

23            JUROR GARNICK:  Yes.  I have a physician at

24   Physician's Regional that graduated from medical school outside

25   the United States.

1          THE COURT:  Okay.

2          Anyone else?

3          Now, with regard to what's been referred to as a

4   Swiss Bank account, can all of you follow an instruction, if

5   the Court were to give you one, that there's nothing inherently

6   wrong with a person having a Swiss Bank account?  Just because

7   most people don't have it doesn't make it wrong.  Anyone have

8   any problem with that?

9          Earlier, one of the jurors talked about the stigma

10  associated with that; and whatever the stigma may or may not

11  be, there's nothing inherently unlawful about it.  And if

12  that's all it is, then that's not a problem.

13         Anyone say I don't care what the Court says, I don't

14  like people that have Swiss Bank accounts?  I don't have one.

15  Anyone have any problem with that?  Those kinds of problems?

16  No one?

17         How about scheduling issues?  Do we have anyone with

18  a schedule conflict between now and the end of next week?

19         And Mr. -- who has the microphone?  Let's go with

20  Mr. Lee then.

21         JUROR LEE:  My son has ongoing health issues, and

22  Mondays and Wednesdays I have to take him to speech therapy and

23  physical therapy; and, just because of the flexibility in my

24  job, I can make up the hours on the weekend.  For my wife,

25  she'd have to take off.

124

```
1            THE COURT:  Okay.  So that either you or your wife
2    have to take him on a set schedule?
3            JUROR LEE:  Yes.
4            THE COURT:  And that's Mondays and Wednesdays?
5            JUROR LEE:  Yes.  Mondays and Wednesdays, every week.
6            THE COURT:  Thank you.
7            Yes?
8            JUROR GARCZEWSKI:  I have a medical treatment
9    scheduled for this upcoming Friday.  It's something that I have
10   to get every eight weeks.  At the Lee Memorial Infusion Center.
11           THE COURT:  All right.  And is that something that
12   would be difficult to either miss or reschedule?
13           JUROR GARCZEWSKI:  Two weeks would be a large time to
14   put that off.
15           THE COURT:  Okay.  All right.
16           Who else?  Ms. Beeson?
17           JUROR BEESON:  My mother is in a nursing home with
18   dementia, and she just has my sister and I, and we are there
19   every day.  We have been there for nine months, one of us each
20   day.  We take turns.  And this has been our ongoing life
21   schedule.  And if anyone has a family member in a nursing home,
22   you have no idea until you do, that they sit in a comatose
23   situation until a family member is there.  And . . . .  I'm
24   sorry.
25           THE COURT:  Take your time.
```

1          JUROR BEESON:  And then they light up when you come

2     to see them.  We provide for her.  We play with water colors,

3     and we play cards with her, and we do -- take her outside into

4     the lovely garden, which no one who works there has time to

5     take her out into the garden area and see the light of day.

6     And we completely make her life happy for as long as she can

7     live in this place.  And this has been our life for the last

8     nine months.  And I will do it until she can do it no more.

9          I'm sorry to be weepy about it, but I will not let

10    her not have this kind of a lifestyle as long as we can afford

11    to keep her here.  And she cannot live at either one of our

12    places, because we would have to rebuild, because she's in a

13    wheelchair, she's already been through a fall, and a broken

14    arm, and a broken leg, and she's recovered, and her body is

15    strong, but her mind is going.  This is the only way to keep

16    her strong.

17          THE COURT:  I get it.

18          JUROR BEESON:  You get it.  She needs us.

19          THE COURT:  Ms. Williamson?

20          JUROR WILLIAMSON:  I have a doctor's appointment on

21    Friday.  I have to have stitches removed.

22          THE COURT:  Is that a ten-minute situation?

23          JUROR WILLIAMSON:  Yes.

24          THE COURT:  All right.

25          Anyone else in the back row?  Ms. Davis?

1        JUROR JUDITH DAVIS:  I have a follow-up doctor's

2  appointment on October 18th.

3        THE COURT:  And how difficult is that to either miss

4  or reschedule?

5        JUROR JUDITH DAVIS:  I had some tests done, so it's

6  kind a hard to reschedule it, because they're not open on the

7  weekends.

8        THE COURT:  All right.

9        Anyone else in the back row?  No one?  All right.

10       Is there anything I haven't asked, that maybe you

11 heard me ask the first group, that you think the lawyers or the

12 Court need to know about your ability to sit fairly on this

13 case?  Now is your chance to say what you've just been waiting

14 for a couple hours to say.  Nothing?  All right.

15       Miss Finley?

16       MS. FINLEY:  Good afternoon.  I'll ask the same

17 questions.

18       Is there anyone on the jury that likes to pay their

19 taxes?  No?  Okay.

20       Does anybody hold strong personal or philosophical

21 feelings about the tax system of the United States, or about

22 the IRS?

23       And this case involves possible criminal violations,

24 and it's not a civil procedure.  So does any member of the

25 prospective jury feel that violations of the federal tax law

1    should not be prosecuted as a crime?

2              And are you or a family member or a close friend or

3    relative, associated with any formal or informal group or

4    organization that is engaged in the study of tax law, federal

5    or state tax law?

6              And are you or any family member, or close personal

7    friend or acquaintance, engaged in any protest against tax

8    laws, or tax policy in general, or do you believe that the tax

9    laws are not constitutional?

10             I have no further questions.  Thank you, Your Honor.

11             THE COURT:  All right.  Thank you.

12             Mr. Hochman?

13             MR. HOCHMAN:  Again, as we saw from the last panel,

14   candor is obviously very important in trying to discover

15   whether or not you have biases for this case, and whether or

16   not you're the right juror for this case.  It is important both

17   for Dr. Patricia Hough and for the government.

18             I know the Judge asked you the question about the

19   Swiss Bank accounts and the stigma issue; but, just trying to

20   get a sense of whether or not people come into this courtroom

21   with a bias, who actually has a belief or -- in the stigma of a

22   Swiss Bank account; that if you have a Swiss Bank account,

23   there must be something wrong?  If you could give me a show of

24   hands as to who has that type of believe as we sit here today.

25             And who believes -- and is everyone -- and, by a show

1    of hands, you can indicate -- willing to consider all the

2    evidence, and, as the Judge put it, whether or not there's a

3    legitimate use for a Swiss Bank account, in this trial, and

4    reach a fair and impartial verdict at the end of the trial?  If

5    you're in that mindset today, could you please raise your hand?

6           I see there's . . . actually, if you're not in that

7    mindset, could you please raise your hand just, so I didn't

8    miss anyone?

9           JUROR AMINIAN:  Could you repeat that?

10          MR. HOCHMAN:  Sure.  Are you in the mindset, today,

11   that you will have a fair and open mind, and determine, at the

12   end of the case, whether or not there was a legitimate use for

13   a Swiss Bank account?  And I wanted to get -- I just couldn't

14   write quick enough.  The people that prepare their own tax

15   return, could you just raise your hand real quickly?  I wasn't

16   able to write real quickly.  Just keep them up for one second,

17   if you could.

