UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

---

THE UNITED STATES OF AMERICA,

              Plaintiff,

                                        Fort Myers, Florida

vs.                                    October 23, 2013

PATRICIA LYNN HOUGH,              9:00 AM

              Defendant.

---

TRANSCRIPT OF JURY TRIAL, DAY ELEVEN

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                         Tax Division
                  P.O. Box 813
                  Washington, DC  20044
                  BY:  CARYN FINLEY, ESQ.

                  U.S. Department of Justice
                         Tax Division
                  Suite 7334
                  601 D Street NW
                  Washington, DC
                  BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

A P P E A R A N C E S
(Continued From Previous Page)


FOR THE DEFENDANT:        Bingham McCutchen, LLP
                         The Water Garden
                         1601 Cloverfield Boulevard
                         Suite 2050 North
                         Santa Monica, CA  90404-4082
                         (310) 904-1000
                         BY:  NATHAN J. HOCHMAN, ESQ.

                         Bruce L. Udolf, PA
                         500 East Broward Boulevard
                         Suite 1400
                         Fort Lauderdale, FL  33394
                         (954) 858-8831
                         BY:  BRUCE L. UDOLF, ESQ.

REPORTED BY:             JEFFREY G. THOMAS, RPR-CP, CRR
                         Official Federal Court Reporter
                         United States Courthouse
                         2110 First Street, Suite 2-194
                         Fort Myers, FL  33901
                         (239) 461-2033


                              *  *  *

I N D E X

| October 23, 2013 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 11 | 4 |
| Jury Instruction Re Closing Arguments | 11 | 7 |
| Closing Argument by Ms. Finley | 11 | 8 |
| Mr. Hochman | 11 | 45 |
| Final Argument by Ms. Finley | 11 | 118 |
| Jury Charge | 11 | 143 |
| Alternate Jurors Released | 11 | 164 |
| Court Recessed for the Day | 11 | 169 |

* * *

1 THEREUPON, the above-entitled case having been called to

2 order, the following proceedings were held herein, to-wit:

3         - - -

4    THE COURT:  Be seated, please.

5    Good morning, everyone.

6    MR. HOCHMAN:  Good morning, Your Honor.

7    MS. FINLEY:  Good morning, Your Honor.

8    THE COURT:  All right.  A few moments ago, you should

9 have received the Court's revisions to the jury instructions

10 and the verdict form.  I received from, I presume, the

11 government, the redacted indictment, which frankly I haven't

12 looked at yet.  But I assume, before it goes to the jury at the

13 end of closing arguments, both sides can take a look at it and

14 make sure it conforms to what we said yesterday.

15    Have any of you had a chance to review the

16 instructions and verdict form?

17    MR. UDOLF:  Yes, sir.  We have no problem with the

18 instructions as revised.  With the verdict form, as to Count 1,

19 Judge, it seems to me confusing.

20    It says, one, "We, the jury, unanimously find that an

21 overt act in furtherance of the conspiracy was committed after

22 May 15, 2007," and then in brackets it says, "If you answered

23 yes to Question 1, please answer Question 2.  If you answered

24 no to Question 1, skip Question 2."

25    It doesn't say that you have to find her not guilty.

1    So we think it should be, or should read:  If you answered no

2    to that Question 1, you must find the defendant not guilty of

3    this count, and then you should proceed on to Count 6.

4              THE COURT:  Well, if they answer no to Question 1,

5    they can't find her guilty, certainly.  I mean, they could

6    indeed find her guilty . . . but not legally because of the

7    statute of limitation issue.

8              MR. HOCHMAN:  But technically, Your Honor, there is

9    actually no verdict.  They would have checked the box no, and

10   would not have actually made a finding of guilt or not guilt.

11   So I think you actually --

12             May I borrow it, please?

13             "If you answered yes to Question 1, please answer

14   Question 2.  If you answered no to Question 1, check the box

15   "not guilty," and proceed to Question Number 2" -- excuse me --

16   "and proceed to Count 6."

17             THE COURT:  All right.

18             What says the government?

19             MS. FINLEY:  That's fine, Your Honor.

20             THE COURT:  All right.  Let me see if I can get you

21   to say that again:  If you answer no to Question 1 --

22             MR. HOCHMAN:  -- then check the below box for not

23   guilty.  And then you'll have to have a line . . . .

24             THE COURT:  You want me to have an arrow like one of

25   the government's charts?  Then check the --

1          MR. HOCHMAN:  Or indicate no, or indicate not guilty,

2     by a check on the . . . .

3          MR. SAUNDERS:  Just check "not guilty."

4          MR. HOCHMAN:  Yes, just check "not guilty," and have

5     a line that says, in all caps, "not guilty," and then skip to

6     Question -- excuse me -- then proceed to Count 6 -- and skip

7     Question 2 and proceed to Count 6.

8          MS. FINLEY:  Don't say, "Skip Question 2," they have

9     to answer Question 2, "no."  Just say, "Check not guilty" --

10         MR. HOCHMAN:  Yes, "Check not guilty in response to

11    Question 2," is probably the best way to say it.

12         And I think what will be important, Your Honor, is

13    when you discuss the verdict with them, you sort of let them

14    know what they have to do, or else we'll probably get a jury

15    note along those lines.

16         THE COURT:  All right.  Here is what I've changed it

17    to:  "If you answered no to Question 1, then check 'not

18    guilty,' in response to Question 2, and proceed to Count 6."

19         MR. HOCHMAN:  Yes, Your Honor.

20         THE COURT:  Does that satisfy everyone?

21         MS. FINLEY:  That's fine, Your Honor.

22         MR. HOCHMAN:  Yes.

23         THE COURT:  Okay.

24         All right.  Anything else?

25         MR. UDOLF:  No, sir.

1           THE COURT:  From the government; any errors detected?

2           MS. FINLEY:  No, Your Honor.

3           THE COURT:  All right.  I'll get the verdict form

4    changed, then, before we get to that point.

5           All right.  Both sides ready?

6           MR. HOCHMAN:  Yes, Your Honor.

7           MS. FINLEY:  Yes, Your Honor.

8           THE COURT:  Have the jury step in, please.

9           MS. FINLEY:  Your Honor, the government has some

10   demonstratives.  I have a copy for the Court.

11          THE COURT:  Have you shown them to counsel?

12          MS. FINLEY:  We've provided them a copy.

13          MR. HOCHMAN:  Yes, I have seen those.  And I have

14   shown the government the demonstrative I intend to use, Your

15   Honor.

16          THE COURT:  All right.

17          (At 9:07 AM, the jury was escorted into the

18      courtroom.)

19          THE COURT:  Good morning, ladies and gentlemen.

20          At this stage of the case, the attorneys will be

21   making their final arguments to you.  Counsel for the

22   government will have the opening argument.  Counsel for the

23   defendant will then have the opportunity for argument.  Then,

24   in conclusion, counsel for the government will have the

25   opportunity to reply, in rebuttal, to the arguments of counsel

1    for the defendant.  This is proper under our rules because the

2    government has the burden of proving the beyond a reasonable

3    doubt.

4           Counsel, in making these arguments to you, will be

5    commenting upon the testimony that you have heard, and the

6    evidence that has been presented.  They, as you, will be

7    recalling the testimony and the evidence in the case.  They

8    will not intentionally try to mislead you.  However, if their

9    recollection of the testimony or the evidence differs from your

10   own recollection, you must follow your own recollection.

11          These final arguments by counsel are not to be

12   construed by you as evidence, or as the instructions on the

13   law; nevertheless, the arguments are intended to help you

14   understand the contentions of each side, and you should give

15   the attorneys your close attention.

16          Ms. Finley?

17          MS. FINLEY:  Thank you, Your Honor.

18          May it please the Court, counsel, ladies and

19   gentlemen of the jury.  When Ms. Kessler stood before you two

20   weeks ago, she told you that this was a case about fraud on the

21   United States Treasury and the Internal Revenue Service.  She

22   told you that this was a case about millions of dollars in

23   unreported income, and unpaid taxes.

24          Ms. Kessler told you that the defendant and her

25   co-conspirator, Dr. Fredrick, took well-timed steps to carry

1    out their conspiracy to defraud, and they did that by using

2    offshore bank accounts, nominee entities, and by filing false

3    tax returns with the United States.

4            And she told you that the evidence would show that

5    the defendant, Dr. Patricia Hough, and her husband, Dr. David

6    Fredrick, founded, owned, and controlled the Saba School of

7    Medicine Foundation, and the Medical University of the

8    Americas, two very successful, profitable, and well-respected

9    medical schools.

10           The government submits to you that the evidence

11   presented over the last few weeks of trial overwhelmingly

12   establishes the guilt of defendant Patricia Hough on all

13   charges of the indictment.

14           Before we get into discussing the evidence, I wanted

15   to talk with you about what the government has to prove.  The

16   Court is going to instruct you on what the law is, but I'd

17   first like to go through the elements of the charges so that,

18   as you review the evidence, you have some contacts for how the

19   evidence that we've presented establishes Count 1 of the

20   indictment, conspiracy to defraud the Internal Revenue Service.

21           The government has to prove, beyond a reasonable

22   doubt, that two or more people, in some way, agreed to

23   accomplish -- to try to accomplish and shared plan, an unlawful

24   plan; the defendant knew that the -- unlawful purpose of the

25   plan and willfully joined it; that, during the conspiracy, one

1   of the conspirators knowingly engaged in at least one overt act

2   described in the indictment; and that the overt act was

3   committed at or about the time alleged in the indictment, and

4   with the purpose of carrying out or accomplishing some object

5   of the conspiracy.

6          The conspiracy, ladies and gentlemen, is a lot like a

7   business.  And it's really not all that different from how

8   David Fredrick and Patricia Hough ran the schools.  There are

9   some employees that have more responsibility than others.

10  There are some who know everything that is going on in the

11  company, and there are some who only know their important

12  duties.

13         However, each employee, from the janitor, to the

14  secretaries, all the way up to the vice-presidents and the

15  CEOs, they are all working toward the common goal, the success

16  of the business.  Each employee plays an important role in

17  contributing to the success of the business.

18         Many times in a business, the janitor or the

19  mail-room guy or the vice-presidents, they are not the public

20  face of the business.  You don't always see the important work

21  that they do to contribute to its success.  It's unspoken.  But

22  you see the result of their critical work, and of their

23  actions, in the final product.

24         Remember, while this is an analogy, when looking at

25  the evidence of the conspiracy here, it also applies literally

1   to both David Fredrick and Patricia Hough's roles that they

2   played in the success of the medical school and in the success

3   of the conspiracy.

4          Some conspirators have bigger roles than others.

5   Some know all aspects of the conspiracy and how it's carried

6   out.  What the defendant and Dr. Fredrick know is that the goal

7   of their enterprise is to defraud the IRS.

8          Now, who are the employees?

9          You have Dr. Fredrick, the CEO, the jack of all

10  trades, as some of the witnesses testified.

11         You have Patricia Hough.  She is the chief operations

12  officer.  Without her, nobody would want to go to Saba School

13  of Medicine or the Medical University of the Americas, because

14  without an accreditation, a medical-school degree is not even

15  worth the paper that the diploma is printed on.  She was

16  critical and essential.  The schools would never have earned

17  money, and have never been sold, without her necessary and

18  essential contributions.

19         Now, who do they use to carry out their conspiracy?

20         Beda Singenberger.  He's the financial adviser who

21  serves as a nominee in assisting Patricia Hough and David

22  Fredrick in creating the nominee entities and signing numerous

23  documents which conceal their ownership and assets and income;

24  and Dieter Luetolf, the banker, without whom no money can be

25  transferred, and, again, without whom Patricia Hough and David

 1   Fredrick could not have concealed their income and assets from

 2   the IRS in their secret Swiss bank accounts.

 3          The next thing that the government has to prove is an

 4   overt act.  An overt act is any transaction or event, even one

 5   that is entirely innocent when viewed alone, that a conspirator

 6   commits to accomplish the objective of the conspiracy.

 7          In this case, ladies and gentlemen, choose one bank

 8   account that Patricia Hough and David Fredrick opened or caused

 9   to be opened, choose one false tax return that Patricia Hough

10   and David Fredrick filed with the IRS, they all fail to include

11   their interest income; their investment income; the profits

12   from the schools; and, in 2007, the sale of the schools.  And

13   they also failed to check the box indicating that they had an

14   interest in, or signature authority over, a foreign account.

15          Choose the creation of one nominee entity:  New

16   Vanguard, Top Fast, Ample Dynamic, Apex Consultants, Medical

17   Technology Associates, Round Hill Project Holding Company;

18   choose an e-mail or a letter sent by Patricia Hough or David

19   Fredrick to Mr. Luetolf or Mr. Singenberger, providing

20   instructions on where to move money, where to have a -- to

21   schedule a meeting, or how to open and close the bank accounts;

22   choose a wire transfer between and among the various accounts

23   or back into the United States; choose a gift that Dr. Fredrick

24   gave to one of his siblings, the house purchased in Asheville,

25   the house purchased in Greenville in the nominee name, the

1    transfer of the Round Hill property from Laura Whitley to the

2    Round Hill Project Holding Company, and then to New Vanguard.

3    There are an abundance of overt acts, ladies and gentlemen, in

4    this case.  Keep this in mind when you review the evidence.

5    Almost every wire transfer, phone call, conversation, e-mail,

6    filing of a tax return, is an overt act.

7            While the indictment is not evidence, you will have

8    the indictment back in the jury room, and the indictment lists

9    out the overt acts.  Remember, an overt act need not be an

10   illegal act, as long as it's used to carry out the conspiracy.

11           You must all unanimously agree, however, that there

12   is at least one overt act performed by one conspirator after

13   May 15th, 2007.

14           The indictment always alleges that the defendant

15   willfully made or signed and filed with the IRS false tax

16   returns for 2005, 2006, 2007, and 2008, and that she did not

17   believe that those tax returns were true and correct as to

18   every material matter; specifically, that the tax returns were

19   false because the defendant reported a certain dollar amount on

20   Line 22, when she then knew and well believed that the total

21   income was substantially greater, and that she failed, on

22   Schedule B, Part 1 and 3, Lines 7A and 7B, to report that she

23   had financial interest or signature authority over a foreign

24   bank account.

25           Again, the Court is going to instruct you on what the

1    government must prove.  What the government must prove is that

2    the defendant made and subscribed, or caused to be made and

3    subscribed, an individual income tax return.  You have four to

4    choose from:  2005, 2006, 2007, and 2008, the returns that she

5    caused Mr. Murtha to prepare, and which she signed.

6          The tax return has to be signed under penalties of

7    perjury.  Each of the tax returns have that jurat and

8    declaration.

9          When the defendant made the tax return, she knew it

10   contained false information.  The returns that they said are

11   false in two ways:  One, they failed to report the substantial

12   income that went into Line 22, including the investment income,

13   the interest income, the profits from the school, and, in 2007,

14   the sale of the schools; and as -- they are also false because

15   of the Schedule B.

16         When she filed a tax return, she had to do so

17   intending that -- excuse me.  When she filed the tax return,

18   she intended to do something that she knew violated the law.

19   And we are going to be talking about intent in a little while.

20         And lastly, the tax return has to be false as to a

21   material matter.  Failing to report your foreign accounts to

22   the IRS and substantially underreporting your total income is

23   material.  The government does not have to show that any taxes

24   were not paid because of the false return, or that any

25   additional taxes are due.

1          Furthermore, the indictment alleges that the tax

2     returns were false in two material respects; the Line 22 and

3     the Schedule B.  The government doesn't have to prove both

4     items -- however, we submit that we have -- but you all must

5     unanimously agree on which way the returns are false.  And the

6     Court is going to explain the verdict form.

7          I would note, however, that as revenue agent Maurer

8     testified, her number, more than $6 million in tax, between

9     Dr. Hough and Dr. Fredrick, was a conservative number, because

10    she did not include the profits from the schools; and because

11    she ultimately treated the MUA portion of the sale as a wash

12    because she did not have basis; and, in 2005 through 2008, her

13    computation did not include the interest income and investment

14    income in the MUA and Saba bank accounts.

15         Timing is everything.  As Ms. Kessler asked you at

16    the beginning of the trial, to pay careful attention to the

17    timing of events, when you are deliberating, and as we review

18    the evidence, think about the timing of events.  Ask yourself

19    what the defendant and the co-conspirator said or wrote at the

20    time that the events are actually taking place; who they think

21    is watching, or listening to their answers; who they are

22    responding to when they provide information; what is the

23    information going to be used for, is it something that the IRS

24    might want to know?

25         The government submits that not only is timing

1    everything in this case, but that the defendant's words speak

2    louder than her actions.

3           The defendant and Dr. Fredrick started Saba in the

4    late 1980s, investing every nickel and dime into the schools,

5    telling Laura Whitley and Paul Dalbec, and other witnesses that

6    testified, that if it wasn't a success they would be done

7    financially.  The school, through their hard work and

8    determination, becomes accredited and begins accepting

9    students.

10          Dr. Hough sets out in her role as the dean of

11   clinical medicine, traveling to obtain the necessary

12   accreditations and rotation placements at the hospitals.

13          Now, the flow chart here, if you take a look at it,

14   on October 17th, 2001, Patricia Hough and David Fredrick opened

15   their first bank account at UBS, a joint bank account in their

16   individual names.  They identify themselves as the beneficial

17   owners, and they had signature authority over the account.

18   You'll find the account-opening documents for that account at

19   Exhibit 3GG.

20          During this time, they also have at least one bank

21   account in the Bahamas, at SG Hambros Bank.  In opening the

22   account at UBS, this is one of the first places that the

23   defendant speaks to you and tells you that she owns the medical

24   schools.  Look at Exhibit 3HH on Page 35.

25          Mr. Futterknecht testified about the client work

1    benches.  He said that the client adviser, in this case Dieter

2    Luetolf, was one of just a handful of people that would have

3    had access to the client work benches, and that it was an

4    internal UBS system that was a compliance requirement, as well

5    as a Swiss regulatory requirement, that the bank know your

6    customer, or KYC, for anti-money laundering purposes.

7            He testified that the client adviser would receive

8    the information contained in the client work bench from the

9    adviser's own research and from the client.

10           In this case, the account activities section of the

11   client work benches states, "Consultants own and operate

12   medical schools."  The client adviser received this information

13   from Dr. Hough, when she went to visit Mr. Luetolf after

14   September 11th, 2001.  And we will see this same information

15   throughout many of the UBS accounts.

16           In July and August of 2003, the defendant and

17   Dr. Fredrick opened two more bank accounts at UBS, in the name

18   of Apex Consultants and Medical Technology Associates.  The

19   Apex Consultants account documents are located at 3N, 3O, 3P,

20   and 3Q.  And the Medical Technology, the MTA account is located

21   at 3J, 3K, 3L, and 3M.  They sign as the beneficial owner and

22   have signature authority on the account, and waive their right

23   to invest in U.S. securities.

24           And if you remember, MTA was the entity that Laura

25   Whitley was the clinical director for; and yet she, as she

1   testified, had no knowledge that she was a clinical director,

2   or even what MTA was.

3          Dr. Hough testified that she had no idea why Laura

4   Whitley would have been listed as the clinical director for

5   MUA, and Laura Whitley was pregnant in the summer of 2004, and

6   had absolutely no skill set that would be applicable to her

7   being called a clinical director.

8          This is evidence, ladies and gentlemen, that this

9   entity is nothing but a nominee to conceal the defendant and

10  her husband's income and assets from the IRS.

11         In December of 2003, Patricia Hough and David

12  Fredrick first become concerned that their accounts may be

13  exposed to the IRS.  Looking at Exhibit 3P, Page 5,

14  Dr. Fredrick e-mails Mr. Luetolf and says:  "Please let us know

15  if you receive a copy of the letter attached."

16         He goes on to say:  "After speaking with people, we

17  concluded that leaving our funds in Nassau makes us too

18  vulnerable."

19         On Page 6 of Exhibit 3P, that contains a letter from

20  the defendant and her husband, reiterating their concerns that,

21  because of changes in U.S. and Bahamas banking policy that take

22  effect January, 2004, "It puts us at a disadvantage."

23         On December 12th, 2003, David Fredrick e-mailed

24  Mr. Luetolf, at Exhibit 3HH, Page 2, and inquires, "about the

25  status of Switzerland with respect to U.S. account holders";

1    what can we do to protect ourselves from open disclosure?

2            Note, ladies and gentlemen, these documents are not

3    concerned with open disclosure for asset protection.  The

4    defendant and her husband are worried about open disclosure to

5    the IRS.  Banks don't stop taking U.S. clients because of

6    asset-protection changes.  The banks stop taking U.S. clients

7    because of new IRS reporting requirements.

8            MR. HOCHMAN:  Objection, Your Honor.  Not based on

9    any evidence in this case.

10           THE COURT:  The objection is overruled.  The jury

11   will recall the evidence.

12           MS. FINLEY:  Once they close the accounts in the

13   Bahamas, the $8 million from SG Hambros Bank goes into their

14   joint account.  On Page 35 and 36 of Government's Exhibit 3HH,

15   in November of 2002, UBS reiterates that Dr. Hough and

16   Dr. Fredrick own medical schools, and detail that the funds

17   were moved into the account from UBS Bahamas because UBS

18   Bahamas no longer takes U.S. clients, in view of the exchange

19   of information with the U.S.

20           I would also note, if the money in the accounts are

21   truly the funds of a legitimate offshore foundation, and it's

22   not really Dr. Hough and Dr. Fredrick's money, and they're not

23   hiding behind the paper, Dr. Fredrick and Dr. Hough would have

24   absolutely no concern about the impact that the change in the

25   U.S. and Bahamas banking policy would have because The

1    Foundation is a non U.S. entity.

2              What else is going on in 2002 and 2003?

3              The defendant and Dr. Hough were trying to sell the

4    schools.  Take a look at Exhibit 6B.  On February 18th, 2002,

5    Dr. Fredrick writes to the prospective buyers and says:  "At

6    the present time, I am the sole owner of the Saba School of

7    Medicine and have controlling shares in the Medical University

8    of the Americas."

9              On March 1st, 2003, Dr. Fredrick previews for you

10   Dr. Hough and Dr. Fredrick's intentions.  Take a look at

11   Exhibit 6C.  He says his intentions, he'd like to keep a

12   majority of the funds offshore if that's what the prospective

13   buyer is interested in.

14             On July 7th, 2003, the defendant and Dr. Fredrick

15   execute a letter of intent, at Exhibit 6D, stating that they

16   intend to sell their controlling interests in Saba and MUA

17   Nevis and MUA Belize.

18             They know, ladies and gentlemen, what a controlling

19   interest means because, in 2005, when Dr. Fredrick sells his

20   50-percent share in MUA Belize, he reports it on his tax

21   return.  He does so because the shares are in his name

22   individually, and he hasn't figured out yet how to conceal that

23   by using the nominee entities.  As we'll discuss later,

24   Dr. Hough and Dr. Fredrick figure out how to do that.

25             In Exhibit 6F, on June 25th, 2003, Dr. Hough and

1    Dr. Fredrick, collectively the sellers, sign an agreement

2    stating that they own or control EIC, Saba School of Medicine

3    Foundation, MUA Nevis, and MUA Belize.  Their grouping of these

4    entities together again illustrates to you that they know that

5    they own all of it.  They don't separate them out.  And this is

6    the third set of documents in this one transaction that

7    unequivocally tell you that they own The Foundation.

8         There's another interesting exchange during this

9    sale.  If you take a look at Exhibit 6I, on July 8th, 2003, the

10   defendant e-mails the prospective buyers, copy her husband, and

11   she tells the buyers that they need to talk soon about the next

12   steps in the process of the sale.  She details stock-issuance

13   concerns, and she provides the buyers with advice that she

14   thinks they would need to form an LLC and other entities.

15        She also says that Dave does not have the patience

16   for this type of work, and that she will be the designate, and

17   they're moving forward on their end.

18        This is not an e-mail of a woman who does not

19   understand finances or transactions, but an e-mail of someone

20   who fully comprehends what is about to happen.

21        Ultimately, the sale does not go through, but

22   Dr. Fredrick receives a letter from Mr. DeCastro and Jones

23   Walker that they had written for the potential buyers.

24        On December 13th, 2003, Mister -- Dr. Fredrick

25   forwards that opinion letter to Mr. Schneider, saying:

1    "Attached is a very confidential legal review of a recommended

2    legal tax structure for our medical schools by a potential

3    buyer.  I assume this information might help us somewhere down

4    the road should we need to consider a new operating structure."

5              What does the opinion letter say?

6              Well, it says that the investors are planning to buy

7    a 75 percent equity interest in a venture consisting of four

8    companies.  This venture is currently owned by Dr. David

9    Fredrick and Dr. Pat Hough.  The letter goes on to describe

10   EIC, Saba School of Medicine Foundation, MUA Belize, and MUA

11   Nevis.

12             Dr. Fredrick's cover letter to Mr. Schneider doesn't

13   say:  Jerry, they've got this whole opinion letter all wrong

14   here, but this might be helpful for The Foundation.

15             He says:  This might be helpful for our medical

16   schools.

17             In 2004, Dr. Hough and Dr. Fredrick, they decide to

18   divide the funds from their joint account into two separate

19   accounts in their individual names; one for Dr. Fredrick, and

20   one for Dr. Hough.

