UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Case No.  2:13-cr-00072-JES-UAM

UNITED STATES OF AMERICA,

     Plaintiff

v.

DAVID LEON FREDERICK, and
PATRICIA LYNN HOUGH

     Defendants.

_____/

### DEFENDANT PATRICIA LYNN HOUGH'S MOTION
### FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29(c)

COMES NOW, Defendant Patricia Lynn Hough, by and through her counsel of record, and moves for a judgment of acquittal on all counts in the indictment, pursuant to Federal Rule of Criminal Procedure 29(c).  Specifically, Dr. Hough contends that the evidence presented at trial, even when viewed in the light most favorable to the government, was insufficient to allow a reasonable juror to find her guilty beyond a reasonable doubt of knowingly and willfully conspiring to defraud the United States and of knowingly and willfully filing false tax returns for the years 2004 through 2008.[1]  This motion is based on the attached memorandum of law and exhibit thereto, the files and records in this case, and such further evidence and argument as may be presented at any hearing on this motion.

---

[1] Contemporaneously with this motion, Dr. Hough has filed a separate motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.  Should this motion be granted as to all counts, the motion for new trial would become moot.  Also contemporaneously with this motion, we have filed a Motion for Leave to File Motion for Judgment of Acquittal in Excess of Twenty Five Pages [DE 136].  In the event that the motion [DE 136] is denied, we ask this Court to allow the undersigned 24 hours to amend and refile this motion.

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................ 1

II.   ARGUMENT ..................................................................................... 4

    A.    Legal Standard .......................................................................... 4

    B.    The Evidence at Trial Was Insufficient to Support Dr. Hough's Conviction on Any Count of the Indictment ................................ 5

        1.    Conspiracy to Defraud the United States (Count One) ............................. 5

        2.    Subscribing to False Tax Returns (Counts Six Through Nine) .............. 12

            a.    Count Seven ................................................................. 13

            b.    Counts Six, Eight and Nine......................................... 15

                (1)    Schedule B, Lines 7a and 7b............................. 15

                (2)    Substantial Underreporting of Total Income ................... 19

                    (a)    Point One:  The Government Failed to Prove That Dr. Hough Owned the Saba School of Medicine Foundation, New Vanguard, Top Fast, and the Funds in Those Entities' Foreign Bank Accounts and the Patricia Hough UBS Account  .22

                        (i)    Dr. Hough Did Not Own the Saba Foundation...................................................22

                        (ii)    Dr. Hough Did Not Own New Vanguard or Top Fast ................................25

                        (iii)    Dr. Hough Did Not Own the Funds in the Patricia Hough UBS Account ...................26

                    (b)    Point Three:  The Government Failed to Prove That the Foreign Income Earned by the Saba Foundation, New Vanguard, Top Fast and Patricia Hough Accounts and Transactions Was Reportable on Dr. Hough's U.S. Tax Returns .......27

                    (c)    Point Four:  The Government Failed to Prove Dr. Hough's Actual Knowledge That Any of the Foreign Accounts or Transactions Earned Taxable Interest, Ordinary Dividends, or Capital Gains That Were Reportable on Her U.S. Tax Returns ................................................................29

III.  CONCLUSION................................................................................ 32

## MEMORANDUM OF LAW

### I.     INTRODUCTION

Dr. Hough recognizes that Rule 29 motions for a judgment of acquittal are routinely made in virtually every case, and are just as routinely denied.  Nevertheless, the Rule exists and was enacted to serve a critically important purpose:  to provide a safety valve whereby a district judge can intercede to protect a defendant from the potentially devastating consequences of a criminal conviction in that rare instance in which the jury system has produced a manifestly unjust result.  *See* Fed. R. Crim. P. 29, Advisory Committee Notes (1944 Adoption) ("[Rule 29(b)] permits the court to render judgment for the defendant notwithstanding a verdict of guilty.  Some Federal courts have recognized and approved the use of a judgment non obstante verdict for the defendant in a criminal case.  The rule sanctions this practice." (citations omitted)).  A post-verdict judgment of acquittal is the congressionally sanctioned remedy where the government's evidence was so abjectly deficient (or absent) as to essential elements of the charges that no reasonable juror could have found the defendant guilty beyond a reasonable doubt.  It is the appropriate remedy here.

The concept of a trial by a jury of one's peers is the cornerstone of our criminal justice system, and while litigants might sometimes disagree with the outcome, in the great majority of cases the system works properly.  But that system is not infallible.  Quite simply, juries sometimes get it wrong.  Jurors may suffer from confusion, bias, prejudice, ignorance, or other factors that obscure their ability to reach a sound and reasoned judgment in accordance with the applicable law.  When the result is that a defendant who appears guilty is set free by a jury verdict, some might grumble and complain, but ultimately we accept the verdict because it is the price of imperfection that we are willing to pay for the right to trial by jury.  But we as a society and as a legal system do not simply shrug off and dismiss the reverse outcome – the erroneous conviction of a defendant – because the consequences of a mistake are so enormous.[2]  As

---

[2] The consequences of the error in this case have already been dire.  Four days after the jury's verdict, the Sarasota County Department of Health asked Dr. Hough to submit her resignation, depriving her of her employment and leaving hundreds of poor and uninsured patients without the treatment of their psychiatrist.  On November 19, 2013, Dr. Hough received a letter from the Wisconsin Medical Board, directing her to voluntarily surrender her medical license within 20 days or face it being revoked by board action.

Blackstone famously said, "Better that ten guilty persons escape, than that one innocent suffer." Rule 29 embodies that principle by recognizing that juries' verdicts are not infallible and providing a mechanism to correct an injustice.

In this case, the jury convicted Dr. Hough of understating her income on her 2006 tax return (Count Seven) despite the unequivocal testimony of the government's own expert, IRS Revenue Agent Sheila Maurer, that Dr. Hough had in fact overstated her income for that year and was owed a refund. While a judgment of acquittal is unquestionably called for on that count (which the Court still has under submission), the problems with the jury's verdict are hardly limited to Count Seven. Rather, the verdict on that count, which is not only unsupported by, but directly contrary to, the evidence, is indicative of a far broader systematic failure in which the jury either did not adequately understand the evidence or decided this case on some basis other than the evidence, in violation of its oath.

A comprehensive review of the trial record, which reads in large part as a trial *in absentia* of co-defendant David Fredrick, shows that the government's proof was woefully deficient – and in some instances *wholly nonexistent* – as to essential elements of the crimes charged against Dr. Hough. As to the conspiracy charge, the government failed to prove beyond a reasonable doubt Dr. Hough's knowing and willful agreement to achieve the specific criminal objective of defrauding the United States, and further failed to prove the existence of an overt act within the statute of limitations that (according to the testimony of the government's own expert) furthered such a conspiracy. With respect to the substantive counts, the government failed to prove that Dr. Hough's answer to question 7a on Part III of Schedule B, dealing with foreign bank accounts, was knowingly false as to any charged year because the government presented **absolutely no evidence** of the "exceptions" that are directly incorporated into that question (and further presented no evidence that Dr. Hough knew what those exceptions were); in addition, the phrasing of question 7a within the structure of Schedule B was so confusing and ambiguous that it is impossible to conclude that Dr. Hough knowingly and willfully answered the question falsely. Moreover, the government failed to prove that Dr. Hough knowingly and willfully

understated her income with respect to any of the charged tax years because (i) the government failed to prove that Dr. Hough owned the accounts that formed the basis of Agent Maurer's total income calculations (and the government's continued insistence that Dr. Hough owned the Saba School of Medicine Foundation required the jury to accept what the evidence showed was a legal impossibility); (ii) the government failed to prove that any taxable interest, ordinary dividends, or capital gains earned on the subject foreign accounts and remaining in the foreign accounts was in fact reportable on Dr. Hough's U.S. tax returns (the only testimony offered on this point, from government witness David Minchenberg, was that such income is **not** taxable if earned offshore and not brought into the United States); and (iii) even assuming the government proved that Dr. Hough owned the subject accounts and that they earned additional total income, the government presented no evidence whatsoever that Dr. Hough *was aware of* any of the taxable interest, ordinary dividends and capital gains earned in the foreign accounts or foreign transactions (which would have required, for instance, that Dr. Hough know the basis of any asset for which the government attributed reportable capital gains) or that any such income was reportable on her tax returns (given Minchenberg's unrefuted advice to her to the contrary).

