1                UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                  FORT MYERS DIVISION

3           CASE NO.:  2:13-CR-72-FtM-29UAM

4
      ——————————————————————————————————————
5  THE UNITED STATES OF AMERICA,

6          Plaintiff,
                              Fort Myers, Florida
7  vs.                          October 10, 2013

8  PATRICIA LYNN HOUGH,          9:00 a.m.

9          Defendant.
      ——————————————————————————————————————
10        TRANSCRIPT OF JURY TRIAL, DAY THREE

11    HELD BEFORE THE HONORABLE JOHN E. STEELE
        UNITED STATES DISTRICT COURT JUDGE
12
              A P P E A R A N C E S
13

14  FOR THE UNITED STATES:    U.S. Department of Justice
                       Tax Division
15                     P.O. Box 813
                     Washington, DC  20044
16                     BY:  CARYN FINLEY, ESQ.

17                     U.S. Department of Justice
                     Tax Division
18                     Suite 7334
                     601 D Street NW
19                     Washington, DC
                     BY:  MARGARET LEIGH KESSLER, ESQ.
20

21

          (Appearances Continue on Following Page)
22

23

24

25

1    A       That's correct.

2    Q       Now, if we can turn to Exhibit 1F . . . and again, is

3    this the 2006 tax return for Patricia Hough?

4    A       Yes, it is.

5    Q       And again, do you prepare this tax return?

6    A       Yes, I did.

7    Q       And if we can turn to the Schedule B, does this tax

8    return have a Schedule B?

9    A       I don't see a Schedule B.

10   Q       And again, if we turn back to the first page, on

11   Line 8A, how much taxable interest did Dr. Hough report in

12   2006?

13   A       $910.

14   Q       And so, again, that same "attach Schedule B if required"

15   note is there.

16           Is it likely that the $910 then fell under that

17   threshold?

18   A       I believe it did.

19   Q       And again, if Dr. Hough had signature authority or an

20   interest in a foreign account, would she still have to file a

21   Schedule B and report that to the IRS?

22   A       I believe so.

23   Q       Now, did Doctor . . . do you know whether Dr. Hough was

24   providing services to Saba for investigation of a school in

25   China?

1    A      Yes.

2    Q      Do you know if Dr. Hough did?

3    A      I don't know.  But I imagine, the medical field, you

4    have to.

5    Q      And the same would be -- well, the medical field, you

6    would take continuing education in the medical field, but you

7    don't know that Dr. Hough took continuing education in

8    accounting and tax; correct?

9    A      I don't believe so.

10   Q      And you said her tax knowledge was about average; is

11   that correct?

12   A      Yes.

13   Q      And that was the same true with Dr. Fredrick; correct?

14   A      I would say, yes.

15   Q      And Dr. Fredrick, to your knowledge, was not a CPA;

16   correct?

17   A      Not that I know of.

18   Q      He didn't have a MBA in accounting; is that correct?

19   A      Not that I know of.

20   Q      And Dr. Fredrick didn't prepare thousands of tax returns

21   over his lifetime; is that correct?

22   A      Not that I know of.

23   Q      Now, dealing with your new client interviews, you told

24   us, when a new client shows up at your firm, you do an intake

25   interview; is that correct?

1    A       That's correct.

2    Q       We'll call that the new client intake interview.

3            Because at the moment the new client shows up at your

4    firm, you pretty much know nothing about them; correct?

5    A       Correct.

6    Q       In you said you asked a number of questions to find out

7    what type of business or income they have, what type of

8    deductions they may be able to claim, those types of questions;

9    is that correct?

10   A       That's correct.

11   Q       And you said that that initial interview lasts, you

12   know, somewhere along the -- excuse me -- somewhere along the

13   lines of about 30 minutes; is that correct?

14   A       That's correct.

15   Q       And again, the point of that is, you don't have any even

16   documentation, any prior returns in front of you, to compare,

17   as you said, you know, the prior year with the current year for

18   a brand-new client; is that correct?

