```
                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                    FORT MYERS DIVISION

            CASE NO.:  2:13-CR-72-FtM-29UAM
```

THE UNITED STATES OF AMERICA,

       Plaintiff,

                                       Fort Myers, Florida

vs.                                         October 11, 2013

PATRICIA LYNN HOUGH,                     9:00 a.m.

       Defendant.

```
           TRANSCRIPT OF JURY TRIAL, DAY FOUR

      HELD BEFORE THE HONORABLE JOHN E. STEELE
          UNITED STATES DISTRICT COURT JUDGE

                  A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                              Tax Division
                          P.O. Box 813
                          Washington, DC  20044
                          BY:  CARYN FINLEY, ESQ.

                          U.S. Department of Justice
                              Tax Division
                          Suite 7334
                          601 D Street NW
                          Washington, DC
                          BY:  MARGARET LEIGH KESSLER, ESQ.



       (Appearances Continue on Following Page)
```

```
 1   A       -- so we . . . .
 2   Q       If we look in the body of the letter, is Ms. Whitley
 3   being appointed as a director for Medical Technology
 4   Associates?
 5   A       That is what -- the action seems to be taking place.
 6   Q       And at the top, what is her title, as director?
 7   A       Just as it's saying, it's to certify that she is -- has
 8   been appointed as one of the directors.
 9   Q       Now, as part of the audit, if Dr. Fredrick or Dr. Hough
10   had an ownership interest in Saba Foundation, is that something
11   that you would have wanted to relay to the auditors?
12   A       Yes.
13   Q       Why?
14   A       Because it's a contradiction in terms, as far as the
15   audit goes.
16   Q       And what does that mean?
17   A       To the best of my understanding, a foundation, a
18   not-for-profit foundation, cannot be owned by an individual.
19   Therefore, if an individual had an ownership in a foundation,
20   it would have to be disclosed to the auditors, because they
21   would need to make note of it in their audited financial
22   statements.
23   Q       In the course of the audit, did questions arise about
24   the business structures of the schools?
25   A       Yes.
```

1   Q       And Dr. Hough was also involved in the accreditation
2   side of the school's business; is that correct?
3   A       Yes.
4   Q       And that meant she went from state to state, to state,
5   or even to the Department of Education, getting accreditation
6   for the Saba school and MUA; is that correct?
7   A       Yes.
8   Q       And she was not involved with the accounting of the
9   financial side of the schools; correct?
10  A       No, she was not.
11  Q       That was yourself; is that correct?
12  A       I was part of the accounting department.  There were
13  others in the accounting department.
14  Q       And Dr. Fredrick was also involved with you as it
15  pertained to accounting or financial matters for the schools;
16  is that correct?
17  A       Yes.  As well as others.
18  Q       And Pat spent the -- excuse me -- Dr. Hough spent the
19  bulk of her time basically traveling around the United States,
20  or over to the islands of Saba or Nevis, dealing with the
21  schools, shall we say the academic side of the schools; is that
22  correct?
23  A       Yes, she did travel to the islands.
24  Q       Now, with respect to taxes, you have said that you
25  believe Dr. Hough's opinion towards taxes was that she thought

```
 1  she wanted to be in compliance; is that correct?
 2  A      Yes.  She talked to me once, that it was something that
 3  she acknowledged --
 4  Q      Okay.
 5  A      -- that she wanted to be in compliance with.
 6  Q      And you said that you thought Dr. Hough would try to get
 7  the information for her taxes, and make sure it got to the
 8  right person; is that correct?
 9  A      Yes; I made that statement.
10  Q      And that she did not seem to be the person who would
11  physically make sure she would do the return herself, but
12  Dr. Hough seemed to be a person that would send it to a person
13  to get it done, or at least follow through to see that it was
14  done; is that correct?
15  A      I believe that was my testimony, if you're reading it.
16  Q      But that's an accurate statement, isn't it correct?
17  A      Yes.
18  Q      And you also described Dr. Hough as someone who
19  multitasked; is that correct?
20  A      Yes.
21  Q      As someone whose mind could be in two different places
22  at the same time, such that she could be talking to you on one
23  subject, but you could tell she was also thinking about another
24  subject at the same time; is that correct?
25  A      Yes, that is correct.
```

```
 1   that correct?
 2   A      That was my understanding.
 3   Q      It's just a disclosure document; is that correct?
 4   A      That was my understanding.
 5   Q      And, in fact, it says that, generally, U.citizens are
 6   allowed to own foreign entities.
 7          Was that your understanding as well?
 8   A      That was my understanding.
 9   Q      And you communicated that to Dr. Hough?
10   A      Correct.
11   Q      And then you said, usually the only time a tax is
12   triggered, is when the U.S. citizen brings money, in the form
13   of profits, gains, et cetera, back into the United States.
14          Do you see that?
15   A      Yes.  That's my understanding.
16   Q      And you also told Dr. Hough in this e-mail that said:
17   "If the citizen is the beneficiary of said profits, gains,
18   et cetera, and keeps those funds offshore, and doesn't bring
19   them back into the U.S., then there are generally no taxes
20   incurred by the U.S. citizen."
21          Do you see that?
22   A      That's exactly what I wrote.
23   Q      And then you asked her, in December 23rd, 2004, to . . .
24   or you informed her that you thought she was going to have to
25   deal with the requirements of 5471s with respect to any
```

1     MR. HOCHMAN: You know what? I'll move on, Your
2  Honor. I think the e-mails will speak for themselves, and we
3  can track it through that way.
4  BY MR. HOCHMAN:
5  Q     And eventually you do meet with Dr. Hough concerning
6  5471s; is that correct?
7  A     I recall having one meeting in her office.
8  Q     And do you recall that Dr. Hough was then cooperative in
9  trying to get you financial information to repair the -- to
10 prepare the Round Hill 5471?
11 A     I believe she did get me some information. I forget
12 whether it was financial information or . . . ownership, or
13 original, like . . . like organizational papers, something of
14 that nature she got from the islands. But she was cooperative.
15 Q     And that's because you had advised her that 5471 for
16 Round Hill was a requirement of the IRS, and she was trying to
17 comply with your advice; is that correct?
18 A     Yes. Well, and I take a step back. Long before myself,
19 Schneider & Associates advised both Dr. Fredrick and Dr. Hough
20 that filing a 5471 was mandatory.
21 Q     But you -- filing 5471s is mandatory, but you had
22 identified Round Hill as one of the 5471s that she needed to
23 comply with, and you -- and she was following your advice and
24 helping you put that together; is that correct?
25 A     I didn't identify Round Hill. Dr. Fredrick gave me a