UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

---

THE UNITED STATES OF AMERICA,

          Plaintiff,

                                    Fort Myers, Florida
vs.                               October 15, 2013

PATRICIA LYNN HOUGH,              10:18 a.m.

          Defendant.

---

TRANSCRIPT OF JURY TRIAL, DAY FIVE

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                              Tax Division
                       P.O. Box 813
                       Washington, DC  20044
                       BY:  CARYN FINLEY, ESQ.

                       U.S. Department of Justice
                              Tax Division
                       Suite 7334
                       601 D Street NW
                       Washington, DC
                       BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

1    Q      Now, I want to go back to what Miss Kessler was asking

2    you about, about this issue of a distinction between the board

3    of the school and the board of The Foundation.

4           You said, I believe, that initially, when you were back

5    in Augusta working on admissions, you didn't have an

6    understanding of who owned the Saba school, it was just

7    starting out; is that right?

8    A      That's correct.

9    Q      But I think you also said, in response to one of

10   Miss Kessler's last questions, that when the school was sold,

11   you expected that the proceeds of that school -- of that sale

12   would go to The Foundation, because The Foundation owned the

13   school; is that correct?

14   A      That's correct, I said that.

15   Q      So am I right that, at some point after your initial

16   early days sitting in the house at Augusta and conducting

17   interviews, you did, in fact, learn that the Saba school was

18   owned by a nonprofit foundation, the Saba School of Medicine

19   Foundation.

20   A      Over the time serving as a board member, and going back

21   and forth to the island, through the accreditation processes

22   that occurred, yes, it became more clear that the operation of

23   the school was a foundation activity.

24   Q      So as you sit here today, it is clear that the school

25   was owned by The Foundation and not by any individual; correct?

1   A       That's correct.

2   Q       And one of the things that The Foundation did was to

3   fund and operate the Saba University School of Medicine;

4   correct?

5   A       That's correct.

6   Q       And The Foundation was involved in other activities as

7   well, even apart from and separate from the school; is that

8   true?

9   A       There was more.

10  Q       What type of activities were you aware of the Foundation

11  being involved in, separate and apart from running the school?

12  A       Philanthropic efforts, hypertension treatment.  And I

13  know that, at one point -- I don't know how it ever came about,

14  but Dr. Hough had met some people that were willing to do

15  cataract surgeries in underserved areas, and --

16  Q       I'm sorry, you said, "underserved area"?

17  A       Underserved areas.  Poor countries.  And so she

18  coordinated with the providers, and The Foundation would

19  provide materials and equipment to do cataract surgeries on

20  people that couldn't otherwise have it done.  And they were

21  donating equipment to clinics, and they were running

22  hypertension screening operations.  That's what I knew about.

23  Q       Okay.  And all of these things had nothing to do with

24  the Saba school; correct?

25          MS. KESSLER:  Your Honor, I'm going to object based

1   A        That's correct.

2   Q        And that wasn't essentially within the job description.

3   You were focused on curriculum and faculty appointments and

4   things like that.

5   A        Yes.  I did not consider that the board's mission.

6   Q        Did you become aware, as members of the board, or as a

7   member of the board, and later chairman, of lawsuits that were

8   filed against the Saba school and The Foundation beginning

9   shortly after the school opened?

10  A        Yes.

11  Q        And let me ask you specifically about a lawsuit in 1995,

12  by an individual named Mohammed Entezampour,

13  E-N-T-E-Z-A-M-P-O-U-R.

14           Is that name familiar to you?

15  A        Yes, it is.

16  Q        Who was Mister -- or Dr. Entezampour?

17  A        He was a professor who was hired to each on the island.

18  And after a short time it became apparent that he was not . . .

19  suitable for teaching.  He was doing a bad job.  So he was

20  fired.  And then he sued.

21  Q        He sued the school?

22  A        Yes.

23  Q        For wrongful termination?

24  A        Yes.

25  Q        Do you recall that being around 1995?

1   A      Yes.

2   Q      And do you recall how much he was asking for in damages?

3   A      It was over a million dollars.

4   Q      What happened to the school's assets when that lawsuit

5   was filed, if you recall?

