UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

THE UNITED STATES OF AMERICA,

        Plaintiff,

vs.

PATRICIA LYNN HOUGH,

        Defendant.

Fort Myers, Florida
October 16, 2013
9:00 a.m.

TRANSCRIPT OF JURY TRIAL, DAY SIX

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:   U.S. Department of Justice
        Tax Division
P.O. Box 813
Washington, DC  20044
BY:  CARYN FINLEY, ESQ.

U.S. Department of Justice
   Tax Division
Suite 7334
601 D Street NW
Washington, DC
BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

1   A       It was a separate LLC.  And I can't remember whether --
2   I can't remember if Dave Fredrick owned it or not, or whether
3   it was another company.  I'm sorry, I can't remember.
4   Q       Was Dr. Fredrick your primary contact?
5   A       Yeah.  I mean, that's -- we like to do it that way.  We
6   don't want . . . we have an expression in private equity:  When
7   you're trying to negotiate with multiple parties, it's like
8   herding cats.
9           And we prefer not to do that, and so we asked
10  Dr. Fredrick to be the designated representative, so that we
11  could talk to one person.  And so it's easier for me, and my
12  team, to just have a point of contact in that regard.
13  Q       Now, did you have any contact with Dr. Hough during the
14  course of the deal?
15  A       Yes.  Yes.
16  Q       And what was her involvement with, to the extent there
17  was any, with the negotiations?
18  A       I mean . . . periodically, there might be something
19  that . . . Pat was involved with, you know, just listening.  We
20  didn't have much hard negotiating.  You know, the biggest
21  hurdle was always price.  And if price isn't a problem, then a
22  lot of it's just detail stuff.  I mean, I certainly negotiated
23  Pat's consulting agreement with her, because it's her agreement
24  for her ongoing involvement.
25          But most of the negotiations -- you know, Dave was

1  involved because he had to generate lots of paper. These
2  situations -- I mean, the stack of paper would be . . . at
3  least eight or nine feet tall, you know, in what it took to
4  paper over the situation. So I interfaced with Dave.
5        Mostly, with Pat, it would be more about learning about
6  the business and things that were her expertise in that area --
7  in those areas.
8  Q    When you had questions, was she able to answer them?
9  A    Yeah. I mean . . . . Yes.
10 Q    Did she seem knowledgeable about the schools?
11 A    Yes.
12 Q    Now, what did you understand her role to be with MUA and
13 Saba?
14 A    I think Pat, from -- I'm sorry, Dr. Hough, was very much
15 involved in the development of the clinical networks, was very
16 much . . . . Because these were startup schools. And when I
17 say "development," you know, a lot of the arrangements were
18 actually -- you have to affiliate with these teaching hospitals
19 in the United States, where students can conduct their
20 education when they come over here. Pat set up a lot of that
21 and was very much involved in curriculum development. And Pat
22 knows a lot about medical education.
23 Q    During your . . . I guess not negotiations, I don't want
24 to say "negotiations," but during the course of the deal, was
25 she concerned with the direction of the schools?

1  A     Yeah. Yes. I mean, any . . . anybody who has built
2  something from nothing would be very concerned with who was
3  going to be involved, and whether they were going to, you know,
4  carry the same banner that they've put out there. And she was
5  very concerned whether or not we were going to be good
6  representatives for the universities going forward.
7  Q     Now, you said that Dr. Hough was involved with the
8  clinical aspect, and some of the -- I guess she was involved
9  with the accreditation?
10 A     Yes.
11 Q     Now, would the school have been an attractive investment
12 for your company if Saba and MUA were not accredited?
13 A     No, they wouldn't have been.
14 Q     Now, what was your understanding of Dr. Fredrick's role
15 with Saba and MUA?
16 A     Dave had general charge of the operations, would be how
17 I would describe it.
18 Q     Was he very invested in what was . . . in the schools?
19 A     Yes. Dave cared about everything.
20 Q     And were you impressed with the quality of education
21 that Saba and MUA was offering?
22 A     Yes. We had invested in St. Matthew's to start, and I
23 thought that they were doing a good job. And then, when I went
24 to see Saba the first time, I was struck how incredibly better
25 it was. And the Medical University of the Americas, or MUA,

