UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

---

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                   Fort Myers, Florida
vs.                                October 17, 2013

PATRICIA LYNN HOUGH,             9:00 a.m.

        Defendant.

---

TRANSCRIPT OF JURY TRIAL, DAY SEVEN

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                          Tax Division
                     P.O. Box 813
                     Washington, DC  20044
                     BY:  CARYN FINLEY, ESQ.

                     U.S. Department of Justice
                          Tax Division
                     Suite 7334
                     601 D Street NW
                     Washington, DC
                     BY:  MARGARET LEIGH KESSLER, ESQ.

           (Appearances Continue on Following Page)

1    A      Yes.

2    Q      Did you also determine, or seek to determine, whether

3    there were capital gains or losses based on transactions that

4    occurred in these accounts?

5    A      Yes, I did.

6    Q      If we turn to Page 17 of this exhibit, can you explain,

7    first of all, how you tracked transactions that were occurring

8    in the account related to purchases and sales of securities?

9    A      I had to utilize a column for valor numbers.

10   Q      Can you explain what the valor number is?

11   A      The unique identifying numbers applied to different

12   stocks and securities.  I had to sort by the valor number.

13   Q      So once you sorted by valor number, what did you do?

14   A      Once I sorted by valor number, then I had -- I was

15   determining the sales price and the basis.

16   Q      Can you explain what basis is?

17   A      Basis is your cost in the investment.

18   Q      And why is that important for purposes of calculating

19   capital gain or loss?

20   A      If you have to determine the gain, you take the sales

21   price minus the basis, and that's your gain.  But if your cost

22   is more than you sold it for, then you have a loss.

23   Q      And you take -- is that something reported as a -- is

24   the net included as an income item on the tax return?

25   A      Yes, it is.

1    A      Patricia Hough.

2    Q      Also within Exhibit R, did you see account opening

3    documents indicating that the account holder was Patricia

4    Hough?

5    A      Yes.

6    Q      And did you see correspondence from Patricia Hough

7    related to this account?

8    A      Yes.

9    Q      Did you also see copies of identification documents,

10   such as passport photos for Patricia Hough?

11   A      Yes.

12   Q      And did you see a power of attorney related to this

13   account entered by Patricia Hough?

14   A      Yes, I did.

15   Q      And who was appointed as power of attorney?

16   A      Charlene Varga.

17   Q      Who do you understand that to be?

18   A      Patricia Hough's sister.

19   Q      Based on this and other pieces of evidence, I want you

20   to assume, for purposes of your computations, that this account

21   was owned by Patricia Hough.

22          If this account were not owned by Patricia Hough, how

23   would that affect the income tax computation that is performed?

24   A      It would not be included in income tax computations with

25   Patricia Hough.

1    A       Yes, I did.

2    Q       Let me show you what's marked as Exhibit 3C, like "cat."

3            What are these documents contained in Exhibit 3C?

4    A       These are the opening documents for . . . New Vanguard

5    Holdings Limited, the account ending in 8833.

6    Q       Now, if we look at pages -- Page 1, who is identified as

7    the contracting party?

8    A       New Vanguard Holdings Limited.

9    Q       And who is identified as the beneficial owners?

10   A       David Leon Fredrick and Patricia Lynn Hough.

11   Q       And at Page 2, who signed this document?

12   A       Beda Singenberger.

13   Q       Now, what was the source of -- what did you determine to

14   be the source of funds and securities when this account was

15   opened?

16   A       The securities and cash from 263, David Fredrick's

17   individual account, and the account ending in 267, Patricia

18   Hough's individual account, went into this account.

19   Q       Now, did you hear any evidence at trial that New

20   Vanguard conducted any actual business?

21   A       New Vanguard Holdings is a domiciliary . . . company,

22   which means it's a nonoperating company.

23   Q       Now, based on these and other evidence, I would like you

24   to assume for purposes of your tax computations that this

25   account was owned jointly by Dr. Hough and Dr. Fredrick.

1          If this account were not owned jointly by Dr. Hough and

2    Dr. Fredrick, how would that affect your income tax

3    computations?

