UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

---

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                    Fort Myers, Florida

vs.                                    October 18, 2013

PATRICIA LYNN HOUGH,            9:00 a.m.

        Defendant.

---

TRANSCRIPT OF JURY TRIAL, DAY 8

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                               Tax Division
                       P.O. Box 813
                       Washington, DC  20044
                       BY:  CARYN FINLEY, ESQ.

                       U.S. Department of Justice
                               Tax Division
                       Suite 7334
                       601 D Street NW
                       Washington, DC
                       BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

1    Data"?  Do you see that?

2    A      Yes.

3    Q      And do you see, in Paragraph 9, that it basically says

4    UBS will provide to the United States certain United States

5    clients, which they call disclosed accounts, as set forth in a

6    letter between UBS and the government dated February 16, 2009,

7    attached hereto, as Exhibit E, and here is the language I want

8    you to focus on, "And filed separately understood seal."  Do

9    you see that?

10   A      I see it.

11   Q      That means that UBS didn't publicly reveal all the U.S.

12   taxpayers it was providing to the U.S. Government, but it filed

13   those names under seal with the court, and they weren't

14   publicly available.  Correct?

15   A      I believe that's what it means.

16   Q      Thank you.  So yesterday I asked you about why you would

17   change your May 14, 2013 report that you had worked on for four

18   years, and you changed it six days into the middle of this

19   trial, on October 14, 2013.  Do you recall that discussion?

20   A      I recall the discussion.

21   Q      And you said that it was because you learned for the

22   first time, during this trial, that Dr. Fredrick and Patricia

23   Hough owned the Saba School of Medicine Foundation and MUA.  Do

24   you recall that?

25   A      I recall that.

1    Q      Thank you.

2           So you said that Mario deCastro was one of the people

3    that you relied on, and the documents he presented, to change

4    your Revenue Agent Report, the one that you gave the

5    prosecutors on May 14th, 2013, and then revised six days into

6    this trial; correct?

7    A      Correct.

8    Q      And then you said you were going to consult with your

9    notes last night.

10          Did you have a chance to consult with your notes to

11   determine if there were any other witnesses or exhibits that

12   resulted in you changing your conclusion six days into this

13   trial?

14   A      Yes, I did.

15   Q      And what were they?

16   A      I have 3S, Page 23.

17   Q      I'm sorry?

18   A      3S, Page 23.

19   Q      3S, Page 23.

20          Okay.  What else?

21   A      3EE, Page 86.

22   Q      Okay.

23   A      I have 6D, as in "dog"; 6F; 6B, as in "boy"; 6H; and I

24   have this document, 8B.

25   Q      8B?

1   A      8B.

2   Q      Okay.  Anything else?

3   A      7II.

4   Q      7II.  Okay.

5   A      That's it.

6   Q      All right.  Well, we just dealt with 8B.

7          And what about 8B convinced to you change your findings,

8   six days into the trial, that Dr. Fredrick and Dr. Hough owned

9   the Saba School of Medicine?

10         (The witness examines an exhibit.)

11  A      It's Page 3, Number 2.

12         MR. HOCHMAN:  If you can put Page 3, Number 2, of 8B

13  up?

14         (An exhibit was projected onto the projector screen.)

15         MR. HOCHMAN:  I'm sorry.  This is 8B, Page 3; B, like

16  in "boy."

17         (An exhibit was projected onto the projector screen.)

18         MR. HOCHMAN:  And highlight Paragraphs 2, 3, and 4,

19  if you could.

20  BY MR. HOCHMAN:

21  Q      Again, we're back with the letter that Mario deCastro

22  wrote to his clients; correct?

23  A      Correct.

24  Q      And that's Brad Anderson and Roy Dobbs; correct?

25  A      Yes.

1    of loan terms . . . loan terms, interest, and statements of

2    when payback is expected, and when payments should be made.

3    Q      Are you aware of people having loans with each other

4    that don't have a formal written document for the loan?

5    A      I have seen those types of loans.

6    Q      And does that make it an invalid loan, the fact that

7    there is not a formal written document laying out all the

8    terms?

9    A      Sometimes yes, sometimes no.  It depends on the

10   underlying circumstances of the document and the related

11   parties involved.

12          MR. HOCHMAN:  If I may present the witness with

13   Exhibit 3C, Your Honor?

14          THE COURT:  You may.

15          MR. HOCHMAN:  Thank you.

16          Now, if we could put the first page of 3C on the

17   screen?

18          (An exhibit was projected onto the projector screen.)

19   BY MR. HOCHMAN:

20   Q      Now, what Exhibit 3C is, is the UBS New Vanguard

21   account; correct?

22   A      Yes.

23   Q      And you see on Form A, it's listed David Leon Fredrick

24   and Patricia Lynn Hough as the beneficial owners of this

25   account; correct?

1    A       Yes.

2    Q       Do you see Dr. Fredrick or Dr. Hough's signature

3    anywhere on this document, the Form A?

4    A       No, I don't.

5    Q       You see Beda Singenberger's signature; correct?

6    A       Yes.

7    Q       Look through this entire packet . . . as fast as you

8    want, and tell me whether or not you see David Fredrick or

9    Patricia Lynn Hough's name anywhere else, other than on this

10   first page of this document.

11          And while you're looking, also see if you see their

12   signatures anywhere else, other than -- well, actually,

13   anywhere on any of the pages of the document.

