```
            UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
                FORT MYERS DIVISION

        CASE NO.:  2:13-CR-72-FtM-29UAM
```

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                                Fort Myers, Florida

vs.                                                October 21, 2013

PATRICIA LYNN HOUGH,                    9:00 a.m.

        Defendant.

```
        TRANSCRIPT OF JURY TRIAL, DAY NINE

    HELD BEFORE THE HONORABLE JOHN E. STEELE
       UNITED STATES DISTRICT COURT JUDGE

             A P P E A R A N C E S
```

FOR THE UNITED STATES:    U.S. Department of Justice
                                  Tax Division
                             P.O. Box 813
                             Washington, DC  20044
                             BY:  CARYN FINLEY, ESQ.

                             U.S. Department of Justice
                                Tax Division
                             Suite 7334
                             601 D Street NW
                             Washington, DC
                             BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

1    THEREUPON, the above-entitled case having been called
2  to order, the following proceedings were held herein,
3  to-wit:
4                          - - -
5           THE COURT:  Good morning, everyone.
6           MR. HOCHMAN:  Good morning, Your Honor.
7           MS. FINLEY:  Good morning, Your Honor.
8           THE COURT:  All right.  Mr. Hochman?
9           MR. HOCHMAN:  Thank you, Your Honor.
10          Your Honor, we would move, under Rule 29, for a
11 judgment of acquittal on all counts charged against Dr. Hough
12 in this case.  We actually, Your Honor, will submit, based on
13 the lack of government evidence to date to establish each and
14 every one of the elements for a conspiracy, and each and every
15 one of the elements for a 26 United States Code Section 72.061
16 charge.
17          And we will submit on that basis, Your Honor.
18          THE COURT:  All right.
19          MR. HOCHMAN:  The second motion -- or the second
20 renewable motion we would like to bring to the Court's
21 attention is the motion dealing with the co-conspirator
22 statements and exclusion.
23          The government's case is now in, Your Honor.  I think
24 what's come out, particularly -- and I will focus on two
25 individuals, Dieter Luetolf and Beda Singenberger, as well as

1   check the box for having a foreign account.
2           THE COURT:  So what's the total amount for Schedule--
3   I'm sorry -- for Line 22, that you assert should have been
4   there, should have been added to the number that was there?
5           MS. FINLEY:  Sorry, Your Honor.  Well, I'm not sure I
6   have exactly done the math, but if you add up the taxable
7   interest, the ordinary dividends, and capital gain, that would
8   go into Line 22.  Those are all above the Line 22.
9           THE COURT:  You are looking at it, I'm not.
10          Is it a hundred dollars or a hundred thousand
11  dollars?
12          MS. FINLEY:  It's almost $240,000.
13          THE COURT:  Okay.  And then, for Count 7, which is
14  for year 2006, you've got the number wrong on the indictment,
15  but -- for Line 22, but beyond that, what's the amount that you
16  claim should be there that's not?
17          MS. FINLEY:  With respect to Line 26, given that the
18  government had changed the numbers based on the evidence that
19  came out at trial, there is unreported taxable interest of
20  $28,000; but, due to the loss, the total income line would be
21  less.
22          However, the government would argue that there is
23  evidence that there was additional income not reported from the
24  profits.  But if the Court were not to accept that, then with
25  respect to the unreported -- the total income line, it would be

1   substantially less.  The government would argue that that is
2   still material because the IRS needs to rely on information
3   provided by the taxpayer in order to accurately compute the tax
4   due and owing.
5            But alternatively, in 2006, they had multiple bank
6   accounts that they had signature authority and interest in, on
7   Schedule B, and the jury could find them guilty with respect to
8   that prong of the 720.61 count.
9            THE COURT:  Let me go back to the beginning, what I
10  think you said.
11           MS. FINLEY:  Sure.
12           THE COURT:  The indictment has . . . the amount for
13  Line 22 is $46,245.  I think that is a actually wrong figure
14  for that line.
15           MS. FINLEY:  If I may get the notebook?
16           THE COURT:  Sure.
17           (Ms. Finley reviews various documents.)
18           MS. FINLEY:  Yes, Your Honor.  On the tax return it's
19  $46,554, on the total income line.  So the indictment, I guess,
20  is off by $3,000.
21           THE COURT:  It looks like you just put the number in
22  Line 37, instead of the number in Line 22?
23           MS. FINLEY:  Yeah.
24           THE COURT:  But in any event, I guess you need to
25  tell me . . . again, your view of the evidence as it came in

```
 1   establishes that the 46,000 and change, whatever it is, is too
 2   high, and that the actual total income should have been lower
 3   than that.
 4           MS. FINLEY:  That's correct.
 5           THE COURT:  And I understand you still think the
 6   count survives because of the foreign accounts.
 7           But with regard to the -- this aspect of the false
 8   statement, how does this portion survive that testimony?
 9           MS. FINLEY:  We would argue that the items that go
10   into that, even on here, the $28,000, that that goes into
11   Line 22, and so even though Line 22 is now a negative number,
12   that that is information that is material to the IRS because it
13   relies on this to compute tax due and owing.  So based on that,
14   we would argue that it should survive.
15           THE COURT:  That's not what you charged.
16           MS. FINLEY:  Additionally, Your Honor, if you look
17   at . . . .
18           THE COURT:  I mean, if you go to the body of the
19   counts, it says you allege that she believed it was
20   substantially greater --
21           MS. FINLEY:  Um-hum.
22           THE COURT:  -- and, as your evidence is, it was
23   actually substantially less.
24           MS. FINLEY:  Well, I think the government doesn't
25   have to allege -- and since there's no requirement that we
```

