```
            UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
                FORT MYERS DIVISION

         CASE NO.:  2:13-CR-72-FtM-29UAM
```

THE UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                 Fort Myers, Florida
                                     October 22, 2013

PATRICIA LYNN HOUGH,           9:00 a.m.

      Defendant.

```
          TRANSCRIPT OF JURY TRIAL, DAY 10

    HELD BEFORE THE HONORABLE JOHN E. STEELE
       UNITED STATES DISTRICT COURT JUDGE

             A P P E A R A N C E S
```

FOR THE UNITED STATES:   U.S. Department of Justice
                               Tax Division
                          P.O. Box 813
                          Washington, DC  20044
                          BY:  CARYN FINLEY, ESQ.

                          U.S. Department of Justice
                             Tax Division
                          Suite 7334
                          601 D Street NW
                          Washington, DC
                          BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

1   Q     At the outset, were you given an assignment to do your
2   best to find out whether the Saba Foundation, that's the Saba
3   School of Medicine Foundation, received and still has the
4   proceeds from the sale of the schools in April, 2007?
5   A     That was the initial scope of work.
6   Q     And based on your review of the government's discovery
7   and the government's investigation in this case, did you see
8   any indication that the government pursued that inquiry after
9   April, 2007?
10            MS. KESSLER:  Objection.  Based on our discussion at
11  sidebar, Your Honor.
12            THE COURT:  You're going to need to come to sidebar
13  again.
14            MR. HOCHMAN:  You know what, Your Honor?  I'll
15  actually withdraw that question.  I'll just go to my next
16  question.
17            THE COURT:  Okay.
18  BY MR. HOCHMAN:
19  Q     Now, you heard that Special Agent Maurer worked on her
20  investigation for four and a half years; is that correct?
21  A     I heard that.
22  Q     How long did you have to fulfill your task?
23  A     Well, I've had two months since we were engaged.  But I
24  actually had less time than that, because I do have other
25  things.  But approximately -- less than two months, maybe five

1  to six weeks.
2  Q    How did you go about fulfilling that task?
3  A    Going back on my experience, of course, you always want
4  to go to the source, you always want to go to what, at least
5  one would perceive to be the very best source of information.
6  So in that regard I thought that the Foundation, or people
7  associated with The Foundation, people associated with the
8  foreign bank accounts, might be a good place to start.  So
9  that's what I did.
10 Q    And would the information provided by the Saba School of
11 Medicine Foundation be the type of information that experts in
12 your field would reasonably rely on, in forming the opinion of
13 whether or not the Saba School of Medicine Foundation received
14 and still has the proceeds from the April, 2007 sale?
15 A    Absolutely.
16 Q    Who in The Foundation did you contact?
17 A    In The Foundation, the Saba School of Medicine
18 Foundation, I contacted a gentleman by the name of Florencio
19 Montenegro.
20 Q    And why did you contact that gentleman?
21 A    He's still on the board, and based on the documents that
22 I reviewed and the information that I had on hand at that time,
23 I decided that he would be someone that would probably have
24 direct knowledge of this information.
25 Q    Is he someone whose name you have seen here on documents

```
 1   at trial?
 2   A     Yes.
 3              MR. HOCHMAN:  May I present the witness with
 4   Exhibit 16C, Your Honor?
 5              THE COURT:  You may.
 6              MR. HOCHMAN:  Thank you.
 7              THE COURT:  This is Government's 16C?
 8              MR. HOCHMAN:  Yes, I'm sorry, Government's.
 9              16C.  And if we can show it on the screen, Your
10   Honor?
11              THE COURT:  You may.
12              MR. HOCHMAN:  Thank you.
13              (An exhibit was projected onto the projector screen.)
14   BY MR. HOCHMAN:
15   Q     And Government's 16C, do you see the letterhead, it says
16   the Saba School of Medicine Foundation?
17   A     I do.
18   Q     And the date on this letter is March 1st, 2011?
19   A     Correct.
20   Q     And if we could focus on the handwriting at the bottom?
21         Do you see the gentleman's name in the right-hand
22   corner; who is that?
23   A     It states:  "Mr. Florencio Montenegro, Board Member."
24   Q     A board member of the Saba School of Medicine
25   Foundation?
```

