UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

THE UNITED STATES OF AMERICA,

        Plaintiff,

vs.

                                   Fort Myers, Florida
                                   October 23, 2013

PATRICIA LYNN HOUGH,

                                   9:00 AM

        Defendant.

---

TRANSCRIPT OF JURY TRIAL, DAY ELEVEN

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                               Tax Division
                         P.O. Box 813
                         Washington, DC  20044
                         BY:  CARYN FINLEY, ESQ.

                         U.S. Department of Justice
                               Tax Division
                         Suite 7334
                         601 D Street NW
                         Washington, DC
                         BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

1    government must prove.  What the government must prove is that

2    the defendant made and subscribed, or caused to be made and

3    subscribed, an individual income tax return.  You have four to

4    choose from:  2005, 2006, 2007, and 2008, the returns that she

5    caused Mr. Murtha to prepare, and which she signed.

6            The tax return has to be signed under penalties of

7    perjury.  Each of the tax returns have that jurat and

8    declaration.

9            When the defendant made the tax return, she knew it

10   contained false information.  The returns that they said are

11   false in two ways:  One, they failed to report the substantial

12   income that went into Line 22, including the investment income,

13   the interest income, the profits from the school, and, in 2007,

14   the sale of the schools; and as -- they are also false because

15   of the Schedule B.

16           When she filed a tax return, she had to do so

17   intending that -- excuse me.  When she filed the tax return,

18   she intended to do something that she knew violated the law.

19   And we are going to be talking about intent in a little while.

20           And lastly, the tax return has to be false as to a

21   material matter.  Failing to report your foreign accounts to

22   the IRS and substantially underreporting your total income is

23   material.  The government does not have to show that any taxes

24   were not paid because of the false return, or that any

25   additional taxes are due.

1    everything in this case, but that the defendant's words speak
2    louder than her actions.

3            The defendant and Dr. Fredrick started Saba in the
4    late 1980s, investing every nickel and dime into the schools,
5    telling Laura Whitley and Paul Dalbec, and other witnesses that
6    testified, that if it wasn't a success they would be done
7    financially.  The school, through their hard work and
8    determination, becomes accredited and begins accepting
9    students.

10           Dr. Hough sets out in her role as the dean of
11   clinical medicine, traveling to obtain the necessary
12   accreditations and rotation placements at the hospitals.

13           Now, the flow chart here, if you take a look at it,
14   on October 17th, 2001, Patricia Hough and David Fredrick opened
15   their first bank account at UBS, a joint bank account in their
16   individual names.  They identify themselves as the beneficial
17   owners, and they had signature authority over the account.
18   You'll find the account-opening documents for that account at
19   Exhibit 3GG.

20           During this time, they also have at least one bank
21   account in the Bahamas, at SG Hambros Bank.  In opening the
22   account at UBS, this is one of the first places that the
23   defendant speaks to you and tells you that she owns the medical
24   schools.  Look at Exhibit 3HH on Page 35.

25           Mr. Futterknecht testified about the client work

1    benches.  He said that the client adviser, in this case Dieter

2    Luetolf, was one of just a handful of people that would have

3    had access to the client work benches, and that it was an

4    internal UBS system that was a compliance requirement, as well

5    as a Swiss regulatory requirement, that the bank know your

6    customer, or KYC, for anti-money laundering purposes.

7            He testified that the client adviser would receive

8    the information contained in the client work bench from the

9    adviser's own research and from the client.

10           In this case, the account activities section of the

11   client work benches states, "Consultants own and operate

12   medical schools."  The client adviser received this information

13   from Dr. Hough, when she went to visit Mr. Luetolf after

14   September 11th, 2001.  And we will see this same information

15   throughout many of the UBS accounts.

16           In July and August of 2003, the defendant and

17   Dr. Fredrick opened two more bank accounts at UBS, in the name

18   of Apex Consultants and Medical Technology Associates.  The

19   Apex Consultants account documents are located at 3N, 3O, 3P,

20   and 3Q.  And the Medical Technology, the MTA account is located

21   at 3J, 3K, 3L, and 3M.  They sign as the beneficial owner and

22   have signature authority on the account, and waive their right

23   to invest in U.S. securities.

24           And if you remember, MTA was the entity that Laura

25   Whitley was the clinical director for; and yet she, as she

1   testified, had no knowledge that she was a clinical director,

2   or even what MTA was.

3          Dr. Hough testified that she had no idea why Laura

4   Whitley would have been listed as the clinical director for

5   MUA, and Laura Whitley was pregnant in the summer of 2004, and

6   had absolutely no skill set that would be applicable to her

7   being called a clinical director.

8          This is evidence, ladies and gentlemen, that this

9   entity is nothing but a nominee to conceal the defendant and

10  her husband's income and assets from the IRS.

11         In December of 2003, Patricia Hough and David

12  Fredrick first become concerned that their accounts may be

13  exposed to the IRS.  Looking at Exhibit 3P, Page 5,

14  Dr. Fredrick e-mails Mr. Luetolf and says:  "Please let us know

15  if you receive a copy of the letter attached."

16         He goes on to say:  "After speaking with people, we

17  concluded that leaving our funds in Nassau makes us too

18  vulnerable."

19         On Page 6 of Exhibit 3P, that contains a letter from

20  the defendant and her husband, reiterating their concerns that,

21  because of changes in U.S. and Bahamas banking policy that take

22  effect January, 2004, "It puts us at a disadvantage."

23         On December 12th, 2003, David Fredrick e-mailed

24  Mr. Luetolf, at Exhibit 3HH, Page 2, and inquires, "about the

25  status of Switzerland with respect to U.S. account holders";

1    what can we do to protect ourselves from open disclosure?

2         Note, ladies and gentlemen, these documents are not

3    concerned with open disclosure for asset protection.  The

4    defendant and her husband are worried about open disclosure to

5    the IRS.  Banks don't stop taking U.S. clients because of

6    asset-protection changes.  The banks stop taking U.S. clients

7    because of new IRS reporting requirements.

