IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA,    )
    )
    v.    )    Case No. 2:13-cr-00072-FtM-JES-UAM
    )
PATRICIA LYNN HOUGH,    )
    )
    Defendant.    )

## GOVERNMENT'S RESPONSE TO DEFENDANT PATRICIA LYNN HOUGH'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29(c)

COMES NOW the United States, by and through counsel, and hereby responds to Defendant Patricia Lynn Hough's Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29(c) ("Defendant's Motion," Doc. 138). Defendant Hough argues that the evidence, "even when viewed in the light most favorable to the government, was insufficient to allow a reasonable juror to find her guilty beyond a reasonable doubt of knowingly and willfully conspiring to defraud the United States and of knowingly and willfully filing false tax returns for the years 2004 through 2008[1]." Defendant's Motion at page 1. The testimonial and documentary evidence admitted at trial, taken in the light most favorable to the government, overwhelmingly supports the jury's verdict, and Defendant Hough's motion should be denied. In support thereof, the government submits the following:

## MEMORANDUM OF POINTS AND AUTHORITIES

A post-trial motion for judgment of acquittal is governed by Federal Rule of Criminal Procedure 29(c). As the text of the Rule indicates, and as courts and other authorities have recognized, "[t]he sole ground for a post-trial motion under Rule 29(c) is that the evidence was

---

[1] Defendant Hough was charged with filing false tax returns in violation of 26 USC § 7206(1) for tax years 2005, 2006, 2007, and 2008.

1

insufficient to sustain a conviction." *United States v. Miranda*, 425 F.3d 953, 962 (11th Cir. 2005) (citation and internal quotation marks omitted). "The standard for assessing the sufficiency of evidence is whether any reasonable view of the evidence, considered in the light most favorable to the government, is sufficient to allow a jury to find guilt beyond a reasonable doubt." *United States v. Leonard*, 138 F.3d 906, 908 (11th Cir. 1998); *United States v. Lecroy*, 441 F.3d 914, 924 (11th Cir. 2006). In deciding a Rule 29 motion for judgment of acquittal, the court must "draw[] all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Tampas*, 493 F.3d 1291, 1297-98 (11th Cir. 2007). "The jury is free to choose among alternative reasonable interpretations of the evidence, [citation omitted], and the government's proof need not exclude 'every reasonable hypothesis of innocence.'" *Id*. at 1298 (citation omitted); *United States v. Merrill*, 513 F.3d 1293, 1299 (11th Cir. 2008). Even when a defendant has properly preserved her challenge to the sufficiency of the evidence, she faces a heavy burden: "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hernandez*, 433 F.3d 1328, 1335 (11th Cir. 2005) (emphasis in original) (internal quotations marks omitted). The Court is "bound by the jury's credibility determinations, and by its rejection of the inferences raised by defendant." *Id*. at 1334 (internal quotation marks omitted). "The evidence does not have to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Id*. at 1334-35 (internal quotation marks and alteration omitted). "The evidence is sufficient so long as a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt." *United States v. Pineiro*, 389 F.3d 1359,

10872345.1

1367 (11th Cir. 2004).  Viewed in the light most favorable to the government, the evidence presented at trial established Defendant Hough's guilty beyond a reasonable doubt.

## THE EVIDENCE

Viewing the evidence in the light most favorable to the prosecution, the Court must decide if the evidence would have permitted a reasonable jury to find Defendant Hough guilty beyond a reasonable doubt.  *Molina*, 443 F.3d at 888.  Defendant Hough's guilt was established by overwhelming documentary evidence and testimony.

Defendant Hough and Fredrick conspired to use nominee entities, including foreign entities and a foreign foundation, to conceal their ownership and income derived from the operation and sale of Saba University School of Medicine Foundation, dba Saba University School of Medicine ("Saba Foundation") and Medical University of the Americas ("MUA"), and other assets from the Internal Revenue Service ("IRS").  Defendant Hough and Fredrick opened and maintained undeclared financial accounts at UBS and other foreign banks in their individual names and in the names of nominee entities to conceal assets and income from the IRS.  As part of the conspiracy, Defendant Hough and Fredrick filed false and fraudulent individual income tax returns, Forms 1040, that failed to report their signature authority in the various undeclared accounts and which also failed to report significant amounts of income, including interest, dividends, capital gains, net profits from the operation of the medical schools and income from the sale of the schools.  Defendant Hough and Fredrick communicated with UBS banker Dieter Luetolf and their financial advisor, Beda Singenberger, by email, telephone and during in-person meetings and provided them with written and oral instructions for the use of the undeclared accounts, including wiring and expenditure instructions.

10872345.1

The evidence at trial established that Defendant Hough and Fredrick, both United States citizens, had an obligation to report on Schedule B of their individual income tax returns, Forms 1040, that they had a financial interest in, or signature authority over, a financial account in a foreign country where the account was maintained.  2Tr. 238-39[2].  They also had an obligation to report all income they earned from foreign bank accounts on their tax returns.  7Tr. 41-42**.**  Furthermore, the evidence at trial established their ownership of the medical schools and thus that they were required to report the net profits of the schools as income as well as capital gains resulting from the sale of the schools.  GX[3] 3U, 3Y, 6B, 6D, 6F, 8B; 3Tr. 95-96, 101, 107, 111, 112, 117; 7Tr. 138-139.

The Saba Foundation was a foundation established and incorporated under the laws of the Netherlands Antilles on October 31, 1988, to provide for the education and training of healthcare professionals, and promote the general well-being of the residents of the Island of Saba.  GX 3V. Defendant Hough and Fredrick owned the Saba Foundation.  Fredrick and Hough funded the creation of the Saba Foundation and the establishment of the medical school with their own funds.  5Tr. 177-78, 6Tr. 139, 140, 142.  Defendant Hough was in charge of accreditation and the Dean of Clinical Medicine for Saba University School of Medicine.  4Tr. 20-21; 9Tr. 81**.**  The Saba Foundation maintained an undeclared account at UBS, and Fredrick and Hough had signature authority over that account and identified themselves as the beneficial owners of the account.  GX 3U and 3Y.  The Saba Foundation also had an undeclared account at Fortis Banque and Lichtenstein Landesbank.  GX 4A, 4C, and 4F.

---

[2] Transcripts of the trial of Defendant Hough are cited herein as "Tr." with the transcript volume preceding and the relevant page number(s) following.
[3] GX represents "Government Exhibit".

