UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Case No. 2:13-cr-00072-JES-UAM

UNITED STATES OF AMERICA,

    Plaintiff

v.

DAVID LEON FREDERICK, and
PATRICIA LYNN HOUGH

    Defendants.

_____/

**DEFENDANT PATRICIA LYNN HOUGH'S
OBJECTIONS TO PRESENTENCE REPORT AND
RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM**

COMES NOW, Defendant Patricia Lynn Hough, by and through her counsel of record, and submits her Objections to Presentence Report and Response to Government's Sentencing Memorandum (filed on April 14, 2014).

    I.    **OBJECTIONS TO "OFFENSE CONDUCT" SECTION OF PRESENTENCE REPORT**

Dr. Hough timely submitted her objections to the presentence report, including its recitation of the offense conduct, to the Probation Officer; those objections are attached to the revised presentence report. The great majority of the objections were rejected, presumably based at least in part on the government's repeated refrain in its response that the objections "ask[] probation to call into question the guilty verdict in the case." Dr. Hough's objections do no such thing. The jury issued no special verdict, and there is no evidence as to which of the scores of overt acts in the indictment it found to have been proved beyond a reasonable doubt. Thus, a challenge to the presentence report's account of the <u>facts</u> underlying a particular transaction, communication, or other overt act, based on the evidence presented (or not presented) at trial, is in no way inconsistent with the jury's verdicts.

For each of the unresolved objections, this Court must either rule on the dispute or make a determination that a ruling is unnecessary because it will not affect sentencing or because it will not be considered in sentencing. Fed. R. Crim. P. 32(i)(3)(B). A copy of the court's findings and determinations must be appended to any copy of the presentence report made available to the Bureau of Prisons. Fed. R. Crim. P. 32(i)(3)(C). "Strict adherence to the dictates of [Rule 32(i)(3)(C)] is essential because the rule helps ensure that future decisions about a defendant's penal treatment are based on a fair and accurate PSI." *United States v. Lopez*, 907 F.2d 1096, 1101 (11th Cir. 1990).

As reflected in her submission to the Probation Officer, one of Dr. Hough's most prevalent objections to the recitation of the offense conduct in the presentence report is that it over and over again attributes to her acts committed by her codefendant Fredrick as to which there is no evidence of Dr. Hough's involvement (and as to which, in many instances, there is affirmative evidence of her lack of involvement). In response to this objection, the government cites the *Pinkerton* principle that a conspirator is legally liable for the reasonably foreseeable acts of her coconspirator in furtherance of the conspiracy. (Gov't Sentencing Memo at 2-3). The "Offense Conduct" section of the presentence report, however, states <u>facts</u>, not conclusions of legal liability. It should accurately state who within the conspiracy did what, based on the evidence presented; it should not assert that Dr. Hough did things that the evidence shows she in fact did not do, regardless of whether she could be held legally liable for such acts. An accurate recitation of the limited nature of Dr. Hough's own acts is essential in addressing Dr. Hough's argument for a minimal-role adjustment,[1] and could also be important in addressing her licensing issues in other proceedings. Yet the PSR continues to obtain numerous demonstrably false statements, including the following:

---

[1] For this reason, Dr. Hough believes it would be difficult for the Court to find that the disputed matters will play no role in determining the sentence – unless, of course, the Court grants Dr. Hough's request for a variance to a sentence of probation.

¶ 20: "Hough and Fredrick explained that they closed their Bahamas accounts because of legislation between the Bahamas and the United States that required disclosure of information concerning United States citizens with bank accounts." The referenced correspondence not only came from Fredrick alone (and **not** Dr. Hough), but said nothing whatsoever about legislation or disclosure of information concerning United States citizens. (Gov. Trial Exh. 3HH p.2, 3P p.6).

¶ 21: "Hough and Fredrick caused Singenberger to open undeclared foreign accounts in the name of New Vanguard and Top Fast at UBS . . . [and] caused Singenberger to open an undeclared foreign account in the name of the nominee entity Ample Dynamic." There is no evidence that Dr. Hough had anything to do with the opening of those accounts, and she did not sign any of the account opening documents for any of them.

¶ 23: "As part of [the attempted sale of the schools in 2002], Hough and Fredrick provided the buyers with information concerning the profitability of the schools as well as ownership." Dr. Hough played no role in providing this information; Mario de Castro, the attorney for the potential buyers who negotiated the deal, testified that he never met, spoke with, or corresponded with Dr. Hough. (10/10/13 RT 128).

