UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Case No.  2:13-cr-00072-JES-UAM

UNITED STATES OF AMERICA,

     Plaintiff

v.

DAVID LEON FREDERICK, and
PATRICIA LYNN HOUGH

     Defendants.

_____/

## DEFENDANT PATRICIA LYNN HOUGH'S
## MEMORANDUM IN AID OF SENTENCING

COMES NOW, Defendant Patricia Lynn Hough, by and through her counsel of record, and submits her Memorandum in Aid of Sentencing.

## I.  INTRODUCTION

> [S]urely, if ever a [wo]man is to receive credit for the good [s]he has done, and [her] immediate misconduct assessed in the context of [her] overall life hitherto, it should be at the moment of [her] sentencing, when [her] very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) (Rakoff, J.).

Dr. Hough stands convicted of one count of conspiracy to defraud the IRS and three counts of subscribing to false tax returns.  While fully respectful of the Court and the judicial process, Dr. Hough continues to maintain her factual innocence and the wrongfulness of her convictions in this case.  Dr. Hough contends that the government failed to prove essential elements of the offenses and that the jury reached its verdicts based on some factor or factors other than the evidence presented in court, as vividly demonstrated by the jury's utterly baseless guilty verdict on Count Seven (which this Court has since dismissed).  In many of the dozens of letters submitted to the Court in connection with this sentencing proceeding, those who know Dr. Hough the best – including a retired judge – express their firm conviction that a terrible mistake

has been made and that Dr. Hough is now being sentenced for crimes that she did not commit. Although the government and the defense continue to have strong and honestly held disagreements about the facts of this case, Dr. Hough recognizes that this sentencing hearing is not the proper forum to address those disagreements, which will ultimately be presented to and resolved by the Eleventh Circuit.

But there is one thing about which the defense believes there is, and can be, no legitimate disagreement, and that is Dr. Hough's extraordinary history of public service.  Many are the defendants who anxiously scour their lives at this juncture to present the sentencing court with the odd charitable contribution given, the intermittent volunteer work with a benevolent organization several years past, the individual who can attest to a life somehow changed for the better by the defendant's acts.  In Dr. Hough's case, no such searching examination is necessary, for her entire adult life has been defined by service to others:  to her patients, to her community, to – quite literally – the world.  Tellingly, of the 20 witnesses presented by the government at trial, *not one* had a bad word to say about Dr. Hough's character; to the contrary, even the government's witnesses uniformly praised her deep commitment to charitable work that has bettered the lives of many thousands of people both in the United States and abroad.  Dr. Hough's personal history and characteristics present an extraordinarily powerful argument for the exercise of leniency in sentencing, and the Probation Officer has recognized that a sentence below the advisory guideline range may be warranted based on that factor alone.  (PSR ¶ 115).

This case demonstrates in a compelling way why the Supreme Court rejected mandatory application of the Sentencing Guidelines and returned discretion to the district court "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted). Sentencing is no longer a matter of mechanically applied formulas, but of an individualized assessment based on the statutory factors set forth in 18 U.S.C. § 3553(a), including all the facts about the defendant's life separate and apart from the offense conduct.  *See id.* at 1235 ("Highly

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

relevant if not essential to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."). In this case, a thorough consideration of the § 3553(a) factors yields the conclusion that a sentence of probation with 12 months of home detention and 1,000 hours of community service is the reasonable, fair, and just result. Among other factors in this case, Dr. Hough is a highly respected community member with no criminal history and a lifelong record of public service that is perhaps unparalleled among defendants who have come before this Court for sentencing; Dr. Hough's advanced age renders her vulnerable to victimization, abuse, adjustment problems, and a shortened life span in prison, and makes prison an inappropriate and unduly harsh punishment; Dr. Hough's involvement in the offense conduct, according to the evidence, was minimal as compared to acts performed by codefendant David Fredrick and others; a sentence of probation is sufficient punishment for the offense when combined with the severe financial, professional and personal penalties imposed on Dr. Hough; a sentence of probation is necessary to avoid unwarranted sentence disparities with defendants who have been convicted of similar or more egregious conduct; a sentence of imprisonment is not needed to provide specific or general deterrence in light of the numerous other severe consequences to Dr. Hough resulting from her conviction; the consequences of Dr. Hough's incarceration would fall disproportionately on innocent third parties, including patients who are being denied essential psychiatric care; and there is no need to protect the public from further criminal conduct by Dr. Hough. These and other factors, individually and in combination, make a term of probation, with conditions that include home confinement and community service, a punishment that is "sufficient, but not greater than necessary," to comply with the statutory goals of sentencing. 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

## II.   ANALYSIS OF STATUTORY SENTENCING FACTORS

The Court must impose a sentence consistent with the mandate of 18 U.S.C. § 3553(a). The Sentencing Guidelines are only a starting point, one of many factors to be weighed when selecting a disposition that is sufficient but not greater than necessary to satisfy the purposes and

goals set forth in 18 U.S.C. §3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007) (guideline range should not be presumed to be reasonable); *Kimbrough*, 552 U.S. at 90 (guidelines only "one factor among several courts must consider in determining an appropriate sentence"). Additionally, the Court is no longer hemmed in by the traditional departure analysis. Rather, the primary objective for this, as any, sentencing is to "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. As Justice Kennedy observed even pre-Booker, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique case study in human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

The "overarching provision" of 18 U.S.C. § 3553(a) is, of course, to impose a sentence sufficient, but not greater than necessary, to meet the goals of sentencing established by Congress. *Kimbrough*, 552 U.S. at 101. Those statutory goals include "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." *Id.*; see 18 U.S.C. § 3553(a). The statute further provides that, in determining the appropriate sentence, the court should consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the sentencing range established" by the Guidelines, "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* "In sum, while the statute still requires a court to give respectful consideration to the Guidelines, *Booker* permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough*, 552 U.S. at 101 (internal quotations and citations omitted). If a sentence other than imprisonment would be sufficient to meet the statutory goals of sentencing, then the Court must impose such an alternative because imprisonment would be a "greater than necessary" sentence. 18 U.S.C. § 3553(a).

*4*

Bruce L. Udolf, PA
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

A/75993207.1/3325070-0000366042

In his concurring opinion in *Rita v. United States*, 551 U.S. 338, 367 (2007), Justice Stevens wrote: "I trust that those judges who have treated the Guidelines as virtually mandatory during the post-Booker interregnum will now recognize that the Guidelines are truly advisory." The decisions in *Kimbrough* and *Gall* have reinforced Justice Stevens' remark and the authority of district courts to fashion the sort of sentence that fits the crime and the individual.

As shown below, it is difficult to imagine a case in which the statutory sentencing factors listed in 18 U.S.C. § 3553(a) more compellingly call for a non-Guidelines sentence. In particular, Dr. Hough's personal history and characteristics and the need to avoid unwarranted sentencing disparities with those convicted of similar or more egregious conduct warrant a substantial variance in this case, which Dr. Hough respectfully submits should result in a term of probation with home confinement and community service – a sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing under the particular facts of this case and this defendant.

**A.     History and Characteristics of the Defendant**

1.     Dr. Hough's Extraordinary Lifetime of Compassionate and Charitable Public Service, Which Has Directly Improved the Health and Quality of Life of Literally Thousands of People in Numerous Countries, is Worthy of the Highest Level of Consideration and Credit at Sentencing

As reflected in the presentence report and in the evidence adduced at trial, Dr. Hough is a highly respected member of the community who has dedicated her career – indeed, her life – to improving the lives of others. In her 67 years, she has never before had any troubles with the law. From humble beginnings growing up on welfare in the public housing projects of Youngstown, Ohio, Dr. Hough's hard-work ethic (she began working 20-25 hours a week as a drugstore clerk at age 16), academic excellence, and commitment to her church led to a work-study scholarship at Phillips University. After earning her bachelor's degree, Dr. Hough continued to pursue education, earning a master's degree in social work, a Ph.D. in philosophy and sociology, and ultimately her M.D. at age 46.

Dr. Hough did not choose to become a doctor in her 40s in pursuit of money or status,

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

but as a means of furthering her lifelong, deep-rooted commitment to helping those in need. From tutoring inner-city children and visiting elderly shut-ins while in high school, to volunteering at a state school for the mentally handicapped while in college, to working as a social worker at that same school after graduation, to again tutoring inner-city children while in her master's program in Chicago, to providing health screenings and sanitation as a volunteer in Mexico and Guatemala, to teaching U.S. Army troops and their dependents in Berlin, to providing volunteer social work at a women's prison in Juarez, Mexico, to teaching social work and sociology at several universities, Dr. Hough consistently sought out opportunities to use her education and skills not to improve her own social or financial standing, but to better the lives of others. And all of the above was before Dr. Hough helped to develop curricula and secure accreditation for two highly successful medical schools that trained thousands of doctors and sent them out into communities to help thousands more families; before Dr. Hough's years of work with indigent and uninsured patients through the Sarasota County Health Department; and before Dr. Hough perfomed work through the Saba Foundation that provided – and continues to provide – desperately needed medical care to impoverished communities in Central America and elsewhere, thereby saving untold numbers of lives.[1]

The trial record is replete with evidence of Dr. Hough's commitment to public service. That record is now supplemented by letters to the Court from numerous colleagues, friends, and family members attesting to the exemplary aspects of Dr. Hough's character and the staggering difference she has made to so many in her community and elsewhere. Those who know Dr. Hough as more than a signature on bank forms and tax returns uniformly speak of her integrity, her ethics, her compassion, her selflessness, her service, and her dedication to charitable work. As Dr. W. Eugene Egerton, Chief Medical Officer of the University of Maryland Medical Center in Baltimore who has known Dr. Hough for more than 30 years, writes:

> Dr. Hough is above all else honest and ethical. . . .   She is a

---

[1] The government's cynical attempt to reduce Dr. Hough's lifetime of hands-on benevolent and compassionate work to making "charitable donations" (Gov't Sentencing Memo at 10-11) is so off-the-mark that it merits no further response.

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

trusting individual who would go and has gone to the fullest extent for those in need and those for whom she cares deeply; however, I have never known her to be dishonest or disingenuous. Pat takes the hard jobs, positions and work that are not particularly desirable for many. Her work with the penal system and with state mental health is a prime example of this. Her Foundation work provided much needed services and resources to underserved populations in remote areas of the world. . . .

