IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v.        )<br>)<br>PATRICIA LYNN HOUGH,   )<br>)<br>Defendant.     ) | Case No. 2:13-cr-00072-FtM-JES-UAM |

**GOVERNMENT'S RESPONSE TO DEFENDANT HOUGH'S OBJECTIONS TO PRESENTECE REPORT AND RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM**

COMES NOW the United States, by and through counsel, and files this Response to Defendant Patricia Lynn Hough's Objections to Presentence Report and Response to Government's Sentencing Memorandum ("Defendant's Motion").  Dkt. #163.

**I.     OBJECTIONS TO THE "OFFENSE CONDUCT" SECTION OF PRESENTENCE REPORT ("PSR")**

The government specifically responds to Defendant Hough's following objections:

¶20: The government presented evidence at trial that Defendants Hough and Fredrick closed their account in the Bahamas when "changes in US & Bahamas banking policies" took effect in January 2004 that "put [them] at a disadvantage."  *See* Government Exhibit ("GX") 3P at page 6.  Defendant Fredrick wrote that "my wife and I have decided to close our account at SG Hambros in Nassau."  *Id*.  These communications coincided with a tax information sharing agreement entered into by The Bahamas and the United States which went into effect on January 1, 2004.  *See* The Bahamas and the United States of America Tax Information Exchange Agreement Act, 2003 (attached as Exhibit 2 to Government's Response to Defendant's Objections to Draft PSR).

1

¶21: Defendant Hough testified at trial that she met with Singenberger in Switzerland to submit account opening documents to UBS, so it is inaccurate to assert that Defendant Hough had nothing to do with the opening of these accounts. *See* 9Tr. 117 - 121. Hough also testified at trial that she met in person with Singenberger on a number of other occasions both in Switzerland and the United States. *See Id.* at pp. 171-172; 177; 184-185; and 271-274. Additionally, on June 23, 2005, Defendant Hough caused the assets in the UBS account in her individual name to be transferred to New Vanguard. *See* GX 3S at p. 9.

¶23: Defendant Hough was involved in providing information to the potential buyers of the schools in 2003 and participated in correspondence and meetings. *See* GX 6E (April 30, 2003 letter from Buyers – references Defendant Hough meeting with Buyers to complete due diligence); GX 6I (July 8, 2003 email from Defendant Hough to Buyers – "I would think you need to form an LLC soon and other entities…Of particular concern is the Belize situation and the issuing of shares. We have delayed having our 50% issued in our names pending a closing and legal advice. We can have them issued to the LLC or other entity if that is advisable…We are moving ahead making sure all is in order on our end.").

¶24: In December 2003, Defendant Fredrick emailed Luetolf and explained that "[a]fter speaking with several people **we** concluded that leaving the funds in Nassau makes us too vulnerable." *See* GX 3P at p.5 (emphasis added). Fredrick also wrote a letter that references Defendant Hough's involvement in the decision, stating: "my wife and I have decided to close our account at SG Hambros in Nassau…but unfortunately the changes in US & Bahamas banking policies that take effect in January 2004, put us at a disadvantage." *See* GX 3S at p. 6, *see also* The Bahamas and the United States of America Tax Information Exchange Agreement

Act, 2003 (attached as Exhibit 2 to Government's Response to Defendant's Objections to Draft PSR).

¶38: According to the April 7, 2003 Letter of Intent, "Fredrick and Hough control and own 100% of EIC." *See* GX 6D, 6F.

The government generally disagrees with all other objections by Defendant Hough as they are not factually supported by the overall evidence in this case.

## II.   OBJECTIONS TO ADVISORY GUIDELINE COMPUTATION OF PRESENTENCE REPORT

### A.  *Relevant Conduct and Tax Loss*

The government wholly rejects Defendant Hough's argument that there is no tax loss; the tax loss, including relevant conduct is $15,518,382.  As detailed in our Sentencing Memorandum, the Revenue Agent Report (RAR) and Revenue Agent (RA) Maurer's expected testimony will satisfy the government's burden of establishing relevant conduct by a preponderance of the evidence.  USSG §6A1.3, comment; *United States v. Watts*, 519 U.S. 148, 156 (1997) (*per curiam*); *United States v. De La Rosa*, 922 F.2d 675, 679 (11th Cir. 1991). Section 1B1.3 of the USSG specifically provides that "[c]onduct that is not formally charged or is not an element of conviction may enter into the determination of the applicable guideline sentencing range." §3B1.3, comment. (backg'd); *United States v. Duncan*, 400 F.3d 1297, 1304-05 (11th Cir. 2005).

