# EXHIBIT 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.: 2:13-CR-72-FtM-29UAM

THE UNITED STATES OF AMERICA,

       Plaintiff,

vs.

                                      Fort Myers, Florida
                                      October 22, 2013

PATRICIA LYNN HOUGH,                 9:00 a.m.

       Defendant.

TRANSCRIPT OF JURY TRIAL, DAY 10

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                              Tax Division
                           P.O. Box 813
                           Washington, DC  20044
                           BY:  CARYN FINLEY, ESQ.

                           U.S. Department of Justice
                              Tax Division
                           Suite 7334
                           601 D Street NW
                           Washington, DC
                           BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

1   Q      So let's focus, if we could, a moment on Round Hill, and
2   I'll ask you a few questions along those lines with respect to
3   Round Hill.
4          In 1999, did you become aware that a property could
5   become available on the island of Saba that the school could
6   build its campus on?
7   A      Yes.
8   Q      And what did you understand, back in 1999, that property
9   to be?
10            MS. FINLEY:  Objection, foundation.
11            THE COURT:  Sustained.
12  BY MR. HOCHMAN:
13  Q      How did you become aware that there was going to be a
14  property coming on the market that the Saba School of Medicine
15  Foundation could purchase and build this campus?
16  A      Dr. Fredrick told me he had received a call from Thomas
17  Eric Johnson, who is one of the foundation directors on Saba,
18  that a man named Leo Chance was selling a very large parcel of
19  land on Saba, and wanted it to go to the medical school wanted
20  the medical school to buy it.
21  Q      And this is approximately 1999?
22  A      Yes.
23  Q      Now, before 1999, where was the Saba School of Medicine
24  holding its classes?
25  A      There were some . . . it's why the school was able to

1  start.  The government had rather large buildings, one was a
2  former school that had been completely renovated, another
3  building had medical labs, and then there was another huge
4  building for classrooms.
5  Q    Was there also an elementary school that was used?
6  A    That . . . it wasn't a -- it was a comprehensive school,
7  but it was sitting at little desks.  It was totally gutted and
8  remodeled with, you know, normal desks and labs and facilities,
9  toilets, everything was done.
10 Q    Now, what was the area called that Round Hill was
11 located in?
12 A    It was called the bottom.
13 Q    All right.  And was the other Saba School of Medicine's
14 facilities located toward the top of the island of Saba?
15 A    Part of it was in the bottom, and then the . . . we had
16 it divided that the first three -- there were five semesters in
17 two years, and the first three were all located in the bottom,
18 and the other two were located . . . in a big building over an
19 area called Cove Bay, that was kind of over the hill.
20 Q    And did Cove Bay get pretty much destroyed by the
21 hurricane that blew through in 1999?
22 A    It was devastated.
23 Q    I'm sorry?
24 A    It was devastated.
25 Q    Now, with respect to the sale of the property that's

1   been called Round Hill, you said that Leo Chance had put on the
2   market, what was your understanding as to who purchased Round
3   Hill?
4   A       It was my understanding it was The Foundation purchased
5   Round Hill.
6   Q       And on what basis -- and on what do you base your
7   understanding?
8   A       From what Dr. Fredrick told me.
9   Q       And what did he tell?
10  A       I wasn't there.  He went and he did all of the -- he and
11  Thomas Eric Johnson, two directors, did all the negotiations.
12  But he said it had been purchased for the medical school.
13  Q       Did he say how much it was purchased for?
14  A       $250,000.
15  Q       Did he tell you, at the time, who, or what, was the
16  title holder for the property?
17  A       No.  I mean, I just assumed it was The Foundation.
18  Q       And at some point -- this is 1999.  At some point in
19  2000, was there a ground breaking on the property?
20  A       Yes, there was.
21  Q       Did you learn something more about who the title was
22  being held in for the Round Hill property in about this time of
23  2000, during the ground breaking?
24  A       Well, it was after the ground breaking.  I had been
25  on . . . I had been on the island for some reason.  I think it

