# EXHIBIT 3

516-

Providence Equity Partners Inc.
50 Kennedy Plaza
Providence, Rhode Island 02903
401 751 1700
401 751 1790 Fax

**PROVIDENCE**EQUITY

June 24, 2004

Dr. Patricia Hough
Dr. David Fredrick
Education Information Consultants, Inc.
63 Walnut Street
Gardner, Massachusetts 01440

Dear Patricia and David:

    We were excited to learn of the continuing progress of your business, and that you are interested in moving forward on the acquisition ("Acquisition") process we were working on last summer. It is with great interest and sincerity that we reaffirm the proposal by an affiliate of Providence Equity Partners Inc. ("**Purchaser**") to purchase (a) all of the assets (the "EIC Assets") of Education Consultants, Inc. ("EIC"), including its real property in Gardner, Massachusetts and the management agreements pursuant to which it manages the businesses, assets and other affairs of SABA University School of Medicine ("SABA") and Medical University of the Americas Limited, a Nevis company ("Nevis"), (b) the assets of Lynn, Leon and Lyon, LLC (the "LLC, and together with EIC, the "Sellers"), including its office building in Gardner, Massachusetts (the "LLC Assets" and together with the EIC Assets, the "Assets"), (c) all of the shares and other ownership interests in SABA (the "SABA Stock") held or that will be held directly or indirectly by Dr. Patricia Hough and Dr. David Fredrick (the "Shareholders") and/or EIC and (d) all of the shares and other ownership interest in Nevis (the "Nevis Stock"). The SABA Stock and the Nevis Stock are referred to collectively as the "Shares". This letter of intent will set forth our mutual understanding and agreement concerning the Acquisition and will serve as the basis for our counsel's preparation of a definitive Purchase Agreement for the Acquisition (the "**Definitive Agreement**").

    In view of your expressed concerns related to potential regulatory issues in the Caribbean and accreditation issues in the United States, we have structured a portion of the Acquisition as a purchase of the Shares. You and we have agreed to work together in good faith to consider a structure that would provide for us to purchase the assets of SABA and Nevis (collectively, the "Universities") so long as there would be no reduction in the price or materially adverse regulatory, tax or accreditation effect resulting from the restructuring. The principal terms of our proposed agreement are as follows:

DM000283

1.  <u>Acquisition</u>. Purchaser would purchase the Assets and Shares free and clear of any and all liens, encumbrances and rights of third parties. Purchaser shall not assume or be responsible for any debts, obligations or liabilities of the Sellers, Shareholders or Universities, other than (a) trade payables and accruals, if any, taken into account in determining the working capital adjustment referred to below and (b) such contractual obligations relating to the Assets and the Universities as were incurred in the ordinary course of business and as shall be mutually acceptable to the parties.

2.  <u>Purchase Price</u>. Purchaser would pay an aggregate of $40,000,000 (adjusted pursuant to the terms below, the "**Purchase Price**") in cash to the Sellers and Shareholders, of which $35,000,000 would be paid in cash upon the closing of the Acquisition and $5,000,000 would be payable to Dr. Patricia Hough and Dr. David Fredrick in equal installments over five years pursuant to a mutually acceptable non-competition, non-solicitation and consulting agreement. The Purchase Price would be adjusted pursuant to a mutually acceptable working capital adjustment to be agreed upon in the Definitive Agreement and reduced by (i) the fair value of any outstanding interest in the Universities owned as of the Closing by persons or entities other than the Shareholders or EIC, and (ii) indebtedness (other than inter-company debt) and liabilities of the University as of the Closing.

In addition, the Shareholders will be offered the opportunity to purchase equity of the Purchaser on the same terms and conditions as Providence Equity in an aggregate amount mutually satisfactory to you and Providence Equity.

3.  <u>Conditions</u>. Purchaser's acquisition of the Assets and Shares would be subject to the following conditions any of which can be waived by Purchaser (the "**Purchaser Closing Conditions**"): (a) a satisfactory financial, legal, tax, accounting, regulatory and business due diligence review of the Assets and the business of the Universities, the results of which shall be satisfactory to Purchaser; (b) the negotiation and execution of (i) the Definitive Agreement containing representations and warranties of the Sellers and the Shareholders, covenants, cash escrow and indemnification provisions of a nature consistent with the transactions contemplated hereby and as shall be mutually agreed upon and (ii) equity investment documentation with the Shareholders, each of which documents described in clauses (i)–(ii) shall be mutually satisfactory to Purchaser and the other parties thereto; (c) Purchaser having obtained senior debt financing upon terms satisfactory to Purchaser; (d) the absence of material adverse changes in the respective businesses of the Sellers or the Universities; (e) the receipt of required consents from third parties (including those relating to the Sellers' and Universities' licenses and accreditation) and the filing of all required notices with third parties, in each case without any resulting adverse condition; (f) SABA shall have been converted to a for-profit corporation under applicable law and all of shares and other equity interests in SABA shall be owned by the Shareholders or EIC immediately prior to Closing; (g) EIC shall have caused to be delivered to Purchaser the audited financial statements of SABA for the twelve month period ended April 30, 2004 (the "2004 SABA Audited Financial Statements"); (h) arrangements satisfactory to Purchaser shall have been made to give Purchaser ownership, directly or through SABA, of the land currently leased by SABA; (i) the structure of Purchaser's investment and the Acquisition shall have been approved by Purchaser's tax and regulatory counsel; and (j) the continued operation of the businesses by the Sellers and Universities in the normal course through the Closing Date, including, but not limited to, their working capital procedures and their marketing of their services in the normal course of business and in accordance with past practice.

