UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA,

    Plaintiff

v.

DAVID LEON FREDERICK, and
PATRICIA LYNN HOUGH

    Defendants.
_____/

Case No. 2:13-cr-00072-JES-UAM

### DEFENDANT PATRICIA LYNN HOUGH'S
### PROPOSED CORRECTIONS TO "OFFENSE CONDUCT" SECTION
### OF PRESENTENCE REPORT

    COMES NOW, Defendant Patricia Lynn Hough, by and through her counsel of record, and submits her Proposed Corrections to the "Offense Conduct" Section of the Presentence Report. These proposed corrections incorporate those objections presented to the Probation Officer on February 20, 2014, those presented in Dr. Hough's Objections to Presentence Report and Response to Government's Sentencing Memorandum filed on April 16, 2014 (Dkt #163), and those argued in court on April 21, 2014. Dr. Hough further incorporates all arguments in her Rule 29 motion challenging the validity of the jury's verdicts and the factual support for its findings. Below are set forth paragraphs 7 through 44 of the presentence report in their entirety, with the proposed corrections marked in redline format to facilitate the Court's review and resolution of the pending objections. Dr. Hough's objections to the Probation Officer's application of the tax loss and minimal role guidelines (PSR ¶¶ 45, 51, 54) have been addressed in Dr. Hough's written submission and will be further argued at the sentencing hearing.

**The Offense Conduct**

    7.   <u>The government contends in summary that the evidence at trial showed that</u> Patricia Lynn Hough and David Leon Fredrick conspired to use nominee entities, including foreign entities and a foreign foundation, to conceal from the Internal Revenue Service ("IRS") their ownership of and income derived from the operation and sale of Saba University School of

Medicine Foundation dba Saba University School of Medicine ("the Saba Foundation"), the Medical University of the Americas ("MUA"), and other assets. Hough disputes each of the above contentions.

8. The government contends in summary that the evidence at trial showed that Hough and Fredrick opened and maintained undeclared foreign bank accounts at UBS and other foreign banks in their individual names and in the names of nominee entities to conceal assets and income from the IRS. As part of the conspiracy, Hough and Fredrick filed false and fraudulent individual income tax returns, Forms 1040, that failed to report their ownership and signature authority in the various undeclared foreign accounts and which also failed to report significant interest and investment income, and their receipt in 2007 of more than $40 million from the sale of the medical schools. Hough and Fredrick communicated with Dieter Luetolf, their UBS client advisor/banker and Beda Singenberger, an outside financial advisor, by email, telephone and in-person meetings and provided them with written and oral instructions for the use of the funds in the undeclared foreign accounts, including wiring and expenditure instructions. Hough disputes each of the above contentions.

### *The Entities/Nominees*

9. The Saba Foundation was a foundation established and incorporated under the laws of the Netherlands Antilles on October 31, 1988, to provide for the education and training of healthcare professionals, and to promote the general well-being of the residents of the Island of Saba, to include the Saba University School of Medicine. Saba University School of Medicine was located on the Island of Saba. Hough and Fredrick ~~owned the Saba Foundation and~~ funded the creation of the Saba University School of Medicine with their own funds. Hough served on the Board of Directors and Board of Trustees in the early 1990s and was an Associate Dean for Clinical Medicine for the Saba University School of Medicine. She was a Clinical Dean and primarily responsible for securing accreditation for both the Saba University School of Medicine and MUA. Fredrick served as the President and a Director of the Saba University School of Medicine. The Saba University School of Medicine became operational in or around

1993. The Saba Foundation maintained an undeclared account at UBS. Hough and Fredrick were listed by Luetolf as the beneficial owners of the undeclared foreign account and had signature authority over it. The Saba Foundation had additional undeclared foreign accounts at Lichtenstein Landesbank and Fortis Banque.

10. MUA was a corporation established and incorporated under the laws of St. Christopher-Nevis, West Indies, on April 29, 1999 to provide medical education and related services. MUA was located on Nevis, West Indies. Fredrick owned 1,750 shares of MUA, and Hough at one time owned 250 shares of MUA, which she sold to Fredrick in October 2003. Hough and Fredrick served as Directors; Hough also served as Director of Accreditation. MUA maintained an undeclared foreign account at UBS. Hough and Fredrick were listed by Luetolf as the beneficial owners of the undeclared foreign account and had signature authority over it. MUA had an additional undeclared foreign account at Fortis Banque.

