UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

Case No.  2:13-cr-00072-JES-UAM

UNITED STATES OF AMERICA,

     Plaintiff

v.

DAVID LEON FREDERICK, and
PATRICIA LYNN HOUGH

     Defendants.

_____/

## DEFENDANT PATRICIA LYNN HOUGH'S
## MOTION FOR BAIL PENDING APPEAL

COMES NOW, Defendant Patricia Lynn Hough, by and through the undersigned counsel, and hereby moves for bail pending her appeal of the convictions and sentence imposed in this case.

Under the Bail Reform Act of 1984 (the "Act"), the district court "shall" order the continuation of bond conditions for a defendant who has already been sentenced if the court finds:

•     By clear and convincing evidence that the defendant is not likely to flee or pose a danger to the safety of any other person or the community; and

•     That the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in (1) reversal; (2) an order for a new trial; (3) a sentence that does not include a term of imprisonment; or (4) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1)(A), (B).  The legislative history of the Act makes clear that its purpose was "not to deny bail entirely to persons who appeal their convictions."  *United States v. Miller*, 753 F.2d 19, 22 (3d Cir. 1985).

**A.      There Is Clear and Convincing Evidence That Dr. Hough Is Not Likely to Flee or Pose a Danger to the Safety of Others If She Is Allowed to Remain on Bond Pending Appeal**

Dr. Hough is not likely to flee and plainly poses no danger to the community.  In allowing Dr. Hough to remain on bond pending her sentencing and again in allowing her to voluntarily surrender following imposition of sentence, this Court has implicitly determined that she is not a flight risk or a danger to the community, as both decisions were governed by the same clear-and-convincing standard applicable here.  *See* 18 U.S.C. § 3143(a)(1), (b)(1)(A).  Notably, the government did not oppose bail pending sentencing and did not request remand after sentence was imposed, effectively conceding the same point.

Dr. Hough has consistently and diligently appeared before the Court in a prompt and respectful manner for every matter in which her presence has been required since her indictment one year ago.  Moreover, Dr. Hough has known of the government investigation since late 2009.  In total, she has lived with the reality of investigation, indictment, trial, conviction, potential imprisonment, and now actual imprisonment for nearly five years, and she has gone nowhere, even when her husband of almost 30 years chose to abandon her and become a fugitive.  By all accounts, while on pretrial, presentence, and now pre-incarceration release, Dr. Hough has been a model supervisee.  She has at all times fully complied with and conducted herself according to all directives of the Court and of Pretrial Services.  *See* PSR ¶ 6 ("Pretrial services records indicate the defendant has complied with all Court ordered conditions of release."); *see also United States v. Shahla*, 2013 WL 3716401, *1 (M.D. Fl. July 15, 2013) (noting in support of finding no flight risk that "Defendant has been compliant with bond conditions since he was released on bond").  Dr. Hough has surrendered her passport to the Court, and she has been on GPS monitoring since the sentencing hearing.

Dr. Hough is a 67-year-old woman who has lived her entire life (other than for education) in the United States and has been a Florida resident for many years.  Her entire remaining family and support network lives in the United States, including her sister Charlene Varga in Ohio, her stepdaughter Laura Walls and four grandchildren in North Carolina, cousins Beth McCann (and her five children, with whom Dr. Hough is extremely close) in Maine and Alice Lettrick in

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394/(954) 858-8831*

Connecticut, and brother- and sister-in law Rex and Melanie Pitts in Texas. If Dr. Hough did not flee to escape the nearly five-year ordeal she has been through, did not become a fugitive with her husband upon indictment, and did not flee during the seven months after her unexpected conviction when facing the reality (and the government recommendation) of up to eight years in prison, she is certainly not going to abandon the life she knows and the family she loves to avoid a two-year sentence that will translate in real incarceration time to approximately 18 months. Taken in sum, this constitutes clear and convincing evidence that Dr. Hough is not a flight risk.

With respect to danger, Dr. Hough has never been arrested prior to the instant case and has been a law-abiding and extraordinarily productive citizen throughout her life. Moreover, the instant offenses of conviction concluded three to eight years ago and are not the type of offenses that reasonably can be viewed as posing a danger to other individuals.

In sum, Dr. Hough has consistently honored the Court's trust before and during trial, as well as pending sentencing and since. She has given the Court no reason to change its faith in her now. For all the reasons which led the Court to allow (and the government not to oppose) bail to this point, a ruling in Dr. Hough's favor on the § 3143(b)(1)(A) factors is supported by clear and convincing evidence.

**B.    The Appeal is Not For the Purpose of Delay**

Dr. Hough has never sought to delay proceedings in this case. She went to trial less than five months after her indictment, and opposed the government's request for a continuance of the sentencing hearing. She has no interest in delay now, but only in ensuring that she does not spend months (or more) in prison on convictions that may ultimately be reversed on appeal.

**C.    The Appeal Will Raise a Number of Substantial Questions**

A "substantial" question has been defined by the Eleventh Circuit as one that is "of more substance than would be necessary to a finding that it was not frivolous. It is a 'close' question or one that very well could be decided the other way." *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985). It could either be novel, not yet decided by controlling precedent or simply "'fairly doubtful.'" *Id.* at 900 (quoting *United States v. Miller*, 753 F.2d 19, 23 (3rd Cir. 1985). Whether a question is "substantial" must be determined on a case-by-case basis. *Id.* at 901.

The phrase "likely to result in reversal or an order for a new trial" describes the *type* of question that must be presented.  It does not require the Court to make a prediction about the outcome of the appeal; it merely requires the Court to address the likely effect **if** the substantial question is determined favorably to the defendant.  *Id*; *see id.* at 900 ("[T]he 'likely to result in reversal' language 'must be read as going to the significance of the substantial issue to the ultimate disposition of the appeal.'" (quoting *Miller*, 753 F.2d at 23)); *Price*, 611 F. Supp. at 505 ("This Court also recognizes that the 'substantial question' is critical enough to the Defendant's conviction that a contrary appellate ruling would warrant a reversal."); *see also United States v. Powell*, 761 F.2d 1234 (8th Cir. 1985) (in deciding whether "likely to result" standard has been satisfied, "the court or judge to whom application for bail is made must assume that the substantial question presented will go the other way on appeal and then assess the impact of such assumed error on the conviction").

