IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 2:13-cr-00072-FtM-JES-CM |
| | ) | |
| PATRICIA LYNN HOUGH, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT PATRICIA LYNN HOUGH'S MOTION FOR BAIL PENDING APPEAL

COMES NOW the United States, by and through counsel, and files this Response in Opposition to Defendant Patricia Lynn Hough's Motion for Bail Pending Appeal ("Defendant's Motion").  Dkt. #202.  Defendant has not met her burden and her Motion should be denied.

The statutory provision governing bond pending appeal presumes that a defendant's convictions are valid and that a defendant should be detained without bond.[1]  *United States v. Giancola*, 754 F.2d 898, 900-01 (11th Cir. 1985).  A federal court therefore must detain a defendant who has been found guilty of an offense and sentenced to a term of imprisonment pending the defendant's appeal unless the defendant overcomes the presumption by showing,

1.  by clear and convincing evidence, that the defendant is not likely to flee or to pose a danger to the safety of any other person or to the community if released;

2.  that the defendant's appeal is not for the purpose of delay;

3.  that the appeal raises a substantial question of law or fact; and

4.  that resolution of this question is likely to result in

    a.  reversal of all counts of conviction on which imprisonment has been imposed,

---

[1]   Defendant errs in stating (at p.1) that there is a presumption for the "continuation of bond conditions for a defendant who has already been sentenced."  In fact, 18 U.S.C. § 3143(b)(1) establishes a presumption that a sentenced defendant shall be detained.

1

      b.   an order for new trial of all counts on which imprisonment has been imposed,

      c.   a sentence that does not include a term of imprisonment, or

      d.   a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 USC §3143(b)(1); *Giancola*, 754 F.2d at 901.  "[A] 'substantial question' is one of more substance than would be necessary to a finding that it was not frivolous.  It is a 'close' question or one that very well could be decided the other way."  *Giancola*, 754 F.2d at 901; *accord United States v. Fernandez*, 905 F.2d 350, 354 (11th Cir. 1990).

In *Giancola,* the Eleventh Circuit looked to *United States v. Miller* in its discussion of "substantial question" and "likely to result in reversal."  *Giancola*, 754 F.2d at 900.  "[T]he Third Circuit held in *Miller* that the proper interpretation of the provision was that it required, first, that the appeal raise a substantial question of law or fact, and, second, that 'if that substantial question is determined favorably to the defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.'"  *Id. citing United States v. Miller*, 753 F.2d 19, 23, 24 (3d Cir. 1985).  *Miller* defined a "substantial question" as "one which is either novel ... has not been decided by controlling precedent, or ... is fairly doubtful."  *Miller*, 753 F.2d at 23.  The Eleventh Circuit expanded on this and held "that an issue may be without controlling precedent largely because that issue is so patently without merit that it has not been found necessary for it to be resolved.  *Giancola*, 754 F.2d at 901.

The *Miller* court further explained that "the likely to result in reversal" language

> must be read as going to the significance of the substantial issue to the ultimate disposition of the appeal. A question of law or fact may be substantial but may, nonetheless, in the circumstances of a particular case, be considered harmless, to have no prejudicial effect, or to have been insufficiently preserved. A court may find that reversal or a new trial is 'likely' only if it concludes that the question is so integral to the merits of the conviction on which defendant is to be imprisoned

2

that a contrary appellate holding is likely to require reversal of the
conviction or a new trial.

*Id.* at 23.

I.    Defendant Hough has failed to prove by clear and convincing evidence that she is not a flight risk

Defendant Hough is a flight risk.  In addition to the fact that imprisonment is no longer a theoretical possibility but is now probable, defendant recently sold her Florida residence and transferred $1.5 million in proceeds overseas without prior notice to the Court, a transaction the government considers to be obstructive conduct.  Defendant also has continued access to substantial overseas assets (at least $50 million) and the circumstances of her husband's flight from justice has never been fully explained.  Defendant's argument that the calculus for risk of flight has not changed since her conviction is incorrect, as the Court implicitly determined in modifying defendant's bond conditions to include GPS monitoring and additional travel restrictions.  The government respectfully submits that defendant has failed to satisfy her burden of proving she is not a flight risk by clear and convincing evidence.

II.   Defendant Hough's appeal does not raise substantial questions

The issues raised by Defendant Hough are not substantial questions that are likely to result in reversal of her conviction or an order for a new trial on all counts on which imprisonment has been imposed.

11481106.1

A. The evidence at trial was overwhelming[2]

The Court in denying Defendant Hough's Motion for a New Trial Pursuant to Rule 33(a) held that "the verdicts of guilty are not against the weight of the evidence. Having heard the evidence and making independent credibility determinations, the Court fully agrees with the guilty verdicts in this case." Dkt. #157 at page 9.

1. Overwhelming evidence to support the conspiracy conviction

There was overwhelming evidence of the conspiracy between Defendant Hough and Fredrick. Hough and Fredrick executed and signed numerous account opening documents for the undeclared foreign accounts, including Forms A identifying themselves as the beneficial owners of the accounts. GX 3 Series and 4 Series. They both, jointly and separately, met and corresponded with Dieter Leutolf ("Leutolf"), Beda Singenberger ("Singenberger"), and other bank employees to facilitate the opening of accounts and to give directions on the operation of the accounts. 9Tr. 117-120, 171-74, 177, 184-85, 271; GX 3S at p. 9 and 24, 3HH at pp. 2, 3, 12, 14, 20, 27, 28, and 30-31, 3KK at p. 22.[3] While they filed tax returns that elected married filing separate status, their return preparer, Thomas Murtha, dealt with both of them and asked them on more than one occasion if they had an offshore bank account, to which they answered "no." 2Tr. 239-40, 243-44, 3Tr. 48-49. Together, they also purchased assets and caused payments to be made to family members using funds in the undeclared accounts. GX 30D, 30P, 6Tr. 221-223, 7Tr. 59-60.

