UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

VOLUME TWO

THE UNITED STATES OF AMERICA,

          Plaintiff,

                                    Fort Myers, Florida
vs.                                    May 1, 2014

PATRICIA LYNN HOUGH,             9:10 AM

          Defendant.

TRANSCRIPT OF SENTENCING

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                            Tax Division
                      P.O. Box 813
                      Washington, DC  20044
                      BY:  CARYN FINLEY, ESQ.

                      U.S. Department of Justice
                            Tax Division
                      Suite 7334
                      601 D Street NW
                      Washington, DC
                      BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

A P P E A R A N C E S
(Continued From Previous Page)


FOR THE DEFENDANT:        Bingham McCutchen, LLP
                         The Water Garden
                         1601 Cloverfield Boulevard
                         Suite 2050 North
                         Santa Monica, CA  90404-4082
                         (310) 904-1000
                         BY:  NATHAN J. HOCHMAN, ESQ.

                         Bruce L. Udolf, PA
                         500 East Broward Boulevard
                         Suite 1400
                         Fort Lauderdale, FL  33394
                         (954) 858-8831
                         BY:  BRUCE L. UDOLF, ESQ.

ALSO PRESENT        JANET ZUK, Probation Officer

REPORTED BY:        JEFFREY G. THOMAS, RPR-CP, CRR
                    Official Federal Court Reporter
                    United States Courthouse
                    2110 First Street, Suite 2-194
                    Fort Myers, FL  33901
                    (239) 461-2033


                         *  *  *

I N D E X

| May 1, 2014 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 1 | 5 |

– – –

### GOVERNMENT'S WITNESSES

| WITNESS | DIRECT Vol. Pg. | CROSS Vol. Pg. | REDIRECT Vol. Pg. | RECROSS Vol. Pg. | VOIR DIRE Vol. Pg. |
|---|---|---|---|---|---|
| SHEILA MAURER | 1  8 | 1  59 | 1  121 | 1  125 | |
| | | | 1  138 | 1  140 | 1  145 |

– – –

### GOVERNMENT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Government's Exhibit 1 Admitted in Evidence | 1 | 10 |
| Government's Exhibit 2 Admitted in Evidence | 1 | 10 |
| Government's Exhibit 3 Admitted in Evidence | 1 | 13 |
| Government's Exhibit 4 Admitted in Evidence | 1 | 14 |
| Government's Exhibit 5 Admitted in Evidence | 1 | 18 |
| Government's Exhibit 6 Admitted in Evidence | 1 | 24 |
| Government's Exhibit 7 Admitted in Evidence | 1 | 32 |
| Government's Exhibit 8 Admitted in Evidence | 1 | 33 |
| Government's Exhibit 14 Admitted in Evidence | 1 | 42 |
| Government's Exhibit 9 Admitted in Evidence | 1 | 48 |
| Government's Exhibits 10 Admitted in Evidence | 1 | 50 |

– – –

DEFENDANT'S WITNESSES

| WITNESS | DIRECT | | CROSS | | REDIRECT | | RECROSS | | VOIR DIRE | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. | Vol. | Pg. |
| HOCHMAN | 1 | 152 | 1 | 164 | 1 | 178 | 1 | 182 | | |

– – –

DEFENDANT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Defendant's Exhibits A marked for identification | 1 | 67 |
| Defendant's Exhibit A Admitted in Evidence | 1 | 69 |
| Defendant's Exhibit B Admitted in Evidence | 1 | 143 |

– – –

I N D E X

| | Vol. | Page |
|---|---|---|
| Argument by Ms. Finley | 1 | 185 |
| Argument by Mr. Hochman | 1 | 195 |
| Argument by Ms. Finley | 1 | 211 |
| Argument by Mr. Hochman | 1 | 218 |
| Court Recessed for the Day | 1 | 223 |

* * *

1       THEREUPON, the above-entitled case having been called to

2   order, the following proceedings were held herein, to-wit:

3                             - - -

4       THE COURT:  This is the case of United States versus

5   Patricia Lynn Hough.  It is Case 2:13 Criminal 72.

6       Counsel, why don't you indicate your appearances for

7   the record before you proceed.

8       MS. FINLEY:  Good morning, Your Honor, Caryn Finley

9   and Margaret Leigh Kessler for the United States.

10      MR. HOCHMAN:  Good morning.  Nathan Hochman, Daniel

11  Saunders, and Bruce Udolf for Defendant Dr. Patricia Hough, who

12  is present on bond, and we are also assisted by Neysa Nardi, a

13  paralegal, Your Honor.

14      THE COURT:  Good morning, everyone.  You should have

15  gotten, literally a few minutes ago, the Court's factual

16  determinations based upon our last hearing.  I presume you

17  haven't had a chance to read it yet, or not very thoroughly.

18      MR. HOCHMAN:  About halfway through, Your Honor.

19      THE COURT:  All right.  We can proceed one of two

20  ways.  I will be happy to get off the bench and give you all a

21  chance to read that, and then proceed with the rest of the

22  hearing, or we can proceed with the rest of the hearing if you

23  don't think it's necessary.  I think the first one is better,

24  but I'll leave it up to you folks.

25      MR. HOCHMAN:  Yes, Your Honor, if you wouldn't mind,

1    I would like to finish reading your rulings on these various

2    objections.

3                THE COURT:  I think that makes sense.

4         MS. FINLEY:  The Government agrees, Your Honor.

5                THE COURT:  All right.  I'm going to go back and have

6    a cup of coffee, and if you'll let me know when you're ready,

7    I'll come out.

8         MR. HOCHMAN:  Thank you, Your Honor.

9         MS. FINLEY:  Thank you, Your Honor.

10                (At 9:12 AM, court was recessed.)

11                          AFTER RECESS

12            (At 10:14 AM, court was reconvened.)

13                THE COURT:  All right.  Counsel, both sides ready in

14   the Patricia Lynn Hough case?

15        MR. HOCHMAN:  Mr. Udolf is just in the restroom, Your

16   Honor.  He will be right back.

17                THE COURT:  Okay.

18        MS. KESSLER:  Your Honor?  I just wanted to make sure

19   the Court still had its copies of the exhibits that I handed up

20   last week.

21            (Mr. Udolf entered the courtroom.)

22                THE COURT:  One through eleven?

23        MS. KESSLER:  Yes, Your Honor.

24                THE COURT:  It says "bench" on it.

25        MS. KESSLER:  Thank you.

1          MR. HOCHMAN:  Mr. Udolf is back, Your Honor.  We are

2     ready to proceed.

3          THE COURT:  All right.  My apologies for the delay

4     from the other case, but it is what it is.

5          All right.  I think where we're at, essentially, is

6     the issue of tax loss, and then role in the offense, were the

7     major items remaining.

8          MR. HOCHMAN:  Yes, Your Honor.

9          THE COURT:  Yes.  I'm sorry.  I'm looking at the

10    report.  No adjustment for role, but you want an adjustment.

11    Okay.  So those are the two issues.

12          All right.  You may proceed.

13          MS. KESSLER:  Your Honor, the Government would call

14    Revenue Agent Sheila Maurer.

15          THE COURT:  Come forward, please.

16          MR. HOCHMAN:  And, Your Honor, I told Government

17    counsel this, before we begin with Agent Maurer, we have Luis

18    Rivera with us today as a potential rebuttal witness.  Because

19    I don't know obviously what Agent Maurer is going to say on the

20    stand, it may become necessary to call Mr. Rivera.  I'll know

21    that after she testifies, Your Honor.

22          THE COURT:  Okay.  That's fine.

23          Come forward, please.

24          COURTROOM DEPUTY:  Do you solemnly swear or affirm to

25    tell the truth, the whole truth, nothing but the truth, in the

1    case now before the Court?

2              THE WITNESS:  I do.

3              COURTROOM DEPUTY:  You may have a seat.

4              State your full name, spelling your last.

5              THE WITNESS:  Sheila Maurer, M-A-U-R-E-R.

6              COURTROOM DEPUTY:  Thank you.

7              MS. KESSLER:  Your Honor, may I approach the witness

8    with the exhibits?

9              THE COURT:  You may approach freely.

10             MS. KESSLER:  Thank you.

11             (Ms. Kessler provided documents to the witness.

12             MS. KESSLER:  Your Honor, I'm just trying to get

13   myself organized.  Too many pieces of paper.

14                          SHEILA MAURER,

15   called as a witness by the Government, and having been first

16   duly sworn, was examined and testified as follows:

17                        DIRECT EXAMINATION

18   BY MS. KESSLER:

19   Q     Agent Maurer, at Dr. Hough's trial, did you testify

20   about the computation of tax due and owing based on evidence

21   you saw and heard at trial?

22   A     Yes.

23   Q     And did you prepare a revenue agent report detailing

24   that computation for purposes of trial?

25   A     Yes.

1    Q      Did you prepare one for each of Patricia Hough and David

2    Fredrick at that time?

3    A      Yes.

4    Q      What did you determine the approximate total tax due and

5    owing to be, combined, for Patricia Hough and David Fredrick,

6    for the years 2005 through 2008, at trial?

7    A      Approximately $6.3 million.

8    Q      Following trial and the guilty verdict in this case, did

9    you prepare a tax due and owing computations for sentencing?

10   A      Yes, I did.

11   Q      And did you prepare revenue agent reports detailing your

12   tax due and owing computations, ma'am?

13   A      Yes.

14   Q      If you could look in front of you at what is marked as

15   Government's Exhibit 1, do you recognize this document?

16   A      Yes, I do.

17   Q      What is this?

18   A      This is the Revenue Agent's Report that I prepared for

19   Patricia Hough for sentencing.

20   Q      Approximately when did you prepare this report?

21   A      End of January, 2014.

22          MS. KESSLER:  Your Honor, the Government would move

23   Exhibit 1 into evidence.

24          THE COURT:  Is that the exhibit that, at the top,

25   says, "Income Tax Discrepancy Adjustments"?

```
 1                THE WITNESS:  Yes, sir.

 2                MR. HOCHMAN:  No objection, Your Honor.

 3                THE COURT:  All right.  Exhibit 1 will be admitted

 4     for sentencing.

 5                (Government's Exhibit 1 admitted into evidence.)

 6     BY MS. KESSLER:

 7     Q     Revenue Agent Maurer, if you could look at Government's

 8     Exhibit 2 . . . do you recognize this document?

 9     A     Yes.

10     Q     And what is this?

11     A     This is the Revenue Agent's Report, also known as

12     "Income Tax Discrepancy Adjustments," for David Fredrick.

13     Q     Did you prepare this report?

14     A     Yes, I did.

15     Q     And did you prepare it for purposes of sentence?

16     A     Yes, I did.

17     Q     And approximately when did you prepare this report?

18     A     The end of January, 2014.

19                MS. KESSLER:  Your Honor, the Government would move

20     Exhibit 2 into evidence.

21                THE COURT:  Any objections?

22                MR. HOCHMAN:  No objection, Your Honor.

23                THE COURT:  Exhibit 2 will be admitted.

24                (Government's Exhibit 2 admitted into evidence.)

25
```

1    BY MS. KESSLER:

2    Q       In the computations you prepared at trial, Agent Maurer,

3    did those include tax loss figures for the years 2003 and 2004?

4    A       No.

5    Q       At the time that you prepared the computations for

6    trial, had you already done -- excuse me.

7            At the time you prepared tax due and owing computations

8    for trial, had you reviewed the bank accounts for the years

9    2003 and 2004?

10   A       Yes.

11   Q       Are the computations and the review, based on the years

12   2003 and 2004, now included in your tax due and owing

13   computations, Government's Exhibit 1 and 2?

14   A       Yes.

15   Q       Do these computations include additional interest and

16   capital gain or loss?

17   A       Yes.

18   Q       Did you compute those amounts in the same manner that

19   you computed them for the other years which you testified to at

20   trial?

21   A       Yes.

22   Q       Did you review all of the transactions for the accounts?

23   A       Yes.

24   Q       And did you track the purchase and sale of assets in the

25   accounts the way you testified to at trial?

1    A       Yes.

2    Q       As to the years 2003 and 2004, did you convert currency

3    to U.S. Dollars as necessary, in the same manner that you

4    testified to at trial?

5    A       Yes.

6    Q       Referring to Government's Exhibit 1, what did you

7    determine the unreported interest to be for Patricia Hough for

8    the year 2003?

9    A       $5,768.

10   Q       And did you determine there to be unreported taxable

11   interest for the year 2004?

12   A       Yes.

13   Q       And how much was that?

14   A       $27,132.

15   Q       Did you also make a determination as to whether there

16   were unreported capital gains or losses for Patricia Hough for

17   the year 2003 and 2004?

18   A       Yes.

19   Q       What was the amount for 2003; again, referring to

20   Government's Exhibit 1.

21   A       There was a gain of $2,977.

22   Q       And as to the year 2004?

23   A       There was a loss of $2,344.

24   Q       Turning to Government's Exhibit 2, did you also

25   determine there to be unreported interest and capital gains or

1  losses, for the years 2003 and 2004, attributable to David

2  Fredrick?

3  A      Yes, I did.

4  Q      And is that reflected similarly on Government's

5  Exhibit 2?

6  A      Yes, it is.

7  Q      If you could turn next to what's Government's Exhibit 3,

8  do you recognize this document?

9  A      Yes.  This is a work paper I prepared summarizing the

10  income adjustments for Patricia Hough.

11  Q      Did you prepare this for purposes of sentencing?

12  A      Yes, I did.

13          MS. KESSLER:  The Government would move Exhibit 3

14  into evidence, Your Honor.

15          THE COURT:  Any objections?

16          MR. HOCHMAN:  No objection, Your Honor.

17          THE COURT:  Three will be admitted.

18          (Government's Exhibit 3 admitted into evidence.)

19  BY MS. KESSLER:

20  Q      Turning to Government's Exhibit 4, do you recognize this

21  document, Revenue Agent Maurer?

22  A      This is a work paper where I summarized the income

23  adjustments for David Fredrick.

24  Q      Did you prepare this document?

25  A      Yes, I did.

1  Q      For purposes of sentencing?

2  A      Yes.

3            MS. KESSLER:  The Government would move Government's

4  Exhibit 4 into evidence, Your Honor.

5            THE COURT:  Any objections?

6            MR. HOCHMAN:  No objection, Your Honor.

7            THE COURT:  Exhibit 4 will be admitted.

8            (Government's Exhibit 4 admitted into evidence.)

9  BY MS. KESSLER:

10  Q      Turning back again to Page 1 of Government's Exhibit 1,

11  does -- do your tax due and owing computations for purposes of

12  sentencing include entries for net income from Saba and net

13  income from MUA?

14  A      Yes.

15  Q      Are those the medical schools which were the subject of

16  testimony in this case?

17  A      Yes.

18  Q      For purposes of your testimony and computations for

19  purposes of sentencing, I would like you to assume that

20  Patricia Hough and David Fredrick were de facto owners of the

21  medical schools Saba and MUA.

22            Did you include any net income from Saba or MUA in your

23  tax due and owing computations at trial?

24  A      No.

25  Q      Why didn't you?

1    A      I was afraid my computations would be based on

2    estimates.  I needed to -- the financial statements that I had

3    were fiscal-year financial statements, and I had to do

4    conversions to more accurately reflect the income, because

5    David Fredrick and Patricia Hough's 1040 income taxes are

6    calendar-year tax returns.  I had the financial statements for

7    Saba University, and one statement for MUA.  The profit and

8    loss statement that I'm used to seeing was not identified as

9    such, they were identified as statements of activities, and

10   where I would be looking for a net income figure, it was

11   changing net assets, and I needed to make sure that I was

12   looking correctly at a profit and loss statement.

13          And also, I was troubled by some testimony from David

14   Minchenberg that there were different documents used for . . .

15   sending reports down to Saba, which I was afraid were a double

16   set of books, and I had some source documents back at the

17   office, and I wanted to make sure I was looking at the correct

18   sets of books and records.

19   Q      Did you review -- since trial, did you review additional

20   documents regarding the profits of the schools?

21   A      Yes, I did.

22   Q      Do you recall testimony at trial indicating that the

23   schools were profitable?

24   A      Yes, I do.

25   Q      What types of documents have you reviewed since trial?

1   A      I reviewed the audited financial statements, and I

2   received a disk after trial that contained David Minchenberg's

3   work that he created and used to help prepare the financial

4   statements.  There were documents in there that matched the

5   financial statements.  His work papers could crosswalk to

6   those.  And also, he would put on some of his statements that

7   he would show that -- where the net -- where the statement of

8   change and activities was actually the net profit.

9   Q      You said that you could see his work papers and they

10  cross-walked.

11         What does that mean; can you explain that?

12  A      That meant that there would be a draft financial

13  statement, and he would scratch out -- well, I think he would

14  point to it, or mark -- I'm not sure if he marked it -- it

15  would say, "net income."

16  Q      These were markings on drafts of the audited financial

17  statements?

18  A      Right.  Right.

19  Q      Okay.  Were you able to convert the financial -- the

20  figures from the audited financial statements to -- from a

21  fiscal year to a calendar year?

22  A      Yes.

23  Q      And did you determine that there were profits of the

24  medical schools which you could rely on and incorporate into

25  your computations for the years 2003 through 2008?

1    A       Yes.

2    Q       What type of entity did you treat MUA and Saba as being

3    for purposes of your computations?

4    A       Schedule C businesses.

5    Q       And can you describe for the Court what that means, a

6    Schedule C business?

7    A       A Schedule C is the default business form that you use

8    to record revenue and expenses and net income when there's no

9    U.S. corporation, partnership, or other type of entity for

10   which these can be reported on.

11   Q       Was the fact that MUA may have been incorporated in

12   Nevis a factor in determining how to treat the entities for tax

13   purposes?

14   A       No.

15   Q       Why not?

16   A       Those were forms used to disguise the true ownership of

17   the revenue, expenses, and income.

18   Q       Was the fact that the Saba Foundation was a Netherlands

19   Antilles foundation a factor?

20   A       No.

21   Q       And is that for the same reason?

22   A       Yes.

23   Q       If we could turn to Government's Exhibit 5, do you

24   recognize this document?

25   A       This is a work paper that I prepared for the Medical

1    Universities of America.  This is a work paper where I am

2    converting the fiscal year financial statements to calendar

3    year.

4    Q       Did you prepare this document?

5    A       Yes, I did.

6    Q       And did you prepare it as part of your computations for

7    sentencing -- of tax due and owing?  Excuse me.

8    A       Yes.

9            MS. KESSLER:  Your Honor, the Government would move

10   Exhibit 5 into evidence.

11           THE COURT:  Any objections?

12           MR. HOCHMAN:  No objection, Your Honor.

13           THE COURT:  Exhibit 5 will be admitted.

14           (Government's Exhibit 5 admitted into evidence.)

15   BY MS. KESSLER:

16   Q       If we could turn to what has been marked and admitted at

17   trial as Exhibit 7EE, as in "Edward," what is this document?

18   A       This is the audited financial statement --

19           MR. HOCHMAN:  May I have a moment, Your Honor?  I

20   didn't know which documents, beyond the ones that she's listed

21   as in her report.

22           THE COURT:  Sure.

23           (Mr. Hochman reviews documents.)

24           MR. HOCHMAN:  I have it now, Your Honor.  Thank you.

25           THE COURT:  All right.  You may proceed.

1    BY MS. KESSLER:

2    Q      Looking again, this is what was admitted at trial as

3    Exhibit EE, as in "Edward."

4           What is this document?

5    A      This is the audited financial statement for the Medical

6    University of the Americas, prepared for the fiscal year ending

7    April 30th, 2004.

8    Q      Did you use figures in this document to assist in

9    determining the net income of Medical University of the

10   Americas?

11   A      Yes, I did.

12   Q      How did you do so?

13   A      In this document there is a statement of activities

14   which --

15   Q      Excuse me, I'm sorry to interrupt.  This is the fourth

16   page of the document.  It has a page number, two, at the bottom

17   of the page.

18   A      Yes.

19   Q      Go ahead.  I'm sorry.

20   A      The statement of activities is a profit and loss

21   statement.  Total revenue for this period was $4,489,714.

22   Total expenses --

23           MR. HOCHMAN:  I'm sorry, Your Honor.  Could we

24   identify for the record which page of the exhibit she's reading

25   from?

1          MS. KESSLER:  It has a Bates number at the bottom

2    right-hand corner of DM000257.  It's the fourth numerical page

3    of the document, but it has the pagination number of two at the

4    bottom.

5          MR. HOCHMAN:  Okay.

6          MS. KESSLER:  Go ahead.  I'm sorry.

7    BY MS. KESSLER:

8    Q     What figures were relevant to your computations here on

9    this page?

10   A     Total revenue of $4,489,714, total expenses of

11   $2,589,640.  The change in net assets is net income.  The net

12   income is $1,900,074.

13   Q     Now, did you then carry that net income figure to

14   Government's Exhibit 5, your work papers?

15   A     Yes.

16   Q     And is that near the top of this document, in the fourth

17   column, second number down?

18   A     Yes.

19   Q     And what are you doing here?

20   A     I'm taking the $1,900,074 net income for that period,

21   and dividing it by 12, to get a monthly net income amount of

22   $158,339.

23   Q     Now, did you apply that to a portion of the calendar

24   year 2003?

25   A     Yes.

1    Q        Which portion is that?

2    A        The last eight months of 2003.

3    Q        And is that computation done for the below, under the

4    heading 2003, again on Page 1 of Government's Exhibit 5?

5    A        Yes.

6    Q        And are you multiplying $158,339 times 8 months?

7    A        Yes, I am.

8    Q        Now, as to the other part of 2003, did you use a

9    different document in order to assist in your determination of

10   net income for MUA?

11   A        I found a document in the work -- in the papers of David

12   Minchenberg, and it is a financial statement -- it's unaudited,

13   and I don't know who prepared it -- that is stating that --

14   Q        Is this Government's Exhibit 6?

15   A        Oh.  Yes.  Sorry.

16   Q        That's all right.

17            Did you use this to assist in determining the profits of

18   MUA for the year 2003?

19   A        Yes.  I did have audited financial statements, and this

20   was the best document I could find.

21   Q        What figures were important to you in this document in

22   assisting and determining the net income of MUA for the year

23   2003?

24   A        Total income of $2,845,363 . . . minus total --

25   Q        I'm sorry to interrupt.  Is that in the first page?

1    A      Yes.

2    Q      Go ahead.

3    A      And then, on the next page, there's total expenses of

4    $3,006,938.  That would be for those 12 months there was an

5    overall loss of $161,575.

6    Q      Now, did you then incorporate that number into your

7    computations on Government's Exhibit 5?

8    A      Yes.

9    Q      Did you convert that to a per-month net income figure?

10   A      Yes.

11   Q      Did you do that again by dividing by 12 months?

12   A      Yes.

13   Q      And what did you determine the net -- excuse me -- the

14   per-month net income figure based on this document to be?

15   A      Based on this document, there was an overall loss of

16   $13,464 per month.

17   Q      And did you then incorporate that number for a portion

18   of -- or multiply that by a part of the year, number of months?

19          Wow.  That question was horrible.

20          Did you take that net income figure, per-month figure,

21   and multiply that by the number of months?

22   A      Yes.

23   Q      And how many months was that?

24   A      Four.

25   Q      Why did you apply that only to four months?

```
1    A      This is the only document that I could find, but like I
2    said, it says, "audited financial statement," but there's no
3    letter identifying that it was independent.  I don't know who
4    prepared it.  And I use the four months because this is a more
5    reliable document because it's an audited financial statement.
6    Q      When you say, "this is a more reliable document," which
7    document are you referring to?
8    A      The Exhibit 7EE.
9    Q      Trial Exhibit 7EE?
10   A      Yes.  The financial statement for the year, the period
11   ended April 30, 2004.
12   Q      What did you determine the total net income for MUA to
13   be for the year 2003?
14   A      $1,212,856.
15   Q      And that's reflected on your -- on Government's
16   Exhibit 5, your work papers?
17   A      Yes.
18   Q      Did you then carry a portion of that to the revenue
19   agent reports, the tax due and owing computations you prepared
20   for each of Patricia Hough and David Fredrick?
21   A      Yes.
22   Q      Looking at Government's Exhibit 1, what is the amount
23   that you carried forward, for 2003, into the tax due and owing
24   computation for Patricia Hough?
25   A      $606,428.
```

1   Q       And referring to Government's Exhibit 2, did you carry

2   forward the same number to David Fredrick's tax due and owing

3   computations?

4   A       Yes.

5           MS. KESSLER:  Your Honor, the Government would move

6   Exhibit 6 into evidence.

7           THE COURT:  Any objections?

8           MR. HOCHMAN:  No objection, Your Honor.

9           THE COURT:  Exhibit 6 will be admitted.

10          (Government's Exhibit 6 admitted into evidence.)

11  BY MS. KESSLER:

12  Q       Moving on to the year 2004, in determining the 2004

13  profits for MUA, did you again rely on, for part of the year,

14  the computations you made based on Trial Exhibit 7EE, the MUA

15  financial statements for the year ended April 30th, 2004?

16  A       Yes.

17  Q       And looking at Government's Exhibit 5, the per-month net

18  income figure you determined, based on Government's

19  Exhibit 7EE, how many months in the calendar year 2004 did you

20  apply that to?

21  A       The first four months.

22  Q       As to the last eight months of 2004, if we could turn to

23  Trial Exhibit 8AA, as in "Adam," what is this document?

24  A       This is the audited financial statement for Medical

25  University of the Americas, for the period ended April 30th,

1    2005.

2    Q      If we turn to the fifth page of this document, which has

3    the Bates number at the bottom right-hand corner of MPNS0147,

4    were figures on this page of the document important to you in

5    your computations?

6    A      Yes.  This is actually titled, "Statement of Income."

7    The total revenue for that period was $5,632,336.  The total

8    expenses were $3,312,649.  The net income for that period was

9    $2,319,687.

10   Q      And did you determine a per-month figure based on that

11   number?

12   A      Yes, I did.

13   Q      And did you do that on Government's Exhibit 5?

14   A      Yes, I did.

15   Q      Did you then apply that to eight months of the calendar

16   year 2005?

17   A      2004?

18   Q      Excuse me, 2004.  I misspoke.  I apologize.

19   A      Okay.  Yes.

20   Q      And what did you determine, approximately, in the middle

21   of the page of Government's Exhibit 5, the total net income of

22   MUA to be for the calendar year 2004?

23   A      $2,179,812.

24   Q      Did you then apply a portion of that to each of Patricia

25   and David Hough -- excuse me -- Patricia Hough and David

1    Fredrick, for the purposes of tax due and owing computations?

2    A      Yes.

3    Q      And referring to Government's Exhibit 1, for the year

4    2004, what is the net income from MUA that you included in your

5    computations here?

6    A      $1,089,906.

7    Q      And looking at Government's Exhibit 2, the tax

8    computations for David Fredrick, did you incorporate the same

9    amount there, for the 2004 net profits of MUA?

10   A      Yes.

11   Q      Now, did you also determine the net income for the

12   calendar year 2005 for MUA?

13   A      Yes, I did.

14   Q      Did you use the same per-month figure for the financials

15   for fiscal year ended April 30th, 2005, to assist in the

16   determination of profits for the calendar year 2005?

17   A      Yes, I did.

18   Q      If we look at what was admitted at trial as Exhibit 9B,

19   like "boy," did you use this document in computing the net

20   income of MUA for the year 2005, calendar 2005?

21   A      Yes.

22   Q      What is this document?

23   A      It's an audited financial statement for the University

24   of the Americas, for the period ending April 30th, 2006.

25   Q      Now, if we turn to the fifth page of this document,

1   which has a Bates number in the bottom right-hand corner of

2   VNJ000007, are figures on this page of the document relevant to

3   your computation?

4   A      Yes.  This statement of operations is a profit and loss

5   statement, and the net income figure is $2,823,617 for this

6   period.

7   Q      And did -- is that determined by subtracting total

8   expenses from total revenue?

9   A      Yes.

10  Q      And what did you determine -- excuse me.

11         Looking, then, at Government's Exhibit 5, did you again

12  perform a computation to determine a per-month net income

13  figure?

14  A      Yes, I did.

15  Q      And how many months in the year 2005 did you apply that

16  to?

17  A      Eight months.

18  Q      And then looking approximately two-thirds of the way

19  down the first page of Government's Exhibit 5, what did you

20  determine the net income of MUA to be for the year 2005?

21  A      $2,655,636.

22  Q      Did you attribute a portion of that to each of Patricia

23  Hough and David Fredrick in your tax computations?

24  A      Yes.

25  Q      What portion to each?

1   A       $1,327,818 was attributed to -- attributable to Patricia

2   Hough, and the same amount to David Fredrick.

3   Q       And is that reflected on Government's Exhibits 1 and 2?

4   A       Yes.

5   Q       Moving to the calendar year 2006, did you use the

6   per-month net income figure for MUA that you calculated using

7   Trial Exhibit 9B, the MUA audited financial statements for the

8   fiscal year ended April 30th, 2006, did you use that for the

9   entire calendar year of 2006?

10  A       Yes, I did.

11  Q       Why didn't you use other audited financial statements

12  for the remainder of 2006?

13  A       There were no audited financial statements past this

14  period, and David Minchenberg no longer worked . . . no longer

15  worked at MUA and Saba, so I had no documents that I could use.

16  So this was the last document that I had.

17  Q       Now, did you believe that -- why did you believe it was

18  appropriate to use the per-month figure based on 2006?

19  A       Well, when I was doing my computations --

20  Q       Are you referring to Government's Exhibit 5?

21  A       Yes.  The yearly income increases, and the monthly

22  income increases, so it . . . .

23  Q       Between what period; between the beginning of when you

24  started your computations, and through to the end of fiscal

25  year --

1    A       '06.

2    Q       -- '06?

3    A       Yes.  The monthly income increased, so I assume that it

4    would have increased for the months subsequent to 4/30/06, but

5    had I no documents to base how much it would have increased, so

6    this number, the 235,301, stayed . . . wouldn't make the

7    monthly income stay the same, so that was conservative, so I

8    used that monthly income number for the whole year.

9    Q       So you applied that to the 12 months of 2006.

10   A       Right.

11   Q       Now, second from the bottom, on Page 1 of Government's

12   Exhibit 5, what did you compute the net income of MUA to be for

13   the calendar year 2006?

14   A       $2,823,617.

15   Q       And did you again attribute half of that to each of

16   Patricia Hough and David Fredrick in your tax due and owing

17   computations?

18   A       Yes.

19   Q       And what figure was incorporated, looking at

20   Government's Exhibit 1, into the tax due and owing computation

21   for Patricia Hough?

22           I believe it's the third page of this document.

23   A       $1,411,808.

24   Q       And looking at Government's Exhibit 2, also, I

25   believe -- yes, the third page of this document, did you

1  incorporate the same amount into the tax due and owing

2  computations for David Fredrick?

3  A    Yes.

4  Q    Now, as -- did you do computations as to the year 2007?

5  A    Yes, I did.

6  Q    And did you do those computations using the same

7  per-month net income figure, based on the fiscal-year

8  financials, audited financial statement for the fiscal year

9  ended April 30th, 2006, what was admitted at trial as

10  Exhibit 9B?

11  A    Yes, I did.

12  Q    And did you do that for the same reasons that we just

13  discussed as to the latter part of 2008 -- I'm sorry -- 2006?

14       Do you want me to repeat the question?

15  A    Yes, please.

16  Q    Did you use the same per-month net income figure for

17  2007 as was used in the calendar year 2006 computations?

18  A    Yes.

19  Q    And did you do that for the same reasons we just

20  discussed as to the latter half of 2006?

21  A    Yes.

22  Q    What did you determine the net income of MUA to be for

23  the year 2007?

