UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

VOLUME TWO

THE UNITED STATES OF AMERICA,

        Plaintiff,

                                       Fort Myers, Florida
vs.                                     May 2, 2014

PATRICIA LYNN HOUGH,              9:00 AM

        Defendant.

TRANSCRIPT OF SENTENCING

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                           Tax Division
                      P.O. Box 813
                      Washington, DC  20044
                      BY:  CARYN FINLEY, ESQ.

                      U.S. Department of Justice
                           Tax Division
                      Suite 7334
                      601 D Street NW
                      Washington, DC
                      BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

                        A P P E A R A N C E S
                    (Continued From Previous Page)


FOR THE DEFENDANT:        Bingham McCutchen, LLP
                          The Water Garden
                          1601 Cloverfield Boulevard
                          Suite 2050 North
                          Santa Monica, CA  90404-4082
                          (310) 904-1000
                          BY:  NATHAN J. HOCHMAN, ESQ.

                          Bruce L. Udolf, PA
                          500 East Broward Boulevard
                          Suite 1400
                          Fort Lauderdale, FL  33394
                          (954) 858-8831
                          BY:  BRUCE L. UDOLF, ESQ.

ALSO PRESENT        JANET ZUK, Probation Officer

REPORTED BY:        JEFFREY G. THOMAS, RPR-CP, CRR
                    Official Federal Court Reporter
                    United States Courthouse
                    2110 First Street, Suite 2-194
                    Fort Myers, FL  33901
                    (239) 461-2033


                          *  *  *

I N D E X

| May 2, 2014 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 2 | 4 |
| Argument by Mr. Hochman | 2 | 15 |
| Argument by Mr. Hochman | 2 | 21 |
| Argument by Ms. Finley | 2 | 29 |
| Argument by Mr. Hochman | 2 | 34 |
| Argument by Ms. Finley | 2 | 41 |
| Argument by Mr. Hochman | 2 | 44 |
| Court Recessed for the Day | 2 | 60 |

* * *

1    THEREUPON, the above-entitled case having been called to

2    order, the following proceedings were held herein, to-wit:

3                            - - -

4         THE COURT:  Good morning, everyone.

5         All right.  We're back in the case of the United

6    States versus Patricia Hough.  Looks like everyone is present

7    and accounted for.  And to the Government, I think.

8         MS. FINLEY:  Your Honor, the Government has argument

9    with respect to the tax loss that we'll pick up where we left

10   off yesterday, and deal with the Court's hypothetical, and the

11   Government's RARs, before --

12        THE COURT:  Do you have any additional witnesses?

13        MS. FINLEY:  It's sort of going to depend on the

14   Court's response to our argument.  We have Revenue Agent Maurer

15   prepared to take the stand; however, the Government, after

16   court yesterday, had time to really think about what the

17   Court's hypothetical was, and the RAR from May of 2013; and,

18   intellectually and legally, the application . . . the use of

19   that RAR for the tax loss is a dishonest application of the law

20   and to the facts of this case.  And the Government stands

21   behind its RAR that it presented to Revenue Agent Maurer

22   yesterday, the 15 million, and the Revenue Agent Report that

23   she testified to at trial, of the 6 million.  And the reason

24   why the Government did not go forward with the May RAR is

25   because, when you look at the evidence that was presented at

1     trial, and when the Government proved -- the Government proved

2     that they owned the school, and that it is a disregarded

3     entity.  And the Government has the Internal Revenue manual to

4     provide to the Court that talks about disregarding entities for

5     purposes of taxation.  And that's what we're talking about

6     here, Your Honor.  And under U.S. tax law, the classification

7     of a foreign entity as a corporation, a partnership, etcetera,

8     it affects aspects of the U.S. taxation, and the first step of

9     the -- IRS will look at is to decide whether there is an entity

10    for federal tax purposes.

11          I understand the Court's . . . that there is

12    literally an entity in Nevis called MUA; however, whether an

13    organization is an entity separate from its owners for federal

14    tax purposes is a matter of federal tax law, and does not

15    depend on whether the organization is recognized as an entity

16    under the local law.  And if the activities of a disregarded

17    entity are treated -- if the entity is then disregarded for

18    federal tax purposes, under the Internal Revenue manual -- and

19    if I may approach, I can provide to the Court -- the activities

20    are then treated in the same manner as a Schedule C, as a sole

21    proprietorship.  And that is what Revenue Agent Maurer did, and

22    the Government stands behind that.

23          And based on the Court's order, with respect to the

24    offense conduct, the Court's ruling, which the Government would

25    submit is correct, was that the Defendant had an ownership of

1    an income derived from the operation and sale of Saba

2    University School of Medicine, and ownership of, or income

3    derived from, Medical University of the Americas.  And the

4    evidence which the Court found establishes by at least a

5    preponderance of the evidence that both the Defendant and her

6    co-defendant had de facto ownership of both of the entities

7    regardless of the legal formalities, i.e., that it is an entity

8    in Nevis, and both received income from operation and sale of

9    both of the entities.

10            And that's exactly what Revenue Agent Maurer is

11   agreeing with the Court, that the evidence that the Government

12   presented at trial, that the jury found its verdict on, is that

13   these are disregarded entities, substance over form.  These are

14   the alter egos of Dr. Fredrick and Dr. Hough.  And the

15   alter-ego law in the 11th Circuit is that, if you would pierce

16   the corporate veil -- the courts do it all the time in

17   collection matters and bankruptcy matters where, if the

18   corporation is a mere device or sham to accomplish some

19   ulterior motive or some ulterior purpose, or is a mere

20   instrumentality or agent of another corporation or an

21   individual owning all or most of its stock, and where the

22   purpose of using that entity is to evade some statute or to

23   accomplish some fraud or illegal purpose, that entity is

24   disregarded, and it's pierced.  And that is exactly what the

25   Government proved at trial.  And to go back to the May, 2013,

1    RAR, the Government did not present that RAR at trial

2    specifically because we submit that we proved that it was a

3    sham entity, that it was a disregarded entity for federal tax

4    purposes, and that the Government is prepared today to put on

5    Revenue Agent Maurer to testify about the transfers, the

6    $2.5 million and the $3.6 million.

7          And the Court heard testimony at trial about the use

8    of all of that money, and the repatriation back into the United

9    States by purchasing assets or transferring money to -- as

10   gifts, or money into Dr. Hough's bank account.  The Government

11   submits that that evidence goes to prove the substance over

12   form, and that they . . . the Defendant did not obey the form.

13   And that goes to why it is a disregarded entity, and not why it

14   is a taxable event.

15         And so the idea that -- so if the Court wants to hear

16   testimony with respect to the literalness of those transfers,

17   the Government is prepared to put Revenue Agent Maurer on the

18   stand to walk through, you know, the various transfers that

19   make up those funds, and the bank records that support it; but

20   we would not argue that those are taxable events, or . . .

21   distributions to her that then should be taxable.  The

22   Government, based on the Internal Revenue manual, 4.6.1.5, the

23   entity classification that, for U.S. tax purposes, the

24   classification is what . . . governs.  And here, as Revenue

25   Agent Maurer testified, the Internal Revenue Service would

1  determine that this is a disregarded entity; and, therefore,

2  it's taxed as a Schedule C, according to the Internal Revenue

3  manual.

4          I'm not done.

5          And the idea that the Court would like to impute this

6  corporate status, as the Internal Revenue manual also talks

7  about, the classification of a foreign entity as a corporation,

8  or a partnership, or a disregarded entity, affects the type of

9  tax.  And Dr. Fredrick and Dr. Hough made a decision that they

10 were not going to make those elections.  They decided that they

11 were going to, instead, use the MUA entity to conceal and

12 disguise their income and assets from the Internal Revenue

13 Service.  This idea that they should have, could have, would

14 have, they should have filed a Form 5471, which Mr. Minchenberg

15 testified to.  And that election, that is how a taxpayer elects

16 to become a controlled foreign corporation, which then gives

17 the taxpayer that tax treatment so that, in the hypothetical,

18 they would not be taxed on the profits until they made

19 distributions to themselves.

20         But the facts of this case are not those facts.  They

21 treated all of that income as their own when it was in Saba.

22 They made decisions about how to use it.  They transferred

23 money from Saba to New Vanguard, to Top Fast.  They decided to

24 then use those funds for their personal benefit.  There were no

25 loans from New Vanguard -- from, excuse me, Saba to New

1    Vanguard, or MUA to New Vanguard, or Saba and MUA to Top Fast.

2    These are all the indicia that the revenue agent and the IRS

3    would rely on to disregard that entity for U.S. tax purposes.

4           And I would note that, in Exhibit 8CC, which is a

5    document that Mr. Minchenberg testified, what was called the

6    tax fraud memo -- and I have a copy of that, also, for the

7    Court . . . if I may approach?

8           THE COURT:  Please.

9           MS. FINLEY:  This is the Internal Revenue manual and

10    the memo.

11           THE COURT:  Thank you.

12           MS. FINLEY:  Mr. Minchenberg actually plans this

13    exact issue for Dr. Fredrick and Dr. Hough.  And if the Court

14    looks on the first page, that overriding all the entities is a

15    concept called, "substance over form."  Now, Mr. Minchenberg

16    did not know all the facts to know that Dr. Fredrick and

17    Dr. Hough both owned the schools.  For example, he was not

18    privy to the Huntington Institute letters where Dr. Fredrick

19    and Dr. Hough state that had they owned or controlled both of

20    the universities.  Though, if the Court remembers the testimony

21    about the exit strategy and the planning that Mr. Minchenberg

22    is trying to do, he did believe that, with respect to the exit

23    strategy, that Dr. Fredrick and Dr. Hough were going to own

24    everything 50/50.

