UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO.:  2:13-CR-72-FtM-29UAM

VOLUME THREE

---

THE UNITED STATES OF AMERICA,

         Plaintiff,

                                   Fort Myers, Florida
vs.                                   May 9, 2014

PATRICIA LYNN HOUGH,                9:00 AM

         Defendant.

---

TRANSCRIPT OF SENTENCING

HELD BEFORE THE HONORABLE JOHN E. STEELE
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S

FOR THE UNITED STATES:    U.S. Department of Justice
                               Tax Division
                        P.O. Box 813
                        Washington, DC  20044
                        BY:  CARYN FINLEY, ESQ.

                        U.S. Department of Justice
                               Tax Division
                        Suite 7334
                        601 D Street NW
                        Washington, DC
                        BY:  MARGARET LEIGH KESSLER, ESQ.

(Appearances Continue on Following Page)

A P P E A R A N C E S
(Continued From Previous Page)


FOR THE DEFENDANT:        Bingham McCutchen, LLP
                         The Water Garden
                         1601 Cloverfield Boulevard
                         Suite 2050 North
                         Santa Monica, CA  90404-4082
                         (310) 904-1000
                         BY:  NATHAN J. HOCHMAN, ESQ.

                         Bruce L. Udolf, PA
                         500 East Broward Boulevard
                         Suite 1400
                         Fort Lauderdale, FL  33394
                         (954) 858-8831
                         BY:  BRUCE L. UDOLF, ESQ.


ALSO PRESENT        JANET ZUK, Probation Officer


REPORTED BY:        JEFFREY G. THOMAS, RPR-CP, CRR
                    Official Federal Court Reporter
                    United States Courthouse
                    2110 First Street, Suite 2-194
                    Fort Myers, FL  33901
                    (239) 461-2033


                         *  *  *

I N D E X

| May 9, 2014 | Vol. | Page |
|---|---|---|
| Preliminary Discussions | 3 | 4 |
| Argument by Mr. Hochman | 3 | 4 |
| Argument by Ms. Finley | 3 | 50 |
| Argument by Mr. Hochman | 3 | 70 |
| Imposition of Sentence | 3 | 80 |
| Defendant Advised of Right to Appeal | 3 | 87 |

– – –

GOVERNMENT'S EXHIBITS

| | Vol. | Page |
|---|---|---|
| Government's Exhibit 12 Admitted in Evidence | 3 | 66 |

– – –

| | Vol. | Page |
|---|---|---|
| Certificate of Court Reporter | 3 | 97 |

* * *

1      THEREUPON, the above-entitled case having been called to

2  order, the following proceedings were held herein, to-wit:

3                              - - -

4            THE COURT:  Good morning.

5            MR. HOCHMAN:  Good morning.

6            MR. UDOLF:  Good morning, Your Honor.

7            THE COURT:  All right.  I don't know who stood up

8  first, but who wants to speak?

9            MR. HOCHMAN:  I just -- I didn't know if you wanted

10 us to quickly announce our presence for the record, Your Honor?

11           THE COURT:  Sure.

12           MR. HOCHMAN:  Nathan Hochman, Daniel Saunders, and

13 Bruce Udolph, on behalf of Defendant Patricia Hough, who is

14 present on bond.

15           MR. UDOLF:  Good morning.

16           THE COURT:  Good morning, everyone.

17           MS. FINLEY:  Good morning.  And Caryn Finley and

18 Margaret Leigh Kessler for the United States, Your Honor.

19           MR. HOCHMAN:  And, with the Court's permission, I'm

20 happy to speak first, Your Honor.

21           THE COURT:  You may.

22           MR. HOCHMAN:  Thank you, Your Honor.

23           Your Honor, I received, yesterday, the Court's

24 rulings on the tax loss issue and the role in the offense

25 issue; and, with the Court's indulgence, if I might just

1   address that, very briefly, before we turn to the 3553(a)

2   factoring analysis?

3            THE COURT:  Only if this is a stipulation as to if I

4   made a mistake.

5            MR. HOCHMAN:  I believe you did, Your Honor.

6            THE COURT:  That's not the first one you thought, and

7   I'm sure the Government feels the same for others, so . . . .

8            MR. HOCHMAN:  I understand.  I would just like to

9   make the record, Your Honor, if I might.

10            THE COURT:  You don't need to make the record.

11            MR. HOCHMAN:  The reason I need to make the record,

12   Your Honor, is that the Court, for the first time in this

13   litigation, introduced a partnership theory that has never been

14   argued by the Government in any of the three Revenue Agent

15   Reports, and has never been are argued by the Government in

16   court, and so we've never responded to the partnership theory

17   argument that the Court lays out in its rulings, so that's the

18   part, Your Honor, I want to address.

19            THE COURT:  Do you object to that?

20            MR. HOCHMAN:  I do, Your Honor.

21            THE COURT:  All right.  You are preserved.  Now let's

22   proceed.

23            MR. HOCHMAN:  Well, may I lay out the basis for

24   objecting to it, Your Honor?

25            THE COURT:  No.  You may file something if you want,

1   but I've made my ruling.  You have preserved your objection to

2   it.  Tell the Court of Appeals how it's wrong.

3         MR. HOCHMAN:  Okay.  Again, Your Honor, there is only

4   one part, if I might point to the CFR section that the Court

5   relies on, to just show there's -- to just show where my

6   disagreement, Your Honor, with the Court's ruling lies.

7         THE COURT:  Which part of my instructions have you

8   not understood so far?

9         MR. HOCHMAN:  Your Honor, I understand.

10        THE COURT:  I understand you object.  You can make

11  your record in writing.  And I've made my ruling.  I spent a

12  lot of time on it.  I may be wrong, but that's why we have

13  appellate courts.

14        MR. HOCHMAN:  Okay, Your Honor.

15        Your Honor, with respect to the 3553(a) factors, I've

16  been doing this about 25 years, Your Honor, participated in

17  hundreds of sentencing, and it's fair to say that I've never

18  had a client like Dr. Patricia Hough.  I've never had a client

19  who, in a criminal tax trial, the Government called 20

20  witnesses, and none of them had anything to say about him or

21  her.  In fact, many of them were actually some of her strongest

22  character witnesses, Your Honor.  I'm referring particularly to

23  Dr. Dalbec, and even Mr. Minchenberg, who talked about her

24  honesty and her trying to get it right.

25        I think Judge Raycoff, as we cite in our papers, sets

1   one of the principles for a criminal sentencing very clearly in

2   the Addelson [sic] case.  He writes -- and I'll convert it to

3   the female gender, Your Honor:  "Surely, if ever a woman is to

4   receive credit for the good she has done, and her immediate

5   misconduct assessed in the context of her overall life

6   hitherto, it should be at the moment of her sentencing, when

7   her very future hangs in the balance.  This elementary

8   principle of weighing the good with the bad, which is basic to

9   all the great religions, moral philosophies, and systems of

10   justice, was plainly part of what Congress had in mind when it

11   directed courts to consider, as a necessary sentencing factor,

12   the history and characteristics of the defendant."

13            Your Honor, I would submit that we have a unique

14   Defendant, with respect to the histories and characteristics of

15   the life she's led.  She is 67 years old, Your Honor, without a

16   criminal history.  And in part, the notion of not having a

17   criminal history, Your Honor, at the age of 67, can be viewed

18   this way:  If Your Honor -- if Dr. Hough was coming before the

19   Court and she was 27 years old, and she had no criminal

20   history, you would think:  Well, she's been an adult for

21   approximately a decade, she's led a good and honest life, but

22   should I take a chance on her; how do we know what the next

23   40 years of her life are going to lead?  Maybe I need to send a

24   very strong message to her, and incarcerate her for her

25   actions, in order that she lead the next 40 years in a good and

ARGUMENT BY MR. HOCHMAN                              8

1   honest way.

2          But I think, Your Honor, when you're sentencing

3   someone who is 67 years old, and you can look back over the

4   expanse of their life, you can see what they've done for the

5   last 50 years, whether or not they have actually been a

6   positive force for society or a negative one, whether or not

7   they've played close to the line and back and forth over the

8   years, whether or not they had old convictions that just aren't

9   counted for this particular sentencing or not.

10          I think what you see with Dr. Hough is a woman who

11  has led a life of extraordinary public service, that her answer

12  to the question of, "Who shall stand up and help those who are

13  in need," is raising her hand and saying, "Myself."  And I see

14  that there's a track record, Your Honor, that we see not just

15  in anticipation of sentencing.  Because many defendants in

16  Dr. Hough's situation who don't have that lifetime of helping

17  others, scrounge around, Your Honor, for any type of charitable

18  contribution that they might have written to some organization

19  who might write them a favorable letter to give to Your Honor.

20  They might quickly run out and do some voluntary work in the

21  community, again trying to show the Court that they truly are

22  someone who is a positive force for society.

23          Dr. Hough is not like that at all, Your Honor.

24  Dr. Hough's charitable contributions go back approximately

25  50 years, Your Honor.  As the Court will recall, she grew up in

1    the projects of Youngstown, Ohio.  She grew up, and at a very

2    early age her parents were divorced.  Her mother was on

3    welfare, her father was an alcoholic, and she basically raised

4    her younger sister in her childhood.

5           She then went to high school, Your Honor, and in high

6    school she excelled both academically, but as importantly for

7    her, she worked with her church during the week and summers,

8    going to charitable missions, Your Honor, in Appalachia, in

9    Mississippi.  And this is as a high school student.  She also

10   worked 20 hours a week to try to support herself.  And through

11   all of her hard work, she ended up getting a scholarship, Your

12   Honor, and she ended up going to school.

13          Now, in school, did she stop at that point and say,

14   "I've done enough in high school, I finally got to college,

15   thank you very much"?  Absolutely not, Your Honor.  If

16   anything, she increased it.  She actually ended up working more

17   hours.  And again, jobs where she was a waitress, Your Honor.

18   She worked in hotels, cleaning, just to pay for her education.

19   But she continued her charitable work, Your Honor.  She worked

20   with the elderly, she worked with the mentally challenged, and

21   this is during college, as well as succeeding academically.

22   But when she was done, Your Honor, she didn't have the funds to

23   do her dream, which was to become a doctor.  So again she

24   decided to do what she could do.  She started first off working

25   for the state institution for the mentally challenged but then

1   got a master's in social work.

2          What did she do with the master's in social work?

3   She worked four years in the inner city schools in Chicago,

4   Your Honor, some of the hardest schools in this country, and

5   worked with those children, and representing them, as she said

6   in court, trying to help out these very, very needy kids.

7   Then, Your Honor, she progressed and got a Ph.D., but where she

8   got it, Your Honor, was overseas.  And while she was overseas,

9   she didn't just study, Your Honor, she helped out the veterans,

10  or the people the military people and their dependents in

11  Berlin, on the base, Your Honor, and taught them.  Now, when

12  she was done, she ended up eventually going to teach in, and be

13  a professor, in Texas.

14         But again, her charitable work doesn't stop when

15  she's done all this because, as Your Honor will recall, she

16  works in the jails, Your Honor, in Juarez, Mexico, helping out

17  the mothers at that point.  And then when she's done with that,

18  Your Honor, she gets finally the opportunity to go to medical

19  school, and she goes to medical school in the Caribbean at Ross

20  medical school.

21         When she's there, that's the point she meets her

22  husband.  But what happens, Your Honor, with her life; does she

23  again go ahead and cash in that medical degree, become a

24  psychiatrist, only work with the truly wealthy, and in -- you

25  know, pocket the money and do what some of the defendants in

1    some of these other offshore cases have done, and buy the

2    Bentleys, the Rolls-Royces, the mansions, the yachts, the

3    helicopters, etcetera, Your Honor?  No, Your Honor.  What she

4    does is work with her husband to start two successful medical

5    schools.

6            And what the reasoning -- we go back to the point of

7    those medical schools, Your Honor, is that what they recognized

8    was that there was a dearth of medical schools in the United

9    States, that there were actually more people who wanted to

10   become doctors in the United States than there were spots in

11   the medical school.  So she and her husband decided to set up

12   two medical schools that had two founding principles, Your

13   Honor, one that they would not -- they would create the best

14   doctors possible.  And the reason I point that out is, if you

15   recall the situations described by Dr. Dalbec and others, what

16   he said is that, many times, they had situations with students

17   that did not qualify academically but had plenty of money, and

18   they could have paid for the spot, and they did not accept

19   those students.

20           On the flip side, they had students who didn't

21   qualify financially or, during the time they were there, lost

22   their financial resources, and they made provisions for those

23   students, Your Honor, to continue because those students could

24   be excellent doctors.  So the schools, Your Honor, were driven

25   by excellence and not a financial motive.  They didn't seek to,

1   like many of the other Caribbean medical schools which are just

2   paper mills, graduate people who would basically not become

3   doctors in the United States.

4          The success of the medical schools, Your Honor, was

5   also borne out by Dr. Hough's personal efforts in this regard.

6   If you recall, again, her two things that she was mostly in

7   charge of while she was at these two medical schools were the

8   clinical contracts with the U.S. hospitals.  And to get those

9   contracts, Your Honor, you had to show that you were a viable

10  medical school.  Your third and fourth-year students who went

11  there had to do well, they had to be educated well on the

12  islands of Saba and Nevis, and they had to perform well, or you

13  won't be able to continue with those medical contracts if

14  you're sending unqualified students into their hospitals.

15         And again, those contracts were extremely successful,

16  the relationship was very good, because Dr. Hough, in large

17  part, helped develop these potential doctors that have treated

18  thousands and thousands of people, here in America and abroad,

19  as a result of her work.

20         Also, the accreditation, Your Honor, you don't pass

21  the accreditation boards of 50 states in the United States, the

22  department of education, in Europe and Canada, unless you have

23  created a real medical school that's going to impart real

24  education to future doctors in America.

25         So not only does she have her own charitable

1    activities all through this time, she helps found medical

2    schools that graduate thousands of doctors that, in turn, help

3    thousands of people.  And while she's doing all this, Your

4    Honor, she, too, actively is involved in charitable works

5    throughout the Caribbean and Central America.  And this would

6    include countries not only the islands of Saba and Nevis, but

7    Haiti, Your Honor, Guatemala, Belize, Honduras, and Mexico, and

8    other countries in central -- in the Caribbean.  And just not,

9    Your Honor, raising money and writing checks.  In fact, the

10   Government takes this entire 50 years of public service and

11   reduces it to one sentence and says she has made charitable

12   donations in her lifetime.  So far from it, Your Honor, that

13   statement is, it's almost hard to reconcile with the life that

14   Dr. Hough has led.

15           And so in that life, Your Honor, she has gone ahead

16   and personally participated, flown down to these islands, to

17   these health centers, in the rural villages of Guatemala.  I

18   have had a chance myself to visit these places in Guatemala,

19   Your Honor, and see the good work that she has done.  The

20   letters that the Court has gone through -- and I'll go through

21   some of those letters later, Your Honor -- attest to the

22   incredible work that she has done to bring health and medical

23   services to the truly needy and truly unprivileged throughout

24   Central America, Mexico, and the Caribbean.  So again, Your

25   Honor -- and that's in addition to whatever funds she's also

1    helped these charitable organizations receive.

