CASE NO. 14-12156

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 2:13-cr-00072-JES-CM |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PATRICIA LYNN HOUGH, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

---

**APPELLANT'S OPENING BRIEF**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

HONORABLE JOHN E. STEELE
United States District Judge

BINGHAM MCCUTCHEN LLP
Nathan J. Hochman (pro hac vice)
nathan.hochman@bingham.com
Daniel A. Saunders (pro hac vice)
daniel.saunders@bingham.com
The Water Garden
Suite 2050 North
1601 Cloverfield Boulevard
Santa Monica, California 90404-4082
Telephone: 310.907.1000
Facsimile: 310.907.2000

BRUCE L. UDOLF, P.A.
Bruce L. Udolf (Fla. Bar No. 0899933)
budolf@bruceudolf.com
Broward Financial Centre
500 East Broward Blvd., Suite 1400
Fort Lauderdale, FL 33394
Telephone: 954.858.8831
Facsimile: 954.523.2872

Attorneys for Defendant-Appellant
Patricia Lynn Hough

United States v. Hough
Case No. 14-12156

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 11th Circuit Rule 26.1-3, Defendant-Appellant Patricia Lynn

Hough certifies that the following is a complete list of all persons or entities known

to have an interest in the outcome of this case or appeal:

**Bentley, Arthur Lee III. ,** U.S. Attorney's Office

**Casas, Jesus M.,** Office of the United States Attorney

**Cihlar, Frank Phillip,** U.S. Department Of Justice, Tax Division

**Davis, Gregory Victor,** U.S. Dept. of Justice, Tax Division

**Finley, Caryn D.,** United States Department of Justice

**Hochman, Nathan J.,**  Bingham McCutchen, LLP

**Hough, Patricia Lynn/** Inmate No. 58807-018

**Kessler, Margaret Leigh,** US Department of Justice Tax Division

**Robbins, Alexander Patrick,** U.S. Department Of Justice, Tax Division

**Saunders, Daniel A.,** Bingham McCutchen, LLP

**Sharter, Kimberly M.** U.S. Department Of Justice

**Steele, Honorable John E.**, United States District Court Middle District of Florida

**BRUCE L. UDOLF, P.A.**
500 East Broward Blvd., Suite 1400
Fort Lauderdale, Florida 33394
Tel: (954) 858-8831

By: /s/ Bruce Udolf _____

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to Eleventh Circuit Rule 28-1(c), Appellant submits that oral argument would be helpful and the decisional process would be significantly aided by its allowance.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ...................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF CONTENTS .................................................................................... iii

TABLE OF AUTHORITIES ............................................................................. vii

I.    PRELIMINARY STATEMENT .................................................................. 1

II.   ISSUES PRESENTED ............................................................................... 1

III.  JURISDICTIONAL STATEMENT AND BAIL STATUS ........................ 2

IV.  STATEMENT OF THE CASE ................................................................... 3

     A.    FACTUAL BACKGROUND AND TRIAL ..................................... 3

          1.    Hough's Background ............................................................... 3

          2.    The Medical Schools and Their Ownership ............................ 4

               a.    Saba University School of Medicine ............................ 4

               b.    Medical University of the Americas (Nevis) ................. 5

               c.    Medical University of the Americas (Belize) ................ 6

          3.    Hough's Role With Respect to the Medical Schools ............... 6

          4.    Lawsuits Against the Schools and Asset Protection ................ 7

          5.    The Foreign Accounts ............................................................ 9

               a.    Bahamas and Initial UBS Accounts .............................. 9

               b.    Hong Kong Entity Accounts ....................................... 10

           6.    The Sale of the Medical Schools ........................................... 13

          7.    Asset Purchases and Gifts .................................................... 14

               a.    Asheville, NC Property ............................................... 14

               b.    Greenville, NC Property ............................................. 15

               c.    Gifts to Family Members ............................................ 16

               d.    Airplane Purchase ...................................................... 17

          8.    The Government's Tax Expert ............................................... 17

     B.    THE JURY'S VERDICT .................................................................. 19

## TABLE OF CONTENTS
(continued)

**Page**

C.    SENTENCING ................................................................ 20

V.   SUMMARY OF ARGUMENT ................................................. 21

VI.   ARGUMENT ................................................................ 23

A.   HOUGH'S CONVICTIONS MUST BE OVERTURNED
BECAUSE THERE WAS INSUFFICIENT EVIDENCE THAT
SHE CONSPIRED TO DEFRAUD THE IRS OR THAT SHE
KNOWINGLY AND WILLFULLY FAILED TO REPORT
INCOME ON HER TAX RETURNS ............................................. 23

1.   Standard of Review ................................................. 23

2.   Conspiracy to Defraud the United States (Count One) .......... 24

3.   Subscribing to False Tax Returns (Counts Six, Eight, and
Nine) ................................................................ 31

a.   Substantial Underreporting of Total Income ............... 31

(1)   The government failed to prove that Hough
owned the Saba Foundation, New Vanguard,
Top Fast, and the funds in those entities'
foreign bank accounts and the Patricia
Hough UBS account ......................................... 33

(a)   Hough did not own the Saba
Foundation ................................................ 33

(b)   Hough Did Not Own New Vanguard
or Top Fast ................................................ 39

(c)   Hough Did Not Own the Funds in the
Patricia Hough UBS Account ................................ 40

(2)   The government failed to prove that the
foreign income earned by the Saba
Foundation, New Vanguard, Top Fast and
Patricia Hough accounts and transactions
was reportable on Hough's U.S. tax returns ....... 41

