income, notwithstanding that the government's own expert had calculated that Hough had **overreported** her income for 2006.[14] The jury also convicted Hough on the conspiracy charge in count one.  (CR 114; Appx. 42).

## C.    SENTENCING

Following trial, Maurer came up with a *third* version of her RAR that more than doubled the tax loss figures to which she had testified at trial by attributing to Hough and Fredrick for the first time more than $14.9 million in alleged "net income" from the Saba Foundation and MUA from 2003 through 2007.  (CR 162 Exh. 2; Appx. 72).  The district court held a four-day sentencing hearing during which Maurer testified and was cross-examined about her newest set of calculations.  Defense expert Rivera also testified, and colleagues of Hough made statements in her support.

On May 9, 2014, the district court sentenced Hough to 24 months of imprisonment and three years of supervised release.  The court further ordered Hough to pay restitution in the amount of $15,518,382, court costs in the amount of $42,732.27, and a special assessment of $400.  (CR 195; Appx. 91).

---

[14] The district court subsequently granted the defense motion for a judgment of acquittal on count seven, finding that no rational juror could have found the evidence sufficient to prove the elements of that count beyond a reasonable doubt. (CR 157; Appx. 62).

## V.

## <u>SUMMARY OF ARGUMENT</u>

Hough's convictions must be overturned because the evidence as to each count was insufficient to support a finding of guilt beyond a reasonable doubt. Even viewing the evidence in the light most favorable to the government, no rational juror could have found that Hough owned the funds in the foreign accounts or the medical schools and thus was responsible for U.S. tax on any unreported income; indeed, with respect to ownership of the schools, all of the evidence was to the contrary. The government also failed to present any evidence in support of a number of essential predicate facts that it needed to establish in order to prove Hough's knowledge and intent and the existence of unreported income, as well as the falsity of her answers on Schedule B. Just as the jury's verdict on count seven for the 2006 tax year was not based on any evidence and was overturned by the district court, so too were the remaining counts of conviction improperly founded on unsupported speculation and guesswork. Indeed, the jury's blatantly unsupported judgment on count seven was symptomatic of a far more widespread breakdown in its ability to understand the evidence presented at trial and/or the jury instructions, including the ultimate concept of reasonable doubt.

Even if this Court does not overturn Hough's convictions, a new trial must be granted because those convictions followed an unfair trial plagued by government misconduct and improperly admitted evidence. Over defense

objection, the government was allowed to ask two of Hough's three character witnesses whether their opinion of Hough's honesty would change if the government proved her guilty of the charges.  Despite the defense calling the district court's attention to binding case authority holding such cross-examination of character witnesses to be violative of due process and the presumption of innocence, the court refused to give a curative instruction and allowed the improper questioning to continue.  Given the central importance of the issue of Hough's credibility and character in this circumstantial case, and in accordance with consistent authority from this and other circuits, the error was not harmless and a new trial is required.

The district court also erred in admitting, over defense objection, statements of alleged coconspirator David Fredrick.  The absent Fredrick's hearsay emails and other out-of-court statements formed the focal point of the government's proof of the charged conspiracy.  Because there was no substantial evidence independent of those statements that established the existence of a tax conspiracy or Hough's membership in such a conspiracy, admission of the hearsay statements under the coconspirator exception was improper.

If this Court does not overturn Hough's convictions or order a new trial, then Hough's sentence must be vacated because the district court committed clear error in determining the tax loss resulting from the offense.  After finding that the government's entire theory underlying its expert's *third* set of tax loss calculations

was incorrect, the court nevertheless adopted those calculations based on its own separate theory that had never been argued by either party and that rested on an erroneous reading of the applicable regulations.  The district court further clearly erred in including in its criminal tax loss and restitution calculations income as to which the government's own expert admitted there was no evidence of Hough's knowledge and therefore no evidence of fraud.

## VI.

## ARGUMENT

**A.  HOUGH'S CONVICTIONS MUST BE OVERTURNED BECAUSE THERE WAS INSUFFICIENT EVIDENCE THAT SHE CONSPIRED TO DEFRAUD THE IRS OR THAT SHE KNOWINGLY AND WILLFULLY FAILED TO REPORT INCOME ON HER TAX RETURNS**

### 1.    Standard of Review

Whether there was sufficient evidence to support a conviction is reviewed *de novo*. *United States v. Jones*, 601 F.3d 1247, 1267 (11th Cir. 2010).  There is insufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found each of the essential elements of the crime beyond a reasonable doubt.  *United States v. Thomas*, 8 F.3d 1552, 1556 (11th Cir. 1993).  "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, then a

rational jury must necessarily entertain a reasonable doubt" and the evidence is therefore insufficient. *Cosby v. Jones*, 682 F.2d 1373, 1383 (11th Cir. 1982).

### 2.    Conspiracy to Defraud the United States (Count One)

The *Klein* conspiracy charge required the government to prove beyond a reasonable doubt a "common agreement" with the specific purpose of violating the law by defrauding the IRS, "established by evidence of actual knowledge by each participant." *United States v. Kottwitz*, 614 F.3d 1241, 1265 (11th Cir.), *opinion vacated in other part on rehearing*, 627 F.3d 1383 (11th Cir. 2010). The requisite knowledge of the object of the conspiracy "must be established by evidence that each alleged conspirator knew that the scheme would culminate in the filing of false tax returns." *Id.* Moreover, "[i]f the conspiracy evidence is circumstantial, it must warrant a jury finding that the conspirators operated with a *common design with unity of purpose* to impede the IRS based on reasonable inferences, and not mere speculation." *Id.* (internal quotations and citations omitted) (emphasis in original); *see Ingram v. United States*, 360 U.S. 672, 680, 79 S. Ct. 1314 (1959) (to prove conspiratorial intent, evidence of knowledge must be clear and unequivocal, and cannot consist of "piling inference upon inference").

