**B.**    **IF HOUGH'S CONVICTIONS ARE NOT VACATED, THEN SHE MUST BE GRANTED A NEW TRIAL BECAUSE THE GOVERNMENT'S IMPERMISSIBLE CROSS-EXAMINATION OF HER CHARACTER WITNESSES DENIED HER DUE PROCESS OF LAW**

1.    Standard of Review

A district court's rulings regarding cross-examination of witnesses are reviewed for abuse of discretion. *United States v. Wilson*, 983 F.2d 221, 223 (11th Cir.1993). The court's discretion in this regard "is accompanied by heavy responsibility . . . to protect the practice from any misuse." *Michelson v. United States*, 335 U.S. 469, 480, 69 S. Ct. 213 (1948). Whether a defendant has been denied due process of law is reviewed *de novo*. *Lonyem v. U.S. Att'y Gen.*, 352 F.3d 1338, 1341 (11th Cir. 2003). The record is also reviewed *de novo* when conducting a harmless error analysis. *United States v. Henderson*, 409 F.3d 1293, 1301 n.4 (11th Cir. 2005).

2.    A New Trial is Required Because the District Court Violated This Circuit's Clear Law in Allowing the Government to Cross-Examine Hough's Character Witnesses With Guilt-Assuming Hypotheticals, to Hough's Prejudice

a.    Background

Hough's knowledge and intent, crucial to satisfying the elements of the crimes for which she was charged, constituted the central focal point of the defense. To this end, in addition to Hough testifying in her own defense at trial, the defense preceded her testimony with three character witnesses who testified as to their high opinion of Hough's character for honesty and truthfulness.

Hough's first character witness, medical psychologist Dr. Alan Gruber, testified that he believed Hough to be "extremely honest" and "very straightforward," that he had never known her even to exaggerate, that "it would make her extraordinarily uncomfortable to bend rules or cut corners," and that his opinion had been consistent throughout the 16 or 17 years that he had known her. (10/17/13 RT 149, 182; Appx. 684, 709).  Gruber was asked on direct examination if his opinion would change if he were told that the government was alleging that Hough took millions of dollars from the Saba Foundation, hid the money for her own use in secret Swiss bank accounts, failed to declare income from those accounts on her tax returns, and conspired with her husband and others to defraud the United States; he replied that he "would be flabbergasted," that "it's just not who she is," and that he had "never known her not to play by the rules."  (10/17/13 RT 182-83; Appx. 709-10).  The following questioning ensued on cross-examination by the government:

> Q:    And I think Mr. Saunders asked you, if you heard the allegations that were in this indictment, that Fredrick and Hough conspired with each other and others to defraud the Internal Revenue Service, that would not change your opinion; is that correct?
>
> A:    Yeah, the question still confuses me.  The allegation doesn't change my mind.  I would just be very surprised if the allegation were true.  I guess that's what I am trying to say.
>
> Q:    And if that was proven, that Fredrick and Hough did conspire to defraud the Internal Revenue Service by not reporting the sale of the medical schools on their tax returns, because they would – would be required to do so, if that was proven, would that change your opinion?
>
> MR. SAUNDERS:  Objection, Your Honor, "if that were proven" is an improper question at this point.

THE COURT:  Overruled.

A:      Yeah, I would be very surprised.

Q:      Would it change your opinion about them?

A:      Yes.

MS. FINLEY:  Thank you, Your Honor.  No further questions.

(10/17/13 RT 196-97; Appx. 711-12).

The following day, prior to calling its next character witness, the defense alerted the district court to the controlling case of *United States v. Candelaria-Gonzalez*, 547 F.2d 291 (5th Cir. 1977).[29]  In that opinion, copies of which were provided to the court and to the government, the court reversed the defendant's conviction because the prosecutor had been allowed to ask two of the defendant's three character witnesses whether the defendant's reputation for truth and veracity would be affected if he were convicted of the narcotics trafficking charges at issue in that trial.  *Id.* at 293.  The *Candelaria-Gonzalez* court explained:

> The district judge below abused [his] discretion when he permitted the prosecution to ask these hypothetical questions on cross-examination. Once the defendant places his reputation in issue, the prosecution has wide latitude to pursue the reputation of the accused on cross-examination. . . .  The nature of the questions put to [the defendant's] witnesses by government counsel, however, was a far cry from any concept of formulated community opinion.  Rather, the questions posed sought speculative responses resting upon an assumption of guilt.  Government counsel asked if [the defendant's] reputation would be affected if he were convicted of the alleged crime.  These hypothetical questions struck at the very heart of the presumption of innocence which is fundamental to Anglo-Saxon concepts of fair trial. **We think that the risk of prejudice to defendant's basic rights**

---

[29] The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**from such questions requires reversal.  The questions put have no place in a criminal trial.**

*Id.* at 294 (citations omitted, emphasis added).[30]

When defense counsel raised *Candelaria-Gonzalez* with the district court in order to avoid compounding the error with the remaining character witnesses, the court incorrectly stated that there had been no objection to the question and therefore there was no error.  (10/18/13 RT 182; Appx. 788).  When defense counsel pointed out that there had in fact been an objection and asked for a curative instruction regarding the prior day's improper questioning, the district court denied that request based solely on a purported distinction between opinion and reputation character evidence:

> THE COURT:  It's a different situation.  The question yesterday was the witness's personal opinion, not his reputation in the community.  And he gave what his personal opinion was.  That's different than the case you've just given me.
> MR. SAUNDERS:  I think in both situations, Your Honor, it asks the witness to assume the defendant's guilt, and reverses the presumption of innocence; and I think that was what concerned the *Candelaria-Gonzalez* court, that the question itself requested a presumption of guilt, whether it's offered in the form of reputation or opinion testimony, that assumption in a criminal case before the case has been submitted to the jury is improper.
> THE COURT:  I disagree.

