[PUBLISH]

## IN THE UNITED STATES COURT OF APPEALS

### FOR THE ELEVENTH CIRCUIT

_____

No. 14-12156 - *CC*

_____

D.C. Docket No. 2:13-cr-00072-JES-CM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PATRICIA LYNN HOUGH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(September 9, 2015)

Before ED CARNES, Chief Judge, ROSENBAUM, Circuit Judge, and SMITH,[*]
District Judge.

_____

[*] Honorable C. Lynwood Smith, United States District Judge for the Northern District of
Alabama, sitting by designation.

ED CARNES, Chief Judge:

It may be, as the Downton Dowager bemoaned, that "[I]ie is so unmusical a word,"[1] but it strikes the right note for some of the statements that Dr. Patricia Lynn Hough made in her tax returns. So does 26 U.S.C. § 7206(1), which provides a penalty of imprisonment for a person who willfully files a return "which [she] does not believe to be true and correct as to every material matter." That is one of the statutes that Hough was convicted of violating. The other is 18 U.S.C. § 371, which prohibits conspiring to defraud an agency of the United States, including the IRS. This is her appeal of those convictions and her sentence.

## I.

In the late 1980s, Hough and her husband, Dr. David Leon Fredrick, decided to establish a medical school on the Caribbean island of Saba, Netherlands-Antilles. To that end, they used almost all of their assets to start the Saba School of Medicine Foundation (the Saba Foundation), which was incorporated in 1988. Five years later, the Saba University School of Medicine (the Saba School) opened its doors. Under Hough and Fredrick's management, the Saba School grew to be very successful — so successful that the couple decided to establish a second medical school in the Caribbean. That school, the Medical University of the Americas (MUA), on the island of Nevis, West Indies, opened in 2000. MUA

---

[1] Downton Abbey: Season 3, Episode 6 (Carnival Films Oct. 21, 2012).

thrived, too. By the mid-2000s, both schools were generating annual profits in the millions of dollars.

In October 2001, the year after MUA opened, Hough and Fredrick opened a joint account at the Swiss Bank UBS in Switzerland. Hough signed an account-opening form, called a "Form A," that identified her as one of the account's beneficial owners.

In early 2002, Fredrick began to negotiate the sale of the medical schools to an entity called the Huntington Institute. While he and Hough waited for the sale to close, they opened two additional accounts at UBS: one in the name of Medical Technology Associates Ltd. (MTA), and the other in the name of Apex Consultants Ltd. (Apex). The couple had incorporated both entities in the late 1990s in the British Virgin Islands. Internal UBS records described the Apex account as a "[r]eceiving account for monies flowing in from the sale of medical schools in the Caribbean" and listed Hough and Fredrick as the owners of those schools. UBS records also contained a copy of a September 2003 email from Fredrick to the couple's UBS banker, Dieter Luetolf. In that email, Fredrick stated that, once the sale closed, he and Hough "plan[ned] to send 8.5 to Apex and 15.5 to MTA."

By the end of September 2003, the planned sale of the schools had fallen through. Hough and Fredrick, however, did not close the MTA and Apex

3

accounts. In December of that year, they instructed one of their banks in the Bahamas to close their account and to wire all of their remaining assets to the Apex account. In a letter to the Bahamian bank, Hough and Fredrick wrote that they wanted to move their funds to Switzerland because "changes in the US & Bahamas banking policies that take effect in January 2004 put us at a disadvantage." They were referring to an agreement between the Bahamas and the United States that required disclosure of information about United States citizens with Bahamian bank accounts.

In January 2004, the couple's UBS banker, Luetolf, traveled to the United States and met with them to discuss various matters, including how they could protect their accounts from "open disclosure." After the meeting, Hough and Fredrick began to consider splitting into individual accounts the joint account that they had opened at UBS in 2001. In an email to Luetolf on the subject, Fredrick wrote that he and Hough were "still in the process of finding a buyer for the schools," and that, when they eventually sold them, they "would send equal amounts to deposit into each account." That April, Hough and Fredrick finally instructed Luetolf to split the account. Hough signed the Form A for her individual account, identifying herself as its beneficial owner. By the end of 2004, Hough's individual account contained approximately $5.5 million.

4

Meanwhile, in the fall of 2004, Hough and Fredrick opened an account at UBS in the name of the Saba Foundation. Hough signed the Form A, which listed her as one of the account's beneficial owners.

In April 2005, Hough and Fredrick worked with a financial advisor named Beda Singenberger to create a Hong Kong-based entity called New Vanguard Holdings Ltd. (New Vanguard). That June, Singenberger opened an account at UBS in New Vanguard's name. The Form A listed Hough and Fredrick as the account's beneficial owners. In July, the couple instructed Luetolf to close their individual accounts at UBS and to wire their money to the New Vanguard account. That same month, Hough and Fredrick bought a million-dollar home in Asheville, North Carolina with funds from the New Vanguard account.

In October 2005, the couple worked with Singenberger to create another Hong Kong-based entity called Top Fast Finance Ltd. (Top Fast). In January 2006, Singenberger opened an account at UBS in Top Fast's name with a $5 million transfer from the Saba Foundation's UBS account. The Form A listed Hough and Fredrick as the Top Fast account's beneficial owners.

In September 2006, Hough and Fredrick found a buyer for their schools, a private equity firm called Equinox Capital. As they negotiated the details of the sale, the couple had Singenberger open two additional New Vanguard accounts, one at the Swiss branch of Liechtensteinische Landesbank (LLB), and the other at

5

the Swiss branch of Fortis Banque (Fortis). The Form A for each account listed Hough and Fredrick as the beneficial owners.

In April 2007, the sale of the schools to Equinox Capital finally went through. The firm paid a total of $37.6 million for the Saba School, MUA, the land that the schools were on, and the schools' United States-based management company. The vast majority of that money — almost $36 million --- was split, to the penny, between the two New Vanguard accounts at LLB and Fortis.