18          And the people who don't prepare their own tax

19   return, does anyone use a CPA, a certified public accountant?

20   And if you could keep your hands up as well?  I'll just quickly

21   note this down.

22          Very good.  No further questions.

23          THE COURT:  All right.  Counsel, if you'd take a look

24   at your notes, and when you're ready, come to sidebar, please.

25          The jurors may stand and stretch if you need to.

1              (Counsel confer at their respective counsel tables.)

2                            AT SIDEBAR

3              THE COURT:  All right.  Challenges for cause.  First,

4    if any, from the government?

5              MS. FINLEY:  Your Honor, I think having a mom in a

6    nursing home is normally -- she was a little overly emotional.

7              MR. HOCHMAN:  I agree.

8              THE COURT:  I agree as well.  That's Ms. Beeson,

9    Number 8.  I'll excuse her for cause.

10             Any other challenges for cause from the government?

11             MS. FINLEY:  With respect to Mr. Lee, who has the son

12   with the health problems, perhaps we could explore just a

13   little further when the appointments are?

14             MR. HOCHMAN:  What I didn't understand is when he has

15   to pick up his son.  Because it might be that he has to either

16   pick him up late enough in the day that we'll be out, and he

17   can make it.

18             THE COURT:  Do you want me to have him come up here?

19             MR. HOCHMAN:  He said Mondays and Wednesdays, and

20   we're dark on Mondays anyway.

21             THE COURT:  Let me just get him up here.

22                            IN OPEN COURT

23             THE COURT:  Mr. Lee?  Can I see you up here, please?

24                            AT SIDEBAR

25             THE COURT:  This is a microphone, so you all have to

1    speak into the microphone that goes to the court reporter's

2    earpiece.

3              I should have asked some questions.  You have to take

4    your son for medical treatment on Monday and Wednesdays?

5              JUROR LEE:  On Mondays he gets speech therapy.  On

6    Wednesdays, he gets physical therapy and occupational therapy.

7    He was born a premie, so he has ongoing physical therapy

8    issues.

9              THE COURT:  Monday won't be a problem, because we're

10   not going to have court next Monday.  Now, on Wednesday, do you

11   drop him off, and then pick him up at the end of the day, or

12   how does that work?

13             JUROR LEE:  He does go to school, but I have to pick

14   him up early at school.  So I have to leave work early, pick

15   him up, and I'm there with him at the physical therapy.

16             THE COURT:  And what time would you have to be out of

17   here in order to get that done on Wednesday?

18             JUROR LEE:  On Wednesday, I would have to leave

19   by 1:30.

20             THE COURT:  Okay.

21             Anything else, by anyone?

22             MS. FINLEY:  No.

23             MR. HOCHMAN:  No, Your Honor.

24             THE COURT:  Thank you.

25             (Juror Lee returned to the juror box.)

1          MR. HOCHMAN:  Hear from the government first?

2          THE COURT:  Okay.

3          MS. FINLEY:  I think, with respect to that, given the

4    son's health issues, that that might be a big burden on him and

5    his family.

6          MR. HOCHMAN:  I can't disagree with that.

7          THE COURT:  Neither can I.  I take that to be a

8    challenge for cause, which the Court will grant.

9          Any other challenges for cause from the government?

10         MS. FINLEY:  There were just two follow-up questions

11   that we did want to see if we could inquire, for Miss Davis?

12   The second Ms. Davis, in the back row.  She said her husband

13   was retired, but she didn't say what her husband did.

14         MR. HOCHMAN:  Which Davis?

15         THE COURT:  At the far right-hand side.

16         MS. FINLEY:  Judith Davis.

17         THE COURT:  Oh, 13 you want.  I don't have a note.

18         MS. FINLEY:  Given that they have been audited -- she

19   said they have been audited twice -- the government just wanted

20   to try and find out what her husband did for a living.

21         THE COURT:  Do you recall if I had asked that?  On

22   the occupation?

23         MR. HOCHMAN:  I mean, you asked -- it's one of those

24   questions you volunteer at the beginning, so I didn't write

25   down what her husband does.  Just that she's a retired HR rep.

1              THE COURT:  Okay.  I'll find out.

2                         IN OPEN COURT

3              THE COURT:  Ms. Judy Davis, I know you said your

4     husband is retired.  Refresh my memory, did you tell us what

5     he's retired from?

6              JUROR JUDITH DAVIS:  He worked for Lockheed Martin.

7              THE COURT:  I heard the Lockheed Martin.

8              JUROR JUDITH DAVIS:  Cost estimating.

9              THE COURT:  Thank you.

10                         AT SIDEBAR

11             MR. HOCHMAN:  And then we would have one challenge --

12             THE COURT:  Hang on.  I'm not sure the government is

13    done.

14             MS. FINLEY:  With Ms. Garnick, she said that she did

15    have a physician that was outside the United States, we were

16    just wondering if she knows what country they were educated in.

17    A lot of the other jurors volunteered what country.

18             THE COURT:  They did.  Does it matter?

19             MS. FINLEY:  To make sure that, perhaps, they didn't

20    go to the same medical school.  If she did have a discussion

21    with her doctor about where he went to school, then it might be

22    relevant.  Or we might ask a follow-up question.

23             THE COURT:  Do you want to know too?

24             MR. HOCHMAN:  I assume that, if it was anything to do

25    with our case, she would have indicated.  I see no harm in

1    asking the question.

2                          IN OPEN COURT

3              THE COURT:  Ms. Garnick?  You said you had a

4    physician that graduated from a medical school outside of the

5    United States.  Do you know what country?

6              JUROR GARNICK:  An island off of South America.  I

7    want to say Grenada, but I'm not sure.

8              THE COURT:  Okay.  Is that something, if you heard

9    it, you may trigger a memory?

10             JUROR GARNICK:  I'm not positive.  It's somewhere in

11   that area.

12             THE COURT:  Okay.  Thank you.

13                          AT SIDEBAR

14             THE COURT:  Does that help you.

15             MS. FINLEY:  That does.  Thank you, Your Honor.

16             MR. HOCHMAN:  We would move for cause, Juror

17   Number 10.

18             THE COURT:  Let me make sure the government is

19   through with theirs.

20             MS. FINLEY:  We are, Your Honor.

21             THE COURT:  Okay.

22             MR. HOCHMAN:  Juror Number 10.  He was the one that

23   indicated that he had the medical treatment, an infusion, and

24   two weeks would probably be too long a time not to have it.

25             THE COURT:  Um-hum.  That's on Friday.

1          What says the government?

2          MS. FINLEY:  I think this may be another situation if

3   we could just find out what time of day it's at, if it's early

4   in the morning, it might not be within -- it might not be a

5   conflict.

6                     IN OPEN COURT

7          THE COURT:  Mr. Garczewski, can I see you up here,

8   please?

9                     AT SIDEBAR

10         THE COURT:  The medical appointment you have on

11  Friday, what time of day is that?

12         JUROR GARCZEWSKI:  It starts at 11:00 a.m., and it is

13  a four-hour procedure.