21             Take a look at Exhibit 3HH, Page 20.  Dr. Fredrick,

22   in a February 6th, 2004, e-mail to Mr. Luetolf, with a copy to

23   Dr. Hough, lays out their intentions.

24             Dr. Hough receives this e-mail and confirms, on

25   March 18th, 2004, that she discussed the arrangement as in full

1    agreement.  She requests the new paperwork and asks Mr. Luetolf

2    how best to split the accounts.  That's in Exhibit 3HH,

3    Page 27.

4            On March 23rd, 2004, both the defendant and

5    Dr. Fredrick confirm in writing that they want their joint

6    account closed and the funds split equally between Dr. Fredrick

7    and Dr. Hough's new individual accounts.  That's at

8    Exhibit 3HH, Page 30 and 31.

9            And that's exactly what happens.  Look at 3JJ, 3KK,

10   and 3LL, that's Dr. Fredrick's account, and 3R, 3S, and 3T,

11   those are Dr. Hough's account.

12           With respect to Dr. Fredrick, he signs all of the

13   opening documents himself, he identifies himself as the

14   beneficial owner, and he waives his right to invest in U.S.

15   securities.  He even jokes -- at Exhibit 3KK, Page 18, on

16   April 20th, 2005, in an e-mail to Mr. Luetolf, requesting that

17   he send a $40,000 check to his sister, Susan McBride -- that,

18   quote, thank God he's running out of relatives that need help.

19           Dr. Hough's account is particularly important.

20   Review the account-opening documents.  Dr. Fredrick doesn't

21   sign any of her account-opening documents, only she does.

22           On April 7, 2004, she identifies herself as the

23   beneficial owner, at Page 1 of 3X -- excuse me -- 3R.  And she

24   tells you that she is the beneficial owner for purposes of U.S.

25   tax law.  That's at Page 7.

1          She also tells you that she is -- she understands

2    that she is aware of the new U.S. tax regulation when she

3    expressly acknowledges that her account will be frozen for all

4    U.S. securities.  That's on Page 10.

5          There is no mistaking that Dr. Hough knows what she's

6    filling out.  She's not -- Dr. Fredrick is not putting blank

7    pages in front of her, because he doesn't sign this one.  Even

8    the power of attorney is her sister, Charlene Varga.  That's on

9    Page 13 and 14.  This account shows that she knows how to fill

10   out these forms properly and understands exactly what they

11   mean.

12         On Page 23 of Exhibit 3S, the client work bench again

13   says:  "Client and her husband are consultants and own and

14   operate medical schools."

15         Now, on September 1st, 2004, the defendant and

16   Dr. Fredrick open an account at UBS in the name of Saba School

17   of Medicine Foundation, and they identify themselves as the

18   beneficial owner.  They have signature authority.  That's in

19   Exhibit 3X, 3U, 3V, 3W . . . and 3W.  They waive the right to

20   invest in U.S. securities.

21         Again, why would a legitimate foreign foundation have

22   to waive its right to invest in U.S. securities, unless you're

23   concerned that doing so would reveal your ownership of a

24   foundation to U.S. taxation authorities?

25         Again, UBS, based on information known to

1    Mr. Luetolf, states that the defendant and her husband own and

2    operate medical schools, and are in the process of selling them

3    and plan to retire.  That's in Exhibit 3W, Page 177.

4           Now, at this point, it's the end of 2004.  Mr. Murtha

5    has been preparing their tax returns for at least three years,

6    and he's already asked them:  Do you have a foreign account?

7           And they denied having one.  Dr. Hough testified that

8    she couldn't remember that Mr. Murtha asked this question.

9           But I ask you to think about Mr. Murtha's testimony.

10   He was sure that he asked Dr. Hough and Dr. Fredrick that

11   question for two reasons:  One, it was his normal practice to

12   ask all new clients, and Dr. Hough and Dr. Fredrick, while not

13   new to the firm or new to him, this question; and, two, he said

14   he would have never checked that box no, on the tax return, if

15   he had asked the question and they had told him, no.

16          Mr. Murtha also testified that he expects clients to

17   tell him if there is a change in circumstances.  The defendant

18   and Dr. Fredrick never went back, in 2003, or 2004, 2005, and

19   said to him:  Hey, you know, when you asked me if I had a

20   foreign account, well, I've actually opened at least four new

21   bank accounts at UBS since the first time you asked me that

22   question.

23          She doesn't tell him the same story that she told

24   you:  You know, it's not my account, it's not my money, but I'm

25   the caretaker, and I have signature authority in case my

1    husband dies and I have to somehow become the executor, or then

2    I become really the caretaker.

3            She doesn't tell him anything, ladies and gentlemen.

4    She doesn't tell him because they're concealing it from the

5    IRS.

6            In the spring of 2004, David Minchenberg is hired at

7    EIC, the management company for both Saba and MUA.  He's paid

8    $55,000 a year, and his primary responsibilities are to oversee

9    the books and records, and to be the liaison for the audits.

10           During the course of the audit, questions are raised

11   about Form 5471 and restructuring.  Mr. Minchenberg is tasked

12   with investigating potential restructuring options.  And he

13   sends out what he called an RFB, or request for proposal.  You

14   can find that at Exhibit 7D and 7E.

15           Mr. Minchenberg is looking for advice for, among

16   other things, the ultimate exit strategy of the owners.

17           And who are those owners, ladies and gentlemen?

18           Well, in 7E, he tells you, it's Dr. Hough and

19   Dr. Fredrick.

20           Jerry Schneider's firm completed the audits for Saba

21   and MUA for 2004 and 2005, and that's in Exhibit 7EE, 8C, 8Q,

22   and 8AA.  And Jeffrey Gallant completed audits for Saba and MUA

23   for 2006, in 9B and 9N.

24           With respect to either school, Mr. Minchenberg, the

25   CFO and comptroller, has no idea that The Foundation or MUA has

1    an offshore bank account at UBS, until it's raised during the

2    audit, when Dr. Fredrick tells the auditor that, in order to

3    complete the bank confirms, he had to send out the letter.

4    Even then, the only bank account that Dr. Fredrick tells

5    Mr. Minchenberg or the auditors about is the one in the name of

6    The Foundation.

7            If New Vanguard and Top Fast and Apex and MTA were

8    all part of The Foundation, wouldn't you want all of The

9    Foundation's assets to be listed on their financials?

10           I would note, the financials don't say, "Saba School

11   of Medicine," they say, "Saba School of Medicine Foundation."

12           The reason that none of these other accounts are

13   included on any audit or financial is because they're Dr. Hough

14   and Dr. Fredrick's bank accounts.  It's their money.  It's

15   their income.

16           In fact, in June of 2005, the defendant and her

17   husband caused Beda Singenberger to open an undeclared account

18   at UBS in the name of New Vanguard, Exhibit 3D, 3E, and . . . .

19   Excuse me, 3C, 3D, 3E, and 3F.

20           Dr. Hough and Dr. Fredrick caused Beda Singenberger

21   to identify the defendant and her husband as the beneficial

22   owner.  You can see, all of the money from their individual

23   accounts flows into New Vanguard.

24           And revenue agent Maurer testified that she followed

25   the flow of those funds from their individual account into New

1    Vanguard.  And Dr. Fredrick and Dr. Hough instructed

2    Mr. Luetolf to do just that, at Exhibit 3S, Page 9.

3              In September, 2005, the defendant and her husband

4    opened an undeclared account in the name of MUA.  Again,

5    Dr. Fredrick identifies he and his wife as the beneficial

6    owner, and they both have signature authority.  And that's at

7    Exhibit 3Y, 3Z, 3AA, and 3BB.

8              In December of 2005, the defendant and Dr. Hough

9    caused Mr. Singenberger to open another undeclared account at

10   UBS, in the name of Top Fast, again executing Form As,

11   identifying themselves as the beneficial owner of the assets.

12   That's at Exhibit 3X -- excuse me -- 3CC, 3DD, 3EE, and 3FF.

13             Remember what Mr. Futterknecht said:  Financial

14   intermediaries like Beda Singenberger have not just a

15   contractual relationship with UBS to conduct the due diligence

16   and do the AML, the anti-money laundering compliance checks,

17   and provide accurate information to UBS for the ultimate

18   beneficial owner of the assets, but it's also Swiss law.

19             And Mr. Futterknecht told you that the ultimate

20   beneficial owner is the person that's going to scream the

21   loudest when all the money is gone.

22             By March, 2006, Mr. Minchenberg has left, and none of

23   his suggestions are implemented.  However, the defendant and

24   Dr. Hough are on notice that there are forms that need to be

25   filed with the IRS, disclosing their ownership interests in

1   foreign countries; that there are tax issues that need to be

2   addressed; and that Mr. Minchenberg recommended that they

3   contemplate reorganizing in anticipation of their ultimate exit

4   strategy.  You can see those e-mails at 7U, 7R, and 7S.

5           In fact, Mr. Minchenberg told Dr. Fredrick that he

6   was committing tax fraud.  Take a look at Exhibit 7K.  He also

7   explained to him, and Mr. Minchenberg explained to you when he

8   testified, what "substance over form" is.

9           He tells Dr. Fredrick that the IRS will collapse all

10  of the entities onto his tax return, and he will be taxed on

11  all of the profits from the schools.

12          What did Dr. Hough and Dr. Fredrick do in response to

13  Mr. Minchenberg's advice and warnings?

14          Do they talk to their personal return preparer,

15  Mr. Murtha; do they talk to Mr. Gallant during the 2006 audit?

16          No.  They continue to conceal their ownership of the

17  schools, their foreign bank accounts, and the income that

18  they're earning in it from the IRS.

19          What else do they do?

20          Well, they actually open some more bank accounts.

21  They start opening bank accounts at Fortis Banque, and

22  Liechtenstein Landesbank, in order to further conceal their

23  ownership of the schools and their unreported income.

24          Between February, 2006, and November, 2006, they

25  cause to be opened seven more bank accounts in the name of the

1    schools and New Vanguard and Top Fast.  Look at the four

2    series.

3              The culmination of more than 20 years of hard work,

4    dedication, blood, sweat, and tears occurs in September of

5    2006, when they finally find a buyer for their schools and

6    close the deal.

7              Steven Rodger meets with Dr. Fredrick in Sturbridge,

8    Massachusetts, and they meet at a restaurant and entered into

9    what he called a napkin agreement for his company to buy the

10   schools.

11             Now, you remember, Mr. Hochman said to Mr. Rodger on

12   cross-examination:  You know, you don't really mean "your

13   company" when you keep using that word, because you don't

14   really own the company and that was just a bad choice of words.

15             However, Mr. Rodger replied:  No, I mean it's my

16   company because I'm the sole shareholder.

17             Think about this when you review the records, and

18   think about how the defendant and Dr. Fredrick describe things

19   at the time that they're doing it.  It's "our company", "our

20   house."

21             Think about how Dr. Hough testified and how she

22   described the schools.  Think about the times when she

23   testified and she caught herself saying "I," or, "our," and

24   then corrected herself.

25             At the time that the events are taking place, they

1    never once say, "The Foundation's company," or, "The

2    Foundation's house," or, "The Foundation's money."  They don't

3    say it that way, ladies and gentlemen, because it's their

4    company, their money, their income.

5          In January, 2007, after Mr. Rodger and Dr. Fredrick

6    have their handshake agreement, they cause Mr. Singenberger to

7    open undeclared accounts, at both UBS and at Zurcher

8    Kantonalbank, ZKB, in the name of Ample Dynamic, identifying

9    the defendant and Dr. Fredrick as the beneficial owners of

10   those accounts.  Those are also in the four series.

11         This occurs just before the execution of the purchase

12   agreement between the defendant and Dr. Fredrick and Steve

13   Rodger's company, Equinox Capital, on February 14th, 2007.  The

14   purchase agreements are 10A, 10B, and 10C.

15         On April 3rd, 2007, Dr. Fredrick and Dr. Hough

16   execute the sales agreement and finally sell their life's work.

17   They're finally set to profit from the more than 20 years of

18   dedication.

19         Steve Rodger said that he primarily negotiated with

20   Dr. Fredrick, but that was Equinox Capital's choice because

21   they only wanted to have to deal with one voice.  He testified

22   that he did negotiate with Dr. Hough on occasion, specifically

23   concerning the non-compete, her consulting agreement, and the

24   guaranty.

25         You remember that Mr. Rodger testified that he would

1  never have completed the deal without that personal guaranty.

2  And it wasn't just that it was a personal guaranty, it had to

3  be Dr. Hough and Dr. Fredrick on the hook.

4       Read the guaranty, ladies and gentlemen.  They

5  sign -- one example of it is Exhibit 10A, Page 52.

6       It says, I quote:  "In consideration of the purchase

7  price to be delivered hereunder, and other good and valuable

8  consideration, all of which directly or indirectly provide

9  significant economic benefit and other benefits to Dr. Fredrick

10  and Dr. Hough, the receipt of which is hereby acknowledged,

11  Dr. Fredrick and Dr. Hough, jointly and severally,

12  unconditionally guarantee to the purchasers the full and prompt

13  payment and punctual performance by the sellers and the

14  guarantors arising under and set forth in the master

15  indemnification agreement."

16       That is a lot to be on the hook for, ladies and

17  gentlemen, if you're only the caretaker.  They don't insist

18  through their attorneys:  No, I'm not getting any of this

19  economic benefit, so I really am just a caretaker of The

20  Foundation's money, and I really shouldn't have to sign this

21  big guaranty.

22       Here again, ladies and gentlemen, the defendant and

23  her husband are telling you, through their words, their

24  omissions, and their actions:  We own it all, we guaranty it

25  all, because it's our income, our money.

1          Another important thing to think about in the sale is

2     that, sometime in 2005, after they're on notice from

3     Mr. DeCastro . . . opinion letter, and Mr. Minchenberg's

4     advice, they cause MUA to issue 20,000 shares which New

5     Vanguard allegedly purchased.

6          This pumps up their equity in the company without it

7     being in their names, because if it's in their name, they have

8     to report it.  Using New Vanguard again allows them to conceal

9     their ownership and their income from the IRS when they get the

10    big payout.

11         Now, they do something similar with Round Hill.

12         If we can just dim the lights?

13         (An exhibit was projected onto the projector screen.)

14         MS. FINLEY:  So if you remember, in February of 1999,

15    they caused 10 acres of land to be purchased at Round Hill,

16    called "The Bottom," and it's purchased in the name of Laura

17    Walls.  You'll find that in Exhibit 6L.

18         In September of 2000, they incorporate Round Hill

19    Project Holding Company, and that's at 11Y, and they are 50/50

20    owners in the shares.

21         In February of 2001, documents are signed that --

22    where Laura Whitley, or Laura Walls at the time, gives Round

23    Hill Project Holding Company the right of superficies so that

24    they can build on the property.  That's at Exhibit 7X.

25         In June of 2004, documents are signed wherein Laura

1    Walls sells the property to Round Hill Project Holding Company.

2            And then, in April of 2007, Round Hill Project

3    Holding Company . . . .  Excuse me.  In April of 2005, Round

4    Hill Project Holding Company buys the shares from Dr. Fredrick

5    and Dr. Hough, for $500,000, which is not reported anywhere on

6    their tax return.

7            And then in April of 2007, the Round Hill Project

8    Holding Company is sold -- the shares are sold to Mr. Rodger

9    for more than $33 million.

10           Now, who did Mr. Rodger say directed the breakdown of

11   the proceeds?

12           Dr. Fredrick.  He made sure that the majority of the

13   funds went into New Vanguard, because New Vanguard, if you

14   remember, was really their joint account.  All the money

15   started in the joint account, was split, and then went right

16   into New Vanguard.  That's their money.

17           Now, this pattern of splitting things, it continues.

18   When they sold the schools, Round Hill Project Holding Company

19   was entitled to $35,873,691.16.  Look at the flow of funds in

20   Exhibit 10F.  The defendant and Dr. Fredrick ensure that the

21   money is split, to the exact penny, between the Fortis Banque

22   New Vanguard account and the Liechtenstein Landesbank New

23   Vanguard account.  And they each get $17,936,845.58, just like

24   they had it when the accounts were in their individual names.

25           Well, once they sell the schools, ladies and

1    gentlemen, they're home free.  They're ready to spend.  And

2    spend they do.

3            Now, I suspect that Mr. Hochman is going to tell you

4    that Dr. Hough and Dr. Fredrick, that they don't spend their

5    money like they have $35 million.  But I submit to you, ladies

6    and gentlemen, there's no playbook about how rich people have

7    to spend their money.  They can buy houses, as they do, in

8    Asheville, in Greenville; they can buy planes, as they do here;

9    they can buy condos; they can give huge gifts to their

10   families; or they can use all of their money for charitable

11   causes.  Just because they don't drive fancy cars or go on

12   fancy vacations doesn't mean the money isn't theirs.

13           I would also submit to you that they really don't

14   have that much time to start spending the money aggressively.

15   Because they sold the schools in April of 2007, and they're

16   continuing to work for the schools into the fall of 2009.  And

17   in the fall of 2009, they find out that their names have just

18   been turned over to the Department of Justice as part of the

19   Deferred Prosecution Agreement between UBS and the Department

20   of Justice.  You'll find that agreement at Exhibit 25A.

21           How they spend the money after the schools are sold

22   is another piece of evidence that shows you it's their money,

23   their income.  Actually, Mr. Hochman nicely summarized that for

24   you in this chart.  Because this chart shows you their dominion

25   and control over the funds, and how they spent the money and

1    moved the money.  This is evidence that they know it's their

2    money.

3          Now, if we look at the events following the medical

4    school, the sale of the medical school, just ten days after

5    they sell the medical school, Dr. Fredrick gives each of the

6    siblings $250,000.

7          In July of 2007, he puts a $50,000 deposit down on a

8    plane with the Cirrus company.  You can find those at

9    Exhibit 23A through 23B.

10          And, in November, they cause $1.6 million to be

11    transferred from New Vanguard to Ample Dynamic, and then from

12    Ample Dynamic to the United States, so that they can buy an

13    airplane in the United States.

14          He then sells that airplane, in 2010, for

15    1.255 million, and the proceeds are wired back to the

16    medicine -- the school of medicine foundation at LLB.

17          Now, when he sends the money back in 2010, ladies and

18    gentlemen, they already know they are under criminal

19    investigation.  The UBS situation has completely blown up, the

20    Deferred Prosecution Agreement has been entered into.  They

21    have to send it back to The Foundation.  And, quite frankly,

22    they are sending it back to themselves, so they deposit their

23    money back into their bank account.

24          They also bought a house in Asheville, North

25    Carolina.  Now, they buy that house in June of 2005.  And

1   Dr. Fredrick e-mails Mr. Luetolf, saying that he's thinking of

2   purchasing another home in North Carolina, in the name of "our

3   companies, Apex or MTA."

4          Dr. Fredrick asks, if he has his personal funds moved

5   from his personal account to MTA or Apex, and the money is then

6   wired to the United States, will he still have to have his name

7   listed on the wire transfer sheet.  That's on Exhibit 3A, 3E,

8   Page 142.

9          Mister -- excuse me.  Dr. Fredrick then e-mails

10  Dr. Hough, Mr. Singenberger, and Mr. Luetolf, in July of 2005,

11  and says that he's unfamiliar with the procedures they need to

12  take in order to get a wire from Mr. Singenberger, so he's

13  sending the e-mail both to Sinco and to the bank.

14         He said he believes:  When we spoke with Beda

15  Singenberger, we determined that the wire for the house that we

16  are buying should come from our Hong Kong company, New

17  Vanguard.

18         And that's exactly what happens, ladies and

19  gentlemen.  Dr. Fredrick and Dr. Hough caused $1.14 million to

20  be sent from New Vanguard to a trust account in Henderson,

21  North Carolina.

22         Now, in February of 2008, you'll remember there was

23  an e-mail, Dr. Hough said that they found property, next to

24  "our" home, in Asheville, and they caused the property to be

25  purchased in the name of the Lynn Leon group, for $200,000.

1    That money also comes from New Vanguard.

2             In November of 2008, Mr. Rudow says that they come to

3    their house -- excuse me -- come to his office, and they want

4    to place the lien on the property for the purchase of the house

5    from Top Fast.  But the money actually came from New Vanguard,

6    so we have some inconsistencies with the documents and what

7    they're telling people.

8             And then, in 2010, they sell the property, allegedly,

9    to a company called Aldunatec, which is out of El Salvador, and

10   the person signing for Aldunatec is Florencio Montenegro.

11            And you'll remember that Mr. Rudow and the e-mails

12   show that the only person that he's dealing with is

13   Dr. Fredrick, that Dr. Fredrick said:  I'll take all the

14   documents; I'm going to get them signed from Mr. Montenegro;

15   let me get the wire transfer information from Mr. Montenegro.

16            Is that a normal transaction, ladies and gentlemen?

17            Then they also buy a house in Greenville, North

18   Carolina.  Laura Whitley testified that she offered to purchase

19   the house, that's at Exhibit 18A and 15C, in 2007, and she

20   attends the closing, and the settlement statement lists the

21   borrower as Ample Dynamic.  She signs for Ample Dynamic, and

22   UBS transfers $590,016.42 from this Top Fast account, then to

23   Ample Dynamic, and then into the United States.

24            In 2011, when they decide they need to sell the

25   house, they have some trouble.  Dr. Fredrick is initially

1    signing for Ample Dynamic, and then some questions arise,

2    whether he can sign, because there's no proof that . . . his

3    relationship to Ample Dynamic.

4           They get some documents initially.  That doesn't pass

5    muster, and so they cause Beda Singenberger to appoint Laura

6    Whitley, the vice-president of Ample Dynamic, so that she can

7    sign the deed.  Those documents are in Exhibit 16J.

8           And again, ladies and gentlemen, those funds then go

9    back overseas to their offshore bank account.

10          If we just total up those transactions, those

11   purchases, it's more than four and a half million dollars.  And

12   that doesn't even include the condo in Sarasota, which was

13   another $850,000.

14          Dr. Fredrick, was he entitled to four and a half

15   million dollars in deferred compensation; did you see any

16   evidence, other than the defendant's statement, that he had

17   deferred compensation?

18          This was their money, their income, and they were

19   spending it for their benefit.

20          Now, if we just take a step back and look at what

21   else is happening in 2008 and 2009, the UBS situation has

22   emerged in the news, and they are asked again, by Mr. Murtha:

23   Do you have a foreign account?

24          And they again deny interest in, or signature

25   authority over, the foreign accounts.

1    However, they didn't need Mr. Murtha to tell them

2  that, because in August of 2008, Dr. Fredrick called

3  Mr. Luetolf, and asked about the situation with UBS.

4    And Mr. Luetolf informed them that, in case of any

5  transactions, that he would need his directions.  That's at

6  Exhibit 3W, Page 1836789.

7    And then what do they do in October of 2008?

8    They close all their UBS accounts and move all the

9  money from UBS to Liechtenstein Landesbank and Fortis Banque.

10    Remember that Dr. Fredrick provided false information

11  in order to open the Saba School of Medicine Foundation bank

12  account.  At Exhibit 4B, Page 1, in December -- on the

13  December 1, 2008, letter, Dr. Fredrick said:  The Saba School

14  of Medicine is owned by The Foundation; and that while The

15  Foundation sold real estate to Equinox corporation, the school

16  remained part of The Foundation.

17    He sold it all in 2007, ladies and gentlemen.  And he

18  signs that letter as president of Saba School of Medicine, a

19  position he hadn't had since April 3rd, 2007.

20    On February 18th, 2009, UBS entered into the Deferred

21  Prosecution Agreement, and Dr. Fredrick and Dr. Hough caused

22  Beda Singenberger to open two more bank accounts at Bank

23  Alpinum, on June 15th, 2009, in the name of Ample Dynamic, and

24  one in the name of Top Fast.  That's at Exhibit 4E and 4I.

25    On both of those forms, Mr. Singenberger identifies

1    Dr. Hough and Dr. Fredrick as the beneficial owner.

2              The question that you're left with, ladies and

3    gentlemen, is:  Did Patricia Hough and David Fredrick knowingly

4    and intentionally agree with one another to defraud the IRS;

5    did they participate with the objective to cheat the IRS out of

6    taxes?

7              The government submits that the evidence has proven

8    that they both did.

9              You must also determine whether the defendant

10   willfully filed false tax returns in 2005 or 2008.  The Judge

11   is going to instruct you as to what the intent elements mean.

12   But every day you are called upon to determine what people are

13   thinking, and we have to look to their actions to determine

14   what their intentions are.

15             First, when people set out to commit a conspiracy,

16   while it's like a business, they don't sit down at a board

17   meeting with an agenda and they say, "Okay, on today's agenda,

18   let's cheat the IRS, and let's all make sure we know what the

19   objective is."

20             There's no minutes, there's no board approval,

21   there's no special handshake or napkin agreement.  You are left

22   to look at Patricia Hough and David Fredrick's contemporaneous

23   words and actions to confirm that they acted with the requisite

24   intent.

25             In this case, Patricia Hough and David Fredrick's

1    actions and omissions; the phone calls and the e-mails; the

2    information they provide, or don't provide, to Mr. Murtha,

3    Mr. Minchenberg, Mr. Gallant; the information on their tax

4    returns; the forms that they filled out when they're trying to

5    sell the schools in 2002 and 2003, and when they ultimately do,

6    in 2007, look at the words that they use, even as they're

7    trying to conceal, and the manner which they purchased assets

8    in the name of nominee entities, and how they opened bank

9    accounts and when they're opening them.  These are what prove

10   to you that they know what the objective of the conspiracy is.

11          The Court is going to instruct you on good faith.

12   Evidence that a person acted in good faith by following the

13   advice of an accountant is inconsistent with unlawful intent.