In light of the above and other patent deficiencies in the government's proof, and properly applying the Court's jury instructions regarding the elements of the offenses, the requisite mental states, and reasonable doubt, no reasonable juror could have found Dr. Hough guilty of the charges against her beyond a reasonable doubt. Yet, for whatever unexplainable reasons of its own, the jury returned verdicts of guilty. As Rule 29 makes clear, those verdicts are not sacrosanct. While this Court may not simply substitute its judgment for that of the jury, it also need not allow an unjust verdict to stand simply because "the jury has spoken." A judgment of acquittal is authorized under the law, and it is the correct result in this case.

## II.     ARGUMENT

### A.     Legal Standard

Federal Rule of Criminal Procedure 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to

sustain a conviction."  Rule 29(b) allows the court to reserve decision on the motion, submit the case to the jury, and decide the motion after the jury returns a verdict of guilty.  Rule 29(c) provides that a defendant may move for a judgment of acquittal, or renew such a motion, following a guilty verdict.

Here, Dr. Hough previously made an oral Rule 29 motion at the close of the government's case-in-chief and submitted that motion without argument.  (10/18/13 RT 180-81; 10/21/13 RT 4).[3]  The Court took the motion under submission as to the "understatement of income" portion of Count Seven, and otherwise denied the motion.[4]  (10/21/13 RT 26-27).  Dr. Hough renewed her Rule 29 motion at the close of all the evidence, with the same result.  (10/22/13 RT 258-59).  Dr. Hough's motion remains under submission under Rule 29(b) with respect to Count Seven; as to that count and all other counts, Dr. Hough now renews and supplements her prior motion under Rule 29(c).

On Rule 29 motions contending insufficiency of the evidence, the evidence is examined in the light most favorable to the prevailing party, in this case the Government.  *United States v. Thomas*, 8 F.3d 1552, 1556 (11th Cir. 1993).  The reversal of a conviction for insufficient evidence is warranted only if no reasonable jury could find proof of guilt beyond a reasonable doubt.  *Id.*  Nevertheless, there must be sufficient evidence to support all necessary elements of the crime.  *Id.*  It is not necessary that the evidence "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt."  *United States v. Broughton*, 689 F.3d 1260, 1276 (11th Cir. 2012).  The jury is free to choose among "the reasonable conclusions to be drawn from the evidence presented at trial," and the Court "must accept all reasonable inferences and credibility determinations made by the jury."  *Id.*  However,

---

[3] The Reporter's Transcript of the trial proceedings is cited herein as "RT" and includes the applicable date and page numbers.  For the Court's convenience, Dr. Hough is filing an Appendix to this motion and her contemporaneously filed Motion for Judgment of Acquittal, which contains all cited transcript pages and trial exhibits.

[4] The alleged false statement underrepresenting Dr. Hough's income on her 2006 tax return, as to which the Court took Count Seven under submission, turned out to be the jury's sole basis for conviction on that count.

"if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, then a reasonable jury must necessarily entertain a reasonable doubt" and a judgment of acquittal must be granted.  *Cosby v. Jones*, 682 F.2d 1373, 1383 (11th Cir. 1982); *accord United States v. Glen*, 312 F.3d 58, 70 (2d Cir. 2002); *United States v. Hernandez-Bautista*, 293 F.3d 845, 854 (5th Cir. 2002).

**B.    The Evidence at Trial Was Insufficient to Support Dr. Hough's Conviction on Any Count of the Indictment**

      1.    <u>Conspiracy to Defraud the United States (Count One)</u>

The conspiracy charged in Count One required the jury to find each of the following elements beyond a reasonable doubt:  (1) two or more people in some way agreed to try to accomplish a shared and unlawful plan; (2) Dr. Hough knew the unlawful purpose of the plan and willingly joined in it; (3) during the conspiracy, and after May 15, 2007, one of the conspirators knowingly engaged in at least one overt act described in the indictment; and (4) the overt act was knowingly committed at or about the time alleged, and with the purpose of carrying out or accomplishing some object of the conspiracy.  (10/23/13 RT 151).  The jury was further instructed that it was not sufficient for the government to simply prove the existence of an agreement; rather, the government was required to prove, beyond a reasonable doubt, that the purpose of the agreement was to impede, impair, obstruct, and defeat the lawful functions of the Internal Revenue Service in the ascertainment, computation, assessment, and collection of taxes. (*Id.* at 153).  That tax purpose was required to be the object of the conspiracy, and not merely a foreseeable consequence of some other conspiratorial scheme.  (*Id.*).

The government cannot point to a single piece of evidence in the record – neither any witness testimony nor any exhibit – that supports a finding that Dr. Hough knowingly entered into a conspiracy that had as its object the defrauding of the United States.  As noted by the Court when the government claimed that there were emails discussing Dr. Hough's and Dr. Fredrick's desire not to disclose their accounts to the IRS, no such emails exist.  (10/21/13 RT

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

23).   In opposing Dr. Hough's Rule 29 motion, and again in closing argument to the jury, the government relied on:  (1) a letter from Dr. Fredrick to Dieter Luetolf dated December 15, 2003, in which Dr. Fredrick stated that "my wife and I have decided to close our account at SG Hambros in Nassau" and that "the changes in US & Bahamas banking policies that take effect in January 2004, put us at a disadvantage"; and (2) an email from Dr. Fredrick to Luetolf dated December 12, 2003, in which he stated he was "curious about the status of SZ with regard to US account holders, etc.," asked "[w]hat can we do to protect ourselves from open disclosure," and stated that "we need to pull [the SG Hambros funds] out and close our account before Jan. 1st." (Gov. Exh. 3P, p.6; Gov Exh. 3HH, p.2; *see* 10/21/13 RT 23-24; 10/23/13 RT 18-19).   The government, however, never bothered to offer a shred of evidence as to *what* the referenced changes in "banking policies" that took effect in January 2004 were.   It certainly would have been easy enough to question Sheila Maurer about this issue, or even to ask the Court to take judicial notice of a change in law if appropriate, but the government instead chose to ask the jury to speculate that the changes related to a tax purpose of the conspiracy without any supporting evidence in the record.   *See* 10/23/13 RT 19 ("Note, ladies and gentlemen, these documents are not concerned with open disclosure for asset protection.   The defendant and her husband are worried about open disclosure to the IRS.   Banks don't stop taking U.S. clients because of asset-protection changes.   The banks stop taking U.S. clients because of new IRS reporting requirements.").[5]

Even if there were any basis in the record for the jury to infer that Dr. Fredrick had a tax purpose in mind in moving the accounts, there is absolutely no evidence that Dr. Hough shared that purpose or was even aware of the communications that the government claimed reflected her knowledge of the object of the conspiracy.   The October 13 email was written by Dr. Fredrick;

---

[5] The only evidence on this issue came from the unsigned, undated UBS client note that stated simply that UBS Bahamas "no longer takes US clients."   (Gov. Exh. 3S p.23).   Dr. Hough's objection to the government's improper line of argument about the *reason* for this change as not being based on any evidence in the case was overruled with the admonition that "[t]he jury will recall the evidence." (10/23/13 RT 19).

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

although he signed it "DF & PH," it came from his email account, Dr. Hough was not copied on the email, and the language used ("can you give me a call") makes clear that it was written by Dr. Fredrick alone. (Gov. Exh. 3HH, p.2). Similarly, although the December 15 letter has both Dr. Fredrick's and Dr. Hough's names typed at the bottom, it is not signed by Dr. Hough, it appears on Dr. Fredrick's letterhead, and the phrasing of the letter ("my wife and I") makes clear that it was written by Dr. Fredrick alone. (Gov. Exh. 3P, p.6). Nor was Dr. Hough cc'd on the email transmission to which the letter was attached. (Gov. Exh. 3P, p.5). Thus, there is no evidence that Dr. Hough ever saw, authorized, or knew of either of these communications, and they do not establish – certainly not beyond a reasonable doubt – *her* knowledge of and agreement to participate in a conspiracy to defraud the United States.