19   A       That's correct.

20   Q       Now, you also said that, once do you this intake

21   interview, you don't have to repeat the process, year in and

22   year out, and ask all the same questions again, because you

23   have that documentation in your file, and if a client has

24   something new, they can bring it to your attention; otherwise,

25   you don't ask the same questions; is that correct?

1    A      That would be true.

2    Q      And that would be true on whether or not you ask a

3    question on whether or not you have a foreign bank account; is

4    that correct?

5    A      From year to year, yes.

6    Q      So just to be clear, if you asked in a new client intake

7    interview, unless something new came up, you wouldn't repeat

8    that question for the subsequent years' returns; correct?

9    A      Probably not.

10   Q      Now, with respect to when Dr. Patricia Hough and

11   Dr. Fredrick came to see you, you said it was in the 2001/2002

12   time period; correct?

13   A      I believe so; yes.

14   Q      And that wasn't the first time that they had come to the

15   Flischel, Townsend & Murtha firm; is that correct?

16   A      That's correct.

17   Q      In fact, they came into the firm in the late nineties,

18   and their first tax preparer was Ray Flischel; is that correct?

19   A      That's correct.

20   Q      And they had gone to Mr. Flischel, presumably, for a

21   couple of years by the time they ended up with you; is that

22   correct?

23   A      That's correct.

24   Q      So they would have had a file at Flischel, Townsend &

25   Murtha that would have had their prior returns in it; is that

1    correct?

2    A       That is true.

3    Q       And that would be a file that, when they came in to see

4    you, you presumably would have had in front of you in order to

5    be able to compare the prior year with the current year; is

6    that correct?

7    A       That's correct.

8    Q       So when they came in to see you, that was not a new

9    client intake interview, as you've described before; would that

10   be correct?

11   A       That's true.

12   Q       This would have been one of those continuation

13   interviews, that you described, that goes on for subsequent

14   years; is that correct?

15   A       Well, I hadn't done their taxes before, so I probably

16   would have been a little more in depth than normal.

17   Q       A little more, certainly.  You probably would have asked

18   them about the type of business they were in.

19           And I believe you said that they said they were in the

20   business of administering medical schools; correct?

21   A       That's correct.

22   Q       And then they gave you the name of one of the schools,

23   the Saba School of Medicine?

24   A       I believe so; yes.

25   Q       And I believe you also said the other school was the

1   Medical University of the Americas; is that correct?

2   A      I believe so; yes.

3   Q      And you also said, though, that there was a

4   Massachusetts management company that they worked for, that

5   they actually got paid from; correct?

6   A      That's correct.

7   Q      And that was called EIC; is that correct?

8   A      Correct.

9   Q      And EIC would have sent them those things called the

10  1099s.  That would have listed how much it paid them in income

11  for their services every year; correct?

12  A      Correct.

13  Q      Now, since this was not a new client intake interview,

14  it happened in 2001 and 2002, which is probably, what, at least

15  12 years ago, plus or minus, do you -- are you certain whether

16  or not you actually asked them, at that first interview, since

17  you had a file in front of you with their prior returns,

18  whether or not they had a foreign bank account?

19  A      Well, based on the way I did my interviews, I believe I

20  did ask them that question.

21  Q      You -- when you asked a question, you said before, of a

22  new client, and in this case you knew that they were being paid

23  from a Massachusetts company, so my question is:  Are you

24  certain, as you sit here today, about a conversation you had

25  12 years ago, that you asked them whether or not they had

1    foreign bank accounts?

2    A     Well, I can't recall at this moment the exact

3    conversation I had.  I mean, that would be impossible, at least

4    for me.  But the boxes were marked "no," and I know that would

5    have been asked in the interview.

6    Q     Well, the boxes were marked "no" from the prior year,

7    too.  And you said that, in a continuation interview, you

8    wouldn't change -- you wouldn't ask the same foreign-bank

9    question in the subsequent years with boxes marked "no" in the

10   prior year, unless something changed that was brought to your

11   attention; isn't that correct?