6   A      We were told, on the board, that it threatened to lock

7   up and freeze the school's assets, financial assets.

8   Q      In fact, were the assets of the school frozen in

9   response to the lawsuit?

10   A      I believe that that was what took place.

11   Q      Was there a time when the school was concerned about its

12   ability to make payroll for the next month because its assets

13   had been frozen?

14   A      That's right.

15   Q      And was that discussed by the board?

16   A      Yes.

17   Q      Did the board, at that time, discuss the likelihood,

18   given the school was just in its infancy, of other lawsuits

19   being filed in the future?

20   A      Yes, we did talk about that, as a liability.

21   Q      And a medical school, for example, could face lawsuits

22   by terminated faculty such as this one; right?

23   A      Yes.

24   Q      Or by discharged students; correct?

25   A      That's correct.

1   Q       Or for any . . . accidents on school property, or at

2   university hospitals where students are working; correct?

3   A       That's correct.

4   Q       Any issues relating to medical schools on their clinical

5   rotations could result in litigation against the school;

6   correct?

7   A       All of those situations.

8   Q       And was that discussed generally by the board, in terms

9   of:  We have a new medical school here, we've just been hit

10  with a lawsuit for over a million dollars, and this is likely

11  going to be the first of many.

12  A       That's correct.

13  Q       And was it your understanding, based on the freezing of

14  those assets of the school in response to that first lawsuit,

15  that, under Netherlands Antilles law, a plaintiff had the

16  ability to freeze the defendant's assets during the pendency of

17  litigation?

18  A       That's what we understood.

19  Q       And that was discussed by the board members?

20  A       Yes.

21  Q       And was it your understanding, as a result of that, that

22  even in the most frivolous lawsuit could potentially result in

23  the school's assets being frozen and the entire school being

24  forced to shut down?

25  A       Yes, that's true.

1    Q       And is it true that the board of trustees of the school

2    was concerned about making sure that the school would continue

3    to operate, and that its assets could be protected in the face

4    of . . . present and upcoming litigation?

5    A       Yes, we were concerned about that.

6    Q       And did the board members authorize someone to talk to a

7    lawyer to find out how to protect the school's assets from

8    seizure under Netherlands Antilles law?

9    A       We wanted to know what we could do.

10   Q       And did you ask someone to find out?

11   A       We asked Dr. Fredrick to do the necessary investigation

12   to find out what could be done.

13   Q       Was there a specific authorization to Dr. Fredrick to

14   talk to a lawyer on St. Martin --

15   A       That's correct.

16   Q       -- who was familiar with Netherlands Antilles law?

17   A       Correct.

18   Q       And to your knowledge, did he do that?

19   A       Yes.

20   Q       Did he report back to the board?

21   A       Yes.

22   Q       And in response to his consultation with the lawyer in

23   St. Martin, the board decided to authorize Dr. Fredrick to move

24   the school's and The Foundation's assets offshore; correct?

25   A       That's correct.

1    Q      And that was to maintain the financial stability of the

2    Saba University School of Medicine; true?

3    A      Yes.

4    Q      And the board decided, in its open consultation, to keep

5    enough assets on hand to meet the school's monthly operating

6    expenses, and to move everything else to overseas accounts to

7    protect it from being seized or frozen; correct?

8    A      That's correct.

9    Q      Was there anything secret about that between

10   Dr. Fredrick and the board?

11   A      No.

12   Q      Was this some type of grand heist of school assets that

13   was being orchestrated by Dr. Fredrick and Dr. Hough, by moving

14   those assets to foreign accounts?

15   A      No.  We understood it to be under the advice of others.

16   Q      Under the advice of others to move those assets for what

17   purpose?

18   A      To protect us from an unreasonable liability.

19   Q      And was it your understanding that Dr. Fredrick had

20   consulted with lawyers and bankers and financial professionals

21   in reaching the decision to do that?

22   A      Yes.

23   Q      Now, in fact, a number of other lawsuits were later

24   filed against the school and The Foundation; true?