1   was a younger school, and wasn't as mature, and as far along in
2   its development, but it too was very strong, and had a great
3   foundation.  But Saba was a . . . really, quite a remarkable
4   place.
5   Q       So when you seek to purchase an asset like the schools,
6   what kind of due diligence do you undertake to determine -- I
7   guess, once you've made that agreement, what kind of things are
8   you doing to culminate the deal?
9   A       Well, we do a lot of things.  We'll look at, you know,
10  things that would be -- what would be under the guise of
11  general business due diligence.  There will be financial due
12  diligence.  And then there will be, what do we really need to
13  have.  Because with private companies, oftentimes they're
14  just . . . they're not publicly traded companies where
15  everything is wrapped up with in a neat little bubble, and it's
16  all out there in documents.  You have to dig around and seek
17  some things for yourself.
18          And then a lot of due diligence took place on how to
19  actually consummate a transaction in two jurisdictions that
20  this isn't a commonplace occurrence, and there's . . . .  It's
21  actually -- in the United States, it's actually, despite
22  everybody complaining about all the regulations and all the
23  laws all the time, it actually makes life easier.
24  Q       We don't need to get into it, I guess, but based on your
25  answer, Saba, and I guess the Netherlands Antilles at the

1  time --
2  A      Yes.
3  Q      -- and Nevis, the established laws and framework for
4  doing all of this wasn't as developed as they might be in the
5  United States.
6  A      Absolutely not.  Not anywhere near so.
7  Q      What did you understand, and who did you understand
8  owned The Foundation -- I'm sorry -- owned the medical school.
9  A      Well, the medical school was part of The Foundation,
10 per se, the Saba University School of Medicine Foundation, I
11 believe, is what it was called.
12 Q      And did you know who owned The Foundation?
13 A      No.
14 Q      Did you care who owned The Foundation?
15 A      No.
16 Q      Why not?
17 A      Well, we didn't want to buy it.  You know, The
18 Foundation is what I would refer to as a person, you know,
19 where it could be a corporate entity, it could be something.
20 But folks like us, we don't -- if possible, we always want to
21 buy the business, not the person, and . . . .  Because then you
22 separate yourself from any history that may exist.
23        In the past, it is typical in our industry to try to do
24 that.  We always try to make sure that we have no liability to
25 the past.  And the easiest way to do that is to buy the

1  business out of the foundation.
2  Q    And did you have an understanding of who owned Medical
3  University of the Americas?
4  A    We did.
5  Q    Who owned that?
6  A    I knew who the stockholders were. Dave Fredrick owned
7  250 shares out of 22,000 or something. And a guy named Cuthwin
8  Lake owned a couple -- about a similar amount. And then the
9  rest was owned by a corporation.
10 Q    And do you remember the name of the corporation, and
11 we'll look at some of the documents --
12 A    I think it was New Vanguard.
13 Q    Do you know who owned New Vanguard?
14 A    No.
15 Q    So your concern going forward was that Dr. Fredrick had
16 the authority to sign for all these entities because you only
17 wanted to deal with one person?
18 A    Yeah. Our concern was like when you buy a house, was
19 that we got good title to the house we bought. So buying a
20 company is the same thing, you want to make sure that it's
21 validly transferred and that you have good title to it.
22 Q    I'm going to show you what's been marked as
23 Exhibit 10A, 10B, and 10C.
24           (Ms. Finley provides exhibits to the witness.)
25           MS. FINLEY: Your Honor, at this time the government