4    A     It would not be included in my income tax computations.

5    Q     Now, did you examine all the transactions that occurred

6    in this account similar to the way you did in the three prior

7    accounts?

8    A     Yes, I did.

9    Q     If we look at Exhibit 30D, at Page 19 . . . what is this

10   document?

11   A     This is my spreadsheet for account -- Master

12   Account 8833, Subaccount 61N.

13   Q     Now, when you were preparing your master spreadsheets

14   for the different subaccounts, and this and all the other

15   master accounts, how did you double-check yourself to make sure

16   that you hadn't missed any transactions?

17   A     The running balance on the far right, I always checked

18   to make sure that my running balance reconciled to the account

19   running balance -- the account statements from UBS.

20   Q     And what type of account did you observe this New

21   Vanguard account to be?

22   A     This is an investment.

23   Q     Looking at this object account, 61N, Page 19,

24   approximately when did you -- was this account opened?

25   A     July of 2005.

1   account.

2   Q      Do you recall which subaccount that appeared in?

3   A      I don't recall, but I can find it, if you allow me time

4   to look.

5   Q      Sure.

6   A      Okay.

7   Q      Actually, if you turn to Subaccount 60Z, which is, I

8   think, Page 48?

9   A      Yes.   There it is.

10         MS. KESSLER:  Permission to publish 30L, Your Honor?

11         THE COURT:  You may.

12         MS. KESSLER:  Page 48?

13         (An exhibit was projected onto the projector screen.)

14  BY MS. KESSLER:

15  Q      And at the top here, is that credit you were referring

16  to reflected?

17  A      Yes.   It is the $5 million credit from the account for

18  the Saba University School of Medicine Foundation.

19  Q      And when was that?

20  A      January 6th of 2006.

21  Q      During the trial, have you heard any evidence that Top

22  Fast conducted any business?

23  A      They did not.

24  Q      Based on this and other evidence, I want you to assume,

25  for purposes of your tax computations, that this account, in

1    the name of Top Fast, was owned jointly by Dr. Hough and

2    Dr. Fredrick.

3         Now, if this account was not owned jointly by Dr. Hough

4    and Dr. Fredrick, would any of the income or investment expense

5    items be included in your tax computations?

6    A    They would not be included.

7    Q    Now, did you review all of the transactions in this

8    account in the same manner that you did the four prior

9    accounts?

10   A    Yes, I did.

11   Q    If we could turn to Page 48 of this document . . .

12   that's where we were before.

13        Is this spreadsheet similar to the spreadsheet that you

14   prepared in your review of the other accounts?

15   A    Yes.

16   Q    And does this reflect all the transactions you observed

17   to occur in Subaccount 60Z --

18             COURT REPORTER:  Could you say it again?

19             MS. KESSLER:  I'm sorry.

20             COURT REPORTER:  Just ask the question.

21   BY MS. KESSLER:

22   Q    Does this spreadsheet reflect all of the transactions

23   you saw to occur in Subaccount 60Z, like "zebra"?

24   A    Yes.

25   Q    Now, did this account also have multiple subaccounts

1    Q      And who is identified as the contracting party --

2    party -- partner.  Excuse me.

3    A      Top Fast Finance Limited.

4    Q      And who is identified as the beneficial owners?

5    A      David Leon Fredrick and Patricia Lynn Hough.

6    Q      Now, if we look at the bottom of this document, who

7    signed this document?

8    A      Beda Singenberger.

9    Q      If we turn now to Page 30G, at Page 1, can you tell,

10   based on your review of the documents, when this account was

11   opened?

12   A      30G . . . .

13          (The witness examines an exhibit.)

14   A      March of 2007?

15   Q      Now, do you recall testimony from Mr. Steven Rodger

16   during trial?

17   A      Yes, I do.

18   Q      Now, did Mr. Rodger testify that he entered into a

19   purchase agreement for the sale of the medical schools on

20   February 14th of 2007?

21   A      Yes, he did.

22   Q      Where did you observe the assets in this account to come

23   from?