14              (The witness examines an exhibit.)

15   A       I don't see their signatures.

16   Q       And you don't even see their names anywhere, other than

17   the first page of this document; correct?

18   A       No; but Beda Singenberger is an intermediary that they

19   gave permission to sign for them.

20   Q       And on what do you base that?

21   A       I believe . . . .  I don't . . . .  I don't know, in my

22   notes, where I have this, and . . . .  But I believe there was

23   a . . . .  Well, for Beda Singenberger to be able to sign for

24   this, they would have to sign -- have to have signed some type

25   of contract with Beda Singenberger, to allow him to put his

1   signature on these documents.

2   Q      That is actually not correct, isn't that right?

3          What you just said is not correct, that David Fredrick

4   and Patricia Hough had to sign a New Vanguard document to allow

5   Beda Singenberger to sign his name.

6   A      I believe that Patricia Hough and David Leon Fredrick

7   would have had to sign a Sinco Treuhand document to allow him

8   to sign for this account.

9   Q      Have you ever seen a Sinco Treuhand document with David

10  Fredrick's or Patricia Hough's signature on it?

11  A      I believe I have.

12  Q      You have.

13  A      I believe so.

14  Q      Please tell me where in the evidence I can find this

15  document.

16  A      I can't.

17  Q      Pretty important document, isn't it?

18  A      Yes.

19  Q      And last night, when you were looking to establish

20  whether or not David Fredrick and Patricia Hough were the owner

21  of the Saba School of Medicine Foundation and all these

22  accounts, did you look for an exhibit that has that document in

23  it?

24  A      I did not.

25  Q      And actually, if you look at the -- Page 39 of this

1    document, that lists authorized signatories . . . .

2              MR. HOCHMAN:  And if we can put 39, and focus on the

3    top four there, please?

4              (An exhibit was projected onto the projector screen.)

5    BY MR. HOCHMAN:

6    Q     There are four people who are authorized signatories to

7    this agreement; correct?

8    A     Yes.

9    Q     Beda Singenberger; Daniel Eric Joerin, spelled

10   J-O-E-R-I-N; Erwin Schulthess; and Brigitte Schaufelberger.

11             Do you see that?

12   A     Yes.

13   Q     Do you see David Fredrick's or Patricia Hough's name

14   anywhere on this document of authorized signatories?

15   A     Their names aren't on this document.

16   Q     And do you see, with respect -- and if you can turn to

17   Page 41, there's a certified corporate resolution . . . that

18   says that Beda Singenberger is the director of New Vanguard

19   Holdings, and that further resolved, and he lists four

20   different people, that these are the people who are allowed to

21   sign on behalf of New Vanguard; do you see that?

22   A     Yes.

23   Q     Now, New Vanguard is a Hong Kong corporation; isn't that

24   correct?

25   A     Yes.

1    Q      And David Fredrick -- either -- well, David Fredrick was

2    not an officer of New Vanguard?

3    A     I don't know that.  I know that David Fredrick put his

4    funds into an account with New Vanguard.  I don't know what his

5    title would be from New Vanguard.

6    Q      Excuse me.  David Fredrick put funds that were in the

7    David Fredrick account into New Vanguard; isn't that correct?

8    A      That's correct.

9    Q      And is it possible that the funds that were in the David

10   Fredrick account, in the name of David Fredrick, were actually

11   the Saba School of Medicine Foundation's money?

12   A      I don't believe that to be true.

13   Q      And isn't it true that the money that went into the

14   David Fredrick account came from the David Fredrick/Pat Hough

15   joint account; is that correct?

16   A      That's correct.

17   Q      And the money that went into that account came from,

18   originally, the Saba School of Medicine Foundation.

19   A      I don't know that . . . I didn't see that.  That's . . .

20   that it came from -- I don't know where it came from, but I

21   don't know that those original funds came from the Saba School

22   of Medicine Foundation.

23   Q      Did you take any efforts to track the original source of

24   funds?

25   A      I . . . .  I tracked it back as far as I could.

1    Q        And as far as you could was where?

2    A        An account in the Bahamas.

3    Q        And the Bahamas account was set up by David Fredrick,

4    for asset-protection reasons, to put the Saba School of

5    Medicine Foundation's funds outside of the Island of Saba;

6    correct?

7    A        I don't know that.

8    Q        Do you have any evidence that David Fredrick, in the

9    late 1990s, or Patricia Hough, had earned millions of dollars

10   of their own income; do you have any evidence of that?

11   A        Those . . . .   There were millions of dollars that went

12   into a joint account at UBS in the name of David Fredrick and

13   Patricia Hough.

14   Q        Right.  And those millions of dollars came from the

15   tuition, the money, the revenues, that had been generated by

16   the Saba School of Medicine up to that point of 2001; isn't

17   that correct?

18   A        I don't know exactly if it was tuition.  I don't know

19   where those funds were accumulated from.

20   Q        But your best estimate, based on how much you know that

21   David Fredrick and Patricia Hough were earning, being doctors

22   or consultants, versus how much the Saba School of Medicine

23   was, based on tuition, is that the money came from the Saba

24   School of Medicine Foundation, rather than David Fredrick and

25   Patricia Hough; correct.

1    A       I really am not following that.  I'm not following what

2    you're saying.