1  prove a tax due and owing, we have presented evidence that the
2  jury could find that it's substantially greater because the
3  profits of the school, there's been testimony and financials
4  that while, for a tax computation, Ms. Maurer might not have
5  felt comfortable including, she did testify that there was
6  evidence from numerous witnesses that the schools were
7  extremely profitable, and if the jury credits the government's
8  theory that this is their school, then the profits of the
9  school should have been reported on other income or on capital
10 gain, and that would have --
11             THE COURT: That's not what your expert witness said.
12             MS. FINLEY: I'm sorry?
13             THE COURT: That's not what your expert witness said,
14 is it.
15             MS. FINLEY: She said there were profits that should
16 have been reported.
17             THE COURT: She still comes up with a negative number
18 on the bottom line.
19             MS. FINLEY: Well, she did not want to commit to the
20 exact number because she felt, for her -- for a tax
21 computation, but that she still believed that there were
22 unreported profits.
23             THE COURT: Yeah. I mean, it still has to be . . . .
24 I guess I really don't understand how an indictment alleges
25 that $46,000, roughly, was a number that was false because the

 1   taxpayer believed there was substantially greater amount of
 2   income.
 3           Your evidence is that the income was actually a
 4   negative number, which is what the witness -- your witness was
 5   comfortable saying.  And then she's less comfortable saying
 6   there's other free floating money out there that should have
 7   been attached and declared, but wasn't.
 8           But isn't that what she changed part of the report
 9   on?
10           MS. FINLEY:  Well, she changed part of her report
11   because the -- based on the evidence that came out at trial,
12   the evidence supported that they did own The Foundation.  And
13   so she removed the two and a half million dollars in income for
14   2006 because, otherwise, not doing so would be in essence
15   double counting, so she felt that . . . including the profits,
16   while she was confident of the diversion out of the school, she
17   felt not less confident that there were not profits, but to
18   include it on this computation.
19           Again, I don't think that the computation necessarily
20   binds the government in the proof that it has to present, and
21   that there is evidence that there was an additional income in
22   those years, both in the profits from the school as well as the
23   interest income from the Saba account and the MUA account, that
24   she just did not do a computation.
25           I think that the jury could -- the bank records are

1  in evidence.  There is evidence to show that there was interest
2  income in those accounts, and that that was not reported on the
3  return.
4          THE COURT:  So you're going to agree with Mr. Hochman
5  in your rebuttal that your agent got it wrong.
6          MS. FINLEY:  No.
7          THE COURT:  Well, she clearly got it wrong, it is
8  just a matter of which wrong you want to pick.
9          MS. FINLEY:  No.  I think she got it right under both
10 circumstances.  She had not had . . . received the evidence
11 that -- the same evidence that the jury had, because of the
12 deCastro letter.  And so, at the time that she did the draft
13 computations, she determined that their diversion of the
14 5 million in one year, and the 3 million or so in 2006 -- or
15 excuse me, 2006 -- was income to them.  And to include that,
16 based on the computation that she did here, would be in essence
17 double counting.  And so they are actually consistent
18 arguments.
19         THE COURT:  They're not consistent with what you've
20 indicted as to that count.  You've indicted 46,000 was
21 substantially less than the real income was, now you have
22 testimony that the real income was a negative number, and you
23 have a theory, unsupported by your witness, that there was
24 other income that should have been declared, kind of free
25 floating, and I guess at some point you will tell the jury what