1  A      Based on this document, yes.
2  Q      And you heard the testimony of Antoine Solagnier, didn't
3  you?
4  A      I did.
5  Q      You heard him testify that he is still working currently
6  with Mr. Montenegro, on behalf of the Saba Foundation, with
7  respect to an egg farm project in which the Saba Foundation is
8  doing work in Guatemala; is that correct?
9  A      Yes.  I heard him testify so.
10 Q      Did you actually speak with Mr. Montenegro?
11 A      I did.
12 Q      Was it especially difficult to reach him?
13 A      A phone call away.
14 Q      And what date do you recall that you spoke with him?
15 A      I spoke with him September 26th of this year.
16 Q      What country code did you call him at?
17 A      If I may refer to my notes real quickly to that?  But I
18 believe it's 504 -- 502 area code.
19 Q      Were you able to ascertain what country that was for?
20 A      Yes.  It's for Guatemala.
21 Q      Prior to speaking with him, did you receive a notarized
22 document?
23 A      I did.
24         MR. HOCHMAN:  May I present what's been marked for
25 identification as Defense Exhibit 141?

1  BY MR. HOCHMAN:
2  Q    And if you could take a look at Defense Exhibit 141, is
3  this a document that you received from Mr. Montenegro?
4  A    It is.
5  Q    And is it a notarized document?
6  A    It is.
7  Q    Does this document, in turn, refer to another document,
8  of a prior certification, in November, 2009?
9  A    It does.
10 Q    And if you can look at what's been marked for
11 identification as Defense Exhibit 100?
12 A    I have it.
13 Q    And is Defense Exhibit 100, the November, 2009,
14 certification referenced by the -- by Exhibit 141?
15 A    I have had a chance to review this document before that;
16 and, yes, it is, it's the same document that's referenced in
17 the letter I received.
18 Q    And the letter you received, what's the date on that
19 letter?
20 A    The letter that I received on the 26th of this year is
21 dated the 25th day of September, 2013.
22 Q    Are these documents that you relied on, in forming your
23 opinion as to where the money is today?
24 A    Yes, they are.
25 Q    And by "money," I mean the Saba School of Medicine

1   Foundation's money that was received from the sale in April,
2   2007.
3   A    Yes.
4   Q    In your phone call with Mr. Montenegro, on
5   September 26th, 2013, did you discuss the topic of where the
6   money had gone from the sale of the Saba School of Medicine
7   Foundation -- excuse me -- where the money from the sale of the
8   schools in April, 2007, went after the sale occurred?
9          MS. KESSLER:  Objection, hearsay.
10         THE COURT:  Sustained.
11  BY MR. HOCHMAN:
12  Q    Did you have a conversation with Mr. Montenegro
13  concerning your task?
14  A    Yes, I did.
15  Q    Is the information Mr. Montenegro provided you something
16  that you relied on in forming your opinion as to where the
17  money from the Saba School of Medicine Foundation's sale, in
18  April of 2007, is today?
19  A    In part, yes.
20  Q    Did you also speak to someone else, in trying to
21  accomplish your task?
22  A    I did.
23  Q    Who was that person that you spoke with?
24  A    I spoke to a gentleman by the name of Erwin Schulthess.
25  Q    And who is Mr. Schulthess?

1   A       He is currently president of Sinco, and works with
2   Sinco, which was, my understanding, is the financial advisers
3   to three companies that have been discussed here:  New
4   Vanguard, Ample Dynamic, and Top Fast.
5   Q       How difficult was it to reach Mr. Schulthess?
6   A       A phone call away.
7   Q       And in what country and city did you reach him at?
8   A       Zurich, Switzerland.
9   Q       How do you know that?
10  A       Well, I dialed a number that I had for him, and I then
11  checked the area codes to ensure that that's what it was, and
12  it came out to Zurich, Switzerland.
13  Q       And have you seen Mr. Schulthess' name on many documents
14  as an authorized signatory for New Vanguard, Top Fast, and
15  Ample Dynamic?
16  A       In several documents, yeah, concerning Sinco, yes.
17              MR. HOCHMAN:  May I present Exhibit 3C, Page 39, to
18  the witness, Your Honor?
19              THE COURT:  You may.  Again, is that Government's 3C?
20              MR. HOCHMAN:  Government's 3C, yes.
21              Do you have that in front of you?  Oh, here it is.
22              And if we could publish Government's Exhibit 3C,
23  Page 39, please?
24              THE COURT:  You may.
25              (An exhibit was projected onto the projector screen.)