8         MR. HOCHMAN:  Objection, Your Honor.  Not based on

9    any evidence in this case.

10        THE COURT:  The objection is overruled.  The jury

11   will recall the evidence.

12        MS. FINLEY:  Once they close the accounts in the

13   Bahamas, the $8 million from SG Hambros Bank goes into their

14   joint account.  On Page 35 and 36 of Government's Exhibit 3HH,

15   in November of 2002, UBS reiterates that Dr. Hough and

16   Dr. Fredrick own medical schools, and detail that the funds

17   were moved into the account from UBS Bahamas because UBS

18   Bahamas no longer takes U.S. clients, in view of the exchange

19   of information with the U.S.

20        I would also note, if the money in the accounts are

21   truly the funds of a legitimate offshore foundation, and it's

22   not really Dr. Hough and Dr. Fredrick's money, and they're not

23   hiding behind the paper, Dr. Fredrick and Dr. Hough would have

24   absolutely no concern about the impact that the change in the

25   U.S. and Bahamas banking policy would have because The

1   Foundation is a non U.S. entity.

2           What else is going on in 2002 and 2003?

3           The defendant and Dr. Hough were trying to sell the

4   schools.  Take a look at Exhibit 6B.  On February 18th, 2002,

5   Dr. Fredrick writes to the prospective buyers and says:  "At

6   the present time, I am the sole owner of the Saba School of

7   Medicine and have controlling shares in the Medical University

8   of the Americas."

9           On March 1st, 2003, Dr. Fredrick previews for you

10  Dr. Hough and Dr. Fredrick's intentions.  Take a look at

11  Exhibit 6C.  He says his intentions, he'd like to keep a

12  majority of the funds offshore if that's what the prospective

13  buyer is interested in.

14          On July 7th, 2003, the defendant and Dr. Fredrick

15  execute a letter of intent, at Exhibit 6D, stating that they

16  intend to sell their controlling interests in Saba and MUA

17  Nevis and MUA Belize.

18          They know, ladies and gentlemen, what a controlling

19  interest means because, in 2005, when Dr. Fredrick sells his

20  50-percent share in MUA Belize, he reports it on his tax

21  return.  He does so because the shares are in his name

22  individually, and he hasn't figured out yet how to conceal that

23  by using the nominee entities.  As we'll discuss later,

24  Dr. Hough and Dr. Fredrick figure out how to do that.

25          In Exhibit 6F, on June 25th, 2003, Dr. Hough and

1    Dr. Fredrick, collectively the sellers, sign an agreement

2    stating that they own or control EIC, Saba School of Medicine

3    Foundation, MUA Nevis, and MUA Belize.  Their grouping of these

4    entities together again illustrates to you that they know that

5    they own all of it.  They don't separate them out.  And this is

6    the third set of documents in this one transaction that

7    unequivocally tell you that they own The Foundation.

8         There's another interesting exchange during this

9    sale.  If you take a look at Exhibit 6I, on July 8th, 2003, the

10   defendant e-mails the prospective buyers, copy her husband, and

11   she tells the buyers that they need to talk soon about the next

12   steps in the process of the sale.  She details stock-issuance

13   concerns, and she provides the buyers with advice that she

14   thinks they would need to form an LLC and other entities.

15        She also says that Dave does not have the patience

16   for this type of work, and that she will be the designate, and

17   they're moving forward on their end.

18        This is not an e-mail of a woman who does not

19   understand finances or transactions, but an e-mail of someone

20   who fully comprehends what is about to happen.

21        Ultimately, the sale does not go through, but

22   Dr. Fredrick receives a letter from Mr. DeCastro and Jones

23   Walker that they had written for the potential buyers.

24        On December 13th, 2003, Mister -- Dr. Fredrick

25   forwards that opinion letter to Mr. Schneider, saying:

1   "Attached is a very confidential legal review of a recommended

2   legal tax structure for our medical schools by a potential

3   buyer.  I assume this information might help us somewhere down

4   the road should we need to consider a new operating structure."

5          What does the opinion letter say?

6          Well, it says that the investors are planning to buy

7   a 75 percent equity interest in a venture consisting of four

8   companies.  This venture is currently owned by Dr. David

9   Fredrick and Dr. Pat Hough.  The letter goes on to describe

10  EIC, Saba School of Medicine Foundation, MUA Belize, and MUA

11  Nevis.

12         Dr. Fredrick's cover letter to Mr. Schneider doesn't

13  say:  Jerry, they've got this whole opinion letter all wrong

14  here, but this might be helpful for The Foundation.

15         He says:  This might be helpful for our medical

16  schools.

17         In 2004, Dr. Hough and Dr. Fredrick, they decide to

18  divide the funds from their joint account into two separate

19  accounts in their individual names; one for Dr. Fredrick, and

20  one for Dr. Hough.

21         Take a look at Exhibit 3HH, Page 20.  Dr. Fredrick,

22  in a February 6th, 2004, e-mail to Mr. Luetolf, with a copy to

23  Dr. Hough, lays out their intentions.

24         Dr. Hough receives this e-mail and confirms, on

25  March 18th, 2004, that she discussed the arrangement as in full

1    agreement.  She requests the new paperwork and asks Mr. Luetolf

2    how best to split the accounts.  That's in Exhibit 3HH,

3    Page 27.

4              On March 23rd, 2004, both the defendant and

5    Dr. Fredrick confirm in writing that they want their joint

6    account closed and the funds split equally between Dr. Fredrick

7    and Dr. Hough's new individual accounts.  That's at

8    Exhibit 3HH, Page 30 and 31.

9              And that's exactly what happens.  Look at 3JJ, 3KK,

10   and 3LL, that's Dr. Fredrick's account, and 3R, 3S, and 3T,

11   those are Dr. Hough's account.