4

MUA was a corporation established and incorporated under the laws of St. Christopher-Nevis, West Indies on April 29, 1999 to provide medical education and related services.  GX 3Z.  MUA operated a for-profit medical school on Nevis, West Indies.  Fredrick owned 1,750 shares of MUA.  GX 11F; 4Tr. 22; 6Tr. 19, 6Tr 216-17, 9Tr 87.  On October 15, 2003, Defendant Hough transferred her shares of MUA to Dr. Fredrick.  GX 7C; 4Tr. 30, 9Tr 87-88.  Fredrick and Defendant Hough served as Directors.  GX 11E; 4Tr. 22.  Defendant Hough also served as the Director of Accreditation for MUA.  9Tr. 147.  MUA maintained an undeclared account at UBS, and Fredrick and Hough had signature authority over that undeclared account and identified themselves as the beneficial owners of the account.  GX 3Y.  MUA also had an undeclared foreign account at Lichtenstein-Landesbank.  GX 4F.

The evidence at trial proved that over the course of nearly a decade, Defendant Hough and Fredrick opened a host of undeclared offshore accounts in a variety of jurisdictions, including the Bahamas, Switzerland and Liechtenstein, in their joint names, in their individual names, in the names of the schools, and in the names of nominee entities, including Apex, Top Fast, New Vanguard and Medical Technology Associates ("MTA").  Hough and Fredrick were the beneficial owners of and had signatory authority over all of these accounts and owned and controlled each of them.  GX 3 Series and 4 Series.

The evidence showed that Hough and Fredrick caused the undeclared foreign accounts to be closed in jurisdictions when circumstances changed causing there to be an increased likelihood of IRS scrutiny of these accounts.  GX 3P at pp. 5-6, 3HH at p. 2, 3W at p. 183.  Defendant Hough and Fredrick then moved the accounts to banks in other jurisdictions, with the purpose of maintaining the secrecy of these accounts from the IRS and United States authorities.  GX 4 series.  In addition, between 2001 and 2011, Fredrick and Hough caused dozens of

10872345.1

monetary transactions to be conducted using the undeclared accounts.  GX 3 series, 4 series and 30 series.

The evidence at trial showed that in 2007, Fredrick and Hough sold the Saba University School of Medicine and MUA for more than $36 million after years of trying to entice a buyer. 6Tr. 9; GX 10A, 10B, 10C, 10F.  The schools were purchased by Equinox Capital, a private equity investment firm.  The sale was personally guaranteed by Defendant Hough and Fredrick. GX 11A; 6Tr. 23-24.  Fredrick directed and requested the proposed apportionment of funds from the sale of the schools among the nominee entities controlled by he and Hough.  GX 10F; 6Tr. 35-39.

It was established at trial that one of the largest assets involved in the sale, in terms of assigned value, was the land on which the Saba University School of Medicine was located.  In the decade prior to the sale, Hough and Fredrick caused this land to be purchased in the name of a nominee, Fredrick's daughter, Laura Whitley.  GX 6L, 7X; 4Tr. 39-40, 6Tr. 146.  Later, Hough and Fredrick caused Whitley to sell the property to Round Hill Holding Company at a price drastically below the price originally paid for the land.  Hough and Fredrick each owned 50% of the outstanding shares of Round Hill Project Holding Company.  GX 7X, 8C, 8J, 8K, 11AA, 11BB; 3Tr. 190. 4Tr. 40.  Hough and Fredrick then sold their shares in Round Hill Holding Company to New Vanguard, which they owned and controlled.  GX 10C; 4Tr. 214 (New Vanguard "was a related party, basically owned by Dr. Fredrick), 6Tr. 31-32, 50-51.  New Vanguard, as part of the sale of the schools to Equinox Capital, sold the Round Hill Holding Company shares for nearly $34 million.  GX 10F.  Hough and Fredrick did not report the majority of the proceeds of this sale on either of their individual income tax returns.  GX 1G and 1X.

6

In addition, Hough and Frederick caused funds to be transferred between the various undeclared foreign accounts, including causing funds to be distributed from the medical schools' undeclared accounts to undeclared accounts in the nominee entities' names.  GX 30 Series; *See* Sheila Maurer's testimony concerning flow of funds in and out of the undeclared accounts, 7Tr. 8-144.  The transfers allowed Hough and Fredrick to use the funds in the undeclared foreign accounts for their personal benefit, including to purchase real estate in Sarasota, Florida, Asheville, North Carolina and Greenville, North Carolina, to purchase planes, to make gifts to family members, and to pay personal expenses.  GX 12B, 12E, 12F, 12H, 13G, 15E, 15G, 16N, 17C, 22B, 23A; 6Tr. 169-179, 208-209, 7Tr. 76-77, 80.  In some correspondence with Luetolf related to these transactions, Fredrick expressed concern about their individual names being on wire transfers into the United States, and instructed Luetolf to ensure that only the names of the nominee entities appeared on any wire transfers.  GX 3KK at p. 14.  Defendant Hough and Fredrick also caused these assets to be purchased in the names of the nominee entities in order to conceal their ownership.  GX 3E at p. 142, 20D, 21A, and 15D.

During the time in question, Hough and Fredrick did not report the existence of any of the foreign accounts they owned and controlled to their individual income tax return preparer. 2Tr. 239, 240, 241-42.  Except for the accounts in the name of Saba University School of Medicine Foundation and MUA, Defendant Hough and Fredrick did not report the existence of any of the foreign accounts to David Minchenberg, the in-house Chief Financial Officer of Education Information Consultants ("EIC"), the entity that handled the administration of Saba University School of Medicine and MUA, or to the accountants preparing audits of Saba University School of Medicine and MUA for purposes of Department of Education review.  GX 8H, 8FF; 3Tr. 205-08, 4Tr. 42-46.  Mr. Minchenberg and other professionals advised Fredrick

and Hough of potential problems with the legal structure of the schools, potential legal consequences resulting therefrom, and suggested changes to the structure to come into compliance.  GX 7D, 7E, 7U, 7K, 7M, 8O 8CC; 3Tr. 224-25, 227, 228, 4Tr. 50-51, 54-55, 58, 63, 77-79, 210-11.