¶ 24: "Between 2001 and 2011, Hough and Fredrick caused dozens of monetary transactions to be conducted using the undeclared foreign accounts." **The government cannot point to a single monetary transaction involving the undeclared accounts that Dr. Hough caused to be conducted.** Her **only** involvement with the foreign accounts, other than signing some blank opening documents, was approving the transfer of funds (initiated by Fredrick) into an account in her name and, 14 months later, approving the transfer of every penny that had been put into that account into the New Vanguard account. Every deposit, withdrawal, expenditure, and wire transfer was directed by Fredrick, assisted by Dieter Luetolf and Beda Singenberger.

¶ 24: "Hough and Fredrick caused funds [from the 2007 sale of the medical schools] to be invested in the undeclared accounts in their own names and in the names of the nominee entities." Dr. Hough did not cause any such thing. Government witness Steven Rodger, the head

of Equinox Capital, testified that Dr. Hough's involvement in the negotiation of the sale was limited to discussing her consulting agreement and guaranty; she had nothing to do with the allocation of proceeds, which was negotiated solely by Dr. Fredrick.  Moreover, no funds from the sale were deposited in any undeclared account in Dr. Hough's name, nor did any such account even exist at the time.

¶ 24:  "Hough and Fredrick were concerned about their individual names being on wire transfers into the United States . . . ."  There is absolutely no evidence that Dr. Hough was ever concerned about her name being on any wire transfer.

¶ 38:  "It was [David] Minchenberg's understanding that Hough and Fredrick owned the management company [for the medical schools]."  In fact, Minchenberg testified (accurately) that Fredrick alone owned 100% of the management company, Education Information Consultants, Inc.  (10/11/13 RT 15, 55-56).

The above is only a representative sampling of the many false statements in the presentence report that attribute acts to Dr. Hough that are unsupported by, and in many instances directly contradictory to, the evidence in this case.  Dr. Hough is entitled to an accurate presentence report on which the most important decisions affecting her life will be based.  *See United States v. Jones*, 856 F.2d 146, 149 (11th Cir. 1988) ("The importance of an accurate PSI in unquestioned.").[2]

## II.   OBJECTIONS TO ADVISORY GUIDELINE COMPUTATION OF PRESENTENCE REPORT

### A.   Base Offense Level

1.   <u>The Government Should Not Be Allowed to Argue For a Tax Loss Greater Than That to Which Its Own Expert Testified Under Oath at Trial</u>

The presentence report calculates the advisory guideline range by using a base offense level of 26 based on a tax loss of greater than $7,000,000, based on the government's

---

[2] Dr. Hough's unresolved objections to the "Offense Conduct" section of the presentence report address paragraphs 7-10, 13-16, 20-25, 27-29, 31-35, 37-38, and 40-45.

representation to the Probation Officer. (PSR ¶¶ 45, 51). However, IRS Revenue Agent Sheila Maurer, the government's own tax computation expert, testified under oath at trial that the total tax loss attributable to Dr. Hough for the charged years of 2005-2008 is $3,162,031, and the total combined tax loss attributable to Dr. Hough and Fredrick is $6,317,860. (Gov. Trial Exh. 30I; 10/17/13 RT 142). That is the largest tax loss number available to the government based on its own expert's calculations sworn to under penalty of perjury, which the Court will recall were revised six days into trial based on the trial testimony and exhibits presented (leading the Court to observe of Ms. Maurer, "She clearly got it wrong, it is just a matter of which wrong you want to pick." (10/21/13 RT 19)). Stunningly, months after Ms. Maurer testified under oath to her "accurate" tax loss calculations at trial, the government now asks the Court to rely on yet a **third** version of those calculations – which increase the combined tax loss by almost 150% – in a misguided and vindictive attempt to jack up Dr. Hough's advisory guideline range as high as possible,