We are unaware of anyone who has a negative view of Dr. Hough and we have seen the effect she has had on others through her work at Saba University and through the Foundation. We feel comfortable in saying that she is the definition of charity. . . . She is an extraordinary individual with an exceptional heart for others who will always be a contributing member of society; indeed, "one of the good ones."

Tom Jaworsky, who has known Dr. Hough for 50 years, writes:

Dr. Hough has devoted a significant portion of her professional career assisting, treating and giving both personal and professional attention to the less fortunate of our society. The forementioned was accomplished in the United States and other developing countries. In my opinion she has demonstrated for many years, an energetic, caring and compassionate personality and character. . . . [Her] influence has served many who would otherwise have been overlooked.

Winifred Oliver, Executive Director of the Phillips University Alumni Association, writes:

It is inconceivable to think of [Dr. Hough's] service to others being interrupted, let alone halted. Many citizens of the United States earn the means to support others, but few are as committed to SERVING others, with little focus, care or concern for their own needs. NEVER has Pat reflected a person of means, other than her gifts and donations to individuals and causes with meaningful needs. I personally know people who benefitted from her generosity, and sensitivity to their personal or medical dilemmas.

The world has been a better place because of Pat Hough. . . . I would entrust my children to her influence and example. It is my deepest wish for leniency and consideration for all she has GIVEN.

Dr. Hough's stepdaughter, Laura Whitley, who testified as a government witness at trial, writes:

I have known Pat for most of my life. She is a genuinely good and decent person. While she isn't perfect, there is an honesty and a naivete, that despite education, adversity, and experience, is fundamental to her character. She truly believes in the goodness of people, regardless of their circumstances – that everyone is worth saving, that there is no such thing as wasted time when you're

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

A/75993207.1/3325070-0000366042

helping someone move towards even the smallest of goals. Whether it is a single forgotten elderly patient who needs someone to treat them with dignity and respect, or an entire village lining up for their first ever medical visit, Pat recounts each of those experiences with the same kind of joy and enthusiasm, and with a passion that is absolutely contagious. The most heartbreaking result of this conviction has been her inability to continue doing the work that she has taken so much joy in over the years, and the loss that her absence will be to her field. . . .

Pat has worked incredibly hard for so long, and in my observation, has rewarded herself with very little, very late. Pat has always struck me as perpetually having the look of someone who probably had to worry about money, maybe a long time ago. Now, she has been left with virtually nothing to show for all those years of working long hours, day in and day out, weekends on-call, 3 am emergencies, university, continuing education, and dedication to patient care in a field where many of the poorest and sickest go overlooked and under-serviced. . . . I consider Pat more like a mother than a stepmother, and as childish as it may seem to say, "Your Honor, please don't send my mom to jail"… Your Honor please don't send my mom to jail. We all need her, and nothing, and no one would be the better for not having her.

Roger Leslie Milner Dunbar, a retired NYU professor who has known Dr. Hough since the 1970s, writes:

[T]wo characteristics distinguish Dr. Hough. First, in whatever she is doing, she takes on the role of a helper who wants to provide support and do what is best for whoever she is dealing with. Second, education is a very important part of her life. She has pursued educational opportunities for herself, and has sought to promote them for others wherever she has been. I think that this intense desire to help and also to understand the issues people she is dealing with have are keys to understanding how Pat lives her life. . . .

Pat was proud of the opportunities the medical schools provided the students. Living in the Caribbean, she was also increasingly conscious of the greater medical needs of the area and I remember she said that she hoped one day, she would be able to help these large numbers of poor people who most often lacked most types of health care. The continuation of the Foundation in Central America is a fulfillment of this dream.

Dr. Hough's cousin, Alice Lettrich, writes:

I know [Dr. Hough] worked hard to help the people of Guatemala and she worked just as hard to educate young medical students to go out in the world to help the suffering. I know she will always try to be useful. . . Pat is devastated because she is not now involved in helping other people, and she needs to be. It is her life's work!

*8*

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

A/75993207.1/3325070-0000366042

Nia McCann, the daughter of another cousin of Dr. Hough's, writes:

> My Aunt Pat is very special to a lot of people around the world. She has done so much for the poorest people in Central America and others around the world.  She encouraged us when we went to Senegal, Africa as short term missionaries. . . .  She is one of the world's most generous people.

Vincent Dolan, an attorney who has known Dr. Hough since they were doctoral students four decades ago, writes:

> My student impressions of Pat have not changed, but rather deepened.  She is a loyal, devoted friend.  She does not suffer fools lightly and she has a strong heart that is committed to real social justice, not slogans. . . .  She has been helping people who need help, whether it be getting along in bewildering social institutions or pressing health concerns. . . .  In your sentencing, may I please ask that you consider her valuable scientific, social and philanthropic work of over forty years . . . .

Maryann Casey, a friend and neighbor of Dr. Hough's for 15 years, writes:

> I especially appreciated [Dr. Hough] helping the less fortunate homeless and mentally challenged.  She cared very much about the wellness of her patients, on many occasions going out of  her way to help relocate and move her patients.  We attended many charity events and supported the local volunteer animal shelters. . . .  As a contributing member of the community Pat continues to volunteer and is active in the Foundation which has helped so many unfortunate people with health care. . . .  Pat is the most loving and giving individual to everyone she meets, helping the less fortunate humans and animals.  To incarcerate her would be a great injustice, she has so much to give and that would be a shame to not let her continue her work.

***

Many of the submitted letters are from those who know Dr. Hough through her deeply valued, successful, and irreplaceable work with the Sarasota County Health Department (SCHD) – work that sadly was terminated after her conviction in this case.  Dr. William Heymann, medical director at the SCHD and Dr. Hough's former supervisor, writes:

> I have known Pat for about six years, and have worked closely with her in medical clinics in Venice and North Port where she worked part time serving patients of the Sarasota County Health Department.  I am aware that she also made at least annual trips to Central America working with patients in her Foundation.  When she began working in the clinic, she also considered other opportunities such as volunteer work at the Salvation Army program for rehabilitation of substance abuse patients, and

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com

subsequently decided she could help best at the Health Department.

I believe Pat is a valuable contributing member of the community, and I am aware that she is currently volunteering at an animal shelter in Venice and with veteran's groups in Charlotte County. Her reputation as I am aware has been one of high moral and ethical integrity.  Her past patient interactions have always provided high quality care in a compassionate and caring fashion, and this includes supporting the often difficult socioeconomic circumstances of her patients.  These patients were without any health insurance, Medicaid, or Medicare benefits.  Her excellent patient care helped avoid hospital and emergency room visits for these patients with very limited resources, and which care would have been at the expense of the community.

This legal process has of course had a major impact on Pat's life, and has also ended her opportunity to provide patient care in the clinic at North Port where she most recently worked providing a greatly needed service providing mental health and neurology care. There has been no one available to replace the care she provided. Her incarceration would end any possibility of a return to providing patient care to her prior and any new patients, and would end all her other volunteer community efforts.

Dr. Deborah Sauder, who worked with Dr. Hough for the SCHD at the North Port Health

Center (NPHC), writes:

Dr. Hough started volunteering at the NPHC in March 2009.  As a physician in the clinic, I would refer patients to her for psychiatric evaluation and treatment.  For more than four years, we collaborated on the care of these patients.  Because I saw them for their other medical conditions, I am a witness to the excellent treatment regimens that she prescribed for our patients and to the gratitude that she inspired in our clients.

The underserved population is a very complex, very sick, and medically/socially marginalized population.  Few psychiatrists want to care for these patients because the income is poor and the work is inversely proportional to the income.  To have a psychiatrist willing to care for these patients – and to do it without compensation – is very rare and precious.

Dr. Hough's compassion, integrity and honesty is well known among the patients and staff at the North Port Health Center.  She is committed to charitable work and to helping others.  The four years of volunteering – without compensation – at the clinic attest to that commitment. . . .

When Dr. Hough withdrew from the clinic, she left a hole that we are still struggling to fill.  Her compassion for these underserved patients is irreplaceable.  Patients that she has cared for four years still ask when she is coming back.  They are disappointed to learn that they have to start the long and difficult process of building

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com

trust in a new psychiatrist.  Incarcerating Dr. Hough will not only hurt her, but will also prevent her from helping future patients.

Carol Gallegos, a social worker at Tri-County Counseling and Life Skills who worked with Dr. Hough, writes:

> It is without reservation that I speak to the character of the woman I have known and worked with for the past two years.  Dr. Hough has selflessly contributed to our community, working with a population that others of her stature and education would not consider worth their time.  Dr. Hough began her work with the Department of Health both in North Port and Venice in 2009.  She collaborated with Tri-County Counseling for 4.5 years.  Dr. Hough wanted to volunteer at a non-profit and interviewed at Salvation Army, however the Department of Health seemed a better fit.  It was required that she become an employee in order to have the advantage of the malpractice protection, as she would be required to work more and prescribe more than she had first planned.  Her per-hour rate was about 30% of what a psychiatrist would usually charge.  Since Dr. Hough has worked the majority of her career with the chronically medically/mentally ill, it was extremely valuable to our patients to have someone of Dr. Hough's tremendous experience working with the patients we served.  Dr. Hough served hundreds of people who were uninsured, or Medicaid patients.  The patients we saw were so sick that most were unable to work, many were homeless, and could not have afforded healthcare in any other way than coming in through the Department of Health.  To this date, the Health Department has not been able to replace Dr. Hough, and when I spoke with my former employer recently, it was reported that the wait for a patient needing to be seen for severe mental health issues is over four months long.  These are some of the most vulnerable among us; most with chronic and severe physical and mental health issues, left with no medication options, and no psychotherapy available. . .

> The support of Dr. Hough had greatly improved the quality of life our patients experienced, and reduced the number of crisis hospitalizations. . . .  Her reputation, her grace, kindness, and care for our patients, and her integrity as a physician are without parallel in this area.  There simply is no replacement for her expertise, but more than that; her heart.

> It would seem to those of us who know, who have worked with, and been friends with Dr. Hough, absolutely unacceptable to lose such a brilliant, selfless community servant.