"Federal tax law is concerned with the economic substance of the transaction under scrutiny and not the form by which it is masked." *United States v. Heller*, 866 F.2d 1336, 1341 (11th Cir. 1989); *see also Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945); *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *see generally Kirchman v. Commissioner*, 862 F.2d 1486, 1490-94 (11th Cir.1989).  The jury's verdict validated the concept of "Substance over

Form" for they could not have found Defendant Hough guilty if they did not conclude that she owned the schools and had an obligation to report the income earned in the bank accounts in the schools' names and the nominee entities' name on her individual income tax returns.  The jury heard testimony from both David Minchenberg and RA Maurer concerning the concept of "Substance over Form."  4 Tr. 84-85; GX 7K.  RA Maurer testified that "[s]ubstance over form means that you can't just fill out papers, or form, and disguise what is really underneath the … what the real underlying transaction is."  7Tr. 128.

There is overwhelming evidence that Defendant Hough actually owned the Foundation and MUA, which supports including 50% of the profits from both MUA and Saba as part of her tax loss computation.  The web of structures was nothing more than window dressing to conceal her ownership interest from the IRS.  The evidence includes:

- An April 7, 2003 Letter of Intent signed by Defendant Hough, GX 6D at p. 1, related to the potential sale of the medical schools which stated that she and Fredrick "have the controlling interest in MUA/Nevis, SABA and 50% of MUA Belize."  *Id*.; 3Tr. 115.  The letter further states that Defendant Hough and Fredrick hold their interests "free and clear of all liens, mortgages and encumbrances" and "directly or indirectly, own[] or control[] ownership of all real estate and property" associated with the schools.  GX 6D.  Defendant Hough signed the Letter in her individual name.  *Id*. p. 5. 3Tr. 156-57.

- A June 25, 2003, Agreement related to the potential sale of the medical schools again stated that she and Fredrick owned or controlled the Saba Foundation and MUA/Nevis.  GX6F, p. 1; 3Tr. 116 - 118.  Defendant Hough again signed the Agreement in her individual capacity as "Seller."  GX 6F at p. 3; 3Tr. 157-58.

- On July 8, 2003, Defendant Hough emailed the potential buyers and copied Fredrick.  GX 6I.  She stated in that e-mail that they were concerned about the issuance of shares for Belize and that "[w]e have delayed having **our** 50% issued in **our** names pending a closing and legal advice." *Id*.; 3Tr. 121 – 122 (emphasis added).

- Mario deCastro drafted an opinion letter based on his understanding of who the sellers of the Saba Foundation, MUA and the other entities were.  He testified that he got this understanding from his clients and he had no reason to believe that his client would not tell him what their understanding was of who the sellers were.  GX 8B; 3Tr. 158-59.  Further, on December 18, 2003, Dr. Fredrick

forwarded this opinion letter to Jerome Schneider stating "[a]ttached is a 'very confidential' legal review of a recommended legal/tax structure for **our** medical schools. *Id*. (emphasis added). 3Tr. 233-234. The opinion letter states that the venture, consisting of four companies, is "currently owned by Dr. David Fredrick, MD, and his wife Dr. Pat Hough, MD." GX 8B at p. 3; 3Tr. 234.

- On September 9, 2005, Fredrick opened an offshore financial account at UBS in the name of MUA where he identified he and Defendant Hough as beneficial owners; both Fredrick and Defendant Hough had signature authority over the account. GX 3Y. Fredrick also emailed Luetolf on May 31, 2005, copying Defendant Hough concerning the execution of the MUA account opening documents. GX 3AA at p. 9.

- Numerous entries in the UBS records indicate that Luetolf understood that Defendant Hough and Fredrick owned medical colleges in the Caribbean. *See* GX 3S, GX 3EE. Mr. Futterknecht testified that Luetolf would have made these entries based on information received from the client**,** 1Tr 69-70, that Leutolf was under a duty to accurately document information related to the background of the client as part of "Know Your Client" and Swiss law, 1Tr. 63-4, 65, and 78, and Defendant Hough testified that she met with Luetolf, provided him with documents necessary to establish accounts, and had a discussion with him related to the medical schools. 9Tr. 117-20.