1    was some orientation.  But, in meeting with the architect, he
2    would bring out a lot of papers, and it shows that Laura
3    Walls -- that the property was registered to Laura Walls.
4    Q    Who did you understand Laura Walls to be?
5    A    Laura Walls is my stepdaughter.
6    Q    And what was your reaction in finding out that the
7    property was registered to Laura Walls?
8    A    I was pretty astonished.
9    Q    Why?
10   A    She was really young then, with a young child.
11   Q    Did you confront Dr. Fredrick about the situation?
12   A    I wouldn't say I confronted him.  I mean, I said why in
13   the world is this in Laura's name?
14   Q    And what, if anything, did he say back to you?
15   A    He said that -- that the sale was done so quickly, in
16   such a short period of time, there were other people that want
17   it, that Speetjens, the notary, the lawyer that handled
18   everything, said there wasn't time to set up any other kind of
19   a company.  He didn't want it in the medical school, because of
20   asset protection, so he was supposed to find a close trusted
21   relative.
22   Q    And what was your understanding as to what the problem
23   would be for asset protection purposes if the Round Hill
24   property was put in the Saba School Foundation's name?
25           MS. FINLEY:  Objection, foundation.

1    THE COURT: Sustained.
2  BY MR. HOCHMAN:
3  Q    Did you have an understanding as to whether or not there
4  would be a problem -- and now I'm focusing back in the year
5  1999/2000 -- if the Round Hill property was put in the Saba
6  School Foundation's name?
7  A    Now well, what we had learned bay back in 1995, with the
8  first lawsuits, was that it could be frozen or seized.
9  Q    So if the Round Hill property was in the Saba School of
10 Medicine Foundation's name, then, if there was a judgment, it
11 could seize the property?
12 A    Yes. Or, you know, if there were tax issues, I mean,
13 even under Antillean law, it was seizable.
14 Q    Did you have any conversations with Dr. Fredrick about
15 moving the property out of Laura Walls' name and into an
16 entity's name?
17 A    I said . . . and I talked with Mr. Johnson, who was a
18 director, and, you know, we really ought to go to the lawyer,
19 Speetjens, and there needed to be another way. It was not a
20 good idea to have it in a young girl's name.
21 Q    Did you participate in another way being created into
22 which this property could be placed?
23 A    I was at the meeting. We went to Saint Maarten, where
24 the lawyer was located, and they wanted to create a company,
25 and suggested, just for the land, that David and I could

1   be . . . caretakers, owners.
2   Q      And was a company formed, in approximately 2000, in
3   connection with Round Hill?
4   A      Yes.
5   Q      What company was that?
6   A      Round Hill Holding Company.
7   Q      And what was your and David's percentage interest?
8   A      Each of us had 50 percent.
9   Q      And this is the same Round Hill Holdings that you filed
10  the -- that were sent in through Mr. Minchenberg, that 5471?
11  A      Yes.
12  Q      Once the Round Hill Holding property was -- excuse me,
13  Round Hill Project Holding Company was formed, did you
14  immediately move the property into that company's name?
15  A      No.  It wasn't immediate.
16  Q      Are you familiar with something called a right of
17  superficies?
18  A      It's a very complicated Dutch Antillean word.
19  Q      Did you participate in a right of superficies being
20  obtained by Round Hill Project holdings in connection with this
21  Round Hill land?
22  A      It was something that Mr. Speetjens knew about, and did
23  a document that allowed -- did some kind of separation between
24  land and buildings.  It allowed buildings to be built, but it
25  protected them.  Like a landowner couldn't claim it.  It

```
                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                         FORT MYERS DIVISION

                  CASE NO.:  2:13-CR-72-FtM-29UAM
```

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                            Fort Myers, Florida
vs.                                        October 21, 2013

PATRICIA LYNN HOUGH,              9:00 a.m.

        Defendant.

```
                  TRANSCRIPT OF JURY TRIAL, DAY NINE

              HELD BEFORE THE HONORABLE JOHN E. STEELE
                  UNITED STATES DISTRICT COURT JUDGE

                         A P P E A R A N C E S


FOR THE UNITED STATES:      U.S. Department of Justice
                               Tax Division
                            P.O. Box 813
                            Washington, DC  20044
                            BY:  CARYN FINLEY, ESQ.

                            U.S. Department of Justice
                               Tax Division
                            Suite 7334
                            601 D Street NW
                            Washington, DC
                            BY:  MARGARET LEIGH KESSLER, ESQ.



              (Appearances Continue on Following Page)
```