DM000284

4.  _Timing_.  The closing of the Acquisition (the "Closing") would take place upon the satisfaction or waiver of all conditions to closing, including the receipt of all necessary governmental and material third party approvals required for the Acquisition (the "**Closing Date**"). The parties will work together in good faith and endeavor to execute the Definitive Agreement as promptly as practicable prior to the expiration of the Negotiation Period (as defined below).

5.  _Access To Information_. In connection with the negotiation and preparation of the Definitive Agreement and other related documents, Sellers and the Shareholders will make available and cause the Universities to make available to Purchaser all information reasonably requested by Purchaser relating to the businesses, properties and assets of the Sellers and the Universities, as well as reasonable access to the management and facilities of the Sellers and the Universities.

6.  _Exclusivity_. In recognition of the time, expense, and effort to be incurred by Purchaser to proceed with this transaction, the Sellers and Shareholders, in their respective capacities as the sole shareholders of EIC and members of LLC, in each case directly and on behalf of their respective representatives and affiliates, agree not to solicit, entertain, discuss or negotiate any possible sale of any of the assets or equity interests or equity-linked securities of the Sellers or the Universities (whether held by the Sellers or the Shareholders) or any financing, merger, consolidation, combination or reorganization of the Sellers or the Universities with any other party or provide any information to any other party in connection with any such possible transaction or where it is reasonable to suspect that the information may be utilized to evaluate any such transaction (each, a "**Potential Transaction**") until the later of September 31, 2004 or 90 days after the date Purchaser receives the 2004 SABA Audited Financial Statements (the "**Negotiation Period**"), or until such date prior to the expiration of the Negotiation Period as this letter of intent may be terminated by mutual written agreement of the parties. Notwithstanding the foregoing, provided that neither the Sellers nor the Shareholders are in breach of their obligations under paragraph 5 hereof, the Sellers may terminate the Negotiation Period thirty (30) days after the Purchaser receives the 2004 SABA Audited Financial Statements (the "**Early Termination Date**") by written notice to Purchaser if Purchaser has not advised Sellers by the Early Termination Date that its due diligence review of the historical financial statements of Sellers and the Universities has proved satisfactory to Purchaser. In such connection, and in view of the mutual desire of Sellers, the Shareholders and Purchaser to maintain strict confidentiality with respect to the proposed Acquisition, Purchaser will coordinate all visits to the Sellers' and the Universities' premises with Sellers or their counsel, and limit the number of individuals sent at any one time to review such historical financial statements to four (4) expected to be representatives of Ernst & Young, LLP and other representatives of Purchaser.

Immediately upon execution of this letter of intent, the Sellers and the Shareholders shall terminate any preexisting discussions with any person involving a Potential Transaction. In the event that the Sellers, the Shareholders or any of their respective representatives or affiliates receives an unsolicited inquiry, proposal or offer with respect to a Potential Transaction, or obtains information that such an inquiry, proposal or offer is likely to be made, the Sellers will provide the Purchaser with prompt notice thereof, and will notify the Purchaser promptly of any subsequent developments with respect to such inquiries, proposals or offers, which notices shall include the identity of the person or persons making such inquiry, proposal or offer and shall include all terms thereof.

7.  <u>Certain Undertakings</u>. Sellers and Shareholders agree to use their commercially reasonable efforts to (a) cause SABA to be converted to a for-profit corporation prior to Closing with the result that all of the SABA Stock is owned by the Shareholders or EIC, the form and substance of such conversion to be satisfactory to Purchaser and (b) cause the shares of Nevis owned by Dr. Cuthwin Lake and William Cornell to be redeemed by Nevis, or transferred to the Shareholders or EIC.

8.  <u>Expenses</u>. Each party shall bear its own legal, accounting and investment banking fees and other expenses incurred by it in connection with the transactions contemplated hereby.