11. Educational Information Consultants, Inc. ("EIC") was a Massachusetts limited liability company located in Gardner, Massachusetts. EIC was wholly owned by Medical Education Group, LLC, a Massachusetts limited liability company owned by Fredrick. EIC managed the Saba University School of Medicine and MUA's academic, administrative, and financial operations in the United States.

12. Lynn, Leon & Lyon Group, LLC, ("LL&L Group") was a Florida limited liability company incorporated in or about July 2003. Hough and Fredrick were both managing members and 50% shareholders. LL&L Group owned real estate and other assets.

13. Apex Consultants Limited ("Apex Consultants") and Education Supply International ("ESI") had foreign accounts at SG Hambros Bank and UBS, respectively, in the Bahamas. Fredrick later transferred those accounts to UBS in Switzerland.

14. Medical Technology Associates Limited ("MTA") was incorporated in the British Virgin Islands on December 10, 1997. Hough and Fredrick were the Directors and Hough was

the Secretary. ~~Hough and Fredrick were the beneficial owners of MTA.~~ MTA maintained an undeclared foreign account at UBS,~~and~~ Hough and Fredrick <u>were listed by Luetolf as the beneficial owners of the MTA account and</u> had signature authority over it.

15. Apex Consultants ~~Limited ("Apex Consultants")~~ was incorporated in the British Virgin Islands on October 26, 1999. Fredrick was the Director and Hough was the Secretary of Apex Consultants. Apex Consultants maintained an undeclared foreign account at UBS, and Hough and Fredrick had signature authority over it. Hough and Fredrick were <u>listed by Luetolf as</u> the beneficial owners of the Apex Consultants undeclared foreign account.

16. New Vanguard Holdings Limited ("New Vanguard") was incorporated in Hong Kong in or about April 2005. New Vanguard maintained an undeclared foreign account at UBS. Hough and Fredrick were identified <u>by Singenberger</u> as the beneficial owners of New Vanguard. New Vanguard owned 20,000 shares of MUA <u>beginning in early 2007</u>. New Vanguard also had undeclared foreign accounts at Fortis Banque and Lichtenstein Landesbank.

17. Top Fast Finance Ltd. ("Top Fast") was incorporated in Hong Kong in or about October 2005. Top Fast maintained an undeclared foreign account at UBS. Hough and Fredrick were identified <u>by Singenberger</u> as the beneficial owners of the Top Fast undeclared foreign account. Top Fast also had undeclared foreign accounts at Fortis Banque, Lichtenstein Landesbank and Bank Alpunim.

18. Ample Dynamic Trading Ltd. ("Ample Dynamic") was incorporated in Hong Kong in or about February 2003. Ample Dynamic maintained an undeclared foreign account at UBS. Hough and Fredrick were identified <u>by Singenberger</u> as the beneficial owners of the Ample Dynamic undeclared foreign account. Ample Dynamic also had undeclared foreign accounts at Lichtenstein Landesbank and Zurcher Kantonal Bank (ZKB).

19. Round Hill Project Holding Company, NV ("Round Hill Project Holding Company") was a limited liability company created in Saba, Netherlands Antilles that held 10 acres of land on which Saba University School of Medicine was located. In September 2000, Hough and Fredrick were each issued 50 shares of Round Hill Project Holding Company.

Hough and Fredrick became directors in 2000 of the Round Hill Project Holding Company. Singenberger became a director in 2005 of the Round Hill Project Holding Company.