In enacting Section 3143(b)(2), Congress in effect re-established the "substantial question" standard applicable under former Rule 46(a)(2) of the Federal Rules of Criminal Procedure prior to the liberalization of that standard in 1956.  *See United States v. Price*, 611 F. Supp. 502, 504 n.4 (S.D. Fl. 1985); *United States v. Hicks*, 611 F. Supp. 497, 499 n.3 (S.D. Fl. 1985).  In *Herzog v. United States*, 75 S. Ct. 349 (1955), Justice Douglas construed the term "substantial question" in that Rule and stated that it "obviously does not mean a decision on the merits."  75 S. Ct. at 350.  To find that no "substantial question" has been raised, "[i]t is not enough that [the Court is] unimpressed" with the argument.  *Id.* at 351.  Rather, all a court must do is determine "whether there is a school of thought, a philosophical view, a technical argument, an analogy, an appeal to precedent, or to reason commanding respect that might possibly prevail."  *Id.*

Consistent with Justice Douglas' view, the Eleventh Circuit and other courts have consistently held that the district court need **not** find that its own rulings are likely to be reversed on appeal in order to find an appellate question "substantial."  Indeed, such a requirement would effectively render § 3143(b) a nullity.  In *Giancola*, the court cited with approval the following analysis of the Third Circuit in *Miller*:

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394/(954) 858-8831

> [W]e are unwilling to attribute to Congress the cynicism that
> would underlie the provision were it to be read as requiring the
> district court to determine the likelihood of its own error.   A
> district judge who, on reflection, concludes that s/he erred may
> rectify that error when ruling on post-trial motions.  Judges do not
> knowingly leave substantial errors uncorrected, or deliberately
> misconstrue applicable precedent.   Thus, it would have been
> capricious of Congress to have conditioned bail only on the
> willingness of a trial judge to certify his or her own error.

*Giancola*, 754 F.2d at 900 (quoting *Miller*, 753 F.2d at 23); *see United States v. McCoy*, 2013

WL 5372813, *1 (M.D. Ga. Sept. 24, 2013) ("While the Court denied Defendant's Rule 29

Motion for Judgment of Acquittal on this issue, the Court readily acknowledges that the issues

raised therein are in no way frivolous and could indeed be decided the other way."); *United*

*States v. White*, 2012 WL 1166440, *2 (M.D. Fl. Apr. 6, 2012) (in ruling on motion for bail

pending appeal, "this Court is not called upon to predict the ultimate outcome of [the] appeal or

the probability of reversal"); *Price*, 611 F. Supp. at 505 ("While this Court firmly believes that it

was correct in its rulings and that the Defendant received a fair trial, it recognizes that the alleged

constitutional violations must be considered 'substantial' within the meaning of the Bail Reform

Act. . . .   The Defendant should therefore be permitted to remain on bond pending the Eleventh

Circuit's resolution of the appeal."); *Hicks*, 611 F. Supp. at 499 ("[I]n determining whether there

is a substantial question, a court must keep in mind that it is not being asked to reverse its

position on issues decided at trial, nor is it being asked to grant a new trial.  It must decide only

that a significant issue exists that merits appellate review and that the issue is critical enough to

the defendant's conviction that a contrary appellate ruling would warrant a reversal."); *accord*

*United States v. Bilanzich*, 771 F.2d 292, 299 (7th Cir. 1985) ("[R]equiring district judges to

determine the likelihood of their own error is repugnant, for in such a case the proper remedy

would be to rectify the error on post-trial motions."); *United States v. Handy*, 761 F.2d 1279,

1281 (9th Cir. 1985) ("[R]equiring the defendant to demonstrate to the district court that its

ruling is likely to result in reversal is tantamount to requiring the district court to certify that it

believes its ruling to be erroneous.  Such an interpretation of the [Bail Reform] Act would make

a mockery of the requirement of Fed. R. App. P. 9(b) that the application for bail be made in the

first instance in the district court.").

Notably, in the 2008 prosecution of Wesley Snipes in the Middle District of Florida, Judge Hodges granted bail pending appeal to Snipes, who had been convicted at trial of three counts of failing to file tax returns and had been sentenced to three years of imprisonment.  After finding from "the history of the case and all of the attendant circumstances" that Snipes was not a flight risk or danger to the community, Judge Hodges stated:

> Obviously, having denied the Defendant's motions asserting the issues he intended to raise on appeal, the Court is dubious as to the "substantiality" of those issues for purposes of appellate review. Nevertheless, the Court recognizes that the offenses of conviction are misdemeanor offenses, not felonies, and that the time required for disposition of an appeal may well equal – or nearly equal – the length of the term of commitment imposed.   Additionally, the Court is not prepared to say that the issues on appeal are patently frivolous or asserted merely for purposes of delay.

*See*, Exhibit "A" attached hereto. Similarly, although this Court has ruled against Dr. Hough on the issues raised herein, such rulings in no way stand as a bar to a finding that they are nonetheless "substantial" issues on appeal.  And given that Snipes' term of imprisonment was 50% longer than Dr. Hough's, her term is even more likely to be completed or nearly completed by the time her appeal is resolved.[1]

The instant case raises numerous substantial issues on appeal that satisfy the governing standard, including but not limited to the following:

1.    The Evidence at Trial Was Insufficient to Support the Convictions

Dr. Hough's post-trial Rule 29 motion laid out the deficiencies in the government's proof as to essential elements of the crimes charged against Dr. Hough.   Those arguments are incorporated herein by reference and will not be set forth in full, but they individually or collectively present a substantial issue – notwithstanding this Court's ruling – in that a reviewing court **could** properly decide that the evidence, even viewed in the light most favorable to the government, was insufficient to support the convictions (as this Court previously found with respect to Count Seven).