Defendant Hough refuses to accept that the jury was free to reject her testimony and believe the prosecution's witnesses and all the reasonable inferences that the prosecution's evidence would

---

[2] Because the defendant has displayed a pattern of re-raising the previously litigated issues underlying her motion for bond pending appeal, the government will not repeat all of the facts raised in prior pleadings. The government believes the Court is familiar with the facts supporting her convictions. Out of an abundance of caution, the government incorporates herein by reference its previously filed oppositions to the defendant's motions for acquittal and new trial. Dkt. #142 and 144.

[3] Transcripts of the trial of Defendant Hough are cited herein as "Tr." with the transcript volume preceding and the relevant page number(s) following.

support.  *United States v. Calderon*, 127 F.3d 1314, 1325 (11th Cir. 1997), *cert denied*, 523 U.S. 1033 (1998) (the jury is free to believe the prosecution's witnesses, even if they consist of "scoundrels, liars and brigands"); *see also United States v. Siegelman*, --- F.3d ---, 2009 WL 564659 (11th Cir. March 6, 2009) at 1 (reviewing courts must respect the jury's credibility determination). The jury was free to disbelieve the testimony of Defendant Hough and instead, to believe the testimony of other witnesses whose testimony was contrary to that of Defendant Hough.  *United States v. Hernandez*, 433 F.3d 1328, 1334 (11th Cir. 2005), *cert. denied*, 547 U.S. 1047 (2006). Defendant Hough also overlooks the fact that, given her decision to testify, the jury was free to determine that her testimony was not credible, and also to regard her false testimony as substantive evidence of her guilt.  *United States v. Poirier*, 312 F.3d 1024, 1032-33 (11th Cir.), *cert. denied*, 540 U.S. 874 (2003); *United States v. Alejandro*, 118 F.3d 1518, 1521 (11th Cir. 1997); *Atkins v. Singletary*, 965 F.2d 952, 961 n. 7 (11th Cir.1992); *United States v. Vasquez*, 53 F.3d 1216, 1225 (11th Cir. 1995); *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995), *cert. denied*, 516 U.S. 1111 (1996); *United States v. Eley*, 723 F.2d 1522, 1525 (11th Cir. 1984) (a false explanatory statement may be viewed by a jury as substantive evidence tending to prove guilt…Moreover, wholly incredible explanations may also form a sufficient basis to allow the jury to find that the defendant had the requisite guilty knowledge.").  In finding Defendant Hough guilty, the jury necessarily rejected her assertions of innocence.  *United States v. Broughton*, 689 F.3d 1260, 1279 (11th Cir. 2012).  Furthermore, Defendant Hough's testimony also provided the jury with evidence of her participation, knowledge and willfulness, and her "testimony undoubtedly undermined [her] credibility in the eyes of the jury."  *United States v. Morales*, 868 F.2d 1562, 1574 (11th Cir. 1989).

The evidence at trial established that both Defendant Hough and Fredrick were fully aware of the purpose of the conspiracy.  They both, independently and together, took steps to open the

undeclared foreign bank accounts, use the funds in those accounts, and conceal their access to and use of the funds in the undeclared accounts. Overt acts taken in furtherance of the conspiracy also evidence Defendant Hough and Fredrick's knowledge of the object of the conspiracy.

Documentary evidence was introduced showing Defendant Hough and Fredrick's signatures on various documents which were necessary to accomplish the object of the conspiracy. Specifically, Defendant Hough and Fredrick created and used a host of nominee entities which concealed the true ownership of the medical schools, foreign accounts, and other assets. See GX 3D, 3K, 3O, 3V, 3Z, 3DD, 6L, 7X, 8C, 8J, 8K, 10C, 11AA, 11BB; 3Tr. 190, 4Tr. 39-40, 6Tr. 146, 214. In addition, Defendant Hough and Fredrick established foreign bank accounts in their names and in the names of these nominee entities. Accounts were established in the names of these nominee entities at multiple financial institutions over a period of years. Defendant Hough and Fredrick signed account opening documents for many of these accounts and, but for only two accounts, they were always identified as the beneficial owners of the accounts. See GX 3B through 3G, 3J through 3LL and 4A through 4N. All of these documents also are circumstantial evidence of the objective of the conspiracy; specifically, to defraud the IRS, as each helped to hide the true ownership of the medical schools, thus facilitating their ability to avoid reporting the income earned upon the sale of the schools, the annual net profits of the schools, and interest, capital gains, and dividend income.

Defendant Hough and Fredrick separately drafted and received correspondence which demonstrated their knowledge of the object of the conspiracy. *See supra*.

Defendant Hough and Fredrick participated in meetings with Singenberger and Leutolf. Defendant Hough testified that she met with Leutolf in Zurich, Switzerland in or around September 2001 to provide documents to him which was necessary to open financial accounts at UBS in

11481106.1

Switzerland.  9Tr. 117-120.  Defendant Hough testified that she and Fredrick met with Singenberger in 2005 in Boston, and that Singenberger suggested that the Defendant Hough and Fredrick establish Hong Kong entities, allegedly for asset protection for the Saba Foundation.  9Tr. 171-74. Defendant Hough testified that she later had a discussion with Fredrick where she was told by him that Hong Kong entities were in fact established.  9Tr. 174.  Defendant Hough testified that she recalled that Singenberger came a few times to Boston and that Fredrick told her on a couple of occasions that he had meetings with Singenberger between 2005 and 2008.  9Tr. 177.  Defendant Hough further testified that she had several meetings with Singenberger, specifically one in the United States and three in Zurich.  Defendant Hough testified that the meetings in Zurich occurred in 2008 and 2009.  9Tr. 184-85; 271.  These meetings resulted in the establishment of nominee entities and the establishment of foreign bank accounts in the names of these nominee entities. These meetings also resulted in the return of offshore funds to the United States in a manner that concealed the true source of the funds, which is again circumstantial evidence of the objective of the conspiracy and the participants' knowledge of the objective of the conspiracy.