24  A    I was aware that the schools were sold approximately

25  April of 2007, so I only applied three months, January,

1    February, and March, for 2007.  And I got a net income figure

2    for those three months to be $705,903.

3    Q       And is that set forth at the bottom of Page 1 of

4    Government's Exhibit 5?

5    A       Yes.

6    Q       Did you then attribute half of that to the tax due and

7    owing computations for each of Patricia Hough and David

8    Fredrick?

9    A       Yes.

10   Q       And what is the amount included in your computations,

11   Page 3 of Sentencing Exhibit 1 -- excuse me -- Government's

12   Exhibit 1, for Patricia Hough?

13   A       $352,951.

14   Q       And did you incorporate the same amount into the tax due

15   and owing computation, Government's Exhibit 2, Page 3 of that

16   exhibit?

17   A       Yes.

18   Q       If we could move now to Government's Exhibit 7?

19           Do you recognize this document?

20   A       This is the same type of work paper for Saba that I

21   prepared for MUA.  This is Saba, and this is to determine

22   calendar-year income from the fiscal-year documents.  I was

23   trying to convert.

24   Q       Did you prepare this work paper?

25   A       Yes, I did.

1    Q      And did you prepare it as part of your tax due and owing

2    computations for purposes of sentencing?

3    A      Yes.

4           MS. KESSLER:  The Government would move Exhibit 7

5    into evidence.

6           MR. HOCHMAN:  No objection, Your Honor.

7           THE COURT:  Exhibit 7 will be admitted.

8           (Government's Exhibit 7 admitted into evidence.)

9    BY MS. KESSLER:

10   Q      Now, if we could look next at Government's Exhibit 8,

11   what is this document?

12   A      This is a profit and loss statement that I found in the

13   records.  It's a profit and --

14   Q      I'm sorry, what records?

15   A      The David Minchenberg records that I referred to before.

16   I'm sorry.

17   Q      That's okay.  Go ahead.

18          What is this?

19   A      A profit and loss statement from January through

20   December, 2003.  It's a calendar-year profit and loss

21   statement.  And it's signed, and it's -- I guess . . . .  It's

22   prepared by El Momo Accountancy, in Saba.

23          MS. KESSLER:  Your Honor, the Government would move

24   Exhibit 8 into evidence.

25          THE COURT:  Any objections?

1          MR. HOCHMAN:  No, for the limited purpose that she

2    relied on it for her analysis, Your Honor.

3          THE COURT:  All right.  Exhibit 8 will be admitted.

4          (Government's Exhibit 8 admitted into evidence.)

5    BY MS. KESSLER:

6    Q     Now, this document is not audited, why did you believe

7    you should rely on this, or the information in this document,

8    for purposes of your computations?

9    A     Well, it does state that an accounting firm prepared it.

10   It was in line with some -- a document that projected . . . a

11   net income that I saw in David Fredrick's work papers.

12   Q     David Fredrick or David Minchenberg's?

13   A     David Minchenberg's.  I'm sorry.

14   Q     Okay.

15   A     And when I saw this document, if you divide the

16   monthly . . . divide the yearly by monthly, it's roughly

17   175,000, but if I -- and it was more conservative than the

18   monthly figure that I could have used with the period ended

19   April 30th, 2004.  So this was easier and more conservative, so

20   I used it.

21   Q     Now, were there figures in this document that you used

22   to determine the net income for Saba, for the calendar year

23   January through December, 2003?

24   A     On Page 1, total income is $7,924,388.  Total expenses

25   were -- on Page 4, on the bottom right-hand corner, there was

1    total expenses of $5,860,452.  But then if you turn to the next

2    page, there's some ordinary income -- interest income added in.

3    The net income figure on Page 5 is $2,101,003.

4    Q      And did you -- looking at Government's Exhibit 5 --

5    excuse me -- 7, did you incorporate that figure in determining

6    the net income for Saba?

7    A      Yes.

8    Q      Did you treat that as the net income for Saba School

9    Saba for the calendar year 2003?

10   A      Yes.

11   Q      And then if we refer back to Government's Exhibits 1

12   and 2, did you incorporate half of that into the tax due and

13   owing computations for each of Patricia Hough and David

14   Fredrick?

15   A      Yes, I did.

16   Q      Looking specifically at Government's Exhibit 1, what was

17   the amount of net income from Saba that you included for

18   Patricia Hough in the year 2003?

19   A      $1,050,501.

20   Q      Did you incorporate that same amount into the tax

21   computations for David Fredrick, Government's Exhibit 2?

22   A      Yes.

23   Q      Moving, then, to the calendar year 2004, if you could

24   turn to what's marked as Government's Exhibit -- Trial Exhibit,

25   excuse me, 8C, like "cat," what is this document?

1   A       This is an audited financial statement for Saba School

2   of Medicine, for the fiscal year ended April 30th, 2004.

3   Q       And did you use this for purposes of computing net

4   income of Saba for the calendar year 2004?

5   A       Yes.

6   Q       Looking at the fifth page of this document, which I

7   believe has a Bates number at the bottom-right of NPNS4308,

8   were the figures set forth here relevant to your computation?

9   A       Yes.

10  Q       What figures were important?

11  A       The total revenue of $7,972,514, minus the total

12  expenses of $5,789,977, the total -- the net profit for that

13  period is $2,182,537.

14  Q       Now, if we turn back to Government's Exhibit 7, your

15  work papers for Saba, did you do a computation to determine a

16  per-month net income figure for fiscal year ended April 30th,

17  2004?

18  A       Yes.

19  Q       And what was that amount?

20  A       The per-month?

21  Q       Yes.

22  A       Is $181,878.

23  Q       And how many months did you apply that to, for the

24  calendar year 2004?

25  A       Four months.

1  Q      If we could move, then, though Government's Exhibit 8 --

2  Trial Exhibit 8Q, like "queen," what is this document?

3  A      This is the audited financial statement for Saba, for

4  the fiscal year ended April 30th, 2005.

5  Q      And if we turn to the fifth page of this document, which

6  I believe has the Bates number at the bottom-right of MPNS2554,

7  were figures on this page important to you in your

8  computations?

9  A      Yes.

10 Q      Which figures were those?

11 A      Total revenue of $9,321,445, total expenses of

12 $6,139,541.  The net profit for that period is $3,181,904.

13        MR. HOCHMAN:  Objection, Your Honor.  To the extent

14 that she's actually reading from the document, the document

15 doesn't say "net profit" anywhere on it.  It says, "change in

16 net assets."  So I don't know if she's actually reading from

17 the document, or claiming to be reading from the document, or

18 just giving her impressions of the document.

19        THE COURT:  It is my impression she was reading from

20 the document, but why don't you clarify that.

21        MS. KESSLER:  Okay.

22 BY MS. KESSLER:

23 Q      Special Agent -- or excuse me -- Revenue Agent Maurer,

24 did you determine the net income for this fiscal-year period

25 based on the figures set forth in the fifth page of Trial

1    Exhibit 8Q?

2    A       Yes.

3    Q       Did you do that by subtracting -- excuse me -- taking

4    the total revenue figure reflected on this page, 5, of

5    $9,321,445, and subtracting from that the total costs and

6    expenses, also reflected on this document, of $6,139,541?

7    A       Yes.

8    Q       And what was the difference?

9    A       $3,181,904.

10   Q       Now, on this page it indicates that that is a change in

11   net assets.  Based on the -- what you see here, as well as

12   other documentation you reviewed since trial, do you believe

13   that that is a net income figure?

14   A       Yes.

15   Q       Then, if we turn back to Government's Exhibit 7, did you

16   again determine a per-month net income figure by dividing this

17   figure by 12?

18   A       Yes.

19   Q       And how many months in the year 2004 did you apply that

20   to?

21   A       Eight months.

22   Q       What did you determine the total net income of Saba to

23   be for the calendar year 2004?

24   A       2,848,707 -- $2,848,776.

25   Q       And that's set forth approximately halfway down on the

1    first page of Government's Exhibit 7?

2    A      Yes.

3    Q      Did you then attribute half of that amount to each of

4    Patricia Hough and David Fredrick in their tax -- the tax due

5    and owing computations you prepared?

6    A      Yes.

7    Q      What is that amount, and is it reflected on Page 1 of

8    Government's Exhibit 1?

9    A      Yes.

10   Q      What is the amount?

11   A      $1,424,388.

12   Q      And did you incorporate the same amount into the tax due

13   and owing computations for David Fredrick . . . Government's

14   Exhibit 2?

15   A      Yes.

16   Q      Did you also determine a net income figure for Saba, for

17   the calendar year 2005?

18   A      Yes.

19   Q      Did you use the per-month net income figure you computed

20   based on the financial statements, Trial Exhibit 8Q, for a

21   portion of the calendar year 2005?

22   A      Yes.

23   Q      And is that because the financial statement applied to a

24   fiscal year ending on April 30th of 2005?

25   A      Yes.

1   Q       Did you also -- turning to Government's Exhibit 9N, like

2   "Nancy," from trial, that's Trial Exhibit 9N, what is this

3   document?

4   A       This is the audited financial statement for Saba, for

5   the period ended April 30th, 2006.

6   Q       Now, if we turn to the fifth page of this document,

7   which has a Bates number on the bottom right-hand corner of

8   VNJ-000363, did you use figures in this document to determine a

9   net income figure for Saba for the fiscal year ended

10  April 30th, 2006?

11  A       Yes.

12  Q       How did you do that?

13  A       Total revenue is $11,911,756, total expenses are

14  $7,000,272 -- sorry -- $7,272,201, and the difference is the

15  net profit of $4,639,555.

16          MR. HOCHMAN:  Your Honor, once again, the document

17  doesn't say "net profit," it says, "increase in unrestricted

18  net assets before loss on property foreclosure."

19          THE COURT:  Okay.

20  BY MS. KESSLER:

21  Q       And in your opinion, that is a net income figure.

22  A       Well, when I looked at David Minchenberg's records,

23  he . . . like I said, these were not the profit and loss

24  statements I was used to.  But in his records, I could tell he

25  was marking what was net income.  He was . . . .

1          MR. HOCHMAN:  Your Honor, I'll object.  To the extent

2     she's referencing some David Minchenberg records, I don't know

3     if she's actually referencing Exhibit 9N, that she's talking

4     about, or some other records; and if she's referencing some

5     other records, I'd ask her to actually identify the records

6     she's referencing.

7          THE COURT:  She can do that.

8          (Ms. Finley and Ms. Kessler confer privately.)

9          MS. KESSLER:  May I approach the witness, Your Honor?

10         THE COURT:  You may.

11         MS. KESSLER:  Handing the witness what I've marked as

12    Government's Exhibit 14 . . . .

13         May I handwrite on there, Your Honor?

14         THE COURT:  Sure.

15    BY MS. KESSLER:

16    Q     Revenue Agent Maurer, do you recognize this document?

17    A     Yes.

18    Q     Is this a document you found amongst the materials you

19    reviewed after trial from David Minchenberg?

20    A     Yes.

21    Q     And does this document include the handwriting, such as

22    you were referencing a few moments ago, where Mr. Minchenberg

23    is working through revenue, less costs and expenses, and

24    hand-noting that that net figure is net income?

25         MR. HOCHMAN:  Objection, Your Honor.  There is no

1    foundation that this witness knows whose actual writing is on

2    this document, whether it is Mr. Minchenberg's, or anybody

3    else's for that matter.

4            THE COURT:  Presumably it's somebody else's if there

5    is handwriting.

6            MR. HOCHMAN:  I believe she's saying that this is

7    Mr. Minchenberg, and he's making a conclusion about this

8    document.  Unless she has the foundation to say that she

9    recognizes Mr. Minchenberg's handwriting, she's spoken to

10   Mr. Minchenberg and confirmed that it is his handwriting, it

11   could be anybody's handwriting.

12           THE COURT:  That objection is overruled.  She can say

13   what she thinks it is, and you can cross.

14           MR. HOCHMAN:  Thank you, Your Honor.

15   BY MS. KESSLER:

16   Q    Based on your review of documents that you understood to

17   have been received from David Minchenberg, do you believe the

18   handwriting on this document to be his?

19   A    Yes.

20   Q    And is this the handwriting, or the notation --

21           MR. HOCHMAN:  Objection, Your Honor.  I'm sorry, Your

22   Honor, my objection is late.  Foundation as to her belief on

23   why she believes this is Mr. Minchenberg's handwriting.

24           THE COURT:  The objection is overruled.

25

1   BY MS. KESSLER:

2   Q       Is the handwriting on this document, indicating net

3   income, the notation that you were referring to a few moments

4   ago, which led you to the belief that revenue, less costs and

5   expenses, in the audited financial statements would constitute

6   net income?

7   A       Correctly -- correct.  It's called -- oh.

8   Q       Go ahead.

9   A       It's called "statement activities," but whatever it's

10  called, the revenue minus the expenses is the net income.

11          MS. KESSLER:  The Government would move Exhibit 14

12  into evidence, Your Honor.

13          THE COURT:  Any objection to 14?

14          MR. HOCHMAN:  Yes, Your Honor.  Objection as to the

15  handwriting on it.  There is improper foundation as to whose

16  handwriting that is, as laid out by the witness.

17          THE COURT:  All right.  The objection is overruled,

18  Exhibit 14 is admitted.

19          (Government's Exhibit 14 admitted into evidence.)

20          MS. KESSLER:  The Court's indulgence, I want to make

21  sure -- I think I lost track of what year we were in.  I

22  believe we were talking about the calendar year 2005.

23  BY MS. KESSLER:

24  Q       Looking back again at Government's Exhibit 9N, Page 5 of

25  that document, Bates Number VNJ000363, did you take total

1    revenue as reflected in this document, less total expenses, to

2    determine what you believe to be a net income figure for this

3    fiscal year?

4    A      Yes.

5    Q      And was that $4,639,555?

6    A      Yes.

7    Q      Then looking back at Government's Exhibit 5, did you

8    determine a per-month net income figure for Saba based on that

9    number?

10   A      Yes.

11          MS. KESSLER:  Government's Exhibit 7.  I apologize,

12   Your Honor.

13   BY MS. KESSLER:

14   Q      Did you then use this per-month net income figure to

15   determine a net income for the calendar year 2005?

16   A      Yes.

17   Q      What did you determine the calendar-year net income of

18   Saba to be, for the calendar year 2005, looking approximately

19   halfway down Government's Exhibit 7?

20   A      $4,153,664.

21   Q      And did you attribute half of that to each of David

22   Fredrick and Patricia Hough, in your tax due and owing

23   computations?

24   A      Yes.

25   Q      Looking at Government's Exhibit 1, what is the net

1   income from Saba, for the year 2005, that you used in those tax

2   due and owing computations?

3   A      $2,076,832.

4   Q      And did you incorporate the same amount into the tax due

5   and owing computations for David Fredrick, Government's

6   Exhibit 2?

7   A      Yes, I did.

8   Q      Now, did you use the per-month net income figure from

9   Government's Exhibit 9N, the financial statement for the fiscal

10  year ended April 30th, 2006, did you apply that to the first

11  four months of 2006?

12         Actually, I withdraw that question.

13         Did you apply that to all 12 months of 2006?

14  A      Yes.

15  Q      Why did you use that per-month profit figure for all of

16  the calendar year 2006, instead of just the first four months?

17  A      I had no audited financial statements past April 30th,

18  2006, and I had no documents from David Minchenberg for the

19  period after April 3rd -- April 30th, 2006.

20  Q      Based on your computation of the net income starting

21  from 2003, and leading up to April 30, 2006, did you observe

22  the net income of Saba to be continually increasing?

23  A      Yes.

24  Q      And by incorporating, or using the per-month figure for

25  the fiscal year ended April 30th, 2006, for all of the calendar

1    year 2006, did you treat the net income as remaining the same

2    instead of increasing?

3    A      Yes, I did.

4    Q      What did you determine, looking at Government's

5    Exhibit 7, to be the net income of Saba for the year 2006?

6    A      $4,639,555.

7    Q      Turning back again to Government's Exhibits 1 and 2, did

8    you incorporate half of that figure into the tax due and owing

9    computations for each of Patricia Hough and David Fredrick?

10   A      Yes.

11   Q      And is that reflected on Page 3 of Government's

12   Exhibit 1?

13   A      Yes.

14   Q      What is the amount of net income from Saba included in

15   Patricia Hough's tax due and owing computation, Government's

16   Exhibit 1, for 2006?

17   A      $2,319,777.

18   Q      Looking at Government's Exhibit 2, the third page of

19   this document, did you incorporate that same amount of net

20   income from Saba, for the year 2005, into the tax due and owing

21   computations for David Fredrick?

22   A      Yes.

23   Q      Now, did you also use the per-month net income figure

24   for Saba, again based on the fiscal year ended April 30th,

25   2006, to determine net income for Saba for 2007?

1    A       Yes.

2    Q       Did you do this -- do that in this manner for the same

3    reasons that we discussed for the latter half of 2006?

4    A       Yes.

5    Q       And did this again assume that the net income for Saba

6    remained the same?

7    A       Yes.

8    Q       How many months in 2007 did you apply that net income

9    figure to?

10   A       Three.

11   Q       Why did you only apply it to three months?

12   A       The school was sold in approximately April of 2007.

13   Q       So you applied it to the first three months of the year?

14   A       Yes.

15   Q       What did you determine -- looking at Government's

16   Exhibit 7, near the bottom -- to be the net income of Saba for

17   the first three months of 2007?

18   A       $1,159,887.

19   Q       And if we look again at Government's Exhibit 1, the

20   third page of this document, did you incorporate half of that

21   amount into the tax due and owing computations for Patricia

22   Hough?

23   A       Yes.

24   Q       What is the net income from Saba that you incorporated

25   for the first three months of 2007?

47

1    A        $579,943.

2    Q        And did you incorporate that same amount into the tax

3    due and owing computations for David Fredrick, looking

4    specifically at Government's Exhibit 2, Page 3?

5    A        Yes.

6             MS. KESSLER:  Your Honor, I just wanted to confirm, I

7    believe I moved into evidence Government's Exhibits 7 and 8?

8             THE COURT:  You have.

9             MS. KESSLER:  Thank you.

10   BY MS. KESSLER:

11   Q        If we could turn now to Government's Exhibit 9, do you

12   recognize this document?

13   A        This is my work paper for the computation of the gain on

14   the sale of the medical schools.

15   Q        As part of your tax computations for trial, did you

16   compute a gain or loss on the sale of the medical schools?

17   A        Yes, I did.

18   Q        Did you revise that computation after trial . . . for

19   purposes of sentencing?

20   A        Yes.

21   Q        And is Government's Exhibit 9 your work papers in doing

22   so?

23   A        Yes.

24   Q        Did you prepare this document?

25   A        Yes.

1          MS. KESSLER:  The Government would move Exhibit 9

2   into evidence.

3          THE COURT:  Any objection?

4          MR. HOCHMAN:  No objection, Your Honor.

5          THE COURT:  Exhibit 9 will be admitted.

6          (Government's Exhibit 9 admitted into evidence.)

7   BY MS. KESSLER:

8   Q     In what way did you change the computations on the gain

9   of this -- or make revisions to the computation of the gain on

10  the sale of the medical schools after trial and in preparation

11  for sentencing?

12  A     The first item, under date 02/9/1999, the purchase

13  price, this is the purchase price for the land.  I used 17,000

14  for the computation at trial.  It was pointed out that that was

15  incorrect, that was a document stating that 17,000 was

16  something paid for the right of superficies, and it was -- I

17  was given a document that shows the correct purchase price for

18  the land to be $250,000.

19  Q     Is this the Round Hill property that we're referring to?

20  A     Yes.

21  Q     What is the result of this change in terms of the

22  overall basis?

23  A     The basis is increased.

24  Q     And what is the effect on the gain of -- if any, on the

25  sale of Round Hill?

1   A      The gain is less.

2   Q      Now, turning to Page 2 of this document, Government's

3   Exhibit 9, based on this revision, what did you determine the

4   gain on the sale of the medical schools to be?

5   A      $31,536,374.

6   Q      Is this more or less gain than you computed at trial?

7   A      Less.

8   Q      Did you then -- actually, if we could move then to

9   Government's Exhibit 10, please.

10         Do you recognize that document?

11  A      Yes.

12  Q      What is this?

13  A      This is a work paper that I prepared for the

14  adjustments, to make sure my adjustments corresponded with the

15  Revenue Agent's Report, which is also the Income Tax

16  Discrepancy Adjustments.

17  Q      Exhibits 1 -- Exhibit 1, excuse me?

18  A      Yes.

19  Q      And these adjustments, referring to Government's

20  Exhibit 10, relate to the computations for Patricia Hough?

21  A      Yes.

22  Q      Did you prepare this document?

23  A      Yes.

24  Q      Turning to Exhibit 11, do you recognize this document?

25  A      This is the same document that I just described, that I

1   prepared for David Fredrick.

2   Q      And you prepared this in preparation for sentencing?

3   A      Yes.

4          MS. KESSLER:  The Government would move Exhibits 10

5   and 11 into evidence.

6          THE COURT:  Any objections?

7          MR. HOCHMAN:  No objection, Your Honor.

8          THE COURT:  Ten and eleven will be admitted.

9          (Government's Exhibits 10 and 11 admitted into

10    evidence.)

11   BY MS. KESSLER:

12   Q      Now, referring back to Exhibit 9, the second page, where

13   you determined the gain on the sale of the medical schools to

14   be $31,536,374, did you incorporate half of that figure into

15   the adjustments for Patricia Hough, referring to Government's

16   Exhibit 10?

17   A      Yes.

18   Q      Can you point out where that is?

19   A      It's under the long-term capital gain.  It's the

20   adjustment for long-term capital gain, $15,768,187.

21   Q      Is that the total long-term gain . . . or is that the --

22   that's the amount -- is that half of $31,536,374?

23   A      Yes.

24   Q      And did you also incorporate that same figure, half,

25   into the adjustments for David Fredrick, Government's

1    Exhibit 11?

2    A      Yes.

3    Q      And were those figures incorporated into your tax due

4    and owing computations, Government's Exhibits 1 and 2, for

5    purposes of sentencing?

6    A      They were incorporated in; yes.

7    Q      Did you bring a calculator?

8    A      Yes.

9    Q      If you could look at Government's Exhibit 1, and tell us

10   the -- actually, what line on Government's Exhibit 1 reflects

11   the tax due and owing for each year?

12   A      Line 16, the one at the bottom, balance due or

13   overpayment.

14   Q      If you total up Line 16, for the years 2003 through

15   2008, what did you determine the tax due and owing to be

16   related to Patricia Hough, the computations for Patricia Hough?

17          (The witness utilizes a calculator.)

18   A      Sorry.  I've got to start over.

19   Q      That's okay.

20          (Once again the witness utilizes a calculator.

21   A      $7,771,972.

22   Q      And if you look at Government's Exhibit 2, under the

23   same computation for the years 2003 through 2008, what do you

24   determine the tax due and owing to be . . . in total . . . for

25   David Fredrick.  Excuse me.

```
1              (The witness once again utilizes a calculator.)
2    A      I'm having trouble again.  I'm sorry.  It won't clear.
3    Q      That's okay.
4              (The witness continues to utilize a calculator.)
5              THE COURT:  Do you need a different calculator; is
6    that the problem?
7              THE WITNESS:  Can I try one more time and let you
8    know?  I think I'll get it this time.  Sorry about that.
9              THE COURT:  Sure.
10             THE WITNESS:  I believe I got it, Your Honor.
11             $7,746,410.
12   BY MS. KESSLER:
13   Q      And the total tax due and owing for both Patricia Hough
14   and David Fredrick, for 2003 through 2008?
15   A      $15,518,382.
16   Q      And does that include any interest or penalties?
17   A      No.
18             MS. KESSLER:  I have no further questions, Your
19   Honor.
20             THE COURT:  Counsel, perhaps you could either tell me
21   or have the witness explain again, either I missed it or I
22   don't understand, the relationship of Exhibits 10 and 11 to the
23   other exhibits that you have identified.
24             MS. KESSLER:  Sure.
25
```

1    BY MS. KESSLER:

2    Q      Revenue Agent Maurer, if we could look at Exhibits 10

3    and 11, can you explain to the Judge what is reflected on this

4    document?

5    A      These are my work papers to reconcile my adjustments to

6    the Revenue Agent's Report.  Specifically, I used these -- I

7    was using these because the computer program I use has to

8    automatically adjust some things.  I guess . . . .  My

9    adjustment for the gain on Round Hill was $15,768,187.  But if

10   you look at 2007, you can't see that number specifically.

11   Q      Are you referring to 2007 in Government's Exhibit 1?

12   A      Yes.  There's a different number reflected on my

13   adjustment report.  That's because the computer program has to

14   consider short-term capital gains and losses, and capital loss

15   carryovers, and long-term capital gains that have already been

16   reported.  I just made sure that when the computer program is

17   finally done doing all its calculations that I can match that

18   number.

19   Q      So, for example, if we look at something more simple,

20   which is the interest in 2003, looking at Government's

21   Exhibit 10, as compared to the taxable interest entry reflected

22   on Government's Exhibit 1, for 2003, per return you have here,

23   reflected on Exhibit 10, $1,075.

24          Is that the amount of interest that was reported on the

25   tax return filed?

1    A      Yes.

2    Q      And, "per exam," what does that mean?

3    A      That means that she should have reported the $1,075 in

4    interest -- excuse me -- Dr. Hough should have reported the

5    $1,075 in interest, which she did, plus she should have

6    reported the additional 507 -- $5,768 in additional interest

7    from foreign accounts.  So her return should have reflected

8    total interest of 6 million -- I'm sorry -- $6,843.

9    Q      And so the adjustment reflected here, of $5,768, for the

10   year 2003, for interest, that carries forward to Government's

11   Exhibit 1, for the calendar year ended December 31st, 2003,

12   taxable interest reflected there, the same number, 5,768; is

13   that correct?

14   A      Yes.

15   Q      And so that adjustment figure, running along that line

16   on Government's Exhibit 10, those figures would carry over to

17   the adjusted amount of taxable interest on Government's

18   Exhibit 1, for each year; is that right?

19   A      Right.

20   Q      And then would the same thing happen for the adjustments

21   listed under dividends in Government's Exhibit 10?

22   A      Yes.

23   Q      And for total adjustments to income under -- after you

24   have totaled short-term and long-term capital gains?

25   A      Right.

1          MS. KESSLER:  Does that help, Your Honor?

2          THE COURT:  That does.

3          I do have one other area I would like you to have her

4     explain, if you would.

5          MS. KESSLER:  Yes.

6          THE COURT:  Looking at Exhibit Number 1, the

7     reference to itemized deductions and exemptions is a positive

8     number.

9     BY MS. KESSLER:

10    Q     Can you explain?

11    A     Itemized deductions?  I gave her the expenses in

12    itemized deductions.  I allowed her expenses for the production

13    of revenue, the expenses that were on the UBS account

14    statements.  I had allowed her this itemized deductions, the

15    negative numbers, that's the -- me giving her additional credit

16    for expenses that she incurred to earn that income in the UBS

17    accounts.

18          The exemption amount . . . .

19          MR. HOCHMAN:  Your Honor, I believe that the chart is

20    reading these as additions to income, not subtractions.  So she

21    just said she gave her credit for expenses, but they are not

22    negative numbers, they are positive numbers.

23          THE COURT:  Well, that's not true across the board.

24    That is true for 2003, where I was looking; but it's not true

25    for 2006 . . . and perhaps 2007, if I line up the chart right.

1           MR. HOCHMAN:  It's actually the -- the only time

2  there's a negative is in 2008, Your Honor.  For 2006, it

3  doesn't report anything for itemized deductions.  And you've

4  got positives showing up for '03, '04, '05, and '07.

5           THE WITNESS:  He's right.  I wasn't lining up my

6  lines right.  I'm sorry.  The $28,181,000, she -- I am allowing

7  her additional itemized deductions.  I think that's right.

8           THE COURT:  Well, I guess my question is, if that's a

9  positive number, how are you allowing her additional

10  deductions?

11           It seems like you're taking away deductions that were

12  claimed, or something like that, except in 2006.

13           THE WITNESS:  Okay.  On my sheet for Government's

14  Exhibit 10 . . . .  2003 . . . .  Yes, I am taking them away,

15  because there's an over -- she claimed total Schedule A

16  expenses of $36,829.  But there's an overall limitation on

17  itemized deductions, and with the increase in income, the

18  limitation is $29,463.  So her allowable Schedule A deductions

19  are $7,366, because of the larger limitation.  So the

20  Schedule A, per exam, allowable Schedule A per exam . . . I

21  can't . . . .  I'm having trouble.  It's due to the overall

22  allowable limitation for Schedule A, because I -- I increased

23  the AGI.

24  BY MS. KESSLER:

25  Q       Because there is an increase in income, is there a

1   decrease in amount of deductions that are --

2   A       -- that are allowable for Schedule A.

3   Q       And is that the reason that there's a positive number

4   under itemized deductions, because fewer deductions are allowed

5   than were taken?

6   A       Yes.   On Exhibit 1 -- one, two, three, four, five, six,

7   seven -- the eighth page, the eighth page in, this is the

8   computer determining Schedule A, itemized deductions.   I put

9   in -- okay.   If you look for miscellaneous deductions subject

10  to the AGI limit, she had zero per return.   I gave her an

11  additional $7,952 in Schedule A miscellaneous deductions.   On

12  the return that she filed, the two percent limitation based on

13  her income --

14          MR. HOCHMAN:   I'm sorry, Your Honor, I'm trying to

15  find which page we're on.

16  BY MS. KESSLER:

17  Q       Which document are you looking at?

18  A       Government's Exhibit 1.

19  Q       Page 8?

20  A       It's not numbered.   It's -- one, two, three, four, five,

21  six, seven -- eight.

22  Q       And at the top it says, "2003 Schedule A Itemized

23  Deductions"?

24  A       Yes.

25  Q       Okay.   I'm sorry.   Now I'm on the same page.

1          Can you walk through that again?

2    A       The per-return figures in the first column, Line 11,

3    miscellaneous deductions subject to AGI limit, she reported

4    zero.  Per exam, I gave her additional Schedule A miscellaneous

5    deductions of $7,952, due to her expenses on . . . to produce

6    the income on UBS.  Per return, her adjusted gross income

7    limitation of 2 percent was $2,249; but, due to the increase in

8    adjusted gross income from the income from MUA, Saba, and

9    dividends, and interest, that limitation was $35,119.  Since

10   that limitation is more than the amount she's allowed, she gets

11   miscellaneous deductions of zero.

12          Then, total, down at the bottom, the itemized

13   worksheet –– deductions worksheet, per exam, this computation

14   is generated by the computer to compute the overall limitations

15   on itemized deductions.  It's the . . . the total of the 3, 4,

16   8, 9, 10, 11, and 14 . . . .

17   Q       So is she, according to your computations, only allowed

18   itemized deductions of $7,366?

19   A       Yes.  So the total per her return, if you go back up to

20   the top, is 35,547 that she claimed.  Due to the AGI

21   limitations, per exam, she's allowed $7,366.  So an adjustment

22   to taxable income for itemized deductions is not in her favor.

23   It is $28,181.

24   Q       Because more itemized deductions were taken than she was

25   eligible to take.

1   A      Based on overall limitation.

2              MS. KESSLER:  Does that answer Your Honor's question?

3              THE COURT:  Thank you.

4              Mr. Hochman?

5              MR. HOCHMAN:  Yes, Your Honor.

6              May I please have a moment to set up, Your Honor?

7              THE COURT:  Sure.

8              MR. HOCHMAN:  Thank you.

9                        CROSS EXAMINATION

10  BY MR. HOCHMAN:

11  Q      Good morning, Agent Maurer.

12  A      Good morning.

13  Q      Could you explain to the Court the difference between

14  criminal tax loss and civil tax loss?