25           But in this memo, on Page 2, Mr. Minchenberg, in the

1    first paragraph, states:  "Due to the way the funds are held in

2    the U.S., commingling of funds, upon examination, the Service

3    could take the position that all profits are those of

4    Dr. Fredrick, they will apply a concept of substance over form.

5    Upon examination, this position will be taken, and Dr. Fredrick

6    will be subject to income taxes based on all of the operating

7    profits since the existence, including penalties and interest."

8           And if you go down to the paragraph beginning with,

9    again, with all the IBCs, Mr. Minchenberg reiterates, again,

10   with all the IBCs, which are international business

11   corporations or companies, as he says earlier in the document:

12   The Service would apply the substance-over-form application.

13   Therefore, with this approach they "look through" how things

14   are formed and go from A to B.  For example, even though MUA

15   did not hold the charter for several years after the school

16   started, they would view that this did not matter, and that

17   MUA . . . the profit was always the beneficiary of the

18   business.

19          Again, that activity would be taxable to Dr. Fredrick

20   and Dr Hough.  Here again, no 5471s have been filed.

21          And they did not file any 5471's.  They did not make

22   that election.  And they didn't make that election because they

23   were using the MUA entity to disguise and defraud the Internal

24   Revenue Service.  And to impute a corporate status to an entity

25   that the Defendant did not honor herself is inconsistent with

1    the Government's evidence at trial, and the tax law as applied

2    to that evidence.

3              And so in the Court's hypothetical with the Shell

4    Oil, in your hypothetical, you're obeying the corporate

5    structure, because the money, the million dollars, is sitting

6    in that entity and it is not being touched.  You are not using

7    it for your personal piggy bank, like Dr. Fredrick and

8    Dr. Hough did.  They are not obeying the corporate structure.

9    They are not making the elections to be treated as a controlled

10   foreign corporation, to notify the Internal Revenue Service

11   that that's what this is.  They are not telling their personal

12   return preparer that this is what they own or they control.

13             And so based upon the Court's finding in the order,

14   the Government submits that our RAR, both at trial and today,

15   are consistent with the Court's finding, and those findings

16   are -- the application of those findings to the tax law is

17   consistent with how the Court has -- excuse me -- how the

18   Government has applied the tax loss in this case, and that the

19   Court should not give respect to entities that the Defendants

20   themselves did not respect for tax purposes.

21             So we're prepared to put Revenue Agent Maurer on the

22   stand for that purpose, but it's not going to be for her to

23   compute tax based on those transfers.

24             THE COURT:  Well, I thought I heard you say that it

25   would not be the Government's position that the 2.5 million and

 1    the 3.6 million were taxable income.  And if that's not your

 2    position, then I don't need to hear testimony about it.  If

 3    your position is, as you've articulated yesterday and today --

 4    and if I don't buy that, then that's the end of it, there is no

 5    fallback position, as someone referred to it, unless it's

 6    otherwise in evidence.  But if you're not going to assert that

 7    those distributions are taxable income, I don't see any

 8    particular reason why I would be the only one taking that

 9    position, because the defense isn't going to say that.

10            So it seems to me that we're back to where you wanted

11    to be all along, is that the exhibits you presented yesterday,

12    either I buy them or I don't buy them, in terms of the

13    calculation of the tax loss, but that's all there is.

14            MS. FINLEY:  Yes, Your Honor, or -- the calculation

15    yesterday includes the profits, is really what's different from

16    what was presented at trial, as well as the dividend and

17    interest income for 2003 and 2004.  That was not testified to

18    at trial.  And so there are -- there is -- the Government would

19    submit that, if the Court is not going to agree that the

20    profits were taxable to them, then the jury's verdict supports

21    the Government's Revenue Agent Report from trial, because the

22    Court -- the jury found that they had dominion and control and

23    owned the nominee entities, New Vanguard and Top Fast, and the

24    Revenue Agent Report at trial included the dividends and income

25    for those nominee entities, as well as the sale of the school

1    and the monies that went to . . . .

2              THE COURT:  So what would the tax loss be, then?

3              MS. FINLEY:  Then I think it was like 6.3 million.

4              THE COURT:  Is that in your submission someplace?

5              MS. FINLEY:  It was Exhibit 30I and 30K . . . at

6    trial.

7              THE COURT:  We talked about those yesterday . . . or

8    at least 30I.

9              MS. FINLEY:  And the Government, with respect to MUA

10   as a corporate entity, it just questions how we would then

11   treat The Foundation, given the Court's ruling.  Because then

12   the taxation theory, if the Government follows the Court's

13   reasoning, is then The Foundation, a legitimate entity also for

14   tax purposes, so that it is a charity, and then when money is

15   diverted out of that entity, or the distributions are made, are

16   they then embezzling or stealing, or diverting income of the

17   foundation.  And again, the Government would not submit that

18   that's consistent with all of the evidence at trial, and the

19   Internal Revenue manual and the tax law.

20             THE COURT:  So if I can give bottom-line numbers, the

21   Government wants roughly 15 million as the amount of tax loss.

22   The fallback position is 6.3 million, based upon the testimony

23   at trial.  And the Defendant has told me, and will tell me

24   again, that their figure is zero.

25             MS. FINLEY:  That's correct, Your Honor.  The

1    Government believes it's 15 million.  If the Court were not to

2    find that the profits were taxable to Dr. Fredrick and

3    Dr. Hough in the year that they were earned, then the fallback

4    would be the Revenue Agent Report as proven at trial -- or

5    presented at trial.

6          And, Your Honor, the Government also, if the Court

7    would like, has the case law with respect to 11th Circuit alter

8    ego and piercing the corporate veil in situations like, for

9    example, if an individual has a levy against them, the IRS will

10   oftentimes pierce an entity that is really just the alter ego

11   for the individual, and go after the entity, because the entity

12   is being disregard by the taxpayer, and the IRS finds that that

13   is, in essence, the individual.

14          THE COURT:  Sure.  Give me those cites, if will you.

15          MS. FINLEY:  I have copies of the cases, if the Court

16   would like.

17          THE COURT:  Sure.

18          MS. FINLEY:  And one is . . . and I apologize, I have

19   one copy of only one of them.  One is Common Weal, W-E-A-L,

20   Inc., versus Internal Revenue Service, which is a bankruptcy

21   court case, 171 BR 405, from the Tampa Division; and the other

22   is Eckhardt, E-C-K-H-A-R-D-T, versus the United States, which

23   is an 11th Circuit case.  It's non-published, but the

24   information and the citations in it cite to the case law

25   concerning both federal tax law -- federal law concerning alter

1    egos and the application of Florida state law to that analysis.

2    And that is 463 Fed. Appx. 852.

3              THE COURT:  Thank you.

4              MS. FINLEY:  The Government would have nothing

5    further.

6              THE COURT:  All right.

7              Mr. Hochman?

8              MR. HOCHMAN:  Yes, Your Honor.

9              Well, Your Honor, I think the Government has either

10   triple or quadruple down, now, on Ms. Maurer's analysis.  And I

11   believe that analysis, as Mr. Rivera spoke in his expert

12   opinion, is absolutely dead wrong as a matter of tax law.  I

13   think what the Government is confusing are corporations that

14   are literally set up -- in the case it just presented to me,

15   this U.S. versus -- or Eckhardt versus the United States, they

16   talk about a situation of . . . .  Let's see, where did it go,

17   the veil will be pierced, and the corporate entity disregarded

18   if it is shown that the corporation is formed or used for some

19   illegal, fraudulent, or unjust purpose which justifies piercing

20   the corporate veil.

21             Your Honor, when you look at -- and I have dealt in

22   the alter-ego tax theory for 20 years now, and the types of

23   corporations that are pierced, Your Honor, are basically these

24   paper companies, dummy companies, domiciliary companies, shelf

25   companies, much of which the Court has heard testimony about.

1    They exist on paper alone, they are a post office box, and they

2    exist to do something improper.  And effectively the individual

3    is nothing more than the alter ego of the particular entity.

4           Here, Your Honor, we have the Saba Foundation, formed

5    in the 1980s, the school opened in 1993.  There is absolutely

6    no dispute, and, in fact, Agent Maurer concedes, that it is an

7    operating company.  It wasn't just the alter ego of Dr. Hough

8    and Dr. Fredrick.  It had an active board of directors.  You

9    saw testify Dr. Dalbec, the president of that board of

10   directors.  It had students, it had teachers, it had

11   administrators, it had a multimillion dollar budget.  It had a

12   campus; it had buildings; it had books; it had clinical

13   contracts with hospitals; and it had accreditation throughout

14   the 50 states, and Europe and Canada.  And it was such a

15   successful medical school, an entity, Your Honor, not an alter

16   ego of Dr. Fredrick and Dr. Hough, but an actual operating

17   entity, that it, along with MUA, was sold for $40 million.

18          And the same exact argument can be made of MUA.  Set

19   up in 1999 with all the corporate documents, it had a board of

20   directors, officers, administrators, students, buildings, land.

21   It had the clinical contracts, the accreditation.  These are

22   operating entities.  In no way, shape, or form were these alter

23   egos of Dr. Hough and Dr. Fredrick, not even close, as a matter

24   of tax law, Your Honor.  So even though the Court has made this

25   finding of ownership for these entities, for taxability, it is

1    the Court's example of a shell corporation.  Now, the Court is

2    given the opportunity, if the Government wanted to do some

3    other type of fallback that was discussed yesterday, this

4    distribution theory.  The Court -- the Government has elected

5    not do that, Your Honor.  The evidence is not before the Court

6    to do that.