2            And in part of -- another way of looking at it is,

3    okay, so then she does all this, Your Honor, in 2007; 2009,

4    approximately 2009 comes around, and what does she do at that

5    point?  Does she cash it all in?  Does she go ahead and get the

6    mansions, the helicopters, the yachts, the Bentleys, etcetera,

7    etcetera?

8            No, Your Honor.  In 2009 she takes a job in the

9    Sarasota County Department of Health, which is part of the

10   Florida Department of Health, and it serves the poor, the

11   uninsured, and veterans all over Sarasota and Charlotte County,

12   Your Honor.  These are the people for whom nobody wants to

13   serve; nobody, Your Honor.  But Dr. Hough again sees a need,

14   she races her hand, she says, "Myself, I will fill that need."

15           And she treats these patients -- who, again, many

16   people would look at and walk away from -- with the greatest of

17   human dignity and respect, Your Honor, and does everything in

18   her power, everything that she has been taught over the decades

19   of her medical experience, to help these people.  That is what

20   she spends her time doing, Your Honor, during the pendency of

21   the investigation in this case.  The four years that this

22   investigation took to eventually reach an indictment, she is

23   helping out the poor, the uninsured, and the veterans, Your

24   Honor.  That is who Dr. Hough is.  And again, it just didn't

25   happen in the last four years, it's happened over the entire

1    50 years.

2            So in looking at the 3553(a) factors, Your Honor,

3    obviously the guideline analysis informs part of it.  It's one

4    of the seven factors and, as we've discussed before, a starting

5    but not ending point of that analysis.  Because I think what

6    Judge Raycoff is saying, what the Supreme Court is saying, and

7    what all the cases post Booker are saying, is that the Court

8    has the ability to look at all seven factors, including the

9    history and characteristics of the Defendant, in order to

10   determine the sentence that is sufficient but not greater than

11   necessary to accomplish the goals of sentencing.

12           And, Your Honor, we would submit that, if the

13   sufficient sentence to accomplish that goal is a sentence of

14   probation with home detention, that a sentence of imprisonment

15   by definition becomes greater than necessary to accomplish

16   those goals.  So if I might I'll go through with a little more

17   depth the character -- the seven factors, Your Honor, that the

18   Court will consider.

19           So we've just talked about the history and

20   characteristics of Dr. Hough.  And the support for that, Your

21   Honor, is found not only in the people who testified at trial,

22   both on the Government and the defense side, but in the

23   numerous letters, Your Honor, that have been submitted on

24   Dr. Hough's behalf.  Approximately 30 letters have been

25   submitted, and some of these letters are some of the best

1    letters I've seen submitted on behalf of any defendant that I

2    have ever had the opportunity to work with.

3            For instance, Dr. Eugene Egerton, who is a chief

4    medical officer at the University of Maryland Medical Center,

5    and has known Dr. Hough for 30 years, states that:  "Pat takes

6    the hard jobs, positions and work that are not particularly

7    desirable for many.  Her work with the penal system and with

8    state mental health is a prime example of this.  We are unaware

9    of anyone who has a negative view of Dr. Hough.  She is the

10   definition of charity, Your Honor.  She's an extraordinary

11   individual with an exceptional heart for others who will always

12   be a contributing member of society; indeed, one of the good

13   ones."

14           Tom Jarowski, who has known her for 50 years, Your

15   Honor, talks about how Dr. Hough helps the less fortunate of

16   our society.  Her influence has served many who otherwise would

17   have been overlooked.

18           Winnifred Oliver, the executive director of Phillips

19   University Alumni Association writes:  "Many citizens of the

20   United States earn the means to support others, but few are as

21   committed to serving others with little focus, care, or concern

22   for their own needs.  The world has been a better place because

23   of Pat Hough."

24           Dr. Hough's stepdaughter, Laura Whitley, who

25   testified at trial, writes:  "Dr. Hough truly believes in the

1    goodness of people regardless of their circumstances, that

2    everyone is worth saving, that there is no such thing as wasted

3    time when you're helping someone move towards even the smallest

4    of goals.  Whether it is a single forgotten elderly patient who

5    needs someone to treat them with dignity or respect, or an

6    entire village lining up for their first ever medical visit,

7    Pat recounts each of those experiences with the same kind of

8    joy and enthusiasm, and with a passion that is absolutely

9    contagious."

10             Roger Leslie Milner Dunbar, a retired NYU professor

11   who has known Dr. Hough for over forties years, states:

12   "First, whatever she is doing, she takes on the role of a

13   helper who wants to provide support and do what is best for

14   whoever she's dealing with.  I think that this intense desire

15   to help, and also to understand the issues people she is

16   dealing with have, are keys to understanding how Pat lives her

17   life."

18             Vincent Dolan -- again, someone who has known her for

19   four decades, Your Honor -- writes:  "Pat has a strong heart

20   and is committed to real social justice, not slogans.  She has

21   been helping people who need help, whether it be getting along

22   in bewildering social institutions or pressing health

23   concerns."

24             Another person who has known Dr. Hough for over

25   15 years, Maryann Casey, writes:  "Pat is the most loving and

ARGUMENT BY MR. HOCHMAN                    18

1    giving individual to everyone she meets, helping less fortunate

2    humans and animals."

3              Dr. Hough has actually been extremely active over

4    these decades, Your Honor, in helping animals as well, and

5    being involved with pet shelters, again, to this present day.

6              With respect to her medical accomplishments, Your

7    Honor, we contacted the gentleman who runs -- he was the

8    medical director of the Sarasota County Department of Health.

9    His name is Dr. William Heymann.  He writes the Court about Dr.

10   Hough's interactions of what she did while she was working

11   there:

12             "Her past patient interactions have always provided

13   high quality care in a compassionate and caring fashion, and

14   this includes supporting the often difficult socio-economic

15   circumstances of her patients.  These patients were without any

16   health insurance, Medicaid or Medicare benefits.  Her excellent

17   patient care helped avoid hospital and emergency-room visits

18   for these patients with very limited resources, and which care

19   would have been at the expense of the community.

20             "There has been no one available to replace the care

21   she provided.  Her incarceration would end any possibility of a

22   return to providing patient care to her prior and any new

23   patients, and would end all her other volunteer community

24   efforts."

25             Dr. Deborah Sander [sic], of the North Port Health

1    Center, writes:  "The underserved population is a very complex,

2    very sick, and medically and socially marginalized population.

3    Few psychiatrists want to care for these patients because the

4    income is poor and the work is inversely proportional to the

5    income.  To have a psychiatrist willing to carry for these

6    patients, and to do it without compensation" -- this is

7    volunteer center that she volunteered, in addition to working

8    with the Sarasota County of health -- "is very rare and

9    precious.  Dr. Hough's compassion, integrity, and honesty is

10   well known among the patients and staff.  Her compassion for

11   these underserved patients is irreplaceable."

12          Carol Gallegos, of the Tri-County Counseling and Life

13   Skills, who has worked with Dr. Hough, writes:  "Dr. Hough has

14   selflessly contributed to our community, working with a

15   population that others of her stature and education would not

16   consider worthy of their time.  Since Dr. Hough has worked the

17   majority of her career with the chronically medical and

18   mentally ill, it was extremely invaluable to our patients to

19   have someone Dr. Hough's tremendous experience working with the

20   patients we served.  Dr. Hough served hundreds of parties who

21   are uninsured or Medicaid patient.  The support of Dr. Hough

22   had greatly improved the quality of life our patients

23   experience, and reduce the number of crisis hospitalizations.

24   Her reputation, her grace, kindness, and care for our patients,

25   and her integrity as a physician, are without parallel in this

1    area.  There simply is no replacement for her expertise, but

2    more than that, her heart."

3         Ivy Waltman writes:  "Even during her time off,

4    Dr. Hough was" -- "I was able to contact Dr. Hough on her

5    personal phone if a patient concern arose, and it was always

6    obvious that she cared deeply about her patients.  Most of her

7    patients had physical and mental disabilities, and needed an

8    advocate when filing for disability.  Dr. Hough spent many

9    hours, even on her own time, to complete these complicated

10   disability applications.  During her absence these last few

11   months, patients expressed their concern about her, and

12   constantly asked when she will be back.  She makes a personal

13   connection with her patients as well as her co-workers."

14        Kathy Powell-McSteen, a vocational rehabilitation

15   counselor who has worked with Dr. Hough, focuses on this part

16   of the experience:  "I have heard from clients and their

17   families more than once how Dr. Hough would come early, or stay

18   late, to ensure a catastrophically ill patient, such as an

19   actively psychotic person with newly diagnosed or untreated

20   schizophrenia, could be promptly seen.  She kept many patients

21   out of the expensive cycle of emergency room and inpatient

22   crisis center stays.  Dr. Hough also helped recovering

23   substance abusers and ex-offenders with underlying mental

24   health problems stay sober and modify their behavior to prevent

25   repeat problems for themselves, their families, their

1  community, and the overburdened courts.  I have gotten calls

2  from clients, distraught because they can no longer see

3  Dr. Hough."

4          Her work with this population, Your Honor, has

5  ripples throughout the society that she helps.  By helping

6  these people, and going so out of her way to do it, she keeps

7  them out of that cycle of going to emergency room and

8  inpatient.  She deals with their families.  Because they're

9  better treated, they don't cause additional problems, both to

10  their family and to society in general, Your Honor.

11          Dr. Lynn Bernstein, who the Court heard from, is a

12  psychologist and friend of Dr. Hough's, writes that:

13  "Dr. Hough's work with the health department has provided the

14  residents of our community a chance at mental health treatment

15  which is sorely lacking.  She has been conservative and

16  thorough in her treatment of patients with severe mental health

17  problems, which has made her an outstanding advocate and

18  practitioner of mental health.  We in the mental health

19  profession, our patients, and community need Dr. Hough to be

20  able to continue her important work in the field."

21          Jeannine Ball, who you also heard from, who works at

22  the North Point Health Center -- North Port Health Center,

23  states:  "Pat has been an active member in her community in the

24  broadest sense" -- and this is important as well, Your Honor --

25  "and a role model for many people of her generations,

1    generations that followed, women, co-workers, and staff.  If

2    ever there can be someone that you would hold up to other

3    women, or men for that matter, and say, "This is the life we

4    want you to lead, this is the sort of thought, now, the giving

5    back to society, that we want to integrate with your

6    profession," I mean, in the legal profession they're always

7    talking about having a pro bono aspect, in addition to working

8    in private practice, Dr. Hough is the embodiment of pro bono,

9    someone who truly has made professional decisions and life

10   decisions motivated by the sole thought of, "How can I help the

11   greatest number of people?"

12          And that's not just -- and it's interesting, it's not

13   just domestically, Your Honor, because it would be enough if

14   you just -- for many people including myself, if I just helped

15   the people in my immediate community.  I would call that a

16   success.  If I helped the people in my state, fabulous; in the

17   country of the United States, even better.  But Dr. Hough, as

18   you've heard repeatedly, has taken that effort abroad, Your

19   Honor.

20          Antoine Solagnier, who testified, Your Honor, the

21   former governor of the Island of Saba, wrote:  "I have visited

22   and observed many of the projects with which Dr. Hough is

23   involved.  I have spoken with many of the recipients and

24   beneficiaries of her charitable work, as well as many of the

25   benefactors and coworkers in her good works.  From these

1    observances and consultations, I can assess these works to be

2    good, many, important, and to a great positive benefit to

3    thousands, if not tens of thousands," Your Honor.

4           José David Echevarria Diax, a member of the Congress

5    of the Republic of Guatemala, wrote:  "Dr. Hough's excellent

6    contacts in the funding of the Saba Foundation have enabled

7    thousands of our citizens in rural locations to receive health

8    care.  Because of that commitment and Dr. Hough's leadership,

9    containers full of equipment and supplies have been sent to

10   government hospitals in isolated areas in the states of Petén,

11   Jutiapa, Quiche, Chimaltenango, Huehuetenango, and my own state

12   of Suchitepéquez.

13          Dr. Eduvigis de Luna, who is the president of the

14   Salvadoran Association of Rural Health, writes of Dr. Hough's

15   great contribution with respect to the programs dealing with

16   diabetes and hypertension in El Salvador.

17          Dr. Alan Gruber -- who the Court heard live, who is

18   one of the heads of that El Salvadoran charity -- writes:  "I

19   have witnessed firsthand the work Dr. Hough has done in Central

20   America, and the life-changing effect that that has had on

21   literally thousands of people.  Through the foundation, Salud y

22   Vida, she has been responsible for establishing our program

23   that has identified and treated more than 3,000 patients" --

24   Your Honor, with hypertension, diabetes, or heart disease.

25          Lois Werner, she's worked in Guatemala.  She's worked

1    in Saba, in the island of Nevis.  She's worked in Haiti.  She's

2    worked in El Salvador.  Lois Werner talks about her work in

3    Guatemala, Your Honor, and she writes:  "The Guatemalan

4    government has neglected most of the national hospitals here,

5    so Pat is determined to support these hospitals with equipment

6    and supplies to assist the doctors who are working under

7    extremely poor conditions.  I have been in meetings when Pat

8    has displayed an absolute compassion for the poor.  Her

9    willingness to volunteer her time as a doctor and fund projects

10   helping the poorest of the poor is an example of her

11   kindheartedness and deep passion to make this world a better

12   place."

13           Dr. John Nekic, who is a Saba board member, Your

14   Honor, wrote a letter, and in that he says:  "Pat has been

15   directly responsible for producing thousands of physicians who

16   have joined the U.S. healthcare industry and are slowly closing

17   the gap of the huge physician shortage that exists in the

18   United States.  Dr. Hough's involvement as an educator and as a

19   humanitarian has truly impacted so many lives it is almost too

20   difficult to describe that in words.  For her not to continue

21   her work would not only affect her life, but also the thousands

22   of lives that her humanitarian projects have touched."

23           And, Your Honor, the Reverend Baker, Reverend Diane

24   Baker's husband, Robert Baker, who has known Dr. Hough for

25   almost 20 years, really puts it in a compact-full way in how he

1    ends his letter.  He says:  "Whatever the tax-related issue

2    with Pat is, can it rise to the importance of the human lives

3    that are directly impacted by Pat?  I respectfully submit that

4    the greatest good for all can be served by letting Pat continue

5    her work and service unimpeded.  It seems to me that the worst

6    thing that can happen by letting Pat remain at her work is that

7    people will be helped and healed."

8         So, Your Honor, when you're evaluating the history

9    and characteristics -- which is one of the primary factors that

10   the Supreme Court has asked you to weigh, as Judge Raycoff has

11   told you, that this is the time, if ever there is a time to

12   weigh with good with the bad -- I would submit that Dr. Hough's

13   life is unparalleled amongst defendants certainly that I have

14   seen, or my co-counsel have seen, and represented over the

15   years, and that that life is now being weighed, and all the

16   good that it has accomplished, with respect to the offense that

17   she's before the Court and facing.