## TABLE OF CONTENTS
(continued)

**Page**

   (3) The government failed to prove Hough's actual knowledge that any of the foreign accounts or transactions earned taxable interest, ordinary dividends, or capital gains that were reportable on her U.S. tax returns ....... 43

  b. Schedule B, Lines 7a and 7b ......................................... 46

B. IF HOUGH'S CONVICTIONS ARE NOT VACATED, THEN SHE MUST BE GRANTED A NEW TRIAL BECAUSE THE GOVERNMENT'S IMPERMISSIBLE CROSS-EXAMINATION OF HER CHARACTER WITNESSES DENIED HER DUE PROCESS OF LAW ........................................ 50

 1. Standard of Review ................................................. 50

 2. A New Trial is Required Because the District Court Violated This Circuit's Clear Law in Allowing the Government to Cross-Examine Hough's Character Witnesses With Guilt-Assuming Hypotheticals, to Hough's Prejudice .................................................. 50

  a. Background .................................................. 50

  b. The District Court's Ruling Allowing the Government's Improper Questioning and Denying a Curative Instruction Was Error .................................. 55

  c. The Error Resulting From the Improper Cross-Examination Was Not Harmless .................................. 57

C. THE DISTRICT COURT ABUSED ITS DISCRETION IN ADMITTING PURPORTED COCONSPIRATOR STATEMENTS WITHOUT SUFFICIENT INDEPENDENT PROOF OF THE CHARGED CONSPIRACY ................................ 65

 1. Standard of Review ................................................. 65

 2. The Alleged Coconspirator Statements Were Improperly Admitted ................................................. 65

## TABLE OF CONTENTS
(continued)

Page

D.    THE DISTRICT COURT ABUSED ITS DISCRETION IN DETERMINING THE TAX LOSS RESULTING FROM THE OFFENSE ........................................................................... 68

    1.    Standard of Review .................................................. 68

    2.    The District Court Erred in Including the Medical Schools' "Profits" in its Tax Loss Calculation Based on a Theory That Had Never Been Briefed or Argued by Either Party, Was Based on an Incorrect Reading of the Applicable Regulations, and Required Factual Findings That Lacked Any Evidentiary Support in the Record ............. 69

    3.    The District Court Clearly Erred in Including Tax Loss From Income Sources as to Which the Government Conceded at Sentencing There Was No Evidence of Hough's Knowledge ................................................. 75

VII.   CONCLUSION ........................................................................... 77

CERTIFICATE OF COMPLIANCE .................................................. 78

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bonner v. City of Prichard,*
   661 F.2d 1206 (11th Cir. 1981)...................................................................... 52

*Bourjaily v. United States,*
   483 U.S. 171, 107 S. Ct. 2775 (1987).............................................................. 66

*Bronston v. United States,*
   409 U.S. 352, 93 S. Ct. 595 (1971)................................................................ 48

*Chapman v. California,*
   386 U.S. 18, 87 S. Ct. 824 (1967).................................................................. 58

*In re Chrome Plate, Inc.,*
   614 F.2d 990 (5th Cir. 1980)........................................................................ 70

*Cosby v. Jones,*
   682 F.2d 1373 (11th Cir. 1982)............................................................... 24, 30

*Gall v. United States,*
   552 U.S. 38, 128 S. Ct. 586 (2007)................................................................ 68

*Ingram v. United States,*
   360 U.S. 672, 79 S. Ct. 1314 (1959).............................................................. 24

*Jackson v. Commissioner,*
   233 F.2d 289 (2d Cir. 1956).......................................................................... 70

*Kotteakos v. United States,*
   328 U.S. 750, 776, 66 S. Ct. 1239 (1946)........................................................ 58

*Lonyem v. U.S. Att'y Gen.,*
   352 F.3d 1338 (11th Cir. 2003)..................................................................... 50

*Michelson v. United States,*
   335 U.S. 469, 69 S. Ct. 213 (1948)................................................................ 50

*Moline Properties, Inc. v. C.I.R.,*
   319 U.S. 436, 63 S. Ct. 1132 (1943)............................................................... 70

*Northern Indiana Public Service Co. v. Commissioner,*
   115 F.3d 506 (7th Cir. 1997)....................................................... 70

*United States v. Adkinson,*
   158 F.3d 1147 (11th Cir. 1998)............................................... 30, 66

*United States v. Barner,*
   572 F.3d 1239 (11th Cir. 2009)...................................................... 77

*United States v. Byrom,*
   910 F.2d 725 (11th Cir. 1990)....................................................... 66

*United States v. Campbell,*
   765 F.3d 1291 (11th Cir. 2014)..................................................... 68

*United States v. Candelaria-Gonzalez,*
   547 F.2d 291 (5th Cir. 1977)..............................................*passim*

*United States v. Cruz,*
   482 Fed. Appx. 528 (11th Cir. 2012)............................................ 68

*United States v. Dickerson,*
   248 F.3d 1036 (11th Cir. 2001).................................................... 66

*United States v. Fagan,*
   518 Fed. Appx. 749 (11th Cir. 2013)................................. 59, 62, 63

*United States v. Grassi,*
   616 F.2d 1295 (5th Cir. 1980)...................................................... 67

*United States v. Guzman,*
   167 F.3d 1350 (11th Cir. 1999)..........................................*passim*

*United States v. Hasner,*
   340 F.3d 1261 (11th Cir. 2003).................................................... 66

*United States v. Henderson,*
   409 F.3d 1293 (11th Cir. 2005).................................................... 50

*United States v. Hewitt,*
   663 F.2d 1381 (11th Cir. 1981)......................................... 60, 62, 63

*United States v. Jayyousi,*
   657 F.3d 1085 (11th Cir. 2011).................................................... 65

*United States v. Jones,*
    601 F.3d 1247 (11th Cir. 2010).......................................................................... 23