Here, the government's purported proof of the charged conspiracy was entirely circumstantial and was insufficient to support a finding that Hough had the **specific intent to defraud the IRS** and knowingly entered into an agreement with Fredrick to achieve that end. This was not a question of credibility; a rational juror

could have fully believed every one of the government's witnesses and still been left with no basis for finding beyond a reasonable doubt that Hough entered into an agreement with the **specific purpose of defrauding the IRS**. There was no witness who testified that Hough was a tax cheat, was dishonest, or ever said anything about wanting or trying to evade taxes or defraud the IRS; to the contrary, Hough's accountant Thomas Murtha (a government witness) testified that Hough was conservative and conscientious about her taxes and corrected her own mistake on one occasion by filing an amended return that increased her tax liability. (10/10/13 RT 55-56, 63-64; Appx. 365-66, 371-72). School accountant David Minchenberg (another government witness) testified that Hough wanted to be in compliance with her tax obligations and fully cooperated with him in preparing her Form 5471 with respect to her interest in Round Hill Project Holding Company, which was inconsistent with someone trying to keep her foreign ownership a secret from the IRS.[15]  (10/11/13 RT 119-20, 142, 149-50; Appx. 448-52).

Indeed, rather than supporting a criminal objective of defrauding the IRS, the only evidence presented by knowledgeable, percipient witnesses regarding the purpose (or, more to the point, Hough's understanding of the purpose) of moving funds offshore and putting accounts in names of different entities was that those actions were undertaken to protect the assets of the Saba Foundation and the

---

[15] Form 5471 is an informational return to be filed by any person who maintains an ownership interest in a foreign entity.  (10/10/13 RT 261-62; Appx. 421-22).

schools from being seized in response to litigation.  Significantly, this was testified

to not only by Hough, but by the government's own witness Dr. Paul Dalbec, the

chairman of the Saba School's board of trustees.  (10/15/13 RT 147-55; Appx.

539-47).  This evidence of the legitimate asset-protection reason for moving the

schools' funds abroad was *uncontradicted* by any other testimony or document

introduced at the trial.

The *only* witness testimony that the government argued supported a finding

that Hough agreed and intended to defraud the IRS was her accountant Thomas

Murtha's statement that he "would have" asked Hough during an initial interview

in 2001 or 2002 whether she had a foreign bank account and that he "believed" she

answered no (while acknowledging that "I can't recall at this moment the exact

conversation I had," conceding that it was not his practice to ask such a question of

preexisting firm clients such as Hough, and speculating as to how he "probably

would have asked the question").  (10/9/13 RT 239-40; 10/10/13 RT 44-50; Appx.

344-45, 356-62).  Murtha was consistent, however, that he had *never* asked Hough

whether she had *signature authority* over a foreign bank account.[16]  (10/9/13 RT

---

[16] The government claimed in closing argument that Hough had denied to Murtha
in 2009 having signature authority over a foreign bank account.  (10/23/13 RT 39;
Appx. 999).  This statement is demonstrably false, as Murtha testified that he never
even asked Hough that question.  (10/9/13 RT 240; 10/10/13 RT 50-52; Appx. 345,
362-64).  Moreover, even had the question been asked, a "No" answer would have
been entirely truthful, as all foreign accounts over which Hough had signature
authority had been closed by the end of 2008.  (10/21/13 RT 229-30; Appx. 916-
17).

240; 10/10/13 RT 50-52, 92; Appx. 345, 362-64, 383).  Moreover, even accepting that Hough made the statement that Murtha conditionally and equivocally attributed to her, it does not prove beyond a reasonable doubt that she intended to obstruct the IRS; indeed, given Murtha's undisputed failure to inquire about signatory authority, a response that Hough did not "have" foreign accounts would have been 100% consistent with her testimony that she believed the accounts belonged to the Saba Foundation and not to her personally.

Nor was there any documentary evidence to compensate for the lack of witness testimony establishing Hough's knowledge of the object of the charged conspiracy.  Indeed, there was not a single document among the thousands of pages of bank records, emails, and other correspondence introduced at trial that had anything to do with the IRS.[17]  In opposing Hough's Rule 29 motion, and again in closing argument to the jury, the government relied on correspondence from Fredrick (**not** from Hough or even copied to Hough) that referenced closing the accounts in the Bahamas because of "changes in US & Bahamas banking policies."[18]  (Exhs. 3P pp.5-6, 3HH p.2; 10/21/13 RT 23-24; 10/23/13 RT 18-19; Appx. 164-65, 195, 821-22, 978-79).  The government, however, never offered any

---

[17] As the district court correctly noted when the government claimed that there were emails discussing Hough's and Fredrick's desire not to disclose their accounts to the IRS, no such emails exist.  (10/21/13 RT 23; Appx. 821).