(10/18/13 RT 183-84; Appx. 789-90).

---

[30] Although the *Candelaria-Gonzalez* court found that the district court had also mistreated defense counsel and demonstrated bias, its language regarding the improper cross-examination makes clear that such questioning alone required reversal of the defendant's conviction.  This reading has been confirmed by the Fifth Circuit.  *See United States v. Smith-Bowman*, 76 F.3d 634, 637 (5th Cir. 1996) ("While the judge's misconduct was at issue in *Candelaria-Gonzalez*, . . . the repeated improper questioning was enough in and of itself to justify reversal.").

-53-

With no curative instruction given, the defense then proceeded to call its next character witness, retired Oklahoma District Judge Thomas Walker, who had known Hough for nearly 50 years.  Like Gruber, Walker expressed an overwhelmingly positive opinion of Hough's character for honesty and truthfulness.  He testified that Hough's character was "absolute top drawer," that he had never had reason to doubt her integrity, and that his opinion of her character for honesty had been consistent across all the years that he had known her. (10/18/13 RT 204-05; Appx. 795-96).  Walker further testified that the nature of the allegations in the case did not change his opinion of whether Hough is an honest and truthful person because the person described in those charges is "just not the Pat Hough that I've known for all these years."  (10/18/13 RT 206-07; Appx. 797-98).

Despite having been alerted to the binding authority of *Candelaria-Gonzalez*, and presumably emboldened by the district court's ruling, the prosecutor again wrapped up her cross-examination by improperly having this character witness assume proof of Hough's guilt before the jury in asking if that would change his opinion of her honesty:

Q:    And, as a judge, you would want to consider all of the evidence before forming an opinion, would you not?
A:    Well, of course.
Q:    And so you would want to keep an open mind.
A:    Sure.
Q:    And so it's possible, if you heard all the evidence, that you might change your opinion about whether Hough is honest or not.

MR. SAUNDERS:  Objection, speculation, Your Honor, and foundation.

THE COURT:  Overruled.

A:  Well, sure.

MS. FINLEY:      No further questions, Your Honor.

(10/18/13 RT 215; Appx. 799).

>   b.   The District Court's Ruling Allowing the Government's
>        Improper Questioning and Denying a Curative Instruction Was
>        Error

The government's questioning of Hough's character witnesses was improper

under *Candelaria-Gonzalez*.  In overruling the defense's objections, the district

court distinguished that case from the instant one on the grounds that *Candelaria-*

*Gonzalez* involved reputation evidence rather than opinion evidence to prove good

character.  This Court, however, has held that the guilt-assuming hypothetical is

"equally inappropriate" and violative of the defendant's due process rights whether

a character witness is testifying to opinion or reputation.  *United States v. Guzman*,

167 F.3d 1350, 1352 (11th Cir. 1999).  In *Guzman*, this Court firmly reiterated that

"[t]he government may not . . . pose hypothetical questions that assume the guilt of

the accused in the very case at bar" because such questions "strike at the very heart

of the presumption of innocence" that is fundamental to a fair trial.  *Id.* (internal

quotations and citation omitted).

Other circuits are in accord that there is no basis for distinguishing between

opinion and reputation testimony in finding the asking of guilt-assuming

hypotheticals to be constitutional error.  *See e.g.*, *United States v. Mason*, 993 F.2d

406, 408-09 (4th Cir. 1993); *United States v. Shwayder*, 312 F.3d 1109, 1121 (9th

Cir. 2002) ; *United States v. Oshatz*, 912 F.2d 534, 539 (2d Cir. 1990); *United States v. Williams*, 738 F.2d 172, 177 (7th Cir. 1984); *United States v. McGuire*, 744 F.2d 1197, 1204 (6th Cir. 1984).  Those courts, like this one, have consistently held that guilt-assuming hypotheticals impair the presumption of innocence and thus are a constitutional violation of due process.  *See, e.g., Mason*, 993 F.2d at 409 ("[I]n addition to a proper application of the rules of evidence, adherence to a basic concept of our justice system, the presumption of innocence, is not served by this line of questioning."); *Shwayder*, 312 F.3d at 1121 ("Following almost every other circuit that has addressed the question, we now hold that the use of guilt assuming hypotheticals undermines the presumption of innocence and thus violates a defendant's right to due process.") (footnote omitted); *Williams*, 738 F.2d at 177 (allowing guilt-assuming hypotheticals "is error because it assumes away the presumption of innocence").