In June 2007, Hough and Fredrick transferred approximately $600,000 from the Top Fast account to a UBS account in the name of Ample Dynamic Trading Ltd. (Ample Dynamic).[2] They then bought a home in Greenville, North Carolina with that money. That November, Fredrick transferred approximately $1.6 million from the New Vanguard account at UBS to the Ample Dynamic account. He used those funds to purchase a Piper Meridian airplane.

In May 2008, the couple purchased a condominium in Sarasota, Florida with $850,000 from the Top Fast account. That November, they purchased a lot next to their Asheville, North Carolina property with $200,000 from the New Vanguard account at Fortis. There is no evidence that Hough and Fredrick used their offshore funds to make any other purchases in the United States after that point.

---

[2] The government did not rely on the Ample Dynamic account in its tax calculations.

On May 15, 2013, Hough and Fredrick were charged with the following crimes: one count of conspiracy to defraud the IRS, in violation of 18 U.S.C. § 371 (Count 1);[3] and four counts each of filing false individual income tax returns for the years 2005 through 2008, in violation of 26 U.S.C. § 7206(1) (Fredrick was charged in Counts 2–5, and Hough was charged in Counts 6–9). In the false-return counts, the government alleged that Hough and Fredrick had made two false statements on their returns: (1) understating total income on each year's Form 1040; and (2) failing to disclose a financial interest in a foreign bank account on the attached Schedule B. Fredrick fled following the indictment and remains a fugitive. Hough pleaded not guilty on all counts and proceeded to trial.

An eleven-day jury trial took place in October 2013. At the close of the government's case, Hough moved for a judgment of acquittal as to all counts. See Fed. R. Crim. P. 29(a). The court took the motion under submission as to the understating of income portion of Count 7 (which pertained to Hough's 2006 tax return) and denied the motion on the remaining counts.

Hough called four witnesses, three of whom testified about their opinion of her character for honesty and truthfulness. She also took the stand herself, testifying for the better part of two days. Hough's basic explanation for her

---

[3] Luetolf and Singenberger were named as unindicted co-conspirators. The district court later found that there was insufficient evidence to show that either man was involved in the charged conspiracy.

7

conduct was that she owned nothing and signed whatever papers were put in front

of her. She testified that the Saba Foundation — not she and Fredrick — had

owned the Saba School and MUA until they were sold in April 2007. She also

testified that all of the undeclared offshore accounts, both those in her name and

those in the names of the various entities, contained the Saba Foundation's money.

Asked why she and Fredrick moved the Foundation's money offshore, and then

from bank account to bank account, Hough explained that it was simply "an asset-

protection strategy." Finally, Hough testified that all of the offshore funds that she

and Fredrick had used to buy assets in the United States were either loans from the

Saba Foundation or were used to make business purchases for the Foundation.

The jury did not credit Hough's testimony and found her guilty on all of the

counts against her: the conspiracy count (Count 1) and the four false-return counts

for the years 2005 through 2008 (Counts 6–9). To find Hough guilty of filing a

false return in a charged year, the jury had to unanimously find that she had

willfully made at least one of the two false statements alleged in the indictment,

namely: (1) understating total income on that year's Form 1040; or (2) failing to

disclose a financial interest in a foreign bank account on the attached Schedule B.

For the years 2005, 2007, and 2008, the jury found that Hough had willfully made

both of those false statements. For the year 2006, the jury found only that Hough

8

had willfully understated her total income; it did not find that she had willfully failed to disclose a financial interest in a foreign bank account.

Hough moved for a post-verdict judgment of acquittal, contending that the evidence was insufficient to support her convictions on any count. See Fed. R. Crim. P. 29(c). Alternatively, she moved for a new trial on two independent grounds. See Fed. R. Crim. P. 33. She contended that the district court had erroneously allowed the government to cross-examine two of her character witnesses with questions that assumed her guilt. She also contended that the court had erroneously admitted Fredrick's out-of-court statements under the co-conspirator exclusion to the hearsay rule. See Fed. R. Evid. 801(d)(2)(E) (providing that a statement is not hearsay if it is offered against the defendant and "was made by [the defendant's] coconspirator during and in furtherance of the conspiracy").

The district court granted in part and denied in part Hough's motion for a judgment of acquittal and denied her motion for a new trial. The court determined that the evidence was sufficient to support her convictions on all counts except for Count 7, the false-return count for the year 2006. The jury's guilty verdict on that count was based on its finding that Hough had <u>understated</u> her total income for that year. The government's tax expert, however, had testified that Hough had actually <u>overstated</u> her total income for that year and was due a refund. In light of that

9

testimony, the court determined that there was insufficient evidence to support the conviction on Count 7 and entered a judgment of acquittal on that count. That left Hough convicted of one count of conspiracy to defraud the IRS (Count 1), and three counts of filing false returns for the years 2005, 2007, and 2008 (Counts 6, 8, and 9).

At Hough's four-day sentence hearing, the court calculated her advisory guidelines range as 78 to 97 months. In doing so it found, over Hough's objection, that the tax loss caused by her conduct was approximately $15 million. The court varied downward and sentenced Hough to 24 months imprisonment.

## II.

Hough contends that the district court erred in denying her motion for a judgment of acquittal on Count 1, the conspiracy charge, and on Counts 6, 8, and 9, the false-return charges. We review de novo a district court's denial of a motion for judgment of acquittal, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict. United States v. Hernandez, 743 F.3d 812, 814 (11th Cir. 2014). We will not overturn a jury's verdict if there is "any reasonable construction of the evidence [that] would have allowed the jury to find the defendant guilty beyond a reasonable doubt." United States v. Friske, 640 F.3d 1288, 1291 (11th Cir. 2011) (quotation mark omitted).

A.

Hough contends that the evidence was insufficient to support her conviction on Count 1, which charged her with conspiracy to defraud the IRS in violation of 18 U.S.C. § 371. That type of conspiracy is commonly called a Klein conspiracy, after the first decision to recognize it. United States v. Klein, 247 F.2d 908 (2d Cir. 1957); see United States v. Adkinson, 158 F.3d 1147, 1154 (11th Cir. 1998).