14         THE COURT:  Oh.  Okay.  Thank you.

15         JUROR GARCZEWSKI:  Sure.

16         (Juror Garczewski returns to the jury box.)

17         MR. HOCHMAN:  We would move for cause, Your Honor.

18         MS. FINLEY:  No objection, Your Honor.

19         THE COURT:  That will be granted.

20         MR. HOCHMAN:  No other cause challenges, Your Honor.

21         THE COURT:  All right.  Peremptories, the government

22  has one, and the defendant has -- I'm sorry, the government has

23  two, and the defendant has four.

24         MS. FINLEY:  Before we exercise our challenge,

25  Miss Davis also had a doctor appointment, for test results.

1          THE COURT:  On the 18th, right.

2          MS. FINLEY:  And I don't know if that's something

3    that could be continued or, again, depending on what kind of

4    test result she may be getting, it may difficult.

5          MR. HOCHMAN:  I believe it's a one year follow-up for

6    a knee replacement?

7          MS. FINLEY:  No.  That was the first group.  I think

8    Miss Crouse had a knee replacement.

9          MR. HOCHMAN:  Oh, I'm sorry.  Some type of follow-up

10   appointment, and she said . . . .

11         THE COURT:  To get test results on the 18th.  I

12   didn't ask what the test results with were for.

13         MR. HOCHMAN:  Maybe she could reschedule it for the

14   following week is the question.

15         THE COURT:  All right.

16                        IN OPEN COURT

17         THE COURT:  Ms. Judy Davis?  The doctor's appointment

18   you have for the 18th?

19         JUROR JUDITH DAVIS:  Yes.

20         THE COURT:  What time is that?

21         JUROR JUDITH DAVIS:  8:00 o'clock.

22         THE COURT:  And do you know how long that would take?

23         JUROR JUDITH DAVIS:  I am assuming just the time it

24   takes to get the results of the tests.

25         THE COURT:  And how easy or difficult would that be

1    to reschedule?

2              JUROR JUDITH DAVIS:  I'd have to reschedule for

3    November.

4              THE COURT:  You say you would have to?

5              JUROR JUDITH DAVIS:  Are you saying for a different

6    time?

7              THE COURT:  A different date, actually.

8              JUROR JUDITH DAVIS:  I would have to reschedule for

9    November.

10             THE COURT:  And that's a problem?

11             JUROR JUDITH DAVIS:  I don't know.

12             THE COURT:  All right.  If it's at 8:00 o'clock,

13   would you feel comfortable making it later that morning into

14   court, after getting the test results?

15             JUROR JUDITH DAVIS:  Yeah.  I have no problem with

16   that.

17             THE COURT:  Okay.  Thank you.

18                            AT SIDEBAR

19             THE COURT:  All right.  I think we're at

20   peremptories, and I think we're with the government.

21             MS. FINLEY:  Your Honor, we'll strike Number 14, Jane

22   Decker.

23             THE COURT:  Jane Decker.  All right.

24             To the defense, for two, if you have two?

25             MR. HOCHMAN:  First of all, Number 6, Your Honor,

1    Mr. Youngblood.

2              THE COURT:  Mr. Youngblood?

3              MR. HOCHMAN:  And the second would be . . . .

4    Mr. Howell, Juror Number 9.

5              THE COURT:  Number 9.

6              Back to the government for its last.

7              (Ms. Finley and Ms. Kessler confer privately.)

8              MS. FINLEY:  Your Honor, we'll use our last challenge

9    on Judy Davis.

10             THE COURT:  That's Number 13.

11             MS. FINLEY:  Number 13.

12             THE COURT:  All right.

13             To the defense?  For their last two?

14             MR. HOCHMAN:  We'll use one of the challenges, Your

15   Honor, with Juror Number 16, Mr. Raybourn.

16             THE COURT:  Raybourn?  All right.

17             MR. HOCHMAN:  And then we'll pass, and hold onto our

18   last challenge, Your Honor.

19             THE COURT:  That makes Ms. Williamson Number 6.

20             MR. HOCHMAN:  I'm sorry?

21             THE COURT:  I'm sorry.  Are you done?  I thought you

22   were reconsidering.

23             MR. HOCHMAN:  We were just trying to figure out how

24   many we have left.

25             THE COURT:  You have one left in terms of

1    peremptories.

2              MR. HOCHMAN:  That's fine, Your Honor.

3              THE COURT:  Ms. Williamson becomes Juror Number 6,

4    Ms. Morgan becomes seven.  Mr. Shaw becomes eight.  Ms. Garnick

5    becomes nine.  And Ms. Davis becomes ten, according to my

6    notes.

7              MR. HOCHMAN:  Yes.

8              THE COURT:  Everyone agree?

9              Let the record reflect I saw Ms. Finley nod her head

10   yes, so I take that as a yes.

11             MS. FINLEY:  I'm sorry, Your Honor.  Yes.

12             THE COURT:  It's quarter to 1:00.  Do you want to

13   break for lunch, or do you want to keep going?

14             MR. HOCHMAN:  I'm kind of dying here, Your Honor.  I

15   would like to break for lunch.

16             THE COURT:  We've got enough to go.  Okay.  We have

17   ten.

18             MR. HOCHMAN:  And we have alternates.

19             MS. FINLEY:  Thank you, Your Honor.

20                        IN OPEN COURT

21             THE COURT:  All right.  I'd like to thank and excuse

22   the following persons.  I would ask that you call that

23   telephone number Monday evening, in case there's another case

24   going to trial next week.

25             In the first row, I would like to thank and excuse

1    Mr. Youngblood.

2              In the second row, I would like to thank and excuse

3    Mr. Lee, Mr. Garczewski, Mr. Howell, and Ms. Beeson.

4              In the third row, I would like to thank and excuse

5    Mr. Raybourn, Ms. Decker, and Ms. Judy Davis.

6              And so, Ms. Williamson, you'll become Number 6.  And

7    Ms. Morgan is seven.  Right.  Mr. Shaw is next.  Right there.

8    Ms. Garnick is next to Mr. Shaw.  And then Ms. Rebecca Davis is

9    next to her.

10             All right.  The good news is we're going to break for

11   lunch.  The bad news is you've got to come back, after lunch,

12   to finish -- we haven't got enough jurors yet, so we're going

13   to finish that process after lunch.  We're going to break now.

14   We'll resume at 2:00 o'clock.

15             When you come back, I'd ask that you have the same

16   seats as you're in now.  Than will be your seat for the

17   duration of the case.

18             Those of you in the spectators' sections, you don't

19   necessarily have to have the same seats, but we're going to

20   take you, as you've seen, in pretty much the same order as you

21   have seen now.  So, when we come back we'll refill the jury

22   box, and come back as many cycles as it needs.

23             So if I can get all of you back here at 2:00 o'clock,

24   for those of you seated in the jury box, you can return to the

25   jury room, the Court Security Officer will bring you out.  The

1    rest of you can just report directly to the courtroom.