14   However, you can't rely on the advice of an accountant when you

15   haven't provided all of the information.  Partial disclosure is

16   insufficient.  A person acting in good faith does not conceal

17   or take steps to mislead.  They answer honestly when asked a

18   direct question.  And if they don't understand or need further

19   clarification, they speak up.

20          And you heard and saw the defendant testify.  She

21   speaks her mind.  She asks questions when she doesn't

22   understand, and asks for clarification.

23          Her silence to Mr. Murtha speaks volumes.  She can't

24   rely when she's not fully disclosing.  Just like when you have

25   a situation with your doctor, if they don't have all the facts,

1    then the diagnosis is going to be flawed or incomplete.  And

2    that's exactly what Patricia Hough did.  She took steps to

3    mislead and conceal her participation in the tax fraud

4    conspiracy.

5            Patricia Hough and David Fredrick knew exactly what

6    they were doing.  They conspired with each other to carry out a

7    scheme to defraud the IRS.  They knew that they had at least

8    15 offshore bank accounts, that they had an interest in and

9    signature authority over.

10           And this is not something that's confusing or hard to

11   understand.  They knew that they owned the medical schools, and

12   they signed documents that unequivocally stated that.  They

13   told Mr. Luetolf that they owned the schools when they opened

14   their bank accounts because UBS was required to know who their

15   customers were, and where the money was coming from.

16           And they used it and showed that they maintained

17   control over the funds when they bought themselves personal

18   items.  They even used it to pay their property taxes on their

19   house.  They put some of the money into their savings account.

20   They knew that they had failed to report their interest income,

21   the investment income, the profits from the schools, and the

22   sale of the medical schools, on their tax returns, and they had

23   failed to inform the IRS that they had signature authority and

24   an interest in over more than 15 offshore bank accounts.

25           They knew all of this, ladies and gentlemen, and all

1    of their actions were going to defraud the Internal Revenue

2    Service in the ascertainment and collection of taxes.

3            Ladies and gentlemen, the government submits to you

4    that the evidence over the last two weeks presented to you

5    compels only one conclusion, that Dr. Hough is guilty of all

6    counts in the indictment.

7            Thank you.

8            MR. HOCHMAN:  Your Honor, may I have a brief break to

9    set up what I need for my opening?

10           THE COURT:  Sure.  Why don't we all take ten minutes

11   between the arguments.

12           And again, please do not discuss the case among

13   yourselves, or allow anyone to discuss them with you or in your

14   presence.

15           Let's shoot for about ten minutes.

16           (At 10:07 AM, the jury was escorted from the

17      courtroom.)

18           THE COURT:  All right.  Ten minutes.

19           MR. HOCHMAN:  Thank you.

20           (At 10:08 AM, court was recessed.)

21                        AFTER RECESS

22           (At 10:25 AM, court was reconvened.)

23           THE COURT:  Both sides ready?

24           MS. FINLEY:  Yes, Your Honor.

25           MR. HOCHMAN:  Yes, Your Honor.

1          THE COURT:  Have the jury step back in, please.

2          (At 10:25 AM, the jury was escorted into the

3      courtroom.)

4          THE COURT:  Mr. Hochman, you may proceed.

5          MR. HOCHMAN:  May it please the Court, ladies and

6      gentlemen of the jury, counsel.

7          When Mr. Saunders gave his opening remarks to you a

8      little over two weeks ago, he told you that the evidence would

9      show that the government in this case is 100 percent wrong;

10     wrong about who Pat Hough is, and wrong about what Pat Hough

11     did.  And that's exactly what the evidence has shown.

12         You know who Pat Hough is.  Someone who has spent her

13     entire life seeking out ways to help others, serving the poor,

14     and helping to train a generation of doctors.  And you know now

15     what Pat Hough did, which was to help to build a charitable

16     foundation and follow along with the plans of her husband and

17     his advisers to protect the assets and the future of that

18     foundation.

19         In fact, if anything, what Mr. Saunders said was an

20     understatement.  The government got this one spectacularly

21     wrong.  They got it so wrong that they had to change their

22     entire theory of the case halfway through the trial.  And they

23     still got it wrong.

24         How did this happen?  How did we get to this point

25     where, for the last two weeks, we've been listening to witness

1   after witness, exhibit after exhibit, of this type of evidence?

2        You heard a lot in the government's case about the

3   theory of substance over form.  Mr. Maurer testified about it,

4   and so did David Minchenberg.  You heard that substance over

5   form is a principle used by the IRS when they'll look at the

6   substance of a transaction, or of an entity, instead of just

7   what's listed on the forms.

8        Well, in this case the government turned that

9   principle on its head.  Because in this investigation, as

10  you've now learned, it was all about forms over substance, and

11  specifically those Form As and other banking forms over the

12  substance.

13       The government received those documents from UBS in

14  April or May of 2009, and they saw those forms with Dr. Hough's

15  name on them.  And as far as they were concerned, that was it.

16  They stopped.  They made their conclusion.  It was Dr. Hough

17  and Dr. Fredrick's foundation, and they didn't alter that

18  conclusion since April or May of 2009.

19       They gave those records to Agent Maurer, who you

20  heard testify, and they said:  Here, these accounts belong to

21  Dr. Fredrick and Dr. Hough.  Go ahead and find the evidence to

22  back up that conclusion.

23       They never gave her any other names.  They had the

24  forms and never bothered to look for the substance.  The

25  government never investigated whether Dr. Hough knew what she

1    was signing, whether those forms were blank when she signed

2    them.  And we know at least one form was blank when she signed

3    it because it's still blank.

4           They didn't investigate why she signed it.  They

5    didn't investigate what was explained to her at the time she

6    signed these forms, or what purpose these particular forms or

7    accounts were serving.

8           There's no evidence that they talked to Dieter

9    Luetolf, or Beda Singenberger, to find out what they told

10   Dr. Hough about the forms she was signing, what they told

11   Dr. Hough about what the funds were that were going into these

12   accounts.

13          There's no evidence they talked to anyone at UBS

14   other than Jean Marc Futterknecht, who knew absolutely nothing,

15   absolutely nothing, about the facts of this case, despite the

16   preferred -- the Deferred Prosecution Agreement that UBS has

17   with the United States, that you heard requires the cooperation

18   of UBS to send to the United States anyone the United States

19   Government asks to, in connection with a criminal case,

20   including producing the client advisers that advised on an

21   account.

22          And there's no evidence that they ever talked to

23   Florencio Montenegro, or to Dr. Haroldo Bautista, or Erwin

24   Schulthess, or anyone else who is currently with the Saba

25   Foundation or Sinco Trust, to see if the Saba Foundation

1    actually still has the money from the 2007 sale of the schools,

2    that the government claims Dr. Hough and Dr. Fredrick stole,

3    hid, and failed to pay tax on.

4          Now, you heard that Ms. Maurer never traced any of

5    the money to where it is today, because she believed it was not

6    her role in the case.  In fact, I think she said that about

7    30 times during her testimony.  The problem is, apparently,

8    nobody else on the prosecution team believed it was their role

9    in the case to do this investigation, not any time in the past

10   four and a half years.

11         And yet Luis Rivera, the defense expert who you heard

12   talk -- who is an experienced CPA, he is a former Number 2

13   person from the IRS Miami office, he's an accountant, he's a

14   tax preparer, he had a 24-year career with the IRS -- he was

15   able to, in less than two months, find out what happened with

16   the money, pick up the telephone, call Florencio Montenegro,

17   pick up the telephone, call Erwin Schulthess, get a notarized

18   document back from Mr. Montenegro, and then conclude from his

19   investigation over just two months, not four and a half years,

20   that the funds from the sale of the schools in 2007 are still

21   with the Saba Foundation today.

22         In fact, he was able to conclude that, as of

23   September 25th, 2013, there's still $54 million in the Saba

24   Foundation's account; not in Dr. Hough's account, not in

25   Dr. Fredrick's account.

1           So what evidence is there that anyone in this

2     government team, anyone, with all the tremendous resources of

3     the U.S. Government and the IRS, having four and a half years

4     to investigate this case, ever thought to make those simple

5     phone calls?  The evidence is:  None.

6           Now, there's a number of witnesses that the

7     government could have called in this case.  Let me just show

8     you a few of them.

9           Now, this chart, with over 40 witnesses that the

10    government could have called, are all from names or

11    testimony -- names on exhibits, or testimony you heard in this

12    case.  They ranged from the Saba School of Medicine's

13    documents, Thomas Eric Johnson and --

14           COURT REPORTER:  Sorry.  What was the first name?

15           MR. HOCHMAN:  Thomas Eric Johnson and Deborah

16    Egerton; the Saba School of Medicine Foundation currently,

17    Mr. Montenegro and Dr. Bautista; the Saba University School of

18    Medicine board of trustees, Mr. Desai and Mr. Peeple; Rex

19    Pitts, this is actually the husband of Melanie Pitts.  They're

20    willing to talk to and call Melanie Pitts, a sister; but

21    someone who actually sits on the Saba School of Medicine board

22    of trustees, Rex Pitts, they didn't call.

23           And I would suggest, as we go through this, if any of

24    these people had anything useful to say for the government's

25    case, they would have had called them.  We don't expect the

1  government to call everyone, we'd be here for two months.  But

2  if any of these people had anything useful to say, we would

3  expect them to have been called.

4         Who else?  Schneider & Associates, we have Dean

5  Hitzler, who actually did the investigation.  We have

6  Bowditch & Dewey.  We have Mr. Refolo and Mr. Angelini.  We had

7  Speeches.  Whenever you heard the name Speeches, from Saint

8  Maarten, we have all the four people from Speeches that didn't

9  end up in this trial that could have told you about the Round

10 Hill transaction and what the thinking was there.

11        From UBS, obviously, we had Dieter Luetolf, Patrick

12 Hoffmann, all the people in those accounts.  We have all the

13 Swiss and Liechtensteinian and Bahama banks.  Not one person.

14 The only banking person you heard from was Jean Marc

15 Futterknecht, someone who has absolutely no connection and

16 basically came over as a custodian.  You didn't hear from any

17 principal person from any bank at any period of time in this

18 trial.

19        We then had the people from Sinco.  We have four

20 people.  In every single New Vanguard, Top Fast, and Ample

21 Dynamic bank opening document, these four people are listed as

22 the authorized signatories.  Where are they?

23        How about from the government of Saba?

24        We actually were the ones that called the former

25 lieutenant governor, Antoine Solagnier.  And also, Will

1   Johnson, you heard his name.

2            How about the government of Nevis; no one.

3            How about from EIC?

4            We heard from Mr. Minchenberg --

5            COURT REPORTER:  Excuse me, sir, you are talking too

6   far from the microphone, and you are blocked by the board.

7            MR. HOCHMAN:  How about from EIC?

8            We heard from Mr. Minchenberg, but did we hear from

9   the assistant, from ten years, of Dr. Patricia Hough, Sandra

10  Murphy, who is still working there?

11           Did we hear from Lisa Gallant, Bernice Ouelette,

12  Phillip Thornton?  And how about the Huntington Institute, the

13  ones that had that aborted sale, Mr. Brad Anderson and Mr. Roy

14  Dobbs?

15           We heard from none of these people.  And trust me --

16  actually, there's one more person we didn't hear from, and if

17  that one more person had anything useful to say, he would have

18  come before you.  And that one person is the lead investigator

19  for the last four and a half years, F. Cameron Lalli.  He's

20  been sitting over there the entire time, and there's -- in the

21  gallery.  If the government believed he had anything useful to

22  say, based on four and a half years of an investigation, he

23  could have walked 20 feet, sat in the witness chair, and be

24  subject to cross-examination.  The government didn't call him.

25           And as you'll hear, the government has the burden in

1    this case.  The government.  Never, ever, ever, does it shift

2    to the defense.  It is up to the government to bring that case

3    to you, to convict, if they can, Dr. Hough.  We don't have to

4    do a thing or present any evidence.

5           The government failed to call any and all of those

6    key witnesses, and I would suggest that's because none of them

7    had anything useful to say in the government's case.

8           Now, instead of the government -- instead, what did

9    the government actually give you, as far as testimony from

10   witness after witness?

11          They showed you witness after witness who had

12   actually never even met Dr. Patricia Hough.  You basically had

13   a situation where you ended up with a case where the government

14   charged Dr. Hough and Dr. Fredrick with stealing over

15   $40 million from the Saba Foundation, and completely

16   disregarded the evidence that shows that the money started with

17   the Saba Foundation, went through a bunch of bank accounts in

18   the '90s and 2000s, and ended up with the Saba Foundation.

19   Probably the best way to see that is with the government's own

20   demonstrative chart.

21          Where does this chart end?  It ends in 2008.

22          They said, "Oh, we didn't have enough room to come up

23   with another chart."  They couldn't put it on the board to show

24   the other Swiss and Liechtenstein accounts.

25          And where did those accounts end?  2009.

1          And where is the rest of the investigation?

2          Because if you clearly believed, and you're searching

3   for the truth to find out if the funds went to Dr. Fredrick and

4   Dr. Hough, because of their theory that they own the school, or

5   they went to The Foundation, the chart would keep going.  And

6   the chart never kept going.

7          Why?  Because I think, at some point, they realized

8   that if the funds end up with the Saba Foundation, that

9   completely messes up their theory.  It completely messes up

10  their theory.  So they stopped looking.

11         Instead, what you had is, you end up with a case

12  where their entire theory changes in the midst of trial.  This

13  is a theory that basically started with the -- if you recall,

14  with Ms. Kessler saying that the -- Dr. Fredrick and Dr. Hough

15  owed ten and a half million dollars?

16         Now that theory is down into the sixes, and that

17  theory is just Theory Number 1.  And it shows that the

18  government was focused, again, on forms over substance.

19  Because under their current theory, not only is Dr. Hough

20  innocent for 2006, not only did she not substantially overstate

21  her income, she actually substantially understated -- excuse

22  me -- not only did she not substantially understate her income,

23  apparently, under their theory, she substantially overstated

24  her income.

25         What do I mean by that?  They actually charge a

1    criminal tax count where the defendant is entitled to a refund

2    by the government.  They're basically saying, on Dr. Hough's

3    2006 return, she put down too much money.

4           Can you imagine that?  If you put down too much money

5    on your return, you can be held liable for a criminal tax

6    charge.  This is actually just shocking.

7           And the problem is that the government relied on

8    forms over substance, and they stopped looking to see what

9    would happen, with respect to this case, if they actually kept

10   looking at all the substance.

11          So instead, what you had is, you had a 67-year-old

12   woman who has done more good in this world than certainly

13   myself, or most people, and they put her through a four-year

14   nightmare, a four-year ordeal, that destroyed her marriage.

15          And for what?  For what?

16          The government stood here, two weeks ago, and told

17   you, in opening statement, that there would be four

18   conspirators, four conspirators:  Dr. Hough, Dr. Fredrick, Beda

19   Singenberger, and Dieter Luetolf.

20          And then the first -- the government's first witness

21   testified, Mr. Futterknecht, the head -- remember his position.

22   He's just not a mere custodian.  He was the head of UBS's

23   anti-money laundering efforts across that entire global

24   company.

25          And you learned that Dieter Luetolf, this supposed

1    mastermind, according to the government's opening statement, a

2    co-conspirator, is still working at UBS today.  And, according

3    to Mr. Futterknecht, and this was shocking, Mr. Futterknecht

4    said that Mr. Luetolf did nothing wrong.  He did nothing wrong.

5    He participated, apparently, in this whole conspiracy,

6    according to the government, but he's still working at UBS, and

7    he did nothing wrong.

8                And what about Beda Singenberger?

9                There was not one witness in the government's entire

10   case who testified, based on their own personal knowledge, to

11   literally anything about Beda Singenberger.  Nothing about Beda

12   Singenberger.  No one met him, who testified; no one worked

13   with him; no one talked with him; no one e-mailed with him; no

14   one communicated with him.  Not one witness testified about

15   that other co-conspirator.

16               And you're going to hear the Judge instruct you in a

17   little while about what you need to find, with respect to a

18   conspiracy, with respect to Dr. Hough.  And I will submit to

19   you that, when you hear those jury instructions, what you will

20   find is that two of the four co-conspirators are missing.  You

21   will find that the only two conspirators, supposedly, that you

22   are to consider are Dr. Hough and Dr. Fredrick.

23               Beda Singenberger?  Gone.  Dieter Luetolf?  Gone.

24               And what you're going to hear is that there was one

25   other -- there's actually -- that was just one of the many

1    changes that occurred in this case, between the time that the

2    government gave its opening statement and where we are today.

3    Because the government, again, instead of bringing Dieter

4    Luetolf here, pursuant to the Deferred Prosecution Agreement,

5    and letting him be subject to cross-examination, the government

6    let's him sit comfortably in Switzerland, still working for

7    UBS.

8              And instead, what do they do?

9              They bring Dr. Hough here, and they hammer on

10   Dr. Hough, with his -- with her lifelong record of charitable

11   good deeds, of giving back and helping the poor and the needy.

12   Instead of bringing Dieter Luetolf here, they got Dr. Hough

13   here.  And they basically create a situation over the last four

14   and a half years, that I mentioned, that just crushes her

15   marriage, in order to be able to say that Dr. Hough is a

16   criminal.

17             How wrong is that, ladies and gentlemen?

18             The government charged Dr. Patricia Hough with five

19   serious crimes, and they brought her in here for trial, then

20   told that you they were going to prove, beyond a reasonable

21   doubt, that she committed all these criminal acts.

22             Well, ladies and gentlemen, Mr. Saunders also told

23   you at the beginning of this trial that the reason that we are

24   all here is not because of them.  It's actually because of you.

25   Because in our system the government does not get to decide

1   Dr. Patricia Hough's fate.  You do.  It's a system, in some

2   ways, that's unique, or fairly unique, in this entire world

3   that we live in.  Because in many countries the prosecutor

4   actually is the judge and the jury of the facts.  If they think

5   you did it, you did it.

6          But in our system, we create a different sort of

7   system that brings 12 people who will ultimately decide this

8   case together, 12 people who are Dr. Hough's peers, and then

9   asks them to take their collective wisdom, their collective

10  common sense, and pool that together.

11         And again, it's not just one or two people, three or

12  four people, it's twelve.  Because the idea is, if -- that the

13  charges in this case are so serious, the criminal charges, that

14  we need 12 people to get together, and we need them to decide

15  unanimously on their verdict.  It is not enough that they don't

16  decide unanimously, they need to decide unanimously in order to

17  return a verdict.

18         You know, it's interesting, I had a newspaper article

19  that I actually cut out a couple months ago, and this newspaper

20  article, at the beginning, was actually -- it took place in

21  reference to a trial in China.  And the trial in China was

22  where the Chinese government was going after a particular

23  person.  And at the beginning of the trial, the government's

24  website had a headline about that trial, and it read:

25  "Prosecutors say defendant pleads not guilty, so he must be

1    strictly punished"; "Prosecutors say defendant pleads

2    guilty" -- "pleads not guilty, so he must be strictly

3    punished."

4              That's not our system.  The prosecutors cannot just

5    say that the defendant pleads not guilty, so the defendant

6    needs to be punished.  Our systems is based on a presumption of

7    innocence, that you are innocent until proven guilty when you

8    show up here; that the indictment -- when you go back in the

9    jury room, you can look at it, but it is not evidence.  It

10   might have a lot of allegations in it, but none of that is

11   evidence.  Ms. Finley's testimony is not testimony.  My

12   speaking to you is not testimony.

13             If Ms. Finley wants to go ahead and say all these

14   things that Special Agent Maurer should have said, that's very

15   nice, but she didn't say them.  And we'll get to that in a

16   minute.

17             This is the type of system we have, and then we ask

18   this system to use the highest standard in the land, "beyond a

19   reasonable doubt," to make your determination.

20             So before I go on, let me thank you.  Let me thank

21   you for the personal sacrifice you have gone through to be here

22   in this case.  And let me thank you for the time and the

23   consideration that you have given, to give detailed attention

24   to this evidence, because, again, the stakes could not be

25   higher.

1           So let's actually talk about the evidence.  Let me

2    talk about the reliability of the government's case, and let me

3    start with their star witness, Sheila Maurer; Sheila Maurer,

4    who changed her entire tax calculations on the sixth day of

5    trial because, supposedly, she changed her mind and decided for

6    the first time, six days into trial, October 14, 2014, at that

7    moment in time, she decides that Dr. Fredrick and Dr. Hough own

8    the medical schools -- own the Saba Foundation.

9           Now, you'll see on the chart behind me that this is

10   Luis Rivera's analysis of the significance of that change.

11   Because I will submit to you that if the change was just a

12   couple thousand dollars, we wouldn't be having this discussion.

13   The government would have just embraced a couple thousand

14   dollars' change.

15          But the government probably saw that May 14th, 2013,

16   revised report and freaked out.  I mean, you heard from Luis

17   Rivera, he had never, in his 24-year career, seen a revenue

18   agent at trial ever change their chart, not even for a dollar.

19   And here the total changes are $6.7 million.  Shocking.

20   Shocking.

21          And these are changes -- again, remember, the

22   May 14th report is done the day before the indictment and

23   doesn't change.  You don't see that there's a May 16th report,

24   or a May 15th report, of 2013.

25          And what we also learned is that that was the report

1    that was given to the defense, and the government intended to

2    use, when this trial began.

3              And how do we know that?

4              Because when we look at the May 14th report, which is

5    Defense Exhibit 30I.4, when you look at this, it's got a little

6    government's exhibit sticker on it, similar to all the ones

7    you'll see in this case.  That was the one they were going to

8    use, until Special Agent Maurer came to this realization, this

9    epiphany, that all of a sudden her theory had to change

10   virtually 180 percent.

11             Now, you'd think that Special Agent Maurer would have

12   given some careful thought before she changed her report in the

13   middle of trial.  In fact, again, the sequence is that she

14   changes her report on October 14, 2013, but she doesn't testify

15   until October 17, 2013.  So she's got an additional three days

16   to think about all the reasons why she changed her report, and

17   she had to have known that she was going to be asked that

18   question.

19             So when she testified, guess what, I asked her that

20   question.  Do you remember, it was the afternoon of the

21   Thursday, and she came back the next Friday morning.

22             And when she was asked that question -- and this is

23   where the jury gets to see the witness's reaction -- what was

24   her reaction when I asked her that question?  She was basically

25   stunned.

1          I asked her:  What testimony or exhibits did you rely

2   on, to so fundamentally change your Revenue Agent Report in

3   this case?

4          She said:  Well, the testimony of Mario deCastro.

5          Anyone else?

6          I can't remember.

7          How about any exhibits; do you have any exhibits?

8          I mean, there are hundreds of exhibits in this case.

9   Ms. Finley, in her opening statement a moment ago, talked about

10  3A, 3B, 3C, 3D, all way into the AA series, then switched to

11  the fours, and went to the AAs in there.  There are hundreds of

12  documents that Ms. Maurer could rely on, if she truly had any

13  basis for the change in her opinion.

14         And she said:  Well, I don't know.

15         I said:  Look, take the evening, think about it.

16         It's 5:00 p.m. at that point, she's coming back

17  at 9:00 a.m. the next morning, she's got 16 hours.

18         Go through your notes -- she had a lot of notes -- go

19  through them, come back and tell us what you have.

20         So Ms. Maurer went through her notes.  And when she

21  went through her notes, she came back and said:  Well,

22  Mr. Futterknecht.

23         What did he say?  He doesn't even know Dr. Hough.

24         Well, he talked about two UBS documents, Document 3S,

25  and Document 3EE.

1          I said:  Okay, let's talk about 3S.

2          And it turns out it's a client note, but what file

3    was it in?  It was in the Patricia Hough file.

4          Patricia Hough file?  Why did that ring a bell?

5          Because that's one of the five files that she said

6    she had read in depth and analyzed in depth, starting in April

7    of 2009.

8          Okay.  So that -- a piece of paper, one piece of

9    paper, on one client note, undated, unsigned, without any

10   identification around it, that changed her mind.

11         Yes, that changed my mind.

12         And you have had that for four and a half years, but

13   it changed your mind now.

14         Yeah, it changed my mind now.

15         Well, how about the other UBS note, what file is that

16   in?

17         Oh, the Top Fast file.

18         That's another one that you reviewed in depth, that

19   you have had for four and a half years.  But now, in the middle

20   of trial, it's changing your mind.

21         Yes, it's changing my mind.

22         What other documents?

23         Well, then she goes into the Mario deCastro

24   documents.  And Ms. Finley just went into the Mario deCastro

25   documents.  And I submit that they both don't understand the

1    Mario deCastro documents, because in 6A -- excuse me -- 6B, you

2    have the original letter from David Fredrick, where he says

3    he's the sole signatory.

4           And remember, this is to Brad Anderson and Roy Dobbs,

5    who they didn't call, and David Fredrick says he's the sole

6    owner of Saba School of Medicine, MUA Belize, MUA Nevis, and

7    EIC.

8           And we start with that letter, and I said:  Is there

9    any indication that Dr. Hough is anywhere on that letter?

10          Well, she's not on the letter.  She's not sent the

11   letter, she's not cc'd with the letter.

12          Okay.  Let's look at what Dr. Hough actually signed.

13          And she gave us a couple more exhibits.

14          And Ms. Finley talked about those exhibits, and those

15   exhibits are key to understanding why Ms. Maurer has completely

16   blown her analysis.