Nor was there any other document introduced into evidence that demonstrated a tax evasion purpose, and certainly none on the part of Dr. Hough. In its closing and rebuttal arguments, the government asked the jury to rely on a host of statements by Dr. Fredrick, none of which mentioned a word about taxes or concealing income from the IRS. (*See, e.g.*, 10/23/13 RT 20-23, 26-27, 34, 37-38, 40, 121, 125). In contrast, the only documents written or signed by Dr. Hough on which the government asked the jury to rely were: (1) some "Form A" account opening documents bearing Dr. Hough's signature and identifying her as a beneficial owner, as to which the evidence established that at least one (and possibly all) was signed in blank[6], which had nothing to do with IRS requirements but were required under Swiss anti-money laundering laws, and which in any event reveal utterly nothing about Dr. Hough's purpose in opening the accounts and signing the documents (*id.* at 16-17, 23-24); (2) Dr. Hough's July 8, 2003 email to prospective school buyers about stock issuance concerns and forming an LLC, which have nothing whatsoever to do with the charged conspiracy (*id.* at 21); (3) the letter of intent executed by Dr. Hough and Dr. Fredrick on July 7, 2003, which stated that they collectively and "directly or indirectly" held "the controlling interest in MUA/Nevis, SABA and 50% of MUA Belize (again, this has nothing to do with the object of the alleged conspiracy) (*id.* at 20); (4) Dr.

---

[6] Government's Exh. 3G; 10/9/13 RT 156.

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

Hough's March 2004 correspondence confirming Dr. Fredrick's request to split the existing Fredrick/Hough account into two accounts, which is devoid of any explanation of why Dr. Hough understood this was being done by Dr. Fredrick and had nothing to do with defrauding the IRS (*id.* at 22-23); (5) the purchase agreement with Equinox Capital, which Steven Rodger testified he negotiated with Dr. Fredrick, which he did not know if Dr. Hough ever read, and as to which he dealt with Dr. Hough only on her consulting agreement[7] – and which again reveals absolutely nothing about Dr. Hough agreeing with anyone to defraud the IRS) (*id.* at 31); and (6) the guaranty executed by Dr. Fredrick and Dr. Hough in connection with the Equinox sale, which yet again has no bearing on whether Dr. Hough had the specific intention of entering into an agreement to defraud the IRS (*id.* at 32).

No witness testimony compensated for the lack of documentary proof to support a finding beyond a reasonable doubt that Dr. Hough ever sought or intended to defraud the IRS or knowingly entered into a conspiracy for that specific purpose.   Of the 20 witnesses in the government's case-in-chief, eight had never met Dr. Hough, and none of the remaining 12 had a bad word to say about her.   There was no witness – not Dr. Hough's accountants, not her colleagues, not her family members – who testified that Dr. Hough was a cheat, was dishonest, or ever said anything about wanting or trying to evade taxes or impede or impair the IRS in its ascertainment, computation, assessment or collection of taxes.   To the contrary, Dr. Hough's accountant Thomas Murtha testified that Dr. Hough was conservative and conscientious about her taxes (10/10/13 RT 55-56) and corrected her own mistake on one occasion by filing an amended return (10/10/13 RT 63-64), and school accountant David Minchenberg testified that Dr. Hough wanted to be in compliance with her tax obligations and, in fact, fully cooperated with him in the filing of her Form 5471 with respect to her interest in Round Hill Project Holdings, NV (10/11/13 RT 119-20, 142).

The *only* witness testimony that conceivably came anywhere near supporting the government's theory was Mr. Murtha's statement that he "would have" asked Dr. Hough in 2001

---

[7] See 10/16/13 RT 14-15, 77-78, 86.

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

or 2002 whether she had a foreign bank account and that he "believed" she answered no (while acknowledging that "I can't recall at this moment the exact conversation I had," conceding that it was not his practice to ask such a question of his firm's preexisting clients, and speculating as to how he "probably would have asked the question").  (10/9/13 RT 239-40; 10/10/13 RT 44-50). Mr. Murtha was confident, however, that he had *never* asked Dr. Hough whether she had *signature authority* over a foreign bank account.[8]  (10/9/13 RT 240; 10/10/13 RT 44-47, 50-52). Even affording credibility to Mr. Murtha's purported recollection of a brief conversation 11 or 12 years ago, as this Court must on a Rule 29 motion, the equivocal and speculative nature of Mr. Murtha's testimony does not support a finding beyond a reasonable doubt that Dr. Hough ever made the alleged statement.  Moreover, even had Dr. Hough made the statement, it does not prove beyond a reasonable doubt that she intended to obstruct the IRS; indeed, given Mr. Murtha's acknowledged failure to inquire about signatory authority, a response that she did not "have" foreign accounts would have been 100% consistent with her testimony that she believed the accounts to belong to the Foundation and not to her personally.

In the absence of any documentary or testimonial evidence demonstrating Dr. Hough's knowing agreement to join in a conspiracy with the specific object of defrauding the IRS, the government fell back on loose assertions about actions undertaken by "the client" or by the fictitious entity "Dr. Fredrick and Dr. Hough."  In its closing argument, the government made a number of claims – wholly unsupported by any evidence introduced at trial – that "they" (*i.e.*, Dr. Fredrick *and* Dr. Hough) caused the opening of accounts for Top Fast, New Vanguard, Ample Dynamic, and MUA as well as accounts at Fortis Banque, Liechtenstein Landesbank (LLB), and Bank Alpinum, that "they" caused money to be transferred between accounts to buy an airplane and other assets, that "they" caused Beda Singenberger to appoint Laura Whitley as

---

[8] The government claimed in closing argument that Dr. Hough had denied to Mr. Murtha in 2009 having signature authority over a foreign bank account.  (10/23/13 RT 39).  This statement is demonstrably false, as the undisputed evidence was that Mr. Murtha never even asked Dr. Hough or Dr. Fredrick that question.  (10/9/13 RT 240; 10/10/13 RT 50-52).

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

vice-president of Ample Dynamic, etc.  (10/23/13 RT 27-30, 36-37, 39-40).  Without directly so stating, ultimately the government asked the jury to speculate that because Dr. Hough's husband knew, did, or intended something, that must mean that Dr. Hough knew, did, or intended it as well.  Such speculation, of course, cannot support a criminal conviction.  *See United States v. Mendez*, 528 F.3d 811, 814 (11th Cir. 2008) ("When the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction.").  While the government might have successfully confused and misled the jury with its vague and overbroad claims, the objective analysis of Rule 29 requires a far more specific inventorying of the evidence introduced regarding *Dr. Hough's* state of mind and a determination of whether that evidence was sufficient to allow a reasonable juror to find that the requisite state of mind beyond a reasonable doubt.

Rather than supporting a criminal objective of defrauding the IRS, the only evidence presented by knowledgeable, percipient witnesses regarding the purpose (or, more specifically, Dr. Hough's understanding of the purpose) of moving funds offshore, putting accounts in names of different entities, etc., was that those actions were undertaken to protect the assets of the Foundation and the schools from being seized in response to litigation.  Significantly, this was testified to not only by Dr. Hough, but by the government's own witness Dr. Paul Dalbec, the Chairman of the Board of Trustees of the Saba University School of Medicine.  Dr. Dalbec testified on cross-examination that the school's assets were frozen in 1995 in response to a lawsuit – a mechanism that was allowed under Netherlands-Antilles law – and that the Board authorized Dr. Fredrick to move the school's and the Foundation's assets offshore in order to maintain the school's financial stability, consistent with the advice obtained from financial professionals.  (10/15/13 RT 147-52).  Dr. Dalbec further testified that he was fully aware over the ensuing years, as Chairman of the Board, that the school's and the Foundation's assets were being held at banks outside the United States and the Netherlands-Antilles and in accounts held under the names of other entities.  (*Id.* at 153-55).  This evidence was *uncontradicted*; the government did not even ask its own witness Dr. Dalbec about the asset protection issues in its

redirect examination, nor did it introduce anything on cross-examination of Dr. Hough (or through any other witness) to challenge her stated understanding of the asset protection purpose for which the funds were moved.

Thus, the jury was (and the Court now is) faced with two possible interpretations of Dr. Hough's mental state with respect to whether she knowingly entered into an agreement with the specific objective of defrauding the United States.  On the one hand is Dr. Hough's account, supported by percipient eyewitness testimony presented in the government's own case-in-chief and unrebutted by any other testimony or document presented at trial.  On the other hand is the government's version, which is not based on any witness testimony, any statement by Dr. Hough, or any document signed by Dr. Hough, but rather requires (1) piling supposition upon speculation with respect to ambiguous documents never signed by or brought to the attention of Dr. Hough, and (2) imputing Dr. Fredrick's purported knowledge and intent to Dr. Hough without any evidentiary basis for doing so.  *See United States v.* Veal, 703 F.2d 1224, 1229 (11th Cir. 1983) ("The crime of conspiracy by its very nature may lead to an improper jury finding of guilt by association with those found to be participants in the conspiracy. . . .  This danger of transferred guilt is acute in this case where the evidence against the sole remaining defendant repeatedly refers to his relationship with persons who have suddenly and unexplainedly disappeared from the trial.  The potential prejudice of such an occurrence is obvious." (internal quotations and citation omitted)).  Even if the evidence viewed in the light most favorable to the government lent equal circumstantial support to these competing theories (and Dr. Hough contends that the government's version falls far short in this regard), then a reasonable juror must necessarily have entertained a reasonable doubt as to whether Dr. Hough knowingly agreed to achieve the charged object of the conspiracy, and a judgment of acquittal must be granted.  *See Cosby*, 682 F.2d at 1383.