12   A     That's correct.

13   Q     So are you certain that, in your first interview, where

14   you had their prior return with boxes marked "no," that you

15   would have asked them the foreign-bank question; are you

16   certain of that?

17   A     I'm certain I would have asked that question.

18   Q     And with respect to that question, assuming you're

19   certain of it, would you have asked them about all foreign bank

20   accounts or some specific foreign bank accounts?

21   A     I would have -- I would have just asked if -- do you

22   have any foreign bank accounts.

23   Q     And would you have asked them, foreign bank accounts

24   related to the islands, where the medical schools were located?

25   A     I probably would have asked the question generally, "Do

1    you have any foreign bank accounts?"

2    Q      And did you ever ask them, with foreign bank accounts,

3    whether or not they had signature authority over those foreign

4    bank accounts?

5    A      I don't believe I did.

6    Q      And the reason you didn't ask them about signature

7    authority is, at the time, you were not aware that there was a

8    separate requirement to report just signature authority of a

9    foreign bank account if you didn't own the foreign bank

10   account; correct?

11   A      I don't remember when we became aware, or . . . . I

12   wouldn't say we weren't aware.  The question we generally just

13   asked is if they had a foreign bank account . . . of all of our

14   clients, or any of our clients that could have it.

15   Q      And did you ever pull out the return, show them

16   Schedule B, and read them all the lines from Schedule B, while

17   you were having this conversation with them?

18   A      No.

19   Q      And was it your understanding that, "Do you have a

20   foreign bank account," referred to, "Do you have your own

21   personal money in a foreign bank account,"as opposed to just

22   signature authority over a foreign bank account?"

23   A      Could you repeat that?  I'm not sure I . . . .

24   Q      And was it your understanding that, when you said, "Do

25   you have a foreign bank account," that referred to just -- to

1    owning a foreign bank account, having your own personal funds

2    in that foreign bank account, as opposed to just having

3    signature over the foreign bank account and having no financial

4    interest in it?

5    A       That was probably the general thinking.

6    Q       Now, with respect to Schedule B -- actually, let's focus

7    on Schedule B for a moment.

8            You said, before, that there were certain times when you

9    actually don't have to file a Schedule B with respect to a

10   return; is that correct?

11   A       That's correct.

12   Q       And your understanding was, if there was no interest

13   with respect to the Schedule B, or dividends that met the

14   threshold, you didn't have to file that particular return;

15   correct --

16   A       That's correct.

17   Q       -- I mean that particular schedule.

18   A       That's correct.

19   Q       Now, did you ever go over the fact that there was a

20   Part 3, in Schedule B, with Dr. Hough or Dr. Fredrick?

21           And that's the Part 3 that deals with foreign bank

22   accounts.

23   A       Probably not specifically gone . . . pulled out the form

24   and looked at it and said:  Hey, here it is.

25   Q       And did you ever tell them at any point that, "Look,

1    guys, if you don't have interest and you don't have dividends,

2    we need to" -- and then you show them Schedule B, Part 3 -- "we

3    might have to fill out this part"?

4         Did you ever have that conversation with them, ever?

5    A    I don't think so, because I don't think I ever had any

6    knowledge that they had any foreign interest or bank accounts.

7    I never saw that, so I don't think I would have gone that far

8    in depth.

9    Q    Right.  And you never had the signature-authority

10   discussion with them ever; isn't this correct?

11   A    Not that I can recall.

12   Q    Now, if we could turn to . . . what's been marked as

13   Government's Exhibit 1B, I think you might have that in front

14   of you?

15        MR. HOCHMAN:  And if we could put 1B up on

16   the . . . .

17        THE WITNESS:  I don't have it.

18        MR. HOCHMAN:  I'm sorry?

19        THE WITNESS:  I don't have it.

20        MR. HOCHMAN:  Oh.  If I could approach the witness,

21   and approach freely, Your Honor?

22        THE COURT:  You may.

23        MR. HOCHMAN:  Thank you.

24        (Mr. Hochman provides an exhibit to the witness.)

25        (Mr. Hochman and Ms. Finley confer privately.)