25   A      That's true.

1    Q      Can you remember what some of those lawsuits were about
2    in the following years?
3    A      Yes.   There was several cases where lawsuits were
4    brought against the university.  One was a medical student who
5    felt he had been unreasonably . . . molested by a faculty
6    member.  There was the case of a professor psychiatrist in
7    Massachusetts, who wanted to take the school away from us for
8    himself.  There was a suit that was outrageous, from St.
9    Michael's, about infringement, and they were suing for
10   $150 million.
11   Q      I'm sorry, 150 million?
12   A      $150 million.
13   Q      Now, when those lawsuits came in, at the time they came
14   in, were they discussed by the board?
15   A      Yes.  We were notified of their existence.
16   Q      And did the board discuss the issue of protecting the
17   assets of the school each time one of those new lawsuits came
18   in?
19   A      Yes.  We were reminded, when that would happen, of the
20   first case, and how it endangered the financial stability of
21   the school, to have those funds exposed.
22   Q      So was this an ongoing discussion over the years, this
23   idea of making sure that the school's assets were protected
24   offshore so they would be safe from litigation?
25   A      Yes.  We knew it.

1   Q      Were you aware -- by the way, do you remember when that

2   $150 million lawsuit was filed?

3   A      It was . . . after 1999.  It was . . . I'm not sure

4   exactly when.  It was 2004, 2005.  I'm not sure exactly when.

5   Q      And were there other lawsuits among the ones that you

6   described that were also seeking damages in the millions of

7   dollars?

8   A      Yes.

9   Q      I believe you said St. Michael's.  Was it St. Matthews?

10  A      St. Matthews, yes.

11  Q      That was the $150 million law suit?

12  A      Yes.

13  Q      And were you aware, in your role as chairman of the

14  board, that the school's and The Foundation's assets were being

15  held at banks outside the U.S. and outside the Netherlands

16  Antilles?

17  A      I didn't know where, but I knew they were elsewhere.

18  Q      In fact, that was whole point, to keep them elsewhere,

19  so they would be out of reach of litigants; is that correct?

20  A      That's correct.

21  Q      Did you know precisely where those accounts were held?

22  A      I did not, no.

23  Q      Did it matter to you?

24  A      No.

25  Q      Why?

1    A      Because I thought that it had been done with good

2    advice, by a trusted person.

3    Q      Now, you said you "thought."

4           Has that thought changed or do you still believe that?

5    A      I still believe that.

6    Q      You still believe that that movement had been done for

7    good reasons, and by a person who was trusted, for good

8    reasons, correct --

9    A      Yes.

10   Q      -- as you sit here in this trial.

11   A      Yes.

12   Q      Were you aware in your role of chairman of the board

13   that Dr. Fredrick was protecting those assets in the names of

14   other companies and entities that were owned by The Foundation?

15   A      I did not know the specifics.  But I knew that it had

16   been moved, and there were places where the money was kept, but

17   I did not know the specific --

18   Q      In fact, you did know on at least one occasion, that

19   land -- I believe you testified about this previously to the

20   grand jury -- that land and other assets of the school were

21   being held in the names every other entities for the purpose of

22   asset protection; correct --

23   A      Yes, that was my understanding.

24   Q      -- that was your understanding?

25   A      Yes.

1    Q    So for purposes of asset protect, it wouldn't make sense

2    to have everything sitting in the name of the Saba University

3    School of Medicine, where it could easily be located; isn't

4    that true?

5    A    I didn't believe that there was any intrigue to the idea

6    of dividing the assets in different places.

7    Q    In fact, there was no deep dark secret about that

8    either; correct?

9    A    No, there wasn't.

10   Q    And were you aware, in your role as chairman, that

11   Dr. Fredrick and his advisers had set up companies in different

12   names to hold real estate and to hold assets of The Foundation;

13   true?

14   A    Yes, that's true.

15   Q    Did you know what those names were?

16   A    I didn't know the names.

17   Q    I believe Miss Kessler read you off, at the end of her

18   questioning, a list of names.

19   A    Yes.

20   Q    You didn't recognize them?

21   A    I didn't recognize those names.

22   Q    Did you ever ask for a list of the names of the various

23   entities that Dr. Fredrick and his advisers had set up to hold

24   on to the assets and protect the assets of the foundation?

25   A    No, I did not.