1  would offer Exhibit 10A; 10B, as in "boy"; and 10C, as in "cat"
2  into evidence?
3          MR. HOCHMAN: No objection, Your Honor.
4          THE COURT: 10A, B, and C will be admitted.
5          (Government's Exhibits 10A, 10B, and 10C were
6      admitted into evidence.)
7          MS. FINLEY: Permission to publish?
8          THE COURT: You may.
9          (An exhibit was projected onto the projector screen.)
10  BY MS. FINLEY:
11  Q    So if we can start with Exhibit 10A . . . and can you
12  tell the jury what this document is?
13         MS. FINLEY: And, Ms. Alexander, I'm sorry, if we can
14  just dim the lights? Thank you.
15         THE WITNESS: This is a purchase agreement that was
16  drafted for part of the transaction. EIC Acquisition Corp. was
17  a corporation we formed, and it was buying these other entities
18  listed below, and then it says other stuff.
19  BY MS. FINLEY:
20  Q    And you're free to look at the screen, but you also have
21  the actual document in front of you, if you need to, because I
22  know we'll get into some smaller print, and I know I have some
23  trouble myself reading on the screen.
24         Was EIC the Gardner, Massachusetts, portion of the
25  business?

Case 2:13-cr-00072-SPC-NPM   Document 139-5   Filed 11/22/13   Page 9 of 14 PageID 3968

STEVEN RODGER - DIRECT/FINLEY                          39

1  A      Well, we always like to decide.  We like to make all the
2  decisions.  But it doesn't always work out that way.  The
3  allocation of funds is always a negotiated item in
4  transactions.  And . . . we always want things exactly the way
5  we want, and sometimes we win, and sometimes we don't.  And in
6  this case . . . this was an allocation that was stipulated by
7  the sellers, principally.
8  Q      And was that Dr. Fredrick that made the request for the
9  apportionment?
10 A      Well, he was the one that communicated it, but this --
11 attorneys are involved at this point.  There are a lot of
12 things that are related to what this means for us, and it's a
13 heavily negotiated item.  There are a lot of people negotiating
14 this.
15 Q      At the end of the day, for your firm, did you look at
16 this as a package deal?
17 A      Yes.  At the end of the day, we had . . . .  For our
18 going-forward tax position, it matters where the money is
19 allocated.  And so, to the extent permissible, we try to get
20 things skewed exactly to our advantage.  But, at the end of the
21 day, sometimes you trade off that position for what you
22 perceive to be the total value.  And in this case the total
23 value merited a less than optimal . . . allocation from our
24 perspective.
25 Q      Were there any portions of the allocation that were

1   place.
2   Q       And both Dr. Fredrick and Hough are very charitable; is
3   that correct?
4   A       I am aware that they are; yes.
5   Q       And through The Foundation, they delivered hospital
6   supplies to remote areas in Central America, and stuff like
7   that; correct?
8   A       I don't know through what -- through what they do it,
9   but I know that they are very charitable all over the world.
10  Q       You and Dr. Fredrick both share an interest in flying
11  private planes; isn't that correct?
12  A       Yes.
13  Q       Do you have a private plane?
14  A       I do.
15  Q       Dr. Fredrick has a private plane; are you aware of that?
16  A       I'm aware that he had access to one.  I don't know who
17  owned it.
18  Q       Did he discuss with you flying in his private plane?
19  A       We always talked -- all pilots talk about flying.
20  Q       Did you ever actually go flying with Dr. Fredrick?
21  A       Only twice.
22  Q       And this would be a plane that he piloted?
23  A       Yes.  Once that he piloted, and once he was in a plane
24  that I was flying.
25  Q       Now, on your financial discussions concerning the