24   A      From the UBS account for Top Fast.

25   Q      Based on this and other evidence, I want you to assume

1    for purposes of your tax computations that this account was

2    owned jointly by Dr. Hough and Dr. Fredrick.

3           Now, similar to the other accounts, if this was not an

4    account owned by Dr. Fredrick and Dr. Hough, would the income

5    items and investment expenses be relevant to your tax

6    computation if that were the case?

7    A     They would not be included.

8    Q     Now, did you analyze the transactions in this account in

9    the same manner that you analyzed the prior accounts we've

10   discussed?

11   A     Yes, I did.

12   Q     And did you examine all of the transactions?

13   A     Yes, I did.

14   Q     Did you do so in the same way?

15   A     Yes, I did.

16   Q     What type of account was this account in the name of --

17   or at Fortis Banque?

18   A     It's an investment account.

19   Q     Now, if we look at, again, at Exhibit 30G, Page 1, was

20   this account at Fortis Banque somewhat similar to the UBS

21   accounts, in that they have subaccounts as well?

22   A     Yes.

23   Q     What are those?

24   A     10,01, 13,33, 14,02 -- I'm sorry.

25           COURT REPORTER:  Ten, comma --

1    owners of this account?

2    A      David Leon Fredrick.

3    Q      And if we turn to Page 4?

4    A      Patricia Lynn Hough.

5    Q      And who signs this document?

6    A      Beda Singenberger.

7    Q      Who is identified as the contracting party?

8    A      Top Fast Finance Limited.

9    Q      Now, in your review of the documents related to this

10   account, do you know where the assets in the account came from?

11   A      They were moved from the UBS account.

12   Q      Based on these and other pieces of evidence, I want you

13   to assume, for purposes of your tax computations, that this

14   account is owned jointly by Dr. Fredrick and Dr. Hough.

15          Now, similar to the other accounts, if this account was

16   not owned by Dr. Fredrick and Dr. Hough, would this be, the

17   income and expense items be relevant to your computations?

18   A      They would not be.

19   Q      Now, did you analyze this account in the same way that

20   you analyzed the prior accounts we've discussed?

21   A      Yes, I did.

22   Q      Did you examine all of the transactions in the account?

23   A      Yes, I did.

24   Q      And did you do so in the same way?

25   A      Yes, I did.

1    evidence?

2              THE COURT:   4J?

3              MS. KESSLER:  J, like "John."

4              THE COURT:  That's in already.

5              MS. KESSLER:  Oh, that's in?

6              Permission to publish?

7              THE COURT:  You may.

8              (An exhibit was projected onto the projector screen.)

9    BY MS. KESSLER:

10   Q      Ms. Maurer, what is this document, Exhibit 4J?

11   A      It's the Form A account opening document at Fortis

12   Banque.

13   Q      And who is identified as the contracting partner?

14   A      New Vanguard Holdings Limited.

15   Q      Who is identified as the beneficial owners?

16   A      David Leon Fredrick and Patricia Lynn Hough.

17   Q      Can you tell who signed this document?

18   A      Beda Singenberger.

19   Q      And when does it appear to be signed?

20   A      November 29th, 2006.

21   Q      Now, if we look . . . based on your analysis, or your

22   review of the account, where did you understand the assets in

23   this account to come from?

24   A      The sale of the schools.

25   Q      And when did that occur?

1    A       April of 2007.

2    Q       Now, based on these and other pieces of evidence, I

3    would like you to assume, for purposes of your tax

4    computations, that this account was owned jointly by Dr. Hough

5    and Dr. Fredrick.

6            Again, if this account were not owned jointly by

7    Dr. Fredrick and Dr. Hough, would it be relevant to your tax

8    computations?

9    A       No, it would not.

10   Q       Did you analyze this account in the same manner that

11   analyzed the others that we have been talking about?

12   A       Yes, I did.

13   Q       And did you examine all of the transactions in the

14   account?

15   A       Yes, I did.

16   Q       Did you do so in the same way that you did the other

17   accounts?