3    Q       Again, the account that was set up in the Bahamas was

4    set up on behalf of the Saba School of Medicine Foundation;

5    correct?

6    A       I don't know that.

7    Q       Did you ever take any steps to try to find out the

8    answer to that question?

9    A       I was unable to find out those original documents from

10   that account in the Bahamas.

11   Q       What steps did you take to try and find that out?

12   A       I looked through the documents that I had -- that were

13   provided that were available to me.

14   Q       Did you have any documents from any of the Bahamas

15   accounts?

16   A       No, but . . . and I don't know the exhibit, but one of

17   the exhibits states, when UBS was doing their due diligence,

18   was that the money in this joint account was coming from the

19   Bahamas, because . . . David Fredrick and Patricia Hough were

20   concerned about the changes in the law.

21   Q       Right.  But my question is the origin of the money.

22           Did you get any Bahamas' accounts, Bahamanian accounts'

23   documents, in order to track where the money originally came

24   from?

25   A       I did not.

1    Q      Do you think that's pretty important, to get something

2    like the Bahama bank account records to track where the money

3    originally came from?

4    A      It would have been nice if those had been available.

5    Q      Did you ask the prosecutors if they could get Bahamas

6    accounts' bank records for you, so that you could review them?

7    A      I did not.

8    Q      Did you ask Special Agent Lalli if he could get the

9    Bahamas bank records so that you could review them?

10   A      I did not.

11   Q      You knew which banks, it was SG Hambros and UBS Bahamas,

12   that the money came from; correct?

13   A      Yes, I believe.

14   Q      Did you contact SG Hambros to say:  Can you please give

15   me the bank records so that I can figure out if these millions

16   of dollars started with David Fredrick and Patricia Hough, or

17   they were the Saba School of Medicine Foundation's money?

18   A      I did not make phone calls.

19   Q      Or any type of communication to SG Hambros; correct?

20   A      Correct.

21   Q      And you also didn't have any type of communication with

22   UBS Bahamas; correct?

23   A      Correct.  There was also testimony . . . .

24          MR. HOCHMAN:  I don't think there's a pending

25   question right now.

1                If I might, I'd like to turn your attention to

2     Exhibit 3CC.

3                If I might present that to the witness, Your Honor?

4                THE COURT:  As long as it's been introduced already,

5     you may present it.

6                MR. HOCHMAN:  Thank you, Your Honor.

7                (Mr. Hochman provides an exhibit to the witness.)

8     BY MR. HOCHMAN:

9     Q     Now, Exhibit 3CC are the Top Fast opening documents at

10    UBS; correct?

11    A     Yes.

12               MR. HOCHMAN:  If we could put Page 1 of 3CC on?

13               (An exhibit was projected onto the projector screen.)

14    BY MR. HOCHMAN:

15    Q     And this is the Form A from the Top Fast UBS account; is

16    that correct?

17    A     Correct.

18    Q     And on Page 1, it identifies David Fredrick as the

19    beneficial owner; correct?

20    A     Yes.

21    Q     And on Page 2, it identifies Patricia Lynn Hough as the

22    beneficial owner; correct?

23    A     Correct.

24    Q     And neither page is signed by David Fredrick or Patricia

25    Hough; is that correct?

1    A      Correct.

2    Q      You have no idea whether or not these documents were

3    ever shown or discussed with David Fredrick or Patricia Hough,

4    at the point at which they were signed; correct?

5    A      I would not have been there to witness any of that.

6    Q      And Mr. Futterknecht, himself, said the same thing, that

7    he didn't participate in . . . in these documents; correct?

8    A      Yes.

9    Q      And you haven't seen any other witness in this case who

10   has talked about how these documents in Government's

11   Exhibit 3CC came to be; correct?

12   A      Could you repeat the question?

13   Q      Mr. Futterknecht didn't say he knew about these

14   documents, and there's no other witness in this trial that has

15   testified that said they knew anything about how this Form A,

16   in Exhibit 3CC, on Pages 1 and 2, came about; correct?

17   A      Mr. Futterknecht explained what this document was, and

18   what it was for, and what it represents.  He did say that he

19   wasn't present at the meeting where these document were signed.

20   Q      And there's no other witness in this trial that

21   testified that they were present at the time these documents

22   were signed; correct?

23   A      Correct.

24   Q      Do the same exercise, if you could, and look through

25   this entire document, and see, other than on Pages 1 and 2, if

1    David Fredrick or Patricia Hough's name is even mentioned.

2            And while you're looking, see whether or not they signed

3    the document in any place.

4            (The witness examines an exhibit.)

5    A      Their names are not here.  They did not sign.

6    Q      Could you turn to Page 16, the authorized signatory

7    line . . . .  We'll just go through that very quickly.

8            There are four authorized signatories.  They are the

9    same ones that were the authorized signatories for New

10   Vanguard; is that correct?

11   A      Correct.

12   Q      And you don't see David Fredrick or Patricia Hough's

13   name as an authorized signatory; correct?

14   A      Correct.

15   Q      And you heard from Mr. Futterknecht that only the

16   authorized signatories can direct UBS with respect to this

17   account; isn't that correct?

18   A      As I said before, I believe there was a contract between

19   Patricia Hough and David Minchenberg that would allow these

20   people to sign for them on this account.