1  that is, but . . . .   How can how can that possibly be enough
2  to get to the jury?
3          MS. FINLEY:  Well, I think, Your Honor, again, the
4  government believes that it has presented evidence that there
5  are numerous items in -- above Line 22, that go into Line 22,
6  that they can determine that there was additional evidence,
7  even if it's not on the revenue agent's RAR.
8          THE COURT:  So tell me what it is.
9          MS. FINLEY:  Again, I think it's the profits, that
10 there are financials from 2006 that show net profits in the
11 millions of dollars, and that the jury could find that those
12 profits, based on the government's argument that this is their
13 school, should have been reported on . . . you know, the
14 capital gain or the other income line, and that that would have
15 made Line 22 substantially greater than the 46,000.  Because if
16 you added the 2 million, or . . . I think it was 2 million or
17 so on each school, onto the tax return, that would make Line 22
18 substantially greater.  And she knew that if the jury credits
19 that she -- this was her school, she knew it was her school,
20 then she knew that the profits should have been reported on her
21 return.
22         THE COURT:  What are your numbers for eight and nine,
23 in terms of the amount that you claim should have been added to
24 the . . . Line 22, in the 2007 and 2008 returns?
25         MS. FINLEY:  For 2007 return, there is interest

1     MS. FINLEY: No. I think it's one portion of it. I
2  think additionally, Your Honor, the . . . the underlying tenor
3  that both Mr. Singenberger and Mr. Luetolf are on e-mails where
4  the discussions are had about non-disclosing to the IRS, that
5  Dr. Hough and Dr. Fredrick's desire not to disclose those to
6  the IRS, shows that they know the objective of the conspiracy
7  is to conceal that from the IRS.
8     THE COURT: You are going to need to show me those
9  e-mails, because I don't remember talk about the IRS in
10 particular.
11    MS. FINLEY: Well, from disclosure to the U.S.
12    THE COURT: Well, that's different. I mean, it's one
13 thing to want to keep your assets private for whatever reasons.
14 It's something else if -- I mean, if there's an e-mail saying,
15 "I want to do this because I don't want to pay taxes to the
16 United States," or, "because I want to cheat my government," or
17 something, that's different. But I don't remember anything
18 like that. And as you pointed out, it's not likely to have
19 that put in writing, but . . . .
20    MS. FINLEY: And I don't mean to say that it says
21 that they are trying to cheat the IRS. I think that the
22 various e-mails are referencing the changes in banking policies
23 with the United States, for disclosure to the United States.
24 And I don't believe that the government would argue
25 circumstantially that, because of the forms that they're

1   filling out with respect to reporting to the IRS, and actually
2   opening the accounts, and Dr. Fredricks does e-mail
3   Mr. Luetolf, and says he's trying to find out what the policies
4   are with respect to disclosure once he moves his information to
5   Switzerland --
6           MR. HOCHMAN: I'm sorry, I didn't catch that last.
7           MS. FINLEY: Once he moves his accounts to
8   Switzerland, he's e-mailing -- I think in 2003, he e-mails
9   Mr. Luetolf to ask what the policies are with Switzerland for
10  disclosure to the United States.
11          And given the way that they're moving money around,
12  his discussions about, "our money, our account, I move it from
13  this account to this account, does my name have to be on it,"
14  that is evidence that . . . the concealment is a purpose of the
15  conspiracy, in concealing it from the United States Government
16  and the IRS.
17          And with respect to Mr. Singenberger, he does provide
18  these nominee shareholders, he's signing things that says he's
19  a director, that he's giving permission, and all he is, is a
20  rubber stamp. And he knows that these things are being used to
21  purchase assets and to continue to conceal their identities.
22          He's on e-mails where the four of them are not clear
23  on how Dr. Fredrick is supposed to ask for money, now that
24  Mr. Singenberger is now involved, showing that these people are
25  not anything more than rubber stamps in order to assist them in

```
 1    concealing their assets from the United States.
 2              And then certainly after 2008, any steps that
 3    Mr. Luetolf and Mr. Singenberger take to assist Dr. Fredrick
 4    and Dr. Hough, at that point, the . . . the jig is sort of up
 5    with respect to UBS, and with --
 6              THE COURT:  Say that sentence again?
 7              MS. FINLEY:  At the point after 2008, when the
 8    UBS . . . and certainly 2009, when UBS enters into the
 9    voluntary disclosure, I am not imputing that necessarily means
10    that what they were doing before, but certainly at that point
11    they understand what U.S. taxpayers were doing, that . . . that
12    there's allegations that that's what they were doing, and they
13    continue to assist Dr. Fredrick and Dr. Hough with concealing
14    the assets.  They continue to sign things for them.
15              Mr. Singenberger, into 2011, is still providing
16    minutes and things, when they need to continue to conceal the
17    assets from the IRS, by saying that Ample Dynamic owns
18    something, or pointing Dr. Fredrick as director.  When that
19    doesn't work, then they appoint Ms. Whitley as a vice-president
20    so that she can sign.  All these things, show that there's
21    really no sub -- the substance is that it is really
22    Dr. Fredrick, there is no form other than a stamp.
23              THE COURT:  Even if all that is true, how does that
24    relate to the other two alleged co-conspirators' knowledge that
25    this is a tax fraud conspiracy, as opposed to some other kind
```