1  BY MR. HOCHMAN:
2  Q      Do you have Government's Exhibit 3C, Page 39, before
3  you?
4  A      I do.
5  Q      Do you see the name, Erwin Schulthess, anywhere as an
6  authorized signatory for New Vanguard?
7  A      Yes.  His name is third from the top.
8         MR. HOCHMAN:  Can we highlight that, please?
9  BY MR. HOCHMAN:
10 Q      And did you see Mr. Schulthess' name on, I think
11 virtually every authorized signatory form for New Vanguard, Top
12 Fast, and Ample Dynamic?
13 A      That's my recollection.
14 Q      Did you have a -- excuse me.
15        Did you have a conversation with Mr. Schulthess?
16 A      I did.
17 Q      Do you recall when that happened?
18 A      Yeah.  That happened October 2nd.
19 Q      Of this year?
20 A      Of this year.
21 Q      And did you discuss the topic that -- of which task you
22 were given to pursue?
23 A      I did.
24 Q      Is the information Mr. Schulthess provided you something
25 you relied on, in forming your opinion as to where the money

1  from the sale of the Saba schools, in 2007, is today?
2  A      It is.
3  Q      And after speaking to Mr. Montenegro, and
4  Mr. Schulthess, reviewing the documentation that's been
5  provided to you, and reviewing the information that's been
6  presented in this case, did you form an opinion as to where the
7  money from the Saba school sale, in April of 2007, went?
8  A      I would add to that that my opinion would also include
9  it was based on the testimony and evidence that was presented.
10 Q      And what is that opinion?
11 A      The opinion is that the money is with the Saba School of
12 Medicine Foundation.
13 Q      And you say the money, the money that was -- that went
14 from -- excuse me -- the money that occurred in April, 2007,
15 with the sale of the schools, is currently with the Saba School
16 of Medicine Foundation?
17 A      That's correct, exactly that money.
18 Q      And how much money were you able to determine are
19 currently in the accounts of the Saba School of Medicine
20 Foundation as of September 25th, 2013?
21 A      Just over $54 million.
22 Q      Now, I'd like to focus you on Agent Maurer's revenue
23 agent report. And we're going to be looking at the two
24 versions of it, the May 14th, 2013, version, and the
25 October 14, 2013, version.

1    MR. HOCHMAN: Thank you, Your Honor.
2    THE COURT: Anything else?
3    MR. HOCHMAN: Two things, Your Honor. We row renew
4    our Rule 29 motion. We'd ask the Court actually to still take
5    Count 6 -- excuse me, Count 7 under advisement, as opposed to
6    ruling at this point.
7    And we would also ask the Court just to allow us to
8    go work with your court clerk to make sure we've moved
9    everything into evidence. We have our list, I know she has her
10   list, but we would not like to finally finally rest until -- or
11   we rest with the caveat of making sure that what we think is in
12   evidence is in evidence. And if, for some reason, it's not,
13   we'd ask the Court to reopen the record just to move into -- or
14   attempt to move into evidence stuff we thought was otherwise
15   moved in.
16   THE COURT: I'll allow both side to reopen if, after
17   consulting with the Courtroom Deputy, you find an exhibit that
18   you felt was admitted and it isn't. I'll let you reopen to
19   move those in.
20   MR. HOCHMAN: Thank, Your Honor.
21   THE COURT: That's not a problem.
22   With regard to the renewed Rule 29 motions, the Court
23   will deny the motions to the extent I denied them earlier; but,
24   based on the testimony, the Court would find that a reasonable
25   jury could find the defendant guilty of the offenses.

```
 1              The Court will reserve, however, as to Count . . . I
 2   think it's Count 7, that relates to 2006, for the reasons I've
 3   said before.
 4              MR. HOCHMAN:  Yes, Your Honor.
 5              THE COURT:  I guess the reason I said it before is
 6   because I wanted to think about it.  And I'm still thinking.
 7              All right.  In terms of closing arguments, both sides
 8   want 90 minutes?
 9              MS. FINLEY:  I think 90 minutes total, between our
10   closing and rebuttal, will be more than enough.  We'll split it
11   accordingly.
12              THE COURT:  Do you want the Court to notify you of
13   any particular time period other than 90 minutes?
14              MS. FINLEY:  No, Your Honor.
15              THE COURT:  And for the defense?
16              MR. HOCHMAN:  Your Honor, I would estimate 90 to 100
17   minutes.  I mean, somewhere right in there.
18              THE COURT:  All right.  I will do 90 to 100 minutes.
19   If you get over a hundred minutes . . . .
20              MR. HOCHMAN:  Once I hit 90 minutes, Your Honor, if
21   you could actually notify me.  I'll do my best to check the
22   clock, as well.  When I have ten minutes left, that would be
23   terrific.
24              THE COURT:  Sure.  That's fine.
25              All right.  Anything else?
```