12             With respect to Dr. Fredrick, he signs all of the

13   opening documents himself, he identifies himself as the

14   beneficial owner, and he waives his right to invest in U.S.

15   securities.  He even jokes -- at Exhibit 3KK, Page 18, on

16   April 20th, 2005, in an e-mail to Mr. Luetolf, requesting that

17   he send a $40,000 check to his sister, Susan McBride -- that,

18   quote, thank God he's running out of relatives that need help.

19             Dr. Hough's account is particularly important.

20   Review the account-opening documents.  Dr. Fredrick doesn't

21   sign any of her account-opening documents, only she does.

22             On April 7, 2004, she identifies herself as the

23   beneficial owner, at Page 1 of 3X -- excuse me -- 3R.  And she

24   tells you that she is the beneficial owner for purposes of U.S.

25   tax law.  That's at Page 7.

1        She also tells you that she is -- she understands

2    that she is aware of the new U.S. tax regulation when she

3    expressly acknowledges that her account will be frozen for all

4    U.S. securities.  That's on Page 10.

5        There is no mistaking that Dr. Hough knows what she's

6    filling out.  She's not -- Dr. Fredrick is not putting blank

7    pages in front of her, because he doesn't sign this one.  Even

8    the power of attorney is her sister, Charlene Varga.  That's on

9    Page 13 and 14.  This account shows that she knows how to fill

10   out these forms properly and understands exactly what they

11   mean.

12       On Page 23 of Exhibit 3S, the client work bench again

13   says:  "Client and her husband are consultants and own and

14   operate medical schools."

15       Now, on September 1st, 2004, the defendant and

16   Dr. Fredrick open an account at UBS in the name of Saba School

17   of Medicine Foundation, and they identify themselves as the

18   beneficial owner.  They have signature authority.  That's in

19   Exhibit 3X, 3U, 3V, 3W . . . and 3W.  They waive the right to

20   invest in U.S. securities.

21       Again, why would a legitimate foreign foundation have

22   to waive its right to invest in U.S. securities, unless you're

23   concerned that doing so would reveal your ownership of a

24   foundation to U.S. taxation authorities?

25       Again, UBS, based on information known to

1  Mr. Luetolf, states that the defendant and her husband own and

2  operate medical schools, and are in the process of selling them

3  and plan to retire.  That's in Exhibit 3W, Page 177.

4          Now, at this point, it's the end of 2004.  Mr. Murtha

5  has been preparing their tax returns for at least three years,

6  and he's already asked them:  Do you have a foreign account?

7          And they denied having one.  Dr. Hough testified that

8  she couldn't remember that Mr. Murtha asked this question.

9          But I ask you to think about Mr. Murtha's testimony.

10 He was sure that he asked Dr. Hough and Dr. Fredrick that

11 question for two reasons:  One, it was his normal practice to

12 ask all new clients, and Dr. Hough and Dr. Fredrick, while not

13 new to the firm or new to him, this question; and, two, he said

14 he would have never checked that box no, on the tax return, if

15 he had asked the question and they had told him, no.

16          Mr. Murtha also testified that he expects clients to

17 tell him if there is a change in circumstances.  The defendant

18 and Dr. Fredrick never went back, in 2003, or 2004, 2005, and

19 said to him:  Hey, you know, when you asked me if I had a

20 foreign account, well, I've actually opened at least four new

21 bank accounts at UBS since the first time you asked me that

22 question.

23          She doesn't tell him the same story that she told

24 you:  You know, it's not my account, it's not my money, but I'm

25 the caretaker, and I have signature authority in case my

1   husband dies and I have to somehow become the executor, or then

2   I become really the caretaker.

3          She doesn't tell him anything, ladies and gentlemen.

4   She doesn't tell him because they're concealing it from the

5   IRS.

6          In the spring of 2004, David Minchenberg is hired at

7   EIC, the management company for both Saba and MUA.  He's paid

8   $55,000 a year, and his primary responsibilities are to oversee

9   the books and records, and to be the liaison for the audits.

10         During the course of the audit, questions are raised

11  about Form 5471 and restructuring.  Mr. Minchenberg is tasked

12  with investigating potential restructuring options.  And he

13  sends out what he called an RFB, or request for proposal.  You

14  can find that at Exhibit 7D and 7E.

15         Mr. Minchenberg is looking for advice for, among

16  other things, the ultimate exit strategy of the owners.

17         And who are those owners, ladies and gentlemen?

18         Well, in 7E, he tells you, it's Dr. Hough and

19  Dr. Fredrick.

20         Jerry Schneider's firm completed the audits for Saba

21  and MUA for 2004 and 2005, and that's in Exhibit 7EE, 8C, 8Q,

22  and 8AA.  And Jeffrey Gallant completed audits for Saba and MUA

23  for 2006, in 9B and 9N.

24         With respect to either school, Mr. Minchenberg, the

25  CFO and comptroller, has no idea that The Foundation or MUA has

1   an offshore bank account at UBS, until it's raised during the

2   audit, when Dr. Fredrick tells the auditor that, in order to

3   complete the bank confirms, he had to send out the letter.

4   Even then, the only bank account that Dr. Fredrick tells

5   Mr. Minchenberg or the auditors about is the one in the name of

6   The Foundation.

7         If New Vanguard and Top Fast and Apex and MTA were

8   all part of The Foundation, wouldn't you want all of The

9   Foundation's assets to be listed on their financials?

10        I would note, the financials don't say, "Saba School

11  of Medicine," they say, "Saba School of Medicine Foundation."

12        The reason that none of these other accounts are

13  included on any audit or financial is because they're Dr. Hough

14  and Dr. Fredrick's bank accounts.  It's their money.  It's

15  their income.

16        In fact, in June of 2005, the defendant and her

17  husband caused Beda Singenberger to open an undeclared account

18  at UBS in the name of New Vanguard, Exhibit 3D, 3E, and . . . .