## **ARGUMENT**

Defendant Hough contends that the evidence presented at trial was insufficient for a reasonable juror to find her guilty beyond a reasonable doubt as charged in the Indictment. Specifically, Defendant Hough argues that with respect to Count 1 of the Indictment, Conspiracy to Defraud the United States in violation of 18 USC § 371, the government failed to prove 1) that Defendant Hough knowingly and willfully agreed with David Fredrick to achieve the specific criminal objective of defrauding the United States and 2) that the government failed to prove an overt act within the statute of limitations that furthered the conspiracy.  Defendant's Motion at p. 4.  Defendant Hough argues that with respect to Counts 5 through 8 of the Indictment, Filing a False Tax Return in violation of 26 USC § 7206(1), the government failed to prove that 1) Defendant Hough's answer to question 7a on Part III of Schedule B was knowingly false because the government did not present evidence of the exceptions or of Defendant Hough's knowledge of those exceptions; 2) the phrasing of question 7a was so confusing and ambiguous that Defendant Hough could not have knowingly and willfully answered the question falsely; and 3) Defendant Hough knowingly and willfully understated her income because the government did not prove that a) Defendant Hough owned the accounts, b) any taxable interest, ordinary dividends or capital gains earned on the accounts were required to be reported by Defendant Hough on her individual income tax returns; and c) Defendant Hough was "aware of any of the

taxable interest, ordinary dividends and capital gains earned in the foreign accounts or foreign transactions.  Defendant's Motion at p. 4-5.

### A.  Conspiracy

> 1. **The Government Proved that Defendant Hough Knowingly and Willfully Agreed with David Fredrick to Achieve the Specific Criminal Objective of Defrauding the United States**

In order to establish a defendant's membership in a conspiracy, the government must prove that the defendant knew of the conspiracy and that she intended to join it and to accomplish the object of the conspiracy.  *United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998).  A defendant may become a member of a conspiracy without knowing all of the details of the unlawful scheme and without knowing all of the members.  *Blumenthal v. United States*, 332 U.S. 539, 557 (1947).  Similarly, a defendant may become a member of a conspiracy even if that person agrees to play a minor role in the conspiracy, so long as he or she understands the essential nature of the scheme and intentionally joins in it.  *United States v. Andrews*, 953 F.2d 1312, 1318 (11th Cir. 1992).  Moreover, in a *Klein* conspiracy, the government must introduce evidence establishing that the intent of each member of the conspiracy was to impede the functions of the IRS.  *Adkinson*, 158 F.3d at 1154; *United States v. Hernandez*, 896 F.2d 513, (11th Cir. 1990).

While an agreement between two or more persons must be established, that agreement need not be express or in writing, and the participants need not have stated to each other the purpose of the agreement or its details.  *United States v. Simon*, 839 F.2d 1461, 1469 (11th Cir. 1988).  Direct proof of a formal agreement is not required and in most cases will not exist since the "mark of a successful conspiracy is secrecy."  *Id*.; *see also Adkinson*, 158 F.3d at 1153. "The more common method of proving an agreement is through circumstantial evidence",

*United States v. Morales*, 868 F.2d 1562, 1574 (11th Cir. 1989), which may also prove knowledge and intent. *United States v. Macko*, 994 F.2d 1526, 1533 (11th Cir. 1993). The existence of the agreement can be proven by inference from the actions and statements of the conspirators and the surrounding circumstances of the scheme. *Glasser v. United States*, 315 U.S. 60, 80 (1942).

The Court's instructions to the jury thoroughly instructed the jury as to the Conspiracy count, including the purpose of the conspiracy and the type of proof required to establish an agreement. Court's Jury Instructions (Doc. #109) at page 10-11. In addition to instruction as to a finding of Defendant Hough's participation in the conspiracy beyond a reasonable doubt, the jury was also instructed that they "must find that the government presented evidence to establish Dr. Fredrick's criminal participation in that conspiracy beyond a reasonable doubt." *Id*. at 11-12.

In the present case there is ample evidence of an agreement between Defendant Hough and Fredrick. Hough and Fredrick executed and signed numerous account opening documents for the undeclared foreign accounts, including Forms A identifying themselves as the beneficial owners of the accounts. GX 3 Series and 4 Series. They both, jointly and separately, met and corresponded with Luetolf, Singenberger, and other bank employees to facilitate the opening of accounts and to give directions on the operation of the accounts. 9Tr. 117-120, 171-74, 177, 184-85, 271; GX 3S at p. 9 and 24, 3HH at pp. 2, 3, 12, 14, 20, 27, 28, and 30-31, 3KK at p. 22. While they filed tax returns that elected married filing separate status, their return preparer, Thomas Murtha, dealt with both of them and asked them on more than one occasion if they had an offshore bank account to which they answered "no." 2Tr. 239-40, 243-44, 3Tr. 48-49. Together, they also purchased assets and caused payments to be made to family members using funds in the undeclared accounts. GX 30D, 30P, 6Tr. 221-223, 7Tr. 59-60.

Defendant Hough refuses to accept that the jury was free to reject her testimony and believe the prosecution's witnesses and all the reasonable inferences that the prosecution's evidence would support. *United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997), *cert denied*, 523 U.S. 1033 (1998) (the jury is free to believe the prosecution's witnesses, even if they consist of "scoundrels, liars and brigands"); *see also United States v. Siegelman*, --- F.3d ---, 2009 WL 564659 (11th Cir. March 6, 2009) at 1 (reviewing courts must respect the jury's credibility determination).   The jury was free to disbelieve the testimony of Defendant Hough and instead, to believe the testimony of other witnesses whose testimony was contrary to that of Defendant Hough.   *United States v. Hernandez*, 433 F.3d 1328, 1334 (11th Cir. 2005), *cert. denied,* 547 U.S. 1047 (2006).   Defendant Hough also overlooks the fact that, given her decision to testify, the jury was free to determine that her testimony was not credible, and also to regard her false testimony as substantive evidence of her guilt.   *United States v. Poirier*, 312 F.3d 1024, 1032-33 (11th Cir.), *cert. denied*, 540 U.S. 874 (2003); *United States v. Alejandro*, 118 F.3d 1518, 1521 (11th Cir. 1997); *Atkins v. Singletary*, 965 F.2d 952, 961 n. 7 (11th Cir.1992); *United States v. Vasquez*, 53 F.3d 1216, 1225 (11th Cir. 1995); *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995), *cert. denied*, 516 U.S. 1111 (1996); *United States v. Eley*, 723 F.2d 1522, 1525 (11th Cir. 1984) (a false explanatory statement may be viewed by a jury as substantive evidence tending to prove guilt…Moreover, wholly incredible explanations may also form a sufficient basis to allow the jury to find that the defendant had the requisite guilty knowledge.").   In finding Defendant Hough guilty, the jury necessarily found her to be incredible and presumably did not believe her testimony.   *United States v. Broughton*, 689 F.3d 1260, 1279 (11th Cir. 2012). Furthermore, Defendant Hough's testimony also provided the jury with evidence of her participation, knowledge and willfulness, and her "testimony undoubtedly undermined [her]

credibility in the eyes of the jury." *United States v. Morales*, 868 F.2d 1562, 1574 (11th Cir. 1989).