Ms. Maurer prepared her initial Revenue Agent Report (RAR) on May 14, 2013, after having been assigned to this case for four years. That RAR was presumably used to present the indictment to the grand jury, was produced in discovery for the defense to prepare its case, and was marked by the government as an exhibit on the first day of trial. Six days into trial, on October 14, 2013, Ms. Maurer abandoned and drastically revised her four-years-in-the-making initial RAR, purportedly based on witness statements and documents that had been in the government's possession for years. Ms. Maurer testified under oath to the accuracy of her calculations in the second RAR, and the jury presumably relied on that testimony in convicting Dr. Hough. Now Ms. Maurer asks the Court to ignore both of her prior "accurate" calculations and rely instead on a third RAR, prepared months after the trial in this case, that flatly contradicts both the prior RARs and Ms. Maurer's own sworn testimony. For example, in RAR #1, Ms. Maurer stated that Dr. Hough owed the IRS $842,310 in unpaid income taxes for 2006. In RAR #2 (and in her sworn testimony during trial), Ms. Maurer stated – in direct contravention

of the charges in the indictment – that Dr. Hough was owed a **refund** of $2,282 for 2006; the Court relied on that testimony in dismissing the jury's conviction on Count Seven.[3]  Now, in RAR #3, Ms. Maurer has now suddenly concluded for the first time that Dr. Hough owes the IRS $1,390,940 for 2006 – the second largest tax loss in the six years in question, despite the Court's acquittal pertaining to that year.[4]

According to the government, this second about-face by its "expert" results from her review of unspecified "additional materials" that allowed her to calculate the "profits" of the Saba University School of Medicine and the Medical University of the Americas (MUA).  At trial, as this Court observed, the government's theory of "free floating" profits (which the government raised in a desperate attempt to save Count Seven from dismissal) was unsupported by Ms. Maurer, who was not comfortable attributing any value to such profits and testified that she lacked sufficient information to provide more than estimates.  (10/17/13 RT 139; 10/21/13 RT 17-20).  Upon being asked to identify the "additional materials" that Ms. Maurer reviewed post-trial, however, the government confirmed that they consist of David Minchenberg documents that were produced to the defense long before trial and that Ms. Maurer unquestionably either reviewed or could have reviewed prior to her trial testimony.  Despite repeated requests, the government has presented the defense with no detailed report from Ms. Maurer explaining what information in which document led her to more than double the tax loss from her sworn testimony.  There is no excuse for this further sandbagging by the government, and the Court should reject the latest RAR incarnation out of hand.

Moreover, Ms. Maurer's newest calculations are flatly contradicted by the evidence.  Dr. Hough could not possibly have received $4,182,483 in "net income" from MUA from 2004 to

---

[3] Ms. Maurer, unlike the Court, refused to acknowledge that this swing of nearly one million dollars in her two sets of calculations was an error.  (10/18/13 RT 99).

[4] While seeking to send Dr. Hough to prison for many years for mistakes on her tax forms, the Tax Division is presumably not seeking to indict Ms. Maurer for making false statements to the government on numerous occasions pertaining to those same tax forms.

2007, as she held absolutely no financial interest in that for-profit entity during those years. According to the documents and uncontradicted testimony presented at trial, Dr. Hough's only ownership interest in MUA consisted of 250 shares that were unknowingly assigned to her by Fredrick in March 2003 and that she transferred back to Fredrick as soon as she learned of them in October 2003.  (Gov. Trial Exh. 7C; 10/21/13 RT 88-89).  Ms. Maurer does not explain how someone can possibly earn profits from a business entity in which she holds no shares or ownership interest.  Nor does Ms. Maurer reveal how she attributes to Dr. Hough over $7.4 million in "net income" from the Saba University School of Medicine from 2003 to 2007 (separate and apart from the sale of the schools), given that the Saba School was undisputedly organized and run as a not-for-profit entity that by definition can yield no net income or profits, as all revenue is invested back into the entity.  The financial statements introduced by the government at trial attest to the fact that the Saba University School of Medicine made no profits, as it was a non-profit institution (Gov. Trial Exh. 8Q, 9N).

   The government's submission of Ms. Maurer's third version of her "accurate" expert tax calculations is but another step in the government's misguided, win-at-all-costs approach to this case.  The new RAR should be rejected and given no weight by this Court.  Should the Court consider RAR #3, however, Dr. Hough requests an evidentiary hearing at which defense counsel will have the opportunity to cross-examine Ms. Maurer on her latest series of calculations.  Prior to such hearing, the government should be ordered to present the defense with a report detailing how Ms. Maurer reached her calculations as well as the precise documents she used in coming up with these newly inflated numbers.