Ivy Waltman, who also worked with Dr. Hough at the SCHD, writes:

> I can honestly say that [Dr. Hough's] patients became very fond of her and only had good things to say about her.  Even during her time off I was able to contact her on her personal phone if a patient concern arose and it was always obvious that she cared deeply about her patients.  Most of her patients have physical and mental disabilities and need an advocate when filing for disability.  Dr.

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com

Hough spent many hours, even on her own time, to complete these complicated disability applications.  In addition, she assisted patients who could not afford costly medications with Patient Assistance Program applications. . . .  [D]uring her absence these last few months, patients express their concern about her and constantly ask when she will be back.  She makes a personal connection with her patients as well as with co-workers, and we all miss her and hope she will return soon.

Kathy Powell-McSteen, a Vocational Rehabilitation Counselor who has interacted with

Dr. Hough through the SCHD, writes:

I visited the Sarasota Genesis Health Center once to pay for an impoverished, severely depressed client to see a doctor and get medication.  I overheard waiting patients telling another how getting "Baker Acted" involuntarily was about the only way to get psychiatric help if you were uninsured and poor around here.  That's a costly band aid involving the tax funded Courts, Sheriff's office, emergency rooms, crisis unit hospitalization, and medications.

My Genesis visit was before the Sarasota Health Department hired Dr. Hough.  I have worked with many mutual clients/patients since then, often referred by Florida Vocational Rehabilitation as too severely limited to return to work.  I have heard from clients and their families more than once how Dr. Hough would come early or stay late to ensure a catastrophically ill patient, such as an actively psychotic person with newly diagnosed or untreated schizophrenia, could be promptly seen.  She kept many patients out of the expensive cycle of emergency room and inpatient crisis center stays.  Dr. Hough also helped recovering substance abusers and ex-offenders with underlying mental health problems stay sober and modify their behaviors to prevent repeat problems for themselves, their families, the community, and the overburdened courts.  I have gotten calls from clients distraught because they could not longer see Dr. Hough.

Dr. Hough has helped not only patients here but through the Saba Foundation, has made an international humanitarian impact.  Although convicted for tax violations, she has saved us many thousands in tax dollars through her work for almost token wages. . . . She is missed and needed in our community.

Dr. Lynn Bernstein, a psychologist and friend of Dr. Hough, writes:

As a Psychiatrist and professional colleague, Dr. Hough has been informative to me and our staff about medications and side effects, has done some chart reviews and more recently has volunteered at my Veterans' PTSD group to teach about medications and side effects.  Her reputation in the community has been honorable and her work with the Health Dept has provided the residents of our community a chance at mental health treatment, which is sorely lacking.  She has been conservative and thorough in her treatment of patients with severe mental health problems which has made her

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com
A/75993207.1/3325070-0000366042

an outstanding advocate and practitioner of mental health. We, in the mental health profession, our patients and community need Dr. Hough to be able to continue her important work in the field.

In my various roles with Dr. Hough, I have found her to have the intelligence, cognitive ability, insight and judgment of a highly functioning person with honesty and integrity, good focus and high achievement goals. There has been nothing, including her current legal issues, without exception, which has been a deterrent to my belief in the honor and trust of this outstanding woman.

Jeannine Ball, who worked with Dr. Hough at the North Port Health Center, writes:

Pat has been an active member of her community in the broadest sense and a role model for many people of her generation, generations that follow, women, coworkers, and staff. This legal matter has eroded the foundation of Pat's life in a most notable manner. She built a life based on her studies in obtaining a medical education and she is now unable to use her license in her generous time investments to help others live functional and meaningful lives.

***

A number of other letters attest to the enormous impact that Dr. Hough's work with the Saba Foundation has had and continues to have on the neediest, most impoverished communities of Central America. Antoine Solagnier, the former Governor of Saba, states:

My impression of Dr. Hough is that she is a committed, contributing member of our global community taking particular and personal interest in the human aspect in all her work. At numerous times I have witnessed this commitment and interest first hand as I was able to obtain from her and through her, much needed humanitarian assistance for the Saban community either in the aftermath of natural disasters or in dealing with physical and mental health issues for the island community.

Currently I am assisting her in a particular effort being undertaken in the country of Guatemala, a community struggling with, among others, challenges in the area of proper nutrition for pregnant ladies and children. I feel particularly honored and privileged to be able to work along Dr. Hough as, despite her legal challenges she is currently facing, she displays selfless care and dedication to her charitable work in the interest of those less privileged and in need of the community. From her I learn to appreciate the value of these qualities on a daily basis as I strive to acquire and adopt them personally.

I have visited and observed many of the projects with which she is involved. I have spoken to many of the recipients and beneficiaries of her charitable work as well as many benefactors and co-workers in her good works. From these observances and consultations I can attest these works to be good, many, important

and to great positive benefit to thousands, if not tens of thousands.

Integrity is a term which, due to its vagueness, is often misused, abused and loosely confused.  Therefore I think it important to define its meaning to myself prior to engaging in its use.  A person of integrity, in my experience, is the person who is one in mind, body and soul, whose actions, thoughts and spirit form one indivisible unit.  In the many, many years I have known Dr. Hough and have worked closely with her I have not been able to detect, not once, neither actions nor words which were deviant from her spirit and purpose in life.

Furthermore, because her spirit is deeply rooted and displays a love for others above her love for self, as I can witness through her selfless devotion to charitable work, I do not only consider her a person of integrity, I do, in fact, consider her a righteous person. .. .

Despite the undue impact this [conviction] has had on her she has rigorously persevered in her pursuit of goals in charitable purposes and work.   These labors will significantly be hampered and affected should they be discontinued or suspended because of eventual incarceration.  This to the disadvantage of thousands upon thousands of people in at least 6 countries that I know of.

It is due to the above reasons and more I beg for consideration on her behalf and solicit leniency from you when it comes to formulating a sentence in her case before your court.  This supplication I make not only on her behalf but also on behalf of members of her personal family, her professional family and the many beneficiaries of Dr. Hough's work both within [and] outside of the field of medicine.

José David Echevarria Diax, a member of the Congress of the Republic of Guatemala, writes:

My country has been honored by the presence of the Saba Foundation and Proyecto Salud y Vida located in Antigua, our colonial capital.  I am personally acquainted with the Director, Dra. Patricia Hough, and have accompanied her to hospital visits in my own state of Suchitepéquez.  Our government does not make health care a priority and most of our public hospitals have a great need for medicines and equipment.

Dra. Hough is very sensitive to our culture and health needs.  She does not make judgments about the conditions in our hospitals and only wishes to help.  Her excellent contacts and the funding of the Saba Foundation have enabled thousands of our citizens in rural locations [to] receive health care.  Because of the Saba Foundation's contributions and Dra. Hough's leadership, containers full of equipment and supplies have been sent to government hospitals in isolated areas in the states of Petén, Jutiapa, Quiche, Chimaltenango, Huehuetenango and my own state of Suchitepéquez.

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com
A/75993207.1/3325070-0000366042

> I am aware that the Saba Foundation and Dr. Hough also help
> hospitals for many years in our neighbor countries of El Salvador,
> Belize and Honduras.  Please allow this kind lady to continue her
> work with my people.

Dr. Eduvigis Auxiliadora Guzmán de Luna, President of the Salvadoran Association for

Rural Health (ASAPROSAR), writes (in translation):

> In the year 2013 we have provided health, education, social
> services to more than 150,000 persons and the program of Health
> is Life has provided visual health care to more than 15,000
> persons.
>
> Our institution, ASAPROSAR feels extremely thankful for the
> great contribution from Dr. Patricia Hough, and as a result of this
> direct assistance, we have permanently established a program that
> will provide medical services to the most poor, especially to those
> persons that show diabetes and hypertension, in this way the living
> conditions of these persons will improve.  The support of Dr.
> Hough in the obtaining of funds and of her direct assistance have
> contributed in the success of this program.
>
> In the last 4 years that I have known Dr. Hough she has always
> shown a great interest for those in most need and has ensured that
> the support given to the poor to be in a humanitarian way and has
> confirmed it personally.

Dr. Alan Gruber, the head of the U.S.-based charity Friends of ASAPROSAR who has

known Dr. Hough for 15 years, writes:

> I have witnessed, firsthand, the work [Dr. Hough] has done in
> Central America and the life-changing effect that has had on,
> literally, thousands of people.  Through the foundation, Salud y
> Vida, she has been responsible for establishing our program that
> has identified and treated more than 3,000 patients with
> hypertension, diabetes or heart disease and who have no other
> accessible source of health care. . . .
>
> Dr. Hough continues as the officer of Salud y Vida who develops
> and monitors grant programs for the poor in Central America.  She
> not only provides funding for projects but is personally involved in
> identifying areas of need and consolidating community
> involvement to address those needs.  Her absence will be a
> remarkable loss to people who have virtually no other resources.

Lois Werner, the co-founder of U.S.-based and Guatemala-based charities that focus on

education and health in Mayan villages, writes:

> I have known Pat for the past four years in connection with SABA
> Foundation and her volunteer work and support of projects in
> Guatemala.  I have had several opportunities to work with Pat in
> her capacity as a board member of Salud y Vida, a Guatemala

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com

organization supporting various aspects of health in rural areas. I have personally seen Pat work for days sorting and labeling medical supplies and cataract equipment for health clinics in Honduras and Guatemala.

For the past several years Pat has traveled to various hospitals throughout Guatemala investigating how she can help improve health care in remote areas. The Guatemalan government has neglected most of the national hospitals here so Pat is determined to support these hospitals with equipment and supplies to assist the doctors who are working under extremely poor conditions. I have been in meetings when Pat has displayed an absolute compassion for the poor. Her willingness to volunteer her time as a doctor and funder of projects helping the poorest of the poor is an example of her kindheartedness and deep passion to make this world a better place. . . .

I hope you will consider leniency as Pat is a professional who is dedicated to helping others. Incarcerating Pat will serve no one.

Lois Werner's husband Kenneth Werner, Sr., who co-founded the above Guatemalan charities with her, writes:

Over the past four years I have known Pat, it is clear her focus is to help impoverished people in Guatemala and Honduras. I know she has reviewed funding proposals, visited projects, and analyzed needs with the goal of helping the most in need and to improve the health care of hundreds of people. During the sentencing process, I ask you to consider Pat's integrity and her kindness for humanity.