- During Minchenberg's tenure, he was concerned with the legal structure, and ownership was an ongoing issue. 4Tr. 47-48. He drafted several memos concerning the exit strategy of the owners, whom he identified as Defendants Hough and Fredrick. 4Tr. 54-55, 58; GX 7D; 7E.

- On March 8, 2006, a Board meeting was held for MUA; present were David Fredrick and Patricia Hough who were identified as "Shareholders." During this meeting, consideration was given to an offer by New Vanguard, another nominee entity owned by Defendants Hough and Fredrick, to purchase shares of MUA. Fredrick made a motion to accept the offer and Defendant Hough seconded it. GX 9H.

- In April 2007, Defendants Hough and Fredrick sold the schools to Equinox Capital. GX 10A, 10B; 10C. Mr. Rodger testified that Defendant Hough was concerned with the direction of the schools and that "anybody who has built something from nothing would be very concerned with who was going to be involved, and whether they were going to, you know, carry the same banner that they've put out there." 6Tr. 16. Mr. Rodger also testified that Defendant Hough signed a personal guaranty and that the deal would not have closed without a personal guaranty of the sale by Defendant Hough and Fredrick. 6Tr. 23-24. Mr. Rodger further stated that he was quite confident that Defendant Hough knew what the guaranty meant. 6Tr. 95.

- Defendant Hough testified that MUA was under the umbrella of the Foundation. The evidence at trial proved that Defendant Hough owned the Foundation, therefore, even under her own explanation, she owned MUA. 10Tr. 70.

### B. Mitigating Role in the Offense

Defendant Hough did not play a minimal role in the offense. The defendant bears the burden of proving that her sentence should be reduced for her minimal role in the offense. *United States v. Rodriguez DeVaron*, 175 F.3d 930 (11th Cir. 1999). Section 3B1.2(a) of the Sentencing Guidelines provides for a four level reduction for a defendant who was "a minimal participant in any criminal activity." This reduction, which covers "defendants who are plainly among the least culpable of those involved in the conduct of a group," is applied infrequently. USSG § 3B1.2, comment. (n.4). A minimal participant will have "a lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of the others." *Id.*; *United States v. Zaccardi*, 924 F.2d 201 (11th Cir. 1991).

Defendant Hough had a full understanding and knowledge of the scope and structure of the conspiracy. She signed almost every single account opening document that Fredrick signed, including the documents to open an account in her individual name, which were only signed by her. *See* GX Three and Four Series. Defendant Hough testified that she met with Dieter Luetolf in Zurich, Switzerland in or around September 2001 to provide documents to Luetolf which were necessary to open financial accounts at UBS in Switzerland. 9Tr. 117-120. Defendant Hough testified that she and Fredrick met with Singenberger in 2005 in Boston, and that Singenberger suggested that Defendants Hough and Fredrick establish Hong Kong entities, allegedly for asset protection for the Saba Foundation. 9Tr. 171-74. Defendant Hough testified that she later had a discussion with Fredrick where she was told by him that Hong Kong entities were in fact established. 9Tr. 174. Defendant Hough further testified that she had several meetings with Singenberger, specifically one in the United States and three in Zurich. Defendant Hough

testified that the meetings in Zurich occurred in 2008 and 2009. 9Tr. 184-85; 271. These meetings resulted in the establishment of nominee entities and the opening and closing of the offshore financial accounts in the names of these nominee entities.

Meeting with bankers and financial intermediaries to open bank accounts and create nominee entities is hardly minimal involvement in a conspiracy centered on just that. Furthermore, Defendant Hough filed her tax returns electing the married filing separate status, thus placing the responsibility solely on herself for filing a true and correct tax return. She cannot blame Fredrick for placing a tax return in front of her and stating "sign here." She was the only person responsible for providing false information to Thomas Murtha for preparation of her false tax returns. She did sign documents approving transfers of funds from one nominee bank account to another, including from the account in her individual name to New Vanguard and the splitting of she and Fredrick's joint account into two separate accounts. *See* GX 3HH pp. 27 and 28. The fact that she did not email Luetolf to direct wire transfers is inconsequential when she was aware that funds were being transferred back into the United States in order to purchase assets from which she benefitted, including a vacation home in Asheville, North Carolina, a condominium in Sarasota, Florida and $250,000 into their personal checking account, from which the property taxes on their personal residence were paid. *See* GX 3E, p. 160, 12E, 12F, 30D, p. 75. For all of these reasons, the Court should deny Defendant Hough's request for a mitigating role in the offense adjustment.