1    MS. FINLEY:  And if we can look at Exhibit 5I.
2    (An exhibit was projected onto the projector screen.)
3 BY MS. FINLEY:
4 Q And is this a copy of the check that you -- one of the
5 checks that you gave to Phillips?
6 A Do I have that?
7 Q I'm sorry.  Yes, you do.  5I should be in there.
8    (The witness examines exhibits.)
9
10 A Yes, I have it.
11 Q And there's nothing in this letter that says,
12 "Dr. Fredrick and I give a gift," is there?
13 A It came from our joint account.
14 Q I know.  But I'm asking you, does the letter -- when
15 you're sending it in to Mr. Clark, the president, you are
16 saying -- you use the word "I," in this letter; correct?
17 A Yes.
18 Q Now, with respect to the Round Hill property, I think
19 yesterday you said you were both a caretaker and an owner; is
20 that correct?
21 A Yes.
22 Q And so is that a different definition of the word
23 "caretaker" than we've been using for The Foundation, or is it
24 the same definition?
25 A Okay.  You've just switched off of donations, now we're

1   on Round Hill?

2   Q      Um-hum?

3   A      Do you have an exhibit?

4   Q      I'm just asking:  Yesterday you testified that you were
5   caretaker and the owner, I just want to understand what, with
6   respect to Round Hill, what you mean by "caretaker."

7   A      Round Hill was a caretaker and an asset-protection
8   strategy for the medical school and its buildings.

9   Q      And so you also owned it?

10  A      The way it was set up, I had 50 percent of the shares.

11  Q      But you didn't -- so you had the shares but you didn't
12  own it?

13         I just want to understand.

14  A      I owned it.

15  Q      You owned it.

16         And so if you owned it, and you sold it to New Vanguard,
17  your shares, in 2005, then you would have told Mr. Murtha that,
18  "I sold my 50 percent shares in Round Hill to another entity";
19  correct?

20  A      I didn't make any money on that.  I mean, it was just a
21  share transfer.  I never made a penny on that.

22  Q      All right.  Well, I think -- do you remember that
23  the . . . asset cost $250,000, is that correct, the land?

24         I think you testified yesterday that you understood that
25  it happened so fast, and Dr. Fredrick had to buy it in

```
 1   Ms. Whitley's name?
 2   A       That's what I was told.
 3   Q       And then somehow the shares get issued, and you now have
 4   ownership.
 5   A       Well, Laura Whitley was not involved in Round Hill.
 6   Q       But she's on the documents; right?
 7   A       Which documents?
 8   Q       She was on deeds, that she bought it.
 9   A       That's not Round Hill.  I mean, that's just a
10   geographical name the people use on small islands.  They have a
11   big round hill in the middle.
12   Q       All right.  The property on which the school sits --
13   A       Yes.
14   Q       -- it's ten acres; correct?
15   A       Yes.
16   Q       And Ms. Whitley . . . that property was purchased in her
17   name.
18   A       She was Laura Walls.  Yes.
19   Q       And then at some point Ms. Walls transfers the asset to
20   the Round Hill Project Holding Company; correct?
21   A       Yes.
22   Q       And you and Mister -- Dr. Fredrick are the 50 percent --
23   you each own 50 percent of the shares of the Round Hill Project
24   Holding Company; correct?
25   A       Yes.
```

1  Q      So now you own the ten acres of land.
2  A      With that right of superficies, I don't know, there was
3  something about land and buildings divided.  But, you know, it
4  might have -- you know, Round Hill was ten acres, and I owned
5  50 percent of it.
6  Q      And so when you -- when you sold your 50-percent share
7  in Round Hill Project Holding Company to New Vanguard, you
8  should have told Mr. Murtha that you sold the asset for
9  $500,000.
10 A      No, I did not.  I did not sell the assets for -- I mean,
11 I don't even remember that.  It was a share transfer, and there
12 was a transfer tax paid.  You're going to have to show me the
13 documents if that's not right.
14         MS. FINLEY:  Your Honor, I didn't know if you wanted
15 to take a break now, for lunch, and I can collect those
16 documents, and then I have just a little bit more.
17         THE COURT:  All right.  Let's break for lunch.
18         Please do not discuss the case among yourselves, or
19 allow anyone to discuss it with you or in your presence.
20 1:00 o'clock.
21         (At 12:00 PM, the jury was escorted from the
22    courtroom.)
23         THE COURT:  All right.  1:00 o'clock.
24         (At 12:01 PM, court was recessed.)
25                         AFTER RECESS