9.  <u>Non-Binding Agreement</u>. It is understood that this letter of intent merely constitutes a statement of our mutual intentions with respect to a possible sale of the Assets and Shares. Any binding commitment with respect to the Acquisition will result only from the Definitive Agreement executed by the parties thereto. Notwithstanding the two preceding sentences of this paragraph, the provisions of Sections 5, 6, 7, 8 and 10 are agreed to be fully binding on the parties hereto upon execution of this letter of intent.

10. <u>No Public Disclosure</u>. None of Purchaser, Sellers or the Shareholders will make, and each of them shall cause their respective representatives and affiliates not to make, any press release or other public disclosure concerning the execution of this letter of intent or the transactions contemplated hereby without the prior approval of the other parties, except as required by law. Notwithstanding anything herein to the contrary, you and each other party to the transaction (and each affiliate and person acting on behalf of any such party) agree that each party (and each employee, representative, and other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to such party or such person relating to such tax treatment and tax structure, except to the extent necessary to comply with any applicable federal or state securities laws.

11. <u>Termination</u>. The proposal represented by this letter shall remain open until 5:00 p.m., Eastern Time, on June 30, 2004, and unless Purchaser has received this letter of intent executed by the other parties hereto by such time, the proposal represented by this letter of intent shall be null and void.

[Signature page follows]

If the foregoing accurately sets forth our understanding, we request that you approve this letter of intent and evidence such approval by signing the copy of this letter of intent and returning it to the undersigned. If you have any questions, please feel free to call me at 401-███. We appreciate the opportunity to present this offer and work towards consummating a transaction.

Sincerely,

PROVIDENCE EQUITY PARTNERS INC.

By: _____
Peter O. Wilde, Principal

DM000287

Agreed and Accepted this _____
day of June, 2004.

EDUCATION INFORMATION
CONSULTANTS, INC., a Massachusetts
corporation

By: _____
Name: David Fredrick
Title: President

LYNN, LEON, LYON, LLC

By: _____
Name:
Title:

_____
Patricia Hough, individually

_____
David Fredrick, individually

[Signature page of Letter of Intent]

DM000288



# DEPARTMENT OF THE TREASURY
Internal Revenue Service
**Criminal Investigation**

# Memorandum of Interview

| | | | |
|---|---|---|---|
| **Investigation #:** | 1000225431 | **Location:** | Conference Call |
| **Investigation Name:** | Fredrick | | |
| **Date:** | September 20, 2013 | | |
| **Time:** | Approximately 11:15a.m. | | |
| **Participant(s):** | Peter Wilde, Witness | | |

Roman Bejger, Providence Equity In-House Counsel
Christopher Garcia, Attorney-Weil, Gotshal & Manges LLP
Joshua Amsel, Attorney-Weil, Gotshal & Manges LLP
Caryn Finley, DOJ Tax Attorney
Margaret Leigh Kessler, DOJ Tax Attorney
F. Cameron Lalli, Special Agent

On the above date and time, a conference call was held with Mr. Wilde to discuss documents faxed to him for review relative to the proposed sale of Dr. Fredrick and Dr. Hough's medical schools. The following information was discussed:

1. Mr. Wilde stated that Providence Equity is a global investment firm which makes private investments into private companies. They are sector specialists concentrating in media and communication. At the time they were looking into expanding their opportunities and were looking into education investments. In 2004, Mr. Wilde would have been a junior partner. He would have been sourcing (identifying) investments, doing due diligence, closings, networking, managing, and sitting on the board of some of these companies. They raise money in dedicated pools of capital and are funded by large state pension funds. They manage $25 billion in investments. He says they issue hundreds of letters of intent a year searching for investments similar to the letter sent to Dr. Fredrick and Dr. Hough dated June 24, 2004. They would issue a letter and if they engage they would try to get more information to see if it would be worth dealing with.

2. He remembers a married couple in their late 50's, early 60's came to the office and had a meeting. The man had a beard and he is not sure if the wife was at the meeting. He does not recall if this could be Dr. Fredrick and Dr. Hough. The meeting would be to see how interested in selling and try to get more information. He does not remember where the school was. He said the information in the letter dated June 24, 2004 would have come from them. He has no recollection they owned the schools but based on the letter it would seem they did. He does not recall what price on the second page of the letter

was based on. You always need a price to get people engaged. He has no specific remembrance why the change to for profit on the school. They would need for profit entities to make the deal. They would not invest in non-profit. He is guessing they rejected this letter as he never heard back from them. Mr. Wilde said they would have closed the file. He has no records or files on this and none would have been kept. This concluded our conversation.

I prepared this memorandum on September 22, 2013, after refreshing my memory from notes made during and immediately after the conversation with Mr. Wilde.

*F. Cameron Lalli*

F. Cameron Lalli
Special Agent