### The Conduct

20.     In the late ~~1990s~~2000s, ~~Hough and Fredrick~~Apex Consultants and ESI had undeclared accounts in the Bahamas at SG Hambros and UBS. In 2001, Hough and Fredrick opened an undeclared foreign account at UBS Switzerland in their individual names, which was a jointly held account. In 2003, Hough and Fredrick opened two additional undeclared foreign accounts at UBS in the names of nominee entities, Apex Consultants and MTA, and were listed by Luetolf as the beneficial owners of and signatories over the accounts. At the end of 2003, ~~Hough and~~ Fredrick closed the Apex Consultants and ESI accounts at ~~it~~ UBS Bahamas and SG Hambros ~~bank accounts~~ and transferred the funds therein to ~~their~~ UBS Switzerland accounts. ~~Hough and~~ Fredrick explained that ~~they~~ he closed ~~their~~ Bahamas accounts because of changes in United States and Bahamas banking policies. ~~legislation between the Bahamas and the United States that required disclosure of information concerning United States citizens with bank accounts.~~ In 2004, Hough and Fredrick opened undeclared accounts at UBS in their individual names and later directed UBS to split the funds in their joint undeclared foreign account evenly into their individually named undeclared foreign accounts. In the Fall of 2004, Hough and Fredrick opened an undeclared foreign account in the name of Saba School of Medicine Foundation at UBS. They were listed by Luetolf as the beneficial owners of this account and had signature authority over the account.

21.     In 2005, Hough and Fredrick became involved with Beda Singenberger who created Hong Kong nominee entities for ~~them~~the Saba Foundation, namely New Vanguard and Top Fast. ~~Hough and~~ Fredrick caused Singenberger to open undeclared foreign accounts in the name of New Vanguard and Top Fast at UBS. Singenberger identified Hough and Fredrick as the beneficial owners of these accounts. In addition, in 2005, ~~Hough and Fredrick~~Luetolf opened an undeclared foreign account in the name of MUA and identified ~~themselves~~ Hough and Fredrick as the owner of the assets. In 2007, ~~Hough and~~ Fredrick caused Singenberger to open

an undeclared foreign account in the name of the nominee entity Ample Dynamic. Hough and Fredrick were also identified by Singenberger as the beneficial owners of the account.

22. In addition to the accounts at UBS, ~~Hough~~ Singenberger and Fredrick opened bank accounts in the names of the nominee entities and the medical schools at other offshore banks, including Fortis Banque (Swiss), Liechtenstein Landesbank (Swiss-Liechtenstein), and Bank Alpunim (Liechtenstein). Hough and Fredrick were identified by Singenberger as the beneficial owners of these nominee entity undeclared foreign accounts, though the Saba Foundation and MUA were identified as the beneficial owners of the accounts in their names. In the summer of 2008, reports began appearing in the United States media indicating that UBS was in trouble with the IRS. In August 2008, Fredrick ~~emailed~~ spoke with Luetolf inquiring about the "situation with UBS" and ultimately instructed UBS to close the UBS ~~ir~~ accounts and transfer the funds to accounts at Fortis Banque and Liechtenstein-Landesbank. UBS entered into a Deferred Prosecution Agreement with the United States in February 2009.

23. In 2002, the Boards of Directors of the Saba Foundation and MUA ~~Hough and Fredrick~~ attempted to sell the medical schools and ~~were~~ Fredrick was negotiating with a potential buyer, namely the Huntington Institute. The Huntington Institute and its principals engaged Jones Walker, a law firm, to assist them with their potential purchase of the schools. As part of this transaction, ~~Hough and~~ Fredrick provided the buyers with information concerning the profitability of the schools as well as ownership. Letters of Intent and Purchase Agreements were executed by Hough and Fredrick which stated that they directly or indirectly had the controlling interest in, or owned or controlled, ~~were the owners of~~ the Saba Foundation and MUA. Ultimately, the sale at that time was not completed.

24. Between 2001 and 2011, ~~Hough and~~ Fredrick, Luetolf, and Singenberger caused dozens of monetary transactions to be conducted using the undeclared foreign accounts. The largest monetary transaction was the sale of the medical schools and real estate associated with the Saba School of Medicine. ~~Hough and~~ Fredrick caused funds to be invested in the undeclared accounts ~~in their own names and~~ in the names of the nominee entities. These undeclared foreign