---

[1] The fact that the Eleventh Circuit eventually affirmed Snipes' convictions demonstrates that the appropriateness of bail pending appeal does not turn on the ultimate resolution of the appeal.  *See also, e.g., United States v. Abbell*, 271 F.3d 1286, 1290 (11th Cir. 2002)  (defendant granted bail on appeal from convictions and 87-month sentence for money laundering conspiracy; Court of Appeals affirmed all convictions and vacated district court's judgment of acquittal on one count).

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394/(954) 858-8831*

With regard to the conspiracy charge, the government was required to prove beyond a reasonable doubt a "common agreement" with the specific purpose of violating the law by defrauding the IRS, "established by evidence of actual knowledge by each participant." *United States v. Kottwitz*, 614 F.3d 1241, 1265 (11th Cir.), *opinion vacated in other part on rehearing*, 627 F.3d 1383 (11th Cir. 2010).   "A conspiracy conviction cannot stand without evidence showing a meeting of the minds to commit the illegal act. . . .  Evidence of a conspiracy or that a defendant acted in a way that would have furthered a conspiracy *if there had been one* is insufficient; there must also be independent evidence that the defendants knew of the conspiracy in progress and knowingly and voluntarily joined it."  *Id.* (internal quotations and citations omitted) (emphasis in original).  Moreover, "[i]f the conspiracy evidence is circumstantial, it must warrant a jury finding that the conspirators operated with a *common design with unity of purpose* to impede the IRS based on reasonable inferences, and not mere speculation."  *Id.* (internal quotations and citations omitted) (emphasis in original); *see Ingram v. United States*, 360 U.S. 672, 680 (1959) (to prove conspiratorial intent, evidence of knowledge must be clear and unequivocal, and cannot consist of "piling inference upon inference").

Here, the government's purported proof of the charged conspiracy was entirely circumstantial and was insufficient to support a finding that Dr. Hough had the **specific intent to defraud the IRS** and knowingly entered into an agreement with Fredrick to achieve that end. Indeed, a reasonable juror could have believed every one of the government's 20 witnesses and still have no basis for finding beyond a reasonable doubt that Dr. Hough entered into an agreement with the specific criminal purpose of defrauding the IRS.  There was no witness who contradicted Dr. Hough's testimony about her understanding that the foreign accounts were for the purpose of protecting Foundation assets; in fact, that testimony was directly corroborated by the government's own witness, Dr. Paul Dalbec.  Nor was there any document among the thousands of pages of bank records, emails, and other correspondence introduced at trial that had

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394/(954) 858-8831*

anything to do with the IRS.[2]   The government introduced correspondence from Fredrick (not from Dr. Hough) that referenced closing accounts in the Bahamas because of "changes in US & Bahamas banking policies" (Gov. Exh. 3P, p.6), but never offered any evidence as to what those changes were, instead asking the jury to speculate that they related to disclosure and taxation without any supporting evidence in the record.  (10/23/13 RT 19).   Moreover, even were there any basis to infer that Fredrick had a tax evasion purpose in moving those accounts, there was no evidence that Dr. Hough shared that purpose.  Nor was there any other document introduced into evidence that demonstrated a tax evasion purpose, and certainly none on the part of Dr. Hough. Rather, the government relied principally on some "Form A" account opening documents bearing Dr. Hough's signature and identifying her as a beneficial owner, as to which the evidence established that at least one (and possibly all) was signed in blank[3], which had nothing to do with IRS requirements but were required under Swiss anti-money laundering laws, and which in any event reveal utterly nothing about Dr. Hough's purpose in opening the accounts and signing the documents.  (10/23/13 RT 16-17, 23-24).

No witness testimony compensated for the lack of documentary proof to support a finding beyond a reasonable doubt that Dr. Hough ever sought or intended to defraud the IRS or knowingly entered into a conspiracy for that specific purpose.  There was no witness – not Dr. Hough's accountants, not her colleagues, not her family members – who testified that Dr. Hough was a cheat, was dishonest, or ever said anything about wanting or trying to evade taxes or impede or impair the IRS in its ascertainment, computation, assessment or collection of taxes. To the contrary, Dr. Hough's accountant Thomas Murtha testified that Dr. Hough was conservative and conscientious about her taxes (10/10/13 RT 55-56) and corrected her own mistake on one occasion by filing an amended return (10/10/13 RT 63-64), and school accountant David Minchenberg testified that Dr. Hough wanted to be in compliance with her tax obligations and, in fact, fully cooperated with him in the filing of her Form 5471 with respect to

---

[2] As noted by the Court when the government claimed that there were emails discussing Dr. Hough's and Fredrick's desire not to disclose their accounts to the IRS, no such emails exist.  (10/21/13 RT 23).

[3] Gov. Exh. 3G; 10/9/13 RT 156.

her interest in Round Hill Project Holdings, NV (10/11/13 RT 119-20, 142).  The government relied on Murtha's testimony that he "would have" asked Dr. Hough in 2001 or 2002 whether she had a foreign bank account and that he "believed" she answered no (while acknowledging that "I can't recall at this moment the exact conversation I had," conceding that it was not his practice to ask such a question of his firm's preexisting clients, and speculating as to how he "probably would have asked the question").  (10/9/13 RT 239-40; 10/10/13 RT 44-50).  Murtha was confident, however, that he had *never* asked Dr. Hough whether she had *signature authority* over a foreign bank account.[4]  (10/9/13 RT 240; 10/10/13 RT 44-47, 50-52).  Moreover, even had Dr. Hough made the statement that Murtha equivocally attributed to her, it does not prove beyond a reasonable doubt that she intended to obstruct the IRS; indeed, given Murtha's acknowledged failure to inquire about signatory authority, a response that Dr. Hough did not "have" foreign accounts would have been 100% consistent with her testimony that she believed the accounts to belong to the Foundation and not to her personally.