Defendant Hough and Fredrick received funds from their offshore bank accounts and used those funds for the purchase of personal assets.  Together, Defendant Hough and Fredrick purchased assets and caused payments to be made to themselves for their personal benefit and to family members as gifts using funds in the undeclared foreign accounts.  *See* GX 30D, p. 75 ($250,000 from New Vanguard to Defendant Hough and Fredrick's joint account); GX 30D p. 83 ($250,000 to siblings); GX30L, p. 76 ($50,000 for Cirrus plane), GX 30Q ($50,000 refund from Cirrus plane deposited into personal domestic account), GX 12, 12F and 5Tr. 13-15 (email from Fredrick with Defendant Hough copied explaining that he has "instructed our overseas bank to wire" $200,000 for the purchase of land "next to our home.").  The offshore bank accounts which

7

were the source of funds used to purchase personal assets were titled in nominee names, thus hiding their true ownership.  Further, many of the personal assets were also purchased in nominee names, further hiding their true ownership as well.  GX 18A, 20C.  Statements made by Fredrick also establish that they did not want their individual names on transfers back into the United States.  *See supra*.  Moreover, when it was clear that the banks in the Bahamas and Switzerland would begin sharing information with the IRS, Defendant Hough and Fredrick caused the bank accounts to be closed and moved to other jurisdictions outside the reach of the IRS.  GX 3S at p. 9, 3W at p. 183, and 3HH at p. 2.  These facts further establish the object of the conspiracy, the defendants' knowledge of the object of the conspiracy, and their knowing participation in the conspiracy.

Hough and Fredrick provided false information to their accountant for use in preparing their individual income tax returns.  Mr. Murtha, the return preparer for Defendant Hough and Fredrick, was asked on direct examination if, when he initially met with the defendants, he asked them if they had any foreign bank accounts.  He testified that it "would have been part of my normal interview to ask that question."  2Tr. 239.  He went on to state that he believed Defendant Hough and Fredrick answered "no."  Id.  Mr. Murtha further explained that the question he would have asked "would be in the nature of, 'Do you have any foreign bank accounts?'"  2Tr. 240.  Mr. Murtha also testified that in 2008 he read in the newspapers about problems UBS was having and, as a result, he would have asked his clients, again, whether they had a foreign account.  2Tr. 243-44.  On cross examination, Mr. Murtha reiterated his belief that he asked Defendant Hough and Fredrick whether they had a foreign bank account:  "Well, based on the way I did my interviews, I believe I did ask them that question."  3Tr. 48.  Counsel for Defendant Hough went on to ask "[s]o are you certain that, in your first interview, where you had their prior return with boxes marked 'no,' that you would have asked them the foreign-bank question; are you certain of that?"  Mr. Murtha answered

8

"I'm certain I would have asked that question."  3Tr. 49.  Mr. Murtha also testified that the boxes related to the foreign bank account inquiry on Schedule B of Defendant Hough and Fredrick's tax returns were checked "no" and he knew that would have been asked in the interview.  3Tr. 49.  Yet the evidence presented at trial proved that Defendant Hough and Fredrick owned foreign bank accounts in their joint names, in their individual names, in the names of nominee entities and in multiple different foreign jurisdictions.  The actions of Defendant Hough and Fredrick in lying to their return preparer evidence the object of the conspiracy, to defraud the IRS, their knowledge of the objective of the conspiracy, and their participation therein.

Defendant Hough and Fredrick signed and filed their Forms 1040 for four successive years which failed to report their undeclared foreign accounts, failed to report interest, dividends, and capital gains earned in the accounts, failed to report net profits of the medical schools, and each of their 2007 individual income tax returns failed to fully report the ultimate sale of the medical schools.

All of this evidence, admitted at trial, established beyond a reasonable doubt that Defendant Hough knowingly and willfully agreed with Fredrick to achieve the specific criminal objective of the conspiracy, namely to defraud the IRS.

      2.  <u>Substantive false return counts</u>

The government presented overwhelming evidence that Defendant Hough's answer to question 7a on Part III of Schedule B was knowingly false and that she had actual knowledge that she was required to "check the box."

The court's jury instructions were correct, thorough, and complete with respect to both the willfulness and knowledge standard.  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).  In addition to the standard willfulness instruction, the court both instructed the jury that proof of knowledge on

the part of Defendant Hough was required and defined knowingly.  Court's Jury Instructions, Dkt. #109 at page 17.

Looking at Schedule B, Part III, Defendant Hough's argument ignores the initial instructions contained therein.  This section of the tax return states, "You must complete this part if you (a) had over $1,500 of taxable interest or ordinary dividends; or (b) had a foreign account; or (c) received a distribution from, or were a grantor of, or a transferor to, a foreign trust."  GX 1D, p. 5; 1G, p. 5; 1H, p. 5; 3Tr. 57.  This threshold question is almost identical to the question Thomas Murtha testified he would have asked as part of his initial "new client intake interview" of Defendant Hough and Dr. Fredrick.  2Tr. 289; 3Tr. 48-49.  He testified that the question would be in the nature of "Do you have any foreign bank accounts?" 2Tr. 240.  These are not unclear or ambiguous questions.