15  A      No.

16  Q      No, you don't know the difference; is that what you're

17  saying?

18  A      I don't know . . . the difference.

19  Q      Well, you're here testifying as an expert at a criminal

20  sentencing where the issue of criminal tax loss is at issue.

21         You realize that; correct?

22  A      Yes.

23  Q      But you don't know the difference between criminal and

24  civil tax loss; correct?

25  A      I know that I determined the tax loss based on the

1   evidence and testimony at trial.

2   Q      Well, do you know the difference between a criminal tax

3   case and a civil tax case?

4   A      Yes, I do.

5   Q      What's the difference between the criminal tax case and

6   a civil tax case?

7   A      A criminal tax case is when I'm the cooperating agent

8   for a special agent.

9   Q      But the point of a criminal tax case is that they're

10  trying to show that a taxpayer intentionally violated a known

11  legal duty of the tax law; correct?

12  A      Correct.

13  Q      And with a civil tax case, you don't have to show the

14  mindset.  In other words, if the taxpayer accidentally,

15  mistakenly, or didn't even know that they had a particular bank

16  account, for example, but that bank account nevertheless earned

17  income, for civil tax purposes, the taxpayer would be

18  responsible for the income earned on that bank account;

19  correct?

20  A      I would agree with that.

21  Q      But for criminal tax purposes, if the taxpayer didn't

22  intentionally violate a known legal duty -- in other words, if

23  they didn't know that the particular account earned any

24  income -- then, for criminal tax purposes, that, whatever

25  income was earned on that particular account would be zero;

1    isn't that correct?

2    A       I understand what you're saying.  But as a cooperating

3    agent, I wouldn't be the one determining if the person violated

4    the known taxable duty.  I would be computing the numbers.

5    Q       I understand that.  But the principle -- you understand

6    the principle I'm saying, that, for a criminal tax case, it is

7    an intentional violation of a known legal duty, so that you

8    have to show that someone knowingly failed to report certain

9    income; isn't that correct?

10   A       I believe that's correct.

11   Q       And if -- in fact, if you don't show that they -- if

12   they didn't know, for instance, that income was earned on a

13   particular bank account, they couldn't have knowingly

14   underreported that income, correct, that just follows.

15   A       Okay.

16           THE COURT:  Why are you talking to you her about

17   that?  You need to be talking to me about that, if that's

18   issues of law that you want the Court to find.

19           MR. HOCHMAN:  To the extent, Your Honor, that she's

20   here, representing criminal tax calculations, my questions are

21   all going to focus on the criminal tax calculations versus any

22   civil tax calculations.

23           THE COURT:  You need to focus on the calculations.

24   You can quiz her as to the law.  I don't care what her answers

25   are.  You need to convince me that there is a difference

1    between criminal tax loss and civil tax loss.  And if you don't

2    convince me, then you're out of luck.  So you can argue with

3    her all you want, you can try to beat her up if you want, it's

4    just not going to matter.  You're wasting time.

5            MR. HOCHMAN:  Your Honor, she's here as an expert,

6    and to the extent that she has expertise that she's --

7            THE COURT:  She's here to calculate tax loss.  She's

8    not here to argue what the law is.  If you want to take the

9    rest of the day to do that, I suppose I'm going to let you, but

10   I'm not sure you will do anyone well by taking that tactic.

11           MR. HOCHMAN:  I'm not here to take that tactic with

12   her, other than to see if what she's ultimately calculated,

13   Your Honor, are criminal tax-loss figures or civil tax-loss

14   figures.  I think that's fair questioning, if I may submit to

15   the Court.

16           THE COURT:  Well, we'll see where you go.  Keep in

17   mind, this isn't a trial.  Your client has been convicted.

18           MR. HOCHMAN:  I understand, Your Honor.  But what she

19   was convicted of, Your Honor, was the 7206(1) count, which is a

20   false subscription count.  There was no criminal tax

21   determination that the jury made, and the Government didn't

22   charge tax evasion, which is 7201, where the jury would have

23   had to make a tax determination.  That's why it's important

24   that, when she's talking about -- to figure out if she's

25   talking about criminal tax numbers or civil tax numbers.

```
 1              THE COURT:  You need to keep in mind, this is a
 2     sentencing hearing and not a filibuster.
 3              MR. HOCHMAN:  I completely understand, Your Honor.
 4              THE COURT:  Go ahead.
 5     BY MR. HOCHMAN:
 6     Q      And, Ms. Maurer, I just want to make sure, with respect
 7     to your background, that -- you testified the week of
 8     October 16, 2013.
 9              Do you recall that?
10     A      Yes.
11     Q      When you testified, I'll just summarize it very quickly,
12     you testified that you were not a CPA; you had not prepared tax
13     returns beyond your tax return and your family's tax return;
14     you had no expertise in international tax law or tax law
15     generally; this was the first time that you were testifying as
16     an expert; that you had no particular background in business
17     valuations; that you had no expertise in any type of nonprofit
18     law as it pertained to the Island of Saba; you had no knowledge
19     of Swiss banking law, Nevis law, or Liechtensteinian law.
20              Is that accurate?
21     A      I don't remember exactly what questions you asked that I
22     responded no to, but . . . I don't have expertise in all of
23     those things you said, except the one -- you said international
24     tax law and general tax law?  I don't believe I'm an expert,
25     but I do know general tax law.
```

1    Q       Okay.

2    A       Okay?

3    Q       And I was just focusing on expert-level knowledge.

4            You don't have expert-level knowledge on any of those

5    things; correct?

6    A       I have -- I was . . . .  I was a summary calculation

7    witness.  I'm not a -- I wouldn't say I was an expert in tax

8    law.

9    Q       Okay.  And the reason I'm asking you this question is,

10   since you've testified, have you developed any expertise in any

11   of the things I just talked about?

12   A       No.

13   Q       And also, you're not an accountant; is that correct?

14   A       Correct.

15   Q       Now, I think we've talked about, before, that, at trial,

16   that you presented a report, six days into trial, on

17   October 14, 2013, which was the Revenue Agent Report that you

18   presented at trial.

19           Do you recall that?

20   A       Yes.

21   Q       And that you had actually had a first report, back on

22   May 14th, 2013, about 4 months before that; do you recall that?

23   A       Yes.

24   Q       And that first report was the day right before the

25   indictment in this case; isn't that correct?

1  A       I believe it was -- it was before the indictment.  It

2  possibly was the day before indictment.  I'm not sure.

3  Q       And that May 14th report was approximately four years

4  after you began working on this case; correct?

5  A       Correct.

6  Q       Now, you have now presented a third report, a third

7  Revenue Agent's Report, and that is Exhibit 1 and 2, in

8  connection with the this sentencing hearing.

9          Do you see those?

10 A       Yes.

11 Q       And those third -- now, let me ask you, with respect to

12 this third report, Exhibits 1 and 2, are you 100 percent

13 certain that the numbers reflected in this now third report are

14 100 percent accurate?

15 A       Based on the testimony and the trial exhibits, and the

16 information I have available, I -- this document is correct.

17 Q       100 percent correct.

18 A       I wouldn't say 100 percent, but it is correct.

19 Q       Would you say 49 percent?

20 A       No.  I would say more correct than that.

21 Q       51 percent?

22 A       This document is correct based on the information I have

23 available.

24 Q       But I'm trying to understand, when you say the word,

25 "correct," your level of confidence and certainty in your

1    findings, are you 100 percent certain that what you found is

2    accurate, or is there something less than that?

3            MS. KESSLER:  Objection, asked and answer, Your

4    Honor.

5            THE COURT:  Overruled.

6            THE WITNESS:  Based on the information I have

7    available, and the things I stated before, testimony and

8    evidence, I'll say that it's 100 percent accurate based on what

9    I know at this time.

10   BY MR. HOCHMAN:

11   Q    Okay.  And with respect to these various reports --

12           MR. HOCHMAN:  Your Honor, I'd like to -- whatever the

13   next -- I think 15 is the next in order.  I would like to mark

14   this as Exhibit 15, Your Honor?

15           MS. FINLEY:  Your Honor, the Government would ask

16   that he use letters so we can distinguish between the

17   government's exhibits and the defense exhibits.

18           THE COURT:  That's fine.

19           MR. HOCHMAN:  Okay.  Then Defense Exhibit A, Your

20   Honor?

21           MS. FINLEY:  Your Honor, the Government has not been

22   provided with any of these exhibits.  If we could get -- prior

23   to right just now.

24           MR. HOCHMAN:  May I approach the witness, Your Honor?

25           THE COURT:  You may.

1              And since this is not your witness,

2    Miss Finley . . . .

3              MS. FINLEY:  I'm sorry, Your Honor.  I apologize.

4    BY MR. HOCHMAN:

5    Q     Agent Maurer, Defense Exhibit A contains a number of

6    calculations that are based on your May 14, 2013, Revenue

7    Agent's Report; your October 14, 2013 Revenue Agent's Report;

8    and now your most recent, January 28th, 2014, Revenue Agent's

9    Report.

10             Do you see that?

11   A     Yes.

12   Q     And the calculations contained here, if I might go over

13   them with you and see if you are in agreement with the

14   calculations that have been done.

15             You computed originally, and I'll just focus on the

16   total income lines -- excuse me -- the total lines, the total

17   line for the May 14, 2013, report -- and when I say, "total

18   income," I mean both for Dr. Hough and Dr. Fredrick -- was

19   $48,334,511.

20             Do you see that?

21   A     Yes.

22   Q     And then the tax that you calculated based on that

23   income --

24             MR. HOCHMAN:  And by the way, Your Honor, I'm

25   focusing on 2005 to 2008, just to make it clear for each of the

1    reports that we're dealing with apples and apples.

2    BY MR. HOCHMAN:

3    Q      So you've calculated $10,552,728 of tax in your May 14,

4    2013 report; do you see that?

5    A      Yes.

6    Q      And you see, in the October 14th report, your numbers

7    went drastically down.

8           You would consider an $11 million change a drastic

9    change, would you not, to the report?

10   A      I made a change to the report.

11   Q      Would you consider $11 million to be a very significant

12   change?

13   A      It's a significant change.

14   Q      And you also reduced the tax by over $4 million in the

15   October 14, 2013, report; do you see that?

16   A      Yes.

17   Q      Now, for the January 28th report, you've gone the other

18   direction.  You've increased the total income -- and again,

19   just for 2005 to 2008 -- by over $15 million, almost

20   $16 million; do you see that?

21   A      Yes.

22   Q      You've increased the tax -- again, just for 2005 to

23   2008 -- over $6 million; do you see that?

24   A      Yes.

25           MR. HOCHMAN:  Your Honor, I'd move Defense Exhibit A

1    into evidence.

2              THE COURT:  Any objections?

3              MS. KESSLER:  No.  Thank you, Your Honor.

4              THE COURT:  Defendant's Exhibit A will be admitted.

5              (Defendant's Exhibit A admitted into evidence.)

6    BY MR. HOCHMAN:

7    Q     Now, the basis for the swing in these most recent

8    reports is contained in Exhibits 1 and 2; correct?

9    A     The basis for the change between October 14th and

10   January 28th are contained in Exhibits 1 and 2.

11   Q     Okay.  And so -- and it seems like what's brand new in

12   Exhibits 1 and 2, that was not in October 14, 2013, is the

13   Schedule C net income for Saba, and the Schedule C net income

14   for MUA; do you see that?

15   A     Yes.

16   Q     Now, Schedule C, I believe you testified at the first

17   trial, is usually for self-employment income; isn't that

18   correct?

19   A     Schedule C is usually for self-employment income; yes.

20   Q     So, in essence, you're saying that the income -- the net

21   income from Saba and MUA, for Dr. Hough and Dr. Fredrick, is

22   self-employment income; is that correct?

23   A     Yes.

24   Q     Now, Saba is an operating company.  I believe you

25   testified to that in the original trial; correct?

1    A       Saba is an operating medical school.

2    Q       And by "operating medical school," it means it's not

3    a -- we used the word in trial -- a domiciliary company;

4    correct?

5    A       I don't remember all those terms Dr. Futterknecht used.

6    I can't . . . .  I don't remember.  I don't remember all these

7    terms.

8    Q       But as an operating company, or generally, as you --

9    based on your understanding of tax law, when an operating

10   company makes money and doesn't distribute that money to the

11   shareholders of the company, the shareholders don't have to

12   record that money as their money; correct?

13   A       That's not a true statement.

14   Q       If it's a real company, a real operating company -- you

15   know, let's say IBM.

16           IBM has a lot of shareholders; correct?

17   A       Yes.

18   Q       And if IBM earns a billion dollars this year, but

19   doesn't distribute any of the money to its shareholders, then

20   the shareholders don't have to report that billion dollars;

21   correct?

22   A       If the shareholders don't get distributions, then they

23   don't have income.

24   Q       Okay.  Shareholders don't get distributions, they don't

25   have income.

1          So in the Saba case, if we assume that Saba is an

2     operating company and doesn't, in a particular year, make

3     distributions to any of its people -- owners, shareholders, or

4     whatnot -- then those owners or shareholders don't have any

5     income to report; correct?

6     A     Well, it would depend on the form of the business that

7     Saba was.  Saba is not a corporation or a partnership or an

8     LLC, so the default is a Schedule C business, and net profits

9     from Schedule Cs are reported on 1040s.

10    Q     But you know, because you were at the trial and heard

11    the testimony and saw the actual documents, that Saba was

12    incorporated in the 1980s as a Netherlands Antilles nonprofit

13    entity.

14          You saw those documents; correct?

15    A     I saw the documents.  But Saba was not a corporation, or

16    S Corp, or a partnership.  Saba was -- those documents were

17    forms that were used to disguise the ownership of Saba for tax

18    purposes.  Saba was Patricia Hough and David Fredrick.

19    Q     Well, again, what you're saying is that it's your

20    opinion that Saba was owned by Patricia Hough and David

21    Fredrick; is that correct?

22    A     Saba was owned by Patricia Hough and David Fredrick.

23    Q     They were shareholders of Saba?

24    A     No, they weren't shareholders, because it was never

25    incorporated.  It is not a corporation.  Saba has no U.S. form.

1   Q      It's a Netherlands Antilles nonprofit, and nobody can

2   own a nonprofit foundation; correct?

3          You heard that testimony.

4   A      I heard that testimony, but that's not the case with

5   Saba.  Saba was owned by Patricia Hough and David Fredrick.

6   Q      And when you say, "owned," again, I'm trying to

7   understand what you mean by "owned."  I mean, generally --

8   A      It was their business.

9   Q      It's a business, it's an operating business, not a shelf

10  company; correct?

11  A      It's an operating business.

12  Q      And did the operating business of Saba have shares that

13  people owned?

14  A      No.

15  Q      No.  It had a board, correct, a board of directors?

16  A      It stated it had a board of directors; yes.

17  Q      And that board of directors controlled The Foundation;

18  correct?

19  A      Patricia Hough and David Fredrick controlled The

20  Foundation in Saba.

21  Q      Are you aware of all the board of director -- did you

22  hear Dr. Dalbec testify, who was the chair of the board of

23  directors of Saba?

24  A      I heard him testify.

25  Q      You've seen board meeting minutes reflecting the minutes

1   of the Saba board's meetings; correct?

2   A       Correct.

3   Q       You saw the sale documents that were signed by the Saba

4   board of directors, you saw those too; correct?

5   A       I saw those documents.

6   Q       So the difference, of course, between a -- and we'll

7   compare Saba, let's say, against a domiciliary or shelf

8   company, if it's an operating company like IBM, even if it has

9   owners or shareholders, if the company makes money and doesn't

10  distribute the money to the individuals, then it's not their

11  income; correct?

12  A       I don't agree with your example at all.  IBM is a

13  C corporation, an S corporation.  Saba is a business owned by

14  Patricia Hough and David Fredrick.  There are no shareholders.

15  It's their business.

16  Q       You know what?  Let's switch to MUA for a moment.

17          MUA was a for-profit corporation, it was MUA limited;

18  correct?

19  A       MUA is a medical school owned by Patricia Hough and

20  David Fredrick.

21  Q       When it was formed, it was formed in Nevis as a

22  corporation, a limited corporation; isn't that correct?

23          You saw the incorporation documents.

24  A       There are documents that state it's a corporation.  But

25  those documents are documents used to disguise the true

1    ownership of MUA, which is David Fredrick and Patricia Hough.

2    Q      And MUA was an operating company as well; correct?

3    A      Yes.  It was an operating medical school.

4    Q      And as an operating medical school, it was owned by the

5    people who owned shares in it; correct?

6    A      There were shareholder documents but, the truth of the

7    matter was, MUA was owned by David Fredrick and Patricia Hough.

8    Q      And on what do you base that MUA was owned by Patricia

9    David -- excuse me, by David Fredrick -- well, actually, MUA

10   was owned by David Fredrick.  He owned 1,750 shares; isn't that

11   correct?

12          MS. KESSLER:  Objection, Your Honor.  I want to

13   object to the line of questioning because I think it's

14   irrelevant, based on the Court's ruling this morning as to the

15   PSR.  The Court found that the Patricia Hough and David

16   Fredrick were the de facto owners of both entities.

17          THE COURT:  And how does that where he's -- I still

18   think they are the de facto owner, but that doesn't necessarily

19   mean that there was tax income to them on each of the calendar

20   years in question.

21          MS. KESSLER:  Then I think . . . .

22          THE COURT:  There may be, but I don't know that yet,

23   and I'm pretty sure I didn't decide that yet.

24          MS. KESSLER:  Okay.

25          THE COURT:  So the short answer, the objection is

1   overruled.

2   BY MR. HOCHMAN:

3   Q      So David Fredrick owned, for a number of these years,

4   1,750 shares of MUA; correct?

5   A      That's what the . . . the form stated.

6   Q      Well, David Fredrick, in 2007, paid tax when he was paid

7   out on those 1,750 shares and reported it on his return;

8   correct?

9   A      Yes.

10  Q      And at no point, from 2004 on, did Patricia Hough own

11  any shares in her own name; is that correct?

12  A      She didn't have pieces of paper that said she owned

13  shares.

14  Q      Now, with respect to, again, using MUA as a for-profit

15  corporation, if that corporation earned money, we'll call it --

16  what you've called net income, but keeps it, retains those

17  earnings, and doesn't distribute it to the shareholders, then

18  the shareholders don't have any tax the year that the company

19  earned the money; correct?

20  A      If there's a corporation and there's net income and

21  profits, and the money wasn't distributed, there would be no

22  tax.

23  Q      And there's something, usually, in these financial

24  statements called "retained earnings," aren't there?

25  A      Right.  But I don't agree with the form that you're

1    saying MUA is.  The forms were used to disguise --

2    Q      I'm sorry, that wasn't my question.  My question was

3    just the retained earnings.

4           In financial statements they list retained earnings;

5    isn't that right?

6    A      Yes.

7    Q      Because that is the earnings that the company retains

8    and doesn't distribute to its shareholders; correct?

9    A      Correct.

10   Q      So we might go through the MUA statements that you were

11   talking about before.  And we'll start, if we could . . . .

12   Let's start with 2003, if we might, which is Exhibit 6.

13   A      Okay.

14   Q      Now, Exhibit 6 is a document that's not an audited

15   financial statement; do you see that?

16          This is the MUA financial statement, January through

17   December, 2003.

18   A      Yes.

19   Q      And that's not audited; correct?

20   A      It's not audited.

21   Q      Do you know who prepared this?

22   A      No.

23   Q      You say you got this from David Minchenberg's documents?

24   A      Yes.

25   Q      Did you speak to David Minchenberg about this document

1   to find out where he got it?

2   A      No.

3   Q      Did you ask anybody, anybody in the Government, or

4   anybody in this world, about where the origin of this document

5   came from?

6   A      No.

7   Q      And it says it's an audited financial statement, but you

8   have no idea the methodology used to audit the Medical

9   Universities of the Americas that led to this statement;

10  correct?

11  A      Yeah.  I didn't have the letters and other documents

12  that go with an audited financial statement.

13  Q      Yet, despite the fact that you have no idea who did the

14  auditing of this financial statement, you have no idea what the

15  methodology is behind it, and you haven't seen the underlying

16  records that led to this statement, you are including this

17  statement in your analysis; is that correct?

18  A      Yes.

19  Q      Now, the statement says January through December, 2003;

20  correct?

21  A      Correct.

22  Q      That's the whole of 2003; correct?

23  A      Correct.

24  Q      And you said it came up with a negative number that said

25  that the net income of MUA for all of 2003 was a negative

1    $161,575.

2          Do you see that?

3    A      Yes.

4    Q      Yet, when you go get to calculating 2003 for MUA, you

5    actually have a positive number of $606,428, not a negative

6    number.

7          MR. HOCHMAN:  And, Your Honor, I'm referring to

8    Exhibit 1.  If you see 2003 MUA, there's a positive 606,428

9    there for 2003.

10         THE COURT:  I'm with you there.

11         I missed your reference to the negative number; where

12   is that?

13         MR. HOCHMAN:  I'm sorry.  We're going back and forth,

14   Your Honor, between Exhibit 6, which has -- when you add,

15   actually, the total income versus total expenses, you came up

16   with that negative $161,000 number.

17         THE COURT:  Is that written someplace; I'm just

18   missing it?

19         MR. HOCHMAN:  Actually, if you go to Exhibit 5, Your

20   Honor, Miss Maurer has calculated it in the first entry, if you

21   see that.

22         THE COURT:  I do see that, okay, now I'm looking.

23         MR. HOCHMAN:  And that is supposedly an audited

24   financial statement for 2003, yet she does not credit that for

25   all of the 2003, creating a negative number, yet she's creating

1    a positive $606,428 number for 2003, in Exhibit 1 and

2    Exhibit 2, for that year.

3            THE COURT:  I'm with you, but you may want to ask

4    that in terms of a question.

5            MR. HOCHMAN:  I just wanted to make sure --

6            THE COURT:  I'm with you in terms, now, of where you

7    got the figures.

8            MR. HOCHMAN:  Very good, Your Honor.

9    BY MR. HOCHMAN:

10   Q    So the way -- so basically you're crediting this

11   document, which is Exhibit 6, but you're not crediting it,

12   because Exhibit 6 talks about all of 2003 being negative

13   161,000, and yet you have put down a positive for 2003;

14   correct?

15   A    Correct.

16   Q    And the way did you that, my understanding is that you

17   went into the audited financial statement for 2004 --

18           MR. HOCHMAN:  Which is a fiscal-year audited

19   financial statement that starts, Your Honor, in May 1st of

20   2003, and goes to April of 2004.

21   BY MR. HOCHMAN:

22   Q    -- and you then determined, because there is a positive

23   number in that audited financial statement, that you would

24   actually come up with your own calculation as to what was going

25   on in 2003; is that correct?

1   A      My calculation is based on the fact that this is an

2   audited financial statement, and the numbers are more reliable

3   for the eight months for 2003 in this document.  I had no

4   document for the first four months of 2003, so I used this.

5   This was -- this was the only document I had available.

6   Q      Right.  You used this, but you chose to disregard the

7   fact that it actually figured out what the net income was for

8   all of 2003, and it's a negative number.

9   A      Because this statement that concludes eight months is a

10  more reliable document.

11  Q      But now here is the interesting thing about that --

12         MR. HOCHMAN:  And we're talking, Your Honor, about

13  Exhibit 7EE, which is the MUA financial statement that ends

14  April 30th, 2004.

15  BY MR. HOCHMAN:

16  Q      -- in that it talks about the entire year between

17  May 1st, 2003, to April 30, 2004; correct?

18  A      I'm sorry.  I was looking for something that you were

19  referring to.  Okay.  Now ask me.  Now I'm ready.

20  Q      And the thing about 7EE, Miss Maurer, is that we don't

21  know -- that encompasses an entire year's worth of revenue;

22  correct?

23  A      Yes.

24  Q      So you don't know if, basically, what happened is that,

25  for all of 2003, they ran a negative 161,000, and then,

1  starting January 1st, until April 30th of 2004, they ran

2  positive numbers, leading to a bigger 2004 number; correct?

3  A     That would be correct.

4  Q     So again, your analysis here is significantly flawed,

5  isn't it?

6  A     It's the best information I have available.

7  Q     Well, no.  The best information you have available is a

8  statement that goes all the way to the end of 2003, that says

9  there's a negative 161,000; isn't that correct?

10 A     I don't agree that that's the best available

11 information.

12 Q     So, in your opinion, audited financial statements are

13 always the best financial information?

14 A     In this case, I would say that audited financial

15 statements are the best information I have.

16 Q     And they're both audited; correct?

17 A     This one is not -- this one is not signed in by anybody,

18 and it doesn't have the other -- the notes attached to it, or

19 the letter attached to it.

20 Q     So you shouldn't rely at all on this statement; is that

21 correct?

22 A     I used it for the first four months.  It was the only

23 document I had available.  I thought that the numbers I used

24 were conservative numbers.

25 Q     Now, let's go, if we could, to 7EE.

1          On 7EE, the title of 7EE is, "Medical Universities of

2     the Americas"; do you see that?

3     A     Yes.

4     Q     That's not the name of the MUA; isn't that correct?

5          MR. HOCHMAN:  Your Honor, may I use the ELMO at this

6     point?

7          THE COURT:  Sure.

8          MR. HOCHMAN:  Thank you.

9     BY MR. HOCHMAN:

10    Q     So you're relying on 7EE for part of your analysis;

11    correct?

12    A     Yes.

13    Q     And 7EE is entitled, "Financial Statements for the

14    Medical Universities of the Americas"; is that correct?

15    A     Yes.

16    Q     But the actual name of the university is not actually

17    the Medical University of the Americas, it's Medical University

18    of the Americas Limited; isn't that correct?

19    A     That's possible.

20    Q     Well, it's not just possible, if you look at the

21    financial statements for 2005 and 2006, which are Exhibits 8AA

22    and 9B, it's actually listed as Medical University of the

23    Americas.  And I'll show --

24         MR. HOCHMAN:  This is, Your Honor, 8AA.  And it's

25    Medical University of the Americas Limited.  And this is 9B,

1    Your Honor.

2    BY MR. HOCHMAN:

3    Q      Do you see that?

4    A      Yes.

5    Q      Now, who prepared Exhibit 7EE, this 2004 financial

6    statement?

7    A      Jerry Schneider.

8    Q      Jerry Schneider.

9           Do you see any indication on this document that Jerry

10   Jerry Schneider prepared this document?

11   A      This is the financial statement, but there were letters

12   that went along with this that I don't have printed.  There

13   were letters that he certified these documents --

14   Q      Well, again --

15   A      -- as an independent auditor's statement.

16   Q      When Jerry Schneider presented these documents -- and

17   now I'm going the back to Exhibit 8AA, you see, in the bottom

18   right-hand corner, MPNS0143, do you see that?

19   A      I see that.

20   Q      That is a designation for a Jerry Schneider presented

21   document; is that correct?

22   A      Yes.

23   Q      If you look at 8AA, and you go to the third page, you

24   see that there's a letter that says "Schneider & Associates";

25   do you see that?

84

1   A       Yes.

2   Q       Again, on the top you listed it as the Medical

3   University of the Americas Limited.

4   A       Yes.

5   Q       But now turning back to 7EE, it's got the wrong name.

6           And then, throughout the document, all we see are David

7   Minchenberg, DM, notations, no notations that it came from

8   Jerry Schneider's office; is that correct?

9   A       Not on this document.

10  Q       Now, if you turn to -- you said that, with respect to

11  Exhibit -- the 2004 document, 7E, you went ahead and -- make

12  sure I get the -- you went ahead and determined that the one --

13  that the -- excuse me -- that the revenue -- that the total

14  revenue was 4,489,714; that the costs and expenses were

15  2,589,640; and it says, "change in net assets," $1,900,074;

16  correct?

17  A       Correct.

18  Q       Now, change in net assets, that's not saying it's net

19  income; correct?

20  A       Not on this document.

21  Q       Now, with respect to this document, do you have any

22  David Minchenberg notations that he said that that was net

23  income?

24  A       Not on this document.

25  Q       And if we can turn to the second document that you were

1    speaking about that lists the second financial statement, this

2    is now the 2005 financial statement, Exhibit 8AA, you went to

3    the net income line, which shows up on Page 8AA 005, and you

4    came up with a net income of 2,319,687.

5         Do you see that?

6    A    Yes.

7    Q    And that's the number that you put on your Exhibit 5,

8    that you divide by 12 and come up with a number; correct?

9    A    Yes.

10   Q    How much of this amount of $2,319,687 was distributed to

11   any of the shareholders of MUA that year?

12   A    It doesn't show distribution on here.

13   Q    But it does show, does it not, on the following page,

14   retained earnings, and the retained earnings -- and this is

15   again a financial statement, compiled this time by Jerry

16   Schneider -- the retained earnings exactly equal the net income

17   of $2,319,687.

18        Do you see that?

19   A    Yes.

20   Q    Which shows that there was no distribution of that net

21   income to any shareholders for that year; correct?

22   A    That's what that document is showing.

23   Q    And this it was a -- if you recall the testimony of

24   Jerry Schneider, he had his people from his company go down and

25   look at all the books and records of the MUA for the 2005

1    audit.

2          Do you recall that testimony?

3    A      He had people go, yes.

4    Q      And he spoke with David Minchenberg, in fact, in helping

5    compile this particular audit; isn't that right?

6    A      Correct.

7    Q      And the same thing would have been true for the 2004

8    numbers; correct?

9    A      Correct.

10   Q      And by the way, did you see any indication, in 2004,

11   that any of that money that was listed as the change in net

12   assets had been distributed to any shareholders?

13   A      No.

14   Q      No, that the -- no, you didn't see any indication that

15   any of the money had been distributed to shareholders; correct?

16   A      I didn't see any indication that the money was

17   distributed.

18   Q      Now, if we look at 2006, MUA financial statement, which

19   is Exhibit 9B, and this is the one that was done by

20   Venning & Jacques, the CPAs; correct?

21   A      Yes.

22   Q      I think Jeffrey Gallant was the witness who came in and

23   testified.

24          And again, if you look at these numbers here, you used

25   that net income figure, which then appears on your Exhibit 5,

1    as the net income that was to be divided equally between

2    Doctors Frederick and Hough.

3         Do you see that?

4    A    Yes.

5    Q    But if you actually see the following page, it yet again

6    shows that the $2,823,657 -- and now I'm referring to -- this

7    is now the -- what page is this?

8         It's indicated at the very bottom, VNJ, a lot of zeros

9    and an eight at the end, that this number of 2,823,617 equals

10   the number that's listed as net income on the preceding page.

11        Do you see that?

12   A    Yes.

13   Q    So once again, in 2006, MUA did not distribute any money

14   to any of its shareholders; correct?

15   A    That's what this document says.

16   Q    Do you have any reason to believe this document is

17   wrong?

18   A    I believe that this document does not reflect the true

19   ownership of MUA.  The true owners of MUA were Patricia Hough

20   and David Fredrick.

21   Q    Venning & Jacques, Jeffrey Gallant, testified that

22   that's their methodology in coming up with this document.

23        Do you recall that testimony?

24   A    Yes.

25   Q    They went down to the island of, in this case, Nevis, to

1   speak with everybody at MUA concerning the financial positions

2   of the company; do you recall that?

3   A      I don't recall that testimony.

4   Q      Do you recall that they spoke to people who were

5   involved with MUA in order to prepare this financial statement?

6   A      I don't recall that.

7   Q      Do you think they prepared this financial statement

8   without speaking to anybody?

9   A      I don't know who they spoke to, to prepare this

10  document.

11  Q      And do you recall, though, that they reviewed all the

12  books and records of MUA in order to prepare this document?