7            So as we go through, then, the analysis of tax loss,

8    Your Honor, I would suggest, for Exhibit 1 and 2, which is now

9    Agent Maurer's third report, you can throw out all the

10   Schedule C income for MUA, you can throw out all the Schedule C

11   income for Saba.  That then leaves you with the taxable

12   interest, dividends, and capital gains.  And I gave you several

13   different arguments yesterday as to why those two, for criminal

14   tax purposes, should not be used.

15           And I reference back again to Agent Maurer and my

16   first question to her, and I asked her:  What is the difference

17   between criminal tax and civil tax?

18           And she said she had no idea.  She just said, "I

19   don't know."

20           But that's exactly what we're doing here, Your Honor.

21   Her entire background, her almost 30 years with the IRS, is

22   doing civil tax audits.  After this case is well done, the

23   civil people will come in, they won't look at Dr. Hough's

24   mindset as it pertains to interest, dividends, and capital

25   gains.  They'll just say:  Look, if it's in a bank statement

1    and we say you own it, you own it for civil tax purposes, and

2    you have got to write us a check, full stop.

3              But, Your Honor, the Court needs to go that one step

4    further for criminal tax loss.  You need to say:  Did

5    Dr. Hough, with respect to each item that they are claiming

6    criminal tax loss on, know it exists, and then intentionally

7    violated a known legal duty?

8              And obviously if there is no evidence -- and Agent

9    Maurer conceded.  She said, when I asked her the question, "Do

10   you have any evidence that shows that Dr. Hough knew that there

11   was interest, tax, or capital gains owned on any of these

12   accounts," the answer was no.  There is no evidence in the

13   record.  And that one little scanty e-mail that they present to

14   you that Dr. Hough -- it's actually a hearsay e-mail where

15   Dr. Fredrick is talking to Dieter Luetolf about a conversation

16   that he had with Dr. Hough, about the fact that there's a

17   certain management plan for one of her accounts, Your Honor,

18   that is the level of their evidence for the entire trial, for

19   the entire sentencing hearing, that shows that Dr. Hough knew

20   that there's taxable interest, dividends, and capital gains for

21   all these accounts?  Your Honor, I would suggest that that

22   evidence falls woefully short of the preponderance of evidence

23   standard the Government has to meet at the sentencing hearing.

24             And then, Your Honor, we have the discussion as well

25   with respect to the sale of the schools.  Again, what would

1   potentially be reasonable for Dr. Hough to know is that the

2   schools are being sold and there's a certain amount of money.

3           The fact that Dr. Fredrick and Mr. Rodgers allocated

4   it in a way that didn't end up in the Saba and MUA accounts was

5   something that Dr. Hough was never privy to.  Agent Hough --

6   Agent Maurer concedes that there is no evidence that Dr. Hough

7   knew how the money was being allocated and where it ended up

8   going.  And if it ended up going as it should have, to the Saba

9   and MUA accounts, we are back in the shell example, Your Honor.

10          And again, to rely and give any credibility to what

11  Agent Maurer's calculations have come up with, you know, this

12  is . . . how best to put this?  You know, we're in a criminal

13  sentence, a criminal sentencing, Your Honor.  The Government,

14  the United States Government has put an expert that's

15  unqualified, by all means -- and the IRS has plenty of

16  qualified people -- that's unprepared, Your Honor.  I mean, if

17  you recall the testimony at trial, before she does her first

18  report and spends four years on it, the Government doesn't

19  share with her the four years' worth of investigation it had

20  done, the memorandum of interviews, all the Minchenberg stuff

21  that it had for years?  They just let her have the bank

22  statements and come up with numbers?

23          And then, even before trial, Your Honor, they still

24  don't share all that information with their expert, so that we

25  can have a different report six days into trial?  And then not

1    even stay with that report, but have a far different report

2    96 days after the trial concludes.

3           And once again, you know, this is a woman on the key

4    question.  And, Your Honor is having -- when you actually have

5    the back-and-forth with Agent Maurer, who is the most telling

6    yesterday, because you asked her a key question that is central

7    to this situation about distributions, and whether or not, if

8    you have a corporate entity, like your shell example, that

9    corporate entity would not be taxed unless it made a

10   distribution.  And she sat there, and there was silence when

11   she was thinking the answer, a long silence, and then she said,

12   "I'll get back to you, Judge, I'll research it."

13          That is not the type of prepared expert witness that

14   this Court should rely on and give any credibility to, where

15   the Government is asking the Court to rely on those numbers to

16   put a 67-year-old woman, who has never had a criminal history,

17   in jail for six to eight years, Your Honor.  It just isn't.

18          So, Your Honor, I would suggest that this is one of

19   the unusual cases where the Government has not met its burden

20   of proof with respect to tax law -- criminal tax loss at the

21   criminal tax loss sentencing hearing, and though it doesn't --

22   and that does not necessarily, as I explained before, affect

23   the validity of the verdicts.  Because if you remember, Your

24   Honor, with each one of the verdicts, the jury is checking off

25   that Schedule B question, and that Schedule B question just

1    says, yes or no, do you have a foreign bank account, signature

2    authority, etcetera.  And the jury found, for '05, '07,

3    and '08, which are the three counts that are still there, plus

4    the conspiracy, that Dr. Hough's answer of no was incorrect.

5           So you do not need to affect the verdicts, Your

6    Honor, by finding no tax loss.  And would I suggest, in this

7    case, given the fact that they've doubled and tripled down on

8    Agent Maurer's unreliable and incredible expert opinion, that

9    this is the case where the Court should make that finding.

10          THE COURT:  All right.  Let's move on to the role

11   issue.

12          And I think that's your issue.

13          MR. HOCHMAN:  That's my issue, Your Honor.

14          MR. HOCHMAN:  As we point out in the papers, the en

15   banc court in the 11th Circuit, in United States versus

16   Rodriguez de Varon, says that, in figuring out a mitigating

17   role in a situation in which relevant conduct is considered,

18   the court can first look at the relevant conduct for which a

19   particular defendant is being held accountable, and then look

20   at that relevant conduct in light of all the other

21   participants.

22          Here, Your Honor, the Government is not just

23   asking -- well, interestingly, Your Honor, if the Court finds

24   that there is no tax loss, then arguably the minimal or minor

25   role in the offense would not apply, because the Court has not

1    found relevant conduct for which it -- for which it -- to which

2    it should apply.

3              THE COURT:  Say that again, please.

4              MR. HOCHMAN:  If the Court were to find that there

5    was no criminal tax loss, as we've asked the Court to do, then

6    what I'm saying, in the minor role, or the minimal role, Your

7    Honor, is that, compared to the "relevant conduct," which is

8    the criminal tax loss, that they are seeking to hold Dr. Hough

9    responsible for, both for herself and Dr. Fredrick, and for the

10   entire conspiracy, that arguably, if you made the initial

11   finding that there was no criminal tax loss, and we're at a six

12   under the guidelines, then this argument, Your Honor, I would

13   argue, probably wouldn't apply.

14             THE COURT:  Okay.  I understand.  I just didn't

15   understand what you were saying before.  But I gotcha.

16             MR. HOCHMAN:  Certainly.

17             But if the Court were to find that there was relevant

18   conduct here, for which Dr. Hough was responsible, then we

19   would suggest that either the minimal role, which is the least

20   culpable person, or the minor role, which is the less culpable

21   person, and one is a four-level departure, and one is a

22   two-level departure, and you could even find in between, for a

23   three-level downward -- these are adjustments -- downward level

24   adjustment should apply.  And here is why, Your Honor:

25             When you look at the evidence here, probably

1    90 percent of the evidence that came in was evidence against

2    Dr. Fredrick.  Dr. Fredrick initiated -- if you recall how the

3    whole situation with the offshore accounts occurred, is that in

4    the mid-nineties, the Saba school was being sued.  The board

5    got together and instructed -- and they were sued on the island

6    of Saba.  Under Netherlands Antilles law, the plaintiff had the

7    right to seize your bank accounts, seize and freeze your bank

8    accounts during the pendency of the litigation.  So they

9    decided, after being sued and having their accounts frozen,

10   that if they are going to have an operating entity, they should

11   have money outside of the island of Saba.  They entrusted

12   Dr. Fredrick to go ahead and open up the overseas accounts.

13   That's what Dr. Dalbec testified to, as the head of the board.

14   They didn't entrust Dr. Hough, because Dr. Hough was not in

15   charge of the finances of either Saba or MUA, Your Honor.  That

16   was exclusively Dr. Fredrick's role.  Dr. Hough's role was only

17   dealing with the accreditations and the clinical part of the

18   program in the third and fourth years of the schools.

19         So Dr. Fredrick goes ahead and opens up the accounts

20   in the Bahamas first, and then Dr. Fredrick decides that the

21   accounts in the Bahamas need to be switched over to the

22   accounts in Switzerland.  Dr. Fredrick reaches out and finds

23   Dieter Luetolf at UBS.  At that point they set up the accounts,

24   Your Honor.  And then if you look at the amount of

25   back-and-forth with Dieter Luetolf, and eventually with Beda

1    Singenberger, 90 to 98 percent of it is with Dr. Fredrick.   And

2    I'm talking about the actual transfers of money.   If you look

3    at every single transfer of money, other than literally one

4    transaction that just moved the money out of Dr. Hough's

5    account into the New Vanguard account, one piece of paper, and

6    the account that split between the David Fredrick/Pat Hough

7    account into the two separate accounts.   So you have two small

8    instances in a ten-year period.   Every other transfer that the

9    Government is talking about, all these supposed distributions,

10   transfers, every single one is Dr. Fredrick, every single one.