18        With respect, then, to the second factor, which is

19   the nature and circumstances of the offense, Your Honor, I

20   would submit that the -- that this is a tax case, Your Honor,

21   obviously.  This is not submitting a false claim to the

22   department of education, or something in connection with

23   Dr. Hough's work with respect to accreditations or clinical

24   contracts.  I think that the evidence, Your Honor, of

25   Dr. Hough's compliance . . . aside from this instant case, Your

1   Honor, I recognize the jury and the Court's findings, but look

2   at the rest of her life as it respects the IRS.  And I think,

3   Your Honor, what you see is, again, an unbroken string of

4   compliance and desire to comply that is both emphasized in her

5   actions and in her dealings with the actual Government

6   witnesses in this case.  And would I refer the Court to the

7   fact that, to the extent that she's ever been audited, Your

8   Honor, it was one time, and it was back in the early seventies.

9   And as she testified, she actually canceled a trip to Europe

10  because the IRS officer surprisingly asked to meet with her on

11  a particular day.  She so wanted to comply and make sure that

12  it was done, she didn't reschedule the meeting, she canceled

13  her trip to Europe, dealt with it, and got a no-change letter.

14          Fast forward, Your Honor, to the 2000s, what do we

15  know about her compliance?  We know that her accountant says

16  that she had basically average tax knowledge.  Other Government

17  witnesses talked about her being unsophisticated at a tax

18  level.  We know, Your Honor, with the 5471 requirements, that

19  unlike her husband, Dr. Fredrick, Dr. Hough's reaction to the

20  did David Minchenberg was:  When can we get this done, and what

21  do you need from me?

22          We know, for instance, the contrast in the gift-tax

23  issue, that when it came to giving money to her sister, that

24  she was in charge of, she complied with the gift-tax

25  restrictions every single year, unlike her husband.  We know,

1    Your Honor, that in 2005, when we had a situation where she

2    discovered, after she filed her tax return, that she had left

3    off $11,000 of -- from a sale, Your Honor -- a sale, by the

4    way, for which there was no 1099 generated, the Government

5    insinuated that, but there is no way the IRS would have found

6    out about this -- her reaction to that was to file an amended

7    return and pay the additional tax.

8           So we have that individual, that sort of tax

9    background, or lack of tax sophistication.  We know she doesn't

10   have a CPA, an accounting degree, or any level of tax or

11   accounting sophistication, and then she's being put into this

12   case, Your Honor, a case where the Government has tried for

13   five years to figure out what the tax theory is.  We know that

14   tax theory has gone through multimillion-dollar variations

15   amongst three Revenue Agent Reports prepared by an expert, Your

16   Honor.  We know that even -- you know, even assuming that the

17   Court has now come up with the last theory, Your Honor, a

18   partnership theory, that is not a theory that any Government

19   expert, anyone from the IRS, anyone from the chief counsel's

20   office of the IRS, where the report has to go to before it gets

21   to the Department of Justice, and any Department of Justice

22   lawyer, Your Honor, has come up with.

23          And so again, in looking at the clarity -- and that's

24   my focus of the nature of the offense -- in looking at the

25   clarity of how obvious this was of a tax loss, a tax situation,

1    I would submit, Your Honor, that this is far from the typical

2    tax case where someone is running a business, they basically

3    take cash in, they don't put it on their return, they sell

4    their business, they don't put it on their return.  Your Honor,

5    it's absolutely clear, it's domestic, you know, the case that

6    the Government refers to, the Asser Levy case, Your Honor,

7    where they sell a New York hotel for $150 million, they then

8    suborn perjury before the IRS in the civil situation.  They

9    tell people to lie to the Government in the criminal situation.

10   They then send the money abroad, they send the money abroad as

11   a -- is what they do with the money.  And we're dealing with

12   sophisticated businessmen to begin with, as all the evidence

13   came out.  That would be the situation where the clarity of the

14   nature of the offense would be apparent to anyone.  And in that

15   case, by the way, they bought mansions and yachts and

16   helicopters and Bentleys and Maseratis with all the money.

17          Here, Your Honor, I would suggest that, even again,

18   given the Court's findings, the clarity that this was

19   partnership income that Dr. Hough did not report -- which, you

20   know, as late as the testimony you've actually had at the

21   sentencing, had Agent Maurer and the Government saying it was

22   Schedule C income on a disregarded entity theory, which

23   apparently the Court has disagreed with, to come up with this

24   alternate way of looking at it -- for Dr. Hough to be expected

25   to know that that happened, and that this is why she's leaving

1    it off her return, I would say, is far from the clarity of a

2    typical case, Your Honor.

3         Obviously, Dr. Hough appreciates the seriousness of

4    these charges.  And I think, Your Honor, that, in looking at

5    the factors here, one of the other factors that's enveloped in

6    the Section 2 factors is the seriousness of the offense,

7    promote respect for the haw, and provide for just punishment.

8    Let me start with the last one, Your Honor, provide for just

9    punishment.  What has been the punishment, Your Honor, that

10   Dr. Hough has already experienced prior to this sentencing?

11        Dr. Hough has lost her reputation that she has spent

12   decades to build, Your Honor.  But it's not just the

13   reputation, Your Honor, because she has lost the ability to do

14   what she loves to do, what she's good at doing, and what has

15   helped so many people.  That is being a medical doctor.  As we

16   point out to you, Your Honor, she has surrendered her South

17   Carolina medical license as a result of this case, she

18   surrendered her Wisconsin medical license, she's surrendering

19   her Massachusetts medical license.  She cannot reapply for a

20   DEA license to prescribe medication.  Her Florida Medicaid

21   provider status has been terminated.  She's subject to an

22   ongoing investigation before the department of health.  And,

23   Your Honor, she was fired immediately after the jury's verdict

24   by the Sarasota County Department of Health, where she's worked

25   for four and a half years helping all those patients, Your

1   Honor.

2          So in terms of punishment, her professional career

3   has been destroyed as a result of this case, Your Honor.  And

4   it's not just that.  We know that she's -- she will be in,

5   and -- is in, and will be in, financial ruin.  We point out,

6   Your Honor, that the FBAR penalty alone here, based on the

7   amount, the total aggregate amount in the accounts -- and we

8   assume it's roughly somewhere between 40 and 60 million, Your

9   Honor -- her FBAR penalty will be about $30 million, separate

10  and apart.  It's a civil FBAR penalty, Your Honor.  She will be

11  in financial ruin the rest of her life.  We know that this case

12  and the investigation has led to the termination of a 25-year

13  marriage, Your Honor.  We know that her health has suffered

14  greatly as a result of the investigation, the prosecution in

15  this case.  And we know that, again, she will not be able to

16  help the people that she has spent all this time helping, in

17  light of the conviction that she has in this case, and will be

18  a convicted felon for the rest of her life.

19          Your Honor, when -- unfortunately, because of this

20  case, if you read the obituary, God forbid, but when Dr. Hough

21  were to pass and there's an obituary, it is going to say,

22  "Dr. Hough, convection felon," in the first sentence, which is

23  an enormous tragedy given the life that she has otherwise led.

24  So in figuring out, again, in weighing all these factors, Your

25  Honor, and looking at just punishment, and what punishment has

1    already been exacted to destroy a woman's life, her finances,

2    her marriage, and what she does in this world, I would suggest

3    that this prosecution -- investigation and prosecution has

4    accomplished a great deal.  And I'll deal with that in a

5    moment, when we talk about deterrence.

6           Actually, I'll turn right now to deterrence, because

7    one of the factors is affording adequate deterrence to criminal

8    conduct.  And as Your Honor is aware, there are two types of

9    deterrences.  One is a particular deterrence for a particular

10   defendant.  I think it goes without saying, Dr. Hough had not,

11   prior to this offense, been engaged in any criminal conduct and

12   will never again be engaged in any criminal conduct.  So then

13   the question, Your Honor, is general deterrence.  And I

14   anticipate, when Ms. Finley gets up, one of the things that

15   she's going to want to tell the Court to do is to "send a

16   message" to the world by putting Dr. Hough in jail.  And she's

17   probably going to ask that six to eight years is the

18   appropriate amount to send Dr. Hough to jail, to send that

19   message and send general deterrence -- send a general

20   deterrence message.

21          My response to that argument is as follows, Your

22   Honor:  First, the link between imprisonment and compliance,

23   Your Honor.  We don't have to look too far for the scientific

24   study between whether or not this Court puts Dr. Hough in jail

25   or gives her probation, and whether or not that increases

1    compliance, because we have an IRS-funded study, Your Honor.

2    That's a Jeffrey Dubin 2004 study that I reference, Your Honor,

3    in our papers.  It was titled, "Criminal Investigation

4    Enforcement Activities and Taxpayer Noncompliance."

5              What Mr. Dubin, who is a -- or is a Caltech

6    professor, and who is doing this study at the behest of the

7    IRS, and worked with all the people in criminal investigations

8    research to conduct this study, he looked at the question of

9    this:  What is the effect of giving a defendant imprisonment

10   versus probation as it affects taxpayer compliance?  That was

11   one of the four questions he was asked to answer.  And what he

12   found is that there was no meaningful difference between giving

13   a probationer -- giving a person a probation or imprisonment,

14   and that the only meaningful difference is, it had to be

15   different than just giving them a civil punishment which was

16   civil fines.  Let me say that again, Your Honor.

17             THE COURT:  I was going to ask you to say that again.

18   You lost me.

19             MR. HOCHMAN:  So what you have, Your Honor, is, he's

20   looking at, is this a meaningful difference between probation

21   and imprisonment, as to whether or not someone is going to be

22   more compliant in the future, which means, if you give them

23   probation, Your Honor -- let's say if you give them

24   imprisonment, are you now going to increase compliance in the

25   future, as opposed to just giving them probation?

1        And what he said is, effectively, as long as someone

2    goes through the criminal process, the criminal process,

3    whether they get imprisonment or probation does not affect

4    compliance.  Only if they aren't criminally prosecuted, and

5    they only are civilly prosecuted, where they just have to pay

6    fines, that affects compliance.  Which means, in other words,

7    if a taxpayer is looking at the situation and sees that the

8    Government only goes after someone civilly and says, "Give me

9    some more money -- "give me that civil FBAR penalty," for

10   instance, Your Honor -- as opposed to going after them

11   criminally, that affects compliance.  But whether or not the

12   Court sentences a defendant to probation or incarceration does

13   not affect compliance, does not -- translated in other words,

14   does not add additional deterrence to the situation.  Because

15   again, what taxpayers apparently, according to Mr. Dubin, are

16   looking at is, is the Government going after you criminally or

17   going after you civilly, not the type of punishment you

18   ultimately get, but which process you get into.

19       And what Dubin found is that if you go through the

20   criminal process -- and again, because you can be a convicted

21   felon, you can lose your reputation, you can have all your

22   money taken away in the process, you can go through the lengthy

23   investigation and the trial -- that the notion of just going

24   into the criminal process alone is what accomplishes the

25   deterrence, not the particular sentence between probation and

1    imprisonment.  That is the only study, Your Honor, that I have

2    found in this area, a study again funded by the Internal

3    Revenue Service, released by the Internal Revenue Service, and

4    Mr. Dubin has a -- it has never been challenged, to my

5    knowledge.  There's no contrary study that says that, if the

6    Court goes ahead and imprisons someone versus giving them

7    probation, that that's more likely to deter anyone.

8          So I start out, Your Honor, with the fundamental link

9    that the Government is going to ask you to draw between sending

10   her to jail and deterring others, and I would strongly urge the

11   Court to say that the only studies that we have dispute and

12   actually contradict that link.

13         So let's then take that one more step.  So what

14   has -- in this particular situation, what have we learned about

15   general deterrence, and this sort of deals with another factor

16   on how similarly situated people have been addressed in this

17   particular case.

18         Your Honor, we actually don't have to look far, and

19   the Court is not writing on a blank slate on this particular

20   area.  Were this sentencing to have occurred in 2009, the Court

21   would be without the benefit of all the Government's efforts,

22   and all the prosecutions and all the decisions by all the

23   district judges across America in these cases.  But we're not

24   writing on that blank slate.  We have two compelling facts for

25   the Court to focus on.

1          First, the Government has offered -- and it's been

2     accepted by, according to the numbers, 43,000 people, Your

3     Honor -- the ability to go into a voluntary disclosure program

4     for unreported foreign bank accounts that are . . . if not

5     identical, even worse than Dr. Hough's situation.

6          How do I know about this program, Your Honor?  I have

7     personally put over 70 people, since 2009, in this program.

8     And this program, Your Honor, is actually not just back in

9     2009, it was offered in 2009, it was offered again in 2011, and

10    it was offered again in 2012, and is actually open-ended at

11    this point.

12         Now, the significance of that, Your Honor, is, again,

13    the Government's valuation on how it is treating people who

14    have unreported bank accounts.  And it basically says, "Look,

15    we just want you to get back into the system, and if we don't

16    find out about you before you get into this program, you don't

17    get criminally prosecuted," Your Honor.  None of those 43,000

18    people have been criminally prosecuted at all.

19         Now, again, I don't think this would necessarily

20    apply to Dr. Hough had not one important fact occurred in this

21    case.  And that is the fact that, before she knew she was on

22    any lists, Your Honor, she tried, within the first program,

23    back in 2009, to get into the program in a timely basis, within

24    that sort of initial opening period, Your Honor, to get into

25    the program.  It is unrefuted, undisputed, that at the time she

1    applied for the program, she did not know that she was one of

2    the 285 people, out of 20,000, that the Government had

3    secretly, under seal, provided the names to the Government in

4    February of 2009, when Dr. Hough tries to get in the program in

5    September of 2009.

6           Again, Your Honor, it is also undisputed, had she not

7    been one of those unlucky 285 out of 20,000 people when she

8    applied in 2009, we would not be here Your Honor.  Despite all

9    the stuff the Court has learned about this case, Your Honor, if

10   she had been accepted into the program in September of 2009,

11   she would not have been criminal -- assuming she finished the

12   program, she would not have been criminally prosecuted, Your

13   Honor, full stop.  That already makes this case incredibly

14   different than every other type of case out there, that the

15   Government has one of these programs.

16          And again, the evidence is absolute that she had no

17   idea she was on this secret list of 285.  So in good faith

18   she's coming in before she has any recognition whatsoever that

19   any of the banks have turned over her names.  And again, for

20   all the 43,000 people who the Government has led into this

21   program, all 43,000 of them came in after UBS, in 2008,

22   announced that it was going to terminate the UBS -- the UBS

23   bank accounts.

24          And again, she didn't wait for 2011 to get into the

25   program, Your Honor.  She didn't wait until the 2012 program,

ARGUMENT BY MR. HOCHMAN                    37

1    like many of my clients have done.  As soon as she basically

2    found out about the program, in 2009, from her attorneys that

3    she had contacted, they said, "Here is the program," she said,

4    "Get me into it"; which, by the way, Your Honor, is very

5    similar to the testimony you heard with Mr. Minchenberg,

6    dealing with the 5471, when he sent her the memo and he said,

7    "You need to file a 5471," she said:  When and how; how fast

8    can we get this done?

9           She does the same thing with the voluntary disclosure

10   program.  So I would suggest, Your Honor, that we are already

11   dealing with a -- in the world of deterrence, the Government

12   was trying to basically tell the 43,000 people, "Get into the

13   program."  She took that action at the earliest -- in the

14   earliest program, and, but for a real quirk of fate, she would

15   have been in the program, succeeded, and never been criminally

16   prosecuted.