*United States v. Kottwitz,*
    614 F.3d 1241 (11th Cir.), *opinion vacated in other part on*
    *rehearing,* 627 F.3d 1383 (11th Cir. 2010)...................................................... 24

*United States v. Lane,*
    474 U.S. 438, 106 S. Ct. 725 (1986) ................................................................ 58

*United States v. Machado,*
    804 F.2d 1537 (11th Cir. 1986)......................................................................... 65

*United States v. Manapat,*
    928 F.2d 1097 (11th Cir. 1991).................................................................. 48, 49

*United States v. Mason,*
    993 F.2d 406 (4th Cir. 1993)................................................................. 55, 56, 63

*United States v. McDonald,*
    935 F.2d 1212 (11th Cir. 1991)................................................................... 66, 67

*United States v. McGuire,*
    744 F.2d 1197 (6th Cir. 1984)........................................................................... 56

*United States v. Mendez,*
    528 F.3d 811 (11th Cir. 2008)........................................................................... 30

*United States v. Oshatz,*
    912 F.2d 534 (2d Cir. 1990)..................................................................... *passim*

*United States v. Polsinelli,*
    649 F.2d 793 (10th Cir. 1981).............................................................. 58, 62, 63

*United States v. Pritchett,*
    908 F.2d 816 (11th Cir.1990)........................................................................... 31

*United States v. Seecharan,*
    523 Fed. Appx. 619 (11th Cir. 2013) ............................................................... 77

*United States v. Shwayder,*
    312 F.3d 1109 (9th Cir. 2002)................................................................. *passim*

*United States v. Siers,*
    873 F.2d 747 (4th Cir. 1989)................................................................... 60, 62

*United States v. Smith-Bowman,*
  76 F.3d 634 (5th Cir. 1996) ................................................................. 53

*United States v. Thomas,*
  8 F.3d 1552 (11th Cir. 1993) .............................................................. 23

*United States v. Veal,*
  703 F.2d 1224 (11th Cir. 1983) ......................................................... 30

*United States v. Williams,*
  738 F.2d 172 (7th Cir. 1984) .......................................... 56, 57, 60, 61

*United States v. Wilson,*
  983 F.2d 221 (11th Cir.1993) ............................................................ 50

## Statutes and Regulations

18 U.S.C. § 3231 ....................................................................................... 2

18 U.S.C. § 3742 ....................................................................................... 2

28 U.S.C. § 1291 ....................................................................................... 2

26 C.F.R.
  §§ 301.7701-1 to 301.7701-3 ............................................................ 71
  § 301.7701-2(b) ...................................................................... 71, 72, 74
  § 301.7701-2(b)(2) .............................................................................. 71
  § 301.7701-2(b)(8) .............................................................................. 71
  § 301.7701-2(c)(1) .............................................................................. 74
  § 301.7701-3 ....................................................................................... 72
  § 301.7701-3(a) ................................................................................... 72
  § 301.7701-3(b)(2)(i)(A), (B) ............................................................ 72
  § 301.7701-3(b)(2)(ii) ................................................................... 72, 74

## Other Authorities

Fed. R. App. P. 4(b)(1)(A) ....................................................................... 2

Federal Rule of Evidence 801(d)(2)(E) ............................................ 65, 66

Internal Revenue Manual § 9.5.13.2.1 ................................................... 75

USSG § 2T1.1(c)(1) ............................................................................... 75

# I.

## PRELIMINARY STATEMENT

Defendant-appellant Dr. Patricia Hough ("Hough"), a 68-year-old woman with no prior criminal record, a stellar community reputation, and an exceptional lifelong record of public service, is innocent of the charges of which she has been convicted.  Yet she sits today in a federal prison – the victim of erroneous district court rulings, a hopelessly confused or biased jury, and a fundamentally unfair trial.  This appeal is the last chance to right the wrong that our justice system has perpetrated on her.

# II.

## ISSUES PRESENTED

1.      Whether the evidence presented at trial was insufficient to prove beyond a reasonable doubt that Hough knowingly conspired to defraud the IRS and knowingly and willfully failed to report income on her tax returns.

2.      Whether the district court abused its discretion in allowing the government to cross-examine Hough's character witnesses with guilt-assuming hypotheticals, in direct contravention of controlling law.

3.      Whether the district court abused its discretion in admitting into evidence purported co-coconspirator statements without sufficient independent evidence to establish Hough's participation in the charged conspiracy.

4.      Whether the district court clearly erred in calculating the tax loss and restitution at sentencing, where the court relied on a theory that misread the applicable statute and made findings that were unsupported by any evidence in the record.

### III.

### JURISDICTIONAL STATEMENT AND BAIL STATUS

Hough appeals from her conviction on one count of conspiracy and three counts of filing false tax returns following a jury trial before the Honorable John E. Steele, United States District Judge for the Middle District of Florida, and from the 24-month sentence imposed.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231.  This court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

The Judgment and Commitment Order was entered on May 12, 2014.  (CR 195; Appx. 91).[1]  Hough filed a timely notice of appeal on May 13, 2014.  (CR 198; Appx. 96).  See Fed. R. App. P. 4(b)(1)(A).

Hough is in custody serving the 24-month sentence imposed in this case.[2]

---

[1] "CR" refers to the Clerk's Record and is followed by the applicable docket number.  "Appx." refers to Appellant's Appendix and is followed by applicable page numbers.  "RT" refers to the Reporter's Transcript of district court proceedings and is preceded by the applicable date and followed by applicable page numbers.  "Exh." refers to exhibits introduced at trial and is followed by the applicable exhibit number.