[18] Although the referenced letter has both Fredrick's and Hough's names typed at the bottom, it is not signed by Hough, it appears on Fredrick's letterhead, and the phrasing of the letter ("my wife and I") makes clear that it was written by Fredrick alone.  (Exh. 3P p.6; Appx. 165).

evidence as to *what* the referenced changes in banking policies were, instead asking the jury to speculate that they related to a tax purpose of the conspiracy without any supporting evidence.[19] (10/23/13 RT 19; Appx. 979). Moreover, even were there any basis to infer that Fredrick had a tax evasion purpose in moving accounts from the Bahamas to Switzerland, there was no evidence that Hough shared that purpose or was even aware of the communications that the government claimed reflected her knowledge of and agreement to participate in a conspiracy to defraud the United States.

The only documents written or signed by Hough on which the government relied to establish her knowledge of the object of the conspiracy were: (1) the "Form A" account opening documents bearing Hough's signature and identifying her as a beneficial owner of some of the accounts, as to which the evidence established that at least one (and possibly all) was signed in blank, and which in any event revealed utterly nothing about Hough's purpose in opening the accounts and signing the documents (Exhs 3GG p.1, 3R p.1; Appx. 166, 193); (2) Hough's July 8, 2003 email to prospective school buyers about stock issuance concerns and forming an LLC, which had nothing whatsoever to do with the charged conspiracy (Exh. 6I; Appx. 221B); (3) a letter of intent executed by Hough and Fredrick on

---

[19] The only evidence in the record of what the "changes in banking policies" were is a file note by Luetolf stating that UBS Bahamas "no longer takes U.S. clients" – an explanation that has nothing to do with the IRS or tax evasion. (Exh. 3S p.23; Appx. 170).

July 7, 2003, which stated that they collectively and "directly or indirectly" held "the controlling interest in MUA/Nevis, SABA and 50% of MUA Belize" (again, this had nothing to do with the object of the alleged conspiracy) (Exh. 6D; Appx. 213); (4) Hough's March 2004 correspondence confirming Fredrick's request to split the existing Fredrick/Hough account into two accounts, which was devoid of any explanation of why Hough understood this was being done by Fredrick and had nothing to do with defrauding the IRS (Exh. 3HH p.27; Appx.197); (5) the voluminous purchase agreements with Equinox Capital, which Steven Rodger testified he negotiated with Fredrick and did not know if Hough ever read, and which again revealed absolutely nothing about Hough agreeing with anyone to defraud the IRS (Exhs. 10A, 10B, 10C); and (6) the guaranty executed by Fredrick and Hough in connection with the Equinox sale, which yet again had no bearing on whether Hough had the specific intention of entering into an agreement to defraud the IRS (Exh. 11A; Appx. 275A).  (10/16/13 RT 77-78, 86; 10/23/13 RT 16-17, 20-24, 31-32; Appx. 609-11, 976-77, 980-84, 991-92).

Thus, the jury was faced with two possible interpretations of Hough's mental state with respect to whether she knowingly entered into an agreement with the specific objective of defrauding the IRS.  On one side was Hough's account of her legitimate asset-protection purpose, supported by percipient eyewitness testimony presented in the government's own case-in-chief and unrebutted by any other testimony or document presented at trial.  On the other side was the

government's version, which was not based on any witness testimony, any statement by Hough, or any document signed by Hough, but rather required (1) piling supposition upon speculation with respect to ambiguous documents never signed by or brought to the attention of Hough; and (2) imputing the absent defendant Fredrick's purported knowledge and intent to Hough without any evidentiary basis for doing so. *See United States v. Mendez,* 528 F.3d 811, 814 (11th Cir. 2008) ("When the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction."); *United States v. Veal,* 703 F.2d 1224, 1229 (11th Cir. 1983) ("The crime of conspiracy by its very nature may lead to an improper jury finding of guilt by association with those found to be participants in the conspiracy. . . . This danger of transferred guilt is acute in this case where the evidence against the sole remaining defendant repeatedly refers to his relationship with persons who have suddenly and unexplainedly disappeared from the trial. The potential prejudice of such an occurrence is obvious." (internal quotations and citation omitted)).

Even if the evidence viewed in the light most favorable to the government lent equal circumstantial support to these competing theories, then a rational juror must necessarily have entertained a reasonable doubt as to whether Hough knowingly agreed to achieve the charged object of the conspiracy. *See Cosby,* 682 F.2d at 1383. Accordingly, the evidence was insufficient to support the conspiracy conviction. *See United States v. Adkinson*, 158 F.3d 1147, 1159 (11th Cir. 1998)

(reversing *Klein* conspiracy convictions where government's case was predicated on circumstantial evidence and there was no "substantial evidence that the defendants both agreed to and intended to impede the IRS"; such proof must be based on "reasonable inferences and not mere speculation"); *United States v. Pritchett,* 908 F.2d 816, 821-22 (11th Cir.1990) (reversing *Klein* conspiracy convictions where efforts at concealment of income were reasonably explainable in terms other than motivation to evade taxes and "[n]o statements of co-conspirators manifesting a desire to evade taxes were presented").