Here, defense counsel, upon doing preliminary research in the evening following Gruber's testimony, acted to preserve Hough's right to a fair trial and to avoid compounding the existing error by immediately alerting the district court and the government to *Candelaria-Gonzalez*.  The district court's attempt to distinguish that decision was meritless, as this Court held in *Guzman*, and therefore the court abused its discretion in allowing the questioning of Gruber to remain and refusing to provide a curative instruction to the jury.  The district court then compounded the constitutional error by failing to prevent the government's improper cross-

examination of the next character witness.  Although the government phrased its question to Walker more cagily than its question to Gruber, the effect was the same; because "all the evidence" could only change the witness' opinion of Hough if it proved her guilt, the question effectively asked Walker to assume Hough's guilt (and he plainly did so in responding that his opinion would change).  Indeed, the question posed to Walker is little different from questions that have been held to be improper in other cases.  *See, e.g.*, *Oshatz*, 912 F.2d at 537; *Williams*, 738 F.2d at 177; *Candelaria-Gonzalez*, 547 F.2d at 294-95.

The cross-examination of Hough's character witnesses "was neither an inquiry into specific instances testing the witnesses' knowledge nor exposure of the witnesses' bias as contemplated by the Federal Rules," but rather "allowed the prosecution to foist its theory of the case repeatedly on the jury and to force an unsuspecting witness to speculate on the effect of a possible conviction." *Williams*, 738 F.2d at 177.  The district court's repeated allowance of this highly improper and prejudicial questioning negated Hough's presumption of innocence and violated her right to due process.  *See Shwayder*, 312 F.3d at 1121; *Williams*, 738 F.2d at 177.

      c.    <u>The Error Resulting From the Improper Cross-Examination Was Not Harmless</u>

Although the error that results from the posing of guilt-assuming hypotheticals is subject to harmless error analysis, *see Guzman*, 167 F.3d at 1352,

the repeated error in this case cannot be viewed as harmless in the context of the entire trial record.

Where constitutional error is involved, reversal is required unless the court finds that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824 (1967).  In cases of nonconstitutional error, reversal is required if the error resulted "in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Lane*, 474 U.S. 438, 449, 106 S. Ct. 725 (1986) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239 (1946)).  This Court has not decided which standard applies to error resulting from guilt-assuming hypothetical questions on cross-examination, but assumed *arguendo* in *Guzman* that the more stringent *Chapman* standard applied.  *Guzman*, 167 F.3d at 1353.  Other courts have similarly applied the constitutional harmless error standard to this issue.  *See, e.g.*, *United States v. Polsinelli*, 649 F.2d 793, 797-98 (10th Cir. 1981).  Because the use of guilt-assuming hypotheticals on cross-examination of character witnesses constitutes a due process violation, *see Shwayder*, 312 F.3d at 1121, the constitutional standard should be applied here, and the district court applied that standard in finding that any error was harmless beyond a reasonable doubt.[31]  (CR

---

[31] The district court stated in its order denying Hough's motion for a new trial that "[n]o one who sat through this trial would have any doubt at all that the responses to the disputed questions to the character witnesses had no impact on the jury's determination of the facts of the case." (Appx. 69).  The court, however, provided

157 p.8; Appx. 69).  Whichever standard is applied, however, reversal of Hough's convictions is required by the district court's repeated allowance of improper questioning that this Court has held "destroy[s]" the presumption of innocence. *Candelaria-Gonzalez*, 547 F.2d at 295.

In *Guzman*, this Court found the error to be harmless beyond a reasonable doubt based on two factors:  (1) the "overwhelming" evidence of the defendant's guilt; and (2) the fact that the character witness refused to accept the proposed assumption or to state that her opinion would change.  *Guzman*, 167 F.3d at 1353. In *United States v. Fagan*, 518 Fed. Appx. 749, 755 (11th Cir. 2013), this Court found the error resulting from guilt-assuming hypotheticals posed to a single character witness harmless because (1) the character witness refused to accept the guilt-assuming premise, and (2) the court gave a curative instruction to the jury on the next day of trial.  Similar factors, as well as the relatively small number of improperly questioned witnesses in relation to the number of character witnesses as a whole, have been cited in other cases in which harmless error has been found. *See, e.g.*, *Oshatz*, 912 F.2d at 541 (finding error harmless where judge gave "prompt and sufficient cautionary instructions" and evidence of guilt was "so substantial as to preclude any reasonable likelihood that the improper cross-

---

no analysis or citation to any supporting evidence in support of this blanket statement.  It should be noted that the district court also continued to maintain that there had been no error, notwithstanding the abundant case authority to the contrary.  (*Id.*).

examination contributed to the verdicts"); *United States v. Siers*, 873 F.2d 747, 749-50 (4th Cir. 1989) (finding error harmless where improper questions were asked to only two of defendant's 14 character witnesses, but "invit[ing] the attention of the district courts and the bar to the fact that the government frequently will not be in such luck as to be able successfully to claim harmless error for cross examination of character witnesses in the manner engaged in by the government in this case"); *Williams*, 738 F.2d at 177 (finding error harmless where defendant did not testify and case did not turn on defendant's credibility); *United States v. Hewitt*, 663 F.2d 1381, 1391 (11th Cir. 1981) (finding error harmless where hypothetical question did not ask witness to assume defendant's guilt in the same matter for which he was standing trial, and witness did not alter her evaluation of defendant's reputation in response to question); *see also Shwayder*, 312 F.3d at 1121-22 (where no objection was made at trial, finding no plain error because character witnesses refused to answer improper hypothetical questions and, when they did answer, refused to modify their opinions).