To convict Hough of conspiracy to defraud the IRS, the government had to prove that: (1) Hough and Fredrick agreed to impede the functions of the IRS; (2) Hough knowingly and voluntarily participated in that agreement; and (3) Hough or Fredrick committed an act in furtherance of the agreement within the six-year statute of limitations (that is, after May 15, 2007). See Adkinson, 158 F.3d at 1153–54 (elements of a Klein conspiracy); United States v. Waldman, 941 F.2d 1544, 1548 (11th Cir. 1991) (statute of limitations for a Klein conspiracy). The government did not need to provide direct evidence of an agreement between Hough and Fredrick; it could instead rely on circumstantial evidence such as "the parties' concerted actions, overt acts, relationship, and the entirety of their conduct." United States v. Kottwitz, 614 F.3d 1241, 1265 (11th Cir.), vacated in part on other grounds on denial of reh'g en banc, 627 F.3d 1383 (11th Cir. 2010). The circumstantial evidence, however, must have supported a "reasonable

inference[]" that Hough and Fredrick had "a common design with unity of purpose to impede the IRS." Id. (emphasis and quotation marks omitted).

A reasonable jury could have found Hough guilty of conspiracy to defraud the IRS. The evidence showed that she and Fredrick owned two successful medical schools in the Caribbean and made millions of dollars from operating and then selling them. The evidence also showed that, instead of reporting and paying taxes on any of that money, the couple followed "a common design" to hide it in multiple offshore accounts. Kottwitz, 614 F.3d at 1265.

Consider, for example, how Hough and Fredrick hid the proceeds from the sale of the schools. In anticipation of selling to the Huntington Institute, they opened two accounts in the names of foreign entities (MTA and Apex) to serve as "[r]eceiving account[s]" for the money that the sale was going to generate. After that sale fell through, the couple split their joint account at UBS and told their banker that they planned to "send equal amounts to deposit into each [individual] account" when they eventually sold the schools. The couple later followed that same basic plan, tweaking it here and there to make it even more difficult for the IRS to find the money. They created a foreign entity (New Vanguard), opened two accounts in the name of that entity at two different banks (LLB and Fortis), and deposited into each account half of the $36 million that the sale generated. There was plenty of circumstantial evidence showing that Hough and Fredrick agreed to

12

hide millions of dollars from the IRS. See, e.g., Adkinson, 158 F.3d at 1158 (observing that "[t]he elaborate creation of foreign . . . corporations [that] have no function whatsoever beyond the receipt and transference of money . . . bespeak[s] a scheme" that has as its objective the "evasion of taxes"); United States v. Moran, 759 F.2d 777, 785 (9th Cir. 1985) (affirming a defendant's Klein conspiracy conviction where he had designed a complex "scheme of foreign and domestic corporations and bank accounts" to "make it as confusing as possible" for the IRS "to unravel [his] case if the IRS ever had to unravel it") (quotation marks omitted).

While sufficient, the circumstantial evidence of Hough's knowing participation in a scheme to defraud the IRS is not the only evidence supporting her conviction on the conspiracy charge. Hough chose to take the stand and testify in her own defense, claiming that what the government called a conspiracy to hide the couple's money from the IRS was really "an asset-protection strategy" for the Saba Foundation's funds. Having seen and heard her testimony, the jury was free to discredit her explanation, to infer that the opposite of what she said was true, and to consider that inference as substantive evidence of her guilt. See United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) ("[A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt. . . . [W]hen a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true.")

(quotation marks omitted); see also United States v. McCarrick, 294 F.3d 1286, 1293 (11th Cir. 2002) ("[Our decision in] Brown . . . stand[s] for [the] proposition . . . that, in combination with other evidence, the jury's disbelief of a defendant's testimony may be used to help establish his guilt.") (emphasis omitted).

The evidence was more than sufficient for the jury to find, as it did, that Hough was guilty of the Klein conspiracy charged in Count 1.

### B.

Hough contends that the evidence was insufficient to support her convictions on Counts 6, 8, and 9, which charged her with filing false individual income tax returns for the years 2005, 2007, and 2008, in violation of 26 U.S.C. § 7206(1).  To meet its burden of proof on each of those counts, the government had to show that: (1) Hough willfully made and signed a tax return; (2) the return contained a written declaration that it was made under penalties of perjury; (3) the return was false as to a material matter; and (4) Hough did not subjectively believe that the return was true as to that material matter.  See United States v. Clarke, 562 F.3d 1158, 1163 (11th Cir. 2009).  Because the heart of the offense is lying to the IRS, the government did not need to show that because of Hough's lie taxes were unpaid or

14

underpaid.  See Boulware v. United States, 552 U.S. 421, 432 n.9, 128 S. Ct. 1168,

1178 n.9 (2008); United States v. Taylor, 574 F.2d 232, 234 (5th Cir. 1978).[4]

In finding Hough guilty of filing false returns for the years 2005, 2007, and

2008, the jury found that she had both (1) understated her total income on each

year's Form 1040, and (2) failed to disclose a financial interest in a foreign bank

account on the attached Schedule B.  She contends that, with respect to each year,

the evidence was insufficient to support either of those two independent bases for

the guilty verdict.

If sufficient evidence supports either basis on each count, that is enough to

support the verdict.  See United States v. Rivera, 77 F.3d 1348, 1351 (11th Cir.

1996) (citing Turner v. United States, 396 U.S. 398, 420, 90 S. Ct. 642, 654

(1970)).  We'll start with the second basis:  that Hough failed to disclose her

financial interest in foreign bank accounts.  Line 7a on Schedule B, an attachment

to the Form 1040 titled "Interest and Ordinary Dividends," asked the following

question for each tax year at issue, after which it gave the choices "Yes" or "No":

"At any time during [tax year], did you have an interest in or a signature or other

authority over a financial account in a foreign country, such as a bank account,

securities account, or other financial account?  See page B-2 for exceptions . . . ."

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we
adopted as binding precedent all decisions of the former Fifth Circuit handed down before
October 1, 1981.

Line 7b stated as follows: "If 'Yes' [to question 7a] enter the name of the foreign country." Hough checked "No" to question 7a and left the line next to question 7b blank.