2              2:00 o'clock.

3              (The jurors left the courtroom.)

4              THE COURT:  Counsel, what's your thoughts as to

5    length of your openings?

6              MS. KESSLER:  I would estimate the government's is

7    not more than 20 minutes.

8              MR. HOCHMAN:  Your Honor, we're somewhere between 45

9    and 55 minutes, Your Honor.

10             THE COURT:  All right.  But you are going to make one

11   instead of reserving?

12             MR. HOCHMAN:  That's correct, Your Honor.

13             THE COURT:  All right.  That may take the rest of the

14   day.  We are on pretty strict orders to stop right at 5:00

15   because of the sequester.  So, if need be, do you have a

16   witness you want to start with?

17             MS. FINLEY:  We have a witness that is prepared to

18   testify today that we can start, if time allows.  We will have

19   him here.

20             THE COURT:  Okay.  See you at 2:00.

21             MR. HOCHMAN:  Thank you very much, Your Honor.

22             (At 12:49 o'clock, PM, court was recessed.)

23                        AFTER RECESS

24             (At 2:02 o'clock, PM, court was reconvened.)

25             THE COURT:  Madam Deputy, if you'd fill the rest of

1   the jury box, please?

2            THE COURTROOM DEPUTY:  Yes, sir.

3            Lynn Wendel, Seat Number 11.  Michael Kincanon, Seat

4   Number 12.  Jennifer Flinn, Seat Number 13.  George Kerper,

5   Seat Number 14.  Constance Krug, Seat Number 15.  Grace Seitz,

6   Seat Number 16.  Wayne Williams, Seat Number 17.  Mark Jago,

7   Seat Number 18.

8            THE COURT:  All right.  Ms. Wendel?

9            JUROR WENDEL:  My name is Lynn Wendel.  I live in

10  Naples for 17 years, and in Florida for 27.  I work for Collier

11  County Public Schools as a transportation supervisor.

12           I'm married.  My husband is a realtor and a school

13  bus driver.  I have no children.

14           I have an associate's college degree.  I have never

15  been in the military.  I don't have any previous court

16  experience, and no jury experience.

17           THE COURT:  Thank you.

18           Mr. Kincanon?

19           JUROR KINCANON:  Sir.  My name is Mike Kincanon.  I'm

20  a retired high school teacher of 32 years.  From Illinois.  My

21  wife and I were both teachers.  We moved to Naples in 2001, so

22  we've been in Florida for 12 years.

23           I have two adult children.  My son, Tim, is 44.  He

24  is a police officer in Pembroke Pines, Florida.  And my

25  daughter is -- works in a restaurant in Naples, Florida.

1        I have been on two juries.  As recently as three

2   months ago in Collier County.  It was a civil case.  And . . .

3   another one, in Illinois, was a civil case, and I was the

4   foreman of that jury.  Both had verdicts.

5        THE COURT:  All right.  Let me ask you a couple

6   questions with regard to your son who was a police officer.

7        JUROR KINCANON:  Yes, sir.

8        THE COURT:  Where, again, was he located?

9        JUROR KINCANON:  Pembroke Pines, Florida.

10       THE COURT:  Any question in your mind in your ability

11   to be fair to both sides in a criminal case?

12       JUROR KINCANON:  No, sir.

13       THE COURT:  Hand that right back to Mr. . . . is it

14   Jago?

15       JUROR JAGO:  Yes, sir.  Good afternoon.  My name is

16   Mark Jago.  I presently live in Bonita Springs.  My wife and I

17   have owned property in Florida for about 20 years.  I became a

18   full-time resident, six month and a day resident I guess, in

19   2010.

20       I'm retired from a senior sales management position

21   in the medical device manufacturing world.  Presently working

22   as a professional caddy, both up north, at TPC Boston, and in a

23   club in Naples.

24       I am married, as I said.  My wife is a company

25   president in the financial services industry.  We have no

1    children.

2          I have an MBA.  I have not served in the military.  I

3    have no court experience.  I have been called a number of times

4    for jury, but have never sat.

5          THE COURT:  All right.  Thank you.

6          Mr. Williams?

7          JUROR WILLIAMS:  I'm Wayne Williams.  I live in

8    Estero.  I have lived there for ten years now.  I was a

9    research supervisor for Merck and Company in New Jersey.

10          And I am married.  And my wife also worked for Merck

11    and Company as an office administrator.  I have two sons from a

12    previous marriage.

13          I have three years of college experience.  I'm a

14    veteran at the U.S. Army.  And my only previous thing in court

15    has been a divorce court.  I have been called for . . . jury

16    duty in Lee County twice, but have never served.

17          THE COURT:  Thank you.

18          Ms. Seitz?

19          JUROR SEITZ:  My name is Grace Seitz.  I live in

20    Naples, and I have lived there and in State of Florida for 30

21    years.  I am a retired registered nurse.

22          I'm married to a retired bank executive.  I have

23    three adult children.  My oldest son is a retired naval

24    officer.  My daughter is a vice-president for human resources

25    for an REIT.  My youngest son is an IT security sales engineer.

1          I have a BS in nursing.

2          I have not been in the military, but my husband was.

3          The only previous court experience I've had was as an

4    officer of our homeowners association that sued the school

5    board about 20 years ago.  And I have had previous jury

6    service.  I did serve on a criminal case, in Collier County,

7    four or five years ago, and a verdict was returned.

8          THE COURT:  All right.  Anything about your

9    litigation experience that you think would make it hard for you

10   to you sit fairly in this case?

11         JUROR SEITZ:  No.  No.

12         THE COURT:  Thank you.

13         Ms. Krug?

14         JUROR KRUG:  My name is Connie Krug.  I live in

15   Bokeelia, on Pine Island.  We became residents of Florida eight

16   years ago.  And the other part of the year we live in Ohio.  We

17   have been in Florida for eight years.  I'm a retired RN,

18   registered nurse, and a retired art therapist.

19         I'm married.  My husband is retired.  He was a market

20   manager for Avery Dennison.  I have no children.

21         I have a master of arts degree.  No military service.

22   My husband and I were sued about 12 years ago, in small claims

23   court in Ohio, by a wallpaper hangar.  And we lost.  And we had

24   to pay a nominal fee.  I was called, about three years ago, for

25   jury duty service in Lee County, but it was at a time when we

1    were in Ohio, so she excused me.

2             THE COURT:  All right.  Anything about your

3    litigation experience that you think would make it hard for you

4    to be fair in this case?

5             JUROR KRUG:  Not at all.

6             THE COURT:  Okay.  Thank you.

7             Mr. Kerper, is it?

8             JUROR KERPER:  My name is George Kerper.  I live in

9    North Fort Myers.  I have been there for six years, and in

10   Florida 14 years.  I am partially self-employed, and also a

11   past government contracts administrator.