17          She talked about the letter of intent and the

18   agreement.  But when you look -- and these are the ones that

19   Dr. Hough signed, when you look at that, it says owned or

20   controlled.  Ms. Finley started saying that just now in her

21   opening.

22          And then, by the time she was done, and I wrote it

23   down, she said:  Oh, those documents show that Dr. Hough and

24   Dr. Fredrick owned the schools.

25          That is wrong.  Read the documents.  Owned or

64

1    controlled, which is a hundred percent true, Dr. Fredrick, as

2    you heard, owned a good chunk of the MUA Nevis, he owned

3    50 percent of MUA Belize, he owned 100 percent of EIC.

4         He controlled -- as Mario deCastro himself conceded,

5    he conceded when I asked him about controlling, you'll see it

6    on the slide in a minute, when I asked him:  When you sit on

7    the board of directors, does that mean you control The

8    Foundation?

9         Answer:  Yes.

10        So he controlled The Foundation, so that statement

11   that they made, that Dr. Hough signs on, is a hundred percent

12   accurate.

13        And that is it.  Don't let Ms. Finley come back up

14   and say:  Well, she should have relied on this, or I am going

15   to testify and now be a witness, that you should look at 3A,

16   3B, 3C, 3D, the dominion evidence, all that.

17        No, no, no, no, no.  We had an expert witness from

18   the IRS.  That's the one government chose to present.  And that

19   witness only relied on these documents.  And those documents in

20   no way support the idea that Dr. Fredrick or Dr. Hough owned

21   the Saba School of Medicine Foundation.

22        In fact, the last Mario deCastro document, actually,

23   when he talked about it, he said:  Look, I hadn't had a chance

24   to do the due diligence because the sale never went through.

25        And how do you know what he said is right; because

1    what is the name he gives the Saba School of Medicine

2    Foundation?

3            If you look at Exhibit 8B, he calls it the Saba

4    University Netherlands Antilles, which doesn't exist, which is

5    indicative of the fact he didn't do the due diligence to

6    actually find out who the owners are.

7            So to the extent that Agent Maurer is understanding

8    this, because it was brought out in cross-examination, and

9    still relied, still relied on this to so revolutionarily change

10   her opinion six days into trial, shows you that she was not

11   being completely forthcoming with you.

12           Now, with respect to the government's opening

13   statement, remember that the opening statement, again, is not

14   evidence, but it lays out the theory of what the government

15   believes that evidence was going to say.  And here is what

16   Ms. Kessler said, right at the beginning of her opening

17   statement, in her fifth sentence, while Agent Maurer was

18   sitting in the first row of the gallery.

19           She said -- this is Ms. Kessler in government's

20   opening:  "The evidence will show that the defendant and her

21   husband, Dr. Fredrick, owned and controlled The Foundation, as

22   well as the Saba University School of Medicine."

23           The government's opening statement, they owned it and

24   controlled it.  That was the government's theory from

25   April/May, 2009, it was their theory at the indictment, it was

1    their theory at the beginning of trial, it was their theory

2    when Ms. Kessler presented the opening statement, but somehow

3    that theory, according to Agent Maurer, didn't reach her until

4    six days into trial.

5              I would suggest that the -- you know, the notion that

6    that is true is not accurate, at best.  Because I think what

7    you'll see is that, with respect to her calculations, and those

8    calculations that are based on that theory, those calculations

9    again are 100 percent wrong.

10             Because again, if you -- according to Agent Maurer,

11   if Dr. Hough and Dr. Fredrick are just -- are owners, or owners

12   of the Saba School of Medicine, then she realized what

13   happened.  What happened is, she got the accounting wrong.  She

14   did a terrible job of accounting.  That's what happened here,

15   six days into trial.  Not that the government's theory changed,

16   not that Agent Maurer changed her theory, but she realized

17   that, "If I actually do believe, if I actually have a theory

18   that they actually own the Saba School of Medicine, I've made a

19   $6.7 million mistake.  So what do I have to do?  I have to come

20   up with something to justify this."

21             And the something she comes up with is to rely on

22   Mario deCastro's testimony, a bunch of UBS notes that she

23   already has, and a bunch of Mario deCastro documents that don't

24   show that the Saba School of Medicine Foundation is owned by

25   Dr. Hough and Dr. Fredrick.

1        These are huge mistakes.  And you can infer what

2   happened in this trial that, at some point during that first

3   week, either Agent Maurer, or someone talked to her and said,

4   "your accounting, I mean your accounting that you are

5   supposedly the expert in, is all messed up."

6        And they are then scrambling for a theory that they

7   can present on the stand to you, a theory that is absolutely

8   shot down by all the documents.

9        And if you see, in Exhibit 30I.8 -- and this is just

10  one example for the 2006 year, of what happens when you mess up

11  all your accounting -- the $2.5 million line that was -- it

12  says, "Income from undeclared foreign accounts," and that was

13  the income, remember, of all these different transactions, it

14  was the income that included a $250,000 transaction, it was the

15  income back and forth to LLL.  Remember, those charts are in

16  evidence.

17       If that goes away then, all of a sudden, what are you

18  left with for total income adjustments for 2006?

19       What you're left with is not just that the number is

20  zero.  Because remember, what they're trying to prove in

21  Count 7, is that there was a substantial understatement of

22  total income.  So what you're left with is that Dr. Hough

23  substantially overstated her income, of $13,729.

24       They don't dismiss the count, ladies and gentlemen.

25  They're asking you to consider that.  They're asking you to

1    consider a situation where the government, itself, admits that

2    Dr. Hough is owed a refund.  That's shocking.  That's what --

3    it's not just my saying it's shocking, that's what our expert,

4    Luis Rivera, said.  Absolutely shocking.

5           Now, I submit to you that what happened here is --

6    actually, this is an interesting way to look at a dynamic of a

7    trial that I'm going to share with you right now:  How did this

8    all come out; how did this all come out about two things, about

9    Special Agent Maurer's qualifications, and Special Agent

10   Maurer's change in the report?

11          Did the government bring it out, on Ms. Kessler's

12   direct, in the few hours that she had with Special Agent

13   Maurer, or did I do it in cross-examination?

14          And in some ways that's the purpose of

15   cross-examination.  And I apologize right now, by the way, if,

16   for some reason, I was too harsh or too direct in

17   cross-examination to try and bring the truth out.

18          Please, if you have -- if you in any way have any ill

19   feelings towards the way I, or my colleagues, the other

20   lawyers, have conducted ourselves in this trial, trying to

21   bring out this truth, please hold it against us.  Please do not

22   hold it against Dr. Hough, because what did the

23   cross-examination have to come out?

24          Well, when Special Agent Maurer took the stand,

25   Ms. Kessler basically said:  What are your qualifications?

1          Oh, I've worked for the IRS since the 1980s.

2          That sounds pretty impressive, 25 years.

3          And I went to all these trainings and classes.

4          Well, that sounds pretty impressive too.

5          And I have spent a long time, I actually brought it

6    out, 250 to 500 hours analyzing these accounts.

7          And they brought in the 30 series of documents, huge

8    notebooks full of documents that looks like Agent Maurer's done

9    her homework.

10         And what do they not tell you?  Let's start with the

11   qualifications.

12         They don't tell you that Agent Maurer is not a CPA.

13   They don't tell that you she's not an accountant.  They do not

14   tell you she's not a tax preparer.  They don't tell you she

15   doesn't have any accounting training -- excuse me -- tax law

16   training.  They don't tell you that she has no expertise in

17   Swiss or Liechtenstein banking law, a pretty important issue in

18   this case.

19         They tell you that she has no expertise with

20   nonprofits, with Netherlands Antilles nonprofits, or Nevis

21   corporations, and has none of Mr. Rodger's expertise in

22   sophisticated international deals.

23         Did you learn that when the government presented its

24   witness to you?

25              Not a penny of that . . . not a word of that.  That,

1    I had to bring out in cross-examination.

2              Now, what's the import of that?

3              Well, the expert who -- representing is very

4    qualified, who you should rely on for their conclusions, is not

5    an expert at all in the key issues of this case.  She might be

6    an expert in some other case.  And by the way, this is also her

7    rookie experience, the first time that she has ever testified

8    for the IRS.  That's who they brought before you.  And that was

9    all exposed in cross-examination.

10             But what's more important of what was exposed?

11             That there was a prior report.  If you recall, that's

12   a defense exhibit, 30I.4.  That is not a government's exhibit.

13   The first time you ever hear that there are, as you saw before,

14   $6.7 million of changes, is in the cross-examination.  It

15   didn't occur in the direct examination.

16             Why?  Because the government was hoping, praying,

17   that somehow I would forget to bring in the original report,

18   and that you would be left with the impression that, oh, the

19   October 14th report is a righteous report, it's a solid report,

20   it's based on evidence, it's based on this.

21             By the way, they don't even discuss the fact that

22   it's based on a change of theory, and what documents support

23   that change theory.  They just shove that testimony right to

24   you and, hope you'll take it in, hook, line, and sinker, and

25   not ask a question.  That is the quality of the evidence you

1    have been presented in this case by the star government witness

2    who did the IRS tax computations.

3           And, folks, we're in a tax case.  This isn't some

4    other case.  This isn't armed bank robbery where the tax

5    calculations don't matter.  In a tax case, the tax calculations

6    are dead center of what matters in this case.

7           Now, with respect to whether or not her ultimate

8    conclusions are reliable, the evidence shows that the second

9    set of conclusions are just as wrong as the first.  Because the

10   evidence in this case, both from defense witnesses and

11   government witnesses, is overwhelming that no one did, and no

12   one can, own the Saba Foundation; not Dr. Hough, not

13   Dr. Fredrick, no one.

14          So let's go over that testimony that shows that no

15   one -- the testimony in this case, the real evidence, that no

16   one can own the Saba School of Medicine Foundation, a nonprofit

17   Netherlands Antilles foundation.  And by the way, what we're

18   about to discuss is all the stuff that Agent Maurer decided not

19   to rely on.

20          So we'll start with Mario deCastro, a tax lawyer.

21   Mario deCastro was asked the question:  "You don't know, as you

22   sit here today, whether anyone can actually own the Saba School

23   of Medicine Foundation; correct?"

24          "That's correct."

25          The next testimony you heard from was Jerry

1    Schneider.  Remember, he's the CPA whose firm conducted the

2    audit in 2004 and 2005.

3            Jerry Schneider was asked -- excuse me -- answered:

4            "A foundation is technically not owned by anybody.

5    There are no individuals that own it.

6            "Question:  To your knowledge, the Saba School of

7    Medicine cannot be owned by anyone; correct?

8            "Correct."

9            The next witness to testify about this is David

10   Minchenberg, remember, another star witness from the government

11   who was supposedly going to say something bad about

12   Dr. Patricia Hough, and establish that she did something wrong.

13           What does he say?  He answers:

14           "To the best of my understanding, a foundation, a

15   not-for-profit foundation, cannot be owned by an individual."

16           Who else do we have?  We have Dr. Paul Dalbec.

17           And I would submit that Dr. Paul Dalbec, which is

18   interestingly a government witness, was one of the absolute key

19   witnesses in this case.  He was the chairman of the Saba School

20   of Medicine Foundation board of trustees, and he was there for

21   basically the entire time period that we're talking about.  And

22   interestingly enough, he's still the chairman of The

23   Foundation -- excuse me -- the chairman of the board of

24   trustees.

25           So what does he say?

1          "Question:  So, as you sit here today, it is clear

2    that the school was owned by the Foundation and not by any

3    individual; correct?

4          "Correct."

5          And what else do we have?

6          We have Dr. Alan Gruber, someone who actually was a

7    student at The Foundation, has relatives at The Foundation, has

8    been with The Foundation since at least 2000.

9          He was asked the question:

10          "Do you know who owned the Saba University?

11          "Answer:  I don't believe anyone owned it.  My

12    understanding was, it was a nonprofit organization."

13          And the last witness that we have was a pretty

14    impressive witness, the government didn't call him, the former

15    governor of the Island of Saba, the gentleman who held a huge

16    number of positions on Saba, including dealing with the

17    finances of Saba.

18          What was he asked?  He was asked:

19          "In your role as governor, who did you understand

20    owned the Saba School of Medicine?

21          "The Saba School of Medicine is the property owned by

22    the Saba School of Medicine Foundation.

23          "Question:  And was the Saba School of Medicine

24    Foundation a Netherlands Antilles foundation?

25          "Correct."

1        The questioning goes on:

2        "And who did you understand owned that The

3  Foundation?

4        "There is no such thing as an owner of a foundation.

5  A foundation is a legal entity that has no transferable shares.

6        "Question:  And is that true for every foundation

7  under Netherlands Antilles law, to your knowledge?

8        "Answer:  Correct."

9        And he concludes:

10        "Question:  So that Saba Foundation is a foundation

11  that, by definition, cannot be owned by any individual?

12        "Answer:  Correct."

13        I think what this tells you is that the evidence in

14  this case, not what Ms. Maurer decides to rely on, not what

15  Ms. Finley would like to you rely on, and she's not an expert

16  witness, and she's not testifying, but the actual people who

17  know anything about the Saba School of Medicine Foundation,

18  have told you, definitively, that the Saba School of Medicine

19  Foundation cannot be owned by anyone, and that certainly

20  includes Dr. Fredrick and Dr. Hough.

21        And I think it's important to know that, with respect

22  to Paul Dalbec, none of his testimony was challenged.  And

23  we'll get into that testimony in a moment.  And there's part of

24  that, the key part of that testimony was that he was sitting on

25  the board when David Fredrick gave -- went to the board and

1    asked for loans, and those loans were approved.  He was sitting

2    on the board when David Fredrick was appointed to do the

3    banking responsibilities for The Foundation.  He was sitting on

4    the board, and testified that David Fredrick would go back to

5    him and tell him that he had moved The Foundation's money into

6    foreign accounts, into foreign accounts -- into foreign

7    countries.

8            And, while Dr. Dalbec didn't ask for the specifics of

9    that information, because he trusted David Fredrick, he

10   absolutely said that David Fredrick came each time.  And here's

11   the important part:  That testimony is unchallenged.  There is

12   not another witness in this case that the government presented,

13   even the cross-examination that they did of Dr. Dalbec -- which

14   on this issue, by the way, was none -- where they said that,

15   somehow, there's some evidence in this report that David

16   Fredrick didn't go to the board to get approval for loans,

17   didn't go to the board to get approval to do these banking

18   transactions in different entities and different countries.

19           That evidence doesn't exist.  The only evidence that

20   exists, again, from a government witness is that David Fredrick

21   took all these actions, sought all those approvals, and got all

22   those approvals from the board.

23           Now, one of the interesting things here is that, when

24   David Fredrick goes to the board to ask for a loan, ask

25   yourself this very simple question:  Why would he go to the

1    board to ask for a loan if he owned the Saba School of Medicine

2    Foundation?  There would be no need.  The only reason you go to

3    the board to ask for a loan of the Saba School of Medicine

4    Foundation's funds is because you don't own it and you're

5    getting a loan from the Saba School of Medicine Foundation.

6           Ask yourself this question about Dr. Hough.  You

7    heard the evidence, Exhibit 205, which were the checks, the

8    reimbursement checks that Dr. Hough put in for her personal

9    charges.  And remember the sequence of this, is that she's

10   traveling a lot, she's traveling about 180 days or so a year,

11   on behalf of the accreditation and clinical rotation business

12   of The Foundation.

13          By the way, as a quick side note, I heard Ms. Finley

14   describe Dr. Hough as the COO, the chief operations officer.  I

15   was stunned.  There is not a lick of evidence that describes

16   Dr. Hough as the chief operations officer because that would

17   imply, by the title, that she knew everything about the

18   finances and operations.  Not even a chance, a lick of evidence

19   in this case.  That is a gross mischaracterization of the

20   evidence by Ms. Finley.  Because the only thing you heard

21   Dr. Hough was in charge of, when it came to the Saba School of

22   Medicine Foundation and MUA, was the clinical program, of which

23   she was the dean of clinical medicine, and the accreditation

24   side.

25          And you heard how much work that entailed.  That

1    entailed her traveling half the year on the road, all over the

2    United States, Canada, and Europe.  Enough.  She didn't need

3    any more burden.  But the one thing she was absolutely not --

4    and again, one more gross mischaracterization in this case --

5    is the COO, the chief operating officer here.

6            But going back to this issue of reimbursements, she

7    goes ahead and reimburses, writes a check to the Saba

8    University for her personal expenses that EIC -- excuse me --

9    the Saba Foundation had paid on her behalf.

10           I ask you the same question:  If Dr. Fredrick is

11   seeking loans with the Saba School of Medicine Foundation, if

12   he owns it, he doesn't need them, why is she reimbursing a

13   place, being conscientious enough to reimburse her personal

14   expenses if she owns the Saba School of Medicine Foundation?

15           It makes absolutely no sense.  What actually makes

16   sense is that the government's theory is 100 percent totally

17   wrong that she owns the Saba School of Medicine Foundation.

18           Well, what else do you know, besides the fact that

19   witness after witness testified that no one can own the Saba

20   School of Medicine Foundation?

21           Well, Ms. Maurer looked at all the accounts, and she

22   looked at five different accounts, call it what they were, the

23   joint account, the individual accounts -- that's three -- the

24   Top Fast and New Vanguard account is five.  That's it.  Five of

25   the eleven UBS accounts she looks at in depth.

1           She doesn't bother to look at in depth, at all, the

2    other Liechtenstein Landesbank, Zurcher Kantonalbank, Fortis

3    Banque, Alpinum accounts.  She doesn't look at those in depth.

4           But the only ones we care about of those are the

5    actual Saba School of Medicine Foundation accounts.  Because if

6    you want to find out who the owner is, of the Saba School of

7    Medicine Foundation, a good place to start is look at the

8    actual Saba School of Medicine Foundation accounts, of which

9    there are three in this case.

10          Two of those accounts . . . .  Two of those accounts

11   have Form As in them.  And Ms. Maurer wanted to stay as far

12   away from those Form As in those accounts as possible.  So did

13   the government.

14          Again, this isn't fronted by the government.  I have

15   to bring it out in cross-examination, because two of those

16   accounts for the Saba School of Medicine Foundation list, as

17   the beneficial owner of the Saba School of Medicine Foundation,

18   the Saba School of Medicine Foundation.  They don't even list

19   Dr. Fredrick or Patricia Hough as a beneficial owner.

20          And Ms. Maurer doesn't want to focus on them.  Why?

21   Because it's vastly inconsistent with the conclusion that she

22   reached back in April or May of 2009.  And you will see that

23   Government's Exhibit 4A, is that particular document.

24          And you'll also see, with respect to the other Saba

25   School of Medicine Foundation account, the UBS one, remember

1    that back-and-forth that I had with Mr. Futterknecht, kind of

2    dry and boring at the time, but very important, and that

3    back-and-forth was operating companies versus domiciliary

4    companies.

5           And what you learned is that an operating company is

6    a real company, and a domiciliary company is a company that

7    exists on paper.  And the key part for Swiss anti-money

8    laundering banking rules is that if it's an operating company,

9    it doesn't need a Form A.

10          And what I basically got Mr. Futterknecht to concede

11   is that when a Form A is submitted by Dieter Luetolf, in

12   connection with the UBS Saba School of Medicine account, that

13   Dieter Luetolf made a mistake.  Because he conceded it was an

14   operating company.  Based on all the indicia, that it had

15   schools, buildings, budget, student, teachers, administrators,

16   operating company, millions of dollars in its budget, he

17   conceded that it was an operating company.  And Mr. Luetolf

18   made a mistake, again reemphasizing the point that an operating

19   company doesn't have beneficial owners, as evidenced by the

20   Saba School of Medicine Form As that were eventually filled out

21   correctly.

22          So, as Ms. Maurer agreed repeatedly -- actually one

23   of the things she actually agreed with me repeatedly on, in her

24   field -- that if it was not Dr. Hough's income -- excuse me --

25   if it wasn't her money, it wasn't her income.  A theme that we

1    have brought up from our opening statement, not her money, not

2    her income.  She conceded that 100 percent to us.

3          Now, her most recent version of the Revenue Agent

4    Report focuses on three sources of income.  And let me show it

5    to you.

6          There are three sources of income that are addressed

7    in her most recent report dealing with the total income line.

8    The total income line is Line 22 of any tax return.  There are

9    taxable interest, ordinary dividends, and capital gains and

10   loss.  And that's for 2005, 2006, 2007, and 2008.

11         Now, let me break it down because they only actually

12   fit into three categories, according to Special Agent Maurer --

13   excuse me -- Agent Maurer's report.

14         The first category is right here -- excuse me --

15   right here (indicating), in the capital gains line, in 2007.

16   This line is made up of three things.  It's made up of capital

17   gains in the New Vanguard and Top Fast accounts; it's made up

18   of the $988,997, or half of that transaction, in April of 2007,

19   when they bought -- when Equinox bought the Saba School of

20   Medicine; and it's made up of the Round Hill transaction.

21   That's this big number right here; the Round Hill transaction,

22   of course, being the largest part of this number.

23         The rest of these numbers -- so again, this number

24   has three things.  All the other numbers, other than this one

25   number here, in 2007, this $15 million number, the rest of

1   these are just made up of bank accounts.  That's it.

2   Basically, you're stuck with flows out of one of three types of

3   bank accounts.  For every year but 2005, it's the New Vanguard

4   and Top Fast accounts.  That's it.  And then for 2005, we have

5   the inclusion of the Patricia Hough account as well.  So that's

6   basically the analysis.

7          What's missing from this analysis?  Let's start with

8   that.  Actually, let's go through the analysis, and then we'll

9   see what's missing from this analysis.

10          When you deal with the bank accounts --

11   actually . . . .  Yeah.  Let's actually start with the sale of

12   the Saba school.  The sale of the Saba school is based on all

13   of the evidence that I just talked about, because only if

14   Dr. Hough owned the Saba School of Medicine would the sale of

15   the Saba School of Medicine be her proceeds.  Only if she owned

16   it as her income -- excuse me -- only if she owned it as her

17   money, which then flows to her income, which then follows, if

18   she doesn't own the Saba School of Medicine, it's not her

19   income.  So one of these three parts is gone.

20          So then let's -- let's see where we go.  Actually,

21   where we can go first is to show you the one internal

22   contradiction in this.  Because I told you that the New

23   Vanguard monies represented in this account -- excuse me -- in

24   this chart, we've got the Top Fast money.

25          But what's missing; what's missing in this chart?

1          Medical Technology Associates, MTA, it's not there.

2    Apex Consultants, you heard about that, that isn't there

3    either.

4          How about Ample Dynamic?  That's not in her chart

5    either.

6          And what does that say to you?

7          Well, if you look at the Form As for those three

8    entities -- and again, that was on Ms. Finley's list, Ample

9    Dynamic, the Form A says it's Dr. Patricia Hough, and Dr. David

10   Fredrick.  Again, that's one of the Form As that they never

11   signed.

12         The ones for Apex Consultants and MTA, they signed,

13   and it lists them as beneficial owners.

14         Why isn't it on the chart?

15         If the Form As are so compelling, why aren't those,

16   the interest, the capital gains, the dividend, on this chart?

17         And I would suggest, this shows that Ms. Maurer,

18   herself, did not believe in the validity of the Form As.  Even

19   she couldn't stomach putting those things on her chart, because

20   she realized that she would be subject to strong

21   cross-examination on it, and we would reveal the fallacy of her

22   decision.

23         So I point that out, just to show that Ms. Maurer's

24   chart, even this chart, is internally inconsistent, by its own

25   admission, by not including these other accounts.

1           Now, with respect to these accounts, what we look at

2     is . . . .  Let's see.  Let's start with the New Vanguard and

3     Top Fast accounts.

4           What do we know about New Vanguard and Top Fast?

5           We know the following:  We know that New Vanguard and

6     Top Fast, Dr. Fredrick and Dr. Hough owned no shares; we know

7     that they were not the directors on those accounts; we know

8     that they were not officers on those accounts; we know -- and

9     this is important -- that they weren't the authorized

10    signatories on the account, because you heard Mr. Futterknecht

11    say, only an authorized signatory can direct the account; we

12    know that they never signed the Form As for New Vanguard or Top

13    Fast; we know that their names are only mentioned once in all

14    the account-opening documents, and that's just on the Form As.

15          And here is another key part:  We know that if you

16    look through the testimony in this case, Dr. Hough did not

17    initiate one transaction, even one transaction.

18          When we deal with all these charts that Ms. Finley

19    has put up, and I hope you got a chance to look at them on the

20    screen, Dr. Hough, Dr. Hough, Dr. Hough, no -- excuse me --

21    Dr. Fredrick, Dr. Fredrick, Dr. Fredrick, no Patricia Hough.

22    That's what we know about New Vanguard and Top Fast.  And the

23    same would probably be true for Ample Dynamic, but it doesn't

24    even show up on the chart.

25          And what is the significance of all that?  What is

1     the point?

2                 The point is, is that it shows that there is actually

3     a story that Agent Maurer was refusing to listen to.  It shows

4     that -- and again, she had the opportunity to do it, she just

5     refused to do it.  Because what we know from the testimony is

6     that, in early 2005, Beda Singenberger comes on the scene.

7                 And what is the only thing we learned about Beda

8     Singenberger?

9                 Again, we know nothing about Beda Singenberger from

10    the government's case.

11                But what did we learn from the defense case?

12                We learned the following, that Beda Singenberger was

13    recommended by Dieter Luetolf as a very well-qualified

14    asset-protection specialist.

15                Now, why do we need asset protection back in the year

16    of 2005?