    2.    <u>Subscribing to False Tax Returns (Counts Six Through Nine)</u>

The substantive charges in Counts Six through Nine required the jury to find each of the following elements beyond a reasonable doubt with respect to the tax years 2005 through 2008:

(1) Dr. Hough made and subscribed, or caused to be made and subscribed, a U.S. individual tax return Form 1040; (2) the U.S. individual tax return Form 1040 contained a written declaration that it was made under the penalty of perjury; (3) when Dr. Hough made or caused to be made the U.S. individual tax return Form 1040, she knew that it contained false material information; (4) when Dr. Hough did so, she intended to do something she knew violated the law; and (5) the false matter in the U.S. individual tax return Form 1040 related to a material statement. (10/23/13 RT 154).  The jury was further instructed that it needed to unanimously agree on the respect in which the income tax return charged in each count was false:  that (1) Dr. Hough reported a certain dollar amount as her total income on Line 22, when she then knew and believed that her total income was substantially greater ("Substantial Underreporting of Total Income"); and/or (2) Dr. Hough failed, on Schedule B, Parts 1 and 3, Lines 7A and 7B, to report that she had a financial interest in, or signature authority over, financial accounts located in foreign countries ("Schedule B Lines 7a and 7b").  (*Id.* at 153-55).

The jury was provided with a special verdict form on which it indicated, as to each substantive count, which statement in the tax return it unanimously found was false.  For each of Counts Six through Nine, the jury checked the line next to the Substantial Under Reporting of Total Income question.  For Counts Six (2005 tax year), Eight (2007 tax year) and Nine (2008 tax year), the jury also checked the line next to the Schedule B Lines 7a and 7b question.  The jury did not check the line next to the Schedule B Lines 7a and 7b question for Count Seven (2006 tax year).

As shown below, the government's proof on elements three and four above – Dr. Hough's knowledge that the returns contained false information and her intent to violate the law – was insufficient to allow a reasonable juror to find those elements satisfied as to each of Counts Six through Nine.

a.      Count Seven

On Count Seven, relating to tax year 2006, the jury convicted Dr. Hough solely on the basis of Substantial Underreporting of Income; the jury did not check the special verdict option

relating to Schedule B Lines 7a and 7b (presumably because Dr. Hough's tax return for 2006 did not include a Schedule B, *see* 10/10/13 RT 18).   However, the government's own expert, Revenue Agent Sheila Maurer, testified that based on her calculations (included in her revised Revenue Agent Report), Dr. Hough **overstated** her total income for 2006 on Line 22 by $13,729 and was owed a refund of a refund of $2,282 from the IRS.  (10/17/13 RT 126; 10/18/13 RT 97-98; Gov. Exh. 30I).   Agent Maurer further testified that she was unable to determine income other than what was included in her calculations and "could only go with the numbers [she] was sure of."  (10/18/13 RT 98).

In opposing Dr. Hough's Rule 29 motion, the government conceded that, when offsetting unreported taxable interest by unreported loss according to Agent Maurer's own numbers, the number reported by Dr.  Hough on Line 22 as her total income was *too high* rather than too low. (10/21/13 RT 14-16).  Incredibly, the government maintained that an *overstatement* of income is still material and supports a prosecution for criminal tax fraud "because the IRS needs to rely on information provided by the taxpayer in order to accurately compute the tax due and owing." (*Id.* at 15-16).  When the Court showed understandable skepticism of that argument (and noted that it was contrary to the charging language in the indictment), the government fell back on arguing that there were additional profits from the schools, not included in Agent Maurer's report, that should have been attributed to Dr. Hough.  (*Id.* at 16-18).  The Court responded:

> You've indicted 46,000 was substantially less than the real income was, now you have testimony that the real income was a negative number, and you have a theory, unsupported by your witness, that there was other income that should have been declared, kind of free floating, and I guess at some point you will tell the jury what that is, but . . . .  How can that possibly be enough to get to the jury?

(*Id*. at 19-20).  The answer to the Court's question, both then and now, is simple:  it is not enough.  To find that a reasonable juror could have found beyond a reasonable doubt that Dr. Hough substantially understated her total income for 2006, when the government's own expert presented calculations that showed precisely the opposite and testified that she herself could not be "sure" of the amount of any other income, would undermine the purpose of Rule 29.

In addition, as developed in more detail below, the government introduced *no evidence* showing that Dr. Hough *knew* that she had substantially understated her total income (*i.e.*, her taxable interest, ordinary dividends and capital gains based on her alleged ownership of the New Vanguard and Top Fast Swiss bank accounts) or that she intended to violate the law by allegedly substantially understating her total income.  The government's position in this regard is made only that much more specious for Count Seven because its own evidence showed that Dr. Hough overstated rather than substantially understated her total income for 2006.

As discussed in the Introduction to this motion, however, the problems with the jury's verdicts do not begin and end with Count Seven.  Rather, the jury's blatantly and colossally unsupportable judgment on Count Seven is symptomatic of a fundamental breakdown in its ability to understand the evidence presented at trial and/or the jury instructions, including the ultimate concept of reasonable doubt.

        b.        Counts Six, Eight and Nine

        (1)        Schedule B, Lines 7a and 7b

In order to evaluate whether the government proved beyond a reasonable doubt that Dr. Hough willfully signed her tax returns at issue knowing that she provided a false answer to the question asked in Schedule B, Part III, lines 7a and 7b, one must start with the precise language of that question.  Line 7a asked the following question for each tax year at issue, after which it gave the choices "Yes" or "No":  "At any time during [tax year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?  **See page B-2 for exceptions** and filing requirements for Form TD F 90-22.1." (emphasis added).  Line 7b stated as follows for each tax year:  "If 'Yes' [to question 7a] enter the name of the foreign country."[9]  Thus, the question on line 7a was *not* "Do you have an interest in or a signature or other authority over a foreign bank account," as the government suggested in its closing argument.  (*See* 10/23/13 RT 14, 133-34).

---

[9] Dr. Hough's return for each of the years 2005 through 2008 answered the question on line 7a "No" and consequently did not list any foreign country in response to the question on line 7b.

That question appeared nowhere on Schedule B.   Rather, the precise question on line 7a asked more specifically whether the taxpayer had an interest in or a signature or other authority over a foreign account *that did not fall within the "exceptions" on "page B-2."*  For if any of those exceptions applied in Dr. Hough's case, then her answer of "No" was unquestionably a true and correct answer.

　　　　Thus, to prove that Dr. Hough knowingly and willfully answered the question on line 7a falsely, the government had to prove both  (1) that Dr. Hough objectively had "an interest in or a signature or other authority over" a foreign financial account that did not fall within the "exceptions" on "page B-2", and (2) that Dr. Hough subjectively *knew* she had "an interest in or a signature or other authority over" a foreign financial account that did not fall within the "exceptions" on "Page B-2."  On both the objective and subjective levels, this required at a minimum that the government introduce evidence of what the "page B-2 exceptions" were for each tax year.  Yet the record is utterly devoid of any documentary or testimonial evidence on this point.  It is undisputed that the "page B-2 exceptions" are not delineated on Schedule B, nor are they found anywhere else in Dr. Hough's tax returns.  The government failed to introduce the IRS instruction document that included the referenced page B-2, any other record that listed the page B-2 exceptions, or even any testimony from the government's expert or any other witness as to what the page B-2 exceptions were, such that the jury could conclude that Dr. Hough's answer was objectively false and that she subjectively knew it to be false.  Government witness Thomas Murtha, Dr. Hough's accountant and tax preparer, testified not only that he never showed Dr. Hough a Schedule B or discussed it with her, but also that he had no idea what the exceptions on page B-2 were (or even where to find page B-2) and therefore never discussed those exceptions with her.[10]  (10/10/13 RT 50-51, 58-60).  Agent Maurer testified that she had no idea if Dr. Hough knew whether or not the exceptions applied.  (10/18/13 RT at 156).