1    a W2 from a company, but rather they work either as a

2    contractor or on their own as sole proprietors, this is where

3    you report your business activity, in that activity.

4    Q      And you see that there's gross receipts listed of

5    152,000?

6    A      That's correct.

7    Q      And Dr. Hough only gave you expenses against that amount

8    for $2,430; is that correct?

9    A      That's true.

10   Q      Percentage-wise, that's less than three percent expenses

11   based on her total amount of gross income; correct?

12   A      That's correct.

13   Q      Is that very conservative, in your estimation, based on

14   preparing thousands of returns, that someone is only going to

15   report about three percent of expenses against their income?

16          MS. FINLEY:  Objection, Your Honor.  Relevance,

17   foundation.

18          THE COURT:  Both objections are overruled.

19          THE WITNESS:  It depends on the business that they're

20   in.  And, you know, some people get paid like just a management

21   fee, and there's no expenses against it.  But $2,000 on 152 is

22   not a lot.

23   BY MR. HOCHMAN:

24   Q      And would you say, generally, that Dr. Hough was someone

25   who was conservative and conscientious about her taxes?

1    A       I would say so.

2    Q       And would you say the same for Dr. Fredrick?

3    A       Yeah, I would say so.

4    Q       If I may turn your attention to Exhibit 1C, which is

5    Dr. Hough's 2004 tax return?

6            And I'd like to -- this is the first tax return that you

7    actually filed a Schedule B for Dr. Hough; correct?

8    A       I'm not sure.  But there is a Schedule B with this

9    return.

10   Q       And this is a return you prepared; correct?

11   A       That's correct.

12   Q       And you prepared the 2003 return that had no Schedule B;

13   correct?

14   A       (Examining exhibit) Okay.  I got it.  Yes, that's

15   correct.

16   Q       So this is the first Schedule B that you prepared for

17   Dr. Hough; is that correct?

18   A       Correct.

19   Q       And we are talking the 2004 return.

20           If you could turn to Page 5, please --

21   A       Okay.

22   Q       -- of the 2004 return, and we can just focus on the

23   bottom, Part 3, for the moment.

24           MR. HOCHMAN:  Your Honor, I am going to do my best to

25   read this for Part 3.

1           And it starts out:  "You must complete this part if

2   you, A, had over $1,500 of taxable interest or ordinary

3   dividends" --

4   BY MR. HOCHMAN:

5   Q       Do you see that?

6   A       I do.

7   Q       -- "or, B, had a foreign account" -- do you see that?

8   A       I do.

9   Q       -- "or, C, received a distribution from, or a grantor

10  of, or a transfer to, a foreign trust."

11          Do you see all that?

12  A       Yes, I do.

13  Q       And if you don't meet one of those three parts, you

14  never need to fill out that particular section, Part 3.

15  A       That's correct.

16  Q       What does it mean to have a foreign bank account?

17          Let me put it differently:  Do you see any definition,

18  anywhere in this return, on what it means to have a foreign

19  bank account?

20  A       No.

21  Q       And if someone was just reading the return, and didn't

22  believe they had a foreign bank account, they would never have

23  to get to Question 7A and 7B; correct?

24  A       I suppose that's correct.

25  Q       So let's go to 7A for a moment . . . let's just assume

1    we get to 7A.

2         It says, in 7A:  "At any time during 2004" -- before we

3    get to 7A, I'm sorry -- when we dealt with that little

4    Subsection B, and it says, "have a foreign bank account," it

5    doesn't say, "have a foreign bank account or signature

6    authority over a foreign bank account"; correct?

7    A    That's correct.

8    Q    So conceivably, if all you have is signature authority

9    over a foreign bank account, you never get to 7A and 7B;

10   correct?

11        In other words, if you don't have a foreign bank

12   account, and you only have signature authority over a foreign

13   bank account, you never get to 7A and 7B; correct?

14   A    I suppose so.

15   Q    So let's get to 7A now, for a moment.  It says:

16        "At any time during 2004, did you have an interest in,

17   or signature over, or other authority over, a financial account

18   in a foreign country, such as a bank account, securities

19   account, or other financial account?"