1   Saba/MUA deal, we're with Dr. Fredrick, with the exception of
2   the consulting agreement that Dr. Hough engaged in; is that
3   correct?
4   A    That's correct.
5   Q    And you also said your discussions with Dr. Hough were
6   about academic stuff: Clinical rotations, the academics on the
7   Saba/MUA campuses, accreditation, stuff like that; is that
8   correct?
9   A    Yes.
10  Q    And you also said, if I recall, in your direct, that
11  Dr. Hough was interested in being able to teach and practice
12  medicine, after she was -- after this sale had gone through in
13  April of 2007; is that correct?
14  A    Yes.
15  Q    And that was the focus of both what she was restricted
16  in, as far as the non-compete goes; is that correct?
17  A    Those were the exceptions to her non-compete that she
18  was allowed to do, those things that she -- that she talked
19  about, you know, practicing clinical medicine.
20  Q    And with respect to Dr. Hough, you actually entered into
21  a consulting agreement with her so that she would actually be
22  available to the schools for a two-year period after the April,
23  2007, sale; is that correct?
24  A    I believe so.
25            MR. HOCHMAN: Your Honor, may I present what's been

1  That was large body of the documentation.  But there were
2  certain things that then get closed.  It was the closing part
3  of the transaction where we were all in the same room together.
4  Q     Very good.
5        Now, you've testified about how you go about signing
6  documents.
7        Do you know, one way or the other, whether Dr. Hough
8  actually reviewed each and every word of each and every
9  document that she signed at the time that she signed it?
10 A     I don't know.
11 Q     And do you know whether or not she -- her lawyers
12 explained anything to her before she signed the document; do
13 you know one way or the other?
14 A     I don't know.  I know everybody was --
15 Q     Do you know one way or the other?
16            THE COURT:  Counsel --
17            MR. HOCHMAN:  I'm sorry.
18            THE COURT:  -- don't interrupt his answer, please.
19            MR. HOCHMAN:  I'm sorry, Your Honor.
20            THE WITNESS:  We were all represented by counsel.  I
21 don't know how they conduct their affairs with their counsel.
22 BY MR. HOCHMAN:
23 Q     And with the documents that were signed outside of
24 April 3rd, those are the ones without the time stamp, you don't
25 know one way or the other whether Dr. Hough signed that

1  document and was just presented as a signature to sign, or
2  whether or not she reviewed the document in total, or whether
3  or not it was explained to her.
4      You don't know any of that; correct?
5  A   No, that's not true.
6  Q   Okay. Let's break it down then.
7      With respect to documents that were signed outside of
8  your presence, you don't know if Dr. Hough signed her name upon
9  a piece of paper that was given to her without reading any
10 other part of the document; correct?
11 A   Well, now, the process is a little different than that.
12 I mean, we had a lot of group calls where we were all on when
13 people were discussing the implications of what we were
14 proposing, or what they were counter-proposing. So we will --
15 everybody was generally aware of the implications, which --
16 which is why, in all deals, not unique to this deal, in all
17 deals there's a fair amount of . . . at points, you know,
18 arguing about it, because you do know the implications and you
19 don't necessarily like them.
20 Q   You said that Dr. Fredrick was the point person for this
21 deal; correct?
22 A   That's correct.
23 Q   Dr. Hough is not the point person for this deal; is that
24 correct?
25 A   That's correct.

1   Q      So when you're having these conference calls about the
2   deal points, other than her consulting agreement, Dr. Fredrick
3   would have been the point person; correct?
4   A      All except for the guaranties.
5   Q      Okay. And then with respect to the guaranty, that also
6   would have been an issue that Dr. Hough was involved with, as
7   well; correct?
8   A      Absolutely. She's a very diligent person about that.
9   Q      Okay. Let's go through, if we could -- you have
10  Exhibit 10A before you?
11         (The witness examines exhibits.)
12  Q      And if you could turn to the sixth page . . . and if we
13  could focus on the whereas clauses?
14         Do you see the first whereas clause, it says the parent
15  owns 100 percent of EIC's membership interests?
16         (The witness examines an exhibit.)
17  A      Yes, I see it.
18         MR. HOCHMAN: Could we open up the . . . to do the
19  top half, to get the very top?
20         There we go. Thank you.
21  BY MR. HOCHMAN:
22  Q      The parent here is Medical Education Group LLC; is that
23  correct?
24  A      That's correct.
25  Q      Because you had said before that you weren't sure what