18   A       Yes, I did.

19   Q       What type of account was this?

20   A       This is an investment account.

21   Q       Now, if we turn to Exhibit 30E, at Page 2, did you

22   determine whether there were short-term capital gains related

23   to this account?

24   A       Yes, I did.

25   Q       Actually, what is this document, Page 2?

1    similar to the UBS statements; yes.

2    Q       Are they a little different, too?

3    A       They're a little different.

4    Q       How are they different generally?

5    A       I have monthly statement of assets, and that's

6    statements, and . . . .  Make sure I'm saying the right thing.

7    And I had no documents to tell me the units bought and sold of

8    stock.  I had to rely on the monthly statements to determine

9    the stocks that were bought and sold.

10   Q       Okay.  Did you see documents entered into evidence

11   related to this account?

12   A       Yes, I did.

13           MS. KESSLER:  If I could approach the witness with

14   previously admitted 4K, like "King"?

15           THE COURT:  You may.

16   BY MS. KESSLER:

17   Q       What is the date of this exhibit, Ms. Maurer?

18   A       The opening documents for New Vanguard Holdings Limited

19   at Landesbank.

20   Q       If we could look at Page 1 of this document, who is

21   identified as the contracting party?

22   A       New Vanguard Holdings Limited.

23   Q       And who, on Page 1, is identified as the beneficial

24   owner?

25   A       David Leon Fredrick.

1    Q      Who appears to have signed this document?

2    A      Beda Singenberger.

3    Q      And if we turn to Page 2, is there another beneficial

4    owner identified?

5    A      Patricia Lynn Hough.

6    Q      And does this document also appear to have been signed

7    by Mr. Singenberger?

8    A      Yes.

9    Q      Can you tell approximately when this account was opened?

10   A      Can I refer to my --

11   Q      Yes.

12   A      Okay.   December of 2006.

13   Q      Do you recall testimony from Mr. Rodger?

14   A      Yes, I do.

15   Q      And do you recall Mr. Rodger testifying that he reached

16   a handshake -- or I think he may have called it a napkin

17   agreement -- with Dr. Fredrick regarding the sale of the

18   schools, in September of 2006?

19   A      Yes.

20   Q      Where did the assets in this account come from?

21   A      From the sale of the schools.

22   Q      Based on these and other items of evidence, I want you

23   to also assume, for purposes of your tax computations, that

24   this account was owned jointly by Patricia Hough and David

25   Fredrick.

1        Now, again, if this account were not owned jointly by

2   Dr. Fredrick and Dr. Hough, how would that -- how would it

3   affect your tax computations?

4   A       It would not appear.

5   Q       And did you analyze this account in the same manner that

6   you analyzed the prior accounts we've discussed?

7   A       Yes, I did.

8   Q       Did you examine all of the transactions that occurred in

9   this account?

10  A       Yes, I did.

11  Q       And did you do that in the same way that you did the

12  other accounts?

13  A       Yes, I did.

14  Q       What type of account is this one?

15  A       It's an investment account.

16  Q       Now, if we turn to Page 2 of Exhibit 30F, is this,

17  again, your income summary?

18  A       Yes, it is.

19  Q       And you prepared this document?

20  A       Yes, I did.

21  Q       Did you determine whether there was interest income

22  earned in any of the subaccounts for account ending in 134?

23  A       134.49.

24  Q       How much interest income was earned in that account in

25  2008?

1    A       The tax due, yes.

2    Q       Now, did you a similar computation for -- did you do a

3    similar computation of whether there was additional tax due and

4    owing for 2006, for Dr. Hough?

5    A       Yes, I did.

6    Q       And looking at Line 16, as to the year 2006, what did

7    you determine the tax due to be?

8    A       Based on the adjustments that I made, I determined that

9    she had additional losses, capital losses, she was entitled to

10   additional expenses.  So, in 2006, it's a refund of $2,282.

11   She overreported her tax liability.

12   Q       Now, did you hear testimony as to the ownership of Saba

13   and MUA during this trial?