21   Q      And do you have any evidence of this contract for Top

22   Fast?

23   A      I . . . I can't pull it up right now.

24   Q      And if . . . when you have a moment during the recess,

25   if you can go back through your notes, I'd appreciate it, and

1    see if you can find evidence of this contract between David

2    Fredrick, Patricia Hough, and Sinco, through either New

3    Vanguard or Top Fast.

4           Would you do that for me?

5    A      I have a couple other things that are . . . I need to

6    attend; but I will try.

7    Q      And if you could turn to Page 20 of this document, once

8    again, it says Beda Singenberger, as a director, sole director

9    of Top Fast Finance, along with three other people, are

10   authorized to sign; correct?

11   A      Correct.

12   Q      And if we look at the Ample Dynamic documents -- well,

13   actually, when you said that you looked at certain accounts,

14   those . . . what was it, six -- the five accounts, none of the

15   five accounts that you looked at in depth was the Ample Dynamic

16   Trading account; correct?

17   A      Correct.

18   Q      Is it fair to say -- I mean, we can go through the

19   exercise, as well, with the UBS account and pull it out, but is

20   it fair to say that, once again, if David Fredrick and Patricia

21   Hough's name were on the beneficial owner lines for Ample

22   Dynamic, that they didn't sign the document in any place in the

23   packet, and they also didn't have their name mentioned in any

24   of the other opening documents?

25   A      I don't -- I don't know that.  I don't remember the

1    Q      Now, you said that you relied, also, on 6D, like in

2    "David"; 6F; 6B, like in "boy"; and 6H.  And I'll call those

3    the Mario deCastro documents.

4           Do you recall that?

5    A      Yes.

6    Q      And we don't have to discuss them.  I think we've

7    already discussed those documents, as well as 8B, which was

8    Mario deCastro's opinion.

9           And I think you had one more document, 7II was a

10   document you relied on?

11   A      I have it in my notes, and I -- I wanted to look at it

12   again.

13   Q      Well, the problem with 7II is, it's never been admitted

14   into evidence.

15          Are you aware of that?

16   A      You could be correct.

17   Q      So when you just said that you relied on 7II to change

18   your opinion about who owned the Saba School of Medicine

19   Foundation, you're incorrect; correct?

20   A      It must have been 7II was presented and objected to.

21   I . . . I guess it was not admitted into evidence.

22   Q      Now, did the government ever hand you copies of the

23   exhibits that they were going to introduce into this case

24   before they introduced them?

25   A      They did not hand me documents before they introduced

1    them.

2    Q     And did you come up during the break and look through

3    the documents that had been introduced as admissible evidence

4    in this case?

5    A     I did not.

6    Q     So is it fair to say the only way you saw a document,

7    sitting in the gallery, is if it was projected up here on the

8    projector; is that correct?

9    A     It could have been projected, or it could have been

10   spoken of.

11   Q     All right.  Then what do you recall of Exhibit 7II that

12   was spoken of, but wasn't admitted into evidence or put on the

13   projector?

14   A     If it's not in evidence, I'm not sure if I should be

15   talking about it.

16   Q     You know, if you relied on -- well, if you relied on

17   something presented here, in court, about 7II, it's presented

18   here in court.

19         What did you rely on?

20   A     I don't -- I don't want to say, if it's not in evidence.

21   I didn't realize it was not presented into evidence, so . . . I

22   don't want to speak of that document then.

23   Q     Did someone give you a copy of 7II?

24   A     No.

25   Q     So the only way you know of 7II is if it was shown on

1   the projector, and it won't be shown on the projector unless

2   it's in evidence.

3          You understand that; correct?

4   A      Correct.

5   Q      So what about 7II, the discussion about 7II, led you to

6   do a 180-degree change, from your May 14th report to your

7   October 14th report, on who owned the Saba School of Medicine

8   Foundation?

9   A      It wasn't about 7II.  There were several documents that

10  we've talked about ahead of it; 7II, I put on here as one of

11  the documents.

12  Q      Which is wrong because -- well, are you saying that what

13  you're relying on is discussion about 7II, not the document

14  itself?

15  A      I don't remember.

16  Q      You wrote 7II as one of the list that you presented this

17  morning.

18         Why did you put it on the list?

19  A      Because I had something in my notes about 7II, but I

20  didn't scratch it off, that it wasn't presented in evidence.

21  Q      And is there a chance, then, that your notes are wrong,

22  as far as evidence that you relied on to make a 180-degree

23  change in your opinion about who owned the Saba School of

24  Medicine Foundation?

25  A      The change in my opinion wasn't based solely on 7II.

1    Q      It wasn't based on 7II at all; correct?

2    A      It should not have been based on 7II if it was not

3    presented into evidence.

4    Q      If you could turn to Exhibit 30I?

5           Actually, I don't think you have 30I.

6              MR. HOCHMAN:  May I approach the . . . .

7              THE COURT:  You may.

8              MS. KESSLER:  Mr. Hochman?  I think 30I may be in one

9    of the binders that are behind her seat.

10             MR. HOCHMAN:  Thank you.

11   BY MR. HOCHMAN:

12   Q      Do you have binders behind you that would have 30I?

13          Do you have Exhibit 30I before you?

14             MR. HOCHMAN:  We don't need to publish it yet.

15             (The witness examines an exhibit.)