1  of conspiracy?
2          MS. FINLEY: Other than the knowledge that, as the
3  government has already talked about from the evidence, with
4  respect to the way that things are described, and the things
5  that they're discussing, that would be the government's
6  evidence, that they understand the purpose is to conceal from
7  the IRS.
8          THE COURT: All right. Thank you.
9          All right. The Court's going to deny the Rule 29
10 motion as to the conspiracy count, which is Count 1. The Court
11 finds that, viewing the evidence in the light most favorable to
12 the government, a reasonable jury could find the defendant
13 guilty of the conspiracy alleged in Count 1.
14         The Court is not convinced by a preponderance of the
15 evidence that Mr. Luetolf or Mr. Singenberger were
16 co-conspirators in the conspiracy alleged in Count 1, but the
17 Court is satisfied as to Defendant Hough and the absent
18 Defendant Fredrick.
19         As to the substantive counts, the Court is going to
20 deny the Rule 29 motion as to Counts 6, 8, and 9, and the Court
21 is going to take the matter under advisement as to Count 7.
22 The Court finds as to Counts 6, 8, and 9, that a reasonable
23 jury could indeed find that the defendant made the false
24 statements alleged in the indictment.
25         With regard to Count 7, the Court would find that a

Case 2:13-cr-00072-SPC-NPM   Document 139-8   Filed 11/22/13   Page 14 of 19 PageID 4056

1   reasonable jury could find the false statement based upon the
2   second allegation; that is, with the foreign accounts.  The
3   Court wants to think a little bit more about the first part of
4   that; that is, the Line 22 income.
5           All right.  We're running a little bit late.
6           What's your witness situation?
7           MR. HOCHMAN:  Your Honor, given the Court's finding
8   that there is not a preponderance of evidence established that
9   Mr. Singenberger and Mr. Luetolf were part of this conspiracy,
10  we would ask the Court then to strike all co-conspirator
11  statements that were related to Mr. Luetolf and
12  Mr. Singenberger that otherwise don't have Mr. Fredrick, as
13  part of -- or Dr. Hough as part of that communication.
14          Examples of that, Your Honor, would be those CAWB,
15  those client work bench notes, that Mr. Luetolf is taking, that
16  we have been objecting to, that don't have a communication
17  directly with Dr. Fredrick.  He's not sending them to
18  Dr. Fredrick, they're just sitting inside the UBS files.  We
19  believe -- for a variety of reasons we believe them
20  untrustworthy; but in addition, if he's not part of the
21  conspiracy and the government's best theory is that, if we had
22  a to guess as to who wrote those notes it was Mr. Luetolf, and
23  they are not part of the conspiracy, we'd ask the Court to
24  strike those type of communications that we already objected
25  to.

1   Q       Sure.  Early 2005, location of the meeting is Boston; is
2   that correct?
3   A       Yes.
4   Q       So focus on that meeting, early 2005.
5           I think you said there were three people at the meeting:
6   Yourself, Beda Singenberger, and Dr. Fredrick; is that correct?
7   A       Yes.
8   Q       And did you discuss what the purpose of that meeting was
9   to be with Dr. Fredrick?
10  A       Yeah.  There was a gigantic lawsuit that was coming --
11  or might have been filed by then -- and it was asset
12  protection . . . for the schools --
13  Q       When you say, "gigantic lawsuit," I think we've heard
14  some testimony about a $200 million lawsuit that Saint
15  Matthew's had filed against the Saba School of Medicine
16  Foundation.
17          Is that the lawsuit that you're referring to?is that
18  true?
19  A       Yes.
20  Q       And with respect to that meeting, do you know -- did you
21  ever speak to Dieter Luetolf about Beda Singenberger?
22  A       No.
23  Q       Do you know if Dr. Fredrick spoke to Dieter Luetolf
24  about Beda Singenberger?
25  A       He told me he did.