19  Excuse me, 3C, 3D, 3E, and 3F.

20        Dr. Hough and Dr. Fredrick caused Beda Singenberger

21  to identify the defendant and her husband as the beneficial

22  owner.  You can see, all of the money from their individual

23  accounts flows into New Vanguard.

24        And revenue agent Maurer testified that she followed

25  the flow of those funds from their individual account into New

1    Vanguard.  And Dr. Fredrick and Dr. Hough instructed

2    Mr. Luetolf to do just that, at Exhibit 3S, Page 9.

3         In September, 2005, the defendant and her husband

4    opened an undeclared account in the name of MUA.  Again,

5    Dr. Fredrick identifies he and his wife as the beneficial

6    owner, and they both have signature authority.  And that's at

7    Exhibit 3Y, 3Z, 3AA, and 3BB.

8         In December of 2005, the defendant and Dr. Hough

9    caused Mr. Singenberger to open another undeclared account at

10   UBS, in the name of Top Fast, again executing Form As,

11   identifying themselves as the beneficial owner of the assets.

12   That's at Exhibit 3X -- excuse me -- 3CC, 3DD, 3EE, and 3FF.

13        Remember what Mr. Futterknecht said:  Financial

14   intermediaries like Beda Singenberger have not just a

15   contractual relationship with UBS to conduct the due diligence

16   and do the AML, the anti-money laundering compliance checks,

17   and provide accurate information to UBS for the ultimate

18   beneficial owner of the assets, but it's also Swiss law.

19        And Mr. Futterknecht told you that the ultimate

20   beneficial owner is the person that's going to scream the

21   loudest when all the money is gone.

22        By March, 2006, Mr. Minchenberg has left, and none of

23   his suggestions are implemented.  However, the defendant and

24   Dr. Hough are on notice that there are forms that need to be

25   filed with the IRS, disclosing their ownership interests in

1   foreign countries; that there are tax issues that need to be

2   addressed; and that Mr. Minchenberg recommended that they

3   contemplate reorganizing in anticipation of their ultimate exit

4   strategy.  You can see those e-mails at 7U, 7R, and 7S.

5           In fact, Mr. Minchenberg told Dr. Fredrick that he

6   was committing tax fraud.  Take a look at Exhibit 7K.  He also

7   explained to him, and Mr. Minchenberg explained to you when he

8   testified, what "substance over form" is.

9           He tells Dr. Fredrick that the IRS will collapse all

10  of the entities onto his tax return, and he will be taxed on

11  all of the profits from the schools.

12          What did Dr. Hough and Dr. Fredrick do in response to

13  Mr. Minchenberg's advice and warnings?

14          Do they talk to their personal return preparer,

15  Mr. Murtha; do they talk to Mr. Gallant during the 2006 audit?

16          No.  They continue to conceal their ownership of the

17  schools, their foreign bank accounts, and the income that

18  they're earning in it from the IRS.

19          What else do they do?

20          Well, they actually open some more bank accounts.

21  They start opening bank accounts at Fortis Banque, and

22  Liechtenstein Landesbank, in order to further conceal their

23  ownership of the schools and their unreported income.

24          Between February, 2006, and November, 2006, they

25  cause to be opened seven more bank accounts in the name of the

1    schools and New Vanguard and Top Fast.  Look at the four

2    series.

3         The culmination of more than 20 years of hard work,

4    dedication, blood, sweat, and tears occurs in September of

5    2006, when they finally find a buyer for their schools and

6    close the deal.

7         Steven Rodger meets with Dr. Fredrick in Sturbridge,

8    Massachusetts, and they meet at a restaurant and entered into

9    what he called a napkin agreement for his company to buy the

10   schools.

11        Now, you remember, Mr. Hochman said to Mr. Rodger on

12   cross-examination:  You know, you don't really mean "your

13   company" when you keep using that word, because you don't

14   really own the company and that was just a bad choice of words.

15        However, Mr. Rodger replied:  No, I mean it's my

16   company because I'm the sole shareholder.

17        Think about this when you review the records, and

18   think about how the defendant and Dr. Fredrick describe things

19   at the time that they're doing it.  It's "our company", "our

20   house."

21        Think about how Dr. Hough testified and how she

22   described the schools.  Think about the times when she

23   testified and she caught herself saying "I," or, "our," and

24   then corrected herself.

25        At the time that the events are taking place, they

1    never once say, "The Foundation's company," or, "The

2    Foundation's house," or, "The Foundation's money."  They don't

3    say it that way, ladies and gentlemen, because it's their

4    company, their money, their income.

5          In January, 2007, after Mr. Rodger and Dr. Fredrick

6    have their handshake agreement, they cause Mr. Singenberger to

7    open undeclared accounts, at both UBS and at Zurcher

8    Kantonalbank, ZKB, in the name of Ample Dynamic, identifying

9    the defendant and Dr. Fredrick as the beneficial owners of

10   those accounts.  Those are also in the four series.

11         This occurs just before the execution of the purchase

12   agreement between the defendant and Dr. Fredrick and Steve

13   Rodger's company, Equinox Capital, on February 14th, 2007.  The

14   purchase agreements are 10A, 10B, and 10C.

15         On April 3rd, 2007, Dr. Fredrick and Dr. Hough

16   execute the sales agreement and finally sell their life's work.

17   They're finally set to profit from the more than 20 years of

18   dedication.

19         Steve Rodger said that he primarily negotiated with

20   Dr. Fredrick, but that was Equinox Capital's choice because

21   they only wanted to have to deal with one voice.  He testified

22   that he did negotiate with Dr. Hough on occasion, specifically

23   concerning the non-compete, her consulting agreement, and the

24   guaranty.

25         You remember that Mr. Rodger testified that he would

1   never have completed the deal without that personal guaranty.

2   And it wasn't just that it was a personal guaranty, it had to

3   be Dr. Hough and Dr. Fredrick on the hook.

4          Read the guaranty, ladies and gentlemen.  They

5   sign -- one example of it is Exhibit 10A, Page 52.