The evidence at trial established that both Defendant Hough and Fredrick were fully aware of the purpose of the conspiracy. They both, independently and together, took steps to open the undeclared foreign bank accounts, use the funds in those accounts, and conceal their use of the funds in the undeclared accounts. Overt acts taken in furtherance of the conspiracy also evidence Defendant Hough and Fredrick's knowledge of the object of the conspiracy.

Documentary evidence was introduced showing Defendant Hough and Fredrick's signatures on various documents which were necessary to accomplish the object of the conspiracy. Specifically, Defendant Hough and Fredrick created and used a host of nominee entities which concealed the true ownership of the medical schools and other assets. *See* GX 3D, 3K, 3O, 3V, 3Z, 3DD, 6L, 7X, 8C, 8J, 8K, 10C, 11AA, 11BB; 3Tr. 190, 4Tr. 39-40, 6Tr. 146, 214. In addition, Defendant Hough and Fredrick established foreign bank accounts in their names and in the names of these nominee entities. Accounts were established in the names of these nominee entities at multiple financial institutions over a period of years. Defendant Hough and Fredrick signed account opening documents for many of these accounts and but for only two accounts, they were always identified as the beneficial owner of the accounts. *See* GX 3B through 3G, 3J through 3LL and 4A through 4N. All of these documents also are circumstantial evidence of the objective of the conspiracy, specifically to defraud the IRS, as each helped to hide the true ownership of the medical schools, thus facilitating their ability to avoid reporting the income earned upon the sale of the schools, the annual net profits of the schools, and interest, capital gains, and dividend income.

12

Defendant Hough and Fredrick separately drafted and received correspondence which demonstrated their knowledge of the object of the conspiracy.  *See supra.*

Defendant Hough and Fredrick participated in meetings with Beda Singenberger and Dieter Leutolf.  Defendant Hough testified that she met with Dieter Luetolf in Zurich, Switzerland in or around September 2001 to provide documents to Luetolf which were necessary to open financial accounts at UBS in Switzerland.  9Tr. 117-120.  Defendant Hough testified that she and Fredrick met with Singenberger in 2005 in Boston, and that Singenberger suggested that the Defendant Hough and Fredrick establish Hong Kong entities, allegedly for asset protection for the Saba Foundation.  9Tr. 171-74.  Defendant Hough testified that she later had a discussion with Fredrick where she was told by him that Hong Kong entities were in fact established.  9Tr. 174.  Defendant Hough testified that she recalled that Singenberger came a few times to Boston and that Fredrick told her on a couple of occasions that he had meetings with Singenberger between 2005 and 2008.  9Tr. 177.  Defendant Hough further testified that she had several meetings with Singenberger, specifically one in the United States and three in Zurich.  Defendant Hough testified that the meetings in Zurich occurred in 2008 and 2009.  9Tr. 184-85; 271.  These meetings resulted in the establishment of nominee entities and the establishment of foreign bank accounts in the names of these nominee entities.  These meetings also resulted in the return of offshore funds to the United States in a manner that concealed the true source of the funds, which is again circumstantial evidence of the objective of the conspiracy and the participants' knowledge of the objective of the conspiracy.

Defendant Hough and Fredrick received funds from their offshore bank accounts and used those funds for the purchase of personal assets.  Together, Defendant Hough and Fredrick purchased assets and caused payments to be made to themselves for their personal benefit and to

13

family members as gifts using funds in the undeclared foreign accounts.  *See* GX 30D, p. 75 ($250,000 from New Vanguard to Defendant Hough and Fredrick's joint account); GX 30D p. 83 ($250,000 to siblings); GX30L, p. 76 ($50,000 for Cirrus plane), GX 30Q ($50,000 refund from Cirrus plane deposited into personal domestic account), GX 12, 12F and 5Tr. 13-15 (email from Fredrick with Defendant Hough copied explaining that he has "instructed our overseas bank to wire" $200,000 for the purchase of land "next to our home.").  The offshore bank accounts which were the source of funds used to purchase personal assets were titled in nominee names, thus hiding their true ownership.  Further, many of the personal assets were also purchased in nominee names, further hiding their true ownership as well.  GX 18A, 20C. Statements made by Fredrick also establish that they did not want their individual names on transfers back into the United States.  *See supra*.  Moreover, when it was clear that the banks in the Bahamas and Switzerland were going to begin sharing information with the IRS, Defendant Hough and Fredrick caused the bank accounts to be closed and moved to other jurisdictions outside the reach of the IRS.  GX 3S at p. 9, 3W at p. 183, and 3HH at p. 2.  These facts further establish the object of the conspiracy, the defendants' knowledge of the object of the conspiracy, and their knowing participation in the conspiracy.

Hough and Fredrick provided false information to their accountant for use in preparing their individual income tax returns.  Mr. Murtha, the return preparer for Defendant Hough and Fredrick, was asked on direct examination if, when he initially met with the defendants, he asked them if they had any foreign bank accounts.  He testified that it "would have been part of my normal interview to ask that question."  2Tr. 239.  He went on to state that he believed Defendant Hough and Fredrick answered "no."  *Id*.  Mr. Murtha further explained that the question he would have asked "would be in the nature of, 'Do you have any foreign bank accounts?'"  2Tr.

14

240.  Mr. Murtha also testified that in 2008 he read in the newspapers about problems UBS was having and, as a result, he would have asked his clients, again, whether they had a foreign account.  2Tr. 243-44.  On cross examination, Mr. Murtha reiterated his belief that he asked Defendant Hough and Fredrick whether they had a foreign bank account:  "Well, based on the way I did my interviews, I believe I did ask them that question."  3Tr. 48.  Counsel for Defendant Hough went on to ask "[s]o are you certain that, in your first interview, where you had their prior return with boxes marked 'no,' that you would have asked them the foreign-bank question; are you certain of that?"  Mr. Murtha answered "I'm certain I would have asked that question."  3Tr. 49.  Mr. Murtha also testified that the boxes related to the foreign bank account inquiry on Schedule B of Defendant Hough and Fredrick's tax returns were checked "no" and he knew that would have been asked in the interview.  3Tr. 49.  Yet the evidence presented at trial proved that Defendant Hough owned foreign bank accounts in their joint names, in their individual names, in the names of nominee entities and in multiple different foreign jurisdictions. The actions of Defendant Hough and Fredrick in lying to their return preparer evidence the object of the conspiracy, to defraud the IRS, their knowledge of the objective of the conspiracy, and their participation therein.