   2.  <u>The Tax Loss Properly Attributable to Dr. Hough is Zero</u>

   Dr. Hough respectfully submits that the tax loss in this case is zero for all the reasons discussed in her Rule 29 motion, including that all income from the foreign accounts did not belong to Dr. Hough because the assets from which that income derived did not belong to Dr. Hough.  Even putting aside that argument, however, the government cannot assert an amount of

**criminal** tax loss without establishing, at least by a preponderance of the evidence,[5] that Dr. Hough **willfully** failed to pay that amount of tax – *i.e.*, that she was aware of the specific amounts of unreported income on which the unpaid tax was due. *See* USSG § 2T1.1, comment. (backg'd) (tax loss guideline focuses on "the amount of loss that was the object of the offense"). This is not a matter of relitigating the jury verdict. The jury made **no finding** as to any amount of tax loss. Indeed, the government repeatedly took the position that tax loss was not an element of the charged offenses and that it did not need to prove any tax due and owing. (10/21/13 RT 16-17; 10/23/13 RT 133). The jury was so instructed. (10/23/13 RT 155). Now, however, is the time for the government not to speculate or throw around numbers created by its "expert" after deciding for the second time that her earlier numbers were inaccurate, but to **prove** that Dr. Hough is **criminally responsible** – *i.e.*, that all of the elements of tax evasion, including an intentional violation of a known legal duty, are satisfied – for **each of the items of unreported income** that go into the government's latest calculation of tax loss. Again, this is not a question of guilt; it is a question of tax loss, which the government has consistently maintained is a wholly separate issue. And in the absence of proof that Dr. Hough was aware of income from the foreign accounts, then the tax loss attributable to that income was not the intended "object of the offense" and it should not be used to determine Dr. Hough's base offense level.

The trial record is empty as to <u>Dr. Hough's knowledge</u> of whether the foreign accounts

---

[5] Although the Eleventh Circuit has not yet required it, some courts have held that due process mandates a "clear and convincing evidence" standard when a sentencing factor has an "extremely disproportionate effect" on a sentence relative to the offense of conviction. *See, e.g., United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001); *see also United States v. Megerson*, 4 F.3d 337, 343 (5th Cir. 1993) (recognizing "a growing number of cases decided by courts in other circuits in which a higher standard of proof has been suggested or required when a finding of a particular fact relevant to sentencing dramatically alters the sentencing options of the court to the disadvantage of the defendant") Here, the difference between an offense level of 6 (for zero tax loss) and 26 (for a tax loss over $7,000,000, as advocated by the government) is the difference between a 0-6 month imprisonment range and a 63-78 month range. Dr. Hough respectfully submits that the higher standard of proof is appropriate here. *See United States v. Hopper*, 177 F.3d 824, 833 (9th Cir. 1999) (enhancements increasing sentencing range from 24-30 months to 63-78 months had extremely disproportionate impact requiring proof by clear and convincing evidence).

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866)951-9058/ budolf@udolflaw.com
A/75992943.1/3325070-0000366042

that form the basis for Ms. Maurer's tax loss calculations – those of the Saba Foundation, New Vanguard, Top Fast, and Patricia Hough – earned taxable interest, ordinary dividends or capital gains, and none of Ms. Maurer's multiple RARs even addresses this point. The government has presented no testimony or documents evidencing that Dr. Hough actually knew that the accounts or transactions that formed the basis for Ms. Maurer's reports generated any interest, dividends or capital gains. To the contrary, the bank records show that the New Vanguard and Top Fast statements (from UBS, LLB, and Fortis Banque) went to Sinco Treuhand AG in Zurich, and the Patricia Hough UBS account and Saba Foundation LLB statements were retained by the banks. There is no evidence that any statements were ever sent to or reviewed by Dr. Hough. There is no evidence that anyone ever discussed with Dr. Hough whether any of these accounts earned money, stayed the same, or lost money. There is no evidence that Dr. Hough instructed any trades in any of these accounts or had any communications with Dieter Luetolf or anyone else regarding the performance of the accounts. (Dr. Hough's only instruction to Luetolf with respect to the UBS account in her name was to close it down and transfer the money to another account. (Gov. Trial Exh. 3S p.9)). There is no evidence that Dr. Hough ever saw or signed a single document related to the New Vanguard or Top Fast accounts, as to which she was not even a signatory. There is not a single document, conversation, or witness demonstrating that Dr. Hough was ever privy to any knowledge that she was understating her income.