Dr. John Nekic, a member of the Board of Directors of the Saba Foundation and a former student and colleague of Dr. Hough's at the Saba University School of Medicine, writes:

As a board member of the Saba Foundation, I have been directly involved with Dr. Hough's humanitarian projects of organizing medical equipment and medicine donations to third world countries for the past 10 years.

I have had [the] pleasure of knowing Dr. Hough as a student and she was a mentor and a role model to us all. I have also had the privilege of working with her on so many selfless projects. I have never met anyone who is so dedicated to education, to each and every student and helping others less fortunate.

She has been directly responsible for producing thousands of physicians who have joined the U.S. health care industry and slowly closing the gap of the huge physician shortage that exists in the United States. . . .

Dr. Hough's involvement as an educator and as a humanitarian has truly impacted so many lives, it is almost too difficult to describe in words. For her not to continue her work would not only affect her life but also the thousands of lives that her humanitarian

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com

projects touch.

Dr. Hough's cousin Beth McCann, who serves on the board of Proyecto Salud y Vida, writes:

> I have seen Pat care about and for many people, as well as her incredible ability to see things as they are, and work from there to improve them.  I have served in missions in Africa, so I am aware of some of the challenges Pat faces serving in a Third World country – challenges she has taken on and met.  I have been in Guatemala and have seen the Foundation that Pat serves on, of which I am a board member, so I have seen her in a professional way as well as personal.  I have seen Pat working with others – both those of the poorest of poor, and those serving them.  She has always been respectful to each and every one.  She is gracious and eager to help.  I have seen her giving food to those that have none, helping small villages get water for drinking and cooking, and providing safe stoves to cook on.  I have also been in a tiny rural Guatemalan health clinic, that the Foundation Pat serves on makes possible, where that is the only medical service available.  She is highly respected by all that benefit from her generously and skills, as well as those that work to serve with her.  Pat has tirelessly served others by giving of her time, skills, money, education, and care for years.  I have seen it first hand, and heard of so many other times from others.  She is generous and kind.  She is a woman that I highly respect and trust. . . .
>
> I have known Pat to be honest and trustworthy.  Her integrity and honesty is a part of her.  She serves those that often no one else wants to. . . .  I truly believe she is an amazing woman and a greatly contributing member of our family, community and all communities she serves throughout the world.
>
> The stress of this has been very difficult on Pat – difficult because it affects her directly, but perhaps even more, those she serves.  Pat is not able to travel to Guatemala and other Central American countries to help the thousands of hurt people she cares about so much.  She is not able to now work at the job of serving in FL those addicted with alcohol and drugs. . . .  She wants to serve others, is skilled, experienced, and compassionate in doing this, and I see no good it would do anyone, but much harm to so very many to not allow this to happen.  She has given years to helping the "least fortunate" in so many ways.  She wants to continue.  I ask you to please allow this to happen.

Ivy Waltman, Dr. Hough's colleague at the SCHD, writes:

> I have had many conversations with Dr. Hough regarding her work with the Foundation in Guatemala.  She has always been very enthusiastic when talking about the people that are helped by the Foundation.  She has been proud of the work and shared pictures with me.  I don't know much about the funding issues, but I know that her heart and soul are in the work that is done.  My guess is that the Guatemalans that she works with love her as much as her

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com

A/75993207.1/3325070-0000366042

patients here at the clinic.

Rev. Diane Baker, a retired minister who has been friends with Dr. Hough for nearly 50 years, writes:

> Although Pat is about my age, she seems to me to be the same active, strong, committed servant-leader that I have known since college.  I have never known her to speak harshly, or falsely.
>
> When I told Pat that my husband and I were working with a medical mission called "Predisan," to bring health services to the remote areas of Honduras, Pat also engaged with that organization and helped arrange projects and financial support for Predisan through a foundation that I believe she had established.
>
> I respectfully ask that as the court considers a sentence for Pat, that the court reflect on Pat's lifetime of service, and her contributions that continue today, both through her daily grind of work as a physician in Florida, as well as her deep contributions to so many non-profit projects across this hemisphere.  A prison sentence would certainly demoralize, if not devastate Pat, whom I value, respect, and trust implicitly.  But beyond the consequences for Pat, I am unable to see a larger benefit to our world that could come by locking up such positive horsepower.

Rev. Baker's husband, Robert Baker, who has known Dr. Hough for 19 years, writes:

> The Pat that I have known is a very bright and caring physician.  My wife, Diane, is in particularly poor health, struggling as a polio survivor who also has a fierce, debilitating, muscle-wasting disease.  But like Pat, Diane loves her work and loves the church.  Whenever there has been a church-related function that my wife needed to participate in, Pat would facilitate the travel, meet Diane at the airports, stay with Diane in the hotels, and help Diane navigate the complexities of the venue where the church work was happening.  Diane has no better friend.
>
> Diane and I have worked in service projects in several Central American countries in the summers.  A few years ago, Diane and I decided to work with a Honduran medical mission called Predisan.  Seeing the great need of the Honduran people, Diane invited Pat to get involved with Predisan.  Pat jumped to the task, and began giving guidance to the medical mission, and found ways to direct some financial support to the Hondurans.  Since much of the Honduran medical mission involves clinical treatment of addiction, Pat was an especially good fit for this service.
>
> And so it has been:  Pat sees a need and steps forward.  She is a physician, psychiatrist, tactician, a devoted friend, and a committed Christian.  It seems nearly incomprehensible to me that the legal system would incarcerate Pat, putting a tragic stop to the contributions she makes to our society.
>
> I respectfully ask that you take Pat's long-time history as a servant

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com

and leader into consideration as you consider how you will deal with her case and sentencing.  We need her.  Pat is not a risk to society, but quite the opposite… a clearly high-functioning contributor.

Whatever the tax-related issue with Pat is, can it rise to the importance of the human lives that are directly impacted by Pat?  I respectfully submit that the greatest good for all can be served by letting Pat continue her work and service unimpeded.  It seems to me that the worst that can happen by letting Pat remain at her work is that people will be helped and healed.

Finally, Linda King, an attorney and board member of Predisan who has worked with Dr. Hough for the past three years to develop healthcare in Honduras, states simply:

I write because I believe Dr. Hough has much good left to do and is uniquely qualified to do it.  Therefore, I respectfully request that you take into consideration her past generous and useful contributions to society and grant her leniency as you determine her sentence.

\*\*\*

The above letters demonstrate, more powerfully than could any words of counsel, Dr. Hough's lifelong commitment to helping others and the powerful force for good she has been in the lives of so many people in need in her own community and around the world.  As Judge Rakoff eloquently stated in the *Rakoff* case (p.1 *supra*), there is no time more appropriate for Dr. Hough to be given credit for the good she has done throughout her life than at the moment of sentencing, "when [her] very future hangs in the balance."  When the offense conduct in this case is properly placed in the context of her prior 67 years, as the sentencing statute requires, Dr. Hough is a highly worthy candidate for a variance to a probationary sentence with conditions of home detention and community service.  Such a sentence will allow Dr. Hough to continue her lifetime of good works, serving those in need and making a difference in quite literally thousands of lives.

2.   Dr. Hough's Age Renders Her Vulnerable to Victimization, Abuse, and Adjustment Problems in Prison and Makes Prison an Inappropriate and Unduly Harsh Punishment

Dr. Hough is a few months shy of 68 years old and, while not suffering from any life-threatening illnesses, suffers from a number of ailments that are consistent with her age (PSR ¶¶ 78-80), and is further at a greater risk of developing new medical problems than a younger

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com
A/75993207.1/3325070-0000366042

defendant.  Among other things, Dr. Hough is at risk for thyroid cancer and has nodules that are required to be checked regularly; she is also genetically at extremely high risk for Alzheimer's Disease and dementia, from which both of her parents suffered.  Most recently, Dr. Hough has been in physical therapy since October for her right shoulder, which has long suffered from bursitis and nerve compression and was reinjured when she fainted in court after the verdict. Interrupting that physical therapy would doubtless lead to greater pain and disability, and Dr. Hough must continue with the therapy in order to regain full function.  (Exh. A).  Dr. Hough is also in treatment and under medication for depression as a result of this case.  (PSR ¶ 80).

The guidelines specifically authorize downward departures based on age.  *See* USSG § 5H1.1 ("Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient and less costly than incarceration."); *see also, e.g., United States v. Chase*, 560 F.3d 828 (8th Cir. 2009) (defendant's advanced age, health, and employment history could support downward variance even if it did not support formal departure); *United States v. Hildebrand*, 152 F.3d 756 (8th Cir. 1998) (affirming downward departure for 70-year-old defendant with health conditions from range of 51-63 months to probation with six months of home confinement), *abrogated on other grounds, Whitfield v. United States*, 543 U.S. 209 (2005); *United States v. Seiber*, 2005 WL 1801614, at *4 (E.D. Tenn. 2005) (probation imposed in case involving advisory guidelines of 97-121 months for 69-year-old defendant in poor health); *United States v. Willis*, 322 F. Supp. 2d 76 (D. Mass. 2004) (downward departure from a level 17 to a level 10 and a sentence of probation with six months home confinement warranted for defendant due to his age of 69 years and various physical ailments); *United States v. Baron*, 914 F. Supp. 660, 662-665 (D. Mass. 1995) (granting downward departure from range of 27-33 months to probation and home detention for a 76-year-old defendant with medical problems that could be made worse by incarceration).

Apart from Dr. Hough's health conditions and the obvious fact that a sentence of imprisonment imposed on a defendant in her late 60s is significantly more draconian than the

same sentence imposed on a younger person, Dr. Hough's senior-citizen status leaves her extremely vulnerable to victimization, abuse, and severe adjustment problems in a prison environment.  Research confirms that there is a remarkable distinction between inmates who age within a prison system and those who are new elderly offenders.  "[N]ew elderly offenders' initial reaction to incarceration later in life was often characterized by family conflict, depression, thoughts of suicide, and a fear of dying in prison."  Ronald H. Aday, *Aging in Prison: A Case Study of New Elderly Offenders, International Journal of Offender Therapy and Comparative Criminology*, Spring 1994, Vol. 38, No. 1. Similarly, the Department of Justice has found that "[m]anagement problems with elderly inmates . . . are intensified in the prison setting and include:  vulnerability to abuse and predation, difficulty in establishing social relationships with younger inmates, [and] need for special physical accommodations in a relatively inflexible physical environment."  Correctional Health Care, *Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, U.S. Dept. of Justice National Institute of Corrections at 9-10 (2004).  This report notes that first time offenders are "easy prey for more experienced predatory inmates" and that this is particularly true for the elderly.  *Id.* at 10.  "Elderly" is defined throughout the report as age 50 or older; clearly, the vulnerabilities of a 67-year-old woman would be significantly higher.