### III. GOVERNMENT'S SENTENCING POSITION

Defendant Hough asserts that the government has leaped to conclusions from incomplete facts and assumptions concerning her transfer of $1.5 million just weeks after her conviction. *See* Defendant's Motion at page 16. While Defendant Hough testified "that she and Fredrick

purchased their Sarasota condo with a loan from the Foundation against Fredrick's deferred income" there is no other evidence to support this.  The Court is asked to rely solely on Defendant Hough's statements, which the jury in this case clearly must not have found to be credible given the guilty verdicts.  Despite Defendant Hough's assertion that "Paul Dalbec confirmed the existence and Board approval of this and other loans," in fact, Mr. Dalbec testified that he did not even know that the Defendants had a condo in Sarasota.  5Tr. 211-212.  There is no evidence on the financial statements for either school to support the assertion that deferred compensation was owed to either Defendant Hough or Fredrick or that there were loans from the Foundation or MUA to Fredrick or Hough.  Certainly one would expect that a liability owed by the schools, including millions of dollars in deferred compensation, would have appeared on the schools' financial statements.  *See* GX 7EE, 8C, 8AA, 9B, and 9N.  This alleged loan based on deferred compensation and other alleged loans did not appear on the financials and no loan documents have been found because the Foundation and MUA were Hough and Fredrick's companies, they used the funds from them for their personal benefit, and no actual loan existed.

      Defendant Hough further argues the reason she wire transferred more than $1.5 million back to the Foundation after her conviction was because there was a loan with an interest rate and that by December 2013 it totaled $1.1 million.  Yet she provides absolutely no evidence to support this.  Where are the loan documents?  Where is the lien to secure the Foundation's interest in the property, either for the original loan or this new "advance"?  Where is the evidence to establish how it is that this "loan" grew from $850,000 to $1.1 million between 2008 and 2013?  Where is the proof that the Foundation "lent" Defendant Hough funds to pay her legal fees?  Where is the invoice to establish how much was billed for the legal fees?  Certainly, Defendant Hough, as the self-professed "caretaker" of the Foundation would want to ensure that

8

the Foundation's interest could be enforced with, at the very least, a signed loan document? There is no evidence because this is nothing more than another example that Defendant Hough controls and uses the Foundation's funds as her own.

### IV.    CONCLUSION

A sentence of 12 months home detention and 1000 hours of community service is substantively unreasonable. Defendant Hough has provided no reasonable basis for this Court to sentence her to anything but a term of imprisonment consistent with the Guidelines range calculated in the PSR.

                LEE BENTLEY
                Acting United States Attorney


          By: /s/ Caryn D. Finley
             CARYN D. FINLEY
             Trial Attorney, Department of Justice, Tax Division
             New York Bar No. 3953882
             2110 First Street, Suite 3-137
             Fort Myers, Florida  33901
             Telephone:  (202) 514-5051
             Facsimile:  (202) 514-0961
             E-mail: caryn.finley@usdoj.gov


          By: /s/ Margaret Leigh Kessler
             MARGARET LEIGH KESSLER
             Trial Attorney, Department of Justice, Tax Division
             2110 First Street, Suite 3-137
             Fort Myers, Florida  33901
             Telephone:  (202) 514-5193
             Facsimile:  (202) 514-9623
             Margaret.Leigh.Kessler@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 18, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of that electronic filing (NEF) to the following:

Bruce L. Udolf
Nathan J. Hochman
Daniel Saunders

/s/ Caryn D. Finley
CARYN D. FINLEY
Trial Attorney, Department of Justice,
Tax Division
New York Bar No. 3953882
2110 First Street, Suite 3-137
Fort Myers, Florida  33901
Telephone:  (239) 461-2200
Telephone:  (202) 514-5051
Facsimile:  (239) 461-2219
E-mail: caryn.finley@usdoj.gov

11358055.1