accounts earned interest, dividend, and capital gains income ~~for Hough and Fredrick~~ which was not reported on ~~their~~ Hough's and Fredrick's Forms 1040. In addition, Frederick ~~and Hough~~ caused transfers of funds amongst the various accounts, including causing funds to be distributed from the medical schools' undeclared foreign accounts to their undeclared foreign accounts in the names of nominee entities. In one instance $5 million was transferred from the Saba University School of Medicine undeclared foreign account to the Top Fast undeclared foreign account. The transaction was ~~falsely~~ represented to be ~~payment~~ funding for "consulting on a project to open a medical school in China~~,~~" which Hough was in fact working on with the approval of the Board of Trustees of the Saba University School of Medicine. The unused portion of that $5 million was later transferred back to the Saba University School of Medicine account. Fredrick also caused over $1 million to be transferred to his siblings in the United States for payoff of their mortgages or as gifts; Hough was unaware of any of these transfers. ~~Hough and~~ Fredrick w~~ere~~as concerned about ~~their~~ his individual names being on wire transfers into the United States, and Fredrick instructed Luetolf to be sure that the names of the nominee entities appeared on any wire transfers.

25.  ~~Hough and~~ Fredrick made several real estate and other asset purchases in the United States using funds from the undeclared foreign accounts. In May 2008, ~~Hough and~~ Fredrick caused UBS to transfer $850,000 from Top Fast to an escrow account in Englewood, Florida for the purchase of a condominium in Sarasota, Florida in the name of LL&L Group. Fredrick also caused $50,000 to be transferred to the United States for a deposit on the purchase of an airplane. Fredrick ultimately decided not to buy this airplane and the $50,000 was refunded to him, which he deposited into his personal domestic bank account.

*Asheville, NC Home*

26.  On June 6, 2005, Fredrick emailed Luetolf to explain that he was thinking of purchasing another home in North Carolina in the name of "our companies (APEX or MTA)." Fredrick inquired "[i]f I have the funds moved from my personal account to MTA or APEX, then have you wire the money to the US, will you still need to have my name listed on the wire

transmittal sheet?" On that same date, Luetolf emailed Fredrick and explained that "[w]e need to mention the name of the account holder. If that is a corporation, that's the name that goes on the transfer."

27. On July 18, 2005, Fredrick emailed Hough, Luetolf, and Singenberger and stated: "Dieter/Beda: I am still a little unfamiliar with the procedure we need to take to get a wire from Beda...so I will send this to you with a copy to Sinco Trust. I believe when we spoke with Beda, we determined that the wire for the house we are buying should come from our Hong Kong company (New Vanguard). The amount and wire instructions are listed below." ~~Hough and~~ Fredrick instructed UBS to wire $1,140,000 to a trust account in Hendersonville, North Carolina. The next day, $1,140,000 was wired from New Vanguard to the trust account. On July 25, 2005, ~~Hough and~~ Fredrick caused LL&L Group to purchase a residence in Asheville, North Carolina using the funds from ~~their~~ undeclared foreign account in the name of New Vanguard.

28. On or about February 28, 2008, Hough and Fredrick caused a North Carolina Deed of Trust to be filed with the Buncombe County Registry recording the transfer of the Deed of Trust for the Asheville, North Carolina residence from LL&L Group to Top Fast Finance for $1.5 million. Marc Rudow, the real estate attorney, testified that Hough and Fredrick came into the office in ~~late 2007 or~~ early 2008 and said they wanted to place the lien on the property for asset protection purposes. <u>Rudow further testified that he had examined his entire file and had not found a single deed, contract, letter, or other document relating to the Asheville property that was signed by Dr. Hough; all of them were signed by Fredrick alone.</u> In or around November 2008, Hough emailed Rudow and explained that she and Fredrick were purchasing a parcel of land adjacent to their home. Fredrick then emailed that the funds for the purchase were coming from their offshore bank. On or about February 2, 2010, Hough and Fredrick ~~allegedly~~ sold the Asheville residence and an adjacent parcel of land to Aldunatec, S.A., an Ecuador entity. Aldunatec, S.A. purchased the property by assuming the existing mortgage to Top Fast Finance in the amount of $1.2 million. The signature for Aldunatec, SA is that of Florencio Montenegro, an ~~alleged~~ Trustee of the Saba Foundation. The signatures on the paperwork appear, based on

other documents in evidence, to be a stamp, and the real estate attorney stated that he only dealt with Fredrick for the sale. In fact, he stated that Fredrick said he would see Montenegro in Guatemala and would have the paperwork signed and returned to him.