Given the dearth of clear and unequivocal evidence of Dr. Hough's specific purpose to defraud the IRS, the sufficiency of the evidence to support the conspiracy conviction is a substantial issue on appeal and, if decided in Dr. Hough's favor, will certainly result in reversal. *See United States v. Adkinson*, 158 F.3d 1147, 1159 (11th Cir. 1998) (reversing *Klein* conspiracy convictions where government's case was predicated on circumstantial evidence and there was no "substantial evidence that the defendants both agreed to and intended to impede the IRS"; such proof must be based on "reasonable inferences and not mere speculation"); *United States v. Pritchett,* 908 F.2d 816, 821-22 (11th Cir.1990) (reversing *Klein* conspiracy convictions where efforts at concealment of income were reasonably explainable in terms other than motivation to evade taxes and "[n]o statements of co-conspirators manifesting a desire to evade taxes were presented").

---

[4] The government claimed in closing argument that Dr. Hough had denied to Mr. Murtha in 2009 having signature authority over a foreign bank account.  (10/23/13 RT 39).  This statement is demonstrably false, as the undisputed evidence was that Mr. Murtha never even asked Dr. Hough or Fredrick that question. (10/9/13 RT 240; 10/10/13 RT 50-52).

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394/(954) 858-8831*

As for the substantive counts (Counts Six, Eight, and Nine), the government failed to prove that Dr. Hough's answer to question 7a on Part III of Schedule B, dealing with foreign bank accounts, was knowingly false as to any charged year because the government presented **absolutely no evidence** of  the "page B-2 exceptions" that are expressly incorporated into that question.[5]  The government failed to introduce the IRS instruction document that included the referenced page B-2, any other record that listed the page B-2 exceptions, or even any testimony from the government's expert or any other witness as to what the page B-2 exceptions were, such that the jury could conclude that Dr. Hough's answer was objectively false and that she subjectively knew it to be false.  Absent such evidence in any trial exhibit or testimony, the jury had absolutely no basis on which to determine whether the foreign accounts at issue fell within any of those exceptions, and therefore it was impossible for any reasonable juror to determine beyond a reasonable doubt that Dr. Hough's "No" answers on line 7a were false – and, equally importantly, that Dr. Hough knew those answers were false at the time she signed her returns.  In addition, the reference to unspecified exceptions not identified anywhere within the tax forms (a deficiency that the IRS has since recognized and corrected) rendered the question on line 7a so ambiguous that no reasonable juror could find that Dr. Hough's response was knowingly and willfully false.  *See United States v. Manapat*, 928 F.2d 1097, 1102 (11th Cir. 1991) ("[T]he government may not provide someone with a confusing and ambiguous form and then prosecute when the answers are inaccurate.").

---

[5] Line 7a asked the following question for each tax year at issue, after which it gave the choices "Yes" or "No":  "At any time during [tax year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?  **See page B-2 for exceptions** and filing requirements for Form TD F 90-22.1." (emphasis added).  Line 7b stated as follows for each tax year:  "If 'Yes' [to question 7a] enter the name of the foreign country."[5]  Thus, the question on line 7a was *not* "Do you have an interest in or a signature or other authority over a foreign bank account," as the government suggested in its closing argument.  (*See* 10/23/13 RT 14, 133-34).  That question appeared nowhere on Schedule B.  Rather, the precise question on line 7a asked more specifically whether the taxpayer had an interest in or a signature or other authority over a foreign account *that did not fall within the "exceptions" on "page B-2."*  For if any of those exceptions applied in Dr. Hough's case, then her answer of "No" was unquestionably a true and correct answer.

With respect to the government's alternate theory on the substantive counts, the government failed to prove that Dr. Hough knowingly and willfully understated her income with respect to 2005, 2007, or 2008 because (i) it failed to prove that Dr. Hough owned the accounts that formed the basis of Revenue Agent Sheila Maurer's total income calculations[6]; (ii) it failed to prove that any taxable interest, ordinary dividends, or capital gains earned on the subject foreign accounts and remaining in the foreign accounts was in fact reportable on Dr. Hough's U.S. tax returns (the only testimony offered on this point, from government witness David Minchenberg, was that such income is **not** taxable if earned offshore and not brought into the United States (Gov. Exh. 7S)); and (iii) even assuming the government proved that Dr. Hough owned the subject accounts and that they earned additional total income, it presented **no evidence whatsoever** that Dr. Hough **was aware of** any of the taxable interest, ordinary dividends and capital gains earned in the foreign accounts or foreign transactions (which would have required, for instance, that Dr. Hough know the basis of any asset for which the government attributed reportable capital gains) or that any such income was reportable on her tax returns (given Minchenberg's unrefuted advice to her to the contrary).  Quite simply, no reasonable juror could find beyond a reasonable doubt that Dr. Hough knowingly and willfully understated her income unless the government proved beyond a reasonable doubt that she knew there was any income to understate – an essential fact that was not established by any testimony or documentary evidence in the record.

---

[6] Ms. Maurer's testimony at trial, unlike her testimony at sentencing, focused on three – and only three – categories of total income for Dr. Hough: taxable interest, ordinary dividends, and capital gains or losses, all emanating from emanating only from the Swiss bank accounts of New Vanguard Holdings, LLC ("New Vanguard"), Top Fast Finance, LLC ("Top Fast"), and (for 2005 only) Patricia Hough.  (Gov. Exh. 30I).  For 2007, Ms. Maurer also included the capital gains earned by New Vanguard from the April 2007 sale of the Round Hill property and the capital gains earned by the Saba Foundation from the April 2007 sale of the Saba School of Medicine, based on the allocation in the Flow of Funds document relating to the Equinox purchase agreement (Gov. Exh. 10F).