Only after answering this initial threshold question in the positive does a taxpayer turn to question 7a.  Mr. Murtha testified that Defendant Hough said she did not have a foreign bank account.  Defendant Hough never told him that she had an interest in or signature authority over a bank account in the Bahamas, Switzerland or Liechtenstein, and she never asked any follow-up questions in response to his question.  2Tr. 241-242.  He also testified that if Defendant Hough had told him that she had a foreign account he would have looked at the exceptions so as to properly fill out the form.  3Tr. 85.  However, Defendant Hough told Mr. Murtha, falsely, that she did not have a foreign account.  *Id*.  Mr. Murtha cannot inquire into exceptions that Defendant Hough affirmatively tells him do not apply to her because she claimed that she did not have a foreign account.  Furthermore, Defendant Hough testified that she was never asked about New Vanguard and "I don't know why I would have told him." 10Tr. 80, *see also* 10Tr. 87.  Providing an accountant or return preparer with inaccurate and incomplete information is an accepted manner of proving willfulness.

11481106.1

*United States v. O'Keefe*, 825 F.2d 314, 318 (11th Cir. 1987); *see also United States v. Bishop*, 264 F.3d 535, 552 (5th Cir. 2001); *United States v. Guidry*, 199 F.3d 1150, 1157 (10th Cir. 1999); *United States v. Garavaglia*, 566 F.2d 1056, 1057-60 (6th Cir. 1977) ("taxpayer who relies on others to keep his records and prepare his tax returns may not withhold information from those persons relative to taxable events and then escape responsibility for the false tax returns which result.").

Mr. Murtha testified that Defendant Hough's tax knowledge was average, and that she understood what papers to bring in at the end of each year and what the different income items and deductions were.  2Tr. 245.  In fact, Defendant Hough exhibited her tax knowledge in sending information to her return preparer for preparation of some of her tax returns and in filing an amended 2005 Form 1040 to report a capital gains transaction not previously reported.  GX 1E, 5C and 5D.

There was also evidence introduced at trial which showed that Defendant Hough knew she was the beneficial owner for U.S. tax purposes of an undeclared foreign account in her sole name.  In GX 3R, Defendant Hough signed a document titled "Supplement for new Account US Status Tax Form US Withholding Tax/Natural Person Assets and Income Subject to United States Withholding Tax declaration of Non-US Status" for her undeclared account in her individual name.  Under Item No. 2, the document, signed by Defendant Hough, reads: "the undersigned account holder hereby declares that he/she is the beneficial owner of the assets and income to which this declaration relates in accordance with US tax law."  GX 3R at p. 7-9.

The jury had all of the tax returns before it to evaluate exactly what the question was.  Defense counsel argued that Defendant Hough was unaware of what the exceptions were and

11

elicited testimony that even Mr. Murtha was unaware of what those exceptions were.  However, the jury rejected this argument by returning a guilty verdict.

The government proved that Defendant Hough owned all of the undeclared accounts, including those in the name of the Saba Foundation and MUA.  *See supra*; Dkt. #185 at ¶¶ 4, 5, 7, 8, 9, 10, 11, 13, and 14.  The jury, based on all of this evidence and testimony, could reasonably conclude that the Saba University School of Medicine Foundation, the Saba University School of Medicine, MUA, and the other nominee entities were nothing more than "form," and that the true substance of the transactions was that Defendant Hough and Fredrick were the actual owners of Saba University School of Medicine Foundation, Saba University School of Medicine, MUA and the other nominee entities.  The fact that many of the witnesses testified that no one could own a Foundation was based solely on the form of the entity and not on the actual substance of the transactions, because Defendant Hough and Fredrick concealed their conduct and their control of all of these entities from these same witnesses.  The witnesses had no personal knowledge of the other acts committed by Defendant Hough that evidenced her knowledge that she owned the Saba University School of Medicine Foundation, the Saba University School of Medicine, MUA, or any of the other nominee entities.  In fact, Defendant Hough testified that the only people that knew about the nominee entities were herself, Fredrick, Singenberger and Leutolf and maybe Dr. Bautista and Mr. Johnson; she did not think even the Board of Directors for the schools were aware of the entities.  10Tr. 83-85, *see also* 4Tr. 45-46; 5Tr. 114, 155-56.

Defendant Hough was aware that these accounts were investment accounts intended to earn money.  Included in the account opening documents were Asset Management Agreements which Defendant Hough executed.  *See* GX 3R at p. 15.  These agreements detailed the investment strategy the client wished to employ.  Defendant Hough signed one for the account in her sole name

12

on April 7, 2004, *Id* at p. 19, and there were similar agreements in all of the other accounts which Defendant Hough also signed.  GX 3C at pp. 23-32, 3U at pp. 17-26, 3Y at pp. 15-24, 3CC at pp. 23-27 and 3GG at pp. 14-20.  Defendant Hough also appointed her sister, Charlene Varga, as power of attorney on this account and emailed Leutolf to make sure that he received the signed paperwork.  GX 3R at p. 13-14**.**  When Defendant Hough closed her account and transferred the funds to an account in the name of New Vanguard, the letter requested that UBS transfer "all equities and other assets" to the newly formed company.  GX 3S at p. 9.  David Fredrick emailed Leutolf on February 8, 2005 stating "Pat said you wanted to tell me about a plan that she was in that I was not…you are not going to let her make more money than me, are you?"  GX 3KK at p. 13.