13  A      They reviewed the books and records.

14  Q      And they spoke to David Minchenberg; isn't that correct?

15  A      Yes.

16  Q      I'm sorry, what was the answer?

17  A      They spoke to David Minchenberg.

18  Q      And in order to prepare this document -- and they're

19  certifying this as an audit; correct?

20  A      Yes, they are.

21  Q      And again, you haven't had a chance to speak to anyone

22  from MUA to see if these numbers are accurate; correct?

23  A      I haven't spoken to anyone at MUA.

24  Q      And you haven't reviewed all of MUA's books and records

25  that led to the preparation of this 2006 financial statement;

1    correct?

2    A       Correct.

3    Q       And you haven't even spoken to David Minchenberg to see

4    if this financial statement is accurate.

5    A       I haven't spoken to David Minchenberg.

6    Q       So you have no reason to disbelieve that all the work

7    done by Venning & Jacques led to an inaccurate document;

8    correct?

9    A       I believe this document is inaccurate.

10   Q       Let's switch, if we could, to . . . the Saba school.

11           THE COURT:  Mr. Hochman?  Do you mind if I interrupt?

12   I've got a question that I don't want to lose.

13           MR. HOCHMAN:  Of course, Your Honor.  You're the

14   ultimate fact finder, so please, any questions.

15           THE COURT:  That's kind of my thought too.

16           I didn't understand the last question.  You said you

17   thought this was inaccurate.

18           Do you think it's inaccurate as to ownership or as to

19   the accounting?

20           THE WITNESS:  Inaccurate as to the ownership.

21           THE COURT:  But if the question was, do you think

22   it's inaccurate as to the accounting, what's your view?

23           THE WITNESS:  I believe this document is accurate to

24   the accounting.

25           THE COURT:  Okay.

1           All right.  Go ahead.

2    BY MR. HOCHMAN:

3    Q      And just so I'm clear, if a medical school corporation

4    retains its earnings and doesn't distribute to its

5    shareholders, the shareholders don't have any taxable income

6    for that year; is that correct?

7    A      If it's a corporation and it's registered, and the

8    corporate structure is . . . is used as a corporation, and the

9    correct documents are filed, and you can follow the correct

10   documents, then, if it's a real corporation and there's real

11   shareholders, and if the money is not distributed, then the

12   shareholders wouldn't have income.

13   Q      And so for it to be a real corporation, you have to have

14   articles of incorporation; correct?

15   A      Yes.

16   Q      And MUA has articles of incorporation; correct?

17   A      They have articles of incorporation for Nevis.

18   Q      And you need bylaws and operating agreements; correct?

19   A      Those are usual documents.

20   Q      And you saw that in the evidence as well; correct?

21   A      They were from Nevis; yes.

22   Q      And it needs to have officers and directors.

23          You saw that it has officers and directors; correct?

24   A      Yes.

25   Q      That it actually has to have a functioning or operating

1    business, like a medical school; correct?

2    A      I don't know about the functioning, but there is a

3    business.

4    Q      And it's -- again, it is a medical school that had

5    professors, administrators, students, contracts with clinical

6    hospitals, and accreditations throughout the United States and

7    Europe; correct?

8    A      Yes.

9    Q      Let me switch to Saba.

10           MR. HOCHMAN:  Your Honor, do you want to take a break

11    right now, or can I keep going?

12           THE COURT:  I'm getting hungry.  How about you?

13           MR. HOCHMAN:  I could use a break, Your Honor.

14           THE COURT:  All right.  Let's break for lunch.

15           1:30 work for everyone?

16           MS. FINLEY:  That's fine, Your Honor.

17           MR. HOCHMAN:  Yes, sir.

18           THE COURT:  All right.  We'll get back at 1:30 then.

19              (At 12:24 PM, court was recessed.)

20                          AFTER RECESS

21              (At 1:32 PM, court was reconvened.)

22           THE COURT:  You may proceed.

23           MR. HOCHMAN:  Thank you, Your Honor.

24    BY MR. HOCHMAN:

25    Q      Ms. Maurer, when we were talking about MUA before -- and

1    I'll put Exhibit 5 --

2              MR. HOCHMAN:  If we could lower the lights just a

3    touch?

4    BY MR. HOCHMAN:

5    Q     We had talked about '03; and '03, we talked that one

6    profit and loss statement for the entire year had only been

7    used for four of the months for '03.  And then we talked

8    about '04 and '05 coming from the financial statements, the '04

9    financial statement not being a -- recognized by any

10   auditor, '05 financial statement being from Mr. Schneider, and

11   '06 from Venning & Jacques.

12         But then you have certain asterisks here, for '06

13   and '07, because the '06 financial statement only takes us to

14   April 30th of 2006; correct?

15   A     Correct.

16   Q     Again, you don't know, within that financial statement,

17   between May 1st, 2005, and April 30th, 2006, if the MUA had a

18   lot of income in '05, and had virtually no income in '06, it

19   would reflect for the year the total amount; correct?

20   A     Could you repeat that?

21   Q     Sure.  When you're looking at a financial statement,

22   it's measuring it for a fiscal year; correct?

23   A     Correct.

24   Q     But you divided this up between '05 and '06, and you

25   don't know one way or another if MUA earned all its money

1   in '05 and nothing in '06, or vice versa; correct?

2   A      I don't know the exact amount of income earned in each

3   month.  I don't have documents available for that.  So I --

4   this is the best method I could use.

5   Q      This is your best guess; is that correct?

6   A      I would say it's more than a guess.

7   Q      Well, with respect to the last eight months of '06, you

8   have no documentation, whatsoever, for the last eight months

9   of '06; correct?

10  A      I didn't have any documentation.

11  Q      And you have no documentation, whatsoever, for the

12  last -- for the entire year of '07; is that correct?

13  A      Correct.

14  Q      So you guessed for the last eight months of '06, and you

15  guess for the last 12 -- or the 12 months of '07; correct?

16  A      My method was that the income was increasing monthly, so

17  the pattern was it was increasing monthly, so I -- it would --

18  the pattern would be that it was increasing in '06 and

19  increasing in '07, but I used a steady number.

20  Q      But again, when you keep saying, "increasing in '06,"

21  you have no idea whether or not there was a lot of income in

22  '05, and it hit the brakes in '06, because you only had the

23  annual statement; correct?

24  A      I guess that could have happened.

25  Q      So that would be -- so basically this is what, an

1    educated guess; would you term it an educated guess here?

2    A     I don't like the word "guess."  This is the amounts

3    based on the information I have available.

4    Q     But ultimately you just don't know for certain; correct?

5    A     I don't know a hundred percent certain.

6    Q     Now, let's turn to Saba, if we could.  With respect to

7    Saba, you start out by -- this is now Exhibit 7.

8          January to December, 2003, you list that the net income

9    is two -- basically 2.1 million; do you see that?

10   A     I'm looking for Exhibit 7, excuse me.

11   Q     Now, if you want to look on the screen, I have it up as

12   well.

13   A     I have Exhibit 7 now.

14   Q     Now, you list it as 2.1 million from January to December

15   of 2003; do you see that?

16   A     Yes.

17   Q     And you base that on a profit and loss statement for --

18   that you received, which is Exhibit 8; do you see that?

19   A     Yes.

20   Q     And this is the profit and loss statement -- let me ask

21   you the first thing about this:  Is this part of an audited

22   financial statement?

23   A     It doesn't say that.

24   Q     And is it -- and do you know who conducted this -- or

25   who wrote this financial statement -- excuse me -- this profit

1   and loss statement.

2   A      It appears to be El Momo Accountancy.

3   Q      And who are the El Momo accountants?

4   A      I don't know.

5   Q      Have you ever done any investigation to find out who the

6   El Momo Accountancy is on the island of Saba?

7   A      No.

8   Q      Would it surprise to you learn that the El Momo

9   Accountancy, or that this particular financial profit and loss

10  statement was done by a retired school principal with little

11  accounting background on the Island of Saba?

12  A      I don't know that.

13  Q      And what steps, if any, did you take to find out who the

14  El Momo Accountancy people are?

15  A      I didn't take any steps.

16  Q      Why not?

17  A      I . . . I'm not allowed to call and interview people,

18  and do things like that.  I base it on the information that I'm

19  provided.

20  Q      But you have no idea whether or not this information is

21  reliable; correct?

22  A      It was in the documents that David Minchenberg . . .

23  those folders.  And these documents were apparently used and

24  reviewed by the -- Jerry Schneider and Jacques & Venning.  So

25  it's in those files.  I assume that, if it wasn't reliable,

1    somebody would have wrote a note on there.

2    Q       So what -- and you said this was reviewed by Jerry

3    Schneider.  Do you see the MPNS designation anywhere on this

4    document that it was part of Jerry Schneider's documents?

5    A       No.

6    Q       So you have no evidence that Jerry Schneider relied on

7    this document in completing his audit; correct?

8    A       No, I don't.

9    Q       And you didn't speak to David Minchenberg about this

10   document; correct?

11   A       No.

12   Q       So as far as you are concerned, this could be a

13   completely -- this is a completely unreliable document; isn't

14   that right?

15   A       I don't believe it's a completely unreliable document.

16   Q       Oh.  Would you agree with me, it's a very unreliable

17   document?

18   A       No.

19   Q       You don't know who the accounting firm is.

20           Do you know the methodology that the accounting firm

21   used to prepare this profit and loss statement?

22   A       No, I don't.

23   Q       Do you know which records they relied upon to prepare

24   this profit and loss statement?

25   A       No.

1    Q      And you relied on this document as your only piece of

2    evidence to determine the 2003 Saba "net income"; correct?

3    A      No.

4    Q      I'm sorry?

5    A      No.

6    Q      Well, the document here has the number, the net

7    ordinary -- excuse me -- of net income, on the last page, of

8    2101003; do you see that?

9    A      Yes.

10   Q      And on your chart, which is Exhibit 7, you have 2101003;

11   correct?

12   A      Correct.

13   Q      So this document is the only document that you used to

14   come up with 2101003 to come up with Saba's net income in 2003;

15   correct?

16   A      No.  Would you like me --

17   Q      Yes.

18   A      In the documents from David Minchenberg, there was a

19   document that was prepared that showed a budget for 2001

20   through -- it was a document, and this document was in line

21   with the projected budget listed on that grid in David

22   Minchenberg's records.  Plus, if you divide this out by

23   12 months, the monthly income is around is 175,000, and if you

24   go to the Saba document, the financial -- the monthly income is

25   approximately 185,000.  So I felt that it was in the range of

1   being reliable.

2   Q      But again, when you say, "go to the other document,"

3   you're talking about the financial statement for Saba?

4   A      The audited financial statement for Saba.

5   Q      The 2004 financial statement?

6   A      Yes.

7   Q      But again, you don't know how much of that income was

8   earned in 2004, and how much was earned in 2003; correct?

9   A      Correct.

10  Q      But here -- it's interesting because, for Saba, you use

11  this unaudited statement, a profit and loss statement, and you

12  use it for the entire year.

13         Do you see that?

14  A      Yes.

15  Q      But when we were talking a moment ago about MUA, and we

16  came up with an audited financial statement for the entire year

17  of 2003, that showed that there it was a loss for the entire

18  year, you weren't satisfied with just using that number,

19  because you used part of that number for four months, and then

20  in part of the 2004 financial statement.

21         Do you see that?

22  A      Yes.

23  Q      That's inconsistent, isn't it.

24  A      It's not inconsistent because, as I said before, that

25  one -- this one was prepared by El Momo Accountancy, and I felt

1    it was . . . because it was January through December, 2003, and

2    it was prepared by an accountant, I felt that I could use that.

3    The other one, I didn't feel like I could -- I had better

4    numbers that I could use for 2003, from the audited financial

5    statements, because the other document was not signed like this

6    one was.

7    Q      But again, you have no way to know what El Momo

8    Accountancy even is, whether a real accountant actually

9    prepared that; correct?  Correct?

10   A      I have this document here, and El Momo Accountancy was

11   used several years by Saba.  There were other documents that --

12   it was used several years by Saba to create these documents.

13   Q      And just to put the contrast, the document that you did

14   not use, this was Exhibit 6 for MUA that said it was an audited

15   financial statement for the entire year.

16          Do you see that?

17   A      Yes.

18   Q      Continuing on with Saba, with respect to the 2004 year,

19   you see it says, "change in net assets"?

20   A      Yes.

21   Q      Now, are you familiar with financial statements and the

22   way that they are prepared?

23   A      I am familiar.

24   Q      And do you understand the difference when a financial

25   statement reads, "change in net assets," as compared to net

1    income?

2    A      This . . . like I said, this change in net assets is the

3    same as net income for this document.

4    Q      And I'll use the comparison, for instance, for MUA, when

5    it talks about net income, whereas -- that's Exhibit 8AA,

6    Page 5, versus Exhibit 8C, which is the Saba 2004 financial

7    statement that says, "change in net assets."

8    A      I see that the words are different.

9    Q      And do you see -- and do you understand that, when CPAs

10   are preparing financial statements for nonprofit institutions,

11   that the correct designation, since no one can own a nonprofit

12   institution, is change in net assets versus net income?

13   A      I don't agree that Saba was a nonprofit.

14   Q      That wasn't my question, though.  My question is, do you

15   agree with me that, when the -- when, in this case,

16   Mr. Schneider, who in this case prepared the financial

17   statement, he prepared it for a nonprofit rather than a

18   for-profit corporation?

19   A      He prepared it for a nonprofit instead of a corporation.

20   Q      And the same thing would be true for Exhibit 8Q, which

21   is the 2005 financial statement; did he also list it on Page 5

22   in that document as change in net assets?

23   A      Yes.

24   Q      And again -- actually, we have gone over that point.

25          And the same thing for 2006, this is Venning & Jacques,

1   for Saba, Exhibit 9N, and they actually have a slightly

2   different designation, increase in unrestricted net assets

3   before loss on property foreclosure.  Do you see that?

4   A      Yes.

5   Q      But you have taken each one of these numbers for Saba

6   and made them net income numbers; correct?

7   A      Correct.

8   Q      And going back to your chart, we'll use Exhibit 1 as our

9   example.  With Exhibit 1, you've listed, for 2003, over a

10  million dollars in net income for Saba, and $606,000, a little

11  over $606,000 of net income from MUA.

12         Do you see that?

13  A      Yes.

14  Q      Let's focus for a moment, if we could, on the taxable

15  interest; where did the taxable interest come from?

16  A      The UBS accounts that I had reviewed.

17  Q      And what evidence did you have that Dr. Hough knew that

18  the UBS accounts that you reviewed, that generated this $5,768

19  of taxable interest, what evidence do you have that she knew

20  that these accounts generated that interest?

21  A      These accounts were either a joint account, with her and

22  Dr. Fredrick, or an account that was just in her name.

23  Q      I'm sorry, but what evidence do you have that she knew

24  that the account generated, in 2003, a little over $5,000 in

25  interest?

1    A       Because they were her accounts.

2    Q       But how do you know that she got the information that

3    that account, that year, generated the interest?

4    A       It's her account.  She would be interested in knowing

5    how much money she had.

6    Q       But that's assuming that, (a) it's her account, and (b)

7    maybe she got the bank statements.

8            Do you have any information that the bank statements

9    were actually sent to Dr. Hough?

10   A       No.

11   Q       Do you have any information that there was any e-mail

12   correspondence between the banker, Dieter Luetolf, and

13   Dr. Hough, explaining that account earned taxable interest in

14   2003?

15   A       No.

16   Q       Do you have any other information, from any other

17   witness that you've heard testify at trial, that Dr. Hough was

18   explained, in 2003, that she had made $5,768 of interest that

19   year?

20   A       No.  But these are investment accounts, and she signed

21   documents to say how the income that she put in the account

22   would be invested, and investment accounts have interest and

23   dividends, and sales, and they . . . it's an investment

24   account.

25   Q       Well, again --

1    A       She signed a document allowing the money to be invested.

2    Q       Were you there when she signed the document?

3    A       No.

4    Q       Do you have any information of the circumstances around

5    her signing that document?

6    A       No.

7    Q       Do you know if it was explained to her that she was

8    actually signing a document to manage the account, or if she

9    was just given a packet of documents and signed her name, one

10   after the other?

11   A       No.

12   Q       And investment accounts sometimes lose money, don't

13   they?

14   A       Correct.

15   Q       And she wouldn't know if she made money or lost money in

16   a particular year; isn't that correct?

17   A       She would if she looks at the statements.

18   Q       Well, you just said you have no evidence that showed

19   that she ever got a statement to look at; correct?

20   A       I have no evidence that she ever got a statement.

21   Q       Agent Maurer, to speed things up, your answer would be

22   the same for '04, '05, '06, '07, and '08, as far as taxable

23   interest, that you have no information that Dr. Hough was

24   provided with any information concerning taxable interest for

25   any of those years; is that correct?

1    A       Correct.

2    Q       And with respect to ordinary dividends, would the answer

3    be the same?

4            We don't have any ordinary dividends listed for '03

5    and '04, but we do for '05, '6, '7, and '8, and would it be

6    accurate to say that you have no evidence that Dr. Hough was

7    provided with any information concerning the dividends that

8    were earned at any of her foreign bank accounts for those

9    years, 2005 to 2008?

10   A       I don't have any evidence.

11   Q       And with respect to capital gains or loss, let's

12   start -- we'll just use 2003, as sort of an example, and then

13   we'll extrapolate.

14           Oh, by the way, you also don't have any evidence for

15   taxable interest or dividends for 2003 to 2008, that Dr. Hough

16   had any information about David Fredrick's taxable interest or

17   dividends for those years; correct?

18   A       In some years they owned joint accounts.  So . . . to

19   the -- the dividends would -- this information would have been

20   available or provided to both of them.

21   Q       But you have no information that it actually was given

22   to Dr. Hough and David Fredrick's accounts, whether they were

23   joint or sole accounts; correct?

24           The same sort of questions I was asking for Dr. Hough, I

25   just want to make sure that's also true for the David Fredrick

1    calculations too.

2    A        Yes.

3    Q        It is true; correct?

4    A        Yes.

5             MR. HOCHMAN:  Your Honor, is it clear enough what I

6    mean by it is true, or should I restate the question?

7             THE COURT:  I understand the question.

8             MR. HOCHMAN:  Very good.  I'll move on.

9    BY MR. HOCHMAN:

10   Q        Capital gains.  With capital gains, you said before, I

11   believe when you were testifying, that capital gains is not

12   just what you sell a stock for; correct?

13   A        Right.

14   Q        Capital gains requires you to go back and find out what

15   you purchased the stock for, in order to determine whether or

16   not it made any money, which would be a gain, or you lost any

17   money, which would be a loss; correct?

18   A        Correct.

19   Q        Do you have any information that Dr. Hough was -- had --

20   do you have any information, or any evidence, that Dr. Hough

21   was provided with either the sale price of the stock or the

22   cost basis of the stock for 2003, all the way to 2008?

23   A        Correct.

24   Q        That she was not -- you have no evidence that shows

25   this; correct?

1    A       Correct.

2    Q       And the same, then, would be true for the David Fredrick

3    calculations in Exhibit 2?

4    A       Correct.

5    Q       Now, for -- in this itemized deduction here, this

6    28,000, I think what you said is that, because Dr. Hough, on

7    your calculations, has this additional very large income coming

8    from MUA and Saba, that that basically raised the floor, that

9    we were talking before about the floor, and that since the

10   floor is raised, if Dr. Hough had claimed a deduction before,

11   she's not entitled to those deductions because there's a higher

12   floor now; is that correct?

13   A       Correct.

14   Q       So if we take -- if we assume for the moment that

15   Dr. Hough should not be responsible for the Saba Schedule C

16   income, and not responsible for the MUA Schedule C income, or

17   the taxable interest, or the capital gains, would that then go

18   back to the original itemized deductions, so there would not be

19   an increase?

20   A       If we assumed that she doesn't -- she's not responsible

21   for the Saba -- yes.  If we assume that you're correct, that

22   these are not her items of income, then the itemized deduction

23   amount, there would be no change.

24   Q       Okay.  And the same thing for exemptions?

25   A       Correct.

1    Q      And that would be true from 2003, all the way through

2    2008.

3    A      I don't agree with your assumption, but if you assume

4    that those items of income are not attributable to her, that

5    would be correct.

6    Q      That would be true also for Exhibit 2, the David

7    Fredrick calculations; is that right?

8    A      If we assume that that's not his income.

9    Q      Okay.  So -- and then with -- in 2003, the only

10   changes -- well, excuse me, you added the -- we've talked about

11   this before -- the Saba and the MUA income, and the interest,

12   and the capital gains from the Swiss bank accounts.

13          The same thing was true in 2004; is that right?

14   A      I'm sorry, what is the question?

15   Q      I just wanted to make sure that -- we're trying to

16   understand the basis for your calculations:  2004 seems to be a

17   lot like 2003; is that correct?

18   A      Correct.

19   Q      Now, in 2005, again, you have Saba and MUA, and then you

20   have taxable interest in these capital gains, and all the rest

21   of these calculations again, flowing from the Swiss Bank

22   accounts; is that accurate?

23   A      Correct.

24   Q      And in 2006, I believe, if you did not have the Saba and

25   the MUA income, that we had that situation where the total

1    income was actually negative, then Dr. Hough would be owed a

2    refund for that year; is that correct?

3    A      That is the situation we had in that year.

4    Q      And that was your October 14, 2013, report that you

5    testified under oath; correct?

6    A      Correct.

7    Q      And now that number swung from about a $2,000 refund to

8    about a 1.39 -- $1.390 million amount due and owing; is that

9    correct?

10   A      Correct.

11   Q      Let's focus, if we can, then, on 2007.  Because in 2007,

12   again, we have the MUA and the Saba income.

13          Do you see that?

14   A      Yes.

15   Q      And we have taxable interest, and we've gone over that

16   situation, the taxable interest.  And we've also gone over

17   everything but this very large number here.  So I'd like to

18   discuss this for a moment, this 15,780,988 number.

19          Do you see that?

20   A      Yes.

21   Q      Now that comes from the sale of the schools; is that

22   correct?

23   A      Correct.

24   Q      Now, with respect to the sale of the school, you come

25   up, in Exhibit 9, with your calculations.

1          Do you see that?

2     A     Yes.

3     Q     Now, with respect to your calculations, there is again

4     no evidence that Dr. Hough knew what the basis was for the sale

5     of the schools; is that correct?

6     A     I don't know if that's correct.  I don't know.

7     Q     Let's review then.  You heard Steven Rodgers testify,

8     the gentleman from Equinox that bought the schools?

9     A     Yes.

10    Q     And he said that he dealt with -- other than dealing

11    with Dr. Hough, with respect to her guaranty and her employment

12    contract, all the other financial discussions were with

13    Dr. Fredrick.

14         Do you recall that?

15    A     I don't recall that he said all the discussions were

16    with Dr. Fredrick.

17              MR. HOCHMAN:  We'll pull the transcript on that in a

18    moment, Your Honor.

19    BY MR. HOCHMAN:

20    Q     With respect to the flow-of-funds memo, do you recall

21    the flow-of-funds memo?

22    A     Yes.

23    Q     Exhibit, I think, 10F?

24    A     Yes.

25    Q     In Exhibit 10F, there is no indication that Dr. Hough

1   ever saw that document; correct?

2   A       I don't know if she saw that document.

3   Q       Do you have any evidence that shows that she did see the

4   document?

5   A       No.

6   Q       Now, with respect to basis here, you go through a

7   calculation to determine the basis for the Round Hill property.

8           Do you see that?

9   A       Correct.

10  Q       And let's start, with respect to your calculation, you

11  go through a variety of things, and you come up with a number,

12  $3,396,623.

13          Do you see that?

14  A       Yes.

15  Q       Are you sure -- is that the most accurate number that

16  you have been able to obtain?

17  A       Yes.

18  Q       And do you believe that you would have a more accurate

19  number, or someone who prepared a financial statement, and did

20  a full auditing of the books and records of the Saba school,

21  would have a more accurate number?

22  A       Possibly.

23  Q       Well, have you looked to see if someone did this kind of

24  calculations in order to determine the basis on the Round Hill

25  properties?

1    A        I did not look to see that.

2    Q        Well, you're trying to find the most accurate number in

3    the documents that you had; correct?

4    A        Well, this is based on documents I had. I guess I don't

5    understand your question.

6    Q        Sure.  If you look at Exhibit 9N, which is the 2006 Saba

7    Foundation financial statement that you've said you've gone

8    through and actually relied on in coming up with your

9    calculations -- do you have Exhibit 9N?

10   A        Yes.

11   Q        If you look at Exhibit 9N, if you turn to Page 7, you

12   have, actually, the basis that's computed as of April 30th,

13   2006, in a certified financial audited -- an audited financial

14   statement, that's $4,625 -- 4,000 -- excuse me -- $4,625,187.

15            Do you see that?

16            MS. KESSLER:  Mr. Hochman, which exhibit is this?

17            MR. HOCHMAN:  This is Exhibit 9N, Page 7.

18            MS. KESSLER:  Thanks.

19            THE WITNESS:  I see that.

20   BY MR. HOCHMAN:

21   Q        And if you compare this number, $4,625,187, versus your

22   number here, of 3.396 million, you miss this number by about

23   1.2 million; isn't that correct?

24   A        This isn't April 30th.  And between April 30th of 2006

25   and the time the schools were sold, there would be more

1    depreciation.  And I used a document to try to determine

2    another year's worth of depreciation, and I got this, the

3    $3 million number for my calculations . . . based on -- I don't

4    have a document that says depreciation as of April of 2007, so

5    I computed some additional depreciation.

6    Q      So this depreciation here, for instance, for vehicles,

7    how did you come up with that number, as an example?

8    A      In the Venning & Jacques information there was a four or

9    five-page document that listed the assets, and I took the

10   assets and the accumulated depreciation, and I . . . I added

11   more in.  I had a document from Venning & Jacques that listed

12   the assets.

13   Q      So you're saying that the difference between your number

14   and the number back in April of '06, of one over 1.2 million,

15   the difference is depreciation taken in one year?

16   A      Part of that number is . . . but I don't know what the

17   rest of the -- I don't know the amount that it is, and I can't

18   calculate it in my head.  But that's one of the differences.

19   Q      What's another one?

20   A      I don't know.  I would have to look at my calculations

21   and the documents from Venning & Jacques, and compare it to

22   this, and see what the difference is.

23   Q      How long would that take you to do?

24   A      I don't know.

25   Q      I mean, again, the difference of 1.2 million here is

1    one -- that 1.2 million goes directly to the tax-loss number;

2    correct?

3    A       Correct.

4    Q       And so if -- so to the extent that your depreciation

5    schedule -- and by the way, when you say you did depreciation,

6    did you do it up until April 30th, 2007; is that when your

7    schedules read?

8    A       My schedules, I used up to April -- it may have been

9    April 30th, 2007.

10   Q       All right.  We'll come back to this number.

11           Returning to the second page of Exhibit 9, do you see

12   where it says sales price for Round Hill?

13   A       Yes.

14   Q       And the sales price for Round Hill, you got that from

15   the sale documents; correct?

16   A       Yes.

17   Q       And that, in particular, was this . . . this

18   flow-of-funds memo that described how different things were

19   allocated; correct?

20   A       Flow of funds -- I know . . . there's another -- I'm not

21   sure.

22           MR. HOCHMAN:  And just so I'm clear, the

23   flow-of-funds memo is Exhibit 10F, Your Honor.

24   BY MR. HOCHMAN:

25   Q       Do you recall this flow-of-funds memo?

1    A      That's not the document I got -- I used.

2           That one is.

3    Q      This is all part of the same document.

4    A      Yes.  Okay.

5    Q      And if you recall, this document has no signature lines

6    on it that would indicate Dr. Hough ever saw it; correct?

7           If you would like to see the document or take my

8    recommendation, either way.

9           THE COURT:  Counsel, when you say 10F, from today or

10   from trial?

11          MR. HOCHMAN:  I'm sorry, Your Honor, 10F from trial.

12   Any time I have a document that has a letter designation, that

13   will be from trial.

14          THE COURT:  Okay.  Thank you.  That's helpful.

15   BY MR. HOCHMAN:

16   Q      So there is no evidence that Dr. Hough ever saw this

17   document; correct?

18   A      Are you asking me based on the fact that you say this is

19   not a signed document?

20   Q      If you have any other evidence, that's fine, but

21   starting with the fact she never signed this document; correct?

22   A      Did she -- I thought you said --

23          MR. HOCHMAN:  I will proffer, Your Honor, there no

24   signature of Dr. Hough on this document.

25          THE WITNESS:  Okay.

1    BY MR. HOCHMAN:

2    Q       Are you aware of any other evidence that this document

3    was discussed with Dr. Hough?

4    A       No.

5    Q       So you have no evidence to show that Dr. Hough knew

6    that, of the $40 million Saba purchase price, Saba/MUA purchase

7    price, $33 million was allocated to Round Hill; correct?

8    A       Correct.

9    Q       Now, let's focus, if we might, for a moment, on this

10   line, taxpayer -- sales price for MUA.

11           Do you see that?

12   A       Yes.

13   Q       And that says it's 2,541,572.

14   A       Right.

15   Q       And that is the sales price, again, that comes from that

16   flow-of-funds memorandum that Dr. Hough did not sign; correct?

17   A       Correct.

18   Q       Now, I see that you give a taxpayer's basis in this of

19   the exact amount, $2,541,572.

20           Do you see that?

21   A       Yes.

22   Q       What records did you rely on to come up with the fact

23   that the basis on the property for MUA is exactly what the

24   sales price was?

25   A       I didn't have the same documents for MUA when I was

1   doing this that I did for Saba, and I knew that 1.5 was for

2   building, and there was land purchased, and there were

3   containers sent over; so . . . and I knew there were loans

4   going back and forth.  And I didn't know if some of this . . .

5   this was foreclosed on by Saba, so . . . just to be

6   conservative and not use so many -- try to find all these

7   loans, and if something was foreclosed on, I just . . . gave

8   them a zero base -- I just gave them a zero gain on that.

9   Q      So in other words, where you didn't have adequate

10  documentation to show that it was a zero loss, you gave them a

11  basis equal to the sales price; correct?

12  A      I gave them a basis equal to the sales price.

13  Q      Because you didn't have adequate documentation to say

14  otherwise; right?

15  A      At the time I was doing this, I didn't have

16  documentation.  I didn't feel I had enough documentation to

17  make a different basis.

18  Q      And that's true all the way through all three reports,

19  isn't that correct, the May report, the October report, the

20  January report.

21  A      This . . . not the main report.

22  Q      Oh, the main report didn't list -- let's focus then on

23  just on the October and January.

24         To this day you don't have, apparently, enough

25  documentation, so you gave the basis equal to the sales price;

1    is that correct?

2    A       I didn't change it.  I didn't look at additional

3    documentation.

4    Q       Now, the basis actually turns out to be more than the

5    sales price, because when you add in everything that's been

6    spent on MUA, let's say it turns out to be $4 million, wouldn't

7    that actually create a capital loss of 1.5 million?

8    A       Yes.

9    Q       But you don't know one way or the other because you

10   never went and did the actual calculations to find out what the

11   basis should be on MUA; correct?

12   A       I don't believe -- the basis . . . is not $4 million.

13   Q       How do you know?

14           You know, just to speed things up I'll be moving on.

15   Let's just switch to Saba for a moment, and then come back to

16   MUA.

17   A       I have it now.

18           MS. KESSLER:  I think there was a question pending

19   that the witness wasn't permitted to answer.

20           THE COURT:  He can withdraw the question if he wants.

21           MR. HOCHMAN:  I'll withdraw the question to move on.

22   BY MR. HOCHMAN:

23   Q       Let's go to Saba for a moment.

24           You see that the sales price for Saba is 988,997; do you

25   see that?