11           And so you have Dr. Fredrick completely organizing

12   the finances and these transfers, and the setting up.   And what

13   does are Dr. Hough do?   She shows up at meetings, she signs

14   papers that are given to her, and she sends probably in the

15   scope -- she initiates and sends probably, in the scope of a

16   ten-year conspiracy, less than a half a dozen e-mails, Your

17   Honor.   Everything else is Dr. Fredrick.   In fact, this case,

18   you know, when you listen to the trial, was almost like we were

19   hearing Dr. Fredrick on trial as opposed to Dr. Hough.

20           So, compared to Dr. Fredrick, Dr. Hough is clearly a

21   minor or a -- potentially the minimal participant, because who

22   are the other participants in this?   Well, you had the Swiss

23   Banker, Dieter Luetolf, that the Government put in the

24   indictment, at least originally, as an unindicted

25   co-conspirator because he's the one -- not Dr. Hough, and not

1    even Dr. Fredrick -- he is the one that's dealing with all the

2    money abroad.  He is the one that physically is moving the

3    money from account to account.  He's the one physically moving

4    the money from account to account.  He's the one that sets up

5    the accounts at UBS -- the 10 or 11 accounts that they have at

6    UBS.

7           Who is the other participant here; Beda Singenberger.

8    With Beda Singenberger, you have someone who is setting up all

9    the Hong Kong accounts.  He becomes the authorized signators.

10   He becomes the gentleman for which all the transactions that

11   David Fredrick initiated had to go to Beda Singenberger in

12   order to go to the banks.  And Beda Singenberger, skilled, is a

13   sophisticated international banker.  Dieter Luetolf,

14   sophisticated international banker.  David Fredrick, in charge

15   of all the finances of Saba and MUA in dealing with this.

16          And then there is Dr. Hough.  What do we know about

17   Dr. Hough from the trial?  We know that she has -- she is

18   unsophisticated when it comes to finances.  We know that from

19   at least five different witnesses that testified at trial,

20   everyone from Antoine Solagnier, we know that from Alan

21   Greenberg, we know that from David Minchenberg.  From David

22   Minchenberg himself, his point was that she was honest and

23   cooperative.  When the Government keeps saying that Dr. Hough

24   was anything other than cooperative, they forget the testimony

25   that, when David Minchenberg came to her and said, "You have to

1    file a 5471 for Round Hill Holdings," her response was, "When

2    can we get this done?"  That's why David Minchenberg found her

3    to be honest and cooperative.

4           What do we know also about her tax history?  What we

5    know about her tax history, Your Honor, is the one and only

6    time she was audited, back in the seventies, she canceled a

7    trip to Europe in order to make sure she could meet with the

8    IRS auditor to fix the particular issue and got a no-change

9    letter.  We know that, in 2005, she had left off $11,000 of

10   rental income from her tax return, rental income that the

11   Government would never -- that the IRS would never have found.

12   She went back to Mr. Murtha, handed him the $11,000 of rental

13   income slip that she had not given before.  He then prepared an

14   amended return, and she paid the tax and the penalties on the

15   $11,000 of income for the 2005 return.

16          We know that Dr. Hough, unlike Dr. Fredrick, when it

17   came to giving gifts to Charlene, her sister, who you heard

18   testify, respected the gift tax limits every single time.  A

19   ten year history of giving gifts, every one of which was within

20   the gift tax limits to her sister.

21          Again when it came for the 5471s, when David

22   Minchenberg said, "You have to do this," her only question was,

23   "When and how fast can we get it done?"  And she actually

24   prepared all the paperwork.  Unfortunately, it went to her

25   lawyer and, for some reason, didn't get submitted, but she did

ARGUMENT  BY  MR.  HOCHMAN                                    27

1    everything she could.

2            So in evaluating, Your Honor, where Dr. Hough's role

3    fits within this, she attends a few meetings; she goes ahead

4    and is cc'd on a bunch of e-mails.  When it deals with her own

5    personal account, Your Honor, she says, "Okay, I agree with

6    Dr. Fredrick to split the accounts."  And at the end, when

7    Dr. Fredrick tells her to send to New Vanguard, she literally

8    signs the piece of paper she's given that says:  Send it to New

9    Vanguard.

10           And the most telling thing about her role in this is

11   what happened with the Patricia Hough only account between 2004

12   and 2005, when it was opened, had about $5 million in it for

13   14 months, Your Honor.  What happened with that account?

14   Nothing.  For 14 months, when she had access, sole access,

15   could have sent herself any amount of money, she distributes

16   not a penny of that money, in 14 months, to herself or anybody

17   else, isn't sent even the bank statements from it; and

18   14 months later, when she's told, "Okay, it's got to be sent to

19   New Vanguard," she signs a piece of paper.

20           That's the telling role, or lack of role, that she

21   had in all of this.  Unlike Dr. Fredrick, who is sending money,

22   unbeknownst to her, to all his relatives, if you recall, like a

23   million dollars to his relatives, that she doesn't know about

24   at the time and gets extremely mad at him when she finally

25   finds out.  That's her role in this, Your Honor.  And again,

1    it's not the role of someone who -- what other key fact is

2    this?  In all the evidence, Your Honor all the evidence, there

3    is not one document, or one witness, that has come into court

4    and said that anything Dr. Hough did was to evade the Internal

5    Revenue Service.  I'll say that again, because it is that

6    important:  Not one document, not one witness, came in and

7    said:  Dr. Hough took actions to evade payment of the Internal

8    Revenue Service.

9         Even that tax fraud memo that the Government talks

10   about, (a) it deals with 5471s; and (b) the evidence was

11   unequivocal, it was never sent to Dr. Hough.  In fact, the only

12   memo, if you recall, that I showed you yesterday, that David

13   Minchenberg did send to Dr. Hough, is the one that told her

14   that, as long as money is overseas and isn't brought back into

15   the United States, tax is not triggered.

16        And again, recall that, with respect to the

17   distributions that came into the United States, as you saw from

18   the testimony I presented of Dr. Dalbec, Dr. Fredrick went to

19   the board and asked for loans, and Dr. Dalbec agreed to this.

20   Agent Maurer said loans are not taxable income.  You heard from

21   Dr. Hough herself that she was told by David Fredrick that

22   haddie had gotten loans based on his deferred compensation,

23   exactly corroborated by Dr. Dalbec.

24        So again, with respect to any money that came into

25   the United States, it was her understanding that it was a loan

1    to be repaid.  And as you also heard from Agent Maurer, the

2    loans were repaid, Your Honor.  So at the end of the day, Your

3    Honor, in assessing Dr. Hough's role in this, we would suggest

4    that, compared to Dr. Fredrick, Beda Singenberger, and Dieter

5    Luetolf, she's the least culpable person here, or at least less

6    than Dr. Fredrick, Beda Singenberger, and Dieter Luetolf.  I

7    would be shocked if the Government came in here and said

8    anything other than that she had a less role than those three

9    gentlemen.  And if the Government then says:  Well, she, with

10   respect to her own tax returns, you know, she's the only one

11   signing her own tax returns, that's why I go back to Rodriguez

12   de Varon, because Rodriguez v. Varon says, if you are holding

13   her responsible for relevant conduct, you have to look at all

14   the actors involved in the relevant conduct, not just the

15   conduct involved in a few counts, Your Honor.

16         And so, again, it's for these reasons that I believe

17   that the minor role or the minimal role applies.

18         THE COURT:  All right.  Thank you.

19         Ms. Finley?

20         MS. FINLEY:  Thank you, Your Honor.

21         The guidelines under 3B1.2 says that in order for the

22   minor or minimal participant role in the offense deduction to

23   apply is that the Defendant has to be plainly among the least

24   culpable.  It is applied infrequently.  And the Court needs to

25   look at her lack of knowledge or understanding of the scope and

1    structure of the enterprise, and of the activities of others.

2    And that's under 3B1.2, as well as 11th Circuit case law, the

3    Zicardi case, with a Z.

4            And the Government submits that the Defendant is not

5    a minor participant, but a co-conspirator of Dr. Fredrick.  If

6    the Court remembers, Mr. Luetolf and Mr. Singenberger, at least

7    according to the Court, were not participants in the

8    conspiracy, or at least the Government had not proven that, and

9    so to use their conduct to now argue that she is a minor

10   participant as compared to these two other individuals that the

11   Court found were not participants in the conspiracy, they

12   merely were serving as nominees and acting at the direction of

13   both Dr. Hough and Dr. Fredrick.  And so their role is

14   irrelevant to the Court's analysis of what Dr. Hough and

15   Dr. Fredrick did in the conspiracy.

16           And the jury's verdict in this case is based on the

17   totality of the evidence that she defrauded the IRS in the

18   ascertainment of her income taxes and Defendant Frederick's

19   income taxes.  That's what the conspiracy was about.  The jury

20   found that, they found that she was a conspirator, and her acts

21   and conduct in this case do not point to her being a minor

22   participant.  She signed documents for almost every single bank

23   account.  I think there were two bank accounts that

24   Dr. Fredrick opened without her signature.  She testified that

25   she met with Mr. Luetolf to open the original bank accounts at

1    UBS.  And the Government submits that the information that was

2    contained in the client workbenches for the opening of those

3    accounts, that Mr. Luetolf detailed in there about both

4    Dr. Fredrick and Dr. Hough owning the schools, the medical

5    universities, that the money that was going to be coming into

6    the accounts, that that information actually came from

7    Dr. Hough.

8         She testified that she did meet with Mr. Luetolf and

9    Mr. Schneider, and the Government would submit that Dr. Hough's

10   testimony that document after document that Dr. Fredrick

11   allegedly put in front of her were blank, and that she signed

12   these documents with no information on them, yet she was the

13   caretaker of the schools, is wholly incredible, and the Court

14   should not credit that testimony in order to analyze whether

15   she was a minor participant.