17          So then let's look, Your Honor, at the approximately

18   100 people that have been criminally prosecuted, approximately

19   60 of which have been sentenced.  Of the 60 people, Your Honor,

20   approximately one-third of those people, one-third of the 60,

21   have actually received any jail time.  Two-thirds of the

22   60 people have received no jail time, Your Honor.  And when I

23   say, "no jail time," I mean probation with home detention or

24   not home detention, and community service.  And I would refer

25   Your Honor to several -- what I would submit are very similarly

1    situated defendants, and I'll -- we gave you an entire list,

2    Your Honor, but I'll point out a few of them.

3          And I'll start with Dr. Arvind Ahuja.  The reason

4    that I start with him, Your Honor, is that he's the case that

5    the Government has said, in their most recent filing, is the

6    most similar to this case.

7          So what happened in Dr. Ahuja's case?  It is a case

8    Your Honor, I followed.  It came out of Wisconsin, out of

9    Milwaukee.  Dr. Ahuja was a neuro . . . was a surgeon, Your

10   Honor, a surgeon who was an Indian America.  What Dr. Ahuja did

11   is that he opened up bank accounts at HSBC India with millions

12   of dollars in them.  He put them in different certificates of

13   deposit, in different names, Your Honor.  And the only issue in

14   that case was not, was this his money, which was obviously one

15   of the issues in this case, because in that case it was

16   absolute, it was his money, he was in control of it.  In that

17   case the only issue was, did he know that he had to report the

18   money that was being earned on these HSBC Indian accounts.

19         He went to trial, Your Honor.  He got convicted.  The

20   Government had asked for a tax loss of over $700,000, resulting

21   in a guideline sentence of 41 to 51 months.  Granted, that is a

22   lower sentence, but the important thing here is what the Court

23   considered, and where the Court ended up, again, in the

24   similarly situated defendant context.  The defense made the

25   point that Dr. Ahuja, like Dr. Hough, have lived a life of

ARGUMENT BY MR. HOCHMAN                    39

1    doing good charitable deeds and, as a doctor, was very

2    important in treating the patients in his community.  They also

3    pointed to the fact that, if Dr. Ahuja went to jail, the

4    patients in his community would not be treated.

5             And they also pointed out, Your Honor, that with

6    respect to Dr. Ahuja, again, the -- at that time it was

7    33,000 -- 33,000 people already been determined by the

8    Government, with similarly situated foreign bank accounts that

9    were unreported, to not be criminally prosecuted.  In fact, if

10   I recall, they asked for somewhere in the guidelines, if not

11   the high end of the guidelines, because he had gone to trial

12   and lost.  The judge, Your Honor, gave a probation sentence.

13   And in giving a probation sentence, the judge recognized and

14   did that balancing between the history and characteristics of

15   Dr. Ahuja, and the offense, even recognizing that it was his

16   money and he orchestrated the events, much more so than

17   Dr. Hough's situation.  Dr. Ahuja, by the way, never even tried

18   to get into the voluntary disclosure program, Your Honor.

19   Dr. Ahuja, again, the court gave him a sentence of probation,

20   six months of home detention, and 150 hours of community

21   service.

22             And again, in looking at the expanse of cases where

23   someone actually went to trial on these situations, and we

24   would argue even had worse facts going to trial -- because here

25   we have two issues, was it her money, did she know she would

1    have to report it; in that case they absolutely knew it was his

2    money, and the only issue was, did he have to report it -- the

3    court balanced all the factors, Your Honor, and came out with a

4    probationary sentence.

5         The Government in that sentence, and I've read the

6    sentencing transcript, made a huge deal about general

7    deterrence, Your Honor.  And they said to the judge:  Judge, if

8    you don't put him in jail you're making a mistake because other

9    people will not be deterred.

10        The judge, in response to that, relied on several

11   different things.  He said:  One, again, that's one factor, but

12   I need to balance the various factors; two, at that point, and

13   I've referred to this already, there have been 50 sentences,

14   and the judge referred to the fact that over two-thirds of

15   those people never went to jail under much more, in some ways,

16   extreme situations than in that case, Dr. Ahuja; and, three,

17   that he viewed Dr. Ahuja's ability to help others while on

18   probation home detention and community service as sufficient

19   but not greater than necessary to accomplish the goals of

20   sentencing.

21        So that's the one case that the Government admits is

22   the most similarly situated case to our case.  But let me refer

23   to a couple others just to give the Court the spectrum of cases

24   that other district judges have grappled with in deciding what

25   types of sentences to mete out in these situation.

1    There's a case, Your Honor, involving a gentleman named
2    Ty Warner.  Ty Warner is the guy who created Beanie Babies.
3    You would not believe, and I did not believe, that Beanie
4    Babies could make so much money, but apparently it did.  He's
5    worth a billion seven, Your Honor.  And what happened is that,
6    for approximately 11 or 12 years, he sent a hundred million
7    dollars to Switzerland, put it in a number of nominee accounts,
8    Your Honor, and for over ten years -- and again, it was
9    absolutely his money, there's no dispute, he controlled
10   everything -- and didn't file FBARs, didn't report the hundred
11   million dollars on any tax return, didn't report the enormous
12   amount of income generated by the hundred million dollars on
13   any of his tax returns for 11 years.  He pleads guilty, Your
14   Honor.  And what he basically says -- and he's looking at a
15   46 to 57-month range; again, lower than this range, but a 46 to
16   57-month range.  He doesn't cooperate with the Government at
17   all.  He basically says to the Court a couple of things:  He
18   points, again, to expanse of cases where people haven't gone to
19   jail and basically people have gotten probation.  He points to
20   the generosity that he has given to people over the decades in
21   which he had these riches.  But that generosity, Your Honor,
22   was writing checks.  He wrote a lot of checks, millions of
23   dollars of checks to foundations, because he was worth a
24   billion seven.  He pointed to some volunteer work that he had
25   done, serving on some boards, Your Honor, not hands-on,

1    in-the-fields, in-the-villages, work that Dr. Hough has done

2    thought her career.  He also pointed out that he was one of

3    these people who tried to do a voluntary disclosure but was

4    also on the 285 list, Your Honor, those secret 285.  And he

5    didn't know he was on the list, like Dr. Hough, but he said:

6    Look, I tried to apply to the program, and unlike the other

7    20,000 people in the UBS, or 43,0000 people for general

8    accounts who got in, I was shut out, but through no fault of my

9    own.

10          And so the judge looked at that, and again did the full

11   balancing.  He looked at the lifetime -- the lack of criminal

12   history; the lifetime of good works, basically writing checks;

13   the fact he tried to get in the voluntary disclosure program

14   and, but for that quirk of fate, was unable to do so; and

15   ultimately he decided to give him probation, Your Honor -- I'm

16   just seeing two years of probation and 500 hours of community

17   service -- evaluating that basically it was better to leave him

18   out, continuing to serve the community as his punishment.  And

19   that was sufficient but not greater than necessary.

20          So again, yes, it is a plea situation; but, Your Honor,

21   I would say that the amounts involved, the activities of

22   Mr. Warner, are far more egregious and aggravating than those

23   of Dr. Hough, he's looking at a 46 to 57-month sentence, and

24   the judge gave him probation.

25          There's a sentence, Your Honor, out of Florida,

1   involving a woman named Mary Estelle Curran.  I happen to know

2   that sentence pretty well because I was involved with it, and

3   with Judge Ryskamp, down in West Palm Beach.  What that case,

4   Your Honor, was, was a woman who, at the time of sentencing,

5   was 79 years old; but, when she was 69 years old, she inherited

6   a $40 million UBS account from her late husband.  She does not

7   put the $40 million UBS account on the estate return, Your

8   Honor, sort of offense number one.  She then has the account

9   for a couple years, and then starts putting it in a number of

10  Panamanian companies, Your Honor.  Over the years that account

11  produces income well north of -- or approximately north of a

12  million dollars.  She ends up being on the 285 list as well,

13  Your Honor.  And on the 285 list, again, she tries to get into

14  the voluntary disclosure program, and she is shut out, unlike

15  the other 43,000 people who get in.  When it comes time for

16  sentencing, Judge Ryskamp looks at the panoply of factors, Your

17  Honor.  He looks at -- again, her lifetime of good service was

18  writing a lot of checks and sitting on boards.  He looks at her

19  lack of criminal history.  At that point she's 79.  He takes

20  into account the nature of the offense.  And her offense was

21  actually significant, the level of activity which was all her,

22  which was signing an estate tax return leaving off $40 million;

23  signing tax returns for eight years that left off the bank

24  account; actually putting the money in a variety of Panamanian

25  companies in order to invest in U.S. securities, which was the

1   reason; and then ultimately -- but the Judge said:  Okay, I'm

2   going to weigh the nature of the offense, and go ahead and

3   balance that against who this woman is, the fact she tried to

4   get into the voluntary disclosure program and didn't, the fact

5   she was looking at, and in that case paid, a huge FBAR penalty,

6   Your Honor, and determined that that woman should not go to

7   jail.

8           In fact, what Judge Ryskamp actually did -- and again,

9   in that case, Your Honor, the Government deferred -- they did

10  not oppose probation, and she was looking at a 30 to 37-month

11  range.  They did not oppose probation.  By the way, Mrs. Curran

12  met with the Government but didn't cooperate, didn't lead to

13  any other cases being made at all.  At most what she did was

14  accept responsibility for her actions.  So the Government

15  looked at that -- Judge Ryskamp looked at that case.  And

16  again, Your Honor, we didn't know where Judge Ryskamp was going

17  to go in this case:  Was he going to put this woman -- give her

18  the guideline sentence of 30 or 37 months; was he going to

19  downwardly depart and say, "Look, I have to send a general

20  message to the community, and that message should be that, if

21  you do these crimes, you're going to go to jail"; no.

22          What Judge Ryskamp did is, he weighed all these factors,

23  Your Honor, and he said:  I'll give you one year of probation.

24          And then Miss Curran stood up and accepted it.

25          And then he said:  I hereby terminate your probation.

ARGUMENT BY MR. HOCHMAN                    45

1       And then he actually says the words, "You have been on

2   probation for five seconds, your case is now done," and he left

3   the courtroom.

4           THE COURT:  You don't really think I'm going do that.

5           MR. HOCHMAN:  Not at all, Your Honor.  We are not

6   asking.  But what I'm trying to show, Your Honor, is the

7   spectrum of cases that have been handled, and in that case, a

8   $40 million case that lasted eight years, of criminal activity

9   involving Panamanian companies, involving at least nine

10  different false tax returns, of which she was responsible and

11  admitted her responsibility.

12          In this case, Your Honor, we are not asking for

13  probation without other significant conditions.  We are asking,

14  actually, for 12 months of home detention and a thousand hours

15  of community service, more home detention than any defendant

16  has received so far in any of these cases, more community

17  service than any defendant has received in any of these cases.

18  If you recall Dr. Ahuja, he received six months of home

19  detention and 150 hours of community service.

20          So when you look at the, again, the panoply of the

21  other cases, Your Honor, you see very sophisticated people like

22  Pius Kampfen, who was an international banker who worked at

23  Julius Baer.  He basically moved accounts from bank to bank, to

24  bank.  When he was asked about the accounts by the IRS, he

25  completely lied and said directly to the IRS that he didn't

ARGUMENT BY MR. HOCHMAN                          46

1    have the account.  And in that situation, Your Honor, again,

2    the court, weighing all the circumstances -- and again, he pled

3    guilty but did not cooperate -- gave him a sentence of

4    probation and home detention.

5            In looking at the case of Igor Olenicoff, Igor

6    Olenicoff admitted that he had $52 million of tax, tax

7    penalties and interest -- $52 million, Your Honor -- but he was

8    one of the first cases that came in.  Igor Olenicoff did not

9    cooperate.  And the Government gave him no cooperation credit,

10   the court gave him no cooperation credit.  The court gave him

11   two years, Your Honor, of probation, for a $52 million tax

12   case.

13           And again I would suggest to the Court that, amongst

14   the panoply of the cases you have seen, whether or not -- or

15   the courts have seen for, now it's almost five years, in

16   sentencing these cases, what should be the deterrent effect of

17   a prosecution.  And they've looked at the various types of

18   cases, and they've said that -- and maybe this is somewhat

19   unusual for these type of cases, but in a situation where we

20   have a voluntary disclosure program, in a situation where we

21   know, from the Dubin study, that just going through the

22   criminal process and getting probation or imprisonment achieves

23   that compliance, and we've seen more and more people go into

24   the voluntary disclosure program, I mean, the numbers go from

25   10,000 to 23, to 33, to 43 thousand, and that's without, Your

1   Honor, sentences that are in the years.  I would suggest that,

2   when you look at the other third, the highest sentence, with

3   one complete outlier that I can distinguish in a second, is

4   somewhere between six months' imprisonment to a year and a day,

5   has been the typical imprisonment to the extent courts have

6   issued imprisonment.  There are a few that are up to 18 months,

7   Your Honor.  But that is sort of the bulk of the third of the

8   cases that are -- resulted in imprisonment.  Again, the only

9   case to go to trial and be sentenced resulted in a probation

10  sentence.

11          So I would say that the facts on the ground have

12  shown that, without sentences in the years, along the 2009 to

13  2014 spectrum, we have had greater and greater compliance, and

14  more and more people going into the voluntary disclosure

15  program.  Because they look at it and they say, "I don't want

16  to go through the criminal process.  Even though people are

17  getting probation, I still don't want to go through the

18  criminal process.  I don't want to be a convicted felon the

19  rest of my life."

20          And that's been driving the deterrence argument.  And

21  where that translates in this case, Your Honor, is, I don't

22  believe the Court needs to "send that message," either for

23  technical reasons because of the Dubin study, or because of the

24  fact that all these other cases have shown that just the

25  probationary sentences are driving people into compliance, Your

1    Honor.  And the facts on the ground, the numbers in the

2    program, back up what I'm saying more than just my words, Your

3    Honor.

4            So, Your Honor, in summation, Your Honor, the

5    significance of this particular sentencing, for me, it could

6    not be greater.  I mean, again, it is a . . . it's a unique

7    situation when I represent someone like Dr. Hough.  I don't

8    know if it will happen again.  And when I heard Beth McCann

9    speak at the first day of our sentencing, she was one of the

10   three character witnesses that we called on Dr. Hough's behalf,

11   I listened to it, I even got the transcript of it because I

12   wanted to make sure I was hearing it myself, and with the

13   Court's indulgence, I would like to just read a very small

14   section of it, because I think it really hits home all the

15   points I'm saying.

16           What Miss McCann said is that:  "Pat has given her

17   time, her energy, her skills, her love, her care and her hard

18   work to help those that cannot help themselves, those that no

19   one else wants to serve.  She has shown great respect for

20   people that are usually not respected.  This I have seen with

21   my own eyes.  She serves those that can give nothing back by

22   the world's standard.  She serves the crippled, physically,

23   mentally, and emotionally; the hurt; the sick; the hungry.  I

24   have watched Pat care for those that need it the most.  I have

25   seen the faces of despair, pain, and helplessness change to be

1    faces of hope, joy, and excitement, all because of Pat and the

2    services she has offered.