[2] The district court found that Hough was neither a flight risk nor a danger to the community and that this appeal was not for purposes of delay, but denied Hough's motion for bail pending appeal based on its finding that the appeal would not raise

## IV.

## STATEMENT OF THE CASE

### A.    FACTUAL BACKGROUND AND TRIAL

On May 15, 2013, Hough and her estranged husband, David Leon Fredrick

("Fredrick"), were indicted on one count of conspiracy to defraud the IRS and four

counts each of filing false tax returns for tax years 2005 through 2008.[3]  (CR 1;

Appx. 1).  The conduct at the core of the indictment was Fredrick's and Hough's

alleged failure to report income from the operation and sale of two highly regarded

and successful medical schools that they helped create on the islands of Saba and

Nevis in the Caribbean.

### 1.    Hough's Background

Hough grew up on welfare in the housing projects of Youngstown, Ohio.

(10/11/13 RT 270; 10/21/13 RT 31-32; Appx. 463, 826-27).  She excelled

academically and became involved in community service and volunteerism at an

early age, and she was awarded a scholarship from her church to attend Phillips

University in Enid, Oklahoma.  (10/21/13 RT 34-38; Appx. 829-33).  Hough was

unable to afford medical school after graduating and instead worked as a social

worker at a state school for the mentally handicapped.  (10/21/13 RT 41-42; Appx.

---

any substantial question.  (CR 210; Appx. 97).  Should this Court determine based
on the briefs and/or argument that reversal is likely, Hough respectfully requests
that the Court grant her immediate release on bail, as there is a likelihood that she
will serve her full custodial sentence before any opinion is issued.
[3] Following the indictment in May 2013, Fredrick failed to appear for arraignment.
He remains a fugitive.

834-35).  She received a master's degree in social work and continued to do
volunteer work, providing medical screenings in impoverished communities in
Central America.  (10/21/13 RT 46-47; Appx. 836-37).  After taking a series of
teaching positions, Hough entered medical school at age 37 at Ross University
School of Medicine in the West Indies.  (10/21/13 RT 53-56; Appx. 838-41).
There she met Fredrick, a professor at the school, and they married in 1984.
(10/21/13 RT 58-59; Appx. 843-44).  Fredrick shared Hough's lifelong passion for
volunteer work and had a dream of starting an affordable, high-quality medical
school.  (10/21/13 RT 61-63, 65; Appx. 846-48, 850).

From March 2009 until her conviction in this case, Hough worked for the
Sarasota County Department of Health, providing psychiatric services to uninsured
low-income patients.  (10/22/13 RT 14-15; Appx. 935-36).

    2.    <u>The Medical Schools and Their Ownership</u>

        a.    <u>Saba University School of Medicine</u>

In 1986, the governor of Saba asked Fredrick to start a medical school on
Saba.  (10/15/13 RT 95-96; Appx. 515-16).  The Saba University School of
Medicine ("Saba School") opened in 1993 with a class of nine students.  (10/15/13
RT 128; Appx. 530).  As of 2013, the Saba School had 120 students per class, with
an extraordinary 98% first-time passing rate on the medical board exams.
(10/15/13 RT 129; Appx. 531).  It has graduated over 1,500 doctors who are
eligible to be licensed to practice anywhere in the United States and Canada; the

Saba School is also the only Caribbean medical school that has satisfied the

accreditation requirements of the European Union. (10/15/13 RT 130-31; Appx.

532-33). In addition, the school has transformed the island of Saba and is currently

responsible for one-third of the island's economy. (10/18/13 RT 227-28; Appx.

804-05).

Until it was sold in 2007, the Saba School was owned and operated by the

Saba School of Medicine Foundation ("Saba Foundation"), a nonprofit foundation

formed in the Netherlands-Antilles in 1988. (10/11/13 RT 12, 22; Exh. 3V; Appx.

171-81, 428, 435). The Saba Foundation had an existence and structure (including

a board of directors) separate and apart from that of the Saba School, and it has

continued to exist as a separate nonprofit philanthropic organization following the

sale of the Saba School in 2007, providing medical supplies and treatment, clean

water, and agricultural development to thousands of poor and needy people in

Central America. (Exh. 111; 10/15/13 RT 119-20, 122-23, 161-62; 10/16/13 RT

106-07; 10/17/13 RT 167-77; 10/18/13 RT 243; 10/22/13 RT 12-14; Appx. 293,

525-26, 528-29, 549-50, 616-17, 696-706, 818, 933-35).

      b.     <u>Medical University of the Americas (Nevis)</u>

Spurred by the success of the Saba School, Fredrick established the Medical

University of the Americas ("MUA") on the island of Nevis in 2000. (10/21/13

RT 90-91; Appx. 859-60). Unlike the nonprofit Saba School, MUA was a for-

profit corporate entity predominantly owned by Fredrick. (10/11/13 RT 22, 207-

08; Appx. 435, 457-58).  Hough held a small number of shares for only a few months in 2003; when she found out they had been issued to her without her request, she signed the shares over to Fredrick.  (10/11/13 RT 29-30; 10/21/13 RT 87-89; Appx. 226-27, 436-37, 856-58).  Thereafter, Hough had no ownership interest in MUA.  (10/16/13 RT 25-27, 102; Appx. 594-96, 615).

### c.   Medical University of the Americas (Belize)

Fredrick also helped establish and owned half of a second campus of the Medical University of the Americas in Belize ("MUA Belize").  Hough owned no shares in that venture either.  (10/21/13 RT 99-100; Appx. 861-62).  Because of concerns over how MUA Belize was being run, Fredrick sold his shares back to the other owner in 2004.  (10/21/13 RT 103; Appx. 863).  It is undisputed that Fredrick properly reported the $740,000 in long-term capital gains from the sale of his shares on his 2004 and 2005 returns.  (Exhs. 1U p.6, 1V p.7; 10/21/13 RT 105-07; Appx. 139, 151, 865-67).