3.     Subscribing to False Tax Returns (Counts Six, Eight, and Nine)

As noted above, the jury found that Hough's tax returns for 2005, 2007, and 2008 were knowingly and willfully false in two respects:  that (1) Hough substantially underreported her total income on Line 22; and (2) Hough failed, on Schedule B, Part III, Lines 7A and 7B, to report that she had a financial interest in, or signature authority over, foreign financial accounts.

a.     Substantial Underreporting of Total Income

Government expert Maurer's analysis focused on three categories of total income – taxable interest, ordinary dividends, and capital gains or loss – emanating from the New Vanguard and Top Fast accounts at UBS, Fortis, and LLB, and (for 2005 only) the individual Hough UBS account.  (Exh. 30I; Appx. 285-88).  For 2007, Maurer also included the capital gains earned by New Vanguard from the April 2007 sale of the Round Hill property and the capital gains earned by the Saba

Foundation from the April 2007 sale of the Saba School; this required Maurer both to compute the basis of each asset and to determine the sales price of each asset based on the allocation in Equinox's Flow-of-Funds memorandum. (10/17/13 RT 18; Exh. 10F; Appx. 248, 654).

For the government to prove that Hough knew that she was substantially underreporting her taxable interest, ordinary dividends, and capital gains for a particular year, thereby intending to do something she knew violated the law, the government at a minimum had to prove beyond a reasonable doubt all four of the following facts: (1) Hough owned the Saba Foundation and the New Vanguard, Top Fast, and Patricia Hough accounts[20]; (2) those accounts generated taxable interest, ordinary dividends, and capital gains in that tax year; (3) those taxable interest, ordinary dividends, and capital gains were reportable by Hough on her U.S. tax returns; and (4) Hough *knew* that those accounts generated taxable interest, ordinary dividends or capital gains in a particular tax year such that she had to report that income on her tax return for that year. The only fact that Maurer's report and testimony arguably established, however, was the second of the four points above; with respect to points one (ownership), three (reportability), and four (knowledge), the government failed to introduce evidence sufficient to

---

[20] Maurer testified unequivocally that if Hough did not own the accounts or the schools, then any income from the accounts or the sale of the schools would not be included in her income tax computations. (10/17/13 RT 224; 10/18/13 RT 120-21, 138; Appx. 724, 775-76, 779A).

allow a rational juror to find those facts beyond a reasonable doubt, and therefore

to conclude beyond a reasonable doubt that Hough knowingly and willfully

substantially underreported her total income for the years charged.

   (1) <u>The government failed to prove that Hough owned the
     Saba Foundation, New Vanguard, Top Fast, and the
     funds in those entities' foreign bank accounts and the
     Patricia Hough UBS account</u>

    (a) Hough did not own the Saba Foundation

Although Maurer's tax analysis for more than four years before the trial had

been based on Fredrick and Hough *not* owning the Saba Foundation, she testified

that she changed her calculations based on evidence she heard for the first time at

trial that Fredrick and Hough owned the Saba Foundation.  (10/17/13 RT 236, 257-

60; 10/18/13 RT 28; Appx. 734, 739-42, 744).  Maurer attributed her mid-trial

about-face to certain documents presented during the testimony of Jean Marc

Futterknecht, the UBS custodian, and Mario de Castro, a former lawyer with the

firm that had represented a potential buyer of the schools in an unsuccessful bid in

2003.  Specifically, Maurer identified only Government Exhibits 3S (p.23), 3EE

(p.86), 6B, 6D, 6F, 6H, and 8B as having caused her radical change in position.[21]

(10/18/13 RT 40-41, 116-17; Appx. 748-49, 773-74).  None of those documents,

even when viewed in the light most favorable to the government, individually or

---

[21] Maurer also identified Government Exhibit 7II as supporting her reversal, but
recanted after admitting she had never seen the document, which had not been
admitted into evidence or published to the jury.  (10/18/13 RT 41, 78-81; Appx.
749, 767-70).

collectively established beyond a reasonable doubt that Hough owned the Saba Foundation:

- The referenced pages of Exhibits 3S and 3EE were client notes in the UBS files.  Exhibit 3S stated, "They own medical colleges in the Caribbean, University of Saba . . . .  Funds were moved to us from UBS Bahamas, which no longer takes U.S. clients, and originate from their schools/consulting business." (Appx. 170).  Exhibit 3EE stated, "The client and her husband are consultants, own and operate medical schools."  (Appx. 192B).  These notes were undated, unsigned, entered into the UBS system by some unknown person, and contained at least one glaring inaccuracy in referring to the "University of Saba," which does not exist.  (10/18/13 RT 74-77; Appx. 763-66).  UBS representative Futterknecht, who had no involvement with the accounts at issue here, testified that such notes can be entered by client advisors, assistants, external third parties, and others, and that he had no idea who made any of the entries in this case.  (10/8/13 RT 69-71; 10/9/13 RT 180; Appx. 298-300, 328).  Maurer similarly did not know who wrote the notes in question.  (10/18/13 RT 74-76; Appx. 763-65).  The unsourced and unreliable notes were not in any way connected with Hough and cannot constitute proof beyond a reasonable doubt of anything.

- While Fredrick claimed in an initial letter to the 2003 prospective buyers to be the sole owner of the Saba University School of Medicine, MUA and EIC (Exh. 6B; Appx. 211), there was no evidence that that letter was ever reviewed,

approved, signed, or even seen by Hough.  (10/10/13 RT 133-34; Appx. 387-88).

Moreover, Fredrick's statement that he was the sole owner, if accepted, would

**negate** rather than prove Hough's ownership.

- The letter of intent (Exh. 6D; Appx. 213) and agreement (Exh. 6F; Appx.