None of the factors on which this Court and others have relied to find the constitutional error resulting from guilt-assuming hypotheticals harmless applies here.  To begin with, unlike *Guzman* and *Oshatz*, the evidence in this case was far from overwhelming.  The government's case was highly circumstantial and depended almost entirely on Hough's signatures on documents prepared by others that she denied having read or understood.  Indeed, this trial was remarkable in that

of the 20 witnesses in the government's case-in-chief against Hough, *not one* had a bad word to say about her.  There was no witness who testified to the existence of an agreement to defraud the IRS; no witness who testified what Hough was told by Fredrick, Luetolf, or Singenberger about the purpose of the foreign accounts or the ownership of the funds therein; no witness who testified that Schedule B was ever reviewed by or explained to Hough; no witness who testified that Hough ever said anything about wanting or trying to evade taxes; no witness who testified that Hough was knowledgeable or sophisticated about banking, taxation, or financial matters; no document in which Hough (or Fredrick) made any reference to evading taxes or to the IRS; no evidence that Hough ever initiated a single transaction into or out of any of the foreign accounts; and no evidence that Hough ever directed the use of any of the funds in any of the foreign accounts for her own personal benefit. Moreover, in a case that centered on foreign bank accounts, not one of the government's 20 witnesses knew anything relevant about any of the accounts at issue; there was no witness from Sinco Treuhand, Fortis, or LLB, and the lone witness from UBS was a custodian of records who had never met or spoken with Luetolf and had no knowledge about the facts of this case.  (10/9/13 RT 110-11, 130-31; Appx. 309-12).  In the absence of such evidence, this case turned on Hough's state of mind with respect to the documents and accounts at issue and her credibility while testifying.  As such, unlike in *Williams*, Hough's character for

honesty was the linchpin of the entire trial. The improper questioning of her character witnesses went directly to that central issue and was grossly prejudicial.

Unlike *Guzman*, *Fagan*, *Hewitt*, and *Shwayder*, in which the character witnesses refused to alter their opinions based on the improper hypotheticals, both Gruber and Walker told the jury that their long-held positive opinions of Hough's honesty would in fact change if the government were to prove her guilt. These concessions, repeatedly and aggressively pursued by the government, implicate the precise reason why such questions are violative of due process. *See Guzman*, 167 F.3d at 1353 ("The harm in allowing the use of this type of improper hypothetical lies in the effect of having the defendant's own character witness assume that the defendant is guilty."). Moreover, unlike *Siers*, in which improper questions were asked to only two of 14 character witnesses, the improper hypotheticals here were posed to two out of Hough's three character witnesses – just as in *Candelaria-Gonzalez*. Unlike *Hewitt*, the questions sought an assumption of guilt of the very charges for which Hough was on trial. Finally, unlike *Fagan* and *Oshatz*, the district court refused to give any cautionary, limiting, or curative instruction to the jury, either at the time of the questioning or at any time thereafter.

Rather, this case falls directly in line with those cases that have declined to find harmless error and have reversed convictions based solely on the improper use of guilt-assuming hypotheticals. In *Polsinelli*, for example, the defendant called three character witnesses in his defense, two of whom were asked if their opinion

of the defendant's reputation would change if they became aware that he had

distributed cocaine (referring to the alleged distributions for which the defendant

was on trial). *Polsinelli*, 649 F.2d at 794-95. Having found that the questioning

was improper, the court further found that the error was not harmless beyond a

reasonable doubt. *Id.* at 797-98. The court noted that the case essentially turned

on the word of the defendant (who testified in his own defense) against the word of

the key government witness, with no corroborating evidence of the defendant's

version; as such, "the testimony of the character witnesses . . . assumed a position

of greater importance than would be true in the ordinary case." *Id.* at 798. The

character witnesses served "[t]o bolster [the defendant's] own testimony

concerning his character, as well as to establish his innocence." *Id.* Accordingly,

the improper posing of questions that "assumed as a fact that [the defendant] was

guilty of the very crimes for which a jury had been impaneled to decide his guilt or

innocence" was not harmless.[32] *Id.*; *see also Mason*, 993 F.2d at 409 (improper

guilt-assuming hypothetical questions to two of the defendant's three character

---

[32] The *Polsinelli* court also relied for its harmfulness finding on the fact that both
of the improperly questioned character witnesses responded that the hypothetical
fact would not change their opinions. *Polsinelli*, 649 F.2d at 794-95. This Court,
however, has repeatedly made clear that it is the character witness' *acceptance* of
the posed assumption, and not its rejection, that is prejudicial. *See Fagan*, 518
Fed. Appx. at 755; *Guzman*, 167 F.3d at 1353; *Hewitt*, 663 F.2d at 1391;
*Candelaria-Gonzalez*, 547 F.2d at 293 nn.2, 3. Here, both witnesses conceded that
their opinion of Hough's character for honesty would or could change if the
government proved her guilt. As this Court's prior decisions make clear, the
prejudice from such responses is manifest.

witnesses held not harmless, under nonconstitutional "reasonable likelihood" standard, where there was little direct evidence of defendant's guilt); *Candelaria-Gonzalez*, 547 F.2d at 294-95 (reversing convictions of two defendants based on guilt-assuming hypotheticals posed to two out of three character witnesses without even engaging in harmlessness analysis, finding that "the risk of prejudice to defendant's basic rights from such questions **requires reversal**") (emphasis added).