A reasonable jury could have found Hough guilty on Counts 6, 8, and 9 based on a finding that she perjured herself by responding as she did to questions 7a and 7b. The multiple Form A's (the account-opening forms at Swiss banks) that the government entered into evidence established that Hough was the beneficial owner, or one of the beneficial owners, of multiple Swiss bank accounts during the years in question, including one that she opened in her own name. Although Hough testified that she owned nothing and signed whatever papers were put in front of her, the jury was free to disbelieve that testimony, to infer the opposite, and to consider that inference as substantive evidence of her guilt. See Brown, 53 F.3d at 314. The Form A's and Hough's testimony were sufficient to support her convictions on Counts 6, 8, and 9.

Hough argues that her convictions on these counts cannot stand because question 7a contained the language "see page B-2 for exceptions," and the government did not prove that her foreign bank accounts failed to fit within those exceptions. If they did fit within an exception, her answer of "No" would have been true. The two page B-2 exceptions are for: (1) accounts containing less than $10,000; and (2) accounts with a U.S. military banking facility operated by a U.S.

financial institution. The evidence in the record establishes beyond a reasonable doubt that the accounts contained more than $10,000 and that they were with financial institutions that were not U.S. military banking facilities operated by U.S. financial institutions. The government met its burden of proving that Hough's "No" answer was false.

Because a reasonable jury could have found Hough guilty on Counts 6, 8, and 9 based on a finding that she failed to disclose her financial interest in foreign bank accounts, her convictions on those counts stand. We need not address the understated-income basis, which is the alternative basis for the jury's guilty verdicts on those counts. See Rivera, 77 F.3d at 1351.

### III.

Hough contends that the district court erred in denying her motion for a new trial. She argues that the court committed two reversible errors during her trial: allowing the government to cross-examine two of her character witnesses with questions that assumed her guilt; and admitting Fredrick's out-of-court statements under the co-conspirator exclusion to the hearsay rule. We consider each alleged error in turn.

### A.

Hough's first witness was Alan Gruber, a medical doctor who graduated from the Saba School, taught there, and knew Hough and Fredrick. During direct

examination, defense counsel asked Gruber about his "opinion as to [Hough's] character for honesty and truthfulness." He responded that Hough is "extremely honest." Defense counsel then described the allegations against Hough and asked Gruber whether his opinion of Hough's character would change in view of those allegations. His response was that he was "flabbergasted" by those allegations because: "That's just not who I know Pat Hough to be. It just doesn't make sense to me." After a 15-minute recess, defense counsel again asked, "If you were to be told the things that I told you the government is alleging in this case, . . . would that change your opinion of Dr. Hough's character for truthfulness and honesty, yes or no?" Gruber replied: "I would not change my opinion if I was told that, because I wouldn't believe it."

On cross-examination, the government followed up on defense counsel's line of questioning of Gruber: "And if that [were] proven, that Dr. Fredrick and Dr. Hough did conspire to defraud the Internal Revenue Service by not reporting the sale of the medical schools on their tax returns, . . . would that change your opinion?" Over Hough's objection, Gruber answered "[y]es," reiterating that he "would be very surprised" if the allegations against Hough were true.

The next day, defense counsel called Thomas Walker, a former Oklahoma state judge who had known Hough since college. Counsel asked Walker what he thought about Hough's character for honesty and truthfulness. Walker replied:

"Absolute top drawer." As he had done in questioning Gruber, defense counsel then described the allegations against Hough and asked Walker whether his opinion would change based on "the nature of those allegations." Like Gruber, Walker replied that his opinion would not change. Describing the allegations in (as he put it) "more detail," counsel pressed: "[D]oes knowing that those are the nature of the allegations . . . change your opinion about whether [Hough is] an honest and truthful person?" Walker replied: "Not in the least."

On cross-examination, the government followed up on that line of questioning by asking Walker whether he had "heard any of the evidence that's been presented in [Hough's] case." He answered that he had not. The government then asked Walker whether, "as a judge, [he] would want to consider all of the evidence before forming an opinion," and he answered that he would. The government concluded: "And so it's possible, if you heard all of the evidence, that you might change your opinion about whether Dr. Hough is honest or not." Over Hough's objection, Walker responded: "Well, sure."

1.

Evidence of a criminal defendant's "pertinent" character trait — such as honesty and truthfulness in a fraud case — is admissible. Fed. R. Evid. 404(a)(2)(A). To elicit such evidence, defense counsel may ask a witness who has heard of the defendant about the defendant's reputation for the pertinent character

19

trait. Defense counsel may also ask a witness who knows the defendant to give his opinion of the defendant's character as it relates to the pertinent trait. Fed. R. Evid. 405(a). Once a witness provides character evidence on direct examination, the government can cross-examine the witness on relevant specific instances of the defendant's conduct. Id.; see United States v. Guzman, 167 F.3d 1350, 1352 (11th Cir. 1999); United States v. Glass, 709 F.2d 669, 673 (11th Cir. 1983). For example, if a witness testifies that the defendant is, in his opinion, an honest woman, the government may test the credibility of that opinion by asking if the witness knows of a specific instance of the defendant's dishonest behavior (e.g., cheating on an exam or doctoring a resume). The government may also ask the witness if his opinion would change if he learned of that specific instance of dishonesty.

The government generally enjoys "wide latitude" to test a defendant's character testimony on cross-examination, United States v. Candelaria-Gonzalez, 547 F.2d 291, 294 (5th Cir. 1977), and the district court has "wide discretion" to control the questioning, Guzman, 167 F.3d at 1352. There is, however, a limit on what the government can ask and on what the district court can allow. This Court has held that the government may not ask a reputation or an opinion character witness questions that assume the defendant is guilty of the charged crimes. See Guzman, 167 F.3d at 1352 (concluding that, where the defendant was charged with

conspiracy to import cocaine into the United States, the government had improperly asked a character witness if his opinion of the defendant would change "if [he] learned that . . . [she] was involved in transporting multi-kilogram quantities of cocaine"); see also Candelaria-Gonzalez, 547 F.2d at 293–94 (concluding that the government had improperly asked character witnesses if the defendant's reputation would be affected if he were convicted of the charged crimes). If the district court abuses its discretion by allowing a guilt-assuming question to be asked and answered, the error is subject to harmless-error analysis. See Guzman, 167 F.3d at 1352–54.