12            I'm married, and my wife is a general manager for

13   Homebuilder.  I have two children, adult children; one 34, one

14   37.  My daughter is an school administrator in Queens County,

15   Maryland; and my son is a web administrator in Fort Myers.

16            I have three years of college.  I have had United

17   States military experience in the United States Navel Air, and

18   I was honorably discharged.  No previous court experience;

19   however, I did serve on a couple of juries in Mineola, in Long

20   Island, and also in Lee County.  Both were civil cases.

21            THE COURT:  All right.  Tell me a little bit about

22   your, I think it was your past employment, as a government

23   contracts administrator?

24            JUROR KERPER:  I worked for a government contractor,

25   and administered the solicitations of subcontractors and also

1    the day-to-day administration of the prime contract with the

2    government.

3              THE COURT:  So you didn't work for the government,

4    you worked for the --

5              JUROR KERPER:  No.  Government contractor.

6              THE COURT:  All right.  Thank you.

7              Mr. Flinn?  Or, I'm sorry, Jennifer Flinn.

8              JUROR FLINN:  My name is Jennifer Flinn.  I've lived

9    in Lehigh for the past three years, but I have lived in Florida

10   for 13.  I am a server.  I'm single.  I've never been in the

11   military.

12             I have two associate's degrees; one is in accounting,

13   and one is just regular arts.

14             And I have court experience, but I'm not sure if I

15   was a witness or a plaintiff.  It was a juvenile case.  And the

16   police officer said that he stole my license plate, and they

17   came and told me about it.  But I just sat in the courtroom.  I

18   didn't do anything.  So I don't think that I was really part of

19   the case.

20             THE COURT:  Okay.

21             JUROR FLINN:  And then I've never sat on a jury.

22             THE COURT:  Tell me a little bit about your

23   accounting associate's degree.  Have you ever used that

24   professionally?

25             JUROR FLINN:  Professionally?  No.  I just tutor in

1   it.  That's all I did with it.

2                THE COURT:  All right.  Thank you.

3                All right.  Once again I'm be addressing primarily

4   the newly seated jurors; but if something comes up for the rest

5   of you that you need to change, or correct, or add to a prior

6   answer, feel free to do so.

7                For the newly seated jurors, does anyone believe you

8   know anything about the case before coming to court today?

9                And Mr. Williams?  We'll get the microphone passed

10  down to you.

11               JUROR WILLIAMS:  I looked on the internet last night

12  to see what was on the docket, and that's . . . .

13               THE COURT:  Oh, okay.  You're going to be an internet

14  problem, aye?  What did it say?

15               JUROR WILLIAMS:  Excuse me?

16               THE COURT:  Did it tell you anything other than the

17  name of the case?

18               JUROR WILLIAMS:  It just gave a little description

19  about the thing.  Nothing that I haven't heard here.

20               THE COURT:  All right.

21               Anyone else know anything before today?  No one?  All

22  right.

23               Do any of you know any of the ladies or gentlemen who

24  were introduced earlier this morning?  No one?

25               Do any of you believe you may know any of the

1   witnesses whose names I read this morning?

2           Ms. Flinn, at the other end, we'll get the microphone

3   passed to you.

4           JUROR FLINN:  There's a possibility that Luis Rivera,

5   I might -- he might be a customer where I work.  That I wait on

6   regularly.

7           THE COURT:  All right.

8           JUROR FLINN:  He's kind of short.  Dark hair.

9   Slightly balding.  No?  Okay.

10          THE COURT:  Not the same?

11          MR. HOCHMAN:  I don't think so, Your Honor.

12          THE COURT:  All right.  Thank you.

13          JUROR FLINN:  Thank you.

14          THE COURT:  All right.

15          Anyone else think you may know any of the potential

16  witnesses?  No one?

17          Does anyone have any physical impairment or condition

18  that would need to be accommodated if you're selected on this

19  particular case?  No one?

20          Do any of the 18 of you know one another before

21  today?

22          For the newly seated jurors, have any of you ever

23  studied law?

24          Okay.  Mr. Kerper.

25          JUROR KERPER:  Mostly federal procurement regulations

1   and international trade regulations.

2          THE COURT:  Did that have any overlap into tax

3   regulations?

4          JUROR KERPER:  No.  It was all weapons.

5          THE COURT:  Thank you.

6          Have any of you, or members of your family, ever

7   worked for the United States Government that you haven't

8   mentioned already?  No one?

9          Okay.  Ms. Seitz?

10         JUROR SEITZ:  Well, my son was in the navy.

11         THE COURT:  Right.  You mentioned that.

12         Anyone else?  Anything you haven't mentioned yet?

13  No?  Okay.

14         Do any of you either presently have, or have you had

15  in the past, or do you anticipate in the future, having

16  litigation with or against the United States Government?  No

17  one?

18         Do any of you have any matters currently pending in

19  front of either the United States Attorney's Office or the

20  United States Department of Justice?

21         Have any of you, or members of your family, or close

22  personal friends, ever worked in law enforcement, that you

23  haven't mentioned already?

24         Okay.  We'll get the microphone down to Mr. Jago.

25         JUROR JAGO:  My sister-in-law is an attorney, but not

1    a practicing . . . .  Never criminal or . . . home sales, that

2    type of thing.  Now an advocate for my autistic nephew in the

3    school system up in Massachusetts.

4              THE COURT:  All right.

5              JUROR JAGO:  Her brother is a police officer.  That's

6    about the -- and I do have a brother-in-law that was in the Air

7    Force a hundred years ago.

8              THE COURT:  Okay.  Anything about any of those

9    relationships that you think is going to impact your ability to

10   be fair in this case?

11             JUROR JAGO:  Not at all, Your Honor.

12             THE COURT:  Anyone else, law enforcement?

13             Ms. Krug?

14             JUROR KRUG:  My brother is just retired from the

15   California Court of Appeals.  He was research attorney.  And my

16   brother-in-law is an attorney doing civil cases.

17             THE COURT:  All right.  Is the brother-in-law local?

18             JUROR KRUG:  One is in California, and one is in

19   Ohio.  The brother-in-law is in Ohio.

20             THE COURT:  Anything about those things that you

21   think would be an issue in this case?

22             JUROR KRUG:  No.

23             THE COURT:  Thank you.

24             Anyone else?

25             Do any of have you such strong feelings about law

1    enforcement, either pro or con, that you would not be able to

2    be fair to both sides in this case?  No one?

3          Does anyone have a personal belief that would make it

4    difficult to sit in judgment of another person?  No one?

5          You heard the jury instruction that I read, that I've

6    summarized several times, in terms of the government's burden

7    of proof being beyond a reasonable doubt; if the government

8    doesn't prove each and every element of each count, that your

9    obligation would be to find the defendant not guilty.  The

10   defendant doesn't have to do anything, quite literally.  And if

11   the defendant exercises her constitutional right not to

12   testify, that can't be held against her in any fashion.  And

13   finally, that your verdicts would have to be the product of the

14   evidence presented, and not because of sympathy, prejudice, or

15   any other sentiment.

16         Is there anyone who could not follow that

17   instruction?  All right.  Let me ask you the other way.