17                The reason, we know, and it came out through three

18    different witnesses, is a $200 million lawsuit got filed

19    against The Foundation.  And this, by the way, in 2005, was not

20    the first lawsuit that had been filed against the Foundation.

21    The lawsuits start all the way back in U.S. courts, in --

22    excuse me -- in 1995.  That's the million-dollar lawsuit from

23    the disgruntled professor.  Then you heard, in 1999, the

24    lawsuit from the guy, Dr. Gill, who tried to take over the

25    university.

1    And you heard about others, a student who went ahead

2    and filed a lawsuit because they were caught cheating and then

3    sued the university.  But then you heard about the monster

4    lawsuit, Mr. Rodger told you about the monster lawsuit in 2005.

5    So what happens at that point is that they decide to

6    get better asset protection.  And they meet with

7    Mr. Singenberger, who comes recommended by Dieter Luetolf.

8    Now, what did we learn about Dieter Luetolf?

9    Dieter Luetolf is a pretty impressive guy in his own

10   right.  He works at UBS.  His grandfather was a director of

11   UBS.  He grew up in a diplomatic family.  These are people

12   that, on the surface, you would think you could trust.

13   And you heard Dr. Hough describe her meeting with

14   Beda Singenberger.  He lays out his credentials, and he

15   suggests to them that there is a better form of asset

16   protection for the Saba School of Medicine Foundation's funds:

17   Rather than just leave it -- rather than just have those funds

18   in the entities that we had them up to date, why don't we

19   create three Hong Kong companies and put those funds -- put the

20   Saba School of Medicine funds in those companies' accounts.

21   Now, what did we learn about asset protection in this

22   case?

23   We learned that asset protection is 100 percent okay.

24   David Minchenberg said that.

25   Remember that, David Minchenberg had the actual chart

1   of creating six different NewCos?

2              And I asked him:  Is that okay?

3              Oh, yeah, that's legitimate.

4              We heard from Steven Rodger.  That man has a lot of

5   corporations.  His Equinox is squared, Equinox 1, 2, 3.  He's

6   got the Saba Dropdown.  He's got EIC.  He's got 50 lawyers

7   creating corporations as fast as they can be created.

8              So the notion of creating corporations is 100 percent

9   okay.  And that's what they're being told:  We are going to

10  create three new corporations, Hong Kong ones, and this gives

11  you a higher level of asset protection.

12             And remember, at that point in time, asset protection

13  is very important to the Saba School of Medicine Foundation;

14  very important for Dr. Fredrick; and very important for

15  Dr. Hough; and, as Dr. Dalbec said as well, very important for

16  the board that's considering the fact that these lawsuits are

17  coming in.

18             So with respect, then, to New Vanguard and Top Fast,

19  which makes the bulk of the transactions for each one of these

20  years, we know that Dr. Hough didn't own it, Dr. Hough didn't

21  control it, it wasn't Dr. Hough's money, and, therefore, it

22  wasn't Dr. Hough's income.  Zero, zero, zero, zero, zero, zero,

23  zero.

24             So what happened -- how did the Patricia Hough

25  account get created?

1          Let me do that story very quickly and relay to you

2     what my understanding of the evidence shows there.

3          The evidence shows, again, that, in 1995 . . . in

4     1995, there was that lawsuit that came, the million-dollar

5     lawsuit.  At that point the board basically goes ahead and

6     says . . . .  The board goes ahead and says to Dr. Fredrick:

7     Go ahead and deal with asset protection.  If you need to open

8     up new accounts in different places, good ahead and do it.

9          Dr. Fredrick then goes to the Bahamas -- you heard

10    that one of the accounts he went to in the Bahamas was UBS,

11    actually, UBS Bahamas -- and sets up accounts with the Saba

12    School of Medicine Foundation's money.

13         How do we know that, by the way?

14         Because the client note in one of the UBS files says

15    that the origination of the money was from the schools.  But

16    then what happens is, there's a change in banking laws between

17    the Bahamas and the United States.

18         Now, Ms. Finley says:  Okay, that means that there is

19    an IRS problem here.

20         I defy you to find, in any document, any document out

21    there, the word "IRS."  I defy you.  And I'm saying IRS,

22    relating to the reason why any of this stuff is occurring.  It

23    doesn't exist.  What they are concerned with is asset

24    protection.  And remember, the first lawsuit actually doesn't

25    get filed in Saba, it gets filed in federal court in Texas.

1   And what they're worried is, they can get a judgment in Texas,

2   bring it to Saba, and freeze all the assets.  That's what

3   they're worried about.

4           So the notion that -- again, we'll deal with this in

5   a moment -- that you can have a conspiracy to defraud the IRS,

6   where there is no evidence of mentioning the IRS in an entire

7   case, is extraordinary.  But let me continue on.

8           So what happened is, again, there's a change in the

9   banking laws in the Bahamas.  They don't believe it's going to

10  be as good an asset-protection vehicle as what they sought out

11  to do.

12          So they asked the UBS people:  What should we do now?

13          And UBS says:  Bring it to Switzerland.  Not just

14  some shady little bank in Switzerland where we can hide your

15  money, bring it to the largest bank in Switzerland, UBS

16  Switzerland.

17          So they followed the advice, and they go -- and you

18  heard that Dr. Hough, after 9/11, was in Europe, asked by

19  Dr. Fredrick to meet with Dieter Luetolf, and meets with Dieter

20  Luetolf.

21          What does she bring him?

22          Now, if you're opening up your own personal bank

23  account, you'll bring your credit report, you'll bring your

24  personal information, you will bring your own ID.

25          No.  She brings the catalogs from the Saba School of

1  Medicine and MUA.  She brings the official government documents

2  of those entities.  She'll bring the curriculum, to show them

3  that the Saba School of Medicine is an operating company.

4            But for whatever reason -- and, again, we don't have

5  Dieter Luetolf here to explain it -- rather than set up an

6  account in the Saba School of Medicine Foundation initially,

7  they set up the David Fredrick/Patricia Hough account.

8            Now, remember what Patricia Hough said, which is

9  unchallenged in the case:  The writing on all the Form A and

10 account-opening documents, other than her signature -- and by

11 the way, that includes the date -- is not hers or

12 Dr. Fredrick's writing.  That is true for the joint account

13 that's opened in 2001, it's also true for the Patricia Hough

14 account that's opened in 2004.  None of the writing exists on

15 that.

16           And then Ms. Finley said:  Oh, well, but she checks

17 the box and she's liable for U.S. taxes.

18           Remember, when I asked Dr. Hough, "Did you actually

19 fill out any of that," she said, "No, that's not my

20 handwriting."

21           Now, she did tell the UBS people, Dieter Luetolf, who

22 she was.  She in no way concealed her identity because she

23 didn't think she had anything to hide.  She was the caretaker

24 for the Saba School of Medicine Foundation's funds, for MUA's

25 funds.  She's handing Dieter Luetolf the documentation to say,

1    "This is where the money is coming from.  It's not ours."

2              Do I know why some client note says they own,

3    operate, and consult, and they add the word "own," and now the

4    government throws its hands up and says:  Okay, Jury, stop, we

5    can go home now?

6              Of course not.  Because we don't have Dieter Luetolf,

7    and we are relying on undated, unsigned, unidentified notes in

8    a file.

9              Back to the story.  So they go ahead and open up the

10   joint account.  Now, fast forward between 2001 and 2004.  And

11   by the way, while this joint account is open, it's not like the

12   government is saying that there's anything going on with the

13   joint account that's suspicious and nefarious.

14             But now we get to 2004.  And what you hear is that

15   the February 6th, 2004, e-mail from David Fredrick to Dieter

16   Luetolf, cc'd to Patricia Hough, that basically says, "We've

17   got an issue here.  I don't believe that Charlene Varga, my

18   love, still my love, is really capable of dealing with the

19   offshore bank account.  She has a huge fear of flying."

20             Dr. Hough knows her sister a lot better, has lived

21   with her sister at that point for probably 60 years, and says,

22   "I trust my sister.  She can do it."

23             So Dr. Fredrick says, "Well, why don't we split up

24   the accounts at this point, because I'm concerned about

25   Charlene Varga."

1          And again, about six weeks later, after conversations

2    that Doctor Fred- -- excuse me -- Dr. Hough had, that

3    conference call that she testified about, where she was

4    concerned, actually, to make sure that, "It's the Saba School

5    of Medicine Foundation, we want to make sure this is done

6    correctly."

7          She's advised, "Okay, this is fine," and she agrees

8    to go forward with the plan.

9          But now, what is the absolute best evidence to show

10   that she is holding this money in the name of Patricia Hough,

11   for the Saba School of Medicine Foundation?

12         The same way, by the way, my back-and-forth with

13   Agent Maurer about the Nathan Hochman account, that I would be

14   holding her money in the Nathan Hochman account, and it doesn't

15   magically convert it to Nathan Hochman's money.

16         So how do we know that Patricia Hough never thought

17   of this as her money, never treated it as her money; because it

18   wasn't her money.  But what you found from the Patricia Hough

19   account -- and again, I had to bring it out -- was that there

20   were 205 trades in that account, 205 trades, buying and

21   selling, buying and selling, stocks and bonds and whatever.

22         That made obviously, we also heard, UBS a lot of

23   money.  They had a lot of incentive to open up these accounts.

24   I believe Agent Maurer totaled up all the expenses for all the

25   accounts for all the years, and UBS made well in excess of a

1   million dollars, not a bad payday for just basically opening up

2   a lot of accounts and doing a lot of trades.

3          But when you look into the trades, and you look into

4   who authorized those trades, you will not find one piece of

5   paper that showed Dr. Patricia Hough authorized those trades.

6   If you look at the 14-month period when she had over $5 million

7   in the account, there is not one indication, not one dime that

8   goes out of that account for Dr. Patricia Hough, not one penny

9   of her own personal funds go into that account.

10         She is a caretaker of that account, treated it

11   exactly like that, and the records are 100 percent indicative

12   of the fact that that account was not a Dr. Patricia Hough

13   personal account, but an account in the name of Patricia Hough,

14   that she held the Saba Foundation's funds in.

15         And, therefore . . . .  And, therefore, it shows

16   that, with respect to the Dr. Patricia Hough account, and the

17   New Vanguard and the Top Fast accounts, all the amounts that

18   are indicated in this chart that reference ownership of these

19   entities or that particular account are wrong.  Because she

20   never -- it was not her money and, therefore, it was not her

21   income.

22         Now, let me deal with Round Hill for a moment, if I

23   might.  Because Round Hill represents the third link of the

24   Maurer analysis here.  With Round Hill, here is the situation

25   we have:  Just like they were doing asset protection for the

1    money, they had to also do asset protection for the land.

2    Because again, as you heard, if the land, this very important

3    land for the Saba School of Medicine Foundation, was put in the

4    Saba School of Medicine Foundation, then if there is a lawsuit,

5    the lawsuit can seize the land during the pendency of the

6    litigation and basically put the entity out of business.

7            So what they did is that they had the opportunity to

8    buy it in late 1999.  It was an rush deal, you heard.  They

9    ended up, rather than being able to form an entity, which gets

10   formed in September of 2000, that's the Round Hill corporation,

11   they quickly, Dr. Fredrick quickly -- unbeknownst, actually, at

12   the time to Dr. Hough -- puts it in Laura Walls' name.  Laura

13   has a different last name than Dr. Fredrick, and he puts it in

14   Laura Walls' name for $250,000.

15           Where did the $250,000 come?  The Saba School of

16   Medicine Foundation.

17           Now, in September of 2001, they want to go ahead and

18   get the right to build on the property.  So again, something

19   that Agent Maurer messed up with, as far as the date of the

20   purchase, supposedly, but in 2001 they get this right of

21   superficies.

22           Fast forward to 2004:  Dr. Hough, again, in 2004, is

23   when they first hear about this $200 million lawsuit coming

24   down the pike.  They are scared.  Their work can be destroyed

25   by one lawsuit.

1       So what do they do?  They go ahead and take this

2   corporation that has already been founded, the Round Hill

3   corporation, and they go ahead and they put the -- or they had

4   the Round Hill corporation transfer the -- excuse me, the land

5   transfer from Laura Walls to the Round Hill corporation.

6       And Ms. Maurer seized on the $17,000 and goes:  Oh,

7   it was -- look at the purchase price, it's $17,000.

8       And then, of course, what do we learn from Antoine

9   Solagnier?

10      We learn that the transfer tax in Saba is about

11  7 percent.  And when you do 7 percent of $250,000, what do you

12  end up with; $17,000.  It wasn't a purchase price, it was a

13  transfer tax.

14      But then what happens?

15      What happens then is that, in 2005, they meet, as you

16  heard, with Beda Singenberger.  And when you meet with Beda

17  Singenberger, he brings in the notion of the three Hong Kong

18  companies being even better protection than the Round Hill

19  company, because the Round Hill exists in the Netherlands

20  Antilles.

21      So they go ahead and they do a transfer from the

22  Round Hill -- excuse me, they transfer the shares of the Round

23  Hill corporation to New Vanguard.

24      And I had you focus on one document that Dr. Patricia

25  Hough signed.  And that was a very key document because that

1    showed that she agreed to the transfer.  And on that document

2    there was no money that was indicated when she agreed to the

3    transfer.

4            But on the government's chart they said:  Oh, she got

5    $500,000 in 2005, $250,000 of which would be hers; and,

6    therefore, she had income there.

7            Let's go back to our chart.  If Revenue Agent Maurer

8    believed that $250,000 would have been part of Dr. Patricia

9    Hough's income in 2005, it would be on this chart.  It is not

10   on this chart.  And the reason it's not on the chart is that --

11   and when the government showed you its Round Hill chart, you

12   didn't see any transfer of $500,000, or $250,000, in April,

13   2005, because it was a transfer without money.

14           Why?  Because Dr. Hough, and she testified, is not

15   only a caretaker in which the -- caretaker for the Saba School

16   of Medicine Foundation money in these various accounts, the

17   bank accounts, she's also a caretaker as it pertains to the

18   Round Hill property.  So she transfers her interest in New

19   Vanguard.

20           Why?  Because she's told to do so.

21           Does she give it much thought?  No.

22           Later on you will hear that there is a -- in the sale

23   documents, when, in April 3rd, 2007, when she's signing

24   document after document, there are only three types of

25   documents she cares about.  There's her consulting contract,

1    the guaranty, and then a non-compete.  She's signing, as you'll

2    see the documents, a whole raft of documents.

3            One of the documents she ends up signing, I expect

4    the government will bring up in rebuttal, is a document that

5    sort of ratifies this transaction.  Again, what you will see

6    about that is that she in no way, and testified to this, read

7    those documents, as they didn't pertain to her guaranty, her

8    employment contract, or her non-compete.

9            So what we have at the end of the day is that the

10   property is transferred to New Vanguard; it's sold, in 2007,

11   the sale in 2007, according to Special Agent Maurer, to New

12   Vanguard, which Dr. Hough does not own; generates the large

13   part, over $15 million, here, on her chart.

14           And if she doesn't own New Vanguard at the time,

15   which I've shown you she doesn't, then it's not her money, it's

16   not her income, as conceded by Revenue Agent Maurer.

17           So those are the three aspects of this chart.  And at

18   the end of the day, Revenue Agent Maurer made a calculation on

19   May 14th, 2013, and it was wrong.  In fact, she concedes that

20   it is wrong.  She made another calculation on October 14th,

21   2013, which is this chart, which we've now learned is also

22   wrong.

23           But she made a third calculation on October 18th,

24   2013, in the middle of her cross-examination, when she filled

25   out this chart, which is Defense Exhibit 30I.1.  That time she

1    got it right.  That's what defense witness Luis Rivera, who

2    reviewed all her documentation and paperwork, sat through this

3    trial and reviewed the government's discovery, said are the

4    right numbers, all zeros.

5           And what else backs that up?  Again, the tracing of

6    the funds.  Because the funds ultimately ended up going back to

7    the Saba School of Medicine Foundation, and ultimately I would

8    tell you that the funds were never, ever, at any point,

9    Dr. Patricia Hough's, and Dr. David Fredrick's.

10          Now, with respect to the chart -- my chart, the

11   defense chart, that Ms. Finley was referring to, about dominion

12   and control, and that this is sort of their best exhibit to

13   show that this was their money -- remember the question that

14   was asked of Revenue Agent Maurer about each one of these

15   items, which was:  What role did any of these items in the

16   boxes play in your RAR for October 14, 2013; what role, if any?

17          So if it played into the dominion and control role

18   that would show that Dr. Hough and Dr. Fredrick owned the Saba

19   School of Medicine Foundation, or Dr. Hough owned New Vanguard,

20   or Dr. Hough owned Top Fast, those were the big ones, if it

21   played any role whatsoever that shows they didn't, there would

22   be something other than zero.

23          So I said:  Put down whatever role it is, whatever

24   impact it had on your RAR.

25          The government forgot the question I asked when they

1    filled out the chart.  But you don't have to forget that

2    question.

3            So what does that mean?  That means that the loans --

4    excuse me, that the money that went to David Fredrick's

5    siblings, all four siblings, played no role in the tax

6    computations in this case.  You heard so much testimony and

7    exhibits about all this, and this is what you find out it's all

8    worth:  Zero.

9            We heard the properties, Asheville, Greenville,

10   Sarasota, we've got more charts on it, we have chronology on

11   this stuff, but what role did it play in the tax computations

12   that are at the center of this case?  Zero.

13           And if it played some dominion-and-control role at

14   all, it would be something other than zero by the expert.  Not

15   this expert (indicating), who is trying to testify but can't

16   testify because she's just a lawyer, that expert over there

17   (indicating), who is the one that they called.

18           How about the airplanes, he spent a million-six on

19   the airplane, what role did that play in Dr. Hough's

20   computations?  Zero.

21           How about all the transfers for all these accounts,

22   between the accounts, among the accounts?  Zero.

23           Miscellaneous, how about this $250,000, 50,000,

24   payment of Sinco fees?  Zero.

25           By the way, where do I get all these from?  I'll give

1   you a quick little clue:  The overt acts.

2           Remember, you heard about this concept of overt acts

3   in the conspiracy?  Overt acts.

4           One of the things you're going to hear about overt

5   acts, when I deal with it in a moment, is that overt acts have

6   to be in furtherance of a conspiracy.  And the conspiracy here

7   is the conspiracy to defraud the IRS.

8           So if all these overt acts and accounts that are

9   relating to them equals zero, according to the government's own

10  expert, then those overt acts, by definition, cannot be in

11  furtherance of a conspiracy.

12          That's the significance of that chart.

13          There's one interesting little piece of evidence I'm

14  going to share with you, because otherwise it will get buried.

15  Shirley Ball, do you remember her, second witness in the case.

16  She's the IRS custodian.  Her testimony was quick and

17  uneventful, and you probably wondered why she even testified.

18  She brought in a lot of these (indicating).

19          What are these?  These are certificate of official

20  records of a transcript of account of Dr. Patricia Hough --

21  this is Exhibits 1K to 1Q -- with respect to the years, tax

22  years 2002 to 2008.

23          And I would submit to you that these records -- and

24  you remember the questions I asked about these records, which

25  is:  Are these -- do these records show any adjustments for

1   Dr. Hough's tax -- taxes, taxes due and owing, or adjustments

2   to her total income, for 2002 through 2008?

3           And remember what she said -- again, a small little

4   piece of information that was buried.  What she said was that

5   the answer is no; other than Dr. Hough's amended 2005 return,

6   there are no adjustments -- and remember, what we're talking

7   about with Miss Maurer are adjustments to income -- no

8   adjustments in the official IRS records, according to the IRS,

9   dated -- all dated September 30th, 2013, right before this

10  trial started.

11          And I would submit to you that whoever is in charge

12  of the IRS's official records didn't accept Agent Maurer's

13  calculations.

14          What does that mean?  That the IRS disagrees, you can

15  infer that the IRS disagrees, itself, based on these documents,

16  with Agent Maurer's calculations.

17          Now, again, with respect to the conspiracy, I'll give

18  you a few quick pointers.  The conspiracy -- because this isn't

19  just any conspiracy, it's a tax conspiracy, you have to say

20  that they actually conspired to defraud the IRS.  The points

21  I've already raised with you is that the IRS doesn't even

22  appear in this case, and for that matter, taxes don't even

23  appear in this case, and there is no evidence of an agreement

24  between Dr. Fredrick and Dr. Hough to conspire to defraud the

25  IRS.

1          And interestingly enough, that last little part is

2     also important.  Because this is a slightly unusual case.  But

3     what the government has done is, again, showed you all the

4     overt acts can group into the zero.  But the overt acts have to

5     have one special quality about them.  Every one of the overt

6     acts that you can actually consider to convict has to be on or

7     after May 15, 2007.

8          Ms. Finley mentioned this in her opening, and you

9     will hear in the instructions, there are, guess how many -- you

10    don't have to guess, I'll tell you -- 109 overt acts that are

11    charged here; 109.

12         Now, what Ms. Finley didn't tell you is how many

13    overt acts are left if you get rid of all the overt acts before

14    May 15, 2007; 84 go by the by.

15         So why would the government charge 109 overt acts, 84

16    of which are statute barred, you can't even consider them to

17    convict, because they're before May 15, 2007.  I would suggest

18    that's indicative of their entire approach in this case.  What

19    they're hoping to do is throw everything against the wall,

20    splatter the wall, and hope something sticks.  They're hoping

21    that they can throw 109 overt acts out there.  And you're

22    thinking:  Wow, if there's 109 overt acts, this has got to be a

23    tremendous amount.

24         And they're not even telling you that 84 of them are

25    statute barred.

1          And then they're doing the same things with the

2     counts in this case.  They're saying:  Okay, well, here, we're

3     not just going to charge one count, we are hoping, if we charge

4     five counts, maybe you, the jury, will think:  Oh, we'll just

5     convict of one count because that means we're not convicting of

6     the other four.

7          That's the whole methodology here, that:  We'll just

8     throw it all against the wall and hope that the jury closes its

9     eyes and splits the baby, or does something along those line.

10          And again, what happens is you, the jury, have heard

11     the evidence; that's the problem, not the testimony of the

12     government lawyers, but the actual evidence presented.  And the

13     actual chart shows you that even the ones that's 24 or so that

14     are left of the overt acts, they all fit within this chart, and

15     they all had zero impact on the conspiracy.

16          Now, let me talk a moment about Schedule B --

17          If we can get to Schedule B there.

18          Schedule B actually is the second part.  So the

19     Counts 6 through 9 have two parts.  They say first, the total

20     income line is substantially understated, that's a reason that

21     it's false.  I have just explained ad nauseam why the total

22     income line is a bunch of zeros here.

23          The second part is the Schedule B.  With the

24     Schedule B, it has Part 3.  In Part 3, there are a number of

25     questions that are asked.

 1              What do we know about Schedule B, Part 3; here's what
 2     we know, let me take you through the evidence.
 3              Starting in the first meeting that the -- Dr. Hough
 4     and Dr. Fredrick had with Tom Murtha, remember the dates, and
 5     the dates are very important.
 6              What I ask is that it was -- when did you first meet,
 7     2001 or 2002?
 8              And again, whether you're trying to evaluate a
 9     witness, look at whether or not what they're saying has a real
10     memory to it.  He has had thousands of clients since 2001 and
11     2002.  The meeting he had with Dr. Patricia Hough and
12     Dr. Fredrick was not a -- it was maybe a new client meeting for
13     him, but it wasn't a new client.  He had the files from Ray
14     Flischel in front of him that had the boxes "no" checked out
15     before.
16              The government keeps saying:  Well, he had to ask the
17     question then, or else he wouldn't know what to put in the
18     boxes.
19              Well, what he testified is that, every year, he never
20     asked the questions thereafter.  And would I suggest he didn't
21     ask them that year either.
22              Well, what if he had asked the question in 2001?
23              Remember, tax time, that he is meeting with them in
24     2001, is for the 2000 return.  Well, tax time is April, 2001.
25              When does the first joint bank account get opened for

1    Dr. Patricia Hough and Dr. David Fredrick?

2           The date, written by somebody else on the Form As, is

3    October 17, 2001.  October 17, 2001.  In their best theory,

4    when Mr. Murtha is meeting with them, in around tax time on

5    2001, Dr. Patricia Hough doesn't have a joint account at that

6    time at UBS.  She doesn't.  And that's assuming that he ever

7    asked this question, because would I suggest this was more of a

8    continuation interview, since he had all the returns right in

9    front of him, than a new client interview of which he is

10   certain, that is what he said on the stand, he has this memory

11   of an unmemorable 20 to 30-minute conversation, 12 years

12   before, of which he is certain.  I would suggest that that is

13   not an accurate memory.

14          But then he goes ahead and says:  Oh, I asked about

15   foreign bank accounts.

16          But then I asked him, and we probed a little further,

17   this Schedule B has something called CB-2, for exceptions.

18          And what does that mean?

19          You can actually read it.  It says if the exceptions

20   apply, you can check the box no, completely accurately.

21          I asked him:  What's the date; is it part of the tax

22   return?

23          No.

24          Is it part of something?

25          No.

1          Do you know what B-2 is?

2          I have no clue.

3          Maurer says it's part of the instructions.  It's part

4    of a 140-page packet not included with these returns.

5          But then we went ahead and asked Mr. Murtha:  Well,

6    what are the exceptions; did you ever explain the exceptions to

7    Dr. Fredrick or Dr. Hough?

8          No, I never explained the exceptions to them.

9          Well, you didn't explain the exceptions, so how do

10   you know what the answer should be?