---

[10] Similarly, Dr. Hough testified that she did not review Schedule B, Part III before signing her return, that she had never discussed this section with Mr. Murtha or anyone else before signing any of her returns, that she did not know where page B-2 could be found (it was not part of the Form 1040 she signed), that she had no idea what the "exceptions" were that were embodied in the question on line 7a and therefore

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866)951-9058/ budolf@udolflaw.com

How could any reasonable juror determine beyond a reasonable doubt that Dr. Hough's answer of "No" in line 7a was false, and equally importantly that Dr. Hough *knew* that answer was false at the time she signed her returns, if the jury never learned what the exceptions on page B-2 were and therefore had absolutely no basis on which to determine whether or not the foreign accounts at issue fell within any of those exceptions?  Because the government abjectly failed to present any evidence as to what the "page B-2 exceptions" were, and because the only evidence adduced on this point at trial was that neither Dr. Hough nor her accountant had the slightest idea what those exceptions were, it would be impossible for a reasonable juror to conclude that the government had proved beyond a reasonable doubt either (1) that Dr. Hough's negative answer to a question asking whether she had any accounts that did not fall within those exceptions was objectively false, or (2) that Dr. Hough subjectively knew the answer was false and intended to violate the law.  (And of course, if line 7a was correctly answered "No," there would be no need to respond to line 7b.)   Accordingly, a judgment of acquittal must be granted as to each substantive count with respect to the "Schedule B Lines 7a and 7b" alleged false statement.

We further note that in any prosecution for making a false statement, which was the essence of the charge in Counts Six through Nine, the law requires at a minimum that the question to which the defendant responded be clear and unambiguous.  *See Bronston v. United States*, 409 U.S. 352, 362 (1971) ("Precise questioning is imperative as a predicate for the offense of perjury.").  In *United States v. Manapat*, 928 F.2d 1097 (11th Cir. 1991), the Eleventh Circuit affirmed the dismissal of an indictment charging the defendant with having knowingly and willfully made a false statement to a government agency.  On an application to the Federal Aviation Administration for an Airman Medical Certificate, the defendant checked "No" to two questions asking for "Record of traffic convictions" and "Record of other convictions"; in fact, however, she had been convicted three times prior to filling out the form.  *Id.* at 1098.  The questions at issue were included under the column "Condition" in a section of the application

---

did not know whether she fit within the exceptions (even assuming she had known that this question was asked in line 7a of Schedule B, which she did not).  (10/21/13 RT 212-15).

titled "Medical History." Although it was "undisputed that defendant's answers to the questions were literally false," *id.* at 1100, the manner in which the questions were listed rendered them "too ambiguous to allow a jury to speculate as to the defendant's intentions at the time she filled out the application form." *Id.* at 1100-01. As the court explained, "[w]hen the question that led to the allegedly false response is fundamentally ambiguous, we cannot allow juries to criminally convict a defendant based on their guess as to what the defendant was thinking at the time the response was made." *Id.* at 1101. Accordingly, the Eleventh Circuit held that "*the government may not provide someone with a confusing and ambiguous form and then prosecute when the answers are inaccurate.*" *Id.* at 1102 (emphasis added).

Although raised here as a challenge to the verdict rather than to the indictment, the problems with Schedule B as it existed at the time of the tax returns in this case are comparable to those in *Manapat*. The failure to define anywhere in Schedule B (or anywhere else in the Form 1040) the "exceptions" that were incorporated into the question on line 7a but were contained in some unidentified, extraneous document rendered that question "fundamentally ambiguous."[11] *Id.* at 1101. In light of this fatal ambiguity, no reasonable juror could have found beyond a reasonable doubt that Dr. Hough's responses to that confusing and ambiguous question on line 7a were knowingly and willfully false. Thus, a judgment of acquittal is warranted as to each substantive count with respect to the "Schedule B Lines 7a and 7b" alleged false statement.

(2)     Substantial Underreporting of Total Income[12]

---

[11] The *Manapat* court noted that the ambiguity of the form was made more evident by the government's own doubts about the clarity of the form, as reflected in a United States Department of Transportation internal memo recommending that the form be changed. *Manapat*, 928 F.2d at 1101 n.3. In this regard, we ask the Court to take judicial notice that the IRS, beginning in 2009 (the year after the last tax return at issue in this case), revised Schedule B to list the instructions (including the exceptions) on page 2 of the schedule itself, and, beginning in 2011, further revised line 7a of Schedule B to separate the reference to "exceptions" into an entirely separate question from the one asking about interest in or authority over a foreign financial account. *See* Exhibit "A" attached hereto (2008-2013 Schedule B forms).

[12] To the extent that the Court finds that the above argument with respect to Count Seven (*i.e.*, that the evidence showed that Dr. Hough overstated rather than substantially understated her 2006 total income) does not alone support a judgment of acquittal on that count, the arguments in this section also apply to the jury's verdict on Count Seven.

The key evidence introduced by the government to establish that Dr. Hough substantially underreported her total income on Line 22 was the analysis conducted by Agent Maurer, the government's expert on tax computations.[13]  (Gov. Exh. 30I).  Agent Maurer's analysis focused on three – and only three – categories of total income for Dr. Hough:  taxable interest, ordinary dividends, and capital gains or loss.  Agent Maurer's analysis for 2005, 2006 and 2008 was based on the taxable interest, ordinary dividends and capital gains attributed to Dr. Hough emanating only from the Swiss bank accounts of New Vanguard Holdings, LLC ("New Vanguard"), Top Fast Finance, LLC ("Top Fast"), and (for 2005 only) Patricia Hough.  No other Swiss bank account for any other entity (*e.g.*, Ample Dynamic Trading LLC, Apex Consultants, Medical Technology Associates, the Saba School of Medicine Foundation, Medical University of the Americas, or the David Fredrick/Patricia Hough joint account) was determined to have generated any unreported income for Dr. Hough for any of the years in question.  For 2007, Agent Maurer also included the capital gains earned by New Vanguard from the April 2007 sale of the Round Hill property and the capital gains earned by the Saba School of Medicine Foundation from the April 2007 sale of the Saba School of Medicine; this required Agent Maurer both to compute the basis of each asset and to determine the sales price of each asset based on the allocation in the Flow of Funds document relating to the Equinox purchase agreement (Gov. Exh. 10F).

---

[13] As the Court is aware, Agent Maurer prepared two Revenue Agent Reports.  The first report, dated May 14, 2013, was the culmination of four years of work after Agent Maurer first received the UBS files in April/May 2009.  It was the only report that the government had at the time of the indictment on May 15, 2013, and was the report that the government intended to use at the outset of the trial on October 8, 2013 (as indicated by the facts that the May 14, 2013 report had a government trial exhibit tab on it and that the total unreported income figure from that report was referenced by the government in its opening statement).  Six days into trial, on October 14, 2013, Agent Maurer radically changed her report and added and subtracted over $6.7 million to total income for three of the four years at issue (2005, 2006, and 2007).  The sole basis for that multi-million-dollar change was supposedly that Agent Maurer learned during the first week of testimony that Dr. Hough and Dr. Fredrick actually owned the Saba School of Medicine Foundation and the Medical University of the Americas.

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866)951-9058/ budolf@udolflaw.com

Agent Maurer's adjustments to total income break down as follows:

| | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|
| Taxable Interest | 45,695 [New Vanguard UBS account; Patricia Hough UBS account] | 28,755 [New Vanguard UBS account; Top Fast UBS account] | 106,301 [New Vanguard UBS account; Top Fast UBS account] | 459,832 [New Vanguard UBS, LLB and Fortis accounts; Top Fast LLB and Fortis accounts] |
| Ordinary Dividends | 116 [New Vanguard UBS account; Patricia Hough UBS account] | 277 [New Vanguard UBS account; Top Fast UBS account] | 40 [New Vanguard UBS account; Top Fast UBS account] | 8,883 [New Vanguard UBS, LLB and Fortis accounts; Top Fast LLB and Fortis accounts] |
| Capital Gains or Loss | 195,960 [New Vanguard UBS account; Patricia Hough UBS account] | (42,761) [New Vanguard UBS account; Top Fast UBS account] | 15,895,988 [New Vanguard UBS account; Top Fast UBS account; New Vanguard Roundhill 2007 sale; Saba Foundation 2007 sale of Saba School of Medicine] | 1,732,469 [New Vanguard UBS, LLB and Fortis accounts; Top Fast LLB and Fortis accounts] |
| Total Income Adjustments | 241,771 | (13,729) | 16,002,329 | 2,201,184 |

For the government to prove that Dr. Hough knew that she was substantially underreporting her taxable interest, ordinary dividends and capital gains for a particular year, thereby intending to do something she knew violated the law, the government at a minimum had to prove beyond a reasonable doubt all four of the following facts:

1.      Dr. Hough owned the Saba Foundation, New Vanguard, Top Fast, and the Patricia Hough account (for if she did not own those entities or the funds in the accounts, then the taxable interest, ordinary dividends and capital gains from those entities' accounts or transactions could not have constituted adjustments to her total income[14]); AND

---

[14] Agent Maurer testified unequivocally that if Dr. Hough did not own these accounts, then they would not be included in her income tax computations.  (10/17/13 RT 37, 52-53, 71-72, 84-85, 93, 99-100, 105-07).