20        Do you see that?

21   A    Yes, I do.

22   Q    But before this question is over, it has some additional

23   words.

24        Can you read those additional words before this question

25   is over?

1    A       "See Page B-2 for exceptions and filing requirements for

2    Form TDF90-22.1."

3    Q       Ah.  So there are some exceptions to this statement that

4    would apply, that may mean that you can answer no; correct?

5    A       That's correct.

6    Q       And B-2, let me -- I think we're on Schedule B.  I'm

7    looking through, I see C, I see D, I see E, I see an SE, I see

8    the alternative minimum tax.

9            Where is B-2?

10   A       I don't know what B-2 is --

11   Q       You've prepared returns since 1987, thousands of

12   returns, that all have presumably, at some point, some of them

13   at least, Schedule B.

14           And this statement says, "See Page B-2," and you don't

15   know where B-2 is?

16   A       There must be an instruction page or something, because

17   I don't . . . .

18   Q       That's a guess, isn't it --

19   A       Yes, it is.

20   Q       -- that's a guess at this point?

21   A       It is.  I don't know what it is.

22   Q       And Dr. Hough obviously didn't have the level of

23   experience that you have preparing returns; correct?

24   A       That's correct.

25   Q       And as you sit here today, can you tell us what the

1    exceptions that are referred to in B-2 are?

2    A      I don't know, offhand, what they are.

3    Q      And if those exceptions apply, the answer "no" could be

4    the right answer; correct?

5    A      That's correct.

6    Q      And then look at 7B, if you could.  It says, only if you

7    answer 7A "yes," do you have to enter the name of the foreign

8    country.

9           Do you see that?

10   A      Yes.

11   Q      So if you answered -- if the answer to 7A is correct to

12   be "no," you never get to 7B; correct?

13   A      That's true; correct.

14   Q      And if we could turn the page to Page 6, we're going to

15   put Page 6 up there, and if I could focus you on the middle,

16   again, Dr. Hough relates gross receipts from her business as a

17   psychiatrist of 144,000.

18          And her expenses are $4,474, again roughly less than

19   3 percent; correct?

20   A      That's correct.

21   Q      All right.  If I can now turn your attention to

22   Exhibit 1D, like in "David."  And . . . actually, if you could

23   go to Line 28 of 1D.  If we could focus on Line 28 for a

24   moment?

25          I see the amount that's entered into this self-employed

THOMAS MURTHA - CROSS/HOCHMAN                63

1    Q      And if you turn the page, you'll see that what she

2    attributed that number to was professional licenses,

3    transcripts, and a conference; do you see that?

4    A      Yes, I do.

5    Q      If you can turn to Exhibit 1E, which is Dr. Hough's

6    2005 return?

7           Excuse me, 1E is the amended 2005 return.

8    A      Correct.

9    Q      Now, Dr. Hough approached you when she realized that she

10   had left off a certain amount of money from her return; is that

11   correct?

12   A      That's correct.

13   Q      I believe you said -- on Page 2 here, if we can go to

14   Page 2 of this exhibit, 1E, and go to the disclosure on the

15   bottom -- that she had left off a sale of investment property

16   when the return was originally filed; do you see that?

17   A      Yes, I do.

18   Q      And if Dr. Hough had not brought this to your attention,

19   you wouldn't have found out about it; correct?

20   A      That's true.

21   Q      And she wouldn't have had to pay the additional tax on

22   the gain she had, of approximately $11,000 gain; correct?

23   A      On the gain, that's correct.

24   Q      And she reported that 11,000-dollar gain to the IRS;

25   correct?

1   A       Correct.

2   Q       And if she hadn't reported it, the IRS would never have

3   known about it; correct?

4   A       I don't know, because I don't know if it would have been

5   reported and caught up in their computerized matching program,

6   so . . . .