14   A       Yes, I did.

15   Q       And did you see exhibits discussed by Mario deCastro,

16   where Dr. Fredrick and Dr. Hough identified themselves as the

17   owners of the schools for a potential sale in 2002 and 2003?

18   A       Yes, I did.

19           MR. HOCHMAN:  Objection, Your Honor, misstates the

20   testimony.

21           THE COURT:  Overruled.

22           The jury can remember what the testimony was, and the

23   witness will give her answer.

24   BY MS. KESSLER:

25   Q       Did you hear testimony from Steven Rodger regarding the

1   A      Yes.   That's what I was doing here.

2   Q      And after taking into account the depreciation on the

3   campus building, what did you determine the basis for that

4   building to be?

5   A      $1,481,850.

6   Q      Now, did you go through the same process with regard to

7   these other items here, on Page 1 of 30-O, the library and

8   generator, etcetera?

9   A      Yes, I did.

10  Q      Then, once you determined the basis as to each of these,

11  were you able to, to the best of your ability, determine the

12  taxpayer's basis in the property . . . known as Round Hill?

13  A      Yes.

14  Q      And what did you determine that to be?

15  A      $3,163,623.

16  Q      Now, is that entry a total of all those numbers above

17  it, in the column under basis?

18  A      Yes.

19  Q      If we turn to Page 2 of this document, you indicate here

20  the sales price of Round Hill is $33,944,000.

21         Where did you obtain that figure from?

22  A      From the . . . sales contract.   It was the one that

23  Mr. Rodger had.

24  Q      And then did you reduce that sales price by the basis

25  you determined on Page 1 of 30-O?

1    A        Yes.

2    Q        And what did you determine to be the gain on the sale

3    from Round Hill?

4    A        30,780,377 -- well, $30,780,377.

5    Q        Now, moving to the next entry, you indicate a sales

6    price here for Saba University School of Medicine for $988,997.

7             Where did you obtain that information?

8    A        From the sales contract.

9    Q        The sales contract Mr. Rodger testified to?

10   A        Yes.

11   Q        What did you determine the taxpayer's basis in the Saba

12   University School of Medicine to be?

13   A        There was no basis in that.

14   Q        Now, how did you -- why did you determine that there was

15   no basis in this?

16   A        Because all the assets were in Round Hill.

17   Q        Okay.  Now, did you determine whether there was a gain

18   on the sale of the Saba University School of Medicine?

19   A        Yes.

20   Q        And what was that?

21   A        $988,997.

22   Q        Now, next is indicated the sale . . . sales price for

23   MUA.

24            Where did you obtain the figure you have there, for the

25   price of $2,541,572?

1   medicine, concurrently.

2   Q       And we'll talk about that in just a moment.

3           Do you know Dr. Patricia Hough and her husband,

4   Dr. David Fredrick?

5   A       I do.

6   Q       When did you first meet them?

7   A       Probably around 1997, I would think that would be

8   my -- '96 and '97.

9   Q       What were the circumstances of your meeting?

10  A       We were introduced by a mutual friend, because he knew

11  that I had some interest in the medical psychology area, and he

12  knew that Saba was interested in some of those things.  And so

13  we were introduced, and the relationship developed from there.

14  Q       Now, you mentioned a moment ago this joint degree

15  program that you were developing.

16          What was that about?

17  A       It's complicated, so I won't bore you; but trying

18  to . . . factor it down, is that there's a movement -- or there

19  has been a movement in the United States, over the past 20 or

20  25 years, trying to get psychologists to be able to prescribe

21  medications as well as doing psychotherapy.  And there are some

22  states, and the military, and the Bureau of Indian affairs, for

23  instance, where psychologists do prescribe.

24          And one of the things that I felt strongly about is that

25  if psychologists are going to have the skills to prescribe,

ALAN GRUBER - DIRECT/SAUNDERS                    153

1    Q      And are you familiar with the Medical University of the

2    Americas?

3    A      Yes.

4    Q      Were you aware that both of those schools were . . .

5    well, that both every those schools were developed by a

6    foundation called the Saba Foundation -- I'm sorry -- the Saba

7    School of Medicine Foundation?

8               MS. FINLEY:  Objection, leading.

9               THE COURT:  Sustained.

10   BY MR. SAUNDERS:

11   Q      Do you know who owned the Saba school?

12   A      I don't believe anyone owned it.  My understanding was

13   that it was a nonprofit organization.