16             THE WITNESS:  Yes.

17   BY MR. HOCHMAN:

18   Q      Now, 30I is your October 14, 2013 report; correct?

19   A      Yes.  It's a revised report.

20   Q      And are you 100 percent confident, as you sit here

21   today, that 30I, your revised report, is a hundred percent

22   accurate?

23   A      I am not a hundred percent confident that this document

24   is a hundred percent accurate.

25   Q      You have some doubt about this document; correct?

1   prosecutors to get them for you?

2   A      I asked the prosecutors if they had documents that

3   weren't here that I could use.

4   Q      And they said they didn't have them?

5   A      We were unable to . . . find documents that would not be

6   based on estimates.

7   Q      And you don't want to estimate; is that correct?

8   A      I do not want to estimate.

9   Q      Because estimates may be right or they may be wrong.

10         They have a certain degree of uncertainty in an

11  estimate; correct?

12  A      Correct.

13  Q      And you don't want to be uncertain, you want to be

14  certain; correct?

15  A      I want to be more certain than for what an estimate

16  provides.

17  Q      Now, the $2.5 million that you took off --

18         MR. HOCHMAN:  Actually, why don't we stay on 30I.  If

19  you could expand this out.

20         (An exhibit was projected onto the projector screen.)

21  BY MR. HOCHMAN:

22  Q      And because you took off that $2.5 million, if you can

23  go down to the very bottom, balance due and owing for 2006, do

24  you see here that there's -- in the balance due and owing for

25  2006, there's actually a negative number, negative $2,282; do

1   you see that?

2   A      Yes.

3   Q      And that means that, under your calculations, for 2006,

4   the United States Government owes Dr. Patricia Hough a refund,

5   is that correct, based on your calculations in Exhibit 30I.

6   A      Yes.  Because I was unable to determine the income from

7   the medical schools.

8   Q      Are you aware of any tax case, criminal tax case, that

9   is based on the U.S. Government owing a taxpayer a refund?

10  A      I am not -- I'm not sure about that.

11  Q      Would you consider the fact that the U.S. Government,

12  under your calculations, owes Dr. Hough a refund, as the fact

13  that Dr. Hough, under your calculations, did not make a

14  substantial -- or excuse me -- did not underreport her income

15  for that year, based on your calculations in Exhibit 30I?

16  A      She underreported her income for that year, but since I

17  could not make anything but an estimate of the income she

18  earned, I could only go with the numbers I was sure of,

19  and . . . .

20  Q      And that creates a refund to Dr. Hough; is that correct?

21  A      Yes.

22  Q      And if you can look at 2007, do you see that your number

23  of $2,429,118, do you see that as a tax owing?

24  A      Yes.

25  Q      If you look back at your May 14, 2013, report, do you

1  Q      If we can go back to 300, Page 2?

2         And with respect to that 988,997 number, you basically

3  said that the taxpayer had zero basis in the account; is that

4  correct?

5  A      I stated that Saba University School of Medicine, I

6  put -- I put zero basis in there because I had put all the

7  assets in the basis for Round Hill.

8  Q      And what did you consider the asset of the Saba School

9  of Medicine Foundation?

10 A      I put the assets in Round Hill.

11 Q      What did you consider the assets of the Saba School of

12 Medicine?

13 A      I have . . . I had . . . .  I don't understand what

14 you're asking me.

15 Q      Well, when you were describing basis, before, you said

16 that you include basically what the -- the person, the

17 taxpayer, has spent, his costs involved in creating, in this

18 case the medical school, in order to offset that against the

19 sales price; correct?

20 A      Correct.

21 Q      And the Saba School of Medicine had more than just land

22 and buildings; correct?

23 A      I don't know that.  All I know is what I attributed to

24 Round Hill.

25 Q      And you attributed the land and the buildings to Round

1    Hill; correct?

2    A      Right.  I . . . I did not see any assets, or basis, for

3    Saba University School of Medicine in the contract.

4    Q      Have you ever valued businesses before, as part of your

5    professional background?

6    A      No.

7    Q      Do you realize that businesses that have -- well, you

8    heard testimony, did you not, that one of the valuable things

9    that the Saba School of Medicine had was the affiliation

10   contracts with various hospitals in the United States and

11   Canada; correct?

12   A      Yes.

13   Q      And it had, also, something very valuable, which was

14   accreditations in all 50 United States, and Canada and Europe

15   as well; correct?

16   A      Yes.

17   Q      And to get the accreditations, you heard a lot of

18   testimony that a lot of hard work went into it over the years;

19   correct?

20   A      Correct.

21   Q      What did you value those accreditations at, in

22   determining the basis here?

23   A      I have no basis there.

24   Q      In fact, you heard Steven Rodgers say that one of the

25   things he considered very valuable about the Saba School of

1   Medicine and MUA was the fact that they had these hospital

2   affiliation contracts and the accreditations for the entire

3   United States, Canada, and Europe; correct?

4   A        Correct.

5   Q        What did you value the hospital affiliation contracts

6   as?

7   A        I don't have a value on that.

8   Q        And that's because you have no background in valuing a

9   business; is that correct?

10  A        I did not see any of those things listed in the contract

11  as assets.

12  Q        But you heard about them, didn't you?

13           You said that -- you sat here in trial and heard all

14  these people talk about the hospital affiliations, the

15  accreditations; correct?

16  A        Yes.

17  Q        Did you contact anyone else in the IRS, who has business

18  valuation experience, and ask them to help you out on this

19  project?