1    MR. HOCHMAN: If we could focus on Part 3?
2  BY MR. HOCHMAN:
3  Q    And I think you said earlier that Mr. Murtha never
4  showed you, and pulled out Schedule B, Part 3, and discussed it
5  with you.
6       Do you recall that?
7  A    Yes. That's what he testified to, and that's what I
8  recall.
9  Q    Did you even know, prior to this case, you know, prior
10 to the onset of this criminal investigation, that there was a
11 Schedule B, Part 3, in your tax return?
12 A    I really wasn't aware of it, like discretely as a
13 Schedule B.
14 Q    Did you ever read Part 3, Schedule B, of your tax return
15 before you signed it?
16 A    Well, I mean, it has interest, I understand interest,
17 so, you know, I would glance at it.
18 Q    And with respect to the words, and if I could focus on
19 the words, in the very first line it says: "You must complete
20 this part if you" -- and then there is -- it says B, "had a
21 foreign account."
22      What did you understand the words, assuming you had ever
23 focused on them, "had a foreign account," to mean?
24 A    I mean, that would mean that I had a -- I put my money
25 in another country.

1   Q    So your personal funds in a foreign account?
2   A    Yes.
3   Q    Did you ever have your personal funds in a foreign
4   account?
5   A    No.
6   Q    So under the terms of Schedule B, you never even get to
7   the next questions; isn't that correct?
8   A    Yes.
9   Q    Let's get to the next question, just to look at it.
10       MR. HOCHMAN:  The next question, if we could
11  highlight the next question, it might be easier to see,
12  Question 7A.
13  BY MR. HOCHMAN:
14  Q    It says:  "At any time during 2005, did you have an
15  interest in or, signature or other authority over, a financial
16  account in a foreign country."
17       Let's start with the words, "interest in."
18       Do you see any definitions of the words, "interest in,"
19  anywhere in your tax return?
20  A    No.
21  Q    Do you see what it means to say, "other authority,"
22  anywhere -- excuse me, the definition of, "other authority,"
23  anywhere in your tax return?
24  A    No.
25  Q    And respect to signature, again, I think you said before

1  that Mr. Murtha never discussed with you just having signature
2  authority over an account; is that correct?
3  A    Yes; that's correct.
4  Q    Now, if you go to that next line, where it says, "See
5  Page B-2 for exceptions"; do you see that?
6  A    Yes.
7  Q    Had you ever focused on this "See Page B-2 for
8  exceptions" line before?
9  A    No.
10 Q    And assuming somehow you had focused on, "See Page B-2,"
11 do you see a Page B-2 in connection with your tax return?
12 A    The form; no.
13 Q    Do you even know where to look for Page B-2?
14 A    No.
15 Q    And it says there that there are exceptions that are
16 located in B-2.
17      Do you know what any of those exceptions are, such as
18 the answer, "no," would be the correct answer?
19 A    No, I don't.
20 Q    And did Mr. Murtha, or for that matter anyone else,
21 prior to this criminal investigation, ever discuss with you
22 what the exceptions were with respect to Question 7A, Part 3,
23 of Schedule B?
24 A    No.
25 Q    It also references filing requirements for foreign

```
 1   TDF90-22.1.
 2           Do you see that as well?
 3   A       Yes.
 4   Q       Do you know what a Form -- prior to this case, do you
 5   know what a Form TDF90-22.1 is?
 6   A       No, I never heard of it.
 7   Q       Did Mr. Murtha ever show you Form TDF90-22.1?
 8   A       No, I never saw this form.
 9   Q       Did Mr. Murtha ever show you the 240 pages of
10   instructions that go along with your Form 1040?
11   A       No.
12   Q       Did you ever, on your own, go ahead and pull out the
13   instructions that go along with your 1040?
14   A       No.
15   Q       Did you ever see anywhere on this return, at the back of
16   it, that the instructions for your 1040 are included?
17   A       No.
18   Q       And that would be true for all your returns; correct?
19   A       Yes.
20   Q       Did you know that the Form TDF90-22.1 was a form that
21   you don't even include with your tax return?
22   A       No.
23   Q       Did you know that the Form TDF90-22.1 is not a tax form,
24   but a disclosure form; did you know that?
25   A       No, I didn't.
```