6          It says, I quote:  "In consideration of the purchase

7   price to be delivered hereunder, and other good and valuable

8   consideration, all of which directly or indirectly provide

9   significant economic benefit and other benefits to Dr. Fredrick

10  and Dr. Hough, the receipt of which is hereby acknowledged,

11  Dr. Fredrick and Dr. Hough, jointly and severally,

12  unconditionally guarantee to the purchasers the full and prompt

13  payment and punctual performance by the sellers and the

14  guarantors arising under and set forth in the master

15  indemnification agreement."

16         That is a lot to be on the hook for, ladies and

17  gentlemen, if you're only the caretaker.  They don't insist

18  through their attorneys:  No, I'm not getting any of this

19  economic benefit, so I really am just a caretaker of The

20  Foundation's money, and I really shouldn't have to sign this

21  big guaranty.

22         Here again, ladies and gentlemen, the defendant and

23  her husband are telling you, through their words, their

24  omissions, and their actions:  We own it all, we guaranty it

25  all, because it's our income, our money.

1          Another important thing to think about in the sale is

2     that, sometime in 2005, after they're on notice from

3     Mr. DeCastro . . . opinion letter, and Mr. Minchenberg's

4     advice, they cause MUA to issue 20,000 shares which New

5     Vanguard allegedly purchased.

6          This pumps up their equity in the company without it

7     being in their names, because if it's in their name, they have

8     to report it.  Using New Vanguard again allows them to conceal

9     their ownership and their income from the IRS when they get the

10    big payout.

11         Now, they do something similar with Round Hill.

12         If we can just dim the lights?

13         (An exhibit was projected onto the projector screen.)

14         MS. FINLEY:  So if you remember, in February of 1999,

15    they caused 10 acres of land to be purchased at Round Hill,

16    called "The Bottom," and it's purchased in the name of Laura

17    Walls.  You'll find that in Exhibit 6L.

18         In September of 2000, they incorporate Round Hill

19    Project Holding Company, and that's at 11Y, and they are 50/50

20    owners in the shares.

21         In February of 2001, documents are signed that --

22    where Laura Whitley, or Laura Walls at the time, gives Round

23    Hill Project Holding Company the right of superficies so that

24    they can build on the property.  That's at Exhibit 7X.

25         In June of 2004, documents are signed wherein Laura

1    Walls sells the property to Round Hill Project Holding Company.

2            And then, in April of 2007, Round Hill Project

3    Holding Company . . . .  Excuse me.  In April of 2005, Round

4    Hill Project Holding Company buys the shares from Dr. Fredrick

5    and Dr. Hough, for $500,000, which is not reported anywhere on

6    their tax return.

7            And then in April of 2007, the Round Hill Project

8    Holding Company is sold -- the shares are sold to Mr. Rodger

9    for more than $33 million.

10           Now, who did Mr. Rodger say directed the breakdown of

11   the proceeds?

12           Dr. Fredrick.  He made sure that the majority of the

13   funds went into New Vanguard, because New Vanguard, if you

14   remember, was really their joint account.  All the money

15   started in the joint account, was split, and then went right

16   into New Vanguard.  That's their money.

17           Now, this pattern of splitting things, it continues.

18   When they sold the schools, Round Hill Project Holding Company

19   was entitled to $35,873,691.16.  Look at the flow of funds in

20   Exhibit 10F.  The defendant and Dr. Fredrick ensure that the

21   money is split, to the exact penny, between the Fortis Banque

22   New Vanguard account and the Liechtenstein Landesbank New

23   Vanguard account.  And they each get $17,936,845.58, just like

24   they had it when the accounts were in their individual names.

25           Well, once they sell the schools, ladies and

1    gentlemen, they're home free.  They're ready to spend.  And

2    spend they do.

3            Now, I suspect that Mr. Hochman is going to tell you

4    that Dr. Hough and Dr. Fredrick, that they don't spend their

5    money like they have $35 million.  But I submit to you, ladies

6    and gentlemen, there's no playbook about how rich people have

7    to spend their money.  They can buy houses, as they do, in

8    Asheville, in Greenville; they can buy planes, as they do here;

9    they can buy condos; they can give huge gifts to their

10   families; or they can use all of their money for charitable

11   causes.  Just because they don't drive fancy cars or go on

12   fancy vacations doesn't mean the money isn't theirs.

13           I would also submit to you that they really don't

14   have that much time to start spending the money aggressively.

15   Because they sold the schools in April of 2007, and they're

16   continuing to work for the schools into the fall of 2009.  And

17   in the fall of 2009, they find out that their names have just

18   been turned over to the Department of Justice as part of the

19   Deferred Prosecution Agreement between UBS and the Department

20   of Justice.  You'll find that agreement at Exhibit 25A.

21           How they spend the money after the schools are sold

22   is another piece of evidence that shows you it's their money,

23   their income.  Actually, Mr. Hochman nicely summarized that for

24   you in this chart.  Because this chart shows you their dominion

25   and control over the funds, and how they spent the money and

1    moved the money.  This is evidence that they know it's their

2    money.

3              Now, if we look at the events following the medical

4    school, the sale of the medical school, just ten days after

5    they sell the medical school, Dr. Fredrick gives each of the

6    siblings $250,000.

7              In July of 2007, he puts a $50,000 deposit down on a

8    plane with the Cirrus company.  You can find those at

9    Exhibit 23A through 23B.

10             And, in November, they cause $1.6 million to be

11   transferred from New Vanguard to Ample Dynamic, and then from

12   Ample Dynamic to the United States, so that they can buy an

13   airplane in the United States.

14             He then sells that airplane, in 2010, for

15   1.255 million, and the proceeds are wired back to the

16   medicine -- the school of medicine foundation at LLB.