Defendant Hough and Fredrick signed and filed their Forms 1040 for four successive years which failed to report their undeclared foreign accounts, failed to report interest, dividends, and capital gains earned in the accounts, failed to report net profits of the medical schools, and each of their 2007 individual income tax returns failed to fully report the ultimate sale of the medical schools.

15

All of this evidence, admitted at trial, established beyond a reasonable doubt that Defendant Hough knowingly and willfully agreed with Fredrick to achieve the specific criminal objective of the conspiracy, namely to defraud the IRS.

2.   **The Government Proved an Overt Act Within the State of Limitations that Furthered the Conspiracy**[4]

The government proved numerous overt acts in furtherance of the conspiracy which occurred within the six year statute of limitations.  It should be noted, first, that the jury was specifically instructed on this element, and the special verdict form required the jury to indicate that they had found such an act.  The jury was instructed in two separate instructions that it must find an overt act was committed "with the purpose of carrying out or accomplishing some object of the conspiracy."  Court's Jury Instructions (Doc. #109) at pages 11-12; Special Verdict Form (Doc. #114) at page 1; *see also United States v. Falcone*, 311 U.S. 205, 210 (1940).  The instructions defined an "overt act," and specifically instructed the jury that the government must prove that at least one overt act was committed during the conspiracy and after May 15, 2007 and was "done to somehow further the goal of the conspiracy or agreement."  *Id*. at 12.  Acts of concealment to further the crime are also admissible as overt acts.  *Grunewald v. United States*, 353 U.S. 391, 405 (1957); *See, e.g., Forman v. United States*, 361 U.S. 416, 422-24 (1960), overruled on other grounds by *Burks v. United States*, 437 U.S. 1 (1978); *United States v. Vogt*, 910 F.2d 1184, 1201-02 (4th Cir. 1990); *United States v. Pinto*, 838 F.2d 426, 435 (10th Cir. 1988); *United States v. Mackey*, 571 F.2d 376, 383-84 (7th Cir. 1978).

Evidence was introduced at trial of numerous overt acts taken by Defendant Hough and Fredrick to further the conspiracy after May 15, 2007.  These include the following:

---

[4] Defendant Hough makes this argument in one sentence on page 2 of her Motion and then fails to elaborate on it further.

16

10872345.1

1. Defendant Hough and Fredrick filed false and fraudulent 2006, 2007, and 2008 individual income tax returns which failed to "check the box" on Schedule B, failed to report substantial net profits from the medical schools, and failed to report interest, capital gain, and dividend income earned in the undeclared foreign accounts. GX 1F, 1G, 1H, 1W, 1X and 1Y;

2. Defendant Hough and Fredrick filed false and fraudulent 2007 individual income tax returns which failed to fully report the capital gain resulting from the sale of the medical schools. GX 1G, 1X;

3. Defendant Hough and Fredrick opened or caused to be opened undeclared foreign accounts in the names of nominee entities that concealed Defendant Hough and Fredrick's beneficial ownership. GX 4E, 4I;

4. Defendant Hough and Fredrick corresponded with each other and with Luetolf and Singenberger, which caused monies to be transferred between undeclared accounts and directed that undeclared accounts be closed. *See supra.*

5. Defendant Hough and Fredrick both lied to their return preparer, Thomas Murtha, in 2008 or 2009, when they told him that they did not have any foreign accounts. 2Tr 243-44;

6. Defendant Hough and Fredrick used funds from the undeclared accounts for numerous personal expenses, including the purchase and sale of real estate, the purchase of an airplane, and a deposit on an airplane. *See supra.*

**B.  Filing False Tax Returns**

Defendant's overarching argument with respect to Counts Five, Six, Seven and Eight of the Indictment is that the government did not prove Defendant Hough's "knowledge that the

17

returns contained false information and her intent to violate the law."  Defendant's Motion at p. 12.

Initially, to the extent that Defendant Hough argues that the government must prove actual knowledge of her legal duty with direct evidence, she is wrong.  While the government is burdened with proving actual knowledge, the government can do so with circumstantial evidence.  *Spies v. United States*, 317 U.S. 492, 499-500 (1943); *United States v. Ytem*, 255 F.3d 394, 396 (7th Cir. 2001) (circumstantial evidence of knowledge is sufficient and direct evidence is not required); *United States v. Tipton*, 56 F.3d 1009, 1012 (9th Cir. 1995) (willfulness, as a state of mind, can rarely be proved by [direct evidence that the defendant knew the illegality of structuring]; instead it is usually established by drawing reasonable inferences from the available facts).  "Evidence of attempts to conceal pertinent information can be treated as circumstantial evidence that a defendant knew he or she was violating the law."  *Tipton*, 56 F.3d at 1013; *see also United States v. Marabelles*, 724 F.2d 1374, 1377 (9th Cir. 1984).  As discussed previously, trial testimony established that Defendant Hough lied to her return preparer on multiple occasions when asked whether she had a foreign bank account.  This is circumstantial evidence that Defendant Hough knew she was violating the law by not reporting the existence of the undeclared foreign accounts established and maintained by Defendant Hough and Fredrick.

1. <u>Count Seven</u>

Defendant Hough essentially argues that because Revenue Agent ("RA") Maurer did not assign a specific numeric value to the net profit estimate for the Saba Foundation and MUA and include those in her tax loss calculation, the government did not prove a substantial understatement of income on Line 22 of Defendant Hough's 2006 individual income tax return. This, however, ignores other evidence that was before the jury and the totality of RA Maurer's

testimony.  It is also contrary to the law.  The jury was properly instructed that proof of a tax deficiency is not required in a false return prosecution.  *United States v. Carter*, 721 F.2d 1514, 1539 (11th Cir.), cert. denied, 469 U.S. 819 (1984); Court's Jury Instructions (Doc. #109) at p. 16.  The jury was also instructed as to what is included in Line 22 of Form 1040, specifically "income from a trade or business."  Court's Jury Instructions (Doc. #109) at p. 16-17.