Similarly, with respect to the capital gains earned by New Vanguard from the April 2007 Round Hill transaction and by the Saba Foundation from the April 2007 sale of the Saba University School of Medicine, there is no evidence that Dr. Hough actually knew whether those transactions generated any capital gains. As Stephen Rodger testified, Dr. Hough's involvement in the negotiation of the sale was limited to discussing her consulting agreement and the guaranty; it did not extend to deciding the allocation of the sales proceeds, which was negotiated solely by Dr. Fredrick and the attorneys. (10/16/13 RT 14-15, 39, 87-88). There is no evidence in the record that Dr. Fredrick (or anyone else) ever discussed the allocation of funds from the

sale with Dr. Hough or that she ever saw the Flow-of-Funds document (which, unlike many of the sale documents, had no signature block). (Gov. Trial Exh. 10F). As Ms. Maurer conceded, the gross proceeds from the sale do not necessarily mean that any reportable capital gains occurred from the sale; in order to determine capital gains, one has to know what the basis was for the asset being sold and subtract that basis from the sales price, and only then can one determine if capital gains occurred. (10/17/13 RT 18). Thus, if the Round Hill property had been allocated only $3 million as part of the overall purchase price of the schools, then the over $3 million basis determined by Ms. Maurer for that property would have resulted in there being no capital gain from the sale of Round Hill. (10/17/13 RT 134). Similarly, Agent Maurer testified that she allocated no basis for the sale of the Saba School of Medicine, even though there were significant costs incurred over the course of a decade in creating and maintaining two of the school's main assets – the contracts with hospitals for clinical rotations and the accreditations with the individual states, the U.S. Department of Education, Canada and the European Union. (10/17/13 135; 10/18/13 RT 126-28). Even assuming that Agent Maurer correctly calculated the capital gains for the April 2007 Round Hill and Saba School of Medicine sales (the Round Hill capital gain having changed substantially from RAR #2 to RAR #3), there is not a scintilla of evidence in the record that Dr. Hough knew the sales prices allocated to each asset, knew the basis for each asset, and consequently knew whether any capital gains for each asset were earned at all.

Nor, even if the government could show that Dr. Hough was aware of the interest, dividends, and capital gains that form the basis for Ms. Maurer's newest report, is there any evidence whatsoever that Dr. Hough knew such income was reportable on her tax returns (and therefore violated a known legal duty in failing to report that income). The only evidence that the jury heard on this issue came from government witness David Minchenberg's testimony and an email that he sent to Dr. Hough on December 23, 2004. In that email, Mr. Minchenberg, a CPA, advised his client:

> The IRS requires that if a US citizen owns an interest in a foreign entity, they must file the IRS Form 5471 with their annual tax return. The Form 5471 is purely an informational document for the IRS. What is meant by informational – is that the Form itself does not create any type of tax to the filer. Generally, US citizens are allowed to own interest(s) in foreign entities. Usually, the only time a tax is "triggered" is when the US citizen brings money (in the form of profits, gains, etc.) back into the US. That said, **if the citizen is the beneficiary of said profits, gains, etc. and keeps those funds "off-shore" and doesn't bring them back into the US, then, there are generally no taxes incurred by the US citizen**.

(Gov. Trial Exh. 7S (emphasis added)). Mr. Minchenberg confirmed in his testimony that these statements accurately reflected his understanding of United States tax law. (10/11/13 RT 138). The government has presented no evidence to show that the taxable interest, ordinary dividends, and capital gains earned in the Saba Foundation's, New Vanguard's, Top Fast's, and Patricia Hough's Swiss accounts were ever repatriated to the United States. That is the state of the record in this case.

In light of the complete absence of evidence of Dr. Hough's knowledge of the existence and extent of the interest, dividends and capital gains that Ms. Maurer asserts as the basis for her tax loss calculations, as well as the absence of evidence of Dr. Hough's knowledge that any such income was reportable on her tax returns (in direct contravention of the advice from a CPA), the government has not carried its burden – and it **is** the government's burden – of proving **any amount** of **criminal** tax loss in this case. In the absence of such proof, the tax loss is zero, and the base offense level is six. *See* USSG § 2T1.1(a)(2).

B.   **Role in the Offense**

Should the Court adopt any of the government's various sets of calculations seeking to hold Dr. Hough accountable for vast sums of tax loss far beyond her highly limited knowledge or participation, then Dr. Hough respectfully submits that a four-level minimal participant downward adjustment is warranted here under USSG § 3B1.2(a). The guideline commentary states that this adjustment "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, *the defendant's lack*

11
Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866)951-9058/ budolf@udolflaw.com

A/75992943.1/3325070-0000366042

*of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant.*" USSG § 3B1.2(a), comment. (n.4) (emphasis added).