By policy, the BOP provides all medically necessary care, but medically appropriate care that may improve quality of life but is not considered by BOP to be "necessary" is provided only if approved by a committee based on factors including the availability of resources.  U.S. Dept. of Justice, Federal Bureau of Prisons, *Program Statement 6031.03* at 5-6 (Aug. 23, 2012).  Older persons in frail health and those with multiple concurrent health problems face special challenges in a prison environment.  Thus, incarceration may be a virtual death sentence for a 67-year-old woman who is a first-time offender and has no experience with the criminal justice system.  The mortality rates for an elderly inmate who enters a prison environment for the first time are markedly high.  The United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics conducted research relating to medical causes of death in state prisons from

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

2001 to 2004.  This research paints a dismal picture of the mortality rate for an elderly inmate, especially one who enters the prison environment at an advanced age versus an inmate who is incarcerated at a younger age and ages within the prison environment.   "Mortality rates rose dramatically with age. The death rate of inmates age 55 and older (1973 per 100,000) was over 3 times high than that of inmates age 45-54 (566 per 100,000), and 11 times higher than those age 35-44 (177 per 100,000).  Inmates age 45 or older comprise 14% of State prisoners from 2001 to 2004, but accounted for 67% of all inmate deaths over the same period."  Christopher J. Mumola, *Medical Causes of Death in State Prisons, 2001-2004*, U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Data Brief NCJ216340 at 2 (Jan. 2007).   "Among older inmates, the mortality rate of those age 65 or older was particularly high. Though these elderly inmates made up 1% of prisoners, they accounted for 15% of prisoners deaths. The mortality rate of elderly prisoners was nearly 3 times higher than that of inmates age 55-64. . . . A majority (59%) of the elderly State prisoners who died during this period were 55 or older when admitted, and 85% were at least 45 years old at time of admission." *Id.*

Moreover, imprisonment is likely to severely diminish Dr. Hough's remaining life expectancy.  "Research points to a trend of  'accelerated aging' in prison, *i.e.*, that a prisoner's physiological age is, on average, seven to 10 years older than his or her chronological age." Mike Mitka, *Aging Prisoners Stressing the Health Care System*, Vol. 292, No. 4, Journal of the American Medical Association (July 2004).   "International studies point to an acceleration of biological age for prisoners, with prisoners having a physical age approximately ten years older than their community counterparts."  National Health Committee (New Zealand), Review of Research On The Effects of Imprisonment on the Health of Inmates and their Families.  In Dr. Hough's case, the effect of age acceleration would make her physiological age between 74 and 77 years old.

In light of these factors and Dr. Hough's advanced age and medical condition, imprisonment is an inappropriate and unduly harsh punishment, and a departure and/or variance from the guideline range is warranted.

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*
A/75993207.1/3325070-0000366042

**B.     Nature and Circumstances of the Offense**

As discussed in Dr. Hough's separately filed objections to the presentence report and argument for a minimal role adjustment, while the parties disagree regarding the circumstances of the offense, it is undisputable that Dr. Hough played a strictly limited role in the financial affairs of the medical schools and the establishment and control of the foreign bank accounts. Rather, the testimony from every percipient witness confirmed that Dr. Hough focused on the wholly legitimate work of running the academic programs, securing accreditations, and establishing clinical programs for medical students.  It is also undisputed that Dr. Hough had no background in tax or accounting, no background in business, and no background in the legalities concerning foreign accounts or foreign account reporting requirements.  The consistent trial evidence further demonstrated that Dr. Hough led a relatively modest and simple lifestyle (particularly for a doctor) and did not indulge in luxuries or extravagant expenses.

In considering the facts of the offense, it is also important to consider Dr. Hough's unsuccessful attempt to enter the IRS' Offshore Voluntary Disclosure Program (OVDP) before she learned she was under investigation.  Since the government began its crackdown on offshore account holders in 2008, only a small percentage of the individuals identified by foreign banks – less than 1% – have been selected for criminal prosecution by the Department of Justice.  In other words, in **over 99%** of the cases, the individuals who have maintained unreported foreign bank accounts, including accounts in the names of phony shell corporations specifically designed to shield income from the IRS, have been punished through civil fines only rather than any prison time or a felony conviction, regardless of the amount of tax loss incurred.  Over **43,000 individuals** to date have entered the OVDP and been given amnesty from criminal prosecution. The only basis on which an applicant is denied participation in the program is if the government is already aware of the applicant's foreign accounts or is the subject of a civil audit at the time they apply to enter the OVDP.

In early September 2009, after consulting with an attorney, Dr. Hough and Dr. Fredrick both applied to enter the OVDP.  (Exh. B).  Their applications were denied as untimely on September 25, 2009.  (Exh. C).  Based on Sheila Maurer's testimony that she was assigned to

review documents produced by UBS related to this investigation in April or May 2009 (10/16/13 RT 242), it is clear that Dr. Hough's and Fredrick's names were among the 285 accountholder names secretly turned over by UBS to the United States on February 18, 2009 – the very first group of names provided by UBS as part of its cooperation.[2]  Because that production was secret, it is unquestionable that Dr. Hough tried in good faith to get into the amnesty program **before** she learned that she was under criminal investigation.  It is also not subject to dispute that, but for the fluke of fate that placed Dr. Hough within those first 285 accountholders – 285 out of over 50,000 UBS accounts held by United States citizens – she would have been accepted into the voluntary disclosure program and **would not have been criminally prosecuted**, just like the 43,000 other individuals who have entered the program.[3]  Also, consistent with the voluntary disclosure program, Dr. Hough would have paid a 20% FBAR penalty instead of the 50% FBAR penalty that she now faces.

Particularly if this Court rejects Dr. Hough's arguments regarding tax loss and imposes a base offense level tied to the broad swath of conduct alleged by the government and included in Ms. Maurer's calculations, Dr. Hough respectfully submits that her limited and passive involvement in such conduct, coupled with her unsuccessful effort to enter the voluntary disclosure program, warrants a variance below the advisory guideline range.

## C.     The Need for the Sentence Imposed to:

   1.    <u>Reflect the seriousness of the offense, promote respect for the law and provide just punishment</u>

Dr. Hough does not dispute that filing false tax returns is a serious offense.  However, Dr. Hough has already paid, and will continue to pay, a substantial price for any transgression she committed.  The civil FBAR penalty alone, as calculated by the government, is more than $33.5 million; to put this in perspective, that is more than half of the $58 million penalty that the Swiss

---

[2] UBS' next production of names of its United States accountholders, a much larger group of 4,450, did not occur until late 2009.

[3] The initial OVDP did not end until October 2009, so Dr. Hough's application was timely but for the fact that the government already had her name from the secret February 2009 UBS production.

Bruce L. Udolf, PA
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

A/75993207.1/3325070-0000366042

bank Bank Wegelin paid to U.S. authorities after pleading guilty to helping U.S. taxpayers hide over $1.2 *billion* from the IRS.[4]  And, as noted above, whatever penalty Dr. Hough pays will likely be two-and-a-half times the civil penalty that would have been imposed had she been accepted, like 43,000 others, into the OVDP.  Dr. Hough has lost her job and most of her savings as a result of the trial and conviction in this case.

But the consequences to Dr. Hough go far beyond financial pain; she has lost the career that defined her and to which she had dedicated her life.  During over 25 years of medical practice, Dr. Hough did not receive one malpractice claim or other complaint.  Now, solely as a result of this case, her licenses to practice medicine have been surrendered or placed under investigation.  In November 2013, Dr. Hough permanently surrendered her South Carolina medical license in the face of an investigation by the Board of Medical Examiners stemming from her indictment.  (Exh. D).  In December 2013, Dr. Hough permanently surrendered her Wisconsin medical license in lieu of a disciplinary hearing requiring legal counsel and payment of the State's legal costs if she did not prevail.  (Exh. E).  In February 2014, Dr. Hough received a notice from the medical board of Massachusetts that disciplinary action would be taken unless she agreed never to seek to renew her license; Dr. Hough executed that agreement.  (Exh. F).  The above are all viewed as disciplinary actions and are posted, along with a report of her felony convictions, in the National Practitioner Data Bank (the national database used by all licensing boards, for employment purposes and for malpractice insurance).  Dr. Hough is also the subject of an ongoing investigation by the Florida Department of Health, which she has requested be deferred pending an appeal of her convictions.  (Exh. G).  Her Florida Medicaid Provider status has been terminated.  (Exh. H).  She cannot reapply for a DEA license to prescribe medication due to her convicted felon status.  And on October 28, 2013, immediately folliwng her conviction in this case, Dr. Hough was asked to resign from her position with the Sarasota County Department of Health, where she had worked for four-and-a-half years treating hundreds of uninsured patients.  (Exh. I).

This case has also deprived Dr. Hough of her ability to carry on with her benevolent work

---

[4] Dr. Hough reserves her right to challenge the government's calculation of the FBAR penalty.

Bruce L. Udolf, PA
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

in Central America.  Due to her travel restrictions and the surrender of her passport, Dr. Hough is no longer able to evaluate and participate in the initiation of new projects in Haiti, the Dominican Republic, Honduras, El Salvador, and Guatemala on behalf of the Saba Foundation.  At home, Dr. Hough's previously unimpeachable professional and personal reputation has been destroyed by a series of local front-page newspaper articles and otherwise extensive reporting of her convictions.  Her 25-year marriage to David Fredrick was destroyed as a result of this case, and she has now been left alone to deal with the devastating financial and family consequences of his flight.   Since the trial, Dr. Hough's anxiety and stress have increased significantly with deteriorating effects on her health (as painfully demonstrated by her collapse in court after the verdicts were read).