### *Greenville, NC Home*

29.     On May 9, 2007, at Fredrick's direction, his daughter Laura Walls made an offer to purchase a house in Greenville, North Carolina. The Purchase Offer listed Walls as the purchaser. On June 11, 2007, ~~Hough and~~ Fredrick caused UBS to transfer $590,016.42 from ~~their~~ undeclared foreign account in the name of Top Fast to ~~their~~ undeclared foreign account in the name of Ample Dynamic. On June 11, 2007, at Fredrick's direction, Walls attended the closing for the purchase of the house. The Settlement Statement listed the borrower as Ample Dynamic and the house was purchased for $590,000 cash. At Fredrick's direction, Walls signed the Settlement Statement on behalf of Ample Dynamic. Walls testified that she was asked by her father to handle the transaction and she did.

30.     In 2011, Hough and Fredrick decided to sell the Greenville, NC home. Hough was directly involved with the sale as she was the primary point of contact for the real estate agent. On April 15, 2011, Fredrick caused Singenberger to appoint Walls as Assistant Vice President of Ample Dynamic in order to sign documents on behalf of Ample Dynamic for the sale after the county would not accept Fredrick's signature on the documents. Walls was unaware that she had been appointed to this position. Walls then attended the closing and signed documents for the sale, including the General Warranty Deed and Owner Affidavit and Indemnity Agreement.

### *Piper Meridian Airplane*

31.     On November 15, 2007, Fredrick caused UBS to transfer $1,601,000 from ~~Hough and Fredrick's~~ the undeclared foreign account in the name of New Vanguard to ~~their~~ undeclared foreign account in the name of Ample Dynamic. Three days later, Fredrick purchased a 2007 Piper Meridian airplane for $1.6 million in his name and in the name of LL&L Group. On June 8, 2010, Fredrick sold the 2007 Piper Meridian airplane for $1,255,000 and caused the proceeds to be wired to ~~Hough and Fredrick's~~the undeclared foreign account in the name of the Saba

Foundation at Liechtenstein-Landesbank. Fredrick, listed as CEO of Ample Dynamic, caused the sale documents to identify Ample Dynamic as the owner of the airplane and caused an agent to sign the sale documents on behalf of Ample Dynamic.

### Purchase and Sale of the Roundhill Property and the Sale of the School

32. In 2007, the Saba School of Medicine Foundation and the Board of Directors of MUA ~~Hough and Fredrick~~ sold Saba University School of Medicine and MUA after years of trying to entice a buyer. The schools were purchased by Equinox Capitol, a private equity investment firm run by Steven Rodger.

33. In order to execute the sale of the school and its assets, Rodger devised the creation of a "Drop Down" to transfer the school ownership. This was a unique structure under Dutch law to allow for purchase of the assets. According to Rodger, the charter is the school. The Foundation could live on without the charter. The Saba University School of Medicine assets, the charter, and payables all went into the Drop Down. New Vanguard was a party to the sale as it "owned" 20,000 shares of MUA and "owned" the Roundhill property. According to Rodger, he understood New Vanguard to be a Hong Kong corporation which owned MUA shares and property; he did not know whether Fredrick owned or controlled it and believed that Fredrick had power of attorney to sign for all parties that were the sellers. Rodger did not know, nor did he care who really owned the schools as long as Fredrick was the person that could sign for the owners. With respect to the distribution of the sale proceeds, Fredrick proposed the apportionment of funds wherein more than $30 million was attributed to the Roundhill property and went to the New Vanguard undeclared foreign accounts.

34. As part of the sale negotiations, Rodger met with Hough who he stated was very knowledgeable about the academic side of the schools. She was concerned about the direction of the schools. Rodger dealt with Fredrick directly on the closing statements and described Fredrick as emotionally involved with getting the transaction done. All of Rodger's financial discussions about the sale were conducted with Fredrick and not with Hough. As part of the sale, Hough and Fredrick had to personally guarantee the transaction. Rodger explained that

Hough and Fredrick were not happy with this. Rodger wanted to ensure that he had someone on the hook to handle issues should they arise following the sale. He did not want to deal with the Hong Kong entities. He wanted someone to be held accountable if there were problems.