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394/(954) 858-8831*

2.      The Government Committed Misconduct by Cross-Examining Two of Dr. Hough's Character Witnesses With Guilt-Assuming Hypotheticals, the Same Error That Has Led the Eleventh Circuit to Reverse Convictions in at Least Three Prior Cases

As raised in Dr. Hough's motion for new trial, the government committed misconduct in questioning two of the three defense character witnesses with improper guilt-assuming hypotheticals. That precise error has led to the reversal of convictions in at least three prior cases – including one binding precedent – and this Court's attempt to distinguish that precedent in allowing the improper questioning and denying Dr. Hough's request for a curative instruction was itself contrary to another binding precedent. Moreover, in light of the wholly circumstantial nature of the government's evidence and the centrality of Dr. Hough's testimony and credibility to the dispositive elements of knowledge and intent, this Court erred in finding any error harmless, and any finding of error by the Eleventh Circuit in accord with its precedents would likely result in a new trial.

The defense preceded Dr. Hough's testimony with three character witnesses who testified as to their high opinion of Dr. Hough's character for honesty and truthfulness. The first character witness, Dr. Alan Gruber, testified glowingly about Dr. Hough's character for honesty and truthfulness. (10/17/13 RT 149, 182-83). Over defense objection, the government was allowed on cross-examination to ask Dr. Gruber if his opinion would change "if [it] was proven that Dr. Fredrick and Dr. Hough did conspire to defraud the Internal Revenue Service by not reporting the sale of the medical schools on their tax returns." Dr. Gruber replied that his opinion would indeed change. (10/17/13 RT 196-97).

The following day, prior to calling its next character witness, the defense alerted the Court to the controlling case of *United States v. Candelaria-Gonzalez*, 547 F.2d 291 (5th Cir. 1977).[7] In that opinion, copies of which were provided to the Court and to the government, the Fifth Circuit reversed the defendant's conviction because the prosecutor had been allowed to ask two of the defendant's three character witnesses whether the defendant's reputation for truth and

---

[7] The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

veracity would be affected if he were convicted of the narcotics trafficking charges at issue in that trial. *Id.* at 293. The *Candelaria-Gonzalez* court found that the district court had abused its discretion in permitting that questioning, which "struck at the very heart of the presumption of innocence which is fundamental to Anglo-Saxon concepts of fair trial." *Id.* at 294 (citations omitted). The court further found that such error "**requires** reversal" (with no analysis of harmlessness) and made clear that guilt-assuming questions "have no place in a criminal trial." *Id.* (emphasis added); s*ee United States v. Smith-Bowman*, 76 F.3d 634, 637 (5th Cir. 1996) (noting that in *Candelaria-Gonzalez*, "the repeated improper questioning was enough in and of itself to justify reversal").

After reviewing the *Candelaria-Gonzalez* opinion, this Court denied Dr. Hough's request for a curative instruction, incorrectly stating that there had been no objection to the question and therefore there was no error. (10/18/13 RT 182). The Court further distinguished *Candelaria-Gonzalez* on the ground that Dr. Gruber had testified to his opinion of Dr. Hough's character rather than, as in *Candelaria-Gonzalez*, the defendant's reputation in the community. (10/18/13 RT 183-84). The Eleventh Circuit has held, however, that the guilt-assuming hypothetical is "equally inappropriate" and violative of the defendant's due process rights whether a character witness is testifying to opinion or reputation. *United States v. Guzman*, 167 F.3d 1350, 1352 (11th Cir. 1999) ("Although the questions at issue in *Candelaria-Gonzalez* were posed to character witnesses who were testifying to the accused's reputation in the community, *these questions are equally inappropriate when asked of opinion character witnesses*.") (emphasis added). In *Guzman*, the Eleventh Circuit firmly reiterated that "[t]he government may not . . . pose hypothetical questions that assume the guilt of the accused in the very case at bar" because such questions "strike at the very heart of the presumption of innocence" that is fundamental to a fair trial. *Id.* (internal quotations and citation omitted).[8]

---

[8] Other circuits are in accord that there is no basis for distinguishing between opinion and reputation testimony in finding the asking of guilt-assuming hypotheticals to be constitutional error. *See e.g.*, *United States v. Mason*, 993 F.2d 406, 408-09 (4th Cir. 1993); *United States v. Shwayder*, 312 F.3d 1109, 1121 (9th Cir. 2002); *United States v. Oshatz*, 912 F.2d 534, 539 (2d Cir. 1990); *United States v. Williams*, 738 F.2d 172, 177 (7th Cir. 1984); *United States v. McGuire*, 744 F.2d 1197, 1204 (6th Cir. 1984). Those courts, like the Fifth and Eleventh Circuits, have consistently held that guilt-assuming hypotheticals impair the presumption of innocence and thus are a constitutional violation of due process. *See, e.g.*,

Emboldened by the Court's ruling, the government proceeded to compound its misconduct by posing a similarly improper question to Dr. Hough's next character witness, retired Oklahoma District Judge Thomas Walker, who also expressed an overwhelmingly positive opinion of Dr. Hough's character for honesty and truthfulness.  (10/18/13 RT 204-07).  Specifically, the government asked Judge Walker whether, if he heard all the evidence, he might change his "opinion about whether Dr. Hough is honest or not."  Judge Walker agreed that his opinion might change.  (10/18/13 RT 215).[9]

In light of controlling precedents that uniformly hold guilt-assuming hypotheticals such as those posed in this case to be a due process violation, this Court's ruling that "the cross-examination of the character witnesses was not error" (CR 157 at 8) cannot be supported. Moreover, and particularly in the absence of any curative instruction, the government's repeated

---

*Mason*, 993 F.2d at 409 ("[I]n addition to a proper application of the rules of evidence, adherence to a basic concept of our justice system, the presumption of innocence, is not served by this line of questioning."); *Shwayder*, 312 F.3d at 1121 ("Following almost every other circuit that has addressed the question, we now hold that the use of guilt assuming hypotheticals undermines the presumption of innocence and thus violates a defendant's right to due process.") (footnote omitted); *Williams*, 738 F.2d at 177 (allowing guilt-assuming hypotheticals "is error because it assumes away the presumption of innocence").