A critical piece of evidence demonstrating knowledge of not only the income earned in the accounts, but of the object of the conspiracy, is Exhibit 3HH, page 20.  This exhibit is a February 6, 2004 email from Fredrick to Leutolf, with a copy to Defendant Hough.  In that e-mail, Fredrick states "Pat and I were discussing how/who would handle our overseas financial affairs in the event of our death."  *Id*.  Fredrick explains that they presently have all of their funds in one joint account and were considering dividing the funds into two separate accounts – one for each of them.  *Id*.  Defendant Hough, on March 18, 2004, confirms that she is in agreement with the arrangement to split the accounts.  GX 3HH at p. 27.  Defendant Hough also testified that she was aware of the use of the funds because she claimed that Fredrick told her on multiple occasions that funds taken from the accounts and used for personal expenditures were deferred compensation.  9Tr. 254-55, 259-60.  Also, Defendant Hough was copied on an email from Fredrick to Marc Rudow for the purchase of the land next to their Asheville, NC home.  Fredrick detailed to Mr. Rudow that he has "instructed our overseas bank to wire" $200,000 for the purchase of the land.  GX 12F; 5Tr. 14-15.

The government presented overwhelming evidence of Defendant Hough's guilt on all counts of the indictment.  Defendant Hough does not raise any substantial questions of law or fact that are likely to result in reversal or an order for a new trial.

B.   The government's cross examination was not improper

Defendant alleges that two questions asked by the government of two character witnesses called by the defense constituted impermissible guilt-assuming hypotheticals which should result in a reversal of Defendant Hough's convictions.  The government disagrees, as did the Court in its Opinion and Order on Defendant Hough's Motion for New Trial Pursuant to Rule 33(a) and Motion for Judgment of Acquittal Pursuant to Rule 29(c).  *See* Dkt. #157.  The Court ruled that "the cross examination of the character witnesses was not error, and even if error, it was harmless beyond a reasonable doubt.  No one who sat through this trial would have any doubt at all that the responses to the disputed questions to the character witnesses had no impact on the jury's determination of the facts of the case."  *Id*. at page 8.

Dr. Alan Gruber ("Dr. Gruber") was called by the defense as a character witness and testified on direct examination to the high opinion he had of Defendant Hough's honesty. 7Tr. 181-83; 186-87.  As part of direct examination, counsel for the defendant asked Dr. Gruber whether his opinion of Defendant Hough would "change if you were told that the government in this case was claiming that [she] took millions of dollars from the Saba Foundation, hid the money for her own use in secret Swiss bank accounts, failed to declare income from those accounts on her tax returns, and conspired with her husband and others to defraud the United States."  7Tr. 182-83.  In response, Dr. Gruber testified that he would be "flabbergasted" and that is not "who she is."  7Tr. 183.  Defense counsel again during direct examination asked Dr. Gruber a similar question as follows: "Again, if you were to be told the things that I told you the government is alleging in this case,

14

specifically that she took millions of dollars from Saba Foundation accounts, put them in her own accounts, hid them in Swiss bank accounts for her own use, for her own benefit, lied about it on her tax returns, conspired with Dr. Fredrick and others to defraud the United States, if you were told that those were the allegations that the government has made in this case, would that change your opinion of Dr. Hough's character for truthfulness and honesty, yes or no?"  7Tr. 186.  Again, Dr. Gruber testified that his opinion would not change because he would not believe it.  7Tr. 186-87.

In response, during cross-examination of Dr. Gruber, the government asked whether his opinion would change if it were *proven* "that Dr. Fredrick and Dr. Hough did conspire to defraud the Internal Revenue Service by not reporting the sale of the medical schools on their tax returns, because they would – would be required to do so, if that was proven, would that change your opinion?"  7Tr. 196.  Defense counsel objected, stating that "'if that were proven' is an improper question at this point," although counsel did not explain what made the question improper.  This Court overruled this objection; Dr. Gruber stated that he "would be very surprised" if that happened, and then stated that it would change his opinion.  7Tr. 196-97.

The following day, defense counsel raised the issue again, directing the Court's attention to *United States v. Candelaria-Gonzalez*, 547 F.2d 291 (5th Cir. 1977), which held that guilt-assuming hypothetical questions are improper in the context of a witness who testified about a defendant's reputation in the community.  8Tr. 182-83.  The Court noted that Dr. Gruber testified about his personal opinion, not defendant's reputation, and overruled the objection.  Nonetheless, the government did not ask that question of any other witnesses.

Defense counsel, on direct examination of its next character witness, asked retired state judge Thomas Walker whether he had an opportunity, in the forty-nine years he has known Defendant Hough, "to form an opinion as to her character for truthfulness and honesty?"  8Tr. 205.

15

Judge Walker stated his opinion was "[t]op drawer.  No hesitation.  No reservation.  Absolute top drawer."  8Tr. 205.  Judge Walker also testified that it had been part of his job for more than three decades to "judge people's character and truthfulness."  8Tr. 205.  Defense counsel then inquired whether Judge Walker had reviewed the indictment and he responded that he had not other than "a seven-word synopsis" the defense counsel gave him.  8Tr. 206.  Defense counsel then asked whether his opinion of Defendant Hough's character "would change if I were to tell you that the government is alleging, in this case, that Dr. Hough took millions of dollars from the foundation that ran the medical schools that she was involved with in the Caribbean; converted those monies to her own use; hid them in secret Swiss bank accounts under her name, for her own use and benefit; failed to declare that money on her tax returns; and conspired with her husband and others to defraud the United States and the Internal Revenue Service."  8Tr. 206.  Judge Walker testified that the allegations did not and that he "wouldn't be here if it changed my opinion."  *Id*. 206-07.  Defense counsel then explored Judge Walker's opinion further, asking "[w]ell, what about the allegations that I've told you of these serious breaches and violations, and taking money, and concealing money, and failing to declare it, and conspiring to defraud the IRS, does knowing that those are the nature of the allegations, in more detail than you've known it before, change your opinion about whether she's an honest and truthful person?" 8Tr. 207.  Judge Walker responded, "[n]ot in the least.  It's just not the Pat Hough that I've known for all these years…" *Id*.