1    A       Yes.

2    Q       But on Saba you give a zero basis.

3    A       Yes.

4    Q       Now, Saba had certain value that Steven Rodgers

5    testified as to what he was buying when he bought the Saba

6    University School of Medicine.

7            You are aware of that; correct?

8    A       Correct.

9    Q       And that value was the accreditations in the 50 United

10   States, Canada, and Europe; correct?

11   A       Yes.

12   Q       And it also were all the contracts that Dr. Hough had

13   gone around the United States and Europe to get with the

14   various hospitals, for the third and fourth-year students at

15   Saba; correct?

16   A       Correct.

17   Q       And there's obviously a cost involved --

18   A       No.  No.  For tax purposes, it's . . . it's . . . it's

19   the cost, and there's -- those things are considered -- there's

20   no cost on those.  That's considered -- what he's buying is

21   goodwill for what she did.  There's no -- there's no asset with

22   a cost.

23   Q       You are not saying it didn't cost the Saba University

24   School of Medicine money to engage and to have all the

25   negotiations, fly around the countries in Europe, deal with the

1  constant trips to maintain these relationships, go through the

2  accreditation process in California, Florida, New York, the

3  department of education, Europe, and Canada, you're saying

4  there was no cost involved with that?

5  A      For tax purposes there is no cost involved in that.  But

6  to sell that, that's what she gets the increased sales price

7  for, because that's what he's paying for, is those things that

8  she did.  But there's no -- there's no cost in something like

9  that.  That's the goodwill.

10  Q      How much -- how many times have you engaged in a

11  valuation of a business?

12  A      I've . . . I've calculated basis for some things, but

13  if -- but valuing a business, I haven't done that.

14  Q      Doesn't the IRS traditionally, when it wants to figure

15  out the basis, employ its actual own expert, and sometimes the

16  taxpayer employs their own expert, to determine how much it

17  would have cost to do all these things that led to the

18  accreditation, a real -- not goodwill, accreditations -- and

19  clinical contracts; doesn't the IRS employ an expert to value

20  what that's worth?

21  A      There are valuation experts.

22  Q      Did you do that in this case?

23  A      No.

24  Q      And even though -- and why didn't you do that in this

25  case?

1   A      I . . . .  That wasn't my -- that's not my call to make.

2   I'm not the person who would say, "We need an expert to value

3   businesses."  I'm not the person that would make that call.

4   Q      You made the call to give it a zero for Saba, where you

5   were willing to give it the full sales price for MUA.

6          You are making that call; isn't that true?

7   A      I am.

8   Q      But you're not making -- in order to determine whether

9   or not zero is the right number, isn't the right call to have

10  asked the IRS, someone at the IRS, to have a valuation expert

11  brought in to determine if zero is the right number?

12  A      I believe my number is correct.

13  Q      And you don't think a valuation expert would have come

14  up with some number higher than zero?

15  A      No.  My understanding is that it's . . . it's the cost.

16  And I don't have a cost for what you're talking about.

17  Q      That's where the valuation expert comes in.  They

18  actually estimate, based on their training and experience, how

19  much it would cost to do all the accreditations and the

20  clinical contracts; isn't that correct?

21  A      I don't know.

22              MR. HOCHMAN:  May I have a moment, Your Honor?

23              THE COURT:  You may.

24              (Mr. Hochman and Mr. Saunders confer privately.)

25              MR. HOCHMAN:  No further questions, Your Honor.

1          THE COURT:  All right.

2          Any redirect?

3          MS. KESSLER:  Just a few questions, Your Honor, if I

4     may.

5                        REDIRECT EXAMINATION

6     BY MS. KESSLER:

7     Q     Agent Maurer, when you were reviewing and -- excuse me,

8     listening to the testimony of Mr. Schneider and Mr. Gallant

9     regarding the preparation of the audited financial statements

10    for Saba and MUA, did they give any indication that they were

11    aware of all of the foreign accounts opened in the name of --

12    names of Saba and MUA?

13    A     They did not know all of the foreign accounts.

14    Q     Did they give any indication that they were aware of

15    accounts in the name of Top Fast?

16    A     No.

17    Q     New Vanguard?

18    A     No.

19    Q     Ample Dynamic?

20    A     No . . . .  Schneider & Associates -- no.

21    Q     Did they indicate that the -- the existence of those

22    accounts in any of the audited financial statements that you

23    reviewed?

24    A     There was one account for Saba, the investment account

25    at UBS, I believe, that --

1   Q      Other than that one account, was there any indication

2   that they knew about the other --

3   A      No.

4   Q       -- nine or more accounts?

5   A      No.

6   Q      Do you know whether Round Hill, the property, was owned

7   by the school, or Round Hill Holding Company -- the Saba

8   school, excuse me -- or Round Hill Holding Company?

9   A      Excuse me?

10  Q      Do you know whether the Round Hill property was owned by

11  the Saba School of Medicine, the Saba School of Medicine

12  Foundation, or Round Hill Holding Company?

13  A       Round Hill was owned by Patricia Hough and David

14  Fredrick.

15  Q      Did you see any documentation indicating that the basis

16  of MUA was more than two and a half million dollars in your

17  review?

18  A      No.

19  Q      Now, Mr. Hochman had touched on an example at one point

20  about IBM, and the shareholders of IBM only needing to report

21  dividends as income on their tax returns if they received those

22  dividends.  If the shareholders of IBM treated IBM as their own

23  and took money from IBM as they pleased, would they still be

24  treated as legitimate shareholders of IBM, or would the IRS

25  treat IBM as a sham, and treat it as owned by the shareholder

SHEILA MAURER – REDIRECT/KESSLER                123

1    who was treating it as their own personal piggy bank?

2    A       It would be treated as owned by the shareholder that is

3    controlling and using the income and assets.

4    Q       And did you see evidence that Patricia Hough and David

5    Fredrick use the assets and income of Saba and MUA for the

6    purchase of homes?

7    A       Yes.

8    Q       For the purchase a plane?

9    A       Yes.

10   Q       For the payment of gifts?

11   A       Yes.

12   Q       Did you see that they had signature authority over a

13   number of accounts, foreign accounts related to the schools?

14   A       Yes.

15   Q       Did you see that they were identified as the beneficial

16   owners of the schools in those accounts?

17   A       They were identified as the beneficial owners on the

18   accounts.

19           MR. HOCHMAN:  I'm sorry, Your Honor, just which

20   accounts are we talking about exactly?

21           MS. KESSLER:  The foreign accounts related to the

22   schools.

23           MR. HOCHMAN:  The foreign -- okay.

24           THE COURT:  Go ahead.

25           THE WITNESS:  Now I forgot the question.

1    BY MS. KESSLER:

2    Q      Did you see that Patricia Hough and David Fredrick were

3    identified as beneficial owners of accounts related to the

4    schools at UBS?

5    A      Yes.

6              MS. KESSLER:  Court's indulgence.

7              (Ms. Kessler confers ^.)

8    BY MS. KESSLER:

9    Q      Just a couple other questions.

10             The costs of getting an accreditation for the schools,

11   would those, in fact, be a deductible business expense in the

12   year that they were incurred, as opposed to a expense that

13   would go to basis for the schools?

14   A      They were deductible expenses.

15   Q      And would the same thing . . . be true for the costs of

16   obtaining clinical contracts, that those would be a deductible

17   business expense in the year they were incurred, not a basis

18   expense?

19   A      Correct.

20             MS. KESSLER:  I have no further questions, Your

21   Honor.

22             THE COURT:  All right.  Thank you.

23             Mr. Hochman?

24             MR. HOCHMAN:  Yes, Your Honor.

25

1                        RECROSS EXAMINATION

2    BY MR. HOCHMAN:

3    Q       Do you know the difference between deductible expense

4    and capital expenses?

5    A       I know the difference, yes.

6    Q       And a capital expense is something that gets put into

7    basis, and the deductible expense gets taken –– and only gets

8    realized when there is an eventual sale; is that correct?

9    A       A capital expense is when you purchase an asset –– and

10   what did you say about deductible?

11   Q       An accreditation or clinical contract is something that

12   goes on for years; isn't that correct?

13   A       They derive benefit from it for years.

14   Q       And isn't the definition of a deductible expense, an

15   annual deductible expense versus a capital expense, that a

16   capital expense is an expense that's derived benefit for years,

17   as opposed to a deductible expense, which are realized in the

18   year that it occurred; isn't that the definition of a capital

19   expense?

20   A       Well, there is no asset on here –– there was no asset on

21   any of those statements that I looked at that had those types

22   of things.  They didn't list an asset of accreditation, or the

23   other thing . . . that I saw.

24   Q       Didn't you see the sale documents where they listed the

25   accreditations –– the clinical contracts with the hospitals,

1    and the accreditations, as exactly what was being bought in

2    connection with the sale of Saba and MUA?

3          Let's more focus on Saba.  You saw the schedule, didn't

4    you?

5    A    I don't know what you're talking about.

6    Q    This is the disclosure schedule for the Saba contract,

7    Exhibit 11S, and it says -- 11S, and it talks about hospital

8    agreements.

9          Do you see that?

10   A    I see that.

11   Q    And that's one of the things that Mr. Rodgers insisted

12   that he was buying, because it's what had value, in purchasing

13   the Saba school; correct?

14   A    I don't know what he testified about this; but, for

15   taxable purposes, there is no basis for this.

16   Q    And for the accreditations, do you see that there was a

17   listing, also, of accreditations also in this disclosure, and

18   it goes on to the next page, of all the accreditations that

19   Mr. Rodgers was buying.

20           MS. KESSLER:  Mr. Hochman, what page are we on?

21           MR. HOCHMAN:  This is pages -- excuse me, I should

22   have identified it earlier, Exhibit 11S, from the trial.

23           MS. KESSLER:  S, as in "Sam"?

24           MR. HOCHMAN:  Yes.  And in the bottom left-hand

25   corner it's 0005 and 6.  That was the hospital contracts.  And

1   0011 and 12 are the accreditations.

2   BY MR. HOCHMAN:

3   Q      I asked you, and I just wanted to make sure the record

4   was clear, I had you asked about '03 and '04, if you had

5   identified any distributions from the Saba/MUA account.

6   Actually, I asked you about '05 as well.

7          I just have one question:  Did you see any distributions

8   from the Saba or MUA accounts to Dr. Hough from 2003 to

9   2008 . . . for the Saba or MUA accounts?

10  A      Yes.

11  Q      What year?

12  A      I don't remember exactly, but those accounts were used

13  to pay -- to buy -- money was -- in those accounts was used to

14  buy houses and . . . .

15  Q      Not from those accounts, not from the Saba or MUA

16  accounts.

17  A      But money was moved out of those accounts and moved

18  in -- they chose, and they had control over Saba and MUA,

19  because they moved money out of those accounts into New

20  Vanguard and Top Fast, and Ample Dynamic, and those accounts

21  were used to purchase personal . . . .

22  Q      That takes me to my next question.

23         We had had a discussion, in trial, that if -- if there's

24  a valid loan that is made, it's not taxable income to the

25  person that receives it; correct?

1          MS. KESSLER:  Objection, Your Honor.  This is outside

2     the scope of redirect.

3          THE COURT:  It may be, but that's overruled.

4     BY MR. HOCHMAN:

5     Q     That's correct, isn't it?

6     A     Repeat the question?

7     Q     A valid loan is not taxable income to the person that

8     receives the proceeds of the loan; correct?

9     A     Correct.

10    Q     And Miss Kessler just gave you the IBM example, where

11    people take money as they please.  But in my example, my

12    counter example, they get a valid loan from the board of IBM.

13          And if they get a valid loan from the board of IBM,

14    that's not taxable income for the year that they received it;

15    correct?

16    A     Correct.

17    Q     And you are aware of Dr. Dalbec's testimony at trial,

18    were you not, in which he talked on behalf of the loan

19    situation as it pertained to what the board of Saba knew with

20    respect to loans that went to Dr. Fredrick.

21          Do you recall that testimony?

22    A     I recall he testified about that.

23    Q     And do you recall, in particular, this is now Page 173

24    of the trial testimony on October 15th, 2013, which was the

25    cross of Dr. Paul Dalbec, one of the Government's witnesses.

1          And the question that was asked by Mr. Saunders was:

2          "And from time to time, Dr. Fredrick would come to the

3   board and would ask for personal loans against that amount he

4   was owed in deferred compensation; true?"

5          Dr. Dalbec said:  "Yes, he did.

6          "How many times in your tenure on the board, to your

7   recollection, did Dr. Fredrick ask the board to approve that

8   type of personal loan?

9          "Answer:  Several.  I can remember at least three or

10  four times that we addressed it as board members, but in

11  general, knew that these requests were something that we would

12  honor.

13         "Question:  And he was asking for loans from the

14  accounts and assets of the school and The Foundation; correct?

15         "Answer:  That's correct.

16         "Question:  Did he ever at any time say, 'Well, this is

17  all my money anyway, so just give it to me' --

18         "Answer:  No.

19         "Question:  -- 'all the assets in these accounts are

20  mine'?

21         "Answer:  No."

22         Question, which then gets sustained, and we'll go down

23  here:

24         "Question:  When he made those requests for loans, were

25  they approved by the board?

1        "Answer:  Yes, they were.

2        "Question:  In fact, the board approved them routinely;

3    right?

4        "Answer:  Yes, they did.

5        "Question:  That was because the board knew that he was

6    already owed far more in deferred compensation than he was

7    asking for in loans?

8        "Answer:  That's correct."

9        So if Dr. Fredrick was getting valid loans from the

10   board, and the board approved those loans, that's not taxable

11   income to Dr. Fredrick at the time he got the loan; correct?

12   A    These were not valid loans.

13   Q    Using my assumptions, my answer is correct; is that

14   right?

15       If Dr. Fredrick was getting a valid loan that the board

16   approved from the Saba Foundation, that's not taxable income to

17   him in the year he received the loan proceeds; correct?

18   A    Are you saying the valid loan has terms and repayments,

19   and is tracked on the books and records?

20   Q    If that's your definition of it, but I'm just saying,

21   "valid loan."

22   A    These are not valid loans, but in that example, if

23   they -- if the loans were tracked on the books and records, and

24   there were documents showing the amount that was loaned, and

25   how much was paid back, and interest terms, then they would be

1    valid loans, and that would not be taxable income.

2    Q     So if there's evidence that these loans were paid back,

3    that would be one indicia they were a valid loan; correct?

4    A     One indicia.

5    Q     And you and I had this discussion at trial about the

6    fact that a loan doesn't have to necessarily be documented to

7    be a valid loan, there could be an oral understanding as well;

8    correct?

9    A     I don't think that example applies in what you're saying

10   here.

11   Q     If we could just focus on my question?

12         A loan does not have to be documented to be a valid

13   loan; correct?

14   A     Some things have to be documented.

15   Q     You can have an oral agreement to make a loan that's not

16   documented at all; correct?

17   A     Personally, I guess it would work; but for businesses,

18   I -- I . . . .  For business, and for him to take money out of

19   the business, there should be more than oral agreement.

20         MR. HOCHMAN:  Your Honor, I'd like to show -- the

21   witness was talking about, a moment ago, the fact that

22   Dr. Hough and Dr. Fredrick were listed on, presumably, the

23   Form As as the owners of these accounts.  I'd like to show the

24   witness three documents that are from the trial; 4A, 4C,

25   and 4F.  We actually -- it's the one notebook I didn't bring,

1   Your Honor.  So we have it on the computer, so if we can switch

2   over to the computer, we can do it that way.

3           THE COURT:  Well, apparently we can't do it right

4   now.

5           MS. KESSLER:  I can give the witness our binder.

6           MR. HOCHMAN:  That's great.  And I'll just put them

7   on the ELMO, Your Honor.

8           THE COURT:  Okay.

9           MS. FINLEY:  That was the four series?

10          MR. HOCHMAN:  Yes.  4A, 4C, and 4F.

11          THE COURT:  Actually, I've got them back here too.

12  BY MR. HOCHMAN:

13  Q    Now, Agent Maurer, you said that one of the factors --

14  one of the pieces of evidence you were relying upon to show

15  that Dr. Hough and --

16          MS. KESSLER:  Your Honor, if I could interrupt so

17  that the witness can look at the exhibit?

18          MR. HOCHMAN:  Well, I had a question before I was

19  going to show her the exhibit.

20          THE COURT:  That's fine.  Go ahead.

21  BY MR. HOCHMAN:

22  Q    You said that one of the pieces of evidence that you

23  relied on to show that Dr. Hough and Dr. Fredrick owned Saba

24  and MUA bank accounts is that they were listed as the

25  beneficial owner; is that correct?

1    A      That was one of the pieces.

2    Q      I show you Exhibit 4A, which is the Fortis Banque

3    account, which is now Page 1 from 4A.

4           This is the Fortis Banque account for Saba school; do

5    you see that?

6    A      Yes.

7    Q      And do you see where it's listed the contracting

8    partner?

9    A      Yes.

10   Q      And do you see that's the Saba School of Medicine

11   Foundation; correct?

12   A      Correct.

13   Q      And do you see the box that's checked?

14   A      Yes.

15   Q      And the box that's checked says that the contracting

16   partner, which is the Saba University School of Medicine, is

17   the beneficial owner of the assets concerned; do you see that?

18   A      Yes, sir.

19   Q      Doesn't say David Fredrick and Patricia Hough are the

20   beneficial owners of the Saba School of Medicine Foundation

21   account in Fortis Banque; correct?

22   A      Can I see the date?

23   Q      Sure.

24   A      Beda Singenberger is a nominee director for Patricia

25   Hough and David Fredrick.

1    Q       And on what do you base that?

2    A       That's what Beda Singenberger was.  They hired him.

3    They had POAs and documents directing him to open accounts and

4    things at UBS.

5    Q       This is actually a very important point.  There is not

6    one shred of documents in this case, whatsoever, in the trial

7    or that you presented, that shows that Dr. Hough and

8    Dr. Fredrick signed any document that empowered Beda

9    Singenberger to act on their behalf.

10   A       Yes, there is.

11   Q       Please produce one shred of documents that gives that

12   POA to Beda Singenberger, from Dr. Fredrick and Dr. Hough, that

13   they signed.

14   A       There were two documents signed, and I don't know the

15   exhibit numbers, but there were two documents that they signed

16   for Beda Singenberger to open accounts for them and . . . .

17   Q       Let me see if I can find those documents for you.  And

18   I'll turn to Exhibit, now, 4C.

19            MR. HOCHMAN:  And this is Page 3 and 4, Your Honor;

20   4C is the Liechtenstein Landesbank –– the Liechtenstein

21   Landesbank account for the Saba School of Medicine.

22   BY MR. HOCHMAN:

23   Q       And you see again it's the contracting partners is the

24   Saba University School of Medicine; do you see that?

25   A       Yes.

1    Q      And you see the box again that is checked is that the

2    contracting partner is the sole beneficial owner of the assets

3    concerned; do you see that?

4    A      Yes.

5    Q      And do you see who signs on behalf of the contracting

6    partner?

7           That's David Fredrick; is that correct?

8    A      Yes.

9    Q      And do you recall, also, that David Fredrick is not

10   listed as an authorized signatory on this account?

11   A      I don't recall that.  But David Fredrick and Patricia

12   Hough owned the Saba School of Medicine; so, therefore, they

13   own the bank accounts for the Saba School of Medicine.

14   Q      Well, they also were empowered by the board of

15   directors, signed by Dr. Paul Dalbec, to open up foreign bank

16   accounts; isn't that correct?

17          Do you want me to read his testimony on this as well?

18          You do recall that, don't you?

19   A      I recall, but . . . the Saba School of Medicine

20   Foundation is owned by -- what is this -- was the Saba School

21   of Medicine Foundation?

22   Q      Saba University School of Medicine Foundation.

23   A      Patricia Hough and David Fredrick owned the Saba School

24   of Medicine Foundation.  All those documents and paper trails

25   and things to add legitimacy to ownership for some other reason

1    are just paper trails, that Patricia Hough and David Fredrick

2    owned those -- owned the school because they had control and

3    they used personal, and they used it for their personal use.

4    Q      Now, I turn your attention to Exhibit --

5           MS. KESSLER:  Your Honor, may I interrupt to switch

6    to the screen so that the Government can have its binder put

7    back to follow along, since the clerk is back?

8           THE COURT:  Sure.  We have a person who can switch

9    now.

10          MS. KESSLER:  Thank you.

11          MR. HOCHMAN:  This is the last one.

12          THE COURT:  I literally have the Court's still back

13   here.

14          MR. HOCHMAN:  You know what?  This is just the last

15   document.  It's just one page too.

16   BY MR. HOCHMAN:

17   Q      And the point I'm making, it wasn't just the Saba school

18   that was listing itself as the beneficial owner.  We have here

19   the Fortis Banque account for the Medical University of the

20   Americas, and it too checked the box, the contracting partner

21   of the Medical University of the Americas is the sole

22   beneficial owner of the assets concerned.

23          Do you see that in Exhibit 4A, Page 1?

24   A      I see.

25   Q      And that's signed on behalf of the contracting partner

1    by David Fredrick and Pat Hough; do you see that?

2    A       Yes.

3    Q       So are those the two signatures in 4C and 4F which you

4    are referring to as the signatures that somehow gave Beda

5    Singenberger the right to represent David Fredrick and Pat

6    Hough?

7    A       No.  That's not the document.

8    Q       There's some other agreement that you've seen?

9    A       Yes.

10          MR. HOCHMAN:  Your Honor, I will proffer that that

11   agreement does not exist, and I have gone through the hundreds

12   of thousands of pages of discovery.  Unless the Government has

13   it, I would be shocked to see it.

14          MS. KESSLER:  Your Honor, I'd ask if we could hand up

15   to the witness the entire Exhibit 4F?

16          THE COURT:  Sure.

17          MS. KESSLER:  To the witness, please?

18          MR. HOCHMAN:  Sure.

19          MS. FINLEY:  To the witness.

20          MR. HOCHMAN:  I would like to review it since I don't

21   have another copy of it.

22          THE COURT:  Go ahead.

23          (Mr. Hochman reviews Government's Exhibit 4A.)

24          (Mr. Hochman provides the exhibit to the witness.)

25          MR. HOCHMAN:  No further questions, Your Honor.

1          THE COURT:  Any redirect, I suppose, or maybe

2    re-redirect?

3                    REDIRECT EXAMINATION

4    BY MS. KESSLER:

5    Q     Agent Maurer, I believe it's the second or the third

6    page of Exhibit 4A -- actually, you're waving it at me.

7    A     Yes.  Sorry.

8    Q     Is this a power of attorney that David Fredrick gives to

9    Sinco, Mr. Beda Singenberger's company?

10   A     Yes.

11   Q     Is it signed by Mr. Fredrick?

12   A     Yes.

13   Q     Going back to the questions that Mister --

14          MR. HOCHMAN:  Your Honor, I apologize, again, because

15   I don't have a copy.  May I just take a look at the copy that

16   counsel just referred to?

17          THE COURT:  Sure.

18          Can we not switch the computer for him, Brenda --

19          COURTROOM DEPUTY:  Sure.

20          THE COURT:  -- so that they can pull up their own?

21          MR. HOCHMAN:  Actually, we just pulled it up right

22   here.

23          MS. KESSLER:  Yes.  They should have control.

24   Please.

25          THE CLERK:  I was looking over there, and you have no

 1    computer, so I didn't get what you were wanting.

 2              THE COURT:  Could you pull it up?

 3              MR. HOCHMAN:  Yes.  I've got it, Your Honor.

 4              MS. KESSLER:  Does Your Honor want to see the page?

 5              THE COURT:  It's up to you.  Your case.

 6              MS. KESSLER:  Could we pull up Page, I believe

 7    it's . . . 3, to the screen?

 8              Can you publish Page 3 onto the screen?

 9              MR. HOCHMAN:  I'm sorry?

10              MS. KESSLER:  Could we publish Page 3 onto the

11    screen?

12              MR. HOCHMAN:  Are we switched over?

13              COURTROOM DEPUTY:  Yes.

14              THE COURT:  There you go.

15              MR. HOCHMAN:  Do you want to start with Page 2, that

16    explains Page 3, or --

17              MS. KESSLER:  If I could ask the witness the

18    following question.  I'm going to move on, now that we've shown

19    this document, to the issue of loans, and a valid loan.

20    BY MS. KESSLER:

21    Q      Did you see any promissory notes documenting loans from

22    the foundation to Dr. Fredrick or Patricia Hough?

23    A      No.

24    Q      Did you see any documents documenting an interest rate

25    set for any loans to the two of them?

1    A        No.

2    Q        Did you see any documents indicating the term or period

3    of time of any loans to Patricia Hough or David Fredrick?

4    A        No.

5    Q        Did you see any indications of any repayment of any

6    loans?

7    A        No.

8    Q        Did you see, in reviewing the audited financial

9    statements for Saba or MUA, any indication that the two

10   entities listed deferred compensation due to Patricia Hough or

11   David Fredrick as outstanding debts or liabilities of the

12   entities?

13   A        No.

14            MS. KESSLER:  No further questions, Your Honor.

15            MR. HOCHMAN:  This will be very briefly, Your Honor.

16            THE COURT:  Go ahead.

17            MR. HOCHMAN:  If we can go back to 4C, Page 2?

18                          RECROSS EXAMINATION

19   BY MR. HOCHMAN:

20   Q        And 4C –– 4F, please, not 4C.

21            And you see, in 4F, Page 2, that David Fredrick and

22   Patricia Hough signed and say:  "On behalf of the board of

23   directors for the Medical University of the Americas, I hereby

24   assign Dr. David Fredrick the power of attorney to conduct all

25   banking and business transactions on behalf of the Medical

1    University of the Americas."

2         Do you see that?

3    A    Yes.

4    Q    Do you see that Dr. Hough thereafter exercised any role

5    with respect to this, or was it just David Fredrick?

6    A    I don't understand the question.

7    Q    Sure.  Apparently, David Fredrick and Patricia Hough

8    authorized David Fredrick to carry out all relations in

9    connection with the business transactions of MUA.

10        Thereafter, do you see Patricia Hough involved in any of

11   the banking transactions of MUA . . . with respect to this

12   account.

13   A    I don't know that.  I don't have all the documents and

14   the timeline, or anything, in front of me.

15   Q    Well, the documents that you do have, which is 4F, which

16   is the entire exhibit from the trial on this bank account, do

17   you see Patricia Hough giving Beda Singenberger or anybody else

18   any additional instructions, or was it just David Fredrick?

19   A    She's giving him power of attorney to conduct banking

20   and business transactions.

21   Q    Switching gears real quick, with respect to the loan

22   issue that Miss Kessler was just talking about, you're aware

23   that, for instance, the loans to the -- for the properties were

24   repaid, weren't they, back to the foundation and one of its

25   entities?

1    A       I'm not aware of that.

2    Q       You're not aware of the trial testimony that talked

3    about the Asheville house being paid for when it was sold, and

4    the money going back to, I believe, Top Fast?

5    A       I do recall that.

6    Q       And with Greenville, as well, the money went back to, it

7    was either Ample Dynamic or Top Fast; do you recall that?

8    A       Yes.

9    Q       And then when the airplane was purchased, that that

10   money went back, it was either Ample Dynamic or Top Fast; do

11   you recall that?

12   A       Yes.  But I wouldn't . . . .  That still doesn't make

13   them loans, and I believe that money was paid back -- most of

14   that was paid back after the investigation began.

15   Q       And did you have a chance, I think you said, to review

16   board meeting minutes for the Saba School of Medicine

17   Foundation?

18   A       I reviewed some board meeting.

19           MR. HOCHMAN:  Your Honor, I would like to present

20   what I'll mark as Defense Exhibit B.

21           May I approach the witness, Your Honor?

22           THE COURT:  You may.

23           (Mr. Hochman provides evidence to the witness.)

24   BY MR. HOCHMAN:

25   Q       Now, Defense Exhibit B are the board meeting minutes for

1    the Saba School of Medicine Foundation, the board meeting on

2    March 21st, 2008.

3         Do you see that?

4    A    I see that.

5         MR. HOCHMAN:  Your Honor, I'd move Defense Exhibit B

6    into evidence.

7              THE COURT:  Any objections?

8              MS. KESSLER:  No, Your Honor.  Thank you.

9              THE COURT:  Exhibit B will be admitted.

10             (Defendant's Exhibit B admitted into evidence.)

11             MR. HOCHMAN:  If I might switch back to the ELMO,

12   Your Honor?  Thank you.

13   BY MR. HOCHMAN:

14   Q    Drawing your attention to the bottom of the first page

15   of Defense Exhibit B, under new business, do you see that?

16   A    Yes.

17   Q    Do you see that, in this board meeting, Dr. Fredrick

18   requested a loan from The Foundation to purchase a rental

19   property in Sarasota, Florida?

20        This would be a secured loan for four years, payable at

21   the current interest rate.  The second day there was

22   discussion.  And if you turn the page, at the very top, it says

23   that the motion passed.  Do you see that?

24   A    Um-hum.

25   Q    So that would be an example, or at least some . . .

1   excuse me . . . some documentation that, in fact, Dr. Fredrick

2   did go to the board, as Dr. Dalbec had testified, did ask for

3   approval for a loan, and did have that loan approved by The

4   Foundation; correct?

5   A      This is the first time that I've seen this.  And I don't

6   see any signatures on this.  And I don't know . . . if this

7   document is not a document that was just created for the

8   purposes of trying to disguise what really happened.

9   Q      That's just your speculation; correct?

10  A      I don't believe it's speculation.  I believe that Saba

11  School of Medicine Foundation was owned by David Fredrick and

12  Patricia Hough, and money was spent from this -- to purchase

13  real estate property, so you really can't loan money to

14  yourself and pay back money from yourself.  This is a document

15  trying to disguise the fact that Patricia Hough and David

16  Fredrick owned the Saba School of Medicine Foundation.

17  Q      And other than your conclusion about that, do you have

18  any evidence that this board meeting minute -- excuse me --

19  board meeting did not occur?

20         Do you have any evidence of that . . . actual evidence.

21  A      No.

22             MR. HOCHMAN:  No further questions.

23             THE COURT:  Ms. Kessler?

24             MS. KESSLER:  No, Your Honor.  Thank you.

25             THE COURT:  Let me ask you a few questions, see if I

1    understand what your position is.

2                    VOIR DIRE EXAMINATION

3    BY THE COURT:

4    Q       I guess I'm going to mix hypotheticals with realities.

5            Let's focus on 2003.  I'm looking at your Exhibit

6    Number 1.  Let's focus with the year ending December 31st,

7    2003.  And if you assume that Saba was a foreign entity, as it

8    was incorporated wherever it was, and if you assume, as

9    Miss Kessler described, that Dr. Hough used it as a personal

10   piggy bank, and if you assume that any money from Saba to

11   Dr. Hough, either in terms of salary or any money that she was

12   provided, or any item that was purchased with Saba, money for

13   her benefit, was all income -- don't worry about whether it was

14   called a loan or not, just any money she got out of that money

15   was income -- how much money would you have in 2003 . . . that

16   went to her?

17   A       I don't know, Your Honor.

18   Q       Is there any way of knowing?

19   A       Can I . . . .  I guess I could look at the -- I don't

20   have all the domestic bank records for MUA, or Saba, for 2003.

21   But the revenues and expenses -- the revenues came in to the

22   United States, and expenses were paid.  What was left was net

23   profit.  And that money was moved out to foreign accounts and

24   other accounts that were controlled by David Fredrick and

25   Patricia Hough.

1    Q      And what is that figure for 2003?

2    A      I don't know, Your Honor.

3    Q      You use a figure of just over one million dollars, I'm

4    going to round it off to a million, for 2003, but it was my

5    understanding that that million dollars wasn't necessarily

6    received by Dr. Hough during 2003; do I understand that

7    correctly or not?