16        She opened bank accounts, provided information to

17   Mr. Luetolf about the ownership of the schools, and provided

18   the information to Mr. Murtha for preparation of her tax

19   return.  And as Mr. Hochman pointed out, I'm not sure how, with

20   respect to her own individual tax returns, Dr. Hough can be

21   only a minor participant when it's only her responsibility to

22   file a correct tax return.

23        And the idea that tax loss doesn't matter, again, the

24   jury convicted her of conspiracy to defraud the Internal

25   Revenue Service in the ascertainment attainment of her and

1   Dr. Fredrick's income taxes.  That's what the Court is looking

2   at as her role in the offense.  And her role was an active

3   participatory role that was not so lacking in understanding of

4   the scope of the enterprise.  She understood that all of these

5   accounts were opened for their benefits, she is signing on

6   every single one, except for, I think, two.  And those accounts

7   are the core of how the Defendants cheated the IRS out of their

8   taxes.  And to say -- again, we would not credit her testimony

9   that she doesn't even know what she's signing.  And then to

10  argue that she's a minor participant because, in her own

11  account, in her own name, she opted not to spend money, and

12  that somehow, because she's more frugal or doesn't spend money

13  and leaves it there to earn interest and dividend income, makes

14  her a minor participant is absurd.

15          First of all, even with respect to that account,

16  Dr. Fredrick has nothing do with the opening of that account.

17  She signs all of those documents by herself.  There were

18  e-mails between her and Mr. Luetolf, where Mr. Luetolf was

19  corresponding with Dr. Hough, in order for her to indicate that

20  Ms. Varga was going to be her power of attorney.  Dr. Hough's

21  signature is not anywhere on those documents.  And again,

22  document after document that she's signing to cause things to

23  be opened, and other entities to then be opened after it, in

24  order to conceal her income and assets from the IRS, are not

25  indicative of a minor participant.

ARGUMENT BY MS. FINLEY                    33

1           And I think Mr. Murtha, the Government would submit

2   there were e-mails and other correspondence in his file that

3   showed that she actually was fairly sophisticated.  She talked

4   about capital gains, in her e-mails, for her domestic income.

5   And the Government would submit she was only honest with

6   individuals about things that the IRS -- that were happening

7   here in the United States.

8           To say, "Well, I realize I had a gain on a sale of

9   property that was here in the United States," well, the IRS is

10  going to know about that because the brokerage firm or the real

11  estate entity, there's going to be a document here that shows

12  the sale.  There will be escrow documents and other things that

13  the IRS would be able to determine.  There's probably going to

14  be 1099s.  All of these things would be reported to the

15  Internal Revenue Service, whereas all of her activity offshore,

16  none of that is being reported to the Internal Revenue Service,

17  and that is why the Government submits they are over there,

18  because they know that none of it is going to be submitted.

19          And when law changed in the Bahamas, and the banking

20  law changed, and it appeared that information was going to

21  start being reported to the United States, Dr. Hough and

22  Dr. Fredrick moved their bank account to a more secret

23  location, to Switzerland.  And when UBS gets the news that

24  they're going to have to enter into a Deferred Prosecution

25  Agreement, and taxpayer information is going to be turned over

ARGUMENT BY MR. HOCHMAN                    34

1   because they're entering into that agreement, what did

2   Dr. Fredrick and Dr. Hough do?  They moved their accounts

3   again, to another location that offers even more secrecy, to

4   Liechtenstein.  These are not actions of an individual that was

5   a minor participant.

6           The case law talks about people that -- like, for

7   example, in a drug conspiracy, where they drive somebody one

8   place, or in a return preparer case, where somebody prepares

9   one tax return.  Dr. Hough's conduct over a multiyear, more

10  than ten-year conspiracy, of filing false tax returns and

11  failing to report her income and assets in the United States,

12  was not minor.  And for those reasons the Government submits

13  that the Court should reject that mitigating role in the

14  offense.

15          THE COURT:  All right.  Thank you.

16          Mr. Hochman, any rebuttal?

17          MR. HOCHMAN:  Thank you, Your Honor.

18          I think the Government forgets some of the evidence

19  at trial.  They forget the blank document that was in the UBS

20  records that Dr. Hough signed.  It was blank.  And it was stuck

21  in as the Form A, in connection with one of the ten UBS

22  accounts, Your Honor.

23          And when I asked, you know, Mr. Futterknecht, does

24  UBS usually allow blank documents; oh, no.  And then I showed

25  him the blank document, and he was saying:  Well, you're right,

1    here's a blank document, it shouldn't be there.

2         When we look at the Dr. Hough file, the Patricia

3    Hough-only file, and we look at the handwriting on that file,

4    none of the handwriting is Dr. Hough's.  The signature was, but

5    none of the handwriting occurred.  And it is unclear when the

6    handwriting occurred, did it occur before or after she signed.

7         When we look at the New Vanguard, Top Fast, Ample

8    Dynamic files, what do we find?  Beda Singenberger had put

9    Dr. Hough's name as a beneficial owner on some of those,

10   actually all of those, but there was not Dr. Hough's signature

11   on those, she was not an authorized signature, and there was no

12   contact whatsoever in any of those files dealing with

13   Dr. Hough.  Who was involved with it?  Dr. Fredrick certainly

14   was involved.

15        And again, there's a difference between a

16   co-conspirator for a -- criminal trial purposes and a

17   participant, I would argue, for criminal sentencing purposes.

18   Clearly, the Government believes, and it would be disingenuous

19   for them to say otherwise, that Dieter Luetolf, who they charge

20   as an unindicted co-conspirator, and Beda Singenberger, were

21   participants in this.  So in weighing against these

22   participants you have the unsophisticated person who, all the

23   witnesses say, you know, basically, when it comes to finances,

24   that is not Pat's strong suit.  She defers to others, against

25   David Fredrick, who is in charge of the finances, and two

1    international bankers, who are putting all of it together.

2          And the Government goes back to, you know, that this,

3    again, was all set up by Dr. Hough to cheat the IRS out of

4    their taxes.  But they keep going back and forgetting the

5    2005 e-mail between David Minchenberg and Dr. Hough.  And it

6    says, if the money is kept overseas and it's not brought

7    back -- and remember, we're talking about setting up Swiss Bank

8    accounts -- then it is not -- then no tax is triggered.

9          Now, when they like what Dr. David Minchenberg has to

10   say, they credit him and trumpet him, but when he actually says

11   something directly to Dr. Hough that they find inconvenient for

12   their theory on why she didn't believe that she was cheating

13   the IRS, all of a sudden they go ahead and discredit David

14   Minchenberg, he's not an international tax man, even though he

15   is the one that consults with international tax lawyers, as he

16   says, and was spearheading the 5471 effort to get them filed.

17         So, Your Honor, again, with respect to weighing the

18   various roles here, clearly Dr. Hough has a minor or a minimal

19   role.  When they point to Mr. Murtha, again, there's only two

20   conversations that they point to, in basically an eight-year

21   period, of Dr. Hough and Mr. Murtha.  They point to a 2001

22   conversation.  I just want to take 30 seconds and go over each

23   one of these because it's very important, because these are the

24   only two that they point to in an eight-year relationship.  And

25   in that first one, Mr. Murtha said it occurred around tax time

1   of 2001, when he first met with them.  They had previously been

2   clients of the firm, and he had been sort of handed over their

3   case.  He's doing, supposedly, an intake interview, and he says

4   in the intake interview -- before tax time of 2001, so

5   approximately April of 2001 -- did you -- do you have any

6   foreign bank accounts?

7          He recalls this conversation 12 years later, and he

8   recalls that they said no.

9          Now, what happens in 2001, in October?  That's

10  when -- in September or October of that year, is when Dr. Hough

11  goes and meets with Dieter Luetolf, and they open that account,

12  in 2001, in UBS.  And that's when it's opened up in the David

13  Fredrick/Patricia Hough names.  Before that, when they're

14  meeting with Mr. Murtha at tax time -- and again, remember

15  Mr. Murtha, he doesn't know what an F-Bar is.  He testified, to

16  this day, he's never dealt with a F-Bar, or knows -- he didn't

17  know what the exceptions on Schedule B were.  But he asked this

18  question on foreign bank accounts, and she doesn't have a

19  foreign bank account, at least in her and her husband's name at

20  that time.  And would I argue that the evidence -- she does not

21  show that she had a foreign bank account in SG Hambros.  I

22  believe that it was Apex, Your Honor, and GSI was actually the

23  other company.  So when she answers that question, and she

24  testified that, to the extent she remembered that question, she

25  thought that she would have her own money in a foreign bank

1   account, and she did not believe that, (a) she didn't have one

2   at that time; and (b) to the extent there was any money

3   involved, that money was the Saba Foundation's money.  So that

4   answer, Your Honor, is true.

5           And Mr. Murtha then says:  Well, I had another

6   conversation.

7           And I pressed him on the date, and he gave me the

8   date of tax time of 2008.