3              "There mentally ill patients in this state that are

4    no longer served, and there are tens of thousands in Central

5    America that have no health care, that Pat has tirelessly

6    served that need her.  There are people that have no one else

7    to speak for them, and there are people that honestly she

8    serves that many of us would cross the road to avoid.  Pat

9    helps those that are left behind, those who have needed her in

10   the years past, and those that still need her in the years to

11   come.  She is 67 years old, and she still has so much to offer

12   our world.  There's nothing for this community or world to gain

13   for Pat to be sent to jail, but there is much this world and

14   community can gain for her to be allowed to be loose to

15   continue her work and to service the community."

16             Your Honor, I would suggest that, and humbly and

17   respectfully suggest to the Court that, in this case, the

18   balancing of the factors shows that a sufficient but not

19   greater than necessary sentence is a sentence of probation of

20   whatever length, Your Honor, home detention of 12 months, and

21   community service of a thousand hours.

22             Thank you very much, Your Honor.

23             THE COURT:  All right.  Thank you.

24             Dr. Hough?  Anything you'd care to say with regard to

25   the sentence the Court should impose?

1            MR. HOCHMAN:  Your Honor, I've spoken to Dr. Hough

2    before the sentencing, and she'll submit on all the thoughts

3    that I put in my presentation, Your Honor.

4            THE COURT:  All right.  She needs to tell me that.

5            MR. HOCHMAN:  I'm sorry.

6            THE DEFENDANT:  That's the case.

7            THE COURT:  I'm sorry?

8            My question is, is there anything you wish to say to

9    the Court personally?

10           THE DEFENDANT:  Mr. Hochman did it on my behalf.

11           THE COURT:  All right.  Thank you.

12           From the Government?

13           MS. FINLEY:  Thank you, Your Honor.

14           The Government is going to sort of walk through the

15   various factors, and to supplement a little bit with what we

16   had in our pleadings, Your Honor, with respect to the

17   3553 factors, and why we think that a significant term of

18   imprisonment is an appropriate sentence in this case.

19           Dr. Hough, her conduct was a deliberate and

20   calculated tax fraud scheme that lasted over at least a dozen

21   years, and if not more, since the schools were -- began, at

22   least one of the schools, in the early 1990s.  And with respect

23   to the nature and circumstances of the offense, this case

24   dwarves the vast majority of other tax crimes, both in

25   timeframe and harm.  And as the guidelines talk about, where

ARGUMENT BY MS. FINLEY                 51

1    you have greater tax loss, it's more harmful to the Government.

2    These kinds of cases, as any tax case, to investigate and

3    prosecute, takes significant resources.  But more particularly

4    in the offshore world, they are even more difficult to detect

5    and investigation.  And particularly with respect to

6    Switzerland, Switzerland has their secrecy laws, their bank

7    secrecy laws that forbid disclosure.  So even pursuant to the

8    Deferred Prosecution Agreement, there were many documents that

9    the United States still did not receive pursuant to that

10   agreement because of Swiss secrecy.

11          And in this case the Government was not able to

12   obtain information from Liechtenstein, from the accounts that

13   Dr. Fredrick and Dr. Hough moved their money out of UBS to

14   Fortis Banque, Liechtenstein Landesbank, and Bank Alpinum,

15   because Liechtenstein also has some very significant secrecy

16   laws, and there are not treaties with those countries,

17   generally speaking, for tax crimes.

18          This was a long-running repetitive conduct, and

19   coupled with the $15 million tax loss, these are aggravated

20   factors that the Court should consider, as far as the nature

21   and circumstance of the offense.

22          Dr. Hough was well positioned, and certainly

23   extremely capable of paying the tax that she would have owed in

24   each of the years, but she made a conscious decision to file

25   false tax returns year and year, despite having a return

ARGUMENT BY MS. FINLEY                    52

1    preparer who specifically asked her if she had offshore

2    accounts.  Those tax returns failed to report interest and

3    dividend income earned in the foreign accounts; the existence

4    of the foreign accounts; the profits from the schools; and, in

5    2007, the sale of the schools.  And she didn't, the Government

6    would submit, report that, as she did perhaps with the other

7    examples that Mr. Hochman gave, because all of these items were

8    offshore, and the Government's ability to reach that

9    information is extremely limited.

10            With respect to the -- to Dr. Hough's history and

11   characteristics, she is an extremely intelligent, well-educated

12   individual.  She filed separately from her husband, something

13   that not -- most married couples do not do.  She was

14   responsible for the accreditation for two extremely successful

15   medical schools.  And she had every educational and, once she

16   sort of became successful, every financial advantage.  But her

17   history also includes the fact that, for the past 20 years, she

18   has not been paying taxes on all of this wealth that she has

19   been accumulating because of the success of the schools.  And

20   between 2003 and 2008, just the monies that we talked about

21   last week, there was more than $60 million in income that went

22   unreported.  And the idea that she should get some sort of

23   credit because she did not spend her money in a particular way,

24   that Mr. Hochman thinks she should have spent it on Bentleys

25   and other such items, is really no excuse.  The Government

1    would submit that, after she sold the schools in 2007, she did

2    buy assets that, to your average citizen, would seem extremely

3    extravagant, including a $1.1 million vacation home in

4    Asheville, North Carolina.  They purchased a home in

5    Greenville, North Carolina, that their daughter, stepdaughter,

6    were able to live in.  She purchased an $850,000 condo in

7    Sarasota, from which they got rental income.  And her husband

8    was able to give gifts to their siblings.  He purchased an

9    airplane.  These are not insignificant purchases, to say that

10   she did not make or benefit from any of it.

11        The Government would submit that her failure to pay

12   taxes has allowed her to be charitable in her life, both to her

13   family, as the letters -- several of the letters allude to the

14   fact that Dr. Hough has provided some of the family members --

15   in addition to Ms. Varga, who testified at trial -- financial

16   support.  Her failure to pay tax and her fraud on the United

17   States has allowed her to be able to choose the employment that

18   she has been able to choose.  She has chosen to be able to

19   minister in the way that she does, and the Government would

20   submit it's because she has been doing it off of the backs of

21   the American taxpayers who are paying their fair share.

22        Mr. Hochman alluded to, in one of the letters, the

23   alumni director of Phillips University said that she had earned

24   the means to serve others.  The Government would submit that

25   she has stolen the means to serve others from the American

ARGUMENT BY MS. FINLEY                    54

1    taxpayers.

2          As the guidelines call for under 5H1.1, civic,

3    charitable, or public service, or employment-related

4    contributions are not usually relevant.  And I know that we are

5    in the 3553 realm, but under 3553, these things have to be

6    exceptional; and as the Repking [sic] case, in the Seventh

7    Circuit, talked about, the Court should evaluate the

8    Defendant's contributions with reference to the -- her wealth

9    and her status in life because more is expected of high level

10   business executives who enjoy sufficient income and community

11   status so that they have the opportunity to engage in charity.

12         The defendants that donate and can donate large sums

13   of money, or not take employment because they're motivated by

14   an ability to earn money, should not gain an advantage over

15   those defendants that can't choose to do that.  And it should

16   not be a get-out-of-jail-free card.

17         Mr. Hochman also talked about the financial motive.

18   The Government would submit that the Defendant did have a

19   financial motive.  Since 2003, she and her husband had been

20   trying to sell the medical schools.  There were two, if not

21   three, potential sales that had gone -- had not gone through

22   before they ultimately sold to it Mr. Rodger, and nobody -- it

23   was Mr. Rodger who testified, nobody was going to want to buy a

24   medical school that was not accredited.  And so her efforts in

25   the school, and her role in the school, made it as successful

1    as it was, and enabled both she and Dr. Fredrick to sell the

2    schools for the amount that they ultimately did.

3            And the Government, just with respect to the Addelson

4    case and Judge Raycoff, there was actually an article that I

5    happened to read on the airplane down here from the ABA

6    magazine, just a couple of months ago, where Judge Raycoff

7    wrote an article about the guidelines and how it actually had

8    imposed greater disparities once the guidelines had gone into

9    effect.  But he actually talked about the Addelson case in that

10   article, and he noted that the guidelines in that case called

11   for Mr. Addelson to get life in prison, and that that was not a

12   reasonable sentence.  And part of the reason that it

13   particularly wasn't reasonable is because Mr. Addelson came in

14   toward the end of the conspiracy, he wasn't a primary

15   conspirator, the loss in that case was somewhat limited, even

16   though it was still extremely large, because of when he came

17   into the conspiracy.  And because of all of that, he varied and

18   gave Mr. Addelson a sentence of three and a half years.  And so

19   I think Addelson is not that applicable here, when you're

20   talking about a life in prison guidelines computation.

21           With respect to the seriousness of the offense, the

22   need to promote respect for the law and provide just

23   punishment, the Government would submit that the tax loss of

24   the 15 million is only for 2003 to 2008.  The schools were

25   owned and operated by Dr. Hough and Dr. Fredrick since the late

1    1990s, and there has been no tax that has ever been paid on any

2    of the profits from the school since its inception.  And even

3    with respect to the accounts that were discussed at trial, not

4    all of those accounts were able to be analyzed to come up with

5    an income amount.  The Saba account and MUA account is

6    more --had been reviewed but had not done the very detailed

7    analysis to come up with the exact income amounts.

8            But this is a decades-long scheme to defraud the

9    Internal Revenue Service.  It was not impulsive or isolated,

10   but instead it required sophisticated transactions;

11   coordination with international bankers, 'annualized to the

12   United States Government, and to Mr. Murtha; and, as Dr. Hough

13   testified, trips abroad, including to Switzerland.

14           And if we're talking about the seriousness of the

15   offense, Your Honor, just briefly with respect to Mr. Hochman's

16   argument with regard to the FBAR penalty, the Government would

17   argue that that, at this point, is speculative.  That's a civil

18   matter.  She was not charged with the FBAR penalty crime in

19   this case, and the 11th Circuit case Crisp says where -- at

20   least with respect to restitution -- where you have more loss,

21   you are going to have greater restitution.  And the Court

22   should not be giving less time in order for that to be paid, as

23   that is not reasonable.

24           With respect to the seriousness of the offense, Your

25   Honor, in promoting respect for the law, the Government in this

1    case did not seek an enhancement under 3C1.1, for obstruction,

2    for Dr. Hough's testimony at trial.  However, the Government

3    submits that her testimony at trial is something that the Court

4    should consider for 3553 factors.

5            The Government submits that Dr. Hough's testimony was

6    wholly incredible, and her post-conviction wire transfer of

7    $1.5 million from the sale her house just a month after she was

8    convicted is also obstructive.  Her tale of asset protection

9    and caretaking should be considered by the Court in the

10   analysis of the seriousness of the offense.  That was rejected

11   by the jury.  It defied any logic, and is illogical and an

12   incredible narrative that, even on cross-examination, she could

13   not keep up with.  In fact, when I pressed her about this

14   preposterous story, that she was signing blank documents but

15   yet she was the caretaker, we had dozens of documents that she

16   was signing, and if you are the caretaker, you would think at

17   some point you might call a timeout and say, "I have this very

18   serious role of making sure that the funds of The Foundation

19   are cared for, I don't think I should be signing blank

20   documents.  What is this about?"

21           When I pressed her, she said that actually she was

22   only the backup caretaker and not just the caretaker.  Again,

23   seems like an incredible story that the jury clearly did not

24   accept.

25           With respect to adequate deterrence, I just actually

ARGUMENT BY MS. FINLEY                                    58

1    would like to start with specific deterrence and pick up with

2    the argument about obstruction.  After Dr. Hough sold her house

3    in December of 2013, she wired $1.5 million, the entire

4    proceeds of that sale, to The Foundation in Guatemala.  And the

5    Government, surprised to see that, and initially the Government

6    would argue that she has now taken funds outside -- moved them

7    outside of the United States, from which the Court could have

8    used to order restitution, and/or the Internal Revenue Service

9    could have used to satisfy her outstanding tax liability that

10   will ultimately be assessed against her.  But when the

11   probation officer asked for proof of the basis for this wire,

12   she said that it was to satisfy unrecorded debt liens.  And,

13   you know, the Government would submit that this wire is just a

14   continuation of the fraud that she has been perpetrating on the

15   United States since the late 1990s, early 2000s.

16          Again, The Foundation is her.  She can't borrow money

17   from herself.  There was no evidence on the financial

18   statements that there was deferred compensation, or loans given

19   from The Foundation or from the medical school, to Dr. Fredrick

20   or Dr. Hough, such that she would have to be paying it back.

21   There were no loan documents for the condo to show that there

22   were funds paid by The Foundation to Dr. Hough, or lent to them

23   to purchase the condo.  There were no -- there was no evidence

24   that funds were used from The Foundation to build the home in

25   Englewood.  And if The Foundation is a real entity that's

ARGUMENT BY MS. FINLEY                                    59

1    independent of Dr. Hough, the Government would submit that it

2    is in their interest to at least have a loan document, let

3    alone securing their interest through a mortgage or a lien, and

4    that that all goes to show that, even after her conviction, she

5    has not . . . she has not . . . . Understanding the importance

6    of this, and that if that was the case, the better course of

7    action perhaps would have been to put that in some sort of

8    escrow account, bring it to the Court's attention, so that that

9    money was not spirited away offshore, outside the reach of the

10   United States.

11          With respect to adequate deterrence, for tax cases,

12   the incidents of prosecution are always lower, and because of

13   that, the level of punishment should be higher, according to

14   the sentencing guidelines, Section 2T, the introductory

15   comment.  The sentence here today must be significant enough to

16   deter would-be tax cheats who might otherwise choose to gamble

17   that if they hide their money in offshore accounts that they

18   will not be caught.  Because the tax system relies on voluntary

19   compliance, and the Government cannot ensure compliance if the

20   general public believes that there are no repercussions for

21   failing to comply with the tax laws.

22          As Leona Helmsley said, only the little people pay

23   taxes, and a sentence here of probation.  Or anything but a

24   significant jail sentence, would send the message that people

25   who don't get to make charitable contributions, only they go to

ARGUMENT BY MS. FINLEY                                    60

1  jail; or, if you had money in an offshore account, well, that's

2  a different kind of tax crime, so you don't have to go to jail.

3         As the 11th Circuit said, in Martin, economic and

4  fraud-based crimes are more rational, cool, and calculated than

5  crimes of passion or opportunity, and significant jail

6  sentences are important to provide for general deterrence.

7         Mr. Hochman talked about the fact that there were no

8  other studies, and the study that he cited to, the Government

9  cited to a study in its sentencing brief in Document 162,

10 Joshua D. Blank wrote a law review article in defense of

11 individual tax privacy.  He notes that studies have shown that

12 salient examples of tax enforcement actions against specific

13 taxpayers, especially those that involve criminal sanctions,

14 have a significance and positive deterrent effect.  So I'm not

15 here to have a dueling law review articles or studies, but

16 there are other studies that do show that jail does serve a

17 general deterrent purpose in tax prosecutions.

18        With respect to the unwarranted disparities, there

19 have been over -- about a hundred criminal cases that have

20 arose out of the offshore enforcement efforts, 60 of those have

21 been pleas, but there have been only six trials, Your Honor.

22 And just to make sure the record is clear, the Government has

23 not stated that Mr. Ahuja -- or Dr. Ahuja's case is most

24 similar to the Government.  We talked about the Cohen Asser

25 Levy case as being the most similar, and had not drawn those

1   comparisons to Dr. Ahuja.