### 3.   Hough's Role With Respect to the Medical Schools

While Fredrick focused on the business side of the Saba School and MUA, managed the schools' assets, and made decisions regarding investments and acquisitions, Hough focused exclusively on the schools' academic aspects and played no active role in the financial side of operating either the schools or the Saba Foundation.  (10/11/13 RT 21, 119; 10/15/13 RT 193-95; Appx. 434, 448, 565-67).  Specifically, Hough handled accreditations and oversaw the clinical

program, finding hospitals in the United States where third- and fourth-year

medical students could perform their clinical rotations. (10/11/13 RT 20-21;

10/15/13 RT 54-55, 68, 104-05, 220; 10/16/13 RT 15, 141; Appx. 433-34, 494-95,

500, 518-19, 570, 584, 632). The largest part of her job was serving as an

"academic ambassador" for the schools, traveling extensively to teaching hospitals

and accreditation boards around the country, preparing the voluminous

accreditation applications to the several state medical boards, and hosting site visits

by the medical boards to the Saba School and its teaching hospitals. (10/11/13 RT

118-19; 10/15/13 RT 133, 142-44; 10/17/13 RT 164-65; 10/21/13 RT 147-48;

Appx. 447-48, 535-38, 693-94, 888-89). All government and defense witnesses

testified consistently that Hough, while having expertise in her fields of psychiatry

and medical education, was not financially astute and relied heavily on other

people to guide her through financial matters. (10/15/13 RT 195-96; 10/17/13 RT

180-81, 201; 10/18/13 RT 200-03, 241; Appx. 567-68, 707-08, 713, 791-94, 816).

　　　4.　　Lawsuits Against the Schools and Asset Protection

　　　Hough testified that she understood that Fredrick had moved the Saba

Foundation's assets offshore and placed them into nominee accounts for asset

protection purposes, and that the funds in those accounts at all times belonged to

the Saba Foundation. (10/21/13 RT 114-16, 135, 141-42, 157, 177-78, 187-88,

258-59; Appx. 868-70, 881, 884-85, 890, 904-05, 924-25). That testimony was

fully corroborated by the government's own witness, Dr. Paul Dalbec.

Dalbec served on the board of trustees of the Saba School since 1994, first as a member and then as chairman. (10/15/13 RT 117; Appx. 523). Dalbec testified that the Saba School's assets were frozen in 1995 in response to a lawsuit – a mechanism allowed under Netherlands-Antilles law[4] – and that the board authorized Fredrick to move the school's and the Foundation's assets offshore in order to maintain the school's financial stability, consistent with the advice obtained from lawyers and financial professionals. (10/15/13 RT 109, 147-52; Appx. 521, 539-44). Dalbec further testified that he was fully aware over the ensuing years, as chairman of the board of trustees, that the school's and the Foundation's assets were being held at banks outside the United States and the Netherlands-Antilles and in accounts held under the names of other entities to keep them out of reach of potential litigants. (10/15/13 RT 153-55; Appx. 545-47). Dalbec was also aware that Fredrick and his advisers had set up entities in different names to hold real estate and other Foundation assets for the same asset protection purpose. (10/15/13 RT 154-55; Appx. 546-47). Fredrick was fully open and transparent with the board about these matters, and even at trial, government witness Dalbec continued to maintain that Fredrick had handled the Saba School's

---

[4] Antoine Solagnier, the former governor of Saba and Registrar of the Common Courts of the Netherlands-Antilles, confirmed the existence and common use of this procedure, as well as its use against the Saba School in the mid-1990s. (10/18/13 RT 234, 238-39; Appx. 811, 813-14). Solagnier further testified that there was nothing unusual about a Netherlands-Antilles foundation putting its assets in Swiss bank accounts to protect them from being frozen in response to litigation. (10/18/13 RT 235; Appx. 812).

assets appropriately.  (10/15/13 RT 151, 155-56, 176-77; Appx. 543, 547-48, 557-58).

This evidence was *uncontradicted* at trial; the government did not even ask Dalbec about the asset protection issues, nor did it introduce any testimony through any other witness to challenge Hough's stated understanding of the asset protection purpose for which the funds were moved offshore.

    5.    <u>The Foreign Accounts</u>

        a.    <u>Bahamas and Initial UBS Accounts</u>

The initial offshore accounts were opened at SG Hambros and UBS in the Bahamas.[5]  (10/18/13 RT 68; Appx. 757).  In December 2003, those accounts were closed and the funds transferred to an account at UBS in Switzerland in the names of David Fredrick and Patricia Hough.  (Exh. 3P pp.5-6; Appx. 164-65).  Hough testified that Fredrick told her that he had been advised by the bank to move all of the Saba Foundation's funds from the Bahamas to Switzerland, and that she understood these Saba Foundation funds were transferred into the initial Fredrick/Hough UBS account.  (10/21/13 RT 122; Appx. 874).  In April 2004, the Fredrick/Hough UBS account was closed and the funds were split equally into two separate accounts, one in Fredrick's name and one in Hough's.  (Exh. 3HH pp.20, 27; Appx. 196-97).

---

[5] The trial record does not disclose when those accounts were opened, by whom, or under what names.  The government obtained no records from the Bahamanian accounts and made no effort to track the source of the funds in those accounts. (10/18/13 RT 65-68; Appx. 754-57).