219) that were signed by Hough in connection with the aborted 2003 sale stated

only that Fredrick and Hough "directly or indirectly . . . have the controlling

interest in" or "own or control" the Saba Foundation, MUA, and EIC – which by

the plain terms of those documents does not prove ownership.  The evidence

showed that MUA was a for-profit Nevis corporation of which Fredrick owned a

majority share at that time; that Fredrick at all times owned 100% of EIC; and that

Fredrick, by virtue of his position on the boards of directors of the Saba

Foundation and MUA, was in a position to control the schools.  (10/10/13 RT 132,

147; 10/11/13 RT 22, 207-08; 10/18/13 RT 33-35; Appx. 386, 391, 435, 457-58,

745-47).  Thus, the cited language is wholly consistent with Hough's own lack of

ownership.

- As for the legal memorandum prepared by de Castro for his clients, that

hearsay memo – which the evidence failed to show was ever reviewed, approved,

signed, or even seen by Hough, and which was based on information received from

the potential buyers rather than from Hough and Fredrick – referenced the sellers

as owning the schools but also stated that it was a "Preliminary Assessment &

Draft" that was "subject to further . . . research and due diligence," which de

-35-

Castro testified never occurred.[22] (Exh. 8B p.2; 10/10/13 RT 101, 104, 133; Appx. 233, 384-85, 387).

- Finally, Exhibit 6H, the last document cited by Maurer, is an email from Fredrick to the potential buyers that mentions absolutely nothing about ownership of anything. (Appx. 221A).

Indeed, the overwhelming and unrebutted evidence at trial showed that no one did *or could* own the nonprofit Netherlands-Antilles Saba Foundation. Not one percipient witness testified that Fredrick and Hough owned the Saba School or the Saba Foundation. CPA Jerry Schneider, a government witness, testified that no individuals own a foundation and that, to his knowledge, the Saba Foundation could not be owned by anybody. (10/10/13 RT 233-34, 238; Appx. 405-06, 410). CPA Thomas Murtha, another government witness, testified that Hough did not own the medical schools, but rather that she and Fredrick administered schools that were owned by a nonprofit foundation. (10/9/13 RT 237; 10/10/13 RT 20-21; Appx. 342, 354-55). CPA David Minchenberg, another government witness, similarly testified that, to his understanding, a nonprofit foundation could not be owned by an individual. (10/11/13 RT 49; Appx. 439). Dr. Paul Dalbec, a government witness who had been a member of the board of trustees of the Saba

---

[22] The absence of due diligence on the ownership of the schools was evidenced by the fact that the memorandum identified the Saba School of Medicine Foundation as "Saba University Netherlands Antilles," a name it never had. (Exh. 8B p.3; 10/10/13 RT 237; Appx. 234, 409).

School for 19 years, testified that the school was owned by the Saba Foundation and not by any individual. (10/15/13 RT 113, 118-19; Appx. 522, 524-25). Dr. Alan Gruber, a former student and faculty member at the Saba School, testified that no one owned the school because it was a nonprofit organization. (10/17/13 RT 153; Appx. 688). Steven Rodger, a government witness whose firm bought the schools in 2007, testified that the Saba School was owned by the Saba Foundation and that Fredrick was only the "manager" of the school. (10/16/13 RT 9-10, 12, 18, 31-32, 133; Appx. 578-79, 581, 587, 600-01, 631). Mario de Castro, the government witness on whose testimony Maurer purported to rely in concluding that Hough and Fredrick owned the schools, testified that he did not know whether anyone could actually own the Saba Foundation. (10/10/13 RT 136; Appx. 390). Luis Rivera, a 24-year veteran of the IRS criminal investigation division, testified that it would be impossible for anyone to own the Saba Foundation. (10/22/13 RT 190; Appx. 967). And most significantly, Antoine Solagnier, the former Governor, Head of Finance, and Acting Public Prosecutor of the island of Saba and former Registrar of the Common Courts of the Netherlands-Antilles, testified that the Saba Foundation was a Netherlands-Antilles foundation, that "[t]here is no such thing as an owner of a foundation," that this is true for every foundation under Netherlands-Antilles law, and that the Saba Foundation (like every other Netherlands-Antilles foundation), *by definition* could not be owned by any individual. (10/18/13 RT 220-23, 229-31; Appx. 800-03, 806-08). The government introduced no evidence

-37-

to contradict this unequivocal explanation of Netherlands-Antilles law.[23]
Nevertheless, despite this plethora of consistent evidence to the contrary, Maurer
based her tax computations on her "opinion" that Fredrick and Hough owned both
the schools and the Saba Foundation.  (10/18/13 RT 163; Appx. 783).

This is not a question of Maurer's credibility.  Rather, it is a question of the
jury accepting what the unrebutted evidence at trial showed to be a **factual and
legal impossibility**.  The apparent belief of Maurer, who conceded that she had no
expertise in Netherlands-Antilles law dealing with nonprofit foundations (10/17/13
RT 209; Appx. 719), that the laws of the Netherlands-Antilles somehow did not
apply to this particular Netherlands-Antilles foundation cannot support a jury
finding that Hough (or anybody else) owned the Saba Foundation.  And if Hough
did not own the Saba Foundation, then she was not liable for any total income
adjustments for the Saba Foundation.  No rational juror could have found
otherwise.