The guilt-assuming questions asked by the government, and twice allowed by the district court, "have no place in a criminal trial." *Candelaria-Gonzalez*, 547 F.2d at 294. In a thin circumstantial case that had as its central issue the defendant's character and credibility, the prosecutor's improper demand that Hough's character witnesses assume her guilt in front of the jury reversed the presumption of innocence and violated Hough's due process right to a fair trial. As the above cases demonstrate, a new trial is the only proper remedy for this repeated and serious constitutional violation. *See id.* at 295 ("The convictions here are due to be reversed for the court's repeated allowance of inherently prejudicial cross-examination by the prosecutor.").

**C.     THE DISTRICT COURT ABUSED ITS DISCRETION IN
        ADMITTING PURPORTED COCONSPIRATOR STATEMENTS
        WITHOUT SUFFICIENT INDEPENDENT PROOF OF THE
        CHARGED CONSPIRACY**

1.     <u>Standard of Review</u>

The district court's evidentiary rulings are reviewed for an abuse of

discretion. *United States v. Jayyousi*, 657 F.3d 1085, 1113 (11th Cir. 2011).

Whether the government offered sufficient independent evidence to support

admission of coconspirator statements under Federal Rule of Evidence

801(d)(2)(E) is reviewed for clear error. *United States v. Machado*, 804 F.2d 1537,

1543 (11th Cir. 1986).

2.     <u>The Alleged Coconspirator Statements Were Improperly Admitted</u>

Prior to trial, the defense moved *in limine* to preclude the government from

introducing statements of alleged coconspirators Fredrick, Luetolf, and

Singenberger until the government had met its burden of proving, by substantial

and independent evidence, the existence of a conspiracy and Hough's participation

in that conspiracy. (CR 64). The district court denied the motion. (CR 73; Appx.

40). At the close of the government's case, the court found that the government

had failed to prove even by a preponderance of the evidence that Luetolf and

Singenberger were members of the conspiracy charged in the indictment.

(10/21/13 RT 26; Appx. 824). The court, however, found that sufficient evidence

had been presented to support admission of Fredrick's hearsay emails and other

statements as coconspirator statements.  (10/21/13 RT 26; Appx. 824).  This was

error.

A coconspirator statement may only be admitted under Federal Rule of

Evidence 801(d)(2)(E) if the government proves by a preponderance of the

evidence that:  (1) a conspiracy existed; (2) the conspiracy included the declarant

and the defendant against whom the statement is offered; and (3) the particular

statement to be introduced was made during the course of and in furtherance of

that conspiracy.  *United States v. Dickerson*, 248 F.3d 1036, 1049 (11th Cir. 2001).

Although the district court may consider the alleged hearsay statement in

determining whether the proper foundation has been laid, *see Bourjaily v. United

States*, 483 U.S. 171, 179-81, 107 S. Ct. 2775 (1987), this Court requires that the

requisite foundational facts be established by "**substantial independent

evidence**," *i.e.*, evidence independent of the statements themselves.  *See Adkinson*,

158 F.3d at 1153; *United States v. McDonald*, 935 F.2d 1212, 1220 (11th Cir.

1991); *see also*, *e.g.*, *United States v. Hasner*, 340 F.3d 1261, 1275 (11th Cir.

2003) (detailing independent evidence that established existence of a conspiracy by

a preponderance of the evidence, supporting introduction of coconspirator

statements); *United States v. Byrom*, 910 F.2d 725, 736-37 (11th Cir. 1990)

(affirming admission of coconspirator statement where there was "abundant

independent evidence" of the conspiracy).  The independent evidence of the

existence of the conspiracy must be at least sufficient to support submitting the

existence of the conspiracy to the jury. *McDonald*, 935 F.2d at 1220.  Moreover,

such independent evidence cannot consist simply of other alleged coconspirator

statements. *See United States v. Grassi*, 616 F.2d 1295, 1300 (5th Cir. 1980)

("Evidence submitted . . . for the purpose of proving a conspiracy must, of course,

be free from hearsay objection; otherwise, a coconspirator's hearsay might

bootstrap itself into admissible evidence.").

The evidence of the existence of a conspiracy to defraud the IRS and of

Hough's knowing and willful participation in that conspiracy, when shorn of

Fredrick's statements, was insufficient to support admission of those statements in

the first instance.  This was made abundantly clear by the government's own

closing and rebuttal arguments to the jury, in which it relied almost exclusively on

Fredrick's out-of-court statements to Luetolf, Singenberger, Minchenberg,

Schneider, and others – statements that were never joined in, adopted by, or often

even known to Hough – to prove the charged conspiracy.  (10/23/13 RT 18-23, 26-

27, 34, 37-38, 40, 121, 125; Appx. 978-83, 986-87, 994, 997-98, 1000-02).  In

contrast, the only "independent" evidence of Hough's involvement in the charged

tax conspiracy that the government cited in its arguments consisted of the

documents discussed at pages 28-29 *supra*, as well as the ambiguous testimony of

Thomas Murtha discussed at pages 26-27 *supra*.  (10/23/13 RT16-17, 20-28, 31-

32, 132; Appx. 976-77, 980-88, 991-92, 1003).  For the reasons previously stated,

none of those items, individually or cumulatively, constituted the requisite

"substantial and independent" evidence establishing by a preponderance Hough's knowing and willful involvement in any criminal conspiracy, let alone a specific conspiracy to defraud the IRS. As such, the district court erred in allowing the government to bootstrap Fredrick's hearsay statements into the foundation for their admission. Given the centrality of Fredrick's statements to the evidence in the case and to the government's argument for conviction, the error from improper admission of those hearsay statements cannot be held harmless, and a new trial is therefore required.