2.

Hough argues that the district court committed reversible error in allowing the government to cross-examine Gruber and Walker with questions that assumed her guilt. Her argument rests on three premises: (1) that the questions posed to both character witnesses asked them to assume her guilt; (2) that allowing the questions to be asked and answered was error under our precedent; and (3) that the error was not harmless. Let's take those assertions in that order.

As to assertion one, we agree with Hough that the government cross-examined both Gruber and Walker with questions that asked them to "assume" her guilt, as that term is used in our decision in United States v. Guzman, 167 F.3d 1350 (11th Cir. 1999), and our predecessor court's decision in United States v.

21

Candelaria-Gonzalez, 547 F.2d 291 (5th Cir. 1977). The government asked

Gruber: "And if that [were] proven, that Dr. Fredrick and Dr. Hough did conspire

to defraud the Internal Revenue Service by not reporting the sale of the medical

schools on their tax returns, . . . would that change your opinion?" As the

government concedes, that question explicitly asked Gruber to assume for purposes

of the question that Hough was guilty of conspiracy and to answer based on that

assumption. The question to Walker, though phrased differently, was close enough

to that. The government asked him: "And so it's possible, if you heard all of the

evidence, that you might change your opinion about whether Dr. Hough is honest

or not[?]" That question implicitly asked Walker to assume for purposes of the

question that the evidence would establish Hough's guilt on one or more of the

charged crimes and to answer based on that assumption.

   As to assertion two, although the government asked guilt-assuming

questions in testing the character testimony of both Gruber and Walker, the district

court did not abuse its discretion in allowing those questions to be asked and

answered. To be sure, we held in Guzman that the district court had abused its

discretion by allowing the government to ask an opinion character witness a

question that assumed the defendant was guilty of one of the charged crimes. 167

F.3d at 1351–52. But Guzman's holding "can reach only as far as [its] facts and

circumstances." Anders v. Hometown Mortg. Servs., Inc., 346 F.3d 1024, 1031

(11th Cir. 2003) (quotation marks omitted); see Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir. 2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); Edwards v. Prime, Inc., 602 F.3d 1276, 1298 (11th Cir. 2010) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case."). Guzman's facts and circumstances differ from those of this case in at least one important respect: As far as we can tell from the opinion in Guzman, defense counsel in that case stuck to a traditional form of direct examination; he elicited testimony about how the witness knew the defendant, how long the witness had known the defendant, and what the witness' opinion of the defendant's character for the pertinent trait was.[5] Guzman, 167 F.3d at 1351–52; see Fed. R. Evid. 405(a). In contrast, when questioning Gruber and Walker, Hough's counsel went beyond traditional direct examination of a character witness. He asked each witness — not once, but twice — whether his opinion of Hough's character for honesty and truthfulness would change in view of the allegations against her. By asking those questions on direct, Hough's counsel, unlike defense counsel in Guzman, "opened

---

[5] The same holds true of defense counsel's questioning in United States v. Candelaria-Gonzalez, 547 F.2d 291, 293 (5th Cir. 1977), the only binding decision in our Circuit other than Guzman to address the issue of whether the government may properly pose a question to a character witness (there, a reputation character witness) that assumes the defendant's guilt of the charged crimes.

23

the door" to the government's guilt-assuming questions on cross-examination. The district court did not abuse its discretion in permitting the government to walk through the door that defense counsel had opened wide and to follow up on that line of questioning. See United States v. Russo, 110 F.3d 948, 952–53 (2d Cir. 1997) (concluding that defense counsel "opened the door" to the government's guilt-assuming questions by asking the character witness on direct if he was aware that the defendant had been charged with certain crimes and if those charges were consistent with the defendant's character).

As to assertion three, even if we assume that the district court improperly allowed the questions, we would find that the error was harmless. See Guzman, 167 F.3d at 1352–54 (holding that such errors can be harmless).[6] Before the jury found Hough guilty on all counts, it heard eleven days' worth of evidence that overwhelmingly established her guilt. See id. at 1353 (observing that "[o]verwhelming evidence of guilt is one factor that may be considered in finding harmless error"); see also supra Part II. Given all of that evidence, it is inconceivable that the jury would have returned a different verdict based on two answers to two allegedly improper questions. As the district court put it in denying

---

[6] While we're assuming things, we'll also assume, as we did in Guzman, that the Chapman standard governs our harmless-error analysis — in other words, that reversal is required unless the government can show that the court's error was harmless beyond a reasonable doubt. Guzman, 167 F.3d at 1353–54 (citing Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967)). We can make that assumption here because it does not affect the result.

Hough's motion for a new trial: "No one who sat through [Hough's] trial would have any doubt at all that the responses to the disputed questions to the character witnesses had no impact on the jury's determination of the facts of the case."

### B.

Hough contends that the district court improperly admitted, over her objections, Fredrick's out-of-court statements, e-mails, and other correspondence under Federal Rule of Evidence 801(d)(2)(E), the co-conspirator exclusion from the rule against hearsay. For a co-conspirator statement to be admissible under that rule, the government must show by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy. United States v. Dickerson, 248 F.3d 1036, 1049 (11th Cir. 2001). In determining whether the government has met those three requirements, the district court may consider both the co-conspirator's out-of-court statement and evidence independent of it. Id. The rule expressly provides, however, that "[t]he statement . . . does not by itself establish . . . the existence of the conspiracy or participation in it." Fed. R. Evid. 801(d)(2); see United States v. Hasner, 340 F.3d 1261, 1274–75 (11th Cir. 2003).

Hough argues that, apart from Fredrick's statements themselves, there was insufficient independent evidence tending to show the first two foundational

25

requirements:  that a conspiracy existed and that she was a knowing and willing participant in it.  We review the admission of evidence under Rule 801(d)(2)(E) only for an abuse of discretion and the underlying factual findings only for clear error.  United States v. Matthews, 431 F.3d 1296, 1308 (11th Cir. 2005).