18         Can you all follow the instruction?  All right.

19         Let me get back in a little bit more detail with

20   regard to social media and the internet.  One of the

21   instructions I'm going to say repeatedly is you can't talk

22   about the case among yourselves, or allow anyone to discuss it

23   with you or in your presence.  That includes your significant

24   others, or your family friends, your local bartender, whoever

25   it is.  You can't talk about the case until you go back and

1   deliberate when I tell you to.

2            Is that going to be a problem for anyone?  Does

3   anyone have a need to get on the internet and start researching

4   your own case?  You think maybe a lawyer didn't ask the right

5   question, you're going to get in and find out something?

6   That's a no no.  Does anyone have a need to do that?  All

7   right.

8            By a show of hands, is there anyone else who has

9   either bookkeeping or accounting experience besides Ms. Flinn?

10  No one?  Anyone have any tax preparation experience?  I guess

11  including . . . .  Let me do it a different way.

12           How many of you prepare your own tax returns?  By a

13  show of hands.  All right.  How many of you utilize the

14  services of a tax professional, whether it be an accountant, or

15  a CPA, or a tax preparing firm?  All right.

16           Have any of you been audited by the IRS?  I need to

17  see the heads shaking.  Otherwise, I think you're asleep.  All

18  right.

19           Have any of you had contact with the IRS less than an

20  audit but more than just filing tax returns?

21           Mr. Kerper, we'll get you the microphone.

22           JUROR KERPER:  It was just an error.  There was no

23  penalty or taxes required.

24           THE COURT:  Any other contacts with the IRS, either

25  exceptionally good or exceptionally bad?

1              Let's get the microphone down here to Mr. Jago.

2              JUROR JAGO:  A number of years ago, we did our own.

3    We used to do our own taxes until it became a little more

4    complex.  And evidently we did them wrong.  There was an error

5    that we owed some federal tax.  And it was paid, the penalties,

6    and off it went.

7              THE COURT:  How long ago was that roughly?

8              JUROR JAGO:  Probably four years ago.

9              THE COURT:  Anything about that experience that would

10   make it hard for you to sit fairly in this case?

11             JUROR JAGO:  No.

12             THE COURT:  Thank you.

13             Anyone else, IRS contacts?  No one?

14             Have any of you utilized either a Swiss bank account

15   or, more generally, a bank account in a foreign country?  No

16   one?

17             Does anyone have a personal sense that, if someone

18   else has utilized a Swiss bank account, or a bank account in a

19   foreign country, that it has to be illegal for some reason?

20             Could you follow an instruction, if I were to give

21   one, that says just having an account -- a bank account in a

22   foreign country is not, per se, unlawful?  Anyone not be able

23   to follow that instruction?

24             Do any of you have a physician who you know to have

25   graduated from a medical school outside the United States?  No

1    one?

2              Let me talk to you about any scheduling issues that

3    anyone has.  Again, the parties anticipate through the end of

4    next week as a fair estimate.  Anyone have any scheduling

5    issues?

6              Ms. Krug?

7              JUROR KRUG:  There isn't anything scheduled, but my

8    husband had his -- he will be 70 tomorrow, and he had his

9    second coronary bypass procedure about four and a half ago

10   months ago.  And he's been fine, but the last couple days he's

11   had very fluctuating blood pressures, and I was very antsy

12   about leaving him alone.  You know, we live together, just two

13   of us, in a fairly remote place on Pine Island.

14             So I need to say that to you . . . in the probably

15   unlikely event anything were to happen, there wouldn't be much

16   question in my mind I'd have to go with him to the hospital.

17   And that's kind of the way we live.  So I don't expect that.  I

18   talked to him at lunch, and, you know, things were fine.  But

19   just to go on the record.

20             THE COURT:  All right.  I appreciate that.  Let me

21   take it a little bit farther.  If you're selected as a juror in

22   the case, I'm going to expect to you pay attention for the next

23   two weeks, and so my question is will you be so distracted

24   about worrying about your husband that you are not going to be

25   able to do that?

1          JUROR KRUG:  No.  I was actually rapt this morning.

2    I was very interested in this whole process, and I didn't worry

3    and I didn't think about Ken.

4          THE COURT:  Okay.

5          JUROR KRUG:  The only issue would be if something

6    were to happen, like say tonight, if his blood pressure goes

7    way high, we may go to the ER.  There's just a little bit of

8    unpredictability there which we live with.  So the chances are

9    I'd expect to be here.  If I'm here, I'm focused.

10         THE COURT:  Okay.

11         JUROR KRUG:  But there's a slim chance.  I just want

12   to kind of put it out there, because I don't expect it to

13   happen . . . .

14         THE COURT:  Okay.

15         JUROR KRUG:  But --

16         THE COURT:  I can deal with that.  That's fine.

17         Anyone else, issues like that?  Mr. Williams?

18         JUROR WILLIAMS:  I just wanted to say my wife had

19   open heart surgery at the end of May, and she's in a similar

20   situation of where we have to monitor her all the time.  But

21   she's doing very good after the surgery that she had in the

22   Mayo Clinic in Minnesota.  And she's home alone.  And that's

23   the only problem.

24         THE COURT:  Let me ask the same question.  If you're

25   selected in the case, can you give the case the attention that

1    the parties deserve, or are you going to be preoccupied with

2    your wife being home alone?

3              JUROR WILLIAMS:  I would be fine.

4              THE COURT:  You're okay?

5              JUROR WILLIAMS:  Yes, sir.

6              THE COURT:  Anyone else, scheduling issues?

7              All right.  Mr. Aminian?

8              JUROR AMINIAN:  Yes.  You know, speaking of mind

9    being clear, you know, as I said it before, you know, we just

10   have one car, and both of us are working with an infant and

11   a -- you know, a child.  It's really, really, you know, making

12   my mind not focus when it comes, you know, about thinking that

13   they're bound at home, and, you know, my students and all those

14   stuff.  So it's really, really, you know, occupying my mind.

15   So I just wanted to share that with you.

16             THE COURT:  All right.  I appreciate that.

17             Anyone else, scheduling issues, with the newly seated

18   jurors, I haven't talked about yet?

19             Anything I haven't asked the newly seated jurors

20   that, perhaps, I asked a different group, or that I should ask

21   you, about your ability to sit in this particular case fairly?

22   Nothing?  All right.

23             Ms. Finley?

24             MS. FINLEY:  Good afternoon.  I'm going to have the

25   same couple questions that I asked the prior panels here.

1    Maybe in a different order but I'll start with the easy one.

2              Does anybody here like to pay their taxes?

3              Does any member of the prospective jury, do you have

4    any strong personal or philosophical feelings about the IRS or

5    the tax system here in the United States?

6              And if the case involves possible criminal, federal

7    violations -- and this is a criminal case, not a civil case --

8    do any members of the prospective jury feel that violations of

9    the federal tax law should be handled civilly, and not

10   prosecuted criminally?

11             And then has anybody, or close members of their

12   family, engage in any study of tax laws or tax policy, either

13   federal or state?