11         I don't know.  Because I'm not -- that's not my level

12   of expertise, but I'm still filling out the form every year.

13         How about the signature authority; the -- Schedule B

14   talks about signature authority, what about that?

15         Well, I never had a discussion about signature

16   authority.

17         So, I mean, you didn't even know to ask the question.

18         And that's the whole point here.  When you go to

19   someone that you believe has expertise, you don't think you

20   have to come up with, and volunteer, questions that you don't

21   know even apply.  You heard, in 2006, Dr. Hough doesn't even

22   have a Schedule B and didn't even know it was missing.

23         So again, you go to the expert, to get the expert to

24   ask you the questions.  If you're going to a doctor, and you

25   have certain medication, and the doctor says what medication

1    you are on, and you give him a list, and you didn't tell him

2    about the herbal supplements that you are also taking, but they

3    didn't ask you about herbal supplements, and you assume

4    medication was a prescription medication, did you lie to your

5    doctor; is it upon you, the responsibility to know that

6    medication includes herbal supplements?

7         Similarly here, Dr. Hough says she has never read,

8    studied, or any way, a Schedule B, Part 3.  The Schedule B she

9    looked at was the interest and the dividends, not these

10   questions buried at the bottom of Schedule B.  She expected her

11   tax preparer, if the information was important, like it is for

12   the alternative minimum tax, Schedule D, Schedule E, to ask the

13   questions.  He never did because he never, unfortunately, knew

14   to ask the questions.

15        So it's not volunteered going forward, and the

16   information never ends up on the return.  But when Dr. Hough

17   signs that return, she believes in good faith that she is

18   signing it correctly.

19        And what you'll hear about the good-faith instruction

20   is that, when you go ahead and sign a return in good faith,

21   even if it turns out later that you're wrong, that the IRS can

22   find out that you're actually -- you made a mistake on your

23   return, you are not guilty of a criminal violation.

24        Let me say that again:  If you sign it in good faith

25   and believe you're correct, but it later turns out you are

1    wrong, it's a 100 percent defense to a criminal violation.

2              And so what is the other evidence that the government

3    has with regard to Schedule B in this foreign bank account?

4              Well, supposedly a conversation in 2008, with Tom

5    Murtha, and Dr. Fredrick, and Dr. Hough, in which he's

6    discussing the UBS stuff.

7              Now, how do we know that that's actually 100 percent

8    false?

9              In 2008, and you can look -- they're meeting in 2008,

10   which he's preparing the 2007 return.  The 2007 return is dated

11   April 9th, I think it's April 9th, 2008.

12             What doesn't happen by April 9, 2008?

13             Guess what, UBS going ahead and closing down any bank

14   account.  It couldn't be in the news until, as the government

15   said, the summer or fall of 2008.  So if Mr. Murtha is having

16   some supposed conversation about this UBS bank account, or UBS

17   situation, such that he is now asking the question in 2008, it

18   can't occur, because those are questions that would be asked

19   around April, 2008, and this situation does not come to light

20   until August, or at least October, 2008.

21             Again, when you're evaluating the credibility of a

22   witness as to whether or not they were asked that question, you

23   can absolutely look at your common sense and evaluate whether

24   or not that witness is correct.

25             And again remember, in 2008, the only thing Dr. Hough

1   had at that point was signature authority -- and by the way,

2   what am I talking about?  She didn't have signature authority.

3   She wasn't one of the authorized signatures of any of the

4   accounts opened in 2008, because they are New Vanguard, Top

5   Fast, and Ample Dynamic.

6          So even if he had asked the question, "Do you have

7   foreign accounts," in 2008, which he never asked, he didn't go

8   into signature authority at all.

9          Let me talk a moment about reasonable doubt.  Because

10  the standard of reasonable doubt here is proof beyond a

11  reasonable doubt.  This is the highest standard, the highest

12  standard, in the U.S. criminal justice system.  It's sort of

13  the Mt. Everest of evidentiary standards.  There is no higher

14  standard in the system.  And the reason is that this is a

15  standard dealing exclusively with criminal cases.  And what is

16  a -- because we are not talking about people's money, like we

17  would in a civil case, we are talking about a criminal case

18  here.

19         And what is basically the -- if we have the slide of

20  reasonable doubt, it says:  "Proof beyond a reasonable doubt is

21  proof so convincing that you would be willing to rely and act

22  on it, without hesitation, in the most important of your own

23  affairs."

24         And we'll get the slide up in a moment.  But let me

25  say that one again:  Proof beyond a reasonable doubt is proof

1    so convincing that you would be willing to rely and act on it,

2    without hesitation, so convincing, without hesitation, in the

3    most important of your own affairs.

4           That is quite a standard.  And let me actually -- in

5    searching for an appropriate analogy, let me try one here.  Let

6    me go into the medical field, since this case involves medical

7    schools and I thought a medical analogy would be appropriate.

8           Imagine that you are entrusted to make a medical

9    decision about whether or not to have a significant operation

10   for a loved one, maybe one as significant as brain surgery.  It

11   would be hard to think of a situation that would probably be

12   more important in the affairs of someone than making that type

13   of medical decision.

14          Now imagine that a government doctor told you to

15   operate, and presented you with evidence of the type and

16   quality that the government has presented in this case, against

17   Dr. Hough, evidence that shows a seriously flawed and deficient

18   investigation of the facts:  Dozens of witnesses never

19   interviewed; eight witnesses that never even bothered to meet

20   the patient here; evidence containing blank documents in the

21   patient file, mistaken documents, documents having nothing to

22   do with the patient, and they tell you to rely, especially, on

23   the government's expert.  They say, "Don't worry, we have this

24   expert who specializes in brain surgery," and they tell you,

25   "This is a great expert, and they've done a great report, and

1    that report says operate."

2          And then you learn the following things:  That that

3    expert that you're relying on has none of the qualifications

4    that they suggested that expert had; and that imagine if you

5    could look into the future, and 6 hours into the operation,

6    6 hours into a 12-hour operation, the expert comes running in

7    and says, "Wait, stop, I've changed my theory 180 degrees.

8    Stop.  We got a -- don't go forward with the operation, or do

9    the operation in a different way."

10         And the question that you would ultimately ask

11   yourself, with that type of analogy, is:  Would you hesitate,

12   for even a moment, to go forward with the operation, based on

13   that quality of case that's presented to you, in one of the

14   most important affairs of your life?

15         Would you hesitate for even a moment; are you so

16   convinced of that evidence that you wouldn't hesitate?

17         Because if you would hesitate in that situation, you

18   don't have proof beyond a reasonable doubt.

19         And in this case, by the same analogy, you would not

20   have proof beyond a reasonable doubt if you cannot -- and you

21   therefore cannot find Dr. Hough guilty of the crimes charged.

22         THE COURT:  Ten minutes, Mr. Hochman.

23         MR. HOCHMAN:  Thank you very much, Your Honor.

24         So what have we learned about this investigation and

25   how it was conducted?

1          Was it an honest, impartial, search for the truth; an

2   investigation that was designed to follow all leads wherever

3   they may take you, a search for justice?

4          I mean, you heard back in the original part of this

5   investigation that only two names were given:  Dr. Hough and

6   Dr. Fredrick.  And they never varied from that conclusion at

7   any point in this case, no matter how much evidence came out

8   that Dr. Fredrick and Dr. Hough didn't own The Foundation, and

9   didn't own these various entities.

10          Now, ladies and gentlemen, there's another way that

11   we can talk about reasonable doubt, and that's the notion of

12   character.  Character.  Dr. Hough's admitted herself -- and

13   didn't have, you'll hear that she didn't have to testify --

14   that Dr. Hough actually was willing to put her character on the

15   line, to let the government take its best shot, and say,

16   "Dr. Hough, here is all the evidence we have of your bad

17   character."

18          And you'll hear that character evidence alone, good

19   character evidence, can create that reasonable doubt with

20   respect to each one of the charges.  And what you've heard

21   about Dr. Hough's character is that it's basically an

22   impeccable character.  It's a character . . . .  Of the people

23   who know her -- in fact, let's look at just a few of the

24   snippets of testimony from people who know her.

25          Tom Murtha, he said that Dr. Hough has average tax

1    knowledge, she's conservative and conscientious about her

2    taxes, she disclosed and filed an amended return when she

3    realized that a mistake was made in her taxes.

4          We have David Minchenberg:  Dr. Hough wanted to be in

5    compliance with her tax obligations -- remember, that's the

6    5471 obligations that the IRS gets, and if they didn't get,

7    they would never know of.  She was cooperative in providing tax

8    information.

9          We have Charlene Varga, her sister, who said

10   Dr. Hough is trustworthy, she's generous, she's a role model.

11   She's known her for 63 years.

12         We have Dr. Paul Dalbec:  Basically, Dr. Hough took

13   advice and direction from others on financial matters.  She

14   lives a modest middle-class lifestyle, she's straightforward.

15   He believes she's done everything honest, and he doesn't

16   believe she's up to anything illegal.

17         We have Dr. Alan Gruber:  Dr. Hough has a superficial

18   understanding of financial.  She was not involved with the

19   financial aspects of the schools.  She is nevertheless

20   100 percent forthright and honest.  She's never less than

21   100 percent forthright and honest.  It would make her extremely

22   uncomfortable to bend the rules or cut corners.  He has never

23   known her not to play by the rules.  She is a woman of enormous

24   integrity.

25         And then we have Antoine Solagnier:  Dr. Hough

1   referred all financial matters relating to the schools to

2   Dr. Fredrick.  He has never had reason to mistrust her; in 20

3   years he has never had reason to doubt her honesty and

4   integrity.

5           And then we have Judge Thomas Walker:  Financial

6   matters are not Dr. Hough's strong suit.  She does not

7   understand details of financial structure.  She relies on

8   others to guide her on financial issues.  In 50 years that he

9   has known, he has never had reason to doubt her integrity.

10  Dr. Hough's character for truthfulness and honesty is

11  absolutely top drawer.

12          You've heard a lot of accounts, bank accounts in this

13  case, but there is one account that you absolutely should

14  consider, and that's the account of good character.  And

15  Dr. Hough has been making deposits into the account of good

16  character her whole entire life.

17          You have heard, from the time she was a child, taking

18  care of her sister when her mom was working; taking care of her

19  mother; working part-time, 20 to 30 hours a week, in high

20  school, to put herself through high school, to get a

21  scholarship; gets a scholarship; and then works 20 to 30 hours

22  a week in jobs like being a maid, a hostess, a waitress, that

23  she goes ahead and, during this entire time while she's working

24  and going to school, volunteering all over the world, in

25  Appalachia, in Mississippi, in Guatemala, in Mexico, for

1  projects to help the underserved and needy.

2           You heard that when she graduates, she wants to be a

3  doctor and has to put that dream off because she doesn't have

4  the money.  But she then becomes a social worker in the inner

5  city schools in Chicago, serving the very needy and unserved.

6  Then you find out that she goes to Europe, and she helps

7  educate the troops and their families.

8           Then she comes back and finally gets the chance to be

9  a doctor, and all the time is volunteering.  Then you heard her

10 on the stand that she has been volunteering, volunteering, not

11 just somehow starting in 2009, but her entire life, all over

12 Saba Island, giving supplies, as does The Foundation, all over

13 Guatemala, El Salvador.  You heard reams of testimony about

14 this.

15          And what did the government present to you, to say

16 that she has any bad character?

17          Not a witness.  Not a document.  Nothing.

18          And when you're evaluating whether someone of her

19 character would knowingly and willfully commit these crimes,

20 that character evidence alone can be cause for you to find

21 reasonable doubt without anything else.

22          Now, ladies and gentlemen, normally in a case like

23 this, the evidence leads to the conclusion.  But here what we

24 had was a conclusion in search of evidence.  And when it didn't

25 find evidence it liked, it ignored it, as Agent Maurer ignored

1  the evidence.  When it found evidence that actually showed the

2  conclusion was wrong, it buried it, and didn't present it to

3  you, the jury.  We had to present it to you, the jury.

4       That's not how it is supposed to happen.  That's not

5  how you conduct a search for are truth.  Because the government

6  isn't supposed to be here to get convictions.  They're supposed

7  to be here to serve justice.  And they do that when they seek

8  out all the evidence, the good, the bad, and the ugly, whether

9  it's consistent with their theory or not.  They didn't do that

10 here.

11      Dr. Hough has lived a four-year nightmare, a

12 nightmare that ended up destroying her marriage, a nightmare

13 that could have been avoided back in April or May, 2009, when

14 Agent Maurer got those files.  If Agent Maurer had done what

15 she had done in correspondence or audits for two years, and

16 sent a letter and said, "Dr. Hough, we have some issues with

17 your returns, we have some issues with these accounts, can you

18 come in, have a discussion, and if there's a problem, let's see

19 if we can fix it," like Agent Maurer testified she did for two

20 years, and dozens and dozens, if not hundreds, of times.

21      Agent Maurer, Special Agent Cameron Lalli, the

22 prosecutors, they didn't pick tup phone and call Dr. Hough back

23 in April or May of 2009.  What they decided to do was launch a

24 criminal investigation for four and a half years, creating the

25 nightmare that we have had.

1           Well, ladies and gentlemen, on this day, at this

2   time, you have the power to end that nightmare.  You have that

3   power right now to end this nightmare for Dr. Patricia Hough.

4           And this is the most frightening point in this trial

5   for me.  I told you I was nervous before, back in opening,

6   during jury selection, I'm really nervous now, and here is why:

7   The reason I'm nervous is, I'm about to sit down, and when I

8   sit down, I'm absolutely sure I'm going to think I had a lot

9   more things to share with this jury that I just didn't have a

10  chance to talk about.  And I know the government is going to

11  get a chance to come up right after me.

12          And the reason they get that chance is that they have

13  this enormous burden of proof, the "without hesitation, so

14  convincing, and the most important affairs of your life" burden

15  of proof.  And because they have the burden of proof, they will

16  get the last word.

17          And the reason I'm nervous is, I won't get a chance

18  to come back up in front of you and rebut what Ms. Finley says.

19  You folks have to do that.  You have to basically ask yourself:

20  What would Dr. Hough and myself have said when Ms. Finley goes

21  ahead and makes the arguments she's going to make; what would

22  they have said to rebut those points, and show the evidence

23  that has been presented at this trial to show that Dr. Hough

24  did none of the things the government alleges that she does?

25          Because I would submit to you that, after you have

1    fairly and impartially considered all of this evidence, that

2    you will absolutely conclude that the government has failed to

3    meet its burden of proof to show that Dr. Patricia Hough

4    conspired with anyone to defraud the IRS in Count 1, and

5    knowingly and willfully filed any false returns for 2005 to

6    2008, in Counts 6, 7, 8, and 9.

7                I would submit to you that the only verdict that you

8    can return, based on the evidence presented in this case, is a

9    verdict of not guilty on all the counts.

10               Thank you very much.

11               THE COURT:  Ms. Finley?

12               MS. FINLEY:  Your Honor, may I have a five-minute

13   break . . . or a two-minute break?  I just need to go to the

14   lady's room.

15               THE COURT:  I understand that.  I'm not going to deny

16   you the break, I'm just thinking if we need to take a lunch

17   break.

18               MS. FINLEY:  I'm not sure I'm going to use my full

19   half an hour, so . . . .

20               THE COURT:  All right.

21               I'm going to give everyone a five-minute break

22   because I want to get the closing arguments done, then I'm

23   going to let you go to lunch.  Then, when you come back, I'm

24   going to give you the instructions.

25               She has 32 minutes left, so you can have a time

1    estimate.  Let's take five minutes.  Again, all the

2    instructions I gave you before still apply.  Don't talk about

3    the case.

4               (At 12:09 PM, the jury was escorted from the

5         courtroom.)

6               THE COURT:  All right.  Five minutes.

7               (At 12:09 PM, court was recessed.)

8                         AFTER RECESS

9               (At 12:17 PM, court was reconvened.)

10              THE COURT:  Are both sides ready for the jury?

11              MR. HOCHMAN:  Yes, sir.

12              MS. FINLEY:  Yes.  Thank you, Your Honor.

13              THE COURT:  You're most welcome.

14              Have the jury step in, please.

15              (At 12:18 PM, the jury was escorted into the

16        courtroom.)

17              THE COURT:  And you may proceed.

18              MS. FINLEY:  Thank you, Your Honor.

19              Ladies and gentlemen, I'm going to apologize in

20   advance, because my rebuttal argument is not going to be quite

21   as flowing as my closing argument, but I have a lot of things

22   that I want to talk with you about, so it's going to probably

23   jump all over the place a little bit, so I want to apologize.

24              First of all, I want to talk to you about "beyond a

25   reasonable doubt."  It is a very high standard, the government

1   does have the burden.  But I submit to you that you use beyond

2   a reasonable doubt every day in your normal life, sometimes in

3   life or death situations, but at other times it's something

4   that we implement all the time.

5          For example, you're driving in your car, you pull up

6   to a stop light or a stop sign.  You stop.  You look both ways.

7   And you are sure, beyond a reasonable doubt, that there's no

8   other cars coming when you pull out into the intersection.  We

9   use it all the time, and we rely on that.  It is a very high

10  burden, I am not trying to downplay that.  But it's not about

11  life or death all the time.  It's something that we rely on,

12  it's a high standard, but we use it in a lot of different areas

13  of our life.

14         So the first thing I want to talk with you about is

15  who the government did and didn't talk to.  So there are some

16  people on that list, like Mr. Hiltzik.  I think, if you

17  remember, Mr. Schneider testified that Mr. Hiltzik, who was the

18  audit partner, actually lives in a nursing home and has early

19  onset dementia, so the government is not in a good position to

20  talk to him because he probably does not remember what is going

21  on.

22         And I would submit that who the government or didn't

23  talk to, and Mr. Hochman's talking about that, is a

24  diversionary tactic for you to not look at what Dr. Hough and

25  Dr. Fredrick are actually telling you in the paper, the

1    documents, their actions and their omissions.  They want to

2    divert your attention from the evidence that the government

3    presented to you in this courtroom.

4            And that is actually what Ms. Maurer relied upon, the

5    same information that you are going to review.  But I want to

6    talk about a little bit why her May 14th draft report is not

7    really inconsistent or a mistake with the testimony that she

8    actually gave at the trial.

9            And this starts with something called a taxable

10   event.  Revenue Agent Maurer explained to -- and let me take a

11   step back.  Mr. Rivera testified that he doesn't know what

12   information she had on May 14, 2008, in order to do that

13   computation.

14           And she testified that she didn't have the six

15   series, the documents that -- where Dr. Hough and

16   Dr. Fredrick -- and I submit to you that you can go back and

17   you can read those documents, and you will determine what

18   Dr. Fredrick and Dr. Hough understood that they were signing.

19   Read those letters.

20           The Judge didn't tell you that you have to leave your

21   common sense out on the sidewalk before you enter this

22   courtroom.  You bring it with you into the jury room.  Think

23   about how people talk about things, the words that they use.

24   If things don't make sense with what they really believe, they

25   speak up.  They say, "Wait a second, own or control, I have a

1    different understanding of that.  They can't sell an equity

2    interest in something that they don't own."

3           And so Mr. Rivera doesn't know what Ms. Maurer had

4    when she did her computation on May 15th.  And she testified

5    that she listened to all the same evidence that you have.

6           Now, Revenue Agent Maurer, in her May 14th

7    computation, the five million dollars, and the two and a half

8    million dollars that got separated out, that have come off of

9    her computation, that's this money, ladies and gentlemen.

10   That's when . . . Patricia Hough and David Fredrick caused MUA

11   and Saba to send $3.1 million, and $2.2 million, $5 million,

12   and $2 million, into the accounts that they owned and

13   controlled.

14          You heard Jeffrey Gallant say that when he talked to

15   Dr. Fredrick, there was the handwritten note on that one

16   document from the audit that said New Vanguard?

17          Jeffrey Gallant, in 2006, said, I asked him:  Who

18   owns New Vanguard?

19          He said:  Dr. Fredrick does.

20          So, in the May 14th computation, Ms. Maurer said that

21   she did not have that six series to be able to definitively say

22   they own the schools.  But her computation accounts for the

23   fact that she did think they owned everything else, that this

24   was their account; that the money flowed from their joint

25   account, the individual accounts, and then into New Vanguard.

1            These are just nominees.  And so when she diverts

2    money from the school, if we, at the time -- she did not feel

3    confident to say definitively, they own The Foundation, when

4    they divert the money into another account that they

5    definitively do own, and they use that money for their dominion

6    and control, for things that they spend, that's the taxable

7    event.

8            Now, after she sat through the trial and heard the

9    same testimony that you heard, she testified that, based on the

10   six series and the other documents, and the testimony that came

11   out that, she could say unequivocally that they owned the

12   schools.

13           And because of that, ladies and gentlemen, you don't

14   double count.  The taxable event now is at the level of The

15   Foundation and MUA.  All the money that's earned in the Saba

16   and MUA accounts, that's theirs.

17           She also testified, the reason that she didn't put it

18   into her computation was because she didn't have definitive

19   numbers.  It's the same reason why she gave the defendant the

20   benefit of the doubt when she was computing the capital gains.

21   It's because she didn't have the basis.  The government is not

22   going to attribute a number just coming out of thin air.

23           So she gave you the numbers that she could

24   definitively tell you, "I sat down, in the New Vanguard

25   account, in the joint account, in the Top Fast account, and I

1    traced every single dollar."

2            She went through that 30 series, ladies and

3    gentlemen.  She literally recreated the bank records.  And I

4    would submit to you, take a look at that.  They have not

5    refuted any of that computation.  They're refuting they don't

6    own The Foundation.

7            So it's either she owns The Foundation or she

8    doesn't.  If she owns The Foundation -- and I submit to you

9    that their actions, their acts, their words and their

10   omissions, prove to you that they did -- then all of the income

11   is theirs.  And when they spend that money, it's not a second

12   taxable event.

13           It's just like with your paycheck.  You get a

14   paycheck, it's taxable when you earn the money.  When you go

15   home with your paycheck and you decide, "Well, I want to go on

16   vacation, or I'm going to buy groceries, or I'm going to put it

17   into my savings account," you don't tell the IRS, "Oh, well,

18   now I get taxed a second time."

19           That's what they're telling you that Revenue Agent

20   Maurer should have done.  And that's not what she did.  She

21   taxed it when the taxable event happened, when they earned the

22   income.

23           And I also submit to you, ladies and gentlemen, that

24   what they're really arguing is that there is actually more

25   income that the government didn't get a chance to compute for

1   you.  And I would submit, based on your review of her records,

2   recalculating, and understanding all these records, with

3   incomplete documents, she did what she could with the records

4   that she had.  She wasn't going to come up with information,

5   she went with things that she knew she could show you, as far

6   as a number goes.

7          And so she walked you through the records.  She

8   showed you how she had to cross reference, because in the

9   security statements it only said the valor number, it didn't

10  say how many shares there were, and she had to go to another

11  document.  This is how it was for all the documents.

12         I would also submit to you, ladies and gentlemen, to

13  take a look at the Deferred Prosecution Agreement, take a look

14  at what UBS was required to provide the government, what it

15  could provide the government, and what it couldn't provide the

16  government, because of Swiss law.

17         And I submit to you to also look at what they were

18  required to supply us, as far as witnesses goes, because I will

19  submit to you, if you read that, it doesn't say that they have

20  to supply Mr. Luetolf to come here and testify.  It says they

21  have to supply a custodian to testify about the records.

22         Now, ladies and gentlemen, they also talked a little

23  bit about the fees that UBS earned, I guess over a million

24  dollars in fees.  But I would submit to you, ladies and

25  gentlemen, that the fees, they're a very small price to pay for

1    not having to pay your taxes.  And you can look at those fees

2    as a service charge for concealing her income and assets from

3    the IRS.  And she gets that as a deduction.

4          And they talk about how she doesn't know what's going

5    on in the account, she is never directing anybody.  But she

6    signs an asset management agreement, ladies and gentlemen.  She

7    indicates to UBS how she wants her account to be managed,

8    that's in all of the documents, so UBS doesn't have to call

9    her, just like if you have a stockbroker or a financial

10   planner, they don't call you every time they are going to trade

11   for you, unless that's the relationship you have, and you have

12   elected that from the beginning.

13         And I submit that you should take a look at

14   Exhibit 3KK, Page 13.  It's an e-mail from Dr. Fredrick to

15   Dieter Luetolf, on February 8th, 2005.  And Dr. Fredrick says

16   to Mr. Luetolf:  "Pat said you wanted to tell me about a plan

17   that she was in, that I'm not.  If you're not going to let her

18   make more money than me, are you?"

19         This is not evidence, ladies and gentlemen, that

20   they're worried about how much money The Foundation making,

21   they are worried about how much money they are making.

22         And again, the fact -- the government is not here to

23   dispute that Dr. Hough is not an extremely charitable person,

24   that she hasn't done wonderful things with her life, that she's

25   not service oriented, but sometimes good people do bad things,

1    and that doesn't negate willfulness.

2            Her friends and the people that she worked with,

3    Dr. Dalbec, Dr. Gruber, they can think highly of her, but they

4    don't know all of the information because she's not telling

5    them.  And there's a lot of trust going on here, ladies and

6    gentlemen.  There's trust from those people.  But they don't

7    know anything about her personal finances, both Mr. Walker, I

8    think even Dr. Dalbec, Dr. Gruber, they have no idea how she

9    spends her money after the schools are sold.  They don't even

10   know what kind of house she lives in.  And again, how people

11   spend their money is not necessarily indicative of how rich

12   they are.