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866)951-9058/ budolf@udolflaw.com

2.      The New Vanguard, Top Fast, Saba Foundation, and Patricia Hough offshore accounts or transactions generated taxable interest, ordinary dividends, and capital gains in a particular tax year (for if they did not, then there was no income to underreport); AND

3.      Any taxable interest, ordinary dividends, or capital gains earned in the New Vanguard, Top Fast , Saba Foundation, and Patricia Hough offshore accounts or foreign-based transactions were reportable by Dr. Hough on her U.S. tax returns (for if that income was not reportable in the first instance, its omission could not constitute underreporting of income); AND

4.      Dr. Hough actually knew that those offshore accounts or transactions generated taxable interest, ordinary dividends or capital gains in a particular tax year such that she had to report that income on her tax return for the particular year at issue (for if she lacked such actual knowledge, then she could not knowingly have underreported her total income).

As shown below, even assuming that Agent Maurer's October 14, 2013 report could establish that for 2005, 2007 and 2008, the New Vanguard, Top Fast, Saba Foundation and Patricia Hough accounts and transactions generated substantial positive total income adjustments for each of those years, this would only establish the second of the four points above.  With respect to points one (ownership), three (reportability of foreign-source total income), and four (knowledge of any total income adjustments), the government abjectly failed to introduce evidence sufficient to allow a reasonable juror to find those facts beyond a reasonable doubt (and therefore to conclude beyond a reasonable doubt that Dr. Hough knowingly and willfully substantially underreported her total income for the years charged).

(a)      Point One:  The Government Failed to Prove That Dr. Hough Owned the Saba School of Medicine Foundation, New Vanguard, Top Fast, and the Funds in Those Entities' Foreign Bank Accounts and the Patricia Hough UBS Account

(i)      Dr. Hough Did Not Own the Saba Foundation

In Agent Maurer's testimony, she stated that she heard evidence for the first time during the first week of trial that demonstrated that Dr. Hough and Dr. Fredrick owned the Saba

Foundation.  (10/17/13 RT 236, 257-58; 10/18/13 RT 28).  For the more than four years prior the trial, Agent Maurer's analysis had been based on Dr. Hough *not* owning the Saba Foundation. (10/17/13 RT 258-60).  Agent Maurer testified that her mid-trial reversal, which resulted in her adding and subtracting over $6.7 million to and from her calculations of Dr. Hough's total income for three of the four years at issue (2005, 2006, and 2007) resulted from seeing certain documents presented during the testimony of Jean Marc Futternecht, the UBS custodian, and Mario de Castro, a former lawyer from Jones Walker, the firm that had represented a potential buyer of the schools in a deal that fell through in 2003.  Specifically, Agent Maurer identified Government Exhibits 3S (p.23), 3EE (p.86), 6B, 6D, 6F, 6H, and 8B.[15]  (10/18/13 RT 40-41). None of these documents, viewed in the light most favorable to the government, established beyond a reasonable doubt that Dr. Hough owned the Saba Foundation.  Exhibits 3S and 3EE were client notes in the UBS files that were undated, unsigned, entered into the UBS system by some unknown person, and contained at least one glaring inaccuracy.[16]  While Dr. Fredrick claimed in an initial letter to be the sole owner of the Saba University School of Medicine, MUA and EIC (Exh. 6B), there was no evidence that that letter was ever reviewed, approved, signed, or even seen by Dr. Hough.  The letter of intent (Exh. 6D) and agreement (Exh. 6F) that were signed by Dr. Hough, in contrast, provide no support at all for Agent Maurer's conclusion:  they state that Dr. Fredrick and Dr. Hough "directly or indirectly . . . have the controlling interest in" (Exh. 6D), or "own or control" (Exh. 6F), the Saba Foundation, MUA, and EIC – which by the plain terms of those documents does not prove ownership.[17]   As for the legal memorandum

---

[15] Agent Maurer also identified Government Exhibit 7II as supporting her radical change in position, but recanted after admitting she had never seen the document, which had not been admitted into evidence or published to the jury.  (10/18/13 RT 41, 78-81).

[16] The client note in Exhibit 3EE states:  "Client and her husband are consultants, own and operate medical schools."  The client note in Exhibit 3S states:  "They own medical colleges in Caribbean (University of Saba www.saba.edu, schools in Nevis and Belize). . . .  Funds were moved to us from UBS Bahamas (which no longer takes US clients) and originate from their schools/consulting business."  There is no such school as "University of Saba."

[17] The evidence showed that Dr. Fredrick, by virtue of his position on the Board of Directors of the Saba Foundation and MUA, was in a position to control the schools; that MUA was a for-profit Nevis corporation of which Dr. Fredrick owned a majority share of at that time; and that Dr. Fredrick at all times owned 100% of EIC, Inc.

prepared by Mr. de Castro for his clients (Exh. 8B), that memo – which the evidence showed was also never reviewed, approved, signed, or seen by Dr. Hough – referenced the sellers as owning the schools but also stated that it was a "preliminary assessment" in "draft form" that was "subject to further research and due diligence."[18]   Finally, Exhibit 6H is an email from Dr. Fredrick to the potential buyers that mentions absolutely nothing about ownership of anything. Thus, none of the evidence cited by Agent Maurer came close to proving beyond a reasonable doubt that Dr. Hough owned the Saba Foundation.

Indeed, the overwhelming evidence at trial showed that by definition no one did *or could* own the non-profit Netherlands Antilles Saba Foundation, and that the government's repeated insistence on Dr. Hough's ownership of that foundation in its closing argument demanded that the jury accept a factual and legal impossibility.   CPA Jerry Schneider testified that no individuals own a foundation and that, to his knowledge, the Saba School of Medicine Foundation could not be owned by anybody.   (10/10/13 RT 233-34, 238).   CPA David Minchenberg similarly testified that, to his understanding, a non-profit foundation could not be owned by an individual.   (10/11/13 RT 49).   Dr. Paul Dalbec, the Chairman of the Board of Trustees of Saba University School of Medicine, testified that the school was owned by the Foundation and not by any individual.   (10/15/13 RT 118-19).   Dr. Alan Gruber, a former student and faculty member at Saba University School of Medicine, testified that he understood that no one owned the school because it was a non-profit organization.   (10/17/13 RT 153).   And most significantly, Antoine Solagnier, the former Governor, Head of Finance, Head of Civil Registry, and Acting Public Prosecutor of the island of Saba and former Registrar of the Common Courts of the Netherlands-Antilles, testified that the Saba School of Medicine Foundation was a Netherlands-Antilles foundation, that "[t]here is no such thing as an owner of a foundation," that this is true for every foundation under Netherlands-Antilles law, and that the Saba Foundation

---

[18] The extent of the lack of due diligence on the ownership of the schools was evidenced by the fact that Mr. de Castro's memorandum identified the Saba School of Medicine Foundation as "Saba University Netherlands Antilles," a name it never had.

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

(like every other Netherlands-Antilles foundation), *by definition*, could not be owned by any individual. (10/18/13 RT 229-31). The government did not ask Governor Solagnier a single question about foundation ownership on cross-examination, nor did the government introduce any other evidence to contradict his unequivocal explanation of Netherlands-Antilles law.

This is not a question of Agent Maurer's credibility. Rather, it is a question of **impossibility** under the unchallenged and unrebutted evidence introduced at trial. The apparent belief of Agent Maurer, who conceded that she had no expertise in Netherlands-Antilles law dealing with non-profit foundations (10/17/13 RT 209), that the laws of the Netherlands-Antilles somehow did not apply to this particular Netherlands-Antilles foundation cannot support a jury finding that Dr. Hough (or anybody else) owned the Saba School of Medicine Foundation.