7   Q       Certainly -- I'm sorry.

8           Certainly you wouldn't have known about it; correct?

9   A       No, I wouldn't have known.

10  Q       If you can turn to Exhibit 1F, which is the 2006

11  Dr. Hough return, and I'll focus your attention on Page 6.

12          Now, that year, if you could focus on the long-term

13  capital gains?

14  A       Yes.

15  Q       That year, Dr. Hough sold what looks like to be stock

16  and some property; do you see that?

17  A       Yes, I do.

18  Q       And she brought all that information to your attention?

19  A       Yes.

20  Q       And you put it down on her return?

21  A       That's correct.

22  Q       And it equaled $183,431?

23  A       Of sales, yes.

24  Q       Of sales.

25          And then she paid tax on that; is that correct?

1    company is called EIC, Inc.  This company has approximately

2    U.S. $1 million in assess, two buildings, and some equipment."

3    Q      Okay.  Now, if you look at Paragraph 4, what is the

4    second entity that's involved in the potential sale?

5    A      "The second company is a foundation in the Netherlands

6    Antilles in Saba.  It is called Saba University Netherlands

7    Antilles.  This entity operates as a medical school with about

8    48,000 square feet of land and some ten new buildings."

9    Q      Now -- I'm sorry.

10   A      No.  I'm done.

11   Q      It appears that the Saba Foundation is going to be sold

12   as part of the potential transaction set forth in this

13   document; is that right?

14   A      I think it says -- repeat your question again, please?

15   Q      Is the Saba Foundation one of the entities that would be

16   sold as part of the transaction in this document?

17   A      Yes.  Yes.

18   Q      Now, what's your understanding of -- is it odd to you

19   that a foundation would be sold?

20   A      Yes.

21   Q      Why?

22   A      Because a foundation is technically not owned by

23   anybody.

24   Q      Why do you say that?

25   A      It operates under the rules of wherever it was formed,

1    the profits remain, or the equity remains within the entity.

2    It can be sold, but if it's sold, the question is, who has the

3    right to sell it?  Because there are no individuals that own

4    it.

5    Q      And looking at, again, at Paragraph 2 of the same Page 3

6    of this document, if you could read the second sentence in that

7    paragraph?

8    A      This is on Page 3?

9    Q      Yes, sir.

10   A      Number 2?

11   Q      Yes.

12   A      "The investors are planning to acquire a 75 percent

13   equity interest in a venture consisting of four companies.

14   This venture is currently owned by Dr. David Fredrick and his

15   wife, Dr. Pat Hough."

16   Q      And does it make -- you stated a minute ago that a

17   foundation couldn't be sold.

18   A      Well, let me clarify that, if I may.  That's under U.S.

19   law.  For lack of a better word, I don't know what the rules

20   are in wherever they were formed.  But more than likely they're

21   the same.

22          MR. HOCHMAN:  Objection, nonresponsive to the

23   question, and lack of foundation for this witness to know

24   anything.

25          THE COURT:  Sustained.

 1   A      I would guess so.  I really don't know.

 2   Q      As you were saying, to your knowledge, the Saba School

 3   of Medicine Foundation cannot be owned by anyone; correct?

 4   A      Correct.

 5   Q      If I can take you backwards, then, to Exhibit 8CC?

 6   A      Okay.

 7   Q      And Exhibit 8CC, I think you said this was a memo that

 8   you had received from David Minchenberg; is that correct?

 9   A      I believe so; yes.

10   Q      And, in this memo, if I may draw your attention to it,

11   his chief concern seems to be the failure of filing these

12   5471s; is that correct?

13   A      Can you point me in that direction so I don't have to

14   read the whole . . . .

15   Q      Sure.

16   A      I see it.

17          Yes, he was very concerned about that.  That's correct.

18   Q      And that's what he believed, if you don't file the

19   5471s, then tax fraud would be committed; is that correct?

20   A      It wouldn't be tax fraud, it would be penalties.

21   Q      So he's actually wrong, it wouldn't be tax fraud, it

22   would be penalties?

23   A      That's correct.  Many people didn't even know about

24   those forms.

25   Q      You actually had other clients that didn't know about