14   Q      And was the program that you were developing --

15   withdrawn.

16          Were you aware that Dr. Fredrick was also involved with

17   the Medical University of the Americas on Nevis?

18   A      Yes.

19   Q      Was the program that you were developing for possible

20   implementation tied to one particular school or the other, or

21   for both schools, if you recall?

22   A      I think we were . . . originally, it was Saba, then it

23   started to move to MUA, and it was really up in the air in

24   terms of which school it was going to be with.  But we were

25   really thinking, at that point, to have it at both schools.

1    Q      Is the same true for Dr. Fredrick?

2    A      Yes.

3    Q      Have you had the opportunity, during the years that

4    you've known Dr. Hough, to form an opinion as to her character

5    for honesty and truthfulness?

6    A      Yes.

7    Q      What is that opinion, Doctor?

8    A      I think she's . . . extremely honest.  She's the kind of

9    person who tells you what she thinks.  She doesn't pull

10   punches.  If she thinks that something needs to be done, or

11   there's an issue to be addressed, she lets you know about it.

12   She's very straight.

13   Q      Have you known her to exaggerate?

14   A      No.

15   Q      Have you known her to cut corners or bend rules?

16   A      No.  Quite the opposite, actually.

17   Q      What do you mean by that?

18   A      Well, I almost think that it would make her

19   extraordinarily uncomfortable to bend rules or cut corners.

20   It's not who she is, in my perspective at least.

21   Q      And has that been consistent across all the years that

22   you've known her?

23   A      Yes.

24   Q      Now, Dr. Gruber, would that opinion of Dr. Hough change

25   if you were told that the government in this case was claiming

1    that Dr. Hough took millions of dollars from the Saba

2    Foundation, hid the money for her own use in secret Swiss bank

3    accounts, failed to declare income from those accounts on her

4    tax returns, and conspired with her husband and others to

5    defraud the United States; would that change your opinion?

6    A       If I knew that?

7    Q       If you were told that that's what the government is

8    alleging in this case.

9    A       I would be flabbergasted.

10   Q       Why?

11   A       That's just not who I know Pat Hough to be.  It just

12   doesn't make sense to me.  I can't -- A, I can't believe that

13   she would do something that would be so dumb.  It's just not --

14   it's just not who she is.

15          And secondly, she's . . . you know, sort of a -- I don't

16   want to be a little insulting here, but she's sort of a little

17   anal.  She plays by the rules.  And I've never known her not to

18   play by the rules.  I just can't see her putting herself in

19   that situation.

20          MR. SAUNDERS:  Your Honor, if we can take a break

21   now, I'll confer with counsel, and possibly pass the witness

22   when we come back from break.

23          Is that all right?

24          THE COURT:  That's fine.

25          All right.  Let's take a 15-minute break.

1    would answer yes to that question.

2              MR. SAUNDERS:  Objection, incomplete hypothetical.

3              THE COURT:  Overruled.

4              You may answer.

5              THE WITNESS:  Yes, I would expect her to tell the

6    truth.

7    BY MS. FINLEY:

8    Q     And I think Mr. Saunders asked you, if you heard the

9    allegations that were in this indictment, that Dr. Fredrick and

10   Dr. Hough conspired with each other and others to defraud the

11   Internal Revenue Service, that that would not change your

12   opinion; is that correct?

13   A     Yeah, the question still confuses me.  The allegation

14   doesn't change my mind.  I would just be very surprised if the

15   allegation were true.  I guess that's what I am trying to say.

16   Q     And if that was proven, that Dr. Fredrick and Dr. Hough

17   did conspire to defraud the Internal Revenue Service by not

18   reporting the sale of the medical schools on their tax returns,

19   because they would -- would be required to do so, if that was

20   proven, would that change your opinion?