20  A        No.

21  Q        There are people in the IRS, though, you know, the

22  entire Internal Revenue Service, that have business valuation

23  experience; isn't that correct?

24  A        Correct.

25  Q        And once again, if David Fredrick and Patricia Hough

1    one last question?  I'm sorry.

2              THE COURT:  One.

3              MR. HOCHMAN:  One.  Thank you.

4    BY MR. HOCHMAN:

5    Q     You have no idea whether or not Dr. Patricia Hough knew

6    whether or not the exceptions applied; correct?

7    A     I don't know her knowledge of that.

8              MR. HOCHMAN:  Thank you.

9              No further questions, Your Honor.

10             THE COURT:  All right.

11             Ms. Kessler?

12             MS. KESSLER:  Your Honor, may I approach the witness,

13   just to make sure that the exhibit I need is up here?

14             THE COURT:  You may.

15             (Ms. Kessler examines multiple exhibits.)

16             MS. KESSLER:  I apologize, Your Honor.  We've got

17   quite a pile.

18                      REDIRECT EXAMINATION

19   BY MS. KESSLER:

20   Q     Good afternoon, Ms. Maurer.

21   A     Good afternoon.

22   Q     If you look at Exhibit 25-A, which I think I pulled out

23   of the file for you . . . it's in a folder at the top, I think?

24   A     Yes.

25   Q     What is this document?

 1    fact, stated during redirect that the titling of that document

 2    does not accurately represent what she believes the contents

 3    reflect.

 4            THE COURT:  You don't need to argue.  That's

 5    overruled.  Both sides can argue what the title should be.  The

 6    content, I think, is accurate, based upon her testimony.

 7            All right.  Now, in terms of additional witnesses?

 8            MS. KESSLER:  None.

 9            THE COURT:  All right.  What I'll do is have you rest

10    in front of the jury, send the jury for our afternoon recess,

11    then hear whatever motions you have.

12            In terms of your witnesses, are you all set?

13            MR. HOCHMAN:  Yes.  In fact, we have two that we need

14    to get on as soon as possible, because they ideally have a

15    plane reservation that we delayed.

16            THE COURT:  Would you like to reserve your Rule 29

17    motion and just proceed with the testimony?

18            MR. HOCHMAN:  Yes, Your Honor.

19            For the record, we fully intend to make a Rule 29

20    motion as soon as the government rests its case, and then we

21    can make the actual motion, if we could, at some later point,

22    prior to the conclusion of the defense case.

23            THE COURT:  Any objection?

24            MS. KESSLER:  No.  Thank you.

25            THE COURT:  All right.  We'll do that.

1            MR. HOCHMAN:  Thank you very much, Your Honor.

2            THE COURT:  I think we'll still recess after she

3    rests.

4            MR. HOCHMAN:  Okay.  Thank you.

5                         IN OPEN COURT

6            THE COURT:

7            MS. KESSLER:  Your Honor, the government rests.

8            THE COURT:  All right.  Ladies and gentlemen, that

9    concludes the testimony and the evidence from the government.

10           Before we turn the case over to the defendant, we'll

11   take a recess.  I know you were just standing, but we'll take a

12   formal recess for 15 minutes.

13           Please do not discuss the case among yourselves, or

14   allow anyone to discuss it with you or in your presence.

15           (At 2:47 PM, the jury was escorted from the

16       courtroom.)

17           THE COURT:  All right.  Mr. Hochman, your Rule 29

18   motion will be deemed to have been made now.  We'll hear

19   argument on it later.  And then we'll take 15 minutes, and you

20   can call your witnesses.

21           MR. HOCHMAN:  Thank you very much, Your Honor.

22           THE COURT:  All right.  Fifteen minutes.

23           (At 2:47 PM, court was recessed.)

24                         AFTER RECESS

25           (At 3:04 PM, court was reconvened.)

1        MR. HOCHMAN:  Your Honor, Mr. Saunders needs to raise

2   a brief issue before our first witness comes in, please.

3        THE COURT:  All right.  You may be seated.

4        MR. SAUNDERS:  Thank you, Your Honor.

5        Your Honor, yesterday, when character witness Alan

6   Gruber was testifying, Ms. Finley asked him, on

7   cross-examination, a question, saying:  "If it was proven that

8   Dr. Fredrick and Dr. Hough did conspire to defraud the Internal

9   Revenue Service by not reporting the sale of the medical

10  schools on their tax returns because they would be required to

11  do so, if that was proven, would that change your opinion?"

12       THE COURT:  You're not going by what's happened with

13  another witness, I assume.

14       MR. SAUNDERS:  I expect the same question might be

15  asked of our next two witnesses, and I want avoid compounding

16  the error, Your Honor.

17       THE COURT:  There was no objection, so there was no

18  error, but go ahead.

19       MR. SAUNDERS:  There was an objection, Your Honor, to

20  that question, at the time, and the Court overruled that

21  objection.  And this is on Page 196 of yesterday's transcript.

22       I've provided the Court, if the Court's had an

23  opportunity to look at it, with the Fifth Circuit, 1977 case of

24  U.S. versus Candelaria Gonzalez, 547 F.2d. 291, a 1977 Fifth

25  Circuit case.  It's finding authority in circuit.  And it deals

1   with a similar situation where the government asked, on

2   cross-examination of a defense character witness, in that case

3   it was a reputation opinion, whether that reputation would

4   change if the defendant were convicted.