17             Now, when he sends the money back in 2010, ladies and

18   gentlemen, they already know they are under criminal

19   investigation.  The UBS situation has completely blown up, the

20   Deferred Prosecution Agreement has been entered into.  They

21   have to send it back to The Foundation.  And, quite frankly,

22   they are sending it back to themselves, so they deposit their

23   money back into their bank account.

24             They also bought a house in Asheville, North

25   Carolina.  Now, they buy that house in June of 2005.  And

1   Dr. Fredrick e-mails Mr. Luetolf, saying that he's thinking of

2   purchasing another home in North Carolina, in the name of "our

3   companies, Apex or MTA."

4           Dr. Fredrick asks, if he has his personal funds moved

5   from his personal account to MTA or Apex, and the money is then

6   wired to the United States, will he still have to have his name

7   listed on the wire transfer sheet.  That's on Exhibit 3A, 3E,

8   Page 142.

9           Mister -- excuse me.  Dr. Fredrick then e-mails

10  Dr. Hough, Mr. Singenberger, and Mr. Luetolf, in July of 2005,

11  and says that he's unfamiliar with the procedures they need to

12  take in order to get a wire from Mr. Singenberger, so he's

13  sending the e-mail both to Sinco and to the bank.

14          He said he believes:  When we spoke with Beda

15  Singenberger, we determined that the wire for the house that we

16  are buying should come from our Hong Kong company, New

17  Vanguard.

18          And that's exactly what happens, ladies and

19  gentlemen.  Dr. Fredrick and Dr. Hough caused $1.14 million to

20  be sent from New Vanguard to a trust account in Henderson,

21  North Carolina.

22          Now, in February of 2008, you'll remember there was

23  an e-mail, Dr. Hough said that they found property, next to

24  "our" home, in Asheville, and they caused the property to be

25  purchased in the name of the Lynn Leon group, for $200,000.

1    That money also comes from New Vanguard.

2         In November of 2008, Mr. Rudow says that they come to

3    their house -- excuse me -- come to his office, and they want

4    to place the lien on the property or the purchase of the house

5    from Top Fast.  But the money actually came from New Vanguard,

6    so we have some inconsistencies with the documents and what

7    they're telling people.

8         And then, in 2010, they sell the property, allegedly,

9    to a company called Aldunatec, which is out of El Salvador, and

10   the person signing for Aldunatec is Florencio Montenegro.

11        And you'll remember that Mr. Rudow and the e-mails

12   show that the only person that he's dealing with is

13   Dr. Fredrick, that Dr. Fredrick said:  I'll take all the

14   documents; I'm going to get them signed from Mr. Montenegro;

15   let me get the wire transfer information from Mr. Montenegro.

16        Is that a normal transaction, ladies and gentlemen?

17        Then they also buy a house in Greenville, North

18   Carolina.  Laura Whitley testified that she offered to purchase

19   the house, that's at Exhibit 18A and 15C, in 2007, and she

20   attends the closing, and the settlement statement lists the

21   borrower as Ample Dynamic.  She signs for Ample Dynamic, and

22   UBS transfers $590,016.42 from this Top Fast account, then to

23   Ample Dynamic, and then into the United States.

24        In 2011, when they decide they need to sell the

25   house, they have some trouble.  Dr. Fredrick is initially

1    signing for Ample Dynamic, and then some questions arise,

2    whether he can sign, because there's no proof that . . . his

3    relationship to Ample Dynamic.

4           They get some documents initially.  That doesn't pass

5    muster, and so they cause Beda Singenberger to appoint Laura

6    Whitley, the vice-president of Ample Dynamic, so that she can

7    sign the deed.  Those documents are in Exhibit 16J.

8           And again, ladies and gentlemen, those funds then go

9    back overseas to their offshore bank account.

10          If we just total up those transactions, those

11   purchases, it's more than four and a half million dollars.  And

12   that doesn't even include the condo in Sarasota, which was

13   another $850,000.

14          Dr. Fredrick, was he entitled to four and a half

15   million dollars in deferred compensation; did you see any

16   evidence, other than the defendant's statement, that he had

17   deferred compensation?

18          This was their money, their income, and they were

19   spending it for their benefit.

20          Now, if we just take a step back and look at what

21   else is happening in 2008 and 2009, the UBS situation has

22   emerged in the news, and they are asked again, by Mr. Murtha:

23   Do you have a foreign account?

24          And they again deny interest in, or signature

25   authority over, the foreign accounts.

1    However, they didn't need Mr. Murtha to tell them

2    that, because in August of 2008, Dr. Fredrick called

3    Mr. Luetolf, and asked about the situation with UBS.

4          And Mr. Luetolf informed them that, in case of any

5    transactions, that he would need his directions.  That's at

6    Exhibit 3W, Page 1836789.

7          And then what do they do in October of 2008?

8          They close all their UBS accounts and move all the

9    money from UBS to Liechtenstein Landesbank and Fortis Banque.

10         Remember that Dr. Fredrick provided false information

11   in order to open the Saba School of Medicine Foundation bank

12   account.  At Exhibit 4B, Page 1, in December -- on the

13   December 1, 2008, letter, Dr. Fredrick said:  The Saba School

14   of Medicine is owned by The Foundation; and that while The

15   Foundation sold real estate to Equinox corporation, the school

16   remained part of The Foundation.

17         He sold it all in 2007, ladies and gentlemen.  And he

18   signs that letter as president of Saba School of Medicine, a

19   position he hadn't had since April 3rd, 2007.

20         On February 18th, 2009, UBS entered into the Deferred

21   Prosecution Agreement, and Dr. Fredrick and Dr. Hough caused

22   Beda Singenberger to open two more bank accounts at Bank

23   Alpinum, on June 15th, 2009, in the name of Ample Dynamic, and

24   one in the name of Top Fast.  That's at Exhibit 4E and 4I.

25         On both of those forms, Mr. Singenberger identifies

1   different understanding of that.  They can't sell an equity

2   interest in something that they don't own."

3           And so Mr. Rivera doesn't know what Ms. Maurer had

4   when she did her computation on May 15th.  And she testified

5   that she listened to all the same evidence that you have.