RA Maurer testified that, based on her review of the evidence and testimony, she saw evidence that Defendant Hough and Fredrick owned the Saba Foundation and MUA.  7Tr. 127.  RA Maurer further testified that, if Defendant Hough and Fredrick owned the Saba Foundation and MUA, then they would have each been required to report one half of the net profits of the medical schools on their individual income tax returns.  7Tr 138.  She testified that, based on her review of their 2005, 2006, and 2007 individual income tax returns, Defendant Hough and Fredrick did not report any net profits from the medical schools.  *Id*.  RA Maurer also testified that she saw documentary evidence and heard testimony that the schools were profitable in each of the relevant tax years, including 2006.  4Tr 31-32, 6Tr 131, 7Tr 138; *see also* GX 7EE at p. 4, 8C at p. 5, 8Q at p. 5, 8AA at p. 5, 9B at p.5, 9N at p.5.  She also testified that a letter written by Fredrick during the proposed sale to the Huntington Institute also provided evidence of the schools profitability.  7Tr 139; HX 6B.

RA Maurer was then asked, "[n]ow if, in fact, the schools were profitable, and the net profits of the schools had been included on Dr. Hough and Dr. Fredrick's income tax returns, would that have increased the tax due and owing?"  She answered "Yes, it would have."  7Tr 139.  She explained that she did not include any profits from the schools as part of her tax due and owing computation because "[t]hat would have been based on estimates.  I would have needed more information to come up with a more reliable figure."  *Id*.

19

Defendant Hough's argument is that the government did not prove a tax loss for 2006 because RA Maurer's report indicated that she was due a refund.  However, this was because RA Maurer did not want to *estimate* the net profits that, in her opinion, should have been reported on Defendant Hough and Fredrick's individual income tax returns – not just for 2006, but for each of the tax years.  She never testified that there were no net profits or that she was not sure that there were net profits.  Instead, she testified that she did not want to use estimates of net profits in preparing her tax computation, and that she would have liked additional information.  7Tr 139.

The government need not prove the specific amount of unreported income on Line 22, but instead only that there was a substantial understatement.  *United States v. Hallmark*, 911 F.2d 399, 402 (10th Cir.1990) ("The government did not have to prove the exact amount by which [the defendant] misstated the tax returns; the witness' combined testimony demonstrated substantial understatements in the wagers he reported."); *United States. v. Levine*, 750 F.Supp. 1433, 1142 (D.Colo.,1990).  RA Maurer's testimony is but one piece of evidence, and her tax computation does not handcuff the jury from evaluating all of the evidence introduced at trial.  Looking at the evidence in the light most favorable to the government, including the financials for 2006 and the uncontroverted testimony that the schools were profitable, there was sufficient evidence for the jury to find as they did – that Defendant Hough should have reported one half of the net profits of the medical schools on her individual income tax returns and that her failure to do so resulted in a substantial understatement on Line 22 in 2006.

2.  Counts Six, Eight and Nine

The question for the court is whether the jury could, based on the evidence presented at trial, rationally conclude that Defendant Hough's answer to question 7a on Part III of Schedule B was knowingly false, and that she had actual knowledge that she was required to "check the

20

box." Defendant Hough also argues that the government failed to prove that she had actual knowledge that the funds earned in the accounts were her taxable income.

      a.  <u>Defendant Hough's Answer to Question 7a on Part III of Schedule B was Knowingly False</u>

To date, there is no dispute among the parties concerning whether the jury was properly instructed; it is presumed that the jury followed the court's instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). The court's jury instructions were correct, thorough, and complete with respect to both the willfulness and knowledge standard. In addition to the standard willfulness instruction, the court both instructed the jury that proof of knowledge on the part of Defendant Hough was required and defined knowingly. Court's Jury Instructions (Doc. #109) at page 17.

Looking at Schedule B, Part III, Defendant Hough's argument ignores the initial instructions contained therein. This section of the tax return states, "You must complete this part if you (a) had over $1,500 of taxable interest or ordinary dividends; or (b) had a foreign account; or (c) received a distribution from, or were a grantor of, or a transferor to, a foreign trust." GX 1D, p. 5; 1G, p. 5; 1H, p. 5; 3Tr. 57. This threshold question is almost identical to the question Thomas Murtha testified he would have asked as part of his initial "new client intake interview" of Defendant Hough and Dr. Fredrick. 2Tr. 289; 3Tr. 48-49. He testified that the question would be in the nature of "Do you have any foreign bank accounts?" 2Tr. 240. These are not unclear or ambiguous questions.

Only after answering this initial threshold question in the positive does a taxpayer turn to question 7a. Mr. Murtha testified that Defendant Hough said she did not have a foreign bank account. Defendant Hough never told him that she had an interest in or signature authority over a bank account in the Bahamas, Switzerland or Liechtenstein, and she never asked any follow-up

questions in response to his question.  2Tr. 241-242.  He also testified that if Defendant Hough had told him that she had a foreign account he would have looked at the exceptions so as to properly fill out the form.  3Tr. 85.  However, Defendant Hough told Mr. Murtha, falsely, that she did not have a foreign account.  *Id.*  Mr. Murtha cannot inquire into exceptions that Defendant Hough affirmatively tells him do not apply to her because she claimed that she did not have a foreign account.  Furthermore, Defendant Hough testified that she was never asked about New Vanguard and "I don't know why I would have told him." 10Tr. 80, *see also* 10Tr. 87. Providing an accountant or return preparer with inaccurate and incomplete information is an accepted manner of proving willfulness.  *United States v. O'Keefe*, 825 F.2d 314, 318 (11th Cir. 1987); *see also United States v. Bishop*, 264 F.3d 535, 552 (5th Cir. 2001); *United States v. Guidry*, 199 F.3d 1150, 1157 (10th Cir. 1999); *United States v. Garavaglia*, 566 F.2d 1056, 1057-60 (6th Cir. 1977) ("taxpayer who relies on others to keep his records and prepare his tax returns may not withhold information from those persons relative to taxable events and then escape responsibility for the false tax returns which result.").

Mr. Murtha testified that Defendant Hough's tax knowledge was average, and that she understood what papers to bring in at the end of each year and what the different income items and deductions were.  2Tr. 245.  In fact, Defendant Hough exhibited her tax knowledge in sending information to her return preparer for preparation of some of her tax returns and in filing an amended 2005 Form 1040 to report a capital gains transaction not previously reported.  GX 1E, 5C and 5D.