The Probation Officer has concluded that a mitigating role adjustment "does not appear warranted" because Dr. Hough "was an active and average participant" in the offense conduct. (PSR Addendum at 4). The evidence does not support that conclusion. Despite presenting 20 trial witnesses and thousands of pages of exhibits, **the government did not show a single deposit, expenditure, wire transfer, or other transaction involving the foreign accounts that was initiated and directed by Dr. Hough**. Rather, all such transactions were initiated and directed by Fredrick. The most that can be said for Dr. Hough, fully accepting the government's evidence, is that she signed documents (at least some of which were blank) that were put in front of her by her husband while she was dedicating herself full-time to the clinical programs and accreditation process of the medical schools. As reflected by the bank records, Dr. Hough played no role with respect to the accounts in the Bahamas; she did not direct Luetolf and Singenberger in the creation or management of the nominee accounts; she had no signature authority over the New Vanguard, Top Fast, or Ample Dynamic accounts; she played no role in any transfer of funds from the schools' accounts to the accounts of the nominee entities; and she played no role in the closing of the UBS accounts or the opening of accounts at Fortis Banque, Liechtenstein Landesbank, and Bank Alpinum (with the single exception of the Fortis account for MUA). In addition, Dr. Hough played no role in providing financial information in 2002 to the potential buyers of the schools (as testified to by government witness Mario de Castro); she played no role in the 2005 and 2006 audits of the schools (as testified to by government witness Jerry Schneider); she did not control or direct the apportionment of the proceeds from the 2007 sale of the schools (as testified to by government witness Steven Rodger); she had no involvement in the original 1999 purchase of the Round Hill property in the name of Fredrick's daughter (as testified to by government witness Laura Whitley); she had no involvement in

Fredrick's purchase of the Piper Meridian airplane (as testified to by government witness Fredrick Ahles); she had no ownership interest in EIC, Medical Education Group, or (other than for a few months in 2003) MUA (as testified to by government witness David Minchenberg); she had no knowledge of Fredrick's monetary gifts to his family members from the offshore accounts (as testified to by government witnesses Marion Cronan, Perry Garner, Melanie Pitts, and Susan McBride); she fully cooperated with David Minchenberg in the preparation of Forms 5471 while expressing her desire to be in full compliance with her tax obligations (as testified to by government witness Minchenberg); and she never expressed any concerns about disclosure, about her name appearing on transfer records, or about concealing any assets or income from the IRS (as reflected by the complete absence of such concerns in any document or testified to by any government witness).

Moreover, the consistent testimony from government and defense witnesses at trial made clear that Dr. Hough is not financially sophisticated and therefore could not have had a full understanding of the scope of the complex tax conspiracy in which the government claims she participated. Dr. Hough's accountant, government witness Thomas Murtha, described her as having "average" tax knowledge and being very conservative and conscientious about her taxes. (10/9/13 RT 245; 10/10/13 RT 55-56). (Murtha also testified that Dr. Hough corrected her own mistake and filed an amended 2005 return when she realized that she had inadvertently failed to report an $11,000 gain on some investment property. Murtha would never have known about that income if Dr. Hough had not self-reported it. (10/10/13 RT 63-64).) Dr. Paul Dalbec, the Chairman of the Board of Trustees of the Saba University School of Medicine, testified that Dr. Hough relied on advice and direction from others on business matters, that Fredrick made the decisions regarding assets, investments, and acquisitions, and that Dr. Hough played no role in the financial side of the schools or the Foundation. (10/15/13 RT 193-94). Dr. Alan Gruber, a former professor at the Saba University School of Medicine, testified that financial issues were not Dr. Hough's "territory," that she had only a "superficial" understanding of finances, and that

she was never involved with the financial aspects of the schools (which were handled exclusively by Fredrick). (10/17/13 RT 180-81). Antoine Solagnier, the former Governor of Saba, testified that Dr. Hough referred all financial matters relating to the schools to Fredrick. (10/18/13 RT 241). Finally, retired Oklahoma District Judge Thomas Walker, who has known Dr. Hough for 49 years and has served on boards with her, testified that financial matters are "not [Dr. Hough's] strong suit," that she does not understand the details of financial structures or financial statements, that she is not knowledgeable about accounting issues or investments, and that she relies on others for guidance on financial matters. (10/18/13 RT 199-201).