The above consequences to Dr. Hough's career, financial stability, and mental and physical health are unquestionably severe and reflect the seriousness of the offenses of which she was convicted.  As Dr. Paul Dalbec, the the Chairman of the Board of Trustees of the Saba University School of Medicine who has known and worked with Dr. Hough for 20 years, writes to the Court:  "I believe the effect of the verdict on her is devastating. . . .  Now she will have her medical license suspended and she has been abandoned by her husband to face this alone.  I do not know how she will be able to go on.  I would bet she'll be depressed for a long time.  I do not think that incarceration would be any greater punishment than what has already happened and would be an additional cost to our society to keep her."   Retired judge Tom Walker, who has known Dr. Hough for 50 years, implores the Court's leniency and assures the Court that "[t]here is no doubt that she will not re-offend.  She has already been stripped of a substantial portion of her livelihood.  More importantly to Pat, a conviction will stain a sterling reputation and reduce to the insignificant her ability to be philanthropic.  That, in and of itself, is punishment enough."  Jeannine Ball of the North Port Health Center observes that "[t]his legal matter has eroded the foundation of Pat's life in a most notable manner.  She built a life based on her studies in obtaining a medical education and she is now unable to use her license in her generous time investments to help others live functional and meaningful lives."

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com

A/75993207.1/3325070-0000366042

What more must be done to punish Dr. Hough apart from financial ruin, termination of a life's work and marriage, debilitated health, and destruction of an unblemished reputation?  At what point does the government's demand that this 67-year-old public servant and first-time offender be sent to prison for 6-8 years become vindictive retribution untethered from fairness and justice?  Particularly given the limited evidence of Dr. Hough's own acts relating to the offense conduct, the further draconian step of incarceration is not "necessary" (as used in § 3553(a)) to promote respect for the law and to provide just punishment.

Perhaps more importantly, the consequences of Dr. Hough's incarceration are likely to fall disproportionately on innocent third parties – whether they be the poor uninsured patients of Sarasota County who are now being denied essential psychiatric care, or the thousands in Central America who will not benefit from the programs that Dr. Hough can no longer spearhead, or the countless others who could benefit from her volunteerism in her community and elsewhere.  *See* Letter from Dr. William C. Heymann ("There has been no one available to replace the care [Dr. Hough] provided.  Her incarceration would end any possibility of a return to providing patient care to her prior and any new patients, and would end all her other volunteer community efforts."); Letter from Dr. Deborah Sauder ("When Dr. Hough withdrew from the clinic, she left a hole that we are still struggling to fill.  Her compassion for these underserved patients is irreplaceable.  Patients that she has cared for four years still ask when she is coming back. . . . Incarcerating Dr. Hough will not only hurt her, but will also prevent her from helping future patients."); Letter from Carol Gallegos ("To this date, the Health Department has not been able to replace Dr. Hough, and . . . the wait for a patient needing to be seen for severe mental health issues is over four months long.  These are some of the most vulnerable among us; most with chronic and severe physical and mental health issues, left with no medication options, and no psychotherapy available."); Letter from Ivy Waltman ("[D]uring [Dr. Hough's] absence these last few months, patients express their concern about her and constantly ask when she will be back. . . .  [W]e all miss her and hope she will return soon."); Letter from Kathy McSteen ("I have gotten calls from clients distraught because they could not longer see Dr. Hough. . . .  She is

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

missed and needed in our community."); Letter from Dr. Lynn Bernstein ("We, in the mental health profession, our patients and community need Dr. Hough to be able to continue her important work in the field."); Letter from Antoine Solagnier ("[Dr. Hough's charitable projects] will significantly be hampered and affected should they be discontinued or suspended because of eventual incarceration.  This to the disadvantage of thousands upon thousands of people in at least 6 countries that I know of."); Letter from Dr. Alan Gruber ("Her absence will be a remarkable loss to people who have virtually no other resources."); Letter from Dr. John Nekic ("Dr. Hough's involvement as an educator and as a humanitarian has truly impacted so many lives, it is almost too difficult to describe in words.  For her not to continue her work would not only affect her life but also the thousands of lives that her humanitarian projects touch.");  Letter from Laura Whitley ("The most heartbreaking result of this conviction has been [Dr. Hough's] inability to continue doing the work that she has taken so much joy in over the years, and the loss that her absence will be to her field."); Letter from Beth McCann ("The stress of this has been very difficult on Pat – difficult because it affects her directly, but perhaps even more, those she serves.  Pat is not able to travel to Guatemala and other Central American countries to help the thousands of hurt people she cares about so much.  She is not able to now work at the job of serving in FL those addicted with alcohol and drugs. . . .  She wants to serve others, is skilled, experienced, and compassionate in doing this, and I see no good it would do anyone, but much harm to so very many to not allow this to happen."); Letter from Robert Baker ("It seems nearly incomprehensible to me that the legal system would incarcerate Pat, putting a tragic stop to the contributions she makes to our society. . . .  I respectfully submit that the greatest good for all can be served by letting Pat continue her work and service unimpeded.  It seems to me that the worst that can happen by letting Pat remain at her work is that people will be helped and healed.").

The Supreme Court has recognized that a sentence of probation is itself a punishment. *See Gall*, 552 U.S. at 44 (recognizing that "probation, rather than 'an act of leniency,' is a 'substantial restriction of freedom'" (quoting district judge)).  If sentenced to probation, Dr.

Hough will be "subject to several standard conditions that substantially restrict [her] liberty." *Id.* at 48. These restrictions may include being required to report regularly to her probation officer, permit unannounced visits to her home, refrain from associating with any person convicted of a felony, and restrictions on her ability to vote and travel. And, of course, barring reversal on appeal, Dr. Hough will forever be a convicted felon, stripped of many of her rights and subject to the social opprobrium that comes with that status. In light of this and the severe financial and other penalties visited on Dr. Hough, a sentence of imprisonment is not necessary to provide punishment for Dr. Hough's offenses of conviction; moreover, countless people in the most dire need would be better served by allowing her to continue her work. There is far more that Dr. Hough can (and will) do to help others and repay any debt to society by remaining in her community than by sitting in prison.

2.      Afford adequate deterrence to criminal conduct

The sentence imposed by the Court should also be sufficient, but not greater than necessary, to adequately deter criminal conduct. 18 U.S.C. § 3553(a)(2)(B). Unquestionably, the goal of specific deterrence has already been met in this case. Dr. Hough's five-year investigation and prosecution and the prospect of a prison sentence have already brought about extreme shame and strain on her. She has suffered public reproval, lost her employment, and had an unblemished medical record tarnished as a result of being charged and convicted in this case. Moreover, even an FBAR penalty substantially less than the $33.5 million sought by the government is sufficient to ensure that Dr. Hough fully complies with her tax obligations in the future.

With regard to general deterrence, Dr. Hough submits that that goal has already been met by her highly publicized prosecution and conviction. Her prosecution and conviction has been reported in every major media outlet and has over 4,300 hits on Google. Any person contemplating underreporting of foreign income will be more than adequately deterred by the enormous financial penalties imposed on Dr. Hough; a sentence of incarceration is not needed to further reinforce this message. Moreover, a probationary sentence itself carries a deterrent

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com

effect.  An empirical analysis of the effect of different sentences on taxpayer compliance, which was funded in part by the IRS, failed to find a difference between convictions that resulted in probation and convictions that resulted in prison; both deterred tax crimes. It did find, however, that convictions resulting only in fines (*i.e.*, in neither prison nor probation) led to lower compliance. *See* Jeffrey A. Dubin, *Criminal Investigation Enforcement Activities and Taxpayer Noncompliance*, 2004 IRS Research Conference (June 2004) (http://www.irs.gov/pub/irs-soi/04dubin.pdf).

> 3.      Protect the public from future crimes of the defendant

Dr. Hough, who has lived nearly seven decades with no interaction with the criminal justice system prior to this case and who has dedicated her life to helping others, poses absolutely no risk of recidivism.  Notably, the United States Sentencing Commission has found that "recidivism rates decline relatively consistently as age increases."  *See* U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, *A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate* (May 2004); *see also United States v. Lucania*, 379 F. Supp. 2d 288, 297 (E.D.N.Y 2005) (recognizing "the inverse relationship between age and recidivism").  There is absolutely no basis to suggest that a sentence of imprisonment is necessary to protect the public.

> 4.      Provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner

There is no need to provide Dr. Hough with any such training, care, or treatment.

**D.      The Kinds of Sentences Available**

As reflected in the presentence report, the Court may impose from one to five years of probation – with conditions of fine, restitution, or community service – in lieu of imprisonment. See 18 U.S.C. § 3561(c)(1).  (PSR ¶ 101).  Restitution may be ordered as a condition of either probation or supervised release.   18 U.S.C. §§ 3563, 3583.

**E.      The Advisory Guideline Range**

The advisory guideline range in this case, as set forth in Dr. Hough's separately filed

objections to the presentence report, is subject to dispute, with the Probation Officer proposing a guideline range of 78-97 months (while stating that a variance may be warranted) and Dr. Hough advocating for a range of 0-6 months.  Of course, post-*Booker*, that range is now only one of several factors that the Court must consider in its sentencing analysis.  *See United States v. Hunt*, 459 F.3d 1180, 1183-85 (11th Cir. 2006) (rejecting a presumption of reasonableness of the Guidelines and holding that "a district court may determine, on a case-by-case basis, the weight to give the Guidelines, so long as that determination is made with reference to the remaining section 3553(a) factors that the court must also consider in calculating the defendant's sentence.").

### F.    Any Pertinent Policy Statement Issued By the Sentencing Commission

Dr. Hough is not aware of any pertinent policy statements that address the unique circumstances of this case.

### G.    The Need to Avoid Unwarranted Sentence Disparities

The goal of avoiding unwarranted sentencing disparities, which was a principal motivating force for the Sentencing Guidelines, remains a key sentencing factor under 18 U.S.C. § 3553.  *See United States v. Docampo*, 573 F.3d 1091, 1102 (11th Cir. 2009); see also 28 U.S.C. § 991(b)(1)(B) (purposes of Sentencing Commission include "avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices").