35. One of the largest assets, in terms of allocation of the sale proceeds, was the physical property upon which the Saba University School of Medicine was located. On February 24, 1999, at ~~Hough and~~ Fredrick's direction, Laura Walls allegedly purchased 10 acres of land in The Bottom, Saba, locally known as Round Hill. However, Laura Walls has stated that she was unaware that she ever purchased land on Saba, was in high school in 1999 and did not have funds to purchase property; she stated that with respect to any transaction involving land of Saba she was completely unaware of these transactions until more recently. The land was purchased for $250,000.

36. On September 11, 2000, Hough and Fredrick were each issued 50 shares of Roundhill Project Holding Company. On February 2, 2001, at Hough and Fredrick's direction, Walls granted Roundhill Project Holding Company the right of superficies on the 10 acres of land known as Round Hill. This permitted the Roundhill Project Holding Company to build on the land. On June 22, 2004, Hough and Fredrick caused documents to be executed that showed that Walls sold Roundhill to the Roundhill Project Holding Company.

37. On or about April 15, 2005, Hough and Fredrick sold their 100 shares in Round Hill Project Holding Company for $500,000 to their Hong Kong company, New Vanguard. On or about April 3, 2007, ~~Hough and~~ Fredrick caused New Vanguard to sell its shares in Roundhill Project Holding Company to Saba University Management Company BV for $33,944,000 as part of the sale to Equinox Capital. When asked about the $33 million allocated on the Use of Funds sheet to the Round Hill purchase, Rodger stated this was how Fredrick wanted it allocated. Fredrick determined the distribution of the total sales price.

[NOTE:  <u>As an alternative to the following proposed corrections to paragraphs 38-44, Dr. Hough suggests striking the paragraphs in their entirety as irrelevant to the offense conduct.</u>]

38. One of the key witnesses in this case was David Minchenberg. Minchenberg was

employed as the CFO of EIC beginning in May 2004, and ended his employment in March 2006 due to medical issues. His duties were to oversee the finance department of the management company for both medical schools. When he interviewed for the position, he interviewed with both Hough and Fredrick. It was Minchenberg's understanding that ~~Hough and~~ Fredrick owned the management company. Minchenberg believed that Saba University School of Medicine was a foundation or a not-for-profit school and that Fredrick was the President; it ~~was very profitable~~generated significant revenue. Minchenberg believed that MUA was a for-profit medical school and that Fredrick was the ~~90%~~majority shareholder based on documents that he saw. Minchenberg understood Round Hill Holdings to be a legal structure that owned land and a building on the Island of Saba where the school was located. He believed, in talking to Hough and Fredrick, that at one time they had ownership percentages in Roundhill, though it may have been transferred at some point.

39. Minchenberg's first task upon being hired was to audit the books of Saba University School of Medicine and to work with the outside accounting firm, Schneider and Associates, to carry out the audit. He went back and performed an internal audit on all of the books and records. The schools needed to be audited so they could be accredited in the United States. He prepared financials to provide to the external accountants.

40. As part of his duties, Minchenberg ~~was also~~ tasked himself with providing advice on business structures and tax planning for the schools. There were discussions about how to reorganize the schools to become either more tax advantageous or to deal with the ultimate sale of the school and what Minchenberg described as the "exit strategy of the owners, Hough and Fredrick." Minchenberg testified, however, that the Saba School of Medicine Foundation was a non-profit foundation that was not and could not be owned by anyone, and that only Fredrick had an ownership interest in MUA. Minchenberg recommended to Fredrick that they should work on coming into tax compliance and then try to develop a structure that worked better for the entities and to minimize Fredrick and Hough's taxes. Minchenberg never advised Fredrick or Hough to evade their taxes. He put together a compilation of possible structures and provided it

to Fredrick. <u>Minchenberg testified that Hough had no involvement in Minchenberg's and Fredrick's discussions regarding the business structures and tax planning. In addition, Minchenberg, a licensed CPA, advised Hough in writing on December 23, 2004, that "US citizens are allowed to own interest(s) in foreign entities" and that "[u]sually, the only time a tax is 'triggered' is when the US citizen brings money (in the form of profits, gains, etc.) back into the US. That said, if the citizen is the beneficiary of said profits, gains, etc. and keeps those funds 'off-shore' and doesn't bring them back into the US, then, there are generally no taxes incurred by the US citizen."</u>

41. For the audit preparation during April 2004 – March 2005, Minchenberg learned that Saba University School of Medicine and MUA had offshore accounts at UBS in Switzerland. This information was only learned during the audit and these records were never part of his everyday records as CFO; they were not kept in the finance department. Fredrick provided the information to the auditors concerning these accounts. No other foreign accounts were disclosed by ~~Hough or~~ Fredrick, <u>who Minchenberg and the auditors testified was the sole person responsible for providing information during the audit</u>.