[9] Although the government phrased its question to Judge Walker differently from its question to Dr. Gruber, the effect was the same.  Because "all the evidence" could only change the witness' opinion of Dr. Hough if it proved her guilt, the question effectively asked Judge Walker to assume Dr. Hough's guilt; indeed, to ask whether Judge Walker's opinion of Dr. Hough's honesty would change if he heard all the evidence and that evidence proved her *innocence* would be nonsensical.  Thus, when Judge Walker replied that his opinion could change, he was necessarily making the precise assumption that the prosecutor's question asked him to make – that "all the evidence" would prove that Dr. Hough had committed the offenses charged.  This question is little different from questions that have been held to be improper in other cases.  *See, e.g., Oshatz*, 912 F.2d at 537  ("If I were to show you that Mr. Oshatz knew that the Markowitz transactions were backdated, would that change your opinion?"); *Williams*, 738 F.2d at 177 ("[I]f you assume that it could be proven" that the defendant gave false information to the insurance company and the police, "would that change your opinion as to his truthfulness and honesty?"); *Candelaria-Gonzalez*, 547 F.2d at 294-95 ("Assuming that a D.E.A. agent with knowledge of Mr. Ledesma's reputation for a narcotics trafficker states he had a reputation for being one of the major narcotics traffickers in the Western United States, assuming an agent like that so testified, would that would [sic] not be inconsistent with your knowledge of him, would it?").

and blatant misconduct was not harmless beyond a reasonable doubt.[10] Indeed, the facts of this case – in which improper guilt-assuming hypotheticals were posed to two of Dr. Hough's three character witnesses – are directly in line not only with the binding precedent of *Candelaria-Gonzalez*, which held that reversal of the defendants' convictions was "require[d]" based on guilt-assuming hypotheticals posed to two out of three character witnesses, 547 F.2d at 294-95, but also with at least two other cases that have reversed convictions based solely on the improper use of guilt-assuming hypotheticals. *See Mason*, 993 F.2d at 409 (improper guilt-assuming hypothetical questions to two of the defendant's three character witnesses held not harmless, even under less demanding non-constitutional "reasonable likelihood" standard, where there was little direct evidence of defendant's guilt); *Polsinelli*, 649 F.2d at 794-98 (improper guilt-assuming hypothetical questions to two of the defendant's three character witnesses held not harmless where the case largely turned on the word of the defendant (who testified in his own defense) against the word of the key government witness with no corroborating evidence of the defendant's version, thereby giving the character witnesses' testimony "a position of greater importance than would be true in the ordinary case").[11]

---

[10] The Eleventh Circuit has not decided whether the constitutional or non-constitutional harmless error standard applies to error resulting from guilt-assuming hypothetical questions on cross-examination, but assumed *arguendo* in *Guzman* that the more stringent constitutional standard of proving harmlessness beyond a reasonable doubt applied. *Guzman*, 167 F.3d at 1353. Other courts have similarly applied the *constitutional* harmless error standard to this issue. *See, e.g., United States v. Polsinelli*, 649 F.2d 793, 797-98 (10th Cir. 1981). Because the use of guilt-assuming hypotheticals on cross-examination of character witnesses constitutes a due process violation, *see Shwayder*, 312 F.3d at 1121, the constitutional standard should be applied here. Whichever standard is applied, however, the destruction of Dr. Hough's presumption of innocence through the Court's repeated allowance of improper questioning requires reversal. *See Candelaria-Gonzalez*, 547 F.2d at 295.

[11] The *Polsinelli* court also relied for its harmlessness finding on the fact that both of the improperly questioned character witnesses responded that the hypothetical fact would not change their opinions. *Polsinelli*, 649 F.2d at 794-95. The Eleventh Circuit, however, has repeatedly made clear that it is the character witness' *acceptance* of the posed assumption, and not its rejection, that is prejudicial. *See Guzman*, 167 F.3d at 1353 (finding error from guilt-assuming hypotheticals harmless because, *inter alia*, witnesses refused to accept the government's assumption and thereby arguably strengthened the defendant's case); *Hewitt*, 663 F.2d at 1391 (finding error from guilt-assuming hypothetical harmless because, *inter alia*, the hypothetical question did not cause the defendant's character witness to alter her evaluation of his reputation in the community); *see also Candelaria-Gonzalez*, 547 F.2d at 293 nn. 2, 3 (convictions reversed where one witness testified that the hypothetical fact would change his opinion, and the other stated that he did not know how to answer the question). Here, of course, both witnesses conceded that their opinion of Dr. Hough's character for honesty would (or could) change if the government proved her guilt. As the Eleventh Circuit's prior decisions make clear, the prejudice from such responses is manifest.

In contrast, those cases that have found the constitutional error resulting from guilt-assuming hypotheticals to be harmless have relied on factors plainly not present in this case. In *Guzman*, the Eleventh Circuit held the error to be harmless based on two factors: (1) the "overwhelming" evidence of the defendant's guilt; and (2) the fact that the character witness refused to accept the proposed assumption or to state that her opinion would change. *Guzman*, 167 F.3d at 1353; *see also Oshatz*, 912 F.2d at 541 (finding error harmless where judge gave "prompt and sufficient cautionary instructions" and evidence of guilt was "so substantial as to preclude any reasonable likelihood that the improper cross-examination contributed to the verdicts"); *United States v. Siers*, 873 F.2d 747, 749-50 (4th Cir. 1989) (finding error harmless where improper questions were asked to only two of defendant's 14 character witnesses, but "invit[ing] the attention of the district courts and the bar to the fact that the government frequently will not be in such luck as to be able successfully to claim harmless error for cross examination of character witnesses in the manner engaged in by the government in this case"); *Williams*, 738 F.2d at 177 (finding error harmless where case did not turn on defendant's credibility); *United States v. Hewitt*, 663 F.2d 1381, 1391 (11th Cir. 1981) (finding error harmless where hypothetical question did not ask witness to assume defendant's guilt in the same matter for which he was standing trial, and witness did not alter her evaluation of defendant's reputation in response to question). Here, the evidence of Dr. Hough's knowledge and intent was far from overwhelming (and, as discussed above, required findings as to which the government presented no evidence whatsoever); her credibility and character for honesty were the linchpins of the entire defense; the improper questions were posed to two out of Dr. Hough's three character witnesses; both witnesses conceded that their long-held positive opinions of Dr. Hough's honesty would in fact change if the government were to prove her guilt; the questions sought an assumption of guilt of the very charges for which Dr. Hough was on trial; and this Court did not give any cautionary, limiting, or curative instruction to the jury, either at the time of the questioning or at any time thereafter.