In response, on cross-examination of Judge Walker, the government first asked Judge Walker about his familiarity with the charges against Defendant Hough.  He admitted that he did not know much about the allegations.  8Tr. 214-15.  The government then asked Judge Walker if he would want to consider all of the evidence and keep an open mind before forming an opinion; Judge Walker responded that he would.  8Tr. 215.  The government then asked "[a]nd so it's possible, if

16

you heard all of the evidence, that you might change your opinion about whether Dr. Hough is honest or not." Over defense counsel's objection, Judge Walker responded that it was possible. *Id.*

The Court did not err in overruling the objection to the single question posed by the government to Dr. Gruber. Counsel for Defendant Hough opened the door to the question by asking Dr. Gruber at length, in great detail, and on two separate occasions about the effect of the allegations against Defendant Hough on his opinion of the defendant. *See United States v. Russo*, 110 F.3d 948, 953 (2d Cir. 1997) (finding that government's cross-examination of character witness was permissible because defense counsel opened the door to the issue of whether that witness knew about the charges against the defendant, and that by "departing from traditional direct examination of a character witness," defense counsel opened the door by asking the character witness "whether, in his opinion, [the defendant's] character is consistent with the charges against [the defendant] .") Here, counsel for Defendant Hough specifically asked Dr. Gruber whether the allegations against Defendant Hough changed his opinion of her character—a question that would be improper if asked by the government. Further, counsel for Defendant Hough walked through those allegations in great detail on two separate occasions during the direct examination of Dr. Gruber. This opened the door to the question posed by the government in cross-examination of Dr. Gruber. *See United States v. Gopie*, 347 Fed.Appx. 495 (11th Cir. 2009) ("During cross examination, the defense opened the door to the disputed line of questioning"); *United States v. Scheigert*, 809 F.2d 1532 (11th Cir. 1987) ("Similarly, the introduction of testimony regarding defendant's use of cocaine was not error. Defendant opened the door to this testimony").

In addition, even though Dr. Gruber did eventually answer the question posed by the government, he first stated he would be very surprised, before stating that it would change his opinion. 7 Tr. 196-97. This was consistent with his testimony on direct examination, when he

17

expressed disbelief that Hough would ever do the things posited in detail by the defense as allegations against her, stating he would be "flabbergasted" and it was "not who she is."  7Tr. 183. When counsel for the defense again detailed allegations against Defendant Hough later during direct examination, Dr. Gruber stated that knowing such allegations would not change his opinion.  7Tr 186-87.  These answers resulted in a bolstering of his positive opinion as to Defendant Hough's character for honesty and truthfulness.  *United States v. Shwayder*, 312 F.3d 1109, 1121 (9th Cr. 2002) (holding that guilt-assuming hypotheticals posed by the government were error, applying a plain error standard, and determining reversal was not appropriate because witnesses expressed disbelief as to the allegations posed by the government as part of the guilt-assuming hypotheticals).

This Court also did not err in overruling the objection of counsel for Defendant Hough to the question posed by the government to Judge Walker, because counsel for Defendant Hough again opened the door to the question posed by the government and because, contrary to defendant's assertion, the question did not require Judge Walker to assume the guilt of Defendant Hough. "Concerns about guilt-assuming hypotheticals arise only if the questions do indeed assume the defendant's guilt."  *United States v. Wilson*, 983 F.2d 221, 224 (11th Cir. 1993).  The question asked by the government of Judge Walker which Defendant Hough alleges to be error, in fact, did not ask the witness to assume that the charged offenses or any specific criminal act had been proven.  A guilt-assuming hypothetical is one that requires the witness to assume or accept the defendant's guilt in order to answer it.  The government asked of Judge Walker "[a]nd so it's possible, if you heard all of the evidence, that you might change your opinion about whether Dr. Hough is honest or not."  8Tr. 215.  Here, Judge Walker could have heard some evidence that did not persuade him of the defendant's guilt, but nonetheless changed his opinion of her character.  For example, Judge Walker testified on direct that he did not think Defendant Hough spent

11481106.1

extravagantly, that she was fiscally conservative and that he did not know her to take shortcuts or bend the rules.  8Tr. 205.  However, on cross-examination, it was elicited that Judge Walker was actually unfamiliar with Defendant Hough's spending habits or personal financial situation.  8Tr. 210-211.  He could therefore answer the question without assuming her guilt.

> 1.  Any error in the cross-examination of the character witnesses was harmless beyond a reasonable doubt

Even if defendant could demonstrate a substantial question whether it was error to allow one or both of the questions posed to Dr. Gruber and Judge Walker, any error was harmless.[4]  A review of the trial record in this case demonstrates that defendant suffered no prejudice from the questions.  First, the independent evidence of defendant's guilt was overwhelming.  *See supra.*  "Overwhelming evidence of guilt is one factor that may be considered in finding harmless error."  *Guzman*, 167 F.3d at 1353.

Second, in determining whether the defendant was harmed by any alleged error, the Eleventh Circuit can consider the length of the trial.  *United States v. Kellogg*, 510 F.3d 188, 196 (3d Cir. 2007) ("Further, because it was but one question posed to one witness during the course of a three-week trial, this is not a situation where [defendant] was unfairly prejudiced . . . ."); *United States v. Paccione*, 949 F.2d 1183, 1202 (2d Cir. 1991) ("We agree that the question was improper, but we regard this single improper question in the course of the 12–week trial as harmless error.")