8    A      If . . . if we're assuming that, as a corporation, then

9    it was not received by her; but if we're assuming that it's a

10   Schedule C entity and she owned it, then the net income is her

11   net income.  She received it.  She had access to it, and she

12   could use it.

13   Q      And then I guess the question is, why do we assume it's

14   Schedule C as opposed to a foreign corporation; or is every

15   foreign corporation deemed to be a Schedule C entity?

16   A      I'm deeming it to be a Schedule C entity because there

17   is no other entity that it can be for a U.S. domestic purposes.

18   And I'm saying it's not a foreign corporation because it was

19   owned by Dr. Fredrick and Patricia Hough.

20   Q      And U.S. citizens can't own foreign corporations?

21   A      Yes, they can.

22   Q      All right.  Then you lost me a little bit.

23          Assuming that the Court finds that Dr. Hough and

24   Dr. Fredrick were the de facto owners of this corporation, but

25   it is nonetheless incorporated under the laws of Saba, wasn't

1    it?

2              MR. HOCHMAN:  Netherlands Antilles for Saba, and

3    Nevis for MUA, Your Honor.

4              THE COURT:  Oh, thank you.  Netherlands Antilles.

5    BY THE COURT:

6    Q     I guess I don't quite understand why a corporation that

7    is indeed incorporated under the laws, in this case of the

8    Netherlands Antilles, gets deemed to be a Schedule C for tax

9    purposes.

10   A     I'm basing it on the fact that the money -- the revenues

11   and the expenses weren't collected offshore, they were already

12   in the United States, and those funds were -- if I want to

13   say -- they didn't have to be repatriated to be claimed.  Those

14   funds were already in the United States.  So they had -- those

15   funds would be their funds.

16   Q     Your shirt is rubbing against the microphone.

17   A     I'm sorry.

18   Q     Say that again, please.

19   A     If it was a foreign corporation and the funds were kept

20   offshore in the foreign corporation, then they would be taxed

21   on Subpart F income, which is dividends and interest and those

22   kind of things.  Whether they take it out nor not, they're

23   taxed on those type of investment income.  The other income,

24   the income from operations, is taxable when they repatriate it.

25   But I'm saying that the income was always onshore because the

1    revenues and tuition from the schools were collected in

2    domestic bank accounts in the United States.  So all this

3    income has, in essence, been repatriated because it was always

4    in the United States.

5    Q      And how does that affect whether Saba is treated as a

6    corporate entity or as a Schedule C situation?

7    A      In my calculations I treat it as a Schedule C.  If I

8    treated it as it's a foreign corporation but they repatriated

9    the money, I believe the money repatriated is the $1,050,501,

10   because it was already onshore and it was her profits.

11   Q      All right.  Let me give you another example because I'm

12   having a hard time with this.  Let's assume I'm Shell Oil

13   Company.  I own it.  The local gas station here in Fort Myers

14   makes me a million dollars a year.  It's a foreign corporation,

15   but clearly the money is made here, the money stays there.  I

16   don't take anything out of it.

17          What's my tax consequences for the million dollars . . .

18   that's made by my oil company?

19   A      You're a U.S. person, and you're taxed on worldwide

20   income, I know that.  You're saying you're a U.S. person and

21   you have a foreign corporation --

22   Q      Yeah, I'm the owner.  Regardless of what it may say in

23   the paperwork, I'm the owner of my foreign corporation.

24   A      And --

25   Q      And I make a million dollars here in Fort Myers.  My

1    question was the consequences.

2    A       Did you -- you made -- you earned the money here in Fort

3    Myers?

4    Q       I did.  But I left it in the company.  I didn't take

5    anything out.  So if you go to the Steele bank account, you see

6    zero; if you go to the Shell Oil account, you see a million

7    bucks.

8    A       You didn't take anything out, but you earned income in

9    the United States.

10   Q       Sure.  My company did.

11   A       I think it's your income because you earned it in the

12   United States.

13   Q       So the whole million?

14   A       Yes, sir.

15   Q       And the fact that it was generated by a foreign

16   corporation and kept in the foreign corporation's account, and

17   never literally distributed to me, doesn't matter?

18   A       It wasn't in a foreign account.  The money is in an

19   account here in the United States?

20   Q       Sure.

21   A       Well, then, in essence, it has been repatriated back to

22   you, it hasn't been left offshore.

23   Q       It was never left offshore.  It has always been here.

24   Let's just assume it's always been here.  But a foreign

25   corporation is what generated it and put it into that account.

1    A      But it's not . . . .  I guess, Your Honor, I'd have to

2    research more, because I believe that, if you left it –– if it

3    was your foreign corporation and you earned it offshore, and

4    you left it offshore, then it wouldn't be taxable until you

5    brought it back into the United States; but you're a U.S.

6    person, and you have this income in the United States, that

7    it's your income, and it hasn't been reported on a

8    U.S. corporation or anything.

9    Q      Does a foreign corporation not have to report income

10   earned in the United States?

11   A      A foreign corporation doesn't have any filing

12   requirements in the United States.

13   Q      Even if money is earned in the United States?

14   A      I believe, if the money is earned in the United States,

15   then . . . then it's U.S. source income, and it's taxable as

16   U.S. source income to the person who owns it.

17   Q      You mean literally to the person who owns the company?

18          You said, "person who owns it"; I guess, what is the it?

19   A      The person who has the control and the personal use of

20   the money that is in the United States.

21   Q      Okay.

22   A      But I can research that.  But I don't have it here.

23          THE COURT:  All right.  Any other questions based

24   upon mine?

25          MS. KESSLER:  No, Your Honor.

1          MR. HOCHMAN:  No, Your Honor.

2          THE COURT:  You may stand down.  Thank you.

3          (The witness left the witness box.)

4          MR. HOCHMAN:  Your Honor, may we call Mr. Luis Rivera

5     briefly, to just sort of respond to some of these questions?

6          THE COURT:  Let's see if the Government has any

7     additional witnesses.

8          MS. KESSLER:  No, Your Honor.  Thank you.

9          THE COURT:  All right.  Then certainly.

10          MR. HOCHMAN:  Thank you.

11          Call Mr. Luis Rivera to the stand.

12          COURTROOM DEPUTY:  Raise your right hand.

13          Do you solemnly swear or affirm to tell the truth,

14     the whole truth, nothing but the truth, in the case now before

15     the Court?

16          THE WITNESS:  I do.

17          COURTROOM DEPUTY:  You may have a seat.

18          State your full name, spelling your last.

19          THE WITNESS:  My name is Luis, L-U-I-S; middle

20     initial is O; Rivera, R-I-V-E-R-A.

21          COURTROOM DEPUTY:  Thank you.

22          MR. HOCHMAN:  And, Your Honor, might I just ask, it's

23     a leading question, but I want to summarize his credentials

24     very quickly in one question.

25          THE COURT:  That's fine.

1                              LUIS RIVERA,

2      called as a witness by the Defendant, and having been first

3      duly sworn, was examined and testified as follows:

4                            DIRECT EXAMINATION

5      BY MR. HOCHMAN:

6      Q       Mr. Rivera, is it accurate to say that you were with the

7      Internal Revenue Service criminal investigation division from

8      approximately 1980 to 2004, rising to the level of the

9      assistant special agent in charge, which is the number two

10     person in the Miami office?

11     A       It would be 2007, but yes, if you say 2007, that would

12     be correct.

13     Q       And would it also be true that you are a CPA?

14     A       Yes.

15     Q       That you have prepared returns for a living as well?

16     A       Hundreds.

17     Q       That during the time that -- you both dealt with

18     criminal tax loss during the 24 years that you were the

19     Internal Revenue Service criminal investigation division?

20     A       Correct.

21     Q       In fact, that was the only thing you were dealing with

22     during that time, is criminal tax loss?

23     A       And fraud, yes.

24     Q       But since you left the Internal Revenue Service, you've

25     also been involved with numerous civil audits; is that correct?

1    A       That's correct.

2    Q       And that you have –– you are obviously a member of a

3    variety of societies dealing with CPAs; is that correct?

4    A       Correct.

5    Q       And if I left out anything else, significant of your

6    experience?

7    A       Well, my practice currently for the last seven years, we

8    deal with a lot of significant tax issues, return preparation,

9    tax controversy, audits, client representation and collection

10   of fees.  So we certainly have a fairly broad range of tax

11   matters that we deal with.

12   Q       So let me actually start with the Judge's question.

13   A       Yes, sir.

14   Q       And the Judge's question, if ––

15           MR. HOCHMAN:  I'll do my best to rephrase it, Your

16   Honor.

17           THE COURT:  Good luck.

18           MR. HOCHMAN:  Thank you.

19   BY MR. HOCHMAN:

20   Q       If you have Shell Oil Company overseas, and Shell Oil

21   Company has a company here in America, and that company in

22   America earns $1 million and it stays in the company's

23   accounts, never leaves the company's accounts, and the Judge is

24   the owner of Shell Oil Company, does the $1 million, in the

25   year that the company makes it, become the Judge's million

1  dollars for tax purposes by the mere fact he owns the company?

2  A      In summary, it does not.  The company has to report it,

3  but it is not income until it's distributed.

4  Q      And we are assuming for this example that it was not

5  distributed, so it would not be income?

6  A      That's correct.  If we are assuming it was not

7  distributed, that's correct.  It's akin to any company that

8  doesn't pay a dividend but has, you know, net income, until

9  they distribute it in the form of a dividend, it's not income

10  to the shareholders or owners.

11  Q      So going back to this Saba/MUA example, I think you

12  heard Miss Maurer agree that both Saba and MUA were operating

13  companies; correct?

14  A      Yes, I did hear.

15  Q      They are not dummy companies or off-the-shelf companies,

16  or what have been called domiciliary companies; correct?

17  A      Correct.

18  Q      And to the extent that Saba and MUA earn money in a

19  particular year, would that money be a taxable -- would it be

20  taxed to the owners of either Saba or MUA, assuming that there

21  were no distributions to the owners in those years?

22  A      Under that particular example there would be no

23  distributions, so there would be no income.

24  Q      And would you put -- would you put any income as

25  Schedule C income on a -- on some type of adjustment?

1    A        That's truly an incorrect assumption.  A Schedule C is

2    for sole proprietors only.  You could have a company that, by

3    default, is a C Corp, single member, and that's what it is

4    known as a disregarded entity; but other than that, in this

5    particular example, in this particular case, you have a

6    two-member company, so that would never be a disregarded

7    entity, and that would never go on a Schedule C.

8    Q        And it's a real operating entity; correct?

9    A        According to the evidence I heard when she testified, I

10   believe it would be so.

11   Q        Disregarded entities are usually entities that have --

12   that are entities on paper alone; is that correct?

13   A        They are on paper, but they're single members and they

14   haven't obtained a designation, whether it be C corps, S corps,

15   or some other kind of floater entity.

16   Q        Are you familiar with the difference between civil and

17   criminal tax loss?

18   A        Oh, yes.

19   Q        And what is that difference?

20   A        Well, for criminal tax purposes, the computations need

21   to be based on hard-core evidence.  You need to be able to

22   show, for example, specific items, which this case happens to

23   be the income from the specific items that would be

24   attributable to the taxpayer.  For civil purposes it's

25   completely different.  You don't need to understand that there

1   has to be willfulness or anything like that.  For criminal tax

2   purposes you need to prove willfulness, to prove that the

3   conduct they engaged in was intended to be fraud to the United

4   States, and you don't need to do that for civil purposes.

5   Q      Does the IRS have an internal revenue manual that it

6   uses and instructs the agents on?

7   A      Part 9 specifically, yes.

8   Q      In your over two decades with the IRS, did you become

9   familiar with that manual?

10  A      Oh, yes.

11  Q      And does it actually have a section that says criminal

12  versus civil tax?

13  A      It does.

14  Q      And does that section talk about the fact that the

15  criminal tax deficiency may differ from the civil tax

16  deficiency in the civil process; criminal violations are

17  charged only against the tax deficiency that results from

18  fraud; the civil tax deficiency is much broader and includes

19  all tax due on a return, i.e., the tax from evaded income and

20  the adjustments to the subject's itemized deductions?

21  A      That is correct.  And having done many, many cases in

22  the criminal division, we always gave all those technical

23  issues in favor of the taxpayer, because you needed to prove

24  beyond a reasonable doubt that there was fraud with respect to

25  those items.  And they're so technical and so complicated in

1    nature that any time we have those, they were given to the

2    taxpayer in his favor or her favor.

3    Q      And even if we use the standard at sentencing which is

4    preponderance of the evidence, if you don't have evidence that

5    meets the preponderance of the evidence, would the ruling be

6    made in favor of the taxpayer, for instance?

7    A      Well, for criminal tax purposes, yes.

8    Q      And we saw, a moment ago, when I went through the MUA

9    sale example, that Ms. Maurer gave the same exact basis as the

10   sales price.

11          Would that be an example where, if you don't have

12   adequate documentation, you would not penalize the taxpayer for

13   the fact you're lacking documentation?

14   A      Yeah.  That would be one example of that.  However, in

15   that particular example, as I listened to it, there seemed to

16   be no real reason, or evidence, supporting either conclusion to

17   give it or not to give it.  And then with respect to the other

18   one, it was the same thing, there was no evidence, they were

19   treated inconsistently.

20   Q      Let's take the Saba sales price.  We had the Saba sales

21   price listed at approximately 988,000, yet Ms. Maurer gave a

22   zero basis for.

23          Do you recall seeing that?

24   A      I recall seeing that.

25   Q      Do you have experience with the valuation of businesses

1   during tax investigations?

2   A       And in my private practice; yes, both.

3   Q       And in order to determine basis, does one at times

4   employ an expert to go and figure out what were the assets that

5   were used to create the business' value?

6   A       We do it all the time.

7   Q       And would the assets of a medical school, in part, be

8   the clinical contracts that it had spent years obtaining from

9   hospitals throughout the United States and Europe, and

10  accreditation that it had spent years obtaining throughout the

11  United States and Europe?

12  A       That would have a value.  You would need a valuation

13  expert to determine what the value of those contracts would be.

14  Almost akin to a patent, a company spends a lot of time and

15  effort doing a patent, and before it even produces a product,

16  that patent has a value, but it has to be valued.  The same

17  thing with the medical contracts, it would have been required

18  to value them to be able to determine what the basis would be

19  in those particular instruments.

20  Q       So going back to Ms. Maurer's tax calculation, you saw

21  that, for 2003 to 2007, she listed Schedule C income for both

22  Saba and MUA for each of those years.

23          Do you recall that?

24  A       I recall that.

25  Q       Was that a correct way to attribute that income to

1    Dr. Hough and Dr. Fredrick?

2    A      It's completely incorrect, and even based on her own

3    testimony it's incorrect.

4    Q      In what way?

5    A      She is saying that they were corporations owned by the

6    two taxpayers, so that's two ownerships, two people owning.  If

7    they are corporations, by definition, even when a corporation

8    doesn't elect a designation before the IRS, it's a default

9    C Corp.  And with a C Corp, the only thing you have in terms of

10   distributions are dividends.  You have dividends.  They can be

11   distributed or not.  So it would be a C Corp.

12   Q      And not a Schedule C?

13   A      Oh, no, not a Schedule C.

14   Q      So all the entries she has in Exhibit 1 and Exhibit 2 --

15   Exhibit 1 being Dr. Hough, Exhibit 2 being Dr. Fredrick -- that

16   list of adjusted items for the Schedule C, MUA and Saba income

17   would be incorrect.

18   A      That's incorrect.

19   Q      Now, with respect to the interest, the capital gains,

20   and the dividends, you heard Agent Maurer say that she had no

21   evidence to show that Dr. Hough ever received the information

22   that any of these accounts earned interest, dividends, or

23   capital gains.

24          Do you recall that?

25   A      I did hear that.

1    Q      Based on your over two decades of experience with the

2    IRS criminal investigation division, how would you treat that

3    information in evaluating the criminal tax loss on those items?

4    A      For criminal tax purposes I would give it to the

5    taxpayer.  I wouldn't count it as income because I would have

6    to develop evidence that the taxpayer actually knew about it.

7    Because if you don't know about it, how can you evade it?

8    Q      And for civil tax purposes would you count it?

9    A      For civil tax purposes it might be construed as a

10   constructive dividend.

11   Q      Or if a bank account, a Swiss Bank account earned

12   interest, whether you knew about it or not, for several tax

13   purposes you're responsible for it; correct?

14   A      If you're a U.S. taxpayer, yes, you are.

15   Q      Because civil tax does not go into your mental state

16   like criminal tax does --

17   A      Not at all, it's a completely different standard.

18   Q      Now, with respect to the sale of the schools, again,

19   we've talked about MUA, we've talked about Saba.  Let's talk

20   about Round Hill for a moment.

21          With respect to Round Hill, the basis that was given --

22   excuse me -- the sales price that was given for Round Hill, do

23   you know if that was based on some fair market value, or was it

24   arbitrarily given by Dr. Fredrick to -- as Mr. Rodgers

25   testified -- to Mr. Rodgers?

1    A        I think it was just computed.

2    Q        And are you aware of any evidence that you've heard

3    going through, sitting through the whole trial, that Dr. Hough

4    was aware of the amount that was given to Round Hill as a sales

5    price in the deal?

6    A        No evidence that she knew about that, no.  I didn't hear

7    anything that would point to that.

8    Q        And if Round Hill -- now, when Round Hill was given a

9    $33 million amount in the sales agreement, do you recall what

10   Ms. Maurer said they had bought it for in 1999?

11   A        I don't recall specifically, but I'll take your word for

12   that.

13   Q        Well, it was $250,000 in 1999.

14   A        I do remember seeing the documents for that.

15   Q        So if the IRS -- based on your experience working with

16   the IRS, if the IRS had seen a piece of property appreciate

17   from $250,000 in 1999, to $33 million in 2007, roughly a 12 and

18   a half thousand percent increase, would the IRS ask questions

19   about that?

20   A        They would ask a lot of questions.  And particularly you

21   see those kinds of questions being asked in estate tax

22   planning, where people try to get the most out of it, and an

23   increase like that would be automatically questioned.  And they

24   would probably use valuators to try to determine the real value

25   of that property.

1   Q       And if the real value of that property was approximately

2   the amount that was put into that property, plus any additional

3   amounts that it appreciated, would that be an amount that the

4   IRS would recharacterize the transaction as?

5   A       You would recapture depreciation, subtract that, and,

6   you know, your gain or loss would be based upon however the

7   numbers fell.

8   Q       So in this particular case, if the IRS had actually --

9   does the IRS use a fair market value approach in many of these

10  type of cases to determine what the true sales price should be?

11  A       For some tax purposes they use fair market value; for

12  others, they actually use valuations.

13  Q       Okay.  And if they had used a fair market -- do we even

14  know what the fair market value of the Round Hill property was

15  in 2007?

16  A       I didn't see anything to determine that.

17  Q       You didn't see any appraisal that was done by anyone?

18  A       I didn't.

19  Q       You didn't hear anyone talk about what the fair market

20  value was, or that there had been any expert valuation of the

21  fair market value in 2007; correct?

22  A       I didn't.

23  Q       And none of this information was communicated to

24  Dr. Hough in 2007, is that right, based on your sitting through

25  all the evidence in this trial.

1    A       I didn't hear anything that would indicate that.

2    Q       And had a fair market value valuation been done that

3    approximated what the basis was, if you subtracted -- if the

4    basis was approximately the value for the Round Hill property,

5    would it have left any capital gains?

6    A       Again, it's wherever the numbers fall.  If you have a

7    basis that exceeds the sales price, you have a loss.  If you

8    have a sales price that exceeds the basis, you have a gain.

9    Q       (MR. HOCHMAN) May I have one moment, Your Honor?

10              THE COURT:  You may.

11              MR. HOCHMAN:  Thank you.

12              (Mr. Hochman, Mr. Saunders, and Mr. Udolf confer

13        privately.)

14              MR. HOCHMAN:  No further questions, Your Honor.

15              THE COURT:  All right.

16              Ms. Finley or Ms. Kessler?

17              MS. FINLEY:  Your Honor, may I just ask defense

18    counsel if they have one of their exhibits that they used at

19    trial?  I don't have it at hand.

20              THE COURT:  Sure.

21              (Ms. Finley and Mr. Hochman confer privately.)

22              MS. FINLEY:  I can start, Your Honor, before . . . .

23              THE COURT:  All right.  I've got some -- well.  I've

24    got all the exhibits anyone gave me still back here, so I don't

25    know if I have the one you need here or not.

1              MR. SAUNDERS:  We've got it on the screen.

2              MS. FINLEY:  Just the first page.

3              MR. SAUNDERS:  This is Trial Defense 30I.

4                         CROSS EXAMINATION

5    BY MS. FINLEY:

6    Q       So, Mr. Rivera, the Judge had asked Ms. Maurer about

7    whether she could show that there was money taken out of the

8    Saba account, or the MUA accounts, and distributed to Dr. Hough

9    or Dr. Fredrick.

10             Do you remember that was what he was, I think . . . .

11   A       I vaguely remember, yeah, something to that effect.

12   Q       I'm mischaracterizing your question.  But if we assumed

13   that Saba and MUA were foreign corporations, even if they're

14   owned by Dr. Fredrick and Dr. Hough, but they don't get a

15   distribution -- until they get a distribution, the money is not

16   taxable.

17             That's the assumption; correct?

18   A       If they're controlled foreign corporations, yeah, they

19   would have to make -- any corporation really, but in that

20   particular example, they would have to make a distribution, for

21   that distribution then to become taxable to the recipient, a

22   U.S. person.

23   Q       And at trial -- if I asked you to assume that New

24   Vanguard and Top Fast, and the other -- Ample Dynamic, the

25   other entity accounts that were offshore, other than Saba and

1    MUA, if I ask you to assume that those are complete shams,

2    nominee entities -- they are what Mr. Hochman has been calling

3    "shelf corporations," they serve no business purpose at all,

4    they're literally a bank account that is owned by Dr. Fredrick

5    and Dr. Hough -- and if MUA and Saba, for example, in 2006,

6    sent $2.5 million from the Saba account to New Vanguard, then

7    that would be income in 2006 to Dr. Hough.  It would be a

8    distribution.

9    A      Assuming that that transfer was a distribution and not a

10   loan, you would be correct.

11   Q      Isn't it true, though, that if you are a shareholder of

12   a controlled foreign corporation, when a controlled foreign

13   corporation makes a loan to its shareholder, who is a United

14   States person, the obligation to repay the loan is United

15   States property, and that the shareholder thereby realizes

16   income under Section 951 of the Internal Revenue Code?

17   A      That could be.  That may be the case.  But when you're

18   dealing with controlled foreign corporations, it gets very

19   technical because it depends how the distributions were made

20   and what the terms of the loan in the contract are.  If you

21   have legitimate loans they may not necessarily be income.

22   Q      And here, other than a board minute and Dr. Dalbec's

23   testimony, there was no evidence that had there were loans,

24   they were not listed as liabilities to Saba or MUA, there was

25   no deferred compensation on the financials for either of the

1    schools, there were no loan documents, there were no payments

2    back or interest payments from Dr. Fredrick and Dr. Hough to

3    the schools; is that correct?

4    A     Other than the testimony in that document, no, I didn't

5    see anything else to indicate those items that you just listed.

6    Q     And so Revenue Agent Maurer's original RAR, that was the

7    May RAR before trial, assumes that Dr. Fredrick and Dr. Hough

8    owned the corporations, but she's only taxing them with income

9    when there was a distribution, income from undeclared foreign

10   accounts on Line F; is that correct?

11          MR. HOCHMAN:  Objection, Your Honor.  Unless we can

12   get the backup of these figures, that assumption is an improper

13   assumption.

14          THE COURT:  Overruled.  He may answer if he can.

15          I'm not sure what she assumed at the time.  I don't

16   think she testified as to what she assumed.  I only know what

17   she put down, and she only taxed the interest and dividends,

18   some capital gains, the adjustments in the itemized deductions

19   that she explained, and of course . . . in that particular

20   revenue agent report, there was income from unreported foreign

21   accounts.  So it was treated differently.

22   Q     If I ask you to assume -- and I will proffer that the

23   2.5 million and the 3.7 million on Line F were transferred from

24   the Saba and MUA accounts into the New Vanguard accounts, and I

25   ask you to assume that that was a distribution, then her RAR is

1   correct from May, because it's including that as taxable income

2   when she received a distribution from her foreign corporation.

3   A      If they were legitimate distributions, yes.

4           MR. HOCHMAN:  I'm sorry, Your Honor, the objection is

5   a clarification whether or not that was for criminal tax

6   purposes or civil tax purposes.

7           THE COURT:  Overruled.  If he understands the

8   question, he may answer.

9   BY MS. FINLEY:

10  Q      On this RAR for criminal purposes, if the proof at

11  trial, or the proof that she was relying on was, there was a

12  $2.5 million wire from Saba University School of Medicine to

13  Dr. Hough's account in the name of New Vanguard, and that is a

14  distribution, and she knew she got the money, and then she used

15  it for her house, to buy a plane, or –– Dr. Hough, or she sent

16  $250,000 to her personal checking account in the United States

17  from New Vanguard, so she's got dominion and control over the

18  money, then that would be income to her; correct?

19  A      If you can prove criminally that that was the substance

20  of the transaction, she intended to evade tax, yes, that would

21  be that would be imputed into the criminal tax figures.

22          MS. FINLEY:  Ms. Alexander, I'm going to use the ELMO

23  now, if that's okay.  Thank you.

24  BY MS. FINLEY:

25  Q      Now, I think Mr. Hochman –– you heard Mr. Hochman ask

1    Ms. Maurer about whether Dr. Hough -- and I think you said you

2    don't think she knew that she was earning income in those

3    accounts; is that correct?

4    A      I heard that; yes.

5    Q      If I can show you, this is from 3KK, from the trial

6    Exhibit, Page 13.  And this is an e-mail from David Fredrick to

7    Mr. Luetolf, in February of 2005.

8           And Dr. Fredrick is telling Mr. Luetolf that:  "Pat said

9    you wanted to tell me about a plan that she was in that I was

10   not.  You are not going to let her make more money than me, are

11   you?"

12          And Mr. Luetolf responds that the plan she was referring

13   to was the double currency which Dr. Fredrick appeared to be

14   already in.

15          Is that what the document states?

16   A      Well, I can read what the document states.  I don't have

17   the context of the document.  But it says, yeah, I think the

18   plan that she was referring -- yeah.  Thank you.  I can read it

19   now:

20          "I think that the plan that she was referring to is the

21   double currency" -- some initials -- "which you were in before

22   she was.  I will do the best to keep you both moving along at a

23   good pace.  Best regards, Dieter."

24          So your question is, what do I think that means?

25   Q      No.  I'm just asking if that's what the document says.

1    A      Yes.

2    Q      So based on that document, it appears that Dr. Hough is

3    telling Dr. Fredrick that she's earning money in these

4    accounts, Dr. Fredrick is concerned he's not keeping up with

5    earning the same amount of money that she is.

6    A      Frankly, to me, it doesn't necessarily appear that.

7    From a criminal investigative standpoint, I would want to add

8    context to that document.  The words are the words in the

9    document, but what did the person that wrote that e-mail really

10   mean by that?  I would have an interview.

11   Q      You would agree with me that, in criminal tax cases, we

12   don't often interview the defendants; is that correct?

13   A      I wouldn't say often.  Sometimes we do, sometimes we

14   don't.

15   Q      And oftentimes the way that we understand what people

16   think in criminal tax cases is by their actions; correct?

17   A      Correct.

18   Q      And this would be one action that Dr. Fredrick is doing

19   to illustrate his knowledge and the information that, on the

20   face of the document, Dr. Hough appears to be telling him.

21   A      It may be.  I would have to put it in context with other

22   documents and information.

23   Q      And if there was another document in the exhibits that

24   Dr. Hough was signing to authorize Mr. Luetolf to invest in the

25   double currency, then that would corroborate this document,

1    would it not?

2    A      That might, yes.

3    Q      And you're familiar that Dr. Hough, when she opened

4    these bank accounts, signed a asset management agreement

5    that . . . that permitted Mr. Luetolf to invest according to

6    her investment strategy or her investment risk profile.

7    A      I don't specifically recall it, but I think there was

8    something to that effect, yes.

9    Q      And you're also familiar that the reason that Dr. Hough

10   did not get any bank statements from UBS is because she opted

11   not to receive any of the bank statements.

12   A      I believe the form was checked to withhold the

13   statements.  I wouldn't mind refreshing my memory with the

14   document, but, as I recall it right now, I think there was a

15   box for that.

16   Q      I'm going to show you just one of the exhibits.  This is

17   Exhibit 3N.

18           MS. FINLEY:  Your Honor, may I approach?

19           THE COURT:  You may.

20           MR. HOCHMAN:  May I ask counsel which page?

21           MS. FINLEY:  I'm sorry.  3N, Page 4.

22           And I will proffer to the Court, I apologize, since

23   he has my copy, this is the account-opening documents for Apex,

24   which were signed in 2003, by both Dr. Fredrick and Dr. Hough.

25

1   BY MS. FINLEY:

2   Q      And on Page 4, does -- the box is checked that says,

3   "retained mail"; is that correct?

4   A      Correspondence instruction says, "To be sent to the

5   following address."

6   Q      And then what does it say?

7   A      Then it's got another box checked across the original,

8   "retain mail."

9   Q      And so does that mean that it appears that she, or at

10  least the document, is stating that she does not want to

11  receive the bank records?

12  A      The document is stating to retain the mail.

13  Q      Okay.  And if I put up on the ELMO, this is Exhibit 3R,

14  this is the account-opening documents for Dr. Hough's

15  individual account, in her own name.

16         And if you turn to Page 2, Dr. Hough, for her own

17  account, is opting to retain -- have the bank retain the mail;

18  is that correct?

19  A      Yeah.  Except for special circumstances, original

20  retained.

21  Q      And on Page 3, Dr. Hough signs the second page of that

22  document.

23  A      I believe that to be her signature; yes.

24  Q      And these all were investment accounts, is that correct,

25  they were not bank accounts.

1    A      That's correct.

2    Q      And so normally when you open an investment account, you

3    expect that you're going to earn money; you could lose money,

4    but you are expecting that you are going to earn money?

5    A      You would hope to earn money, of course.

6    Q      Now, you said -- I think Mr. Hochman was asking you

7    about that the IRS would ask questions about a sale if they saw

8    that a property was purchased for $250,000, and then sold for

9    33 million; is that correct, the IRS would ask questions about

10   such a huge gain?

11   A      It depends on the context of the transaction, but yeah,

12   they would.

13   Q      Doesn't that presume that the IRS knows about the

14   transaction, for it to be able to ask questions?

15   A      Well, yeah, you would have to know about it to ask.

16   Q      And here the IRS did not know about it because

17   Dr. Fredrick and Dr. Hough did not report the sale to the

18   Internal Revenue Service.

19   A      They didn't report the sale, no.

20   Q      And would you agree that, when Mr. Rodger and

21   Dr. Fredrick sat down, I think he said in Sturbridge,

22   Massachusetts, to work out the deal to sell the schools, that

23   Mr. Rodger, an extremely experienced individual in buying

24   businesses, that he determined the fair market value was

25   40 million, when he said he wrote the price on the napkin and

1  passed it to Dr. Fredrick, and they pretty much had ironed out

2  a deal at the table there, that the fair market value was

3  determined by the buyer and the seller when they agreed to that

4  number?

5  A      That's not a valuation, but I believe the testimony was

6  along those lines.

7  Q      Do you think that Mr. Rodger would pay an amount for a

8  huge asset like the schools that he did not think it was the

9  fair market value?

10  A      I don't know what he would think; but, you know, you

11  would hope he wouldn't.

12  Q      And fair market value is a concept that is different

13  than basis; is that correct?