9           And I said:  Are you sure it was 2008?

10          He says:  Yeah, 2008.

11          And I had this conversation because I read about the

12  UBS case, and I had a conversation with Drs. Fredrick and Hough

13  about this situation.

14          The problems with that testimony, Your Honor, as I

15  pointed out to the jury, is that the UBS situation does not

16  blow, shall we say, and come alive, until August of 2008, not

17  tax time of 2008, in April, August of 2008.  That conversation

18  couldn't have occurred.  And then where it really becomes hot

19  and heavy is around the end of March of 2009, when the UBS

20  enters -- when it's publicly disclosed that it has entered into

21  the agreement in February, and they open up the voluntary

22  disclosure program in March of 2009.

23          My point for all this is that the scant amount of

24  evidence that they have against Dr. Hough, here, needs to be

25  weighed against, in this case, the much larger evidence they

1    had against David Fredrick and his role, Beda Singenberger, and

2    Dieter Luetolf.

3            Thank you, Your Honor.

4            MS. FINLEY:  Your Honor, I think Mr. Hochman

5    misstated the record on two things.

6            THE COURT:  I'll let you get back, but he's not done

7    yet.  I've got a couple questions for him.

8            MR. HOCHMAN:  I'm sorry, Your Honor.

9            THE COURT:  How does one have a minor role in the

10   substantive offenses that she was convicted of?

11           MR. HOCHMAN:  The way that Rodriguez de Varon looked

12   at it, Your Honor, is that if you will were only going to be

13   convicting -- if the tax loss, for instance in this case, let's

14   say I gave you a potential other than zero of taxable interest.

15   If you just looked at the taxable interest for just her

16   returns, and not David Fredrick's returns, then arguably my

17   argument does not apply.

18           THE COURT:  Okay.

19           MR. HOCHMAN:  But if you add them together, that's

20   where my argument applies.

21           THE COURT:  All right.  And then let me go, secondly,

22   to the conspiracy count.

23           Is it your view that a conspiracy has to have a minor

24   participant?

25           MR. HOCHMAN:  No, Your Honor.  I think that -- in

1    other words -- I'm sorry, you didn't finish your question.

2            THE COURT:  No, I think I had.  Go ahead.

3            MR. HOCHMAN:  Your Honor, if this case involved --

4    for instance, if this wasn't a tax case involving the finances,

5    and this was a fraud case on the department of education,

6    because you submitted fraudulent documents getting your

7    accreditations, and we had, you know, two people who were

8    meeting with the department of education, and they're going to

9    all the meetings and preparing all the documents together, and

10   they conspired to defraud the department of education on an

11   accreditation issue, then they would have equal roles, Your

12   Honor, or quasi-equal roles.

13           Arguably, if you had a situation here, where

14   Dr. Hough was the finance person, they were basically

15   co-finance people, you know, one was in charge of MUA's

16   accounts, one was in charge of Saba's accounts, and they worked

17   together to . . . to engage in this conspiracy, those could be

18   equal roles.

19           Where you have something so vastly different here,

20   where one woman is in charge of the accreditation and

21   clinical -- the clinical experience at the schools, and as she

22   said, she spent 180 days on the road on a typical year, running

23   around the world, dealing with that aspect of her duties, and

24   that, as you heard Mr. Rogers, he was talking to her when he

25   bought the school about the academic side.  When you heard

1   about everybody else described Dr. Hough's role, it is all on

2   the academic and not on the financial side.  But these crimes

3   are financial crimes, dealing with money flowing all over the

4   place, and Dr. Fredrick being effectively solely responsible

5   for this, but putting Pat as sort of a second signatory on a

6   bunch of documents and having her showing up at an occasional

7   meeting and signing papers, that disparity in roles, Your

8   Honor, is where I believe either the minor or minimal role

9   adjustment applies.

10                  THE COURT:  All right.  Thank you.

11                  Ms. Finley, there was something you wanted to add?

12                  MS. FINLEY:  Yes, Your Honor.

13                  I find it ironic that Mr. Hochman's hypothetical,

14   because the Government would submit that the department of

15   education hypothetical is exactly the facts here, because the

16   heart of the financial crime here are the creation of the

17   nominee entities and their accounts, and Dr. Hough is, again,

18   on almost every single one, signing and opening each of those

19   documents, and accounts, and . . . without those, their

20   conspiracy would not have been successful.

21                  But with respect to the evidence at trial,

22   Mr. Murtha, I think, testified that he spoke and first asked

23   Dr. Hough and Dr. Fredrick if they had offshore accounts for

24   preparation of the 2001 tax return, which would have happened

25   in April of 2002.  And at that time they had already opened the

1    bank accounts, and so the Government submits that she lied to

2    Mr. Murtha when she said that they she did not have any foreign

3    accounts.

4                I think he testified that he did know what a F-Bar

5    was, it's just that he didn't have clients . . . that needed to

6    file them because none of them, according to him, had offshore

7    bank accounts.

8                And then with respect to the second time he asked Dr.

9    Hough if she had an offshore account, he said that that would

10   have been for the preparation of the 2008 tax return, which

11   would have been in April of 2009.  And in August of 2008, the

12   media reports started to -- which is what triggered him to ask

13   that question, and it would have been, then, around the time of

14   preparation of the 2008 tax return, which would have been in

15   2009.  In February of 2009, UBS entered into the Deferred

16   Prosecution Agreement.  And then in March of 2009, is when the

17   voluntary disclosure initiative had been announced.

18               And so the Government submits that his recitation

19   that all of those things were happening in 2008, prior to the

20   announcement of UBS's issues, is not supported by the testimony

21   at trial.

22               THE COURT:  All right.  Thank you.

23               Any other guideline-related issue?

24               MR. HOCHMAN:  No, Your Honor.  Those are the two main

25   issues that are remaining, or actually at issue.

1          THE COURT:  Do you care to be heard with regard to

2     the 3553 factors, or do you want me to resolve the guidelines

3     issues first?

4          MR. HOCHMAN:  Your Honor, if you could resolve the

5     guideline issues first, I think that would probably be useful

6     in fashioning the 3553(a) discussion.  Unless you find --

7     unless you would like to do it differently.

8          THE COURT:  Well, that's my normal practice, is to

9     resolve the guideline issues first, and then both sides know

10    what the guidelines are when they're addressing either variance

11    or 3553 factors.

12          I guess my problem is a more practical one.  I mean,

13    there are some things I want to look at that I think are

14    important to the calculation of the guidelines that, as I sit

15    here right now, I'm not sure I know the answer.  I know that

16    each of you think you know the answer, and, unfortunately,

17    they're different answers, so I don't know what I think yet.

18    And I haven't read, certainly, what was submitted today.

19          I think there is one issue that probably drives it

20    all, in terms of the income.  I know everyone is from someplace

21    other than Fort Myers.  I hesitate to make you come back.

22          Having said, that those are my concerns.  Thoughts?

23          MR. HOCHMAN:  One moment, Your Honor?

24          THE COURT:  Sure.

25          Your lawyer will tell you what your thoughts are.

 1              (Mr. Hochman and Mr. Saunders confer privately.)

 2              MR. HOCHMAN:  Your Honor, I think . . . .  I have two

 3    points, Your Honor.  Obviously, with respect to these various

 4    issues, particularly the tax loss issue, it is the Government's

 5    burden on this one.  It is not the defense burden to disprove

 6    it, it is the Government's burden to prove it.  And to the

 7    extent that they haven't, that's certainly one of the factors.

 8              Secondly, I think it would be useful to do the

 9    3553 factors, even if the Court isn't prepared to rule right

10    now on the guidelines, because I think part of -- I can weave

11    into the analysis either direction I think the Court might go

12    on the tax loss and the minimal role, but the guidelines, as

13    the Court's aware, is the starting point, not the ending point,

14    and only one of seven factors.

15              So I think that part of what our overall pitch will

16    be is a particular sentence, Your Honor, and one can get there

17    in either guideline calculation, in my mind.  Obviously we

18    believe that the lower guideline calculation is appropriate.

19    But I think I can hopefully make a compelling presentation to

20    the Court as to why the ultimate sentence that we're advocating

21    for is justified for a full consideration of the 3553(a)

22    factors.

23              THE COURT:  So you want to do the 3553 argument now,

24    is what you're saying, or not?

25              MR. HOCHMAN:  Well, if the Court is not inclined to

1    rule right now on the guidelines analysis, I mean, if the Court

2    wants . . . you know, some time, so we can potentially

3    hopefully finish today, to think about it, certainly, I defer

4    to the Court on that amount of time, because it clearly is a

5    crucial starting point for an analysis.  But I think hearing

6    all the rest of the 3553 -- the other six 3553(a) factors and

7    how they apply so compellingly in this case, I think, would be

8    useful in deciding the ultimate sentence.  So yes, I would ask

9    to probably go forward with the 3553 discussion, if we could.

10             THE COURT:  I'll certainly let you do that.  And your

11   argument may, indeed, overlap into what we've talked about so

12   far.  As a matter of law, I don't think what you say about the

13   3553 factors can be considered by the Court in the calculation

14   of tax loss.  It's not an end result driven.  I mean, I

15   understand I don't have to impose a sentence within the

16   guideline range, but . . . the guidelines are what they are,

17   and my sentence will be whatever it is.

18             MR. HOCHMAN:  For instance, Your Honor, one of the

19   points --

20             THE COURT:  I'm sorry to interrupt, but the bottom

21   line is, I'm going to let you make your arguments now, if you

22   wish.  I just don't want you to think that -- you know, you may

23   well convince me, based upon 3553, that your client needs

24   probation -- I'm not saying that, but if you do -- but I'm not

25   going to calculate the guidelines to make that happen.