2          In fact, the Government put in its brief, the

3   Government argued that the tax loss in that case was 700,000,

4   that the guidelines was 41 to 51 months and was asking for that

5   sentence.  The Government is appealing that sentence.  And one

6   of the primary reasons that the Court gave for departing in

7   that sentence was that Dr. Ahuja was a neurosurgeon, and was

8   literally the only neurosurgeon in a, I think, 250-mile radius

9   that could perform a specific type of surgery.  And so he was

10  almost literally irreplaceable in his community because of the

11  type of complicated neurosurgery that he performed.  And the

12  Government submits that, while Dr. Hough may perform admirable

13  service, that she is not irreplaceable.

14         But if you look at the six trials, cases that have

15  gone to trial, there are -- the Government submits that that is

16  who the Court should look to when you're talking about

17  unwarranted disparities.  Because again, as the Martin case

18  indicates, unwarranted disparities should be looked at among

19  defendants with similar records who have been found guilty of

20  similar conduct.  And all the other cases that Mr. Hochman

21  cites to you are significantly different.  First of all, they

22  have account balances and tax losses that are much lower than

23  the Defendant's.  And the Government laid out the

24  distinguishing factors in its sentencing memo in Docket

25  Number 162.  In many of those cases the defendants cooperated

ARGUMENT BY MS. FINLEY                              62

1    and provided information on bankers, or banks, or asset

2    managers.  They pleaded guilty and accepted responsibility, so

3    they get a reduction for that, or they had an advanced age.

4            And the Curran case particularly is an anomaly, Your

5    Honor.  And the Court's sentence there, Miss Curran was

6    79 years old, suffered from various health problems.  That case

7    was an inheritance case, she inherited the account.  And as the

8    court there stated, the court specifically remarked on this

9    distinction, stating:  "This case is totally out of the scope

10   of all the Government's other cases where people are skimming

11   or trying to hide funds.  I mean, this was inheritance over

12   there, and I think a lot of reasonable people would think you

13   don't have to report this."

14           Dr. Hough is not an inheritance case.  She used her

15   accounts for dozens of years to conceal millions and millions

16   of dollars in profits from her medical school, and the interest

17   income and dividend income that she earned from those accounts.

18   And then, when she finally gets to sell the school and she's

19   ready to make a huge profit, she uses those accounts to further

20   conceal income and assets from the United States.

21           Many of the defendants that have been sentenced, even

22   under pleas, have received terms of incarceration, even after a

23   plea, and even after 5Ks.  Mr. Allen, from the District of West

24   Virginia, got 21 months.  The Ferdik case in the Central

25   District of California got 18 months, and that's where the tax

1   loss was $148,000, Your Honor.  On Page 19 of the Government's

2   sentencing memo, we note a bunch of other cases where

3   defendants have received a year and a day in jail.

4          And then lastly, Your Honor, with respect to

5   Mr. Hochman's argument about the offshore voluntary disclosure,

6   and Dr. Hough's attempt to get into that program, I think we

7   need to look at that in the context of all of her conduct,

8   because what actually was happening?

9          In August of 2008, if Your Honor remembers, there was

10  a note in the UBS records, in Exhibit 3W, Page 183, where it

11  appears that Dr. Fredrick called an employee, Mr. Luetolf, or

12  someone at the bank, and there's a note that states that

13  he's . . . calling in response to the situation with UBS, and

14  what should they do.  At that same time, in August of 2008,

15  news reports begin to surface in the United States and major

16  news media because Bradley Birkenfeld was going to be pleading

17  guilty.  The news is out, in August of 2008, that UBS is on the

18  IRS's radar screen, and potentially may be in criminal trouble,

19  and potentially accounts could -- information could be turned

20  over.

21          In February -- at the end of February, 2009, UBS

22  entered into the Deferred Prosecution Agreement.  And what does

23  Dr. Hough do at that time?  Well, in April of 2009, she filed a

24  false 2008 tax return that did not report her interest in, or

25  income earned from, the offshore accounts.  And in March, the

ARGUMENT BY MS. FINLEY                           64

1   end of March, of 2009, the Offshore Voluntary Disclosure

2   Program was announced.  The Government, in its pleading, had

3   said that the original deadline was September 23rd, 2009.

4   Apparently, on September 21, 2009, the Internal Revenue Service

5   offered an extension of two weeks, until October 15th.  And so

6   on September 22nd, the Defendant filed her voluntary

7   disclosure, just the day before the original deadline.

8            On September 28th, 2009, her attorney reached out to

9   the Department of Justice, at which time she knew she was under

10  criminal investigation.  So in September, the end of September,

11  2009, she knows that she's under criminal investigation.

12           And what do she and Dr. Fredrick do, after being

13  rejected from the voluntary disclosure program?  They move

14  additional funds and open additional bank accounts at Fortis

15  Banque, and in the name of New Vanguard.  In December of 2009,

16  significant funds of money are flowing into that bank account

17  at Fortis Banque.  And in December of 2009, Your Honor, well

18  after she now knows she's under criminal investigation, the

19  Saba Foundation bank account now has a balance of $60 million.

20           And the Government wanted to offer into evidence,

21  this is going to be Government's Exhibit 12 . . . .  Your

22  Honor, may I approach?

23           THE COURT:  You may.

24           MS. FINLEY:  It's another copy.  I didn't know if

25  Miss Alexander was going to hold onto one.

1           But in December of 2009, the Saba bank account --

2     which previously, if the Court remembers from Ms. Maurer's

3     spreads, did not have the significant amounts of money, the

4     almost $35 million from the sale of the school had gone into

5     the New Vanguard accounts, but in December of 2009, more than

6     $60 million lands in the Saba University account at

7     Liechtenstein Landesbank.  The Government would submit that

8     this was a step in Dr. Hough's efforts to frame her defense

9     that it was always the Saba University School of Medicine

10    Foundation's money, and that it was all getting transferred

11    back there at that time.

12          But the guidelines also talk about -- and Mr. Hochman

13    wants to make this argument that she came forward, she told the

14    Government, "Here I am," but the guidelines say it has to have

15    been unlikely to have been discovered otherwise, and that there

16    can't be the knowledge that discovery was likely or imminent,

17    under 5K2.16.  And based on the dates that the Government has

18    reviewed, Dr. Hough well knew that it was likely that her name

19    could be turned over to the Internal Revenue Service.

20          Sorry, Your Honor.

21          The Government would ask that Exhibit 12 be admitted

22    for sentencing purposes.

23          THE COURT:  Any objections?

24          MR. HOCHMAN:  Not for sentencing purposes, Your

25    Honor.

ARGUMENT BY MS. FINLEY                 66

1          THE COURT:  All right.  For sentencing purposes,

2    then, 12 will be admitted.

3          (Government's Exhibit 12 admitted into evidence.)

4          MS. FINLEY:  Thank you, Your Honor.

5          So based on the totality of all of the 3553 factors,

6    Your Honor, and the guideline analysis, the Government submits

7    that a significant term of incarceration for Dr. Hough is

8    necessary and reasonable in order to serve the purposes under

9    3553, and we would ask the Court to impose such a sentence.

10         Thank you.

11         THE COURT:  Let me ask you a couple questions, if I

12   might.

13         Tell me again, if you haven't already, why it was she

14   was declined participation in the disclosure program.

15         MS. FINLEY:  I think the technical answer that she

16   would have been given was that it was not timely.  I think

17   that's the language that the IRS uses in the tax arena, in this

18   arena.  "Timely" means that the Government already knows about

19   you, and Dr. Hough was disclosed to the Government as part of

20   the Deferred Prosecution Agreement with UBS.  Her name was

21   turned over to the Department of Justice.  So she was already

22   identified as a foreign account holder.

23         THE COURT:  All right.  So "timely" doesn't mean she

24   missed a deadline, it just means she --

25         MS. FINLEY:  That's correct.  She filed on the eve of

1    the initial date, two weeks before the first deadline, but

2    timely in this case would be because she was already a target.

3              THE COURT:  Okay.  And then I think -- with regard to

4    the nature of the offense, and the seriousness of it, I think

5    Mr. Hochman, I think his phrase, it was a lack of clarity,

6    either as to the tax loss or the income, I'm not quite sure

7    which.  And he cites the various versions of the Government's

8    evidence, and then the Court's resolution of that.

9              What's your response to a lack of clarity as being

10   somehow a basis for a variance?

11             MS. FINLEY:  Well, Your Honor, I think part of the

12   reason the lack of clarity -- first of all, the Government

13   would submit that Mr. Hochman has tried to muddy the waters

14   with respect to the clarity, but that Dr. Hough knew that she

15   was earning income in those accounts, she knew how much money

16   was in those accounts, and she opted not to receive bank

17   statements.  The computation that Ms. Maurer was required to do

18   here was because we did not get a nice bank statement from UBS

19   that showed exactly how much income and dividend income she

20   had.  That's something that the bank normally does.  It's not

21   something that was provided to us.  And so because of that, for

22   proof at trial, Ms. Maurer had to go through the analysis that

23   she did.  But as a client of UBS, and as an account owner, she

24   would have, if she opted to get it and had not checked that box

25   on her account application, she would have gotten, just like

ARGUMENT BY MS. FINLEY                    68

1    you do in the United States, a document that showed what her

2    profits or losses would have been in those accounts, a year-end

3    statement.  And we did not have that, and so we were forced

4    to -- I don't want to say, "forced," but that was how we had to

5    compute the income and interest dividend income.

6          And I'm sorry, Your Honor, I don't know if I answered

7    all of the questions.

8          THE COURT:  No.  I think understand your position.

9          Let me go back, again, to the -- I think both sides

10   have told me, there's approximately 100 criminal cases, a third

11   went to jail, so I . . . .  I'm sorry.  It was 60 had been

12   sentenced, a third of which went to jail, so I assume that's

13   20 people roughly.

14         The sentences I've heard, I think the longest anyone

15   mentioned was 18 months.  There are several for a year and a

16   day.  There was one outlier, which I don't remember if that was

17   the 18 months or something else.

18         MS. FINLEY:  Those were all in plea situations, Your

19   Honor.  With respect to the six defendants that went to trial,

20   one defendant is pending sentencing as we speak, in the Desai

21   case, which is in California.  The Cohen Asser Levy case, which

22   the Government submits is most similar to this case, although

23   there are guideline enhancements that do not apply in this

24   case, but the conduct of using offshore accounts to conceal

25   income and assets, and the sale of business assets, is very

1    similar to this case, and in that -- as well as the charges

2    that they were convicted at trial of, conspiracy and filing

3    false tax returns.  In the Cohen case they got ten years.

4            There was the Simon case that went to trial, and he

5    got 72 months.  And then Ahuja, which Mr. Hochman talked about,

6    received three years probation although the Government argued

7    for a guideline sentence and is appealing that sentence.  And

8    then the Kerr case, K-E-R-R, in Arizona, the Court there found

9    the tax loss to be zero, and sentenced the defendants to ten

10   months in prison.

11           And so with respect to those that went to trial,

12   there is 10 years, 72 months, and then some much lower

13   sentences.  And then with respect to those that have pled

14   guilty, there are some 21 months, some 18 months, which are, I

15   think, one or two of those cases, and then most of the cases

16   have been a year and a day, a year in prison, for the remaining

17   sentences that were imposed that had jail.

18           THE COURT:  Even for those that go to trial, there's

19   quite a spread there.

20           MS. FINLEY:  There is quite a spread, Your Honor.

21   And some of it is the conduct.  Again, Dr. Ahuja's tax loss was

22   $700,000.  The Kerr case, the tax loss was zero.  In the Cohen

23   case, the tax loss was much higher and much more close, I think

24   the guidelines range was exactly the same as Dr. Hough's.  And

25   so the ten years in that case was partly driven by some of

1   these other enhancements that admittedly do not apply here, but

2   that case is much more similarly situated to this one.

3              THE COURT:  How do you have a tax loss of zero and a

4   sentence of 72 months?

5              MS. FINLEY:  No.  The Simon case, there was -- that's

6   the Simon case, and there was a tax loss in that case.  And I

7   apologize, Your Honor, I don't have exactly what the tax loss

8   was.  The zero tax loss was in the Kerr case, K-E-R-R, in

9   Arizona, and that was where the defendant received ten months

10  in prison.

11             THE COURT:  Okay.  I misunderstood then.

12             All right.  Thank you.

13             Mr. Hochman?

14             MR. HOCHMAN:  Thank you, Your Honor.

15             Your Honor, addressing the Court's two questions to

16  the Government first, I believe that -- I think, actually, it's

17  been clarified that Dr. Hough did timely submit her

18  application.  The application deadline was October 15, 2009.

19  She submitted it September 22nd, 2009, well within the proper

20  time.  And again, the only reason she was rejected was

21  something unbeknownst to her, that the sealed 285 names, as

22  part of the Deferred Prosecution Agreement back in February of

23  2009, had been turned over, and unlike the other 20,000 people

24  who were able to successfully and timely, timely in terms of

25  the IRS, been able to partake in the program, but for the fact

1    that she was one of the unlucky 285, she would otherwise have

2    not been criminally prosecuted at all.

3         With respect to the nature of the offense, and my

4    concept of lack of clarity, Your Honor, Miss Finley says that

5    Mr. Hochman is the one who has muddied the waters.  Your Honor,

6    Mr. Hochman didn't have four years to prepare a first RAR, come

7    up with a number, move it by millions of dollars to a second

8    RAR, and then move it by millions of dollars to a third RAR,

9    and then come up with the Court's calculation under partnership

10   income.

11        So, again, I use that to say that I-- this I can say

12   without fear of contradiction, I'm unaware of any other case,

13   any other criminal tax case, and I'll expand that beyond just

14   Swiss Bank account cases, in which there are three versions of

15   a RAR that moves a tax loss back and forth in the way that this

16   case occurred.  And then -- but the significance of it is to

17   then say that Dr. Hough knew, or should have known -- actually,

18   not even should have known, actually knew, which is the

19   standard, intentionally violated a known legal duty, in leaving

20   off partnership income -- as the Court has now determined,

21   where nobody, for five years, has ever determined it to be

22   partnership income -- goes to, again, the nature of the

23   circumstances of the case, and a huge distinguishing factor

24   from any other case that the Government cites, or any other

25   case among the hundred where, for instance, in Dr. Ahuja, in

1    Kerr, and Simon, and Cohen, the tax loss is obvious.  The only

2    question is, did they violate it?  But nobody is disputing that

3    there was a tax loss partnership Schedule C or some other

4    version of it.  That was the easy part.  The only question is,

5    you know, did they knowingly violate what was already obvious.

6            So would I again suggest, Your Honor, that this

7    weighs in on the calculation of the nature of the offense, and

8    Dr. Hough's . . . Dr. Hough's knowledge with respect to it.

9            With respect, Your Honor -- again, just briefly to

10   the examples that they gave --

11           THE COURT:  Let me stop you there.

12           MR. HOCHMAN:  Certainly.

13           THE COURT:  I think we discussed, before, with regard

14   to the jury verdict, that the charge was substantially

15   underreporting income, as opposed to a tax loss?