Dieter Luetolf was the client advisor for the UBS accounts.[6]  (10/9/13 RT

29; Appx. 303).  In seeking to prove that the money in the accounts belonged to

Fredrick and Hough and not the Saba Foundation, the government relied heavily

on documents prepared by Luetolf, principally the "Form A" in each account file.[7]

The Form As for the initial UBS accounts listed Fredrick and Hough as both

"contracting partner" and "beneficial owner," and Hough signed the Form As for

the Fredrick/Hough account and the individual Hough account.  (Exhs. 3GG p.1,

3R p.1; Appx. 166, 193).  The government never called Luetolf to testify; instead,

it called a witness who had no idea what Luetolf had told Hough about what was

meant by "contracting partner" or "beneficial owner."  (10/9/13 RT 138-39, 192;

Appx. 313-14, 334).Nor did the UBS witness know whether Hough signed the

forms in blank and Luetolf filed in the information later, as the evidence suggested

was Luetolf's practice.[8]  (10/9/13 RT 139; Appx. 314).

>    b.    Hong Kong Entity Accounts

In 2005, the Saba School was sued by a competing medical school for $150

million.  (10/15/13 RT 152-53; Appx. 544-45).  In response to that lawsuit, Luetolf

referred Fredrick to Beda Singenberger, a financial advisor with Sinco Treuhand

---

[6] Although the indictment named Luetolf as an unindicted co-conspirator, the district court found insufficient evidence to allow the jury to make a finding of his involvement in any conspiracy.  (10/21/13 RT 26; Appx. 824).

[7] Form A is a Swiss anti-money laundering form that has nothing to do with taxes. (10/9/13 RT 141, 169; Appx. 316, 326).

[8] One of the Form As introduced by the government had Hough's signature but had not been completed by Luetolf with identification of the contracting partner and beneficial owner.  (Exh. 3G p.1; 10/9/13 RT 156; Appx. 162, 320).

-10-

who served as an intermediary with Luetolf and UBS.[9]  (10/9/13 RT 67-68;

10/21/13 RT 170-72; Appx. 304-05, 900-02).  Singenberger created three Hong

Kong-based companies:  New Vanguard Holdings Limited ("New Vanguard"),

Top Fast Finance Limited ("Top Fast"), and Ample Dynamic Trading Limited

("Ample Dynamic").

The individual Fredrick and Hough UBS accounts were closed in July 2005,

and all funds in those accounts were transferred by Luetolf to a UBS account in the

name of New Vanguard.  (10/17/13 RT 43, 50; Appx. 655-56).  Although the Form

A for the New Vanguard account listed Fredrick and Hough as the beneficial

owners, they did not sign that Form A, nor are their names found anywhere else in

the entire account file.  (Exh. 3C p.1; 10/9/13 RT 77-78, 184; 10/18/13 RT 61-62;

Appx. 157, 306-07, 330, 750-51).  In November and December 2006, Singenberger

opened separate accounts for New Vanguard at Fortis Banque ("Fortis") and

Liechtensteinische Landesbank ("LLB"); as with the UBS New Vanguard account,

although Fredrick's and Hough's names were typed on the Form As as the

beneficial owners, their signatures do not appear on the Form As or on any other

document in the file.  (Exhs. 4J, 4K pp.1-2; 10/17/13 RT 99, 105-06; Appx. 206-

08, 674-76).  Hough had no signature authority or other control over any of the

_____

[9] Like Luetolf, the indictment named Singenberger as an unindicted co-conspirator.
Also like Luetolf, the district court found insufficient evidence to allow the jury to
make a finding of Singenberger's involvement in any conspiracy.  (10/21/13 RT
26; Appx. 824).

-11-

New Vanguard accounts, and no New Vanguard account statements were ever sent to Hough. (Exhs. 3C pp.39-41, 4K p.15; 10/9/13 RT 189-90; 10/21/13 RT 182-84; Appx. 159-61, 210, 331-32, 906-08).

A UBS account for Top Fast was opened by Singenberger in January 2006 with a transfer from the Saba Foundation's UBS account. (10/17/13 RT 70-71; Appx. 662-63). In 2008, the UBS account for Top Fast was closed and the funds transferred by Singenberger to an account for Top Fast at Fortis; another account for Top Fast was opened by Singenberger at LLB in December 2006. (10/17/13 RT 76, 81, 84, 92-93; Appx. 665, 670-73). As with the New Vanguard accounts, although Fredrick's and Hough's names were typed on Form As as the beneficial owners, they did not sign the forms, nor do their names appear anywhere else in the account files. (Exhs. 3CC pp.1-2, 4G p.1, 4H pp.3-4; 10/9/13 RT 92; 10/17/13 RT 84; 10/18/13 RT 69-71; Appx. 188-89, 198, 203-04, 308, 671, 758-60). The authorized signatories were the same as for the New Vanguard accounts; Hough had no signature authority or other control over any of the Top Fast accounts, and there is no evidence that she had any involvement in their creation.[10] (Exhs. 3CC pp.16, 20, 4G p.15, 4H p.9; 10/21/13 RT 183-84; Appx. 191-92, 200, 205, 907-08).

---

[10] Singenberger also opened an account at UBS in the name of Ample Dynamic. As with Top Fast and New Vanguard, Hough was not a signatory on that account and did not sign the Form A identifying her and Fredrick as beneficial owners. (10/21/13 RT 184; Appx. 908). The government did not rely on the Ample Dynamic account in formulating its tax calculations. (Exh. 30I; Appx. 285-88).

6.   <u>The Sale of the Medical Schools</u>

In April 2007, private equity firm Equinox Capital purchased the Saba

School, MUA, Round Hill Project Holding Company,[11] and Education

International Consultants, LLC ("EIC," the Massachusetts-based management

company for the schools), for a total purchase price of purchase price of

$37,628,054.53.  (10/16/13 RT 37, 48; Appx. 603, 606).  Steven Rodger, the owner

of Equinox, testified for the government that his initial contact regarding the sale

was with Fredrick and that Fredrick remained the point person throughout the

negotiations.  (10/16/13 RT 9-10, 14-15, 74, 87; Appx. 578-79, 583-84, 608, 612).