---

[23] Apart from witnesses, the documents introduced at trial thoroughly refuted any
notion that Fredrick and Hough owned the Saba Foundation.  The accounting
methods in the independently audited financial statements for the Saba School,
introduced by the government, corroborated that the Saba School was run as a
nonprofit foundation.  (10/22/13 RT 181-88; Appx. 958-65).  Credit card records
showed that Hough was fastidious about reimbursing the Saba Foundation for all
personal expenses incurred on the credit card bills it paid for her – an act that
would have been utterly pointless if Hough believed that she "owned" the
Foundation and its assets.  (Exh. 205; 10/22/13 RT 6-8; Appx. 294-95, 930-32).

(b)     Hough Did Not Own New Vanguard or Top Fast

The government introduced no percipient testimony concerning the

ownership of New Vanguard and Top Fast, and the documents on which the

government relied conclusively showed that Hough was **not** an officer, director,

shareholder, representative, or authorized signatory for either entity. (Exhs. 3C

pp.39-41, 3CC pp.16, 20; Appx. 159-61, 191-92). There was not one document

that showed Hough communicating on either entity's behalf with Luetolf,

Singenberger, or anyone at Fortis or LLB (where New Vanguard and Top Fast also

had accounts). The only documents in the voluminous New Vanguard and Top

Fast bank files that even mentioned Hough's name were the single-page Form As

on which her name was typed as a beneficial owner of the accounts but that were

never signed or approved by Hough. (Exhs. 3C p.1, 3CC p.2; 10/18/13 RT 61-64,

69-72; Appx. 157, 189, 750-53, 758-61). Moreover, there was no evidence that

Hough ever initiated a single transaction on behalf of New Vanguard or Top Fast,

directed or approved of any transaction initiated by anyone else, or authorized or

signed any email, correspondence, or other document on either entity's behalf.

(10/21/13 RT 145-46; Appx. 886-87). Whether or not the jury accepted the

premise that the Hong Kong entities were set up as additional asset protection for

the Saba Foundation's funds, the record was simply bereft of evidence that would

have allowed a rational juror to find beyond a reasonable doubt that Hough owned

New Vanguard and Top Fast.

        (c)     Hough Did Not Own the Funds in the Patricia Hough UBS Account

Finally, with respect to the Patricia Hough UBS account, the evidence was undisputed that during the 15 months (April 2004 to July 2005) that this account was open and contained over $5 million, Hough did not initiate one transaction concerning the account, did not take any funds from the account, and made no deposits to the account. (10/21/13 RT 167-68; Appx. 897-98). Every penny of funds that had been transferred into the Patricia Hough account and that emanated initially from the Saba Foundation's Bahamanian accounts was, in turn, transferred to the New Vanguard UBS account set up by Luetolf and Singenberger. (10/17/13 RT 43; Appx. 655). The only writings by Hough on the account opening statements were her signatures on various forms; all the rest of the handwritten entries on the forms were not Hough's handwriting, and there was no evidence that any information on any of the forms was explained to Hough prior to her signing them. (10/21/13 RT 124-28, 161-62, 164-65; Appx. 876-80, 891-92, 894-95). This evidence was insufficient for a rational juror to conclude beyond a reasonable doubt that the money in the account was Hough's personal money and not, as she testified (and as government witness Dalbec corroborated), the Saba Foundation's money.

      (2)    <u>The government failed to prove that the foreign income earned by the Saba Foundation, New Vanguard, Top Fast and Patricia Hough accounts and transactions was reportable on Hough's U.S. tax returns</u>

Assuming *arguendo* that a rational juror could have found beyond a reasonable doubt that Hough owned the funds in the Saba Foundation, New Vanguard, Top Fast, and Patricia Hough accounts, the government was next required to prove beyond a reasonable doubt that the taxable interest, ordinary dividends and capital gains earned in those foreign accounts or through foreign-based transactions were reportable on Hough's U.S. tax returns. The only evidence that the jury heard on this issue, however, was directly to the contrary. CPA David Minchenberg, the former accountant for the schools and a government witness, testified about an email that he sent to Hough on December 23, 2004. In that email, Minchenberg advised his client:

> Generally, US citizens are allowed to own interest(s) in foreign entities. Usually, the only time a tax is "triggered" is when the US citizen brings money (in the form of profits, gains, etc.) back into the US. That said, **if the citizen is the beneficiary of said profits, gains, etc. and keeps those funds "off-shore" and doesn't bring them back into the US, then, there are generally no taxes incurred by the US citizen**.

(Exh. 7S (emphasis added); Appx. 230). That email was the **only** evidence introduced at trial regarding U.S. taxability of foreign bank accounts.[24]

---

[24] At the sentencing hearing, Maurer confirmed the accuracy of Minchenberg's advice. (5/1/14 RT 150; Appx. 1027).

-41-

Maurer's analysis calculated what was earned in each of the Swiss accounts, but performed no tracing to see whether any of the taxable interest, ordinary dividends, and capital gains earned in the Swiss accounts for the Saba Foundation, New Vanguard, Top Fast, and Patricia Hough were ever repatriated to the United States. Indeed, the *only* tracing of which any evidence was presented at trial was performed by defense expert witness Luis Rivera, who determined that the funds from the 2007 sale to Equinox still reside today with the Saba Foundation in offshore accounts that total over $54 million. (10/22/13 RT 157-65; Appx. 944-52). That expert testimony was unrebutted by any other evidence.