**D.   THE DISTRICT COURT ABUSED ITS DISCRETION IN DETERMINING THE TAX LOSS RESULTING FROM THE OFFENSE**

1.   <u>Standard of Review</u>

The district court's interpretation and application of the Sentencing Guidelines are reviewed *de novo*, and its factual findings for clear error. *United States v. Campbell*, 765 F.3d 1291, 1301 (11th Cir. 2014). Improper calculation of the Sentencing Guidelines constitutes procedural error warranting the reversal of the sentence imposed. *United States v. Cruz*, 482 Fed. Appx. 528, 531 (11th Cir. 2012); *see Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586 (2007).

2.    <u>The District Court Erred in Including the Medical Schools' "Profits"
in its Tax Loss Calculation Based on a Theory That Had Never Been
Briefed or Argued by Either Party, Was Based on an Incorrect
Reading of the Applicable Regulations, and Required Factual
Findings That Lacked Any Evidentiary Support in the Record</u>

The issue of tax loss, which was the principal driver of the Sentencing

Guidelines range in this case, was heavily contested and litigated at a four-day

sentencing hearing.[33]   The government again presented the testimony of Sheila

Maurer, who surprisingly came up with a *third* version of her RAR that more than

doubled the tax figures to which she had testified at trial by attributing to Hough

and Fredrick for the first time all "net income" or "profits" from the Saba

Foundation and MUA from 2003 through 2007.  (Appx. 73-80).  On that issue, the

parties' dispute centered on (1) whether Fredrick and Hough owned those entities;

(2) whether the Saba Foundation, as a nonprofit entity, could have "profits" (as

opposed to non-taxable revenues); and (3) whether, even assuming ownership and

profits of the entities, such profits constituted taxable income absent any

distributions to the owners (*e.g.*, through payment of dividends).

Maurer testified, and the government insisted, that the Saba Foundation and

MUA were to be treated as "disregarded entities" under the Internal Revenue Code

such that their net income became immediately taxable to Fredrick and Hough as

---

[33] The government's calculations, which were adopted by the Probation Officer,
relied on a tax loss of more than $7 million, resulting in a guideline range of 78-97
months.  The defense argued that because of the government's failure to carry its
burden of proof by a preponderance of the evidence on the tax loss issue, the tax
loss for purposes of sentencing should be zero, resulting in a guideline range of 0-6
months.

Schedule C self-employment income, even in the absence of any distributions.[34]

(5/1/14 RT 17, 69; 5/2/14 RT 4-8; Appx. 1007, 1011, 1041-45).  As Hough

demonstrated, however, the government's theory was fatally flawed; under the

controlling test of *Moline Properties, Inc. v. C.I.R.*, 319 U.S. 436, 438-39, 63 S. Ct.

1132 (1943), a corporation remains a separate taxable entity as long as it carries on

actual business activities, which the schools in this case unquestionably did.  *See,*

*e.g.*, *Northern Indiana Public Service Co. v. Commissioner*, 115 F.3d 506, 512 (7th

Cir. 1997); *In re Chrome Plate, Inc.*, 614 F.2d 990, 996 (5th Cir. 1980); *Jackson v.*

*Commissioner*, 233 F.2d 289, 290 (2d Cir. 1956).  In its written ruling, the district

court agreed with Hough and rejected the government's theory, finding that "Saba

Foundation and MUA, while actually owned by Fredrick and Hough, nonetheless

satisfied the *Moline Properties* test and were capable of being separate taxable

entities."  (CR 192 p.6; Appx. 86).  As such, any profits of the Saba Foundation

and MUA – even assuming Hough's ownership of those entities – would not be

taxable to Hough absent a distribution, and the government's entire articulated

basis for Maurer's new calculations was wrong.

---

[34] After the district court indicated its skepticism about this theory through its own
questioning of Maurer, the government briefly reverted to Maurer's initial May
2013 RAR (which she had now repudiated twice), arguing as a "backup" that tax
loss should be calculated based on the amounts of actual distributions from the
Saba Foundation and MUA accounts to Fredrick and Hough.  (5/1/14 RT 148-50,
166-67, 189-95; Appx. 1025-36).  The next day, however, the government
expressly disavowed that position and went so far as to repudiate its own expert's
initial RAR as "a dishonest application of the law [] to the facts of this case."
(5/1/14 RT 217-18, 223; 5/2/14 RT 4, 11-14; Appx. 1037-38, 1041, 1046-49).

The district court, however, then went on to adopt Maurer's fundamentally flawed calculations based on a new taxation theory that had not been raised, briefed, or argued by either party, that had never been presented by Maurer in any of her three sets of calculations, and that had never even been suggested by the IRS or the DOJ Tax Division at any time in the nearly five-year history of this case. Specifically, the court read 26 C.F.R. §§ 301.7701-1 to 301.7701-3 to mean that the Saba Foundation and MUA were to be treated for federal tax purposes not as corporations (as Hough contended) or disregarded entities (as the government contended), but as *partnerships*, with their income attributed to the individual partners. (CR 192 pp.6-8; Appx. 86-88). When defense counsel sought leave to explain how this new theory misread the applicable and highly complex regulations, the district court refused to hear argument and directed that all such argument be addressed to this Court. (5/9/14 RT 4-6; Appx. 1051-53).