Hough's argument fails.  Apart from the statements themselves, there was sufficient independent evidence of a conspiracy between Hough and Fredrick.  As we have already explained, the evidence showed that the couple operated with "a common design" in hiding the money they received from the operation and sale of the medical schools.  Kottwitz, 614 F.3d at 1265; see supra Part II.A.  There was no error, much less reversible error, in admitting Fredrick's co-conspirator statements.

## IV.

Hough contends that the district court erred in calculating the tax loss, which was the principal basis for her advisory guidelines range of 78 to 97 months imprisonment.  The court calculated a tax loss of approximately $15 million from Hough and Fredrick's scheme for the years 2003 through 2008.  In reaching that figure, the court determined that they knowingly failed to report and pay taxes on the following income:  (1) the medical schools' annual profits from 2003 until they were sold in April 2007; (2) the capital gains in the offshore accounts, which

26

included the multi-million dollar proceeds from the sale of the schools; and (3) the interest and dividends that went into the offshore accounts.

Hough challenges the district court's tax loss calculation on two grounds. First, she argues that it was error for the court to include in the loss amount the tax she owed on the interest, dividends, and capital gains in the offshore accounts because the government failed to prove that she "criminally evaded" paying taxes on that income.  Second, she argues that the court erred in finding that the medical schools' profits were taxable to Fredrick and to her.  In considering Hough's arguments, we review the district court's tax loss calculation and the underlying factual findings only for clear error.  United States v. Patti, 337 F.3d 1317, 1323 (11th Cir. 2003).

A.

According to Hough, the evidence showed that she did not know about the interest, dividends, and capital gains in the offshore accounts, and the failure to report income she did not know about results only in a civil tax deficiency, not a criminal violation.  That argument is meritless.  Hough was convicted of conspiracy to defraud the IRS based on ample evidence that she and Fredrick agreed to hide millions of dollars — including the money they received from the sale of the schools — in secret offshore accounts.  See supra Part II.A.  The district

27

court did not clearly err by including in the loss amount the tax she owed on the interest, dividends, and capital gains in those accounts.

### B.

The second issue Hough raises — whether the medical schools' profits were taxable to Fredrick and to her — was hotly contested at her four-day sentence hearing. To resolve that issue, the district court had to determine how to properly classify the medical schools for federal tax purposes.

Hough argued in the district court that, even if she did own the Saba Foundation (the Saba School's parent entity) and MUA, both were legitimate corporations. As such, she and Fredrick were not liable to pay taxes on the medical schools' income until they personally received the funds. In response, the government argued that the Saba Foundation and MUA were disregarded entities because Hough and Fredrick had treated the purported corporations as "their own personal piggy bank." Because they had done that, the medical schools' income became immediately taxable to them, even if they had not personally received the funds.

The district court rejected the government's theory and found that the Saba Foundation and MUA were separate taxable entities because they carried on actual business after their formations. See Moline Props., Inc. v. Comm'r, 319 U.S. 436, 438–39, 63 S. Ct. 1132, 1134 (1943). But the court did not embrace Hough's

28

theory that the Saba Foundation and MUA were corporations. Instead, it found that the Saba Foundation and MUA were partnerships. Because partnership income is attributed to the individual partners, the bottom line for Hough and Fredrick was the same as if the court had credited the government's disregarded-entity theory: the court adopted the government's loss calculation of approximately $15 million.

Hough argues that the court erred in finding that the Saba Foundation and MUA were properly classified as partnerships for federal tax purposes. Assessing that argument requires us to hack through the undergrowth of Treasury regulations.

1.

The Treasury regulations provide that "[a] business entity with two or more members is classified for federal tax purposes as either a corporation or a partnership." 26 C.F.R. § 301.7701-2(a). The regulations then define the term "corporation" in eight different ways. Id. § 301.7701-2(b)(1)–(8). If the business entity does not fall into any of the seven categories described in subsections (b)(1) and (b)(3) through (b)(8), then it is referred to as an "eligible entity" and can elect its classification for federal tax purposes. Id. § 301.7701-3(a)–(b).

If the eligible entity does not make an election, the regulations' default classification applies. Id. For a foreign eligible entity, there are three possible default classifications, only two of which are relevant here: a "partnership," which

is not a corporation, and an "association," which is. Id. § 301.7701-2(b)(2). A foreign eligible entity is a "partnership" if it has two or more members and "at least one member does not have limited liability." Id. § 301.7701-3(b)(2)(i)(A). A foreign eligible entity is an "association," and thus a corporation, if it has two or more members and "all members have limited liability." Id. § 301.7701-3(b)(2)(i)(B); see id. § 301.7701-2(a). The regulations' definition of the term "limited liability" explains:

> [A] member of a foreign eligible entity has limited liability if the member has no personal liability for the debts of or claims against the entity by reason of being a member. This determination is based solely on the statute or law pursuant to which the entity is organized, except that if the underlying statute or law allows the entity to specify in its organizational documents whether the members will have limited liability, the organizational documents may also be relevant.

Id. § 301.7701-3(b)(2)(ii).

## 2.

In making its way through these regulations, the district court found that the Saba Foundation and MUA were foreign eligible entities because they did not qualify as "corporations" under Treasury Regulation § 301.7701-2(b)(1) and (b)(3)–(8). Without first determining whether either the Saba Foundation or MUA had elected a classification, the court proceeded to determine which default classification — partnership or association — applied to each entity. It decided

that issue in one sentence: "Under the facts found by the jury and the [c]ourt, [the] Saba Foundation and MUA are treated as partnerships for federal tax purposes."