14             And then are you, or any family member, or relative,

15   or close acquaintance, engaged in protests against tax laws, or

16   tax policy in general, or do you think that the tax laws in the

17   United States are unconstitutional?

18             That's all I have, Your Honor.  Thank you.

19             THE COURT:  All right.  Thank you.

20             Mr. Hochman?

21             MR. HOCHMAN:  Yes, Your Honor.

22             All right.  Mr. Kincanon, you said that both you and

23   your wife are teachers; is that correct?

24             JUROR KINCANON:  Yes.

25             MR. HOCHMAN:  What subjects do you teach?

1              JUROR KINCANON:  Physical education, health, and

2    driver education.

3              MR. HOCHMAN:  And your wife?

4              JUROR KINCANON:  She was elementary, second grade.

5              THE COURT:  Where is the microphone?

6              MR. HOCHMAN:  And you said you are a retired teacher.

7    Are you still teaching at some level?

8              JUROR KINCANON:  No.  I have been retired since June

9    of 2001.

10             MR. HOCHMAN:  And is your wife currently a teacher?

11             JUROR KINCANON:  No.  We both retired within a day of

12   each other.

13             MR. HOCHMAN:  That's very nice.

14             Ms. Flinn, you said that you got an accounting

15   degree; is that correct?

16             JUROR FLINN:  Yes.

17             MR. HOCHMAN:  An associate's degree?

18             JUROR FLINN:  Yes.

19             MR. HOCHMAN:  Where did you get the degree?

20             JUROR FLINN:  Edison State College.

21             MR. HOCHMAN:  How many years did it take to get that

22   degree?

23             JUROR FLINN:  Maybe two and a half.

24             MR. HOCHMAN:  And, as part of your getting your

25   accounting degree, did you have to take any tax law classes?

1          JUROR FLINN:  Yes, there was some taxation.

2          MR. HOCHMAN:  What subject of taxation did you study?

3          JUROR FLINN:  Like we took governmental taxation, and

4   personal, and business.  It was a combined into two semesters

5   of taxation.  And laws were kind of wrapped into every class,

6   so I don't really fully understand what you're asking.

7          MR. HOCHMAN:  I was just sort of getting there.

8   Personal versus business, partnership.

9          JUROR FLINN:  They covered all different ranges of

10  accounting from personal taxation, and filling out like actual

11  forms, and the laws that are associated with that.

12         MR. HOCHMAN:  And I forgot, when you were raising or

13  not raising your hand, do you prepare your own tax return?

14         JUROR FLINN:  Yes, I do.

15         MR. HOCHMAN:  Do you consider yourself, even though

16  you have an accounting degree, an expert in tax law?

17         JUROR FLINN:  An expert?  No.

18         MR. HOCHMAN:  Mr. Kerper?

19         JUROR KERPER:  Yes.

20         MR. HOCHMAN:  You said that you had sat on two -- sat

21  on couple of juries; and my only question is, did the juries

22  reach verdicts?  Don't tell us the verdicts, but --

23         JUROR KERPER:  The one in Mineola was settled before

24  it reached the jury, and the one in Lee County, a verdict was

25  provided.

1          MR. HOCHMAN:  Very good.

2          Miss Seitz?  You said that your husband was a retired

3    bank executive?

4          JUROR SEITZ:  Yes.

5          MR. HOCHMAN:  What bank did he work for?

6          JUROR SEITZ:  Northern Trust.

7          MR. HOCHMAN:  And what did he do when he worked

8    there?

9          JUROR SEITZ:  He was a vice-president of marketing.

10          MR. HOCHMAN:  How long did he work there for?

11          JUROR SEITZ:  Oh.  I think he was there 18 years?

12          MR. HOCHMAN:  And as part of working there, did he

13    have to ever deal with offshore banks?

14          JUROR SEITZ:  Oh, no.  No.  No.  He was trying to get

15    clients for Northern Trust.

16          MR. HOCHMAN:  Get the clients from offshore back on

17    shore; is that it?

18          JUROR SEITZ:  I don't recall him ever talking about

19    any foreign bank, or offshore, or anything.

20          MR. HOCHMAN:  And the Judge has asked the question,

21    and the other panelists have answered the question; so, for the

22    new people, does anyone have any very strong feelings about the

23    stigma concerning Swiss bank accounts such that they don't

24    believe they could be a fair and impartial juror here, today,

25    in this particular case?

1           Mr. . . . is it pronounced Jago?

2           JUROR JAGO:  Jago.

3           MR. HOCHMAN:  If you'd pass the microphone.

4           You said that you live here in Florida six months and

5    a day; is that correct?

6           JUROR JAGO:  Yes.

7           MR. HOCHMAN:  Could you explain what that means, to

8    live in Florida for six months and a day?

9           JUROR JAGO:  It's really the definition of a . . .

10   I'm a permanent resident.  But I still maintain another home up

11   in Foxborough, Massachusetts.

12          MR. HOCHMAN:  And is there some advantage to being a

13   permanent resident here in Florida?

14          JUROR JAGO:  Yes.

15          MR. HOCHMAN:  What is that advantage?

16          MS. FINLEY:  Your Honor?  I'm sorry.  Are these

17   questions about the tax law, or whether he can be fair and

18   impartial?

19          THE COURT:  I'll take the answer.

20          JUROR JAGO:  There's tax advantage, yes.

21          MR. HOCHMAN:  And does anyone else have that tax

22   advantage, of living six months and a day?  Mr. Shaw.  And

23   Ms. Krug.

24          That's all the questions, Your Honor.  Thank you.

25          THE COURT:  All right.  Thank.

1          If you'll each take a look at your notes, and when

2     you're ready, come to sidebar.  Jurors, if you need to stand,

3     feel free.

4          (Counsel conferred at their respective counsel tables

5          and then approached sidebar.)

6                              AT SIDEBAR

7          THE COURT:  All right.  As to the issue of cause,

8     Mr. Aminian has renewed his pitch for cause, so to speak.  So I

9     will reopen that discussion for him to the extent anyone has

10    concerns based upon what he has said; but, with that noted, any

11    challenge for cause from the government?

12         MS. FINLEY:  No, Your Honor.

13         MR. HOCHMAN:  No, Your Honor.

14         THE COURT:  All right.

15         The government has no peremptories left, and the

16    defense has one peremptory left.

17         (Counsel for the defense confer privately.)

18         MR. HOCHMAN:  We'll accept, Your Honor.

19         THE COURT:  All right.

20         In terms of the alternates, right now we have 13

21    through 18.

22         MR. HOCHMAN:  And you said the three alternates will

23    each get two strikes?

24         THE COURT:  Yes.  From the government?

25         MS. FINLEY:  We're fine, Your Honor.

1         MR. HOCHMAN:  We'll use our two strikes for, then, 13

2    and 14.

3         THE COURT:  Ms. Flinn and Mr. Kerper?

4         MR. HOCHMAN:  Yes.

5         THE COURT:  All right.  I said three alternates.

6    I've got four.  I guess I'm prepared to keep them at four

7    unless someone has a problem with Mr. Jago as a fourth.