13           There's also a lot of trust going on with Dr. Hough

14   and Dr. Fredrick and the bank, Mr. Luetolf, Mr. Singenberger.

15   They have to trust that the information they are providing is

16   to be carried out as they ask.  That's why they don't get the

17   bank statements.  Take a look at the bank opening documents.

18   They say, "Retain bank statements."

19           If they are the caretakers of The Foundation, ladies

20   and gentlemen, don't you think they'd want The Foundation to

21   have bank statements, so The Foundation, the board of

22   directors, they could make reports to the board of directors

23   about where all the assets are?

24           The fact is, nobody at The Foundation, not the CFO,

25   not the board members, they don't know anything about these

1    accounts, other than they have rubber-stamped some sort of

2    power of attorney that allows Dr. Fredrick and Dr. Hough the

3    opportunity to go and open these accounts.

4            And let's talk about rubber stamps for a second.

5    Florencio Montenegro.  The government would submit to you, like

6    Mr. Singenberger, Florencio Montenegro is nothing but a rubber

7    stamp.  If you take a look at all the exhibits where his

8    signature appears, I ask you to compare them.  And using your

9    common sense, you tell me if that's somebody that's considering

10   the duties he had as a board member, and whether that might be

11   someone who is just rubber-stamping a document, a piece paper,

12   to make it look like what he needs or she needs it to look

13   like.

14           Because the paper, ladies and gentlemen, a piece of

15   paper that says this is a foundation, that is a form.  And

16   Dr. Hough would like you to believe that if you take a little

17   sign and you put it over The Foundation, you say "foundation,"

18   it's a foundation.  But you can't just put a little tag on it

19   and say it's a foundation, when the way that they are using it,

20   controlling it, all of their acts surrounding it, the things

21   that they write in those documents, you can't call a duck a

22   chicken, it's a duck.  And that's what's going on here, ladies

23   and gentlemen.

24           Mr. Minchenberg told you to look at all of the

25   transactions, that that was what the IRS would do.  See what's

1    going on each step of the way.  And Mr. Hochman talked about

2    the overt acts and what's going on before 2007, as if somehow

3    that doesn't matter, you shouldn't worry about it.

4            First of all, there's a legal reason why you need to

5    find something after 2007, and that's the statute of

6    limitations.  So the government does have to prove that one of

7    the conspirators took an act to further the conspiracy after

8    May 15, 2007.

9            But those overt acts, they serve another purpose.

10   And it is not an issue of whether they are significant or not.

11   The entire conspiracy, the entire course of conduct alleged by

12   the government, this tells you the story.  It explains to you

13   why people are doing what they're doing, how they're doing it.

14   It shows you the defendant's intent and her knowledge.

15           And these are the defendant's own acts.  This is

16   their purposeful way that they go about carrying out the

17   conspiracy.  You can't have X, Y, Z, without A, B, C, D, E, F,

18   G, as Mr. Minchenberg said.  You need to look at the totality

19   of the conduct.

20           I also would submit, if you take a look at Revenue

21   Agent Maurer's testimony and her schedules, you can't steal

22   from yourself.  If the government's theory is correct, and I

23   would submit that it is, that The Foundation is their money,

24   they're not stealing from The Foundation.  They're stealing

25   from the United States Treasury.  Because they're not paying

1    their fair share over to the government.

2              I would also ask you to look at Revenue Agent

3    Maurer's transactions, where she tallies everything that comes

4    in and out of that account.  I ask you to look at that and see,

5    from the time periods that are in those binders, if anything is

6    happening in that account that relates to the school.  There

7    are no expenditures for the school, save for the $250,000

8    coming out of the account for purchase of the land, for Round

9    Hill, that have anything to do with building buildings,

10   operating the school, charitable activities of The Foundation.

11   All that is going on in those accounts, ladies and gentlemen,

12   is, it's earning money for the defendant tax free, and then

13   she's spending it.

14             And the fact that she's not directing the wire

15   transfer doesn't mean she doesn't know about it.  She testified

16   that, in 2009, when she found out that Dr. Fredrick gave his

17   siblings $1 million, she felt betrayed.  She felt betrayed

18   because she said that she and Dr. Hough were a team who

19   discussed financial transactions, that they decided how money

20   was going to be spent together.  So she can't have it both

21   ways.  She can't both know things about the asset protection,

22   and then not know things for other reasons.

23             In talking about the asset protection, ladies and

24   gentlemen, the Judge is going to instruct you that, when a

25   defendant testifies, you evaluate his or her testimony the same

1   way that you evaluate all the other witnesses.  And I submit to

2   you that her story about asset protection just doesn't make

3   sense, that the timing of the events, and this idea that,

4   somehow:  Sometimes it's okay to have it here; and then, I

5   don't know, Dr. Fredrick told me that maybe it wasn't safe

6   anymore, and Hong Kong corporations were now going to be

7   better, and so we had to move there; but then, oh, it was okay

8   to open an account in the same of the school; and then, oh, no,

9   somehow now the Bahamas isn't safe; and, oh, no, now

10  Switzerland or UBS isn't safe.

11         Look at when those events are happening.  It all

12  happens at around the time that's talking about disclosure.

13  And she's not worried about the account in the United States,

14  she's only worried about the accounts overseas.

15         There's another interesting thing that Dr. Hough

16  testified, and she talked about asset protection in layers,

17  that these were all the layers that were supposed to protect.

18  And I don't know that she could really explain that to you, and

19  I think she couldn't explain it to you because, I would submit,

20  that that really wasn't what was going on.

21         But I ask you to peel back those layers, peel back

22  the nominee entities that Dr. Hough and Dr. Fredrick put in

23  place to conceal their interests in, their control over, all of

24  these companies and their income and their assets.

25         If you go from A to Z, Dr. Hough and Dr. Fredrick,

1    they're at A, and they're at Z.  You can't put a bunch of paper

2    entities in between, and jump up and down and say it's The

3    Foundation, when the evidence, their own words, their own

4    actions, refutes that.

5           And the information that goes into these accounts,

6    ladies and gentlemen, Mr. Futterknecht testified that

7    Mr. Singenberger and Mr. Luetolf have a duty to accurately put

8    the information on there.  They're getting the information from

9    Dr. Fredrick and Dr. Hough.  She fills out at least ten

10   different accounts, maybe eight different accounts, where she's

11   actually signing the documents.

12          If Dr. Fredrick is putting things in front of her:

13   Okay, the first time, I trust my husband, I'm going to sign

14   something; the second time, okay; but then I'm thinking, Huh,

15   I'm this caretaker of the Foundation, and either they're blank

16   or they're not, according to her, saying the right things, you

17   speak up, you say something.

18          You say, you know: Dr. Fredrick, I don't know, this

19   doesn't really seem to comport with what you're telling me for

20   these asset-protection purposes.  I'm on here, I don't want to

21   be on here, this isn't my money.

22          She doesn't speak up, ladies and gentlemen, because

23   she knows it's her money, and that's the point of it.  It's her

24   money, she knows it, she knows when she signs.

25          And Mr. Hochman pointed to the fact that there were

 1   two accounts at Fortis Banque that identify the Saba Foundation

 2   as the beneficial owner.  There are 17 accounts in total,

 3   ladies and gentlemen.  That's two.  And I would submit, in that

 4   one of those same accounts, that's where Dr. Fredrick provides

 5   a false document that says Saba School of Medicine Foundation

 6   still owns the school.

 7          So an equally possible answer to that, is that the

 8   15 other accounts, the ones that they are directly signing,

 9   where it says that Dr. Fredrick and Dr. Hough are the

10   beneficial owner, and even ones that they got Mr. Singenberger

11   to fill out, in June of 2009, those identify Dr. Fredrick and

12   Dr. Hough as the beneficial owners, that is what's the truthful

13   answer.

14          And asset protection, ladies and gentlemen, that's

15   okay.  Mr. Minchenberg testified to it.  Mr. Rodger testified

16   to it.  But they also told you that asset protection is not

17   about cheating on your taxes.  Mr. Rodger told you that there

18   might be different entities that he has things in for liability

19   purposes, but he reports those.  They're on financial

20   statements.  They're disclosed to the IRS.

21          Here, none of that is happening.  They're not telling

22   anybody about it.  The only people that know about all but

23   maybe the Saba and MUA accounts are Dr. Fredrick and Dr. Hough,

24   Mr. Luetolf and Mr. Singenberger.  That's it.

25          They don't tell the auditors, "Hey, you know, our

1   school, our Foundation, is so profitable, here is all of our

2   accounts.  Make sure you get it on there.  Round Hill property?

3   That's our hugest asset.  We sell that for 34, $33 million.  We

4   want to make sure that's listed as an asset on our school's

5   books and records."

6            But they don't, ladies and gentlemen.  And they don't

7   because they know it's theirs, and they know that, if they

8   disclose, it should be reported to the IRS.

9            With respect to counts-- the counts related to the

10  tax returns, again, the government submits that they had

11  boatloads of unreported income in 2005 through 2008.  It's the

12  investment income, the interest income, the profits.  Just

13  because Revenue Agent Maurer didn't give you a number, you have

14  the evidence before you to show that, in all of those years,

15  there were huge profits.  And if you believe and conclude that

16  they own The Foundation, then they should have reported those

17  profits on their tax return, and that would have made Line 22

18  substantially greater.

19           We don't have to prove a tax loss.  The government

20  never said that that RAR is an all-inclusive.  It's just some

21  of the money that we discussed at the trial.

22           Additionally, ladies and gentlemen, she has signature

23  authority on a lot of these accounts.  Notwithstanding even the

24  interest in the accounts, where she's identifying herself as

25  the beneficial owner.  She should have checked the box saying:

1    I have signature authority over a foreign bank account.

2            Ladies and gentlemen, I ask you, as an impartial

3    jury, you have been extremely attentive, you've taken notes,

4    you heard all the evidence, you've written down the documents

5    go back and review them for yourself.  You shouldn't trust what

6    I say, you shouldn't trust necessarily what Mr. Hochman says.

7    You have the evidence.  You have the defendant's own words to

8    listen to.

9            And her words tell you that she knows that she owns

10   The Foundation, that that is her income, that is her money, and

11   that she did not pay tax on any of it.  And the government

12   submits that that proves, beyond a reasonable doubt, that she

13   is guilty of all counts in the indictment.

14           Thank you.

15           THE COURT:  Move that down, please.

16           All right.  Ladies and gentlemen, as I told you,

17   we're going to break for lunch now.  We'll have you come back,

18   and then the Court will give you the jury instructions.

19           I know it's real tempting, because you're so close to

20   the end of the case, to talk about it.  But you still can't

21   talk about the case.  The good news is, you only have one more

22   person that's going to talk to you, that's me, for half an hour

23   or so, maybe a little longer than a half an hour, and then you

24   get to talk among yourselves for the first time.

25           So let's get back here -- it's quarter to 1:00 now,

1    let's get back at quarter to 2:00, and then I'll give you the

2    instructions and you can deliberate.

3              (At 12:43 PM, the jury was escorted from the

4         courtroom.)

5              THE COURT:  All right.  What did I say?  1:45.

6              MR. HOCHMAN:  Yes, Your Honor.  Thank you.

7              MS. FINLEY:  Thank you.

8              (At 12:44 PM, court was recessed.)

9                        AFTER RECESS

10             (At 1:49 PM, court was reconvened.)

11             THE COURT:  All right.  Mr. Saunders, I think I was

12   told you have an issue with the verdict form.

13             MR. SAUNDERS:  I can address it, Your Honor.  We just

14   noticed, and I apologize for not catching it sooner, but with

15   respect to the substantive counts, six through nine, the

16   verdict form for each one says, "as to Count" -- blank -- "of

17   the indictment, which charges that on or about" -- a date --

18   "Patricia Lynn Hough willfully made . . ."  I believe that the

19   proper mental state, according to the instructions, it should

20   say, "knowingly and willfully."

21             And it's the same with respect to the options that

22   the jury has for how the return was false.  In the second

23   option dealing with Schedule B, it should say, "knowingly and

24   willfully failed on Schedule B . . ." and those two changes

25   would apply -- actually, it should be . . . .

1          MS. FINLEY:  The intent standard is "willfully," but

2     she knows . . . .  The intent standard is "willful."  She's

3     making --

4          MR. SAUNDERS:  The instruction requires her to know

5     that it was materially false, and --

6          MS. FINLEY:  That she knew it was materially false

7     and willfully did it.  So I think that that doesn't

8     necessarily -- it's not knowing and willfully, it's just

9     willfully doing it, knowing it's false.

10         MR. UDOLF:  Well, there are two different states of

11    mind that she has for each type of violation of that statute.

12    She has to know it was false at the time made, and she has

13    to -- in spite of that knowledge, she has to intend the

14    unlawful result.

15         MR. SAUNDERS:  I think it would be correct, Your

16    Honor, to submit "knowingly and willfully" for both the initial

17    statement of the offense, before the not guilty/guilty, and

18    also with respect to each of the two options for how the

19    defendant specifically made a false statement.  The defendant

20    knowingly and willfully reported a total income, and defendant

21    knowingly and willfully failed, on Schedule B, etcetera.  The

22    "knowingly" doesn't capture the full requirement.

23         THE COURT:  Well, let me go to Page 2, Count 6, first

24    of all, and see if I understand what you're saying.

25         As to Count 6, you want that sentence to include the

1    word "knowingly," so it would read:  "As to Count 6 of the

2    indictment, which charges that, on or about September 15th,

3    2006, Patricia Lynn Hough knowingly and willfully made and

4    signed," etcetera.

5              MR. SAUNDERS:  Correct, Your Honor.

6              THE COURT:  And does the government agree to that, or

7    not?

8              MS. FINLEY:  We object, Your Honor.  The jury

9    instruction says that, in the beginning, it says the

10   defendant -- it's a federal crime to willfully and knowingly

11   prepare, that she willfully made and signed an income tax

12   return which she did not believe to be true and correct as to

13   every material matter, and then the elements.  And so the

14   intent stated under 72.061 is willful.

15             THE COURT:  All right.  That objection is overruled.

16   The indictment charges willful, as to Count 6 through 9.  So,

17   to the extent that you want that as to each of the verdict

18   forms related to six, seven, eight, and nine, that would also

19   be overruled.

20             You wanted something else someplace else, though, so

21   tell me what that is.

22             MR. SAUNDERS:  Well, as Count 6 continues, then, on

23   Page 3, Your Honor, the jury has two options to check for the

24   particular false statement.  The first one doesn't include any

25   mental state at all, and the second one includes "knowingly,"

1    where we believe it should be "knowingly and willfully," but at

2    a minimum should be "willfully."

3           THE COURT:  The first one does include a mental

4    state, but . . . .  Okay.

5           MR. SAUNDERS:  I see.

6           MS. FINLEY:  Your Honor, I think the introductory

7    paragraph to the count includes the "willfully made."  I think,

8    as the Court said, that the first prong that they could elect

9    does have the what she then, there, knew and believed.

10          And then we would agree that, with respect to the

11   second prong, instead of "knowingly," it should say,

12   "willfully . . . but not knowingly."

13          MR. SAUNDERS:  In that case, Your Honor, we'd ask

14   that "willfully" be inserted as the second word in the first

15   option as well, that the defendant willfully reported.

16          THE COURT:  And then you want me to strike the, "she

17   then knew and believed," language?

18          MR. SAUNDERS:  No.  Because that deals with

19   knowledge, which is a separate element than willfulness.

20          THE COURT:  And knowledge isn't included in willful?

21          MR. SAUNDERS:  It's actually a separate element, Your

22   Honor, under the instruction.  The defendant knew it contained

23   material false information, and that's Element 3.

24          And Element 4 is that the defendant intended to do

25   something that she knew violated the law, which is the

FINAL ARGUMENT BY MS. FINLEY                    139

1    definition of willfulness.

2              MS. FINLEY:  Then, Your Honor, if that's the case,

3    the introductory paragraph to each count says that, that she

4    willfully made and signed federal income tax return forms which

5    she did not believe to be true and correct as to every material

6    matter.

7              THE COURT:  Go ahead.

8              MS. FINLEY:  And then it says, if you find the

9    defendant guilty -- or not guilty, you skip it, but if guilty,

10   then indicate the manner.  And so then, to be consistent, you

11   would -- if you're taking the intent out of both of those

12   elements it would be, the defendant reported a total income of

13   183,000, on Line 22, for the 2005 calendar year, when her total

14   income was substantially greater, you would then remove that

15   she then knew and believed.

16             And for the other one, the defendant failed, on

17   Schedule B, Parts 1 and 3, Lines 7A and B, to report that she

18   had a financial interest, etcetera.  Because the intent

19   elements is in the introductory paragraph, both the willful and

20   the knowing.

21             THE COURT:  Well, why don't I just do this, and again

22   focusing on Count 6, as kind of the pattern, when we come down

23   to the two options for the first one . . . just say total

24   income of 183,167, for Line 22, for calendar -- for 2005

25   calendar year, and strike everything else, and then for the

1   second option is Schedule B, Parts 1 and 3, Lines 7A and 7B.

2            MR. SAUNDERS:  And strike everything else from that

3   second option as well, Your Honor?

4            THE COURT:  Exactly.  I mean, all we're trying to do

5   is not reinstruct the jury, but to have them tell us which of

6   the two options, if either, they find.

7            MR. SAUNDERS:  May I have a moment, Your Honor?

8            THE COURT:  Sure.

9            (Mr. Saunders and Mr. Hochman confer privately.)

10           MR. HOCHMAN:  Your Honor, the problem with ending it

11  where you said is that tax return -- she actually did report

12  her total income of $183,167.  The issue is whether or not the

13  jury finds there to be -- be that a substantial understatement

14  of her income, that she owed substantially greater than that

15  amount.

16           THE COURT:  Maybe that's what we should say,

17  substantial unreported income at Line 22, for calendar year

18  2005.

19           MR. HOCHMAN:  Yes.  I guess it's sort of a

20  restatement of the charge that the jury is finding that the

21  defendant reported substantially . . . .  Well, actually, it's

22  the defendant -- again, it goes back to the knowingly and

23  willfully.

24           THE COURT:  No, it doesn't.  All we are trying to do

25  is figure out which of the two options in the indictment they

FINAL ARGUMENT BY MS. FINLEY                141

1    find that she violated.  So I think we could probably say

2    underreporting, substantial underreporting of income at

3    Line 22, and then, for the second one, something like failure

4    to report Schedule B, Parts 1 and 3, Lines 7A and 7B.

5                MR. HOCHMAN:  Okay.

6                MS. FINLEY:  I'm sorry, can you just repeat the first

7    paragraph, how it would be altered?

8                THE COURT:  I'm not sure if I can.

9                MR. HOCHMAN:  Defendant substantially underreported

10   total income --

11               MR. SAUNDERS:  On Line 22.

12               MR. HOCHMAN:  -- on Line 22, for the 2005 calendar

13   year.

14               THE COURT:  Yes.

15               MR. HOCHMAN:  And then I think you could say

16   defendant, in the next one, defendant . . . .

17               MS. FINLEY:  We would just take out "knowingly."

18               MR. HOCHMAN:  Yeah, you could just take out

19   "knowingly" there:  The defendant failed to, on Schedule B, to

20   report that she had a financial interest, etcetera.

21               THE COURT:  So let me have you tell me again, for the

22   first option, "Defendant" --

23               MS. FINLEY:  -- "substantially underreported total

24   income on Line 22 for the 2005 calendar year."

25               MR. HOCHMAN:  And then for each year, for each count,

1    we've just got to adjust the year.

2            THE COURT:  All right.  So let me read the first one,

3    make sure we're on the same page.

4            The first option would read:  "Defendant

5    substantially underreported total income on Line 22, for the

6    2005 calendar year."

7            MR. SAUNDERS:  Right.

8            THE COURT:  And the second option would be:  "The

9    defendant failed, on Schedule B, Parts 1 and 3, Lines 7A and B,

10   to report that she had a financial interest in, or signature

11   authority over, financial accounts located in foreign

12   countries."

13           MR. HOCHMAN:  Yes, Your Honor.  I think that would do

14   it.

15           THE COURT:  And then do the same for each count?

16           MR. HOCHMAN:  Yes, Your Honor.

17           MS. FINLEY:  Yes, Your Honor.

18           THE COURT:  All right.  Counsel, do you want me to

19   begin with the instructions and give you the changes as we get

20   them done, or do you want me to wait, and so we can take a look

21   at what the version looks like?

22           MR. HOCHMAN:  Your Honor, I believe we could start,

23   certainly, and then we have -- we indicated our changes on

24   this.  Assuming that the version you get back tracks what

25   you've just agreed, to Your Honor, then you could probably read

1    it from the bench even.

2          THE COURT:  All right.  I've made notes, which I hope

3    are accurate, so I think we can do that.

4          MR. HOCHMAN:  Very good, Your Honor.

5          THE COURT:  My law clerk will give you a copy as it's

6    done, even if I'm instructing, so . . . hopefully, before we

7    get to that point, you'll have a chance to take a look at it.

8          MR. HOCHMAN:  Very good, Your Honor.  Thank you.

9          MS. FINLEY:  Thank you, Your Honor.

10          (The Court confers with the Courtroom Deputy

11       privately.)

12          THE COURT:  All right.  With that said, now, are both

13    sides ready for the jury?

14          MR. HOCHMAN:  Yes, Your Honor.

15          MS. FINLEY:  Yes, Your Honor.

16          THE COURT:  Have the jury step in, please.

17          (At 2:05 PM, the jury was escorted into the

18       courtroom.)

19          THE COURT:  Members of the jury, it is my duty to

20    instruct you on the rules of law that you must use in deciding

21    the case.  After I have completed these instructions, you will

22    go to the jury room and begin your discussions, what we call

23    your deliberations.  You must decide whether the government has

24    proved the specific facts necessary to find the defendant

25    guilty beyond a reasonable doubt.

1          Your decision must be based only on the evidence

2     presented here.  You must not be influenced, in any way, by

3     either sympathy for or prejudice against the defendant or the

4     government.

5          I see some of you are taking notes.  Feel free to do

6     that, but I'm going to give you a copy of the instructions to

7     read in the jury room, so if that impacts what you do, that's

8     fine.

9          You must follow the law as I explain it, even if you

10    do not agree with the law; and you must follow all of my

11    instructions as a whole.  You must not single out or disregard

12    any of the Court's instructions on the law.

13         The indictment, or formal charge, against a defendant

14    is not evidence of guilt.  The law presumes every defendant is

15    innocent.  The defendant does not have to prove her innocence,

16    or produce any evidence at all.  The government must prove

17    guilt beyond a reasonable doubt.  If it fails to do so, you

18    must find the defendant not guilty.

19         The government's burden of proof is heavy, but it

20    does not have to prove a defendant's guilt beyond all possible

21    doubt.  The government's proof only has to exclude any

22    reasonable doubt concerning the defendant's guilt.

23         A reasonable doubt is a real doubt, based upon your

24    reason and common sense, after you have carefully and

25    impartially considered all of the evidence in the case.  Proof

1    beyond a reasonable doubt is proof so convincing that you will

2    be willing to rely and act on it, without hesitation, in the

3    most important of your own affairs.  If you are convinced that

4    the defendant has been proved guilty beyond a reasonable doubt,

5    say so; if you are not convinced, say so.

6         As I said before, you must consider only the evidence

7    that I have admitted in the case.  Evidence includes the

8    testimony of witnesses and the exhibits admitted.  But anything

9    the lawyers say is not evidence and is not binding on you.

10        You should not assume, from anything I have said,

11   that I have any opinion about any factual issue in the case.

12   Except for my instructions to you on the law, you should

13   disregard anything I may have said during the trial in arriving

14   at your own decision about the facts.  Your own recollection

15   and interpretation of the evidence is what matters.

16        In considering the evidence, you may use reasoning

17   and common sense to make deductions and reach conclusions.  You

18   should not be concerned about whether the evidence is direct or

19   circumstantial.

20        Direct evidence is the testimony of a person who

21   asserts that he or she has actual knowledge of a fact, such as

22   an eye witness.  Circumstantial evidence is proof of a chain of

23   facts and circumstances that tend to prove or disprove a fact.

24   There is no legal difference in the weight you may give to

25   either direct or circumstantial evidence.

1          When I say you must consider all of the evidence, I

2    do not mean that you must accept all of the evidence as true or

3    accurate.  You should decide whether you believe what each

4    witness had to say, and how important that testimony was.

5          In making that decision, you may believe or

6    disbelieve any witness, in whole or in part.  The number of

7    witnesses testifying concerning a particular point does not

8    necessarily matter.

9          To decide whether you believe any witness, I suggest

10   that you ask yourself a few questions:

11         Did the witness impress you as one who was telling

12   the truth?

13         Did the witness have any particular reason not to

14   tell the truth?

15         Did the witness have a personal interest in the

16   outcome of the case?

17         Did the witness seem to have a good memory?

18         Did the witness have the opportunity and ability to

19   accurately observe the things he or she testified about?

20         Did the witness appear to understand the questions

21   clearly and answer them directly?

22         Did the witness's testimony differ from other

23   testimony or other evidence?

24         You should also ask yourself whether there was

25   evidence that a witness testified falsely about an important

1    fact, and ask whether there was evidence that, at some other

2    time, a witness said or did something, or did not say or do

3    something, that was different from the testimony the witness

4    gave during this trial.