If Dr. Hough did not own the Saba Foundation, then, as Agent Maurer conceded, she was not liable for any total income adjustments for the Saba Foundation, including the capital gains adjustment of $494,498.50 from the April 2007 sale of the Saba School of Medicine that Agent Maurer attributed to Dr. Hough in her October 14, 2013 report. No reasonable juror could have found otherwise.

> (ii)    Dr. Hough Did Not Own New Vanguard or Top Fast

All of Agent Maurer's other total income adjustments but one (the Patricia Hough UBS account) required the jury to find that Dr. Hough owned New Vanguard and Top Fast – for as Agent Maurer conceded, if Dr. Hough did not own New Vanguard and Top Fast, then Agent Maurer's income adjustments based on those entities' accounts would not apply to Dr. Hough. Again, the evidence demonstrated just the opposite. The government introduced no percipient testimony at all concerning the ownership of New Vanguard and Top Fast. The documents on which the government relied conclusively showed that Dr. Hough was **not** an officer, director, shareholder, representative, or authorized signatory for either entity – classic badges of ownership; rather, the documents showed that the officers, directors, shareholders and authorized signatories of New Vanguard and Top Fast were Beda Singenberger, Daniel Eric Joerin, Erwin Schulthess, and Brigitte Schaufelberger. (Exh. 3C p.39, 41; Exh. 3CC p. 16, 20). There was not

one document that showed Dr. Hough communicating on either entity's behalf with Dieter Luetolf at UBS or with anyone at LLB, Fortis Banque, or Sinco Trust (including Beda Singenberger).  The only documents in the voluminous New Vanguard and Top Fast bank files that even mentioned Dr. Hough's name were the single-page Form As that listed Dr. Hough's typewritten name as a beneficial owner of the accounts but that were never signed by Dr. Hough. (10/18/13 RT 61-64, 69-72; Exh. 3C p.1; Exh. 3CC p.2).  The evidence showed that these Form As were not IRS documents; instead, the Form As were exclusively used for Swiss anti-money laundering purposes.  (10/9/13 RT 141).  Indeed, the term "beneficial owner" in the Form As appears nowhere in the Internal Revenue Code.  Moreover, the record was devoid of any evidence that Dr. Hough ever initiated a single transaction on behalf of New Vanguard or Top Fast, directed or approved of any transaction initiated by anyone else, or authorized or signed any email, correspondence, or other document on either entity's behalf.[19]

The evidence showed that Beda Singenberger's establishment in 2005 of New Vanguard and Top Fast, two Hong Kong companies, coincided with the Saba Foundation being sued in 2005 by a competitor school, St. Matthews, for $200 million.  (10/15/13 RT 152-53; 10/21/13 RT 172).  Whether or not the jury accepted the premise that the entities were set up as additional asset protection for the Saba Foundation's funds, the record was simply bereft of evidence – any witness, any incorporation document, any email, any bank record other than unsigned Form As that there was no evidence Dr. Hough ever authorized or saw – that would allow a reasonable juror to find beyond a reasonable doubt that Dr. Hough owned New Vanguard and Top Fast.  As such, no reasonable juror could find that the taxable interest, ordinary dividends, and capital gains earned in the accounts of those two entities – including the capital gains adjustment of $15,390,188.50 from New Vanguard's April 2007 sale of Round Hill that Agent Maurer

---

[19] To the extent the government argues that Dr. Hough "owned" New Vanguard and Top Fast because she controlled and/or benefited from their funds (*e.g.*, by the purchase of any of the Florida or North Carolina properties), there was no evidence introduced demonstrating that Dr. Hough in any way controlled or directed the funds or that she even knew the funds used to make any purchases came from New Vanguard or Top Fast.

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

attributed to Dr. Hough in her October 14, 2013 report – properly constituted adjustments to Dr. Hough's total income.

        (iii)    Dr. Hough Did Not Own the Funds in the Patricia Hough UBS Account

Finally as to the "point one" ownership issue, with respect to the Patricia Hough UBS account, the evidence was undisputed that during the 15 months (April 2004 to July 2005) that this account was open and contained over $5 million, Dr. Hough did not initiate one transaction concerning the account, did not take one penny from the account, and made no deposits to the account.  The only writings on the account opening statements that were Dr. Hough's were her signatures on various forms; all the rest of the handwritten entries on the forms were not Dr. Hough's handwriting, and there was no evidence presented that any information on any of the forms was explained to Dr. Hough prior to her signing them.  This scant evidence is insufficient for a reasonable juror to conclude beyond a reasonable doubt that the money in the account was Dr. Hough's personal money and not, as she testified (and as Dr. Dalbec corroborated), the Saba Foundation's money.  Accordingly, no reasonable juror could find beyond a reasonable doubt that any of the taxable interest, ordinary gains, or capital gains earned in the Patricia Hough UBS account constituted an adjustment to Dr. Hough's total income.  Even assuming *arguendo* that this account (unlike the accounts for the Saba Foundation, New Vanguard and Top Fast) survives point one by virtue of Dr. Hough's name being on the account, it fails to pass muster under points three and four below and must therefore be eliminated from a reasonable juror's calculation of Dr. Hough's total income.

        (b)    Point Three:  The Government Failed to Prove That the Foreign Income Earned by the Saba Foundation, New Vanguard, Top Fast and Patricia Hough Accounts and Transactions Was Reportable on Dr. Hough's U.S. Tax Returns

Assuming *arguendo* that the government established beyond a reasonable doubt that under point one Dr. Hough owned the Saba Foundation, New Vanguard, Top Fast, and the funds in those accounts as well as the Patricia Hough UBS account, and that under point two those

accounts and transactions generated additional total income,[20] the government was next required to prove beyond a reasonable doubt that the taxable interest, ordinary dividends and capital gains earned in those Swiss accounts or through foreign-based transactions were reportable on Dr. Hough's U.S. tax returns.   Once again, the government failed to do so, and the available evidence was actually to the contrary.   The only evidence that the jury heard on this issue came from CPA David Minchenberg's testimony and an email that he sent to Dr. Hough on December 23, 2004.   In that email, Mr. Minchenberg advised his client:

> The IRS requires that if a US citizen owns an interest in a foreign entity, they must file the IRS Form 5471 with their annual tax return. The Form 5471 is purely an informational document for the IRS. What is meant by informational – is that the Form itself does not create any type of tax to the filer.   Generally, US citizens are allowed to own interest(s) in foreign entities.   Usually, the only time a tax is "triggered" is when the US citizen brings money (in the form of profits, gains, etc.) back into the US.   That said, **if the citizen is the beneficiary of said profits, gains, etc. and keeps those funds "offshore" and doesn't bring them back into the US, then, there are generally no taxes incurred by the US citizen**.

(Def. Exh. 73 (emphasis added)).   Mr. Minchenberg confirmed in his testimony that these statements accurately reflected his understanding of United States tax law.  (10/11/13 RT 138).

The government presented absolutely no evidence to show that the taxable interest, ordinary dividends, and capital gains earned in the Saba Foundation's, New Vanguard's, Top Fast's, and Patricia Hough's Swiss accounts were ever repatriated to the United States.   Agent Maurer's analysis calculated what was earned in each of the Swiss accounts, but performed no tracing to see whether any of this purported income was ever brought back to the United States. Indeed, the *only* tracing of which any evidence was presented at trial was performed by expert witness Luis Rivera, a licensed CPA and the former Assistant Special Agent in Charge of the Miami field office of the IRS, who determined that the funds from the 2007 sale to Equinox still reside today with the Saba School of Medicine Foundation in offshore accounts that total over

---

[20] As discussed above, the government plainly failed to establish point two with respect to tax year 2006 (Count Seven).