21             MR. SAUNDERS:  Objection, Your Honor, "if that were

22   proven" is an improper question at this point.

23             THE COURT:  Overruled.

24             THE WITNESS:  Yeah, I would be very surprised.

25

1    BY MS. FINLEY:

2    Q     Would it change your opinion about them?

3    A     Yes.

4          MS. FINLEY:  Thank you, Your Honor.  No further

5    questions.

6          THE COURT:  Mr. Saunders, redirect?

7          MR. SAUNDERS:  Just a moment, Your Honor?

8          (Mr. Saunders and Mr. Udolf confer privately.)

9                    REDIRECT EXAMINATION

10   BY MR. SAUNDERS:

11   Q     Dr. Gruber, if you were told that the house, that the

12   prosecutor described was purchased in Greenville, North

13   Carolina, had 11 rooms, including 5 bedrooms, rooms that could

14   be used for meetings, conferences, etcetera, would that be a

15   suitable location for a home base for the program that you and

16   Dr. Fredrick were seeking to develop?

17   A     Yeah.  Yes.

18   Q     You were asked if it would change your opinion of

19   Dr. Hough's honesty if you knew -- or -- I'm sorry.

20         You were asked if it would change your belief that she

21   didn't know anything about the financial matters if you were

22   told that she was a signatory on certain bank accounts.

23         Do you recall that?

24   A     Yes.

25         MS. FINLEY:  Misstates the question, Your Honor.

1   participated in sophisticated international deals.

2          Do you have any special expertise in Netherlands

3   Antilles law dealing with nonprofits?

4   A      No, I do not.

5   Q      How about Nevis law dealing with for-profit

6   corporations?

7   A      No.

8   Q      Do you have any expertise in Swiss banking law?

9   A      No.

10  Q      Do you have any expertise in Swiss anti-money laundering

11  regulations?

12  A      No.

13  Q      Have you ever attended -- do you remember

14  Mr. Futterknecht coming in from UBS and testifying?

15  A      Yes.

16  Q      And do you recall that he was -- he talked about being a

17  member of the Swiss Bankers Association, the association that

18  creates the code of compliance that Swiss banks are obligated

19  to live under; Do you recall that?

20  A      Yes.

21  Q      Have you ever attended a meeting of the Swiss Bankers

22  Association?

23  A      No.

24  Q      Are you a member of the Swiss Bankers Association?

25  A      No.

1    Foundation, if I recall, is owned which Dave Fredrick and

2    Patricia Hough; correct?

3    A      Correct.

4    Q      And isn't part of your analysis based on seeing the

5    Form A in the Saba School of Medicine's UBS account?

6    A      Yes.

7    Q      And that Form A, which should never have been filled

8    out, lists, as beneficial owners, David Fredrick and Patricia

9    Hough; correct?

10   A      Correct.

11   Q      Because an operating company like the Saba School of

12   Medicine Foundation doesn't need to fill out a Form A, because

13   it has no beneficial owners; isn't that correct?

14   A      The Saba School of Medicine Foundation is owned by

15   Patricia Hough and David Fredrick.  I don't know what

16   discussions there were about the Form A with Dieter Luetolf.

17   Q      Well, again, I'm going to the whole notion of whether or

18   not an operating company like the Saba School of Medicine

19   Foundation, which you've already conceded to me, had to fill

20   out a Form A listing beneficial owners; and I believe you said

21   it did not.  Correct?

22   A      That's what the witness from UBS said.

23   Q      And do you have any reason to doubt Mr. Futterknecht,

24   the witness from UBS?