5          And the Fifth Circuit in that case found that that

6   was such an improper question and that it reversed the

7   presumption of innocence in asking the witness to assume the

8   defendant's guilt, that it, in and of itself -- and it was

9   asked of two different witnesses over objection -- required

10  reversal.

11         So we would just ask, at this point, that any similar

12  questioning of any further character witnesses be precluded.

13  And if the Court agrees, we will ask the Court to provide a

14  curative instruction to the jury regarding the question and

15  answer of Dr. Gruber yesterday on that subject.

16         THE COURT:  You can ask.  It's a different situation.

17  The question yesterday was the witness's personal opinion, not

18  his reputation in the community.  And he gave what his personal

19  opinion was.  That's different than the case you've just given

20  me.

21         MR. SAUNDERS:  I think in both situations, Your

22  Honor, it asks the witness to assume the defendant's guilt, and

23  reverses the presumption of innocence; and I think that was

24  what concerned the Candelaria Gonzalez court, that the question

25  itself requested a presumption of guilt, whether it's offered

1    in the form of reputation or opinion testimony, that assumption

2    in a criminal case before the case has been submitted to the

3    jury is improper.

4                THE COURT:  I disagree.

5                All right.  Go ahead.

6                Ready; both sides ready?

7                MR. HOCHMAN:  Yes, Your Honor.

8                MR. SAUNDERS:  Yes, we are ready.

9                THE COURT:  Have the jury step in, please.

10               Hang on a second.  I'm sorry.  I'm sitting here.  I

11   have two notes.

12               They're basically about scheduling issues.  I know

13   we've got some time concerns.  So maybe we should discuss them

14   afterwards?

15               MR. HOCHMAN:  That would be great, Your Honor.

16               THE COURT:  All right.

17               MR. HOCHMAN:  Thank you.

18               THE COURT:  Don't let me forget, please.

19               MR. HOCHMAN:  I'll make a note right now.

20               THE COURT:  Make a note not to forget the note.

21               Have the jury step in, please.

22               (At 3:08 PM, the jury was escorted into the

23          courtroom.)

24               THE COURT:  Mr. Saunders?  You may proceed.

25               MR. SAUNDERS:  Thank you, Your Honor.

1    A       Yes.

2    Q       Two to three times a year?

3    A       Yes.

4    Q       Now, you said, when she asked you to join, you

5    understood she was displeased with the way that the

6    foundation's assets were being spent; is that right?

7    A       Yes.

8    Q       Did you, once you joined the board, join with her in

9    opposing the way that the foundation was going through its

10   assets?

11   A       Yes.

12   Q       Is it fair to say, based on your interactions with

13   Dr. Hough, that she is fiscally conservative?

14   A       Very.

15   Q       Have you ever known her, in the 49 years that you have

16   known her, to be extravagant or to act like she has a lot of

17   money?

18   A       No.

19   Q       Have you ever known her to act as a person who has

20   millions of dollars squirreled away in secret bank accounts?

21   A       No.

22   Q       During all the years that you have known her, some

23   50 years, with a break in there, have you ever had reason to

24   doubt Dr. Hough's integrity?

25   A       No.  Absolutely not.

1   Q       Have you ever known her to take shortcuts, or bend the

2   rules, or violate the law?

3   A       Quite the contrary.

4   Q       What do you mean?

5   A       Well, when she asked me to join the board of directors,

6   she had this sense that things weren't copasetic, that

7   something was not being done according to Hoyle, and . . . said

8   to me, "You'll know the questions to ask.  I don't."

9   Q       Have you had the opportunity, in the 49 years that you

10  have known Dr. Hough, to form an opinion as to her character

11  for truthfulness and honesty?

12  A       Absolutely.

13  Q       And what is it?

14  A       Top drawer.  No hesitation.  No reservation.  Absolute

15  top drawer.

16  Q       Now, it's been part of your job for more than three

17  decades to judge people's character and truthfulness; is that

18  right?

19  A       Yes.

20  Q       And has your opinion of Dr. Hough's character for

21  honesty been consistent across all the years that you've known

22  her?

23  A       Yes.

24  Q       Now, let me ask you if your opinion would change -- let

25  me withdraw that.

1          Have you reviewed the indictment in this case?

2   A     No.

3   Q     Do you know what Dr. Hough is charged with?

4   A     You gave me about a seven-word synopsis, and that's what

5   I know.

6   Q     That's about it.

7   A     That's about it.  I started to look it up, and I

8   thought:  No, I better not.

9   Q     Let me ask, now, if your opinion of her character would

10  change if I were to tell you that the government is alleging,

11  in this case, that Dr. Hough took millions of dollars from the

12  foundation that ran the medical schools that she was involved

13  with in the Caribbean; converted those monies to her own use;

14  hid them in secret Swiss bank accounts under her name, for her

15  own use and benefit; failed to declare that money on her tax

16  returns; and conspired with her husband and others to defraud

17  the United States and the Internal Revenue Service.  Let me ask

18  you to assume that that's what the government is alleging in

19  this case.

20  A     Okay.

21  Q     Does the nature of those allegations change your

22  opinion?

23  A     No.

24  Q     Why not?

25  A     Not at all.  I wouldn't be here if it changed my

1  opinion.