6           Now, Revenue Agent Maurer, in her May 14th

7   computation, the five million dollars, and the two and a half

8   million dollars that got separated out, that have come off of

9   her computation, that's this money, ladies and gentlemen.

10  That's when . . . Patricia Hough and David Fredrick caused MUA

11  and Saba to send $3.1 million, and $2.2 million, $5 million,

12  and $2 million, into the accounts that they owned and

13  controlled.

14          You heard Jeffrey Gallant say that when he talked to

15  Dr. Fredrick, there was the handwritten note on that one

16  document from the audit that said New Vanguard?

17          Jeffrey Gallant, in 2006, said, I asked him:  Who

18  owns New Vanguard?

19          He said:  Dr. Fredrick does.

20          So, in the May 14th computation, Ms. Maurer said that

21  she did not have that six series to be able to definitively say

22  they own the schools.  But her computation accounts for the

23  fact that she did think they owned everything else, that this

24  was their account; that the money flowed from their joint

25  account, the individual accounts, and then into New Vanguard.

1   not having to pay your taxes.  And you can look at those fees

2   as a service charge for concealing her income and assets from

3   the IRS.  And she gets that as a deduction.

4           And they talk about how she doesn't know what's going

5   on in the account, she is never directing anybody.  But she

6   signs an asset management agreement, ladies and gentlemen.  She

7   indicates to UBS how she wants her account to be managed,

8   that's in all of the documents, so UBS doesn't have to call

9   her, just like if you have a stockbroker or a financial

10  planner, they don't call you every time they are going to trade

11  for you, unless that's the relationship you have, and you have

12  elected that from the beginning.

13          And I submit that you should take a look at

14  Exhibit 3KK, Page 13.  It's an e-mail from Dr. Fredrick to

15  Dieter Luetolf, on February 8th, 2005.  And Dr. Fredrick says

16  to Mr. Luetolf:  "Pat said you wanted to tell me about a plan

17  that she was in, that I'm not.  If you're not going to let her

18  make more money than me, are you?"

19          This is not evidence, ladies and gentlemen, that

20  they're worried about how much money The Foundation making,

21  they are worried about how much money they are making.

22          And again, the fact -- the government is not here to

23  dispute that Dr. Hough is not an extremely charitable person,

24  that she hasn't done wonderful things with her life, that she's

25  not service oriented, but sometimes good people do bad things,

1   school, our Foundation, is so profitable, here is all of our

2   accounts.  Make sure you get it on there.  Round Hill property?

3   That's our hugest asset.  We sell that for 34, $33 million.  We

4   want to make sure that's listed as an asset on our school's

5   books and records."

6           But they don't, ladies and gentlemen.  And they don't

7   because they know it's theirs, and they know that, if they

8   disclose, it should be reported to the IRS.

9           With respect to counts-- the counts related to the

10  tax returns, again, the government submits that they had

11  boatloads of unreported income in 2005 through 2008.  It's the

12  investment income, the interest income, the profits.  Just

13  because Revenue Agent Maurer didn't give you a number, you have

14  the evidence before you to show that, in all of those years,

15  there were huge profits.  And if you believe and conclude that

16  they own The Foundation, then they should have reported those

17  profits on their tax return, and that would have made Line 22

18  substantially greater.

19          We don't have to prove a tax loss.  The government

20  never said that that RAR is an all-inclusive.  It's just some

21  of the money that we discussed at the trial.

22          Additionally, ladies and gentlemen, she has signature

23  authority on a lot of these accounts.  Notwithstanding even the

24  interest in the accounts, where she's identifying herself as

25  the beneficial owner.  She should have checked the box saying:

1    I have signature authority over a foreign bank account.

2           Ladies and gentlemen, I ask you, as an impartial

3    jury, you have been extremely attentive, you've taken notes,

4    you heard all the evidence, you've written down the documents

5    go back and review them for yourself.  You shouldn't trust what

6    I say, you shouldn't trust necessarily what Mr. Hochman says.

7    You have the evidence.  You have the defendant's own words to

8    listen to.

9           And her words tell you that she knows that she owns

10   The Foundation, that that is her income, that is her money, and

11   that she did not pay tax on any of it.  And the government

12   submits that that proves, beyond a reasonable doubt, that she

13   is guilty of all counts in the indictment.

14          Thank you.

15          THE COURT:  Move that down, please.

16          All right.  Ladies and gentlemen, as I told you,

17   we're going to break for lunch now.  We'll have you come back,

18   and then the Court will give you the jury instructions.

19          I know it's real tempting, because you're so close to

20   the end of the case, to talk about it.  But you still can't

21   talk about the case.  The good news is, you only have one more

22   person that's going to talk to you, that's me, for half an hour

23   or so, maybe a little longer than a half an hour, and then you

24   get to talk among yourselves for the first time.

25          So let's get back here -- it's quarter to 1:00 now,

1   members planned together all of the details of the plan or the

2   overt acts that the indictment charges would be carried out in

3   an effort to commit the intended crime.

4          The defendant can be found guilty of this crime only

5   if all the following facts are proved beyond a reasonable

6   doubt:

7          One, two or more people in some way agreed to try to

8   accomplish a shared and unlawful plan;

9          Two, the defendant knew the unlawful purpose of the

10  plan and willfully joined in it;

11         Three, during the conspiracy, and after May 15, 2007,

12  one of the conspirators knowingly engaged in at least one overt

13  act described in the indictment;

14         And, four, the overt act was knowingly committed on

15  or -- at or about the time alleged, and with the purpose of

16  carrying out or accomplishing some object of the conspiracy.

17         For reasons that do not concern you, the case against

18  co-defendant David Leon Fredrick is not before you.  This fact

19  should not influence your verdict with reference to defendant

20  Patricia Lynn Hough.

21         However, since a conspiracy requires the

22  participation of at least two persons, in order to find

23  defendant Hough guilty of the conspiracy, you must find that

24  the government presented evidence to establish Dr. Fredrick's

25  criminal participation in the conspiracy beyond a reasonable

1    doubt.