There was also evidence introduced at trial which showed that Defendant Hough knew she was the beneficial owner for US tax purposes of an undeclared foreign account in her sole name.  In GX 3R, Defendant Hough signed a document titled "Supplement for new Account US

Status Tax Form US Withholding Tax/Natural Person Assets and Income Subject to United

States Withholding Tax declaration of Non-US Status" for her undeclared account in her

individual name.  Under Item No. 2, the document, signed by Defendant Hough, reads: "the

undersigned account holder hereby declares that he/she is the beneficial owner of the assets and

income to which this declaration relates in accordance with US tax law."  GX 3R at p. 7-9.

　　　　The jury had all of the tax returns before it to evaluate exactly what the question was.

Defense counsel argued that Defendant Hough was unaware of what the exceptions were and

elicited testimony that even Mr. Murtha was unaware of what those exceptions were.  However,

the jury rejected this argument by returning a guilty verdict.

　　　　b.　<u>Defendant Hough Knew that the Funds Earned in the Undeclared Accounts
　　　　　　Should Have Been Reported on Her Individual Income Tax Returns</u>

　　　　The government proved that Defendant Hough owned all of the undeclared accounts,

including those in the name of the Saba Foundation and MUA.  Initially, the jury heard

testimony from both David Minchenberg and RA Maurer concerning the concept of "Substance

over Form."  4 Tr. 84-85; GX 7K.  RA Maurer testified that "[s]ubstance over form means that

you can't just fill out papers, or form, and disguise what is really underneath the … what the real

underlying transaction is." 7Tr. 128.  While there was testimony at trial that, in form, no

individual can own a Netherlands Antilles Foundation, all of the evidence introduced at trial

proved that, in substance, Defendant Hough and Fredrick actually owned the Saba Foundation

and MUA.  Evidence that Defendant Hough and Fredrick in actuality owned the Foundation and

the medical schools includes the following.

　　　　In 2003, Defendant Hough and Fredrick attempted to sell the schools.  Defendant Hough

signed an April 7, 2003 Letter of Intent, GX 6D at p. 1, related to the potential sale of the

medical schools which stated that she and Fredrick "have the controlling interest in MUA/Nevis,

23

SABA and 50% of MUA Belize." *Id*.; 3Tr. 115. The letter further states that Defendant Hough and Fredrick hold their interests "free and clear of all liens, mortgages and encumbrances" and "directly or indirectly, own[] or control[] ownership of all real estate and property" associated with the schools. *Id*. Defendant Hough signed the Letter in her individual name. *Id*. p. 5. 3Tr. 156-57.

On June 25, 2003, Defendant Hough signed another Agreement related to the potential sale of the medical schools and again stated that she and Fredrick owned or controlled the Saba Foundation and MUA/Nevis. GX6F, p. 1; 3Tr. 116 - 118. She again signed the Agreement in her individual capacity as "Seller." *Id*. at p. 3; 3Tr. 157-58. On July 8, 2003, Defendant Hough emailed the potential buyers and copied Fredrick. GX 6I. She stated in that e-mail that they were concerned about the issuance of shares for Belize and that "[w]e have delayed having **our** 50% issued in our names pending a closing and legal advice." *Id*.; 3Tr. 121 – 122 (emphasis added).

On October 15, 2003, Defendant Hough transferred her shares of MUA to Dr. Fredrick. GX 7C; 4Tr. 30.

Mario deCastro drafted an opinion letter based on his understanding of who the sellers of the Saba Foundation, MUA and the other entities were. He testified that he got this understanding from his clients and he had no reason to believe that his client would not tell him what their understanding was of who the sellers were. GX 8B; 3Tr. 158-59. Further, on December 18, 2003, Dr. Fredrick forwarded this opinion letter to Jerome Schneider stating "[a]ttached is a 'very confidential' legal review of a recommended legal/tax structure for **our** medical schools. *Id*. (emphasis added). 3Tr. 233-234. The opinion letter states that the venture,

consisting of four companies, is "currently owned by Dr. David Fredrick, MD, and his wife Dr. Pat Hough, MD."  GX 8B at p. 3; 3Tr. 234.

After this potential sale fell through, Defendant Hough and Fredrick opened undeclared accounts at UBS in the names of the Saba Foundation (September 1, 2004) and MUA (September 9, 2005), identifying themselves as beneficial owners and as having signature authority over the accounts.  GX 3U, 3Y.  Numerous entries in the UBS records indicate that Luetolf understood that Defendant Hough and Fredrick owned medical colleges in the Caribbean.  *See* GX 3S, GX 3EE.  Mr. Futterknecht testified that Luetolf would have made this entry based on information received from the client**,** 1Tr 69-70, that Leutolf was under a duty to accurately document information related to the background of the client as part of "Know Your Client" and Swiss law, 1Tr. 63-4, 65, and 78, and Defendant Hough testified that she met with Luetolf, provided him with documents necessary to establish accounts, and had a discussion with him related to the medical schools.  9Tr. 117-20.

During Minchenberg's tenure, he was concerned with the legal structure and ownership was an ongoing issue.  4Tr. 47-48.  He drafted several memos concerning the exit strategy of the owners, whom he identified as Defendant Hough and Fredrick.  4Tr. 54-55, 58; GX 7D; 7E.

In April 2007, Defendant Hough and Fredrick sold the schools to Equinox Capital.  GX 10A, 10B; 10C.  Mr. Rodger testified that Defendant Hough was concerned with the direction of the schools and that "anybody who has built something from nothing would be very concerned with who was going to be involved, and whether they were going to, you know, carry the same banner that they've put out there."  6Tr. 16.  Mr. Rodger also testified that Defendant Hough signed a personal guaranty and that the deal would not have closed without a personal guaranty

of the sale by Defendant Hough and Fredrick.  6Tr. 23-24.  Mr. Rodger further stated that he was quite confident that Defendant Hough knew what the guaranty meant.  6Tr. 95.