The government notified the Probation Officer that a mitigating role adjustment is not warranted because, *inter alia*: (1) Dr. Hough played an "integral" role in the conspiracy by developing the curriculum and obtaining accreditation for the schools, which "ultimately" was instrumental in the schools being sold to Equinox Capital; and (2) Dr. Hough was convicted of three counts of filing false individual income tax returns, as to which she was solely responsible for providing her return preparer with the necessary information. Neither of these arguments supports denying a role adjustment here. The government's first argument rests on the ludicrous concept that Dr. Hough's wholly legitimate work in developing curricula and accrediting successful medical schools to train thousands of doctors was so that she could later sell those schools, put the proceeds in foreign bank accounts, fail to pay taxes on those accounts, and thereby defraud the IRS. Dr. Hough's professional conduct with respect to developing the curriculum and securing accreditation is simply far too attenuated from any illegal acts to be considered part of the conspiracy; indeed, her work on behalf of the schools is mentioned nowhere in the indictment, either as part of the "manner and means" of the conspiracy or as part of any of the 113 overt acts charged.

As to the government's second argument, although Dr. Hough was convicted of counts relating to her individual returns as well as the conspiracy, the Guidelines make clear that "[t]he determination of a defendant's role in the offense is to be made on the basis of all conduct within

the scope of § 1B1.3 (Relevant Conduct) . . . and not solely on the basis of elements and acts cited in the count of conviction." USSG Ch. 3 Pt. B (intro. comment.); *see United States v. Rodriguez de Varon*, 175 F.3d 930, 940-45 (11th Cir. 1999) (en banc) (determination of a defendant's mitigating role involves measuring the defendant's role against (1) the relevant conduct for which she is held accountable at sentencing, and (2) the other participants in that relevant conduct). In other words, as part of the first step, "the district court must assess whether the defendant is a minor or minimal participant in relation to the relevant conduct attributed to the defendant in calculating her base offense level." *Rodriguez de Varon*, 175 F.3d at 941. Here, the government seeks to set Dr. Hough's base offense level not on the basis of the amount of tax loss attributable to her individual returns for 2005, 2007, or 2008, but rather for all tax loss attributable to both her and Fredrick's returns for a six-year period (2003-08). The government cannot seek to hold Dr. Hough responsible for the entire tax loss of the conspiracy as relevant conduct and simultaneously argue that her role in the offense should be assessed only by reference to her individual substantive counts of conviction. Under the plain language of the Guidelines and Eleventh Circuit law, Dr. Hough's role must be measured with respect to the entirety of the relevant conduct attributed to her by virtue of the conspiracy conviction, and must further be assessed in relation to Fredrick's involvement in that same conduct. As the Eleventh Circuit en banc explained:

> [G]iven the relatively broad definition of relevant conduct under § 1B1.3, some defendants may be held accountable for conduct that is much broader than their specific acts. A conspiracy conviction is the classic example of this phenomenon. In such cases, a defendant's relevant conduct may be coextensive with the entire conspiracy even though her role in that conspiracy was relatively minor. Under these circumstances, a district court may adjust the defendant's sentence for her mitigating role in this broad criminal conspiracy. This adjustment allows a district court to impose a sentence that more closely mirrors the defendant's actual conduct, furthering the Guidelines' goal of imposing comparable sentences for similar acts.

*Id.*

For the foregoing reasons, it is clear that Dr. Hough, even fully crediting the government's proof, was far less culpable than Fredrick and lacked full knowledge and understanding of the scope and structure of the enterprise and of the activities of others in furtherance of the conspiracy charged in the indictment, which forms the basis for the calculation of her base offense level. As such, Dr. Hough is entitled to a four-level decrease as a minimal participant.[6]

### III.   RESPONSE TO GOVERNMENT'S SENTENCING POSITION

As shown in Dr. Hough's separately filed sentencing position and in the letters submitted to the Court in her support, it is difficult to imagine a case in which the statutory sentencing factors listed in 18 U.S.C. § 3553(a) more compellingly call for a non-Guidelines sentence. The Probation Officer has agreed that a sentence below the advisory guideline range may be warranted in light of Dr. Hough's personal history and characteristics. (PSR ¶ 115). In light of this recognition and the truly exceptional nature of Dr. Hough's lifelong history of public service and betterment of thousands of lives around the world, the government's reflexive opposition to **any** variance is nothing more than unseemly saber-rattling that bespeaks a lack of balance and proportionality, and borders on vindictiveness for Dr. Hough exercising her right to a trial.