The most recent statistics from the U.S. Sentencing Commission show that of all federal tax defendants sentenced nationwide in fiscal year 2013, a substantial majority – 64.6% – was sentenced below the applicable guideline range (20.0% with the government's support and 44.6% without).   U.S. Sentencing Commission, *2013 Sourcebook of Federal Sentencing Statistics*   ("*Sourcebook*"),   Table   27A   (http://www.ussc.gov/Research_and_Statistics/

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

A/75993207.1/3325070-0000366042

Annual_Reports_and_Sourcebooks/2013/sbtoc13.htm).[5]   Focusing only on offshore tax prosecutions, the trend of below-guideline sentences is even more notable.  An analysis of such cases conducted shortly after Dr. Hough's conviction reveals that the United States has prosecuted 103 people since 2008, securing 62 guilty pleas and five trial convictions.  Of 49 defendants who have been sentenced, most received probation or home confinement; only 18 received prison time.  In almost every case examined, the defendants have received sentences below the applicable guideline range.  David Voreacos, *Beanie Baby Billionaire Sentence Comes Amid Tax Leniency*, Bloomberg (Oct. 31, 2013) (http://www.bloomberg.com/news/2013-11-01/beanie-baby-billionaire-sentence-comes-amid-tax-leniency.html).  A review of court records and government press releases in several of those cases reveals that probation not only is the most commonly imposed sentence, but has also been regularly granted to defendants whose conduct involved far greater knowledge and affirmative conduct of evasion than anything demonstrated by Dr. Hough.

In February 2013, Dr. Arvind Ahuja was sentenced in the United States District Court for the Eastern District of Wisconsin, Case No. 11-CR-135, after being convicted by a jury of filing a false tax return and failing to file an FBAR.  Dr. Ahuja, a prominent neurosurgeon, transferred millions of dollars from the United States to undeclared foreign accounts in India, invested the funds in these accounts in certificates of deposit, and earned undeclared interest income of $2.76 million on those certificates of deposit from 2005 through 2009.   According to the government, the total tax loss was $967,944.66.  At sentencing, the government sought a prison term of 41-51

---

[5] As a further demonstration of how excessive the government's recommendation of a 78-97 month sentence is, the Sentencing Commission statistics further show that for all federal tax cases prosecuted nationwide in fiscal year 2013, the median sentence imposed was 12 months and the mean sentence was 14 months.  *Sourcebook*, Table 13.  In tax cases in which imprisonment was imposed, the median term of imprisonment nationwide was 16 months and the mean term was 21 months.  *Id.*, Table 14.  Not surprisingly, where imprisonment was imposed on tax defendants in Criminal History Category I, the nationwide median term (13 months)  and mean term (19 months) were both below those applicable to imprisoned tax defendants as a whole.  *Id.*

*32*
*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

A/75993207.1/3325070-0000366042

months[6]; the defense argued for a sentence of probation based, among other things, on Dr. Ahuja's years of service to the community (including the needy) through the practice of medicine and the significant harm that would befall others were he to be sentenced to prison and lose his medical license.   The district court imposed a sentence of three years' probation (including six months of house arrest and 150 hours of community service).

In February 2014, billionaire (and Beanie Babies creator) H. Ty Warner was sentenced in the United States District Court for the Northern District of Illinois, Case No. 13-CR-00731, after pleading guilty to tax evasion in the most significant offshore account case brought by the United States during its five-year crackdown.  Warner admitted evading almost $5.6 million in taxes on more than $24.4 million in undeclared income on accounts totaling over $100 million at UBS AG and Zuercher Kantonalbank from 1996 to 2007, as well as failing to file FBARs from 1996 through 2008.  Although Warner's net worth was over $1.7 billion and he could have paid the taxes on his Swiss accounts easily, he made a conscious effort for over a decade to evade taxes and to conceal the offshore accounts from the accountants who prepared his tax returns. The sentencing guideline range, as stipulated in Warner's plea agreement, was 46-57 months. Noting Warner's charitable contributions and finding that "society will be best served by allowing him to continue his good works," the district court sentenced Warner to two years of probation and 500 hours of community service.

There is no reason that Dr. Hough, with her lifetime of charitable work, a tax loss just over half of Warner's (focusing on the tax loss attributed to Dr. Hough in Ms. Maurer's second RAR and trial testimony), and conduct that consisted principally of signing account opening documents, should receive a greater sentence than imposed on either Dr. Ahuja or Warner.[7]  But

---

[6]  Should this Court adopt the tax loss calculations presented by the government at trial (base offense level 24), impose the sophisticated-means enhancement, and grant a minimal role reduction, Dr. Hough's advisory guideline range would be the same 41-51 months faced by Dr. Ahuja.

[7] The government claims that the case "most analogous" to her own is that of father-and-son defendants Mauricio Cohen Assor and Leon Cohen Levy, who were each sentenced to 10 years' imprisonment in 2011.  (Gov't Sentencing Memo at 16-17).   This comparison is specious.  Assor and Levy were sophisticated businessmen who hid $150 million in assets and failed to report $49 million in income. They also forged documents to defraud the IRS, suborned perjury from witnesses in a related civil matter, induced other individuals to make false statements to federal law enforcement agents, and used their ill-

33
Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com
A/75993207.1/3325070-0000366042

those defendants are hardly isolated cases.  Other defendants who have received probation in offshore tax cases include:

● Mary Estelle Curran, charged in the United States District Court for the Southern District of Florida, Case No. 9:12-CR-80206-KLR.  She pleaded guilty to two counts of subscribing to false tax returns based on her failure to disclose $43 million in an undisclosed account at Swiss bank UBS.  The tax loss was $667,716; she also paid a $21.6 million FBAR penalty.  (Sentenced in April 2013 to one year of probation, which District Judge Kenneth Ryskamp immediately revoked, resulting in, as the court stated, "five seconds of probation")

● Igor Olenicoff, charged in the United States District Court for the Central District of California, Case No. 07-CR-227.  He controlled and hid assets in undisclosed foreign accounts for at least 13 years, and filed false tax returns for seven years in which he failed to disclose those foreign accounts.  Olenicoff's tax liability to the IRS, including interest and penalties, totaled $52 million.  (Sentenced to two years of probation)

● Pius Kampfen, charged in the United States District Court for the Northern District of California, Case No. 3:13-cr-00369-JST.  Kampfen, an international banker for 40 years who worked in San Francisco as the senior West Coast representative for Swiss bank Julius Baer until his retirement in 2001, failed to disclose or report on his tax returns a number of accounts he controlled at UBS and other Swiss banks.  He created a British Virgin Islands entity, Albia Investments Limited, for the purpose of holding his assets in Swiss accounts and concealing his ownership interest.  When initially interviewed by the IRS, Kampfen falsely stated that he was not familiar with Albia.  Kampfen pleaded guilty to failing to disclose his foreign accounts, which were valued as high as $2.93 million; the FBAR penalty was $1.465 million.  The total offense level was 10, and the guideline range was 6-12 months; the government sought a sentence of six months' imprisonment.  (Sentenced to two years of probation with six months of

---

gotten proceeds to buy Miami Beach mansions (including a $26 million personal residence), a $10 million condo at Trump World Tower in New York City, multiple yachts, a helicopter, a limousine, and and luxury vehicles including a Rolls Royce Phantom, a Porsche Carrera GT, a Bentley, and a Ferrari Testarossa.

A/75993207.1/3325070-0000366042

home detention)

● Robert Greeley, charged in the United States District Court for the Northern District of California, Case No. 3:11-cr-00374-CRB.  A San Francisco man who managed the investment of employee benefit funds at Hewlett-Packard Co., Greeley was convicted of filing a false tax return and admitted concealing more than $15 million in two bank accounts that he held at UBS in the names of Cayman Islands nominee entities.  He also failed to report more than $734,000 in interest income that he earned in the UBS accounts.  (Sentenced to three years of probation with six months of home detention)

● John McCarthy, charged in the United States District Court for the Central District of California, Case No. 09-CR-784.  He transferred over $1 million that he illegally skimmed from his Los Angeles business into an undisclosed UBS account and regularly communicated with UBS representatives to authorize transactions with respect to his undisclosed accounts. Although McCarthy cooperated with the government, the district judge stated that she also relied on the fact that he had no prior criminal record and had otherwise "led a responsible, law-abiding life." (Sentenced to three years of probation with six months of home detention and 300 hours of community service)

● Paul Zabczuk, charged in the United States District Court for the Southern District of Florida, Case No. 10-CR-60112.  He directed his foreign clients to make payments to his company through offshore accounts he controlled in the Bahamas and Switzerland, further funded those offshore accounts by disguising payments made from his domestic corporation to his offshore corporation as commissions, and repatriated funds to the United States through cash withdrawals at UBS branches in Nassau, London, and Zurich, as well as by wiring money to the Republic of China and using it to buy furniture and other antiques that were then shipped to him in the United States.  According to the government, the tax loss was $267,597.  Zabczuk unsuccessfully attempted to enter the OVDP.  The government sought a sentence of 18 months' imprisonment based on Zabczuk's cooperation.  (Sentenced to three years of probation with 12 months of home detention and 150 hours of community service)

● Steven Rubinstein, charged in the United States District Court for the Southern District of Florida, Case No. 09-CR-60166.  An accountant, he repatriated approximately $7 million from his undisclosed UBS accounts into the United States to purchase property and build his personal residence in Boca Raton, and deposited and sold more than $2 million in South African Krugerrands through his UBS accounts.  The government sought a prison term of 12 months based on Rubinstein's substantial assistance.  (Sentenced to three years of probation with 12 months of home detention)[8]

● Juergen Homann, charged in the United States District Court for the District of New Jersey, Case No. 09-CR-724.  He created a nominee Hong Kong corporation to hide his ownership interest in his UBS account, orchestrated a sham $5 million loan to a second Hong Kong entity in order to obtain financing for his United States business, and made a conscious decision not to seek out and enter into the IRS' voluntary disclosure program.  As stated in the plea agreement, the tax loss was over $400,000.  (Sentenced to five years of probation with 300 hours of community service)

● Jules Robbins, charged in the United States District Court for the Southern District of New York, Case No. 10-CR-333.  He created a sham Hong Kong corporation to be listed as the nominal holder of his UBS accounts (which collectively contained almost $42 million) and took numerous affirmative steps to conceal his interest in those accounts from the IRS, including having his Swiss attorney receive all correspondence relating to the accounts at his law firm in Switzerland.  He pleaded guilty to five counts of filing false tax returns.  (Sentenced to one year of probation)

● Ernest Vogliano, charged in the United States District Court for the Southern District of New York, Case No. 10-CR-00327.  He opened UBS accounts in the names of Liechtenstein and Hong Kong shell corporations and, according to the United States Attorney, "went to

---

[8] The government challenges Dr. Hough's reliance, among these many cases, on a small number in which the defendant's cooperated.  (Gov't Sentencing Memo at 17-18).  The point of cases such as Zabczuk and Rubinstein, however, is that the government sought incarceration notwithstanding those defendants' cooperation, and the district courts nevertheless imposed probationary sentences.