42. In late 2004 – 2005, there were frequent conversations <u>between Minchenberg and Fredrick</u> about whether Hough and Fredrick had interests in foreign entities and whether they had to file Forms 5471 with the IRS. ~~Minchenberg had these conversations with both Hough and Fredrick, in person and through email.~~ Schneider & Associates was also involved. Schneider & Associates, along with Minchenberg, recommended to Hough and Fredrick that the Forms 5471 be filed. Minchenberg responded to Hough and Fredrick with Form 5471 information, specifically information on the filing requirements. Minchenberg provided information to Schneider (income balance sheets) to prepare Forms 5471. It was determined that numerous Forms 5471 needed to be filed and Minchenberg advised ~~both Hough and~~ Fredrick of this.

43. Minchenberg prepared an international tax meeting memo in early 2005 which he gave to Fredrick. Minchenberg advised Fredrick he needed to comply with IRS tax filings which included the Form 5471 and the memo detailed the filing requirements. Minchenberg advised

Hough and Fredrick in person and in writing that multiple Forms 5471 needed to be filed for multiple entities, including Roundhill and MUA. <u>Minchenberg spoke to Hough on only one occasion about Forms 5471, and she was fully cooperative and provided him with the information he requested to prepare her Forms 5471 for Round Hill Project Holding Company. Minchenberg testified that Hough told him that she wanted to be in compliance with all of her tax obligations.</u>

44. In February 2005, Minchenberg prepared a memo titled "International Tax Meeting – Overriding All the Entities is a Concept Called Substance Over Form." Minchenberg gave this document to Fredrick. The document detailed the taxability of the offshore entities and the impact it might have on Fredrick. It also covered concerns Minchenberg had about whether Hough and Fredrick were in tax compliance. <u>With respect to the failure to file Forms 5471, t</u>The memo states "I hate to use the language, but I can't sugarcoat it. Tax fraud is being committed. I have attached corresponding Internal Revenue code sections that are applicable and felony charges that would apply. Any such actions would jeopardize all our accreditations..." Minchenberg attached a copy of the statutes for tax evasion and willful failure to file. In August 2005, Minchenberg emailed this document to Fredrick, <u>to Minchenberg's attorney, to Minchenberg's wife, to Minchenberg's sister, and others,</u> but he did not email it to Hough. Either before or after he sent the document, Fredrick denied ever having this conversation with Minchenberg. Minchenberg ended his employment a full year prior to the sale of the schools.

Dated: April 24~~5~~, 2014

Respectfully submitted,

| | |
|---|---|
| **BRUCE L. UDOLF, P.A.**<br>Counsel for Defendant Hough<br>Broward Financial Centre<br>500 East Broward Blvd., Suite 1400<br>Fort Lauderdale, Florida 33394<br>Tel: (866) 951-9058/ Fax (954) 525-2134<br><br>By: /s/ Bruce L. Udolf<br>    Fla. Bar No. 0899933<br>    budolf@udolflaw.com | **BINGHAM MCCUTCHEN, LLP**<br>Counsel for Defendant Hough<br>Suite 2050 North, 1601 Cloverfield Blvd.<br>Santa Monica, California 90404<br>Tel: (310) 907-1000/ Fax (310) 907-2000<br><br>By: /s/ Nathan J. Hochman<br>    California Bar No. 139137<br>    nathan.hochman@bingham.com<br>By: /s/ Daniel A. Saunders<br>    California Bar No. 161051<br>    Daniel.saunders@bingham.com |

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, on this 25th— day of April, 2014.

By: /s/ Bruce L. Udolf

16
*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394*
*(866)951-9058/ budolf@udolflaw.com*

A/76002141.1/3325070-0000366042