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394/(954) 858-8831*

The guilt-assuming questions asked by the government, and twice allowed by the Court, reversed Dr. Hough's presumption of innocence and "have no place in a criminal trial." *Candelaria-Gonzalez*, 547 F.2d at 294. Although this Court denied Dr. Hough a new trial on this ground, one need only read *Candelaria-Gonzalez*, *Mason*, and *Polsinelli* – all of which held that reversal of convictions was required under strikingly similar circumstances – to conclude that the issue "very well could be decided the other way" and is therefore a substantial issue on appeal. *Giancola*, 754 F.2d 901; *see Candelaria-Gonzalez*, 547 F.2d at 294-95 ("The convictions here are due to be reversed for the court's repeated allowance of inherently prejudicial cross-examination [of two out of three character witnesses] by the prosecutor.").

3.   <u>The Court's Resolution of the Disputed Tax Loss Issue at Sentencing, Which Relied on a Theory That Had Never Been Briefed or Argued by Either Party, Was Based on an Incorrect Reading of the Applicable Regulations and on Factual Findings That Lacked Any Evidentiary Support in the Record</u>

As this Court knows, the issue of tax loss, which was the principal driver of the Sentencing Guidelines range in this case, was heavily contested and litigated at sentencing. The government presented the testimony of Sheila Maurer, who came up with a third version of her tax loss calculations that more than doubled the figures to which she had testified at trial by attributing to Dr. Hough and Fredrick all "profits" from the Saba School of Medicine Foundation and Medical University of the Americas ("MUA") from 2003 through 2007. The government insisted that Saba and MUA were to be treated as "disregarded entities" such that their profits became immediately taxable as Schedule C sole proprietorship income to the owners of the Saba Foundation and the shareholders of MUA even in the absence of any distributions. As Dr. Hough demonstrated in supplemental briefing to the Court, the government's theory was fatally flawed; under the controlling test of *Moline Properties, Inc. v. C.I.R.*, 319 U.S. 436, 438-39 (1943), a corporation remains a separate taxable entity as long as it carries on actual business activities. In its written ruling, this Court agreed with the defense and rejected the government's theory, finding that "Saba Foundation and MUA, while actually owned by Fredrick and Hough, nonetheless satisfied the *Moline Properties* test and were capable of being separate taxable entities." (CR 192 at 6). As such, profits of the Saba Foundation and MUA would not be

taxable to Dr. Hough absent a distribution, and the government's entire articulated basis for Ms. Maurer's new calculations was wrong.

The Court, however, then went on to adopt Ms. Maurer's calculations based on a new taxation theory that had not been raised, briefed, or argued by either party, that had never been presented by Ms. Maurer in any of her three sets of calculations, and that had never even been suggested by the IRS or Tax Division at any time in the nearly five-year history of this case. Specifically, the Court read 26 C.F.R. §§ 301.7701-1 to 301.7701-3 to mean that the Saba Foundation and MUA were to be treated as partnerships for federal tax purposes and their income attributed to the individual partners. (CR 192 at 6-8). When defense counsel sought leave to explain to the Court how this never-briefed, never-argued new theory misapplied the applicable and highly complex regulations, the Court refused to hear argument and directed that all such argument be addressed to the Eleventh Circuit.

Dr. Hough respectfully submits that when that argument is presented on appeal, it will demonstrate the Court's error and result in a remand for resentencing. As recognized by the Court, a business entity, foreign or domestic, constitutes a "corporation" for federal tax purposes if it falls within any of the eight subparagraphs of 26 C.F.R. § 301.7701-2(b). The Court also correctly noted that the entities at issue do not fall within the list of foreign entities in § 301.7701-2(b)(8). The Court, however, failed to address § 301.7701-2(b)(2), which states that a "corporation" includes "[a]n association (as determined under § 301.7701-3)." That regulation, in turn, states that a business entity constitutes an "association" (and therefore a corporation under § 301.7701-2(b)) under the following two circumstances, both of which were recognized by the Court in its order: (1) an eligible entity with at least two members can elect to be classified as an association for federal tax purposes (26 C.F.R. § 301.7701-3(a)); or (2) unless the entity elects otherwise, a foreign entity is an association if all members have limited liability and a partnership if at least one member does not have limited liability (26 C.F.R. § 301.7701-3(b)(2)(i)(A), (B)). The regulation goes on to define "limited liability" as meaning that the member of the foreign entity "has no personal liability for the debts of or claims against the entity by reason of being a member." 26 C.F.R. § 301-7701-3(b)(2)(ii). The regulation

continues:  "This determination is based **solely** on the statute or law pursuant to which the entity is organized, except that if the underlying statute or law allows the entity to specify in its organizational documents whether the members will have limited liability, the organizational documents may also be relevant."  *Id.* (emphasis added).