---

[4] In *United States v. Chesser*, 663 F.2d 1381, 1391 (11th Cir. 1981), the Eleventh Circuit applied ordinary harmless-error analysis pursuant to Federal Rule of Criminal Procedure 52(a) to the issue of guilt-assuming hypotheticals.  However, the appellate court later stated that it had not decided whether ordinary harmless-error analysis or a more stringent standard should be used to determine whether an error involving a guilt-assuming hypothetical was harmless.  *United States v. Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999).  Nonconstitutional errors that do not affect substantial rights must be disregarded.  Fed. R. Crim. P. 52(a); *Guzman*, 167 F.3d at 1353 ("[N]onconstitutional error requires reversal only if it resulted in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict.") (internal quotations omitted).  Constitutional error must be found harmless beyond a reasonable doubt.  *Id.* (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).  In both cases, however, the Court should consider the entire trial record in determining whether an error was harmless.  *Id.* (quoting *United States v. Hasting*, 461 U.S. 499, 509 (1983)).

11481106.1

Defendant here objected to only two questions posed during the course of a two-and-a-half-week trial involving more than twenty witnesses; there was no prejudice.

Third, the absence of harm is also illustrated by the fact that the jury heard other witnesses opine as to Defendant Hough's character for truthfulness and honesty. Defendant Hough called a third character witness, Antoine Solagnier, who testified regarding his opinion of Defendant Hough's character for truthfulness and honesty and whose testimony on this point was unchallenged. 8Tr. 244-45. Dr. Paul Dalbec, who was called by the government, testified that he knew Defendant Hough dating back to before the establishment of the medical schools and that he believed that "everything she's done was, in my opinion, honest. I don't believe she's…up to anything illegal. I've never witnessed it either in her personal behavior or in her professional behavior." 5Tr. 199-200.

Other positive character testimony was elicited from five additional witnesses called by the government. Charlene Varga, Defendant Hough's sister, testified she trusts her sister and did not think that her sister would ask her to do anything wrong. 4Tr 263-65. Laura Whitley, Defendant Hough's step-daughter, testified that Defendant Hough is "[i]ncredibly intelligent. Probably one of the smartest women I've ever known, and … very professional, loving, funny…very smart, and very capable, and just, you know, an all-around very successful, driven person." 6Tr. 161-62. Mr. Minchenberg, testified that Defendant Hough wanted to be in compliance with her taxes and she would make sure she got the information for her taxes to the right person. 4Tr. 119-120; 194. Steven Rodger, the purchaser of the schools, testified that Defendant Hough was very charitable. 6Tr. 77. Thomas Murtha, her return preparer, testified that she was conservative and conscientious about her taxes. 3Tr. 55. This substantial amount of unchallenged positive character testimony,

20

including testimony from several of the government's own witnesses, removed any possible prejudice from the cross-examination of Dr. Gruber and Judge Walker.

Finally, this case presents none of the particular dangers that appellate courts have associated with guilt-assuming hypotheticals. For example, the courts have suggested that such questions might allow the prosecutor to "foist its theory of the case repeatedly on the jury." *United States v. Williams*, 738 F.2d 172, 177 (7th Cir. 1984). However, although defense counsel repeatedly detailed what he described as the charges against defendant during the direct examinations of Dr. Gruber and Judge Walker, the government referred to the allegations in a rather perfunctory way when cross-examining Dr. Gruber and did not refer to them at all when cross-examining Judge Walker. Some courts have expressed concern that hearing a prosecutor "repeatedly . . . assure a trial judge that he has a good faith basis for asking permitted hypothetical questions" might cause the jury to infer that "the prosecutor has evidence of guilt beyond the evidence in the record." *United States v. Oshatz*, 912 F.2d 534, 539 (2d Cir. 1990). No such assurances were made in this case; there accordingly was no danger that the jury would form the impression that the prosecutor had additional evidence of defendant's guilt.

Nor was this a case involving a "swearing contest" between Defendant Hough and a single key government witness. *See United States v. Page*, 808 F.2d 723, 732 (10th Cir. 1987); *Williams*, 738 F.2d at 177 (distinguishing *United States v. Polsinelli*, 649 F.2d 793, 798 (10th Cir. 1981)). Much of the evidence against Defendant Hough was in the form of documents she signed. Defendant Hough had a full opportunity to explain those documents when she testified. The jury, having had the opportunity to evaluate Defendant Hough's credibility and honesty first-hand, apparently disbelieved her explanation and convicted her. Indeed, the jury's impression of

21

Defendant Hough based on her own testimony would carry more weight than any witness's testimony about her general character or her character for truthfulness and honesty.

      C.  <u>Defendant's contention that the Court's tax loss determination was clearly erroneous fails to raise a substantial question of fact or law</u>

A district court's factual findings at sentencing are reviewed for clear error, and its legal conclusions de novo. *United States v. Gupta*, 572 F.3d 878, 887 (11th Cir. 2009), *cert. denied*, 463 F.3d 1182; *United States v. Machado*, 333 F.3d 1225, 1227 (11th Cir. 2003). A district court, at sentencing, must "make *independent* findings establishing the factual basis for its Guidelines calculations." *United States v. Hamaker,* 455 F.3d 1316, 1338 (11th Cir. 2006); Fed. R. Crim. P. 32(i)(3)(B). The district court has broad discretion in calculating loss for purposes of sentencing and its findings may be based on evidence presented at trial, undisputed statements in the Presentence Report, or evidence and argument presented during the sentencing hearing. *Id*. Furthermore, a precise amount is not required; the court must only make a reasonable estimate based on the available facts. USSG §2T1.1, Application Note 1; *United v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999).

The Court, pursuant to Fed. R. Crim. P. 32(i)(3)(B), made extensive independent factual findings and legal conclusions to support the tax loss calculation. *See* Second Notice Regarding Court's Sentencing Determinations, Dkt. #192. The Court found

> Evidence which the Court found credible establish that defendant had an ownership of and income derived from the operation and sale of Saba University School of Medicine Foundation (Saba Foundation), and ownership of or income derived from the Medical University of the Americas (MUA). Additionally, evidence which the Court found credible establishes by at least a preponderance of the evidence that both defendant and her co-defendant husband David Fredrick (Fredrick) had *de facto* ownership of both entities regardless of the legal formalities, and both received income from the operation and sale of both entities. (Doc. #185, pp. 3-4).