14  A      Yes, it is.

15  Q      Fair market value is for what somebody on the open

16  market might purchase an asset for.

17  A      Yeah, what somebody in the open market might pay for a

18  particular asset.

19  Q      And basis is something that is used to compute tax.

20  A      Yes.  It's normally used to compute tax, correct.

21  Q      You don't normally use the fair market value to compute

22  tax.

23  A      No, you probably wouldn't use a fair market value to

24  compute tax, except if you are doing a valuation and you want

25  to determine a basis, you might allude to the fair market value

1   as a valuator in order to be able to say what is that asset

2   really worth at this time to come up with a basis; what do I

3   have in my hands, and then what do I sell it for?

4   Q       But the IRS doesn't compute tax based on hypotheticals

5   of what a business could get on the open market or what

6   somebody might pay for it.

7   A       Sometimes hypothetical; sometimes they do impute a fair

8   market value.

9   Q       They don't compute tax based on fair market value.

10  A       Well, once you impute a fair market value, at the end of

11  the day it leads to a tax computation.

12  Q       The tax computation is based on the actual money that

13  was received for the sale, is it not?

14  A       Yeah, but sometimes they will impute a fair market value

15  upon a transaction.  You see this a lot on, sometimes on

16  companies that are you undervalued, and the Internal Revenue

17  Service will go back and impute a fair market value on a

18  transaction.  And once you do that, the rest of it is really

19  math.  You're coming down to a tax due and owing.

20  Q       They would do that, though, in situations where a

21  taxpayer was purposely undervaluing a company in order not to

22  realize a huge gain in some circumstances.

23  A       Not necessarily, but sometimes people have different

24  concepts of what something is worth, or something is valued at,

25  and so the Internal Revenue Service may weigh in on that with

1    those computations.  You see a lot of that in estate planning.

2    Q      I think Mr. Hochman asked Ms. Maurer about whether

3    Dr. Hough knew that the Round Hill property was purchased for

4    $250,000.

5           Do you remember that?

6    A      Yes, I remember.

7    Q      And you remember that Dr. Hough testified at trial that,

8    in 1999, Dr. Fredrick had informed her that the Round Hill

9    property was purchased for $250,000.

10   A      I recall.

11   Q      And so they did know what the basis was in 1999, in the

12   Round Hill property, when it was purchased.

13   A      That's not necessarily the basis.  Because to basis on

14   sales of property, you would have, for example, other items

15   that would affect that basis a year, two years, three years

16   down the road.

17   Q      And Ms. Maurer included all those items in her

18   computation of the basis.  I'm just asking, she knew what the

19   purchase price of the property was, the -- that it was

20   purchased for 250,000?

21   A      Oh, the purchase price, yeah, but she may not have known

22   the basis.

23   Q      But she knew that it was being developed; correct?

24          Didn't we see a picture of her, that they put up on the

25   screen at trial, of her --

1    A       Well, there was construction going on.

2    Q       She knew that it was going to be built; right?

3    A       There was construction, and there was going to be an

4    asset being built.

5    Q       And in order to do that, you have to spend money.

6    A       Oh, yes, I would think.

7    Q       And you would agree that, with respect to civil and

8    criminal tax loss, that oftentimes -- well, first of all, the

9    IRS civil is not bound by a criminal number; is that correct?

10   A       That's correct.  And they are often different numbers

11   actually.

12   Q       And they are most often higher; correct?

13   A       Most of them they are higher; except for rare

14   exceptions, they usually are higher.

15           THE COURT:  Which is higher?

16           MS. FINLEY:  The civil is usually higher.

17           THE COURT:  Thank you.

18   BY MS. FINLEY:

19   Q       And part of that is because, civilly, the standard is

20   lower; is that correct?

21   A       It's a different burden.

22   Q       And the revenue agent can consider additional items that

23   might not be admissible in a criminal case; is that correct?

24   A       That's correct.

25   Q       And civilly, the burden is on the taxpayer, not on the

1   IRS or the Government.

2   A      On the civil side, that is correct.

3   Q      And based on your 20 years' experience, you would agree

4   that, when you had trials, the number that might have been

5   proven at trial by a revenue agent or summary witness was

6   different than the number proven at sentencing.

7   A      It was a variety of experience.  My most recent

8   experience, actually, the Government and the defense agreed on

9   a number.  And it was pretty much close to the number for

10  criminal tax number.

11  Q      We're moving on from civil.  I'm talking just if you --

12  when you had a trial, on one of your cases, and you had a

13  summary witness testify, that witness would come up with,

14  perhaps, a number for trial purposes of the tax due and owing;

15  is that correct?

16  A      Yeah.  They may be different numbers.

17  Q      Then at sentencing, where the standard is lower and

18  relevant conduct could be considered, you might have a new RAR

19  that has a much higher number; is that correct?

20  A      You might, you might not.

21  Q      So there's nothing wrong with having another RAR that

22  has a higher number because it includes relevant conduct.

23  A      In and of itself, no.  In and of itself, no.

24         MS. FINLEY:  I'm sorry, Your Honor, Court's

25  indulgence.

 1              (Ms. Finley and Ms. Kessler confer privately.)

 2              MS. FINLEY:  I have nothing further, Your Honor.

 3    Thank you.

 4              THE COURT:  All right.  Thank you.

 5              Mr. Hochman?

 6                        REDIRECT EXAMINATION

 7    BY MR. HOCHMAN:

 8    Q       Going back to the example that Miss Finley just gave you

 9    about the sale of the Saba school, if the IRS determined that

10    the Round Hill property, instead of being worth 33 million, was

11    worth about 3 to 4 million dollars, if it made that

12    determination -- first off, it couldn't make that

13    determination.

14    A       At this particular time it could.

15    Q       And if it made that determination, it would make it

16    through, presumably, appraisals and estimating the fair market

17    value of the transaction; correct?

18    A       At the civil level it would be a negotiated process

19    where the Government would allege X, and the taxpayer would

20    allege Y, and it would probably come down to a valuation.

21    Q       So a valuation.

22              Now, in this case, if the IRS has determined, or any

23    determination had been made of the fair market value of the

24    Round Hill property, and it equaled a three to

25    four million-dollar amount that's been attributed to basis,

1    then the amount of capital gains from the Round Hill property

2    would be zero; is that correct?

3    A       Yes.  On that example, yes, it would be.

4    Q       And the rest of the value could have gone to the

5    purchase of the Saba school or, for that matter, MUA; is that

6    correct?

7    A       It could go any -- yeah, it could go into different

8    several pockets or buckets, um-hum.

9    Q       And then if the value went to the Saba school, and the

10   Saba school is an operating entity, and it goes to the Saba

11   accounts and doesn't get distributed to Dr. Fredrick or

12   Dr. Hough, that's not taxable income to them; is that correct?

13   A       It goes to Saba.

14   Q       Based on your over 20 years on the criminal side -- and

15   I think you testified at trial that you have been involved,

16   either personally or through the agents you supervised, in well

17   over 50 different criminal tax trials; is that correct?

18   A       Oh, yeah.

19   Q       Have you ever seen a summary witness have such

20   multimillion-dollar swings in their three reports, one on the

21   eve of an indictment, one six days into trial, and one about

22   96 days after the trial concludes?

23   A       I never actually saw that.  But as to the swings, it's

24   atypical.

25   Q       Atypical?

1   A       Atypical.

2   Q       And when Ms. Finley was discussing the fact that the

3   sales proceeds didn't show up on Dr. Fredrick or Dr. Hough's

4   returns, that's not actually true, isn't it, because --

5   A       Some of the sales proceeds did show up.

6   Q       It did show up.  It showed up on Dr. Fredrick's return,

7   in his 2007 return, reflecting the amount that he got for the

8   sale of EIC and MUA; is that correct?

9   A       That's correct.

10  Q       And then very quickly, when we dealt with 3R -- do you

11  still have that before you?

12  A       This is 3N.

13  Q       3N?  Do you have 3 -- actually, I'll take 3N from you,

14  if I might.

15          And do you have 3R?

16  A       I don't.

17  Q       With 3N, I think . . . I'll use the ELMO.

18          With 3N, Ms. Finley directed your attention to the

19  retained mail section of this document.

20          Do you see that?

21  A       It's a little fuzzy, but . . . . I see it now, yes.

22  Q       Do you see any signature for Dr. Hough on this document?

23  A       No, I don't.

24  Q       Do you recall Dr. Hough's testimony at trial that that's

25  not her handwriting?

1    A       Yes.

2    Q       Now I'll show you, with respect to 3R . . . .

3            MR. HOCHMAN:  Do you have 3R?

4            (Mr. Hochman and Ms. Finley confer privately.)

5    BY MR. HOCHMAN:

6    Q       I'm showing you the second page of Exhibit 3R.

7    A       Yes.

8    Q       Once again check retained?

9    A       Yes.

10   Q       And do you recall Dr. Hough's testimony that she didn't

11   sign -- that none of the writing on this document is hers?

12   A       Vaguely I remember; yes.

13   Q       And that the only writing that she put -- she recalls on

14   Page 1 of Form A, that it's her signature, but that none of the

15   writing on that document was hers?

16   A       Yeah, I recall, vaguely recall; but I recall that, yes.

17   Q       And then on Page 3 of that exhibit that, again, that's

18   her signature and her writing out of the date and the place.

19   A       It's a little fuzzy, but --

20   Q       I apologize.

21   A       -- yeah, um-hum.

22   Q       But that that document was given to her by

23   correspondence.  And by that I will focus you, at the very

24   bottom, at the bottom, do you see the box, "by correspondence,"

25   is checked?

1   A       Correct.  I see that, yes.

2   Q       Do you recall what that meant, that Mr. Luetolf

3   basically sent her a packet of documents, she signed them all

4   and sent them back?

5   A       I recall that, yes.

6               MR. HOCHMAN:  No further questions, Your Honor.

7               Oh, I'm sorry.  One last question.  I apologize.

8               (Mr. Hochman and Mr. Saunders confer privately.)

9   BY MR. HOCHMAN:

10  Q       Last question, Mr. Rivera:  Regardless of whether or not

11  Dr. Hough checked the box or didn't check the box in retaining

12  mail, doesn't the Government bear the burden of proof, at a

13  criminal tax loss sentencing, of showing that, in fact,

14  Dr. Hough was presented with information that showed that she

15  earned interest tax and capital gains in order to prove

16  criminal tax loss?

17  A       For criminal tax purposes, that would be correct.

18              MR. HOCHMAN:  No further questions.

19              THE COURT:  Ms. Finley?

20              MS. FINLEY:  Just extremely briefly, Your Honor.

21                        RECROSS EXAMINATION

22  BY MS. FINLEY:

23  Q       If we look back at Exhibit 3N, for the retaining mail,

24  and you look . . . .  Is this a two-page document; if you look

25  at the bottom, you see Page 1 of 2?

1    A       I see that says Page 1 of 2; yes.

2    Q       And if you want to look, we can zoom in at the very

3    bottom.

4            Does it say Page 2 of 2?

5    A       Yes, it does.

6    Q       And does this one actually say that it was done in

7    person?

8    A       That one has the in-person box checked.

9    Q       And Dr. Hough signs this document.

10   A       I believe that to be her signature; yes.

11   Q       And isn't the standard at sentencing reasonable

12   foreseeability for tax loss, not beyond a reasonable doubt,

13   that she knew exactly, specifically, every single dime that she

14   earned?

15           MR. HOCHMAN:  Objection, calls for legal conclusion.

16           THE COURT:  Didn't your question call for that too?

17           MR. HOCHMAN:  Not this particular legal conclusion,

18   Your Honor.

19           THE COURT:  I know it was a different legal

20   conclusion you wanted, but . . . .  Overruled under the "what's

21   good for the goose is good for the gander" rule, or some such

22   thing.

23           THE WITNESS:  You would be correct.

24           MS. FINLEY:  Thank you.  No further questions.

25           THE COURT:  I have a question for the witness.

1          What was the first exhibit that you showed this

2    witness?  And it might have been a defense exhibit.

3          MS. FINLEY:  It was.  Defense 30I, Your Honor, which

4    was the -- what they would call our original RAR.

5          THE COURT:  Oh, okay.  Thank you.

6          MR. HOCHMAN:  That's the May RAR, Your Honor.

7          MS. FINLEY:  Or Revenue Agent Report.

8          THE COURT:  All right.  Thank you.  You may stand

9    down.

10          Anything further?

11          MS. FINLEY:  Not from the Government, Your Honor.

12          (Mr. Hochman and Mr. Saunders confer privately.

13          MR. HOCHMAN:  No further witnesses, Your Honor.

14          THE COURT:  You may stand down, then.  Thank you.

15          (The witness left the witness box.)

16          THE COURT:  Anything else, in terms of witnesses,

17    from the Government?

18          MS. FINLEY:  No, Your Honor.

19          THE COURT:  All right.  Anyone care to be heard in

20    argument?

21          MR. HOCHMAN:  Yes, Your Honor.

22          THE COURT:  Why am I not surprised?

23          MR. HOCHMAN:  Your Honor, Mr. Saunders is correct,

24    it's their burden, so they should probably go first, Your

25    Honor.

1          THE COURT:  Think so?

2          MS. FINLEY:  Thank you, Your Honor.

3          And are we having argument just on the tax loss,

4    since we still have the minor participant, or would the Court

5    like to hear argument on everything once we've finished that?

6          THE COURT:  Would I like to hear argument on the tax

7    loss.

8          MS. FINLEY:  Okay.  Thank you.

9          Thank you, Your Honor.  The Government submits that

10   the evidence that we presented, both at trial and here today,

11   support the presentence report finding that the tax loss is

12   $15,518,382, which equals a Level 26, pursuant to

13   Section 2T1.1, 1.9, and 4.1 of the sentencing guidelines.

14   Under Section 1B1.3A1A, and Section 2, the standard is

15   reasonable foreseeability of the acts and conduct of all the

16   actors, and that is also the standard in the 11th Circuit under

17   the Bradley case.  The standard is preponderance, and the Court

18   can consider information, including reliable hearsay,

19   regardless of its admissibility at trial.

20          Tax loss, again, was not an element of the offense,

21   but the Government at trial did put on testimony concerning tax

22   loss, and that tax loss was over $6 million, at trial, that we

23   submit that we showed to the jury.

24          THE COURT:  So tell me how tax loss is defined for my

25   purposes today.

1          MS. FINLEY:  Tax loss is defined as the unreported

2     income that both Dr. Hough and Dr. Fredrick intended to conceal

3     from the Internal Revenue Service during the course of the

4     conspiracy, and specifically in the years that she filed false

5     tax returns that she was convicted of.  The Government submits

6     that the Court can also find acquitted conduct, so we are

7     including 2007 -- excuse me, 2006 in that computation.

8          And the evidence shows that Dr. Fredrick and

9     Dr. Hough were the owners of Saba and MUA, and that all of the

10    profits from those schools should have been reported in the

11    United States on their tax returns.  They did not file tax

12    returns here, they did not opt to incorporate here, they didn't

13    become a C Corporation.  As Ms. Maurer testified, the entities,

14    the Nevis entity and The Foundation, were nothing but nominees

15    in order to conceal and disguise Dr. Fredrick and Dr. Hough's

16    ownership.

17         The jury's verdict, the Government would submit,

18    supports that finding that she owned the schools, because --

19    and that she had a duty to report that income on her tax

20    return, because they could not have found her guilty,

21    especially of the false-return counts, unless they had found

22    that she had an interest in an ownership of the school

23    accounts.

24         THE COURT:  Is there some either case law or

25    statutory authority that would support your position that the

1  income to Saba becomes Schedule C income to either Dr. Hough or

2  Dr. Fredrick?

3        MS. FINLEY:  Your Honor, as the Government stated to

4  you last time, the Supreme Court has held that federal tax law

5  is concerned with the economic substance of the transaction and

6  not the form by which it is masked.  And when the form of the

7  transaction presents an accurate -- where the form of the

8  transaction presents an accurate reflection of the substantive

9  rights and responsibilities allocated by the parties, then the

10 form should be respected.  But when it does not, and the

11 substance of the transaction differs from the form, then that

12 transaction's substance controls.  And that's both in Gregory

13 v. Havering, and Frank Lyon -- L Y O N -- Company versus the

14 United States, both Supreme Court cases.

15        And the Government submits that the entities and the

16 corporation were nothing but the window dressing to conceal

17 Dr. Fredrick and Dr. Hough's ownership, that these were their

18 corporations that should have been reported on their individual

19 tax returns.  They didn't opt to become a corporation, they did

20 not incorporate, they didn't get EINs, and so the default is

21 that it is a Schedule C, and that that is how it should be

22 taxed for criminal tax purposes.

23        THE COURT:  Didn't they incorporate under the laws

24 of, I think it was Netherlands Antilles, for Saba?

25        MS. FINLEY:  For MUA there was an incorporation

1   document.  But again, the Government would argue that they did

2   not respect the form, that they did not obey and use the form

3   as it was intended, because they had ultimate decision-making

4   authority.  The Government would submit that the board of

5   directors were nothing but nominees who were ultimately going

6   to agree to do whatever Dr. Fredrick or Dr. Hough asked.

7          I think Dr. Dalbec, while he said that Dr. Fredrick

8   came to the board to ask them for money, that they approved it

9   every single time, that they didn't know about the sale of the

10  school until Dr. Fredrick came to them to tell them about it,

11  that assets are being purchased for the land and other things,

12  and that all of those things, we have other evidence that we

13  did not put on at trial where there were other board members

14  who informed the Government that board minutes where their

15  names appeared, that they were never even at those meetings.

16         And the Government has that memorandum here today, if

17  the Court would like it more than my proffer that that was what

18  was said.  But Dr. Digiacomo, D-I-G-I-A-C-O-M-O, was a board

19  member for many of these years, and he -- when he was

20  interviewed by the Government and we provided him with board

21  meetings that he was at meetings, and he said:  I wasn't there.

22  I don't remember those things happening.  I couldn't have been

23  there for some of the meetings.

24         And so the Government submits that all of this

25  paperwork is nothing but window dressing to conceal Dr. Hough

1    and Dr. Fredrick's ownership.

2           THE COURT:  Well, assuming that's true, though, at

3    least with MUA, you still had a corporate entity out there.

4    Doesn't there have to be some evidence of distribution of money

5    from MUA to the Defendant and Dr. Fredrick, as opposed to just

6    money going into MUA, and all of it being attributed half to

7    one and half to the other?

8           MS. FINLEY:  Your Honor, the -- if I can address --

9    this is sort of an area where I can address the Government's

10   different RARs, because it actually really speaks specifically

11   and pointedly to the Court's question.

12          When the Government received information from

13   Mr. DeCastro's offer on the eve of indictment, we presented

14   some of that to the grand jury; but at that time the Government

15   did not believe that we had sufficient evidence where we could

16   really sham it, or collapse the entities from the very, very

17   top, being Saba and MUA, because we did not have what we had in

18   those six series of documents, Dr. Fredrick and Dr. Hough's own

19   words saying, "We own Saba and MUA."

20          And so for purposes of the May RAR, we honored the

21   form that Saba and MUA were corporations.

22          MR. HOCHMAN:  Your Honor?  I'm sorry.  I'm going to

23   object to the extent that counsel is testifying.  None of this

24   came out from any witness, or any document that's in evidence

25   before the Court.  If counsel wants to take the stand and

ARGUMENT BY MS. FINLEY                    190

1    testify and be cross-examined, that's one thing, but to talk

2    about interviews of people that aren't before the Court, to

3    talk about what she and the Government were doing back in May,

4    that aren't before the Court, that's my -- that would be my

5    objection to this type of argument, Your Honor.

6         THE COURT:  The objection is overruled.  If what she

7    says really becomes important, I may give you a chance to

8    cross-examine her, but let me at least hear what she proffers.

9         MS. FINLEY:  Thank you, Your Honor.  I'm happy to

10   provide the Court with the memorandum of Dr. Digiacomo, if --

11        THE COURT:  No, I don't need that.

12        MS. FINLEY:  And so in that case there were funds

13   that came out of the MUA and the Saba accounts, into the New

14   Vanguard and the Top Fast accounts.  And that was what you were

15   just reviewing with Mr. Rivera, was the 2.5 million and the

16   3.9 million.  And then that was were the Government -- there

17   were distributions from the Saba school, and they were to

18   Dr. Fredrick and Dr. Hough's entity of New Vanguard.

19        THE COURT:  So what's the dollar amount of the

20   distributions that you can show in the relevant timeframe of

21   2003 to 2008?

22        MS. FINLEY:  Sure, your Honor.

23        And again, I'm sorry, if you could pull the May RAR

24   up again?

25        Your Honor, if you have a screen up there . . . .

ARGUMENT BY MS. FINLEY                          191

1    Just let me know when you can see it, and I'm happy to proceed.

2           THE COURT:  I've got a screen way down here.  It's

3    better off using that one.

4           MS. FINLEY:  All right.  So in 2006, there was

5    $2.5 million in transfers out of the Saba and MUA accounts into

6    the New Vanguard and/or -- and, given that we did not present

7    this at trial, we have supporting documents which we, if we

8    take a break, I can go down to the U.S. Attorney's Office and

9    print up, to support what those specific transfers are -- I can

10   see Mr. Hochman standing briefly there -- and then, in 2007, we

11   can show that 3.7 million and change came out of the Saba and

12   MUA accounts, and landed in the New Vanguard or the Top Fast

13   accounts.

14          And based on that -- and I -- if we could just turn

15   to the second page?  I'm sorry.  I'm sorry, the third page.

16   And there was none in 2008 because the schools had already been

17   sold.

18          So I apologize, Ms. Nardi, if we can just go back up

19   to the third page, toward the bottom.  Right there.

20          And then so based on the inclusion of that income,

21   the tax loss for 2004 to 2008 was the $10,552,728.

22          THE COURT:  And where do I see that figure?

23          MS. FINLEY:  It would be, Your Honor, on Line 14.  It

24   says, "deficiency/increase in tax."  If you add it up

25   for '04, '05 -- sorry, '05, '06, '07, and '08, it totaled the

1    $10 million in Mr. Hochman's Defense Exhibit A from the

2    sentencing today.  He totaled it up for the Court.

3           THE COURT:  That equals 10 million?

4           MS. FINLEY:  And then you have the same amounts on

5    Dr. Fredrick's Revenue Agent Report.

6           THE COURT:  Oh, I see what you're talking about.

7           MS. FINLEY:  So each of them got 2.5, I think there

8    was 5 million that came out in '06, and 6-plus million in 2007,

9    and they were split evenly between the two of them.

10          And I think Ms. Maurer did testify at trial

11   concerning the movement of the money out of the MUA and Saba

12   bank accounts, and on redirect she was asked whether -- why the

13   RAR had changed, and she had testified that you could not steal

14   money from yourself.  And so the reason that those amounts, the

15   2.5 million and the 3-plus million, were removed from this RAR

16   was because we were, at trial, going forth with the theory that

17   the profits from -- that Dr. Fredrick and Dr. Hough owned MUA

18   and Saba, and that the profits should have been reported on

19   their individual income tax return, and that the proof at

20   trial.

21          THE COURT:  So am I roughly correct, this is

22   $5 million that you attribute in distributions to Dr. Hough?

23          MS. FINLEY:  Yes, Your Honor.  And then the same to

24   Dr. Fredrick.

25          THE COURT:  Correct.  And is . . . .  Is that the

1    total of distributions that you think you can establish from

2    Saba or MUA to either Dr. Hough, Dr. Fredrick, or one of the

3    entities?

4              MS. FINLEY:  Yes, Your Honor.

5              THE COURT:  Okay.  Go ahead.

6              MS. FINLEY:  And so I think if we were using Your

7    Honor's example of honoring the corporation, or the gas

8    station, and he doesn't pull any money out, the 2.5 and the

9    3.6, or whatever it was, is what would have been those

10   distributions.  And then she would be taxed on them at that

11   point.

12             So the Government submits that the revenue agent

13   report that we have submitted for sentencing is what the Court

14   should adopt because the -- Dr. Hough and Dr. Fredrick owned

15   The Foundation and the schools, and the profits all should have

16   been reported on their income tax returns in the year that they

17   had been earned.

18             Just with respect to this argument that she doesn't

19   know that she's earning income in the accounts, these were

20   investment accounts, they opted, as the Government just showed

21   in several of the exhibits, not to get statements.  She is

22   talking to Dr. Fredrick in 3KK, Page 13, that shows that she

23   knows these are for investments.  There are other e-mails and

24   evidence where Dr. Fredrick, with Dr. Hough copied on the

25   e-mails, talks about splitting the accounts, or they want to

1    make sure their financial affairs are taken care of, and it

2    sort of -- the Government belies any reality to think that

3    money was not being earned in these accounts, and she's opted

4    not to receive the statements, and so she can't put her head in

5    the sand and say, "I don't know I'm earning money in investment

6    accounts that I opened and opted to have a discretionary

7    mandate so I didn't have to tell Mr. Luetolf how I wanted my

8    funds invested."  And she is moving money in between the

9    accounts.

10            And then with respect to what I expect Mr. Hochman to

11   argue, that she doesn't know about her husband's taxes, you

12   know, they are married, filing joint, but she did have

13   information --

14            THE COURT:  Filing separate.

15            MS. FINLEY:  I'm sorry, filing separate.

16            If you look at Exhibit 5J, Mister -- there is an

17   e-mail from Dr. Hough to Mr. Murtha, where Dr. Hough is talking

18   about Dr. Fredrick's income, and providing information to

19   Mr. Murtha about Dr. Fredrick's tax returns, and the Government

20   submits that they were operating in concert, they both owned

21   the schools 50/50, they owned all of the other entities 50/50,

22   including Round Hill, Lynn Lyon Group, and that it was

23   reasonably foreseeable that she knew that Dr. Fredrick was not

24   reporting his income as well on his tax returns.

25            So while the Government would submit that the

1    15 million is the appropriate number, the alternative argument

2    would be that the May, 2013 RAR that shows 10 million total,

3    $552,728, would be the Government's backup tax loss argument.

4          And unless the Court has further questions of me, I

5    have no further argument.

6          THE COURT:  I might come back in a few minutes.

7          MS. FINLEY:  Okay.

8          THE COURT:  Mr. Hochman?

9          MR. HOCHMAN:  Yes, Your Honor.

10         Your Honor, the issue here, I think the Government

11   has mistaken ownership for taxable income.  Because I

12   understand the Court's findings.  Obviously we object for the

13   record to the Court's findings that Dr. Fredrick and Dr. Hough

14   owned the Saba school and owned MUA.  But as the Court has

15   pointed out in its own hypotheticals, and I believe Mr. Rivera

16   made absolutely clear, the mere fact that someone might own a

17   corporation does not transform that corporation's money that it

18   earns in a particular year into your taxable income absent a

19   distribution.

20         So I think to the extent that the Government has

21   failed to identify the particular distributions, with any

22   particularity, and I'll deal with the backup argument that

23   Ms. Finley has just presented, by the way, Miss Maurer didn't

24   even present the backup argument, going back to her first RAR,

25   but I think the fundamental concept that deals with the Saba

1    and MUA line items on Exhibit 1, that take us from 2003 to

2    2007, for that reason alone, those line items, Your Honor, are

3    improper and should be removed from the calculations.

4         The second level of analysis, Your Honor, deals with

5    taxable interest, dividends, and capital gains.  And there's

6    several different arguments, Your Honor, on the issue of

7    criminal tax loss with respect to these.  I think the

8    Government actually articulated a fairly close definition of

9    criminal tax loss, Your Honor, because they said that it's

10   unreported income from Dr. Fredrick and Dr. Hough that has been

11   intended to conceal and evade that tax.  Well, obviously, if

12   you don't know that you have particular income, by definition,

13   you can't intend to conceal income that you don't know you have

14   earned.  And that truly is the difference between criminal tax

15   loss and civil tax loss.

16        I think Mr. Rivera told you that in civil tax loss,

17   Your Honor, the numbers are much bigger because the Government

18   does not have to get into the mental state of the particular

19   taxpayer.  If it shows up on some bank account they had no idea

20   that they owned, but ultimately it's shown that they do own it,

21   they are liable for it for civil reasons, but not for criminal

22   reasons, Your Honor.

23        THE COURT:  Can you give me, or maybe you have cited

24   already, a case that makes that distinction for sentencing

25   purposes?

1          MR. HOCHMAN:  Your Honor, we have actually looked for

2     a variety of cases on this issue, and surprising the issue

3     hasn't come up with more regularity.  The guidelines talk about

4     the criminal tax loss being the object of the offense, being a

5     violation of the criminal tax loss, the actual loss flows from

6     the violation of the criminal tax laws.  The definition of a

7     violation of criminal tax law is an intentional violation of a

8     known legal duty.

9          We have one case that we found in the 11th Circuit

10    dealing with a tax preparer named Mr. Schroeder.  I can get the

11    Court the cite.  The problem with that is, again, they don't

12    analyze this particular issue.  They do, as a matter of fact,

13    point to Mr. Schroeder, a tax preparer, who was, I think, found

14    guilty with respect to certain tax clients that he had.  The

15    Government tried at sentencing to add other tax clients.  The

16    argument was, that doesn't rise to the level of criminal tax

17    loss because you didn't show that Mr. Schroeder willfully

18    intended and knew that those other people are failing to report

19    their taxes as well, and the Court affirmed the fact that

20    Mr. Schroeder -- I'm sorry, Your Honor, I misspoke.  It's a

21    7th Circuit case.  And that, quite honestly, is as close as we

22    got.  The cite is 536 F.3d. 746.

23          And they state that, in this case, the Government

24    bore the burden of proving, by the preponderance of the

25    evidence, that the unpaid taxes discovered through the civil

1    audit were attributed to Schroeder's criminal or unlawful

2    conduct.  And that's -- and that generally is, Mr. Rivera

3    testified, is what they do in criminal tax cases.  We read and

4    he affirmed the IRS manual, that a criminal tax loss relates to

5    fraud, relates to your ability to prove it's fraud.

6         And I gave the Court, last time, examples of what the

7    Government could have done here to establish it.  They could

8    have said, or shown, that Dr. Hough actually received the bank

9    statement that had any of this information on it.  And again,

10   the mere fact that she signed some document that, a page

11   before, said that she was going to allow the bank to retain the

12   statements doesn't meet the Government's proof that she ever

13   saw a statement.

14        And the Government seems to think that it's

15   reasonable that you're going to assume that you're going to

16   make money, and make taxable interest, dividends, and capital

17   gains, just by the mere fact that you have an account.  Their

18   own numbers belie that concept because we know, in certain

19   years, they actually lost a lot of money, they lost capital

20   gains.  They have negative, you know, other items with respect

21   to income.

22        So it's not a natural that the mere fact you have an

23   account is going to lead you to believe that you actually

24   earned income that particular year.  And if you didn't know,

25   the Government didn't prove, by a preponderance of the

1    evidence, that you knew that you earned income in a particular

2    year, you can't intended to conceal income you never had, or

3    that you never knew that you had.  So the way the Government

4    would have proved it, they could have proved it by the bank

5    statements.  They could have called Mr. Luetolf, and

6    Mr. Luetolf could have testified.  Because, remember, he still

7    works for UBS, they still are under this Deferred Prosecution

8    Agreement, where they have to produce documents and witnesses.

9    They produced Mr. Futterknecht but not Mr. Luetolf, but

10   Mr. Luetolf could have come in and said, "Yes, I had

11   discussions, telephone calls with Dr. Hough, and we discussed

12   not whether it should be in a double-currency account, because

13   again, we show that if you lost money in certain years, but

14   that we actually made money along the way.  We made taxable

15   interest, dividends, capital gains."  They didn't do that.