1          MR. HOCHMAN:  Of course, Your Honor.

2          THE COURT:  The guidelines turn out to be what they

3     are, and then I think I can impose a sentence below the

4     guidelines, above the guidelines, or within them.  I mean, I

5     think it's pretty clear, after Booker, that, as you said,

6     that's just one factor.

7          MR. HOCHMAN:  Absolutely, Your Honor.  And to show

8     Your Honor just the tie-in between this guidelines discussion

9     and 3553(a) discussion, is that, for instance, if Agent Maurer,

10    after 500 hours of analysis, in three different RARs, can't

11    definitively tell us what the tax loss is, what the number

12    should have been on Dr. Hough's returns, with all the expertise

13    she has, obviously, compared to the lack of expertise that

14    Dr. Hough has, how did one -- how does one expect Dr. Hough to

15    get it right, if Agent Maurer still can't get right?  It would

16    be at least a tie-in between the two arguments, Your Honor.

17         THE COURT:  I understand it.  I don't buy that, but I

18    understand it, what you're talking about with the tie-in.  And

19    like I say, I'm certainly willing to hear those arguments,

20    because I'd rather spend the time doing something.

21         MR. HOCHMAN:  Certainly.

22         Do you want to hear from the Government first, Your

23    Honor, and then we can respond?  How would you like to do that?

24         THE COURT:  No.

25         MS. FINLEY:  Your Honor, if the Government can be

1   heard just on the order that we're going to do this, just for

2   the record?

3              THE COURT:  Yes.

4              MS. FINLEY:  The Government actually thinks that it

5   would be more productive for the Court to rule on the

6   guidelines because some of the 3553 arguments that the

7   Government makes are impacted by what the Court would find the

8   tax loss to be.

9              Additionally, things like restitution and other items

10  are driven by the Court's finding of tax loss.  And so we --

11  again, we don't want to rush the Court.  We're here all day.

12  I'm not sure if it's something the Court thinks it can resolve

13  today.  If it's not, then we are prepared to make the

14  arguments.  But I think that some of the arguments we might

15  make may somewhat differ, depending upon the Court's ruling.

16             THE COURT:  Well, has anyone given me a case, or a

17  statute, or anything authoritative, other than testimony of

18  experts or arguments of counsel, with regard to the taxability

19  of the revenue for the two companies in each year?

20             I mean, getting back to my Shell Oil example, be it

21  ever so humble, it seems to me that that's where the bulk of

22  the alleged income for each of the years is, and depending on

23  the result of that, the guidelines may well change.

24             But do I have, in what you have given me, a case that

25  I can read where a light will go off and I can say:  Of course,

1    why didn't I see that?

2         MS. FINLEY:  I think with regard to the Internal

3    Revenue manual, which talks about corporations and how the IRS

4    would collapse them or determine that it is really actually a

5    disregarded entity and a Schedule C, and that that is why

6    Revenue Agent Maurer treated it as such, that is an Internal

7    Revenue manual that we provided today, as well as the cases

8    concerning piercing the corporate veil or alter ego, and that's

9    what the Government provided today.

10        MR. HOCHMAN:  And, Your Honor, we can provide cases

11   of situations like this, with operating -- if the Court reads

12   those cases, knowing the facts of these two operating

13   companies, and somehow decides that these operating companies

14   are nothing more than sham alter egos of Dr. Hough and

15   Dr. Fredrick, notwithstanding all of the indicia that they're

16   operating companies, then I can get you additional cases

17   dealing with the alter-ego theory where it was not found in the

18   exact situations where there were operating companies, and the

19   IRS didn't disregard the entity an operating company.

20        I just -- you know, I didn't know the Government --

21   the Government didn't provide me these cases until today.  To

22   the extent that -- and Agent Maurer didn't give us -- I asked

23   for a broader report on how Agent Maurer came up with her

24   calculations, and I got it on the stand, Your Honor, so I don't

25   have -- I didn't have the ability to brief that ahead of time.

1    But if Your Honor is at all inclined in finding that these are

2    sham corporations that should be disregarded for tax purposes,

3    I'm happy to get you the law, 11th Circuit and whatnot, that

4    shows that the alter-ego theory does not apply here.

5           THE COURT:  I'm not sure the Government has argued --

6    maybe I misunderstood, but I'm not sure the Government has

7    argued that they have to be sham corporations --

8           MS. FINLEY:  No, we have not.

9           THE COURT:  -- for this to kick in.  Just the

10   opposite, I think they are arguing that, even if it is an

11   operating company, based upon my findings in the evidence, the

12   tax ramifications of that is that it becomes immediately

13   taxable.

14          And I'm sorry, but let me just finish a thought.

15          MR. HOCHMAN:  Please.

16          THE COURT:  I don't think any of my findings have

17   suggested that it's a sham company in the sense that it wasn't

18   operating and doing things, and that there wasn't a medical

19   school.

20          MR. HOCHMAN:  The company has to be formed, which is

21   the . . . the case that they just gave, formed, Your Honor, or

22   used for illegal purposes.  This company -- these two companies

23   weren't formed for illegal purposes --

24          THE COURT:  How about the tax manual . . . in terms

25   of what the revenue agent testified that, you know, and I don't

1    want to try to quote it, but the effect of it was that this

2    becomes a Schedule C income, as opposed to something retained

3    by the corporation?  It is the accuracy of that, or the

4    inaccuracy of that, that gives me concern about being able to

5    determine.

6            MR. HOCHMAN:  And without hesitation, unlike Agent

7    Maurer, who hesitated in answering your question, when

8    Mr. Rivera took the stand, who is a CPA, who is fully

9    qualified, I asked him that first question, he said absolutely

10   not, unequivocally, it cannot be a Schedule C.  He said the

11   default, Your Honor --

12           THE COURT:  If he was the Judge, I would let him get

13   involved.

14           MR. HOCHMAN:  I understand.  But it is based on his

15   experience and reading of the tax law for, at this point,

16   30 years.  The default is not to Schedule C, which is a

17   self-employment situation.  It is as if Your Honor sets up, you

18   know, a little business in your backyard.

19           THE COURT:  But it should be easy for you or somebody

20   to give me some law or regulation that says that.

21           MS. FINLEY:  Your Honor, the Government would

22   submit --

23           THE COURT:  Hang on.  One at a time.

24           MR. HOCHMAN:  I'll get you that.  Yes, Your Honor,

25   again, I'm happy to get Your Honor that law.  I'll just need to

1    spend a little time getting the research done, and I can get

2    right back to you hopefully, if I can get the things

3    together . . . .  Give me two hours, I can get you something,

4    or sooner, Your Honor.  If you otherwise . . . are going to

5    view these as disregarded entities.

6            THE COURT:  Well, let me suggest this --

7            And, Ms. Finley, I don't know if there's something

8    else you wanted to add, but --

9            MS. FINLEY:  With respect to this alter-ego idea,

10   Your Honor, in fact, the company, in the Eckhardt case that the

11   Government cites to, was true operating company.  It was

12   running a business.  It had been incorporated.  The husband and

13   the wife were the owners and the president and the

14   vice-president.  And for taxation purposes, because of the way

15   that they treated the income and the use of the money, the IRS

16   disregarded it.  And the Internal Revenue's manual, which

17   apparently Mr. Rivera, in disagreeing with what Revenue Agent

18   Maurer says, that is what Revenue Agent Maurer is relying on.

19   The Internal Revenue manual says, if it is a disregarded

20   entity, it is treated as a Schedule C.

21           It is the same thing as if a defendant or a taxpayer

22   incorporated and elected to be a S Corporation, or a trust, but

23   then did not obey or use that form according to the rules of

24   that form, the IRS would then disregard it and make it, for

25   example, a grantor trust.  If it was a trust, and the trust is

1    supposed to have independent authority, and there's a trustee,

2    and the taxpayer can't direct the use of the money, and that it

3    has to be an independent individual, if the taxpayer is doing

4    all of those things, then the Internal Revenue Service would

5    disregard the trust, and it would then be on the taxpayer's

6    individual income tax return for tax purposes.  It's the same

7    concept here.

8              MR. HOCHMAN:  Your Honor, I'm reading from -- is it

9    the Internal Revenue manual -- the Internal Revenue manual that

10   says that --

11             MS. FINLEY:  What section, please?

12             MR. HOCHMAN:  I'm looking for it.  It is

13   Section 4.61.5.3.1, business entity classification process.

14             And it says:  A business entity that is not

15   necessarily classified as a corporation under a certain reg can

16   elect its classification for federal tax purposes under

17   different regs, but those rules provide that, if there's at

18   least two members -- and here . . . at a minimum the Government

19   says there is two members -- it can be classified as a

20   partnership or an association taxable as a corporation.  If

21   it's a single member, which the Government is not saying this

22   is, only if this is a single member can the association be

23   disregarded as an entity separate from its owner, "a

24   disregarded entity."

25             So here, at a minimum, Your Honor, the corporation

1    would be, since it's got at least two members, has to be

2    treated as either a partnership or a corporation, Your Honor,

3    not as a Schedule C.  And that comes directly from the Internal

4    Revenue manual's own manual.

5              MS. FINLEY:  Your Honor, if the Court looks, because

6    it's the same language in the document that the Government

7    passed up, it says it can elect its classification, and an

8    eligible entity with at least two members can be classified as

9    either a partnership or an association.  It doesn't say that it

10   must be or that it can't.