16           MR. HOCHMAN:  Correct, Your Honor.

17           THE COURT:  All right.

18           MR. HOCHMAN:  And again . . . .  That's correct.  And

19   again, what we don't know, because the Government gave at least

20   three different categories of possibility for substantially

21   underreporting of income; interest, which is actually a fairly

22   low amount.  In fact, if the Court were to have just calculated

23   tax loss based on interest, we would be probably at the one to

24   two-year range, as opposed to a six to eight-year range.  Then

25   there's dividends, and then capital gains.

1           The Government concedes that there's no evidence that

2    Dr. Hough ever got any of these bank statements to do any of

3    these calculations.  And whether or not they ascribe that to

4    Dr. Hough checking a box or not, the reality is, she never got

5    the bank statements to make the calculations.  And as we know

6    with capital gains, you have to have multiple bank statements

7    to see when a stock was bought in order to determine whether or

8    not you actually made or lost money.

9           With respect to the -- the Government makes one

10   statement that I'm sure that they didn't mean, and that's this

11   statement:  They said, basically, that the failure to pay taxes

12   is what has allowed Dr. Hough to be charitable in her life.

13   I'm sure they didn't mean that, Your Honor.  Because Dr. Hough

14   was charitable in her life well before she had two nickels to

15   rub together.  I mean, she's been charitable in her life when

16   basically she's got to work 20 to 25 hours just to put food on

17   the table for her family.

18           You know, their best argument, Your Honor, is

19   probably the early 2000s, is when Saba and MUA first become

20   profitable.  If you remember the financial statement for MUA,

21   as late as 2003, it was a negative $161,000.  She did not

22   spend, she did not -- her failure to pay taxes is not why she

23   has been charitable in her life.  She has been charitable in

24   her life because that's her DNA, Your Honor.  That's how she's

25   made up.  Some people are like that, most people aren't, but

1    that's how Dr. Hough is made up.  So to ascribe her generosity

2    and her charitable good deeds to somehow the U.S. Government

3    was funding it . . . completely contradicts every fact in this

4    case.

5            With respect, Your Honor, to specific, and again

6    general deterrence, with specific deterrence, they talk about

7    this payment of the money when she sold her house in Englewood,

8    and she paid over money to the Saba Foundation.  Your Honor,

9    several points to that.

10           Number 1, what she paid the money back to the Saba

11   Foundation for was two things:  The $850,000 loan that is part

12   of Exhibit B.  If you recall, Your Honor, I showed you

13   Exhibit B, which is a board meeting minute of the Saba

14   Foundation, in which they approved an $850,000 Sarasota loan.

15   And that was back in 2008.  She repaid that loan, plus

16   interest, Your Honor.  She did that after consulting with

17   myself, Mr. Udolf, and Mr. Saunders, to see if it was

18   appropriate to repay a loan.

19           I have done two things to check that out, Your Honor:

20   One, I read the board meeting minute, saw it was a loan; two, I

21   saw the money came from one of the entities, I think it was Top

22   Fast that went there, and the money was being repaid to the

23   Saba Foundation; three, I have spoken to Mr. Montenegro and

24   Dr. Batista, who were the current board members of the Saba

25   Foundation, to confirm there was an outstanding loan, and the

1    money was being repaid for the loan.

2           Also, part of that payment goes for advancement of

3    legal fees that the Saba Foundation had done, on Dr. Hough's

4    behalf, to pay for my firm's legal fees.  So that's what the

5    repayment was for.  It was not in any way nefarious or to

6    obstruct justice.  Dr. Hough consulted with her counsel before

7    she did it.  We evaluated the facts and basically said that we

8    thought that was an appropriate repayment of both a valid loan

9    and the advancement of legal fees, Your Honor.

10          With respect to the FBAR penalty, which the

11   Government says is speculative, again, having negotiated over a

12   hundred FBAR penalties, Your Honor, the Government -- the same

13   exact standard, only it's under not the beyond a reasonable

14   doubt, Your Honor, but it will be the willful standard, will

15   apply in the FBAR context.  They will use this conviction as a,

16   basically, collateral estoppel on the main elements.  The

17   Government is certainly aware of these cases because the tax

18   division is the one who argues them.  And the FBAR penalty will

19   not be speculative.  It will be in the order of somewhere

20   between 20 and 30 million dollars after this hearing is over,

21   in addition to whatever the Court argues -- submits is the

22   restitution amount that Dr. Hough owes.

23          On the issue, Your Honor, the Government saying this

24   is a hellbent calculated effort by Dr. Hough and her husband in

25   conspiracy to completely keep the IRS in the dark, I would

1    point, Your Honor, to two or three facts that came out in the

2    trial that dispute that conclusion.  If you recall, Your Honor,

3    when MUA Belize, the Medical University of the Americas in

4    Belize was sold, and that was approximately 2004 and 2005, an

5    offshore sale for which the IRS would never have any knowledge

6    of, never saw the bank records, the proceeds from that sale

7    ended up on Dr. Fredrick's return because he had shares in MUA

8    Belize, and those shares had been cashed out.  If, in fact,

9    they were hellbent on not letting the IRS know anything about

10   what was going on overseas with MUA, they certainly, Your

11   Honor, would not have reported a sale that in no way -- is a

12   foreign sale that nobody shows up in America, and the IRS would

13   not know about it.

14          And the same thing, Your Honor, for the actual sale

15   of MUA.  When MUA was sold in 2007, the proceeds from that sale

16   that are attributed to Dr. Fredrick's share show up on his tax

17   return.  And the significance of both of these showing up on

18   the tax return is that it allows the IRS to ask questions.  It

19   certainly puts the issue first and foremost on their radar, and

20   allows them to ask questions, get sale documents, do an audit

21   if they want.  So again, if you were hellbent to conceal these

22   activities from the IRS 100 percent, as Miss Finley seems to

23   suggest, why would you go ahead and do -- and then also file a

24   5471, with respect to MUA Belize, and try to attempt to do one

25   with the Round Hill property?  There is no reason to do that if

1    you are, again, hellbent in keeping the IRS in the dark on what

2    your activities are with respect to foreign medical schools.

3           Your Honor, the Government cites its own study, the

4    Blank study, in that law review article that they are talking

5    about.  And they cite the words:  "Studies have shown that

6    salient examples of tax enforcement against specific taxpayers,

7    especially those that involve criminal sanctions, have a

8    significance and positive deterrent effect."

9           The study that Mr. Blank cites, Your Honor, is the

10   Dubin study.  So that law review article actually cites our

11   study, and it says, "especially those that involve criminal

12   sanctions."  Because the point, Your Honor, is again, criminal

13   versus civil, not imprisonment versus probation.  And what

14   Blank confirms that Dubin says is, that as long as there's a

15   criminal sanction, which is a felony, it's irrelevant for tax

16   compliance and deterrence whether or not the person gets

17   probation, or whether or not the person gets imprisonment.

18          And again, I refer back to the statistics in this

19   very effort that the Government has with offshore compliance,

20   notwithstanding the fact that two-thirds of the people have

21   received probation sentences.  And I would submit, as I've

22   given you, the examples of international bankers, accountants,

23   businessmen, sophisticated people, who have committed

24   significant crimes and received probation sentence.  Dr. Ahuja,

25   is just another example.  He went to trial and got a probation

ARGUMENT BY MR. HOCHMAN                              78

1    sentence.  Notwithstanding those probation sentences, the

2    compliance -- the sentences have pushed people to get into the

3    voluntary disclosure program.  Why?  Because the mere fact of a

4    criminal sanction, as opposed to necessarily imprisonment, is

5    what's pushing them in, as concludes the Government's own study

6    and the law review article that they cite that incorporates

7    that study by reference.

8            And so, Your Honor, we take issue with the

9    Government's conclusion, obviously, because we ask ourselves

10   what -- if you're trying to deter people, and the Government

11   comes out with its press release that says:  If you commit this

12   crime, you will be investigated for four years, we will try the

13   case, we will convict you, we will go ahead and take all your

14   money and ruin you financially, we will destroy your reputation

15   and your ability to practice your chosen profession, we'll

16   leave you in financial ruin the rest of your life, and we will

17   put an untoward stress both on your marriage and your health.

18           There is no additional sanction, as again the Dubin

19   study points to, that you need to increase, on top of that, in

20   order to say, "I don't want to do that.  That doesn't sound

21   very good," and be a convicted felon for the rest of your life.

22   So for the notion of general deterrence, which in some ways

23   applies in many of these cases, has shown that it's unnecessary

24   in this particular case.  And the one thing that the Government

25   does not talk about, but I will talk about and end with, with

1    respect to those other hundred cases, and the 60 that have been

2    sentenced, probably with the potential exception of Dr. Ahuja,

3    in Wisconsin, and his neurosurgery, neurosurgeon charitable

4    efforts as part of that, there is no other defendant,

5    whatsoever, that has the extraordinary life of public service

6    of Dr. Hough, none of them -- and I've looked at every one of

7    those cases, Your Honor -- not even close.

8            And I would say, again, that factor, weighed against

9    all these other factors that we have talked about, strongly

10   militates in favor of a probationary sentence with home

11   detention and that thousand hours of community service, plus

12   this huge restitution that the Court will order, plus a huge

13   civil fine that she's going to get for an FBAR penalty.   I

14   think that sends the message to the community and would be the

15   sufficient but not greater than necessary sentence, Your Honor.

16           Thank you.

17           THE COURT:  All right.  Thank you.

18           Dr. Hough, anything further you'd like to say?

19           THE DEFENDANT:  No, Your Honor.

20           THE COURT:  All right.

21           Anything further from the Government?

22           MS. FINLEY:  No, Your Honor.

23           THE COURT:  Counsel, do you and your client wish to

24   approach the podium, or is Dr. Hough more comfortable where she

25   is?

1              MR. UDOLF:  If she can sit here, Judge.

2              MR. HOCHMAN:  I can approach, or my client, I can --

3    probably better if Dr. Hough is seated, Your Honor?

4              THE COURT:  That's fine.

5              MR. HOCHMAN:  I'm sorry.  She would -- she will

6    approach, Your Honor.

7              THE COURT:  Okay.  She may do that too.

8              I'm not sure I technically asked the Government, yet,

9    whether there's any victim present in the courtroom who wishes

10   to address the Court.

11             MS. FINLEY:  No, Your Honor.

12             THE COURT:  Okay.

13             THE COURT:  Dr. Hough, the Court is required to

14   impose a sentence that is sufficient, but not greater than

15   necessary, after considering all the factors in Title 18,

16   United States Code, Section 3553.  I have considered those

17   factors, and each of them.  I've read everything that's been

18   submitted, every letter.  I've reread those portions of the

19   letters that have been incorporated in your attorneys' legal

20   submissions.  Obviously, I sat through the trial as well.

21             The Court has calculated the guidelines as I've set

22   forth in two written orders.  The Court recognizes that the

23   calculation of the guidelines is required, but is simply a

24   factor.  The guidelines are no longer mandatory.  The Court has

25   the authority to impose a sentence within the guidelines, or

1    below the guidelines, or above the guidelines for that matter.

2             In this case, the calculation of the guidelines

3    seemed to take on a life of itself as we attempted to compute

4    tax loss.  The bottom line is, that's just one of several

5    factors the Court is required to consider.  I'm not going

6    discuss all the factors, or all the testimony, or all the

7    arguments.  I do want to discuss some of those factors.

8             With regard to your personal situation, I recognize

9    you're 67 years old.  As that goes, in terms of the people I

10   see, that's on the older side of things.  It's probably

11   unfortunate that you're not the oldest person I've sentenced,

12   and you're not the oldest physician I've sentenced.

13            With regard to your personal life history, the

14   presentence report, as well as testimony at trial, convinces

15   me -- as I think your attorney has summarized it accurately, in

16   terms of your personal background -- you are obviously highly

17   educated.  You were involved in a number of what your attorney

18   has referred to as charitable works, I think correctly.  I

19   think that was done for years, and the Court considers that.

20            You were involved in international transactions, as

21   well as international charity work.  There was testimony with

22   regard to what I guess I would refer to generally as financial

23   naivete.  I did not buy that, or at least not to the extent

24   that your attorneys have argued, or some of the witnesses have

25   testified.  That's inconsistent with some of the documents I

1    saw, and what you've done with your life, in terms of the

2    medical schools and the business associated with those medical

3    schools.

4            The nature of the offense, I think it is a serious

5    offense.  I think the jury heard the -- I forget how long the

6    trial was, but the jury heard a number of witnesses talking

7    about the facts of the case.

8            I understand what the trial has meant in terms of

9    your employment and your licenses.  Your husband, I don't know

10   if it was as a result of this case or not, but he's -- in terms

11   of relation to the marriage, he's been a fugitive from day one,

12   and remains a fugitive.

13           With regard to the similarly situated defendants and

14   disparity of sentence, that's something I try to pay close

15   attention to, because I think it's important.  It's usually

16   difficult, just because I don't think any judge can know what

17   every other judge is doing.  The Ninth Circuit, I think, has a

18   case that essentially says that -- United States versus Kahre,

19   K-A-H-R-E, that talks about, while disparity is something that

20   the Court could consider, that no judge can really be expected

21   to know what other judges have done.  Just too many factors.  I

22   assume every judge who has imposed a sentence that you or the

23   Government has talked about has done his or her best to get it

24   right in dealing with the facts in front of him.  That's all I

25   can do as well.

1          After considering all the factors in the case, it is

2     the judgment of the Court that you be committed to the custody

3     of the Bureau of Prisons, to be imprisoned for a term of

4     24 months as to each count.  Those terms are to run

5     concurrently with one another.

6          Upon your release from imprisonment, you will be

7     placed on supervised release for a term of three years.  Those

8     three years' terms shall be three years as to Count 1, and then

9     one year as to Count 6, 8, and 9.  Those terms are to be served

10    concurrently with one another.

11         You will be required to comply with the standard

12    conditions adopted in the Middle District of Florida, and the

13    following special conditions:

14         You will be prohibited from incurring new credit card

15    charges -- I'm sorry, I said that wrong -- new credit charges,

16    opening additional lines of credit, or obligating yourself for

17    any major purchases, without the approval of the probation

18    officer.

19         You will be required to provide the probation officer

20    with any financial information requested.

21         You will be required to cooperate with the Internal

22    Revenue Service with regard to any outstanding taxes, interest,

23    or penalties relating to the offenses of conviction.

24         You will be required to cooperate with the probation

25    officer in the collection of DNA.

1          The mandatory drug testing requirements of the

2    Violent Crime Control Act are waived.  However, you will be

3    required to pay the -- I'm sorry -- to submit to random drug

4    testing, not to exceed 104 tests per year.

5          You will be required to pay restitution in the amount

6    of $15,518,382 to the Internal Revenue Service.  That

7    restitution obligation is payable to the Clerk of the United

8    States District Court for distribution to the victims.  Payment

9    schedule will be set with the probation office.

10         Based upon the obligation to make restitution, the

11   Court declines to impose a fine.

12         You will be required to pay the cost of prosecution

13   in the amount of $42,732.27.  You will also be required to pay

14   the mandatory special assessments.  Those total $400, and are

15   due immediately.

16         Counsel, any other condition or recommendation anyone

17   wants me to consider?

18         First, from the Government?

19         MR. HOCHMAN:  With respect --

20         THE COURT:  Hang on.  Let me hear from the Government

21   first.