Hough's involvement was limited to the negotiation of her consulting and non-

compete agreements and the guaranty of sale, as well as answering the buyer's

questions about academics, accreditations, and the clinical program.  (10/16/13 RT

14-15, 29, 77-78, 87-88; Appx. 583-84, 598, 609-10, 612-13).

---

[11] In 1999, the Saba School board of trustees approved the acquisition of a land
parcel called Round Hill on which to build a permanent campus.  (10/15/13 RT
181; Appx. 562).  The property was purchased for $250,000 in the name of
Fredrick's daughter, Laura Walls.  (Exh. 6L; Appx. 222).  In July 2004, the
property was transferred to the Netherlands-Antilles entity Round Hill Project
Holding Company NV for $17,000, representing the transfer tax on the initial
purchase price.  (Exh. 8K; 10/18/13 RT 222; 10/21/13 RT 241; Appx. 244, 802,
918).  The chairman of the board of trustees and the former governor of Saba both
testified that these third-party transactions were conducted for the same asset
protection purpose for which the school's accounts had been moved offshore, <u>i.e.</u>,
to protect the valuable property on which the Saba School campus sat from being
seized in connection with any litigation against the school.  (10/15/13 RT 184-85;
10/18/13 RT 232-33; Appx. 563-64, 809-10).  At the time of the 2007 sale, Round
Hill Project Holding Company was owned by New Vanguard, which had acquired
Fredrick's and Hough's shares.  (Exh. 11C; 10/16/13 RT 31-32, 51; Appx. 276-78,
600-01, 607).

Rodger prepared a Flow-of-Funds memorandum detailing how the total purchase price was to be apportioned.  (Exh. 10F; Appx. 248).  That allocation was negotiated by Fredrick; Hough was not involved.  (10/15/13 RT 162-64; 10/16/13 RT 39; Appx. 550-52, 605).  It is undisputed that Fredrick properly reported on his 2007 federal tax return the capital gains on the sale of his MUA stock and on his 100% equity in Medical Education Group, LLC (the parent of EIC).  (10/10/13 RT 48, 77-78; 10/16/13 RT 13-14, 21, 110-12; 10/21/13 RT 85-86; Appx. 360, 375-76, 582-83, 590, 618-20, 854-55).  Hough had no ownership interest in MUA or Medical Education Group/EIC, and therefore received no income to report. (10/11/13 RT 15; 10/16/13 RT 21-22, 89, 102; 10/18/13 RT 33-34; 10/21/13 RT 85; Appx. 431, 590-91, 614-15, 745-46, 854).

     7.   <u>Asset Purchases and Gifts</u>

     The government sought to prove that Hough owned the medical schools and their bank accounts by introducing evidence of asset purchases made with funds from those accounts.  Again, however, the evidence showed little to no involvement by Hough with any of the transactions, and fully supported her defense that she did not believe the purchases were made with any unreported personal income.

     a.   <u>Asheville, NC Property</u>

In July 2005, Lynn, Leon, & Lyon Group (LL&L), an LLC owned by Fredrick and Hough, purchased a house in Asheville, North Carolina, with a $1.2

million loan from Top Fast, which was memorialized by a credit agreement.

(10/15/13 RT 7-11, 40-41; Appx. 465-69, 484-85).  In November 2008, LL&L

purchased a lot adjacent to the Asheville property for $200,000, using funds wired

from the New Vanguard account at Fortis.  (10/15/13 RT 13-16, 44-46; Appx. 471-

74, 488-90).  In November 2009, the Asheville property was sold to Aldunatec, an

Ecuadorian company run by Saba Foundation board member Florencio

Montenegro, which assumed the existing $1.2 million loan.  (10/15/13 RT 21-24;

Appx. 477-80).  Other than an initial introductory meeting with the real estate

attorney, Hough had no involvement in the Asheville transactions; all of the

voluminous documents, deeds, credit agreements, sales contracts, and letters in the

file were signed by Fredrick alone.[12]  (10/15/13 RT 9, 12, 15, 18, 24, 31-32, 39, 43-

45, 48-49; Appx. 467, 470, 473, 476, 480-83, 487-89, 492-93).

      b.   Greenville, NC Property

Ample Dynamic, on behalf of the Saba Foundation, purchased a residence in

Greenville, North Carolina, in June 2007.  (Exh. 16C; 10/16/13 RT 168-70, 212;

Appx. 279, 634-36, 645).  Fredrick had been working for several years, with the

board's approval, on developing a joint degree program with East Carolina

---

[12] Hough testified that Fredrick told her that the Asheville purchases were made
with approved loans from the Saba Foundation against his substantial deferred
compensation.  (10/21/13 RT 253-55; Appx. 921-23).  Dr. Paul Dalbec, the
chairman of the board of trustees of the Saba School, testified for the government
that Fredrick was granted a number of loans by the board against deferred
compensation for his unpaid work during the early years of the school's operation.
(10/15/13 RT 108, 172-76; Appx. 520, 553-57).

University in Greenville, and the purchase of a property to house students and

classes for that program was within the scope of the board's funding authorization.

(10/15/13 RT 178-80; 10/17/13 RT 149-55, 160-61; Appx. 559-61, 684-92).  The

program was never instituted and the Greenville house was sold by the Saba

Foundation in March 2011; the sales proceeds were wired back to the Ample

Dynamic account.  (Exhs. 16C, 16E, 16N; 10/16/13 RT 179, 181-82, 208-10;

Appx. 279-83, 637, 639-43).

        c.    <u>Gifts to Family Members</u>

Fredrick's four half-siblings testified about monetary gifts they received

from Fredrick, including $250,000 each in April 2007 after the schools were sold.