With respect to the Patricia Hough UBS account, while Hough is obviously not a "foreign entity" like New Vanguard, Top Fast, and the Saba Foundation, the last two sentences of Minchenberg's above-quoted advice were plainly broad enough to cover personal assets where profits and gains from those assets are kept offshore and not brought into the United States. Moreover, the evidence was undisputed that not one penny in the Patricia Hough UBS account was moved anywhere during the 15 months that the account remained open.

Because the **only** evidence the government presented of whether Hough had to report interest, dividends, and capital gains that originated abroad and stayed abroad was that such income was ***not*** reportable, no rational juror could have found beyond a reasonable doubt that any income derived from the foreign accounts was reportable on Hough's tax returns.

    (3)    <u>The government failed to prove Hough's actual knowledge that any of the foreign accounts or transactions earned taxable interest, ordinary dividends, or capital gains that were reportable on her U.S. tax returns</u>

Even if a rational juror could somehow have found beyond a reasonable doubt (1) that Hough owned the Saba Foundation, New Vanguard, and Top Fast, (2) that those entities and the Patricia Hough UBS account earned taxable interest, ordinary dividends and capital gains, and (3) that such income was reportable on Hough's tax returns for the years at issue, that would *still* be insufficient to support Hough's convictions.  For in order to prove that Hough willfully violated a known legal duty, the government was also required to establish beyond a reasonable doubt that Hough *knew* that the accounts earned taxable interest, ordinary dividends, and capital gains, and that such income was reportable.  On this essential point, the trial record is silent.

No testimony or other evidence was presented demonstrating that Hough knew that the accounts and transactions that formed the basis for Maurer's report generated any interest, dividends or capital gains.  The bank records showed that the New Vanguard and Top Fast statements (from UBS, Fortis, and LLB) went to Sinco Treuhand AG in Zurich, and the Patricia Hough UBS account and Saba Foundation LLB statements were retained by the banks; there was no evidence that any statements were ever sent to or reviewed by Hough.  (10/9/13 RT 9; Exhs. 3C p.37, 3R p.2, 3CC p.3, 4G p.9, 4H pp.1-2, 4K p.9; Appx. 158, 167, 190, 199, 201-

02, 209, 302). There was no evidence that Hough instructed any trades in any of the accounts or that anyone ever communicated with Hough about whether the accounts earned money, stayed the same, or lost money. Hough's only instruction to Luetolf with respect to the UBS account in her name was to close it down and transfer the money to another account. (Exh. 3S p.9; Appx. 169).

With respect to the capital gains earned by New Vanguard from the April 2007 Round Hill transaction and by the Saba Foundation from the April 2007 sale of the Saba School, there is similarly no evidence that Hough actually knew whether those transactions generated any capital gains. As Maurer testified, to determine whether any reportable capital gains occurred, one has to know the cost basis for the asset and subtract that basis from the sales price. (10/17/13 RT 18; Appx. 654). Thus, for example, if the Round Hill property had been allocated only $3 million as part of the overall purchase price of the schools, then the over $3 million basis calculated by Maurer for that property would have resulted in there being no capital gain from the sale of Round Hill. (10/17/13 RT 134; Appx. 681).

Even affording full credit to Maurer's calculations of the capital gains for the April 2007 Round Hill and Saba School of Medicine sales, **there is not a scintilla of evidence in the trial record that Hough knew the sales prices allocated to each asset, knew the basis for each asset, and consequently knew whether any capital gains for each asset were earned at all**. As government witness Stephen Rodger testified, Hough had no involvement in deciding the

allocation of the sales proceeds, which was negotiated solely by Fredrick and the attorneys.  (10/16/13 RT 14-15, 39, 87-88; Appx. 583-84, 605, 612-13).  There is no evidence in the record that Fredrick (or anyone else) ever discussed the allocation of funds from the sale with Hough or that she ever even saw the Flow-of-Funds document.  (Exh. 10F; 10/21/13 RT 251-52; Appx. 248, 919-20).  No rational juror could have found beyond a reasonable doubt that Hough knowingly and willfully understated her income in light of the government's failure to introduce any testimony or documentary evidence proving that she knew there was any income to understate.[25]

Moreover, even had the government proved that Hough knew that the accounts and transactions considered by Maurer generated interest, dividends, or capital gains, the trial record contains no evidence that Hough knew such foreign-based income was reportable on her tax returns.  Without such knowledge, Hough could not have willfully violated a known legal duty by failing to include that income.  As discussed above, the only evidence of what was communicated to Hough in this regard was CPA Minchenberg's advice that such income was ***not***

_____

[25] As discussed further in Section VI.D.3 *infra*, Maurer testified at the sentencing hearing that she was aware of **no evidence** that Hough knew of the existence of interest or dividends, knew the basis for any of the attributed capital gains, or was aware of the sales price allocated to the Round Hill property in the 2007 sale. (5/1/14 RT 101-06, 109-10, 113-15; Appx. 1014-24).  Given that Maurer sat through the entire trial to testify as a summary witness (10/17/13 RT 244-45; Appx. 735-36), her testimony at the sentencing hearing is a concession that no evidence as to any of these points was introduced at trial.

reportable as long as it remained offshore. For this purpose, it is irrelevant whether Minchenberg's counsel was accurate or inaccurate; as the district court instructed the jury, "[e]vidence that the defendant, in good faith, followed the advice of an accountant or an attorney would be inconsistent with [] an unlawful intent." (10/23/13 RT 156; Appx. 1005). Because the only evidence the government presented of whether Hough knew that she had to report interest, dividends, and capital gains that originated abroad and stayed abroad was that Minchenberg specifically told her that she did ***not*** need to report such income, no rational juror could have found beyond a reasonable doubt that she knew the income was reportable and intended to violate the law by failing to include it on her tax returns.