The district court's *sua sponte* legal theory supporting its tax loss calculations was erroneous as a matter of both fact and law. As recognized by the district court, a business entity, foreign or domestic, constitutes a "corporation" for federal tax purposes if it falls within any of the eight subparagraphs of 26 C.F.R. § 301.7701-2(b). The district court also correctly noted that the Saba Foundation and MUA do not fall within the list of foreign entities in § 301.7701-2(b)(8). The court, however, failed to address § 301.7701-2(b)(2) – another one of the eight subparagraphs – which states that a "corporation" includes "[a]n association (as

-71-

determined under § 301.7701-3)."  That regulation, in turn, states that a business

entity constitutes an "association" (and therefore a corporation under § 301.7701-

2(b)) under the following two circumstances:  (1) an eligible entity with at least

two members can elect to be classified as an association for federal tax purposes

(26 C.F.R. § 301.7701-3(a)); or (2) unless the entity elects otherwise, a foreign

entity is an association if all members have limited liability and a partnership if at

least one member does not have limited liability (26 C.F.R. § 301.7701-

3(b)(2)(i)(A), (B)).  The regulation goes on to define "limited liability" as meaning

that the member of the foreign entity "has no personal liability for the debts of or

claims against the entity by reason of being a member."  26 C.F.R. § 301.7701-

3(b)(2)(ii).  The regulation continues:  "This determination is based **solely** on the

statute or law pursuant to which the entity is organized, except that if the

underlying statute or law allows the entity to specify in its organizational

documents whether the members will have limited liability, the organizational

documents may also be relevant."  *Id.* (emphasis added).

Thus, in order to conclude that the Saba Foundation and MUA were

partnerships under the regulations, the government (which had the burden of proof

at sentencing) would have had to prove, and the district court would have had to

find by a preponderance of the evidence, at least the following two facts:  (1)

neither the Saba Foundation nor MUA elected to be classified as an association

taxable as a corporation for federal tax purposes; and (2) at least one member of

each entity did not have limited liability under the laws of the Netherlands-Antilles

and Nevis, or under the organizational documents if the foreign laws allow such

documents to specify whether the members will have limited liability.  **The**

**government presented absolutely no evidence as to either of these**

**foundational facts during the four-day sentencing hearing.**[35]  There was no

evidence from Maurer or any other IRS witness or record demonstrating whether

the Saba Foundation and MUA did or did not make an election, and the

government bore the burden of proving that such an election was not made in order

to prove that the entities were partnerships rather than associations/corporations.

There was no evidence presented as to whether Hough and Fredrick bore "personal

liability for the debts of or claims against" the Saba Foundation and MUA by

virtue of owning those entities, 26 C.F.R. § 301.7701-3(b)(2)(ii), and the

government bore the burden of proving that at least one member of each entity did

not have limited liability under the laws of the Netherlands-Antilles and Nevis in

order to prove that the entities were partnerships rather than

---

[35] The district court's statement in its order that "[u]nder the facts found by the jury
and the Court, Saba Foundation and MUA are treated as partnerships for federal
tax reasons" is incorrect.  (CR 192 p.7; Appx. 87).  No facts were found by either
the jury or the district court with respect to whether the entities elected a
classification or whether the members of the entities had personal liability for the
debts of or claims against the entities under the laws of the Netherlands-Antilles
(for Saba) or Nevis (for MUA) or the organizational documents for each.
Moreover, even had there been such findings in support of the partnership theory,
they would be clearly erroneous because there is no evidence in the record to
support them.  Even the government's expert Maurer testified that the Saba
Foundation was not a partnership.  (5/1/14 RT 71; Appx. 1013).

associations/corporations.[36]  In fact, the only evidence in the record is to the

contrary:  the Memorandum of Association of MUA, introduced by the

government at trial, expressly states:  "The liability of the members is limited."

(Exh. 3Z ¶ 4; Appx. 186).  Yet the district court completely relieved the

government of its burden of proof on these issues – a burden that the government

could not carry, which presumably explains why it **never claimed** the entities were

partnerships – and simply assumed the existence of the foundational facts essential

to the partnership classification without any supporting evidence in the record.

In sum, the district court's premise in its ruling that a business entity is a

partnership for federal tax purposes if it is not a corporation under § 301.7701-2(b)

and has at least two members (CR 192 p.7; Appx. 87) was correct.  26 C.F.R.

§ 301.7701-2(c)(1).  What the district court missed, however – and what further

argument that the court refused to entertain would have pointed out – is that if an

entity is an "association" under § 301.7701-3, then it **is** a corporation under

§ 301.7701-2(b) and not a partnership.  Given the absence of any evidence that any

owner of the Saba Foundation and MUA did not have limited liability under

foreign law and that the entities did not elect to be classified as associations taxable

as corporations, there is no support whatsoever in the record for the district court's

---

[36] A determination of personal liability would, at a minimum, have required evidence of the applicable laws of the Netherlands-Antilles or Nevis pursuant to which the Saba Foundation and MUA were organized (which under the regulations are the "sole" basis for the determination of limited liability status of a foreign entity).  See 26 C.F.R. § 301.7701-3(b)(2)(ii).  No such evidence was presented.

-74-

"partnership" taxation theory, and its tax loss findings pursuant to that theory are clearly erroneous.