The district court started out on the right path: the Saba Foundation and MUA are foreign eligible entities. And the destination it reached may be correct: treating those entities as partnerships. We don't know. To determine that the Saba Foundation and MUA are properly treated as partnerships, the district court needed to find two foundational facts: (1) that neither entity elected to be classified as an association taxable as a corporation; and (2) that at least one member of each entity did not have limited liability. 26 C.F.R. § 301.7701-3(a), (b)(2)(A)–(B). To make the second finding, the court needed to consult the laws of the Netherlands-Antilles and Nevis (where the Saba Foundation and MUA were organized, respectively, and the entities' organizational documents if the foreign laws allow such documents to specify whether the members will have limited liability. Id. § 301.7701-3(b)(2)(ii). The district court did not make either foundational finding (or consult any foreign laws or organizational documents, for that matter). So we can't retrace the district court's steps.

These circumstances call for a limited remand. If the government chooses not to defend the partnership theory that was the basis for the district court's tax loss calculation, the court will need to recalculate the tax loss by subtracting out the taxes owed on both schools' annual profits from 2003 until they were sold in

31

April 2007. If the newly calculated loss amount corresponds with a base offense level other than 26, the court should recalculate Hough's advisory guidelines range and resentence her. We express no opinion as to what that sentence should be.

Alternatively, if the government wishes to argue that the Saba Foundation and MUA are properly treated as partnerships, then it must present evidence on both of the foundational facts discussed in this opinion. After the district court hears that evidence, it must make the following determinations as to each entity: (1) whether the entity elected its classification for federal tax purposes; and (2) if not, whether all of the entity's members have limited liability. In making the second determination, the court will have to consult the law under which the entity was organized and, if applicable, the entity's organizational document.

If the court finds that (1) neither entity elected to be classified as an association taxable as a corporation, and (2) at least one member of each entity does not have limited liability, then the Saba Foundation and MUA are properly treated as partnerships. In that case, the tax loss, Hough's advisory guidelines range, and her 24-month sentence should remain the same.

If, however, the court finds either (1) that at least one of the entities elected to be classified as an association taxable as a corporation, or (2) that (a) neither entity elected its classification for federal tax purposes, and (b) all of the members of at least one entity have limited liability, then the court will need to recalculate

32

the tax loss because at least one entity is properly treated as an association taxable as a corporation, and its profits are not taxable to Hough and Fredrick. The court should recalculate the tax loss by subtracting out the taxes owed on the annual profits of the Saba School, MUA, or both schools from 2003 until they were sold in April 2007. If the newly calculated loss amount corresponds with a base offense level other than 26, the court should recalculate Hough's advisory guidelines range and resentence her. Again, we express no opinion as to what that sentence should be.[7]

---

[7] The government argues that we can affirm Hough's sentence even if the district court erred in concluding that the Saba Foundation and MUA were properly treated as partnerships. The argument goes like this: The evidence showed that Hough and Fredrick deposited almost all of the money from the April 2007 sale of the Saba School and MUA — approximately $36 million — into two "New Vanguard" accounts. The district court found at sentencing that Hough and Fredrick were the beneficial owners of those accounts. Putting those two facts together, the government argues that, even if the Saba Foundation and MUA are associations taxable as corporations, the capital gains on the sale of the medical schools were nonetheless taxable to Hough and Fredrick in 2007 because they personally received the funds that year. The government then points out that, if we multiply $36 million by the sentencing guidelines' default tax rate of 28%, the tax loss from the sale of the schools alone is approximately $10 million, which is more than enough to support the base offense level of 26 that the district court used in calculating Hough's advisory guidelines range. See U.S.S.G. § 2T4.1(K) (providing for a base offense level of 26 if the tax loss is more than $7 million but less than $20 million).

The problem with the government's argument is that the default rate of 28% applies only in cases where the tax loss is not "reasonably ascertainable" — that is, where neither the government nor the defense has provided "sufficient information for a more accurate assessment of the tax loss." U.S.S.G. § 2T1.1 cmt. n.1; see id. § 2T1.1(c)(1) n.(A). That is not the case here. Before Hough's sentencing, the government's tax expert, Shelia Maurer, prepared a report detailing the taxes that both Hough and Fredrick owed in the years 2003 through 2008. In 2007, the year that Maurer included Hough's and Fredrick's capital gains from the sale of the schools, she reported that they owed a total of $5,529,135 in additional taxes. Because the government gave the district court enough information to accurately assess the tax loss associated with the sale of the schools, and that loss amount is less than $7 million, we cannot affirm Hough's sentence based on the government's theory that a "reasonable estimate" of the tax loss associated with the sale of the schools is more than $7 million.

## V.

We **AFFIRM** Hough's convictions, **VACATE** her sentence, and **REMAND** for further proceedings consistent with this opinion.

ED CARNES, Chief Judge, concurring:

Not surprisingly, as the author of the Court's opinion I concur in all of it. I write separately to offer my view about our decisions in Guzman and Candelaria-Gonzalez insofar as they hold that a prosecutor cannot cross-examine the defense's opinion or reputation character witnesses by asking whether their testimony would change if the defendant had committed the crimes with which she is charged. See United States v. Guzman, 167 F.3d 1350, 1351–52 (11th Cir. 1999); United States v. Candelaria-Gonzalez, 547 F.2d 291, 293–95 (5th Cir. 1977). We are bound to follow prior panel precedent even if we disagree with it, but we are not bound to remain silent about whether it is wrong. And the central holding of Guzman and Candelaria-Gonzalez is wrong.

Candelaria-Gonzalez first announced the erroneous holding in a case involving the cross-examination of defense witnesses who gave testimony about the defendant's good reputation in the community, 547 F.2d at 293–95, and Guzman extended the holding to cross-examination of witnesses who gave opinion testimony about the defendant's good character, 167 F.3d at 1351–52. The reason given for the holding was that "[t]hese hypothetical questions [strike] at the very heart of the presumption of innocence which is fundamental to Anglo-Saxon concepts of fair trial." Candelaria-Gonzalez, 547 F.2d at 294; see Guzman, 167 F.3d at 1352. No they don't.