8         MS. FINLEY:  We have no objection, Your Honor.

9         MR. HOCHMAN:  No objection.

10        THE COURT:  All right.  Let's keep him just to be on

11   the safe side, since we've got him.

12        MR. HOCHMAN:  Okay.

13        THE COURT:  Okay.

14                       IN OPEN COURT

15        THE COURT:  All right.  Ladies and gentlemen, I'm

16   going to thank and excuse some of you.  I would ask that you

17   call that telephone number next Monday, afternoon.

18        In the back row, I would like to thank and excuse

19   Mr. Kerper and Ms. Flinn.

20        And for those of you seated in the spectators

21   section, I'm going to thank and excuse all of you.  We have

22   selected is the jury in this case, so we will not need your

23   services.  I would ask that you call that telephone number

24   Monday afternoon.

25        Yes?

```
1                UNIDENTIFIED JUROR:  Call the same number?

2                THE COURT:  Say again?

3                UNIDENTIFIED JUROR:  The same telephone number we

4    called to confirm for today?

5                THE COURT:  Exactly.

6                All right.  I appreciate your coming.  Thank you.

7                (Jurors left the courtroom.)

8                THE COURT:  For those of you in the back row, this is

9    where the witness is going to be testifying from.  You've got

10   some flexibility, so I'd ask that you stay in the same order,

11   but if you want to move over a seat or two, feel free.  As far

12   as I'm concerned, you're good, but . . . .  All right.

13               Madam Deputy, if you'll place the jury under oath,

14   please.

15               THE COURTROOM DEPUTY:  Yes, sir.

16               Do each of you solemnly swear or affirm that you will

17   well and truly try the issues in the case between the United

18   States of the America and the defendant, Patricia Hough, and

19   render a true verdict according to the evidence and the charge

20   of the Court, so say you all?

21               (All jurors indicated affirmatively.)

22               THE COURTROOM DEPUTY:  You may be seated.

23               THE COURT:  Members of the jury, you have now been

24   sworn as the jury to try this case.  By your verdicts, you will

25   decide the disputed issues of fact.
```

1              I will decide all questions of law that arise during

2    the trial, and before you retire to deliberate together and

3    decide the case, at the end of the trial, I will instruct you

4    on the rules of law that you must follow and apply in reaching

5    your decisions.

6              Because you will be called upon to decide the facts

7    of the case, you should give careful attention to the testimony

8    and the evidence presented for your consideration during the

9    trial.  But you should keep an open mind, and should not form

10   or state any opinion about the case, one way or the other,

11   until you have heard all of the evidence, and have had the

12   benefit of the closing arguments of the lawyers as well as my

13   instructions to you on the applicable law.

14             During the trial, you must not discuss the case in

15   any manner, among yourselves or with anyone else, and you must

16   not permit anyone to attempt to discuss it with you or in your

17   presence.  And insofar as the lawyers are concerned, as well as

18   others whom you may come to recognize as having some connection

19   with the case, you are instructed that, in order to avoid even

20   the appearance of impropriety, you should have no conversation,

21   whatever, with those persons while you are serving on the jury.

22             You must also avoid reading any newspaper articles

23   that might be publish about the case now that the trial has

24   begun, and avoid listening to or observing any broadcast news

25   program on either television, radio, or any other social media,

1    because of the possibility some mention might be made of the

2    case now that the trial is in progress.

3          The reason for these cautions, of course, lies in the

4    fact that it will be your duty to decide the case only on the

5    basis of the testimony and the evidence presented during the

6    trial, without consideration of any other matter whatsoever.

7          From time to time during the trial, I may be called

8    upon to make rulings of law on motions or objections made by

9    the lawyers.  You should not infer or conclude, from any ruling

10   I may make, that I have any opinions on the merits of the case

11   favoring one side or the other; and if I sustain an objection

12   to a question that goes unanswered by the witness, you should

13   not speculate on what the answer might have been, nor should

14   you draw any inferences or conclusions from the question

15   itself.

16         During the trial, it may be necessary for me to

17   confer with the lawyers from time to time, out of your hearing,

18   concerning questions of law or procedure that require

19   consideration by the Court alone.  On some occasions you may be

20   excused from the courtroom.  On other occasions, we may have a

21   sidebar, like you've seen us do already, during the jury

22   selection.  We will try to limit those interruptions as much as

23   we can.

24         Because transcripts will not be available, you will

25   be permitted to take notes during the trial if you wish to do

1    so, and we'll provide you with notebooks, and pens or pencils,

2    if you wish.  On the other hand, you are not required to take

3    notes if you do not wish to do so.  That will be left up to

4    each of you individually.

5           If you do decide to take notes, I suggest that you be

6    careful not to get so involved in the note taking process that

7    you become distracted from the ongoing proceedings.  Again, I

8    suggest that you not try to summarize all the testimony, but

9    instead limit your note taking to specific items of information

10   that might be difficult to remember later.  Remember that you

11   must decide the credibility, or the believability, of each

12   witness, and you must therefore observe the demeanor and

13   appearance of each witness while testifying.  Note taking must

14   not distract from you that task.

15          Also, your notes should be used only as aids to your

16   memory, and whether you take notes or not, you should rely upon

17   your own independent recollection or memory of what the

18   testimony was, and should not be unduly influenced by the notes

19   of other jurors.  Notes are not entitled to any greater weight

20   than the recollection or impression of each juror as to what

21   the testimony was.

22          We will begin by affording the lawyers for each side

23   an opportunity to make opening statements to you in which they

24   may explain the issues in the case and summarize the facts they

25   expect the evidence will show.  After all of the testimony and

1    the evidence has been presented, the lawyers will then be given

2    another opportunity to address you, at the end of the trial,

3    and make their summations, or their final arguments in the

4    case.

5         The statements that the lawyers make now, as well as

6    the arguments they present at the end of the trial, are not to

7    be considered by you either as the evidence of the case, which

8    will come only from the witnesses and the exhibits, or as your

9    instructions on the law, which will come only from me.

10   Nevertheless, these arguments and statements are intended to

11   help you understand the issues and the evidence as it comes in,

12   as well as the position taken by both sides.  So I ask that you

13   now give the lawyers your close attention as I recognize them

14   for the purpose of making opening statements.

15        Who is making opening?  All right.  Ms. Kessler.

16        And before we do that, do any of the jurors want to

17   take notes for opening?  You want pens and pads?

18        Can we see what we've got back there?

19        (The Courtroom Deputy provided pens and notebooks to

20        the jurors.)

21        THE COURT:  All right.  You may proceed.

22             -- -- -- -- -- -- -- --

23   (Thereupon, at 2:47 o'clock p.m., jury selection for

24        the above-entitled matter was concluded.)

25             -- -- -- -- -- -- -- --

1                              CERTIFICATE

2          I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

3     ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC RECORD IN

4     THE ABOVE-ENTITLED MATTER.

5

6          Dated this 10th day of October, 2013.

7

8                              /s/ Jeffrey G. Thomas
                              JEFFREY G. THOMAS, RPR
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25