5            But keep in mind that a simple mistake does not mean

6    a witness was not telling the truth as he or she remembers it.

7    People naturally tend to forget some things, or remember them

8    inaccurately.  So if a witness misstated something, you must

9    decide whether it was because of an innocent lapse of memory or

10   an intentional deception.  The significance of your decision

11   may depend on whether the misstatement is about an important

12   fact, or about an unimportant detail.

13           A defendant has a right not to testify.  But since

14   the defendant did testify, you should decide whether you

15   believe the defendant's testimony in the same way as that of

16   any other witness.  Evidence of a defendant's character traits

17   may create a reasonable doubt.  You should consider testimony

18   that a defendant is an honest and law abiding citizen, along

19   with all other evidence, to decide whether the government has

20   proved, beyond a reasonable doubt, that the defendant committed

21   the offense.

22           You must consider some witnesses' testimony with more

23   caution than others.  For example, witnesses who have been

24   promised immunity from prosecution may have a reason to make a

25   false statement in order to strike a good bargain with the

1    government.  So while a witness of that kind may be entirely

2    truthful when testifying, you should consider that testimony

3    with more caution than the testimony of other witnesses.

4           When scientific, technical, or other specialized

5    knowledge might be helpful, a person who has special training

6    or experience in that field is allowed to state an opinion

7    about the matter.  But that does not mean that you must accept

8    the witness's opinion.  As with any other witness's testimony,

9    you must decide for yourself whether to rely upon the opinion.

10          During the trial you have seen counsel use summaries,

11   charts, drawings, or similar material which were offered to

12   assist in the presentation and understanding of the evidence.

13   Unless the materials were admitted as an exhibit, this material

14   is not, itself, evidence, and must not be considered as proof

15   of any facts.

16          On the other hand, charts or summaries prepared by

17   witnesses Sheila Maurer and Luis Rivera have been admitted into

18   evidence, and have been shown to you during the trial for the

19   purpose of explaining facts that are allegedly contained in

20   books, records, or other documents which are in evidence in the

21   case.  You may consider these charts and summaries as you would

22   any other evidence admitted during the trial, and give them

23   such weight or importance, if any, as you feel they deserve.

24          You have been permitted to take notes during the

25   trial.  Most of you, perhaps all of you, have taken advantage

1   of that opportunity.  You must use your notes only as a memory

2   aid during deliberations.  You must not use your notes -- I'm

3   sorry -- you must not give your notes priority over your

4   independent recollection of the evidence, and you must not

5   allow yourself to be unduly influenced by the notes of other

6   jurors.  I emphasize that notes are not entitled to any greater

7   weight than your memories or impressions about the testimony.

8           The indictment charges five separate crimes, called

9   counts, against the defendant.  Each count has a number.  You

10  will be given a copy of the indictment to refer to during your

11  deliberations.

12          Count 1 of the indictment charges that, from on or

13  about February 24, 1999, continuing until on or about

14  April 15th, 2011, the defendant knowingly, willfully, and

15  unlawfully combined, conspired, confederated, and agreed, with

16  David Leon Fredrick, to defraud the United States for the

17  purpose of impeding, impairing, obstructing, and defeating the

18  lawful government functions of the Internal Revenue Service.

19          Counts 6 through 9 charge that, for the calendar

20  years 2005, 2006, 2007, and 2008, defendant willfully made and

21  signed individual tax returns which she did not believe to be

22  true and correct as to every material matter.

23          I will now explain the law governing those offenses.

24  First, Count 1.

25          It is a federal crime for anyone to conspire, or

1    agree with someone else, to defraud the United States or any of

2    its agencies.  Count 1 of the indictment charges that, from on

3    or about February 24th, 1999, continuing to on or about

4    April 15th, 2011, the defendant, Patricia Lynn Hough, did

5    unlawfully, voluntarily, intentionally, and knowingly conspire,

6    combine, confederate, and agree with David Leon Fredrick to

7    defraud the United States for the purpose of impeding,

8    impairing, obstructing, and defeating the lawful government

9    functions of the Internal Revenue Service, of the Treasury

10   Department, in the ascertainment, computation, assessment, and

11   collection of income tax.

12          To defraud the United States means to interfere with

13   any of its lawful governmental functions by deceit, craft, or

14   trickery.

15          A conspiracy is an agreement by two or more persons

16   to commit an unlawful act.  In other words, it is a kind of

17   partnership in criminal purposes.  Every member of the

18   conspiracy becomes the agent, or partner, of every other

19   member.

20          The government does not have to prove that those who

21   were members of the plan made any kind of formal agreement.

22   The heart of a conspiracy is the making of the unlawful plan

23   itself, so the government does not have to prove that the

24   conspirators succeeded in carrying out the plan.

25          The government does not have to prove that the

1    members planned together all of the details of the plan or the

2    overt acts that the indictment charges would be carried out in

3    an effort to commit the intended crime.

4             The defendant can be found guilty of this crime only

5    if all the following facts are proved beyond a reasonable

6    doubt:

7             One, two or more people in some way agreed to try to

8    accomplish a shared and unlawful plan;

9             Two, the defendant knew the unlawful purpose of the

10   plan and willfully joined in it;

11            Three, during the conspiracy, and after May 15, 2007,

12   one of the conspirators knowingly engaged in at least one overt

13   act described in the indictment;

14            And, four, the overt act was knowingly committed on

15   or -- at or about the time alleged, and with the purpose of

16   carrying out or accomplishing some object of the conspiracy.

17            For reasons that do not concern you, the case against

18   co-defendant David Leon Fredrick is not before you.  This fact

19   should not influence your verdict with reference to defendant

20   Patricia Lynn Hough.

21            However, since a conspiracy requires the

22   participation of at least two persons, in order to find

23   defendant Hough guilty of the conspiracy, you must find that

24   the government presented evidence to establish Dr. Fredrick's

25   criminal participation in the conspiracy beyond a reasonable

1   doubt.

2           An overt act is any transaction or event, even one

3   which may be entirely innocent when viewed alone, that a

4   conspirator commits to accomplish some object of the

5   conspiracy.  In order to sustain its burden of proof on this

6   element under Count 1 of the indictment, the government must

7   prove, beyond a reasonable doubt, that one of the members of

8   the alleged conspiracy or agreement knowingly performed at

9   least one overt act; that this act was performed during the

10  existence or life of the conspiracy and after May 15, 2007; and

11  was done to somehow further goal of the conspiracy or

12  agreement.

13          Although you must unanimously agree on the same --

14  that the same overt act was committed, the government is not

15  required to prove more than one of the overt acts charged.

16          A person may be a conspirator even without knowing

17  all the details of the unlawful plan, or the names and

18  identities of all the other alleged conspirators.

19          If the defendant played only a minor part in the

20  plan, but had a general understanding of the unlawful purpose

21  of the plan, and willfully joined in the plan on at least one

22  occasion, that is sufficient for you to find the defendant

23  guilty.

24          But simply being present at the scene of an event, or

25  merely associating with certain people and discussing common

1    goals and interests, does not establish proof of a conspiracy.

2              Also, a person who does not know about a conspiracy,

3    but happens to act in a way that advances some purpose of one,

4    does not automatically become a conspirator.

5              It is not sufficient for the government to simply

6    prove the existence of an agreement.  The government must also

7    prove, beyond a reasonable doubt, that the purpose of the

8    agreement was to impede, impair, obstruct, and defeat the

9    lawful functions of the Internal Revenue Service in the

10   ascertainment, computation, assessment, and collection of

11   income taxes.

12             This tax purpose must be the object of the

13   conspiracy, and not merely a foreseeable consequence of some

14   other conspiratorial scheme.

15             Now, as to Counts 6 through 9, it is a federal crime

16   to willfully and knowingly prepare and file a false tax return.

17   Counts 6 through 9 charge that, from calendar years 2005, 2006,

18   2007, and 2008, defendant Patricia Lynn Hough willfully made

19   and signed individual tax return forms which she did not

20   believe to be true and correct as to every material matter.

21             The indictment charges that defendant Hough's income

22   tax returns for these years were false in two material

23   respects:

24             One, defendant reported a certain dollar amount as

25   her total income on Line 22, when she then knew and believed

1    that her total income was substantially greater;

2              And two, defendant failed, on Schedule B, Parts 1

3    and 3, Lines 7A and 7B, to report that she had a financial

4    interest in, or signature authority over, financial accounts

5    located in foreign countries.

6              The defendant can be found guilty of this crime only

7    if all of the following facts are proved beyond a reasonable

8    doubt:

9              One, the defendant made and subscribed, or caused to

10   be made and subscribed, a U.S. individual tax return Form 1040;

11             Two, the U.S. individual income tax return Form 1040

12   contained a written declaration that it was made under the

13   penalty of perjury;

14             Three, when the defendant made or caused to be made

15   the U.S. individual income tax return Form 1040, she knew that

16   it contained false material information;

17             Four, when the defendant did so, she intended to do

18   something she knew violated the law;

19             And, five, the false matter in the U.S. individual

20   income tax return Form 1040 related to a material statement.

21             The government has the burden of proving each of

22   these five elements beyond a reasonable doubt for each of the

23   years in question.

24             A declaration is false if it is untrue when it is

25   made and the person making it knows it is untrue.

1          A declaration is material if it concerns a matter of

2     significance or importance, not a minor or insignificant or

3     trivial detail, and was capable of influencing the Internal

4     Revenue Service.

5          The government does not have to show that any taxes

6     were not paid because of the false return, or that any

7     additional taxes are due.  It only has to prove that the

8     defendant intentionally caused to be filed a materially false

9     return, which defendant knew violated the law.

10         As I said before, the indictment charges that the

11    defendant's income tax returns for these years were false in

12    two material respects.  The government does not have to

13    establish, beyond a reasonable doubt, that the defendant's tax

14    return for any given year was false for both reasons.  It is

15    sufficient if the evidence establishes, beyond a reasonable

16    doubt, the falsity and materiality of a single item in each

17    year.  You must, however, unanimously agree on that single

18    item.

19         On the other hand, if you unanimously find that none

20    of these items was material and falsely reported on defendant's

21    return, then you must find the defendant not guilty for the

22    count related to that year.

23         Total income, as found at Line 22 of a tax return,

24    includes, but is not limited to, compensation for services,

25    such as wages, salaries, fees, and commissions, income derived

1   from a trade or business, gains derived from dealings on

2   property, interest, rents, royalties, and dividends.

3          You will see that the indictment charges that a crime

4   was committed on or about a certain date.  The government does

5   not have to prove that the crime occurred upon an exact date.

6   The government only has to prove, beyond a reasonable doubt,

7   that the crime was committed on a date reasonably close to the

8   date alleged.

9          The word "knowingly" means that an act was done

10  voluntarily and intentionally, and not because of a mistake or

11  by accident.

12         The word "willfully" means that the act was done

13  voluntarily and purposely, with the specific intent to violate

14  a known legal duty; that is, with the intent to do something

15  the law forbids.  This agreement with the law, or a belief that

16  the law is wrong, does not excuse willful conduct.

17         Good faith is a complete defense to all counts of the

18  indictment because the government must prove, beyond a

19  reasonable doubt, that the defendant acted with intent to

20  defraud, and a specific intent to violate a known legal duty.

21         Evidence that the defendant, in good faith, followed

22  the advice of an accountant or an attorney would be

23  inconsistent with such an unlawful intent.  The burden of proof

24  is not on the defendant to prove good-faith intent because the

25  defendant does not need to prove anything.  The government must

1    establish, beyond a reasonable doubt, that the defendant acted

2    willfully as charged.

3           Each count of the indictment is charged as separate

4    crime.  You must consider each crime and the evidence related

5    to it separately.  If you find the defendant guilty or not

6    guilty of one crime, that must not affect your verdict for any

7    other crime.

8           I caution you that the defendant is on trial only for

9    the specific crimes charged in the indictment.  You are here to

10   determine from the evidence in this case, whether the defendant

11   guilty or not guilty of those specific crimes.

12          You must never consider punishment, in any way, to

13   decide whether the defendant is guilty.  If you find the

14   defendant guilty, the punishment is for the judge alone to

15   decide later.

16          During your deliberations you must not communicate or

17   provide any information to anyone, by any means, about the

18   case.  You may not use any electronic device or media to

19   communicate, to anyone, any information about this case, or to

20   conduct any research about the case, until I accept your

21   verdict.

22          In other words, you cannot talk to anyone on the

23   phone, correspond with anyone, or electronically communicate

24   with anyone about the case.  You can only discuss the case in

25   the jury room, with your fellow jurors, during deliberations.

1    I expect you will inform me if you become aware of another

2    juror's violation of these instructions.

3              You may not use these electronic means to investigate

4    or communicate about the case because it's important that you

5    decide the case based solely on the evidence presented in this

6    courtroom.  Information on the internet, or available through

7    social media, might be wrong, incomplete, or inaccurate.  You

8    are only permitted to discuss the case with your fellow jurors

9    during deliberations because they have seen and heard the same

10   evidence you have.

11             In our judicial system, it is important that you are

12   not influenced by anything or anyone outside of this courtroom.

13   Otherwise, your decision may be based on information known only

14   to you, and not your fellow jurors or the parties in the case.

15   This would unfairly and adversely impact the judicial process.

16             Your verdict, whether guilty or not guilty, must be

17   unanimous.  In other words, you must all agree.  Your

18   deliberations are secret, and you will never have to explain

19   your verdict to anyone.

20             Each of you must decide the case for yourself, but

21   only after fully considering the evidence with the other

22   jurors.  So you must discuss the case with one another, and try

23   and reach an agreement.

24             While you are discussing the case, do not hesitate to

25   reexamine your own opinion, and change your mind if you become

1    convinced that you were wrong.  But do not give up your honest

2    beliefs just because others think differently, or because you

3    simply want to get the case over with.  Remember that, in a

4    very real way, you are judges, judges of the facts.  Your only

5    interest is to seek the truth from the evidence in the case.

6           When you go to the jury room, choose one of your

7    members to act as your foreperson.  The foreperson will direct

8    your deliberations and will speak for you here, in court.

9           A verdict form has been prepared for your

10   convenience.

11          Counsel, did you have a chance to review that in the

12   interim?

13          MR. UDOLF:  Yes, sir.  It's fine, Your Honor.

14          MS. FINLEY:  It's fine.  Thank you.

15          THE COURT:  All right.

16          The verdict form is six pages.  I am going to walk

17   you through it now, and by walk you through it, I'm going to

18   read it, then you'll see various places where you are called

19   upon to answer questions.

20          It begins, of course, with Count 1.  It summarizes

21   what the charges in Count 1, it says:  "As to Count 1 of the

22   indictment, which charges that, on or about February 24, 1999,

23   continuing until about April the 15th, 2011, defendant Patricia

24   Lynn Hough knowingly, willfully, and unlawfully combined,

25   conspired, confederated, and agreed with David Leon Fredrick to

1    defraud the United States for the purpose of impeding,

2    impairing, obstructing, and defeating the lawful government

3    functions of the Internal Revenue Service of the Treasury

4    Department in the ascertainment, computation, assessment, and

5    collection of taxes.

6             And it has Number 1:  "We, the jury, unanimously find

7    that an overt act in furtherance of the conspiracy was

8    committed after May the 15th -- May 15, 2007," you are called

9    upon to check either yes or no.  When you unanimously decide,

10   you check obviously just one of those.

11            The form then, on Page 2, has some instructions for

12   you, depending on what you checked.

13            It reads:  "If you answered yes to Question 1, please

14   answer Question 2.  If you answered no to Question 1, then

15   check 'not guilty' in response to Question 2, and proceed to

16   Count 6."

17            So if you have checked yes, that means you found an

18   overt act after the date of the statute of limitations.

19            Then the second question is:  "We, the jury,

20   unanimously find the defendant" -- and either not guilty or

21   guilty, then you check the appropriate box.

22            The form continues as to Count 6.  It says:  "As to

23   Count 6 of the indictment, which charges that, on or about

24   September 15, 2006, Patricia Lynn Hough willfully made and

25   signed individual income tax return forms which she did not

1    believe to be true and correct as to every material matter, we,

2    the jury, unanimously find the defendant" -- and again you've

3    got two choices, not guilty or guilty.

4         Then, after you've checked the appropriate box,

5    there's an instruction for you.

6         It says: "If you find the defendant not guilty,

7    proceed to Count 7" -- which is the next count -- "if you find

8    the defendant guilty, indicate below the matter that you

9    unanimously agree was false" -- and it says:  "Check all that

10   apply."

11        And you remember, in the instructions, I told you

12   that the allegation is that the tax returns were false for two

13   different reasons, and you're going to tell us which of the two

14   you unanimously agree upon, or both.

15        So the options are -- and you've got a box where you

16   can check either one.  First one is:  "Defendant substantially

17   underreported the total income on Line 22, for the 2005

18   calendar year."

19        And the second choice is:  "Defendant failed, on

20   Schedule B, Parts 1 and 3, Lines 7A and 7B, to report that she

21   had a financial interest in, or signature authority over,

22   financial accounts located in foreign countries."

23        So if you found the defendant guilty, you have to

24   tell us either one or both of those.  And as the instruction

25   says, it's check all that apply, so it's either just one or

1    both.

2              We then proceed to Count 7, and the pattern is going

3    to repeat itself because the counts are similar.

4              Count 7 says:  "As to Count 7 of the indictment,

5    which charges that, on or about June 21, 2007, Patricia Lynn

6    Hough willfully made and signed individual tax return forms,

7    which she did not believe to be true and correct as to every

8    material matter, we, the jury, unanimously find the

9    defendant" -- and your options are either guilty or not guilty.

10             The instructions then will be the same.  If you find

11   the defendant not guilty, you proceed to the next count.  If

12   you find the defendant guilty, you are to check one or both of

13   the two matters that you find, unanimously, were applied; that

14   is, the Line 22 income, or the failure to report the foreign

15   accounts.

16             Count 8 then says:  "As to Count 8 of the indictment,

17   which charges that, on or about April 15, 2008, Patricia Lynn

18   Hough willfully made and signed individual income tax return

19   forms which she did not believe to be true and correct as to

20   every material matter, we, the jury, unanimously find the

21   defendant" -- same two options, guilty or not guilty, and then

22   the same instructions:  If it's not guilty, you go to the next

23   count; if it's guilty, you tell us which matter you find to be

24   the falsity.

25             The last count is Count 9.  It says:  "As to Count 9

1    of the indictment which charges that, on or about April 15,

2    2009, Patricia Lynn Hough willfully made and signed individual

3    income tax return forms which she did not believe to be true

4    and correct as to every material matter, we, the jury,

5    unanimously find the defendant" -- guilty or not guilty, again,

6    one of those.  And then again, depending on which it is, if

7    it's not guilty, that's the end of the form; if it is guilty,

8    you need to tell us which of the two apply.

9           When you've finished that, the verdict form says:

10   "So say we all," has a line for the date and a line for the

11   foreperson's signature.  So obviously it will be dated and

12   signed after your verdicts have been reached.

13          You will take the verdict form with you to the jury

14   room.  When you have all agreed to the verdicts, your

15   foreperson must fill in the form, sign it, date it, and carry

16   it with you when you come into the courtroom.  If you wish to

17   communicate with me at any time, please write down your message

18   or question and give it to the Court Security Officer.

19          The Court security officer will bring it to me, and I

20   will respond as promptly as possible, either in writing or by

21   speaking with you here in the courtroom.  But I caution you not

22   to tell me how many jurors have voted one way or the other at

23   any time.

24          Counsel, did anyone detect any material deviations

25   from my reading of the instructions?

1           MR. UDOLF:  No, Your Honor.

2           MS. FINLEY:  No, Your Honor.

3           THE COURT:  All right.

4           Ladies and gentlemen, in a moment I'm going to send

5     you into the jury room.  Shortly thereafter, we will send you a

6     written copy of the instructions I just read, the verdict form

7     that I just read, a copy of the indictment that has been filed,

8     and a copy of all the exhibits.  It may take a few minutes to

9     get the exhibits lined up, but all those will be coming to you.

10          Now, you remember all those instructions I gave you

11    about not talking about the case?  Those instructions are

12    lifted.  Now is the time you are to discuss the case.

13          So, with the exception of Mr. Jago, Mr. Williams, and

14    Ms. Seitz, the rest of you may return to the jury room and

15    begin your deliberations.

16          (At 2:39 PM, the jury was escorted from the

17       courtroom.)

18          THE COURT:  Be seated, please.

19          You are the alternates in this case.  What that means

20    for you is a couple of things.  First of all, all those

21    instructions I gave you about not talking about the case still

22    apply to you.  The reason for that is, I'm going to put you on

23    hold, and if anything should happen to one of the jurors during

24    the deliberation, if they get sick, or if a family member gets

25    sick, and they can't continue, anything like that, I'd call one

1   of you, have you report to the jury room, tell the jury to

2   begin their deliberations all over again, and reach a verdict,

3   as opposed to having to try the case all over again.  So it's

4   still very important for you folks not to discuss the case with

5   anyone.

6            If the jury reaches verdicts without your assistance,

7   and I certainly hope that that's the case, we will call you and

8   tell you that we do not need your help.  I can't tell you when

9   that is, because I don't know when the jury is going to return

10  verdicts.  It might be today, it might be tomorrow.  I just

11  don't know.  But regardless of what the verdict is, we will

12  call you to let you know whether we need your services or do

13  not need your services.

14           I'm going to ask that you give my Courtroom Deputy a

15  phone number we can reach you, a cell phone or whatever it is

16  that works for each of you.  And as I said, we will call you

17  when we know anything.

18           Do any of you have any personal belongings still in

19  the jury room that you need to retrieve?

20           All right.  Give the Court Security Officer a

21  description, he'll get it.  If you'll give my Courtroom Deputy

22  your notes.  We'll save those notes.  In case we do need to

23  call you back, you'll have all your personal notes there.  And

24  if you will give the phone number at the same time, we

25  appreciate it.

1           (Thereupon, the alternate jurors provided contact

2       information to the Courtroom Deputy.)

3           THE COURT:  Don't be walking off with those juror

4    buttons.  I don't care about the pens, but I want those

5    buttons.

6           Everyone got whatever you need?

7           All right.  Please rise for the jurors.

8           And you may leave.

9           (Thereupon, the alternate jurors were escorted from

10      the courtroom.)

11          THE COURT:  All right.  Counsel, if you'd please get

12   with my Courtroom Deputy, make sure the exhibits are all lined

13   up so that only the exhibits that have been admitted actually

14   go to the jury.  I'd check the verdict form again, the

15   instructions, and the redacted indictment, make sure those are

16   proper, before they go back.

17          Anything else before we recess?

18          MR. HOCHMAN:  No, Your Honor.

19          MS. FINLEY:  No, Your Honor.

20          THE COURT:  All right.  We'll be in recess until we

21   hear from the jury.

22          MS. FINLEY:  Actually, I'm sorry.

23          Do you call the jury back at 5:00 p.m., to formally

24   dismiss them on the record, or do you just let them go?

25          THE COURT:  Yes.  I probably have done it both ways.

1    I think what I'll do is call them back in so I can repeat the

2    instruction about not talking about the case or doing any

3    research kind of thing.

4                MR. HOCHMAN:  Thank you, Your Honor.

5                MS. FINLEY:  Thank you, Your Honor.

6                (At 2:44 PM, court was recessed.)

7                THE COURT:  Counsel, it's 5:00 o'clock.  We have not

8    heard from the jury.  I would propose to have the CSO ask if

9    they're ready to go home.

10               MR. HOCHMAN:  Yes, Your Honor.

11               THE COURT:  And then, presuming the answer is yes,

12   have them come into the courtroom again, and give them some

13   instructions and send them home.

14               Anyone object?

15               MR. HOCHMAN:  No, Your Honor.

16               MS. FINLEY:  No, Your Honor.

17               THE COURTROOM DEPUTY:  They're knocking.

18               MR. SAUNDERS:  Apparently they're ready to go home

19   too.

20               (At 5:02 PM, the jury was escorted into the

21        courtroom.)

22               THE COURT:  Ladies and gentlemen, it's 5:00 o'clock.

23               May I assume you're ready to go home?

24               (Nods of the head.)

25               THE COURT:  All right.  All the instructions I gave

1   you before, about not talking about the case or doing any kind

2   of research, kind of kick in again.  You can only discuss the

3   case when you're all together and begin your deliberations.

4           So we'll recess until 9:00 o'clock in the morning.

5   I'll have you report directly to the jury room.  I'm not going

6   to call you into the courtroom and tell you to get started, but

7   you can't talk about the case until all 12 of you are there.

8           Once all 12 of you are there, you can resume your

9   deliberations, and just let us know next time you want to see

10  me.

11          All right?  Have a good evening.

12          (At 5:03 PM, the jury was escorted from the

13      courtroom.)

14          THE COURT:  All right.  Counsel, we'll be in recess.

15          Do you intend to be here in the morning, or just be

16  available by phone, or what's your pleasure?

17          MR. HOCHMAN:  We would prefer to be available by

18  phone, Your Honor.

19          THE COURT:  And do we have numbers?

20          MR. HOCHMAN:  We gave all our numbers to the court

21  clerk.

22          THE COURT:  All right.

23          MS. FINLEY:  Same from the government, Your Honor.

24          THE COURT:  All right.  Very good.  See you tomorrow.

25                  -- -- -- -- -- -- -- --

1          (At 5:03 PM, court was recessed, to be reconvened on

2     Thursday, October 24, 2013, at the jury's pleasure.)

3               -- -- -- -- -- -- -- --

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25