$54 million.  (10/22/13 RT 157-65). That expert testimony was unrebutted by any other evidence.[21]

With respect to the Patricia Hough UBS account, while Dr. Hough is obviously not a "foreign entity" like New Vanguard, Top Fast, and the Saba Foundation, the last two sentences of Mr. Minchenberg's above-quoted advice as set forth in his December 23, 2004 email were plainly broad enough to cover personal assets where profits and gains from those assets are kept offshore and not brought into the United States.  Moreover, the evidence was undisputed that not one penny in the Patricia Hough UBS account was moved anywhere during the 15 months that the account remained open.  For this purpose, it is irrelevant whether Mr. Minchenberg's counsel was accurate or inaccurate.  As the Court instructed the jury, "[e]vidence that the defendant, in good faith, followed the advice of an accountant or an attorney would be inconsistent with [] an unlawful intent."  (10/23/13 RT 156).  Because the only evidence the government presented of whether Dr. Hough had to report interest, dividends, and capital gains that originated abroad and stayed abroad (and of her understanding of that reporting obligation) was that CPA Minchenberg specifically told her that she did ***not*** need to report such income, no reasonable juror could find beyond a reasonable doubt either that the income derived from the foreign accounts of the Saba Foundation, New Vanguard, Top Fast, or Patricia Hough was reportable on Dr. Hough's tax returns or that she knew it was reportable and intended to violate the law.[22]

> (c)   Point Four:  The Government Failed to Prove Dr. Hough's Actual Knowledge That Any of the Foreign Accounts or Transactions Earned Taxable Interest, Ordinary Dividends, or Capital Gains That Were Reportable on Her U.S. Tax Returns

Even if a reasonable juror could have found beyond a reasonable doubt, based on this scattershot and woefully lacking trial record, that Dr. Hough owned the Saba Foundation, New

---

[21] Agent Maurer not only failed to perform any tracing analysis of where the funds went once they left the accounts she analyzed, but she also failed to perform any tracing analysis of where the funds in the Swiss accounts that she analyzed for four years had originated.  (10/18/13 RT 65-68).

[22] Even if a reasonable juror could find that the Patricia Hough UBS account (unlike the entity accounts) was not covered by Mr. Minchenberg's advice, the income from that account must still be excluded from a reasonable juror's calculation of unreported income based on point four below.

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

Vanguard, and Top Fast, that those entities (and the Patricia Hough UBS account) earned taxable interest, ordinary dividends and capital gains, and that such taxable interest, ordinary dividends and capital gains were reportable on Dr. Hough's tax returns for the years at issue, a final point must still be proven beyond a reasonable doubt before Dr. Hough can be found to have knowingly and willfully underreported that income; the government must have proved that Dr. Hough *actually knew* that the accounts and transactions of the Saba Foundation, New Vanguard, Top Fast, and the Patricia Hough UBS account earned taxable interest, ordinary dividends or capital gains. On this essential point, the trial record is utterly silent.

What testimony was presented demonstrating that Dr. Hough actually knew that the accounts or transactions that formed the basis for Agent Maurer's report generated any interest, dividends or capital gains? None. What documents established Dr. Hough's knowledge? None. The bank records showed that the New Vanguard and Top Fast statements (from UBS, LLB, and Fortis Banque) went to Sinco Treuhand AG in Zurich, and the Patricia Hough UBS account and Saba Foundation LLB statements were retained by the banks; there was no evidence that any statements were ever sent to or reviewed by Dr. Hough. There was no evidence that anyone ever discussed with Dr. Hough whether any of these accounts earned money, stayed the same, or lost money. There was no evidence that Dr. Hough instructed any trades in any of these accounts or had any communications with Dieter Luetolf or anyone else regarding the performance of the accounts. Dr. Hough's only instruction to Luetolf with respect to the UBS account in her name was to close it down and transfer the money to another account. (Gov. Exh. 3S p.9).

With respect to the capital gains earned by New Vanguard from the April 2007 Round Hill transaction and by the Saba Foundation from the April 2007 sale of the Saba University School of Medicine, there is similarly no evidence that Dr. Hough actually knew whether those transactions generated any capital gains. As Stephen Rodger testified, Dr. Hough's involvement in the negotiation of the sale was limited to discussion of her consulting agreement and the guaranty; it did not extend to deciding the allocation of the sales proceeds, which was negotiated solely by Dr. Fredrick and the attorneys. (10/16/13 RT 14-15, 39, 87-88). There is no evidence

in the record that Dr. Fredrick (or anyone else) ever discussed the allocation of funds from the sale with Dr. Hough or that she ever saw the Flow-of-Funds document (which, unlike many of the sale documents, had no signature block).  (Gov. Exh. 10F).  As Agent Maurer testified, the gross proceeds from the sale do not necessarily mean that any reportable capital gains occurred from the sale.  In order to determine capital gains, one has to know what the basis was for the asset being sold and subtract that basis from the sales price; only then can one determine if capital gains occurred.  (10/17/13 RT 18).  Thus, if the Round Hill property had been allocated only $3 million as part of the overall purchase price of the schools, then the over $3 million basis determined by Agent Maurer for that property would have resulted in there being no capital gain from the sale of Round Hill.  (10/17/13 RT 134).  Similarly, Agent Maurer testified that she allocated no basis for the sale of the Saba School of Medicine, even though there were significant costs incurred over the course of a decade in creating and maintaining two of the school's main assets – the contracts with hospitals for clinical rotations and the accreditations with the individual states, the U.S. Department of Education, Canada and the European Union. (10/17/13 135; 10/18/13 RT 126-28).  Even assuming that Agent Maurer correctly calculated the capital gains for the April 2007 Round Hill and Saba School of Medicine sales, **there is not a scintilla of evidence in the trial record that Dr. Hough knew the sales prices allocated to each asset, knew the basis for each asset, and consequently knew whether any capital gains for each asset were earned at all**.

In sum, with respect to this final point four regarding Dr. Hough's actual knowledge of reportable total income, the government completely failed to introduce any evidence from any source that Dr. Hough knew that the accounts and transactions charged to her by Agent Maurer earned taxable interest, ordinary dividends or capital gains, and therefore completely failed to prove that Dr. Hough knowingly understated her income (because there was no evidence that Dr. Hough knew there was any income to understate.)   Here, as with the other required findings discussed above, the government did not call upon the jurors to draw reasonable inferences from the evidence, but rather exhorted them to engage in rank speculation in the absence of

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

evidence.[23]  In light of the complete absence of witness or documentary evidence of Dr. Hough's knowledge of the existence and extent of the interest, dividends and capital gains that Agent Maurer concluded constituted an adjustment to Dr. Hough's income, no reasonable juror could find beyond a reasonable doubt that Dr. Hough knowingly and willfully failed to include such interest, dividends and capital gains on her tax returns.

For all of the above reasons, a judgment of acquittal is warranted on Counts Six through Nine.

### III.    CONCLUSION

Rule 29 exists to prevent the precise type of miscarriage of justice that has occurred in this case.  The undersigned respectfully submit that if that Rule is ever to be used and not rendered a meaningless safeguard, it should be used now.  Wherefore, for the reasons set forth herein, the undersigned respectfully request this Honorable Court grant the foregoing Motion for Judgment of Acquittal, and all such other and further relief deemed just and proper under the circumstances.

Dated: November 22, 2013.

Respectfully submitted,

| | |
|---|---|
| **BRUCE L. UDOLF, P.A.** | **BINGHAM MCCUTCHEN, LLP** |
| Counsel for Defendant Hough | Counsel for Defendant Hough |
| Broward Financial Centre | Suite 2050 North, 1601 Cloverfield Blvd |
| 500 East Broward Blvd., Suite 1400 | Santa Monica, California 90404 |
| Fort Lauderdale, Florida 33394 | Tel: (310) 907-1000/ Fax (310) 907-2000 |
| Tel: (866) 951-9058/ Fax (954) 525-2134 | |

By: /s/ Bruce L. Udolf
   Fla. Bar No. 0899933
   budolf@udolflaw.com

By:  /s/ Nathan J. Hochman
   California Bar No. 139137
   nathan.hochman@bingham.com

By:  /s/ Daniel A. Saunders
   California Bar No. 161051
   Daniel.saunders@bingham.com

---

[23] Black's Law Dictionary defines "inference" as a "conclusion reached by considering other facts and deducing a logical consequence from them" and "speculation" as the "act or practice of theorizing about matters over which there is no certain knowledge."  Black's Law Dictionary (9th ed. 2009).

## <u>CERTIFICATE OF COMPLIANCE</u>

WE HEREBY CERTIFY that the undersigned has conferred with opposing counsel prior to the filing of this motion, that counsel has been unable to resolve the issues by agreement, and that the motion concerns matters which are not covered by the scheduling order, as directed in the Court's Criminal Scheduling Order [DE 22], at ¶ II (D).

By: <u>/s/ Bruce L. Udolf</u>

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, on this 22nd day of November, 2013.

By: <u>/s/ Bruce L. Udolf</u>

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*