25   A      I don't have any reason to doubt him.

SHEILA MAURER - CROSS/HOCHMAN                257

1   Q      Now, you said you sat through the opening statements,
2   all the testimony, and all of the exhibits during the first
3   week of this trial of this case; correct?
4   A      Correct.
5   Q      So that's October 8th we started, a Tuesday; and I
6   believe the evidence was done, at least for that week, 9th,
7   10th -- on October 11th, a Friday; is that correct?
8   A      Correct.
9   Q      So, after hearing that testimony and all the
10  cross-examination, did you make a change to your May 15, 2013
11  report?
12  A      Yes, I did.
13  Q      And you made that change to your May 14, 2013 report on
14  October 14th, 2013; isn't that correct?
15  A      Correct.
16  Q      Five months to the day after you first submitted the
17  report to the prosecutors; correct?
18  A      Correct.
19  Q      And you made at least three key changes to your report
20  based on errors in your original report; correct?
21  A      They were not errors.  I made changes, but they were not
22  due to errors.
23  Q      What were they due to?
24  A      I heard testimony that . . . and I reviewed documents,
25  and, from the evidence and documents, I understood that David

1    Fredrick and Patricia Hough owned the medical schools.  Okay?

2    In 2007, I needed to show their gain on the sale of the medical

3    schools, because they were -- they owned the medical schools.

4    But my RAR had based income that I had attributed in them of

5    money coming out of the medical schools that they used for

6    personal expenses.

7         But if you own something, then the income is treated a

8    different way.  It's not income to you when you pull out the

9    money and use it for personal expenses; the money is yours when

10   you earn it each year.  So I changed my RAR based on the fact

11   that they owned the medical schools, and I was gonna -- and the

12   capital gain on that was going to be charged to them.  So if

13   they owned the medical schools, then the RAR should show, every

14   year, income to them from their ownership of the schools, not

15   when it came out and they used it for personal expenses.

16   Q    What evidence did you hear -- well.  The evidence that

17   you heard during this first week of trial, that changed your

18   mind, you had never heard before the first day of this trial?

19   Is that correct?

20   A    I had never heard.

21   Q    And that's because you didn't speak to any of the

22   government witnesses; correct?

23   A    That is correct.

24   Q    Did the government ever give you any of its memorandum

25   of interview, of its conversations with the witnesses for you

1    to review prior to preparing your May -- yes, prior to

2    preparing your May 14th report?

3    A       I got a few, but not -- I don't have -- I was not

4    regularly given memorandums of interview.

5    Q       Which interviews did you get?

6    A       I don't know.  They were way back in the beginning.  I

7    don't remember.  There were only two or three.

8    Q       Two or three.  Which ones?

9    A       I really don't remember.

10   Q       Was it back in 2009?

11   A       Yes; it would have been back in 2009.

12   Q       Now, you've heard that a number of witnesses went to the

13   grand jury.  Did the government ever give you any of the grand

14   jury transcripts before you completed your report on May 14th?

15   A       No, they didn't; but I'm not sure if that's procedures,

16   or policies, or if they're supposed to.  I don't know.  I was

17   not given transcripts.

18   Q       And that was true before the trial here, as well;

19   correct?

20   A       Correct.

21   Q       On October 8th.

22   A       Correct.

23   Q       So the first time you're hearing some evidence that

24   resulted in you changing your Revenue Agent's Report was

25   between October 8th and October 11th, during this trial; is

1    that correct?

2    A      Yes.

3    Q      What testimony did you hear, what evidence did you hear,

4    that changed your mind?

5    A      There was evidence from Mario deCastro.

6    Q      Okay.

7    A      And there were a couple of others.  I just really

8    don't -- I can't pull them out of my head right now.

9    Q      This is a pretty big issue, a huge issue, resulting in

10   your changing your report; and you've given me Mario deCastro.

11   Is there a particular document that you saw on the screen that

12   changed your mind to say that, before, David Fredrick and

13   Patricia Hough were not the owners of the Saba school, but --

14   A      No, but.

15   Q      -- let me finish my question, if I might.  But that now,

16   after you hear the testimony, they are the owners of the Saba

17   school?

18   A      It wasn't just Mario deCastro.  I know there were other

19   documents, and testimony.  I just can't remember those right

20   this very minute.

21   Q      Would you like a moment to go through your notes?

22   A      I'll try.  I would like . . . .  I'll try.

23          MR. HOCHMAN:  Actually, since we're -- I can ask a

24   few more questions, Your Honor, and then, during the recess, or

25   overnight, she can go through her notes.