2  Q     Why?

3  A     With no disrespect to the Judge, I was a judge a heck of

4  a long time, and -- and -- and I value my word, and I don't

5  give it lightly.  And if I had any hesitation, I wouldn't be

6  here.

7  Q     Well, what about the allegations that I've told you of

8  these serious breaches and violations, and taking money, and

9  concealing money, and failing to declare it, and conspiring to

10 defraud the IRS, does knowing that those are the nature of the

11 allegations, in more detail than you've known it before, change

12 your opinion about whether she's an honest and truthful person?

13 A     Not in the least.

14 Q     And why not?

15 A     It's just not the Pat Hough that I've known for all

16 these years, that I went to a tiny college with, and I would

17 see from year to year, over the years, and then over the last

18 five or six years become acquainted with again.  That's just

19 not that person.

20 Q     Would it be consistent with your knowledge of

21 Dr. Hough's personality and character for her to have relied on

22 others for guidance in connection with financial matters

23 relating to the schools that she was involved with?

24 A     I would be surprised if she didn't.  I mean -- I'm

25 sorry.  Absolutely yes, that is in keeping with her character.

1    the indictment in this case.

2    A       Yes, ma'am.

3    Q       And have you heard any of the evidence that's been

4    presented in this case?

5    A       No.

6    Q       And you don't know what the jury has heard.

7    A       Correct.

8    Q       And all you've heard is the -- I think Mr. Saunders said

9    it was one or two sentences that he described what he believed

10   the allegations were, to you.

11   A       Yes, ma'am; right.

12   Q       And, as a judge, you would want to consider all of the

13   evidence before forming an opinion, would you not?

14   A       Well, of course.

15   Q       And so you would want to keep an open mind.

16   A       Sure.

17   Q       And so it's possible, if you heard all of the evidence,

18   that you might change your opinion about whether Dr. Hough is

19   honest or not.

20           MR. SAUNDERS:  Objection, speculation, Your Honor,

21   and foundation.

22           THE COURT:  Overruled.

23           THE WITNESS:  Well, sure.

24           MS. FINLEY:  No further questions, Your Honor.

25           THE COURT:  Mr. Saunders, any redirect?

1    in 1999, so after I became -- I assumed the position of

2    governor of the island.

3    Q      Did you meet her husband, Dr. David Fredrick, at the

4    same time?

5    A      Correct.

6    Q      And over the years that you were on Saba as the

7    governor, did you come to develop a relationship with them?

8    A      Yes.

9    Q      Would they spend time with you when they were on the

10   island?

11   A      Yes.

12   Q      In your role as governor, who did you understand owned

13   the Saba School of Medicine?

14             MS. FINLEY:  Object . . . .  I withdraw.

15             THE COURT:  You may answer.

16             THE WITNESS:  The Saba School of Medicine is . . .

17   the property owned by the Saba School of Medicine Foundation.

18   BY MR. SAUNDERS:

19   Q      Okay.  And was the Saba School of Medicine Foundation a

20   Netherlands Antilles foundation?

21   A      Correct.

22   Q      Chartered under Netherlands Antilles law?

23   A      Yes.

24   Q      And who did you understand owned that foundation?

25   A      There is no such thing as an owner of a foundation.  A

1    foundation is a legal entity that has no transferable shares.

2    Q      And is that true for every foundation under Netherlands

3    Antilles law, to your knowledge?

4    A      Correct.

5    Q      Does Netherlands Antilles law permit a foundation to be

6    owned by an individual?

7    A      No.  Not at the time.

8    Q      And have there been some changes at some point?

9    A      There have been some changes, but the changes have been

10   recent, and I do not carry . . . have enough knowledge to tell

11   you anything sensible about it.

12   Q      But at any rate, at the time that the Saba Foundation

13   was formed, that was prior to any of these changes; correct?

14   A      Correct.

15   Q      So that is a foundation that, by definition, cannot be

16   owned by any individual?

17   A      Correct.

18   Q      So if it's not owned, who is a foundation, under

19   Netherlands Antilles law, governed, or run by?

20   A      It is governed by its own statutes, the bylaws of the

21   foundation, which stipulates what purpose the funds may be used

22   for.

23   Q      And the bylaws don't actually make decisions.  Who makes

24   the decision on behalf of the foundation?

25   A      The decision maker is the board of the foundation.

1   Q      The board of directors?

2   A      The board of directors, yes.

3   Q      So is it correct that a Netherlands Antilles foundation

4   can be managed and directed by individuals, but not owned by

5   individuals?

6   A      Correct.

7   Q      And does the fact that an individual, in directing or

8   managing the foundation, or acting on the foundation's behalf,

9   makes decisions in connection with the foundation's financial

10  affairs, transform the foundation's assets into that

11  individual's assets?

12  A      No, it does not.

13  Q      Were you aware -- put back up, please, 117.

14         Were you aware of the sale of this Round Hill property

15  to The Foundation was taking place?

16  A      Yes.

17  Q      And I'm sorry, was it your understanding that it was the

18  Foundation that was buying this property?

19  A      Yes.

20  Q      Was the government involved, and encouraging The

21  Foundation to buy the Round Hill property?

22  A      Yes.

23  Q      How did that sale come about?

24  A      That sale came about after November of 1999, when the

25  island was hit by a hurricane.  We had encouraged the . . . the