2            An overt act is any transaction or event, even one

3    which may be entirely innocent when viewed alone, that a

4    conspirator commits to accomplish some object of the

5    conspiracy.  In order to sustain its burden of proof on this

6    element under Count 1 of the indictment, the government must

7    prove, beyond a reasonable doubt, that one of the members of

8    the alleged conspiracy or agreement knowingly performed at

9    least one overt act; that this act was performed during the

10   existence or life of the conspiracy and after May 15, 2007; and

11   was done to somehow further goal of the conspiracy or

12   agreement.

13           Although you must unanimously agree on the same --

14   that the same overt act was committed, the government is not

15   required to prove more than one of the overt acts charged.

16           A person may be a conspirator even without knowing

17   all the details of the unlawful plan, or the names and

18   identities of all the other alleged conspirators.

19           If the defendant played only a minor part in the

20   plan, but had a general understanding of the unlawful purpose

21   of the plan, and willfully joined in the plan on at least one

22   occasion, that is sufficient for you to find the defendant

23   guilty.

24           But simply being present at the scene of an event, or

25   merely associating with certain people and discussing common

1    goals and interests, does not establish proof of a conspiracy.

2          Also, a person who does not know about a conspiracy,

3    but happens to act in a way that advances some purpose of one,

4    does not automatically become a conspirator.

5          It is not sufficient for the government to simply

6    prove the existence of an agreement.  The government must also

7    prove, beyond a reasonable doubt, that the purpose of the

8    agreement was to impede, impair, obstruct, and defeat the

9    lawful functions of the Internal Revenue Service in the

10   ascertainment, computation, assessment, and collection of

11   income taxes.

12         This tax purpose must be the object of the

13   conspiracy, and not merely a foreseeable consequence of some

14   other conspiratorial scheme.

15         Now, as to Counts 6 through 9, it is a federal crime

16   to willfully and knowingly prepare and file a false tax return.

17   Counts 6 through 9 charge that, from calendar years 2005, 2006,

18   2007, and 2008, defendant Patricia Lynn Hough willfully made

19   and signed individual tax return forms which she did not

20   believe to be true and correct as to every material matter.

21         The indictment charges that defendant Hough's income

22   tax returns for these years were false in two material

23   respects:

24         One, defendant reported a certain dollar amount as

25   her total income on Line 22, when she then knew and believed

1    that her total income was substantially greater;

2            And two, defendant failed, on Schedule B, Parts 1

3    and 3, Lines 7A and 7B, to report that she had a financial

4    interest in, or signature authority over, financial accounts

5    located in foreign countries.

6            The defendant can be found guilty of this crime only

7    if all of the following facts are proved beyond a reasonable

8    doubt:

9            One, the defendant made and subscribed, or caused to

10   be made and subscribed, a U.S. individual tax return Form 1040;

11           Two, the U.S. individual income tax return Form 1040

12   contained a written declaration that it was made under the

13   penalty of perjury;

14           Three, when the defendant made or caused to be made

15   the U.S. individual income tax return Form 1040, she knew that

16   it contained false material information;

17           Four, when the defendant did so, she intended to do

18   something she knew violated the law;

19           And, five, the false matter in the U.S. individual

20   income tax return Form 1040 related to a material statement.

21           The government has the burden of proving each of

22   these five elements beyond a reasonable doubt for each of the

23   years in question.

24           A declaration is false if it is untrue when it is

25   made and the person making it knows it is untrue.

1    A declaration is material if it concerns a matter of

2    significance or importance, not a minor or insignificant or

3    trivial detail, and was capable of influencing the Internal

4    Revenue Service.

5    The government does not have to show that any taxes

6    were not paid because of the false return, or that any

7    additional taxes are due. It only has to prove that the

8    defendant intentionally caused to be filed a materially false

9    return, which defendant knew violated the law.

10    As I said before, the indictment charges that the

11    defendant's income tax returns for these years were false in

12    two material respects. The government does not have to

13    establish, beyond a reasonable doubt, that the defendant's tax

14    return for any given year was false for both reasons. It is

15    sufficient if the evidence establishes, beyond a reasonable

16    doubt, the falsity and materiality of a single item in each

17    year. You must, however, unanimously agree on that single

18    item.

19    On the other hand, if you unanimously find that none

20    of these items was material and falsely reported on defendant's

21    return, then you must find the defendant not guilty for the

22    count related to that year.

23    Total income, as found at Line 22 of a tax return,

24    includes, but is not limited to, compensation for services,

25    such as wages, salaries, fees, and commissions, income derived

1   from a trade or business, gains derived from dealings on

2   property, interest, rents, royalties, and dividends.

3          You will see that the indictment charges that a crime

4   was committed on or about a certain date.  The government does

5   not have to prove that the crime occurred upon an exact date.

6   The government only has to prove, beyond a reasonable doubt,

7   that the crime was committed on a date reasonably close to the

8   date alleged.

9          The word "knowingly" means that an act was done

10  voluntarily and intentionally, and not because of a mistake or

11  by accident.

12         The word "willfully" means that the act was done

13  voluntarily and purposely, with the specific intent to violate

14  a known legal duty; that is, with the intent to do something

15  the law forbids.  This agreement with the law, or a belief that

16  the law is wrong, does not excuse willful conduct.

17         Good faith is a complete defense to all counts of the

18  indictment because the government must prove, beyond a

19  reasonable doubt, that the defendant acted with intent to

20  defraud, and a specific intent to violate a known legal duty.

21         Evidence that the defendant, in good faith, followed

22  the advice of an accountant or an attorney would be

23  inconsistent with such an unlawful intent.  The burden of proof

24  is not on the defendant to prove good-faith intent because the

25  defendant does not need to prove anything.  The government must