The jury, based on all of this evidence and testimony, could reasonably conclude that the Saba University School of Medicine Foundation, the Saba University School of Medicine, MUA, and the other nominee entities were nothing more than "form," and that the true substance of the transactions was that Defendant Hough and Fredrick were the actual owners of Saba University School of Medicine Foundation, Saba University School of Medicine, MUA and the other nominee entities.  The fact that many of the witnesses testified that no one could own a Foundation was based solely on the form of the entity and not on the actual substance of the transactions because Defendant Hough and Fredrick concealed their conduct and their control of all of these entities from these same witnesses.  The witnesses had no personal knowledge of the other acts committed by Defendant Hough that evidenced her knowledge that she owned the Saba University School of Medicine Foundation, the Saba University School of Medicine, MUA, or any of the other nominee entities.  In fact, Defendant Hough testified that the only people that knew about the nominee entities were herself, Fredrick, Singenberger and Luetolf and maybe Dr. Bautista and Mr. Johnson; she did not think even the Board of Directors for the schools were aware of the entities.  10Tr. 83-85, *see also* 4Tr. 45-46; 5Tr. 114, 155-56.

3.   The Government Proved that the Additional Income Was Required To Be Reported by Defendant Hough on her Individual Income Tax Returns

In addition to the testimony detailed above, Mr. Murtha testified that if Defendant Hough had interest income from a foreign bank account that was not reported on her tax return, it would have probably increased the total income.  3Tr. 16.  Murtha testified that if Defendant Hough told him that she owned the medical schools and sold them in 2007, he would have reported the capital gains on her tax return.  3Tr. 21.  This additional income would have increased her Line

26

22 total income and her tax due and owing.  *Id*.  RA Maurer also testified that Defendant Hough

should have reported all of the income in the undeclared accounts on her individual income tax

returns if they owned the accounts.  7Tr. 37, 41-42, 46, 52-3, 55, 71-2, 84-5, 93, 100, and 106-7.

     4.  <u>Defendant Hough Was Aware of the Additional Income Earned in the Accounts</u>

     Defendant Hough was aware that these accounts were investment accounts intended to

earn money.  Included in the account opening documents were Asset Management Agreements

which Defendant Hough executed.  *See* GX 3R at p. 15.  These agreements detail the investment

strategy the client wished to employ.  Defendant Hough signed one for the account in her sole

name on April 7, 2004, *Id* at p. 19, and there were similar agreements in all of the other accounts

which Defendant Hough also signed.  GX 3C at pp. 23-32, 3U at pp. 17-26, 3Y at pp. 15-24,

3CC at pp. 23-27 and 3GG at pp. 14-20.  Defendant Hough also appointed her sister, Charlene

Varga, as power of attorney on this account and emailed Luetolf to make sure that he received

the signed paperwork.  GX 3R at p. 13-14**.**  When Defendant Hough closed her account and

transferred the funds to an account in the name of New Vanguard, the letter requested that UBS

transfer "all equities and other assets" to the newly formed company.  GX 3S at p. 9.  David

Fredrick emailed Luetolf on February 8, 2005 stating "Pat said you wanted to tell me about a

plan that she was in that I was not…you are not going to let her make more money than me, are

you?"  GX 3KK at p. 13.

     A critical piece of evidence demonstrating knowledge of not only the income earned in

the accounts, but of the object of the conspiracy, is Exhibit 3HH, page 20.  This exhibit is a

February 6, 2004 email from Fredrick to Luetolf, with a copy to Defendant Hough.  In that e-

mail, Fredrick states "Pat and I were discussing how/who would handle our overseas financial

affairs in the event of our death."  *Id*.  Fredrick explains that they presently have all of their funds

27

in one joint account and were considering dividing the funds into two separate accounts – one for each of them.  *Id*.  Defendant Hough, on March 18, 2004, confirms that she is in agreement with the arrangement to split the accounts.  GX 3HH at p. 27.

Defendant Hough claims that there was "no evidence introduced demonstrating that she in any way controlled or directed the funds or that she even knew the funds used to make any purchases came from New Vanguard and Top Fast.  Defendant's Motion at p. 24, fn19.  This is wholly false and belied by the evidence introduced at trial.  First, Defendant Hough testified that she was aware of the use of the funds because she claimed that Fredrick told her on multiple occasions that funds taken from the accounts and used for personal expenditures were deferred compensation.  9Tr. 254-55, 259-60.  Also, Defendant Hough was copied an email from Fredrick to Marc Rudow for the purchase of the land next to their Asheville, NC home.  Fredrick detailed to Mr. Rudow that he has "instructed our overseas bank to wire" $200,000 for the purchase of the land.  GX 12F; 5Tr. 14-15.  Again, the jury is free to disbelieve Defendant Hough's testimony and find just the opposite.

///

///

///

///

///

///

///

///

///

28

## CONCLUSION

The government presented overwhelming evidence for a reasonable juror to find Defendant Hough guilty beyond a reasonable doubt as charged in the Indictment.  The government proved that Defendant Hough knowingly and willfully agreed with Fredrick to achieve the specific criminal objective of defrauding the IRS and proved numerous overt acts within the statute of limitations.  Furthermore, the government proved that Defendant Hough knowingly and willfully filed false tax returns for 2005, 2006, 2007, and 2008 intending to violate the law.  For the foregoing reasons, Defendant Hough's motion should be denied without argument.

LEE BENTLEY

Acting United States Attorney

By:　　/s/ Caryn D. Finley
　　　　CARYN D. FINLEY
　　　　Trial Attorney, Department of Justice, Tax
　　　　Division
　　　　New York Bar No. 3953882
　　　　2110 First Street, Suite 3-137
　　　　Fort Myers, Florida  33901
　　　　Telephone:  (202) 514-5051
　　　　Facsimile:  (202) 514-0961
　　　　E-mail: caryn.finley@usdoj.gov

By:　　/s/ Margaret Leigh Kessler
　　　　MARGARET LEIGH KESSLER
　　　　Trial Attorney, Department of Justice, Tax
　　　　Division
　　　　2110 First Street, Suite 3-137
　　　　Fort Myers, Florida  33901
　　　　Telephone:  (202) 514-5193
　　　　Facsimile:  (202) 514-9623
　　　　Margaret.Leigh.Kessler@usdoj.gov

10872345.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 11, 2013, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing

(NEF) to the following:

Bruce L. Udolf
Charles Edward Falk
Brianna L. Abrams

In addition, I have served copies of this filing on the following parties using email:

Nathan J. Hochman
Daniel Saunders

/s/ Caryn D. Finley
CARYN D. FINLEY
Trial Attorney, Department of Justice,
Tax Division
New York Bar No. 3953882
2110 First Street, Suite 3-137
Fort Myers, Florida  33901
Telephone:  (239) 461-2200
Telephone:  (202) 514-5051
Facsimile:  (239) 461-2219
E-mail: caryn.finley@usdoj.gov

10872345.1