While Dr. Hough's sentencing memorandum rebuts the government's application of the § 3553(a) factors, one factual claim in the government's memorandum bears addressing here. The government points to Dr. Hough's recent transfer of the proceeds of the sale of her Englewood home to the Saba Foundation, as well as her use of the word "our" as evidence that "the conspiracy is still ongoing" and that Dr. Hough needs to go to prison. (Gov't Sentencing Memo at 3-4, 9 n.7, 12). As it has done throughout this case, the government leaps to conclusions from incomplete facts and assumptions and ascribes nefarious (even criminal) motives to innocent and justifiable conduct.

---

[6] At minimum, a two-level adjustment for minor participant or a three-level adjustment for cases falling between minimal and minor participant is warranted. *See* USSG § 3B1.2(b).

As testified to at trial, Dr. Fredrick and Dr. Hough purchased their Sarasota rental condominium in 2008 with a loan from the Foundation against Fredrick's deferred income. (10/21/13 RT 259-61). Government witness Paul Dalbec confirmed the existence and Board approval of this and other loans. (10/15/13 108-09, 173-76). The May 2008 loan for the Sarasota condominium was $850,000 at 4.5% per annum interest, yielding a balance in December 2013 of approximately $1.1 million. The balance of the amount wired to the Foundation was a payment towards legal fees that had been advanced by the Foundation to Bingham McCutchen LLP. The reason Dr. Hough signed for Fredrick was simply because the Englewood house was in a trust held in both of their names, as to which Dr. Hough has held Fredrick's power of attorney since 2000. (Exh. "A" attached hereto). There is nothing illicit or inappropriate in Dr. Hough seeking to pay off her outstanding loans and legal fees prior to sentencing. (The Sarasota condominium is still owned, now free and clear, in Dr. Hough's name, so she has in fact not been disposing of or hiding assets.)

The government continues to insist that "Defendant Hough owns and controls the Foundation" and therefore "she is in reality 'borrowing' money from herself.'" It makes no difference if the government repeats this fallacy 100 times: it is simply not true. The Foundation is a nonprofit entity that is controlled by a Board of Directors, of which Dr. Hough is not even a member. The assets of the Foundation are owned by the Foundation; they are not owned by Dr. Hough, any more than Bill and Melinda Gates personally own the assets of the Bill & Melinda Gates Foundation. Defense counsel has both met in person and spoken by telephone with members of the Foundation Board of Directors on numerous occasions. Funds that are loaned or advanced by the Foundation come from the Foundation, not Dr. Hough; money that is repaid to the Foundation goes to the Foundation, not Dr. Hough. It cannot be said any more plainly – the government's newest conspiracy theory is flat-out, 100% wrong.

17
Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866)951-9058/ budolf@udolflaw.com

A/75992943.1/3325070-0000366042

## IV. CONCLUSION

For the reasons set forth herein and in Dr. Hough's separately filed Memorandum in Aid of Sentencing, Dr. Hough respectfully requests a sentence of probation with conditions of 12 months of home detention and 1000 hours of community service.

Dated: April 16, 2014

Respectfully submitted,

| | |
|---|---|
| **BRUCE L. UDOLF, P.A.** | **BINGHAM MCCUTCHEN, LLP** |
| Counsel for Defendant Hough | Counsel for Defendant Hough |
| Broward Financial Centre | Suite 2050 North, 1601 Cloverfield Blvd. |
| 500 East Broward Blvd., Suite 1400 | Santa Monica, California 90404 |
| Fort Lauderdale, Florida 33394 | Tel: (310) 907-1000/ Fax (310) 907-2000 |
| Tel: (866) 951-9058/ Fax (954) 525-2134 | |
| | By: /s/ Nathan J. Hochman |
| By: /s/ Bruce L. Udolf |     California Bar No. 139137 |
|     Fla. Bar No. 0899933 |     nathan.hochman@bingham.com |
|     budolf@udolflaw.com | By: /s/ Daniel A. Saunders |
| |     California Bar No. 161051 |
| |     Daniel.saunders@bingham.com |

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, on this 16th day of April, 2014.

By: /s/ Bruce L. Udolf

A/75992943.1/3325070-0000366042