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394
(866) 951-9058/ budolf@udolflaw.com
A/75993207.1/3325070-0000366042

extreme lengths to hide his income at UBS and other offshore banks." Vogliano repatriated large sums of money from his undisclosed UBS accounts by traveling to Zurich and mailing traveler's checks from the UBS account to himself in the United States, and further used the UBS accounts to pay numerous personal expenses for himself and his wife (including transferring money to a contractor in Greece, sending money to an art gallery in Paris, and charging hundreds of thousands of dollars on credit cards linked to his UBS account). After learning of the criminal investigation of UBS, Vogliano transferred $1 million from UBS to a Liechtenstein-based bank that did not have offices in the United States. Vogliano pleaded guilty to one count of conspiracy and five counts of filing false tax returns. (Sentenced to two years of probation)

● Harry Abrahamsen, charged in the United States District Court for the District of New Jersey, Case No. 10-CR-00254. He funded his undisclosed foreign accounts with approximately $1.3 million in false and inflated expenses paid by his business to a Swiss company, which expenses he then deducted on the business' corporate tax returns. Abrahamsen transferred his UBS accounts to a nominee Panamanian corporation for the purpose of hiding them from the IRS. Per the plea agreement, the tax loss was between $325,000 and $550,000, and the stipulated total offense level was 16, with a guideline sentencing range of 21-27 months. (Sentenced to three years of probation with 12 months of home detention)

● Leonid Zaltsberg, charged in the United States District Court for the District of New Jersey, Case No. 10-CR-437. He transferred his undisclosed foreign bank accounts to a nominee Panamanian corporation for the purpose of hiding them from the IRS and, as found by the District Court at sentencing, "made a conscious and calculated decision to hide money offshore." Per the plea agreement, the total offense level was 13, with a guideline sentencing range of 12-18 months. (Sentenced to four years of probation with 12 months of home detention)

● Jacques Wajsfelner, charged in the United States District Court for the Southern District of New York, Case No. 12-CR-00641. A retired real estate and advertising executive, he concealed $5.7 million in undisclosed accounts at two Swiss banks, including one account in the name of a sham Hong Kong corporation that he created to hide his ownership of the account

from the IRS.  The tax loss was over $419,000, and the civil FBAR penalty was over $2.8 million.  (Sentenced to six months of probation with three months of home detention)

● Jeffrey Chatfield, charged in the United States District Court for the Southern District of California, Case No. 10-CR-4546.  He opened a UBS account in the name of a nominee entity, deposited $900,000 in untaxed cash and securities that he received from his consulting work, and later transferred account assets into another UBS account held in the name of another nominee entity.  (Sentenced to three years of probation)

● Richard Chong, charged in the United States District Court for the Northern District of California, Case No. 3:13CR00442-001 JST.  Chong failed to pay taxes on $1.8 million held in an undisclosed foreign account and faced an advisory guideline range of 10-16 months.  At sentencing in December 2013, the district granted a downward variance based in large part on the sentences given to similarly situated defendants.  (Sentenced to two years of probation and 200 hours of community service)

● Lothar Hoess, charged in the United States District Court for the District of New Hampshire, Case No. 11-CR-154.  He deposited his business receipts into an undisclosed UBS account and used another undisclosed UBS account to pay his personal expenses.  Hoess was aware of and understood his obligation to file FBARs and report those accounts, having previously filed FBARs for an account that he controlled in Italy.  The plea agreement included a base offense level of 20 (tax loss over $400,000), a total offense level of 19, and a guideline sentencing range of 30-37 months.  Hoess' total tax liability to the IRS, including penalties and interest, was $2,033,209.  (Sentenced to three years of probation with eight months of home detention)

● Wolfgang Roessel, charged in the United States District Court for the Southern District of Florida, Case No. 12-CR-60074.  He held undisclosed accounts in nominee names at UBS and at another Swiss bank, into which he deposited foreign proceeds of his business totaling over $11.5 million.  When Roessel became aware of the government's investigation into his UBS accounts, he disclosed only the existence of the UBS accounts on his tax returns for those years

A/75993207.1/3325070-0000366042

and did not report the other Swiss account.  Per the plea agreement, the stipulated tax loss was $312,803, the total offense level was 17, and the guideline sentencing range was 24-30 months. (Sentenced to eight months of home detention with three years of supervised release)

●  Josephine Bhasin, charged in the United States District Court for the Eastern District of New York, Case No. 2:11-CR-00268.  She failed to disclose on her tax return a number of foreign accounts at HSBC India valued at $8.3 million, and further failed to disclose $169,000 of interest income earned on certificates of deposit maintained at HSBC India.  (Sentenced to two years of probation with three months of home detention and 150 hours of community service)

●  Rakesh Chitkara, charged in the United States District Court for the District of New Jersey, Case No. 3:13-cr-00202-MLC.  He failed to disclose on his tax returns his interest in at least two UBS accounts.  He also formed a Bahamanian corporation that he used to conceal his beneficial ownership in one of the UBS accounts.  The tax loss was $27,000 and the civil FBAR penalty was $839,885.  (Sentenced to one year of probation)

●  Roberto Cittadini, charged in the United States District Court for the Western District of Washington, Case No. CR 09-0344.  A retired sales manager for Boeing, he concealed nearly $2 million in undisclosed UBS accounts.  After initially opening a UBS account in his own name, he transferred the assets in that account to a nominee Hong Kong corporation in order to evade United States reporting and withholding requirements.  (Sentenced to one year of probation with six months of home detention and 200 hours of community service)

●  Gregory Rudolph, charged in the United States District Court for the District of Massachusetts, Case No. 1:10-cr-10360-NMG.  He failed to disclose a UBS account containing at least $1.5 million, and created shell companies in the British Virgin Islands and in Hong Kong to assist in hiding the income from the undisclosed UBS account.  (Sentenced to one year of probation with one month of home detention)

●  Arthur Joel Eisenberg, charged in the United States District Court for the Western District of Washington, Case No. 2:10-cr-00369-JCC.  He failed to disclose his ownership of several UBS accounts containing a total of over $4.2 million.  He also authorized and caused the

*39*
*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

A/75993207.1/3325070-0000366042

formation of a Hong Kong corporation and transferred his assets into a UBS account in the corporation's name to conceal his beneficial ownership.  Upon learning of the UBS investigation in 2008, he closed his UBS account and transferred the funds to another large global Swiss bank. (Sentenced to three years of probation)

> ● Anton Ginzburg, charged in the United States District Court for the Eastern District of New York, Case No. 1:11-cr-00432-SJ.  A New York podiatrist, he concealed his ownership of a UBS account containing $3.11 million and paid a civil FBAR penalty of over $1.5 million. (Sentenced to five years of probation)

> ● Michael F. Schiavo, charged in the United States District Court for the District of Massachusetts, Case No. 1:11-CR-10192-RGS.   A venture capitalist, he arranged to have $99,273 in taxable income from an investment wired to an undisclosed bank account in Bermuda, and failed to report the account to the IRS or declare the payment on his tax return. The tax loss was $40,624.   (Sentenced to one year of probation with one month of home detention)

> ● Humberto Gomez, charged in the United States District Court for the Southern District of Florida, Case No. 1:12-CR-20198-JEM.  He filed false tax returns that failed to disclose a UBS account that he held in the name of a sham British Virgin Islands corporation and into which he deposited nearly $1.9 million in business receipts.  (Sentenced to three years of probation)

In light of national sentencing data and the above and other cases, a prison term for Dr. Hough would create an unwarranted sentencing disparity with other defendants found guilty of similar or more egregious conduct, and a downward variance to a sentence of probation is appropriate to avoid such a disparity.  See 18 U.S.C. § 3553(a)(6).

## H.     The Need to Provide Restitution to Victims of the Offense

A probationary sentence will aid, rather than hinder, Dr. Hough's ability to pay any restitution obligation to the IRS because it will allow her to maintain employment and income.

## III.     CONCLUSION

For the reasons set forth herein and in Dr. Hough's separately filed Objections to Presentence Report and Response to Government's Sentencing Memorandum, and taking into consideration Dr. Hough's personal history and characteristics and all of the goals of sentencing enumerated in § 3553(a)(2), Dr. Hough respectfully requests a sentence of probation with conditions of 12 months of home detention and 1000 hours of community service.

Dated: April 16, 2014

Respectfully submitted,

**BRUCE L. UDOLF, P.A.**
Counsel for Defendant Hough
Broward Financial Centre
500 East Broward Blvd., Suite 1400
Fort Lauderdale, Florida 33394
Tel: (866) 951-9058/ Fax (954) 525-2134

By: /s/ Bruce L. Udolf
    Fla. Bar No. 0899933
    budolf@udolflaw.com

**BINGHAM MCCUTCHEN, LLP**
Counsel for Defendant Hough
Suite 2050 North, 1601 Cloverfield Blvd.
Santa Monica, California 90404
Tel: (310) 907-1000/ Fax (310) 907-2000

By: /s/ Nathan J. Hochman
    California Bar No. 139137
    nathan.hochman@bingham.com
By: /s/ Daniel A. Saunders
    California Bar No. 161051
    Daniel.saunders@bingham.com

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, on this 16th day of April, 2014.

By: /s/ Bruce L. Udolf

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866) 951-9058/ budolf@udolflaw.com*

A/75993207.1/3325070-0000366042