Thus, in order to conclude that the Saba Foundation and MUA were partnerships under the regulations, the government would have to prove and the Court would have to find by a preponderance of the evidence at least the following two facts:  (1) neither the Saba Foundation nor MUA elected to be classified as an association taxable as a corporation for federal tax purposes; and (2) at least one member of each entity did not have limited liability under the laws of the Netherlands-Antilles and Nevis, or under the organizational documents if the foreign laws allow such documents to specify whether the members will have limited liability.  **The government presented absolutely no evidence as to either of these necessary foundational facts.**[12]  There was no evidence from Ms. Maurer or any other IRS witness or record demonstrating whether the Saba Foundation and MUA did or did not make an election, and the government bore the burden of proving that such an election was not made in order to prove that the entities were partnerships.  There was no evidence presented as to whether Dr. Hough and Fredrick bore "personal liability for the debts of or claims against" the Saba Foundation and MUA by virtue of owning those entities, 26 C.F.R. § 301.7701-3(b)(2)(ii) – a determination that would, at a minimum, have required evidence of the applicable laws of the Netherlands-Antilles or Nevis pursuant to which the entities were organized (which under the regulations are the "sole" basis for the determination of limited liability status of a foreign entity) – and the government bore the burden of proving that at least one member of each entity did not have limited liability under those foreign laws in order to prove that the entities were partnerships

---

[12] The Court's statement in its order that "[u]nder the facts found by the jury and the Court, Saba Foundation and MUA are treated as partnerships for federal tax reasons" is incorrect.  (CR 192 at 7).  At most, the jury and the Court found that Dr. Hough and Fredrick were the *de facto* owners of the Saba Foundation and MUA.  No facts were found with respect to whether the entities elected a classification or whether the members of the entities had personal liability for the debts of or claims against the entities under the laws of the Netherlands Antilles (for Saba) or Nevis (for MUA) or the organizational documents for each.  Moreover, even had there been such findings in support of the partnership theory, they would be clearly erroneous because there is no evidence in the record to support them.

Bruce L. Udolf, PA
Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394/(954) 858-8831

rather than corporations.   In fact, the only evidence in the record is to the contrary:   the Memorandum of Association of MUA, introduced by the government as Trial Exhibit 3Z, expressly states at paragraph 4:  "The liability of the members is limited."  Yet the Court relieved the government of its burden of proof on these issues – a burden that the government could not carry, which presumably explains why it **never claimed** the entities were partnerships – and simply assumed the existence of the foundational facts essential to the partnership classification without any supporting evidence in the record.

In sum, the Court's premise in its ruling that a business entity is a partnership for federal tax purposes if it is not a corporation under § 301-7701-2(b) and has at least two members (CR 192 at 7) was correct.  26 C.F.R. § 301.7701-2(c)(1).  What the Court missed, however – and what further briefing or argument would have pointed out – is that if an entity is an "association" under § 301.7701-3, then it **is** a corporation under § 301.7701-2(b) and not a partnership.  Given the utter absence of any evidence that any owner of the Saba Foundation and MUA did not have limited liability under foreign law and that the entities did not elect to be classified as associations taxable as corporations, there is no support in the record for the Court's "partnership" taxation theory, and its findings in that regard constitute a substantial issue on appeal.

A further substantial appellate issue is raised by the other elements of Ms. Maurer's and the Court's tax calculations, specifically, the inclusion of interest, dividends, and capital gains. Neither Ms. Maurer nor, apparently, the Court drew any distinction between civil and criminal tax loss, a distinction set out in the Sentencing Guidelines and in the IRS' own manual.  *See* USSG § 2T1.1(c)(1) ("[T]he tax loss is the total amount of loss that was the **object of the offense** . . . ." (emphasis added)); Internal Revenue Manual § 9.5.13.2.1 (Criminal vs. Civil Tax) ("The criminal tax deficiency may differ from the civil tax deficiency in the civil process. Criminal violations are charged only against the tax deficiency that results from fraud. . . . Adjustments of a [] non-fraudulent nature may be considered solely for civil purposes.").  Ms. Maurer conceded in her testimony at the sentencing hearing that she was aware of **no** evidence that Dr. Hough knew that any of the accounts used for the tax loss calculation bore interest or

*Bruce L. Udolf, PA*
*Broward Financial Centre, 500 East Broward Blvd., Suite 1400, Fort Lauderdale, Florida 33394/(954) 858-8831*

dividends, **no** evidence that Dr. Hough was aware of the basis for any of the attributed capital gains, and **no** evidence that Dr. Hough was aware of the sales price allocated to the Round Hill property in the 2007 sale (which controlled the amount of capital gain or loss on that property). In the absence of such evidence, the government failed to carry its burden of proving that Dr. Hough knew of the items of unreported income that formed the basis for Ms. Maurer's calculations.   And without proof of such knowledge, there can be no finding that Dr. Hough **criminally** evaded tax on that income, *i.e.*, that she intentionally violated a known legal duty by failing to report the income on her tax returns.

WHEREFORE, for the reasons set forth herein, the undersigned respectfully request this Honorable Court grant the foregoing Motion for Bail Pending Appeal and continue Dr. Hough on the existing conditions of her release.

Dated: May 16, 2014

Respectfully submitted,

| | |
|---|---|
| **BRUCE L. UDOLF, P.A.** | **BINGHAM MCCUTCHEN, LLP** |
| Counsel for Defendant Hough | Counsel for Defendant Hough |
| Broward Financial Centre | Suite 2050 North, 1601 Cloverfield Blvd. |
| 500 East Broward Blvd., Suite 1400 | Santa Monica, California 90404 |
| Fort Lauderdale, Florida 33394 | Tel: (310) 907-1000/ Fax (310) 907-2000 |
| Tel: (866) 951-9058/ Fax (954) 525-2134 | |
| | By:  /s/ Nathan J. Hochman |
| By: /s/ Bruce L. Udolf | California Bar No. 139137 |
|      Fla. Bar No. 0899933 | nathan.hochman@bingham.com |
|      budolf@udolflaw.com | |
| | By: /s/ Daniel A. Saunders |
| | California Bar No. 161051 |
| | daniel.saunders@bingham.com |

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically using the Court's CM/ECF system, on this 16th day of May, 2014.

By: /s/ Bruce L. Udolf