Dkt. #192 at pages 3-4.  The Court found that "[u]nder the facts found by the jury and the Court, Saba Foundation and MUA are treated as partnerships for federal tax purposes."  *Id*. at page 7; *see also* Notice Regarding Court's Sentencing Determinations, Dkt. #185.[5]  The Court applied the jury's verdict as well as its findings to the law in concluding that the tax loss was in excess of $15 million.  *Id*. at pages 4-8.  This finding was not error.

        D.  <u>Defendant fails to raise a substantial question that is likely to result in a sentence less than the expected duration of the appeal process</u>

Defendant Hough has failed to raise a substantial question that is likely to result in a sentence less than the expected duration of the appeal process.

The Eleventh Circuit has held that where the district court "unambiguously expressed that it would have imposed the same sentence, even without the erroneous calculation, that the guideline error is harmless.  *United States v. Barner*, 572 F.3d 1329, 1247-48 (11th Cir. 2009); *see also United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006) ("Even if the guideline calculations are wrong, my application of the sentencing factors under Section 3553(a) would still compel the conclusion that a 10-year sentence…is reasonable and appropriate under all the factors that I considered."); *United States v. Overstreet*, 713 F.3d 627, 639 n. 15 (11th Cir. 2013); *United States v. Dean*, 517 F.3d 1224, 1232 (11th Cir. 2008) (At sentencing, the court stated that he still would have imposed the same sentence, regardless of any guidelines miscalculation); *but see United States v. Paley*, 442 F.3d 1273, 1278–79 (11th Cir. 2006) (*per curiam*) (where the district court has emphasized that the guideline range influenced the sentence, we have held that a calculation error was not harmless).

---

[5] The government provided the Court with Internal Revenue Manual ("IRM") 4.61.5 which discussed disregarded entities and classification.  This section of the IRM, which was offered by both  sides in support of their tax loss argument, addressed the issue of taxation under the partnership theory.

The Court calculated the Guidelines range to be 78 – 97 months based on a tax loss of more than $15 million and a two-level enhancement for use of sophisticated means.  Dkt. #192.  The Court, based on the factors in 18 USC §3553(a), sentenced Defendant Hough to 24 months incarceration, a sentence 54 months below the advisory Guidelines range.  The government respectfully submits that there is no indication that if the tax loss and resulting Guidelines offense level was lower, the Court would have sentenced Defendant Hough to less than 24 months' incarceration.[6]

For example, had the Court found the tax loss to be as the government proved at trial (more than $6 million) the Guidelines range would have been 63 – 78 months.  Or, if the Court determined that co-defendant David Fredrick's tax loss was not reasonably foreseeable to Defendant Hough because she and Fredrick filed separate tax returns, the tax loss associated with her tax returns alone was in excess of $7 million and would not have affected the base offense level.[7]  *See* Dkt. #192 at page 9.  The government respectfully suggests, based on the record and the fact the 24-month sentence was the result of a substantial variance, that the Court would have sentenced Defendant Hough to twenty four months' incarceration even if the tax loss was lower, and the government would respectfully urge the Court to make that finding.  *See United States v. Barner*, 572 F.3d 1239, 1248 (11th Cir.2009) ("Where a district judge clearly states that he would impose the same sentence, even if he erred in calculating the guidelines, then any error in the calculation is harmless.").

---

[6] With respect to Defendant Hough's observation (at p. 6) that "Judge Hodges granted bail pending appeal to [Wesley] Snipes, who…had been sentenced to three years of imprisonment" – while Defendant Hough was sentenced to only two years' imprisonment – the government will simply note that one of Defendant Hough's counsel was the Assistant Attorney General at the time of the *Snipes* case and that it would be inappropriate for the government to comment on its not appealing the bail grant in *Snipes*.

[7] Indeed, the tax loss could have been as low as $30,001 and the 24 month sentence imposed by the Court would still be within the resulting Guidelines range.

11481106.1

## CONCLUSION

Defendant Hough is a flight risk.  She has not met her burden to establish that her appeal raises a substantial question of law or fact and that the resolution of her appeal is likely to result in reversal of all counts of conviction on which imprisonment has been imposed, an order for new trial of all counts on which imprisonment has been imposed, a sentence that does not include a term of imprisonment, or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.  For the foregoing reasons, Defendant Hough's Motion for Bond Pending Appeal should be denied.

LEE BENTLEY
Acting United States Attorney

By:   /s/ Caryn D. Finley
       CARYN D. FINLEY
       MARGARET LEIGH KESSLER
       Trial Attorneys, Dept. of Justice, Tax Division
       New York Bar No. 3953882
       2110 First Street, Suite 3-137
       Fort Myers, Florida  33901
       Telephone:  (202) 514-5051
       Facsimile:  (202) 514-0961
       E-mail: caryn.finley@usdoj.gov
       Margaret.Leigh.Kessler@usdoj.gov

11481106.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2014, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send a notification of that electronic filing (NEF) to

the following:

Bruce L. Udolf
Nathan J. Hochman
Daniel Saunders

<div style="margin-left: 50%;">

/s/ Caryn D. Finley
CARYN D. FINLEY
Trial Attorney, Department of Justice,
Tax Division
New York Bar No. 3953882
2110 First Street, Suite 3-137
Fort Myers, Florida  33901
Telephone:  (239) 461-2200
Telephone:  (202) 514-5051
Facsimile:  (239) 461-2219
E-mail: caryn.finley@usdoj.gov

</div>

26