16        They could have had other types of -- mail

17   correspondence, letters, other witnesses, where Dr. Hough was

18   confiding in someone, "Look, you know, I just got word from the

19   Swiss that I made some more taxable interest or dividends."

20        We learned with capital gains, not only do you have

21   to know how much the sale -- the stock sold for in a particular

22   year, you have to do that very lengthy analysis that Agent

23   Maurer testified at trial that took her somewhere between 250

24   and 500 hours, Your Honor, to track back the purchase price of

25   the stock to see if, in fact, she actually made money when

ARGUMENT BY MR. HOCHMAN                    200

1    there was a sale.  We know that no evidence exists that

2    Dr. Hough ever did that, or has presented any evidence that she

3    made or lost, for that matter, any capital gains in a

4    particular year.

5          So dealing again with taxable interest, dividends,

6    and capital gains, the Government has to show that she knew

7    that she earned that in a particular year.  And they haven't

8    done that.  I think Miss Maurer candidly admitted that there

9    was no evidence, no evidence in the record whatsoever, to

10   establish Dr. Hough's knowledge.  And if you didn't know it,

11   you can't conceal the fact of something you did not know.

12         So that deals with sort of the taxable interest, the

13   dividends, and the -- and the capital gains, Your Honor.

14         So now what happens?  The Government comes up, at the

15   11th hour and 59th minute, and says:  We have a report back on

16   May 14th, that Miss Maurer completely disaffirms at trial,

17   completely, six days into trial, she says that report is wrong

18   by over $11 million of total income and $4 million of tax.  She

19   then is given more time, 96 more days, Your Honor.

20         And again, you got to evaluate the source of the

21   person that's supplying you this expert testimony, Your Honor.

22   It's inconceivable that the Government could not have found

23   someone who works at the IRS, who is a CPA, who is an

24   accountant, who has expertise in this field, who can answer the

25   Court's questions off the top of their head rather than having

ARGUMENT BY MR. HOCHMAN                        201

1    to research a question that is central for this case,

2    inconceivable that the Government wants to use Agent Maurer in

3    such an important thing as a criminal tax trial and then a

4    criminal tax sentencing.

5            I fully expected the Government to come in with

6    someone who met all the criteria of a fully competent and

7    expert expert to give us their analysis, and review Agent

8    Maurer's finding, and say, "Yes, I'm a CPA, I've checked with

9    all the experts, the valuation experts, everybody at the IRS."

10           This is such an important matter.  These numbers

11   could control whether or not Dr. Hough goes to jail, your

12   Honor.  Yet, they present Agent Maurer again.  She gives you a,

13   for lack of an expression, a cockamamie theory on Schedule C

14   that, as Mr. Rivera told you, is dead wrong on the tax law.

15   The one thing we can absolutely conclude is that these are

16   operating companies and not Schedule C companies.  That goes

17   without saying.  We'll deal with the distribution issue in a

18   minute, but to call these Schedule C sole proprietorships, or

19   self-employment income, Your Honor, for operating companies

20   that are -- you know, have as many attributes of an operating

21   company, and again, Miss Maurer conceded that both Saba and MUA

22   are operating companies, it just -- it defies reason and logic

23   that the Government would put -- would double down on Agent

24   Maurer, Your Honor, and say that:  We're going to let her

25   increase the total income, just for '05 to '08, by $15 million,

ARGUMENT BY MR. HOCHMAN                    202

1   and stand by that as late as the testimony of Agent Maurer.

2           They didn't go to the -- go -- they didn't ask Agent

3   Maurer, "Let's go back to your first RAR that you've already

4   disaffirmed now twice.  Let's go back to that $2.5 million and

5   the $3.7 million income from undeclared accounts.

6           What is that, Your Honor?  There is nothing in the

7   record that shows what the income from undeclared accounts is,

8   other than Miss Finley testifying about it, which is in

9   evidence.  So the point, Your Honor, is that they have now

10  thrown the Hail Mary pass because they understand that

11  Miss Maurer's calculations are severely flawed, that she didn't

12  have the proper training and experience to make them, and she

13  made three different versions.  And, Your Honor, I would point

14  out something very interesting about the third version, if I

15  might.

16          If we can switch the screen back to the ELMO, Your

17  Honor?

18          In Exhibit 1, Your Honor, on Page 4, it has one very

19  key word, and that word is "draft."  That is the same word,

20  Your Honor, that, when we were in trial, and I was asking Agent

21  Maurer, "Are you sure these calculations are right?  Because

22  you just took off the income from undeclared accounts of 2.5

23  and 3.7 million dollars, you've just revamped your chart," and,

24  you know, Agent Maurer said back then, the calculations are

25  right, but it was a draft.

1           Now the Government has, at the 11th hour, after they

2      have had almost five years to do this, and two other drafts,

3      let Agent Maurer come up with a third draft and call it a

4      draft, Your Honor.  My fear is that, you know, if we keep going

5      with this, Your Honor, the number could go up, it could go

6      down, but the unreliability of all these numbers, Your Honor --

7      and again, the Government had its choice, they could have gone

8      with someone other than Miss Maurer, Your Honor.  The IRS has

9      100,000 employees.  There's 14 other people in her very group,

10     some of which she said were CPAs and far better trained than

11     she was.  They chose not to.

12          So they give you this MUA/Saba Schedule C, or

13     Miss Maurer does.  The Government affirms it, until it realizes

14     that maybe they're not going with it, Your Honor.  So they're

15     saying:  Let's punt, let's go back to the distribution concept,

16     but we haven't really worked up the distribution.

17          And by the way, Agent Maurer walked away from it,

18     now, twice.  She didn't come up with another schedule, Your

19     Honor, a backup to the third RAR, and say, "Judge, if you don't

20     believe this, go with the distribution model."

21          Why they didn't, who knows, Your Honor.  Part of the

22     thing is that the Court, while it is a preponderance of the

23     evidence, and the Government's right, the Court is reasonably

24     foreseeable, you still have to hit preponderance of the

25     evidence, the burden of proof.  And so you have a situation,

1    again, where the Government has failed to show distribution

2    theory of this, and it failed at any detail.  All we have is

3    income from undeclared accounts, Your Honor.

4           With respect to -- so the three -- so far we've got

5    the MUA/Saba are not Schedule C income; taxable interest,

6    dividends, and capital gains have not been shown at the

7    criminal tax level; that Dr. Hough knew that these accounts

8    were earning those amounts during the various years.  But we

9    have a different notion for criminal tax.  Again, what is going

10   on in Dr. Hough's mind?

11          And with respect to this, I take Your Honor to

12   Exhibit 7S, which is the David Minchenberg memo.  And the David

13   Minchenberg memo to Dr. Hough -- excuse me, from Dr. Hough, it

14   went back and forth to Dr. Hough.  And this is in January --

15   approximately January of 2005.  The key language here, Your

16   Honor, is here, starting with "usually."

17          It says:  "Usually, the only time a tax is triggered

18   is when the U.S. citizen brings money in the form of profits,

19   gains, etcetera, back into the U.S.  That said, if the citizen

20   is the beneficiary of said profits, gains, etcetera, and keeps

21   those funds offshore and doesn't bring them back into the U.S.,

22   then there are generally no taxes incurred by the U.S.

23   citizen."

24          We have not heard any expert testimony by Agent

25   Maurer or anybody else that the advice that David

1   Minchenberg -- a CPA, unlike Agent Maurer -- gave is wrong.  On

2   the contrary, that evidence -- that expert advice, or that

3   advice that he gave her, which is advice that she relied on,

4   happens to be right.  So that's the additional layer of

5   analysis here, which is the distributions that they're talking

6   about, that five-plus million dollars of distributions, are

7   money that went from the Saba and MUA -- my assumption is,

8   based on what they have said, because let's work off of their

9   assumption.  Their assumption is, Saba and MUA sent money to

10  New Vanguard and Top Fast.  That's the assumptions we're

11  working with, not the evidence.  But let's work with the

12  assumptions for a moment.

13          What David Minchenberg says to Pat Hough, which again

14  forms her criminal knowledge, or the knowledge that informs

15  whether or not she is criminally liable for the particular tax

16  loss says, if the money went to New VanGuard and Top Fast, then

17  what happens is that, as long as they keep it overseas and they

18  don't bring it back, you don't bring it back to, or it's not

19  distributed back to you, in the United States, you don't have

20  to pay tax on it.  Right there in the black and white.

21          So even if you assume that the income from undeclared

22  sources was Saba and MUA income to New Vanguard and Top Fast,

23  evidence that's not in the record.  And then you also -- then

24  you have to factor in, for criminal tax purposes, whether or

25  not the New Vanguard and Top Fast money was distributed back to

1   Patricia Hough and Dr. Fredrick in the United States, Your

2   Honor.  And again, we have no record presented at this

3   sentencing hearing to get you there.  And it's the Government's

4   burden to get there.  So the five-plus million that they're

5   talking about distributions doesn't get around the Minchenberg

6   advice for criminal tax purposes.  So again, you have a

7   situation with multiple layers of our response to the

8   Government's evidence.  And again, the Government could have

9   presented this in any way, we are dealing with the way they

10  presented.  The MUA/Saba situation, Schedule C, we have dealt

11  with.  Taxable interest, capital gains, interest, we have dealt

12  with.  This whole notion of distributions, the money going to

13  Switzerland or Liechtenstein, but not coming back to the United

14  States, even if you assume that that's what the distributions

15  were, again, not for criminal tax purposes; maybe civil, but

16  not criminal tax purposes.

17          And then, Your Honor, you have the sale.  The sale is

18  one of the bigger items in 2007.  And what do we know about the

19  sale?  We know a couple things.  We know that Dr. Hough, as the

20  evidence shows, was not involved in the financial discussions

21  as to the sales price or the breakdown of the sale amount.  We

22  know that was Dr. Fredrick negotiating with Mr. Rodgers.

23          The second thing we know, Your Honor, is that there's

24  a cost basis.  You know, there are certain allocations made in

25  that sale.  There was an allocation for Round Hill, for Saba,

1   for MUA.  Let's start with MUA.  With MUA, Your Honor, we have

2   a situation where Agent Maurer again showed just the lack of

3   diligence in her analysis, where she basically said:  With MUA,

4   I can't figure it out.  I know that there's some basis there,

5   maybe it's 2.5 million, maybe it's a million, maybe a million

6   five, maybe it's 4 million.  Who knows?  But because I can't

7   figure it out, I'm going to go ahead and just say it's the same

8   as the sales price.

9          Then you switch to Saba.  And again, she knows that

10  there are assets that are being bought, long-term assets, these

11  contracts and accreditations.  Mr. Rodgers testifies, that's

12  the value, that's the assets of the thing he has bought.  She

13  gives a zero basis for it.

14         Mr. Rivera says, that's not the way to do it.  The

15  IRS has experts that can go ahead and value this stuff, but you

16  go ahead and come up with some amount.

17         So for MUA, when she realizes she doesn't have the

18  documentation, she gives the taxpayer the credit.  With Saba,

19  when she doesn't have the documentation, she just gives it

20  zero.  Which, again, is not the way that the IRS handles these

21  things.  As Mr. Rivera said, in criminal tax situations, you

22  default to the taxpayer's benefit unless you can prove that the

23  basis is zero, and she can't.

24         And then with respect to Round Hill, Your Honor, we

25  pointed out it was slightly complicated how the testimony came

ARGUMENT BY MR. HOCHMAN                          208

1   in, but it basically is this:  The IRS typically would

2   advantage a taxpayer.  In this case, it would actually

3   advantage Mr. Rodgers.  Because what Mr. Rodgers wants is the

4   highest possible amount for Round Hill, because when he sells

5   Round Hill later, he doesn't want to report capital gains, and

6   if you vastly overpriced Round hill at $33 million from

7   $250,000, if you go to sell Round Hill later, at probably the

8   real price, which is a fraction of $33 million, guess what?

9   You have a capital loss.

10          So that -- and none of this is being discussed, of

11   course, with Dr. Hough.  So the idea that you can go in and

12   basically say that this particular loss is something -- or

13   excuse me, this particular gain is both accurate, as a matter

14   of tax law, and, for criminal tax purposes, something that

15   Dr. Hough knew existed, is absolutely wrong.  Because Dr. Hough

16   assumed that two things were being sold:  Saba, which also has

17   Round Hill as part of it; and MUA, which also has property as

18   part of it.  She doesn't see that flow of funds that they broke

19   it up into three different components:  Round Hill, Saba, MUA.

20          And again, if the money had gone to Saba, and the

21   money had gone to MUA, well, if it was MUA, part of that

22   Dr. Fredrick would report on his tax returns because he gets

23   paid out for his shares; part of that money, Your Honor, goes

24   to the MUA account, of which there was a Swiss MUA account; and

25   with respect to the Saba, the money for Saba went to the Saba

1    account in Switzerland.  And we know, as we have been

2    discussing at the beginning, if it went to Saba and it went to

3    MUA, which would be the logical assumptions, to the extent

4    we're talking about reasonable foreseeability, if you're

5    selling Saba and you're selling MUA, the logical thing, Your

6    Honor, is that the money goes to Saba and MUA.  And if it goes

7    into Saba and MUA, and into their accounts, then we go back to

8    the shell corporations situation:  Unless they distribute the

9    money to you, it is not taxable to you.

10           And again, when we're dealing with criminal tax

11   purposes, this type of logic, and they call it reasonable

12   foreseeability, I'll go reasonable foreseeability.  There is

13   nothing reasonably foreseeable that Dr. Fredrick and

14   Mr. Rodgers are going to come up with an allocation of

15   $33 million to Round Hill.  That's ridiculous.  The money

16   should have been Saba and MUA, because that's what he was

17   buying.  And that's what Dr. Hough, to the extent that she had

18   any thoughts on this because she is not seeing the

19   documentation, would have reasonably assumed that the money

20   would have gone to.

21           But the Government doesn't want to go there, of

22   course.  Because if they go there, they have the problems of

23   all my other arguments here, and they still can't deal with

24   Mr. Minchenberg's advice that, if the money goes to

25   Switzerland, even if it goes to Saba, MUA, New Vanguard, or

1    whatever account, and doesn't come back to the United States,

2    as Mr. Minchenberg said, there are generally no taxes incurred

3    by the U.S. citizen if the funds are kept offshore and they are

4    not brought back to the United States.

5              So as you go through all these different types of

6    analyzes and response, I ask the Court to bear certain things

7    in mind:  Number one, the Government has the burden of proof;

8    number two, they chose how to present this evidence to you

9    through Agent Maurer's incredibly flawed analysis; number

10   three, as we go through these various back-and-forth

11   machinations between the RAR, you know, I ask the Court to know

12   that in a situation where a jury's finding is a false statement

13   but not a tax loss, it does exist -- situations exist where the

14   Court does not feel comfortable, based on the Government's

15   analysis and the evidence, to find a criminal tax loss.  That

16   is unusual, Your Honor.  I would even say fairly unusual.  But

17   that is this situation, where you have all these multiple

18   hurdles the Government has not overcome.

19             It doesn't disturb, by the way, the convictions, Your

20   Honor.  My arguments do not disturb the convictions.

21   Obviously, we took issues with the convictions, but you can

22   actually find no criminal tax loss but still believe that they

23   didn't properly report their total income; or, remember what

24   the backup was, that she checked the wrong box on the

25   Schedule B.  That was the backup as well, Your Honor.  And

ARGUMENT BY MS. FINLEY                          211

1   Schedule B has nothing to do with tax loss whatsoever.

2           So I'd's ask, unless the Court has any questions, I

3   believe that, in this unusual case, Your Honor, the Government

4   has not met its burden, and that the criminal tax loss should

5   be zero.

6           THE COURT:  I can't tell if you're done.

7           MR. HOCHMAN:  I'm sorry?

8           THE COURT:  I can't tell if you're done.

9           MR. HOCHMAN:  I am sorry.  Yes, I'm finished, Your

10  Honor, unless the Court has any question.

11          THE COURT:  I may after I hear from counsel.

12          MS. FINLEY:  Your Honor, the Government is not

13  backing off of Revenue Agent Maurer's testimony or the evidence

14  she gave here.  The issues with Ms. Maurer's Revenue Agent

15  Reports are all driven by the taxable event, and the Government

16  submits that, at trial, we proved that they owned the entities,

17  and that the evidence we presented today, through Revenue Agent

18  Maurer, is that the profits should have been reported on her

19  tax return in the -- and in Dr. Hough's tax returns, in the

20  year that the profits were earned by the company, regardless of

21  whether they were repatriated or not repatriated.  And as

22  Ms. Maurer testified, the money was actually expatriated

23  because it was received here in the United States, the tuition

24  came into bank accounts in the United States, and then was sent

25  from the United States overseas, so there was never -- the

1   distribution was from themselves, in the United States, to

2   another bank account overseas.

3         The Government's addressing the May 14th, 2013,

4   Revenue Agent Report was in response to the Court's questions

5   of the witnesses with respect to the distribution, to explain

6   that that was the taxable event in that case is the

7   distribution.  And so they are consistent.  As Revenue Agent

8   Maurer testified, you can't tax them twice.  If you find that

9   the taxable event is their ownership at the very top, that they

10  own MUA and Saba, and that they should have been reported the

11  income on their tax returns, the profits in the years that it

12  was received and earned by schools, then that is the taxable

13  event, and that is when they are taxed, not when it was

14  distributed.

15        If they reported that income, just like if you earn a

16  paycheck, and you then decide to spend your paycheck on items,

17  you distribute it to make purchases, you don't get taxed a

18  second time when you use your money.  And that is what Revenue

19  Agent Maurer's Revenue Agent Reports are actually consistent

20  with each other.  And the Government stands behind her

21  testimony that there's been no evidence that they intended it

22  to be a C Corporation, other than, again, the incorporation

23  documents in Nevis.

24        And if she's shamming it from the top, if she's

25  collapsing it from the very top, from Saba and MUA onto their

1    tax return, she can't double-tax them.  She has to choose one

2    way or the other.  And the May 14th, the Government's

3    addressing that was to show that we had thought about that, but

4    we believe that the evidence came out differently at trial, and

5    that is why we are standing behind our Revenue Agent Report

6    that we submitted today.

7              With respect to this idea that the Government has to

8    prove, down to the very penny, the exact amount of income that

9    she knew that she had earned, the Government has a burden of

10   showing that she violated a known legal duty to report her

11   income.  And the jury's verdict, the jury found that she

12   violated that known legal duty when she did not report her

13   income on her 2005, '6, '7, and '8 tax returns by failing to

14   report the interest income and the sale of the schools on her

15   tax returns.

16             And inherent in that is that she knew about it.  It's

17   very similar to, I think to a drug case, it's as if the

18   Government would have -- if somebody is involved in a

19   conspiracy to distribute drugs, and they know that the object

20   of the conspiracy is to distribute cocaine, but they think, you

21   know, it's going to be X amount of cocaine, 50 -- I don't do

22   drug cases, so my amounts are going to be off, but 50 pounds of

23   cocaine, but the conspiracy really distributes 100 pounds of

24   cocaine, if it was reasonably foreseeable that that criminal

25   enterprise, the conspiracy was in the business of distributing

1    cocaine, and that it was reasonably foreseeable that, if it was

2    50 pounds, 55 pounds, 100-pounds, then that drug defendant is

3    sentenced on the relevant conduct, what was reasonably

4    foreseeable.

5         Here the Government -- again, she can't stick her

6    head in the sand and say, "I'm going to opt not to get bank

7    statements, and I go into investment accounts expecting to lose

8    money," and then say, "I don't know how much income I earned,"

9    and then say, "because I don't know it, the Government hasn't

10   proven it."

11        The Government submits that the jury's verdict, as

12   well as the evidence, supports that she did know that she was

13   earning income.

14        With respect to Mr. Minchenberg's document, 7S, first

15   of all, Mr. Minchenberg testified that he was not an

16   international tax expert.  The Government would submit that the

17   opinion, or his statement in there, first of all, he says

18   "usually," and "generally," there are caveats in there.  He is

19   writing that based on incomplete information that was not

20   provided to him by Dr. Fredrick and Dr. Hough.  If

21   Mr. Minchenberg knew that Dr. Fredrick and Dr. Hough owned the

22   company -- and I think actually if you look -- and I apologize,

23   I have to look back -- at the tax fraud memo, the memo that he

24   writes to Dr. Fredrick, and I won't characterize how it came

25   out with respect to Dr. Hough, but in that memo he says:  You

1    have to be careful because if the IRS determines that you own

2    Saba, all of the profits from the schools are going to be

3    reported and attributable to you.

4           He says that to Dr. Fredrick.  So in two different

5    places he's giving different advice to the taxpayers.  She

6    can't rely on advice from anybody when she does not fully

7    disclose.  And the Government submits that she didn't tell

8    Mr. Minchenberg that she owned the schools.  And furthermore,

9    she had a return preparer, Mr. Murtha, who asked her, on two

10   different occasions, whether she had an offshore bank account.

11   She never raises this issue of the 5471.  The form that

12   Mr. Minchenberg is writing about is a 5471, it is not her 1040.

13   And she doesn't ever ask Mr. Murtha, the person that's

14   responsible for preparing her tax return, about

15   Mr. Minchenberg's advice.

16          And Mr. Minchenberg testified, not only wasn't he an

17   international tax expert, but he had absolutely no

18   responsibility for their personal income taxes.

19          And then I questioned why, if Dr. Hough truly

20   believes that she does not own the schools, why she would ever

21   rely on Mr. Minchenberg's advice, because she wouldn't need to.

22   If she doesn't own the schools, then she doesn't need to report

23   any of the income.

24          Furthermore, as Ms. Maurer testified, U.S. persons

25   are taxed on worldwide income, and so the fact that monies went

ARGUMENT BY MS. FINLEY                                216

1    from Saba into New Vanguard, the monies from New Vanguard then

2    came back into the United States to buy the various assets.

3    They went to Saba to MUA, or MUA to New Vanguard, to Top Fast,

4    and then Top Fast back into the United States to purchase the

5    house, to purchase the condo, to purchase the plane.  She sent

6    $250,000 to her personal checking account, which she used to

7    pay her property taxes and to invest in a CD.  There were the

8    gifts to the various siblings that Dr. Hough -- excuse me --

9    Dr. Fredrick made.

10             I think also this case, that I didn't get the name of

11   the case, that they cited with respect to the return preparer,

12   I think they said that the court found that they couldn't

13   attribute the tax to his conduct.  And I think in that case --

14   I haven't read it, but I would suspect that what they're

15   talking about there is that they could not attribute the tax

16   loss on those individual's returns specifically to that return

17   preparer, that he did not cause that harm.  But again, I didn't

18   see the case, I don't know that they cited to it in their

19   pleadings, so I can't specifically respond to it.

20             And with respect to New Vanguard -- excuse me -- to

21   Round Hill, the Government -- Mr. Hochman says that it's

22   ridiculous that 33 million would be going to -- attributable to

23   Round Hill.  The Government would actually say that that was

24   very purposeful.  And the reason that was purposeful, Your

25   Honor, is because $33 million from the sale of the school for

1    Round Hill went directly, 50/50 to the penny, if you remember

2    Ms. Maurer's testimony, into the two different New Vanguard

3    accounts.  And the Government would submit that that's evidence

4    that Dr. Fredrick and Dr. Hough, like they do with everything

5    else, were splitting the proceeds of the sale of their school

6    50/50.

7            She signs the sale documents as a personal guarantee.

8    And Mr. Rodger testified that the sale was not going to get

9    done unless -- that Dr. Fredrick had this idea of how to split

10   the money, and that that was how he wanted it, and that the

11   sale wasn't going to get done, and that Dr. Fredrick insisted

12   on the attribution of 33 million going to Round Hill.

13           Additionally, Ms. Maurer has considered the various

14   items that went in to build the school in her Exhibit 9, and

15   the depreciation schedule for Round Hill.  She's given

16   Dr. Hough all the expenses for building the school, the campus

17   building, the library, the generator, the gym, she was able to

18   find all these very specific expenses that went into building

19   the school, and she gives Dr. Hough credit for that, which is

20   why she doesn't give additional credit for any other

21   depreciation for Saba University School of Medicine, is because

22   she's given it on Page 1 of Exhibit 9.

23           I have nothing further, Your Honor, unless the Court

24   has additional questions.  And I, to the extent the Court is

25   going to look at the May, 2013, Revenue Agent's Report, the

1   Government does have supporting documentations and would put

2   Revenue Agent Maurer back on the stand or submit the supporting

3   documents to show what wires are made up of that 2.5 million

4   and 3.6 million.

5            THE COURT:  When do you propose to do that?

6            MS. FINLEY:  We could do it tomorrow, Your Honor.

7            THE COURT:  All right.

8            (Mr. Hochman and Mr. Saunders confer privately.)

9            MR. HOCHMAN:  Your Honor had asked about authority

10  for the proposition of civil versus criminal.

11           THE COURT:  Yes.

12           MR. HOCHMAN:  The Internal Revenue manual, I think,

13  at least, is a decent authority, Your Honor, since it's

14  arguably bind on the Government as to what it says.  And

15  Internal Revenue manual, 9.5.13.2.1, which is what I read to

16  Agent -- or excuse me -- Mr. Rivera, says criminal -- the title

17  of it is, "Criminal Versus Civil Tax."  And it says the

18  criminal tax deficiency may differ from the civil tax

19  deficiency of the civil process.  Criminal violations are

20  charged only against a tax deficiency that results from fraud.

21  And the definition of fraud is an intentional violation of a

22  known legal duty.  The civil tax deficiency is much broader.

23  It includes all tax due on a return, i.e., the tax from the

24  evaded income and the adjustments to the subject's itemized

25  deductions.

1          So I think, again, it's not case authority, Your

2    Honor, but it does come from a party opponent, I would argue,

3    that would be IRS, as to the distinction between criminal and

4    civil tax loss.

5          Your Honor, with respect to just a few of the points

6    that were made here, when . . . .  Mr. Saunders points out the

7    Application Note 2 to the guideline section of 2T1.1C1.

8          In Application Note 2 it says:  In determining the

9    total tax loss attributable to the offense, all conduct

10   violating the tax laws -- again the intentional violation of a

11   known legal duty -- should be considered as part of the same

12   course of conduct or common scheme.

13         THE COURT:  I'm sorry, what part of that were you

14   reading and what part were you editorializing?  I couldn't tell

15   if you were editorializing.

16         MR. HOCHMAN:  Let me read it, and then I'll put in

17   brackets the editorial comment.

18         THE COURT:  Okay.

19         MR. HOCHMAN:  "In determining the total tax loss

20   attributable to the offense, all conduct violating the tax

21   laws" -- and by -- [by definition, that means conduct that's in

22   violation of a known legal duty] -- "should be considered as

23   part of the same course of conduct or common scheme."

24         Again, there isn't -- we've looked pretty hard for

25   more case law on this, Your Honor, and we don't see it.  I

ARGUMENT BY MR. HOCHMAN                                220

1    think because, generally, courts sentence on the criminal tax

2    loss that it comes out of where a client has violated a known

3    legal duty.

4            The Government gives an example of this 50/50 split,

5    the New Vanguard gets 50/50, and that that somehow shows that

6    Dr. Hough knew that the split was going to occur.  The problem

7    with that argument, Your Honor, is that the only evidence of

8    where that split occurred is that flow-of-funds memorandum that

9    was never discussed or shown to Dr. Hough.  She didn't sign it,

10   she never saw it.  And that, and only in that memo does it

11   actually split the money into two different New Vanguard

12   accounts.  I would gone argue that the much more reasonably

13   foreseeable situation was not that the money was going to go to

14   Round Hill Holdings owned by New Vanguard, but it was going to

15   go to Saba and MUA.  And if it went to Saba and MUA, we have

16   the exact situation of the Shell Oil Corporation.

17           And if the Government keeps defaulting back to the

18   taxpayer is responsible for worldwide income, even Agent Maurer

19   says that if it's earned by a corporation, and it's not

20   distributed to the owners of the corporation, it is not their

21   taxable income.  Even Agent Maurer will at least concede that

22   much.

23           So again -- oh, and the interesting thing about --

24   they keep going back to the jury found all this income that

25   shows up on Agent Maurer's chart.  That's not true either.  We

1    actually don't know which of the items in the total income

2    items that were presented to the jury -- remember, they were

3    presented with taxable interest, dividends, capital gains, and

4    a few other adjustment, Your Honor -- we don't know which one

5    they picked.  They must have picked something, Your Honor.  One

6    would assume they picked something.  Although we know with

7    Count 6, or the 2006 count, where it actually resulted in an

8    overstatement of income, they said that was an understatement

9    too.

10             So the jury's logic here is to be a bit questioned by

11   the count that the Court reversed.  Maybe they just thought it

12   was the taxable interest, Your Honor.  Maybe they thought,

13   somehow, someone should reasonably foresee that an account will

14   have taxable interest.  It is not logical necessarily to

15   foresee that the account is going to produce a dividend.

16   Because for a dividend, that means that you invested not just

17   in a stock, Your Honor, but in a stock that, in turn, pays off

18   dividends.  That's not necessarily reasonably foreseeable, and

19   capital gain or loss certainly depends on what you bought the

20   stock for.  And it is not reasonably foreseeable that

21   Dr. Hough, who has never seen any of the bank statements, never

22   talked to them about what they're buying stocks for, would know

23   whether or not she made a loss or a gain in any particular

24   year.

25             And with the sale of the school, Your Honor, I raised

1    a lot of the same arguments on the sale of the school, and why

2    that shouldn't be -- why the jury shouldn't find the sale of

3    the school as an addition to total income.  So perhaps what

4    they said, and I'm just guessing, Your Honor, because that's

5    all we can do at this point is kind of guess, but when we're

6    trying to figure out what is reasonably foreseeable, maybe it

7    is taxable interest, and they figured -- they must have assumed

8    they earned some interest.  I'm trying to find a way, other

9    than zero, for the Court to say:  What could the jury possibly

10   have been thinking, given the choices they were given?  And

11   maybe that's it.

12          I disagree.  I still say that there was no evidence

13   that Dr. Hough knew she was earning taxable interest, but I

14   throw that out as at least a potential option.

15          And I think, Your Honor, unless the Court has any

16   questions, that's all I have for the Court.

17          THE COURT:  All right.  Thank you.

18          MS. FINLEY:  Your Honor, may I just -- two very minor

19   things?

20          One, I would just ask that the Court read the full

21   application note in 2T1.1, Commentary Application Note 2,

22   because Mr. Hochman did not read the entire thing; and, two,

23   with respect to the criminal tax loss versus civil tax loss,

24   Dr. Hough was convicted of conspiracy to defraud the Internal

25   Revenue Service, and so under the Internal Revenue manual, she

COURT RECESSED FOR THE DAY                                        223

1    was convicted of fraud; and, three, the Government would submit

2    that, with respect to 2006, the jury could have thought that

3    the reason she still had an understatement on her tax return

4    was because they believed that there was profits from the

5    school that she had not reported, as the Government had argued

6    in its post-trial motions.  Thank you.

7             THE COURT:  All right.  Well, to the extent you want

8    me to to rely upon the so-called fallback position, I suggest,

9    tomorrow morning, when we meet, you present some evidence.

10   Otherwise, I'll be stuck with what you've got so far, and you

11   may or may not be happy with that.

12            Other than that, we still have the role issue, and

13   then the 3553 issues after that, at least as I see it.

14            MR. HOCHMAN:  Yes, Your Honor.

15            THE COURT:  All right.  9:00 o'clock?

16            MR. HOCHMAN:  Yes, Your Honor.

17            MS. FINLEY:  Yes, Your Honor.

18            THE COURT:  See you tomorrow morning at 9:00 o'clock.

19                    -- -- -- -- -- -- -- --

20            (At 4:59  p.m., court was recessed, to be reconvened

21        at 9:00 a.m., on Friday, May 2, 2014.)

22                    -- -- -- -- -- -- -- --

23

24

25