11             And if Dr. Fredrick and Dr. Hough were filing a joint

12   tax return, the Schedule C would be recorded on their

13   individual tax return jointly.  The fact that they are filing a

14   separate tax return requires that the income be recorded

15   separately, 50/50, on each of their tax returns.

16             MR. HOCHMAN:  That's not what this is talking about,

17   Your Honor.  Schedule C is, again, self-employment.  You know,

18   Agent Maurer, when I asked her, is Schedule C self-employment;

19   yes.

20             The example, Your Honor, is when Dr. Hough or

21   Dr. Fredrick was an independent consultant.  They reported the

22   money they received, the 1099 they received as an independent

23   consultant, as a Schedule C.  Here, again, the reason I'm

24   trying to -- and we will be happy to get the Court more on

25   this, is that a situation where the IRS has disregarded

1    entities would be like Apex Consultants, Your Honor, or ESI, or

2    MTA, you know, basically corporations that exist in paper

3    alone, where, if they are operating companies, they have Beda

4    Singenberger running the company, Your Honor, you know, from a

5    post office box, with no employees, no administrators,

6    directors, campus, buildings.  Or you have Dr. Fredrick and

7    Dr. Hough taking out all the money and putting it for their own

8    personal uses.

9            Why would Dr. Fredrick, Your Honor, go to the board

10   and get a loan, as Dr. Dalbec testified to, if it was all his

11   money anyway, and he wanted to disregard the proper formalities

12   of the entity?

13           We have Dr. Dalbec's undisputed testimony that

14   Dr. Fredrick went to the board to get a loan; again, respecting

15   the form of the company.  And at all points, Your Honor, you

16   know, the Government talks about these being their personal

17   piggy bank?  But again, the only undisputed testimony is when

18   they got personal distributions, for a house or whatnot,

19   Dr. Dalbec -- excuse me -- Dr. Fredrick went to the board for

20   loans, and the loans were approved.

21           So to the extent, Your Honor, that we are

22   disregarding this very operating company and saying they're

23   nothing more, that all those people who worked for this thing

24   are nothing more than Dr. Fredrick and Dr. Hough, full stop,

25   and if this whole thing was cooked up to, you know, to create

 1   an illegal nominee structure for these two individuals, that

 2   they -- I guess they cooked it up in the eighties or nineties,

 3   and then just put it into effect in the 2000s is, to use one of

 4   Ms. Finley's words, absurd.  And I'm happy to get you examples.

 5   I think what I can get you, Your Honor, is examples of

 6   situations where the Government -- the Government -- the IRS

 7   has not disregarded the circumstances where entities have these

 8   type of classifications, and they weren't, you know, used

 9   solely and exclusively by two people as their personal piggy

10   bank.

11           MS. FINLEY:  I would just point out that the loans

12   that Mr. Hochman talks about were supposedly from The

13   Foundation; however, the testimony at trial, and the bank

14   records, show that all of the transfers of the money actually

15   came out of New Vanguard and Top Fast, and not directly out of

16   the Saba Foundation.  And so the causing of the money to be

17   transferred initially from Saba to New Vanguard or Top Fast,

18   which are complete nominee entities and have no operating

19   purpose at all, and the Government would dispute that the

20   alter-ego doctrine only applies to shell corporations, again,

21   Dr. Fredrick, the Government would submit, going to the board,

22   or creating documents to make it look like Top Fast is

23   authorizing the purchase of a house, or an airplane, are

24   nothing more the than acts to further the conspiracy and

25   conceal those assets and income from the Internal Revenue

 1    Service.

 2              THE COURT:  Okay.  I'm fairly confident I can let you

 3    the two argue for the rest of the day and not be much farther

 4    along.  I was thinking about having everyone come back

 5    at 2:00 o'clock.  I'm not sure that's going to be enough time,

 6    actually.

 7              How much time do you want to get me cases, if it's

 8    not today?  I mean, if you got me cases in a couple hours, I'm

 9    not sure I could -- I could read them, but I'm not sure I

10    could, in my own mind, decide what the answer is.

11              MR. HOCHMAN:  Your Honor, I can get you cases as fast

12    as you want them.  I'll just mobilize some folks and get -- and

13    about three lawyers here who can get on Lexis Nexis pretty

14    quickly and see what we could find.  I'm confident that the

15    cases in this area are out there, and 11th Circuit cases as

16    well.  I shouldn't be overly confident until I start looking,

17    but this is an issue that the IRS in the civil area talks about

18    all the time.  So if you want the cases by 2:00, I can do my

19    best to get you them by 2:00.  If you want the -- and we can

20    try and do that, Your Honor, and see where we are

21    at 2:00 o'clock.

22              And if you -- obviously, if you want to schedule it

23    for a different today, we'll come back, Your Honor, but . . . .

24    We can see what we can do as fast as we can.

25              THE COURT:  Maybe next time we'll have it in

1   California.

2          MR. HOCHMAN:  Very nice, Your Honor.  I'll find a

3   courtroom for Your Honor.

4          THE COURT:  I can find a courtroom.

5          MR. HOCHMAN:  And I'm happy to do that.

6          THE COURT:  Let's come back at 2:00 o'clock.  If

7   whatever cases either sides find, just either e-mail them to my

8   chambers or drop them off, or something.  If it's before 2:00,

9   I'll try and take look that.  And I'll let you know

10  at 2:00 o'clock whether I think we can proceed or not.

11         MR. HOCHMAN:  Okay.  We'll get cracking, Your Honor.

12         THE COURT:  I guess my preference would be to do it

13  today, just because of logistics, but we'll see.

14         MR. HOCHMAN:  Thank you, Your Honor.

15         MS. FINLEY:  Your Honor, I'm not sure we have

16  chambers' address.

17         THE COURT:  You can check with my Courtroom Deputy.

18  They'll give you the e-mail.

19         I assume that's the most convenient way for you?

20         MS. FINLEY:  Yes, Your Honor.

21         THE COURT:  Okay.  We will be in recess, then,

22  until 2:00 o'clock.

23         MR. HOCHMAN:  Thank you, Your Honor.

24              (At 10:26 AM, court was recessed.)

25                    AFTER RECESS

1              (At 2:06 PM, court was reconvened.)

2          THE COURT:  All right.  We're back on the record with

3     the United States versus Patricia Hough.  Looks like everyone

4     is here.

5          I've received citations from three cases from the

6     Government.  I've received something from the defense literally

7     as I took the bench, so I haven't read it.  Apparently there's

8     some other citations that have been cited, but I have not seen

9     those.

10         MR. HOCHMAN:  The citations that are referenced in

11    that memo, Your Honor, we sent as a separate e-mail PDF for

12    each of the citations.  We're actually having a hard copy

13    printed up as well right now.

14         Does the Court prefer it electronically or in paper,

15    either way is fine with us, or both.

16         THE COURT:  You know, I'm old school, so I'm going to

17    highlight it.

18         MR. HOCHMAN:  We will have the paper here as fast as

19    they can get it printed.

20         THE COURT:  All right.

21         I've read the Government's cases that they gave me in

22    court, and the ones that they've cited.

23         When do you want to come back?

24         MR. HOCHMAN:  We'd ask the Court to read our cases as

25    well.  I don't know how fast the Court reads, but if the Court

1    reads . . . .

2              THE COURT:  It's not how fast I read, it's how fast I

3    comprehend, which is slower than my reading.

4              MR. HOCHMAN:  I mean, in a perfect world, Your Honor,

5    we'd love to finish today.  But if you are telling us that you

6    need the time to do it, it's obviously a very important issue,

7    and --

8              THE COURT:  Let me put it this way:  Unless there is

9    an agreement as to what that tax loss is, I don't know what the

10   answer is yet, and it's going to take more reading, and I think

11   I'm going to have to take a look at some exhibits as well.

12             MR. HOCHMAN:  Well, Your Honor . . . .

13             THE COURT:  I don't sense any chance of an agreement

14   as to tax loss in this case.

15             MR. HOCHMAN:  I don't think so, Your Honor.

16             MS. FINLEY:  I don't believe so, Your Honor.

17             Your Honor, we are just going to have Special Agent

18   Lalli get our calendar.

19             THE COURT:  That's fine.

20             MS. KESSLER:  Your Honor, may I be excused to run

21   downstairs and get our calendar?

22             THE COURT:  Certainly.

23             And we can go off the record to discuss scheduling,

24   unless someone sees that otherwise.

25             MR. HOCHMAN:  That's fine, Your Honor.

60

1            MS. FINLEY:  Yes.

2            THE COURT:  Okay.

3            (There was discussion off the record.)

4            THE COURT:  All right.  Counsel, after the

5    off-the-record discussion, it is my understanding that May

6    the 9th, which is a Friday, at 9:00 o'clock in the morning,

7    works for everyone.  So unless there's anything else someone

8    wants to add now, I will see everyone back here Friday, May

9    the 9th.

10           As I said, I will try and get an order out resolving

11   the issues we have been discussing today.  And to the extent

12   anyone has any additional case law, or statutes, or whatever

13   you need to send to the Court, feel free to send that.  I do

14   not anticipate wanting a formal written memorandum, but

15   certainly any case law, or codes, or anything like that, you

16   can send the citations, and I'll take a look at those.

17           All right.  Anything else?

18           MS. FINLEY:  Nothing from the Government, Your Honor.

19           MR. HOCHMAN:  Nothing, Your Honor.

20           THE COURT:  All right.  We will be in recess, then.

21                  -- -- -- -- -- -- -- --

22           (At 2:17 PM, court was recessed, to be reconvened at

23       9:00 AM, on Friday, May 9, 2014.)

24                  -- -- -- -- -- -- -- --

25