22         MS. FINLEY:  No, Your Honor.

23         MR. HOCHMAN:  With respect to recommendations, Your

24   Honor, we would ask the Court to make a nonbinding

25   recommendation to the Bureau of Prisons for the federal prison

1    camp in Coleman, Florida?

2              THE COURT:  Any objections from the Government?

3              MS. FINLEY:  No, Your Honor.

4              THE COURT:  I don't typically make recommendations

5    for a specific facility, but I actually think that's the one

6    that she's most likely to get anyhow.

7              So the Court would recommend a facility as close to

8    home as possible, home being the Sarasota area.  And in this

9    case I will recommend that that be Coleman.

10             MR. HOCHMAN:  And that's the federal prison camp, is

11   my understanding, Your Honor.

12             THE COURT:  I know they have a number of . . . .

13             MR. HOCHMAN:  That's why I'm asking.  I think if we

14   could have the recommendation for the federal prison camp,

15   because they do have different levels at Coleman, I would

16   request that, Your Honor.

17             THE COURT:  I guess I don't know, on the female side,

18   what they have.  I know they have females there, I don't know

19   what the differences are.

20             MR. HOCHMAN:  I think just that the camp is the

21   lowest level security, Your Honor, in light of Dr. Hough, her

22   record not meeting any higher level security.  And it's a

23   nonbinding recommendation, Your Honor.  We'd ask for the

24   federal prison camp recommendation.

25             THE COURT:  I'll do it this way:  The Court does not

1   oppose placement in the camp facility.  Issues of security, I

2   just don't know enough about what they consider important for

3   that designation.  Based upon what I've seen of Dr. Hough, I

4   have no reason to think that would be inappropriate.

5              MR. HOCHMAN:  Thank you, Your Honor.

6              We would ask for two things, Your Honor.  We'd ask

7   for bail pending appeal, Your Honor, because we think that --

8   again, not knowing how fast the 11th Circuit will get to this

9   case, we think we have -- we've met the issues, or the standard

10  for bail pending appeal.  You know, obviously the 11th Circuit

11  doesn't get to the case in the two-year time period, Your

12  Honor, whenever they release her, and then the 11th Circuit

13  were to rule in our favor on these issues, she would already

14  have served the time.  So we would ask for bail pending appeal.

15             We do not believe -- we understand that the burden of

16  proof switches to us, Your Honor, on that issue.  We don't

17  think that Dr. Hough is a flight risk.  She's obviously known

18  about the case for four-plus years, she's known about this

19  trial and all the court proceedings.  She's been here every

20  single time, on a timely base, has checked in with her pretrial

21  services officer on an absolute regular basis, and has had no

22  problems with pretrial service, Your Honor, and we believe that

23  she wouldn't be a flight risk if granted bail pending appeal.

24             THE COURT:  Let me come back too that.  I need to

25  take care of some other things first, before we talk about

1    that.

2              MR. HOCHMAN:  Thank you, Your Honor.

3              THE COURT:  Okay.  First of all, Counsel, having

4    heard the sentence the Court has imposed, and the manner in

5    which it has been imposed, are there any objections?

6              First, from the Government?

7              MS. FINLEY:  Your Honor, just for the record, the

8    Government will object to the sentence being unreasonable

9    under 3553.

10             THE COURT:  Okay.  For the record, your objection is

11   noted.

12             Mr. Hochman?

13             MR. HOCHMAN:  And, Your Honor, we would incorporate

14   all the objections we have had before, both to the guideline

15   range, which we think, obviously, at some level affects the

16   ultimate sentence, and which incorporates the tax loss and role

17   in the offense objections, and then to the sentence itself, and

18   then to the restitution amount, which, in turn, feeds off of

19   the tax-loss amount analysis.  We incorporate, or incorporate

20   by reference, all our prior objections.

21             THE COURT:  All right.  Those objections are also

22   noted.

23             THE COURT:  Dr. Hough, you do have the right to

24   appeal both your convictions and the sentence.  To do that, you

25   have to file what's called a notice of appeal within 14 days of

1    the entry of the judgment.  If you fail to file the notice of

2    appeal within that 14-day period, you waive, or give up, your

3    right to take an appeal.

4              If you wish to appeal, you have the right to be

5    represented by an attorney, and if you cannot afford an

6    attorney, the Court will appoint one to represent you, at no

7    cost or obligation to yourself.

8              Do you understand what I've said about your right to

9    appeal?

10             THE DEFENDANT:  Yes, I do.

11             THE COURT:  Do you have any questions about that?

12             THE DEFENDANT:  No.

13             THE COURT:  All right.  Now, Mr. Hochman, let me come

14   back to your issue of bail pending appeal.

15             What says the Government?

16             MS. FINLEY:  Your Honor, with respect to bail pending

17   appeal, the Government would oppose it.  First, the Government

18   thinks that, after the sentencing, and given the enormous

19   resources offshore, that there is a potential for risk of

20   flight considering the Court's sentence, and that -- which sort

21   of piggybacks on the bond situation, but that's one of the

22   factors that the Court should consider for bond pending appeal,

23   and that the Government does not believe that the appeals --

24   the appeal will raise any issues -- excuse me -- any

25   substantial questions of fact or law that would ultimately

1    reverse the outcome of the trial.

2            THE COURT:  What is the Defendant's situation with

3    regard to a passport?

4            MR. HOCHMAN:  It's been turned over, Your Honor, to

5    the pretrial services officer --

6            THE COURT:  Okay.

7            MR. HOCHMAN:  -- either the pretrial service or the

8    clerk of the court, Your Honor, one of the two.

9            THE COURT:  All right.  I'm going do it this way:

10           The Court is going to take the request of bail under

11   advisement.  I'm going to direct counsel to file a written

12   motion.  I'm going to direct the Defendant to self surrender to

13   the designated facility on or before June 20th, absent further

14   order of the Court.

15           What that means is, the Bureau of Prisons designates

16   a facility June the 15th, instead of June the 20th, you are to

17   report to that facility unless I've entered an order granting

18   you bail pending appeal.

19           And as I said, in the meantime, the Defendant shall

20   file such a motion, assuming you want bail, and the Government

21   shall respond to it.

22           In terms of timing, how much time would you like to

23   file?

24           MR. HOCHMAN:  Today is Friday, Your Honor.  We can

25   get that motion on file by next Wednesday, Your Honor.

```
 1            THE COURT:  That would be great.  I'd give you more
 2   time than that, if you want.
 3            MR. HOCHMAN:  Next Friday, then, Your Honor.  We'll
 4   take a week.
 5            THE COURT:  All right.  So next Friday is May
 6   the 16th.
 7            And do you care to respond . . . from the Government?
 8            MS. FINLEY:  If we could have until that following
 9   Friday, Your Honor, or right before Labor Day weekend, whatever
10   that time.
11            MR. UDOLF:  Labor Day?
12            MS. FINLEY:  Excuse me.  Memorial Day.
13            THE COURT:  That would be May 23rd, right?
14            MS. FINLEY:  Yeah.
15            MR. HOCHMAN:  Your Honor, if we may be permitted a
16   brief reply, we can do it in less than a week, probably by
17   May 28th, Your Honor, if that's possible?
18            THE COURT:  All right.  May 28th is a Wednesday.
19   That's fine.  So I'm gone until June the 9th, so I'd extend the
20   dates a little bit if anybody needs more time.
21            MR. HOCHMAN:  Let me ask you, Your Honor, my
22   experience has been with most Bureau of Prisons that they take
23   at least 60 days to designate, so maybe what we can do, if we
24   could ask for maybe a self-surrender date towards the middle or
25   end of July, then that would give the Court enough time to look
```

1    at our papers and rule.

2            THE COURT:  July the 18th is a Friday.  I you're

3    right, I don't really intend them to designate her before I've

4    ruled on the motion.  So maybe a July the 18th surrender date

5    would facilitate that.  All right.  The Court will change the

6    June 20th date to July the 18th.

7            MR. HOCHMAN:  Thank you, Your Honor.

8            THE COURT:  And then, in terms of motions, May 16th

9    still works for the motion, the 23rd for the Government, and

10   then the 28th for the reply.

11           Or do you want to extend those dates?

12           MR. HOCHMAN:  If we can have until that Friday, Your

13   Honor, which will be, I think, May 30th, for the rely, that

14   will give us those two extra days, that will be fine.

15           THE COURT:  Sure.

16           MS. FINLEY:  That's fine, Your Honor.

17           THE COURT:  All right.  Counsel, anything further,

18   from either side?

19           MS. FINLEY:  Your Honor, just given the Government's

20   position about flight risk, if the Court is going to be

21   inclined to have bail pending appeal, then we would ask that

22   her conditions be increased because of the flight risk.

23           THE COURT:  Okay.  Tell me what conditions you'd

24   like.

25           MS. FINLEY:  I think that we would request a

 1    bracelet, if the Court is going to grant bail pending appeal.

 2              THE COURT:  Are you talking electronic monitoring

 3    when you say, "bracelet"?

 4              MS. FINLEY:  Yes, Your Honor.

 5              THE COURT:  Are you talking about that now, or if I

 6    grant bail pending appeal?

 7              MS. FINLEY:  I think the Government's position right

 8    now is that she is a flight risk presently.  I think

 9    Mr. Hochman talked about $50 million, the Government is of --

10    at the end of 2009, there was $60 million offshore.  Her

11    husband has fled.  She has sold her residence and is living in

12    a rental, and is now facing a jail term.  And for those

13    reasons, the Government believes that she is a flight

14    risk . . . and so that an electronic monitoring would be

15    appropriate.

16              THE COURT:  All right.

17              Mr. Hochman?

18              MR. HOCHMAN:  Your Honor, I do not believe electronic

19    monitoring is appropriate for these series of reasons:  She's

20    known about this case, Your Honor, for over five years.  She --

21    unlike her husband, who fled, she stayed.  She's made every

22    single appearance and been completely cooperative with pretrial

23    service.  Coming into this sentencing, Your Honor, the

24    guidelines were six to eight years.  If she was going to -- and

25    according to the Government, she's had 40-plus million dollars

1    at her beck and call for five years now, including up until

2    today.

3              If she was going to leave, based on the resources

4    that exist, and knowing that she was potentially, under the

5    guidelines, facing six to eight years, coming in today, she

6    would have left, Your Honor.  I think the fact that she has

7    stayed the entire time, has not left, like her husband, and is

8    before Your Honor, will be checking in and has checked in

9    regularly, I think it's on a weekly basis with pretrial

10   service, her passport has been surrendered, I don't think there

11   is any reason to increase the bail conditions in light of the

12   Court's sentence, and that we can obviously revisit that if the

13   Court were to grant a bail pending appeal, and order the

14   additional two years, you want some additional conditions,

15   certainly we can address that in our back-and-forth motions,

16   but I don't think we need to do anything between now and

17   potentially July 18th, when she would self surrender, Your

18   Honor.

19             THE COURT:  Let me talk to the probation officer.

20             (The Court confers with the probation officer

21        privately.)

22             THE COURT:  The Court is going to require electronic

23   monitoring be added as a condition of her release.  She will be

24   required, as I understand it, to remain under the supervision

25   of pretrial services, so she will be required to contact

1    pretrial services and make the arrangements for the electronic

2    monitoring.  I know it requires a landline at the residence.

3              MR. HOCHMAN:  Part of the problem, Your Honor, just

4    as a technical matter, is that Dr. Hough doesn't have a

5    landline.  I mean, obviously, we will do our best to get it

6    installed.  It will take a little while to coordinate with the

7    phone company.

8              May I offer the alternative, and I know pretrial

9    services has done it with other situations, of what they call

10   an intensive pretrial service supervision.  And what that

11   requires you to do is, usually more than once a week, you

12   actually go in and physically meet with your pretrial services

13   officer, and/or call them, so that they are constantly

14   monitoring you, as opposed to the usually once a month, or

15   sometimes more than once a month, or once every other week.  I

16   have seen the intensive pretrial supervision be sort of the

17   hybrid between the general pretrial and monitoring.

18             THE COURT:  Dr. Hough, who is your pretrial service

19   officer?

20             MR. SAUNDERS:  Tad Parks.

21             THE COURT:  All right.  I'm going to see if Mr. Parks

22   is available, and I'll talk to him and see what they have

23   available.

24             See if you can call him.

25             And we'll take a 15-minute recess.

1          MR. HOCHMAN:  Thank you, Your Honor.

2                 (At 11:26 AM, court was recessed.)

3                          AFTER RECESS

4                 (At 11:44 AM, court was reconvened.)

5          THE COURT:  The Court is going to modify the

6     conditions of the Defendant's release as follows:

7          The Defendant's travel will be restricted to the

8     Middle District of Florida, except as necessary to meet with

9     lawyers.  Meetings with lawyers shall be . . . .  Let me think

10    how I want to say this.  The pretrial services officer will be

11    told prior to the meetings that the meetings will be taking

12    place.  I was going to use the word, "coordinate," but that's

13    not what I mean.  I just mean that pretrial services will be

14    notified that she will be traveling to Miami, or LA, or

15    wherever it is, so that she will be outside the Middle District

16    of Florida.  Otherwise, as I said, travel will be restricted to

17    the Middle District of Florida.  She will be required to wear a

18    GPS device that does not require any landline.

19          I think those are the conditions that I have in mind.

20          Any additional either conditions or comments?

21          MS. FINLEY:  Not from the Government, Your Honor.

22          MR. HOCHMAN:  Not from the defense, Your Honor.

23          THE COURT:  Mr. Parks, was there something else?

24          MR. PARKS:  Yes, Your Honor.  If you are going to be

25    placing her on GPS monitoring, are you placing her in the home

1   confinement program, and what component, home incarceration,

2   home detention, or curfew, would you like to use for that GPS?

3           THE COURT:  The third -- well, maybe it's the fourth

4   I'm using.  I'm less concerned about curfew.  I'm not doing the

5   first two.  I'm not doing home detention or home confinement.

6   For the curfew, unless it's somehow necessary for the GPS to

7   work, I'm not concerned that she be home certain hours in the

8   evening.  I'm concerned about travel outside the Middle

9   District of Florida and how we monitor that.

10          So what else do I have to say to make that work for

11  you?

12          MR. PARKS:  Understood.  Thank you, sir.

13          MR. HOCHMAN:  Thank you, Your Honor.

14          THE COURT:  And that will be in effect until the time

15  I decide is the soon-to-be-pending motion for bail, and then

16  that may change.

17          The self-surrender date, again, pending my order,

18  will be July the 18th, 2014.

19          All right.  Anything else?

20          MS. FINLEY:  Not from the Government, Your Honor.

21          MR. HOCHMAN:  Not from the defense, Your Honor.

22          THE COURT:  All right.  We'll be in recess.

23                  -- -- -- -- -- -- -- --

24          (Thereupon, at 11:47 AM, the above-entitled matter

25      was concluded.)

1                        -- -- -- -- -- -- -- --

2                              CERTIFICATE

3        I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

4     ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC RECORD IN

5     THE ABOVE-ENTITLED MATTER.

6

7        Dated this 21st day of June, 2014.

8

9                            /s/ Jeffrey G. Thomas
                            JEFFREY G. THOMAS, RPR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25