(10/15/13 RT 56-59, 69-71, 222; 10/16/13 RT 221-24; Appx. 496-99, 501-03, 572,

646-49).  The half-siblings testified, however, that Hough not only had no

involvement with the gifts, but did not know about them and was extremely upset

when she learned what Fredrick had done.  (10/15/13 RT 72-73, 226-28; 10/16/13

RT 222-23, 225-26; Appx. 504-05, 573-75, 647-48, 650-51).  In contrast to

Fredrick, all of Hough's gifts to family members fell were fully tax-compliant,

within the gift tax allowance, and came from her domestic account in her own

name, not from any foreign accounts of the Saba Foundation.  (10/11/13 RT 239-

41; 10/21/13 RT 276-77; Appx. 460-62, 926-27).

d.    Airplane Purchase

In November 2007, Fredrick purchased a Piper Meridian airplane for $1.6 million on behalf of Ample Dynamic. (10/15/13 RT 81-82; Appx. 507-08). When the plane was sold for $1.255 million in June 2010, the proceeds were wired back to the LLB account for the Saba Foundation. (Exh. 21D; 10/15/13 RT 86-87, 91; Appx. 284, 510-11, 513). Fredrick Ahles, who handled the 2010 sale, testified for the government that he never met or even heard of Hough, who had no involvement with the sale. (10/15/13 RT 78, 85, 88; Appx. 506, 509, 512).

8.    The Government's Tax Expert

IRS revenue agent Sheila Maurer testified as the government's summary witness and tax computation expert. Prior to trial, Maurer prepared a revenue agent's report ("RAR") for Hough for the tax years 2005 through 2008. In that report, which the government marked as an exhibit on the first day of trial and relied on in its opening statement, Maurer calculated that Hough owed additional taxes of $81,173.00 for 2005, $842,310 for 2006, $3,661,703 for 2007, and $680,442 for 2008.[13] (Exh. 30I.4; 10/8/13 RT 4; 10/22/13 RT 169, 192-93; Appx. 289-92, 297, 953, 969-70).

Maurer radically revised her methodology and calculations and prepared a second RAR on October 14, 2013, one week into the trial. (Exh. 30I; Appx. 285-

---

[13] Hough and Fredrick filed their returns under the status "married filing separately," which means that they reported their income separately on each of their respective returns. (10/9/13 RT 247; 10/10/13 RT 65-66; Appx. 352, 373-74).

88).  Maurer, who had been assigned to this case for four-and-a-half years, testified

that the changes were based on evidence she first saw during the trial that proved

that Fredrick and Hough owned the Saba Foundation and MUA.  (10/16/13 RT

242; 10/17/13 RT 257-58; Appx. 652, 739-40).  Based on her mid-trial new theory,

Maurer testified that Fredrick and Hough should be charged with the capital gains

on the sale of the schools, and not (as in her initial RAR) with income taken out of

the school accounts and moved to one of the other accounts (such as New

Vanguard or Top Fast).  (10/17/13 RT 128, 257-58; Appx. 680, 739-40).  This

mid-trial change in the central assumption of Maurer's expert testimony resulted in

in **$6.7 million** worth of changes to the RAR that had served as the basis for the

indictment and that had been produced to the defense in discovery to prepare for

trial.  (10/18/13 RT 176-77; 10/22/13 RT 172-73; Appx. 784-85, 956-57 ).

According to Maurer's revised calculations, Hough owed an additional

$81,173 in tax for 2005, an additional $2,429,118 for 2007, and an additional

$654,022 for 2008.  (Exh. 30I; 10/17/13 RT 125, 139; Appx. 285-88, 677, 683).

For 2006, a year in which the indictment charged Hough with substantially

understating her income, Maurer now calculated that Hough had **overreported** her

tax liability and was **owed a refund** of $2,282.  (Exh. 30I; 10/17/13 RT 126;

10/18/13 RT 97-98; Appx. 285-86, 678, 771-72).

Luis Rivera – a 24-year veteran of the IRS' criminal investigation division, a

licensed CPA, and the former Assistant Special Agent in Charge of the Miami field

office of the IRS – testified as a rebuttal expert.  (10/22/13 RT 130, 132, 137-38; Appx. 937, 939, 940-41).  Unlike Maurer, who testified that she conducted no interviews, engaged in no investigation, requested no documents beyond what the prosecutors provided her, and made no effort to trace the proceeds of the 2007 sale beyond the accounts that initially received them, Rivera spoke with and obtained records from a current board member of the Saba Foundation in Guatemala and from the current president of Sinco Treuhand in Zurich.  (10/17/13 RT 228-34; 10/22/13 RT 157-64; Appx. 944-51).  Based on that investigation, Rivera testified that all of the money from the April 2007 sale of the schools was currently in the accounts of the Saba Foundation, totaling over $54 million as of September 25, 2013.  (10/22/13 RT 165; Appx. 952).  The government did not cross-examine Rivera on this testimony or introduce any evidence to contradict his finding.  (10/22/13 RT 192-95; Appx. 969-72).

## B.  THE JURY'S VERDICT

Each of the four false tax return counts charged that Hough made two separate false statements on the applicable year's return:  (1) that she substantially underreported her total income on Line 22; and (2) that she failed to report, on Schedule B, lines 7a and 7b, that she had an interest in or signature or other authority over a foreign account.  For counts six (2005), eight (2007), and nine (2008), the jury found the return false as to both matters.  For count seven (2006), the jury found the return false based **only** on the substantial understatement of