> b.    Schedule B, Lines 7a and 7b

Line 7a of Schedule B asked the following question for each tax year at issue, after which it gave the choices "Yes" or "No":  "At any time during [tax year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?  **See page B-2 for exceptions** and filing requirements for Form TD F 90-22.1." (emphasis added).  Line 7b stated as follows for each tax year:  "If 'Yes' [to question 7a] enter the name of the foreign country."[26]  (Exhs. 1D p.5, 1G p.5, 1H p.5; Appx. 105, 116, 125).  Thus, the question on line 7a was *not* "Do you

---

[26] Hough's return for each of the years in question answered the question on line 7a "No" and consequently did not list any foreign country in response to the question on line 7b.

have an interest in or a signature or other authority over a foreign bank account";
rather, the question in its entire context asked whether the taxpayer had an interest
in or a signature or other authority over a foreign account *that did not fall within*
*the "exceptions" on "page B-2."* If any of those exceptions applied in Hough's
case, then her answer of "No" was a true and correct answer.

Thus, to prove that Hough knowingly and willfully answered the question on
line 7a falsely, the government had to prove both (1) that Hough objectively had
"an interest in or a signature or other authority over" a foreign financial account
that did not fall within the "exceptions" on "page B-2", and (2) that Hough
subjectively *knew* she had "an interest in or signature or other authority over" a
foreign financial account that did not fall within the "exceptions" on "Page B-2."
On both the objective and subjective levels, this required at a minimum that the
government introduce evidence of what the "page B-2 exceptions" were for each
tax year at issue. Yet **the record is devoid of any documentary or testimonial**
**evidence on this point**. As Maurer testified, the exceptions are not delineated on
Schedule B or anywhere else in Hough's tax returns, but are found in a separate
IRS instruction document. (10/18/13 RT 152-53; Appx. 780-81). The government
failed to introduce that document, any other record that listed the page B-2
exceptions, or even any testimony from the government's expert or any other

witness as to what the page B-2 exceptions were.[27]  In light of this complete

absence of proof, no rational juror could have found beyond a reasonable doubt

either that Hough's negative answers on line 7a were objectively false or that

Hough subjectively knew the answer was false and intended to violate the law.

Furthermore, in any prosecution for making a false statement, the law

requires at a minimum that the question to which the defendant responded be clear

and unambiguous.  *See Bronston v. United States*, 409 U.S. 352, 362, 93 S. Ct. 595

(1971).  In *United States v. Manapat*, 928 F.2d 1097 (11th Cir. 1991), this Court

affirmed the dismissal of an indictment charging the defendant with having

knowingly and willfully made a false statement to the Department of

Transportation.  Although it was "undisputed that defendant's answers to the

questions were literally false," the manner in which the questions were listed

rendered them "too ambiguous to allow a jury to speculate as to the defendant's

intentions at the time she filled out the application form."  *Id.* at 1100-01.

Accordingly, this Court held that "the government may not provide someone with

a confusing and ambiguous form and then prosecute when the answers are

inaccurate."  *Id.* at 1102.

---

[27] Thomas Murtha, Hough's accountant and tax preparer, testified not only that he never showed Hough a Schedule B or discussed it with her, but also that he had no idea what the exceptions on page B-2 were (or even where to find page B-2) and therefore never discussed those exceptions with her.  (10/10/13 RT 50-51, 58-60; Appx. 362-63, 368-70).  Maurer testified that she had no idea if Hough knew whether or not the exceptions applied.  (10/18/13 RT 156; Appx. 782).

The problems with Schedule B as it existed at the time of the tax returns in this case are comparable to those in *Manapat*. The failure to define anywhere in Schedule B (or anywhere else in the Form 1040) the "exceptions" that were incorporated into the question on line 7a but were contained in some unidentified, extraneous document rendered that question "fundamentally ambiguous."[28] *Id.* at 1101. In light of this fatal ambiguity, no rational juror could have found beyond a reasonable doubt that Hough's responses to the question on line 7a were knowingly and willfully false.

For all of the above reasons, the evidence was insufficient to support the convictions on counts six, eight, and nine with respect to both understatement of income and Schedule B, and those convictions must be vacated.

---

[28] The *Manapat* court found that the ambiguity of the form was made more evident by the government's own doubts about the clarity of the form, as reflected in an internal Department of Transportation memo recommending that the form be changed. *Manapat*, 928 F.2d at 1101 n.3. In this regard, it should be noted that the IRS, beginning in 2009 (the year after the last tax return at issue in this case), revised Schedule B to list the instructions (including the exceptions) on page 2 of the schedule itself, and, beginning in 2011, further revised line 7a of Schedule B to separate the reference to "exceptions" into an entirely separate question from the one asking about interest in or authority over a foreign financial account. (CR 138 Exh. A; Appx. 49).