> 3.   The District Court Clearly Erred in Including Tax Loss From Income Sources as to Which the Government Conceded at Sentencing There Was No Evidence of Hough's Knowledge

Apart from the issue of profits, the district court also erred in including in its tax loss calculation Maurer's computations of tax due and owing on the interest, dividends, and capital gains in the subject UBS, Fortis, and LLB accounts.

There is an essential distinction between the concepts of civil and criminal tax loss, as set out in the Sentencing Guidelines and in the IRS' own manual. *See* USSG § 2T1.1(c)(1) ("[T]he tax loss is the total amount of loss that was the **object of the offense** . . . ." (emphasis added)); Internal Revenue Manual § 9.5.13.2.1 (Criminal vs. Civil Tax) ("The criminal tax deficiency may differ from the civil tax deficiency in the civil process. Criminal violations are charged only against the tax deficiency that results from fraud. . . . Adjustments of a [] non-fraudulent nature may be considered solely for civil purposes."). Thus, for an item to be included in a calculation of *criminal* tax loss, it is insufficient to show simply that a tax was due; the government bears the burden of proving that such deficiency results from fraud, *i.e.*, the willful violation of a known legal duty. Although Maurer, who had spent her entire career doing civil audits and had never investigated a criminal case, testified that she did not know the difference between criminal and civil tax loss, she eventually agreed that for criminal purposes there must be a showing of a

violation of a known legal duty (such as the knowing failure to report certain income), whereas in the civil context no such culpable state of mind is required to determine tax owed.  (10/17/13 RT 210; 5/1/14 RT 59-61; Appx. 720, 1008-10).

With respect to Maurer's inclusion in her calculations (which the district court adopted) of interest, dividends, and capital gains, the government failed to make the required showing that the tax loss on those items resulted from fraud.  On cross-examination during the sentencing hearing, Maurer admitted that she was aware of **no** evidence that Hough knew that any of the accounts used for the tax loss calculation bore interest or dividends, **no** evidence that Hough was aware of the basis for any of the attributed capital gains, and **no** evidence that Hough ever saw the Flow-of-Funds memorandum or was otherwise aware of the sales price allocated to the Round Hill property in the 2007 sale (which controlled the amount of capital gain or loss on that property).  (5/1/14 RT 101-06, 109-10, 113-15; Appx. 1014-24).  In the absence of such evidence, the government failed to carry its burden of proving that Hough knew of the items of unreported income that formed the basis for Maurer's calculations, and therefore failed to carry its burden of proving that Hough **criminally** evaded tax on that income; one cannot willfully violate a known legal duty by failing to report income if the government concedes there is no evidence that the taxpayer knew the income existed.

Because the district court's finding of a criminal tax loss stemming from the interest, dividends, and capital gains in Maurer's report was – according to

Maurer's own testimony – based on no evidence, it was clearly erroneous. *See United States v. Seecharan*, 523 Fed. Appx. 619, 631 (11th Cir. 2013).

Accordingly, Hough's sentence must be vacated and the case remanded.[37]

## VII.

## <u>CONCLUSION</u>

For the foregoing reasons, Hough's convictions should be vacated, or, if they are not vacated, a new trial should be ordered. Should this Court allow Hough's convictions to stand notwithstanding the lack of evidence and the district court's legal errors, then her sentence should be vacated and the case remanded for resentencing.

DATED: November 6, 2014


BINGHAM MCCUTCHEN LLP          BRUCE L. UDOLF, P.A.


By: /s/ Daniel A. Saunders              By: /s/ Bruce L. Udolf
      Nathan J. Hochman                      Bruce L. Udolf
    nathan.hochman@bingham.com            budolf@bruceudolf.com
      Daniel A. Saunders              Attorneys for Defendant-Appellant
    daniel.saunders@bingham.com
  Attorneys for Defendant-Appellant

---

[37] Although the district court granted a substantial variance from the 78-97 month guideline range to a sentence of 24 months, the error in calculating the guideline range is not harmless because there is no clear statement in the record that the court would have imposed the same sentence if it had begun with the correct range (which Hough contends was 0-6 months). *See United States v. Barner*, 572 F.3d 1239, 1247-48 (11th Cir. 2009).

## <u>CERTIFICATE OF COMPLIANCE</u>

Appellant certifies that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) (as modified by this Court's order dated 10/24/14)  because it contains

19,992 words, excluding the parts of the brief exempted by Fed.R.App.P.

32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in 14-point Times New Roman font.

# U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 6, 2014, I electronically filed the foregoing

**APPELLANT'S OPENING BRIEF** with the United States Court of Appeals for the Eleventh

Circuit by using the CM/ECF system, which transmits via email a true and correct copy of the

document(s) listed above on this date to the person(s) at the email address(es) set forth below:

Frank Philip Cihlar
U.S. Department of Justice, Tax Division
P.O. Box 502
Washington, DC  20044
*Service Via Email:*  *frank.p.cihlar@usdoj.gov*

Gregory Victor Davis
U.S. Department of Justice, Tax Division
P.O. Box 502
Washington, DC  20044
*Service Via Email:*  *gregory.v.davis@usdoj.gov*

Alexander Patrick Robbins
U.S. Department of Justice, Tax Division
P.O. Box 502
Washington, DC  20044
*Service Via Email:*  *alexander.p.robbins@usdoj.gov*

/s/ Daniel A. Saunders
DANIEL A. SAUNDERS
Counsel for Defendant-Appellant
Patricia Lynn Hough