35

The condemned questions are conditional. They are "if" questions. They do not instruct the witness or the jury that the defendant is guilty, nor do they ask the jury to assume during deliberations that she is guilty. They ask the witness whether, *if* the defendant were guilty of the crimes charged — *if* she did do the acts that she is accused of doing — that would affect the defendant's reputation or the witness' opinion of the defendant's character. The fear that this type of questioning undermines the presumption of innocence is "utterly illogical," because "[t]here is no chain of reasoning by which a rational jury could conclude that a question calling for a witness to indulge an assumption for the purpose of testing that witness' opinion invites the jury to indulge the same assumption when weighing the evidence of which that opinion is a part." United States v. Oshatz, 912 F.2d 534, 545 (2nd Cir. 1990) (Mukasey, J., concurring). Put more bluntly — and conditionally — *if* we cannot expect jurors to understand the plain meaning of the commonly used, simple, one-syllable word "if," there is no hope for our jury system anyway.

In this case, as in every case, the court instructed the jury on the presumption of innocence and instructed it that the burden was on the prosecution to prove guilt beyond a reasonable doubt. "A crucial assumption underlying [the jury trial] system is that juries will follow the instructions given them by the trial judge." Parker v. Randolph, 442 U.S. 62, 73, 99 S. Ct. 2132, 2139 (1979), abrogated on

other grounds by Cruz v. New York, 481 U.S. 186, 107 S. Ct. 1714 (1987); see

also Weeks v. Angelone, 528 U.S. 225, 234, 120 S. Ct. 727, 733 (2000); Romano

v. Oklahoma, 512 U.S. 1, 13, 114 S. Ct. 2004, 2012 (1994); Richardson v. Marsh,

481 U.S. 200, 206, 107 S. Ct. 1702, 1707 (1987); Francis v. Franklin, 471 U.S.

307, 324 n.9, 105 S. Ct. 1965, 1976 n.9 (1985); Puiatti v. McNeil, 626 F.3d 1283,

1315 (11th Cir. 2010); Ferguson v. Sec'y for Dep't Corr., 580 F.3d 1183, 1199

(11th Cir. 2009).  That presumption is the one that was undermined in the Guzman

and Candelaria-Gonzalez cases, and the undermining was not done by the

prosecutor at trial but by this Court on appeal.

Cross-examination questions that are conditioned on the defendant having

committed an act or acts do not undermine the presumption of innocence any more

than instructions on verdict forms that use conditional language to instruct the jury

what it must do if it finds that the defendant is guilty.  In this case, for example,

part of the verdict form concerning Count Six, the false-return count for calendar

year 2005, told the jury:

> *If you find the Defendant guilty*, indicate below the matter that you
> unanimously agree was false:  (check all that apply)
>
> __ Defendant substantially under reported [sic] the total income
> on Line 22 for the 2005 calendar year.

___ Defendant failed, on Schedule B, Parts I and III, lines 7a and
7b, to report that she had a financial interest in or signature
authority over financial accounts located in foreign
countries.

The verdict form contained identical instructions on Counts Seven, Eight, and
Nine, the false-return counts for calendar years 2006, 2007, and 2008. Each one
instructed the jury what it should do next "[i]f you find the defendant guilty" of the
crime charged in that count. Under the reasoning of Guzman, all of those
instructions on the verdict form, which are typical of instructions commonly used
on verdict forms, "assume the guilt of the accused in the very case at bar," 167
F.3d at 1352, and according to Candelaria-Gonzalez they strike "at the very heart
of the presumption of innocence which is fundamental to Anglo-Saxon concepts of
fair trial," 547 F.2d at 294. It makes you wonder why no one has ever noticed that
startling fact before.

The questions that the prosecutor asked during cross-examination of the
defense's reputation and opinion character witnesses in Candelaria-Gonzalez, in
Guzman, and in this case are proper questions. They are proper because they test
the witness' definition of good character and test his credibility. If the witness
answers that even if Hough had cheated on her taxes by making false statements
under penalty of perjury on her tax returns, as the indictment charges, he still

thinks she has good character, that tells the jury a lot. It tells the jury that the witness either has such a low standard for good character that his opinion is not entitled to any weight, or he is so biased in favor of the defendant that his testimony is not credible. See Oshatz, 912 F.2d at 539 ("Steadfast adherence to a favorable opinion by a witness asked to assume the defendant's guilt might provide some basis for concluding that the witness is simply supporting the defendant, rather than providing credible testimony about [her] character."): United States v. Hewitt, 663 F.2d 1381, 1391 (11th Cir. 1981) (observing that, when a reputation character witness testifies on cross-examination that he has heard of a certain fact that reflects negatively on the defendant's reputation but still maintains that the defendant's reputation is good, "the government has shown that the witness is either lying or is applying a lowered standard by which he assesses the defendant's good reputation"); see also See United States v. Kellogg, 510 F.3d 188, 196 (3d Cir. 2007) ("Generally speaking, a person testifying regarding a present opinion should be open to cross-examination on how additional facts would affect that opinion. In the context of opinion character testimony cross-examination about the charged crime tests both the witness' bias and the witness' own standards by asking whether the witness would retain a favorable opinion of the defendant even if the evidence at trial proved guilt.") (quotation marks omitted).

Conversely, should a character witness for Hough answer that if she were guilty of the crimes charged he would not think she has good character, that answer actually helps the defense because it means that the witness vouching for her has a defensible standard of good character and is credible. And from his answer the jury may also infer that the witness does not believe that Hough committed the charged crimes, because if he did, he would not be testifying that she has good character.

Regardless of how the witness answers the question, it is a proper one on cross-examination because it helps the jury get at the truth. Cross-examination, as Professor Wigmore stated, is "beyond any doubt the greatest legal engine ever invented for the discovery of truth." 5 John Henry Wigmore, Evidence in Trials at Common Law § 1367, at 32 (Chadbourn rev. 1974). That engine for the discovery of truth should be allowed to run at full speed and not be choked to a halt by misunderstandings about conditional questions and answers or by facile references to "Anglo-Saxon concepts of fair trial." Candelaria-Gonzalez, 547 F.2d at 294. As Thomas Paine observed, "such is the irresistible nature of truth, that all it asks, and all it wants, is the liberty of appearing." Thomas Paine, Rights of Man 151 (Everyman's Library ed. 1958) (1791). We ought to do what we can to give truth the liberty of appearing in a trial.